Robert A. Scher (RS 2910)
FOLEY & LARDNER LLP
90 Park Avenue
New York, NY  10016
Phone:    (212) 682-7474
Facsimile:  (212) 682-2329
Email:  rscher@foley.com

-and-

Mark L. Prager (*pro hac vice*)
Steve Szczepanski (*pro hac vice*)
David B. Goroff (*pro hac vice pending*)
Mary Jo Boldingh (*pro hac vice pending*))
Jill L. Murch (4535712)
FOLEY & LARDNER LLP
321 N. Clark Street, Suite 2800
Chicago, IL  60610
Phone:    (212) 832-4500
Facsimile:  (213) 832-4700
Email: sszczepanski@foley.com
*Attorneys for Appellant Parus Holdings, Inc.*
*Successor-By-Merger to EffectNet, Inc. and*
*EffectNet, LLC*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
_____

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| WORLDCOM, INC., et al., | ) Jointly Administered |
| | ) |
| Debtors, | ) Case No. 02-13533 (AJG) |
| | ) |
| PARUS HOLDINGS, INC., | ) |
| Appellant, | ) Case No. 07-cv-10507 (BSJ) |
| | ) |
| v. | ) ECF Case |
| | ) |
| WORLDCOM, INC., et al. | ) **OPENING BRIEF** |
| | ) **FOR APPELLANT** |
| | ) **PARUS HOLDINGS, INC.** |
| | ) |
| | ) **ORAL ARGUMENT** |
| | ) **REQUESTED** |

# **TABLE OF CONTENTS**

**Page**

I.      JURISDICTIONAL STATEMENT .................................................................................. 1

II.     STATEMENT OF ISSUES ............................................................................................. 1

    A.      Breach Of Contract By Intermedia ....................................................................... 1

    B.      Breach Of The Covenant Of Good Faith And Fair Dealing, Civil
Conspiracy And Unfair And Deceptive Trade Practices By Intermedia ............... 2

    C.      Tortious Interference With Contract By WorldCom .............................................. 2

    D.      Civil Conspiracy By WorldCom ........................................................................... 3

    E.      Unfair And Deceptive Practices By WorldCom ..................................................... 3

    F.      Errors Common To All Counts Asserted Against Intermedia And
WorldCom .............................................................................................................. 3

III.    STANDARD OF REVIEW ............................................................................................ 4

IV.     STATEMENT OF THE CASE ....................................................................................... 4

    A.      WorldCom And Intermedia Filed For Bankruptcy And Parus' Predecessor,
EffectNet, Inc., Filed Claims Against Both ........................................................... 4

    B.      Debtors Failed To Produce Relevant Documents In Response To Parus'
February 2005 Requests And Parus Filed A Motion To Compel ........................... 4

    C.      Rather Than Producing Relevant Documents In Response To Parus'
Motion To Compel, Debtors Filed A Summary Judgment Motion ....................... 5

    D.      The Bankruptcy Court Ordered Depositions Of Debtors To Determine The
Reason For Debtors' Failure To Produce Electronically-Stored Documents ........ 5

    E.      Debtors' Summary Judgment Motion Was Briefed While Parus Was Still
Pursuing Its Motion To Compel ............................................................................. 6

    F.      Parus Discovered That Critical Evidence Was Not Produced Because It
Was Destroyed Or Made Inaccessible By WorldCom And Filed A Motion
To Stay The Ruling On Debtors' Motion For Summary Judgment ........................ 6

    G.      Parus Filed A Motion For Relief Due To Debtors' Spoliation Of Evidence .......... 7

    H.      The Bankruptcy Court Agreed to Decide The Spoliation Motion Together
With The Summary Judgment Motion .................................................................... 7

i

I.  The Bankruptcy Court Issued A Ruling On Debtors' Motion For Summary Judgment And Motion To Strike But Dismissed Parus' Spoliation Motion As Moot ........................................................................................................ 7

V.  RELEVANT FACTS ........................................................................................................ 8

A.  In 1997, Parus' Predecessor Webley Was Formed To Commercialize The UC Product ............................................................................................................ 8

B.  EffectNet Licensed Webley's UC Product And Webley Ultimately Acquired EffectNet ...................................................................................................... 9

C.  On May 29, 2000, WorldCom Was Ordered By The D.C. District Court To Preserve Intermedia's Assets And Maintain Intermedia's Operations Separate From WorldCom's ............................................................................ 9

D.  In August 2000, EffectNet Began Negotiations With Intermedia, Which Had A Large Subscriber Base And A Rudimentary UC Type Product ................. 9

E.  Between August And November 2000, EffectNet And Intermedia Negotiated The UC Contract To Utilize Intermedia's Seasoned Sales Force To Sell The UC Product To Intermedia's Existing Subscribers And To New Subscribers ...................................................................................... 9

F.  In September 2000, WorldCom Signed An Agreement To Acquire Intermedia .......................................................................................................... 10

G.  On November 20, 2000, EffectNet And Intermedia Executed The UC Contract ............................................................................................................ 10

H.  Both Parties To The UC Contract Had Expectations For The UC Product That Were Significantly Higher Than The Minimums In The UC Contract ........ 10

I.  In November And December 2000, EffectNet Expended Enormous Resources To Support The Launch Of The UC Product By Intermedia .............. 11

J.  By The End of November 2000, Intermedia Began To Default On Its Obligations Under The UC Contract .................................................................... 12

K.  In Fact, In Late April Or Early May 2001, Intermedia Decided To "Scrap" The UC Product But Concealed Its Decision From Parus .................................... 13

L.  In The Same Time Frame WorldCom Negotiated A License Agreement With Webley Relating To The Same Technology ................................................ 13

M.  On July 1, 2001, WorldCom Closed On The Acquisition of Intermedia And Intermedia Continued To Default On Its Obligations Under The UC Contract ............................................................................................................ 14

CHIC_1666821.11

| | N. | In September 2001, WorldCom Executed A License Agreement With Webley While Intermedia Canceled Nearly All Of Its Accounts Under The UC Contract And Pulled The UC Product From All 25 Markets | 14 |

| | O. | In February – March, 2002, Intermedia Failed To Make Even The Minimum Payments Under The UC Contract And Asked to Close All Accounts | 14 |

| | P. | On March 12, 2002, Parus Sent A Notice of Default Letter To Intermedia, Demanding That Intermedia Cure Its Material Defaults | 15 |

| | Q. | Intermedia Failed To Cure Its Material Defaults Of The UC Contract And Instead Of Assuring Future Performance, Offered Settlement Discussions | 15 |

| VI. | | SUMMARY OF ARGUMENT | 16 |

| | A. | The Bankruptcy Court Committed Reversible Error By Granting Summary Judgment, Severely Limiting Parus' Damages For Intermedia's Breach Of The UC Contract | 16 |

| | B. | The Bankruptcy Court Committed Reversible Error By Granting Summary Judgment On Parus' Claims For Breach Of The Covenant Of Good Faith And Fair Dealing, Civil Conspiracy And Unfair And Deceptive Trade Practices | 18 |

| | C. | The Bankruptcy Court Committed Reversible Error In Dismissing Parus' Tortious Interference With Contract Claim Against WorldCom | 18 |

| | D. | The Bankruptcy Court Committed Reversible Error By Summarily Dismissing Parus' Civil Conspiracy Claim Against WorldCom | 19 |

| | E. | The Bankruptcy Court Committed Reversible Error By Summarily Dismissing Parus' Claim For Unfair And Deceptive Trade Practices Against WorldCom | 19 |

| | F. | The Bankruptcy Court Committed Reversible Error And Abused Its Discretion By Failing To Grant Any Relief To Parus For Debtors' Spoliation Of Evidence | 19 |

| | G. | The Bankruptcy Court Erred By Denying Parus The Benefit Of Favorable Inferences On Summary Judgment | 20 |

| | H. | The Bankruptcy Court Abused Its Discretion By Failing To Grant Parus Relief Under Fed. R. Civ. P. 56(f) | 20 |

| VII. | | ARGUMENT | 20 |

| | A. | The Bankruptcy Court Committed Reversible Error By Severely Limiting Parus' Damages For Breach Of Contract | 20 |

CHIC_1666821.11

1.  The Bankruptcy Court Erred When It Denied "Benefit Of The Bargain" Damages On the Ground That They Are Consequential Rather Than General Damages ................................................. 21

2.  The Bankruptcy Court Erred When It Ruled That Intermedia Did Not Anticipatorily Breach The UC Contract ............................................. 23

3.  The Bankruptcy Court Erred When It Ruled That Parus Is Not Entitled To Recover All Reconciliation Payments As Part Of Its Damages ................................................................................. 26

B.  The Bankruptcy Court Erroneously Dismissed Parus' Breach Of Covenant Of Good Faith And Fair Dealing, Civil Conspiracy, And Unfair And Deceptive Practice Claims Against Intermedia Based On A Misreading Of The Limitation Of Liability Clause ....................................................... 27

1.  The Bankruptcy Court Erred When It Failed To Recognize That There Is No Privilege For Interferences Which Began Before The Acquisition ................................................................................ 30

2.  The Bankruptcy Court Erroneously Found Privilege Even Though WorldCom And Intermedia Lacked The Required Unity Of Interest And WorldCom's Ability To Lawfully Control Intermedia Was Restricted ............................................................................ 31

3.  Contrary To The Bankruptcy Court's Ruling, WorldCom's Interference <u>Did</u> Cause Intermedia To Breach The UC Contract ............. 31

4.  The Bankruptcy Court Erred When It Failed To Rule That Any Privilege Was Lost When WorldCom Acted Contrary To Intermedia's Interest ....................................................................... 32

5.  The Bankruptcy Court Erred When It Found No "Wrongful Means" Despite Evidence That WorldCom's Interfering Actions Were In Violation Of A Federal Court Order And In Violation Of Unfair And Deceptive Trade Practices Acts .......................................... 32

C.  The Bankruptcy Court Erred When It Dismissed Parus' Civil Conspiracy Claim Against WorldCom ........................................................................ 33

1.  Contrary To The Bankruptcy Court's Ruling, The Limitation Of Liability Clause Does Not Bar Direct Damages For Civil Conspiracy ................................................................................... 33

2.  Contrary To The Bankruptcy Court's Ruling, The Conspiracy Was To Eliminate Parus' UC Product As Competition For WorldCom's genD Product, Not Merely To Breach The UC Contract ......................... 34

D.  The Bankruptcy Court Erred When It Summarily Dismissed Parus' Unfair And Deceptive Trade Practices Against WorldCom On *Sua Sponte* Grounds .................................................................................... 35

iv

1. Parus' Deceptive Practices Claim Is Based On WorldCom's Scheme To Eliminate The UC Product As Competition For WorldCom's genD Product, Not Merely To Breach The UC Contract ........................................................................................ 35

2. Untriggered Provisions In The UC Contact To Which WorldCom Is Not A Party Do Not Immunize WorldCom From Unfair And Deceptive Trade Practices Statutes ........................................................... 35

E. The Bankruptcy Court Erred When It Failed To Impose Sanctions For Debtors' Spoliation ................................................................................. 36

F. The Bankruptcy Court Erred When It Failed To Give The Benefit Of Reasonable Inferences To Parus ........................................................... 41

G. The Bankruptcy Court Abused Its Discretion By Denying Parus Relief Pursuant To Rule 56(f) ..................................................................... 44

VIII. CONCLUSION AND REQUEST FOR RELIEF ............................................ 47

CHIC_1666821.11

# TABLE OF AUTHORITIES

Page

**FEDERAL CASES**

*Allstate Ins. Co. v. Mazzola,*
    175 F.3d 255 (2d Cir. 1999).............................................................................4

*B.F. Goodrich v. Betkoski,*
    99 F.3d 505 (2d Cir. 1996)..............................................................................44

*Badger Pharmacal, Inc. v. Colgate-Palmolive Co.,*
    1 F.3d 621 (7th Cir. 1993) .............................................................................32

*Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.,*
    210 F.R.D. 506 (S.D.N.Y. 2002) ...................................................................37

*Barosum v. NYC Housing Auth.,*
    202 F.R.D. 396 (S.D.N.Y. 2001) ...................................................................40

*Berne Street Enterprises, Inc. v. American Export Isbrandtsen Co.,*
    289 F. Supp. 195 (S.D.N.Y. 1968) ................................................................46

*Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.,*
    945 F. Supp. 693 (S.D.N.Y. 1996) ................................................................46

*Broccoli v. Echostar Com. Corp.,*
    229 F.R.D. 506 (D. Md. 2005)...................................................................37, 40

*Carney v. Philippone,*
    332 F.3d 163 (2d Cir. 2003)..............................................................................4

*Carter v. AT&T Communications,*
    759 F. Supp. 155 (S.D.N.Y. 1991) ................................................................46

*Celotex v. Catrett,*
    477 U.S. 317 (1986).......................................................................................46

*Cine Forty-Second St. Theatre Corp. v. Allied Artists Pics. Corp.,*
    602 F.2d 1062 (2d Cir. 1979) ........................................................................41

*Consol. Aluminum Corp. v. Alcoa, Inc.,*
    No. 03-1055-C-M2, 2006 U.S. Dist. LEXIS 66642 (M.D. La. July 19, 2006) ...............38

*Emerson Radio Corp. v. Orion Sales, Inc.,*
    253 F.3d 159 (3d Cir. 2001) .......................................................29, 32, 34, 36

*Evans v. Stephens,*
    407 F.3d 1272 (11th Cir. 2005) .....................................................................42

vi

*Freeman Management Corp. v. Shurgard Storage Centers, LLC*,
    461 F. Supp. 2d 629 (M.D. Tenn. 2006) .................................................................31

*Glen Eden Hospital, Inc. v. Blue Cross & Blue Shield of Michigan*,
    740 F.2d 423 (6th Cir. 1984) .....................................................................46-47

*Golia v. The Leslie Fay Co., Inc.*,
    No. 01 Civ. 1111(GEL), 2003 WL 21878788 (S.D.N.Y. 2003).......................39, 40

*Handgards, Inc. v. Johnson & Johnson*,
    413 F. Supp. 921 (N.D. Cal. 1975) ..........................................................................42

*Houlihan v. Marriott International Inc.*,
    No. 00 Civ. 7439 (RRC), 2003 WL 22271206 (S.D.N.Y. Sept. 30, 2003) ..............37

*In re Integrated Resources, Inc.*,
    147 B.R. 650 (S.D.N.Y. 1992)......................................................................................4

*In re Kelsey*,
    Nos. 94-10415, 00-1034, 2001 WL 34050736 (Bankr. D. Vt. 2001).....................39

*Israel Discount Bank Ltd. v. Gottesman*,
    544 F.2d 80 (2d Cir. 1976).......................................................................................21

*Kronisch v. U.S.*,
    150 F.3d 112 (2d Cir. 1998)..............................................................................39, 40

*McCarthy v. Olin Corp.*,
    119 F.3d 148 (2d Cir. 1997)........................................................................................4

*McJunkin Corp. v. North Carolina Natural Gas Corp.*,
    300 F.2d 794 (4th Cir. 1961) ...................................................................................27

*Metro. Opera Assoc., Inc. v. Local 100 Hotel Employ. & Rest. Employ. Int'l Union*,
    212 F.R.D. 178 (S.D.N.Y. 2003) ..............................................................................40

*Odom v. Wal-Mart Stores, Inc.*,
    32 F.3d 566 (5th Cir. 1994) ...............................................................................42, 44

*Penncro Assocs., Inc. v. Sprint Spectrum, L.P.*,
    499 F.3d 1151 ....................................................................... 23, 28-29, 34

*Phoenix Four, Inc. v. Strategic Res. Corp.*,
    No. 05 Civ. 4837(HB), 2006 WL 1409413 (S.D.N.Y. 2006)..................................39

*Residential Fund.Corp. v. DeGeorge Fin. Corp.*,
    306 F.3d 99 (2d Cir. 2002) .............................................................................39, 40

*Ruta v. Delta Airlines*,
    324 F. Supp. 2d 524 (S.D.N.Y. 2004)...............................................................37, 38

CHIC_1666821.11

*Rutgerswerke AG v. Abex Corp.*,
    2002 WL 1203836 (S.D.N.Y. 2002) ...................................................................39

*Shaw v. Coast Hotels*,
    185 F.3d 868 (9th Cir. 1999) ...........................................................................47

*Teraforce Technology Corp. v. Vista Controls, Inc.*,
    2007 WL 3377441 (Bankr. N.D. Tex) ..........................................................33, 35

*TMJ Inc. v. Nippon Trust Bank*,
    16 Fed. Appx. 795 (9th Cir. 2001) ...................................................................47

*Tonnas v. Stonebridge Life Insurance Co.*,
    78 Fed. Appx. 966 (5th Cir. 2003) ...................................................................47

*Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc.*,
    487 F.3d 89 (2d Cir. 2007)...........................................................................22-23

*Treppel v. BioVail Corp.*,
    233 F.R.D. 363 (S.D.N.Y. 2006) ......................................................................38

*TVT Records v. Island Def Jam Music Group*,
    412 F.3d 82 (2d Cir. 2005)...............................................................................46

*Union Oil Company of California v. John Brown E&C*,
    1995 WL 354250 (N.D. Ill. 1995) ....................................................................29

*United States v. Diebold, Inc.*,
    369 U.S. 654 (1962) .........................................................................................42

*West v. Goodyear Tire & Rubber Co.*,
    167 F.3d 776 (2d Cir. 1999)..............................................................................39

*Wright v. Coughlin*,
    132 F.3d 133 (2d Cir. 1998)..............................................................................42

*Zubulake v. UBS Warburg*,
    220 F.R.D. 212 (S.D.N.Y. 2003) ("*Zubulake IV*") .................................................37

*Zubulake v. UBS Warburg*,
    229 F.R.D. 422 (S.D.N.Y. 2004) ("*Zubulake V*")..................................................37

## STATE CASES

*Arizona's Towing Professionals, Inc. v. State of Arizona*,
    196 Ariz. 73, 993 P.2d 1037 (Ct. App. 1999)....................................................27

*Baker Pacific Corp. v. Suttles*,
    220 Cal. App.3d 1148, 269 Cal. Rptr. 709 (Cal. Ct. App. 1990)............................29

CHIC_1666821.11

*Central Housing Inv. Corp. v. Federal Nat. Mortg. Ass'n,*
    74 Ariz. 308, 248 P.2d 866 (1952) .......................................................................21

*Diamos v. Hirsch,*
    91 Ariz. 304, 372 P.2d 76 (1962) ...............................................................17, 24

*Dorman v. Swift & Co.,*
    162 Ariz. 228, 782 P.2d 704 (1989) ...................................................................22

*Dozier & Gay Paint Co. v. Dilley,*
    518 So. 2d 946 (Fla. Ct. App. 1988) .................................................................30

*Halloway v. Skinner,*
    898 S.W. 2d 793 (Tex. 1995) ...............................................................................31

*Metropolitan Life Ins. Co. v. La Mansion Hotels & Resorts Ltd.,*
    762 S.W. 2d 646 (Tex. Ct. App. 1988) .............................................................30

*Morganteen v. Cowboy Adventures, Inc.,*
    190 Ariz. 463, 949 P.2d 552 (Ct. App. 1997) .................................................27

*Naarden Trust v. Kieber,*
    195 Ariz. 526, 990 P.2d 1085 (Ct. App. 1999) ...............................................22

*Palmer v. Kelly,*
    54 Ariz. 466, 97 P.2d 209 (1939) .......................................................................21

*Rawlings v. Apodaca,*
    151 Ariz. 149, 726 P.2d 565 (1986) (*en banc*) ...............................................29

*Rhue v. Dawson,*
    173 Ariz. 220, 841 P.2d 215 (Ct. App. 1992) .................................................27

*Simon v. Safeway,*
    2007 WL 41141194 (Ariz. App. Dec. 20, 2007) ............................................47

*Sirek v. Fairfield Snowbowl, Inc.,*
    166 Ariz. 183, 800 P.2d 1291 (Ct. App. 1990) ...............................................27

*Voicestream Wireless Corp. v. U.S. Communications, Inc.,*
    912 So. 2d 34 (Fla. 2005) ............................................................................ 29-30

*Waste Conversion Systems, Inc. v. Greenstone Industries, Inc.,*
    33 S.W. 3d 779 (Tenn. 2000) .............................................................................31

CHIC_1666821.11

**FEDERAL STATUTES**

28 U.S.C. §158(a) ............................................................................................................1

**RULES**

Fed. R. Civ. P. 56(e) ......................................................................................................43

Fed. R. Civ. P. 56(f) ................................................................................................*Passim*

Fed. R. Bankr. P. 7056 .............................................................................................. 6-7, 44

**TREATISES**

C. Wright et al. FEDERAL PRACTICE AND PROCEDURE § 2340 (3d ed. 1998) ...............................46

C. Wright, et al. FEDERAL PRACTICE AND PROCEDURE, § 2727 (3d ed. 1998)..............................42

WILLISTON ON CONTRACTS, §64:12 (4th ed. 2002) ..............................................................16, 21

**OTHER**

Restatement (Second) of Contracts §251.....................................................................25

Restatement (Second) of Contracts §347 cmt. a..........................................................22

CHIC_1666821.11

## I.    JURISDICTIONAL STATEMENT

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. §158(a) ("The district courts of the United States shall have jurisdiction to hear appeals (1) from final judgments, orders, and decrees … of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under Section 157 of this title.").  The Bankruptcy Court entered a final judgment in the present case on October 3, 2007.  A4337 – A4340.[1]

## II.    STATEMENT OF ISSUES

As enumerated below, the Bankruptcy Court committed a series of distinct, reversible errors in its dismissal of each of Parus' claims against Debtors and in its failure to award relief to Parus for Debtors' spoliation of evidence.

### A.    Breach Of Contract By Intermedia

1.    Did the Bankruptcy Court commit reversible error by denying Parus "benefit of the bargain" damages based on its determination that such damages are <u>consequential</u> damages barred by §11 ("Limitation of Liability clause") of a contract relating to a Unified Communications Contract (the "UC Contract")[2] between Parus and Intermedia, when such damages are instead <u>general</u> damages and therefore outside the scope of the Limitation of Liability clause?

2.    Did the Bankruptcy Court commit reversible errors when it held both that a breach of the "four corners" of the UC Contract is a prerequisite for establishing anticipatory breach and that Parus did not satisfy this prerequisite:

   a.    even though, by definition, <u>anticipatory</u> breach may occur before any performance is required and, therefore, does not require an <u>actual</u> breach of the "four corners" of an agreement?

   b.    even though Parus established Intermedia's anticipatory breach, because Intermedia clearly manifested that it would not honor its obligations under the UC Agreement and did not to provide adequate assurance that it would perform?

   c.    where, even assuming actual breach by Intermedia were required, the record here – including the Bankruptcy Court's finding that Intermedia's failure to cure the defaults set forth in Parus' notice of default letter caused the UC Contract to

---

[1] Copies of these Orders are attached hereto as Exhibit 1.

[2] A copy of the UC Contract is attached hereto as Exhibit 2.

terminate[3] – shows that Intermedia did materially breach the "four corners" of the UC Contract?

3.      Did the Bankruptcy Court commit reversible errors in construing § 5.3 of the UC Contract, that specified what <u>obligations</u> would be excused in the event that the UC Contract were terminated, as also releasing a breaching party – Intermedia – from <u>damages</u> for reconciliation payments that were not yet overdue prior to the breach and in failing to recognize that full damages had accrued prior to the termination date?

**B.      Breach Of The Covenant Of Good Faith And Fair Dealing, Civil Conspiracy And Unfair And Deceptive Trade Practices By Intermedia**

1.      Did the Bankruptcy Court commit reversible error by construing the Limitation of Liability clause – which excludes only certain forms of <u>damages</u> for a claim (*i.e.*, "incidental, indirect, special, punitive, consequential or similar damages of any kind") – to also bar Parus' general, direct damages.

2.      Did the Bankruptcy Court commit reversible error by holding that the Limitation of Liability clause disclaimed all damages against Intermedia for breach of the covenant of good faith and fair dealing, civil conspiracy and unfair and deceptive trade practices, when such a disclaimer, even if true, would have been void for violating public policy?

**C.      Tortious Interference With Contract By WorldCom**

1.      Did the Bankruptcy Court commit reversible error when it held that WorldCom was not liable for tortious interference with the UC Contract, even though:

a.      WorldCom's interference with Parus' rights under the UC Contract began before WorldCom acquired Intermedia and was therefore not privileged;

b.      WorldCom and Intermedia lacked the identity of interest required for privilege;

c.      WorldCom's actions were detrimental to Intermedia and, therefore, were not privileged;

---

[3] The UC Agreement provided for automatic termination if default with respect to <u>material</u> obligations was not cured within 30 days after notice. *See* Appendix to Parus' brief ("A"), which is being filed simultaneously herewith, at p. 10 of § 5.2. The Appendix contains all portions of the record relevant to this appeal. Citations to the Appendix ("A.___") refer to the page number where the cited reference may be found. The Bankruptcy Court's finding that Parus' letter resulted in termination when Intermedia did not cure, necessarily includes a finding that defaults were material. A copy of the Bankruptcy Court's opinion ("Opinion") is attached hereto as Exhibit 3.

CHIC_1666821.11

      d.      WorldCom's interference caused Intermedia to materially breach certain provisions of the UC Contract and to subsequently anticipatorily breach the entire UC Contract?

      2.      Did the Bankruptcy Court commit reversible error when it held that WorldCom did not use "wrongful means" (a) by dismembering the Intermedia division that was responsible for the UC Contract, even though WorldCom acted in direct violation of orders of the United States District Court for the District of Columbia and (b) by engaging in deceptive acts, including concealing its intention not to perform under the UC Contract to prevent Parus from finding another partner?

      **D.**      **Civil Conspiracy By WorldCom**

      1.      Did the Bankruptcy Court commit reversible error by holding that WorldCom could not conspire with Intermedia because the Limitation of Liability clause precluded all damages for Parus' civil conspiracy claim against Intermedia, even though direct damages were not precluded and WorldCom was not a party to the UC Contract or entitled to enforce the Limitation of Liability clause?

      2.      Did the Bankruptcy Court commit reversible error by mischaracterizing the conspiracy as being merely to breach the UC Contract rather than one to keep the UC Product off the market?

      **E.**      **Unfair And Deceptive Practices By WorldCom**

      Did the Bankruptcy Court commit reversible error by holding that provisions for liquidated damages in § 5.4 and minimum reconciliation payments in § 2.13 of the UC Contract immunized WorldCom from Parus' claim for damages under unfair and deceptive trade practices statutes, even though WorldCom was not a party to the UC Contract and neither provision was triggered?

      **F.**      **Errors Common To All Counts Asserted Against Intermedia And WorldCom**

      1.      Did the Bankruptcy Court commit reversible error by, in essence, rewarding the Debtors for their intentional, massive and wrongful destruction of critical evidence by failing to grant relief for Parus' motion for spoliation directed at that destruction, including by denying Parus the benefit of favorable inferences it should have received because of Debtors' spoliation and by failing to order any sanctions against the Debtors for such egregious misconduct?

      2.      Did the Bankruptcy Court commit reversible error throughout its review of Intermedia and WorldCom's motion for summary judgment by failing to draw all reasonable inferences in favor of the nonmoving party, Parus?

CHIC_1666821.11

3.      Did the Bankruptcy Court commit reversible error by denying Parus' Rule 56(f) request even though Debtors failed to produce critical evidence which was timely requested by Parus?

## III.    STANDARD OF REVIEW

This Court reviews the Bankruptcy Court's grant of summary judgment *de novo. Carney v. Philippone*, 332 F.3d 163, 167 (2d Cir. 2003); *McCarthy v. Olin Corp.*, 119 F.3d 148, 167 (2d Cir. 1997); *Allstate Ins. Co. v. Mazzola*, 175 F.3d 255, 258 (2d Cir. 1999). This Court also reviews the Bankruptcy Court's determinations of state law *de novo. Carney*, 332 F.3d at 167. This Court reviews the Bankruptcy Court's rulings regarding pretrial discovery under an abuse of discretion standard. *In re Integrated Resources, Inc.,* 147 B.R. 650, 664 (S.D.N.Y. 1992).

## IV.    STATEMENT OF THE CASE

### A.     WorldCom And Intermedia Filed For Bankruptcy And Parus' Predecessor, EffectNet, Inc., Filed Claims Against Both

In 2002, WorldCom and its subsidiaries, including Intermedia, filed for bankruptcy under Chapter 11 of the U.S. Bankruptcy Code. A46. In January 2003, EffectNet, Inc.,[4] filed proofs of claim against Intermedia and WorldCom (the "Claims"; A1-A44), asserting that it was entitled to damages. Parus asserted the following five claims against Intermedia and WorldCom (which collectively are referred to as "Debtors"):

(1)     Intermedia's breach of the UC Contract;

(2)     Intermedia's breach of its implied covenant of good faith and fair dealing;

(3)     WorldCom's tortious interference with the UC Contract;

(4)     Intermedia's and WorldCom's civil conspiracy; and

(5)     Intermedia's and WorldCom's unfair and deceptive trade practices.

A1-3; A23-A24. On June 10, 2004, Debtors filed an Objection to Parus' Claims (A45-A51), and on July 30, 2004, Parus filed its response and opposition to Debtors' Objection. A52-A106.

