UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>**WORLDCOM, INC., et al.**<br><br>Debtors. | **Chapter 11 Case No.**<br>**02-13533 (AJG)**<br><br>**(Jointly Administered)** |

## DECLARATION OF STEPHEN A. WOOD

STEPHEN A. WOOD, declares the following is true and correct under the penalties of perjury pursuant to 28 U.S.C. § 1746:

1.      I am a member of the law firm of Kelley Drye & Warren LLP ("Kelley Drye"), attorneys for Parus Holdings, Inc., successor-by-merger to EffectNet, Inc. and EffectNet, LLC (collectively, "Parus"), a creditor and party-in-interest in a contested matter regarding proofs of claim, bearing claim numbers 9291, 9293, 11173 and 11242, filed by Parus, against Intermedia Communications, Inc. ("Intermedia") and MCI WorldCom Communications, Inc. ("MCI WorldCom") (collectively, "Debtors") in the above captioned WorldCom, Inc., et al. bankruptcy pending before this Court.

2.      In this case, Kelley Drye is the successor counsel to Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. ("Mintz, Levin"). A true and accurate copy of the Notice of Substitution of Counsel and Consent to Substitution of Counsel, dated December 16, 2004, is attached as Exhibit A hereto.

3.      I make this declaration in support of Parus' motion to compel production by the Debtors of responsive documents to Parus' First Request for Documents, dated February 7, 2005 by date certain provided by this Court (the "Motion"). Specifically, I make this

**A 00157**

declaration to provide the factual background to the Motion and to describe Parus' extensive efforts to resolve these matters before resorting to court intervention.

4.    I make this declaration based upon personal knowledge and upon my review of the Court filings and Kelley Drye's files related to this contested matter.

### Parus' Claims Against the Debtors

5.    On or about January 8, 2003, EffectNet, Inc.,[1] through their counsel Mintz, Levin, filed proofs of claim in the United States Bankruptcy Court for the Southern District of New York against MCI WorldCom, claim no. 9291, and Intermedia, claim no. 9293. Subsequently, on or about January 15, 2003, Parus filed amended proofs of claim against Intermedia, claim no. 11173, and MCI WorldCom, claim no. 11242. *See* Exhibit B and C. These proofs of claim amended and superceded the proofs of claim that were filed with this Court on or about January 8, 2003.

6.    EffectNet's claims against the Debtors relate to Intermedia's total breach and repudiation of its duties under a Unified Communications Services General Agreement between EffectNet and Intermedia dated as of November 20, 2000 (the "UC Contract"). *See* Exhibits B and C and the UC Contract attached thereto.

7.    Pursuant to the UC Contract, EffectNet was obligated to supply unified messaging, wholesale communications and related services ("Services") to Intermedia for marketing and resale to its end users and customers. *See* the UC Contract attached to Exhibit B and C hereto. The UC Contract included an unconditional minimum take-or-pay obligation for the Services. *See id.* at §§ 2.12 and 2.13. The take-or-pay obligations of the UC Contract

---

[1]    EffectNet, Inc. is the successor in interest to EffectNet, LLC (collectively, "EffectNet"). *See* EffectNet, Inc.'s Proof of Claim 11173 against Intermedia, dated January 15, 2003, attached as Exhibit B hereto; and EffectNet, Inc.'s Proof of Claim 11242 against MCI WorldCom, dated January 15, 2003, attached as Exhibit C hereto.

A 00158

required Intermedia to compensate EffectNet as if Intermedia had at least 10,000 subscribers for the Services for all periods on or after December 18, 2001 through the expiration of the contract on November 20, 2003. *See id.* The pricing for these Services was provided in Appendix P to the UC Contract. *See id.* at Appendix P.

        8.     Intermedia breached the UC Contract by failing to pay amounts due under it for Services provided by EffectNet, and by purposefully failing to purchase and market the Services supplied by EffectNet under the UC Contract. *See* Exhibits B and C. In March of 2002, EffectNet formally notified Intermedia that it was in default of its obligations under the UC Contract. *See* March 12, 2002 Letter attached as Exhibit F to the Response and Opposition of Parus Holdings, Inc. to Debtors' Objection to Proofs of Claim Filed By EffectNet, Inc., dated July 30, 2004, attached as Exhibit D hereto; and March 25, 2002 Letter attached to Exhibits B and C hereto. Intermedia failed and refused to cure its default under the UC Contract despite EffectNet's demands. *See* Exhibit D at ¶ 20. The EffectNet notices state that EffectNet "may" terminate the UC Contract if Intermedia did not cure the default. *See* March 12, 2002 Letter attached to Exhibit D hereto; and March 25, 2002 Letter attached to Exhibits B and C hereto. However, EffectNet at no time terminated the UC Contract as a result of the default. On July 21, 2002 and November 8, 2002, the Debtors and various affiliates filed separate voluntary Chapter 11 bankruptcy petitions. *See* Exhibit D at ¶ 21. Intermedia has never cured its default. *See id.* at ¶ 22.

        9.     As a result of Intermedia's breach of the UC Contract, EffectNet suffered damages, at a minimum, equal to unpaid invoices for the period ending March 20, 2002, approximately $828,000, and Intermedia's remaining minimum monthly take-or-pay

A 00159

commitment under the UC Contract for the period March 21, 2002 through November 20, 2003, approximately $5.5 million. *See* Exhibit D at ¶¶ 23-26.

10.    Moreover, EffectNet contends that Intermedia and MCI WorldCom, on or before July 1, 2001 (MCI WorldCom completed its acquisition of and/or merger with Intermedia in July 2001), acted in concert to breach the UC Contract. *See* Exhibit D at ¶¶ 1, 14-15 and 27-28. EffectNet contends that these actions were made with knowledge that a breach of the UC Contract would impose financial distress on EffectNet, a competitor of MCI WorldCom, as well as create leverage to obtain better terms under a separate Master Agreement for Software Licenses ("MASL") that MCI WorldCom was at this time negotiating with Webley Systems, Inc. ("Webley"), a company that supplied technology to EffectNet that EffectNet was, at this same time, merging with. *See id.* In fact, last minute price concessions were demanded regarding the MASL. *See id.* Furthermore, EffectNet contends that as part of this process, MCI WorldCom made improper use of confidential financial and other disclosures it obtained from EffectNet and Webley as part of MCI WorldCom's due diligence requests negotiating the MASL as well as disclosures made to WorldCom Ventures as part of a separate inquiry by Webley concerning whether MCI WorldCom might have an interest in investing in Webley. *See id.*

11.    As a result, EffectNet has additional claims against Intermedia for unfair and deceptive trade practices, a breach of the implied covenant of good faith and fair dealing, and conspiracy. *See* Exhibit B and Exhibit D at ¶¶ 27-38. EffectNet also has separate claims against MCI WorldCom for interference with EffectNet's contractual relations under the UC Contract, unfair and deceptive trade practices, and civil conspiracy in procuring Intermedia's breach of the UC Contract. *See* Exhibit C and Exhibit D at ¶¶ 27-38. EffectNet contends that its

A 00160

damages as a result of the Debtors' concerted action were foreseeable and estimates that its damages attributable to the foregoing may exceed $20 million. *See* Exhibit D at ¶ 38.

12.   On or about February 23, 2004 EffectNet, Inc. served and filed a notice of name change. A true and accurate copy of the Notice of Name Change for EffectNet, Inc., dated February 23, 2004, is attached as Exhibit E hereto. The notice stated that on or about January 28, 2004 EffectNet, Inc. was merged into Parus Holdings, Inc. *See id.*

13.   On or about June 10, 2004, the Debtors served and filed their objection to Parus' proofs of claim. A true and accurate copy of the Debtors' Objection to all Proofs of Claim Filed by EffectNet, Inc. Which is Now Merged Into Parus Holdings, Inc., Including but Not Limited to Claim Numbers 9291, 11242, 9293 and 11173, dated June 10, 2004, is attached as Exhibit F hereto. In turn, on or about July 30, 2004, Parus timely served and filed its response and opposition to Debtors' objection. *See* Exhibit D.

14.   On or about October 8, 2004, the Debtors and Parus timely exchanged their initial disclosures pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure ("Federal Rule/s") and Rule 7026 of the Federal Rules of the Bankruptcy Procedure ("Bankruptcy Rule/s").

### Current Discovery Dispute

15.   On February 7, 2005, Parus served its First Request for Documents on Debtors' counsel ("Parus' Document Request"), pursuant to Federal Rules 26 and 34 and made applicable to these proceedings by Bankruptcy Rules 7026 and 7034. *See* Feb. 7, 2005 Cover Letter from K. Smith to L. Bigus and attached Claimant's First Request for Documents, attached as Exhibit G hereto. Parus' Document Request focused on documents pertinent to the contract and tort claims set forth in its amended proofs of claim (*see* Exhibits B and C attached hereto) as

A 00161

well as the assertions and defenses set forth in the Debtors' objection to Parus' proofs of claim

(*see* Exhibit F attached hereto). Thus, each of Parus' requests are proper and calculated to lead

to the discovery of relevant and admissible evidence as required by the Federal Rules 26 and 34

and Bankruptcy Rules 7026 and 7034. *See* Exhibit G.

16.    Debtors' counsel requested and were granted an extension of time to

respond to Parus' Document Request to March 25, 2005. On or about March 25, 2005, Debtors'

counsel served on Parus Debtors' written responses to Parus' Document Request ("Debtors'

Document Responses"). *See* Debtors' Responses to Claimant's First Request for Production of

Documents, dated March 25, 2005, attached as Exhibit H hereto.

17.    Simultaneously with the Debtors' Document Responses, Debtors' made a

minimal production consisting of approximately 33 documents (a total of 343 pages). These

documents were produced to Parus' counsel and were organized by individual document requests

as set forth in Federal Rule 34 and Bankruptcy Rule 7034. However, the bulk of this production

consisted of copies of executed contracts and agreements as well as communications already in

the possession of both parties. Consequently, little of substance was actually produced.

18.    Debtors' March 25, 2005 production was made up of:

10 letters (total of 30 pages);

11 e-mails (total of 39 pages);

4 contracts/agreements (total of 64 pages);

3 reports (total of 37 pages);

2 manuals (total of 166 pages); and

3 approval forms (total of 7 pages).

A 00162

19.     What made the March 25, 2005 production even less substantive was the fact that Debtors had previously produced a number of these documents in January of 2005. Pursuant to an amended scheduling order, the parties exchanged documents referred to in their Federal Rule 26 and Bankruptcy Rule 7026 disclosures on or about January 26, 2005. A true and accurate copy of the Amended Scheduling Order signed by this Court on January 24, 2005, is attached as Exhibit I hereto. Parus produced approximately 750 pages of documents and the Debtors produced approximately 247 pages of documents.

