## VI.    THE DEBTORS' OBJECTIONS TO EFFECTNET'S LOST REVENUE CLAIMS ARE ALSO UNFOUNDED ON THE MERITS OR AT LEAST REQUIRE DISCOVERY

56.    Even if the Claims Objection satisfies the Debtors' burden to adduce evidence and meets the requirements of Bankruptcy Rule 3007, the Debtors' arguments concerning EffectNet's lost revenue Claims lack merit and must be denied for the reasons that follow.

57.    At a minimum, any decision on that portion of the Claims Objection that relates to EffectNet's breach of contract claims must be deferred to permit discovery as is provided by Bankruptcy Rules 9014 and 7001 et. seq.  See In re Thompson 965 F.2d 1136, 1147 (1st Cir. 1992)(noting that a claims objection is a contested matter); Sure-Snap Corp. v. Bradford National Bank, 128 B.R. 885 (D. Vt. 1991)(same); In re Rockefeller Center Properties, 272 B.R. 524, 540 (Bankr. S.D.N.Y. 2000)(observing that "[w]hen an objection to a claim is contested, a contested matter is created").

58.    As a cautionary measure, EffectNet responds in summary fashion to the substance of the Debtors' objections as follows:[9]

### (i)    EffectNet is Entitled to Damages for Lost Revenues.

59.    The Debtors have mischaracterized one element of EffectNet's Claims by their argument that EffectNet is merely seeking to recover monthly payments under a contract that was cancelled.  EffectNet is in fact seeking damages based on Intermedia's total breach and repudiation of the UC Contract.

60.    As noted, EffectNet reserves all rights concerning the measure of damages it is entitled to based on Intermedia's breach of the UC Contract, including, but not limited to, lost revenue.  At the same time, courts have measured lost revenues damages in breach of contract actions based on the total take-or-pay payments that remain due under these contract

---

[9] EffectNet reserves all rights to present a more formal brief discussing these issues in this contested matter.

A 00977

requirements. See Colorado Interstate Gas Company, Inc. v. Chemco, Inc., 833 P.2d 786 (Colo App. 1992) (rejecting arguments that awarding damages based on this measure would over-compensate plaintiff; Prenalta Corp. v. Colorado Interstate Gas Co., 944 F.2d 677 (10th Cir. 1991). Based on this reasoning alone, WorldCom's objection to EffectNet's breach of contract claim should be rejected summarily.

61.     Further, it is settled Arizona law[10] that upon a material breach of contract, the injured party may cease further performance and still enforce valid claims based on the agreement. See, e.g., Coronado Co., Inc. v. Jacome's Department Store, Inc., 629 P.2d 553 (Ariz. 1981) (under the independent breach of contract by one party, the other party may treat the contract at an end and sue for damages); Zancanaro v. Cross, 339 P.2d 746 (Ariz. 1959); see also All American School Supply Co. v. Slavens, 609 P.2d 46 (Ariz. 1980) (affirming judgment that awarded full contract price).

62.     In the Zancanaro case, for example, a subcontractor agreed to install plumbing in 50 homes.  The defendant built only 25 houses and the plaintiff sued for a breach of the agreement. The Supreme Court of Arizona found that the defendant breached his promise to have the entire 50 houses ready for Zancanaro. See id.  In finding for the plaintiff, the Court observed that when there is a material breach of contract, one remedy available to the wronged party is "the right to cease performance and recover the profits which would have been made had the entire contract been performed." See id. at 749.  Here, EffectNet's contract claims are for amounts due for Services actually tendered and for the aggregate payments EffectNet expected to receive under the UC Contract for the remainder of its term.  These are clearly recoverable under the foregoing legal authority.

---

[10] The UC Contract contains a choice of law provision that directs the parties to use the laws of Arizona.

A 00978

63.    In fact, EffectNet's Claims under the UC Contract are consistent with and should be allowed based on Intermedia's "total breach" of the UC Contract. See Healey v. Coury, 783 P.2d 795 (Ariz. 1989) (finding it reversible error where trial court prohibited plaintiff from seeking award of total damages based on defendant's breach of contract); see also Mobil Oil Exploration & Producing Southeast, Inc. v. U.S., 120 S. Ct. 2423 (2000).

64.    Finally, this objection by the Debtors to EffectNet's breach of contract Claim should be rejected as an apparent ploy to enforce contract provisions that the Debtors are apparently seeking to impute to the agreement. EffectNet submits that there is no provision in the UC Contract that limits EffectNet's damages in the manner that has been suggested. At most, the UC Contract relieved EffectNet of any obligation to further perform under the UC Contract once Intermedia breached the UC Contract and thereafter refused to cure its defaults after notice to Intermedia. To the extent there is, however, a provision that limits EffectNet's damages if the UC Contract is terminated, the Debtors cannot seek to enforce any such limitation by virtue of Intermedia's prior breach of that same agreement and by reason of Intermedia's willful misconduct, bad faith and unconscionable conduct in breaching the UC Contract in the manner it did. See, e.g., Countryside Orthopedics, P.C. v. Peyton, 541 S.E.2d 279 (Va. 2000) ("when the first breaching party commits a material breach, that party cannot enforce the contract").

A 00979

(ii)    **The Claims are not a Penalty.**

65.    None of the damages EffectNet seeks are a "penalty" and the Court should therefore reject the Debtors' argument that EffectNet cannot recover the damages it has sought on these grounds.

66.    Take-or-pay obligations like those sought as EffectNet's minimum lost revenue Claims based on the breach of the UC Contract are neither liquidated damages nor penalties. See Prenalta Corp. v. Colorado Interstate Gas Co., 944 F.2d 677 (10th Cir. 1991); Sabine Corp. v. ONG Western, Inc., 725 F.Supp. 1157 (W.D. Okla. 1989) (rejecting arguments that take-or-pay obligations under contract were penalty); Resources Investment Corp. v. Enron Corp., 669 F.Supp. 1038 (D. Colo. 1987)(take-or-pay obligations impose alternative obligations – not penalties or liquidated damages); Colorado Interstate Gas Company, Inc. v. Chemco, Inc., 833 P.2d 786 (Colo App. 1992). Since the obligations EffectNet seeks payment for are not penalties, the Debtors' penalty argument fails.

67.    Moreover, the penalty arguments are unconvincing. Arizona case law provides that even when damages are specified in a contract, "the terms of the contract generally control." Roscoe-Gill v. Newman, 937 P.2d 673 (Ariz. 1997). The Debtors have offered no evidence and have cited no cases to displace this presumption, even if the Court were to find that the minimum payments were damages.

68.    Even if EffectNet's minimum Claims were stipulated damages, they still do not constitute a penalty. Arizona law provides that stipulated damages are enforceable so long as they are a reasonable forecast of just compensation for the harm caused by a breach, and the harm is difficult of actual estimation. Pima Savings and Loan Assn. v. Rampello, 812 P.2d 1115

A 00980

(Ariz. 1991) (enforcing liquidated damages clause on facts); Mechanical Air Engineering Co. v. Totem Construction Co., 801 P.2d 426 (Ariz. 1989)(same).

69.    As noted, the compensation required by the UC Contract was based in part on the number of Intermedia customers that purchased Services.  It is clear, therefore, that the precise compensation required by the basic terms of UC Contract would depend on the number of Intermedia customers that used the Services, a figure difficult to project.  As also noted, Intermedia agreed in the UC Contract to deliver a minimum number of users for the Services, described as a Minimum Commitment, and agreed to tender Reconciliation Payments based on any failure to deliver the required number of subscribers for the Services.  Here, EffectNet has based a portion of its Claims on these provisions of the UC Contract.  It is clear that this portion of the Claims is directly tied to the compensation EffectNet has been deprived of based on Intermedia's breach of the contract.

**(iii)    EffectNet has Properly Calculated its Minimum Claims under the Agreement.**

70.    The Debtors' argument that EffectNet has not properly calculated some or all of its Claims under the UC Contract is also faulty.

71.    It appears that this portion of the Claims Objection relates to EffectNet's Claims based the take-or-pay requirements of the UC Contract.  As is set forth above, the UC Contract provides in Sections 2.12 and 2.13 that, as a minimum payment, Intermedia must pay an amount equal to the Minimum Commitment times the base monthly price applicable to the Services. Here, the Minimum Commitment under the UC Contract for all relevant periods was 10,000 customers.  See UC Contract, at section 2.12.  At the same time, the based monthly price was set

20

at $27.40 per customer.[11]  A simple multiplication of these amounts totals $274,000 per month

for the remaining contract term.  The Debtors' arguments on this issue are simply unfounded.

