Hearing Date and Time:  September 13, 2005, at 10:00 A.M. EDT
Objection Deadline:  August 31, 2005, at 4:00 P.M. EDT

STINSON MORRISON HECKER LLP

Robert L. Driscoll, Esq.
Lawrence W. Bigus, Esq.
1201 Walnut Street
Kansas City, MO  64106
Telephone:  (816) 842-8600
Facsimile:  (816) 691-3495
Attorneys for Debtors and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x
In re                                                    :
                                                         :   Chapter 11 Case No. 02-13533 (AJG)
WORLDCOM, INC., et al.,                                  :
                                                         :   (Jointly Administered)
                        Debtors.                         :
---------------------------------------------------------x

**MEMORANDUM IN SUPPORT OF WORLDCOM'S MOTION
FOR SUMMARY JUDGMENT AGAINST PARUS HOLDINGS, INC.,
SUCCESSOR-BY-MERGER TO EFFECTNET, INC. AND EFFECTNET, LLC**

Pursuant to Fed. R. Civ. P. 56, Fed. R. Bankr. P. 7056, and Fed. R. Bankr. P. 9014, the above-captioned debtors ("Reorganized Debtors" or "WorldCom"), submit their Memorandum in Support of WorldCom's Motion for Summary Judgment Against Parus Holdings Inc., successor-by-merger to EffectNet, Inc. and EffectNet, LLC ("Parus Holdings" or "Claimant") on Claim Nos. 11242 (replacing 9291) and 11173 (replacing 9293).

**INTRODUCTION**

Parus Holdings has attempted to convert a relatively straightforward $460,000 breach of contract claim into one which Parus Holdings advises may exceed $20 million, resulting from the asserted commission of multiple torts related to contract breach and accompanied by far-reaching discovery requests for electronic and paper archived records.  The review and production of paper and electronically stored documents in response to these requests would

**A 01027**

likely exceed the value of the contract claim itself, and would place an extraordinary burden on Reorganized Debtors. None of this is necessary, however, because Parus Holdings' tort claims fail as a matter of law, and such far-reaching discovery is not relevant to or reasonably calculated to lead to the discovery of evidence related to Parus Holdings' contract claim.

The agreement at issue is the Unified Communications Services General Agreement (the "UC Contract"), which Intermedia and EffectNet entered into on November 20, 2000. Pursuant to the UC Contract, EffectNet agreed to supply Intermedia with unified messaging, wholesale communications and related services that Intermedia could resell to Intermedia's end user customers. The service EffectNet sold to Intermedia for resale to its end users provided such users with unified access to both their personal and business communications, such as voice mail, e-mail, faxes, conference calls, calendars and address books. All of the claims asserted by Parus Holdings arise from the failure of Intermedia to perform its obligations under the UC Contract and thus its breach of that Contract.

The efforts by Parus Holdings to convert its breach of contract claim into claims sounding in tort fail as a matter of law for the following reasons:

- The tort theories of civil conspiracy and tortious interference with contract fail because the assertedly conspiratorial and/or interfering conduct was between a parent corporation (WorldCom) and its wholly owned subsidiary (Intermedia), a unified interest relationship that precludes such claims.

- The claim for breach of an implied covenant of good faith and fair dealing fails because the UC Contract at issue was an ordinary private commercial agreement between two business entities, whose contractual relationship did not embrace public interest, arise from a position of adhesion or involve fiduciary responsibilities.

A 01028

- The claim that WorldCom and Intermedia engaged in deceptive trade practice fails because neither WorldCom nor Intermedia sold any service or product to EffectNet. Indeed, it was the other way around. Moreover, EffectNet was not the target of any deceptive advertising, and claimant therefore cannot maintain an action under the Arizona Consumer Fraud Act.

Further, because EffectNet terminated the UC Contract as of April 12, 2002, the liability of Reorganized Debtors for any alleged breach of that contract is expressly limited to "those obligations that accrued prior to the date of such termination." Based on the UC Contract's express provision for the dollar value of those obligations, Reorganized Debtors' liability for any alleged breach of that contract is no more than $460,442.30 – a fraction of Parus Holdings' asserted $20 million claim – and less than the cost of reviewing and producing the requested paper and electronically stored documents.

