Hearing Date and Time: December 6, 2005, at 10:00 A.M. Eastern Time
Response Deadline:  November 18, at 4:00 P.M. Eastern Time
Reply Deadline:  December 2, 2005, at 4:00 P.M. Eastern Time

STINSON MORRISON HECKER LLP

Robert L. Driscoll, Esq.
Allison M. Murdock, Esq.
Jodi M. Hoss, Esq.
1201 Walnut Street
Kansas City, MO  64106
Telephone:  (816) 842-8600
Facsimile:  (816) 691-3495
Attorneys for Reorganized Debtors

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
    -------------------------------------------------------x

In re                                              :
                                                   :        Chapter 11 Case No. 02-13533 (AJG)
WORLDCOM, INC., et al.,                            :
                                                   :        (Jointly Administered)
                         Debtors.                  :
-------------------------------------------------------x

### WORLDCOM'S MOTION FOR SUMMARY
### JUDGMENT AGAINST PARUS HOLDINGS, INC.,
### SUCCESSOR-BY-MERGER TO EFFECTNET, INC. AND EFFECTNET, LLC

Pursuant to Fed. R. Civ. P. 56, Fed. R. Bankr. P. 7056, and Fed. R. Bankr. P. 9014, the

above-captioned reorganized debtors ("Reorganized Debtors" or "WorldCom") move for

summary judgment against Parus Holdings, Inc., successor-by-merger to EffectNet, Inc. and

EffectNet, LLC ("Parus Holdings" or "Claimant") on Claim No. 11242 (replacing 9291) against

MCI WorldCom Communications, Inc. ("WorldCom") and Claim No. 11173 (replacing 9293)

against Intermedia Communications, Inc. ("Intermedia").

WorldCom's Statement of Material Facts as to Which There Are No Genuine Issues to be

Tried is annexed hereto as Schedule I.  In addition, this motion is supported by WorldCom's

Memorandum of Law, which will be filed contemporaneously with this Motion, and by the

**A 01109**

exhibits contained in WorldCom's Appendix of Exhibits, which will be provided as an

attachment to this Motion.

Respectfully submitted,

STINSON MORRISON HECKER LLP

By:   _s/Robert L. Driscoll_____
                Robert L. Driscoll, Esq.
                Allison M. Murdock, Esq.
                Jodi M. Hoss, Esq.
                1201 Walnut Street, Suite 2800
                Kansas City, MO  64106
                (816) 842-8600 – Telephone
                (816) 691-3495 – Facsimile

ATTORNEYS FOR REORGANIZED DEBTORS

## CERTIFICATE OF SERVICE

I hereby certify that on October 18, 2005, I electronically filed the foregoing with
the Clerk of the Bankruptcy Court using the CM/ECF system which sent notification of
such filing to all parties receiving electronic means.

_s/Robert L. Driscoll_____
Attorney for Reorganized Debtors

**A 01110**

**Schedule I**
**WorldCom's Statement of Material Facts**
**As to Which There Are No Genuine Issues To Be Tried**

**The Contracting Parties and the Contract at Issue**

1.     On November 20, 2000, EffectNet LLC, a Nevada limited liability company with its principal place of business in Phoenix, Arizona ("EffectNet") and Intermedia Communications, Inc., a Delaware corporation with its principal place of business in Florida ("Intermedia") entered into a Unified Communications Services General Agreement (the "UC Contract").  Ex. A, UC Contract.

2.     Parus Holdings, Inc. is the successor in interest to EffectNet.  Ex. B, Response and Opposition of Parus Holdings, Inc. to Debtors' Objection to Proofs of Claim Filed by EffectNet, Inc. ("Parus Opposition") at p. 1. [1]

3.     On July 1, 2001, WorldCom, Inc., a Georgia corporation with its headquarters in Clinton, Mississippi ("WorldCom"), acquired Intermedia pursuant to the merger of a wholly owned subsidiary of WorldCom with and into Intermedia.  Findings of Fact and Conclusions of Law (1) Approving (i) Substantive Consolidation and (ii) the Settlements Under Debtors' Modified Second Amended Joint Plan of Reorganization, dated October 21, 2003, and (2) Confirming Debtors' Modified Second Amended Joint Plan of Reorganization, dated October 21, 2003 (Doc. #9681) at p. 34 § II.C(i); Ex. B, Parus Opposition at p. 6 ¶ 14.

---

[1]     For the purposes of this motion only, WorldCom accepts as true the referenced statements of fact made in the Parus Opposition.  WorldCom reserves the right to contest any and all statements contained in the Parus Opposition in the event the Court determines that a trial is necessary.

**A 01111**

4.      After the acquisition, WorldCom controlled Intermedia and EffectNet was advised that WorldCom would be overseeing all projects relating to the UC Contract.  Ex. B, Parus Opposition at p. 22, ¶ 79.

5.      Exhibit A is a true copy of the November 20, 2000, UC Contract between EffectNet and Intermedia.  Ex. B, Parus Opposition at p. 3, ¶ 3.

6.      The UC Contract provides that its interpretation will be in accordance with the laws of the State of Arizona.  Ex. A, UC Contract at p. 10, § 12.3.

7.      The UC Contract provides that the parties to the contract shall not be liable to each other

> FOR ANY INCIDENTAL, INDIRECT, SPECIAL, PUNITIVE, CONSEQUENTIAL OR SIMILAR DAMAGES OF ANY KIND INCLUDING WITHOUT LIMITATION, LOSS OF PROFITS, LOSS OF BUSINESS OR INTERRUPTION OF BUSINESS, WHETHER SUCH LIABILITY IS PREDICATED ON CONTRACT, STRICT LIABILITY OR ANY OTHER THEORY WITHOUT REGARD TO WHETHER SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

Ex. A, UC Contract at p. 10, § 11.

**B.      The Actions of Intermedia**

**Before Acquisition by WorldCom**

8.      On September 5, 2000, WorldCom and Intermedia entered into a merger agreement.  Ex. C, Final Judgment at 5, United States v. WorldCom, Inc., et al., Civ. Act. No. 1:00CV02789 (RWR) (D.D.C.).

9.      On November 17, 2000, the United States Department of Justice filed an action against WorldCom and Intermedia under the Clayton Act.  United States v. WorldCom, Inc., et al., Civ. Act. No. 1:00CV02789 (RWR) (D.D.C.).

10.     On November 20, 2000, Intermedia paid $175,000 to EffectNet as a contract performance deposit.  See Ex. A, UC Contract at p. 6, § 4.5.1.

**A 01112**

11.     On June 26, 2001, the United States District Court for the District of Columbia ordered and directed WorldCom and Intermedia to "divest the Intermedia Assets as an ongoing, viable business" within 180 days from the closing of the merger.  Ex. C, Final Judgment at 5-6, Doc. No. 12 in United States v. WorldCom, Inc., Civ. Act. No. 1:00CV02789 (RWR).

### After Acquisition by WorldCom

12.     After July 1, 2001, Intermedia's project manager for the UC Contract was terminated and Intermedia's sales force was disbanded through terminations of employment or reassignment to other projects.  Ex. B, Parus Opposition at p. 6, ¶ 16.

13.     In September, 2001, Intermedia cancelled 682 of the existing 729 subscriptions for services to be provided under the UC Contract.  Id. at p. 7, ¶ 17.

14.     On or about February 6, 2002, EffectNet invoiced Intermedia for payments under the UC Contract.  Intermedia did not pay those invoices.  Ex. D, March 12, 2002 letter from Robert C. McConnell, General Counsel of EffectNet, to Rich Black of Intermedia at p. 2; Ex. B, Parus Opposition at p. 7, ¶ 18.

15.     On or about March 1, 2002, Intermedia requested cancellation of all remaining services under the UC Contract.  Ex. B, Parus Opposition at pp. 6-7, ¶ 17.

### C.    EffectNet's Termination of the UC Contract

16.     By letter dated March 12, 2002, EffectNet gave notice of default to Intermedia under Section 5.2 of the UC Contract and notice of EffectNet's intent to strictly enforce all provisions of default in the UC Contract, including the contract termination provision.  Ex. D, March 12, 2002 letter from Robert C. McConnell, General Counsel of EffectNet, to Rich Black of Intermedia.

17.     By letter dated March 25, 2002, EffectNet confirmed its March 12, 2002 notice of default to Intermedia under Section 5.2 of the UC Contract, confirmed its intent to strictly

A 01113

enforce the default provisions of the UC Contract, including the contract termination provision, and advised that the UC Contract would be terminated on April 12, 2002 if Intermedia had not cured its defaults.  Ex. E, March 25, 2002 letter from Robert C. McConnell, General Counsel of EffectNet, to Brett Bacon of MCI/WorldCom.

18.    Section 5.2 of the UC Contract provides that termination of the UC Contract "shall be effective thirty (30) days after written notice to the defaulting Party if the default has not been cured within such thirty (30) day period."  Ex. A, UC Contract at p. 6, § 5.2.

19.    Intermedia did not cure its defaults under the UC Contract.  Ex. B, Parus Opposition at p. 7, ¶ 20.

20.    Section 5.3 of the UC Contract, captioned "Effect of Termination," provides that upon termination of the contract "for any reason, each Party shall remain liable for those obligations that accrued prior to the date of such termination . . ."  Ex. A, UC Contract at p. 6, § 5.3.

**D.    Unpaid Obligations Under the UC Contract that Accrued Prior to April 12, 2002**

21.    During the December 2001 billing cycle, Intermedia delivered 47 active mailboxes, EffectNet billed WorldCom $1,308.85 for the active mailboxes, and Intermedia had a volume shortfall of 9,953 mailbox subscriptions.  Ex. C, attachment to Ex. B, Parus Opposition. The volume shortfall times the basic rate of $11.45 equals $113,961.85.  See Ex. P (Pricing), attached to Ex. A, UC Contract.

22.    During the January 2002 billing cycle, Intermedia delivered 47 active mailboxes, EffectNet billed WorldCom $1,308.85 for the active mailboxes and Intermedia had a volume shortfall of 9,953 mailbox subscriptions.  Ex. D, attachment to Ex. B, Parus Opposition.  The volume shortfall times the basic rate of $11.45 equals $113,961.85.  See Ex. P (Pricing), attached to Ex. A, UC Contract.

