ORIGINAL

# EffectNet

# Unified Communications Services General Agreement For

# Intermedia Communications, Inc.

A 01158

# UNIFIED COMMUNICATIONS SERVICES GENERAL AGREEMENT

This Unified Communications General Agreement (the "Agreement") is entered into as of the 20 day of November 2000, ("Effective Date") by and between EffectNet LLC, a Nevada Limited Liability Company ("EffectNet") and Intermedia Communications, Inc. organized under the laws of The State of Delaware, with a business address at One Intermedia Way, Tampa, FL 33647 ("Intermedia") (collectively "Parties" or individually a "Party").

**WHEREAS**, Intermedia is Integrated Communications Provider providing telecommunication services including local dial tone, long distance, data services, etc.

**WHEREAS**, EffectNet is a unified communications application service provider that offers private label Internet and telecommunications products and services, including unified communications and other value-added services, in-house customer services, billing and technical support (the "EffectNet Services").

**WHEREAS**, EffectNet desires to provide Intermedia with a customized Intermedia-branded wholesale communications service ("Private Label") for sale by Intermedia to its end user customers (the services collectively hereinafter described as "Intermedia UC Services" or "UC Services").

**WHEREAS**, EffectNet and Intermedia recognize that the provision of Intermedia UC Services requires the Parties to closely work together to meet customer needs and to implement and ensure the commercial viability of the Intermedia UC Services.

**NOW THEREFORE**, in consideration of the promises and mutual agreements contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which the Parties acknowledge, the Parties agree as follows:

1.    **GENERAL PROVISIONS.**

1.1    Both Parties agree that EffectNet shall offer Intermedia UC Services for Intermedia as described in this Agreement. Intermedia will market the UC Services to Intermedia customers and end-users as it sees fit.  For purposes of this Agreement, the term "customers" shall include, but not be limited to wholesale and retail customers of Intermedia UC Services.

1.2    EffectNet may make changes to the EffectNet Services from time to time in order to improve, modify or extend the EffectNet Services ("EffectNet Changes"), but in no event shall such changes decrease the quality of the EffectNet Services provided to Intermedia. EffectNet will provide Intermedia with notice ninety (90) days in advance of the commercial release date of such changes.

1.3    The Parties shall use their best efforts to accomplish the initial launch of the Intermedia UC Services ("Initial Launch Date") by December 18, 2000.

1.4    Each Party shall promptly notify the other in writing of any event, which might result in such Party's inability to continue to meet its obligations under this Agreement.  Such event shall specifically include, but not be limited to, a materially adverse change in a Party's financial situation. EffectNet acknowledges and understands that Intermedia is in the process of a merger involving all of its assets with MCI/Worldcom, Inc.  Such merger shall not, in and of itself, constitute an event requiring

notice pursuant to this provision, and that, accordingly, no further notice of the merger or the consummation thereof, shall be required of Intermedia.

## 2.    OBLIGATIONS OF THE PARTIES.

2.1    Product Coordinator: EffectNet and Intermedia will each designate their own Product Coordinator to coordinate the process described below.

2.1.1    The designated Product Coordinators will be the principal points of contact between the parties on product issues (the "Product Advisory Process"). Each party may rely on the authority and technical competence of the other Party's Product Coordinator to represent its respective company in connection with the priorities, needs and progress of their company's product issues.

2.1.2    The Product Advisory Process will include in-person/telephonic/electronic communication between representatives, which should be ongoing, or occur not less than once each month during the Term of this Agreement, except if the parties expressly agree to some different frequency.

2.2    EffectNet Materials. EffectNet will provide Intermedia with regular access to and copies of the following:

2.2.1    Plans for current and future enhancements to the EffectNet Services which by their nature apply to the Intermedia UC Services; and

2.2.2    Functional descriptions, development plans, schedules and periodic status for enhancements to the EffectNet Services under development, as soon as such materials exist.

2.3    Product Development. Intermedia and EffectNet agree that the EffectNet Services provided to Intermedia will be the same version of the EffectNet Services generally made commercially available, unless Intermedia deploys modifications of the EffectNet Services in order to satisfy large blocks of customer/end users, provided, however, that EffectNet shall have no obligation to support Intermedia any modification not previously known to EffectNet.

2.3.1    Intermedia will implement new versions within 30 days with call avoidance measures built into the process, including but not limited to adequate customer notification of new features, benefits and the availability of training timed to coincide with the release of any new versions.

2.3.2    EffectNet will provide Intermedia with at least ninety (90) days advance notice of an expected new release or version of EffectNet Services.

2.4    Forecasts. Intermedia shall provide EffectNet with non-binding forecasts for expected mailbox activations, at minimum of once every two (2) months during the Term of this Agreement. Intermedia will also provide EffectNet with quarterly and annual non-binding forecasts of expected mailbox activations. The availability of platform capacity to be provided by EffectNet to Intermedia is conditioned on the platform capacity demand not exceeding the forecast provided by Intermedia for any period addressed by such forecast. With respect to timely provided mailbox activation forecasts only, EffectNet will use reasonable efforts to meet Intermedia's forecasted demand. However, EffectNet reserves the right to request additional guarantees from Intermedia when the forecasts provided by Intermedia require significant or unusual capital and cost

by EffectNet. Intermedia is to provide the first of such forecasts to EffectNet on or before November 30, 2000. For purposes of this section EffectNet must allocate constrained capacity to Intermedia on terms at least as favorable as offered to any other customer of EffectNet. In the event that EffectNet declines orders because of capacity constraints, then EffectNet shall notify Intermedia and the Parties shall use commercially reasonable efforts to develop a solution that will provide Intermedia with a method of ensuring that the needs of Intermedia's existing and potential end users are met while ensuring that EffectNet is permitted to increase capacity in an orderly fashion.

2.5    Billing Cycle. On an every 15-day basis, EffectNet will invoice Intermedia for account fees for each account active during the previous 15 days and any late charges for previous outstanding invoices.

2.6    Payment. Intermedia will pay EffectNet in then available U.S. funds on a net-15 day basis.

2.7    Call Detail Records for Billing. Each day, EffectNet will provide to Intermedia Calling Detail Records ("CDR") on a timely basis, in a mutually agreed-upon electronic format.

2.8    Billings and Collections. Intermedia shall be responsible, at its sole expense, for all invoicing and collections with its customers, end-users, agents, subagents or resellers. EffectNet will not be responsible for any collections or bad debt by Intermedia's customers, end-users, agents, subagents or resellers2.9   Fraud. Intermedia will be solely responsible for fraudulent misuse of the Intermedia UC Services due to credit fraud, fraudulently established accounts and stolen accounts (except to the extent if such theft occurs-through misuse or theft the records or facilities of EffectNet); provided that, Intermedia shall not be responsible for fraudulent misuse occurring after EffectNet has become aware of such occurrence; and, provided further, that the extent of Intermedia's liability to EffectNet for fraudulent misuse of Intermedia UC Services shall be EffectNet's direct damages and costs incurred. EffectNet shall notify Intermedia of fraud as soon as practicable, upon EffectNet's becoming aware of such fraud. The Parties will use commercially reasonable efforts to establish fraud control means and measures.

2.10    Customer Service Call Center and Technical Support. EffectNet shall maintain a customer service call center for its Intermedia customers and end-users, as appropriate in accordance with industry standards. This call center will be responsible for all customer support.

2.10.1 Call items outside the scope of EffectNet support services are: non-EffectNet related software problems and call forwarding issues.

2.11    Customer Fulfillment Process. Intermedia, when taking orders for new customers or end users, or taking orders to modify or update a customer's order, will use the EffectNet Customer Fulfillment Process or compatible process to gather the information required and to provide the customer information to EffectNet. Intermedia is responsible for providing to EffectNet such new mailbox account information reasonably required by EffectNet in order to activate a new mailbox. EffectNet shall provide documentation and training, in accordance with the training provision of this Agreement, to Intermedia on the EffectNet Customer Fulfillment Process.    2.12    Minimum Commitment. Intermedia hereby agrees to deliver a minimum 1,500 then current active subscribers on

or before three (3) months after December 18, 2000 (the "Rollout Date"); an additional 1,500 then current active subscribers (total 3,000) on or before six (6) months after the Rollout Date; and additional 3,500 then current active subscribers (total 6,500) on or before nine (9) months after the Rollout Date; and 10,000 total then current active subscribers on or before twelve (12) months after the Rollout Date (the "Ramp Date"), and at the end of each calendar month thereafter ( the "Minimum Commitment") for the Term of this Agreement.

     2.13   <u>Reconciliation Payment</u>. On the Ramp Date and at the end of each calendar month thereafter, EffectNet will calculate the actual number of then current active subscribers on the last day of such calendar month and compare it to the Minimum Commitment. If the number of subscribers is less than the Minimum Commitment for the month in question, such difference will constitute a "Volume Shortfall." Intermedia shall pay EffectNet a Reconciliation Payment equal to the Volume Shortfall multiplied by the base monthly price applicable to the Intermedia UC Service per subscriber,

## 3.    <u>MARKETING AND BRANDING.</u>

     3.1   <u>Web Presence</u>.  At no additional charge, EffectNet will provide Intermedia with a private label website, URL links and related branding as reasonably directed by Intermedia.

