Hearing Date and Time: December 6, 2005, at 10:00 A.M. Eastern Time
Response Deadline: November 18, 2005, at 4:00 P.M. Eastern Time
Reply Deadline: December 2, 2005, at 4:00 P.M. Eastern Time

STINSON MORRISON HECKER LLP

Robert L. Driscoll, Esq.
Allison M. Murdock, Esq.
Jodi M. Hoss, Esq.
1201 Walnut Street
Kansas City, MO  64106
Telephone:  (816) 842-8600
Facsimile:  (816) 691-3495
Attorneys for Reorganized Debtors

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
In re                                              :
                                                   :   Chapter 11 Case No. 02-13533 (AJG)
WORLDCOM, INC., et al.,                            :
                                                   :   (Jointly Administered)
                    Debtors.                       :
-------------------------------------------------------x

## MEMORANDUM IN SUPPORT OF WORLDCOM'S MOTION FOR SUMMARY JUDGMENT AGAINST PARUS HOLDINGS, INC., SUCCESSOR-BY-MERGER TO EFFECTNET, INC. AND EFFECTNET, LLC

Pursuant to Fed. R. Civ. P. 56, Fed. R. Bankr. P. 7056, and Fed. R. Bankr. P. 9014, the above-captioned debtors ("Reorganized Debtors" or "WorldCom"), submit their Memorandum in Support of WorldCom's Motion for Summary Judgment Against Parus Holdings Inc., successor-by-merger to EffectNet, Inc. and EffectNet, LLC ("Parus Holdings" or "Claimant") on Claim Nos. 11242 (replacing 9291) and 11173 (replacing 9293).

### INTRODUCTION

All of the claims of Parus Holdings relate to the November 2000 Unified Communications Services General Agreement (the "UC Contract") between EffectNet, Inc. (a predecessor of Parus Holdings) and Intermedia Communications, Inc. ("Intermedia"), a wholly owned subsidiary of WorldCom.  Under the UC Contract, EffectNet agreed to sell and Intermedia agreed to buy (for resale) a variety of voice communication services.  Parus Holdings

A 01214

now seeks compensatory damages from Intermedia for the alleged breach of the UC Contract and consequential damages from WorldCom and Intermedia for allegedly acting in concert to breach the UC Contract. All of Parus Holdings' claims are appropriate for summary adjudication by the Court.

The consequential damage claims of Parus Holdings fail as matters of indisputable fact and law for the following reasons:

- EffectNet and Intermedia agreed in the UC Contract that in "no event" would either party be liable to the other "for any incidental, indirect, special, punitive, consequential or similar damages of any kind." As a result, by contractual agreement, Parus Holdings (as successor to EffectNet) has no claim for consequential damages against Intermedia.

- Claimant's tort theories of civil conspiracy to breach the UC Contract and tortious interference with that contract fail because it is a matter of indisputable fact--contrary to Parus Holdings' unsupported assertions of improper purpose--that Intermedia assets were divested after the July 2001 merger of Intermedia and WorldCom under the auspices and pursuant to the direct order of the United States District Court for the District of Columbia.

- Claimant's tort theories of civil conspiracy to breach the UC Contract and tortious interference with that contract also fail because the assertedly conspiratorial and/or interfering conduct was between a parent corporation (WorldCom) and its wholly owned subsidiary (Intermedia), a unified interest relationship that precludes such claims. Moreover, WorldCom's actions in pursuit of its legitimate business interests were privileged and, as a matter of law, did not constitute tortious interference.

A 01215

- The claim that WorldCom and Intermedia engaged in deceptive trade practice fails because neither WorldCom nor Intermedia sold any service or product to EffectNet. Indeed, it was the other way around. Moreover, EffectNet was not the target of any deceptive advertising, and claimant therefore cannot maintain an action under any consumer fraud or deceptive practices act.

- Parus Holdings' breach of the implied covenant of good faith and fair dealings is solely a contract claim. Intermedia did not act in bad faith; a court order directed divestiture of Intermedia assets. In any event, the remedy for any such breach is on the UC Contract itself.

Parus Holdings' breach of contract claim is also appropriate for summary adjudication. The UC Contract provides that it will terminate 30 days after one of the contracting parties provides written notice of default to the other, assuming the default is not cured in that 30 day time period. It is undisputed that EffectNet provided such a notice of default to Intermedia, and it is further undisputed that the default was not cured. As a result, the UC Contract was terminated. Under such a circumstance, the defaulting party's liability is limited to "those obligations that accrued prior to the date of termination." The dollar value of Intermedia's accrued obligations at the time of contract termination is calculable by applying the terms of the UC Contract itself – a process which yields $460,442.30 as the amount owed.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

WorldCom respectfully refers the Court to its Statement of Material Facts as to Which There Are No Genuine Issues to be Tried ("Undisputed Facts"), which was filed concurrently with the instant Motion.

