**KELLEY DRYE & WARREN LLP**
John M. Callagy (JC 8166)
Robert S. Friedman (RF 1538)
101 Park Avenue
New York, New York  10178
Tel:  (212) 808-7800
Fax: (212) 808-7897
Attorneys for Claimant Parus Holdings, Inc.
Successor-By-Merger to EffectNet, Inc. and
EffectNet, LLC

**Hearing Date: December 6, 2005 at 10:00 a.m.**
**Reply Deadline: December 2, 2005 at 4:00 p.m.**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>WORLDCOM, INC., *et al.*,<br><br>                    Debtors. | Case No. 02-13533 (AJG)<br><br>Chapter 11<br><br>(Jointly Administered) |

**CLAIMANT PARUS HOLDINGS, INC.'S RESPONSE AND**
**OPPOSITION TO DEBTORS' MOTION FOR SUMMARY JUDGMENT**

**TO:   THE HONORABLE ARTHUR J. GONZALEZ, UNITED STATES**
**BANKRUPTCY JUDGE:**

Claimant Parus Holdings, Inc., Successor-By-Merger to EffectNet, Inc. and

EffectNet, LLC ("Claimant", "EffectNet" or "Parus"), by and through its attorneys, Kelley Drye

& Warren LLP, submits this response and opposition to the above-captioned Debtors'

("Debtors" or "Intermedia" or "WorldCom") Motion for Summary Judgment on Claim Nos.

11242 (replacing 9291) and 11173 (replacing 9293) (the "Motion").

**PRELIMINARY STATEMENT**

Debtors' Motion is a tactical maneuver born of desperation.  Realizing that they

have an admitted breach of contract with significant exposure on the contract and torts claims,

Debtors have posited a last ditch effort to avoid their discovery obligations under the law.  They

A 01233

attempt to offer an "easy" way out in a complex commercial case with sharp factual issues. Debtors' attempts fail, however, as the Motion ignores established precedent, especially considering the pre-discovery status of the case. The only undisputed fact is that Debtor Intermedia Communications, Inc. ("Intermedia") breached the Unified Communications Services General Agreement, dated as of November 20, 2000 ("UC Contract"), and caused significant damage to Parus.

Debtors' interpretation of the law underlying Parus' claims is just plain wrong. Debtors ignore authority directly contrary to their arguments and exceptions to the "general rules" they cast as absolute barriers to Parus' claims. Moreover, Debtors' arguments ignore the fact that WorldCom and Intermedia were totally distinct entities during the time period most crucial to Parus' tort claims: the months leading up to the merger of those companies – September 2000 through July 2001. As Parus alleges in its Response and Opposition to Debtors' Objection to Parus' Claims, dated and filed on July 30, 2004 (Parus' "Opposition"), the conduct of WorldCom and Intermedia which gave rise to Parus' claims includes actions "on or before July 1, 2001". Opposition at ¶ 15. Accordingly, the entire premise for Debtors' motion with respect to the conspiracy and tortious interference claims fails as a matter of law.

Further, Debtors advance a theory that Intermedia's assets were "divested" pursuant to a court order, not because of anything unlawful or improper done by WorldCom. However, Debtors' attempt to hide behind the Court's Order is belied by the very order Debtors purport to rely on. Under the terms of that order, WorldCom was directed to refrain from doing anything to "impede in any way the operation, sale, or divestiture" of the "Intermedia Assets", which the order defines to include the UC Contract at issue. (*See* Ex. C to Debtors' Motion (the

A 01234

"Antitrust Order") at ¶¶ (II)(F); (IV)(F)). In other words, the Antitrust Order prohibited – not enabled – WorldCom's meddling in the UC Contract.

Similarly, Debtors' attempt to extricate themselves from an admitted and intentional contract breach fails on its face. The UC Contract actually provides for direct damages of more than $6,000,000 in minimums that Intermedia was obligated to meet and well in excess of $6 million for the benefit of Parus' bargain and the lost value of the UC Contract. (See Ex. F to Reneau Aff. at §§ 2.12, 5.1). Neither of these direct damages are limited by the so-called limitation of liability clause contained in the UC Contract. Even assuming this provision is enforceable, which is highly questionable, it does not preclude direct or benefit-of-the-bargain damages, which is what Parus seeks on its breach of contract claims.

Debtors' Motion is little more than another attempt to evade their discovery obligations. It is patently obvious that Debtors' motion was filed for purely tactical purposes. Debtors claim that the Motion raises legal issues that do not require discovery. If this is the case, then Debtors have no explanation for waiting two and a half years from Parus' proof of claim to file this Motion. The only thing that changed in this time period was Debtors' obligation to engage in discovery and Parus seeking to hold Debtors to their discovery obligations.

## SUMMARY OF FACTS PERTINENT TO PARUS' RESPONSE AND OPPOSITION

### EffectNet and its Relationship With Intermedia

After several months of exploratory activities and negotiations, in or about August 2000, EffectNet, and Intermedia Communications, Inc. ("Intermedia") entered into a Memorandum of Understanding pursuant to which EffectNet agreed to provide communications services to Intermedia, including unified communications services, for ultimate use by

A 01235

Intermedia's end-user customers. (*See* Reneau Aff. at ¶¶ 5, Ex. A)[1]. The Memorandum of Understanding between EffectNet and Intermedia was the start of a collaborative effort to launch EffectNet's unified communications service and applications into Intermedia's customer distribution channels. (Reneau Aff. at ¶ 6).

