documents might have been eliminated from review by Debtors, whether the information in the indices was sufficient to exclude boxes from review. (Ex. L to Friedman Decl.).

On September 13, 2004, the hearing on Parus' Motion to Compel was again continued because the alleged production was not complete. Also at the September 13th hearing, Debtors represented they were producing only 8 boxes out of the 10,000 originally identified boxes of documents. (Ex. M to Friedman Decl.)

On November 1, 2005, another hearing was held before the Court regarding the Motion to Compel. During that hearing, Parus identified for the Court the several categories of documents Debtors still have failed to produce (as mentioned above), the inconsistencies and problems with Debtors' use of the indices and lists of boxes for production, and that Debtors conceded they have not produced any communications between WorldCom and Intermedia regarding the UC Contract. (Ex. O to Friedman Decl.).

As a result of the November 1st hearing, the Court ordered deposition(s) of WorldCom/Intermedia individuals who have knowledge regarding their document retention, their selection of documents, and their production of documents, as well as the maintenance, storage, retention and indexing of the documents. (Friedman Decl. at ¶ 34-36, 56, Ex. O at Tr. 10-13; 25). Debtors produced for deposition on November 14, 2005, Donald Ramsay, an attorney with Stinson Morrison Hecker LLP, retained by Debtors to represent them in this matter. Mr Ramsay's deposition testimony highlights that there remain significant issues with respect to Debtors' identification, location and production of Intermedia and WorldCom documents. Mr. Ramsay identified four individuals at WorldCom's records management group, who he spoke with regarding documents, and searches for documents. Mr. Ramsay, however, could not recall whether he took notes of his conversations with them, or gave them search terms

A 01258

in writing, or how they conducted searches, only except that he received indices of boxes resulting apparently from their searches. (Friedman Decl. at ¶ 55, Ex. P at Tr. 191:21-195:15). Importantly, the indices generated by WorldCom's records management group were merely based on a search for terms in merely another index. (Friedman Decl. at ¶ 55, Ex. P at Tr. 201:19-202:20). There was never any search conducted of the actual documents retained by Debtors. (Id.). Further, with respect to numerous entries on the indices generated by Debtors as a result of search terms provided by Stinson, Mr. Ramsay did not know what the entries referred to. (See e.g., Friedman Decl. ¶ 35, 57, Ex. P at Tr. 137:18-138:12). With respect to Mr. Ramsay's request of a WorldCom employee to conduct a search of accounting records, he did not know how the search was conducted, if they searched actual records or a database, what search terms were used or where they searched. (Friedman Decl. at ¶ 35, 57, Ex. P at Tr. 191:22-193:17). Yet Debtors claim they used these indices to reduce 10,000 boxes down to 10 which were produced. (See Friedman Decl., Ex. P at Tr. 203:06-204:04).

The Court provided leave to make further applications after the deposition. (Friedman Decl., Ex. O at Tr. 25). Debtors represented that they would respond on electronic discovery issues. (Id. at Tr. 25). However, Debtors continue to refuse to produce any electronically stored documents and now, contrary to their representations have refused all discovery and have moved for a stay. (Friedman Decl., Exs. U and X).

Even after significant disputes and attempted resolutions to date by this Court, Debtors' document productions still fail to provide a complete production of documents concerning, among other things,

- communications among the Debtors regarding the UC Contract (Document Request No. 18);

A 01259

- documents reflecting Intermedia's payments to Claimant for any services provided by Claimant under the General Agreement or any documents concerning communications regarding payments to Claimant.  (Document Request No. 17.)

- documents concerning the cessation or termination of Intermedia's operations as it related to Claimant.[6]  (Document Request Nos. 14, 15, and 19.)

- documents concerning Claimant from the files of related WorldCom entities including, but not limited to, WorldCom Ventures.  These documents are especially relevant here because WorldCom Ventures was contemplating an investment in Webley/Parus Holdings and received highly sensitive, confidential, and comprehensive strategic and financial material of Claimants.  (Document Request Nos. 20 and 21.)

- documents concerning Debtors' evaluation or analysis of Claimant's finances, business, technology or products.  (Document Request Nos. 20 and 21.)

- documents related to the WorldCom/MCI genD initiative, a competitor to EffectNet's Unified Communications product. (Doc. Req. No. 35.).

Moreover, Debtors failed to produce any documents from key individual employee's work files, including but not limited to, James Renforth, James Faust, Kathy Victory, Brett Bacon, Barry Zipp, Richard Black and Cheryl Mellon, regarding the UC Contract and the MASL, and the drafting, negotiation, pricing and performance of same. (Document Request Nos. 11 and 22.)

Significantly, Debtors have failed to produce any electronically stored documents from either Intermedia or WorldCom/MCI, notwithstanding the fact that on October 24, 2005,

---

[6]    However, Debtors have produced certain documents regarding the cessation or termination of Intermedia operations concerning solely technical integration issues between Intermedia and WorldCom products, as well as a reduction in headcount of Intermedia employees.

A 01260

after a conference on October 21, 2005 during which the parties discussed outstanding discovery, Parus provided in good faith a list of names of individuals' electronic files and search terms for use in searches of Intermedia's and WorldCom/MCI's electronic databases. (Ex. T to Friedman Decl.). Indeed, on November 11, 2005, Debtors informed Parus that it had only just recently engaged an outside vendor to complete a cost estimate to determine the cost of searching for responsive documents in MCI's and Intermedia's electronic media. (Ex. U to Friedman Decl.). Clearly, both sets of electronic media are likely to contain documents responsive to Parus' discovery requests.

All of the above demonstrates that Debtors' failure to respond meaningfully to Parus' discovery requests puts Parus in the position of having to try to support its claims without access to the very documents and information necessary to do so. As set forth at the November 1, 2005 hearing, there is significant discovery yet to be finished in order to permit a full evaluation of Parus' claims. Indeed, putting aside the hard-copy documents, Debtors have never once searched their electronic databases for responsive materials. Therefore, as an initial matter, this Court should deny Debtors' Motion under Fed. R. Civ. Proc. 56(f) and direct Debtors to produce discovery materials sufficient to enable the full evaluation of Parus' claims.

## II.

### DEBTORS' ATTEMPT TO LIMIT CLAIMANT'S DAMAGES UNDER THE UC CONTRACT IS WITHOUT MERIT AND SHOULD BE DENIED

Debtors concede that Intermedia breached the UC Contract. *See* Debtors' Statement of Facts at 19. Accordingly, Parus succeeds on its breach of contract claim as a matter of law. However, numerous factual issues remain as to the amount of damages which Parus is entitled on that claim, resulting from ambiguities in the UC Contract. In addition, there are

A 01261

several obvious ambiguities in the UC Contract including undefined terms, missing terms and blanks. With respect to these ambiguities, parol evidence is discoverable and admissible with respect to Parus' contract damage claims. *See, e.g., Joy Enterprises, Inc. v. Reppel*, 112 Ariz. 42, 46 (1975) (parol evidence could be admitted to explain ambiguities); *see also Hartford v. Industrial Commission of Ariz.*, 178 Ariz. 106, 111 (App. 1994) ("Any ambiguity is subject to a factual determination concerning the intent of the parties and is to be resolved conclusively by the trier of fact").

Accordingly, and at a minimum, the UC Contract reveals the need for additional discovery in this case designed to permit a determination of exactly how much those damages should be.

