**KELLEY DRYE & WARREN LLP**
John M. Callagy  (JC 8166)
Robert S. Friedman (RF 1538)
101 Park Avenue
New York, New York  10178
Tel:  (212) 808-7800
Fax: (212) 808-7897
Attorneys for Parus Holdings, Inc., Successor-By-
Merger to EffectNet, Inc. and EffectNet, LLC

**Hearing Date: December 6, 2005 at 10:00 a.m.**
**Reply Deadline: December 2, 2005 at 4:00 p.m.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **In re:** | **Case No. 02-13533 (AJG)** |
| **WORLDCOM, INC.,** *et al.*, | **Chapter 11** |
| **Debtors.** | **(Jointly Administered)** |

## CLAIMANT PARUS HOLDINGS, INC.'S STATEMENT
## IN RESPONSE AND OPPOSITION TO DEBTORS'
## STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Fed. R. Civ. P. 56, Fed. R. Bankr. P. 7056, and Rule 7056-1 of the

Local Bankruptcy Rules for the Southern District of New York, Claimant Parus Holdings, Inc.,

Successor-By-Merger to EffectNet, Inc. and EffectNet, LLC ("Claimant", "EffectNet" or

"Parus"), by and through its attorneys, Kelley Drye & Warren LLP, submits this Statement in

Response and Opposition to Reorganized Debtors' Statement of Undisputed Material Facts

submitted in support of debtors' ("Debtors") Motion for Summary Judgment on Claim Nos.

11242 (replacing 9291) and 11173 (replacing 9293) (the "Motion").  Claimant also submits,

starting at ¶¶ 26 – 73, pursuant to Fed. R. Civ. P. 56, Fed. R. Bankr. P. 7056, and Rule 7056-1 of

the Local Bankruptcy Rules for the Southern District of New York, its Statement of Material

Facts in Response and Opposition to Debtors' Statement of Undisputed Material Facts.

Claimant further submits, as outlined in Claimant's response and opposition to

A 01289

Debtors' motion for summary judgment, dated November 18, 2005, and the Declaration of

Robert S. Friedman, dated November 18, 2005, that discovery in this case is not yet complete.

Claimant has responded to the Debtors' Statements of Undisputed Material Facts on the present

record and Claimant's Statements are made on the present record.  Claimant reserves its right to

supplement this Statement in Response and Opposition to Debtors' Statement of Undisputed

Material Facts upon further discovery of evidence.

### RESPONSE AND OPPOSITION TO DEBTORS' STATEMENTS OF UNDISPUTED MATERIAL FACTS

1.    Parus does not dispute paragraph 1 of WorldCom's Statement of Material

Facts as to Which There are No Genuine Issues To Be Tried ("Debtors' 56.1 Stmt.")

2.    Parus does not dispute paragraph 2 of Debtors' 56.1 Stmt.

3.    Parus does not dispute paragraph 3 of Debtors' 56.1 Stmt.

4.    In response to paragraph 4 of Debtors' 56.1 Stmt., Parus respectfully

refers the Court to Parus' Response and Opposition to Debtors' Objection to Proofs of Claim

Filed by EffectNet, Inc. (*See* Friedman Decl., Ex. D ("Parus' Objection Opposition")) for a

complete and accurate statement of its contents, since Debtors misstate and mischaracterize

paragraph 79.  In fact, paragraph 79 of Parus' Objection Opposition states, in full,

> After the Intermedia-WorldCom business combination, EffectNet
> was advised that WorldCom would be overseeing all projects
> relating to the UC Contract, and senior members of Intermedia that
> had dealt with EffectNet concerning the UC Contract were
> apparently dismissed or reassigned.  Accordingly, EffectNet
> believes that WorldCom was directly involved in and directed the
> apparent decision to breach the UC Contract.

Friedman Decl., Exhibit D at ¶ 79.

5.    Parus does not dispute paragraph 5 of Debtors' 56.1 Stmt.

A 01290

6.      Parus respectfully refers the Court to the Unified Communications Services General Agreement, dated as of November 20, 2000 ("UC Contract"), for a full and complete statement of its terms. (Reneau Aff. at ¶ 10, Ex. F, § 12.3).[1]

7.      Parus disputes paragraph 7 of Debtors' 56.1 Stmt. because it incompletely and inaccurately describes Section 11 of the UC Contract.  Parus respectfully refers the Court to Section 11 of the UC Contract for a full and complete statement of the terms of that Section. (Reneau Aff., Ex. F, § 11).

8.      Parus does not dispute paragraph 8 of Debtors' 56.1 Stmt.

9.      Parus does not dispute paragraph 9 of Debtors' 56.1 Stmt.

10.      Parus disputes the statement in paragraph 9 of Debtors' 56.1 Stmt. that the deposit was a "contract performance deposit", and Parus respectfully refers the Court to Section 4.5.1 of the UC Contract for a full and complete statement of the terms of that Section. (Reneau Aff., Ex. F, § 4.5.1).

