**KELLEY DRYE & WARREN LLP**
John M. Callagy (JC 8166)
Robert S. Friedman (RF1538)
101 Park Avenue
New York, New York 10178
Tel: (212) 808-7800
Fax: (212) 808-7897
Attorneys for Claimant Parus Holdings, Inc.
Successor-By-Merger to EffectNet, Inc. and
EffectNet. LLC

Hearing Date: December 6, 2005 at 10:00 a.m.
Reply Deadline: December 2, 2005 at 4:00 p.m.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 02-13533 (AJG) |
| **WORLDCOM, INC.**, *et al.*, | **Chapter 11** |
| **Debtors.** | **(Jointly Administered)** |

### DECLARATION OF ROBERT S. FRIEDMAN
### IN SUPPORT OF CLAIMANT'S RESPONSE
### AND OPPOSITION TO REORGANIZED
### DEBTORS' MOTION FOR SUMMARY JUDGMENT

**ROBERT S. FRIEDMAN** declares, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am a member of the firm of Kelley Drye & Warren LLP, attorneys for

Claimant Parus Holdings, Inc., Successor-by-Merger to EffectNet, Inc. and EffectNet, LLC

("Claimant" or "EffectNet" or "Parus").  I am fully familiar with the facts set forth below based

upon personal knowledge, a review of documents, and pleadings in this case.

2.      I make this declaration in support of Claimant's response and opposition

to Reorganized Debtors' motion for summary judgment seeking dismissal of Claim nos. 11242

and 11173.  This declaration sets forth facts in support of Parus' application pursuant to Fed. R.

Civ. P. 56(f) and, in addition, attaches documents and evidence from the limited record in this

case.

**Fed. R. Civ. Proc. 56(f) Requires Denial of Debtors' Motion for Summary Judgment**

3.       Debtors' Motion for summary judgment should be denied for all the reasons set forth in Parus' memorandum of law in opposition to that motion. Parus has clearly alleged each of its claims sufficiently and has produced evidence in support of its claims, even from the limited discovery thus far. However, in significant part, Debtors have utterly failed properly to produce any responsive or relevant documentary evidence responsive to Parus' document requests, which will permit Parus to effectively oppose any summary judgment motion by Debtors.

**A.       The Nature of the Uncompleted Discovery**

4.       The UC Contract was a major undertaking for Intermedia and EffectNet, as set forth in the Affidavit of Taj Reneau, submitted in connection with Parus' response and opposition to Debtors' motion for summary judgment. Immediately upon the merger, WorldCom shut the UC Contract down. (Reneau Aff. at ¶¶ 26-33). Obviously, there were extensive communications between WorldCom and Intermedia prior to the shutdown. Despite this, Debtors have produced a single document related to communications between Debtors and EffectNet regarding the UC Contract.

5.       In addition, Debtors have failed to produce any documents concerning the UC Contract including pricing, negotiation, drafting or communications among Intermedia employees and/or between Intermedia and WorldCom regarding the UC Contract.

6.       Debtors have failed also to produce any documents regarding Intermedia's payments to Parus for any services under the UC Contract.

A 01311

7.     Debtors have failed to produce any documents regarding Intermedia's cessation of the operations surrounding the UC Contract, including any communications, internally or with WorldCom.

8.     Debtors' failures to properly respond to and produce documents in this case provides a separate and independent basis to deny Debtors' motion.  Fed. R. Civ. Proc. 56(f).  At this stage of the litigation, little or no real discovery has occurred.  In fact, not a single deposition – with the exception of one deposition regarding Debtors' discovery failures - has occurred in this case.

9.     Indeed, as mentioned above, there are particular areas of discovery – including documents and depositions – of Debtors, which are needed.  Virtually all of the evidence sought is in the exclusive control of the Debtors, and others, including former employees of Debtors.  Incredibly, Debtors make this motion without having made a single search of their electronic system.  Indeed, Debtors have refused to do so.

**B.     Discovery Is Expected to Demonstrate A Genuine Issue of Material Fact**

10.     Permitting Parus to pursue this and other discovery will allow Parus to marshal facts further supporting its contentions that Debtors owe Parus significantly more than outstanding invoices for the unlawful breach of the UC Contract, and that Debtors committed tortious interference with the UC Contract, conspiracy, breach of the implied covenant of good faith and fair dealing, and unfair trade/business practices.

