or before three (3) months after December 18, 2000 (the "Rollout Date"); an additional 1,500 then current active subscribers (total 3,000) on or before six (6) months after the Rollout Date; and additional 3,500 then current active subscribers (total 6,500) on or before nine (9) months after the Rollout Date; and 10,000 total then current active subscribers on or before twelve (12) months after the Rollout Date (the "Ramp Date"), and at the end of each calendar month thereafter ( the "Minimum Commitment") for the Term of this Agreement.

2.13    Reconciliation Payment. On the Ramp Date and at the end of each calendar month thereafter, EffectNet will calculate the actual number of then current active subscribers on the last day of such calendar month and compare it to the Minimum Commitment. If the number of subscribers is less than the Minimum Commitment for the month in question, such difference will constitute a "Volume Shortfall." Intermedia shall pay EffectNet a Reconciliation Payment equal to the Volume Shortfall multiplied by the base monthly price applicable to the Intermedia UC Service per subscriber,

3.    MARKETING AND BRANDING.

3.1    Web Presence. At no additional charge, EffectNet will provide Intermedia with a private label website, URL links and related branding as reasonably directed by Intermedia.

3.2    Use of Trademarks, Service Marks and Trade names. The Parties agree not to display or use any of the trade names, service marks, brands or trademarks of the other Party, and shall not permit the same to be displayed or used by third parties, other than in connection with the sale, distribution or promotion of the brand(s) used for the Intermedia UC Services covered by this Agreement and subject to the prior written approval of the other or a third Party owning such trademark, service mark or trade name (except where such approval between the Parties is contained in this Agreement). In the absence of specific prior written consent from the other Party, a Party shall not use any part of any of the other Party's trade names, service marks, brands or trademarks as part of its own name, service marks or trademarks or in any other manner not so approved by the other Party. It is expressly understood by both Parties that trade names, service marks and trademarks of the other party are proprietary and that nothing in this Agreement constitutes the grant of a general license to use said trade names, service marks and trademarks. Upon termination of this Agreement, any and all rights or privileges of a Party to use the other Party's trade names, service marks, brands or trademarks shall expire, and each Party shall discontinue the use of the other Party's trade names, service marks, brands. The provisions of this section shall also apply to third party branding incidental to this Agreement.

3.3    Intermedia Marketing Expenses. Intermedia as the buyer of the wholesale services from EffectNet, is responsible for all expenses and obligations incurred by Intermedia as a result of its efforts to attract and solicit customers for Intermedia UC Services. Intermedia expressly acknowledges that it is not entitled to any reimbursement by EffectNet for such expenses unless, and only to the extent that, both parties hereto agree in writing prior to the incursion of such expenses, as set forth in this Agreement.

A 01360

4.    CHARGES AND BILLING STATEMENTS.

4.1    Traffic- or usage-sensitive rates shall be computed in 30-second initial and 6-second continual increments.

4.2    Intermedia shall be responsible for all applicable taxes, including but not limited to sales or value-added taxes, utility or excise taxes, fees and/or surcharges that are imposed by federal, state, or local governments on the Intermedia UC Services or business generated by Intermedia through the sale of Intermedia UC Services as a result of long distance or services bundled within the Intermedia UC Services. Intermedia shall pay or reimburse EffectNet for all taxes collected or imposed on these services provided by EffectNet. The prices quotes in the following sections are exclusive of any and all taxes. Excluded from this responsibility are taxes based on EffectNet's net income. EffectNet shall comply with all federal and state regulations with respect to employee withholding taxes.

4.3    Pricing.    Pricing shall be as indicated by Appendix "P" attached hereto.

4.4    Seven (7) working days post the close of the month, EffectNet shall provide to Intermedia a settlement statement ("Settlement Statement") providing a summary of charges for the previous month's billing cycle in an industry standard format. The settlement statement, unless specified elsewhere in this Agreement, shall contain the following:

4.4.1    A listing of monthly recurring charges for the current or prior month's billing cycle.

4.4.2    For calls or traffic originated by Intermedia or any customers, agents, sub-agents and/or end-users during the previous month, the individual call detail and the aggregate usage charge payable broken down by termination location.

4.4.3    For calls or traffic terminated by Intermedia or any customers, agents, sub-agents and/or end-users during the previous month, the individual call detail and the aggregate usage charge payable broken down by termination location.

4.4.4    Any taxes, fees and/or charges that are imposed by federal, state, and/or local governments.

4.4.5    The net amount payable by Intermedia to EffectNet or payable to Intermedia by EffectNet.

4.4.6    When applicable, any mutually negotiated additional fees.

4.5    Payment of the Settlement Statement shall be made within 15(fifteen) calendar days after the Settlement Statement and invoice are received by Intermedia (the "Due Date"). Payments to EffectNet shall be in United States dollars and are to be made for credit to an account of EffectNet to be determined by EffectNet and provided to Intermedia within three (3) days of the date of execution of this Agreement by the later signing party. If payment is not received by the Due Date, a late fee of the lesser of (a)

A 01361

one (1) percent per month or (b) the maximum percentage permitted by law shall be assessed on the delinquent balance of undisputed usage not paid by the Due Date.

4.5.1 Deposit. Intermedia has provided EffectNet with a fully refundable deposit in anticipation of this Agreement in the amount of minimum subscriber commitment multiplied times $17.50 (US dollars) for a total of $175,000. This deposit shall be refunded to Intermedia in whole on or before the Ramp Date as long as Intermedia has met the Minimum Commitment as of such date. If Intermedia has not met the Minimum Commitment as of the Ramp Date, EffectNet shall refund to Intermedia the full amount of the deposit less the Reconciliation Payment then due. The amount of such Reconciliation Payment shall remain on deposit until such time as the Minimum Commitment is met.

4.5.2 In the event that Intermedia disputes any charge assessed by EffectNet, the Parties agree to cooperate to resolve the dispute at the earliest practicable date. The late charges set forth in Section of this Agreement shall not apply to payments that are the subject of a good faith dispute between EffectNet and Intermedia. If there is a good faith dispute, EffectNet cannot demand a late payment deposit.

