## Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.

One Financial Center
Boston, Massachusetts 02111

George B. Hofmann

*Direct dial 617 348 1753*
gbhofmann@mintz.com

617 542 6000
617 542 2241 *fax*

January 7, 2003

**BY FEDERAL EXPRESS**

United States Bankruptcy Court
WorldCom Claims Docketing Center
One Bowling Green, Room 534
New York, NY 10004-1408

Re:    MCI Worldcom Communications, Inc.
Chapter 11; Case No. 02-42223

Dear Sir or Madam:

Enclosed please find the original and two copies of a proof of claim in connection with the above case. Please file the original and return one of the copies date-stamped to the undersigned in the enclosed self-addressed stamped envelope.

Thank you for your assistance. Please contact me if you have any questions.

Very truly yours,

MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY and POPEO, P.C.

George B. Hofmann

GBH
Enclosures
cc:    Robert C. McConnell, Esq.
       Robert Duggan, Esq.
       Michael S. Gardener, Esq.

TRA 1750116v1

*Boston  New York  Reston  Washington  New Haven*

**A 01670**

Form B10 (Official Form 10)  (Rev. 4.01)

| United States Bankruptcy Court | | PROOF OF CLAIM |
|---|---|---|
| Name of Debtor<br>MCI Worldcom Communications, Inc. | Case Number<br>02-42223 | |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. §503.

| Name of Creditor (The person or entity to whom the debtor owes money or property):<br>EffectNet, Inc.<br><br>Name and Addresses Where Notices Should be Sent:<br>EffectNet, Inc.<br>c/o Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.<br>Attn: George B. Hofmann<br>One Financial Center<br>Boston, MA 02111<br>Telephone No. 617-542-6000 | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>☐ Check box if you have never received any notices from the bankruptcy court in this case.<br><br>☒ Check box if the address differs from the address on the envelope sent to you by the court. | Filed: USBC - Southern District of New York<br>Worldcom, Inc., Et Al.<br>02-13533 (AJG)    0000011242<br><br><br>THIS SPACE IS FOR<br>COURT USE ONLY |
| Account or other number by which creditor identifies debtor: N/A | Check here ☐ replaces<br>if this claim ☒ amends    a previously filed claim, dated: 1/8/03 | |

| 1. Basis for Claim | |
|---|---|
| ☐ Goods sold<br>☒ Services performed<br>☐ Money loaned<br>☐ Personal injury/wrongful death<br>☐ Taxes<br>☒ Other _____ See Addendum | ☐ Retiree benefits as defined in 11 U.S.C. §1114(a)<br>☐ Wages, salaries and compensation (Fill out below)<br>Your SS #: _____<br>Unpaid compensation for services performed<br>from _____ to _____<br>(date)            (date) |
| 2. Date debt was incurred:<br>December 2001 and thereafter | 3. If court judgment, date obtained: |

4. Total Amount of Claim at Time Case Filed:    $6,855,844.27 plus unliquidated amounts

If all or part of your claim is secured or entitled to priority, also complete Item 5 or 6 below.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

| 5. Secured Claim. | 6. Unsecured Priority Claim. |
|---|---|
| ☐ Check this box if your claim is secured by collateral (including a right of setoff).<br>Brief Description of Collateral:<br><br>☐ Real Estate    ☐ Motor Vehicle<br>☐ Other (See Addendum)<br><br>Value of Collateral: $<br><br>Amount of arrearage and other charges at time case filed included in secured claim, if any: $ | ☐ Check this box if you have an unsecured priority claim<br>Amount entitled to priority $_____<br>Specify the priority of the claim:<br>☐ Wages, salaries, or commissions (up to $4,650).* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. §507(a)(3)<br>☐ Contributions to an employee benefit plan - 11 U.S.C. §507(a)(4)<br>☐ Up to $2,100* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. §507(a)(6)<br>☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. §507(a)(7)<br>☐ Taxes or penalties of governmental units - 11 U.S.C. §507(a)(8)<br>☐ Other - Specify applicable paragraph of 11 U.S.C. §507(a) (_1_).<br><br>*Amounts are subject to adjustment on 4/1/04 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment. |

| 7. Credits: The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.<br>8. Supporting Documents: Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.<br>9. Date-Stamped Copy: To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim. | THIS SPACE IS FOR COURT USE ONLY<br><br>RECEIVED<br>JAN 1 5 2003<br>US BANKRUPTCY COURT<br>SO. DIST. OF NEW YORK |
|---|---|
| Date<br>December 12, 2002 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):<br><br>EffectNet, Inc. By TAJ RENEAU, CHIEF EXECUTIVE OFFICER |

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§152 and 3571.

TRA 1742227v2

**A 01671**

## Addendum to Proof of Claim

Debtor:        MCI Worldcom Communications, Inc. (the "Debtor")

Case No.:      02-42223 (AJG) (Jointly administered under case no. 02-13533 (AJG))

Creditor:      EffectNet, Inc. ("EffectNet")

EffectNet, LLC[1] and Intermedia Communications, Inc. ("Intermedia") were parties to a certain Unified Communications Services General Agreement dated as of November 20, 2000 (the "Agreement"). A copy of the Agreement is attached to this Proof of Claim. Intermedia and the Debtor are affiliated bankrupt companies, whose bankruptcy cases are jointly administered. Pursuant to the Agreement, EffectNet was obligated to provide services to Intermedia for resale. Section 2.12 of the Agreement specified the minimum monthly commitment of Intermedia to purchase EffectNet's services, and the pricing for these services was provided in Appendix P to the Agreement.

Intermedia breached the Agreement by failing to pay amounts due under it for services provided by EffectNet, and by purposefully failing to purchase the services supplied by EffectNet under the Agreement. As a result of Intermedia's breach of the Agreement, EffectNet sent a letter dated March 25, 2002 (the "Letter"), a copy of which is attached to this Proof of Claim. The Letter details the amounts owing by Intermedia to EffectNet prior to March 2002.

In addition to the amounts described in the Letter, as a result of Intermedia's breach of the Agreement, EffectNet suffered damages equal to Intermedia's remaining minimum monthly commitment under the Agreement, multiplied by the number of months remaining in the term of the Agreement. These damages are summarized in the spreadsheet which is attached to this Proof of Claim.

The Debtor caused damages to EffectNet, which are included but not limited to those damages summarized in the spreadsheet. EffectNet has claims against the Debtor for tortious interference with contractual relations, unfair and deceptive trade practices, and conspiracy based on the Debtor's actions in concert with Intermedia. The Debtor and Intermedia agreed to cause

---

[1] EffectNet Inc. is the sucessor in interest to EffectNet LLC.

Intermedia to breach the Agreement, in an effort to wrongfully improve the Debtor's bargaining position with respect to a certain Master Agreement for Software Licenses ("MASL") with Webley Systems, Inc. ("Webley"), a company which is affiliated with EffectNet. The Debtor and Intermedia knew that the termination of the Agreement would place EffectNet and Webley in a position of severe financial distress, and would therefore force Webley to accept onerous terms in the negotiation of the MASL that favored the Debtor to a much greater degree than would have been possible had the Agreement been in full force and effect. The damages suffered by Webley and EffectNet as a result of the concerted action are substantial, but unliquidated in amount.

EffectNet expressly reserves its right to amend or supplement this Proof of Claim, including, but not limited to, for the purpose of quantifying the damages suffered as a result of the actions of Intermedia and the Debtor described in the preceeding paragraph. This proof of claim is made without prejudice to the filing by EffectNet of additional proofs of claim with respect to any other indebtedness or liability of the Debtor to EffectNet.

TRA 1742230v2

A 01673

COPY

# EffectNet

# Unified Communications
# Services
# General Agreement
# For

# Intermedia Communications, Inc.

A 01674

# UNIFIED COMMUNICATIONS SERVICES GENERAL AGREEMENT

This Unified Communications General Agreement (the "Agreement") is entered into as of the 20 day of November 2000, ("Effective Date") by and between EffectNet LLC, a Nevada Limited Liability Company ("EffectNet") and Intermedia Communications, Inc. organized under the laws of The State of Delaware, with a business address at One Intermedia Way, Tampa, FL 33647 ("Intermedia") (collectively "Parties" or individually a "Party").

WHEREAS, Intermedia is Integrated Communications Provider providing telecommunication services including local dial tone, long distance, data services, etc.

