| BOX NO. | BATES NO. | CORRESPONDING REQUEST NO. |
|---|---|---|
| VA 002 | MCIW019999-20110 | 1, 2, 3, 4, 5, 14, 15 |
| 224664903 | MCIW020111-20307 | 11, 30, 35 |
| 224664903 | MCIW020308-21942 | 35 |
| 224664905 | MCIW021943-22451 | 11, 30, 35 |
| 298408973A | MCIW022452-23058 | 35 |
| 224664879 | MCIW023059-23651 | 11, 30, 35 |
| 224664879 | MCIW023652-23726 | 35 |
| 224664879 | MCIW023727-24418 | 11, 30, 35 |
| 224664879 | MCIW024419-24503 | 35 |
| 224664879 | MCIW024504-25016 | 11, 30, 35 |
| 224664891 | MCIW025017-25678 | 35 |
| 191496627 | MICW025679-015912 | 1, 2, 3, 4, 14, 15 |
| VA 016 | MCIW025913-0225914 | 17 |
| VA002 | MCIW025915-025926 | 1, 2, 3, 4, 14, 15 |
| Not from Iron Mountain Boxes | MCI025927-025988 | 1, 2, 3, 4, 14, 15 |

DB02/048629.0094_0019/6836461.1

A 02149

**EXHIBIT 5**

A 02150

In re: WorldCom, Inc., et al.
02-13555
Parus Holdings/EffectNet Claim

## MCI'S SUPPLEMENTAL RESPONSE TO FIRST REQUEST FOR DOCUMENTS
### October 7, 2005

**Parus Holdings' Requests for Documents**

1.    Documents concerning objection to Claim No. 9291

2.    Documents concerning  objection to Claim No. 9293.

3.    Documents concerning objection to Claim No. 11173.

4.    Documents concerning objection to Claim No. 112242.

5.    Documents concerning objection on ground that Claimant is not entitled to double recovery.

6.    Documents concerning Debtors' alleged payment.

7.    Documents concerning Debtors' contention that Claimant terminated the UC contract.

8.    Documents concerning allegation that Claimant seeks an unenforceable penalty.

9.    Documents concerning allegation that Claimant has calculated its damages using amount per commitment higher than contract specifies.

10.    Documents concerning allegation that UC Contract prohibits assignment.

11.    Documents concerning the General Agreement.

12.    Documents concerning the Memorandum of Understanding.

13.    Documents concerning the Interim Agreement.

14.    Documents concerning decision to give notice to cancel accounts in September 2001.

15.    Documents concerning decision to give notice to cancel accounts in March 2002.

16.    Communication between Debtor and Claimant re: General Agreement.

17.    Documents concerning payment under General Agreement.

18.    Communication among Debtors concerning General Agreement.

19.    Documents concerning communications among Debtors re: cancellation of accounts created pursuant to the General Agreement.

A 02151

20.   Documents concerning Claimant.

21.   Documents concerning analysis of Claimants' finances, business, technology, or products.

22.   Documents concerning Master Licensing Agreement ("MLA").

23.   Documents concerning communication between Debtors and Claimant re: MLA.

24.   Documents concerning communication between Debtors and Claimant from September 1, 2000 to present re: products and services provided under MLA.

25.   Documents concerning price to be paid under MLA.

26.   Documents concerning Debtors' payments under MLA.

27.   Documents concerning Debtors' communications among each other re: MLA.

28.   Documents concerning Jim Renforth's ceasing employment.

29.   Documents concerning Jimmy Faust's ceasing employment.

30.   Documents concerning in product suite IntermediaOne.

31.   Documents concerning launch of IntermediaOne.

32.   Communications among debtors re: IntermediaOne.

33.   Documents re: merger that relate to Claimant.

34.   Documents re: merger that relate to Unified Messaging Product.

35.   Documents concerning efforts to develop, obtain, market or launch Unified Communications product or service.

**DOCUMENT INDEX BY REQUEST NUMBER**

2

A 02152

| BOX NO. | BATES NO. | CORRESPONDING REQUEST NO. |
|---|---|---|
| 177204265 | MCIW025989-025995 | 32, 30 |
| 177204265 | MCIW025996-025999 | 35 |
| 177204265 | MCIW02600-02675 | 32, 30 |
| 177204265 | MCIW026076-026077 | 18 |
| 177204265 | MCIW026078-026089 | 1, 2, 3, 4 |
| 177204265 | MCIW026090-026094 | 30 |
| 177204265 | MCIW026095-026141 | 18 |
| 177204259 | MCIW026142-026256 | 1, 2, 3, 4, 14, 30, 32, 33 |
| 177204259 | MCIW026257-026281 | 31, 35 |
| 177204259 | MCIW026282-026333 | 30, 31, 32, 35 |
| 166134 | MCIW026334-026396 | 30, 31, 32, 35 |
| 166110 | MCIW026397-026420 | 35 |
| 166103 | MCIW026421-026435 | 30, 31, 32, 35 |
| 177204253 | MCIW026436-026517 | 30, 32 |
| 177204255 | MCIW026518-026663 | 30, 32, 35 |
| 166107 | MCIW026664-026786 | 31, 35 |
| 177204254 | MCIW026787-026798 | 30, 32, 35 |
| 224664879 | MCIW026799-028760 | 30, 35 |
| Not from Iron Mountain boxes | MCIW028761-028773 | 1, 2, 3, 4 |
| | MCIW028774-029033 | 1, 2, 3, 4, 29 |
| | MCIW029036-029088 | 1, 2, 3, 4, 29 |
| | MCIW029089-029208 | 1, 2, 3, 4, 30, 31, 35 |

3

A 02153

| BOX NO. | BATES NO. | CORRESPONDING REQUEST NO. |
|---|---|---|
| | MCIW029209-029232 | 1, 2, 3, 4 |
| | MCIW029233-029244 | 1, 2, 3, 4 |
| | MCIW029245-029249 | 1, 2, 3, 4 |
| | MCIW029250-029252 | 1, 2, 3, 4, 14 |
| | MCIW029253-029267 | 1, 2, 3, 4 |
| | MCIW029228-029295 | 1, 2, 3, 4, 30, 32 |
| | MCIW029296-02865 | 1, 2, 3, 4, 14, 30, 32 |
| | MCIW029866-030180 | 1, 2, 3, 4, 14, 30, 32 |

DB02/048629 0094_0019/6861801.1

A 02154

# Exhibit O

A 02155

1101wcm-parus(1).txt

0001
1
2
      UNITED STATES BANKRUPTCY COURT
3   SOUTHERN DISTRICT OF NEW YORK
      -----------------------------x
4  In re
                  Case No.
5   WORLDCOM, INC., et al,    02-13533
            Reorganized Debtors.
6   -----------------------------x
                  November 1, 2005
7            1:30 p.m.
8            United States Custom House
            One Bowling Green
9            New York, New York   10004
10
      DIGITALLY RECORDED PROCEEDINGS
11        (E X C E R P T)
12   01:30 02-13533 WORLDCOM, INC., ET AL
13   Motion by Parus Holdings, Inc. to compel
   production of documents and to extend
14   discovery deadlines.
15   Response filed.
16
17  B E F O R E:
18    THE HONORABLE ARTHUR J. GONZALEZ
      United States Bankruptcy Judge
19
20
21
22        DEBORAH HUNTSMAN, Court Reporter
          198 Broadway, Suite 903
23        New York, New York  10038
          (212) 608-9053    (917) 723-9898
24
25
0002
1
2  A P P E A R A N C E S:
3   STINSON MORRISON HECKER LLP
      Special Counsel for Reorganized
4   Debtors
          1201 Walnut Street
5       Kansas City, Missouri   64106
6   BY:  ROBERT L. DRISCOLL, ESQ.
            -and-
7       JODI HOSS, ESQ
                  (via telephone)
8
   KELLEY DRYE & WARREN LLP
9   Attorneys for Parus Holdings, Inc.
       101 Park Avenue
10       New York, New York   10178
11   BY:  ROBERT FRIEDMAN, ESQ.
12

Page 1

**A 02156**

1101wcm-parus(1).txt

```
13
14
15
16
17
18
19
20
21
22
23
24
25
0003
 1        Proceedings
 2        (Whereupon, the following is an
 3  excerpt from the proceedings taken on 11/1/05
 4  in re WorldCom, Inc., et al, Case No.
 5  02-13533.)
 6        JUDGE GONZALEZ:  Please be seated.
 7  All right.  Let's proceed.
 8        MR. FRIEDMAN:  Thank you, Your
 9  Honor.  Robert Friedman from Kelley Drye &
10  Warren.
11        JUDGE GONZALEZ:  Speak louder,
12  please.
13        MR. FRIEDMAN:  Sure.  Robert
14  Friedman from Kelley Drye & Warren for the
15  Claimant Parus Holdings.  Good afternoon,
16  Your Honor.
17        We are before the Court yet again
18  on what we believe is the Debtors' failure to
19  produce the most relevant documents in this
20  case.  The last few times we were before the
21  Court, Your Honor, Your Honor recognized that
22  there would likely be significant issues with
23  respect to the Debtors' production and their
24  decision as to which documents to review and
25  produce.  You directed us, in light of a
0004
 1        Proceedings
 2  representation that more documents were
 3  coming, to wait until we review those
 4  documents to hone in on the deficiencies.  We
 5  have reviewed the documents that were
 6  produced to us by the Debtors, and we have
 7  honed in on the deficiencies, Your Honor;
 8  and, unfortunately, there are many
 9  deficiencies.
10        We have attempted to address these
11  deficiencies.  We have called Debtors'
12  counsel.  We wrote a letter to the Court on
13  October 11th.  We wrote a letter to counsel
14  on October 24th, after we discussed these
15  matters at a conference with Judge Morris.
16  We have yet to receive any substantive
```

Page 2

A 02157

1101wcm-parus(1).txt

17  response to our concerns.
18        The Debtors have filed a
19  Supplemental Response, which we believe
20  repeats a lot of what they have presented to
21  the Court before.  We were never served with
22  this response.  We did obtain it yesterday
23  when we were checking the docket.
24        What I would like to do is just
25  give the Court a few examples, because from
0005
1        Proceedings
2  our standpoint what is most telling is what
3  we don't have and we know or believe should
4  exist.
5        Directing the Court to our Request
6  Nos. 18 and 19, which relates to documents
7  concerning communications between the
8  Debtors, Intermedia and WorldCom, concerning
9  the Unified Communications Agreement.  This
10  is related to both our tort and contract
11  claims.  Request No. 19, which are documents
12  relating to the termination of my client's
13  contract with Intermedia.
14        The Debtors have produced a total
15  of one document relating to these requests.
16  These are, in our view, some of the most
17  relevant documents to both our contract and
18  tort claims.  Just to give the Court a little
19  context as to why these documents are so
20  relevant, we have evidence now, Your Honor,
21  that when the merger was announced in
22  September of 2000, there was internally
23  within WorldCom no intention of ever carrying
24  forward with my client's contract with
25  Intermedia.  They knew that they were going
0006
1        Proceedings
2  to either sell it or take some other action
3  with respect to not going forward with the
4  Unified Communications Agreement.
5        Now, the merger was closed in July
6  of 2001.  That is a crucial time period,
7  between September of 2000 and July of 2001.
8  We know that they have no intention of going
9  forward right now.  We know that in early
10  2001, there were no new accounts opened.  We
11  know that the merger closed in July of 2001.
12  We know that the head of this project for
13  Intermedia was fired almost immediately upon
14  the closing of the merger in 2001.  We know
15  that not only were no new accounts opened,
16  but accounts were cancelled shortly
17  thereafter.  This all, Your Honor, didn't
18  happen in a vacuum.  It is obvious.  It is
19  plain on its face.  This decision in this
20  process was ongoing from the fall of 2000 up

                    Page 3

A 02158

1101wcm-parus(1).txt

21  through July of 2001, and yet we have one
22  single document and that document doesn't
23  even really relate to communications between
24  and among the Debtors.  Clearly this was an
25  ongoing process with many documents relating
0007
1          Proceedings
2  to communications.  There has been no showing
3  in any of these factual submissions as to
4  whether we even have documents from WorldCom.
5  It appears that the factual presentation from
6  the Debtors so far is related only to
7  Intermedia documents.  We have attempted to
8  get the answer to this, and we haven't been
9  given a straight answer as to whether
10  WorldCom has produced documents.  We haven't
11  received any electronic documents.
12          Right now, to have a single
13  document on two of these most important
14  requests is an indication to us -- which is
15  the only way we can present this, since we
16  don't know what is there -- that there are
17  deficiencies in the production.  There are
18  other examples, Your Honor.
19          Request No. 16, relating to
20  communications between the parties regarding
21  the crucial Unified Communications Agreement,
22  there are no documents produced.  We have
23  other examples.  Part of what we believe,
24  Your Honor, is because WorldCom had a
25  competing product to our Unified
0008
1          Proceedings
2  Communications product.  They basically
3  tanked our product.  That is, in part, the
4  basis of some of our tort claims, and our
5  unfair competition, unfair and deceptive
6  practices claims.  Yet, Your Honor, we have
7  requested and we have received no documents
8  relating to WorldCom's competing genD
9  product, and we have received no response
10  regarding our request to receive these
11  documents.
12          We have received no documents
13  relating to the evaluation of the Effectnet
14  finances.  Again, WorldCom had a private
15  equity arm that was looking into an
16  investment into Effectnet.  At the same time
17  that they were tanking our product, they were
18  actually taking our confidential information
19  and using it.  We have requested information
20  relating to this review of Effectnet.  They
21  have only produced some unrelated information
22  relating to Webley.  They have produced
23  nothing relating to Effectnet, nothing
24  relating to WorldCom Ventures, which was a

