KELLEY DRYE & WARREN LLP

Robert L. Driscoll, Esq.
October 24, 2005
Page Two

- Documents concerning the cessation or termination of Intermedia's operations as it related to Claimant.[1] (Document Request Nos. 14, 15, and 19.)

- Documents concerning Claimant from the files of related WorldCom entities including, but not limited to, WorldCom Ventures. (Document Request Nos. 20 and 21.)

- Documents concerning Debtors' evaluation or analysis of Claimant's finances, business, technology or products. (Document Request Nos. 20 and 21.)

- Documents related to the WorldCom/MCI genD initiative, a competitor to EffectNet's Unified Communications product. (Doc. Req. No. 35.)

- Documents from key individual employee's work files, including but not limited to, James Renforth, James Faust, Kathy Victory, Brett Bacon, Barry Zipp, Richard Black and Cheryl Mellon, regarding the General Agreement and the Master Agreement for Software Licenses, dated September 14, 2001 ("MASL"), and the drafting, negotiation, pricing and performance of same. (Document Request Nos. 11 and 22.)

**MCI Documents.** Please produce forthwith the MCI Documents identified in Debtors' Supplemental Responses to Claimant's First Request for Production of Documents, dated July 1, 2005. Our understanding is that we have received thus far only Intermedia documents.

**WorldCom Entities Other than MCI WorldCom Communications, Inc. and Intermedia Communications, Inc.** In Debtors' Responses to Claimant's First Request for Production of Documents, dated March 25, 2005, Debtors objected to including in the definition of Debtors any entity other than Intermedia Communications, Inc. or MCI WorldCom Communications, Inc. Please confirm that Debtors no longer maintain that objection and Debtors will produce documents from all WorldCom entities which have documents responsive and relevant to both the contract and tort claims or documents reasonably calculated to lead to the discovery of admissible evidence.

We also have a concern regarding the Debtors' production of only 11 boxes of purportedly responsive documents from a total of 10,000 boxes held in various depositories in the United States which contained potentially responsive paper documents of Intermedia

---

[1] Debtors have produced documents regarding the cessation or termination of Intermedia operations concerning only technical integration issues between Intermedia and WorldCom products, as well as a reduction in headcount of Intermedia employees.

KELLEY DRYE & WARREN LLP

Robert L. Driscoll, Esq.
October 24, 2005
Page Three

Communications, Inc.  The 11 boxes of Intermedia documents were apparently identified by Debtors' counsel from certain indices generated previously by Intermedia personnel.  Based on our review of the indices and lists of boxes at the depositories, only 14 of the boxes identified on these lists had descriptions sufficient to determine that they may contain responsive documents. The remainder of the 10,000 boxes have either no description at all, descriptions that are meaningless, or the descriptions are too vague.  While you have informed us that your review and production has been made in good faith and in compliance with your discovery obligations, we believe the only way to determine whether Debtors have complied fully with their discovery obligations is through testimony of a corporate representative(s) of Debtors regarding their document production.  Accordingly, please provide dates on which such corporate representatives are available to testify.

        Further, enclosed are the lists of names of individuals whose documents and email boxes should be searched for responsive documents and the search terms to be used for that search.

        Thank you for your cooperation in this matter.

                                Sincerely,

                                Kevin J. Smith

Enclosures

KELLEY DRYE & WARREN LLP

**In re: WorldCom, Inc.**
**Claims of Parus Holdings, Inc., Claim Nos. 11242 and 11173**

Names and Search Terms for Searches of MCI/WorldCom electronic media and Intermedia electronic media, for the period September 1, 2000 through April 12, 2002:

<u>**The names of individuals whose e-mail boxes and hard-drives should be searched using the terms below:**</u>

Maria Ayala
Biaji Bary
Jennifer Carroll
Peter Cassidy
Shirley Elizabeth Denham-Dale
Vicky Galante-Lee
Claro Hernandez
Steve Hooper
Mandy Johnson
Sharon Kasimow
Susan Kennedy
Mary Kilmartin
Carleen Mitchell
Nasser Sheikh
Pamela F. Dunnam
Don Fergus
Dave Wurster
Teresa Hastings
Patrice Carroll
James Meeks-Johnson
Brenda Speer
Cheryl Mellon
James Renforth
James Faust
Kathy Victory
Richard Jeffers
Brett Bacon
Barry Zipp
Richard Black
Sherri Baughman
Alan Hill
Jim Tills
Jack Kerrigan
James DeMerlis
Angela Baker
Scott Concourse
Scott E. Pospichel

1

A 02258

KELLEY DRYE & WARREN LLP

**Databases, search terms and phrases include:**

I.    **Documents on hard drives and the above referenced individuals' e-mail boxes which include the following terms:**

EffectNet, or
EN, or
Webley, or
WSI , or
IntermediaOne  (including variations such as Intermedia One, IM1, IOne, I One, I-One, etc.), or
Unified Communications, or
UC, or
Unified Communications Services General Agreement (and variations of that Agreement), or
Unified Messaging, or
UM, or
CommuniKate, or
Kate, or
HearMyMail, or
HMM, or
auto attendant, or
text to speech, or
TTS, or
genD, or
voice recognition (use "!" to broaden search), or
speech recognition (use "!" to broaden search), or
speech enabled (use "!" to broaden search), or
voice activated (use "!" to broaden search), or
enhanced communications (use "!" to broaden search), or
Master Agreement for Software Licenses (and variations of that Agreement), or
MASL, or
Webley AND license(s), or
Minimum Commitment.


