**KELLEY DRYE & WARREN LLP**
John M. Callagy  (JC 8166)
Robert S. Friedman (RF 1538)
101 Park Avenue
New York, New York  10178
Tel:  (212) 808-7800
Fax: (212) 808-7897
Attorneys for Claimant Parus Holdings, Inc.
Successor-By-Merger to EffectNet, Inc. and
EffectNet, LLC

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Case No. 02-13533 (AJG)** |
| **WORLDCOM, INC.,** *et al.*, | **Chapter 11** |
| **Debtors.** | **(Jointly Administered)** |

**AFFIDAVIT OF TAJ RENEAU IN SUPPORT OF CLAIMANT**
**PARUS HOLDINGS, INC.'S RESPONSE AND**
**OPPOSITION TO DEBTORS' MOTION FOR SUMMARY JUDGMENT**

| | |
|---|---|
| STATE OF ILLINOIS | ) |
| | ) SS.: |
| COUNTY OF LAKE | ) |

**TAJ RENEAU**, being duly sworn, deposes and says:

1.    I make this Affidavit in support of Claimant Parus Holdings, Inc.'s response and opposition to Debtors' motion for summary judgment seeking dismissal of Parus' Holding, Inc.'s claims.  I make this Affidavit based upon personal knowledge and my review of documents in Parus' files.

**Brief Background**

2.    I am the President and Chief Executive Officer of Parus Holdings, Inc., a successor by merger to EffectNet, Inc. and EffectNet, LLC.  I co-founded EffectNet, Inc. in 1998

and from its inception held the position of Chairman and Chief Executive Officer. EffectNet, Inc. was, and through its successor companies, continues to be, a leading integrator and provider of unified communications services and applications and voice portal technologies.

3.    EffectNet, Inc., based previously in Phoenix, Arizona, was a unified communications application service provider that offered private label Internet and telecommunications products and services, including unified communications and other value-added services, in-house customer services, billing and technical support. In 2001, EffectNet began the process of a merger with Webley Systems, Inc. ("Webley"), a company based in Illinois and, today, is part of a combined company called Parus Holdings, Inc. Since July 21, 2001, EffectNet has had its principal place of business in Chicago, Illinois. (I refer to EffectNet, Inc. and the successor companies as either EffectNet, Claimant, or Parus.)

4.    Since that time, EffectNet, as an application service provider, has offered products created by Webley to enterprises and various organizations, under the brand name CommuniKate, as well as on a private label basis.

**EffectNet and its Relationship With Intermedia**

5.    After several months of exploratory activities and negotiations, in or about August 2000, EffectNet, and Intermedia Communications, Inc. ("Intermedia") entered into a Memorandum of Understanding pursuant to which EffectNet agreed to provide communications services to Intermedia, including unified communications services, for ultimate use by Intermedia's end-user customers. (A copy of the Memorandum of Understanding, dated as of September 1, 2000, is attached hereto as Exhibit A.)

6.    The Memorandum of Understanding between EffectNet and Intermedia was the start of a collaborative effort to launch EffectNet's unified communications service and applications into Intermedia's customer distribution channels.

A 02298

7.      Intermedia was a provider of integrated data and voice telecom, internet access and local and long-distance phone services to approximately 90,000 small and medium sized businesses.  (*See e.g.,* Exhibit B attached hereto, which is a copy of an internet article regarding Intermedia Communications, dated September 26, 2000.)  The unified communications service and applications provided by EffectNet was ultimately to be bundled into a product called Intermedia*One*, and sold to Intermedia's customer's through Intermedia's network of sales representatives in 50 cities of the United States.  (*See e.g.,* Exhibit C attached hereto, which is a copy of an e-mail from J. Renforth to J. Jessup, dated September 22, 2000.)  It was our understanding from conversations with Intermedia personnel that Intermedia believed the product would be hugely successful, so by January 2001, it had separated EffectNet's unified communications service and applications into a product separate from Intermedia*One*, which was called "Intermedia Unified Messaging" (otherwise referred to hereinafter as EffectNet's Service).

8.      Intermedia Unified Messaging was the first Web and telephone based unified messaging platform offered by a major U.S. service provider and allowed business professionals to custom build a communications portal that retrieved and sent fax, e-mail and telephone messages through any device, with the help of a virtual assistant.  (*See e.g.,* Exhibit D attached hereto, which is a copy of an Intermedia Communications, Inc. Press Release, dated January 30, 2001.)  EffectNet's unified communications service applications powered Intermedia's Unified Messaging product and was the integral component for it.

9.      On September 1, 2000, EffectNet and Intermedia entered into an Interim Agreement, pursuant to which EffectNet continued to provide unified communications service provided under the Memorandum of Understanding.  (A copy of the Interim Agreement, dated September 1, 2000, is attached hereto as Exhibit E.)

