

September 26, 2000

| | x sean | | x go | |
| x Click here if you don't |
| x register |
| x login |

**NEW!**
Click here for the TTA
Message Board

## Contents
1. Strong Buys
2. The Sell Report
3. Insider Trading Alert
4. Upgrades & Downgrades
5. Keyson's Hot Lunch
6. Executives Zero In
7. Telecom Insight
8. The Local Loop
9. Wireless Dispatch
10. Analyst's Spotlight
11. Panning for Gold
12. Top Company Picks
13. The D.C. Buzz
14. Rants, Raves & Stress

### 8. The Local Loop          Issue #26

Intermedia Communications

The Shape of Consolidation to Come
By Ben Mattlin

x Local Loop

In the first week of September, a deal was announced that made Mark Bacurin of Robert W. Baird & Co. and many others very happy. Back on Aug. 17, Mr. Bacurin had initiated coverage of INTERMEDIA COMMUNICATIONS (ICIX), a Tampa, Fla.-based competitive local-exchange carrier (CLEC), which had nearly $1 billion in revenue last year. The shares were trading at $16.25 after touching their 52-week low of $14.75 the day before. Mr. Bacurin set a 12-month price target of $34.

Less than a month later, on Sept. 5, the global telecom giant WORLDCOM (WCOM) purchased INTERMEDIA for a reported $39 per share. INTERMEDIA shares closed that day at nearly $32, and Mr. Bacurin's faithful followers had practically doubled their money in less than three weeks. The shares closed at $26 on Sept. 21.

INTERMEDIA is a provider of integrated data and voice telecom, Internet access and local and long-distance phone service to some 90,000 small- and medium-size businesses, mostly in the eastern United States, where it competes with BELLSOUTH (BLS). With more than 600,000 access lines in service, INTERMEDIA is one of the largest CLECs.

Perhaps more importantly, the company owns 62% of and holds a 94% voting stake in DIGEX (DIGX), a leading Web-hosting company whose customers include J. Crew, Forbes and NISSAN MOTOR (NSANY). In a statement following the acquisition announcement, WORLDCOM chief executive Bernard Ebbers called the marriage "an important enhancement of our existing Web-hosting capability."

S    049

WS00193

KDW00201155

A 02321



**Printable Article**

☒ Click Here for PDF Version!

☒ Read the Internet

**Interested?**
For a free subscription to TTA, please register.

About TTA
Advertise
Affiliate
HOME
Archives
Conference Calendar

More than that, the implications of the merger are widespread. Mark Kastan, an analyst at Credit Suisse First Boston, called the acquisition "positive for the CLEC sector, as it further underscores the value of CLEC assets, especially in the data arena. While we note that WORLDCOM's primary focus in the transaction was to acquire a controlling stake in DIGEX, we look for further consolidation in the telecom sector as larger telcos look to strengthen their various product lines and integrate vertically. We expect further consolidation within the group to focus on those companies with extensive local broadband assets and data and voice customer bases."

INTERMEDIA has a well-established distribution network, to be sure. But it had fallen on tough times. After reaching a high of $77 in early March, the stock took a nosedive, losing half its value by April. Then, after announcing in July that its revenue would not meet expectations, the stock fell even farther. The Wall Street Journal reported that INTERMEDIA even considered filing for bankruptcy. Institutional investors own some 90% of its equity, and the high-powered investment firm of Kohlberg Kravis Roberts & Co. has a $200 million stake in the company, and two seats on its board.

"We view the WORLDCOM deal as favorable," said David Heger, an analyst with A.G. Edwards & Sons, adding "all along we have felt that the best option for shareholders would be an outright sale of the company, rather than just a sale of the DIGEX stake."

With a price objective of $39, Mr. Heger maintains his ACCUMULATE rating on INTERMEDIA COMMUNICATIONS "since we also have an ACCUMULATE rating on WCOM shares," he explained. "At this point, we view a purchase of INTERMEDIA shares as a means of receiving WORLDCOM shares at a discount. Furthermore, if a competing offer is made, INTERMEDIA shareholders should benefit on the upside."

⌐⌐ Send to a friend.

View the **text only** version for easier printing. For comments, questions, rants or raves, please e-mail us at TTA@multex.com.

Previous                                                                                        Next

1. Strong Buys   2. The Sell Report   3. Insider Trading Alert   4. Upgrades & Downgrades   5. Keyson's Hot Lunch   6. Executives Zero In   7. Telecom Insight   8. The Local Loop   9. Wireless Dispatch   10. Analyst's Spotlight   11. Panning for Gold   12. Top Company Picks   13. The D.C. Buzz   14. Rants, Raves & Stress

The TTA Universe | Top 150 Telecom Index | Telecom Most Written About Companies

WS00194

S    050

KDW00201156

**A 02322**

Telecom Most Read About Companies | Telecom Market Cap Index |
The Convergence Industry Index   TTA Message Board

*Publisher:* Lauren Keyson          *Managing Editor:* James C. Condon
*Senior Editor:* Paul DeMartino     *Production Manager:* Mitch Burkhardt
*Publishing Assoc.:* Eric Lopkin    *Production Coordinator:* Rika Marubashi
*Customer Service:* David Allikas    *Web Designer:* Robin Barrett

The Telecomm Analyst(SM) is a weekly online magazine for Internet
Investors, published every Tuesday.
© Copyright 2000, Multex.com, Inc. All rights reserved.
Please read our Privacy Statement.

WS00195

S    051

# EXHIBIT C

A 02324

**Brad Steinmeyer**

| | |
|---|---|
| From: | Renforth, Jim [EXCH] [JRenforth@intermedia.com] |
| Sent: | Friday, September 22, 2000 2:16 PM |
| To: | 'jjessup@effectnet.com' |
| Subject: | FW: IntermediaOne |

```
-----Original Message-----
From: Hill, Alan
Sent: Friday, September 22, 2000 9:21 AM
To:   Mellon, Cheryl D. [EXCH]
Subject:   IntermediaOne
```

```
  <<...>>
Intermedia touts bundled services
By Tim Greene
Network World Fusion, 09/20/00
```

Intermedia Communications just launched IntermediaOne, a service bundle that
includes voice, data, Internet access and unified messaging.

