STINSON MORRISON HECKER LLP

Robert L. Driscoll, Esq.
Allison M. Murdock, Esq.
Jodi M. Hoss, Esq.
1201 Walnut Street
Kansas City, MO  64106
Telephone:  (816) 842-8600
Facsimile:  (816) 691-3495
Attorneys for Reorganized Debtors


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
In re                                                    :
                                                         :        Chapter 11 Case No. 02-13533 (AJG)
WORLDCOM, INC., et al.,                                  :
                                                         :        (Jointly Administered)
                    Reorganized Debtors.                 :
------------------------------------------------------x


**REPLY MEMORANDUM IN SUPPORT OF WORLDCOM'S MOTION
FOR SUMMARY JUDGMENT AGAINST PARUS HOLDINGS, INC.,
SUCCESSOR-BY-MERGER TO EFFECTNET, INC. AND EFFECTNET, LLC**


STINSON MORRISON HECKER LLP

Robert L. Driscoll, Esq.
Allison M. Murdock, Esq.
Jodi M. Hoss, Esq.
1201 Walnut Street, Suite 2900
Kansas City, MO  64106
(816) 842-8600 – Telephone
(816) 691-3495 – Facsimile

ATTORNEYS FOR REORGANIZED DEBTORS

A 02681

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

WORLDCOM'S REPLY TO PARUS HOLDINGS'
"SUMMARY OF FACTS" ....................................................................................1

    A.  Reply to Parus Holdings' Assertions Concerning
        the UC Contract (Response at 5-7) and the Amount
        Owed by Intermedia (Response at 11-12). ...............................................2

    B.  Reply to Subsection Concerning Alleged Pre-merger Conspiracy
        to Breach UC Contract (Response at 12-14)..............................................2

ARGUMENT .........................................................................................................3

I.     PARUS HOLDINGS HAS FAILED TO RAISE ANY ISSUE OF MATERIAL FACT
      OR DEMONSTRATE ANY BASIS FOR OPPOSING WORLDCOM'S MOTION
      UNDER FED. R. CIV. P. 56(f). ..................................................................3

    A.  Parus Holdings Has Not Raised Any Issue of Material Fact ........................5

        1.  Parus Holdings Fails in its Attempt to Create an Issue of Fact
            on its Claims for Conspiracy or Tortious Interference. ..........................5

        2.   Parus Holdings Fails to Identify an Issue of Fact Concerning Intermedia's
            Obligations Under the UC Contract.......................................................8

    B.  Parus Holdings Has Failed to Demonstrate Any Basis for a
        Continuance Under Fed. R. Civ. P. 56(f).......................................................8

II.    CLAIMANT'S DAMAGES MAY BE DETERMINED AS A MATTER OF LAW...10

    A.  Claimant's Damages May Not Exceed $460,422.30.....................................10

        1.  EffectNet Indisputably Terminated the UC Contract as of April 12, 2002 ..........10

        2.  As a Matter of Law, Intermedia's Accrued Obligations Are Limited to the
            Reconciliation Payments That Were Due at the Time of the Termination...........12

            a)  Sections 2.12 and 2.13 of the UC Contract Limit Intermedia's
               Obligation to Make Reconciliation Payments .................................12

A 02682

      b) Intermedia's Obligation to Pay Reconciliation Payments
         Did Not Survive Termination of the UC Contract on April 12, 2002. ...........13

      c) EffectNet Elected to Terminate the UC Contract; It Did Not
         Elect to Sue for Breach ..................................................................................14

      d) Intermedia Could Terminate the UC Contract For Any Reason ....................15

   3. The Plain Language of the UC Contract Calls For the
     "Basic" Service Price of $11.45. ...............................................................................16

B. Parus Holdings Bargained for Limited Liability ............................................................17

C. The Court Should Enforce the Contract's Limitations of Liability...............................19

  1. Parus Holdings Agreed to Limited Remedies............................................................19

  2. The Limitation of Liability Section is Complete and Unambiguous..........................20

III.    CLAIMANT'S TORT CLAIMS ARE BARRED AS A MATTER OF LAW .............22

A. The Conspiracy Claim Should Be Denied As A Matter of Law.....................................22

B. Summary Judgment Should Be Entered on the Tortious Interference Claim...............26

C. Parus Holdings Cannot Proceed on Its Deceptive Trade Practice Claim ....................32

D. Summary Judgment Should Be Entered on the Claim For
   Breach of an Implied Covenant of Good Faith and Fair Dealing ................................36

CONCLUSION....................................................................................................................37

A 02683

## INTRODUCTION

Pursuant to Fed. R. Civ. P. 56, Fed. R. Bankr. P. 7056, and Fed. R. Bankr. P. 9014, the above-captioned debtors ("Reorganized Debtors" or "WorldCom"), submit this Reply Memorandum in Support of WorldCom's Motion for Summary Judgment Against Parus Holdings Inc., successor-by-merger to EffectNet, Inc. and EffectNet, LLC ("Parus Holdings" or "Claimant") on Claim Nos. 11242 (replacing 9291) and 11173 (replacing 9293). In Claimant Parus Holdings, Inc.'s Response and Opposition to Debtors' Motion for Summary Judgment ("Response"), Parus Holdings fails to demonstrate a genuine issue of material fact on any of its claims. Parus Holdings has a routine claim for breach of contract that can be determined now as a matter of law. As set forth below, the Court should enter summary judgment in favor of the Debtors, dismiss each of Claimant's tort and statutory claims, and limit Claimant's allowable recovery on Claim Nos. 11242 and 11173 to the amount provided in the parties' contract.

## WORLDCOM'S REPLY TO PARUS HOLDINGS' "SUMMARY OF FACTS"

Parus Holdings devotes nearly thirteen pages consisting of eight unnumbered subsections to "summarize" its facts. Only three of the subsections warrant a reply.[1] As set forth below, Parus Holdings' subsections concerning the UC Contract, the amount owed by Intermedia, and an alleged pre-merger conspiracy to breach the UC Contract (Response at 5-7, 11-12, 12-14, respectively) are based upon impermissible characterizations of unambiguous contractual terms,

---

[1] For purposes of this Motion only, WorldCom does not dispute the facts "summarized" under the following subheadings: "EffectNet and its Relationship With Intermedia" (Response at 3-5); "EffectNet Devotes Its Resources to Intermedia" (id. at 7-9); "Intermedia Ceased Performance of Its Material Obligations Under the UC Contract" (id. at 9-10); "The EffectNet/Webley Merger and Webley's Investor Pitches" (id. at 14-15); and "Debtor's Bankruptcy Proceedings" (id. at 16). See also WorldCom's Reply To Parus Holding, Inc.'s "Statement In Response And Opposition To Debtors' Statement Of Undisputed Material Facts" (filed concurrently herewith).

A 02684

misrepresentations of the underlying documents submitted by Parus Holdings, and inadmissible

evidence that does not meet the standards required for summary judgment.

> **A.    Reply to Parus Holdings' Assertions Concerning the UC Contract (Response at 5-7) and the Amount Owed by Intermedia (Response at 11-12).**

Parus Holdings' summary of purported facts related to the UC Contract and the amounts

allegedly owed by Intermedia to EffectNet under the UC Contract are based entirely on the

affidavit of Taj Reneau, EffectNet's President and CEO.  Response at 5-7, 11-12.  As explained

more fully in WorldCom's accompanying Motion to Strike, the portions of Mr. Reneau's affidavit

concerning these subjects should be stricken because (1) they impermissibly assert self-serving

post hoc statements about the parties' intent; (2) they impermissibly assert conclusions of law;

and (3) they impermissibly characterize unambiguous terms of the UC Contract in a manner that

is not consistent with the UC Contract itself.  See BellSouth Telecomms., Inc. v. W.R. Grace &

Co., 77 F.3d 603, 615 (2d Cir. 1996) ("[U]ltimate or conclusory facts and conclusions of law . . .

cannot be utilized on a summary judgment motion"); In re Chateaugay Corp, 116 B.R. 887, 905

(S.D.N.Y. Bankr. 1990) (post hoc, self-serving statements which show affiant's subjective intent

are inadmissible); Fed. R. Civ. P. 56(e); Taylor v. State Farm Mut. Auto. Ins. Co., 854 P.2d

1134, 1138 (Ariz. 1993) (parol evidence rule prohibits extrinsic evidence to vary or contradict

agreement); Fed. R. Bank. P. 7056.  As discussed hereafter in part II of the Argument, the

relevant terms of the UC Contract are not ambiguous and are subject to the Court's interpretation

as a matter of law.

> **B.    Reply to Subsection Concerning Alleged Pre-merger Conspiracy to Breach UC Contract (Response at 12-14).**

Purporting to rely on the affidavits and documents described in its recitation of facts,

Parus Holdings exaggerates and distorts the evidence referenced at pages 12-14 and again at 18-

20 of its Response to argue that a fact question exists on the issues of a pre-merger plan to

**A 02685**

interfere with the UC Contract.  To avoid duplication, Claimant's alleged material facts are

addressed hereafter in part I.A.1 of the Argument.  As illustrated in that section, the evidence to

which Parus Holdings cites, even when viewed in the light most favorable to Parus Holdings,

does not support any reasonable inference supporting its claims.  Indeed, examination reveals

that Parus Holdings has stretched the content of its "evidence" far beyond anything reasonable.

Ultimately, Parus Holdings' summary of facts regarding Intermedia and WorldCom's alleged pre-

merger conspiracy is bottomed on the assertions of counsel, but lacks the support of admissible

evidence.  Thus, it fails to raise any issue of fact that would preclude summary judgment.  <u>See</u>

Fed. R. Civ. P. 56(e) ("[w]hen a motion for summary judgment is made and supported as

provided in this rule, an adverse party may not rest upon the mere allegations or denials of the

adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided

in this rule, must set forth specific *facts* showing that there is a genuine issue for trial").

## <u>ARGUMENT</u>

**I.     PARUS HOLDINGS HAS FAILED TO RAISE ANY ISSUE OF MATERIAL
       FACT OR DEMONSTRATE ANY BASIS FOR OPPOSING WORLDCOM'S
       MOTION UNDER FED. R. CIV. P. 56(f).**

Relying only on superseded authority, Parus Holdings suggests that summary judgment is

disfavored and should be used sparingly.  <u>See</u> Response at 16.  Just the opposite is so, as was

established 19 years ago by the Supreme Court's controlling rulings in <u>Celotex Corp. v. Catrett</u>,

477 U.S. 317, 322 (1986), <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986), and

<u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986), which Parus

Holdings fails even to acknowledge.  As the Supreme Court made clear in <u>Celotex</u>, <u>Liberty

Lobby</u> and <u>Matsushita</u>, summary judgment shall be rendered *forthwith* when there is no dispute

as to material facts and the motion is well founded in the law.

A 02686

Although the party seeking summary judgment bears the initial burden of showing that no genuine issue of material fact exists, <u>Celotex Corp.</u>, 477 U.S. at 323, the non-moving party must do "more than simply show that there is some metaphysical doubt as to material facts." <u>Matsushita</u>, 475 U.S. at 586. To defeat a motion for summary judgment, the non-moving party must present "specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e). It "may not rely on conclusory allegations or unsubstantiated speculation." <u>Scotto v. Almenas</u>, 143 F.3d 105, 114 (2d Cir.1998). And, pursuant to Rule 56(e), affidavits offered in opposition to summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."

