documents responsive to all but six of Parus Holdings' 35 document requests. As to five of these requests, WorldCom produced responsive documents in its earlier productions or the requests related to WorldCom's legal theories based on the language of the UC Contract. Id. at 8-9. As to the remaining request, WorldCom has not located any documents regarding communications between WorldCom and Intermedia regarding the General Agreement between Intermedia and Parus Holdings' predecessor, EffectNet.

Just because Parus Holdings can think up categories of documents that were not located in WorldCom's review of hundreds of document boxes does not mean either that the documents must exist or that WorldCom has failed to perform its discovery obligations. WorldCom's counsel has reviewed over 450 boxes of documents (which Parus Holdings was offered the opportunity to help select, but didn't) and has interviewed over 20 current or former WorldCom and/or Intermedia employees (in addition to WorldCom's in-house counsel) for the purpose of locating documents that might be responsive to Parus Holdings' claims and document requests. WorldCom has an obligation to make reasonable inquiry to locate and produce responsive documents and it has more than done so.

### E.    WorldCom's Production of Electronic Documents.

Parus Holdings continues to argue that WorldCom has failed to produce any electronic documents even though it knows this is untrue. Response at 28-29. As already noted and supported by the sworn declaration of Mr. Ramsay, WorldCom's counsel obtained and produced electronically stored documents from WorldCom employees that related to (1) Master Licensing Agreement between Webley and WorldCom, (2) WorldCom's financial analysis of Webley, (3) the integration of Intermedia and WorldCom, and (4) the significant reduction in force that occurred after the WorldCom/Intermedia merger. See WorldCom's Supplemental Opp. to Motion to Compel at 8 (Docket No. 17471).

Similarly, Parus Holdings' assertion that, on November 11, 2005, WorldCom "informed Parus that it had only just recently engaged an outside vendor to complete a cost estimate" for electronic discovery shades, or omits, the actual facts.  <u>See</u> Response at 29.  As Parus Holdings knows from exhibits attached to its own motion to compel, WorldCom's counsel advised Parus Holdings as early as June 20, 2005, that it had contacted third party vendors to provide cost estimates for searching electronic data.  June 30, 2005, email from Larry Bigus to Steve Wood, Ex. II to Parus Holdings' Motion to Compel (Docket No. 16423).  At that time, the cost estimate based on the search of 250 backup tapes for information sought in Parus Holdings' discovery requests was $900,000.  <u>Id.</u>  WorldCom requested that, pursuant to controlling authority, Parus Holdings share in the cost associated with electronic discovery.  <u>Id.</u>

Parus Holdings' motion to compel, filed on July 13, 2005, specifically excluded electronic discovery because the parties had not yet conferred regarding issues related to its production:

> Clearly, the factual record does not currently exist to even began [sic] the type of [cost-shifting] analysis that the Zubulake Court sets forth.  Therefore, Parus' present Motion to Compel does not address the production of electronic documents.  Parus will confer with Debtors regarding the electronic document production and make a good faith effort to resolve any disputes without the intervention of this Court.

Parus Holdings' Motion to Compel ¶ 72 at p. 32 (Docket No. 16423).  Parus Holdings' counsel made this same representation to the Court during the August 9, 2005, hearing on the motion to compel:

> MR. WOOD: . . .In our motion to compel, Your Honor, we didn't address the issue of electronic documents.  Frankly, I don't think there is sufficient factual record before the Court to deal with the issue of production or cost shifting with regard to the Debtors' electronic documents.  We indicated in our motion and in the brief reply, which we filed yesterday, that we would like to work with Debtors' counsel to see if there was some resolution that we can word out with regard to the production of their electronic documents.

A 02731

August 9, 2005, Hearing Transcript at 15 (Ex. 1).

It was not until October 24, 2005, more than two months after the August 9 hearing, that Parus Holdings responded to WorldCom's request for search terms to utilize in the review of WorldCom's electronic media.  In response, on November 11, 2005, Parus Holdings was advised of the search vender's estimate of costs associated with the electronic search Parus Holdings had requested.  As stated in that communication:

> Following receipt of Mr. Smith's letter of October 24, 2005, we requested that Kroll Ontrack provide us with a cost estimate for searching the electronic media of MCI and Intermedia (quarterly back-up tapes) utilizing the names, search terms and time-frame specified in Mr. Smith's letter.  We have now received that estimate which ranges from $207,633.99 to $331,160.12, depending on assumed amounts of retained MCI data.

> These estimated costs from a search vendor, of course, do not include the necessary additional costs that will be incurred for qualified personnel to review electronically identified documents regarding their actual responsiveness or privileged nature before production.  All told, costs associated with the proposed electronic discovery will be considerably higher than the cash distribution value of Parus Holdings' breach of contract claim--$191,544--if MCI's summary judgment is granted and Parus' claim is treated as a Class 12 Intermedia claim.

November 11, 2005 letter from Robert Driscoll to James Callagy, Robert Friedman and Kevin Smith (Ex. 6).[2]

In sum, Parus Holding's increasingly barbed complaints about WorldCom's discovery efforts stray greatly from the facts, add nothing to the substantive legal issues before the Court and ought to be disregarded.

---

[2]   Because of the cost associated with this discovery and its immateriality to WorldCom's pending motion for summary judgment, WorldCom requested that Parus Holdings consent to a stay of discovery until the Court rules on the motion for summary judgment.  Id.  Parus Holdings declined to do so, and WorldCom has requested an informal conference with the Court to discuss its request for a stay of discovery.  November 17, 2005 letter to the Honorable Arthur J. Gonzalez  from Robert Driscoll (Docket No. 17580).

A 02732

# ADDENDUM
# EXHIBIT 1

1

1
2
3   UNITED STATES BANKRUPTCY COURT
    SOUTHERN DISTRICT OF NEW YORK
4   ------------------------------x
    In re
5                           Case No.
    WORLDCOM, INC., et al,        02-13533
6
            Reorganized Debtors.
7   ------------------------------x
8               August 9, 2005
                10:40 a.m.
9
                United States Custom House
10              One Bowling Green
                New York, New York   10004
11
            E X C E R P T
12      (Parus Holdings, Inc.)
13  10:30 Motion by Parus Holdings, Inc. to
    compel production of documents and to extend
14  discovery deadlines.
15  Response filed.
16
17
18  B E F O R E:
19      THE HONORABLE ARTHUR J. GONZALEZ
        United States Bankruptcy Judge
20
21
22
23
24
25

15

|    | Proceedings |
|----|----|
| 1  | |
| 2  | filed in response to our opposition to this |
| 3  | motion to compel. |
| 4  | In our motion to compel, Your |
| 5  | Honor, we didn't address the issue of |
| 6  | electronic documents.  Frankly, I don't think |
| 7  | there is a sufficient factual record before |
| 8  | the Court to deal with the issue of |
| 9  | production or cost shifting with regard to |
| 10 | the Debtors' electronic documents.  We |
| 11 | indicated in our motion and in the brief |
| 12 | reply, which we filed yesterday, that we |
| 13 | would like to work with the Debtors' counsel |
| 14 | to see if there was some resolution that we |
| 15 | can work out with regard to the production of |
| 16 | their electronic documents.  I don't think |
| 17 | that that is an issue that is completely ripe |
| 18 | for consideration by this Court today. |
| 19 | The relief that we are seeking, |
| 20 | Your Honor, is an order directing the parties |
| 21 | to produce their responsive documents.  It is |
| 22 | applicable to both parties by both sides by a |
| 23 | date certain.  I am willing to listen to the |
| 24 | proposal of the Debtors' counsel concerning |
| 25 | the date.  We would also like both parties to |

A 02735

19

```
 1              Proceedings
 2   review of the indexes they were too general
 3   and that nonresponsive documents were
 4   involved and were meaningless.
 5              Next WorldCom offered to review all
 6   of the documents itself and to screen those
 7   for privilege.  It also offered to either
 8   provide to Parus Holdings all of the
 9   remaining documents after a privilege screen
10   or, if Parus Holdings chose, to provide all
11   documents that we believed were responsive to
12   the document request after that review.  In
13   connection with that offer, there was a
14   request for a split of the logistical costs,
15   not the cost of reviewing the documents.  All
16   of that is reflected on Exhibit K to the
17   Debtors' response in opposition.  Again, this
18   proposal was rejected by Parus Holdings and
19   that is reflected in Exhibit L.
20              Finally, as our response starting
21   at page 9, I indicated this along with
22   Mr. Ramsay's declaration Exhibit E, WorldCom
23   is in the process of doing now what Parus
24   Holdings initially refused to do, and that
25   is, based on a review of the very same
```

A 02736

20

```
 1              Proceedings
 2   document indexes to first rule out those
 3   obviously nonresponsive boxes of documents
 4   based on the index and then to pull others
 5   within the time frame overlapping and before
 6   and after the contractual relationships
 7   between Intermedia and WorldCom and then to
 8   review those.  As you have been advised, the
 9   number of those document boxes that we have
10   identified is 387.  They are currently
11   located in Kansas City, having been shipped
12   to three different repositories, and we have
13   a team of legal personnel looking through
14   them.
15              Counsel is correct, I do believe,
16   that that constitutes a good faith effort to
17   be in compliance with the requirements of
18   Rule 34.  I also believe that none of the
19   authorities cited by Parus Holdings are to
20   the contrary.  All except one, the Hagemeyer
21   case from the Eastern District of Wisconsin
22   involved producing parties which were ongoing
23   concerns -- General Motors, Sears, and the
24   like.  All they wanted in the Hagemeyer case
25   involved an entity that was factually similar
```

**A 02737**

23

| | |
|---|---|
| 1 | Proceedings |
| 2 | time frame? |
| 3 | MR. DRISCOLL:  Your Honor, it would |
| 4 | not fit in at all.  In that regard, we would |
| 5 | have no problem at all extending that |
| 6 | discovery time frame. |
| 7 | JUDGE GONZALEZ:  Then the documents |
| 8 | would be made available in Kansas following |
| 9 | your review? |
| 10 | MR. DRISCOLL:  They would be made |
| 11 | available, as the parties agreed under |
| 12 | whatever terms the parties think are |
| 13 | appropriate.  Certainly, here in Kansas City |
| 14 | would be one such place.  If that is not |
| 15 | agreeable, then whatever is. |
| 16 | JUDGE GONZALEZ:  Parus Holdings, |
| 17 | what is your objection to that proposal, |
| 18 | other than you may think it took too long to |
| 19 | get there? |
| 20 | MR. WOOD:  I don't have any |
| 21 | objection, Your Honor, to concurring with |
| 22 | counsel regarding the appropriate location |
| 23 | for producing these documents to us.  It may |
| 24 | be, in fact, depending on the circumstances, |
| 25 | more cost effective for us to send some |

**A 02738**

24

| 1 | Proceedings |
| 2 | people to Kansas City.  I just don't know at |
| 3 | this point, but I am happy to discuss that |
| 4 | with counsel.  As far as their agreeing to |
| 5 | review and produce 387 boxes of documents and |
| 6 | reviewing them for responsiveness or |
| 7 | producing responsive documents to us at their |
| 8 | cost, I have no objection to that whatsoever. |
| 9 | I was going to make a suggestion, |
| 10 | Your Honor.  I think it might make sense at |
| 11 | this point and I don't want Debtors' counsel |
| 12 | to review all 10,000 boxes of documents.  If |
| 13 | there are documents in there or boxes of |
| 14 | documents that are clearly outside the |
| 15 | relevant time frame or clearly unrelated to |
| 16 | the issues in this case, I don't want to |
| 17 | waste time looking at all 10,000 boxes of |
| 18 | documents.  I do want them to produce |
| 19 | documents that are responsive to our |
| 20 | requests.  We can take a look at the 387 |
| 21 | boxes of documents and see where we stand |
| 22 | after we have had an opportunity to review |
| 23 | them.  It may be appropriate, Your Honor, at |
| 24 | that point for us to have a informal |
| 25 | conference with the Court and advise the |

A 02739

26

```
 1              Proceedings
 2              JUDGE GONZALEZ:  Based on the
 3    Debtors' representation, I don't think Parus
 4    is going to see these documents for six or
 5    eight weeks, but I guess you would be able to
 6    see the list of the 300 or so boxes and match
 7    that up against the original list you have?
 8              MR. WOOD:  Yes.  I would imagine
 9    that that probably could be provided
10    forthwith.
11              JUDGE GONZALEZ:  Do both sides
12    think that August 30th is too soon to react
13    to the proposal that is before me now?
14              MR. WOOD:  Do you mean that is the
15    date by which they should be prepared?
16              JUDGE GONZALEZ:  No.  I mean at
17    that point, I think if you were able to
18    review the list of the 10,000 boxes or review
19    the list of the 300 boxes, you may get a
20    sense at that point as to whether or not you
21    are going to need any further discovery on
22    the whole issue as to whether it was
23    reasonable to pare them down from 10,000 to
24    the 300.
25              MR. WOOD:  I think we can do that
```

A 02740

# ADDENDUM

# EXHIBIT 2

A 02741

# KELLEY DRYE & WARREN LLP

A LIMITED LIABILITY PARTNERSHIP

**IOI PARK AVENUE**

**NEW YORK, NEW YORK IOI78**

———

(2I2) 808-7800

WASHINGTON, DC

TYSONS CORNER, VA

CHICAGO, IL

STAMFORD, CT

PARSIPPANY, NJ

———

BRUSSELS, BELGIUM

———

AFFILIATE OFFICES
JAKARTA, INDONESIA
MUMBAI, INDIA

FACSIMILE

(2I2) 808-7897

www.kelleydrye.com

DIRECT LINE: (212) 808-5102

EMAIL: ksmith@kelleydrye.com

October 24, 2005

**VIA FACSIMILE ((816) 691-3495)**
Robert L. Driscoll, Esq.
Stinson Morrison Hecker LLP
1201 Walnut Street, Suite 2800
Kansas City, Missouri  64106

Re:    *In re WorldCom, Inc., Chapter 11 Case No. 02-13533*
       *Parus Holdings' Claims; Discovery Issues*

Dear Mr. Driscoll:

As discussed on Friday, October 21, 2005, at the settlement conference, and in a further attempt to resolve our outstanding discovery issues, we write to provide you with specific categories of documents previously requested, but not yet produced in this litigation. In addition, we provide you with names of individuals whose electronic databases and e-mail boxes should be searched as well as search terms for searches in Debtors' electronic databases and e-mail boxes. The items identified below are an attempt to narrow certain categories of documents pursuant to your request. We reserve all rights with respect to Parus Holdings' document requests.

