the music simply cannot be played without the 8-track tape player.  In the same way, by disposing of the equipment, i.e., the severs, necessary to read the Intermedia backup tapes long after the Debtors' preservation obligation arose and long after the litigation with Parus was commenced, the Debtors rendered its own data inaccessible:

> Q.     Now, did Intermedia -- I'm assuming at some point in time Intermedia did have the ability to search the data on the backup tapes that are referenced in your -- or, I'm sorry, the servers?
>
> A.   We didn't have the ability to search -- search the data on the tapes.  We could search for a file and identify the file and restore it and then search the file, but we would have to -- in order to search files, we would have to restore them.
>
> Q.     And that's just a common, routine practice --
>
> A.     Correct.
>
> Q.     -- whenever you're searching for files?
>
> A.     Correct, on tape.
>
> Q.     On tape.  But the difference is here you don't have the equipment to restore the tape?
>
> A.     Correct.
>
> Q.     Is that accurate?
>
> A.     Correct.
>
> Q.     Okay.  And at what point in time did Intermedia lose the ability to search -- or to restore that data?  Is that when the servers were decommissioned?
>
> A.     When servers are decommissioned, yes.

(Valdes Dep. Tr., Ex. J, at 145:11-146:8).  In fact, Valdes identified that as of 2004, only two remaining active Intermedia servers with information relevant to Parus existed.  (Id. at 132:16-133:10).  However, in 2006 the Debtors even decommissioned these two remaining active servers.  (Id. at 165:7-15).  As such, the tapes for these two formerly active servers have also now been rendered unreadable.  (Id. at 81:8-22).  Had a litigation hold been in place, this scenario could have been obviated.  In fact, nothing could more succinctly demonstrate this than Valdes' own testimony:

CHIC_1392725

A 02935

Q.    [C]ould Intermedia have preserved that capability had it wanted to restore those tapes?

A.    Yes.

Q.    And what would have been required to do so?

A.    We would just have had to have been given instructions to do so.

(Id. at 260:20-261:1).

### c.    Email:  The Debtors Failed to Preserve Relevant POP3 Email.

How a server stores information depends upon the program it is operating.  For example, the Debtors have disclosed that they had at least 2 types of email programs:  POP3 email and Exchange email.  (Valdes Dep. Tr., at 204:3-6).  One of the fundamental differences between POP3 email and Exchange email is *how* such email is stored on the respective POP3 and Exchange email servers.  For example, POP3 email is routed through a server directly to a user's computer.  (Id. at ¶ 15).  The POP3 email is not stored on the server and a copy of the POP3 email is not saved on the server.  (Id.).  Instead, POP3 email is routed to and written on the hard-drive of an individual user's computer. (Id.). The only POP3 email contained on a POP3 email server would be *undelivered* POP3 email that is waiting to be delivered to a user's hard drive:

Q.    Now, can you explain to me what the POP e-mail system is?

A.    The way I understand POP e-mail is that it's more of a gateway.  An e-mail comes in.  It's stored there until you get it. Once you get it, it's gone from the system and it goes on.

(Valdes Dep. Tr., Ex. J, at 204:14-19).

The Debtors repeatedly allege that Intermedia has 78 POP3 email backup tapes for the relevant time period. (June 16, 2006 Letter by Allison Murdock) (the "June 16, 2006 Murdock Letter").  A copy of the June 16, 2006 Murdock Letter is attached as Exhibit P.  However, the Debtors fail to reveal a cardinal problem with this type of alleged electronic preservation.

CHIC_1392725

A 02936

Copies of POP3 emails are not stored on the POP3 server and instead are directly routed to a user's hard drive. Only undelivered email is contained on the POP3 server. Therefore, the information on a POP3 server is severely limited. Moreover, as the Court may recall, backup tapes are only snapshots in time of information contained on a server. (Chung Decl., Ex. K, at ¶ 12). Therefore, if the POP3 servers do not contain POP3 email, then the backup tapes will not contain POP3 email. (Id. at ¶ 16). As such, the POP3 email backup tapes that the Debtors tout as available are actually worthless.

Rather than relying on POP3 backup tapes, the Debtors and their counsel were under an obligation to ascertain the IT structure of the POP3 email system and its servers. Zubulake V, 229 F.R.D. at 432 (noting that counsel should become "fully familiar" with their client's document retention policies, as well as the client's data retention architecture and should speak with information technology personnel, who can explain system-wide backup procedures and the actual implementation of the client's recycling policy.). Had they done so, they would have learned (if they didn't already know) that the POP3 emails would not be stored on backup tape, but instead on an individual user's computer, where the only record of such POP3 emails would lie. Therefore, the Debtors were required to: (a) identify those users with relevant information who had POP3 email accounts, (b) ensure that such users did not delete their POP3 emails, and (c) make a copy of such relevant emails from those users' hard drives. This was not done. MCI did not back up the hard drives of all of its employees. (LaMantia Dep. Tr., Ex. M, at 68:24-69:4; 125:17-19). Instead, MCI only backed up the hard drives of users who were directors and - even then - such backups were entirely optional and were only used by a minority of such high-level employees. (Id.); see also id. at 125:1-126:2.

CHIC_1392725

A 02937

**d.    Hard Drives:  The Debtors Failed to Image the Hard Drives of Key Witnesses' Computers.**

Julio Valdes testified that a number of procedures could occur with respect to a person's hard drive when he or she left Intermedia, ranging from doing nothing all the way to completing a full backup:

> Q.    Let's say an employee who had a PST file on his or her hard drive was terminated or quit, what happens to that hard drive?
>
> A.    That system, that hard drive, that system, would be turned back in to either their manager and sent back in to the PC Support Team.  And depending on the user, they would either -- they would either hold that system, provide the files to their manager, or do nothing with the system.
>
> Q.    Now, when you say hold the system, what do you mean?
>
> A.    They would hold onto that desktop until a later time, a month or two months, and then at that point they would recycle it, use it for someone else.
>
> Q.    Okay.  So is it three options, either hold it for an undetermined amount of time or they would take files off of the computer and provide it to managers or they would do nothing?  Is that --
>
> A.    There might be one more option, and that was I recall that there were some instances where they would back up the entire user's system to a file server and retain that data for a period of time.
>
> Q.    And under what circumstances was that backup one?
>
> A.    It was based on the manager's request.
>
> Q.    And was that done on a case-by-case basis?
>
> A.    I believe so.

(Valdes Dep. Tr., Ex. J, at 116:11-117:13).  Valdes testified that as part of a litigation hold, Intermedia would have asked in the past that a user's hard drive be backed up:

> Q.    Had you done anything else [in connection with a litigation hold] besides taking a tape out of rotation?
>
> A.    We have been asked by HR or security to back up someone's files in the past.
>
> Q.    Would that be on a server or on their hard drive?

40

A 02938

> A.    It would be both . . . .

(Valdes, Dep. Tr., Ex. J, at 199:16-22) (brackets added). However, there is no record that images of hard drives were made of anyone's computers with respect to the Parus dispute. Moreover, Valdes is not aware of any record kept by Intermedia identifying which of these procedures were performed with respect to a person's hard drive when he or she left Intermedia. (Id. at 169:3-12). Such a fact is particularly troublesome, particularly when James Renforth stated that he stored extensive IntermediaOne and unified messaging files on his hard drive.

> **e.    Backup Tapes:  The Debtors Failed to Pull Relevant Backup Tapes out of Rotation Prior to July 2002.**

Zubulake IV proffered the following guidelines when determining whether backup tapes must be preserved:

> As a general rule, that litigation hold does not apply to inaccessible backup tapes (*e.g.,* those typically maintained solely for the purpose of disaster recovery), which may continue to be recycled on the schedule set forth in the company's policy. <u>On the other hand, if backup tapes are accessible (*i.e.,* actively used for information retrieval), then such tapes *would* likely be subject to the litigation hold.</u>
>
> <u>However, it does make sense to create one exception to this general rule. If a company can identify where particular employee documents are stored on backup tapes, then the tapes storing the documents of "key players" to the existing or threatened litigation should be preserved if the information contained on those tapes is not otherwise available. This exception applies to *all* backup tapes.</u>

Zubulake IV, 220 F.R.D. at 218 (underline added; italics in original). Here, Intermedia satisfied both of these rules. First, Intermedia actively used backup tapes for information retrieval:

> Q.    Did Intermedia actively use backup tapes for information retrieval?
>
> A.    Yes.

(Valdes Dep. Tr., Ex. J, at 121:2-4). Second, the use of home directories on computer servers

CHIC_1392725

A 02939

enables an IT professional to identify where a particular user's documents were or have been stored on servers. Therefore, the IT professional would be able to identify which backup tapes were used to backup those home directories. (Chung Decl., Ex. K, at ¶ 19). Intermedia had the ability to locate backup tapes based on "home directories." In fact, Valdes testified that Intermedia had utilized such home directories:

> Q.     Did Intermedia's file servers include user data folders called home directories?
>
> A.     Yes.
>
> Q.     Let me ask how these home directors worked. If I wanted to find, you know, Johm [sic] Smith's user data on the home directory, how difficult would that be?
>
> A.     It would not be difficult.

(Valdes Dep. Tr., Ex. J, at 96:20-23). In addition, MCI had the ability to trace users to certain servers in connection with MCI's Legato system.

> Q.     For the period of 2000 to 2002 would there have been any lists of directors who said they wanted to be or were backed up by Legato?
>
> A.     I'm sure there was. There was an account listings of that.
>
> ***
>
> Q.     Was there a list created as to which users were on Legato?
>
> A.     It would have to be -- it depends on what point in time there is, and I don't know if those were saved or not.
>
> Q.     But there was a list at some point in time?
>
> A.     Sure, at some point in time. We knew what counts [sic][13] were on which.

(LaMantia Dep. Tr., Ex. M, at 67:18-22; 72:13-20).

The Debtors failure to retain backup tapes prior to July 1, 2002 is in clear derogation of their duty to preserve evidence for two cardinal reasons. <u>First</u>, the Debtors had in the past been

---

[13] This is a typographical error. The word should be "accounts," not "counts."

CHIC_1392725

A 02940

asked to preserve backup tapes in connection with litigation holds, but in the case of Parus failed

to do so. <u>Second</u>, the Debtors had the capability to identify the "key players" regarding the UC

Contract dispute and even had the ability to ascertain which backup tapes these key players'

information would have been stored. However, the Debtors declined to do so.

### 2. The Debtors Failed to Preserve Hard-Copy Documents and Also Failed to Keep Such Documents in Readily Accessible Format.

In addition to their failure to preserve electronic data, the Debtors have failed to preserve

hard copy documents. Donald Ramsey, outside counsel for the Debtors, testified that in his

opinion, the Debtors' hard copy document production was complete. (Ramsey Dep. Tr., Ex. I, at

182:15-19). However, conspicuously absent from the Debtors' production were any of the hard

copy documents identified by James Renforth, including the labeled file folders contained in his

office relating to IntermediaOne and Unified Messaging. (Renforth Dep. Tr., Ex. A, at 51:6-9).

It is disconcerting that none of these labeled folders was produced, particularly when Renforth

testified that Intermedia's policy was to "document, document, document." (<u>Id</u>. at 83:9). Given

Intermedia's corporate culture of creating a "paper trial" and Renforth's own diligence in

preserving hard copy documents, no legitimate explanation exists as to why these documents

were not produced to Parus. (<u>Id</u>. at 29:13).

The Debtors' should also be held liable for spoliation as a result of their failure to

maintain hard copy documents in a readily accessible format.:

> The Second Circuit has held that conduct that hinders access to
> relevant information is sanctionable, even if it does not result in the
> loss or destruction of evidence . . . . Accordingly, permitting the
> downgrading of data to a less accessible form--which
> systematically hinders future discovery by making the recovery of
> the information more costly and burdensome--is a violation of the
> preservation obligation.

<u>Treppel v. Biovail Corp.</u>, 233 F.R.D. 363, 372 n.4 (S.D.N.Y. 2006) (citing <u>Res. Fund. Corp. v.</u>

CHIC_1392725

A 02941

DeGeorge Fin. Corp., 306 F.3d 99, 110 (2d Cir. 2002)).  Approximately 13 boxes have been produced to Parus, out of an estimated 10,000 boxes in existence.  In fact, only one document relating to the UC Agreement (other than copies of the UC Agreement itself) has been produced by MCI.  The Debtors posit that they have satisfied their obligations to produce relevant documents by providing Parus with indices that purport to indicate the content of the 10,000 boxes in existence.  Yet, ironically, even the Debtors admit that the so-called "indices" are impossible to decipher, and the Debtors acknowledge that they themselves are incapable of determining the contents of the 10,000 boxes:

> A.    I asked [the Records Management people] if there was anyone who could read the index and know what was going to be contained in the boxes from the index, to help us select or help anybody, Parus, anybody select boxes to be reviewed.
>
> Q.    Did they have a response to you?
>
> A.    They indicated there was none, didn't have anybody that can do that.
>
> Q.    When you say they didn't have anybody that can do that, meaning no one that could interpret, so to speak, the terms of the index and tell you based on that, what was in the actual boxes?
>
> A.    Yes.

(Ramsey Dep. Tr., Ex. I, at 106:7-20) (brackets added).  In fact, Ramsey admitted that neither he nor anyone else at MCI could interpret the various descriptions on the indices in order to determine what was actually contained in the boxes:

> Q.    With respect to any of the major description, minor descriptions, or long descriptions that are contained, not just in this particular entry in Ramsay Exhibit no. 4, but all of the entries in Ramsay Exhibit 4, did you contact anyone at Records Management to determine what different entries meant?
>
> A.    Well, I talked to them to some extent, as I mentioned, and tried to find somebody who maybe could interpret the descriptions, and was told there really wasn't anybody ho could interpret those description any better than we could, from looking at them.  They didn't know about what was in these boxes.

CHIC_1392725

A 02942

> \*\*\*
>
> Q.    After having received index that we marked for
> identification as Ramsay Exhibit No. 4, did you contact anyone to
> determine what any of the descriptions meant within the index?
>
> \*\*\*
>
> A.    I talked to Joe Stevens and/or Hasselvander about
> descriptions and what they might mean.  I was told they didn't
> know either.

(Id. at 114:22-115:11; 123:2-5; 123:9-11).

In an sheer and unabashed abdication of their discovery obligations, Ramsay testified that

it was because the Debtors themselves were unable to decipher the indices that the Debtors asked

Parus to select the boxes they wished to review for relevant documents:

> Q.    If you look on the first line of that entry, it says
> engagement letter for sale of Intermedia, attorneys notes and
> correspondence.  Is there any way to tell from this file, why, or is
> there any way to tell from this entry as to what attorneys notes and
> correspondence might contain?
>
> A.    I can't tell from that entry.  This is among the reasons we
> asked for – Parus on selection of boxes.

(Id. at 138:4-12).  How can the Debtors reasonably expect Parus to construe such hieroglyphics

when the Debtors themselves are unable to do so?  As a result of these indecipherable indices,

the Debtors have effectively rendered the hard copy documents in their possession inaccessible.

In fact, Ramsay revealed his own inability to understand the information contained in the

indices the Debtors' produced:

> Q.    On the first page of Ramsey Exhibit No. 4 towards the
> middle of the page, there's an entry that says one of 10 of 338
> records searched.
>
> A.    I see that, yes.
>
> Q.    Do you know what this refers to, what the means?
>
> A.    I'm not certain.
>
> Q.    And the next line says "with customer equals M" as in
> Mary "WLDK."
>
> \*\*\*

CHIC_1392725

A 02943

Q.    Do you have an understanding as to what that line is referring to, and then what the customer is referring to?

A.    No.

***

Q.    Still, on the first page of the Ramsay Exhibit No. 4, there's an entry that says 290 and then there's a space or something, 48. Do you know what that refers to?

