| Date | Bates Range | Author | Recipient | CC | Description | Privilege |
|------|-------------|--------|-----------|-----|-------------|-----------|
| 10/17/04 | | Roland Behm | **Bruce Borghardt** | | E-mail to in-house counsel re: letter to Intermedia employees with attorney handwritten notes and attached report. | Attorney-Client Communication Attorney Work Product |
| 08/20/02 | | David Stoughton | **Michele Kloeppel** | | Fax to in-house counsel re: Intermedia Communications officers with counsel's handwritten notes. | Attorney-Client Communication Attorney Work Product |
| 05/21/01 | MCIWC007387-7396 | Mary Campanola | **Michael Drayer,** Kathy Victory | Chris Gaffney, Bill Rochfort, Rick Buyens | E-mail to in-house counsel and others re: Merchant Wired – LD Voice with proposed edits to draft of Addendum. | Attorney-Client Communication |
| 04/03/01 | MCIWC007404-7405 | James Coldren | **Michael Drayer,** Sherrie Butler, Chris Gaffney, Michael Dunn | Jim Renforth | E-mail to in-house counsel and others re: Merchant Wired/Voice and IntermediaOne product. | Attorney-Client Communication |
| 04/03/01 | MCIWC007406-7408 | **Michael Drayer** | Chris Gaffney, Michael Dunn, Ken Nordine, Suzanne Schwallie | Cheryl Mellon, Sherrie Butler, Jim Renforth, Gianni Walkey, Kathy Victory, Bill Rochfort, Dennis Fredrickson, Pamela Campodonico | E-mail from in-house counsel providing legal advice re: Merchant Wired/Voice with attached document that includes revised terms requested by counsel. | Attorney-Client Communication |

38

A 03065

| Date | Bates Range | Author | Recipient | CC | Description | Privilege |
|---|---|---|---|---|---|---|
| 04/02/01 | MCIWC007409-7411 | **Michael Drayer** | Jim Renforth | Cheryl Mellon, Sherrie Butler, Gianni Walkey | E-mail from in-house counsel providing legal advice re: Merchant Wired with attached document reflecting counsel's revisions. | Attorney-Client Communication |
| 03/28/01 | MCIWC007414-7415 | **Michael Drayer** | Ken Nordine | Bill Rochfort, Suzanne Schwallie | E-mail from in-house counsel re: Merchant Wired Changes. | Attorney-Client Communication |
| 03/22/01 | MCIWC007416-7418 | **Michael Drayer** | Kathy Victory, Cheryl Mellon, Jack Lee, Sherrie Butler | Dennis Fredrickson, Bill Rochfort, Suzanne Schwallie, Michael Dunn, Chris Gaffney, Ken Nordine | E-mail from in-house counsel providing legal advice re: Merchant Wired MSA Revisions with attached draft of addendum reflecting counsel's revisions. | Attorney-Client Communication<br><br>Attorney Work Product |
| 04/17/01 | Not numbered | **Rob Manning** | Chip Yorkgifts | | Memo providing legal advice re: follow-up questions from the Department of Justice | Attorney-Client Communication |
| 09/10/01 | Not numbered | **Prince Jenkins** | Michael Randels | | E-mail providing legal advice re: regulatory issues for WorldCom | Attorney-Client Communication |
| 09/02/05 | MCIW029866 | Michael Randels | **Donald Ramsay** | | E-mail sending documents re: headcount due diligence. Document attached to e-mail has been produced. | Attorney-Client Communication |

DB02/048629 0094_0019/6733688.2

A 03066

| Date | Bates Range | Author | Recipient | CC | Description | Privilege |
|---|---|---|---|---|---|---|
| 09/02/05 | MCIW029869 | Michael Randels | **Donald Ramsay** | | E-mail forwarding to counsel information re: Product Weekly Integration Updates. Information sent with e-mail has been produced. | Attorney-Client Communication |
| 09/02/05 | MCIW029873 | Michael Randels | **Donald Ramsay** | | E-mail forwarding information re: Sales – Weekly integration issues, updates and changes. Information attached to e-mail has been produced. | Attorney-Client Communication |
| 09/02/05 | MCIW029876 | Michael Randels | **Donald Ramsay** | | E-mail forwarding information re: Sales Final-Update. Information attached to e-mail has been produced. | Attorney-Client Communication |
| 09/02/05 | MCIW029878 | Michael Randels | **Donald Ramsay** | | E-mail forwarding information re: 10/24/ Wednesday Report: P1-P16. Information attached to e-mail has been produced. | Attorney-Client Communication |
| 09/02/05 | MCIW029880 | Michael Randels | **Donald Ramsay** | | E-mail forwarding information re: Intermedia RIF date report. Attached information has been produced. | Attorney-Client Communication |

