accomplished by delivering the paper documents to Stinson Morrison Hecker LLP and the electronic documents to Stinson Morrison Hecker LLP or Kroll Ontrack. Also, Debtors are retaining the backup tapes for MCI's email system known as MCI Mail.

**Question 9**     **How did Intermedia and MCI ensure compliance with the litigation hold. How did Intermedia and MCI monitor compliance with the litigation hold. Who was in charge of implementing the litigation hold, who was in charge of monitoring the litigation hold, who was in charge of taking possession or custody of documents subject to the litigation hold.**

**Answer.**              Subject to and without waiving the general objection set forth above regarding Claimant's use of the phrase "litigation hold," Debtors respond to Question No. 9 as follows:

Debtors ensured preservation of documents related to Claimant's claims, the UC Contract, the relationship between Claimant and Debtors, and the relationship between Webley and Debtors with regard to the MASL by delivering the paper documents to Stinson Morrison Hecker LLP and the electronic documents to Stinson Morrison Hecker LLP or Kroll Ontrack. Debtors further have ensured preservation of the backup tapes for MCI's email system known as MCI Mail. The persons responsible for implementing the preservation of such documents already have been identified in response to Question No. 7. Please also refer to Debtors' answer to Question No. 8, which Debtors incorporate here.

**Question 10**   **How long was the litigation hold in effect.  Did Intermedia and MCI send out reminders of the litigation hold.  If yes, on what dates were such**

20

**reminders transmitted, to whom were they transmitted, and how were such reminders transmitted. If such reminders were not transmitted, why not.**

**Answer.**      Subject to and without waiving the general objection set forth above regarding Claimant's use of the phrase "litigation hold," Debtors respond to Question No. 10 as follows:

All documents regarding Claimant's claims, the UC Contract, the relationship between Claimant and Debtors and the relationship between Webley and Debtors with regard to the MASL were collected and continue to be preserved as set forth in Debtors' response to Question No. 8 above and to Question No. 12 below, both of which Debtors incorporate here.

**Question 11**    **Was the litigation hold implemented by Intermedia and MCI as to EffectNet/Parus in conformity with MCI and Intermedia's policies (whether written or oral) for litigation holds. If yes, how so. If no, how did the EffectNet/Parus litigation hold differ from Intermedia and MCI's policies.**

**Answer.**      Yes. Subject to and without waiving the general objection set forth above regarding Claimant's use of the phrase "litigation hold," Debtors respond to Question No. 11 as follows:

The procedures used by in-house and outside counsel in attempting to locate and preserve documents regarding Claimant's claims, the UC Contract, the relationship between Claimant and Debtors, and the relationship between Webley and Debtors with regard to the MASL were consistent with the way documents were located and retained for other litigation matters during the time period in question. Moreover, the procedures used were reasonable and appropriate given

21

A 03096

that, at the time, Debtors' and their counsel were investigating and defending over 60,000 claims filed in the bankruptcy proceeding. Also, in the period after WorldCom declared bankruptcy, there were numerous personnel changes including changes in MCI's in-house counsel. As a result, by the time Claimant filed its claim most of the custodians of potentially responsive materials, or potential witnesses, were no longer employed by Debtors.

**Question 12    What was done with documents that were subject to the litigation hold and where are those documents presently located.**

**Answer.**            Subject to and without waiving the general objection set forth above regarding Claimant's use of the phrase "litigation hold," Debtors respond to Question No. 12 as follows:

All paper documents that Debtors were able to locate regarding Claimant's claims, the UC Contract, the relationship between Claimant and Debtors, and the relationship between Webley and Debtors with regard to the MASL are at the offices of Stinson Morrison Hecker LLP or at an Iron Mountain storage facility in Kansas City, Missouri, as are all of the boxes of documents identified on the paper documents indices (which have been provided to Claimant) that were reviewed by Debtors' counsel. The remaining boxes of documents identified on the indices are maintained at the storage facility identified on the indices.

All paper documents responsive to Claimant's discovery requests have been produced twice to Claimant. The initial production was made to Kelley Drye, LLP, Claimant's prior counsel. At the request of Claimant's current

22

**A 03097**

counsel, Foley & Lardner, LLP, such documents were made available again to Claimant in September and October 2006.

All electronic documents that Debtors have located in the electronic discovery completed to date regarding Claimant's claims, the UC Contract, the relationship between Claimant and Debtors, and the relationship between Webley and Debtors with regard to the MASL, as well as all Intermedia backup tapes and MCI POP email tapes for the relevant time period identified by Claimant in its counsel's October 24, 2005 letter to Debtors' counsel, are maintained by Kroll Ontrack. All Intermedia and MCI backup tapes outside the relevant time period identified in Claimant's October 24, 2005 letter continue to be maintained by Debtors. The backup tapes for MCI's email system known as MCI Mail are maintained by Debtors.

The electronic documents responsive to Claimant's document requests that were from accessible electronic data and the responsive electronic documents located on the backup tapes Claimant selected for sampling have been produced to Claimant twice. The initial production was made to Kelley Drye, LLP, Claimant's prior counsel. At the request of Claimant's current counsel, Foley & Lardner, LLP, such documents were made available again to Claimant in September and October 2006.

**Question 13   Did outside counsel apprise Intermedia and MCI of the need for a litigation hold. If yes, (a) when was Intermedia and MCI notified, (b) who notified Intermedia and MCI, (c) when after notification by outside counsel did Intermedia and MCI implement the litigation hold.**

23

A 03098

**Answer.**                  Subject to the general objection set forth above regarding Claimant's use

of the phrase "litigation hold," Debtors respond to Question 13 as follows:

Debtors object to this request as seeking information that is protected from

disclosure pursuant to the attorney-client privilege and/or litigation work product

immunity. Further, the information requested is not relevant to the issue of

whether documents were properly preserved by Debtors. Subject to and without

waiving these objections, however, Debtors state that, as noted above, both in-

house counsel and outside counsel understood the need to locate and preserve

documents and, in most instances, worked together with regard to the preservation

of documents related to Claimant's claims, the UC Contract, the relationship

between Claimant and Debtors and the relationship between Webley and Debtors

with regard to the MASL.


Respectfully submitted,

STINSON MORRISON HECKER LLP

By:  _Allison M. Murdock_

Robert L. Driscoll
Allison M. Murdock
Mark M. Iba
1201 Walnut Street, Suite 2900
Kansas City, MO 64106
(816) 842-8600 – Telephone
(816) 691-3495 – Facsimile

ATTORNEYS FOR REORGANIZED DEBTORS

24

A 03099

## Certificate of Service

I hereby certify that on this 19th day of December, 2006, I served a copy of the foregoing *via* United States mail, postage prepaid, directed to:

Robert A. Scher
Emily Sausen
FOLEY & LARDNER LLP
90 Park Avenue
New York, NY 10016

Mark L. Prager
William J. McKenna
Jill L. Murch
Joanne Lee
FOLEY & LARDNER LLP
321 N. Clark Street, Suite 280
Chicago, IL 60610

and a copy of the foregoing *via* electronic mail to Jill L Murch at jmurch@foley.com.

Attorney for Reorganized Debtors

25

A 03100

## Verification

I verify under penalty of perjury that I am the Associate General Counsel - Litigation and Regulatory for Verizon Business, that I have read Debtors' Response to Claimant's Questions Regarding "Litigation Hold," and that the responses are true to the best of my knowledge, information, and belief.

Mary L. Coyne

Dated: December 17, 2006.

26

A 03101

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

FILED

MAY 3 0 2001

UNITED STATES OF AMERICA,          )
       Plaintiff,          )
                  )
                  )     Case No. 1:00CV02789(RWR)
       v.              )
                  )
WORLDCOM, INC., and          )
INTERMEDIA COMMUNICATIONS, INC          )
       Defendants.          )
                  )

## HOLD SEPARATE STIPULATION AND ORDER
### [ERRATA]

It is hereby stipulated and agreed by and between the undersigned parties, subject to approval

and entry by the Court, that:

### I.    DEFINITIONS

As used in this Hold Separate Stipulation and Order:

A.    "Acquirer" means the entity to whom defendants divest the Intermedia Assets.

B.    "WorldCom" means defendant WorldCom, Inc., a Georgia corporation with its

headquarters in Clinton, Mississippi, its successors and assigns, and its subsidiaries, divisions, groups,

affiliates, partnerships and joint ventures, and their directors, officers, managers, agents and

employees.

C.    "Intermedia" means defendant Intermedia Communications, Inc., a Delaware

Corporation with its headquarters in Tampa, Florida, its successors and assigns, and its subsidiaries

divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers

agents and employees.

D    "Digex" means Digex, Inc., a Delaware Corporation with its headquarters in Beltsville.

**Exhibit A**

A 03102

Maryland, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents and employees.

