1391ngvaldes.txt

25    left.

                                                                          42

1         Q.    And what happened to the rest of the servers

2    that you had mentioned?

3         A.    They were put in a storage -- a storage area

4    and later I believe it might have been disposed of

5    through asset disposal.

6         Q.    So the -- so we have 50 servers --

7    approximately 50 servers that are in Ashburn.   The

8    remaining set of servers were put into storage.   where

9    was that storage facility?

10        A.    In Ashburn.

11        Q.    But it was a different storage facility than

12   where the 50 servers went to?

13        A.    Yes.

14        Q.    And what happened to those other servers, not

15   the 50, but the other ones that were disposed of?

16        A.    I don't know.

17        Q.    And whose decision was it to dispose of it?

18        A.    Gosh, I don't know.

19        Q.    Do you know when they were disposed of?

20        A.    ■ would have to say sometime in 2004.

21        Q.    Do you know if there was information relating

22   to Parus on any of those servers that were disposed

23   of?

24        A.    I don't know.

25        Q.    would you have any idea what information

                          Page 38

A 03135

1391ngvaldes.txt

14      THE WITNESS:  okay.  As part of the process
15  of identifying all the systems that we wanted to
16  either send up to Ashburn or in order to decommission,
17  we would -- if a server was determined that it was no
18  longer needed, the data would be archived off the tape
19  and then the system would be turned off and shipped up
20  to Ashburn.
21          Does that -- is that what you're looking for?
22  BY MS. MURCH:
23      Q.    That helps.  But what other -- when you say
24  it was no longer needed, how did you determine if it
25  was no longer needed, that server?

70

1       A.    There were consolidation efforts made to be
2   able to house multiple databases on one server as
3   opposed to on separate servers.
4       Q.    And do you know if any information on the 50
5   servers relates to Parus or would there be any
6   information on the 50 servers?
7       A.    I don't know.
8       Q.    How would there -- is there any way to find
9   out whether there's information on those 50 servers
10  that relate to Parus?
11      A.    Well, I don't know.  Searches -- a search
12  could be made, which we've attempted and have had no
13  luck.
14      Q.    okay.  We'll get into that.
15          But how about for the other -- the non-50
16  servers, you know, we don't know the number exactly.

Page 63

A 03136

1391ngvaldes.txt

17    so I'll just call them the non-50 servers, how would

18    you know or find out if there's any information

19    related to Parus on those non-50 servers?

20        A.    I don't know.

21        Q.    Could searches be run on those?

22        A.    Not that I'm aware of.    I don't believe those

23    servers are in Ashburn anymore.

24        Q.    Okay.    When did they leave Ashburn?

25        A.    I believe it was sometime in 2004.

71

1        Q.    And whose decision was it to have these

2    non-50 servers leave Ashburn?

3        A.    I don't know.

4        Q.    Do you know any grounds for why those non-50

5    servers left Ashburn?

6        A.    They were part of asset disposal from what I

7    understand.

8        Q.    And what do you mean by asset disposal?

9        A.    When a system is end of life or is no longer

10    needed, they -- I believe they used to have a process

11    for asset disposal where they would take the hardware

12    or any assets off the books and dispose of it.

13        Q.    Now, when you say take it off the books, does

14    that mean they physically still exist but they're not

15    listed on the company's books and records or does it

16    mean that the actual physical assets are destroyed or

17    sold?

18        A.    I don't know.

19        Q.    Okay.    So do you know if the non-50 servers

Page 64

1391ngvaldes.txt

10    identified.

11         We were asked about any other location where

12    mail might be kept.   Tampa Mail was identified.

13         And then we were asked if there were any web

14    servers that might house any data, and Intramedia was

15    identified.

16    Q.    Now, you have 350.   You used date range and

17    you used the name of the tapes that kind of cut back

18    that number.   So how many tapes were left after you

19    did that?

20         MS. MURDOCK:   Objection.   That's vague.

21    350 what?

22         MS. MURCH:   Tapes.

23         MS. MURDOCK:   I'm not sure that that's what

24    he testified, but go ahead.

25    BY MS. MURCH:

⧠

                                                          79

1     Q.    Well, feel free to correct me if I misstated.

2     A.    Well, my understanding I think the first date

3     range we pulled like 3-, 400 tapes or so and then I

4     believe that date range was changed and the number of

5     tapes changed.   And I don't remember if it happened

6     twice or three times, but every time the number would

7     change.

8     Q.    Okay.   And what was the final number of

9     tapes, then, that were pulled in connection with the

10    Parus litigation?

11    A.    I don't remember what that number was.

12    Q.    Okay.   And, again, is there any way -- not
                        Page 71

1391ngvaldes.txt

13    again, I didn't ask the question.

14         But is there any way of figuring out the

15    tapes that you pulled, whether they came from the 50

16    servers or the non-50 servers?

17         A.   The tapes that I had identified would be part

18    of the 50 servers.

19         Q.   So then those tapes that you pulled should be

20    readable --

21         A.   Actually, let me restate that because I keep

22    forgetting about the Exchange servers.   The Exchange

23    servers were decommissioned.   so the tapes identified

24    included part of the 50 and part of the non-50 that

25    were sent up because the Exchange servers were

80

1    decommissioned.

2         Q.   okay.   So all backup tapes regarding e-mail,

3    Exchange e-mails, were part of the non-50 that you

4    pulled?

5         A.   Not all.

6         Q.   Okay.

7         A.   Tampa Mail is a server that still exists --

8    well, actually, the data on it has been migrated to

9    another server.   But relative to this, Tampa Mail

10   still exists.

11        Q.   okay.

12        A.   So it is part of the 50.

13        Q.   okay.   So which one of these systems that you

14   checked are not part of the 50?

15        A.   The Exchange servers.

Page 72

1391ngvaldes.txt

16    Q.    And, again, why was it determined that the

17    Exchange servers would be decommissioned?

18    A.    We migrated all of our user -- all of our

19    mail to WorldCom's systems, unified Messaging.

20    Q.    So if these Exchange systems were

21    decommissioned because they were migrated, would there

22    be any way to search for backup tapes regarding the

23    Exchange e-mail data on worldcom's system?

24    A.    ■ don't know.

25    Q.    who would know?

81

1    A.    Maybe Joe Falleur.

2    Q.    I'm sorry, who?

3    A.    Maybe Joe Falleur, Joseph Falleur.

4    Q.    uh-huh.  And what's his title?

5    A.    ■ don't know.

6    Q.    Do you work with him at all?

7    A.    From time to time.

8    Q.    So other than the Exchange servers that were

9    decommissioned, Tampa Data, Tampa Mail, Intramedia

10    were part of the 50 servers?

11    A.    Yes.

12    Q.    And those should be readable or retrievable?

13    A.    what should be retrievable, the tapes?

14    Q.    The backup tapes, yes.

15    A.    All the backup tapes are still available.

16    Q.    I'm sorry, readable where you wouldn't have

17    to go out and do a special process to read those

18    tapes?

Page 73

A 03140

1391ngvaldes.txt

19      A.      ▪ would have to say at this time no because

20    we've migrated the data from those servers to newer,

21    better servers and have pretty much discontinued using

22    the format of tape.

23      Q.    okay.  So while the 50 still exist, those 50

24    servers, the information has been migrated to

25    different servers?

82

1      A.    In many cases, yes.

2            Going back to what you were asking about

3    whether the tapes are still readable, we may be able

4    to take tapes from, let's just say, Tampa Data and

5    read them on one of the other systems that's out

6    there.

7      Q.    How difficult is that?

8      A.    The difficult part would be the space, space

9    limitations.  For instance, Tampa Data is a very large

10    data repository.  ▪ don't know of any other server we

11    have that's left out of the 50 or so that has the

12    space to be able to restore that kind of data.

13      Q.    And how large is Tampa Data?

14      A.    Tampa Data ▪ think is 700 gigabytes.  It has

15    at one point been over a terabyte, but I think the

16    last number I had heard six months ago was about 700

17    gigs.

18      Q.    so let me -- ▪ just kind of want to solidify

19    the chronology regarding the 50 and the non-50.

20      A.    okay.

21      Q.    I'm a little confused.  so the 50 -- at one

A 03141

1391ngvaldes.txt

1     A.   It was nightly.

2     Q.   And was it an incremental backup or a

3 full-system backup?

4     A.   For the e-mail systems it was full system.

5     Q.   okay.  Does Intermedia have any diagrams of

6 its network configuration?

7     A.   I know we had, yes.

8     Q.   Do you know if there are any anymore -- or

9 where they would be?

10    A.   NO.

11    Q.   okay.  Do you know if those were ever

12 provided to Debtors' counsel?

13    A.   NO.

14    Q.   Did Intermedia have any diagrams of its

15 e-mail architecture?

16    A.   I don't know.

17    Q.   Did Intermedia's file servers include user

18 data folders called home directories?

19    A.   Yes.

20    Q.   Let me ask how these home directors worked.

21 If I wanted to find, you know, Johm smith's user data

22 on the home directory, how difficult would that be?

23    A.   It would not be difficult.

24    Q.   About how long would that take do you think?

25    A.   we would have to know the first name, middle

97

1 initial, and last name of the person.

2    Q.   Did anybody ever ask you to do that, to look

3 for specific names?

Page 87

A 03142

1391ngvaldes.txt

106

1    stored on a yearly tape that was also on a quarterly
2    tape or a monthly tape?
3         A.    That's correct.
4         Q.    so it would be cumulative?
5         A.    No, it would not be cumulative.
6         Q.    NO?  okay.
7         A.    It would only be what was on the system at
8    the time of the backup.
9         Q.    Okay.  So it's possible that something you
10   had on a yearly tape would not be on a monthly tape?
11        A.    correct.
12             MS.  MURCH:   Do you need a break?  Let's take
13   a break.
14                      (whereupon,  a ten-minute recess was
15                       taken.)
16   BY MS.  MURCH:
17        Q.    Mr.  valdes, we're back on the record.
18        A.    Yes,  ma'am.
19        Q.    And you're still under oath.
20             You had mentioned that there were PST files
21   with respect to ■ believe it was the Tampa Mail
22   system?
23        A.    Yes.
24        Q.    were there any other PST files?
25        A.    It's possible that there were PST files on

107

1   Tampa Data.

page 96

1391ngvaldes.txt

116

1   on Tampa Mail?

2   A.  We wouldn't know about the user's hard drive.

3   We would only know if the file existed on Tampa Mail.

4   Q.  And did Intermedia have any policy with

5   respect to retention of PST files on users' hard

6   drives?

7   A.  No.  Not that I'm aware of, no.

8   Q.  So it's possible, then, that a PST file on a

9   person's hard drive could be lost forever?

