1401lmcroslin.txt

19  information related to Parus or any names related to

20  Parus asking to preserve documents?

21      A.  Other than the February and March 2006,

22  no.

23      MS. MURCH:  I think we can break for lunch a

24  few minutes early.

25      MS. CLARK:  Okay.  Do you want to start back

                                                        103

1   at 1:00?

2       MS. MURCH:  That's great.

3                   (WHEREUPON, a one-hour

4                    recess was had.)

5       MS. MURCH:  Mr. Croslin, we are back on the

6   record and you're still under oath.

7       THE WITNESS:  Okay.

8   BY MS. MURCH:

9       Q.  You had mentioned managing Active Data I

10  think at some point or Active Data you had

11  responsibility -- or is it Active Directories?

12      A.  I never managed Active Directory, no.

13      Q.  Did you have any responsibilities with

14  respect to Active Directories?

15      A.  During the time frame?

16      Q.  Correct.

17      A.  No.

18      Q.  And how about now?

19      A.  No.  Limited to only my job.

20      Q.  Which would be?

21      A.  Part of our backup platform we can deploy

                    Page 93

A 03185

1401lmcroslin.txt

22    the agent through the use of a group policy object

23    which is implemented through Active Directory.

24        Q.    What does that mean?

25        A.    Basically when the user logs into the

104

1    domain it, a group policy will be enforced on a

2    machine that will run a script and install the backup

3    application.

4        Q.    Got it.

5        A.    It doesn't always work because they don't

6    always log into the domain.

7        Q.    Okay.  And do you know if executives ever

8    took their laptops home after they quit MCI?

9        MS. CLARK:  Before you answer, I'll object.

10    And to the extent your knowledge is based on

11    communications with counsel, legal counsel from MCI,

12    in-house counsel, I don't want you to answer that.

13    If there's other basis for a response to that.

14    BY THE WITNESS:

15        A.    I don't have firsthand knowledge of that

16    happening.

17    BY MS. MURCH:

18        Q.    Okay.  Do you have secondhand knowledge

19    other than through counsel?

20        A.    Hearsay.

21        Q.    But other than through counsel?

22        A.    No, not through counsel.

23        Q.    So no one at MCI other than legal counsel

24    talked to you about what was done with laptops after

Page 94

A 03186



STINSON
MORRISON
HECKER LLP

Allison M. Murdock
(816) 691-3138
amurdock@stinsonmoheck.com
www.stinsonmoheck.com

1201 Walnut, Suite 2900
Kansas City, MO 64106-2150

*Tel* (816) 842-8600
*Fax* (816) 691-3495         June 16, 2006

**VIA CM/ECF**

The Honorable Arthur J. Gonzalez
United States Bankruptcy Judge
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, NY 10004

> Re:    In re WorldCom, Inc., et al., Case No. 02-13533
>        Claims of Parus Holdings, Inc.

Dear Judge Gonzalez:

I am writing in response to the letter filed on June 2, 2006, by Robert Friedman, counsel for Claimant Parus Holdings, Inc. ("Parus Holdings"), requesting that a scheduling order be entered with regard to Parus Holdings' claims or, alternatively, seeking an informal conference to discuss Parus Holdings' proposed scheduling order and Debtors' alleged failure to produce electronic documents.

As discussed more fully below, Mr. Friedman's letter contains numerous misrepresentations regarding the status of electronic discovery in this case. Mr. Friedman's letter also demonstrates a complete lack of understanding as to the substantive issues related to Debtors' electronic discovery. His statements that certain electronic data is inaccessible because of alleged delays related to electronic discovery is untrue. As reflected in my correspondence and subsequent discussions with Mr. Friedman's colleague, Kevin Smith, MCI Telecommunications, Inc. ("MCI") did not begin backing up (i.e., retaining) information from its Exchange email system until July of 2002. As Mr. Friedman knows, this is *after* the relevant time period identified by Parus Holdings – September 1, 2000 through April 12, 2002 – which ended more than three months before Debtors filed their petition in Bankruptcy and more than a year before Parus Holdings filed its claims. See December 15, 2005 letter from Ms. Murdock to Messrs. Callagy, Friedman and Smith (Ex. A). No backup tapes were destroyed, as Mr. Friedman erroneously suggests.

Moreover, as Mr. Smith was advised, Debtors have located for the relevant time period 78 backup tapes related to MCI's email system known as "POP email." With regard to the 29 backup tapes of Debtor Intermedia Communications, Inc.

KANSAS CITY
OVERLAND PARK
WICHITA
WASHINGTON, D.C.
PHOENIX
ST. LOUIS
OMAHA
JEFFERSON CITY

DB02/048629 0094_0019/7191814.1

Exhibit P

**A 03187**

The Honorable Arthur J. Gonzalez
June 16, 2006
Page 2

("Intermedia") mentioned in Mr. Friedman's letter, Mr. Smith was advised that Kroll Ontrack, the vendor assisting Debtors with electronic discovery, is unable to restore these tapes because of the manner in which the tapes are formatted but has located another vendor that believes it can restore the tapes. Mr. Friedman either failed to obtain this information from Mr. Smith or chose not to disclose this information in his letter to the Court.

In fact, contrary to Mr. Friedman's accusations, Debtors diligently have been conducting electronic discovery. The scope of Parus Holdings' electronic discovery requests have made this effort extraordinarily time consuming and costly. Debtors, however, already have reviewed the equivalent of over 375 boxes of electronic documents, have made eight electronic document productions to Parus Holdings and have incurred electronic discovery costs of over $130,000. These efforts, nevertheless, have yielded only a very small percentage of documents responsive to Parus Holdings' discovery requests. It is anticipated that the remaining electronic discovery will be equally burdensome, even more costly and will yield a similarly small percentage of responsive documents.

Debtors, therefore, request a pre-motion conference pursuant to Local Bankruptcy Rule 7007-1(b) to discuss the filing of a protective order to shift the costs associated with electronic discovery to Parus Holdings. Debtors respectfully submit that until the Court determines whether Parus Holdings must bear all or some portion of the costs of the electronic discovery it seeks, and any further electronic discovery is completed (assuming any further electronic discovery should even be had), it is premature to enter a scheduling order.

The entry of a scheduling order at this time also is premature because Mr. Friedman's firm only last month returned to Debtors 388 boxes of their client files that Debtors requested from his firm over six months ago. Parus Holdings complains as part of its claim that Debtors MCI and Intermedia conspired with one another prior to their merger in violation of a Hold Separate Order entered by the United States District Court for the District of Columbia as part of an investigation by the United States Justice Department into the propriety of their merger.

