UNITED STATES BANKRUPTCY COURT  For Publication
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------
            :
In re           :  Chapter 11
            :
WORLDCOM, INC., et. al.,   :  Case No. 02-13533 (AJG)
            :
    Reorganized Debtors.  :
            :
---------------------------------------------------------

## OPINION PARTIALLY GRANTING AND PARTIALLY DENYING DEBTORS' MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE PORTIONS OF AFFIDAVITS

**APPEARANCES**

STINSON MORRISON HECKER LLP
Attorneys for the Reorganized Debtors
1201 Walnut Street
Kansas City, MO  64106

   Robert L. Driscoll, Esq.
   Allison M. Murdock, Esq.
   Jodi M. Hoss, Esq.

KELLEY DRYE & WARREN LLP
Attorneys for Parus Holdings, Inc.
101 Park Avenue
New York, NY  10178

   John M. Callagy, Esq.
   Robert S. Friedman, Esq.


ARTHUR J. GONZALEZ
United States Bankruptcy Judge

   WorldCom, Inc. ("WorldCom") and certain of its direct and indirect subsidiaries, as

debtors and debtors in possession (collectively, referred to as the "Debtors" herein at all times

pre- and post-petition) filed a motion for summary judgment and a motion to strike portions of

A 03367

affidavits submitted as evidence to defeat summary judgment by Parus Holdings, Inc. ("Parus").

## I. Jurisdiction and Venue

The Court has subject matter jurisdiction over this proceeding pursuant to sections 1334(b) and 157(a) of title 28 of the United States Code. This matter is a core proceeding within the meaning of section 157(b) of title 28 of the United States Code. Venue is properly before the Court, pursuant to sections 1408 and 1409 of title 28 of the United States Code.

## II. Background

The Debtors provided a broad range of communication services in over 200 countries on six continents. Through their core communications service business, which includes voice, data, internet and international services, the Debtors carried more data over its networks than any other entity. The Debtors were the second largest carrier of consumer and small business long distance telecommunications services in the United States and provided a wide range of retail and wholesale communications services.

Intermedia Communications, Inc. ("Intermedia"), a Delaware corporation with its principal place of business in Florida, was a provider of integrated data and voice telecom, internet access, and local and long-distance phone services to approximately 90,000 small and medium sized businesses. On September 5, 2000, Intermedia entered into a merger agreement with WorldCom. On November 17, 2000, the United States filed a complaint against WorldCom and Intermedia under the Clayton Act. *United States v. WorldCom, Inc.*, 2001 WL 1188484, at *1 (D.D.C. June 27, 2001). The final judgment entered by the District Court for the District of Columbia ("D.C. District Court") ordered WorldCom "to divest the Intermedia Assets as an ongoing, viable business ... ." *Id.* at *2. The order further provided that WorldCom "shall not

A 03368

take any action, direct or indirect, that will impede in any way the operation, sale, or divestiture of the Intermedia Assets." *Id*. at *3. "Intermedia Assets" was defined by the D.C. District Court to include "all contracts, teaming arrangements, agreements, leases, commitments, certifications, and understandings, relating to the Intermedia Assets, including supply agreements ... ." *Id*. at *1.

On November 20, 2000, Intermedia and EffectNet LLC ("EffectNet"), a Nevada company with its principal place of business in Arizona of which Parus is the successor-in-interest, entered into a Unified Communications Services General Agreement ("UC Contract") whereby EffectNet was to provide telecommunication services to Intermedia. The launch date of the UC Contract began in December 2000 and had an initial term of three years. Section 5.2 provided that "[t]ermination due to default under this Section shall be effective thirty (30) days after written notice to the defaulting Party if the default has not been cured within such thirty (30) day period." Section 12.3, titled <u>Governing Law</u>, provided that "[t]his Agreement will be interpreted in accordance with the laws of the state of Arizona, excluding its conflict of law rules."

On January 1, 2001, EffectNet announced a proposed merger with a company called Webley Systems, Inc. ("Webley"). Salomon Smith Barney ("Salomon") was retained by Webley to help raise $35 million in financing for corporate purposes. However, Salomon conditioned such assistance upon the completion of the proposed EffectNet/Webley merger because of "the significant forecasted customer base and revenue EffectNet would generate under the UC Contract."

In April and May of 2001, Salomon solicited potential private investors to aid in the

3

financing initiative.  WorldCom Ventures (included within the term "WorldCom"), a WorldCom

venture capital firm, was one of the potential investors that was contacted.  According to Parus's

proofs of claim, on or about the same time, WorldCom was negotiating a Master Agreement for

Software Licenses ("MASL") with Webley.  Upon being contacted as a potential investor,

WorldCom, in May 2001, received access to a private placement memorandum, which included,

among other things, "information regarding the EffectNet UC Contract and its expected,

generated revenues over the term of the contract."  Parus alleges that "[i]t was clear from the

investor presentation that the forecasted revenues from the UC Contract were a major component

to EffectNet's and Webley's 'bottom line.'"  According to Parus's proofs of claim

> The Debtor and [Intermedia, in claim no. 11242; MCI, in claim no.
> 11173] agreed to cause Intermedia to breach the [UC Contract] in
> an effort to wrongfully improve the Debtor's bargaining position
> with respect to [the MASL].  The Debtor and Intermedia knew that
> the termination of the [UC Contract] would place EffectNet and
> Webley in a position of severe financial distress, and would
> therefore force Webley to accept onerous terms in the negotiation
> of the MASL that favored the Debtor to a much greater degree
> than would have been possible had the [UC Contract] been in full
> force and effect.

On July 1, 2001, WorldCom, a Georgia corporation with its headquarters in Mississippi,

acquired Intermedia pursuant to the merger of a wholly owned subsidiary of WorldCom with and

into Intermedia.  According to Parus, after the completion of the merger, "Intermedia's project

manager for the UC Contract was terminated and Intermedia's sales force was disbanded through

terminations of employment or reassignment to other projects."  Moreover, "Parus was ...

informed at that time that hundreds of sales personnel – who had been trained by EffectNet to

provide support under the UC Contract – were told to stop working on the project."  Thereafter,

Intermedia cancelled 682 of then-existing 729 subscriptions under the UC Contract in September

A 03370

2001.  On September 14, 2001, WorldCom and Webley executed the MASL.  In February of 2002, EffectNet invoiced Intermedia for services provided in December 2001 under the UC Contract.  However, Intermedia did not pay these invoices.  WorldCom concedes, and Parus does not dispute, that "[o]n or about March 1, 2002, Intermedia requested cancellation of all remaining services under the UC Contract."

On March 12, 2002, the general counsel of Parus, Robert C. McConnell, wrote a letter ("March 12th Letter") to Rich Black, senior vice president of Intermedia at the time, informing him that Intermedia had breached Section 5.2 of the UC Contract by failing to pay for services provided by EffectNet

> EffectNet hereby gives Intermedia written notice of default under Section 5.2 of the Agreement with respect to the Intermedia Defaults and EffectNet further hereby gives Intermedia written notice that EffectNet may (i) terminate this Agreement under Section 5.2 due to default effective thirty (30) days after this written notice if each of the Intermedia Defaults has not been cured within such thirty (30) day period, and (ii) further exercise all available remedies pursuant to the terms of the Agreement and as otherwise may be available at law or in equity.

In his letter, Mr. McConnell requested payment of past due amounts beginning from December 2001 and informed Intermedia that it had "until the expiration of thirty (30) days after this written notice to remit the Required Payment."  On March 25, 2002, Mr. McConnell wrote a letter ("March 25th Letter") to Brett Bacon of MCI/WorldCom informing him that none of the past payments had been received and therefore, Intermedia was still in default under the UC Contract.  Mr. McConnell further informed Mr. Bacon that

> [T]he Agreement in Section 5.2 provides that "[t]ermination due to default under this Section shall be effective thirty (30) days after written notice to the defaulting Party if the default has not been cured within such thirty (30) day period."  Accordingly, the

5

A 03371

> Agreement will be terminated for default by Intermedia on or
> about April 12, 2002 if the Intermedia Defaults are not cured prior
> thereto.