### B.     Debtors Failed To Produce Relevant Documents In Response To Parus' February 2005 Requests And Parus Filed A Motion To Compel

Parus initiated discovery by serving document requests upon Debtors in February 2005. A733-A744; A161-A162 ¶ 15. Parus' document requests sought documents relating to the UC Contract and to the events leading to Intermedia's breach of that agreement. A740-A742 ¶¶

---

[4] EffectNet, Inc. was successor-in-interest to EffectNet, LLC and Parus Holdings, Inc. is the successor-by-merger to EffectNet, Inc. (Parus and its predecessors are hereinafter collectively referred to as "Parus").

11-35. In mid-March 2005, Debtors objected to the production of the requested documents (A746-A772), made a limited production of 343 pages, and asserted that they were continuing their efforts to locate and produce additional responsive documents. A162-A164 ¶¶ 16-22; A752-A753; A2038 at 6-14. Due to Debtors' failure to produce discovery in response to Parus' requests, Parus was granted leave on June 29, 2005 to file a motion to compel the production of documents by Debtors. A911 at 12-22; A176 ¶ 47. Parus filed its motion to compel on July 13, 2005. A121-A156.

### C. Rather Than Producing Relevant Documents In Response To Parus' Motion To Compel, Debtors Filed A Summary Judgment Motion

Debtors failed to produce any additional documents in response to Parus' motion to compel; instead, on August 3, 2005, Debtors filed a motion for summary judgment. A1320-A1321 ¶ 31. On August 9, 2005, the Court heard Parus' motion to compel and continued the hearing to allow Parus time to review Debtors' indexes to tens of thousands of boxes of potentially-responsive documents. A2035-A2072; A1321 ¶ 32; A2060 at 16-A2061 at 16. However, the indexes were admitted by Debtors' outside counsel to be useless, which rendered any paper documents that may have been retained by Debtors inaccessible. A806.

The Bankruptcy Court held additional hearings on Parus' motion to compel. A2074-A2104; A2156-A2168; A1321 ¶¶ 33-34. Debtors did not produce any additional relevant documents. A2158 at 6:5-A2160 at 10:17.

On November 14, 2005, in response to Parus' motion to compel, the Bankruptcy Court ordered depositions of individuals with knowledge of Debtors' document retention, selection of documents, production of documents, and maintenance, storage, and indexing of documents. A2160-A2161 at 10:5-13:19; A2167 at 25:21-24; A1322-A1323; A2170-A2245. The deposition, of Debtors' outside counsel, Donald Ramsay, revealed that there were potentially tens of thousands of documents that still needed to be reviewed that were possibly responsive to Parus' requests. A1322; A2220 at 203:6-15.

### D. The Bankruptcy Court Ordered Depositions Of Debtors To Determine The Reason For Debtors' Failure To Produce Electronically-Stored Documents

Debtors also failed to produce responsive electronically-stored documents from either Intermedia or WorldCom. A168-A169 ¶ 32; A171 ¶ 37. Debtors admitted that they had failed to retain in accessible form many of the electronically-stored documents, and emails of key employees and individuals were not retained in an accessible format. A2996-A2997 at Request No. 38. In fact, in April or May of 2003, Intermedia's Data Center was closed at MCI's request, and "much" of the equipment contained in the Intermedia Data Center was disassembled and

5

sent to MCI's Ashburn, Virginia facility. A3125-A3127 at 11:4-13:9. Some of the equipment was placed back into production while some of the equipment was "disposed of." *Id.* Of 300 Intermedia data center servers that housed electronic data, including email and documents, on its network, "roughly only 50 or so servers [were] left." A3132 at 28:1-7; A3133 at 31:10-14; A3134-A3135 at 41:20-42:5; A3136-3137 at 70:15-71:12. As such, once again, the Bankruptcy Court granted Parus leave to take the depositions of Debtors' IT employees, in order to determine how and why Debtors were unable to access archives of potentially responsive electronically-stored documents and emails. A4410 at 2-A4412 at 19. In addition to these depositions, Parus propounded further discovery upon Debtors in order to gain information about Debtors' basic document retention policies, as well as the measures Debtors took to impose a litigation hold and ensure that any potentially responsive documents were retained. A2984-A3021; A3076-A3011.

### E.    Debtors' Summary Judgment Motion Was Briefed While Parus Was Still Pursuing Its Motion To Compel

While still prosecuting its motion to compel, on November 18, 2005, Parus had to file its response and opposition to Debtors' summary judgment motion. A1233-A1288. Parus included with its response a request under Rule 56(f) to deny the motion and order production of discovery. A1253-A1261. In support of that response and opposition, Parus submitted the affidavits of two of its officers, Robert C. McConnell and Taj Reneau. A2286-A2296; A2297-A2680. On December 2, 2005, Debtors submitted their reply in support of their motion for summary judgment, along with a motion to strike portions of the affidavits Parus had submitted in support of its opposition as purportedly containing conclusory statements. A2681-A2810. A hearing was held on January 17, 2006. A2837-A2847. The Bankruptcy Court took the parties' arguments under advisement. *Id.*

### F.    Parus Discovered That Critical Evidence Was Not Produced Because It Was Destroyed Or Made Inaccessible By WorldCom And Filed A Motion To Stay The Ruling On Debtors' Motion For Summary Judgment

On September 5, 2006, Parus filed a motion to stay the Bankruptcy Court's ruling on the motion for summary judgment because of Debtors' failure to comply with discovery that Parus was entitled to under Bankruptcy Rule 7056.[5] On October 3, 2006, Parus withdrew this motion

---

[5] Bankruptcy Rule 7056 states that "Rule 56 F.R.Civ.P. applies in adversary proceedings." Rule 56(f) provides that "If a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1)

CHIC_1666821.11

because the Bankruptcy Court stated it would not rule on summary judgment until at least December 2006, giving Parus sufficient time to file a motion for spoliation.  A4446 at 19-18.

### G.    Parus Filed A Motion For Relief Due To Debtors' Spoliation Of Evidence

Parus discovered evidence that Debtors had failed to institute a litigation hold to stop destruction of evidence until, at the earliest, the fall of 2004 (A3454) and possibly the litigation hold was never implemented.  A3172 at 3-11.  The discovery also showed that Debtors destroyed electronic evidence and failed to maintain any electronic evidence, in violation of their internal document retention policies, the D.C. Court Orders and the law, even after the commencement of this lawsuit.  A3196-A3339; A1200 at C; A3106 at A.1.  On January 26, 2007, Parus filed a motion for sanctions against Debtors for their spoliation of evidence (the "Spoliation Motion").  A2887-A3366.

### H.    The Bankruptcy Court Agreed to Decide The Spoliation Motion Together With The Summary Judgment Motion

Parus requested that its motion for spoliation be considered in conjunction with the motion for summary judgment so that adverse inferences against Debtors could be properly applied.  A4445-A4446.  The Bankruptcy Court agreed to "factor" Parus' Spoliation Motion into the Debtors' summary judgment motions:

> JUDGE GONZALEZ:  All right.  I remember that.  I understand why.  There was a concern by Parus Holdings that I would rule on the summary judgment motion before my ruling on the spoliation motion, and I said don't worry I wasn't going to rule on it in the near term.  I will factor all of that in.  I do remember that.

A4446.

### I.    The Bankruptcy Court Issued A Ruling On Debtors' Motion For Summary Judgment And Motion To Strike But Dismissed Parus' Spoliation Motion As Moot

On May 2, 2007, the Bankruptcy Court issued its Opinion and Order on Debtors' motion for summary judgment and motion to strike.  A3367-A3401.  In its Opinion, the Bankruptcy Court granted both of Debtors' motions, with the exception of a disputed issue on the meaning of the monthly base rate for a small payment that the Bankruptcy Court awarded.  A3401.  Although Parus had filed its Spoliation Motion on January 26, 2007, several months before the Bankruptcy Court's ruling, the Bankruptcy Court gave no indication that it considered this motion in connection with its ruling.  The Bankruptcy Court imposed no sanction upon Debtors

deny the motion; (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or (3) issue any other just order."

because of their spoliation and did nothing to address Parus' prejudice resulting from destruction of evidence. The Opinion did not address the fact that Parus was harmed by such spoliation and does not impose any penalty on Debtors. Indeed, the Opinion does not mention Parus' Spoliation Motion. A3367-A3401.

Although Parus believed it was prejudiced as to all contested fact issues by Debtors' spoliation of evidence, the Bankruptcy Court did not allow Parus to move for reconsideration of the Bankruptcy Court's failure to consider Parus' Spoliation Motion. Instead, the Bankruptcy Court limited Parus' amended spoliation motion to the one remaining issue of fact, *i.e.*, whether damages should be computed at $27.40 or $11.45 base rate. A4470 at 3-6, and at 2-14. Based on this ruling, on June 13, 2007, Parus filed its restricted amended motion for relief as a result of Debtors' spoliation of evidence (the "Amended Spoliation Motion"). A3402-A4079.

However, Debtors filed a motion to partially withdraw their objection to Parus' Claims to remove that remaining issue of fact from dispute. A4279-A4285. The parties briefed Debtors' motion to partially withdraw their objection, and Debtors subsequently amended their motion to withdraw. A4298-A4304. On October 3, 2007, the Bankruptcy Court signed a final order which awarded to Parus $926,844.24. A4337-A4340. The Order denied Parus' Spoliation Motion as moot. A4340.

On October 19, 2007, Parus filed a notice of appeal with the Bankruptcy Court.

## V.    RELEVANT FACTS

### A.    In 1997, Parus' Predecessor Webley Was Formed To Commercialize The UC Product

Webley was incorporated in February 1997 to commercialize the UC Product. A2427. By the end of 1997, the UC Product was the first and only fully developed unified communications product available for commercial use. *Id.* The UC Product was used to manage a user's inbound and outbound calling, messaging, conferencing and paging requirements. A2426. The UC Product could page, find, follow or not disturb a user, and accept and deliver all of a user's messages via voicemail, email, fax and pager over the phone or on the Internet, using the user's local number or a personal 800-number. *Id.* The UC Product also allowed a user to call, page, or email any one of 2,000 contacts by speaking only the contact name. *Id.* The UC Product could also deliver voicemail via streaming audio anywhere on the Internet with virtually no delays and allow users to listen to, reply to and send email over the telephone. *Id.* By early 1998, the UC Product was fully tested and refined. A management team was put into place at Webley, a business strategy was developed and implemented, and the UC Product was offered to

8

the public. A2427. Within one year, Webley had 151 employees and its revenue from its UC Product subscribers exceeded $1.1 million. A2416.

**B.    EffectNet Licensed Webley's UC Product And Webley Ultimately Acquired EffectNet**

As part of its strategy to expand the market for its UC Product, Webley entered into a licensing agreement with EffectNet in the fall of 2000. A2415; A2427. In the fall of 2000, EffectNet launched the UC Product to its initial customer, World Wide Group L.L.C. A2442. Subsequently, on March 22, 2001, Webley acquired EffectNet. A2305.

**C.    On May 29, 2000, WorldCom Was Ordered By The D.C. District Court To Preserve Intermedia's Assets And Maintain Intermedia's Operations Separate From WorldCom's**

The D.C. Court entered a "Hold Separate order which required that all assets of Intermedia except for the capital stock of Digex be held, preserved and operated separate from WorldCom until they were divested by WorldCom. Until then, Intermedia assets were to be preserved and operated separately from WorldCom. A3102-3111. A subsequent Final Judgment entered on June 26, 2001 incorporated the Hold Separate Order and added additional restrictions on WorldCom. A1189-A1203. The Final Judgment required compliance for 10 years or, alternatively, for one year after Intermedia's assets were divested. A1189-A1203; A3102-A3111.

**D.    In August 2000, EffectNet Began Negotiations With Intermedia, Which Had A Large Subscriber Base And A Rudimentary UC Type Product**

Intermedia was a provider of integrated data and voice telecom, internet access and local and long-distance telephone services for approximately 90,000 small and medium-sized businesses. A1236; A2299; A2321-A2323. Intermedia already had success in selling its own rudimentary UC product, called "unifiedvoice.net," which bundled voice, Internet access, and data communications. A2326. Missing from unifiedvoice.net, however, were unified communications applications that EffectNet was licensing through Webley. Intermedia was to market UC Product under the trademark Intermedia*One* to Intermedia's customers through Intermedia's network of over 600 sales representatives in 50 cities across the United States. A2299; A2325-A2328; A2971 at 5:20.

**E.    Between August And November 2000, EffectNet And Intermedia Negotiated The UC Contract To Utilize Intermedia's Seasoned Sales Force To Sell The UC Product To Intermedia's Existing Subscribers And To New Subscribers**

After several months of discussions and negotiations, in or about August 2000, EffectNet and Intermedia entered into a Memorandum of Understanding, under which EffectNet agreed to

9

provide communication services to Intermedia, including unified communications services. A1235-A1236; A2298; A2312-A2319.  Specifically, EffectNet was to provide Intermedia with the UC Product to resell to its own customers (existing and new) or "end users" as a component of its flagship product, Intermedia*One*.  *Id.*  On September 1, 2000, EffectNet and Intermedia entered into an Interim Agreement, under which EffectNet continued to provided unified communications services as it had done under the Memorandum of Understanding.  A1237; A2299; A2335-A2336.

### F.    In September 2000, WorldCom Signed An Agreement To Acquire Intermedia

On September 5, 2000, WorldCom entered into a proposed merger agreement with Intermedia.  A1192.

### G.    On November 20, 2000, EffectNet And Intermedia Executed The UC Contract

On November 20, 2000, EffectNet entered into the UC Contract with Intermedia, pursuant to which EffectNet agreed to provide, and Intermedia agreed to use and sell to end-user customers (*i.e.*, subscribers) the UC Product for a term of three years.  A1237; A2300; A2338-A2351.  More specifically, under the UC Contract, EffectNet agreed to provide private-label internet and telecommunication products and services, including unified communications and other value-added services, in-house customer services, billing, and technical support.  *Id.*  Essentially, the UC Contract was the end result of the parties' efforts since August 2000 to work together to launch the unified communications services applications provided by EffectNet.  *Id.*  The UC Contract provided for an initial launch date of December 18, 2000, and the initial three-year term ran to December 2003.  A5 at § 1.3; A10 at § 5.1.  The UC Contract required that Intermedia guarantee a *minimum* of 10,000 active account subscribers by December 2001 and through the remainder of the Initial Term, December 2003 (the "Minimum Commitment").  A7-A8 at § 2.12.

### H.    Both Parties To The UC Contract Had Expectations For The UC Product That Were Significantly Higher Than The Minimums In The UC Contract

Both parties expected that the UC Product would be extremely successful for both companies.  A2299 at ¶7.  Intermedia's unified messaging product was the first web and telephone-based unified messaging platform offered by a major U.S. service provider.  *Id.* at ¶8. According to Intermedia, the enhancements to its product, including the unified communications component supplied by EffectNet, expanded its addressable market to 90%.  A2326 at ¶3.  Thus, EffectNet's unified communications service was an integral component of Intermedia's UC

10

Product.  A2299 at ¶8.  On January 30, 2001, Intermedia issued a press release announcing the first Web and telephone-based unified messaging platform offered by a major U.S. service provider – an innovative system powered by EffectNet.  A2330-A2333.

Indeed, the parties each expected a number of active account subscribers that significantly exceeded the minimums in the UC Contract.  Mr. Renforth, Senior Project Manager of Intermedia in charge of the UC Product, testified that Intermedia's product marketing had conservatively forecasted 300 new customers a month with five mailboxes per customer, for a total of 1,500 new mailboxes a month.  A2970.  In addition, Intermedia expected 1,200 existing customers per month to be converted or "up-sold" to the new Intermedia*One* product.  This constituted 1,200 additional customers at five mailboxes a month.  *Id.*  The new customer mailboxes totaled 1,500 per month for a total of 18,000 in the first year and the existing customers totaled 6,000 a month:

> Q.  So if I understand the forecast correctly, the new customers would be about -- you said there were about 15 to 16 hundred a month. That would be at a minimum about 18,000 mailboxes for the first year?
>
> A.  For the first year.
>
> Q.  And then for the existing customers, you said about 6,000 a month was being -
>
> A.  A month.
>
> Q.  To the base.  So 6,000 times 12, plus the 18,000 that you had mentioned?
>
> A.  That's correct.

*Id.*  These forecasts were for a 3-year period and were very conservative estimates given that there were 600 salespeople assigned to the account.  A2971.  Therefore, the total number of mailboxes would be 90,000 per year for 3 years or 270,000 mailboxes, which, at $27.40 per mailbox per month (A1171) **comes to $133,164,000 for the three-year period**.  As Mr. Renforth testified, the estimate of mailboxes was on the "conservative" side.  A2971 at 58:18-59:2.

### I.    In November And December 2000, EffectNet Expended Enormous Resources To Support The Launch Of The UC Product By Intermedia

In preparation for the launch of the product under the UC Agreement during September 2000 to December 2000, the parties worked together to begin the roll-out for the unified communications service applications in at least 20 markets.  A2302-A2303 at ¶¶20-22.  This roll-out included extensive training by EffectNet for Intermedia's sales staff in each market, as well as Intermedia's customer care group, so that these employees would be intimately familiar with how the applications worked.  *Id.*; A2302 at ¶ 20; A2353-A2355.  In fact, EffectNet

11

provided training on the unified communications service applications to hundreds of Intermedia's employees over a course of several months. A2302 at ¶ 21; A2353-A2355. The training included the establishment of a technical training facility for the sales and customer service staff, as well as the preparation and publication of an EffectNet training manual and curriculum. A2303 at ¶ 24; A2357-A2369.

During this roll-out period, Intermedia employed approximately 50 personnel on the project. A2302-A2303 at ¶ 22; A2371-A2374. In addition, there were 10 Intermedia*One* team leaders for different areas. A2376. In reliance upon Intermedia's projections and forecasts for the product, EffectNet also expended enormous resources to support the launch of the product. A1240; A2303-2304 at ¶¶ 24-25. For instance, EffectNet committed and invested substantial personnel and technology resources to the project, dedicating approximately one-third of its total workforce to the Intermedia project. A2303 at ¶24. Team leaders were also assigned, who were devoted on a full-time basis solely to the Intermedia project in order to ensure that Intermedia's *daily* needs were satisfied. *Id.* Furthermore, in addition to the extensive training it provided to Intermedia's employees, EffectNet also provided a 24-hour, 7-day per week technical support center. *Id.* This support center alone took up approximately 10,000 square feet of EffectNet's office space and maintained facilities for 100 customer care representatives – all dedicated to supporting the anticipated Intermedia business. *Id.*

**J.    By The End of November 2000, Intermedia Began To Default On Its Obligations Under The UC Contract**

Beginning on November 30, 2001, Intermedia began to default on its obligations under the UC Contract. In particular, the UC Contract called for Intermedia to provide EffectNet with non-binding forecasts for expected new subscribers at a minimum once every two months. A6-A7 at § 2.4. The first required forecast was due on or before November 30, 2000. *Id.* Intermedia did not meet this obligation. A1010. In January, 2001, EffectNet noticed that Intermedia was only opening accounts for its own sales representatives and executives. A1241; A2304 at ¶26.

The UC Contract also required Intermedia to provide Parus with non-binding quarterly and annual forecasts of expected mailboxes for new subscribers. A6-A7 at § 2.4. The first quarterly forecast was due on February 20, 2001. *Id.* Intermedia did not meet this obligation. A1010. Next, Intermedia defaulted under the UC Contract by failing to meet the 1,500 subscriber commitment by March 18, 2001. A2393 (showing that the total Intermedia users as of April, 2001 was 638). Indeed, the few hundred subscribers that Intermedia did deliver were

12

Intermedia's executives and representatives.  A2393 (showing that the "Total Intermedia Users" as of July, 2001 was 729).  Thereafter, Intermedia defaulted on its obligation to deliver 3,000 subscribers as of June 18, 2001 and the only subscribers it did deliver were still Intermedia's executives and representatives.  *Id.*

**K.    In Fact, In Late April Or Early May 2001, Intermedia Decided To "Scrap" The UC Product But Concealed Its Decision From Parus**

In or about April or May 2001, at a meeting of Intermedia's product management staff – the committee that managed all of Intermedia's products, including Intermedia*One* – Intermedia's Vice-President of Sales, Kathy Victory, its Director of Sales, Jack Hee, and Cheryl Mellon, another Intermedia Supervisor, announced that Intermedia would be "scrapping" the Intermedia*One* Product and returning to the "single T" product that Intermedia had as its main product line in the 1990s.  A2973 at 74:22.  Because the initiation of the UC Product was approved at Intermedia's highest executive levels, a reasonable inference is that the decision to scrap the product also had to be approved by this level.  A2968-A2969 at 49:21-50:8.

**L.    In The Same Time Frame WorldCom Negotiated A License Agreement With Webley Relating To The Same Technology**

The UC Contract with Intermedia was for the <u>hosted</u> UC Product.  A-2330-A2333.  In the same time frame, WorldCom was negotiating with Webley for the UC technology for its own <u>hosted</u> UC Product called genD.  A 1247; A2306-A2307; A2523-A2592.  Thus, the UC Product which was the subject of the UC Contract was in direct competition with genD of WorldCom.

In May 2001, WorldCom Ventures received a private placement memorandum that provided detailed and confidential information about EffectNet and Webley and the proposed merger.  A2306; A2503-A2518; A1247; A2307; A2663-A2668.

Also ongoing at this time were negotiations between Webley and WorldCom regarding a potential agreement to govern licenses for some of Webley's software technology products, including Webley's session initiation protocol (or "SIP")-based unified communications platform.  A1247; A2306; A2520-A2521.  WorldCom was interested in a licensing agreement for this technology in order to support its own unified messaging product, genD Next Generation IP Unified Messaging/VoiceMail product ("genD").  *Id.*  Specifically, genD concerned data communications, and relied upon SIP to deliver voice and other communication data via the Internet, much liked the unified messaging bundle that was provided via Intermedia's product. A1247; A2306-A2307; A2523-A2592.

**M.     On July 1, 2001, WorldCom Closed On The Acquisition of Intermedia And Intermedia Continued To Default On Its Obligations Under The UC Contract**

On July 1, 2001, WorldCom closed on the acquisition of Intermedia.  A1111.  On July 7, 2001, Intermedia's project manager gave notice for the UC Contract, James Renforth resigned because the UC Project was "scrapped."  A2304; A2391.  Shortly thereafter Intermedia terminated or transferred to unrelated departments, its entire sales force for the UC project, which had been trained by Parus to sell the UC Product.  A2973 at 74:1; 75:21-76:3; A1241; A2304.

In July 2001, one of Intermedia's team leaders, Jack Kerrigan, informed EffectNet that there would be no new customers.  A1241; A2304; A2380-A2389; A1241; A2304; A2380-A2389.

**N.     In September 2001, WorldCom Executed A License Agreement With Webley While Intermedia Canceled Nearly All Of Its Accounts Under The UC Contract And Pulled The UC Product From All 25 Markets**

In early September 14, 2001, Webley (which, by now, had already acquired EffectNet) completed its negotiations with WorldCom and executed the Master Agreement for Software Licenses (the "MASL").  A1247; A2307; A2593-A2661.  WorldCom licensed from Webley the same technology that Intermedia had procured under the UC Contract.  A2593-A2661.  The key difference was that the UC Contract involved a wholesale relationship in which the technology was <u>hosted by EffectNet</u> and which generated monthly recurring revenue.  *Id.*  In contrast, the MASL involved a one-time perpetual license fee at a fraction of the cost of the Intermedia*One* service, which technology was <u>hosted by WorldCom</u> and, unlike Intermedia*One*, generated no recurring product revenue for Webley.  A2903.

On September 10, 2001, Intermedia only had 729 subscribers – the same number as in July 2001, (all or nearly all executives or representatives of Intermedia) and it cancelled 682 of these subscriptions.  A3017 at Request 164.  Thus, while under the UC Contract, Intermedia should have been approaching a minimum of 6,500 subscribers; Intermedia delivered 47 subscribers.  A2393.  Intermedia also failed to pay EffectNet for the remaining 47 accounts, as well as to pay the Volume Shortfall.  A1113; A1242; A2304.

In early September 2001, Intermedia had canceled more than 90% of the accounts and Intermedia had pulled the product from over 25 markets.  A1113; A1241; A2304; A2395.

**O.     In February – March, 2002, Intermedia Failed To Make Even The Minimum Payments Under The UC Contract And Asked to Close All Accounts**

14

On February 12, 2002, Parus delivered to Intermedia invoices for the December 2001 and January 2002 reconciliation payments of $548,087.25.  A3070; A651; A653.  Payment of the invoices was due on February 17, 2002.  A10 at § 4.5.  Intermedia defaulted on this obligation as well.  A1011.   In fact, the last payment from Intermedia to EffectNet on the remaining 47 accounts was on December 7, 2001.  A1242; A2304.  From December 2001 through March 2002, Intermedia used and EffectNet invoiced Intermedia for those 47 accounts.  A1114-A1115.

In March 2002, Jim Faust, the new Project Manager for Intermedia, demanded that all remaining accounts be canceled.  A1113; A1242; A2305; A2395.  As of that time, invoices from December 2001 through March 2002 still remained outstanding.  *Id.*  Since Intermedia did not deliver the minimum number of subscribers, it was obligated under the UC Contract to pay a reconciliation payment.  A8 at § 2.13.

### P.    On March 12, 2002, Parus Sent A Notice of Default Letter To Intermedia, Demanding That Intermedia Cure Its Material Defaults

On March 12, 2002, Robert McConnell, EffectNet's General Counsel, sent a letter to Intermedia, advising Intermedia that it was in material breach of its obligations under the UC Agreement, *inter alia*, due to its continued failure to meet the Minimum Commitment and pay the outstanding invoices.  A2287; A2290-A2292.  The letter specifically advised Intermedia that Intermedia was liable for $548,087.25 in outstanding invoices, as well as the Minimum Commitment through December 2003.  *Id.*  Mr. McConnell requested immediate payment of the outstanding invoices and cure of the breach, and specifically reserved EffectNet's rights and remedies under the UC Contract.  *Id.*  The letter also enumerating certain defaults and directed that they that the defaults be cured in 30 days.  *Id.*

### Q.    Intermedia Failed To Cure Its Material Defaults Of The UC Contract And Instead Of Assuring Future Performance, Offered Settlement Discussions

Intermedia did not offer to cure its breaches or offer assurances of performance.  Instead, on March 13, 2002, Intermedia indicated that it was interested in pursuing settlement discussions.  A122.  Intermedia failed to cure its breach of the UC Contract.  A1114; A1242; A2287; A2305.  On March 25, 2002, Mr. McConnell sent a second letter to Intermedia, again advised Intermedia of its breach of the UC Contract along with the increased amount of $827,844.27 on the outstanding invoices.  A1242; A2287; A2305; A2294-A2296.  Once again, the letter requested that Intermedia immediately cure its breach of the UC Contract and advised Intermedia that EffectNet would claim any and all damages as a result of Intermedia's breach of the contract, which included, but was not limited to, the Minimum Commitment payments

15

through the end of the Initial Term.  A2287; A2295-A2296.  EffectNet received no response from Intermedia.  A1114; A1242; A2287; A2305; A2287 at § 7.

Intermedia did not pay the outstanding invoice amounts, did not pay any of the Reconciliation Payments, and did not provide any assurance of future performance.  A1114; A1242; A2287; A2305.

## VI.    SUMMARY OF ARGUMENT

In granting summary judgment in favor of Debtors WorldCom and Intermedia as to all counts of Parus' Complaint that were in contest,[6] the Bankruptcy Court made a series of errors specific to each claim and also made certain global errors that permeate its entire ruling. Together, these errors deprived Parus of damages potentially exceeding $130 million and overwhelmingly require reversal here.  The matter should be remanded to the Bankruptcy Court and, due to Debtors' massive, unlawful destruction of evidence, the Bankruptcy Court should be ordered to enter judgment for Parus.  In the alternative, and at the very least, Parus should be given the opportunity to prove its case at trial.  At such a trial, Parus should be given the benefit of favorable evidentiary findings and inferences because of Debtors' spoliation of evidence and other gross misconduct.

### A.    The Bankruptcy Court Committed Reversible Error By Granting Summary Judgment, Severely Limiting Parus' Damages For Intermedia's Breach Of The UC Contract

The Bankruptcy Court agreed that Intermedia breached the UC Contract but then erroneously denied Parus the "benefit of the bargain" damages that customarily flow from such a breach.  The Bankruptcy Court did so because of it accepted Debtors' erroneous argument that "benefit of the bargain" damages were a form of "consequential" damages that were barred by §11, the Limitation of Liability clause of the UC Contract.  However, that Clause only barred certain forms of damages (such as consequential damages) that were not at issue but do not limit Parus' right to recover the "benefit of the bargain" or expectation damages that Parus sought.  In ruling otherwise, the Bankruptcy Court disregarded well-established hornbook law that "benefit of the bargain" damages are a form of general and not consequential damages.  *E.g.,* WILLISTON ON CONTRACTS, §64:12 at 123 (4th ed. 2002) (noting that general damages are sometimes called "loss of bargain damages").  The Bankruptcy Court's misapplication of the Clause had

---

[6] The Bankruptcy Court did direct Debtors to pay Parus a small amount for overdue invoices that the Debtors conceded they owed.

16

catastrophic consequences here for Parus, as Parus' evidence demonstrates that its general damages caused by Intermedia's breaches are to exceed $100 million.