20.     Debtors' January 26, 2005 production was made up of:

        3 letters (total of 11 pages);

        2 e-mails (total of 4 pages);

        8 contracts/agreements (total of 161 pages);

        6 reports (total of 45 pages);

        Parus' proof of claim (total of 22 pages); and

        1 chart (total of 4 pages).

21.     The Debtors' Document Responses included multiple meritless general and specific objections as well as modifications and limitations to Parus' Document Requests. *See* Exhibit H. However, subject to those objections, modifications and/or limitations, Debtors' agreed to produce non-privileged documents responsive to requests 6 – 7 and 11 – 27 in addition to the attached limited document production. *See id.* Indeed, the Debtors acknowledged that much remained to be done regarding document production. *See id.* The Debtors' Document Responses set forth a long and detailed narrative under the heading "Continuing Effort to Locate Documents" regarding the vast quantities of potentially responsive documents that the Debtors had yet to locate and/or review as of March 25, 2005 for production. *Id.* at pp. 7-8. Based on

A 00163

these representations, the Debtors' production of responsive documents to date would be dwarfed by responsive documents yet to be produced.

22.    Having heard nothing further on this issue or receiving any additional responsive documents from Debtors during the ensuing weeks, Parus' counsel contacted Debtors' counsel telephonically on May 12, 2005 requesting, under the circumstances, that Debtors agree to amend the current amended scheduling order which required Parus to designate its experts on or before June 20, 2005. *See* Exhibit I. In a May 17, 2005 e-mail, Debtors' counsel indicated that they would not agree to extending the expert disclosure deadline. *See* May 17, 2005 e-mail from D. Ramsay to S. Wood, attached as Exhibit J hereto.

23.    A telephone conference was held between counsel for the parties on May 18, 2005 wherein Parus explained the unfairness of requiring it to disclose experts when none of Debtors' witnesses had been deposed and the vast majority of its responsive documents remained to be produced. However, nothing was resolved in this conference call. In a subsequent e-mail, dated May 24, 2005, Debtors again indicated they would object to any extension of deadlines in the amended schedule. *See* May 24, 2005 e-mail from D. Ramsay to S. Wood, attached as Exhibit K hereto.

24.    On May 25, 2005, in an effort to resolve this issue and avoid bringing it before the Court, Parus again requested, that in light of the Debtors' acknowledged failure to produce the overwhelming bulk of their documents, that Debtors agree to extend the deadline for Parus to disclose experts in this case. *See* May 25, 2005 letter from S. Wood to L. Bigus, attached as Exhibit L hereto. Another telephone conference was held between counsel for Parus and counsel for Debtors on May 31, 2005 in an effort to reach an agreement on extending the deadline for Parus to disclose experts. Again, no resolution was reached.

A 00164

25.    On May 31, 2005, more than two months after serving their Document Responses and nearly four months after receiving Parus' Document Requests, Debtors' counsel sent Parus a "proposal" for producing responsive documents. *See* May 31, 2005 letter from L. Bigus to S. Wood, attached as Exhibit M hereto. This proposal borrowed verbatim from statements in Debtors' Document Responses, to wit, that Debtors had located "thousands of boxes" of documents in "multiple locations around the country." *Id.* That this proposal used the same language as the Debtors' Document Responses suggested that Debtors had expended no new effort to locate, review or produce documents beyond that expended prior to service of the Debtors' Document Responses. In fact, Debtors admitted in their letter that all they had done was review the indexes and that Debtors' counsel's "office had not reviewed or examined any of these additional documents." *Id.*

26.    In the May 31, 2005 letter, Debtors proposed providing Parus with copies of the indexes to the thousands and thousands of boxes for Parus to review, letting Parus select from these indexes boxes to be reviewed and produced by Debtors. *See id.* These were the same indexes that the Debtors characterized in the very letter as "not being very precise" and which Debtors' counsel themselves were not able to "determine which of the boxes of documents would be relevant and/or responsive and therefore appropriately produced for [Parus'] review." *Id.* In essence, the Debtors having reviewed only the indexes, and not a single document from these boxes, and finding the indexes useless, now proposed that Parus review the indexes and decide which of the thousands and thousands of boxes it wanted to review for potentially responsive documents to Parus' Document Request. The proposal went onto say that once Parus identified the boxes of interest, Debtors would have to review them for privilege, confidentiality and responsiveness, making the remaining documents available for inspection at a suitable

A 00165

location. *See id.* Aside from the unfair and improperly burden-shifting nature of this proposal, it would take weeks if not months for Parus to actually receive, let alone review, Debtors' documents. This was clearly not enough time to provide the Debtors' documents to Parus' experts prior to the current June 20, 2005 expert disclosure deadline.

27.     On May 31, 2005, Parus' counsel wrote the Debtors to address the shortcomings in Debtors' Document Responses, in particular the meritlessness of various general and specific objections, modifications and limitations made in Debtors' Document Responses, demanding their immediate withdrawal and confirmation that Debtors would not be withholding any documents from Parus on those bases. *See* May 31, 2005 letter from S. Wood to L. Bigus, attached as Exhibit N thereto. Furthermore, to the extent that Debtors were withholding any documents on the basis of privilege, the letter demanded a prompt production of a privilege log pursuant to Local Bankruptcy Rule 7034-1(c). *See id.* To date, no privilege log has been produced.

28.     Among other issues, Parus' May 31, 2005 letter advised Debtors that Debtors' general objection in Paragraph 3 and the objection to the definition of "Debtor" in paragraph 4 of the Debtors' Document Response were improper. *Id. See also* Exhibit H at pp. 1-2 and 4-5. The Debtors could not limit their responses to Parus' Document Request to documents in the possession, custody or control of only Intermedia Communications, Inc. and MCI WorldCom Communications, Inc. Parus pointed out that, pursuant to section 5.1 of the Debtors' Modified Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code dated October 21, 2004 ("WorldCom Plan"), the WorldCom Debtors (as defined in section 1.118 and Exhibit A1 of the WorldCom Plan) have been substantively consolidated. Therefore, "each and every Claim filed or to be filed in the Chapter 11 case of any

A 00166

of the WorldCom Debtors shall be deemed filed against the WorldCom Debtors, and shall be one

Claim against and obligation of the WorldCom Debtors." *See* WorldCom Plan at § 5.1.

WorldCom Debtors include, but are not limited to, Intermedia Communications, Inc., MCI

WorldCom Communications, Inc. as well as MCI WorldCom Network Services, Inc. Therefore,

Debtors had an obligation to produce any and all responsive documents to Parus' Document

Request in the possession, custody or control of any and all of the WorldCom Debtors as well as

their "officers, directors, employees, partners, corporate parent subsidiaries or affiliates." *See*

Local Federal Rule 26.3(c)(5) (made applicable to this contested matter pursuant to Local

Bankruptcy Rule 7026-1).

       29.    On June 1, 2005, Debtors' counsel yet again rejected extending any

deadlines. *See* June 1, 2005 letter from L. Bigus to S. Wood, attached as Exhibit O hereto.

Dismissive of their failure to produce documents, the Debtors asserted that Parus did not need

any of the Debtors' documents or testimony from their witnesses prior to disclosing its experts

and providing expert reports in this litigation. *See id.* Furthermore, Debtors stated that they

needed to "get this case tried and behind them . . . as expeditiously as possible," and "extending

deadlines [would] not accomplish that goal." *Id.*

       30.    On June 1, 2005, Debtors sent another letter in response to Parus' May 31,

2005 letter. *See* June 1, 2005 letter from L. Bigus to S. Wood, attached as Exhibit P hereto.

Despite the detailed objections to the Debtors' Document Responses, the Debtors did not

respond to any of them and stated that their May 31, 2005 letter containing the index "proposal"

made most of Parus' May 31, 2005 letter "moot" and "[e]ven though our initial responses

contained objections we have now proposed sending [Parus] indexes and opening all of the files

up for [Parus'] review . . . ." *Id.*

A 00167

31.    Parus' counsel also sent a letter to Debtors' counsel on June 1, 2005 setting forth questions and concerns that Parus had with the Debtors' May 31, 2005 "proposal" and informing the Debtors that Parus was unable to accept the proposal as stated. *See* June 1, 2005 letter from S. Wood to L. Bigus, attached as Exhibit Q hereto. First, Parus wanted Debtors to respond to all of the objections raised by Parus in its May 31, 2005 letter to Debtors' Document Responses, in particular, to the issue of which entities would be producing documents as a result of the substantive consolidation of the Debtors' bankruptcy proceeding. *See id.* Second, Parus wanted to know whether Debtors were proposing that Parus sift through a large number of non-responsive documents (thousands and thousands of boxes) to locate responsive documents. *See id.* Third, Parus questioned the utility of reviewing indexes that were by Debtors own admission "not very precise" in an effort to identify responsive documents. *See id.* Finally, Parus noted that the proposal made no mention of documents stored in electronic form and inquired as to their production status. *See id.*

32.    In response to Parus' June 1, 2005 letter, Debtors' counsel inexplicably lashed out at Parus' counsel for summarily rejecting Debtors' "serious proposal." *See* e-mail dated June 1, 2005 from L. Bigus to S. Wood, attached as Exhibit R hereto. Debtors' counsel stated that they "do not have an obligation to review all possible documents to determine if they are relevant. [Debtors] have a right to make the documents available to [Parus] for [Parus'] review and determination." *Id.* In fact, Debtors' admitted in their May 31, 2005 proposal that they did not review a single document from the thousands of boxes that they were now making available to Parus. *See* Exhibit M. Furthermore, Debtors' counsel accused Parus' counsel of asserting in Parus' June 1, 2005 letter that Debtors had not produced any emails and boasting that Debtors had produced "hundreds of pages of documents that contain[ed] emails." *See*

12

A 00168

Exhibit R. In truth, Debtors actually produced a grand total of 13 emails (consisting of a total of 43 pages) and the May 31, 2005 proposal did not mention any e-mails or other documents stored in electronic form which the Debtors were obliged to review and produce under the Federal and Bankruptcy Rules. Debtors' counsel also indicated that they were not in a position to respond to "the issue that all MCI entities that are included in the substantive consolidation have an obligation to search for the documents that [Parus is] seeking," and would respond to the issue as soon as they had finished researching the issue. *See id.* Debtors' counsel never responded to this issue. Finally, Debtors' counsel again admitted that the indexes that they had offered to make available to Parus for review were "not very useful," and stated "[i]f the indexes were useful we would have narrowed the number of boxes down by using the indexes. Since we have no means to identify what is responsive other than by examining all documents we are simply making the documents available to you subject to a few normal stipulations." *Id.*

33. Parus' counsel responded to the points raised in Debtors' counsel's e-mail. *See* June 1, 2005 e-mail from S. Wood to L. Bigus, attached as Exhibit S hereto. First, Parus' counsel noted that Parus did not reject the May 31, 2005 proposal outright but asked for clarity regarding certain issues. *See id.* Second, Parus' counsel pointed out the inadequate production of documents to date by the Debtors in response to Parus' Document Request and questioned Debtors' efforts to locate, identify and produce responsive documents beyond reviewing the indexes set forth in the Debtors' proposal. Finally, Parus' counsel noted that its inquiry into the status of an e-mail production were valid since, contrary to Debtors' assertion, Debtors had only produced 13 emails (total of 43 pages) to date and made no reference to e-mails in their May 31, 2005 proposal.