> **(iv)    The Debtors' Assignment Argument is Defective.**

72.    The Court should summarily reject the Debtors' assignment arguments as well.

There has been no assignment and even if there had been, the UC Contract would have permitted

that action.

73.    The UC Contract was signed by EffectNet, LLC and Intermedia.  On or about

December 27, 2000, EffectNet LLC merged into EffectNet, Inc.  In 2004, EffectNet, Inc. merged

into Parus Holdings, Inc.[12]

74.    Moreover, the Debtors' assertion that the UC Contract does not permit assignment

is defective.  Section 12.2 of the UC Contract clearly anticipated and authorized the contract's

assignment.  See UC Contract, at Section 12.2 (permitting assignment).

75.    Indeed, the UC Contract was prepared at a time when Intermedia was

contemplating a business combination with WorldCom, and the UC Contract clearly provides

that if Intermedia was acquired by WorldCom, no approval was required to assign the contract.

Id. As is evident by the captioned chapter 11 proceedings, WorldCom and Intermedia did in fact

engage in a business combination (with Intermedia remaining a separate entity); thus no consent

for any assignment of the agreement was required in the first place.

> **(v)    EffectNet has not Received any Payment on its Claims.**

76.    The Court should also reject the Debtors' bald assertion that EffectNet has

received payment on a portion of its Claims.  The Debtors have failed to specify which payments

---

[11] See discussion at paragraphs 25-26, supra.
[12] True and accurate copies of certificates concerning these merger transactions are attached as Exhibits G and H.

A 00982

they believe were made to EffectNet. Moreover, EffectNet has no record that any payments attributable to its Claims has even been tendered, much less accepted.

## VII. THE DEBTORS' OBJECTIONS RELATING TO EFFECTNET'S CONSPIRACY, UNFAIR TRADE PRACTICES AND TORTIOUS INTERFERENCE CLAIMS REQUIRE DISCOVERY

77.    Finally, the Debtors' objection to EffectNet's conspiracy, unfair trade practices and tortious interference claims are premature and must be denied and or at least deferred pending discovery.

78.    As noted in the background discussion, Intermedia's breach of the UC Contract took place contemporaneously with the negotiations between WorldCom and Webley concerning the MASL and after WorldCom completed intensive technology and financial due diligence of Webley. Given these disclosures, the Debtors were clearly aware of EffectNet's pending merger with Webley, aware of the UC Contract's importance to EffectNet/Webley's business plan and financial condition, and aware of the contract's importance to its ability to raise equity, and to fund ongoing operations.

79.    After the Intermedia-WorldCom business combination, EffectNet was advised that WorldCom would be overseeing all projects relating to the UC Contract, and senior members of Intermedia that had dealt with EffectNet concerning the UC Contract were apparently dismissed or reassigned. Accordingly, EffectNet believes that WorldCom was directly involved in and directed the apparent decision to breach the UC Contract.

80.    In its negotiations concerning the MASL, WorldCom attempted to negotiate a patently unfair licensing agreement to use EffectNet-Webley technology.

81.    WorldCom succeeded in obtaining MASL terms that would not have been attainable unless the Debtors had imposed severe financial pressures upon EffectNet.

A 00983

82.    EffectNet believes that the juxtaposition of these events strongly suggests that these matters were directly related.  However, the Debtors control a majority of the evidence relevant to these claims.

83.    "When an objection to a claim is contested, a contested matter is created."  In re Rockefeller Center Properties, 272 B.R. 524 (Bankr. S.D.N.Y. 2000).  A number of the rules found in Part VII of the Federal Rules of Bankruptcy Procedure which apply in adversary proceedings are also applicable here.  These include various discovery rules found in Rules 7026 – 7036.  EffectNet intends to initiate discovery shortly concerning the matters described in its Proofs of Claim in accordance with these rules.  It is therefore premature for the Court to make any determination concerning EffectNet's conspiracy, unfair trade practices and tortious interference claims.

## VIII.   RESERVATION OF RIGHTS

84.    EffectNet reserves all rights to supplement or otherwise amend this response to, without limitation, reflect information gathered in discovery.

WHEREFORE, EffectNet respectfully requests that the Court (i) overrule the Claims Objection; (ii) enter a scheduling order; and (iii) grant such other and further relief as is just and

A 00984

necessary.

Date:   New York, New York
        July 30, 2004

By:     /s/ Stephanie K. Hoos
        Stephanie K. Hoos (SH-9821)
        MINTZ, LEVIN, COHN, FERRIS,
            GLOVSKY & POPEO, P.C.
        Chrysler Center
        666 Third Avenue
        New York, New York 10017

        -and-

        Michael Gardener
        Robert Duggan
        Ian A. Hammel
        MINTZ, LEVIN, COHN, FERRIS,
            GLOVSKY & POPEO
        1 Financial Center
        Boston, Massachusetts 02111

        Attorneys for Parus Holdings, Inc., successor to
        EffectNet, Inc.

24

A 00985

*Exhibit A*

A 00986

ORIGINAL

# EffectNet

# Unified Communications Services General Agreement For

# Intermedia Communications, Inc.

A 00987

# UNIFIED COMMUNICATIONS SERVICES GENERAL AGREEMENT

This Unified Communications General Agreement (the "Agreement") is entered into as of the 20 day of November 2000, ("Effective Date") by and between EffectNet LLC, a Nevada Limited Liability Company ("EffectNet") and Intermedia Communications, Inc. organized under the laws of The State of Delaware, with a business address at One Intermedia Way, Tampa, FL 33647 ("Intermedia") (collectively "Parties" or individually a "Party").

**WHEREAS,** Intermedia is Integrated Communications Provider providing telecommunication services including local dial tone, long distance, data services, etc.

**WHEREAS,** EffectNet is a unified communications application service provider that offers private label Internet and telecommunications products and services, including unified communications and other value-added services, in-house customer services, billing and technical support (the "EffectNet Services").

**WHEREAS,** EffectNet desires to provide Intermedia with a customized Intermedia-branded wholesale communications service ("Private Label") for sale by Intermedia to its end user customers (the services collectively hereinafter described as "Intermedia UC Services" or "UC Services").

**WHEREAS,** EffectNet and Intermedia recognize that the provision of Intermedia UC Services requires the Parties to closely work together to meet customer needs and to implement and ensure the commercial viability of the Intermedia UC Services.

**NOW THEREFORE,** in consideration of the promises and mutual agreements contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which the Parties acknowledge, the Parties agree as follows:

1.  **GENERAL PROVISIONS.**

    1.1     Both Parties agree that EffectNet shall offer Intermedia UC Services for Intermedia as described in this Agreement. Intermedia will market the UC Services to Intermedia customers and end-users as it sees fit.   For purposes of this Agreement, the term "customers" shall include, but not be limited to wholesale and retail customers of Intermedia UC Services.

    1.2     EffectNet may make changes to the EffectNet Services from time to time in order to improve, modify or extend the EffectNet Services ("EffectNet Changes"), but in no event shall such changes decrease the quality of the EffectNet Services provided to Intermedia. EffectNet will provide Intermedia with notice ninety (90) days in advance of the commercial release date of such changes.

    1.3     The Parties shall use their best efforts to accomplish the initial launch of the Intermedia UC Services ("Initial Launch Date") by December 18, 2000.

    1.4     Each Party shall promptly notify the other in writing of any event, which might result in such Party's inability to continue to meet its obligations under this Agreement.  Such event shall specifically include, but not be limited to, a materially adverse change in a Party's financial situation. EffectNet acknowledges and understands that Intermedia is in the process of a merger involving all of its assets with MCI/Worldcom, Inc.  Such merger shall not, in and of itself, constitute an event requiring

A 00988

notice pursuant to this provision, and that, accordingly, no further notice of the merger or the consummation thereof, shall be required of Intermedia.

2.    **OBLIGATIONS OF THE PARTIES**.

    2.1    **Product Coordinator**: EffectNet and Intermedia will each designate their own Product Coordinator to coordinate the process described below.

        2.1.1    The designated Product Coordinators will be the principal points of contact between the parties on product issues (the "Product Advisory Process"). Each party may rely on the authority and technical competence of the other Party's Product Coordinator to represent its respective company in connection with the priorities, needs and progress of their company's product issues.

        2.1.2    The Product Advisory Process will include in-person/telephonic/electronic communication between representatives, which should be ongoing, or occur not less than once each month during the Term of this Agreement, except if the parties expressly agree to some different frequency.

    2.2    **EffectNet Materials**. EffectNet will provide Intermedia with regular access to and copies of the following:

        2.2.1    Plans for current and future enhancements to the EffectNet Services which by their nature apply to the Intermedia UC Services; and

        2.2.2    Functional descriptions, development plans, schedules and periodic status for enhancements to the EffectNet Services under development, as soon as such materials exist.