With the threat of protracted, burdensome and expensive discovery looming, as reflected by Parus Holdings' pending motion to compel, WorldCom urges the Court to favorably consider this motion for summary judgment at this juncture. Doing so is completely consistent with the law and the language of the parties' contract. Doing so at this time would also obviate the need to engage in the burdensome and disproportionately expensive discovery of paper and electronically stored documents sought by Parus Holdings. This is so because, in the absence of Parus Holdings' various non-contract claims, the remaining breach of contract claim can be (and should be) decided by the Court, without resort to evidence outside the contract.

## FACTS

WorldCom respectfully refers the Court to its Statement of Material Facts as to Which There Are No Genuine Issues to be Tried, which accompanies the instant Motion.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the movant demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Forsyth v. Fed'n Empl. & Guidance Serv., 409 F.3d 565, 569 (2d Cir. 2005). The substantive law governing the case will identify those facts which are material and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "The mere existence of factual issues – where those issues are not material to the claims before the court – will not suffice to defeat a motion for summary judgment." Quarles v. General Motors Corp., 758 F.2d 839, 840 (2d Cir. 1985).

Summary judgment is not a "disfavored" remedy. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). Rather, it is "an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." Id. Indeed, summary judgment permits a court to "streamline the process for terminating frivolous claims and to concentrate its resources on meritorious litigation." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986). Where, as here, there is no dispute as to material facts, and the motion is well founded in the law, summary judgment should be granted. Anderson, 477 U.S. at 247-48; Knight, 804 F.2d at 11 (citing Fed. R. Civ. P. 56(c)).

As set forth below, there are no genuine issues of material fact and WorldCom is entitled to summary judgment as a matter of law on the issues addressed below.

## ARGUMENT

**I.     Arizona Law Governs the Claims at Issue**

Federal courts apply the choice of law rules prevailing in the state in which the court sits. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). Courts hearing bankruptcy

cases also employ the forum state's choice of law doctrines where the underlying rights and obligations are defined by state law. See Koreag, Controle Et Revision S.A. v. Refco F/X Assocs., Inc., 961 F.2d 341, 350 (2d Cir.1992). This Court therefore applies New York choice of law rules.

Arizona law governs both the contract and tort claims in this contested matter. The UC Contract contains an Arizona choice of law provision. Ex. A, UC Contract at 10, § 12.3. New York courts enforce the choice of law provision agreed upon by the parties in a contract if the state selected has a reasonable relationship to the contract and the selected laws do not violate a fundamental public policy of New York. Finucane v. Interior Constr. Corp., 695 N.Y.S.2d 322, 324-25 (N.Y. App. Div. 1999). Arizona has a reasonable relationship to the contract: EffectNet's principal place of business was located in Arizona (WorldCom's Statement of Material Facts, "Undisputed Facts" ¶ 1) and the parties agreed that the UC Contract "will be interpreted in accordance with the laws of the state of Arizona." Ex. A, UC Contract at 10, § 12.3; see Finucane, 695 N.Y.S.2d at 325 (fact that party's principal place of business is in state is sufficient to support enforcement of contractual choice of law). Further, there is no plausible basis to assert that the Arizona laws at issue here violate New York public policy or in any way could be said to be offensive to the public policy of the State of New York. Finucane, 695 N.Y.S.2d at 325.

New York choice of law rules also require application of the substantive law of the state with the most significant interest in the lawsuit. Lee v. Bankers Trust Co., 166 F.3d 540, 545 (2d Cir. 1999). With respect to the tort claims asserted by Parus Holdings, the state with the most significant interest is the state where the tort allegedly took place. Lee, 166 F.3d at 545. Arizona has the most significant interest in the claim and is the locale of the purported torts because

5

(1) all of the alleged actions by Intermedia and WorldCom concern the alleged breach of the UC Contract and an alleged plan to breach the UC Contract, (2) the parties to the UC Contract agreed to an Arizona choice of law provision (see Ex. A, UC Contract at 10, § 12.3) and (3) EffectNet's principal place of business at the time of the UC Contract was in Arizona.

For each of these reasons, Arizona law governs the claims of Parus Holdings.