**A 01114**

23.    During the February 2002 billing cycle, Intermedia delivered 42 active mailboxes, EffectNet billed WorldCom $1,381.80 for the active mailboxes, and Intermedia had a volume shortfall of 9,958 mailbox subscriptions.  Ex. E, attachment to Ex. B, Parus Opposition.  The volume shortfall times the basic rate of $11.45 equals $114,019.10.  See Ex. P (Pricing), attached to Ex. A, UC Contract.

24.    The minimum commitment for the March 2002 billing cycle was 10,000.  Ex. A, UC Contract § 2.12.  The minimum commitment times the basic rate of $11.45 equals $114,500.00.  See Ex. P (Pricing), attached to Ex. A, UC Contract.

25.    The total volume shortfall for the billing cycles of December 2001, and January 2002 through March 2002, multiplied by the $11.45 per month basic rate specified in the UC Contract, plus amounts due for active mailboxes, equals $460,442.30.  Undisputed Facts ¶¶ 21-24; Ex. P (Pricing), attached to Ex. A, UC Contract.

## CERTIFICATE OF COUNSEL

I certify that I am authorized to and do, on behalf of Reorganized Debtors, stipulate to the facts stated above in paragraphs 21 through 25.


    *s/Robert L. Driscoll*
    Robert L. Driscoll
    ATTORNEY FOR REORGANIZED DEBTORS

A 01115

STINSON MORRISON HECKER LLP

Robert L. Driscoll, Esq.
Allison M. Murdock, Esq.
Jodi M. Hoss, Esq.
1201 Walnut Street
Kansas City, MO  64106
Telephone:  (816) 842-8600
Facsimile:  (816) 691-3495
Attorneys for Reorganized Debtors


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
In re                                              :
                                                   :      Chapter 11 Case No. 02-13533 (AJG)
WORLDCOM, INC., et al.,                            :
                                                   :      (Jointly Administered)
                          Debtors.                 :
-------------------------------------------------------x

## APPENDIX OF EXHIBITS

| Exhibit | Description |
| --- | --- |
| A | Unified Communications Services General Agreement |
| B | Response and Opposition of Parus Holdings, Inc. to Debtors' Objection to Proofs of Claim Filed by EffectNet, Inc. |
| C | Final Judgment, United States v. World Com, Inc., et al., Civ. Act. No. 1:00CV02789 (RWR) (D.D.C.) |
| D | March 12, 2002 letter from Richard C. McConnell, General Counsel of EffectNet, To Rich Black of Intermedia |
| E | March 25, 2002 letter from Richard C. McConnell, General Counsel of EffectNet to Brett Bacon of MCI/WorldCom |

# Exhibit A

A 01117

**ORIGINAL**

# EffectNet

# Unified Communications
# Services
# General Agreement
# For

# Intermedia Communications, Inc.

A 01118

# UNIFIED COMMUNICATIONS SERVICES GENERAL AGREEMENT

This Unified Communications General Agreement (the "Agreement") is entered into as of the 20 day of November 2000, ("Effective Date") by and between EffectNet LLC, a Nevada Limited Liability Company ("EffectNet") and Intermedia Communications, Inc. organized under the laws of The State of Delaware, with a business address at One Intermedia Way, Tampa, FL 33647 ("Intermedia") (collectively "Parties" or individually a "Party").

**WHEREAS,** Intermedia is Integrated Communications Provider providing telecommunication services including local dial tone, long distance, data services, etc.

**WHEREAS,** EffectNet is a unified communications application service provider that offers private label Internet and telecommunications products and services, including unified communications and other value-added services, in-house customer services, billing and technical support (the "EffectNet Services").

**WHEREAS,** EffectNet desires to provide Intermedia with a customized Intermedia-branded wholesale communications service ("Private Label") for sale by Intermedia to its end user customers (the services collectively hereinafter described as "Intermedia UC Services" or "UC Services").

**WHEREAS,** EffectNet and Intermedia recognize that the provision of Intermedia UC Services requires the Parties to closely work together to meet customer needs and to implement and ensure the commercial viability of the Intermedia UC Services.

**NOW THEREFORE,** in consideration of the promises and mutual agreements contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which the Parties acknowledge, the Parties agree as follows:

## 1.    GENERAL PROVISIONS.

1.1    Both Parties agree that EffectNet shall offer Intermedia UC Services for Intermedia as described in this Agreement. Intermedia will market the UC Services to Intermedia customers and end-users as it sees fit.   For purposes of this Agreement, the term "customers" shall include, but not be limited to wholesale and retail customers of Intermedia UC Services.

1.2    EffectNet may make changes to the EffectNet Services from time to time in order to improve, modify or extend the EffectNet Services ("EffectNet Changes"), but in no event shall such changes decrease the quality of the EffectNet Services provided to Intermedia. EffectNet will provide Intermedia with notice ninety (90) days in advance of the commercial release date of such changes.

1.3    The Parties shall use their best efforts to accomplish the initial launch of the Intermedia UC Services ("Initial Launch Date") by December 18, 2000.

1.4    Each Party shall promptly notify the other in writing of any event, which might result in such Party's inability to continue to meet its obligations under this Agreement. Such event shall specifically include, but not be limited to, a materially adverse change in a Party's financial situation. EffectNet acknowledges and understands that Intermedia is in the process of a merger involving all of its assets with MCI/Worldcom, Inc. Such merger shall not, in and of itself, constitute an event requiring

notice pursuant to this provision, and that, accordingly, no further notice of the merger or the consummation thereof, shall be required of Intermedia.

2.    **OBLIGATIONS OF THE PARTIES.**

2.1    Product Coordinator: EffectNet and Intermedia will each designate their own Product Coordinator to coordinate the process described below.

2.1.1    The designated Product Coordinators will be the principal points of contact between the parties on product issues (the "Product Advisory Process"). Each party may rely on the authority and technical competence of the other Party's Product Coordinator to represent its respective company in connection with the priorities, needs and progress of their company's product issues.

2.1.2    The Product Advisory Process will include in-person/telephonic/electronic communication between representatives, which should be ongoing, or occur not less than once each month during the Term of this Agreement, except if the parties expressly agree to some different frequency.

2.2    EffectNet Materials. EffectNet will provide Intermedia with regular access to and copies of the following:

2.2.1    Plans for current and future enhancements to the EffectNet Services which by their nature apply to the Intermedia UC Services; and

2.2.2    Functional descriptions, development plans, schedules and periodic status for enhancements to the EffectNet Services under development, as soon as such materials exist.

2.3    Product Development. Intermedia and EffectNet agree that the EffectNet Services provided to Intermedia will be the same version of the EffectNet Services generally made commercially available, unless Intermedia deploys modifications of the EffectNet Services in order to satisfy large blocks of customer/end users, provided, however, that EffectNet shall have no obligation to support Intermedia any modification not previously known to EffectNet.

2.3.1    Intermedia will implement new versions within 30 days with call avoidance measures built into the process, including but not limited to adequate customer notification of new features, benefits and the availability of training timed to coincide with the release of any new versions.

2.3.2    EffectNet will provide Intermedia with at least ninety (90) days advance notice of an expected new release or version of EffectNet Services.

2.4    Forecasts. Intermedia shall provide EffectNet with non-binding forecasts for expected mailbox activations, at minimum of once every two (2) months during the Term of this Agreement. Intermedia will also provide EffectNet with quarterly and annual non-binding forecasts of expected mailbox activations. The availability of platform capacity to be provided by EffectNet to Intermedia is conditioned on the platform capacity demand not exceeding the forecast provided by Intermedia for any period addressed by such forecast. With respect to timely provided mailbox activation forecasts only, EffectNet will use reasonable efforts to meet Intermedia's forecasted demand. However, EffectNet reserves the right to request additional guarantees from Intermedia when the forecasts provided by Intermedia require significant or unusual capital and cost

by EffectNet. Intermedia is to provide the first of such forecasts to EffectNet on or before November 30, 2000. For purposes of this section EffectNet must allocate constrained capacity to Intermedia on terms at least as favorable as offered to any other customer of EffectNet. In the event that EffectNet declines orders because of capacity constraints, then EffectNet shall notify Intermedia and the Parties shall use commercially reasonable efforts to develop a solution that will provide Intermedia with a method of ensuring that the needs of Intermedia's existing and potential end users are met while ensuring that EffectNet is permitted to increase capacity in an orderly fashion.

2.5     Billing Cycle. On an every 15-day basis, EffectNet will invoice Intermedia for account fees for each account active during the previous 15 days and any late charges for previous outstanding invoices.

2.6     Payment. Intermedia will pay EffectNet in then available U.S. funds on a net-15 day basis.

2.7     Call Detail Records for Billing. Each day, EffectNet will provide to Intermedia Calling Detail Records ("CDR") on a timely basis, in a mutually agreed-upon electronic format.

2.8     Billings and Collections. Intermedia shall be responsible, at its sole expense, for all invoicing and collections with its customers, end-users, agents, subagents or resellers. EffectNet will not be responsible for any collections or bad debt by Intermedia's customers, end-users, agents, subagents or resellers2.9     Fraud. Intermedia will be solely responsible for fraudulent misuse of the Intermedia UC Services due to credit fraud, fraudulently established accounts and stolen accounts (except to the extent if such theft occurs-through misuse or theft the records or facilities of EffectNet); provided that, Intermedia shall not be responsible for fraudulent misuse occurring after EffectNet has become aware of such occurrence; and, provided further, that the extent of Intermedia's liability to EffectNet for fraudulent misuse of Intermedia UC Services shall be EffectNet's direct damages and costs incurred. EffectNet shall notify Intermedia of fraud as soon as practicable, upon EffectNet's becoming aware of such fraud. The Parties will use commercially reasonable efforts to establish fraud control means and measures.

2.10    Customer Service Call Center and Technical Support. EffectNet shall maintain a customer service call center for its Intermedia customers and end-users, as appropriate in accordance with industry standards. This call center will be responsible for all customer support.

2.10.1 Call items outside the scope of EffectNet support services are: non-EffectNet related software problems and call forwarding issues.