     3.2   <u>Use of Trademarks, Service Marks and Trade names</u>. The Parties agree not to display or use any of the trade names, service marks, brands or trademarks of the other Party, and shall not permit the same to be displayed or used by third parties, other than in connection with the sale, distribution or promotion of the brand(s) used for the Intermedia UC Services covered by this Agreement and subject to the prior written approval of the other or a third Party owning such trademark, service mark or trade name (except where such approval between the Parties is contained in this Agreement). In the absence of specific prior written consent from the other Party, a Party shall not use any part of any of the other Party's trade names, service marks, brands or trademarks as part of its own name, service marks or trademarks or in any other manner not so approved by the other Party. It is expressly understood by both Parties that trade names, service marks and trademarks of the other party are proprietary and that nothing in this Agreement constitutes the grant of a general license to use said trade names, service marks and trademarks. Upon termination of this Agreement, any and all rights or privileges of a Party to use the other Party's trade names, service marks, brands or trademarks shall expire, and each Party shall discontinue the use of the other Party's trade names, service marks, brands. The provisions of this section shall also apply to third party branding incidental to this Agreement.

     3.3   <u>Intermedia Marketing Expenses.</u>  Intermedia as the buyer of the wholesale services from EffectNet, is responsible for all expenses and obligations incurred by Intermedia as a result of its efforts to attract and solicit customers for Intermedia UC Services.  Intermedia expressly acknowledges that it is not entitled to any reimbursement by EffectNet for such expenses unless, and only to the extent that, both parties hereto agree in writing prior to the incursion of such expenses, as set forth in this Agreement.

4.     **CHARGES AND BILLING STATEMENTS.**

4.1     Traffic- or usage-sensitive rates shall be computed in 30-second initial and 6-second continual increments.

4.2     Intermedia shall be responsible for all applicable taxes, including but not limited to sales or value-added taxes, utility or excise taxes, fees and/or surcharges that are imposed by federal, state, or local governments on the Intermedia UC Services or business generated by Intermedia through the sale of Intermedia UC Services as a result of long distance or services bundled within the Intermedia UC Services. Intermedia shall pay or reimburse EffectNet for all taxes collected or imposed on these services provided by EffectNet. The prices quotes in the following sections are exclusive of any and all taxes. Excluded from this responsibility are taxes based on EffectNet's net income. EffectNet shall comply with all federal and state regulations with respect to employee withholding taxes.

4.3     Pricing.   Pricing shall be as indicated by Appendix "P" attached hereto.

4.4     Seven (7) working days post the close of the month, EffectNet shall provide to Intermedia a settlement statement ("Settlement Statement") providing a summary of charges for the previous month's billing cycle in an industry standard format. The settlement statement, unless specified elsewhere in this Agreement, shall contain the following:

4.4.1   A listing of monthly recurring charges for the current or prior month's billing cycle.

4.4.2   For calls or traffic originated by Intermedia or any customers, agents, sub-agents and/or end-users during the previous month, the individual call detail and the aggregate usage charge payable broken down by termination location.

4.4.3   For calls or traffic terminated by Intermedia or any customers, agents, sub-agents and/or end-users during the previous month, the individual call detail and the aggregate usage charge payable broken down by termination location.

4.4.4   Any taxes, fees and/or charges that are imposed by federal, state, and/or local governments.

4.4.5   The net amount payable by Intermedia to EffectNet or payable to Intermedia by EffectNet.

4.4.6   When applicable, any mutually negotiated additional fees.

4.5     Payment of the Settlement Statement shall be made within 15(fifteen) calendar days after the Settlement Statement and invoice are received by Intermedia (the "Due Date"). Payments to EffectNet shall be in United States dollars and are to be made for credit to an account of EffectNet to be determined by EffectNet and provided to Intermedia within three (3) days of the date of execution of this Agreement by the later signing party. If payment is not received by the Due Date, a late fee of the lesser of (a)

one (1) percent per month or (b) the maximum percentage permitted by law shall be assessed on the delinquent balance of undisputed usage not paid by the Due Date.

      4.5.1 Deposit. Intermedia has provided EffectNet with a fully refundable deposit in anticipation of this Agreement in the amount of minimum subscriber commitment multiplied times $17.50 (US dollars) for a total of $175,000. This deposit shall be refunded to Intermedia in whole on or before the Ramp Date as long as Intermedia has met the Minimum Commitment as of such date. If Intermedia has not met the Minimum Commitment as of the Ramp Date, EffectNet shall refund to Intermedia the full amount of the deposit less the Reconciliation Payment then due. The amount of such Reconciliation Payment shall remain on deposit until such time as the Minimum Commitment is met.

      4.5.2 In the event that Intermedia disputes any charge assessed by EffectNet, the Parties agree to cooperate to resolve the dispute at the earliest practicable date. The late charges set forth in Section of this Agreement shall not apply to payments that are the subject of a good faith dispute between EffectNet and Intermedia. If there is a good faith dispute, EffectNet cannot demand a late payment deposit.

## 5.  TERM AND TERMINATION.

      5.1  Term. Unless otherwise terminated as provided herein, this Agreement shall be in force for an initial term of three (3) years after the Effective Date (the "Initial Term"). This agreement shall continue automatically for successive one year terms under the same terms and conditions contained herein together with any subsequent amendments hereto, unless either Party has sent written notice of its intent not to renew the Term at least thirty (30) days prior to the expiration of the Initial Term or the renewal period then in effect.

      5.2  Termination. Either Party may terminate this Agreement: (a) if the other Party fails to fulfill any of its material obligations under this Agreement; (b) if the other Party is in breach of Section 7 (Confidentiality); (c) if the other Party becomes insolvent or admits in writing its inability to pay debts as they mature, or makes an assignment for the benefit of creditors; or (d) if a petition under any foreign, state or United States bankruptcy act, receivership statute, or the like is filed by the other Party and is not dismissed within sixty (60) days after such filing. Termination due to default under this Section shall be effective thirty (30) days after written notice to the defaulting Party if the default has not been cured within such thirty (30) day period._5.3   Effect of Termination. Upon termination of this Agreement for any reason, each Party shall remain liable for those obligations that accrued prior to the date of such termination; provided, however, that nothing herein shall be construed to obligate EffectNet to offer Services to Intermedia after the termination of this Agreement.

      5.4  Early Termination. If prior to the end of the Initial Term this Agreement is terminated for any reason by Intermedia other than pursuant to Section 5.2, Intermedia shall pay EffectNet, as liquidated damages and as the sole remedy of EffectNet and the exclusive liability of Intermedia, a one-time early termination fee equal to $270,400 times the lesser of (i) 12 months, or (ii) the number of months remaining in the contract term.

## 6.  SURVIVAL. The following provisions shall survive the expiration or termination, for any reason, of this Agreement: (Subscriber Information), (Charges and Billing

Statements); (Term and Termination); (Confidentiality); (Warranties); (Intellectual Property); (Indemnification); (Limitation of Liability); (General Provisions).

**7.    CONFIDENTIALITY.**  All information disclosed to the other party shall be deemed confidential and proprietary (hereinafter referred to as "Proprietary Information"). Such information includes, but is not limited to, trade secrets, know-how, technical specifications, processes, functional descriptions, architectural specifications, development plans, schedules, design information, customer lists, pricing and financial information concerning the parties' products or services, or other information relating to business development, operations, marketing, sales, performance, and any other information disclosed hereunder, which, by its nature, might reasonably be presumed to be proprietary in nature.

7.1    Each party agrees to use the Proprietary Information received from the other party only for the purposes of analyzing the business arrangement between the parties, and in accordance with this Agreement. No patent, copyright, trademark, invention, service mark, or other proprietary rights are implied or granted under this Agreement.

7.2    Proprietary information supplied pursuant to this Agreement shall not be reproduced in any form by the receiving party except as required to accomplish the intent of this Agreement.

7.3    The receiving party shall provide, at a minimum, the same care to avoid disclosure or unauthorized use of the Proprietary Information as is provided to protect its own Proprietary Information, but in no event less than a reasonable standard of care. It is agreed that all Proprietary Information shall be retained by the receiving party in a secure place with access limited to the receiving party's employees or agents who need to know of the content of such information for purposes of fulfilling its obligations pursuant to this Agreement. The receiving party shall be fully responsible for any breach of this Agreement by its employees or agents. The receiving party will promptly report to the disclosing party any actual or suspected violation of the terms of this Agreement, and will take all reasonable steps requested by the disclosing party to prevent, control or remedy any such violation.

7.4    All Proprietary Information, unless otherwise specified in writing, shall remain the property of the disclosing party. Such information shall be used by the receiving party only for the purpose set forth in this Agreement. In addition, such Proprietary Information, including all copies thereof, shall be returned to the disclosing party or, at the request of the disclosing party, may be destroyed by the receiving party and certified as destroyed by an officer of the receiving party after the Receiving party's need for it has expired, upon request of the disclosing party; and, in any event, upon termination of the Agreement.

7.5    Exceptions to confidentiality:  It is understood that the parties have no obligation to maintain the confidentiality of Proprietary Information which:

7.5.1    has been published or is now otherwise in the public domain through no fault of the receiving party.

7.5.2    prior to disclosure hereunder is within the legitimate possession of the receiving party without obligation of confidentiality as can be demonstrated by written documentation.