A 01216

## **SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate if the movant demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Forsyth v. Fed'n Empl. & Guidance Serv., 409 F.3d 565, 569 (2d Cir. 2005). The substantive law governing the case will identify those facts which are material and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "The mere existence of factual issues – where those issues are not material to the claims before the court – will not suffice to defeat a motion for summary judgment." Quarles v. General Motors Corp., 758 F.2d 839, 840 (2d Cir. 1985).

Summary judgment is "an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). Indeed, summary judgment permits a court to "streamline the process for terminating frivolous claims and to concentrate its resources on meritorious litigation." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986). Where, as here, there is no dispute as to material facts, and the motion is well founded in the law, summary judgment should be granted. Anderson, 477 U.S. at 247-48; Knight, 804 F.2d at 11 (citing Fed. R. Civ. P. 56(c)).

As set forth below, there are no genuine issues of material fact and WorldCom is entitled to summary judgment as a matter of law on the issues addressed below.

A 01217

# ARGUMENT

### I. Parus Holdings is Precluded by the Terms of the UC Contract from Recovering Consequential or Other Similar Damages from Intermedia

In this proceeding, Parus Holdings seeks to recover damages from Intermedia based on Intermedia's alleged breach of the UC Contract. Parus Holdings' Proof of Claim No. 11173. In addition to damages flowing directly from that breach, Parus Holdings also seeks to recover from Intermedia an additional amount that "may exceed $20 million" because Intermedia and WorldCom assertedly "acted in concert to breach the UC Contract." Id.; see also Ex. B, Parus Opposition at 3, ¶ 4 and 11, ¶¶ 37-38. Unlike its straight breach of contract claim, this additional claim by Parus Holdings for consequential damages is not appropriately before the Court. Indeed, it is expressly precluded from being brought by the terms of the very contract that Parus Holdings seeks to enforce in this proceeding.

> Section 11 of the UC Contract provides:
>
> LIMITATION OF LIABILITY. EXCEPT FOR DAMAGES ARISING UNDER SECTION [left blank in original], IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY INCIDENTAL, INDIRECT, SPECIAL, PUNITIVE, CONSEQUENTIAL OR SIMILAR DAMAGES OF ANY KIND INCLUDING WITHOUT LIMITATION, LOSS OF PROFITS, LOSS OF BUSINESS OR INTERRUPTION OF BUSINESS, WHETHER SUCH LIABILITY IS PREDICATED ON CONTRACT, STRICT LIABILITY OR ANY OTHER THEORY WITHOUT REGARD TO WHETHER SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

Ex. A, UC Contract § 11; Undisputed Facts ¶ 7. This unequivocal prohibition against either party to the UC Contract from seeking to impose liability on the other for consequential or similar damages is clearly preclusive of the consequential damage element of Parus Holdings' claim and it is enforceable under controlling Arizona law.[1] See Southwest Pet Prods., Inc. v.

---

[1] EffectNet, the predecessor of Parus Holdings, and Intermedia expressly provided that the terms of their UC Contract were to be "interpreted in accordance with the laws of the State of Arizona." Ex. A, UC Contract at 10, ¶ 12.3; Undisputed Facts ¶ 6. Under circumstances that are present here, the courts of New York enforce such contractual choice of law provisions. See Finucane v. Interior Constr. Corp., 695 N.Y.S.2d 322, 324-25 (N.Y. App.

5

Koch Indus., Inc., 107 F. Supp. 2d 1108, 1113-15 (D. Ariz. 2000) (holding a contract clause that limits incidental and consequential damages was enforceable).  "Under Arizona law, where a contract provides the remedy in event of breach, its terms will control the determination of contract damages."  Tucson Elec. Power Co. v. Bailey Controls Co., No. CIV 92-185 TUC RMB, 1992 WL 430467, at *2 (D. Ariz. Oct. 5, 1992) (citing Green v. Snodgrass, 79 Ariz. 319, 322 (1955)).[2]

Accordingly, Parus Holdings' claim for recovery of consequential damages against Intermedia should be summarily dismissed.

## II.     The Court Should Dismiss Parus Holdings' Tort and Statutory Claims Against WorldCom and Intermedia Because They Fail Based on Indisputable Fact and as Matters of Law

Parus Holdings asserts claims against Intermedia for conspiracy based on its alleged actions in concert with WorldCom to breach the UC Contract, unfair and deceptive trade practices, and breach of the implied covenant of good faith and fair dealing.  Ex. B, Parus Opposition at 3, ¶ 4.  Parus Holdings asserts claims against WorldCom for civil conspiracy based on its alleged actions in concert with Intermedia to cause Intermedia to breach the UC Contract, tortious interference with EffectNet's contractual relations, as well as unfair and deceptive trade practices.  Id. ¶ 5.  Reorganized Debtors request that the Court enter summary judgment against Parus Holdings on all of its tort and statutory claims because they are all deficient in fact and in law.