Intermedia was a provider of integrated data and voice telecom, internet access and local and long-distance phone services to approximately 90,000 small and medium sized businesses. (Reneau Aff. at ¶ 7, Ex. B) The unified communications service and applications provided by EffectNet was ultimately to be bundled into a product called Intermedia*One*, and sold to Intermedia's customer's through Intermedia's network of sales representatives in 50 cities of the United States. (Reneau Aff. at ¶ 7, Ex. C). It was EffectNet's understanding from conversations with Intermedia personnel that Intermedia believed the product would be hugely successful, so by January 2001, it had separated EffectNet's unified communications service and applications into a product separate from Intermedia*One*, which was called "Intermedia Unified Messaging" (otherwise referred to hereinafter as EffectNet's Service).

Intermedia Unified Messaging was the first Web and telephone based unified messaging platform offered by a major U.S. service provider and allowed business professionals to custom build a communications portal that retrieved and sent fax, e-mail and telephone messages through any device, with the help of a virtual assistant. (Reneau Aff. ¶ 8, Ex. D). EffectNet's unified communications service applications powered Intermedia's Unified Messaging product and was the integral component for it.

---

[1]    "Reneau Aff." refers to the Affidavit of Taj Reneau in Support of Claimant Parus Holdings, Inc.'s Response and Opposition to Debtors' Motion for Summary Judgment, sworn to on November 18, 2005.

A 01236

On September 1, 2000, EffectNet and Intermedia entered into an Interim Agreement, pursuant to which EffectNet continued to provide unified communications service provided under the Memorandum of Understanding.  (Reneau Aff. ¶ 9, Ex. E)

**UC Contract**

On November 20, 2000, EffectNet and Intermedia entered into the Unified Communications Services General Agreement ("UC Contract") pursuant to which EffectNet agreed to provide, and Intermedia agreed to use and sell to end-user customers, a platform of telecommunications services.  (Reneau Aff. ¶ 10; Ex. F at first Whereas Clause and § 1.1 [PH00563-576]).  The term of the contract was three years.  The UC Contract was the culmination of the parties' efforts since August 2000 to work together to launch the unified communications service applications provided by EffectNet.

The UC Contract had an initial launch date of December 18, 2000, and the three-year term ran to December 2003. (Reneau Aff. ¶ 11, Ex. F at §§ 1.3, 5.1).

Pursuant to the UC Contract, EffectNet promised to do what it had been doing under the Memorandum of Understanding and Interim Agreement:  provide private label internet and telecommunications products and services, including unified communications and other value added services, in-house customer services, billing and technical support.  (Reneau Aff. ¶ 12, Ex. F).

In return, Intermedia contracted to supply the customer accounts who would use the product, pay Intermedia, and Intermedia would then pay EffectNet.  (Reneau Aff. ¶ 13; Ex. F, § 2.12-2.13).

Intermedia agreed to deliver a minimum number of accounts over specific time frames, including up to 10,000 current active account subscribers by December 2001 and,

A 01237

thereafter, through the remainder of the Initial Term, December, 2003. (Reneau Aff. ¶ 14, Ex. F, § 2.12). Intermedia also agreed that if it failed to meet its Minimum Commitment, it was obligated to pay EffectNet a "Reconciliation Payment" equal to the "Volume Shortfall multiplied by the base monthly price applicable to the Intermedia UC Service per subscriber". (Reneau Aff. ¶ 14, Ex. F, § 2.12 – 2.13).

The only price negotiated as the "base monthly price" was the "Unlimited Service" rate of $27.40. (Reneau Aff. at ¶ 15). This is the price the parties intended to be used for the calculation of Minimum Commitment and Reconciliation Payment. (*Id.*) The "Basic Service" was included in Appendix P merely as an expedient service for those few end-users or customers that just wanted to try the UC Service on a temporary or initial basis. (*Id.*) Indeed, the parties intended to use the Basic Service only as an introductory low-price marketing option for customers who were primarily testing or trialing the service. (*Id.*) Further, the Basic Service only appeared inexpensive because of the $11.45 monthly fee but because all inbound minutes were charged at 10 cents per minute, the Basic Service would in fact be more expensive to a customer in almost all cases because the Unlimited Service did not charge for inbound minutes of use. (*Id.*) The expected actual minute usage for almost all customers made the Unlimited Service economically more compelling than the Basic Service. (*Id.*)

In fact, the typical customer of equivalent services provided by EffectNet and Webley averaged between roughly 300 and 400 minutes of usage per month. For example, a customer of the Basic Service with only 250 inbound minutes of usage per month would pay not only the fixed base monthly price of $11.45 but would also pay 10 cents per inbound minute of usage, or a total of $27.40 per month. (*Id.*) By contrast, the Unlimited Service included all inbound minutes of usage without charge and, therefore, customers averaging more than 250

A 01238

inbound minutes of usage per month would save money with the Unlimited Service and would be economically compelled to make that decision. (*Id.*)

In addition, the statement "base monthly price" was used by the parties and understood to mean the fixed monthly fee in contrast to the variable usage-based per minute pricing in the $27.40 "Unlimited Service" price plan. (Reneau Aff. at ¶ 16). Here "base" served to distinguish between fixed monthly fees and variable usage based fees--a commonly understood distinction and phraseology in the telecommunications industry. (*Id.*) The word "base" never had anything to do with the term "Basic" as applied to the Pricing as either "Unlimited Service" or "Basic Service" for accounts as between EffectNet and Intermedia. (*Id.*) Thus, the "Unlimited Service" rate of $27.40 was to be the base monthly price used in calculating any Reconciliation Payment. (Reneau Aff. at ¶ 16).

This "take or pay" provision is common in the telecommunications industry, requiring Intermedia to supply a guaranteed minimum number of customers each month. (Ex. F, §§ 2.12-2.13). (Reneau Aff. at ¶ 18).

During the entire term of the UC Contract, including in 2000, 2001, and 2002, EffectNet performed all of its material obligations under the UC Contract. (Reneau Aff. at ¶ 19).