A.     Parus' Breach of Contract Damages Are Not Limited to $460,422.30 Under the "Minimum" Provisions

Debtors misstate and misapply various provisions of the UC Contract in manufacturing an argument that Parus' damages are limited to $460,422.30. Debtors provide definitions of various terms used in the UC Contract that simply do not exist and are contrary to the plain language of the contract and the intent of the parties.

1.     Parus' Damages Are Not Limited to Amounts Due Under Invoices Outstanding at the Time of the Purported Termination

Pursuant to the UC Contract, Intermedia agreed to a "take or pay" minimum commitment:

> 2.12. <u>Minimum Commitment</u>. Intermedia hereby agrees to deliver a minimum 1,500 then current active subscribers on or before three (3) months after December 18, 2000 (the "Rollout Date"); an additional 1,500 then current active subscribers (total 3,000) on or before six (6) months after the Rollout Date; and additional 3,500 then current active subscribers (total 6,500) on or before nine (9) months after the Rollout Date; and 10,000 total then current active subscribers on or before twelve (12) months after the Rollout Date (the "Ramp Date") and at the and of each calendar month

A 01262

thereafter (the "Minimum Commitment") for the Term of this Agreement.

2.13  <u>Reconciliation Payment</u>.  On the Ramp Date and at the end of each calendar month thereafter, EffectNet will calculate the actual number of then current active subscribers on the last day of such calendar month and compare it to the Minimum Commitment.  If the number of subscribers is less than the Minimum Commitment for the month in question, such difference will constitute a "Volume Shortfall."  *Intermedia shall pay EffectNet a Reconciliation Payment equal to the Volume Shortfall multiplied by the base monthly price applicable to the Intermedia UC Service per subscriber.*

(Ex. F to Reneau Aff. at §§ 2.12-2.13) (emphasis added).

Parus has calculated the outstanding Minimum Commitment Reconciliation Payment, based on Intermedia's failure to meet the Minimum Commitment from March 2002 through December 2003, which was the end of the Initial Term.  (Reneau Aff. ¶ 47, Ex. F).  The amount outstanding to be paid by Intermedia to Parus, solely with respect to the Minimum Commitment obligation is $5,754,000.00.  (Reneau Aff. ¶ 47, Ex. F.).  In addition, Intermedia still owes $827,844.27, the outstanding amounts set forth in invoices for the billing periods December 2001, January 2002 and February 2002.  (Reneau Aff. ¶¶ 44-46).  These amounts are exclusive of interest.

In addition, Section 5.3 of the UC Contract entitled "Effect of Termination" provides in full:

Upon termination of this Agreement for any reason, each Party shall remain liable for those obligations that accrued prior to the date of such termination; provided, however, that nothing herein shall be construed to obligate EffectNet to offer Services to Intermedia after the termination of this Agreement.

(Reneau Aff., Ex. F at § 5.3).  Debtors argue that under this provision, "Intermedia remained responsible only for those obligations that accrued prior to April 12, 2002 – the date of termination."  Debtors' Memo at 16.  Debtors mischaracterize the manner in which obligations

A 01263

accrue and the plain language of the contract. Not surprisingly, Debtors offer no evidence in support of their argument and cite no relevant authority.[7]

"Accrue" means "[t]o come into existence as an enforceable claim or right." Black's Law Dictionary 22 (8th ed. 2004); *accord Gust, Rosenfeld & Henderson v. Prudential Ins. Co.*, 182 Ariz. 586, 588 (1995) ("As a general matter, a cause of action accrues . . . when one party is able to sue another"). EffectNet had an enforceable right to payment for Intermedia's minimum commitment when Intermedia breached the contract. *See, e.g., Enyart v. Transamerica Ins. Co.*, 195 Ariz. 71, 76 (App. 1998) ("Because Enyart lost the benefit of his bargain here, he is entitled to immediate expectation damages . . . We agree that Enyart's right to sue on the breach of contract claim fully matured when Transamerica failed to procure the backup annuity policy"). As set forth above, even the limited evidence in the record establishes that the breach of the "take or pay" provisions occurred in 2001 or earlier, well before the so-called "termination." (Reneau Aff. ¶¶ 26-31, Exs. N-R). Indeed, Debtors had shut down the UC Contract in 2001 and could never have met the Minimum Commitment. (Reneau Aff. ¶¶ 31-33, Exs. Q-S). Accordingly, under Arizona law, even if Debtors are correct in their interpretation of § 5.3, which they are not, damages of well over $6 million had accrued prior to April, 2002.

Moreover, EffectNet was ready and able to perform its obligations under the contract, and as a result of Debtors' anticipatory repudiation and breach of the contract, EffectNet's right to payment included the Minimum Commitment Reconciliation Payment for

---

[7]     The single case Debtors come up with in support of this argument has nothing to do with when damages are deemed to accrue. See *Herman Chanen Constr. Co. v. Guy Apple Masonry Contractors, Inc.*, 453 P.2d 541 (Ariz. App. 1969) The contract provision at issue in *Herman* concerned a class of possible plaintiffs, and the issue was whether the plaintiff in that case fell within that named plaintiff class.

A 01264

the entire length of the contract term. (Reneau Aff. ¶¶ 47-49); *see United Cal. Bank v. Prudential Ins. Co.*, 140 Ariz. 238, 283-84 (App. 1983) ("to recover damages for anticipatory breach, the injured party need only show that he had the ability to perform his own obligations under the agreement"). Intermedia not only did not perform its obligations, but manifested an intent to *never* perform its obligations. From the date of the announced merger, on September 1, 2000, WorldCom intended to proceed with its competing unified messaging initiative, including genD, and shut down EffectNet's applications marketed through Intermedia's bundled product, Intermedia*One*. (Exs. S and V to Friedman Decl.). Indeed, WorldCom intended to sell off the bulk of Intermedia in any event. (*Id.*). Thus, it is clear that WorldCom, from the date of the announced merger with Intermedia, never intended that Intermedia would go forward with the UC Contract. Furthermore, by January 2001, Intermedia and WorldCom apparently had discussions that the EffectNet UC Contract was a "completed" contract. (Ex. Q to Friedman Decl.). Indeed, as early as January 2001, Intermedia was only opening accounts for Intermedia sales representatives and selected executives. (Reneau Aff. ¶ 26). In addition, in July 2001, Intermedia's Jack Kerrigan informed EffectNet that no new customers would be added. (Reneau Aff. at ¶ 26, Ex. N). Also in July 2001, Intermedia fired Jim Renforth. (Debtors' 56.1 Stmt. at ¶ 12; Reneau Aff. at ¶ 27, Ex. O). At the same time, dozens of Intermedia employees who had also been working on the UC Contract were either fired or reassigned to unrelated departments. (Debtors' 56.1 Stmt. at ¶ 12; Reneau Aff. ¶ 27). As of July 2001, the EffectNet product was effectively shut down by WorldCom in breach of the UC Contract. Indeed, by September 2001, Debtors had pulled IntermediaOne from over 25 markets, pursuant to their exit strategy. (Ex. Y to Friedman Decl.)

A 01265

The anticipatory breach of the UC Contract entitled EffectNet to bring an immediate cause of action for the entire value of the contract. *See United Cal. Bank v. Prudential Ins. Co.*, 140 Ariz. 238, 277 (App. 1983) ("if one party unequivocally indicates he will not perform when the date arrives, an anticipatory breach is committed"). It is undisputed that Intermedia's obligations accrued prior to the termination of the UC Contract in April 2002, and Parus is entitled to damages representing at least the Minimum Commitment Reconciliation Payment for the entire term of the contract. The monthly amount due ($274,000.00) for the remainder of the term (until December 2003) of the UC Contract, beginning in March 2002 (21 months), equals $5,754,000.00. (Ex. F to Reneau Aff. at UC Contract at §§ 2.12, 5.1; Appendix P to UC Contract; Reneau Aff. ¶ 47).