11.      Parus does not dispute paragraph 11 of Debtors' 56.1 Stmt. and respectfully refers the Court to Debtors' Exhibit C for a full and complete statement of its terms and import.

12.      Parus does not dispute paragraph 12 of Debtors' 56.1 Stmt.

13.      Parus does not dispute paragraph 13 of Debtors' 56.1 Stmt.

14.      Parus does not dispute paragraph 14 of Debtors' 56.1 Stmt. except that Parus' invoice, dated February 6, 2002, was sent to Intermedia on or about February 12, 2002.

---

[1]      "Reneau Aff." refers to the Affidavit of Taj Reneau in Support of Claimant's Response and Opposition to Debtors' Motion for Summary Judgment, sworn to on November 17, 2005.

A 01291

(Reneau Aff., Ex. R; McConnell Aff., Ex. A).[2]  Parus respectfully refers the Court to the documents cited by Debtors for full and complete statements of their terms.

15.    Parus does not dispute paragraph 15 of Debtors' 56.1 Stmt.

16.    Parus disputes Debtors' characterization of the March 12, 2002 letter from Robert C. McConnell to Rich Black of Intermedia as a "termination" of the UC Contract. (McConnell Aff. at ¶¶ 5, 8-10, Ex. A).   Parus does not dispute that the March 12, 2002 letter gave notice to Intermedia of its breach of the UC Contract, and that in the letter EffectNet requested immediate payment for the outstanding invoices and that Intermedia cure its breach. *(Id.)* The March 12, 2002 letter never terminated or operated to terminated the UC Contract. *(Id.)*   Indeed, the March 12, 2002 letter stated "If Intermedia fails to cure the Intermedia Defaults and if EffectNet terminates the Agreement as aforesaid, EffectNet may claim damages for all amounts due pursuant to the Agreement. . ." *(Id.)*  Mr. McConnell also specifically reserved rights and remedies EffectNet had under the UC Contract and other law.  *(Id.)*  Parus respectfully refers the Court to the March 12, 2002 letter from Mr. McConnell to Mr. Black for a full and complete statement of its terms and import.  *(Id.)*

17.    Parus disputes Debtors' characterization of the March 25, 2002 letter from Robert C. McConnell to Brett Bacon of WorldCom as a "termination" of the UC Contract. (McConnell Aff. at ¶¶ 6, 8-10, Ex. B).  Parus further states Intermedia neither paid the outstanding invoices nor cured the breach identified in the March 12, 2002 letter.  Mr. McConnell therefore wrote a second letter, dated March 25, 2005, again requesting payment of the invoices, which were now $827,844.27, and further requesting that Intermedia cure its

---

[2]    "McConnell Aff." refers to the Affidavit of Robert C. McConnell in Support of Claimant Parus Holdings, Inc.'s Response and Opposition to Debtors' Motion for Summary Judgment, sworn to on November 18, 2005.

A 01292

breach. *(Id.)*  There was no intention to terminate the UC Contract. *(Id.)*  Indeed, the March 25, 2002 letter stated, "If Intermedia fails to cure the Intermedia Defaults and if EffectNet terminates the Agreement as aforesaid, EffectNet may claim damages for all amounts due pursuant to the Agreement. . ." *(Id.)*  EffectNet advised Intermedia that EffectNet may claim damages for all amounts due under the UC Contract, which included the Minimum Commitment through the end of the Initial Term.  EffectNet again reiterated its reservation of its rights and remedies. *(Id.)*  Parus respectfully refers the Court to the March 25, 2002 letter for a full and complete statement of its terms.

18.    Parus disputes paragraph 18 of Debtors' 56.1 Stmt. because it fails to recite the full text of Section 5.2 of the UC Contract.  Parus respectfully refers the Court to Section 5.2 of the UC Contract for a full and complete statement of the terms of that Section. Parus further disputes that either the March 12, 2002 or March 25, 2002 letters acted as a termination under the UC Contract. (McConnell Aff. at ¶¶ 5, 6, 8-10, Exs. A and B; Reneau Aff., Ex. F at §5.2).  Indeed, the March 12, 2002 and March 25, 2002 letters each stated, "If Intermedia fails to cure the Intermedia Defaults and if EffectNet terminates the Agreement as aforesaid, EffectNet may claim damages for all amounts due pursuant to the Agreement. . ." (McConnell Aff. at ¶¶ 5, 6, 8-10, Exs. A and B).  In fact, Mr. McConnell's sole and clear intention in sending the March 12th and March 25th letters was to receive payment of the invoices and provide notice of the breach in an effort to encourage Intermedia's cure and ultimate performance of its obligations under the UC Contract.  Mr. McConnell never intended to terminate the UC Contract nor limit Intermedia's obligations in any manner.  (McConnell Aff. at ¶ 9).