11.     Specifically, Parus should be permitted the opportunity to obtain discovery, including documents and depositions of witnesses, in the following areas:

a.     Information concerning drafting and negotiating of the UC Contract, including the parties' intentions regarding the limitation on liability provision, pricing

A 01312

in connection with the "Reconciliation Payment", and termination provisions of the UC Contract. To date there has been little or no discovery in this area.

        b.     Information concerning the drafting and negotiating of the UC Contract.  To date, there has been little or no discovery in this area.

        c.     Information concerning the actions and statements of WorldCom personnel concerning, among other things the UC Contract in 2000 and 2001.  To date, there has been little or no discovery in this area.

        d.     Information concerning the actions and statements of Intermedia personnel concerning, among other things, the UC Contract, in 2000 and 2001.  To date, there has been little or no discovery in this area.

        e.     Information concerning discussions among WorldCom and Intermedia personnel concerning the UC Contract including but not limited to discussions regarding the cessation of the UC Contract in 2000 and 2001.  To date, there has been little or no discovery in this area.

        f.     Information about WorldCom products and applications which were competitive with the EffectNet product, including but not limited to genD.

        12.     As is evident from the foregoing list, such evidence is in the exclusive control of Debtors.

**1.    Conspiracy**

        13.     With respect to Parus' conspiracy claim, Debtors contend that parents and subsidiaries are incapable of conspiring with each other since WorldCom acquired Intermedia on July 1, 2001.  However, Parus argues that WorldCom and Intermedia were conspiring long before the merger resulting in their parent-subsidiary status.  Parus expects that inspection of

A 01313

hard documents and electronic files, and depositions of relevant witnesses will reveal that WorldCom and Intermedia discussed breaching the UC Contract in bad faith—permitting WorldCom to proceed with its unified messaging initiative, "genD" and related products and applications—and shutting down Intermedia's competing buncled applications, Intermedia*One*, long before the merger on July 1, 2001.

14.    Parus' expectation is supported by the limited documentary evidence produced thus far, demonstrating that several months prior to the closing of the merger, communications among representatives of WorldCom and Intermedia occurred.  (Ex. Q).[1]  This document – what appears to be a spreadsheet of contracts, including the Unified Communications Contract with EffectNet, lists among other things, start date, expiration date, term, and commitment/month – shows that at least by January 2001, Intermedia and WorldCom were communicating with each other regarding the UC Contract. (Ex. Q).  In fact, since it is a "revised" document, it is evident that WorldCom and Intermedia were communicating well in advance of January 2001.

15.    Another document, dated November 21, 2000, produced by Debtors, confirms these earlier discussions, stating in part,

> With the announcement of the MCI/WorldCom merger, and the pending subsequent sale of the Intermedia lines of business to another organization, the need of the company for a long-term focused process has been greatly diminished.

(Ex. R).  This document supports Parus' expectation that further discovery will reveal a conspiracy to breach the UC Contract in bad faith and tortiously interfere in Parus' contractual

---

[1]    Debtors have stated that this document is responsive to Parus' document request no. 18, which sought "all documents concerning Debtors' communications among each other regarding the [UC Contract]."

A 01314

relations, since it is clear from this document that the plans to interfere were already in place before the announcement of the merger.

16.    Parus seeks evidence that would prove that such a relationship did not exist during the relevant time period.  Such evidence is directly relevant to the relationship of WorldCom and Intermedia and the conspiratorial behavior of those parties, thus precluding summary judgment.

### 2.    Tortious Interference

17.    Debtors contend that a parent is incapable of tortiously interfering in its wholly-owned subsidiary's contractual relations.  However, Parus alleges that WorldCom commenced its tortious interference with the contract between Intermedia and EffectNet long before the July 1, 2001 merger resulting in the parent-subsidiary relationship between Debtors. Parus expects that further discovery will reveal this to be true.  This expectation is supported by the same evidence relevant to Parus' conspiracy claims (*see* above).  Such evidence is directly relevant to WorldCom's intentions and behavior towards the UC Contract and the relations between EffectNet and Intermedia before the parent-subsidiary relationship between Debtors arose, thus precluding summary judgment.