5.    TERM AND TERMINATION.

5.1    Term. Unless otherwise terminated as provided herein, this Agreement shall be in force for an initial term of three (3) years after the Effective Date (the "Initial Term"). This agreement shall continue automatically for successive one year terms under the same terms and conditions contained herein together with any subsequent amendments hereto, unless either Party has sent written notice of its intent not to renew the Term at least thirty (30) days prior to the expiration of the Initial Term or the renewal period then in effect.

5.2    Termination. Either Party may terminate this Agreement: (a) if the other Party fails to fulfill any of its material obligations under this Agreement; (b) if the other Party is in breach of Section 7 (Confidentiality); (c) if the other Party becomes insolvent or admits in writing its inability to pay debts as they mature, or makes an assignment for the benefit of creditors; or (d) if a petition under any foreign, state or United States bankruptcy act, receivership statute, or the like is filed by the other Party and is not dismissed within sixty (60) days after such filing. Termination due to default under this Section shall be effective thirty (30) days after written notice to the defaulting Party if the default has not been cured within such thirty (30) day period. 5.3    Effect of Termination. Upon termination of this Agreement for any reason, each Party shall remain liable for those obligations that accrued prior to the date of such termination; provided, however, that nothing herein shall be construed to obligate EffectNet to offer Services to Intermedia after the termination of this Agreement.

5.4    Early Termination. If prior to the end of the Initial Term this Agreement is terminated for any reason by Intermedia other than pursuant to Section 5.2, Intermedia shall pay EffectNet, as liquidated damages and as the sole remedy of EffectNet and the exclusive liability of Intermedia, a one-time early termination fee equal to $270,400 times the lesser of (i) 12 months, or (ii) the number of months remaining in the contract term.

6.    SURVIVAL. The following provisions shall survive the expiration or termination, for any reason, of this Agreement: (Subscriber Information), (Charges and Billing

A 01362

Statements); (Term and Termination); (Confidentiality); (Warranties); (Intellectual Property); (Indemnification); (Limitation of Liability); (General Provisions).

7.    CONFIDENTIALITY.  All information disclosed to the other party shall be deemed confidential and proprietary (hereinafter referred to as "Proprietary Information").  Such information includes, but is not limited to, trade secrets, know-how, technical specifications, processes, functional descriptions, architectural specifications, development plans, schedules, design information, customer lists, pricing and financial information concerning the parties' products or services, or other information relating to business development, operations, marketing, sales, performance, and any other information disclosed hereunder, which, by its nature, might reasonably be presumed to be proprietary in nature.

7.1    Each party agrees to use the Proprietary Information received from the other party only for the purposes of analyzing the business arrangement between the parties, and in accordance with this Agreement.  No patent, copyright, trademark, invention, service mark, or other proprietary rights are implied or granted under this Agreement.

7.2    Proprietary information supplied pursuant to this Agreement shall not be reproduced in any form by the receiving party except as required to accomplish the intent of this Agreement.

7.3    The receiving party shall provide, at a minimum, the same care to avoid disclosure or unauthorized use of the Proprietary Information as is provided to protect its own Proprietary Information, but in no event less than a reasonable standard of care.  It is agreed that all Proprietary Information shall be retained by the receiving party in a secure place with access limited to the receiving party's employees or agents who need to know of the content of such information for purposes of fulfilling its obligations pursuant to this Agreement. The receiving party shall be fully responsible for any breach of this Agreement by its employees or agents. The receiving party will promptly report to the disclosing party any actual or suspected violation of the terms of this Agreement, and will take all reasonable steps requested by the disclosing party to prevent, control or remedy any such violation.

7.4    All Proprietary Information, unless otherwise specified in writing, shall remain the property of the disclosing party.  Such information shall be used by the receiving party only for the purpose set forth in this Agreement.  In addition, such Proprietary Information, including all copies thereof, shall be returned to the disclosing party or, at the request of the disclosing party, may be destroyed by the receiving party and certified as destroyed by an officer of the receiving party after the Receiving party's need for it has expired, upon request of the disclosing party; and, in any event, upon termination of the Agreement.

7.5    Exceptions to confidentiality:  It is understood that the parties have no obligation to maintain the confidentiality of Proprietary Information which:

7.5.1    has been published or is now otherwise in the public domain through no fault of the receiving party.

7.5.2    prior to disclosure hereunder is within the legitimate possession of the receiving party without obligation of confidentiality as can be demonstrated by written documentation.

A 01363

7.5.3   subsequent to disclosure hereunder is lawfully received from a third party having rights to such Proprietary Information without restriction of the third party's right to disseminate the Proprietary Information and without notice of any restriction against its further disclosure, is disclosed with the written approval of the other party as can be proven by documentation.

7.5.4   is obligated to be produced by a Party under order of a court of competent jurisdiction or other government authority; provided however, that the receiving party shall immediately provide notice to the disclosing party such that the disclosing party may seek injunctive relief and/or a protective order; and further provided that the disclosing party shall use best efforts to ensure that the information shall be treated as confidential by the party to whom it is disclosed.

7.5.5   is independently developed by the receiving party without reference to or reliance upon the confidential information.

In the event of a disputed disclosure, the receiving party shall bear the burden of proof of demonstrating that the information falls under one of the above exceptions.

8.    **WARRANTIES.**

8.1.    **Authorization.** Each Party represents and warrants to the other Party that the execution and delivery of this Agreement and the performance of such Party's obligations under this Agreement have been duly authorized, and that the Agreement is a valid and binding agreement, enforceable in accordance with its terms.

8.2.    **Legal Compliance.** Each Party represents and warrants that it has obtained, or will obtain prior to offering the Services hereunder, all licenses, approvals and/or regulatory authority necessary to provide the Services described herein. This Agreement is made expressly subject to all present and future valid orders and regulations of any regulatory body having jurisdiction over the subject matter of this Agreement.