WHEREAS, EffectNet is a unified communications application service provider that offers private label Internet and telecommunications products and services, including unified communications and other value-added services, in-house customer services, billing and technical support (the "EffectNet Services").

WHEREAS, EffectNet desires to provide Intermedia with a customized Intermedia-branded wholesale communications service ("Private Label") for sale by Intermedia to its end user customers (the services collectively hereinafter described as "Intermedia UC Services" or "UC Services").

WHEREAS, EffectNet and Intermedia recognize that the provision of Intermedia UC Services requires the Parties to closely work together to meet customer needs and to implement and ensure the commercial viability of the Intermedia UC Services.

NOW THEREFORE, in consideration of the promises and mutual agreements contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which the Parties acknowledge, the Parties agree as follows:

1.    **GENERAL PROVISIONS.**

1.1    Both Parties agree that EffectNet shall offer Intermedia UC Services for Intermedia as described in this Agreement. Intermedia will market the UC Services to Intermedia customers and end-users as it sees fit.   For purposes of this Agreement, the term "customers" shall include, but not be limited to wholesale and retail customers of Intermedia UC Services.

1.2    EffectNet may make changes to the EffectNet Services from time to time in order to improve, modify or extend the EffectNet Services ("EffectNet Changes"), but in no event shall such changes decrease the quality of the EffectNet Services provided to Intermedia. EffectNet will provide Intermedia with notice ninety (90) days in advance of the commercial release date of such changes.

1.3    The Parties shall use their best efforts to accomplish the initial launch of the Intermedia UC Services ("Initial Launch Date") by December 18, 2000.

1.4    Each Party shall promptly notify the other in writing of any event, which might result in such Party's inability to continue to meet its obligations under this Agreement.  Such event shall specifically include, but not be limited to, a materially adverse change in a Party's financial situation.  EffectNet acknowledges and understands that Intermedia is in the process of a merger involving all of its assets with MCI/Worldcom, Inc.  Such merger shall not, in and of itself, constitute an event requiring

A 01675

notice pursuant to this provision, and that, accordingly, no further notice of the merger or the consummation thereof, shall be required of Intermedia.

## 2.    OBLIGATIONS OF THE PARTIES.

2.1    Product Coordinator: EffectNet and Intermedia will each designate their own Product Coordinator to coordinate the process described below.

2.1.1    The designated Product Coordinators will be the principal points of contact between the parties on product issues (the "Product Advisory Process"). Each party may rely on the authority and technical competence of the other Party's Product Coordinator to represent its respective company in connection with the priorities, needs and progress of their company's product issues.

2.1.2    The Product Advisory Process will include in-person/telephonic/electronic communication between representatives, which should be ongoing, or occur not less than once each month during the Term of this Agreement, except if the parties expressly agree to some different frequency.

2.2    EffectNet Materials. EffectNet will provide Intermedia with regular access to and copies of the following:

2.2.1    Plans for current and future enhancements to the EffectNet Services which by their nature apply to the Intermedia UC Services; and

2.2.2    Functional descriptions, development plans, schedules and periodic status for enhancements to the EffectNet Services under development, as soon as such materials exist.

2.3    Product Development. Intermedia and EffectNet agree that the EffectNet Services provided to Intermedia will be the same version of the EffectNet Services generally made commercially available, unless Intermedia deploys modifications of the EffectNet Services in order to satisfy large blocks of customer/end users, provided, however, that EffectNet shall have no obligation to support Intermedia any modification not previously known to EffectNet.

2.3.1    Intermedia will implement new versions within 30 days with call avoidance measures built into the process, including but not limited to adequate customer notification of new features, benefits and the availability of training timed to coincide with the release of any new versions.

2.3.2    EffectNet will provide Intermedia with at least ninety (90) days advance notice of an expected new release or version of EffectNet Services.

2.4    Forecasts. Intermedia shall provide EffectNet with non-binding forecasts for expected mailbox activations, at minimum of once every two (2) months during the Term of this Agreement. Intermedia will also provide EffectNet with quarterly and annual non-binding forecasts of expected mailbox activations. The availability of platform capacity to be provided by EffectNet to Intermedia is conditioned on the platform capacity demand not exceeding the forecast provided by Intermedia for any period addressed by such forecast. With respect to timely provided mailbox activation forecasts only, EffectNet will use reasonable efforts to meet Intermedia's forecasted demand. However, EffectNet reserves the right to request additional guarantees from Intermedia when the forecasts provided by Intermedia require significant or unusual capital and cost

A 01676

by EffectNet. Intermedia is to provide the first of such forecasts to EffectNet on or before November 30, 2000. For purposes of this section EffectNet must allocate constrained capacity to Intermedia on terms at least as favorable as offered to any other customer of EffectNet. In the event that EffectNet declines orders because of capacity constraints, then EffectNet shall notify Intermedia and the Parties shall use commercially reasonable efforts to develop a solution that will provide Intermedia with a method of ensuring that the needs of Intermedia's existing and potential end users are met while ensuring that EffectNet is permitted to increase capacity in an orderly fashion.

2.5    Billing Cycle. On an every 15-day basis, EffectNet will invoice Intermedia for account fees for each account active during the previous 15 days and any late charges for previous outstanding invoices.

2.6    Payment. Intermedia will pay EffectNet in then available U.S. funds on a net-15 day basis.

2.7    Call Detail Records for Billing. Each day, EffectNet will provide to Intermedia Calling Detail Records ("CDR") on a timely basis, in a mutually agreed-upon electronic format.

2.8    Billings and Collections. Intermedia shall be responsible, at its sole expense, for all invoicing and collections with its customers, end-users, agents, subagents or resellers. EffectNet will not be responsible for any collections or bad debt by Intermedia's customers, end-users, agents, subagents or resellers2.9    Fraud. Intermedia will be solely responsible for fraudulent misuse of the Intermedia UC Services due to credit fraud, fraudulently established accounts and stolen accounts (except to the extent if such theft occurs-through misuse or theft the records or facilities of EffectNet); provided that, Intermedia shall not be responsible for fraudulent misuse occurring after EffectNet has become aware of such occurrence; and, provided further, that the extent of Intermedia's liability to EffectNet for fraudulent misuse of Intermedia UC Services shall be EffectNet's direct damages and costs incurred. EffectNet shall notify Intermedia of fraud as soon as practicable, upon EffectNet's becoming aware of such fraud. The Parties will use commercially reasonable efforts to establish fraud control means and measures.

2.10    Customer Service Call Center and Technical Support. EffectNet shall maintain a customer service call center for its Intermedia customers and end-users, as appropriate in accordance with industry standards. This call center will be responsible for all customer support.

2.10.1  Call items outside the scope of EffectNet support services are: non-EffectNet related software problems and call forwarding issues.

2.11    Customer Fulfillment Process. Intermedia, when taking orders for new customers or end users, or taking orders to modify or update a customer's order, will use the EffectNet Customer Fulfillment Process or compatible process to gather the information required and to provide the customer information to EffectNet. Intermedia is responsible for providing to EffectNet such new mailbox account information reasonably required by EffectNet in order to activate a new mailbox. EffectNet shall provide documentation and training, in accordance with the training provision of this Agreement, to Intermedia on the EffectNet Customer Fulfillment Process.    2.12    Minimum Commitment. Intermedia hereby agrees to deliver a minimum 1,500 then current active subscribers on

A 01677

or before three (3) months after December 18, 2000 (the "Rollout Date"); an additional 1,500 then current active subscribers (total 3,000) on or before six (6) months after the Rollout Date; and additional 3,500 then current active subscribers (total 6,500) on or before nine (9) months after the Rollout Date; and 10,000 total then current active subscribers on or before twelve (12) months after the Rollout Date (the "Ramp Date"), and at the end of each calendar month thereafter ( the "Minimum Commitment") for the Term of this Agreement.

    2.13   <u>Reconciliation Payment</u>. On the Ramp Date and at the end of each calendar month thereafter, EffectNet will calculate the actual number of then current active subscribers on the last day of such calendar month and compare it to the Minimum Commitment. If the number of subscribers is less than the Minimum Commitment for the month in question, such difference will constitute a "Volume Shortfall." Intermedia shall pay EffectNet a Reconciliation Payment equal to the Volume Shortfall multiplied by the base monthly price applicable to the Intermedia UC Service per subscriber,

### 3.   MARKETING AND BRANDING.

    3.1   <u>Web Presence</u>. At no additional charge, EffectNet will provide Intermedia with a private label website, URL links and related branding as reasonably directed by Intermedia.