Page 4

A 02159

1101wcm-parus(1).txt

25  private equity arm that was considering this
0009
1         Proceedings
2  advancement, that, obviously, they decided
3  not to go forward with, because they knew
4  that the main asset of Parus was going to be
5  tanked.
6         We have requested the personal
7  files of the key actors.  We have received
8  none of that.  We have received no electronic
9  production, except there is a representation
10  that one former employee has searched their
11  electronic files.  We have received no other
12  electronic files from either WorldCom or
13  Intermedia.  WorldCom was not a defunct
14  entity.  It has its computer system.  We have
15  provided search terms.  There has been no
16  response, except to say that they are
17  considering our search terms.  Since that
18  system is intact, there should just be an
19  immediate search and then they come back to
20  us and say, "Okay.  We have the X number of
21  documents.  Let's discuss what we do with
22  them."  "It is too much."  "It is too
23  little."  There has been none of this.  They
24  haven't even told us that they are searching.
25  We don't have a shred, aside from this one
0010
1         Proceedings
2  employee of electronic documents right now,
3  and this is the same time that they filed a
4  summary judgment motion, Your Honor.
5         We believe, Your Honor, that it is
6  essential at this point with all the time and
7  opportunity that has been granted to the
8  Debtors to comply with their obligations,
9  that we take depositions or a deposition of
10  the WorldCom/Intermedia individuals who have
11  knowledge of their document retention, their
12  selection of documents, and their production
13  of documents.  There are significant
14  questions that are raised by their response
15  and their lack of clarity in the information
16  that they are giving us as to that
17  methodology.
18         They have done, apparently, some
19  sampling of documents.  We don't know what
20  their methodology was for the sampling or
21  what percentages they used, the exact boxes
22  that they reviewed and then disregarded.
23  Somehow they had 10,000 boxes -- now, these
24  are only Intermedia.  Again, they haven't
25  produced any WorldCom documents, to our
0011
1         Proceedings
2  knowledge, or at least from what they have

Page 5

A 02160

1101wcm-parus(1).txt

3   told us.  They have gone from 10,000 boxes to
4   450 boxes to 12 boxes.  We don't know how
5   that occurred.  The only information we have
6   is that they use some dates, which is fine.
7   That is a perfectly acceptable way to start.
8   We don't know how many boxes were eliminated
9   by the dates.  We don't want documents prior
10  to January of 2000.  If they took the
11  documents and separated all of the ones that
12  were prior to January of 2000 and said,
13  "Okay.  That is how we got down to 450," then
14  that is a responsible response.  However, we
15  don't know how they got down to 12 after
16  that.  Again, they did some sampling.  We
17  don't know how and we don't know why.
18          The other thing they say is, "Well,
19  we have some subject matter indexes."  Well,
20  we have reviewed those indexes, Your Honor,
21  and the only subject matters that had any
22  type of help, at least to us -- and based
23  upon the submissions, there has been no
24  clarity with respect to how they went about
25  it -- were 14.  Fourteen out of 10,000.
0012
1          Proceedings
2   There are many inconsistencies within this
3   group, within the indices and the ones they
4   have chosen for production.  I am just going
5   to cite a few examples, Judge, but there are
6   many more.  For example, there were five
7   boxes marked, quote, "MBA," unquote, for the
8   time period November 2000 to December 2000,
9   that were marked for review.  There were 20
10  boxes with the exact same marking in a
11  similar date range that were not marked for
12  review.  Now, these are not marked for
13  production.  These are just marked for
14  review.  I assume this means how they got to
15  the 10,000 to the 450.
16          There were five boxes marked,
17  quote, "Tampa FL, Florida," unquote, with a
18  submarking "CS + SOL&P Files-E," close quote.
19  There were five of those boxes, Judge, that
20  were marked for selection for review and 60
21  boxes with the same designation and a similar
22  date range that were not reviewed.
23          There were three boxes with a
24  marking "BEV File Cabinet" that were marked
25  for review.  There were 11 others that were
0013
1          Proceedings
2   not selected.
3          Your Honor, we need, as I said, in
4   our view, a deposition on both the hard copy
5   documents and the electronic documents.  We
6   believe, based on the lack of production on

Page 6

A 02161

1101wcm-parus(1).txt

7  these important group of documents, based on
8  the inconsistencies, based on the lack of
9  information with regard to the selection, the
10  culling, and how they went about producing
11  the documents, aside from the fact that there
12  may have been some date elimination, which is
13  reasonable, we believe the only way to go
14  about it at this point is to depose a quick
15  deposition or depositions of the people who
16  were responsible for the maintenance,
17  storage, retention, indexing and the
18  electronic document production.
19          JUDGE GONZALEZ:  All right.
20          WorldCom?
21          MR. FRIEDMAN:  Judge, just one more
22  thing.  I would also like some type of Court
23  ordered production date for their full
24  production of documents, if the Court is
25  going to grant our motion to compel; or if
0014
1          Proceedings
2  the Court is going to grant it in a limited
3  fashion with respect to some of the documents
4  that I identified.  In that interim, we are
5  requesting depositions of the witnesses with
6  the right to renew, based upon the
7  information that we get.  Thank you.
8          JUDGE GONZALEZ:  All right.  The
9  Debtors?
10          MR. DRISCOLL:  Thank you, Your
11  Honor.  Robert Driscoll for WorldCom.
12          Like all document requests, Parus
13  Holdings' document requests in this matter
14  did not ask for a particular document.  They
15  asked for categories of documents.  WorldCom
16  in its production has produced documents
17  responsive to 30 of the 31 categories that
18  appear in the document request.
19          The motion before the Court deals
20  exclusively with WorldCom's alleged failure
21  to make document discovery.  We have
22  discussed before, and I am not going to
23  belabor the Court with another discussion,
24  about how the give and take went back and
25  forth concerning the boxes of documents of
0015
1          Proceedings
2  Intermedia.  It did go back and forth, and
3  shortly after the last suggestion we made to
4  Parus Holdings about how to proceed with that
5  particular situation, this motion was filed.
6  The motion does not concern the quality of
7  our production.  The motion expressly
8  excludes electronic discovery.  The motion
9  does not mention deposition discovery.  In
10  other words, all of the things that counsel

Page 7

A 02162

1101wcm-parus(1).txt

11  just spoke to the Court about are not
12  addressed in the motion that is before the
13  Court.
14          Referencing specifically WorldCom's
15  Supplemental Response, which was filed last
16  Thursday, WorldCom has produced in excess of
17  29,000 pages of documents in response to
18  Parus' document request. It has been able to
19  locate documents responsive to 30 of the 31
20  categories, as I mentioned to you a moment
21  ago. It has interviewed in excess of 20
22  current, primarily former, employees of
23  WorldCom or Intermedia to locate documents.
24  WorldCom's attorneys have spent in excess of
25  350 hours just going through the Intermedia
0016
1           Proceedings
2   documents alone.
3           Now, just addressing the electronic
4   discovery point specifically, WorldCom has
5   produced thousands of e-mail copies to Parus
6   Holdings. Approximately eight boxes of those
7   e-mails were reviewed by our attorneys and
8   tens of hundreds of e-mails were produced in
9   response to that. Attached to our
10  Supplemental Opposition, Your Honor, are the
11  indices of the documents produced by WorldCom
12  in this matter. Those include advising
13  whether they came from some source other than
14  the Intermedia boxed documents or those boxed
15  documents. In excess of 6,482 of the
16  produced documents are not from the
17  Intermedia boxes. They are from other
18  sources, including these electronic
19  documents -- the paper version of these
20  electronic documents -- that have, in fact,
21  been produced.
22          I would submit, Your Honor, that on
23  the evidence before the Court, WorldCom under
24  the current situation has made reasonable
25  efforts to find, locate, review, and produce
0017
1           Proceedings
2   documents that are responsive to their
3   request.
4           JUDGE GONZALEZ: When are you going
5   to finish?
6           MR. DRISCOLL: I am sorry?
7           JUDGE GONZALEZ: When are you going
8   to finish your review and complete your
9   production?
10          MR. DRISCOLL: Consistent with our
11  obligations under the rules, those efforts
12  continue. But as far as the documents --
13          JUDGE GONZALEZ: What are you
14  looking at today? I don't want to waste a

Page 8

A 02163

1101wcm-parus(1).txt

15  lot of time.  I have spent enough time on the
16  discovery dispute.  When is your initial
17  review going to be complete?
18          MR. DRISCOLL:  It is complete, Your
19  Honor.
20          JUDGE GONZALEZ:  What are you
21  reviewing now?
22          MR. DRISCOLL:  Nothing in
23  particular, other than trying to find
24  additional witnesses and additional
25  documents.
0018
1          Proceedings
2          JUDGE GONZALEZ:  So you have
3  produced every document?
4          MR. DRISCOLL:  That we believe are
5  responsive to the document request that we
6  know about.
7          JUDGE GONZALEZ:  An issue that
8  Parus Holdings has raised is how you
9  discriminated among the documents; is that
10  correct?
11          MR. DRISCOLL:  How we what?
12          JUDGE GONZALEZ:  How you
13  discriminated among the documents.  How you
14  determined which documents to produce and how
15  you determined boxes were not relevant, that
16  is an issue that they have raised.
17          MR. DRISCOLL:  Your Honor, that
18  issue was addressed in Mr. Ramsey's affidavit
19  in our initial response to the Court.
20  Mr. Ramsey advised in that affidavit -- and I
21  think it is paragraph 3, but I am going by
22  raw memory here -- precisely how he and the
23  lawyers under his supervision went about
24  selecting the boxes to review.  They are
25  those that cover the date ranges pre the
0019
1          Proceedings
2  November 2000 contract at issue.  I believe
3  they started in January of 2000 and went
4  through 2002.  The contract was terminated in
5  April of 2002.  That was the date range.
6          They looked at box descriptions,
7  and if the descriptions fit the document
8  requests, those were pulled.  If there were
9  descriptions that did not fit, but we
10  couldn't tell what it was, those were pulled.
11          With regard to the sampling that
12  counsel said he didn't know about, on August
13  12th -- and this appears as Exhibit 2 to our
14  Supplemental Opposition -- I wrote to counsel
15  for Parus Holdings and advised him precisely
16  how the sampling took place and advised him
17  that what we had done was where we couldn't
18  tell from a description on a box, if it

Page 9

A 02164

1101wcm-parus(1).txt

19  looked like it might have something, that we
20  would sample boxes of that sort.  If it
21  turned out there were responsive things in
22  the boxes with that label, we pulled them all
23  and we looked at them all.  That is in
24  writing and it is in evidence in this Court.
25        JUDGE GONZALEZ:  So you have
0020
1       Proceedings
2  completed that process, in your view?
3        MR. DRISCOLL:  Yes, sir.
4        JUDGE GONZALEZ:  At least one
5  example is mentioned.  There is only one
6  document produced with respect to a specific
7  category, and that, at least in Parus
8  Holdings' view, there should have been
9  considerably more.  Is there any response to
10  that, as to the accuracy of the description
11  of what was produced and the number of
12  documents related to that category that were,
13  in fact, produced?
14        MR. DRISCOLL:  When counsel is
15  speaking, I can look at the document index to
16  make, at least, a paper review of that.  At
17  the moment, I can't respond to that
18  factually, because I don't know.  But I can
19  find out the answer to that and provide the
20  answer to the Court, if the Court wishes.
21        JUDGE GONZALEZ:  All right.
22        MR. DRISCOLL:  Excuse me, Your
23  Honor.  May I ask counsel a question as to
24  the document number?
25        JUDGE GONZALEZ:  Go ahead.
0021
1       Proceedings
2        MR. FRIEDMAN:  It is 18 and 19.
3        MR. DRISCOLL:  18 and 19.  Thank
4  you, Your Honor.
5        MR. FRIEDMAN:  I believe I can help
6  out counsel on 18, because I can quote from
7  his response.
8        JUDGE GONZALEZ:  Just speak into
9  the microphone though, please.
10        MR. FRIEDMAN:  Yes.  May I respond
11  to a few points, Your Honor?
12        JUDGE GONZALEZ:  All right.  Go
13  ahead.
14        MR. FRIEDMAN:  With respect to
15  Request No. 18, which, again, are documents
16  relating to communications between WorldCom
17  and Intermedia, especially preclosing of the
18  merger, relating to the Intermedia product,
19  the Intermedia product with my client, the
20  Unified Communications product, where we know
21  there are thousands upon thousands of
22  documents.  There just has to be.