II.   **Any e-mail communications to and/or from wcom.com and intermedia.com e-mail boxes which contain the above terms should be produced.**

2

A 02259

KELLEY DRYE & WARREN LLP

**III.    All _____@wcom.com emails (with attachments) to or from ANY other address that  include any of the following words:**

EffectNet,
EN,
Webley,
WSI ,
IntermediaOne (including variations such as Intermedia One, IM1, IOne, I One, I-One, etc.,)
or
CommuniKate,
Kate,
HearMyMail,
HMM,
auto attendant,
text to speech,
TTS.

**IV.    All intermedia.com emails (with attachments) to or from effectnet.com e-mails.**

**V.    All intermedia.com emails (with attachments) to or from ANY other address that  include  any of the following words:**

genD
WCom (include aka's)

          AND

EffectNet
EN
Webley
WSI
IntermediaOne  (including variations such as Intermedia One, IM1, IOne, I One, I-One, etc.),
Unified Communications
UC
Unified Communications Services General Agreement (and variations of that Agreement),
Unified Messaging
UM
CommuniKate
Kate
HearMyMail
HMM.

3

A 02260

# Exhibit U

A 02261



**STINSON MORRISON HECKER** LLP

*Tel* **(816) 842-8600**
*Fax* **(816) 691-3495**
**1201 Walnut, Suite 2900**
**Kansas City, MO 64106-2150**

# Facsimile

| To: | Facsimile # | Firm | Firm Telephone # |
|---|---|---|---|
| John M. Callagy, Esq. | 212-808-7897 | Kelley Drye & Warren LLP | 212 808-7800 |
| Robert S. Friedman, Esq. | Same | Same | Same |
| Kevin J. Smith, Esq. | Same | Same | Same |

| | | | |
|---|---|---|---|
| **From:** | Robert L. Driscoll | | |
| **Date:** | November 11, 2005 | **Pages:** ─3 | (including this cover sheet) |
| **Sender ID#:** | 2710 | **Client-Matter #:** | 048629-0094 |

**The original of this document was sent by**
☐ First Class Mail
☐ Messenger
☐ Air Mail
☐ Overnight Mail
☒ No Other Delivery
☐ Other: _____

**Comment:** *In re WorldCom, Inc., Chapter 11*, Case No. 02-13533

Parus Holdings' Claims

---

**Return Original To:** _____

**Notify When Complete:** _____

KANSAS CITY
OVERLAND PARK
WICHITA
WASHINGTON, D.C.
PHOENIX
ST. LOUIS
OMAHA
JEFFERSON CITY

THIS TRANSMITTAL AND ACCOMPANYING DOCUMENTS ARE INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED, AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. Unauthorized use, disclosure or copying is strictly prohibited and may be unlawful. If you have received this communication in error, please immediately notify us at (816) 842-8600.

A 02262



**STINSON**
**MORRISON**
**HECKER** LLP

Robert L. Driscoll
(816) 691-3102
bdriscoll@stinsonmoheck.com
www.stinsonmoheck.com

1201 Walnut, Suite 2900
Kansas City, MO 64106-2150

November 11, 2005

*Tel* (816) 842-8600
*Fax* (816) 691-3495

**<u>Via Facsimile</u> 212-808-7897**
John M. Callagy, Esq.
Robert S. Friedman, Esq.
Kevin J. Smith, Esq.
Kelley Drye & Warren LLP
101 Park Avenue
New York, New York 10178

> Re:     *In re WorldCom, Inc., Chapter 11,* Case No. 02-13533
>         Parus Holdings' Claims

Gentlemen:

    I am writing concerning the electronic discovery you have proposed that MCI undertake regarding the claims of Parus Holdings.

    Following receipt of Mr. Smith's letter of October 24, 2005, we requested that Kroll Ontrack provide us with a cost estimate for searching the electronic media of MCI and Intermedia (quarterly back-up tapes) utilizing the names, search terms and time-frame specified in Mr. Smith's letter. We have now received that estimate which ranges from $207,633.99 to $331,160.12, depending on assumed amounts of retained MCI data.

    These estimated costs from a search vendor, of course, do not include the necessary additional costs that will be incurred for qualified personnel to review electronically identified documents regarding their actual responsiveness or privileged nature before production. All told, costs associated with the proposed electronic discovery will be considerably higher than the cash distribution value of Parus Holdings' breach of contract claim--$191,544--if MCI's summary judgment is granted and Parus' claim is treated as a Class 12 Intermedia claim. Further, none of the requested electronic discovery--and for that matter, none of the hard-copy production discovery that you are pursuing--is needed to determine the validity of either the contract or the non-contract claims of Parus Holdings. MCI's pending summary judgment motion on these issues centers entirely on questions of law and contract interpretation.