3

A 02299

10.     On November 20, 2000, EffectNet and Intermedia entered into the Unified Communications Services General Agreement ("UC Contract") pursuant to which EffectNet agreed to provide, and Intermedia agreed to use and sell to end-user customers, a platform of telecommunications services. (A copy of the UC Contract, dated November 20, 2000, is attached hereto as Exhibit F). The term of the contract was three years. The UC Contract was the culmination of the parties' efforts since August 2000 to work together to launch the unified communications service applications provided by EffectNet.

11.     The UC Contract had an initial launch date of December 18, 2000, and a three-year term, running to December 2003. (Ex. at F, §§ 1.3, 5.1).

12.     Pursuant to the UC Contract, EffectNet promised to do what it had been doing under the Memorandum of Understanding and Interim Agreement:  provide private label internet and telecommunications products and services, including unified communications and other value added services, in-house customer services, billing and technical support. (Ex. F).

13.     In return, Intermedia contracted to supply the customer accounts who would use the product, pay Intermedia, and Intermedia would then pay EffectNet. (Ex. F, § 2.12-2.13).

14.     Intermedia agreed to deliver a minimum number of accounts over specific time frames, including up to 10,000 current active account subscribers by December 2001 and, thereafter, through the remainder of the Initial Term, December, 2003. (Ex. F, § 2.12). Intermedia also agreed that if it failed to meet its Minimum Commitment, it was obligated to pay EffectNet a "Reconciliation Payment" equal to the "Volume Shortfall multiplied by the base monthly price applicable to the Intermedia UC Service per subscriber,". (Ex. F, § 2.12 – 2.13).

15.     The only price negotiated as the "base monthly price" was the "Unlimited Service" rate of $27.40. This is the price the parties intended to be used for the calculation of Minimum Commitment and Reconciliation Payment. The "Basic Service" was included in

A 02300

Appendix P merely as an expedient service for those few end-users or customers that just wanted to try the UC Service on a temporary or initial basis. Indeed, the parties intended to use the Basic Service only as an introductory low-price marketing option for customers who were primarily testing or trialing the service. Further, the Basic Service only appeared inexpensive because of the $11.45 monthly fee but because all inbound minutes were charged at 10 cents per minute, the Basic Service would in fact be more expensive to a customer in almost all cases because the Unlimited Service that did not charge for inbound minutes of use. The expected actual minute usage for almost all customers made the Unlimited Service economically more compelling than the Basic Service. In fact, the typical customer of equivalent services provided by EffectNet and Webley averaged between roughly 300 and 400 minutes of usage per month. A simple example illustrates why the Unlimited Service would be economically compelling for these customers. A customer of the Basic Service with only 250 inbound minutes of usage per month would pay not only the fixed base monthly price of $11.45 but would also pay 10 cents per inbound minute of usage, or a total of $27.40 per month. By contrast, the Unlimited Service included all inbound minutes of usage without charge and, therefore, customers averaging more than 250 inbound minutes of usage per month would save money with the Unlimited Service and would be economically compelled to make that decision.

16. In addition, the statement "base monthly price" was used by the parties and understood to mean the fixed monthly fee in contrast to the variable usage-based per minute pricing in the $27.40 "Unlimited Service" price plan. Here "base" served to distinguish between fixed monthly fees and variable usage based fees--a commonly understood distinction and phraseology in the telecommunications industry. The word "base" never had anything to do with the term "Basic" as applied to the Pricing, either "Unlimited Service" or "Basic Service," for accounts as between EffectNet and Intermedia.

A 02301

17.    Thus, the "Unlimited Service" rate of $27.40 was to be the base monthly price used in calculating any Reconciliation Payment.

18.    This "take or pay" provision is common in the telecommunications industry, requiring Intermedia to supply a guaranteed minimum number of customers each month. (Ex. F, §§ 2.12-2.13).

19.    During the entire term of the UC Contract, including in 2000, 2001, and 2002, EffectNet performed all of its material obligations under the UC Contract.

**EffectNet Devotes Its Resources to Intermedia**

20.    The roll-out for the unified communications service applications began in September 2000 and continued through December 2000, in at least 20 markets. (*See e.g.,* Ex. C). The roll-out schedule encompassed and included extensive training by EffectNet of Intermedia sales staff in each market. EffectNet also trained Intermedia's customer care group during this roll-out period. (*See e.g.,* Exhibit G attached hereto, which is a copy of e-mails from J. Kerrigan to J. Freeman, dated October 27, 2000, and October 31, 2000.)

21.    EffectNet trained hundreds of Intermedia's sales staff in the different markets during this roll-out period and included the establishment of a technical facility for training sales staff and customer care staff (Ex. G), and the preparation of an EffectNet training manual and curriculum. (*See e.g.,* Exhibit H attached hereto, which is a copy of an e-mail from J. Kerrigan to W. Webber, J. Renforth and J. Freeman, dated April 9, 2001.)