IntermediaOne also can add frame relay, Web hosting, firewall service and
voice features such as direct inward dialing and hunt groups to the new
service. Customers get to pick and choose which features they want, and all
are delivered over a T-1 circuit.

Intermedia already had a bundled offering called unifiedvoice.net that
included just voice and Internet access over a single link between customer
sites and Intermedia's network.

Because all the services are provisioned via a single customer-site box,
Intermedia can turn services on and off quickly. Intermedia supports
customer sites with gear supplied by either Vina Technologies or Carrier
Access Corp., depending on the requirements of each customer.

Because the voice services include network-based features such as call
forwarding, three-way conferencing and call waiting, customer sites do not
require PBXs.

IntermediaOne includes local and long-distance voice services. The unified
messaging provides text-to-speech translation so e-mails can be picked up
over the phone. Voice mails are e-mailed as audio files, and faxes are also
e-mailed so customers can pick up any message either as e-mail or voice
mail.

Intermedia says the multiple services allow customers to deal with just one
service provider for virtually all WAN services.
IntermediaOne is available in Boston, Charlotte, Chicago, Minneapolis, New
York, Pittsburgh and Raleigh. The service will roll out in 50 other cities
over the next few months, the company says.

Look, No Hands! Intermedia Adds to Its Bundled Services Portfolio
Type: FROM: CURRENT ANALYSIS (INDUSTRY ANALYST) Competitive Intelligence
Report        Current Perspective:    Positive/Neutral

Analyst:   C. Garland
<http://www.currentanalysis.com/currentcompete/SiteGuide/formattedbio2-CarlG
arland.cfm
<http://www.currentanalysis.com/currentcompete/SiteGuide/formattedbio2-CarlG
arland.cfm> >, J. Knowles        Vendor Importance:     Moderate

Report Date:     September 21, 2000         Market Impact:    Moderate

                                    1

**PH 00661**

**A 02325**

Summary

Event Summary

September 18, 2000 -- Building on its unifiedvoice.net offering, Intermedia
announced IntermediaOne, a bundled voice, Internet access, and data
communications platform for business. Through a single T1 connection,
business customers will receive unified messaging, high-speed Internet,
local and long-distance, broadband data, and Web hosting services all on one
bill. IntermediaOne is currently available in seven cities and the company
plans to offer the service in 50 cities over the next few months.

Perspective

Current Perspective: Positive/Neutral
We are taking a slightly positive stance on IntermediaOne, Intermedia's
bundled voice, data, Internet, and messaging package aimed at small- and
medium-sized business customers. Intermedia, which has already demonstrated
experience with bundled services, has taken the functionality of its
PBX-based Single-T offering and the cost savings of its Centrex-based
unifiedvoice.net offering, and added high-speed data transport and enhanced
Internet services, thereby creating a bundled offering usually reserved for
large business customers.

The twist, which differentiates IntermediaOne from the similar offerings of
competitors such as e.spire, ICG, and Qwest, is that Intermedia has also
tied in high-end Internet services and advanced calling features.
Intermedia's rollout of unifiedvoice.net was revolutionary last year,
because it gave small business customers access to bundled voice and data
services (see "unifiedvoice.net: Intermedia's Small to Medium Business
Integrated Solution," 06/10/99) without the expense of a PBX. IntermediaOne
takes that same approach and adds unified messaging, Web hosting, firewall
security, and dial-up services, all of which are provisioned through a
single T1 and invoiced on a single bill. Intermedia claims that these added
features boost its addressable market to 90%. While this may be an
overstatement on their part, there is no doubt that smaller companies have
been frustrated by the hitherto lack of a compelling, affordable bundle of
local, long-distance, data, and Internet services.

Small businesses are typically more concerned with cost than with an a la
carte collection of best-in-class services. The convenience of a single bill
and single point of contact is probably also high on the list of priorities
of businesses that don't have lavishly staffed telecom and IT departments.
Large enterprises have had the option of high-end integrated services such
as Sprint's ION, AT&T's INC, and WorldCom's On-Net for some time now. These
services are typically ATM-based, and as such they offer voice and data
services that are truly integrated at the packet level to squeeze the
maximum efficiency from multiplexed T1 and T3 network connections. Such
solutions are not for the light of purse however, and this is where
IntermediaOne and Intermedia's other bundled offerings come in. These
services do not packetize and integrate voice and data traffic at the
customers' premises. Instead, voice and data traffic are directed down
separate channels within a T1, hence services are bundled rather than
integrated. Although some would argue that this distinction is artificial,
in our opinion a bundle over a single T1 or a bundle over multiple lines
amount to the same thing, provided the cost and convenience of bundling are
present. A truly integrated service is technically more sophisticated and
costly to provision, as evidenced by Sprint's problems making ION available
to its smaller business customers.

All things being equal, we feel that Intermedia's announcement and
deployment of IntermediaOne will have a positive impact on the company and
at least a moderate impact on the market.

>From an industry perspective, this announcement will have a moderate

2

PH 00662

A 02326

impact.
Intermedia is no longer the only company to offer bundled services to small businesses -- competitors now include e.spire, ICG, and Qwest. Although none of these companies includes high-end Internet services in its bundled offerings, it certainly won't be hard for the likes of Qwest to squeeze access to unified messaging and Web hosting down a T1. While Intermedia appears to have re-established its first-to-market advantage, it probably won't be long lived.
Vendor Importance: Moderate
· This offering builds on an existing service, unifiedvoice.net, although it is not as revolutionary as this earlier ground-breaking product. As a result, revenues from IntermediaOne are more likely to be evolutionary than revolutionary.