In addition, the Court is to determine whether there exists any disputed issue of *material* fact. <u>See</u>, <u>e.g.</u>, <u>Donahue v. Windsor Locks Bd. of Fire Comm'rs</u>, 834 F.2d 54, 58 (2d Cir.1987); <u>Knight v. United States Fire Ins. Co.</u>, 804 F.2d 9, 11 (2d Cir.1986), <u>cert. denied</u>, 480 U.S. 932 (1987). The substantive law determines which facts are critical and which facts are irrelevant. <u>See</u>, <u>e.g.</u>, <u>Anderson</u>, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Id.</u>

In this case, Parus Holdings impermissibly relies on inadmissible evidence in an attempt to raise disputed issues of fact and refers the Court to allegedly disputed facts that are immaterial to WorldCom's Motion. Neither of these tactics provides any basis for avoiding summary judgment. Parus Holdings also claims that summary judgment should be denied because it has not completed discovery and must be given an opportunity to do so. But it fails to demonstrate how the discovery it seeks could have actual significance regarding resolution of WorldCom's

4

**A 02687**

Motion.  Thus, the request for further discovery before ruling on WorldCom's Motion is properly ignored.

### A.    Parus Holdings Has Not Raised Any Issue of Material Fact

#### 1.    Parus Holdings Fails in its Attempt to Create an Issue of Fact on its Claims for Conspiracy or Tortious Interference.

Parus Holdings contends "indisputable evidence" supports its claim that WorldCom hatched a plan before its merger with Intermedia "to undermine Intermedia's performance under the UC Contract."  Response at 18.  Notwithstanding its bold claim, Parus Holdings fails to deliver any evidence of a plan to interfere, let alone the heralded "indisputable" evidence of such a plan.

Parus Holdings repeatedly refers to Exhibits S and V to its counsel Robert S. Friedman's declaration.  The documents contained in both of those exhibits are dated in September and October 2000, over one month <u>before</u> the UC Contract was formed.  While both exhibits unquestionably reflect that WorldCom acquired Intermedia for its Digex subsidiary, which would help WorldCom advance its genD program, they make absolutely no mention of a plan to shut down either Intermedia or the as-yet unformed UC Contract.  Indeed, Exhibit V explicitly states that "WorldCom's first choice" is to sell Intermedia as "one going concern to some other owner."  And "[i]f a deal of that nature does not materialize," it may sell separate lines of Intermedia's business to other companies.  Exhibit V further states that "it is no one's intent" to terminate employees or sell off hard assets.  It then describes "three plans aimed at keeping employees productively engaged in our various business units so that those units continue as vibrant, 'going concerns' when the time comes for the subsequent transfer to a new owner(s)."

Notwithstanding the actual contents of Exhibits S and V, and the fact that they were written <u>before</u> the UC Contract came into existence, Parus Holdings cites them as the support for

A 02688

its argument that from the date of the announced merger between WorldCom and Intermedia, WorldCom planned to "shut down the competing UC Contract" along with Intermedia's competing product, IntermediaOne, and never intended that Intermedia would go forward with the UC Contract.  See Response at 19.[2]  Exhibits S and V thus do not support—indeed, they contradict—Parus Holdings' argument that from "the get go" WorldCom intended to shut down the UC Contract and Intermedia's products.  They accordingly do not raise any genuine issue of fact.

Parus Holdings also cites to Exhibits Q and R of its counsel's declaration to support its assertion that WorldCom and Intermedia conspired about the UC Contract before the merger. Exhibit Q is an Intermedia spreadsheet entitled "Vendor Management Contracts Status – Access & Services."  Parus Holdings contends that this spreadsheet evidences a discussion between WorldCom and Intermedia that the UC Contract is a completed contract.  Response at 13.  The spreadsheet, however, does not evidence any substantive discussion between the companies and merely lists basic information about the UC Contract, such as start and expiration dates, alongside the basic contract information of other vendors to Intermedia.[3]  Parus Holdings actually misquotes Exhibit R to argue that it confirms the existence of pre-merger discussions

---

[2]   Notably, Exhibits S and V never even mention the IntermediaOne product.  The only reference to IntermediaOne is found in Exhibit Y, which is dated September 13, 2001, nearly a year after Exhibits S and V and after the WorldCom-Intermedia merger had been completed.  Exhibit Y, which plainly reflects post-merger decisions to exit some and retain other parts of IntermediaOne, says nothing about pre-merger activities.

[3]   The only support for relating the spreadsheet to communications between WorldCom and Intermedia is Debtors' document production index, which regrettably was in error listing this document as being responsive to Request No. 18, which sought documents concerning Debtors' communications among each other regarding the UC Contract.  Absent that error, there is nothing in the document itself (nor its source, which are Intermedia's files from Florida) that evidences a discussion about the UC Contract, let alone a conspiracy to breach the contract.

6

A 02689

about the UC Contract.[4]  Exhibit R, which is dated November 21, 2001, does not reflect any discussion whatsoever between WorldCom and Intermedia.  Nor does it say anything about the UC Contract, which at that time had not yet been signed by EffectNet.  It plainly reflects an Intermedia manager's efforts to shift the focus and responsiveness of a group called the "Voice Process Team" at Intermedia in light of the announced merger.  Even the quoted sentence confirms that there was no plan to shut down Intermedia but to sell it to "another organization."

Finally, apparently to support its claim of a conspiracy to interfere, Parus Holdings argues that "Intermedia never sold one account outside of its own sales representatives."  Response at 20.  The cited affidavit of Taj Reneau simply does <u>not</u> say that.[5]  Further, Parus Holdings contends that, as a result of conspiracy and interference, "Intermedia was not going to even open one new account until August 2001."  Id.  But the underlying document Parus Holdings cites to support this assertion, Exhibit N of Mr. Reneau's affidavit, is a post-merger email in which Intermedia itemizes problems and decisions made during a conference call with EffectNet concerning the services under the UC Contract and concludes with the statement that "[i]ncrease in account volumes is not anticipated to begin before August 1, 2001." (emphasis supplied).  Again, this post-merger email between Intermedia and EffectNet provides no support for Parus Holdings' speculation of a pre-merger plan to interfere and creates no issue of fact on the claims for conspiracy and tortious interference.

---

[4]  Parus Holdings omits the word "team" from its quotation.  <u>Compare</u> Response at 19.  The last clause of the quoted sentence should read "the need of the company for a long-term focused process <u>team</u> has been greatly diminished."  <u>See</u> Ex. R to Friedman Decl.

[5]  The affidavit makes no such sweeping statement.  It merely states that users were limited to Intermedia sales representatives at the very beginning (in January 2001, the first month after the service was rolled out) and very end (March 2002) of the UC Contract.  Reneau Affidavit ¶¶ 26, 29.  Mr. Reneau makes no attempt in his affidavit to characterize the hundreds of customers signed up between the beginning and end points of the contract.

A 02690

2.    **Parus Holdings Fails to Identify an Issue of Fact Concerning Intermedia's Obligations Under the UC Contract.**

Parus Holdings also has not raised any issue of fact with regard to Intermedia's obligations under the UC Contract. <u>See</u> Response at 20-21. Parus Holdings' arguments about what obligations accrued under the UC Contract are issues of law, not fact, which are reserved for the Court to determine. <u>See</u> <u>Readco, Inc. v. Marine Midland Bank</u>, 81 F.3d 295, 299 (2d Cir. 1996) (construction of contract is question of law). Whether, when, and how Debtors accounted for the Minimum Commitment and Reconciliation Payment under the UC Contract are all immaterial to the claim for breach and contract damages. There is no dispute that Intermedia defaulted under the contract and owes the amounts specified therein. Nor does Parus Holdings create a material dispute by arguing, with no citation to supporting authority, that Debtors had already breached the UC Contract by July 2001. Response at 21. Parus Holdings itself asserts that the breach occurred in and after July 2001. <u>See id.</u> at 9-10 (describing that dismantling IntermediaOne, terminating product manager, and ceasing work under the UC Contract all occurred in July 2001 and thereafter). Parus Holdings cannot create an issue of fact by arguing contrary to what its evidence says. In short, the material facts concerning breach and termination are undisputed and it is the construction of the UC Contract (purely a legal question) that is in issue. Summary judgment on the contract claim is therefore proper.

B.    **Parus Holdings Has Failed to Demonstrate Any Basis for a Continuance Under Fed. R. Civ. P. 56(f)**

Parus Holdings contends that because discovery has not yet been completed, WorldCom's Motion should be denied under Fed. R. Civ. P. 56(f). Response at 22-29. But Parus Holdings acknowledges that in order to avoid summary judgment under Fed. R. Civ. P. 56(f), it must demonstrate the following: (1) the nature of the uncompleted discovery; (2) how such discovery is expected to demonstrate a genuine issue of material fact; (3) what effort the nonmovant has

8

made to obtain such discovery; and (4) why those efforts were unsuccessful.  Id. at 22.  Parus

Holdings devotes almost 15 percent of its response to a repetition of the history of the discovery

dispute that it instigated and still maintains before the Court.  Id. at 22-29.  However, Parus

Holdings fails in its Response to demonstrate how the discovery it references is expected to raise

a genuine issue of material fact in light of the legal arguments made by WorldCom in its Motion.

Id.

 Relief under Fed. R. Civ. P. 56(f) will be denied if the discovery appears irrelevant to the

issues to be adjudicated.  Bill Diodato Photography, LLC v. Kate Spade, LLC, 388 F. Supp. 2d

382, 395 (S.D.N.Y. 2005) (citing Contemporary Mission, Inc. v. N.Y. Times Co., 842 F.2d 612,

622 (2d Cir. 1988)); see also Flaherty v. Filardi, 388 F. Supp. 2d 274, 291 (S.D.N.Y. 2005)

(denying plaintiff's request for additional discovery under Rule 56(f) because plaintiff failed to

establish that there was any material issue as to which additional evidence was necessary to

decide the pending motion for summary judgment).  Applying this principle here, Parus

Holdings has failed to provide any basis for postponing determination of WorldCom's motion for

summary judgment.

 Parus Holdings contends that WorldCom improperly filed its motion for summary

judgment in an effort to avoid its discovery obligations.  Response at 23.  On the contrary,

WorldCom has complied with its discovery obligations and properly has invoked the summary

judgment procedure at this stage of the case because Parus Holdings at best has a straightforward

breach of contract claim that can be resolved as a matter of law.  As set forth in WorldCom's

Motion, Parus Holdings as a matter of law cannot convert its breach of contract claim into

multiple tort claims.

A 02692

Much of Parus Holdings' regurgitation of the parties' discovery dispute has been presented to the Court on multiple occasions. It is irrelevant here because the discovery Parus Holdings purports to seek does not address any issue of material fact.[6] Parus Holdings obviously designed its lengthy and misleading rhetoric regarding discovery to deflect attention away from the substantive issues in this case. None of Parus Holdings' discovery complaints has merit and none provides any basis for opposing WorldCom's motion for summary judgment.