First, please refer to our October 11, 2005 letter to Judge Gonzalez and copied to you. In addition, the following highlight certain outstanding production categories for electronic and hard-copy documents, which should be produced:

- Documents concerning the Unified Communications Services General Agreement ("General Agreement") itself, including the pricing of services, negotiation, drafting or communications among Intermedia employees and/or between Intermedia and WorldCom/MCI, regarding the General Agreement. (Document Request No. 11.)

- Documents reflecting Intermedia's payments to Claimant for any services provided by Claimant under the General Agreement or any documents concerning communications regarding payments to Claimant. (Document Request No. 17.)

**A 02742**

### KELLEY DRYE & WARREN LLP

Robert L. Driscoll, Esq.
October 24, 2005
Page Two

- Documents concerning the cessation or termination of Intermedia's operations as it related to Claimant.[1] (Document Request Nos. 14, 15, and 19.)

- Documents concerning Claimant from the files of related WorldCom entities including, but not limited to, WorldCom Ventures. (Document Request Nos. 20 and 21.)

- Documents concerning Debtors' evaluation or analysis of Claimant's finances, business, technology or products. (Document Request Nos. 20 and 21.)

- Documents related to the WorldCom/MCI genD initiative, a competitor to EffectNet's Unified Communications product. (Doc. Req. No. 35.)

- Documents from key individual employee's work files, including but not limited to, James Renforth, James Faust, Kathy Victory, Brett Bacon, Barry Zipp, Richard Black and Cheryl Mellon, regarding the General Agreement and the Master Agreement for Software Licenses, dated September 14, 2001 ("MASL"), and the drafting, negotiation, pricing and performance of same. (Document Request Nos. 11 and 22.)

**MCI Documents.** Please produce forthwith the MCI Documents identified in Debtors' Supplemental Responses to Claimant's First Request for Production of Documents, dated July 1, 2005. Our understanding is that we have received thus far only Intermedia documents.

**WorldCom Entities Other than MCI WorldCom Communications, Inc. and Intermedia Communications, Inc.** In Debtors' Responses to Claimant's First Request for Production of Documents, dated March 25, 2005, Debtors objected to including in the definition of Debtors any entity other than Intermedia Communications, Inc. or MCI WorldCom Communications, Inc. Please confirm that Debtors no longer maintain that objection and Debtors will produce documents from all WorldCom entities which have documents responsive and relevant to both the contract and tort claims or documents reasonably calculated to lead to the discovery of admissible evidence.

We also have a concern regarding the Debtors' production of only 11 boxes of purportedly responsive documents from a total of 10,000 boxes held in various depositories in the United States which contained potentially responsive paper documents of Intermedia

---

[1]     Debtors have produced documents regarding the cessation or termination of Intermedia operations concerning only technical integration issues between Intermedia and WorldCom products, as well as a reduction in headcount of Intermedia employees.

A 02743

## KELLEY DRYE & WARREN LLP

### In re: WorldCom, Inc.
### Claims of Parus Holdings, Inc., Claim Nos. 11242 and 11173

Names and Search Terms for Searches of MCI/WorldCom electronic media and Intermedia electronic media, for the period September 1, 2000 through April 12, 2002:

### The names of individuals whose e-mail boxes and hard-drives should be searched using the terms below:

Maria Ayala
Biaji Bary
Jennifer Carroll
Peter Cassidy
Shirley Elizabeth Denham-Dale
Vicky Galante-Lee
Claro Hernandez
Steve Hooper
Mandy Johnson
Sharon Kasimow
Susan Kennedy
Mary Kilmartin
Carleen Mitchell
Nasser Sheikh
Pamela F. Dunnam
Don Fergus
Dave Wurster
Teresa Hastings
Patrice Carroll
James Meeks-Johnson
Brenda Speer
Cheryl Mellon
James Renforth
James Faust
Kathy Victory
Richard Jeffers
Brett Bacon
Barry Zipp
Richard Black
Sherri Baughman
Alan Hill
Jim Tills
Jack Kerrigan
James DeMerlis
Angela Baker
Scott Concourse
Scott E. Pospichel

1

A 02744

## KELLEY DRYE & WARREN LLP

**Databases, search terms and phrases include:**

I.    **Documents on hard drives and the above referenced individuals' e-mail boxes which include the following terms:**

EffectNet, or
EN, or
Webley, or
WSI , or
IntermediaOne  (including variations such as Intermedia One, IM1, IOne, I One, I-One, etc.), or
Unified Communications, or
UC, or
Unified Communications Services General Agreement (and variations of that Agreement), or
Unified Messaging, or
UM, or
CommuniKate, or
Kate, or
HearMyMail, or
HMM, or
auto attendant, or
text to speech, or
TTS, or
genD, or
voice recognition (use "!" to broaden search), or
speech recognition (use "!" to broaden search), or
speech enabled (use "!" to broaden search), or
voice activated (use "!" to broaden search), or
enhanced communications (use "!" to broaden search), or
Master Agreement for Software Licenses (and variations of that Agreement), or
MASL, or
Webley AND license(s), or
Minimum Commitment.

II.   **Any e-mail communications to and/or from wcom.com and intermedia.com e-mail boxes which contain the above terms should be produced.**

2

A 02745

KELLEY DRYE & WARREN LLP

III.    All _____@wcom.com emails (with attachments) to or from ANY other address
        that include any of the following words:

   EffectNet,
   EN,
   Webley,
   WSI,
   IntermediaOne (including variations such as Intermedia One, IM1, IOne, I One, I-One, etc.,)
or
   CommuniKate,
   Kate,
   HearMyMail,
   HMM,
   auto attendant,
   text to speech,
   TTS.

IV.    All intermedia.com emails (with attachments) to or from effectnet.com e-mails.

V.     All intermedia.com emails (with attachments) to or from ANY other address that
       include any of the following words:

   genD
   WCom (include aka's)

        AND

   EffectNet
   EN
   Webley
   WSI
   IntermediaOne (including variations such as Intermedia One, IM1, IOne, I One, I-One, etc.),
   Unified Communications
   UC
   Unified Communications Services General Agreement (and variations of that Agreement),
   Unified Messaging
   UM
   CommuniKate
   Kate
   HearMyMail
   HMM.

3

A 02746

# ADDENDUM

# EXHIBIT 3

A 02747

**STINSON**
**MORRISON**
**HECKER** LLP

Robert L. Driscoll
(816) 691-3102
bdriscoll@stinsonmoheck.com
www.stinsonmoheck.com

1201 Walnut, Suite 2900
Kansas City, MO 64106-2150

*Tel* (816) 842-8600
*Fax* (816) 691-3495

August 12, 2005

**VIA FEDERAL EXPRESS**

Mr. Steven Wood
Kelley Drye & Warren LLP
333 West Wacker Drive, Suite 2600
Chicago, Illinois 60606

    Re:    In re Worldcom, Inc. -- Claim of Parus Holdings, Inc.

Dear Steve:

    As discussed at the conclusion of the hearing held on Tuesday, August 9, I am enclosing a list of the boxes of Intermedia Communications, Inc. ("Intermedia") documents that have been shipped to Kansas City and currently are being reviewed. Also enclosed are copies of the five indexes, which were previously provided to you by email, with the boxes selected for review highlighted. The highlighted indexes provide the same information as the list. (The index for the boxes in the Mississippi Filings Systems depository is not highlighted because it does not appear that there are any responsive documents in that depository.)

    As you will see in reviewing the highlighted indexes, a sampling of boxes was selected for review in a few instances even though the boxes appeared to contain non-responsive documents. For example, there are approximately 12 boxes of documents in the Tampa depository described as "CS & SO Stop Bill Migration." We have selected five of these boxes for review to determine whether the boxes described in that manner may contain responsive documents. If so, we will retrieve the remaining approximately seven boxes with this same description for review.

    Also, as you may have gathered from my responses to the Court on August 9 regarding future scheduling, I will be out of the office the next couple of weeks. In my absence, please call my partner, Allison Murdock, if you have any questions regarding the boxes selected for review or if you identify any additional boxes that you believe should be reviewed. Allison's direct dial is (816) 691-3138. Concerning

KANSAS CITY
OVERLAND PARK
WICHITA
WASHINGTON, D.C.
PHOENIX
ST. LOUIS
OMAHA
JEFFERSON CITY

DB02/048629 0094/6769393.1

**A 02748**

Mr. Steven Wood
August 12, 2005
Page 2

the related point of electronically stored documents, Allison will contact you soon to discuss review and production of those documents.

Very truly yours,

STINSON MORRISON HECKER LLP

Robert L. Driscoll

Enclosures

cc:    Allison M. Murdock

A 02749

# ADDENDUM

# EXHIBIT 4

A 02750



**STINSON**
**MORRISON**
**HECKER** LLP

Robert L. Driscoll
(816) 691-3102
bdriscoll@stinsonmoheck.com
www.stinsonmoheck.com

1201 Walnut, Suite 2900
Kansas City, MO 64106-2150

*Tel* (816) 842-8600
*Fax* (816) 691-3495

September 1, 2005

Mr. Steven Wood
Kelley Drye & Warren LLP
333 West Wacker Drive, Suite 2600
Chicago, Illinois 60606

Re:    In re Worldcom, Inc. -- Claim of Parus Holdings, Inc.

Dear Steve:

I am writing to advise that we now have completed our review of the over 350 boxes of Intermedia Communications, Inc. ("Intermedia") documents that were shipped to Kansas City for review before the August 9 hearing. We are in the process of copying and Bates numbering the responsive documents and preparing a privilege log. I will contact you once this process is competed to discuss the manner in which you would like these documents produced.

Also, we determined that approximately 70 additional boxes of Intermedia documents listed on the Tampa index should be reviewed. A list of those boxes is attached. The boxes have been shipped to Kansas City and currently are being reviewed.

Please call Allison Murdock or me if you have any questions.

Very truly yours,

**STINSON MORRISON HECKER** LLP

Robert L. Driscoll

KANSAS CITY
OVERLAND PARK
WICHITA
WASHINGTON, D.C.
PHOENIX
ST. LOUIS
OMAHA
JEFFERSON CITY

Enclosure

cc:    Allison M. Murdock

DB02/048629 0094/6805988.1

**A 02751**

## Parus Holdings Claims
## Additional Boxes Selected for Review

| | | | | |
|---|---|---|---|---|
| T094D | Tampa | W15420803 | 154208034 | |
| T094D | Tampa | R10115/C105 | 165034485 | Sandy Pechin |
| T094D | Tampa | C2043 | 165034479 | Mills Computer |
| T094D | Tampa | C2013 | 165034484 | W. Adams |
| T094D | Tampa | C1350 | 165034483 | Shepahali |
| T094D | Tampa | C1348 | 165034491 | Inactive Files - Angela Palms |
| T094D | Tampa | C1348 | 165034486 | Inactive Files - Rodney |
| T094D | Tampa | C1348 | 165034490 | Recurring Angela Palms |
| T094D | Tampa | C1051 | 165034481 | Sandy Pechin |
| T094D | Tampa | B1015 | 165034475 | |
| T094D | Tampa | AV113 | 165034489 | File Room |
| T094D | Tampa | AV103 | 165034477 | File Room |
| T094D | Tampa | | 226516611 | Intermedia-Tampa FL CS&SO Sop Bill Migration files |
| T094D | Tampa | | 226516610 | Intermedia-Tampa FL CS&SO Sop Bill Migration files |
| T094D | Tampa | | 226516609 | Intermedia-Tampa FL CS&SO Sop Bill Migration files |
| T094D | Tampa | | 226516608 | Intermedia-Tampa FL CS&SO Sop Bill Migration files |
| T094D | Tampa | | 226516606 | Intermedia-Tampa FL CS&SO Sop Bill Migration files |
| T094D | Tampa | | 226516605 | Intermedia-Tampa FL CS&SO Sop Bill Migration files |
| T094D | Tampa | | 224664982 | Intermedia-Tampa FL CS and SO LNP files-I |
| T094D | Tampa | | 224664981 | Intermedia-Tampa FL CS and SO LNP files-I |
| T094D | Tampa | | 224664980 | Intermedia-Tampa FL CS and SO LNP files-I |
| T094D | Tampa | | 224664979 | Intermedia-Tampa FL CS and SO LNP files-I |
| T094D | Tampa | | 224664978 | Intermedia-Tampa FL CS and SO LNP files-I |
| T094D | Tampa | | 224664933 | Intermedia-Tampa FL CS and SO LNP Out.J |
| T094D | Tampa | | 224664932 | Intermedia-Tampa FL CS and SO LNP Out.I |
| T094D | Tampa | | 177204267 | Bev's File Cabinet Binders |
| T094D | Tampa | | 177204266 | Bev's File Cabinet Binders |
| T094D | Tampa | | 177204265 | Bev's File Cabinet Smith Credenza |
| T094D | Tampa | | 177204261 | Bev's File Cabinet |
| T094D | Tampa | | 177204260 | Bev's File Cabinet |
| T094D | Tampa | | 177204259 | Bev's File Cabinet |
| T094D | Tampa | | 177204258 | Bev's File Cabinet |
| T094D | Tampa | | 177204256 | Bev's File Cabinet |
| T094D | Tampa | | 177204255 | Bev's File Cabinet |
| T094D | Tampa | | 177204254 | Bev's File Cabinet |
| T094D | Tampa | | 177204253 | Bev's File Cabinet |