A.    I don't.

Q.    And then moving across on the same line, it says status; do you know what this is referring to?

A.    I don't.

***

Q.    And then the next line is box department 59823.  Do you have an understanding of what that means?

A.    I don't.

***

Q.    [referring to Ramsay Exhibit No. 11]  It's a description management book analysis balance sheet REC's, February to September 2001.  It carries over to the following line.  It says STFI revenue elimination January to September 2001.

A.    Yes.

Q.    Do you know what those entries refer to?

A.    I do not know for certain, no.

Q.    Dropping below to box number 65 it looks like, it says a description it says JE Jan '01 – Sept '01

A.    I see that.

Q.     Do you know what that refers to?

A.    I don't.

***

Q.    Box number 68, if you look under the description for that it says GLIFC 2000, GLDGX 2000, GLD Roman numeral two or two I's, 2000, GLINT8 / 2000.  Do you know what that refers to?

A.    I don't know for certain, no.

(Id. at 111:6-14; 111:16-19; 112:3-11; 113:5-8; 180:8-21) (brackets added).

Equally disturbing is that when MCI initiated a reduction in force of Intermedia employees, Intermedia employees were simply advised to box up their documents and create an

46

A 02944

index of those hard copy documents (Id. at 52:7-13). However, there is no indication that the employees were given any type of template or guidelines to help them properly code or label their documents. (Id. at 52:14-17).

The Court should not reward the Debtors for their utter failure to preserve hard copy documents in a retrievable format. Indeed, such haphazard storage is tantamount to spoliation, and Parus should be entitled to relief against the Debtors as a result. Treppel v. Biovail Corp., 233 F.R.D. 363, 372 n.4 (S.D.N.Y. 2006) (citing Res. Fund. Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 110 (2d Cir. 2002)).

## IV.    THE DEBTORS FAILED TO COMPLY WITH THEIR OWN DOCUMENT RETENTION POLICIES.

Not only did the Debtors fail to uphold their obligations to preserve evidence under federal common law, the Debtors failed to comply with their very own document retention policies. While Intermedia had no written document retention policy, Intermedia alleged in public filings that it was ISO[14] certified. MCI, on the other hand, did have a written document retention policy (the "Retention Policy"), a copy of which is attached as Exhibit Q.

Upon the MCI/Intermedia Merger on July 1, 2001, Intermedia became subject to MCI's Retention Policy. Indeed, MCI's Retention Policy clearly specifies that "[w]hen MCI acquires or merges with another company, it is RIM's responsibility to bring the new company into compliance with the retention program." (Id. at p. 27). Even more significant was a mandate issued by the Retention Policy that all companies with whom MCI mergers must preserve all documents during the merger process: "While your records program is being evaluated by RIM,

---

[14]    The acronym ISO stands for "International Organization for Standardization." (http://www.iso.org/iso/en/aboutiso/introduction/index.html). Note that ISO is, in fact, the proper acronym for the International Organization for Standardization even though the acronym's letters are inverted. ISO is the world's largest developer of standards. Id.

CHIC_1392725

**A 02945**

<u>absolutely no records destruction of any kind can take place</u>." (<u>Id.</u> at p. 78) (emphasis added).

Note that Julio Valdes was the person responsible for ensuring that Intermedia's electronic data was in compliance with the Retention Policy during the merger. (Valdes Dep. Tr., Ex. J, at 234:15-23). Yet, Valdes was not even aware of MCI's tape rotation policy until 2004 – long after the July 1, 2001 MCI/Intermedia Merger was consummated. (Valdes Dep. Tr., Ex. J, at 247:11-20).

Specific instances of when the Debtors failed to comply with the Retention Policy include the following: (1) the servers at issue were decommissioned and tapes were rendered unreadable; and (2) the Debtors failed to retain information from the hard drives of James Renforth, among others.

### 1.    *The Debtors Failed to Comply with Their Own Retention Policy When They Decommissioned the Intermedia Servers.*

After the MCI/Intermedia Merger, MCI ordered the decommissioning of Intermedia's servers. (<u>See</u> <u>supra</u> § III.C.1.a). However, the Debtors failed to comply with their own Retention Policy, which mandated that data on a decommissioned system be retrievable and readable until it has reached its full retention requirement:

### DECOMMISSIONING SYSTEMS

\*\*\*

Any data contained on the decommissioned system that has a retention requirement <u>must be retrievable and readable until it has fulfilled its retention requirement</u> . . . . <u>If the data contained on a system can only be read with a particular program, the program must be retained for the life of the system, and then migrated to the new system, or until the retention requirement for the data has been reached</u>.

(Retention Policy, Ex. Q. at p. 85) (emphasis added).

The Retention Policy set forth detailed schedules specifying such "retention requirements." (<u>Id.</u> at p. 42). However, the Debtors did not preserve in retrievable and readable

CHIC_1392725

A 02946

form documents that remained subject to such retention requirements. For example, the retention requirement for the UC Agreement, drafts, and correspondence relating to UC Agreement negotiations was <u>15 years</u> after the UC Agreement was closed, completed or canceled. (<u>Id.</u> at p. 43-44). However, this was not done and the Debtors now claim that the relevant backup tapes relating to the UC Contract are unreadable and inaccessible. (June 16, 2006 Murdock Letter, Ex. P, at p. 7).

### 2. *The Debtors Failed to Comply with their Retention Policy When They Failed to Preserve James Renforth's Email As Well as the Email of Any Other Employee Who Left the Debtors and Had Relevant Information Related to Parus.*

The Retention Policy specifically provides, "When an employee leaves the company, all files on his/her computer must be reviewed (including e-mail and e-mail attachments) for retention requirements under the Records Retention Schedule . . . . Files that require retention must be pulled of thee computer and stored appropriately." (Retention Policy, Ex. Q, at p. 112). In addition, the Retention Policy requires the Debtors to save the email of a departing or terminated employee 3 years after that employee departed or was terminated. <u>Id.</u> at 44. As in the case of James Renforth, Renforth had extensive email communications regarding IntermediaOne and the UC Agreement. (<u>See</u> <u>supra</u> § III.B.). His employment with Intermedia ended on July 27, 2001. (Renforth Dep. Tr., Ex. A, at 257:25). The Debtors were, therefore, under an obligation to preserve Renforth's email until July 27, 2004 by virtue of the Retention Policy.

From July 27, 2004 going forward, the Debtors were required to preserve Renforth's email pursuant to a litigation hold, as it was relevant to Parus' claims. The same holds true for Renforth's supervisor Jack Lee, as well as a number of former Intermedia employees. Equally disconcerting is the fact that Parus has not received all of Renforth's emails from the Debtors.

49

A 02947

For example, Parus has produced to the Debtors certain emails created by Renforth. Yet the Debtors never produced these same emails to Parus.

The Debtors may attempt to allege that such email is located on an inaccessible backup tape and that is why such email has not been produced. However, this poses yet another pitfall for the Debtors, as the Debtors' own document retention policy mandates that such information be maintained in a readily retrievable format. (Retention Policy, Ex. Q, at pp. 4, 26) ("Also, the program is designed to ensure that in the event that legal or financial problems do occur, the organization will have, in a readily retrievable form, the information it needs to defend itself."). These failings simply underscore the Debtors' irregular and haphazard treatment of documents related to Parus.

## V.   THE DEBTORS FAILED TO ENSURE CONTINUED COMPLIANCE WITH THEIR PRESERVATION OBLIGATIONS IN DERELICTION OF THEIR DUTIES UNDER THE ZUBULAKE DECISIONS.

Even assuming *arguendo* that the Debtors had instituted a timely litigation hold, the Debtors' alleged litigation hold did not comply with the strictures set forth in the Zubulake decisions. In other words, simply making a general request for preservation is not enough. A party must oversee compliance with the litigation hold: "A party's discovery obligations do not end with the implementation of a "litigation hold"-to the contrary, that's only the beginning. Counsel must oversee compliance with the litigation hold, monitoring the party's efforts to retain and produce the relevant documents." Zubulake V, 229 F.R.D. at 432. In fact, counsel "must take *affirmative steps* to monitor compliance so that all sources of discoverable information are identified and searched." Id. at 432. (emphasis added). Counsel must issue a "litigation hold" at the "outset of litigation or whenever litigation is reasonably anticipated," and the litigation hold should "be periodically re-issued so that new employees are aware of it, and so that it is fresh in the minds of all employees." Id. at 433.

50

A 02948

"'The obligation to retain discoverable materials is an affirmative one; it requires that the agency or corporate officers having notice of discovery obligations communicate those obligations to employees in possession of discoverable materials.'" Samsung Elec. Co., Ltd. v. Rambus, Inc., 439 F. Supp. 2d 524, 543 (E.D. Va. 2006) (quoting National Ass'n of Radiation Survivors v. Turnage, 115 F.R.D. 543, 557-58 (N.D. Cal. 1987)). "It is no defense that particular employees were not on notice of the duty to preserve evidence or what kinds of evidence were material to the potential litigation." Id. "'To hold otherwise would permit an agency, corporate officer, or legal department to shield itself from discovery obligations by keeping its employees ignorant.'" Id. (quoting Turnage, 115 F.R.D. at 557). Indeed, a failure to monitor and ensure compliance with a litigation hold is "not taken lightly." Metro. Opera Assoc., Inc. v. Local 100, Hotel Employ. & Rest. Employ. Int'l Union, 212 F.R.D. 178, 222 (S.D.N.Y. 2003) (ordering default judgment because counsel, inter alia, never gave adequate instructions to clients about clients' overall discovery obligations, including what constitutes a 'document' and knew the client had no document retention or filing systems and yet failed to implement a systematic procedure for document production or for retention of documents).

However, the facts as they stand today, reveal no significant efforts by the Debtors to undertake the guidelines set forth in Zubulake V and to monitor and ensure continuing compliance with a litigation hold.

### 1.     The Debtors Fail to Provide Any Documentary Evidence Regarding Ensuring the Continued Compliance with Their Alleged Litigation Hold.

The Debtors have failed to provide any written documentation regarding monitoring and compliance with a litigation hold.  For example, Parus' Second Request for Production sought, inter alia, information related to the Debtors' efforts to (a) preserve documents and (b) implement and monitor litigation holds relating to Parus.  Such request included the following:

51

A 02949

Request No. 51   All Documents that refer or relate to the following Debtors' compliance and/or non-compliance with the following Debtors' document preservation manuals, policies, procedures, or guidelines regarding Documents related to the Claimant: (a) Intermedia and (b) MCI.

Request No. 52   All Documents that refer or relate to requests by the following Debtors to their employees, agents, and/or personnel to preserve, retain, make accessible and/or place a Litigation Hold on Documents related to the Claimant, including, but not limited to, Documents relating to the Person who made such request(s), when such request(s) were made, and to whom such request(s) were made: (a) Intermedia and (b) MCI.

Request No. 53   All Documents that refer or relate to policies of the following Debtors regarding requests by the Debtors to their employees, agents, and/or personnel to preserve, retain, make accessible and/or place a Litigation Hold on Documents: (a) Intermedia and (b) MCI.

Request No. 54   All Documents that refer, relate to, and/or evidence compliance and/or non-compliance with requests by the following Debtors to their employees, agents, and/or personnel to preserve, retain, make accessible and/or place a Litigation Hold on Documents related to the Claimant: (a) Intermedia and (b) MCI.

Request No. 55   All Documents that refer or relate to the destruction, spoliation, corruption, loss, and/or failure to maintain and/or preserve Documents by the following Debtors that relate to the Claimant's Claim: (a) Intermedia and (b) MCI.

Request No. 56   All Documents that refer or relate to the following Debtors' efforts to maintain and/or preserve Documents (regardless of whether such Documents are Hard Copy or electronic Documents) related to the Claimant and/or the Claimant's Claim in an accessible and/or searchable format: (a) Intermedia and (b) MCI.

Request No. 57   All Documents that refer or relate to requests made by the following Debtors to destroy, erase, purge and/or render inaccessible or unsearchable Documents regarding or relating to the Claimant: (a) Intermedia and (b) MCI.

See Debtors' Objections and Responses to Claimant Parus Holding, Inc.'s Second Request for Production of Documents, Nos. 51-57 ("Debtors' Document Production Responses"), a copy of the relevant portions of which is attached as Exhibit R.

In response, the Debtors refused to produce a single page or document relating to the

52

A 02950

Debtors' efforts to implement and monitor a litigation hold. Id.[15] Parus is hard-pressed to see how the Debtors can credibly assert that a timely and complete litigation hold was both implemented and monitored for compliance, when the Debtors refuse to provide a single document evidencing such implementation or compliance.

To further exacerbate matters, the Debtors contend in their Litigation Hold Response that "In-House and outside counsel communicated orally *and in writing* with regard to . . . preserving documents that might relate to Claimant's Claims, the UC Contract, the relationship between Claimant and the Debtors, and the relationship between Webley and the Debtors. (Litigation Hold Response, Ex. H, at p. 11) (emphasis added). Yet, no such written communications were produced in response to Parus' document requests. To the extent such documents actually exist, Parus invites the Debtors to submit for *in camera* inspection such documents.

### 2. *No Mention Is Made Regarding the Debtors' Litigation Hold in the Debtors' Privilege Log.*

The Debtors' Privilege Log further highlights the complete dearth of documentary evidence regarding the Debtors' litigation hold. The Debtors have raised myriad objections to Parus' request for such litigation hold information, including the attorney-client privilege. If the documents evidencing the implementation of and compliance with a litigation hold are privileged (which Parus disputes), then (a) why did the Debtors fail to identify these documents in their November 2005 Privilege Log and (b) why did the Debtors fail to produce a privilege log identifying these documents in response to Parus' Second Request for Production? Again, the Debtors fail to provide any answer. As noted in the Metro Opera decision, the Debtors' non-compliance should not be taken lightly. Metro. Opera Assoc., Inc. v. Local 100, Hotel Employ.

---

[15] In fact, the Debtors did not provide one single page of documents in response to Parus' 164 document requests. Instead, the Debtors interposed 128 pages of objections to such document requests.

CHIC_1392725

A 02951

& Rest. Employ. Int'l Union, 212 F.R.D. 178, 222 (S.D.N.Y. 2003).

> **3.** **The Debtors Cannot Rely on an Order Entered by the District Court on July 1, 2002 Regarding Unrelated Federal Securities Litigation as Evidence of Their Implementation of and Compliance with a Litigation Hold With Respect to Parus.**

Realizing for the first time that the Debtors failed to implement a timely and specific litigation hold as to Parus' claims, the Debtors struggle to rely upon a July 1, 2002 order entered in totally unrelated securities litigation in S.E.C. v. WorldCom, Inc., Case No. 1:02-cv-04963-JSR, United States District Court for the Southern District of New York (the "Securities Litigation Order"). A copy of the Securities Litigation Order is attached as Exhibit S. In its Litigation Hold Response, the Debtors allege that they have complied with their duty to preserve as a result of the entry of the Securities Litigation Order:

> Further, pursuant to a Stipulation and Order entered on July 1, 2002 in the matter of S.E.C. v. WorldCom, Inc., Case No. 1:02-cv-04963-JSR (the "Order") (attached as Exhibit B), "WorldCom, its officers, agents, accountants, employees, and attorneys, and those persons in active concert or participation with them" preserved all documents "relating to, referring to or concerning any aspect of WorldCom's financial reporting obligations, public disclosures required by the federal securities laws, or any other accounting matters relating to WorldCom…." To comply with this Order, WorldCom and its affiliates preserved all daily backup tapes of their email systems (including Intermedia's email system), as well as non-email electronic data and paper documents encompassed by the order."