40

A 03067

| Date | Bates Range | Author | Recipient | CC | Description | Privilege |
|------|-------------|--------|-----------|----|-----|-----------|
| 09/02/05 | MCIW030054 | Michael Randels | Donald Ramsay | | E-mail forwarding Master RIF list. Master list has been produced. | Attorney-Client Communication |
| 09/02/05 | MCIW030109 | Michael Randels | Donald Ramsay | | E-mail forwarding Financial Spreadsheet. Financial Spreadsheet has been produced. | Attorney-Client Communication |
| 09/02/05 | MCIW030113 | Michael Randels | Donald Ramsay | | E-mail forwarding Voice Product Strategy Plans. Information attached to e-mail has been produced. | Attorney-Client Communication |
| 09/02/05 | MCIW030138 | Michael Randels | Donald Ramsay | | E-mail forwarding Integration Planning – Presentations. Integration Planning Presentations have been produced. | Attorney-Client Communication |
| 09/02/05 | MCIW030150 | Michael Randels | Donald Ramsay | | E-mail forwarding document re: 7/20/00 presentation. Information attached to e-mail has been produced. | Attorney-Client Communication |
| 09/02/05 | MCI030177 | Michael Randels | Donald Ramsay | | E-mail forwarding document re: Intermedia's HRM's PeopleSoft is merging with WCOM's HRMS PeopleSoft. Document sent with e-mail has been produced. | Attorney-Client Communication |

41

A 03068

| Date | Bates Range | Author | Recipient | CC | Description | Privilege |
|------|-------------|--------|-----------|----|-------------|-----------|
| 09/02/05 | MCIW030179 | Michael Randels | **Donald Ramsay** | | E-mail forwarding document re: ICIX Headcount slides. Document attached to e-mail has been produced. | Attorney-Client Communication |
| 09/10/02 | Not Numbered | **Jeff Hsu** | **Megan Lawless** | | Cover sheet regarding Webley Systems (attached document produced at Bates Nos. MCIWC030392-030463) | Attorney-Client Communication  Attorney Work Product |

42

A 03069



10230 S. 50th Place
Phoenix, AZ 85044
Office: 602.296.3300
Fax: 602.296.3311

Writer's Direct No.
(888)-387-3481

March 12, 2002

**Via Federal Express Mail**
Mr. Rich Black
Senior Vice President
of Sales and Marketing
One Intermedia Way
Tampa, Florida 33647

Re: Unified Communications General Agreement, dated November 20, 2000, by and between EffectNet, Inc. (formerly EffectNet LLC) ("**EffectNet**") and Intermedia Communications, Inc. ("**Intermedia**") (the "**Agreement**")

Dear Mr. Black:

Pursuant to the terms of the referenced Agreement, Intermedia agreed to market the UC Services to Intermedia customers and end users, including wholesale and retail customers. Intermedia agreed to provide periodic forecasts of expected mailbox activations, the first of such forecasts to be provided on or before November 30, 2000. Intermedia also agreed to deliver a minimum number of current active subscribers on or before certain dates up to a minimum of 10,000 such subscribers on or before December 18, 2001 and at the end of each calendar month thereafter for the Term of the Agreement. Intermedia also agreed to pay the agreed pricing for activated mailboxes pursuant to the Agreement. Intermedia further agreed to pay all invoices within 15 calendar days of receipt. Intermedia also agreed to pay a Reconciliation Payment as of the Ramp Date and the end of each calendar month thereafter during the Term. On February 12, 2002, Intermedia received an invoice for the pricing applicable to subscribers and for the Reconciliation Payment with respect to the

Exhibit F

A 03070

Mr. Rich Black
Page 2 of 3
March 12, 2002

month of December 2001 (including the Ramp Date) and the month of January 2002.  Each of the forgoing obligations has not been fulfilled by Intermedia as required by the Agreement ("**Intermedia Defaults**") and each such obligation is a material obligation of Intermedia under the Agreement.  The forgoing is not intended to be a full and complete statement of all material obligations under the Agreement that remain unfulfilled by Intermedia.  Capitalized terms used in this letter without definition have the meaning assigned to such term in the Agreement.

EffectNet hereby gives Intermedia written notice of default under Section 5.2 of the Agreement with respect to the Intermedia Defaults and EffectNet further hereby gives Intermedia written notice that EffectNet may (i) terminate the Agreement under Section 5.2 due to default effective thirty (30) days after this written notice if each of the Intermedia Defaults has not been cured within such thirty (30) day period, and (ii) further exercise all available remedies pursuant to the terms of the Agreement and as otherwise may be available at law or in equity.

EffectNet hereby demands immediate payment, in accordance with the terms of the Agreement, of the amounts itemized below:

| | |
|---|---|
| Total Amount Past Due on invoice 1010, dated February 6, 2002, and delivered to Intermedia on February 12, 2002 (for the December 2001 billing cycle): | $274,021.05 |
| Total Amount Past Due on invoice 1011, dated February 6, 2002, and delivered to Intermedia on February 12, 2002 (for the January 2002 billing cycle): | $274,066.20 |
| **Required Payment:** | $548,087.25 |

The total amount past due is as of March 12, 2002.  EffectNet gives notice that all provisions of default will be strictly enforced.  As indicated above, Intermedia has until the expiration of thirty (30) days after this written notice to remit the Required Payment.  The Required Payment should be made payable, and delivered by wire transfer to Wells Fargo Bank, Tempe, Arizona; ABA Routing Number 1221-05278; EffectNet Operations Account; Account Number 046-4657220; attn: Stephanie Jordan at 480-644-8396.

Mr. Rich Black
Page 3 of 3
March 12, 2002

Intermedia should also take notice of the Due Date of invoice #1018, dated March 5, 2002, in the amount of $279,757.02 and delivered to Intermedia on March 6, 2002. Payment of this amount is due on or before March 21, 2002.