     E.     "Capital Stock of Digex" means the capital stock of Digex, regardless of class, owned by Intermedia.

     F.     "Intermedia Assets" means all of assets of Intermedia, except for the Capital Stock of Digex, including:

     1.     All tangible assets that comprise the Intermedia business, including research and development activities; all networking equipment and fixed assets, personal property, office furniture, materials, supplies, and other tangible property and all assets used exclusively in connection with the Intermedia Assets; all licenses, permits and authorizations issued by any governmental organization relating to the Intermedia Assets; all contracts, teaming arrangements, agreements, leases, commitments, certifications, and understandings, relating to the Intermedia Assets, including supply agreements; all customer lists, contracts, accounts, and credit records; all repair and performance records and all other records relating to the Intermedia Assets;

     2.     All intangible assets used in the development, production, servicing and sale of Intermedia Assets, including, but not limited to all patents, licenses and sublicenses, intellectual property, copyrights, trademarks, trade names, service marks, service names, technical information, computer software and related documentation, know-how, trade secrets, drawings, blueprints, designs, design protocols, specifications for materials, specifications for parts and devices, safety procedures for the handling of materials and substances, all research data concerning historic and current research and development

2

A 03103

relating to the Intermedia Assets, quality assurance and control procedures, design tools and simulation capability, all manuals and technical information defendants provide to their own employees, customers, suppliers, agents or licensees, and all research data concerning historic and current research and development efforts relating to the Intermedia Assets, including, but not limited to designs of experiments, and the results of successful and unsuccessful designs and experiments.

G.    "Merger" means the proposed merger of WorldCom and Intermedia pursuant to the merger agreement dated September 5, 2000.

## II.    OBJECTIVES

The Final Judgment filed in this case is meant to ensure defendants' prompt divestiture of the Intermedia Assets for the purpose of preserving a viable competitor in the provision of Internet backbone and access services in order to remedy the effects that the United States alleges would otherwise result from WorldCom's acquisition of Intermedia. This Hold Separate Stipulation and Order ensures, prior to such divestitures, that the Intermedia Assets remain independent, economically viable, and ongoing business concerns that will remain independent and uninfluenced by WorldCom, and that competition is maintained during the pendency of the ordered divestitures.

## III.    JURISDICTION AND VENUE

This Court has jurisdiction over each of the parties hereto and over the subject matter of this action, and venue of this action is proper in the United States District Court for the District of Columbia. The Complaint states a claim upon which relief may be granted against defendants under Section 7 of the Clayton Act, as amended, 15 U.S.C § 18.

## IV.    COMPLIANCE WITH AND ENTRY OF FINAL JUDGMENT

3

A 03104

A.    The parties stipulate that a Final Judgment in the form attached hereto as Exhibit A may be filed with and entered by the Court, upon the motion of any party or upon the Court's own motion, at any time after compliance with the requirements of the Antitrust Procedures and Penalties Act (15 U.S.C. § 16), and without further notice to any party or other proceedings, provided that the United States has not withdrawn its consent, which it may do at any time before the entry of the proposed Final Judgment by serving notice thereof on defendants and by filing that notice with the Court.

B.    Defendants shall abide by and comply with the provisions of the proposed Final Judgment, pending the Judgment's entry by the Court, or until expiration of time for all appeals of any Court ruling declining entry of the proposed Final Judgment, and shall, from the date of the signing of this Stipulation by the parties, comply with all the terms and provisions of the proposed Final Judgment as though the same were in full force and effect as an order of the Court.

C.    Defendants shall not consummate the transaction sought to be enjoined by the Complaint herein before the Court has signed this Hold Separate Stipulation and Order.

D    This Stipulation shall apply with equal force and effect to any amended proposed Final Judgment agreed upon in writing by the parties and submitted to the Court.

E.    In the event (1) the United States has withdrawn its consent, as provided in Section IV(A) above, or (2) the proposed Final Judgment is not entered pursuant to this Stipulation, the time has expired for all appeals of any Court ruling declining entry of the proposed Final Judgment, and the Court has not otherwise ordered continued compliance with the terms and provisions of the proposed Final Judgment, then the parties are released from all further obligations under this Stipulation, and the making of this Stipulation shall be without prejudice to any party in this or any

4

other proceeding.

      F.     Defendants represent that the divestiture ordered in the proposed Final Judgment can and will be made, and that defendants will later raise no claim of mistake, hardship or difficulty of compliance as grounds for asking the Court to modify any of the provisions contained therein.

      G.     The United States and Defendants, WorldCom and Intermedia, by their respective attorneys, have consented to the entry of this Hold Separate Stipulation and Order without trial or adjudication of any issue of fact or law, and without this Hold Separate Stipulation and Order constituting any evidence against or admission by any party regarding any issue of fact or law.

### V.   HOLD SEPARATE PROVISIONS

A.     Until the closing of the Merger contemplated by the Final Judgment:

      1.     Intermedia shall preserve, maintain, and continue to operate the Intermedia Assets as an independent, ongoing, economically viable competitive business, with management, sales, and operations of such assets held entirely separate, distinct, and apart from those of WorldCom's operations. WorldCom shall not coordinate its production, marketing, or terms of sale of any products with those produced by or sold under any of the Intermedia Assets. Within twenty (20) days after the entry of the Hold Separate Stipulation and Order, defendants will inform the United States of the steps defendants have taken to comply with this Hold Separate Stipulation and Order.

      2.     Intermedia shall use all reasonable efforts to maintain and increase the sales and revenues of the services provided by the Intermedia Assets, and shall maintain at 2000 or previously approved levels for 2001, whichever are higher, all promotional, advertising, sales, technical assistance, network capacity configurations and expansions, marketing and

5

A 03106

merchandising support for the Intermedia Assets.

      3.      Intermedia shall take all steps necessary to ensure that the Intermedia Assets are fully maintained in operable condition at no less than their current capacity and sales, including projected capacity expansions currently planned or planned prior to negotiations between the defendants relating to the Merger, and shall maintain and adhere to normal repair and maintenance schedules for the Intermedia Assets.

      4.      Intermedia shall not remove, sell, lease, assign, transfer, pledge, or otherwise dispose of any of the Intermedia Assets.

      5.      WorldCom shall not solicit to hire, or hire, any employee of any business that is a part of the Intermedia Assets.

      6.      Defendants shall take no action that would jeopardize, delay, or impede the sale of the Intermedia Assets.

      B.      After the closing of the Merger and until the divestiture required by the Final Judgment has been accomplished:

      1.      Defendants shall preserve, maintain, and continue to operate the Intermedia Assets as an independent, ongoing, economically viable competitive business, with management, sales, and operations of such assets held entirely separate, distinct, and apart from those of WorldCom's other operations. WorldCom shall not coordinate its production, marketing, or terms of sale of any products with those produced by or sold under any of the Intermedia Assets. Within twenty (20) days after the closing of the Merger, defendants will inform the United States of the steps defendants have taken to comply with this Hold Separate Stipulation and Order.

6

A 03107

2.    Defendants shall take all steps necessary to ensure that (1) the Intermedia Assets will be maintained and operated as independent, ongoing, economically viable and active competitor in the provision of telecommunications services currently offered by Intermedia; (2) management of the Intermedia Assets will not be influenced by WorldCom (or Digex); and (3) the books, records, competitively sensitive sales, marketing and pricing information, and decision-making concerning provision of services by any of the Intermedia Assets will be kept separate and apart from WorldCom's other operations.

3.    Defendants shall use all reasonable efforts to maintain and increase the sales and revenues of the services provided by the Intermedia Assets, and shall maintain at 2000 or previously approved levels for 2001, whichever are higher, all promotional, advertising, sales, technical assistance, network capacity configurations and expansions, marketing and merchandising support for the Intermedia Assets.

4.    WorldCom shall provide sufficient working capital and lines and sources of credit to continue to maintain the Intermedia Assets as economically viable and competitive, ongoing businesses, consistent with the requirements of Sections V(A) and (B).

5.    WorldCom shall take all steps necessary to ensure that the Intermedia Assets are fully maintained in operable condition at no less than its current capacity and sales, including projected capacity expansions currently planned or planned prior to negotiations between the defendants relating to the Merger, and shall maintain and adhere to normal repair and maintenance schedules for the Intermedia Assets.

6.    Defendants shall not, except as part of a divestiture approved by the United States in accordance with the terms of the proposed Final Judgment, remove, sell, lease,

7

A 03108

assign, transfer, pledge, or otherwise dispose of any of the Intermedia Assets

7.    Defendants shall maintain, in accordance with sound accounting principles, separate, accurate, and complete financial ledgers, books, and records that report on a periodic basis, such as the last business day of every month, consistent with past practices, the assets, liabilities, expenses, revenues and income of products produced, distributed or sold utilizing the Intermedia Assets.