10   A.  I don't know.  It's possible.

11   Q.  If the — let me ask you this:  Let's say an

12   employee who had a PST file on his or her hard drive

13   was terminated or quit, what happens to that hard

14   drive?

15   A.  That system, that hard drive, that system,

16   would be turned back in to either their manager and

17   sent back in to the PC Support Team.  And depending on

18   the user, they would either — they would either hold

19   that system, provide the files to their manager, or do

20   nothing with the system.

21   Q.  Now, when you say hold the system, what do

22   you mean?

23   A.  They would hold onto that desktop until a

24   later time, a month or two months, and then at that

25   point they would recycle it, use it for someone else.

117

A 03144

1391ngvaldes.txt

1    Q.    Okay.  So is it three options, either hold it
2    for an undetermined amount of time or they would take
3    files off of the computer and provide it to managers
4    or they would do nothing?  Is that --
5    A.    There might be one more option, and that was
6    I recall that there were some instances where they
7    would back up the entire user's system to a file
8    server and retain that data for a period of time.
9    Q.    And under what circumstances was that backup
10   done?
11   A.    It was based on the manager's request.
12   Q.    And was that done on a case-by-case basis?
13   A.    I believe so.
14   Q.    Was there any criteria for determining -- was
15   there any criteria a manager would use for determining
16   whether or not a user's individual hard drive should
17   be backed up?
18   A.    I don't know.
19   Q.    And how long would that e-mail -- or that
20   user's system be backed up for?  Is there a standard
21   period?
22   A.    No, I don't -- I don't know if they had a
23   standard or not.  I think it might have had to do with
24   space.
25   Q.    Okay.  Were hard drives -- where PST files

118

1    were located, were those ever erased or wiped out or
2    cleansed?
3    A.    I don't know.
                        Page 106

A 03145

1391ngvaldes.txt

10    A.    I'm not familiar with the term.

11    Q.    Okay.    Neither am I.    ▪ was hoping you could
12  tell me.

13         In addition to storing documents on hard
14  drives, did Intermedia employees have the ability to
15  store documents on the server directly?

16    A.    when you say "the server," what server?

17    Q.    Or an applicable server.    so if it were like
18  an Excel or a Power Point or whatever, it would be on
19  a file server?

20    A.    They could.    They had the ability.

21    Q.    Did many people use that?

22    A.    They did.

23    Q.    Is there any way to track who did that or
24  when it was done?

25    A.    No, only by the directory.    If a directory

⌐

121

1   was requested, we created it.

2    Q.    Did Intermedia actively use backup tapes for
3  information retrieval?

4    A.    Yes.

5    Q.    And how was that done?

6    A.    It was used for restoring systems whenever
7  files or systems -- whenever they were requested.

8    Q.    And how often was that?

9    A.    Not too often.    I would say we probably did
10  one or two restores a week.    It depended whether it
11  was e-mail or data.

12    Q.    what kind of backup tapes did Intermedia use?
Page 109

A 03146

1391ngvaldes.txt

19  unreadable when you had them?

20      A.  It's hard to say.  The tapes, we see them as

21  going bad.

22      Q.  okay.  And were any tapes -- ▮ believe it was

23  110 backup tapes that you identified that we talked

24  about -- or was it 105.  It was 110 tapes that went to

25  Kroll.  were any of them that you know of damaged or

124

1  corrupted?

2      A.  I don't know.

3      Q.  Did Kroll ever call you or talk to you about

4  any of these tapes directly?

5      A.  NO.

6      Q.  And how frequently -- what was the rotation

7  schedule for backup tapes?

8      A.  We had a six-week rotation.

9      Q.  so that means every six weeks a tape would be

10  overwritten, the data on the tape would be

11  overwritten, is that --

12      A.  In some cases, yes.

13      Q.  How about in other cases?

14      A.  well, some tapes would not be overwritten

15  because they were pulled out of the rotation.

16      Q.  And how many restores per tape?

17      A.  Excuse me?

18      Q.  How many restores?  Is there a single backup

19  on a tape, or is there multiple backup sets on a tape?

20      A.  It could be both.

21      Q.  And how would you determine?

Page 112

A 03147

1391ngvaldes.txt

11      A.    My understanding was because ▮ was familiar

12  with the tapes and the Intermedia systems.

13      Q.    Would you say the person most familiar with

14  the Intermedia tapes?

15      A.    ▮ believe so.

16      Q.    Now let's talk about the substance of your

17  affidavit.  If you could look at Paragraph 2, and you

18  say that you're in charge of all windows backup tapes

19  for Intermedia.

20            And we may have covered this, so I apologize,

21  but how many backup tapes did that encompass for the

22  period at issue?

23      A.    Well, for the period at issue --

24      Q.    Which was for clarification on the record

25  January 1, 2000 through December 31, 2002.

132

1       A.    Well, my understanding is the subset included

2   about 483 servers -- or 483 backup tapes.

3       Q.    And what was the date of the last Intermedia

4   backup tape?

5       A.    The last backup tape on there?

6       Q.    No.

7       A.    Of this subset?

8       Q.    No.  Of any Intermedia backup tape.

9       A.    Well, we are still performing backups of some

10  of the remaining systems.

11      Q.    Of the remaining Intermedia servers?

12      A.    Yes, yes.

13      Q.    Now, what do you mean when you say you were

Page 119

A 03148

1391ngvaldes.txt
14   in charge of all windows backup tapes?

15       A.    My team was responsible for those backups.

16       Q.    And how about when you said you were in

17   charge of the two remaining active Intermedia servers?

18       A.    That my team was responsible for Tampa Mail

19   and Tampa Data.

20             where do you see the two?

21             MS. MURDOCK:   (Indicating.)

22   BY MS. MURCH:

23       Q.    so the two remaining servers that are

24   referenced in this affidavit are Tampa Mail and

25   Tampa Data?

                                                     133

1        A.    I'm trying to see where ■ had put two, the

2    number two.

3        Q.    oh, I'm sorry.  Go to Paragraph 2.

4        A.    okay.

5        Q.    It's in the second-to-last line right at the

6    end:  For Intermedia and the two remaining active

7    Intermedia windows servers.

8        A.    okay.

9        Q.    And those servers were the Tampa Mail --

10       A.    Tampa Mail and Tampa Data.

11       Q.    Tampa Data.  okay.  And where are these two

12   active servers located?

13       A.    Tampa.

14       Q.    And what types of servers are these?  Are

15   they e-mail --

16       A.    They're file servers, file servers that

                        Page 120

1391ngvaldes.txt

19      Q.    How about during the relevant time period?

20    So when you started decommissioning these servers,

21    what is the approximate size of all of the equipment

22    you would need to be able to now read?

23      A.    Several racks' worth of equipment.

24      Q.    Several racks like --

25      A.    A rack is like the size of the door

145

1    (indicating).

2      Q.    okay.  so that door is, what, probably --

3      A.    Three-feet-by-seven-feet high, eight-feet

4    high.

5      Q.    And how many racks would you think?

6      A.    ▪ don't know, a half a dozen racks.  ▪ don't

7    know.

8      Q.    okay.

9      A.    It depends on how much of the 110 tapes we

10    would want to restore.

11      Q.    okay.  Now, did Intermedia -- I'm assuming at

12    some point in time Intermedia did have the ability to

13    search the data on the backup tapes that are

14    referenced in your -- or, I'm sorry, the servers?

15      A.    we didn't have the ability to search --

16    search the data on the tapes.  we could search for a

17    file and identify the file and restore it and then

18    search the file, but we would have to -- in order to

19    search files, we would have to restore them.

20      Q.    And that's just a common, routine practice --

21      A.    Correct.

Page 131

1391ngvaldes.txt

22      Q.    -- whenever you're searching for files?

23      A.    Correct, on tape.

24      Q.    on tape.  But the difference is here you

25    don't have the equipment to restore the tape?

146

1       A.    Correct.

2       Q.    Is that accurate?

3       A.    Correct.

4       Q.    okay.  And at what point in time did

5     Intermedia lose the ability to search -- or to restore

6     that data?  Is that when the servers were

7     decommissioned?

8       A.    when servers are decommissioned, yes.

9       Q.    Let's talk about the decommissioning of the

10    servers.  Now, you had mentioned that Intermedia did

11    not have a formal document retention policy but used,

12    was it, Gartner policy?

13      A.    we used industry standards, just common

14    practice.

15      Q.    And the industry standards were based on

16    Gartner.  Was there anyone else?

17      A.    It's -- Gartner is, like ■ said, a consortium

18    of different companies and how they go about doing

19    things.

20      Q.    But I'm just trying to get an idea of what

21    the universe -- what in your mind is an industry

22    standard.

23      A.    well, our industry standard is what we were

24    following, which is a six-week rotation.

Page 132

A 03151

1391ngvaldes.txt

16    Q.    By anyone at MCI?

17        MS. MURDOCK:    It's privileged to the extent

18  it came from in-house counsel at MCI█

19        You can testify to what else you did.

20  BY MS. MURCH:

21    Q.    I guess my question is:  was there any

22  nonlawyer who communicated to you about what you

23  should be searching, either -- or at MCI?

24    A.    NO.

25    Q.    Did you consult with anybody at MCI other

█

165

1   than the in-house lawyer about how to structure the

2   search or how to run it?

3     A.    NO.

4     Q.    And that was basically your determination as

5   to how to run the search?

6     A.    Yes.

7     Q.    Have any of the facts contained in your

8   affidavit changed since you executed it on August 4th,

9   2005?

10    A.    The only thing █ can say has changed is that

11  the two remaining active Intermedia servers in

12  question have been migrated to a newer system.

13    Q.    And when did that happen?

14    A.    I'd like to say at the beginningof this

15  year.

16    Q.    And what newer system is that?

17    A.    Excuse me?

18    Q.    what newer system is that?

A 03152

1391ngvaldes.txt

1    I probably had a few employees' backup -- a few
2    employees' hard drives backed up.
3        Q.    Was there any record kept by Intermedia when
4    an employee left or was terminated as to what was done
5    with their computer hard drives?
6             So, for example, ▮ believe you testified any
7    number of things could happen.  It could have been
8    backed up, nothing was done, it could have been
9    deleted.  Was there any record with respect to each
10   person who was terminated or left Intermedia which one
11   of those options had occurred?
12       A.    Not that I'm aware of.
13       Q.    Would it have been good policy to do that do
14   you think?
15       A.    ▮ don't know.
16       Q.    Was there a log of any personal computers
17   that were turned in when a person left?
18       A.    There may have been.  ▮ don't know.
19       Q.    Do you know who would know?
20       A.    No.
21       Q.    How many people at Intermedia had the
22   authority to specifically reach out and direct that
23   electronic documents be saved?
24       A.    ▮ would say every employee was empowered to
25   be able to say that.  If an employee was either

1    terminated or rift, their management would have that
Page 153

A 03153

1391ngvaldes.txt

14     A.    Meta data?  I don't understand of meta data.

15     Q.    what is meta data?

16     A.    That's the part that I don't quite

17 understand.