Mr. Friedman's own firm, Kelley Drye & Warren LLP ("Kelley Drye"), represented Intermedia with regard to the merger and the Hold Separate Order. Because Parus Holdings complains that there should be additional paper documents related to the merger that Debtors have not yet produced, Debtors requested in November of 2005 that Kelley Drye return their client files so the files could be searched for responsive documents. See November 18, 2005 Letter from Maureen F. Del Duca to James J. Kirk (Ex. B). Despite repeated requests that the files be returned, Mr. Friedman's firm failed to return the files until last month.

Given that Mr. Friedman's firm only recently has returned Debtors' client files for review and Parus Holdings' own requests have made electronic discovery an unnecessarily time consuming and costly endeavor, Debtors should be given an opportunity to complete their review of the Kelley Drye files and file their motion for

7191814_1.DOC

A 03188

The Honorable Arthur J. Gonzalez
June 16, 2006
Page 3

protective order regarding further electronic discovery and cost-shifting before any scheduling order is entered.

## I.    DEBTORS RESPECTFULLY SUBMIT THAT IT IS PREMATURE TO ENTER A SCHEDULING ORDER.

### A.    Debtors Have Been Complying With Their Electronic Discovery Obligations.

Mr. Friedman's accusation that Debtors have failed to produce electronic discovery is patently false. Debtors diligently have been complying with their electronic discovery obligations. In the past few months alone, Debtors, among other things, have

•    restored and searched accessible and inaccessible electronic media, including nine back up tapes, four of which were selected by Parus Holdings' counsel for the purpose of sampling the inaccessible data, so that Debtors could determine whether a cost-shifting motion is appropriate (which it is);

•    searched the electronic media using the search terms and custodian names provided by Parus Holdings' counsel;

•    reviewed over 900,000 pages of electronic documents, which is the equivalent of over 375 boxes of documents;

•    made eight separate electronic document productions to Parus Holdings;

•    conferred by telephone and in writing at least 20 times with Mr. Smith regarding the status of Debtors' electronic discovery efforts; and

•    incurred over $130,000 in costs complying with Debtors' electronic discovery obligations.

In accusing Debtors of failing to undertake electronic discovery, Mr. Friedman either failed to confer with Mr. Smith regarding Debtors' electronic document productions or consciously disregarded the information he received. In either event, the accusations and misrepresentations set forth in Mr. Friedman's June 2 letter to the Court are inexcusable and counter-productive to the open lines of communications that had been established with Mr. Smith regarding Debtors' electronic discovery efforts. See December 15, 2005 letter from Ms. Murdock to Messrs. Callagy, Friedman and Smith (outlining all sources of electronic discovery) (Ex. A); January 26, 2006 letter from Ms. Murdock to Mr. Smith (requesting the selection of backup tapes for sampling purposes in order to determine cost-shifting) (Ex. C); January 30, 2006 letter from Mr. Smith to Ms. Murdock (selecting tapes to be sampled) (Ex. D); April 4, 2006 letter from Ms. Murdock to Mr. Smith (discussing the need to limit search terms) (Ex. E); April 7, 2006 letter from Mr. Smith to Ms. Murdock (agreeing to limit certain search terms) (Ex. F); Letters from Ms. Murdock to Mr. Smith enclosing electronic document productions (Ex. G).

7191814_1.DOC

The Honorable Arthur J. Gonzalez
June 16, 2006
Page 4

### B.    The Scheduling Order Proposed By Parus Holdings Is Unrealistic.

Parus Holdings proposes that the production of all outstanding documents be completed by the end of June, including electronic documents. This proposed deadline completely disregards that as a result of Mr. Friedman's firm's repeated delays in returning Debtors' client files, Debtors just recently have received 388 boxes of documents that must be reviewed for responsiveness to Parus Holdings' discovery requests. Parus Holdings' proposed deadline further disregards that, although Debtors already have completed a large amount of electronic discovery, a tremendous amount of work is left to be completed and Debtors have not yet had an opportunity to file their cost-shifting motion.

### 1.    Additional time is needed to review the 388 boxes of Debtors' client files that Kelley Drye failed to return to Debtors until last month.

On behalf of Parus Holdings, Kelley Drye has served discovery requests on Debtors seeking documents related to MCI's and Intermedia's operations before and after their merger, and accuses Debtors of failing to produce the requested documents. Also, although not referenced in its original claims, Parus Holdings, since filing its claims, has accused MCI and Intermedia of conspiring with one another prior to their merger in violation of the Hold Separate Order in order to cause damage to Parus Holdings. See Hearing Transcript dated January 17, 2006 at 38-39 (Ex. H).

As previously discussed, Kelley Drye represented MCI and Intermedia before the bankruptcy. It sought from MCI, and was given, a limited conflict waiver to represent Parus Holdings with regard to its claims. More significantly, however, Kelley Drye represented Intermedia with regard to its merger with MCI and with regard to the very Hold Separate Order it now accuses MCI and Intermedia of conspiring to violate. In fact, Kelley Drye partner Brad Mutschelknause actually signed the Hold Separate Oder on Intermedia's behalf. November 17, 2000 Hold Separate Stipulation and Order (Ex. I).

Given Kelley Drye's representation of Intermedia and the accusations now made regarding that representation, Debtors believe that some of the documents requested by Parus Holdings, as well as documents needed for Debtors' defense of Parus Holdings' claims, may be in Debtors' files maintained by Kelley Drye. Therefore, on November 15, 2005, Maureen Del Duca, Vice President of Litigation for MCI, sent a written request to James Kirk, the managing partner of Kelley Drye, requesting that Kelley Drye turn over all original files, including any files or documents maintained electronically, related to its representation of MCI, Intermedia and/or an affiliated company, Digex, within ten days. See November 18, 2005 letter from Ms. Del Duca to Mr. Kirk (Ex. B). On November 29, 2005, Mr. David Wachen, Associate Litigation Counsel for MCI spoke with Mr. Steven Caley of Kelley Drye to follow up on the status of Ms. Del Duca's request. Mr. Caley advised that other than leaving a voice mail message or two for Jonathan Canis, the Kelley Drye lawyer

7191814_1.DOC

A 03190

The Honorable Arthur J. Gonzalez
June 16, 2006
Page 5

whom Mr. Caley believed to be in charge of the Debtors' representation, no steps had been taken to begin collecting the requested documents. See November 29, 2005 letter from Mr. Wachen to Mr. Caley (Ex. J). Mr. Wachen requested again that Kelley Drye return the requested files as soon as possible and no later than December 6. Id.

In response, Mr. Caley requested that Debtors should provide a more focused request for the files they needed and advised that Kelley Drye expected to be compensated for any efforts undertaken in segregating, reviewing and supplying the files to Debtors. See November 30, 2005 letter from Mr. Caley to Mr. Wachen (Ex. K). Mr. Caley then directed that, because of his other commitments, any further communications regarding Debtors' request for the return of their files needed to be directed to yet other attorneys at Kelley Drye, Richard Donovan and Glenn Manishin. Id.