Both the March 12th Letter and March 25th Letter ended with the same statement reserving

EffectNet's rights

> Nothing in this letter is intended to be a waiver or release of any
> rights or remedies, or an election thereof, that EffectNet has under
> the Agreement or applicable law, and all such rights and remedies
> are hereby expressly reserved in their entirety.

EffectNet did not receive a response to either of Mr. McConnell's letters and thereafter ceased

performing its duties under the UC Contract.

On July 21, 2002 and November 8, 2002, the Debtors commenced cases under chapter 11

of title 11 of the United States Code (the "Bankruptcy Code"). On October 29, 2002, the Court

entered an order establishing January 23, 2003, as the bar date for filing proofs of claim (the

"Bar Date"). By entry of the Confirmation Order on October 31, 2003, the Court confirmed a

plan of reorganization (the "Plan"). The Plan became effective on April 20, 2004 (the "Effective

Date"). Upon the Effective Date, WorldCom changed its name to MCI, Inc. On January 6,

2006, Verizon Communications, Inc. and MCI merged. Under the merger agreement, MCI, Inc.

merged with and into Eli Acquisition, LLC, as a direct, wholly owned subsidiary of Verizon

Communications Inc. Eli Acquisition LLC, as the surviving entity, was immediately renamed

MCI, LLC. MCI, LLC is now doing business as Verizon Business Global LLC.

Parus filed two amended proofs of claim ("Claim 11173" and "Claim 11242") on

December 12, 2002. Claim 11173 was filed against Intermedia claiming damages for breach of

the UC Contract and alleging to have claims for unfair and deceptive trade practices, breach of

the implied covenant of good faith and fair dealing, and "conspiracy based on the Debtor's

6

actions in concert with MCI WorldCom Network Services, Inc."  Claim 11242 was filed against

MCI WorldCom Communications, Inc. claiming damages for breach of the UC Contract and

alleging to have claims for tortious interference with contractual relations, unfair and deceptive

trade practices, and "conspiracy based on the Debtor's actions in concert with Intermedia."

*1.  Breach of the UC Contract*

Appendix P to the UC Contract listed an $11.45 per month rate for a basic service and a

$27.40 per month rate for an unlimited service.  Section 2.12, titled <u>Minimum Commitment</u>,

provided

> Intermedia hereby agrees to deliver a minimum 1,500 then current
> active subscribers on or before three (3) months after December
> 18, 2000 (the "Rollout Date"); an additional 1,500 then current
> active subscribers (total 3,000) on or before six (6) months after
> the Rollout Date; an[] additional 3,500 then current active
> subscribers (total 6,500) on or before nine (9) months after the
> Rollout Date; and 10,000 total then current active subscribers on or
> before twelve (12) months after the Rollout Date (the "Ramp
> Date"), and at the end of each calendar month thereafter (the
> "Minimum Commitment") for the Term of this Agreement.

Section 2.13, titled <u>Reconciliation Payment</u>, provided

> On the Ramp Date and at the end of each calendar month
> thereafter, EffectNet will calculate the actual number of then
> current active subscribers on the last day of such calendar month
> and compare it to the Minimum Commitment.  If the number of
> subscribers is less than the Minimum Commitment for the month
> in question, such difference will constitute a "Volume Shortfall."
> Intermedia shall pay EffectNet a Reconciliation Payment equal to
> the Volume Shortfall multiplied by the ***base monthly price***
> applicable to the Intermedia UC Service per subscriber.

(emphasis added).  The term "base monthly price" is not defined in the UC Contract.

Intermedia acknowledges it breached the UC Contract when it failed to timely pay its

December 2001 through March 2002 invoices.  Intermedia claims that during the December

7

2001 and January 2002 billing cycles, it had 47 active mailboxes billed to it for $1,308.85. Intermedia also had a volume shortfall of 9,953 mailbox subscriptions during each of those months. Therefore, pursuant to Appendix P and the <u>Reconciliation Payment</u> section of the UC Contract, Intermedia contends that it owes EffectNet $1,308.85 plus a reconciliation payment of 9,953 (volume shortfall) times a base monthly price of $11.45 (basic service rate) for a total of $113,961.85 for each of those months.  During the February 2002 billing cycle, Intermedia had 42 active mailboxes billed to it for $1,381.80.  Intermedia also had a volume shortfall of 9,958 mailbox subscriptions.  Intermedia therefore contends that it owes EffectNet $1,381.80 plus a February 2002 reconciliation payment of $114,019.10 (9,958 x $11.45).  During the March 2002 billing cycle, Intermedia had a volume shortfall of 10,000 mailbox subscriptions.  Intermedia therefore contends that it owes EffectNet a March 2002 reconciliation payment of $114,500 (10,000 x. $11.45).  Intermedia contends that March 2002 was the month in which the UC Contract was terminated pursuant to the March 12th Letter, March 25th Letter, and Section 5.2 of the UC Contract, thereby ending its liability to EffectNet.  Overall, Intermedia asserts that it only owes EffectNet $460,442.30.

Parus asserts, however, that the base monthly price used to determine the amount of the reconciliation payment is the unlimited service rate of $27.40, instead of the basic service rate of $11.45 that Intermedia applies.  Parus contends, and Intermedia does not dispute, that "Debtors never objected contemporaneously to the invoices submitted using the Unlimited Services rate." In further support of its position, Parus submitted the affidavit of Taj Reneau, the president and chief executive officer of Parus.  In his affidavit, Mr. Reneau stated

> The only price negotiated as the "base monthly price" was the
> "Unlimited Service" rate of $27.40.  This is the price the parties

8

> intended to be used for the calculation of Minimum Commitment
> and Reconciliation Payment.  The "Basic Service" was included in
> Appendix P merely as an expedient service for those few end-users
> or customers that just wanted to try the UC Service on a temporary
> or initial basis.  Indeed, the parties intended to use the Basic
> Service only as an introductory low-price marketing option for
> customers who were primarily testing or trialing the service.
>
> ...
>
> In addition, the statement "base monthly price" was used by the
> parties and understood to mean the fixed monthly fee in contrast to
> the variable usage-based per minute pricing in the $27.40
> "Unlimited Service" price plan.  Here "base" served to distinguish
> between fixed monthly fees and variable usage based fees – a
> commonly understood distinction and phraseology in the
> telecommunications industry.  The word "base" never had
> anything to do with the term "Basic" as applied to the Pricing,
> either "Unlimited Service" or "Basic Service," for accounts as
> between EffectNet and Intermedia.

Parus also maintains that Mr. McConnell's March 12th Letter and March 25th Letter did not

constitute letters of termination.  In support of its position, Parus submitted the affidavit of Mr.

McConnell, in which he states that the letters he sent were "never intended to terminate the UC

Contract nor limit Intermedia's obligations in any manner."  If anything, Parus contends that

Intermedia anticipatorily repudiated the contract through actions taken prior to the March 12th

Letter.  Parus therefore asserts that it is owed money from December 2001 until the expiration of

the UC Contract in December 2003.

Based on the affidavit of Mr. Reneau, Parus specifically claims a debt for services

performed of $1,308.85 plus a reconciliation payment of $272,712.20 [9,953 (volume shortfall) x

$27.40 (unlimited service rate)] for December 2001; $1,354 for services performed and late fees

plus a reconciliation payment of $272,712.20 [9,953 (volume shortfall) x $27.40 (unlimited

service rate)] for January 2002; $6,907.82 for services performed and late fees plus a

A 03375

reconciliation payment of $272,849.20 [9,958 (volume shortfall) x $27.40 (unlimited service rate)] for February 2002; and a reconciliation payment of $274,000 [10,000 (volume shortfall) x $27.40 (unlimited service rate)] for the twenty months remaining on the UC Contract (March 2002 until December 2003).  Overall, Parus claims it is owed a total of $6,307,844.27 plus interest.