In addition, the Bankruptcy Court recognized that Intermedia materially breached the UC Contract but then denied Parus meaningful relief for such breach. A clause of the UC Contract provided that the contract would terminate if a <u>material</u> breach remained uncured within 30 days of notice (the "Termination Clause"). The Bankruptcy Court found that the Termination Clause was triggered when Intermedia within 30 days did not remedy material defaults identified by Parus in its letter detailing such defaults and requesting performance. Because Intermedia's material breaches caused this termination, Parus, as the non-breaching party ready to perform, should have received "benefit of the bargain" damages. Yet, again, the Bankruptcy Court denied Parus such damages.

Intermedia's failure to perform or to otherwise provide adequate assurance in response to Parus' letters meant that Intermedia had committed an anticipatory breach of the UC Contract that independently entitled Parus to "benefit of the bargain" damages. The Bankruptcy Court denied Parus such relief based on its erroneous determination that Intermedia committed no breach "within any of the four corners" of the UC Contract. This ruling was both wrong on the law and ignored critical facts. A breach of the "four corners of the Agreement" is not a prerequisite for establishing liability for anticipatory breach. By definition, an actionable anticipatory breach may occur before <u>complete</u> performance is required and, indeed, before <u>any</u> performance is due. Under governing Arizona law, to recover for anticipatory breach, an aggrieved party need only demonstrate that its counterparty made a positive and unequivocal manifestation that it would not render the promised performance when the time for the performance arises. *See Diamos v. Hirsch*, 91 Ariz. 304, 307, 372 P.2d 76, 78 (1962). Here, Parus amply established this. Debtors, in addition to failing to make the assurances Letter, among other things: (1) caused the project manager to leave by telling him that the UC Project was "scrapped" and fired or redeployed the entire sales force who had been trained to market the US Product to be produced under the UC Contract; (2) canceled all ongoing projects related to the UC Contract; (3) stopped opening new customer accounts for the Product; (4) cancelled most of the subscriptions Intermedia had obtained; (5) failed to make even the minimum payments required under the UC Contract; (6) failed to cure the defaults enumerated in the Letter and in a subsequent letter; and (7) publicly announced that Debtors would proceed with the marketing of a system that was in direct competition with the Product.

CHIC_1666821.11

Here, the Bankruptcy Court compounded its error by further restricting the damages recoverable for Intermedia's breach. The Bankruptcy Court held that damages were limited to amounts that already were past due as of the date of termination based on its misreading of § 5.3 of the UC Contract. That section does not in any way limit damages for breach but merely limited the parties' further <u>obligations to perform</u> following termination. This misconstruction rewarded Debtors for their breach and punished Parus – the aggrieved party – for demanding that Intermedia cure its defaults. Instead, the Bankruptcy Court should have held that, upon material breaches and/or anticipatory repudiation of the UC Contract, all monies Parus expected under the UC Contract had immediately accrued as damages.

**B.     The Bankruptcy Court Committed Reversible Error By Granting Summary Judgment On Parus' Claims For Breach Of The Covenant Of Good Faith And Fair Dealing, Civil Conspiracy And Unfair And Deceptive Trade Practices**

The Bankruptcy Court, in error, summarily dismissed Parus' claims for Intermedia's breach of the covenant of good faith and fair dealing, civil conspiracy and unfair and deceptive trade practices by reading the Limitation of Liability clause to bar damages for these claims. This constituted reversible error for several reasons. First, the Bankruptcy Court misread the Limitation of Liability clause as limiting all non-contractual damages. This was wrong because the Limitation of Liability clause only limits forms of damages that were outside the scope of what Parus was seeking against Debtors on these counts. Second, public policy requires that the covenant of good faith and fair dealing be implied by law in every contract. The Bankruptcy Court, by finding that Parus and Intermedia, through the Limitation of Liability clause, disclaimed any action based on the breach of this covenant, permitted Debtors to flout such public policy and act in bad faith with impunity. Similarly, public policy precludes disclaimers of damages for intentional torts, such as civic conspiracy or for violations of statutes which protect the public at large as well as individuals.

**C.     The Bankruptcy Court Committed Reversible Error In Dismissing Parus' Tortious Interference With Contract Claim Against WorldCom**

The Bankruptcy Court also made several errors in granting WorldCom summary judgment against Parus' claim for WorldCom's tortious interference with the UC Contract between Intermedia and Parus based on the Bankruptcy Court's finding that WorldCom was protected by a privilege as the later owner of Intermedia. First, the misconduct by WorldCom that constitutes tortious interference with Parus' rights under the UC Contract began well before WorldCom owned Intermedia. WorldCom is still answerable for such misconduct even if it later

18

bought Intermedia and even if the breach caused by its misconduct did not occur until after this purchase.  Second, WorldCom's conduct indisputably violated the D.C. Court Hold Separate Order.  This violation of a federal court order contrary to the Bankruptcy Court's finding, should have precluded any claim of "privilege."  Third, Intermedia and WorldCom lacked the required "unity of interest."  Finally, the Bankruptcy Court ignored governing law which holds that, even where a corporate parent has an ownership interest, it is not privileged to interfere with its subsidiary's contract where that would injure the subsidiary, as was true here.  Here, Worldcom's conduct caused Intermedia to breach a contract that was expected to be highly valuable to Intermedia and to which Intermedia had devoted great resources in getting ready to roll out.

> **D.    The Bankruptcy Court Committed Reversible Error By Summarily Dismissing Parus' Civil Conspiracy Claim Against WorldCom**

The Bankruptcy Court then compounded its error in excusing Intermedia from liability for civil conspiracy by concluding that, if Intermedia were not liable, WorldCom, too, could not be liable as a co-conspirator.  However, nothing in the Limitation of Liability clause or the UC Contract as a whole prohibited any claims or any form of damages against a third party or gave any outsider to the UC Contract such as WorldCom a right to rely on its terms.  Moreover, controlling law allows the victim of a civil conspiracy to sue other conspirators even where one conspirator is otherwise shielded.

Further, the Bankruptcy Court misconstrued the conspiracy here which was to cause Parus' bankruptcy, thereby allowing WorldCom to prefer its genD competitive product, and not to cause a breach of the UC Contract, as the Bankruptcy Court erroneously found.

> **E.    The Bankruptcy Court Committed Reversible Error By Summarily Dismissing Parus' Claim For Unfair And Deceptive Trade Practices Against WorldCom**

In granting summary judgment for Debtors on Parus' statutory claim for unfair and deceptive practices, the Bankruptcy Court misread the Limitation of Liability clause to prohibit this entire <u>claim</u>, even though Parus was seeking only damages for this claim that were outside the scope of the Limitation of Liability clause.

> **F.    The Bankruptcy Court Committed Reversible Error And Abused Its Discretion By Failing To Grant Any Relief To Parus For Debtors' Spoliation Of Evidence**

Even if the Bankruptcy Court had not otherwise erred in its adjudication as to Parus' individual claims, reversal is still required here because of at least three key, global errors the Bankruptcy Court made.  First, the Bankruptcy Court failed to hold Debtors accountable for their

19

massive and intentional destruction of relevant documents in this matter. The Debtors destroyed such critical evidence even after they knew of the onset of this lawsuit and of their duty to preserve such documents. When Parus moved for sanctions based on Debtors' intentional spoliation of critical evidence, the Bankruptcy Court said that it would consider this motion in tandem with Debtors' summary judgment motion. In fact, however, the Bankruptcy Court never gave the Spoliation Motion meaningful consideration. Most significantly, the Bankruptcy Court imposed no sanction against Debtors for such spoliation, even though such spoliation should have caused the Bankruptcy Court to enter judgment for Parus. At the very least, such destruction should have resulted in a finding that such evidence would have been favorable to Parus as to each subject area covered by a destroyed document. The Bankruptcy Court's failure to impose any sanction effectively rewarded Debtors for their gross misconduct.

### G.    The Bankruptcy Court Erred By Denying Parus The Benefit Of Favorable Inferences On Summary Judgment

The Bankruptcy Court in ruling on summary judgment denied Parus the benefit of favorable inferences. Indeed, in ruling on Parus unfair Trade Practices claim, the Bankruptcy Court *sua sponte* raised an argument in favor of Debtors – the movants – and dismissed Parus' claims based on this argument without giving Parus a chance even to respond. The Bankruptcy Court thereby ceased being a neutral arbiter and became WorldCom's advocate. As the non-movant for purposes of a summary judgment motion, Parus was entitled to such favorable inferences and the Bankruptcy Court committed reversible error by acting otherwise.

### H.    The Bankruptcy Court Abused Its Discretion By Failing To Grant Parus Relief Under Fed. R. Civ. P. 56(f)

In opposing summary judgment, Parus asked the Bankruptcy Court to delay ruling so that it could obtain necessary, relevant discovery that was in Debtors' possession, that Parus had repeatedly requested the Debtors produce but that Debtors had failed to provide. The Bankruptcy Court wrongfully denied Parus any relief under Rule 56(f) because it believed, erroneously, that all of Parus' claims could be decided on the purported plain language of the UC Contract and because Parus could only speculate what additional discovery might show. Of course, one cannot say with certainty what he might be able to discover until he is given a chance to do such discovery.

## VII.    ARGUMENT

### A.    The Bankruptcy Court Committed Reversible Error By Severely Limiting Parus' Damages For Breach Of Contract

CHIC_1666821.11

1.    **The Bankruptcy Court Erred When It Denied "Benefit Of The Bargain" Damages On the Ground That They Are Consequential Rather Than General Damages**

Parus' breach of contract claim is for general damages, which include receiving the benefit it expected to receive had Intermedia not breached (so-called "benefit of the bargain" damages). The Debtors argued, however, that Parus' "benefit of the bargain" damages were barred by the Limitation of Liability clause of the UC Contract. A3387. The Bankruptcy Court, in error, accepted Debtors' argument and granted summary judgment on this point. A3391.

The Bankruptcy Court's ruling is in error because the "benefit of the bargain" damages are <u>general</u> or <u>direct</u> damages and the Limitation of Liability clause does not prevent recovery of <u>general</u> or <u>direct</u> damages. That the Limitation of Liability clause provides:

> 11.    <u>LIMITATION OF LIABILITY</u>.  Except for damages arising under section, in no event shall either party be liable to the other party for any incidental, indirect, special, punitive, consequential or similar damages of any kind including without limitation, loss of profits, loss of business or interruption of business, whether such liability is predicated on contract, strict liability or any other theory without regard to whether such party has been advised of the possibility of such damages.[7]

A14. Indeed, the principle that "benefit of the bargain" or "loss of bargain" damages are general damages is hornbook law:

> <u>General damages</u> are considered to include those damages that flow naturally from a breach, that is, damages that would follow any breach of similar character in the usual course of events.  Such damages are said to be the proximate result of a breach, and are <u>sometimes called "loss of bargain" damages</u>, because they reflect a failure on the part of the defendant to live up to the bargain it made, or a failure of the promised performance itself.

WILLISTON ON CONTRACTS §64:12 at 123 (footnotes deleted; emphasis added).  The Arizona Supreme Court has made it clear that damages are subdivided into two categories:  general and special.  *Palmer v. Kelly*, 54 Ariz. 466, 468, 97 P.2d 209, 209-10 (1939) ("Damages are either general or special").  Under the Restatement (Second) of Contracts, which is followed by

---

[7] Under the maxim of *expressio uniis est exclusio alterius*, because the Limitation of Liability clause listed out the damages that were to be limited, the failure to list out general damages or benefit of the bargain damages shows that such unmentioned forms of damages were not to be limited.  *E.g.*, *Israel Discount Bank Ltd. v. Gottesman*, 544 F.2d 80, 82 (2d Cir. 1976); *Central Housing Inv. Corp. v. Federal Nat. Mortg. Ass'n*, 74 Ariz. 308, 310, 248 P.2d 866, 867 (1952) (applying Arizona law).

CHIC_1666821.11

Arizona,[8] an aggrieved party's right to recover general damages including "benefit of the bargain" damages for breach is set forth in subsection (a) of §347.[9]  Special damages are separately addressed in subsection (b) and include consequential damages.  *Id.* ("any other loss, including incidental or consequential loss, caused by the breach.")

The Second Circuit recently reaffirmed the difference between <u>general</u> and <u>consequential</u> damages based on lost profits.  In *Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc.*, 487 F.3d 89, 109 (2d Cir. 2007), the Second Circuit found that a district court erred when it classified the "benefit of the bargain" lost profits as consequential damages.  The Court explained that lost profits are consequential damages if they are on profits from collateral business arrangements:

> Lost profits are consequential damages when, as a result of the breach, the non-breaching party suffers loss of profits on collateral business arrangements.  In the typical case, the ability of the non-breaching party to operate his business, and thereby generate profits on collateral transactions, is contingent on the performance of the primary contract.  When the breaching party does not perform, the non-breaching party's business is in some way hindered, and the profits from potential collateral exchanges are "lost."

*Id.* at 109.  The Second Circuit further explained that lost profits which are <u>bargained for under the contract</u> are <u>general</u> damages:

> By contract, when the non-breaching party seeks only to recover money that the breaching party agreed to pay under the contract, the damages sought are <u>general damages</u>.  The damages may still be characterized as lost profits since, had the contract been performed, the non-breaching party would have profited to the extent that his cost of performance was less than the total value of the breaching party's promised payments.  But, in this case, the lost profits are the direct and probably consequence of the breach.  The profits are precisely what the non-breaching party bargained for, and only an award of damages equal to lost profits will put the non-breaching party in the same position he would have occupied and the contract been performed.

*Id.* 109-10 (footnotes and case law citations omitted; emphasis added).  The Second Circuit concluded that the district court confused the benefit of the bargain damages – which are general

---

[8] Arizona follows the Restatement (Second) of Contracts.  *Naarden Trust v. Kieber*, 195 Ariz. 526, 528, 990 P.2d 1085, 1087 (Ct. App. 1999); *Dorman v. Swift & Co.*, 162 Ariz. 228, 231, 782 P.2d 704, 707 (1989).

[9] "Contract damages are ordinarily based on the injured party's expectation interest and are intended to give him the <u>benefit of his bargain </u>by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed."  Restatement (Second) of Contracts §347 cmt. a.

CHIC_1666821.11

damages sought by plaintiff AEP – with profits on collateral transaction which are consequential damages:

> In characterizing AEP's claim as one for consequential damages, the <u>district court confused the benefit of the bargain</u> with speculative profits on collateral transactions. AEP seeks only what it bargained for – the amount it would have profited on the payments TEMI promised to make for the remaining years of the contract. <u>This is most certainly a claim for general damages</u>.

Id. (emphasis added). Similarly, in *Penncro Assocs., Inc. v. Sprint Spectrum, L.P.*, 499 F.3d 1151. 1156 (10th Cir. 2007), the Tenth Circuit found that a clause similar to the Limitation of Liability clause in the present case, did not bar plaintiff's anticipated benefit of the bargain damages:

> Lost profits, under appropriate circumstances, can be recoverable as a component of either (and both) direct and consequential damages. Thus, for example, if a services contract is breached and the plaintiff anticipated profit under the contract, those profits would be recoverable as a component of direct, benefit of the bargain damages. If that same breach had the knock-on effect of causing the plaintiff to close its doors, precluding it from performing other work for which it had contracted and from which it expected to make a profit, those lost profits might be recovered 'consequential' to the breach.

The Court found that the limitation of damages clause, "simply [did] not speak to direct damages, or to lost profits recoverable under such a [benefit of the bargain] theory." *Id.*

The Bankruptcy Court below made <u>the same error</u> when it classified the benefit of the bargain damages sought by Parus as consequential rather than general damages. Like the plaintiffs in *Tractebel* and in *Penncro*, Parus seeks profits that it had bargained for in the UC Contract. Parus seeks the benefit of the bargain profits which would put Parus in the same position as if the UC Contract had been performed by Intermedia. Parus does not seek profits lost from any collateral transaction. Therefore, like in *Tractebel* and in *Penncro*, Parus' claim is for <u>general</u> damages. Since general damages are not precluded by the Limitation of Liability clause, the summary judgment dismissing Parus' claim for the benefit of the bargain damages was in error and should be reversed.

## 2.    The Bankruptcy Court Erred When It Ruled That Intermedia Did Not Anticipatorily Breach The UC Contract

The Bankruptcy Court erroneously held that Parus did not establish anticipatory repudiation because there was no breach "within any of the four corners of the UC Contract." A3387. This holding is wrong on the law and wrong on the facts.

The holding is wrong on the law because, by definition a breach of the "four corners" of the agreement is not a prerequisite for establishing <u>anticipatory</u> repudiation. All that is required

CHIC_1666821.11

under the controlling law is "a positive and unequivocal manifestation on the part of the party allegedly repudiating that he will not render the promised performance when the time fixed for it in the contract arrives." *Diamos v. Hirsh*, 91 Ariz. 304, 307, 372 P.2d 76, 78 (1962). Below the Bankruptcy Court treated Intermedia's breach of the Minimum Commitment obligation as though it were of no consequence instead of whether it was a "positive" and "unequivocal" manifestation that Intermedia would not render the performance it promised under the UC Contract. The Bankruptcy Court erroneously ruled:

> The fact that Intermedia did not meet its minimum number of subscribers does not evidence any type of breach, much less the type of "positive and unequivocal manifestation on the part of the party allegedly repudiating that he will not render the promised performance when the time fixed for it in the contract arrives.

A3387. There is no such requirement in the law. Indeed, a manifestation that the contract will not be performed may precede any performance. Thus, by definition, a breach of the "four corners" is not a requirement for establishing anticipatory repudiation.

The Bankruptcy Court further erred because, in addition to the minimum subscriber breaches, the record contains evidence of several additional breaches by Intermedia, as described above. While the Bankruptcy Court claimed it could find no evidence of "a breach within any of the four corners of the UC Contract," this is belied by the Bankruptcy Court's own acknowledgment on page 18 of the Opinion that Debtors admitted that they breached the UC Agreement. A3384 ("the Debtors concede that Intermedia breached the UC Contract….").

Indeed, defaults under the UC Contract began at least as early as of December 18, 2000 and continued until termination. The UC Contract provided that, after significant preparatory work by both parties (A5 at § 1.3), the UC Product would be "rolled out" on December 18, 2000. A7-A8 at §2.12. Intermedia defaulted on this obligation – there was no commercial launch of the UC Product and there were no commercial customers. A2304 at ¶¶ 26 and 29. Since a commercial launch of the UC Product was the foundation for the successful implementation of the project, as of December 18, 2000, there was a manifestation by Intermedia that it might not perform its obligations under the UC Contract. Next, under the UC Contract, Intermedia was obligated to deliver a minimum of 1,500 subscribers by March 18, 2001 followed by a minimum of 3,000 subscribers by June 18, 2001, a minimum of 6,500 subscribers by September 18, 2001, and a minimum of 10,000 subscribers by December 18, 2001. A7-A8 at § 2.12. Intermedia failed to meet the 1,500 subscriber commitment by March 18, 2001. Indeed, the few hundred subscribers that Intermedia did deliver were Intermedia's internal executives and representatives. A2304 at ¶¶26 and 29. This default by Intermedia was another manifestation by Intermedia that

24

it might not perform under the UC Contract.  Third, Intermedia defaulted on its obligation to deliver 3,000 subscribers by June 18, 2001 and the only subscribers did deliver were still Intermedia's executives and representatives.  *Id.*  This was yet another manifestation by Intermedia that it might not perform its obligations under the UC Contract.

Intermedia's defaults and lack of reasonable performance continued after WorldCom closed the acquisition on July 1, 2001.  On July 7, 2001, Intermedia Mr. Renforth, the project manager for the UC Contract, resigned and shortly thereafter Intermedia started to terminate its sale force for the UC project, which had been trained by Parus to sell the UC Product.  A2304 at § 27.  By September 1, 2001, Intermedia had terminated or reassigned to other projects the entire sales force.  A2304, ¶27.  This was yet a fourth manifestation that Intermedia would not perform under the UC Contract.  On September 10, 2001, Intermedia only had 729 subscribers (all or nearly all executives or representatives of Intermedia) and it cancelled 682 of these subscriptions.  A3017 Request 164.  Thus, while, under the UC Contract, Intermedia should have been approaching a <u>minimum</u> of 6,500 subscribers, Intermedia delivered 47 subscribers.  This was now a fifth manifestation that Intermedia would not perform under the UC Contract.

Since Intermedia did not deliver the minimum number of subscribers, it was obligated under the UC Contract to pay a reconciliation payment.  A8 at §2.13.  On February 12, 2002, Parus delivered to Intermedia an invoice for the December and January 2001 reconciliation payments of $548,087.25.  The payment of the invoice was due on February 17, 2002.  A10 at §4.51.  Intermedia defaulted on this obligation as well.  A01011.  This was yet a sixth manifestation that Intermedia would not perform its obligations under the UC Contract.

On March 12, 2002, Parus sent to Intermedia a letter enumerating several of the defaults and requested that the defaults be cured within 30 days.  A1018-A1020.  Intermedia did not offer to cure breaches and did not offer assurances of performance.  Instead, on March 13, 2002 Intermedia indicated that it was interested in pursuing <u>settlement</u> discussions.  A0122.  This was a seventh manifestation that Intermedia would not perform its obligations under the UC Contract.  Indeed, under <u>Restatement (Second) of Contracts</u> §251, which Arizona follows, a failure to provide assurances is in itself an anticipatory repudiation of the UC Contract.  *See Tecom, Inc. v. United States*, 66 Fed. Cl., 736, 776 (Ct. Cl. 2005).  On March 25, 2002, Parus sent another letter requesting Intermedia to cure the defaults.  A0122-A0123.  Again, Intermedia did not respond with assurances of performance.  A2287 §7.

While there may be a fact question as to when Intermedia's manifestations that it will not render the promised performance became "positive and unequivocal" so as to trigger anticipatory

CHIC_1666821.11

repudiation, reasonable minds cannot disagree that, by March 13, 2002, when Intermedia suggested settlement discussions instead of offering assurances of performance, the UC Contract was anticipatorily repudiated by Intermedia.

Accordingly, the ruling of the Bankruptcy Court dismissing Parus' claim for breach of contract based on anticipatory repudiation should be reversed.

### 3.    The Bankruptcy Court Erred When It Ruled That Parus Is Not Entitled To Recover All Reconciliation Payments As Part Of Its Damages

The Bankruptcy Court also erred in limiting damages which it did award. Based on an erroneous construction of § 5.3 of the UC Contract, the Bankruptcy Court limited Parus' reconciliation payment damages solely to those that already were overdue at the time of termination of the UC Contract.[10] The Bankruptcy Court erroneously construed this section as releasing damages for the breach of obligations rather than excusing future performance of certain obligations by EffectNet under the UC Contract. The Bankruptcy Court also erred in limiting reconciliation damages because upon the material breach of contract and/or upon the anticipatory repudiation, both of which preceded the termination date, all damages had accrued and §5.3 does not limit accrued damages.

Specifically, §5.3 of the Agreement provides that upon termination of the contract the parties remained liable for obligations that accrued prior to the termination date:

> 5.3    Effect of Termination. Upon termination of this Agreement for any reason, each Party shall remain liable for those obligations that accrued prior to the date of such termination; provided, however, that nothing herein shall be construed to obligate EffectNet to offer Services to Intermedia after the termination of this Agreement.

A10. (emphasis added). The only fair reading of Section 5.3 is that it defines what obligations the parties must still be liable for performing even after the termination date. This section does not even mention damages, much less limit them. Indeed, by its terms, it is applicable to a termination which would not involve a claim for damages. The Bankruptcy Court held, however, that this section cut off not only the obligation to make reconciliation payments but also damages for the reconciliation payments that were not yet scheduled to be due at the

---

[10] The Bankruptcy Court found that the monthly fee per subscriber to be applied presented a material question of fact (A3384-A3385) but subsequently the Debtors conceded that the rate asserted by Parus – $27.40 per subscriber per month – was correct. A4279-A4285.

CHIC_1666821.11

termination date (even though by virtue of Intermedia's breach, their due dates were accelerated). A3386-3387.

Since all damages for the breach of the UC Contract by Intermedia accrued before the termination, even if §5.3 were construed to apply to damages for obligations it would not bar recovery of all reconciliation payments because damages for all reconciliation payments had accrued prior to the termination date.

The Bankruptcy Court's construction of §5.3 as a limitation on Parus' right to recover damages for Intermedia's breach of its obligations is incorrect. It well established that release or limitation of damages clauses must be clear and unequivocal and must be strictly construed against the party which attempts to rely on such clause. *Morganteen v. Cowboy Adventures, Inc.*, 190 Ariz. 463, 949 P.2d 552 (Ct. App. 1997); *Sirek v. Fairfield Snowbowl, Inc.*, 166 Ariz. 183, 186-87, 800 P.2d 1291, 1294-95 (Ct. App. 1990). In the present case, the only fair construction of §5.3 is that it cuts off Parus' need to perform parties' obligations, but does not release Intermedia from damages for its breach.

It is fundamental that, upon a major breach of contract, all damages accrue of the time of the breach. *Rhue v. Dawson*, 173 Ariz. 220, 230, 841 P.2d 215, 225 (Ct. App. 1992) (Contract damages "are measured at the time of the breach"); *Arizona's Towing Professionals, Inc. v. State of Arizona,* 196 Ariz. 73, 78, 993 P.2d 1037, 1042 (Ct. App. 1999); *McJunkin Corp. v. North Carolina Natural Gas Corp.*, 300 F.2d 794, 801 (4th Cir. 1961). The major breaches in the present case occurred necessarily more than 30 days prior to the termination date because they occurred prior to Parus' notice of defaults. The termination clause provides that the UC Contract terminates 30 days from the notice if the noticed default is not cured. Similarly, anticipatory repudiation occurred prior to the termination of the contract on, at the very latest, March 13, 2002, when in response to Parus request for performance Intermedia did not give assurances that it would perform and instead advised Parus that Intermedia wanted to discuss "settlement."

Accordingly, the Bankruptcy Court's ruling that §5.3 cuts off recovery of damages for reconciliation payments that were not due as of the termination date is in error and should be reversed.

**B.      The Bankruptcy Court Erroneously Dismissed Parus' Breach Of Covenant Of Good Faith And Fair Dealing, Civil Conspiracy, And Unfair And Deceptive Practice Claims Against Intermedia Based On A Misreading Of The Limitation Of Liability Clause**

Based on an incorrect construction of the Limitation of Liability clause, the Bankruptcy Court erroneously granted summary judgment on Parus' claims against Intermedia for (1) breach

CHIC_1666821.11

of covenant of good faith and fair dealing, (2) civil conspiracy; and (3) unfair deceptive practices. The Bankruptcy Court ruled that "the Limitation of Liability clause prohibited the imposition of any non-contractual damages against Intermedia." A3391. The Bankruptcy Court's ruling is in error because the Limitation of Liability clause does not prohibit the recovery of general or direct damages in any context and it does not prohibit recovery of damages of any sort based on theories other than contract.

In a recent case the Tenth Circuit construed a similar limitation of liability clause which barred "the recovery of 'consequential' damages, specifying that they 'include, but are not limited to, lost profits, lost revenues and lost business opportunities.'" *Penncro Assocs., Inc. v. Sprint Spectrum, L.P.*, 499 F.3d 1151, 1155-56 (10th Cir. 2007). The Tenth Circuit found that lost profits referred "only to those that are 'a part or component' of the larger group or class of consequential damages." *Id.* at 1156. The Court noted that the "common legal meaning of the terms involved confirms" this construction:

> The common legal meaning of the terms involved confirms this reading. Direct damages refer to those which the party lost from the contract itself--in other words, the benefit of the bargain-while consequential damages refer to economic harm beyond the immediate scope of the contract. Lost profits, under appropriate circumstances, can be recoverable as a component of either (and both) direct and consequential damages.

*Id.* (footnote deleted). The Court explained that the section bars "only the recovery of consequential lost profits, not direct lost profits." *Id.* The Court held that the section did not bar direct damages:

> Section 13 says that no consequential damages are recoverable, "includ[ing]" lost profits; it simply does not speak to direct damages, or to lost profits recoverable under such a theory.