A 00169

34.    As a result of the Debtors' repeated refusals to agree to extend discovery deadlines because of their failure to produce responsive documents, on June 6, 2005, Parus' counsel was forced to request an informal conference before this Court pursuant to Local Bankruptcy Rule 7007-1(b) to consider Parus' request to amend the current scheduling order. *See* June 6, 2005 letter from S. Wood to the Honorable Arthur J. Gonzalez and exhibits attached thereto, attached as Exhibit T hereto. Parus suggested in this letter that the informal conference be held on June 14, 2005 as the parties were scheduled to appear before the Court on another motion. *See id.*

35.    On June 10, 2005, Parus produced to Debtors' counsel approximately 23,000 pages documents in response to Debtors' document requests. Unlike the Debtors, Parus invested substantial time and resources to locate, review and produce responsive documents to the Debtors as required under the Federal and Bankruptcy Rules. Parus also had the responsive documents scanned at its own expense to make their review and production more efficient. Furthermore, Parus promptly provided Debtor a list of the topics or subjects of the documents produced as well as a chart correlating the bates numbers of the produced documents with the Debtors' requests pursuant to Parus' obligation to produce documents organized to correspond to the categories in the numbered requests. *See* June 15, 2005 e-mail from L. Bigus. to S. Wood; June 17, 2005 e-mail from S. Wood to L. Bigus and June 21 e-mail from S. Wood to L. Bigus, attached as Exhibit U hereto.

36.    During the hearing held on June 14, 2005 before this Court on another motion brought by Parus, this Court instructed the parties to discuss and attempt to resolve their various discovery and scheduling disputes and to arrange a conference call with the Court for June 22, 2005. This Court also extended all discovery deadlines in the interim until after the

14                              **A 00170**

June 22, 2005 conference call. This conference call was later continued by the Court to June 29, 2005 and Parus' deadline to disclose experts was extended by the Court to July 5, 2005.

37.    Pursuant to the Court's direction, in an effort to compromise and to keep discovery moving, Parus' counsel agreed to review the indexes set forth in Debtors' counsel's proposal of May 31, 2005. Parus also agreed to Debtors' request that nothing contained in the indexes would result in any waiver of a privilege. *See* June 14, 2005 e-mail form S. Wood to L. Bigus, attached as Exhibit V hereto. During the discussions of June 14, 2005, the subject of electronic documents was also raised. Debtors' counsel represented to Parus' counsel that Debtors did not have electronic documents because e-mail messages were not stored in a central location by Debtors and were instead stored on local PCs which Debtors no longer possessed.

38.    On June 15, 2005 Debtors forwarded copies of the indexes to Parus' counsel for review. *See* June 15, 2005 e-mail from D. Ramsay to S. Wood, attached as Exhibit W hereto (Parus has not attached the actual indexes to this declaration because of their voluminous nature and difficulty of printing out in a readable hard document form, however, Parus can and will make these indexes available if the Court desires to inspect them).

39.    On June 16, 2005, two days after the Court directed the parties to make an effort to work out their disputes, Debtors' counsel sent an e-mail regarding Parus' request for an extension of time to disclose experts. Despite Debtors' failure to produce their documents, Debtors requested additional information from Parus before they would consider agreeing to an extension: how long of an extension Parus was seeking, the subjects on which Parus intended to have experts testify and how many experts Parus intended to testify. *See* June 16, 2005 e-mail from L. Bigus to S. Wood, attached as Exhibit X hereto. Parus' counsel responded to each of the Debtors' counsel's requests for information: Parus was agreeable to working with Debtors on the

A 00171

deadline as long as it permitted some time to review Debtors' documents and take some depositions of Debtors' witnesses, Parus did not know how many experts it would need since some of them may be obviated by discovery of Debtors, and the subject matters of expert testimony were addressed in the Parus' June 6, 2005 letter to the Court. *See* June 16, 2005 e-mail from S. Wood to L. Bigus, attached as Exhibit Y hereto; *see also* Exhibit T.

40.    On June 19, 2005, apparently unsatisfied with Parus' response, Debtors' counsel accused Parus of refusing to provide information necessary for Debtors to analyze Parus' request for extension of deadlines. *See* June 19, 2005 e-mail from L. Bigus to S. Wood, attached as Exhibit Z hereto. Although believing its previous response to be both reasonable and responsive, Parus nevertheless attempted to respond with greater specificity. *See* June 20, 2005 e-mail from S. Wood to L. Bigus, attached as Exhibit AA hereto. Parus, despite the difficulties presented by not having access to Debtors' documents or witnesses, estimated the number of experts and the subjects of expert testimony. *See id.* As to the length of the extension, Parus' counsel offered to produce expert reports 75 days from the date Debtors' document production would be completed. *See id.*

41.    Again, this was not satisfactory to Debtors. In response to Parus' counsel's June 20, 2005 e-mail, Debtors' counsel asserted for the first time that "[w]e have already produced our documents." *See* June 21, 2005 e-mail from L. Bigus to S. Wood, attached as Exhibit BB hereto. Debtors' counsel continued in this vein:

> On May 31, 2005 we sent you a letter which produced the documents and talked about the procedures for production. We have advised you as to the location of the documents. You have an index of the documents. The documents have been produced and it is up to you to inform us as to when you want to view the documents. Additionally there is the subject of the cost of review. Since you want to examine the documents we expect that you will pay the cost of removing them from the storage shelves and returning them to the storage shelves.

16

A 00172

*Id.* This was the first time Debtors had taken the position that they had produced documents by providing useless indexes and the first time they demanded that Parus pay the costs associated with document retrieval. Debtors also continued to accuse Parus of not cooperating with their request for information on Parus' experts. *See id.*

42.    On June 27, 2005, Parus counsel sent another letter setting forth its concerns regarding the May 31, 2005 "proposal" and Debtors' counsel's June 21, 2005 e-mail. *See* June 27, 2005 letter from S. Wood to L. Bigus, attached as Exhibit CC hereto. Parus' counsel advised the Debtors that the indexes forwarded on June 15, 2005 were not helpful in identifying whether the boxes described therein contained responsive documents. *See id.* Furthermore, Parus took issue with Debtors' counsel's assertion that they produced documents on May 31, 2005. *See id.* The only productions of documents by the Debtors to date were the documents produced in January and March of 2005, described *supra* at paragraphs 17-20. Since March 25, 2005 it appeared that Debtors had done nothing except to send a proposal with essentially useless indexes and insist that Parus bear the burden and expense of culling through Debtors' boxes to identify responsive documents, if any. In contrast, Parus had undertaken a time-consuming effort to find, review and produce over 23,000 pages of responsive documents to date. Therefore, Parus expected Debtors to comply with the discovery rules and review their documents and produce or make available for inspection documents responsive to Parus' Document Request and bear the expense of complying with the discovery requests. *See id.* Finally, Parus requested, yet again, an update on responsive electronic documents which Debtors' counsel had previously indicated did not exist. *See id.*

43.    Debtors' counsel wasted no time in lashing out once again, accusing Parus' counsel repeatedly of making "allegations" that were "false" and "inaccurate". *See* June

17

27, 2005 e-mail form L. Bigus to S. Wood, attached as Exhibit DD hereto. Debtors' counsel stated, in part, that they had located many electronic documents but most involved legal counsel and therefore were privileged. *See id.* However, to date, Debtors had yet to provide a privilege log to Parus as required under Local Bankruptcy Rule 7034-1(c). Debtors continued to assert that they had produced the documents listed on the indexes. *See id.* Debtors interestingly also indicated that they had located additional documents "beyond those reflected in the indexes" and were waiting to receive them at their offices before producing them. *See id.* The Debtors provided no further details as to what types of documents, why it took five months to locate them, and when the documents would be produced.

44.    Parus' counsel quickly responded on June 28, 2005 to the Debtors' counsels assertions in its June 27, 2005 e-mail. *See* June 28, 2005 e-mail from S. Wood to L. Bigus, attached as Exhibit EE hereto. Parus counsel stated that all statements made in its June 27, 2005 letter were true and accurate. *See id.* Parus' counsel reminded Debtors' counsel that they had represented after the June 14, 2005 Court hearing that Debtors had no electronic documents because e-mail messages were not kept in a central location and were stored on local PCs which Debtors no longer had. *See id.* Furthermore, Parus' counsel again pointed out that Debtors had only produced roughly 500 pages of documents to date and the production of indecipherable indexes to thousands of potentially responsive boxes of documents did not comply with the Federal and Bankruptcy Rules. *See id.*

45.    Since raising this request for the first time approximately six weeks prior on May 12, 2005 and after endless discussions, correspondence and repeated rejections by Debtors' counsel of any extension to the Parus' expert disclosure deadline, Debtors' counsel suddenly and for the first time on June 29, 2005, only hours prior to a conference call before this

A 00174

Court on this very issue, proposed a 120 day extension. *See* June 29, 2005 e-mail from L. Bigus

to S. Wood, attached as Exhibit FF hereto. It is unclear what if anything had changed during the

six weeks that led to Debtors' new position except for the simple fact that within hours Debtors'

counsel would have to defend their position before this Court. Notwithstanding this change in

position, Debtors continued to assert that they had produced the documents set forth in the

indexes and that it was Parus' obligation to pay the various fees associated with document

retrieval. *See id.*

46.    Shortly thereafter, counsel for both parties participated in a conference call

before this Court. *See* June 29, 2005 Transcript of the Conference Call before this Court re:

Parus Holdings, attached as Exhibit GG hereto. Parus counsel informed the Court that the

parties had agreed to a tentative 120 day extension of Parus' expert disclosure deadline and

requested that the Court also provide an intermediate deadline for all parties to produce their

remaining responsive documents. *See* Exhibit GG at pp. 6-7. In response, Debtors' counsel

represented to this Court that they had "legally produced the documents. We have given them

indexes to tens of thousands of boxes. We have given them the location where those boxes are

kept. Under Rule 34(b) we have chosen to produce those as they are kept in the usual course of

business." Exhibit GG at p. 7. Furthermore, Debtors' counsel represented to the Court that they

had done "far beyond what is required by the rule" and actually looked at all the indexes they

provided to Parus and made an attempt to identify what was responsive. Exhibit GG at pp. 12-

13. However, at the same time, Debtors' counsel admitted to the Court that the indexes that they

had provided to Parus as part of their "legal production" were useless for trying to determine

which of the thousands of boxes actually contained responsive documents, Exhibit GG at p. 11, a

fact that had been represented by Debtors' counsel multiple times before and confirmed by
Parus' counsel after reviewing the indexes themselves.