    2.3    **Product Development**.  Intermedia and EffectNet agree that the EffectNet Services provided to Intermedia will be the same version of the EffectNet Services generally made commercially available, unless Intermedia deploys modifications of the EffectNet Services in order to satisfy large blocks of customer/end users, provided, however, that EffectNet shall have no obligation to support Intermedia any modification not previously known to EffectNet.

        2.3.1    Intermedia will implement new versions within 30 days with call avoidance measures built into the process, including but not limited to adequate customer notification of new features, benefits and the availability of training timed to coincide with the release of any new versions.

        2.3.2    EffectNet will provide Intermedia with at least ninety (90) days advance notice of an expected new release or version of EffectNet Services.

    2.4    **Forecasts**.  Intermedia shall provide EffectNet with non-binding forecasts for expected mailbox activations, at minimum of once every two (2) months during the Term of this Agreement. Intermedia will also provide EffectNet with quarterly and annual non-binding forecasts of expected mailbox activations. The availability of platform capacity to be provided by EffectNet to Intermedia is conditioned on the platform capacity demand not exceeding the forecast provided by Intermedia for any period addressed by such forecast. With respect to timely provided mailbox activation forecasts only, EffectNet will use reasonable efforts to meet Intermedia's forecasted demand. However, EffectNet reserves the right to request additional guarantees from Intermedia when the forecasts provided by Intermedia require significant or unusual capital and cost

A 00989

by EffectNet. Intermedia is to provide the first of such forecasts to EffectNet on or before November 30, 2000. For purposes of this section EffectNet must allocate constrained capacity to Intermedia on terms at least as favorable as offered to any other customer of EffectNet. In the event that EffectNet declines orders because of capacity constraints, then EffectNet shall notify Intermedia and the Parties shall use commercially reasonable efforts to develop a solution that will provide Intermedia with a method of ensuring that the needs of Intermedia's existing and potential end users are met while ensuring that EffectNet is permitted to increase capacity in an orderly fashion.

2.5    Billing Cycle. On an every 15-day basis, EffectNet will invoice Intermedia for account fees for each account active during the previous 15 days and any late charges for previous outstanding invoices.

2.6    Payment. Intermedia will pay EffectNet in then available U.S. funds on a net-15 day basis.

2.7    Call Detail Records for Billing. Each day, EffectNet will provide to Intermedia Calling Detail Records ("CDR") on a timely basis, in a mutually agreed-upon electronic format.

2.8    Billings and Collections. Intermedia shall be responsible, at its sole expense, for all invoicing and collections with its customers, end-users, agents, subagents or resellers. EffectNet will not be responsible for any collections or bad debt by Intermedia's customers, end-users, agents, subagents or resellers2.9    Fraud. Intermedia will be solely responsible for fraudulent misuse of the Intermedia UC Services due to credit fraud, fraudulently established accounts and stolen accounts (except to the extent if such theft occurs-through misuse or theft the records or facilities of EffectNet); provided that, Intermedia shall not be responsible for fraudulent misuse occurring after EffectNet has become aware of such occurrence; and, provided further, that the extent of Intermedia's liability to EffectNet for fraudulent misuse of Intermedia UC Services shall be EffectNet's direct damages and costs incurred. EffectNet shall notify Intermedia of fraud as soon as practicable, upon EffectNet's becoming aware of such fraud. The Parties will use commercially reasonable efforts to establish fraud control means and measures.

2.10    Customer Service Call Center and Technical Support. EffectNet shall maintain a customer service call center for its Intermedia customers and end-users, as appropriate in accordance with industry standards. This call center will be responsible for all customer support.

2.10.1 Call items outside the scope of EffectNet support services are: non-EffectNet related software problems and call forwarding issues.

2.11    Customer Fulfillment Process. Intermedia, when taking orders for new customers or end users, or taking orders to modify or update a customer's order, will use the EffectNet Customer Fulfillment Process or compatible process to gather the information required and to provide the customer information to EffectNet. Intermedia is responsible for providing to EffectNet such new mailbox account information reasonably required by EffectNet in order to activate a new mailbox. EffectNet shall provide documentation and training, in accordance with the training provision of this Agreement, to Intermedia on the EffectNet Customer Fulfillment Process.    2.12    Minimum Commitment. Intermedia hereby agrees to deliver a minimum 1,500 then current active subscribers on

A 00990

or before three (3) months after December 18, 2000 (the "Rollout Date"); an additional 1,500 then current active subscribers (total 3,000) on or before six (6) months after the Rollout Date; and additional 3,500 then current active subscribers (total 6,500) on or before nine (9) months after the Rollout Date; and 10,000 total then current active subscribers on or before twelve (12) months after the Rollout Date (the "Ramp Date"), and at the end of each calendar month thereafter ( the "Minimum Commitment") for the Term of this Agreement.

2.13    Reconciliation Payment. On the Ramp Date and at the end of each calendar month thereafter, EffectNet will calculate the actual number of then current active subscribers on the last day of such calendar month and compare it to the Minimum Commitment. If the number of subscribers is less than the Minimum Commitment for the month in question, such difference will constitute a "Volume Shortfall." Intermedia shall pay EffectNet a Reconciliation Payment equal to the Volume Shortfall multiplied by the base monthly price applicable to the Intermedia UC Service per subscriber,

## 3.    MARKETING AND BRANDING.

3.1    Web Presence. At no additional charge, EffectNet will provide Intermedia with a private label website, URL links and related branding as reasonably directed by Intermedia.

3.2    Use of Trademarks, Service Marks and Trade names. The Parties agree not to display or use any of the trade names, service marks, brands or trademarks of the other Party, and shall not permit the same to be displayed or used by third parties, other than in connection with the sale, distribution or promotion of the brand(s) used for the Intermedia UC Services covered by this Agreement and subject to the prior written approval of the other or a third Party owning such trademark, service mark or trade name (except where such approval between the Parties is contained in this Agreement). In the absence of specific prior written consent from the other Party, a Party shall not use any part of any of the other Party's trade names, service marks, brands or trademarks as part of its own name, service marks or trademarks or in any other manner not so approved by the other Party. It is expressly understood by both Parties that trade names, service marks and trademarks of the other party are proprietary and that nothing in this Agreement constitutes the grant of a general license to use said trade names, service marks and trademarks. Upon termination of this Agreement, any and all rights or privileges of a Party to use the other Party's trade names, service marks, brands or trademarks shall expire, and each Party shall discontinue the use of the other Party's trade names, service marks, brands. The provisions of this section shall also apply to third party branding incidental to this Agreement.

3.3    Intermedia Marketing Expenses.  Intermedia as the buyer of the wholesale services from EffectNet, is responsible for all expenses and obligations incurred by Intermedia as a result of its efforts to attract and solicit customers for Intermedia UC Services.  Intermedia expressly acknowledges that it is not entitled to any reimbursement by EffectNet for such expenses unless, and only to the extent that, both parties hereto agree in writing prior to the incursion of such expenses, as set forth in this Agreement.

A 00991

4.    **CHARGES AND BILLING STATEMENTS.**

4.1    Traffic- or usage-sensitive rates shall be computed in 30-second initial and 6-second continual increments.

4.2    Intermedia shall be responsible for all applicable taxes, including but not limited to sales or value-added taxes, utility or excise taxes, fees and/or surcharges that are imposed by federal, state, or local governments on the Intermedia UC Services or business generated by Intermedia through the sale of Intermedia UC Services as a result of long distance or services bundled within the Intermedia UC Services. Intermedia shall pay or reimburse EffectNet for all taxes collected or imposed on these services provided by EffectNet. The prices quotes in the following sections are exclusive of any and all taxes. Excluded from this responsibility are taxes based on EffectNet's net income. EffectNet shall comply with all federal and state regulations with respect to employee withholding taxes.

4.3    Pricing.    Pricing shall be as indicated by Appendix "P" attached hereto.

4.4    Seven (7) working days post the close of the month, EffectNet shall provide to Intermedia a settlement statement ("Settlement Statement") providing a summary of charges for the previous month's billing cycle in an industry standard format. The settlement statement, unless specified elsewhere in this Agreement, shall contain the following:

4.4.1    A listing of monthly recurring charges for the current or prior month's billing cycle.

4.4.2    For calls or traffic originated by Intermedia or any customers, agents, sub-agents and/or end-users during the previous month, the individual call detail and the aggregate usage charge payable broken down by termination location.

4.4.3    For calls or traffic terminated by Intermedia or any customers, agents, sub-agents and/or end-users during the previous month, the individual call detail and the aggregate usage charge payable broken down by termination location.