## II.    The Court Should Dismiss Parus Holdings' Tort and Statutory Claims Because They Fail as a Matter of Law

### A.    Parus Holdings' Civil Conspiracy Claim Fails as a Matter of Law Because a Corporation Cannot Conspire with Itself

Parus Holdings' claims for civil conspiracy fail as a matter of law.  For a civil conspiracy to occur under Arizona law, two or more persons must agree to accomplish an unlawful purpose or to accomplish a lawful objective by unlawful means, causing damages.  Savard v. Selby, 508 P.2d 773 (Ariz. 1973); Uvodich v. Ariz. Bd. of Regents, 453 P.2d 229 (Ariz. 1969).  Consistent with this fundamental proposition that a civil conspiracy requires a concerted action of "two or more persons," it is Arizona law (as well as the law elsewhere) that "[a] corporation cannot conspire with itself any more than a private individual can." Rowland v. Union Hills Country Club, 757 P.2d 105, 110 (Ariz. App. 1988) (quotations omitted) (citing Nelson Radio & Supply Co. v. Motorola, 200 F.2d 911, 914 (5th Cir. 1952); 15A C.J.S. Conspiracy § 2 (1967)).

Claimant alleges that Intermedia and WorldCom engaged in a civil conspiracy by "act[ing] in concert to breach the UC Contract . . . with the knowledge that a breach . . . would have a devastating impact on EffectNet." Ex. B, Parus Opposition at 3, ¶ 4, see also ¶¶ 5, 53 and 54.  However, on July 1, 2001, WorldCom acquired Intermedia and Intermedia became a wholly owned subsidiary of WorldCom.  Undisputed Facts ¶ 4.  As a matter of law, a parent and its wholly owned subsidiaries are legally incapable of forming a conspiracy with one another because they have a complete unity of interest.  Fogie v.Thorn Ams. Inc., 190 F.3d 889, 898 (8th

6

Cir. 1999); Satellite Fin. Planning Corp. v. First Nat'l Bank of Wilmington, 633 F. Supp. 386, 395 (D. Del. 1986) (parent and wholly owned subsidiary share common purpose and cannot, as matter of law, conspire with each other); Carl Hizel & Sons Inc. v. Browning Ferris Indust. Inc., 590 F. Supp. 1201 (D. Colo. 1984) (same).

In support of its claim of a civil conspiracy between WorldCom and Intermedia, Claimant relies entirely on actions by the alleged co-conspirators that took place after July 1, 2001, the date of the acquisition of Intermedia by WorldCom. In particular, Claimant points to:

1) The firing of Intermedia's project manager for the UC Contract, disbanding of Intermedia's sales force, and reassignment of that sales force to different projects. All of this occurred after July 1, 2001. Undisputed Facts ¶ 6.

2) Intermedia's cancellation of 682 of the existing 729 subscriptions for service, which occurred in September, 2001. Id. ¶ 7.

3) EffectNet's invoicing Intermedia for payments under the UC Contract and Intermedia's failure to pay those invoices, all of which occurred on or after February 6, 2002. Id. ¶ 8.

4) Intermedia's request that all remaining accounts for services under the UC Contract be cancelled, a request that came on March 1, 2002. Id. ¶ 9.

Such actions, which are assumed to be true for purposes of this motion only, may constitute evidence of a breach of contract, but because Intermedia was a wholly owned subsidiary of WorldCom, they cannot support a claim for civil conspiracy. Fogie, 190 F.3d at 898. Moreover, none of the actions stated above violated any law nor were they used to accomplish an unlawful purpose. At most, they constitute acts leading to ordinary civil breaches of contract. Accordingly, Claimant's allegations of civil conspiracy fail as a matter of law.