2.11    Customer Fulfillment Process. Intermedia, when taking orders for new customers or end users, or taking orders to modify or update a customer's order, will use the EffectNet Customer Fulfillment Process or compatible process to gather the information required and to provide the customer information to EffectNet. Intermedia is responsible for providing to EffectNet such new mailbox account information reasonably required by EffectNet in order to activate a new mailbox. EffectNet shall provide documentation and training, in accordance with the training provision of this Agreement, to Intermedia on the EffectNet Customer Fulfillment Process.     2.12     Minimum Commitment. Intermedia hereby agrees to deliver a minimum 1,500 then current active subscribers on

or before three (3) months after December 18, 2000 (the "Rollout Date"); an additional 1,500 then current active subscribers (total 3,000) on or before six (6) months after the Rollout Date; and additional 3,500 then current active subscribers (total 6,500) on or before nine (9) months after the Rollout Date; and 10,000 total then current active subscribers on or before twelve (12) months after the Rollout Date (the "Ramp Date"), and at the end of each calendar month thereafter ( the "Minimum Commitment") for the Term of this Agreement.

2.13    Reconciliation Payment. On the Ramp Date and at the end of each calendar month thereafter, EffectNet will calculate the actual number of then current active subscribers on the last day of such calendar month and compare it to the Minimum Commitment. If the number of subscribers is less than the Minimum Commitment for the month in question, such difference will constitute a "Volume Shortfall." Intermedia shall pay EffectNet a Reconciliation Payment equal to the Volume Shortfall multiplied by the base monthly price applicable to the Intermedia UC Service per subscriber,

## 3.    MARKETING AND BRANDING.

3.1    Web Presence. At no additional charge, EffectNet will provide Intermedia with a private label website, URL links and related branding as reasonably directed by Intermedia.

3.2    Use of Trademarks, Service Marks and Trade names. The Parties agree not to display or use any of the trade names, service marks, brands or trademarks of the other Party, and shall not permit the same to be displayed or used by third parties, other than in connection with the sale, distribution or promotion of the brand(s) used for the Intermedia UC Services covered by this Agreement and subject to the prior written approval of the other or a third Party owning such trademark, service mark or trade name (except where such approval between the Parties is contained in this Agreement). In the absence of specific prior written consent from the other Party, a Party shall not use any part of any of the other Party's trade names, service marks, brands or trademarks as part of its own name, service marks or trademarks or in any other manner not so approved by the other Party. It is expressly understood by both Parties that trade names, service marks and trademarks of the other party are proprietary and that nothing in this Agreement constitutes the grant of a general license to use said trade names, service marks and trademarks. Upon termination of this Agreement, any and all rights or privileges of a Party to use the other Party's trade names, service marks, brands or trademarks shall expire, and each Party shall discontinue the use of the other Party's trade names, service marks, brands. The provisions of this section shall also apply to third party branding incidental to this Agreement.

3.3    Intermedia Marketing Expenses. Intermedia as the buyer of the wholesale services from EffectNet, is responsible for all expenses and obligations incurred by Intermedia as a result of its efforts to attract and solicit customers for Intermedia UC Services. Intermedia expressly acknowledges that it is not entitled to any reimbursement by EffectNet for such expenses unless, and only to the extent that, both parties hereto agree in writing prior to the incursion of such expenses, as set forth in this Agreement.

## 4.    CHARGES AND BILLING STATEMENTS.

4.1    Traffic- or usage-sensitive rates shall be computed in 30-second initial and 6-second continual increments.

4.2    Intermedia shall be responsible for all applicable taxes, including but not limited to sales or value-added taxes, utility or excise taxes, fees and/or surcharges that are imposed by federal, state, or local governments on the Intermedia UC Services or business generated by Intermedia through the sale of Intermedia UC Services as a result of long distance or services bundled within the Intermedia UC Services. Intermedia shall pay or reimburse EffectNet for all taxes collected or imposed on these services provided by EffectNet. The prices quotes in the following sections are exclusive of any and all taxes. Excluded from this responsibility are taxes based on EffectNet's net income. EffectNet shall comply with all federal and state regulations with respect to employee withholding taxes.

4.3    Pricing.    Pricing shall be as indicated by Appendix "P" attached hereto.

4.4    Seven (7) working days post the close of the month, EffectNet shall provide to Intermedia a settlement statement ("Settlement Statement") providing a summary of charges for the previous month's billing cycle in an industry standard format. The settlement statement, unless specified elsewhere in this Agreement, shall contain the following:

4.4.1    A listing of monthly recurring charges for the current or prior month's billing cycle.

4.4.2    For calls or traffic originated by Intermedia or any customers, agents, sub-agents and/or end-users during the previous month, the individual call detail and the aggregate usage charge payable broken down by termination location.

4.4.3    For calls or traffic terminated by Intermedia or any customers, agents, sub-agents and/or end-users during the previous month, the individual call detail and the aggregate usage charge payable broken down by termination location.

4.4.4    Any taxes, fees and/or charges that are imposed by federal, state, and/or local governments.

4.4.5    The net amount payable by Intermedia to EffectNet or payable to Intermedia by EffectNet.

4.4.6    When applicable, any mutually negotiated additional fees.

4.5    Payment of the Settlement Statement shall be made within 15(fifteen) calendar days after the Settlement Statement and invoice are received by Intermedia (the "Due Date"). Payments to EffectNet shall be in United States dollars and are to be made for credit to an account of EffectNet to be determined by EffectNet and provided to Intermedia within three (3) days of the date of execution of this Agreement by the later signing party. If payment is not received by the Due Date, a late fee of the lesser of (a)

A 01123

one (1) percent per month or (b) the maximum percentage permitted by law shall be assessed on the delinquent balance of undisputed usage not paid by the Due Date.

4.5.1 Deposit. Intermedia has provided EffectNet with a fully refundable deposit in anticipation of this Agreement in the amount of minimum subscriber commitment multiplied times $17.50 (US dollars) for a total of $175,000. This deposit shall be refunded to Intermedia in whole on or before the Ramp Date as long as Intermedia has met the Minimum Commitment as of such date. If Intermedia has not met the Minimum Commitment as of the Ramp Date, EffectNet shall refund to Intermedia the full amount of the deposit less the Reconciliation Payment then due. The amount of such Reconciliation Payment shall remain on deposit until such time as the Minimum Commitment is met.

4.5.2  In the event that Intermedia disputes any charge assessed by EffectNet, the Parties agree to cooperate to resolve the dispute at the earliest practicable date. The late charges set forth in Section of this Agreement shall not apply to payments that are the subject of a good faith dispute between EffectNet and Intermedia. If there is a good faith dispute, EffectNet cannot demand a late payment deposit.

5.    TERM AND TERMINATION.

5.1    Term.  Unless otherwise terminated as provided herein, this Agreement shall be in force for an initial term of three (3) years after the Effective Date (the "Initial Term"). This agreement shall continue automatically for successive one year terms under the same terms and conditions contained herein together with any subsequent amendments hereto, unless either Party has sent written notice of its intent not to renew the Term at least thirty (30) days prior to the expiration of the Initial Term or the renewal period then in effect.

5.2    Termination.  Either Party may terminate this Agreement:  (a) if the other Party fails to fulfill any of its material obligations under this Agreement; (b) if the other Party is in breach of Section 7 (Confidentiality); (c) if the other Party becomes insolvent or admits in writing its inability to pay debts as they mature, or makes an assignment for the benefit of creditors; or (d) if a petition under any foreign, state or United States bankruptcy act, receivership statute, or the like is filed by the other Party and is not dismissed within sixty (60) days after such filing. Termination due to default under this Section shall be effective thirty (30) days after written notice to the defaulting Party if the default has not been cured within such thirty (30) day period. 5.3    Effect of Termination. Upon termination of this Agreement for any reason, each Party shall remain liable for those obligations that accrued prior to the date of such termination; provided, however, that nothing herein shall be construed to obligate EffectNet to offer Services to Intermedia after the termination of this Agreement.

5.4    Early Termination. If prior to the end of the Initial Term this Agreement is terminated for any reason by Intermedia other than pursuant to Section 5.2, Intermedia shall pay EffectNet, as liquidated damages and as the sole remedy of EffectNet and the exclusive liability of Intermedia, a one-time early termination fee equal to $270,400 times the lesser of (i) 12 months, or (ii) the number of months remaining in the contract term.

6.    SURVIVAL.  The following provisions shall survive the expiration or termination, for any reason, of this Agreement: (Subscriber Information), (Charges and Billing

Statements);  (Term and Termination);  (Confidentiality); (Warranties); (Intellectual Property); (Indemnification); (Limitation of Liability);  (General Provisions).

7.     **CONFIDENTIALITY.**   All information disclosed to the other party shall be deemed confidential and proprietary (hereinafter referred to as "Proprietary Information").  Such information includes, but is not limited to, trade secrets, know-how, technical specifications, processes, functional descriptions, architectural specifications, development plans, schedules, design information, customer lists, pricing and financial information concerning the parties' products or services, or other information relating to business development, operations, marketing, sales, performance, and any other information disclosed hereunder, which, by its nature, might reasonably be presumed to be proprietary in nature.

7.1     Each party agrees to use the Proprietary Information received from the other party only for the purposes of analyzing the business arrangement between the parties, and in accordance with this Agreement.  No patent, copyright, trademark, invention, service mark, or other proprietary rights are implied or granted under this Agreement.

7.2     Proprietary Information supplied pursuant to this Agreement shall not be reproduced in any form by the receiving party except as required to accomplish the intent of this Agreement.

7.3     The receiving party shall provide, at a minimum, the same care to avoid disclosure or unauthorized use of the Proprietary Information as is provided to protect its own Proprietary Information, but in no event less than a reasonable standard of care.  It is agreed that all Proprietary Information shall be retained by the receiving party in a secure place with access limited to the receiving party's employees or agents who need to know of the content of such information for purposes of fulfilling its obligations pursuant to this Agreement. The receiving party shall be fully responsible for any breach of this Agreement by its employees or agents.  The receiving party will promptly report to the disclosing party any actual or suspected violation of the terms of this Agreement, and will take all reasonable steps requested by the disclosing party to prevent, control or remedy any such violation.

7.4     All Proprietary Information, unless otherwise specified in writing, shall remain the property of the disclosing party.  Such information shall be used by the receiving party only for the purpose set forth in this Agreement.  In addition, such Proprietary Information, including all copies thereof, shall be returned to the disclosing party or, at the request of the disclosing party, may be destroyed by the receiving party and certified as destroyed by an officer of the receiving party after the Receiving party's need for it has expired, upon request of the disclosing party; and, in any event, upon termination of the Agreement.