7.5.3  subsequent to disclosure hereunder is lawfully received from a third party having rights to such Proprietary Information without restriction of the third party's right to disseminate the Proprietary Information and without notice of any restriction against its further disclosure, is disclosed with the written approval of the other party as can be proven by documentation.

7.5.4  is obligated to be produced by a Party under order of a court of competent jurisdiction or other government authority; provided however, that the receiving party shall immediately provide notice to the disclosing party such that the disclosing party may seek injunctive relief and/or a protective order; and further provided that the disclosing party shall use best efforts to ensure that the information shall be treated as confidential by the party to whom it is disclosed.

7.5.5  is independently developed by the receiving party without reference to or reliance upon the confidential information.

In the event of a disputed disclosure, the receiving party shall bear the burden of proof of demonstrating that the information falls under one of the above exceptions.

## 8.    WARRANTIES.

8.1.    Authorization.  Each Party represents and warrants to the other Party that the execution and delivery of this Agreement and the performance of such Party's obligations under this Agreement have been duly authorized, and that the Agreement is a valid and binding agreement, enforceable in accordance with its terms.

8.2.    Legal Compliance.  Each Party represents and warrants that it has obtained, or will obtain prior to offering the Services hereunder, all licenses, approvals and/or regulatory authority necessary to provide the Services described herein. This Agreement is made expressly subject to all present and future valid orders and regulations of any regulatory body having jurisdiction over the subject matter of this Agreement.

8.3    No Other Warranties.  With respect to the UC Services to be provided in, and to users accessing these services from the United States and Canada, EffectNet warrants that it will exercise commercially reasonable care in the performance of its obligations under this Agreement

EFFECTNET DOES NOT WARRANT THAT THE EFFECTNET SERVICES OR THE PLATFORM THAT IT PROVIDES TO INTERMEDIA IS ERROR-FREE. IN ADDITION, THE EFFECTNET SERVICES OR INTERMEDIA PLATFORM IS PROVIDED "AS IS" AND WITHOUT ANY WARRANTY OF ANY KIND. EFFECTNET DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.  NEITHER PARTY SHALL BE LIABLE FOR ANY DAMAGES ARISING FROM THE OTHER PARTY'S OR ANY THIRD PARTY'S USE OF THE EQUIPMENT, INCLUDING WITHOUT LIMITATION INDIRECT, INCIDENTAL, SPECIAL, OR CONSEQUENTIAL DAMAGES, EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILTY OF SUCH DAMAGES.  THE PARTIES AGREE TO THE ALLOCATION OF LIABILITY RISK SET FORTH IN THIS SECTION.  THIS LIMITATION ON LIABILITY IS INTENDED ITO APPLY WITHOUT REGARD TO

WHETHER OTHER PROVISIONS OF THIS CONTRACT HAVE BEEN BREACHED OR PROVEN INEFFECTIVE. "AS IS" means the As Is condition of the EffectNet Services to be provided as Intermedia UC Services, including such customer support, software and hardware as required in the condition as of the Initial Launch Date agreed upon between the Parties and including any planned enhancement as well as any other changes mutually agreed upon. These products may as of the Initial Launch Date include works for hire for the benefit of Intermedia as further described in Section 9.2.

**9.    INTELLECTUAL PROPERTY.**

9.1    General. Except as otherwise agreed in writing between the Parties, EffectNet shall own any Patent applications and Patents issued on inventions under this Agreement. All Inventions that are not the subject of patents or applications will be considered Confidential Information of EffectNet. Nothing in this Agreement shall be construed to transfer any right title or interest in EffectNet's designs, inventions, copyrights, trade secrets, trade names or other intellectual property.

**10.    INDEMNIFICATION.** Each Party ("Indemnitor") will defend, indemnify and hold harmless the other Party and such Party's affiliates, directors, officers, employees, proprietors, independent contractors, consultants, partners, shareholders, representatives, customers, agents, predecessors, successors, and permitted assigns (collectively, "Indemnitees") from and against any claim, suit, demand, loss, damage, expense (including reasonable attorneys' fees and costs) or liability that may result from, arise out of or relate to: (a) acts or omissions arising out of or in connection with this Agreement resulting in property damage; by Indemnitor and (b) intentional or negligent violations by Indemnitor of any applicable laws or governmental regulation.

Intermedia shall indemnify and hold harmless EffectNet from and against any and all claims, expenses, judgments, liabilities, damages or losses, including reasonable attorney's fees and expenses, and shall defend all third-party actions and proceedings arising from any infringement or alleged infringement of any patent, copyright, trade secret, mask work, trade marks or service marks of any third party to the extent such claims are caused by the acts or omissions of Intermedia with respect to the marketing and/or provision of the Intermedia UC Services, but not including any claims, expenses, judgments, liabilities, damages or losses to the extent attributable to the EffectNet Services. EffectNet shall indemnify and hold harmless Intermedia from and against any and all claims, expenses, judgments, liabilities, damages or losses, including reasonable attorneys' fees and expenses, and shall defend all third-party actions and proceedings arising from any infringement or alleged infringement of any patent, copyright, trade secret, mask work or other intellectual property right of any third party, to the extent such claims are caused by use of the EffectNet Services. In the event that an injunction or restraining order is obtained against the use or distribution of any product or deliverable pursuant to this Agreement because of any infringement or alleged infringement of any patent, copyright, trade secret, mask work or other intellectual property right or any proprietary, contract or other right of any third party, or if in EffectNet's reasonable judgment any product or deliverable is likely to become the subject of a successful claim of such infringement, then EffectNet's sole obligation to Intermedia (in addition to its obligations of indemnification set forth above) shall be to promptly: (i) procure for Intermedia the right to use the product or deliverable as provided in this Agreement, (ii)

replace or modify the EffectNet product or deliverable so it becomes non-infringing without materially affecting the performance thereof, or if options (i) and (ii) are not available despite commercially reasonable efforts, (iii) terminate the licenses granted hereunder, and accept the return of all copies of all products.

**11.    LIMITATION OF LIABILITY.**  EXCEPT FOR DAMAGES ARISING UNDER SECTION  , IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY INCIDENTAL, INDIRECT, SPECIAL, PUNITIVE, CONSEQUENTIAL OR SIMILAR DAMAGES OF ANY KIND INCLUDING WITHOUT LIMITATION, LOSS OF PROFITS, LOSS OF BUSINESS OR INTERRUPTION OF BUSINESS, WHETHER SUCH LIABILITY IS PREDICATED ON CONTRACT, STRICT LIABILITY OR ANY OTHER THEORY WITHOUT REGARD TO WHETHER SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

**12.    GENERAL PROVISIONS.**

12.1    Monetary Values.  All monetary values in the Agreement refer to U.S. dollars.

12.2    Assignment.  Either Party may assign its rights or obligations under this Agreement with written notice to the other Party, and after obtaining written approval by the other party, which shall not be unreasonably withheld or delayed.  In the event that Intermedia is acquired by WorldCom no such written approval shall be required.  In the event of a restructuring, merger, or acquisition of either party, in which such party retains at least 25 percent control of the resulting entity such notice and approval shall not be required.

12.3    Governing Law.  This Agreement will be interpreted in accordance with the laws of the state of Arizona, excluding its conflict of law rules.  The Parties agree that the federal and state courts located in Arizona and/or Florida shall be the proper forum for any action brought against the other Party, and each Party shall take all necessary actions to consent to the jurisdiction of such courts.12.4    Notices.  All notices or other communications between EffectNet and Intermedia under this Agreement shall be in writing and delivered personally, sent by confirmed facsimile, by confirmed e-mail, by certified mail, postage prepaid and return receipt requested, or by a nationally recognized express delivery service addressed to the Parties at the addresses first set forth below or at such other addresses, facsimile numbers or e-mail addresses or to such individuals as either Party may specify by notice to the other Party pursuant to this Section. All notices shall be in English and shall be effective upon receipt. As a courtesy, Parties are encouraged to send duplicate copies of notice, demands, or other by facsimile. Issuance of a facsimile copy of a notice, request, demand or other communication shall not replace the requirements for delivery by mail or overnight courier in the manner provided in this Section, nor shall the date the facsimile received constitute the official receipt date. Any Party may change the address to which notices, requests, demands or other to such Party shall be delivered or mailed by giving notice of the change to the other Party in the manner provided in this Section. The addresses for the Parties for the purposes of this Agreement are:

**For EffectNet:**

Taj Reneau

Chief Executive Officer

EffectNet

Phone:  602.296.3300

Fax:      602.296.3311

**For Intermedia Communications, Inc.**

Kathleen A. Victory

VP Product Line Management

Intermedia Communications Inc.

Phone:  813.829.6703

Fax:      813.829.2359

12.5    <u>Independent Contractors</u>. This Agreement and the relations hereby established do not constitute a partnership, joint venture, franchise or agency between the Parties. Both parties are independent contractors acting for their own accounts and neither is authorized to bind, or attempt to bind, the other to any contract, general warranty, covenant or undertaking of any nature whatsoever unless authorized in writing. Neither party shall have the authority to accept delivery, collect or otherwise take possession of any funds or other property of the other party, and if done so inadvertently, shall immediately notify the other party, shall hold same in trust and shall immediately deliver same to the other party. In all matters relating to this Agreement neither party nor such party's employees or agents are, or will act, as employees of the other party within the meaning of any federal or state laws.