---

Div. 1999) (New York courts enforce contractual choice of law provisions if state selected has reasonable relationship to contract and selected laws do not violate a fundamental public policy of New York).  Here one of the contracting parties, EffectNet, was principally officed in Arizona [Undisputed Facts ¶ 1] and no fundamental public policy of New York is implicated, let alone violated, by the UC Contract.

[2]  This is consistent with the law in every other jurisdiction having a connection to the disputed claim of Parus Holdings.  See, e.g., Voicestream Wireless v. U.S. Communications, Inc., No. 4D04-4913, 2005 WL 2016838, at *2-3 (Fla. App. 4 Dist. Aug. 24, 2005) (Florida law, enforcing contractual prohibition of consequential damages); Royer Homes v. Chandeleur Homes, 857 So.2d 748, 754 (Miss. 2003) (same, applying Mississippi law); Peluso v. Tauscher Cronacher Prof'l Eng'rs, 270 A.D.2d 325, 325 (N.Y.S.2d 2000) (same, applying New York law).

A 01219

A.    **Choice of Law for Tort Claims**

In New York, courts engage in a choice of law analysis only where an "actual conflict" exists between the applicable rules of the relevant jurisdictions.[3]  In re Allstate Ins. Co., 613 N.E.2d 936 (N.Y. 1993).  An actual conflict exists when the applicable law from each jurisdiction provides different substantive rules and those differences are relevant to the issue at hand and have a "significant possible effect on the outcome of the trial." Simon v. Philip Morris, Inc., 124 F. Supp. 2d 46,71 (E.D.N.Y. 2000).  Here, Arizona or Mississippi law could apply to Parus Holdings' claims against WorldCom, and Arizona or Florida law could apply to Parus Holdings' claims against Intermedia.[4]  Regardless of the law applied, however, there are no differences in the substantive rules that would effect an analysis on the merits of the claims at issue.

B.    **Parus Holdings' Conspiracy and Tortious Interference Claims Fail as a Matter of Indisputable Fact**

Unlike criminal conspiracy, which is based on the act of conspiracy itself, civil conspiracy cannot be established by proof of the conspiracy alone.  To establish an actionable civil conspiracy under Arizona, Mississippi or Florida law, Parus Holdings must prove that Intermedia and WorldCom agreed to accomplish an <u>unlawful</u> purpose or to accomplish a lawful objective by <u>unlawful</u> means, causing damages.[5]  Gallagher Bassett Servs., Inc. v. Jeffcoat, 887

---

[3]  Although the UC Contract contains a choice of law clause, it does not apply to claimant's tort claims. Knieriemen v. Bache Halsey Stuart Shilds Inc., 427 N.Y.S.2d 10 (App. Div. 1st Dep't 1980) *overruled on other grounds*, Rescildo v. R.H. Macy's, 594 N.Y.S.2d 139 (App. Div. 1st Dep't 1993) (New York courts are reluctant to construe contractual choice of law clauses broadly to encompass extra-contractual causes of action); see Twinlab Corp. v. Paulson, 724 N.Y.S.2d 496, 496 (App. Div. 2d Dep't 2001).  Under New York law, tort claims are outside the scope of contractual choice of law provisions that specify what law governs construction of the terms of the contract even when the contract includes a broader forum selection clause.  Knock v. Lipsay, 97 F.3d 640, 645 (2d Cir. 1996) (applying New York law to interpret scope of choice of law clause).
[4]  EffectNet had its principal place of business in Arizona, Intermedia had its principal place of business in Florida, and WorldCom had its principal place of business in Mississippi.  Undisputed Facts ¶¶ 1, 3.
[5]  Under Arizona law, "there is no claim for relief for civil conspiracy in and of itself, but . . . the action is one for damages arising out of the acts committed pursuant to the conspiracy." Savard v. Selby, 508 P.2d 773, 776 (Ariz. Ct. App. 1973).  Florida law recognizes an independent tort of civil conspiracy, but only when the defendants have

7

So.2d 777, 786 (Miss. 2004); <u>Florida Fern Growers Ass'n, Inc. v. Concerned Citizens of Putnam County</u>, 616 So.2d 562, 565 (Fla. Dist. Ct. App. 1993); <u>Savard v. Selby</u>, 508 P.2d 773, 776 (Ariz. 1973); <u>Uvodich v. Ariz. Bd. of Regents</u>, 453 P.2d 229 (Ariz. 1969).