**EffectNet Devotes Its Resources to Intermedia**

The roll-out for the unified communications service applications began in September 2000 and continued through December 2000, in at least 20 markets. (Reneau Aff. at ¶ 20, Ex. C at 20). The roll-out schedule encompassed and included extensive training by EffectNet of Intermedia sales staff in each market. EffectNet also trained Intermedia's customer care group during this roll-out period. (Reneau Aff. at ¶ 20, Ex. G).

A 01239

EffectNet trained hundreds of Intermedia's sales staff in the different markets during this roll-out period and included the establishment of a technical facility for training sales staff and customer care staff (Reneau Aff. at ¶ 21, Ex. G), and the preparation of an EffectNet training manual and curriculum.  (Reneau Aff. at ¶ 21, Ex. H)

During September 2000 to December 2000, there were approximately 50 Intermedia personnel actively engaged in this project.  (Reneau Aff. at ¶ 22, Ex. I).  In addition, there were 10 Intermedia*One* team leaders for different areas, including Jim Renforth, Marketing – Senior Product Manager; Sherrie Baughman, Marketing – Senior Product Manager; Wanda Friend, Senior Manager – Customer Care; Carol Vigor, Customer Billing Operations Manager; Theresa Blake, Sales Operations – Account Consulting; Donna Serdinak, Billing Operations; Jhan West, Sales Operations Manager; Len Jasczak, HR-Training; Brian Pruitt, Network Operations; and Jack Kerrigan, Program Manager.  (Reneau Aff. at ¶ 22, Ex. J)

Intermedia provided multiple forecasts to EffectNet, including one in November 2000, which forecasted that by the end of 2001 Intermedia would have 10,000 active accounts. (Reneau Aff. at ¶ 23, Ex. K-L)

EffectNet relied on these forecasts and devoted considerable resources to the unified communications service application.  EffectNet committed and invested significant personnel and technology resources to this project.  (Reneau Aff. at ¶ 24)  Indeed, EffectNet dedicated approximately one-third of its total workforce, including its lead Project Manager, Javid Freeman,  to the Intermedia project.  Mr. Freeman and others were devoted full-time to this project.  They created, structured  and organized EffectNet's unified communications service applications to meet Intermedia's needs, on a daily basis.  Further, EffectNet established a training facility and curriculum for Intermedia sales and customer care staff for multiple full-day

A 01240

training sessions. (Reneau Aff. at ¶ 24, Ex. M). EffectNet also provided a 24-hour, 7-day per week technical support center that occupied approximately 10,000 square feet out of about 17,000 total square feet of EffectNet office space. This technical support center was fully furnished with cubicles offering customer care seating for over 100 representatives and was intended to support the expected Intermedia business. (Reneau Aff. at ¶ 24)

This incredible commitment of resources was extremely expensive, both in out of pocket costs and in diversion of professionals. The cost of the ramp-up, training, and project management by EffectNet was significant in time, employees and cost.

**Intermedia Ceased Performance of Its Material Obligations Under the UC Contract**

In July 2001, Intermedia's Jack Kerrigan informed EffectNet that there would be no new customers at that time. (Reneau Aff. at ¶ 26, Ex. N). Indeed, even as early as January 2001, EffectNet noticed that Intermedia was only opening accounts for Intermedia sales representatives and certain Intermedia executives. (Reneau Aff. at ¶ 26).

Also in July 2001, Intermedia fired Jim Renforth, who was the Intermedia-EffectNet point person on the UC Contract. (Reneau Aff. at ¶ 27, Ex. O at S.319). Parus was informed that at the same time, dozens of Intermedia employees who had also been working exclusively on the UC Contract were either fired or reassigned to unrelated departments. (Reneau Aff. at ¶ 27)

Parus was further informed at that time that hundreds of sales personnel – who had been trained by EffectNet to provide support under the UC Contract – were told to stop working on the project. (*Id.*)

In July and September 2001, Intermedia cancelled about 94% of the accounts. At this time, only approximately 47 accounts remained open and these were exclusively for

A 01241

Intermedia employees. (Reneau Aff. at ¶ 29, Ex. P). In fact, by September 2001, Debtors pulled the IntermediaOne (including the EffectNet applications) from over 25 markets. (Ex. Y to Friedman Decl.)

The last payment made by Intermedia for these remaining 47 accounts was on December 7, 2001, for $15,616.92. Since that time, Intermedia failed, and has continued to fail, to make any obligated payments under the UC Contract, with respect to either its outstanding invoices or Minimum Commitment. (Reneau Aff. at ¶ 30).

In March 2002, Jim Faust, the new Project Manager for Intermedia, demanded cancellation of all remaining accounts, also contrary to Intermedia's obligations under the UC Contract. (Reneau Aff. at ¶ 31; Ex. Q). As of March 2002, invoices for the December 2001, and January and February 2002 billing periods had not been paid. (Reneau Aff. at ¶ 31; Ex. R).

On March 12, 2002, Robert McConnell, EffectNet's General Counsel wrote to Intermedia advising Intermedia of the breach of its obligations under the UC Contract by failing to meet the Minimum Commitment of accounts, and failing to pay outstanding invoices, at that time totaling $548,087.25. (Reneau Aff. at ¶ 32, Ex. R; McConnell Aff. at ¶ 5[2], Ex. A). Mr. McConnell wrote another letter to Intermedia on March 25, 2002 advising of the continued breach of Intermedia's Minimum Commitment obligations, and its increased outstanding invoice obligations of $827,844.27. (Reneau Aff. at 32; McConnell Aff. at ¶ 6, Ex. B).

After EffectNet received no response from Intermedia, EffectNet ceased performing for Intermedia under the UC Contract.