In addition, nothing in Section 5.3 indicates a limitation on recoverable damages. On the contrary, the provision preserves the parties' liabilities for obligations accruing prior to termination. As set forth above, Intermedia's obligation to deliver the minimum subscribers or pay for the Volume Shortfall for the duration of the contract term accrued before the contract terminated.

Finally, extending Debtors' interpretation to its logical end in the context of other provisions of the UC Contract would lead to bizarre results. *See Gesina v. Gen. Electric Co.*, 162 Ariz. 39 (App. 1989) ("Each section of an agreement must be read in relation to each other to bring harmony, if possible, between all parts of the writing"); *United Cal. Bank v. Prudential Ins. Co.*, 140 Ariz. 238, 259 (App. 1983) (the Courts of Arizona determine intent by viewing words in the context of the entire contract). By their reasoning, EffectNet could have recovered more damages by simply waiting, as more obligations "accrued," to give notice of default. Furthermore, had Intermedia actually terminated the UC Contract pursuant to Section 5.4 ("Early

A 01266

Termination") rather than waiting for EffectNet to give notice of default, EffectNet could have

recovered $3,244,800 ("$270,400 times the lesser of (i) 12 months, or (ii) the number of months

remaining in the contract term") – an amount seven times greater than the $460,422.30 quoted by

Debtors.  Intermedia did not take advantage of Section 5.4's liquidated damages provision, and

Plaintiff's damages are therefore not limited by it, but it is incongruous to suggest that Plaintiff's

damages are reduced even further because the breaching party did not undertake the

responsibility of actually terminating the contract.

> 2.   An Issue of Fact Exists As to Whether the UC Contract was "Terminated"
>       By  Robert McConnell's March 12, 2002 and March 25, 2002 Letters

By March 2002, Intermedia had cancelled all remaining accounts and ceased

paying EffectNet for any services.  At that time, invoices for the December 2001, and January

and February 2002 billing periods remained outstanding.  (Reneau Aff. ¶ 32; McConnell Aff.

¶ 5, Ex. A).  Therefore, on March 12, 2002, Robert McConnell, EffectNet's General Counsel

wrote to Intermedia advising Intermedia of the breach of its obligations under the UC Contract

by failing to deliver the Minimum Commitment of 10,000 active accounts on or before

December 18, 2001 and at the end of each calendar month thereafter through December 2003,

and to pay a Reconciliation Payment as of the Ramp Date, and to pay outstanding invoices,

totaling $548,087.25.  (Reneau Aff. ¶ 32; McConnell Aff. ¶ 6, Ex. B).  In that letter, EffectNet

demanded immediate payment for the past due amount.  Further, that letter stated that, "If

Intermedia fails to cure the Intermedia Defaults and **if EffectNet terminates** the Agreement as

aforesaid, EffectNet may claim damages for all amounts due pursuant to the Agreement. . ." (Ex.

A to McDonnell Aff.) (emphasis added).  The letter continues, "Nothing in this letter is intended

to be a waiver or release of any rights or remedies, or an election thereof, that EffectNet has

A 01267

under the Agreements or applicable law, and all such rights and remedies are hereby expressly reserved in their entirety." (*Id.*)

Having received no payment resulting from their first letter, EffectNet, by Mr. McConnell, wrote on March 25, 2002 another letter to Intermedia/WorldCom. (Reneau Aff. ¶ 32; McConnell Aff. ¶ 6, Ex. B). This letter also provided Intermedia with notice of its defaults and demanded immediate payment of the outstanding amounts, totaling $827,844.27. *Id.* In addition, the March 25th letter further states, "If Intermedia fails to cure the Intermedia Defaults and **if EffectNet terminates** the Agreement as aforesaid, EffectNet may claim damages for all amounts due pursuant to the Agreement. . ." (McConnell Aff. ¶ 6, Ex. B) (emphasis added). The letter continues, "Nothing in this letter is intended to be a waiver or release of any rights or remedies, or an election thereof, that EffectNet has under the Agreements or applicable law, and all such rights and remedies are hereby expressly reserved in their entirety." *Id.* Despite some apparent discussions to resolve the outstanding amounts, EffectNet received no response from Intermedia and the outstanding amounts were never paid.

Debtors contend that the March 12, 2002 and March 25, 2002 letters from Robert McConnell acted to terminated the UC Contract, limiting Parus' remedies. (*See* Debtors' Memo of Law at 15-16). In fact, Mr. McConnell's sole and clear intention in sending the letters was to receive payment of the invoices and provide notice of the breach in an effort to encourage Intermedia's cure and ultimate performance of its obligations under the UC Contract. (McConnell Aff. ¶ 9). Mr. McConnell never terminated the UC Contract nor limited Intermedia's obligations in any manner. (*Id.*)

The McConnell letters are expressly conditional and reserve all rights to recoup all damages. The intention of the parties with respect to exchange of correspondence in the

A 01268

March 2002 time period is at least a question of fact that must be explored in discovery.  *See*

Wright & Miller § 2730 ("Summary judgment frequently is denied in contract actions requiring

an inquiry into the intentions of the contracting parties").  Debtors have offered no evidence of

the parties intentions.  Indeed, the only evidence in the record establishes that neither WorldCom

nor Parus views these documents as termination letters.  (McConnell Aff. ¶ 10).

<div style="margin-left:2em">

3.    There Is A Genuine Issue of Material Fact Regarding the Meaning the
      Parties Intended for "Base Rate"

</div>

Debtors offer absolutely no evidence to support their conclusion that $11.45 is the

right price to apply to the Minimum Commitment Reconciliation Payment calculation.  Contrary

to Debtors' bald assertions regarding pricing under the UC Contract (*see* Debtors' Memo at 17),

nothing in the UC Contract indicates that "base monthly price," as used in Section 2.13 of the

UC Contract (concerning the calculation of "Reconciliation Payment" for "Volume Shortfall"),

refers to the pricing for "Basic" accounts listed in Appendix P.  In fact, the only price negotiated

as the "base monthly price" was the "Unlimited Service" rate of $27.40.  (Reneau Aff. at ¶ 15).

This is the price the parties negotiated and intended to be used for the calculation of Minimum

Commitment and Reconciliation Payment.  (Reneau Aff. at ¶ 15).  The "Basic Service" was

included in Appendix P merely as an expedient service for those few end-users or customers that

just wanted to try the UC Service on a temporary or initial basis.  (Reneau Aff. at ¶ 15).  Indeed,

the parties intended to use the Basic Service  only as an introductory low-price marketing option

for customers who were primarily testing or trialing the service.  (*Id.*) The actual minute usage for

all other customers would make the Unlimited Service economically compelling.  (*Id.*)

In addition, the statement "base monthly price" was used by the parties and

understood to mean the fixed monthly fee in contrast to the variable usage-based per minute

pricing in the $27.40 "Unlimited Service" price plan.  (Reneau Aff. at ¶ 16).  Here "base" served

A 01269

to distinguish between fixed monthly fees and variable usage based fees--a commonly understood distinction and phraseology in the telecommunications industry. (Reneau Aff. ¶ 16). The word "base" never had anything to do with the term "Basic" as applied to the Pricing as either "Unlimited Service" or "Basic Service" for accounts as between EffectNet and Intermedia. Thus, the "Unlimited Service" rate of $27.40 was to be the base monthly price used in calculating any Reconciliation Payment. (Reneau Aff. ¶ 16).