19.    Parus does not dispute paragraph 19 of Debtors' 56.1 Stmt.

A 01293

20.     Parus disputes that paragraph 20 of Debtors' 56.1 Stmt. contains the full text of Section 5.3 of the UC Contract. Parus also disputes that a "termination" actually occurred based on the March 12th and March 25th letters. (McConnell Aff. at ¶¶ 5, 6, 8-10, Exs. A and B). Indeed, the March 12, 2002 and March 25, 2002 letters each stated, "If Intermedia fails to cure the Intermedia Defaults and if EffectNet terminates the Agreement as aforesaid, EffectNet may claim damages for all amounts due pursuant to the Agreement. . ." (McConnell Aff. at ¶¶ 5, 6, 8-10, Exs. A and B). Parus respectfully refers the Court to Section 5.3 of the UC Contract for a full and complete statement of the terms of that Section. (Reneau Aff., Ex. F, § 5.3).

21.     Parus disputes paragraph 21 of Debtors' 56.1 Stmt. Parus disputes that the "Basic Service" rate of $11.45 was applicable to computation of amounts due under the UC Contract as the Reconciliation Payment. (Reneau Aff. at ¶¶ 15-17, Ex. F, § 2.12-2.13, Appendix P). Rather, Parus states that the "Unlimited Service" rate of $27.40 is applicable to computation of amounts due under the UC Contract for the Reconciliation Payment calculation. (Reneau Aff. at ¶¶ 15-17). Thus, Parus states that Volume Shortfall (9,953) multiplied by the "Unlimited Service" rate of $27.40 equals $272,712.20. (Reneau Aff., Ex. F, Appendix P). The total amount due EffectNet during the December 2001 billing cycle was $274,021.05. (Reneau Aff. at ¶¶ 43-44, Ex. CC).

22.     Parus dispute paragraph 22 of Debtors' 56.1 Stmt. Parus disputes that the "Basic Service" rate of $11.45 was applicable to computation of amounts due under the UC Contract as the Reconciliation Payment. (Reneau Aff. at ¶¶ 15-17, Ex. F, § 2.12-2.13, Appendix P). Parus states that the "Unlimited Service" rate of $27.40 is applicable to computation of amounts due under the UC Contract for the Reconciliation Payment calculation. (Reneau Aff. at ¶¶ 15-17). Parus states that the Volume Shortfall during the January 2002 billing cycle was

A 01294

9,953 accounts.  That Volume Shortfall (9,953) multiplied by the "Unlimited Service" rate of

$27.40 equals $272,712.20.  (Reneau Aff. at ¶ 45, Ex. F, Appendix P).  The total amount due

EffectNet during the January 2002 billing cycle was $274,066.20.  (Reneau Aff. at ¶ 45, Ex.

DD).

23.     Parus disputes paragraph 23 of Debtors' 56.1 Stmt.   Parus disputes that

the "Basic Service" rate of $11.45 was applicable to computation of amounts due under the UC

Contract as the Reconciliation Payment. (Reneau Aff. at ¶¶ 15-17, Ex. F, § 2.12-2.13, Appendix

P).  Parus states that the "Unlimited Service" rate of $27.40 is applicable to computation of

amounts due under the UC Contract for the Reconciliation Payment calculation. (Reneau Aff. at

¶ 46).  Parus states that Volume Shortfall (9,958) multiplied by the "Unlimited Service" rate of

$27.40 equals $272,849.20.  (Reneau Aff. at ¶ 46, Ex. F, Appendix P).  The total amount due

EffectNet during the February 2002 billing cycle was $279,757.02.  (Reneau Aff. at ¶ 46, Ex.

CC).

24.     Parus disputes paragraph 24 of Debtors' 56.1 Stmt.  Parus disputes the

statement that the "Basic Service" rate of $11.45 was applicable to computation of amounts due

under the UC Contract for the Reconciliation Payment, though Parus does not dispute that the

Minimum Commitment for the March 2002 billing cycle was 10,000 active accounts.  (Reneau

Aff. at ¶ 47, Ex. F, §§ 2.12-2.13, Appendix P).

25.     Parus disputes paragraph 25 of Debtors' 56.1 Stmt.  Parus states that

beginning with the March 2002 billing cycle, and for 20 months thereafter – until expiration of

the term of the UC Contract – the Volume Shortfall was 10,000 customers.  (Reneau Aff. at ¶ 47,

Ex. F at §§ 2.12, 5.1).  That Volume Shortfall for the March 2002 billing cycle (10,000) and the

20 months thereafter multiplied by the "Unlimited Service" rate of $27.40 equals $274,000.00

A 01295

for March 2002, and the 20 months thereafter.  (Reneau Aff. at ¶ 47, Ex. F, Appendix P).

Therefore, the monthly amount due ($274,000.00) for the remainder of the term of the UC

Contract, beginning in March 2002 (21 months), equals $5,754,000.00 (Reneau Aff. at ¶47, Ex.

F at §2.12-2.13, Appendix P).  Parus further states that Intermedia's obligations under the UC

Contract included at a minimum, the requirements under the "take or pay" provision to meet

10,000 accounts annually.  (Reneau Aff. at ¶ 48, Ex. F at §§2.12-2.13).  Indeed, Intermedia's

forecasts expected at least 10,000 accounts annually. (Reneau Aff. at ¶ 48, Exs. L and M).