18.    One exception to the general rule that parents are incapable of tortiously interfering with their subsidiary's contracts arises when a parent acts detrimentally to its subsidiary's economic interest.  Parus alleges that this is exactly what happened between Debtors.  However, Debtors have failed to produce evidence concerning WorldCom's evaluations of the UC Contract and communications between Debtors.  Parus expects that further discovery will reveal documentary and testimonial evidence that WorldCom only considered its own interests and consciously acted to the detriment of Intermedia when it interfered in the UC

A 01315

Contract. This expectation is supported by documentary evidence revealing WorldCom's

disregard for Intermedia's interest as WorldCom sought control of Digex while planning to

dismantle Intermedia. (Exs. S, V). Such evidence is directly relevant to, *inter alia*, WorldCom's

intentions and behavior toward Intermedia, thus precluding summary judgment.

### 3.    Breach of the Implied Covenant of Good Faith and Fair Dealing

19.    Debtors argue that they did not breach the covenant of good faith and fair

dealing implied in the UC Contract. Parus argues that Debtors did breach this covenant.

However, Debtors have not yet meaningfully responded to Parus' requests for documents

concerning Debtors' evaluations of the UC Contract. Furthermore, Debtors have not yet

produced witnesses for deposition, without which it is difficult if not impossible to determine

issues of motive present in a claim of breach of the implied covenant of good faith and fair

dealing. This evidence is necessary if Parus is to demonstrate that Debtors acted in bad faith,

with the motive of frustrating Parus' rights under the UC Contract. Parus expects that further

discovery, depositions in particular, will reveal evidence that Debtors intentionally frustrated

Parus' rights under the UC Contract, creating a genuine issue of material fact regarding Debtors'

motive, and thus precluding summary judgment.

### 4.    Breach of Contract

20.    Debtors have refused to respond to Parus' discovery requests concerning,

among other things, the negotiation, evaluation, performance, and breach of the UC Contract.

Such evidence is necessary because Parus' breach of contract claim involves determining the

intended meaning of ambiguous and undefined terms (including "base rate" and "termination"),

the identity of an omitted term (the limitation of liability provision), through parol evidence, and

A 01316

the intentions of the parties concerning the application of the limitation of liability provision, all of which require review of the parties' course of dealing.

21.    Debtors argue in their Motion that the "Basic Service" rate of $11.45 should be used to calculate the "Reconciliation Payment" for any "Volume Shortfall" in accounts during the Initial Term of the UC Contract. Debtors equate the word "base" in "base monthly price" with "Basic Service" rate. However, Debtors fail to introduce on this motion or produce in this litigation any evidence demonstrating that the "Basic Service" rate of $11.45 is the price to used for such calculation, based on the above "base" language or otherwise. Debtors have failed to produce, despite requests, for communications between the Debtors and Parus regarding negotiating and drafting of the UC Contract to determine what rate – "Unlimited Service" as Parus contends, or "Basic Service" as Debtors contend – should be used to calculate the Reconciliation Payment. Parus has submitted an affidavit from Taj Reneau, Chief Executive Officer of Parus, who attests that negotiations occurred with respect to use of the "Unlimited Service" rate to determine the Reconciliation Payment. Debtors have produced no documents on this sharp factual issue.

22.    Debtors also argue that only obligations of outstanding invoices accrued as of April 12, 2002, the date that Debtors contend Parus "terminated" the UC Contract. Sharp fact issues exist concerning both accrual and the UC Contract's purported termination.

23.    Debtors contend, based on section 5.3 of the UC Contract, that Parus' damages of solely the outstanding invoices were the only damages to accrue as of April 12, 2002. As demonstrated in Parus' response and opposition to Debtors' summary judgment motion, this is a contested issue of fact. Debtors' limited amount of documents shows that Debtors understood by January 2001, that they had a commitment to sell 10,000 accounts under

A 01317

the UC Contract and had already accounted for such commitment.  (Ex. Q to Friedman Decl.).
At the very least, knowledgeable personnel of the Debtors need to be deposed to determine
whether Debtors accounted for the 10,000 account commitment upon entry into the UC Contract
or at some other time.

24.    Furthermore, communications among the Debtors on this subject is also
important to demonstrate that Debtors had already breached the UC Contract by July 2001, by
dismantling the entire Intermedia*One* structure, terminating the product manager, canceling over
90% of the accounts, and ceasing all work with respect to the UC Contract services.

25.    Debtors also attempt to enforce on this motion for summary judgment the
"limitation of liability" provision.  However, there is a carve-out to the provision which is blank
in the contract, making it obviously ambiguous and unclear.  Yet, Debtors have failed to produce
any documents concerning the negotiation or drafting of the UC Contract.  Such documents are
highly relevant to determine the intentions of the parties concerning the limitation of liability
provision.