8.3    **No Other Warranties.** With respect to the UC Services to be provided in, and to users accessing these services from the United States and Canada, EffectNet warrants that it will exercise commercially reasonable care in the performance of its obligations under this Agreement

EFFECTNET DOES NOT WARRANT THAT THE EFFECTNET SERVICES OR THE PLATFORM THAT IT PROVIDES TO INTERMEDIA IS ERROR-FREE. IN ADDITION, THE EFFECTNET SERVICES OR INTERMEDIA PLATFORM IS PROVIDED "AS IS" AND WITHOUT ANY WARRANTY OF ANY KIND. EFFECTNET DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. NEITHER PARTY SHALL BE LIABLE FOR ANY DAMAGES ARISING FROM THE OTHER PARTY'S OR ANY THIRD PARTY'S USE OF THE EQUIPMENT, INCLUDING WITHOUT LIMITATION INDIRECT, INCIDENTAL, SPECIAL, OR CONSEQUENTIAL DAMAGES, EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILTY OF SUCH DAMAGES. THE PARTIES AGREE TO THE ALLOCATION OF LIABILITY RISK SET FORTH IN THIS SECTION. THIS LIMITATION ON LIABILITY IS INTENDED ITO APPLY WITHOUT REGARD TO

A 01364

WHETHER OTHER PROVISIONS OF THIS CONTRACT HAVE BEEN BREACHED OR PROVEN INEFFECTIVE. "AS IS" means the As Is condition of the EffectNet Services to be provided as Intermedia UC Services, including such customer support, software and hardware as required in the condition as of the Initial Launch Date agreed upon between the Parties and including any planned enhancement as well as any other changes mutually agreed upon. These products may as of the Initial Launch Date include works for hire for the benefit of Intermedia as further described in Section 9.2.

9.    **INTELLECTUAL PROPERTY.**

9.1    _General._ Except as otherwise agreed in writing between the Parties, EffectNet shall own any Patent applications and Patents issued on inventions under this Agreement. All Inventions that are not the subject of patents or applications will be considered Confidential Information of EffectNet. Nothing in this Agreement shall be construed to transfer any right title or interest in EffectNet's designs, inventions, copyrights, trade secrets, trade names or other intellectual property.

10.    **INDEMNIFICATION.** Each Party ("Indemnitor") will defend, indemnify and hold harmless the other Party and such Party's affiliates, directors, officers, employees, proprietors, independent contractors, consultants, partners, shareholders, representatives, customers, agents, predecessors, successors, and permitted assigns (collectively, "Indemnitees") from and against any claim, suit, demand, loss, damage, expense (including reasonable attorneys' fees and costs) or liability that may result from, arise out of or relate to: (a) acts or omissions arising out of or in connection with this Agreement resulting in property damage; by Indemnitor and (b) intentional or negligent violations by Indemnitor of any applicable laws or governmental regulation.

Intermedia shall indemnify and hold harmless EffectNet from and against any and all claims, expenses, judgments, liabilities, damages or losses, including reasonable attorney's fees and expenses, and shall defend all third-party actions and proceedings arising from any infringement or alleged infringement of any patent, copyright, trade secret, mask work, trade marks or service marks of any third party to the extent such claims are caused by the acts or omissions of Intermedia with respect to the marketing and/or provision of the Intermedia UC Services, but not including any claims, expenses, judgments, liabilities, damages or losses to the extent attributable to the EffectNet Services. EffectNet shall indemnify and hold harmless Intermedia from and against any and all claims, expenses, judgments, liabilities, damages or losses, including reasonable attorneys' fees and expenses, and shall defend all third-party actions and proceedings arising from any infringement or alleged infringement of any patent, copyright, trade secret, mask work or other intellectual property right of any third party, to the extent such claims are caused by use of the EffectNet Services. In the event that an injunction or restraining order is obtained against the use or distribution of any product or deliverable pursuant to this Agreement because of any infringement or alleged infringement of any patent, copyright, trade secret, mask work or other intellectual property right or any proprietary, contract or other right of any third party, or if in EffectNet's reasonable judgment any product or deliverable is likely to become the subject of a successful claim of such infringement, then EffectNet's sole obligation to Intermedia (in addition to its obligations of indemnification set forth above) shall be to promptly: (i) procure for Intermedia the right to use the product or deliverable as provided in this Agreement, (ii)

A 01365

replace or modify the EffectNet product or deliverable so it becomes non-infringing without materially affecting the performance thereof, or if options (i) and (ii) are not available despite commercially reasonable efforts, (iii) terminate the licenses granted hereunder, and accept the return of all copies of all products.

11.    LIMITATION OF LIABILITY.  EXCEPT FOR DAMAGES ARISING UNDER SECTION  , IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY INCIDENTAL, INDIRECT, SPECIAL, PUNITIVE, CONSEQUENTIAL OR SIMILAR DAMAGES OF ANY KIND INCLUDING WITHOUT LIMITATION, LOSS OF PROFITS, LOSS OF BUSINESS OR INTERRUPTION OF BUSINESS, WHETHER SUCH LIABILITY IS PREDICATED ON CONTRACT, STRICT LIABILITY OR ANY OTHER THEORY WITHOUT REGARD TO WHETHER SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

12.    GENERAL PROVISIONS.

12.1    Monetary Values.  All monetary values in the Agreement refer to U.S. dollars.

12.2    Assignment.  Either Party may assign its rights or obligations under this Agreement with written notice to the other Party, and after obtaining written approval by the other party, which shall not be unreasonably withheld or delayed.  In the event that Intermedia is acquired by WorldCom no such written approval shall be required.  In the event of a restructuring, merger, or acquisition of either party, in which such party retains at least 25 percent control of the resulting entity such notice and approval shall not be required.