    3.2   <u>Use of Trademarks, Service Marks and Trade names</u>. The Parties agree not to display or use any of the trade names, service marks, brands or trademarks of the other Party, and shall not permit the same to be displayed or used by third parties, other than in connection with the sale, distribution or promotion of the brand(s) used for the Intermedia UC Services covered by this Agreement and subject to the prior written approval of the other or a third Party owning such trademark, service mark or trade name (except where such approval between the Parties is contained in this Agreement). In the absence of specific prior written consent from the other Party, a Party shall not use any part of any of the other Party's trade names, service marks, brands or trademarks as part of its own name, service marks or trademarks or in any other manner not so approved by the other Party. It is expressly understood by both Parties that trade names, service marks and trademarks of the other party are proprietary and that nothing in this Agreement constitutes the grant of a general license to use said trade names, service marks and trademarks. Upon termination of this Agreement, any and all rights or privileges of a Party to use the other Party's trade names, service marks, brands or trademarks shall expire, and each Party shall discontinue the use of the other Party's trade names, service marks, brands. The provisions of this section shall also apply to third party branding incidental to this Agreement.

    3.3   <u>Intermedia Marketing Expenses.</u> Intermedia as the buyer of the wholesale services from EffectNet, is responsible for all expenses and obligations incurred by Intermedia as a result of its efforts to attract and solicit customers for Intermedia UC Services. Intermedia expressly acknowledges that it is not entitled to any reimbursement by EffectNet for such expenses unless, and only to the extent that, both parties hereto agree in writing prior to the incursion of such expenses, as set forth in this Agreement.

A 01678

4.    CHARGES AND BILLING STATEMENTS.

4.1    Traffic- or usage-sensitive rates shall be computed in 30-second initial and 6-second continual increments.

4.2    Intermedia shall be responsible for all applicable taxes, including but not limited to sales or value-added taxes, utility or excise taxes, fees and/or surcharges that are imposed by federal, state, or local governments on the Intermedia UC Services or business generated by Intermedia through the sale of Intermedia UC Services as a result of long distance or services bundled within the Intermedia UC Services. Intermedia shall pay or reimburse EffectNet for all taxes collected or imposed on these services provided by EffectNet. The prices quotes in the following sections are exclusive of any and all taxes. Excluded from this responsibility are taxes based on EffectNet's net income. EffectNet shall comply with all federal and state regulations with respect to employee withholding taxes.

4.3    Pricing.    Pricing shall be as indicated by Appendix "P" attached hereto.

4.4    Seven (7) working days post the close of the month, EffectNet shall provide to Intermedia a settlement statement ("Settlement Statement") providing a summary of charges for the previous month's billing cycle in an industry standard format. The settlement statement, unless specified elsewhere in this Agreement, shall contain the following:

4.4.1    A listing of monthly recurring charges for the current or prior month's billing cycle.

4.4.2    For calls or traffic originated by Intermedia or any customers, agents, sub-agents and/or end-users during the previous month, the individual call detail and the aggregate usage charge payable broken down by termination location.

4.4.3    For calls or traffic terminated by Intermedia or any customers, agents, sub-agents and/or end-users during the previous month, the individual call detail and the aggregate usage charge payable broken down by termination location.

4.4.4    Any taxes, fees and/or charges that are imposed by federal, state, and/or local governments.

4.4.5    The net amount payable by Intermedia to EffectNet or payable to Intermedia by EffectNet.

4.4.6    When applicable, any mutually negotiated additional fees.

4.5    Payment of the Settlement Statement shall be made within 15(fifteen) calendar days after the Settlement Statement and invoice are received by Intermedia (the "Due Date"). Payments to EffectNet shall be in United States dollars and are to be made for credit to an account of EffectNet to be determined by EffectNet and provided to Intermedia within three (3) days of the date of execution of this Agreement by the later signing party. If payment is not received by the Due Date, a late fee of the lesser of (a)

A 01679

one (1) percent per month or (b) the maximum percentage permitted by law shall be assessed on the delinquent balance of undisputed usage not paid by the Due Date.

4.5.1 Deposit. Intermedia has provided EffectNet with a fully refundable deposit in anticipation of this Agreement in the amount of minimum subscriber commitment multiplied times $17.50 (US dollars) for a total of $175,000. This deposit shall be refunded to Intermedia in whole on or before the Ramp Date as long as Intermedia has met the Minimum Commitment as of such date. If Intermedia has not met the Minimum Commitment as of the Ramp Date, EffectNet shall refund to Intermedia the full amount of the deposit less the Reconciliation Payment then due. The amount of such Reconciliation Payment shall remain on deposit until such time as the Minimum Commitment is met.

4.5.2 In the event that Intermedia disputes any charge assessed by EffectNet, the Parties agree to cooperate to resolve the dispute at the earliest practicable date. The late charges set forth in Section of this Agreement shall not apply to payments that are the subject of a good faith dispute between EffectNet and Intermedia. If there is a good faith dispute, EffectNet cannot demand a late payment deposit.

5. <u>TERM AND TERMINATION.</u>

5.1    <u>Term</u>. Unless otherwise terminated as provided herein, this Agreement shall be in force for an initial term of three (3) years after the Effective Date (the "Initial Term"). This agreement shall continue automatically for successive one year terms under the same terms and conditions contained herein together with any subsequent amendments hereto, unless either Party has sent written notice of its intent not to renew the Term at least thirty (30) days prior to the expiration of the Initial Term or the renewal period then in effect.

5.2    <u>Termination</u>. Either Party may terminate this Agreement: (a) if the other Party fails to fulfill any of its material obligations under this Agreement; (b) if the other Party is in breach of Section 7 (Confidentiality); (c) if the other Party becomes insolvent or admits in writing its inability to pay debts as they mature, or makes an assignment for the benefit of creditors; or (d) if a petition under any foreign, state or United States bankruptcy act, receivership statute, or the like is filed by the other Party and is not dismissed within sixty (60) days after such filing. Termination due to default under this Section shall be effective thirty (30) days after written notice to the defaulting Party if the default has not been cured within such thirty (30) day period. 5.3    <u>Effect of Termination</u>. Upon termination of this Agreement for any reason, each Party shall remain liable for those obligations that accrued prior to the date of such termination; provided, however, that nothing herein shall be construed to obligate EffectNet to offer Services to Intermedia after the termination of this Agreement.

5.4    <u>Early Termination</u>. If prior to the end of the Initial Term this Agreement is terminated for any reason by Intermedia other than pursuant to Section 5.2, Intermedia shall pay EffectNet, as liquidated damages and as the sole remedy of EffectNet and the exclusive liability of Intermedia, a one-time early termination fee equal to $270,400 times the lesser of (i) 12 months, or (ii) the number of months remaining in the contract term.

6.    <u>SURVIVAL</u>. The following provisions shall survive the expiration or termination, for any reason, of this Agreement: (Subscriber Information), (Charges and Billing

A 01680

Statements); (Term and Termination); (Confidentiality); (Warranties); (Intellectual Property); (Indemnification); (Limitation of Liability); (General Provisions).

7.    <u>CONFIDENTIALITY</u>.  All information disclosed to the other party shall be deemed confidential and proprietary (hereinafter referred to as "Proprietary Information").  Such information includes, but is not limited to, trade secrets, know-how, technical specifications, processes, functional descriptions, architectural specifications, development plans, schedules, design information, customer lists, pricing and financial information concerning the parties' products or services, or other information relating to business development, operations, marketing, sales, performance, and any other information disclosed hereunder, which, by its nature, might reasonably be presumed to be proprietary in nature.

7.1    Each party agrees to use the Proprietary Information received from the other party only for the purposes of analyzing the business arrangement between the parties, and in accordance with this Agreement.  No patent, copyright, trademark, invention, service mark, or other proprietary rights are implied or granted under this Agreement.

7.2    Proprietary information supplied pursuant to this Agreement shall not be reproduced in any form by the receiving party except as required to accomplish the intent of this Agreement.