A 02165

1101wcm-parus(1).txt

23        This is the response from their
24  papers: "WorldCom has not located any
25  documents regarding communications between
0022
1          Proceedings
2  WorldCom and Intermedia regarding the general
3  agreement between Intermedia and Parus
4  Holdings' predecessor Effectnet."
5          According to the indices that they
6  have provided, there is not one single
7  document on Request No. 19, which relates to
8  the termination of our product; and I went
9  through other examples as well.  These are
10  just examples.  When we look at paragraph 3
11  of Mr. Ramsey's affidavit, he doesn't give
12  any information as to the percentages they
13  used for sampling the methodology.  All he
14  does say, which is repeated in the letter,
15  is: "We have done some sampling."  For
16  example, if there were five boxes and they
17  didn't appear to be relevant with the same
18  label, then we went on to the next.  But
19  there are inconsistencies, as I said.  I have
20  only pointed out three inconsistencies, Your
21  Honor.  We need to get to the bottom of this.
22          What has been presented to us, they
23  have told they are complete with their
24  production.  There is almost nothing relating
25  to these communications between the parties,
0023
1          Proceedings
2  almost nothing relating to the Unified
3  Communications.
4          Counsel says that they have
5  produced e-mails.  I am not quite clear yet
6  whether they have searched the system --
7  because that is where the documents are going
8  to be, on their system -- or whether these
9  were printed out hard copy e-mails.  That is
10  not what we are talking about.  In our view,
11  those are hard copy documents.  As the Court
12  well knows from handling the WorldCom matter,
13  that most relevant documents are going to be
14  e-mails between the parties that are taken
15  from the system.  WorldCom has their system.
16  It is readily accessible.  We have received
17  zero documents from that.  We have received
18  zero documents from Intermedia's electronic
19  system.
20          Now, counsel is correct when he
21  says that, as a technical matter, we did not
22  move to compel on these electronic search
23  issues, because the day before we filed our
24  motion to compel, we received a communication
25  from Debtors' counsel saying, "Oh, we have
0024

Page 11

A 02166

1101wcm-parus(1).txt

```
1          Proceedings
2  now located all these backup tapes." Since
3  that time, and what our position was from the
4  beginning, Your Honor, is, "Okay. Well,
5  let's try to develop a factual record." So
6  we have asked them, "Well, what is going to
7  be involved in this?" "Can we reduce the
8  servers?" "Can we do this? Can we do that?"
9  We have gotten wildly inconsistent
10  information. They told us first $900,000.
11  Then they submitted an affidavit that said it
12  ranges between $500,000 and $2 million. We
13  have no idea right now what it is going to
14  take to get these documents. Right now, at
15  this point, we have two and a half weeks
16  until we file our summary judgment response,
17  Your Honor. We need to get this information
18  immediately. That is why we had asked for
19  depositions, and that is why we believe
20  depositions are necessary, because there are
21  more questions right now, than answers.
22          JUDGE GONZALEZ: When is the
23  summary judgment scheduled right now?
24          MR. FRIEDMAN: The hearing is on
25  December 6th, and our responsive papers are
0025
1          Proceedings
2  due November 18th.
3          JUDGE GONZALEZ: All right. Do the
4  Debtors have anything further?
5          MR. DRISCOLL: Yes, Your Honor,
6  very briefly.
7          With regard to the summary judgment
8  response, nothing in the motion for summary
9  judgment requires evidence. These are
10  matters purely of law and contract
11  interpretation. That is number one. Number
12  two, with regard to electronic discovery, we
13  did not receive until a week ago from Parus
14  Holdings, the parameters of the desired
15  search, consisting of names of people and
16  search terms. The practicalities of what has
17  been requested are being investigated. But
18  that investigation just started, because we
19  didn't have the information as to what they
20  wanted. Now, we do.
21          JUDGE GONZALEZ: All right. What I
22  am going to order is Parus Holdings can take
23  the depositions regarding the hard copy
24  production. Hold off on the electronic until
25  you are getting a full response from
0026
1          Proceedings
2  WorldCom. After that, I will give you 15
3  days to take the depositions. If necessary,
4  the Court will entertain another request for
```

A 02167

1101wcm-parus(1).txt

5  a discovery conference with respect to the
6  motion to produce.
7        All right.  So I assume I will hear
8  from you sometime after the next 15 days.
9        MR. FRIEDMAN:  Thank you, Your
10 Honor.
11       MR. DRISCOLL:  Thank you, Your
12 Honor.
13       JUDGE GONZALEZ:  All right.  Thank
14 you.
15
16
17
18
19
20
21
22
23
24
25
0027
1
2        C E R T I F I C A T E
3  STATE OF NEW YORK    )
              : SS:
4  COUNTY OF NEW YORK   )
5
6        I, DEBORAH HUNTSMAN, a Shorthand
7  Reporter and Notary Public within and for the
8  State of New York, do hereby certify:
9        That the within is a true and
10 accurate transcript of the Digitally Recorded
11 Proceedings recorded on the 1st day of
12 October, 2005.
13       I further certify that I am not
14 related by blood or marriage to any of the
15 parties and that I am not interested in the
16 outcome of this matter.
17       IN WITNESS WHEREOF, I have hereunto
18 set my hand this 3rd day of October, 2005.
19
20       DEBORAH HUNTSMAN
21
22
23
24
25

Page 13

A 02168

# Exhibit P

A 02169

Donald Ramsay  11/14/2005



1
2        UNITED STATES BANKRUPTCY COURT
          SOUTHERN DISTRICT OF NEW YORK
3        ---------------------------x
4        IN RE:
          WORLDCOM, INC., ET AL
5        REORGANIZED DEBTORS      No. 02-13533
6        ---------------------------x
7
8
9
10        DEPOSITION OF DONALD C. RAMSAY
11            New York, New York
12        Monday, November 14, 2005
13
14
15
16
17
18
19
20    Reported by:
        Miriam Kaplan
21    JOB NO. 179103
22
23
24
25

                                              2
1
2    A P P E A R A N C E S:
3
4        KELLEY DRYE & WARREN, LLP
5        Attorneys for PARUS HOLDINGS, INC.
6            101 Park Avenue
7            New York, New York 10178
8        BY:  KEVIN J. SMITH, ESQ.
9
10        STINSON MORRISON HECKER, LLP
11        Attorneys for WORLDCOM, INC.
12            1201 Walnut Street
13            Kansas City, MO, 64106
14        BY:   ROBERT L. DRISCOLL, ESQ.
15
16
17
18
19
20
21
22
23
24
25

                                              1
1
2            November 14, 2005
3            10:40 a.m.
4
5        Deposition of DONALD C. RAMSAY, held
6    at the offices of Kelley Drye & Warren, 101
7    Park Avenue, New York, New York, pursuant
8    to Notice, before Miriam Kaplan, a Notary
9    Public of the State of New York.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

                                              3
1
2            IT IS HEREBY STIPULATED AND AGREED, by
3    and between counsel for the respective parties
4    hereto, that the filing, sealing and
5    certification of the within deposition shall
6    be and the same are hereby waived;.
7            IT IS FURTHER STIPULATED AND AGREED
8    that all objections, except as to the form of
9    he question, shall be reserved to the time of
10    the trial;
11            IT IS FURTHER STIPULATED AND AGREED
12    that the within deposition may be signed
13    before any Notary Public with the same force
14    and effect as if signed and sworn to before
15    the Court.
16
17
18
19
20
21
22
23
24
25

A 02170

Donald Ramsay  11/14/2005

4

1
2    DONALD C. RAMSAY, called as a witness, having
3        been duly sworn by a Notary Public, was
4        examined and testified as follows:
5    EXAMINATION BY
6    MR. SMITH:
7        Q.  Please state your name for the record.
8        A.  Donald C. Ramsay.
9        Q.  Please state your address for the
10   record.
11       A.  4940 West 151 Terrace, Leewood, Kansas
12   66224.
13       MR. DRISCOLL:  I'd like to put on a
14   statement.
15       MR. SMITH:  Okay.
16       MR. DRISCOLL:  Which is simply that
17   Mr. Ramsay is here today, as we all know, to
18   provide deposition testimony as authorized by
19   Judge Gonzales on November 1, concerning the
20   hard copy document production made by WorldCom
21   in this proceeding.  And as I advised you and
22   other counsel in this firm, this would, of
23   course, include his discoverable information
24   that he may have concerning maintenance
25   storage retention and indexing of documents

6

1
2    documents and production of documents, on the
3    transcript page 10 of the November 1 hearing,
4    as well as, on page 13 of that hearing, where
5    we requested and it was granted that
6    deposition or depositions of the people who
7    are responsible for the maintenance, storage,
8    retention, indexing, production of the
9    documents here in this proceeding.  And we
10   just -- I just note that for the record, not
11   to get into an argument with you, but to make
12   sure that it's clear from our position what
13   the purpose of the deposition is.
14       MR. DRISCOLL:  Yes.  Miss Kaplan, would
15   you mark this, please?
16       MR. SMITH:  I'm not going to have you
17   marking Exhibits.  I will mark Exhibits, and I
18   understand your statement.  Your statement is
19   what it is, and my statement is what it is.
20   It's my deposition, Mr. Driscoll.  I'm not
21   going to have you mark Exhibits until the end
22   of the deposition.  I let you, as a courtesy,
23   make a statement on the record, and I
24   appreciate that, but I'd like to get my
25   deposition started with Mr. Ramsay.

5

1
2    involved in WorldCom's hard copy production.
3    That's it.
4        MR. SMITH:  Just to clarify one minor
5    point which might be a matter of semantics, is
6    that the deposition of -- since you produced
7    Mr. Ramsay, is the deposition of Mr. Ramsay,
8    it's pursuant to the Judge's order, which may
9    be a matter of semantics in your use of the
10   word authorized versus order.
11       MR. DRISCOLL:  No.  I'm referring to the
12   statement by The Court, page 25 of the
13   November 1 transcript.  "What I'm going to
14   order, is Parus Holdings can take the
15   depositions regarding the hard copy
16   production".  That's what I'm referring to.
17       MR. SMITH:  I understand.  And I for the
18   record, it's our position that Mr. Ramsay, or
19   anyone else for that matter from the debtors,
20   should be deposed concerning not only the hard
21   copy production, but also as was requested and
22   granted in our view at the November 1 hearing,
23   the deposition or depositions of WorldCom
24   Intermedia individuals who have knowledge of
25   their document retention selection, of

7

1
2        MR. DRISCOLL:  That's fine.  But this
3    document will be marked as an Exhibit.  It is
4    a copy of my letter to you and your colleagues
5    dated November 4 on the subject of what is a
6    proper subject matter for this particular
7    deposition.  It is appropriate to have it on
8    the record now, but it can wait.
9        MR. SMITH:  Well, I think your statement
10   is on the record.
11       Q.  Now, to get the deposition started.
12   Mr. Ramsay, good morning.  As I mentioned before
13   my, name is Kevin Smith.  I'm an attorney here at
14   Kelley Drye & Warren.  Kelley Drye represents the
15   claimant in the WorldCom bankruptcy by the name
16   Parus Holdings Inc. As Mr. Driscoll and I have
17   discussed, we're here to take your deposition
18   concerning, among other things, the hard copy
19   production of documents by the debtors in this
20   proceeding by order of the court.  I understand
21   you're an attorney; correct?
22       A.  Correct.
23       Q.  And you're an attorney at Stinson,
24   Morrison, Hecker in Kansas City?
25       A.  I am.  Let me say real quickly.  My

A 02171

Donald Ramsay  11/14/2005

8

1
2  voice is sometimes hard to understand, it doesn't
3  carry. Either one of you don't hesitate to stop me
4  and ask me to repeat if you don't hear what I'm
5  saying. It's a raspy voice, and I understand it
6  doesn't carry sometimes.
7      Q.  Very well, thank you.
8      A.  Yeah.
9      Q.  I understand you're an attorney. I'll
10  cover a couple of quick ground rules for the
11  deposition. Please let me ask the question before
12  you start to answer, and I'll try to complete it,
13  or let you complete your answer before I ask you
14  another question, and if you can do the same, that
15  way the court reporter can take everything down.
16      A.  I'll do my best.
17      Q.  If you need to take a break, let me
18  know. We can take a break whenever you want to
19  take a break. The only thing I ask, is that you
20  answer any questions that are pending before we do
21  take a break, okay?
22      A.  That's fine with me.
23      Q.  Did you prepare in any way for today's
24  deposition?
25      A.  I did.

9

1
2      Q.  How did you do that?
3      A.  I met with Mr. Driscoll and others that
4  have been involved in the litigation to review the
5  facts.
6      Q.  When did you meet with Mr. Driscoll?
7      A.  On several days over the past week.
8      Q.  When you met with Mr. Driscoll, did you
9  also meet with the other individuals who have been
10  involved in the litigation?
11      A.  I did.
12      Q.  Who are the other individuals?
13      A.  Allison Murdock, Jodi Hoss and I
14  believe, very briefly Jeff Befort.
15      Q.  How many meetings did you have?
16      A.  I'm not certain about this, but four,
17  five.
18      Q.  When was the first meeting with
19  Mr. Driscoll and the others?
20      A.  Again I'm having trouble remembering
21  exactly, but I believe it was a week ago today.
22  I'm not certain about that, but I believe that was
23  the first time.
24      Q.  You believe November 7 may have been the
25  first one?