    Under these circumstances, I am requesting that you consent to a temporary stay of discovery until the Court rules on MCI's pending motion for summary judgment. Such a stay would not cause legal prejudice to Parus Holdings and it would prevent the unnecessary expenditure of hundreds of thousands of dollars by MCI and Parus Holdings. If discovery becomes necessary in the future, however, we

KANSAS CITY
OVERLAND PARK
WICHITA
WASHINGTON, D.C.
PHOENIX
ST. LOUIS
OMAHA
JEFFERSON CITY

**A 02263**

John M. Callagy, Esq.
Robert S. Friedman, Esq.
Kevin J. Smith, Esq.
November 11, 2005
Page 2

in return will agree to any reasonable extension of the discovery period that you propose.

Your consideration of this request would be appreciated. Please contact me if there are particular matters you wish to discuss about either the Kroll Ontrack estimate or the proposed temporary stay.

Very truly yours,

STINSON MORRISON HECKER LLP

Robert L. Driscoll

RLD:lkm

A 02264

# Exhibit V

A 02265



**A Twice-Weekly Report from Intermedia's Senior Management Team to Intermedia's Employees about the Merger with WorldCom**

#12 – Wednesday, October 18, 2000

### Today's FYI...

Today's *FYI* contains important new information on four subjects. That information is summarized as follows:

- Intermedia will work with WorldCom to market Intermedia's lines of business to some other owner or owners.
- Intermedia will pay retention bonuses to employees.
- Change-of-control provisions in Intermedia and Digex stock option agreements will be activated for Intermedia employees at the closing of the WorldCom merger.
- Anyone who loses her or his job without cause as part of a job elimination associated with this merger will receive Intermedia's standard severance package.

An individualized packet of with more details will be sent to your home within the next several weeks. You are encouraged to read this issue of *FYI* and the home-mailed materials completely.

### Core Intermedia lines of business to be sold...

WorldCom has been clear from their first communications about this merger that a principal strategic focus in the deal was control of Digex. After consideration of the full impacts of the merger and acting in what they consider to be the best interests of WorldCom stockholders, WorldCom officials have now advised us of their desire to sell all or substantially all of the assets or lines of business that comprise "core" Intermedia.

We will start immediately to market the business – excluding the Digex holdings (which WorldCom will retain) and Intermedia's debt (which WorldCom will retain or pay down). We expect that the marketing of Intermedia's lines of business will generate a lot of interest from prospective buyers. It is WorldCom's first choice, and ours as well, that Intermedia be sold as one going concern to some other owner. If a deal of that nature does not materialize, there may be lines of Intermedia's business that are sold to other companies (i.e., pieces of the company).

It is most important to note that the most advantageous~~salient~~ packaging of Intermedia to prospective buyers would be as a "going concern." Some employees have expressed concern that employees might be terminated and hard assets sold - like switches, for example. This not only would not make good business sense, it is no one's intent. Our people – you - tie together the customers, the hardware, the systems, and the other components that, together, comprise a "going concern."

Because of the uncertainty that is present in not knowing to whom or when a sale or sales of this nature might occur, WorldCom and Intermedia have agreed to three plans aimed at keeping employees productively engaged in our various business

MCIW025915

units so that those units continue as vibrant, "going concerns" when the time comes for the subsequent transfer to a new owner(s). These plans are summarized below under the headings of Retention Programs, Stock Option Vesting, and Severance Programs.

### Retention pPrograms...

Retention bonus payments will be made to non-Sales employees. Here's how the retention programs will work:

#### Exempt Employees in salary grades 1 through 9:

Exempt employees in this group will be eligible to receive a retention bonus of 15% based on their annualized base salary as of November 1, 2000. To receive this bonus, employees and must have commenced employment on or before November 1, 2000. Bonuses for exempt employees with less than one year of service at closing will be prorated accordingly.

The retention bonus will be paid to eligible exempt employees in two equal payments: 50% on February 28, 2001 and 50% on the date of closing. If the WorldCom transaction closes prior to February 28, 2001, then 100% of the bonus will be paid at closing. Eligible employees must be on the payroll on February 28 to earn the first bonus. They must be on the payroll on the date of closing to earn the second. If the transaction closes earlier than February 28, then being on the payroll on the date of closing earns the entire bonus.

#### Non-Exempt Employees in salary grades 1 through 9:

Non-exempt employees will be eligible to receive a retention bonus of 15% of their wages earned. Wages earned for purposes of calculating the retention bonus are defined as the base salary and overtime, if any, paid to the employee over the 12 months ending on the date the merger closes. To receive this bonus, employees must have commenced employment on or before November 1, 2000. Bonuses for non-exempt employees with less than one year of service at closing will be 15% of wages earned, as defined above, for the period of employment.

The retention bonus will be paid to eligible non-exempt employees in two, roughly equal payments: the first on February 28, 2001 and the second on the date of closing. Because of the variability of overtime for non-exempt employees, the first payment will be approximately 50% of the full bonus, and the second payment will "true up" for all wages earned in the period to closing. If the WorldCom transaction closes prior to February 28, 2001, then 100% of the bonus will be paid at closing. Eligible employees must be on the payroll on February 28 to earn the first bonus. They must be on the payroll on the date of closing to earn the second. If the transaction closes earlier than February 28, then being on the payroll on the date of closing earns the entire bonus.