22.    During September 2000 to December 2000, there were approximately 50 Intermedia personnel actively engaged in this project. (*See e.g.,* Exhibit I attached hereto, which is a copy of an e-mail from J. Renforth to J. Freeman and B. Steinmeyer with attachment, dated April 11, 2001.) In addition, there were 10 Intermedia*One* team leaders for different areas, including Jim Renforth, Marketing – Senior Product Manager; Sherrie Baughman, Marketing –

A 02302

Senior Product Manager; Wanda Friend, Senior Manager – Customer Care; Carol Vigor,

Customer Billing Operations Manager; Theresa Blake, Sales Operations – Account Consulting;

Donna Serdinak, Billing Operations; Jhan West, Sales Operations Manager; Len Jasczak, HR-

Training; Brian Pruitt, Network Operations; and Jack Kerrigan, Program Manager. (*See e.g.*,

Exhibit J attached hereto, which is a copy of an Intermedia One- EffectNet Team Contact List.)

     23.     Intermedia provided multiple forecasts to EffectNet, including one in November

2000, which forecasted that by the end of 2001 Intermedia would have 10,000 active accounts.

(*See e.g.*, Exhibit K and L, attached hereto, which are copies of e-mails from J. Renforth to J.

Freeman and R. Blanchard, dated March 15, 2001, and November 28, 2000.)

     24.     EffectNet relied on these forecasts and devoted considerable resources to the

unified communications service application. EffectNet committed and invested significant

personnel and technology resources to this project. Indeed, EffectNet dedicated approximately

one-third of its total workforce, including its lead Project Manager, Javid Freeman, to the

Intermedia project. Mr. Freeman and others were devoted full-time to this project. They

created, structured and organized EffectNet's unified communications service applications to

meet Intermedia's needs, on a daily basis. Further, EffectNet established a training facility and

curriculum for Intermedia sales and customer care staff for multiple full-day training sessions.

(*See e.g.,* Exhibit M, which is a copy of an EffectNet/Intermedia Meeting Document.) EffectNet

also provided a 24-hour, 7-day per week technical support center that occupied approximately

10,000 square feet out of about 17,000 total square feet of EffectNet office space. This technical

support center was fully furnished with cubicles offering customer care seating for over 100

representatives and was intended to support the expected Intermedia business.

A 02303

25.    This incredible commitment of resources was extremely expensive, both in out of pocket costs and in diversion of professionals.  The cost of the ramp-up, training, and project management by EffectNet was significant in time, employees and cost.

**Intermedia Ceased Performance of Its Material Obligations Under the UC Contract**

26.    In July 2001, Intermedia's Jack Kerrigan informed EffectNet that there would be no new customers at that time.  (*See e.g.*, Exhibit N attached hereto, which is a copy of an e-mail from J. Kerrigan to J. Freeman, dated July 11, 2001.)  Indeed, even as early as January 2001, we noticed that Intermedia was only opening accounts for Intermedia sales representatives and certain Intermedia executives.

27.    Also in July 2001, Intermedia fired Jim Renforth, who was the Intermedia-EffectNet point person on the UC Contract.  (*See e.g.*, Exhibit O attached hereto, which is a copy of an e-mail from J. Renforth to R. Blanchard, dated July 20, 2001.)  We were informed that at the same time, dozens of Intermedia employees who had also been working exclusively on the UC Contract were either fired or reassigned to unrelated departments.

28.    We were further informed at that time that hundreds of sales personnel – who had been trained by EffectNet to provide support under the UC Contract – were told to stop working on the project.

29.    In July and September 2001, Intermedia cancelled about 94% of the accounts. (*See e.g.*, Exhibit P, which is a copy of an Intermedia Revenue Share Worksheet of 2001.)  At this time, only approximately 47 accounts remained open and these were exclusively for Intermedia employees.

30.    The last payment made by Intermedia for these remaining 47 accounts was on December 7, 2001, for $15,616.92.  Since that time, Intermedia failed, and has continued to fail,

A 02304

to make any obligated payments under the UC Contract, with respect to either its outstanding invoices or Minimum Commitment.

31.    In March 2002, Jim Faust, the new Project Manager for Intermedia, demanded cancellation of all remaining accounts, also contrary to Intermedia's obligations under the UC Contract. (*See e.g.* Exhibit Q, attached hereto, which is a copy of an e-mail from J. Faust to Support@Intermedia.com, dated March 1, 2002.)  As of March 2002, invoices for the December 2001, and January and February 2002 billing periods remained outstanding. (*See e.g.*, Exhibit R attached hereto, which is a copy of a letter from B. McConnell to R. Black, dated March 12, 2002.)

32.    On March 12, 2002, Robert McConnell, EffectNet's General Counsel wrote to Intermedia advising Intermedia of the breach of its obligations under the UC Contract by failing to meet the Minimum Commitment of accounts, and failing to pay outstanding invoices, at that time totaling $548,087.25. (Ex. R).  Mr. McConnell wrote another letter to Intermedia on March 25, 2002 advising of the continued breach of Intermedia's Minimum Commitment obligations, and its increased outstanding invoice obligations of $827,844.27. (*See e.g.* Exhibit S, attached hereto, which is a copy of a letter from B. McConnell to B. Bacon, dated March 25, 2002.)

33.    After EffectNet received no response from Intermedia, EffectNet ceased performing for Intermedia under the UC Contract.