· Intermedia is taking its unifiedvoice.net to the next level by integrating high-speed data (Frame Relay), unified messaging, and Web hosting onto one platform. These improvements should give Intermedia a fresh edge (if not a new blade) against competitors such as Qwest and e.spire that have rolled out their own bundled service offerings over the past year.
Market Impact: Moderate
· Despite adding enhanced features to its bundled services package, Intermedia is no longer the only company targeting smaller businesses with such a service. IntermediaOne must takes its place alongside Intermedia's Single-T and unfiedvoice.net offerings as well as those of e.spire, Qwest, Sprint, and a host of others.

· In contrast to most service provider product announcements, IntermediaOne attacks three ILEC revenue streams -- voice, data, and Internet access -- all in one hit.

· By upping the bundled services ante with IntermediaOne, Intermedia will force other players in this space to implement similar enhancements in their own bundled offerings.

Positives and Concerns

Competitive Positives

· Intermedia has already demonstrated experience with integrated services with its Single-T and unifiedvoice.net products. IntermediaOne is a perfect complement to these services, slotting between the higher-end PBX-based Single-T service and the more basic Centrex-based unifiedvoice.net.

· Intermedia's ability to offer local, long-distance, data, and Internet services over one network provides a compelling advantage over RBOCs (which, for the most part, cannot offer long-distance services) and CLECs (many of which lack a bundled services offering).

· Like e.spire's XpressLink and Qwest's bundled offering, IntermediaOne includes Frame Relay WAN connectivity. However, Intermedia takes its offering a step further and also provides unified messaging, Web hosting, dial-up services and firewall protection.

· Intermedia is the first network services provider to offer a compelling bundled (not integrated) communications solution to small businesses. For now at least, IntermediaOne enables the company to regain the initiative from more recent market entrants such as e.spire and Qwest.

Recommended Actions

3

PH 00663

A 02327

Recommended Competitor Actions
· CLECs such as e.spire that offer a bundled solution that includes a PBX
should closely look at demand for Intermedia's line-by-line Centrex-based
bundled offerings. If the demand is there, these carriers should rapidly
deploy competing services.

· Competitors looking to get into the bundled services market should look to
acquire/purchase Intermedia.
Target Markets
· Large Enterprises
· Small to Medium Enterprises

Recommended End User / Customer Actions
· We believe that IntermediaOne is a compelling service that small business
customers should evaluate for their voice, data, and Internet access
requirements.

· IntermediaOne customers will receive practically all the functionality of
Intermedia's PBX-based Single-T service in addition to high-end Internet
services.

Alan Hill
Director of Public Relations
Intermedia Communications Inc.
813-829-4409 (w)
813-829-2640 (fax)
JAHill@intermedia.com <mailto:JAHill@intermedia.com>

4

PH 00664

A 02328

# EXHIBIT D

A 02329



(877) 783-2598

Home    Products    Company    Contact    Site Map

Site Menu - Make Selection

**Contact**
**Alan Hill,** *Public Relations Director,* Intermedia Communications Inc., 813-829-4409, jahill@intermedia.com

## COMPANY

- Company Index
- Customer Case Studies
- Industry Awards
- **Press Room**
  - News Releases
  - News Search
  - Corporate Information
  - Recent Media Coverage

SEARCH Releases

Browse by year
2001
2000
1999
1998
1997
1996
1995

## Intermedia Communications Unveils Web and Telephone-based Unified Messaging For Business and Government Customers

*Find me, Follow me Unified Messaging Platform Gives Users the Ability to Coordinate All Their Communications From Any Place, At Any Time*

**Tampa, FL (1/30/01)** - In the business environment of the 21st century, professionals need the ability to seamlessly coordinate their communications, regardless of where they are or what resources they have available to them.

Intermedia Communications (Nasdaq: ICIX), an integrated communications provider, announced today that all of its customers now have that ability through Intermedia Unified Messaging, a voice recognition-based "find me, follow me" messaging service that frees professionals from the need to always be near their fax machines, desktop computers or office telephones.

Intermedia Unified Messaging, the first Web and telephone-based unified messaging platform offered by a major U.S. service provider, allows business professionals to custom build a communications portal that retrieves and sends fax, e-mail and telephone messages through any device, with the help of a virtual assistant. This innovative system is powered by EffectNet. It can be set up in less than 10 minutes by the customer, and is built around a universal, toll-free 800 number that serves as the user's personal communications portal. It offers features such as 32-port conference calling, call blasting to as many as four personal telephone numbers, and a customizable Web page that allows users to create their own messaging profile. The service is available for as little as $19.95 a month per user, giving businesses an affordable way to streamline their communications.

"Intermedia Unified Messaging gives today's business professional a competitive edge by providing truly unlimited mobility," said Kathy Victory, vice president of voice services for Intermedia Communications. "This easy-to-use service has the potential to save companies millions of dollars in wasted time and resources."

Industry analyst firm Ovum Ltd. estimates the global unified messaging market will rise to $31 billion by 2006 as small, mid-

PH 00730

A 02330

sized and enterprise companies realize the productivity enhancements unified communications provides. In 1999, the industry's total market was $272 million.

Through Intermedia Unified Messaging, customers can create a personalized account on a secure Web site, allowing them to access all their e-mail, voice and fax messages through any telephone, Internet, broadband or wireless network. A virtual assistant does all the work for the user, keeping track of as many as four personal work, home and cellular telephone numbers, as well as faxes and e-mails.

Intermedia first offered unified messaging with IntermediaOne, the company's fully integrated voice, Internet access and data communications platform for businesses. Today, it is available in three separate pricing packages to all of Intermedia's new and existing customers, and can be bundled with Intermedia's vast array of communications solutions.