## II.    CLAIMANT'S DAMAGES MAY BE DETERMINED AS A MATTER OF LAW

### A.    Claimant's Damages May Not Exceed $460,422.30

#### 1.    EffectNet Indisputably Terminated the UC Contract as of April 12, 2002.

As provided by Section 5.2, the UC Contract was terminated on April 12, 2002, thirty days after EffectNet's General Counsel gave notice of default to Intermedia and Intermedia failed to cure its default within the allotted thirty days. Parus Holdings falsely assumes that termination of the contract can be undone, and a fact issue created, three years after the fact by filing an affidavit from the author of the original default notice (an interested party to this proceeding in his role as General Counsel of claimant Parus Holdings) stating that he never intended to terminate the UC Contract. McConnell Affidavit ¶ 9 ("I never intended to terminate the UC Contract . . . ."). Mr. McConnell's current statement to this Court is at complete odds with his contemporaneous statement in 2002 concerning the consequences of the notice of default that he sent on behalf of EffectNet to Intermedia: On March 25, 2002, Mr. McConnell told WorldCom:

---

[6]    WorldCom, nevertheless feels compelled to respond to Parus Holdings' ongoing misrepresentations about WorldCom's discovery efforts despite multiple sworn declarations submitted by WorldCom's counsel, Donald Ramsay, and Parus Holdings' seven hour deposition of Mr. Ramsay. Rather than burden this Reply Memorandum with discovery matters that are not germaine to summary judgment, WorldCom respectfully refers the Court to the "Addendum" attached hereto, which unfolds Parus Holdings' many contortions concerning the status of discovery and WorldCom's responsiveness in discovery.

A 02693

> EffectNet, by letter to the attention of Mr. Rich Black, dated March 12, 2002,
> issued a written notice of default under Section 5.2 of the Agreement with respect
> to the Intermedia Defaults, as defined in the March 12 letter (the "March 12
> Letter") . . . As you know, the Agreement in Section 5.2 provides that
> "[t]ermination due to default under this Section shall be effective thirty (30) days
> after written notice to the defaulting Party if the default has not been cured within
> such thirty (30) day period." <u>Accordingly, the [UC Contract] will be terminated
> for default by Intermedia on or about April 12, 2002 if the Intermedia Defaults are
> not cured prior thereto</u>.

March 25, 2002 letter to Brett Bacon from Robert C. McConnell, Ex. E to Summary Judgment

Motion (emphasis added).  Tellingly, Parus Holdings omits the critical underlined sentence from

its misleading discussion of the March 25 letter.

By an impermissible, after-the-fact affidavit, Mr. McConnell argues that he did not mean

what he said in 2002 about termination of the UC Contract.[7]  That, however, is of no moment.

Parus Holdings does not dispute that it gave notice of default and that Intermedia failed to cure

within 30 days.  Response and Opposition to Debtors' Statement of Undisputed Material Facts

¶¶ 19, 54.  Thus, by operation of Section 5.2, the UC Contract terminated thirty days after Mr.

McConnell's March 12, 2002 letter.  Further belying its post hoc protestations to the contrary,

Parus Holdings' own undisputed facts show that EffectNet understood that the contract had been

terminated.  Parus Holdings asserts as an undisputed fact that EffectNet ceased performing under

the UC Contract after it received no response from Intermedia to Mr. McConnell's March 12 and

25, 2002 letters.  <u>Id.</u> ¶¶ 54-55.  Such a cessation of performance by EffectNet is entirely

consistent with the termination provision of the UC Contract, which provides: "nothing herein

shall be construed to obligate EffectNet to offer Services to Intermedia after the termination of

this Agreement."  UC Contract § 5.3 (Ex. A. to Summary Judgment Motion).  Accordingly, the

---

[7]    <u>See</u> Motion to Strike Affidavits at 2-3.

A 02694

Court may, and should, find as a matter of law that, pursuant to EffectNet's default notices and Section 5.2 of the UC Contract, the contract was terminated on April 12, 2002.

> **2.    As a Matter of Law, Intermedia's Accrued Obligations Are Limited to the Reconciliation Payments That Were Due at the Time of the Termination.**

There is no dispute that the principal contract terms governing the amounts owed upon the termination of the UC Contract for default are sections 2.12, 2.13, 5.3, and Appendix P of that contract.  Nor is there any dispute over the meaning of "accrue" or that EffectNet has an enforceable right to payment for Intermedia's obligations that had accrued prior to the contract's termination.  The only question is what obligations had accrued under the contract prior to its termination--a purely legal question of contract interpretation.

Parus Holdings agrees Section 5.3 provides that upon termination of the agreement for any reason (except as noted in Section 5.4) each party shall remain liable for those obligations that *accrued prior to the date of the termination*.  Parus Holdings merely challenges the amount that should have accrued.  Ignoring the plain language of the contract, Parus Holdings argues that Intermedia anticipatorily breached the contract and, therefore, that the obligations that accrued prior to the date of termination were the full amounts that would have been owed under the Minimum Commitment provisions of Sections 2.12 and 2.13 had the contract run its full three-year term.  Parus Holdings overlooks, however, the language in Sections 2.12, 2.13, 5.4, and 6 of the UC Contract.

> **a)    Sections 2.12 and 2.13 of the UC Contract Limit Intermedia's Obligation to Make Reconciliation Payments.**

Placed among the provisions entitled "Obligations of the Parties," Sections 2.12 and 2.13 define how the Minimum Commitment Reconciliation Payment obligation arises.  It is far from a guaranteed three-year revenue stream.  Instead, both sections very specifically describe the

A 02695

Minimum Commitment and the Reconciliation Payment as obligations that arise only at the end

of each month after December 18, 2001.  Section 2.12 contemplates that Intermedia will have

10,000 subscribers using EffectNet's services on the "Ramp Date" (defined as December 18,

2001) "*and at the end of each calendar month thereafter* (the "Minimum Commitment") for the

Term of this Agreement."  UC Contract, § 2.12.  Section 2.13 describes the monetary obligation

connected with the Minimum Commitment and uses similar, though not identical, language

about monthly calculations:

> 2.13  <u>Reconciliation Payment</u>.  On the Ramp Date [December 18, 2001] and *at
> the <u>end</u> of each calendar month thereafter*, EffectNet will calculate the actual
> number of then current active subscribers *on the last day of such calendar month*
> and compare it to the Minimum Commitment.  If the number of subscribers is less
> than the Minimum Commitment *for the month in question*, such difference will
> constitute a "Volume Shortfall."  Intermedia shall pay EffectNet a Reconciliation
> Payment equal to the Volume Shortfall multiplied by the base monthly price
> applicable to the Intermedia UC Service per subscriber.

<u>Id.</u> § 2.13 (emphasis supplied).  Notably, Section 2.13 does not contain the language "for the

Term of this Agreement" found in Section 2.12.  It also makes clear that the Reconciliation

Payment becomes an obligation only on the Ramp date and at the end of each calendar month

thereafter.  Thus, assuming the contract was terminated on April 12, 2002 (as it was), the only

months in question for which an obligation could arise to pay the Reconciliation Payment were

December 2001 and January through March 2002.

### b)  Intermedia's Obligation to Pay Reconciliation Payments Did Not Survive Termination of the UC Contract on April 12, 2002.

Section 6, which governs the survival of contractual provisions after termination, is fully

consistent with the understanding that the Reconciliation Payment obligation in Section 2.13

only accrues at the end of each month prior to termination.  Section 6 identifies those parts of the

contract that survive termination (i.e., Subscriber Information, Charges and Billing Statements,

Term and Termination, Confidentiality, Warranties, Intellectual Property, Indemnification,

13

A 02696

Limitation of Liability, and General Provisions).  Significantly omitted as a provision surviving termination of the UC Contract is the entirety of Section 2, "Obligations of the Parties," of which the Minimum Commitment (§ 2.12) and Reconciliation Payment (§ 2.13) provisions are part.  Thus, under Section 6, the Minimum Commitment and Reconciliation Payment calculations cease after termination.  Pursuant to Section 6, only those Reconciliation Payment obligations that had accrued before termination of the contract, as specified in Section 5.3, survive that termination.

> ### c)    EffectNet Elected to Terminate the UC Contract; It Did Not Elect to Sue for Breach.

Parus Holdings argues repeatedly that Intermedia anticipatorily breached the contract and that it should be entitled to claim damages for total breach as a result.  While the facts do not evidence anticipatory breach, the issue is irrelevant because Parus Holdings undisputedly elected to wait until Intermedia defaulted on its Reconciliation Payments before it terminated the agreement.  Parus Holdings does not even claim to have asserted an anticipatory repudiation at the time it now alleges that Intermedia had anticipatorily breached the contract.  Nor does it claim to have then exercised or attempted to exercise its right to sue that would have arisen from an anticipatory breach.  Indeed, Parus Holdings' default letters of March 12 and 25, 2002 make no mention of any anticipatory breach.  Instead, Parus Holdings elected to terminate the contract under Section 5.2.  Demonstrating that it understood it had terminated the contract, Parus Holdings admits that EffectNet ceased performing its obligations, as permitted under Section 5.3, when Intermedia did not cure its defaults within thirty days.  Response and Opposition to Debtors' Statement of Undisputed Material Facts ¶ 55.  Accordingly, Parus Holdings' remedy is

A 02697

to collect the obligations that had accrued before the termination, i.e., no more than $460,442.30, as explained in Debtors' original brief supporting summary judgment.[8]

### d)    Intermedia Could Terminate the UC Contract For Any Reason

The UC Contract's early termination provision, Section 5.4, further refutes Claimant's argument that it had a legal right to receive Reconciliation Payments through the contract's potential expiration in November 2003.  Instead, Parus Holdings only had a contingent future hope of continuing revenues under the contract.  This is because Intermedia had the right to terminate the UC Contract at any time for any reason:

> 5.4  Early Termination.  If prior to the end of the Initial Term this Agreement is terminated for any reason by Intermedia other than pursuant to Section 5.2 [defaults by EffectNet], Intermedia shall pay EffectNet, *as liquidated damages and as the sole remedy of EffectNet and the exclusive liability of Intermedia*, a one-time early termination fee equal to $270,400 times the *lesser* of (i) 12 months, or (ii) the number of months remaining in the contract term.

US Contract, § 5.4 (emphasis added).

Under Section 5.4, if Intermedia had terminated the contract early (which it did not), the most Parus Holdings would have had a right to receive would have been an early termination fee of $3,244,800, representing $270,400 for 12 months.  Thus, given Intermedia's right to terminate early for any reason, Parus Holdings cannot be entitled under any circumstances to damages that are based upon a calculation of the Minimum Commitment beyond the date of a contract termination under Section 5.2.  Nor can Parus Holdings claim expectation damages for the duration of the contract term when Intermedia had the right to terminate at any time.  Such a claim, if awarded, would constitute an improper windfall.  See Royal's Reconditioning Corp.,

---

[8]    Although quibbling with the name, Parus Holdings admits that Intermedia paid the $175,000 deposit described in Section 4.5.1 of the UC Contract.  WorldCom's Facts ¶ 10; Claimant's Response to Facts ¶ 10.  Thus, the total amount owed must be reduced by that deposit in accordance with the terms of the UC Contract § 4.5.1.

A 02698

Inc. v. Royal, 689 N.E.2d 237, 240-41 (Ill. Ct. App. 1997) (collecting cases and reducing award to reflect termination notice period).

In sum, as Reorganized Debtors asserted in their opening summary judgment brief, EffectNet's termination of the UC Contract triggered Section 5.3, which provides that Parus Holdings' only remedy for Intermedia's defaults is recovery of the obligations that had accrued before termination. Those obligations are limited to the invoiced amounts for December 2001 and January through March 2002, as adjusted to reflect the appropriate Reconciliation Payment described at page 17 of Reorganized Debtors' opening brief, less the deposit paid pursuant to Section 4.5.1 of the UC Contract.