A 02752

## Parus Holdings Claims
### Additional Boxes Selected for Review

| | | | | | |
|---|---|---|---|---|---|
| T094D | Tampa | 177204252 | 177204252 | 177204252 | Sheila McDaniel's File |
| T094D | Tampa | 177204054 | 177204054 | 177204054 | Wanda Friend - Binders |
| T094D | Tampa | 177204053 | 177204053 | 177204053 | Wanda Friend - Binders |
| T094D | Tampa | 177204052 | 177204052 | 177204052 | Wanda Friend - Binders |
| T094D | Tampa | 177204051 | 177204051 | 177204051 | Wanda Friend - Binders |
| T094D | Tampa | 166137 | DST273547 | 0000166137 | Jim Geiger |
| T094D | Tampa | 166136 | DST273546 | 0000166136 | Jim Geiger |
| T094D | Tampa | 166135 | DST273545 | 0000166135 | Jim Geiger |
| T094D | Tampa | 166134 | DST273544 | 0000166134 | Jim Geiger |
| T094D | Tampa | 166133 | DST273543 | 0000166133 | Jim Geiger |
| T094D | Tampa | 166132 | DST273542 | 0000166132 | Jim Geiger |
| T094D | Tampa | 166131 | DST273541 | 0000166131 | Jim Geiger |
| T094D | Tampa | 166130 | DST273540 | 0000166130 | Jim Geiger |
| T094D | Tampa | 166129 | DST273539 | 0000166129 | Jim Geiger |
| T094D | Tampa | 166128 | DST273538 | 0000166128 | Jim Geiger |
| T094D | Tampa | 166127 | DST273537 | 0000166127 | Jim Geiger |
| T094D | Tampa | 166126 | DST273536 | 0000166126 | Jim Geiger |
| T094D | Tampa | 166125 | DST273535 | 0000166125 | Jim Geiger |
| T094D | Tampa | 166124 | DST273534 | 0000166124 | Jim Geiger |
| T094D | Tampa | 166123 | DST273533 | 0000166123 | Jim Geiger |
| T094D | Tampa | 166122 | DST273532 | 0000166122 | Jim Geiger |
| T094D | Tampa | 166121 | DST273531 | 0000166121 | Jim Geiger |
| T094D | Tampa | 166120 | DST273530 | 0000166120 | Jim Geiger |
| T094D | Tampa | 166119 | DST273529 | 0000166119 | Jim Geiger |
| T094D | Tampa | 166118 | DST273528 | 0000166118 | Jim Geiger |
| T094D | Tampa | 166117 | DST273527 | 0000166117 | Jim Geiger |
| T094D | Tampa | 166116 | DST273526 | 0000166116 | Jim Geiger |
| T094D | Tampa | 166114 | DST273525 | 0000166114 | Jim Geiger |
| T094D | Tampa | 166113 | DST273524 | 0000166113 | Jim Geiger |
| T094D | Tampa | 166112 | DST273523 | 0000166112 | Jim Geiger |
| T094D | Tampa | 166111 | DST273522 | 0000166111 | Jim Geiger |
| T094D | Tampa | 166110 | DST273521 | 0000166110 | Jim Geiger |
| T094D | Tampa | 166109 | DST273520 | 0000166109 | Jim Geiger |
| T094D | Tampa | 166108 | DST273519 | 0000166108 | Jim Geiger |
| T094D | Tampa | 166107 | DST273518 | 0000166107 | Jim Geiger |
| T094D | Tampa | 166106 | DST273517 | 0000166106 | Jim Geiger |
| T094D | Tampa | 166105 | DST273516 | 0000166105 | Jim Geiger |

A 02753

## Parus Holdings Claims
## Additional Boxes Selected for Review

| | | | |
|---|---|---|---|
| T094D | Tampa | 166104 | DST273515 | 0000166104 Jim Geiger |
| T094D | Tampa | 166103 | DST273514 | 0000166103 Jim Geiger |
| T094D | Tampa | 166102 | DST273513 | 0000166102 Jim Geiger |
| T094D | Tampa | 166101 | DST273512 | 0000166101 Jim Geiger |

A 02754

# ADDENDUM

# EXHIBIT 5

A 02755

Page 1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------x

IN RE:

    WORLDCOM, INC., ET AL

    REORGANIZED DEBTORS      No. 02-13533

------------------------------x

DEPOSITION OF DONALD C. RAMSAY

New York, New York

Monday, November 14, 2005

Reported by:

Miriam Kaplan

JOB NO. 179461

Ramsay

1  in this litigation.
2      Q.  Do you know if she contacted current or
3  former MCI employees, or both?
4      A.  I'm not sure.  She had a list of
5  individuals that I'm not sure whether some of them
6  may have been former.  I'm not sure.
7      Q.  Do you know the names of any of the
8  individuals she contacted to try to locate
9  documents?
10     A.  I haven't been back over the list
11 specifically, of who she tried to contact.  I'd
12 seen a list that included people I contacted, but
13 I'm not sure as I sit here today, which ones she
14 contacted.
15     Q.  Do you know if Miss Stolte did anything
16 else in connection with trying to locate documents
17 in connection with this proceeding?
18     A.  I don't know.
19     Q.  You don't know?
20     A.  I don't.
21     Q.  Do you know what Larry Bigus did in
22 connection with trying locate documents in
23 connection with this proceeding?
24     A.  He contacted individuals, asked them if

Page 22

Ramsay

1  they had documents relating to the issues in this
2  proceeding.
3      Q.  Do you know who Mr. Bigus contacted?
4      A.  I know some of them, yes.
5      Q.  Who were they?
6      A.  I participated in some of the names
7  contacted.  I recall Richard Black, Kathleen
8  Victory, Teresa Hastings, Barry Zip.  I believe he
9  may have talked to others, but I don't remember
10 those.  I was present and participated in the
11 others.
12     Q.  Your recollection is that Mr. Bigus
13 contacted the four individuals you named, but he
14 may have contacted others?
15     A.  He may have.
16     Q.  At the time that Mr. Bigus was
17 contacting these other individuals, was it still
18 early fall 2004, or was it some other time?
19     A.  It was '04, probably mid to late fall,
20 the ones I was aware of.
21     Q.  So would you say, late fall of 2004 was
22 around the time that you started to become involved
23 in the collection, or the location of the documents
24 in connection with this proceeding?

Page 23

Ramsay

1      A.  Yes.
2      Q.  Do you know if Mr. Bigus did anything
3  else in connection with locating documents in this
4  proceeding?
5      A.  I know he did some other things, but I'm
6  not sure I can describe them.  I believe he may
7  have sent e-mails -- let me back up.  Sharon Stolte
8  also sent e-mails for getting something.  I know
9  she sent e-mails to a group of individuals.
10     Q.  So Miss Stolte's contact with MCI
11 employees was both via telephone, as well as
12 e-mail?
13     A.  Correct.
14     Q.  Aside from contacting MCI employees to
15 see if they had documents, do you know if Miss
16 Stolte did anything else in connection with
17 locating documents?
18     A.  I'm not certain.  I'm not certain they
19 were all current employees.
20     Q.  You mentioned that you recall that
21 Mr. Bigus may have done other stuff in connection
22 with locating documents?
23     A.  If I used that imprecise term, maybe
24 that's kind of what it is.  I know I recall that he

Page 24

Ramsay

1  sent e-mail as well.
2      Q.  An e-mail to other either current or
3  former employees of the debtors, to try to locate
4  documents?
5      A.  Correct.
6      Q.  Do you know if Mr. Bigus did anything
7  else?
8      A.  I don't know, don't recall.
9      Q.  Do you know if Miss Stolte received any
10 responses from any of these individuals she
11 contacted?
12     A.  I believe, she did.
13     Q.  Do you know who the responses were from?
14     A.  One of the names I can't pronounce, it's
15 Nasser Sheikh.  It's a very -- it's what I remember
16 of it, and I believe there was a Stevens.  There
17 may be others, but I remember seeing something, a
18 response from those.  She received responses from
19 others.  By response, I mean she received some
20 documents.  She received responses from a number of
21 them beyond that.
22     Q.  Do you recall what the nature of the
23 responses were?
24     A.  A number of them did not have any

Page 25

A 02757

Ramsay

1 documents relating to issues in these proceedings.
2   Q.  Do you recall what Miss Stolte's request
3 was of them?
4   A.  Not specifically. I remember it was a
5 very broad request for anything, as I recall,
6 relating to EffectNet or Webley, or the
7 relationship between the Intermedia and EffectNet
8 or MCI, and Webley or MCI; any of those parties,
9 anything, period. I can't recite what it said, but
10 I remember it was very broad.
11   Q.  Do you know if Stinson still has the
12 e-mail, or e-mails, that were sent by either Miss
13 Stolte or Mr. Bigus to those individuals?
14   A.  I have no reason to think they wouldn't.
15 I would think they would.
16   MR. SMITH: I make a request for a copy
17   of those e-mails that were sent to the
18   individuals by Miss Stolte and/or Mr. Bigus.
19   MR. DRISCOLL: Take it under advisement.
20   Q.  Do you know if any of the individuals
21 who responded to Miss Stolte, responded either
22 verbally or in an e-mail?
23   MR. DRISCOLL: I'm sorry, could you read
24   that back?

Page 26

Ramsay

1 (Record read.)
2   A.  Either one. I believe they did.
3   Q.  In both matters?
4   A.  No, I'm not sure about e-mail. It may
5 have been. I don't remember. There may be.
6   MR. SMITH: To the extent that there
7   were e-mail responses to Miss Stolte and
8   Mr. Bigus, in response to their requests for
9   documents, we request a copy of those
10   documents.
11   Q.  Do you know if Mr. Bigus received any
12 responses from any individuals that he contacted?
13   A.  I believe that he did.
14   Q.  Do you know who from?
15   A.  Specifically, no.
16   Q.  Do you recall for which entities, or
17 entity, any of the individuals Miss Stolte
18 contacted were either working for at the time, or
19 had worked for previously?
20   A.  No. The specific name of -- the
21 corporate name of the entity that they worked for
22 at the time, I don't recall.
23   Q.  Do you know the name of the individuals,
24 employees that Mr. Bigus contacted?

Page 27

Ramsay

1   A.  I don't recall. I'm not sure that I
2 knew, but I don't recall now.
3   Q.  In late fall 2004, was anyone else
4 involved in locating, coordinating the review of
5 documents in this proceeding?
6   A.  Other than the in-house counsel, no one
7 from the firm, no.
8   Q.  Who from in-house counsel was involved?
9   A.  David Wachen.
10   Q.  Can you spell the last name?
11   A.  W A C H E N.
12   Q.  Was Mr. Wachen involved at the same time
13 we've been discussing Miss Stolte's roles, or role,
14 as well as Mr. Bigus's role?
15   A.  I believe it was.
16   Q.  What's Mr. Wachen's title; do you know?
17   A.  No.
18   Q.  You just know him to be in-house counsel
19 at MCI?
20   A.  Correct.
21   Q.  Is Mr. Wachen still involved in this
22 proceeding?
23   A.  I believe that he is.
24   Q.  Do you know what, if anything,

Page 28

Ramsay

1 Mr. Wachen did in late fall, or in the fall of
2 2004, in connection with attempting to locate, or
3 locate documents, or coordinate review of documents
4 in this proceeding?
5   MR. DRISCOLL: Excuse me, that's a
6   compound question. I missed the second part.
7   (Record read.)
8   MR. DRISCOLL: That's locate or
9   coordinate.
10   MR. SMITH: If you have an objection,
11   I'll rephrase it.
12   MR. DRISCOLL: It was a question of
13   understanding.
14   MR. SMITH: Sure.
15   A.  I don't think I can recite everything he
16 did, but I'm aware that he sent an e-mail advising
17 employees to retain any documents they had; they
18 could not be destroyed. I'm aware he provided, let
19 me hold that off. He may have been the one I'm not
20 certain, who provided a list of individuals who
21 might have information.
22   Q.  Do you know when Mr. Wachen sent the
23 e-mail you mentioned, advising to retain e-mails or
24 documents?

Page 29

A 02758

Ramsay

1    A.    Part of that initial effort before I
2  became involved, early fall, late fall, of '04.
3    Q.    Do you know who he sent the e-mail to?
4    A.    I couldn't try to list them.
5    Q.    Do you know who?
6    A.    I don't recall the list of people he
7  sent it to.
8    Q.    Have you ever seen the e-mail that he
9  sent?
10    A.    I have.
11    Q.    Does Stinson have it in its possession?
12    A.    I assume so.
13          MR. SMITH:  I'd like to request a copy
14    of that e-mail as well.
15    Q.    Aside from providing the list of
16  individuals to contact for information, did
17  Mr. Wachen, to your knowledge, do anything else
18  with respect to locating documents?
19    A.    I believe he did, yes.
20    Q.    What else?
21    A.    Again, I'm not certain at all, but my
22  memory is that he put us in contact with a
23  depository of some documents in Ashburn Virginia.
24  I believe he's the individual who located and

Page 30

Ramsay

1    advised us of those.  I'm not sure, but I think so.
2    Q.    Do you know how he went about finding
3  these documents in Virginia?
4    A.    I don't.
5    Q.    Do you know if Mr. Wachen did anything
6  else, with respect to locating documents in this
7  proceeding?
8    A.    As I said, I don't recall all.  He put
9  us in contact with a number of individuals, and as
10  we went through the process, I don't recall what he
11  did, or necessarily all the individuals, but I
12  recall that.
13    Q.    Who were the names of the individuals he
14  put you in contact with?
15    A.    Well the names that initial list I
16  believe, he provided to Sharon Stolte and Larry
17  Bigus.  I believe, he put us in contact with a
18  woman by the last name of Tate, and a Beckman.
19    Q.    What was the first name?
20    A.    I think it's Roger, I think it's Brenda
21  Tate, and at one point put us in contact with a
22  gentleman by the name of Mancini.
23    Q.    Do you know the first name?
24    A.    I don't remember, I don't recall.  I

Page 31

Ramsay

1    don't recall his first name.
2    Q.    Anyone else that you recall him putting
3  you in touch with?
4    A.    As I sit here, no, I don't recall.  As
5  we go through, I may hear questions as we go
6  through this process, I may think of something
7  else, but at the top of my head, no.
8    Q.    Do you have any documents that would
9  refresh your recollection, as to any other
10  individuals he put you in contact with?
11    A.    Do I have them with me, or do they
12  exist; what's the question?
13    Q.    Do they exist?
14    A.    There are some.
15    Q.    What are those documents?
16    A.    I have made some notes as I went through
17  the process.
18    Q.    Anything else?
19    A.    E-mail that went back and forth might
20  refresh my memory.
21    Q.    Do you recall anything else that
22  Mr. Wachen did in connection with locating
23  documents in this proceeding?
24    A.    I recall that he participated in at

Page 32

Ramsay

1    least two phone conferences with individuals
2  regarding back up tapes.
3    Q.    Anything else?
4    A.    That's all that's coming to mind right
5  now.  As we go through this, I'll try, something
6  might jog my memory from your questions, but that's
7  all I think of now.
8    Q.    With respect to the two phone
9  conferences; were you on the phone as well?
10    A.    Yes.
11    Q.    Did you take notes of those phone calls?
12    A.    I don't recall.  I may have, but I
13  don't -- I'm not certain.
14    Q.    You mentioned a person by the name of
15  Brenda Tate that Mr. Wachen put you in touch with?
16    A.    Correct.
17    Q.    Who is she?
18    A.    I believe, and she is one of the
19  individuals with the WorldCom records management
20  function.
21    Q.    She's still employed by MCI, or
22  reorganized debtors?
23    A.    As far as I know.
24    Q.    Yes, as far as you know?