(Litigation Hold Response, Ex. H, at Ans. 6, pp. 6-7) (emphasis added).

A plethora of problems exist with the Debtors' reliance on the Securities Litigation Order as evidence of compliance with a litigation hold as to Parus. First, the Securities Litigation Order was entered on July 1, 2002 – exactly one year after the Debtors' duty to preserve evidence began. Second, the Securities Litigation Order has no application to Parus' claims or the litigation hold required to be implemented by the Debtors regarding Parus. The Debtors'

CHIC_1392725

A 02952

Litigation Hold Response selectively quotes from the Securities Litigation Order. Indeed, the Securities Litigation Order actually provides:

> Defendant, WorldCom, its officers, agents, accountants, employees, and attorneys, and those persons in active concert or participation with them, and each of them, <u>who receive actual notice of this Order by personal service or otherwise</u>, shall not destroy, mutilate, conceal, alter, or dispose of any item (including but not limited to books, records, documents, contracts, agreements, assignments, evidence of obligations or payments, press releases, public announcements, drafts of any of the foregoing, or any other item within their possession, custody or control) relating to, referring to or concerning any aspect of WorldCom's <u>financial reporting obligations, public disclosures required by the federal securities laws, or any accounting matters relating to WorldCom, including but not limited to the matters referred to in the Commission's Complaint filed herein;</u>"

(Securities Litigation Order, Ex. H, at ¶ 1) (emphasis added). Nothing in the Securities Litigation Order encompasses an obligation to preserve documents related to actual or anticipated litigation between the Debtors and Parus. Rather, the order simply addresses "financial reporting obligations, public disclosures required by federal securities laws, and accounting matters." <u>Id</u>. Indeed, it would make little sense for this order to encompass the UC Agreement dispute with Parus since the scope of the SEC's two-count complaint against WorldCom (the "SEC Complaint") stemmed from WorldCom's failure to disclose improper accounting that materially overstated WorldCom's income before taxes and minority interests in violation of the Securities Exchange Act of 1934. A copy of the SEC Complaint is attached hereto as <u>Exhibit T</u>.

 <u>Third</u>, only parties who receive "actual notice" of the Securities Litigation Order were bound by its terms. The Debtors provide no evidence that those at the Debtors with knowledge or information regarding Parus even received the Securities Litigation Order or, for that matter, could have conceivably construed the Securities Litigation Order as requiring the preservation of

55

A 02953

documents related to Parus.

Fourth, the Debtors allege that they have kept all back up tapes as required by the Securities Litigation Order. However, the existence of such tapes does not satisfy the Debtors' obligation to implement a litigation regarding Parus for no less than 3 reasons: (a) the backup tapes relate to data that was created 1 year *after* the Debtors' preservation obligation arose; (b) the Debtors and their IT professionals admit that they have failed to keep the tapes in an accessible format in contravention of its electronic preservation obligations under Treppel v. Biovail Corp., 233 F.R.D. 363, 372 n.4 (S.D.N.Y. 2006); and (c) the backup tapes do not contain all information related to Parus. Instead, the backup tapes are mere "snapshots" in time. (Chung Decl., Ex. K, at ¶ 12); see also (LaMantia Dep. Tr., Ex. M, at 48:12-6); see also (Valdes Dep Tr., Ex. J, at 106:4-8).

Therefore, if an individual created a document but deleted that document before the "snapshot" was taken on the backup tape, that document is lost forever. Rather than relying on the backup tapes required by the Securities Litigation Order, the Debtors were under a specific duty to identify employees with information and direct them to save information related to Parus' claims – not hope that a backup tape may or may not capture such information. The Debtors cannot now in hindsight use the Securities Litigation Order as a shield to protect themselves from their own failure to implement an appropriate and timely litigation hold.

## VI.    THE DEBTORS DESTROYED EVIDENCE WITH A "CULPABLE STATE OF MIND."

In order to demonstrate a culpable state of mind, Parus need only show that the Debtors acted with ordinary negligence: "In this circuit, a 'culpable state of mind' for purposes of a spoliation inference includes ordinary negligence." Zubulake V, 229 F.R.D. at 431 (citing Res. Fund. Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 108 (2d Cir. 2002)); see also Ruta v. Delta Air

56

A 02954

Lines, Inc., 324 F. Supp. 2d 524, 528 (S.D.N.Y. 2004) (negligent loss of relevant evidence constitutes spoliation). In fact, "[o]nce the duty to preserve attaches, any destruction of documents is, at a minimum, negligent." Zubulake IV, 220 F.R.D. at 220 (brackets added); see also Chan v. Triple 8 Palace, Inc., Case No. 03CIV6048(GEL), 2005 WL 1925579, at *7 (S.D.N.Y. Aug. 11, 2005) ("the utter failure to establish any form of litigation hold at the outset of litigation is grossly negligent"). Here, Parus has clearly established, at a minimum, ordinary negligence.

It is clear from the deposition testimony of Donald Ramsay that a litigation hold came too late, and once it finally was in place, no attorney adequately explained it to key recordkeepers and IT personnel or monitored it as evidenced by the testimony of Julio Valdes, Bryan Miller, Kenneth Croslin, Joseph Falleur, and James LaMantia. These recurring incidents at the very least establish ordinary negligence.

## VII. THE EVIDENCE DESTROYED AND/OR RENDERED INACCESSIBLE BY THE DEBTORS WAS "RELEVANT" TO PARUS' CLAIMS SUCH THAT A REASONABLE TRIER OF FACT COULD FIND THAT IT WOULD SUPPORT PARUS' CLAIMS.

In ascertaining the relevance of documents, courts have cautioned against "holding the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed evidence," explaining that doing so would "subvert the prophylactic and punitive purposes of the adverse inference . . . ." Kronisch v. U.S., 150 F.3d 112, 128 (2d Cir. 1998); see also Phoenix Four, Inc. v. Strategic Res. Corp., No. 05 Civ. 4837(HB), 2006 WL 1409413, at *4 (S.D.N.Y. May 23, 2006) ("[c]ourts should be careful not to hold the movant to 'too strict a standard of proof regarding the likely contents of the destroyed [or unavailable] evidence' however, lest the spoliator profits from its misconduct."). In fact, "it is not incumbent upon the plaintiff to show that specific documents were lost. It would be enough to demonstrate that certain types of

CHIC_1392725

A 02955

relevant documents existed and that they were necessarily destroyed  . . . ."  Treppel v. Biovail Corp., 233 F.R.D. 363, 372 (S.D.N.Y. 2006).

As the District Court for the Southern District of New York has held, a party may establish the relevance of destroyed documents in the following 2 ways:

> Relevance in this context may be established in two ways. First, it may be inferred if the spoliator is shown to have a sufficiently culpable state of mind. "Where a party destroys evidence in bad faith, that bad faith alone is sufficient circumstantial evidence from which a reasonable fact finder could conclude that the missing evidence was unfavorable to the party." . . . . Likewise, "a showing of gross negligence in the destruction or untimely production of evidence will in some circumstances suffice, standing alone, to support a finding that the evidence was unfavorable to the grossly negligent party."  Second, the moving party may submit extrinsic evidence tending to demonstrate that the missing evidence would have been favorable to it.

Chan v. Triple 8 Palace, Inc., Case No. 03CIV6048(GEL), 2005 WL 1925579, at *8 (S.D.N.Y. Aug. 11, 2005) (internal citations omitted).  Parus has satisfied both tests for relevance.

### A.    **Parus Has Satisfied the Relevancy Test by Demonstrating that the Debtors Were Grossly Negligent.**

"[A] showing of gross negligence in the destruction or untimely production of evidence will in some circumstances suffice, standing alone, to support a finding that the evidence was unfavorable to the grossly negligent party."  Res. Fund. Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 109 (2d Cir. 2002).  As described at length herein,[16] the Debtors were grossly negligent for no less than 3 reasons.  First, the Debtors failed to implement a timely litigation hold.  Chan v. Triple 8 Palace, Inc., Case No. 03CIV6048(GEL), 2005 WL 1925579, at *8 (S.D.N.Y. Aug. 11, 2005) ("the utter failure to establish any form of litigation hold at the outset of litigation is grossly negligent").  Second, the Debtors repeatedly failed to abide by their own document

---

[16] See supra §§ II-V herein.

CHIC_1392725

A 02956

retention policies and protocols. <u>Finally,</u> the Debtors failed to ensure continued compliance with their preservation obligations in dereliction of their duties under the <u>Zubulake</u> decisions.

**B.    Parus Has Also Satisfied the Relevancy Test by Demonstrating that the Missing Evidence Is Favorable to Parus.**

Parus has tendered significant evidence demonstrating that the missing evidence would have been favorable to it. For example, the Debtors have alleged that Parus is only entitled to damages of $460,442.30. Yet, as fully detailed herein, James Renforth testified that Intermedia had numerous revenue reports and projections, business reports, marketing studies, and financial analysis regarding the IntermediaOne product and the use of Unified Messaging. (<u>See</u> <u>supra</u> § III.B.). This information was contained in electronic form (including email, information shared on Intermedia's 'K' drive, and Renforth's hard drive) as well as hard copy in the form of Word documents, Excel documents, and Microsoft Projects (which were also stored electronically). This information, if produced, would contravene the Debtors' allegation of de minimis damages of $460,442.30 and would fully support Parus' claim for expectation damages in the range of $50.7 million and $81.2 million for its breach of contract claim alone.

**VIII.    BECAUSE OF THE DEBTORS' SPOLIATION OF EVIDENCE, PARUS IS ENTITLED TO VARIOUS REMEDIES AGAINST THE DEBTORS.**

A federal district court has broad power to impose sanctions under Fed. R. Civ. P. 37(b) "to serve the prophylactic, punitive and remedial rationales underlying the spoliation doctrine." <u>West v. Goodyear Tire & Rubber Co.</u>, 167 F.3d 776, 779 (2d Cir. 1999). Sanctions for spoliation include the entry of judgment in favor of the harmed party, the issuance of an adverse inference due to the unavailability of the evidence, the preclusion of certain evidence and testimony, and monetary sanctions. <u>See</u>, <u>e.g.</u>, <u>id.</u> at 780; <u>Chan v. Triple 8 Palace, Inc.</u>, Case No. 03CIV6048(GEL), 2005 WL 1925579, at *9 (S.D.N.Y. Aug. 11, 2005); <u>Rutgerswerke AG and Frendo S.P.A. v. Abex Corp.</u>, No. 93 CIV. 2914 JFK, 2002 WL 1203836, at *12 (S.D.N.Y. June

59

CHIC_1392725

**A 02957**

4, 2002); <u>Zubulake IV</u>, 220 F.R.D. at 219-222; <u>In re Kelsey</u>, Nos. 94-10415, 00-1034, 2001 WL 34050736, at *4 (Bankr. D. Vt. Oct. 23, 2001).

A.    **Parus Is Entitled to an Adverse Inference Against the Debtors.**

As evidenced in herein, the Debtors were grossly negligent with respect to their discovery and preservation obligations.  Therefore, the issuance of an adverse inference against the Debtors is warranted.  <u>Barsoum v. NYC Hous. Auth.</u>, 202 F.R.D. 396, 400 (S.D.N.Y. 2001) ("adverse inference sanction may also be predicated on a finding of bad faith, intentional misconduct, or fault in the form of gross negligence"); <u>see also</u> <u>Broccoli v. Echostar Comms. Corp.</u>, 229 F.R.D. 506, 512 (D. Md. 2005) (approving adverse inference instruction based on gross spoliation of evidence); <u>cf.</u> <u>Chan v. Triple 8 Palace, Inc.</u>, Case No. 03CIV6048(GEL), 2005 WL 1925579, at *9 (S.D.N.Y. Aug. 11, 2005) ("Gross negligence qualifies as 'fault' such that the threshold requirement for the sanction of dismissal or default is met."); <u>see also</u>; <u>Pastorello v. City of N.Y.</u>, No. 95 Civ. 470(CSH), 2003 WL 1740606, *8 (S.D.N.Y. April 1, 2003) ("Gross negligence, willfulness, bad faith, or fault on the part of the sanctioned party may make dismissal appropriate…").

B.    **Parus Is Entitled to an Order Barring the Debtors from Presenting and/or Contesting Evidence Related to Damages Asserted by Parus.**

This Court may also bar the Debtors from presenting or contesting evidence related to damages.  A court may preclude "the culpable party from giving testimony regarding the destroyed evidence." <u>Rutgerswerke AG and Frendo S.P.A. v. Abex Corp.</u>, 2 No. 93 CIV. 2914 JFK, 2002 WL 1203836, at *12 (S.D.N.Y. June 4, 2002; <u>see also</u> Fed. R. Civ. P. 37(c)(1).  The "overwhelming weight of authority is that preclusion is *required* and *mandatory* absent some unusual or extenuating circumstances." <u>Elion v. Jackson</u>, No. 05-0992 (PLF), 2006 WL 2583694, at *1 (D.D.C. Sept. 8, 2006) (emphasis in original).  Here, the Debtors should be

CHIC_1392725

A 02958

barred from presenting and/or contesting any evidence related to damages asserted by Parus.

### C.    Parus Is Entitled to an Award of Damages.

An award of damages in this case is also appropriate.  Parus has gone to extraordinary lengths to obtain proper discovery in this case and has been thwarted at every turn by the Debtors.  Indeed, certain electronic documents produced by Parus were never produced by the Debtors even though these documents were originated by the Debtors. A court may assess attorney's fees when a party delays or disrupts the litigation.  Wachtel v. Health Net, Inc., ---- F.R.D.----, Nos. Civ.01 4183, Civ.03 18012006 WL 3538935 at *15 (D.N.J. Dec. 6, 2006).  See also Fed. R. Civ. P. 37(a)(4).  Therefore, an award of damages is also appropriate.

### CONCLUSION

For each of the reasons cited herein, the Court should not countenance the Debtors' behavior and their failure to preserve and maintain evidence in a timely and appropriate fashion. Therefore, Parus respectfully requests that the relief sought herein be granted, including, but not limited to:  (a)  an adverse inference against the Debtors; (b) an order barring the Debtors from presenting and/or contesting evidence related to damages asserted by Parus; (c) an award of damages against the Debtors; and/or (d) such other remedies as this Court deems just and proper, including a denial the Debtors' pending summary judgment motion.