If Intermedia fails to cure the Intermedia Defaults and if EffectNet terminates the Agreement as aforesaid, EffectNet may claim damages for all amounts due pursuant to the Agreement, including, without limitation, the following:

| | |
|---|---|
| Required Payment | $   548,087.25 |
| Invoice # 1018 | $   279,757.02 |
| Reconciliation Payments | |
| for the unexpired Term | $5,662,667.58 |
| Forfeiture of Deposit | $   175,000.00 |

Nothing in this letter is intended to be a waiver or release of any rights or remedies, or an election thereof, that EffectNet has under the Agreement or applicable law, and all such rights and remedies are hereby expressly reserved in their entirety.

Very truly yours,

Robert C. McConnell
General Counsel

A 03072

SCANNED

JAN 7 2005

 *EffectNet*™

One Parkway North
Fourth Floor North
Deerfield, Illinois 60015
Office: 888.444.6400

Writer's Direct No.
(888)-387-3481

March 25, 2002

**Via Federal Express Mail**
Mr. Brett Bacon
MCI/WorldCom
1945 Old Gallows Road
Vienna, Virginia 22182

Re: Unified Communications General Agreement, dated November 20, 2000, by and between EffectNet, Inc. (formerly EffectNet LLC) ("**EffectNet**") and Intermedia Communications, Inc. ("**Intermedia**") (the "**Agreement**")

Dear Mr. Bacon:

EffectNet, by letter to the attention of Mr. Rich Black, dated March 12, 2002, issued a written notice of default under Section 5.2 of the Agreement with respect to the Intermedia Defaults, as defined in the March 12 letter (the "**March 12 Letter**"). I understand from you that Mr. Black referred the March 12 letter to your attention upon receipt. As you know, the Agreement in Section 5.2 provides that "[t]ermination due to default under this Section shall be effective thirty (30) days after written notice to the defaulting Party if the default has not been cured within such thirty (30) day period." Accordingly, the Agreement will be terminated for default by Intermedia on or about April 12, 2002 if the Intermedia Defaults are not cured prior thereto.

I spoke with you on or about March 13 and you indicated that Intermedia and/or its affiliates were interested in pursuing immediate settlement discussions. I also understand that you spoke with Mr. Jim Calandra, Chief Financial Officer of EffectNet on March 18 and that you told Mr. Calandra that Mr. Barry Zip would

Exhibit G

A 03073

Mr. Brett Bacon
Page 2 of 3
March 25, 2002

be handling settlement discussions.   Further, I understand that you told Mr.
Calandra that you would provide Mr. Zip with contact information of Mr.
Calandra.   On March 20, Mr. Calandra exchanged voice messages with you
whereby Mr. Calandra inquired of Mr. Zip and the lack of communication from
him and you responded by giving Mr. Calandra, for the first time, contact
information for Mr. Zip.  Mr. Calandra called Mr. Zip the same day, March 20, and
left a voice message for Mr. Zip requesting that Mr. Zip return the call.  Neither
Mr. Calandra nor anyone else has since received any communications from
Intermedia or its affiliates regarding this matter.   As you might imagine,
EffectNet is becoming increasingly concerned that Intermedia and/or its affiliates
fail to understand the gravity of this matter and the urgency with which it must
be addressed.

Intermedia should also take notice of the Due Date of invoice #1018, dated
March 5, 2002, in the amount of $279,757.02 and delivered to Intermedia on
March 6, 2002.  Payment of this amount was due on or before March 21, 2002.
EffectNet has not received this past due payment (the **"February Payment
Default"**).

Accordingly, EffectNet hereby gives Intermedia written notice of default under
Section 5.2 of the Agreement with respect to the February Payment Default and
EffectNet further hereby gives Intermedia written notice that EffectNet may (i)
terminate the Agreement under Section 5.2 due to default effective thirty (30)
days after this written notice (if the Agreement is not sooner terminated
pursuant to the March 12 Letter) if the February Payment Default has not been
cured within such thirty (30) day period, and (ii) further exercise all available
remedies pursuant to the terms of the Agreement and as otherwise may be
available at law or in equity.

EffectNet hereby demands immediate payment, in accordance with the terms of
the Agreement, of the amounts itemized below:

Total Amount Past Due on invoice 1010,
dated February 6, 2002, and delivered to
Intermedia on February 12, 2002
(for the December 2001 billing cycle):                    $274,021.05


Total Amount Past Due on invoice 1011,
dated February 6, 2002, and delivered to
Intermedia on February 12, 2002
(for the January 2002 billing cycle):                     $274,066.20

A 03074

Mr. Brett Bacon
Page 3 of 3
March 25, 2002

Total Amount Past Due on Invoice #1018,
dated March 5, 2002, and delivered to
Intermedia on March 6, 2002
(for the February 2002 billing cycle):                    $279,757.02

**Required Payment:**                                    $827,844.27

The total amount past due is as of March 21, 2002.  EffectNet gives notice that
all provisions of default will be strictly enforced.  As indicated above, Intermedia
has until the expiration of thirty (30) days after the March 12 Letter or this
written notice, as the case may be, to remit the Required Payment.   The
Required Payment should be made payable and delivered by wire transfer to
Wells Fargo Bank, Tempe, Arizona; ABA Routing Number 1221-05278; EffectNet
Operations Account; Account Number 046-4657220; attn: Stephanie Jordan at
480-644-8396.

If Intermedia fails to cure the Intermedia Defaults and the February Payment
Default and if the Agreement is terminated as aforesaid, EffectNet may claim
damages for all amounts due pursuant to the Agreement.