8.    Defendants shall take no action that would jeopardize, delay, or impede the sale of the Intermedia Assets.

9.    Except in the ordinary course of business or as is otherwise consistent with this Hold Separate Stipulation and Order, defendants shall not hire, transfer, terminate, or otherwise alter the salary or employment agreements for any Intermedia employee who, on the date of defendants' signing of this Hold Separate Stipulation and Order is a member of Intermedia's management.    Further, during the pendency of this Hold Separate Stipulation and Order, and consistent with the Final Judgment, defendant WorldCom shall not solicit to hire, or hire, any employee of any business that is a part of the Intermedia Assets.

C.    Defendants shall take no action that would interfere with the ability of any trustee appointed pursuant to the Final Judgment to complete the divestitures pursuant to the Final Judgment to an Acquirer acceptable to the United States.

8

A 03109

D.    This Hold Separate Stipulation and Order shall remain in effect until consummation

of the divestiture required by the proposed Final Judgment or until further order of the Court.

Dated· November 17, 2000.

Respectfully submitted,

FOR PLAINTIFF
UNITED STATES OF AMERICA

FOR DEFENDANT
WORLDCOM, INC.

FOR DEFENDANT
INTERMEDIA COMMUNICATIONS, INC

**ORDER**

IT IS SO ORDERED by the Court, this __24th__ day of ___May___, 2000.

**United States District Judge**

9

## CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing Hold Separate Stipulation and Order [ERRATA] was served, as indicated below, this 20th day of November, 2000 upon each of the parties listed below:

Charles F. Rule, Esq.  (BY HAND)
Covington & Burling
1201 Pennsylvania Avenue, N.W.
Washington, DC 20004-2401
(202) 662-5119
Counsel for WorldCom, Inc.

Brad E. Mutschelknaus, Esq.  (BY HAND)
Kelley Drye & Warren, LLP
1200 19th Street, N.W., Suite 500
Washington, D.C.  20036
(202) 955-9600
Counsel for Intermedia Communications, Inc.

David F. Smutny
Counsel for Plaintiff

06/27/02 THU 23:48 FAX 202 8965391



U. S. DISTRICT COURT
FILED
JUL - 1 2002
S. D. OF N.Y.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,
           Plaintiff,
       v.

WORLDCOM, INC.,
           Defendant.

: Civ No.  02-CV-4963 (JSR)
:
:
:
:
:
:

## STIPULATION AND ORDER

  Plaintiff Securities and Exchange Commission ("Commission"), and defendant

WorldCom, Inc. ("WorldCom"), by and through their counsel of record, hereby agree and

stipulate to the Court's entry of the following Order in the above-captioned matter, subject to the

Court's approval:

  IT IS HEREBY ORDERED THAT:

  1. Defendant WorldCom, its officers, agents, accountants, employees, and attorneys, and

those persons in active concert or participation with them, and each of them, who receive actual

notice of this Order by personal service or otherwise, shall not destroy, mutilate, conceal, alter or

dispose of any item (including but not limited to books, records, documents, contracts,

agreements, assignments, evidence of obligations or payments, press releases, public

announcements, drafts of any of the foregoing, or any other item within their possession, custody

or control) relating to, referring to or concerning any aspect of WorldCom's financial reporting

obligations, public disclosures required by the federal securities laws, or any accounting matters

relating to WorldCom, including but not limited to the matters referred to in the Commission's

Complaint filed herein;

**Exhibit B**

MICROFILM
·12·00 PM
JUL - 1 2002

2.  Upon appointment by the Court pursuant to this Order, the Corporate Monitor for WorldCom shall have oversight responsibility with respect to all compensation paid by WorldCom. The intent of the parties is that the Corporate Monitor shall exercise its oversight responsibility to prevent unjust enrichment as a result of the conduct alleged in the Complaint and to ensure that the assets of WorldCom are not dissipated by payments that are not necessary to the operation of its business. For purposes of this Stipulation and Order, compensation is defined so as to include salary, as well as any severance payment, bonus, indemnification, gift, loan, reimbursement, advance, or consideration of any kind in excess of established salary, but does not include payments to reimburse employees for ordinary business expenses incurred. In exercising its oversight responsibility, the Corporate Monitor shall have discretion to determine the type of compensation to review and either approve or disapprove, as well as the discretion to determine the group of officers, directors and employees with respect to which such compensation shall be reviewed and either approved or disapproved;

3.  Until a Corporate Monitor is in place, WorldCom, its officers, agents, accountants, employees, attorneys, and those persons in active concert or participation with them, and each of them, who receive actual notice of this Order by personal service or otherwise, shall not (1) make any payment greater than $100,000 to any present or former officer, director or employee of WorldCom or any of its affiliates, or (2) make any extraordinary payment (which is defined for purposes of this Stipulation and Order as any payment other than those WorldCom is required to make by virtue of a legal obligation established prior to May 15, 2002) to any present or former director of WorldCom, any present or former officer of WorldCom who currently holds or formerly held a position at or above the level of Vice-President, or any person currently

2

A 05113

or formerly employed within WorldCom's financial reporting or accounting functions;

4. In the event the Corporate Monitor does not promptly approve any payment of compensation sought to be made by WorldCom, WorldCom may, upon notice to the Commission, seek the Court's approval for such payment;

5. By further Order of this Court, and subject to the Court's approval, a Corporate Monitor for defendant WorldCom, to be jointly named and proposed to the Court by the parties hereto, shall be appointed to exercise the oversight responsibility referenced in paragraph 2 of this Order, and, with respect to paragraph 1 of this Order, the Corporate Monitor shall confirm that WorldCom has implemented reasonable document retention policies and the Corporate Monitor shall take reasonable steps to oversee compliance with those policies. The Corporate Monitor shall report forthwith to the Court any evidence or indication of a violation of this Order of which the Corporate Monitor becomes aware;

6. If the parties cannot agree to a Corporate Monitor by July 3, 2002, the parties will ask the Court for an immediate conference with respect to the selection and appointment of a Corporate Monitor;

7. WorldCom shall cooperate in full with the Corporate Monitor and make its books, records and accounts available to the Corporate Monitor as the Corporate Monitor shall, in his or her discretion, request in order to perform the duties outlined above;

8. The Corporate Monitor's fees and expenses shall be paid by WorldCom.

9. The term of the Corporate Monitor will cease no later than the date on which the Commission's investigation of this matter concludes, the Court determines the function of the

3

Corporate Monitor is no longer necessary, or the parties so agree.

SO ORDERED SUBJECT TO THE CONDITIONS STATED
AND AGREED TO IN COURT ON 6/28/92

Dated: June 28, 2002

United States District Judge

Consented to:

Peter H. Bresnan
Deputy Chief Litigation Counsel
Securities and Exchange Commission
450 Fifth Street, NW
Washington, DC 20549
202/942-4788 (phone)
202/942-9581 (fax)

Michael H. Salsbury
Executive Vice President and General Counsel
WorldCom, Inc.
1133 19th St., N.W.
Washington, D.C.

4

Ramsay

1
2  documents relating to issues in these proceedings.
3    Q.  Do you recall what Miss Stolte's request
4  was of them?
5    A.  Not specifically.  I remember it was a
6  very broad request for anything, as I recall,
7  relating to EffectNet or Webley, or the
8  relationship between the Intermedia and EffectNet
9  or MCI, and Webley or MCI; any of those parties,
10  anything, period.  I can't recite what it said, but
11  I remember it was very broad.
12    Q.  Do you know if Stinson still has the
13  e-mail, or e-mails, that were sent by either Miss
14  Stolte or Mr. Bigus to those individuals?
15    A.  I have no reason to think they wouldn't.
16  I would think they would.
17    MR. SMITH:  I make a request for a copy
18  of those e-mails that were sent to the
19  individuals by Miss Stolte and/or Mr. Bigus.
20    MR. DRISCOLL:  Take it under advisement.
21    Q.  Do you know if any of the individuals
22  who responded to Miss Stolte, responded either
23  verbally or in an e-mail?
24    MR. DRISCOLL:  I'm sorry, could you read
25    that back?

Page 26

Ramsay

1
2  (Record read.)
3    A.  Either one.  I believe they did.
4    Q.  In both matters?
5    A.  No, I'm not sure about e-mail.  It may
6  have been.  I don't remember.  There may be.
7    MR. SMITH:  To the extent that there
8  were e-mail responses to Miss Stolte and
9  Mr. Bigus, in response to their requests for
10  documents, we request a copy of those
11  documents.
12    Q.  Do you know if Mr. Bigus received any
13  responses from any individuals that he contacted?
14    A.  I believe that he did.
15    Q.  Do you know who from?
16    A.  Specifically, no.
17    Q.  Do you recall for which entities, or
18  entity, any of the individuals Miss Stolte
19  contacted were either working for at the time, or
20  had worked for previously?
21    A.  No.  The specific name of -- the
22  corporate name of the entity that they worked for
23  at the time, I don't recall.
24    Q.  Do you know the name of the individuals,
25  employees that Mr. Bigus contacted?