18     Q.    okay.  Do you know what meta data is?

19     A.    I've heard of the term, but I'm not familiar

20 with meta data in particular.

21     Q.    okay.  well, that's two of us, then.

22           ▮ guess the question I have is:  would the

23 same information, for example, when you searched the

24 two active servers as you mentioned sometime in July

25 or August of 2005, would the information at that time


                                                    196


1 that you searched now be on the new HP server?

2     A.    More than likely that data has changed over

3 time.

4     Q.    So we're not talking about identical

5 replication of what was on the server at 2005 to what

6 was on the HP server in 2006?

7     A.    I can't say for certain, no.

8     Q.    All right.  Now, Mr. valdes, when were you

9 notified that you were required to begin or implement

10 like a litigation hold?  Do you know what a litigation

11 hold is?

12     A.    No, please explain.

13     Q.    Okay.  For the purpose of that term what ▮

14 mean is an instruction perhaps by someone at Stinson

15 or an instruction by in-house counsel or an

16 instruction basically by anybody saying we want you to

                        Page 177

1391ngvaldes.txt

17  hold or preserve all documents in connection with a

18  certain party.  We'll call that a litigation hold.

19  Make sure you do not destroy any documents and that

20  all documents are kind of frozen in time.

21          Have you ever done that?

22      A.    Have I ever had to do that, or for this

23  particular case?

24      Q.    Have you ever had to do that?

25      A.    we have had to do that in the past.


                                                    197


1       Q.    okay.  Did you do that for this particular

2   case with respect to Parus?

3       A.    NO.

4       Q.    Do you know why not?

5       A.    Wasn't -- first off, the data -- there was

6   never data clearly identified as to what was to be

7   kept or what not kept.  We just followed our — we

8   continued to follow our standard procedures for

9   backing up and purging of data.

10      Q.    were you aware of any e-mails or notices sent

11  by Mr. -- I believe it was David wachen, W-a-c-h-e-n,

12  regarding a litigation hold as to Parus?

13      A.    NO.

14      Q.    Did you ever instruct anyone to retain or

15  preserve documents relating to Parus?

16      A.    No.

17      Q.    Do you know if anyone else made those

18  notices?

19      A.    I don't know.

                        Page 178

A 03155

1391ngvaldes.txt

20    Q.    How about anybody on the MCI side?

21    A.    I don't know.

22    Q.    who -- was there anybody at Intermedia or MCI

23    that you're aware of who was in charge of implementing

24    litigation holds?

25    A.    No, I don't know.

198

1    Q.    How about enforcing those litigation holds?

2    A.    They could have been enforced by any member

3    of management if they were instructed to.

4    Q.    Now, you said you have done litigation holds

5    in the past --

6    A.    Yes.

7    Q.    -- but not in connection with this matter?

8    A.    Yes.

9    Q.    can you kind of walk me through step by step

10    what was done, how you received notice of the

11    litigation hold and what you then, in turn, did?

12    A.    we would be instructed to not erase any tapes

13    at all, not even in a rotation.

14    Q.    And how did that -- let me back up.  How did

15    that notification come to you?  was it e-mail or a

16    memo?

17    A.    Sometimes -- the one I'm even thinking about

18    was actually a verbal from my management.

19    Q.    so please go ahead.

20    A.    verbal from my management.

21    Q.    And the next step in the process is you would

22    get a notice, either verbal or written, saying don't

Page 179

A 03156

1391ngvaldes.txt

23    delete anything, don't delete, don't rotate tapes?

24        A.    Uh-huh.

25        Q.    what then would you do?  what was your next

199

1    step?

2        A.    I would work with my managers or engineers

3    directly to give the instruction that no tapes are to

4    be recycled, and we would not recycle any tapes.

5              we would follow along with our continued

6    six-week rotation, but after the six weeks those tapes

7    would not be erased.  we would just -- we would rotate

8    in new tapes so that none would be erased.

9        Q.    And you're talking about backup tapes?

10        A.    Yes.

11        Q.    Any other electronic documents or protocols

12    that you would use besides no longer, you know,

13    rotating those tapes?

14        A.    For this particular one that I'm thinking of,

15    no.

16        Q.    Had you done anything else besides taking a

17    tape out of rotation?

18        A.    We have been asked by HR or security to back

19    up someone's files in the past.

20        Q.    would that be on a server or on their hard

21    drive?

22        A.    It would be both.  Their hard drive -- in

23    most cases we did not get involved with the hard

24    drives, the desktops.  we would only be related to the

25    servers.

Page 180

1391ngvaldes.txt

7      Q.    And would you know or would there be any way
8  to find out if these rogue servers had information
9  related to Parus on them?
10     A.    I don't know.
11     Q.    And for the MCI servers, what's the name of
12  the manufacturer of the drives for those?
13     A.    The drives?
14     Q.    I'm sorry, the servers.
15     A.    It's a number of vendors, Dell, Compaq, HP,
16  IBM.
17     Q.    And how many servers do you think there are
18  in total?
19     A.    Oh, gosh, I have heard of numbers of like
20  4500 servers.
21     Q.    And how about the time maybe, if you know,
22  between 2000 and 2002, approximately how many servers?
23     A.    That I don't know.
24     Q.    And why are certain manufacturer's servers
25  used?  Is there any kind of rhyme or reason to that?

204

1      A.    A department will buy a server whenever
2  however they want.
3      Q.    Let's talk about MCI's e-mail system.  What
4  kind of e-mail systems does MCI use?
5      A.    As far as I know, they use Exchange and I
6  think they're migrating over from POP.
7      Q.    And when did they start migrating over to
8  POP?
9      A.    I don't know.  To POP or from POP?

Page 184

A 03158

1391ngvaldes.txt

10    Q.    I'm sorry.  From POP?

11    A.    I don't know.

12    Q.    Did you have any involvement in that at all?

13    A.    Only as an end user.

14    Q.    Now, can you explain to me what the POP

15    e-mail system is?

16    A.    The way I understand POP e-mail is that it's

17    more of a gateway.  An e-mail comes in.  It's stored

18    there until you get it.  Once you get it, it's gone

19    from the system and it goes on.

20    Q.    And when you say gone from the system, you

21    mean gone from the server?

22    A.    That's the way I understand it.  I don't

23    know.

24    Q.    So is it fair to say a backup tape of a POP

25    e-mail system may not have very many e-mails on it?

                                                     205


1    A.    I don't know.

2    Q.    Okay.

3    A.    I don't know.

4    Q.    Do you know how the capture of a backup tape

5    works with respect to a POP e-mail system?

6    A.    I can only assume.

7    Q.    Okay.  Have you ever worked on a POP e-mail

8    system before?

9    A.    I've been an end user of a POP e-mail system

10    but not an administrator.

11    Q.    Okay.  Do you know why there's some users at

12    MCI using a POP e-mail system and some using an
                         Page 185

1391ngvaldes.txt

5      Q.    okay.  Your boss was Sill?

6      A.    No -- well, Bill Novak and then later on

7    Frank Ludlow.

8      Q.    And Frank Ludlow, was he on the Intermedia

9    side or the MCI side?

10     A.    MCI side.

11     Q.    whatever happened to Sill Novak?  when did he

12    leave?

13     A.    He was part of a reduction ∎ want to say

14    early 2003.

15     Q.    okay.  And who was -- who was ultimately

16    responsible at the Intermedia side to make sure

17    Intermedia was in compliance with MCI's document

18    retention policies?

19     A.    well, ∎ would have to say Frank was

20    responsible for that.

21     Q.    okay.  But he was already on the MCI side,

22    right?

23     A.    Then it would have been me.

24     MS. MURCH:  okay.  You know what, I'm going

25    to have maybe a little five-minute break.

235

1            THE WITNESS:  okay.

2                  (whereupon,  a twenty-minute recess

3                  was taken.)

4    BY MS. MURCH:

5      Q.    okay.  we're back on the record again,

6    Mr. valdes, and you are still under oath.

7            okay.  Let's turn to page -- we're still on

Page 212

1391ngvaldes.txt

10   says:   Just to recap our meeting today, I want to make

11   sure that you understand that you are not to give

12   authorization for tape rotation to any group.   It will

13   be necessary that each end user requesting tape

14   rotation put their request in writing with all the

15   necessary information we need in order to access R▪VS

16   role.

17          ▪ think that must mean assess rather than

18   access.

19          The e-mail needs to indicate the department

20   making the request, the department's function, why

21   they need tape rotations, what type of information on

22   the tape, how often do they want the rotations, how

23   many tapes, et cetera, as well as the other questions

24   that Vicki referenced in her e-mail.

25          Did you ever make -- in your responsibilities

                                                         247

1    at MCI with respect to the windows backup tapes, did

2    you ever formalize any request such as this in

3    writing?

4         A.    NO.

5         Q.    Did you have to confer or consult with

6    anybody about when tapes were rotated for the MCI

7    windows backup tapes?

8         A.    NO.

9         Q.    So that was solely within your discretion?

10        A.    Yes.

11        Q.    Now, if you would flip to the prior page,

12   which is 31816 of Exhibit 4, you'll see about halfway

                        Page 223

1391ngvaldes.txt

13    down Draft Policy Re Tape Rotation.

14         Do you know if a formal policy was ever

15    implemented?

16         A.    when?

17         Q.    From the time you joined -- well, this e-mail

18    was in 2001, so any time after 2001?

19         A.    I was not made aware of any of these RIM

20    documents until sometime ■ would have to say 2004.

21         Q.    Maybe the beginning, end, middle, do you

22    know?

23         A.    ■ don't remember.

24         Q.    okay.  Do you know when MCI began using

25    backup tapes?

                                                                    248

1         A.    NO.

2         Q.    Let's go to Page 31870.  This is a Guide For

3    New Acquisitions.  That's what it's called.

4         Did you ever receive this document in

5    connection with the MCI/Intermedia merger?

6         A.    NO.

7         Q.    Do you know if anyone else at Intermedia

8    received this document?

9         A.    NO, I do not know.

10        Q.    If you turn to the following page, 31871, at

11    the top it says:  while your records program is being

12    evaluated by RIM, absolutely no records destruction of

13    any kind can take place.

14        Did you ever receive that directive from RIM?

15        A.    ■ was only -- ■ only received those

                    Page 224

1391ngvaldes.txt

17   which would have been July/August 2005, were you still

18   doing those metrics reports?