Having heard no response regarding the status of Kelley Drye's efforts to return Debtors' files, Ms. Mary Coyne, Associate General Counsel for Verizon, wrote to Messrs. Donovan and Manishin requesting again that the files be returned immediately. See February 7, 2006 letter from Ms. Coyne to Messrs. Donovan and Manishin (Ex. L). Ms. Coyne further advised Messrs. Donovan and Manishin that while Debtors reserved the right to have all of their files and documents returned, their request here was more narrow and could be limited to the files and documents related to the MCI/Intermedia merger and the antitrust litigation that the Department of Justice brought in connection with that merger, and that resolution of any cost issues (if there are any) should not hold up the return of these documents. Id.

On February 15, 2006, Mr. Manishin wrote Ms. Coyne to advise that although it had "initiated the process [of] locating and assembling" the requested files, Kelley Drye still was not prepared to discuss the logistics of returning them to Debtors. See February 15, 2006 letter from Mr. Manishin to Ms. Coyne (Ex. M). He also requested that Ms. Coyne provide confirmation that she had authority on behalf of the Debtors to request the return of the files. Id. On February 21, Ms. Coyne provided Mr. Manishin with the confirmation he sought and again requested that he advise when the files would be returned. See February 21, 2006 letter from Ms. Coyne to Mr. Manishin (Ex. N).

On March 10, 2006, Mr. Manishin finally notified Ms. Coyne that Kelley Drye was in possession of 382 boxes of Intermedia and Digex documents and had completed its review of these documents. However, Mr. Manishin proposed returning all 382 boxes of client files to Debtors rather than incur the time, cost and expense to identify those files related to the MCI/Intermedia merger and the related antitrust issues. See March 10, 2006 email from Mr. Manishin to Ms. Coyne (Ex. O). Mr. Manishin directed that arrangements would have to be made through Mr. Canis to pick up the documents and wanted Debtors to reimburse Kelley Drye for the costs

A 03191

The Honorable Arthur J. Gonzalez
June 16, 2006
Page 6

associated with copying and returning the files. Id.; March 14, 2006 email from Mr. Manishin to Ms. Coyne (Ex. O).

Debtors' counsel, Mark Iba, then contacted Mr. Canis to inquire as to the amount of payment Kelley Drye expected for the return of the files. Despite repeated requests for this information, Mr. Canis failed to provide the information until April 22, 2006, when he estimated that Kelley Drye's charges would be approximately $15,000. See April 22, 2006 email from Mr. Canis to Mr. Iba (Ex. P). An invoice was then sent to Mr. Iba on April 27, 2006, seeking payment for $19,606.14 almost half of which is attributable to time recorded by Kelley Drye lawyers spent "considering" Debtors' request, discussing document review and production issues and discussing and preparing the invoice to Debtors. See April 27, 2006 Invoice (Ex. Q).

On April 27, 2006, Mr. Iba requested that Mr. Canis confirm whether Kelley Drye intended to retain Debtors' the files until the invoice was paid. See April 27, 2006 email from Mr. Iba to Mr. Canis (Ex. R). Mr. Canis finally advised that Debtors could make arrangements to pick up the files, which by then were in 388 boxes. See April 28, 2006 email from Mr. Canis to Mr. Iba (Ex. R). Debtors promptly made the necessary arrangements, and the 388 boxes of documents were shipped to Debtors counsel's office in mid-May.

Kelley Drye took almost six months to return Debtors' client files despite its ethical obligation to return the files immediately. Debtors had to make repeated requests for the files, and their requests were pushed off to at least four Kelley Drye lawyers, all of whom billed for the time spent conferring with one another regarding Debtors' request. The return of the files further was held up for well over a month while Kelley Drye sought assurances that it would be paid for its time and calculated the amount of payment it expected receive. Now Kelley Drye wants Debtors to complete a substantive review the 388 boxes of documents before the end of this month. Debtors should not be subjected to this unreasonable deadline when their inability to meet it is a direct result of Kelley Drye's delay in returning their client files.

### 2. Additional time is needed for Debtors to complete electronic discovery and file their cost-shifting motion.

Parus Holdings' proposed deadline further disregards that, although Debtors already have completed a large amount of electronic discovery, much work still is left to be completed and Debtors have not yet had an opportunity to file their cost-shifting motion. Using the search terms proposed by Parus Holdings, Debtors already have been required to review the equivalent of over 375 boxes of documents, and there are dozens of backup tapes that still must be restored and reviewed. This work cannot be completed by the end of June.

7191814_1.DOC

A 03192

The Honorable Arthur J. Gonzalez
June 16, 2006
Page 7

Moreover, although Parus Holdings wants Debtors to continue their electronic discovery efforts while the Court determines the cost-shifting issue, Parus Holdings to date has refused to agree to be bound by the Court's Order and pay all portions of the costs that may be shifted to it for the electronic discovery conducted while the cost-shifting motion is pending. Essentially, Parus Holdings wants Debtors to incur costs for electronic discovery while the Court considers the cost-shifting issue and then, if ordered to pay all or some portion of the costs that have been and will be incurred, it wants the ability to withdraw its overly broad requests so as to avoid paying those costs. This should not be permitted. As has been the procedure in other cases involving the cost-shifting issue, the Court should determine cost-shifting before further electronic discovery proceeds. Parus Holdings may prefer to forego the broad discovery it now seeks if it is required to pay the costs associated with it.

The other deadlines proposed by Parus Holdings are similarly unrealistic given the additional time needed to complete paper and electronic discovery.

## II.    DEBTORS SHOULD BE PERMITTED TO FILE A MOTION FOR PROTECTIVE ORDER AND COST-SHIFTING.

Most of the electronic discovery that remains to be completed is on backup tapes which are clearly inaccessible. Zubulake v. UBS Warburg, 217 F.R.D. 309, 320 (S.D.N.Y. 2003). In particular, there are 71 Intermedia backup tapes that still must be restored and searched and 78 email tapes from MCI's POP email system. Just searching the nine tapes selected for sampling using Parus Holdings' search terms required Debtors' counsel to review over 740,000 pages (or almost 300 boxes) of documents and incur approximately $73,000 in costs (which does not include any attorney review time).[1] And the number of responsive documents located as a result of this time consuming and expensive undertaking was extremely low (only approximately 3.3%). Extrapolating the costs from the nine backup tapes that were sampled, the costs associated with completing the remaining electronic discovery could exceed $1.2 million.[2]

The search and review of the electronic data is unduly burdensome and expensive particularly in light of the low percentage of responsive documents that are being found as a result of the electronic discovery. Parus Holdings refuses to voluntarily bear any portion of costs associated with the inaccessible electronic discovery. Therefore, Debtors request that the Court enter a protective order ordering

---

[1] Parus Holdings selected four tapes for sampling. Because one of these tapes was part of a set, Kroll Ontrack advised Debtors that they should sample all of the tapes in the set in order to obtain complete data. Debtors, therefore, sampled nine tapes rather than just the four selected by Parus Holdings.