Intermedia counters Parus's contention that it is liable for reconciliation payments until December 2003 by referencing section 5.3, titled <u>Effect of Termination</u>, which states that "[u]pon termination of this Agreement for any reason, each Party shall remain liable for those obligations that accrued prior to the date of such termination."  Intermedia interprets this section as meaning that only outstanding debts owed prior to termination are owed after termination.  In further support of its contention, Intermedia references Section 11 ("Limitation of Liability clause")

> EXCEPT FOR DAMAGES ARISING UNDER SECTION []
[1], IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY INCIDENTAL, INDIRECT, SPECIAL, PUNITIVE, CONSEQUENTIAL OR SIMILAR DAMAGES OF ANY KIND INCLUDING WITHOUT LIMITATION, LOSS OF PROFITS, LOSS OF BUSINESS OR INTERRUPTION OF BUSINESS, WHETHER SUCH LIABILITY IS PREDICATED ON CONTRACT, STRICT LIABILITY OR ANY OTHER THEORY WITHOUT REGARD TO WHETHER SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

Intermedia also disputes Parus's use of the above portions of Mr. McConnell's and Mr. Reneau's affidavits to support its position, claiming that the above responses constitute inadmissible legal conclusions and conclusory statements on factual issues.  As such, the Debtors have submitted a

---

[1]This part was blank in the UC Contract.

A 03376

motion to strike these portions of the affidavits as evidence in the Court's consideration of the

Debtors' motion for summary judgment.

*2. Parus's Other Claims*

The services provided by EffectNet to Intermedia were ultimately to be bundled into a

product called Intermedia*One* and sold to Intermedia's customers through Intermedia's network

of sales representatives in 50 cities throughout the United States. "It was EffectNet's

understanding from conversations with Intermedia personnel, other representations and

forecasts, that Intermedia believed the product would be hugely successful. Thus, by January

2001, it had separated EffectNet's unified communications service and applications into a

product separate from Intermedia*One*, which was called Intermedia Unified Messaging.

"Intermedia Unified Messaging was the first web and telephone based unified messaging

platform offered by a major U.S. service provider and allowed business professionals to custom

build a communications portal that retrieved and sent fax, e-mail and telephone messages

through any device, with the help of a virtual assistant."

Relying on a sworn declaration of Robert S. Friedman, who is one of the attorneys for

Parus, Parus contends that WorldCom was in the process of implementing a unified messaging

application called "genD" prior to the WorldCom/Intermedia merger. An exhibit to Mr.

Friedman's declaration shows an email from Bernard J. Ebbers to WorldCom employees dated

September 5, 2000. The email states, in part

> Today we announced an exciting merger that promises to catapult
> our ***generation d*** initiative to new heights. We have agreed to
> acquire Intermedia, a U.S.-based competitive local exchange
> carrier, which also gives us control of Digex, one of the industry's
> leading Web and application hosting services companies.

11

**A 03377**

(emphasis added). The email further discusses WorldCom's intent to begin marketing Intermedia for sale. Parus argues that this email helps show that "WorldCom intended to proceed with its competing Unified Messaging application, 'genD,' and shut down Intermedia's bundled product, Intermedia*One* and Intermedia Unified Messaging." Parus further supports its allegations by stating (1) WorldCom fired its point person for the UC Contract upon the closing of the merger, (2) WorldCom "disbanded" the sales force implementing the UC Contract upon the closing of the merger, and (3) WorldCom cancelled almost all of the accounts under the UC Contract upon the closing of the merger. Parus further contends that non-responsive and/or delay tactics have been employed by the Debtors to prevent further discovery by Parus regarding these allegations.

The Debtors counter by arguing that the email written by Mr. Ebbers does not support Parus's contention that WorldCom intended to shut down Intermedia*One* and Intermedia Unified Messaging. Instead, the email "merely describes how WorldCom's merger with Intermedia and its subsidiary Digex ... will enhance WorldCom's generation D initiative." The Debtors assert that any other conclusion would be derived out of speculation.

The Court held a hearing on January 17, 2006.

### III. Discussion

#### A. *Motion to Strike Portions of McConnell and Reneau Affidavits*

The Debtors filed a Motion to Strike Portions of Affidavits Submitted in Support of Claimant Parus Holdings, Inc.'s Response and Opposition to WorldCom's Motion for Summary Judgment. The Debtors claim that portions of Mr. McConnell's and Mr. Reneau's affidavits dealing with the applicable rate in calculating the reconciliation payment and whether or not the

A 03378

March 12th Letter and March 25th Letter terminated the UC Contract, among other portions, violate Rule 56(e) of the Federal Rules of Civil Procedure and should be stricken because they "contain impermissible characterizations of unambiguous contractual terms, misrepresentations of the underlying documents submitted by Parus Holdings, and post hoc, self-serving statements about the parties' subjective intent."

Rule 56(e) provides that "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e). "The party opposing the motion [for summary judgment] must set forth 'concrete particulars.' ... It is not sufficient merely to assert a conclusion without supplying supporting argument or facts ... ." *Bellsouth Telecomm., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) *quoting SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978). "In addition, 'ultimate or conclusory facts and conclusions of law ... cannot be utilized on a summary judgment motion.'" *Id. quoting* 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2738, at 486 & 489 (1983). "Such conclusory statements are insufficient to raise a triable issue of material fact ... ." *Bellsouth Telecomm.*, 77 F.3d at 615.

With regard to Mr. McConnell's affidavit wherein he states that he never intended that his letters effect a termination of the UC Contract, the Court finds that this statement is conclusory. Mr. McConnell's statement is a legal conclusion and is irrelevant to the inquiry as to whether his letters did, in fact, effect a termination under the express terms of the UC Contract. Therefore, that portion of the affidavit is stricken. Moreover, paragraph 8 of Mr. McConnell's affidavit responds to the Debtors' claim that his letters constituted a termination of

A 03379

the UC Contract by stating "[t]his claim is frankly preposterous and ignores the words of the letters as well as the understanding and intention of the parties." This statement is conclusory and is stricken. Therefore, the Debtors' motion to strike is granted with respect to those portions of Mr. McConnell's affidavit.

With regard to Mr. Reneau's affidavit, wherein he discusses his belief as to why $27.40 is the "base monthly price," the Court finds that he did not merely make a conclusory statement since he provided sufficient argument and facts to support his conclusion. Such supporting facts and argument were included in paragraph 16 of his affidavit

> In addition, the statement "base monthly price" was used by the parties and understood to mean the fixed monthly fee in contrast to the variable usage-based per minute pricing in the $27.40 "Unlimited Service" price plan. Here "base" served to distinguish between fixed monthly fees and variable usage based fees – a commonly understood distinction and phraseology in the telecommunications industry. The word "base" never had anything to do with the term "Basic" as applied to the Pricing, either "Unlimited Service" or "Basic Service," for accounts as between EffectNet and Intermedia.

The Debtors are correct that nowhere in Mr. Reneau's affidavit does he state that he was a part of these negotiations or was present when they were taking place. However, as the president and chief executive officer of Parus, it is reasonable to conclude that he is aware of intended meanings of "phraseology in the telecommunications industry." Paragraph 17 of Mr. Reneau's affidavit concludes: "Thus, the 'Unlimited Service' rate of $27.40 was to be the base monthly price used in calculating the Reconciliation Payment." The portions of Mr. Reneau's affidavits in paragraphs 44, 45, and 46, to which the Debtors object, consist of Mr. Reneau calculating the same volume shortfall listed in the Debtors' motion for summary judgment for December 2001, January 2002, and February 2002 times a "base monthly price" of $27.40. Again, Mr. Reneau

14

provided sufficient argument and facts as to why he believed $27.40 was the "base monthly price" and his calculation of the money owed using this number is merely a continuation of his argument. Paragraph 48 of Mr. Reneau's affidavit states that Intermedia was required to meet 10,000 accounts annually. This statement is supported by Section 2.12 of the UC Contract. Therefore, the Court denies the Debtors' motion to strike as to these portions of paragraphs 16, 17, 44, 45, 46, and 48 in Mr. Reneau's affidavit.