*Id.*

Similarly, the Limitation of Liability clause in the UC Contract bars only "incidental, indirect, special, punitive, consequential or similar damages." A14 §11. This part of the Limitation of Liability clause <u>does not</u> bar recovery of either <u>general</u> or <u>direct</u> damages. The rest of the Limitation of Liability clause, after the word "including" gives examples of "incidental, indirect, special, punitive or similar damages" and further provides that these "incidental, indirect, special, punitive or similar damages" may not be recovered through another theory ("whether such liability is predicated on contract, strict liability or any other theory"). *Id.* The Limitation of Liability clause further provides that it does not matter whether a party was advised of the possibility of such damages, *i.e.*, "incidental, indirect, special, punitive or similar

CHIC_1666821.11

damages" ("without regard to whether such party has been advised of the possibility of such damages"). *Id.*

In the breach of covenant of good faith and fair dealing, civil conspiracy and unfair and deceptive practice claims, Parus seeks only general or direct damages. For example, for Intermedia's breach of covenant of good faith and fair dealing,[11] Parus is entitled to recover either <u>general</u> damages (including "benefit of the bargain"). Upon proof of an intentional breach and need to discourage the conduct engaged in by Intermedia, <u>direct</u> tort damages. *Emerson Radio Corp. v. Orion Sales, Inc.*, 253 F.3d 159, 169-172 (3d Cir. 2001) (Plaintiff is entitled to recover expectation damages for breach of covenant of good faith and fair dealing). *Rawlings*, 151 Ariz. at 159, 726 P.2d at 575 ("when the provider of the service fails to provide the very item which was the implicit objective of the making of the contract, then contract damages are seldom adequate, and the cases have generally permitted the plaintiff to maintain an action in tort as well as in contract.") Parus seeks and is entitled to recover <u>direct</u> damages on the civil conspiracy claim. Finally, Parus is entitled to recover <u>direct</u> damages caused directly to Parus by Intermedia's intentional violation of unfair and deceptive trade practices statutes. Additionally, the Bankruptcy Court's construction of the Limitation of Liability clause is also improper because it would make the covenant of good faith and fair dealing unenforceable. Parties to a contract are not permitted to disclaim the covenant of good faith and fair dealing. *Union Oil Company of California v. John Brown E&C*, 1995 WL 354250 *2 (N.D. Ill. 1995) (Parties to a contract "may not be permitted to disclaim the covenant of good faith…"). Similarly, by construing the Limitation of Liability clause to preclude Parus' civil conspiracy claim, the Court read that clause to permit Intermedia to engage in an intentional tort with impunity. This, too, violates public policy. *E.g., Baker Pacific Corp. v. Suttles*, 220 Cal. App.3d 1148, 1154, 269 Cal. Rptr. 709 (Cal. Ct. App. 1990). Finally, in reading the Limitation of Liability clause to bar Parus' claim for violation of the unfair and deceptive trade practice statute the Court ignores law holding that parties to a contract may not disclaim liability for violations of a statute which (like the unfair and deceptive trades practices statutes here) are intended to protect both individuals and the public. *See, e.g., Voicestream Wireless Corp. v. U.S. Communications, Inc.,* 912 So. 2d 34, 38 (Fla. 2005) ("However, a party cannot waive liability imposed by

---

[11] Under the controlling Arizona law, a covenant of good faith and fair dealing is implied in every contract. *Rawlings v. Apodaca*, 151 Ariz. 149, 153, 726 P.2d 565, 569 (1986) (*en banc*).

CHIC_1666821.11

statutory provisions that are intended to protect both an individual and the public because to do so would be contrary to public policy.")

Accordingly, summary judgment dismissing breach of covenant of good faith and fair dealing civil conspiracy and unfair and deceptive practice claims against Intermedia should be reversed.

The Bankruptcy Court Committed Several Errors In Dismissing Parus' Tortious Interference With Contract Claim Against WorldCom

The Bankruptcy Court erroneously subdivided actions relating to WorldCom's interference into "pre-merger" wrongdoing and "post-merger" wrongdoing and then committed further errors in finding that WorldCom was not liable for any of this wrongdoing.  A3395.  The Bankruptcy Court dismissed pre-merger wrongdoing because it ruled – in error –  that "the only evidence" of interference was that Intermedia was opening only accounts for its sales representatives and executives.  A3395.  The Bankruptcy Court ruled that this activity failed to satisfy the breach requirement for the tortious interference claim because Intermedia did not need to honor its obligations under the UC Contract as long as it paid minimum reconciliation payments.  A3395-A3396.  The Bankruptcy Court wrongly held that WorldCom's post-acquisition interference was privileged.  A3396-A3398.

**1.    The Bankruptcy Court Erred When It Failed To Recognize That There Is No Privilege For Interferences Which Began Before The Acquisition**

The Bankruptcy Court's analysis is flawed because it ignored longstanding authority holding that a defendant may not claim parent-subsidiary privilege with respect to a conspiracy that <u>began</u> prior to the acquisition even if it continued after.  *Metropolitan Life Ins. Co. v. La Mansion Hotels & Resorts Ltd.*, 762 S.W. 2d 646, 652 (Tex. Ct. App. 1988) (no privilege where parent did not acquire subsidiary until a month after alleged conspiracy began); *Dozier & Gay Paint Co. v. Dilley*, 518 So. 2d 946, 950 (Fla. Ct. App. 1988) (shareholders of a recently formed corporation can be sued for civil conspiracy where the corporation was not in existence at the time of the alleged conspiracy).  Accordingly, the issue with respect to privilege is whether, with all reasonable inferences drawn in favor of Parus, there is evidence that the conspiracy <u>began</u> before WorldCom acquired Intermedia.  It does not matter if Intermedia <u>breached</u> the UC Contract prior to the acquisition date.  Here the evidence demonstrates that WorldCom's and Intermedia's tortious conspiracy <u>began</u> prior to the acquisition <u>and</u> that, as a result, Intermedia repeatedly breached the UC Contract prior to the acquisition date.  Accordingly, here, too, the Bankruptcy Court's ruling is wrong on the facts and wrong on the law.

30

2.     **The Bankruptcy Court Erroneously Found Privilege Even Though WorldCom And Intermedia Lacked The Required Unity Of Interest And WorldCom's Ability To Lawfully Control Intermedia Was Restricted**

First, the Bankruptcy Court failed to address the threshold question whether privilege applied at all. It is fundamental that for the parent-subsidiary privilege to apply, WorldCom and Intermedia must have had a complete unity of interest. *Halloway v. Skinner*, 898 S.W. 2d 793, 797 (Tex. 1995) ("When there is a complete identity of interest [between the party to the contract and the alleged tort feasor there can be no interference as a matter of law"); *Waste Conversion Systems, Inc. v. Greenstone Industries, Inc.*, 33 S.W. 3d 779, 782 (Tenn. 2000) ("*Forrester* indicates that Tennessee has recognized a privilege against interference of contract claim when there is unity of interest between the interfering party and the breaching party.").

Intermedia and WorldCom did not have a unity of interest and or control during nearly the entire period of the interference. Specifically, the interfering activities began prior to the acquisition date of July 1, 2001, when Intermedia and WorldCom did not have the required unity of interest and control. A prospective parent does not have a privilege before its acquisition is completed. *See Freeman Management Corp. v. Shurgard Storage Centers, LLC*, 461 F. Supp. 2d 629, 638-39 (M.D. Tenn. 2006) (Prospective parent and subsidiary did not have a complete unity of interest or control prior to acquisition to invoke privilege).

Intermedia and WorldCom also did not have the required unity of interest or lawful control after the acquisition as the result of the D.C. Court Hold Separate Order. Under the D.C. Court Hold Separate Order, WorldCom was legally obligated to preserve Intermedia's assets until Intermedia was divested. A3102-A3111. In addition, the D.C. Court Hold Separate Order severely restricted WorldCom's control over Intermedia. WorldCom's interest was to best served in destroying the UC Contract so as to eliminate the UC Product which was going to be in competition with WorldCom's genD product. Intermedia's best interest, in sharp contrast, was served in proceeding with the commercial launch of the UC Product because after divesture from WorldCom the genD product would not be available to Intermedia. Thus, Intermedia and WorldCom did not have a unity of interest or control which are the cornerstones of the parent-subsidiary privilege and privilege does not apply.

3.     **Contrary To The Bankruptcy Court's Ruling, WorldCom's Interference Did Cause Intermedia To Breach The UC Contract**

Contrary to the Bankruptcy Court's ruling, there is no rule of law that excuses non-performance of contractual obligations because the agreement provides for minimum payments.

CHIC_1666821.11

Failure to perform under an agreement is actionable breach even if there are minimums and even if the minimums are paid. The Third Circuit in *Emerson Radio Corp. v. Orion Sales, Inc.*, 253 F.3d 159 (3d Cir. 2001), addressed the issue of whether payments of minimums provided for in an agreement exempted a party who did not perform its obligations under the agreement from damages for nonperformance. The district court dismissed plaintiff's claim for breach of implied covenant of good faith and fair dealing because plaintiff although did not perform as expected under the agreement it paid the required minimums. The Third Circuit reversed. The Court found that the minimum payments in the agreement constituted *"minimum* expectations" and ruled that the failure to perform under the contract was a breach and that plaintiff could recover damages for its <u>actual</u> reasonable expectations to the extent that they exceeded the minimums specified in the agreement. *Id.* at 171-172. *See also Badger Pharmacal, Inc. v. Colgate-Palmolive Co.,* 1 F.3d 621, 630 (7th Cir. 1993).

Similarly, in the present case, the parties entered into the UC Contract with reasonable expectations which far exceeded the minimums specified in the UC Contract. A2299 at ¶7; A2970-A2971. The minimums were set out only as the worst case possibility. Accordingly, WorldCom's interference gives rise to damages well beyond the "minimum" floors.

### 4. The Bankruptcy Court Erred When It Failed To Rule That Any Privilege Was Lost When WorldCom Acted Contrary To Intermedia's Interest

The Bankruptcy Court acknowledged that the law imposes two exceptions to the applicability of a privilege: (1) the interference was contrary to subsidiary's economic internet and (2) "wrongful means" was used in connection with the interference. (Opinion pp. 30-31), but then proceeded to ignore facts showing that each of these exceptions applies here. Regarding the first exception to privilege, the Bankruptcy Court ignored that WorldCom's interference with the UC Contract was detrimental to Intermedia. The breach of the UC Contract subjected Intermedia to damages for breach of contract and to related claims and it deprived Intermedia of an important asset – the UC Product – which was of great commercial importance to Intermedia. The loss of UC Product was especially detrimental to Intermedia because, under the D.C. Court Hold Separate Order, the portion of Intermedia which was responsible for the UC product was to be divested from WorldCom. A3102-A3111. Therefore, Intermedia lost a critical asset and, since it was divested from WorldCom, it could not use the WorldCom's competing UC product – genD.

### 5. The Bankruptcy Court Erred When It Found No "Wrongful Means" Despite Evidence That WorldCom's Interfering Actions Were In

32

**Violation Of A Federal Court Order And In Violation Of Unfair And Deceptive Trade Practices Acts**

The Bankruptcy Court denied the "wrongful means" exception on the ground that "Parus filed to meet the necessary burden to show that WorldCom utilized wrongful means. The Court's ruling is in error because WorldCom's interference violated both a federal court order – the D.C. Court Hold Separate Order – and governing statutory law – the unfair and deceptive trade practices acts.

While the D.C. Court Hold Separate Order required WorldCom to maintain assets of Intermedia, WorldCom's interference with the UC Contract caused the total destruction of Intermedia's assets relating to valuable UC products. There should be no question that an interference in violation of a federal court order is a wrongful act.

The Bankruptcy Court likewise failed to consider that WorldCom's violations of Unfair and Deceptive Trade Practices Acts are "improper means" which defeat any possibility of privilege. *See Teraforce Technology Corp. v. Vista Controls, Inc.*, 2007 WL 3377441, at *8-9 (Bankr. N.D. Tex.) (Defendant's deceptive acts which would violate Unfair and Deceptive Trade Practices Act are "improper means" which defeats privilege).

Accordingly, the Bankruptcy Court's summary dismissal of Parus' tortious interference claim against WorldCom should be reversed.

**C.    The Bankruptcy Court Erred When It Dismissed Parus' Civil Conspiracy Claim Against WorldCom**

The Bankruptcy Court dismissed Parus' civil conspiracy count against WorldCom based on three alternative reasons, each of which fails for the reasons separately addressed below.

**1.    Contrary To The Bankruptcy Court's Ruling, The Limitation Of Liability Clause Does Not Bar Direct Damages For Civil Conspiracy**

The first reason given by the Bankruptcy Court is that since the Limitation of Liability clause purportedly bars all non-contractual claims against Intermedia, therefore, according to the Bankruptcy Court, Intermedia could not be a co-conspirator of WorldCom. A3393 ("WorldCom cannot be guilty of conspiracy but guilty of conspiracy since there would be no second party with whom to conspire"). The Bankruptcy Court's ruling is in error because as discussed on pages __- __ of this brief, the Limitation of Liability clause <u>does</u> <u>not</u> bar all non-contractual claims.[12]

---

[12] Even assuming, *arguendo*, that the Limitation of Liability clause provided a defense to <u>Intermedia</u> against a conspiracy claim, it would not excuse *WorldCom* from liability for civil conspiracy because there is no rule of law that limits recovery against one co-conspirator merely because another is immune.

CHIC_1666821.11

Rather, the Limitation of Liability clause precludes the use of other theories to recover "incidental, indirect, special, punitive, consequential or similar damages." A14 §11. The Limitation of Liability clause does not preclude recovery of <u>general</u> or <u>direct</u> or damages under any theory. *See Penncro*, 499 F.3d at 1156 (the term "including" introduces examples of the groups identified before it).

The Bankruptcy Court's second reason for its ruling is that the an agreement between Intermedia and WorldCom to intentionally breach the UC Contract is "not tortious nor a breach" because the UC Contract provided for minimum payments. A3393. The Bankruptcy Court's ruling that third parties are free to conspire to intentionally breach a contract as long as the contract has a minimum payment clause defies both common sense and controlling law. The existence of a minimum payments clause does not preclude the injured party from recovery for breaches of the contract, including breach of good faith and fair dealing obligation. *Emerson*, 253 F.3d at 169-172. Here, the Bankruptcy Court's logic is especially flawed in that it overlooks that Intermedia <u>never paid the minimums</u> and that the civil conspiracy produced a total breach of the UC Contract entitling Parus to damages giving it the full benefit of its bargain.

> **2.    Contrary To The Bankruptcy Court's Ruling, The Conspiracy Was To Eliminate Parus' UC Product As Competition For WorldCom's genD Product, Not Merely To Breach The UC Contract**

The Bankruptcy Court erroneously characterized Parus' civil conspiracy claim as being limited to breaching the UC Contract. A3393. ("even if WorldCom and Intermedia had an agreement to breach UC Contract, the existence of such an agreement does not, by itself rise to the level of civil conspiracy"). In fact, the conspiracy went beyond merely breaching the UC Contract. Intermedia concealed its intention not to perform so that it could prevent Parus from partnering with another company. The goal of the conspiracy was to keep Parus bound by the UC Contract while WorldCom and Intermedia subverted that contract. Their ultimate goal was to deprive Parus of anticipated revenues from the UC Contract and force Parus into bankruptcy. WorldCom was in negotiations with Parus and knew Parus' financial status, and knew that the revenues Parus anticipated from the UC Contract were a significant part of Parus' total expected revenues. WorldCom, in the meantime negotiated an agreement with Parus which provided that, in case of a bankruptcy by Parus WorldCom would still get Parus' technology relating to the UC Product. A 2594-A2609 at A2609.

Accordingly, the Bankruptcy Court's summary judgment on Parus' civil conspiracy claim against WorldCom is in error and should be reversed.

CHIC_1666821.11

**D.    The Bankruptcy Court Erred When It Summarily Dismissed Parus' Unfair And Deceptive Trade Practices Against WorldCom On *Sua Sponte* Grounds**

The Bankruptcy Court dismissed Parus' unfair and deceptive trade practices claim on a *sua sponte*[13] theory that a clause in the UC Contract for minimum reconciliation payments and a clause for liquidated damages in case of premature cancellation by Intermedia immunized WorldCom from Parus' claim under the unfair and deceptive trade practices acts.  A3400-3401. The Bankruptcy Court did not cite any legal authorities for this astounding ruling.  None of the briefs filed by WorldCom and Intermedia include any authorities which would support this conclusion.  Prior to ruling the Bankruptcy Court gave Parus no opportunity to respond to this new argument.  Indeed, neither WorldCom nor Intermedia advocated the theory relied upon by the Bankruptcy Court in any of their briefs.[14]  By advocating for WorldCom, the Bankruptcy Court ceased to be a neutral arbiter, as due process required.  Moreover, the Bankruptcy Court's reasoning was substantially flawed.

**1.    Parus' Deceptive Practices Claim Is Based On WorldCom's Scheme To Eliminate The UC Product As Competition For WorldCom's genD Product, Not Merely To Breach The UC Contract**

As noted above as to civil conspiracy, Debtors' goal was to keep Parus bound to the UC Contract while they subverted Parus' interest.  The Plan was to force Parus into bankruptcy, while reaping the benefit of Parus' technology because of WorldCom's agreement.

In *Teraforce*, a Texas bankruptcy court found that defendant's actions concealing its intent not to perform under agreements it had with a plaintiff designed to prevent that plaintiff from finding a new partner was "deceptive" and, if proven, would satisfy the statute.  2007 WL 3377441 at *12.

Similarly, here, WorldCom's scheme was "deceptive," in violation of unfair and deceptive trade practice statutes.

**2.    Untriggered Provisions In The UC Contact To Which WorldCom Is Not A Party Do Not Immunize WorldCom From Unfair And Deceptive Trade Practices Statutes**

---

[13] Intermedia's and WorldCom's summary judgment motions were based on the argument that Intermedia was not a seller of goods or services.  As pointed out in Parus' response brief, this argument was contrary to the controlling case law.  A1284-1286.

[14] To the contrary, WorldCom argued that it should not be liable because it was <u>not</u> a party to the UC Contract.  A1225.

CHIC_1666821.11

The Bankruptcy Court also excused WorldCom from actions for deceptive trade practices based on its application of the UC Contract.  However, because WorldCom was not a party to the UC Contract it could not rely on the UC Contract to absolve itself of statutory liability. Additionally, neither of the provisions relied on by the Bankruptcy Court to excuse WorldCom were invoked even by Intermedia during the term of the UC Contract.  Intermedia did not terminate early under §5.4 and Intermedia did not pay any reconciliation payments under §5.3. Third, the existence of "minimums" required by a party in a contract does not bar a counterparty's recovery of damages proven to be in excess of these minimums, even if the minimums are paid.  *Emerson*, 253 F.3d at 169-172 (Plaintiff is entitled to recover damages to the extent they exceed the minimums specified in the contract and paid by defendant).  Here, of course, there was no payment.

Accordingly, summary judgment with respect to Parus' unfair and deceptive trade practices claim should be reversed, as well.

### E.    The Bankruptcy Court Erred When It Failed To Impose Sanctions For Debtors' Spoliation

The Bankruptcy Court committed reversible error by failing to grant Parus any relief arising from Debtors' spoliation of material and critical evidence, which spoliation occurred, at least in part, long after Debtors' knew of this suit and years after they knew of their duty to preserve documents related to Parus.  As such, the Bankruptcy Court effectively rewarded Debtors for destroying evidence.  Indeed, the Bankruptcy Court punished <u>Parus</u> at times for not having evidence when such evidence was or might have been destroyed by Debtors.

As part of its response to the Debtors' summary judgment motion, Parus submitted the declaration of its counsel, Robert S. Friedman, in support of its argument that the Debtors' motion was premature in light of Federal Rule of Civil Procedure 56(f) because of the vast amount of discovery Debtors had failed to produce (the "Friedman Declaration").  A1310-A2285.  According to the Friedman Declaration, at the time the Debtors filed their motion for summary judgment, Debtors had yet to provide Parus with discovery on, among other things, the following pertinent subjects:

- Information concerning the drafting and negotiation of the UC Contract, which could shed light on the parties' intent with regard to a number of provisions in the UC Contract, including, but not limited to, the Limitation of Liability clause, pricing, and the termination provision.  A1312-A1313.

- Information concerning the actions and statements of WorldCom and Intermedia personnel concerning, among other things, the UC Contract in 2000 and 2001. A1313.

36

- Information concerning discussions among WorldCom and Intermedia personnel related to the UC contract, including, but not limited to, discussions regarding the cessation of the UC Contract in 2000 and 2001. *Id.*

- Information regarding the WorldCom's products and applications which were competitive with the EffectNet product, including, but not limited to, genD. *Id.*

After Parus made further attempts at obtaining discovery from the Debtors, it became clear that the reason the Debtors continued to stonewall Parus' legitimate discovery requests was because the Debtors had, in fact, destroyed material and responsive documents. (*See* Parus' Motion for Relief Resulting from the Debtors' Spoliation of Evidence. A2887-A3366).

Where one has a duty to preserve documents, the failure to do so constitutes spoliation. *See, e.g., Zubulake v. UBS Warburg*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) ("*Zubulake IV*"); *Zubulake v. UBS Warburg*, 229 F.R.D. 422, 431 (S.D.N.Y. 2004) ("*Zubulake V*").

The duty to preserve evidence arises when the party has notice that the evidence is relevant to litigation when a party should have known that the evidence may be relevant to future litigation. *Zubulake IV*, 220 F.R.D. at 216 (quoting *Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001)). Indeed, a duty to preserve can arise before a claim is filed by a claimant, as occurred in *Zubulake IV. Id.*

On November 4, 2005, the Debtors provided a privilege log to Parus. A3028-A3069. This shows that, as of March 23, 2001, Debtors already were preparing documents that they claimed to be subject to the attorney-client privilege which related to "claims by EffectNet," the predecessor to Parus, showing that Debtors were aware at that time the possibility of future litigation with Parus. A2908.

Moreover, as of May 2001, Debtors were withholding documents pursuant to the work product privilege, a privilege that indicates documents are being prepared in anticipation of litigation or for trial. *See Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 210 F.R.D. 506, 509 (S.D.N.Y. 2002); *Houlihan v. Marriott International Inc.*, No. 00 Civ. 7439 (RRC), 2003 WL 22271206 at *2 (S.D.N.Y. Sept. 30, 2003).

Despite this, the Debtors did not put in place any litigation "hold," as was required. *See, e.g., Broccoli v. Echostar Com. Corp.*, 229 F.R.D. 506, 510 (D. Md. 2005); *Zubulake IV*, 220 F.R.D. at 218, *Zubulake V*, 229 F.R.D. at 431; *Ruta v. Delta Airlines*, 324 F. Supp. 2d 524, 528 (S.D.N.Y. 2004).

Indeed, the outside counsel for Debtors testified that he did not request any litigation hold until Fall 2004, almost 2 years after Parus had already filed its claim. A2915, A3116-A3117. Even this assertion is dubious. Julio Valdez, who was in charge of implementing litigation holds

37

for Debtors, testified that he never was told to put a litigation hold regarding any materials as to Parus.  As he testified:

> A.  My team implements litigation holds based on a request by one of several organizations within the company to save all current e-mail on a system for a specific user and also make copies of those e-mails as they enter or leave the account in the future.

> Q.  And did you ever implement a litigation hold with respect to Parus?

> A.  I did not.  My team may have but not for Parus that I know of.

A3172; *see also* A3154-3155.

Indeed, Debtors' representatives testified that substantial documents and sources of discovery were destroyed even after Parus sent its demand letter on March 12, 2002 and after it filed its proof of claim on January 8, 2003.  Courts have held that a duty to preserve relevant evidence arises as soon as a party sent a demand letter.  *See Ruta*, 324 F. Supp. 2d at 526-27; *Consol. Aluminum Corp. v. Alcoa, Inc.*, No. 03-1055-C-M2, 2006 U.S. Dist. LEXIS 66642, at *12, n. 8 (M.D. La. July 19, 2006).  Despite this obligation, in April and May 2003 Intermedia, for example, closed its data center and much of the equipment that was there was dismantled. Among the things Intermedia disposed of were some 250 of its 300 computer servers.  *See* A3135, 3138-39, 3170.  Debtors also disposed of the exchange e-mail server and otherwise failed to preserve e-mails.  A3150-51, A3158-59.

In 2006, Debtors decommissioned the two remaining servers that had information on them regarding Parus.  A3139-40, A3149, A3152.

Because the servers had been destroyed, even any back tapes that remained cannot be read.  A3150-51.  Where records are not retained in an accessible format, courts have held that this violates an entity's preservation obligations.  *See Treppel v. BioVail Corp.*, 233 F.R.D. 363, 372 n.4 (S.D.N.Y. 2006).

Moreover, in destroying such documents of Intermedia, Debtors failed to comply with the MCI Document Retention Policy, which governed.  A3196-A3339.  This Policy specified that there was to be no destruction of records while a records program of an acquired company is being evaluated by WorldCom/MCI following a merger.  A3273.  The Policy also provided specific steps as to decommissioning that were not followed here.  A2946; A3280.[15]

---

[15] By destroying records of Intermedia, Debtors also violated the D.C. Court's Hold Separate Order, which required WorldCom to preserve and hold separate Intermedia's records until the order – a 10-year order – expired or until one year after divestiture was completed, which never occurred.  A1200 at 3(c).

CHIC_1666821.11

Here, Debtors' actions unquestionably constituted spoliation. "Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999).

Courts in the Second Circuit have broadly defined relevant evidence for purposes of spoliation as "evidence having *any* tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Residential Fund.Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 109 (2d Cir. 2002) (emphasis in original) (citing Federal Rule of Evidence 401). Courts are willing to infer the relevance of unpreserved evidence upon a showing of gross negligence. *Phoenix Four, Inc. v. Strategic Res. Corp.*, No. 05 Civ. 4837(HB), 2006 WL 1409413, at *4 (S.D.N.Y. 2006). Indeed, the Second Circuit has cautioned against "holding the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed evidence," explaining that doing so would "subvert the prophylactic and punitive purposes of the adverse inference . . . ." *Kronisch v. U.S.*, 150 F.3d 112, 128 (2d Cir. 1998). In fact, the Second Circuit has held that the "level of proof that will suffice to support an inference in favor of the innocent party on a particular issue <u>must be less than the amount that would suffice to survive summary judgment on that issue</u>." *Id.* (emphasis added).

In light of Debtors' spoliation, Parus should have been given the benefit of one or many of the sanctions that the Bankruptcy Court could and should have imposed. These include:

(a) dismissal of the culpable party's suit;

(b) summary judgment in favor of the prejudiced party;

(c) preclusion of the culpable party from giving testimony regarding the missing evidence, or

(d) an adverse inference instruction to the jury against the culpable party.

*Rutgerswerke AG v. Abex Corp.*, 2002 WL 1203836, *12 (S.D.N.Y. 2002). In addition, Parus should also have been awarded damages for the prejudice it suffered. *In re Kelsey*, Nos. 94-10415, 00-1034, 2001 WL 34050736, at *4 (Bankr. D. Vt. 2001).

Here, Debtors' intentional, wholesale destruction of relevant documents should have led the Bankruptcy Court to grant summary judgment in favor of Parus, the prejudiced party. *Golia v. The Leslie Fay Co., Inc.*, No. 01 Civ. 1111(GEL), 2003 WL 21878788, at *9 (S.D.N.Y. 2003). Instead, the Bankruptcy Court upended equity and granted summary judgment in favor of the party that caused the prejudice.

CHIC_1666821.11

Alternatively, the Bankruptcy Court should have denied Debtors' motion for summary judgment. *See also Metro. Opera Assoc., Inc. v. Local 100 Hotel Employ. & Rest. Employ. Int'l Union*, 212 F.R.D. 178, 220 (S.D.N.Y. 2003) (a default judgment was appropriate because of counsel's failure to advise client about discovery obligations including, duties as document retention and production.)

Even if the Bankruptcy Court were not prepared to dismiss Debtors' summary judgment motion entirely, at the very least awarded the mildest sanction and should have made adverse inferences in favor of Parus and against Debtors as to each issue on which a document had been destroyed, made inaccessible or otherwise not produced. *See Barosum v. NYC Housing Auth.*, 202 F.R.D. 396, 400 (S.D.N.Y. 2001) ("adverse inference sanction may also be predicated on bad faith, intentional misconduct or gross negligence"); *Broccoli*, 229 F.R.D. at 510 (adverse inference appropriate because of gross negligence); *Golia*, 2003 WL 21878788 at *11 (adverse inference); *Residential Fund. Corp. v. DeGeorge Fin. Corp.*, 306 F.3d at 109 ("a showing of gross negligence in the destruction or untimely production of evidence will in some circumstances suffice, standing alone, to support a finding that the evidence was unfavorable to the grossly negligent party"). "Where a party destroys evidence in bad faith, that bad faith alone is sufficient circumstantial evidence from which a reasonable fact finder could conclude that the missing evidence was unfavorable to that party." *Id.* at 109 (citing *Kronisch,* 150 F.3d at 126).

The appropriate adverse inferences that the Bankruptcy Court should have made but denied to Parus included:

- Intermedia manifested a clear intention to breach the UC Contract as early as July through September 2001, when it began canceling its accounts with Parus and firing its employees dedicated to the UC project, and therefore, anticipatorily repudiated the UC Contract.

- The parties did not intend for the Termination clause in § 5.3 of the UC Contract to limit Parus' damages to only the amounts that accrued as of March 2002.

- The parties did not intend for the Limitation of Liability clause to preclude Parus' damages, for breaches of Intermedia's covenant of good faith and fair dealing, civil conspiracy with WorldCom, or unfair and deceptive trade practices.

- Intermedia and WorldCom entered into an agreement, prior to WorldCom's acquisition of Intermedia, under which Intermedia would shut down the UC project and discontinue its performance under the UC Contract to foreclose any anticipated revenue to EffectNet and Webley under the UC Contract, thus allowing WorldCom to extract favorable concessions from Webley in their negotiations on the MASL.

- WorldCom engaged in "wrongful conduct" by obtaining Intermedia's agreement to shut down the UC project and discontinue its performance on the UC Contract,

40

so that WorldCom could exploit the resulting harm to Webley in its negotiation of the MASL WorldCom engaged in unfair and deceptive business practices by obtaining Intermedia's agreement to shut down the UC project and discontinue its performance on the UC Contract, so that WorldCom could exploit the resulting harm to Webley in its negotiation of the MASL.