47.     Despite the fact that Debtors represented that they had produced the
documents, Debtors' counsel objected to any interim deadline for producing its documents, and
raised the issues of cost-shifting regarding the boxes. Exhibit GG at pp. 7-8. Interestingly,
Debtors made no mention at this hearing and had not yet advised Parus that Debtors had located
additional responsive non-privileged electronic documents. Parus' counsel reminded the Court
that Parus had undertaken considerable efforts and expenses to locate, review and produce
responsive documents as was required by the Federal and Bankruptcy Rules. Exhibit GG at pp.
13-14. The Court gave permission to Parus to file a motion to compel and noted that it required
an affidavit to be filed by the Debtors in response to the Motion "set[ting] forth what has been
done and what the legal arguments are regarding what has to be done." *Id.* at p. 14. Finally, in
the interim, the Court extended Parus' expert disclosure by 120 days from June 20, 2005. *Id.* at
p. 16.

48.     Within approximately one hour of the June 29, 2005 conference call with
the Court, Debtors made an offer for the first time to review their hard documents for responsive
documents and make those responsive documents available for review and copying by Parus.
*See* June 29, 2005 e-mail from L. Bigus to S. Wood, attached hereto as Exhibit HH. This offer
was made despite Debtors having represented to this Court that Debtors had legally produced
their documents and had done "far beyond what is required by the rule," and despite having
previously represented that they had "no means to identify what is responsive." However,
Debtors still expected Parus to pay for half the costs associated with document retrieval. *See id.*

A 00176

Importantly too, the Debtors made no commitment to producing documents by a date certain. *See id.*

49.    In addition, on June 30, 2005, after multiple inquiries by Parus on the status of Debtors' electronic documents, Debtors' counsel for the first time informed Parus that they had located 250 back up tapes that might contain responsive electronic documents. *See* June 30, 2005 e-mail from L. Bigus to S. Wood, attached as Exhibit II hereto. Debtors' counsel provided no further details as to those back up tapes and merely informed Parus that "the costs to have the data moved from the tapes to servers so that the data could be searched and then searching the data to try to determine what is relevant" would be approximately $900,000 and, despite the fact that Debtors had only produced a total of 13 emails to date, it was Parus' obligation to cover any and all costs associated with the search of the electronic documents.

50.    On July 1, 2005, Parus' counsel informed debtors that Parus could not agree to the proposal set forth by the Debtors on June 29, 2005 because Debtors did not commit to producing the responsive documents by a date certain even though Debtors have had Parus' Document Request for approximately five months and because Debtors continued to insist that Parus bear half the costs associated with the retrieval of the boxes from its warehouses. *See* July 1, 2005 email from S. Wood to L. Bigus, attached as Exhibit JJ hereto.

51.    Three months after the service of Debtors' Document Responses, Debtors served upon Parus Debtors' Supplemental Responses to Claimant's First Request for Production of Documents ("Debtors' Supplemental Document Responses"). *See* July 1, 2005 e-mail from L. Bigus to S. Wood attaching Debtors' Supplemental Responses to Claimant's First Request for Production of Documents, attached as Exhibit KK hereto. Not surprisingly, Debtors' Supplemental Document Responses did not attach a single responsive document. Instead,

21

Debtors object to *all* of Parus' Document Requests on the ground that they are unduly burdensome and they object to producing any documents immediately. *See id.* The Debtors now represent that they have found a new set of documents, the "MCI Documents", from which it "may be possible to produce responsive documents." *Id.* The Supplemental Document Responses further offer the same litany regarding the thousands of stored boxes of documents: indexes have been provided to Parus, these documents have therefore been produced pursuant to Rule 34(b), and Parus may inspect the stored boxes at any time. *Id.* With regard to these stored documents, this explanation is no different then that offered in Debtors' Document Responses served in March of 2005, so the clear inference is that Debtors have done nothing with these stored documents since that time. Debtors also indicate they located 250 back up tapes of e-mails that Debtors had informed Parus of the first time on June 30, 2005. Debtors did not set forth any further details about the additional documents or back up tapes and did not set forth why it took them approximately five months to locate these documents. What is clear from the Supplemental Document Response is that Debtors had not reviewed any of these documents for responsiveness and that regardless they would insist that any discovery costs regarding these documents to be shifted to Parus.

52.    Amazingly, the same day Debtors served their Supplemental Document Responses in which they object to any deadlines for their own production of documents, Debtors' counsel sent a letter to Parus' counsel demanding that Parus produce all of its remaining responsive documents to Debtors' document requests within the next ten days. *See* July 1, 2005 letter from L. Bigus to S. Wood, attached as Exhibit LL hereto. Debtors modified this deadline unilaterally when on July 8, 2005, Debtors' counsel demanded that Parus produce all of its remaining responsive documents as well as serve revised discovery responses by July

22

31, 2005. *See* July 8, 2005 e-mail from L. Gagliardi to S. Wood attaching two letters from L. Bigus to S. Wood, attached as Exhibit MM hereto. The amendment of the deadline did little to lessen the Debtors' hypocrisy. These letters are astonishing in light of the fact that the parties had appeared before this Court only a week earlier to address various discovery disputes and during that conference Debtors' counsel not only failed to raise these issues but actually objected to Parus' counsel's request that this Court provide a deadline by which both parties would be required to produce the remaining responsive documents.

53.    Just when Parus thought it had seen it all, Debtors' counsel sent another letter on July 8, 2005 threatening to file a motion for a protective order in connection with newly discovered back up tapes. *See* Exhibit MM. The Debtors had informed Parus only a week prior that they had located these back up tapes and provided no further information except that they expected Parus to cover the allegedly nearly million dollar in costs involved in searching these electronic documents. *See id.* Furthermore, the Debtors made an opaque proposal regarding these electronic documents. They apparently requested that Parus stay electronic discovery pending Debtors' filing of a partial summary judgment motion which Debtors claim, if granted, would eliminate some but not all of Parus' claims and obviate the need for electronic documents. *See id.* As far as Parus is concerned responsive electronic documents are relevant to all the claims against the Debtors and not only the tort claims. Curiously, while the proposal suggested that Parus agree to staying electronic discovery, Debtors requested that Parus agree to pay the costs of searching the electronic documents and that reasonable parameters be set in connection with searching the electronic documents. *See id.* The proposal as written is nonsensical since the first element of the proposal is mutually exclusive of the next two elements. Notwithstanding

A 00179

Debtors confusing proposal regarding the back up tapes, Parus is unable to respond because the factual record is completely undeveloped on this issue.

54.    It is interesting to note that Debtors' counsel waited until the afternoon of Friday, July 8th to transmit the letter regarding electronic discovery and back up tapes. During the June 29, 2005 conference call before this Court Debtors' counsel informed the Court that he would be out of the office on vacation from July 8th through the 18th and requested that no hearings be scheduled during that time period. *See* Exhibit GG at p. 15. Nonetheless, Debtors' counsel had his secretary forward this letter after he had left on vacation knowing that Parus would be unable to discuss these issues with Debtors' counsel prior to having to file this Motion to Compel on July 13, 2005.

### Parus' Good Faith Efforts to Resolve These Discovery Disputes

55.    As set forth in great detail above, Parus' counsel made a good faith effort to resolve these discovery related disputes with Debtors' counsel as required by Federal Rule 37, Bankruptcy Rule 7037 and the Local Bankruptcy Rule 7007-1(a). However, despite Parus' counsel's efforts to resolve the disputes raised in this Motion without motion practice, Parus has been unable to do so and this Court has granted permission for Parus to submit the present Motion on or before July 13, 2005.

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 13, 2005.

*/s/ Stephen A. Wood*
Stephen A. Wood

A 00180

# EXHIBIT A

A 00181

| Time period | Minimum Commitment | Price | Total per month | Total for period |
|---|---|---|---|---|
| Past due invoices prior to March, 2002 | | | | $827,844.27 |
| March 2002 through December 2002 | 10000 | $27.40 | $274,000.00 | $2,740,000.00 |
| December 18, 2002-December 18, 2003 | 10000 | $27.40 | $274,000.00 | $3,288,000.00 |
| | | | Total: | $6,855,844.27 |

A 00182

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| WORLDCOM, INC., et al. | Case No. 02-13533 (AJG) |
| Debtors. | (Jointly Administered) |

<u>**NOTICE OF SUBSTITUTION OF COUNSEL**</u>

PLEASE TAKE NOTICE that upon the Consent to Substitution of Counsel, a true copy of which is

attached, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. hereby withdraws and Kelley Drye & Warren LLP

("Kelley Drye") enters its appearance as counsel on behalf of Parus Holdings, Inc., successor-by-merger to EffectNet,

Inc. and EffectNet, LLC ("EffectNet"). All notices, pleadings, applications, motions, and other documents served and

filed in the contested matter between the Debtors and EffectNet should be served on:

KELLEY DRYE & WARREN LLP
Stephen A. Wood (SW 6270)
Robert S. Friedman (RF 1538)
Robert L. LeHane (RL 9422)
101 Park Avenue
New York, New York 10178
Tel: 212-808-7800

Dated: New York, New York
       December 16, 2004

MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
and POPEO, P.C.

By: */s/ Ian A. .Hammel*
    Ian A. Hammel (IH 8267)
1 Financial Center
Boston, Massachusetts 02111

and

Stephanie K. Hoos (SH 9871)
Chrysler Center
666 Third Avenue
New York, New York 10017

KELLEY DRYE & WARREN LLP

By:  */s/ Robert L. LeHane*
    Stephen A. Wood (SW 6270)
    Robert S. Friedman (RF 1538)
    Robert L. LeHane (RL 9422)
101 Park Avenue
New York, New York 10178
Tel: 212-808-7800

**A 00183**

Mr. Brett Bacon
Page 3 of 3
March 25, 2002

Total Amount Past Due on invoice #1018,
dated March 5, 2002, and delivered to
Intermedia on March 6, 2002
(for the February 2002 billing cycle):                $279,757.02

**Required Payment:**                                 $827,844.27

The total amount past due is as of March 25, 2002. EffectNet gives notice that all provisions of default will be strictly enforced. As indicated above, Intermedia has until the expiration of thirty (30) days after the March 12 Letter or this written notice, as the case may be, to remit the Required Payment. The Required Payment should be made payable and delivered by wire transfer to Wells Fargo Bank, Tempe, Arizona, ABA Routing Number 1221-05278; EffectNet Operations Account, Account Number 4045-4657220; attn: Stephanie Jordan at 480-644-8306.

If Intermedia fails to cure the Intermedia Defaults and the February Payment Default and if the Agreement is terminated as aforesaid, EffectNet may claim damages for all amounts due pursuant to the Agreement.