4.4.4    Any taxes, fees and/or charges that are imposed by federal, state, and/or local governments.

4.4.5    The net amount payable by Intermedia to EffectNet or payable to Intermedia by EffectNet.

4.4.6    When applicable, any mutually negotiated additional fees.

4.5    Payment of the Settlement Statement shall be made within 15(fifteen) calendar days after the Settlement Statement and invoice are received by Intermedia (the "Due Date"). Payments to EffectNet shall be in United States dollars and are to be made for credit to an account of EffectNet to be determined by EffectNet and provided to Intermedia within three (3) days of the date of execution of this Agreement by the later signing party. If payment is not received by the Due Date, a late fee of the lesser of (a)

A 00992

one (1) percent per month or (b) the maximum percentage permitted by law shall be assessed on the delinquent balance of undisputed usage not paid by the Due Date.

> 4.5.1 Deposit. Intermedia has provided EffectNet with a fully refundable deposit in anticipation of this Agreement in the amount of minimum subscriber commitment multiplied times $17.50 (US dollars) for a total of $175,000. This deposit shall be refunded to Intermedia in whole on or before the Ramp Date as long as Intermedia has met the Minimum Commitment as of such date. If Intermedia has not met the Minimum Commitment as of the Ramp Date, EffectNet shall refund to Intermedia the full amount of the deposit less the Reconciliation Payment then due. The amount of such Reconciliation Payment shall remain on deposit until such time as the Minimum Commitment is met.

> 4.5.2 In the event that Intermedia disputes any charge assessed by EffectNet, the Parties agree to cooperate to resolve the dispute at the earliest practicable date. The late charges set forth in Section of this Agreement shall not apply to payments that are the subject of a good faith dispute between EffectNet and Intermedia. If there is a good faith dispute, EffectNet cannot demand a late payment deposit.

## 5.    TERM AND TERMINATION.

5.1    Term. Unless otherwise terminated as provided herein, this Agreement shall be in force for an initial term of three (3) years after the Effective Date (the "Initial Term"). This agreement shall continue automatically for successive one year terms under the same terms and conditions contained herein together with any subsequent amendments hereto, unless either Party has sent written notice of its intent not to renew the Term at least thirty (30) days prior to the expiration of the Initial Term or the renewal period then in effect.

5.2    Termination. Either Party may terminate this Agreement: (a) if the other Party fails to fulfill any of its material obligations under this Agreement; (b) if the other Party is in breach of Section 7 (Confidentiality); (c) if the other Party becomes insolvent or admits in writing its inability to pay debts as they mature, or makes an assignment for the benefit of creditors; or (d) if a petition under any foreign, state or United States bankruptcy act, receivership statute, or the like is filed by the other Party and is not dismissed within sixty (60) days after such filing. Termination due to default under this Section shall be effective thirty (30) days after written notice to the defaulting Party if the default has not been cured within such thirty (30) day period. 5.3    Effect of Termination. Upon termination of this Agreement for any reason, each Party shall remain liable for those obligations that accrued prior to the date of such termination; provided, however, that nothing herein shall be construed to obligate EffectNet to offer Services to Intermedia after the termination of this Agreement.

5.4    Early Termination. If prior to the end of the Initial Term this Agreement is terminated for any reason by Intermedia other than pursuant to Section 5.2, Intermedia shall pay EffectNet, as liquidated damages and as the sole remedy of EffectNet and the exclusive liability of Intermedia, a one-time early termination fee equal to $270,400 times the lesser of (i) 12 months, or (ii) the number of months remaining in the contract term.

6.    SURVIVAL. The following provisions shall survive the expiration or termination, for any reason, of this Agreement: (Subscriber Information), (Charges and Billing

A 00993

Statements); (Term and Termination); (Confidentiality); (Warranties); (Intellectual Property); (Indemnification); (Limitation of Liability); (General Provisions).

7.    **CONFIDENTIALITY.**  All information disclosed to the other party shall be deemed confidential and proprietary (hereinafter referred to as "Proprietary Information"). Such information includes, but is not limited to, trade secrets, know-how, technical specifications, processes, functional descriptions, architectural specifications, development plans, schedules, design information, customer lists, pricing and financial information concerning the parties' products or services, or other information relating to business development, operations, marketing, sales, performance, and any other information disclosed hereunder, which, by its nature, might reasonably be presumed to be proprietary in nature.

7.1    Each party agrees to use the Proprietary Information received from the other party only for the purposes of analyzing the business arrangement between the parties, and in accordance with this Agreement.  No patent, copyright, trademark, invention, service mark, or other proprietary rights are implied or granted under this Agreement.

7.2    Proprietary information supplied pursuant to this Agreement shall not be reproduced in any form by the receiving party except as required to accomplish the intent of this Agreement.

7.3    The receiving party shall provide, at a minimum, the same care to avoid disclosure or unauthorized use of the Proprietary Information as is provided to protect its own Proprietary Information, but in no event less than a reasonable standard of care.  It is agreed that all Proprietary Information shall be retained by the receiving party in a secure place with access limited to the receiving party's employees or agents who need to know of the content of such information for purposes of fulfilling its obligations pursuant to this Agreement. The receiving party shall be fully responsible for any breach of this Agreement by its employees or agents.  The receiving party will promptly report to the disclosing party any actual or suspected violation of the terms of this Agreement, and will take all reasonable steps requested by the disclosing party to prevent, control or remedy any such violation.

7.4    All Proprietary Information, unless otherwise specified in writing, shall remain the property of the disclosing party.  Such information shall be used by the receiving party only for the purpose set forth in this Agreement.  In addition, such Proprietary Information, including all copies thereof, shall be returned to the disclosing party or, at the request of the disclosing party, may be destroyed by the receiving party and certified as destroyed by an officer of the receiving party after the Receiving party's need for it has expired, upon request of the disclosing party; and, in any event, upon termination of the Agreement.

7.5    Exceptions to confidentiality:  It is understood that the parties have no obligation to maintain the confidentiality of Proprietary Information which:

7.5.1    has been published or is now otherwise in the public domain through no fault of the receiving party.

7.5.2    prior to disclosure hereunder is within the legitimate possession of the receiving party without obligation of confidentiality as can be demonstrated by written documentation.

A 00994

7.5.3   subsequent to disclosure hereunder is lawfully received from a third party having rights to such Proprietary Information without restriction of the third party's right to disseminate the Proprietary Information and without notice of any restriction against its further disclosure, is disclosed with the written approval of the other party as can be proven by documentation.

7.5.4   is obligated to be produced by a Party under order of a court of competent jurisdiction or other government authority; provided however, that the receiving party shall immediately provide notice to the disclosing party such that the disclosing party may seek injunctive relief and/or a protective order; and further provided that the disclosing party shall use best efforts to ensure that the information shall be treated as confidential by the party to whom it is disclosed.

7.5.5   is independently developed by the receiving party without reference to or reliance upon the confidential information.

In the event of a disputed disclosure, the receiving party shall bear the burden of proof of demonstrating that the information falls under one of the above exceptions.

8.    **WARRANTIES.**

8.1.    Authorization.  Each Party represents and warrants to the other Party that the execution and delivery of this Agreement and the performance of such Party's obligations under this Agreement have been duly authorized, and that the Agreement is a valid and binding agreement, enforceable in accordance with its terms.

8.2.    Legal Compliance.  Each Party represents and warrants that it has obtained, or will obtain prior to offering the Services hereunder, all licenses, approvals and/or regulatory authority necessary to provide the Services described herein. This Agreement is made expressly subject to all present and future valid orders and regulations of any regulatory body having jurisdiction over the subject matter of this Agreement.

8.3    No Other Warranties.  With respect to the UC Services to be provided in, and to users accessing these services from the United States and Canada, EffectNet warrants that it will exercise commercially reasonable care in the performance of its obligations under this Agreement

**EFFECTNET DOES NOT WARRANT THAT THE EFFECTNET SERVICES OR THE PLATFORM THAT IT PROVIDES TO INTERMEDIA IS ERROR-FREE. IN ADDITION, THE EFFECTNET SERVICES OR INTERMEDIA PLATFORM IS PROVIDED "AS IS" AND WITHOUT ANY WARRANTY OF ANY KIND. EFFECTNET DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. NEITHER PARTY SHALL BE LIABLE FOR ANY DAMAGES ARISING FROM THE OTHER PARTY'S OR ANY THIRD PARTY'S USE OF THE EQUIPMENT, INCLUDING WITHOUT LIMITATION INDIRECT, INCIDENTAL, SPECIAL, OR CONSEQUENTIAL DAMAGES, EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILTY OF SUCH DAMAGES. THE PARTIES AGREE TO THE ALLOCATION OF LIABILITY RISK SET FORTH IN THIS SECTION. THIS LIMITATION ON LIABILITY IS INTENDED ITO APPLY WITHOUT REGARD TO**

A 00995

WHETHER OTHER PROVISIONS OF THIS CONTRACT HAVE BEEN BREACHED OR PROVEN INEFFECTIVE. "AS IS" means the As Is condition of the EffectNet Services to be provided as Intermedia UC Services, including such customer support, software and hardware as required in the condition as of the Initial Launch Date agreed upon between the Parties and including any planned enhancement as well as any other changes mutually agreed upon. These products may as of the Initial Launch Date include works for hire for the benefit of Intermedia as further described in Section 9.2.