A 01033

**B.     Parus Holdings Cannot Establish Tortious Interference**

   **1.     A Parent Company Cannot Tortiously Interfere With a Contract of Its Subsidiary**

Parus Holdings' claim for tortious interference with a contractual relationship fails as a matter of law for the same reasons that its civil conspiracy claim fails.  A parent company cannot be held liable for tortious interference with a contract of its subsidiary because the financial interests of both entities are so closely aligned that they are viewed as being the same entity when analyzing a claim for tortious interference.  Deauville Corp. v. Federated Dep't Stores, Inc., 756 F.2d 1183, 1196 (5th Cir. 1985) (relying on analysis of Supreme Court in Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 771 (1984)); see also Boulevard Assoc. v. Sovereign Hotels, Inc., 72 F.3d 1029, 1036 (2d Cir. 1995) (citing multiple cases in which courts found that a "parent company does not engage in tortious conduct when it directs its wholly-owned subsidiary to breach a contract that is no longer in the subsidiary's economic interest to perform."); Texas Taco Cabana, L.P. v. Taco Cabana of N.M., Inc., 304 F. Supp. 2d 903, 912 (W.D. Tx. 2003) ("As a matter of law, a parent corporation is incapable of tortiously interfering with its subsidiary's contracts.   A parent and its subsidiary are so closely aligned in business interests as to render them, for tortious interference purposes, the same entity." (internal citations omitted));  Battenfield of Am. Holding, Inc. v. Baird, Kurts & Dobson, No. 97-2336-JWL, 1999 WL 232915, at *4 (D. Kan. Feb. 5, 1999); Starcom, Inc. v. U.S. Telecom, Inc., Civ. A. No. 87-2540-V, 1991 WL 279291, at *3 (D. Kan. Dec. 11, 1991) (two subsidiaries of a common parent corporation cannot, as a matter of law, tortiously interfere with each other's contracts).  Record Club of Am., Inc. v. United Artists Records, Inc., 643 F. Supp. 925, 943 (S.D.N.Y. 1986) (citing Felsen v. Sol Cafe Mfg. Corp., 249 N.E.2d 459, 461 (N.Y. 1969) (parent has privilege of

A 01034

interfering with contract of subsidiary and third party)), *vacated on other grounds*, 890 F.2d 1264 (2d Cir. 1989).

As noted above, WorldCom acquired Intermedia on July 1, 2001 – nearly a year before Intermedia allegedly breached the UC Contract. Given the unity of corporate interest between WorldCom, the parent, and Intermedia, its wholly owned subsidiary, tortious interference with each others' contracts is not legally possible. Therefore, as a matter of law, at the time of the alleged contract breach in March, 2002, WorldCom cannot be found to have tortiously interfered with its subsidiary, Intermedia's, UC Contract.

### 2. The Actions of WorldCom Were Privileged

In connection with its tortious interference allegations, Claimant also asserts that Intermedia and WorldCom made a conscious decision not to perform under EffectNet's UC Contract so that WorldCom could offer its own competing similar products. Parus Opposition at 6, ¶ 15. Even if true, these assertions would not provide the bases for a tortious interference claim because pursuit of one's own legitimate business interest is privileged conduct that, as a matter of law, does not constitute tortious interference. See D&S Farms v. Producers Cotton Oil Co., 492 P.2d 429, 431 (Ariz. App. 1972) (interference done to protect a party's own rights is privileged); Martin v. Texaco, Inc., 304 F. Supp. 498, 502 (S.D. Miss. 1969) (interference must be wrongful to be actionable; exercise of legitimate interest or right constitutes privileged interference); see also Am. Jur.2d, Interference § 27. As a consequence, Parus Holdings' tortious interference claim also fails as a matter of law.

9

    **C.**    **Parus Holdings' Claim of Breach of an Implied Covenant of Good Faith Fails as a Matter of Law Because No "Special Relationship" Existed Between the Parties**

Claimant alleges that Intermedia breached an implied covenant of good faith and fair dealing when it allegedly breached the UC Contract. Ex. B, Parus Opposition at 3, ¶ 4 and 15, ¶ 53.

It is well settled that Arizona law implies a covenant of good faith and fair dealing in every contract, Enyart v. Transamerica Ins., Co., 985 P.2d 556, 561, ¶ 14 (Ariz. 1998) (citing Rawlings v. Apodaca, 726 P.2d 565 (Ariz. 1986)), and that implied terms are as much a part of a contract as express terms. Golder v. Crain, 437 P.2d 959 (Ariz. App. 1968). However, it is equally clear under Arizona law that a party may bring an action in tort claiming damages for a breach of the implied covenant of good faith and fair dealing only where there exists a "special relationship . . . arising from elements of public interest, adhesion, and fiduciary responsibility." Burkons v. Ticor Title Ins., 813 P.2d 710, 720 (Ariz. 1991). The two most important factors in determining whether a tort action for bad faith will lie are "(1) whether the plaintiff contracted for security or protection rather than for profit or commercial advantage, and (2) whether permitting tort damages will provide a substantial deterrence against breach by the party who derives a commercial benefit from the relationship." Dodge v. Fid. & Deposit Co. of Md., 778 P.2d 1240, 1242 (Ariz. 1989).