7.5     Exceptions to confidentiality:  It is understood that the parties have no obligation to maintain the confidentiality of Proprietary Information which:

7.5.1   has been published or is now otherwise in the public domain through no fault of the receiving party.

7.5.2   prior to disclosure hereunder is within the legitimate possession of the receiving party without obligation of confidentiality as can be demonstrated by written documentation.

7.5.3   subsequent to disclosure hereunder is lawfully received from a third party having rights to such Proprietary Information without restriction of the third party's right to disseminate the Proprietary Information and without notice of any restriction against its further disclosure, is disclosed with the written approval of the other party as can be proven by documentation.

7.5.4   is obligated to be produced by a Party under order of a court of competent jurisdiction or other government authority; provided however, that the receiving party shall immediately provide notice to the disclosing party such that the disclosing party may seek injunctive relief and/or a protective order; and further provided that the disclosing party shall use best efforts to ensure that the information shall be treated as confidential by the party to whom it is disclosed.

7.5.5   is independently developed by the receiving party without reference to or reliance upon the confidential information.

In the event of a disputed disclosure, the receiving party shall bear the burden of proof of demonstrating that the information falls under one of the above exceptions.

## 8.    WARRANTIES.

8.1.    Authorization.  Each Party represents and warrants to the other Party that the execution and delivery of this Agreement and the performance of such Party's obligations under this Agreement have been duly authorized, and that the Agreement is a valid and binding agreement, enforceable in accordance with its terms.

8.2.    Legal Compliance.  Each Party represents and warrants that it has obtained, or will obtain prior to offering the Services hereunder, all licenses, approvals and/or regulatory authority necessary to provide the Services described herein. This Agreement is made expressly subject to all present and future valid orders and regulations of any regulatory body having jurisdiction over the subject matter of this Agreement.

8.3    No Other Warranties.  With respect to the UC Services to be provided in, and to users accessing these services from the United States and Canada, EffectNet warrants that it will exercise commercially reasonable care in the performance of its obligations under this Agreement

EFFECTNET DOES NOT WARRANT THAT THE EFFECTNET SERVICES OR THE PLATFORM THAT IT PROVIDES TO INTERMEDIA IS ERROR-FREE. IN ADDITION, THE EFFECTNET SERVICES OR INTERMEDIA PLATFORM IS PROVIDED "AS IS" AND WITHOUT ANY WARRANTY OF ANY KIND. EFFECTNET DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. NEITHER PARTY SHALL BE LIABLE FOR ANY DAMAGES ARISING FROM THE OTHER PARTY'S OR ANY THIRD PARTY'S USE OF THE EQUIPMENT, INCLUDING WITHOUT LIMITATION INDIRECT, INCIDENTAL, SPECIAL, OR CONSEQUENTIAL DAMAGES, EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILTY OF SUCH DAMAGES. THE PARTIES AGREE TO THE ALLOCATION OF LIABILITY RISK SET FORTH IN THIS SECTION. THIS LIMITATION ON LIABILITY IS INTENDED ITO APPLY WITHOUT REGARD TO

WHETHER OTHER PROVISIONS OF THIS CONTRACT HAVE BEEN BREACHED OR PROVEN INEFFECTIVE. "AS IS" means the As Is condition of the EffectNet Services to be provided as Intermedia UC Services, including such customer support, software and hardware as required in the condition as of the Initial Launch Date agreed upon between the Parties and including any planned enhancement as well as any other changes mutually agreed upon. These products may as of the Initial Launch Date include works for hire for the benefit of Intermedia as further described in Section 9.2.

9.    **INTELLECTUAL PROPERTY**.

9.1    General. Except as otherwise agreed in writing between the Parties, EffectNet shall own any Patent applications and Patents issued on inventions under this Agreement. All Inventions that are not the subject of patents or applications will be considered Confidential Information of EffectNet. Nothing in this Agreement shall be construed to transfer any right title or use or interest in EffectNet's designs, inventions, copyrights, trade secrets, trade names or other intellectual property.

10.    **INDEMNIFICATION**. Each Party ("Indemnitor") will defend, indemnify and hold harmless the other Party and such Party's affiliates, directors, officers, employees, proprietors, independent contractors, consultants, partners, shareholders, representatives, customers, agents, predecessors, successors, and permitted assigns (collectively, "Indemnitees") from and against any claim, suit, demand, loss, damage, expense (including reasonable attorneys' fees and costs) or liability that may result from, arise out of or relate to:  (a) acts or omissions arising out of or in connection with this Agreement resulting in property damage; by Indemnitor and (b) intentional or negligent violations by Indemnitor of any applicable laws or governmental regulation.

Intermedia shall indemnify and hold harmless EffectNet from and against any and all claims, expenses, judgments, liabilities, damages or losses, including reasonable attorney's fees and expenses, and shall defend all third-party actions and proceedings arising from any infringement or alleged infringement of any patent, copyright, trade secret, mask work, trade marks or service marks of any third party to the extent such claims are caused by the acts or omissions of Intermedia with respect to the marketing and/or provision of the Intermedia UC Services, but not including any claims, expenses, judgments, liabilities, damages or losses to the extent attributable to the EffectNet Services. EffectNet shall indemnify and hold harmless Intermedia from and against any and all claims, expenses, judgments, liabilities, damages or losses, including reasonable attorneys' fees and expenses, and shall defend all third-party actions and proceedings arising from any infringement or alleged infringement of any patent, copyright, trade secret, mask work or other intellectual property right of any third party, to the extent such claims are caused by use of the EffectNet Services.  In the event that an injunction or restraining order is obtained against the use or distribution of any product or deliverable pursuant to this Agreement because of any infringement or alleged infringement of any patent, copyright, trade secret, mask work or other intellectual property right or any proprietary, contract or other right of any third party, or if in EffectNet's reasonable judgment any product or deliverable is likely to become the subject of a successful claim of such infringement, then EffectNet's sole obligation to Intermedia (in addition to its obligations of indemnification set forth above) shall be to promptly: (i) procure for Intermedia the right to use the product or deliverable as provided in this Agreement, (ii)

replace or modify the EffectNet product or deliverable so it becomes non-infringing without materially affecting the performance thereof, or if options (i) and (ii) are not available despite commercially reasonable efforts, (iii) terminate the licenses granted hereunder, and accept the return of all copies of all products.

**11.    LIMITATION OF LIABILITY.** EXCEPT FOR DAMAGES ARISING UNDER SECTION  , IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY INCIDENTAL, INDIRECT, SPECIAL, PUNITIVE, CONSEQUENTIAL OR SIMILAR DAMAGES OF ANY KIND INCLUDING WITHOUT LIMITATION, LOSS OF PROFITS, LOSS OF BUSINESS OR INTERRUPTION OF BUSINESS, WHETHER SUCH LIABILITY IS PREDICATED ON CONTRACT, STRICT LIABILITY OR ANY OTHER THEORY WITHOUT REGARD TO WHETHER SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

**12.    GENERAL PROVISIONS.**

    12.1    Monetary Values. All monetary values in the Agreement refer to U.S. dollars.

    12.2    Assignment. Either Party may assign its rights or obligations under this Agreement with written notice to the other Party, and after obtaining written approval by the other party, which shall not be unreasonably withheld or delayed. In the event that Intermedia is acquired by WorldCom no such written approval shall be required. In the event of a restructuring, merger, or acquisition of either party, in which such party retains at least 25 percent control of the resulting entity such notice and approval shall not be required.

    12.3    Governing Law. This Agreement will be interpreted in accordance with the laws of the state of Arizona, excluding its conflict of law rules. The Parties agree that the federal and state courts located in Arizona and/or Florida shall be the proper forum for any action brought against the other Party, and each Party shall take all necessary actions to consent to the jurisdiction of such courts. 12.4    Notices. All notices or other communications between EffectNet and Intermedia under this Agreement shall be in writing and delivered personally, sent by confirmed facsimile, by confirmed e-mail, by certified mail, postage prepaid and return receipt requested, or by a nationally recognized express delivery service addressed to the Parties at the addresses first set forth below or at such other addresses, facsimile numbers or e-mail addresses or to such individuals as either Party may specify by notice to the other Party pursuant to this Section. All notices shall be in English and shall be effective upon receipt. As a courtesy, Parties are encouraged to send duplicate copies of notice, demands, or other by facsimile. Issuance of a facsimile copy of a notice, request, demand or other communication shall not replace the requirements for delivery by mail or overnight courier in the manner provided in this Section, nor shall the date the facsimile received constitute the official receipt date. Any Party may change the address to which notices, requests, demands or other to such Party shall be delivered or mailed by giving notice of the change to the other Party in the manner provided in this Section. The addresses for the Parties for the purposes of this Agreement are:

**For EffectNet:**

Taj Reneau

Chief Executive Officer

EffectNet

Phone:  602.296.3300

Fax:    602.296.3311

**For Intermedia Communications, Inc.**

Kathleen A. Victory

VP Product Line Management

Intermedia Communications Inc.

Phone:  813.829.6703

Fax:    813.829.2359

12.5   Independent Contractors. This Agreement and the relations hereby established do not constitute a partnership, joint venture, franchise or agency between the Parties. Both parties are independent contractors acting for their own accounts and neither is authorized to bind, or attempt to bind, the other to any contract, general warranty, covenant or undertaking of any nature whatsoever unless authorized in writing. Neither party shall have the authority to accept delivery, collect or otherwise take possession of any funds or other property of the other party, and if done so inadvertently, shall immediately notify the other party, shall hold same in trust and shall immediately deliver same to the other party.  In all matters relating to this Agreement neither party nor such party's employees or agents are, or will act, as employees of the other party within the meaning of any federal or state laws.

12.6   Severability. If any provision of this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other term or provision hereof.  The Parties agree that they will negotiate in good faith or will permit a court to replace any provision hereof so held invalid, illegal or unenforceable with a valid provision, which is as similar as possible in substance to the invalid, illegal or unenforceable provision.