12.6    <u>Severability</u>. If any provision of this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other term or provision hereof. The Parties agree that they will negotiate in good faith or will permit a court to replace any provision hereof so held invalid, illegal or unenforceable with a valid provision, which is as similar as possible in substance to the invalid, illegal or unenforceable provision.

12.7    <u>Entire Agreement And Modifications</u>. This Agreement together with any appendices, exhibits and attachments constitute the entire agreement between the Parties with regard to the subject matter hereof and supersedes all prior, agreements and understandings, whether written or oral, relating to the subject matter hereof. This Agreement may only be modified by a written instrument duly executed by each Party, making specific reference to this Agreement and to the clause to be modified.

12.8    <u>Captions</u>. Where provided, captions of the sections and subsections of this Agreement are for reference purposes only and do not constitute terms or conditions of this Agreement, and shall not limit or affect the terms and conditions hereof.

12.9    <u>Waiver</u>. No provision of, right, power or privilege under this Agreement shall be deemed to have been waived by any act, delay, omission or acquiescence on the part of either Party, its agents, or employees, but only by an instrument in writing signed by an authorized officer of each Party. No waiver by either Party of any breach or default of any provision of this Agreement by the other Party shall be effective as to any other breach or default, whether of the same or any other provision and whether occurring prior to, concurrent with, or subsequent to the date of such waiver.

12.10  Counterparts. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. In making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart.

12.11  Force Majeure. Neither Party shall have any liability to the other for delays resulting from any "Event of Force Majeure" or from any act or omission of the such other Party. An Event of Force Majeure shall include without limitation any delay or failure in performance due to acts of God, earthquake, labor disputes, changes in law, regulation or government policy, riots, war, fire, epidemic, acts or omissions of vendors or suppliers, equipment failures, transportation difficulties, or other occurrences which are beyond the affected Party's reasonable control.

12.12  Conflicts. To the extent the terms of this Agreement and the MOU conflict, the terms of this Agreement shall be controlling.

**IN WITNESS WHEREOF,** the Parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the date first written above.

**EffectNet, L.L.C.**

Signature: _____

Printed Name: Brad Steinmeyer

Title: VP  PARTNER  DEVELOPMENT

Date: 11/27/00

**Intermedia Communications, Inc.**

Signature: Kathleen A Victory

Printed Name: Kathleen A. Victory

Title: VP Product Line Management

Date: November 20, 2000

## APPENDIX P (Pricing)

EffectNet shall offer the following products to Intermedia at the prices attached thereto as follows:

### 1.    Basic

$11.45 per month for each basic account with all platform usage and inbound call times on the EffectNet platform an additional $.10 per minute. The basic account includes unlimited free on-line usage including checking e-mails, faxes, etc... Outbound calling will be $.10 per minute.  This package includes customer service and technical support.  All basic accounts will be billed a base subscription price of $ 6.00 for the first calendar month of activation partial or full, and $11.45 for any calendar month thereafter partial or full.

### 2.    Unlimited

$27.40 per month for each unlimited account with unlimited free platform usage and inbound call time included. Outbound calling will be $.10 per minute. The unlimited account includes unlimited free on-line usage including checking e-mails, faxes, etc. Outbound calls include: conference calls (per member), outbound long distance, outbound fax, follow me, notification, return calls, etc. All unlimited accounts will be billed a base subscription price of $ 14.00 for the first calendar month of activation partial or full, and $27.40 for any calendar month thereafter partial or full.

Intermedia shall be responsible for any and all expenses incurred related to the completion of the Virtual Private Network ("VPN").   No expenses shall be incurred on behalf of Intermedia for the VPN without prior consent from Intermedia.

A 01171

*Exhibit B*

A 01172

**From:** Faust, Jimmy J. [mailto:JJFaust@Intermedia.com]
**Sent:** Tuesday, March 12, 2002 8:50 AM
**To:** 'support@Intermediamail.com'; 'rjeffers@webley.com'
**Cc:** Mellon, Cheryl D.
**Subject:** FW: Cancel Accounts

On Friday March 1st, I requested that all accounts (Mailboxes) for Intermedia be canceled. I have not received conformation that these accounts have been turned off.

As of this morning I can still call into the mailboxes.

Please advise.

**Jimmy J. Faust**
Sr. Product Manager
(813) 829-4327


-----Original Message-----
**From:** Faust, Jimmy J.
**Sent:** Friday, March 01, 2002 9:44 AM
**To:** 'support@intermediamail.com'
**Subject:** Cancel Accounts

My records indicate that we have 47 active mailboxes on this account.

Please cancel all mailboxes as of today (03-01-02).

Thanks

**Jimmy J. Faust**
Sr. Product Manager
(813) 829-4327
**WorldCom, Inc.**
Jimmy.faust@wcom.com

A 01173

*Exhibit C*

A 01174

Jun 19 04 10:34a                                                    p.1

EffectNet

10230 S. 50th Place
Phoenix, AZ 85044

# Invoice

| Date | Invoice # |
|------|-----------|
| 2/6/2002 | 1010 |

**Bill To**

WorldCom Purchasing, LLC
PO Box 7
Clinton, MS 39060-0007
Attn: Accounts Payable

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 4570182205 | Net 15 | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | December 2001 Billing Cycle | | |
| 46 | Unified Messaging Mailbox- Unlimited | 27.40 | 1,260.40 |
| 1 | Unified Messaging Mailbox- Basic | 11.45 | 11.45 |
| 370 | Outbound Calling Originated (Minutes) | 0.10 | 37.00 |
| | Reconciliation Payment as of Ramp Date (12/18/01) | | |
| 9,953 | Volume Shortfall (Minimum Monthly Commitment is 10,000) | 27.40 | 272,712.20 |
| | | | |
| | For billing inquiries, please call Richard Jeffers, 877.551.9365 | | |

| | | |
|---|---|---|
| PO# 4570182205 | **Total** | $274,021.05 |

A 01175

*Exhibit D*

Jun 19 04 10:34a                                                                    P.2

EffectNet

10230 S. 50th Place
Phoenix, AZ 85044

# Invoice

| Date | Invoice # |
|------|-----------|
| 2/6/2002 | 1011 |

**Bill To**

WorldCom Purchasing, LLC
PO Box 7
Clinton, MS 39060-0007
Attn: Accounts Payable

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 4570182205 | Net 15 | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | January 2002 Billing Cycle | | |
| 46 | Unified Messaging Mailbox- Unlimited | 27.40 | 1,260.40 |
| 1 | Unified Messaging Mailbox- Basic | 11.45 | 11.45 |
| 370 | Outbound Calling Originated (Minutes) | 0.10 | 37.00 |
| | Reconciliation Payment as of January 31, 2002 | | |
| 9,953 | Volume Shortfall (Minimum Monthly Commitment of 10,000) | 27.40 | 272,712.20 |
| | Late Fees at 1% per month | | |
| 1,833 | September Invoice # 1006 | 0.01 | 18.33 |
| 1,373 | October Invoice # 1007 | 0.01 | 13.73 |
| 1,309 | November Invoice # 1008 | 0.01 | 13.09 |
| | For billing inquiries, please call Richard Jeffers, 877.551.9365. | | |

PO# 4570182205

| **Total** | **$274,066.20** |
|-----------|-----------------|

A 01177

*Exhibit E*

A 01178

EffectNet

10230 S. 50th Place
Phoenix, AZ 85044

# Invoice

| Date | Invoice # |
|------|-----------|
| 3/5/2002 | 1018 |

**Bill To**

WorldCom Purchasing, LLC
PO Box 7
Clinton, MS 39060-0007
Attn: Accounts Payable

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 4570182205 | Net 15 | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | February 2002 Billing Cycle | | |
| 42 | Unified Messaging Mailbox-Unlimited | 27.40 | 1,150.80 |
| 2,310 | Outbound Calling Originated (Minutes) | 0.10 | 231.00 |
| | | | |
| | Reconciliation Payment as of February 28, 2002 ( | | |
| 9,958 | Volume Shortfall (Minimum Monthly Commitment is 10,000) | 27.40 | 272,849.20 |
| | | | |
| | Late Fees at 1% per month | | |
| 1,833 | September Invoice # 1006 | 0.01 | 18.33 |
| 1,373 | October Invoice # 1007 | 0.01 | 13.73 |
| 1,309 | November Invoice # 1008 | 0.01 | 13.09 |
| 274,021.05 | December Invoice #1010 | 0.01 | 2,740.21 |
| 274,066.2 | January Invoice # 1010 | 0.01 | 2,740.66 |

PO# 4570182205

| **Total** | **$279,757.02** |
|-----------|-----------------|

*Exhibit F*

A 01180



10230 S. 50th Place
Phoenix, AZ 85044
Office: 602.296.3300
Fax: 602.296.3311

Writer's Direct No.
(888)-387-3481

March 12, 2002

**Via Federal Express Mail**
Mr. Rich Black
Senior Vice President
of Sales and Marketing
One Intermedia Way
Tampa, Florida 33647

Re: Unified Communications General Agreement, dated November 20, 2000, by and between EffectNet, Inc. (formerly EffectNet LLC) ("**EffectNet**") and Intermedia Communications, Inc. ("**Intermedia**") (the "**Agreement**")