Here, Parus Holdings asserts an unsupported belief that, after WorldCom and Intermedia merged in July 2001, Intermedia was prevented from performing the UC Contract because it was dismantled for improper purposes.[6]  To the contrary, it is a matter of public record that WorldCom and Intermedia divested the assets of Intermedia under the auspices and pursuant to the direct order of the United States District Court for the District of Columbia.  See Ex. C, Final Judgment at 5-6, <u>United States v. WorldCom, Inc., et al.</u>, Case No. 1:00CV02789 (RWR) (D.D.C.).

As the court record reflects, on June 26, 2001, the United States District Court for the District of Columbia "ordered and directed" WorldCom and Intermedia to "divest the Intermedia Assets as an ongoing, viable business" within 180 days from closing of the WorldCom/Intermedia merger.  <u>Id.</u> at 5-6; Undisputed Facts ¶ 11.  As the Final Judgment of the District Court also reflects, the divestiture order of the Court was prompted by a Clayton Act complaint, involving the asserted anti-competitive impact of the WorldCom/Intermedia merger,

---

some "peculiar power of coercion . . . by virtue of their combination, which power an individual would not possess." <u>Churraca v. Miami Jai Alai, Inc.</u>, 353 So.2d 547, 550 (Fla. 1977). "When the acts of the defendants do not create a greater harm than if the acts were committed by one person alone, then there can be no recovery." <u>Martin v. Marlin</u>, 529 So.2d 1174, 1179 (Fla. App. 3 Dist. 1988) (citation omitted).  Here, if Intermedia breached the UC Contract, it could have done so with or without the aid and cooperation of anyone else.  Thus, the peculiar power of coercion necessary to establish an independent tort of civil conspiracy is not present.  Mississippi law does not address whether an independent tort of conspiracy is recognized.

[6] In support of its claims, Claimant points to the following acts occurring after the July 2001 merger between WorldCom and Intermedia:
  1) The firing of Intermedia's project manager for the UC Contract, disbanding of Intermedia's sales force, and reassignment of that sales force to different projects.  Undisputed Facts ¶ 12.
  2) Intermedia's cancellation of 682 of the existing 729 subscriptions for service.  <u>Id.</u> ¶ 13.
  3) EffectNet's invoicing Intermedia for payments under the UC Contract and Intermedia's failure to pay those invoices.  <u>Id.</u> ¶ 14.
  4) Intermedia's request that all remaining accounts for services under the UC Contract be cancelled.  <u>Id.</u> ¶ 15.

A 01221

which had been filed by the United States on November 17, 2000--three days before EffectNet and Intermedia entered into the UC Contract. Ex. C, Final Judgment at 1, 3. Furthermore, the potentially adverse impact of the WorldCom/Intermedia merger on Intermedia's ability to perform under the UC Contract was understood and expressly acknowledged by EffectNet in the UC Contract. See Ex. A, UC Contract § 1.4 wherein EffectNet expressly acknowledges the fact of the WorldCom/Intermedia merger and agrees that the merger "shall not, in and of itself, constitute an event" requiring notice of Intermedia's inability to meet its obligations under the UC Contract.

It is indisputable fact, as evidenced by the public record and as foreseen in the UC Contract itself, that Intermedia's failure to perform its obligations under the UC Contract was not the result of improper acts.

    **C.**    **A Parent Corporation Cannot Conspire with or Tortiously Interfere with Its Wholly Owned Subsidiary**

In addition to being factually unsupported, Parus Holdings' allegations of civil conspiracy and tortious interference are legally deficient.

**Civil Conspiracy.** Consistent with the fundamental proposition that a civil conspiracy requires a concerted action of "two or more persons," it is Arizona law (as well as the law elsewhere) that "[a] corporation cannot conspire with itself any more than a private individual can." Rowland v. Union Hills Country Club, 757 P.2d 105, 110 (Ariz. App. 1988) (quotations omitted) (citing Nelson Radio & Supply Co. v. Motorola, 200 F.2d 911, 914 (5th Cir. 1952); 15A C.J.S. Conspiracy § 2 (1967)); St. Petersburg Yacht Charters, Inc. v. Morgan Yacht, Inc., 457 So.2d 1028, 1041 n.4 (Fla. Ct. App. 1984). Further, it is the general rule that parent and wholly owned subsidiary corporations (such as WorldCom and Intermedia) have such a unity of interest that they are legally incapable of engaging in an actionable conspiracy with each other. See