---

[2]     "McConnell Aff." refers to the Affidavit of Robert C. McConnell in Support of Claimant Parus Holdings, Inc.'s Response and Opposition to Debtors' Motion for Summary Judgment, sworn to on November 18, 2005.

A 01242

**The Minimum Amount Owed by Intermedia to EffectNet is the Reconciliation Payment Plus Outstanding Invoices**

Almost all (97.74%) of the customer end-user accounts that were opened in 2000 and 2001, were the "Unlimited Service" at a fixed monthly rate of $27.40 per account (as opposed to $11.45). (*See, e.g.* Reneau Aff. at ¶ 39, Ex. P). In addition, Debtors never objected contemporaneously to the invoices submitted using the Unlimited Service rate. (*See, e.g.*, Reneau Aff. at ¶ 39, Exs. P & BB).

During the December 2001 billing cycle, 46 out of 47 of then-active mailboxes being supplied to EffectNet under the UC Contract were "Unlimited Service" mailboxes, which were billed at $27.40 per month, as opposed to "Basic Service" mailboxes. (Reneau Aff., Ex. CC, Ex. F, Appendix P).

The Volume Shortfall during the December 2001 billing cycle was 9,953 accounts. (*Id.*). That Volume Shortfall (9,953) multiplied by the "Unlimited Service" rate of $27.40 equals $272,712.20. (*Id.*). The total amount due EffectNet during the December 2001 billing cycle was $274,021.05. (Reneau Aff., Ex. CC).

During the January 2002 billing cycle, 46 out of 47 of then-active mailboxes being supplied to EffectNet under the UC Contract were again "Unlimited Service" mailboxes, which were billed at $27.40 per month, as opposed to "Basic Service" mailboxes. (Reneau Aff., Ex. DD, Ex. F, Appendix P). The Volume Shortfall during the January 2002 billing cycle was 9,953 accounts. (Reneau Aff., Ex. DD). That Volume Shortfall (9,953) multiplied by the "Unlimited Service" rate of $27.40 equals $272,712.20. (*Id.*). The total amount due EffectNet during the January 2002 billing cycle was $274,066.20. (*Id.*).

During the February 2002 billing cycle, all 42 of the then-active mailboxes being supplied to EffectNet under the UC Contract were "Unlimited Service" accounts, which were

A 01243

billed at $27.40 per month, as opposed to "Basic Service" accounts. (Reneau Aff., Ex. EE). The Volume Shortfall during the February 2002 billing cycle was 9,958. (*Id.*). That Volume Shortfall (9,958) multiplied by the "Unlimited Service" rate of $27.40 equals $272,849.20. (*Id.*). The total amount due EffectNet during the February 2002 billing cycle was $279,757.02. (*Id.*).

Beginning with the March 2002 billing cycle, and for 20 months thereafter – until expiration of the term of the UC Contract – the Volume Shortfall was 10,000 customers. (Reneau Aff. at ¶ 47, Ex. F at §§ 2.12, 5.1). That Volume Shortfall for the March 2002 billing cycle (10,000) and the 20 months thereafter multiplied by the "Unlimited Service" rate of $27.40 equals $274,000.00 for March 2002, and the 20 months thereafter. (Reneau Aff., Ex. F at Appendix P). Therefore, the monthly amount due ($274,000.00) for the remainder of the term of the UC Contract, beginning in March 2002 (21 months), equals $5,754,000.00. (*Id.*).

Intermedia's obligations under the UC Contract included at a minimum, the requirements under the "take or pay" provision to meet 10,000 accounts annually. (Ex. F to Reneau Aff.). Indeed, Intermedia's forecasts expected at least 10,000 accounts annually. (Exs. L and M to Reneau Aff.). (Reneau Aff. at ¶ 48).

Accordingly, simply applying the minimum "take or pay" provisions of the UC Contract, the "Reconciliation Payment" and EffectNet's direct damages are $6,307,844.27 ($5,754,000 + $827,844.27 = $6,307,844.27) plus interest. (Reneau Aff. at ¶ 49).

**The Evidence Establishes that Intermedia and WorldCom Conspired Pre-Merger About Ceasing the UC Contract**

On September 1, 2000, Intermedia and WorldCom entered into an Agreement and Plan of Merger. (Debtors' 56.1 Stmt. at 3, 8). WorldCom consummated the acquisition of Intermedia on July 1, 2001. (*Id.*; *see also* Findings of Fact and Conclusions of Law (1) Approving (i) Substantive Consolidation and (ii) the Settlements Under Debtors' Modified

**A 01244**

Second Amended Joint Plan of Reorganization, dated October 21, 2003, and (2) Confirming

Debtors' Modified Second Amended Joint Plan of Reorganization, dated October 21, 2003 (Doc.

No. 9681) at p. 34, § II.C(i)).  From the date of the announced merger, the evidence indicates,

based on the scant production thus far, that WorldCom intended to proceed with its competing

Unified Messaging application, "genD", and shut down Intermedia's bundled product,

Intermedia*One* and Intermedia Unified Messaging.  (Friedman Decl., Exs S and V).  Indeed,

from the get go, WorldCom intended to sell off the bulk of Intermedia.  (*Id.*).

    Indeed, the actions of WorldCom and Intermedia demonstrate that they did act

together prior to the closing to shut down the competing UC Contract.  Starting in early 2001,

Intermedia effectively stopped opening new accounts.  (Reneau Aff. ¶ 26, *see also* Ex. N).

Immediately upon the closing of the merger, WorldCom fired the Intermedia-EffectNet point

person, James Renforth, disbanded the sales force that was over one hundred strong and shortly

thereafter canceled almost all of the EffectNet accounts.  (Debtors' 56.1 Stmt. at ¶ 12; Reneau

Aff. at ¶ 27).  Obviously these monumental business decisions did not occur in a vacuum and

were well planned for many months in advance.  Thus, it is clear that WorldCom, from the date

of the announced merger with Intermedia, never intended that Intermedia would go forward with

the UC Contract and acted to shut down the EffectNet product.