Discovery has so far established that if any rate is proper it is the "Unlimited Service" rate or $27.40. Intermedia received invoices from EffectNet which clearly noted that the Reconciliation Payment was calculated by multiplying the Minimum Commitment by $27.40 – the "Unlimited Service" rate; Intermedia never objected to this calculation. (Reneau Aff. at ¶ 39). In addition, 97.74% of the accounts actually generated under the UC Contract were "Unlimited Service" accounts. (Reneau Aff. at ¶ 39, Ex. P) Indeed, discovery has yet to reveal any evidence that supports Debtors' definition of the term. At the very least, because "base monthly price" is nowhere defined in the agreement, additional discovery is necessary to determine what exactly the parties meant. *United Cal. Bank*, 140 Ariz. at 264 ("It is fundamental that if the language of a contract is susceptible to more than one reasonable interpretation, the circumstances existing at the time of contracting must be considered by the court in ascertaining the meaning of the contract").

Further support for defining the "base monthly rate" as the "Unlimited Service" rate derives from § 5.4 of the UC Contract, which states that if Intermedia terminates the agreement early, Parus' liquidated damages will be $270,400 (that figure appears to be a typographical error and the figure should more likely be $274,000) times the lesser of 12 months or the number of months remaining in the contract term. (Reneau Aff., Ex. F). Although that

A 01270

section only applies if Intermedia terminates the UC Contract early (as opposed to breaching the

agreement or repudiating it), the use of the "Unlimited Service" rate in that context shows the

parties' intent to use that rate, rather than the "Basic Service" rate, to compute Parus's damages

under the Agreement. *Id.*

  B.  <u>Debtors Ignore Parus' Benefit of the Bargain Damages</u>

    Debtors completely ignore Parus' claim for benefit of the bargain on the breach of

contract. In the absence of either a statute or common law, the courts of Arizona follow the

Restatement. *See Naarden Trust v. Kieber*, 195 Ariz. 526, 528 (Ariz.App. 1999) (citing *Dorman*

*v. Swift & Co.*, 162 Ariz. 228, 231 (1989)). Arizona follows the Restatement (Second) of

Contracts (the "Restatement") which defines a party's "expectation interest" as "his interest in

having the benefit of his bargain by being put in as good a position as he would have in had the

contract been performed." Restatement § 344; *see also Reynolds Metals Co. v. Westinghouse*

*Electric Corp.*, 758 F.2d 1073, 1079 (5th Cir. 1985) ("The law of contract, whether under the

common law or the Uniform Commercial Code, generally authorizes damages for breach in the

amount of the expectancy interest of the wronged party").

    Section 347 of the Restatement states the general measure of contract damages

based on the injured party's "expectation interest":

> (a) the loss in the value to him of the other party's performance
> caused by its failure or deficiency, plus
>
> (b) any other loss, including incidental or consequential loss,
> caused by the breach, less
>
> (c) any cost or other loss that he has avoided by not having to
> perform.

Restatement § 347. The term "value" is not defined. However, Comment (b) to Section 347

states, "If no performance is rendered, the loss in value caused by the breach is equal to the value

A 01271

that the performance would have had to the injured party." *See also* Illustrations (1) & (2) to §

347; *Kenco Homes, Inc. v. Williams*, 94 Wash.App. 219, 224 (Wash.App. 1999) ("When a buyer

breaches before either side has begun to perform, the amount needed to give the seller the benefit

of his or her bargain is the difference between the contract price and the seller's expected cost of

performance"). As set forth above, the Restatement specifically differentiates between loss of

value damage and "incidental or consequential loss". Accordingly, even if the limitation of

liability provision is enforced, Parus is still entitled to the loss of value damages.

    C.    <u>The Limitation of Liability Section Should Not Be Enforced</u>

        1.    <u>The Construction of the Limitation of Liability Section Urged By Debtors Is Unreasonable Because It Would Leave Parus Without A Remedy</u>

The Limitation of Liability provision at Section 11 of the UC Contract provides in

full:

> <u>LIMITATION OF LIABILITY</u>. EXCEPT FOR DAMAGES
> ARISING UNDER SECTION , IN NO EVENT SHALL EITHER
> PARTY BE LIABLE TO THE OTHER PARTY FOR ANY
> INCIDENTAL, INDIRECT, SPECIAL, PUNITIVE,
> CONSEQUENTIAL OR SIMILAR DAMAGES OF ANY KIND
> INCLUDING WITHOUT LIMITATION, LOSS OF PROFITS,
> LOSS OF BUSINESS OR INTERRUPTION OF BUSINESS,
> WHETHER SUCH LIABILITY IS PREDICATED ON
> CONTRACT, STRICT LIABILITY OR ANY OTHER THEORY
> WITHOUT REGARD TO WHETHER SUCH PARTY HAS
> BEEN ADVISED OF THE POSSIBILITY OF SUCH
> DAMAGES.

(Reneau Aff., Ex. F at § 11). Adopting the construction of the limitation of liability provision

urged by Debtors—which would permit Claimant to recover only the damages under the past due

invoices—would leave Claimant without an adequate remedy for its expectation damages under

the contract with Intermedia. There is no support for applying this provision to the "take or pay"

commitment through the end of the UC Contract. Such amounts are direct contractual damages,

as are the benefit of the bargain losses. Moreover, such a result would be patently unreasonable.

A 01272

According to the Restatement Section 203, there is a judicial preference for interpretations of a contract "which give[ ] a reasonable, lawful, and effective meaning to all the terms." Restatement § 203(a). Corbin explains:

> If, therefore, the words of a contract have more than one possible meaning, and one of these meanings would produce a legal effect that the court believes the parties intended to produce, while another meaning would not, the court should unhesitatingly adopt the first meaning.

5 MARGARET N. KNIFFIN, CORBIN ON CONTRACTS § 24.22 (rev. ed. 1998).

Thus in *Parker v. Pulitzer Publishing Company*, the Missouri Court of Appeals rejected as unreasonable an interpretation of a contract that would have left one of the parties without an effective remedy. 882 S.W.2d 245, 251 (Mo. App. 1994). Explained the Court:

> The reading Pulitzer attributes to the waiver clause in the contract would render most of the terms in the contract unenforceable. . . . The contract escapes the ranks of being an illusory contract merely because in the event Pulitzer fires a distributor, he/she is entitled to the fair market value of the route. Such an interpretation of the contract is not plausible in light of the more reasonable alternative.

*Id.*

The UC Contract contemplates an exchange of money—the amount based on a minimum number of subscribers over the entire term of the contract—for services. This was the bargain reached by EffectNet and Intermedia. In order to render such services, EffectNet made an extensive investment and spent a substantial amount of time and money developing the underlying network, products and services for Intermedia and training Intermedia's personnel, foregoing other lucrative opportunities, preparations that were clearly contemplated by both parties to the UC Contract. (*See* Reneau Aff. ¶¶ 24-25, Exs. G-H and M). Now Debtors claim that the limitation of liability clause precludes damages for all but the past due invoices. The total past due on the invoices is significantly less than Parus' actual direct damages, and a

A 01273

construction of the limitation of liability clause that would preclude damages to that extent would be unreasonable.