Accordingly, simply applying the minimum "take or pay" provisions of the UC Contract, the

"Reconciliation Payment" and EffectNet's direct damages are $6,307,844.27 ($5,754,000 +

$827,844.27 = $6,307,844.27) plus interest.  (Reneau Aff. at ¶ 49).

## CLAIMANT PARUS HOLDINGS, INC.'S
## STATEMENT OF MATERIAL FACTS

### EffectNet and its Relationship With Intermedia

26.     After several months of exploratory activities and negotiations, in or about

August 2000, EffectNet, and Intermedia Communications, Inc. ("Intermedia") entered into a

Memorandum of Understanding pursuant to which EffectNet agreed to provide communications

services to Intermedia, including unified communications services, for ultimate use by

Intermedia's end-user customers.  (Reneau Aff., Ex. A).

27.     The Memorandum of Understanding between EffectNet and Intermedia

was the start of a collaborative effort to launch EffectNet's unified communications service and

applications into Intermedia's customer distribution channels.

28.     Intermedia was a provider of integrated data and voice telecom, internet

access and local and long-distance phone services to approximately 90,000 small and medium

sized businesses. (Reneau Aff. at ¶ 7, Ex. B).  The unified communications service and

A 01296

applications provided by EffectNet was ultimately to be bundled into a product called
Intermedia*One*, and sold to Intermedia's customer's through Intermedia's network of sales
representatives in 50 cities of the United States. (Reneau Aff. at ¶ 7, Ex. C).  It was EffectNet's
understanding from conversations with Intermedia personnel, other representations and forecasts,
that Intermedia believed the product would be hugely successful.  Thus, by January 2001, it had
separated EffectNet's unified communications service and applications into a product separate
from Intermedia*One*, which was called "Intermedia Unified Messaging" (otherwise referred to
hereinafter as EffectNet's Service). (Reneau Aff. at ¶ 7).

      29.    Intermedia Unified Messaging was the first Web and telephone based
unified messaging platform offered by a major U.S. service provider and allowed business
professionals to custom build a communications portal that retrieved and sent fax, e-mail and
telephone messages through any device, with the help of a virtual assistant. (Reneau Aff. at ¶ 8,
Ex. D).  EffectNet's unified communications service applications powered Intermedia's Unified
Messaging product and was the integral component for it. (Reneau Aff. at ¶ 8).

      30.    On September 1, 2000, EffectNet and Intermedia entered into an Interim
Agreement, pursuant to which EffectNet continued to provide unified communications service
provided under the Memorandum of Understanding.  (Reneau Aff. at ¶ 9, Ex. E).

**UC Contract**

      31.    On November 20, 2000, EffectNet and Intermedia entered into the Unified
Communications Services General Agreement ("UC Contract") pursuant to which EffectNet
agreed to provide, and Intermedia agreed to use and sell to end-user customers, a platform of
telecommunications services.  (Reneau Aff. at ¶ 10, Ex. F).  The term of the contract was three
years.  The UC Contract was the culmination of the parties' efforts since August 2000 to work

A 01297

together to launch the unified communications service applications provided by EffectNet. (Reneau Aff. at ¶ 10).

32.    The UC Contract had an initial launch date of December 18, 2000, and the three-year term ran to December 2003. (Reneau Aff. at ¶ 11, Ex. F at §§ 1.3, 5.1).

33.    Pursuant to the UC Contract, EffectNet promised to do what it had been doing under the Memorandum of Understanding and Interim Agreement:  provide private label internet and telecommunications products and services, including unified communications and other value added services, in-house customer services, billing and technical support.  (Reneau Aff. at ¶ 12, Ex. F).

34.    In return, Intermedia contracted to supply the customer accounts who would use the product, pay Intermedia, and Intermedia would then pay EffectNet.  (Reneau Aff. at ¶13, Ex. F).

35.    Intermedia agreed to deliver a minimum number of accounts over specific time frames, including up to 10,000 current active account subscribers by December 2001 and, thereafter, through the remainder of the Initial Term, December, 2003.  (Reneau Aff. at ¶14, Ex. F, §2.12).  Intermedia also agreed that if it failed to meet its Minimum Commitment, it was obligated to pay EffectNet a "Reconciliation Payment" equal to the "Volume Shortfall multiplied by the base monthly price applicable to the Intermedia UC Service per subscriber,".  (Reneau Aff. at ¶ 14, Ex. F, §2.12-2.13).