26.    The above referenced limited evidence so far produced by Debtors –
without even the benefit of electronic discovery, e-mail or, significantly, deposition testimony of
relevant witnesses – clearly shows a genuine issue of material fact.  Each of these factual
questions relates directly to issues raised by Parus' tort and contract claims.  Because they are
unresolved and present sharp factual issues, summary judgment is improper.

**C.    Parus Has Diligently Pursued Discovery, And Debtors Have Unreasonably Refused
to Cooperate With Parus' Discovery Requests**

27.    Parus served its document requests on Debtors in February 2005. (Ex. E).
Parus' document requests sought from Debtors, among other things, documents concerning the
Memorandum of Understanding, Interim Agreement and UC Contract, the decision to cancel all

A 01318

accounts created pursuant to the UC Contract, documents communications between Debtors and

Parus regarding the UC Contract, documents concerning Debtors' payments to Parus under the

UC Contract, communications among the Debtors regarding the UC Contract, including

cancellation of accounts, documents concerning Parus, including finances, business, technology

and products and any evaluation of such matters, documents concerning the MASL and

communications among Debtors regarding the MASL, documents concerning Intermedia*One*,

including its launch, communications among the Debtors regarding that subject, documents

concerning the merger of WorldCom and Intermedia as it related to Parus and/or Intermedia*One*,

and documents concerning WorldCom's competing unified messaging initiative, genD. (Ex. E).

Parus' document request sought both hard-copy documents as well as electronic documents. (Ex.

E).

      28.    In mid-March, 2005, Debtors responded and objected to the production of

the requested documents on several grounds, though they made a limited production of

approximately 343 pages and stated they were continuing their efforts to locate and produce

additional documents.  The Debtors' Document Responses included multiple meritless general

and specific objections as well as modifications and limitations to Parus' Document Requests.

*See* Exhibit H to Motion to Compel.  However, subject to those objections, modifications and/or

limitations, Debtors agreed to produce non-privileged documents responsive to requests 6 – 7

and 11 – 27 in addition to the attached limited document production.  *See id.*  Indeed, the Debtors

acknowledged that much remained to be done regarding document production.  *See id.*  The

Debtors' Document Responses set forth a long and detailed narrative under the heading

"Continuing Effort to Locate Documents" regarding the vast quantities of potentially responsive

documents that the Debtors had yet to locate and/or review as of March 25, 2005 for production.

A 01319

*Id.* at pp. 7-8.  Since that time, Debtors have delayed and then avoided producing to Parus the documents and information it seeks.

        29.     For example, on May 31, 2005, more than two months after serving their Document Responses, Debtors' counsel stated that Debtors had located "thousands of boxes" of documents in "multiple locations around the country."  *See* May 31, 2005 letter from L. Bigus to S. Wood, attached as Exhibit M to the Motion to Compel.  Debtors also admitted in their letter that all they had done was review indexes of these boxes and that Debtors' counsel's "office had not reviewed or examined any of these additional documents."  (*Id.*)

        30.     Debtors and Parus then engaged in significant correspondence, via letter, e-mail, and telephonically, concerning the obligations of Debtors to produce the documents and review the indices.  (*See, e.g.,* Exs. F – P and T – U).  After no resolution resulted, on June 29, 2005, the Court granted permission to file a motion to compel the production of documents by Debtors.  (Ex. K).  Then, three (3) months after the service of Debtors' Document Responses, Debtors served a supplemental response to Parus' First Request for Production of Documents.  The Supplemental Response did not contain a single responsive document, but instead, objected to all of Parus' document requests on the ground they were unduly burdensome and objected to producing any documents immediately.  (Ex. G).  Further, the Debtors represented that they had found a new set of documents, "the MCI Documents" from which it "may be possible to produce responsive documents."  Moreover, Debtors indicated they located 250 back up tapes of e-mails that Debtors had informed Parus of the first time on June 30, 2005.  (Ex. G).

        31.     On July 13, 2005, Parus filed its motion to compel.  (Ex. H).  Then, on August 3, 2005, Debtors' continued efforts to delay and avoid any document production culminated with the improper filing of a motion for summary judgment.  The clear tactic of the

motion for summary judgment was apparent from Debtors' Response and Opposition to the Motion to Compel, served and filed on August 4, 2005, in which they relied almost exclusively on their motion for summary judgment. (Ex. I).