12.3    Governing Law. This Agreement will be interpreted in accordance with the laws of the state of Arizona, excluding its conflict of law rules.  The Parties agree that the federal and state courts located in Arizona and/or Florida shall be the proper forum for any action brought against the other Party, and each Party shall take all necessary actions to consent to the jurisdiction of such courts. 12.4    Notices.  All notices or other communications between EffectNet and Intermedia under this Agreement shall be in writing and delivered personally, sent by confirmed facsimile, by confirmed e-mail, by certified mail, postage prepaid and return receipt requested, or by a nationally recognized express delivery service addressed to the Parties at the addresses first set forth below or at such other addresses, facsimile numbers or e-mail addresses or to such individuals as either Party may specify by notice to the other Party pursuant to this Section. All notices shall be in English and shall be effective upon receipt. As a courtesy, Parties are encouraged to send duplicate copies of notice, demands, or other by facsimile. Issuance of a facsimile copy of a notice, request, demand or other communication shall not replace the requirements for delivery by mail or overnight courier in the manner provided in this Section, nor shall the date the facsimile received constitute the official receipt date. Any Party may change the address to which notices, requests, demands or other to such Party shall be delivered or mailed by giving notice of the change to the other Party in the manner provided in this Section. The addresses for the Parties for the purposes of this Agreement are:

A 01366

*For EffectNet:*                          *For Intermedia Communications, Inc.*

Taj Reneau                                Kathleen A. Victory

Chief Executive Officer                   VP Product Line Management

EffectNet                                 Intermedia Communications Inc.

Phone:  602.296.3300                      Phone:  813.829.6703

Fax:     602.296.3311                     Fax:     813.829.2359

12.5     Independent Contractors. This Agreement and the relations hereby established do not constitute a partnership, joint venture, franchise or agency between the Parties. Both parties are independent contractors acting for their own accounts and neither is authorized to bind, or attempt to bind, the other to any contract, general warranty, covenant or undertaking of any nature whatsoever unless authorized in writing. Neither party shall have the authority to accept delivery, collect or otherwise take possession of any funds or other property of the other party, and if done so inadvertently, shall immediately notify the other party, shall hold same in trust and shall immediately deliver same to the other party.  In all matters relating to this Agreement neither party nor such party's employees or agents are, or will act, as employees of the other party within the meaning of any federal or state laws.

12.6     Severability.  If any provision of this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other term or provision hereof.  The Parties agree that they will negotiate in good faith or will permit a court to replace any provision hereof so held invalid, illegal or unenforceable with a valid provision, which is as similar as possible in substance to the invalid, illegal or unenforceable provision.

12.7     Entire Agreement And Modifications.  This Agreement together with any appendices, exhibits and attachments constitute the entire agreement between the Parties with regard to the subject matter hereof and supersedes all prior, agreements and understandings, whether written or oral, relating to the subject matter hereof.  This Agreement may only be modified by a written instrument duly executed by each Party, making specific reference to this Agreement and to the clause to be modified.

12.8     Captions.  Where provided, captions of the sections and subsections of this Agreement are for reference purposes only and do not constitute terms or conditions of this Agreement, and shall not limit or affect the terms and conditions hereof.

12.9     Waiver.  No provision of, right, power or privilege under this Agreement shall be deemed to have been waived by any act, delay, omission or acquiescence on the part of either Party, its agents, or employees, but only by an instrument in writing signed by an authorized officer of each Party.  No waiver by either Party of any breach or default of any provision of this Agreement by the other Party shall be effective as to any other breach or default, whether of the same or any other provision and whether occurring prior to, concurrent with, or subsequent to the date of such waiver.

A 01367

12.10  Counterparts. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. In making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart.

12.11  Force Majeure. Neither Party shall have any liability to the other for delays resulting from any "Event of Force Majeure" or from any act or omission of the such other Party. An Event of Force Majeure shall include without limitation any delay or failure in performance due to acts of God, earthquake, labor disputes, changes in law, regulation or government policy, riots, war, fire, epidemic, acts or omissions of vendors or suppliers, equipment failures, transportation difficulties, or other occurrences which are beyond the affected Party's reasonable control.

12.12  Conflicts. To the extent the terms of this Agreement and the MOU conflict, the terms of this Agreement shall be controlling.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the date first written above.


EffectNet, L.L.C.                          Intermedia Communications, Inc.

Signature:                                 Signature:

Printed Name: Brad Steinmeyer              Printed Name: Kathleen A. Victory

Title: VP PARTNER DEVELOPMENT             Title: VP Product Line Management

Date: 11/27/00                             Date: November 20, 2000

A 01368

## APPENDIX P (Pricing)

EffectNet shall offer the following products to Intermedia at the prices attached thereto as follows:

**1.    Basic**

$11.45 per month for each basic account with all platform usage and inbound call times on the EffectNet platform an additional $.10 per minute. The basic account includes unlimited free on-line usage including checking e-mails, faxes, etc... Outbound calling will be $.10 per minute.  This package includes customer service and technical support.  All basic accounts will be billed a base subscription price of $ 6.00 for the first calendar month of activation partial or full, and $11.45 for any calendar month thereafter partial or full.

**2.    Unlimited**

$27.40 per month for each unlimited account with unlimited free platform usage and inbound call time included. Outbound calling will be $.10 per minute. The unlimited account includes unlimited free on-line usage including checking e-mails, faxes, etc. Outbound calls include: conference calls (per member), outbound long distance, outbound fax, follow me, notification, return calls, etc. All unlimited accounts will be billed a base subscription price of $ 14.00 for the first calendar month of activation partial or full, and $27.40 for any calendar month thereafter partial or full.

Intermedia shall be responsible for any and all expenses incurred related to the completion of the Virtual Private Network ("VPN").   No expenses shall be incurred on behalf of Intermedia for the VPN without prior consent from Intermedia.

A 01369



One Parkway North
Fourth Floor North
Deerfield, Illinois 60015
Office: 888.444.6400

Writer's Direct No.
(888)-387-3481

March 25, 2002

**Via Federal Express Mail**
Mr. Brett Bacon
MCI/WorldCom
1945 Old Gallows Road
Vienna, Virginia 22182

Re: Unified Communications General Agreement, dated November 20, 2000, by and between EffectNet, Inc. (formerly EffectNet LLC) ("**EffectNet**") and Intermedia Communications, Inc. ("**Intermedia**") (the "**Agreement**")

Dear Mr. Bacon:

EffectNet, by letter to the attention of Mr. Rich Black, dated March 12, 2002, issued a written notice of default under Section 5.2 of the Agreement with respect to the Intermedia Defaults, as defined in the March 12 letter (the "**March 12 Letter**"). I understand from you that Mr. Black referred the March 12 letter to your attention upon receipt. As you know, the Agreement in Section 5.2 provides that "[t]ermination due to default under this Section shall be effective thirty (30) days after written notice to the defaulting Party if the default has not been cured within such thirty (30) day period." Accordingly, the Agreement will be terminated for default by Intermedia on or about April 12, 2002 if the Intermedia Defaults are not cured prior thereto.