7.3    The receiving party shall provide, at a minimum, the same care to avoid disclosure or unauthorized use of the Proprietary Information as is provided to protect its own Proprietary Information, but in no event less than a reasonable standard of care.  It is agreed that all Proprietary Information shall be retained by the receiving party in a secure place with access limited to the receiving party's employees or agents who need to know of the content of such information for purposes of fulfilling its obligations pursuant to this Agreement. The receiving party shall be fully responsible for any breach of this Agreement by its employees or agents.  The receiving party will promptly report to the disclosing party any actual or suspected violation of the terms of this Agreement, and will take all reasonable steps requested by the disclosing party to prevent, control or remedy any such violation.

7.4    All Proprietary Information, unless otherwise specified in writing, shall remain the property of the disclosing party.  Such information shall be used by the receiving party only for the purpose set forth in this Agreement.  In addition, such Proprietary Information, including all copies thereof, shall be returned to the disclosing party or, at the request of the disclosing party, may be destroyed by the receiving party and certified as destroyed by an officer of the receiving party after the Receiving party's need for it has expired, upon request of the disclosing party; and, in any event, upon termination of the Agreement.

7.5    <u>Exceptions to confidentiality</u>:  It is understood that the parties have no obligation to maintain the confidentiality of Proprietary Information which:

7.5.1    has been published or is now otherwise in the public domain through no fault of the receiving party.

7.5.2    prior to disclosure hereunder is within the legitimate possession of the receiving party without obligation of confidentiality as can be demonstrated by written documentation.

A 01681

7.5.3    subsequent to disclosure hereunder is lawfully received from a third party having rights to such Proprietary Information without restriction of the third party's right to disseminate the Proprietary Information and without notice of any restriction against its further disclosure, is disclosed with the written approval of the other party as can be proven by documentation.

7.5.4    is obligated to be produced by a Party under order of a court of competent jurisdiction or other government authority; provided however, that the receiving party shall immediately provide notice to the disclosing party such that the disclosing party may seek injunctive relief and/or a protective order; and further provided that the disclosing party shall use best efforts to ensure that the information shall be treated as confidential by the party to whom it is disclosed.

7.5.5    is independently developed by the receiving party without reference to or reliance upon the confidential information.

In the event of a disputed disclosure, the receiving party shall bear the burden of proof of demonstrating that the information falls under one of the above exceptions.

8.    <u>WARRANTIES.</u>

8.1.    <u>Authorization</u>.  Each Party represents and warrants to the other Party that the execution and delivery of this Agreement and the performance of such Party's obligations under this Agreement have been duly authorized, and that the Agreement is a valid and binding agreement, enforceable in accordance with its terms.

8.2.    <u>Legal Compliance</u>.  Each Party represents and warrants that it has obtained, or will obtain prior to offering the Services hereunder, all licenses, approvals and/or regulatory authority necessary to provide the Services described herein. This Agreement is made expressly subject to all present and future valid orders and regulations of any regulatory body having jurisdiction over the subject matter of this Agreement.

8.3    <u>No Other Warranties</u>.  With respect to the UC Services to be provided in, and to users accessing these services from the United States and Canada, EffectNet warrants that it will exercise commercially reasonable care in the performance of its obligations under this Agreement

EFFECTNET DOES NOT WARRANT THAT THE EFFECTNET SERVICES OR THE PLATFORM THAT IT PROVIDES TO INTERMEDIA IS ERROR-FREE.  IN ADDITION, THE EFFECTNET SERVICES OR INTERMEDIA PLATFORM IS PROVIDED "AS IS" AND WITHOUT ANY WARRANTY OF ANY KIND.  EFFECTNET DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.  NEITHER PARTY SHALL BE LIABLE FOR ANY DAMAGES ARISING FROM THE OTHER PARTY'S OR ANY THIRD PARTY'S USE OF THE EQUIPMENT, INCLUDING WITHOUT LIMITATION INDIRECT, INCIDENTAL, SPECIAL, OR CONSEQUENTIAL DAMAGES, EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILTY OF SUCH DAMAGES.  THE PARTIES AGREE TO THE ALLOCATION OF LIABILITY RISK SET FORTH IN THIS SECTION.  THIS LIMITATION ON LIABILITY IS INTENDED ITO APPLY WITHOUT REGARD TO

A 01682

WHETHER OTHER PROVISIONS OF THIS CONTRACT HAVE BEEN BREACHED OR PROVEN INEFFECTIVE. "AS IS" means the As Is condition of the EffectNet Services to be provided as Intermedia UC Services, including such customer support, software and hardware as required in the condition as of the Initial Launch Date agreed upon between the Parties and including any planned enhancement as well as any other changes mutually agreed upon. These products may as of the Initial Launch Date include works for hire for the benefit of Intermedia as further described in Section 9.2.

9.    INTELLECTUAL PROPERTY.

9.1    General. Except as otherwise agreed in writing between the Parties, EffectNet shall own any Patent applications and Patents issued on inventions under this Agreement. All Inventions that are not the subject of patents or applications will be considered Confidential Information of EffectNet. Nothing in this Agreement shall be construed to transfer any right title or interest in EffectNet's designs, inventions, copyrights, trade secrets, trade names or other intellectual property.

10.    **INDEMNIFICATION. Each Party ("Indemnitor") will defend, indemnify and hold harmless the other Party and such Party's affiliates, directors, officers, employees, proprietors, independent contractors, consultants, partners, shareholders, representatives, customers, agents, predecessors, successors, and permitted assigns (collectively, "Indemnitees") from and against any claim, suit, demand, loss, damage, expense (including reasonable attorneys' fees and costs) or liability that may result from, arise out of or relate to: (a) acts or omissions arising out of or in connection with this Agreement resulting in property damage; by Indemnitor and (b) intentional or negligent violations by Indemnitor of any applicable laws or governmental regulation.**

Intermedia shall indemnify and hold harmless EffectNet from and against any and all claims, expenses, judgments, liabilities, damages or losses, including reasonable attorney's fees and expenses, and shall defend all third-party actions and proceedings arising from any infringement or alleged infringement of any patent, copyright, trade secret, mask work, trade marks or service marks of any third party to the extent such claims are caused by the acts or omissions of Intermedia with respect to the marketing and/or provision of the Intermedia UC Services, but not including any claims, expenses, judgments, liabilities, damages or losses to the extent attributable to the EffectNet Services. EffectNet shall indemnify and hold harmless Intermedia from and against any and all claims, expenses, judgments, liabilities, damages or losses, including reasonable attorneys' fees and expenses, and shall defend all third-party actions and proceedings arising from any infringement or alleged infringement of any patent, copyright, trade secret, mask work or other intellectual property right of any third party, to the extent such claims are caused by use of the EffectNet Services. In the event that an injunction or restraining order is obtained against the use or distribution of any product or deliverable pursuant to this Agreement because of any infringement or alleged infringement of any patent, copyright, trade secret, mask work or other intellectual property right or any proprietary, contract or other right of any third party, or if in EffectNet's reasonable judgment any product or deliverable is likely to become the subject of a successful claim of such infringement, then EffectNet's sole obligation to Intermedia (in addition to its obligations of indemnification set forth above) shall be to promptly: (i) procure for Intermedia the right to use the product or deliverable as provided in this Agreement, (ii)

A 01683

replace or modify the EffectNet product or deliverable so it becomes non-infringing without materially affecting the performance thereof, or if options (i) and (ii) are not available despite commercially reasonable efforts, (iii) terminate the licenses granted hereunder, and accept the return of all copies of all products.

**11.    LIMITATION OF LIABILITY.**  EXCEPT FOR DAMAGES ARISING UNDER SECTION  , IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY INCIDENTAL, INDIRECT, SPECIAL, PUNITIVE, CONSEQUENTIAL OR SIMILAR DAMAGES OF ANY KIND INCLUDING WITHOUT LIMITATION, LOSS OF PROFITS, LOSS OF BUSINESS OR INTERRUPTION OF BUSINESS, WHETHER SUCH LIABILITY IS PREDICATED ON CONTRACT, STRICT LIABILITY OR ANY OTHER THEORY WITHOUT REGARD TO WHETHER SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

**12.    GENERAL PROVISIONS.**

12.1    Monetary Values.  All monetary values in the Agreement refer to U.S. dollars.

12.2    Assignment.  Either Party may assign its rights or obligations under this Agreement with written notice to the other Party, and after obtaining written approval by the other party, which shall not be unreasonably withheld or delayed.  In the event that Intermedia is acquired by WorldCom no such written approval shall be required.  In the event of a restructuring, merger, or acquisition of either party, in which such party retains at least 25 percent control of the resulting entity such notice and approval shall not be required.