10

1
2      A.  Week ago on a Monday, I believe was the
3  first time.
4      Q.  Did you meet with all of the individuals
5  that you mentioned, Mr. Driscoll and Miss Murdock,
6  Mr. Hoss?
7      A.  Mrs. Hoss.
8      Q.  Miss Hoss, okay, and Mr. Befort?
9      A.  On that day I don't believe so, no.
10      Q.  Who did you meet with on that day?
11      A.  I don't believe Miss Hoss was there or
12  Mr. Befort, as I recall.
13      Q.  So your recollection is?
14      A.  To the best of my recollection.
15      Q.  Your recollection is about a week ago
16  today, you met with Mr. Driscoll and Miss Murdock?
17      A.  Correct.
18      Q.  How long was the meeting, approximately?
19      A.  Again I'm not hundred percent certain,
20  but it was probably three hours approximately.
21      Q.  Did you review any documents during that
22  meeting?
23      A.  Yes.
24      Q.  What were the documents?
25      A.  I'm gonna have trouble remembering which

11

1
2  documents I reviewed at which time. I don't
3  remember which ones I reviewed in that initial
4  meeting.
5      Q.  When was the next meeting?
6      A.  I believe it was Tuesday.
7      Q.  How long was that meeting?
8      A.  Similar amount of time, approximate
9  three hours. I don't have the times, but something
10  like that.
11      Q.  And again, was this meeting with just
12  Mr. Driscoll and Miss Murdock, or someone else as
13  well?
14      A.  I believe, Miss Hoss joined us for this
15  meeting.
16      Q.  Just for the record, Mr. Driscoll and
17  Miss Murdock and Miss Hoss are all attorneys at
18  Stinson Morrison; is that correct?
19      A.  That's correct.
20      Q.  During the course of the deposition, I
21  assume we all understand what I mean if I say just
22  Stinson, we'll understand that to mean your firm;
23  correct?
24      A.  I believe I can do that.
25      Q.  After the meeting last Tuesday, when was

A 02172

Donald Ramsay  11/14/2005

12

1
2  the next meeting you had with any of the
3  individuals you mentioned?
4      A.  I believe it was Wednesday.
5      Q.  How long was that meeting?
6      A.  Similar amount of time, three
7  approximately, three hours.  Some of these could
8  have been more or less, something like that.
9      Q.  When you say more or less, by
10 approximately how much time more or less?
11     A.  An hour.
12     Q.  Okay, so it could be anywhere from two
13 to four hours each of the meetings you mentioned,
14 thus far as Monday, Tuesday and Wednesday of last
15 week?
16     A.  Correct.
17     Q.  When was the next meeting after the last
18 Wednesday meeting?
19     A.  I believe it was Friday.  I don't
20 believe we met on Thursday, as best as I recall,
21 but I don't think we did.
22     Q.  How long was your meeting on Friday?
23     A.  Approximately three hours, something
24 like in that range, same two to four.
25     Q.  Two to four hours, okay.

13

1
2          Did you have any meeting after the
3  Friday meeting?
4      A.  Saturday morning.
5      Q.  Just getting back for one second.  At
6  the Wednesday meeting, who was present at that
7  meeting?
8      A.  Bob Driscoll, Allison Murdock, Jodi
9  Hoss.  On one of these meetings, Jeff Befort was
10 there for a little bit of time.  It probably was
11 Wednesday.
12     Q.  Was Mr. Befort at any of the other
13 meetings?
14     A.  I don't believe so, not that I recall.
15     Q.  In the Friday meeting, was it
16 Mr. Driscoll, Miss Murdock and Miss Hoss present,
17 as well?
18     A.  Yes, yes.
19     Q.  How long was the Saturday meeting?
20     A.  Three hours.  I'm a little more
21 confident on the time on that.  It was about 9 to
22 noon.  Actually it might have been 9 to 11:30, it
23 wasn't past noon.
24     Q.  Who was present for the Saturday morning
25 meeting?

14

1
2      A.  Robert Driscoll, Allison Murdock and
3  Jodi Hoss.
4      Q.  Did you have any other meetings?
5      A.  Not that I recall.
6      Q.  Okay.
7          At any of these meetings described, was
8  anyone from the debtors present?
9      A.  No.
10     Q.  Was anyone else present?
11     A.  I don't recall anyone else being
12 present.  No I don't think so.
13     Q.  At any of these meetings, I think you
14 mentioned earlier, that you did review documents;
15 correct?
16     A.  I did.
17     Q.  Do you recall what documents you
18 reviewed?
19     A.  Let's see if I can give you a complete
20 list.  I'll try, and as we go along, if I think of
21 anything I'll say.  I reviewed the motion to
22 compel.  I'm not certain I reviewed all of the
23 attachments, but I reviewed a number of them, quite
24 a few attachments to them.  I reviewed our response
25 and attachments.  I reviewed our supplemental

15

1
2  response and attachments.  I reviewed indexes of
3  boxes of documents, indexes.  I think that's all.
4  I think that is all.  If I think of anything else
5  as we go along, I'll say something.  Something you
6  ask may jog my memory, but I think that's it.  Oh,
7  I'm sorry, I did review the request for production
8  of documents.
9      Q.  Did you review the debtors response and
10 objections in the documents?
11     A.  I did to some extent.  I reviewed parts
12 of that, I'm sure.
13     Q.  Did you review -- did you review any
14 handwritten notes?
15     A.  No.
16     Q.  Just very briefly, what is your legal
17 background.  Where, for example, where did you go
18 to Law School, how long have you been practicing
19 law, what states do you have your bar license in?
20     A.  Sure, sure.  I can give you a real
21 quick -- I went to the University of Kansas.  I've
22 been practicing law approximately 30 years.  I'm
23 licensed to practice in Kansas and Missouri.
24     Q.  What is your practice in the past five
25 years, let's say?

A 02173

Donald Ramsay  11/14/2005

16

1
2      A.   Business, commercial litigation with
3   some focus on document production in large
4   litigation.
5      Q.   When you say focus on document
6   production in large litigation?
7      A.   I'd say an area of focus in my practice
8   -- I've done this a number of times, multiple times
9   that have involved large litigation, my
10   responsibility related to the document production
11   issues.
12      Q.   What were the other litigations that
13   you were involved in that dealt with, that your
14   role was with respect to the document productions?
15      A.   Their have been a number of them.
16   Again, I'm not sure that I can give you the names
17   of all of them, but among them would be, and I
18   guess it's okay to name them, the name of the
19   parties.
20      MR. DRISCOLL:   Is the name of the client
21   important, or is the kind of matter more
22   important, because the name of the client, I'd
23   say he should stay away from, or clients?
24      MR. SMITH:   Well, if the name of your
25   client is privileged in some way, I can

17

1
2   understand.
3      MR. DRISCOLL:   It's not. It's his
4   involvement.
5      MR. SMITH:   Let me -- maybe I'm not
6   going to get into details of what exactly you
7   did in terms of the exact nature, but based on
8   what he described as he's been involved in,
9   I'd like to know what the names of the
10   litigations were, meaning, it was --
11      MR. DRISCOLL:   So long as we're just
12   talking --
13      MR. SMITH:   Generalities.
14      MR. DRISCOLL:   Generalities.
15      MR. SMITH:   That's fine.
16      MR. DRISCOLL:   Okay, thank you.
17      A.   It would include Blacken Beach
18   (spelling) versus Farmland Industries which
19   involved constructions, and it includes some
20   several Sprint -- our client was Sprint, class
21   action matters involving billing, universal service
22   fund, charges, that sort of thing, and a number of
23   other construction cases involving conveyor systems
24   for commercial mailing companies, construction of a
25   mayonnaise facility, construction of a beer

18

1
2   distributor, that sort of thing. A number of them
3   were construction.
4      Q.   In the Sprint litigation you mentioned,
5   how many documents were produced in that case, if
6   you can recall, by Sprint?
7      A.   I don't recall the total number, I real
8   don't. It's many more than are involved in this
9   case, but 30 boxes perhaps. I don't remember
10   exactly. That's a guess. I shouldn't guess at
11   that. It's a large number.
12      Q.   How about with respect to the
13   construction litigations you mentioned.
14   Approximately how many documents would you say were
15   produced in that case?
16      A.   Hundred boxes.
17      MR. DRISCOLL:   Just so the record is
18   clear, the hundred boxes is the volume of
19   boxes produced.
20      THE WITNESS:   I think so. We
21   reviewed --
22      MR. DRISCOLL:   Well, I just want it to
23   be clear that was your question, wasn't it
24   counsel?
25      MR. SMITH:   Correct.

19

1
2      MR. DRISCOLL:   Not volume reviewed?
3      MR. SMITH:   Correct.
4      A.   I'm not absolutely certain about that,
5   but that's kind of my memory.
6      Q.   In the litigation you just mentioned,
7   where hundred boxes approximately, I'm not going to
8   hold you to that, were produced, how many were
9   reviewed?
10      A.   Well, you're asking me to reach back
11   quite a while. We reviewed one number -- I
12   remember over 900 hundred boxes of documents
13   produced by Blacken Beach (spelling) for their
14   production. In our production, I don't remember
15   how many we reviewed. What I remember is a room, a
16   large room, full of boxes, and I don't remember how
17   many there were. I don't know that we counted
18   them, and they weren't all boxes, they were file
19   cabinets in some cases. I don't...
20      Q.   What was your role in connection with
21   the production of documents in this proceeding?
22      A.   I was responsible for locating,
23   coordinating, locating documents, coordinating,
24   review of the documents.
25      Q.   When were you first assigned that role?

A 02174

Donald Ramsay  11/14/2005

20

1
2    A.   Oh, I was have to say it evolved.  I
3    started in the litigation doing a variety of
4    things.  It kind of evolved.  I don't know if I can
5    put a date on it.
6    Q.   When did you first attempt to locate
7    documents in connection with this proceeding?
8    A.   Me personally?
9    Q.   Well, when did Stinson first try to
10   locate documents in connection with this
11   proceeding?
12   A.   Early fall of 2004, as I recall.
13   Q.   Were you involved in the location or
14   review of documents at that time?
15   A.   No.
16   Q.   Do you know who was?
17   A.   Yes.
18   Q.   Who was it?
19   A.   Sharon Stolte and Larry Bigus.
20   Q.   Do you know what Sharon Stolte did in
21   connection with locating documents, in connection
22   with this proceeding?
23   A.   I know generally what she did is contact
24   MCI employees or individuals, to see if they had
25   documents that were -- that related to the issues

21

1    in this litigation.
2    Q.   Do you know if she contacted current or
3    former MCI employees, or both?
4    A.   I'm not sure.  She had a list of
5    individuals that I'm not sure whether some of them
6    may have been former.  I'm not sure.
7    Q.   Do you know the names of any of the
8    individuals she contacted to try to locate
9    documents?
10   A.   I haven't been back over the list
11   specifically, of who she tried to contact.  I'd
12   seen a list that included people I contacted, but
13   I'm not sure as I sit here today, which ones she
14   contacted.
15   Q.   Do you know if Miss Stolte did anything
16   else in connection with trying to locate documents
17   in connection with this proceeding?
18   A.   I don't know.
19   Q.   You don't know?
20   A.   I don't.
21   Q.   Do you know what Larry Bigus did in
22   connection with trying locate documents in
23   connection with this proceeding?
24   A.   He contacted individuals, asked them if

22

1
2    they had documents relating to the issues in this
3    proceeding.
4    Q.   Do you know who Mr. Bigus contacted?
5    A.   I know some of them, yes.
6    Q.   Who were they?
7    A.   I participated in some of the names
8    contacted.  I recall Richard Black, Kathleen
9    Victory, Teresa Hastings, Barry Zip.  I believe he
10   may have talked to others, but I don't remember
11   those.  I was present and participated in the
12   others.
13   Q.   Your recollection is that Mr. Bigus
14   contacted the four individuals you named, but he
15   may have contacted others?
16   A.   He may have.
17   Q.   At the time that Mr. Bigus was
18   contacting these other individuals, was it still
19   early fall 2004, or was it some other time?
20   A.   It was '04, probably mid to late fall,
21   the ones I was aware of.
22   Q.   So would you say, late fall of 2004 was
23   around the time that you started to become involved
24   in the collection, or the location of the documents
25   in connection with this proceeding?