#### Management salary grades 10 through 15:

These employees, who are currently working under the Management Incentive Plan (MIP), will be eligible for a retention bonus payment based on their annualized base salary as of November 1, 2000. This retention bonus

**CONFIDENTIAL AND PROPRIETARY**
Any distribution by recipient is prohibited
Copyright © 2000 – Intermedia Communications Inc.
All rights reserved

MCIW025916

MCIW025916
A 02267

will replace their normal MIP. To be eligible, employees must have commenced employment on or before November 1, 2000.

Employees will be eligible to receive 120% of their MIP target bonus. For example, if your current MIP bonus target is 15%, the retention bonus would be 18% (15% x 1.2).

The retention bonus for job grades 10-12 will be 18% of base salary. Job grades 13-14 will receive 24%. Job grade 15 employees will receive 30%.

Fifty percent of this bonus will be paid on February 28, 2001; the second 50% will be paid at the closing of the transaction with WorldCom. If the WorldCom transaction closes prior to February 28, 2001, then 100% of the bonus will be paid at closing. Again, eligible employees must be on the payroll on February 28 to earn the first bonus. They must be on the payroll on the date of closing to earn the second. If the transaction closes earlier than February 28, then being on the payroll on the date of closing earns the entire bonus. Bonuses for those with less than one year of service at closing will be prorated accordingly.

### Sales
The above retention programs exclude employees working under a Sales commission plan. Salespeople's commission programs have already been leveraged to increase payouts and thus function as a retention incentive program (the previously announced 4Q2000 "50/50 Plan").

### Stock oOption vVesting pPrograms...
Intermedia employees at the closing of the WorldCom merger will become employees of the WorldCom affiliated group at that time. Vesting provisions of the various Intermedia stock option agreements and plans will govern what happens at the change of control, but at that time, vested and unvested Intermedia stock options will become options to acquire WorldCom stock based on the exchange rate used for the exchange of WorldCom shares for Intermedia shares.

At a later point when a current Intermedia asset or line of business would pass to a new owner (i.e., a sale by WorldCom of all or part of current Intermedia), the employees who would go with the asset or business unit would receive immediate vesting of all their WorldCom options (previously Intermedia options). Options of employees who continue to work for the WorldCom affiliated group would continue to vest under the terms of the relevant Intermedia option agreement and plan. Any employee terminated without cause by WorldCom would receive immediate vesting of all options.

Digex options held by Intermedia employees fall under the change-of-control provisions of the Digex option agreements under which those options were granted as well; and like the Intermedia options, the Digex options held by affected employees would immediately vest upon the sale of the former Intermedia asset or line of business by WorldCom to a new owner.

### Severance pPrograms...

**CONFIDENTIAL AND PROPRIETARY**
Any distribution by recipient is prohibited
Copyright © 2000 – Intermedia Communications Inc.
All rights reserved

MCIW025917

MCIW025917
A 02268

Wednesday, October 18, 2000      *FYI*      Page 4

In Intermedia's history, there have been several instances where certain jobs have been eliminated. In these cases, Intermedia provided a standard severance payment to employees who were active employees in good standing at the time of the job elimination and were not able to find other positions within Intermedia. WorldCom has agreed that either WorldCom or the acquiring company (in the case of a sale of a current Intermedia asset or line of business) will provide severance benefits equal to the current Intermedia severance package should job eliminations become necessary. This policy will be in effect for terminations taking place within four months of the closing after the merger with WorldCom. After four months, the severance policies of the acquiring company – either WorldCom or some other company – would be in effect.

Intermedia's severance pay guidelines are based on title/job grade and length of service. The severance pay amount is comprised of two components: a base amount and a variable amount.

The base amount is offered to all employees within each category, regardless of length of service, as follows:

| | |
|---|---|
| Front-line employees, Supervisors (1-10) | 2 weeks pay |
| Managers, Sr. Managers (11-12) | 4 weeks pay |
| Directors, Sr. Directors, AVPs (13-15) | 8 weeks pay |

Added to the base amount is a variable amount, which is calculated as **2 weeks pay per year or part-year of employment.**

The maximum total amount payable for a severance award (base amount plus variable amount) is 12 weeks pay for Job Grades 1-10; 26 weeks pay for Job Grades 11-14; and 39 weeks pay for Job Grade 15.

Severance pay applies to eligible full or part-time non-union employees only (i.e. excludes independent contractors, temporary, supplemental, student, or any employees covered by a collective bargaining agreement). Additionally, severance pay is offered as consideration for and is conditional upon signing a separation agreement and general release.

One week's pay is the base pay rate that an employee received for regularly scheduled hours of work in the week immediately preceding the termination.

***Stay tuned, more information to come...***
This outline of three programs – retention bonus, stock option vesting, and severance programspackages – should provide sufficient data for many employees to look some distance into the future and project the value of staying with Intermedia through the closing of this deal – and possibly to a new home as a business unit with many current Intermedia employees. We remain bullish about the Intermedia business and are very pleased with these generous programsretention arrangements. Clearly, this demonstrates our collective belief that the employees of Intermedia are the most valuable assets we have. Your continued hard work to improve the business is as important now, as ever, and we are prepared to reward those who stick with us to continue to make Intermedia great.