**The EffectNet/Webley Merger and Webley's Investor Pitches**

34.    In January 2001, EffectNet announced a proposed merger with a company called Webley Systems, Inc.

35.    Also at this time, Webley retained Salomon Smith Barney to help raise $35 million in financing, through the private placement issuance of Series C Convertible Preferred Stock, to provide working capital, for among other things, general corporate purposes. (*See e.g.*

A 02305

Exhibit T attached hereto, which is a copy of a Private Placement Memorandum for Webley

Systems Inc.) Salomon Smith Barney conditioned any private placement financing upon the

consummation of the proposed merger between EffectNet and Webley. One of the reasons

Salomon Smith Barney conditioned Webley's financing upon the merger with EffectNet was the

significant forecasted customer base and revenue EffectNet would generate under the UC

Contract. In addition, Intermedia was a major business partner for EffectNet that was very

compelling to prospective investors.

36.    Salomon Smith Barney solicited potential investors at investor meetings held in

April and May 2001. One of the potential investors was WorldCom Ventures, a WorldCom

venture capital firm. In this regard, WorldCom Ventures received a Webley private placement

memorandum in May 2001. (*See e.g.*, Exhibit U attached hereto, which is a copy of an Investor

Summary, dated May 21, 2001.) The private placement memorandum included, among other

things, information regarding the EffectNet UC Contract and its expected, generated revenues

over the term of the contract. (Ex. T). It was clear from the investor presentations that the

forecasted revenues from the UC Contract were a major component to EffectNet's and Webley's

"bottom line".

37.    During the same time period, Webley was also engaged in negotiations with

WorldCom for an agreement to govern licenses for certain software technology products,

including Webley's session initiation protocol, or SIP, based unified communications platform

for implementation of WorldCom's genD NextGeneration IP Unified Messaging/VoiceMail

product. (*See e.g.* Exhibit V attached hereto, which is a copy of an internal Webley document

regarding WorldCom's Unified Messaging initiative.) WorldCom's genD NextGeneration IP

Unified Messaging product concerned data communications, and relied upon SIP to deliver voice

and other communication data via the Internet.. (*See e.g.* Exhibits W and X attached hereto,

A 02306

which are copies of WorldCom powerpoint presentations.)  The agreement reached between WorldCom and Webley was called a "Master Agreement for Software Licenses," and ultimately executed as of September 14, 2001 (the "MASL").  (A copy of the MASL, dated September 14, 2001 is attached hereto as Exhibit Y.)

38.    Pursuant to commercial due diligence requests by WorldCom in connection with that negotiation, in April 2001, EffectNet and Webley made a number of disclosures to WorldCom.  (*See e.g.* Exhibit Z attached hereto, which is a copy of an e-mail from B. McConnell to D. Wurster, dated April 4, 2001.)  These disclosures included, among other things, a private placement memorandum for the Series C Convertible Preferred Stock, information regarding EffectNet's pending merger with Webley and the status of the companies. (Ex. T)  These disclosures highlighted the important role the UC Contract played in that merger, since Webley and EffectNet were anticipating earning substantial revenue through the UC Contract.  (*See e.g.*, Exhibit AA attached hereto, which is a copy of a letter from R. McConnell to D. Wurster, dated April 4, 2001.)

**The Minimum Amount Owed by Intermedia to EffectNet is the Reconciliation Payment Plus Outstanding Invoices**

39.    In addition, almost all, indeed 97.74% of the customer end-user accounts that were opened in 2000 and 2001, were the "Unlimited Service" at a fixed monthly rate of $27.40 per account (as opposed to $11.45). (*See, e.g.*, Ex. P).  In addition, Debtors never objected contemporaneously to the invoices submitted using the "Unlimited Service" rate. (*See e.g.*, Exhibit BB attached hereto, which is a copy of an invoice,  dated September 14, 2001.)

40.    In September 2001, Intermedia cancelled about 94% of the accounts.  At this time, only approximately 47 accounts remained open. (Ex. P).

41.    The last payment made by Intermedia for these remaining 47 accounts was on December 7, 2001, for $15,616.92.  Since that time, Intermedia failed, and has continued to fail,

A 02307

to make any obligated payments under the UC Contract, with respect to either its outstanding invoices or Reconciliation Payment for the Minimum Commitment.

42.    In March 2002, Jim Faust demanded cancellation of all remaining accounts. (Ex. Q). As of March 2002, invoices for the December 2001, and January and February 2002 billing periods remained outstanding.  (Ex. R).

43.    During the December 2001 billing cycle, 46 out of 47 of then-active mailboxes being supplied to EffectNet under the UC Contract were "Unlimited Service" mailboxes, which were billed at $27.40 per month, as opposed to "Basic Service" mailboxes.  (A copy of the December 2001 billing cycle invoice, dated Feb. 6, 2002, is annexed hereto as Exhibit CC; *see also* Ex. F, Appendix P.)