With the help of a virtual assistant and a voice recognition user interface, Intermedia Unified Messaging includes the following features:

- Anytime, anywhere Web-based messaging and response capabilities for voice, e-mail and fax, with communications via personal computer, cellular, fax, telephone and pager
- Text-to-voice translation of e-mails over the telephone
- E-mail voice reply (answer e-mails via touch tone telephone)
- Reads your fax headings over the telephone
- Hear voice mail messages online and view faxes online
- Puts together conference calls on the fly with up to 32 ports
- Proactively finds you at any of four personal telephone numbers
- Calls your contact lists on request
- Provides real time call records for client billing
- Forwards faxes to any machine or PC
- Broadcasts faxes to multiple people worldwide
- Message delivery notification
- Unlimited message storage
- Security protection
- Voice broadcast (send a voice message to multiple people at once)

PH 00731

A 02331



## About Intermedia Communications Inc.

Intermedia Communications (Nasdaq:ICIX) is dedicated to providing fully integrated next generation data-centric solutions to the complex communications needs of business and government customers in major U.S. markets. Intermedia offers broadband data, high-speed Internet access, advanced network and voice services. Headquartered in Tampa, FL, Intermedia is among the largest independent Competitive Local Exchange Carriers, the nation's fourth largest frame relay provider, a leading systems integration provider, a tier-one Internet Service Provider and the nation's largest provider of multi-tenant services.

**Internet Users:** Intermedia news releases, investor contacts and other useful information are available on Intermedia's Web site at www.intermedia.com. To receive news releases by e-mail or to request that information be mailed to you, please visit the Press Room section of the Web site and go to the "Request Information"

PH 00732

A 02332

link.

*Statements contained in this news release regarding expected financial results and other planned events are forward-looking statements, subject to uncertainties and risks, including, but not limited to, the demand for Intermedia's services and the ability of the Company to successfully implement its strategies, each of which may be impacted, among other things, by economic, competitive or regulatory conditions. These and other applicable risks are summarized under the caption "Risk Factors" in the Company's Form 10-K Annual Report for its fiscal year ended December 31, 1999 and are updated periodically through the filing of reports and registration statements with the Securities and Exchange Commission.*

Home | Products/Services | Company | Contact Us | Site Map

© 2002 Intermedia Communications Inc. (877) 783-2598
Legal Notices

PH 00733

A 02333

# EXHIBIT E

A 02334

# INTERIM AGREEMENT

THIS INTERIM AGREEMENT is made and entered into as of this 1st day of September, 2000, by and between EffectNet, Inc. ("EffectNet"), an Arizona corporation, with principal offices at 10230 S. 50ᵗʰ Place, Phoenix, Arizona 85045, and Intermedia Communications Inc. ("Intermedia"), a Delaware corporation, with offices at One Intermedia Way, Tampa, Florida 33647-1752.

## Recitals

WHEREAS, EffectNet and Intermedia are currently negotiating the terms of a final and definitive contract agreement (hereafter the "Definitive Agreement") whereby EffectNet will provide certain electronic mail messaging services for resale by Intermedia as more fully described below.

WHEREAS, this Interim Agreement is intended to allow EffectNet to commence the provision of the aforementioned services prior to execution of the Definitive Agreement.

NOW THEREFORE, EffectNet and Intermedia each hereby agree as follows:

1.    Services.  Commencing on September 1, 2000, EffectNet will offer the following services (the "Services") pursuant to the terms of this Interim Agreement. The Services shall consist of the provision by EffectNet of the following:

(a)    Unified Messaging Mailboxes for resale by Intermedia under the name of Intermedia, and for use by Intermedia's end-user customers ("Customers") by agreement between Intermedia and such Customers.

(b)    On-line ordering capability in order that Intermedia may order Unified Messaging Mailboxes for use by Customers.

(c)    A web page with Intermedia dress and logo for access by Customers.

(d)    Help desk, staffed 24 hours per day, every day (no exceptions), available to Customers on-line or by toll-free telephone number.

(e)    Toll-free telephone access to EffectNet's Unified Messaging platform for Customers via an EffectNet-provided toll free number (eventually transitioning to an Intermedia-provided number).

In addition to the foregoing, EffectNet shall provision orders for the Services consistent with the rollout schedule attached hereto as Exhibit A.

2.    Deposit.    Intermedia shall pay to EffectNet as a deposit, the sum of One Hundred Seventy Five Thousand Dollars ($175,000.00). This does not constitute and shall not be construed as a minimum commitment or any other commitment, unless the parties expressly agree to such treatment in the Definitive Agreement. Intermedia understands that EffectNet is expending significant capital monies to address the very immediate needs of Intermedia and its Customer base under this Interim Agreement. In the event the Definitive Agreement is not signed by the parties and this Interim Agreement is terminated, the parties shall mutually agree on an equitable payment to be made by Intermedia for Services rendered during the term of this Interim Agreement and to compensate EffectNet for its costs incurred during such time. If the Definitive Agreement is executed by the parties, the full amount of the deposit shall be refunded to Intermedia immediately upon reaching 10,000 Unified Messaging Mailboxes, the specific terms of such refund to be set forth in the Definitive Agreement.

1

MCIWC000082

A 02335

3.    <u>Pricing and Identification of EffectNet Services</u>.  EffectNet Services for Intermedia will encompass three products initially based on a three year term:

(a)    CommuniKate Basic: Intermedia will pay $11.45 per month for each CommuniKate basic account with all platform usage.  Inbound call time on the EffectNet platform shall be rated at $0.10 per minute.  The basic account includes unlimited free on-line usage including checking emails, faxes, etc.  Outbound calling will be rated at $0.10 per minute.

(b)    CommuniKate Unlimited: Intermedia will pay $27.40 per month for each CommuniKate unlimited account, with unlimited free platform usage and inbound call time included.  Outbound calling will be rated at $0.10 per minute.