### 3. The Plain Language of the UC Contract Calls For the "Basic" Service Price of $11.45.

Parus Holdings contends that the "base" rate contemplated in Section 2.13 of the UC Contract is the "Unlimited" rate provided in Appendix P (Pricing) to the UC Contract. Response at 37.[9] Parus Holdings bases this contention on inadmissible affidavit statements of Mr. Reneau. As detailed in Reorganized Debtors' Motion to Strike, filed contemporaneously with this Reply, these paragraphs of Mr. Reneau's affidavit should be stricken and disregarded because he impermissibly attempts to provide ultimate or conclusory facts and conclusions of law to contradict and vary the terms of the contract.[10] Such "ultimate or conclusory facts and conclusions of law . . . cannot be utilized on a summary judgment motion." BellSouth Telecomms. Inc. v. W.R. Grace & Co., 77 F.3d 603, 615 (2d Cir. 1996). Moreover, the parol evidence rule prohibits extrinsic evidence to vary or contradict an agreement. Taylor v. State

---

[9]   Parus Holdings also mistakenly suggests that Intermedia never objected to the calculations on its invoices. Response at 38. On the contrary, it is undisputed that Intermedia did not pay those invoices.

[10]   Motion to Strike Affidavits at 3-5.

Farm Mut. Auto. Ins. Co., 854 P.2d 1134, 1138 (Ariz. 1993); see also Readco, Inc. v. Marine Midland Bank, 81 F.3d 295, 299 (2d Cir 1996) (construction of contract is question of law and parol evidence is not admissible to create ambiguity) (citations omitted); In re Chateaugay Corp., 116 B.R. 887, 905 (S.D.N.Y. Bankr. 1990) ("Where proof is to be made of a fact which is recorded in a writing, the best evidence of the contents of the writing consists of the document itself." (citation omitted)).

In any event, as noted in Reorganized Debtors' Memorandum, "the plain language of the contract must control." Campisano v. Phillips, 547 P.2d 26, 30 (Ariz. Ct. App. 1976). A contract term is not ambiguous just because the parties disagree about its meaning. Chandler Med. Bldg. Partners v. Chandler Dental Group, 855 P.2d 787, 791 (Ariz. Ct. App. 1993). Instead, the contract "is to be read in light of the parties' intentions as reflected by their language and in view of all circumstances; if the intention of the parties is clear from such a reading, there is no ambiguity." Harris v. Harris, 991 P.2d 262, 265 (Ariz. Ct. App. 1999). Here, Section 2.12 of the UC Contract, the so-called reconciliation provision, provided for a reconciliation payment based on the "base" monthly price. Appendix P (Pricing) to the UC Contract provided two pricing options: "Basic" and "Unlimited." It is illogical and unreasonable to equate "base" with "Unlimited." It is, however, logical and reasonable to equate "base" with "Basic." Accordingly, the Court should enter summary judgment holding that the "Basic" rate of $11.45 per month applies and, as detailed in Reorganized Debtors' motion for summary judgment, $460,442.30, less the Section 4.5.1 deposit, is the upper limit of Intermedia's obligations on Parus Holdings' claim for breach of contract.

### B.    Parus Holdings Bargained for Limited Liability

Parus Holdings grumbles that Reorganized Debtors have ignored its claim for benefit of the bargain. On the contrary, the gravamen of Reorganized Debtors' argument is that the parties

A 02700

bargained explicitly regarding what the effects should be for default and termination under the UC Contract.  See UC Contract §§ 5.2, 5.3 and 11.  Parus Holdings' citation to default principles concerning breach of contract does not create a genuine issue of fact and ignores Arizona law. "Under Arizona law, where a contract provides the remedy in event of breach, its terms will control the determination of contract damages."  Tucson Elec. Power Co. v. Bailey Controls Co., No. CIV 92-185 TUC RMB, 1992 WL 430467, at *2 (D. Ariz. Oct. 5, 1992) (citing Green v. Snodgrass, 79 Ariz. 319, 322 (1955)).  Parus Holdings explicitly bargained that Intermedia would remain responsible only for those obligations that accrued prior to April 12, 2002, the date of the termination.  UC Contract § 5.3.  Under Arizona contract construction rules, this express statement of the parties' obligations for termination excluded other forms of liability that might otherwise apply.  Herman Chanen Constr. Co. v. Guy Apple Masonry Contractors, Inc., 453 P.2d 541, 543 (Ariz. Ct. App. 1969) (applying the doctrine of *expression unius est exclusion arterius* to limit indemnification to class of employees named in contract, excluding other employees not named).  Further, refuting Parus Holdings' suggestion that it should be entitled to "lost value," the parties explicitly excluded recovery, without limitation, of such damages as loss of profits and loss of business.  UC Contract § 11.

As set forth above, the UC Contract was terminated on April 12, 2002 pursuant to Section 5.2 of that contract and, under the express terms of the parties' bargain, Claimant's damages are limited to those amounts that had accrued prior to April 12, 2002.  Awarding damages beyond the limits expressly agreed to in Sections 5.3 and 11 would amount to an improper windfall for Parus Holdings.  See Royal's Reconditioning, 689 N.E.2d at 241.

### C.     The Court Should Enforce the Contract's Limitations of Liability

#### 1.     Parus Holdings Agreed to Limited Remedies.

As stated in Reorganized Debtors' Memorandum, Section 11 of the UC Contract, which unequivocally prohibits either party to the UC Contract from seeking to impose liability on the other for consequential or similar damages, is enforceable under controlling Arizona law.  A contract clause that limits incidental and consequential damages is enforceable.  Southwest Pet Prods. Inc. v. Koch Indust., Inc., 107 F. Supp. 2d 1108, 1113-15 (D. Ariz. 2000).  Particularly in a commercial setting with two sophisticated parties such as EffectNet and Intermedia, limitations or waivers of consequential damages are fully enforceable.  Raybond Elecs., Inc. v. Glen-Mar Door Mfr. Co., 528 P.2d 160, 166 (Ariz. Ct. App. 1974).  Indeed, under the governing law of Arizona, a valid contract must be given full force and effect regardless of whether that contract is thought to be unwise or improvident or its enforcement perceived to be harsh.  Goodman v. Newzona Inv. Co., 421 P.2d 318, 322 (Ariz.1966) (citations omitted).

Parus Holdings wrongly asserts that enforcement of Section 11 would leave it without an adequate remedy and, relying on a Missouri case, could only result from an unreasonable interpretation of the provision.  Response at 13-14.  Specifically, Parus Holdings relies on Parker v. Pulitzer Publ'g Co., 882 S.W.2d 245 (Mo. Ct. App. 1994).  However, Parker involved neither a limitation of liability clause nor Arizona law.  Instead, it involved interpretation of the word "continuation" as used in the waiver clauses of distributorship agreements and it applied Missouri law.  Id. at 250-51.  The court held that only one reasonable interpretation of the word "continuation" existed, noting that Pulitzer's interpretation was unreasonable because it left the distributors without a remedy absent termination.  Id. at 251.

Here, only one interpretation of Section 11 exists – it unequivocally prohibits either party to the UC Contract from seeking to impose liability on the other for consequential or similar

A 02702

damages.  UC Contract § 11.  Moreover, Section 11 is consistent with the other provisions of the UC Contract and did not leave EffectNet without a remedy.  To the contrary, enforcement of Section 11 of the parties' contract leaves intact Parus Holdings' straight breach of contract claim for amounts Intermedia owed to Parus Holdings under Section 5.3 before the date of termination.

### 2.    The Limitation of Liability Section is Complete and Unambiguous.

Attempting to evade the liability limitation provisions of Section 11, Parus Holdings argues that a blank in the first clause of the paragraph renders it incomplete and thus requires further discovery from the parties.  Nothing could be further from the truth.  The blank is found in an introductory clause that the parties could have agreed to use, had they so desired, to exempt a specific provision of the contract from the liability limitations.  The exception, however, is merely a potential modifier to the terms of Section 11 and otherwise wholly unnecessary to understanding and applying the liability limitations of that provision.  In other words, Section 11 is fully capable of enforcement as written, without filling in the blank.

It is well settled that blanks in a contract do not, per se, render the contract unenforceable or ambiguous.  Hofmann Co. v. Meisner, 497 P.2d 83, 86 (Ariz. Ct. App. 1972) superseded by statute on other grounds by A.R.S. § 25-214 (C)(2) (citing Reidy v. Almich, 418 P.2d 390 (Ariz. Ct. App. 1966)).  Blanks left in contracts have been found simply to be evidence that the parties did not reach an agreement on that issue.  For example, in Smith v. Those Certain Ins. Cos. Subscribing to Aircraft Ins. Policy No. Reinco 57, 645 P.2d 1285 (Ariz. Ct. App. 1982), which involved a dispute arising under an insurance contract, the parties did not fill in a space that called for the name of an authorized agent for the purpose of accepting service of process.  645 P.2d at 1285, 1287.  The contract provided for two alternate methods for service of process, under either of which the underwriters agreed to submit to the jurisdiction of the court.  Id. at 1287.  One method provided for service through the agent designated by filling in a blank in the

A 02703

contract and the other called for service pursuant to a specific statutory provision.  Id.  After the plaintiffs attempted to accomplish service by yet a different method, the court dismissed the case for lack of jurisdiction due to insufficient service of process on the underwriters.  Id. at 1286.  As here, the Smith plaintiffs argued that the contract was ambiguous because of the blank in the contract.  Id. at 1287.  The court rejected plaintiffs' argument, holding that "the failure to fill in the blank spaces in the insurance contract did not create an ambiguity; the omission merely shows absence of any agreement for substituted service[.]"  Id.

"[M]ere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment."  Conroy v. N.Y. State D.O.C. Servs., 333 F.3d 88, 94 (2d Cir. 2003) (quoting Cifarelli v. Village of Babylon, 93 F.3d 47, 51 (2d Cir. 1996)).  Other than its conclusory argument on ambiguity, Parus Holdings offers nothing to suggest that EffectNet's understanding of Section 11 differs in any respect from that of Intermedia, or that the UC Contract somewhere exempts damages arising from certain sections.  Parus Holdings thus has failed to present any alternative interpretation of the damage limitation provision that could demonstrate an ambiguity.  Parus Holdings also cites no case law supporting its argument that the blank makes Section 11 ambiguous.  Instead, it merely provides a list of inapposite cases for the unremarkable proposition that a court may turn to parol evidence to interpret ambiguities.[11] See Response at 42.  No ambiguity exists in Section 11 of the UC Contract; therefore, parol evidence is unnecessary.

---

[11]   Parus Holdings cites Hartford v. Ind'l Comm'n of Ariz., 463 P.2d 547, 549 (Ariz. 1970), and AROK Constr Co. v. Indian Constr. Servs., 848 P.2d 870 (Ariz. Ct. App. 1993), for general rules regarding the use of parol evidence to interpret ambiguous contracts.  Unlike the UC Contract, Joy Enters., Inc. v. Reppel, 537 P.2d 591 (Ariz. 1975), and Aztec Film Prods. v. Tucson Gas & Elec. Co., 463 P.2d 547 (Ariz. 1969), involved contracts in which the parties had not fully reduced to writing such essential terms as dates of performance or type of film.  None of these cases involved blanks such as found in Section 11 of the UC Contract.