Page 33

A 02759

Ramsay

1
2      A.   Yes, as far as I know.
3      Q.   Who is Roger Beckman, I believe you
4  mentioned?
5      A.   You're asking me to reach back.  I'm not
6  certain of this, but I think he's one of the
7  individuals who had knowledge of a group of boxes
8  located in Ashburn, Virginia.
9      Q.   Do you know if he is employed by MCI?
10     A.   I believe, he is.
11     Q.   And you mentioned a person with the last
12 name of Mancini?
13     A.   Correct.
14     Q.   Who is that person?
15     A.   He's also the record management function
16 of MCI.
17     Q.   Do you know if he's still employed?
18     A.   As far as I know, yes.
19     Q.   Did you speak with each of these
20 individuals; Miss Tate, Mr. Beckman and
21 Mr. Mancini?
22     A.   Yes.
23     Q.   When did you speak with them?
24     A.   Would have been early winter of '05.  I
25 say earlier, it would have been winter of '05, but

Page 34

Ramsay

1
2      A.   I believe it is.
3      Q.   Do you know what her title was at the
4  time you spoke with her?
5      A.   I don't recall.
6      Q.   Do you know what her role was at the
7  time you spoke with her, at WorldCom and MCI?
8      A.   Other than she worked with their records
9  management function, I don't.
10     Q.   What, if any, information did Miss Tate
11 provide to you?
12     A.   I'm gonna have trouble distinguishing
13 between whether it was Miss Tate or Miss Taylor,
14 but one or both of those individuals ultimately
15 provided some indexes, I believe, of boxes of
16 documents.
17     Q.   You mentioned a Miss Taylor?
18     A.   Yes.
19     Q.   Who is that?
20     A.   She's another individual that works with
21 the records management function at MCI.
22     Q.   When did you speak with Miss Taylor?
23     A.   In that same time frame.
24     Q.   What did your request of either Miss Tate
25 or Miss Taylor, when you spoke with them?

Page 36

Ramsay

1
2  I'm not certain whether it was early winter, mid
3  winter, or late winter.
4          MR. DRISCOLL:  Or not yet winter of '05.
5      A.   I'm sorry -- yes I think that is when I
6  talked to them.
7          MR. DRISCOLL:  Today, November 14, '05.
8      A.   I'm a year off on this, I'm a year off,
9  pardon me.  It would have been winter of 0 -- no it
10 would have been January, February of '05.
11         MR. DRISCOLL:  Okay.
12     Q.   When you're referring to winter '05,
13 right now you're referring to January, February of
14 2005?
15     A.   Yes.
16         MR. SMITH:  If I take Mr. Driscoll
17 correctly, you were referring to presently, as
18 perhaps the winter of '05.
19         MR. DRISCOLL:  Obviously.
20     A.   That would be early winter.  It would
21 have been January, February of '05, or March; it
22 could have been.
23     Q.   With respect to Miss Tate, and I assume,
24 if you correct me if I'm wrong, Tate is spelled T A
25 T E?

Page 35

Ramsay

1
2      A.   Their assistance in locating any
3  documents in relation to this litigation,
4  including, in part, documents that might have been
5  stored by Intermedia.
6      Q.   Do you know if they had any role with
7  respect to storage of documents with Intermedia?
8      A.   I believe, as far as I know, they didn't
9  store them -- weren't involved in the storing of
10 them, but they had information about them.
11     Q.   Do you know if Miss Taylor or Miss Tate
12 worked for Intermedia at some point?
13     A.   I don't believe either did, but I'm not
14 sure.
15     Q.   Do you know if Mr. Beckman or
16 Mr. Mancini, ever worked for Intermedia?
17     A.   I don't recall, I don't believe so, but
18 I don't recall for sure.
19     Q.   Did you -- when you made the request of
20 Miss Taylor and Miss Tate, did you make the request
21 verbally or in writing?  You mentioned before, you
22 made a request.
23     A.   I believe there was some of both.
24     Q.   What do you mean, some of both?
25     A.   Writing and verbal.

Page 37

A 02760

Ramsay

1  my understanding, that their function relating to
2  it crosses all the corporate entities, whether I
3  can tell you 199 -- my understanding is, it's all.
4  Nobody gave me a list of them, but.
5      Q.   Where did you gain that understanding,
6  that she had, or her group, had a role of
7  overseeing storage of all of the documents?
8      A.   From conversations with Phil
9  Hasselvander.
10     Q.   Can you spell the name for me?
11     A.   H A S S E L V A N D E R.
12     Q.   Where is he from?
13     A.   He's with their records management
14  function. I'm not sure where he's located.
15     Q.   Is this Mr. Hasselvander, is he another
16  individual that Mr. Wachen put you in touch with?
17     A.   Indirectly. I think that may be as I --
18  this is -- I'm not certain of this, but I believe
19  that one of the others ultimately referred me to
20  him, or he contacted me as a result of my
21  conversations with one of the other individuals
22  with the records management.
23     Q.   So your recollection, just so I'm clear,
24  at some point in either late fall of 2004 going

Page 42

Ramsay

1  into perhaps January, February 2004?
2      A.   '05.
3      Q.   Excuse me, 2005, thank you.
4          Mr. Hasselvander either contacted you,
5  or you contacted him as a result of your speaking
6  with either Mr. Wachen, Miss Taylor, Miss Tate or
7  Mr. Beckman or Mr. Mancini?
8      A.   Correct.
9      Q.   Do you know what Mr. Hasselvander's
10 function was at the time you spoke with him, in
11 connection with records management?
12     A.   I don't recall his title, but I believe
13 he's some supervisory capacity over one or more of
14 these other individuals. I believe, he may be the
15 head of that function, stored records. I believe,
16 he is. I'm not certain.
17     Q.   What did Mr. Hasselvander say to you in
18 connection with his group's function of storing
19 WorldCom documents?
20     A.   Well, I had a number of conversations
21 with them. I'm not sure generally- if you're
22 referring to whether it crossed corporate lines, I
23 asked him the question, and he said yes.
24     Q.   You asked him -- what question did you

Page 43

Ramsay

1  ask him?
2      A.   I asked him -- at one point, I said we
3  had a large group of Intermedia documents. I said
4  ask him if his searches done by computer would be
5  limited by corporate lines, and he said no, this
6  would cross all corporate lines.
7      Q.   When we say all corporate lines, that
8  would include all Intermedia entities, all WorldCom
9  entities, or MCI entities?
10     A.   That's my understanding.
11     Q.   Do you know the name of the group or the
12 entity at WorldCom that Mr. Hasselvander and the
13 others worked for?
14     A.   Yes. RIM, records information
15 management.
16     Q.   Do you know what they're a subsidiary
17 of, an affiliate of one of the WorldCom entities?
18     A.   I don't know.
19     Q.   Do you know if it's a group, or a
20 department within one of the WorldCom entities?
21     A.   I don't know.
22     Q.   Do you know if it's an organization
23 independent of any of the WorldCom entities?
24     A.   Independent of any one of them?

Page 44

Ramsay

1      Q.   Right, right.
2      A.   I think it's part of one or more of the
3  entities, but I'm not sure the corporate structure.
4      Q.   Do you know if any of them, any of the
5  individuals you mentioned thus far;
6  Mr. Hasselvander, Miss Taylor, Miss Tate, Mr.
7  Beckman, or Mr. Mancini, conducted searches for
8  documents?
9      A.   I'm certain they did, mechanically did
10 it. I'm not certain. I believe Mr. Hasselvander
11 did some, in some cases in his direction.
12     Q.   Do you know how any one of those
13 individuals did searches, or directed that searches
14 be done?
15     A.   I don't know the physical mechanics of
16 it, but I'm aware that they had information, names,
17 and terms, and conducted searches through that
18 process.
19     Q.   What was the information that they had
20 that he used to conduct the searches?
21     A.   I believe, I can't sit here and recall
22 all of it, but I believe it would have included
23 EffectNet, it would have included Intermedia One,
24 it would have included request for information

Page 45

A 02761

Ramsay

1  regarding a merger between MCI and Intermedia.
2  There were names I know that included James Faust
3  and Jim Renforth and others. That's at least some
4  of them, probably Webley.
5      Q.  Why do you say, probably Webley?
6      A.  Because it was one of the entities
7  involved in the matter.
8      Q.  Do you know if in fact, either one of
9  those individuals either did the search, or
10  directed a search to include Webley in that search?
11     A.  I can't sit here today and say for sure.
12  I'm more confident in some of the other terms,
13  because I see them in the indexes, but I don't
14  recall Webley for sure.
15         MR. DRISCOLL: I couldn't hear that.
16  Can you read that back?
17         (Record read.)
18     Q.  Do you know if they used the term
19  EffectNet in their searches?
20     A.  I believe they did.
21     Q.  Why do you believe that?
22     A.  The reason I believe that, is because
23  the indexes came back and I looked at them, and the
24  EffectNet was not among the words in the indexes,

Page 46

Ramsay

1  so I called about that -- why is that, and the
2  answer was, it doesn't come up in search.
3      Q.  Who did you speak to when you called?
4      A.  I recall it could have been Joe Stevens,
5  it could have been Emmy Taylor, it could have been
6  Phil Hasselvander or Brenda Tate.
7      Q.  So it could have been one of those four
8  or five individuals you mentioned?
9      A.  Yes, yes.
10     Q.  Do you know how they went about the
11  search with the term EffectNet?
12     A.  Mechanically, if that's what you mean.
13  I don't know the mechanical process. It includes
14  entering into the computer system search terms like
15  many other systems, but I don't know.
16     Q.  I mean, let me back up a couple of steps
17  perhaps. When you spoke with one of these four
18  individuals, and I know that your recollection is
19  that you spoke with them, you're just not sure
20  which ones perhaps, and what time frames, in what
21  order; but when you asked them to do a search,
22  strike that.
23         When you spoke with these individuals,
24  what was your understanding as to what they were

Page 47

Ramsay

1  searching for?
2      A.  Stored documents, indexes, electronic
3  indexes of stored documents.
4      Q.  So your understanding was that they had
5  index, or multiple indexes, of documents that they
6  had stored somewhere?
7      A.  Yes.
8      Q.  The actual physical document stored
9  somewhere then, had an index?
10     A.  A computerized index, yes.
11     Q.  When they conducted, either they
12  themselves, or had someone conduct the searches,
13  they searched the index or indices for the term,
14  for example EffectNet?
15     A.  That is my understanding, yes.
16        MR. DRISCOLL: Can you read back the
17  last question?
18        (Record read.)
19     Q.  Just so I'm clear, they didn't actually
20  go to the boxes of documents and search for these
21  documents with these terms?
22     A.  I don't believe they did.
23     Q.  Do you know how they determined what
24  indexes or indices existed?