Dated:  January 26, 2007                    Respectfully submitted,

                                     By:    /s/ Jill L. Murch
                                            Robert A. Scher (RS 2910)
                                            FOLEY & LARDNER LLP
                                            90 Park Avenue
                                            New York, NY 10016
                                            Phone:  (212) 682-7474

                                              -and-

                                            Mark L. Prager (*admitted pro hac vice*)
                                            William J. McKenna  (*admitted pro hac*

CHIC_1392725

A 02959

*vice*)
Jill L. Murch (*admitted pro hac vice*)
Joanne Lee (*admitted pro hac vice*)
FOLEY & LARDNER LLP
321 N. Clark Street, Suite 2800
Chicago, IL 60610
Phone:  (312) 832-4500
Fax:  (312) 832-4700

*Attorneys for Claimant Parus Holdings,
Inc., Successor-By-Merger to EffectNet,
Inc. and EffectNet, LLC*

CHIC_1392725

**A 02960**

JAMES RENFORTH        VOLUME I        NOVEMBER 17, 2006

Page 14

1    Q.  And when did you join Intermedia?
2    A.  That was January 1998.
3    Q.  And how did you join Intermedia?
4    A.  I joined Intermedia as a consultant,
5  contractor.
6    Q.  And for how long were you a consultant?
7    A.  About nine months.  There were three
8  successive 90-day contracts.
9    Q.  And what did you do, Mr. Renforth, as a
10  consultant during that nine-month period?
11    A.  The initial charter for me was to analyze the
12  local resale business unit, to identify sales
13  improvements, process improvements, and to turn the
14  gross margins around.
15    Q.  Now, when you say charter, what do you mean by
16  charter?
17    A.  My responsibility.
18    Q.  Now, let me back up.  You said you had three
19  successive 90-day contracts.  So were those renewed
20  after --
21    A.  Yes.  The initial contract was 90 days.  It
22  was then renewed again for another 90 days, and then a
23  third 90 days.
24    Q.  And tell me a little bit about the local
25  resale business that you were chartered with

Page 15

1  responsibilities.
2    A.  Okay.  The local resale business, when they --
3  when Intermedia brought me in, had -- initially, the
4  objective of the local resale business was for
5  Intermedia to obtain a market presence in the local
6  telephone business.
7        And subsequently to that, over a period of
8  time, their gross margins had dropped to like a negative
9  34 percent.  And the C.E.O., Dave Ruberg, wanted to know
10  what do we need to do to fix this.
11        So my analysis, my team's analysis uncovered
12  several discrepancies in that -- in that business unit
13  whereby we could recover lost monthly recurring
14  revenues.
15    Q.  And how did you identify those discrepancies?
16  What were those problems that you corrected?
17    A.  Okay, good question.
18        One of the initial things we did was to look
19  at what was being resold.  And the company, Intermedia,
20  at that time was doing what's known in the industry as
21  bill flips.
22        In other words, they were taking over the
23  responsibility of billing the end-user customers simply
24  by contacting the local incumbent, who was at the time
25  Verizon, or Bell South, or Southwestern Bell, whatever

Page 16

1  area that customer resided in, and just flipping a bill
2  from the end-user customer to Intermedia, then
3  Intermedia would bill the end-user customer.
4        And there was an inherent ten percent margin
5  built into that for Intermedia.  But what we found when
6  we looked first into the billing system was that there
7  were over 10,000 items in the billing system that had
8  been zero rated, in other words, Intermedia was charging
9  zero to the customer because they didn't know what it
10  was.
11        So our team restructured the local resale
12  business unit with regard to products being resold and
13  identified just like a half a dozen features that should
14  be part of the local resale business, rather than just
15  everything.
16        So we streamlined the business unit with
17  regard to what they were selling, we identified what
18  those items were in the local incumbent's tariffs, and
19  then charged accordingly to the end-user customer.
20    Q.  And how successful were you in restructuring
21  the business?  I know you mentioned that you had -- that
22  Intermedia had negative 34 percent margin?
23    A.  Yes.
24    Q.  When you were done, what --
25    A.  When we were done, the margins had improved to

Page 17

1  a positive 35 percent, and we recovered over 5 million
2  dollars in monthly recurring revenues to the company.
3    Q.  So needless to say, you did a good job.
4    A.  Well, we did a good job.
5    Q.  So what happened after your nine-month
6  consultant period was over?
7    A.  Intermedia brought me on full time.
8    Q.  And why were you brought on full time?  What
9  did you do as a full-time employee?
10    A.  Oh, as a full-time employee?
11    Q.  Um-hum (affirmative).
12    A.  I came in as a product manager.  Senior --
13  senior product manager.
14    Q.  And can you tell me what you did as a senior
15  product manager?
16    A.  Sure.  As a senior product manager, I was then
17  responsible for what I had created.  I was responsible
18  for life cycle support of the local resale business,
19  initially.
20    Q.  And can you tell us what you mean by life
21  cycle support for the resale business?
22    A.  Just to make sure that sales was selling what
23  they should be selling, to provide any updated training
24  that was required in the field for salespeople, and to
25  monitor results.

5 (Pages 14 to 17)

Exhibit A

A 02961

JAMES RENFORTH        VOLUME I        NOVEMBER 17, 2006

Page 18

1    Q.   Now, you had mentioned that you had assembled
2  a team regarding local resale.  Can you tell us a little
3  bit about that team?
4    A.   Sure.  That team was comprised of several unit
5  representatives within the company.  We had
6  representatives from the billing department, a
7  representative from sales.  We had a representative from
8  the product marketing department, product management,
9  the service department, and customer operations.
10   Q.   And you were in which department, Mr.
11  Renforth?
12   A.   Well, I was assigned under product management.
13   Q.   And tell me what this team did with respect to
14  local resale.
15   A.   They did the actual legwork with regard to
16  downloading reports from the billing system, identifying
17  the products that were being resold, and then the next
18  step would be -- was to identify the products that we
19  should be reselling.
20   Q.   And did these teams -- or did the team members
21  meet?
22   A.   Oh, yes.
23   Q.   And for local resale, about how many times did
24  they meet, if you recall?
25   A.   At least once a week.

Page 19

1    Q.   And do you know if minutes were kept of these
2  team meetings?
3    A.   Absolutely.
4    Q.   And what were done with these minutes, were
5  they distributed to anyone?
6    A.   Yes, minutes were distributed to each of the
7  members.
8    Q.   Each of the members of the team?
9    A.   Each of the team members.  Each of their
10  immediate supervisors, those respective directors, and
11  the executive staff.
12   Q.   And were all team minutes distributed to these
13  people?
14   A.   Yes.
15   Q.   And do you recall how they were distributed?
16   A.   Yeah.  They were both -- they were distributed
17  both soft copy and hard copy.
18   Q.   And when you say soft copy, do you mean, for
19  example, e-mail, or --
20   A.   E-mail, with the document attached.  And then
21  hard copies through intercompany mail.
22   Q.   Okay.  So let's jump back to when you were
23  retained by Intermedia or brought on full time.  What
24  happened when you were retained full time?  What were
25  you charged to do?

Page 20

1    A.   Life cycle support for the local resale
2  business initially.
3    Q.   And for about how long was that?
4    A.   That was about four months.
5    Q.   Um-hum (affirmative).  And then what happened
6  next?
7    A.   Then right before Thanksgiving that same year
8  --
9    Q.   And that year would be?
10   A.   That was '98.
11        My immediate supervisor and our director and
12  myself met at a lunch meeting.  And my director during
13  that meeting gave me a new responsibility.
14   Q.   Um-hum (affirmative).
15   A.   And that was to develop a local line-side
16  service product.  And when I say line side, prior to
17  that, the only -- well, not the only, but the two major
18  products and service that Intermedia sold were the local
19  resale and a product called single T.  Single T was
20  targeted towards larger P.B.X. business customers, and
21  provided trunk-side services.
22        Intermedia had an imbedded -- an imbedded base
23  of Northern Telecom central office switches around the
24  country that also had the capability to provide
25  line-side services, and that being for residential or

Page 21

1  smaller business customers that used key systems.
2        Key systems were targeted at that time for
3  customers that had, oh, typically from one to -- ten
4  lines for business lines.  But that capability was not
5  being used anywhere in the company.
6        So at that meeting, our director asked me to
7  develop a new line-side service product for the smaller
8  and midsized business customers.
9    Q.   And when you say smaller and midsized business
10  customers, about how large would those be?
11   A.   Typically, from 20 to a hundred employees, and
12  five to ten lines, business lines.
13        That was a market segment that Intermedia had
14  never been able to access before.
15   Q.   And so what happened at this meeting in
16  November '98 to create a product to target these smaller
17  and midsized business customers?  What do you do after
18  that meeting?
19   A.   Put the team back together.  Same members as
20  described before.
21   Q.   And what happened after you put the team
22  together?
23   A.   Well, that was after the holidays.  We came
24  back after Thanksgiving, put that team back together.  A
25  lot of the representatives were the same.  We had

                                      6 (Pages 18 to 21)

b0c218e2-9fb7-469b-8cdf-a85f57429de2

A.02962

JAMES RENFORTH          VOLUME I          NOVEMBER 17, 2006

Page 22

1  billing represented, customer service, customer
2  operations, switching, sales, sales support, product
3  marketing. Regulatory was then brought in, because we
4  were creating a new product, and it would have to be
5  tariffed.
6        Our director then took that -- took that idea
7  to the executive committee, presented what we had --
8  what we were planning to do with regard to putting this
9  new product together. They got terrific buy-in, all the
10 way from the C.E.O. through all the -- all the executive
11 staff. There was tremendous dedication given to
12 developing that product and launching that product.
13       Our team -- the team that we assembled met
14 nearly every day for about the first month and a half.
15    Q.  And when you say there was tremendous dedicate
16 -- well, let me back up.
17       What did this product -- what was the name of
18 this product that it eventually became?
19    A.  It became Unified Voice.
20    Q.  And for Unified Voice, you said that there was
21 tremendous dedication by the team.  What kinds of things
22 did the team do specifically to try to get this product
23 launched?
24    A.  Well, we had to design the product first, what
25 was it going to do, who was it going to be targeted to.

Page 23

1  We had to identify what the market was that we were
2  going to sell into. We had to bring human resources
3  training department in to put together training
4  curriculum for the sales force and for customer service
5  and switching service.
6        We had to allocate funds, certainly, from --
7  from the company to do this work. And when I say
8  dedication, I mean people worked around the clock on
9  this, seven days a week at times. And the product was
10 launched in 62 days.
11    Q.  That seems like it's pretty fast.
12    A.  Real fast. Typically in the industry for that
13 time, life cycle for the product -- for the launch of a
14 new product was anywhere upwards to three years.
15       But the company was small enough that we could
16 move quickly. So 62 days from that meeting in November
17 of '98, the product was launched.
18    Q.  Now, you talked about steps that the team
19 took, for example, the product had to be designed. What
20 went into the product -- designing the product?
21    A.  One of the things that we did was to --
22 product marketing contacted a -- a market analysis
23 company in Long Beach, California.
24       And one of the things we did was set up focus
25 groups, customer focus groups. We did that in five

Page 24

1  cities around the country, where we brought prospective
2  market segment customers in to identify are we making
3  something that you really want.
4     Q.  And in what cities were the focus groups
5  conducted, if you recall?
6     A.  They were Boston, Charlotte, Chicago, New
7  York, and Raleigh.
8     Q.  And can you tell me a little bit more how the
9  focus groups were conducted?
10    A.  Sure. It was fun. We had -- the company that
11 we hired for out of California -- out of Long Beach was
12 the facilitator.
13       Product marketing and product management put
14 together a list of questions and specific scenarios with
15 regard to size, and features, and functionality that we
16 asked the customers are these items important to you, or
17 based upon a range from one to ten, which are most
18 important to you.
19       And we invited companies from all over the
20 spectrum. I mean, mom-and-pop pizza places. We had
21 Fortune 500 and Fortune 200 people in those groups. And
22 those groups ranged anywhere from 15 to 20 attendees in
23 each session.
24       And we performed these in areas that provided
25 an isolated space for Intermedia people to be behind the

Page 25

1  one-way mirrors to take notes and watch what was going
2  on and just to learn from that. And it was a -- it was
3  a great experience in actually asking our customers what
4  would you like to have.
5     Q.  And did you ever help determine or create any
6  questions for the focus groups?
7     A.  Oh, sure. With regard to features and
8  functionality. Since I was the product manager
9  designing the product, we had to know what kinds of
10 things would you like for us to be able to do, other
11 than just being able to get dial tone and make calls.
12    Q.  And what kind of things and features and
13 functionality did you see that people were interested
14 in?
15    A.  For the Unified Voice product, they just
16 wanted -- they wanted basic custom calling features
17 along with being able to get dial tone and make calls,
18 and those being voicemail, call waiting, three-way
19 calling, call forwarding, transfer.
20    Q.  And were the results of the focus groups
21 documented?
22    A.  Yes.
23    Q.  In addition to conducting the focus groups,
24 what else were your responsibilities in terms of
25 designing the product?

7  (Pages 22 to 25)

b0c218e2-9fb7-469b-8cdf-a89766f46863

A 02263

JAMES RENFORTH          VOLUME I          NOVEMBER 17, 2006

Page 26

1       A.  Well, certainly working with product marketing
2    to identify what is our target market, where do we sell
3    this and who do we sell it to.  And also identifying
4    what do we charge for it.
5       Q.  And how was it determined what was a target
6    market?
7       A.  Product marketing led that effort with regard
8    to where we were going to sell it, who we were going to
9    sell it to.
10          And that department actually assembled the
11   data based on market demographics and research
12   information that they had, and then made the
13   recommendations to product marketing -- or to product
14   management and to -- with input from sales, of course,
15   as to where we would sell it initially.
16          Ultimately, it was going to be ubiquitously
17   available across the United States in all of the large
18   metropolitan areas where Intermedia had a switch.
19      Q.  And when you say where Intermedia had a
20   switch, what do you mean?
21      A.  Well, if you think about your -- your line
22   here or at home, when you pick it up, you get a dial
23   tone.  And that dial tone comes from a central office.
24          Well, when I mean Intermedia had a switch, I
25   mean they had a central office in 54, 55 cities around

Page 27

1    the country.
2       Q.  Now, in terms of designing this Unified Voice
3    product, were each of the steps in designing the product
4    documented?
5       A.  Yes.
6       Q.  And how were they documented?
7       A.  In minutes.  And not only minutes, but we also
8    had -- the team had a project coordinator assigned to
9    keep track of everything, all of the meeting minutes,
10   each department's responsibility, who that key person
11   was on the team that represented the particular
12   department, put timelines and milestones together that
13   were to be met during that launch period.
14          And that was documented in Microsoft Projects.
15      Q.  And were these documents distributed among the
16   team members?
17      A.  Yes.
18      Q.  And again, that would have been hard copy and
19   soft copy?
20      A.  Hard copy and soft copy.
21      Q.  Were there any forecasts or financial analysis
22   created in the launch of Unified Voice?
23      A.  Sure, there were.  We had a lot of detail that
24   came in from product marketing with regard to forecasts,
25   based upon, again, where we were going to take it, who

Page 28

1    we were going to sell it to, and how much we were going
2    to charge for it, and what the -- well, what the costs
3    were going to be to Intermedia.
4       Q.  And again, this was all documented?
5       A.  That was documented.
6       Q.  Were there any Excel spreadsheets as well?
7       A.  Yes, Excel spreadsheets, Microsoft Projects,
8    Word documents.
9       Q.  What was the culture at Intermedia in terms of
10   documenting a launch of a product such as this?
11      A.  Not only just the launch of this product, the
12   culture was -- it was document, document, document.
13   Paper trail was extremely high profile at Intermedia.
14      Q.  So was it safe to say that basically every
15   step you took in the launch of a new product would have
16   been documented by Intermedia?
17      A.  Yes.
18      Q.  And would this have been done, this
19   documenting each of the steps, would that have been done
20   for every launch of a new product?
21      A.  Oh, absolutely.
22      Q.  Sir, you talked about there were four steps in
23   bringing Unified Voice to market, and that was to design
24   the product, to target the market, and then the third
25   one you mentioned was training.  Can you talk a little

Page 29

1    bit about training?
2       A.  Yes.  Product management and human resources
3    training department took the lead on developing the
4    product description and providing a final document that
5    would become the training curriculum for sales and
6    customer service.
7       Q.  And again, was this all documented?
8       A.  Oh, yeah.
9       Q.  And I think the fourth step you mentioned was
10   allocating funds from the company?  Is that budgeting?
11   What do you mean by that?
12      A.  Budgeting.  We had -- certainly, there was
13   operating capital that the company operated on and
14   functioned on.  And there had to be funds dedicated to
15   pay salaries, pay expenses, pay for material creation,
16   sales collateral, public relations, bulletins, internal
17   and external.
18          Dollars had to be allocated and earmarked for
19   that launch.
20      Q.  So this wasn't something that was simply done
21   in isolation.  It seems to me it would impact a whole
22   host of areas within the company.
23      A.  Yes, impacted the entire company.
24      Q.  And how successful was Unified Voice?
25      A.  Very.