Nothing in this letter is intended to be a waiver or release of any rights or
remedies, or an election thereof, that EffectNet has under the Agreement or
applicable law, and all such rights and remedies are hereby expressly reserved in
their entirety.

Very truly yours,

Robert C. McConnell
General Counsel

CC:  Mr. Rich Black

A 03075

STINSON MORRISON HECKER LLP

Robert L. Driscoll, Esq.
Allison M. Murdock, Esq.
Mark M. Iba, Esq.
1201 Walnut Street
Kansas City, MO 64106
Telephone:    (816) 842-8600
Facsimile:    (816) 691-3495
Attorneys for Reorganized Debtors

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | |
| | : | Chapter 11 Case No. 02-13533 (AJG) |
| WORLDCOM, INC., *et al.*, | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |

--------------------------------------------------------x

## **DEBTORS' RESPONSE TO CLAIMANT'S
QUESTIONS REGARDING "LITIGATION HOLD"**

Debtors MCI WorldCom Communications, Inc. ("MCI") and Intermedia

Communications, Inc. ("Intermedia") (collectively "Debtors") provide the following responses to

the questions regarding "litigation hold" served by Claimant Parus Holdings, Inc. successor-by-

merger to EffectNet, Inc. and EffectNet, LLC ("Claimant") on November 21, 2006.[1]

### **General Objection**

Claimant's questions use the phrase "litigation hold" without explanation or definition.  If

Claimant intends "litigation hold" to be defined as set forth in Claimant's Second Request for

---

[1] Claimant served these questions after Debtors objected to subpoenas served on their former in-house litigation counsel Jeffrey Hsu and David Wachen and to a notice of deposition served on Debtors pursuant to Fed. R. Civ. P. 30(b)(6) because they sought information and documents protected from disclosure by the attorney-client privilege and/or litigation work product immunity.

DB02/048629

Exhibit H

A 03076

Production of Documents served on October 20, 2006, Debtors object to that definition. In its

second document request, Claimant defines "litigation hold" to mean "an express written or oral

instruction, order or directive to preserve and/or maintain documents." This definition fails to

acknowledge or include the concept that a duty to preserve documents does not arise until the

party is put on notice that litigation is reasonably anticipated. Even then, the obligation is limited

to a duty to preserve documents that are relevant to the anticipated claim. The existence of a

duty to take affirmative steps to preserve documents, as well as the scope and extent of any such

duty, must also be evaluated in the context of the Debtors' bankruptcy filing in which over

60,000 claims were asserted. Thus, Debtors object to Claimant's definition of "litigation hold"

because it improperly attempts to impose or assume a legal obligation to preserve certain

documents at times when no such obligation existed.

## Specific Objections and Responses

Subject to and without waiving the foregoing general objection, Debtors respond to

Claimant's questions as follows:

**Question 1.** **On what date did Intermedia and MCI believe that a possible threat of**
**litigation with EffectNet/Parus existed.**

**Answer.** Regarding the breach of contract claim, Debtors have not identified the

date on which they first believed that a possible or likely threat of litigation

existed regarding Claimant's claim that Intermedia failed to make reconciliation

payments in breach of the Unified Communications Services General Agreement

dated November 20, 2000 between Intermedia and EffectNet LLC ("UC

Contract"). Although Claimant did not bill Intermedia for reconciliation

payments under the UC Contract until February 2002, during March 2002,

2

A 03077

Claimant's General Counsel advised that if Intermedia did not make those reconciliation payments on or before April 12, 2002, the UC Contract would terminate on that date pursuant to §5.2 of the contract and that Claimant "may claim damages for all amounts due pursuant to the [UC Contract]." Intermedia did not make the reconciliation payments that Claimant claimed were due. Nevertheless, Claimant did not assert any claim for breach of contract until after WorldCom had instituted bankruptcy proceedings on July 21, 2002.

Regarding consequential damage and tort claims, Debtors had no reason to believe that there was a threat or likelihood of litigation before Claimant actually asserted such claims. This is true for three reasons. First, under section §11 of the UC Contract, the parties (which include Parus Holdings, Inc. and WorldCom as successors by merger to EffectNet LLC and Intermedia, respectively) may not assert any claims for consequential damages against each other. Second, WorldCom and Intermedia were prohibited from engaging in the type of business activities that Claimant has alleged as the bases for its consequential damage and tort claims. Specifically, from and after November 17, 2000, WorldCom and Intermedia were subject to a Hold Separate Stipulation and Order entered into with the United States Department of Justice and filed with the federal court requiring WorldCom and Intermedia to maintain the business operations of Intermedia (including its contractual relationships) separate from and uninfluenced by WorldCom. See Hold Separate Stipulation and Order dated November 17, 2000, USA v. WorldCom, Inc. & Intermedia Communications, Inc., D.D.C., Case No. 1:00CV02789 (RWR) (attached as Exhibit A). Third,

3

A 03078

Intermedia was a subsidiary of WorldCom on and after July 1, 2001. As a matter of black letter law, a subsidiary cannot conspire with its parent, nor does a claim lie for a parent interfering with its contracts, which are what Claimant has alleged. Debtors did not know (nor did they have any reason to know) that the Claimant was going to make such allegations until after Claimant filed its claim in the bankruptcy proceeding. Prior to reviewing Claimant's filing – which was one of over 60,000 claims filed in WorldCom's bankruptcy proceeding – Debtors believed that Claimant was seeking only unpaid reconciliation payments under the UC Contract raised in 2002.