Page 27

Ramsay

1
2    A.  I don't recall.  I'm not sure that I
3  knew, but I don't recall now.
4    Q.  In late fall 2004, was anyone else
5  involved in locating, coordinating the review of
6  documents in this proceeding?
7    A.  Other than the in-house counsel, no one
8  from the firm, no.
9    Q.  Who from in-house counsel was involved?
10    A.  David Wachen.
11    Q.  Can you spell the last name?
12    A.  W A C H E N.
13    Q.  Was Mr. Wachen involved at the same time
14  we've been discussing Miss Stolte's roles, or role,
15  as well as Mr. Bigus's role?
16    A.  I believe it was.
17    Q.  What's Mr. Wachen's title; do you know?
18    A.  No.
19    Q.  You just know him to be in-house counsel
20  at MCI?
21    A.  Correct.
22    Q.  Is Mr. Wachen still involved in this
23  proceeding?
24    A.  I believe that he is.
25    Q.  Do you know what, if anything,

Page 28

Ramsay

1
2  Mr. Wachen did in late fall, or in the fall of
3  2004, in connection with attempting to locate, or
4  locate documents, or coordinate review of documents
5  in this proceeding?
6    MR. DRISCOLL:  Excuse me, that's a
7  compound question.  I missed the second part.
8    (Record read.)
9    MR. DRISCOLL:  That's locate or
10  coordinate.
11    MR. SMITH:  If you have an objection,
12  I'll rephrase it.
13    MR. DRISCOLL:  It was a question of
14  understanding.
15    MR. SMITH:  Sure.
16    A.  I don't think I can recite everything he
17  did, but I'm aware that he sent an e-mail advising
18  employees to retain any documents they had; they
19  could not be destroyed.  I'm aware he provided, let
20  me hold that off.  He may have been the one I'm not
21  certain, who provided a list of individuals who
22  might have information.
23    Q.  Do you know when Mr. Wachen sent the
24  e-mail you mentioned, advising to retain e-mails or
25  documents?

Page 29

Exhibit I

A 03116

Ramsay

1
2    A.   Part of that initial effort before I
3  became involved, early fall, late fall, of '04.
4    Q.   Do you know who he sent the e-mail to?
5    A.   I couldn't try to list them.
6    Q.   Do you know who?
7    A.   I don't recall the list of people he
8  sent it to.
9    Q.   Have you ever seen the e-mail that he
10 sent?
11   A.   I have.
12   Q.   Does Stinson have it in its possession?
13   A.   I assume so.
14      MR. SMITH: I'd like to request a copy
15 of that e-mail as well.
16   Q.   Aside from providing the list of
17 individuals to contact for information, did
18 Mr. Wachen, to your knowledge, do anything else
19 with respect to locating documents?
20   A.   I believe he did, yes.
21   Q.   What else?
22   A.   Again, I'm not certain at all, but my
23 memory is that he put us in contact with a
24 depository of some documents in Ashburn Virginia.
25 I believe he's the individual who located and

Page 30

Ramsay

1
2  don't recall his first name.
3    Q.   Anyone else that you recall him putting
4  you in touch with?
5    A.   As I sit here, no, I don't recall.  As
6  we go through, I may hear questions as we go
7  through this process, I may think of something
8  else, but at the top of my head, no.
9    Q.   Do you have any documents that would
10 refresh your recollection, as to any other
11 individuals he put you in contact with?
12   A.   Do I have them with me, or do they
13 exist; what's the question?
14   Q.   Do they exist?
15   A.   There are some.
16   Q.   What are those documents?
17   A.   I have made some notes as I went through
18 the process.
19   Q.   Anything else?
20   A.   E-mail that went back and forth might
21 refresh my memory.
22   Q.   Do you recall anything else that
23 Mr. Wachen did in connection with locating
24 documents in this proceeding?
25   A.   I recall that he participated in at

Page 32

Ramsay

1
2  advised us of those.  I'm not sure, but I think so.
3    Q.   Do you know how he went about finding
4  these documents in Virginia?
5    A.   I don't.
6    Q.   Do you know if Mr. Wachen did anything
7  else, with respect to locating documents in this
8  proceeding?
9    A.   As I said, I don't recall all.  He put
10 us in contact with a number of individuals, and as
11 we went through the process, I don't recall what he
12 did, or necessarily all the individuals, but I
13 recall that.
14   Q.   Who were the names of the individuals he
15 put you in contact with?
16   A.   Well the names that initial list I
17 believe, he provided to Sharon Stolte and Larry
18 Bigus.  I believe, he put us in contact with a
19 woman by the last name of Tate, and a Beckman.
20   Q.   What was the first name?
21   A.   I think it's Roger, I think it's Brenda
22 Tate, and at one point put us in contact with a
23 gentleman by the name of Mancini.
24   Q.   Do you know the first name?
25   A.   I don't remember, I don't recall.  I

Page 31

Ramsay

1
2  least two phone conferences with individuals
3  regarding back up tapes.
4    Q.   Anything else?
5    A.   That's all that's coming to mind right
6  now.  As we go through this, I'll try, something
7  might jog my memory from your questions, but that's
8  all I think of now.
9    Q.   With respect to the two phone
10 conferences; were you on the phone as well?
11   A.   Yes.
12   Q.   Did you take notes of those phone calls?
13   A.   I don't recall.  I may have, but I
14 don't -- I'm not certain.
15   Q.   You mentioned a person by the name of
16 Brenda Tate that Mr. Wachen put you in touch with?
17   A.   Correct.
18   Q.   Who is she?
19   A.   I believe, and she is one of the
20 individuals with the WorldCom records management
21 function.
22   Q.   She's still employed by MCI, or
23 reorganized debtors?
24   A.   As far as I know.
25   Q.   Yes, as far as you know?

Page 33

**Esquire Deposition Services**
**(212) 687-8010**

A 03117

Ramsay
1
2 January 1, 2000 through the end of 2002, December
3 of 2002?
4    A.   Time frame for what?
5    Q.   For your request for of their search in
6 these stored documents?
7    A.   Well, that is a time frame we worked
8 with, but I don't believe their search for stored
9 documents was limited in that way.  They searched
10 for terms and sometimes what I recall concepts,
11 marketing, that sort of thing, Intermedia
12 marketing, names.  I'm sure we did give them dates,
13 but I know the index we produced includes documents
14 from earlier time frames, so it can't have been
15 that limited.
16    Q.   Do you know where the documents that
17 they had indices of were stored?
18    A.   I don't know where they were stored.
19 They were stored sometimes, at least in commercial
20 storage companies, like Iron Mountain, and perhaps
21 all over the world for that matter.
22    Q.   Do you know how the indices that they
23 had were created?
24    A.   I have some information about how the
25 index of Intermedia originating documents were
Page 50

Ramsay
1
2 were asked to box up documents and create an index
3 and leave them in their office or their space.
4    Q.   You said RIF, I assume you're talking
5 about reduction in force?
6    A.   Correct.
7    Q.   As I understand your testimony, at the
8 time when Intermedia was either being merged into
9 or shutting down, in some way the employees who
10 were laid off or terminated, in some way were told
11 to box up their documents, create an index for
12 those documents, and leave them where they were?
13    A.   That's my understanding, yes.
14    Q.   Do you know if they were given some
15 template to create an index what was contained in
16 whatever documents they had?
17    A.   I don't know.
18    Q.   Do you know what information they
19 included in there respective indices?
20    A.   Well, we have the index, but beyond
21 that, no.  We have overall large index you've seen
22 on those boxes.
23    Q.   Well, were the indices that were given
24 to you, and ultimately given to us in this case,
25 the indices of each individual employee?
Page 52

Ramsay
1
2 created.
3    Q.   Before I get to that, you make a
4 distinction between the index of Intermedia
5 documents and between other documents?
6    A.   In terms of how they were created, yes.
7    Q.   Do you know if there were different
8 indices for different entities?
9    A.   My understanding, again, is it's when
10 computerized indexing system, whether they go to
11 two to three separate systems.  I'm not absolutely
12 sure of that, but the information on the indexes, I
13 guess, is what I have some information on as it
14 relates to Intermedia originated documents.
15    Q.   I don't recall if this was the question
16 I just asked you.  Do you know how the indices were
17 created?
18    A.   I again, I've been told, in some respect
19 how information for the indexes was generated for
20 Intermedia.
21    Q.   Okay, and what information were you told
22 about, how the information was gathered for
23 Intermedia documents?
24    A.   That as Intermedia was winding up and
25 employees were leaving their employment, RIF, they
Page 51