19       A.    No.

20           MS. MURDOCK:  Let me object.  That misstates

21   his testimony as to when the searches were done.

22   BY MS. MURCH:

23       Q.    okay.  To clarify the record, when were the

24   searches done that you performed?

25           MS. MURDOCK:  Asked and answered.

260

1           THE WITNESS:   Sometime in early 2005 I

2   believe.

3   BY MS. MURCH:

4       Q.    And so at that time were you still preparing

5   metrics reports?

6       A.    No.

7       Q.    when did you cease preparing metrics reports?

8       A.    It would have to be sometime in 2003.

9       Q.    Now, did Intermedia have the capability of

10   restoring backup tapes in 2000?

11      A.    Yes.

12      Q.    How about 2001?

13          MS. MURDOCK:  objection, asked and answered.

14          THE WITNESS:   Yes.

15   BY MS. MURCH:

16      Q.    2002?

17          MS. MURDOCK:  same objection.

18          THE WITNESS:  Yes.

19   BY MS. MURCH:

Page 235

A 03163

1391ngvaldes.txt

20    Q.    And could you -- I'm sorry, could Intermedia

21    have preserved that capability had it wanted to to

22    restore those tapes?

23    A.    Yes.

24    Q.    And what would have been required to do so?

25    A.    we would just have had to have been given

261

1     instructions to do so.

2         MS. MURCH:    I don't have any further

3     questions.

4

5                    CROSS-EXAMINATION

6                    BY MS. MURDOCK:

7

8     Q.    Mr. valdes, at the very beginning of the day

9     today Ms. Murch asked you some questions about the

10    number of times that you communicated with Mr. Ramsay

11    or perhaps in-house counsel, and I believe you told

12    her that there were a couple of times in addition to

13    your declaration.

14        Do you recall giving Ms. Murch that testimony

15    earlier today?

16    A.    Yes.

17    Q.    Is it possible that there were more

18    communications than just a couple via telephone?

19    A.    There were a few, yes.

20    Q.    And generally what time frame were they in,

21    the same time frame that you already described to

22    Ms. Murch of 2005?

page 236

Robert A. Scher (RS 2910)
FOLEY & LARDNER LLP
90 Park Avenue
New York, NY 10016
Phone: (212) 682-7474
Fax: (212) 682-2329
email: rscher@foley.com

-and-

Mark L. Prager (*admitted pro hac vice*)
William J. McKenna (*admitted pro hac vice*)
Jill L. Murch (*admitted pro hac vice*)
Joanne Lee (*admitted pro hac vice*)
FOLEY & LARDNER LLP
321 N. Clark Street, Suite 2800
Chicago, IL 60610
Phone: (312) 832-4500
Fax: (312) 832-4700

*Attorneys for Claimant Parus Holdings, Inc.*
*Successor-By-Merger to EffectNet, Inc. and*
*EffectNet, LLC*

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | CHAPTER 11 |
| | Jointly Administered |
| WORLDCOM, INC., et al., | |
| | |
| Debtors. | Case No. 02-13533 (AJG) |

**DECLARATION OF ALISON CHUNG**

1.    Alison Chung, being first duly sworn, hereby states under oath as follows:

2.    I have personal knowledge of the facts stated in this Declaration.  If called as a witness, I could testify competently as to each of the facts stated in this Declaration.

3.    I am President of TeamWerks.  I have held that position since TeamWerks was formed in 1997.

4.    I obtained my Bachelor of Arts in Mathematics from Wellesley College, my Master of Arts in Mathematics from Stanford University, and my Master of Business

Exhibit K

A 03165

Administration from the University of Chicago. I also completed the Harvard Business School Executive Program for Financial Strategies at Harvard University.

5.    I have extensive experience in a variety of platforms and operating systems including mainframes, mini-computers and personal computers.

6.    I have managed a broad variety of assignments including strategic information systems planning; client/server strategy, planning and implementation; analysis and development of automation strategies; assessment of procedures and controls in a data processing environment; design and implementation of user acceptance testing procedures; and design and implementation of litigation and practice support systems.

7.    TeamWerks is a full-service technology consulting firm, founded in Chicago in 1997. TeamWerks' business is providing full service technology consulting to clients on "e-commerce" issues. TeamWerks offers its clients its expertise in configuring computer hardware and software, designing and maintaining web sites and networks, working with databases, developing custom applications, and computer forensic investigations.

8.    TeamWerks' staff members have over eighteen years of experience in the design and implementation of client/server and Internet/intranet application development, web site design and development, LAN/WAN design and implementation, electronic mail messaging systems, Internet security, and computer forensics.

9.    Computer servers can house various types of electronic data, including electronic mail ("email"), documents, and other computer applications which access electronic information on a company's network.

10.    There can also be several types of servers, including email servers, file servers, and print servers.

A 03166

11.    Once a computer server is dismantled, unless the hard drive was retained, the only way to access information previously contained on that server (at a particular point in time) is through the use of backup tapes created for that server.

12.    When information that exists on a particular server is saved onto a backup tape, only the information that is on the server at the time the backup tape is created is actually stored on that backup tape.   In other words, backup tapes are "snapshots" in time of the information contained on a particular server at a given time.

13.    The way in which a server stores information on its hard drive(s) depends upon the operating system and application software used on the server.

14.    A POP3 email server ("POP3 Email Server") does not store POP3 emails indefinitely.  Rather, a POP3 Email Server only stores undelivered POP3 emails that are waiting to be delivered to a user's hard drive.

15.    Once a POP3 email is delivered to the user's computer, the POP3 email is not stored on the POP3 server nor is a copy of the POP3 email saved on the POP3 Email Server. Instead, the POP3 email is routed directly to and written on the hard-drive of the individual user's computer.

16.    When a backup tape is created from a POP3 Email Server, only those POP3 emails that remained undelivered at the time the backup was created will be stored on the backup tape.  If the POP3 Email Server had no undelivered POP3 emails at the time the backup tape was created, there will be no POP3 emails on the backup tape.

17.    Backup tapes are typically "rotated," a process by which the information that currently exists on a backup tape is written over and replaced with new information collected from the server on a future date.

18. Once the information and data is written over on a backup tape as a result of the rotation (the "Prior Backup Tape Information"), the Prior Backup Tape Information is permanently deleted and is irretrievable.

19. The use of home directories on computer servers enables an IT professional to identify where a particular user's documents have been stored on servers. That information enables the IT professional to identify the backup tapes which were used to back up those home directories.

FURTHER AFFIANT SAYETH NOT.

_____
Alison Chung

STATE OF MASSACHUSETTS
COUNTY OF NORFOLK

Signed this 25th day of January, 2007.

_____
Notary Public

BARBARA M. COLONNA
MY COMMISSION EXPIRES
APRIL 4, 2008

Page 13

1   doing architecture and design as an Engineer II

2   and III.

3           As a Senior Engineer you're responsible for

4   architecting systems and services as well as leading

5   technical teams.

6       Q.   And have you given any presentations or

7   seminars or training regarding document retention?

8   And when I say documents, I mean electronic or hard

9   copy?

10      A.   No.

11      Q.   Have you written or authored any articles or

12  publications?

13      A.   No.

14      Q.   Mr. Miller, I'm handing you what's been

15  marked as -- it's Exhibit 1.  And this is a letter

16  from Allison Murdock of the Stinson Morrison firm

17  dated July 31st, 2006 to Mr. Kevin Smith of Kelley,

18  Drye & Warren.

19          And if you look, there's some indented

20  paragraphs.  Your name is in the second indented

21  paragraph.  If you could read that and let me know

22  when you're done.

23      A.   I'm done.

24      Q.   Is this an accurate description of your job

25  function during the period 2000 to 2002?

cae3c1cd-0528-4208-88af-4850707ed630
A 03169

1      A.    Yes.

2      Q.    And just for clarification, were you employed

3   by WorldCom or MCI?

4      A.    WorldCom at this time.

5      Q.    Did MCI have its own separate employees from

6   2000 to --

7      A.    Not to my knowledge.

8      Q.    By virtue of being employed by WorldCom,

9   would you be familiar with MCI at this time, from

10   2000 to 2002?

11          MR. IBA:  I'm going to object.  The question

12   is vague and ambiguous.

13          You can answer if you understand it.

14          THE WITNESS:  I'm not sure I can answer that.

15   BY MS. MURCH:

16      Q.    I can rephrase that.

17          Was MCI to your knowledge part of the

18   corporate tree of WorldCom?

19      A.    Could you define what corporate tree means in

20   your mind?

21      Q.    Affiliate, subsidiary, related entity.  If

22   you don't know, that's okay.

23      A.    I do not know.

24      Q.    Okay.  Did you -- during the period of 2000

25   through 2002 did you have any responsibilities with

A 03170
cae3c1cd-0528-4208-88af-48507b76b3a0

Page 94

1    proxy area, for both POP and IMAP proxy.

2        Q.    Anything else?

3        A.    That's all I can remember.

4        Q.    Any changes based on your reading of these

5    industry papers to retention of e-mail?

6        A.    No.

7        Q.    How about backup tapes?

8        A.    No.

9        Q.    Were you ever alerted at any point from 2000

10   to the present time to place a -- to preserve any

11   documents or electronically stored documents related

12   to Parus?

13       A.    No.

14       Q.    Did you ever receive notice of a litigation

15   hold related to Parus?  Do you know what a litigation

16   hold is?

17       A.    Yes.

18       Q.    Okay.  Can you tell me in your own words what

19   you understand a litigation hold to be?

20       A.    What I have been told a litigation hold is --

21            MR. IBA:  Hold on.  Is this something that

22   you've learned from attorneys?

23            THE WITNESS:  No.

24            MR. IBA:  Okay.

25

cae3c1cd-0528-4208-88af-48507b7603a0

A.03171

Page 95

1    BY MS. MURCH:

2        Q.    Go ahead.

3        A.    My team implements litigation holds based on

4    a request by one of several organizations within the

5    company to save all current e-mail on a system for a

6    specific user and also make copies of those e-mails as

7    they enter or leave the account in the future.

8        Q.    And did you ever implement a litigation hold

9    with respect to Parus?

10        A.    I did not.  My team may have but not for

11    Parus that I know of.

12        Q.    Do you have any idea how long MCI retains its

13    backup tapes for the services your department is in

14    charge of?

15        A.    Currently for the Exchange and Unified

16    Messaging platforms we were given an order on

17    July 21st, 2002 to retain all backup tapes currently

18    available and from that point forward indefinitely.