[2] A search of the nine sample tapes alone resulted in 746,228 pages of documents to review (an average of 82,914 pages of documents per tape), at a cost of approximately $72,900 (an average of $8,100 per tape), not including attorney review time. Using these numbers to estimate the volume of data and cost for the remaining 71 Intermedia backup tapes and the 78 MCI POP email backup tapes, a search could result in an additional 12,354,186 pages of documents (4,942 boxes) to review at a cost of approximately $1,206,900, not including attorney review time.

A 03193

The Honorable Arthur J. Gonzalez
June 16, 2006
Page 8

that the discovery not be had or that Parus Holdings bear the expense associated with
such discovery, which could be in excess of $1.2 million.

Fed. R. Civ. P. 26(c) gives the Court broad authority to protect a party from
undue burden or expense by ordering relief ranging from a complete bar of the
discovery to reasonable restrictions. Under Rule 26(c), the Court may impose limits
on the scope of discovery by weighing the benefits against the burden of discovery,
and may shift the costs of discovery. Mitchell v. Fishbein, 227 F.R.D. 239 (S.D.N.Y.
2005); Zubulake v. UBS Warburg, 217 F.R.D. 309 (S.D.N.Y. 2003); see also
Hagemeyer N. Am. v. Gateway Data Science Corp., 222 F.R.D. 594, 601 (E.D. Wis.
2004).

Cost-shifting should be considered when, as here, discovery imposes an undue
burden or expense on the requesting party. Zubulake, 217 F.R.D. at 318. Whether
production of documents is unduly burdensome or expensive turns primarily on
whether the documents are kept in an accessible or inaccessible format. Id. Here,
there is no question that the backup tapes are inaccessible. They cannot be retrieved
and restored without incurring substantial cost.

Application of the Zubulake factors favors shifting the costs of electronic
discovery to Parus Holdings. Factors 1 and 2 address the extent to which the requests
are tailored to discover relevant information and the availability of such information
from other sources. Id. at 318. The less likely it is that the documents contain
information relevant to a claim or defense, the more unjust it would be to make the
responding party search for the documents at its own expense. Id. Debtors have
reviewed 746,228 pages of documents from the nine backup tapes that were sampled
of which only 24,483 pages were responsive to Parus Holdings' document requests.
Even this number, however, is artificially high because several documents are
spreadsheets that are hundreds of pages long but contain only one or two responsive
lines of information.[3] In addition, the responsive documents are of limited utility.
The productions consist largely of copies of executed contracts and agreements
already in possession of both parties, lengthy reports that contain one or two lines
detailing payments made to Parus Holdings, training schedules and manuals, emails
and attachments regarding the IntermediaOne product suite and/or Parus Holdings'
product, several versions or drafts of the same power point presentations, and many
other documents that contain very little substance.

The court in Zubulake grouped factors 3, 4 and 5 together in a category
referred to as "cost issues:" "'How expensive will this production be?' and, 'Who can
handle that expense?'" Id. at 323. These factors mitigate in favor of cost-shifting in
this case. Debtors are responding to claims as debtors in a bankruptcy proceeding.

---

[3] For example, 44 documents are between 100 and 706 pages long. These lengthy spreadsheets consist
of a combined total of 9,955 pages. Each document, however, generally contains only one or two lines
that are relevant to this claim. The relevant lines generally involve payments made to EffectNet by
Intermedia.

7191814_1.DOC

The Honorable Arthur J. Gonzalez
June 16, 2006
Page 9

The estimated costs of responding to Parus Holdings' broad document requests are extremely high – exceeding $1.2 million.

Zubulake factors 6 and 7 – the importance of the issues at stake in the litigation and the benefit to the parties of retrieval – also favor cost-shifting. This action involves a business dispute and nothing more. Compare Zubulake, 217 F.R.D. at 321 (describing actions involving "important issues" as including toxic tort class actions, environmental actions, and "so called 'impact' or social reform litigation"). Also, Debtors have no business purpose for retrieving these documents. The backup tapes were created for disaster recovery purposes. Any benefit of retrieval will be derived solely by Parus Holdings.

Application of the Zubulake factors to the circumstances of this case overwhelmingly favors shifting to Parus Holdings the costs related to restoring and searching the remaining 71 Intermedia backup tapes and the 78 MCI POP email backup tapes.

Accordingly, Debtors respectfully request permission to file a motion for protective order and cost-shifting. Debtors further request that the Court postpone entering a scheduling order until after the cost-shifting issue is resolved and paper and any further electronic discovery is completed.

Respectfully submitted,

**STINSON MORRISON HECKER LLP**

*/s/ Allison M. Murdock*

Allison M. Murdock

AMM:af

cc:    Mr. Robert S. Friedman (*Via* CM/ECF)
       Mr. Kevin J. Smith (*Via* CM/ECF)

7191814_1.DOC

*CONFIDENTIAL*



Records and Information Management

# RECORDS MANAGEMENT PROGRAM

## *POLICIES AND PROCEDURES*

**by Lisa Hayward**

**July 1, 1998**

**Edited : July 2001**

**by Victoria S. Lucas**

**Edited : April 2004**

**by Chris Moses/James Green**

Exhibit Q

*CONFIDENTIAL*



EXHIBIT
tabbies®
4

MCIWC031794

A 03196

Records Management Program – Policies & Procedures

# TABLE OF CONTENTS

Records Retention Program, Introduction .................................................. 4

Records Retention Schedule (RRS)

      History ................................................................................................ 5

      How to Use ........................................................................................ 7

Vital Records ........................................................................................... 11

Storage Information ................................................................................. 13

Retention Hold Codes.............................................................................. 18

Inventory Reviews ................................................................................... 19

Inventory Projects.................................................................................... 19

Destruction Review.................................................................................. 20

Imaging Systems or Other Electronic Data ............................................ 21

HR Records and Imaging......................................................................... 22

Other Storage Medium / Tape Rotation .................................................. **22**

Decommissioning Systems....................................................................... **26**

Acquisitions, Mergers & Joint Ventures.................................................. 27

RIM Compliance Audit Program............................................................. 28

Records Retention Initiative (RRI).......................................................... 29

Internal Email Policy .............................................................................. 30

Records Management Training................................................................. 31

New Employee Communication…........................................................... 32

Off-site Storage Inventory Database ....................................................... 35

RIM's Website ......................................................................................... 36

MCI Resources ........................................................................................ 37

Other RIM Resources .............................................................................. 39

Appendix A – Record Retention Schedule (RRS) ................................... 41

Appendix B – Records Needed by LPP for Possible Litigations ............. 42

**Appendix C – RRS, Merged Records (1998)** ........................................ 47

Appendix D – RRS, Electronic version for storage vendors .................... 48

Appendix E – Statement of Work and "MCI Procedures for Vendor

  Off-Site Records Management and Storage".......................................... 49