However, the Court grants the motion to strike as to the remaining portions of Mr. Reaneau's affidavit for the following reasons. Paragraph 16 states that the intention of the parties was that the unlimited service rate of $27.40 would be considered the "base monthly price" since the base service rate of $11.45 would actually be more expensive considering the fact that inbound calls are charged at $.10 a minute under that plan whereas they are not charged under the unlimited service plan, thereby essentially compelling customers to choose the $27.40 rate. The Court finds Mr. Reneau's statements as to the intention of the parties to be conclusory and insufficiently supported by argument and/or facts. Moreover, paragraph 47 states that the Debtors also owe Parus for an additional 20 months from March 2002 until the end of the UC Contract, and paragraph 49 incorporates paragraph 47's assertion and concludes that the Debtors owe $6,307,844.27. However, no other supporting facts are presented to support those assertions. Therefore, they are conclusory statements and are stricken. The Debtors' motion to strike is granted in part and denied in part with regard to portions of Mr. Reneau's affidavit.

B. *Summary Judgment*

The basic principles governing a motion for summary judgment are well settled. First, summary judgment may be granted only if the Court determines that there is no genuine issue of

A 03381

material fact to be tried and the moving party is therefore entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056; *see generally Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Second, the burden is upon the moving party to clearly establish the absence of a genuine issue as to any material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Third, in considering such, the Court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the non-moving party. *Institute for Shipboard Educ. v. Cigna Worldwide Ins., Co.*, 22 F.3d 414, 418 (2d Cir. 1994). Fourth, the movant can meet its burden for summary judgment by showing that little or no evidence may be found to support the non-movant's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Finally, if no reasonable jury could find in favor of the non-movant because evidence to support its case is slight, there is no genuine issue of material fact and a grant of summary judgment is proper. *See Gallo v. Prudential Residential Servs., Ltd. Partnership*, 22 F.3d 1219, 1224 (2d Cir. 1994).

Parus argues that since discovery is incomplete, summary judgment is premature under Rule 56(f) of the Federal Rules of Civil Procedure. Rule 56(f), incorporated in its entirety into the Federal Bankruptcy Rules through Rule 7056, provides

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

An affidavit in opposition to a motion for summary judgment, which seeks further discovery, should explain

16

A 03382

(1) what facts are sought and how they are to be obtained,
(2) how those facts are reasonably expected to create a genuine
     issue of material fact,
(3) what effort affiant has made to obtain them, and
(4) why the affiant was unsuccessful in those efforts.

*Gurary v. Winehouse* 190 F.3d 37, 43 (2d Cir. 1999); *Meloff v. New York Life Ins. Co.*, 51 F.3d

372, 375 (2d Cir. 1995).

A decision on whether to afford more time for discovery pursuant to Federal Rule of

Civil Procedure 56(f) is within a court's discretion. *Paddington Partners v. Bouchard*, 34 F.3d

1132, 1137 (2d Cir. 1994). Summary judgment may be granted where plaintiff gives "no basis

to conclude that further discovery would yield proof" of the evidence it requires. *Meloff*, 51 F.3d

at 375.

A party must already have a claim for which it seeks additional discovery, as discovery is

not meant to allow a party "to find out if it has a claim." *Paddington*, 34 F.3d at 1138. The mere

expectation of potentially developing further evidence is not sufficient. *Id*. Rather, the evidence

sought must be to fill in evidentiary gaps. *Id*. (citations omitted).

A party may not defeat a motion for summary judgment by merely restating conclusory

allegations and amplifying them only with speculation about what discovery might uncover.

*Contemporary Mission, Inc. v. U.S. Postal Serv.*, 648 F.2d 97, 107 (2d Cir. 1981). An opposing

party's mere hope that further evidence may develop prior to trial is an insufficient basis upon

which to justify the denial of the motion. *Id*.

Thus, a properly and timely made Rule 56(f) request for discovery may nevertheless be

denied if a court determines that the request is based on "speculation as to what potentially could

be discovered." *Paddington*, 34 F.3d at 1138. A party seeking Rule 56(f) relief must show that

A 03383

the material sought is related to the defense, and that it is not cumulative or speculative.  *Id*.  A

bare assertion that the evidence supporting a plaintiff's allegation is in the hands of the defendant

is not sufficient to justify a denial of a motion for summary judgment under Rule 56(f).  *Id*.

Parus submitted a Rule 56(f) affidavit in the form of a declaration by Robert S. Friedman.

However, the Court declines to exercise its discretion to allow Mr. Friedman's declaration to

defeat the Court's resolution of the Debtors' motion for summary judgment.  The Court reaches

this decision because (1) it can decide the issues based on the plain language of the UC Contract,

and, alternatively, (2) the Court believes Mr. Friedman's statements requesting additional

discovery constitute "speculation as to what potentially could be discovered."  *Id*.  Therefore, the

Court will proceed with its analysis on the Debtors' motion for summary judgment.

1.  *The UC Contract*

The Debtors concede that Intermedia breached the UC Contract when it failed to timely

pay its invoices for December 2001 through March 2002.  However, the Debtors argue (1) the

"base monthly price" refers to the basic service rate of $11.45, which is the rate that should be

used in calculating the reconciliation payment, (2) the March 12th Letter and March 25th Letter

effected a termination of the UC Contract, (3) the only outstanding payments remaining under

the UC Contract are from December 2001 until March 2002, and (4) the Limitation of Liability

clause prohibits Parus from receiving any "benefit of the bargain" damages.  Since Section 12.3

of the UC Contract provides that it will be interpreted in accordance with the laws of Arizona

and both parties concede that Arizona law applies, the Court will apply Arizona law as needed.

A.  *Base Monthly Price*

In its motion for summary judgment, the Debtors list, without explanation, the basic

18

service rate of $11.45 as the "base monthly price" used in calculating the reconciliation payment.

Parus counters, through the affidavit of Mr. Reneau, that the "base monthly price" was actually intended to be the unlimited service rate of $27.40.  The Court reviewed the UC Contract and found no definition of "base monthly price."  Therefore, the Court finds that a material issue of fact exists regarding which rate constitutes the "base monthly price."  Summary judgment is denied in this regard.

B.  *Termination of the UC Contract*

The Debtors claim that the March 12th Letter and March 25th Letter effected a termination of the UC Contract on April 12, 2002.  Parus claims that the letters did no such thing.  The Court finds section 5.2 of the UC Contract to be unambiguous.  That section states that "[t]ermination due to default under this Section shall be effective thirty (30) days after written notice to the defaulting Party if the default has not been cured within such thirty (30) day period."  Mr. McConnell sent a letter to Intermedia on March 12, 2002, and followed up with the March 25th Letter wherein he informed Intermedia that "the Agreement will be terminated on or about April 12, 2002 if the Intermedia Defaults are not cured prior thereto."  The Debtors concede that at the time, it was in default due to non-payment of invoices and that it never cured such default.

Mr. McConnell claims in his affidavit that he never intended for his letters to constitute a termination of the UC Contract.  The Court has already stricken that portion of Mr. McConnell's affidavit under Rule 56(e).  However, even if that evidence was not stricken, Mr. McConnell's intent is irrelevant since the language of Section 5.2 is unambiguous.  The Court finds that the

A 03385

unambiguous language of Section 5.2 requires a conclusion that Mr. McConnell's letters did effect a termination of the UC Contract on April 12, 2002.