Yet another available remedy for the spoliation of evidence is the exclusion of any testimony on the subject area of the missing evidence. *See Cine Forty-Second St. Theatre Corp. v. Allied Artists Pics. Corp.*, 602 F.2d 1062, 1068 (2d Cir. 1979) (exclusion of evidence). their grossly improper conduct.

Applying this law, the Bankruptcy Court's ruling on the Debtors' summary judgment motion without awarding sanctions pursuant to Parus' Spoliation Motion was a flagrant abuse of its discretion and a clearly erroneous determination. There can be no dispute that the topics outlined in Friedman's Declaration were directly relevant to all of the claims set forth in Parus' Claims. Yet, the Bankruptcy Court held in error that because it believed that it could decide the issues in the Debtors' summary judgment motion based upon the "plain language" of the UC Contract, it need not provide Parus with the opportunity to obtain discovery on its claims. Of course, as noted above, the Bankruptcy Court completely misapplied the UC Contract in adjudicating each of Parus' claims. Moreover, Parus' claims for civil conspiracy, tortious interference and unfair and deceptive trade practices did not depend on the contract language. Further, such contract language was irrelevant as to all of Parus' claims against WorldCom, as WorldCom was not a party to the UC Contract or able to rely on its terms.

The Bankruptcy Court also dismissed the Friedman Declaration as being speculative as to the discovery Parus expected to receive, but this put Parus in a Catch-22. Parus could not know with certainty what discovery it would obtain until it was given a chance to obtain this. The Bankruptcy Court erred in refusing to give Parus this chance.

In any event, the Bankruptcy Court gave no indication in its Opinion that it even considered Parus' Spoliation Motion. A3384. Certainly the Bankruptcy Court awarded no relief to Parus because of this. As a result, the Bankruptcy Court effectively awarded Debtors for their wrongdoing.

### F.     The Bankruptcy Court Erred When It Failed To Give The Benefit Of Reasonable Inferences To Parus

In their leading treatise on federal practice and procedure, Professors Wright, Miller and Kane note that, at all times in construing a summary judgment motion, a court is to give the benefit of all inferences to the nonmovant. As they explain:

CHIC_1666821.11

> Because the burden is on the movant, the evidence presented to the court always is construed in favor of the party opposing the motion and the opponent is given the benefit of all favorable inferences that can be drawn from it.

15A C. Wright, et al. FEDERAL PRACTICE AND PROCEDURE, § 2727 (3d ed. 1998) at 459.

When conflicts arise between facts evidenced by the parties, a court on summary judgment is to credit the non-moving party's version. *Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005). If, under any reasonable construction of the facts in evidence under any acceptable theory of law the party opposing the motion for summary judgment would be entitled to prevail, summary judgment is improper. *See Handgards, Inc. v. Johnson & Johnson*, 413 F. Supp. 921 (N.D. Cal. 1975).

Thus, in *United States v. Diebold, Inc.*, 369 U.S. 654 (1962) (*per curiam*), the United States Supreme Court reversed on direct appeal a district court's grant of summary judgment in an antitrust case for failure to give the nonmovant the benefit of inferences. As the Supreme Court stated:

> On summary judgment the inferences to be drawn from the underlying facts contained in such materials [– affidavits attached exhibits and depositions –] must be viewed in the light most favorable to the party opposing the motion. A study of the record in this light leads us to believe that inferences contrary to those drawn by the trial court might be permissible.

*Id*. at 655. Similarly in *Wright v. Coughlin*, 132 F.3d 133 (2d Cir. 1998), the United States Court of Appeals for the Second Circuit vacated a district court's grant of summary judgment as "improper" based on its finding that "the district court did not assess the record in the light most favorable to the non-moving party, Wright, and instead resolved disputed issues of fact by crediting Kelly's assertions." *Id*. at 138. *See also Odom v. Wal-Mart Stores, Inc.,* 32 F.3d 566 (5th Cir. 1994) (Table) (reversing grant of summary judgment because District court ignored inferences in favor of nonmovant).

Likewise, here, the Bankruptcy Court repeatedly failed to construe facts in the light most favorable to Parus or to grant Parus the benefit of favorable inferences to be drawn from the facts. The most egregious example of the Bankruptcy Court's failure here is with regard to its handling of Parus' unfair and deceptive trade practices act claim, where the Bankruptcy Court, *sua sponte,* raised an argument for denial of that claim that the Debtors themselves never raised and then found for Debtors on this basis without giving Parus any opportunity to marshal facts to disprove the Bankruptcy Court's theory. As noted before, the Bankruptcy Court here became Debtors' advocate and certainly did not accord Parus as nonmovant the benefits of favorable factual inferences, as the law required. This, alone, requires reversal.

CHIC_1666821.11

The Bankruptcy Court's failure to resolve disputed issues in favor of Parus or to otherwise give Parus the benefit of favorable inferences permeated the Bankruptcy Court's analysis of each claim.  With regard to Parus' breach of contract claim, for example, the Bankruptcy Court construed the letter from Robert McConnell, General Counsel of Parus, as having the legal effect of terminating the UC Contract.  Yet, Mr. McConnell's letter, by its express terms, does not terminate the UC Contract, but instead invites Intermedia to cure its defaults within 30 days.  Had Intermedia done so, the UC Contract would have remained in force.  When Mr. McConnell sent the letter, it was Intermedia's choice how to respond.  Yet the Bankruptcy Court ignored this possibility of cure.  It also disregarded Mr. McConnell's affidavit explaining his own intent, finding the author's own explanation of what he intended by his own letter to be somehow "conclusory."[16]

The Bankruptcy Court's failure to accord inferences for the benefit of Parus continued with regard to Parus' claim of anticipatory breach.  As noted above, on at least 10 separate occasions after the UC Contract was signed, Intermedia failed to perform a material task required by the UC Contract and then, when asked to cure its default and assure future performance, failed to do either.  Each of these instances evidences, not only a breach in itself by Intermedia of the UC Contract, but a manifest intent by Intermedia not to perform its future obligations under the UC Contract.  Yet the Bankruptcy Court found no breach whatsoever in any of these acts – whether they are considered separately or together – and, based on this erroneous finding, found there had been no manifest intent by Intermedia to not perform.  This disregarded overwhelming evidence, and again, cannot be squared with the Bankruptcy Court's duty to view all inferences in favor of Parus, the nonmovant.

With regard to Parus' tortious interference and civil conspiracy claims, the Bankruptcy Court denied Parus the benefit of favorable inferences as to when the interference began.  The facts show that WorldCom signed an agreement to purchase Intermedia in September 2000 but did not close on that purchase until July 2001.  In the interim, however, Intermedia ceased to enroll outside accounts under the UC Contract and only signed up as accounts a small number of internal personnel.  These numbers were far below Intermedia's minimum requirements specified in the UC Contract.  Particularly when considered in light of Intermedia's significant efforts prior to WorldCom's purchase to gear up to roll out the UC Product, the sudden about

---

[16] As Mr. McConnell's affidavit fully satisfied Fed. R. Civ. P. 56(e), the Bankruptcy Court also violated this Rule by striking it.

CHIC_1666821.11

face by Intermedia certainly gives rise to an inference that WorldCom – its new parent-to-be – was the cause of this about-face. Yet, the Bankruptcy Court found this not to be true, as a matter of law.

Similarly, the Bankruptcy Court ignored the inference favorable to Parus arising from WorldCom's treatment of Parus itself. WorldCom had created a rival product which was to compete with the UC product under the UC Contract – genD. WorldCom had negotiated with Parus for the opportunity to use Parus' UC technology in the event of a Parus bankruptcy. From that negotiation, WorldCom knew Parus was seriously short of cash. WorldCom also knew how important the intended revenue from the UC Contract was to Parus' continuing viability. Yet WorldCom, through its manipulation of Intermedia, caused the UC Contract to fail. Intermedia, under WorldCom's control, did not even make reconciliation payments to Parus that were plainly owed under the UC Contract. All of this behavior is consistent with an intent by WorldCom to benefit its own competitive product at Parus' expense, yet, again, the Bankruptcy Court found otherwise, as a matter of law.

Finally, with regard to spoliation of evidence, the Bankruptcy Court, without ever considering what could have been proven by the tens of thousands of documents covering multiple areas that the Debtors had destroyed, found, as a matter of law, that none of this evidence would have made any difference for Parus, based on its finding that WorldCom and Intermedia prevailed as a matter of law as to each substantive claim. This is circular reasoning; a court may only find that a movant prevails as a matter of law if it knows there is no possible set of facts which the nonmovant could prove otherwise. Here, the Bankruptcy Court could not have known this where it never addressed what the evidence destroyed by Debtors might have shown.

As in *Diebold, Wright*, and *Odom,* the Bankruptcy Court should be reversed because of its failure to accord favorable inferences in favor of Parus.

### G.    The Bankruptcy Court Abused Its Discretion By Denying Parus Relief Pursuant To Rule 56(f)

An appeal from a trial court's failure to follow Fed. R. Civ. P. 56(f), made applicable to the Bankruptcy Court through Bankruptcy Rule 7056, is reviewed under an abuse of discretion standard. *See B.F. Goodrich v. Betkoski*, 99 F.3d 505, 523 (2d Cir. 1996). Here, the Bankruptcy Court abused its discretion by proceeding to finally adjudicate Debtors' summary judgment motion even though Debtors had failed to produce tens of thousands of boxes of documents and other materials in their control and even though Parus had not been fully able to identify, much

44

less depose, the relevant representatives of Debtors who engaged in the wrongdoing at issue and who otherwise had knowledge of the critical facts here.

Below, Parus argued to the Bankruptcy Court that summary judgment was improper under Rule 56(f) because Parus had been denied a reasonable opportunity to make a record in order to properly oppose summary judgment. Parus supported this argument with a detailed listing of how Debtors had thwarted its attempts to take necessary discovery. It supplied the Friedman Declaration to support these claims and to stress the prejudice caused to Parus by these discovery denials.

As Parus advised the Court, Debtors had refused to provide any electronically-stored documents. A1259. While Debtors had originally identified 10,000 boxes of documents as potentially relevant, Debtors had produced only 8 of these boxes, a ridiculously small fraction. As Parus made clear, the areas on which Debtors had failed to produce discovery were directly relevant and included, among other things:

- Communications among the Debtors regarding the UC Contract.
- Documents reflecting any payments by Intermedia to Parus for any services provided by Parus under the UC Agreement or any documents concerning communications regarding payments to Parus.
- Documents concerning the cessation or termination of Intermedia's operations as they related to Parus.
- Documents concerning Parus from the files of related WorldCom entities.
- Documents concerning Debtors' evaluations or analyses of Parus' finances, business, technology or products.
- Documents relating to the WorldCom/MCI's genD initiative, a competitor to Parus' UC Product. A1259-60.

Despite this clear showing of obviously necessary discovery, the Bankruptcy Court improperly rejected Parus' Rule 56(f) argument. First, the Bankruptcy Court erroneously held that it could decide the issues based on the plain language of the UC Contract. As shown above, the Bankruptcy Court's ruling belies this belief and shows that the Bankruptcy Court seriously misconstrued the UC Contract. In addition, it was impossible for the Bankruptcy Court to decide definitively that no additional evidence would be helpful regarding the UC Contract where it gave Parus no opportunity to take discovery regarding or to submit additional documents showing what the parties' intent and understanding was as to the UC Contract.

Additionally, the Bankruptcy Court ignored that many of Parus' claims have nothing to do with the four corners of the UC Contract, including, as noted above, all claims against WorldCom, which was not even a party to the UC Contract and cannot avail itself of its benefits.

CHIC_1666821.11

This also includes Parus' claims directed at the misconduct that WorldCom engaged in either together with Intermedia or toward Intermedia including for tortious interference with contract, civil conspiracy and unfair and deceptive trade practices.

Second, the Bankruptcy Court rejected that Rule 56(f) was relevant because it determined that the Friedman Declaration was "speculative" because it could not state with certainty what discovery would be obtained. As noted above, this put Parus in a Catch-22. It also forgets that the essence of "discovery" is that one be given the chance to explore and "discover" documents and information he does not already have.

By so ruling, the Bankruptcy Court abused its discretion. Rule 56(f) "requires courts to ensure that parties have a reasonable opportunity to make their record before ruling on a motion for summary judgment." *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 945 F. Supp. 693, 706 (S.D.N.Y. 1996), *abrogated on other grounds*, *TVT Records v. Island Def Jam Music Group*, 412 F.3d 82 (2d Cir. 2005). "[Because Rule 56(f)] is a safeguard against premature grants of summary judgment, [it] 'should be applied with a spirit of liberality.'" *Bonnie & Co. Fashions, Inc.*, 945 F. Supp. at 706, citing 10A C. Wright et al. FEDERAL PRACTICE AND PROCEDURE § 2340. *See also Celotex v. Catrett*, 477 U.S. 317, 326 (1986) (Rule 56(f) "allows a summary judgment motion to be denied, or the hearing on the motion be continued, if the nonmoving party has not had an opportunity to make full discovery"). This is particularly true where, as here, "most of the allegedly material facts are largely or exclusively in the possession of Defendants." *Berne Street Enterprises, Inc. v. American Export Isbrandtsen Co.*, 289 F. Supp. 195, 196-97 (S.D.N.Y. 1968).

Moreover, Rule 56(f) makes it appropriate to deny a summary judgment motion where, as here, a movant fails to comply with the nonmovant's discovery requests. *See Carter v. AT&T Communications*, 759 F. Supp. 155, 160 (S.D.N.Y. 1991). Thus in *Glen Eden Hospital, Inc. v. Blue Cross & Blue Shield of Michigan*, 740 F.2d 423, 428 (6th Cir. 1984), the Sixth Circuit held that a district court had abused its discretion in denying a nonmovant the right to seek discovery that was uniquely in the possession of the movant. As the Sixth Circuit stated:

> We conclude that the district court did abuse its discretion in declining to permit Glen Eden to conduct further discovery. Blue Cross had not been extremely forthcoming in response to Glen Eden's requests. The inactivity during the period of the interlocutory appeal did not indicate that Glen Eden had completed its discovery on all issues in the case. The Rule 56(f) affidavit clearly pointed out the areas in which Glen Eden was seeking further information based on facts within the possession of Blue Cross. Under these circumstances we will leave summary judgment was premature with respect to Glen Eden's [antitrust] claim.

CHIC_1666821.11

Likewise, here, Debtors "had not been extremely forthcoming" in response to Parus' requests, to say the least. *See also Tonnas v. Stonebridge Life Insurance Co.*, 78 Fed. Appx. 966 (5th Cir. 2003) (reversing district court because it denied nonmovant's motion to take two additional depositions where nonmovant had she put court on notice before it granted summary judgment and explained why this additional discovery was necessary); *TMJ Inc. v. Nippon Trust Bank*, 16 Fed. Appx. 795 (9th Cir. 2001) (district court abused discretion by refusing nonmovant additional time to take depositions); *Shaw v. Coast Hotels*, 185 F.3d 868 (9th Cir. 1999) (table) (same). *Cf. Simon v. Safeway*, 2007 WL 41141194 (Ariz. App. Dec. 20, 2007) ("The trial court abused its discretion in denying Simon's Rule 56(f) motion for additional disclosure on the issue of whether a master-servant relationship existed between Safeway and Howard.") (applying Arizona law modeled on Federal Rule 56(f)).

The Bankruptcy Court's abuse of discretion with regard to Parus' request under Rule 56(f) is an additional independent ground for reversal.

## VIII.  CONCLUSION AND REQUEST FOR RELIEF

For reasons set forth above, Parus respectfully requests that this Court:

1.      reverse the grant of summary judgment;

2.      remand the case to the Bankruptcy Court with directions to enter judgment for Parus due to Debtors' spoliation.  Alternatively, this Court should at the very least remand with instructions that Parus be allowed to complete discovery and that Debtors pay damages to Parus resulting from Debtors' spoliation and have adverse inferences entered against them in connection with any trial on the merits.  This Court should also specify that, at any such trial, Parus should be given the opportunity to recover not only its actual and compensatory damages but also exemplary damages for Debtors' wanton and willful conduct and attorneys' fees for Debtor's violation of unfair and deceptive trade practices statutes.  This Court should also award Parus such other and further relief as its deems just and appropriate.

Dated:  January 4, 2008                    FOLEY & LARDNER LLP

By: _/s/ Jill L. Murch_

Robert A. Scher (RS 2910)
90 Park Avenue
New York, NY 10016
Phone:  (212) 682-7474

-and-

47

FOLEY & LARDNER LLP
Mark L. Prager
Steve Z. Szczepanski
David B. Goroff
Mary Jo Boldingh
Jill L. Murch (4535712)
321 N. Clark Street, Suite 2800
Chicago, IL 60610
Phone:  (312) 832-4500

Attorneys for Claimant Parus Holdings, Inc.
Successor-By-Merger to EffectNet, Inc. and
EffectNet, LLC

48

# EXHIBIT 1

Robert A. Scher (RS 2910)
FOLEY & LARDNER LLP
90 Park Avenue
New York, NY 10016
Phone: (212) 682-7474
Fax: (212) 682-2329
email: rscher@foley.com

-and-

Mark L. Prager (*admitted pro hac vice*)
William J. McKenna (*admitted pro hac vice*)
Jill L. Murch (*admitted pro hac vice*)
Joanne Lee (*admitted pro hac vice*)
FOLEY & LARDNER LLP
321 N. Clark Street, Suite 2800
Chicago, IL 60610
Phone: (312) 832-4500
Fax: (312) 832-4700
*Attorneys for Claimant Parus Holdings, Inc.
Successor-By-Merger to EffectNet, Inc. and
EffectNet, LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------x

In re                                        :

                                             :      Chapter 11 Case No. 02-13533 (AJG)

WORLDCOM, INC., et al.,                      :

                                             :      (Jointly Administered)

                        Debtors.             :

----------------------------------------------------x

**ORDER PARTIALLY GRANTING AND PARTIALLY DENYING DEBTORS' MOTION
FOR SUMMARY JUDGMENT AND MOTION TO STRIKE PORTIONS OF
AFFIDAVITS CONCERNING CLAIM 11242 (REPLACING 9291) AGAINST MCI
WORLDCOM COMMUNICATIONS, INC. AND CLAIM 11173 (REPLACING 9293)
AGAINST INTERMEDIA COMMUNICATIONS, INC.**

THE COURT has considered (i) Debtors' Motion for Summary Judgment (the "Summary

Judgment Motion") Against Parus Holdings, Inc. ("Parus"), Successor-By-Merger to EffectNet,

Inc. and EffectNet, LLC, in which Debtors sought summary judgment on Claim No. 11242

(replacing 9291) against MCI WorldCom Communications, Inc. ("WorldCom") and Claim No.

11173 (replacing 9293) against Intermedia Communications, Inc. ("Intermedia"); and (ii)

Debtors' Motion to Strike Portions of Affidavits Submitted in Support of Claimant Parus

Holdings, Inc.'s Response and Opposition to WorldCom's Motion for Summary Judgment (the

"Motion to Strike"). The Court also has considered the papers submitted in support of and in opposition to these motions and the arguments that the parties presented at oral argument to the extent such supporting and opposing papers were submitted and to the extent such oral argument was heard. For the reasons stated in the Court's Opinion Partially Granting and Partially Denying Debtors' Motion for Summary Judgment and Motion to Strike Portions of Affidavits, which was entered on May 2, 2007 (Docket No. 18853) (the "Opinion"), it is ORDERED that:

1.      The Debtors' Motion to Strike is granted in part and denied in part.

2.      With regard to Parus's breach of contract claim against Intermedia, the Debtors' Summary Judgment Motion is denied with respect to the Debtors' interpretation of "base monthly price."

3.      With regard to Parus's breach of contract claim against Intermedia, the Debtors' Summary Judgment Motion is granted with regard to the number of payments remaining under the November 20, 2000 Unified Communications Services General Agreement ("UC Contract"), the effect of the March 12, 2002 and March 25, 2002 letters of Mr. Robert McConnell, and the applicability of the Limitation of Liability clause contained in the UC Contract.

4.      The Debtors' Summary Judgment Motion is granted with regard to Parus's claims against Intermedia for unfair and deceptive trade practices, breach of the implied covenant of good faith and fair dealing, and civil conspiracy.

5.      The Debtors' Summary Judgment Motion is granted with regard to Parus's claims against WorldCom for civil conspiracy, tortious interference with a contract, and unfair and deceptive trade practices.

SO ORDERED                              **s/Arthur J. Gonzalez**
Dated: New York, New York              UNITED STATES BANKRUPTCY JUDGE
       October 3, 2007

2

**EXHIBIT 1**                                                    **A 04338**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------x
In re                                      :
                                           :          Chapter 11 Case No.
WORLDCOM, INC., et al.,                    :          02-13533 (AJG)
                                           :
                                           :          (Jointly Administered)
                          Debtors.         :
----------------------------------------------------x

## ORDER GRANTING DEBTORS' AMENDED
## MOTION FOR PARTIAL WITHDRAWAL OF
## CLAIM OBJECTION AND ALLOWANCE OF RESULTING CLAIM

THE COURT has considered Debtors' Amended Motion for an Order Permitting Partial Withdrawal of Claim Objection and Allowance of Resulting Claim (the "Motion") and the papers filed in support of the Motion. It is hereby ORDERED that:

1.     The Debtors' objection is withdrawn to the "Parus Claim," as such term is defined in Paragraph 2 herein, with respect to the issue of whether the "base monthly price" is the "basic service rate" of $11.45 or the "unlimited service rate" of $27.40 for purposes of calculating the four Reconciliation Payments (the "Remaining Issue") that this Court found to be owed under its May 2, 2007 Opinion Partially Granting and Partially Denying Debtors' Motion for Summary Judgment and Motion to Strike Portions of Affidavits (the "Opinion") (Docket No. 18853), and the unlimited service rate of $27.40 shall apply;

2.     Proof of Claim number 11173 (replacing 9293) against Intermedia Communications, Inc. filed by Parus Holdings, Inc., successor-by-merger to EffectNet, Inc. and EffectNet, LLC (the "Parus Claim") is hereby allowed in the amount of $926,844.27 and treated as a Class 12 claim under the Debtors' Modified Second Amended Joint Plan of Reorganization (the "Plan"); and

DB03/048629.0125/7754842.

**EXHIBIT 1**                                         **A 04339**

3.    Pursuant to the Court's statements on the record on July 10, 2007, the Court directs that all other pending motions are denied as moot.  The motions denied as moot are as follows:  (1) Motion of Claimant Parus Holdings, Inc. to Compel Production of Documents and to Extend Discovery Deadlines (Docket No. 16423); (2) Motion of Claimant Parus Holdings, Inc. for Relief Resulting from the Debtors' Spoliation of Evidence (Docket No. 18689); (3) Amended Motion of Parus Holdings, Inc. for Relief Resulting from the Debtors' Spoliation of Evidence (Docket No. 18935); (4) Debtors' Motion to Apply Bankruptcy Rule 7068 (Offer of Judgment) to the Proceedings on Claim Nos. 11242 (Replacing 9291) and 11173 (Replacing 9293); and (4) Debtors' Motion to Compel Parus Holdings, Inc. to Appear for a Properly Noticed Rule 30(b)(6) Deposition (Docket No. 18740).

SO ORDERED

Dated: New York, New York
         October 3, 2007


                              s/Arthur J. Gonzalez
                              HONORABLE ARTHUR J. GONZALEZ,
                              UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT 2

COPY

# EffectNet

# Unified Communications
# Services
# General Agreement
# For

# Intermedia Communications, Inc.

EXHIBIT 2                                    A 00004

# UNIFIED COMMUNICATIONS SERVICES GENERAL AGREEMENT

This Unified Communications General Agreement (the "Agreement") is entered into as of the 20 day of November 2000, ("Effective Date") by and between EffectNet LLC, a Nevada Limited Liability Company ("EffectNet") and Intermedia Communications, Inc. organized under the laws of The State of Delaware, with a business address at One Intermedia Way, Tampa, FL 33647 ("Intermedia") (collectively "Parties" or individually a "Party").

WHEREAS, Intermedia is Integrated Communications Provider providing telecommunication services including local dial tone, long distance, data services, etc.

WHEREAS, EffectNet is a unified communications application service provider that offers private label Internet and telecommunications products and services, including unified communications and other value-added services, in-house customer services, billing and technical support (the "EffectNet Services").

WHEREAS, EffectNet desires to provide Intermedia with a customized Intermedia-branded wholesale communications service ("Private Label") for sale by Intermedia to its end user customers (the services collectively hereinafter described as "Intermedia UC Services" or "UC Services").

WHEREAS, EffectNet and Intermedia recognize that the provision of Intermedia UC Services requires the Parties to closely work together to meet customer needs and to implement and ensure the commercial viability of the Intermedia UC Services.

NOW THEREFORE, in consideration of the promises and mutual agreements contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which the Parties acknowledge, the Parties agree as follows:

1.    <u>GENERAL PROVISIONS.</u>

1.1    Both Parties agree that EffectNet shall offer Intermedia UC Services for Intermedia as described in this Agreement. Intermedia will market the UC Services to Intermedia customers and end-users as it sees fit.   For purposes of this Agreement, the term "customers" shall include, but not be limited to wholesale and retail customers of Intermedia UC Services.

1.2    EffectNet may make changes to the EffectNet Services from time to time in order to improve, modify or extend the EffectNet Services ("EffectNet Changes"), but in no event shall such changes decrease the quality of the EffectNet Services provided to Intermedia. EffectNet will provide Intermedia with notice ninety (90) days in advance of the commercial release date of such changes.

1.3    The Parties shall use their best efforts to accomplish the initial launch of the Intermedia UC Services ("Initial Launch Date") by December 18, 2000.

1.4    Each Party shall promptly notify the other in writing of any event, which might result in such Party's inability to continue to meet its obligations under this Agreement.  Such event shall specifically include, but not be limited to, a materially adverse change in a Party's financial situation.  EffectNet acknowledges and understands that Intermedia is in the process of a merger involving all of its assets with MCI/Worldcom, Inc.  Such merger shall not, in and of itself, constitute an event requiring

**EXHIBIT 2**                                                                    **A 00005**

notice pursuant to this provision, and that, accordingly, no further notice of the merger or the consummation thereof, shall be required of Intermedia.

## 2.    OBLIGATIONS OF THE PARTIES.

2.1    Product Coordinator. EffectNet and Intermedia will each designate their own Product Coordinator to coordinate the process described below.

2.1.1    The designated Product Coordinators will be the principal points of contact between the parties on product issues (the "Product Advisory Process"). Each party may rely on the authority and technical competence of the other Party's Product Coordinator to represent its respective company in connection with the priorities, needs and progress of their company's product issues.

2.1.2    The Product Advisory Process will include in-person/telephonic/electronic communication between representatives, which should be ongoing, or occur not less than once each month during the Term of this Agreement, except if the parties expressly agree to some different frequency.

2.2    EffectNet Materials. EffectNet will provide Intermedia with regular access to and copies of the following:

2.2.1    Plans for current and future enhancements to the EffectNet Services which by their nature apply to the Intermedia UC Services; and

2.2.2    Functional descriptions, development plans, schedules and periodic status for enhancements to the EffectNet Services under development, as soon as such materials exist.

2.3    Product Development. Intermedia and EffectNet agree that the EffectNet Services provided to Intermedia will be the same version of the EffectNet Services generally made commercially available, unless Intermedia deploys modifications of the EffectNet Services in order to satisfy large blocks of customer/end users, provided, however, that EffectNet shall have no obligation to support Intermedia any modification not previously known to EffectNet.

2.3.1    Intermedia will implement new versions within 30 days with call avoidance measures built into the process, including but not limited to adequate customer notification of new features, benefits and the availability of training timed to coincide with the release of any new versions.

2.3.2    EffectNet will provide Intermedia with at least ninety (90) days advance notice of an expected new release or version of EffectNet Services.

2.4    Forecasts. Intermedia shall provide EffectNet with non-binding forecasts for expected mailbox activations, at minimum of once every two (2) months during the Term of this Agreement. Intermedia will also provide EffectNet with quarterly and annual non-binding forecasts of expected mailbox activations. The availability of platform capacity to be provided by EffectNet to Intermedia is conditioned on the platform capacity demand not exceeding the forecast provided by Intermedia for any period addressed by such forecast. With respect to timely provided mailbox activation forecasts only, EffectNet will use reasonable efforts to meet Intermedia's forecasted demand. However, EffectNet reserves the right to request additional guarantees from Intermedia when the forecasts provided by Intermedia require significant or unusual capital and cost

**EXHIBIT 2**

A 00006

by EffectNet. Intermedia is to provide the first of such forecasts to EffectNet on or before November 30, 2000. For purposes of this section EffectNet must allocate constrained capacity to Intermedia on terms at least as favorable as offered to any other customer of EffectNet. In the event that EffectNet declines orders because of capacity constraints, then EffectNet shall notify Intermedia and the Parties shall use commercially reasonable efforts to develop a solution that will provide Intermedia with a method of ensuring that the needs of Intermedia's existing and potential end users are met while ensuring that EffectNet is permitted to increase capacity in an orderly fashion.

2.5     Billing Cycle. On an every 15-day basis, EffectNet will invoice Intermedia for account fees for each account active during the previous 15 days and any late charges for previous outstanding invoices.

2.6     Payment. Intermedia will pay EffectNet in then available U.S. funds on a net-15 day basis.

2.7     Call Detail Records for Billing. Each day, EffectNet will provide to Intermedia Calling Detail Records ("CDR") on a timely basis, in a mutually agreed-upon electronic format.