Nothing in this letter is intended to be a waiver or release of any rights or remedies, or an election thereof, that EffectNet has under the Agreement or applicable law, and all such rights and remedies are hereby expressly reserved in their entirety.

Very truly yours,

Robert C. McConnell
General Counsel

CC: Mr. Rich Black

A 00184

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>WORLDCOM, INC., et al.<br><br>     Debtors. | Chapter 11<br><br>Case No. 02-13533 (AJG)<br>(Jointly Administered) |

### CONSENT TO SUBSTITUTION OF COUNSEL

   IT IS HEREBY STIPULATED, CONSENTED AND AGREED, that as of the date hereof,

the firm of Kelley Drye & Warren LLP is hereby substituted as attorneys of record for Parus Holdings, Inc.,

successor-by-merger to EffectNet, Inc. and EffectNet, LLC., in place of Mintz, Levin, Cohen, Ferris,

Glovsky and Popeo, P.C.

KELLEY DRYE & WARREN LLP

Dated: New York, New York
    December 16, 2004

By: */s/ Robert L. LeHane*
  Stephen A. Wood (SW 6270)
  Robert S. Friedman (RF 1538)
  Robert L. LeHane (RL 9422)
101 Park Avenue
New York, New York 10178
Tel: 212-808-7800

MINTZ, LEVIN, COHN, FERRIS, GLOVSKY and
POPEO, P.C.

By:*/s/ Ian A. Hammel*
  Ian A. Hammel (IH 8267)
1 Financial Center
Boston, Massachusetts 02111

and

Stephanie K. Hoos (SH 9871)
Chrysler Center
666 Third Avenue
New York, New York 10017

**A 00185**

Mr. Brett Bacon
Page 2 of 3
March 25, 2002

be handling settlement discussions. Further, I understand that you told Mr. Calandra that you would provide Mr. Zip with contact information of Mr. Calandra. On March 20, Mr. Calandra exchanged voice messages with you whereby Mr. Calandra inquired of Mr. Zip and the lack of communication from him and you responded by giving Mr. Calandra, for the first time, contact information for Mr. Zip. Mr. Calandra called Mr. Zip the same day, March 20, and left a voice message for Mr. Zip requesting that Mr. Zip return the call. Neither Mr. Calandra nor anyone else has since received any communications from Intermedia or its affiliates regarding this matter. As you might imagine, EffectNet is becoming increasingly concerned that Intermedia and/or its affiliates fail to understand the gravity of this matter and the urgency with which it must be addressed.

Intermedia should also take notice of the Due Date of invoice #1018, dated March 5, 2002, in the amount of $279,757.02 and delivered to Intermedia on March 6, 2002. Payment of this amount was due on or before March 21, 2002. EffectNet has not received this past due payment (the "**February Payment Default**").

Accordingly, EffectNet hereby gives Intermedia written notice of default under Section 5.2 of the Agreement with respect to the February Payment Default and EffectNet further hereby gives Intermedia written notice that EffectNet may (i) terminate the Agreement under Section 5.2 due to default effective thirty (30) days after this written notice (if the Agreement is not sooner terminated pursuant to the March 12 Letter) if the February Payment Default has not been cured within such thirty (30) day period, and (ii) further exercise all available remedies pursuant to the terms of the Agreement and as otherwise may be available at law or in equity.

EffectNet hereby demands immediate payment, in accordance with the terms of the Agreement, of the amounts itemized below:

Total Amount Past Due on invoice 1010,
dated February 6, 2002, and delivered to
Intermedia on February 12, 2002
(for the December 2001 billing cycle):                    $274,021.05

Total Amount Past Due on invoice 1011,
dated February 6, 2002, and delivered to
Intermedia on February 12, 2002
(for the January 2002 billing cycle):                     $274,066.20

## CERTIFICATE OF SERVICE

I, Robert L. LeHane, hereby certify that on this 16th day of December 2004, I caused a true

and correct copy of the foregoing **NOTICE OF SUBSTITUTION OF COUNSEL** to be upon the parties

identified below by overnight mail.

> Lawrence W. Bigus, Esq.
> Sharon L. Stolte, Esq.
> Mark A. Shaiken, Esq.
> Stinson Morrison Hecker, LLP
> 9 Corporate Woods, Suite 450
> 9200 Indian Creek Parkway
> Overland Park, KS 66210

> _/s/ Robert L. LeHane_
> Robert L. LeHane

A 00187



One Parkway North
Fourth Floor North
Deerfield, Illinois 60015
Office: 888.444.6400

Writer's Direct No.
(888)-387-3481

March 25, 2002

**Via Federal Express Mail**
Mr. Brett Bacon
MCI/WorldCom
1945 Old Gallows Road
Vienna, Virginia 22182

Re: Unified Communications General Agreement, dated November 20, 2000, by and between EffectNet, Inc. (formerly EffectNet LLC) ("**EffectNet**") and Intermedia Communications, Inc. ("**Intermedia**") (the "**Agreement**")

Dear Mr. Bacon:

EffectNet, by letter to the attention of Mr. Rich Black, dated March 12, 2002, issued a written notice of default under Section 5.2 of the Agreement with respect to the Intermedia Defaults, as defined in the March 12 letter (the "**March 12 Letter**"). I understand from you that Mr. Black referred the March 12 letter to your attention upon receipt. As you know, the Agreement in Section 5.2 provides that "[t]ermination due to default under this Section shall be effective thirty (30) days after written notice to the defaulting Party if the default has not been cured within such thirty (30) day period." Accordingly, the Agreement will be terminated for default by Intermedia on or about April 12, 2002 if the Intermedia Defaults are not cured prior thereto.

I spoke with you on or about March 13 and you indicated that Intermedia and/or its affiliates were interested in pursuing immediate settlement discussions. I also understand that you spoke with Mr. Jim Calandra, Chief Financial Officer of EffectNet on March 18 and that you told Mr. Calandra that Mr. Barry Zip would

A 00188

# EXHIBIT B

A 00189

## APPENDIX P (Pricing)

EffectNet shall offer the following products to Intermedia at the prices attached thereto as follows:

### 1. Basic

$11.45 per month for each basic account with all platform usage and inbound call times on the EffectNet platform an additional $.10 per minute. The basic account includes unlimited free on-line usage including checking e-mails, faxes, etc... Outbound calling will be $.10 per minute. This package includes customer service and technical support. All basic accounts will be billed a base subscription price of $ 6.00 for the first calendar month of activation partial or full, and $11.45 for any calendar month thereafter partial or full.

### 2. Unlimited

$27.40 per month for each unlimited account with unlimited free platform usage and inbound call time included. Outbound calling will be $.10 per minute. The unlimited account includes unlimited free on-line usage including checking e-mails, faxes, etc. Outbound calls include: conference calls (per member), outbound long distance, outbound fax, follow me, notification, return calls, etc. All unlimited accounts will be billed a base subscription price of $ 14.00 for the first calendar month of activation partial or full, and $27.40 for any calendar month thereafter partial or full.

Intermedia shall be responsible for any and all expenses incurred related to the completion of the Virtual Private Network ("VPN"). No expenses shall be incurred on behalf of Intermedia for the VPN without prior consent from Intermedia.

A 00190

Form B10 (Official Form 10) (Rev. 4.01)

| United States Bankruptcy Court | PROOF OF CLAIM |
|---|---|

| Name of Debtor | Case Number |
|---|---|
| Intermedia Communications, Inc. | 02-42154 |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. §503.

| | |
|---|---|
| Name of Creditor (The person or entity to whom the debtor owes money or property):<br>EffectNet, Inc. | ☐ Check box if you are aware anyone else has filed a p... relating to your claim. A... of statement giving part... |
| Name and Addresses Where Notices Should be Sent:<br>EffectNet, Inc.<br>c/o Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.<br>Attn: George B. Hofmann<br>One Financial Center<br>Boston, MA 02111<br>Telephone No. 617-542-6000 | ☐ Check box if you have r... received any notices fro... bankruptcy court in this case.<br><br>☒ Check box if the address differs from the address on the envelope sent to you by the court. |

Filed: USBC - Southern District of New York
Worldcom, Inc., Et Al.
02-13533 (AJG)    0000011173

THIS SPACE IS FOR COURT USE ONLY

| Account or other number by which creditor identifies debtor: N/A | Check here ☐ replaces<br>if this claim ☒ amends    a previously filed claim, dated:   1/8/03 |
|---|---|

| 1. Basis for Claim | |
|---|---|
| ☐ Goods sold<br>☒ Services performed<br>☐ Money loaned<br>☐ Personal injury/wrongful death<br>☐ Taxes<br>☒ Other    See Addendum | ☐ Retiree benefits as defined in 11 U.S.C. §1114(a)<br>☐ Wages, salaries and compensation (Fill out below)<br>   Your SS #: _____<br>   Unpaid compensation for services performed<br>   from _____ to _____<br>          (date)             (date) |

| 2. Date debt was incurred:<br>    December 2001 and thereafter | 3. If court judgment, date obtained: |
|---|---|

4. Total Amount of Claim at Time Case Filed:       $6,855,844.27 plus unliquidated amounts
   If all or part of your claim is secured or entitled to priority, also complete Item 5 or 6 below.
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

| 5. Secured Claim. | 6. Unsecured Priority Claim. |
|---|---|
| ☐ Check this box if your claim is secured by collateral (including a right of setoff).<br><br>Brief Description of Collateral:<br><br>☐ Real Estate      ☐ Motor Vehicle<br>☐ Other (See Addendum)<br><br>Value of Collateral: $<br><br>Amount of arrearage and other charges at time case filed included in secured claim, if any: $ | ☐ Check this box if you have an unsecured priority claim<br>   Amount entitled to priority $ _____<br>   Specify the priority of the claim:<br>☐ Wages, salaries, or commissions (up to $4,650),* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. §507(a)(3)<br>☐ Contributions to an employee benefit plan - 11 U.S.C. §507(a)(4)<br>☐ Up to $2,100* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. §507(a)(6)<br>☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. §507(a)(7)<br>☐ Taxes or penalties of governmental units - 11 U.S.C. §507(a)(8)<br>☐ Other - Specify applicable paragraph of 11 U.S.C. §507(a) (_1_).<br>   *Amounts are subject to adjustment on 4/1/04 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment. |

7. Credits: The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

8. Supporting Documents: *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

9. Date-Stamped Copy: To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

RECEIVED
JAN 1 5 2003
US BANKRUPTCY COURT
SO. DIST. N. NEW YORK

| Date<br>December 12, 2002 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):<br><br>_(signature)_<br>EffectNet, Inc. BY TAJ REVEAU, CHIEF EXECUTIVE OFFICER |
|---|---|

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§152 and 3571.*

TRA 1739466v2

A 00191

**12.10** Counterparts. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. In making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart.