9.    INTELLECTUAL PROPERTY.

9.1    General. Except as otherwise agreed in writing between the Parties, EffectNet shall own any Patent applications and Patents issued on inventions under this Agreement. All Inventions that are not the subject of patents or applications will be considered Confidential Information of EffectNet. Nothing in this Agreement shall be construed to transfer any right title or interest in EffectNet's designs, inventions, copyrights, trade secrets, trade names or other intellectual property.

10.    INDEMNIFICATION. Each Party ("Indemnitor") will defend, indemnify and hold harmless the other Party and such Party's affiliates, directors, officers, employees, proprietors, independent contractors, consultants, partners, shareholders, representatives, customers, agents, predecessors, successors, and permitted assigns (collectively, "Indemnitees") from and against any claim, suit, demand, loss, damage, expense (including reasonable attorneys' fees and costs) or liability that may result from, arise out of or relate to:  (a) acts or omissions arising out of or in connection with this Agreement resulting in property damage; by Indemnitor and (b) intentional or negligent violations by Indemnitor of any applicable laws or governmental regulation.

Intermedia shall indemnify and hold harmless EffectNet from and against any and all claims, expenses, judgments, liabilities, damages or losses, including reasonable attorney's fees and expenses, and shall defend all third-party actions and proceedings arising from any infringement or alleged infringement of any patent, copyright, trade secret, mask work, trade marks or service marks of any third party to the extent such claims are caused by the acts or omissions of Intermedia with respect to the marketing and/or provision of the Intermedia UC Services, but not including any claims, expenses, judgments, liabilities, damages or losses to the extent attributable to the EffectNet Services. EffectNet shall indemnify and hold harmless Intermedia from and against any and all claims, expenses, judgments, liabilities, damages or losses, including reasonable attorneys' fees and expenses, and shall defend all third-party actions and proceedings arising from any infringement or alleged infringement of any patent, copyright, trade secret, mask work or other intellectual property right of any third party, to the extent such claims are caused by use of the EffectNet Services. In the event that an injunction or restraining order is obtained against the use or distribution of any product or deliverable pursuant to this Agreement because of any infringement or alleged infringement of any patent, copyright, trade secret, mask work or other intellectual property right or any proprietary, contract or other right of any third party, or if in EffectNet's reasonable judgment any product or deliverable is likely to become the subject of a successful claim of such infringement, then EffectNet's sole obligation to Intermedia (in addition to its obligations of indemnification set forth above) shall be to promptly: (i) procure for Intermedia the right to use the product or deliverable as provided in this Agreement, (ii)

A 00996

replace or modify the EffectNet product or deliverable so it becomes non-infringing without materially affecting the performance thereof, or if options (i) and (ii) are not available despite commercially reasonable efforts, (iii) terminate the licenses granted hereunder, and accept the return of all copies of all products.

**11.    LIMITATION OF LIABILITY.**  EXCEPT FOR DAMAGES ARISING UNDER SECTION  , IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY INCIDENTAL, INDIRECT, SPECIAL, PUNITIVE, CONSEQUENTIAL OR SIMILAR DAMAGES OF ANY KIND INCLUDING WITHOUT LIMITATION, LOSS OF PROFITS, LOSS OF BUSINESS OR INTERRUPTION OF BUSINESS, WHETHER SUCH LIABILITY IS PREDICATED ON CONTRACT, STRICT LIABILITY OR ANY OTHER THEORY WITHOUT REGARD TO WHETHER SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

**12.    GENERAL PROVISIONS.**

12.1    Monetary Values.  All monetary values in the Agreement refer to U.S. dollars.

12.2    Assignment.  Either Party may assign its rights or obligations under this Agreement with written notice to the other Party, and after obtaining written approval by the other party, which shall not be unreasonably withheld or delayed.  In the event that Intermedia is acquired by WorldCom no such written approval shall be required.  In the event of a restructuring, merger, or acquisition of either party, in which such party retains at least 25 percent control of the resulting entity such notice and approval shall not be required.

12.3    Governing Law.  This Agreement will be interpreted in accordance with the laws of the state of Arizona, excluding its conflict of law rules.  The Parties agree that the federal and state courts located in Arizona and/or Florida shall be the proper forum for any action brought against the other Party, and each Party shall take all necessary actions to consent to the jurisdiction of such courts. 12.4    Notices.  All notices or other communications between EffectNet and Intermedia under this Agreement shall be in writing and delivered personally, sent by confirmed facsimile, by confirmed e-mail, by certified mail, postage prepaid and return receipt requested, or by a nationally recognized express delivery service addressed to the Parties at the addresses first set forth below or at such other addresses, facsimile numbers or e-mail addresses or to such individuals as either Party may specify by notice to the other Party pursuant to this Section. All notices shall be in English and shall be effective upon receipt. As a courtesy, Parties are encouraged to send duplicate copies of notice, demands, or other by facsimile. Issuance of a facsimile copy of a notice, request, demand or other communication shall not replace the requirements for delivery by mail or overnight courier in the manner provided in this Section, nor shall the date the facsimile received constitute the official receipt date. Any Party may change the address to which notices, requests, demands or other to such Party shall be delivered or mailed by giving notice of the change to the other Party in the manner provided in this Section. The addresses for .he Parties for the purposes of this Agreement are:

A 00997

| | |
|---|---|
| **For EffectNet:** | **For Intermedia Communications, Inc.** |
| Taj Reneau | Kathleen A. Victory |
| Chief Executive Officer | VP Product Line Management |
| EffectNet | Intermedia Communications Inc. |
| Phone:  602.296.3300 | Phone:  813.829.6703 |
| Fax:     602.296.3311 | Fax:     813.829.2359 |

12.5    <u>Independent Contractors</u>. This Agreement and the relations hereby established do not constitute a partnership, joint venture, franchise or agency between the Parties. Both parties are independent contractors acting for their own accounts and neither is authorized to bind, or attempt to bind, the other to any contract, general warranty, covenant or undertaking of any nature whatsoever unless authorized in writing. Neither party shall have the authority to accept delivery, collect or otherwise take possession of any funds or other property of the other party, and if done so inadvertently, shall immediately notify the other party, shall hold same in trust and shall immediately deliver same to the other party.  In all matters relating to this Agreement neither party nor such party's employees or agents are, or will act, as employees of the other party within the meaning of any federal or state laws.

12.6    <u>Severability</u>.  If any provision of this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other term or provision hereof.  The Parties agree that they will negotiate in good faith or will permit a court to replace any provision hereof so held invalid, illegal or unenforceable with a valid provision, which is as similar as possible in substance to the invalid, illegal or unenforceable provision.

12.7    <u>Entire Agreement And Modifications</u>.  This Agreement together with any appendices, exhibits and attachments constitute the entire agreement between the Parties with regard to the subject matter hereof and supersedes all prior, agreements and understandings, whether written or oral, relating to the subject matter hereof.  This Agreement may only be modified by a written instrument duly executed by each Party, making specific reference to this Agreement and to the clause to be modified.

12.8    <u>Captions</u>.  Where provided, captions of the sections and subsections of this Agreement are for reference purposes only and do not constitute terms or conditions of this Agreement, and shall not limit or affect the terms and conditions hereof.

12.9    <u>Waiver</u>.  No provision of, right, power or privilege under this Agreement shall be deemed to have been waived by any act, delay, omission or acquiescence on the part of either Party, its agents, or employees, but only by an instrument in writing signed by an authorized officer of each Party.  No waiver by either Party of any breach or default of any provision of this Agreement by the other Party shall be effective as to any other breach or default, whether of the same or any other provision and whether occurring prior to, concurrent with, or subsequent to the date of such waiver.

A 00998

12.10  Counterparts. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. In making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart.

12.11  Force Majeure. Neither Party shall have any liability to the other for delays resulting from any "Event of Force Majeure" or from any act or omission of the such other Party.  An Event of Force Majeure shall include without limitation any delay or failure in performance due to acts of God, earthquake, labor disputes, changes in law, regulation or government policy, riots, war, fire, epidemic, acts or omissions of vendors or suppliers, equipment failures, transportation difficulties, or other occurrences which are beyond the affected Party's reasonable control.