Claimant's breach of implied covenant of good faith and fair dealing claim fails because EffectNet did not have a "special relationship" with Intermedia. The UC Contract was between two commercial enterprises that pursued their respective business interests: public interest was not involved, no element of adhesion was present, no fiduciary relationship existed between the parties and neither security nor protection was the subject of the contract.

Absent a special relationship, and there is none here, EffectNet's claims sound in contract, not tort. Wells Fargo Bank v. Ariz. Laborers, Teamsters, 38 P.3d 12, 29 (Ariz. 2002). "Although tort damages may be sought where there exists a special relationship between the parties, the remedy for breach of this implied covenant is ordinarily by action on the contract." Southwest Sav. & Loan Assoc. v. SunAmp Sys., Inc., 838 P.2d 1314, 1318 (Ariz. App. 1992) (quotations and citations omitted).[1] Claimant's interest is adequately protected by contract remedies. Its tort claim for breach of an implied covenant of good faith and fair dealing fails as a matter of law.

### D.  Parus Holdings' Deceptive Trade Practices Claim Fails as a Matter of Law

Claimant alleges that Intermedia and WorldCom engaged in "unfair and deceptive trade practices." Ex. B, Parus Opposition at 3, ¶¶ 4, 5, 15, 53, 54. Arizona law regarding unfair and deceptive practices is statutory. See Arizona Consumer Fraud Act, A.R.S. § 44-1552.

Arizona's Consumer Fraud Act makes it illegal to commit fraud or deception "in connection with the sale or advertisement of any merchandise." A.R.S. § 44-1522. "The clear intent of this provision is to protect unwary buyers from unscrupulous sellers." Sutter Home Winery, Inc. v. Vintage Selections, Ltd., 971 F.2d 401, 407 (9th Cir. 1992); Enyart v. Transamerica Ins. Co., 985 P.2d 556, 563 (Ariz. Ct. App. 1999) ("The Consumer Fraud Act is a broadly drafted remedial provision designed to eliminate unlawful practices in merchant-consumer transactions.") (citation omitted).

Claimant alleges that Intermedia and WorldCom engaged in deceptive trade practices related to Intermedia's alleged breach of the UC Contract. That allegation, however, fails as a matter of law because:

---

[1] New York law is the same: "Under New York law, parties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract." Fasolino Foods Co. v. Banca

11

1)  EffectNet was not a "buyer" of services, it was the seller, Ex. A, UC Contract;

2)  Intermedia was not the "seller" of anything to EffectNet, id.; and

3)  WorldCom was not a party to the 2000 UC Contract, nor was it then related to Intermedia. Id.; Undisputed Facts ¶ 4.

Consequently, EffectNet cannot maintain an action under Arizona's Consumer Fraud Act.

### III. The UC Contract Limits Parus Holdings' Damages for Breach of Contract to $460,422.30

Analysis of contract language and application of principles of contract interpretation are matters of law. L.K. Comstock & Co., Inc. v. United Eng'rs & Constructors, Inc., 880 F.2d 219, 221 (9th Cir. 1989) (applying Arizona law). Under Arizona law, "the plain language of the contract must control." Campisano v. Phillips, 547 P.2d 26, 30 (Ariz. Ct. App. 1976). EffectNet terminated the UC Contract on April 12, 2002. Undisputed Facts ¶¶ 10, 12 and 13. Pursuant to the plain language of Section 5.2 of the UC Contract, damages for breach are limited to the obligations that had accrued as of the date of termination.

#### A. EffectNet Terminated the UC Contract on April 12, 2002

On March 12, 2002, pursuant to Section 5.2 of the UC Contract, EffectNet gave notice of default to Intermedia.[2] Undisputed Facts ¶ 10. The March 12, 2002 letter from Robert C. McConnell, General Counsel of EffectNet, to Rich Black of Intermedia specifically stated:

---

Nazionale del Lavora, 961 F.2d 1052, 1056 (2d Cir. 1992) (internal quotations and citations omitted).