12.7   Entire Agreement And Modifications.  This Agreement together with any appendices, exhibits and attachments constitute the entire agreement between the Parties with regard to the subject matter hereof and supersedes all prior, agreements and understandings, whether written or oral, relating to the subject matter hereof.  This Agreement may only be modified by a written instrument duly executed by each Party, making specific reference to this Agreement and to the clause to be modified.

12.8   Captions.  Where provided, captions of the sections and subsections of this Agreement are for reference purposes only and do not constitute terms or conditions of this Agreement, and shall not limit or affect the terms and conditions hereof.

12.9   Waiver.  No provision of, right, power or privilege under this Agreement shall be deemed to have been waived by any act, delay, omission or acquiescence on the part of either Party, its agents, or employees, but only by an instrument in writing signed by an authorized officer of each Party.  No waiver by either Party of any breach or default of any provision of this Agreement by the other Party shall be effective as to any other breach or default, whether of the same or any other provision and whether occurring prior to, concurrent with, or subsequent to the date of such waiver.

A 01129

12.10  <u>Counterparts</u>. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. In making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart.

12.11  <u>Force Majeure</u>. Neither Party shall have any liability to the other for delays resulting from any "Event of Force Majeure" or from any act or omission of the such other Party. An Event of Force Majeure shall include without limitation any delay or failure in performance due to acts of God, earthquake, labor disputes, changes in law, regulation or government policy, riots, war, fire, epidemic, acts or omissions of vendors or suppliers, equipment failures, transportation difficulties, or other occurrences which are beyond the affected Party's reasonable control.

12.12  <u>Conflicts</u>. To the extent the terms of this Agreement and the MOU conflict, the terms of this Agreement shall be controlling.

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the date first written above.

EffectNet, L.L.C.                                        Intermedia Communications, Inc.

Signature: _____        Signature: _____

Printed Name: Brad Steinmeyer              Printed Name: Kathleen A. Victory

Title: VP PARTNER DEVELOPMENT             Title: VP Product Line Management

Date: 11/27/00                                      Date: November 20, 2000

## APPENDIX P (Pricing)

EffectNet shall offer the following products to Intermedia at the prices attached thereto as follows:

### 1.    Basic

$11.45 per month for each basic account with all platform usage and inbound call times on the EffectNet platform an additional $.10 per minute. The basic account includes unlimited free on-line usage including checking e-mails, faxes, etc... Outbound calling will be $.10 per minute.  This package includes customer service and technical support.  All basic accounts will be billed a base subscription price of $ 6.00 for the first calendar month of activation partial or full, and $11.45 for any calendar month thereafter partial or full.

### 2.    Unlimited

$27.40 per month for each unlimited account with unlimited free platform usage and inbound call time included. Outbound calling will be $.10 per minute. The unlimited account includes unlimited free on-line usage including checking e-mails, faxes, etc. Outbound calls include: conference calls (per member), outbound long distance, outbound fax, follow me, notification, return calls, etc. All unlimited accounts will be billed a base subscription price of $ 14.00 for the first calendar month of activation partial or full, and $27.40 for any calendar month thereafter partial or full.

Intermedia shall be responsible for any and all expenses incurred related to the completion of the Virtual Private Network ("VPN").   No expenses shall be incurred on behalf of Intermedia for the VPN without prior consent from Intermedia.

# Exhibit B

A 01132

MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY and POPEO, P.C.
Chrysler Center
666 Third Avenue
New York, New York 10017
Stephanie K. Hoos (SH-9821)

-and-

1 Financial Center
Boston, Massachusetts 10009
Michael Gardener (MG-3241)
Ian A. Hammel (IH-8267)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) |
| | ) |
| WORLDCOM, INC., et al. | )    Chapter 11 Case No. |
| | )    02-13533 (AJG) |
| | ) |
| Debtors. | )    (Jointly Administered) |
| | ) |

## RESPONSE AND OPPOSITION OF PARUS HOLDINGS, INC. TO DEBTORS' OBJECTION TO PROOFS OF CLAIM FILED BY EFFECTNET, INC.

Parus Holdings, Inc., successor-by-merger to EffectNet, Inc. and EffectNet, LLC, ("EffectNet") opposes the *"Debtors' Objection to all Proofs of Claim Filed by EffectNet, Inc. which is now Merged into Parus Holdings, Inc., Including, but not Limited to Claim Numbers 9291, 11242, 9293 and 11173"* that was filed in these proceedings on June 10, 2004 (the "Claims Objection").

### I.    PRELIMINARY STATEMENT

1.    EffectNet is a creditor and party-in-interest in these proceedings with contract, tortious interference, civil conspiracy, and other claims ("Claims") against Intermedia Communications, Inc. ("Intermedia") and MCI WorldCom Communications, Inc., ("WorldCom"

A 01133

and, with Intermedia, the "Debtors"). As is set forth in EffectNet's proofs of claim and in this response, Intermedia intentionally breached, indeed repudiated, a certain Unified Communications Services General Agreement almost immediately after WorldCom completed its July 2001 acquisition of and/or merger with Intermedia. EffectNet believes that this breach reflected a conscious decision by Intermedia and WorldCom to reject the agreement in favor of a competing WorldCom strategy. The agreement had been the centerpiece of Intermedia's unified communications program, but this strategy apparently collided with WorldCom's own plans. Moreover, EffectNet believes that this breach may also have had other sinister motives. EffectNet believes that this breach may have been orchestrated to impose financial distress on EffectNet as a competitor and to create leverage to obtain better terms under a separate Master Agreement for Software Licenses that WorldCom was at this same time negotiating with Webley Systems, Inc., a company that supplied technology to EffectNet that EffectNet was, at this same time, merging with. In every event, this breach had a devastating impact on EffectNet.

2.    The Claims Objection is limited to unsupported assertions and is inconsistent with the Debtors' obligations under Rule 3007 of the Federal Rules of Bankruptcy Procedure. The Claims Objection should be rejected on this basis alone. Even if the Court examines the merits of EffectNet's Claims at this early stage of this contested matter, EffectNet submits that a majority of the arguments advanced in the Claims Objection must be summarily rejected while the remaining portions of the Claims Objection cannot be resolved until discovery is completed as contemplated by Bankruptcy Rule 9014.

A 01134

## II. BACKGROUND

### A.    *Summary of EffectNet's Claims.*

3.    EffectNet's Claims against both Debtors relate to Intermedia's total breach and repudiation of its duties under a Unified Communications Services General Agreement between EffectNet and Intermedia dated as of November 20, 2000 (the "UC Contract"). A true and accurate copy of the UC Contract is attached as Exhibit A.

4.    EffectNet's Claims against Intermedia include damages based on Intermedia's breach of the UC Contract. EffectNet also has Claims against Intermedia for unfair and deceptive trade practices, a breach of the implied covenant of good faith and fair dealing, and conspiracy. EffectNet believes that Intermedia and WorldCom acted in concert to breach the UC Contract. EffectNet believes that these actions were made with knowledge that a breach of the UC Contract would have a devastating impact on EffectNet, a competitor of WorldCom, and might enhance WorldCom's ability to extract pricing and other concessions with respect to a separate contract, a Master Agreement for Software Licenses (the "MASL"). See proofs of claim.

5.    EffectNet's Claims against WorldCom are based on WorldCom's separate interference with EffectNet's contractual relations under the UC Contract, unfair and deceptive trade practices, and civil conspiracy in procuring Intermedia's breach of the UC Contract. Id. EffectNet believes that as part of this process, WorldCom made improper use of confidential information given to WorldCom in order to advance its own selfish interests to the detriment of EffectNet.

**A 01135**

**B.    *The UC Contract and the Services.***

6.    The UC Contract represents EffectNet's agreement to supply to Intermedia unified messaging, wholesale communications and related services (the "Services") and Intermedia's agreement to purchase those Services. The UC Contract was the underpinning of a major Intermedia initiative (announced in the fall of 2000) set around a new Intermedia product suite branded "IntermediaOne". IntermediaOne was planned for a launch of this product in 2001 through Intermedia's 700-member plus direct sales force into a substantial base of existing small and medium sized Intermedia business customers.

7.    The Services included, inter alia, enhanced telecommunication products hosted through EffectNet. The Services provided users with unified any-time, any-where access to, and management of their personal and business communications, such as e-mails, faxes, voices-messages, conference calls, calendars, and address books. Subscribers to the Services could, for example, access text-to-voice translation of e-mails over the telephone, view faxes online, arrange conference calls, access contact lists on request, obtain real-time call records for client billing, and re-direct faxes to any machine or PC. Users of the Services could also access and manage their personal and business communications from any type of communications device (such as telephones, mobile phones, personal computers and PDA's).

8.    The UC Contract reflects Intermedia's intent to re-sell the Services to Intermedia's end user customers. Evidence in this contested matter will establish that Intermedia represented to EffectNet at the time the UC Contract was signed that Intermedia had hundreds of sales personnel (many of whom were activated as EffectNet end users prior to July 1, 2001) that would market the Services to Intermedia's customers. Contemporary industry estimates

4

A 01136

projected that unified communications products like the Services would soon become a multi-billion dollar industry.

9.      As is common with re-seller contracts in the telecommunications industry, the UC Contract included an unconditional take-or-pay obligation for the Services.    Take-or-pay requirements are often included in exchange for pricing concessions by a supplier and represent minimal commitments/expectations within a larger anticipated volume.

10.     The take-or-pay obligations of the UC Contract required Intermedia to compensate EffectNet as if Intermedia had *at least* 10,000 subscribers for the Services for all periods on and after December 18, 2001 (the "Minimum Commitment"), although even greater revenues were anticipated by both parties. See UC Contract, at Section 2.12 and 2.13.

11.     The take-or-pay obligations of the UC Contract provided that if the number of active subscribers for Services in any month was less than the Minimum Commitment, the difference between the actual number of active subscribers and the Minimum Commitment would be deemed a "Volume Shortfall". Id. at Section 2.13.   In any month with a Volume Shortfall, EffectNet would be entitled to a "Reconciliation Payment" in addition to payments based on the Services Intermedia re-sold to its customers. Id.   The Reconciliation Payment is the product of the Volume Shortfall multiplied by the base monthly price applicable to the Intermedia Services per subscriber. Id.

12.     Based on these take-or-pay elements of the UC Contract, at all times relevant to EffectNet's Claims, the minimum compensation due under the UC Contract was $274,000 per month. See paragraphs 25-26, infra.