Dear Mr. Black:

Pursuant to the terms of the referenced Agreement, Intermedia agreed to market the UC Services to Intermedia customers and end users, including wholesale and retail customers. Intermedia agreed to provide periodic forecasts of expected mailbox activations, the first of such forecasts to be provided on or before November 30, 2000. Intermedia also agreed to deliver a minimum number of current active subscribers on or before certain dates up to a minimum of 10,000 such subscribers on or before December 18, 2001 and at the end of each calendar month thereafter for the Term of the Agreement. Intermedia also agreed to pay the agreed pricing for activated mailboxes pursuant to the Agreement. Intermedia further agreed to pay all invoices within 15 calendar days of receipt. Intermedia also agreed to pay a Reconciliation Payment as of the Ramp Date and the end of each calendar month thereafter during the Term. On February 12, 2002, Intermedia received an invoice for the pricing applicable to subscribers and for the Reconciliation Payment with respect to the

A 01181

Mr. Rich Black
Page 2 of 3
March 12, 2002

month of December 2001 (including the Ramp Date) and the month of January 2002. Each of the forgoing obligations has not been fulfilled by Intermedia as required by the Agreement ("**Intermedia Defaults**") and each such obligation is a material obligation of Intermedia under the Agreement. The forgoing is not intended to be a full and complete statement of all material obligations under the Agreement that remain unfulfilled by Intermedia. Capitalized terms used in this letter without definition have the meaning assigned to such term in the Agreement.

EffectNet hereby gives Intermedia written notice of default under Section 5.2 of the Agreement with respect to the Intermedia Defaults and EffectNet further hereby gives Intermedia written notice that EffectNet may (i) terminate the Agreement under Section 5.2 due to default effective thirty (30) days after this written notice if each of the Intermedia Defaults has not been cured within such thirty (30) day period, and (ii) further exercise all available remedies pursuant to the terms of the Agreement and as otherwise may be available at law or in equity.

EffectNet hereby demands immediate payment, in accordance with the terms of the Agreement, of the amounts itemized below:

| | |
|---|---|
| Total Amount Past Due on invoice 1010, dated February 6, 2002, and delivered to Intermedia on February 12, 2002 (for the December 2001 billing cycle): | $274,021.05 |
| Total Amount Past Due on invoice 1011, dated February 6, 2002, and delivered to Intermedia on February 12, 2002 (for the January 2002 billing cycle): | $274,066.20 |
| **Required Payment:** | $548,087.25 |

The total amount past due is as of March 12, 2002. EffectNet gives notice that all provisions of default will be strictly enforced. As indicated above, Intermedia has until the expiration of thirty (30) days after this written notice to remit the Required Payment. The Required Payment should be made payable and delivered by wire transfer to Wells Fargo Bank, Tempe, Arizona; ABA Routing Number 1221-05278; EffectNet Operations Account; Account Number 046-4657220; attn: Stephanie Jordan at 480-644-8396.

Mr. Rich Black
Page 3 of 3
March 12, 2002

Intermedia should also take notice of the Due Date of invoice #1018, dated
March 5, 2002, in the amount of $279,757.02 and delivered to Intermedia on
March 6, 2002.  Payment of this amount is due on or before March 21, 2002.

If Intermedia fails to cure the Intermedia Defaults and if EffectNet terminates the
Agreement as aforesaid, EffectNet may claim damages for all amounts due
pursuant to the Agreement, including, without limitation, the following:

| | |
|---|---|
| Required Payment | $  548,087.25 |
| Invoice # 1018 | $  279,757.02 |
| Reconciliation Payments | |
| for the unexpired Term | $5,662,667.58 |
| Forfeiture of Deposit | $  175,000.00 |

Nothing in this letter is intended to be a waiver or release of any rights or
remedies, or an election thereof, that EffectNet has under the Agreement or
applicable law, and all such rights and remedies are hereby expressly reserved in
their entirety.

Very truly yours,

Robert C. McConnell
General Counsel

*Exhibit G*

A 01184

# Delaware

PAGE  1

## The First State

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE CERTIFICATE OF OWNERSHIP, WHICH MERGES:

"EFFECTNET, INC.", A DELAWARE CORPORATION,

WITH AND INTO "PARUS HOLDINGS, INC." UNDER THE NAME OF "PARUS HOLDINGS, INC.", A CORPORATION ORGANIZED AND EXISTING UNDER THE LAWS OF THE STATE OF DELAWARE, WAS RECEIVED AND FILED IN THIS OFFICE THE FIFTH DAY OF FEBRUARY, A.D. 2004, AT 6:48 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID CORPORATION SHALL BE GOVERNED BY THE LAWS OF THE STATE OF DELAWARE.



Harriet Smith Windsor, Secretary of State

3361348  8330

040534366

AUTHENTICATION: 3246598

DATE: 07-21-04

A 01185

*Exhibit H*

A 01186

*State of Delaware*

## Office of the Secretary of State

PAGE    1

---

I, EDWARD J. FREEL, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF MERGER, WHICH MERGES:

"EFFECTNET L.L.C.", A NEVADA LIMITED LIABILITY COMPANY,

WITH AND INTO "EFFECTNET, INC." UNDER THE NAME OF "EFFECTNET, INC.", A CORPORATION ORGANIZED AND EXISTING UNDER THE LAWS OF THE STATE OF DELAWARE, AS RECEIVED AND FILED IN THIS OFFICE THE TWENTY-EIGHTH DAY OF DECEMBER, A.D. 2000, AT 1:01 O'CLOCK P.M.

A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE NEW CASTLE COUNTY RECORDER OF DEEDS.



3337277   8100M

001656793

Edward J. Freel, Secretary of State

AUTHENTICATION: 0886563

DATE: 12-29-00

A 01187

# Exhibit C

A 01188

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff, | )<br>)<br>) |
|  | ) Civil Action No. 1:00CV02789 (RWR) |
| v. | )<br>) |
| WORLDCOM, INC., and<br>INTERMEDIA COMMUNICATIONS, INC.<br>    Defendants. | )<br>) |

FILED

JUN 2 7 2001

### FINAL JUDGMENT

WHEREAS, plaintiff, United States of America, filed its Complaint on November 17, 2000, and plaintiff and defendants, WorldCom Inc. ("WorldCom") and Intermedia Communications, Inc. ("Intermedia"), by their respective attorneys, have consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law;

AND WHEREAS, this Final Judgment does not constitute any evidence against or admission by any party regarding any issue of fact or law;

AND WHEREAS, defendants agree to be bound by the provisions of this Final Judgment pending its approval by the Court;

AND WHEREAS, the essence of this Final Judgment is the prompt and certain divestiture of certain rights or assets by the defendants to assure that competition is not substantially lessened;

AND WHEREAS, plaintiff requires defendants to make certain divestitures for the purpose of remedying the loss of competition alleged in the Complaint;

AND WHEREAS, defendants have represented to the United States that the divestitures

A 01189

required below can and will be made and that they will later raise no claims of hardship or difficulty as grounds for asking the Court to modify any of the divestiture provisions contained below;

NOW THEREFORE, before testimony is taken, and without trial or adjudication of any issue of fact or law, and upon consent of the parties, it is ORDERED, ADJUDGED, AND DECREED:

## I.  JURISDICTION

This Court has jurisdiction over the subject matter of and each of the parties to this action. The Complaint states a claim upon which relief may be granted against defendants under Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.

## II.  DEFINITIONS

As used in this Final Judgment:

A.    "Acquirer" means the entity to whom defendants divest the Intermedia Assets.

B.    "WorldCom" means defendant WorldCom, Inc., a Georgia corporation with its headquarters in Clinton, Mississippi, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents and employees.

C.    "Intermedia" means defendant Intermedia Communications, Inc., a Delaware Corporation with its headquarters in Tampa, Florida, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents and employees.

D.    "Digex" means Digex, Inc., a Delaware Corporation with its headquarters in Beltsville, Maryland, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships

3

A 01190

and joint ventures, and their directors, officers, managers, agents and employees.

    E.    "Capital Stock of Digex" means the capital stock of Digex, regardless of class, owned by Intermedia.

    F.    "Intermedia Assets" means all of assets of Intermedia, except for the Capital Stock of Digex, including:

        1.    All tangible assets that comprise the Intermedia business, including research and development activities; all networking equipment and fixed assets, personal property, office furniture, materials, supplies, and other tangible property and all assets used exclusively in connection with the Intermedia Assets; all licenses, permits and authorizations issued by any governmental organization relating to the Intermedia Assets; all contracts, teaming arrangements, agreements, leases, commitments, certifications, and understandings, relating to the Intermedia Assets, including supply agreements; all customer lists, contracts, accounts, and credit records; all repair and performance records and all other records relating to the Intermedia Assets;

        2.    All intangible assets used in the development, production, servicing and sale of Intermedia Assets, including, but not limited to all patents, licenses and sublicenses, intellectual property, copyrights, trademarks, trade names, service marks, service names, technical information, computer software and related documentation, know-how, trade secrets, drawings, blueprints, designs, design protocols, specifications for materials, specifications for parts and devices, safety procedures for the handling of materials and substances, all research data concerning historic and current research and development relating to the Intermedia Assets, quality assurance and control procedures, design tools and

4

A 01191

simulation capability, all manuals and technical information defendants provide to their own

employees, customers, suppliers, agents or licensees, and all research data concerning historic

and current research and development efforts relating to the Intermedia Assets, including, but

not limited to designs of experiments, and the results of successful and unsuccessful designs

and experiments.