A 01222

Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 777 (1984) (parent and wholly-owned subsidiary have complete unity of interest and are incapable of conspiring); Fogie v. Thorn Ams. Inc., 190 F.3d 889, 898 (8th Cir. 1999) (parent and wholly owned subsidiary share common purpose and cannot conspire with each other); Carl Hizel & Sons Inc. v. Browning Ferris Indust. Inc., 590 F. Supp. 1201 (D. Colo. 1984) (same); Atlantic Richfield Co. v. Misty Prods, Inc., 820 S.W.2d 414, 420 (Tex. Ct. App. 1992) ("As a matter of law, a parent corporation cannot conspire with its fully owned subsidiary.") (citing Copperweld, 467 U.S. at 777; Deauville Corp. v. Federated Dep't Stores, Inc., 756 F.2d 1183, 1192 (5th Cir. 1985)).

Here, each act assertedly undertaken by WorldCom and Intermedia in furtherance of their alleged conspiracy occurred after the July 2001 merger of those corporations. See Undisputed Facts ¶¶ 12-15. Accordingly, Parus Holdings' claim of conspiracy fails as a matter of law.

**Tortious Interference.** Parus Holdings' claim for tortious interference with a contractual relationship also fails as a matter of law. A parent company cannot be liable for interference with a contract of its subsidiary because the financial interests of both entities are so closely aligned that they are viewed as being the same entity when analyzing a claim for tortious interference. See Boulevard Assoc. v. Sovereign Hotels, Inc., 72 F.3d 1029, 1036 (2d Cir. 1995) (citing multiple cases supporting the proposition that a "parent company does not engage in tortious conduct when it directs a wholly-owned subsidiary to breach a contract that is no longer in the subsidiary's economic interest to perform."); Texas Taco Cabana, L.P. v. Taco Cabana of N. M., Inc., 304 F. Supp. 2d 903, 912 (W.D. Tex. 2003) ("As a matter of law, a parent corporation is incapable of tortiously interfering with its subsidiary's contracts. A parent and its subsidiary are so closely aligned in business interests as to render them, for tortious interference purposes, the same entity." (internal citations omitted)); Battenfield of Am. Holdings, Inc. v.

A 01223

Baird, Kurtz & Dobson, No. 97-2336-JWL, 1999 WL 232915, at *4 (D. Kan. Feb. 5, 1999); Starcom, Inc. v. U.S. Telecom, Inc., Civ. A. No. 87-2540-V, 1991 WL 279291, at *3 (D. Kan. Dec. 11, 1991) (two subsidiaries of a common parent corporation cannot, as a matter of law, tortiously interfere with each other's contracts); Record Club of Am., Inc. v. United Artists Records, Inc., 642 F. Supp. 925, 943 (S.D.N.Y. 1986) (citing Felsen v. Sol Café Mfg. Corp., 249 N.E.2d 459, 461 (N.Y. 1969) (parent has privilege of interfering with contract of subsidiary and third party)), *vacated on other grounds*, 890 F.2d 1264 (2d Cir. 1989).

### D. Parus Holdings' Deceptive Trade Practices Claims Fail as a Matter of Law

Claimant alleges that Intermedia and WorldCom engaged in "unfair and deceptive trade practices." Ex. B, Parus Opposition at 3, ¶¶ 4, 5, 15, 53, 54. Arizona, Mississippi and Florida law regarding unfair and deceptive practices is statutory. See Arizona Consumer Fraud Act, A.R.S. § 44-1522; Mississippi Consumer Protection Act, Miss. Code Ann. § 75-24-5; Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 et seq.

Arizona's Consumer Fraud Act makes it illegal to commit fraud or deception "in connection with the sale or advertisement of any merchandise." A.R.S. § 44-1522. "The clear intent of this provision is to protect unwary buyers from unscrupulous sellers." Sutter Home Winery, Inc. v. Vintage Selections, Ltd., 971 F.2d 401, 407 (9th Cir. 1992); Enyart v. Transamerica Ins. Co., 985 P.2d 556, 563 (Ariz. Ct. App. 1999) ("The Consumer Fraud Act is a broadly drafted remedial provision designed to eliminate unlawful practices in merchant-consumer transactions.") (citation omitted).

The Mississippi Consumer Fraud Act prohibits specific acts or practices "in the conduct

11

of any trade or commerce.[7] Miss. Code Ann. § 75-24-5. The Florida Deceptive and Unfair Trade Practices Act also makes it illegal to commit unfair or deceptive acts in the conduct of trade or commerce. Fla. Stat. § 501.204. "Trade or commerce" means "the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property . . ." Fla. Stat. § 501.203(8).