    Indeed, based on the limited production in this case that WorldCom and

Intermedia discussed the status of various contracts well in advance of WorldCom's acquisition

of Intermedia on July 1, 2001.  In fact, a spreadsheet entitled "Vendor Management Contracts

Status – Access & Services, revised 1/25/01", produced by Debtors, demonstrates

communications between WorldCom and Intermedia.  (Ex. Q to Friedman Decl.).  Intermedia

and WorldCom discuss in this document the EffectNet UC Contract as a "completed" contract.

A 01245

(Ex. Q to MCIW026077).[3]  Another document, dated November 21, 2000, produced by Debtors, confirms this, stating in part,

> With the announcement of the MCI/WorldCom merger, and the pending subsequent sale of the Intermedia lines of business to another organization, the need of the company for a long-term focused process has been greatly diminished.

(Ex. R to Friedman Decl. at MCIWC030868-869).

### The EffectNet/Webley Merger and Webley's Investor Pitches

On January 21, 2001, EffectNet announced a proposed merger with a company called Webley Systems, Inc. ("Webley").  (Reneau Aff. ¶ 34).

Also at this time, Webley retained Salomon Smith Barney to help raise $35 million in financing, through the private placement issuance of Series C Convertible Preferred Stock, to provide working capital, for among other things, general corporate purposes.  (Reneau Aff. ¶ 35, Ex. T).  Salomon Smith Barney conditioned any private placement financing upon the consummation of the proposed merger between EffectNet and Webley.  One of the reasons Salomon Smith Barney conditioned Webley's financing upon the merger with EffectNet was the significant forecasted customer base and revenue EffectNet would generate under the UC Contract.  In addition, Intermedia was a major business partner for EffectNet that was very compelling to prospective investors.

Salomon Smith Barney solicited potential investors at investor meetings held in April and May 2001.  One of the potential investors was WorldCom Ventures,  a WorldCom

---

[3]    Debtors concede they have produced no other documents concerning communications between WorldCom and Intermedia regarding the UC Contract, despite the fact that these documents obviously exist.  (Ex. N to Friedman Decl; WorldCom's Supplemental Response to Claimant's Motion to Compel at 8).  Notwithstanding that admission, it is clear from the spreadsheet referenced above that WorldCom and Intermedia discussed the UC Contract.  Indeed, Debtors state in their document productions that the spreadsheet is responsive to Document Request No. 18 seeking "all documents concerning communications among Debtors regarding the UC Contract."

A 01246

venture capital firm. In this regard, WorldCom Ventures received a Webley private placement memorandum in May 2001. (Reneau Aff. ¶ 36, Ex. U). The private placement memorandum included, among other things, information regarding the EffectNet UC Contract and its expected, generated revenues over the term of the contract. (Reneau Aff. ¶ 36, Ex. T). It was clear from the investor presentations that the forecasted revenues from the UC Contract were a major component to EffectNet's and Webley's "bottom line".

During the same time period, Webley was also engaged in negotiations with WorldCom for an agreement to govern licenses for certain software technology products, including Webley's session initiation protocol, or SIP, based unified communications platform for implementation of WorldCom's genD NextGeneration IP Unified Messaging/VoiceMail product. (Reneau Aff. ¶ 37, Ex. V). WorldCom's genD NextGeneration IP Unified Messaging product concerned data communications, and relied upon SIP to deliver voice and other communication data via the Internet. (Reneau Aff. ¶ 37, Exs. W-X). The agreement reached between WorldCom and Webley was called a "Master Agreement for Software Licenses," and ultimately executed as of September 14, 2001 (the "MASL"). (Reneau Aff. ¶ 37, Ex. Y).

Pursuant to commercial due diligence requests by WorldCom in connection with that negotiation, in April 2001, EffectNet and Webley made a number of disclosures to WorldCom. (Reneau Aff. ¶ 38, Ex. Z). These disclosures included, among other things, a private placement memorandum for the Series C Convertible Preferred Stock, information regarding EffectNet's pending merger with Webley and the status of the companies. (*Id*. at Ex. T). These disclosures highlighted the important role the UC Contract played in that merger, since Webley and EffectNet were anticipating earning substantial revenue through the UC Contract. (*Id*. at Ex. AA).

A 01247

**Debtors' Bankruptcy Proceedings**

On July 21, 2002 and November 8, 2002, WorldCom, Intermedia, and their various affiliates filed for voluntary chapter 11 bankruptcy protection.  On January 15, 2003, EffectNet filed its amended proofs of claim against Reorganized Debtors.  (Ex. A to Friedman Decl.).  On June 10, 2004, Reorganized Debtors filed their objection to EffectNet's claims.  (Ex. C to Friedman Decl.).  On July 30, 2004, Parus Holdings/EffectNet filed its Response and Opposition to Reorganized Debtors' Objection to Proofs of Claim.  (Ex. D to Friedman Decl.). On October 31, 2003, Debtors' Modified Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code was confirmed.  (Docket No. 9861.).