　　2.　　The Limitation of Liability Section Is Ambiguous

　　　　The limitation of liability provision is incomplete on its face: the parties clearly intended to exclude damages arising under *some* section from the limitation of liability, but the limitation does not say which section that was. Indeed the section contains a blank. Further discovery is necessary to determine the parties' intentions. *See, e.g., Joy Enterprises, Inc. v. Reppel*, 112 Ariz. 42, 46 (1975) (where some terms were not reduced to writing, the contract was ambiguous, and parol evidence could be admitted to explain the ambiguities); *Aztec Film Productions v. Tucson Gas Electric Co.*, 463 P.2d 547, 549 (Ariz. 1970) (parol evidence admissible where the purchase order for films was missing the number and type of each film); *see also Hartford v. Industrial Commission of Ariz.*, 178 Ariz. 106, 111 (App. 1994) ("Any ambiguity is subject to a factual determination concerning the intent of the parties and is to be resolved conclusively by the trier of fact"); *AROK Construction Co. v. Indian Construction Services*, 174 Ariz. 291, 298 (App. 1993) ("Even if some terms of the oral contract between AROK and ICS were missing or uncertain, extrinsic evidence is always admissible to aid in interpretation and to establish the meaning that was intended by the party") (internal citation omitted).

## III.

## PARUS' TORT CLAIMS ARE NOT BARRED AS A MATTER OF LAW

　　　　The hallmark of Debtors' defense to Parus' tort claims is a principle derived from, and applicable to, antitrust caselaw: "a parent corporation cannot conspire with or tortiously interfere with its wholly owned subsidiary." *See Copperweld Corp. v. Independence Tube Corp.*,

A 01274

467 U.S. 752 (1984). Indeed, this is Debtors' entire defense to Parus' conspiracy claim.

However, this antitrust principle is inapposite here, as courts have recognized conspiracy and

tortious interference claims involving parents and subsidiaries. As Debtors acknowledge, the

notion that parents cannot conspire with subsidiaries is, at best, a "general rule" limited to

specific situations, and is therefore subject to fact-based exceptions. Similarly, Debtors'

argument that a parent is "privileged" to interfere with its subsidiaries' contracts ignores the

numerous exceptions to that rule, and it fails to account for the specific facts of this case.

Moreover, as described above, the crux of Parus' claims is that WorldCom and

Intermedia conspired, and that WorldCom tortiously interfered with Intermedia's performance

under the UC Contract, *before* they were related companies. As such, it does not matter that

WorldCom later acquired Intermedia.

A.    WorldCom Was Not Intermedia's Parent Prior to July 1, 2001

The sole basis for Debtors' Motion on the tort claims is the parent-subsidiary

relationship between WorldCom and Intermedia. However, prior to July 1, 2001, WorldCom

was not Intermedia's parent, and WorldCom's relationship with Intermedia prior to July 1, 2001

is therefore at the heart of Parus' claims. As Parus alleges, the conspiratorial relationship

between Intermedia and WorldCom arose "on *or before* July 1, 2001". (Friedman Decl., Ex. D

(Opposition) at ¶ 15 (emphasis added)). Debtors admit that the acquisition did not take place

until July 1, 2001. (Debtors' 56.1 Stmt. at ¶¶ 8-12). Thus, even if the "general rule" Debtors

seize upon in an attempt to preclude Parus' conspiracy and tortious interference claims were

applicable, much of WorldCom's improper conduct took place during a time when that "general

rule" would not even apply. *See, e.g., Dozier & Gay Paint Co. v. Dilley*, 518 So. 2d 946, 950

(Fla. Ct. App. 1988) (shareholders of recently formed corporation can be sued for civil

A 01275

conspiracy where the corporation was not yet in existence at the time of their alleged conspiracy; summary judgment denied); *Metropolitan Life Ins. Co. v. La Mansion Hotels & Resorts Ltd.*, 762 S.W.2d 646, 652 (Tex. Ct. App. 1988) (parent and subsidiary capable of conspiring where parent did not acquire subsidiary until a month after alleged conspiracy began); 4 Causes of Action 2d 517, § 17 (2005) ("A single entity defense based on corporate identity cannot be raised if certain of the conspirators' actions in devising or furthering the conspiracy occurred prior to the . . . merger of corporate identities"); *Maryland Jockey Club v. ODS Technologies, L.P.,* 2005 WL 1200181, n.7 (D. Md. 2005) (refusing to extend parent's privilege to interfere with subsidiary's contract to cover prospective purchaser of subsidiary).

Since Parus' claims include those which arise from activities of WorldCom and Intermedia which occurred on or before July 1, 2001, Debtors' defense fails, and summary judgment must be denied.

B.     Conspiracy

Claims for civil conspiracy are actionable where conspirators conspire to accomplish an unlawful purpose, or a lawful purpose unlawfully, and the alleged conspiracy gives rise to damages.  *Wells Fargo Bank v. Arizona Laborers, Teamsters, and Cement Masons Local No. 395 Pension Trust Fund*, 38 P.3d 12, 38 (Ariz. 2002); *Roussel v. Hutton*, 638 So. 2d 1305, 1315 (Miss. 1994); *see also Wolpin v. Philip Morris, Inc.*, 974 F. Supp. 1465, 1471 (S.D. Fla. 1997 (underlying wrong of fraud, deception, or misrepresentation supports claim for civil conspiracy under Florida law).  Under Illinois law, conspiracy claims require that the conspirators engaged in unlawful conduct, or lawful conduct for an unlawful purpose, in furtherance of which at least one of the conspirators committed a tortious act.  *Adcock v.*

-44-

A 01276

*Brakegate, Ltd.*, 645 N.E.2d 888, 894 (Ill. 1994).[8] Parus alleges WorldCom's and Intermedia's conspiracy resulted in tortious conduct and caused substantial damages to Parus.

Debtors contend that parents and subsidiaries are incapable of conspiring with each other. *See* Debtors' Memorandum of Law at 9. This argument is based entirely on caselaw involving factual scenarios different from that here. Each of the cases cited by Debtors concerns conspiracies either (1) between a corporation and its own officers or (2) under the Antitrust laws. Neither situation is present here. The conspiracy at issue here involved two totally distinct corporate entities – WorldCom and Intermedia – which were not even related to each other at the time Parus alleges the conspiracy arose.[9]

The argument that parents and subsidiaries generally are incapable of conspiring with each other as a matter of law also has been rejected by numerous courts. Those courts question the notion that parents and subsidiaries are "one and the same", and are therefore incapable of conspiring with each other, and have largely limited the rule to cases brought under the Sherman Act. *See, e.g., In re Conticommodity Services, Inc.*, 733 F.Supp. 1555, 1568 (N.D. Ill. 1990) (limiting rule to the antitrust context; holding that "a subsidiary is not necessarily an agent of its parent" and can conspire with its parent), rev'd in part on other grounds, 976 F.2d

---

[8] Debtors presume Arizona law applies to all of Parus' tort claims. Debtors are incorrect. Illinois law should apply to the tort claims. Under New York choice of law rules, for conduct-regulating issues, the "locus of the tort" determines which state's law applies to tort claims, and the place tort damages are felt is considered the "locus of the tort". *Hidden Brook Air, Inc. v. Thabet Aviation Int'l, Inc.*, 241 F. Supp. 2d 246, 277 (S.D.N.Y. 2002); *Frink America, Inc. v. Champion Road Machinery, Ltd.*, 48 F. Supp. 2d 198, 205 (N.D.N.Y. 1999). Since EffectNet integrated most of its products and services with an Illinois entity in 2001, by July 2001 its principal place of business was in Chicago, Illinois, and since most of EffectNet's damages resulting from the conspiracy were felt after that, it is likely that Illinois law – not Arizona law – applies to Parus' tort claims. However, Debtors' arguments fail under both Arizona and Illinois law.