36.    The only price negotiated as the "base monthly price" was the "Unlimited Service" rate of $27.40.  (Reneau Aff. at ¶ 15).  This is the price the parties intended to be used for the calculation of Minimum Commitment and Reconciliation Payment. *(Id.)*  The "Basic Service" was included in Appendix P merely as an expedient service for those few end-users or

A 01298

customers that just wanted to try the UC Service on a temporary or initial basis. *(Id.)* Indeed, the parties intended to use the Basic Service only as an introductory low-price marketing option for customers who were primarily testing or trialing the service. Further, the Basic Service only appeared inexpensive because of the $11.45 monthly fee but because all inbound minutes were charged at 10 cents per minute, the Basic Service would in fact be more expensive to a customer in almost all cases because the Unlimited Service that did not charge for inbound minutes of use. *(Id.)* The expected actual minute usage for almost all customers made the Unlimited Service economically more compelling than the Basic Service. *(Id.)* In fact, the typical customer of equivalent services provided by EffectNet and Webley averaged between roughly 300 and 400 minutes of usage per month. A simple example illustrates why the Unlimited Service would be economically compelling for these customers. *(Id.)* A customer of the Basic Service with only 250 inbound minutes of usage per month would pay not only the fixed base monthly price of $11.45 but would also pay 10 cents per inbound minute of usage, or a total of $27.40 per month. *(Id.)* By contrast, the Unlimited Service included all inbound minutes of usage without charge and, therefore, customers averaging more than 250 inbound minutes of usage per month would save money with the Unlimited Service and would be economically compelled to make that decision. (Reneau Aff. at ¶ 15).

     37.     In addition, the statement "base monthly price" was used by the parties and understood to mean the fixed monthly fee in contrast to the variable usage-based per minute pricing in the $27.40 "Unlimited Service" price plan. Here "base" served to distinguish between fixed monthly fees and variable usage based fees--a commonly understood distinction and phraseology in the telecommunications industry. The word "base" never had anything to do with

A 01299

the term "Basic" as applied to the Pricing, either "Unlimited Service" or "Basic Service," for accounts as between EffectNet and Intermedia. (Reneau Aff. at ¶ 16).

38.     Thus, the "Unlimited Service" rate of $27.40 was to be the base monthly price used in calculating any Reconciliation Payment. (Reneau Aff. at ¶17).

39.     This "take or pay" provision is common in the telecommunications industry, requiring Intermedia to supply a guaranteed minimum number of customers each month.  (Reneau Aff. at ¶ 18, Ex. F, §§ 2.12-2.13).

40.     During the entire term of the UC Contract, including in 2000, 2001, and 2002, EffectNet performed all of its material obligations under the UC Contract. (Reneau Aff. at ¶19).

## EffectNet Devotes Its Resources to Intermedia

41.     The roll-out for the unified communications service applications began in September 2000 and continued through December 2000, in at least 20 markets. (Reneau Aff. at ¶20, Ex. C).  The roll-out schedule encompassed and included extensive training by EffectNet of Intermedia sales staff in each market.  EffectNet also trained Intermedia's customer care group during this roll-out period.  (Reneau Aff. at ¶20, Ex. G).

42.     EffectNet trained hundreds of Intermedia's sales staff in the different markets during this roll-out period and included the establishment of a technical facility for training sales staff and customer care staff (Reneau Aff. at ¶21, Ex. G), and the preparation of an EffectNet training manual and curriculum. (Reneau Aff. at ¶21, Ex. H)

43.     During September 2000 to December 2000, there were approximately 50 Intermedia personnel actively engaged in this project. (Reneau Aff. at ¶22, Ex. I).  In addition, there were 10 Intermedia*One* team leaders for different areas, including Jim Renforth, Marketing

A 01300

– Senior Product Manager; Sherrie Baughman, Marketing – Senior Product Manager; Wanda

Friend, Senior Manager – Customer Care; Carol Vigor, Customer Billing Operations Manager;

Theresa Blake, Sales Operations – Account Consulting; Donna Serdinak, Billing Operations;

Jhan West, Sales Operations Manager; Len Jasczak, HR-Training; Brian Pruitt, Network

Operations; and Jack Kerrigan, Program Manager. (Reneau Aff. at ¶22, Ex. J)

44.     Intermedia provided multiple forecasts to EffectNet, including one in

November 2000, which forecasted that by the end of 2001 Intermedia would have 10,000 active

accounts. (Reneau Aff. at ¶ 23, Exs. K and L).

45.     EffectNet relied on these forecasts and devoted considerable resources to

the unified communications service application.  EffectNet committed and invested significant

personnel and technology resources to this project.  (Reneau Aff. at ¶ 24)  Indeed, EffectNet

dedicated approximately one-third of its total workforce, including its lead Project Manager,

Javid Freeman,  to the Intermedia project.  Mr. Freeman and others were devoted full-time to this

project.  They created, structured  and organized EffectNet's unified communications service

applications to meet Intermedia's needs, on a daily basis.  Further, EffectNet established a

training facility and curriculum for Intermedia sales and customer care staff for multiple full-day

training sessions.  (Reneau Aff. at ¶24; Ex. M).  EffectNet also provided a 24-hour, 7-day per

week technical support center that occupied approximately 10,000 square feet out of about

17,000 total square feet of EffectNet office space.   This technical support center was fully

furnished with cubicles offering customer care seating for over 100 representatives and was

intended to support the expected Intermedia business. (Reneau Aff. at ¶ 24).