32.    A hearing on Parus' motion to compel was held on August 9, 2005. (Ex. L). During the hearing, the Court decided to continue the hearing to allow Debtors to finish their review of the 387 boxes of documents, produce what was found to be responsive, permit Parus the opportunity to review those documents and determine what, if any, deficiencies remain in Debtors' document production. (Ex. L). In addition, the continued hearing would permit Parus to receive and review the document box indices and lists of boxes to, among other things, "hone in on deficiencies" and determine whether or why certain boxes of documents might have been eliminated from review by Debtors, whether the information in the indices was sufficient to exclude boxes from review. (Ex. L).

33.    On September 13, 2005, the hearing on Parus' Motion to Compel was again continued because the alleged production was not complete. (Ex. M). Also at the September 13th hearing, Debtors represented they were producing only eight (8) boxes out of the 10,000 originally identified boxes of documents. (Ex. M). Debtors ended up producing only 11 ½ boxes out of the 10,000.

34.    On November 1, 2005, another hearing was held before the Court regarding the Motion to Compel. During that hearing, Parus identified for the Court the several categories of documents Debtors still have failed to produce (as mentioned above), the inconsistencies and problems with Debtors' use of the indices and lists of boxes for production, and that Debtors conceded they have not produced any communications between WorldCom and Intermedia regarding the UC Contract. (Ex. O).

A 01321

35.    As a result of the November 1st hearing, the Court ordered deposition(s) of WorldCom/Intermedia individuals who have knowledge regarding their document retention, their selection of documents, and their production of documents, as well as the maintenance, storage, retention and indexing of the documents.  (Friedman Decl. at ¶ 54, Ex. O at Tr. 10-13; 25).  Debtors produced for deposition on November 14, 2005, Donald Ramsay, an attorney with Stinson Morrison Hecker LLP, retained by Debtors to represent them in this matter. Mr Ramsay's deposition testimony highlights that there remain significant issues with respect to Debtors' identification, location and production of Intermedia and WorldCom documents. Mr. Ramsay identified four individuals at WorldCom's records management group, who he spoke with regarding documents, and searches for documents.  Mr. Ramsay, however, could not recall whether he took notes of his conversations with them, or gave them search terms in writing, or how they conducted searches, only except that he received indices of boxes resulting apparently from their searches.  (Friedman Decl., Ex. P at Tr.191:21-195:15).  Importantly, the indices generated by WorldCom's records management group were merely based on a search for terms in merely another index. (Friedman Decl., Ex. P at Tr. 201:19-202:20).  There was never any search conducted of the actual documents retained by Debtors. (*Id.*).  Further, with respect to numerous entries on the indices generated by Debtors as a result of search terms provided by Stinson, Mr. Ramsay did not know what the entries referred to.  (*See e.g.*, Ex. P at Tr. 137:18-1388:12).  With respect to Mr. Ramsay's request of a WorldCom employee to conduct a search of accounting records, he did not know how the search was conducted, if they searched actual records or a database, what search terms were used or where they searched.  (Ex. P at Tr. 191:22-193:17).  Yet Debtors claim they used these indices to reduce 10,000 boxes down to 10 which were produced.  (*See* Friedman Decl., Ex. N; P at Tr. 203:13-205:4).  Further, Mr. Ramsay

A 01322

acknowledged Debtors produced one document concerning communications among Debtors

regarding the UC Contract, and did not know why that was the case, nor did he ask. (Friedman

Decl., Ex. P at Tr. 207:6-208:21).  Mr. Ramsay also admitted they had never searched for

"genD" documents, a competitive application. (Friedman Decl., Ex. P at Tr. 75:25-76:5).

36.    During the November 1st hearing, the Court provided leave to make

further applications after the deposition. (Friedman Decl., Ex. O at Tr. 25).  Debtors also

represented that they would respond on electronic discovery issues. (*Id.* at Tr. 25).  However,

Debtors continue to refuse to produce any electronically stored documents.  (Ex. U).

37.    Even after significant disputes and attempted resolutions to date by this

Court, Debtors' document productions still fail to provide a complete production of documents

concerning, among other things,

- communications among the Debtors regarding the UC Contract (Document

Request No. 18);

- documents reflecting Intermedia's payments to Claimant for any services

provided by Claimant under the General Agreement or any documents concerning

communications regarding payments to Claimant.  (Document Request No. 17.)

- documents concerning the cessation or termination of Intermedia's operations

as it related to Claimant.  (Document Request Nos. 14, 15, and 19.)