I spoke with you on or about March 13 and you indicated that Intermedia and/or its affiliates were interested in pursuing immediate settlement discussions. I also understand that you spoke with Mr. Jim Calandra, Chief Financial Officer of EffectNet on March 18 and that you told Mr. Calandra that Mr. Barry Zip would

**A 01370**

Mr. Brett Bacon
Page 2 of 3
March 25, 2002

be handling settlement discussions. Further, I understand that you told Mr. Calandra that you would provide Mr. Zip with contact information of Mr. Calandra. On March 20, Mr. Calandra exchanged voice messages with you whereby Mr. Calandra inquired of Mr. Zip and the lack of communication from him and you responded by giving Mr. Calandra, for the first time, contact information for Mr. Zip. Mr. Calandra called Mr. Zip the same day, March 20, and left a voice message for Mr. Zip requesting that Mr. Zip return the call. Neither Mr. Calandra nor anyone else has since received any communications from Intermedia or its affiliates regarding this matter. As you might imagine, EffectNet is becoming increasingly concerned that Intermedia and/or its affiliates fail to understand the gravity of this matter and the urgency with which it must be addressed.

Intermedia should also take notice of the Due Date of invoice #1018, dated March 5, 2002, in the amount of $279,757.02 and delivered to Intermedia on March 6, 2002. Payment of this amount was due on or before March 21, 2002. EffectNet has not received this past due payment (the "**February Payment Default**").

Accordingly, EffectNet hereby gives Intermedia written notice of default under Section 5.2 of the Agreement with respect to the February Payment Default and EffectNet further hereby gives Intermedia written notice that EffectNet may (i) terminate the Agreement under Section 5.2 due to default effective thirty (30) days after this written notice (if the Agreement is not sooner terminated pursuant to the March 12 Letter) if the February Payment Default has not been cured within such thirty (30) day period, and (ii) further exercise all available remedies pursuant to the terms of the Agreement and as otherwise may be available at law or in equity.

EffectNet hereby demands immediate payment, in accordance with the terms of the Agreement, of the amounts itemized below:

Total Amount Past Due on invoice 1010,
dated February 6, 2002, and delivered to
Intermedia on February 12, 2002
(for the December 2001 billing cycle):                    $274,021.05


Total Amount Past Due on invoice 1011,
dated February 6, 2002, and delivered to
Intermedia on February 12, 2002
(for the January 2002 billing cycle):                     $274,066.20

**A 01371**

Mr. Brett Bacon
Page 3 of 3
March 25, 2002

Total Amount Past Due on invoice #1018,
dated March 5, 2002, and delivered to
Intermedia on March 6, 2002
(for the February 2002 billing cycle):                    $279,757.02

**Required Payment:**                                      $827,844.27

The total amount past due is as of March 21, 2002. EffectNet gives notice that
all provisions of default will be strictly enforced. As indicated above, Intermedia
has until the expiration of thirty (30) days after the March 12 Letter or this
written notice, as the case may be, to remit the Required Payment. The
Required Payment should be made payable and delivered by wire transfer to
Wells Fargo Bank, Tempe, Arizona, ABA Routing Number 1221-05278, EffectNet
Operations Account, Account Number 046-465-2220, attn Stephanie Jordan at
480-644-8396.

if Intermedia fails to cure the Intermedia Defaults and the February Payment
Default and if the Agreement is terminated as aforesaid, EffectNet may claim
damages for all amounts due pursuant to the Agreement.

Nothing in this letter is intended to be a waiver or release of any rights or
remedies, or an election thereof, that EffectNet has under the Agreement or
applicable law, and all such rights and remedies are hereby expressly reserved in
their entirety.

Very truly yours,

Robert C. McConnell
General Counsel

CC:  Mr. Rich Black

A 01372

| Time period | Minimum Commitment | Price | Total per month | Total for period |
|---|---|---|---|---|
| Past due invoices prior to March, 2002 | | | | $827,844.27 |
| March 2002 through December 2002 | 10000 | $27.40 | $274,000.00 | $2,740,000.00 |
| December 18, 2002-December 18, 2003 | 10000 | $27.40 | $274,000.00 | $3,288,000.00 |
| | | | Total: | $6,855,844.27 |

A 01373

## Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.

One Financial Center
Boston, Massachusetts 02111

George B. Hofmann

*Direct dial 617 348 1753*
gbhofmann@mintz.com

617 542 6000
617 542 2241 *fax*

January 14, 2003

**BY FEDERAL EXPRESS**

United States Bankruptcy Court
WorldCom Claims Docketing Center
One Bowling Green, Room 534
New York, NY 10004-1408

Re:   Intermedia Communications, Inc.
      Chapter 11; Case No. 02-42154

Dear Sir or Madam:

Enclosed please find the original and two copies of a proof of claim in connection with the above case.  Please file the original and return one of the copies date-stamped to the undersigned in the enclosed self-addressed stamped envelope.

Thank you for your assistance.  Please contact me if you have any questions.

Very truly yours,

MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY and POPEO, P.C.