12.3    Governing Law. This Agreement will be interpreted in accordance with the laws of the state of Arizona, excluding its conflict of law rules.  The Parties agree that the federal and state courts located in Arizona and/or Florida shall be the proper forum for any action brought against the other Party, and each Party shall take all necessary actions to consent to the jurisdiction of such courts.12.4    Notices.  All notices or other communications between EffectNet and Intermedia under this Agreement shall be in writing and delivered personally, sent by confirmed facsimile, by confirmed e-mail, by certified mail, postage prepaid and return receipt requested, or by a nationally recognized express delivery service addressed to the Parties at the addresses first set forth below or at such other addresses, facsimile numbers or e-mail addresses or to such individuals as either Party may specify by notice to the other Party pursuant to this Section. All notices shall be in English and shall be effective upon receipt. As a courtesy, Parties are encouraged to send duplicate copies of notice, demands, or other by facsimile. Issuance of a facsimile copy of a notice, request, demand or other communication shall not replace the requirements for delivery by mail or overnight courier in the manner provided in this Section, nor shall the date the facsimile received constitute the official receipt date. Any Party may change the address to which notices, requests, demands or other to such Party shall be delivered or mailed by giving notice of the change to the other Party in the manner provided in this Section. The addresses for the Parties for the purposes of this Agreement are:

A 01684

*For EffectNet:*                     *For Intermedia Communications, Inc.*

Taj Reneau                            Kathleen A. Victory

Chief Executive Officer               VP Product Line Management

EffectNet                             Intermedia Communications Inc.

Phone:  602.296.3300                  Phone:  813.829.6703

Fax:       602.296.3311               Fax:      813.829.2359

12.5    Independent Contractors.  This Agreement and the relations hereby established do not constitute a partnership, joint venture, franchise or agency between the Parties. Both parties are independent contractors acting for their own accounts and neither is authorized to bind, or attempt to bind, the other to any contract, general warranty, covenant or undertaking of any nature whatsoever unless authorized in writing. Neither party shall have the authority to accept delivery, collect or otherwise take possession of any funds or other property of the other party, and if done so inadvertently, shall immediately notify the other party, shall hold same in trust and shall immediately deliver same to the other party.  In all matters relating to this Agreement neither party nor such party's employees or agents are, or will act, as employees of the other party within the meaning of any federal or state laws.

12.6    Severability.  If any provision of this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other term or provision hereof.  The Parties agree that they will negotiate in good faith or will permit a court to replace any provision hereof so held invalid, illegal or unenforceable with a valid provision, which is as similar as possible in substance to the invalid, illegal or unenforceable provision.

12.7    Entire Agreement And Modifications.  This Agreement together with any appendices, exhibits and attachments constitute the entire agreement between the Parties with regard to the subject matter hereof and supersedes all prior, agreements and understandings, whether written or oral, relating to the subject matter hereof.  This Agreement may only be modified by a written instrument duly executed by each Party, making specific reference to this Agreement and to the clause to be modified.

12.8    Captions.  Where provided, captions of the sections and subsections of this Agreement are for reference purposes only and do not constitute terms or conditions of this Agreement, and shall not limit or affect the terms and conditions hereof.

12.9    Waiver.  No provision of, right, power or privilege under this Agreement shall be deemed to have been waived by any act, delay, omission or acquiescence on the part of either Party, its agents, or employees, but only by an instrument in writing signed by an authorized officer of each Party.  No waiver by either Party of any breach or default of any provision of this Agreement by the other Party shall be effective as to any other breach or default, whether of the same or any other provision and whether occurring prior to, concurrent with, or subsequent to the date of such waiver.

A 01685

12.10   Counterparts. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. In making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart.

12.11   Force Majeure. Neither Party shall have any liability to the other for delays resulting from any "Event of Force Majeure" or from any act or omission of the such other Party. An Event of Force Majeure shall include without limitation any delay or failure in performance due to acts of God, earthquake, labor disputes, changes in law, regulation or government policy, riots, war, fire, epidemic, acts or omissions of vendors or suppliers, equipment failures, transportation difficulties, or other occurrences which are beyond the affected Party's reasonable control.

12.12   Conflicts. To the extent the terms of this Agreement and the MOU conflict, the terms of this Agreement shall be controlling.

**IN WITNESS WHEREOF,** the Parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the date first written above.

EffectNet, L.L.C.                           Intermedia Communications, Inc.

Signature: _____              Signature: _____

Printed Name: Brad Steinmeyer            Printed Name:  Kathleen A. Victory

Title: VP Partner Development             Title: VP Product Line Management

Date: 11/27/00                           Date: November 20, 2000

A 01686

## APPENDIX P (Pricing)

EffectNet shall offer the following products to Intermedia at the prices attached thereto as follows:

1.    **Basic**

$11.45 per month for each basic account with all platform usage and inbound call times on the EffectNet platform an additional $.10 per minute. The basic account includes unlimited free on-line usage including checking e-mails, faxes, etc... Outbound calling will be $.10 per minute. This package includes customer service and technical support. All basic accounts will be billed a base subscription price of $ 6.00 for the first calendar month of activation partial or full, and $11.45 for any calendar month thereafter partial or full.

2.    **Unlimited**

$27.40 per month for each unlimited account with unlimited free platform usage and inbound call time included. Outbound calling will be $.10 per minute. The unlimited account includes unlimited free on-line usage including checking e-mails, faxes, etc. Outbound calls include: conference calls (per member), outbound long distance, outbound fax, follow me, notification, return calls, etc. All unlimited accounts will be billed a base subscription price of $ 14.00 for the first calendar month of activation partial or full, and $27.40 for any calendar month thereafter partial or full.

Intermedia shall be responsible for any and all expenses incurred related to the completion of the Virtual Private Network ("VPN"). No expenses shall be incurred on behalf of Intermedia for the VPN without prior consent from Intermedia.

A 01687



One Parkway North
Fourth Floor North
Deerfield, Illinois 60015
Office: 888.444.6400

Writer's Direct No.
(888)-387-3481

March 25, 2002

**Via Federal Express Mail**
Mr. Brett Bacon
MCI/WorldCom
1945 Old Gallows Road
Vienna, Virginia 22182

Re: Unified Communications General Agreement, dated November 20, 2000, by and between EffectNet, Inc. (formerly EffectNet LLC) ("**EffectNet**") and Intermedia Communications, Inc. ("**Intermedia**") (the "**Agreement**")

Dear Mr. Bacon:

EffectNet, by letter to the attention of Mr. Rich Black, dated March 12, 2002, issued a written notice of default under Section 5.2 of the Agreement with respect to the Intermedia Defaults, as defined in the March 12 letter (the "**March 12 Letter**"). I understand from you that Mr. Black referred the March 12 letter to your attention upon receipt. As you know, the Agreement in Section 5.2 provides that "[t]ermination due to default under this Section shall be effective thirty (30) days after written notice to the defaulting Party if the default has not been cured within such thirty (30) day period." Accordingly, the Agreement will be terminated for default by Intermedia on or about April 12, 2002 if the Intermedia Defaults are not cured prior thereto.

I spoke with you on or about March 13 and you indicated that Intermedia and/or its affiliates were interested in pursuing immediate settlement discussions. I also understand that you spoke with Mr. Jim Calandra, Chief Financial Officer of EffectNet on March 18 and that you told Mr. Calandra that Mr. Barry Zip would

A 01688

Mr. Brett Bacon
Page 2 of 3
March 25, 2002

be handling settlement discussions. Further, I understand that you told Mr. Calandra that you would provide Mr. Zip with contact information of Mr. Calandra. On March 20, Mr. Calandra exchanged voice messages with you whereby Mr. Calandra inquired of Mr. Zip and the lack of communication from him and you responded by giving Mr. Calandra, for the first time, contact information for Mr. Zip. Mr. Calandra called Mr. Zip the same day, March 20, and left a voice message for Mr. Zip requesting that Mr. Zip return the call. Neither Mr. Calandra nor anyone else has since received any communications from Intermedia or its affiliates regarding this matter. As you might imagine, EffectNet is becoming increasingly concerned that Intermedia and/or its affiliates fail to understand the gravity of this matter and the urgency with which it must be addressed.

Intermedia should also take notice of the Due Date of invoice #1018, dated March 5, 2002, in the amount of $279,757.02 and delivered to Intermedia on March 6, 2002. Payment of this amount was due on or before March 21, 2002. EffectNet has not received this past due payment (the "**February Payment Default**").