23

1
2    A.   Yes.
3    Q.   Do you know if Mr. Bigus did anything
4    else in connection with locating documents in this
5    proceeding?
6    A.   I know he did some other things, but I'm
7    not sure I can describe them.  I believe he may
8    have sent e-mails -- let me back up.  Sharon Stolte
9    also sent e-mails for getting something.  I know
10   she sent e-mails to a group of individuals.
11   Q.   So Miss Stolte's contact with MCI
12   employees was both via telephone, as well as
13   e-mail?
14   A.   Correct.
15   Q.   Aside from contacting MCI employees to
16   see if they had documents, do you know if Miss
17   Stolte did anything else in connection with
18   locating documents?
19   A.   I'm not certain.  I'm not certain they
20   were all current employees.
21   Q.   You mentioned that you recall that
22   Mr. Bigus may have done other stuff in connection
23   with locating documents?
24   A.   If I used that imprecise term, maybe
25   that's kind of what it is.  I know I recall that he

A 02175

Donald Ramsay  11/14/2005

24

1
2    sent e-mail as well.
3        Q.   An e-mail to other either current or
4    former employees of the debtors, to try to locate
5    documents?
6        A.   Correct.
7        Q.   Do you know if Mr. Bigus did anything
8    else?
9        A.   I don't know, don't recall.
10       Q.   Do you know if Miss Stolte received any
11   responses from any of these individuals she
12   contacted?
13       A.   I believe, she did.
14       Q.   Do you know who the responses were from?
15       A.   One of the names I can't pronounce, it's
16   Nasser Sheikh. It's a very -- it's what I remember
17   of it, and I believe there was a Stevens. There
18   may be others, but I remember seeing something, a
19   response from those. She received responses from
20   others. By response, I mean she received some
21   documents. She received responses from a number of
22   them beyond that.
23       Q.   Do you recall what the nature of the
24   responses were?
25       A.   A number of them did not have any

25

1
2    documents relating to issues in these proceedings.
3        Q.   Do you recall what Miss Stolte's request
4    was of them?
5        A.   Not specifically. I remember it was a
6    very broad request for anything, as I recall,
7    relating to EffectNet or Webley, or the
8    relationship between the Intermedia and EffectNet
9    or MCI, and Webley or MCI; any of those parties,
10   anything, period. I can't recite what it said, but
11   I remember it was very broad.
12       Q.   Do you know if Stinson still has the
13   e-mail, or e-mails, that were sent by either Miss
14   Stolte or Mr. Bigus to those individuals?
15       A.   I have no reason to think they wouldn't.
16   I would think they would.
17       MR. SMITH: I make a request for a copy
18   of those e-mails that were sent to the
19   individuals by Miss Stolte and/or Mr. Bigus.
20       MR. DRISCOLL: Take it under advisement.
21       Q.   Do you know if any of the individuals
22   who responded to Miss Stolte, responded either
23   verbally or in an e-mail?
24       MR. DRISCOLL: I'm sorry, could you read
25       that back?

26

1
2        (Record read.)
3        A.   Either one. I believe they did.
4        Q.   In both matters?
5        A.   No, I'm not sure about e-mail. It may
6    have been. I don't remember. There may be.
7        MR. SMITH: To the extent that there
8    were e-mail responses to Miss Stolte and
9    Mr. Bigus, in response to their requests for
10   documents, we request a copy of those
11   documents.
12       Q.   Do you know if Mr. Bigus received any
13   responses from any individuals that he contacted?
14       A.   I believe that he did.
15       Q.   Do you know who from?
16       A.   Specifically, no.
17       Q.   Do you recall for which entities, or
18   entity, any of the individuals Miss Stolte
19   contacted were either working for at the time, or
20   had worked for previously?
21       A.   No. The specific name of -- the
22   corporate name of the entity that they worked for
23   at the time, I don't recall.
24       Q.   Do you know the name of the individuals,
25   employees that Mr. Bigus contacted?

27

1
2        A.   I don't recall. I'm not sure that I
3    knew, but I don't recall now.
4        Q.   In late fall 2004, was anyone else
5    involved in locating, coordinating the review of
6    documents in this proceeding?
7        A.   Other than the in-house counsel, no one
8    from the firm, no.
9        Q.   Who from in-house counsel was involved?
10       A.   David Wachen.
11       Q.   Can you spell the last name?
12       A.   W A C H E N.
13       Q.   Was Mr. Wachen involved at the same time
14   we've been discussing Miss Stolte's roles, or role,
15   as well as Mr. Bigus's role?
16       A.   I believe it was.
17       Q.   What's Mr. Wachen's title; do you know?
18       A.   No.
19       Q.   You just know him to be in-house counsel
20   at MCI?
21       A.   Correct.
22       Q.   Is Mr. Wachen still involved in this
23   proceeding?
24       A.   I believe that he is.
25       Q.   Do you know what, if anything,

A 02176

Donald Ramsay  11/14/2005

28

1
2    Mr. Wachen did in late fall, or in the fall of
3    2004, in connection with attempting to locate, or
4    locate documents, or coordinate review of documents
5    in this proceeding?
6        MR. DRISCOLL: Excuse me, that's a
7    compound question. I missed the second part.
8        (Record read.)
9        MR. DRISCOLL: That's locate or
10    coordinate.
11        MR. SMITH: If you have an objection,
12    I'll rephrase it.
13        MR. DRISCOLL: It was a question of
14    understanding.
15        MR. SMITH: Sure.
16    A.   I don't think I can recite everything he
17    did, but I'm aware that he sent an e-mail advising
18    employees to retain any documents they had; they
19    could not be destroyed. I'm aware he provided, let
20    me hold that off. He may have been the one I'm not
21    certain, who provided a list of individuals who
22    might have information.
23    Q.   Do you know when Mr. Wachen sent the
24    e-mail you mentioned, advising to retain e-mails or
25    documents?

29

1
2    A.   Part of that initial effort before I
3    became involved, early fall, late fall, of '04.
4    Q.   Do you know who he sent the e-mail to?
5    A.   I couldn't try to list them.
6    Q.   Do you know who?
7    A.   I don't recall the list of people he
8    sent it to.
9    Q.   Have you ever seen the e-mail that he
10    sent?
11    A.   I have.
12    Q.   Does Stinson have it in its possession?
13    A.   I assume so.
14        MR. SMITH: I'd like to request a copy
15    of that e-mail as well.
16    Q.   Aside from providing the list of
17    individuals to contact for information, did
18    Mr. Wachen, to your knowledge, do anything else
19    with respect to locating documents?
20    A.   I believe he did, yes.
21    Q.   What else?
22    A.   Again, I'm not certain at all, but my
23    memory is that he put us in contact with a
24    depository of some documents in Ashburn Virginia.
25    I believe he's the individual who located and

30

1
2    advised us of those. I'm not sure, but I think so.
3    Q.   Do you know how he went about finding
4    these documents in Virginia?
5    A.   I don't.
6    Q.   Do you know if Mr. Wachen did anything
7    else, with respect to locating documents in this
8    proceeding?
9    A.   As I said, I don't recall all. He put
10    us in contact with a number of individuals, and as
11    we went through the process, I don't recall what he
12    did, or necessarily all the individuals, but I
13    recall that.
14    Q.   Who were the names of the individuals he
15    put you in contact with?
16    A.   Well the names that initial list I
17    believe, he provided to Sharon Stolte and Larry
18    Bigus. I believe, he put us in contact with a
19    woman by the last name of Tate, and a Beckman.
20    Q.   What was the first name?
21    A.   I think it's Roger, I think it's Brenda
22    Tate, and at one point put us in contact with a
23    gentleman by the name of Mancini.
24    Q.   Do you know the first name?
25    A.   I don't remember, I don't recall. I

31

1
2    don't recall his first name.
3    Q.   Anyone else that you recall him putting
4    you in touch with?
5    A.   As I sit here, no, I don't recall. As
6    we go through, I may hear questions as we go
7    through this process, I may think of something
8    else, but at the top of my head, no.
9    Q.   Do you have any documents that would
10    refresh your recollection, as to any other
11    individuals he put you in contact with?
12    A.   Do I have them with me, or do they
13    exist; what's the question?
14    Q.   Do they exist?
15    A.   There are some.
16    Q.   What are those documents?
17    A.   I have made some notes as I went through
18    the process.
19    Q.   Anything else?
20    A.   E-mail that went back and forth might
21    refresh my memory.
22    Q.   Do you recall anything else that
23    Mr. Wachen did in connection with locating
24    documents in this proceeding?
25    A.   I recall that he participated in at

A 02177

Donald Ramsay  11/14/2005

32

1
2    least two phone conferences with individuals
3    regarding back up tapes.
4        Q.   Anything else?
5        A.   That's all that's coming to mind right
6    now.  As we go through this, I'll try, something
7    might jog my memory from your questions, but that's
8    all I think of now.
9        Q.   With respect to the two phone
10   conferences; were you on the phone as well?
11       A.   Yes.
12       Q.   Did you take notes of those phone calls?
13       A.   I don't recall.  I may have, but I
14   don't -- I'm not certain.
15       Q.   You mentioned a person by the name of
16   Brenda Tate that Mr. Wachen put you in touch with?
17       A.   Correct.
18       Q.   Who is she?
19       A.   I believe, and she is one of the
20   individuals with the WorldCom records management
21   function.
22       Q.   She's still employed by MCI, or
23   reorganized debtors?
24       A.   As far as I know.
25       Q.   Yes, as far as you know?

33

1
2        A.   Yes, as far as I know.
3        Q.   Who is Roger Beckman, I believe you
4    mentioned?
5        A.   You're asking me to reach back.  I'm not
6    certain of this, but I think he's one of the
7    individuals who had knowledge of a group of boxes
8    located in Ashburn, Virginia.
9        Q.   Do you know if he is employed by MCI?
10       A.   I believe, he is.
11       Q.   And you mentioned a person with the last
12   name of Mancini?
13       A.   Correct.
14       Q.   Who is that person?
15       A.   He's also the record management function
16   of MCI.
17       Q.   Do you know if he's still employed?
18       A.   As far as I know, yes.
19       Q.   Did you speak with each of these
20   individuals; Miss Tate, Mr. Beckman and
21   Mr. Mancini?
22       A.   Yes.
23       Q.   When did you speak with them?
24       A.   Would have been early winter of '05.  I
25   say earlier, it would have been winter of '05, but

34

1
2    I'm not certain whether it was early winter, mid
3    winter, or late winter.
4        MR. DRISCOLL:  Or not yet winter of '05.
5        A.   I'm sorry -- yes I think that is when I
6    talked to them.
7        MR. DRISCOLL:  Today, November 14, '05.
8        A.   I'm a year off on this, I'm a year off,
9    pardon me.  It would have been winter of 0 -- no it
10   would have been January, February of '05.
11       MR. DRISCOLL:  Okay.
12       Q.   When you're referring to winter '05,
13   right now you're referring to January, February of
14   2005?
15       A.   Yes.
16       MR. SMITH:  If I take Mr. Driscoll
17   correctly, you were referring to presently, as
18   perhaps the winter of '05.
19       MR. DRISCOLL:  Obviously.
20       A.   That would be early winter.  It would
21   have been January, February of '05, or March; it
22   could have been.
23       Q.   With respect to Miss Tate, and I assume,
24   if you correct me if I'm wrong, Tate is spelled T A
25   T E?

35

1
2        A.   I believe it is.
3        Q.   Do you know what her title was at the
4    time you spoke with her?
5        A.   I don't recall.
6        Q.   Do you know what her role was at the
7    time you spoke with her, at WorldCom and MCI?
8        A.   Other than she worked with their records
9    management function, I don't.
10       Q.   What, if any, information did Miss Tate
11   provide to you?
12       A.   I'm gonna have trouble distinguishing
13   between whether it was Miss Tate or Miss Taylor,
14   but one or both of those individuals ultimately
15   provided some indexes, I believe, of boxes of
16   documents.
17       Q.   You mentioned a Miss Taylor?
18       A.   Yes.
19       Q.   Who is that?
20       A.   She's another individual that works with
21   the records management function at MCI.
22       Q.   When did you speak with Miss Taylor?
23       A.   In that same time frame.
24       Q.   What did you request of either Miss Tate
25   or Miss Taylor, when you spoke with them?

Page  32 - 35

A 02178

Donald Ramsay  11/14/2005

36

1
2    A.    Their assistance in locating any
3    documents in relation to this litigation,
4    including, in part, documents that might have been
5    stored by Intermedia.
6    Q.    Do you know if they had any role with
7    respect to storage of documents with Intermedia?
8    A.    I believe, as far as I know, they didn't
9    store them -- weren't involved in the storing of
10    them, but they had information about them.
11    Q.    Do you know if Miss Taylor or Miss Tate
12    worked for Intermedia at some point?
13    A.    I don't believe either did, but I'm not
14    sure.
15    Q.    Do you know if Mr. Beckman or
16    Mr. Mancini, ever worked for Intermedia?
17    A.    I don't recall, I don't believe so, but
18    I don't recall for sure.
19    Q.    Did you -- when you made the request of
20    Miss Taylor and Miss Tate, did you make the request
21    verbally or in writing?  You mentioned before, you
22    made a request.
23    A.    I believe there was some of both.
24    Q.    What do you mean, some of both?
25    A.    Writing and verbal.

37

1
2    Q.    Did you send them an e-mail, send them a
3    letter; how did you communicate with them in
4    writing?
5    A.    I believe Mr. Bigus sent an e-mail that
6    described what we were looking for.  I may have as
7    well.  I'm not certain.  It may depend on who
8    you're talking about.  We've got three, four
9    individuals here.
10    Q.    I take from your last statement that you
11    may have, for example, spoken with Miss Taylor, but
12    sent an e-mail or something in writing to Miss Tate
13    or visa versa?
14    A.    I'm confused.  I spoke with all those
15    individuals.
16    Q.    Okay.  Did you ever send Miss Taylor or
17    Miss Tate, Mr. Beckman or Mr. Mancini, anything in
18    writing?
19    A.    Me personally?
20    Q.    You or Stinson?
21    A.    I believe so, yes.
22    Q.    You think Stinson may have sent
23    something in writing to either Miss Taylor or Miss
24    Tate, Mr. Beckman or Mr. Mancini?
25    A.    I believe so.