**CONFIDENTIAL AND PROPRIETARY**
Any distribution by recipient is prohibited
Copyright © 2000 – Intermedia Communications Inc.
All rights reserved

Wednesday, October 18, 2000        *FYI*        Page 5

Hopefully you appreciate the extreme importance of maintaining and growing our core businesses as the merger works its way through the regulatory approval process. We don't know what the final structure will look like, but it is clear that we will be working to sell a whole business or businesses to another owner. We will be working to present Intermedia's business in the best possible light to effect the best possible home for the business and hopefully for you.

Individually – within the next 15 business days – you will receive a letter at your home mailing address containing additional information about these and other details of the merger. It is very important that you check the home mailing address on file with the Company to ensure your letter is delivered most expeditiously. You may check and change that address on-line by visiting: https://psoft.intermedia.com/. Information about the new self-service PeopleSoft personal data maintenance feature can be found on Intramedia by visiting: https://intramedia.intermedia.com/news/article.cfm?articleid=367.

We appreciate your patience as we continue working to secure answers to the questions that are on your mind and that you have expressed through your management teams or through Intramedia. Your management teams and Intermedia will continue providing explanations as quickly and thoroughly as possible.

Your Senior Management Team:
Rick Buyens
Davis Howe
Pat Kurlin
Rob Manning
Dick Marchant
David Ruberg

**CONFIDENTIAL AND PROPRIETARY**
Any distribution by recipient is prohibited
Copyright © 2000 – Intermedia Communications Inc.
All rights reserved

MCIW025919

MCIW025910
A 02270

# Exhibit W

A 02271

☒ The Telecomm Analyst

☑ This   ☑ Indices   ☑ Conference   ☑ Letter   ☑ Ts   ☑ Portfolio   ☑ Archive   September 26, 2000

☒ sean     ☒ go

☒ Click here if you don't

☑ register

☑ login

**NEW!**
Click here for the TTA
Message Board

### Contents

1. Strong Buys
2. The Sell Report
3. Insider Trading Alert
4. Upgrades & Downgrades
5. Keyson's Hot Lunch
6. Executives Zero In
7. Telecom Insight
8. The Local Loop
9. Wireless Dispatch
10. Analyst's Spotlight
11. Panning for Gold
12. Top Company Picks
13. The D.C. Buzz
14. Rants, Raves & Stress

**8. The Local Loop**    **Issue #26**

☒

Intermedia Communications

The Shape of Consolidation to Come
By Ben Mattlin

☒ Local Loop

In the first week of September, a deal was announced that made Mark Bacurin of Robert W. Baird & Co. and many others very happy. Back on Aug. 17, Mr. Bacurin had initiated coverage of INTERMEDIA COMMUNICATIONS (ICIX), a Tampa, Fla.-based competitive local-exchange carrier (CLEC), which had nearly $1 billion in revenue last year. The shares were trading at $16.25 after touching their 52-week low of $14.75 the day before. Mr. Bacurin set a 12-month price target of $34.

Less than a month later, on Sept. 5, the global telecom giant WORLDCOM (WCOM) purchased INTERMEDIA for a reported $39 per share. INTERMEDIA shares closed that day at nearly $32, and Mr. Bacurin's faithful followers had practically doubled their money in less than three weeks. The shares closed at $26 on Sept. 21.

INTERMEDIA is a provider of integrated data and voice telecom, Internet access and local and long-distance phone service to some 90,000 small- and medium-size businesses, mostly in the eastern United States, where it competes with BELLSOUTH (BLS). With more than 600,000 access lines in service, INTERMEDIA is one of the largest CLECs.

Perhaps more importantly, the company owns 62% of and holds a 94% voting stake in DIGEX (DIGX), a leading Web-hosting company whose customers include J. Crew, Forbes and NISSAN MOTOR (NSANY). In a statement following the acquisition announcement, WORLDCOM chief executive Bernard Ebbers called the marriage "an important enhancement of our existing Web-hosting capability."

WS00193

S    049

A 02273
PH27809



**Printable Article**

☒ Click Here for
   PDF Version!

☒ Read the Internet

**Interested?**
For a free subscription to
TTA, please register.

About TTA
Advertise
Affiliate
**HOME**
Archives
Conference Calendar

More than that, the implications of the merger are widespread. Mark Kastan, an analyst at Credit Suisse First Boston, called the acquisition "positive for the CLEC sector, as it further underscores the value of CLEC assets, especially in the data arena. While we note that WORLDCOM's primary focus in the transaction was to acquire a controlling stake in DIGEX, we look for further consolidation in the telecom sector as larger telcos look to strengthen their various product lines and integrate vertically. We expect further consolidation within the group to focus on those companies with extensive local broadband assets and data and voice customer bases."