44.    The Volume Shortfall during the December 2001 billing cycle was 9,953 accounts.  (Ex. CC).  That Volume Shortfall (9,953) multiplied by the "Unlimited Service" rate of $27.40 equals $272,712.20.  (Ex. CC; *see also* Exhibit F, Appendix P).  The total amount due EffectNet during the December 2001 billing cycle was $274,021.05.  *(Id.)*

45.    During the January 2002 billing cycle, 46 out of 47 of then-active mailboxes being supplied to EffectNet under the UC Contract were again "Unlimited Service" mailboxes, which were billed at $27.40 per month, as opposed to "Basic Service" mailboxes.  (A copy of the January 2002 billing cycle invoice is attached hereto as Exhibit DD.)  The Volume Shortfall during the January 2002 billing cycle was 9,953 accounts.  That Volume Shortfall (9,953) multiplied by the "Unlimited Service" rate of $27.40 equals $272,712.20.  (Ex. DD; *see also* Ex. F, Appendix P).  The total amount due EffectNet during the January 2002 billing cycle was $274,066.20.  (Ex. DD).

46.    During the February 2002 billing cycle, all 42 of the then-active mailboxes being supplied to EffectNet under the UC Contract were "Unlimited Service" accounts, which

A 02308

were billed at $27.40 per month, as opposed to "Basic Service" accounts. (A copy of the February 2002 billing cycle invoice is attached hereto as Exhibit EE.; *see also* Ex. F, Appendix P). The Volume Shortfall during the February 2002 billing cycle was 9,958. (Ex. EE). That Volume Shortfall (9,958) multiplied by the "Unlimited Service" rate of $27.40 equals $272,849.20. (Ex. EE; *see also* Ex. F, Appendix P). The total amount due EffectNet during the February 2002 billing cycle was $279,757.02. (Ex. EE).

47.    Beginning with the March 2002 billing cycle, and for 20 months thereafter – until expiration of the term of the UC Contract – the Volume Shortfall was 10,000 customers. (Ex. F at §§ 2.12, 5.1). That Volume Shortfall for the March 2002 billing cycle (10,000) and the 20 months thereafter multiplied by the "Unlimited Service" rate of $27.40 equals $274,000.00 for March 2002, and the 20 months thereafter. (Ex. F, Appendix P). Therefore, the monthly amount due ($274,000.00) for the remainder of the term of the UC Contract, beginning in March 2002 (21 months), equals $5,754,000.00 (Ex. F at §§ 2.12, 5.1; Appendix P).

48.    Intermedia's obligations under the UC Contract included at a minimum, the requirements under the "take or pay" provision to meet 10,000 accounts annually. (Ex. E at § 2.12-2.13). Indeed, Intermedia's forecasts expected at least 10,000 accounts annually. (Exs. L and M).

49.    Accordingly, simply applying the minimum "take or pay" provisions of the UC Contract, the "Reconciliation Payment" and EffectNet's direct damages are $6,307,844.27 ($5,754,000 + $827,844.27 = $6,307,844.27) plus interest.

A 02309

50.    EffectNet's relationship with and contract with Intermedia was the major undertaking of its time for EffectNet.  Intermedia's and WorldCom's actions, including the breach of the UC Contract, which we believe WorldCom directed based upon its desire to better position its own competitive applications and products, caused EffectNet significant financial and strategic difficulties, including but not limited to, a loss of substantial value in the company, requiring it to reduce significantly its workforce, causing it to restructure, and a continued inability to raise investor interest to assist in financing the company.

_____
TAJ RENEAU

Sworn to before me
this 1̲3̲ th day of November 2005.

_____
Notary Public

```
"OFFICIAL SEAL"
DIAN E. DZIUBINSKYJ
NOTARY PUBLIC STATE OF ILLINOIS
My Commission Expires 02/15/2009
```

A 02310

# EXHIBIT A

A 02311

## Memorandum of Understanding

This Memorandum of Understanding (the "MOU") is made effective as of _____, 2000 (the "Effective Date") between EffectNet, LLC, a limited liability company organized under the laws of Nevada with its principal business location at 10230 S. 50th Place, Phoenix, Arizona 85044 (hereinafter referred to as "EffectNet"), and Intermedia Communications, Inc., a corporation duly incorporated under the laws of the State of Delaware with executive offices at One Intermedia Way, Tampa, Florida 33647 (hereinafter referred to as "Intermedia").

1. **Scope of MOU**

    1.1.    EffectNet is a communications service provider that offers private-label Internet and telecommunications products and services, including unified communications and other value-added services, in-house customer service, billing and technical support.

    1.2.    Intermedia is a competitive local exchange carrier ("CLEC") that offers long distance and communications services (the "Intermedia Services").

    1.3.    EffectNet and Intermedia desire to set forth the general terms and conditions under which the Effectnet Services will be provided to Intermedia and as shall be more specifically set forth in a General Agreement embodying definitive terms and conditions.

    This MOU, including Exhibits attached hereto, shall govern the mutual obligations of the parties from the Effective Date until the Initial Launch Date or the execution by the parties hereto of a General Agreement. The parties agree to execute the MOU by not later than September 1, 2000. The Parties will use best efforts to reach an Initial Launch Date of September 15, 2000.