(c)    CommuniKate Corporate: Intermedia will pay $11.45 per month and $29.50 per month per receptionist for each CommuniKate corporate account.  CommuniKate Corporate is the enterprise version of the Services where a call to an enterprise's general number leads to the employee list and then goes to individual extensions.  Receptionist becomes $11.45 per month for enterprise users with ten (10) or more mailboxes.

The Definitive Agreement shall set forth terms for billing and method of payment for Services rendered.

4.    <u>Term; Termination</u>.  The term of this Interim Agreement shall be until the earlier of the date either party notifies the other in writing of its desire to cease negotiations toward the Definitive Agreement, or the date the Definitive Agreement is executed by both parties.  Neither party shall have any liability whatsoever to the other party if it elects at any time and for any reason, or for no reason, to cease negotiations toward the Definitive Agreement (except such liability as may have arisen pursuant to the terms of this Interim Agreement prior to the date of its termination).  Entry into this Interim Agreement does not create any warranty or representation on the part of either party with regard to the Definitive Agreement, except that, during the time when negotiations toward the Definitive Agreement are ongoing, each party shall conduct itself in a professional manner and in good faith.  Nothing herein shall be construed to imply any duty or obligation on the part of either party to or both parties to consummate the Definitive Agreement.

4.    <u>Confidentiality</u>.  The terms of this Interim Agreement and the existence and conduct of negotiations toward the Definitive Agreement shall be kept confidential between the parties.  Each party agrees not to disclose the terms of this Interim Agreement or the fact of such negotiations to any third party unless required by law.  No press release or other public communication relating to these matters will be made unless approved by both parties.

Accepted and Agreed:

EFFECTNET, INC.                          INTERMEDIA COMMUNICATIONS INC.

By: _____             By: _____

Darius Reneau                            Kathleen A. Victory
Name                                     Name
Pres. / COO                              VP Product Line Management
Title                                    Title
Sept 28, 2000                            September 1, 2000
Date                                     Date

2

MCIWC000083

**A 02336**

# EXHIBIT F

A 02337

ORIGINAL

# EffectNet

# Unified Communications
# Services
# General Agreement
# For

# Intermedia Communications, Inc.

PH 00563

A 02338

# UNIFIED COMMUNICATIONS SERVICES GENERAL AGREEMENT

This Unified Communications General Agreement (the "Agreement") is entered into as of the 20 day of November 2000, ("Effective Date") by and between EffectNet LLC, a Nevada Limited Liability Company ("EffectNet") and Intermedia Communications, Inc. organized under the laws of The State of Delaware, with a business address at One Intermedia Way, Tampa, FL 33647 ("Intermedia") (collectively "Parties" or individually a "Party").

WHEREAS, Intermedia is Integrated Communications Provider providing telecommunication services including local dial tone, long distance, data services, etc.

WHEREAS, EffectNet is a unified communications application service provider that offers private label Internet and telecommunications products and services, including unified communications and other value-added services, in-house customer services, billing and technical support (the "EffectNet Services").

WHEREAS, EffectNet desires to provide Intermedia with a customized Intermedia-branded wholesale communications service ("Private Label") for sale by Intermedia to its end user customers (the services collectively hereinafter described as "Intermedia UC Services" or "UC Services").

WHEREAS, EffectNet and Intermedia recognize that the provision of Intermedia UC Services requires the Parties to closely work together to meet customer needs and to implement and ensure the commercial viability of the Intermedia UC Services.

NOW THEREFORE, in consideration of the promises and mutual agreements contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which the Parties acknowledge, the Parties agree as follows:

1.    GENERAL PROVISIONS.

1.1    Both Parties agree that EffectNet shall offer Intermedia UC Services for Intermedia as described in this Agreement. Intermedia will market the UC Services to Intermedia customers and end-users as it sees fit.   For purposes of this Agreement, the term "customers" shall include, but not be limited to wholesale and retail customers of Intermedia UC Services.

1.2    EffectNet may make changes to the EffectNet Services from time to time in order to improve, modify or extend the EffectNet Services ("EffectNet Changes"), but in no event shall such changes decrease the quality of the EffectNet Services provided to Intermedia. EffectNet will provide Intermedia with notice ninety (90) days in advance of the commercial release date of such changes.

1.3    The Parties shall use their best efforts to accomplish the initial launch of the Intermedia UC Services ("Initial Launch Date") by December 18, 2000.

1.4    Each Party shall promptly notify the other in writing of any event, which might result in such Party's inability to continue to meet its obligations under this Agreement. Such event shall specifically include, but not be limited to, a materially adverse change in a Party's financial situation. EffectNet acknowledges and understands that Intermedia is in the process of a merger involving all of its assets with MCI/Worldcom, Inc. Such merger shall not, in and of itself, constitute an event requiring

**PH 00564**

**A 02339**

notice pursuant to this provision, and that, accordingly, no further notice of the merger or the consummation thereof, shall be required of Intermedia.

2.    OBLIGATIONS OF THE PARTIES.

2.1    Product Coordinator. EffectNet and Intermedia will each designate their own Product Coordinator to coordinate the process described below.

2.1.1    The designated Product Coordinators will be the principal points of contact between the parties on product issues (the "Product Advisory Process"). Each party may rely on the authority and technical competence of the other Party's Product Coordinator to represent its respective company in connection with the priorities, needs and progress of their company's product issues.

2.1.2    The Product Advisory Process will include in-person/telephonic/electronic communication between representatives, which should be ongoing, or occur not less than once each month during the Term of this Agreement, except if the parties expressly agree to some different frequency.

2.2    EffectNet Materials. EffectNet will provide Intermedia with regular access to and copies of the following:

2.2.1    Plans for current and future enhancements to the EffectNet Services which by their nature apply to the Intermedia UC Services; and

2.2.2    Functional descriptions, development plans, schedules and periodic status for enhancements to the EffectNet Services under development, as soon as such materials exist.