A 02704

As in <u>Smith</u>, the blank in the limitations clause means that the parties did not agree to exempt any provisions of the UC Contract from the damages limitation. The Court thus may enforce and implement the limitation of liability provisions without exception. Accordingly, the Court should reject Parus Holdings' ambiguity argument and apply the damages limitation clause as written.

## III.    CLAIMANT'S TORT CLAIMS ARE BARRED AS A MATTER OF LAW

Bent on converting an ordinary contract claim into several torts, Parus Holdings advances empty arguments about when WorldCom and Intermedia merged (to avoid the general rules barring conspiracy and tortious interference claims among parent and subsidiary corporations); misinterprets the judgment requiring WorldCom to divest itself of Intermedia assets; and speciously attempts to recast Intermedia in the part of the seller under the UC Contract. All of these efforts fail. Claimant has not shown the existence of a genuine issue of material fact on any of its tort claims. Accordingly, each of Claimant's tort claims is barred as a matter of law.

### A.    The Conspiracy Claim Should Be Denied As A Matter of Law

Parus Holdings does not dispute that a claim of civil conspiracy cannot rest on proof of a conspiracy alone. Indeed, citing Illinois law, Parus argues that the purported conspirators must have engaged in unlawful conduct, or lawful conduct for an unlawful purpose, in furtherance of which at least one of the conspirators committed a tortious act.[12] Response at 44 (<u>citing</u> <u>Adcock</u>

---

[12] Relying on the affidavit of Mr. Taj Reneau, Parus Holdings claims that EffectNet's principal place of business was in Chicago, Illinois. Mr. Reneau's affidavit assertion that EffectNet's principal place of business has been in Chicago, Illinois since July 21, 2001, however, is belied by the facts that:

- EffectNet's March 12, 2002 notice of default to Intermedia originated from the Phoenix, Arizona office of EffectNet at 10230 S. 50th Place, Phoenix, AZ 85044 (Ex. D to Summary Judgment Motion);

A 02705

v. Brakegate, Ltd., 645 N.E.2d 888, 894 (Ill. 1994)).  Accord Gallagher Bassett Servs., Inc. v.

Jeffcoat, 887 So.2d 777, 786 (Miss. 2004); Florida Fern Growers Ass'n, Inc. v. Concerned

Citizens of Putnam County, 616 So.2d 562, 565 (Fla. Dist. Ct. App. 1993); Savard v. Selby, 508

P.2d 773, 776 (Ariz. 1973); Uvodich v. Ariz. Bd. of Regents, 453 P.2d 229 (Ariz. 1969).  Parus

Holdings fails, however, to identify anything more than its claims for breach of contract and

tortious interference as the underlying tortious acts.  A simple breach of contract, which is the

focus of Parus Holdings' claims here, cannot serve as an underlying tort that would permit

imposing joint and several liability on WorldCom through a conspiracy theory.  John's

Insulation, Inc. v. Siska Constr. Co., Inc., 774 F. Supp. 156, 162 (S.D.N.Y. 1991).[13]  Nor can

Claimant hold Intermedia liable through a conspiracy theory for tortious interference when, as

discussed below, its tortious interference claim fails.  See id. at 162-63; JIT Concepts, Inc. v.

Shelby County Healthcare Corp., 358 F. Supp. 2d 678, 688 (W.D. Tenn. 2005) (to prevail on

---

- That same communication directed Intermedia to make its payments via wire transfer to a Tempe, Arizona Wells Fargo Bank (id.);

- The Certificate of Merger between EffectNet Acquisition Corp. and EffectNet, Inc., which was filed on April 7, 2003 and executed by Mr. Taj Reneau, states that "the executed Agreement and Plan of Merger is on file *at the office of the surviving corporation [EffectNet, Inc.], the address of which is 10230 South 50th Place, Phoenix, Arizona 85044;*" Ex. A, Delaware Certificate of Merger; and

- Maintaining the office at 10230 S. 50th Place, Phoenix, AZ 85044, is consistent with the Certificate of Merger between EffectNet LLC and EffectNet, Inc., which Mr. Taj Reneau executed on December 27, 2000, id.

[13]  Nothing in Parus Holdings' arguments in opposition to summary judgment evidence that the actions taken by WorldCom after July 1, 2001 were anything other than business decisions made in a competitive market.  As such, they are not "unlawful" for purposes of Parus Holdings' civil conspiracy claim.  See, e.g., De L'Ogier Park Dev. Corp. v. First Fed. Sav. & Loan, 286 N.E.2d 583, 586 (Ill. Ct. App. 1972) (holding that damage done to competitors, including forcing competitors out of business, is not per se unlawful).

A 02706

civil conspiracy claim based on inducement to breach contract, plaintiff must first establish claim for inducement to breach a contract).

In its effort to avoid the rule that parent and subsidiary corporations cannot conspire, Parus Holdings now argues that the "crux" of its claims is that WorldCom and Intermedia conspired, and that WorldCom tortiously interfered with Intermedia's contract, *before* they were related companies.  Response at 43.[14]  Although Parus Holdings argues in conclusory fashion that WorldCom's alleged improper conduct took place before the merger, none of the facts it has alleged constitutes a tortious act predating July 1, 2001.  On the contrary, Claimant explicitly alleges that the purportedly wrongful acts took place *after* the WorldCom-Intermedia business combination.  See, e.g., Parus Opposition at ¶¶ 16-18 (alleging acts that occurred "after the WorldCom-Intermedia business combination"), 79-81 (alleging acts that occurred "[a]fter the Intermedia-WorldCom business combination") Ex. B to Summary Judgment Motion.

Parus Holdings also fails to supply any basis for diverging from the Supreme Court's ruling that a parent and its wholly-owned subsidiary cannot conspire with each other due to a unity of economic interest.  Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 777 (1984).  Parus Holdings offers no controlling (or persuasive) authority that would support ignoring the Copperweld decision here.  Parus Holdings cites some decisions that question the extent to which Copperweld should apply, but all are factually distinguishable.  For example, in Stamp v. Inamed Corp., 777 F. Supp. 623 (N.D. Ill. 1991), the court held that a subsidiary could sue its parent corporation, not that a parent and subsidiary could be sued for a conspiracy.  Id. at

---

[14]  To make this argument, Claimant seizes upon its single boilerplate allegation that "EffectNet believes that on or before July 1, 2001, Intermedia and WorldCom made a conscious election to breach and repudiate the UC Contract."  Parus Opposition at ¶ 15 Ex. B to Summary Judgment Motion.  Claimant's equivocation on the timing underscores the conclusory nature of its conspiracy theory.

A 02707

625-26.  Likewise, Parus Holdings misstates the discussion of Illinois law in In re

ContiCommodity Services, Inc. Securities Lit., 733 F. Supp. 1555, 1568 (N.D. Ill. 1990).  The

court there did not hold, as Parus Holdings argues, that a subsidiary can conspire with its parent;

it held that an agent cannot conspire with a principal, but that the plaintiffs might be able to

prove a conspiracy if they failed to hold the parent liable on agency principles.  Id.  In Borden,

Inc. v. Spoor Behrins Campbell & Young, Inc., 828 F. Supp. 216 (S.D.N.Y. 1993), the court

discussed Copperweld's scope in dicta, but ultimately concluded that Copperweld did not pose a

hurdle because the parent and subsidiary had conspired with other third parties so as to allow the

conspiracy claims to proceed.  Id.

Unlike in Claimant's cases, WorldCom and Intermedia had a complete unity of

commercial interest after their July 1, 2001 merger.  Their objectives were common, not

disparate, and their general corporate objectives were guided or determined not by two separate

corporate consciousnesses, but one.  See Copperweld, 467 U.S. at 771-72.  Like any other

wholly owned subsidiary, Intermedia acted for the benefit of its sole shareholder, WorldCom.

For these reasons, Copperweld applies, and the Court should find that, as parent and subsidiary

corporations, WorldCom and Intermedia were incapable of conspiring with each other.

Finally, in a separate section to itself, Parus Holdings misconstrues the court order that

established an indisputably lawful purpose for divesting Intermedia's assets.  Response at 51-52.

The broad order to divest all Intermedia Assets as an ongoing, viable business was subsequently

modified.  The Department of Justice recognized that conditions in the telecommunications

marketplace had deteriorated, that growth in telecommunications services markets had slowed

dramatically, and that there was a glut of carrier business and assets becoming available at

distressed prices, resulting in many companies being forced to restructure or substantially

25

downsize their operations.  Memorandum in Support of Joint Motion to Modify Hold Separate

Stipulation and Order at 3 (attached hereto as Exhibit B).  Accordingly, the Justice Department

agreed that the original requirement could be modified so that only Intermedia's internet

backbone assets needed to be sold as an ongoing, viable business.  Id. at 4-5.  On August 30,

2001, the court modified its order as proposed, keeping in place the order to divest Intermedia

assets, as set forth in the Final Judgment, but no longer requiring assets, such as the UC Contract,

which did not relate to internet backbone services, to be part of an ongoing business to be sold.

Modified Hold Separate Stipulation and Order at 2, 4 (attached hereto as Exhibit C). Thus, the

government's action requiring WorldCom to divest itself of Intermedia in order to go forward

with the acquisition continues to contradict Claimant's contention that Intermedia's failure to

perform obligations under the UC Contract resulted from improper acts.

## B.    Summary Judgment Should Be Entered on the Tortious Interference Claim

The Court should enter summary judgment on Parus Holdings' claim that WorldCom

tortiously interfered with its contract with Intermedia.  Parus Holdings offers no legitimate

reason for departing from what it concedes to be the general rule that a parent cannot tortiously

interfere with its subsidiary's contract.  As explained in Waste Conversion Sys., Inc. v.

Greenstone Indus., Inc., 33 S.W.3d 779, 781-82 (Tenn. 2000), which Parus Holdings cited in its

Response, this rule arises from the usual identity of interests between a subsidiary and its parent.

Indeed, ". . . a parent and a subsidiary are so closely aligned in business interests as to render

them, for tortious interference purposes, the same entity."  American Med. Int'l, Inc. v.

Giurintano, 821 S.W.2d 331, 336 (Tex. Ct. App. 1991), citing Deauville Corp. v. Federated Dep't

Stores, Inc., 756 F.2d 1183, 1197 (5th Cir. 1985).  As the Supreme Court aptly put it:

> A parent and its wholly owned subsidiary have a complete unity of interest.  Their
> objectives are common, not disparate; their general corporate actions are guided
> or determined not by two separate corporate consciousnesses, but one. They are

26

**A 02709**

> not unlike a multiple team of horses drawing a vehicle under the control of a single driver. With or without a formal "agreement," the subsidiary acts for the benefit of the parent, its sole shareholder. If a parent and a wholly owned subsidiary do "agree" to a course of action, there is no sudden joining of economic resources that had previously served different interests . . . . [I]n reality a parent and a wholly owned subsidiary always have a "unity of purpose or a common design." They share a common purpose whether or not the parent keeps a tight rein over the subsidiary; the parent may assert full control at any moment if the subsidiary fails to act in the parent's best interest.

Copperweld, 467 U.S. at 771-72. Even though the Supreme Court provided this reasoning in the context of an antitrust case, "the underlying relationship between the two corporations would be no different in a tortious interference of contract case." Waste Conversion, 33 S.W.3d at 782.