Page 48

Ramsay

1      A.  It's my understanding, their
2  computerized index system would include their
3  searches, would include search of all indexes of
4  stored hard copy documents.
5      Q.  Okay.
6         Do you know what the stored documents
7  encompassed, or included?
8      A.  I guess I'm not sure I understand your
9  question.
10     Q.  And certainly, if at any time during
11  today you don't understand a question, tell me and
12  I'll try to rephrase it so you understand. I think
13  you may have answered this before, but let me ask
14  it again. I think I know what the answer would be
15  but just.
16         Do you know of what entities the stored
17  documents were from, that they had these indices
18  for?
19     A.  Again, my understanding is all related
20  entities.
21     Q.  And that would have included Intermedia
22  entities, WorldCom entities, or MCI entities?
23     A.  Correct.
24     Q.  Again, the time frame for that was

Page 49

A 02762

Ramsay

1  January 1, 2000 through the end of 2002, December
2  of 2002?
3     A.  Time frame for what?
4     Q.  For your request for of their search in
5  these stored documents?
6     A.  Well, that is a time frame we worked
7  with, but I don't believe their search for stored
8  documents was limited in that way.  They searched
9  for terms and sometimes what I recall concepts,
10  marketing, that sort of thing, Intermedia
11  marketing, names.  I'm sure we did give them dates,
12  but I know the index we produced includes documents
13  from earlier time frames, so it can't have been
14  that limited.
15     Q.  Do you know where the documents that
16  they had indices of were stored?
17     A.  I don't know where they were stored.
18  They were stored sometimes, at least in commercial
19  storage companies, like Iron Mountain, and perhaps
20  all over the world for that matter.
21     Q.  Do you know how the indices that they
22  had were created?
23     A.  I have some information about how the
24  index of Intermedia originating documents were

Page 50

Ramsay

1  created.
2     Q.  Before I get to that, you make a
3  distinction between the index of Intermedia
4  documents and between other documents?
5     A.  In terms of how they were created, yes.
6     Q.  Do you know if there were different
7  indices for different entities?
8     A.  My understanding, again, is it's when
9  computerized indexing system, whether they go to
10  two to three separate systems.  I'm not absolutely
11  sure of that, but the information on the indexes, I
12  guess, is what I have some information on as it
13  relates to Intermedia originated documents.
14     Q.  I don't recall if this was the question
15  I just asked you.  Do you know how the indices were
16  created?
17     A.  I again, I've been told, in some respect
18  how information for the indexes was generated for
19  Intermedia.
20     Q.  Okay, and what information were you told
21  about, how the information was gathered for
22  Intermedia documents?
23     A.  That as Intermedia was winding up and
24  employees were leaving their employment, RIF, they

Page 51

Ramsay

1  were asked to box up documents and create an index
2  and leave them in their office or their space.
3     Q.  You said RIF, I assume you're talking
4  about reduction in force?
5     A.  Correct.
6     Q.  As I understand your testimony, at the
7  time when Intermedia was either being merged into
8  or shutting down, in some way the employees who
9  were laid off or terminated, in some way were told
10  to box up their documents, create an index for
11  those documents, and leave them where they were?
12     A.  That's my understanding, yes.
13     Q.  Do you know if they were given some
14  template to create an index what was contained in
15  whatever documents they had?
16     A.  I don't know.
17     Q.  Do you know what information they
18  included in there respective indices?
19     A.  Well, we have the index, but beyond
20  that, no.  We have overall large index you've seen
21  on those boxes.
22     Q.  Well, were the indices that were given
23  to you, and ultimately given to us in this case,
24  the indices of each individual employee?

Page 52

Ramsay

1     A.  That is my understanding.
2     Q.  For employees who were not either laid
3  off, terminated, or in some way, do you know what
4  they did with respect to their documents?
5     A.  I only know that was the process and, I
6  don't know who you'd be referring to, or what
7  circumstance you'd be referring to, but as they
8  left to merge to go to MCI or to leave employment,
9  whatever; they asked to box them and leave an
10  index.
11     Q.  Do you know if their boxes were titled
12  in some way specific to those particular
13  individuals?
14     A.  Well again, from the indexes that you've
15  seen, we've seen, there are some instances where
16  that's the case, but generally not.
17     Q.  Do you know if, for example, I think you
18  mentioned a Jim Renforth or James Renforth; do you
19  know if he had created an index of whatever
20  documents he had at the time that he left
21  employment with Intermedia?
22     A.  I know that I'd ask records management
23  to run his name against their stored documents, and
24  it produced only his personal file.  No other

Page 53

Ramsay

1  documents identify as his.
2
3      Q.   Aside from individual employees creating
4  indices for documents they had in their offices, do
5  you know, otherwise, how documents stored by
6  Intermedia were indexed?
7      A.   That's it.  I believe, that's what I
8  understand, that's what I understand the practice
9  was.
10     Q.   Do you know if Intermedia had, I'm going
11 to try and phrase the question; tell me if you
12 understand it or not.
13         Do you know if Intermedia had a records
14 management office that on a rolling basis
15 employees, would send documents or files so that
16 these documents could be maintained in its own
17 storage space contemporaneously with their own work
18 files, for example?
19     A.   Well, I believe my understanding is the
20 same storage function to the extent that happened,
21 it would be through records management and part of
22 their stored documents that is, encompasses all, so
23 to the extent documents were stored prior to, or
24 other than, I think it would be part of that as
25 well.

Page 54

Ramsay

1
2      Q.   Let me give you an example of what I'm
3  driving at and see if it's any clearer.  For
4  example, here at Kelly Drye, if I receive a
5  document or letter, correspondence, whatever it
6  might be, I send that letter when I receive it, or
7  a copy of it, to our records management department.
8  I also keep a copy for myself so I have a work
9  file.  Do you know if Intermedia had a similar type
10 of records management, where on either,
11 contemporaneously, employees would send a document
12 or file that they received or sent out to that
13 central records management, and also perhaps retain
14 their own work file?
15     A.   I'm not certain of that.  What I
16 understand, is that whatever that process is, it
17 would have ended up with RIM after it closed, after
18 Intermedia closed.
19     Q.   With respect to indices not of
20 Intermedia, do you know how those indices were
21 created?
22     A.   I'm not certain how those were created.
23     Q.   Did any of the individuals from RIM,
24 including Mr. Hasselvander, Miss Taylor, Miss Tate,
25 Mr. Beckman, or Mr. Mancini, ever indicate to you

Page 55

Ramsay

1
2  how other indices were created?
3      A.   Don't recall that they did.
4      Q.   Aside from Intermedia documents, did
5  they have indices of other entities?
6      A.   Well, again, I'm not- I don't know that
7  their indices are divided by entities.  It's my
8  understanding, their computer indexes cross entity
9  lines, so I don't believe they were separated
10 necessarily, by corporate entity, they may.  I'm
11 not aware of what they do, and I have been informed
12 that their searches cross corporate lines.
13     Q.   Aside from the terms you mentioned
14 earlier, I believe EffectNet Intermedia One and
15 merger between MCI and Intermedia, were there other
16 search terms that were used to search the indices
17 that RIM had in its possession?
18     A.   Again, I believe Webley would have been
19 used, and individual names were also used.
20     Q.   Well, I understand.  I'm just talking
21 about terms, I wasn't talking about names.
22     A.   Unified Communications, probably was
23 used.
24     Q.   Probably?
25     A.   I believe it was.

Page 56

Ramsay

1
2      Q.   Why do you believe it was?
3      A.   Well, one of the boxes produced is
4  labelled Unified Communications.  It was a key
5  term.  It was logically, one that we would have
6  used, might have used, Webley in connection with
7  master software licensing agreement.  I'm not
8  certain at all, but I think they may have looked
9  for management reports, marketing, that sort of
10 thing, but I don't recall the terms.
11     Q.   Do you have any notes of what terms they
12 did use?
13     A.   I don't believe I do.
14     Q.   When you discussed with them, or
15 communicated with them in connection with the terms
16 to be used, did you send them anything in writing
17 to include the terms to be used to search the
18 indices?
19     A.   I simply don't recall.
20     Q.   You mentioned earlier that they used the
21 term EffectNet to conduct the search, and there
22 were no results from that search; is that accurate?
23     A.   I believe that's true, that's my best
24 recollection.
25     Q.   Do you know how they input that search

Page 57

A 02764

1                      Ramsay
2   term into the data base to search for it?
3       **A.   Physically inputted?**
4       Q.   Meaning how it was spelled.
5       **A.   Spelled?**
6       Q.   Right.
7       **A.   Not certain, but they're pretty good.  I**
8   **think from conversations with them, they're aware**
9   **that you have to use a variety of terms**
10  **sometimes -- no, they didn't.**
11      Q.   I didn't finish my question.  Did they
12  tell you how they input the name to do the search?
13      **A.   I don't recall that they did.**
14      Q.   You mentioned a couple of names that
15  they had searched, among others.  Two names you did
16  mention were Faust and Renforth; is that correct?
17      **A.   That is correct.**
18      Q.   Do you know how they -- do you know if
19  they had any results from the search including the
20  name Faust?
21      **A.   His personnel file.**
22      Q.   Anything else?
23      **A.   My understanding is there wasn't**
24  **anything else.**
25      Q.   I believe you testified the same result

                                                Page 58

1                      Ramsay
2   with respect to Mr. Renforth?
3       **A.   That's correct.**
4       Q.   Do you know if they conducted searches
5   of other individuals?
6       **A.   They did.**
7       Q.   Using their names?
8       **A.   Yes they did.**
9       Q.   Do you know the results were of that?
10      **A.   Nothing, other than personnel files.**
11      Q.   Do you know if there were searches done
12  for work files for Mr. Faust?
13      **A.   Well, I mean, they searched using his**
14  **name, so I'm not sure what you mean by work files.**
15      Q.   Let me try it this way.  When either
16  yourself or Mr. Bigus, or Miss Stolte, or anyone
17  else at Stinson, communicating with individuals who
18  either worked at presently, at that time, or
19  formerly at WorldCom Intermedia or MCI, did you
20  contact Mr. Faust?
21      **A.   I did not.**
22      Q.   Do you know if any of the other
23  individuals at Stinson did?
24      **A.   I'm not aware if any of them did.**
25      Q.   Did anyone from Stinson contact

                                                Page 59

1                      Ramsay
2   Mr. Renforth?
3       **A.   I'm not aware if they did or didn't.**
4       Q.   I believe you had mentioned earlier that
5   either yourself, or someone else from Stinson had
6   contacted Mr. Black?
7       **A.   That's correct.**
8       Q.   Did you personally, or did someone else
9   from Stinson?
10      **A.   I participated in phone conversations**
11  **with Mr. Black -- more than one but -- I know at**
12  **least two actually.**
13      Q.   I'm sorry?
14      **A.   At least two.**
15      Q.   Two conversations with him?
16      **A.   Mr. Black, yes.**
17      Q.   Is he still employed with MCI?
18      **A.   Yes.**
19      Q.   During the conversation with Mr. Black,
20  was it requested of him whether or not he had to
21  maintain, or keep a work file regarding either
22  EffectNet or Intermedia One, or anything relating
23  to this proceeding?
24      **A.   We asked if he had any records relating**
25  **to those issues, yes.**

                                                Page 60

1                      Ramsay
2       Q.   What was his response?
3       **A.   He did not.**
4       Q.   Did he say whether he had ever worked on
5   any matters relating to EffectNet or Intermedia
6   One, or Webley or Unified Communications?
7       **A.   I'm not certain to what extent I can go**
8   **into the details of Mr. Black, without waiving**
9   **privilege.**
10          MR. DRISCOLL:  Can you read the question
11      back?
12          (Record read.)
13          MR. DRISCOLL:  I guess we need to talk.
14          MR. SMITH:  Hold on.  Just to be clear
15      for the record.  The discussion is to
16      determine whether or not any discussions that
17      Mr. Ramsay or others that he was involved with
18      at the time, any conversation with Mr. Black
19      impinges upon privileged communication?
20          MR. DRISCOLL:  That's why I want to have
21      this chat.
22          MR. SMITH:  I want it to be clear.
23          MR. DRISCOLL:  Could you read the
24      question back?
25          (Record read.)

                                                Page 61

Ramsay

1    MR. DRISCOLL: So whether Black worked
2    for any of those, or on any of those things.
3    (Discussion off the record.)
4    **A.  Can I have the question read back?**
5    **(Record read.)**
6    **A.  And my answer is, I don't recall.**
7    Q.  Did he say whether or not he had any
8    documents relating to any of those topics?
9    **A.  He said he did not.**
10    Q.  Did you take any notes of that
11    conversation with Mr. Black?
12    **A.  I did.**
13    Q.  You also mentioned, either you or
14    someone else from Stinson had spoken with Kathleen
15    Victory?
16    **A.  That's correct.**
17    Q.  Was it you, or was it somebody else, or
18    you and somebody else at the same time?
19    **A.  I was present, participated in one**
20    **conversation with Larry Bigus, and I had at least**
21    **one other conversation myself individually.**
22    Q.  Did Miss Victory indicate whether she
23    had any documents relating to the topics I
24    mentioned before, with respect to Mr. Black?

Page 62

Ramsay

1    **A.  She said she did not.**
2    Q.  Did she say she had ever worked on any
3    of those matters, or involved in some way?
4    **A.  I don't recall.**
5    Q.  Miss Hastings?
6    **A.  No, I don't recall.  There's -- she**
7    **signed the contract, but beyond that I don't**
8    **recall.**
9    Q.  The contract meaning the Unified
10    Communications agreement?
11    **A.  Right.**
12    Q.  With respect to, I believe, you had said
13    Teresa Hastings, either you, or you and somebody
14    else from Stinson had conversations with her
15    regarding documents; did she indicate in your
16    conversation with her or anyone else from Stinson,
17    having a conversation with her indicate whether she
18    had any documents?
19    **A.  She said she did not.**
20    Q.  Did she indicate whether she had worked
21    on any of the matters that I asked you before, with
22    respect to Mr. Black?
23    **A.  I don't recall the list now that you**
24    **were asking about.  What was the list of topics?**

Page 63

Ramsay

1    Q.  EffectNet --
2    **A.  I'm not trying to be- I think she may**
3    **have had, or recalled something about Webley Master**
4    **Software Licensing Agreement.  I'm not certain.  I**
5    **don't know if that was part of your list or not.**
6    Q.  It was.
7    I believe you had also mentioned you had
8    conversations, or someone from Stinson, had
9    conversations with Barry Zip; is that correct?
10    **A.  That's correct.**
11    Q.  Did Barry Zip indicate whether he had
12    any documents related to EffectNet Intermedia One,
13    Webley, Unified Communications or any of those
14    topics?
15    **A.  I believe he did not.**
16    Q.  Do you know if he said he was involved
17    with, or he had worked on any of these topics?
18    **A.  I don't recall.**
19    Q.  You mentioned either you, or someone
20    else from Stinson Stinson, may have contacted other
21    individuals?
22    **A.  Yes.**
23    Q.  Do you remember the names of those other
24    individuals?