8 (Pages 26 to 29)

b0c218e2-9fb7-469b-8cdf-a89f6d129a64

JAMES RENFORTH        VOLUME I        NOVEMBER 17, 2006

Page 30

1    Q.  What were the estimated revenues from Unified
2  Voice for the first year?
3    A.  First year, the revenues for the company
4  increased from -- I believe it was 65 million to over a
5  hundred and -- over a hundred million.
6    Q.  So people must have liked this product?
7    A.  Yes.
8    Q.  And when you joined Intermedia, do you
9  remember approximately how many employees there were?
10   A.  I think about 3,000.
11   Q.  And how would you compare your experience
12  between G.T.E. and Intermedia?  How would you compare
13  those two?
14   A.  G.T.E. was great.  I mean, it was a terrific
15  experience, a terrific career.  Intermedia was exciting.
16  A little different than G.T.E., because it felt like
17  G.T.E. probably would have been 20 years earlier,
18  because it was smaller, had a lot of excitement,
19  individual activity.
20        Not that that didn't exist, but it was just --
21  it was just a different culture.  It wasn't as fast
22  paced.  Intermedia was -- it was a little faster paced.
23  Decisions could be made very, very quickly.  We could
24  change direction of the company quite rapidly because it
25  was so -- it was so much smaller.

Page 31

1    Q.  So how often would the Unified Voice team
2  meet?
3    A.  For the first month and a half or so, it was
4  nearly every day.
5    Q.  And were minutes taken?
6    A.  Yes.
7    Q.  And about how long would these meetings be
8  every day?
9    A.  About an hour.
10   Q.  And --
11   A.  First thing in the morning.
12   Q.  Bright and early.
13   A.  Bright and early.
14   Q.  And the minutes were then distributed to team
15  members?
16   A.  Just -- not just team members.  They were
17  distributed to the same distribution list that I
18  mentioned before; team members, their immediate
19  supervisors, directors, and executive staff.
20   Q.  And when you say executive staff, does that
21  include Dave Ruberg?
22   A.  Yes.
23   Q.  And what was Dave's title at Intermedia?
24       MR. IBA:  Asked and answered.
25   A.  C.E.O.

Page 32

1  BY MS. MURCH:
2    Q.  How many markets were -- was Unified Voice
3  going to be put in?
4    A.  All 50-some.  54, 55.
5    Q.  Now, were there any reports after the -- let
6  me back up.  You said that there were 62 -- this product
7  was launched in 62 days.  After the launch, were any
8  reports made with respect to the Unified Voice product?
9    A.  Sure.  Business analysis did monthly reports
10  on product performance, net gain for customers, new
11  customers brought on.
12   Q.  Any kind of monthly revenue reports?
13   A.  And the revenue reports, certainly.
14   Q.  Let's talk a little bit in general about the
15  development of new products overall.  How is it that, at
16  Intermedia, a new product would be developed?  And I
17  mean how did you determine if there was a need or what
18  direction Intermedia was going?
19       Did you learn that from sales staff?  What --
20   A.  Actually, two fronts -- well, three, really.
21  Product marketing certainly did the -- the demographics
22  and the -- the market research.  And let me -- let me
23  preface that with saying Intermedia was a market-driven
24  company, rather than being product driven.
25       So, in other words, the company didn't just

Page 33

1  design something and then try to force feed the public
2  with it.  We actually designed our products based on the
3  market.  So it was a market-driven company.
4        So the -- the design of new products actually
5  rested on the shoulders of three or four departments;
6  product marketing, product management, sales, and then
7  certainly switching services, is it something we can do.
8  It had to be available.
9    Q.  So would it be something that, for example,
10  your sales force would be out there and they would have
11  customers say, "We would like X, Y feature," and then
12  they would come back to you or -- and say this is a
13  trend we are seeing?
14        Or is it something you -- you would research
15  and say, "Boy, the market seems to be wanting this?"  Or
16  --
17   A.  Actually, both.  Yeah, sales would come in
18  with requests from customers for what was called then a
19  special assembly process where it was a little bit
20  outside what was in the box for them.
21        If they wanted a -- a capability or feature
22  that wasn't part of the standard offering, then they
23  would come to product management and request some
24  special pricing, and to determine is it something that
25  we can do.

9  (Pages 30 to 33)

b0c218e2-9fb7-469b-8cdf-a8f45f046a05

A02965

JAMES RENFORTH        VOLUME I        NOVEMBER 17, 2006

Page 38

1  Voice?  What were you -- what were your responsibilities
2  after that?
3     A.   Again, life cycle support.  And being the
4  product manager, part of the product manager's
5  responsibility is to add services and -- and -- vertical
6  services and enhancements to an existing product set.
7  Which led us to the next iteration of Unified Voice,
8  which was to add high-speed internet access to it.
9     Q.   To Unified Voice?
10    A.   To Unified Voice.
11    Q.   And what was that product called?
12    A.   That product was called Unified Voice Dot Net,
13 after the internet component was added to it.
14    Q.   And do you remember about what time frame
15 Unified Voice Dot Net was created?
16    A.   Oh, gosh, that was --
17    Q.   If you don't remember, that's okay.
18    A.   I think it was mid 1999.
19    Q.   And why was it that internet access was added?
20    A.   Customer demand.  Customer desire.
21    Q.   And was a team assembled, then, for the
22 creation of Unified Voice Dot Net?
23    A.   It was, but it was not nearly as demanding as
24 the initial launch, because not every department really
25 needed to be involved in developing it.

Page 39

1            Because we pretty much knew what internet was.
2  And we had the capability to do it, we just needed to
3  create the -- the billing system information, do a
4  little updated training for sales, and operations, and
5  customer service, price it and tariff it, and assign
6  someone responsible for it.
7     Q.   And so Unified Voice Dot Net was basically
8  Unified Voice, the same thing, but just adding internet
9  service?
10    A.   Exactly.
11    Q.   Okay.  And what came after the Unified Voice
12 Dot Net product?
13    A.   Ah.  After the Unified Voice Dot Net product
14 came -- well, it ultimately became IntermediaOne.
15    Q.   And can you tell me how IntermediaOne came
16 about?
17    A.   Yeah, that was exciting, too.
18            We had research from market -- product
19 marketing and from product management that identified a
20 new vertical service that the market was seeing that was
21 being received extremely well, it was called Unified
22 Messaging.
23    Q.   And when was this about, kind of the inception
24 of IntermediaOne?
25    A.   The inception of IntermediaOne was -- in a

Page 40

1  nutshell was bringing the Unified Messaging service onto
2  the Unified Voice Dot Net platform.
3     Q.   And would this have been sometime in 2000?
4     A.   It was -- yes, that was in 2000.
5     Q.   And how was it Intermedia came to learn about
6  this Unified Messaging component?
7     A.   Actually, it came from two directions; one
8  internally, one externally.  And when I say that, I mean
9  it had caught our eye in product management because it
10 had been appearing in -- in trade journals, business
11 industry magazines, publications.
12           And I as a product manager started looking at
13 Unified Messaging, and had put out a few feelers,
14 looking for someone that could provide that service,
15 rather than us building it, because it was already being
16 built, we just needed to find somebody that could do it.
17    Q.   Um-hum (affirmative).
18    A.   And about that same time, we had -- we got a
19 call -- actually, I got a -- one of these lovely little
20 sticky notes handed to me that had said, "You need to
21 call these guys."  That's what the note said.
22           And it was a note -- the note came from Dave
23 Ruberg's office through my director to my supervisor to
24 me.  And it was a Unified Messaging provider.  The
25 company's name was EffectNet.

Page 41

1     Q.   And what happened after you got that little
2  sticky post-it?
3     A.   Well, there was a flurry -- flurry of
4  activity.
5           But at that time, there was one other company
6  that I had weeded through and kept to make contact with.
7  And EffectNet and this other company were the only two
8  that were really in the running.
9           I made the phone call to EffectNet, and I
10 think the -- Jay Jessup was the gentleman I had the name
11 and phone number for that came from Dave Ruberg's office
12 that said, "You need to call these guys."
13           So I called Jay Jessup, explained what we
14 were, who Intermedia was, what we were looking to do.
15 This was -- and I remember distinctly because it was so
16 unique in the industry.
17           At that time, again, remember, the industry
18 being huge, it moves like a battleship.  I mean, it's so
19 slow.  But Intermedia being able to move quickly.  And
20 it was unique to see another company that moved as
21 quickly.
22           The conversation I remember took place on a
23 Tuesday.  And I had, in talking to Jay Jessup, I
24 described what we were thinking of doing, had a little
25 bit of an idea what EffectNet could provide, and I asked

11  (Pages 38 to 41)

JAMES RENFORTH        VOLUME I        NOVEMBER 17, 2006

Page 42

1    him how soon can we get together.
2         He said, "We'll be there Thursday."
3         Q.   And can you tell me when you say Unified
4    Messaging what you mean?
5         A.   Yes.  Unified Messaging at that time was the
6    capability to access all of your messaging information,
7    I mean voicemail, e-mail, faxes, via a touchtone
8    telephone.  It had the capability, the system had the
9    capability to do text-to-voice translations.
10        One of the things that we had gotten from our
11   customer base was I need to be -- I need to be able to
12   access my messaging, I need to be able to access
13   voicemail, e-mail, and faxes from other than in my
14   office, because I'm not there, I'm out, I'm traveling,
15   I'm in the airport, I can't get my e-mail, I know there
16   is an important e-mail in there for me, I can't get to
17   it.
18        Well, Unified Messaging has -- has that
19   service -- inherent with that service, one of the
20   capabilities was to be able to access all of that
21   messaging information, translate it from text to voice,
22   and have your e-mails read to you over the phone.
23        Then you could not only respond to that e-mail
24   with a voice message attached back to an e-mail message
25   as a wav file for the sender to receive, but you could

Page 43

1    also forward it, you could save it, you could have faxes
2    read to you over the phone.
3         So it was a -- it was an incredible asset to
4    our -- to our product set.
5         Q.   And what did you think of Unified Messaging at
6    the time, your overall impression?
7         A.   Cutting edge.  It was expected to be a huge
8    business.  Market analysis at that time calculated a 16
9    billion dollar business.
10        Q.   And did Intermedia conduct business analysis
11   regarding Unified Messaging and its profitability?
12        A.   Yes.
13        Q.   Now, I'm just going to back up a second.  You
14   said you talked to someone from EffectNet on a Tuesday,
15   and they came out on a Thursday.
16        A.   Right.
17        Q.   So what happened on that Thursday?
18        A.   That Thursday, we had -- I got my team
19   together.  My team included at that time my -- my peers
20   in product management, because it encompassed other than
21   just the -- the Unified Voice product, in fact, the
22   Unified Voice Dot Net.
23        So it was my peers, our supervisor, and I
24   think there were two -- two members from EffectNet that
25   were in that meeting.  They brought PowerPoint

Page 44

1    presentations and product description information, more
2    detailed than what I had had at that time.
3         And in that meeting, we decided, "we",
4    Intermedia decided to move forward with negotiations
5    with EffectNet.
6         Q.   And what exactly happened at that meeting?
7         A.   Well, we saw a terrific presentation that
8    described what we envisioned as being a great product to
9    add to our Unified Voice Dot Net service.  And we saw a
10   team of people that was as dedicated as we were and
11   responsive to -- to our needs.
12        Q.   And do you know if there were profitability
13   studies conducted regarding Unified Messaging at
14   Intermedia?
15        A.   Yes.
16        Q.   So let's talk about the decision to go with
17   EffectNet and offer a Unified Messaging product.  That
18   addition of Unified Messaging to Unified Voice Dot Net
19   eventually became IntermediaOne?
20        A.   Became IntermediaOne.
21        Q.   So can you walk me through the systems for the
22   launch for that product?
23        A.   The launch was -- it was -- it was very
24   exciting to launch.  It wasn't as demanding as
25   developing a brand new product, like Unified Voice was,

Page 45

1    because we already had the -- the basic framework in
2    place.
3         But the Unified Voice -- I mean the Unified
4    Messaging component of IntermediaOne -- of what became
5    IntermediaOne created a lot of excitement, again, in the
6    company.
7         IntermediaOne, based upon its capabilities,
8    Intermedia became the -- largest CLEC in the United
9    States that was able to provide that combined service,
10   that integrated service.
11        Dave Ruberg, our C.E.O., dubbed IntermediaOne
12   our flagship product.
13        Q.   So was the IntermediaOne product important to
14   Intermedia's revenues?
15        A.   Tremendously.
16        Q.   You said there was a lot of excitement about
17   the IntermediaOne product.  What do you mean by
18   excitement?
19        A.   Oh, yeah.  Because this was something that the
20   salespeople had brought in to us.  So they were
21   tremendous -- they were behind it a hundred percent.
22        Because one of the things they had told us
23   from the customers was I need to be able to get access
24   to our messaging.  I can't do it, I'm in the airport.
25   You know, there was no wi-fi in those days, no hot --

12  (Pages 42 to 45)

b0c218e2-9fb7-469b-8cdf-a85a8704c967

A 72967

JAMES RENFORTH        VOLUME I        NOVEMBER 17, 2006

Page 46

1  you know, or very few hot spots. So you had -- you just
2  couldn't get that -- the access to that information
3  while you were a business traveler.
4       So we were satisfying a need sales saw. We
5  were satisfying an opportunity product marketing saw
6  that was going to be a tremendous business opportunity,
7  16 billion dollars. So Intermedia saw an opportunity to
8  make a lot of money with that product.
9       Q. And do you know if there was any marketing
10  analysis?
11      A. Yeah. Yeah, there was. And we had -- and
12  that was done, again, by product marketing. We didn't
13  see a lot of the detail in the background information,
14  but we just saw pretty much a flag go up, say, "Yeah,
15  the market wants it, and here's what -- here's what it
16  can bear with regard to pricing."
17      Q. And would you describe Intermedia as being
18  thorough in terms of its investigation of a new product
19  launch?
20      A. Yes.
21      Q. And why would you say it would be thorough?
22      A. Thorough because we didn't -- we didn't make a
23  move, the company didn't make a move on launching any
24  product without all of the I's being dotted, all of the
25  T's being crossed, document, document, document, the

Page 47

1  analysis being done, and approval from the executive
2  staff to go forward.
3       Q. And how was IntermediaOne viewed with respect
4  to Intermedia's strategic plan going forward?
5       MR. IBA: Objection, foundation.
6  BY MS. MURCH:
7       Q. Let me back up. You testified earlier that
8  Intermedia was, I'll paraphrase, extremely important to
9  Intermedia's revenues. How was it viewed within
10  Intermedia this IntermediaOne product going forward?
11      MR. IBA: Objection, foundation.
12  BY MS. MURCH:
13      Q. You can answer.
14      A. IntermediaOne, again, Dave Ruberg called it
15  our flagship product. So that message coming personally
16  from our C.E.O., that led every employee in the company
17  to believe we need to focus on making this successful.
18      Q. And -- and how did people try to make this
19  product as successful as possible?
20      A. Well, the -- the Unified Messaging component
21  was not only added to the Unified Voice Dot Net product,
22  which became IntermediaOne.
23      The Unified Voice -- or the Unified Messaging
24  capability was also added to every other business unit
25  in the company as a standalone product that could be

Page 48

1  sold independently. And I say independently, I mean
2  independently from what had been Unified Voice Dot Net
3  and IntermediaOne.
4       Unified Messaging was not only part of the
5  IntermediaOne offering, it could also be sold standalone
6  to existing customers that were in the single T product
7  environment, to other business units, the Advanced
8  Business Unit, called A.B.U., that encompassed
9  multi-tenant high-rise buildings in large metropolitan
10  service areas around the country. That business unit
11  was also chartered with selling Unified Messaging.
12      The single T customer was going to be up-sold
13  Unified Messaging. And Unified Messaging as a
14  standalone product could be sold to any business,
15  anywhere.
16      Q. So if I'm understanding you correctly, in
17  addition to selling it in the 54, 55 markets where
18  Intermedia had a product, it could be sold nationwide?
19      A. Where Intermedia had a switch --
20      Q. A switch.
21      A. -- it could be sold nationwide.
22      And not just nationwide. Worldwide. Because
23  access to that functionality was based upon having a
24  touchtone phone and dialing a toll free 800 number.
25      Q. And EffectNet was the partner with Intermedia

Page 49

1  in assisting with that Unified Messaging?
2       A. Yes.
3       Q. How committed at that meeting that you had, I
4  believe it was on a Thursday, did EffectNet seem to
5  making the Unified Messaging a reality?
6       A. Extremely. There was -- Jay Jessup's words
7  were "We'll do whatever we have to do to make this
8  happen for you."
9       Q. And do you feel that EffectNet did that?
10      A. Yeah. Yes, I do.
11      Q. Did product marketing at Intermedia perform
12  demographic studies and due diligence regarding
13  IntermediaOne product?
14      A. Yes.
15      Q. And again, were these documented?
16      A. Yes, they were.
17      Q. And were there -- we talked a little bit
18  earlier in your deposition about team meetings, you
19  know, the team was assembled.
20      A. Um-hum (affirmative).
21      Q. Was a team assembled for IntermediaOne?
22      A. Yes, IntermediaOne, and the team was led by
23  actually our director, Jack Lee, he took the forefront
24  on that to ensure that we had representation from all
25  the departments, buy-in from all the executives.