**Question 2.**  **On what date did Intermedia and MCI determine that litigation with EffectNet/Parus was likely to occur or may occur.**

**Answer.**    See Debtor's response to Question No. 1.

**Question 3.**  **On what date Intermedia and MCI should have known that there was a possible threat of litigation with EffectNet/Parus.**

**Answer.**    Debtors object to this request as seeking a legal conclusion, not facts. Without waiving this objection, see Debtors' response to Question No. 1.

**Question 4.**  **Which persons at Intermedia and MCI identified the threat or possibility of litigation with EffectNet/Parus and how was such threat or possibility determined.**

**Answer.**    Debtors' in-house counsel identified the threat or possibility of litigation with Claimant concerning an alleged breach of contract after Intermedia failed to make certain reconciliation payments on or before April 12, 2002 based on correspondence from Claimant's General Counsel stating (1) that the UC Contract

4

would be terminated as of April 12, 2002 pursuant to §5.2 of that contract if
Intermedia did not make certain payments by that date and (2) that Claimant "may
claim damages for all amounts due pursuant to the [UC Contract]" if Intermedia
did not make those payments.

Debtors did not identify a threat or possibility of litigation with Claimant
concerning any consequential damages or tort claims until Claimant actually
asserted those claims in WorldCom's bankruptcy proceeding. Debtors' counsel
determined that such claims had been made by evaluating Claimant's proofs of
claim among the over 60,000 of proofs of claim filed in the bankruptcy
proceeding.

**Question 5.** **Was the possible threat of litigation with EffectNet/Parus identified as part of
the due diligence related to the MCI/Intermedia merger. If yes, on what
date, by whom, and how so.**

**Answer.**          For purposes of responding to this question, Debtors assume that the
phrase "the due diligence related to the MCI/Intermedia merger" means during the
time preceding the July 1, 2001 effective date of the MCI/Intermedia merger
during which the parties were undertaking pre-merger due diligence. Based on
that assumption, as of July 1, 2001, Intermedia had not yet failed to make the
reconciliation payments which underlie Claimant's breach of contract claim, and
Claimant had not yet made known its consequential damage or tort claims. In
addition, all of the acts that Claimant has advanced to support its consequential
damage and tort claims took place after July 1, 2001. Accordingly, Debtors do
not believe that a possible threat of litigation was identified, nor could have been

5

identified, during the due diligence period regarding either the breach of contract or consequential damage and tort claims, both of which were only asserted by Claimant after July 1, 2001. Please also see Debtors' responses to Question Nos. 1 and 4.

**Question 6.**   **On what date(s) did Intermedia and MCI implement a litigation hold relating to EffectNet/Parus.**

**Answer.**           Subject to and without waiving the general objection set forth above regarding Claimant's use of the phrase "litigation hold," Debtors respond to Question No. 6 as follows: Concerning Claimant's breach of contract claims, after being advised by Claimant that the UC Contract would terminate on April 12, 2002 and that Claimant "may claim damages for all amounts due pursuant to the [UC Contract]" unless Intermedia made certain payments under that contract on or before April 12, 2002, coupled with the fact that Intermedia did not make the demanded payments, Debtors' in-house counsel  preserved (1) correspondence from Claimant's General Counsel advising of the possible contract claim, and (2) the UC Contract itself. Further, pursuant to a Stipulation and Order entered on July 1, 2002 in the matter of S.E.C. v. WorldCom, Inc., Case No. 1:02-cv-04963-JSR (the "Order") (attached as Exhibit B), "WorldCom, its officers, agents, accountants, employees, and attorneys, and those persons in active concert or participation with them" preserved all documents "relating to, referring to or concerning any aspect of WorldCom's financial reporting obligations, public disclosures required by the federal securities laws, or any accounting matters relating to WorldCom...." To comply with this Order, WorldCom and its

6

affiliates preserved all daily backup tapes of their email systems (including Intermedia's email system), as well as non-email electronic data and paper documents encompassed by the Order.

**Question 7.**    **How was the litigation hold regarding EffectNet/Parus implemented. More specifically, (a) who initiated the litigation hold; (b) the names of all persons involved in implementing the litigation hold and their respective responsibilities; (c) how was the litigation hold communicated to persons at MCI and Intermedia; (c) [sic] what was the scope of the documents subject to the litigation hold (i.e., all documents relating to EffectNet or Parus or a subset of such information); (d) did Intermedia and MCI identify or compile a list of persons who had information that would be need to be preserved pursuant to the litigation hold and if yes, where is that list presently located; (e) which persons at MCI and Intermedia were instructed to preserve documents (both electronic and hard copy) relating to EffectNet/Parus; (f) whether such persons complied with the litigation hold; (g) how such persons complied with the litigation hold; (h) whether documents subject to the litigation hold were ever destroyed, purged, or rendered inaccessible and why such documents were destroyed, purged, or rendered inaccessible; and (i) whether any outside third parties were used to assist with implementing the litigation hold and if yes, who.**

**Answer.**    Subject to and without waiving the general objection set forth above regarding Claimant's use of the phrase "litigation hold," Debtors respond to Question No. 7 as follows:

7

A 03082

(a) The Honorable Jed S. Rakoff entered the Stipulation and Order in the matter of S.E.C. v. WorldCom, Inc., Case No. 1:02-cv-04963-JSR, on July 1, 2002, directing "WorldCom, its officers, agents, accountants, employees, and attorneys, and those persons in active concert or participation with them" to preserve all documents "relating to, referring to or concerning any aspect of WorldCom's financial reporting obligations, public disclosures required by the federal securities laws, or any accounting matters relating to WorldCom...." To comply with this Order, WorldCom and its affiliates preserved all daily backup tapes of their email systems (including Intermedia's email system). Debtors also preserved non-email electronic data encompassed by the Order, as subsequently modified or varied by agreement of the parties with regard to such data. Debtors also preserved paper documents encompassed by the Order.