Ramsay
1
2    A.   That is my understanding.
3    Q.   For employees who were not either laid
4 off, terminated, or in some way, do you know what
5 they did with respect to their documents?
6    A.   I only know that was the process and, I
7 don't know who you'd be referring to, or what
8 circumstance you'd be referring to, but as they
9 left to merge to go to MCI or to leave employment,
10 whatever; they were asked to box them and leave an
11 index.
12    Q.   Do you know if their boxes were titled
13 in some way specific to those particular
14 individuals?
15    A.   Well again, from the indexes that you've
16 seen, we've seen, there are some instances where
17 that's the case, but generally not.
18    Q.   Do you know if, for example, I think you
19 mentioned a Jim Renforth or James Renforth; do you
20 know if he had created an index of whatever
21 documents he had at the time that he left
22 employment with Intermedia?
23    A.   I know that I'd ask records management
24 to run his name against their stored documents, and
25 it produced only his personal file.  No other
Page 53

Ramsay

1            Ramsay
2  Records Management people earlier, yes.  Losing my
3  voice.
4     Q.   What did you discuss with Records
5  Management, in terms of that process that you
6  described right now?
7     A.   I asked them if there was anyone who
8  could read the index and know what was going to be
9  contained in the boxes from the index, to help us
10  select or help anybody, Parus, anybody select boxes
11  to be reviewed.
12     Q.   Did they have a response to you?
13     A.   They indicated there was none, didn't
14  have anybody that can do that.
15     Q.   When you say they didn't have anybody
16  that can do that, meaning no one that could
17  interpret, so to speak, the terms of the index and
18  tell you based on that, what was in the actual
19  boxes?
20     A.   Yes.
21     Q.   Aside from that conversation with
22  Records Management, did you have any other
23  discussions with anyone at WorldCom Intermedia
24  about the process you undertook to identify certain
25  boxes on the indices?

Page 106

Ramsay

1            Ramsay
2     MR. DRISCOLL:  You're talking about
3  something that happened in June or July of
4  '05, according to this witness's testimony.
5     MR. SMITH:  Okay.
6     MR. DRISCOLL:  Intermedia didn't
7  function.
8     Q.   At any of the debtor's--  I'll rephrase
9  my question to say that -- do you understand my
10  question?
11     A.   You probably have to rephrase it.
12     Q.   Sure. Did you have any discussions with
13  anyone at the debtors, aside from what you
14  mentioned at Records Management, regarding the
15  process you undertook to identify boxes on the
16  indices?
17     A.   Don't recall that I did.  You can go
18  ahead and ask questions if you want.  I'm just sort
19  of --
20     Q.   Let me know if you want to take a break.
21  I don't mind continuing if you're standing.
22     A.   Go ahead.
23     MR. DRISCOLL:  Kevin, why don't we take
24  a break.
25     (Time noted: 2:51 p.m.)

Page 107

Ramsay

1            Ramsay
2     (Recess taken.)
3     MR. SMITH:  Can you mark this as Ramsay
4  4.
5     (Ramsay Exhibit 4, search report from
6  Iron Mountain Records, received March 25,
7  2005, marked for identification, as of this
8  date.)
9     Q.   Mr. Ramsay, I'm going to put in front of
10  you a multi-page document that we've marked for
11  identification as Ramsay Exhibit No. 4, and on the
12  first page it has at the top, Records center, Iron
13  Mountain Records Center, and it looks like you
14  stamped "received of March 25, 2005" what appears
15  to be search result. It's a fairly lengthy
16  document, and I don't have the page number in
17  total, but do you recognize this set of documents?
18     A.   Generally, yes.
19     Q.   What you recognize it as?
20     A.   One of the indexes that was provided by
21  our clients.
22     Q.   That you received?
23     A.   That we received, yes.
24     Q.   Do you know what the index purports to
25  contain, in terms of types of documents -- strike

Page 108

Ramsay

1            Ramsay
2  that.
3     Let me try and rephrase the question,
4  I'm sorry.
5     Do you have an understanding as to how
6  this index that we've marked as Ramsay Exhibit No.
7  4 was created?
8     A.   I can't tell you about this specific.
9  It's one of a number that came as they did
10  searches.  Obviously they have highlighted the term
11  Intermedia on this, but I'm not sure what searches,
12  terms were used for this one.
13     Q.   So this index Ramsay Exhibit No. 4 is an
14  index, as I understand it, and correct me if I'm
15  wrong, I'm trying to understand all of this.  This
16  index that was marked as Ramsay Exhibit No. 4 is an
17  index created from computer data base, based on a
18  search of the term Intermedia?
19     A.   I really can't say- well if you read it
20  at the top, all I can say it's records containing
21  Intermedia.  One of 10 of 338 records searched,
22  records containing Intermedia, but I don't
23  otherwise know what terms were used.
24     Q.   Did you have any conversations with
25  anyone at Records Management Group to determine how

Page 109

A 03119

1           Ramsay
2  they came up with, or where this resulted from,
3  this index, meaning Ramsay Exhibit No. 4?
4      A.  Probably with, generally, I did, but I
5  don't know that I can -- I probably --
6      Q.  Do you have a recollection of doing
7  that?
8      A.  I don't have a current recollection.
9          MR. DRISCOLL:  I got lost.
10         Could you read it back?
11         (Record read.)
12     Q.  Do you have an understanding as to
13 whether or not the documents -- strike that.
14         Do you have an understanding as to
15 whether or not the index that we marked as Ramsay
16 Exhibit No. 4 is an index of all the documents
17 maintained by Iron Mountain of debtor's documents?
18     A.  I have an understanding that it's not.
19     Q.  That it's not?
20     A.  Correct.
21     Q.  So this index is an index of documents
22 that resulted from a search of the word, or records
23 containing Intermedia; is that correct?
24     A.  Well, again, as I said before, the face
25 of it says records containing Intermedia and that

Page 110

1           Ramsay
2  term is highlighted in the descriptions of each of
3  these boxes, but I don't have a present
4  recollection of a conversation about that.
5      Q.  I see.  Okay.
6          On the first page of Ramsay Exhibit No.
7  4 towards the middle of the page, there's an entry
8  that says one of 10 of 338 records searched.
9      A.  I see that, yes.
10     Q.  Do you know what this refers to, what
11 that means?
12     A.  I'm not certain.
13     Q.  And the next line says "with customer
14 equals M" as in Mary "WLDK."
15     A.  I see that, yes.
16     Q.  Do you have an understanding as to what
17 that line is referring to, and then what the
18 customer is referring to?
19     A.  No.
20     Q.  Do you have an understanding as to what
21 the next line refers to as "records containing
22 Intermedia"?
23     A.  Only what appears on its face, that it
24 is a search to identify records containing the term
25 Intermedia.  The term Intermedia is highlighted in

Page 111

1           Ramsay
2  major, and all descriptions.
3      Q.  Still, on the first page of Ramsay
4  Exhibit No. 4, there's an entry that says 290 and
5  then there's a space or something, 48.  Do you know
6  what that refers to?
7      A.  I don't.
8      Q.  And then moving across on the same line,
9  it says status; do you know what this is referring
10 to.
11     A.  I don't.
12     Q.  And then dropping down, there's an entry
13 of a long number, it's 273788675; do you know what
14 that refers to?
15     A.  That's the box number.  That's a number
16 they put on the boxes.
17     Q.  And then across from there to the right,
18 there's an entry that says at Iron Mountain?
19     A.  Yes.
20     Q.  Do you have an understanding of what
21 that means?
22     A.  My understanding is that they're stored
23 at Iron Mountain.
24     Q.  And then below the lengthy number that
25 we read a second ago, there's an entry that says

Page 112

1           Ramsay
2  customer MWLDK.  I think you indicated, you didn't
3  have an understanding?
4      A.  I don't.
5      Q.  And then the next line is box department
6  59823.  Do you have an understanding of what that
7  means?
8      A.  I don't.
9      Q.  There's an entry for box record code
10 with the entry of RS45.  Do you have an
11 understanding of what that means?
12     A.  I don't currently.  No, I should say
13 that I discussed some of those things, and I don't
14 remember which, with Phil Hasselvander and others,
15 Joe Stevens, but they did not appear to provide
16 anything significant to me in finding documents,
17 and I don't remember which one it is, but I did go
18 through some of those.  I just don't remember now
19 what they were.
20     Q.  And then there's another entry major
21 description next to it, it says WorldCom A slash P,
22 storage forms for.
23         Do you have an understanding as to what
24 the major description refers to?
25     A.  It's a description they had of contents

Page 113

1              Ramsay
2  of the box.
3      Q.   Okay.
4          When you say "they had", meaning?
5      A.   Records Management at MCI, part of their
6  computer system.
7      Q.   And then there's an entry for minor
8  description, with next to it, it says Jackson /
9  Clinton MS office.
10     A.   Right.  Sometimes it's additional
11 information about the contents, sometimes it's a
12 location, sometimes it's a topic.
13     Q.   And then below that, there's an entry
14 for long description?
15     A.   Same thing.
16     Q.   I'm not going to read that, but do you
17 have an understanding as to what long description
18 is referred to there?
19     A.   It's my understanding, it's information
20 that he had about what's in the box.
21     Q.   Okay.
22          With respect to any of the major
23 description, minor descriptions, or long
24 descriptions that are contained, not just in this
25 particular entry in Ramsay Exhibit No. 4, but all
                                          Page 114