19    We are still following those orders.

20        Q.    And where did these orders come from?

21        A.    The order that I saw came from

22    Richard Breedan, the court monitor.

23        Q.    Who is he?

24        A.    The court monitor established by the

25    bankruptcy court.

cae3c1cd-0528-4208-88af-48507b7e0340
A.03172

Page 6

1    A.  Okay.
2    Q.  Did you meet with anyone in preparation of
3  your deposition today?
4    A.  Yes, I did.
5    Q.  Who did you meet with?
6    A.  Teresa and Don Ramsay.
7    Q.  And did you meet with them at the same time?
8    A.  Yes.
9    Q.  And when was that?
10    A.  Yesterday.
11    Q.  And where did you meet with them?
12    A.  203 LaSalle.
13    Q.  And for how long?
14    A.  From 9:00 to 3:00.
15    Q.  Was anyone else present?
16    A.  No.
17    Q.  What was the purpose of the meeting?
18    A.  Review pre-deposition.
19    Q.  Did you review any documents in preparation
20  of your deposition?
21    A.  One, my resume' from the November '05.
22    Q.  I'm sure that was an easy one to go through.
23      Any other documents you reviewed yesterday?
24    A.  No.
25    Q.  Did you bring any documents with you today?

Page 7

1    A.  No.
2    Q.  Other than preparing for your deposition,
3  have you ever discussed anything related to Parus or
4  Parus' claims?
5    A.  Not to my knowledge.
6    Q.  Have you reviewed any pleadings or deposition
7  transcripts or court transcripts in connection with
8  this case?
9    A.  No.
10    Q.  Do you know who Parus or EffectNet is?
11    A.  I've heard the name, but other than that, no.
12    Q.  When did you learn of Parus or when did you
13  hear the name?
14    A.  I believe it was sometime mid 2005, but I
15  can't be specific of the date.
16    Q.  And how did you learn of Parus?
17    A.  I was requested to look for data for certain
18  people with regards to -- the title of the e-mail was,
19  to my recollection, it was Parus Holding was the title
20  of the e-mail, a litigation case.
21    Q.  Do you remember the contents of the e-mail?
22    A.  Not off the top of my head --
23      MS. CLARK:  Objection.  If the e-mail was
24  from legal counsel, I'm going to object as to
25  attorney-client privilege.

Page 8

1  BY MS. MURCH:
2    Q.  Who was the e-mail from?
3    A.  Jeff Jacobs.
4    Q.  And look was Jeff Jacobs?
5    A.  Internal MCI lawyer.
6    Q.  Did you ever receive any further
7  correspondence from Mr. Jacobs?
8    A.  I can't -- I don't recall.  It's possible.
9    Q.  Mr. LaMantia, do you have a copy of your
10  resume' with you here today?
11    A.  No, I don't.
12      MS. MURCH:  I'd like to get a copy of that.
13      MS. CLARK:  Send a document request.
14      MS. MURCH:  We will.
15  BY MS. MURCH:
16    Q.  Do you know anything about the nature
17  between -- the dispute between Parus and the Debtors?
18    A.  No.
19    Q.  Was the litigation ever described to you by
20  anyone?
21    A.  No.
22    Q.  Do you know how much money is involved in the
23  litigation?
24    A.  No.
25    Q.  Do you know what the Unified Communications

Page 9

1  Agreement is or the UC Agreement?
2    A.  Nope.
3    Q.  How about the Master Agreement for Software
4  Licenses or MASL?
5    A.  No, sorry.
6    Q.  That's fine.  If you don't know, you don't
7  know.
8      Who at the Debtors have you spoken with about
9  Parus or Parus' claim?
10    A.  Debtors?
11    Q.  MCI or Intermedia?
12    A.  No one.
13    Q.  Do you know who Intermedia is?
14    A.  Yes.
15    Q.  And what's your understanding of Intermedia?
16    A.  Intermedia was purchased by WorldCom at some
17  point.
18    Q.  Anything else you know about Intermedia?
19    A.  No.
20    Q.  Do you know what kind of products or services
21  they provided?
22    A.  Telecommunications products.
23    Q.  Anything more specifically?
24    A.  (Indicating.)
25      THE COURT REPORTER:  Was that a "no"?

3 (Pages 6 to 9)

Sound Deposition Services    Exhibit M
888-297-6863

d6103dc2-b695-44d4-bf13-054c0b903c50

A 03173

Page 46

1  servers?
2      A.  They would go through what's called an ADR
3  process, and I don't know what ADR stands for, but it
4  would be -- basically go -- you know, go through the
5  process and then the company would do what they needed
6  to.
7          It was sent to a centralized location, and
8  they would sell it or do whatever they did with it.  I
9  don't know.  We followed the ADR process.
10     Q.  So once the servers were decommissioned, did
11  you or anyone from your department track what happened
12  to them?
13     A.  No.
14     Q.  Do you know who would have knowledge of what
15  happened to those servers after they were
16  decommissioned?
17     A.  The folks that run the ADR.
18     Q.  Do you have any idea what location they were
19  sent off to?
20     A.  No.
21     Q.  Let's talk about -- can you explain to me
22  step by step when a server is decommissioned what
23  happens to the data that's on that server?  I know you
24  mentioned it was consolidated, but what are the
25  specific steps that --

Page 47

1      A.  I can't -- I can only generalize because I
2  didn't do that.
3      Q.  Okay.  That's fine.  Based on your knowledge,
4  what was done?
5      A.  Based on my knowledge, that data would be
6  moved from that server we're trying to decommission to
7  another server within that same geographical area.
8      Q.  Would any data get lost during that --
9      A.  There's always that possibility.
10     Q.  And was there anything done to prevent the
11  loss of that data?
12     A.  Sure.  Part of the process would be to ensure
13  you have a backup of that complete server before you
14  decommissioned it.
15     Q.  And would the backup of the server, would did
16  that entail, like a backup tape or --
17     A.  Yes.
18     Q.  Now, let me try to understand backup tapes a
19  little bit.  If you're decommissioning a server and
20  before you decommission it you run a backup tape, what
21  kind of information would be on that backup tape for
22  that server?
23     A.  Hopefully the data that was on the server
24  would be on the backup tape.
25     Q.  All of it?

Page 48

1      A.  Hopefully.
2      Q.  The time that backup tape is run on the
3  server that's supposed to be decommissioned, does that
4  backup tape include all of the data that was ever on
5  the server or --
6      A.  No, just at the present time.
7      Q.  Do you know what was done with the backup
8  tape for decommissioned servers?
9      A.  They would be put back in a rotation with
10  whatever other backups for the other servers in that
11  same geographical location.
12     Q.  Do you know what the backup tape rotation
13  policy was from 2000 to 2002?
14     A.  It varied by geographic location.
15     Q.  So if you had a, say, for example, a file
16  server in Tulsa, it might have a different backup tape
17  rotation for --
18     A.  Than one in Virginia, yes.
19     Q.  And who was the -- who determined the
20  rotation periods for those file servers?
21     A.  The area managers.
22     Q.  And how many were there?  Do you know?
23     A.  That would be an estimate, too.
24     Q.  Okay.  Ten, a hundred, a thousand?  If you
25  don't know, that's okay.

Page 49

1      A.  Yeah, I don't.  It's less than 20.
2      Q.  Do you know if there was a formalized written
3  policy by MCI from 2000 to 2002 about the rotation of
4  tapes?
5      A.  Not to my knowledge.
6      Q.  Okay.  Is there anything else you did with
7  respect to file or print servers?  We talked about --
8  I'm sorry, reports.  We talked about availability
9  reports, decommission reports.
10         You know what, let me back up.
11         Those decommission reports, do you know if
12  those still exist or how long they were retained?
13     A.  I don't know that.
14     Q.  Any other reports that you received during
15  2000 to 2002 regarding file or print servers?
16     A.  Not off the top of my head, no.
17     Q.  You also mentioned you were in charge of
18  during this time period domains, and this is --
19  Exhibit 1A was along the lines of what you meant when
20  you said domains?
21     A.  Along the lines, but it was different at that
22  period than it is in this picture.  This is current.
23     Q.  And back then do you recall if they had
24  child -- was it child domains?
25     A.  There was child domains, but I don't know the

13  (Pages 46 to 49)

Sound Deposition Services
888-297-6863

d6103dc2-b695-44d4-bf13-054c0b903c50

A 03174

Page 54

1      Okay. Mr. LaMantia, did you ever give any
2   presentations or seminars about your responsibilities
3   whether in MCI or outside of MCI?
4      A.  Absolutely not.
5      Q.  And how about have you ever written anything
6   on your responsibilities or IT or --
7      A.  My resume'.
8      Q.  Okay. Mr. LaMantia, I'm going to show you
9   what I've marked as Exhibit 1 and it's a July 31st,
10  2006 letter from Allison Murdoch to Kevin Smith at
11  Kelley, Drye & Warren and I'm going to ask you to turn
12  to the second page.
13     On the top of the second page Allison Murdoch
14  mentions your name and says during 2000 to 2002 you
15  served in WorldCom, Inc.'s Enterprise Field Services
16  managing its desktops and active data, assisted in
17  search of desktops, shared drives and desktop backups.
18     Is this description accurate?
19     A.  On the latter part --
20     MS. CLARK:  Do you know what she's talking
21  about in that letter?
22     THE WITNESS:  Well, I'm just based on this
23  information here.
24     MS. CLARK:  Okay.
25     THE WITNESS:  At some point in 2002 there's a

Page 55

1   possibility I could have done this. I don't recall.
2   I don't think I had those responsibilities before
3   then.
4   BY MS. MURCH:
5      Q.  Which responsibilities are you referring to?
6      MS. CLARK:  I don't think he understands the
7   letter. He's never seen it before, and I think he's
8   reading this as everything listed there is something
9   he -- a job performance responsibility he had in 2000
10  to 2002.
11     THE WITNESS:  Correct.
12     MS. CLARK:  That's how he's reading the
13  letter.
14     MS. MURCH:  Okay. Well, we're working on
15  clarifying that.
16  BY MS. MURCH:
17     Q.  So explain to me what is not accurate about
18  this paragraph I've read to you?
19     A.  During 2000 to 2002 I believe my job title at
20  that time was Enterprise Services, not
21  Enterprise Field Services.
22     At some point in 2002, yes, I did become --
23  or to my best of my ability per my resume' I did take
24  back the desktops. So I'm -- I don't know, you know,
25  if this is accurate or not.