Appendix F – Inventory Forms and Fax Order Form............................... 62

Appendix G – Inventory Project documents ........................................... 63

MCIWC031795    A 03197

Records Management Program – Policies & Procedures

Appendix H – Destruction, Memo to LPP and Spreadsheet listing eligible records ................................................................................. 72

Appendix I – IRS Rev. Proc 97-22 and 98-25 ...................................... 73

Appendix J – HR Records Imaged and LPP Approval Memo ................. 74

Appendix K – Guide for New Acquisitions, Memo and Questionnaire ..... 76

**Appendix L – Compliance Audit Exhibits** ........................................ 97

Appendix M – RRI, List of HLQs and required retention ...................... 98

Appendix N – LPP "E-Mail Guidelines" .............................................. 99

Appendix O – Training Handouts and daily RIM questions ................. 105

Appendix P – RIM Website extracts ................................................. 144

MCIWC031796

A 03198

## INTRODUCTION

The objective of MCI's records retention program is to ensure legal compliance; audit protection; access to valuable information; cost savings; and, maintain an orderly and efficient records life-cycle management. MCI's records retention program covers all media forms and has been approved by the Law & Public Policy Department (LPP) and the Tax Department.

A records retention program is considered one element of an organization's larger preventive law strategy, designed to insulate the organization from potential legal or financial problems and risks. Also, the program is designed to ensure that, in the event that legal or financial problems do occur, the organization will have, in a readily retrievable form, the information it needs to defend itself.

The backbone of the Records Management Program is the Record Retention Schedule (RRS). The RRS specifies the length of time that business records must be retained. The retention program is based upon the concept that information has a life cycle and the value of most information tends to decline as time passes. This program provides for the disposal of obsolete information in order to control the volume of records. The record retention schedule constitutes the official policy for information retention and disposal. Without it, records may be unnecessarily maintained for excessive periods of time or hastily disposed of without regard for their value.

A records retention program provides for the identification of records that must be retained for business purposes, and the systematic destruction of records that no longer serve any useful business purpose. Under this program the process of records retention and disposal is designed to occur regularly, in the normal course of business, rather than on an arbitrary or selective basis.

MCIWC031797

A 03199

## RECORDS RETENTION SCHEDULE

**History**

In 1992, MCI hired Price Waterhouse as a consultant to help create a records retention schedule for a records management program.

Price Waterhouse and MCI interviewed VPs, Directors, and Sr. Managers regarding the type of records they had within their departments, and what function each department performed. The Records Retention Schedule (RRS), and the functional records within it, was created from this information. Price Waterhouse created the RRS, as a database, on Paradox for Windows. The database and software currently reside on Lisa Hayward's CPU and within the NSPCY105 LAN server. RIM also has the software on diskette. In addition, the RRS has been converted to Microsoft Access for use within RIM's website.

The legal periods appearing in the RRS were derived two different ways. Price Waterhouse performed the legal research for all Federal recordkeeping requirements. Once Price Waterhouse turned over the RRS to MCI, Records Management performed all the legal research for state and local recordkeeping requirements. The legal research was performed by using the books "Legal Requirements for Business Records, Guide to Records Retention and Recordkeeping Requirements" by Donald S. Skupsky, JD, CRM, Information Requirements Clearinghouse. There are two volumes for state requirements and two volumes for federal requirements. Once a year, supplements or amendments are sent to RIM, and the books are updated. RIM pays for this yearly service.

Federal recordkeeping requirements should be researched through the "Guide to Record Retention Requirements in the Code of Federal Regulations" (CFR), the Legal Requirements books as stated above, or through Lexis-Nexis. The CFR is published by the Office of the Federal Register, National Archives and Records Administration. The latest version of this book is January 1, 1994. All federal and state recordkeeping requirements need to be reviewed every five years. Supplements and amendments are reviewed as they are received via first-class mail. In addition, RIM can contact network MCI Library and submit a research request. The network MCI Library will perform any kind of research. You can submit a research request through the web at http://nml.MCIt.com/library/researchit.htm.

With the legal recordkeeping requirements taken care of, RIM reviewed company operational recordkeeping requirements for each functional type record. This was performed by asking each department to justify the retention of any functional type record for longer than a one year period. If there are no legal or operational recordkeeping requirements, records are to be destroyed. If records with no recordkeeping requirements are placed in storage, they are retained until the yearly destruction review project is performed. Operational need of a record may extend longer than a legal period. If this is the case, it must be documented. The retention period will be noted in the retention schedule. The new retention period will now become company policy.

MCIWC031798

A 03200

Any reduction of records retention period within the RRS needs to be approved by LPP. For any changes in retention periods for financial records, Tax and LPP must approve the change.

The RRS has been changed 3 times in the last five years. The last revision to the RRS was to change its look, as well as merge records series or change some retention periods. A majority of the financial records that were 10 years in retention were changed to 7 years. There were three states driving the retention of 10 years: NC, SC, and CT. LPP and Records Management performed a search for the citations and found that two of the states repealed their 10 year retention rule to 7 years - that left one state with a 10 year retention (NC). MCI's Controller, LPP and Tax were consulted regarding the risk factors for the company if we reduced the retention to 7 years, even though one state dictated that we must retain financial records for 10 years. The Controller, LPP and Tax decided that the risk was minimal, especially since the federal requirement is 7 years. The change to the RRS was made mid-1997.

Records Management performed the legal research for Canadian legal records retention requirements via software called "Filelaw". The RRS is based on the "conservative thought" that the company use the highest retention period found under federal, state or local laws. The legal research for Canadian laws shows that there were only two record series, trademarks and patents, that needed changing. **The change to the RRS was** performed in the beginning of 1997.

The final change to the RRS was in early 1998. This change involved merging "like type" records together, creating one record series for each type record. See Appendix C for this merged listing. For the latest version of the RRS see Appendix A.

A listing of "Records Needed by LPP for Possible Litigations" is under Appendix B.

The electronic version of the RRS sent to the storage vendors for downloading to their system is in Appendix D.

The retention value for the RRS is S+15 under record series RS757.

MCIWC031799

A 03201

## The Record Retention Schedule (RRS)

The RRS is a tool used by all MCI employees to determine time frames for the retention and disposition of all records created, received, used, and distributed by MCI.

It is not beneficial to MCI to retain records longer than the RRS indicates. There are as many risks in retaining records too long, as there are by not retaining them long enough; therefore, each employee should know the retention requirement, according to the RRS, for all records within their department.

Please understand that even if a record does not have a legal retention value, the records are fully discoverable under law, and can be requested during a litigation. Therefore, it is important that records with no retention be purged when a department's operational need is complete. If records are disposed of during the course of business instead of being unduly retained, they would not be available for discovery during a litigation. Once a record has been requested under discovery for a litigation, it must not be destroyed until authorized by LPP.