The Court also notes that although Mr. McConnell's letters referenced Intermedia's other supposed "defaults" under the UC Contract, his letters specifically discussed non-payment of invoices as the only default. Moreover, Mr. McConnell's letters further implied that all "defaults" would be cured when Intermedia paid its invoices. Furthermore, EffectNet concedes that after Intermedia failed to cure its default of non-payment, it ceased performing services under the UC Contract. Section 5.3, titled <u>Effect of Termination</u>, allowed EffectNet to cease performing such services upon "termination of this Agreement ... ." Therefore, the Court notes that Mr. McConnell's discussion of defaults in his letters and EffectNet's actions subsequent to Intermedia's failure to cure provide further support for this Court's conclusion. Therefore, summary judgment is granted in this regard.

## C. *The Amount of Payments Remaining Under the UC Contract*

Parus claims that Intermedia's actions prior to the sending of the March 12th Letter evidenced an intention by Intermedia to not carry out its obligations under the UC Contract. Such actions included the transfer or termination of employees working in furtherance of the UC Contract upon completion of the merger and Parus's observance that as of January 1, 2001, the only accounts being opened by Intermedia were for its employees. Therefore, Parus claims that under Arizona law, Intermedia anticipatorily repudiated the UC Contract, thereby entitling it to receive its "benefit of the bargain" damages until the end of the UC Contract in December 2003.

Under Arizona law, "an action may be maintained for breach of contract based upon the anticipatory repudiation by one of the parties to the contract." *Diamos v. Hirsch*, 372 P.2d 76, 78 (Ariz. 1962). "It is well established that in order to constitute an anticipatory breach of

A 03386

contract there must be a positive and unequivocal manifestation on the part of the party allegedly repudiating that he will not render the promised performance when the time fixed for it in the contract arrives." *Id.* Moreover, "[i]n contract cases in which both parties have duties to perform at the time of an anticipatory repudiation, the plaintiff may recover future damages." *Healey v. Coury*, 783 P.2d 795, 802 (App. 1989).

The Court will note again that it is required to make all possible inferences in favor of the non-moving party. Even taking all evidence in a light most favorable to Parus does not lead the Court to reach the conclusion Parus desires. WorldCom's transfer or termination of employees working in furtherance of the UC Contract upon completion of its merger with Intermedia does not constitute a breach within any of the four corners of the UC Contract. Moreover, Parus's observance that as of January 1, 2001, the only accounts being opened by Intermedia were for its employees also does not constitute a breach of the UC Contract. Parus negotiated terms in the UC Contract which gave Intermedia the right to either provide a minimum number of subscribers per month or pay a reconciliation payment for any shortfall. The fact that Intermedia did not meet its minimum number of subscribers does not evidence any type of breach, much less the type of "positive and unequivocal manifestation on the part of the party allegedly repudiating that he will not render the promised performance when the time fixed for it in the contract arrives." *Diamos*, 372 P.2d at 78. The Debtors are only required to pay Parus for the months of December 2001 until March 2002. Summary judgment is therefore granted in this regard.

D. *Limitation of Liability Clause*

The Debtors further contend that the Limitation of Liability clause prohibits Parus from seeking "benefit of the bargain" damages or other consequential damages. Section 11 provides

21

> EXCEPT FOR DAMAGES ARISING UNDER SECTION          ,
> IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE
> OTHER PARTY FOR ANY INCIDENTAL, INDIRECT,
> SPECIAL, PUNITIVE, CONSEQUENTIAL OR SIMILAR
> DAMAGES OF ANY KIND INCLUDING WITHOUT
> LIMITATION, LOSS OF PROFITS, LOSS OF BUSINESS OR
> INTERRUPTION OF BUSINESS, WHETHER SUCH
> LIABILITY IS PREDICATED ON CONTRACT, STRICT
> LIABILITY OR ANY OTHER THEORY WITHOUT REGARD
> TO WHETHER SUCH PARTY HAS BEEN ADVISED OF THE
> POSSIBILITY OF SUCH DAMAGES.

Parus counters that Section 11 does not provide a proper basis upon which to grant summary judgment since the blank space after the word "SECTION" and before the word "IN" makes the contract ambiguous.

Although parol evidence may not be admitted for the purpose of varying or contradicting the terms of a contract, parol evidence may be admitted for the purpose of interpretation. *Taylor v. State Farm Mut. Auto. Ins. Co.*, 854 P.2d 1134, 1138 (Ariz. 1993). Arizona follows the Corbin view of contract interpretation. *Id*. at 1139. The Corbin view has two steps

> First, the court *considers* the evidence that is alleged to determine the extent of integration, illuminate the meaning of the contract language, or demonstrate the parties' intent. The court's function at this stage is to eliminate the evidence that has no probative value in determining the parties' intent. *Id*. The second step involves "finalizing" the court's understanding of the contract. Here, the parol evidence rule applies and *precludes admission* of the extrinsic evidence that would vary or contradict the meaning of the written words.

*Id*. Moreover, a finding of ambiguity is not required prior to considering extrinsic evidence under the Corbin view. *Id*. at 1138.

Despite the liberal application of the parol evidence rule in Arizona, the Court nonetheless finds that it cannot be applied in the present situation. The blank space, which allegedly signifies a missing term in the Limitation of Liability clause, is unlike a situation where

22

**A 03388**

a material price term is left blank in a contract. In the latter situation, the contract cannot be

enforced and/or otherwise interpreted without the integration of the missing term. In the former

situation, however, the Court has determined that the UC Contract can be enforced and

interpreted without the addition of the allegedly missing term. The Limitation of Liability

clause, as currently written, does not allow any exceptions to its pronouncement that neither

party shall be liable for any non-contractual damages, which is not an unreasonable result. Any

term included in the blank space will obviously provide an exception not otherwise currently

available, thereby varying or contradicting the terms of the contract. This is a result that Arizona

law does not allow. *Taylor*, 854 P.2d at 1138.

Furthermore, after considering Parus's argument that the parties, "clearly intended to

exclude damages arising under *some* section from the limitation of liability," the Court notes that

Parus has failed to provide the Court with any evidence as to which provision should have been

asserted, and has failed to provide a sufficient basis to show the presence of mutual mistake.

Under Arizona law, interpretation of a contract is a question of law for the court where

the terms of a contract are found to be plain and unambiguous. *Smith v. Melson, Inc*., 659 P.2d

1264, 1266 (Ariz. 1983). Whether a contract is ambiguous is a question of law; the mere fact

that parties disagree as to its meaning does not establish an ambiguity. *DeCarlo v. MCSA, Inc*.,

785 P.2d 592, 594 (Ariz. Ct. App. 1988). The controlling rule of contract interpretation requires

that the ordinary meaning of language be given to words where circumstances do not show a

different meaning is applicable. *Brady v. Black Mountain Inv. Co.*, 459 P.2d 712, 714 (Ariz.

1969). A contract must be construed so that every part is given effect, and "[e]ach section of an

agreement must be read in relation to each other to bring harmony, if possible, between all parts

of the writing." *Gesina v. General Elec. Co.*, 780 P.2d 1380, 1386 (Ariz. Ct. App. 1989). As a

A 03389

corollary, the Arizona courts will not construe one provision in a contract so as to render another provision meaningless. *Norman v. Recreation Centers of Sun City, Inc.*, 752 P.2d 514, 517 (Ariz. Ct. App. 1988). Arizona requires the application of a standard of reasonableness in contract interpretation. *Gesina*, 780 P.2d at 1386. Therefore, based on the reasoning set forth below, the Court finds that the Limitation of Liability clause, as written, does not produce an unreasonable result.

After reviewing the UC Contract, the Court has determined that there were only two provisions within the UC Contract that address termination. The first termination provision, Section 5.2, addressed four specific situations that would constitute termination, and the effect of such termination was defined in Section 5.3 of the UC Contract. The second termination provision, section 5.4, addresses early termination and provides for liquidated damages as the sole remedy in the event of such a termination.