2.8     Billings and Collections. Intermedia shall be responsible, at its sole expense, for all invoicing and collections with its customers, end-users, agents, subagents or resellers. EffectNet will not be responsible for any collections or bad debt by Intermedia's customers, end-users, agents, subagents or resellers 2.9   Fraud. Intermedia will be solely responsible for fraudulent misuse of the Intermedia UC Services due to credit fraud, fraudulently established accounts and stolen accounts (except to the extent if such theft occurs-through misuse or theft the records or facilities of EffectNet); provided that, Intermedia shall not be responsible for fraudulent misuse occurring after EffectNet has become aware of such occurrence; and, provided further, that the extent of Intermedia's liability to EffectNet for fraudulent misuse of Intermedia UC Services shall be EffectNet's direct damages and costs incurred. EffectNet shall notify Intermedia of fraud as soon as practicable, upon EffectNet's becoming aware of such fraud. The Parties will use commercially reasonable efforts to establish fraud control means and measures.

2.10    Customer Service Call Center and Technical Support. EffectNet shall maintain a customer service call center for its Intermedia customers and end-users, as appropriate in accordance with industry standards. This call center will be responsible for all customer support.

2.10.1 Call items outside the scope of EffectNet support services are: non-EffectNet related software problems and call forwarding issues.

2.11  Customer Fulfillment Process. Intermedia, when taking orders for new customers or end users, or taking orders to modify or update a customer's order, will use the EffectNet Customer Fulfillment Process or compatible process to gather the information required and to provide the customer information to EffectNet. Intermedia is responsible for providing to EffectNet such new mailbox account information reasonably required by EffectNet in order to activate a new mailbox. EffectNet shall provide documentation and training, in accordance with the training provision of this Agreement, to Intermedia on the EffectNet Customer Fulfillment Process.     2.12          Minimum Commitment. Intermedia hereby agrees to deliver a minimum 1,500 then current active subscribers on

**EXHIBIT 2**                                                                          A 00007

or before three (3) months after December 18, 2000 (the "Rollout Date"); an additional 1,500 then current active subscribers (total 3,000) on or before six (6) months after the Rollout Date; and additional 3,500 then current active subscribers (total 6,500) on or before nine (9) months after the Rollout Date; and 10,000 total then current active subscribers on or before twelve (12) months after the Rollout Date (the "Ramp Date"), and at the end of each calendar month thereafter ( the "Minimum Commitment") for the Term of this Agreement.

2.13    Reconciliation Payment. On the Ramp Date and at the end of each calendar month thereafter, EffectNet will calculate the actual number of then current active subscribers on the last day of such calendar month and compare it to the Minimum Commitment. If the number of subscribers is less than the Minimum Commitment for the month in question, such difference will constitute a "Volume Shortfall." Intermedia shall pay EffectNet a Reconciliation Payment equal to the Volume Shortfall multiplied by the base monthly price applicable to the Intermedia UC Service per subscriber,

## 3.    MARKETING AND BRANDING.

3.1    Web Presence.  At no additional charge, EffectNet will provide Intermedia with a private label website, URL links and related branding as reasonably directed by Intermedia.

3.2    Use of Trademarks, Service Marks and Trade names. The Parties agree not to display or use any of the trade names, service marks, brands or trademarks of the other Party, and shall not permit the same to be displayed or used by third parties, other than in connection with the sale, distribution or promotion of the brand(s) used for the Intermedia UC Services covered by this Agreement and subject to the prior written approval of the other or a third Party owning such trademark, service mark or trade name (except where such approval between the Parties is contained in this Agreement). In the absence of specific prior written consent from the other Party, a Party shall not use any part of any of the other Party's trade names, service marks, brands or trademarks as part of its own name, service marks or trademarks or in any other manner not so approved by the other Party.  It is expressly understood by both Parties that trade names, service marks and trademarks of the other party are proprietary and that nothing in this Agreement constitutes the grant of a general license to use said trade names, service marks and trademarks.  Upon termination of this Agreement, any and all rights or privileges of a Party to use the other Party's trade names, service marks, brands or trademarks shall expire, and each Party shall discontinue the use of the other Party's trade names, service marks, brands. The provisions of this section shall also apply to third party branding incidental to this Agreement.

3.3    Intermedia Marketing Expenses.  Intermedia as the buyer of the wholesale services from EffectNet, is responsible for all expenses and obligations incurred by Intermedia as a result of its efforts to attract and solicit customers for Intermedia UC Services. Intermedia expressly acknowledges that it is not entitled to any reimbursement by EffectNet for such expenses unless, and only to the extent that, both parties hereto agree in writing prior to the incursion of such expenses, as set forth in this Agreement.

**EXHIBIT 2**

A 00008

**4.    CHARGES AND BILLING STATEMENTS.**

4.1    Traffic- or usage-sensitive rates shall be computed in 30-second initial and 6-second continual increments.

4.2    Intermedia shall be responsible for all applicable taxes, including but not limited to sales or value-added taxes, utility or excise taxes, fees and/or surcharges that are imposed by federal, state, or local governments on the Intermedia UC Services or business generated by Intermedia through the sale of Intermedia UC Services as a result of long distance or services bundled within the Intermedia UC Services. Intermedia shall pay or reimburse EffectNet for all taxes collected or imposed on these services provided by EffectNet. The prices quotes in the following sections are exclusive of any and all taxes. Excluded from this responsibility are taxes based on EffectNet's net income. EffectNet shall comply with all federal and state regulations with respect to employee withholding taxes.

4.3    Pricing. Pricing shall be as indicated by Appendix "P" attached hereto.

4.4    Seven (7) working days post the close of the month, EffectNet shall provide to Intermedia a settlement statement ("Settlement Statement") providing a summary of charges for the previous month's billing cycle in an industry standard format. The settlement statement, unless specified elsewhere in this Agreement, shall contain the following:

4.4.1    A listing of monthly recurring charges for the current or prior month's billing cycle.

4.4.2    For calls or traffic originated by Intermedia or any customers, agents, sub-agents and/or end-users during the previous month, the individual call detail and the aggregate usage charge payable broken down by termination location.

4.4.3    For calls or traffic terminated by Intermedia or any customers, agents, sub-agents and/or end-users during the previous month, the individual call detail and the aggregate usage charge payable broken down by termination location.

4.4.4    Any taxes, fees and/or charges that are imposed by federal, state, and/or local governments.

4.4.5    The net amount payable by Intermedia to EffectNet or payable to Intermedia by EffectNet.

4.4.6    When applicable, any mutually negotiated additional fees.

4.5    Payment of the Settlement Statement shall be made within 15(fifteen) calendar days after the Settlement Statement and invoice are received by Intermedia (the "Due Date"). Payments to EffectNet shall be in United States dollars and are to be made for credit to an account of EffectNet to be determined by EffectNet and provided to Intermedia within three (3) days of the date of execution of this Agreement by the later signing party. If payment is not received by the Due Date, a late fee of the lesser of (a)

**EXHIBIT 2**                                                                      A 00009

one (1) percent per month or (b) the maximum percentage permitted by law shall be assessed on the delinquent balance of undisputed usage not paid by the Due Date.

4.5.1 Deposit. Intermedia has provided EffectNet with a fully refundable deposit in anticipation of this Agreement in the amount of minimum subscriber commitment multiplied times $17.50 (US dollars) for a total of $175,000. This deposit shall be refunded to Intermedia in whole on or before the Ramp Date as long as Intermedia has met the Minimum Commitment as of such date. If Intermedia has not met the Minimum Commitment as of the Ramp Date, EffectNet shall refund to Intermedia the full amount of the deposit less the Reconciliation Payment then due. The amount of such Reconciliation Payment shall remain on deposit until such time as the Minimum Commitment is met.

4.5.2 In the event that Intermedia disputes any charge assessed by EffectNet, the Parties agree to cooperate to resolve the dispute at the earliest practicable date. The late charges set forth in Section of this Agreement shall not apply to payments that are the subject of a good faith dispute between EffectNet and Intermedia. If there is a good faith dispute, EffectNet cannot demand a late payment deposit.

5.  **TERM AND TERMINATION.**

5.1     Term. Unless otherwise terminated as provided herein, this Agreement shall be in force for an initial term of three (3) years after the Effective Date (the "Initial Term"). This agreement shall continue automatically for successive one year terms under the same terms and conditions contained herein together with any subsequent amendments hereto, unless either Party has sent written notice of its intent not to renew the Term at least thirty (30) days prior to the expiration of the Initial Term or the renewal period then in effect.

5.2     Termination. Either Party may terminate this Agreement:  (a) if the other Party fails to fulfill any of its material obligations under this Agreement; (b) if the other Party is in breach of Section 7 (Confidentiality); (c) if the other Party becomes insolvent or admits in writing its inability to pay debts as they mature, or makes an assignment for the benefit of creditors; or (d) if a petition under any foreign, state or United States bankruptcy act, receivership statute, or the like is filed by the other Party and is not dismissed within sixty (60) days after such filing. Termination due to default under this Section shall be effective thirty (30) days after written notice to the defaulting Party if the default has not been cured within such thirty (30) day period. 5.3     Effect of Termination. Upon termination of this Agreement for any reason, each Party shall remain liable for those obligations that accrued prior to the date of such termination; provided, however, that nothing herein shall be construed to obligate EffectNet to offer Services to Intermedia after the termination of this Agreement.

5.4     Early Termination. If prior to the end of the Initial Term this Agreement is terminated for any reason by Intermedia other than pursuant to Section 5.2, Intermedia shall pay EffectNet, as liquidated damages and as the sole remedy of EffectNet and the exclusive liability of Intermedia, a one-time early termination fee equal to $270,400 times the lesser of (i) 12 months, or (ii) the number of months remaining in the contract term.

6.  **SURVIVAL.** The following provisions shall survive the expiration or termination, for any reason, of this Agreement: (Subscriber Information), (Charges and Billing

**EXHIBIT 2**                                                    A 00010

Statements); (Term and Termination); (Confidentiality); (Warranties); (Intellectual Property); (Indemnification); (Limitation of Liability); (General Provisions).

**7.    CONFIDENTIALITY.**   All information disclosed to the other party shall be deemed confidential and proprietary (hereinafter referred to as "Proprietary Information"). Such information includes, but is not limited to, trade secrets, know-how, technical specifications, processes, functional descriptions, architectural specifications, development plans, schedules, design information, customer lists, pricing and financial information concerning the parties' products or services, or other information relating to business development, operations, marketing, sales, performance, and any other information disclosed hereunder, which, by its nature, might reasonably be presumed to be proprietary in nature.

7.1    Each party agrees to use the Proprietary Information received from the other party only for the purposes of analyzing the business arrangement between the parties, and in accordance with this Agreement. No patent, copyright, trademark, invention, service mark, or other proprietary rights are implied or granted under this Agreement.

7.2    Proprietary information supplied pursuant to this Agreement shall not be reproduced in any form by the receiving party except as required to accomplish the intent of this Agreement.

7.3    The receiving party shall provide, at a minimum, the same care to avoid disclosure or unauthorized use of the Proprietary Information as is provided to protect its own Proprietary Information, but in no event less than a reasonable standard of care. It is agreed that all Proprietary Information shall be retained by the receiving party in a secure place with access limited to the receiving party's employees or agents who need to know of the content of such information for purposes of fulfilling its obligations pursuant to this Agreement. The receiving party shall be fully responsible for any breach of this Agreement by its employees or agents. The receiving party will promptly report to the disclosing party any actual or suspected violation of the terms of this Agreement, and will take all reasonable steps requested by the disclosing party to prevent, control or remedy any such violation.

7.4    All Proprietary Information, unless otherwise specified in writing, shall remain the property of the disclosing party. Such information shall be used by the receiving party only for the purpose set forth in this Agreement.   In addition, such Proprietary Information, including all copies thereof, shall be returned to the disclosing party or, at the request of the disclosing party, may be destroyed by the receiving party and certified as destroyed by an officer of the receiving party after the Receiving party's need for it has expired, upon request of the disclosing party; and, in any event, upon termination of the Agreement.

7.5    Exceptions to confidentiality: It is understood that the parties have no obligation to maintain the confidentiality of Proprietary Information which:

7.5.1   has been published or is now otherwise in the public domain through no fault of the receiving party.

7.5.2   prior to disclosure hereunder is within the legitimate possession of the receiving party without obligation of confidentiality as can be demonstrated by written documentation.

**EXHIBIT 2**                                    A 00011

7.5.3   subsequent to disclosure hereunder is lawfully received from a third party having rights to such Proprietary Information without restriction of the third party's right to disseminate the Proprietary Information and without notice of any restriction against its further disclosure, is disclosed with the written approval of the other party as can be proven by documentation.

7.5.4   is obligated to be produced by a Party under order of a court of competent jurisdiction or other government authority; provided however, that the receiving party shall immediately provide notice to the disclosing party such that the disclosing party may seek injunctive relief and/or a protective order; and further provided that the disclosing party shall use best efforts to ensure that the information shall be treated as confidential by the party to whom it is disclosed.

7.5.5   is independently developed by the receiving party without reference to or reliance upon the confidential information.

In the event of a disputed disclosure, the receiving party shall bear the burden of proof of demonstrating that the information falls under one of the above exceptions.

8.   __WARRANTIES.__

8.1.   __Authorization.__  Each Party represents and warrants to the other Party that the execution and delivery of this Agreement and the performance of such Party's obligations under this Agreement have been duly authorized, and that the Agreement is a valid and binding agreement, enforceable in accordance with its terms.

8.2.   __Legal Compliance.__  Each Party represents and warrants that it has obtained, or will obtain prior to offering the Services hereunder, all licenses, approvals and/or regulatory authority necessary to provide the Services described herein. This Agreement is made expressly subject to all present and future valid orders and regulations of any regulatory body having jurisdiction over the subject matter of this Agreement.

8.3   __No Other Warranties.__  With respect to the UC Services to be provided in, and to users accessing these services from the United States and Canada, EffectNet warrants that it will exercise commercially reasonable care in the performance of its obligations under this Agreement

EFFECTNET DOES NOT WARRANT THAT THE EFFECTNET SERVICES OR THE PLATFORM THAT IT PROVIDES TO INTERMEDIA IS ERROR-FREE.  IN ADDITION, THE EFFECTNET SERVICES OR INTERMEDIA PLATFORM IS PROVIDED "AS IS" AND WITHOUT ANY WARRANTY OF ANY KIND.  EFFECTNET DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.  NEITHER PARTY SHALL BE LIABLE FOR ANY DAMAGES ARISING FROM THE OTHER PARTY'S OR ANY THIRD PARTY'S USE OF THE EQUIPMENT, INCLUDING WITHOUT LIMITATION INDIRECT, INCIDENTAL, SPECIAL, OR CONSEQUENTIAL DAMAGES, EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILTY OF SUCH DAMAGES.  THE PARTIES AGREE TO THE ALLOCATION OF LIABILITY RISK SET FORTH IN THIS SECTION.  THIS LIMITATION ON LIABILITY IS INTENDED ITO APPLY WITHOUT REGARD TO

**EXHIBIT 2**                                      A 00012

WHETHER OTHER PROVISIONS OF THIS CONTRACT HAVE BEEN BREACHED OR PROVEN INEFFECTIVE. "AS IS" means the As Is condition of the EffectNet Services to be provided as Intermedia UC Services, including such customer support, software and hardware as required in the condition as of the Initial Launch Date agreed upon between the Parties and including any planned enhancement as well as any other changes mutually agreed upon. These products may as of the Initial Launch Date include works for hire for the benefit of Intermedia as further described in Section 9.2.

9.    INTELLECTUAL PROPERTY.

       9.1    General. Except as otherwise agreed in writing between the Parties, EffectNet shall own any Patent applications and Patents issued on inventions under this Agreement. All Inventions that are not the subject of patents or applications will be considered Confidential Information of EffectNet. Nothing in this Agreement shall be construed to transfer any right title or interest in EffectNet's designs, inventions, copyrights, trade secrets, trade names or other intellectual property.

10.    **INDEMNIFICATION. Each Party ("Indemnitor") will defend, indemnify and hold harmless the other Party and such Party's affiliates, directors, officers, employees, proprietors, independent contractors, consultants, partners, shareholders, representatives, customers, agents, predecessors, successors, and permitted assigns (collectively, "Indemnitees") from and against any claim, suit, demand, loss, damage, expense (including reasonable attorneys' fees and costs) or liability that may result from, arise out of or relate to: (a) acts or omissions arising out of or in connection with this Agreement resulting in property damage; by Indemnitor and (b) intentional or negligent violations by Indemnitor of any applicable laws or governmental regulation.**

       Intermedia shall indemnify and hold harmless EffectNet from and against any and all claims, expenses, judgments, liabilities, damages or losses, including reasonable attorney's fees and expenses, and shall defend all third-party actions and proceedings arising from any infringement or alleged infringement of any patent, copyright, trade secret, mask work, trade marks or service marks of any third party to the extent such claims are caused by the acts or omissions of Intermedia with respect to the marketing and/or provision of the Intermedia UC Services, but not including any claims, expenses, judgments, liabilities, damages or losses to the extent attributable to the EffectNet Services. EffectNet shall indemnify and hold harmless Intermedia from and against any and all claims, expenses, judgments, liabilities, damages or losses, including reasonable attorneys' fees and expenses, and shall defend all third-party actions and proceedings arising from any infringement or alleged infringement of any patent, copyright, trade secret, mask work or other intellectual property right of any third party, to the extent such claims are caused by use of the EffectNet Services. In the event that an injunction or restraining order is obtained against the use or distribution of any product or deliverable pursuant to this Agreement because of any infringement or alleged infringement of any patent, copyright, trade secret, mask work or other intellectual property right or any proprietary, contract or other right of any third party, or if in EffectNet's reasonable judgment any product or deliverable is likely to become the subject of a successful claim of such infringement, then EffectNet's sole obligation to Intermedia (in addition to its obligations of indemnification set forth above) shall be to promptly: (i) procure for Intermedia the right to use the product or deliverable as provided in this Agreement, (ii)

**EXHIBIT 2**                                                                A 00013

replace or modify the EffectNet product or deliverable so it becomes non-infringing without materially affecting the performance thereof, or if options (i) and (ii) are not available despite commercially reasonable efforts, (iii) terminate the licenses granted hereunder, and accept the return of all copies of all products.

**11.    LIMITATION OF LIABILITY.** EXCEPT FOR DAMAGES ARISING UNDER SECTION  , IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY INCIDENTAL, INDIRECT, SPECIAL, PUNITIVE, CONSEQUENTIAL OR SIMILAR DAMAGES OF ANY KIND INCLUDING WITHOUT LIMITATION, LOSS OF PROFITS, LOSS OF BUSINESS OR INTERRUPTION OF BUSINESS, WHETHER SUCH LIABILITY IS PREDICATED ON CONTRACT, STRICT LIABILITY OR ANY OTHER THEORY WITHOUT REGARD TO WHETHER SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

**12.    GENERAL PROVISIONS.**

12.1    Monetary Values. All monetary values in the Agreement refer to U.S. dollars.

12.2    Assignment. Either Party may assign its rights or obligations under this Agreement with written notice to the other Party, and after obtaining written approval by the other party, which shall not be unreasonably withheld or delayed. In the event that Intermedia is acquired by WorldCom no such written approval shall be required. In the event of a restructuring, merger, or acquisition of either party, in which such party retains at least 25 percent control of the resulting entity such notice and approval shall not be required.

12.3    Governing Law. This Agreement will be interpreted in accordance with the laws of the state of Arizona, excluding its conflict of law rules. The Parties agree that the federal and state courts located in Arizona and/or Florida shall be the proper forum for any action brought against the other Party, and each Party shall take all necessary actions to consent to the jurisdiction of such courts. 12.4    Notices. All notices or other communications between EffectNet and Intermedia under this Agreement shall be in writing and delivered personally, sent by confirmed facsimile, by confirmed e-mail, by certified mail, postage prepaid and return receipt requested, or by a nationally recognized express delivery service addressed to the Parties at the addresses first set forth below or at such other addresses, facsimile numbers or e-mail addresses or to such individuals as either Party may specify by notice to the other Party pursuant to this Section. All notices shall be in English and shall be effective upon receipt. As a courtesy, Parties are encouraged to send duplicate copies of notice, demands, or other by facsimile. Issuance of a facsimile copy of a notice, request, demand or other communication shall not replace the requirements for delivery by mail or overnight courier in the manner provided in this Section, nor shall the date the facsimile received constitute the official receipt date. Any Party may change the address to which notices, requests, demands or other to such Party shall be delivered or mailed by giving notice of the change to the other Party in the manner provided in this Section. The addresses for the Parties for the purposes of this Agreement are:

**EXHIBIT 2**                    A 00014

| *For EffectNet:* | *For Intermedia Communications, Inc.* |
|---|---|
| Taj Reneau | Kathleen A. Victory |
| Chief Executive Officer | VP Product Line Management |
| EffectNet | Intermedia Communications Inc. |
| Phone:  602.296.3300 | Phone:  813.829.6703 |
| Fax:     602.296.3311 | Fax:     813.829.2359 |

12.5    Independent Contractors. This Agreement and the relations hereby established do not constitute a partnership, joint venture, franchise or agency between the Parties. Both parties are independent contractors acting for their own accounts and neither is authorized to bind, or attempt to bind, the other to any contract, general warranty, covenant or undertaking of any nature whatsoever unless authorized in writing. Neither party shall have the authority to accept delivery, collect or otherwise take possession of any funds or other property of the other party, and if done so inadvertently, shall immediately notify the other party, shall hold same in trust and shall immediately deliver same to the other party.  In all matters relating to this Agreement neither party nor such party's employees or agents are, or will act, as employees of the other party within the meaning of any federal or state laws.

12.6    Severability.  If any provision of this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other term or provision hereof.  The Parties agree that they will negotiate in good faith or will permit a court to replace any provision hereof so held invalid, illegal or unenforceable with a valid provision, which is as similar as possible in substance to the invalid, illegal or unenforceable provision.

12.7    Entire Agreement And Modifications.  This Agreement together with any appendices, exhibits and attachments constitute the entire agreement between the Parties with regard to the subject matter hereof and supersedes all prior, agreements and understandings, whether written or oral, relating to the subject matter hereof.  This Agreement may only be modified by a written instrument duly executed by each Party, making specific reference to this Agreement and to the clause to be modified.

12.8    Captions.  Where provided, captions of the sections and subsections of this Agreement are for reference purposes only and do not constitute terms or conditions of this Agreement, and shall not limit or affect the terms and conditions hereof.

12.9    Waiver.  No provision of, right, power or privilege under this Agreement shall be deemed to have been waived by any act, delay, omission or acquiescence on the part of either Party, its agents, or employees, but only by an instrument in writing signed by an authorized officer of each Party.  No waiver by either Party of any breach or default of any provision of this Agreement by the other Party shall be effective as to any other breach or default, whether of the same or any other provision and whether occurring prior to, concurrent with, or subsequent to the date of such waiver.

**EXHIBIT 2**

A 00015

12.10  Counterparts. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. In making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart.

12.11  Force Majeure. Neither Party shall have any liability to the other for delays resulting from any "Event of Force Majeure" or from any act or omission of the such other Party. An Event of Force Majeure shall include without limitation any delay or failure in performance due to acts of God, earthquake, labor disputes, changes in law, regulation or government policy, riots, war, fire, epidemic, acts or omissions of vendors or suppliers, equipment failures, transportation difficulties, or other occurrences which are beyond the affected Party's reasonable control.

12.12  Conflicts. To the extent the terms of this Agreement and the MOU conflict, the terms of this Agreement shall be controlling.

**IN WITNESS WHEREOF,** the Parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the date first written above.

EffectNet, L.L.C.                                    Intermedia Communications, Inc.

Signature:                                           Signature:

Printed Name: Brad Steinmeyer                        Printed Name: Kathleen A. Victory

Title: VP PARTNER DEVELOPMENT                        Title: VP Product Line Management

Date: 11/27/00                                       Date: November 20, 2000

**EXHIBIT 2**                                        A 00016

## APPENDIX P (Pricing)

EffectNet shall offer the following products to Intermedia at the prices attached thereto as follows:

### 1.    Basic

$11.45 per month for each basic account with all platform usage and inbound call times on the EffectNet platform an additional $.10 per minute. The basic account includes unlimited free on-line usage including checking e-mails, faxes, etc... Outbound calling will be $.10 per minute.  This package includes customer service and technical support.  All basic accounts will be billed a base subscription price of $ 6.00 for the first calendar month of activation partial or full, and $11.45 for any calendar month thereafter partial or full.

### 2.    Unlimited

$27.40 per month for each unlimited account with unlimited free platform usage and inbound call time included. Outbound calling will be $.10 per minute. The unlimited account includes unlimited free on-line usage including checking e-mails, faxes, etc. Outbound calls include: conference calls (per member), outbound long distance, outbound fax, follow me, notification, return calls, etc. All unlimited accounts will be billed a base subscription price of $ 14.00 for the first calendar month of activation partial or full, and $27.40 for any calendar month thereafter partial or full.

Intermedia shall be responsible for any and all expenses incurred related to the completion of the Virtual Private Network ("VPN").   No expenses shall be incurred on behalf of Intermedia for the VPN without prior consent from Intermedia.

**EXHIBIT 2**                                              A 00017

# EXHIBIT 3

UNITED STATES BANKRUPTCY COURT   For Publication
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------
            :
In re          :   Chapter 11
            :
WORLDCOM, INC., et. al.,   :   Case No. 02-13533 (AJG)
            :
    Reorganized Debtors.  :
            :
--------------------------------------------------------

## OPINION PARTIALLY GRANTING AND PARTIALLY DENYING DEBTORS' MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE PORTIONS OF AFFIDAVITS

**APPEARANCES**

STINSON MORRISON HECKER LLP
Attorneys for the Reorganized Debtors
1201 Walnut Street
Kansas City, MO  64106

   Robert L. Driscoll, Esq.
   Allison M. Murdock, Esq.
   Jodi M. Hoss, Esq.

KELLEY DRYE & WARREN LLP
Attorneys for Parus Holdings, Inc.
101 Park Avenue
New York, NY  10178

   John M. Callagy, Esq.
   Robert S. Friedman, Esq.

ARTHUR J. GONZALEZ
United States Bankruptcy Judge

   WorldCom, Inc. ("WorldCom") and certain of its direct and indirect subsidiaries, as

debtors and debtors in possession (collectively, referred to as the "Debtors" herein at all times

pre- and post-petition) filed a motion for summary judgment and a motion to strike portions of

affidavits submitted as evidence to defeat summary judgment by Parus Holdings, Inc. ("Parus").

## I. Jurisdiction and Venue

The Court has subject matter jurisdiction over this proceeding pursuant to sections 1334(b) and 157(a) of title 28 of the United States Code. This matter is a core proceeding within the meaning of section 157(b) of title 28 of the United States Code. Venue is properly before the Court, pursuant to sections 1408 and 1409 of title 28 of the United States Code.

## II. Background

The Debtors provided a broad range of communication services in over 200 countries on six continents. Through their core communications service business, which includes voice, data, internet and international services, the Debtors carried more data over its networks than any other entity. The Debtors were the second largest carrier of consumer and small business long distance telecommunications services in the United States and provided a wide range of retail and wholesale communications services.

Intermedia Communications, Inc. ("Intermedia"), a Delaware corporation with its principal place of business in Florida, was a provider of integrated data and voice telecom, internet access, and local and long-distance phone services to approximately 90,000 small and medium sized businesses. On September 5, 2000, Intermedia entered into a merger agreement with WorldCom. On November 17, 2000, the United States filed a complaint against WorldCom and Intermedia under the Clayton Act. *United States v. WorldCom, Inc.*, 2001 WL 1188484, at *1 (D.D.C. June 27, 2001). The final judgment entered by the District Court for the District of Columbia ("D.C. District Court") ordered WorldCom "to divest the Intermedia Assets as an ongoing, viable business ... ." *Id.* at *2. The order further provided that WorldCom "shall not

2

**EXHIBIT 3**                                    A 03368

take any action, direct or indirect, that will impede in any way the operation, sale, or divestiture of the Intermedia Assets." *Id.* at *3. "Intermedia Assets" was defined by the D.C. District Court to include "all contracts, teaming arrangements, agreements, leases, commitments, certifications, and understandings, relating to the Intermedia Assets, including supply agreements ... ." *Id.* at *1.

On November 20, 2000, Intermedia and EffectNet LLC ("EffectNet"), a Nevada company with its principal place of business in Arizona of which Parus is the successor-in-interest, entered into a Unified Communications Services General Agreement ("UC Contract") whereby EffectNet was to provide telecommunication services to Intermedia. The launch date of the UC Contract began in December 2000 and had an initial term of three years. Section 5.2 provided that "[t]ermination due to default under this Section shall be effective thirty (30) days after written notice to the defaulting Party if the default has not been cured within such thirty (30) day period." Section 12.3, titled <u>Governing Law</u>, provided that "[t]his Agreement will be interpreted in accordance with the laws of the state of Arizona, excluding its conflict of law rules."

On January 1, 2001, EffectNet announced a proposed merger with a company called Webley Systems, Inc. ("Webley"). Salomon Smith Barney ("Salomon") was retained by Webley to help raise $35 million in financing for corporate purposes. However, Salomon conditioned such assistance upon the completion of the proposed EffectNet/Webley merger because of "the significant forecasted customer base and revenue EffectNet would generate under the UC Contract."