**12.11** Force Majeure. Neither Party shall have any liability to the other for delays resulting from any "Event of Force Majeure" or from any act or omission of the such other Party. An Event of Force Majeure shall include without limitation any delay or failure in performance due to acts of God, earthquake, labor disputes, changes in law, regulation or government policy, riots, war, fire, epidemic, acts or omissions of vendors or suppliers, equipment failures, transportation difficulties, or other occurrences which are beyond the affected Party's reasonable control.

**12.12** Conflicts. To the extent the terms of this Agreement and the MOU conflict, the terms of this Agreement shall be controlling.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the date first written above.

EffectNet, L.L.C.

Signature: _____
Printed Name: Brad Steinmeyer
Title: VP PARTNER DEVELOPMENT
Date: 11/27/00

Intermedia Communications, Inc.

Signature: _____
Printed Name: Kathleen A. Victory
Title: VP Product Line Management
Date: November 20, 2000

## Addendum to Proof of Claim

Debtor:        Intermedia Communications, Inc. (the "Debtor")

Case No.:      02-42154 (AJG) (Jointly administered under case no. 02-13533 (AJG))

Creditor:      EffectNet LLC ("EffectNet")

EffectNet, LLC[1] and the Debtor were parties to a certain Unified Communications Services General Agreement dated as of November 20, 2000 (the "Agreement"). A copy of the Agreement is attached to this Proof of Claim. Pursuant to the Agreement, EffectNet was obligated to provide services to the Debtor for resale. Section 2.12 of the Agreement specified the minimum monthly commitment of the Debtor to purchase EffectNet's services, and the pricing for these services was provided in Appendix P to the Agreement.

The Debtor breached the Agreement by failing to pay amounts due under it for services provided by EffectNet, and by purposefully failing to purchase the services supplied by EffectNet under the Agreement. As a result of the Debtor's breach of the Agreement, EffectNet sent a letter dated March 25, 2002 (the "Letter"), a copy of which is attached to this Proof of Claim. The Letter details the amounts owing by the Debtor to EffectNet prior to March 2002.

In addition to the amounts described in the Letter, as a result of the Debtor's breach of the Agreement, EffectNet suffered damages equal to the Debtor's remaining minimum monthly commitment under the Agreement, multiplied by the number of months remaining in the term of the Agreement. These damages are summarized in the spreadsheet which is attached to this Proof of Claim.

EffectNet has additional claims against the Debtor for unfair and deceptive trade practices, breach of the implied covenant of good faith and fair dealing, and conspiracy based on the Debtor's actions in concert with MCI Worldcom Network Services, Inc. ("MCI"). The Debtor and MCI agreed to cause the Debtor to breach the Agreement, in an effort to wrongfully improve MCI's bargaining position with respect to a certain Master Agreement for Software Licenses ("MASL") with Webley Systems, Inc. ("Webley"), a company which is affiliated with

---

[1] EffectNet, Inc. is the sucessor in interest to EffectNet LLC.

**For EffectNet:**

Taj Reneau

Chief Executive Officer

EffectNet

Phone: 602.296.3300

Fax:    602.296.3311

**For Intermedia Communications, Inc.**

Kathleen A. Victory

VP Product Line Management

Intermedia Communications Inc.

Phone: 813.829.6703

Fax:    813.829.2359

12.5    Independent Contractors. This Agreement and the relations hereby established do not constitute a partnership, joint venture, franchise or agency between the Parties. Both parties are independent contractors acting for their own accounts and neither is authorized to bind, or attempt to bind, the other to any contract, general warranty, covenant or undertaking of any nature whatsoever unless authorized in writing. Neither party shall have the authority to accept delivery, collect or otherwise take possession of any funds or other property of the other party, and if done so inadvertently, shall immediately notify the other party, shall hold same in trust and shall immediately deliver same to the other party. In all matters relating to this Agreement neither party nor such party's employees or agents are, or will act, as employees of the other party within the meaning of any federal or state laws.

12.6    Severability. If any provision of this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other term or provision hereof. The Parties agree that they will negotiate in good faith or will permit a court to replace any provision hereof so held invalid, illegal or unenforceable with a valid provision, which is as similar as possible in substance to the invalid, illegal or unenforceable provision.

12.7    Entire Agreement And Modifications. This Agreement together with any appendices, exhibits and attachments constitute the entire agreement between the Parties with regard to the subject matter hereof and supersedes all prior, agreements and understandings, whether written or oral, relating to the subject matter hereof. This Agreement may only be modified by a written instrument duly executed by each Party, making specific reference to this Agreement and to the clause to be modified.

12.8    Captions. Where provided, captions of the sections and subsections of this Agreement are for reference purposes only and do not constitute terms or conditions of this Agreement, and shall not limit or affect the terms and conditions hereof.

12.9    Waiver. No provision of, right, power or privilege under this Agreement shall be deemed to have been waived by any act, delay, omission or acquiescence on the part of either Party, its agents, or employees, but only by an instrument in writing signed by an authorized officer of each Party. No waiver by either Party of any breach or default of any provision of this Agreement by the other Party shall be effective as to any other breach or default, whether of the same or any other provision and whether occurring prior to, concurrent with, or subsequent to the date of such waiver.

A 00194

EffectNet. The Debtor and MCI knew that the termination of the Agreement would place EffectNet and Webley in a position of severe financial distress, and would therefore force Webley to accept onerous terms in the negotiation of the MASL that favored MCI to a much greater degree than would have been possible had the Agreement been in full force and effect. The damages suffered by Webley and EffectNet as a result of the concerted action are substantial, but unliquidated in amount.

EffectNet expressly reserves its right to amend or supplement this Proof of Claim, including, but not limited to, for the purpose of quantifying the damages suffered as a result of the actions of MCI and the Debtor described in the preceding paragraph. This proof of claim is made without prejudice to the filing by EffectNet of additional proofs of claim with respect to any other indebtedness or liability of the Debtor to EffectNet.

TRA 1739472v2

replace or modify the EffectNet product or deliverable so it becomes non-infringing without materially affecting the performance thereof, or if options (i) and (ii) are not available despite commercially reasonable efforts, (iii) terminate the licenses granted hereunder, and accept the return of all copies of all products.

**11.    LIMITATION OF LIABILITY.** EXCEPT FOR DAMAGES ARISING UNDER SECTION  , IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY INCIDENTAL, INDIRECT, SPECIAL, PUNITIVE, CONSEQUENTIAL OR SIMILAR DAMAGES OF ANY KIND INCLUDING WITHOUT LIMITATION, LOSS OF PROFITS, LOSS OF BUSINESS OR INTERRUPTION OF BUSINESS, WHETHER SUCH LIABILITY IS PREDICATED ON CONTRACT, STRICT LIABILITY OR ANY OTHER THEORY WITHOUT REGARD TO WHETHER SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

**12.    GENERAL PROVISIONS.**

    12.1    Monetary Values. All monetary values in the Agreement refer to U.S. dollars.

    12.2    Assignment. Either Party may assign its rights or obligations under this Agreement with written notice to the other Party, and after obtaining written approval by the other party, which shall not be unreasonably withheld or delayed. In the event that Intermedia is acquired by WorldCom no such written approval shall be required. In the event of a restructuring, merger, or acquisition of either party, in which such party retains at least 25 percent control of the resulting entity such notice and approval shall not be required.

    12.3    Governing Law. This Agreement will be interpreted in accordance with the laws of the state of Arizona, excluding its conflict of law rules. The Parties agree that the federal and state courts located in Arizona and/or Florida shall be the proper forum for any action brought against the other Party, and each Party shall take all necessary actions to consent to the jurisdiction of such courts. 12.4    Notices. All notices or other communications between EffectNet and Intermedia under this Agreement shall be in writing and delivered personally, sent by confirmed facsimile, by confirmed e-mail, by certified mail, postage prepaid and return receipt requested, or by a nationally recognized express delivery service addressed to the Parties at the addresses first set forth below or at such other addresses, facsimile numbers or e-mail addresses or to such individuals as either Party may specify by notice to the other Party pursuant to this Section. All notices shall be in English and shall be effective upon receipt. As a courtesy, Parties are encouraged to send duplicate copies of notice, demands, or other by facsimile. Issuance of a facsimile copy of a notice, request, demand or other communication shall not replace the requirements for delivery by mail or overnight courier in the manner provided in this Section, nor shall the date the facsimile received constitute the official receipt date. Any Party may change the address to which notices, requests, demands or other to such Party shall be delivered or mailed by giving notice of the change to the other Party in the manner provided in this Section. The addresses for the Parties for the purposes of this Agreement are:

A 00196

**COPY**

# EffectNet

# Unified Communications
# Services
# General Agreement
# For

# Intermedia Communications, Inc.

A 00197

WHETHER OTHER PROVISIONS OF THIS CONTRACT HAVE BEEN BREACHED OR PROVEN INEFFECTIVE. "AS IS" means the As Is condition of the EffectNet Services to be provided as Intermedia UC Services, including such customer support, software and hardware as required in the condition as of the Initial Launch Date agreed upon between the Parties and including any planned enhancement as well as any other changes mutually agreed upon. These products may as of the Initial Launch Date include works for hire for the benefit of Intermedia as further described in Section 9.2.

9.    INTELLECTUAL PROPERTY.

9.1    General. Except as otherwise agreed in writing between the Parties, EffectNet shall own any Patent applications and Patents issued on inventions under this Agreement. All inventions that are not the subject of patents or applications will be considered Confidential Information of EffectNet. Nothing in this Agreement shall be construed to transfer any right title or interest in EffectNet's designs, inventions, copyrights, trade secrets, trade names or other intellectual property.

10.    INDEMNIFICATION. Each Party ("Indemnitor") will defend, indemnify and hold harmless the other Party and such Party's affiliates, directors, officers, employees, proprietors, independent contractors, consultants, partners, shareholders, representatives, customers, agents, predecessors, successors, and permitted assigns (collectively, "Indemnitees") from and against any claim, suit, demand, loss, damage, expense (including reasonable attorneys' fees and costs) or liability that may result from, arise out of or relate to: (a) acts or omissions arising out of or in connection with this Agreement resulting in property damage; by Indemnitor and (b) intentional or negligent violations by Indemnitor of any applicable laws or governmental regulation.