12.12  Conflicts. To the extent the terms of this Agreement and the MOU conflict, the terms of this Agreement shall be controlling.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the date first written above.

EffectNet, L.L.C.

Signature:

Printed Name: Brad Steinmeyer

Title: VP PARTNER DEVELOPMENT

Date: 11/27/00

Intermedia Communications, Inc.

Signature: Kathleen A Vichy

Printed Name: Kathleen A. Victory

Title: VP Product Line Management

Date: November 20, 2000

A 00999

## APPENDIX P (Pricing)

EffectNet shall offer the following products to Intermedia at the prices attached thereto as follows:

1. **Basic**

$11.45 per month for each basic account with all platform usage and inbound call times on the EffectNet platform an additional $.10 per minute. The basic account includes unlimited free on-line usage including checking e-mails, faxes, etc... Outbound calling will be $.10 per minute.  This package includes customer service and technical support.  All basic accounts will be billed a base subscription price of $ 6.00 for the first calendar month of activation partial or full, and $11.45 for any calendar month thereafter partial or full.

2. **Unlimited**

$27.40 per month for each unlimited account with unlimited free platform usage and inbound call time included. Outbound calling will be $.10 per minute. The unlimited account includes unlimited free on-line usage including checking e-mails, faxes, etc. Outbound calls include: conference calls (per member), outbound long distance, outbound fax, follow me, notification, return calls, etc. All unlimited accounts will be billed a base subscription price of $ 14.00 for the first calendar month of activation partial or full, and $27.40 for any calendar month thereafter partial or full.

Intermedia shall be responsible for any and all expenses incurred related to the completion of the Virtual Private Network ("VPN").   No expenses shall be incurred on behalf of Intermedia for the VPN without prior consent from Intermedia.

A 01000

*Exhibit B*

**From:** Faust, Jimmy J. [mailto:JJFaust@Intermedia.com]
**Sent:** Tuesday, March 12, 2002 8:50 AM
**To:** 'support@intermediamail.com'; 'rjeffers@webley.com'
**Cc:** Mellon, Cheryl D.
**Subject:** FW: Cancel Accounts

On Friday March 1st, I requested that all accounts (Mailboxes) for Intermedia be canceled. I have not received conformation that these accounts have been turned off.

As of this morning I can still call into the mailboxes.

Please advise.

### Jimmy J. Faust

Sr. Product Manager
(813) 829-4327


-----Original Message-----
**From:** Faust, Jimmy J.
**Sent:** Friday, March 01, 2002 9:44 AM
**To:**    'support@intermediamail.com'
**Subject:**    Cancel Accounts

My records indicate that we have 47 active mailboxes on this account.

Please cancel all mailboxes as of today (03-01-02).

Thanks

### Jimmy J. Faust

Sr. Product Manager
(813) 829-4327
**WorldCom, Inc.**
Jimmy.faust@wcom.com

*Exhibit C*

Jun 19 04 10:34a

P.1

EffectNet

10230 S. 50th Place
Phoenix, AZ 85044

# Invoice

| Date | Invoice # |
|------|-----------|
| 2/6/2002 | 1010 |

**Bill To**

WorldCom Purchasing, LLC
PO Box 7
Clinton, MS 39060-0007
Attn: Accounts Payable

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 4570182205 | Net 15 | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | December 2001 Billing Cycle | | |
| 46 | Unified Messaging Mailbox- Unlimited | 27.40 | 1,260.40 |
| 1 | Unified Messaging Mailbox- Basic | 11.45 | 11.45 |
| 370 | Outbound Calling Originated (Minutes) | 0.10 | 37.00 |
| | Reconciliation Payment as of Ramp Date (12/18/01) | | |
| 9,953 | Volume Shortfall (Minimum Monthly Commitment is 10,000) | 27.40 | 272,712.20 |
| | | | |
| | For billing inquiries, please call Richard Jeffers, 877.551.9365 | | |

PO# 4570182205

| **Total** | **$274,021.05** |
|-----------|-----------------|

A 01004

*Exhibit D*

Jun 19 04 10:34a                                                    P.2

EffectNet

10230 S. 50th Place
Phoenix, AZ 85044

# Invoice

| Date | Invoice # |
| --- | --- |
| 2/6/2002 | 1011 |

**Bill To**

WorldCom Purchasing, LLC
PO Box 7
Clinton, MS 39060-0007
Attn: Accounts Payable

| P.O. No. | Terms | Project |
| --- | --- | --- |
| 4570182205 | Net 15 | |

| Quantity | Description | Rate | Amount |
| --- | --- | --- | --- |
| | January 2002 Billing Cycle | | |
| 46 | Unified Messaging Mailbox- Unlimited | 27.40 | 1,260.40 |
| 1 | Unified Messaging Mailbox- Basic | 11.45 | 11.45 |
| 370 | Outbound Calling Originated (Minutes) | 0.10 | 37.00 |
| | Reconciliation Payment as of January 31, 2002 | | |
| 9,953 | Volume Shortfall (Minimum Monthly Commitment of 10,000) | 27.40 | 272,712.20 |
| | Late Fees at 1% per month | | |
| 1,833 | September Invoice # 1006 | 0.01 | 18.33 |
| 1,373 | October Invoice # 1007 | 0.01 | 13.73 |
| 1,309 | November Invoice # 1008 | 0.01 | 13.09 |
| | For billing inquiries, please call Richard Jeffers, 877.551.9365. | | |

PO# 4570182205

| **Total** | **$274,066.20** |
| --- | --- |

A 01006

*Exhibit E*

A 01007

Jun 19 04 10:34a                                                    p.3

EffectNet

10230 S. 50th Place
Phoenix, AZ 85044

# Invoice

| Date | Invoice # |
|------|-----------|
| 3/5/2002 | 1018 |

| Bill To |
|---------|
| WorldCom Purchasing, LLC<br>PO Box 7<br>Clinton, MS 39060-0007<br>Attn: Accounts Payable |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 4570182205 | Net 15 | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | February 2002 Billing Cycle | | |
| 42 | Unified Messaging Mailbox-Unlimited | 27.40 | 1,150.80 |
| 2,310 | Outbound Calling Originated (Minutes) | 0.10 | 231.00 |
| | Reconciliation Payment as of February 28, 2002 ( | | |
| 9,958 | Volume Shortfall (Minimum Monthly Commitment is 10,000) | 27.40 | 272,849.20 |
| | Late Fees at 1% per month | | |
| 1,833 | September Invoice # 1006 | 0.01 | 18.33 |
| 1,373 | October Invoice # 1007 | 0.01 | 13.73 |
| 1,309 | November Invoice # 1008 | 0.01 | 13.09 |
| 274,021.05 | December Invoice #1010 | 0.01 | 2,740.21 |
| 274,066.2 | January Invoice # 1010 | 0.01 | 2,740.66 |

PO# 4570182205

| **Total** | $279,757.02 |
|-----------|-------------|

A 01008

*Exhibit F*

A 01009



10230 S. 50th Place
Phoenix, AZ 85044
Office: 602.296.3300
Fax: 602.296.3311

Writer's Direct No.
(888)-387-3481

March 12, 2002

**Via Federal Express Mail**
Mr. Rich Black
Senior Vice President
of Sales and Marketing
One Intermedia Way
Tampa, Florida 33647

Re: Unified Communications General Agreement, dated November 20, 2000, by and between EffectNet, Inc. (formerly EffectNet LLC) ("**EffectNet**") and Intermedia Communications, Inc. ("**Intermedia**") (the "**Agreement**")

Dear Mr. Black:

Pursuant to the terms of the referenced Agreement, Intermedia agreed to market the UC Services to Intermedia customers and end users, including wholesale and retail customers. Intermedia agreed to provide periodic forecasts of expected mailbox activations, the first of such forecasts to be provided on or before November 30, 2000. Intermedia also agreed to deliver a minimum number of current active subscribers on or before certain dates up to a minimum of 10,000 such subscribers on or before December 18, 2001 and at the end of each calendar month thereafter for the Term of the Agreement. Intermedia also agreed to pay the agreed pricing for activated mailboxes pursuant to the Agreement. Intermedia further agreed to pay all invoices within 15 calendar days of receipt. Intermedia also agreed to pay a Reconciliation Payment as of the Ramp Date and the end of each calendar month thereafter during the Term. On February 12, 2002, Intermedia received an invoice for the pricing applicable to subscribers and for the Reconciliation Payment with respect to the

A 01010

Mr. Rich Black
Page 2 of 3
March 12, 2002

month of December 2001 (including the Ramp Date) and the month of January 2002. Each of the forgoing obligations has not been fulfilled by Intermedia as required by the Agreement ("**Intermedia Defaults**") and each such obligation is a material obligation of Intermedia under the Agreement. The forgoing is not intended to be a full and complete statement of all material obligations under the Agreement that remain unfulfilled by Intermedia. Capitalized terms used in this letter without definition have the meaning assigned to such term in the Agreement.