[2] Section 5.2 of the UC Contract provides:
   Either party may terminate this Agreement: (a) if the other Party fails to fulfill any of its material obligations under this Agreement; (b) if the other parties are in breach of Section 7 (Confidentiality); (c) if the other Party becomes insolvent or admits in writing its inability to pay debts as they mature, or makes an assignment for the benefit of creditors; or (d) if a petition under any foreign, state or United States bankruptcy act, receivership statute, or the like is filed by the other Party and is not dismissed within sixty (60) days after such filing. <u>Termination due to default under this Section shall be effective thirty (30) days after written notice to the defaulting Party if the default has not been cured within such thirty (30) day period.</u>
Ex. A, UC Contract § 5.2 (emphasis added).

> EffectNet hereby gives Intermedia written notice of default under Section 5.2 of the Agreement with respect to the Intermedia Defaults and EffectNet further hereby gives Intermedia written notice that EffectNet may (i) terminate the Agreement under Section 5.2 due to the default effective thirty (30) days after this written notice if each of the Intermedia Defaults has not been cured within such thirty (30) days.

Id.  On March 25, 2002, EffectNet's General Counsel confirmed termination of the UC Contract in his letter to Brett Bacon of MCI/WorldCom, in which he stated:

> EffectNet, by letter to the attention of Mr. Rich Black, dated March 12, 2002, issued a written notice of default under Section 5.2 of the Agreement with respect to the Intermedia Defaults, as defined in the March 12, letter ("March 12 Letter"). I understand from you that Mr. Black referred the March 12 Letter to your attention upon receipt.  As you know, the Agreement in Section 5.2 provides that "[t]ermination due to default under this Section shall be effective thirty (30) days after written notice of the defaulting Party if the default has not been cured within such thirty (30) day period."  Accordingly, <u>the Agreement will be terminated for default by Intermedia on or about April 12, 2002 if the Intermedia Defaults are not cured prior thereto</u>.

Id. ¶ 11 (emphasis added).

Section 5.2 of the UC Contract unambiguously states that termination due to default "shall be effective" thirty days after written notice.  Ex. A, UC Contract § 5.2.  EffectNet clearly understood this to be the case as evidenced by the words of its own General Counsel advising that the UC Contract "will be terminated . . . on or about April 12, 2002" unless Intermedia cured its defaults.  Undisputed Facts ¶ 11.  It is also undisputed that Intermedia did not cure its defaults.  Undisputed Facts ¶ 13.  Accordingly, the UC Contract was terminated on April 12, 2002, thirty days after EffectNet's notice of default.

### B. The UC Contract Limits Liability to Obligations That Accrued Before Termination on April 12, 2002

EffectNet's termination of the UC Contract triggered Section 5.3 of the UC Contract, which provides that upon termination of the Agreement for any reason, "<u>each Party shall remain liable for those obligations that accrued prior to the date of such termination</u>."  Ex. A, UC

A 01039

Contract § 5.3 (emphasis added).  Accordingly, pursuant to the plain language of Section 5.3, Intermedia remained responsible only for those obligations that accrued prior to April 12, 2002 – the date of termination.  Under Arizona contract construction rules, by the parties' provision in the UC Contract that each would remain liable for obligations which accrued prior to the date of termination, the parties excluded other forms of liability that might be applicable.  <u>Herman Chanen Constr. Co. v. Guy Apple Masonry Contractors, Inc.</u> 453 P.2d 541, 543 (Ariz. App. 1969) (applying the doctrine of *Expressio unius est exclusion arterius* to limit indemnification to class of employees named in contract, excluding other employees not named).