A 01137

**C.**    *Intermedia Committed a Total Breach of the UC Contract.*

13.    The UC Contract had a three-year initial term measured from the "Effective Date" set forth in the UC Contract.  See UC Contract, at Section 5.1.  The UC Contract designated November 20, 2000 as the Effective Date. Id. at Recitals.  Therefore, the initial term of the UC Contract was set to expire in late November, 2003.

14.    On or about July 1, 2001, WorldCom acquired and/or merged with Intermedia.

15.    EffectNet believes that on or before July 1, 2001, Intermedia and WorldCom made a conscious election to breach and repudiate the UC Contract.  EffectNet believes that this decision may have been reached to make way for a competing WorldCom initiative to offer products which were similar to the Services provided by EffectNet under the UC Contract, but were based on an incompatible business model.[1]

16.    After the WorldCom-Intermedia business combination, the Debtors dismantled Intermedia's ability to perform under the UC Contract.  For example, Intermedia's project manager for the UC Contract was summarily fired in July 2001.  Further, EffectNet believes that the approximately 40 other Intermedia employees that had been staffed to perform the UC Contract were either terminated or reassigned to other projects.  A sales force numbering in the hundreds (which had been trained by EffectNet to facilitate the performance of Intermedia's obligations) was effectively disbanded and did not exist after September 10, 2001.  From and after July 2001, Intermedia made no apparent material efforts to perform under the UC Contract and few, if any, additional sales of Services were made.

17.    In September, 2001, Intermedia cancelled 682 of the existing 729 subscriptions for the Services.  Thereafter, no new users of the Services were added.  Finally, by an e-mail

---

[1] EffectNet believes that one important distinction between the EffectNet Services and WorldCom's competing product may have been that the EffectNet Services were hosted by EffectNet, while WorldCom's competing product was available to WorldCom through means that were more profitable to WorldCom.

    A 01138

communication to EffectNet dated March 1, 2002, Intermedia demanded that all remaining accounts for Services under the UC Contract be cancelled. A true and accurate copy of that communication is attached as Exhibit B.

18.    Both prior to and after March 1, 2002, Intermedia failed and refused to remit various payments to EffectNet for Services. Without limitation, Intermedia failed and refused to remit any payments for: (a) invoice 1010 in the amount of $274,021.05 (representing amounts due for the period ending January 20, 2002); (b) invoice 1011 in the amount of $274,066.20 (representing amounts due for the period ending February 20, 2002); and (c) invoice 1018 in the amount of $279,757.02 (representing amounts due for the period ending Mach 20, 2002). True and accurate copies of these invoices are attached as Exhibits C, D, and E.

19.    By a letter dated March 12, 2002, EffectNet formally notified Intermedia that Intermedia was in default of its obligations under the UC Contract. EffectNet's March 12, 2002 letter to Intermedia identified various defaults by Intermedia including, inter alia, (a) its failure to market the Services; (b) its failure to provide periodic forecasts of expected mailbox activations; (c) its failure to deliver a minimum number of current active subscribers; and (d) its failure and refusal to make payments totaling $548,087.25 on invoices 1010 and 1011 which were, by that time, over due. A true and accurate copy of that letter is attached as Exhibit F.

20.    Intermedia failed and refused to cure its defaults under the UC Contract despite EffectNet's demands. Moreover, Intermedia made no apparent good faith efforts to perform after July 2001.

7

A 01139

**D.    *EffectNet Incurred Damages for Lost Revenues Relating to the Breach.***

21.    On July 21, 2002 (the "Commencement Date") and November 8, 2002, WorldCom, Intermedia, and various affiliates filed separate voluntary Chapter 11 bankruptcy petitions.

22.    As of the Commencement Date, Intermedia had not cured its defaults under the UC Contract (nor has it done so since that time).

23.    As of the Commencement Date, the following invoices for Services had been issued but had not been paid:

| Invoice Number | Invoice Amount |
|---|---|
| 1010 (for 12/01) | $274,021.05 |
| 1011 (for1/02) | $274,066.20 |
| 1018 (for 2/02) | $279,757.02 |
| *Total* | *$827,844.27* |

24.    The foregoing invoices cover the period ending March 20, 2002. EffectNet further claims contract damages for the period March 21, 2002 through November 20, 2003, when, as noted, the initial term of the UC Contract was scheduled to expire.

25.    EffectNet reserves all rights concerning the value of its damages, including, but not limited to damages for the revenues it was entitled to for the UC Contract's remaining term, but states that, at a minimum, EffectNet was damaged by the loss of the take-or-pay payments contemplated by the UC Contract. At all relevant times for the period March 21, 2002 through November 20, 2003, (when the initial term of the UC Contract was set to expire), the Minimum Commitment was 10,000 subscribers, and the base price for each subscriber called for under the UC Contract was $27.40 / month for this purpose.[2]

---

[2] While Appendix P to the UC Contract contains two price options, the unlimited rate was to be used for this purpose. See proofs of claim.

A 01140

26.    Based on the take-or-pay provisions of the UC Contract alone, therefore, EffectNet was, at a minimum, entitled to Reconciliation Payments of $274,000 per month through November 20, 2003. EffectNet's minimum Claim for lost revenues over the remaining term of the UC Contract – a period of approximately 20 months - totals $5,480,000.[3] EffectNet asserts that it is also entitled to other damages arising from WorldCom's breach.

**E.    *EffectNet's Additional Claims.***

27.    In addition to its damages for lost revenues based on Intermedia's breach of the UC Contract, EffectNet asserts that it has incurred additional damages as the direct result of actions by the Debtors relating to the UC Contract's breach.

28.    EffectNet believes that WorldCom and Intermedia agreed to cause Intermedia to breach the UC Contract to hamper EffectNet's financial position and strengthen its own position in the unified communications marketplace and purposefully obtain unfair bargaining leverage in negotiations with respect to a certain Master Agreement for Software Licenses ("MASL").[4]

29.    In addition, the breach of the UC Contract effectively crippled and otherwise damaged EffectNet/Webley as follows: (a) EffectNet/Webley was unable to raise equity funding from its existing investors; (b) EffectNet/Webley was forced to undergo several reductions in force that severely impaired EffectNet's infrastructure, reputation, and credit standing; (c) EffectNet/Webley lost substantial enterprise value; (d) EffectNet/Webley suffered a substantial diminution of reputation; and (e) EffectNet/Webley lost substantial sales momentum and market appeal.

---

[3] As the result of a scrivener's error, EffectNet indicated in its proofs of claim that this period totaled 22 months. EffectNet acknowledges that this period was in fact 20 months and hereby reduces this portion of its minimum claim by $548,000.

[4] Ironically, the MASL governed technology was a means of implementing WorldCom's unified communications business model in place of the Intermedia model which it was abandoning.

A 01141

30.    In March, 2001, EffectNet, Inc. and Webley Systems, Inc. ("Webley") executed a merger agreement that proposed to combine those two companies.[5] The UC Contract was a critical revenue component of the EffectNet-Webley merger.

31.    At the same time that the EffectNet – Webley merger was moving forward, Webley and WorldCom began negotiating the MASL.

32.    EffectNet and Webley made substantial financial and other disclosures to WorldCom as part of WorldCom's due diligence requests in negotiating the MASL.

33.    Based on the disclosures made to WorldCom during negotiations over the MASL, and disclosures made to WorldCom Ventures as part of a separate inquiry by Webley concerning whether WorldCom might have interest in investing in Webley (and which prominently mentioned the UC Contract), EffectNet believes that WorldCom and Intermedia had actual knowledge during this period that EffectNet and Webley were in the process merging their companies and of the business plan which such merger represented.

34.    Based on these disclosures, EffectNet believes that WorldCom and Intermedia had actual knowledge at this time that the UC Contract was one of primary revenue sources anticipated by the EffectNet-Webley business plan.

35.    Based on these disclosures, EffectNet believes that WorldCom and Intermedia had actual knowledge that a breach of the UC Contract would impose severe financial pressure on the EffectNet-Webley combination and might, inter alia, make the MASL a more critical revenue source and sales milestone for the EffectNet-Webley combination.[6]

---

[5] Webley Systems, Inc. was ultimately merged into what is now EffectNet.
[6] At a minimum, EffectNet believes that WorldCom and Intermedia may have made improper use of the financial information they received concerning EffectNet and Webley in violation of confidentiality provisions and use restrictions that information carried with it.

**A 01142**

36.     As EffectNet's proofs of claim establish, EffectNet believes the Debtors knew that termination of the UC Contract might force Webley to make price concessions regarding the MASL that would not have been obtained if EffectNet was receiving the ongoing cash flow contemplated by the UC Contract. In fact, last minute price concessions were demanded (not negotiated) by WorldCom.

37.     As noted, Intermedia effectively repudiated the UC Contract just days after WorldCom completed its merger-acquisition of Intermedia. Four days before the MASL was ultimately signed, Intermedia cancelled 682 of the 729 existing subscriptions for the Services. After it became clear that Intermedia had no intention of meeting its obligations under the UC Contract, EffectNet-Webley was forced to concede to a substantial reduction in the payments required by the MASL.

38.     EffectNet believes that its damages based on WorldCom's conduct in connection with the breach of the UC Contract were foreseeable and estimates that its damages attributable to the foregoing may exceed $20 Million.

## F.     *The Bankruptcy Proceedings.*

39.     On January 8, 2003, EffectNet filed proofs of claim against WorldCom and Intermedia based on the foregoing Claims.

40.     On January 15, 2003, EffectNet filed amended proofs of claim against WorldCom and Intermedia. These proofs of claim amended and superceded the proofs of claim that were filed with the Court on January 8, 2004.[7]

41.     On June 10, 2004, the Debtors filed and served the Claims Objection.

---

[7] Given the January 15, 2003 amendment of the proofs of claim filed January 8, 2003, there are, for all practical purposes, only two proofs of claim by EffectNet in these proceedings.

42.    By agreement of the parties, the deadline for EffectNet to respond to the Claims Objection was scheduled for July 31, 2004.