G.     "Merger" means the proposed merger of WorldCom and Intermedia pursuant to the

merger agreement dated September 5, 2000.

### III.   APPLICABILITY

A.     This Final Judgment applies to WorldCom and Intermedia, as defined above, and all

other persons in active concert or participation with any of them who receive actual notice of this

Final Judgment by personal service or otherwise.

B.     Defendants shall require, as a condition of the sale or other disposition of all or

substantially all of their assets or of lesser business units that include the Intermedia Assets, that the

purchaser  agrees to be bound by the provisions of this Final Judgment, provided, however, that

defendants need not obtain such an agreement from the Acquirer.

### IV.   DIVESTITURES

A.     Defendants are ordered and directed, within one hundred eighty (180) calendar days

from the closing of the Merger following the receipt of all required approvals by the Federal

Communications Commission and state authorities, to divest the Intermedia Assets as an ongoing,

viable business in a manner consistent with this Final Judgment to an Acquirer acceptable to the

United States in its sole discretion.  The United States, in its sole discretion, may agree to an

5

A 01192

extension of this time period for up to thirty (30) calendar days after regulatory approvals required to close the divestiture of the Intermedia Assets have been obtained. The United States shall notify the Court in the case of such an extension. Defendants agree to use their best efforts to divest the Intermedia Assets as expeditiously as possible.

B.   In accomplishing the divestiture ordered by this Final Judgment, defendants promptly shall make known, by usual and customary means, the availability of the Intermedia Assets. Defendants shall inform any person making an inquiry regarding a possible purchase of the Intermedia Assets that they are being divested pursuant to this Final Judgment and provide that person with a copy of this Final Judgment. Defendants shall offer to furnish to all prospective Acquirers, subject to customary confidentiality assurances, all information and documents relating to the Intermedia Assets customarily provided in a due diligence process except such information or documents subject to attorney-client privilege or attorney work-product privileges. Defendants shall make available such information to the United States at the same time that such information is made available to any other person.

C.   Defendants shall provide the Acquirer and the United States information relating to the personnel involved in the management of the Intermedia Assets and personnel engaged in the provision and selling of services offered by the Intermedia Assets in order to enable the Acquirer to make offers of employment. Defendants shall not interfere with any negotiations by the Acquirer to employ any Intermedia employee who works at, or whose primary responsibility concerns, any business that is part of the Intermedia Assets. Further, for a period of twelve (12) months following the closing of the Merger, defendants shall not solicit to hire, or hire, any Intermedia employee who, within six (6) months of the date of the sale of the business that is part of the Intermedia Assets that

6

A 01193

employs the individual, receives a reasonable offer of employment from the approved Acquirer of the Intermedia Assets, unless such employee is terminated or laid off by the Acquirer.

    D.    Defendants shall permit prospective Acquirers of the Intermedia Assets to have reasonable access to personnel and to make inspections of the physical facilities of the Intermedia Assets any and all environmental, zoning, and other permit or license documents and information, and to make inspection of the Intermedia Assets, and have access to any and all financial, operational, business, strategic or other documents and information customarily provided as part of a due diligence process.

    E.    Defendants shall warrant to any Acquirer of the Intermedia Assets that the assets will be fully operational on the date of sale.

    F.    Defendants shall not take any action, direct or indirect, that will impede in any way the operation, sale, or divestiture of the Intermedia Assets.

    G.    Unless the United States otherwise consents in writing, the divestitures pursuant to Section IV or by trustee appointed pursuant to Section V of this Final Judgment shall include all Intermedia Assets and be accomplished in such a way as to satisfy the United States, in its sole discretion, that the Intermedia Assets can and will be used by the Acquirer as a viable, ongoing business engaged in the provision of Internet backbone and access services. Unless the United States otherwise consents in writing, the divestitures required by Section IV or V shall be made to a single Acquirer. If, after making a reasonable, good faith effort, Defendants are unable to effect a sale to a single Acquirer, they may submit more than one Acquirer for approval by the United States which, in its sole discretion, may determine whether to permit such a sale. The divestiture, whether pursuant to Section IV or Section V of this Final Judgment, shall be made to an Acquirer for whom it is

7

**A 01194**

demonstrated to the United States's sole satisfaction that: (1) the Acquirer has the capability and intent of competing effectively in the provision of Internet backbone and access services; and (2) the Acquirer has the managerial, operational, and financial capability to compete effectively in the provision of Internet backbone and access services. Such divestiture shall be accomplished so as to satisfy the United States, in its sole discretion, that none of the terms of any agreement between an Acquirer and defendants gives any defendant the ability unreasonably to raise the Acquirer's costs, lower the Acquirer's efficiency, or otherwise interfere in the ability of the Acquirer to compete effectively.

H.       Nothing herein shall be construed to provide to any person or entity that is not a party to this Final Judgment any rights with respect to its enforcement, modification or termination.

## V.    APPOINTMENT OF TRUSTEE

A.       In the event that defendants have not divested the Intermedia Assets within the time specified in Section IV(A) of this Final Judgment, defendants shall notify the United States of that fact in writing. Upon application of the United States, the Court shall appoint a trustee to be selected by the United States and approved by the Court to effect the divestiture of the Intermedia Assets.

B.       After the appointment of the trustee becomes effective, only the trustee shall have the right to divest the Intermedia Assets. The trustee shall have the power and authority to accomplish the divestiture to an Acquirer acceptable to the United States at such price and on such terms as are then obtainable upon reasonable efforts of the trustee, subject to the provisions of Sections IV, V and VI of this Final Judgment, and shall have such other powers as the Court shall deem appropriate. Subject to Section V(D) of this Final Judgment, the trustee shall have the power and authority to hire

8

A 01195

at the cost and expense of defendants any investment bankers, attorneys, or other agents, who shall be solely accountable to the trustee, reasonably necessary in the judgment of the trustee to assist in the divestiture. The trustee shall have the power and authority to accomplish the divestiture at the earliest possible time to an Acquirer acceptable to the United States, in its sole discretion, and shall have such other powers as this Court shall deem appropriate.

C.    Defendants shall not object to a sale by the trustee on any ground other than the trustee's malfeasance. Any such objections by defendants must be conveyed in writing to the United States and the trustee within ten (10) calendar days after the trustee has provided the notice required under Section VI.

D.    The trustee shall serve at the cost and expense of defendants, on such terms and conditions as the United States approves, and shall account for all monies derived from the sale of each asset sold by the trustee and all costs and expenses so incurred. After approval by the Court of the trustee's accounting, including fees for its services and those of any professionals and agents retained by the trustee, all remaining money shall be paid to defendants and the trust shall then be terminated. The compensation of such trustee and of any professionals and agents retained by the trustee shall be reasonable in light of the value of the divested Intermedia Assets and based on a fee arrangement providing the trustee with an incentive based on the price and terms of the divestiture and the speed with which it is accomplished, but timeliness is paramount.

E.    Defendants shall use their best efforts to assist the trustee in accomplishing the required divestitures, including their best efforts to effect all necessary regulatory approvals. The trustee and any consultants, accountants, attorneys, and other persons retained by the trustee shall have full and complete access to the personnel, books, records, and facilities of the Intermedia Assets,

9

**A 01196**

and defendants shall develop financial and other information relevant to such business as the trustee may reasonably request, subject to reasonable protection for trade secrets or other confidential research, development or commercial information  Defendants shall take no action to interfere with or to impede the trustee's accomplishment of the divestiture.

F.    After its appointment, the trustee shall file monthly reports with the United States and the Court setting forth the trustee's efforts to accomplish the divestitures ordered under this Final Judgment. To the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court. Such reports shall include the name, address, and telephone number of each person who, during the preceding month, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Intermedia Assets, and shall describe in detail each contact with any such person. The trustee shall maintain full records of all efforts made to divest the Intermedia Assets.

G.    If the trustee has not accomplished such divestiture within six months after its appointment, the trustee shall file promptly with the Court a report setting forth (1) the trustee's efforts to accomplish the required divestiture, (2) the reasons, in the trustee's judgment, why the required divestiture has not been accomplished, and (3) the trustee's recommendations. To the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court. The trustee shall at the same time furnish such report to the United States, who shall have the right to make additional recommendations consistent with the purpose of the trust. The Court thereafter shall enter such orders as it shall deem appropriate to carry out the purpose of the Final Judgment, which may, if necessary, include extending the trust and the term of

10

A 01197

the trustee's appointment by a period requested by the United States.

## VI.    NOTICE OF PROPOSED DIVESTITURE

A.    Within two (2) business days following execution of a definitive divestiture agreement, defendants or the trustee, whichever is then responsible for effecting the divestiture, shall notify the United States of the proposed divestiture. If the trustee is responsible, it shall similarly notify defendants. The notice shall set forth the details of the proposed transaction and list the name, address, and telephone number of each person not previously identified who offered, or expressed an interest in or desire to acquire any ownership interest in the Intermedia Assets, together with full details of the same.