Claimant alleges that Intermedia and WorldCom engaged in unspecified deceptive trade practices related to Intermedia's alleged breach of the UC Contract. That allegation, however, fails as a matter of law because:

- EffectNet was not a "buyer" of services, it was the seller. Ex. A, UC Contract

- Intermedia was not the "seller" of anything to EffectNet. Id.

- WorldCom was not a party to the 2000 UC Contract. Id.

Moreover, neither Intermedia nor WorldCom engaged in any of the acts prohibited by the Arizona, Mississippi or Florida Acts, nor are they alleged to have done so. Consequently,

---

[7] The Mississippi Act specifically prohibits the following acts and practices:
    (a) Passing off goods or services as those of another;
    (b) Misrepresentation of the source, sponsorship, approval, or certification of goods or services;
    (c) Misrepresentation of affiliation, connection, or association with, or certification by another;
    (d) Misrepresentation of designation of geographic origin in connection with goods or services;
    (e) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have;
    (f) Representing that goods are original or new if they are reconditioned, reclaimed, used, or secondhand;
    (g) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;
    (h) Disparaging the goods, services, or business of another by false or misleading representation of fact;
    (i) Advertising goods or services with intent not to sell them as advertised;
    (j) Advertising goods or services with intent not to supply reasonably expected public demand, unless the advertisement discloses a limitation of quantity;
    (k) Misrepresentation of fact concerning the reasons for, existence of, or amounts of price reductions;
    (l) Advertising by or on behalf of any licensed or regulated health care professional which does not specifically describe the license or qualifications of the licensed or regulated health care professional.
Miss. Code Ann. § 75-24-5.

12

A 01225

EffectNet cannot maintain an action under the Arizona, Mississippi or Florida Acts and, therefore, Parus Holdings' claims fail as a matter of law.

### E. Parus Holdings' Claim of Breach of an Implied Covenant of Good Faith Fails as a Matter of Law

Claimant alleges that Intermedia breached an implied covenant of good faith and fair dealing when it allegedly acted in concert with WorldCom to breach the UC Contract. Ex. B, Parus Opposition at 3, ¶ 4 and 15, ¶ 53.

It is well settled that Arizona law implies a covenant of good faith and fair dealing in every contract. Enyart v. Transamerica Ins., Co., 985 P.2d 556, 561, ¶ 14 (Ariz. 1998) (citing Rawlings v. Apodaca, 726 P.2d 565 (Ariz. 1986)). "The essence of that duty is that neither party will act to impair the right of the other to receive the benefits which flow from their agreement or contractual relationship." Rawlings, 726 P.2d at 570. "[T]he relevant inquiry always will focus on the contract itself, to determine what the parties did agree to." Id. (quoting Wagenseller v. Scottsdale Mem'l Hosp., 710 P.2d 1025, 1040 (Ariz. 1985). "A party may breach an express covenant of a contract without breaching the implied covenant of good faith and fair dealing." Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund, 39 P.3d 12, 29 (Ariz. 2002) (citations omitted). Intermedia did not act in bad faith or breach any implied covenant. After the acquisition by WorldCom, it merely followed a court order. See Ex. C, Final Judgment at 5-6.

In any event, even if Intermedia breached the implied covenant of good faith and fair dealing, the remedy for such breach is on the UC Contract itself.[8] Rawlings, 726 P.2d at 574

---

[8] Parus Holdings is not entitled to tort damages for this claim. Under Arizona law a party may not bring an action in tort claiming damages for a breach of the implied covenant of good faith and fair dealing unless there exists a "special relationship . . . arising from elements of public interest, adhesion, and fiduciary responsibility." Burkons v. Ticor Title Ins., 813 P.2d 710, 720 (Ariz. 1991). The two most important factors in determining whether a tort action for bad faith will lie are "(1) whether the plaintiff contracted for security or protection rather than for profit or commercial advantage, and (2) whether permitting tort damages will provide a substantial deterrence against breach

(citing Wagenseller, 710 P.2d at 1038).  As discussed *infra*, the UC Contract provides specific remedies for an alleged breach and any damages are limited to contractual damages.