## ARGUMENT

## I.

## SUMMARY JUDGMENT IS INAPPROPRIATE

A.    Debtors Fail to Meet the Standard for Summary Judgment Because Issues of Fact Exist

Summary judgment "must be used sparingly."  *Egelston v. State Univ. College at Geneseo*, 535 F.2d 752, 754 (2d Cir. 1976).  Summary judgment is improper where it would "deprive a litigant of a full trial of genuine fact issues" or where "the existence of material fact issues is uncertain."  Wright, Miller & Kane, *Federal Practice and Procedure*: Civil 3d § 2712. "Before the court can apply the law, it must have an adequate factual basis for doing so."  *Id.* at § 2725; *see also American Mfrs. Mut. Ins. Co. v. American Broadcasting-Paramount Theatres, Inc.*, 388 F.2d 272, 279 (2d Cir. 1967); *Miller v. Gen. Outdoor Advertising Co.*, 337 F.2d 944, 948 (2d Cir. 1964) ("[T]here are instances where summary judgment is too blunt a weapon with which to win the day, particularly where so many complicated issues of fact must be resolved in order to deal adequately with difficult questions of law which remain in the case").

A 01248

On a motion for summary judgment, the movant has the burden of establishing the total absence of any genuine issue of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "In ruling on a motion for summary judgment, a court must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion." *Montana v. First Federal Sav. and Loan Ass'n of Rochester*, 869 F.2d 100, 103 (2d Cir. 1989); *see also Hill v. A-T-O Inc.*, 535 F.2d 1349, 1354 (2d Cir. 1976).

Where there is the "slightest doubt" as to the existence of a genuine issue of material fact, summary judgment is improper. *Arnstein v. Porter*, 154 F.2d 464, 468 (2d Cir. 1946). Summary judgment is improper also where existing evidence is subject to conflicting interpretations, *Empire Electronics Co. v. U.S.*, 311 F.2d 175, 180 (2d Cir. 1962), and "[i]t is especially important to observe the procedural requirements respecting summary judgment and to afford the opposing party a fair opportunity to conduct such discovery as may be necessary when evidence of motivation on the part of the movant is of critical importance." Wright, Kane, & Miller at § 2728; citing *Lavin v. Illinois High School Ass'n*, 527 F.2d 58, 61 (7th Cir. 1975). To that end, "summary judgment is ordinarily inappropriate where intent and state of mind are at issue." *Montana*, 869 F.2d at 103; *Patrick v. LeFevre*, 745 F.2d 153, 159 (2d Cir. 1984).

Furthermore, courts routinely deny summary judgment where – as here – discovery is not yet complete. *See, e.g., Burroughs Wellcome Co. v. Commercial Union Ins. Co.*, 632 F. Supp. 1213 (S.D.N.Y. 1986) (incomplete discovery precludes summary judgment, even if majority of new discovery would be irrelevant); *Sanders v. Quikstak, Inc.*, 889 F. Supp. 128, 130 (S.D.N.Y. 1995) (summary judgment denied where nonmovant demonstrated reasonable expectation that continued discovery would reveal genuine issue of material fact). Indeed, summary judgment is rarely granted prior to the end of discovery. *Diversified Carting, Inc. v.*

A 01249

*City of New York*, No. 04CIV9507HB, 2005 WL 1950135, *12 (S.D.N.Y. Aug. 15, 2005).

Rather, summary judgment "should only be entered on the ground that the nonmovant's proof is

insufficient when the nonmovant has had an adequate opportunity to conduct discovery", and

"[t]he court should not permit the nonmoving party to be railroaded by a premature motion for

summary judgment." *Id.*, citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986).

Debtors' Motion forces Parus to support its claims prior to document discovery

and no deposition testimony from Debtors. A full evaluation of these issues requires continued

discovery in this action. Still, it is clear from Debtors' own filings – just a fraction of Debtors'

documents available to Parus - that many factual issues going to the heart of Parus' claims are

wide open, many fact issues exist, and Debtors' motion for summary judgment should be

denied.[4]

Debtors admit that WorldCom and Intermedia were formally engaged in merger

discussions almost a full year before their merger actually closed. *See* Debtors' 56.1 Stmt. at ¶ 8.

In fact, WorldCom did not acquire Intermedia until after July 1, 2001. Debtors' 56.1 Stmt. at ¶¶

8-11. In their Motion, Debtors ignore the 10-month period leading up to WorldCom's and

Intermedia's formal merger announcement. Indeed, nowhere do Debtors refute Parus' claim,

which is now supported by indisputable evidence that WorldCom hatched its plan to undermine

Intermedia's performance under the UC Contract during that period.

Based on the limited documents produced thus far, we now know that WorldCom

never intended to go forward with the UC Contract. Immediately after the announced merger,

WorldCom intended to sell off the bulk of Intermedia. (Friedman Decl., Exs. S and V). Indeed,

---

[4]    Moreover, Debtors' are wrong on the law. Debtors misstate the rules applicable to Parus' claims
for conspiracy, tortious interference with contract, and implied breach of the covenant of good
faith and fair dealing. (See Point II, *infra*.) As such, Debtors' Motion should be denied as a
matter of law.

A 01250

from the date of the announced merger, WorldCom intended to proceed with its own competitive

products and applications, including "genD", and shut down Intermedia's competing product,

Intermedia*One*. (Friedman Decl., Exs. S, V, and Y). Thus, it is clear that WorldCom, from the

date of the announced merger with Intermedia, never intended that Intermedia would go forward

with the UC Contract.

Significantly, Debtors have produced at least one other document demonstrating

unquestionably that in the several months prior to the closing of the merger, communications

among representatives of WorldCom and Intermedia occurred. (Ex. Q to Friedman Decl.)[5]  This

document – what appears to be a spreadsheet of contracts, including the Unified

Communications Contract with EffectNet, lists among other things, start date, expiration date,

term, and commitment/month – shows that at least by January 2001, Intermedia and WorldCom

were communicating with each other regarding the UC Contract. (Ex. Q to Friedman Decl.).  In

fact, since it is a "revised" document, it is evident that WorldCom and Intermedia were

communicating well in advance of January 2001.  Another document, dated November 21, 2000,

produced by Debtors, confirms these earlier discussions, stating in part,

> With the announcement of the MCI/WorldCom merger, and the
> pending subsequent sale of the Intermedia lines of business to
> another organization, the need of the company for a long-term
> focused process has been greatly diminished.