[9] Debtors disingenuously state that Parus' conspiracy allegations are based solely on the facts set forth in Paragraphs 12 through 15 of Debtors' Statement of Facts. (*See* Debtors' Memorandum of Law at 10). This is simply untrue. Parus contends the conspiracy arose well before those acts took place. (*See* Friedman Decl., Ex. D, ¶¶ 13-15).

A 01277

1104 (7th Cir. 1992); *Holloway v. Atlantic Richfield Co.*, 860 S.W.2d 439, 447 (Tex. Ct. App.

1998) (limiting rule to the antitrust context; holding that parents and subsidiaries can conspire);

*Stamp v. Inamed Corporation*, 777 F. Supp. 623, 628-29 (N.D. Ill. 1991) (concluding that a

parent and subsidiary "are independent entities" for purposes of civil conspiracy cases); *Borden,*

*Inc. v. Spoor Behrins Campbell & Young, Inc.*, 828 F. Supp. 216, 224 (S.D.N.Y. 1993) (noting

the "logic in the position that entities, which are made distinct by state corporate law, are also

separate entities capable of entering into illicit agreements under state civil conspiracy law");

*Perry v. Household Retail Services, Inc.*, 953 F. Supp. 1378, 1381 (M.D. Ala. 1996) (denying

summary judgment where issues of material fact existed as to whether parent and subsidiary

engaged in civil conspiracy together); *Two Brothers Scotto, Inc. v. SDG Macerich Properties,*

*L.P.*, Nos. Civ.A 99-5485, Civ.A. 99-6395, Civ.A 99-6398, 2000 WL 1052017, **7-8 (E.D. Pa.

2000) (recognizing conspiracy claim against parent and subsidiary where each pursued its own

goals, each had its own management, and each performed its own operations).[10]

C.    Tortious Interference

Debtors offer a similarly flawed argument on the tortious interference claims.

Debtors ignore several distinct exceptions to the "general rule" that parents cannot tortiously

interfere with their subsidiaries' contracts. These exceptions involve fact-intensive analyses

which are not appropriate for summary judgment. While courts recognize that parent

---

[10]    The *Copperweld* rule has also been applied sparingly by courts in some RICO cases. *See, e.g.,*
*Fogie v. Thorn Americas, Inc.*, 190 F.3d 889 (8th Cir. 1999). But like *Copperweld*, these cases
are limited to a specific statute – RICO. Moreover, for every court that has extended *Copperweld*
to RICO actions, another has refused to do so, limiting *Copperweld* to the boundaries of the
antitrust laws. *See, e.g., Ashland Oil v. Arnett*, 875 F.2d 1271, 1281 (7th Cir. 1989) (policy
considerations underlying *Copperweld* pose no threat to the goals of antitrust law, but do pose a
threat to objectives of anti-racketeering laws); *Webster v. Omnitrition Int'l*, 79 F.3d 776, 787 (9th
Cir. 1996) (intracorporate conspiracy rule limited to antitrust cases and does not apply in RICO
cases); *Kirwin v. Price Communications Corp.*, 391 F.3d 1323, 1326-27 (11th Cir. 2004) (same).
In any event, this case does not involve a conspiracy claim against a parent and subsidiary
brought under the RICO or antitrust laws.

A 01278

corporations have interests in the affairs of their subsidiaries, a parent company loses any

"privilege" to interfere when it acts detrimentally to its subsidiary's economic interest.

*Boulevard Associates v. Sovereign Hotels, Inc.*, 72 F.3d 1029, 1037 (2d Cir. 1995); *In re*

*Conticommodity Services, Inc.*, 733 F.Supp. 1555, 1568 (N.D. Ill. 1990); *Waste Conversion*

*Systems, Inc. v. Greenstone Industries, Inc.*, 33 S.W.3d 779,  (Tenn. 2000); *see also Phil*

*Crowley Steel Corp. v. Sharon Steel Corp.*, 782 F.2d 781, 784 (8th Cir. 1986) (parent lost

privilege to interfere where it caused subsidiary to breach contract to its financial detriment).

The factual issue is whether the parent acted in its own interest, rather than the interest of its

subsidiary.  *See, e.g., HPI Health Care Svcs., Inc. v. Mt. Vernon Hosp., Inc.* 545 N.E.2d 672, 678

(Ill. 1989) (defendant hospital management company would not be justified in interfering with

hospital's contract where doing so would further only the management company's interests).

   In *In re Conticommodity*, the Court denied summary judgment on a tortious

interference claim against a parent and subsidiary, holding that the existence of any "privilege"

between a parent and subsidiary is a question of fact:

> Conti, however, can be liable for interfering with the contract to
> the extent it conspired with Continental and Continental's acts
> were not privileged.  Whether or not a parent or corporate officers
> were qualifiedly privileged depends on a variety of factors and the
> particular circumstances.  This includes questions of good faith and
> malice.  The question of privilege is not one that can be resolved
> on summary judgment on this record.

*In re Conticommodity*, 733 F.Supp. at 1568 (internal citations omitted); *see, e.g., Holmes Prods.*

*Corp. v. Dana Lighting, Inc.*, 958 F. Supp. 27 (D. Mass. 1997) (genuine issues of material fact as

to whether defendant was aware of competitor's contractual relationship, and whether letter sent

to competitor's client threatening to withhold business was a result of improper means or

improper motive precluded summary judgment on tortious interference claims); *Towe Farms,*

*Inc. v. Central Iowa Production Credit Ass'n*, 528 F. Supp. 500 (D. Iowa 1981) (summary

A 01279

judgment denied where genuine fact issue existed as to defendant's knowledge of plaintiff's contract and defendant's intent, if any, to induce breach of that contract); *Seven D. Enterprises, Ltd. v. Fonzi*, 438 F. Supp. 161 (D. Mich. 1977) (summary judgment denied where fact issue existed as to whether defendant had justifiable basis to tell his employer to breach contracts with plaintiff, or whether defendant was acting solely for his own benefit, in action involving termination of contract between plaintiff and defendant's employer).

WorldCom induced Intermedia to breach a contract which contains damages provisions subjecting Intermedia to considerable financial liability upon its breach. (Friedman Decl., Ex. D (Opposition) at ¶¶ 11-12, 25-26). By causing Intermedia to breach the UC Contract and thereby become liable for damages, even the limited evidence adduced so far indicates that WorldCom was protecting its own interest (i.e., supporting its own competitive product) and acting to Intermedia's direct financial detriment. As such, there are sharp factual issues as to whether WorldCom lost any "privilege" it might have had to influence Intermedia's performance under the UC Contract.

Debtors' reliance on the *Boulevard* case is misplaced. As Debtors point out, the contract at issue in *Boulevard* was no longer in the subsidiary's economic interest to perform. *Boulevard Assoc. v. Sovereign Hotels, Inc.*, 72 F.3d 1029, 1037 (2d Cir. 1995).[11] Unlike that contract, the UC Contract explicitly contemplated severe economic consequences to Intermedia

---

[11]    The other cases Debtors cite on this point either derive from *Copperweld*, are limited to antitrust cases and therefore are inapplicable to this matter (see discussion at § III(A), *infra*), or explicitly state that a parent is not privileged to interfere where it employs "wrongful" or "improper" means, or acts with malice. *Texas Taco Cabana, L.P. v. Taco Cabana of N.M., Inc.*, 304 F. Supp. 2d 903, 912 (W.D. Tex. 2003) (citing *Copperweld*); *Battenfield of America Holding, Inc. v. Baird, Kurtz & Dobson*, No. 97-2336-JWL, 1999 WL 232915, *4 (D. Kan. Feb. 5, 1999) (citing *Copperweld*); *Starcom, Inc. v. U.S. Telecom, Inc.*, No. 87-2540-V, 1991 WL 279291, *3 (D. Kan. Dec. 11, 1991) (citing *Copperweld*); *Record Club of America, Inc. v. United Artists Records, Inc.*, 611 F.Supp. 211, 217 (S.D.N.Y. 1985) (parent cannot interfere where it uses improper means or is motivated by malice); *Felsen v. Sol Café Mfg. Corp.*, 249 N.E.2d 459, 461 (N.Y. 1969) (same).