46.     This incredible commitment of resources was extremely expensive, both

in out of pocket costs and in diversion of professionals.  The cost of the ramp-up, training, and

A 01301

project management by EffectNet was significant in time, employees and cost. (Reneau Aff. at ¶24).

## Intermedia Ceased Performance of Its Material Obligations Under the UC Contract

47.     In July 2001, Intermedia's Jack Kerrigan informed EffectNet that there would be no new customers at that time.  (Reneau Aff. at ¶ 26, Ex. N).  Indeed, even as early as January 2001, Parus noticed that Intermedia was only opening accounts for Intermedia sales representatives and certain Intermedia executives. (Reneau Aff. at ¶ 26).

48.     Also in July 2001, Intermedia fired Jim Renforth, who was the Intermedia-EffectNet point person on the UC Contract.  (Debtors' 56.1 Stmt. at ¶ 12; Reneau Aff. at ¶ 27, Ex. O).  Parus was informed that at the same time, dozens of Intermedia employees who had also been working exclusively on the UC Contract were either fired or reassigned to unrelated departments. (Reneau Aff. at ¶ 27).

49.     Parus was further informed at that time that hundreds of sales personnel – who had been trained by EffectNet to provide support under the UC Contract – were told to stop working on the project. (Reneau Aff. at ¶ 28).

50.     In July and September 2001, Intermedia cancelled about over 90% of the accounts.  At this time, only approximately 47 accounts remained open and these were exclusively for Intermedia employees. (Reneau Aff. at ¶ 29, Ex. P).

51.     In fact, by September 2001, Debtors pulled the IntermediaOne (including the EffectNet applications) from over 25 markets. (*See* Friedman Decl., Ex. Y)

52.     The last payment made by Intermedia for these remaining 47 accounts was on December 7, 2001, for $15,616.92.  Since that time, Intermedia failed, and has continued to

A 01302

fail, to make any obligated payments under the UC Contract, with respect to either its outstanding invoices or Minimum Commitment. (Reneau Aff. at ¶ 30).

53.    In March 2002, Jim Faust, the new Project Manager for Intermedia, demanded cancellation of all remaining accounts, also contrary to Intermedia's obligations under the UC Contract. (Reneau Aff. at ¶ 31, Ex. Q). As of March 2002, invoices for the December 2001, and January and February 2002 billing periods remained outstanding. (McConnell Aff. at ¶ 4, Ex. A).

54.    On March 12, 2002, Robert McConnell, EffectNet's General Counsel wrote to Intermedia advising Intermedia of the breach of its obligations under the UC Contract by failing to meet the Minimum Commitment of accounts, and failing to pay outstanding invoices, at that time totaling $548,087.25. (McConnell Aff. at ¶ 5, Ex. A (March 12, 2002 Letter) Mr. McConnell wrote another letter to Intermedia on March 25, 2002 advising of the continued breach of Intermedia's Minimum Commitment obligations, and its increased outstanding invoice obligations of $827,844.27. (McConnell Aff. at ¶ 6, Ex. B).

55.    After EffectNet received no response from Intermedia, and in light of Intermedia's breach of the UC Contract, EffectNet ceased performing for under the UC Contract. (Reneau Aff. at ¶ 33).

**The Minimum Amount Owed by Intermedia to EffectNet is the Reconciliation Payment Plus Outstanding Invoices**

56.    Almost all (97.74%) of the customer end-user accounts that were opened in 2000 and 2001, were the "Unlimited Service" at a fixed monthly rate of $27.40 per account (as opposed to $11.45). (*See, e.g.,* Reneau Aff. at ¶39; Ex. P). In addition, Debtors never objected contemporaneously to the invoices submitted using the Unlimited Service rate. (*See, e.g.,* Reneau Aff. at ¶ 39, Ex. BB).

A 01303

57.     During the December 2001 billing cycle, 46 out of 47 of then-active mailboxes being supplied to EffectNet under the UC Contract were "Unlimited Service" mailboxes, which were billed at $27.40 per month, as opposed to "Basic Service" mailboxes. (Reneau Aff. at ¶ 43, Ex. CC).

58.     The Volume Shortfall during the December 2001 billing cycle was 9,953 accounts. (Reneau Aff. at ¶ 44, Ex. CC). That Volume Shortfall (9,953) multiplied by the "Unlimited Service" rate of $27.40 equals $272,712.20. (Reneau Aff. at ¶ 44, Ex. CC, Ex. F at Appendix P). The total amount due EffectNet during the December 2001 billing cycle was $274,021.05. (*Id.*).

59.     During the January 2002 billing cycle, 46 out of 47 of then-active mailboxes being supplied to EffectNet under the UC Contract were again "Unlimited Service" mailboxes, which were billed at $27.40 per month, as opposed to "Basic Service" mailboxes. The Volume Shortfall during the January 2002 billing cycle was 9,953 accounts. Ex. D to Parus' Opposition. That Volume Shortfall (9,953) multiplied by the "Unlimited Service" rate of $27.40 equals $272,712.20. The total amount due EffectNet during the January 2002 billing cycle was $274,066.20. (Reneau Aff. at ¶45, Exs. DD, F at Appendix P).