- documents concerning Claimant from the files of related WorldCom entities

including, but not limited to, WorldCom Ventures.  These documents are especially relevant here

because WorldCom Ventures was contemplating an investment in Webley/Parus Holdings and

received highly sensitive, confidential, and comprehensive strategic and financial material of

Claimants.  (Document Request Nos. 20 and 21.)

A 01323

- documents concerning Debtors' evaluation or analysis of Claimant's finances, business, technology or products. (Document Request Nos. 20 and 21.)

- documents related to the WorldCom/MCI genD initiative, a competitor to EffectNet's Unified Communications product. (Doc. Req. No. 35.).

38.    Moreover, Debtors failed to produce any documents from key individual employee's work files, including but not limited to, James Renforth, James Faust, Kathy Victory, Brett Bacon, Barry Zipp, Richard Black and Cheryl Mellon, regarding the UC Contract and the MASL, and the drafting, negotiation, pricing and performance of same. (Document Request Nos. 11 and 22.)

39.    Significantly, Debtors have failed to produce any electronically stored documents from either Intermedia or WorldCom/MCI, notwithstanding the fact that on October 24, 2005, after a conference on October 21, 2005 during which the parties discussed outstanding discovery, Parus provided a list of names of individuals' electronic files and search terms for use in searches of Intermedia's and WorldCom/MCI's electronic databases. (Ex. T). On November 11, 2005, Debtors informed Parus that it had only just recently engaged an outside vendor to complete a cost estimate to determine the cost of searching for responsive documents in MCI's and Intermedia's electronic media. (Ex. U). Debtors admit that the cost of conducting electronic searches is a fraction of what they previously represented. (*Id.*) Still, despite their prior representations, they have simply refused to search or produce any electronically stored documents. (*Id.*) Clearly, both sets of electronic media are likely to contain documents responsive to Parus' discovery requests.

40.    All of the above demonstrates that Debtors' failure to respond meaningfully to Parus' discovery requests puts Parus in the position of having to try to support

A 01324

its claims without access to the very documents and information necessary to do so.  As set forth

at the November 1, 2005 hearing, there is significant discovery yet to be finished in order to

permit a full evaluation of Parus' claims.  Indeed, putting aside the hard-copy documents,

Debtors have never once searched their electronic media databases for responsive materials, and

no depositions have been conducted.  Therefore, as an initial matter, this Court should deny

Debtors' Motion under Fed. R. Civ. Proc. 56(f) and direct Debtors to produce discovery

materials sufficient to enable the full evaluation of Parus' claims.

**Documents and Materials Relevant to Parus' Response and Opposition**

41.    This Declaration annexes several documents in support of Parus' response

and opposition to Debtors' Motion for summary judgment sufficient to demonstrate, *inter alia*,

the existence of genuine issues of material fact to deny summary judgment in Debtors' favor, and

pursuant to Fed. R. Civ. P. 56(f), that more discovery is required by Parus to demonstrate that

such fact issues exist.

42.    Annexed as Exhibit A is a true and correct copy of proof of claim (no.

11242), dated January 15, 2003.

43.    Annexed as Exhibit B is a true and correct copy of proof of claim (no.

11173), dated January 15, 2003.

44.    Annexed hereto as Exhibit C is a true and correct copy of Debtors'

Objection to All Proofs of Claim Filed By EffectNet, Inc., dated June 10, 2004.

45.    Annexed hereto as Exhibit D is a true and correct copy of Parus' Response

and Opposition to Debtors' Objections to the Proof of Claims dated July 30, 2004.

46.    Annexed as Exhibit E is a true and correct copy of Claimant's First

Request for Documents, dated February 7, 2005.

A 01325

47.    Annexed as Exhibit F is a true and correct copy of Debtors' Responses and Objections to First Request for Documents, dated March 22, 2005.

48.    Annexed as Exhibit G is a true and correct copy of Debtors' Supplemental Responses to Claimant's First Request for Production of Documents, dated July 1, 2005.

49.    Annexed as Exhibit H is a true and correct copy of the Motion of Claimant, Parus Holdings, Inc. to Compel production of Responsive Documents and to Extend Discovery Deadlines, dated and filed on July 13, 2005.

50.    Annexed as Exhibit I is a true and correct copy of WorldCom's Response and Opposition to Claimant's Motion to Compel Production of Responsive Documents and to Extend Discovery Deadlines, dated and filed on August 4, 2005.

51.    Annexed as Exhibit J is a true and correct copy of the Reply of Claimant, Parus Holdings, Inc., in further support of its Motion to Compel Production, dated and filed on August 8, 2005.