George B. Hofmann

GBH
Enclosures

TRA 1750115v2

*Boston  New York  Reston  Washington  New Haven*

MINTZ LEVIN
COHN FERRIS
SKY AND
PC

*Boston*
*Washington*
*Reston*

# *Production Center Work Order*

_r_ NAME   J A Hammel

_RETARY_   K. Flynn

_ENT_ NAME _____

ATTORNEY # 3042   EXT. # ____

EXT. # 5066661   FLOOR # 38

CLIENT # 24000   MATTER # 008

Deliver to Attorney ☑
+ e-mail

_e_ Submitted: 2/19   Time: 10:30

Date Needed: 2/19   Time: 2:10 p.m

Call Atty./Sec. for Pick-up ☐

_adocs_ ☐   Tradocs ☑   Litdocs ☐   MLSDocs ☐   DCDocs ☐   RestonDocs ☐   NYDocs ☐

_ . #_ _____

## JOB TYPE (CHECK ALL THAT APPLY)

| | | |
|---|---|---|
| ☐ Original Input | COMPARERITE | ☐ Lotus Organizer |
| ☐ Clean | ☒ Existing Version  ☒ New Version | ☐ Other Database |
| ☐ Edit Existing Document | ☒ Redline (vers ____ vs ____) | ☐ Merge   Data Source # |
| ☒ Supercopy Document | ☒ Comparerite w/ ‡ for Deletions | Main Doc. # |
| ☐ Bond/Registration Stmt/Public Offering | ☒ Comparerite w/ strikethrough | ☐ Labels   Size: |
| ☐ Use A/A Settings | ☒ No Redline | |
| ☐ Tape How many? | ☐ Word Drawing | ☐ Conversion   ☒ Cleanup |
| Side A ___ B ___ | ☐ Visio | ☒ Download from Disk to System |
| | ☐ PowerPoint | ☒ Download from System to Disk |
| | ☐ Excel Spreadsheet | |

_PECIAL_ INSTRUCTIONS: Please scan in pdf format
Deliver Original to I Hammel and
e-mail scanned copy. Thank you
Please save as "Exhibit B"

_Please_ help us with feedback by letting us know about the quality of service we have provided!