Accordingly, EffectNet hereby gives Intermedia written notice of default under Section 5.2 of the Agreement with respect to the February Payment Default and EffectNet further hereby gives Intermedia written notice that EffectNet may (i) terminate the Agreement under Section 5.2 due to default effective thirty (30) days after this written notice (if the Agreement is not sooner terminated pursuant to the March 12 Letter) if the February Payment Default has not been cured within such thirty (30) day period, and (ii) further exercise all available remedies pursuant to the terms of the Agreement and as otherwise may be available at law or in equity.

EffectNet hereby demands immediate payment, in accordance with the terms of the Agreement, of the amounts itemized below:

Total Amount Past Due on invoice 1010,
dated February 6, 2002, and delivered to
Intermedia on February 12, 2002
(for the December 2001 billing cycle):                    $274,021.05

Total Amount Past Due on invoice 1011,
dated February 6, 2002, and delivered to
Intermedia on February 12, 2002
(for the January 2002 billing cycle):                     $274,066.20

A 01689

Mr. Brett Bacon
Page 3 of 3
March 25, 2002

Total Amount Past Due on invoice #1018,
dated March 5, 2002, and delivered to
Intermedia on March 6, 2002
(for the February 2002 billing cycle):                    $279,757.02

**Required Payment:**                                     $827,844.27

The total amount past due is as of March 21, 2002. EffectNet gives notice that
all provisions of default will be strictly enforced. As indicated above, Intermedia
has until the expiration of thirty (30) days after the March 12 Letter or this
written notice, as the case may be, to remit the Required Payment.    The
Required Payment should be made payable and delivered by wire transfer to
Wells Fargo Bank, Tempe, Arizona, ABA Routing Number 1221-05278; EffectNet
Operations Account, Account Number 040-4657220, attn: Stephanie Jordan at
480-644-8396.

If Intermedia fails to cure the Intermedia Defaults and the February Payment
Default and if the Agreement is terminated as aforesaid, EffectNet may claim
damages for all amounts due pursuant to the Agreement.

Nothing in this letter is intended to be a waiver or release of any rights or
remedies, or an election thereof, that EffectNet has under the Agreement or
applicable law, and all such rights and remedies are hereby expressly reserved in
their entirety.

Very truly yours,


Robert C. McConnell
General Counsel




CC: Mr. Rich Black

| Time period | Minimum Commitment | Price | Total per month | Total for period |
|---|---|---|---|---|
| Past due invoices prior to March, 2002 | | | | $827,844.27 |
| March 2002 through December 2002 | 10000 | $27.40 | $274,000.00 | $2,740,000.00 |
| December 18, 2002-December 18, 2003 | 10000 | $27.40 | $274,000.00 | $3,288,000.00 |
| | | | Total: | $6,855,844.27 |

A 01691

## Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.

One Financial Center
Boston, Massachusetts 02111

George B. Hofmann

*Direct dial  617 348 1753*
gbhofmann@mintz.com

617 542 6000
617 542 2241 *fax*

January 14, 2003

**BY FEDERAL EXPRESS**

United States Bankruptcy Court
WorldCom Claims Docketing Center
One Bowling Green, Room 534
New York, NY 10004-1408

      Re:   MCI Worldcom Communications, Inc.
             Chapter 11; Case No. 02-42223

Dear Sir or Madam:

     Enclosed please find the original and two copies of a proof of claim in connection with the above case.  Please file the original and return one of the copies date-stamped to the undersigned in the enclosed self-addressed stamped envelope.

     Thank you for your assistance.  Please contact me if you have any questions.

             Very truly yours,

             MINTZ, LEVIN, COHN, FERRIS,
             GLOVSKY and POPEO, P.C.

             George B. Hofmann

GBH
Enclosures

TRA 1750116v2

*Boston  New York  Reston  Washington  New Haven*

**A 01692**

Form B10 (Official Form 10)  (Rev. 4.01)

| United States Bankruptcy Court | | PROOF OF CLAIM |
|---|---|---|

| Name of Debtor | Case Number |
|---|---|
| Intermedia Communications, Inc. | 02-42154 |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case.  A "request" for payment of an administrative expense may be filed ~~~~~~~~~~~
11 U.S.C. §503.

| Name of Creditor (The person or entity to whom the debtor owes money or property):<br>EffectNet, Inc. | ☐ Check box if you a<br>anyone else has fil<br>relating to your cla<br>of statement givin |
|---|---|
| Name and Addresses Where Notices Should be Sent:<br><br>EffectNet, Inc.<br>c/o Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.<br>Attn: George B. Hofmann<br>One Financial Center<br>Boston, MA 02111<br>Telephone No.  617-542-6000 | ☐ Check box if you h<br>received any notices ~~~~ the<br>bankruptcy court in this case.<br><br>☒ Check box if the address differs from<br>the address on the envelope sent to<br>you by the court. |

Filed: USBC - Southern District of New York
Worldcom, Inc., Et Al.
02-13533 (AJG)          0000009293

THIS SPACE IS FOR
COURT USE ONLY

| Account or other number by which creditor identifies debtor: N/A | Check here  ☐ replaces<br>if this claim  ☐ amends       a previously filed claim, dated: |
|---|---|

| 1. Basis for Claim | |
|---|---|
| ☐ Goods sold | ☐ Retiree benefits as defined in 11 U.S.C. §1114(a) |
| ☒ Services performed | ☐ Wages, salaries and compensation (Fill out below) |
| ☐ Money loaned | Your SS #: _____ |
| ☐ Personal injury/wrongful death | Unpaid compensation for services performed |
| ☐ Taxes | from _____ to _____ |
| ☒ Other_____ See Addendum_____ | (date)                    (date) |

| 2. Date debt was incurred:<br>December 2001 and thereafter | 3. If court judgment, date obtained: |
|---|---|

4. Total Amount of Claim at Time Case Filed:          $6,855,844.27 plus unliquidated amounts
   If all or part of your claim is secured or entitled to priority, also complete Item 5 or 6 below.
   ☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim.  Attach itemized statement of all interest or additional charges.

| 5. Secured Claim. | 6. Unsecured Priority Claim. |
|---|---|
| ☐ Check this box if your claim is secured by collateral (including a right of setoff).<br>Brief Description of Collateral:<br>☐ Real Estate      ☐ Motor Vehicle<br>☐  Other (See Addendum)<br>Value of Collateral: $<br>Amount of arrearage and other charges at time case filed included in secured claim, if any: $ | ☐ Check this box if you have an unsecured priority claim<br>Amount entitled to priority $_____<br>Specify the priority of the claim:<br>☐ Wages, salaries, or commissions (up to $4,650),* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. §507(a)(3)<br>☐ Contributions to an employee benefit plan - 11 U.S.C. §507(a)(4)<br>☐ Up to $2,100* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. §507(a)(6)<br>☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. §507(a)(7)<br>☐ Taxes or penalties of governmental units - 11 U.S.C. §507(a)(8)<br>☐ Other - Specify applicable paragraph of 11 U.S.C. §507(a) ( _1_ ).<br>*Amounts are subject to adjustment on 4/1/04 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment. |

7. Credits:  The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

8. Supporting Documents: *Attach copies of supporting documents*, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien.  DO NOT SEND ORIGINAL DOCUMENTS.  If the documents are not available, explain.  If the documents are voluminous, attach a summary.

9. Date-Stamped Copy:  To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR
COURT USE ONLY

JAN - 8 2003
BANKRUPTCY COURT
S.D. DIST. OF NEW YORK

| Date<br>December 12, 2002 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):<br><br>EffectNet, Inc.  BY TAJ REVEAU, CHIEF EXECUTIVE OFFICER |
|---|---|

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§152 and 3571.

TRA 1739466v2

**A 01693**

**Addendum to Proof of Claim**

Debtor:        Intermedia Communications, Inc. (the "Debtor")

Case No.:      02-42154 (AJG) (Jointly administered under case no. 02-13533 (AJG))

Creditor:      EffectNet LLC ("EffectNet")

EffectNet, LLC[1] and the Debtor were parties to a certain Unified Communications Services General Agreement dated as of November 20, 2000 (the "Agreement"). A copy of the Agreement is attached to this Proof of Claim. Pursuant to the Agreement, EffectNet was obligated to provide services to the Debtor for resale. Section 2.12 of the Agreement specified the minimum monthly commitment of the Debtor to purchase EffectNet's services, and the pricing for these services was provided in Appendix P to the Agreement.