38

1
2    Q.    What, if any, information did you
3    request from Mr. Beckman and Mr. Mancini?
4    A.    I'll break each part separately.
5    Mr. Mancini I spoke to on at least two occasions
6    about Intermedia's backup tapes, or where we might
7    find their electronic stored documents, if there
8    were any.  Mr. Beckman, I believe, spoke to
9    regarding the documents stored at Ashburn,
10    Virginia.
11    Q.    Did anyone from Stinson ever send Mr.
12    Beckman anything in writing concerning documents?
13    A.    I don't recall if we did.
14    MR. SMITH:  I make a request for any of
15    the materials or documents that were sent to
16    either Miss Taylor, Miss Tate, Mr. Mancini at
17    this time, and I'm putting -- excuse me, not
18    Mr. Mancini, Mr. Beckman.  I'm going to put
19    Mr. Mancini on the side for the moment,
20    because as I understand the Court's order,
21    we're not here concerning a discovery or
22    e-mail productions, so I will reserve my
23    rights as to that, but I'm not going to go
24    beyond what the Court's order is.
25    Q.    When Stinson made the requests for

39

1
2    documents, whatever it may have been, to Miss
3    Taylor, Miss Tate or Mr. Beckman, did it include a
4    request for documents from -- strike that.
5    I apologize.
6    When Stinson sent requests for documents
7    to Miss Taylor, Miss Tate or, Mr. Beckman, what
8    entities were the documents sought from?
9    A.    If I can back up just a little.  Your
10    question includes three individuals.  I don't
11    recall that we sent requests to all these -- of
12    those individuals, so I couldn't say.  I can add to
13    the point, I think that we did not limit the
14    request to specific corporate entities, and I say
15    request.  They may have been by phone.  To the
16    extent I recall my conversations, we did not put
17    any corporate entity limits on.
18    Q.    What was the name of the entities that
19    were used in the request, whether it was verbal or
20    written?
21    A.    I don't recall.
22    Q.    Do you recall if it included requests
23    for any Intermedia entities?
24    A.    I believe it would have included
25    Intermedia, yes.

A 02179

Donald Ramsay  11/14/2005

40

1
2    Q.   Do you recall what the time frame was
3    with respect to the request?
4    A.   The general time frame we were working
5    from, and I can't necessarily recall with regard to
6    each conversation, but general time frame was from
7    January 1, 2000 through the end of 2002, the period
8    we thought was -- should include anything.
9    Q.   Prior to, strike that.
10        Do you know what function Miss Taylor
11   had at the time you were speaking with her?
12        MR. DRISCOLL:  You mean job?
13        MR. SMITH:  Correct.
14   A.   Other than she worked with the Records
15   Management Group, no.
16   Q.   Do you know what records, either she or
17   her group oversaw?
18   A.   I believe they oversaw all stored
19   documents.
20   Q.   Stored documents of what entities?
21   A.   All.
22   Q.   When you say all, what does that
23   include?
24   A.   Well, I believe it's my understanding
25   there's some 200 entities involved here.  It's also

41

1
2    my understanding, that their function relating to
3    it crosses all the corporate entities, whether I
4    can tell you 199 -- my understanding is, it's all.
5    Nobody gave me a list of them, but.
6    Q.   Where did you gain that understanding,
7    that she had, or her group, had a role of
8    overseeing storage of all of the documents?
9    A.   From conversations with Phil
10   Hasselvander.
11   Q.   Can you spell the name for me?
12   A.   H A S S E L V A N D E R.
13   Q.   Where is he from?
14   A.   He's with their records management
15   function.  I'm not sure where he's located.
16   Q.   Is this Mr. Hasselvander, is he another
17   individual that Mr. Wachen put you in touch with?
18   A.   Indirectly.  I think that may be as I --
19   this is -- I'm not certain of this, but I believe
20   that one of the others ultimately referred me to
21   him, or he contacted me as a result of my
22   conversations with one of the other individuals
23   with the records management.
24   Q.   So your recollection, just so I'm clear,
25   at some point in either late fall of 2004 going

42

1
2    into perhaps January, February 2004?
3    A.   '05.
4    Q.   Excuse me, 2005, thank you.
5        Mr. Hasselvander either contacted you,
6    or you contacted him as a result of your speaking
7    with either Mr. Wachen, Miss Taylor, Miss Tate or
8    Mr. Beckman or Mr. Mancini?
9    A.   Correct.
10   Q.   Do you know what Mr. Hasselvander's
11   function was at the time you spoke with him, in
12   connection with records management?
13   A.   I don't recall his title, but I believe
14   he's some supervisory capacity over one or more of
15   these other individuals.  He may be the
16   head of that function, stored records.  I believe,
17   he is.  I'm not certain.
18   Q.   What did Mr. Hasselvander say to you in
19   connection with his group's function of storing
20   WorldCom documents?
21   A.   Well, I had a number of conversations
22   with them.  I'm not sure generally- if you're
23   referring to whether it crossed corporate lines, I
24   asked him the question, and he said yes.
25   Q.   You asked him --  what question did you

43

1
2    ask him?
3    A.   I asked him -- at one point, I said we
4    had a large group of Intermedia documents.  I said
5    ask him if his searches done by computer would be
6    limited by corporate lines, and he said no, this
7    would cross all corporate lines.
8    Q.   When we say all corporate lines, that
9    would include all Intermedia entities, all WorldCom
10   entities, or MCI entities?
11   A.   That's my understanding.
12   Q.   Do you know the name of the group or the
13   entity at WorldCom that Mr. Hasselvander and the
14   others worked for?
15   A.   Yes.  RIM, records information
16   management.
17   Q.   Do you know what they're a subsidiary
18   of, an affiliate of one of the WorldCom entities?
19   A.   I don't know.
20   Q.   Do you know if it's a group, or a
21   department within one of the WorldCom entities?
22   A.   I don't know.
23   Q.   Do you know if it's an organization
24   independent of any of the WorldCom entities?
25   A.   Independent of any one of them?

A 02180

Donald Ramsay  11/14/2005

44

1
2    Q.   Right, right.
3    A.   I think it's part of one or more of the
4  entities, but I'm not sure the corporate structure.
5    Q.   Do you know if any of them, any of the
6  individuals you mentioned thus far;
7  Mr. Hasselvander, Miss Taylor, Miss Tate, Mr.
8  Beckman, or Mr. Mancini, conducted searches for
9  documents?
10    A.   I'm certain they did, mechanically did
11  it.  I'm not certain.  I believe Mr. Hasselvander
12  did some, in some cases in his direction.
13    Q.   Do you know how any one of those
14  individuals did searches, or directed that searches
15  be done?
16    A.   I don't know the physical mechanics of
17  it, but I'm aware that they had information, names,
18  and terms, and conducted searches through that
19  process.
20    Q.   What was the information that they had
21  that he used to conduct the searches?
22    A.   I believe, I can't sit here and recall
23  all of it, but I believe it would have included
24  EffectNet, it would have included Intermedia One,
25  it would have included request for information

45

1
2  regarding a merger between MCI and Intermedia.
3  There were names I know that included James Faust
4  and Jim Renforth and others.  That's at least some
5  of them, probably Webley.
6    Q.   Why do you say, probably Webley?
7    A.   Because it was one of the entities
8  involved in the matter.
9    Q.   Do you know if in fact, either one of
10  those individuals either did the search, or
11  directed a search to include Webley in that search?
12    A.   I can't sit here today and say for sure.
13  I'm more confident in some of the other terms,
14  because I see them in the indexes, but I don't
15  recall Webley for sure.
16        MR. DRISCOLL:  I couldn't hear that.
17  Can you read that back?
18        (Record read.)
19    Q.   Do you know if they used the term
20  EffectNet in their searches?
21    A.   I believe they did.
22    Q.   Why do you believe that?
23    A.   The reason I believe that, is because
24  the indexes came back and I looked at them, and the
25  EffectNet was not among the words in the indexes,

46

1
2  so I called about that -- why is that, and the
3  answer was, it doesn't come up in search.
4    Q.   Who did you speak to when you called?
5    A.   I recall it could have been Joe Stevens,
6  it could have been Emmy Taylor, it could have been
7  Phil Hasselvander or Brenda Tate.
8    Q.   So it could have been one of those four
9  or five individuals you mentioned?
10    A.   Yes, yes.
11    Q.   Do you know how they went about the
12  search with the term EffectNet?
13    A.   Mechanically, if that's what you mean.
14  I don't know the mechanical process.  It includes
15  entering into the computer system search terms like
16  many other systems, but I don't know.
17    Q.   I mean, let me back up a couple of steps
18  perhaps.  When you spoke with one of these four
19  individuals, and I know that your recollection is
20  that you spoke with them, you're just not sure
21  which ones perhaps, and what time frames, in what
22  order; but when you asked them to do a search,
23  strike that.
24        When you spoke with these individuals,
25  what was your understanding as to what they were

47

1
2  searching for?
3    A.   Stored documents, indexes, electronic
4  indexes of stored documents.
5    Q.   So your understanding was that they had
6  index, or multiple indexes, of documents that they
7  had stored somewhere?
8    A.   Yes.
9    Q.   The actual physical document stored
10  somewhere then, had an index?
11    A.   A computerized index, yes.
12    Q.   When they conducted, either they
13  themselves, or had someone conduct the searches,
14  they searched the index or indices for the term,
15  for example EffectNet?
16    A.   That is my understanding, yes.
17        MR. DRISCOLL:  Can you read back the
18  last question?
19        (Record read.)
20    Q.   Just so I'm clear, they didn't actually
21  go to the boxes of documents and search for these
22  documents with these terms?
23    A.   I don't believe they did.
24    Q.   Do you know how they determined what
25  indexes or indices existed?

A 02181

Donald Ramsay  11/14/2005

48

1
2    A.   It's my understanding, their
3    computerized index system would include their
4    searches, would include search of all indexes of
5    stored hard copy documents.
6    Okay.
7        Do you know what the stored documents
8    encompassed, or included?
9        A.   I guess I'm not sure I understand your
10    question.
11        Q.   And certainly, if at any time during
12    today you don't understand a question, tell me and
13    I'll try to rephrase it so you understand.  I think
14    you may have answered this before, but let me ask
15    it again.  I think I know what the answer would be,
16    but just.
17        Do you know of what entities the stored
18    documents were from, that they had these indices
19    for?
20        A.   Again, my understanding is all related
21    entities.
22        Q.   And that would have included Intermedia
23    entities, WorldCom entities, or MCI entities?
24        A.   Correct.
25        Q.   Again, the time frame for that was

49

1
2    January 1, 2000 through the end of 2002, December
3    of 2002?
4        Time frame for what?
5        Q.   For your request for of their search in
6    these stored documents?
7        A.   Well, that is a time frame we worked
8    with, but I don't believe their search for stored
9    documents was limited in that way.  They searched
10    for terms and sometimes what I recall concepts,
11    marketing, that sort of thing, Intermedia
12    marketing, names.  I'm sure we did give them dates,
13    but I know the index we produced includes documents
14    from earlier time frames, so it can't have been
15    that limited.
16        Q.   Do you know where the documents that
17    they had indices of were stored?
18        A.   I don't know where they were stored.
19    They were stored sometimes, at least in commercial
20    storage companies, like Iron Mountain, and perhaps
21    all over the world for that matter.
22        Q.   Do you know how the indices that they
23    had were created?
24        A.   I have some information about how the
25    index of Intermedia originating documents were

50

1
2    created.
3        Q.   Before I get to that, you make a
4    distinction between the index of Intermedia
5    documents and between other documents?
6        A.   In terms of how they were created, yes.
7        Q.   Do you know if there were different
8    indices for different entities?
9        A.   My understanding, again, is it's when
10    computerized indexing system, whether they go to
11    two to three separate systems.  I'm not absolutely
12    sure of that, but the information on the indexes, I
13    guess, is what I have some information on as it
14    relates to Intermedia originated documents.
15        Q.   I don't recall if this was the question
16    I just asked you.  Do you know how the indices were
17    created?
18        A.   I again, I've been told, in some respect
19    how information for the indexes was generated for
20    Intermedia.
21        Q.   Okay, and what information were you told
22    about, how the information was gathered for
23    Intermedia documents?
24        A.   That as Intermedia was winding up and
25    employees were leaving their employment, RIF, they

51

1
2    were asked to box up documents and create an index
3    and leave them in their office or their space.
4        Q.   You said RIF, I assume you're talking
5    about reduction in force?
6        A.   Correct.
7        Q.   As I understand your testimony, at the
8    time when Intermedia was either being merged into
9    or shutting down, in some way the employees who
10    were laid off or terminated, in some way were told
11    to box up their documents, create an index for
12    those documents, and leave them where they were?
13        A.   That's my understanding, yes.
14        Q.   Do you know if they were given some
15    template to create an index what was contained in
16    whatever documents they had?
17        A.   I don't know.
18        Q.   Do you know what information they
19    included in there respective indices?
20        A.   Well, we have the index, but beyond
21    that, no.  We have overall large index you've seen
22    on those boxes.
23        Q.   Well, were the indices that were given
24    to you, and ultimately given to us in this case,
25    the indices of each individual employee?