INTERMEDIA has a well-established distribution network, to be sure. But it had fallen on tough times. After reaching a high of $77 in early March, the stock took a nosedive, losing half its value by April. Then, after announcing in July that its revenue would not meet expectations, the stock fell even farther. The Wall Street Journal reported that INTERMEDIA even considered filing for bankruptcy. Institutional investors own some 90% of its equity, and the high-powered investment firm of Kohlberg Kravis Roberts & Co. has a $200 million stake in the company, and two seats on its board.

"We view the WORLDCOM deal as favorable," said David Heger, an analyst with A.G. Edwards & Sons, adding "all along we have felt that the best option for shareholders would be an outright sale of the company, rather than just a sale of the DIGEX stake."

With a price objective of $39, Mr. Heger maintains his ACCUMULATE rating on INTERMEDIA COMMUNICATIONS "since we also have an ACCUMULATE rating on WCOM shares," he explained. "At this point, we view a purchase of INTERMEDIA shares as a means of receiving WORLDCOM shares at a discount. Furthermore, if a competing offer is made, INTERMEDIA shareholders should benefit on the upside."

Send to a friend.

View the text only version for easier printing. For comments, questions, rants or raves, please e-mail us at TTA@multex.com.

Previous                                                                    Next

1. Strong Buys  2. The Sell Report  3. Insider Trading Alert  4. Upgrades & Downgrades  5. Keyson's Hot Lunch
6. Executives Zero In  7. Telecom Insight  8. The Local Loop  9. Wireless Dispatch  10. Analyst's Spotlight
11. Panning for Gold  12. Top Company Picks  13. The D.C. Buzz  14. Rants, Raves & Stress

The TTA Universe | Top 150 Telecom Index | Telecom Most Written About Companies

S        050

WS00194

PH202213

Telecom Most Read About Companies | Telecom Market Cap Index |
The Convergence Industry Index    TTA Message Board

*Publisher:* Lauren Keyson        *Managing Editor:* James C. Condon
*Senior Editor:* Paul DeMartino    *Production Manager:* Mitch Burkhardt
*Publishing Assoc.:* Eric Lopkin   *Production Coordinator:* Rika Marubashi
*Customer Service:* David Allikas  *Web Designer:* Robin Barrett

The Telecomm Analyst(SM) is a weekly online magazine for Internet
Investors, published every Tuesday.
© Copyright 2000, Multex.com, Inc. All rights reserved.
Please read our Privacy Statement.

WS00195

S    051

PHA202274

# Exhibit X

A 02275



**STINSON**
**MORRISON**
**HECKER** LLP

Robert L. Driscoll
(816) 691-3102
bdriscoll@stinsonmoheck.com
www.stinsonmoheck.com

1201 Walnut, Suite 2900
Kansas City, MO 64106-2150

*Tel* (816) 842-8600
*Fax* (816) 691-3495

November 17, 2005

The Honorable Arthur J. Gonzalez
U.S. Bankruptcy Judge
United States Bankruptcy Court
Alexander Hamilton Customs House-One Bowling Green
New York, New York  10004-1408

    Re:   *In re WorldCom, Inc., Chapter 11*, Case No. 02-13533
             Parus Holdings' Claims

Dear Judge Gonzalez:

    Pursuant to LBR 7007-1, I am writing to request an informal discovery conference with the Court and counsel for claimant Parus Holdings to discuss, and hopefully resolve, WorldCom's request to temporarily stay discovery until the Court determines WorldCom's pending motion for summary judgment. WorldCom has twice requested Parus Holdings' assent to such a stay. See attached letters of November 11, 2005 (Exhibit A) and November 16, 2005 (Exhibit B) to counsel for Parus Holdings from counsel for WorldCom. Counsel for Parus Holdings responded yesterday evening, advising that it would not consent to WorldCom's proposed stay.

    **WorldCom's Motion for Summary Judgment.** With leave from this Court, WorldCom has filed a motion seeking summary judgment on all claims presented in this proceeding by Parus Holdings. If granted, that motion will eliminate all non-breach of contract claims asserted by Parus Holdings and its breach of contract claim will be valued at $460,442.30. Parus Holdings has not sought to forestall summary determination of the summary judgment motion in order to take discovery as provided by Fed. R. Civ. P. 56(f) and, as discussed, there is no basis to do so. The response of Parus Holdings to the motion is due Friday, November 18, 2005, and oral argument of the motion has been set by the Court for December 6, 2005.

    **Status of Discovery.** In addition to its initial disclosure of core documents, WorldCom has produced in excess of 29,000 pages of hard copy documents after reviewing the contents of over 400 boxes of Reorganized Debtors' stored documents. As suggested by this Court, Parus Holdings was twice offered the opportunity to participate in selecting from document indexes additional stored documents for review. It never did so. Instead, it has chosen, after-the-fact, to second-guess and disparage the hard copy document production efforts of WorldCom. The post-production conduct of Parus Holdings is on-going.