2. **EffectNet Services**

    2.1.    The EffectNet Services shall be the unified communications' features and functionality as commercially offered by Effectnet on the Effective Date and as set forth in Exhibit A.   Exhibit A describes which EffectNet Services shall be made available through individually assigned toll free numbers to each user of the EffectNet Services.

    2.2.    The parties will promptly disclose to each other in writing any Errors of which they become aware.

    2.3.    EffectNet may make changes to the EffectNet Services from time to time in order to improve, modify or extend the EffectNet Services ("EffectNet Changes"),

PH 00669

A 02312

but in no event shall such changes materially decrease the quality of the EffectNet Services provided to Intermedia. EffectNet will use commercially reasonable efforts to provide Intermedia with notice ninety (90) days in advance of the commercial release date of such changes. Deployment of new releases (EffectNet Services features/functionality) is the decision and option of Intermedia. The parties agree to permit multiple versions of the product. Intermedia may decline to use any enhanced or changed version of the EffectNet Services and continue to use the version then in use by Intermedia so long as it is commercially reasonable for EffectNet to continue to support such pre-existing version.

2.3.1.   EffectNet and Intermedia will each designate their own Product Coordinator to coordinate the process described below.

- The designated Product Coordinators will be the principal points of contact between the parties on product issues (the "Product Advisory Process"). Each party may rely on the authority and technical competence of the other Party's Product Coordinator to represent its respective company in connection with the priorities, needs and progress of their company's product issues.

2.3.2.   EffectNet will provide Intermedia with regular access to and copies of the following:

- Plans for current and future enhancements to the EffectNet services which by their nature apply to the Intermedia Services; and

- Functional descriptions, architecture descriptions, specifications, development plans, schedules and periodic status for enhancements to the EffectNet Services under development, as soon as such materials exist.

2.4.   EffectNet and Intermedia agree that the EffectNet Services provided to Intermedia will be the same version of the EffectNet Services generally made commercially available, unless Intermedia deploys multiple versions of the EffectNet service in order to satisfy large blocks of customer/end users, provided, however, that EffectNet shall have no obligation to support Intermedia modification not previously agreed to by EffectNet.

## 3.   Pricing and Identification of EffectNet Services

3.1.   EffectNet Services for Intermedia will encompass three products initially based on a three year term:

3.1.1.   CommuniKate Basic: Intermedia will pay $11.45 Per month for each CommuniKate basic account with all platform usage and inbound call time on the Effectnet platform an additional 10 cents per minute. The basic account

PH 00670

A 02313

includes unlimited free on-line usage including checking emails, faxes, etc...
Outbound calling will be 10 cents per minute.

3.1.2.    CommuniKate Unlimited: Intermedia will pay $27.40 per month for
each CommuniKate unlimited account with unlimited free platform usage and
inbound call time included. Outbound calling will be 10 cents per minute.

3.1.3.    CommuniKate Corporate: Intermedia will pay $11.45 per month and
$29.50 per receptionist for each CommuniKate corporate account which is the
enterprise version where a call to an enterprise's general number leads to the
employee list and then goes to individual extensions. Receptionist is $11.45
per month for enterprise users with 10 or more accounts.

3.1.4.    Intermedia may provide its own DIDs and pricing will be adjusted in
a manner to be defined in the general agreement.

3.2.    On a bi-weekly basis EffectNet will invoice Intermedia for account fees for
each account active during the previous month. Intermedia will be charged a daily
pro rated amount for start-up and terminated accounts.

3.3.    Call detail information will be agreed upon in the General Agreement.

3.4.    Intermedia will pay EffectNet on a net-10 day basis. EffectNet may attach
penalties for late payment.

3.5.    Minimum Commitment. Intermedia hereby agrees to deliver a minimum
1,500 then current active Subscribers on or before three (3) months after the Rollout
Date; an additional 1,500 then current active Subscribers (total 3,000) on or before six
(6) months after the Rollout Date; an additional 3,500 then current active Subscribers
(total 6,500) on or before nine (9) months after the Rollout Date; and 10,000 total
then current active Subscribers on or before twelve (12) months after the Rollout Date
(the "Ramp Date"), and at the end of each calendar month thereafter (the "Minimum
Commitment") for the term of the agreement. Minimum Commitment levels shall
relate to the CommuniKate unlimited pricing account.

3.6.    Reconciliation Payment. On the Ramp Dates, and at the end of each calendar
month thereafter, EffectNet will calculate Intermedia's actual number of then current
active Subscribers on the last day of such calendar month and compare it to the
Minimum Commitment. If Intermedia does not meet or exceed the Minimum
Commitment for the month in question, Intermedia will have a Volume Shortfall, and
Intermedia shall pay EffectNet a Reconciliation payment associated with that Volume
Shortfall. Each month is measured independently; there is no carry back or forward
of surpluses or deficiencies. The Reconciliation Payment is equal to the Volume
Shortfall multiplied by the base monthly price applicable to the UM Service per
Subscriber, based on a total number of Subscribers equal to the Minimum
Commitment level (the "Base Monthly Fee").