2.3    Product Development. Intermedia and EffectNet agree that the EffectNet Services provided to Intermedia will be the same version of the EffectNet Services generally made commercially available, unless Intermedia deploys modifications of the EffectNet Services in order to satisfy large blocks of customer/end users, provided, however, that EffectNet shall have no obligation to support Intermedia any modification not previously known to EffectNet.

2.3.1    Intermedia will implement new versions within 30 days with call avoidance measures built into the process, including but not limited to adequate customer notification of new features, benefits and the availability of training timed to coincide with the release of any new versions.

2.3.2    EffectNet will provide Intermedia with at least ninety (90) days advance notice of an expected new release or version of EffectNet Services.

2.4    Forecasts. Intermedia shall provide EffectNet with non-binding forecasts for expected mailbox activations, at minimum of once every two (2) months during the Term of this Agreement. Intermedia will also provide EffectNet with quarterly and annual non-binding forecasts of expected mailbox activations. The availability of platform capacity to be provided by EffectNet to Intermedia is conditioned on the platform capacity demand not exceeding the forecast provided by Intermedia for any period addressed by such forecast. With respect to timely provided mailbox activation forecasts only, EffectNet will use reasonable efforts to meet Intermedia's forecasted demand. However, EffectNet reserves the right to request additional guarantees from Intermedia when the forecasts provided by Intermedia require significant or unusual capital and cost

PH 00565

A 02340

by EffectNet. Intermedia is to provide the first of such forecasts to EffectNet on or before November 30, 2000. For purposes of this section EffectNet must allocate constrained capacity to Intermedia on terms at least as favorable as offered to any other customer of EffectNet. In the event that EffectNet declines orders because of capacity constraints, then EffectNet shall notify Intermedia and the Parties shall use commercially reasonable efforts to develop a solution that will provide Intermedia with a method of ensuring that the needs of Intermedia's existing and potential end users are met while ensuring that EffectNet is permitted to increase capacity in an orderly fashion.

2.5    Billing Cycle. On an every 15-day basis, EffectNet will invoice Intermedia for account fees for each account active during the previous 15 days and any late charges for previous outstanding invoices.

2.6    Payment. Intermedia will pay EffectNet in then available U.S. funds on a net-15 day basis.

2.7    Call Detail Records for Billing. Each day, EffectNet will provide to Intermedia Calling Detail Records ("CDR") on a timely basis, in a mutually agreed-upon electronic format.

2.8    Billings and Collections. Intermedia shall be responsible, at its sole expense, for all invoicing and collections with its customers, end-users, agents, subagents or resellers. EffectNet will not be responsible for any collections or bad debt by Intermedia's customers, end-users, agents, subagents or resellers 2.9    Fraud. Intermedia will be solely responsible for fraudulent misuse of the Intermedia UC Services due to credit fraud, fraudulently established accounts and stolen accounts (except to the extent if such theft occurs through misuse or theft the records or facilities of EffectNet); provided that, Intermedia shall not be responsible for fraudulent misuse occurring after EffectNet has become aware of such occurrence; and, provided further, that the extent of Intermedia's liability to EffectNet for fraudulent misuse of Intermedia UC Services shall be EffectNet's direct damages and costs incurred. EffectNet shall notify Intermedia of fraud as soon as practicable, upon EffectNet's becoming aware of such fraud. The Parties will use commercially reasonable efforts to establish fraud control means and measures.

2.10    Customer Service Call Center and Technical Support. EffectNet shall maintain a customer service call center for its Intermedia customers and end-users, as appropriate in accordance with industry standards. This call center will be responsible for all customer support.

2.10.1    Call items outside the scope of EffectNet support services are: non-EffectNet related software problems and call forwarding issues.

2.11    Customer Fulfillment Process. Intermedia, when taking orders for new customers or end users, or taking orders to modify or update a customer's order, will use the EffectNet Customer Fulfillment Process or compatible process to gather the information required and to provide the customer information to EffectNet. Intermedia is responsible for providing to EffectNet such new mailbox account information reasonably required by EffectNet in order to activate a new mailbox. EffectNet shall provide documentation and training, in accordance with the training provision of this Agreement, to Intermedia on the EffectNet Customer Fulfillment Process.    2.12    Minimum Commitment. Intermedia hereby agrees to deliver a minimum 1,500 then current active subscribers on

PH 00566

A 02341

or before three (3) months after December 18, 2000 (the "Rollout Date"); an additional 1,500 then current active subscribers (total 3,000) on or before six (6) months after the Rollout Date; and additional 3,500 then current active subscribers (total 6,500) on or before nine (9) months after the Rollout Date; and 10,000 total then current active subscribers on or before twelve (12) months after the Rollout Date (the "Ramp Date"), and at the end of each calendar month thereafter ( the "Minimum Commitment") for the Term of this Agreement.

2.13    Reconciliation Payment. On the Ramp Date and at the end of each calendar month thereafter, EffectNet will calculate the actual number of then current active subscribers on the last day of such calendar month and compare it to the Minimum Commitment. If the number of subscribers is less than the Minimum Commitment for the month in question, such difference will constitute a "Volume Shortfall." Intermedia shall pay EffectNet a Reconciliation Payment equal to the Volume Shortfall multiplied by the base monthly price applicable to the Intermedia UC Service per subscriber,

3.      MARKETING AND BRANDING.

3.1    Web Presence. At no additional charge, EffectNet will provide Intermedia with a private label website, URL links and related branding as reasonably directed by Intermedia.