Parus Holdings devotes the bulk of its argument to multiple string cites of cases containing dicta and, in some instances, holdings that a parent may be liable for interfering with a subsidiary's contract if it employs improper means. Rather than support Parus Holdings' arguments, however, the cases highlight the propriety of summary judgment here. For example, Parus Holdings misplaces its reliance on Boulevard Assoc. v. Sovereign Hotels, Inc., 72 F.3d 1029 (2d Cir. 1995), for the proposition that "a parent company loses any 'privilege' to interfere when it acts detrimentally to its subsidiary's economic interest." Response at 47. The Second Circuit, however, expressly refrained from opining on that issue:

> And so we have no occasion to consider whether a sole shareholder, motivated purely by self-interest, where that self-interest is contrary to the interests of its subsidiary, could in some circumstances be held liable for tortious interference when it directs its subsidiary to breach a contract. Nor need we decide whether or under what conditions a sole shareholder's use of improper methods would make tortious its interference in the contracts of a subsidiary.

Id. at 1038. Instead, the court affirmed summary judgment for the parent corporation. Id.

Likewise, the court in HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc., 545 N.E.2d 672 (Ill. 1989), affirmed the dismissal of a tortious interference claim against a hospital management company that caused the hospital to breach a pharmaceutical services agreement

27

A 02710

with the plaintiff by failing to make payments that were due and owing under the agreement.  Id.

at 676.  Significantly, the Illinois Supreme Court explained that courts recognize a privilege

"where the defendant was acting to protect an interest which the law deems to be of equal or

greater value than the plaintiff's contractual rights."  Id. at 677.  Specifically, it recognized a

privilege for corporate officers and directors to use their business judgment and discretion on

behalf of their corporations because "the duty of corporate officers and directors to their

corporations' shareholders outweighs any duty they might owe to the corporations' contract

creditors."  Id.  While the court noted in dicta that a defendant is not justified in engaging in

conduct that is totally unrelated or even antagonistic to the interest which gave rise to the

privilege, it found that the plaintiffs in that action had not alleged anything more than conclusory

allegations that the defendants had acted without sufficient legal justification, thus warranting

dismissal of the claims against the hospital management company.

There is no dispute that some courts have denied summary judgment where there was a

genuine dispute as to whether a defendant employed improper means in interfering with a

contract.  Those cases also are instructive because they reveal the paucity of Parus Holdings'

arguments here.  For example, in In re Conticommodity, 733 F. Supp. at 1568, the court believed

that the record before it would not allow resolution by summary judgment.  That record

involved, among other things, facts that could give rise to violations of RICO, fraudulent

misrepresentations that violated the Commodity Exchange Act, and breaches of fiduciary duty.

Id. at 1563-69.  Likewise, applying Missouri law (which is inapplicable here), the court in Phil

Crowley Steel Corp. v. Sharon Steel Corp., 782 F.2d 781 (8th Cir. 1986), held that a subsidiary's

parent corporations had an improper purpose when they knowingly acted to the detriment of the

A 02711

subsidiary in order to enhance their interests in a separate subsidiary. Id. at 784.[15] Finally, applying Tennessee law, the court in Waste Conversion determined that a parent corporation may be subject to liability for tortious interference with a contract if it acted detrimentally to the subsidiary's economic interests or used wrongful means, but there is no further guidance on the facts of that case because the court was merely answering questions certified from the federal court in which the underlying case was pending. 33 S.W.3d 779.

These cases underscore the propriety of summary judgment in this action. Parus Holdings simply has not demonstrated the existence of a genuine dispute that could avoid the general rule that a parent corporation cannot be held liable for interfering with a subsidiary's contract. Parus Holdings makes four arguments on the issue of improper means. None suffices to defeat summary judgment.

First, Parus Holdings argues that breaching the UC Contract was contrary to Intermedia's economic interests solely because Intermedia would have to pay contract damages for the alleged breach. Response at 48-49.[16] Parus Holdings does not cite a single case that would permit a finding of tortious interference on this ground. Nor has WorldCom located any. This is because such an exception would swallow the rule. By definition, a subsidiary is liable for contract damages, if any, when a parent corporation causes it to breach a contract. The subsidiary's liability for contract damages is necessarily presumed even though the parent cannot be charged with tortious interference. Hence the Second Circuit held in Boulevard Assoc. that the parent

---

[15]    Notably, in Phil Crowley, the subsidiary's president had protested the parent corporation's demand to breach. 782 F.2d at 782. Here, by contrast, Parus Holdings alleges no disagreement and, instead, asserts its belief that both Intermedia and WorldCom made a conscious election to breach and repudiate the UC Contract. Parus Opposition ¶ 15.

[16]    Belying its contention that the contract's termination provisions are not penalties, Parus Holdings argues that "the UC Contract explicitly contemplated *severe economic consequences* to Intermedia if it did not perform." Response at 48-49 (emphasis added).

A 02712

corporation could not be liable for tortious interference even though the subsidiary owed and had apparently paid contract damages. 72 F.3d at 1032 (noting that the subsidiary had settled a suit for contract damages brought by the party that succeeded to Boulevard's rights under the lease in question). The subsidiary's obligation to pay any contract damages is irrelevant to the issue of a parent's tortious interference. Even Phil Crowley Steel, the only case Parus Holdings cites that actually turned on an economic detriment to the subsidiary, did not adopt Parus Holdings' tautology. It never discussed contract damages at all. Parus Holdings' argument about Intermedia owing contract damages thus is nothing more than the predicate of every case in which summary judgment has been granted for a parent corporation that interfered with a subsidiary's contract. It does not establish a genuine issue of improper conduct.

Second, with absolutely no supporting authority, Parus Holdings offers the circular argument that WorldCom engaged in improper conduct by causing Intermedia to breach the UC Contract. Response at 50. Again, this exception, if legitimate, would swallow the rule. It would impose strict liability on parent corporations every time they caused a subsidiary to breach a contract. Having caused the subsidiary to breach satisfies one element of a tortious interference claim, but it does not also satisfy the separate element requiring plaintiffs to demonstrate that a parent corporation employed improper means when it caused the subsidiary to breach its contract.[17] A parent corporation may be liable for tortious interference only if it engages in improper means, which require a showing of "some fraud, misrepresentation, intimidation or

---

[17] A cause of action for tortious interference with contract requires the intentional procurement of a third party's breach of a contract *without justification*. King's Daughters & Sons Circle Number Two of Greenville v. Delta Regional Med. Ctr., 856 So.2d 600, 604 (Miss. Ct. App. 2003); Barrow v. Arizona Bd. of Regents, 761 P.2d 145, 152 (Ariz. Ct. App. 1988); D&S Farms v. Producers Cotton Oil Co., 492 P.2d 429, 431 (Ariz. Ct. App. 1972). "An interference is not wrongful and actionable if undertaken by someone in the exercise of a legitimate interest or right which constitutes 'privileged interference.'" King's Daughters, 856 So.2d at 604.

A 02713

molestation, beyond the fact of the interference itself." Boulevard Assoc., 72 F.3d at 1036

(citing Smith v. Brown, 1992 WL 219300, at *2 (Conn. Super. Ct. Aug. 28, 1992); see also

Waste Conversion, 33 S.W. 3d at 784 ("'wrongful means' is defined to include acts which are

wrongful in and of themselves, such as misrepresentations of facts, threats, violence, defamation,

trespass, restraint of trade, or any other wrongful act recognized by statute or common law.")

(internal citations omitted). Parus Holdings does not even allege, let alone offer evidence, of any

such wrongful means.

Third, Parus Holdings contends that WorldCom engaged in improper conduct because it

intended to put forward its own unified messaging initiative to the expense of all others. This

assertion also fails as a matter of law. Response at 50-51. The evidence that Parus Holdings

cites for this proposition states exactly the contrary on its face. It states that it was WorldCom's

"first choice" to sell Intermedia as a going concern and that terminating employees and selling

hard assets "is no one's intent." Friedman Decl., Exhibit V. Likewise, no reasonable jury can

infer improper means from the two September 2000 emails announcing WorldCom's agreement

to merge with Intermedia. Friedman Decl., Exhibit S. Those emails predate the UC Contract

itself and predate the alleged breach by more than a year. As such, the emails cannot reasonably

constitute improper means used to interfere with a subsidiary's contract.

Finally, Parus Holdings speculates that WorldCom interfered to eliminate a funding

source to EffectNet and thereby negotiate a better price for a competing service from EffectNet's

affiliate, Webley. Response at 51. As evidence, Parus Holdings merely cites its own baseless

allegations in the response it filed to Reorganized Debtors' claim objection. To survive summary

judgment, a party may not rest upon the mere allegations or denials of its pleadings, but must set

forth specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56(e). Parus

31

Holdings' rank conjecture cannot defeat summary judgment.  Nor could it suffice, even if supported by evidence, to overcome WorldCom's clear duty imposed by the government and federal court to divest itself of Intermedia Assets.  In short, there is no genuine issue of material fact and the Court should enter summary judgment on Parus Holdings' claim for tortious interference.

### C.    Parus Holdings Cannot Proceed on Its Deceptive Trade Practice Claim

In their Memorandum In Support of Summary Judgment, Reorganized Debtors demonstrated that Intermedia had not violated the consumer protection acts of either Arizona, Mississippi or Florida because it had not sold anything to EffectNet, but on the contrary had purchased services from EffectNet.  Memorandum at 11-13.  In response, Parus Holdings argues that Intermedia was a "seller" under these acts, and, alternatively, that Intermedia can be found to have violated the Arizona Consumer Fraud Act ("ACFA") regardless of whether it sold either merchandise or services.  Response at 52-54.  Each of these arguments lacks merit.

Incredibly, Parus Holdings' first argument seeks to recast Intermedia as the seller (and EffectNet as the buyer) of merchandise or services.  Parus Holdings argues that Intermedia's commitment to purchase a specified minimum amount of EffectNet's communication services under the UC Contract was itself the provision of a service (or possibly the sale of "commodities" or "intangibles").[18]  Id. at 53.  Notably, Parus Holdings fails to cite any legal authority in support of its novel view of Intermedia's status as a service provider.  Id.  Instead, revealing the level to which it is willing to manufacture different contractual interpretations, Parus Holdings disingenuously cites a portion of Section 2.12 of the UC Contract in an attempt

---

[18]    Parus Holdings' attempt to disguise itself as the buyer of products or services is particularly surprising in light of its claim for over $800,000 in past due amounts on its invoices to Intermedia.

A 02715

to create the impression that Intermedia was selling "subscribers" to EffectNet.  Parus Holdings

has argued exactly the contrary at least twice.  In its addenda to its Proofs of Claim, Parus

Holdings contended that

> Section 2.12 of the Agreement specified the minimum monthly commitment of
> Intermedia to *purchase* EffectNet's services, and the pricing for these services was
> provided in Appendix P to the Agreement.

Friedman Decl. Exs. A and B (emphasis supplied).  And, in its response to Reorganized Debtors'

objections, Parus Holdings cited Section 2.12 and 2.13 for the proposition that

> The take-or-pay obligations of the UC Contract required Intermedia to
> compensate EffectNet *as if Intermedia had at least 10,000 subscribers* for the
> Services [which Claimant defined as "EffectNet's agreement to supply to
> Intermedia unified messaging, wholesale communications and related services"]
> . . . .  See UC Contract, at Section 2.12 and 2.13.

Parus Opposition ¶¶ 6, 10 (emphasis supplied), Ex. B to Motion for Summary Judgment.