Page 64

Ramsay

1    **A.  I could give you some, certainly.**
2    Q.  Okay.
3    **A.  Steve Hooper, Mike Randles.**
4    Q.  What was the name again?
5    **A.  Steve Hooper, Mike Randles, Maria Ayala,**
6    **Julio Valdez, gentleman by the name of Perez, whose**
7    **last name I don't recall -- whose first name I**
8    **don't recall.  There were others, but they're not**
9    **coming to mind immediately, but there were others.**
10    **Again, as we go through it, perhaps**
11    **chronologically, your question might bring them up;**
12    **there were others.**
13    Q.  Were these individuals you just
14    mentioned, individuals that at the same time as you
15    had contacted Mr. Black, Miss Victory for example,
16    you also contacted these individuals?
17    **A.  Mr. Black and Miss Victory were**
18    **contacted sometime in '04, and the other**
19    **individuals were sometime in '05.  I don't know**
20    **exactly when, but it was a little bit later.**
21    MR. DRISCOLL:  Can you read that back?
22    (Record read.)
23    Q.  Did you ask any of these individuals you
24    just mentioned, whether they had any files

Page 65

A 02766

Ramsay

1    concerning EffectNet, Intermedia One or anything
2    else relating to this litigation?
3    **A.  Yes.**
4    Q.  What was their response?
5    **A.  Steve Hooper did have documents.**
6    Q.  Anyone else?
7    **A.  Mike Randles had documents.**
8    Q.  Anyone else?
9    **A.  Julio Valdez had something on the**
10   **electronic side for back up tapes.  I don't know if**
11   **you want to go into that, but he's aware of the**
12   **process, and so forth of backup tapes.  Perez, I**
13   **don't believe, had any documents.  He again, was on**
14   **the electronic side, was the one I contacted**
15   **because it was thought he might have information**
16   **before we reached Julio, I believe, and found he**
17   **had the information we needed.**
18   Q.  How about Maria Ayala?
19   **A.  She did not have any documents.**
20   Q.  Did Mr. Hooper and Mr. Randles work for
21   WorldCom or Intermedia?
22   **A.  Mr. Hooper worked for WorldCom, and**
23   **Mr. Randles had worked for Intermedia, and**
24   **currently works for MCI or WorldCom.**

Page 66

Ramsay

1    Q.  Do you know if the documents that they
2    mentioned they had were -- had also been included
3    in the indices that were searched by the RIM
4    office?
5    **A.  I don't believe they were.**
6    Q.  So they had documents independent, or
7    separate, from what was on the indices?
8    **A.  That's correct.**
9    Q.  Do you know if those documents were
10   obtained by Stinson for review for purpose of
11   production in this case?
12   **A.  They were.**
13   Q.  Do you know if they were produced?
14   **A.  Non-privileged response documents from**
15   **those sets were produced.**
16   MR. SMITH:  Can I mark this as Ramsay
17   Exhibit No. 1?
18   (Ramsay Exhibit 1, WorldCom's first
19   amended initial disclosure, marked for
20   identification, as of this date.)
21   Q.  Mr. Ramsay, you should have in front of
22   you what we marked for identification as Ramsay
23   Exhibit No. 1.  It has a caption of United States
24   Bankruptcy Court, Southern District of New York,

Page 67

Ramsay

1    Chapter 11 case number 02-13533, (AJG), in re,
2    WorldCom Inc., et al.  And it's WorldCom Inc.'s
3    first amended initial disclosure pursuant to fed
4    rule bankruptcy procedure 706281, and it's dated
5    certificate of service has it dated as November 23,
6    2004.  Do you recognize this document at all?
7    **A.  I do.**
8    Q.  Have you seen it before?
9    **A.  I have.**
10   Q.  Did you have help in preparing this
11   document?
12   **A.  I believe -- is that the amended**
13   **version?  I participated, I believe I have.**
14   Q.  For the purposes of right now, my
15   question really focuses on page two of the document
16   under disclosures A, witnesses.  And there's a list
17   of 25 names here.  Did you have a chance to take a
18   look at the names listed?
19   **A.  I just now glanced.**
20   Q.  Does looking at this list refresh your
21   recollection in any way of other individuals you
22   may have contacted, or Stinson may have contacted,
23   in connection with trying to locate documents in
24   this proceeding?

Page 68

Ramsay

1    **A.  To some degree.  There are other names**
2    **on here that I believe we contacted.  We, meaning**
3    **either I, or others with Stinson.**
4    Q.  Okay.
5    **A.  Well, and I -- I don't know how you want**
6    **to approach this.**
7    MR. DRISCOLL:  Let him ask the question.
8    Q.  There are certain names here that you've
9    already identified, and I'm not going to cover them
10   again, but then there were names that you have not
11   identified that I was going to ask you.  I'll just
12   go through and try to make it as expeditious as
13   possible, so that we don't waste time just doing
14   this, but maybe the easiest way is, aside from the
15   individual names you've mentioned already, are
16   there other names on this list who you did
17   communicate with or contact with, to determine
18   whether they had documents or not?
19   **A.  Are you asking me personally?**
20   Q.  Either you and/or Stinson?
21   **A.  Okay.  There are other names on there**
22   **that I believe we did contact.  Some cases, I**
23   **believe, they were on the list that Sharon Stolte**
24   **contacted, but I'm not as certain about that.  I**

Page 69

A 02767

Ramsay

1  believe Jennifer Carroll was contacted. Patrice
2  Carroll may have been, I'm not certain. Barry,
3  last name Barry, number two. There may have been.
4  I'm not certain.
5      Q.    I'm sorry?
6      A.    I don't know about Patrice Carroll and
7  Barry. Peter Cassidy, I believe, was contacted. I
8  believe Shirley Denham-Dale was contacted. Donald
9  Fergus was contacted. I've already mentioned
10 Teresa Hastings. I believe maybe Richard Jeffers
11 was, and I believe maybe Johnson was. I believe
12 Sharon Kasimow was. I believe Susan Kennedy was.
13 I believe Mary Kilmartin was. I believe Carleen
14 Mitchell was. This Nasser S H E I K H was; it's
15 the name I couldn't spell earlier, and I believe
16 Pamela Dunman was.
17     Q.    Do you know if, in reverse order, do you
18 know if Cheryl Mellon was contacted?
19     A.    I'm not certain. I did not -- I don't
20 believe I did.
21     Q.    Do you know if anyone from Stinson
22 contacted her?
23     A.    I'm not certain.
24     Q.    Do you know if Claro Hernandez was

Page 70

Ramsay

1  contacted, on Page three, number 12?
2      A.    That is not a name I recognize, so I
3  don't believe I did, but it's possible Sharon did.
4      Q.    Do you know that Miss Stolte actually
5  did contact her?
6      A.    No, I don't know. I don't know for
7  certain that she did.
8      Q.    Further up on the list, number ten,
9  Vicki Galante-Lee; do you know if anyone contacted
10 her?
11     A.    I'm not certain. I don't believe I did,
12 but Sharon might have.
13     Q.    But you're not certain?
14     A.    I'm not certain.
15     Q.    I believe going back to page two, sorry
16 number four, with respect to Patrice Carroll, I
17 believe you said someone may have contacted her?
18     A.    I may be confusing the two Carroll's. I
19 recognize Carroll's name, but I'm not sure which of
20 them was contacted. It may have been Jennifer, but
21 I'm not certain about Patrice.
22     Q.    Are you certain about Jennifer Carroll?
23     A.    No, I'm not. I believe one -- a Carroll
24 was, but I'm not sure.

Page 71

Ramsay

1      Q.    Do you know if the Carroll that was
2  contacted had any documents in connection with this
3  proceeding?
4      A.    They would not have had.
5      Q.    Why do you say, they would not have had?
6      A.    Because I'm familiar with the documents,
7  and we got documents from anyone that had them, and
8  there were none provided by her.
9      Q.    Do you know if Peter Cassidy had any
10 documents?
11     A.    I believe I talked to Peter Cassidy, and
12 he did not.
13     Q.    Do you know if Shirley Elizabeth
14 Denham-Dale had any documents?
15     A.    I believe she did not.
16     Q.    Do you know if Donald Fergus had any
17 documents?
18     A.    I believe he did not.
19     Q.    Do you know if Richard Jeffers had any
20 kind of documents?
21     A.    I believe he did not -- if he was
22 contacted, he did not.
23     Q.    You're not certain if Mr. Jeffers was
24 contacted?

Page 72

Ramsay

1      A.    No.
2      Q.    Do you know if Mandy Johnson had any
3  documents?
4      A.    She did not. She did answer. I believe
5  she did not.
6      Q.    Did Sharon Kasimow have any documents?
7      A.    No.
8      Q.    Did Susan Kennedy have any documents?
9      A.    I believe she did not.
10     Q.    Mary Kilmartin?
11     A.    As I recall, she did not.
12     Q.    Carleen Mitchell?
13     A.    As I recall, she did not.
14     Q.    Nasser Sheikh?
15     A.    He did.
16     Q.    Do you know what those documents related
17 to?
18     A.    As best I recall, they relate to the
19 Webley master software licensing agreement.
20     Q.    Anything else?
21     A.    I don't recall what it is.
22     Q.    With respect to Pamela Dunham, do you
23 know if she had any documents?
24     A.    No. As best I know, she did not.

Page 73

A 02768

Ramsay

1  
2    Q.  With respect to each of the individuals  
3  who you mentioned, as a result of Exhibit 1, as  
4  well as the other individuals who you testified did  
5  not have documents, I understand your testimony to  
6  be that you do not recall them saying that they did  
7  not have documents; is that correct?  
8        MR. DRISCOLL: Objection to the form of  
9    the question. Can you try it again, because  
10   it's convoluted.  
11   Q.  With respect to the individuals we just  
12  went through the names of the individuals, as I  
13  understand your testimony, as to those who did not  
14  have documents, your testimony is that you do not  
15  believe that they indicated they had documents; is  
16  that correct?  
17   **A.  What I remember is, that everybody we**  
18  **talked to we asked if they had documents, and if we**  
19  **did, we got them. There was no one we talked to**  
20  **that had documents, that we didn't get and we don't**  
21  **have, and I know we don't have documents for those**  
22  **names.**  
23   Q.  How do you know you don't have documents  
24  with respect to the names?  
25   **A.  Because I know who we have documents**  

Page 74

Ramsay

1  
2  **from, and they're not those people.**  
3   Q.  How do you know who you have documents  
4  from?  
5   **A.  Some cases, because I talked to them and**  
6  **they sent them, and other cases because Sharon**  
7  **talked to them and they sent them, I know they're**  
8  **in our file.**  
9   Q.  When you had spoken with the  
10  individuals, what were either the documents or  
11  categories of documents, that you had asked them  
12  for?  
13        MR. DRISCOLL: Objection to the form of  
14    the question. Asked and answered.  
15   **A.  Generally, described to them the claims**  
16  **made in the Parus Holdings pleadings, and asked if**  
17  **they had any documents that would relate to those**  
18  **issues.**  
19   Q.  When you say described to them the  
20  pleadings, are you -- what pleadings are you  
21  referring to?  
22   **A.  Parus Holdings response to MCI's**  
23  **objections to their claim, principally excluding**  
24  **the details of the claim.**  
25   Q.  In the conversations you had with the  

Page 75

Ramsay

1  
2  individuals, did you ever ask them for documents  
3  concerning a Generation D product of WorldCom?  
4   **A.  I was not familiar with that term until**  
5  **your October letter, so no, I didn't.**  
6   Q.  Did you ask them for any products that  
7  WorldCom had that was a competing product to the  
8  Unified Communications product?  
9   **A.  I asked about Unified messaging products**  
10  **documents relating to the Unified messaging**  
11  **products.**  
12   Q.  What was their response?  
13   **A.  They didn't have.**  
14   Q.  Did any of the individuals, either  
15  listed here or that we discussed today, earlier  
16  today, work for WorldCom ventures?  
17   **A.  I don't know. I'm not aware that they**  
18  **did. Again that's -- you had not requested**  
19  **anything from WorldCom ventures and that term I**  
20  **wasn't familiar with until your October '05 letter.**  
21   Q.  Were they asked for any analysis they  
22  may have done of either Webley's financials, or  
23  products, or EffectNet's financials or products?  
24   **A.  Some were asked about Webley, as I**  
25  **recall. I don't recall about EffectNet.**  

Page 76

Ramsay

1  
2   Q.  Which ones were asked about Webley and  
3  not EffectNet?  
4   **A.  Steve Hooper was asked about what**  
5  **information had been obtained. Your -- Parus's**  
6  **objection to the claim alleged that MCI had**  
7  **inquired financial information as part of its**  
8  **negotiations with Webley contract. He was familiar**  
9  **with that, and I asked him about that.**  
10   Q.  Did he have any documents concerning  
11  that?  
12   **A.  My understanding is yes, he did.**  
13   Q.  And those documents have been produced?  
14   **A.  To my understanding, yes.**  
15   Q.  Aside from Steve Hooper, who was asked  
16  about Webley, but not EffectNet?  
17   **A.  I'm not saying they were asked about**  
18  **Webley but not EffectNet. I'm saying, I recall**  
19  **specifically asking about Webley. I don't recall**  
20  **specifically asking about EffectNet.**  
21   Q.  Aside from Steve Hooper, who else do you  
22  recall asking about Webley, but don't recall asking  
23  about EffectNet?  
24        MR. DRISCOLL: Just so the record is  
25    clear, you both I think, are using shorthand  

Page 77

A 02769

Ramsay

1  now. The way the question started out as I
2  recall, an evaluation of EffectNet finances or
3  evaluation of Webley financials, correct, and
4  that's what the shorthand has evolved to.
5        MR. SMITH: That was my question, and
6  Mr. Ramsay's response was he didn't ask about
7  analysis of financials of products, he asked
8  about Webley or EffectNet, that's my
9  understanding of what his response was.
10       A.   Mr. Driscoll is probably trying to clear
11  up that we're talking about financial analysis, not
12  EffectNet.
13       MR. DRISCOLL: I'm trying to get a clean
14  record here, that's all, and to me it seems
15  like it's gotten muddy.
16       MR. SMITH: I don't think it has gotten
17  muddy. I think Mr. Ramsay's response has
18  framed, then my questions to him to ask what
19  it seems he was answering, and so I don't
20  think it's been muddied. I think it's based
21  on his responses, and where we are right now.
22       A.   If it's been muddied, perhaps I muddied
23  it with my answer. Go ahead.
24       Q.   My understanding of your testimony

Page 78

Ramsay

1  earlier was with respect to Mr. Hooper, is you
2  recall asking him about Webley generally, but you
3  don't recall asking him about EffectNet?
4       A.   I specifically remember Webley.
5  Generally, I described all those claims to
6  everybody I talked to. I believe the time frame he
7  was talking about, EffectNet might have merged with
8  Webley, but I'm not sure. He was involved with the
9  master licensing contract issues, so I specifically
10  remember that.
11       Q.   With respect to anyone else that we
12  talked about today, in terms of that either you or
13  someone else from Stinson contacted for documents,
14  did you request from any of them, aside from
15  Mr. Hooper, documents concerning their evaluation
16  or analysis of Webley or EffectNet?
17       A.   I asked for everything they had relating
18  to Webley or EffectNet, everything and anything.
19       Q.   Of the individuals we've talked about so
20  far today that you recalled being contacted, two of
21  those individuals had documents, that was Steve
22  Hooper and Mike Randles; is that correct?
23       A.   That is correct. There were others I
24  mentioned earlier, for example I'll look back at

Page 79

Ramsay

1  the list, Nasar S H E I K H.
2       Q.   My apologies. Anyone else?
3       A.   Don't recall anybody else. I should say
4  that documents were collected before I got involved
5  in the case. It is conceivable that in Sharon's
6  contact with some of these people, there were
7  somebody else on that list that I'm not, as I sit
8  here, aware of.
9       Q.   Who collected the documents before you
10  became involved in the case?
11       A.   Sharon Stolte and Larry Bigus.
12       Q.   Do you know how many documents they
13  collected?
14       A.   I don't.
15       Q.   Do you know where they collected the
16  documents from?
17       A.   Generally, they contacted individuals on
18  this list, and perhaps through in-house counsel,
19  I'm not certain.
20       Q.   Do you know the source of the documents
21  that they collected?
22       MR. DRISCOLL: Other than what he just
23  said.
24       MR. SMITH: Yes.