13 (Pages 46 to 49)

ESQUIRE DEPOSITION SERVICES, LLC - CHICAGO
312.782.8087    800.708.8087    FAX: 312.704.4950

b0c218e2-9fb7-469b-8cdf-a857571769b0
A.02968

JAMES RENFORTH        VOLUME I        NOVEMBER 17, 2006

Page 50

1    And when I say the executives, I mean senior
2  V.P.'s, V.P.'s, C.E.O., C.F.O., all the C level
3  officers. And I know he had independent meetings with
4  them that our team certainly wasn't involved in, but I
5  know he -- he acquired all of the support that the
6  company needed to go forward with developing the
7  IntermediaOne product, which again, became the flagship
8  product.
9    Q.  And the team assembled included which
10  departments?
11    A.  All of those I mentioned before.
12    Q.  Um-hum (affirmative).
13    A.  Product marketing, product management, sales,
14  customer service, customer operations, switching,
15  regulatory, public relations, and -- I think I said
16  switching.
17    Q.  And were there minutes taken of the
18  IntermediaOne team meetings?
19    A.  Yes.
20    Q.  And what did you -- and were those minutes for
21  the IntermediaOne team meetings documented?
22    A.  Yes.
23    Q.  And how were they documented?
24    A.  Documented, again, in Word, Microsoft
25  Projects, Excel spreadsheets.

Page 51

1    Q.  And how did you receive copies of those
2  minutes?
3    A.  Soft and hard copies.
4    Q.  And what did you do with those copies you
5  received?
6    A.  I had two repositories -- actually, three. We
7  had a shared drive on a company server. I had soft
8  copies in folders on my hard drive. And then hard
9  copies in file drawers in my office.
10    Q.  And do you remember the name or the letter of
11  the shared drive at IntermediaOne where the
12  IntermediaOne information was stored?
13    A.  Yeah.
14    Q.  And that was which drive?
15    A.  It was K. I hadn't thought of that in years.
16    Q.  And so you said you had information on the
17  shared drive. So would any -- would financial or any
18  other information regarding the IntermediaOne product
19  have been put on the shared drive at Intermedia?
20    A.  Yes.
21    Q.  So in addition to you, there were other users
22  who would put information on that shared drive?
23    A.  That's correct.
24    Q.  And you said you also had electronic
25  documents?

Page 52

1    A.  That's right.
2    Q.  And where did you keep those electronic
3  documents, Mr. --
4    A.  On my hard drive.
5    Q.  Would that include e-mail, Mr. Renforth?
6    A.  Yes, ma'am.
7    Q.  And did you ever delete any of these documents
8  off of your hard drive?
9    A.  Only really old e-mail messages. And I say
10  old, 1990 -- 1998, early 1998, as a -- as a prompt from
11  our I.T. folks saying, "Hey, you've got too much stuff.
12  You need to get rid of some of it."
13    Q.  And so the old e-mail messages -- the only
14  thing you got off -- deleted from your hard drive is old
15  e-mail messages from 1997 and 1998?
16    A.  19 --
17    MR. IBA:  Objection, misstates the testimony.
18  BY MS. MURCH:
19    Q.  Can you tell me, was there anything else you
20  deleted off your hard drive besides certain e-mails?
21    A.  No.
22    Q.  And when were those e-mails deleted off --
23  from what time period did those e-mails come?
24    A.  Probably first few months of 1998.
25    Q.  Did you ever delete any of the documents

Page 53

1  related to IntermediaOne off your hard drive?
2    A.  No.
3    Q.  And you --
4    A.  And let me back up. The e-mails weren't
5  deleted. They were removed and saved to floppies.
6    Q.  So there was always a copy of the e-mails you
7  had?
8    A.  Oh, yeah.
9    Q.  And what happened to those floppies?
10    A.  They were in my desk.
11    Q.  So is it safe to say that during your time at
12  IntermediaOne, you always kept records of every
13  electronic e-mail and document you had, whether it was
14  on your hard drive or on floppy?
15    A.  Yes.
16    Q.  Did other people at Intermedia embrace kind of
17  the same policy you had of saving all of this
18  information?
19    MR. IBA:  Objection, foundation.
20  BY MS. MURCH:
21    Q.  You can answer.
22    A.  I -- yes. I think because of the culture of
23  the company.
24    Q.  And you also mentioned that you had hard copy
25  documents relating to the IntermediaOne product?

14  (Pages 50 to 53)

b0c218e2-9fb7-469b-8cdf-a89f6012969

JAMES RENFORTH       VOLUME I       NOVEMBER 17, 2006

Page 54

1    A.  That's correct.
2    Q.  And where were those stored, Mr. Renforth?
3    A.  In a file drawer in my drawer -- in my office.
4    Q.  And were these file drawers relate -- somehow
5  labeled?
6    A.  The folders in the drawers were.
7    Q.  And so if you had -- well, let me back up.
8        Did you have file folders related to the
9  IntermediaOne product?
10   A.  Sure.
11   Q.  And were these folders labeled?
12   A.  Yes.
13   Q.  And how were they labeled?
14   A.  Well, there were several -- several hanging
15  folders, because of the amount, that were labeled
16  IntermediaOne, and then manila folders inside those
17  hanging folders with specific labels with regard to
18  content, such as "product description", "training,"
19  "forecasts", "reports".
20   Q.  So you kept a hard copy of the reports and
21  forecasts for the IntermediaOne product?
22   A.  Yes.
23   Q.  And again, this was both -- I'm sorry, was on
24  hard copy in file -- labeled file folders in your
25  office, on your hard drive, and as well as on the shared

Page 55

1  drive in Intermedia?
2    A.  That's correct.
3    Q.  Mr. Renforth, we've been going about an hour,
4  so I'm going to take a little five- or ten-minute break,
5  if that's okay with you.
6    A.  Works for me.
7    Q.  Let you get a cup of coffee.
8        THE VIDEOGRAPHER:  Going off the record at
9    10:45.
10       (Recess.)
11       THE VIDEOGRAPHER:  This is tape number two of
12    the continued videotaped deposition of James
13    Renforth.  We're back on the record at 10:58.
14  BY MS. MURCH:
15   Q.  Okay.  Mr. Renforth, we were talking about,
16  earlier in your deposition, that you had stored
17  information on the shared K drive, the hard drive, and
18  you also had hard copies.
19       Would that information that you kept on the
20  shared K drive, the Intermedia -- on your personal hard
21  drive, and the hard copies regarding the IntermediaOne
22  product include information regarding Unified Messaging?
23   A.  Yes.
24   Q.  I'm going to talk about -- you had mentioned
25  that everyone at Intermedia was very excited about the

Page 56

1  IntermediaOne product and enthusiastic.  Were there
2  forecasts created for the usage of the IntermediaOne
3  product?
4    A.  For usage?
5    Q.  I'm sorry, for the number of customers or --
6    A.  Oh, yes.  For the number of customers, yeah.
7    Q.  And what kind of forecasts were created?
8    A.  Two that I was familiar with.  And there were
9  others, again with the other business units, A.B.N. and
10  standalone.
11       We had a forecast from product marketing that
12  identified the objective for -- or the -- the estimate
13  for new customers and existing customers.
14   Q.  And can you tell me about the forecasts for
15  new customers?
16   A.  New customers, sure.  We had, from product
17  marketing, that identified an estimate of 300 plus,
18  excuse me, new customers a month.  Each of those new
19  customers was estimated to have 100 employees, and
20  conservatively, to be equipped with five Unified
21  Messaging mailboxes for each customer.
22   Q.  So about how many mailboxes would that have
23  been per month?
24   A.  About -- between 15 and 16,000 -- no.
25   Q.  1500?

Page 57

1    A.  Yeah, 15 to 1600.
2    Q.  And then we would multiply that by 12 months?
3    A.  Yes.
4    Q.  Okay.
5    A.  The other forecast was for existing customers,
6  both Unified Voice Dot Net, which ultimately became
7  IntermediaOne, and single T customers.  There were
8  approximately 12,000 existing customers that could be
9  up-sold.  And that estimate was at ten percent, which
10  would have been 1200 customers.  And again, we used the
11  five mailbox figure.
12       So in addition to the 15 to 1600, we were
13  talking about adding about 6,000 a month to that base.
14   Q.  So if I understand the forecast correctly, the
15  new customers would be about -- you said there were
16  about 15 to 16 hundred a month.  That would be at a
17  minimum about 18,000 mailboxes for the first year?
18   A.  For the first year.
19   Q.  And then for the existing customers, you said
20  about 6,000 a month was being --
21   A.  A month.
22   Q.  To the base.
23       So 6,000 times 12, plus the 18,000 that you
24  had mentioned?
25   A.  That's correct.

15 (Pages 54 to 57)

b0c218e2-9fb7-469b-8cdf-a85fAc02970

JAMES RENFORTH       VOLUME I       NOVEMBER 17, 2006

Page 58

1    Q.  And the forecasts you had seen, were they for
2  three years?  Or were they for just one year?  Projected
3  out.
4    A.  Three years.  With incremental growth monthly.
5    Q.  And what do you mean by incremental growth
6  monthly?
7    A.  Well, the -- the 1500 to 1600 plus the 6,000 a
8  month.
9    Q.  Um-hum (affirmative).
10   A.  Cumulative, cumulated over the three-year
11  period.
12   Q.  So IntermediaOne -- or Intermedia didn't
13  expect those numbers to remain stagnant?
14   A.  No, absolutely not.
15   Q.  And did IntermediaOne -- or, I'm sorry,
16  Intermedia continue to expect those numbers to grow year
17  after year?
18   A.  Yes.  Yes.  In fact, I might add that those --
19  the numbers were very conservative in these estimates.
20  Because if you think about having a sales force of 600
21  plus people, 600 salespeople, and targeting 300 new
22  accounts a month, that's only selling a half a deal a
23  month.
24   Q.  And do you know if whoever created those
25  forecasts factored in this sales force of 600?

Page 59

1    A.  No, I don't think they did.  No.  I'm sure
2  they didn't.
3    Q.  And do you know if there were any quotas for
4  sales staff?
5    A.  There were.
6    Q.  So sales staff did have to sell a certain
7  amount of IntermediaOne product?
8    A.  Yes.
9    Q.  And do you know if they received commissions
10  for IntermediaOne product?
11   A.  Yes, they did.  In fact, the commission was
12  structured so that they would be -- and, you know,
13  salespeople sell what they get paid for.
14        So IntermediaOne, with the Unified Messaging
15  component, was targeted in a very lucrative commission
16  base that would incent the salespeople, here is what I'm
17  going to sell because this is what I make money on.
18   Q.  Do you think that Intermedia was generally
19  conservative in its forecasts for new launches?
20   A.  Yes, I do.
21   Q.  And in terms of, for example, the Unified
22  Voice Dot Net, you had talked about the revenue base
23  jumped from, I may not quite have the numbers right,
24  approximately 65 million to over a hundred million?
25   A.  Um-hum (affirmative).  That's correct.

Page 60

1    Q.  And so then again, as exemplified by the
2  Unified Voice product, that also exceeded expectations?
3    A.  The Unified Messaging --
4        MR. IBA:  Objection, mischaracterizes
5    testimony, assumes facts not in evidence.
6  BY MS. MURCH:
7    Q.  Mr. Renforth, I'm going to back up.
8    A.  Okay.
9    Q.  And if you can explain to me how Unified
10  Voice, that product, exceeded expectations.
11   A.  The Unified Voice product?
12   Q.  Um-hum (affirmative).
13   A.  Exceeded expectations exponentially.  Nearly
14  doubled the company's revenues.
15   Q.  And the Unified Voice product was basically
16  the basis for Unified Voice Dot Net, which was the basis
17  then in turn for IntermediaOne; is that fair?
18   A.  That's correct.
19   Q.  And let's talk about how many cities were
20  targeted for the launch, if you recall, for the
21  IntermediaOne product.
22   A.  For IntermediaOne?
23   Q.  Um-hum (affirmative).
24   A.  Initially, seven.
25   Q.  And do you recall which cities those were?

Page 61

1    A.  I think so.  Now, I know five of them were the
2  five that we did the customer focus groups in.
3    Q.  Okay.
4    A.  And then there were two additional ones.  The
5  additional ones were Minneapolis and Pittsburgh.
6    Q.  And just for the record, if you could recall
7  what the other five were.
8    A.  Boston, Charlotte, Chicago, New York, and
9  Raleigh.
10   Q.  And how were the other cities factored in?  I
11  know you had mentioned that IntermediaOne had 54 to 55
12  cities.  How did those factor into the launch in
13  IntermediaOne?
14   A.  They were going to be -- those cities were
15  going to be turned up for sales monthly after the
16  initial launch in those seven cities through the end of
17  2000.  So there would have been probably four to five a
18  month, new cities turned on.
19   Q.  And would the financial -- I'm sorry, the
20  forecasts, would those have been updated as the
21  additional cities were added to the launch?
22   A.  Yes, they would be.
23   Q.  And what time frame did Intermedia have for
24  adding all of the 54 to 55 cities?
25   A.  That was through the end of 2000.