In-house counsel for MCI preserved (1) correspondence from Claimant's General Counsel advising of the possible contract claim, and (2) the UC Contract. The people who would have participated in preserving these documents included in-house counsel Brett Bacon, Jeffrey Hsu, and the in-house counsel who succeeded them.

David Wachen, in-house counsel for MCI, and Sharon Stolte, Donald Ramsay, and Lawrence Bigus, attorneys with Stinson Morrison Hecker LLP, were responsible for attempting to locate documents related to the claims asserted by Claimant in WorldCom's bankruptcy proceeding, the UC Contract, the relationship between Claimant and Debtors, and the relationship between Webley Systems, Inc. ("Webley") and Debtors with regard to the September 14, 2001

8

A 03083

Master Agreement for Software Licenses ("MASL"). These individuals also were responsible for directing that such documents be preserved for purposes of litigating Claimant's claims.

(b) "WorldCom, its officers, agents, accountants, employees, and attorneys, and those persons in active concert or participation with them" were responsible for implementing the preservation of the documents identified in Judge Rakoff's July 1, 2002 Order. In addition, Jeffrey Jacobs, Associate Litigation Counsel for MCI, was responsible for distributing Judge Rakoff's July 1, 2002 Order to WorldCom's information technology employees. Julio Valdes, Bryan Miller and Joseph Falleur and employees in their respective IT-related departments were responsible for preserving the daily backup tapes of WorldCom and its affiliates' email systems (including Intermedia's email system) in response to Judge Rakoff's July 1, 2002 Order.

In-house counsel for MCI preserved (1) correspondence from Claimant's General Counsel advising of the possible contract claim, and (2) the UC Contract. The people who would have participated in preserving these documents included in-house counsel Brett Bacon, Jeffrey Hsu, and the in-house counsel who succeeded them.

Philip Hasselvander, in the Debtors' Records Information and Management department, preserved the boxes of stored paper documents of MCI and Intermedia that might relate to Claimant's claims, the UC Contract, the relationship between Claimant and Debtors, and the relationship between Webley and Debtors by delivering to counsel all boxes that counsel requested. Claimant

9

A 03084

has been provided with copies of the indices of the stored boxes of Debtors' documents related to Intermedia and with a list of the boxes from those indices that Debtors' counsel reviewed.

Julio Valdes testified at his deposition that, in addition to preserving email backup tapes as described above, he also preserved the Intermedia backup tapes for the time period identified by Debtors' counsel by delivering such backup tapes to Kroll Ontrack, which is assisting Debtors with their electronic data. The relevant time period given to Mr. Valdes by Debtors' counsel was that set forth by Claimant in its counsel's October 24, 2005 letter to Debtors' counsel.

Bryan Miller testified in his deposition that, in addition to preserving email backup tapes as described above, he also preserved MCI's POP email backup tapes for the time period identified by Debtors' counsel by delivering such backup tapes to Kroll Ontrack. The relevant time period given to Mr. Miller by Debtors' counsel was that set forth by Claimant in its counsel's October 24, 2005 letter to Debtors' counsel. Mr. Miller also preserved the earliest backup tapes available for MCI's Exchange email system by delivering such backup tapes to Kroll Ontrack. Mr. Miller also preserved the backup tapes for MCI's email system known as MCI Mail, and those tapes remain in the possession of Debtors.

Kenneth Croslin testified at his deposition that he preserved the desktop data for the persons identified by Debtors' counsel. The persons identified by Debtors' counsel were certain of the custodians identified by Claimant in its counsel's October 24, 2005 letter to Debtors' counsel.

10

A 03085

Of the remaining persons identified by Debtors' counsel who might have documents related to Claimant's claims, the UC Contract, the relationship between Claimant and Debtors, and the relationship between Webley and Debtors with regard to the MASL, only two had any such documents: Teresa Hastings and Steve Hooper. These persons preserved their documents by promptly turning them over to Debtors' counsel.

(c) In-house and outside counsel communicated orally and in writing with regard to preserving documents pursuant to Judge Rakoff's July 1, 2002 Order and to preserving documents that might relate to Claimant's claims, the UC Contract, the relationship between Claimant and Debtors, and the relationship between Webley and Debtors.

(c) [sic]  Judge Rakoff's  July 1, 2002 Order directed the preservation of all documents relating to, referring to or concerning any aspect of WorldCom's financial reporting obligations, public disclosures required by the federal securities laws, or any accounting matters relating to WorldCom.  To comply with this Order, WorldCom and its affiliates preserved all daily backup tapes of their email systems (including Intermedia's email system).  Debtors also preserved non-email electronic data encompassed by the Order, as subsequently modified or varied by agreement of the parties with regard to such data.  Debtors also preserved paper documents encompassed by the Order.

In-house and outside counsel further requested that all documents that might relate to Claimant's claims, the UC Contract, the relationship between

11

A 03086

Claimant and Debtors, and the relationship between Webley and Debtors be preserved.