1              Ramsay
2  of the entries in Ramsay Exhibit 4, did you contact
3  anyone at Records Management to determine what
4  different entries meant?
5      A.   Well, I talked to them to some extent,
6  as I mentioned, and tried to find somebody who
7  maybe could interpret the descriptions, and was
8  told there really wasn't anybody who could
9  interpret those description any better than we
10 could, from looking at them.  They didn't know
11 about what was in these boxes.
12     Q.   Did they indicate how Records Management
13 arrived at the descriptions that are contained in
14 the major, minor, and long description categories?
15     A.   Only it was my understanding that at
16 least in part, the information came from what was
17 left by employees as they were leaving the company.
18 Other than that, I'm not- I don't.
19     Q.   So is it your understanding, that the
20 documents that are referenced in Ramsay Exhibit No.
21 4, are documents from Intermedia?
22     A.   Not necessarily, because, I mean, there
23 are documents that relate to Intermedia, some of
24 them may be from Intermedia, some of them may not
25 be.
                                          Page 115

1              Ramsay
2      Q.   Do you know where else the documents
3  that are contained in Ramsay Exhibit No. 4 came
4  from, if not Intermedia?
5      A.   Well, they could have come from MCI
6  entity of some kind, and relate to Intermedia in
7  some way.
8      Q.   Are all of the boxes that are contained
9  in Ramsay Exhibit No. 4, boxes that were reviewed
10 by Stinson to determine whether they contain
11 responsive documents?
12     A.   No.
13     Q.   Does Ramsay Exhibit No. 4 contain
14 reference to any documents that were reviewed by
15 Stinson for possible production in this proceeding?
16     A.   Yes.
17     Q.   Can you tell me which ones those are?
18     A.   I believe we provided to you the list
19 that was highlighted.
20     Q.   I'm sorry, say that again?
21     A.   I belive on the list we provided you, I
22 believe they're highlighted.
23     Q.   They're highlighted on this Ramsay
24 Exhibit No. 4?
25     A.   Correct.
                                          Page 116

1              Ramsay
2      Q.   So if you turn to page, for example,
3  page five of the Exhibit, it's not a numbered five,
4  but just turn to the fifth page of the Exhibit.
5      A.   Correct.
6      Q.   In the middle of the page there's an
7  entry with the number, it looks like 307327251.
8      A.   Correct.
9      Q.   On the copy it looks as though it's a
10 grayed line, shaded so to speak.  Is that the
11 highlighting you're referring to as to those
12 documents that were identified to be reviewed for
13 possible production?
14     A.   Yes.
15     Q.   With respect to that particular entry,
16 how did you determine to review that entry for
17 possible production in this proceeding?
18          MR. DRISCOLL:  Maybe it's clear on the
19 record, but I'm not clear.  Which one are you
20 referring to?
21          MR. SMITH:  It's on page five of the
22 Exhibit not numbered five, but the fifth page
23 of the Exhibit with the number 307327251.
24          MR. DRISCOLL:  Got it, thank you.
25     A.   You know, I believe, and I'm not hundred
                                          Page 117

A 03121

1              Ramsay
2  review?
3      A.  That's correct.
4      Q.  Do you have an understanding as to what
5  is mentioned in the major, minor, and long
6  descriptions here?
7      A.  "TCOMS Exemption, clean up reports a
8  location, Intermedia, source reports for initial
9  cleanup:  Mega standalone response file."
10     Q.  Other than what's described there, you
11 don't have any understanding of what you believe
12 that means?
13     A.  I believe source is a reference to one
14 of their billing systems, at some point in time.
15     Q.  One of their billing systems, is that
16 what you said?
17     A.  Correct, Intermedia's.
18     Q.  Do you know what is referred to as
19 cleanup reports?
20     A.  I do not.
21     Q.  Did you contact anyone at either Records
22 Management, or anyone else at WorldCom to determine
23 what any of the terms within that description
24 meant?
25     A.  Not this specific description.

Page 122

1              Ramsay
2      Q.  After having received index that we
3  marked for identification as Ramsay Exhibit No. 4,
4  did you contact anyone to determine what any of the
5  descriptions meant within the index?
6          MR. DRISCOLL:  Object to the question.
7      Asked and answered.  He already said he spoke
8      to Mr. Hasselvander and others.
9      A.  I talked to Joe Stevens and/or
10 Hasselvander about descriptions and what they might
11 mean.  I was told they didn't know either.
12     Q.  My apologies.  If you go to the 33 page
13 of the Exhibit.
14         MR. DRISCOLL:  What's the caption?  204
15     is on top and.
16         MR. SMITH:  The number would be a
17     highlighted number, 273701050.
18         MR. DRISCOLL:  All right.  270.
19         MR. SMITH:  It may be Page 32.
20     A.  What's the number?
21     Q.  273701050.  And it also has a check mark
22 next to it?
23     A.  I found it, yes.
24         MR. DRISCOLL:  Good.  I'm going to look
25     over your shoulder.

Page 123

1              Ramsay
2      Q.  That indicates from the highlight, based
3  on my understanding of your testimony earlier, that
4  - that box that's referenced here was requested and
5  reviewed by Stinson; is that correct?
6      A.  That's correct.
7      Q.  There appears to be a check mark to the
8  right-hand side of the descriptions there, do you
9  see where I'm referring?
10     A.  I do.
11     Q.  Do you have an understanding of what the
12 check mark refers to?
13     A.  No.
14     Q.  Do you know who placed the check mark
15 there?
16     A.  No.
17     Q.  Do you know if it was anyone from
18 Stinson that may have placed the check mark there?
19     A.  I don't know.
20     Q.  Aside from just that entry there, are
21 other check marks on the page that we were looking
22 at, as well as other pages, do you have an
23 understanding of the check marks otherwise within
24 the document?
25     A.  No.

Page 124

1              Ramsay
2      Q.  Do you know who else reviewed the index
3  that we marked as Ramsay Exhibit No. 4 at Stinson?
4      A.  As I testified, Jeff Befort.
5      Q.  Aside from him, did anyone else that
6  you're aware of?
7      A.  I'm sure Diaz, the legal assistant would
8  have.  Not reviewed to select boxes, but probably
9  looked through the index.
10         MR. DRISCOLL:  Clarification counsel.
11     Does anyone else include Mr. Ramsay or not?
12         MR. SMITH:  I don't understand what you
13     mean.
14         MR. DRISCOLL:  Well --
15         MR. SMITH:  My question was, did anyone
16     else other than Mr. Ramsay review the Exhibit
17     that we marked as Exhibit No. 4?
18         MR. DRISCOLL:  And he said Befort.
19         MR. SMITH:  I'm sorry, I thought it was
20     clear that Mr. Ramsay had reviewed.
21     A.  I'm not certain that I, on this
22 particular index -- I reviewed this index --
23 whether I selected the boxes.  Maybe all Befort
24 did.  I just don't recall.  There's over ten
25 thousand of them.

Page 125

Ramsay

1       Ramsay
2       A.   It didn't appear to have anything to be
3   linked to the issues in this case.
4       Q.   If you look on the first line of that
5   entry, it says engagement letter for sale of
6   Intermedia, attorneys notes and correspondence.  Is
7   there any way to tell from this file why, or is
8   there any way to tell from this entry as to what
9   attorneys notes and correspondence might contain?
10      A.   I can't tell from that entry.  This is
11  among the reasons we asked for -- Parus on
12  selection of boxes.  Can I take a quick break.
13          (Recess taken.)
14          MR. SMITH:  Can you mark this as Exhibit
15  Ramsay No. 7?
16          (Ramsay Exhibit 7, document stating DEPT
17      record CUST box, WorldCom Unified Messaging,
18      marked for identification, as of this date.)
19      Q.   Mr. Ramsay, you should have in front of
20  you, what we marked as Ramsay Exhibit No. 7.  It's
21  a legal sized paper, it appears to be a
22  spreadsheet, and it has at the top left corner of
23  it DEPT record CUST box and various different
24  columns for entries, and just for purposes of
25  identifying the document aside from the Exhibit No.