Page 56

1      Q.  So in 2000 to 2002 you did not manage the
2   desktops?
3      A.  From -- to the best of my knowledge, during
4   2000 to the beginning of 2002, no, I did not manage
5   the desktops. I managed the file and print servers at
6   that point.
7      At some point in early 2002, I did manage the
8   desktops to the best of my recollection.
9      Q.  Do you know between 2000 to 2002 who was in
10  charge of the desktops?
11     A.  Joe, I'll think of his name here in a minute.
12  I can't think of his name off the top of my head, but
13  he was based out of Carey, North Carolina.
14     Q.  Carey, North Carolina?
15     A.  Right. He was a peer of mine.
16     Q.  Is he still with --
17     A.  No.
18     Q.  Do you know where he is now?
19     A.  No idea.
20     Q.  Any idea when he left?
21     A.  No idea on that either.
22     Q.  Now, this paragraph also says that you
23  managed active data from 2000 to 2002. Is that
24  accurate?
25     A.  Where does it state that at?

Page 57

1      Q.  The second line:  Managing exec desktops and
2   active data.
3      A.  I think that should read active directory.
4   I'm not sure what active data is referring to.
5      Q.  Okay. We didn't either.
6      A.  Yeah.
7      Q.  What's an active directory, then?
8      A.  It goes back to the domains in the picture
9   (indicating), the all-encompassing over the domains.
10  That would make -- that would be right for that time
11  frame.
12     Q.  Now, it says you assisted in the search of
13  desktops, shared drives and desktop backups. Any idea
14  what that's referring to?
15     A.  At that time frame, no, because I don't
16  believe I did it at that time frame, at least until
17  the latter part -- or the beginning parts of 2002.
18     So in 2002 I believe I did take the desktops,
19  and I was involved in data harvesting of the desktops
20  or information on the desktops.
21     Q.  Did you do any searches of desktops, shared
22  drives or desktop backups in connection with this case
23  with Parus?
24     A.  I know I was sent an e-mail with some names
25  to do some searches with, which I passed on to my

15  (Pages 54 to 57)

d6103dc2-b695-44d4-bf13-054c0b903c50

A 03175

**Page 66**

1   about?
2        THE WITNESS:  That's -- yeah, that's pretty
3   much a standard for -- from ever since I've been with
4   all these companies.
5   BY MS. MURCH:
6        Q.   And how is it determined if a user had a
7   space where he or she could back up?
8        A.   That would have to be -- they, again, would
9   open a ticket with the Help Desk and request that
10  space.
11       Q.   Was anyone automatically given that space?
12  Were any users, for example, based on their level in
13  the company -- if I were the CEO of WorldCom or I were
14  a VP, would I automatically be given that space?
15       MS. CLARK:  What time period are you asking
16  about?
17       MS. MURCH:  2000-2002.
18       THE WITNESS:  No, because those were handled
19  in a different way for backups for the executives.
20  BY MS. MURCH:
21       Q.   And how were the backups for executives
22  handled?
23       A.   It was their choice if they wanted to be
24  backed up or not, and I believe this is the time
25  frame.  I can't be sure when we put these systems in

**Page 67**

1   place.
2        We had a disaster recovery system called
3   Legato Connected, and it was back -- the people that
4   chose to be on it, it was the directors and above that
5   had that option that backed them up on a daily basis.
6        Q.   Everybody below a director, were they backed
7   up?
8        A.   Absolutely not.
9        Q.   No.  Who was determined -- how was it
10  determined which users were backed up?
11       A.   Using --
12       Q.   Legato?
13       A.   Using Legato.  The criteria, one, they had to
14  be a director or above and it was optional for them if
15  they wanted it or not.
16       Q.   Any idea why it was optional?
17       A.   No.
18       Q.   For the period of 2000 to 2002 would there
19  have been any lists of directors who said they wanted
20  to be or were backed up by Legato?
21       A.   I'm sure there was.  There was an account
22  listings of that.
23       Again, though, I'm not confident that these
24  systems were in place at that time.  I don't know
25  exactly when we put the system in place.

**Page 68**

1        Q.   So what kind of things were in place to back
2   up directors' and officers' information?
3        A.   The only thing I knew about was the disaster
4   recovery, and that was solely due to if they lost
5   their hard drives on their laptops, that we could
6   rebuild their machine quickly.
7        Q.   And were there disaster recovery tapes for
8   these folks, like backup tapes or --
9        A.   From the Legato servers?  From -- I don't
10  know that.  We'd have to ask the person who managed
11  the Legato servers if they were being backed up.
12       Q.   Okay.  So just so I'm understanding, Legato
13  was a type of server or a type of software?
14       A.   Legato, there was -- some amount of servers
15  out in the field used the Connected software on the
16  desktop.  That software would connect back to that
17  server and make sure the data from the PC was put onto
18  the server.
19       Q.   And how does Legato fit in with that?
20       A.   Legato is just -- that was the name of it, of
21  the product.
22       Q.   Oh, of the process?
23       A.   Of the product, Legato Connected.
24       Q.   Now, Legato Connected would take information
25  from a computer's user and put it on a server?

**Page 69**

1        A.   Would back it up to a server.
2        Q.   And Legato was only used for directors and
3   above?
4        A.   Again, and it was optional.  So it wasn't
5   everybody.
6        Q.   And were there backup tapes?
7        A.   I don't know that.  Again, we have to ask the
8   person who managed that.
9        Q.   Do you know who that was at all?
10       A.   Ken Croslin.
11       Q.   Were there any other servers for directors
12  and officers that were used to help --
13       A.   There was one other system that was very
14  similar.  It was a Veritas system, and it was only
15  used in Ashburn, Virginia once that became the
16  corporate headquarters for Michael Cepallias and his
17  direct reports.  At the time he was the CEO of the
18  company.
19       Q.   So only his information would be --
20       A.   His and his direct reports.
21       Q.   When you mean direct reports, the reports
22  that went directly to him?
23       A.   No, his direct reports meaning a gentleman
24  named Fred Briggs was direct report of his,
25  Cynthia Andreatti (phonetic) was a direct report of

18  (Pages 66 to 69)

Sound Deposition Services
888-297-6863

Page 70

1  his.
2       I don't know all the others. People that
3  reported to Michael Cepallias at the time were backed
4  up to that Veritas backup system.
5       Both those systems have been replaced with a
6  newer backup system we use today.
7       Q. And do you know when that was?
8       A. I believe it came on line in 12-2005, the new
9  one.
10      Q. And where were those -- where are the other
11 servers?
12      A. I assume sitting where they were. I'm not
13 sure, though. We had some problems with the old
14 Legato ones. They started to fail on us.
15      Q. So just so, again, I'm clear, the Legato
16 servers for 2000-2002, do you know where those would
17 be?
18      A. I don't even know if that's the time period,
19 but if they were, again, I don't know where they are
20 today but Ken might know that.
21      Q. Okay. And how about the Veritas system?
22      A. The Veritas system I believe is still in
23 Ashburn, Virginia. It might be used for something
24 else by now, though. I don't know that.
25      Q. Okay. So I'm understanding this, we had a

Page 71

1  couple of systems. We had the Legato. That was for
2  directors and above and was optional. We don't know
3  if there were backup tapes. And then we have the
4  Veritas system which had Michael Capel?
5       A. Cepallias.
6       Q. Cepallias and his direct reports,
7  Fred Briggs. Who were the other direct reports?
8       A. I don't know. Cindy Andreatti.
9       Q. Cindy?
10      MS. CLARK: For the record how do you spell
11 Cepallias?
12      THE WITNESS: I think it's C-e-p-a-l-l-i-a-s.
13 I'm pretty sure that's how it was.
14 BY MS. MURCH:
15      Q. Okay. And Cindy?
16      A. Andreatti, she was the head of sales.
17 Fred Briggs was the head of operations.
18      He had a head of marketing. He had a head of
19 finance. I don't recall all the names.
20      Q. And did you have any responsibility between
21 2000 to 2002 for the Legato or Veritas systems?
22      A. That's iffy. I don't know the time frames.
23 So at some point in time, yes, I was responsible for
24 those but I don't know specifically the dates I was.
25      Q. And how were you -- what was encompassed in

Page 72

1  those responsibilities?
2       A. First of all, it was to ensure that, again,
3  that the servers were up and running and that the
4  backups actually worked and that were sent back to the
5  server, the information was sent back.
6       Q. Do you know did you see decommission reports
7  for these systems, the Veritas and Legato?
8       A. I don't know that for a fact. I know we had
9  end-of-life issues with several of them, and we had to
10 rotate people off of several of them and put them on
11 others and rebuild these servers. We were having lots
12 of problems with these later on.
13      Q. Was there a list created as to which users
14 were on Legato?
15      A. It would have to be -- it depends on what
16 point in time there is, and I don't know if those were
17 saved or not.
18      Q. But there was a list at some point in time?
19      A. Sure, at some point in time. We knew what
20 counts were on which.
21      Q. What kind of servers were used, then, for the
22 folks that weren't on Legato or Veritas?
23      A. None. None, yeah.
24      Q. So how would their information be kept?
25      A. There was no backup policy for them, for a

Page 73

1  director or below. There was no policy, period.
2       If they did save something, it might have
3  been saved through a share if they had a share.
4       Q. And what's a share?
5       A. A share would be on a file server, meaning
6  you would have a possibly what's called a home share,
7  an H. Drive that you could access as a user if you
8  requested that space and you might be able -- you
9  know, you would put documents or whatever you wanted
10 to keep there as your backups.
11      Q. And would other people have access to that?
12      A. No.
13      Q. Would there be any backup tapes for
14 electronic documents for people who were not on Legato
15 or Veritas?
16      A. There was backup tapes for the file and print
17 all through the time period. They were rotated. So,
18 you know, yes, there was backup tapes.
19      Q. So I'm a user at MCI and I have a document, a
20 Word document, I have created and let's say it's -- I
21 don't know where I stored it and -- was there any
22 procedure to store that information on a server?
23      A. It's based on you as a user to determine how
24 important that is and where you store that
25 information. I can't answer that.