Only the official copyholder of a record is required to retain a record for the total retention period. If you maintain originals, you are the official copyholder. Creating a record does not mean you are the official copyholder; you must also maintain the original.

Copies should not be kept once a department's operational need is completed. Operational need being the time MCI requires a record to be retained that has no legal retention.

The RRS is reviewed annually by the RIM, LPP and Tax to determine if changes are necessary to reflect any possible changes in MCI's organizational structure, and/or changes in applicable recordkeeping laws/regulations.

You should use the RRS any time you are trying to determine retention/disposition actions for MCI's records. You must also use the RRS to determine the Record Series (RS) number when placing records in storage and filling out an inventory form.

The RRS groups "like records" first by major function (Primary Classification), and then by type of record within that function. The RRS gives descriptions of each record series, along with the total retention period for which records should be retained before consideration for disposition.

For example:

MCIWC031800

A 03202

Records Management Program – Policies & Procedures ▬▬▬▬▬▬▬▬▬▬

**WORLDCOM**
**Records Retention Schedule**

| PRIMARY CATEGORY : ACCOUNTING | | Friday, January 05, 200 | Page 1 | |
|---|---|---|---|---|
| **RS #** | **RECORD SERIES** | **DEFINITION** | **TOTAL (years)** | **COM** |
| | 1 ACCOUNTING | The management of receipts and expenditures, cost accounting and payroll, and the auditing of said functions | | |
| 5 | 2 Audits | Audits of accounting records and/or procedures, including backup materials such as Internal Document Requests (IDRs) | C + 7 | FA, V |
| | 2 Cash | | | |
| 12 | 3 Accruals | Information concerning cash forecast and related accounts, such as Cash Forecast Reports, Cash Accrual Reports, etc. | 1 | |
| 11 | 3 Accumulation Accounts | Cash balance reports for WCOM bank accounts | 7 | FA |
| 13 | 3 Daily Cash Folders | Folders incorporating items such as Chase Concentration Report and Cash Report | 2 | |
| | 3 Flow | | | |

RS # - The Record Series Number that uniquely identifies each type of record.

RECORD SERIES - A grouping of like records by classification/function.

DEFINITION - Used to describe a particular Record Series, may include sample document types.

TOTAL - The total length of time (number of years) that a Record Series must be retained.

Note: Retention periods are usually expressed as a number of years. Some retention periods are preceded by a letter. The letter is an abbreviation for a record occurrence (i.e., termination or completion of a contract). For example, C + 15 for a contract means that the contract needs to be retained for 15 years after the contract is canceled, completed, or closed. For an explanation of the abbreviations see Key to Comments and Abbreviations.

Primary Classifications and their definitions are as follows:

ACCOUNTING - The management of receipts and expenditures, cost accounting and payroll, and the auditing of said functions.

ADMINISTRATION - Office affairs, functions and services; administrative reporting and management.

CORPORATE - Corporate structure, policy formulating bodies, acquisitions and divestitures, and corporate stock.

MCIWC031801
**A 03203**

Records Management Program – Policies & Procedures

FINANCE - Operating & capital budget data; financial statements prepared for shareholders and regulatory bodies; relations with banks, MCI internal financial reports, analysis, policies and procedures and related projects.

HUMAN RESOURCES - Hiring of employees, monitoring their work and relationships with MCI and the administration of employee-related programs.

LEGAL - Contracted rights and obligations; liability disputes and their resolution; compliance and dealings with government and outside counsel.

MARKETING & SALES - The promotion, advertising and sales of company activities and services; the projection of a favorable corporate image.

NETWORK SERVICES - Equipment, technical facilities, utilization (traffic), personnel and other aspects of installing, activating and maintaining services to MCI customers.

SYSTEMS - The design, installation, operations and maintenance of electronic information and communications systems.

TAX - Information and records pertaining to the Federal, state and locally required income and non-income filings.

## Locating a Record Series Number

Groupings of like records have been assigned unique Records Series names, numbers, and definitions. Refer to RRS example on page 8:

The numbers (1,2,3,4) to the left of the Record Series name indicates "levels" of classification. The levels narrow until you reach the Record Series number.

> 1 = Primary classification
> 2 = Secondary classification
> 3 = Tertiary classification
> 4 = Quaternary classification

In the two examples shown above, the Records Series number is at the level of "Claims" (Quaternary classification) and "Purchase" (Tertiary classification) under "Human Resources/Benefits/Disability" and "Legal/Contracts/Agreement", respectively.

Locate a Records Series number using a paper copy of the RRS printed from the website:

1) Scan your record to gain an understanding of the main topic.

2) Identify the Primary subject classifications (indicated by the number 1 to the left of the Record Series name) for your record, i.e., is this an accounting record, human resources, financial etc.?

MCIWC031802

A 03204

Records Management Program – Policies & Procedures

3) Examine the Secondary subject classifications under your selected Primary (number 2) that best describes your record. Note: If you find the Record Series number at this Secondary level of classification, skip steps 4 and 5.

4) Examine the Tertiary classification (number 3), under your selected Secondary, and the Quaternary classification (number 4), under your selected Tertiary, until you identify your Record Series.

5) If none of the Record Series numbers adequately to describe your record, contact Records Management.

Locate a Record Series number using the website:

To locate a record series number using the website, go to the Searchable Records Retention Schedule. The searchable RRS will allow you to search for a record series number using a key word in the definition field.

Once you have obtained your search results, read each record series description to determine which record series is applicable to your type of record.

Remember: ONLY the Official Copyholder of a record is required to retain a record for the total retention period indicated in the RRS. Copies should not be kept or stored once your operational need is completed.

Note: You are only responsible for the disposal of records within your office. Any records off-site that are eligible for destruction will be destroyed by RIM after being reviewed by LPP and Tax.

MCIWC031803

A 03205

# VITAL RECORDS

A vital record is the recorded information that is essential for the continuation or reconstruction of an organization. Vital records help establish the legal and financial position of MCI, and are critical to preserving the rights of the organization, its employees, customers and stockholders.

It is the information on a record that is considered vital and needs protection not the record itself. Only 1 to 3 percent of all company information is considered vital.

If a department's information has been labeled vital, per the Record Retention Schedule (RRS), it means the department is responsible for ensuring that an up-to-date copy of the vital information is maintained in a location other than the department's primary location. One copy of the information may remain on-site, and the other copy should be kept in off-site storage. If the vital information consistently changes, the department needs to ensure that they continually update the copy that is in off-site storage. If the information is backed up onto tape, it is recommended that the department set up a tape rotation account with the company's off-site storage vendor.

Below are record series numbers listed by function, which are currently listed as vital in the company's RRS. As of July 10, 2001, the RRS is being reviewed to ensure that it reflects the records that are truly considered vital.