The Court finds that even if the insertion of a particular termination provision was permitted, any attempt to insert either of the termination provisions renders the remaining language within the Limitation of Liability clause superfluous, whereas when the Limitation of Liability clause is read in its original form, it does not produce an unreasonable result.

First, if the Court was to insert Section 5.2 into the blank space of the Limitation of Liability clause, the Limitation of Liability clause would provide Section 5.2 was excepted from any limitation of damages. However, this would also render the remaining language superfluous because Section 5.4 already provides for liquidated damages as the sole remedy for early termination, and the only purpose of the remaining language would then be to reiterate that no damages were available under Section 5.4.

24

Next, if the Court were to insert section 5.4 into the blank space of the Limitation of Liability clause, the Court finds that it would result in language that merely repeats the limitation on damages provided in Section 5.4.  Since Section 5.4 provides the sole remedy for early termination, the Limitation of Liability clause would be excepting from damages the section that already provides a limitation on damages.

However, if the Limitation of Liability clause is left unaltered, the result, which is that the Limitation of Liability clause provides no exception to the limitation of damages, is not unreasonable.  As the Court mentioned above, Parus only argues that "some" section was meant to be excluded and offers no evidence as to what section was allegedly meant to occupy the blank space of the Limitation of Liability clause.  The Court notes that Parus's failure to provide such evidence may be based on their own analysis, similar to that which the Court just made, that any section inserted into the blank space of Section 11 produced an unreasonable result, rendering other language within the clause meaningless or superfluous.

Therefore, summary judgment is granted with regard to the Debtors' argument that the Limitation of Liability clause limits Intermedia's liability to the express terms of the contract. With this finding, the Court further rules that summary judgment is also granted in favor of Debtors with regard to Parus's claims against Intermedia for unfair and deceptive trade practices, breach of the covenant of good faith and fair dealing, and civil conspiracy since the Limitation of Liability clause prohibited the imposition of any non-contractual damages against Intermedia.

2.  *Parus's Other Claims*

In Claim 11242, Parus alleged damages against WorldCom resulting from conspiracy, tortious interference with contract, and unfair and deceptive trade practices.  The Debtors

A 03391

provide alternative arguments as to why summary judgment should be granted as a matter of law.

A.  *Civil Conspiracy*[2]

The Debtors contend that summary judgment should be granted as a matter of law since a corporation cannot, by law, conspire with itself.  The Debtors further contend that any action taken was required by the final judgment rendered by the D.C. District Court in its Clayton Act action.  Parus argues, however, that the majority of its claim arises from actions undertaken by WorldCom and Intermedia while they were acting as separate entities prior to their merger on July 1, 2001, and that the final judgment issued by the D.C. District Court prohibited WorldCom from interfering with "Intermedia Assets," the definition of which included the UC Contract.[3]

"Civil conspiracy consists of a combination of two or more persons for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means."  *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 894 (Ill. 1994).  "The function of a conspiracy claim is to extend liability in tort beyond the active wrongdoer to those who have merely planned, assisted or encouraged the wrongdoer's acts."  *Id*.  "While the agreement is a necessary and important element of a cause of action for civil conspiracy, it does not assume the

---

[2]The Debtors argue that Arizona or Mississippi law apply to this claim.  Parus argues that Illinois law applies because that is where the injury was felt by EffectNet.  The Court notes that the standard for civil conspiracy is similar in all three states.  *See Gallagher Bassett Servs., Inc. v. Jeffcoat*, 887 So. 2d 777, 786 (Miss. 2004); *Wells Fargo Bank v. Arizona Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 38 P.3d 12, 36 (Ariz. 2002); *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 894 (Ill. 1994).  Therefore, the Court can decide the issue without conducting a choice of law analysis since the result reached will be the same notwithstanding the particular states' law that is utilized.  The Court will proceed with its analysis of civil conspiracy, without making a determination of the applicable law, based on Illinois law.

[3]The D.C. District Court's opinion states that "[n]othing herein shall be construed to provide to any person or entity that is not a party to this Final Judgment any rights with respect to its enforcement, modification or termination."  2001 WL 1188484, at *4.  Parus was not a party to this "Final Judgment."  Therefore, to the extent Parus is seeking to collect damages as a result of the Debtors' alleged failure to comply with the D.C. District Court's final judgment, such efforts are improper since Parus lacks standing.

A 03392

same importance as in a criminal action." *Id*. "An agreement to commit a wrongful act is not a tort, even if it might be a crime." *Id*.

Since the Court has already granted summary judgment with regard to Parus's conspiracy claim against Intermedia, WorldCom cannot be guilty of conspiracy since there would be no second party with whom to conspire. Nonetheless, assuming, without deciding, that Parus has sufficiently alleged an agreement between WorldCom and Intermedia to affect the performance of the UC Contract, the question then becomes whether the conduct as alleged constitutes conduct rising to the level of civil conspiracy. The Court finds that it does not.

First, even if WorldCom and Intermedia had an agreement to breach the UC Contract, the existence of such an agreement does not, by itself, rise to the level of civil conspiracy. *See id*. Second, even if such an agreement between WorldCom and Intermedia called for Intermedia to intentionally fail to procure a sufficient amount of subscribers, cancel numerous accounts, and transfer or terminate current employees, such conduct on its part is not tortious nor a breach since the UC Contract provided for a contingency in the form of a reconciliation payment should Intermedia fail to meet its minimum monthly number of subscribers. Section 2.12 of the UC Contract required Intermedia to provide EffectNet with a minimum commitment of 10,000 subscribers at the end of each calendar month. Section 2.13 of the UC Contract alternatively provided that should Intermedia fail to meet its Section 2.12 obligations, it was required to pay EffectNet a reconciliation payment in the form of a "base monthly price" multiplied by the number of subscribers Intermedia failed to get under the 10,000 minimum commitment. For example, if Intermedia provided EffectNet with only 1,000 subscribers at the end of any given month, then Intermedia would be contractually required to make up the difference by paying

A 03393

EffectNet a reconciliation payment of 9,000 subscribers under the minimum commitment number times the "base monthly price."

Therefore, Intermedia was well within its rights under the UC Contract to either provide EffectNet with the minimum number of subscribers at the end of any given month or pay EffectNet a reconciliation payment for its failure to do so.  The fact that Intermedia chose not to meet its minimum monthly amount of subscribers, regardless of WorldCom's urging, did not constitute tortious conduct nor a breach of the UC Contract  Therefore, summary judgment is denied with regard to Parus's conspiracy claim against WorldCom.

B. *Tortious Interference with a Contract*[4]

---

[4]The Debtors argue that Arizona or Mississippi law apply to this claim.  Parus argues that Illinois law applies because that is where the injury was felt by EffectNet.  Arizona law requires the claimant to prove

> (1) existence of a valid contractual relationship, (2) knowledge of the relationship on the part of the interferor, (3) intentional interference inducing or causing a breach, (4) resultant damage to the party whose relationship has been disrupted, and (5) that the defendant acted improperly.

*Safeway Ins. Co., Inc. v. Guerrero*, 106 P.3d 1020, 1025 (Ariz. 2005) *quoting Wells Fargo Bank v. Arizona Laborers, Teamsters and Cement Masons Local No. 395 Pension Trust*, 38 P.3d 12, 31 (2002).  Similarly, Illinois law requires the claimant to prove

> (1) the existence of a valid and enforceable contract between plaintiff and another; (2) the awareness on the part of the defendant of the contractual relation; (3) defendant's intentional and unjustified inducement of the breach of the contract; (4) a subsequent breach by the other caused by defendant's wrongful conduct; and (5) damages.