In April and May of 2001, Salomon solicited potential private investors to aid in the

3

**EXHIBIT 3**                                                            A 03369

financing initiative.  WorldCom Ventures (included within the term "WorldCom"), a WorldCom

venture capital firm, was one of the potential investors that was contacted.  According to Parus's

proofs of claim, on or about the same time, WorldCom was negotiating a Master Agreement for

Software Licenses ("MASL") with Webley.  Upon being contacted as a potential investor,

WorldCom, in May 2001, received access to a private placement memorandum, which included,

among other things, "information regarding the EffectNet UC Contract and its expected,

generated revenues over the term of the contract."  Parus alleges that "[i]t was clear from the

investor presentation that the forecasted revenues from the UC Contract were a major component

to EffectNet's and Webley's 'bottom line.'" According to Parus's proofs of claim

> The Debtor and [Intermedia, in claim no. 11242; MCI, in claim no.
> 11173] agreed to cause Intermedia to breach the [UC Contract] in
> an effort to wrongfully improve the Debtor's bargaining position
> with respect to [the MASL].  The Debtor and Intermedia knew that
> the termination of the [UC Contract] would place EffectNet and
> Webley in a position of severe financial distress, and would
> therefore force Webley to accept onerous terms in the negotiation
> of the MASL that favored the Debtor to a much greater degree
> than would have been possible had the [UC Contract] been in full
> force and effect.

On July 1, 2001, WorldCom, a Georgia corporation with its headquarters in Mississippi,

acquired Intermedia pursuant to the merger of a wholly owned subsidiary of WorldCom with and

into Intermedia.  According to Parus, after the completion of the merger, "Intermedia's project

manager for the UC Contract was terminated and Intermedia's sales force was disbanded through

terminations of employment or reassignment to other projects."  Moreover, "Parus was ...

informed at that time that hundreds of sales personnel – who had been trained by EffectNet to

provide support under the UC Contract – were told to stop working on the project."  Thereafter,

Intermedia cancelled 682 of then-existing 729 subscriptions under the UC Contract in September

4

**EXHIBIT 3**                                                              A 03370

2001.  On September 14, 2001, WorldCom and Webley executed the MASL.  In February of

2002, EffectNet invoiced Intermedia for services provided in December 2001 under the UC

Contract.  However, Intermedia did not pay these invoices.  WorldCom concedes, and Parus

does not dispute, that "[o]n or about March 1, 2002, Intermedia requested cancellation of all

remaining services under the UC Contract."

On March 12, 2002, the general counsel of Parus, Robert C. McConnell, wrote a letter

("March 12th Letter") to Rich Black, senior vice president of Intermedia at the time, informing

him that Intermedia had breached Section 5.2 of the UC Contract by failing to pay for services

provided by EffectNet

> EffectNet hereby gives Intermedia written notice of default under
> Section 5.2 of the Agreement with respect to the Intermedia
> Defaults and EffectNet further hereby gives Intermedia written
> notice that EffectNet may (i) terminate this Agreement under
> Section 5.2 due to default effective thirty (30) days after this
> written notice if each of the Intermedia Defaults has not been cured
> within such thirty (30) day period, and (ii) further exercise all
> available remedies pursuant to the terms of the Agreement and as
> otherwise may be available at law or in equity.

In his letter, Mr. McConnell requested payment of past due amounts beginning from December

2001 and informed Intermedia that it had "until the expiration of thirty (30) days after this

written notice to remit the Required Payment."  On March 25, 2002, Mr. McConnell wrote a

letter ("March 25th Letter") to Brett Bacon of MCI/WorldCom informing him that none of the

past payments had been received and therefore, Intermedia was still in default under the UC

Contract.  Mr. McConnell further informed Mr. Bacon that

> [T]he Agreement in Section 5.2 provides that "[t]ermination due to
> default under this Section shall be effective thirty (30) days after
> written notice to the defaulting Party if the default has not been
> cured within such thirty (30) day period."  Accordingly, the

5

**EXHIBIT 3**                                    A 03371

> Agreement will be terminated for default by Intermedia on or
> about April 12, 2002 if the Intermedia Defaults are not cured prior
> thereto.

Both the March 12th Letter and March 25th Letter ended with the same statement reserving

EffectNet's rights

> Nothing in this letter is intended to be a waiver or release of any
> rights or remedies, or an election thereof, that EffectNet has under
> the Agreement or applicable law, and all such rights and remedies
> are hereby expressly reserved in their entirety.

EffectNet did not receive a response to either of Mr. McConnell's letters and thereafter ceased

performing its duties under the UC Contract.

On July 21, 2002 and November 8, 2002, the Debtors commenced cases under chapter 11

of title 11 of the United States Code (the "Bankruptcy Code"). On October 29, 2002, the Court

entered an order establishing January 23, 2003, as the bar date for filing proofs of claim (the

"Bar Date"). By entry of the Confirmation Order on October 31, 2003, the Court confirmed a

plan of reorganization (the "Plan"). The Plan became effective on April 20, 2004 (the "Effective

Date"). Upon the Effective Date, WorldCom changed its name to MCI, Inc. On January 6,

2006, Verizon Communications, Inc. and MCI merged. Under the merger agreement, MCI, Inc.

merged with and into Eli Acquisition, LLC, as a direct, wholly owned subsidiary of Verizon

Communications Inc. Eli Acquisition LLC, as the surviving entity, was immediately renamed

MCI, LLC. MCI, LLC is now doing business as Verizon Business Global LLC.

Parus filed two amended proofs of claim ("Claim 11173" and "Claim 11242") on

December 12, 2002. Claim 11173 was filed against Intermedia claiming damages for breach of

the UC Contract and alleging to have claims for unfair and deceptive trade practices, breach of

the implied covenant of good faith and fair dealing, and "conspiracy based on the Debtor's

6

**EXHIBIT 3**                                   **A 03372**

actions in concert with MCI WorldCom Network Services, Inc."  Claim 11242 was filed against

MCI WorldCom Communications, Inc. claiming damages for breach of the UC Contract and

alleging to have claims for tortious interference with contractual relations, unfair and deceptive

trade practices, and "conspiracy based on the Debtor's actions in concert with Intermedia."

*1.  Breach of the UC Contract*

Appendix P to the UC Contract listed an $11.45 per month rate for a basic service and a

$27.40 per month rate for an unlimited service.  Section 2.12, titled Minimum Commitment,

provided

> Intermedia hereby agrees to deliver a minimum 1,500 then current
> active subscribers on or before three (3) months after December
> 18, 2000 (the "Rollout Date"); an additional 1,500 then current
> active subscribers (total 3,000) on or before six (6) months after
> the Rollout Date; an[] additional 3,500 then current active
> subscribers (total 6,500) on or before nine (9) months after the
> Rollout Date; and 10,000 total then current active subscribers on or
> before twelve (12) months after the Rollout Date (the "Ramp
> Date"), and at the end of each calendar month thereafter (the
> "Minimum Commitment") for the Term of this Agreement.

Section 2.13, titled Reconciliation Payment, provided

> On the Ramp Date and at the end of each calendar month
> thereafter, EffectNet will calculate the actual number of then
> current active subscribers on the last day of such calendar month
> and compare it to the Minimum Commitment.  If the number of
> subscribers is less than the Minimum Commitment for the month
> in question, such difference will constitute a "Volume Shortfall."
> Intermedia shall pay EffectNet a Reconciliation Payment equal to
> the Volume Shortfall multiplied by the ***base monthly price***
> applicable to the Intermedia UC Service per subscriber.

(emphasis added).  The term "base monthly price" is not defined in the UC Contract.

Intermedia acknowledges it breached the UC Contract when it failed to timely pay its

December 2001 through March 2002 invoices.  Intermedia claims that during the December

7

**EXHIBIT 3**                                                    A 03373

2001 and January 2002 billing cycles, it had 47 active mailboxes billed to it for $1,308.85. Intermedia also had a volume shortfall of 9,953 mailbox subscriptions during each of those months. Therefore, pursuant to Appendix P and the <u>Reconciliation Payment</u> section of the UC Contract, Intermedia contends that it owes EffectNet $1,308.85 plus a reconciliation payment of 9,953 (volume shortfall) times a base monthly price of $11.45 (basic service rate) for a total of $113,961.85 for each of those months. During the February 2002 billing cycle, Intermedia had 42 active mailboxes billed to it for $1,381.80. Intermedia also had a volume shortfall of 9,958 mailbox subscriptions. Intermedia therefore contends that it owes EffectNet $1,381.80 plus a February 2002 reconciliation payment of $114,019.10 (9,958 x $11.45). During the March 2002 billing cycle, Intermedia had a volume shortfall of 10,000 mailbox subscriptions. Intermedia therefore contends that it owes EffectNet a March 2002 reconciliation payment of $114,500 (10,000 x. $11.45). Intermedia contends that March 2002 was the month in which the UC Contract was terminated pursuant to the March 12th Letter, March 25th Letter, and Section 5.2 of the UC Contract, thereby ending its liability to EffectNet. Overall, Intermedia asserts that it only owes EffectNet $460,442.30.

Parus asserts, however, that the base monthly price used to determine the amount of the reconciliation payment is the unlimited service rate of $27.40, instead of the basic service rate of $11.45 that Intermedia applies. Parus contends, and Intermedia does not dispute, that "Debtors never objected contemporaneously to the invoices submitted using the Unlimited Services rate." In further support of its position, Parus submitted the affidavit of Taj Reneau, the president and chief executive officer of Parus. In his affidavit, Mr. Reneau stated

> The only price negotiated as the "base monthly price" was the
> "Unlimited Service" rate of $27.40. This is the price the parties

8

**EXHIBIT 3**                                                    A 03374

intended to be used for the calculation of Minimum Commitment and Reconciliation Payment.  The "Basic Service" was included in Appendix P merely as an expedient service for those few end-users or customers that just wanted to try the UC Service on a temporary or initial basis.  Indeed, the parties intended to use the Basic Service only as an introductory low-price marketing option for customers who were primarily testing or trialing the service.

...

In addition, the statement "base monthly price" was used by the parties and understood to mean the fixed monthly fee in contrast to the variable usage-based per minute pricing in the $27.40 "Unlimited Service" price plan.  Here "base" served to distinguish between fixed monthly fees and variable usage based fees – a commonly understood distinction and phraseology in the telecommunications industry.  The word "base" never had anything to do with the term "Basic" as applied to the Pricing, either "Unlimited Service" or "Basic Service," for accounts as between EffectNet and Intermedia.

Parus also maintains that Mr. McConnell's March 12th Letter and March 25th Letter did not constitute letters of termination.  In support of its position, Parus submitted the affidavit of Mr. McConnell, in which he states that the letters he sent were "never intended to terminate the UC Contract nor limit Intermedia's obligations in any manner."  If anything, Parus contends that Intermedia anticipatorily repudiated the contract through actions taken prior to the March 12th Letter.  Parus therefore asserts that it is owed money from December 2001 until the expiration of the UC Contract in December 2003.

Based on the affidavit of Mr. Reneau, Parus specifically claims a debt for services performed of $1,308.85 plus a reconciliation payment of $272,712.20 [9,953 (volume shortfall) x $27.40 (unlimited service rate)] for December 2001; $1,354 for services performed and late fees plus a reconciliation payment of $272,712.20 [9,953 (volume shortfall) x $27.40 (unlimited service rate)] for January 2002; $6,907.82 for services performed and late fees plus a

9

EXHIBIT 3                                                        A 03375

reconciliation payment of $272,849.20 [9,958 (volume shortfall) x $27.40 (unlimited service rate)] for February 2002; and a reconciliation payment of $274,000 [10,000 (volume shortfall) x $27.40 (unlimited service rate)] for the twenty months remaining on the UC Contract (March 2002 until December 2003). Overall, Parus claims it is owed a total of $6,307,844.27 plus interest.

Intermedia counters Parus's contention that it is liable for reconciliation payments until December 2003 by referencing section 5.3, titled <u>Effect of Termination</u>, which states that "[u]pon termination of this Agreement for any reason, each Party shall remain liable for those obligations that accrued prior to the date of such termination." Intermedia interprets this section as meaning that only outstanding debts owed prior to termination are owed after termination. In further support of its contention, Intermedia references Section 11 ("Limitation of Liability clause")

> EXCEPT FOR DAMAGES ARISING UNDER SECTION []¹, IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY INCIDENTAL, INDIRECT, SPECIAL, PUNITIVE, CONSEQUENTIAL OR SIMILAR DAMAGES OF ANY KIND INCLUDING WITHOUT LIMITATION, LOSS OF PROFITS, LOSS OF BUSINESS OR INTERRUPTION OF BUSINESS, WHETHER SUCH LIABILITY IS PREDICATED ON CONTRACT, STRICT LIABILITY OR ANY OTHER THEORY WITHOUT REGARD TO WHETHER SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

Intermedia also disputes Parus's use of the above portions of Mr. McConnell's and Mr. Reneau's affidavits to support its position, claiming that the above responses constitute inadmissible legal conclusions and conclusory statements on factual issues. As such, the Debtors have submitted a

---

[1] This part was blank in the UC Contract.

10

**EXHIBIT 3**                                                                    A 03376

motion to strike these portions of the affidavits as evidence in the Court's consideration of the Debtors' motion for summary judgment.

*2. Parus's Other Claims*

The services provided by EffectNet to Intermedia were ultimately to be bundled into a product called Intermedia*One* and sold to Intermedia's customers through Intermedia's network of sales representatives in 50 cities throughout the United States. "It was EffectNet's understanding from conversations with Intermedia personnel, other representations and forecasts, that Intermedia believed the product would be hugely successful. Thus, by January 2001, it had separated EffectNet's unified communications service and applications into a product separate from Intermedia*One*, which was called Intermedia Unified Messaging. "Intermedia Unified Messaging was the first web and telephone based unified messaging platform offered by a major U.S. service provider and allowed business professionals to custom build a communications portal that retrieved and sent fax, e-mail and telephone messages through any device, with the help of a virtual assistant."

Relying on a sworn declaration of Robert S. Friedman, who is one of the attorneys for Parus, Parus contends that WorldCom was in the process of implementing a unified messaging application called "genD" prior to the WorldCom/Intermedia merger. An exhibit to Mr. Friedman's declaration shows an email from Bernard J. Ebbers to WorldCom employees dated September 5, 2000. The email states, in part

> Today we announced an exciting merger that promises to catapult our **generation d** initiative to new heights. We have agreed to acquire Intermedia, a U.S.-based competitive local exchange carrier, which also gives us control of Digex, one of the industry's leading Web and application hosting services companies.

11

**EXHIBIT 3**                                                                 A 03377

(emphasis added).  The email further discusses WorldCom's intent to begin marketing Intermedia for sale.  Parus argues that this email helps show that "WorldCom intended to proceed with its competing Unified Messaging application, 'genD,' and shut down Intermedia's bundled product, Intermedia*One* and Intermedia Unified Messaging."  Parus further supports its allegations by stating (1) WorldCom fired its point person for the UC Contract upon the closing of the merger, (2) WorldCom "disbanded" the sales force implementing the UC Contract upon the closing of the merger, and (3) WorldCom cancelled almost all of the accounts under the UC Contract upon the closing of the merger.  Parus further contends that non-responsive and/or delay tactics have been employed by the Debtors to prevent further discovery by Parus regarding these allegations.

The Debtors counter by arguing that the email written by Mr. Ebbers does not support Parus's contention that WorldCom intended to shut down Intermedia*One* and Intermedia Unified Messaging.  Instead, the email "merely describes how WorldCom's merger with Intermedia and its subsidiary Digex ... will enhance WorldCom's generation D initiative."  The Debtors assert that any other conclusion would be derived out of speculation.

The Court held a hearing on January 17, 2006.

### III.  Discussion

#### A.  *Motion to Strike Portions of McConnell and Reneau Affidavits*

The Debtors filed a Motion to Strike Portions of Affidavits Submitted in Support of Claimant Parus Holdings, Inc.'s Response and Opposition to WorldCom's Motion for Summary Judgment.  The Debtors claim that portions of Mr. McConnell's and Mr. Reneau's affidavits dealing with the applicable rate in calculating the reconciliation payment and whether or not the

12

**EXHIBIT 3**                                                          A 03378

March 12th Letter and March 25th Letter terminated the UC Contract, among other portions, violate Rule 56(e) of the Federal Rules of Civil Procedure and should be stricken because they "contain impermissible characterizations of unambiguous contractual terms, misrepresentations of the underlying documents submitted by Parus Holdings, and post hoc, self-serving statements about the parties' subjective intent."

Rule 56(e) provides that "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Fed. R. Civ. P. 56(e).  "The party opposing the motion [for summary judgment] must set forth 'concrete particulars.' ...  It is not sufficient merely to assert a conclusion without supplying supporting argument or facts ... ." *Bellsouth Telecomm., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) *quoting SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978).  "In addition, 'ultimate or conclusory facts and conclusions of law ... cannot be utilized on a summary judgment motion.'"  *Id. quoting* 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2738, at 486 & 489 (1983).  "Such conclusory statements are insufficient to raise a triable issue of material fact ... ."  *Bellsouth Telecomm.*, 77 F.3d at 615.

With regard to Mr. McConnell's affidavit wherein he states that he never intended that his letters effect a termination of the UC Contract, the Court finds that this statement is conclusory.  Mr. McConnell's statement is a legal conclusion and is irrelevant to the inquiry as to whether his letters did, in fact, effect a termination under the express terms of the UC Contract.  Therefore, that portion of the affidavit is stricken.  Moreover, paragraph 8 of Mr. McConnell's affidavit responds to the Debtors' claim that his letters constituted a termination of

13

**EXHIBIT 3**                                                            A 03379

the UC Contract by stating "[t]his claim is frankly preposterous and ignores the words of the letters as well as the understanding and intention of the parties." This statement is conclusory and is stricken. Therefore, the Debtors' motion to strike is granted with respect to those portions of Mr. McConnell's affidavit.

With regard to Mr. Reneau's affidavit, wherein he discusses his belief as to why $27.40 is the "base monthly price," the Court finds that he did not merely make a conclusory statement since he provided sufficient argument and facts to support his conclusion. Such supporting facts and argument were included in paragraph 16 of his affidavit

> In addition, the statement "base monthly price" was used by the parties and understood to mean the fixed monthly fee in contrast to the variable usage-based per minute pricing in the $27.40 "Unlimited Service" price plan. Here "base" served to distinguish between fixed monthly fees and variable usage based fees – a commonly understood distinction and phraseology in the telecommunications industry. The word "base" never had anything to do with the term "Basic" as applied to the Pricing, either "Unlimited Service" or "Basic Service," for accounts as between EffectNet and Intermedia.

The Debtors are correct that nowhere in Mr. Reneau's affidavit does he state that he was a part of these negotiations or was present when they were taking place. However, as the president and chief executive officer of Parus, it is reasonable to conclude that he is aware of intended meanings of "phraseology in the telecommunications industry." Paragraph 17 of Mr. Reneau's affidavit concludes: "Thus, the 'Unlimited Service' rate of $27.40 was to be the base monthly price used in calculating the Reconciliation Payment." The portions of Mr. Reneau's affidavits in paragraphs 44, 45, and 46, to which the Debtors object, consist of Mr. Reneau calculating the same volume shortfall listed in the Debtors' motion for summary judgment for December 2001, January 2002, and February 2002 times a "base monthly price" of $27.40. Again, Mr. Reneau

14

EXHIBIT 3                                    A 03380

provided sufficient argument and facts as to why he believed $27.40 was the "base monthly price" and his calculation of the money owed using this number is merely a continuation of his argument. Paragraph 48 of Mr. Reneau's affidavit states that Intermedia was required to meet 10,000 accounts annually. This statement is supported by Section 2.12 of the UC Contract. Therefore, the Court denies the Debtors' motion to strike as to these portions of paragraphs 16, 17, 44, 45, 46, and 48 in Mr. Reneau's affidavit.

However, the Court grants the motion to strike as to the remaining portions of Mr. Reaneau's affidavit for the following reasons. Paragraph 16 states that the intention of the parties was that the unlimited service rate of $27.40 would be considered the "base monthly price" since the base service rate of $11.45 would actually be more expensive considering the fact that inbound calls are charged at $.10 a minute under that plan whereas they are not charged under the unlimited service plan, thereby essentially compelling customers to choose the $27.40 rate. The Court finds Mr. Reneau's statements as to the intention of the parties to be conclusory and insufficiently supported by argument and/or facts. Moreover, paragraph 47 states that the Debtors also owe Parus for an additional 20 months from March 2002 until the end of the UC Contract, and paragraph 49 incorporates paragraph 47's assertion and concludes that the Debtors owe $6,307,844.27. However, no other supporting facts are presented to support those assertions. Therefore, they are conclusory statements and are stricken. The Debtors' motion to strike is granted in part and denied in part with regard to portions of Mr. Reneau's affidavit.

## B. *Summary Judgment*

The basic principles governing a motion for summary judgment are well settled. First, summary judgment may be granted only if the Court determines that there is no genuine issue of

15

**EXHIBIT 3**                                                                    A 03381

material fact to be tried and the moving party is therefore entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056; *see generally Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Second, the burden is upon the moving party to clearly establish the absence of a genuine issue as to any material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Third, in considering such, the Court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the non-moving party. *Institute for Shipboard Educ. v. Cigna Worldwide Ins., Co.*, 22 F.3d 414, 418 (2d Cir. 1994). Fourth, the movant can meet its burden for summary judgment by showing that little or no evidence may be found to support the non-movant's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Finally, if no reasonable jury could find in favor of the non-movant because evidence to support its case is slight, there is no genuine issue of material fact and a grant of summary judgment is proper. *See Gallo v. Prudential Residential Servs., Ltd. Partnership*, 22 F.3d 1219, 1224 (2d Cir. 1994).

Parus argues that since discovery is incomplete, summary judgment is premature under Rule 56(f) of the Federal Rules of Civil Procedure. Rule 56(f), incorporated in its entirety into the Federal Bankruptcy Rules through Rule 7056, provides

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

An affidavit in opposition to a motion for summary judgment, which seeks further discovery, should explain

16

**EXHIBIT 3**                                                            A 03382

(1) what facts are sought and how they are to be obtained,
(2) how those facts are reasonably expected to create a genuine
   issue of material fact,
(3) what effort affiant has made to obtain them, and
(4) why the affiant was unsuccessful in those efforts.

*Gurary v. Winehouse* 190 F.3d 37, 43 (2d Cir. 1999); *Meloff v. New York Life Ins. Co.*, 51 F.3d
372, 375 (2d Cir. 1995).

A decision on whether to afford more time for discovery pursuant to Federal Rule of
Civil Procedure 56(f) is within a court's discretion. *Paddington Partners v. Bouchard*, 34 F.3d
1132, 1137 (2d Cir. 1994). Summary judgment may be granted where plaintiff gives "no basis
to conclude that further discovery would yield proof" of the evidence it requires. *Meloff*, 51 F.3d
at 375.

A party must already have a claim for which it seeks additional discovery, as discovery is
not meant to allow a party "to find out if it has a claim." *Paddington*, 34 F.3d at 1138. The mere
expectation of potentially developing further evidence is not sufficient. *Id.* Rather, the evidence
sought must be to fill in evidentiary gaps. *Id.* (citations omitted).

A party may not defeat a motion for summary judgment by merely restating conclusory
allegations and amplifying them only with speculation about what discovery might uncover.
*Contemporary Mission, Inc. v. U.S. Postal Serv.*, 648 F.2d 97, 107 (2d Cir. 1981). An opposing
party's mere hope that further evidence may develop prior to trial is an insufficient basis upon
which to justify the denial of the motion. *Id.*

Thus, a properly and timely made Rule 56(f) request for discovery may nevertheless be
denied if a court determines that the request is based on "speculation as to what potentially could
be discovered." *Paddington*, 34 F.3d at 1138. A party seeking Rule 56(f) relief must show that

17

**EXHIBIT 3**                                                                     A 03383

the material sought is related to the defense, and that it is not cumulative or speculative. *Id.* A bare assertion that the evidence supporting a plaintiff's allegation is in the hands of the defendant is not sufficient to justify a denial of a motion for summary judgment under Rule 56(f). *Id.*

Parus submitted a Rule 56(f) affidavit in the form of a declaration by Robert S. Friedman. However, the Court declines to exercise its discretion to allow Mr. Friedman's declaration to defeat the Court's resolution of the Debtors' motion for summary judgment. The Court reaches this decision because (1) it can decide the issues based on the plain language of the UC Contract, and, alternatively, (2) the Court believes Mr. Friedman's statements requesting additional discovery constitute "speculation as to what potentially could be discovered." *Id.* Therefore, the Court will proceed with its analysis on the Debtors' motion for summary judgment.

### 1. *The UC Contract*

The Debtors concede that Intermedia breached the UC Contract when it failed to timely pay its invoices for December 2001 through March 2002. However, the Debtors argue (1) the "base monthly price" refers to the basic service rate of $11.45, which is the rate that should be used in calculating the reconciliation payment, (2) the March 12th Letter and March 25th Letter effected a termination of the UC Contract, (3) the only outstanding payments remaining under the UC Contract are from December 2001 until March 2002, and (4) the Limitation of Liability clause prohibits Parus from receiving any "benefit of the bargain" damages. Since Section 12.3 of the UC Contract provides that it will be interpreted in accordance with the laws of Arizona and both parties concede that Arizona law applies, the Court will apply Arizona law as needed.

### A. *Base Monthly Price*

In its motion for summary judgment, the Debtors list, without explanation, the basic

18

**EXHIBIT 3**                                                              **A 03384**

service rate of $11.45 as the "base monthly price" used in calculating the reconciliation payment. Parus counters, through the affidavit of Mr. Reneau, that the "base monthly price" was actually intended to be the unlimited service rate of $27.40.  The Court reviewed the UC Contract and found no definition of "base monthly price."  Therefore, the Court finds that a material issue of fact exists regarding which rate constitutes the "base monthly price."  Summary judgment is denied in this regard.

B.  *Termination of the UC Contract*

The Debtors claim that the March 12th Letter and March 25th Letter effected a termination of the UC Contract on April 12, 2002.  Parus claims that the letters did no such thing.  The Court finds section 5.2 of the UC Contract to be unambiguous.  That section states that "[t]ermination due to default under this Section shall be effective thirty (30) days after written notice to the defaulting Party if the default has not been cured within such thirty (30) day period."  Mr. McConnell sent a letter to Intermedia on March 12, 2002, and followed up with the March 25th Letter wherein he informed Intermedia that "the Agreement will be terminated on or about April 12, 2002 if the Intermedia Defaults are not cured prior thereto."  The Debtors concede that at the time, it was in default due to non-payment of invoices and that it never cured such default.

Mr. McConnell claims in his affidavit that he never intended for his letters to constitute a termination of the UC Contract.  The Court has already stricken that portion of Mr. McConnell's affidavit under Rule 56(e).  However, even if that evidence was not stricken, Mr. McConnell's intent is irrelevant since the language of Section 5.2 is unambiguous.  The Court finds that the

19

**EXHIBIT 3**                                                                 **A 03385**

unambiguous language of Section 5.2 requires a conclusion that Mr. McConnell's letters did

effect a termination of the UC Contract on April 12, 2002.

The Court also notes that although Mr. McConnell's letters referenced Intermedia's other

supposed "defaults" under the UC Contract, his letters specifically discussed non-payment of

invoices as the only default.  Moreover, Mr. McConnell's letters further implied that all

"defaults" would be cured when Intermedia paid its invoices.  Furthermore, EffectNet concedes

that after Intermedia failed to cure its default of non-payment, it ceased performing services

under the UC Contract.  Section 5.3, titled <u>Effect of Termination</u>, allowed EffectNet to cease

performing such services upon "termination of this Agreement ... ."  Therefore, the Court notes

that Mr. McConnell's discussion of defaults in his letters and EffectNet's actions subsequent to

Intermedia's failure to cure provide further support for this Court's conclusion.  Therefore,

summary judgment is granted in this regard.

C. *The Amount of Payments Remaining Under the UC Contract*

Parus claims that Intermedia's actions prior to the sending of the March 12th Letter

evidenced an intention by Intermedia to not carry out its obligations under the UC Contract.

Such actions included the transfer or termination of employees working in furtherance of the UC

Contract upon completion of the merger and Parus's observance that as of January 1, 2001, the

only accounts being opened by Intermedia were for its employees.  Therefore, Parus claims that

under Arizona law, Intermedia anticipatorily repudiated the UC Contract, thereby entitling it to

receive its "benefit of the bargain" damages until the end of the UC Contract in December 2003.

Under Arizona law, "an action may be maintained for breach of contract based upon the

anticipatory repudiation by one of the parties to the contract."  *Diamos v. Hirsch*, 372 P.2d 76,

78 (Ariz. 1962).  "It is well established that in order to constitute an anticipatory breach of

**EXHIBIT 3**                                                      A 03386

contract there must be a positive and unequivocal manifestation on the part of the party allegedly repudiating that he will not render the promised performance when the time fixed for it in the contract arrives." *Id.* Moreover, "[i]n contract cases in which both parties have duties to perform at the time of an anticipatory repudiation, the plaintiff may recover future damages." *Healey v. Coury*, 783 P.2d 795, 802 (App. 1989).