Intermedia shall indemnify and hold harmless EffectNet from and against any and all claims, expenses, judgments, liabilities, damages or losses, including reasonable attorney's fees and expenses, and shall defend all third-party actions and proceedings arising from any infringement or alleged infringement of any patent, copyright, trade secret, mask work, trade marks or service marks of any third party to the extent such claims are caused by the acts or omissions of Intermedia with respect to the marketing and/or provision of the Intermedia UC Services, but not including any claims, expenses, judgments, liabilities, damages or losses to the extent attributable to the EffectNet Services. EffectNet shall indemnify and hold harmless Intermedia from and against any and all claims, expenses, judgments, liabilities, damages or losses, including reasonable attorneys' fees and expenses, and shall defend all third-party actions and proceedings arising from any infringement or alleged infringement of any patent, copyright, trade secret, mask work or other intellectual property right of any third party, to the extent such claims are caused by use of the EffectNet Services. In the event that an injunction or restraining order is obtained against the use or distribution of any product or deliverable pursuant to this Agreement because of any infringement or alleged infringement of any patent, copyright, trade secret, mask work or other intellectual property right or any proprietary, contract or other right of any third party, or if in EffectNet's reasonable judgment any product or deliverable is likely to become the subject of a successful claim of such infringement, then EffectNet's sole obligation to Intermedia (in addition to its obligations of indemnification set forth above) shall be to promptly: (i) procure for Intermedia the right to use the product or deliverable as provided in this Agreement, (ii)

A 00198

# UNIFIED COMMUNICATIONS SERVICES GENERAL AGREEMENT

This Unified Communications General Agreement (the "Agreement") is entered into as of the 20 day of November 2000, ("Effective Date") by and between EffectNet LLC, a Nevada Limited Liability Company ("EffectNet") and Intermedia Communications, Inc. organized under the laws of The State of Delaware, with a business address at One Intermedia Way, Tampa, FL 33647 ("Intermedia") (collectively "Parties" or individually a "Party").

WHEREAS, Intermedia is Integrated Communications Provider providing telecommunication services including local dial tone, long distance, data services, etc.

WHEREAS, EffectNet is a unified communications application service provider that offers private label Internet and telecommunications products and services, including unified communications and other value-added services, in-house customer services, billing and technical support (the "EffectNet Services").

WHEREAS, EffectNet desires to provide Intermedia with a customized Intermedia-branded wholesale communications service ("Private Label") for sale by Intermedia to its end user customers (the services collectively hereinafter described as "Intermedia UC Services" or "UC Services").

WHEREAS, EffectNet and Intermedia recognize that the provision of Intermedia UC Services requires the Parties to closely work together to meet customer needs and to implement and ensure the commercial viability of the Intermedia UC Services.

NOW THEREFORE, in consideration of the promises and mutual agreements contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which the Parties acknowledge, the Parties agree as follows:

1.    **GENERAL PROVISIONS.**

1.1    Both Parties agree that EffectNet shall offer Intermedia UC Services for Intermedia as described in this Agreement. Intermedia will market the UC Services to Intermedia customers and end-users as it sees fit.  For purposes of this Agreement, the term "customers" shall include, but not be limited to wholesale and retail customers of Intermedia UC Services.

1.2    EffectNet may make changes to the EffectNet Services from time to time in order to improve, modify or extend the EffectNet Services ("EffectNet Changes"), but in no event shall such changes decrease the quality of the EffectNet Services provided to Intermedia. EffectNet will provide Intermedia with notice ninety (90) days in advance of the commercial release date of such changes.

1.3    The Parties shall use their best efforts to accomplish the initial launch of the Intermedia UC Services ("Initial Launch Date") by December 18, 2000.

1.4    Each Party shall promptly notify the other in writing of any event, which might result in such Party's inability to continue to meet its obligations under this Agreement. Such event shall specifically include, but not be limited to, a materially adverse change in a Party's financial situation. EffectNet acknowledges and understands that Intermedia is in the process of a merger involving all of its assets with MCI/Worldcom, Inc. Such merger shall not, in and of itself, constitute an event requiring

A 00199

7.5.3  subsequent to disclosure hereunder is lawfully received from a third party having rights to such Proprietary Information without restriction of the third party's right to disseminate the Proprietary Information and without notice of any restriction against its further disclosure, is disclosed with the written approval of the other party as can be proven by documentation.

7.5.4  is obligated to be produced by a Party under order of a court of competent jurisdiction or other government authority; provided however, that the receiving party shall immediately provide notice to the disclosing party such that the disclosing party may seek injunctive relief and/or a protective order; and further provided that the disclosing party shall use best efforts to ensure that the information shall be treated as confidential by the party to whom it is disclosed.

7.5.5  is independently developed by the receiving party without reference to or reliance upon the confidential information.

In the event of a disputed disclosure, the receiving party shall bear the burden of proof of demonstrating that the information falls under one of the above exceptions.

8.    WARRANTIES.

8.1.    Authorization.  Each Party represents and warrants to the other Party that the execution and delivery of this Agreement and the performance of such Party's obligations under this Agreement have been duly authorized, and that the Agreement is a valid and binding agreement, enforceable in accordance with its terms.

8.2.    Legal Compliance.  Each Party represents and warrants that it has obtained, or will obtain prior to offering the Services hereunder, all licenses, approvals and/or regulatory authority necessary to provide the Services described herein. This Agreement is made expressly subject to all present and future valid orders and regulations of any regulatory body having jurisdiction over the subject matter of this Agreement.

8.3    No Other Warranties.  With respect to the UC Services to be provided in, and to users accessing these services from the United States and Canada, EffectNet warrants that it will exercise commercially reasonable care in the performance of its obligations under this Agreement

EFFECTNET DOES NOT WARRANT THAT THE EFFECTNET SERVICES OR THE PLATFORM THAT IT PROVIDES TO INTERMEDIA IS ERROR-FREE. IN ADDITION, THE EFFECTNET SERVICES OR INTERMEDIA PLATFORM IS PROVIDED "AS IS" AND WITHOUT ANY WARRANTY OF ANY KIND. EFFECTNET DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. NEITHER PARTY SHALL BE LIABLE FOR ANY DAMAGES ARISING FROM THE OTHER PARTY'S OR ANY THIRD PARTY'S USE OF THE EQUIPMENT, INCLUDING WITHOUT LIMITATION INDIRECT, INCIDENTAL, SPECIAL, OR CONSEQUENTIAL DAMAGES, EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILTY OF SUCH DAMAGES. THE PARTIES AGREE TO THE ALLOCATION OF LIABILITY RISK SET FORTH IN THIS SECTION. THIS LIMITATION ON LIABILITY IS INTENDED ITO APPLY WITHOUT REGARD TO

A 00200

notice pursuant to this provision, and that, accordingly, no further notice of the merger or the consummation thereof, shall be required of Intermedia.

## 2.    OBLIGATIONS OF THE PARTIES.

2.1    Product Coordinator: EffectNet and Intermedia will each designate their own Product Coordinator to coordinate the process described below.

2.1.1    The designated Product Coordinators will be the principal points of contact between the parties on product issues (the "Product Advisory Process"). Each party may rely on the authority and technical competence of the other Party's Product Coordinator to represent its respective company in connection with the priorities, needs and progress of their company's product issues.

2.1.2    The Product Advisory Process will include in-person/telephonic/electronic communication between representatives, which should be ongoing, or occur not less than once each month during the Term of this Agreement, except if the parties expressly agree to some different frequency.

2.2    EffectNet Materials. EffectNet will provide Intermedia with regular access to and copies of the following:

2.2.1    Plans for current and future enhancements to the EffectNet Services which by their nature apply to the Intermedia UC Services; and

2.2.2    Functional descriptions, development plans, schedules and periodic status for enhancements to the EffectNet Services under development, as soon as such materials exist.

2.3    Product Development. Intermedia and EffectNet agree that the EffectNet Services provided to Intermedia will be the same version of the EffectNet Services generally made commercially available, unless Intermedia deploys modifications of the EffectNet Services in order to satisfy large blocks of customer/end users, provided, however, that EffectNet shall have no obligation to support Intermedia any modification not previously known to EffectNet.

2.3.1    Intermedia will implement new versions within 30 days with call avoidance measures built into the process, including but not limited to adequate customer notification of new features, benefits and the availability of training timed to coincide with the release of any new versions.

2.3.2    EffectNet will provide Intermedia with at least ninety (90) days advance notice of an expected new release or version of EffectNet Services.

2.4    Forecasts. Intermedia shall provide EffectNet with non-binding forecasts for expected mailbox activations, at minimum of once every two (2) months during the Term of this Agreement. Intermedia will also provide EffectNet with quarterly and annual non-binding forecasts of expected mailbox activations. The availability of platform capacity to be provided by EffectNet to Intermedia is conditioned on the platform capacity demand not exceeding the forecast provided by Intermedia for any period addressed by such forecast. With respect to timely provided mailbox activation forecasts only, EffectNet will use reasonable efforts to meet Intermedia's forecasted demand. However, EffectNet reserves the right to request additional guarantees from Intermedia when the forecasts provided by Intermedia require significant or unusual capital and cost

A 00201

Statements); (Term and Termination); (Confidentiality); (Warranties); (Intellectual Property); (Indemnification); (Limitation of Liability); (General Provisions).

7.    **CONFIDENTIALITY.**  All information disclosed to the other party shall be deemed confidential and proprietary (hereinafter referred to as "Proprietary Information"). Such information includes, but is not limited to, trade secrets, know-how, technical specifications, processes, functional descriptions, architectural specifications, development plans, schedules, design information, customer lists, pricing and financial information concerning the parties' products or services, or other information relating to business development, operations, marketing, sales, performance, and any other information disclosed hereunder, which, by its nature, might reasonably be presumed to be proprietary in nature.

   7.1    Each party agrees to use the Proprietary Information received from the other party only for the purposes of analyzing the business arrangement between the parties, and in accordance with this Agreement.  No patent, copyright, trademark, invention, service mark, or other proprietary rights are implied or granted under this Agreement.

   7.2    Proprietary information supplied pursuant to this Agreement shall not be reproduced in any form by the receiving party except as required to accomplish the intent of this Agreement.

   7.3    The receiving party shall provide, at a minimum, the same care to avoid disclosure or unauthorized use of the Proprietary Information as is provided to protect its own Proprietary Information, but in no event less than a reasonable standard of care.  It is agreed that all Proprietary Information shall be retained by the receiving party in a secure place with access limited to the receiving party's employees or agents who need to know of the content of such information for purposes of fulfilling its obligations pursuant to this Agreement. The receiving party shall be fully responsible for any breach of this Agreement by its employees or agents.  The receiving party will promptly report to the disclosing party any actual or suspected violation of the terms of this Agreement, and will take all reasonable steps requested by the disclosing party to prevent, control or remedy any such violation.

   7.4    All Proprietary Information, unless otherwise specified in writing, shall remain the property of the disclosing party.  Such information shall be used by the receiving party only for the purpose set forth in this Agreement.  In addition, such Proprietary Information, including all copies thereof, shall be returned to the disclosing party or, at the request of the disclosing party, may be destroyed by the receiving party and certified as destroyed by an officer of the receiving party after the Receiving party's need for it has expired, upon request of the disclosing party; and, in any event, upon termination of the Agreement.

   7.5    Exceptions to confidentiality:  It is understood that the parties have no obligation to maintain the confidentiality of Proprietary Information which:

      7.5.1    has been published or is now otherwise in the public domain through no fault of the receiving party.

      7.5.2    prior to disclosure hereunder is within the legitimate possession of the receiving party without obligation of confidentiality as can be demonstrated by written documentation.