EffectNet hereby gives Intermedia written notice of default under Section 5.2 of the Agreement with respect to the Intermedia Defaults and EffectNet further hereby gives Intermedia written notice that EffectNet may (i) terminate the Agreement under Section 5.2 due to default effective thirty (30) days after this written notice if each of the Intermedia Defaults has not been cured within such thirty (30) day period, and (ii) further exercise all available remedies pursuant to the terms of the Agreement and as otherwise may be available at law or in equity.

EffectNet hereby demands immediate payment, in accordance with the terms of the Agreement, of the amounts itemized below:

| | |
|---|---|
| Total Amount Past Due on invoice 1010, dated February 6, 2002, and delivered to Intermedia on February 12, 2002 (for the December 2001 billing cycle): | $274,021.05 |
| Total Amount Past Due on invoice 1011, dated February 6, 2002, and delivered to Intermedia on February 12, 2002 (for the January 2002 billing cycle): | $274,066.20 |
| **Required Payment:** | $548,087.25 |

The total amount past due is as of March 12, 2002. EffectNet gives notice that all provisions of default will be strictly enforced. As indicated above, Intermedia has until the expiration of thirty (30) days after this written notice to remit the Required Payment. The Required Payment should be made payable and delivered by wire transfer to Wells Fargo Bank, Tempe, Arizona; ABA Routing Number 1221-05278; EffectNet Operations Account; Account Number 046-4657220; attn: Stephanie Jordan at 480-644-8396.

Mr. Rich Black
Page 3 of 3
March 12, 2002

Intermedia should also take notice of the Due Date of invoice #1018, dated March 5, 2002, in the amount of $279,757.02 and delivered to Intermedia on March 6, 2002. Payment of this amount is due on or before March 21, 2002.

If Intermedia fails to cure the Intermedia Defaults and if EffectNet terminates the Agreement as aforesaid, EffectNet may claim damages for all amounts due pursuant to the Agreement, including, without limitation, the following:

|  |  |
|---|---|
| Required Payment | $  548,087.25 |
| Invoice # 1018 | $  279,757.02 |
| Reconciliation Payments for the unexpired Term | $5,662,667.58 |
| Forfeiture of Deposit | $  175,000.00 |

Nothing in this letter is intended to be a waiver or release of any rights or remedies, or an election thereof, that EffectNet has under the Agreement or applicable law, and all such rights and remedies are hereby expressly reserved in their entirety.

Very truly yours,

Robert C. McConnell
General Counsel

A 01012

*Exhibit G*

A 01013

# Delaware

PAGE  1

## The First State

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE CERTIFICATE OF OWNERSHIP, WHICH MERGES:

"EFFECTNET, INC.", A DELAWARE CORPORATION,

WITH AND INTO "PARUS HOLDINGS, INC." UNDER THE NAME OF "PARUS HOLDINGS, INC.", A CORPORATION ORGANIZED AND EXISTING UNDER THE LAWS OF THE STATE OF DELAWARE, WAS RECEIVED AND FILED IN THIS OFFICE THE FIFTH DAY OF FEBRUARY, A.D. 2004, AT 6:48 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID CORPORATION SHALL BE GOVERNED BY THE LAWS OF THE STATE OF DELAWARE.



Harriet Smith Windsor
Harriet Smith Windsor, Secretary of State

3361348  8330

040534366

AUTHENTICATION: 3246598

DATE: 07-21-04

A 01014

*Exhibit H*

A 01015

*State of Delaware*

## Office of the Secretary of State

PAGE   1

---

I, EDWARD J. FREEL, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF MERGER, WHICH MERGES:

"EFFECTNET L.L.C.", A NEVADA LIMITED LIABILITY COMPANY,

WITH AND INTO "EFFECTNET, INC." UNDER THE NAME OF "EFFECTNET, INC.", A CORPORATION ORGANIZED AND EXISTING UNDER THE LAWS OF THE STATE OF DELAWARE, AS RECEIVED AND FILED IN THIS OFFICE THE TWENTY-EIGHTH DAY OF DECEMBER, A.D. 2000, AT 1:01 O'CLOCK P.M.

A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE NEW CASTLE COUNTY RECORDER OF DEEDS.



Edward J. Freel, Secretary of State

3337277   8100M

001656793

AUTHENTICATION: 0886563

DATE: 12-29-00

A 01016

# Exhibit C

A 01017



10230 S. 50th Place
Phoenix, AZ 85044
Office:  602.296.3300
Fax:  602.296.3311

Writer's Direct No.
(888)-387-3481

March 12, 2002

**Via Federal Express Mail**
Mr. Rich Black
Senior Vice President
of Sales and Marketing
One Intermedia Way
Tampa, Florida 33647

Re: Unified Communications General Agreement, dated November 20, 2000, by and between EffectNet, Inc. (formerly EffectNet LLC) ("**EffectNet**") and Intermedia Communications, Inc. ("**Intermedia**") (the "**Agreement**")

Dear Mr. Black:

Pursuant to the terms of the referenced Agreement, Intermedia agreed to market the UC Services to Intermedia customers and end users, including wholesale and retail customers.  Intermedia agreed to provide periodic forecasts of expected mailbox activations, the first of such forecasts to be provided on or before November 30, 2000.  Intermedia also agreed to deliver a minimum number of current active subscribers on or before certain dates up to a minimum of 10,000 such subscribers on or before December 18, 2001 and at the end of each calendar month thereafter for the Term of the Agreement.  Intermedia also agreed to pay the agreed pricing for activated mailboxes pursuant to the Agreement.  Intermedia further agreed to pay all invoices within 15 calendar days of receipt.  Intermedia also agreed to pay a Reconciliation Payment as of the Ramp Date and the end of each calendar month thereafter during the Term. On February 12, 2002, Intermedia received an invoice for the pricing applicable to subscribers and for the Reconciliation Payment with respect to the

MCIWC000251

**A 01018**

Mr. Rich Black
Page 2 of 3
March 12, 2002

month of December 2001 (including the Ramp Date) and the month of January 2002. Each of the forgoing obligations has not been fulfilled by Intermedia as required by the Agreement ("**Intermedia Defaults**") and each such obligation is a material obligation of Intermedia under the Agreement. The forgoing is not intended to be a full and complete statement of all material obligations under the Agreement that remain unfulfilled by Intermedia. Capitalized terms used in this letter without definition have the meaning assigned to such term in the Agreement.

EffectNet hereby gives Intermedia written notice of default under Section 5.2 of the Agreement with respect to the Intermedia Defaults and EffectNet further hereby gives Intermedia written notice that EffectNet may (i) terminate the Agreement under Section 5.2 due to default effective thirty (30) days after this written notice if each of the Intermedia Defaults has not been cured within such thirty (30) day period, and (ii) further exercise all available remedies pursuant to the terms of the Agreement and as otherwise may be available at law or in equity.

EffectNet hereby demands immediate payment, in accordance with the terms of the Agreement, of the amounts itemized below:

| | |
|---|---|
| Total Amount Past Due on invoice 1010, dated February 6, 2002, and delivered to Intermedia on February 12, 2002 (for the December 2001 billing cycle): | $274,021.05 |
| Total Amount Past Due on invoice 1011, dated February 6, 2002, and delivered to Intermedia on February 12, 2002 (for the January 2002 billing cycle): | $274,066.20 |
| **Required Payment:** | $548,087.25 |

The total amount past due is as of March 12, 2002. EffectNet gives notice that all provisions of default will be strictly enforced. As indicated above, Intermedia has until the expiration of thirty (30) days after this written notice to remit the Required Payment. The Required Payment should be made payable and delivered by wire transfer to Wells Fargo Bank, Tempe, Arizona; ABA Routing Number 1221-05278; EffectNet Operations Account; Account Number 046-4657220; attn: Stephanie Jordan at 480-644-8396.

MCIWC000252

A 01019

Mr. Rich Black
Page 3 of 3
March 12, 2002

Intermedia should also take notice of the Due Date of invoice #1018, dated March 5, 2002, in the amount of $279,757.02 and delivered to Intermedia on March 6, 2002. Payment of this amount is due on or before March 21, 2002.