  **C. Under the Terms of the UC Contract, the Maximum Revenue Due Parus Holdings Equals $460,422.30**

The amounts accrued prior to April 12, 2002 include the adjusted amounts for three past-due invoices (charges for December, 2001 and January and February, 2002), and the minimum commitment amount for March, 2002.  The minimum commitment provision of the contract obligated Intermedia to deliver 10,000 subscribers per month starting December 18, 2001.  Ex. A, UC Contract § 2.12.  The so-called "reconciliation" provision of the contract provided that if Intermedia failed to deliver the minimum commitment for a month, it must pay a reconciliation payment for the shortfall "equal to the volume Shortfall multiplied by the <u>base</u> monthly price applicable to the Intermedia UC Service per subscriber."  <u>Id.</u> § 2.13 (emphasis added).  Appendix P (Pricing) to the UC Contract provided two pricing options:  "Basic" at a rate of $11.45 per month, and "Unlimited" at a rate of $27.40 per month.  Ex. P (Pricing), attached to Ex. A, UC Contract.  Applying the basic – or base – rate, the upper limit of Intermedia's obligation – accrued amounts from December 18, 2001 to April 12, 2002 – are as follows:

A 01040

| BILLING CYCLE | DAMAGES |
|---|---|
| December 2001 (unpaid invoice #1010 – adjusted to $11.45 for shortfall of 9,953) | $115,270.70 |
| January 2002 (unpaid invoice #1011 – adjusted to $11.45 for shortfall of 9953) | $115,270.70 |
| February 2002 (unpaid invoice #1018 – adjusted to $11.45 for shortfall of 9958) | $115,400.90 |
| March 2002 (one month at $11.45 for 10,000) | $114,500.00 |
| **TOTAL** | **$460,442.30** |

Undisputed Facts ¶¶ 14-18.

This maximum amount of revenue is consistent with Section 11 of the UC Contract, which limits the parties' liability and prohibits consequential damages. Section 11 states:

> LIMITATION OF LIABILITY. EXCEPT FOR DAMAGES ARISING UNDER SECTION [left blank in original], IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY INCIDENTAL, INDIRECT, SPECIAL, PUNITIVE, CONSEQUENTIAL OR SIMILAR DAMAGES OF ANY KIND INCLUDING WITHOUT LIMITATION, LOSS OF PROFITS, LOSS OF BUSINESS OR INTERRUPTION OF BUSINESS, WHETHER SUCH LIABILITY IS PREDICATED ON CONTRACT, STRICT LIABILITY OR ANY OTHER THEORY WITHOUT REGARD TO WHETHER SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

Ex. A, UC Contract § 11.

WorldCom therefore requests that the Court enforce the plain terms of the UC Contract, and issue a declaration that EffectNet terminated the UC Contract on April 12, 2002, that Intermedia is responsible only for those obligations that accrued prior to April 12, 2002, and that the maximum amount of revenue that could have accrued was $460,442.30.

## CONCLUSION

Parus Holdings, through Claim Nos. 11242 and 11173, attempts to transform a relatively straightforward breach of contract claim into numerous torts claims. Such tort claims, however,

are barred by the parties' agreement prohibiting recovery of damages from such claims and as a matter of law. The civil conspiracy and tortious interference claims fail because Intermedia was a wholly owned subsidiary of WorldCom. No breach of an implied covenant of good faith and fair dealing is cognizable because no special relationship existed between Claimant and Intermedia. The deceptive trade practices statutes do not apply because Claimant cannot maintain an action under the Arizona Consumer Fraud Act. Moreover, any breach of contract damages allowable as a matter of law are limited to amounts accrued prior to April 12, 2002. For these reasons, WorldCom requests that this Court grant summary judgment against Parus Holdings dismissing its statutory and tort based claims and limiting its recovery for breach of contract to the amount provided by the parties' contract, to wit: $460,442.30.

Respectfully submitted,

STINSON MORRISON HECKER LLP

By: *s/Robert L. Driscoll*
    Robert L. Driscoll
    Lawrence W. Bigus
    1201 Walnut Street, Suite 2800
    Kansas City, MO 64106
    (816) 842-8600 – Telephone
    (816) 691-3495 – Facsimile

ATTORNEYS FOR DEBTORS AND DEBTORS IN POSSESSION

**CERTIFICATE OF SERVICE**

I hereby certify that on August 1, 2005, I electronically filed the foregoing with the Clerk of the Bankruptcy Court using the CM/ECF system which sent notification of such filing to all parties receiving electronic means.

*s/Robert L. Driscoll*
Attorney for Debtors