## III.    SUMMARY OF THE DEBTORS' OBJECTION

43.    The Claims Objection is limited to a series of statements unsupported by reference to any applicable law regarding EffectNet's Claims.    The Debtors' unsupported statements assert that:

(a)    EffectNet has requested a double recovery and the Court should not permit EffectNet to recover on more than one claim;

(b)    EffectNet terminated the UC Contract, which terminated EffectNet's rights to receive continuing monthly minimum payments;

(c)    The minimum monthly commitment payments and damages sought by EffectNet are unenforceable penalties that are not recoverable by EffectNet;

(d)    Even if EffectNet is entitled to recover some or all of the minimum monthly commitments requested by EffectNet, EffectNet has calculated its alleged damages using an amount per commitment which is significantly higher than the amount the contract specifies should be used;

(e)    EffectNet is not a party to the original contract and the UC Contract prohibits assignment;

(f)    EffectNet's claims have been partially paid;

(g)    The Debtors did not engage in any conspiracy and therefore are not liable as such;

(h)    The Debtors did not engage in unfair and deceptive trade practices and therefore are not liable as such;

(i)    The Debtors did not tortiously interfere with EffectNet's contractual relationships and are not liable as such; and

(j)    EffectNet has not pled its claims with sufficient specificity and has therefore failed to state a claim.

See Claims Objection, at ¶¶ 14 – 24.

A 01144

**IV.    THE OBJECTION DOES NOT CARRY THE DEBTORS' BURDEN TO ADDUCE EVIDENCE TO DEFEAT EFFECTNET'S CLAIM AND SEEKS TO IMPOSE REQUIREMENTS FOR CLAIMS THAT ARE NOT SUPPORTED BY LAW**

44.    The Claims Object is procedurally defective and should be denied on that basis alone. It is well-settled that the Federal Rules of Bankruptcy Procedure impose only limited requirements for proofs of claim. It is equally settled that a filed proof of claim constitutes prima facie evidence of its amount and validity. Fed. R. Bankr. P. 3001(f); In re 183 Lorraine St. Assocs., 198 B.R. 16, 26 (E.D.N.Y. 1996); In re Reilly, 245 B.R. 768, 773 (B.A.P. 2nd Cir. 2000). Nothing in the Claims Objection rebuts that inference.

45.    Rule 3001 of the Federal Rules of Bankruptcy Procedure sets out the required contents of a proof of claim. That Rule provides that a proof of claim shall (a) be in writing; (b) conform to the official form; (c) set forth the creditor's claim; and (d) be executed by the creditor or an authorized agent. The Rule also provides that if a claim is based on a writing or is a secured claim, the creditor should attach the writings on which a claim is based and attach documents evidencing perfection of any security interest. See Fed. R. Bankr. P. 3001; see also 9 Collier on Bankruptcy (15th Ed. Revised), ¶ 3001.01 (listing requirements and observing that "Rule 3001 is the definitive authority concerning the contents"). Unless a claim is based on a writing or is secured, Rule 3001 does not require that any evidence be attached to the proof of claim. In re Garner, 246 B.R. 617, 621 (B.A.P. 9th Cir. 2000)(describing requirements).

46.    EffectNet's proofs of claim meet the requirements listed in Rule 3001. The proofs of claim are in writing and use the official form B10 that has been prescribed for this purpose. An authorized representative of EffectNet signed the proofs of claim. A portion of the

Claims are based on the UC Contract, which is attached to the proofs of claim. EffectNet is not asserting a secured claim, so the final requirement of Rule 3001 does not apply.[8]

47.    As a matter of law, the Debtors bear the initial burden of adducing credible evidence that supports their arguments that EffectNet's Claims are not valid. See, e.g., In re Reilly, 245 B.R. at 773; see also In re Lewis, 80 B.R. 39, 40 (E.D. Pa. 1987).

48.    More than conclusory statements denying liability are necessary to rebut the presumption raised by EffectNet's timely proofs of claim. Indeed, "[t]o overcome this prima facie evidence, the objecting party must come forth with evidence which, if believed, would refute at least one of the allegations essential to the claim." In re Reilly, 245 B.R. at 773.

49.    To police the requirements of Rule 3007, bankruptcy courts should summarily overrule conclusory objections. See In re Garner, 246 B.R. 617, 623 (B.A.P. 9th Cir. 2000).

50.    The Garner opinion, for example, involved a debtor who objected to a proof of claim by asserting that "there is no valid obligation to pay . . . and there are no written documents or other competent evidence of any valid obligations owed to said creditor." At a hearing on the debtor's claim objection, the debtor offered no evidence in support of these assertions. The bankruptcy court ruled that the debtor did not fulfill the burden of production to rebut the presumption of validity. See Garner, 246 B.R. at 620. On appeal, the Ninth Circuit B.A.P. affirmed the bankruptcy Court, noting "[t]hat the difficulty in this instance is that appellant proffered no evidence whatsoever, choosing instead to stand on a mere formal objection that the proofs of claim were not good enough." Garner, 246 B.R. at 623.

---

[8] Thus, to the extent the Claims Objection (i) argues that EffectNet's proofs of claim have not complied with these requirements, or (ii) attempts to impose additional requirements on EffectNet that are not set forth in Rule 3001, e.g. specificity requirements, those arguments should be rejected in view of the foregoing. As a practical matter, the Debtors control many of the proofs relevant to that portion of the Claims that is not based on a simple breach of the UC Contract, see infra. It would be improper to find fault with EffectNet's statement of this portion of its Claims under these conditions. See Section VII, infra.

**A 01146**

51.    In the contested matter now before this Court regarding EffectNet's Claims, the Debtors have offered no rationale for disallowance of the Claims other than the facile statements listed above. These conclusory objections are plainly inadequate to overcome the Claims' prima facie validity.

## V.    EFFECTNET IS NOT SEEKING A DOUBLE RECOVERY

52.    Even if the Debtors have satisfied Rule 3007, the Court should summarily reject the Debtors' argument that EffectNet is seeking a double recovery. EffectNet's proofs of claim and the foregoing recitation of the background to this contested matter reveal that EffectNet is not seeking a double recovery in this case.

53.    EffectNet's proofs of claim show that EffectNet seeks damages from Intermedia based on Intermedia's breach of the UC Contract. EffectNet also seeks damages from Intermedia based on that company's unfair and deceptive trade practices, breach of the implied covenant of good faith and fair dealing, unauthorized use of confidential information and conspiracy based on its actions in concert with WorldCom to breach the UC Contract.

54.    EffectNet's claims against WorldCom are distinct. As is set forth in the proofs of claim, EffectNet believes that WorldCom committed its own separate acts by tortiously interfering with EffectNet's contractual relations, committing unfair and deceptive trade practices, misusing confidential information and committing civil conspiracy based on its actions in concert with Intermedia to cause Intermedia to breach the UC Contract.

55.    This description reflects that there is no duplication requested by these Claims. Indeed, the Debtors' confirmed plan reflects that WorldCom and Intermedia remain distinct entities. The Debtors' first argument should be rejected on these grounds.

15                                                              **A 01147**

**VI.    THE DEBTORS' OBJECTIONS TO EFFECTNET'S LOST REVENUE CLAIMS
ARE ALSO UNFOUNDED ON THE MERITS OR AT LEAST
REQUIRE DISCOVERY**

56.    Even if the Claims Objection satisfies the Debtors' burden to adduce evidence and

meets the requirements of Bankruptcy Rule 3007, the Debtors' arguments concerning

EffectNet's lost revenue Claims lack merit and must be denied for the reasons that follow.

57.    At a minimum, any decision on that portion of the Claims Objection that relates to

EffectNet's breach of contract claims must be deferred to permit discovery as is provided by

Bankruptcy Rules 9014 and 7001 et. seq.  See In re Thompson 965 F.2d 1136, 1147 (1st Cir.

1992)(noting that a claims objection is a contested matter); Sure-Snap Corp. v. Bradford

National Bank, 128 B.R. 885 (D. Vt. 1991)(same); In re Rockefeller Center Properties, 272 B.R.

524, 540 (Bankr. S.D.N.Y. 2000)(observing that "[w]hen an objection to a claim is contested, a

contested matter is created").

58.    As a cautionary measure, EffectNet responds in summary fashion to the substance

of the Debtors' objections as follows:[9]

(i)    **EffectNet is Entitled to Damages for Lost Revenues.**

59.    The Debtors have mischaracterized one element of EffectNet's Claims by their

argument that EffectNet is merely seeking to recover monthly payments under a contract that

was cancelled.  EffectNet is in fact seeking damages based on Intermedia's total breach and

repudiation of the UC Contract.

60.    As noted, EffectNet reserves all rights concerning the measure of damages it is

entitled to based on Intermedia's breach of the UC Contract, including, but not limited to, lost

revenue.  At the same time, courts have measured lost revenues damages in breach of contract

actions based on the total take-or-pay payments that remain due under these contract

---

[9] EffectNet reserves all rights to present a more formal brief discussing these issues in this contested matter.

16    **A 01148**

requirements. See Colorado Interstate Gas Company, Inc. v. Chemco, Inc., 833 P.2d 786 (Colo App. 1992) (rejecting arguments that awarding damages based on this measure would over-compensate plaintiff; Prenalta Corp. v. Colorado Interstate Gas Co., 944 F.2d 677 (10th Cir. 1991). Based on this reasoning alone, WorldCom's objection to EffectNet's breach of contract claim should be rejected summarily.

61.    Further, it is settled Arizona law[10] that upon a material breach of contract, the injured party may cease further performance and still enforce valid claims based on the agreement. See, e.g., Coronado Co., Inc. v. Jacome's Department Store, Inc., 629 P.2d 553 (Ariz. 1981) (under the independent breach of contract by one party, the other party may treat the contract at an end and sue for damages); Zancanaro v. Cross, 339 P.2d 746 (Ariz. 1959); see also All American School Supply Co. v. Slavens, 609 P.2d 46 (Ariz. 1980) (affirming judgment that awarded full contract price).

62.    In the Zancanaro case, for example, a subcontractor agreed to install plumbing in 50 homes. The defendant built only 25 houses and the plaintiff sued for a breach of the agreement. The Supreme Court of Arizona found that the defendant breached his promise to have the entire 50 houses ready for Zancanaro. See id. In finding for the plaintiff, the Court observed that when there is a material breach of contract, one remedy available to the wronged party is "the right to cease performance and recover the profits which would have been made had the entire contract been performed." See id. at 749. Here, EffectNet's contract claims are for amounts due for Services actually tendered and for the aggregate payments EffectNet expected to receive under the UC Contract for the remainder of its term. These are clearly recoverable under the foregoing legal authority.