B.    Within fifteen (15) calendar days of receipt by the United States of such notice, the United States may request from defendants, the proposed Acquirer, any other third party, or the trustee, if applicable, additional information concerning the proposed divestiture, the proposed Acquirer, or any other potential Acquirer. Defendants and the trustee shall furnish any additional information requested within fifteen (15) calendar days of the receipt of the request, unless the parties shall otherwise agree.

C.    Within thirty (30) calendar days after receipt of the notice or within twenty (20) calendar days after the United States has been provided the additional information requested from defendants, the proposed Acquirer, any third party, and the trustee, whichever is later, the United States shall provide written notice to defendants and the trustee, if there is one, stating whether or not it objects to the proposed divestiture. If the United States provides written notice that it does not object, the divestiture may be consummated, subject only to defendants' limited right to object to the

11

**A 01198**

sale under Section V(C) of this Final Judgment. Absent written notice that the United States does

not object to the proposed Acquirer, or upon objection by the United States, a divestiture proposed

under Section IV or Section V shall not be consummated. Upon objection by defendants under

Section V(C), a divestiture proposed under Section V shall not be consummated unless approved by

the Court.

## VII.    FINANCING

Defendants shall not finance all or any part of any purchase made pursuant to Section IV or

V of this Final Judgment.

## VIII.    HOLD SEPARATE

Until the divestiture required by this Final Judgment has been accomplished, defendants shall

take all steps necessary to comply with the Hold Separate Stipulation and Order entered by this

Court. Defendants shall take no action that would jeopardize the divestiture order by this Court.

## IX.    AFFIDAVITS

A.    Within twenty (20) calendar days of the filing of the Complaint in this matter and every

thirty (30) calendar days thereafter until the divestiture has been completed, pursuant to Section IV

or Section V of this Final Judgment, defendants shall deliver to the United States an affidavit as to

the fact and manner of compliance with Sections IV or V of this Final Judgment. Each such affidavit

shall include the name, address, and telephone number of each person who during the preceding thirty

days made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire,

or was contacted or made an inquiry about acquiring, any interest in the Intermedia Assets, and shall

12

A 01199

describe in detail each contact with any such person during that period. Each such affidavit shall also include a description of the efforts defendants have taken to solicit buyers for the Intermedia Assets and to provide required information to prospective Acquirers, including the limitations, if any, on such information. Assuming the information set forth in the affidavit is true and complete, any objection by the United States to information provided by defendants, including limitation on information, shall be made within fourteen (14) days of receipt of such affidavit.

B.    Within twenty (20) calendar days of the filing of the Complaint in this matter, defendants shall deliver to the United States an affidavit which describes in reasonable detail all actions defendants have taken and all steps defendants have implemented on an ongoing basis to preserve and maintain the Intermedia Assets and to comply with Section VIII of this Final Judgment. The affidavit also shall describe, but not be limited to, defendants' efforts to maintain and operate the Intermedia Assets as a viable active competitor; to maintain separate management, staffing, sales, marketing, and pricing the Intermedia Assets; and to maintain the Intermedia Assets in operable condition at current (and currently projected future) capacity configurations. Defendants shall deliver to the United States an affidavit describing any changes to the efforts and actions outlined in defendants' earlier affidavit(s) filed pursuant to this section within fifteen (15) calendar days after the change is implemented.

C.    Defendants shall keep all records of all efforts made to preserve and divest the Intermedia Assets until one year after such divestiture has been completed

D.    Defendants shall promptly inform the United States of any change in the management or operation of the Intermedia Assets that would affect the defendants' ability to fulfill their obligations under this Final Judgment or the Hold Separate Stipulation and Order. Such notice shall

13

A 01200

include a description of all the steps defendants have taken or will take regarding the subject of such notice.

## X.   COMPLIANCE INSPECTION

A.      For the purposes of determining or securing compliance with this Final Judgment, or of determining whether the Final Judgment should be modified or vacated, and subject to any legally recognized privilege, from time to time duly authorized representatives of the United States Department of Justice, including consultants and other persons retained by the United States, shall, upon written request of a duly authorized representative of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to defendants, be permitted:

1.      Access during office hours of defendants to inspect and copy, or at the option of the United States, to require defendants to provide copies of, all books, ledgers, accounts, correspondence, memoranda, and other records and documents in the possession or under the control of defendants, relating to any matters contained in this Final Judgment; and

2.      To interview, either informally or on the record, defendant's officers, employees, or agents, who may have their individual counsel present, regarding such matters. The interviews shall be subject to the reasonable convenience of the interviewee and without restraint of interference by the defendants.

B.      Upon the written request of a duly authorized representative of the Assistant Attorney General in charge of the Antitrust Division, defendants shall submit such written reports, under oath if requested, relating to any of the matters contained in this Final Judgment and the Hold Separate Stipulation and Order as may be requested.

14

A 01201

C.   No information or documents obtained by the means provided in this section shall be divulged by the United States to any person other than an authorized representative of the executive branch of the United States, except in the course of legal proceedings to which the United States is a party (including grand jury proceedings), or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

D.   If at the time information or documents are furnished by defendants to the United States, defendants represent and identify in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(7) of the Federal Rules of Civil Procedure, and defendants mark each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(7) of the Federal Rules of Civil Procedure," then the United States shall give defendants ten (10) calendar days notice prior to divulging such material in any legal proceeding (other than a grand jury proceeding).

## XI.   NO REACQUISITION

Defendants may not reacquire any part of the Intermedia Assets during the term of this Final Judgment.

## XII.   RETENTION OF JURISDICTION

This Court retains jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

15

A 01202

## XIII.    EXPIRATION OF FINAL JUDGMENT

Unless this Court grants an extension, this Final Judgment will expire upon the tenth anniversary of the date of its entry.

## XIV.    PUBLIC INTEREST DETERMINATION

Entry of this Final Judgment is in the public interest.

Date: 6/26/01

Court approval subject to procedures of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16.

**United States District Judge**

16

A 01203

# Exhibit D

A 01204



10230 S. 50th Place
Phoenix, AZ 85044
Office: 602.296.3300
Fax: 602.296.3311

Writer's Direct No.
(888)-387-3481

March 12, 2002

**Via Federal Express Mail**
Mr. Rich Black
Senior Vice President
of Sales and Marketing
One Intermedia Way
Tampa, Florida 33647

Re: Unified Communications General Agreement, dated November 20, 2000, by and between EffectNet, Inc. (formerly EffectNet LLC) ("**EffectNet**") and Intermedia Communications, Inc. ("**Intermedia**") (the "**Agreement**")

Dear Mr. Black:

Pursuant to the terms of the referenced Agreement, Intermedia agreed to market the UC Services to Intermedia customers and end users, including wholesale and retail customers. Intermedia agreed to provide periodic forecasts of expected mailbox activations, the first of such forecasts to be provided on or before November 30, 2000. Intermedia also agreed to deliver a minimum number of current active subscribers on or before certain dates up to a minimum of 10,000 such subscribers on or before December 18, 2001 and at the end of each calendar month thereafter for the Term of the Agreement. Intermedia also agreed to pay the agreed pricing for activated mailboxes pursuant to the Agreement. Intermedia further agreed to pay all invoices within 15 calendar days of receipt. Intermedia also agreed to pay a Reconciliation Payment as of the Ramp Date and the end of each calendar month thereafter during the Term. On February 12, 2002, Intermedia received an invoice for the pricing applicable to subscribers and for the Reconciliation Payment with respect to the

MCIWC000251

Mr. Rich Black
Page 2 of 3
March 12, 2002

month of December 2001 (including the Ramp Date) and the month of January 2002. Each of the forgoing obligations has not been fulfilled by Intermedia as required by the Agreement ("**Intermedia Defaults**") and each such obligation is a material obligation of Intermedia under the Agreement. The forgoing is not intended to be a full and complete statement of all material obligations under the Agreement that remain unfulfilled by Intermedia. Capitalized terms used in this letter without definition have the meaning assigned to such term in the Agreement.

EffectNet hereby gives Intermedia written notice of default under Section 5.2 of the Agreement with respect to the Intermedia Defaults and EffectNet further hereby gives Intermedia written notice that EffectNet may (i) terminate the Agreement under Section 5.2 due to default effective thirty (30) days after this written notice if each of the Intermedia Defaults has not been cured within such thirty (30) day period, and (ii) further exercise all available remedies pursuant to the terms of the Agreement and as otherwise may be available at law or in equity.

EffectNet hereby demands immediate payment, in accordance with the terms of the Agreement, of the amounts itemized below:

Total Amount Past Due on invoice 1010,
dated February 6, 2002, and delivered to
Intermedia on February 12, 2002
(for the December 2001 billing cycle):                    $274,021.05

Total Amount Past Due on invoice 1011,
dated February 6, 2002, and delivered to
Intermedia on February 12, 2002
(for the January 2002 billing cycle):                     $274,066.20

**Required Payment:**                                     $548,087.25

The total amount past due is as of March 12, 2002. EffectNet gives notice that all provisions of default will be strictly enforced. As indicated above, Intermedia has until the expiration of thirty (30) days after this written notice to remit the Required Payment. The Required Payment should be made payable and delivered by wire transfer to Wells Fargo Bank, Tempe, Arizona; ABA Routing Number 1221-05278; EffectNet Operations Account; Account Number 046-4657220; attn: Stephanie Jordan at 480-644-8396.