### III. The UC Contract Limits Parus Holdings' Damages for Breach of Contract to $460,422.30

Pursuant to the UC Contract, Arizona law governs Parus Holdings' contract claims.  Ex. A, UC Contract at 10, § 12.3; Undisputed Fact ¶ 6; see Finucane v. Interior Constr. Corp., 695 N.Y.S.2d 322, 324-25 (N.Y. App. Div. 1999) (New York courts enforce contractual choice of law provisions if state selected has reasonable relationship to contract and selected laws do not violate a fundamental public policy of New York).  Under Arizona law, "the plain language of the contract must control." Campisano v. Phillips, 547 P.2d 26, 30 (Ariz. Ct. App. 1976).  Contracts are given a reasonable construction "so as to accomplish the intention of the parties." Harris v. Harris, 991 P.2d 262, 265 (Ariz. Ct. App. 1999).  A contract is "to be read in light of the parties' intentions as reflected by their language and in view of all circumstances; if the intention of the parties is clear from such a reading, there is no ambiguity." Id.  A contract is not ambiguous just because the parties disagree about its meaning. Chandler Med. Bldg. Partners v. Chandler Dental Group, 855 P.2d 787, 791 (Ariz. Ct. App. 1993).  Instead, language is only ambiguous when it can reasonably be construed to have more than one meaning. State ex re. Goddard v. R.J. Reynolds Tobacco Co., 75 P.3d 1075, 1078 (Ariz. Ct. App. 2003).  Whether contract language is reasonably susceptible to more than one interpretation is a question of law for the Court.  Hartford v. Indus. Comm'n of Ariz., 870 P.2d 1202, 1207 (Ariz. Ct. App. 1996);

---

by the party who derives a commercial benefit from the relationship." Dodge v. Fid. & Deposit Co. of Md., 778 P.2d 1240, 1242 (Ariz. 1989).  EffectNet did not have a "special relationship" with Intermedia.  The UC Contract was between two commercial enterprises that pursued their respective business interests:  public interest was not involved, no element of adhesion was present, no fiduciary relationship existed between the parties and neither security nor protection was the subject of the contract.  Absent a special relationship, and there is none here, EffectNet's claims sound in contract, not tort.  Wells Fargo Bank v. Ariz. Laborers, Teamsters, 38 P.3d 12, 29 (Ariz. 2002).

A 01227

L.K. Comstock & Co., Inc. v. United Eng'rs & Constructors, Inc., 880 F.2d 219, 221 (9th Cir. 1989) (applying Arizona law).

### A. The UC Contract was Terminated on April 12, 2002

On March 12, 2002, pursuant to Section 5.2 of the UC Contract, EffectNet gave notice of default to Intermedia.[9] Undisputed Facts ¶ 16. The March 12, 2002 letter from Robert C. McConnell, General Counsel of EffectNet, to Rich Black of Intermedia specifically stated:

> EffectNet hereby gives Intermedia written notice of default under Section 5.2 of the Agreement with respect to the Intermedia Defaults and EffectNet further hereby gives Intermedia written notice that EffectNet may (i) terminate the Agreement under Section 5.2 due to the default effective thirty (30) days after this written notice if each of the Intermedia Defaults has not been cured within such thirty (30) days.

Ex. D, March 12, 2002 letter from Richard C. McConnell; Undisputed Facts ¶ 16. On March 25, 2002, EffectNet's General Counsel confirmed termination of the UC Contract in his letter to Brett Bacon of MCI/WorldCom, in which he stated:

> EffectNet, by letter to the attention of Mr. Rich Black, dated March 12, 2002, issued a written notice of default under Section 5.2 of the Agreement with respect to the Intermedia Defaults, as defined in the March 12, letter ("March 12 Letter"). I understand from you that Mr. Black referred the March 12 Letter to your attention upon receipt. As you know, the Agreement in Section 5.2 provides that "[t]ermination due to default under this Section shall be effective thirty (30) days after written notice of the defaulting Party if the default has not been cured within such thirty (30) day period." Accordingly, <u>the Agreement will be terminated for default by Intermedia on or about April 12, 2002 if the Intermedia Defaults are not cured prior thereto</u>.

---

[9] Section 5.2 of the UC Contract provides:
> Either party may terminate this Agreement: (a) if the other Party fails to fulfill any of its material obligations under this Agreement; (b) if the other parties are in breach of Section 7 (Confidentiality); (c) if the other Party becomes insolvent or admits in writing its inability to pay debts as they mature, or makes an assignment for the benefit of creditors; or (d) if a petition under any foreign, state or United States bankruptcy act, receivership statute, or the like is filed by the other Party and is not dismissed within sixty (60) days after such filing. <u>Termination due to default under this Section shall be effective thirty (30) days after written notice to the defaulting Party if the default has not been cured within such thirty (30) day period.</u>

Ex. A, UC Contract § 5.2 (emphasis added); Undisputed Facts ¶ 18.

A 01228

Ex. E, March 25, 2002 letter from Richard C. McConnell (emphasis added); Undisputed Facts ¶ 17.

Section 5.2 of the UC Contract unambiguously states that termination due to default "shall be effective" thirty days after written notice. Ex. A, UC Contract § 5.2; Undisputed Facts ¶ 18. EffectNet clearly understood this to be the case as evidenced by the words of its own General Counsel advising that the UC Contract "will be terminated . . . on or about April 12, 2002" unless Intermedia cured its defaults. Undisputed Facts ¶ 17. It is also undisputed that Intermedia did not cure its defaults. Id. ¶ 19. Accordingly, the UC Contract was terminated on April 12, 2002, thirty days after EffectNet's notice of default.