(Ex. R to Friedman Decl.)

Moreover, even when Intermedia was forecasting in November 2000 and March

2001 that it would bring in thousands of accounts, with 10,000 by the end of 2001, Intermedia

never sold one account outside of its own sales representatives. (Reneau Aff. ¶¶ 23, 26).  Indeed,

---

[5]    Debtors have stated that this document is responsive to Parus' document request no. 18, which
sought "all documents concerning Debtors' communications among each other regarding the [UC
Contract]".

A 01251

unbeknownst to EffectNet, and as a result of the conspiracy and interference by WorldCom, Intermedia was not going to even open one new account until August 2001 (which, of course, never actually occurred once WorldCom and Intermedia closed their merger agreement). (Reneau Aff., Ex. N).  Indeed, in mid-July, 2001, Jim Renforth, the senior product manager for the UC Contract, was fired by Intermedia.  (Debtors' 56.1 Stmt. at ¶ 12; Reneau Aff. ¶ 27, Ex. O).  Then, Jim Faust took over Mr. Renforth's position and cancelled over 90% of the outstanding service accounts with the 100's of Intermedia sales representatives.  (Reneau Aff. ¶ 31, Ex. Q).  At the same time, these dozens of Intermedia employees who had also been working on the UC Contract were either fired or reassigned to unrelated departments, (Debtors' 56.1 Stmt. at ¶ 12; Reneau Aff. at ¶ 27), and the hundreds of sales personnel – who had been trained by EffectNet to provide support under the UC Contract – stopped working on the project. (Reneau Aff. at ¶ 28).  These significant business actions were obviously planned for many months.  The substance of discussions pre-merger and other documents related to these discussions, which clearly took place even based on the limited document production to date, are critical to Parus' tort claims.

    Furthermore, significant issues of fact exist concerning Debtors' argument that its obligations "accrued" upon the purported April 12, 2002 "termination" of the UC Contract.  The limited documentary evidence produced by Debtors shows that Debtors understood as of at least January 2001, that Intermedia had a commitment to sell 10,000 accounts under the UC Contract and had already accounted for such commitment.  (Ex. Q to Friedman Decl.).  At the very least, a question of fact exists requiring discovery of knowledgeable personnel to determine whether Debtors did account for its 10,000 account commitment obligations upon entry into the UC Contract or at some other time.

A 01252

Furthermore, and in any event, Debtors had already breached the UC Contract by July 2001, by dismantling the entire Intermedia*One* structure, terminating the product manager, canceling over 90% of the accounts, and ceasing all work with respect to the UC Contract services. Therefore, as discussed at Point II.A., *infra*, the anticipatory repudiation of the UC Contract precludes Debtors from arguing that Parus "terminated" the UC Contract.

The above referenced limited evidence so far produced by Debtors – without even the benefit of electronic discovery, e-mail or, significantly, deposition testimony of relevant witnesses – clearly shows a genuine issue of material fact. Each of these factual questions relates directly to issues raised by Parus' tort and contract claims. Because they are unresolved and present sharp factual issues, summary judgment is improper.

    B.      Summary Judgment is Inappropriate Pursuant to
               Federal Rule of Civil Procedure 56(f)

At a minimum, summary judgment is improper pursuant to Fed. R. Civ. Proc. 56(f). Rule 56(f) "requires courts to ensure that parties have a reasonable opportunity to make their record before ruling on a motion for summary judgment." *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 945 F. Supp. 693, 706 (S.D.N.Y. 1996); abrogated on other grounds, *TVT Records v. Island Def Jam Music Group*, 412 F.3d 82 (2d Cir. 2005). Rule 56(f) empowers courts to deny motions for summary judgment where the nonmoving party has been precluded from discovering evidence necessary to defeat the motion. "Because [Rule 56(f)] is a safeguard against premature grants of summary judgment, [it] 'should be applied with a spirit of liberality.'" *Bonnie & Co. Fashions, Inc.* at 706, citing 10A Wright, Miller & Kane at § 2340; *see also Celotex*, 477 U.S. at 326 (Rule 56(f) "allows a summary judgment motion to be denied, or the hearing on the motion to be continued, if the nonmoving party has not had an opportunity to make full discovery"). This is particularly true where, as here, "most of the allegedly material

A 01253

facts are largely or exclusively in the possession of defendants." *Berne Street Enterprises, Inc. v. American Export Isbrandtsen Co.,* 289 F.Supp. 195, 196-97 (S.D.N.Y. 1968).

Furthermore, Rule 56(f) empowers courts to deny a motion for summary judgment when a defendant does not adequately comply with the plaintiff's discovery requests. *See Carter v. AT & T Communications*, 759 F.Supp. 155, 160 (S.D.N.Y. 1991). For instance, in *Carter v. AT & T Communications*, the court denied a motion for summary judgment and granted the plaintiff a continuance, because the defendant failed to sufficiently respond to the plaintiff's discovery requests. *Id.* In so holding, the court cited *Glen Eden Hosp., Inc. v. Blue Cross & Blue Shield of Michigan, Inc.,* 740 F.2d 423, 428 (6th Cir. 1984), in which the Sixth Circuit held that the district court had abused its discretion when it denied the plaintiff a continuance where the defendant "had not been extremely forthcoming in responding to [plaintiff's discovery] requests." *Carter*, 759 F.Supp. at 160.

To state a valid request under Rule 56(f), a party opposing summary judgment must provide an affidavit showing the following: (1) the nature of uncompleted discovery; (2) how such discovery is expected to demonstrate a genuine issue of material fact; (3) what efforts the nonmovant has made to obtain such discovery; and (4) why those efforts were unsuccessful. *Bonnie & Co. Fashions, Inc.* at 706, citing *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 925 (2d Cir. 1985).