A 01280

if it did not perform.  (Reneau Aff., Ex. F at §§ 2.12-2.13, 5.3).  It was most definitely in

Intermedia's economic interest *not* to breach the UC Contract.  This is especially true since

Intermedia agreed to deliver a minimum number of accounts over specific time frames, including

to 10,000 current active subscribers by December 2001.  (Reneau Aff. ¶ 14, Ex. F, § 2.12).

Intermedia also agreed that if it failed to meet its Minimum Commitment, it was obligated to pay

EffectNet a "Reconciliation Payment", equal to the "Volume Shortfall multiplied by the based

monthly price applicable to the Intermedia UC Service per subscriber."  (Reneau Aff. ¶ 14, Ex.

F, § 2.12 – 2.13).  In addition, Intermedia provided multiple forecasts to EffectNet, including one

in November 2000 and one in March 2001, which forecasted that by the end of 2001 Intermedia

would have 10,000 account users pursuant to the UC Contract and consistent with the Minimum

Commitment.  (Reneau Aff. ¶ 23, Exs. K-L).  The roll-out for these products began in September

2000, continuing through December 2000, in at least 50 cities in the United States.  (Reneau Aff.

¶ 20).  The roll-out schedule encompassed and included training by EffectNet of Intermedia sales

staff in each market.  There was also training of Intermedia's customer care group during this

roll-out period.  (Reneau Aff. ¶ 21).  EffectNet trained hundreds of Intermedia's sales staff in the

different markets during this roll-out period.  (Reneau Aff. ¶ 21).  During September 2000 to

December 2000, there were approximately 50 Intermedia personnel actively engaged in the

project.  (Reneau Aff. ¶ 22).  In addition, there were 10 Intermedia*One* team leaders for different

areas.  (Reneau Aff. ¶ 22, Ex. I).  Moreover, the UC Contract product provided to Intermedia

was trumpeted as the support for the Intermedia Unified Messaging product.  (Ex. D to Reneau

Aff.).  In addition, telecommunications analysts were forecasting that the global unified

messaging market was likely to rise to $31 billion by 2006.  (Ex. D to Reneau Aff.).  Even the

A 01281

limited record establishes that the UC Contract was a major undertaking for Intermedia and the complete shut down by WorldCom could not have been in Intermedia's interest.

Parent companies also lose their "privilege" to interfere when they employ wrongful means in interfering. *Boulevard Associates*, 72 F.3d at 1037; *Phil Crowley Steel Corp.*, 782 F.2d at 783; *Speroni S.p.A. v. Perceptron, Inc.*, 12 Fed. Appx. 355, 360 (6th Cir. 2001); *Waste Conversion Systems*, 33 S.W.3d at 783-84; *see also Rutledge v. Arizona Bd. of Regents*, 711 P.2d 1207, 1223-24 (Ariz. Ct. App. 1985) (employee loses privilege to interfere with employer's contract where he engages in wrongful means); *Soderlund Bros., Inc. v. Carrier Corp.*, 663 N.E.2d 1, 10 (Ill. Ct. App. 1995) (privilege to interfere destroyed by use of wrongful means); *Vestal v. Oden*, 500 S.2d 954, 957 (Miss. 1986) (bad faith destroys privilege to interfere of party with financial interest in a contract); *Turkey Creek, Inc. v. Londono*, 567 So. 2d 943, 948 (Fla. Ct. App. 1990), aff'd, 609 So. 2d 14 (Fla. 1992) (party with financial interest in contract loses privilege to interfere where party uses improper means). "Wrongful means" include acts that are "wrongful in and of themselves", such as misrepresentation of facts, restraint of trade, or "any other wrongful act recognized by statute or common law." *Waste Conversion Systems*, 33 S.W.3d at 784; *see also Boulevard Associates*, 72 F.3d at 1037 ("wrongful means" include acting with malice, or intimidating a subsidiary to breach a contract); *Hidden Brook Air, Inc.*, 241 F. Supp. 2d at 278 (noting "it is always improper for a competitor to induce a party to breach an existing contract"); *Turkey Creek*, 567 So. 2d at 948.

WorldCom's inducement of Intermedia's contract breach falls squarely within the realm of misbehavior constituting "wrongful means". As Parus alleges, WorldCom forced Intermedia to breach the UC Contract for WorldCom's benefit. WorldCom had its own unified messaging initiative, which was a competitor to the Unified Communications service and

A 01282

applications provided by EffectNet under the UC Contract. (Reneau Aff. ¶ 37). Upon the announcement by WorldCom of the merger, its sole intention was to put forth its own unified messaging initiative at the expense of all others. (Friedman Decl., Exs. S and V). Neither WorldCom nor Intermedia ever disclosed this to EffectNet. Instead, they encouraged EffectNet to continue to pour money and resources into the project. In addition, WorldCom was pursuing technology with another company, Webley Systems, Inc., which was in the process of merging with EffectNet, of which WorldCom was well aware. (*See* Reneau Aff. ¶¶ 34-38, Exs. T-Z). WorldCom wanted to eliminate any funding source to Webley/EffectNet to gain leverage for better license prices in its negotiations with Webley. (Friedman Decl., Ex. D (Opposition) at ¶¶ 33-37). To the extent the value of the UC Contract was diminished, WorldCom's relationship with Webley would be made more lucrative. WorldCom was successful in changing the terms of the license agreements, negotiating a much better price for the license. (*Id.*). WorldCom's conduct in forcing Intermedia to breach the UC Contract hampered competition and caused significant financial exposure to Intermedia. As such, many factual questions exist as to whether any "privilege" WorldCom may have had to interfere with Intermedia's performance under the UC Contract disappeared. Summary judgment is therefore improper. *See, e.g., In re Conticommodity*, 733 F. Supp. at 1568 (defendant's summary judgment motion denied because existence of parent's "privilege" to interfere with subsidiary's contract with third party was not sufficiently developed on the record).

D.    The Antitrust Order

Debtors point to an order from the United States District Court for the District of Columbia dated June 26, 2001 (the "Antitrust Order") to argue it was the antitrust laws – specifically, the Clayton Act – that caused Intermedia to breach the UC Agreement, not

A 01283

WorldCom.  This ploy to deflect attention from their own culpable conduct is transparent.  Far

from inviting WorldCom's behavior, the Antitrust Order actually directs WorldCom to *not*

disturb Intermedia's contractual relationships or otherwise interfere in Intermedia's business.  As

the Antitrust Order states:

> Defendants are ordered and directed . . . to divest the Intermedia
> Assets *as an ongoing, viable business*. . . . Defendants shall
> warrant to any Acquirer of the Intermedia Assets that *the assets*
> *will be fully operational* on the date of sale. . . . *Defendants shall*
> *not take any action, direct or indirect, that will impede in any way*
> *the operation, sale, or divestiture of the Intermedia Assets*. . . . the
> divestitures . . . shall . . . be accomplished in such a way as to
> satisfy the United States . . . that the Intermedia Assets can and will
> be used by the Acquirer as a viable, ongoing business engaged in
> the provision of Internet backbone and access services.