60.     During the February 2002 billing cycle, all 42 of the then-active mailboxes being supplied to EffectNet under the UC Contract were "Unlimited Service" accounts, which were billed at $27.40 per month, as opposed to "Basic Service" accounts. The Volume Shortfall during the February 2002 billing cycle was 9,958. That Volume Shortfall (9,958) multiplied by the "Unlimited Service" rate of $27.40 equals $272,849.20. The total amount due EffectNet during the February 2002 billing cycle was $279,757.02. (Reneau Aff. at ¶ 46, Exs. EE, F, Appendix P).

A 01304

61.    Beginning with the March 2002 billing cycle, and for 20 months thereafter – until expiration of the term of the UC Contract – the Volume Shortfall was 10,000 customers. That Volume Shortfall for the March 2002 billing cycle (10,000) and the 20 months thereafter multiplied by the "Unlimited Service" rate of $27.40 equals $274,000.00 for March 2002, and the 20 months thereafter. Therefore, the monthly amount due ($274,000.00) for the remainder of the term of the UC Contract, beginning in March 2002 (21 months), equals $5,754,000.00. (Reneau Aff. at ¶ 47, Ex. F, Appendix P).

62.    Intermedia's obligations under the UC Contract included at a minimum, the requirements under the "take or pay" provision to meet 10,000 accounts annually. (Ex. F, §§ 2.12-2.13). Indeed, Intermedia's forecasts expected at least 10,000 accounts annually. (Reneau Aff. at ¶ 48, Exs. K and L).

63.    Accordingly, simply applying the minimum "take or pay" provisions of the UC Contract, the "Reconciliation Payment" and EffectNet's direct damages are $6,307,844.27 ($5,754,000 + $827,844.27 = $6,307,844.27) plus interest. (Reneau Aff. at ¶ 49).

**Even the Limited Evidence Produced Thus Far Establishes that Intermedia and WorldCom Conspired Pre-Merger About Ceasing the UC Contract**

64.    On September 1, 2000, Intermedia and WorldCom entered into an Agreement and Plan of Merger. (Debtors' 56.1 Stmt. at 3, 8-12). WorldCom consummated the acquisition of Intermedia on July 1, 2001. (*Id.*; *see also* Findings of Fact and Conclusions of Law (1) Approving (i) Substantive Consolidation and (ii) the Settlements Under Debtors' Modified Second Amended Joint Plan of Reorganization, dated October 21, 2003, and (2) Confirming Debtors' Modified Second Amended Joint Plan of Reorganization, dated October 21, 2003 (Doc. No. 9681) at p. 34, § II.C(i)).

A 01305

65.     From the date of the announcement of the proposed merger, the evidence indicates, based on the scant production thus far, that WorldCom intended to proceed with its competing Unified Messaging application, "genD", and shut down Intermedia's bundled product, Intermedia*One* and Intermedia Unified Messaging. (Friedman Decl., Exs. S and V). Indeed, from the get go, WorldCom intended to sell off the bulk of Intermedia. (Exs. S and V).

66.     Indeed, the actions of WorldCom and Intermedia demonstrate that they did act together prior to the closing to shut down the competing UC Contract. Starting in early 2001, Intermedia effectively stopped opening new accounts. (Reneau Aff. at ¶ 26, Ex. N). Immediately upon the closing of the merger, WorldCom fired the Intermedia-EffectNet point person, James Renforth, disbanded the sales force that was over one hundred strong and shortly thereafter canceled almost all of the EffectNet accounts. (Debtors' 56.1 Stmt. at ¶ 12; Reneau Aff. at ¶ 27).

67.     Indeed, based on the limited production in this case that WorldCom and Intermedia discussed the status of various contracts well in advance of WorldCom's acquisition of Intermedia on July 1, 2001. In fact, a spreadsheet entitled "Vendor Management Contracts Status – Access & Services, revised 1/25/01", produced by Debtors, demonstrates communications between WorldCom and Intermedia. (Friedman Decl., Ex. Q). Intermedia and WorldCom discuss in this document the EffectNet UC Contract as a "completed" contract. (Friedman Decl., Ex. Q).[3] Another document, dated November 21, 2000, produced by Debtors, confirms this, stating in part,

_____

[3]     Debtors concede they have produced no other documents concerning communications between WorldCom and Intermedia regarding the UC Contract. (Friedman Decl. at ¶ 17, Ex. N; WorldCom's Supplemental Response to Claimant's Motion to Compel at 8). Notwithstanding that admission, it is clear from the spreadsheet referenced above that WorldCom and Intermedia discussed the UC Contract. Indeed, Debtors state in their document productions that the

-18-

A 01306

> With the announcement of the MCI/WorldCom merger, and the pending subsequent sale of the Intermedia lines of business to another organization, the need of the company for a long-term focused process has been greatly diminished.