52.    Annexed as Exhibit K is a true and correct copy of the transcript of the hearing conducted on June 29, 2005.

53.    Annexed as Exhibit L is a true and correct copy of the transcript of the hearing conducted on August 9, 2005.

54.    Annexed hereto as Exhibit M are true and correct copy of the transcript of the hearing conducted on September 13, 2005.

55.    Annexed hereto as Exhibit N is a true and correct copy of Debtors' Supplemental Response to the Motion to Compel, dated October 27, 2005.

56.    Annexed hereto as Exhibit O is a true and correct copy of the transcript of the hearing conducted on November 1, 2005.

A 01326

57.    Annexed hereto as Exhibit P is a true and correct copy of the transcript of the deposition of Donald Ramsay on November 14, 2005.

58.    Annexed hereto as Exhibit Q is a true and correct copy of a document entitled "Vendor Management Contracts Status – Access and Services, (Revise 1/25/01)."

59.    Annexed hereto as Exhibit R is a true and correct copy of a document entitled "Paradigm Shift:  From Strategical to Tactical," dated November 21, 2000.

60.    Annexed hereto as Exhibit S is a true and correct copy of emails between Eric T. Hovanky, Scott Sullivan, Bruce Borghardt, David Myers, and Michele Kloeppel, dated September 8, 2000 and September 11, 2000.

61.    Annexed hereto as Exhibit T is a true and correct copy of a letter from Kevin J. Smith to Robert L. Driscoll, dated October 24, 2005.

62.    Annexed hereto as Exhibit U is a true and correct copy of a letter from Robert L. Driscoll to John M. Callagy, dated November 11, 2005.

63.    Annexed hereto as Exhibit V is a true and correct copy of a document entitled "FYI – A Twice-Weekly Report from Intermedia's Senior Management Team to Intermedia's Employees about the Merger with WorldCom," dated October 18, 2000.

64.    Annexed hereto as Exhibit W is a true and correct copy of an article entitled "Intermedia Communications – The Shape of Consolidation to Come," dated September 26, 2000.

65.    Annexed hereto as Exhibit X is a true and correct copy of a letter from Robert L. Driscoll to the Honorable Arthur J. Gonzalez, dated November 17, 2005.

A 01327

66.    Annexed hereto as Exhibit Y is a true and correct copy of a spreadsheet entitled "IntermediaOne and Intermedia Local Resale Strategy, dated September 13, 2001.

I declare under penalties of perjury that the foregoing is true and correct.

Executed on November 18, 2003

_____/s/ Robert S. Friedman_____
ROBERT S. FRIEDMAN

A 01328

# Exhibit A

A 01329

Form B10 (Official Form 10) (Rev. 4.01)

| United States Bankruptcy Court | | PROOF OF CLAIM |
|---|---|---|

| Name of Debtor | Case Number |
|---|---|
| MCI Worldcom Communications, Inc. | 02-42223 |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. §503.

Name of Creditor (The person or entity to whom the debtor owes money or property):
EffectNet, Inc.

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

Name and Addresses Where Notices Should be Sent:
EffectNet, Inc.
c/o Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
Attn: George B. Hofmann
One Financial Center
Boston, MA 02111
Telephone No. 617-542-6000

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☒ Check box if the address differs from the address on the envelope sent to you by the court.

Filed: USBC - Southern District of New York
Worldcom, Inc., Et Al.
02-13533 (AJG)     0000011242

THIS SPACE IS FOR COURT USE ONLY

Account or other number by which creditor identifies debtor: N/A

Check here ☐ replaces
if this claim ☒ amends     a previously filed claim, dated: 1/8/03

**1. Basis for Claim**
☐ Goods sold
☒ Services performed
☐ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
☒ Other                See Addendum

☐ Retiree benefits as defined in 11 U.S.C. §1114(a)
☐ Wages, salaries and compensation (Fill out below)
Your SS #: _____
Unpaid compensation for services performed
from _____ to _____
        (date)                        (date)

**2. Date debt was incurred:**
December 2001 and thereafter

**3. If court judgment, date obtained:**

**4. Total Amount of Claim at Time Case Filed:**     $6,855,844.27 plus unliquidated amounts
If all or part of your claim is secured or entitled to priority, also complete Item 5 or 6 below.
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5. Secured Claim.**
☐ Check this box if your claim is secured by collateral (including a right of setoff).
Brief Description of Collateral:
☐ Real Estate     ☐ Motor Vehicle
☐ Other (See Addendum)
Value of Collateral: $
Amount of arrearage and other charges at time case filed included in secured claim, if any: $