FOR OPERATOR USE ONLY

_M._ _____   OPERATOR: _____   COMMENTS: _____

# Exhibit C

A 01376

HEARING DATE AND TIME July 13, 2004 AT 10:00 A.M. EST
OBJECTION DEADLINE: July 8, 2004 AT 4:00P.M. EST

STINSON MORRISON HECKER LLP
Attorneys for Debtors and Debtors in Possession
1201 Walnut Street
Kansas City, MO 64106
Telephone: (816) 842-8600
Facsimile: (816) 691-3495
Mark A. Shaiken, Esq.
Lawrence W. Bigus, Esq.
Sharon L. Stolte, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------x
In re                                           :
                                                :     Chapter 11 Case No.
WORLDCOM, INC., et al.,                         :     02-13533 (AJG)
                                                :
                                                :     (Jointly Administered)
                     Debtors.                   :
------------------------------------------------x
```

**DEBTORS' OBJECTION
TO ALL PROOFS OF CLAIM FILED BY EFFECTNET, INC.
WHICH IS NOW MERGED INTO PARUS HOLDINGS, INC.,
INCLUDING, BUT NOT LIMITED TO
<u>CLAIM NUMBERS 9291, 11242, 9293 AND 11173</u>**

TO THE HONORABLE ARTHUR J. GONZALEZ,
UNITED STATES BANKRUPTCY JUDGE

      WorldCom, Inc. and certain of its direct and indirect subsidiaries, as debtors and debtors in possession (collectively, the "Debtors"), respectfully represent:

<u>**JURISDICTION**</u>

    1.    The Court has jurisdiction to consider this Objection and the relief requested herein pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding

A 01377

pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**BACKGROUND**

2.    On July 21, 2002 (the "Commencement Date") and November 8, 2002, WorldCom, Inc. and certain of its direct and indirect domestic subsidiaries commenced cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). By Orders dated July 22, 2002 and November 12, 2002, the Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On July 29, 2002, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured creditors (the "Committee").

3.    WorldCom, Inc., one of the Debtors in the above captioned cases, together with approximately 200 direct and indirect domestic subsidiaries and 200 non-debtor foreign affiliates (collectively, the "Company"), is one of the world's preeminent global communications companies that provides a broad range of communication services in over 200 countries on six continents.  Through its core communications services business, which includes voice, data, Internet and international services, the Company carries more data over its networks than any other entity.  The Company is also the second largest carrier of consumer and small business long distance telecommunications services in the United States, provides a broad range of retail and wholesale communications services, including long distance voice and data communications, consumer local voice communications, wireless messaging and voice services, private line services and dial-up Internet access services.

A 01378

4.    For the year ended December 31, 2001, WorldCom recorded revenue of more than $30 billion.[1]    As of March 31, 2002, WorldCom's books and records reflected liabilities totaling approximately $41 billion. As of June 30, 2002, WorldCom employed more than 63,900 individuals, of which approximately 57,700 were full-time employees and approximately 6,200 were part-time employees.

## SCHEDULES AND PROOFS OF CLAIM

5.    On November 21, 2002, the Debtors filed their Schedules of Liabilities (as amended and supplemented, the "Debtors' Schedules") and their Schedules of Executory Contracts and Unexpired Leases.  On December 5, 2002, the Debtors filed their Statements of Financial Affairs.

6.    On October 29, 2002, this Court entered its Order (a) Pursuant to ~ankruptcy Rule 3003 (c)(3) Establishing the Deadline for Filing Certain Proofs of Claim and Approving the Form and Manner of Notice Thereof (the "Bar Date Order"). The Bar Date Order established January 23, 2003 as the bar date (the "Bar Date") for filing proofs of claim in these cases.  Pursuant to the terms of the Bar Date Order, on or about November 22, 2002, the Debtors mailed notice of the bar date (the "Bar Date Notice") to in excess of 1.2 million creditors and potential claimants.

7.    On March 25, 2003, the Court entered its Order Pursuant to 11 U.S.C. § 105 Approving Notice Procedures Regarding Claim Objections and Deemed Schedule Amendment Motions ("Claim Objection Procedure Order"), approving certain procedures regarding noticing of claims objections and omnibus motions for deemed schedule amendments.

---

[*] The amounts in this paragraph are stated on a consolidated basis, including Debtors and non-debtor domestic .osidiaries only. WorldCom, Inc. has announced its intention to restate the financial statements for 2000, 2001 and the first quarter of 2002.

3

8.    As of the date of this Objection, in excess of 34,000 proofs of claim have been filed in connection with these chapter 11 cases (the "Proofs of Claim"). The Debtors have begun the process of conducting a comprehensive review and reconciliation of all prepetition claims, including both the claims scheduled in the Debtors' Schedules (the "Scheduled Claims") and the claims asserted in the Proofs of Claim (the "Filed Claims"). This process includes identifying particular categories of Filed Claims that may be targeted for disallowance and expungement, reduction and allowance, or reclassification and allowance. To reduce the number and volume of pleadings, and to reduce the possibility of double recovery or improper recovery by claimants, the Debtors are filing this objection to all of the claims filed by EffectNet, Inc. and/or Parus Holdings, Inc. into which EffectNet, Inc. has been merged (hereinafter referred to as "Claimant").

9.    According to available records, Claimant has filed two claims as follows: Claim No. 9291 filed on January 08, 2003, which was replaced by and amended by Claim No. 11242 filed January 15, 2003; and Claim No. 9293 filed on January 08, 2003 which was replaced by and amended by Claim No. 11173 filed January 15, 2003.

10.    Upon information and belief this court has already entered an order expunging claim numbers 9291 and 9293.

11.    The above-referenced claims are the only claims that Debtors have a record of receiving which have been filed by Claimant.

12.    If any other claims have been filed by Claimant or any of Claimant's related entities then these objections apply to and relate to all such claims.

A 01380

13.    The claims filed by Claimant are duplicative claims which claim the exact same dollars for the exact same alleged debts and therefore all objections to one claim are objections to the other claim.

## OBJECTIONS

14.    Claimant is not entitled to a double recovery and therefore may not recover on more than one claim.

15.    Claimant terminated the contract upon which it based its claims. The termination of the contract at issue terminated Claimant's rights to receive continuing monthly minimum payments by the very terms of the contract.

16.    Claimant is seeking minimum monthly commitment payments and liquidated damages as specified in the contract. The amounts being sought by Claimant for these items constitute unenforceable penalties and therefore are not recoverable by Claimant.

17.    Even if Claimant is entitled to recover some or all of the minimum monthly commitments Claimant has calculated its alleged damages using an amount per commitment which is significantly higher than the amount the contract specifies should be used.

18.    Claimant was not a party to the original contract and the contract prohibits assignment.

19.    Claimant's claims have been partially paid.

20.    Debtors did not engage in any conspiracy and therefore are not liable for such.

21.    Debtors did not engage in unfair and deceptive trade practices and therefore are not liable for such.

A 01381

22.    Debtors did not tortiously interfere with Claimant's contractual relationships and therefore are not liable for such.

23.    Debtors were not damaged by any of the alleged tortious conduct of Claimant.

24.    Claimant's claims are not set forth with enough specificity for Debtors to determine the exact conduct involved and/or alleged and/or the damages alleged to have occurred with respect to the alleged tortious interference, unfair and deceptive trade practices and/or conspiracy. Therefore, Claimant has failed to properly state its claim.

25.    Pursuant to the above objections, Debtors request that all proofs of claims filed or asserted by Claimant be disallowed in their entireties.

### MEMORANDUM OF LAW

26.    assertions such that Debtors cannot Claimant asserts many claims with general, vague and ambiguous fully determine whether there are novel issues of law. Accordingly, the Debtors respectfully request that the Court waive the requirement contained in Rule 9013-1(b) of the Local Bankruptcy Rules for the Southern District of New York that a separate memorandum of law be submitted in support of the Objection.

### NOTICE

27.    Notice of this Objection has been provided to each of the persons or entities that filed the proofs of claim identified herein and their counsel (if known), and to other parties in accordance with the Claim Objection Procedure Order. The Debtors submit that no other or further notice need be given.