The Debtor breached the Agreement by failing to pay amounts due under it for services provided by EffectNet, and by purposefully failing to purchase the services supplied by EffectNet under the Agreement. As a result of the Debtor's breach of the Agreement, EffectNet sent a letter dated March 25, 2002 (the "Letter"), a copy of which is attached to this Proof of Claim. The Letter details the amounts owing by the Debtor to EffectNet prior to March 2002.

In addition to the amounts described in the Letter, as a result of the Debtor's breach of the Agreement, EffectNet suffered damages equal to the Debtor's remaining minimum monthly commitment under the Agreement, multiplied by the number of months remaining in the term of the Agreement. These damages are summarized in the spreadsheet which is attached to this Proof of Claim.

EffectNet has additional claims against the Debtor for unfair and deceptive trade practices, breach of the implied covenant of good faith and fair dealing, and conspiracy based on the Debtor's actions in concert with MCI Worldcom Network Services, Inc. ("MCI"). The Debtor and MCI agreed to cause the Debtor to breach the Agreement, in an effort to wrongfully improve MCI's bargaining position with respect to a certain Master Agreement for Software Licenses ("MASL") with Webley Systems, Inc. ("Webley"), a company which is affiliated with

---

[1] EffectNet, Inc. is the sucessor in interest to EffectNet LLC.

EffectNet. The Debtor and MCI knew that the termination of the Agreement would place EffectNet and Webley in a position of severe financial distress, and would therefore force Webley to accept onerous terms in the negotiation of the MASL that favored MCI to a much greater degree than would have been possible had the Agreement been in full force and effect. The damages suffered by Webley and EffectNet as a result of the concerted action are substantial, but unliquidated in amount.

EffectNet expressly reserves its right to amend or supplement this Proof of Claim, including, but not limited to, for the purpose of quantifying the damages suffered as a result of the actions of MCI and the Debtor described in the preceding paragraph. This proof of claim is made without prejudice to the filing by EffectNet of additional proofs of claim with respect to any other indebtedness or liability of the Debtor to EffectNet.

TRA 1739472v2



One Parkway North
Fourth Floor North
Deerfield, Illinois 60015
Office: 888.444.6400

Writer's Direct No.
(888)-387-3481

March 25, 2002

**Via Federal Express Mail**
Mr. Brett Bacon
MCI/WorldCom
1945 Old Gallows Road
Vienna, Virginia 22182

Re: Unified Communications General Agreement, dated November 20, 2000, by and between EffectNet, Inc. (formerly EffectNet LLC) ("**EffectNet**") and Intermedia Communications, Inc. ("**Intermedia**") (the "**Agreement**")

Dear Mr. Bacon:

EffectNet, by letter to the attention of Mr. Rich Black, dated March 12, 2002, issued a written notice of default under Section 5.2 of the Agreement with respect to the Intermedia Defaults, as defined in the March 12 letter (the "**March 12 Letter**"). I understand from you that Mr. Black referred the March 12 letter to your attention upon receipt. As you know, the Agreement in Section 5.2 provides that "[t]ermination due to default under this Section shall be effective thirty (30) days after written notice to the defaulting Party if the default has not been cured within such thirty (30) day period." Accordingly, the Agreement will be terminated for default by Intermedia on or about April 12, 2002 if the Intermedia Defaults are not cured prior thereto.

I spoke with you on or about March 13 and you indicated that Intermedia and/or its affiliates were interested in pursuing immediate settlement discussions. I also understand that you spoke with Mr. Jim Calandra, Chief Financial Officer of EffectNet on March 18 and that you told Mr. Calandra that Mr. Barry Zip would

A 01696

Mr. Brett Bacon
Page 2 of 3
March 25, 2002

be handling settlement discussions.   Further, I understand that you told Mr. Calandra that you would provide Mr. Zip with contact information of Mr. Calandra.   On March 20, Mr. Calandra exchanged voice messages with you whereby Mr. Calandra inquired of Mr. Zip and the lack of communication from him and you responded by giving Mr. Calandra, for the first time, contact information for Mr. Zip.  Mr. Calandra called Mr. Zip the same day, March 20, and left a voice message for Mr. Zip requesting that Mr. Zip return the call.  Neither Mr. Calandra nor anyone else has since received any communications from Intermedia or its affiliates regarding this matter.   As you might imagine, EffectNet is becoming increasingly concerned that Intermedia and/or its affiliates fail to understand the gravity of this matter and the urgency with which it must be addressed.

Intermedia should also take notice of the Due Date of invoice #1018, dated March 5, 2002, in the amount of $279,757.02 and delivered to Intermedia on March 6, 2002.  Payment of this amount was due on or before March 21, 2002. EffectNet has not received this past due payment (the **"February Payment Default"**).

Accordingly, EffectNet hereby gives Intermedia written notice of default under Section 5.2 of the Agreement with respect to the February Payment Default and EffectNet further hereby gives Intermedia written notice that EffectNet may (i) terminate the Agreement under Section 5.2 due to default effective thirty (30) days after this written notice (if the Agreement is not sooner terminated pursuant to the March 12 Letter) if the February Payment Default has not been cured within such thirty (30) day period, and (ii) further exercise all available remedies pursuant to the terms of the Agreement and as otherwise may be available at law or in equity.

EffectNet hereby demands immediate payment, in accordance with the terms of the Agreement, of the amounts itemized below:

Total Amount Past Due on invoice 1010,
dated February 6, 2002, and delivered to
Intermedia on February 12, 2002
(for the December 2001 billing cycle):                          $274,021.05

Total Amount Past Due on invoice 1011,
dated February 6, 2002, and delivered to
Intermedia on February 12, 2002
(for the January 2002 billing cycle):                            $274,066.20

A 01697

Mr. Brett Bacon
Page 3 of 3
March 25, 2002

Total Amount Past Due on invoice #1018,
dated March 5, 2002, and delivered to
Intermedia on March 6, 2002
(for the February 2002 billing cycle):                    $279,757.02

**Required Payment:**                                      $827,844.27

The total amount past due is, as of March 21, 2002. EffectNet gives notice that all provisions of default will be strictly enforced. As indicated above, Intermedia has until the expiration of thirty (30) days after the March 12 Letter or this written notice, as the case may be, to remit the Required Payment. The Required Payment should be made payable and delivered by wire transfer to Wells Fargo Bank, Tempe, Arizona, ABA Routing Number 1221-05278; EffectNet Operations Account, Account Number 046-4667220, attn: Stephanie Jordan at 480-644-8396.

If Intermedia fails to cure the Intermedia Defaults and the February Payment Default and if the Agreement is terminated as aforesaid, EffectNet may claim damages for all amounts due pursuant to the Agreement.

Nothing in this letter is intended to be a waiver or release of any rights or remedies, or an election thereof, that EffectNet has under the Agreement or applicable law, and all such rights and remedies are hereby expressly reserved in their entirety.

Very truly yours,

Robert C. McConnell
General Counsel

CC: Mr. Rich Black

A 01698

| Time period | Minimum Commitment | Price | Total per month | Total for period |
|---|---|---|---|---|
| Past due invoices prior to March, 2002 | | | | $827,844.27 |
| March 2002 through December 2002 | 10000 | $27.40 | $274,000.00 | $2,740,000.00 |
| December 18, 2002-December 18, 2003 | 10000 | $27.40 | $274,000.00 | $3,288,000.00 |
| | | | Total: | $6,855,844.27 |

A 01699

## Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.

One Financial Center
Boston, Massachusetts 02111

George B. Hofmann

*Direct dial 617 348 1753*
gbhofmann@mintz.com

617 542 6000
617 542 2241 *fax*

January 14, 2003

**BY FEDERAL EXPRESS**

United States Bankruptcy Court
WorldCom Claims Docketing Center
One Bowling Green, Room 534
New York, NY 10004-1408

      Re:    Intermedia Communications, Inc.
              Chapter 11; Case No. 02-42154

Dear Sir or Madam:

    Enclosed please find the original and two copies of a proof of claim in connection with the above case. Please file the original and return one of the copies date-stamped to the undersigned in the enclosed self-addressed stamped envelope.

    Thank you for your assistance. Please contact me if you have any questions.

                  Very truly yours,

                  MINTZ, LEVIN, COHN, FERRIS,
                  GLOVSKY and POPEO, P.C.