A 02182

Donald Ramsay  11/14/2005

52

1
2    A.   That is my understanding.
3    Q.   For employees who were not either laid
4    off, terminated, or in some way, do you know what
5    they did with respect to their documents?
6    A.   I only know that was the process and, I
7    don't know who you'd be referring to, or what
8    circumstance you'd be referring to, but as they
9    left to merge to go to MCI or to leave employment,
10   whatever; they were asked to box them and leave an
11   index.
12   Q.   Do you know if their boxes were titled
13   in some way specific to those particular
14   individuals?
15   A.   Well again, from the indexes that you've
16   seen, we've seen, there are some instances where
17   that's the case, but generally not.
18   Q.   Do you know if, for example, I think you
19   mentioned a Jim Renforth or James Renforth; do you
20   know if he had created an index of whatever
21   documents he had at the time that he left
22   employment with Intermedia?
23   A.   I know that I'd ask records management
24   to run his name against their stored documents, and
25   it produced only his personal file. No other

53

1
2    documents identify as his.
3    Q.   Aside from individual employees creating
4    indices for documents they had in their offices, do
5    you know, otherwise, how documents stored by
6    Intermedia were indexed?
7    A.   That's it. I believe, that's what I
8    understand, that's what I understand the practice
9    was.
10   Q.   Do you know if Intermedia had, I'm going
11   to try and phrase the question; tell me if you
12   understand it or not.
13   Do you know if Intermedia had a records
14   management office that on a rolling basis
15   employees, would send documents or files so that
16   these documents could be maintained in a central
17   storage space contemporaneously with their own work
18   files, for example?
19   A.   Well, I believe my understanding is the
20   same storage function to the extent that happened,
21   it would be through records management and part of
22   their stored documents that is, encompasses all, so
23   to the extent documents were stored prior to, or
24   other than, I think it would be part of that as
25   well.

54

1
2    Q.   Let me give you an example of what I'm
3    driving at and see if it's any clearer. For
4    example, here at Kelly Drye, if I receive a
5    document or letter, correspondence, whatever it
6    might be, I send that letter when I receive it, or
7    a copy of it, to our records management department.
8    I also keep a copy for myself so I have a work
9    file. Do you know if Intermedia had a similar type
10   of records management, where either,
11   contemporaneously, employees would send a document
12   or file that they received or sent out to that
13   central records management, and also perhaps retain
14   their own work file?
15   A.   I'm not certain of that. What I
16   understand, is that whatever that process is, it
17   would have ended up with RIM after it closed, after
18   Intermedia closed.
19   Q.   With respect to indices not of
20   Intermedia, do you know how those indices were
21   created?
22   A.   I'm not certain how those were created.
23   Q.   Did any of the individuals from RIM,
24   including Mr. Hasselvander, Miss Taylor, Miss Tate,
25   Mr. Beckman, or Mr. Mancini, ever indicate to you

55

1
2    how other indices were created?
3    A.   Don't recall that they did.
4    Q.   Aside from Intermedia documents, did
5    they have indices of other entities?
6    A.   Well, again, I'm not- I don't know that
7    their indices are divided by entities. It's my
8    understanding, their computer indexes cross entity
9    lines, so I don't believe they were separated
10   necessarily, by corporate entity, they may. I'm
11   not aware of what they do, and I have been informed
12   that their searches cross corporate lines.
13   Q.   Aside from the terms you mentioned
14   earlier, I believe EffectNet Intermedia One and
15   merger between MCI and Intermedia, were there other
16   search terms that were used to search the indices
17   that RIM had in its possession?
18   A.   Again, I believe Webley would have been
19   used, and individual names were also used.
20   Q.   Well, I understand. I'm just talking
21   about terms, I wasn't talking about names.
22   A.   Unified Communications, probably was
23   used.
24   Q.   Probably?
25   A.   I believe it was.

A 02183

Donald Ramsay 11/14/2005

56

1
2    Q.  Why do you believe it was?
3    A.  Well, one of the boxes produced is
4    labelled Unified Communications.  It was a key
5    term.  It was logically, one that we would have
6    used, might have used, Webley in connection with
7    master software licensing agreement.  I'm not
8    certain at all, but I think they may have looked
9    for management reports, marketing, that sort of
10   thing, but I don't recall the terms.
11   Q.  Do you have any notes of what terms they
12   did use?
13   A.  I don't believe I do.
14   Q.  When you discussed with them, or
15   communicated with them in connection with the terms
16   to be used, did you send them anything in writing
17   to include the terms to be used to search the
18   indices?
19   A.  I simply don't recall.
20   Q.  You mentioned earlier that they used the
21   term EffectNet to conduct the search, and there
22   were no results from that search; is that accurate?
23   A.  I believe that's true, that's my best
24   recollection.
25   Q.  Do you know how they input that search

57

1
2    term into the data base to search for it?
3    A.  Physically inputed?
4    Q.  Meaning how it was spelled.
5    A.  Spelled?
6    Q.  Right.
7    A.  Not certain, but they're pretty good.  I
8    think from conversations with them, they're aware
9    that you have to use a variety of terms
10   sometimes -- no, they didn't.
11   Q.  I didn't finish my question.  Did they
12   tell you how they input the name to do the search?
13   A.  I don't recall that they did.
14   Q.  You mentioned a couple of names that
15   they had searched, among others.  Two names you did
16   mention were Faust and Renforth; is that correct?
17   A.  That is correct.
18   Q.  Do you know how they -- do you know if
19   they had any results from the search including the
20   name Faust?
21   A.  His personnel file.
22   Q.  Anything else?
23   A.  My understanding is there wasn't
24   anything else.
25   Q.  I believe you testified the same result

58

1
2    with respect to Mr. Renforth?
3    A.  That's correct.
4    Q.  Do you know if they conducted searches
5    of other individuals?
6    A.  They did.
7    Q.  Using their names?
8    A.  Yes they did.
9    Q.  Do you know the results were of that?
10   A.  Nothing, other than personnel files.
11   Q.  Do you know if there were searches done
12   for work files for Mr. Faust?
13   A.  Well, I mean, they searched using his
14   name, so I'm not sure what you mean by work files.
15   Q.  Let me try it this way.  When either
16   yourself or Mr. Bigus, or Miss Stolte, or anyone
17   else at Stinson, communicating with individuals who
18   either worked at presently, at that time, or
19   formerly at WorldCom Intermedia or MCI, did you
20   contact Mr. Faust?
21   A.  I did not.
22   Q.  Do you know if any of the other
23   individuals at Stinson did?
24   A.  I'm not aware if any of them did.
25   Q.  Did anyone from Stinson contact

59

1
2    Mr. Renforth?
3    A.  I'm not aware if they did or didn't.
4    Q.  I believe you had mentioned earlier that
5    either yourself, or someone else from Stinson had
6    contacted Mr. Black?
7    A.  That's correct.
8    Q.  Did you personally, or did someone else
9    from Stinson?
10   A.  I participated in phone conversations
11   with Mr. Black -- more than one but -- I know at
12   least two actually.
13   Q.  I'm sorry?
14   A.  At least two.
15   Q.  Two conversations with him?
16   A.  Mr. Black, yes.
17   Q.  Is he still employed with MCI?
18   A.  Yes.
19   Q.  During the conversation with Mr. Black,
20   was it requested of him whether or not he had to
21   maintain, or keep a work file regarding either
22   EffectNet or Intermedia One, or anything relating
23   to this proceeding?
24   A.  We asked if he had any records relating
25   to those issues, yes.

Donald Ramsay  11/14/2005

60

1
2      Q.   What was his response?
3      A.   He did not.
4      Q.   Did he say whether he had ever worked on
5   any matters relating to EffectNet or Intermedia
6   One, or Webley or Unified Communications?
7      A.   I'm not certain to what extent I can go
8   into the details of Mr. Black, without waiving
9   privilege.
10      MR. DRISCOLL:  Can you read the question
11   back?
12      (Record read.)
13      MR. DRISCOLL:  I guess we need to talk.
14      MR. SMITH:  Hold on.  Just to be clear
15   for the record.  The discussion is to
16   determine whether or not any discussions that
17   Mr. Ramsay or others that he was involved with
18   at the time, any conversation with Mr. Black
19   impinges upon privileged communication?
20      MR. DRISCOLL:  That's why I want to have
21   this chat.
22      MR. SMITH:  I want it to be clear.
23      MR. DRISCOLL:  Could you read the
24   question back?
25      (Record read.)

61

1
2      MR. DRISCOLL:  So whether Black worked
3   for any of those, or on any of those things.
4      (Discussion off the record.)
5      A.   Can I have the question read back?
6      (Record read.)
7      A.   And my answer is, I don't recall.
8      Q.   Did he say whether or not he had any
9   documents relating to any of those topics?
10      A.   He said he did not.
11      Q.   Did you take any notes of that
12   conversation with Mr. Black?
13      A.   I did.
14      Q.   You also mentioned, either you or
15   someone else from Stinson had spoken with Kathleen
16   Victory?
17      A.   That's correct.
18      Q.   Was it you, or was it somebody else, or
19   you and somebody else at the same time?
20      A.   I was present, participated in one
21   conversation with Larry Bigus, and I had at least
22   one other conversation myself individually.
23      Q.   Did Miss Victory indicate whether she
24   had any documents relating to the topics I
25   mentioned before, with respect to Mr. Black?

62

1
2      A.   She said she did not.
3      Q.   Did she say she had ever worked on any
4   of those matters, or involved in some way?
5      A.   I don't recall.
6      Q.   Miss Hastings?
7      A.   No, I don't recall.  There's -- she
8   signed the contract, but beyond that I don't
9   recall.
10      Q.   The contract meaning the Unified
11   Communications agreement?
12      A.   Right.
13      Q.   With respect to, I believe, you had said
14   Teresa Hastings, either you, or you and somebody
15   else from Stinson had conversations with her
16   regarding documents; did she indicate in your
17   conversation with her or anyone else from Stinson,
18   having a conversation with her indicate whether she
19   had any documents?
20      A.   She said she did not.
21      Q.   Did she indicate whether she had worked
22   on any of the matters that I asked you before, with
23   respect to Mr. Black?
24      A.   I don't recall the list now that you
25   were asking about.  What was the list of topics?

63

1
2      Q.   EffectNet --
3      A.   I'm not trying to be- I think she may
4   have had, or recalled something about Webley Master
5   Software Licensing Agreement.  I'm not certain.  I
6   don't know if that was part of your list or not.
7      Q.   It was.
8      I believe you had also mentioned you had
9   conversations, or someone from Stinson, had
10   conversations with Barry Zip; is that correct?
11      A.   That's correct.
12      Q.   Did Barry Zip indicate whether he had
13   any documents related to EffectNet Intermedia One,
14   Webley, Unified Communications or any of those
15   topics?
16      A.   I believe he did not.
17      Q.   Do you know if he said he was involved
18   with, or he had worked on any of these topics?
19      A.   I don't recall.
20      Q.   You mentioned either you, or someone
21   else from Stinson Stinson, may have contacted other
22   individuals?
23      A.   Yes.
24      Q.   Do you remember the names of those other
25   individuals?

Donald Ramsay  11/14/2005

64

1
2     A.  I could give you some, certainly.
3     Q.  Okay.
4     A.  Steve Hooper, Mike Randles.
5     Q.  What was the name again?
6     A.  Steve Hooper, Mike Randles, Maria Ayala,
7  Julio Valdez, gentleman by the name of Perez, whose
8  last name I don't recall -- whose first name I
9  don't recall.  There were others, but they're not
10  coming to mind immediately, but there were others.
11  Again, as we go through it, perhaps
12  chronologically, your question might bring them up;
13  there were others.
14     Q.  Were these individuals you just
15  mentioned, individuals that at the same time as you
16  had contacted Mr. Black, Miss Victory for example,
17  you also contacted these individuals?
18     A.  Mr. Black and Miss Victory were
19  contacted sometime in '04, and the other
20  individuals were sometime in '05.  I don't know
21  exactly when, but it was a little bit later.
22     MR. DRISCOLL:  Can you read that back?
23     (Record read.)
24     Q.  Did you ask any of these individuals you
25  just mentioned, whether they had any files

65

1
2  concerning EffectNet, Intermedia One or anything
3  else relating to this litigation?
4     A.  Yes.
5     Q.  What was their response?
6     A.  Steve Hooper did have documents.
7     Q.  Anyone else?
8     A.  Mike Randles had documents.
9     Q.  Anyone else?
10     A.  Julio Valdez had something on the
11  electronic side for back up tapes.  I don't know if
12  you want to go into that, but he's aware of the
13  process, and so forth of backup tapes.  Perez, I
14  don't believe, had any documents.  He again, was on
15  the electronic side, was the one I contacted
16  because it was thought he might have information
17  before we reached Julio, I believe, and found he
18  had the information we needed.
19     Q.  How about Maria Ayala?
20     A.  She did not have any documents.
21     Q.  Did Mr. Hooper and Mr. Randles work for
22  WorldCom or Intermedia?
23     A.  Mr. Hooper worked for WorldCom, and
24  Mr. Randles had worked for Intermedia, and
25  currently works for MCI or WorldCom.