KANSAS CITY
OVERLAND PARK
WICHITA
WASHINGTON, D.C.
PHOENIX
ST. LOUIS
OMAHA
JEFFERSON CITY

**A 02276**

The Honorable Arthur J. Gonzalez
November 17, 2005
Page 2

Regarding electronic discovery, WorldCom has already produced several thousands of pages of e-mail communications. In addition, after receiving search terms and other search criteria from Parus Holdings, WorldCom obtained a cost estimate range from Kroll Ontrack of $207,633.99 to $331,160.12 to perform the search of electronic media that Parus Holdings has proposed. The vendor's estimated search costs, which do not include the additional costs that will be incurred for qualified personnel to review and produce responsive, non-privileged documents from those electronically identified, exceeds the cash distribution value of Parus Holdings' breach of contract claim--$191,544-- assuming the Court's interpretation of the contract at issue is the same as WorldCom's and Parus Holdings' claim is treated as a Class 12 Intermedia claim.

**Impact of a Temporary Stay of Discovery.** No legal prejudice will result to either party if discovery is temporarily stayed until the Court decides WorldCom's pending summary judgment motion. Discovery is not needed to respond to the motion because it presents only issues of law and contract interpretation. Further, if summary judgment is granted to WorldCom on Parus Holdings' non-contract claims, a temporary stay of discovery prior to such a ruling would prevent expending funds on discovery that would have no utility for the remaining breach of contract claim. Finally, if discovery remains a necessity after the Court decides the motion, WorldCom has already informed Parus Holdings' counsel that it will agree to any reasonable discovery extension that Parus Holdings might propose.

Fed. R. Civ. P. 26(c) authorizes the Court to stay discovery upon a finding of good cause. See Johnson v. New York Univ. School of Education, 205 F.R.D. 433, 434 (S.D.N.Y. 2002) (granting stay, and considering "the breadth of discovery sought and the burden of responding to it"); Spencer Trask Software and Information Services LLC v. RPost Int'l Ltd., 206 F.R.D. 367, 368 (S.D.N.Y. 2002). "Good cause may be shown where a party has filed a dispositive motion, the stay is for a short period of time, and the opposing party will not be prejudiced by the stay." Spencer Trask, 206 F.R.D. at 368 (holding that proceeding with discovery during pendency of a dispositive motion "would unnecessarily drain the parties' resources"). WorldCom believes that the circumstances described above constitute good cause for a temporary stay of discovery in this matter until the pending motion for summary judgment is decided by the Court.

Therefore, pursuant to LBR 7007-1, I respectfully request an informal conference with the Court to discuss a temporary stay of discovery until the Court determines WorldCom's pending motion for summary judgment. Because counsel for the parties will be before the Court on December 6, 2005 to argue WorldCom's summary judgment motion, that would be an appropriate time to schedule a conference on WorldCom's temporary stay of discovery request, unless the Court wishes to address it at an earlier time.

A 02277

The Honorable Arthur J. Gonzalez
November 17, 2005
Page 3

Respectfully submitted,

**STINSON MORRISON HECKER** LLP

Robert L. Driscoll

RLD:lkm
Attachments

cc:     John M. Callagy, Esq. (via ECF and e-mail)
        Robert S. Friedman, Esq. (via ECF and e-mail)
        Kevin J. Smith, Esq. (via ECF and e-mail)

A 02278

# EXHIBIT A

A 02279

**STINSON**
**MORRISON**
**HECKER** LLP

Robert L. Driscoll
(816) 691-3102
bdriscoll@stinsonmoheck.com
www.stinsonmoheck.com

1201 Walnut, Suite 2900
Kansas City, MO 64106-2150

*Tel* (816) 842-8600
*Fax* (816) 691-3495

November 11, 2005

<u>**Via Facsimile 212-808-7897**</u>
John M. Callagy, Esq.
Robert S. Friedman, Esq.
Kevin J. Smith, Esq.
Kelley Drye & Warren LLP
101 Park Avenue
New York, New York 10178

      Re:    *In re WorldCom, Inc., Chapter 11*, Case No. 02-13533
               Parus Holdings' Claims

Gentlemen:

      I am writing concerning the electronic discovery you have proposed that MCI undertake regarding the claims of Parus Holdings.

      Following receipt of Mr. Smith's letter of October 24, 2005, we requested that Kroll Ontrack provide us with a cost estimate for searching the electronic media of MCI and Intermedia (quarterly back-up tapes) utilizing the names, search terms and time-frame specified in Mr. Smith's letter. We have now received that estimate which ranges from $207,633.99 to $331,160.12, depending on assumed amounts of retained MCI data.

      These estimated costs from a search vendor, of course, do not include the necessary additional costs that will be incurred for qualified personnel to review electronically identified documents regarding their actual responsiveness or privileged nature before production. All told, costs associated with the proposed electronic discovery will be considerably higher than the cash distribution value of Parus Holdings' breach of contract claim--$191,544--if MCI's summary judgment is granted and Parus' claim is treated as a Class 12 Intermedia claim. Further, none of the requested electronic discovery--and for that matter, none of the hard-copy production discovery that you are pursuing--is needed to determine the validity of either the contract or the non-contract claims of Parus Holdings. MCI's pending summary judgment motion on these issues centers entirely on questions of law and contract interpretation.

KANSAS CITY

OVERLAND PARK

WICHITA

WASHINGTON, D.C.