PH 00671

A 02314

3.7.    The pricing described in this MOU does not include taxes. Intermedia shall pay or reimburse EffectNet for any sales or use taxes associated with EffectNet Services, which have been provided according to the terms of this MOU. If EffectNet should have to pay new Federal taxes under laws already in place, then Intermedia will pay its share. EffectNet shall be responsible for all taxes based on EffectNet's net income.

3.8.    Intermedia will provide concurrent with the execution of this MOU a non-refundable deposit of $250,000 to cause Effectnet to begin the provisioning process of the Intermedia accounts. Should Intermedia cancel the project for any reason prior to the execution of the General Agreement then this amount shall remain with Effectnet as total liquidated damages. In no event will Intermedia be liable for any damages beyond this amount for failure to execute a General Agreement. When all contractual obligations have been met Effectnet shall return said amount to Intermedia.

4.  **EffectNet Obligations**

4.1.    EffectNet will provide Intermedia with all existing customer service procedures, training materials, FAQ's and scripts.  A dedicated EffectNet team will work on site with Intermedia to train Intermedia's trainers at a cost of $1,500 per trainer per day plus out of pocket travel expenses if at Intermedia.

4.2.    EffectNet will provide Intermedia with help desk technical support necessary to the implementation of the Initial Launch Date within the normal course of the relationship, and for a reasonable period thereafter.

4.3.    Arrangements will be defined in the general agreement for transfer of calls and handling thereof. Intermedia will qualify and transfer technical support calls. Definition of "qualification" and costs related thereto.

4.4.    EffectNet will provide 24/7 Network Operation Center support for Tier Three calls.  Tier Three support includes power outages, and EffectNet System and network outages.  Tier Three support will be provided by EffectNet at no charge.

4.5.    EffectNet will provide call detail records ("CDR's") to Intermedia in a media and at an interval to be determined in the general agreement.

5.  **Intermedia Obligations**

5.1.    Intermedia will be responsible for all new account provisioning, manuals, user training, fulfillment materials, billing and collections, Tier One customer support and Tier Two customer support

5.2.    Intermedia will be solely responsible for fraudulent misuse of (a) domestic (United States) EffectNet services due to credit fraud, fraudulently established accounts, stolen accounts, and (b) all international accounts, regardless of the method of fraud. EffectNet will use commercially reasonable efforts to cooperate with

PH 00672

A 02315

Intermedia to arrive at fraud control means and measures to curtail and/or eliminate fraud.

5.3.    The general agreement will define the requirement of forecasts of account activations anticipated at certain intervals also to be defined. The assurance of availability of Platform capacity is conditioned on demand from Intermedia not exceeding a variance of twenty percent of forecast estimates. EffectNet reserves the right to request additional guarantees from Intermedia when forecasts require significant or unusual capital and cost by EffectNet.

5.4.    Each of the Parties shall notify the other in writing promptly of any event, which might result in such Party's inability to continue to meet its obligations under this MOU. Such event shall specifically include, but not be limited to a material adverse change in a Party's financial situation.

5.5.    An abuse of service clause will be agreed upon between Effectnet and Intermedia and included in the general agreement.

6.  **Other Provisions**

    6.1.    Confidentiality

        6.1.1.    All information disclosed to the other party shall be deemed confidential and proprietary (hereinafter referred to as "Proprietary Information"). Such information includes, but is not limited to, trade secrets, know-how, technical specifications, processes, design information, customer lists, pricing and financial information concerning the party's products or services, or other information relating to business development, operations, marketing, sales, performance, and any other information disclosed hereunder, which, by its nature, might reasonably be presumed to be proprietary in nature.

        6.1.2.  .  Each party agrees to use the Proprietary Information received from the other party only for the purposes of analyzing the business arrangement between the parties, and in accordance with this MOU. No patent, copyright, trademark, invention, service mark, or other proprietary rights are implied or granted under this Agreement.

        6.1.3.    Proprietary information supplied pursuant to this Agreement shall not be reproduced in any form by the receiving party except as required to accomplish the intent of this Agreement.

        6.1.4.    The receiving party shall provide, at a minimum, the same care to avoid disclosure or unauthorized use of the Proprietary Information as is provided to protect its own similar Proprietary Information, but in no event less than a reasonable standard of care. It is agreed that all Proprietary Information shall be retained by the receiving party in a secure place with access limited to the receiving party's employees or agents who need to know

PH 00673

A 02316

such information for purposes of this Agreement. The receiving party shall be fully responsible for any breach of this MOU by its employees or agents. The receiving party will promptly report to the disclosing party any actual or suspected violation of the terms of this MOU, and will take all reasonable steps requested by the disclosing party to prevent, control or remedy any such violation.