3.2    Use of Trademarks, Service Marks and Trade names. The Parties agree not to display or use any of the trade names, service marks, brands or trademarks of the other Party, and shall not permit the same to be displayed or used by third parties, other than in connection with the sale, distribution or promotion of the brand(s) used for the Intermedia UC Services covered by this Agreement and subject to the prior written approval of the other or a third Party owning such trademark, service mark or trade name (except where such approval between the Parties is contained in this Agreement). In the absence of specific prior written consent from the other Party, a Party shall not use any part of any of the other Party's trade names, service marks, brands or trademarks as part of its own name, service marks or trademarks or in any other manner not so approved by the other Party. It is expressly understood by both Parties that trade names, service marks and trademarks of the other party are proprietary and that nothing in this Agreement constitutes the grant of a general license to use said trade names, service marks and trademarks. Upon termination of this Agreement, any and all rights or privileges of a Party to use the other Party's trade names, service marks, brands or trademarks shall expire, and each Party shall discontinue the use of the other Party's trade names, service marks, brands. The provisions of this section shall also apply to third party branding incidental to this Agreement.

3.3    Intermedia Marketing Expenses. Intermedia as the buyer of the wholesale services from EffectNet, is responsible for all expenses and obligations incurred by Intermedia as a result of its efforts to attract and solicit customers for Intermedia UC Services. Intermedia expressly acknowledges that it is not entitled to any reimbursement by EffectNet for such expenses unless, and only to the extent that, both parties hereto agree in writing prior to the incursion of such expenses, as set forth in this Agreement.

PH 00567

A 02342

4.    <u>CHARGES AND BILLING STATEMENTS.</u>

4.1    Traffic- or usage-sensitive rates shall be computed in 30-second initial and 6-second continual increments.

4.2    Intermedia shall be responsible for all applicable taxes, including but not limited to sales or value-added taxes, utility or excise taxes, fees and/or surcharges that are imposed by federal, state, or local governments on the Intermedia UC Services or business generated by Intermedia through the sale of Intermedia UC Services as a result of long distance or services bundled within the Intermedia UC Services. Intermedia shall pay or reimburse EffectNet for all taxes collected or imposed on these services provided by EffectNet. The prices quotes in the following sections are exclusive of any and all taxes. Excluded from this responsibility are taxes based on EffectNet's net income. EffectNet shall comply with all federal and state regulations with respect to employee withholding taxes.

4.3    <u>Pricing.</u>    Pricing shall be as indicated by Appendix "P" attached hereto.

4.4    Seven (7) working days post the close of the month, EffectNet shall provide to Intermedia a settlement statement ("Settlement Statement") providing a summary of charges for the previous month's billing cycle in an industry standard format. The settlement statement, unless specified elsewhere in this Agreement, shall contain the following:

4.4.1    A listing of monthly recurring charges for the current or prior month's billing cycle.

4.4.2    For calls or traffic originated by Intermedia or any customers, agents, sub-agents and/or end-users during the previous month, the individual call detail and the aggregate usage charge payable broken down by termination location.

4.4.3    For calls or traffic terminated by Intermedia or any customers, agents, sub-agents and/or end-users during the previous month, the individual call detail and the aggregate usage charge payable broken down by termination location.

4.4.4    Any taxes, fees and/or charges that are imposed by federal, state, and/or local governments.

4.4.5    The net amount payable by Intermedia to EffectNet or payable to Intermedia by EffectNet.

4.4.6    When applicable, any mutually negotiated additional fees.

4.5    Payment of the Settlement Statement shall be made within 15(fifteen) calendar days after the Settlement Statement and invoice are received by Intermedia (the "Due Date"). Payments to EffectNet shall be in United States dollars and are to be made for credit to an account of EffectNet to be determined by EffectNet and provided to Intermedia within three (3) days of the date of execution of this Agreement by the later signing party. If payment is not received by the Due Date, a late fee of the lesser of (a)

PH 00568

A 02343

one (1) percent per month or (b) the maximum percentage permitted by law shall be assessed on the delinquent balance of undisputed usage not paid by the Due Date.

4.5.1 <u>Deposit</u>. Intermedia has provided EffectNet with a fully refundable deposit in anticipation of this Agreement in the amount of minimum subscriber commitment multiplied times $17.50 (US dollars) for a total of $175,000. This deposit shall be refunded to Intermedia in whole on or before the Ramp Date as long as Intermedia has met the Minimum Commitment as of such date. If Intermedia has not met the Minimum Commitment as of the Ramp Date, EffectNet shall refund to Intermedia the full amount of the deposit less the Reconciliation Payment then due. The amount of such Reconciliation Payment shall remain on deposit until such time as the Minimum Commitment is met.

4.5.2 In the event that Intermedia disputes any charge assessed by EffectNet, the Parties agree to cooperate to resolve the dispute at the earliest practicable date. The late charges set forth in Section of this Agreement shall not apply to payments that are the subject of a good faith dispute between EffectNet and Intermedia. If there is a good faith dispute, EffectNet cannot demand a late payment deposit.

5.    <u>TERM AND TERMINATION.</u>

5.1    <u>Term</u>. Unless otherwise terminated as provided herein, this Agreement shall be in force for an initial term of three (3) years after the Effective Date (the "Initial Term"). This agreement shall continue automatically for successive one year terms under the same terms and conditions contained herein together with any subsequent amendments hereto, unless either Party has sent written notice of its intent not to renew the Term at least thirty (30) days prior to the expiration of the Initial Term or the renewal period then in effect.

5.2    <u>Termination</u>. Either Party may terminate this Agreement: (a) if the other Party fails to fulfill any of its material obligations under this Agreement; (b) if the other Party is in breach of Section 7 (Confidentiality); (c) if the other Party becomes insolvent or admits in writing its inability to pay debts as they mature, or makes an assignment for the benefit of creditors; or (d) if a petition under any foreign, state or United States bankruptcy act, receivership statute, or the like is filed by the other Party and is not dismissed within sixty (60) days after such filing. Termination due to default under this Section shall be effective thirty (30) days after written notice to the defaulting Party if the default has not been cured within such thirty (30) day period. 5.3 <u>Effect of Termination</u>. Upon termination of this Agreement for any reason, each Party shall remain liable for those obligations that accrued prior to the date of such termination; provided, however, that nothing herein shall be construed to obligate EffectNet to offer Services to Intermedia after the termination of this Agreement.