Furthermore, even a cursory review of the UC Contract belies Claimant's characterization of

Intermedia as a service provider to EffectNet.  The very first clause of the UC Contract

establishes the relationship between the parties, with EffectNet as the seller of services and

Intermedia as the buyer of services:

> 1.    General Provisions
>
> 1.1    Both parties agree that EffectNet shall offer Intermedia UC Services for
> Intermedia as described in this Agreement.  Intermedia will market the UC
> Services to Intermedia customers and end-users as it sees fit.  For the purposes of
> this Agreement, the term "customers" shall include, but not be limited to
> wholesale and retail customers of Intermedia UC Services.

UC Contract § 1.  Simply put, under the UC Contract, EffectNet agreed to sell and Intermedia

agreed to buy (for resale to its own customers) a variety of communication services.  See id.

EffectNet was not purchasing accounts, subscribers, customers or anything else from Intermedia.

On the contrary, Intermedia retained its subscribers and was solely responsible for marketing,

billing and invoicing the service it had purchased from EffectNet to its subscribers.  Id. § 2.8.

33

A 02716

Furthermore, Section 2.12 of the UC Contract does not (as Parus Holdings suggests) transform EffectNet from a service provider into a consumer. This section merely establishes a floor for the minimum volume of services that Intermedia agreed to purchase from EffectNet at certain dates in the performance of the parties' agreement. Id. § 2.12. In summary, Parus Holdings' argument that it purchased "commodities" "services" "intangibles" or anything else from Intermedia is unsupported by citation to legal authority, contrary to the plain language of the UC Contract and belied by the economic realities of the parties' relationship.

Parus Holdings' fall back position is that the ACFA and other state consumer protection acts apply regardless of whether Intermedia is a "seller." Response at 53-54. This argument also lacks merit. As established above, Intermedia was the *customer* for EffectNet's communication services. Parus Holdings has not cited (and WorldCom is unaware) of any reported decision imposing liability on a customer under the ACFA. Indeed, the very purpose of the *consumer* protection statutes such as the ACFA "is to provide injured *consumers* with a remedy to counteract the disproportionate bargaining power often present in consumer transactions." Waste Mfg. & Leasing Corp. v. Hambicki, 900 P.2d 1220, 1224 (Ariz. Ct. App. 1995) (emphasis added).

Parus Holdings' reliance on State ex rel. Woods v. Sgrillo, 859 P.2d 771 (Ariz. Ct. App. 1993), is misplaced as Woods is readily distinguished from the current matter. In Woods, the state filed an action against two individuals and numerous related business entities alleging that the defendants had violated the ACFA by their conduct in selling information about low-interest credit cards to consumers. 859 P.2d at 771. The trial court entered summary judgment against the defendants finding a violation of the ACFA. Id. On appeal, the individual defendants argued that they had not violated the ACFA because they had not personally sold the information to

A 02717

consumers, but rather had committed "acts [that] were in aid of a sale by another entity." Id. at 772. The appellate court rejected this argument and held that the remedial purpose of protecting consumers by eliminating fraud should not be defeated by the "niggling distinction" between a person who makes a sale and a person who aids in the same sale. Id.

Unlike the defendants in Woods, however, Intermedia does not seek to avoid liability by parsing the language of the ACFA. On the contrary, Intermedia's argument goes to the fundamental purpose of consumer protection statutes. The undisputed facts in this matter demonstrate that Intermedia neither made nor aided in a sale of anything to EffectNet. Instead, Intermedia purchased services from EffectNet. To find that the ACFA applies allows a service provider to sue its customer "would require stretching the language of the Act beyond its intended reach." Waste Mfg., 900 P.2d at 1225 (rejecting argument by corporate plaintiff that scope of ACFA stretches to include sale of existing business entity as sale of merchandise).

In summary, Parus Holdings essentially invites this Court to find that Intermedia's failure to pay EffectNet's invoices somehow constitutes a consumer protection act violation. The Court should refuse this invitation. Indeed, the Second Circuit held that it is reversible error to find that a simple contract breach is sufficient to establish a violation of a consumer protection act. Boulevard Assoc., 72 F.3d at 1039 (reversing district court determination that defendant's breach of lease constituted violation of Connecticut Unfair Trade Practices Act). As the Second Circuit explained in Boulevard Assoc., a rule to the contrary would convert every contract dispute into a consumer protection violation. Id. This Court should follow the Second Circuit's lead in declining to assume that any state legislature intended such an extraordinary alteration of the common law. Id.

A 02718

### D.    Summary Judgment Should Be Entered on the Claim For Breach of an Implied Covenant of Good Faith and Fair Dealing

As WorldCom explained in its original memorandum, the Arizona Supreme Court has held that while the duty of good faith and fair dealing is implied in every contract, a breach of that duty gives rise to a *tort claim* only under special circumstances.  Rawlings v. Apodaca, 726 P.2d 565, 574-75 (Ariz. 1986).  As explained in Rawlings, tort claims for a breach of the duty of good faith and fair dealing are recognized only where the type of contract is one in which the plaintiff "seeks something more than commercial advantage or profit."  Id. at 575.  Under Arizona law, a tort action for breach of the implied covenant will not lie unless there exists a "special relationship" between the parties arising from elements of "public interest, adhesion, and fiduciary responsibility."[19]  Burkons v. Ticor Title Ins., 813 P.2d 710, 720 (Ariz. 1991).   The two most important factors in determining whether a tort claim action for bad faith will lie are "(1) whether the plaintiff contracted for security or protection rather than for profit or commercial advantage, and (2) whether permitting tort damages will provide a substantial deterrence against breach by the party who derives a commercial benefit from the relationship." Dodge v. Fid. & Dep. Co. of Md., 778 P.2d 1240, 1242 (Ariz. 1989).

---

[19]    While the Court in Rawlings left open the possibility that a tort action might be recognized outside of the relationship of insured and insurer, it appears that every attempt since Rawlings to extend the tort of bad faith in Arizona beyond the insurance industry has been rejected.  In each instance, the court concluded that the "special circumstances" necessary to give rise to tort action for breach of the implied covenant of good faith and fair dealing were lacking.  See Oldenburger v. Del E. Webb Dev. Co., 765 P.2d 531 (Ariz. Ct. App. 1988) (rejecting a bad faith tort remedy arising from a real estate contract); McAlister v. Citibank, 829 P.2d 1253 (Ariz Ct. App. 1992) (rejecting a bad faith tort remedy arising from a banking contract); Nelson v. Phoenix Resort Corp., 888 P.2d 1375 (Ariz. App. 1994) (rejecting a bad faith tort remedy arising from an employment contract). While theoretically it is possible that someday in the future, Arizona law may recognize a tort action for breach of the implied covenant of good faith and fair dealing be extended beyond the insurer/insured relationship, the reality today is that it has only been applied to insurance companies.

A 02719

Applying these principles of law to the undisputed facts in this case leads to the conclusion that EffectNet did not have a "special relationship" with Intermedia giving rise to a tort action for breach of the implied covenant of good faith and fair dealing.[20]  The UC Contract was an ordinary commercial contract between two sophisticated business entities pursuing "profit or commercial advantage."  The public interest was not involved, no element of adhesion was present, no fiduciary relationship existed between the parties and neither security nor protection was the subject of the contract.  Absent a special relationship, and none existed here, EffectNet has no tort action for breach of the covenant of good faith and fair dealing.  Wells Fargo Bank v. Ariz. Laborers, Teamsters, 38 P.3d 12, 29 (Ariz. 2002).  Lacking a tort action, the remedy for an alleged breach is on the UC Contract itself.  Rawlings, 726 P.2d at 574.  However, Intermedia has already agreed to pay damages for breach of the UC Contract.  SOF ¶¶ 21-25.  Accordingly, Reorganized Debtors are entitled to summary judgment on the claim for breach of the implied covenant of good faith and fair dealing.

## CONCLUSION

For all the foregoing reasons and the reasons set forth in WorldCom's opening memorandum, summary judgment should be entered against Parus Holdings on each of its claims.  Specifically, Parus Holdings' claims for civil conspiracy, tortious interference, deceptive trade practices, and breach of the implied covenant of good faith and fair dealings should be denied in their entirety as a matter of law.  In addition, the limitation of liability provisions contained in the UC Contract should be enforced and Claimant's allowable recovery for breach of contract should be limited to the amount provided by the parties' contract, less the amount

---

[20]  Parus Holdings' Response fails to argue that a special relationship giving rise to a tort claim exists between Intermedia and EffectNet; indeed, Parus Holdings has not articulated any reason why the traditional contract damage rule would not provide adequate compensation in this case for the breach of the covenant of good faith and fair dealing.

A 02720

Intermedia paid in advance as a deposit for its Minimum Commitment as reflected in the UC

Contract § 4.5.1, to wit:  $285,442.30 ($460,442.30 - $175,000.00).

Respectfully submitted,

STINSON MORRISON HECKER LLP


By:   *s/Robert L. Driscoll*
      Robert L. Driscoll, Esq.
      Allison M. Murdock, Esq.
      Jodi M. Hoss, Esq.
      1201 Walnut Street, Suite 2900
      Kansas City, MO  64106
      (816) 842-8600 – Telephone
      (816) 691-3495 – Facsimile

ATTORNEYS FOR REORGANIZED DEBTORS


## CERTIFICATE OF SERVICE

I hereby certify that on December 2, 2005, I electronically filed the foregoing with the Clerk of the Bankruptcy Court using the CM/ECF system which sent notification of such filing to all parties receiving electronic means.

*s/Robert L. Driscoll*
Attorney for Reorganized Debtors

38

**A 02721**

STINSON MORRISON HECKER LLP

Robert L. Driscoll, Esq.
Allison M. Murdock, Esq.
Jodi Hoss, Esq.
1201 Walnut Street
Kansas City, MO  64106
Telephone:  (816) 842-8600
Facsimile:  (816) 691-3495
Attorneys for Reorganized Debtors

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
In re                                                       :
                                                            :          Chapter 11 Case No. 02-13533 (AJG)
WORLDCOM, INC., et al.,                    :
                                                            :          (Jointly Administered)
                    Reorganized Debtors.         :
-----------------------------------------------------------------x

## APPENDIX OF ATTACHMENTS

**Addendum**

| | |
|---|---|
| Ex. 1 to Addendum | August 9, 2005 Hearing Transcript |
| Ex. 2 to Addendum | October 24, 2005 Letter from Kevin Smith to Robert Driscoll |
| Ex. 3 to Addendum | August 12, 2005 Letter from Robert Driscoll to Stephen Wood |
| Ex. 4 to Addendum | September 1, 2005 Letter from Robert Driscoll to Stephen Wood |
| Ex. 5 to Addendum | Donald Ramsay Deposition Transcript |
| Ex. 6 to Addendum | November 11, 2005 Letter from Robert Driscoll to James Callagy, Robert Friedman and Kevin Smith |

**A 02722**

**Reply Brief Exhibits**

| | |
|---|---|
| Ex. A to Reply Brief | Delaware Certificate of Merger |
| Ex. B to Reply Brief | Memorandum in Support of Judgment to Modify Hold Separate Stipulation and Order |
| Ex. C to Reply Brief | Modified Hold Separate Stipulation and Order |

DB02/048629 0094/6942399.1

**A 02723**

**ADDENDUM TO REPLY MEMORANDUM IN SUPPORT OF WORLDCOM'S
MOTION FOR SUMMARY JUDGMENT AGAINST PARUS HOLDINGS, INC.,
SUCCESSOR-BY-MERGER TO EFFECTNET, INC. and EFFECTNET, LLC**

In its Response to Debtors' Motion for Summary Judgment, Parus Holdings categorically

charges that "Debtors have systematically ignored Parus 'targeted' discovery requests and caused

the significant uncompleted discovery in this case."  Response at 22.  Rather than burden its

Reply Memorandum with discovery matters not germane to summary judgment, in this

Addendum WorldCom summarizes its efforts to locate and produce documents (both hard copy

and electronic) in response to Parus Holdings' document request, and identifies multiple

instances where Parus Holdings' characterizations of those efforts stray significantly from the

facts.