Page 80

Ramsay

1       A.   Other than what I just said, I don't.
2       Q.   Do you know if the in-house counsel
3  collected documents from someplace?
4       A.   I'm not certain.
5       (Luncheon recess:  1:02 p.m.)

Page 81

Ramsay

1
2
3        A F T E R N O O N   S E S S I O N
4        (Time noted: 1:58 p.m.)
5   DONALD C. RAMSAY, resumed and testified as
6   follows:
7   EXAMINATION BY
8   MR. SMITH (Cont'd.):
9        Q.    Obviously, you're still under oath after
10  your lunch break.
11       A.    I understand that, yes.
12       Q.    Did you, or anyone from Stinson, ever
13  request or communicate -- let me try to rephrase
14  it, I'm sorry. Did you, or anyone from Stinson,
15  ever communicate with a person by the name of
16  Richard Dryer concerning any documents in this
17  case?
18       A.    Don't recall that we did. I don't
19  recall if we did.
20       MR. DRISCOLL:  Spell the name please.
21       MR. SMITH:  D R Y E R.
22       A.    I don't recall. It's possible, but I
23  don't recall.
24       Q.    Did you, or anyone from Stinson, every
25  communicate with a person by the name of Richard

Page 82

Ramsay

1
2   Drayer, and I think you spell it DRAYER. It may be
3   the same person, it may just be misspellings of the
4   last name. I just want to be sure. Did you ever
5   communicate with him regarding any documents in
6   this case?
7        A.    I don't recall if we did.
8        Q.    With respect to the individuals
9   mentioned in this morning's session, in addition to
10  the ones we talked about on the initial disclosure
11  of that list which would encompass others that you
12  had mentioned, did you ever ask them for, if they
13  had documents concerning the Unified Communications
14  general agreement, or the negotiation concerning
15  it, or the pricing structure of it, or the drafting
16  of that document?
17       MR. DRISCOLL:  Excuse me. Read that
18  back.
19       (Record read.)
20       MR. DRISCOLL:  Object to the form of the
21  question. It starts out with asking about
22  individuals, and then moves to asking about
23  content of conversations, so it's a confusing
24  question.
25       MR. SMITH:  All right. I'll try and

Page 83

Ramsay

1
2   rephrase it. I didn't think it was confusing,
3   but I'll rephrase it.
4        MR. DRISCOLL:  It's okay.
5        Q.    Did you request, of any of the
6   individuals we discussed this morning, any
7   documents concerning the Unified Communications
8   services general agreement, including but not
9   limited to, the negotiations, drafting, pricing of
10  the services under that agreement?
11       A.    Yes, we would have asked first of all,
12  generally, for everything that they had that
13  related any way to EffectNet, and in addition, at
14  least I believe, the individual topics would have
15  been discussed in one or more of those
16  conversations.
17       Q.    Do you have a recollection of discussing
18  that topic with any of those individuals?
19       A.    You've got a list of topics. Yes, I
20  recall discussing those topics specifically.
21       MR. DRISCOLL:  Just so we're clear, the
22  Unified services agreement to which you're
23  referring is the November 20, 2000 agreement
24  between EffectNet and Intermedia?
25       MR. SMITH:  Correct.

Page 84

Ramsay

1
2        Q.    Did you request of any of the
3   individuals who were mentioned this morning in our
4   discussion, whether they had any documents
5   concerning the cessation or termination of the
6   Unified Communications agreement, the November 20,
7   2000 agreement, hereabout at all?
8        A.    I believe we did, yes.
9        Q.    What were their responses?
10       A.    The question is, did they have
11  documents?
12       Q.    Correct.
13       A.    In general, did not.
14       Q.    Did any of them specifically have any
15  documents?
16       MR. DRISCOLL:  Asked and answered.
17       A.    Did any of who, I guess?
18       Q.    Any of the individuals you mentioned you
19  spoke with, or Stinson spoke with, the names of
20  which we mentioned this morning?
21       A.    Relating to cessation?
22       Q.    Or termination of the agreement.
23       A.    Well, we produced documents relating to
24  the termination of the agreement. And I can't
25  recall exactly who produced what, but I think I've

Page 85

A 02771

Ramsay

1
2    Q.   I understood that you had reviewed it.
3    A.   I have looked at this index, yes.
4    Q.   If you go to the last page of the
5    Exhibit, the last page of Ramsay Exhibit No. 4,
6    there's an entry at top of the page, for example
7    the number 224400777.
8    A.   Yes.
9    Q.   And there's in the descriptions
10   Intermedia PO's POB, looks like II, the numbers
11   483-5130 in both the major and long descriptions.
12   Do you have an understanding as to what that refers
13   to?
14   A.   I don't.  PO often refers to purchase
15   order, but I don't know the specifics.
16   Q.   Do you know if Jeff Befort contacted
17   anyone at WorldCom to make any inquiries as to
18   descriptions?
19   A.   I don't know.
20   Q.   Put this to the side for now.
21        MR. SMITH:  Can you mark this as Ramsay
22   Exhibit 5, please.
23        (Ramsay Exhibit 5, Intermedia accounts
24   payable records Mississippi filings system,
25   marked for identification, as of this date.)

Page 126

Ramsay

1
2    Q.   Mr. Ramsay, I put in front of you what
3    we marked for identification as Ramsay Exhibit No.
4    5.  It's again, it's a multi page document, 11
5    pages and it has on the top left corner what
6    appears to be a heading of some sort, Intermedia
7    accounts payable records Mississippi filings
8    system.  Do you recognize this document?
9    A.   I do.
10   Q.   What do you recognize it as?
11   A.   An index provided to us of boxes stored
12   at Mississippi filings.
13   Q.   That was one of the Records Management
14   Companies that was utilized by WorldCom to store
15   documents?
16   A.   Correct.
17   Q.   Do you know who created the index that
18   we marked as Ramsay Exhibit No. 5?
19   A.   The Records Management people, Joe
20   Stevens, Phil Hasselvander and Brenda Tate, one of
21   those, one of them.
22   Q.   So one of the individuals at WorldCom
23   Records Management Group created the index that we
24   marked as Ramsay Exhibit No. 5?
25   A.   Correct.

Page 127

Ramsay

1
2    Q.   Do you know what they used to create
3    this index?
4    A.   The same search information that had
5    been used otherwise, I believe.
6    Q.   I don't understand what you mean.
7    A.   Well, they were given a description of
8    the claims and asked to find documents relating to
9    EffectNet, Intermedia, any of the claims in this
10   litigation.
11   Q.   Just so I understand, the folks, the
12   individuals that worked at Records Management Group
13   of WorldCom, did a search of something at
14   Mississippi Filings System.  That search then
15   resulted in this index?
16   A.   Yes.
17   Q.   So then this index refers to Ramsay
18   Exhibit No. 5, correct?
19   A.   Correct.
20   Q.   So the index that we marked as Ramsay
21   Exhibit No. 5, is not an index of all documents at
22   Mississippi Filings Systems?
23   A.   That's correct.
24   Q.   Did you select any documents from index,
25   from the index that we marked as Ramsay Exhibit No.

Page 128

Ramsay

1
2    5, for review?
3    A.   No.
4    Q.   Why is that?
5    A.   It did not appear any of them were
6    responsive, or relevant relating to the issues in
7    this case.
8    Q.   And that was based on your review of the
9    descriptions that they contained in, and the index
10   that was marked as Ramsay Exhibit No. 5?
11   A.   Correct.
12   Q.   After having received this index, did
13   you speak with anyone about their descriptions that
14   they provided in this index?
15   A.   Don't recall that I did.  This one has
16   accounts payable records description on it.  That
17   appears to consist of what's in the document.
18   Actually, I did discuss that generally, the fact
19   that it was accounts payable, but I don't
20   specifically recall sitting here.
21   Q.   On the first page of Ramsay Exhibit No.
22   5, the very first entry under description of
23   records column, you see where I'm referring?
24   A.   I'm not sure.  Description- okay.
25   Q.   It says --

Page 129

A 02772

Ramsay

1              Ramsay
2    **A.**  **Not to my knowledge, but I don't know**
3  **for sure.**
4    Q.  You don't know for sure?
5    **A.**  **No.**
6    Q.  On the first page of Ramsay Exhibit No.
7  6, there's what appears to be the first entry so to
8  speak, which has heading of F subfile room
9  comments, and then there's Redwell dash -- it could
10  be either 2 or double I, with a highlight on it.
11  What does the highlight indicate?
12    **A.**  **It means it's a set of documents we**
13  **asked to be sent to our offices for review.**
14    Q.  When you say you asked, it was of the
15  Records Management folks again, that you described
16  previously?
17    **A.**  **Yes, yes.**
18    Q.  Do you know if Ramsay Exhibit No. 6 is a
19  print-out from a computer screen?
20    **A.**  **I know -- I'm not sure what you mean.**
21  **It was sent to me electronically.**
22    Q.  Was it sent to you electronically in the
23  form that it is in presently?
24    **A.**  **I believe that as it was sent to me, if**
25  **I hit print, it prints like this. It maybe could**

Page 134

1              **Ramsay**
2  **be rearranged, but I believe this is the way it**
3  **prints.**
4    Q.  I guess my point in asking this
5  question, I'm looking at the first two headings,
6  the first two categories or sections that have much
7  larger descriptions with comments, and they are
8  actually highlighted, and then on the same first
9  page of Ramsay Exhibit No. 6 sort of the third
10  entry, there's a much smaller box with just
11  Redwell-7HSR. Do you know if the comments within
12  that category are the only comments that are in
13  there, or do you have to sort of click on that link
14  and it opens up into the much larger comments that
15  are above that?
16    **A.**  **I don't believe that's the case, your**
17  **latter description. I believe those are the only**
18  **comments on what was sent to us electronically. I**
19  **don't remember seeing anything in back of that, or**
20  **otherwise accessible, not to my knowledge.**
21    Q.  You know what I'm talking about?
22    **A.**  **I believe I do.**
23    Q.  Do you know how the entries in Ramsay
24  Exhibit No. 6 were selected to be sent to you?
25    **A.**  **You mean the highlighted version?**

Page 135

1              **Ramsay**
2    Q.  Not the highlighted version but -- let
3  me back up.
4      From your testimony previously today, I
5  understand you received a document which we're
6  calling now for identification Ramsay No. 6,
7  without any highlights on it. You received it.
8  You then highlighted it and sent it back to the
9  Records Management folks for selection?
10    **A.**  **That's correct.**
11    Q.  Do you know how it was, that Records
12  Management actually selected Ramsay Exhibit No. 6,
13  without the highlights?
14    **A.**  **Well, among your request for production,**
15  **there were requests for documents relating to the**
16  **merger between MCI Intermedia that might relate to**
17  **Unified Messaging, or documents relating to the**
18  **merger of -- there was one other category relating**
19  **to the merger between MCI and Intermedia. We asked**
20  **them to produce for us all the documents they could**
21  **locate relating to the merger between MCI and**
22  **Intermedia, and this is among other materials they**
23  **sent to us in response to that.**
24      I might clarify an answer to an earlier
25  question. This index suggests that some of these

Page 136

1              **Ramsay**
2  **were located and came from Clinton.**
3    Q.  Why do you say that?
4    **A.**  **Well the last page, "Intermedia Docs in**
5  **Clinton".**
6    Q.  Where is that?
7    **A.**  **The second from the bottom group.**
8    Q.  Redwell-1, correspondence attorney's
9  notes filings Intermedia, Intermedia Docs in
10  Clinton, 1/02, okay. Can you tell me why certain
11  of the Redwells were selected for review, and
12  others were not?
13    **A.**  **Well, the general criteria was, if it**
14  **appears it might have something linked to the**
15  **issues in this case as best we could determine, to**
16  **bring it back, bring it back meaning, bring it to**
17  **our offices for review.**
18    Q.  If you look at second page of Ramsay
19  Exhibit No. 6, it's the very bottom, it seems as
20  though it carries over to the third page.
21    **A.**  **Okay.**
22    Q.  It's the Redwell Roman numeral 9.
23    **A.**  **Yes.**
24    Q.  Do you know why this particular Redwell,
25  or sub file, was not selected?