16  (Pages 58 to 61)

b0c218e2-9fb7-469b-8cdf-a89f6ca25751

A-0297.1

JAMES RENFORTH          VOLUME I          NOVEMBER 17, 2006

**Page 66**

1    Q.  And so to your knowledge, then, Intermedia was
2  also looking to sell Unified Messaging through its
3  Advanced Business Unit arm?
4    A.  That's exactly right.
5    Q.  And I believe you also talked about agent
6  sales --
7    A.  Agent sales.
8    Q.  -- as another area in addition to what you
9  were familiar with where this Unified Messaging would be
10  sold?
11    A.  That's right.
12    Q.  And can you tell me a little bit about that?
13    A.  Just a little bit, because I was involved just
14  briefly at the outset, and that was to go train one
15  specific agent in Boston on what the product was and how
16  to sell it.
17        And then they were going to implement it on
18  their website to sell to business customers in the
19  Boston area.
20    Q.  And who was going to provide that online sales
21  vehicle?  Do you know?
22    A.  It would be a direct electronic link from that
23  company to Intermedia's order entry system.
24    Q.  And so a customer, rather than having to deal
25  with a live person, could just go online and place an

**Page 67**

1  order for those Unified Messaging product?
2    A.  That's correct.
3    Q.  And do you remember the name of the company
4  that would offer that internet service with Intermedia?
5    A.  That one was called Simplicity.
6        (Knock on door.)
7        MR. JUNG:  Come in.
8  BY MS. MURCH:
9    Q.  And do you know what ever happened with
10  Simplicity?
11    A.  No.
12    Q.  Mr. Renforth, let's talk about pricing of the
13  IntermediaOne product.
14    A.  IntermediaOne or the Unified Messaging
15  component.
16    Q.  Unified Messaging component.
17    A.  Okay.
18    Q.  What can you tell me about that?
19    A.  We had three different tiers set up, based
20  upon customer's need.  And I'm not -- I don't really
21  remember the exact numbers, but I'm thinking 9.95,
22  19.95, and 24.95, something like that.
23    Q.  And how was this pricing determined?
24    A.  Based upon market -- product marketing,
25  research, what the market would bear, and Intermedia's

**Page 68**

1  costs, make sure we had a margin.
2    Q.  So for the 4.90 -- or, I'm sorry, the 9.95,
3  what was the approximate cost to Intermedia?
4    A.  It was around $5.
5    Q.  $5?
6        And so the gross margin would have been, what,
7  about a hundred percent?
8    A.  About a hundred percent.  And that was -- that
9  was across the board for all three tiers.
10    Q.  Now, under the Unified Communications
11  Agreement, there were two tiers of pricing, there was
12  limited service and unlimited service.  Do you know, for
13  purposes of the new mailboxes, did Intermedia assume it
14  would be unlimited service at the 27.40 price or at the
15  lower price?
16        MR. IBA:  Objection, leading, misstates, the
17    contract speaks for itself.
18  BY MS. MURCH:
19    Q.  Mr. Renforth, do you know which pricing would
20  have been used under the Unified Communications
21  Agreement?
22    A.  The -- the unlimited was used.
23    Q.  Okay.  I'm going to hand you a copy of the
24  Unified Communications Agreement, which has been marked
25  as Exhibit 2.  Here is a copy for your counsel.

**Page 69**

1        Mr. Renforth, I'm going to ask you to go to
2  the very last page, which is pricing.  And you'll see
3  there is a basic of 11.45 and an unlimited of 27.40.  Do
4  you see those two figures there?
5    A.  I do.
6    Q.  And so which two of these figures did
7  Intermedia assume, was it the 11.45 or the 27.40?
8    A.  27.40.
9        MR. IBA:  Objection.
10        Mr. Renforth, you need to let me assert my
11    objections first --
12        THE DEPONENT:  Oh, I'm sorry.
13        MR. IBA:  -- before you answer.
14        I'm going to object to foundation, and vague
15    and ambiguous.
16        MS. MURCH:  Okay.
17  BY MS. MURCH:
18    Q.  We'll back up, Mr. Renforth.  You see Exhibit
19  2, which is the EffectNet Unified Communications Service
20  General Agreement for Intermedia Communications, Inc.?
21    A.  Yes.
22    Q.  Have you seen this document before?
23    A.  Yes.
24    Q.  And were you involved at all in negotiating
25  this agreement?

                                    18  (Pages 66 to 69)

A-02972

JAMES RENFORTH          VOLUME I          NOVEMBER 17, 2006

Page 74

1     A.  I left because my product was scrapped.
2     Q.  And how did you learn your product was
3  scrapped?
4     A.  Product management staff meeting April, May
5  time frame.
6     Q.  Of which year, Mr. Renforth?
7     A.  2001.
8     We had our vice president, Kathy Victory, Jack
9  Lee, our director, Cheryl Mellon, my supervisor, my
10  peers, and myself.  In that meeting, we learned that the
11  IntermediaOne product was going to be dropped, and that
12  Intermedia's focus would go back to the single T
13  product.
14     Q.  So let me get this straight.  So all of the
15  work for Unified Voice, which was transferred into
16  Unified Voice Dot Net, which was then transferred into
17  the flagship product of IntermediaOne, was being
18  scrapped?
19     A.  Yes.
20     Q.  And Intermedia was going back to the single T
21  product which it had back in 1990 --
22     A.  In the 1990's.
23     Q.  How was it determined, do you know, that the
24  IntermediaOne product was going to be scrapped?
25     A.  The reason we were given -- because several of

Page 75

1  us were very involved, as you know, and were verbally
2  upset by that news.  And when we asked why, the reason
3  that we were given from our V.P. was "The back office
4  can't keep up."
5     Q.  Did you believe that reason?
6     A.  No.
7     Q.  And what role did the executives have in
8  scrapping that product?
9     A.  I don't know.  Other than just saying we're
10  not going to sell it anymore.
11     Q.  Was there ever a -- in April, May 2001, was
12  there an executive committee decision to scrap the
13  product?
14     MR. IBA:  Objection, foundation.
15     A.  I don't know.
16  BY MS. MURCH:
17     Q.  I'm sorry?
18     A.  There had to have been.
19     MR. IBA:  Speculative.
20  BY MS. MURCH:
21     Q.  And so the product you found out in April, May
22  2000 was going to be scrapped, and you decided to leave
23  because?
24     MR. IBA:  Objection, asked and answered.
25  BY MS. MURCH:

Page 76

1     Q.  You can answer.
2     A.  I just thought my product is gone, I need to
3  get out of here.
4     Q.  What can you tell me about the merger between
5  M.C.I. and Intermedia --
6     MR. IBA:  Objection, calls --
7  BY MS. MURCH:
8     Q.  -- and your involvement?
9     MR. IBA:  It calls for a narrative answer.
10  BY MS. MURCH:
11     Q.  Mr. Renforth, did you do anything in
12  connection with the M.C.I./Intermedia merger?
13     A.  No.
14     Q.  Were you aware of the M.C.I./Intermedia
15  merger?
16     A.  I was aware that there were negotiations.
17     Q.  And what was your knowledge of those
18  negotiations?
19     A.  Initially was that M.C.I. was doing due
20  diligence or asked for due diligence from Intermedia.
21  And the word that we got as employees was their initial
22  interest was in just the Digex Properties.
23     Q.  And Digex, D-I-G- --
24     A.  D-I-G-E-X.
25     Q.  And was Digex related to the IntermediaOne

Page 77

1  product?
2     A.  They provided the transport, the -- the
3  connectability between all those cities, they provided
4  the backbone, transport facilities through digital
5  medium.
6     Q.  At the time, did you feel that the
7  M.C.I./Intermedia merger would have had an impact on
8  IntermediaOne?
9     A.  No.
10     Q.  And why not?
11     A.  Because we were a local services provider and,
12  again, their interest, what we heard from our -- from
13  our other employees was that they were interested in
14  just Digex, not the Intermedia products or services.
15     Q.  So Intermedia products and services were
16  independent of the Digex?
17     A.  Independent from the Digex Property, sure.
18     Q.  I'm just going to skip around for one quick
19  moment.  We had talked about gross margins for the
20  IntermediaOne product.  And I think you said it was
21  roughly 90 to a hundred percent?  Is that accurate?
22     A.  Unified Messaging was.
23     Q.  Yes.  Um-hum (affirmative).
24     A.  Yes.
25     Q.  And was it always geared towards 90 to a

ESQUIRE DEPOSITION SERVICES, LLC - CHICAGO
312.782.8087  800.708.8087  FAX: 312.704.4950

b0c218e2-9fb7-469b-8cdf-a89f6c02973

JAMES RENFORTH        VOLUME I        NOVEMBER 17, 2006

Page 82

1  manager when I left. And I gave him access to those
2  files with my I.D. and password.
3      Q.  So when you left, did you throw anything away?
4      A.  No.
5      Q.  Did you delete anything from your hard drive
6  when you left?
7      A.  No.
8      Q.  Did you delete any e-mail?
9      A.  No.
10     Q.  Did you throw away any hard-copy documents?
11     A.  No.
12     Q.  So all of the information relating to
13 IntermediaOne and Unified Messaging, when you left
14 Intermedia, was kept intact by you?
15     A.  Yes.
16         MS. MURCH:  I'm just going to take a quick
17     five-minute break.
18         THE VIDEOGRAPHER:  Going off the record at
19     11:38.
20         (Recess.)
21         THE VIDEOGRAPHER:  This is tape number three
22     of the continued videotaped deposition of James
23     Renforth. We're back on the record at 11:48.
24 BY MS. MURCH:
25     Q.  Now, Mr. Renforth, can you tell me when

Page 83

1  approximately your last day of employment was with
2  Intermedia?
3      A.  Yes.  June 27th, 2001.
4      Q.  Now, do you know if Intermedia had a document
5  retention policy?  A written document retention policy?
6      A.  I don't remember seeing one, but I know it was
7  verbally stated throughout the company.
8      Q.  And what was that verbal statement?
9      A.  Document, document, document.  I can hear my
10 director saying it.
11     Q.  And do you know if there was a periodic
12 destruction of records by Intermedia?
13     A.  Periodic destruction?
14     Q.  Um-hum (affirmative).  For example, was there
15 a schedule where documents would be destroyed monthly or
16 yearly?
17     A.  Not that I know of.
18     Q.  Do you know if other people who were working
19 on the IntermediaOne product put documents on the K
20 drive?
21     A.  Yes.
22     Q.  And who had access to the K drive?
23     A.  The team -- the team members, their directors,
24 immediate supervisors, and the executive staff.  And I
25 know they were password protected, so not just anybody

Page 84

1  could get in there.
2      Q.  And do you know what departments shared the K
3  drive?
4      A.  Some.  That would have been product
5  management, product marketing.
6      Q.  And so would all -- oh, go ahead.
7      A.  And I don't know who else.
8      Q.  And so would all information, say, for
9  example, related to a launch, whether it be Unified
10 Voice or IntermediaOne, would that have been stored on
11 the K drive?
12     A.  Yes.
13         MS. MURCH:  I don't have any other questions
14     for you right now.
15         THE DEPONENT:  You're not -- you're done?
16         MS. MURCH:  I -- I think so.  Knock wood.  I'm
17     going to turn it over to Mr. Iba.
18         THE DEPONENT:  Thank you.
19         MR. JUNG:  All right.
20             CROSS-EXAMINATION
21 BY MR. IBA:
22     Q.  Mr. Renforth, I want to just take us back
23 quickly and talk a little bit about Intermedia as a
24 company.
25     A.  Um-hum (affirmative).

Page 85

1      Q.  What did Intermedia do?
2      A.  Intermedia was a competitive local exchange
3  carrier, a CLEC.
4      Q.  And how do CLEC's work?
5      A.  CLEC's, at that time, when I joined them, they
6  resold local resale.
7      Q.  So they would go to the incumbent local
8  exchange carrier, buy time on the local company's
9  facilities, and then resell that time, is that --
10     A.  That, plus take ownership and responsibility
11 for specific end-user customers who had agreed to sign
12 up with that CLEC.
13         In other words, nothing would change, the
14 infrastructure would not change in the way a customer
15 was connected to the local incumbent's facilities.  The
16 only thing that would change is the billing.
17         The billing from the incumbent would move from
18 billing end-user customer to billing the CLEC, then the
19 CLEC would bill the end-user customer with a seven
20 percent gross margin built in.
21     Q.  So if -- I can't remember where Intermedia had
22 switches.  Did they have switches down here in Florida?
23     A.  Yes.
24     Q.  All right.  What city?
25     A.  Tampa.

22 (Pages 82 to 85)

JAMES RENFORTH        VOLUME I I        NOVEMBER 17, 2006

Page 256

1    Q.   So is it fair to say IntermediaOne was an
2  evolving product with enhancements going forward?
3    A.   Yes. Absolutely.
4    Q.   Mr. Renforth, I remember you testifying about
5  an E.D.I. transport upgrade?
6    A.   Yes.
7    Q.   Could you tell me what that is?  I don't know
8  that I followed you on that.
9    A.   E.D.I. stands for electronic data information,
10 or data interface.  That was the automated billing
11 system that we wanted to put in place between EffectNet
12 and Intermedia.  Where before I said we received both a
13 paper copy and a C.D. with the billing data.
14   Q.   Um-hum (affirmative).
15   A.   We wanted to be able to upgrade that, so we
16 had immediate and real time of day updates to the
17 system.
18   Q.   And would the E.D.I. have been part of the
19 enhancements to the IntermediaOne product?
20   A.   Yes.
21   Q.   Now, I believe earlier you testified that you
22 left Intermedia in June 2001, but based on the
23 correspondence you see today, it would have been in July
24 2001; is that accurate?
25   A.   It was -- that's correct, July 27th.

Page 257

1    Q.   Now, Mr. Renforth, I want to get back to your
2  reasons for leaving Intermedia.  You had mentioned that
3  you thought there was a meeting where it was announced,
4  and I may be wrong, so correct me, I thought it was
5  maybe the April, May 2001 time frame where there was an
6  announcement where the IntermediaOne product was going
7  to be scrapped.  And you were going to leave as a result
8  of your product being scrapped.
9         And today we've seen some correspondence that
10 talks about the IntermediaOne product that postdates
11 that.
12        Can you kind of square away your recollection
13 as to when that announcement was made where the product
14 was going to be scrapped?  Do you remember hearing that?
15 And how that kind of fits in with the -- for example,
16 the exhibits that Mr. Iba gave?
17   A.   That announcement was made to us through our
18 V.P., Kathy Victory, through our direct supervisors,
19 that the focus, Intermedia's focus was shifting back to
20 the single T product, and that the IntermediaOne product
21 was not going to be our primary objective for sales.
22        And that didn't mean that there was not going
23 to be any sales, because there were still some in the
24 process.  What I saw that was, what I saw that as being
25 was that the product was going to be scrapped, and I

Page 258

1  being the product manager, you know, you see the
2  handwriting on the wall.
3         So I thought, okay, this -- this shows a lack
4  of confidence on the company's part for product that I'm
5  managing.  So, you know, I just felt that my expertise
6  and my abilities were in danger.
7         So rather than waiting for the ax to fall, I
8  said, hey, I've got to get out of here.
9    Q.   And can you tell me a little bit more about
10 that conversation that Kathy Victory made the
11 announcement?  Was that common knowledge, or was that
12 just disseminated to you, or --
13   A.   I don't know where else it had gone in the
14 company, but I know it came from her, which meant that
15 it had to have come from some agreement that the
16 executive committee -- or the executive staff had come
17 to.
18        And it was -- I don't know who else knew it,
19 at that time whether we were the first to know it or
20 whether we were the last to know it.  But I know the
21 statement was made, and it was quite nonchalant.
22 Actually, it was just an agenda item in the meeting,
23 IntermediaOne was gone, single T is the primary focus.
24        And we were just all very much in shock.  We
25 all just said, "Well, what do you mean?  Why are we

Page 259

1  doing this?"  And the reason, again, as I stated before,
2  was, as she said, the back office can't keep up.
3    Q.   And when she told you Intermedia was gone, why
4  did Intermedia continue to sell the IntermediaOne
5  product?
6    A.   Because it was still part and parcel of the
7  products that we sold.
8    Q.   Did you construe that to mean while you might
9  continue to sell it now, it might be scrapped in the
10 near future entirely?  Or how did you --
11   A.   And, yeah, that was just my thoughts.  My
12 thoughts were, and my instinct told me if -- if our
13 focus is now off the IntermediaOne product, it's -- it's
14 downhill from here.
15   Q.   Okay, Mr. Renforth, I'm going to ask you to go
16 to Exhibit 27.
17   A.   Got it.
18   Q.   Now, if I recall your testimony, you said that
19 these requirement -- the -- for example, the attachment
20 to be 27, the second page, I believe you said that these
21 were requirements, not forecasts?  What did you mean by
22 that?
23   A.   These were requirements that we had put into
24 place to meet that 10,000 bogey by the end of the first
25 year of the agreement.  It was not our forecast.  Our

22 (Pages 256 to 259)

fa2bd518-aeb9-45ff-93ed-bef8ede28960

A.02975

Effectnet - Conf Call Notes 711
From: Kerrigan, Jack G. (EXCH) [JGKerrigan@intermedia.com]
Sent: Wednesday, July 11, 2001 1:15 PM
To: 'Javid Freeman'; Ireland, Glenn T. (EXCH); Baughman, Sherrie (EXCH);
Serdinak, J. Donna [EXCH]
Cc: Renforth, Jim [EXCH]
Subject: Effectnet - Conf Call Notes 7/11

Importance: High

All,  Here is a summary of the items we covered and the decisions made:

1.  Notification Back on "Closed Accounts"  submissions:
     a)  When closed accounts are submitted to Effectnet immediate
acknowledgement is recevd.
     b)  Effectnet is to provide an email back to the email submitting the
Closed Accounts email within 24
          hours. This is not happening.  Javid will have Debbie contact Jack
to bring closure.