Also preserved are: Intermedia backup tapes for the relevant time period set forth by Claimant in its counsel's October 24, 2005 letter to Debtors' counsel; MCI's POP email backup tapes for the relevant time period set forth by Claimant in its counsel's October 24, 2005 letter to Debtors' counsel; the earliest backup tapes available for MCI's Exchange email; the backup tapes for MCI's email system known as MCI Mail; and desktop data for certain custodians identified by Claimant in its counsel's October 24, 2005 letter to Debtors' counsel.

(d) Debtors' in-house and outside counsel identified current and former Intermedia and MCI employees who might have documents that might relate to Claimant's claims, the UC Contract, the relationship between Claimant and Debtors, and the relationship between Webley and Debtors, and information regarding other persons who might have such documents. These persons were contacted (to the extent they could be found); as more information became known, additional persons were contacted. There is no single "list" of persons contacted; however, Debtors have identified the persons contacted in response to subpart (e) below.

(e) Debtors' in-house and outside counsel contacted the following current and former Intermedia and MCI employees to determine if they had documents regarding Claimant's claims, the UC Contract, the relationship between Claimant and Debtors, and the relationship between Webley and Debtors, and to direct that any such documents be preserved:

12

A 03087

Maria Ayala – Ms. Ayala was an MCI employee when she was contacted. Ms. Ayala was involved with the collection of Webley's purchase of wholesale telecommunications services from WorldCom ("Webley's wholesale account"), but she had no connection to the MASL or Claimant. Ms. Ayala did not have and would not have had any potentially relevant documents.

Roger Beckman – Mr. Beckman was an MCI employee in the Records and Information Management ("RIM") department when he was contacted. Mr. Beckman assisted Debtors' counsel in finding indices for Debtors' stored paper documents.

Richard Black – Mr. Black was an MCI employee when he was contacted. Prior to that, Mr. Black was employed by Intermedia. Mr. Black had no responsive documents.

Fred Briggs – Mr. Briggs was an MCI employee when he was contacted. Mr. Briggs had no connection to the MASL or Claimant. Mr. Briggs did not have and would not have had any potentially relevant documents.

Thomas Brand – Mr. Brand was an MCI employee when he was contacted. Mr. Brand had no connection to the MASL or Claimant. Mr. Brand did not have and would not have had any potentially relevant documents.

Jennifer Carroll – Ms. Carroll was an MCI employee when she was contacted. Ms. Carroll had no connection to the MASL or Claimant. Ms. Carroll did not have and would not have had any potentially relevant documents.

Peter Cassidy – Mr. Cassidy was an MCI employee when he was contacted. Mr. Cassidy was involved with Webley's wholesale account, but had

13

A 03088

no connection to the MASL or Claimant. Mr. Cassidy did not have and would not have had any potentially relevant documents.

Kenneth Croslin – Claimant has deposed Mr. Croslin.

Shirley ("Beth") Denham-Dale – Ms. Denham-Dale was an MCI employee when she was contacted. She was involved with Webley's wholesale account. Ms. Denham-Dale did not have and would not have had any potentially relevant documents.

Pamela F. Dunnam – Ms. Dunnam was an MCI employee when she was contacted. Ms. Dunnam did not have and would not have had any potentially relevant documents.

Ralph Dyer – Mr. Dyer was a former Intermedia employee when he was contacted. Mr. Dyer ceased working for Intermedia in September 2001. Mr. Dyer had no responsive documents.

Joseph Falleur – Claimant has deposed Mr. Falleur.

James Faust – Mr. Faust was a former Intermedia employee when he was contacted. Mr. Faust ceased working for Intermedia in October 2001. Mr. Faust had no responsive documents.

Donald Fergus – Mr. Fergus was a former Intermedia employee when he was contacted. Mr. Fergus ceased working for Intermedia in December 2001. Mr. Fergus had no responsive documents.

Phil Hasselvander – Mr. Hasselvander was an MCI employee in the RIM department when he was contacted. Mr. Hasselvander assisted Debtors' counsel with the search for Debtors' stored paper documents.

14

A 03089

Teresa Hastings – Ms. Hastings was an MCI employee when she was contacted. Ms. Hastings provided Debtors' counsel documents related to the MASL.

Steve Hooper – Mr. Hooper was an MCI employee when he was contacted. Mr. Hooper provided Debtors' counsel with documents related to the MASL.

Mandy Johnson – Ms. Johnson was an MCI employee when she was contacted. Ms. Johnson did not have and would not have had any potentially relevant documents.

Susan Kennedy – Ms. Kennedy was an MCI employee when she was contacted. Ms. Kennedy was involved with Webley's wholesale account, but she had no connection to the MASL or Claimant. Ms. Kennedy did not have and would not have had any potentially relevant documents.

Mary Kilmartin – Ms. Kilmartin was an MCI employee when she was contacted. Ms. Kilmartin was involved with Webley's wholesale account, but she had no connection to the MASL or Claimant. Ms. Kilmartin did not have and would not have had any potentially relevant documents.

Patricia Kurlin – Ms. Kurlin was a former Intermedia employee when she was contacted. Ms. Kurlin ceased working for Intermedia in August 2001. Ms. Kurlin had no responsive documents.

James LaMantia – Claimant has deposed Mr. LaMantia.