Page 138

1       Ramsay
2   Within the major description, it has WorldCom
3   Unified Messaging.  Have you had a chance to take a
4   look at document?
5       A.   I have.
6       Q.   What do you recognize it to be?
7       A.   One of the indexes provided to us by the
8   Records Management Group at MCI as a result of the
9   search that was done.
10      Q.   Do you know what they were searching to
11  arrive at the index that we marked as Ramsay
12  Exhibit No. 7?
13      A.   Well as you mentioned, and at the top
14  entry it's Unified Messaging project plans.  I
15  don't really know what produced that, but I can
16  guess, I'd have to be guessing, a guess that it was
17  Unified Messaging who produced it, but the names
18  below that are names that I believe, they were
19  provided among the names that were provided to us
20  search.
21      Q.   I guess my question is, what was the
22  data base they were searching to come up with this
23  index?
24      A.   Okay.  Their stored documents data base
25  of all their stored documents.

Page 139

1       Ramsay
2       Q.   Okay.  The ten thousand boxes or so we
3   discussed earlier, or something else?
4       A.   No -- I'm sure -- ten thousand is what
5   the results -- the data base would be much larger
6   than that.
7       Q.   Maybe I'm misunderstanding something.
8   What is the universe of documents or boxes of
9   documents, that were searched within the data base
10  on the computerized data base at WorldCom?
11      A.   I believe it to be all of MCI and their
12  related entities stored documents.
13      Q.   How many boxes of documents?
14      A.   I have no idea.
15          MR. DRISCOLL:  In that data base?
16          MR. SMITH:  Correct.
17      A.   I don't know.
18      A.   So there's more than ten thousand boxes?
19      A.   Oh, I'm- yes.
20      Q.   The ten thousand boxes of documents that
21  have been referred to in responses and letters
22  regarding discovery in this case, are referring to
23  what?
24      A.   They are the boxes of documents on the
25  indexes we provided, and they are the boxes

Page 140

1       Ramsay
2   produced or the results of the searches produced by
3   a list, or lists that included over ten thousand
4   boxes.
5       Q.   Okay, thank you.
6           And the index that we've marked as
7   Ramsay Exhibit No. 7, is an index of some boxes
8   that include or encompass that ten thousand boxes,
9   or make up part of that ten thousand boxes correct?
10      A.   The boxes identified on Exhibit 7 are
11  part of the boxes, part of the ten thousand boxes,
12  yes.
13      Q.   Do you have an understanding as to what
14  each of the different, I guess, column codes stand
15  for at the top of the page?
16      A.   As I sit here now, I don't.  I do recall
17  going over some of this information with, if not
18  all, with people at Records Management, but it was
19  not helpful to me in the search.
20      Q.   Was it your understanding that within
21  the first entry there, that next in the row that
22  starts with CP661 --
23      A.   Yes.
24      Q.   -- that the date of the documents that
25  were contained in that box, were from January 1,

Page 141

A 03123

Ramsay

1    
2    Q.   There are on some of the pages
3    highlighted, or what look to be shaded since
4    they're not colored on here, entries is it correct,
5    that those shaded entries are ones that you
6    selected for review?
7    A.   No.
8    Q.   Can you tell me what those shaded
9    entries mean?
10   A.   No, I can't.  I don't know, I don't
11   recall.
12   Q.   Do you know if any of the boxes that are
13   contained within Ramsay Exhibit No. 10 were
14   selected for review?
15   A.   I'm hesitating because this may be a
16   duplicate of another index that was printed in
17   another format, and I'm not certain.
18          MR. SMITH:  Can you mark this as 11?
19          (Ramsay Exhibit 11, duplicate printout
20          in landscape format, marked for
21          identification, as of this date.)
22   Q.   You should have in front of you what we
23   marked as Ramsay Exhibit No. 11.  You can take a
24   look at that document as well.  Do you recognize
25   Ramsay Exhibit No. 11?

Page 178

Ramsay

1    
2    A.   I believe it's a duplicate, simply
3    printed out, landscape, yes.
4    Q.   Is that what you are referring to --
5    A.   Seeing it now, yes, I believe it is.
6    Q.   From the other format which seems to be
7    in Ramsay No. 11, are you able to tell whether or
8    not any documents or boxes were selected for review
9    from this set?
10   A.   I do not believe they were.  If they
11   were, we would have advised you of it.
12   Q.   So the shading, or highlighting doesn't
13   indicate that those boxes were selected?
14   A.   No, I don't believe so.  It's shading
15   done -- something other than by hand apparently.
16   Q.   Either you or someone else at Stinson
17   had, in order to make that determination to select
18   boxes for review, looked at the description of the
19   materials that are contained in Exhibit 11?
20   A.   I believe we did, yes.
21   Q.   If you go to the fourth page of Exhibit
22   11, and it will be box number 62.  It says
23   Intermedia, and then under the description it
24   appears to say JE logbooks.
25   A.   Yes.

Page 179

Ramsay

1    
2    Q.   June 2000 Intermedia, do you know what
3    that refers to?
4    A.   I don't for certain, no.
5    Q.   Going up on that page under, I guess,
6    it's box 50.
7    A.   Yes.
8    Q.   It's a description management book
9    analysis balance sheet REC's, February to September
10   2001.  It carries over to the following line.  It
11   says STFI revenue elimination January to September
12   2001.
13   A.   Yes.
14   Q.   Do you know what those entries refer to?
15   A.   I do not for certain, no.
16   Q.   Dropping down below to box number 65 it
17   looks like, it says a description it says JE Jan
18   '01 - Sept '01.
19   A.   I see that.
20   Q.   Do you know what that refers to?
21   A.   I don't.
22   Q.   Do you know what JE stands for?
23   A.   It sometimes refers to journal entry,
24   but I don't know what it is in this case.
25   Q.   Do you know if it could be a person's

Page 180

Ramsay

1    
2    initials, or something like that?
3    A.   It's possible.
4    Q.   Box number 68, if you look under the
5    description for that it says GLIFC 2000, GLDGX
6    2000, GLD Roman numeral two or two I's, 2000,
7    GLINT8 / 2000.  Do you know what that refers to?
8    A.   I don't for certain, no.
9    Q.   On the following page box 71.
10   A.   Devnet concession fees.
11   Q.   Right.  There's a number of different
12   entries, then there's an entry for shared revenue
13   2001, and then below that within the same box it
14   appears ICIMGNT book 7 / '01.  Do you know what any
15   of those entries mean?
16   A.   Other than what's said there, I don't
17   know.
18   Q.   With respect to any of the entries and
19   the descriptions, aside from what just may be
20   within the words that are there, do you have any
21   idea of what they refer to?
22   A.   I know they do not appear to me to have
23   a significant likelihood of anything in response to
24   -- that's my view of it.
25   Q.   Just so I'm clear, Ramsay Exhibit No.

Page 181

A 03124

1391ngvaldes.txt

1    BY MS. MURCH:

2         Q.    Let me ask you this:  Did you review any

3    documents in anticipation of those meetings?

4         A.    The only documents ■ reviewed were those that

5    I had created.

6         Q.    And which were those?

7         A.    Lists of tapes.

8         Q.    Did you review any documents after this

9    meeting?

10        A.    Not that I recall.

11        Q.    Now, when you say list of tapes, whose tapes?

12        A.    The tapes that -- the tapes we had shipped to

13   Ashburn, Virginia.

14        Q.    And when you say "we," who do you mean?

15        A.    Myself and a team of people who were closing

16   a data center.

17        Q.    okay.  Now, are we talking Intermedia tapes

18   or MCI tapes?

19        A.    Intermedia tapes.

20        Q.    And let's talk about this data center.  where

21   was that located?

22        A.    Tampa, Florida.

23        Q.    And who was in charge of the Tampa, Florida

24   data center?

25        A.    At the time the CIO was Ruben Lopez.

12

Exhibit J

A 03125

1391ngvaldes.txt

1    Q.    And at the time what was your title?

2    A.    I was Director of Systems Support.

3    Q.    Now, why was the data center being closed?

4    A.    WorldCom/MCI had decided that we would move

5    all -- almost all of our systems to Ashburn, Virginia

6    and close down the center for cost-saving purposes.

7    Q.    And when did that closure occur?

8    A.    I believe it was April or May of 2003.

9    Q.    So this was sometime after the merger?

10   A.    Yes, ma'am.

11   Q.    And what kinds of things were transferred

12   over to Ashburn, Virginia?

13   A.    computer systems, tapes.

14   Q.    Now, I'm sorry.  I'm kind of new to this.

15   when you say computer system, what do you mean by a

16   computer system?

17   A.    we had several types of computer systems,

18   sun hardware, Compaq hardware, IBM hardware.

19   Q.    And this was hardware that would do what?

20   A.    It pretty much was the infrastructure for

21   Intermedia communications.

22   Q.    was that equipment transferred basically

23   intact to Ashburn?

24   A.    Much of it was disassembled.  The pieces that

25   would be connected with cables would be disassembled

13

1    and packed on a truck or in boxes and shipped.

2    Q.    okay.  Now, when it made it to Ashburn, I'm

3    assuming that was also in April of 2003 approximately?