19 (Pages 70 to 73)

d6103dc2-b695-44d4-bf13-054c0b903c50

A 03177

Page 114

1 want to take a look at it, Ms. Clark.
2 BY MS. MURCH:
3    Q. Mr. LaMantia, we're going to shift gears a
4 little bit today and talk about whether -- about
5 litigation holds.
6       Do you know what a litigation hold is?
7    A. No.
8    Q. Let me try and describe that for you. That
9 would be, for example, if MCI or the Debtor were aware
10 of litigation or should have known of litigation, they
11 would place a hold or require documents to -- or
12 prevent documents from being destroyed, they would
13 require that they specifically be maintained, kind of
14 akin to what happened I think when you mentioned there
15 was a bankruptcy court order do not destroy documents.
16    A. Okay.
17    Q. Did you ever receive a litigation hold or an
18 instruction not to destroy documents or preserve
19 electronic records in any form ever during the period
20 of 2000 to 2005?
21    A. The only one that I was aware of was getting
22 back to the servers, keeping the server backups, but
23 personally, no.
24    Q. And when you mean the server backups, was
25 there any specific directive that said other than

Page 115

1 out -- outside the ordinary course?
2    A. Yes, it gave us a wider time frame to -- and
3 I'm not -- I don't know specific time frames, but it
4 was outside the normal course of backups that we had
5 to buy additional tapes to meet that.
6    Q. And when was that done?
7    A. I don't know the specific dates. It was
8 during the bankruptcy. That's all I can tell you.
9    Q. And that was specifically related to the
10 bankruptcy?
11    A. To my knowledge, yes.
12    Q. Did you ever receive a litigation hold with
13 respect to Parus?
14    A. No.
15    Q. With an -- how about with respect to an
16 entity called EffectNet?
17    A. No.
18    Q. And how about with respect to an entity named
19 Webley?
20    A. No.
21    Q. And we talked about an Exhibit, I believe,
22 1A. This was the -- what did we call it again,
23 active?
24    A. Active directory.
25    Q. Now, is there any kind of summary of the

Page 116

1 active directory at all anywhere or describe it or --
2    A. Active directory can be -- it's on --
3 Microsoft's web page can give you an overview of
4 active directory and what it is.
5    Q. Okay. And so if I were to look at
6 Microsoft's definition of active directory, that would
7 be synonymous with the term you're using here as
8 active directory?
9    A. Correct.
10    Q. Now, Mr. LaMantia, let's talk about searches
11 that either you or your designee conducted in
12 connection with the Parus litigation.
13    A. Okay.
14    Q. When did you -- when were you contacted
15 about -- when were you first contacted about Parus?
16    A. I couldn't give you a specific date.
17    Q. Was it 2004, 2005?
18    A. I think it was 2005.
19    Q. And who contacted you?
20    A. To the best of my knowledge, it was
21 Jeff Jacobs, one of our internal lawyers.
22    Q. Do you recall how long that conversation was?
23    A. It wasn't a conversation. It was through an
24 e-mail.
25    Q. Do you know what he said in that e-mail?

Page 117

1       MS. CLARK: Objection, privilege, calls for
2 privileged information.
3       MS. MURCH: Are you instructing the witness
4 not to answer?
5       MS. CLARK: The information in the document
6 is protected by the attorney-client privilege and/or
7 work product. Yes, I am instructing the witness not
8 to answer.
9 BY MS. MURCH:
10    Q. Are you going to follow your counsel's
11 advice?
12    A. Yes.
13       MS. CLARK: Yes, you are.
14       MS. MURCH: I think he can answer for
15 himself.
16       THE WITNESS: Yes, I am.
17 BY MS. MURCH:
18    Q. What steps did you take, Mr. LaMantia, after
19 you received that e-mail?
20    A. I passed that e-mail on to Ken Croslin to do
21 research.
22    Q. And what kind of research did you ask him to
23 do?
24    A. To look and see if we had any -- had any of
25 those people that were currently being backed up using

30 (Pages 114 to 117)

d6103dc2-b695-44d4-bf13-054c0b903c50

A 03178

Page 122

1    Q.  What's your opinion as to Mr. Croslin?
2         MS. CLARK:  As to what?  Objection,
3    ambiguous.  Opinion as to what?
4    BY MS. MURCH:
5    Q.  His work.
6    A.  His work is top notch.
7    Q.  Would you consider him reliable?
8    A.  Absolutely.
9    Q.  Would you consider him thorough?
10   A.  Yes.
11   Q.  And so -- I'm sorry.  I forgot.  So there
12   were -- the search results were found, there were
13   subsequent e-mails, and you don't recall what was done
14   after that?
15   A.  No.
16   Q.  If you were to run the search -- would there
17   have been any way you would have run it?
18   A.  No.
19   Q.  Would you have known how to run the search?
20   A.  No.
21   Q.  Do you know on what systems the search was
22   run?
23   A.  To my knowledge it was run on the Legato
24   backup disaster recovery systems.
25   Q.  Was that the only thing to your knowledge?

Page 123

1    A.  I remember being requested to at some point
2    that we look on shares at some point, too, in time.
3    Q.  Do you know if that was done?
4    A.  I know it was done, but I don't know the
5    results of that.
6    Q.  Do you know approximately when that was done?
7    A.  In a similar time frame.
8    Q.  I think we said about 2005?
9    A.  (Indicating.)
10        THE COURT REPORTER:  Can you say "yes" or
11   "no"?
12        THE WITNESS:  Yes.
13   BY MS. MURCH:
14   Q.  If I direct you back to Exhibit 1, which was
15   the letter to Ms. Murdock, on the second page is a
16   paragraph we talked about earlier.  It says:  Assisted
17   in search of desktops, shared drives, and desktop
18   backups.
19        Do you know if Mr. Croslin searched desktop
20   backups?
21   A.  Desktop backups would have been -- well, it
22   could have been.  This is, again, depending who the
23   person was, the desktop backup could have been -- when
24   I see the word desktop backup, that refers to the
25   disaster recovery system to me.  Okay.

Page 124

1    Q.  And when you see the word desktop, searches
2    of desktops, does that mean I would go into your
3    office and just start searching on your desktop?
4    A.  No, not unless LPP/Jeff Jacobs specifically
5    requested that.  That would be a current employee that
6    we did that to.
7    Q.  So --
8    A.  So the answer to your question is yes, as
9    long as we had legal LPP's guidance to do that.  They
10   set the appointment, and we would go to their desktop.
11   Q.  Do you know if that was done with respect to
12   searches for Parus?
13   A.  I don't know that.
14   Q.  Do you think Jeff -- I'm sorry, Ken Croslin
15   would know?
16   A.  Possibly, yes.
17   Q.  Would anybody else know if this was done?
18   A.  No, not between Jeff, Ken or myself.
19   Q.  And can you tell me any other specifics about
20   the manner in which these searches were run?
21   A.  No.
22   Q.  Do you know if whoever was running these
23   searches, whether it was Mr. Croslin or someone else,
24   did they encounter any kind of obstacles or problems?
25   A.  Specific to the Parus Holding case?

Page 125

1    Q.  Yes.
2    A.  I don't know.
3    Q.  Did you or anyone under your supervision or
4    control make any images of hard drives in connection
5    with the Parus dispute?
6    A.  I did not.  And I would say, again, if it was
7    done, you're not making images, you're taking the
8    Legato backup data, the disaster recovery data, and
9    that is the full backup of the unit in its entirety.
10   So if you're referring to an image, if that's what
11   you're referring to --
12   Q.  Uh-huh.
13   A.  -- if that data was present for a custodian
14   and he was on the list or she was on the list, then,
15   yes, that data would have been captured through that
16   manner.
17   Q.  And Legato was only used for directors and
18   above?
19   A.  Correct.
20   Q.  Do you know how many directors and above used
21   Legato or opted to use Legato?
22   A.  No.
23   Q.  Do you think it was a majority?
24   A.  During what time frame?
25   Q.  Well, let's shoot for 2000 to 2002.

32  (Pages 122 to 125)

d6103dc2-b695-44d4-bf13-054c0b903c50

A 03179

Page 126

1    A. No, I don't recall and I doubt if it was the
2  majority.
3    Q. And why would someone -- strike that.
4       Do you have your documents backed up on
5  Legato?
6    A. On the new system, yes.
7    Q. For how long have you had that done?
8    A. At least three years I've been using it.
9    Q. And prior to that --
10   A. Or four years, three or four. When the
11  systems came on line, whenever that first day was, I
12  started using the system.
13   Q. Okay. And how did you back up your documents
14  prior to Legato?
15   A. I didn't.
16   Q. Mr. LaMantia, I'm going to direct you back to
17  Exhibit 3, which is this document retention policy.
18      Have you ever seen this document before?
19   A. Not in hard copy.
20   Q. And where have you seen it?
21   A. I've seen this document on the RIM website.
22   Q. Have you ever read this document on the RIM
23  website?
24   A. Completely, no.
25   Q. And can you tell me what portions you have?

Page 127

1    A. No. Have and have not read, no, I can't tell
2  you that.
3    Q. And when was the last time you consulted this
4  document on the RIM website?
5    A. I frankly don't recall.
6    Q. Do you recall what the purpose was for
7  consulting with this document?
8    A. Records retention.
9    Q. But anything more specifically? Were you
10  looking it up with respect to a particular policy?
11   A. No. If I had questions usually regarding
12  records retention, that would be discussed with legal
13  directly, with Jeff Jacobs.
14   Q. And what did you understand your
15  responsibilities to be under this Exhibit 3?
16   A. Exhibit 3, Records Management Retention?
17   Q. Yes.
18   A. That would be my own responsibility to ensure
19  that I kept documents that I felt were -- fell under
20  these categories kept in a safe place.
21      So it's only to me, the individual, and with
22  the people that were under me, to ensure they kept
23  their records accordingly.
24      In the MCI time frame from -- or from -- in
25  the MCI time frame, and I'm not sure of the dates,

Page 128

1  it's the users' responsibility to retain records. And
2  if those records are critical records, they need to
3  ensure the safety of those records.
4    Q. And how did MCI ensure that was done?
5    A. I don't think they could. I don't know how
6  they did that. Again, it was up to the user to ensure
7  that.
8    Q. So -- and I'm just going to paraphrase, and
9  feel free to change or tell me otherwise, but your
10  responsibilities under Exhibit 3 were with respect to
11  the documents you created as a user and your
12  responsibilities to save those documents that you
13  made?
14   A. Correct, unless there was a specific policy
15  given to me saying that policy was dictating to the
16  servers or whatever I supported, that would be a
17  different story. But containing this -- or pertaining
18  to this, yes, specific to me, only me.
19   Q. Did you get any of these other policies?
20   A. The one time to extend the time frames on our
21  systems for the backups.
22   Q. And that was the bankruptcy order?
23   A. That was the bankruptcy order.
24   Q. Okay. Mr. LaMantia, if I could ask you to
25  please turn to Page 31870 of Exhibit 3.