Record series under Accounting that are considered Vital: 5, 14, 17, 31, 34, 35, 38, 43, 48, 50, 51, 54, 56, 64, 65, 467, 561, 566, 585, 592, 599, 733, 734, 836

Record series under Administration that are considered Vital: 101, 104, 106, 108, 112, 115, 120, 159, 160, 163, 167, 317, 471, 473, 474, 475, 476, 534, 536, 723, 731, 757, 837, 838

Record series under Corporate that are considered Vital: 178, 184, 195, 197, 198, 199, 481, 520, 726, 776

Record series under Finance that are considered Vital: 69, 71, 267, 273

Record series under Human Resources that are considered Vital: 356, 357, 359, 361, 363, 365, 366, 367, 368, 370, 374, 384, 386, 389, 390, 399, 409, 417, 540, 547, 844

Record series under Legal that are considered Vital: 277, 282, 283, 285, 288, 289, 292, 298, 301, 497, 589, 596, 598, 706, 761, 803, 806

Record series under Marketing & Sales that are considered Vital: 522, 524, 529, 568, 569, 741

Record series under Network Services that are considered Vital: 227, 234, 237, 611, 729, 773, 815, 829, 848

MCIWC031804

A 03206

Records Management Program – Policies & Procedures

Record series under Systems that are considered Vital:  215, 508, 515, 532, 557, 748

Record series under Tax that are considered Vital:   427, 430, 434, 435, 437, 438, 439, 445, 446, 450, 705



MCIWC031805

A 03207

## STORAGE INFORMATION

Off-site storage is to be used for inactive records. If you need to place active records into storage due to space limitations on-site, please contact RIM for special storage procedures.

MCI has approved off-site storage contracts with several different vendors. Iron Mountain is MCI's national vendor for off-site records storage. There are also five other storage vendors:

Kenwood Records Management, Cedar Rapids, IA
Storage Plus (Five R, Inc.), Tulsa, OK
Mississippi Filing, Jackson, MS.
Datalok, Carson, CA
Recall Storage, San Leandro, CA

The Statement of Work (SOW) for Iron Mountain is attached as Appendix E. This SOW outlines RIM's required services. Also attached, in Appendix E, is what could be called a generic SOW ("MCI Procedures for Vendor Off-Site Records Management and Storage") that is a carve-out that can be used with prospective storage vendors.

OFF-SITE STORAGE SERVICES

MCI's off-site storage vendors offer a number of services. RIM encourages the use of off-site storage for all records with a retention requirement. Each off-site storage facility is designed to handle paper records, as well as electronic media, and is better prepared to handle disasters, such as flood, tornadoes, and fire, then any MCI facility.

The advantages of off-site storage are multiple. The obvious is to free-up on-site storage space. The storage vendors contracted by MCI respond to requests for pick-up and retrieval within 24-48 hours, so your records are readily accessible. Cartons along with their descriptive data are entered in to a database upon receipt at the vendor's site. MCI has the ability to query this data in order locate records when needed.

Records Management (RIM) pays all costs relating to off-site storage services, except for two-hour rush requests and when the requestor or his/her stated alternate are not available when the vendor responds to a request, these instances are charged back to your department.

The most important advantage is that MCI's records are reviewed under an established and approved policy. The use of off-site storage also minimizes any risks MCI may encounter related to their records. Since all records in storage must be identified using an inventory form which identifies the record type, required retention through the record series and full description, we know what we have, what we have to keep and where it is. Knowing where our records are is essential for MCI in order to do business effectively and efficiently.

MCIWC031806

A 03208

## HANDLING INSTRUCTIONS FOR PAPER, MICROFORM, AND ELECTRONIC RECORDS

### Paper Records

Place all records in manila file folders. Do not send cartons of loose papers, ring binders or hanging folders. Computer print-outs should be removed from binders and laid flat in cartons.

All Managers' working files for employees should be sent to the HR Fileroom (9835/700) once an employee no longer works for the company or your department. If an employee transfers to another department, you should send any manager notes regarding the employee to the HR Fileroom. It is acceptable to give the new manager the employee's attendance record, performance review and PAF, but you cannot give those notes or written comments that are about or concern the employee.

For the records within your department that are considered copies, there is no retention value. This includes records such as day-timers, appointment books, calendars, telephone messages, reports generated from the mainframe, personal meeting notes and copies of any records where the original was sent to another department. These types of records should not be retained for longer than one year.

### Microform

Place microfilm in protective cartons, and microfiche in jackets. Microfilm, microfiche, tape, imaging platters, and other types of electronic media need to be stored in the vendor's climate control vault.

### Electronic Records

Because of their small size relative to the amount of information they contain, diskettes and magnetic tapes may not require transfer to off-site storage. If such records are to be moved off-site, they should be stored in closed cartons, in humidity/temperature controlled storage sites. MCI's approved storage vendors are equipped to handle this type of storage. Do not use diskettes for long-term storage, since they are not designed for this purpose.

If decommissioning a system, several factors need to be reviewed. If the system contains financial information/data, the tax department needs to be notified before the system is decommissioned. Any data contained on the decommissioned system that has a retention requirement must be retrievable and readable until it has fulfilled its retention requirement. The data does not have to be in the same format as it was on the decommissioned system; however, none of the data may be altered. If the data is in a database format, the database may be saved in a flat file format, so that it may be read on any system. Documentation of the data conversion should be created to prove that it was only converted, and that the value or significance of the data had not been changed.

MCIWC031807

A 03209

If data contained on a system can only be read with a particular program, the program must be retained for the life of the system, and then migrated to the new system, or until the retention requirement for the data has been reached.

## WHEN TO SEND RECORDS TO OFF-SITE STORAGE

At least once a year, usually following the end of the calendar or fiscal year, the RRS should be reviewed by the department's Manager to determine which of their records should be transferred to off-site storage or destroyed.

It is recommended that when your department's operational need for any records is complete, and need to be retained according to the RRS, the records should be transferred to off-site storage for safekeeping.

## PICK-UP / DELIVERY SCHEDULE

Storage vendors will pick-up and deliver your cartons. All requested orders that are sent to the storage vendor by 4:00 p.m. will be delivered or picked-up on the next work day. Normal hours of operation are Monday through Friday 8:00 a.m. to 5:00 p.m. locally (except holidays). If a storage vendor cannot fulfill a request because you or your alternate contact is not available, your department will be charged for all fees. NO RUSH OR EMERGENCY RETRIEVALS WILL BE ACCEPTED WITHOUT PRIOR APPROVAL FROM RIM. If you have an emergency situation, please contact Phil Hasselvander at Vnet 806-3398 (703-886-3398) or Chris Moses at Vnet 806-7117 (703-886-7117).