*Agrimerica, Inc. v. Mathes*, 557 N.E. 2d 357, 367 (Ill. App. Ct. 1990).  Mississippi law provides a slight difference by not explicitly requiring a "breach" of the contract as one of its elements.  Under Mississippi law, a claimant must prove

> (1) the acts were intentional and willful; (2) that they were calculated to cause damages to the plaintiffs in their lawful business; (3) that they were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant; and (4) that actual loss occurred. ... It must also be proven that the contract would have been performed but for the alleged interference.

*Levens v. Campbell*, 733 So. 2d 753, 760-61 (Miss. 1999).  Despite this slight difference, the Court reads all three states' law as requiring similar elements.  Therefore, the Court can decide the issue without conducting a choice of law analysis since the result reached will be the same notwithstanding the particular states' law that is utilized.

A 03394

The Debtors contend that summary judgment should be granted as a matter of law since a parent company cannot, by law, tortiously interfere with a subsidiary's contract. The Debtors further argue that any action taken was required by the final judgment rendered by the D.C. District Court in its Clayton Act action. Parus counters that WorldCom may not hide behind this defense since the bulk of its allegations involve actions taken prior to the WorldCom/Intermedia merger.

Under Illinois law, a party asserting a claim of tortious interference with a contract must prove

> (1) the existence of a valid and enforceable contract between plaintiff and another; (2) the awareness on the part of the defendant of the contractual relation; (3) defendant's intentional and unjustified inducement of the breach of the contract; (4) a subsequent breach by the other caused by defendant's wrongful conduct; and (5) damages.

*Agrimerica, Inc. v. Mathes*, 557 N.E.2d 357, 367 (Ill. App. Ct. 1990).

The Court first notes that Parus does not mention any of the above elements constituting the claim of tortious interference with a contract. Nonetheless, viewing the facts presented in a light most favorable to Parus, the Court finds that Parus's claim of pre-merger wrongdoing by WorldCom fails since the only evidence posited by Parus regarding such wrongdoing is a statement noting that "as early as January 2001, EffectNet noticed that Intermedia was only opening accounts for Intermedia sales representative and certain Intermedia executives." Even if WorldCom induced Intermedia to cease opening up new accounts, such an action would not constitute a breach of the UC Contract since Intermedia was well within its rights to either meet the minimum number of subscribers each month or pay EffectNet a reconciliation payment for

Court will proceed with its analysis of tortious interference, without making a determination of the applicable law, based on Illinois law.

A 03395

any shortfall. Therefore, element four of the five-part test for tortious interference with a contract would fail because such an action would not constitute a breach under the UC Contract. No reasonable jury could find in favor of Parus because the evidence to support its case with regard to alleged pre-merger wrongdoing is slight. *See Gallo*, 22 F.3d at 1224.

Parus alternatively argues that WorldCom's post-merger wrongdoings should support a denial of summary judgment. Parus's allegations of post-merger wrongdoing are based on the following facts

> (1) after the WorldCom/Intermedia merger, Intermedia cancelled 682 of then-existing 729 subscriptions under the UC Contract in September of 2001;
>
> (2) the only accounts maintained under the UC Contract after such date were exclusively for Intermedia employees;
>
> (3) WorldCom allegedly acted in concert with Intermedia to breach the UC Contract in order to garner leverage in its negotiations with Webley regarding the MASL, which was executed on September 14, 2001; and
>
> (4) Intermedia requested cancellation of all its accounts on or about March 1, 2002.

WorldCom defends its actions by stating that summary judgment should be granted as a matter of law since a parent company cannot, by law, tortiously interfere with a subsidiary's contract. Furthermore, WorldCom argues that even if WorldCom and Intermedia made a conscious decision not to perform under the UC Contact, as alleged by Parus, such allegations would not provide the basis for tortious interference because such actions would be considered privileged.[5] Parus posits, however, that even if the general rule applies that a parent corporation

---

[5] As the Court has already noted, it can decide the issue of tortious interference without conducting a choice of law analysis since the result reached will be the same notwithstanding the particular states' law that is utilized. The Court has determined that it can decide the issue of privilege with respect to a parent and a subsidiary in a similar fashion. Nonetheless, the Court will examine all three states' laws.

A 03396

cannot tortiously interfere with its subsidiary's contracts, "a parent company loses any

'privilege' to interfere when it acts detrimentally to its subsidiary's economic interest."  In this

regard, Parus alleges that WorldCom's inducement of breach of the UC Contract was not in

Intermedia's economic interest since breach of the UC Contract would cause penalties to be

imposed upon Intermedia.  Parus further contends that as a parent corporation, WorldCom also

---

In Arizona, there is no decision on point by the highest court of Arizona.  Therefore, the Court must predict how the highest court in that particular jurisdiction would rule.

When a federal court needs to decide an issue of state law, it must do so in the way that the state's highest court would.  *See In re Eurospark Indus., Inc.*, 288 B.R. 177, 182 (Bankr. E.D.N.Y. 2003).  If there is no decision on point by the state's highest court, "then federal authorities must apply what they find to be the state law after giving 'proper regard' to relevant rulings of other courts of the State."  *Comm'r of Internal Revenue v. Estate of Bosch*, 387 U.S. 456, 465 (1967).  *See also In re Eurospark*, 288 B.R. at 182 ("In predicting how the highest state court would rule, the federal court should look to the trends displayed by prior rulings of that court, to rulings of the lower state courts, to relevant rulings from other jurisdictions and to secondary materials.").  A federal court in this position must apply the law of the state as it exists, and must not engage in an attempt to change or expand state substantive law.  *See Burris Chem., Inc. v. USX Corp.*, 10 F.3d 243, 247 (4th Cir. 1993).

One of the Arizona Courts of Appeal addressed a similar issue of privilege and personal liability of corporate directors for inducing a breach of the corporation's contract with a third party and held that, "the acts of such directors should be privileged provided that the acts complained of were in good faith and the director believed that his acts were for the best lawful interests of the corporation."  *Ong Hing v. Arizona Harness Raceway*, 459 P.2d 107, 115 (Ariz. Ct. App. 1969).  Since the Court's research failed to produce any recitation of Arizona law to the contrary, it believes that the Arizona Supreme Court would apply the same rule in the present situation.

In *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E. 2d 672, 677 (Ill. 1989), the Supreme Court of Illinois held that "where the conduct of a defendant in an interference with contract action was privileged, it is the plaintiff's burden to plead and prove that the defendant's conduct was unjustified or malicious."  Further, the court in *HPI Health Care Services* held that "[c]ourts will recognize a privilege in intentional interference with contract cases where the defendant was acting to protect an interest which the law deems to be of equal or greater value than the plaintiff's contractual rights."  *Id.*  In that case, the court held that, similarly to corporate directors acting in good faith when carrying out the duties of a corporation, a hospital management company's decisions with regard to the termination of contractual relations were privileged since the company was exercising its business judgment.  *Id.*  Under the law of Illinois, the Court finds that even assuming WorldCom induced a breach of the UC Contract, Parus has failed to create an issue of fact regarding WorldCom's misuse of such business judgment.

The Supreme Court of Mississippi held that, "[t]he general rule in [Mississippi] is that there is no tortious interference when one has a justifiable interest and reason for acting."  *Vestal v. Oden*, 500 So. 2d 954, 955 (Miss. 1986).  *See also Irby v. Citizens Nat'l Bank of Meridian*, 121 So. 2d 118 (1960); *Standard Fruit and Steamship Co. v. Putnam*, 290 So.2d 612 (Miss. 1974); *Southwest Drug Co. v. Howard Brothers Pharmacy of Jackson, Inc.*, 320 So. 2d 776 (Miss. 1975).  Further, "[a]ny interference is not wrongful and actionable if undertaken by someone in the exercise of [a] legitimate interest or right, which constitutes 'privileged interference.'"  *Vestal*, 500 So. 2d 954, 956 (Miss. 1986) (quoting *Martin v. Texaco, Inc.*, 304 F. Supp. 498, 502 (S.D. Miss. 1969)).  The Court finds that, under Mississippi law, any alleged action undertaken by WorldCom to induce breach of the UC Contract would be considered privileged.