The Court will note again that it is required to make all possible inferences in favor of the non-moving party. Even taking all evidence in a light most favorable to Parus does not lead the Court to reach the conclusion Parus desires. WorldCom's transfer or termination of employees working in furtherance of the UC Contract upon completion of its merger with Intermedia does not constitute a breach within any of the four corners of the UC Contract. Moreover, Parus's observance that as of January 1, 2001, the only accounts being opened by Intermedia were for its employees also does not constitute a breach of the UC Contract. Parus negotiated terms in the UC Contract which gave Intermedia the right to either provide a minimum number of subscribers per month or pay a reconciliation payment for any shortfall. The fact that Intermedia did not meet its minimum number of subscribers does not evidence any type of breach, much less the type of "positive and unequivocal manifestation on the part of the party allegedly repudiating that he will not render the promised performance when the time fixed for it in the contract arrives." *Diamos*, 372 P.2d at 78. The Debtors are only required to pay Parus for the months of December 2001 until March 2002. Summary judgment is therefore granted in this regard.

D. *Limitation of Liability Clause*

The Debtors further contend that the Limitation of Liability clause prohibits Parus from seeking "benefit of the bargain" damages or other consequential damages. Section 11 provides

21

**EXHIBIT 3**                    A 03387

> EXCEPT FOR DAMAGES ARISING UNDER SECTION          ,
> IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE
> OTHER PARTY FOR ANY INCIDENTAL, INDIRECT,
> SPECIAL, PUNITIVE, CONSEQUENTIAL OR SIMILAR
> DAMAGES OF ANY KIND INCLUDING WITHOUT
> LIMITATION, LOSS OF PROFITS, LOSS OF BUSINESS OR
> INTERRUPTION OF BUSINESS, WHETHER SUCH
> LIABILITY IS PREDICATED ON CONTRACT, STRICT
> LIABILITY OR ANY OTHER THEORY WITHOUT REGARD
> TO WHETHER SUCH PARTY HAS BEEN ADVISED OF THE
> POSSIBILITY OF SUCH DAMAGES.

Parus counters that Section 11 does not provide a proper basis upon which to grant summary judgment since the blank space after the word "SECTION" and before the word "IN" makes the contract ambiguous.

Although parol evidence may not be admitted for the purpose of varying or contradicting the terms of a contract, parol evidence may be admitted for the purpose of interpretation. *Taylor v. State Farm Mut. Auto. Ins. Co.*, 854 P.2d 1134, 1138 (Ariz. 1993). Arizona follows the Corbin view of contract interpretation. *Id.* at 1139. The Corbin view has two steps

> First, the court *considers* the evidence that is alleged to determine
> the extent of integration, illuminate the meaning of the contract
> language, or demonstrate the parties' intent. The court's function
> at this stage is to eliminate the evidence that has no probative
> value in determining the parties' intent. *Id.* The second step
> involves "finalizing" the court's understanding of the contract.
> Here, the parol evidence rule applies and *precludes admission* of
> the extrinsic evidence that would vary or contradict the meaning
> of the written words.

*Id.* Moreover, a finding of ambiguity is not required prior to considering extrinsic evidence under the Corbin view. *Id.* at 1138.

Despite the liberal application of the parol evidence rule in Arizona, the Court nonetheless finds that it cannot be applied in the present situation. The blank space, which allegedly signifies a missing term in the Limitation of Liability clause, is unlike a situation where

22

**EXHIBIT 3**                                                    A 03388

a material price term is left blank in a contract.  In the latter situation, the contract cannot be

enforced and/or otherwise interpreted without the integration of the missing term.  In the former

situation, however, the Court has determined that the UC Contract can be enforced and

interpreted without the addition of the allegedly missing term.  The Limitation of Liability

clause, as currently written, does not allow any exceptions to its pronouncement that neither

party shall be liable for any non-contractual damages, which is not an unreasonable result.  Any

term included in the blank space will obviously provide an exception not otherwise currently

available, thereby varying or contradicting the terms of the contract.  This is a result that Arizona

law does not allow.  *Taylor*, 854 P.2d at 1138.

Furthermore, after considering Parus's argument that the parties, "clearly intended to

exclude damages arising under *some* section from the limitation of liability," the Court notes that

Parus has failed to provide the Court with any evidence as to which provision should have been

asserted, and has failed to provide a sufficient basis to show the presence of mutual mistake.

Under Arizona law, interpretation of a contract is a question of law for the court where

the terms of a contract are found to be plain and unambiguous.  *Smith v. Melson, Inc.*, 659 P.2d

1264, 1266 (Ariz. 1983).  Whether a contract is ambiguous is a question of law; the mere fact

that parties disagree as to its meaning does not establish an ambiguity.  *DeCarlo v. MCSA, Inc.*,

785 P.2d 592, 594 (Ariz. Ct. App. 1988).  The controlling rule of contract interpretation requires

that the ordinary meaning of language be given to words where circumstances do not show a

different meaning is applicable.  *Brady v. Black Mountain Inv. Co.*, 459 P.2d 712, 714 (Ariz.

1969).  A contract must be construed so that every part is given effect, and "[e]ach section of an

agreement must be read in relation to each other to bring harmony, if possible, between all parts

of the writing."  *Gesina v. General Elec. Co.*, 780 P.2d 1380, 1386 (Ariz. Ct. App. 1989).  As a

23

**EXHIBIT 3**                    A 03389

corollary, the Arizona courts will not construe one provision in a contract so as to render another provision meaningless. *Norman v. Recreation Centers of Sun City, Inc.*, 752 P.2d 514, 517 (Ariz. Ct. App. 1988). Arizona requires the application of a standard of reasonableness in contract interpretation. *Gesina*, 780 P.2d at 1386. Therefore, based on the reasoning set forth below, the Court finds that the Limitation of Liability clause, as written, does not produce an unreasonable result.

After reviewing the UC Contract, the Court has determined that there were only two provisions within the UC Contract that address termination. The first termination provision, Section 5.2, addressed four specific situations that would constitute termination, and the effect of such termination was defined in Section 5.3 of the UC Contract. The second termination provision, section 5.4, addresses early termination and provides for liquidated damages as the sole remedy in the event of such a termination.

The Court finds that even if the insertion of a particular termination provision was permitted, any attempt to insert either of the termination provisions renders the remaining language within the Limitation of Liability clause superfluous, whereas when the Limitation of Liability clause is read in its original form, it does not produce an unreasonable result.

First, if the Court was to insert Section 5.2 into the blank space of the Limitation of Liability clause, the Limitation of Liability clause would provide Section 5.2 was excepted from any limitation of damages. However, this would also render the remaining language superfluous because Section 5.4 already provides for liquidated damages as the sole remedy for early termination, and the only purpose of the remaining language would then be to reiterate that no damages were available under Section 5.4.

24

EXHIBIT 3                                                          A 03390

Next, if the Court were to insert section 5.4 into the blank space of the Limitation of Liability clause, the Court finds that it would result in language that merely repeats the limitation on damages provided in Section 5.4. Since Section 5.4 provides the sole remedy for early termination, the Limitation of Liability clause would be excepting from damages the section that already provides a limitation on damages.

However, if the Limitation of Liability clause is left unaltered, the result, which is that the Limitation of Liability clause provides no exception to the limitation of damages, is not unreasonable. As the Court mentioned above, Parus only argues that "some" section was meant to be excluded and offers no evidence as to what section was allegedly meant to occupy the blank space of the Limitation of Liability clause. The Court notes that Parus's failure to provide such evidence may be based on their own analysis, similar to that which the Court just made, that any section inserted into the blank space of Section 11 produced an unreasonable result, rendering other language within the clause meaningless or superfluous.

Therefore, summary judgment is granted with regard to the Debtors' argument that the Limitation of Liability clause limits Intermedia's liability to the express terms of the contract. With this finding, the Court further rules that summary judgment is also granted in favor of Debtors with regard to Parus's claims against Intermedia for unfair and deceptive trade practices, breach of the covenant of good faith and fair dealing, and civil conspiracy since the Limitation of Liability clause prohibited the imposition of any non-contractual damages against Intermedia.

2. *Parus's Other Claims*

In Claim 11242, Parus alleged damages against WorldCom resulting from conspiracy, tortious interference with contract, and unfair and deceptive trade practices. The Debtors

25

**EXHIBIT 3**                                        **A 03391**

provide alternative arguments as to why summary judgment should be granted as a matter of law.

A.  *Civil Conspiracy*[2]

The Debtors contend that summary judgment should be granted as a matter of law since a corporation cannot, by law, conspire with itself.  The Debtors further contend that any action taken was required by the final judgment rendered by the D.C. District Court in its Clayton Act action.  Parus argues, however, that the majority of its claim arises from actions undertaken by WorldCom and Intermedia while they were acting as separate entities prior to their merger on July 1, 2001, and that the final judgment issued by the D.C. District Court prohibited WorldCom from interfering with "Intermedia Assets," the definition of which included the UC Contract.[3]

"Civil conspiracy consists of a combination of two or more persons for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means."  *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 894 (Ill. 1994).  "The function of a conspiracy claim is to extend liability in tort beyond the active wrongdoer to those who have merely planned, assisted or encouraged the wrongdoer's acts."  *Id.*  "While the agreement is a necessary and important element of a cause of action for civil conspiracy, it does not assume the

---

[2]The Debtors argue that Arizona or Mississippi law apply to this claim.  Parus argues that Illinois law applies because that is where the injury was felt by EffectNet.  The Court notes that the standard for civil conspiracy is similar in all three states.  *See Gallagher Bassett Servs., Inc. v. Jeffcoat*, 887 So. 2d 777, 786 (Miss. 2004); *Wells Fargo Bank v. Arizona Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 38 P.3d 12, 36 (Ariz. 2002); *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 894 (Ill. 1994).  Therefore, the Court can decide the issue without conducting a choice of law analysis since the result reached will be the same notwithstanding the particular states' law that is utilized.  The Court will proceed with its analysis of civil conspiracy, without making a determination of the applicable law, based on Illinois law.

[3]The D.C. District Court's opinion states that "[n]othing herein shall be construed to provide to any person or entity that is not a party to this Final Judgment any rights with respect to its enforcement, modification or termination."  2001 WL 1188484, at *4.  Parus was not a party to this "Final Judgment."  Therefore, to the extent Parus is seeking to collect damages as a result of the Debtors' alleged failure to comply with the D.C. District Court's final judgment, such efforts are improper since Parus lacks standing.

26

EXHIBIT 3                                    A 03392

same importance as in a criminal action." *Id.* "An agreement to commit a wrongful act is not a tort, even if it might be a crime." *Id.*

Since the Court has already granted summary judgment with regard to Parus's conspiracy claim against Intermedia, WorldCom cannot be guilty of conspiracy since there would be no second party with whom to conspire. Nonetheless, assuming, without deciding, that Parus has sufficiently alleged an agreement between WorldCom and Intermedia to affect the performance of the UC Contract, the question then becomes whether the conduct as alleged constitutes conduct rising to the level of civil conspiracy. The Court finds that it does not.

First, even if WorldCom and Intermedia had an agreement to breach the UC Contract, the existence of such an agreement does not, by itself, rise to the level of civil conspiracy. *See id.* Second, even if such an agreement between WorldCom and Intermedia called for Intermedia to intentionally fail to procure a sufficient amount of subscribers, cancel numerous accounts, and transfer or terminate current employees, such conduct on its part is not tortious nor a breach since the UC Contract provided for a contingency in the form of a reconciliation payment should Intermedia fail to meet its minimum monthly number of subscribers. Section 2.12 of the UC Contract required Intermedia to provide EffectNet with a minimum commitment of 10,000 subscribers at the end of each calendar month. Section 2.13 of the UC Contract alternatively provided that should Intermedia fail to meet its Section 2.12 obligations, it was required to pay EffectNet a reconciliation payment in the form of a "base monthly price" multiplied by the number of subscribers Intermedia failed to get under the 10,000 minimum commitment. For example, if Intermedia provided EffectNet with only 1,000 subscribers at the end of any given month, then Intermedia would be contractually required to make up the difference by paying

27

**EXHIBIT 3**                                                                                 A 03393

EffectNet a reconciliation payment of 9,000 subscribers under the minimum commitment number times the "base monthly price."

Therefore, Intermedia was well within its rights under the UC Contract to either provide EffectNet with the minimum number of subscribers at the end of any given month or pay EffectNet a reconciliation payment for its failure to do so.  The fact that Intermedia chose not to meet its minimum monthly amount of subscribers, regardless of WorldCom's urging, did not constitute tortious conduct nor a breach of the UC Contract  Therefore, summary judgment is denied with regard to Parus's conspiracy claim against WorldCom.

B. *Tortious Interference with a Contract*[4]

---

[4]The Debtors argue that Arizona or Mississippi law apply to this claim.  Parus argues that Illinois law applies because that is where the injury was felt by EffectNet.  Arizona law requires the claimant to prove

> (1) existence of a valid contractual relationship, (2) knowledge of the relationship on the part of the interferor, (3) intentional interference inducing or causing a breach, (4) resultant damage to the party whose relationship has been disrupted, and (5) that the defendant acted improperly.

*Safeway Ins. Co., Inc. v. Guerrero*, 106 P.3d 1020, 1025 (Ariz. 2005) *quoting Wells Fargo Bank v. Arizona Laborers, Teamsters and Cement Masons Local No. 395 Pension Trust*, 38 P.3d 12, 31 (2002).  Similarly, Illinois law requires the claimant to prove

> (1) the existence of a valid and enforceable contract between plaintiff and another; (2) the awareness on the part of the defendant of the contractual relation; (3) defendant's intentional and unjustified inducement of the breach of the contract; (4) a subsequent breach by the other caused by defendant's wrongful conduct; and (5) damages.

*Agrimerica, Inc. v. Mathes*, 557 N.E. 2d 357, 367 (Ill. App. Ct. 1990).  Mississippi law provides a slight difference by not explicitly requiring a "breach" of the contract as one of its elements.  Under Mississippi law, a claimant must prove

> (1) the acts were intentional and willful; (2) that they were calculated to cause damages to the plaintiffs in their lawful business; (3) that they were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant; and (4) that actual loss occurred. ...  It must also be proven that the contract would have been performed but for the alleged interference.

*Levens v. Campbell*, 733 So. 2d 753, 760-61 (Miss. 1999).  Despite this slight difference, the Court reads all three states' law as requiring similar elements.  Therefore, the Court can decide the issue without conducting a choice of law analysis since the result reached will be the same notwithstanding the particular states' law that is utilized.

**EXHIBIT 3**                                    A 03394

The Debtors contend that summary judgment should be granted as a matter of law since a parent company cannot, by law, tortiously interfere with a subsidiary's contract. The Debtors further argue that any action taken was required by the final judgment rendered by the D.C. District Court in its Clayton Act action. Parus counters that WorldCom may not hide behind this defense since the bulk of its allegations involve actions taken prior to the WorldCom/Intermedia merger.

Under Illinois law, a party asserting a claim of tortious interference with a contract must prove

> (1) the existence of a valid and enforceable contract between plaintiff and another; (2) the awareness on the part of the defendant of the contractual relation; (3) defendant's intentional and unjustified inducement of the breach of the contract; (4) a subsequent breach by the other caused by defendant's wrongful conduct; and (5) damages.

*Agrimerica, Inc. v. Mathes*, 557 N.E.2d 357, 367 (Ill. App. Ct. 1990).

The Court first notes that Parus does not mention any of the above elements constituting the claim of tortious interference with a contract. Nonetheless, viewing the facts presented in a light most favorable to Parus, the Court finds that Parus's claim of pre-merger wrongdoing by WorldCom fails since the only evidence posited by Parus regarding such wrongdoing is a statement noting that "as early as January 2001, EffectNet noticed that Intermedia was only opening accounts for Intermedia sales representative and certain Intermedia executives." Even if WorldCom induced Intermedia to cease opening up new accounts, such an action would not constitute a breach of the UC Contract since Intermedia was well within its rights to either meet the minimum number of subscribers each month or pay EffectNet a reconciliation payment for

---

Court will proceed with its analysis of tortious interference, without making a determination of the applicable law, based on Illinois law.

EXHIBIT 3                                    A 03395

any shortfall.  Therefore, element four of the five-part test for tortious interference with a contract would fail because such an action would not constitute a breach under the UC Contract. No reasonable jury could find in favor of Parus because the evidence to support its case with regard to alleged pre-merger wrongdoing is slight.  *See Gallo*, 22 F.3d at 1224.

Parus alternatively argues that WorldCom's post-merger wrongdoings should support a denial of summary judgment.  Parus's allegations of post-merger wrongdoing are based on the following facts

> (1) after the WorldCom/Intermedia merger, Intermedia cancelled 682 of then-existing 729 subscriptions under the UC Contract in September of 2001;
>
> (2) the only accounts maintained under the UC Contract after such date were exclusively for Intermedia employees;
>
> (3) WorldCom allegedly acted in concert with Intermedia to breach the UC Contract in order to garner leverage in its negotiations with Webley regarding the MASL, which was executed on September 14, 2001; and
>
> (4) Intermedia requested cancellation of all its accounts on or about March 1, 2002.

WorldCom defends its actions by stating that summary judgment should be granted as a matter of law since a parent company cannot, by law, tortiously interfere with a subsidiary's contract.  Furthermore, WorldCom argues that even if WorldCom and Intermedia made a conscious decision not to perform under the UC Contact, as alleged by Parus, such allegations would not provide the basis for tortious interference because such actions would be considered privileged.[5]  Parus posits, however, that even if the general rule applies that a parent corporation

---

[5] As the Court has already noted, it can decide the issue of tortious interference without conducting a choice of law analysis since the result reached will be the same notwithstanding the particular states' law that is utilized. The Court has determined that it can decide the issue of privilege with respect to a parent and a subsidiary in a similar fashion.  Nonetheless, the Court will examine all three states' laws.

**EXHIBIT 3**                                    A 03396

cannot tortiously interfere with its subsidiary's contracts, "a parent company loses any

'privilege' to interfere when it acts detrimentally to its subsidiary's economic interest."  In this

regard, Parus alleges that WorldCom's inducement of breach of the UC Contract was not in

Intermedia's economic interest since breach of the UC Contract would cause penalties to be

imposed upon Intermedia.  Parus further contends that as a parent corporation, WorldCom also

---

In Arizona, there is no decision on point by the highest court of Arizona.  Therefore, the Court must predict how the highest court in that particular jurisdiction would rule.

When a federal court needs to decide an issue of state law, it must do so in the way that the state's highest court would. *See In re Eurospark Indus., Inc.*, 288 B.R. 177, 182 (Bankr. E.D.N.Y. 2003).  If there is no decision on point by the state's highest court, "then federal authorities must apply what they find to be the state law after giving 'proper regard' to relevant rulings of other courts of the State."  *Comm'r of Internal Revenue v. Estate of Bosch*, 387 U.S. 456, 465 (1967).  *See also In re Eurospark*, 288 B.R. at 182 ("In predicting how the highest state court would rule, the federal court should look to the trends displayed by prior rulings of that court, to rulings of the lower state courts, to relevant rulings from other jurisdictions and to secondary materials.").  A federal court in this position must apply the law of the state as it exists, and must not engage in an attempt to change or expand state substantive law.  *See Burris Chem., Inc. v. USX Corp.*, 10 F.3d 243, 247 (4th Cir. 1993).

One of the Arizona Courts of Appeal addressed a similar issue of privilege and personal liability of corporate directors for inducing a breach of the corporation's contract with a third party and held that, "the acts of such directors should be privileged provided that the acts complained of were in good faith and the director believed that his acts were for the best lawful interests of the corporation."  *Ong Hing v. Arizona Harness Raceway*, 459 P.2d 107, 115 (Ariz. Ct. App. 1969).  Since the Court's research failed to produce any recitation of Arizona law to the contrary, it believes that the Arizona Supreme Court would apply the same rule in the present situation.

In *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E. 2d 672, 677 (Ill. 1989), the Supreme Court of Illinois held that "where the conduct of a defendant in an interference with contract action was privileged, it is the plaintiff's burden to plead and prove that the defendant's conduct was unjustified or malicious."  Further, the court in *HPI Health Care Services* held that "[c]ourts will recognize a privilege in intentional interference with contract cases where the defendant was acting to protect an interest which the law deems to be of equal or greater value than the plaintiff's contractual rights."  *Id.*  In that case, the court held that, similarly to corporate directors acting in good faith when carrying out the duties of a corporation, a hospital management company's decisions with regard to the termination of contractual relations were privileged since the company was exercising its business judgment.  *Id.*  Under the law of Illinois, the Court finds that even assuming WorldCom induced a breach of the UC Contract, Parus has failed to create an issue of fact regarding WorldCom's misuse of such business judgment.

The Supreme Court of Mississippi held that, "[t]he general rule in [Mississippi] is that there is no tortious interference when one has a justifiable interest and reason for acting."  *Vestal v. Oden*, 500 So. 2d 954, 957 (Miss. 1986).  *See also Irby v. Citizens Nat'l Bank of Meridian*, 121 So. 2d 118 (1960); *Standard Fruit and Steamship Co. v. Putnam*, 290 So.2d 612 (Miss. 1974); *Southwest Drug Co. v. Howard Brothers Pharmacy of Jackson, Inc.*, 320 So. 2d 776 (Miss. 1975).  Further, "[a]ny interference is not wrongful and actionable if undertaken by someone in the exercise of [a] legitimate interest or right, which constitutes 'privileged interference.'"  *Vestal*, 500 So. 2d 954, 956 (Miss. 1986) (quoting *Martin v. Texaco, Inc.*, 304 F. Supp. 498, 502 (S.D. Miss 1969)).  The Court finds that, under Mississippi law, any alleged action undertaken by WorldCom to induce breach of the UC Contract would be considered privileged.

Furthermore, the United States Court of Appeals for the Second Circuit in *Boulevard Assocs. v. Sovereign Hotels, Inc.*, 72 F.3d 1029, 1036 (2d Cir. 1995) noted the existence of privilege between a parent and a subsidiary, holding that, "[c]ourts in other states have uniformly found that a parent company does not engage in tortious conduct when it directs its wholly-owned subsidiary to breach a contract that is no longer in the subsidiary's economic interest to perform."

31

**EXHIBIT 3**                                                      A 03397

lost its right to interfere with Intermedia's contractual relations when it used "wrongful means" in inducing Intermedia to breach.[6]

Parus's arguments, however, fail. WorldCom concedes that Intermedia breached the UC Contract when it failed to make required payments to EffectNet from December 2001 until March 2002. Parus contends, however, that the above facts also show that Intermedia breached the UC Contract well before December 2001. However, the Court finds that even assuming, without deciding, that Parus's allegations are true that WorldCom induced Intermedia to cease opening up new accounts, cancel 682 then-existing accounts, and terminate or transfer employees working in furtherance of the UC Contract, such conduct is not a breach within the four corners of the UC Contract.

The Court again notes that EffectNet and Intermedia negotiated at arms-length provisions in the UC Contract allowing Intermedia the option of either meeting its minimum monthly number of subscribers or making a reconciliation payment for any monthly shortfall. For

---

[6] Each party has provided the Court with several cases that define "wrongful means" outside of the jurisdictions mentioned above. Although the parties failed to provide the Court with specific examples of "wrongful means" in the abovementioned jurisdictions, the Court notes that both parties have supplemented this deficiency with the decision in *Waste Conversion Sys., Inc. v. Greenstone Indus., Inc.,* 33 S.W.3d 779, 782 (Tenn. 2000), where the Supreme Court of Tennessee provides a thorough discussion of the parent/subsidiary privilege, examples of what would constitute "wrongful means" for the purposes of creating an exception to such a privilege, and a summary of definitions of "wrongful means" from other jurisdictions. One of the representative cases analyzed in *Waste Conversion* is discussed below.

In *Paglin v. Saztec Int'l, Inc.,* 834 F. Supp. 1184 (W.D. Mo. 1993), the court held that Missouri law allows a parent corporation to protect its economic interests (i.e., act for its own benefit) by interfering with its subsidiary's contractual relations "so long as the parent does not employ 'wrongful means' or interfere for an 'improper purpose.'" *Id.* at 1195-96. Furthermore, the Court determined that, "'wrongful means' is defined to include acts which are wrongful in and of themselves, such as 'misrepresentation of fact, threats, violence, defamation, trespass, restraint of trade, or any other wrongful act recognized by statute or common law.'" *Id.* at 1196 (citations omitted). Since Parus failed to allege any of the acts constituting "wrongful means" by the *Paglin* court, it has failed to create an issue of material fact in this regard.

32

EXHIBIT 3    A 03398

whatever reason, Intermedia chose to continue making monthly reconciliation payments instead of meeting its minimum monthly number of subscribers.  Such action, even upon WorldCom's urging, would still not lead to a breach of the UC Contract and would therefore fail to satisfy element four of the Illinois five-part test for tortious interference with a contract.  As the Court has already determined, the first breach occurred when Intermedia failed to pay its December 2001 invoice.  Parus does not allege that WorldCom induced Intermedia to not timely pay its invoices.  The failure to timely pay such invoices was the only breach committed by Intermedia, and this issue was not discussed by Parus in its documents.

Furthermore, the Court finds that Parus has failed to provide anything other than conclusory statements with regard to the argument that WorldCom's actions were not privileged because WorldCom used "wrongful means" when they interfered with the UC Contract.  Although Parus provides the Court with numerous citations of cases that provide for exceptions to the privileged activity of a parent, Parus merely alleges that Intermedia's incurrence of damages based on the breach of the UC Contract constitutes "wrongful means."  Thus, the Court finds that Parus has failed to meet the necessary burden to show that WorldCom utilized wrongful means with respect to any activity in connection with Intermedia and the breach of the UC Contract.  Therefore, summary judgment is granted with regard to Parus's claim that WorldCom tortiously interfered with the UC Contract.

C.  *Unfair and Deceptive Trade Practices*[7]

The Debtors contend that since under the UC Contract, Intermedia was a "buyer" of goods, and not a "seller," Parus's unfair and deceptive trade practices claim fails as a matter of

---

[7]Again, the parties dispute which stat law applies.  However, since the Court can decide the issue without the aid of state law, a conflict of law analysis is unnecessary.

33

**EXHIBIT 3**                                    **A 03399**

law since the relevant statutes in Arizona and Mississippi only apply to wrongdoing committed by "sellers." Parus counters that Intermedia was a "seller" of services under the UC Contract, and since they failed to deliver the required number of subscribers, the "Debtors' conduct unquestionably affected the ability of subscribers, and potential subscribers, to obtain services that would have been available to them if not for the Debtors' conduct, which caused the premature termination of the UC Contract."

Assuming, without deciding, that Intermedia was a "seller" of goods under the relevant statutes does not affect the Court's conclusion. Parus is correct that Intermedia agreed to provide a minimum number of subscribers in Section 2.12 of the UC Contract. However, as the Court earlier found, Intermedia's failure to provide this minimum number of subscribers, by itself, did not constitute a breach of the UC Contract since Intermedia and EffectNet contractually provided in Section 2.13 that should Intermedia not meet its minimum requirement, it would be required to pay EffectNet a reconciliation payment. Such reconciliation payment presumably yielded EffectNet a similar, if not higher, revenue stream as would be provided had Intermedia met its minimum requirement.[8] EffectNet also contracted for a liquidated damages provision in Section 5.4, which provided that if Intermedia prematurely terminated the contracted for any reason other than explicitly stated in the UC Contract, it owed EffectNet damages amounting to "$274,400 times the lesser of (i) 12 months, or (ii) the number of months remaining in the contract term."

---

[8] EffectNet stated in its briefs that the majority of subscribers it received through Intermedia chose the unlimited service rate of $27.40. If a reconciliation payment had to be made, EffectNet argues that Intermedia would be charged $27.40 per subscriber under the minimum commitment number. This presumably leads to a similar, if not higher, revenue stream for EffectNet.

34

EXHIBIT 3                    A 03400

Therefore, EffectNet was well aware of, and specifically contracted for, damages as a result of early termination of the UC Contract by Intermedia.  Based on these facts and the Court's review of the specific consumer fraud statutes in Arizona, Illinois, and Mississippi, the Court does not believe that EffectNet can, in the first instance, negotiate at arms length for such a contingency and, in the second instance, argue that such a negotiated provision constitutes an unfair and deceptive trade practice on the part of the Debtors.  Therefore, the Debtors are granted summary judgment with regard to Parus's claim for unfair and deceptive trade practices.

### IV.  Conclusion

The Court concludes that the Debtors' motion to strike portions of the McConnell and Reneau affidavits are granted in part and denied in part.  With regard to the contract issues, the Debtors' motion for summary judgment is denied with regard to its interpretation of "base monthly price."  However, it is granted with regard to the number of payments remaining under the UC Contract, the effect of the March 12th Letter and the March 25th Letter, and the applicability of the Limitation of Liability clause.  With regard to Parus's other claims, the Debtors' motion for summary judgment is granted with regard to Parus's claims against Intermedia for unfair and deceptive trade practices, breach of the implied covenant of good faith and fair dealing, and civil conspiracy.  The Debtors' motion for summary judgment is also granted with regard to Parus's claims against WorldCom for civil conspiracy, tortious interference with a contract, and unfair and deceptive trade practices.

The Debtors are to settle an order consistent with this opinion.


Dated: New York, New York
       May 2, 2007


                                   s/Arthur J. Gonzalez
                                   UNITED STATES BANKRUPTCY JUDGE