A 00202

by EffectNet. Intermedia is to provide the first of such forecasts to EffectNet on or before November 30, 2000. For purposes of this section EffectNet must allocate constrained capacity to Intermedia on terms at least as favorable as offered to any other customer of EffectNet. In the event that EffectNet declines orders because of capacity constraints, then EffectNet shall notify Intermedia and the Parties shall use commercially reasonable efforts to develop a solution that will provide Intermedia with a method of ensuring that the needs of Intermedia's existing and potential end users are met while ensuring that EffectNet is permitted to increase capacity in an orderly fashion.

2.5     Billing Cycle. On an every 15-day basis, EffectNet will invoice Intermedia for account fees for each account active during the previous 15 days and any late charges for previous outstanding invoices.

2.6     Payment. Intermedia will pay EffectNet in then available U.S. funds on a net-15 day basis.

2.7     Call Detail Records for Billing. Each day, EffectNet will provide to Intermedia Calling Detail Records ("CDR") on a timely basis, in a mutually agreed-upon electronic format.

2.8     Billings and Collections. Intermedia shall be responsible, at its sole expense, for all invoicing and collections with its customers, end-users, agents, subagents or resellers. EffectNet will not be responsible for any collections or bad debt by Intermedia's customers, end-users, agents, subagents or resellers2.9    Fraud. Intermedia will be solely responsible for fraudulent misuse of the Intermedia UC Services due to credit fraud, fraudulently established accounts and stolen accounts (except to the extent if such theft occurs through misuse or theft the records or facilities of EffectNet); provided that, Intermedia shall not be responsible for fraudulent misuse occurring after EffectNet has become aware of such occurrence; and, provided further, that the extent of Intermedia's liability to EffectNet for fraudulent misuse of Intermedia UC Services shall be EffectNet's direct damages and costs incurred. EffectNet shall notify Intermedia of fraud as soon as practicable, upon EffectNet's becoming aware of such fraud. The Parties will use commercially reasonable efforts to establish fraud control means and measures.

2.10    Customer Service Call Center and Technical Support. EffectNet shall maintain a customer service call center for its Intermedia customers and end-users, as appropriate in accordance with industry standards. This call center will be responsible for all customer support.

2.10.1 Call items outside the scope of EffectNet support services are: non-EffectNet related software problems and call forwarding issues.

2.11    Customer Fulfillment Process. Intermedia, when taking orders for new customers or end users, or taking orders to modify or update a customer's order, will use the EffectNet Customer Fulfillment Process or compatible process to gather the information required and to provide the customer information to EffectNet. Intermedia is responsible for providing to EffectNet such new mailbox account information reasonably required by EffectNet in order to activate a new mailbox. EffectNet shall provide documentation and training, in accordance with the training provision of this Agreement, to Intermedia on the EffectNet Customer Fulfillment Process.    2.12    Minimum Commitment. Intermedia hereby agrees to deliver a minimum 1,500 then current active subscribers on

A 00203

one (1) percent per month or (b) the maximum percentage permitted by law shall be assessed on the delinquent balance of undisputed usage not paid by the Due Date.

4.5.1 Deposit. Intermedia has provided EffectNet with a fully refundable deposit in anticipation of this Agreement in the amount of minimum subscriber commitment multiplied times $17.50 (US dollars) for a total of $175,000. This deposit shall be refunded to Intermedia in whole on or before the Ramp Date as long as Intermedia has met the Minimum Commitment as of such date. If Intermedia has not met the Minimum Commitment as of the Ramp Date, EffectNet shall refund to Intermedia the full amount of the deposit less the Reconciliation Payment then due. The amount of such Reconciliation Payment shall remain on deposit until such time as the Minimum Commitment is met.

4.5.2 In the event that Intermedia disputes any charge assessed by EffectNet, the Parties agree to cooperate to resolve the dispute at the earliest practicable date. The late charges set forth in Section of this Agreement shall not apply to payments that are the subject of a good faith dispute between EffectNet and Intermedia. If there is a good faith dispute, EffectNet cannot demand a late payment deposit.

## 5.    TERM AND TERMINATION.

5.1    Term. Unless otherwise terminated as provided herein, this Agreement shall be in force for an initial term of three (3) years after the Effective Date (the "Initial Term"). This agreement shall continue automatically for successive one year terms under the same terms and conditions contained herein together with any subsequent amendments hereto, unless either Party has sent written notice of its intent not to renew the Term at least thirty (30) days prior to the expiration of the Initial Term or the renewal period then in effect.

5.2    Termination. Either Party may terminate this Agreement: (a) if the other Party fails to fulfill any of its material obligations under this Agreement; (b) if the other Party is in breach of Section 7 (Confidentiality); (c) if the other Party becomes insolvent or admits in writing its inability to pay debts as they mature, or makes an assignment for the benefit of creditors; or (d) if a petition under any foreign, state or United States bankruptcy act, receivership statute, or the like is filed by the other Party and is not dismissed within sixty (60) days after such filing. Termination due to default under this Section shall be effective thirty (30) days after written notice to the defaulting Party if the default has not been cured within such thirty (30) day period. 5.3    Effect of Termination. Upon termination of this Agreement for any reason, each Party shall remain liable for those obligations that accrued prior to the date of such termination; provided, however, that nothing herein shall be construed to obligate EffectNet to offer Services to Intermedia after the termination of this Agreement.

5.4    Early Termination. If prior to the end of the Initial Term this Agreement is terminated for any reason by Intermedia other than pursuant to Section 5.2, Intermedia shall pay EffectNet, as liquidated damages and as the sole remedy of EffectNet and the exclusive liability of Intermedia, a one-time early termination fee equal to $270,400 times the lesser of (i) 12 months, or (ii) the number of months remaining in the contract term.

6.    SURVIVAL. The following provisions shall survive the expiration or termination, for any reason, of this Agreement: (Subscriber Information), (Charges and Billing

A 00204

or before three (3) months after December 18, 2000 (the "Rollout Date"); an additional 1,500 then current active subscribers (total 3,000) on or before six (6) months after the Rollout Date; and additional 3,500 then current active subscribers (total 6,500) on or before nine (9) months after the Rollout Date; and 10,000 total then current active subscribers on or before twelve (12) months after the Rollout Date (the "Ramp Date"), and at the end of each calendar month thereafter ( the "Minimum Commitment") for the Term of this Agreement.

2.13    Reconciliation Payment. On the Ramp Date and at the end of each calendar month thereafter, EffectNet will calculate the actual number of then current active subscribers on the last day of such calendar month and compare it to the Minimum Commitment. If the number of subscribers is less than the Minimum Commitment for the month in question, such difference will constitute a "Volume Shortfall." Intermedia shall pay EffectNet a Reconciliation Payment equal to the Volume Shortfall multiplied by the base monthly price applicable to the Intermedia UC Service per subscriber,

3.    MARKETING AND BRANDING.

3.1    Web Presence. At no additional charge, EffectNet will provide Intermedia with a private label website, URL links and related branding as reasonably directed by Intermedia.

3.2    Use of Trademarks, Service Marks and Trade names. The Parties agree not to display or use any of the trade names, service marks, brands or trademarks of the other Party, and shall not permit the same to be displayed or used by third parties, other than in connection with the sale, distribution or promotion of the brand(s) used for the Intermedia UC Services covered by this Agreement and subject to the prior written approval of the other or a third Party owning such trademark, service mark or trade name (except where such approval between the Parties is contained in this Agreement). In the absence of specific prior written consent from the other Party, a Party shall not use any part of any of the other Party's trade names, service marks, brands or trademarks as part of its own name, service marks or trademarks or in any other manner not so approved by the other Party. It is expressly understood by both Parties that trade names, service marks and trademarks of the other party are proprietary and that nothing in this Agreement constitutes the grant of a general license to use said trade names, service marks and trademarks. Upon termination of this Agreement, any and all rights or privileges of a Party to use the other Party's trade names, service marks, brands or trademarks shall expire, and each Party shall discontinue the use of the other Party's trade names, service marks, brands. The provisions of this section shall also apply to third party branding incidental to this Agreement.

3.3    Intermedia Marketing Expenses. Intermedia as the buyer of the wholesale services from EffectNet, is responsible for all expenses and obligations incurred by Intermedia as a result of its efforts to attract and solicit customers for Intermedia UC Services. Intermedia expressly acknowledges that it is not entitled to any reimbursement by EffectNet for such expenses unless, and only to the extent that, both parties hereto agree in writing prior to the incursion of such expenses, as set forth in this Agreement.

A 00205

4.    **CHARGES AND BILLING STATEMENTS.**

    4.1    Traffic- or usage-sensitive rates shall be computed in 30-second initial and 6-second continual increments.

    4.2    Intermedia shall be responsible for all applicable taxes, including but not limited to sales or value-added taxes, utility or excise taxes, fees and/or surcharges that are imposed by federal, state, or local governments on the Intermedia UC Services or business generated by Intermedia through the sale of Intermedia UC Services as a result of long distance or services bundled within the Intermedia UC Services. Intermedia shall pay or reimburse EffectNet for all taxes collected or imposed on these services provided by EffectNet. The prices quotes in the following sections are exclusive of any and all taxes. Excluded from this responsibility are taxes based on EffectNet's net income. EffectNet shall comply with all federal and state regulations with respect to employee withholding taxes.

    4.3    <u>Pricing.</u>  Pricing shall be as indicated by Appendix "P" attached hereto.

    4.4    Seven (7) working days post the close of the month, EffectNet shall provide to Intermedia a settlement statement ("Settlement Statement") providing a summary of charges for the previous month's billing cycle in an industry standard format. The settlement statement, unless specified elsewhere in this Agreement, shall contain the following:

    4.4.1    A listing of monthly recurring charges for the current or prior month's billing cycle.

    4.4.2    For calls or traffic originated by Intermedia or any customers, agents, sub-agents and/or end-users during the previous month, the individual call detail and the aggregate usage charge payable broken down by termination location.

    4.4.3    For calls or traffic terminated by Intermedia or any customers, agents, sub-agents and/or end-users during the previous month, the individual call detail and the aggregate usage charge payable broken down by termination location.

    4.4.4    Any taxes, fees and/or charges that are imposed by federal, state, and/or local governments.

    4.4.5    The net amount payable by Intermedia to EffectNet or payable to Intermedia by EffectNet.

    4.4.6    When applicable, any mutually negotiated additional fees.

    4.5    Payment of the Settlement Statement shall be made within 15(fifteen) calendar days after the Settlement Statement and invoice are received by Intermedia (the "Due Date"). Payments to EffectNet shall be in United States dollars and are to be made for credit to an account of EffectNet to be determined by EffectNet and provided to Intermedia within three (3) days of the date of execution of this Agreement by the later signing party. If payment is not received by the Due Date, a late fee of the lesser of (a)

A 00206