If Intermedia fails to cure the Intermedia Defaults and if EffectNet terminates the Agreement as aforesaid, EffectNet may claim damages for all amounts due pursuant to the Agreement, including, without limitation, the following:

|  |  |
|---|---|
| Required Payment | $ 548,087.25 |
| Invoice # 1018 | $ 279,757.02 |
| Reconciliation Payments for the unexpired Term | $5,662,667.58 |
| Forfeiture of Deposit | $ 175,000.00 |

Nothing in this letter is intended to be a waiver or release of any rights or remedies, or an election thereof, that EffectNet has under the Agreement or applicable law, and all such rights and remedies are hereby expressly reserved in their entirety.

Very truly yours,

Robert C. McConnell
General Counsel

MCIWC000253

A 01020

# Exhibit D

A 01021



One Parkway North
Fourth Floor North
Deerfield, Illinois 60015
Office: 888.444.6400

Writer's Direct No.
(888)-387-3481

March 25, 2002

**<u>Via Federal Express Mail</u>**
Mr. Brett Bacon
MCI/WorldCom
1945 Old Gallows Road
Vienna, Virginia 22182

Re: Unified Communications General Agreement, dated November 20, 2000, by and between EffectNet, Inc. (formerly EffectNet LLC) ("**EffectNet**") and Intermedia Communications, Inc. ("**Intermedia**") (the "**Agreement**")

Dear Mr. Bacon:

EffectNet, by letter to the attention of Mr. Rich Black, dated March 12, 2002, issued a written notice of default under Section 5.2 of the Agreement with respect to the Intermedia Defaults, as defined in the March 12 letter (the "**March 12 Letter**"). I understand from you that Mr. Black referred the March 12 letter to your attention upon receipt. As you know, the Agreement in Section 5.2 provides that "[t]ermination due to default under this Section shall be effective thirty (30) days after written notice to the defaulting Party if the default has not been cured within such thirty (30) day period." Accordingly, the Agreement will be terminated for default by Intermedia on or about April 12, 2002 if the Intermedia Defaults are not cured prior thereto.

I spoke with you on or about March 13 and you indicated that Intermedia and/or its affiliates were interested in pursuing immediate settlement discussions. I also understand that you spoke with Mr. Jim Calandra, Chief Financial Officer of EffectNet on March 18 and that you told Mr. Calandra that Mr. Barry Zip would

A 01022

Mr. Brett Bacon
Page 2 of 3
March 25, 2002

be handling settlement discussions. Further, I understand that you told Mr. Calandra that you would provide Mr. Zip with contact information of Mr. Calandra. On March 20, Mr. Calandra exchanged voice messages with you whereby Mr. Calandra inquired of Mr. Zip and the lack of communication from him and you responded by giving Mr. Calandra, for the first time, contact information for Mr. Zip. Mr. Calandra called Mr. Zip the same day, March 20, and left a voice message for Mr. Zip requesting that Mr. Zip return the call. Neither Mr. Calandra nor anyone else has since received any communications from Intermedia or its affiliates regarding this matter. As you might imagine, EffectNet is becoming increasingly concerned that Intermedia and/or its affiliates fail to understand the gravity of this matter and the urgency with which it must be addressed.

Intermedia should also take notice of the Due Date of invoice #1018, dated March 5, 2002, in the amount of $279,757.02 and delivered to Intermedia on March 6, 2002. Payment of this amount was due on or before March 21, 2002. EffectNet has not received this past due payment (the **"February Payment Default"**).

Accordingly, EffectNet hereby gives Intermedia written notice of default under Section 5.2 of the Agreement with respect to the February Payment Default and EffectNet further hereby gives Intermedia written notice that EffectNet may (i) terminate the Agreement under Section 5.2 due to default effective thirty (30) days after this written notice (if the Agreement is not sooner terminated pursuant to the March 12 Letter) if the February Payment Default has not been cured within such thirty (30) day period, and (ii) further exercise all available remedies pursuant to the terms of the Agreement and as otherwise may be available at law or in equity.

EffectNet hereby demands immediate payment, in accordance with the terms of the Agreement, of the amounts itemized below:

Total Amount Past Due on invoice 1010,
dated February 6, 2002, and delivered to
Intermedia on February 12, 2002
(for the December 2001 billing cycle):                    $274,021.05

Total Amount Past Due on invoice 1011,
dated February 6, 2002, and delivered to
Intermedia on February 12, 2002
(for the January 2002 billing cycle):                     $274,066.20

A 01023

Mr. Brett Bacon
Page 3 of 3
March 25, 2002

Total Amount Past Due on invoice #1018,
dated March 5, 2002, and delivered to
Intermedia on March 6, 2002
(for the February 2002 billing cycle):                    $279,757.02

**Required Payment:**                                      $827,844.27

The total amount past due is as of March 21, 2002. EffectNet gives notice that
all provisions of default will be strictly enforced. As indicated above, Intermedia
has until the expiration of thirty (30) days after the March 12 Letter or this
written notice, as the case may be, to remit the Required Payment. The
Required Payment should be made payable and delivered by wire transfer to
Wells Fargo Bank, Tempe, Arizona; ABA Routing Number 1221-05278; EffectNet
Operations Account; Account Number 046-4657220; attn: Stephanie Jordan at
480-644-8396.

If Intermedia fails to cure the Intermedia Defaults and the February Payment
Default and if the Agreement is terminated as aforesaid, EffectNet may claim
damages for all amounts due pursuant to the Agreement.

Nothing in this letter is intended to be a waiver or release of any rights or
remedies, or an election thereof, that EffectNet has under the Agreement or
applicable law, and all such rights and remedies are hereby expressly reserved in
their entirety.

Very truly yours,

*Robert C. McConnell*

Robert C. McConnell
General Counsel

CC: Mr. Rich Black

MCIWC000244

A 01024

02/12/02 06. A P.003

## Invoice

**EffectNet**
10230 S. 50th Place
Phoenix, AZ 85044

| DATE | INVO |
|---|---|
| 2/6/2002 | 1011 |

**BILL TO**
WorldCom Purchasing, LLC
PO Box 7
Clinton, MS 39060-0007
Attn: Accounts Payable

| P.O. NO. | TERMS | | PROJECT |
|---|---|---|---|
| 4570182205 | Net 15 | | |

| QUANTITY | DESCRIPTION | RATE | AMOUNT |
|---|---|---|---|
| | January 2002 Billing Cycle | | |
| 46 | Unified Messaging Mailbox- Unlimited | 27.40 | 1,260.40 |
| 1 | Unified Messaging Mailbox- Basic | 11.45 | 11 45 |
| 370 | Outbound Calling Originated (Minutes) | 0.10 | 37.00 |
| | Reconciliation Payment as of January 31, 2002 | | |
| 9,953 | Volume Shortfall (Minimum Monthly Commitment of 10,000) | 27.40 | 272,712.20 |
| | Late Fees at 1% per month: | | |
| 1,833 | September Invoice # 1006 | 0.01 | 18.33 |
| 1,373 | October Invoice # 1007 | 0.01 | 13.73 |
| 1,309 | November Invoice # 1008 | 0.01 | 13.09 |
| | For billing inquiries, please call Richard Jeffers, 877.551.9365. | | |

PO# 4570182205

| | Total | $274,06 6.20 |
|---|---|---|

MCIWC000245

A 01025

03/07/02 07  1A  P.002

**EffectNet**
10230 S. 50th Place
Phoenix, AZ 85044

# Invoice

| DATE | INVOICE # |
|------|-----------|
| 3/5/2002 | 1018 |

**BILL TO**

WorldCom Purchasing, LLC
PO Box 7
Clinton, MS 39060-0007
Attn: Accounts Payable

| P.O. NO. | TERMS | PROJECT |
|----------|-------|---------|
|          | Net 15 |        |

| QUANTITY | DESCRIPTION | RATE | AMOUNT |
|----------|-------------|------|--------|
|  | February 2002 Billing Cycle | | |
| 42 | Unified Messaging Mailbox-Unlimited | 27.40 | 1,150.80 |
| 2,810 | Outbound Calling Originated (Minutes) | 0.10 | 231.00 |
|  | Reconciliation Payment as of February 28, 2002 ( | | |
| 9,958 | Volume Shortfall (Minimum Monthly Commitment is 10,000) | 27.40 | 272,849.20 |
|  | Late Fees at 1% per month | | |
| 1,833 | September Invoice # 1006 | 0.01 | 18.33 |
| 1,373 | October Invoice # 1007 | 0.01 | 13.73 |
| 1,309 | November Invoice # 1008 | 0.01 | 13.09 |
| 274,021.05 | December Invoice #1010 | 0.01 | 2,740.21 |
| 274,066.2 | January Invoice # 1010 | 0.01 | 2,740.66 |

PO# 4570182205

| | Total | $279,757.02 |
|--|-------|-------------|

MCIWC000246

A 01026