---

[10] The UC Contract contains a choice of law provision that directs the parties to use the laws of Arizona.

**A 01149**

63.    In fact, EffectNet's Claims under the UC Contract are consistent with and should be allowed based on Intermedia's "total breach" of the UC Contract. See Healey v. Coury, 783 P.2d 795 (Ariz. 1989) (finding it reversible error where trial court prohibited plaintiff from seeking award of total damages based on defendant's breach of contract); see also Mobil Oil Exploration & Producing Southeast, Inc. v. U.S., 120 S. Ct. 2423 (2000).

64.    Finally, this objection by the Debtors to EffectNet's breach of contract Claim should be rejected as an apparent ploy to enforce contract provisions that the Debtors are apparently seeking to impute to the agreement.  EffectNet submits that there is no provision in the UC Contract that limits EffectNet's damages in the manner that has been suggested.  At most, the UC Contract relieved EffectNet of any obligation to further perform under the UC Contract once Intermedia breached the UC Contract and thereafter refused to cure its defaults after notice to Intermedia.  To the extent there is, however, a provision that limits EffectNet's damages if the UC Contract is terminated, the Debtors cannot seek to enforce any such limitation by virtue of Intermedia's prior breach of that same agreement and by reason of Intermedia's willful misconduct, bad faith and unconscionable conduct in breaching the UC Contract in the manner it did. See, e.g., Countryside Orthopedics, P.C. v. Peyton, 541 S.E.2d 279 (Va. 2000) ("when the first breaching party commits a material breach, that party cannot enforce the contract").

A 01150

(ii)    **The Claims are not a Penalty.**

65.    None of the damages EffectNet seeks are a "penalty" and the Court should therefore reject the Debtors' argument that EffectNet cannot recover the damages it has sought on these grounds.

66.    Take-or-pay obligations like those sought as EffectNet's minimum lost revenue Claims based on the breach of the UC Contract are neither liquidated damages nor penalties. See Prenalta Corp. v. Colorado Interstate Gas Co., 944 F.2d 677 (10th Cir. 1991); Sabine Corp. v. ONG Western, Inc., 725 F.Supp. 1157 (W.D. Okla. 1989) (rejecting arguments that take-or-pay obligations under contract were penalty); Resources Investment Corp. v. Enron Corp., 669 F.Supp. 1038 (D. Colo. 1987)(take-or-pay obligations impose alternative obligations – not penalties or liquidated damages); Colorado Interstate Gas Company, Inc. v. Chemco, Inc., 833 P.2d 786 (Colo App. 1992).  Since the obligations EffectNet seeks payment for are not penalties, the Debtors' penalty argument fails.

67.    Moreover, the penalty arguments are unconvincing.  Arizona case law provides that even when damages are specified in a contract, "the terms of the contract generally control." Roscoe-Gill v. Newman, 937 P.2d 673 (Ariz. 1997).  The Debtors have offered no evidence and have cited no cases to displace this presumption, even if the Court were to find that the minimum payments were damages.

68.    Even if EffectNet's minimum Claims were stipulated damages, they still do not constitute a penalty. Arizona law provides that stipulated damages are enforceable so long as they are a reasonable forecast of just compensation for the harm caused by a breach, and the harm is difficult of actual estimation. Pima Savings and Loan Assn. v. Rampello, 812 P.2d 1115

19    **A 01151**

(Ariz. 1991) (enforcing liquidated damages clause on facts); <u>Mechanical Air Engineering Co. v.</u>

<u>Totem Construction Co.</u>, 801 P.2d 426 (Ariz. 1989)(same).

69.    As noted, the compensation required by the UC Contract was based in part on the

number of Intermedia customers that purchased Services. It is clear, therefore, that the precise

compensation required by the basic terms of UC Contract would depend on the number of

Intermedia customers that used the Services, a figure difficult to project. As also noted,

Intermedia agreed in the UC Contract to deliver a minimum number of users for the Services,

described as a Minimum Commitment, and agreed to tender Reconciliation Payments based on

any failure to deliver the required number of subscribers for the Services. Here, EffectNet has

based a portion of its Claims on these provisions of the UC Contract. It is clear that this portion

of the Claims is directly tied to the compensation EffectNet has been deprived of based on

Intermedia's breach of the contract.

    **(iii)**    **EffectNet has Properly Calculated its Minimum Claims under the Agreement.**

70.    The Debtors' argument that EffectNet has not properly calculated some or all of

its Claims under the UC Contract is also faulty.

71.    It appears that this portion of the Claims Objection relates to EffectNet's Claims

based the take-or-pay requirements of the UC Contract. As is set forth above, the UC Contract

provides in Sections 2.12 and 2.13 that, as a minimum payment, Intermedia must pay an amount

equal to the Minimum Commitment times the base monthly price applicable to the Services.

Here, the Minimum Commitment under the UC Contract for all relevant periods was 10,000

customers. See UC Contract, at section 2.12. At the same time, the based monthly price was set

20

A 01152

at $27.40 per customer.[11]  A simple multiplication of these amounts totals $274,000 per month

for the remaining contract term.  The Debtors' arguments on this issue are simply unfounded.

**(iv)    The Debtors' Assignment Argument is Defective.**

72.    The Court should summarily reject the Debtors' assignment arguments as well.

There has been no assignment and even if there had been, the UC Contract would have permitted

that action.

73.    The UC Contract was signed by EffectNet, LLC and Intermedia.  On or about

December 27, 2000, EffectNet LLC merged into EffectNet, Inc.  In 2004, EffectNet, Inc. merged

into Parus Holdings, Inc.[12]

74.    Moreover, the Debtors' assertion that the UC Contract does not permit assignment

is defective.  Section 12.2 of the UC Contract clearly anticipated and authorized the contract's

assignment.  See UC Contract, at Section 12.2 (permitting assignment).

75.    Indeed, the UC Contract was prepared at a time when Intermedia was

contemplating a business combination with WorldCom, and the UC Contract clearly provides

that if Intermedia was acquired by WorldCom, no approval was required to assign the contract.

Id. As is evident by the captioned chapter 11 proceedings, WorldCom and Intermedia did in fact

engage in a business combination (with Intermedia remaining a separate entity); thus no consent

for any assignment of the agreement was required in the first place.

**(v)    EffectNet has not Received any Payment on its Claims.**

76.    The Court should also reject the Debtors' bald assertion that EffectNet has

received payment on a portion of its Claims.  The Debtors have failed to specify which payments

---

[11] See discussion at paragraphs 25-26, supra.

[12] True and accurate copies of certificates concerning these merger transactions are attached as Exhibits G and H.

**A 01153**

they believe were made to EffectNet. Moreover, EffectNet has no record that any payments attributable to its Claims has even been tendered, much less accepted.

## VII. THE DEBTORS' OBJECTIONS RELATING TO EFFECTNET'S CONSPIRACY, UNFAIR TRADE PRACTICES AND TORTIOUS INTERFERENCE CLAIMS REQUIRE DISCOVERY

77. Finally, the Debtors' objection to EffectNet's conspiracy, unfair trade practices and tortious interference claims are premature and must be denied and or at least deferred pending discovery.

78. As noted in the background discussion, Intermedia's breach of the UC Contract took place contemporaneously with the negotiations between WorldCom and Webley concerning the MASL and after WorldCom completed intensive technology and financial due diligence of Webley. Given these disclosures, the Debtors were clearly aware of EffectNet's pending merger with Webley, aware of the UC Contract's importance to EffectNet/Webley's business plan and financial condition, and aware of the contract's importance to its ability to raise equity, and to fund ongoing operations.

79. After the Intermedia-WorldCom business combination, EffectNet was advised that WorldCom would be overseeing all projects relating to the UC Contract, and senior members of Intermedia that had dealt with EffectNet concerning the UC Contract were apparently dismissed or reassigned. Accordingly, EffectNet believes that WorldCom was directly involved in and directed the apparent decision to breach the UC Contract.

80. In its negotiations concerning the MASL, WorldCom attempted to negotiate a patently unfair licensing agreement to use EffectNet-Webley technology.

81. WorldCom succeeded in obtaining MASL terms that would not have been attainable unless the Debtors had imposed severe financial pressures upon EffectNet.

A 01154

82.     EffectNet believes that the juxtaposition of these events strongly suggests that these matters were directly related.  However, the Debtors control a majority of the evidence relevant to these claims.

83.     "When an objection to a claim is contested, a contested matter is created."  In re Rockefeller Center Properties, 272 B.R. 524 (Bankr. S.D.N.Y. 2000).  A number of the rules found in Part VII of the Federal Rules of Bankruptcy Procedure which apply in adversary proceedings are also applicable here.  These include various discovery rules found in Rules 7026 – 7036.  EffectNet intends to initiate discovery shortly concerning the matters described in its Proofs of Claim in accordance with these rules.  It is therefore premature for the Court to make any determination concerning EffectNet's conspiracy, unfair trade practices and tortious interference claims.

## VIII.  RESERVATION OF RIGHTS

84.     EffectNet reserves all rights to supplement or otherwise amend this response to, without limitation, reflect information gathered in discovery.

WHEREFORE, EffectNet respectfully requests that the Court (i) overrule the Claims Objection; (ii) enter a scheduling order; and (iii) grant such other and further relief as is just and

A 01155

necessary.

Date:  New York, New York
       July 30, 2004

                              By:      /s/ Stephanie K. Hoos
                                      Stephanie K. Hoos (SH-9821)
                                      MINTZ, LEVIN, COHN, FERRIS,
                                          GLOVSKY & POPEO, P.C.
                                      Chrysler Center
                                      666 Third Avenue
                                      New York, New York 10017

                                      -and-

                                      Michael Gardener
                                      Robert Duggan
                                      Ian A. Hammel
                                      MINTZ, LEVIN, COHN, FERRIS,
                                          GLOVSKY & POPEO
                                      1 Financial Center
                                      Boston, Massachusetts 02111

                                      Attorneys for Parus Holdings, Inc., successor to
                                      EffectNet, Inc.

**A 01156**

TRA 1932782v4

*Exhibit A*