MCIWC000252

**A 01206**

Mr. Rich Black
Page 3 of 3
March 12, 2002

Intermedia should also take notice of the Due Date of invoice #1018, dated March 5, 2002, in the amount of $279,757.02 and delivered to Intermedia on March 6, 2002. Payment of this amount is due on or before March 21, 2002.

If Intermedia fails to cure the Intermedia Defaults and if EffectNet terminates the Agreement as aforesaid, EffectNet may claim damages for all amounts due pursuant to the Agreement, including, without limitation, the following:

| | |
|---|---|
| Required Payment | $ 548,087.25 |
| Invoice # 1018 | $ 279,757.02 |
| Reconciliation Payments for the unexpired Term | $5,662,667.58 |
| Forfeiture of Deposit | $ 175,000.00 |

Nothing in this letter is intended to be a waiver or release of any rights or remedies, or an election thereof, that EffectNet has under the Agreement or applicable law, and all such rights and remedies are hereby expressly reserved in their entirety.

Very truly yours,

Robert C. McConnell
General Counsel

MCIWC000253

A 01207

# Exhibit E

A 01208



One Parkway North
Fourth Floor North
Deerfield, Illinois 60015
Office: 888.444.6400

Writer's Direct No.
(888)-387-3481

March 25, 2002

**Via Federal Express Mail**
Mr. Brett Bacon
MCI/WorldCom
1945 Old Gallows Road
Vienna, Virginia 22182

Re: Unified Communications General Agreement, dated November 20, 2000, by and between EffectNet, Inc. (formerly EffectNet LLC) ("**EffectNet**") and Intermedia Communications, Inc. ("**Intermedia**") (the "**Agreement**")

Dear Mr. Bacon:

EffectNet, by letter to the attention of Mr. Rich Black, dated March 12, 2002, issued a written notice of default under Section 5.2 of the Agreement with respect to the Intermedia Defaults, as defined in the March 12 letter (the "**March 12 Letter**"). I understand from you that Mr. Black referred the March 12 letter to your attention upon receipt. As you know, the Agreement in Section 5.2 provides that "[t]ermination due to default under this Section shall be effective thirty (30) days after written notice to the defaulting Party if the default has not been cured within such thirty (30) day period." Accordingly, the Agreement will be terminated for default by Intermedia on or about April 12, 2002 if the Intermedia Defaults are not cured prior thereto.

I spoke with you on or about March 13 and you indicated that Intermedia and/or its affiliates were interested in pursuing immediate settlement discussions. I also understand that you spoke with Mr. Jim Calandra, Chief Financial Officer of EffectNet on March 18 and that you told Mr. Calandra that Mr. Barry Zip would

A 01209

Mr. Brett Bacon
Page 2 of 3
March 25, 2002

be handling settlement discussions.  Further, I understand that you told Mr.
Calandra that you would provide Mr. Zip with contact information of Mr.
Calandra.  On March 20, Mr. Calandra exchanged voice messages with you
whereby Mr. Calandra inquired of Mr. Zip and the lack of communication from
him and you responded by giving Mr. Calandra, for the first time, contact
information for Mr. Zip. Mr. Calandra called Mr. Zip the same day, March 20, and
left a voice message for Mr. Zip requesting that Mr. Zip return the call. Neither
Mr. Calandra nor anyone else has since received any communications from
Intermedia or its affiliates regarding this matter.  As you might imagine,
EffectNet is becoming increasingly concerned that Intermedia and/or its affiliates
fail to understand the gravity of this matter and the urgency with which it must
be addressed.

Intermedia should also take notice of the Due Date of invoice #1018, dated
March 5, 2002, in the amount of $279,757.02 and delivered to Intermedia on
March 6, 2002.  Payment of this amount was due on or before March 21, 2002.
EffectNet has not received this past due payment (the "**February Payment
Default**").

Accordingly, EffectNet hereby gives Intermedia written notice of default under
Section 5.2 of the Agreement with respect to the February Payment Default and
EffectNet further hereby gives Intermedia written notice that EffectNet may (i)
terminate the Agreement under Section 5.2 due to default effective thirty (30)
days after this written notice (if the Agreement is not sooner terminated
pursuant to the March 12 Letter) if the February Payment Default has not been
cured within such thirty (30) day period, and (ii) further exercise all available
remedies pursuant to the terms of the Agreement and as otherwise may be
available at law or in equity.

EffectNet hereby demands immediate payment, in accordance with the terms of
the Agreement, of the amounts itemized below:

Total Amount Past Due on invoice 1010,
dated February 6, 2002, and delivered to
Intermedia on February 12, 2002
(for the December 2001 billing cycle):            $274,021.05

Total Amount Past Due on invoice 1011,
dated February 6, 2002, and delivered to
Intermedia on February 12, 2002
(for the January 2002 billing cycle):             $274,066.20

**A 01210**

Mr. Brett Bacon
Page 3 of 3
March 25, 2002

Total Amount Past Due on invoice #1018,
dated March 5, 2002, and delivered to
Intermedia on March 6, 2002
(for the February 2002 billing cycle):                    $279,757.02

**Required Payment:**                                    $827,844.27

The total amount past due is as of March 21, 2002. EffectNet gives notice that all provisions of default will be strictly enforced. As indicated above, Intermedia has until the expiration of thirty (30) days after the March 12 Letter or this written notice, as the case may be, to remit the Required Payment. The Required Payment should be made payable and delivered by wire transfer to Wells Fargo Bank, Tempe, Arizona; ABA Routing Number 1221-05278; EffectNet Operations Account; Account Number 046-4657220; attn: Stephanie Jordan at 480-644-8396.

If Intermedia fails to cure the Intermedia Defaults and the February Payment Default and if the Agreement is terminated as aforesaid, EffectNet may claim damages for all amounts due pursuant to the Agreement.

Nothing in this letter is intended to be a waiver or release of any rights or remedies, or an election thereof, that EffectNet has under the Agreement or applicable law, and all such rights and remedies are hereby expressly reserved in their entirety.

Very truly yours,

Robert C. McConnell
General Counsel

CC: Mr. Rich Black

MCIWC000244

02/12/02 06.  A  P.003

☒003

# Invoice

**EffectNet**
10230 S. 50th Place
Phoenix, AZ 85044

| DATE | INVO |
|------|------|
| 2/6/2002 | 1011 |

BILL TO

WorldCom Purchasing, LLC
PO Box 7
Clinton, MS 39060-0007
Attn: Accounts Payable

| P.O. NO. | TERMS | PROJECT |
|----------|-------|---------|
| 4570182205 | Net 15 | |

| QUANTITY | DESCRIPTION | RATE | AMOUNT |
|---------|-------------|------|--------|
| | January 2002 Billing Cycle | | |
| 46 | Unified Messaging Mailbox- Unlimited | 27.40 | 1,260.40 |
| 1 | Unified Messaging Mailbox- Basic | 11.45 | 11.45 |
| 370 | Outbound Calling Originated (Minutes) | 0.10 | 37.00 |
| | Reconciliation Payment as of January 31, 2002 | | |
| 9,953 | Volume Shortfall (Minimum Monthly Commitment of 10,000) | 27.40 | 272,712.20 |
| | Late Fees at 1% per months. | | |
| 1,833 | September Invoice # 1006 | 0.01 | 18.33 |
| 1,373 | October Invoice # 1007 | 0.01 | 13.73 |
| 1,309 | November Invoice # 1008 | 0.01 | 13.09 |
| | For billing inquiries, please call Richard Jeffers, 877.551.9365. | | |

PO# 4570182205

| | Total | $274,06 6.20 |
|--|-------|-------------|

MCIWC000245

A 01212

@002

09/07/02  0F   1A  P.002

**EffectNet**
10230 S. 50th Place
Phoenix, AZ 85044

# Invoice

| DATE | INVOICE # |
|------|-----------|
| 3/5/2002 | 1018 |

**BILL TO**

WorldCom Purchasing, LLC
PO Box 7
Clinton, MS 39060-0007
Attn: Accounts Payable

| | P.O. NO. | TERMS | PROJECT |
|---|---|---|---|
| | | Net 15 | |

| QUANTITY | DESCRIPTION | RATE | AMOUNT |
|---|---|---|---|
| | February 2002 Billing Cycle | | |
| 42 | Unified Messaging Mailbox-Unlimited | 27.40 | 1,150.80 |
| 2,810 | Outbound Calling Originated (Minutes) | 0.10 | 231.00 |
| | | | |
| | Reconciliation Payment as of February 28, 2002 ( | | |
| 9,958 | Volume Shortfall (Minimum Monthly Commitment is 10,000) | 27.40 | 272,849.20 |
| | Late Fees at 1% per month | | |
| 1,833 | September Invoice # 1006 | 0.01 | 18.33 |
| 1,373 | October Invoice # 1007 | 0.01 | 13.73 |
| 1,309 | November Invoice # 1008 | 0.01 | 13.09 |
| 274,021.05 | December Invoice #1010 | 0.01 | 2,740.21 |
| 274,066.2 | January Invoice # 1010 | 0.01 | 2,740.66 |

PO# 4570182205

| | Total | $279,757.02 |
|---|---|---|

MC1WC000246

**A 01213**