### B. The UC Contract Limits Liability to Obligations That Accrued Before Termination on April 12, 2002

EffectNet's termination of the UC Contract triggered Section 5.3 of the UC Contract, which provides that upon termination of the Agreement for any reason, "<u>each Party shall remain liable for those obligations that accrued prior to the date of such termination</u>." Ex. A, UC Contract § 5.3 (emphasis added); Undisputed Facts ¶ 20. Accordingly, pursuant to the plain language of Section 5.3, Intermedia remained responsible only for those obligations that accrued prior to April 12, 2002 – the date of termination. Under Arizona contract construction rules, by the parties' provision in the UC Contract that each would remain liable for obligations which accrued prior to the date of termination, the parties excluded other forms of liability that might be applicable. <u>Herman Chanen Constr. Co. v. Guy Apple Masonry Contractors, Inc.</u> 453 P.2d 541, 543 (Ariz. App. 1969) (applying the doctrine of *Expressio unius est exclusion arterius* to limit indemnification to class of employees named in contract, excluding other employees not named). This interpretation of Section 5.3 is also consistent with Section 11 of the UC Contract which precludes liability of either contracting party for "incidental, indirect, special, punitive,

consequential or similar damages of any kind."

### C. Under the Terms of the UC Contract, the Maximum Revenue Due Parus Holdings Equals $460,422.30

The amounts accrued prior to April 12, 2002 include the adjusted amounts for three past-due invoices (charges for December, 2001 and January and February, 2002), and the minimum commitment amount for March, 2002. The minimum commitment provision of the contract obligated Intermedia to deliver 10,000 subscribers per month starting December 18, 2001. Ex. A, UC Contract § 2.12. The so-called "reconciliation" provision of the contract provided that if Intermedia failed to deliver the minimum commitment for a month, it must pay a reconciliation payment for the shortfall "equal to the volume Shortfall multiplied by the base monthly price applicable to the Intermedia UC Service per subscriber." Id. § 2.13 (emphasis added). Appendix P (Pricing) to the UC Contract provided two pricing options: "Basic" at a rate of $11.45 per month, and "Unlimited" at a rate of $27.40 per month. Ex. P (Pricing), attached to Ex. A, UC Contract. Applying the basic – or base – rate, the upper limit of Intermedia's obligation – accrued amounts from December 18, 2001 to April 12, 2002 – are as follows:

| BILLING CYCLE | DAMAGES |
|---|---|
| December 2001 (unpaid invoice #1010 – adjusted to $11.45 for shortfall of 9,953) | $115,270.70 |
| January 2002 (unpaid invoice #1011 – adjusted to $11.45 for shortfall of 9953) | $115,270.70 |
| February 2002 (unpaid invoice #1018 – adjusted to $11.45 for shortfall of 9958) | $115,400.90 |
| March 2002 (one month at $11.45 for 10,000) | $114,500.00 |
| TOTAL | $460,442.30 |

Undisputed Facts ¶¶ 21-25.

A 01230

## CONCLUSION

Parus Holdings, through Claim Nos. 11242 and 11173, attempts to transform a relatively straightforward breach of contract claim into numerous torts claims.  The UC Contract expressly precludes claimant from recovering consequential or other similar damages from Intermedia, and claimant's tort and statutory claims fail as a matter of law.  Further, contract damages allowable as a matter of law are limited to amounts accrued prior to April 12, 2002.  For these reasons, WorldCom requests that this Court grant summary judgment against Parus Holdings, dismissing its statutory and tort based claims and limiting its recovery for breach of contract to the amount provided by the parties' contract, to wit:  $460,442.30.

Respectfully submitted,

STINSON MORRISON HECKER LLP


By:   *s/Robert L. Driscoll*
      Robert L. Driscoll, Esq.
      Allison M. Murdock, Esq.
      Jodi M. Hoss, Esq.
      1201 Walnut Street, Suite 2800
      Kansas City, MO  64106
      (816) 842-8600 – Telephone
      (816) 691-3495 – Facsimile

ATTORNEYS FOR REORGANIZED DEBTORS

## CERTIFICATE OF SERVICE

      I hereby certify that on October 18, 2005, I electronically filed the foregoing with the Clerk of the Bankruptcy Court using the CM/ECF system which sent notification of such filing to all parties receiving electronic means.

                                                    *s/Robert L. Driscoll*
                                              Attorney for Reorganized Debtors

A 01232