As described herein, and as set forth more fully in the accompanying declaration of Robert S. Friedman, Debtors have systematically ignored Parus' targeted discovery requests and caused the significant uncompleted discovery in this case. Parus' discovery is aimed directly at the factual background underlying Parus' tort claims and contract damages – specifically, the nature and extent of WorldCom's relationship with Intermedia and communications between

A 01254

them during the time period leading up to the merger of those companies on July 1, 2001, and all

communications among the Debtors, as well as between Debtors and Parus between 2000 and

July 2001, Debtors' access to and review of Parus' financials, and Worldcom's development of

competitive products and applications, including "genD". Debtors' discovery failures and

significant delays are the subject of Parus' motion to compel, currently still pending before this

Court. (Ex. H to Friedman Decl.). Indeed, Debtors' tactics to avoid any discovery in this case

culminated in the filing of the instant motion for summary judgment. (Friedman Decl. ¶ 31).

Debtors used their improperly filed motion for summary judgment to avoid further discovery on

any topic. (Friedman Decl. ¶ 31, 50, Ex. I).

      Parus served its document requests on Debtors in February 2005. (Ex. E to

Friedman Decl.). Parus' document requests sought from Debtors, among other things,

documents concerning the Memorandum of Understanding, Interim Agreement and UC

Contract, the decision to cancel all accounts created pursuant to the UC Contract, documents

communications between Debtors and Parus regarding the UC Contract, documents concerning

Debtors' payments to Parus under the UC Contract, communications among the Debtors

regarding the UC Contract, including cancellation of accounts, documents concerning Parus,

including finances, business, technology and products and any evaluation of such matters,

documents concerning the MASL and communications among Debtors regarding the MASL,

documents concerning Intermedia*One*, including its launch, communications among the Debtors

regarding that subject, documents concerning the merger of WorldCom and Intermedia as it

related to Parus and/or Intermedia*One*, and documents concerning WorldCom's competing

unified messaging initiative, genD. (Ex. E to Friedman Decl.). Parus' document request sought

both hard-copy documents as well as electronic documents. (Ex. E to Friedman Decl.).

A 01255

In mid-March, 2005, Debtors responded and objected to the production of the requested documents on several grounds, though they made a limited production of approximately 343 pages and stated they were continuing their efforts to locate and produce additional documents. The Debtors' Document Responses included multiple meritless general and specific objections as well as modifications and limitations to Parus' Document Requests. *See* Exhibit H to Motion to Compel. However, subject to those objections, modifications and/or limitations, Debtors agreed to produce non-privileged documents responsive to requests 6 – 7 and 11 – 27 in addition to the attached limited document production. *See id.* Indeed, the Debtors acknowledged that much remained to be done regarding document production. *See id.* The Debtors' Document Responses set forth a long and detailed narrative under the heading "Continuing Effort to Locate Documents" regarding the vast quantities of potentially responsive documents that the Debtors had yet to locate and/or review as of March 25, 2005 for production. *Id.* at pp. 7-8. Since that time, Debtors have delayed and then avoided producing to Parus the documents and information it seeks.

For example, on May 31, 2005, more than two months after serving their Document Responses, Debtors' counsel stated that Debtors had located "thousands of boxes" of documents in "multiple locations around the country." *See* May 31, 2005 letter from L. Bigus to S. Wood, attached as Exhibit M to the Motion to Compel. Debtors also admitted in their letter that all they had done was review indexes of these boxes and that Debtors' counsel's "office had not reviewed or examined any of these additional documents." *Id.*

Debtors and Parus then engaged in significant correspondence, via letter, e-mail, and telephonically, concerning the obligations of Debtors to produce the documents and review the indices. (*See, e.g.*, Exs. F–P and T–U to Friedman Decl.). After no resolution resulted, on

-24-

A 01256

June 29, 2005 the Court granted permission to file a motion to compel the production of documents by Debtors. (Ex. K to Friedman Decl.). Then, three (3) months after the service of Debtors' Document Responses, Debtors served a supplemental response to Parus' First Request for Production of Documents. The Supplemental Response did not contain a single responsive document, but instead, objected to all of Parus' document requests on the ground they were unduly burdensome and objected to producing any documents immediately. (Ex. G to Friedman Decl.). Further, the Debtors represented that they had found a new set of documents, "the MCI Documents" from which it "may be possible to produce responsive documents." Moreover, Debtors indicated they located 250 back up tapes of e-mails that Debtors had informed Parus of the first time on June 30, 2005. (Ex. G to Friedman Decl.).

On July 13, 2005, Parus filed its motion to compel. (Ex. H to Friedman Decl.). Then, on August 3, 2005, Debtors' continued efforts to delay and avoid any document production culminated with the improper filing of a motion for summary judgment. (Friedman Decl. ¶ 30, 50, Ex. I). The clear tactic of the motion for summary judgment was apparent from Debtors' Response and Opposition to the Motion to Compel, served and filed on August 4, 2005, in which they relied almost exclusively on their motion for summary judgment. (*Id.*).

A hearing on Parus' motion to compel was held on August 9, 2005. (Ex. L to Friedman Decl.). During the hearing, the Court decided to continue the hearing to allow Debtors to finish their review of the 387 boxes of documents, produce what was found to be responsive, permit Parus the opportunity to review those documents and determine what, if any, deficiencies remain in Debtors' document production. (Ex. L to Friedman Decl.). In addition, the continued hearing would permit Parus to receive and review the document box indices and lists of boxes to, among other things, "hone in on deficiencies" and determine whether or why certain boxes of

A 01257