Antitrust Order at § IV, ¶¶ A, E, F, G (Debtors' Motion, Ex. C).  The Antitrust Order defines

"Intermedia Assets" to include "all contracts" to which Intermedia is a party.  § II, ¶ F.

Effectively, then, the Antitrust Order directs WorldCom to preserve Intermedia's ongoing

business operations – independent from WorldCom's influence – including Intermedia's

obligations under the UC Contract, which was in effect when the Antitrust Order was issued.  *Id.*

In short, the Antitrust Order establishes the opposite of what Debtors imply.  That

Debtors rely on it to explain away Intermedia's breach of the UC Contract is a telling indication

of what WorldCom's motivations prior to the merger really were.  Indeed, the scant evidence

produced thus far shows that WorldCom was never intending to go forward with the UC

Contract prior to the Order.  (Friedman Decl., Exs. S and V; Reneau Aff., Exs. N, P and Q).

E.    Deceptive Trade Practices

Debtors misconstrue the statute underlying Parus' claim of deceptive trade

practices, as well as language in the UC Contract that demonstrates Parus' right to rely on that

statute.  Under the Arizona Consumer Fraud Act (the "ACFA"), parties are prohibited from using

A 01284

deception, fraud, misrepresentation, false promises, or concealment or suppression of any

material fact, with the intent to induce reliance, in connection with the sale of any merchandise.

A.R.S. § 44-1522(A). "Merchandise", as used in the Arizona statute, is defined to include, *inter*

*alia*, "commodities", "intangibles", and "services". A.R.S. § 44-1521.5.[12]

      Debtors argue that Arizona's statute does not apply to them because "Intermedia

was not the 'seller' of anything to EffectNet" (*See* Debtors' Memorandum of Law at 12). This

argument fails. Under Section 2.12 of the UC Contract, Intermedia agrees to "deliver a

minimum of 1,500 . . . subscribers . . . " to Parus. By this language, it is clear that what

Intermedia was contracting to provide to EffectNet was a specified amount of "commodities",

"services", and perhaps also "intangibles". At the very least, what Intermedia was providing to

EffectNet – in the form of a minimum number of subscribers – was a service.

      Nor is Debtors' argument that it was not a "seller" availing. Under the ACFA,

deceptive acts are prohibited "regardless of whether the deceiver is the seller." *State ex rel.*

*Woods v. Sgrillo*, 859 P.2d 771, 772 (Ariz. Ct. App. 1993). As that court states, "[t]he broadly

remedial purposes of the CFA should not be defeated by niggling distinctions ...." *Id.*, citing

*Villegas v. Transamerica Financial Svcs., Inc.*, 708 P.2d 781, 783 (Ariz. Ct. App. 1985) (holding

that money constitutes "merchandise" under the ACFA). Intermedia's agreement to provide

---

[12]    Similarly, the Florida Deceptive and Unfair Trade Practices Act (the "FDUTPA") outlaws all "unfair methods of competition" and "unfair or deceptive acts or practices in the conduct of any trade or commerce." F.S.A. § 501.204. Like the ACFA, Florida's statute is defined broadly, stating an explicit purpose of protecting "legitimate business enterprises from those who engage in" such unfair or deceptive conduct. F.S.A. 501.202. In setting forth the class of permissible plaintiffs under the FDUTPA, that statute defines "consumer" to include any "business", "firm", "corporation", or "commercial entity, however denominated", and the statute specifically applies to "providing" or "distributing" "any good or service, . . . whether tangible or intangible, or any other article, commodity, or thing of value." F.S.A. § 501.203. The Mississippi Consumer Fraud Act is likewise drafted in broad terms to cover the "distribution of any services and any property, tangible or intangible, . . . and any other article, commodity, or thing of value" to "corporations" or "any other legal entity." Miss. Code Ann. §§ 75-24-3, 5.

A 01285

subscribers to EffectNet, as embodied in the UC Contract, fits squarely within the scope of the ACFA.

The Illinois Consumer Fraud and Deceptive Business Practices Act (the "Illinois Act") is similarly broad, covering the sale of any "commodities", "intangibles", or "services" to any "company" or "business entity". 815 ILCS § 505/1. Moreover, even if a plaintiff is not deemed to be a "consumer" under the Illinois Act, the plaintiff can still sue under that act if the defendant's alleged conduct affected consumers generally or otherwise implicated consumer protection concerns. *Peter J. Hartmann Co. v. Capital Bank and Trust Co.*, 694 N.E.2d 1108, 1116-17 (Ill. Ct. App. 1998). Here, Debtors' conduct unquestionably affected the ability of subscribers, and potential subscribers, to obtain services that would have been available to them if not for Debtors' conduct, which caused the premature termination of the UC Contract. At the very least, further discovery on this issue is necessary.

## IV.

### PARUS' CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING IS NOT BARRED AS A MATTER OF LAW

Debtors again invoke the Antitrust Order to argue they did not breach the covenant of good faith and fair dealing implied in the UC Contract. *See* Debtors' Memorandum of Law at 13. As explained above, if it bears on this case at all, the Antitrust Order serves to bolster Parus' claims – including its claim for breach of the implied covenant of good faith and fair dealing – not diminish them. By the very terms of the Antitrust Order, WorldCom was obligated to ensure the UC Contract remained in effect. Antitrust Order at § IV, ¶¶ A, E, F, G.

A party breaches the implied covenant of good faith and fair dealing when it denies the other party its right to receive benefits flowing from the contract at issue. *Rawlings v.*

A 01286

*Apodaca*, 726 P.2d 565, 569 (Ariz. 1986).  As explained above, Intermedia intentionally and

totally frustrated Parus' rights under the UC Contract, thereby denying Parus the explicit benefits

provided by that contract. (*See* Reneau Aff. at ¶¶ 20-33, 50).  Discovery in this action will

doubtless yield additional evidence of specific acts establishing Intermedia's breach of the

implied covenant of good faith and fair dealing.  Moreover, as noted in *G. Golden Assocs. of*

*Oceanside, Inc. v. Arnold Foods Co.*:

> "Whether a party has acted in good faith is typically a question to
> be answered by the trier of fact, not in a summary judgment
> motion. Issues of motive simply are not easily determinable before
> trial on the basis of a limited record without the ability to assess
> the credibility of witnesses."

870 F. Supp. 472 (E.D.N.Y. 1994) (citing *Brass v. American Film Technologies, Inc.*, 987 F.2d

142, 148-49 (2d Cir. 1993)) (denying summary judgment on breach of covenant of good faith

action where genuine fact issue existed as to whether trademark assignee acted in good faith

when it ceased performing on a contract after its parent company acquired a competitor with a

competing product).  Consequently, Debtors' Motion must be denied as a matter of law.

A 01287

**WHEREFORE**, Parus respectfully requests that this Court enter an order denying Debtors' Motion For Summary Judgment and granting such other and further relief as this Court deems just and proper.

Dated: New York, New York
       November 18, 2005

Respectfully submitted,

KELLEY DRYE & WARREN LLP


By: /s/ Robert S. Friedman
    John M. Callagy (JC 8166)
    Robert S. Friedman (RF 1538)

    101 Park Avenue
    New York, NY 10178
    (212) 808-7800

    Attorneys for Claimant
    Parus Holdings, Inc., Successor-By-Merger
    to EffectNet, Inc. and EffectNet, LLC

A 01288