(Friedman Decl., Ex. R). Thus, WorldCom and Intermedia discussed the status of various contracts in advance of the merger closing on July 1, 2001.[4]

**The EffectNet/Webley Merger and Webley's Investor Pitches**

68.    On January 21, 2001, EffectNet announced a proposed merger with a company called Webley Systems, Inc. ("Webley"). (Reneau Aff. at ¶ 34).

69.    In early 2001, WorldCom Ventures received confidential business information concerning Webley Systems, Inc., indicating its intentions to merge with EffectNet. (Reneau Aff. at ¶¶ 36-38, Exs. T, U).

70.    Also at this time, Webley retained Salomon Smith Barney to help raise $35 million in financing, through the private placement issuance of Series C Convertible Preferred Stock, to provide working capital, for among other things, general corporate purposes. (Reneau Aff. at ¶ 35, Ex. T). Salomon Smith Barney conditioned any private placement financing upon the consummation of the proposed merger between EffectNet and Webley. One of the reasons Salomon Smith Barney conditioned Webley's financing upon the merger with EffectNet was the significant forecasted customer base and revenue EffectNet would generate under the UC Contract. In addition, Intermedia was a major business partner for EffectNet that was very compelling to prospective investors. (Reneau Aff. at ¶ 35).

---

spreadsheet is responsive to Document Request No. 18 seeking "all documents concerning communications among Debtors regarding the UC Contract."

[4]    As discussed in the Declaration of Robert S. Friedman, depositions of relevant witnesses will demonstrate these discussion took place well in advance of the July 1, 2001 WorldCom/Intermedia merger closing.

A 01307

71.    Salomon Smith Barney solicited potential investors at investor meetings held in April and May 2001.  One of the potential investors was WorldCom Ventures,  a WorldCom venture capital firm.  In this regard, WorldCom Ventures received a Webley private placement memorandum in May 2001. (Reneau Aff. at ¶ 36; Ex. U).  The private placement memorandum included, among other things, information regarding the EffectNet UC Contract and its expected, generated revenues over the term of the contract. (Reneau Aff. at ¶ 36; Ex. T). It was clear from the investor presentations that the forecasted revenues from the UC Contract were a major component to EffectNet's and Webley's "bottom line". (Reneau Aff. at ¶ 38).

72.    During the same time period, Webley was also engaged in negotiations with WorldCom for an agreement to govern licenses for certain software technology products, including Webley's session initiation protocol, or SIP, based unified communications platform for implementation of WorldCom's genD NextGeneration IP Unified Messaging/VoiceMail product. (Reneau Aff. at ¶ 37, Ex. V).  WorldCom's genD NextGeneration IP Unified Messaging product concerned data communications, and relied upon SIP to deliver voice and other communication data via the Internet. (Reneau Aff. at ¶ 37, Exs. W and X).  The agreement reached between WorldCom and Webley was called a "Master Agreement for Software Licenses," and ultimately executed as of September 14, 2001 (the "MASL"). (Reneau Aff. at ¶37, Ex. Y).

73.    Pursuant to commercial due diligence requests by WorldCom in connection with that negotiation, in April 2001, EffectNet and Webley made a number of disclosures to WorldCom. (Reneau Aff. at ¶ 38, Ex. Z).  These disclosures included, among other things, a private placement memorandum for the Series C Convertible Preferred Stock, information regarding EffectNet's pending merger with Webley and the status of the companies.

A 01308

(Reneau Aff. at ¶ 38, Ex. T).  These disclosures highlighted the important role the UC Contract

played in that merger, since Webley and EffectNet were anticipating earning substantial revenue

through the UC Contract.  (Reneau Aff. at ¶ 38, Ex. AA).

**Debtors' Bankruptcy Proceedings**

        74.    On July 21, 2002 and November 8, 2002, WorldCom, Intermedia, and

their various affiliates filed for voluntary chapter 11 bankruptcy protection.  On January 15,

2003, EffectNet filed its amended proofs of claim against Debtors. (Friedman Decl., Ex. A-B).

On June 10, 2004, Debtors filed their objection to EffectNet's claims. (Friedman Decl., Ex. C).

On July 30, 2004, Parus Holdings/EffectNet filed its Response and Opposition to Reorganized

Debtors' Objection to Proofs of Claim. (Friedman Decl., Ex. D).  On October 31, 2003, Debtors'

Modified Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy

Code was confirmed. (Docket No. 9681).

Dated: New York, New York
      November 18, 2005

Respectfully submitted,

KELLEY DRYE & WARREN LLP


By:   /s/  Robert S. Friedman
    John M. Callagy (JC 8166)
    Robert S. Friedman (RF 1538)

    101 Park Avenue
    New York, NY  10178
    (212) 808-7800

    Attorneys for Plaintiff
    Parus Holdings, Inc., Successor-By-Merger
    to EffectNet, Inc. and EffectNet, LLC

A 01309