**6. Unsecured Priority Claim.**
☐ Check this box if you have an unsecured priority claim
Amount entitled to priority $_____
Specify the priority of the claim:
☐ Wages, salaries, or commissions (up to $4,650),* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. §507(a)(3)
☐ Contributions to an employee benefit plan - 11 U.S.C. §507(a)(4)
☐ Up to $2,100* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. §507(a)(6)
☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. §507(a)(7)
☐ Taxes or penalties of governmental units - 11 U.S.C. §507(a)(8)
☐ Other - Specify applicable paragraph of 11 U.S.C. §507(a) (_1_).
*Amounts are subject to adjustment on 4/1/04 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**7. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**8. Supporting Documents:** Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**9. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

RECEIVED
JAN 15 2003
US BANKRUPTCY COURT
SD NY ... NEW YORK

| Date | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): |
|---|---|
| December 12, 2002 | EffectNet, Inc. by TAJ KEVEAU, CHIEF EXECUTIVE OFFICER |

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§152 and 3571.

TRA 1742227v2

A 01330

**Addendum to Proof of Claim**

Debtor:     MCI Worldcom Communications, Inc. (the "Debtor")

Case No.:   02-42223 (AJG) (Jointly administered under case no. 02-13533 (AJG))

Creditor:   EffectNet, Inc. ("EffectNet")

EffectNet, LLC[1] and Intermedia Communications, Inc. ("Intermedia") were parties to a certain Unified Communications Services General Agreement dated as of November 20, 2000 (the "Agreement"). A copy of the Agreement is attached to this Proof of Claim. Intermedia and the Debtor are affiliated bankrupt companies, whose bankruptcy cases are jointly administered. Pursuant to the Agreement, EffectNet was obligated to provide services to Intermedia for resale. Section 2.12 of the Agreement specified the minimum monthly commitment of Intermedia to purchase EffectNet's services, and the pricing for these services was provided in Appendix P to the Agreement.

Intermedia breached the Agreement by failing to pay amounts due under it for services provided by EffectNet, and by purposefully failing to purchase the services supplied by EffectNet under the Agreement. As a result of Intermedia's breach of the Agreement, EffectNet sent a letter dated March 25, 2002 (the "Letter"), a copy of which is attached to this Proof of Claim. The Letter details the amounts owing by Intermedia to EffectNet prior to March 2002.

In addition to the amounts described in the Letter, as a result of Intermedia's breach of the Agreement, EffectNet suffered damages equal to Intermedia's remaining minimum monthly commitment under the Agreement, multiplied by the number of months remaining in the term of the Agreement. These damages are summarized in the spreadsheet which is attached to this Proof of Claim.

The Debtor caused damages to EffectNet, which are included but not limited to those damages summarized in the spreadsheet. EffectNet has claims against the Debtor for tortious interference with contractual relations, unfair and deceptive trade practices, and conspiracy based on the Debtor's actions in concert with Intermedia. The Debtor and Intermedia agreed to cause

---

[1] EffectNet Inc. is the sucessor in interest to EffectNet LLC.

**A 01331**

Intermedia to breach the Agreement, in an effort to wrongfully improve the Debtor's bargaining position with respect to a certain Master Agreement for Software Licenses ("MASL") with Webley Systems, Inc. ("Webley"), a company which is affiliated with EffectNet. The Debtor and Intermedia knew that the termination of the Agreement would place EffectNet and Webley in a position of severe financial distress, and would therefore force Webley to accept onerous terms in the negotiation of the MASL that favored the Debtor to a much greater degree than would have been possible had the Agreement been in full force and effect. The damages suffered by Webley and EffectNet as a result of the concerted action are substantial, but unliquidated in amount.

EffectNet expressly reserves its right to amend or supplement this Proof of Claim, including, but not limited to, for the purpose of quantifying the damages suffered as a result of the actions of Intermedia and the Debtor described in the preceeding paragraph. This proof of claim is made without prejudice to the filing by EffectNet of additional proofs of claim with respect to any other indebtedness or liability of the Debtor to EffectNet.

TRA 1742230v2

A 01332

COPY

# EffectNet

# Unified Communications
# Services
# General Agreement
# For

# Intermedia Communications, Inc.

A 01333