28.    No previous application for the relief sought herein has been made to this or any other Court.

·6

A 01382

WHEREFORE the Debtors respectfully request entry of an order granting the relief requested herein and such other and further relief as is just.

Dated: June 10, 2004
      New York, New York

                                        STINSON MORRISON HECKER LLP

                                        /s/    Sharon L. Stolte
                                        Mark A. Shaiken, Esq.
                                        Lawrence W. Bigus, Esq.[2]
                                        Sharon L. Stolte, Esq.
                                        9 Corporate Woods, Ste. 450
                                        9200 Indian Creek Parkway
                                        Overland Park, KS 66210
                                        (913) 344-8026-Telephone
                                        (913) 451-6352-Facsimile
                                        Attorneys for Debtors and
                                        Debtors in Possession

---

[2] Please contact this attorney with any questions.

7

CWDDOCS 113444v5

A 01383

# Exhibit D

A 01384

MINTZ, LEVIN, COHN, FERRIS
GLOVSKY and POPEO, P.C.
Chrysler Center
666 Third Avenue
New York, New York 10017
Stephanie K. Hoos (SH-9821)

-and-

1 Financial Center
Boston, Massachusetts 10009
Michael Gardener (MG-3241)
Ian A. Hammel (IH-8267)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) |
| | ) |
| WORLDCOM, INC., et al. | ) Chapter 11 Case No. |
| | ) 02-13533 (AJG) |
| Debtors. | ) |
| | ) (Jointly Administered) |

## RESPONSE AND OPPOSITION OF PARUS HOLDINGS, INC. TO DEBTORS' OBJECTION TO PROOFS OF CLAIM FILED BY EFFECTNET, INC.

Parus Holdings, Inc., successor-by-merger to EffectNet, Inc. and EffectNet, LLC, ("EffectNet") opposes the *"Debtors' Objection to all Proofs of Claim Filed by EffectNet, Inc. which is now Merged into Parus Holdings, Inc., Including, but not Limited to Claim Numbers 9291, 11242, 9293 and 11173"* that was filed in these proceedings on June 10, 2004 (the "Claims Objection").

### I.    PRELIMINARY STATEMENT

1.    EffectNet is a creditor and party-in-interest in these proceedings with contract, tortious interference, civil conspiracy, and other claims ("Claims") against Intermedia Communications, Inc. ("Intermedia") and MCI WorldCom Communications, Inc., ("WorldCom"

A 01385

and, with Intermedia, the "Debtors"). As is set forth in EffectNet's proofs of claim and in this response, Intermedia intentionally breached, indeed repudiated, a certain Unified Communications Services General Agreement almost immediately after WorldCom completed its July 2001 acquisition of and/or merger with Intermedia. EffectNet believes that this breach reflected a conscious decision by Intermedia and WorldCom to reject the agreement in favor of a competing WorldCom strategy. The agreement had been the centerpiece of Intermedia's unified communications program, but this strategy apparently collided with WorldCom's own plans. Moreover, EffectNet believes that this breach may also have had other sinister motives. EffectNet believes that this breach may have been orchestrated to impose financial distress on EffectNet as a competitor and to create leverage to obtain better terms under a separate Master Agreement for Software Licenses that WorldCom was at this same time negotiating with Webley Systems, Inc., a company that supplied technology to EffectNet that EffectNet was, at this same time, merging with. In every event, this breach had a devastating impact on EffectNet.

2.      The Claims Objection is limited to unsupported assertions and is inconsistent with the Debtors' obligations under Rule 3007 of the Federal Rules of Bankruptcy Procedure. The Claims Objection should be rejected on this basis alone. Even if the Court examines the merits of EffectNet's Claims at this early stage of this contested matter, EffectNet submits that a majority of the arguments advanced in the Claims Objection must be summarily rejected while the remaining portions of the Claims Objection cannot be resolved until discovery is completed as contemplated by Bankruptcy Rule 9014.

2

A 01386

## II. BACKGROUND

### A.   *Summary of EffectNet's Claims.*

3.     EffectNet's Claims against both Debtors relate to Intermedia's total breach and repudiation of its duties under a Unified Communications Services General Agreement between EffectNet and Intermedia dated as of November 20, 2000 (the "UC Contract").   A true and accurate copy of the UC Contract is attached as Exhibit A.

4.     EffectNet's Claims against Intermedia include damages based on Intermedia's breach of the UC Contract.   EffectNet also has Claims against Intermedia for unfair and deceptive trade practices, a breach of the implied covenant of good faith and fair dealing, and conspiracy. EffectNet believes that Intermedia and WorldCom acted in concert to breach the UC Contract.  EffectNet believes that these actions were made with knowledge that a breach of the UC Contract would have a devastating impact on EffectNet, a competitor of WorldCom, and might enhance WorldCom's ability to extract pricing and other concessions with respect to a separate contract, a Master Agreement for Software Licenses (the "MASL").   See proofs of claim.

5.     EffectNet's Claims against WorldCom are based on WorldCom's separate interference with EffectNet's contractual relations under the UC Contract, unfair and deceptive trade practices, and civil conspiracy in procuring Intermedia's breach of the UC Contract.  Id. EffectNet believes that as part of this process, WorldCom made improper use of confidential information given to WorldCom in order to advance its own selfish interests to the detriment of EffectNet.

A 01387

**B.     *The UC Contract and the Services.***

6.     The UC Contract represents EffectNet's agreement to supply to Intermedia unified messaging, wholesale communications and related services (the "Services") and Intermedia's agreement to purchase those Services. The UC Contract was the underpinning of a major Intermedia initiative (announced in the fall of 2000) set around a new Intermedia product suite branded "IntermediaOne". IntermediaOne was planned for a launch of this product in 2001 through Intermedia's 700-member plus direct sales force into a substantial base of existing small and medium sized Intermedia business customers.

7.     The Services included, inter alia, enhanced telecommunication products hosted through EffectNet. The Services provided users with unified any-time, any-where access to, and management of their personal and business communications, such as e-mails, faxes, voices-messages, conference calls, calendars, and address books. Subscribers to the Services could, for example, access text-to-voice translation of e-mails over the telephone, view faxes online, arrange conference calls, access contact lists on request, obtain real-time call records for client billing, and re-direct faxes to any machine or PC. Users of the Services could also access and manage their personal and business communications from any type of communications device (such as telephones, mobile phones, personal computers and PDA's).

8.     The UC Contract reflects Intermedia's intent to re-sell the Services to Intermedia's end user customers. Evidence in this contested matter will establish that Intermedia represented to EffectNet at the time the UC Contract was signed that Intermedia had hundreds of sales personnel (many of whom were activated as EffectNet end users prior to July 1, 2001) that would market the Services to Intermedia's customers. Contemporary industry estimates

4

projected that unified communications products like the Services would soon become a multi-billion dollar industry.

9.    As is common with re-seller contracts in the telecommunications industry, the UC Contract included an unconditional take-or-pay obligation for the Services.    Take-or-pay requirements are often included in exchange for pricing concessions by a supplier and represent minimal commitments/expectations within a larger anticipated volume.

10.    The take-or-pay obligations of the UC Contract required Intermedia to compensate EffectNet as if Intermedia had *at least* 10,000 subscribers for the Services for all periods on and after December 18, 2001 (the "Minimum Commitment"), although even greater revenues were anticipated by both parties.    See UC Contract, at Section 2.12 and 2.13.

11.    The take-or-pay obligations of the UC Contract provided that if the number of active subscribers for Services in any month was less than the Minimum Commitment, the difference between the actual number of active subscribers and the Minimum Commitment would be deemed a "Volume Shortfall".    Id. at Section 2.13.    In any month with a Volume Shortfall, EffectNet would be entitled to a "Reconciliation Payment" in addition to payments based on the Services Intermedia re-sold to its customers.    Id.    The Reconciliation Payment is the product of the Volume Shortfall multiplied by the base monthly price applicable to the Intermedia Services per subscriber.    Id.

12.    Based on these take-or-pay elements of the UC Contract, at all times relevant to EffectNet's Claims, the minimum compensation due under the UC Contract was $274,000 per month.    See paragraphs 25-26, infra.

5

A 01389