                  George B. Hofmann

GBH
Enclosures

TRA 1750115v2

*Boston  New York  Reston  Washington  New Haven*

A 01700

# Exhibit B

A 01701



PAGE 1

*The First State*

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF OWNERSHIP, WHICH MERGES:

"EFFECTNET, INC.", A DELAWARE CORPORATION,

WITH AND INTO "PARUS HOLDINGS, INC." UNDER THE NAME OF "PARUS HOLDINGS, INC.", A CORPORATION ORGANIZED AND EXISTING UNDER THE LAWS OF THE STATE OF DELAWARE, AS RECEIVED AND FILED IN THIS OFFICE THE FIFTH DAY OF FEBRUARY, A.D. 2004, AT 6:48 O'CLOCK P.M.



*Harriet Smith Windsor*
Harriet Smith Windsor, Secretary of State

3361348  8100M

040082255

AUTHENTICATION: 2917428

DATE: 02-06-04

A 01702

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 06:48 PM 02/05/2004*
*FILED 06:48 PM 02/05/2004*
*SRV 040082255 - 3361348 FILE*

## CERTIFICATE OF OWNERSHIP AND MERGER

### OF

EffectNet, Inc.
(a Delaware corporation)

### INTO

Parus Holdings, Inc.
(a Delaware corporation)

It is hereby certified that:

1.   Parus Holdings, Inc. (hereinafter sometimes referred to as the "Corporation") is a business corporation of the State of Delaware.

2. The Corporation is the owner of all of the outstanding shares of the stock of EffectNet, Inc., which is also a business corporation of the State of Delaware.

3. On January 28, 2004, the Board of Directors of the Corporation adopted the following resolutions to merge EffectNet, Inc. into the Corporation:

> RESOLVED: that EffectNet, Inc. be merged into this Corporation, and that all of the estate, property, rights, privileges, powers and franchises of EffectNet, Inc. be vested in and held and enjoyed by this Corporation as fully and entirely and without change or diminution as the same were before held and enjoyed by EffectNet, Inc. in its name.

> RESOLVED: that this Corporation shall assume all of the obligations of EffectNet, Inc.

> RESOLVED: that this Corporation shall cause to be executed and filed and/or recorded the documents prescribed by the laws of the State of Delaware and by the laws of any other appropriate jurisdiction and will cause to be performed all necessary acts within the State of Delaware and within any other appropriate jurisdiction.

> RESOLVED: that this Certificate of Ownership and Merger shall be effective on the date it is filed with the Secretary of State of the State of Delaware.

**A 01703**

Executed on January 28 2004.

Parus Holdings, Inc.

By: TAT RENEAU
Its: CEO

# EXHIBIT F

A 01705

HEARING DATE AND TIME July 13, 2004 AT 10:00 A.M. EST
OBJECTION DEADLINE: July 8, 2004 AT 4:00P.M. EST

STINSON MORRISON HECKER LLP
Attorneys for Debtors and Debtors in Possession
1201 Walnut Street
Kansas City, MO  64106
Telephone:  (816) 842-8600
Facsimile:  (816) 691-3495
Mark A. Shaiken, Esq.
Lawrence W. Bigus, Esq.
Sharon L. Stolte, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------x
In re                                                          :
                                                               :
WORLDCOM, INC., et al.,                                        :        Chapter 11 Case No.
                                                               :        02-13533 (AJG)
                                                               :
                                                               :        (Jointly Administered)
                        Debtors.                               :
-----------------------------------------------------x

## DEBTORS' OBJECTION
## TO ALL PROOFS OF CLAIM FILED BY EFFECTNET, INC.
## WHICH IS NOW MERGED INTO PARUS HOLDINGS, INC.,
## INCLUDING, BUT NOT LIMITED TO
## CLAIM NUMBERS 9291, 11242, 9293 AND 11173

TO THE HONORABLE ARTHUR J. GONZALEZ,
UNITED STATES BANKRUPTCY JUDGE

WorldCom, Inc. and certain of its direct and indirect subsidiaries, as debtors and

debtors in possession (collectively, the "Debtors"), respectfully represent:

### JURISDICTION

1.      The Court has jurisdiction to consider this Objection and the relief

requested herein pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding

A 01706

pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

2.    On July 21, 2002 (the "Commencement Date") and November 8, 2002, WorldCom, Inc. and certain of its direct and indirect domestic subsidiaries commenced cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). By Orders dated July 22, 2002 and November 12, 2002, the Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On July 29, 2002, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured creditors (the "Committee").

3.    WorldCom, Inc., one of the Debtors in the above captioned cases, together with approximately 200 direct and indirect domestic subsidiaries and 200 non-debtor foreign affiliates (collectively, the "Company"), is one of the world's preeminent global communications companies that provides a broad range of communication services in over 200 countries on six continents.  Through its core communications services business, which includes voice, data, Internet and international services, the Company carries more data over its networks than any other entity.  The Company is also the second largest carrier of consumer and small business long distance telecommunications services in the United States, provides a broad range of retail and wholesale communications services, including long distance voice and data communications, consumer local voice communications, wireless messaging and voice services, private line services and dial-up Internet access services.

A 01707

4.    For the year ended December 31, 2001, WorldCom recorded revenue of more than $30 billion.[1]  As of March 31, 2002, WorldCom's books and records reflected liabilities totaling approximately $41 billion. As of June 30, 2002, WorldCom employed more than 63,900 individuals, of which approximately 57,700 were full-time employees and approximately 6,200 were part-time employees.

## SCHEDULES AND PROOFS OF CLAIM

5.    On November 21, 2002, the Debtors filed their Schedules of Liabilities (as amended and supplemented, the "Debtors' Schedules") and their Schedules of Executory Contracts and Unexpired Leases.  On December 5, 2002, the Debtors filed their Statements of Financial Affairs.

6.    On October 29, 2002, this Court entered its Order (a) Pursuant to Bankruptcy Rule 3003 (c)(3) Establishing the Deadline for Filing Certain Proofs of Claim and Approving the Form and Manner of Notice Thereof (the "Bar Date Order"). The Bar Date Order established January 23, 2003 as the bar date (the "Bar Date") for filing proofs of claim in these cases.  Pursuant to the terms of the Bar Date Order, on or about November 22, 2002, the Debtors mailed notice of the bar date (the "Bar Date Notice") to in excess of 1.2 million creditors and potential claimants.

7.    On March 25, 2003, the Court entered its Order Pursuant to 11 U.S.C. § 105 Approving Notice Procedures Regarding Claim Objections and Deemed Schedule Amendment Motions ("Claim Objection Procedure Order"), approving certain procedures regarding noticing of claims objections and omnibus motions for deemed schedule amendments.

---

[1] The amounts in this paragraph are stated on a consolidated basis, including Debtors and non-debtor domestic subsidiaries only. WorldCom, Inc. has announced its intention to restate the financial statements for 2000, 2001 and the first quarter of 2002.

3

A 01708

8.    As of the date of this Objection, in excess of 34,000 proofs of claim have been filed in connection with these chapter 11 cases (the "Proofs of Claim"). The Debtors have begun the process of conducting a comprehensive review and reconciliation of all prepetition claims, including both the claims scheduled in the Debtors' Schedules (the "Scheduled Claims") and the claims asserted in the Proofs of Claim (the "Filed Claims"). This process includes identifying particular categories of Filed Claims that may be targeted for disallowance and expungement, reduction and allowance, or reclassification and allowance. To reduce the number and volume of pleadings, and to reduce the possibility of double recovery or improper recovery by claimants, the Debtors are filing this objection to all of the claims filed by EffectNet, Inc. and/or Parus Holdings, Inc. into which EffectNet, Inc. has been merged (hereinafter referred to as "Claimant").

9.    According to available records, Claimant has filed two claims as follows: Claim No. 9291 filed on January 08, 2003, which was replaced by and amended by Claim No. 11242 filed January 15, 2003; and Claim No. 9293 filed on January 08, 2003 which was replaced by and amended by Claim No. 11173 filed January 15, 2003.

10.    Upon information and belief this court has already entered an order expunging claim numbers 9291 and 9293.

11.    The above-referenced claims are the only claims that Debtors have a record of receiving which have been filed by Claimant.

12.    If any other claims have been filed by Claimant or any of Claimant's related entities then these objections apply to and relate to all such claims.

4

A 01709