66

1
2     Q.  Do you know if the documents that they
3  mentioned they had were -- had also been included
4  in the indices that were searched by the RIM
5  office?
6     A.  I don't believe they were.
7     Q.  So they had documents independent, or
8  separate, from what was on the indices?
9     A.  That's correct.
10     Q.  Do you know if those documents were
11  obtained by Stinson for review for purpose of
12  production in this case?
13     A.  They were.
14     Q.  Do you know if they were produced?
15     A.  Non-privileged response documents from
16  those sets were produced.
17     MR. SMITH:  Can I mark this as Ramsay
18  Exhibit No. 1?
19     (Ramsay Exhibit 1, WorldCom's first
20  amended initial disclosure, marked for
21  identification, as of this date.)
22     Q.  Mr. Ramsay, you should have in front of
23  you what we marked for identification as Ramsay
24  Exhibit No. 1.  It has a caption of United States
25  Bankruptcy Court, Southern District of New York,

67

1
2  Chapter 11 case number 02-13533, (AJG), in re,
3  WorldCom Inc., et al.  And it's WorldCom Inc.'s
4  first amended initial disclosure pursuant to fed
5  rule bankruptcy procedure 706281, and it's dated
6  certificate of service has it dated as November 23,
7  2004.  Do you recognize this document at all?
8     A.  I do.
9     Q.  Have you seen it before?
10     A.  I have.
11     Q.  Did you have help in preparing this
12  document?
13     A.  I believe -- is that the amended
14  version?  I participated, I believe I have.
15     Q.  For the purposes of right now, my
16  question really focuses on page two of the document
17  under disclosures A, witnesses.  And there's a list
18  of 25 names here.  Did you have a chance to take a
19  look at the names listed?
20     A.  I just now glanced.
21     Q.  Does looking at this list refresh your
22  recollection in any way of other individuals you
23  may have contacted, or Stinson may have contacted,
24  in connection with trying to locate documents in
25  this proceeding?

A 02186

Donald Ramsay  11/14/2005

68

1
2    A.  To some degree.  There are other names
3  on here that I believe we contacted.  We, meaning
4  either I, or others with Stinson.
5    Q.  Okay.
6    A.  Well, and I -- I don't know how you want
7  to approach this.
8      MR. DRISCOLL:  Let him ask the question.
9    Q.  There are certain names here that you've
10  already identified, and I'm not going to cover them
11  again, but then there were names that you have not
12  identified that I was going to ask you.  I'll just
13  go through and try to make it as expeditious as
14  possible, so that we don't waste time just doing
15  this, but maybe the easiest way is, aside from the
16  individual names you've mentioned already, are
17  there other names on this list who you did
18  communicate with or contact with, to determine
19  whether they had documents or not?
20    A.  Are you asking me personally?
21    Q.  Either you and/or Stinson?
22    A.  Okay.  There are other names on there
23  that I believe we did contact.  Some cases, I
24  believe, they were on the list that Sharon Stoite
25  contacted, but I'm not as certain about that.  I

69

1  believe Jennifer Carroll was contacted.  Patrice
2  Carroll may have been, I'm not certain.  Barry,
3  last name Barry, number two.  There may have been,
4  I'm not certain.
5    Q.  I'm sorry?
6    A.  I don't know about Patrice Carroll and
7  Barry.  Peter Cassidy, I believe, was contacted.  I
8  believe Shirley Denham-Dale was contacted.  Donald
9  Fergus was contacted.  I've already mentioned
10  Teresa Hastings.  I believe maybe Richard Jeffers
11  was, and I believe maybe Johnson was.  I believe
12  Sharon Kasimow was.  I believe Susan Kennedy was.
13  I believe Mary Kilmartin was.  I believe Carleen
14  Mitchell was.  This Nasser S H E I K H was; it's
15  the name I couldn't spell earlier, and I believe
16  Pamela Dunman was.
17    Q.  Do you know if, in reverse order, do you
18  know if Cheryl Mellon was contacted?
19    A.  I'm not certain.  I did not -- I don't
20  believe I did.
21    Q.  Do you know if anyone from Stinson
22  contacted her?
23    A.  I'm not certain.
24    Q.  Do you know if Claro Hernandez was

70

1  contacted, on Page three, number 12?
2    A.  That is not a name I recognize, so I
3  don't believe I did, but it's possible Sharon did.
4    Q.  Do you know that Miss Stoite actually
5  did contact her?
6    A.  No, I don't know.  I don't know for
7  certain that she did.
8    Q.  Further up on the list, number ten,
9  Vicki Galante-Lee; do you know if anyone contacted
10  her?
11    A.  I'm not certain.  I don't believe I did,
12  but Sharon might have.
13    Q.  But you're not certain?
14    A.  I'm not certain.
15    Q.  I believe going back to page two, sorry
16  number four, with respect to Patrice Carroll, I
17  believe you said someone may have contacted her?
18    A.  I may be confusing the two Carroll's.  I
19  recognize Carroll's name, but I'm not sure which of
20  them was contacted.  It may have been Jennifer, but
21  I'm not certain about Patrice.
22    Q.  Are you certain about Jennifer Carroll?
23    A.  No, I'm not.  I believe one -- a Carroll
24  was, but I'm not sure.

71

1
2    Q.  Do you know if the Carroll that was
3  contacted had any documents in connection with this
4  proceeding?
5    A.  They would not have had.
6    Q.  Why do you say, they would not have had?
7    A.  Because I'm familiar with the documents,
8  and we got documents from anyone that had them, and
9  there were none provided by her.
10    Q.  Do you know if Peter Cassidy had any
11  documents?
12    A.  I believe I talked to Peter Cassidy, and
13  he did not.
14    Q.  Do you know if Shirley Elizabeth
15  Denham-Dale had any documents?
16    A.  I believe she did not.
17    Q.  Do you know if Donald Fergus had any
18  documents?
19    A.  I believe he did not.
20    Q.  Do you know if Richard Jeffers had any
21  kind of documents?
22    A.  I believe he did not -- if he was
23  contacted, he did not.
24    Q.  You're not certain if Mr. Jeffers was
25  contacted?

A 02187

Donald Ramsay  11/14/2005

72

1
2    A.   No.
3    Q.   Do you know if Mandy Johnson had any
4    documents?
5    A.   She did not.  She did answer.  I believe
6    she did not.
7    Q.   Did Sharon Kasimow have any documents?
8    A.   No.
9    Q.   Did Susan Kennedy have any documents?
10   A.   I believe she did not.
11   Q.   Mary Kilmartin?
12   A.   As I recall, she did not.
13   Q.   Carleen Mitchell?
14   A.   As I recall, she did not.
15   Q.   Nasser Sheikh?
16   A.   He did.
17   Q.   Do you know what those documents related
18   to?
19   A.   As best I recall, they relate to the
20   Webley master software licensing agreement.
21   Q.   Anything else?
22   A.   I don't recall what it is.
23   Q.   With respect to Pamela Dunham, do you
24   know if she had any documents?
25   A.   No.  As best I know, she did not.

73

1
2    Q.   With respect to each of the individuals
3    who you mentioned, as a result of Exhibit 1, as
4    well as the other individuals who you testified did
5    not have documents, I understand your testimony to
6    be that you do not recall them saying that they did
7    not have documents; is that correct?
8         MR. DRISCOLL:  Objection to the form of
9    the question.  Can you try it again, because
10   it's convoluted.
11   Q.   With respect to the individuals we just
12   went through the names of the individuals, as I
13   understand your testimony, as to those who did not
14   have documents, your testimony is that you do not
15   believe that they indicated they had documents; is
16   that correct?
17   A.   What I remember is, that everybody we
18   talked to we asked if they had documents, and if we
19   did, we got them.  There was no one we talked to
20   that had documents, that we didn't get and we don't
21   have, and I know we don't have documents for those
22   names.
23   Q.   How do you know you don't have documents
24   with respect to the names?
25   A.   Because I know who we have documents

74

1
2    from, and they're not those people.
3    Q.   How do you know who you have documents
4    from?
5    A.   Some cases, because I talked to them and
6    they sent them, and other cases because Sharon
7    talked to them and they sent them, I know they're
8    in our file.
9    Q.   When you had spoken with the
10   individuals, what were the documents or
11   categories of documents, that you had asked them
12   for?
13        MR. DRISCOLL:  Objection to the form of
14   the question.  Asked and answered.
15   A.   Generally, described to them the claims
16   made in the Parus Holdings pleadings, and asked if
17   they had any documents that would relate to those
18   issues.
19   Q.   When you say described to them the
20   pleadings, are you -- what pleadings are you
21   referring to?
22   A.   Parus Holdings response to MCI's
23   objections to their claim, principally excluding
24   the details of the claim.
25   Q.   In the conversations you had with the

75

1
2    individuals, did you ever ask them for documents
3    concerning a Generation D product of WorldCom?
4    A.   I was not familiar with that term until
5    your October letter, so no, I didn't.
6    Q.   Did you ask them for any products that
7    WorldCom had that was a competing product to the
8    Unified Communications product?
9    A.   I asked about Unified messaging products
10   documents relating to the Unified messaging
11   products.
12   Q.   What was their response?
13   A.   They didn't have.
14   Q.   Did any of the individuals, either
15   listed here or that we discussed today, earlier
16   today, work for WorldCom ventures?
17   A.   I don't know.  I'm not aware that they
18   did.  Again that's -- you had not requested
19   anything from WorldCom ventures and that term I
20   wasn't familiar with until your October '05 letter.
21   Q.   Were they asked for any analysis they
22   may have done of either Webley's financials, or
23   products, or EffectNet's financials or products?
24   A.   Some were asked about Webley, as I
25   recall.  I don't recall about EffectNet.

Page  72 - 75

A 02188

Donald Ramsay  11/14/2005

76

1
2    Q.   Which ones were asked about Webley and
3    not EffectNet?
4    A.   Steve Hooper was asked about what
5    information had been obtained.  Your -- Parus's
6    objection to the claim alleged that MCI had
7    inquired financial information as part of its
8    negotiations with Webley contract.  He was familiar
9    with that, and I asked him about that.
10    Q.   Did he have any documents concerning
11    that?
12    A.   My understanding is yes, he did.
13    Q.   And those documents have been produced?
14    A.   To my understanding, yes.
15    Q.   Aside from Steve Hooper, who was asked
16    about Webley, but not EffectNet?
17    A.   I'm not saying they were asked about
18    Webley but not EffectNet.  I'm saying, I recall
19    specifically asking about Webley.  I don't recall
20    specifically asking about EffectNet.
21    Q.   Aside from Steve Hooper, who else do you
22    recall asking about Webley, but don't recall asking
23    about EffectNet?
24    MR. DRISCOLL:  Just so the record is
25    clear, you both I think, are using shorthand

77

1
2    now.  The way the question started out as I
3    recall, an evaluation of EffectNet finances or
4    evaluation of Webley financials, correct, and
5    that's what the shorthand has evolved to.
6    MR. SMITH:  That was my question, and
7    Mr. Ramsay's response was he didn't ask about
8    analysis of financials of products, he asked
9    about Webley or EffectNet, that's my
10    understanding of what his response was.
11    A.   Mr. Driscoll is probably trying to clear
12    up that we're talking about financial analysis, not
13    EffectNet.
14    MR. DRISCOLL:  I'm trying to get a clean
15    record here, that's all, and to me it seems
16    like it's gotten muddy.
17    MR. SMITH:  I don't think it has gotten
18    muddy.  I think Mr. Ramsay's response has
19    framed, then my questions to him to ask what
20    it seems he was answering, and so I don't
21    think it's been muddied.  I think it's based
22    on his responses, and where we are right now.
23    A.   If it's been muddied, perhaps I muddied
24    it with my answer.  Go ahead.
25    Q.   My understanding of your testimony

78

1
2    earlier was with respect to Mr. Hooper, is you
3    recall asking him about Webley generally, but you
4    don't recall asking him about EffectNet?
5    A.   I specifically remember Webley.
6    Generally, I described all those claims to
7    everybody I talked to.  I believe the time frame he
8    was talking about.  EffectNet might have merged with
9    Webley, but I'm not sure.  He was involved with the
10    master licensing contract issues, so I specifically
11    remember that.
12    Q.   With respect to anyone else that we
13    talked about today, in terms of that either you or
14    someone else from Stinson contacted for documents,
15    did you request from any of them, aside from
16    Mr. Hooper, documents concerning their evaluation
17    or analysis of Webley or EffectNet?
18    A.   I asked for everything they had relating
19    to Webley or EffectNet, everything and anything.
20    Q.   Of the individuals we've talked about so
21    far today that you recalled being contacted, two of
22    those individuals had documents, that was Steve
23    Hooper and Mike Randles; is that correct?
24    A.   That is correct.  There were others I
25    mentioned earlier, for example I'll look back at

79

1
2    the list, Nasar S H E I K H.
3    Q.   My apologies.  Anyone else?
4    A.   Don't recall anybody else.  I should say
5    that documents were collected before I got involved
6    in the case.  It is conceivable that in Sharon's
7    contact with some of these people, there were
8    somebody else on that list that I'm not, as I sit
9    here, aware of.
10    Q.   Who collected the documents before you
11    became involved in the case?
12    A.   Sharon Stolte and Larry Bigus.
13    Q.   Do you know how many documents they
14    collected?
15    A.   I don't.
16    Q.   Do you know where they collected the
17    documents from?
18    A.   Generally, they contacted individuals in
19    this list, and perhaps through in-house counsel,
20    I'm not certain.
21    Q.   Do you know the source of the documents
22    that they collected?
23    MR. DRISCOLL:  Other than what he just
24    said.
25    MR. SMITH:  Yes.

A 02189