PHOENIX

ST. LOUIS

OMAHA

JEFFERSON CITY

      Under these circumstances, I am requesting that you consent to a temporary stay of discovery until the Court rules on MCI's pending motion for summary judgment. Such a stay would not cause legal prejudice to Parus Holdings and it would prevent the unnecessary expenditure of hundreds of thousands of dollars by MCI and Parus Holdings. If discovery becomes necessary in the future, however, we

A 02280

John M. Callagy, Esq.
Robert S. Friedman, Esq.
Kevin J. Smith, Esq.
November 11, 2005
Page 2

in return will agree to any reasonable extension of the discovery period that you
propose.

Your consideration of this request would be appreciated.  Please contact me if
there are particular matters you wish to discuss about either the Kroll Ontrack
estimate or the proposed temporary stay.

Very truly yours,

STINSON MORRISON HECKER LLP

Robert L. Driscoll

RLD:lkm

A 02281

# EXHIBIT B

A 02282



STINSON
MORRISON
HECKER LLP

Robert L. Driscoll
(816) 691-3102
bdriscoll@stinsonmoheck.com
www.stinsonmoheck.com

1201 Walnut, Suite 2900
Kansas City, MO 64106-2150

November 16, 2005

Tel (816) 842-8600
Fax (816) 691-3495

**Via Facsimile 212-808-7897**

John M. Callagy, Esq.
Robert S. Friedman, Esq.
Kevin J. Smith, Esq.
Kelley Drye & Warren LLP
101 Park Avenue
New York, New York 10178

      Re:   *In re WorldCom, Inc., Chapter 11*, Case No. 02-13533
              Parus Holdings' Claims

Gentlemen:

      You have not yet responded to my request of last week that discovery regarding the Parus Holdings' claims be temporarily stayed until the Court decides MCI's pending motion for summary judgment. Although I recognize that such a stay would alter the course of action you are pursuing, a temporary stay of discovery would conserve the parties' resources, without prejudicing either party, and would assist the Court by permitting it to direct its energies to a matter that is potentially dispositive rather than have those energies diverted to a continuing series of discovery filings.

      Please advise me today if you will agree to such a temporary stay.

      Very truly yours,

      **STINSON MORRISON HECKER** LLP

      Robert L. Driscoll

RLD:lkm

KANSAS CITY
OVERLAND PARK
WICHITA
WASHINGTON, D.C.
PHOENIX
ST. LOUIS
OMAHA
JEFFERSON CITY

**A 02283**

# EXHIBIT Y

A 02284

**IntermediaOne and Intermedia Local Resale Strategy**

| City | Trunkside Strategy | Number of Trunkside Customers | Lineside Strategy | Number of Lineside Customers | Local Resale Strategy | Number of Resale Lines by State |
|---|---|---|---|---|---|---|
| Atlanta | Retain Base | 139 | Exit | 362 | Exit | GA 3,029 |
| Birmingham | Retain Base | 29 | Exit | 75 | Exit | AL 5 |
| Boston | Retain Base | 50 | Exit | 26 | Exit | None |
| Charlotte | Retain Base | 30 | Exit | 112 | Exit | NC 1,214 |
| Chicago | Retain Base | 48 | Exit | 146 | Exit | None |
| Cincinnati | Retain Base | 102 | Exit | 206 | Exit | OH 2 |
| Cleveland | Exit | 15 | Exit | 60 | Exit | None |
| Dallas | Retain Base | 96 | Exit | 76 | Exit | TX 2,553 |
| Houston | Retain Base | 55 | Exit | 129 | Exit | See Dallas |
| Indianapolis | Exit | 5 | Exit | 183 | Exit | None |
| Jacksonville | Retain Base | 11 | Exit | 169 | Exit | FL 20,064 |
| Los Angeles | Exit | 0 | Exit | 0 | Exit | None |
| Memphis | Retain Base | 21 | Exit | 137 | Exit | TN 314 |
| Miami | Retain Base | 145 | Exit | 488 | Exit | See Jacksonville |
| Minneapolis | Retain Base | 54 | Exit | 107 | Exit | None |
| Nashville | Retain Base | 9 | Exit | 63 | Exit | See Memphis |
| New Orleans | Exit | 11 | Exit | 65 | Exit | LA 22 |
| New York | Retain Base | 139 | Exit | 90 | Exit | NY 866 |
| Orlando | Retain Base | 57 | Exit | 287 | Exit | See Jacksonville |
| Philadelphia | Retain Base | 23 | Exit | 87 | Exit | None |
| Phoenix | Exit | 18 | Exit | 83 | Exit | None |
| Pittsburgh | Retain Base | 18 | Exit | 120 | Exit | None |
| Raleigh | Retain Base | 94 | Exit | 80 | Exit | See Charlotte |
| Shreveport | Retain Base | 1 | Exit | 16 | Exit | See New Orleans |
| St. Louis | Retain Base | 138 | Exit | 213 | Exit | MO 9 |
| Tampa | Retain Base | 226 | Exit | 382 | Exit | See Jacksonville |
| Washington DC | Retain Base | 41 | Exit | 108 | Exit | None |
| West Palm Beach | Exit | Included in Miami # | Exit | Included in Miami # | Exit | See Jacksonville |

IOne Transition Strategy

Intermedia Confidential

9/13/01

MCIW014221

A 02285