6.1.5.    All Proprietary Information, unless otherwise specified in writing, shall remain the property of the disclosing party. Such information shall be used by the receiving party only for the purpose set forth in this Agreement. In addition, such Proprietary Information, including all copies thereof, shall be returned to the disclosing party or, at the request of the disclosing party, may be destroyed by the receiving party and certified as destroyed by an officer of the receiving party after the Receiving party's need for it has expired, upon request of the disclosing party; and, in any event, upon termination of the Agreement.

6.1.6.    Exceptions to confidentiality

It is understood that the parties have no obligation to maintain the confidentiality of Proprietary Information which:

- has been published or is now otherwise in the public domain through no fault of the receiving party.

- prior to disclosure hereunder is within the legitimate possession of the receiving party without obligation of confidentiality as can be demonstrated by written documentation.

- subsequent to disclosure hereunder is lawfully received from a third party having rights to such Proprietary Information without restriction of the third party's right to disseminate the Proprietary Information and without notice of any restriction against its further disclosure, is disclosed with the written approval of the other party as can be proven by documentation.

- is obligated to be produced under order of a court of competent jurisdiction or other government authority; provided however, that the receiving party shall immediately provide notice to the disclosing party such that the disclosing party may seek injunctive relief; and further provided that the disclosing party shall use best efforts to ensure that the information shall be treated as confidential by the party to whom it is disclosed.

- is independently developed by the receiving party without reference to or reliance upon the confidential information

PH 00674

A 02317

In the event of a disputed disclosure, the receiving party shall bear the burden of proof of demonstrating that the information falls under one of the above exceptions.

6.1.7.    EffectNet will not use Intermedia's customer information or other proprietary information or data for any purpose other than as set forth in their MOU.

6.1.8.    <u>Remedies</u>.  The parties agree that, without limiting any other rights and remedies against each other for damages or otherwise, upon breach of this Agreement, an injunction may be sought by the party disclosing information to protect its right thereunder.  Disputes between the parties shall be resolved by arbitration.

6.2.    This MOU will terminate in six (6) months or at the time a general agreement is signed, whichever comes first. The general agreement shall have a term of three (3) years (the "Initial Term") based upon pricing options selected by Intermedia. Said term to begin at the end of the Ramp Period.

6.3.    Effectnet does not warrant that the Effectnet services that it provides to Intermedia are error-free.  Effectnet disclaims all warranties, express or implied, including but not limited to the warranties of merchantability and fitness for a particular purpose.  Neither party shall be liable for any damages arising from the other party's or any third party's use of the equipment, including without limitation indirect, incidental, special, or consequential damages, even if it has been advised of the possibility of such damages.

6.4.    At all times, the relationship between the parties shall be that of independent contractors.  Neither party shall have any authority to contract for, or bind any other parties in any manner whatsoever.

6.5.    No addition to or modification of this MOU shall be effective or binding on either of the parties hereto unless agreed in writing and executed by the respective duly authorized representatives of each of the parties hereto.  The terms and conditions in this MOU and the attached Exhibits supersede all prior oral and written understandings, discussions and agreements between the parties regarding the subject matter hereof and constitute the entire agreement of the parties with respect to such subject matter.

6.6.    The construction, interpretation and performance of this MOU and all transactions under it shall be governed by the laws of Arizona, notwithstanding its provisions relating to conflicts of law.  The parties agree that they shall not assert any claim that they are not subject to the jurisdiction of such courts, that the venue is improper, that the forum is inconvenient or any similar objection, claim or argument.

6.7.    Any notices required or permitted under this MOU shall be in writing and delivered in person or sent by nationally-recognized overnight courier or registered or certified mail, return receipt requested, with proper postage affixed to the parties, at

PH 00675

A 02318

the addresses set forth above. No purchase order or other document that purports to modify or supplement the text of this MOU or any section, schedule or exhibit shall add to or vary the terms of this MOU. Neither party shall be liable for any failure to perform other than failure to pay amounts due hereunder due to causes beyond its reasonable control. The failure by a party to exercise any right hereunder shall not operate as a waiver of such party's right to exercise that right or any other right in the future and any waiver must be in writing to be effective. In the event that any of the terms of this MOU become or are declare to invalid or void by any court or tribunal of competent jurisdiction, such terms or terms shall be null and void and shall be deemed severed from this MOU and all the remaining terms of this MOU shall remain in full force and effect.

6.8.    The parties intend that the general terms and conditions contained in this MOU be included in a General Agreement along with such other definitive terms and conditions as are consistent therewith.

6.9. This MOU may be executed and delivered in two or more counterparts, each of which, when so executed and delivered, shall be deemed an original, and all such counterparts together shall constitute but one and the same MOU. The parts shall not be binding on any party until all parties have executed it.

6.10.    The EffectNet Services covered by this MOU shall be available in the contiguous 48 United States.


IN WITNESS WHEREOF the parties have executed the Memorandum of Understanding effective as of the Effective Date.


Effectnet, LLC                          Intermedia Communications, Inc.

By: _____            By: _____

    Printed Name                           Printed Name

Its _____            Its _____


_____                _____
Signature              Date            Signature              Date

PH 00676

A 02319

# EXHIBIT B

A 02320