5.4    <u>Early Termination</u>. If prior to the end of the Initial Term this Agreement is terminated for any reason by Intermedia other than pursuant to Section 5.2, Intermedia shall pay EffectNet, as liquidated damages and as the sole remedy of EffectNet and the exclusive liability of Intermedia, a one-time early termination fee equal to $270,400 times the lesser of (i) 12 months, or (ii) the number of months remaining in the contract term.

6.    <u>SURVIVAL.</u> The following provisions shall survive the expiration or termination, for any reason, of this Agreement: (Subscriber Information), (Charges and Billing

PH 00569

A 02344

Statements); (Term and Termination); (Confidentiality); (Warranties); (Intellectual Property); (Indemnification); (Limitation of Liability); (General Provisions).

7.   CONFIDENTIALITY.   All information disclosed to the other party shall be deemed confidential and proprietary (hereinafter referred to as "Proprietary Information"). Such information includes, but is not limited to, trade secrets, know-how, technical specifications, processes, functional descriptions, architectural specifications, development plans, schedules, design information, customer lists, pricing and financial information concerning the parties' products or services, or other information relating to business development, operations, marketing, sales, performance, and any other information disclosed hereunder, which, by its nature, might reasonably be presumed to be proprietary in nature.

7.1   Each party agrees to use the Proprietary Information received from the other party only for the purposes of analyzing the business arrangement between the parties, and in accordance with this Agreement. No patent, copyright, trademark, invention, service mark, or other proprietary rights are implied or granted under this Agreement.

7.2   Proprietary information supplied pursuant to this Agreement shall not be reproduced in any form by the receiving party except as required to accomplish the intent of this Agreement.

7.3   The receiving party shall provide, at a minimum, the same care to avoid disclosure or unauthorized use of the Proprietary Information as is provided to protect its own Proprietary Information, but in no event less than a reasonable standard of care. It is agreed that all Proprietary Information shall be retained by the receiving party in a secure place with access limited to the receiving party's employees or agents who need to know of the content of such information for purposes of fulfilling its obligations pursuant to this Agreement. The receiving party shall be fully responsible for any breach of this Agreement by its employees or agents. The receiving party will promptly report to the disclosing party any actual or suspected violation of the terms of this Agreement, and will take all reasonable steps requested by the disclosing party to prevent, control or remedy any such violation.

7.4   All Proprietary Information, unless otherwise specified in writing, shall remain the property of the disclosing party. Such information shall be used by the receiving party only for the purpose set forth in this Agreement. In addition, such Proprietary Information, including all copies thereof, shall be returned to the disclosing party or, at the request of the disclosing party, may be destroyed by the receiving party and certified as destroyed by an officer of the receiving party after the Receiving party's need for it has expired, upon request of the disclosing party; and, in any event, upon termination of the Agreement.

7.5   Exceptions to confidentiality: It is understood that the parties have no obligation to maintain the confidentiality of Proprietary Information which:

7.5.1   has been published or is now otherwise in the public domain through no fault of the receiving party.

7.5.2   prior to disclosure hereunder is within the legitimate possession of the receiving party without obligation of confidentiality as can be demonstrated by written documentation.

11/20/00                          Page 7

PH 00570

A 02345

7.5.3    subsequent to disclosure hereunder is lawfully received from a third party having rights to such Proprietary Information without restriction of the third party's right to disseminate the Proprietary Information and without notice of any restriction against its further disclosure, is disclosed with the written approval of the other party as can be proven by documentation.

7.5.4    is obligated to be produced by a Party under order of a court of competent jurisdiction or other government authority; provided however, that the receiving party shall immediately provide notice to the disclosing party such that the disclosing party may seek injunctive relief and/or a protective order; and further provided that the disclosing party shall use best efforts to ensure that the information shall be treated as confidential by the party to whom it is disclosed.

7.5.5    is independently developed by the receiving party without reference to or reliance upon the confidential information.

In the event of a disputed disclosure, the receiving party shall bear the burden of proof of demonstrating that the information falls under one of the above exceptions.

8.    WARRANTIES.

8.1.    Authorization.  Each Party represents and warrants to the other Party that the execution and delivery of this Agreement and the performance of such Party's obligations under this Agreement have been duly authorized, and that the Agreement is a valid and binding agreement, enforceable in accordance with its terms.

8.2.    Legal Compliance.  Each Party represents and warrants that it has obtained, or will obtain prior to offering the Services hereunder, all licenses, approvals and/or regulatory authority necessary to provide the Services described herein. This Agreement is made expressly subject to all present and future valid orders and regulations of any regulatory body having jurisdiction over the subject matter of this Agreement.

8.3    No Other Warranties.  With respect to the UC Services to be provided in, and to users accessing these services from the United States and Canada, EffectNet warrants that it will exercise commercially reasonable care in the performance of its obligations under this Agreement.

EFFECTNET DOES NOT WARRANT THAT THE EFFECTNET SERVICES OR THE PLATFORM THAT IT PROVIDES TO INTERMEDIA IS ERROR-FREE.  IN ADDITION, THE EFFECTNET SERVICES OR INTERMEDIA PLATFORM IS PROVIDED "AS IS" AND WITHOUT ANY WARRANTY OF ANY KIND.  EFFECTNET DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.  NEITHER PARTY SHALL BE LIABLE FOR ANY DAMAGES ARISING FROM THE OTHER PARTY'S OR ANY THIRD PARTY'S USE OF THE EQUIPMENT, INCLUDING WITHOUT LIMITATION INDIRECT, INCIDENTAL, SPECIAL, OR CONSEQUENTIAL DAMAGES, EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.  THE PARTIES AGREE TO THE ALLOCATION OF LIABILITY RISK SET FORTH IN THIS SECTION.  THIS LIMITATION ON LIABILITY IS INTENDED ITO APPLY WITHOUT REGARD TO

PH 00571

A 02346