A.    **WorldCom's Selection of Boxes from Document Indexes for Review.**

In its opposition to Parus Holdings' motion to compel, WorldCom advised that it was

undertaking a further attempt to offer a reasonable compromise with respect to the review of the

10,000 boxes of stored documents related to Intermedia stored in depositories in Florida,

Virginia, Colorado and Mississippi.  WorldCom's Opp. to Motion to Compel at 9-10 (Docket

No. 16687).  Using the document indexes, WorldCom identified 387 of the over 10,000 boxes

that – either based on the date or subject matter description listed on the index or the lack thereof

– might contain responsive documents.[1]  Consequently, if the description of a box on the index

---

[1]    The contract at issue in this action is dated November 20, 2000.  See WorldCom's SOF ¶ 1.
The contract was terminated by EffectNet on April 12, 2002.  Id. ¶¶ 16; 17.  WorldCom did
not retrieve boxes dated before January 1, 2000, unless it appeared based on their
description that they might contain potentially responsive documents.  Parus Holdings'
counsel did not object to the time frame selected for review.  August 9, 2005, Hearing
Transcript at 23-24 (Ex. 1) (stating that Parus Holdings had no objection to WorldCom's
proposal regarding the selection of boxes for review).  Moreover, on October 24, 2005,
Parus Holdings narrowed the relevant time frame even further, from September 1, 2000 to
April 12, 2002.  Attachment to October 24, 2005 letter from Kevin Smith to Robert Driscoll
(Ex. 2).

A 02724

suggested that the box might contain responsive documents, WorldCom retrieved the box for

review.  Id.; WorldCom's Supplemental Opp. to Motion to Compel at 5-6 (Docket No. 17471).

Similarly, if the indexes did not describe the contents of a box and the documents were listed as

being in the relevant time frame or no time frame was listed, WorldCom retrieved the box for

review.  Id.

       WorldCom's method for selecting boxes from the indexes for review also was discussed

at the August 9, 2005 hearing on the Parus Holdings' motion to compel.  August 9, 2005 Hearing

Transcript at 19-20 (Ex. 1).  WorldCom's counsel advised the Court that it would take

approximately six to eight weeks to review the documents and that the responsive documents

would be produced at a place to be agreed upon by the parties.  Id. at 23.  The Court specifically

asked if Parus Holdings had any objection to WorldCom's proposal for review of these

documents:

> JUDGE GONZALEZ:  Parus Holdings, what is your objection to that proposal
> other than you may think it took too long to get there?
>
> MR. WOOD:  . . . As far as their agreeing to review and produce 387 boxes of documents
> and reviewing them for responsiveness or producing responsive documents to us at their
> cost, I have no objection to that whatsoever.
>
> I was going to make a suggestion, Your Honor.  I think it might make sense at this point
> and I don't want Debtors' counsel to review all 10,000 boxes of documents.  If there are
> documents in there or boxes of documents clearly outside the relevant time frame or
> clearly unrelated to the issues in this case, I don't want to waste time looking at all 10,000
> boxes of documents. . . .

Id. at 23-24.  The Court further stated that Parus Holdings should be provided a list of the boxes

selected for review so it could get a sense whether it was reasonable to pare down the list from

10,000 boxes.  Id. at 26.

       On August 12, 2005, WorldCom provided Parus Holdings a list of all of the boxes

WorldCom selected from the indexes for review and invited Parus Holdings to advise of any

additional boxes it believed WorldCom should review.  See August 12, 2005 letter from Robert

Driscoll to Steven Wood (Ex. 3).  For ease of reference, WorldCom also provided Parus

Holdings on this same date a highlighted copy of the indexes showing the boxes selected for

review.  Id.  Parus Holdings never identified any additional boxes that it believed WorldCom

should have reviewed.

      After reviewing the boxes originally retrieved from the depositories, WorldCom's counsel

re-examined the indexes in light of documents found during the initial review to determine

whether additional boxes should be retrieved from the depositories.  Based on this re-

examination, WorldCom's counsel retrieved an additional 77 boxes from the depositories for

review.  WorldCom's Supplemental Opp. to Motion to Compel at 6 (Docket No. 17471).  Once

again, WorldCom provided Parus Holdings a list of the additional boxes it intended to review.

See September 1, 2005 letter from Robert Driscoll to Steven Wood (Ex. 4).  And, again, Parus

Holdings did not identify any additional boxes it believed WorldCom should review.

WorldCom's Supplemental Opp. to Motion to Compel at 6 (Docket No. 17471).

      Despite its approval of the process used by WorldCom to select boxes from the document

indexes for review and multiple invitations to identify additional boxes for review, Parus

Holdings has not once notified WorldCom that there are additional boxes of documents on the

document index that it believes should be reviewed but were not.

      **B.**    **WorldCom's Production of Documents From Indexed Boxes.**

      Parus Holdings continues to misrepresent how WorldCom selected documents for

production by suggesting that WorldCom picked eight boxes from the 10,000 boxes listed on the

document indexes and produced the documents in those boxes.  Response at 26.  As set forth in

WorldCom's supplemental opposition to Parus Holdings' motion to compel, supported by the

sworn declaration of WorldCom's counsel and explained during the November 1, 2005 hearing,

**A 02726**

seven of WorldCom's outside counsel spent over 350 hours of attorney time reviewing the 464 boxes of documents selected from the document indexes for review in order to cull from those boxes the documents responsive to Parus Holdings' document requests.  WorldCom's counsel did not, as Parus Holdings implies, use the document indexes to select whole boxes for production. WorldCom's Supplemental Opp. to Motion to Compel at 7-8 (Docket No. 17471).

C.    Deposition of WorldCom's Counsel, Donald Ramsay.

Parus Holdings makes multiple misleading statements about Mr. Ramsay's deposition testimony.  First, Parus Holdings states that Mr. Ramsay only spoke to four persons in WorldCom's records management group regarding documents and searches for documents, implying that these are the only persons with whom Mr. Ramsay spoke regarding the search for documents.  Response at 26.  As Parus Holdings knows, *in addition* to the *six* persons from WorldCom's records management, Mr. Ramsay identified *at least 19* other persons who were contacted by WorldCom's counsel regarding the search for documents.  See Ramsay Transcript at 23 (identifying Richard Black, Kathleen Victory, Teresa Hastings and Barry Zipp), 25 (identifying Nasser Sheikh and Ms. Stevens), 31 (identifying Brenda Tate, Mr. Mancini and Roger Beckman), 36 (identifying Emmy Taylor), 42 (identifying Phil Hasselvander), 47 (identifying Joe Stevens), 65 (identifying Mike Randels, Maria Ayala, Julio Valdez and Mr. Perez), and 70 (identifying Peter Cassidy, Shirley Denham-Dale, Donald Furgus, Richard Jeffers, Mr. Johnson, Susan Kennedy, Mary Kilmartin, Carleen Mitchell and Pamela Dunman) (Ex. 5).

Citing four pages of Mr. Ramsay's testimony given toward the end of his seven hour deposition, Parus Holdings next claims that Mr. Ramsay did not know whether he took notes of his conversations with the persons from WorldCom's records management group, or gave them search terms or how they conducted the searches.  Response at 26-27 (citing Ramsay Transcript at 191-195).  The cited testimony, however, refers only to an attempt to locate accounting

A 02727

documents that was undertaken by Margie Polgar.  (Parus Holdings obviously knows this because it cites this same deposition testimony several lines later and identifies it as specifically related to a search for accounting records.)  Although Mr. Ramsay could not recall specifics regarding Ms. Polgar's efforts, he did not believe his request called for the use of search terms and no documents were found.  Ramsay Transcript at 192-193.  Mr. Ramsay further testified that he believed he had notes of his conversations with Ms. Polgar as well as notes of conversations with others.  Id. at 195-196.

Parus Holdings also fails to advise the Court that Mr. Ramsay had knowledge of and testified, repeatedly, regarding the search terms that were used to locate basic documents.  On no less than 14 occasions during his seven hour deposition, Mr. Ramsay testified regarding the variety of search terms and document descriptions that were used to locate documents.  Ramsay Transcript at 26, 45-46, 48, 50, 53-54, 55-59, 65-66, 75-77, 79, 84-85, 128, 136, 153, 195. (Ex.5).  Those search terms, or document category descriptions, included descriptors such as Jim Renforth, James Faust, EffectNet, IntermediaOne, documents related to the merger between Intermedia and WorldCom and those related to EffectNet or Webley.

Pointing to Mr. Ramsay's testimony that the documents indexes were maintained at the box level, Parus Holdings next makes the baseless assertion that no search was ever conducted of documents maintained by Reorganized Debtors.  Response at 27.  As Parus Holdings knows from Mr. Ramsay's supplemental declaration filed in this case and the hearings on its motion to compel, WorldCom's counsel have spent over 350 hours of attorney time reviewing the 464 boxes of documents selected from the document indexes in order to cull from those boxes the documents responsive to Parus Holdings' document requests.  See, Supplemental Declaration of Donald C. Ramsay, Ex. 1 to WorldCom's Supplemental Opposition to Motion to Compel

A 02728

(Docket No. 17471).  Parus Holdings chose not to even question Mr. Ramsay about these document production efforts.

Parus Holdings also complains, as if it had significance, that Mr. Ramsay did not know what numerous entries on the document indexes referred to.  Response at 27.  WorldCom always has acknowledged that with respect to numerous entries on the indexes, it does not have this information.  This is why WorldCom selected boxes from the indexes for review that – either based on the date or subject matter description listed on the index or the lack thereof – might contain responsive documents.  Parus Holdings' counsel approved this selection method and, although given the opportunity, has never identified any boxes that WorldCom should have reviewed but did not.  See supra pp. 1-3.

Finally, Parus Holdings contorts Mr. Ramsay's testimony to suggest once again that WorldCom used the document indexes "to reduce 10,000 boxes down to the 10 that were produced."  Response at 27.  On the contrary, as Parus Holdings is well aware, WorldCom (with the approval of Parus Holdings' counsel) used the document indexes to select 464 boxes of documents for review.  These 464 boxes were reviewed and from them responsive documents that themselves filled 12 boxes were culled for production.

### D.    WorldCom Has Produced Documents Responsive to Parus Holdings' Requests.

Parus Holdings continues to allege that WorldCom has failed to produce documents responsive to its requests.  This is not so.  With its document productions, WorldCom provided to Parus Holdings an index showing by Bates number the document requests to which the produced documents were responsive and, where applicable, the number of the box in which the documents were found.  See WorldCom's Supplemental Opp. to Motion to Compel, Exs. 4 and 5 (Docket No. 17471).  These indexes reflect that WorldCom's productions have included

**A 02729**