Page 137

Ramsay

1
2    Q.    4, 5, 6, 7 and 8?
3    A.    I believe we provided you with other
4 indices as well, not marked, but other indices.
5    Q.    Okay.
6         So this is not the complete set?
7    A.    That I sent to Mr. Wood?
8    Q.    Right.
9    A.    I don't believe it is.
10    Q.    I'm not talking about listing of boxes
11 selected for review. I'm strictly talking about
12 the indices.
13    A.    I understand. I don't believe this is
14 all of them.
15    Q.    Okay. I'll follow up on that in a few
16 minutes. I just want to go through this one as
17 well. On the first page of Ramsay Exhibit No. 8,
18 there are different columns at the top that go
19 across the entire page?
20    A.    Yes.
21    Q.    Do you have an understanding as to what
22 those columns refer to?
23    A.    Well, they're the same columns as you
24 will see on some of the other indices, and my
25 testimony is the same with regard to these. In

Page 150

Ramsay

1
2 some instance, I know the box numbers are what
3 shows up on the Iron Mountain box, and there's a
4 description, a major description, a minor
5 description, and each of those I know, and the
6 others I do recall asking some about those numbers,
7 but they were not helpful to my process, and I
8 don't recall the answers.
9    Q.    Are the boxes of documents referred to
10 in Ramsay Exhibit No. 8, do they include boxes of
11 documents in the Iron Mountain list that we
12 reviewed earlier as Ramsay Exhibit No. 4?
13    A.    I haven't done the comparison, but I
14 believe somebody told me that, at least somebody at
15 Records Management, that there may be some overlap.
16    Q.    Okay.
17         Do you have any sense as to the extent
18 of the overlap?
19    A.    I don't.
20    Q.    Do you know how Ramsay Exhibit No. 8 was
21 created?
22    A.    Through the same process we described
23 with the other indices, with one perhaps caveat. I
24 believe these are located at Orlando, which was the
25 headquarters of Intermedia, and that was part of

Page 151

Ramsay

1
2 the reason they were all believed to be linked to
3 Intermedia in some way.
4    Q.    Do you understand that the boxes of
5 documents referred to in Ramsay Exhibit 8 are those
6 that are from Orlando, Florida or Intermedia's
7 headquarters?
8    A.    Yes.
9    Q.    Based on your last answer, I understand
10 that Ramsay Exhibit No. 8 was created by someone at
11 Records Management within WorldCom, based on their
12 search of the larger computer data base that they
13 have of stored documents.
14    A.    Correct.
15    Q.    When the person at Records Management,
16 or people at Records Management created Ramsay
17 Exhibit 8, did they just cut and paste what was in
18 their data base into this index in terms of the
19 information that's here?
20    A.    I don't have any reason to believe that
21 they did any cutting or pasting, no.
22    Q.    Do you know what the mechanics were of
23 how they created this index from that data base?
24    A.    I was advised it was an index of all the
25 boxes that were probably all related to Intermedia.

Page 152

Ramsay

1
2 I don't know the mechanics of it.
3    Q.    Do you know what search terms were used
4 to create to come up with the terms that were in
5 this index?
6    A.    Beyond what I said before?
7    Q.    Meaning, you described to them what the
8 claims --
9    A.    What the claims were about and they did
10 searches. In this particular instance, I believe -
11 let me back up. As I mentioned, there were some
12 other instances where they had done searches using
13 terms and produced some of these indexes, and
14 decided to simply produce an index which should
15 include everything that existed relating to
16 Intermedia. This together with the others you've
17 already mentioned, my understanding, does that.
18    Q.    Your understanding does that?
19    A.    Yes.
20    Q.    Within this index that we've marked as
21 Ramsay Exhibit No. 8, there are again highlighted
22 entries.
23    A.    Correct.
24    Q.    What are the highlighted entries again?
25    A.    Those are boxes that we reviewed that we

Page 153

A 02774

Ramsay

1
2    Q.    Did it also include a Mike Randles?
3    A.    I don't believe we had identified those
4  at that time.
5    Q.    Aside from the names of other attorneys
6  at Stinson that you mentioned today, were there any
7  other attorneys at Stinson involved in the
8  production or review of documents in the case?
9    A.    Not that I recall.  I think I named them
10  all.
11    Q.    Aside from Mr., I think it's Wachen,
12  in-house attorney at WorldCom, aside from him, were
13  there any attorneys at WorldCom involved in
14  the location or review of documents in the case?
15    A.    Not that I recall.
16    Q.    Aside from the individuals that you
17  mentioned from Records Management Group at
18  WorldCom, is there any other individuals or groups
19  for that matter, involved in the location or
20  identification of documents that were requested in
21  this case?
22    A.    We're talking about hard copy?
23    Q.    Correct.
24    A.    Well, I've named others that weren't
25  with Records Management review that we talked to.

Page 190

Ramsay

1
2    Q.    Specific individuals?
3    A.    I can't think of anybody that I haven't
4  named.
5    Q.    I'm specifically referring to the people
6  at Records Management, as others who were involved
7  in the identification or location of documents, and
8  I was excluding in my mind the people who you
9  contacted, or someone from Stinson contacted
10  directly who you believe may have had some
11  involvement in the case.  That's what I was
12  focusing on.
13    A.    You know, as I sit here, I think there
14  may have been another person or two, some people
15  whose names I don't now remember.  There's a
16  gentleman whose name I can't call up right now
17  beginning with F, Fuiridi (phonetic)  or something
18  to that effect, and I think -- oh, Margie Polgar.
19  As I sit here, there was another person.  It's hard
20  to, over the course of a year, to sit here and call
21  up all the names.
22    Q.    You mentioned a person by the name of
23  Margie Polgar?
24    A.    Yes.
25    Q.    What was her role in this?

Page 191

Ramsay

1
2    A.    And I was given her name as someone who
3  might have accounting records relating to
4  Intermedia.
5    Q.    Did you speak with her?
6    A.    Yes.
7    Q.    Did she conduct a search for any kind of
8  records regarding Intermedia?
9    A.    Yes.
10    Q.    How did she go about conducting her
11  search?
12    A.    The words I remember her using was --
13  were something to the effect, that she would ask
14  her team to search, and I don't know physically how
15  they did that.
16    Q.    Do you know what they were searching?
17    A.    Accounting records, as I recall.  She
18  was someone who was thought, might have information
19  about the location of Intermedia accounting
20  records.
21    Q.    Do you know how they conducted the
22  search?
23    A.    I'm not certain.
24    Q.    Do you know if they searched actual hard
25  copy documents, or did they search through a data

Page 192

Ramsay

1
2  base of some sort?
3    A.    I don't recall, don't recall.
4    Q.    Do you know what --
5    A.    Don't believe there was a data base, but
6  whether they were checking their own files or
7  calling other people, I'm not certain.
8    Q.    Do you know what search terms they used?
9    A.    I don't.
10    Q.    Were there any individual --
11    A.    She was looking in general, for any
12  accounting records.  I don't think it was a search
13  term process.
14    Q.    Where were the accounting records based,
15  that she was having her team look for?
16    A.    I don't recall, don't recall if there
17  was a location that was identified.
18    Q.    Where was she based?
19    A.    I don't recall that either.  Talked to
20  her on the phone.
21    Q.    Did her review or search, or her team's
22  review or search, result in any documents?
23    A.    They were not able to locate any.
24    Q.    Were they looking in WorldCom documents,
25  or some other source?

Page 193

A 02775

Ramsay

1
2    A.  I don't recall.
3    Q.  Were there any other individuals that
4 you spoke with or communicated with, or that
5 Stinson spoke with, communicated with, regarding
6 the search for documents?
7    A.  Again, I talked to people over the
8 course of almost a year.  I don't think I could sit
9 here and be absolutely certain of saying every
10 name, but I don't recall any others as I sit here
11 today.
12    Q.  Do you recall if there were others aside
13 from what you mentioned?
14    MR. DRISCOLL:  Didn't you just ask that?
15    MR. SMITH:  I don't know.  I'm trying to
16    get a clear answer.
17    A.  I would be willing to guess there were,
18 but I just can't remember who they might be, or
19 whether there were for certain.  It's just that, in
20 the normal course of events, if you ask somebody to
21 name everybody you talked to, it's quite possible
22 that I left somebody out, so I can't be certain.
23    Q.  Do you remember if you spoke with anyone
24 other than who you mentioned already, regarding
25 other types of documents, and as an example, you

Page 194

Ramsay

1
2 mentioned Margie Polgar, who you spoke to regarding
3 accounting records.  Do you remember if there were
4 other types of records that you spoke with a person
5 about, as opposed to the name of a person?
6    A.  I believe by and large, most of them
7 were any documents relating to EffectNet,
8 Intermedia, Webley, MCI, the merger, anything of
9 those sorts of things, indices, in relationship to
10 those parties, or those contracts, and the contract
11 with EffectNet contract, with master software
12 licensing agreement.
13    Q.  Did you ever ask any of those
14 individuals about WorldCom competing Unified
15 Messaging product?
16    A.  Yes.
17    Q.  All of the individuals you mentioned
18 already?
19    A.  I can't sit here today, say that I
20 recall asking about that to people I talked to.
21    Q.  I may have asked you this with respect
22 to particular individuals, but I'll ask it globally
23 in terms of the conversation you had with all of
24 the individuals.  Did you take notes of those
25 conversations with individuals regarding your

Page 195

Ramsay

1
2 requests for documents?
3    A.  Sometimes yes, and sometimes no.
4    Q.  Which ones did you take notes versus
5 which ones you didn't?
6    A.  I remember some, some I don't and --
7    Q.  Who were the ones you remember that you
8 took notes?
9    A.  I remember taking notes of Kathleen
10 Victory, Richard Black, Barry Zip, Teresa Hastings.
11 I believe I have some notes of conversations with
12 Margie Polgar, and I believe there probably are
13 notes of others, but I don't recall.  The notes may
14 be simply yes or no they have documents, they said
15 they don't have documents, that's all.
16    Q.  I understand.
17    (Recess taken.)
18    Q.  When you first went and contacted or
19 communicated with the internal WorldCom records
20 management people, what was the, I guess, what was
21 the data base that they were going to search, what
22 did that encompass?
23    A.  The data base they're searching is
24 again, my understanding it's a data base of all
25 stored boxes or documents.

Page 196

Ramsay

1
2    Q.  Okay, and did the data base -- was the
3 data base made up of only what's in these indices
4 that were produced to us, or does the data base
5 have a larger group of names or terms within them
6 that the search terms were plugged into?
7    MR. DRISCOLL:  Asked and answered
8    multiple times.
9    Q.  I'm just not understanding how that
10 worked.
11    A.  I'm, I guess, I'm not exactly sure I
12 understand this particular question.
13    Q.  When the WorldCom records management
14 people, not specific names, but just the group did
15 the search using whatever search terms were
16 provided to them, what was the data base that the
17 search terms went into to then generate the indices
18 that we now have?
19    MR. DRISCOLL:  Are you asking for its
20    name?
21    MR. SMITH:  No, not the name but --
22    Q.  Do you understand my question?
23    A.  I don't.  Other than the answer I gave
24 before, the data base of information relating to
25 all the stored documents.  So beyond that, you

Page 197

# ADDENDUM

# EXHIBIT 6

A 02777

**STINSON**
**MORRISON**
**HECKER** LLP

Robert L. Driscoll
(816) 691-3102
bdriscoll@stinsonmoheck.com
www.stinsonmoheck.com

1201 Walnut, Suite 2900
Kansas City, MO 64106-2150

November 11, 2005

*Tel* (816) 842-8600
*Fax* (816) 691-3495

**Via Facsimile 212-808-7897**
John M. Callagy, Esq.
Robert S. Friedman, Esq.
Kevin J. Smith, Esq.
Kelley Drye & Warren LLP
101 Park Avenue
New York, New York 10178

> Re:    *In re WorldCom, Inc., Chapter 11,* Case No. 02-13533
>        Parus Holdings' Claims

Gentlemen:

I am writing concerning the electronic discovery you have proposed that MCI undertake regarding the claims of Parus Holdings.

Following receipt of Mr. Smith's letter of October 24, 2005, we requested that Kroll Ontrack provide us with a cost estimate for searching the electronic media of MCI and Intermedia (quarterly back-up tapes) utilizing the names, search terms and time-frame specified in Mr. Smith's letter. We have now received that estimate which ranges from $207,633.99 to $331,160.12, depending on assumed amounts of retained MCI data.

These estimated costs from a search vendor, of course, do not include the necessary additional costs that will be incurred for qualified personnel to review electronically identified documents regarding their actual responsiveness or privileged nature before production. All told, costs associated with the proposed electronic discovery will be considerably higher than the cash distribution value of Parus Holdings' breach of contract claim--$191,544--if MCI's summary judgment is granted and Parus' claim is treated as a Class 12 Intermedia claim. Further, none of the requested electronic discovery--and for that matter, none of the hard-copy production discovery that you are pursuing--is needed to determine the validity of either the contract or the non-contract claims of Parus Holdings. MCI's pending summary judgment motion on these issues centers entirely on questions of law and contract interpretation.

Under these circumstances, I am requesting that you consent to a temporary stay of discovery until the Court rules on MCI's pending motion for summary judgment. Such a stay would not cause legal prejudice to Parus Holdings and it would prevent the unnecessary expenditure of hundreds of thousands of dollars by MCI and Parus Holdings. If discovery becomes necessary in the future, however, we

KANSAS CITY
OVERLAND PARK
WICHITA
WASHINGTON, D.C.
PHOENIX
ST. LOUIS
OMAHA
JEFFERSON CITY

John M. Callagy, Esq.
Robert S. Friedman, Esq.
Kevin J. Smith, Esq.
November 11, 2005
Page 2

in return will agree to any reasonable extension of the discovery period that you propose.

Your consideration of this request would be appreciated. Please contact me if there are particular matters you wish to discuss about either the Kroll Ontrack estimate or the proposed temporary stay.

Very truly yours,

**STINSON MORRISON HECKER** LLP

Robert L. Driscoll

RLD:lkm