2.  When will CDR file transmission officially begin:
     a)  According to Donna Serdinak, transmission is already underway.
     b)  CDRs on the files received go back to August 2000.  Should these
files be processed?
          -  Jack, Sherrie and Donna will meet to determine when to begin
procesing the CDR files.

3.  When will we receive an invoice to proces:
     a)  Javid has committed to arranging to have the invoice provided to
Sherrie Baughman by Monday,
          July 16.

4.  When will mulitple accounts entry be available:
     a)  A new design is being considered to handle this capability.  Javid
will send an email to Jack
          identifying the details and a potential date for when this
capability can be ready for testing.

5.  "Warm Tranover" process and followup:
     a)  Glenn Ireland and Debbie (Effectnet) have been discussion this
topic.
     b)  Glen will provide the details of how the process will work when he
and Debbie have completed their
          discussions.

Increase in account volumes is not anticipated to begin before August 1,
2001.

Jack

Exhibit B

Page 1

.S    279

A 02976

Hearing Date and Time: December 6, 2005, at 10:00 A.M. Eastern Time
Response Deadline:  November 18, at 4:00 P.M. Eastern Time
Reply Deadline:  December 2, 2005, at 4:00 P.M. Eastern Time

STINSON MORRISON HECKER LLP

Robert L. Driscoll, Esq.
Allison M. Murdock, Esq.
Jodi M. Hoss, Esq.
1201 Walnut Street
Kansas City, MO  64106
Telephone:  (816) 842-8600
Facsimile:  (816) 691-3495
Attorneys for Reorganized Debtors

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

In re                                          :
                                               :      Chapter 11 Case No. 02-13533 (AJG)
WORLDCOM, INC., et al.,                        :
                                               :      (Jointly Administered)
                        Debtors.               :
--------------------------------------------------------x

## WORLDCOM'S MOTION FOR SUMMARY JUDGMENT AGAINST PARUS HOLDINGS, INC., SUCCESSOR-BY-MERGER TO EFFECTNET, INC. AND EFFECTNET, LLC

Pursuant to Fed. R. Civ. P. 56, Fed. R. Bankr. P. 7056, and Fed. R. Bankr. P. 9014, the

above-captioned reorganized debtors ("Reorganized Debtors" or "WorldCom") move for

summary judgment against Parus Holdings, Inc., successor-by-merger to EffectNet, Inc. and

EffectNet, LLC ("Parus Holdings" or "Claimant") on Claim No. 11242 (replacing 9291) against

MCI WorldCom Communications, Inc. ("WorldCom") and Claim No. 11173 (replacing 9293)

against Intermedia Communications, Inc. ("Intermedia").

WorldCom's Statement of Material Facts as to Which There Are No Genuine Issues to be

Tried is annexed hereto as Schedule I.  In addition, this motion is supported by WorldCom's

Memorandum of Law, which will be filed contemporaneously with this Motion, and by the

Exhibit C

exhibits contained in WorldCom's Appendix of Exhibits, which will be provided as an

attachment to this Motion.

Respectfully submitted,

STINSON MORRISON HECKER LLP

By:    *s/Robert L. Driscoll*       
          Robert L. Driscoll, Esq.
          Allison M. Murdock, Esq.
          Jodi M. Hoss, Esq.
          1201 Walnut Street, Suite 2800
          Kansas City, MO  64106
          (816) 842-8600 – Telephone
          (816) 691-3495 – Facsimile

ATTORNEYS FOR REORGANIZED DEBTORS

## CERTIFICATE OF SERVICE

      I hereby certify that on October 18, 2005, I electronically filed the foregoing with the Clerk of the Bankruptcy Court using the CM/ECF system which sent notification of such filing to all parties receiving electronic means.

    *s/Robert L. Driscoll*       
    Attorney for Reorganized Debtors

A 02978

**Schedule I**
**WorldCom's Statement of Material Facts**
**As to Which There Are No Genuine Issues To Be Tried**

**The Contracting Parties and the Contract at Issue**

1.      On November 20, 2000, EffectNet LLC, a Nevada limited liability company with its principal place of business in Phoenix, Arizona ("EffectNet") and Intermedia Communications, Inc., a Delaware corporation with its principal place of business in Florida ("Intermedia") entered into a Unified Communications Services General Agreement (the "UC Contract").  Ex. A, UC Contract.

2.      Parus Holdings, Inc. is the successor in interest to EffectNet.  Ex. B, Response and Opposition of Parus Holdings, Inc. to Debtors' Objection to Proofs of Claim Filed by EffectNet, Inc. ("Parus Opposition") at p. 1. [1]

3.      On July 1, 2001, WorldCom, Inc., a Georgia corporation with its headquarters in Clinton, Mississippi ("WorldCom"), acquired Intermedia pursuant to the merger of a wholly owned subsidiary of WorldCom with and into Intermedia.  Findings of Fact and Conclusions of Law (1) Approving (i) Substantive Consolidation and (ii) the Settlements Under Debtors' Modified Second Amended Joint Plan of Reorganization, dated October 21, 2003, and (2) Confirming Debtors' Modified Second Amended Joint Plan of Reorganization, dated October 21, 2003 (Doc. #9681) at p. 34 § II.C(i); Ex. B, Parus Opposition at p. 6 ¶ 14.

---

[1]      For the purposes of this motion only, WorldCom accepts as true the referenced statements of fact made in the Parus Opposition.  WorldCom reserves the right to contest any and all statements contained in the Parus Opposition in the event the Court determines that a trial is necessary.

**A 02979**

4.      After the acquisition, WorldCom controlled Intermedia and EffectNet was advised that WorldCom would be overseeing all projects relating to the UC Contract.  Ex. B, Parus Opposition at p. 22, ¶ 79.

5.      Exhibit A is a true copy of the November 20, 2000, UC Contract between EffectNet and Intermedia.  Ex. B, Parus Opposition at p. 3, ¶ 3.

6.      The UC Contract provides that its interpretation will be in accordance with the laws of the State of Arizona.  Ex. A, UC Contract at p. 10, § 12.3.

7.      The UC Contract provides that the parties to the contract shall not be liable to each other

> FOR ANY INCIDENTAL, INDIRECT, SPECIAL, PUNITIVE, CONSEQUENTIAL OR SIMILAR DAMAGES OF ANY KIND INCLUDING WITHOUT LIMITATION, LOSS OF PROFITS, LOSS OF BUSINESS OR INTERRUPTION OF BUSINESS, WHETHER SUCH LIABILITY IS PREDICATED ON CONTRACT, STRICT LIABILITY OR ANY OTHER THEORY WITHOUT REGARD TO WHETHER SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

Ex. A, UC Contract at p. 10, § 11.

**B.      The Actions of Intermedia**

      **Before Acquisition by WorldCom**

8.      On September 5, 2000, WorldCom and Intermedia entered into a merger agreement.  Ex. C, Final Judgment at 5, <u>United States v. WorldCom, Inc., et al.</u>, Civ. Act. No. 1:00CV02789 (RWR) (D.D.C.).

9.      On November 17, 2000, the United States Department of Justice filed an action against WorldCom and Intermedia under the Clayton Act.  <u>United States v. WorldCom, Inc., et al.</u>, Civ. Act. No. 1:00CV02789 (RWR) (D.D.C.).

10.      On November 20, 2000, Intermedia paid $175,000 to EffectNet as a contract performance deposit.  <u>See</u> Ex. A, UC Contract at p. 6, § 4.5.1.

A 02980

11.     On June 26, 2001, the United States District Court for the District of Columbia ordered and directed WorldCom and Intermedia to "divest the Intermedia Assets as an ongoing, viable business" within 180 days from the closing of the merger.  Ex. C, Final Judgment at 5-6, Doc. No. 12 in United States v. WorldCom, Inc., Civ. Act. No. 1:00CV02789 (RWR).

**After Acquisition by WorldCom**

12.     After July 1, 2001, Intermedia's project manager for the UC Contract was terminated and Intermedia's sales force was disbanded through terminations of employment or reassignment to other projects.  Ex. B, Parus Opposition at p. 6, ¶ 16.

13.     In September, 2001, Intermedia cancelled 682 of the existing 729 subscriptions for services to be provided under the UC Contract.  Id. at p. 7, ¶ 17.

14.     On or about February 6, 2002, EffectNet invoiced Intermedia for payments under the UC Contract.  Intermedia did not pay those invoices.  Ex. D, March 12, 2002 letter from Robert C. McConnell, General Counsel of EffectNet, to Rich Black of Intermedia at p. 2; Ex. B, Parus Opposition at p. 7, ¶ 18.

15.     On or about March 1, 2002, Intermedia requested cancellation of all remaining services under the UC Contract.  Ex. B, Parus Opposition at pp. 6-7, ¶ 17.

**C.     EffectNet's Termination of the UC Contract**

16.     By letter dated March 12, 2002, EffectNet gave notice of default to Intermedia under Section 5.2 of the UC Contract and notice of EffectNet's intent to strictly enforce all provisions of default in the UC Contract, including the contract termination provision.  Ex. D, March 12, 2002 letter from Robert C. McConnell, General Counsel of EffectNet, to Rich Black of Intermedia.

17.     By letter dated March 25, 2002, EffectNet confirmed its March 12, 2002 notice of default to Intermedia under Section 5.2 of the UC Contract, confirmed its intent to strictly

A 02981

enforce the default provisions of the UC Contract, including the contract termination provision, and advised that the UC Contract would be terminated on April 12, 2002 if Intermedia had not cured its defaults.  Ex. E, March 25, 2002 letter from Robert C. McConnell, General Counsel of EffectNet, to Brett Bacon of MCI/WorldCom.

18.     Section 5.2 of the UC Contract provides that termination of the UC Contract "shall be effective thirty (30) days after written notice to the defaulting Party if the default has not been cured within such thirty (30) day period."  Ex. A, UC Contract at p. 6, § 5.2.

19.     Intermedia did not cure its defaults under the UC Contract.  Ex. B, Parus Opposition at p. 7, ¶ 20.

20.     Section 5.3 of the UC Contract, captioned "Effect of Termination," provides that upon termination of the contract "for any reason, each Party shall remain liable for those obligations that accrued prior to the date of such termination . . ."  Ex. A, UC Contract at p. 6, § 5.3.

**D.     Unpaid Obligations Under the UC Contract that Accrued Prior to April 12, 2002**

21.     During the December 2001 billing cycle, Intermedia delivered 47 active mailboxes, EffectNet billed WorldCom $1,308.85 for the active mailboxes, and Intermedia had a volume shortfall of 9,953 mailbox subscriptions.  Ex. C, attachment to Ex. B, Parus Opposition. The volume shortfall times the basic rate of $11.45 equals $113,961.85.  See Ex. P (Pricing), attached to Ex. A, UC Contract.

22.     During the January 2002 billing cycle, Intermedia delivered 47 active mailboxes, EffectNet billed WorldCom $1,308.85 for the active mailboxes and Intermedia had a volume shortfall of 9,953 mailbox subscriptions.  Ex. D, attachment to Ex. B, Parus Opposition.  The volume shortfall times the basic rate of $11.45 equals $113,961.85.  See Ex. P (Pricing), attached to Ex. A, UC Contract.

A 02982

23.     During the February 2002 billing cycle, Intermedia delivered 42 active mailboxes, EffectNet billed WorldCom $1,381.80 for the active mailboxes, and Intermedia had a volume shortfall of 9,958 mailbox subscriptions.  Ex. E, attachment to Ex. B, Parus Opposition.  The volume shortfall times the basic rate of $11.45 equals $114,019.10.  See Ex. P (Pricing), attached to Ex. A, UC Contract.

24.     The minimum commitment for the March 2002 billing cycle was 10,000.  Ex. A, UC Contract § 2.12.  The minimum commitment times the basic rate of $11.45 equals $114,500.00.  See Ex. P (Pricing), attached to Ex. A, UC Contract.

25.     The total volume shortfall for the billing cycles of December 2001, and January 2002 through March 2002, multiplied by the $11.45 per month basic rate specified in the UC Contract, plus amounts due for active mailboxes, equals $460,442.30.  Undisputed Facts ¶¶ 21-24; Ex. P (Pricing), attached to Ex. A, UC Contract.

**CERTIFICATE OF COUNSEL**

I certify that I am authorized to and do, on behalf of Reorganized Debtors, stipulate to the facts stated above in paragraphs 21 through 25.


         s/Robert L. Driscoll
         Robert L. Driscoll
         ATTORNEY FOR REORGANIZED DEBTORS

A 02983

STINSON MORRISON HECKER LLP
Mark A. Shaiken, Esq.
Robert L. Driscoll, Esq.
Allison M. Murdock, Esq.
1201 Walnut Street
Kansas City, MO 64106
Telephone: (816) 842-8600
Facsimile: (816) 691-3495
Attorneys for Debtors

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

In re                                              :

                                                   :        Chapter 11 Case No. 02-13533 (AJG)

WORLDCOM, INC., *et al.*,                          :

                                                   :        (Jointly Administered)

          Debtors.                                 :

------------------------------------------------------x

## DEBTORS' OBJECTIONS AND RESPONSES TO CLAIMANT PARUS HOLDINGS, INC.'S FIRST SET OF REQUESTS FOR ADMISSION

Debtors submit the following objections and responses to Claimant Parus Holdings, Inc.'s

First Request for Admission to Debtors ("Requests for Admission").

### Objections to Claimant's Definitions

1.    Pursuant to S.D.N.Y. Bankr. R. 7026-1 and S.D.N.Y. R. 26.3, Debtors object to

Claimant's definitions of the terms "Communication(s)," "Document(s)," and "Person" because

they are broader than the uniform definitions established in this Court's local rules. Debtors will

apply the definitions established in this Court's local rules.

2.    Debtors object to Claimant's definition of "Claimant" as overbroad because it

includes entities and individuals that do not assert claims in this proceeding. Debtors will

construe "Claimant" to mean Parus Holdings, Inc., successor-by-merger to EffectNet, LLC.

Exhibit D

A 02984