15

A 03090

Mark Mancini – Mr. Mancini was an MCI employee when he was contacted. Mr. Mancini assisted Debtors' counsel in determining the appropriate information technology personnel to assist them in locating electronic data.

Cheryl Mellon – Ms. Mellon was a former Intermedia employee when she was contacted. Ms. Mellon ceased working for Intermedia in August 2002. Debtors' initial attempts to locate Ms. Mellon were unsuccessful. At the time Ms. Mellon was located and contacted, she did not have any potentially relevant documents. She believes that she may have downloaded data onto a CD when she left Intermedia but she cannot locate the CD.

Bryan Miller – Claimant already has deposed Mr. Miller.

Carleen Mitchell – Ms. Mitchell was an MCI employee when she was contacted. Ms. Mitchell was involved with Webley's wholesale account, but she had no connection to the MASL or Claimant. Ms. Mitchell did not have and would not have had any potentially relevant documents.

Joyce Moultry – Ms. Moultry was an MCI employee in the RIM department when she was contacted. Ms. Moultry assisted in providing information to Debtors' counsel regarding Debtors' stored documents.

Margorie Polgar – Ms. Polgar was an MCI employee when she was contacted. Ms. Polgar did not have and would not have had any potentially relevant documents.

Michael Randels – Mr. Randels was an MCI employee when he was contacted. Mr. Randels formerly worked for Intermedia. Mr. Randels assisted Debtors' counsel in locating personnel records and information.

16

**A 03091**

Pam Rask – Ms. Rask was an MCI employee when she was contacted.
Ms. Rask did not have and would not have had any potentially relevant
documents.

James Renforth – Mr. Renforth was a former Intermedia employee when
he was contacted. Claimant already has deposed Mr. Renforth.

Nasser Sheikh – Mr. Sheikh was an MCI employee when he was
contacted. Mr. Sheikh was involved with Webley's wholesale account, but he had
no connection to the MASL or Claimant. Mr. Sheikh did not have and would not
have had any potentially relevant documents.

Joe Stephens – Mr. Stephens was an MCI employee in the RIM
department when he was contacted. Mr. Stephens assisted Debtors' counsel with
the search for Debtors' stored paper documents.

Linda "Diane" Stevens – Ms. Stevens was an MCI employee when she
was contacted. Ms. Stevens was a former Intermedia employee. Ms. Stevens had
no relevant documents.

Brenda Tate – Ms. Tate was an MCI employee in the RIM department
when she was contacted. Ms. Tate assisted Debtors' counsel with the search for
Debtors' stored paper documents.

Amy Taylor – Ms. Taylor was an MCI employee in the RIM department
when she was contacted. Ms. Tate assisted Debtors' counsel with the search for
Debtors' stored paper documents.

Julio Valdes – Claimant has deposed Mr. Valdes.

17

A 03092

Kathleen Victory – Ms. Victory was a former Intermedia employee when she was contacted. Ms. Victory ceased working for Intermedia in October 2001. Ms. Victory had no relevant documents.

Barry Zipp – Mr. Zipp was an MCI employee when he was contacted. Mr. Zipp had no relevant documents.

(f) It is Debtors understanding and belief that all persons identified above complied with Debtors' direction to locate and preserve documents regarding Claimant's claims, the UC Contract, the relationship between Claimant and Debtors, and the relationship between Webley and Debtors with regard to the MASL.

(g) To the extent persons identified above had documents regarding Claimant's claims, the UC Contract, the relationship between Claimant and Debtors and the relationship between Webley and Debtors with regard to the MASL, they gave those documents to Stinson Morrison Hecker LLP for review and preservation. Paper documents were delivered to Stinson Morrison Hecker LLP and electronic data was delivered to Stinson Morrison Hecker LLP or Kroll Ontrack. The backup tapes for MCI's email system known as MCI Mail remain in Debtors' possession.

(h) Debtors are not aware of, and do not believe that, any documents counsel requested to be preserved regarding Claimant's claims, the UC Contract, the relationship between Claimant and Debtors and the relationship between Webley and Debtors with regard to the MASL were ever destroyed, purged, or rendered inaccessible. As Julio Valdes testified during his deposition, searches of

18

the active Intermedia servers using the search terms identified by Claimant in its counsel's October 2005 letter were unsuccessful because of the volume of data contained on those servers.

(i) Debtors' outside counsel and Kroll Ontrack have assisted Debtors in implementing the preservation of documents regarding Claimant's claims, the UC Contract, the relationship between Claimant and Debtors, and the relationship between Webley and Debtors with regard to the MASL. Electronic Data Systems, Inc. was responsible for maintaining MCI's POP email system. At counsel's request, EDS provided to Kroll Ontrack the backup tapes for MCI's POP email system for the relevant time period as set forth by Claimant in its counsel's October 24, 2005 letter to Debtors' counsel.

**Question 8.**  **How did Intermedia and MCI monitor compliance with the litigation hold. Did Intermedia and MCI request that persons respond or acknowledge either electronically or by hard copy documents that they would agree to abide by the litigation hold. If no, why not. If acknowledgments were requested, where are the acknowledgements by such persons presently located.**

**Answer.**  Subject to and without waiving the general objection set forth above regarding Claimant's use of the phrase "litigation hold," Debtors respond to Question No. 8 as follows:

Debtors' monitoring of preservation of documents related to Claimant's claims, the UC Contract, the relationship between Claimant and Debtors, and the relationship between Webley and Debtors with regard to the MASL was

19

A 03094