Page 11

A 03126

1391ngvaldes.txt

4    A.    We had been sending equipment there part of

5    the early -- of early 2003.    Several trucks were sent

6    to Ashburn.    Some was for equipment that would be

7    later put back into production, and some of it was for

8    hardware that would be later on disposed by the

9    company.

10    Q.    Okay.    And was it determined at the time that

11    equipment was put on the truck what would be disposed

12    of and what would be put back into production?

13    A.    Everything was very clearly marked.

14    Q.    And who decided that?

15    A.    It was myself and a team of engineers.

16    Q.    Okay.    And what did you -- what were the

17    criteria for determining whether something would be

18    disposed of or put back into production?

19    A.    If the system was still needed by the

20    business, we would mark it as -- and schedule for it

21    to be put back into production.    That was -- that that

22    was determined that we can dispose of, no longer use,

23    was marked.

24    Q.    And how did you determine if something was

25    needed?

14

1    A.    The business, the application owners, the

2    users, would help make that determination.

3    Q.    Now, when you say the users, the application

4    owners, what exactly do you mean?

5    A.    The end users, the employees of

6    Intermedia Communications.

Page 12

A 03127

1391ngvaldes.txt

10    in talking with the customer, they would say, no, we

11    no longer need it.  we use some other system.

12        Q.    And about how many times do you think that

13    happened where you overruled a user's decision to

14    either continue to put it into production or dispose

15    of it?

16        A.    ■ don't know.

17        Q.    Five times, fifty times?

18        A.    It's difficult to say.  ■ don't know.

19        Q.    okay.  Did you consult with anyone?  I know

20    you mentioned some engineers and part of a team in

21    closing down the data center.  who had lead

22    responsibility for that?

23        A.    who handled the responsibility for closing

24    the data center?

25        Q.    who had lead responsibility for closing it?

16

1        A.    I had lead responsibility.

2        Q.    And who assisted you in doing that?

3        A.    There were several engineers that were part

4    of that team.

5        Q.    were there any lead engineers or a primary

6    point person of contact?

7        A.    There were managers that would help and, of

8    course, their engineers would be helping as part of

9    that, but we also had other directors.  And my senior

10    director was also part of the closure.

11        Q.    And who is your senior director?

12        A.    sill Novak.

Page 14

A 03128

1391ngvaldes.txt

19    3,000 I think.

20        Q.    And what years did those cover?

21        A.    Oh, gosh, they probably went back to 1996

22    maybe all the way through 2003.

23        Q.    okay.   And do any of those backup tapes,

24    would they have included, if you know, information

25    related to Parus?


19

1        A.    I don't know.

2        Q.    I'm going to backup a little bit.

3              Have you talked to anyone who's been deposed

4    in this litigation between Parus and the Debtors other

5    than Mr. Ramsay?

6        A.    NO.

7        Q.    Have you reviewed any deposition transcripts,

8    other court transcripts, in connection with this

9    litigation?

10        A.    NO.

11        Q.    Do you know who Parus is?

12        A.    vaguely.

13        Q.    okay.   what do you know about Parus briefly?

14        A.    Just what -- what's been discussed.

15        Q.    And discussed by whom?

16        A.    Myself and the attorneys.

17        Q.    okay.   And when did you first learn of Parus?

18        A.    I want to say at the beginning of 2005.

19        Q.    And you learned about Parus through --

20        A.    First by one of the company attorneys, I

21    don't remember his name, but then later worked with

Page 17

A 03129

1391ngvaldes.txt

2     Q.    When you say computer terminal, what do you

3 mean by that?

4     A.    Monitors.

5     Q.    Does that include the actual CPU?

6     A.    Yes.

7     Q.    Now, have you ever given any presentations or

8 seminars or speeches or any training regarding

9 document retention or document storage policies?

10     A.    No, ma'am.

11     Q.    Have you ever written or authored any

12 articles regarding document retention policies?

13     A.    No, ma'am.

14     Q.    Okay.  When were you employed by Intermedia,

15 Mr. Valdes?

16     A.    I believe it was April of '96.

17     Q.    Through what date?

18     A.    Oh, gosh.  Well, through the mergers all the

19 way to today.

20     Q.    And do you recall when the merger was?

21     A.    I believe it was sometime early 2001.

22     Q.    I want to just jump back and ask you another

23 question.

24     Do you know what kind of products or services

25 EffectNet -- and that's E-f-f-e-c-t-N-e-t -- provided

24

1 or Parus provided?

2     A.    No.

3     Q.    Now, what positions or titles did you hold

4 while employed by Intermedia?

Page 21

A 03130

1391ngvaldes.txt

5        A.    I started out as a LAN administrator.    ▪

6   believe I moved up to manager, then to director.

7        Q.    And what were the respective dates you held

8   those positions?

9        A.    I was promoted to director in I believe it

10  was mid 2000.   Prior to that I think it was in '98

11  that I became manager.

12       Q.    And what was were your responsibilities as a

13  LAN administrator?

14       A.    I was responsible for all of the windows

15  servers for Intermedia communications.

16       Q.    And about how many servers would that be?

17       A.    I guess it depends on what the time frame

18  that you're asking.

19                    (Mr. Szczepanski enters room.)

20  BY MS. MURCH:

21       Q.    Well, let's start from the date you became

22  LAN administrator.

23       A.    The day ▪ became LAN administrator we had

24  approximately 30 servers.

25       Q.    And how many servers did you have when you

⬜

25

1   were promoted to manager?

2        A.    I would have to say over 100.

3        Q.    what other responsibilities did you have as

4   LAN administrator?

5        A.    I helped with Executive Desktop support.

6        Q.    what does that mean?

7        A.    supporting the executives of the company,

Page 22

A 03131

1391ngvaldes.txt
14  responsibilities.

15      Q.    And about how long was that document, how

16  many pages?

17      A.    Probably two or three pages.

18      Q.    Did you ever review that document?

19      A.    ▪ did.

20      Q.    Have you ever tendered that document to

21  Stinson Morrison or anyone in connection with the

22  litigation?

23      A.    No.

24      Q.    Did you read the document?

25      A.    Yes, ma'am.


                                                        28


1       Q.    Now, you said you were Director of systems

2   support and you had control or supervision over all

3   windows servers?

4       A.    Yes.

5       Q.    How many servers would that be?

6       A.    I believe that number had gone up to close to

7   300 servers.

8       Q.    And please explain to me what you mean by

9   when you say a windows server as opposed to a UNIX

10  server?

11      A.    It's servers that have the windows operating

12  system on them.

13      Q.    And at that time what was the operating

14  system?

15      A.    Gosh, ▪ would say windows NT40 and

16  windows 2000.

                        Page 25

1391ngvaldes.txt
23  customer networks?

24      A.   The majority of them were.  ■ would have to

25  say 95 percent of them were.


31

1       Q.   And the remaining would be for the employee

2   network?

3       A.   For employee network and infrastructure.

4       Q.   okay.  Now, tell me about the employee

5   network.  what did that encompass?

6       A.   The communications between our buildings and

7   our remote sites.

8       Q.   And would the UNIX servers include e-mail or

9   would that be the windows servers?

10      A.   They did not.  E-mail was only on windows.

11      Q.   And what about, for example, electronic

12  documents?  would that have been on UNIX or would that

13  have been on windows?

14      A.   That would have been on windows.

15      Q.   so what kinds of information would be on the

16  UNIX servers?

17      A.   only network monitoring type of information.

18      Q.   And what do you mean by network monitoring?

19      A.   It would house the tools that are used to

20  monitor the connections between two locations or

21  multiple locations.

22      Q.   okay.  so if you had an office at Point A and

23  then an office at point B, that would make sure that

24  those communications remained sound; is that fair?

25      A.   That's correct.

Page 28

A 03133

1391ngvaldes.txt

22    Q.    Mr. Valdes, was information disposed of when

23    the data center was put out of commission?

24    A.    No, it was not.

25    Q.    okay.    Then all information was preserved

41

1    when the data center was shut down?

2    A.    I believe it was.

3    Q.    okay.    Let me ask you this:    was there any

4    equipment that was disposed of when the data center

5    was shut down?

6    A.    No.    It was all moved up to Ashburn.

7    Q.    okay.    so let me back up again.    with respect

8    to this warm site, you're telling me approximately

9    2002 the information was sent back to Tampa?

10    A.    Yes.

11    Q.    okay.    And the equipment?

12    A.    Was sent back to Tampa as well.

13    Q.    sent back.    okay.    was all of that

14    information and equipment intact when it came back to

15    Tampa?

16    A.    Yes.

17    Q.    And what happened when it got back to Tampa?

18    A.    It was stored and then later sent to Ashburn

19    when we closed the data center.

20    Q.    okay.    What currently exists at the Ashburn

21    center?

22    A.    As it pertains to Intermedia equipment?

23    Q.    uh-huh, yes.

24    A.    I believe there's roughly 50 or so servers

Page 37

A 03134