Page 129

1    A. 31870?
2    Q. Yes, sir.
3    A. A Guide for New Acquisitions?
4    Q. Yes. And for the record this is a document
5  entitled A Guide for New Acquisitions.
6       Did you ever receive a copy of this document
7  that you recall from 2000 to 2004?
8    A. I may have. I don't recall.
9    Q. If I could get you to turn to the next page,
10  31871, and at the very first paragraph it says: While
11  your records program is being evaluated by RIM,
12  absolutely no records destruction of any kind can take
13  place.
14      Do you know or were you asked to enforce this
15  policy?
16   A. I don't know what time frame this -- this
17  would be specific to a time frame I would assume,
18  maybe through one of the mergers. I don't know.
19      That's what it seems like to me because it
20  states "while going through the transition." So this
21  tells me we're going through yet another merger or
22  acquisition.
23   Q. And that's -- my understanding is that this
24  would relate to documents during a merger scenario.
25  Do you know if this policy was followed in connection

33 (Pages 126 to 129)

d6103dc2-b695-44d4-bf13-054c0b903c50

A 03180

Page 26

1  excuse me.
2    Q.  So if I, for example, were a customer of
3  MCI, would I have my own IMAP account?
4    A.  No, it would be related to business.
5    Q.  I'm not sure I follow.
6    A.  It would be an account that was used for a
7  specific business purpose.  So an outside customer
8  would communicate using that functional account.
9    Q.  Could you give me an example?
10    A.  Let's say we had a service, and customers
11  communicated with us for information about that
12  service.
13    Q.  Oh.  Could it be, for example, if you had
14  a web site and it said for help e-mail this e-mail
15  account?
16    A.  Exactly.
17    Q.  Okay.  Where does MCI Mail fit into
18  unified messaging if at all?  Are you familiar with
19  MCI Mail?
20    A.  I know what MCI Mail was, but I never had
21  any direct access to -- well, excuse me.  I wasn't
22  involved in supporting MCI Mail.
23    Q.  Do you know if that was part of the
24  unified messaging?
25    A.  It's not.

Page 27

1    Q.  Do you know whose department that would
2  have fallen under?
3    A.  When MCI Mail was being -- was still in
4  production, that person's name was Chris Crisman
5  (phonetic).
6    Q.  Do you know if he is still with WorldCom
7  or MCI or Verizon?
8    A.  Yes.
9    Q.  Do you know when MCI Mail was phased out?
10    A.  I can't remember.  I'm sorry.
11    Q.  That's okay.  It's not a test of your
12  memory.
13        And why was Exchange not included in
14  unified messaging?
15    A.  It's a different application.
16    Q.  Do you know about how many users were on
17  Exchange during the relevant time period?
18    A.  Yes.
19    Q.  Okay.  And how many would that be?
20    A.  Approximately 3,000.
21    Q.  What types of folks used the Exchange
22  system?
23    A.  Mainly executives and executive
24  administration.
25    Q.  Do you know why executives and executive

Page 28

1  administration were on a different e-mail system?
2    A.  Mainly for calendaring reasons.
3    Q.  When you saw calendaring reasons, Exchange
4  has a program where you can -- you have a calendar
5  and you can put dates in and reminders?
6    A.  Yes, ma'am.
7    Q.  I'm going to hand you Exhibit 1 which I
8  know your counsel is all very familiar with.  It's a
9  July 31st, 2006, letter to -- from Allison Murdock
10  to Kevin Smith of Kelley Drye & Warren.  If you see
11  kind of down near the bottom, you'll see your name
12  on the first page.
13        Do you see that, Mr. Falleur?
14    A.  (Nodding head.)
15    Q.  It says during 2000 to 2002 you served as
16  WorldCom, Inc.'s team lead for messaging group
17  relating to relaying and unified messaging.  You
18  assisted in search of e-mail backup and relay log.
19        Is that description accurate?
20    A.  Yes.
21    Q.  And during that time period, were you
22  employed by WorldCom, Inc., or MCI?
23    A.  I'm not sure when we were officially MCI.
24  We merged with MCI in '99 to my best recollection,
25  and then when I was an employee of, officially an

Page 29

1  employee of MCI I'm not -- I don't know for sure.
2    Q.  But as an employee of WorldCom, would you
3  have knowledge or familiarity with MCI's e-mail
4  servers during this time or e-mail?
5    A.  No.
6    Q.  I guess --
7    A.  Please restate the question because that's
8  a little bit confusing.
9    Q.  My understanding is WorldCom had maybe
10  200 affiliates, subsidiaries, and the nature of the
11  dispute with Parus is specifically between
12  Intermedia and MCI/WorldCom Communications.  I'm
13  just trying to figure out if you're the right person
14  to be talking to with respect to e-mail protocol for
15  MCI Communications -- I'm sorry, MCI/WorldCom
16  Communications.
17        MR. IBA:  And the question is what?
18        MS. MURCH:  Would he have knowledge about
19  MCI/WorldCom Communications during the relevant time
20  period.
21        THE WITNESS:  That's a really broad
22  question.  Yes.  Yes.
23  BY MS. MURCH:
24    Q.  Okay.  Would you have any responsibilities
25  with respect to MCI/WorldCom Communications during

8  (Pages 26 to 29)

Exhibit N

e918e88a-82d7-4dd8-8412-8f4a4b2dda8e

A-031121

Page 130

1 our bankruptcy.
2    Q. Good news. I'm skipping all these pages.
3    A. I do recall something about this document
4 in relationship to where we were supposed to ship
5 tapes when they -- when we needed to send them to
6 storage.
7    Q. Do you remember anything specifically?
8    A. No, just that where I needed to get the
9 tapes to get them taken care of.
10    Q. Okay. When you say taken care of, you
11 just mean --
12    A. Stored.
13    Q. -- stored?
14    A. Sorry, I should have said stored.
15    Q. Did you have any involvement with moving
16 e-mail accounts from Intermedia to MCI?
17    A. Probably. I don't remember specifically.
18    Q. Do you know of anybody else who might have
19 been involved?
20    A. The Intermedia people.
21    Q. Any names that you can think of?
22    A. Julio Valdez maybe.
23    Q. Are you familiar with the term litigation
24 hold?
25    A. I am now. Recently, yes.

Page 131

1    Q. I won't ask you how you know.
2       What is your understanding of a litigation
3 hold?
4    A. Litigation hold is where we are requested
5 to retain all e-mail for a person for a infinite
6 amount of time or until requested to stop.
7    Q. And did you ever receive a litigation hold
8 request with respect to Parus?
9    A. I don't recall. Seriously, I don't
10 recall.
11    Q. How about any individuals that may have
12 been -- I know you testified that you don't -- you
13 think in terms of names --
14    A. Right.
15    Q. -- rather than actual overall projects.
16       Do you recall if there were any names
17 asked of you to put litigation holds on that may
18 have related to Parus?
19    A. During that time frame?
20    Q. No.
21    A. At any time?
22    Q. At any time.
23    A. I don't recall any holds.
24    Q. What kind of -- when you were searching
25 the relay -- when you searched relay logs, this

Page 132

1 could be at any time, what kind of software did you
2 use to search those relay logs?
3       MR. IBA: I think that was asked and
4 answered.
5       THE WITNESS: It's calls CWYGI -- it's a
6 program that you can run on a Dos or a -- excuse me,
7 a Windows machine to mimic UNIX commands. UNIX
8 commands are more powerful in my opinion than a lot
9 of Windows commands or Windows -- yeah, command line
10 type commands you can run, and we basically set up
11 these scripts to search through the relay logs.
12 BY MS. MURCH:
13    Q. What was the software again?
14    A. I can't -- it's a freeware. You can
15 download it from the Internet. I want to say CY --
16 I'd just have to find out.
17    Q. Okay.
18    A. Okay.
19    Q. Was there any kind of software that you
20 used for other servers besides their relay servers,
21 like Exchange servers, to search on the servers?
22       MR. IBA: The question is vague and
23 ambiguous.
24       THE WITNESS: Could you repeat the
25 question?

Page 133

1 BY MS. MURCH:
2    Q. So you use this freeware software to
3 search I believe it was relay servers?
4    A. You have to understand how the data is
5 stored.
6    Q. Okay.
7    A. Okay. So in for the relay logs the data
8 is stored in an ASCII file format so it's easily
9 searchable, and the compressed files are not in
10 ASCII format, but you can use UNIX commands in
11 conjunction with the software to search through the
12 compressed files.
13    Q. And Exchange --
14    A. And on Exchange you have to -- there's not
15 a utility available that I know of to look through
16 an Exchange database that hasn't been restored to
17 the server.
18    Q. Okay. How would you look through the
19 database once it had been restored?
20    A. You can search for a user's account the
21 same way you would in a production system.
22    Q. How would that be?
23    A. Through the Exchange admin interface.
24    Q. What's the Exchange admin interface?
25    A. It's a module that you install to use with

34 (Pages 130 to 133)

e918e88a-82d7-4dd8-8412-8f144c3ddad2    A 03182

1401lmcroslin.txt
2    assisted with the deployment in 2002?

3         A.    Yes.

4         Q.    And when did you inherit the system from

5    Mr. Carroll?

6         A.    I believe in 2003.

7         Q.    And when you say you inherited the

8    system, what does that mean?

9         A.    He moved -- changed positions and moved

10   to Ashburn, Virginia to assist in the tier one

11   executives in the Ashburn facility.

12        Q.    And what's the tier one executives?

13        A.    Michael Capellas, he supported him

14   directly and Michael Capellas's support staff.

15        Q.    And what were your responsibilities then

16   after you inherited the Legato system?

17        A.    I would maintain the backups and the

18   accounts on the server and address any server

19   failings or maintenance issues.

20        Q.    And this started in 2003?

21        A.    I believe so.

22        Q.    And who handled the backups and the

23   server issues prior to then?

24        A.    The server backups?

25        Q.    Well, you used the word backups.  Are

                                                    24


1    there multiple kinds of backups?

2         A.    I only deal with the desktop and laptop

3    backups.  My servers only back those devices up.

4         Q.    Do you deal with any other types of

                    Page 21

Exhibit O

A 03183

1401lmcroslin.txt

16          Q.    Did you ever communicate with anyone else

17    at MCI other than counsel about these searches?

18          A.    No.

19          Q.    Did you ever draft any e-mails or reports

20    or documents about these searches to anyone other

21    than Mr. Jacobs or Mr. Ramsay?

22          A.    No.    My management would have been copied

23    on the e-mails.    I wouldn't have drafted anything

24    specifically.

25          Q.    And no other searches made by you in

102

1     connection with Parus?

2           A.    Outside of backup, no.

3           Q.    Mr. Croslin, are you aware of what a

4     litigation hold is?

5           A.    Not specifically.

6           Q.    I'm going to tell you what my impression

7     of a litigation hold is and then I'll ask you if you

8     were ever asked to do so.

9                 A litigation hold is a request made

10    to preserve all documents going forward, whether it's

11    electronic, whether it's e-mail, whether it's Word,

12    whatever you would have had responsibility for.

13                Were you ever asked to -- other

14    than -- and I would consider, frankly, the backups

15    that you did, litigation holds, because you're

16    preserving those documents going forward.

17                Other than those names that you were

18    given in February/March of 2006, did you ever get any

Page 92

A 03184