## NEW STORAGE

(A copy of the MCI Box Inventory Form, File-Level Inventory Form and Fax Order Form are in Appendix F)

Obtain off-site storage supplies (approved record storage cartons and barcode labels) from your storage vendor through the supply request form on RIM's website.

The MCI Box Inventory Form can also be obtained on RIM's website.

Follow these steps to send cartons to storage:

1. Complete the Inventory Form (see instructions below).
2. Two identical peel-off, die cut, barcode labels are provided. Affix the small barcode label to the Inventory Form where indicated. This barcode number is your carton number. This is the number you will use to retrieve and refile your cartons.
3. Affix the larger barcode label to the narrow side of the carton under the hold handle.
4. The inventory form is not a two-part form. After affixing the barcode label, make a copy of this form for your files.
5. Schedule a pick-up by completing the new storage pick-up request form on the RIM website. If you are not sure which city you should choose, please contact Phil

MCIWC031808    **A 03210**



Hasselvander at Vnet 806-3398 (703-886-3398) or Chris Moses at Vnet 806-7117 (703-886-7117).

6. You must FAX your inventory form to RIM at 703-886-0807 for review before pick-up of new storage can occur. Once RIM has reviewed your inventory form to ensure that it has been completed properly, RIM will forward your pick-up request to the storage vendor. This change in procedure is to ensure that the records are completely identifiable, easily retrievable and the information required for retention and destruction review is correct.

Complete the Inventory Form as follows:

Check whether it is Standard Storage or Climate Control Storage at the top of the form. Climate Control is used for electronic media. Do not mix electronic records with paper records. If you have both standard storage and climate control storage, you need to fill out a separate form for each type of storage.

ACCT. #: Fill in the storage vendor account number for your area. See the Storage Vendor Telephone Directory and Contact List for account numbers in your area.
PREPARED BY: Fill in your name.
PHONE NO.: Fill in your outside telephone number here.
DATE: Fill in the date the form is filled out.
DEPT: Fill in your department name or four-digit department number. Location number is not needed.
CARTON BARCODE: Place small die cut barcode label from the large barcode label sheet here.
RECORD CLASSIFICATION CODE: Fill in the Record Series # from MCI's Records Retention Schedule.
DATE RANGE: Fill in From and Thru dates of records in carton. For example, if a box contains invoices from June 1996 to September 1996, you should fill in the "From" field with 06/01/1996 and the "Thru" field with 09/30/1996. If you only have a year, then span the entire year (i.e., 01/01/96 to 12/31/96).
RETENTION CODE: Leave blank, unless instructed otherwise by RIM. You would need to complete this field if you are storing active records, or records under litigation or audit; therefore, please call RIM for the code.
DESCRIPTION: 55 characters of descriptive information that FULLY explains the records in the carton. The description should be able to identify, to anyone within the company, the contents of the carton.

IMPORTANT:

The Inventory form is used to identify carton contents and ownership. It is also used to input carton information into MCI's national database of records. All storage vendors have been instructed, by RIM, to refuse pick-up of new storage cartons without accompanying inventory forms. In addition, all storage vendors have been instructed to return any cartons with an incomplete inventory form. Unique abbreviations, acronyms, numbers without qualifiers, individuals' names, terms such as: miscellaneous files, general files, desk files, old files, office files are unacceptable. Cartons containing these types of descriptions or cartons picked-up with no inventory forms will be returned to

MCIWC031809    A 03211

you. All costs associated with returning cartons to you will be charged to your department. If you have questions regarding acceptable/unacceptable descriptions, contact Phil Hasselvander at Vnet 806-3398 (703-886-3398) or Chris Moses Vnet 806-7117 (703-886-7117).

RETRIEVALS

Retrievals are those cartons that you wish to have recalled from the storage vendor and returned to you for temporary use. To retrieve cartons from storage, use the retrieval request form on the RIM website. You will need to indicate which carton numbers you want retrieved from storage and delivered to you. You may only retrieve records stored by your department.

A department may not purge any records from a box that was retrieved from storage. Cartons that are retrieved must be returned to storage within 10 business days. For an exception to this policy, send an e-mail to RIM at rim@mci.com with an explanation and justification for longer retention within the department.

REFILES

Refiles are those cartons previously retrieved from the storage vendor, that you wish to have re-stored. To refile records with your storage vendor, use the pick-up request form on the RIM website to schedule carton pick-ups. To add cartons to your pick-up order, you must prepare a new request form.



17

Records Management Program – Policies & Procedures

## RETENTION HOLD CODES

A Retention Hold Code assigned to records prevents those records from going through the destruction review process when its retention period has been met. Any boxes in storage that are being used for an audit or litigation must have a "hold" code assigned to each carton/item.  The codes used are as follows:

        002 - additional 2 years retention
        455 - Legal hold
        458 - Patent Litigation (will be deleted, not showing on any boxes yet)
        488 - 900 Litigation
        ACT - active
        373 - permanent (will be deleted)
        355 - Tax hold
        296 - audits
        105 - yearly review - temporary
        TR - tape rotation

(as of 12/13/2000)

A retention hold code report is to be received from each storage vendor/district annually. This is to be reviewed and the need for the retention codes to be continued verified with the end-user.

MCIWC031811

A 03213

## INVENTORY REVIEWS

In 1994 and 1995, RIM had the storage vendors perform an inventory project that included approximately 65,000 boxes, in total. This project was necessary when RIM took control of all storage company-wide.

RIM performs an inventory review, on a monthly basis, for all new box storage and an inventory review once a year for all storage. The monthly and annual inventory reports received from the storage vendors is run in record class order first, then box number.

During the inventory review, RIM looks for missing data, incorrect data or illogical descriptions. For any boxes missing information or with incomplete data, RIM will request the user to provide the information needed. If the boxes are old or the department that is responsible for the boxes cannot be located, RIM either requests the storage vendor to inventory the boxes, or pulls the boxes into the office to review them and provide the appropriate information to the vendor via e-mail. All data changes to inventory are sent to the storage vendor via e-mail.

A quarterly outcard report is also received from the storage vendors/districts. This is to be reviewed for records being retained beyond RIM's policy.

## INVENTORY PROJECTS

The events necessitating an inventory project to be conducted at a storage vendor would be the transfer of inventory from a MCI location or a third-party storage location (such as a self-serve storage facility). The project would be initiated in order to obtain the required descriptive data for the records.

Attached in Appendix G is a Project Requirements document, a Project Estimate Request document and an Inventory Form designed to be used with an inventory project, these specific documents would be submitted to the storage vendor performing the project. Also included is a Project Plan; this is an internal document used to direct all of the RIM team members on the project. These documents would be used for in-house inventory projects; meaning a project to be conducted on records/cartons already in storage at the vendor's facility. These documents would have to be rewritten to accommodate a third-party inventory project such as a current storage vendor retrieving inventory from another storage vendor location, a self-storage unit or from a MCI warehouse or deactivated office.

MCIWC031812