Furthermore, the United States Court of Appeals for the Second Circuit in *Boulevard Assocs. v. Sovereign Hotels, Inc.*, 72 F.3d 1029, 1036 (2d Cir. 1995) noted the existence of privilege between a parent and a subsidiary, holding that, "[c]ourts in other states have uniformly found that a parent company does not engage in tortious conduct when it directs its wholly-owned subsidiary to breach a contract that is no longer in the subsidiary's economic interest to perform."

lost its right to interfere with Intermedia's contractual relations when it used "wrongful means" in inducing Intermedia to breach.[6]

Parus's arguments, however, fail. WorldCom concedes that Intermedia breached the UC Contract when it failed to make required payments to EffectNet from December 2001 until March 2002. Parus contends, however, that the above facts also show that Intermedia breached the UC Contract well before December 2001. However, the Court finds that even assuming, without deciding, that Parus's allegations are true that WorldCom induced Intermedia to cease opening up new accounts, cancel 682 then-existing accounts, and terminate or transfer employees working in furtherance of the UC Contract, such conduct is not a breach within the four corners of the UC Contract.

The Court again notes that EffectNet and Intermedia negotiated at arms-length provisions in the UC Contract allowing Intermedia the option of either meeting its minimum monthly number of subscribers or making a reconciliation payment for any monthly shortfall. For

---

[6] Each party has provided the Court with several cases that define "wrongful means" outside of the jurisdictions mentioned above. Although the parties failed to provide the Court with specific examples of "wrongful means" in the abovementioned jurisdictions, the Court notes that both parties have supplemented this deficiency with the decision in *Waste Conversion Sys., Inc. v. Greenstone Indus., Inc.,* 33 S.W.3d 779, 782 (Tenn. 2000), where the Supreme Court of Tennessee provides a thorough discussion of the parent/subsidiary privilege, examples of what would constitute "wrongful means" for the purposes of creating an exception to such a privilege, and a summary of definitions of "wrongful means" from other jurisdictions. One of the representative cases analyzed in *Waste Conversion* is discussed below.

In *Paglin v. Saztec Int'l, Inc.,* 834 F. Supp. 1184 (W.D. Mo. 1993), the court held that Missouri law allows a parent corporation to protect its economic interests (i.e., act for its own benefit) by interfering with its subsidiary's contractual relations "so long as the parent does not employ 'wrongful means' or interfere for an 'improper purpose.'" *Id.* at 1195-96. Furthermore, the Court determined that, "'wrongful means' is defined to include acts which are wrongful in and of themselves, such as 'misrepresentation of fact, threats, violence, defamation, trespass, restraint of trade, or any other wrongful act recognized by statute or common law.'" *Id.* at 1196 (citations omitted). Since Parus failed to allege any of the acts constituting "wrongful means" by the *Paglin* court, it has failed to create an issue of material fact in this regard.

A 03398

whatever reason, Intermedia chose to continue making monthly reconciliation payments instead of meeting its minimum monthly number of subscribers. Such action, even upon WorldCom's urging, would still not lead to a breach of the UC Contract and would therefore fail to satisfy element four of the Illinois five-part test for tortious interference with a contract. As the Court has already determined, the first breach occurred when Intermedia failed to pay its December 2001 invoice. Parus does not allege that WorldCom induced Intermedia to not timely pay its invoices. The failure to timely pay such invoices was the only breach committed by Intermedia, and this issue was not discussed by Parus in its documents.

Furthermore, the Court finds that Parus has failed to provide anything other than conclusory statements with regard to the argument that WorldCom's actions were not privileged because WorldCom used "wrongful means" when they interfered with the UC Contract. Although Parus provides the Court with numerous citations of cases that provide for exceptions to the privileged activity of a parent, Parus merely alleges that Intermedia's incurrence of damages based on the breach of the UC Contract constitutes "wrongful means." Thus, the Court finds that Parus has failed to meet the necessary burden to show that WorldCom utilized wrongful means with respect to any activity in connection with Intermedia and the breach of the UC Contract. Therefore, summary judgment is granted with regard to Parus's claim that WorldCom tortiously interfered with the UC Contract.

C. *Unfair and Deceptive Trade Practices*[7]

The Debtors contend that since under the UC Contract, Intermedia was a "buyer" of goods, and not a "seller," Parus's unfair and deceptive trade practices claim fails as a matter of

---

[7]Again, the parties dispute which stat law applies. However, since the Court can decide the issue without the aid of state law, a conflict of law analysis is unnecessary.

A 03399

law since the relevant statutes in Arizona and Mississippi only apply to wrongdoing committed by "sellers." Parus counters that Intermedia was a "seller" of services under the UC Contract, and since they failed to deliver the required number of subscribers, the "Debtors' conduct unquestionably affected the ability of subscribers, and potential subscribers, to obtain services that would have been available to them if not for the Debtors' conduct, which caused the premature termination of the UC Contract."

Assuming, without deciding, that Intermedia was a "seller" of goods under the relevant statutes does not affect the Court's conclusion. Parus is correct that Intermedia agreed to provide a minimum number of subscribers in Section 2.12 of the UC Contract. However, as the Court earlier found, Intermedia's failure to provide this minimum number of subscribers, by itself, did not constitute a breach of the UC Contract since Intermedia and EffectNet contractually provided in Section 2.13 that should Intermedia not meet its minimum requirement, it would be required to pay EffectNet a reconciliation payment. Such reconciliation payment presumably yielded EffectNet a similar, if not higher, revenue stream as would be provided had Intermedia met its minimum requirement.[8] EffectNet also contracted for a liquidated damages provision in Section 5.4, which provided that if Intermedia prematurely terminated the contracted for any reason other than explicitly stated in the UC Contract, it owed EffectNet damages amounting to "$274,400 times the lesser of (i) 12 months, or (ii) the number of months remaining in the contract term."

---

[8] EffectNet stated in its briefs that the majority of subscribers it received through Intermedia chose the unlimited service rate of $27.40. If a reconciliation payment had to be made, EffectNet argues that Intermedia would be charged $27.40 per subscriber under the minimum commitment number. This presumably leads to a similar, if not higher, revenue stream for EffectNet.

A 03400

Therefore, EffectNet was well aware of, and specifically contracted for, damages as a result of early termination of the UC Contract by Intermedia.  Based on these facts and the Court's review of the specific consumer fraud statutes in Arizona, Illinois, and Mississippi, the Court does not believe that EffectNet can, in the first instance, negotiate at arms length for such a contingency and, in the second instance, argue that such a negotiated provision constitutes an unfair and deceptive trade practice on the part of the Debtors.  Therefore, the Debtors are granted summary judgment with regard to Parus's claim for unfair and deceptive trade practices.

## IV.  Conclusion

The Court concludes that the Debtors' motion to strike portions of the McConnell and Reneau affidavits are granted in part and denied in part.  With regard to the contract issues, the Debtors' motion for summary judgment is denied with regard to its interpretation of "base monthly price."  However, it is granted with regard to the number of payments remaining under the UC Contract, the effect of the March 12th Letter and the March 25th Letter, and the applicability of the Limitation of Liability clause.  With regard to Parus's other claims, the Debtors' motion for summary judgment is granted with regard to Parus's claims against Intermedia for unfair and deceptive trade practices, breach of the implied covenant of good faith and fair dealing, and civil conspiracy.  The Debtors' motion for summary judgment is also granted with regard to Parus's claims against WorldCom for civil conspiracy, tortious interference with a contract, and unfair and deceptive trade practices.

The Debtors are to settle an order consistent with this opinion.


Dated: New York, New York
       May 2, 2007


                              s/Arthur J. Gonzalez
                              UNITED STATES BANKRUPTCY JUDGE

A 03401