Robert A. Scher (RS 2910)
FOLEY & LARDNER LLP
90 Park Avenue
New York, NY 10016
Phone: (212) 682-7474
Fax: (212) 682-2329
email: rscher@foley.com

-and-

Mark L. Prager (*admitted pro hac vice*)
Jill L. Murch (*admitted pro hac vice*)
FOLEY & LARDNER LLP
321 N. Clark Street, Suite 2800
Chicago, IL 60610
Phone: (312) 832-4500
Fax: (312) 832-4700

*Attorneys for Claimant Parus Holdings, Inc.*
*Successor-By-Merger to EffectNet, Inc. and*
*EffectNet, LLC*

## UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) CHAPTER 11 |
| | ) Jointly Administered |
| WORLDCOM, INC., et al., | ) |
| | ) |
| Debtors. | ) Case No. 02-13533 (AJG) |
| | ) |

## MEMORANDUM OF LAW IN SUPPORT OF
## PARUS HOLDINGS, INC.'S AMENDED MOTION FOR RELIEF
## RESULTING FROM THE DEBTORS' SPOLIATION OF EVIDENCE

A 03410

## TABLE OF CONTENTS

OVERVIEW ............................................................................................................... 1

I.      SUMMARY ................................................................................................... 1

II.     BACKGROUND ............................................................................................ 2
        A.    The Debtors' Summary Judgment Motion ......................................... 2
        B.    Parus' Request That The Court Stay Its Summary Judgment Ruling.................... 2
        C.    Parus' Spoliation Motion .................................................................. 3
        D.    The Court's Summary Judgment Opinion And The Ongoing Relevance of
              Parus' Spoliation Motion .................................................................. 4

III.    SIGNIFICANT AND MATERIAL EVIDENCE ONCE EXISTED REGARDING
        THE BASE MONTHLY PRICE, BUT WAS DESTROYED AT A TIME WHEN
        THE DEBTORS KNEW OR SHOULD HAVE KNOWN OF THEIR
        OBLIGATION TO PRESERVE EVIDENCE ............................................... 6
        A.    James Renforth Possessed Both Hard Copy And Electronic Information
              Relating To And Bearing Upon The Base Monthly Price. ..................... 7
        B.    The Reasoning For Using The Unlimited Rate As The Base Monthly Price ......... 9
        C.    Renforth's Maintenance And Preservation Of Documents Related To The
              UC Contract And The Base Monthly Price ....................................... 10
        D.    The Debtors' Failure To Preserve Information Relating To The Base
              Monthly Price And To Implement A Timely Litigation Hold............... 10
        E.    The Debtors' Spoliation Of Evidence Was In Contravention Of Its Own
              Document Retention Policies........................................................... 11
              1.    The Debtors' Failure to Preserve Renforth's Email ................. 11
              2.    The Debtors' Failure To Keep Documents In An Accessible Form........ 12

IV.     THE EVIDENCE DESTROYED WAS "RELEVANT" TO PARUS' CLAIMS
        SUCH THAT A REASONABLE TRIER OF FACT COULD FIND THAT IT
        WOULD SUPPORT PARUS' CLAIMS............................................................ 15
        A.    Parus Has Satisfied The Relevancy Test By Demonstrating That The
              Debtors Were, At A Minimum, Grossly Negligent ............................ 16
        B.    Parus Has Also Satisfied The Relevancy Test By Demonstrating That The
              Missing Evidence Is Favorable To Parus........................................... 16
        C.    Parus' Spoliation Motion Remains Relevant, Notwithstanding This
              Court's Summary Judgment Ruling, Because The Debtors' Destroyed
              And/Or Rendered Inaccessible Evidence Containing Information Relating
              To The Use Of The Unlimited Rate As The Base Monthly Price ...................... 17

CONCLUSION............................................................................................................ 19

Per the Court's request during its May 22, 2007 telephonic hearing with the parties, Claimant Parus Holdings, Inc., as successor by merger to EffectNet, Inc. and EffectNet LLC ("Parus" and/or "EffectNet"), submits this Memorandum of Law in Support of Parus' Amended Motion for Relief Resulting from the Debtors' Spoliation of Evidence (the "Amended Motion").

## OVERVIEW

### I.    SUMMARY

Intermedia Communications, Inc. and MCI WorldCom Communications, Inc.'s (together, the "Debtors") spoliation of paper and electronic evidence was at a minimum grossly negligent. Such spoliation included the loss of evidence regarding the "base monthly price" (the "Base Monthly Price"), as that term was used in the Unified Communications Services General Agreement (the "UC Contract"), and whether such Base Monthly Price should be calculated at a rate of $11.45 or $27.40 per month per subscriber.

The facts reveal three things:  (a) that documents existed (both in paper form and in electronic form) evidencing that the UC Contract contemplated a Base Monthly Price of $27.40; (b) that such documents were circulated within Intermedia; and (c) that such documents were lost or destroyed by the Debtors in violation of their own document retention policy and *after* the duty to preserve had already arisen.  Specifically, a non-party witness, James Renforth ("Renforth"), who was the point person at Intermedia regarding the UC Contract, testified that documents existed in electronic and paper form which established the $27.40 price as the Base Monthly Price.  The discovery taken by Parus further shows the Debtors' own document retention policy prohibited destruction of these documents and that the Debtors were under a duty to preserve them.

The policy behind spoliation – to prevent a wrongdoer from benefiting from his own wrong – is fully applicable in this case.  Having engaged in spoliation of critical evidence, the

Debtors should, *inter alia*, be precluded from offering any evidence regarding the Base Monthly Price which would contradict the testimony of Parus' witnesses that the UC Agreement contemplated a Base Monthly Price of $27.40.

## II.    BACKGROUND

Parus' Amended Motion is filed at the request of the Court. To assist the Court, Parus is providing the Court with an abbreviated recitation of the procedural posture of the contested claims litigation.

### A.    The Debtors' Summary Judgment Motion

The Debtors moved for summary judgment on August 3, 2005 in connection with Parus' claims[1] against the Debtors. Due to the Debtors' failure to comply with Local Rule 7056-1(a), the Debtors were required to file a second Motion for Summary Judgment, and did so on October 19, 2005. Parus filed its Response in Opposition to the Debtors' Summary Judgment Motion on November 18, 2005, alleging, <u>inter alia</u>, that summary judgment should be denied pursuant to Fed. R. Civ. Proc. 56(f), as further discovery was necessary in order to properly defend against the motion. The Debtors were given until December 2, 2005 to file their reply brief. A hearing on the Summary Judgment Motion occurred on January 17, 2006.

### B.    Parus' Request That The Court Stay Its Summary Judgment Ruling

On September 9, 2006, Parus filed its Motion to Stay Court's Ruling on Debtors' Motion for Summary Judgment Pending Discovery Regarding Spoliation (the "Stay Motion"). Parus' Stay Motion stated that certain court-ordered depositions of the Debtors' IT employees were scheduled to occur and that such depositions could potentially establish spoliation by the Debtors. The Stay Motion further asserted that such discovery could result in an adverse

---

[1] Parus' Claims are designated as Claim Nos. 11242 and 11173.

A 03413

inference or other remedy against the Debtors that could impact the outcome of the Debtors' Summary Judgment Motion. At the October 3, 2006 hearing, the Court advised the parties that it would not rule on the Summary Judgment Motion until after December 15, 2006 and that the parties could come back to the Court after the conclusion of the depositions. Parus concluded those depositions on November 10, 2006.

### C.    **Parus' Spoliation Motion**

On January 26, 2007, Parus filed its Motion for Relief Resulting from the Debtors' Spoliation of Evidence (the "Spoliation Motion") and a Memorandum of Law in support thereof (the "Spoliation Memorandum").

At the March 13, 2007 hearing before this Court, Parus noted that it had made a prior request that Court stay its ruling of the Debtors' Summary Judgment Motion until the issue of spoliation had been decided:

> MS. MURCH: Your Honor, may I just interpose, prior to the Court's ruling on the summary judgment motion, Parus had filed a motion requesting that the Court stay its ruling on the summary judgment motion in order to consider the spoliation motion, and the reason is, we felt that the spoliation motion would have some bearing on the Debtors' summary judgment motion. That being, if the Court, for example, felt that evidence was destroyed, there would be a possible adverse inference or some other step the Court has within its powers to take and, obviously, the Court can determine for itself if it feels that spoliation would be relevant to its summary judgment ruling. That was a request. We had filed a motion back, I believe, in October to ask the Court to consider spoliation when determining its summary judgment ruling.
>
> MS. MURDOCK: Your Honor, that motion was withdrawn. There is no motion pending on that.
>
> MS. MURCH: Your Honor, we withdrew, because the Court said, "Well, go ahead and get it on file before the summary judgment ruling." So that is why it was withdrawn and that is what we did pursuant to the Court's directive.
>
> JUDGE GONZALEZ: All right. I remember that. I understand why. There was a concern by Parus Holdings that I

A 03414

> would rule on the summary judgment motion before my ruling on
> the spoliation motion, and I said don't worry I wasn't going to rule
> on it in the near term. I will factor all of that in. I do remember
> that.

(Mar. 13, 2007 Tr., 25:17-25; 26:1-18). The Court has not yet issued a ruling on Parus'

Spoliation Motion. Parus again requests that the Court consider the impact of the Debtors'

spoliation prior to or in conjunction with an evidentiary hearing concerning the damages to

which Parus is entitled.

### D.    The Court's Summary Judgment Opinion And The Ongoing Relevance of Parus' Spoliation Motion

On May 2, 2007, the Court issued its Opinion Partially Granting and Partially Denying

Debtors' Motion for Summary Judgment and Motion to Strike Portions of Affidavits (the

"Opinion"). In re WorldCom, Inc., ------ B.R. ------, 2007 WL 1267830 (Bankr. S.D.N.Y. May

2, 2007). More specifically, the Opinion granted summary judgment to the Debtors on each of

Parus' claims with the exception of Parus' breach of contract claim against Intermedia. The

Court noted that the Debtors admitted that they breached the underlying UC Contract and that an

issue of fact existed as to what constituted the Base Monthly Price for purposes of calculating

Parus' breach of contract damages. Contrary to the Debtors' assertion, the Spoliation Motion

remains highly relevant to the calculation of Parus' damages claims – even after the issuance of

the Court's Opinion.

This Amended Motion is not intended to replace or supersede the prior Spoliation Motion

or the Spoliation Memorandum. Instead, this Amended Motion is respectfully submitted as a

result of the Court's May 22, 2007 request that Parus address certain specific issues regarding the

Debtor's spoliation of evidence in light of the Court's Opinion.

As a result of the parties' dispute regarding the ongoing relevance of the Spoliation

Motion, the Court has requested that Parus submit an amendment to the Spoliation Motion

addressing the issue of whether evidence has been destroyed by the Debtors regarding the Base

Monthly Price under the UC Contract.  More specifically, the issue at hand is whether the Base

Monthly Price encompassed a "basic" monthly charge of $11.45 per month (plus additional

charges) for each subscriber or an "unlimited" monthly charge of $27.40 (plus additional

charges):

> THE COURT:   We reconvened this to give me an opportunity to review the spoliation motion in light of the Court's recent opinion.  It appears to me that if Parus Holdings wants to proceed with spoliation, they are going to have to amend the motion and set forth the relevant issues related to the determination of the basis versus the unlimited rate that would be related to the spoliation motion.  I can't really ascertain that from reviewing it. The focus of the motion was in light of, in my view, the expectation damages.  It is replete with references that would incorporate that concept into it.  I understand why at the time it was done that way . . . . I will give [Parus] until June 13th to file an amendment to the spoliation motion focusing specifically on the issue to be determined.
> ***
> MS. MURCH:   Just for clarification, in connection with that motion, we will be pointing out to the Court evidence that did exist as to the 11 versus the 27, and then we will be highlighting the relevance of that information?
>
> THE COURT:   Yes.

(May 22, 2007 Tr. 2:10-21; 3:20-23; 6:4-9) (brackets added).

Parus incorporates the prior Spoliation Motion and the Spoliation Memorandum, which

are attached hereto as Exhibit A, as if fully set forth herein.  For the convenience of the Court,

rather than embedding the allegations relating to the Base Monthly Price throughout the

previously filed Spoliation Motion and Memorandum, the Amended Motion seeks to highlight

and address those specific issues raised by the Court on May 22, 2007, that is:  (1) that evidence

once existed but no longer exists regarding the Base Monthly Price vis-à-vis the unlimited and

basic subscriber amounts (i.e., the $11.45 versus the $27.40) and (2) the relevance of the

destroyed evidence to the pending litigation.

A 03416

III.    **SIGNIFICANT AND MATERIAL EVIDENCE ONCE EXISTED REGARDING THE BASE MONTHLY PRICE, BUT WAS DESTROYED AT A TIME WHEN THE DEBTORS KNEW OR SHOULD HAVE KNOWN OF THEIR OBLIGATION TO PRESERVE EVIDENCE.**

As previously averred in the prior Spoliation Memorandum, "'The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation.'" Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) ("Zubulake IV") (emphasis added) (quoting Fujitsu Ltd. v. Fed. Exp. Corp., 247 F.3d 423, 436 (2d Cir. 2001)).  When a party fails to preserve evidence (whether through mere negligence, gross negligence, or intentional misconduct), an opposing party may seek remedies for spoliation.  Zubulake IV, 220 F.R.D. at 220; see also Zubulake v. UBS Warburg LLC, 229 F.R.D. 422, 431 (S.D.N.Y. 2004) ("Zubulake V").

Here, the Debtors failed to preserve evidence related to the Base Monthly Price  at a time when they knew or should have known that such evidence may have been relevant to the pending contested claims litigation with Parus.[2]  As a result, Parus is entitled to the relief requested herein, including, but not limited to:  (a)  an adverse inference against the Debtors; (b) an order barring the Debtors from presenting and/or contesting evidence related to damages asserted by Parus; (c) an award of damages against the Debtors; and/or (d) such other remedies as this Court deems just and proper.

---

[2] For a discussion as to *when* the Debtors knew or should have known of their obligation to preserve relevant evidence, see Section II of the prior Spoliation Memorandum.  (Spoliation Memorandum, Ex. A, at pp. 7-15).

A 03417

**A.    James Renforth Possessed Both Hard Copy And Electronic Information Relating To And Bearing Upon The Base Monthly Price.**

A key witness in the pending litigation is James Renforth.  Renforth was employed by Intermedia from approximately January 1998 to June 2001.  (Declaration of James Renforth, at ¶ 3) (hereinafter "Renforth Decl.").  A copy of the Renforth Decl. is attached hereto as Exhibit B.

Renforth served as Project Manager for IntermediaOne and was responsible for, inter alia, working with EffectNet in negotiating, implementing, and executing the UC Contract.  (Nov. 17, 2007 Deposition Transcript of James Renforth, at 17:5-13; 18:11-16; 22:17-23:5; 25:3-26:4) (hereinafter "Renforth Dep. Tr.").  A copy of the Renforth Dep. Tr. is attached as Exhibit C.

Specifically, Renforth testified that he was involved in negotiating the UC Contract:

> Q.    We'll back up, Mr. Renforth.  You see Exhibit 2, which is the EffectNet Unified Communications Service General Agreement for Intermedia Communications, Inc.?
>
> A.    Yes.
>
> Q.    Have you seen this document before?
>
> A.    Yes.
>
> Q.    And were you involved at all in negotiating this agreement?
>
> A.    Yes.
>
> Q.    And how so?
>
> A.    I was the facilitator between both legal departments and both contract negotiation lawyers, at EffectNet and Intermedia, in finalizing the verbiage, content, and material contained in this agreement.
>
> ***
>
> Q.    Now, you mentioned you were the facilitator for the Unified Communications Agreement?  Can you tell me a little bit about that?
>
> A.    Yes.  The original contract in its -- in its entirety was passed from the EffectNet lawyer, and I don't remember his name, but, to me, then from me to Intermedia's attorney for content changes, verbiage changes, product information, with regard to product information, specific to Intermedia, functionality and

A 03418

services.   I would review those as the product manager to make sure that the information was accurate and complete with regard to functionality and capabilities.

Q.    Okay.

A.    Then this -- the original document in soft copy would pass from Intermedia to EffectNet through me, and then from EffectNet to Intermedia through me until it was finalized.

Q.    And so you were basically the point of contact for both sides?

A.    Yes.

(Renforth Dep. Tr., Ex. C, at  69:18-26; 70:1-6; 70:15-25; 71:1-10); *see also* (Renforth Decl., Ex.

B at ¶¶ 14, 15, 17).   Renforth had clear and uncontested knowledge about the Base Monthly

Price while employed at Intermedia:

Q.    And so were you familiar with the prices identified on the last page of Exhibit 2?

A.    Yes.

Q.    Is it your belief that Intermedia, in  considering its financial forecasts, relied on the 27.40 number or the 11.45?

A.    27.40.

Q.    Thank you.

(Renforth Dep. Tr., Ex. C, at  70:7-14).

As the liaison for the parties with respect to the UC Contract, Renforth reviewed and

retained multiple drafts and versions of the UC Contract from Intermedia (the "UC Drafts").  (Id.

at ¶ 11).  The UC Drafts were transmitted to Renforth from other Intermedia employees in both

hard and electronic form and via facsimile and e-mail.  (Id. at ¶ 12).  Renforth reviewed the

language of the UC Drafts, as such language was relevant to product functionality.  (Id. at ¶ 13).

Such drafts included information relevant to the Base Monthly Price.  (Id. at ¶ 15).

Despite the existence of such UC Drafts, at no time have the Debtors provided the UC

Drafts to Parus.  In fact, only one document relating to the UC Contract (other than copies of the

UC Contract itself) has been produced by the Debtors – despite the wealth of information in Renforth's possession.

Yet, Renforth's knowledge regarding the Base Monthly Price did not exist only as a result of the UC Drafts. While at Intermedia, Renforth also attended multiple meetings at Intermedia involving representatives from several departments at Intermedia (including product marketing, product management, sales, customer service, customer operations, switching, regulatory, and public relations (the "Interdepartmental Meetings") in which various employees and officers of Intermedia prepared, circulated, and reviewed hard copies and electronic copies of: (a) reports, forecasts, and drafts of the UC Contract; (b) correspondence and other documents related to the negotiation of the UC Contract; and (c) the strategic initiatives and marketing plans that would be put into place once the UC Contract was executed (collectively, the "Meeting Documents"). (Renforth Decl., Ex. B, at ¶ 8).

Among these Meeting Documents were documents that contained information relating to the prices to be charged or expected to be charged by Intermedia to subscribers for Unified Messaging under the UC Contract, which would necessarily include information relevant to the Base Monthly Price. (Id. at ¶ 9). Again, these Meeting Documents were never produced to Parus.

**B.    <u>The Reasoning For Using The Unlimited Rate As The Base Monthly Price</u>**

At the time the Parties were negotiating and finalizing the terms of the UC Contract, Intermedia's management decided that Intermedia would not focus its sales of Unified Messaging on usage based per minute charges. (Id. at ¶ 14). Instead, Intermedia would market Unified Messaging as a package. (Id.). The basic accounts were charged $0.10 per minute for all inbound and outbound calls, while the unlimited accounts permitted unlimited free platform

A 03420

usage and inbound call time. (Id.). As such, Intermedia made the decision to market the unlimited accounts to its customers. (Id.).

The documents that Renforth reviewed and maintained contained changes and revisions that were relevant to Intermedia's decision to concentrate its marketing efforts on selling package deals to its customers (as opposed to usage based per minute charges), as well as the parties' understanding of the Base Monthly Price referred to in § 2.13 of the final version of the UC Contract. (Id. at ¶ 15). For example, Intermedia's forecasts with respect to IntermediaOne were calculated and prepared under the assumption that Intermedia the subscriber rate was the unlimited rate. (Id. at ¶ 17). Despite the existence of such forecasts and documentation evidencing the use of the unlimited rate, no such forecasts have been provided to Parus.

### C.    Renforth's Maintenance And Preservation Of Documents Related To The UC Contract And The Base Monthly Price

Renforth retained all of the Meeting Documents and the UC Drafts in <u>at least</u> one of four locations: (a) hard copies of the documents inside labeled file folders in his office, (b) electronic copies of the documents on the hard drive of his office desktop computer, (c) electronic copies of the documents on a floppy disk he kept in his office, and (d) electronic copies of the documents saved onto Intermedia's shared network drive ("K Drive"). (Renforth Decl., Ex. B, ¶ 18). At no time did Renforth destroy, delete, purge, or erase any of the Meeting Documents or UC Drafts. (Renforth Decl., Ex. B, ¶ 19).

### D.    The Debtors' Failure To Preserve Information Relating To The Base Monthly Price And To Implement A Timely Litigation Hold

Despite the existence of the UC Drafts and Meeting Materials, the only hard copy documents the Debtors could find from Renforth were Renforth's personnel file:

> Q.    Do you know if, for example, I think you mentioned a Jim Renforth or James Renforth; do you know if he had created an

A 03421

index of whatever documents he had at the time he left employment with Intermedia?

A.    I know that I'd ask records management to run his name against their stored documents, and *it produced only his personal file. No other documents identify as his.*

(Nov. 14, 2005 Deposition Transcript of Donald Ramsay, at 53:18-54:2) (hereinafter "Ramsay Dep Tr.") (emphasis added).  A copy of the relevant portions of the Ramsay Dep. Tr. is attached as <u>Exhibit D</u>.   The Debtors have not provided any of the UC Drafts, Meeting Materials, and/or forecasts showing the use of the unlimited rate – either in hard copy or electronic form – to Parus even though such documents clearly existed.[3]

### E.    The Debtors' Spoliation Of Evidence Was In Contravention Of Its Own Document Retention Policies

In addition to failing to timely implement the required litigation hold, as seen in Section II of the prior Spoliation Memorandum, the Debtors failed to comply with their own Document Retention Policy.  (Spoliation Memorandum, Ex. A, at pp. 7-15).

#### *1.    The Debtors' Failure to Preserve Renforth's Email*

The Debtors failed to comply with their own Document Retention Policy when they failed to preserve Renforth's email as well as the email of any other employee who left the Debtors and had relevant information related to Parus' claims.  The Retention Policy specifically provides, "When an employee leaves the company, all files on his/her computer must be reviewed (including e-mail and e-mail attachments) for retention requirements under the Records Retention Schedule . . . . Files that require retention must be pulled of thee computer and stored

---

[3] Note that Parus filed its claims over 4 years ago on January 15, 2003 and issued discovery to the Debtors over 2 years ago on February 7, 2005.  Despite the significant passage of time, the UC Drafts and Meeting Materials have not been tendered by the Debtors even though they have been requested by Parus.

A 03422

appropriately." (Debtors' Retention Policy, at p. 112) (hereinafter the "Retention Policy"). A copy of the Retention Policy is attached as Exhibit E.

In addition, the Retention Policy requires the Debtors to save the email of a departing or terminated employee 3 years after that employee departed or was terminated. (Id. at 44. Renforth's employment with Intermedia ended on July 27, 2001. (Renforth Dep. Tr., Ex. C, at 257:25). The Debtors were, therefore, under an obligation to preserve Renforth's email until July 27, 2004 by virtue of their own Retention Policy.

From July 27, 2004 going forward, the Debtors were required to preserve Renforth's email pursuant to a litigation hold, as it was relevant to Parus' claims.[4] The same holds true for Renforth's supervisor Jack Lee, as well as a number of former Intermedia employees. Interestingly, Parus has not received emails sent to and by Renforth including and relating to the UC Drafts and the Meeting Materials. Even more disconcerting is that Parus has produced to the Debtors certain emails created by Renforth; yet, the Debtors never produced these same emails to Parus.

### 2.    The Debtors' Failure To Keep Documents In An Accessible Form

The Debtors also failed to abide by their document retention policy by failing to keep hard copy documents in a readily retrievable form. The Retention Policy provided: "Also, the [records retention] program is designed to ensure that in the event that legal or financial problems do occur, the organization will have, in a readily retrievable form, the information it needs to defend itself." (Retention Policy, Ex. E, at pp. 4, 26).

---

[4] Indeed, the Debtors' duty to preserve arose on July 1, 2001, if not earlier, when the Debtors decided to terminate IntermediaOne and the UC Contract. (Spoliation Memorandum, Ex. A, at pp. 7-9). Moreover, the Debtors even anticipated the lawsuit with EffectNet as set forth in their privilege log which is detailed at length in the prior Spoliation Memorandum. (Id. at pp 9-14).

By way of example, the Debtors posit that they have satisfied their obligations to produce relevant documents by providing Parus with indices that purport to indicate the content of the 10,000 boxes in existence. Yet, ironically, even the Debtors admit that the so-called "indices" are impossible to decipher, and the Debtors acknowledge that they themselves are incapable of determining the contents of the 10,000 boxes:

> A.    I asked [the Records Management people] if there was anyone who could read the index and know what was going to be contained in the boxes from the index, to help us select or help anybody, Parus, anybody select boxes to be reviewed.
>
> Q.    Did they have a response to you?
>
> A.    They indicated there was none, didn't have anybody that can do that.
>
> Q.    When you say they didn't have anybody that can do that, meaning no one that could interpret, so to speak, the terms of the index and tell you based on that, what was in the actual boxes?
>
> A.    Yes.

(Ramsay Dep. Tr., Ex. I, at 106:7-20) (brackets added). In fact, Ramsay admitted that neither he nor anyone else at MCI could interpret the various descriptions on the indices in order to determine what was actually contained in the boxes:

> Q.    With respect to any of the major description, minor descriptions, or long descriptions that are contained, not just in this particular entry in Ramsay Exhibit no. 4, but all of the entries in Ramsay Exhibit 4, did you contact anyone at Records Management to determine what different entries meant?
>
> A.    Well, I talked to them to some extent, as I mentioned, and tried to find somebody who maybe could interpret the descriptions, and was told there really wasn't anybody ho could interpret those description any better than we could, from looking at them. They didn't know about what was in these boxes.
>
> ***
>
> Q.    After having received index that we marked for identification as Ramsay Exhibit No. 4, did you contact anyone to determine what any of the descriptions meant within the index?
>
> ***

A 03424

> A.    I talked to Joe Stevens and/or Hasselvander about descriptions and what they might mean. I was told they didn't know either.

(Id. at 114:22-115:11; 123:2-5; 123:9-11).

In an sheer and unabashed abdication of their discovery obligations, Ramsay testified that it was because the Debtors themselves were unable to decipher the indices that the Debtors asked Parus to select the boxes they wished to review for relevant documents:

> Q.    If you look on the first line of that entry, it says engagement letter for sale of Intermedia, attorneys notes and correspondence. Is there any way to tell from this file, why, or is there any way to tell from this entry as to what attorneys notes and correspondence might contain?

> A.    I can't tell from that entry. This is among the reasons we asked for – Parus on selection of boxes.

(Id. at 138:4-12). How can the Debtors reasonably expect Parus to construe such hieroglyphics when the Debtors themselves are unable to do so? In fact, the failure to maintain indices was in clear contravention of the Retention Policy. When WorldCom acquired Intermedia, it was required to "bring the new company into compliance with the [WorldCom] retention program." (Retention Policy, Ex. E, at p. 27) (brackets added). In fact, when WorldCom acquired Intermedia (as well as after the acquisition), WorldCom was required to perform "an inventory review, on a monthly basis, for all new box storage." (Id. at p. 19). The Retention Policy further provides:

> During the inventory review, RIM looks for missing data, incorrect data or illogical descriptions. For any boxes missing information or with incomplete data, RIM will request the user to provide the information needed. If the boxes are old or the department that is responsible for the boxes cannot be located, RIM either requests the storage vendor to inventory the boxes, or pulls the boxes into the office to review them and provide the appropriate information to the vendor via e-mail.

A 03425

(Id.).  The Debtors never followed the Retention Policy and as Ramsay's testimony reveals, the Debtors certainly never corrected any "illogical descriptions."  As such, the Debtors acted in contravention of their own Retention Policy in multiple instances, thereby leading to the dilemma presently before the Court.

## IV.    THE EVIDENCE DESTROYED WAS "RELEVANT" TO PARUS' CLAIMS SUCH THAT A REASONABLE TRIER OF FACT COULD FIND THAT IT WOULD SUPPORT PARUS' CLAIMS.

In ascertaining the relevance of the UC Drafts and the Meeting Materials, courts have cautioned against "holding the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed evidence," explaining that doing so would "subvert the prophylactic and punitive purposes of the adverse inference . . . ."  Kronisch v. U.S., 150 F.3d 112, 128 (2d Cir. 1998); see also Phoenix Four, Inc. v. Strategic Res. Corp., No. 05 Civ. 4837(HB), 2006 WL 1409413, at *4 (S.D.N.Y. May 23, 2006) ("[c]ourts should be careful not to hold the movant to 'too strict a standard of proof regarding the likely contents of the destroyed [or unavailable] evidence' however, lest the spoliator profits from its misconduct.").  **In fact, "it is not incumbent upon the plaintiff to show that specific documents were lost.  It would be enough to demonstrate that certain types of relevant documents existed and that they were necessarily destroyed . . . ."**  Treppel v. Biovail Corp., 233 F.R.D. 363, 372 (S.D.N.Y. 2006) (emphasis added).

As the District Court for the Southern District of New York has held, a party may establish the relevance of destroyed documents in the following 2 ways:

> Relevance in this context may be established in two ways. First, it may be inferred if the spoliator is shown to have a sufficiently culpable state of mind. "Where a party destroys evidence in bad faith, that bad faith alone is sufficient circumstantial evidence from which a reasonable fact finder could conclude that the missing evidence was unfavorable to the party." . . . . Likewise, "a showing of gross negligence in the destruction or

A 03426

> untimely production of evidence will in some circumstances suffice, standing alone, to support a finding that the evidence was unfavorable to the grossly negligent party." Second, the moving party may submit extrinsic evidence tending to demonstrate that the missing evidence would have been favorable to it.

Chan v. Triple 8 Palace, Inc., Case No. 03CIV6048(GEL), 2005 WL 1925579, at *8 (S.D.N.Y. Aug. 11, 2005) (internal citations omitted). Parus has satisfied both tests for relevance.

**A.    Parus Has Satisfied The Relevancy Test By Demonstrating That The Debtors Were, At A Minimum, Grossly Negligent**

"[A] showing of gross negligence in the destruction or untimely production of evidence will in some circumstances suffice, standing alone, to support a finding that the evidence was unfavorable to the grossly negligent party." Res. Fund. Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 109 (2d Cir. 2002). The Debtors were grossly negligent for no less than 3 reasons. First, the Debtors failed to implement a timely litigation hold. Chan v. Triple 8 Palace, Inc., Case No. 03CIV6048(GEL), 2005 WL 1925579, at *8 (S.D.N.Y. Aug. 11, 2005) ("the utter failure to establish any form of litigation hold at the outset of litigation is grossly negligent"). Second, the Debtors repeatedly failed to abide by their own document retention policies and protocols. Finally, the Debtors failed to ensure continued compliance with their preservation obligations in dereliction of their duties under the Zubulake decisions.

**B.    Parus Has Also Satisfied The Relevancy Test By Demonstrating That The Missing Evidence Is Favorable To Parus**

Parus has tendered significant evidence demonstrating that the missing evidence would have been favorable to it, including Renforth's deposition testimony as well as Renforth's affidavit that both hard and soft copy documents existed that related to the Base Monthly Price, including the UC Drafts, the Meeting Materials, and forecasts. In addition, Renforth specifically testified that he had seen and maintained documents relating to the UC Contract, including those

A 03427

that would both demonstrate and explain why Intermedia's intent for purposes of the Base

Monthly Price would be the unlimited rate:

> The Meeting Documents and the UC Drafts that I received, reviewed, and retained evidenced Intermedia's desire and intention that the "base monthly price applicable to the Intermedia UC Service" in § 2.13 of the UC Agreement to refer to the Unlimited price of $27.40 per subscriber, because this was the price for the services Intermedia agreed to under the UC Agreement in accordance with its strategic decision to market Unlimited Accounts. Therefore, any Volume Shortfall, as defined by § 2.13 would be multiplied by $27.40 in order to determine the Reconciliation Payment owed to EffectNet. For example, Intermedia's forecasts with respect to IntermediaOne were calculated and prepared under the assumption that Intermedia would only be selling Unlimited Accounts.

(Id. at ¶ 17). Such information is clearly favorable to Parus.

### C. Parus' Spoliation Motion Remains Relevant, Notwithstanding This Court's Summary Judgment Ruling, Because The Debtors' Destroyed And/Or Rendered Inaccessible Evidence Containing Information Relating To The Use Of The Unlimited Rate As The Base Monthly Price

As evidenced herein, the Debtors were, at a minimum, grossly negligent with respect to

their discovery and preservation obligations. Therefore, the issuance of an adverse inference

against the Debtors with respect to the Base Monthly Price is warranted. Barsoum v. NYC

Hous. Auth., 202 F.R.D. 396, 400 (S.D.N.Y. 2001) ("adverse inference sanction may also be

predicated on a finding of bad faith, intentional misconduct, or fault in the form of gross

negligence"); see also Broccoli v. Echostar Comms. Corp., 229 F.R.D. 506, 512 (D. Md. 2005)

(approving adverse inference instruction based on gross spoliation of evidence); cf. Chan v.

Triple 8 Palace, Inc., Case No. 03CIV6048(GEL), 2005 WL 1925579, at *9 (S.D.N.Y. Aug. 11,

2005) ("Gross negligence qualifies as 'fault' such that the threshold requirement for the sanction

of dismissal or default is met."); see also; Pastorello v. City of N.Y., No. 95 Civ.

A 03428

470(CSH), 2003 WL 1740606, *8 (S.D.N.Y. April 1, 2003) ("Gross negligence, willfulness, bad faith, or fault on the part of the sanctioned party may make dismissal appropriate...").

This Court may also bar the Debtors from presenting or contesting evidence related to their belief that the Base Monthly Price was the basic price rather than the unlimited price. Rutgerswerke AG and Frendo S.P.A. v. Abex Corp., 2 No. 93 CIV. 2914 JFK, 2002 WL 1203836, at *12 (S.D.N.Y. June 4, 2002) (A court may preclude "the culpable party from giving testimony regarding the destroyed evidence."); see also Fed. R. Civ. P. 37(c)(1).  Here, the Debtors should be barred from presenting and/or contesting any evidence related to the Base Monthly Price.

An award of damages in this case is also appropriate.  Parus has gone to extraordinary lengths to obtain proper discovery in this case and has been thwarted at every turn by the Debtors.  Indeed, certain electronic documents produced by Parus were never produced by the Debtors even though these documents were originated by the Debtors. A court may assess attorney's fees when a party delays or disrupts the litigation.  Wachtel v. Health Net, Inc., ----F.R.D.----, Nos. Civ.01 4183, Civ.03 18012006 WL 3538935 at *15 (D.N.J. Dec. 6, 2006).  See also Fed. R. Civ. P. 37(a)(4).  Therefore, an award of damages is also appropriate.

Finally, to the extent this Court determines the Debtors abdicated their responsibility to preserve information relevant to Parus' claims, Parus is entitled to judgment on its breach of contract claim and a finding that the unlimited rate constitutes the Base Monthly Rate.  Metro. Opera Assoc., Inc. v. Local 100, Hotel Employ. & Rest. Employ. Int'l Union, 212 F.R.D. 178, 182 (S.D.N.Y. 2003) (noting that granting of judgment was appropriate and elaborating on the multiple ways the defendants stymied discovery, including repeated representations to the court that all responsive documents had been produced even though there was no basis for such a statement, knowing client's files were in disarray but failing to institute a document retention

A 03429

policy, failing to oversee the document production and leaving it in the hands of an employee, replacing computers after the plaintiff warned it might seek a forensic expert to search them, etc.). In short, this Court is empowered to implement any number of remedies with respect to the issues presently before the Court.

## CONCLUSION

For each of the reasons cited herein, the Court should not countenance the Debtors' behavior and their failure to preserve and maintain evidence in a timely and appropriate fashion. Therefore, Parus respectfully requests that the relief sought herein be granted, including, but not limited to: (a) an adverse inference against the Debtors; (b) an order barring the Debtors from presenting and/or contesting evidence related to damages asserted by Parus; (c) an award of damages against the Debtors; and/or (d) such other remedies as this Court deems just and proper, including judgment in favor of Parus.

Dated: June 13, 2007                    Respectfully submitted,

                                        By:    /s/ Jill L. Murch
                                            Robert A. Scher (RS 2910)
                                            FOLEY & LARDNER LLP
                                            90 Park Avenue
                                            New York, NY 10016
                                            Phone: (212) 682-7474

                                                -and-

                                            Mark L. Prager (*admitted pro hac vice*)
                                            Jill L. Murch (*admitted pro hac vice*)
                                            FOLEY & LARDNER LLP
                                            321 N. Clark Street, Suite 2800
                                            Chicago, IL 60610
                                            Phone: (312) 832-4500
                                            Fax: (312) 832-4700

                                            *Attorneys for Claimant Parus Holdings,*
                                            *Inc., Successor-By-Merger to EffectNet,*
                                            *Inc. and EffectNet, LLC*

A 03430

Hearing Date and Time:  February 20, 2007 at 10:00 p.m. Eastern Time
Response Deadline: February 15, 2007 at 4:00 p.m. Eastern Time

Robert A. Scher (RS 2910)
FOLEY & LARDNER LLP
90 Park Avenue
New York, NY 10016
Phone:  (212) 682-7474
Fax:  (212) 682-2329
email:  rscher@foley.com

-and-

Mark L. Prager (*admitted pro hac vice*)
William J. McKenna
Jill L. Murch (*admitted pro hac vice*)
Joanne Lee (*admitted pro hac vice*)
FOLEY & LARDNER LLP
321 N. Clark Street, Suite 2800
Chicago, IL 60610
Phone:  (312) 832-4500
Fax:  (312) 832-4700

*Attorneys for Claimant Parus Holdings, Inc.*
*Successor-By-Merger to EffectNet, Inc. and*
*EffectNet, LLC*

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | CHAPTER 11 |
| | ) | Jointly Administered |
| WORLDCOM, INC., et al., | ) | |
| | ) | |
| Debtors. | ) | Case No. 02-13533 (AJG) |
| | ) | |

### MOTION OF PARUS HOLDINGS, INC. FOR RELIEF
### RESULTING FROM THE DEBTORS' SPOLIATION OF EVIDENCE

Claimant Parus Holdings, Inc., as successor by merger to EffectNet, Inc. and EffectNet

LLC ("Parus" and/or "EffectNet"), pursuant to the Court's inherent equitable powers to

adjudicate the matters before it; 11 U.S.C. § 105(a); Federal Rule of Civil Procedure 37, as

incorporated by Rule 7037 of the Federal Rules of Bankruptcy Procedure; and Local Rule 7007-



1[1] for the Unites States Bankruptcy Court for the Southern District of New York, by and through

its attorneys Foley & Lardner LLP, hereby respectfully requests that the Court grant certain

remedies against Intermedia Communications, Inc. and MCI WorldCom Communications, Inc.

(together, the "Debtors") in connection with the Debtors' failure to preserve and maintain

evidence related to Parus' claims.[2]  As discussed in detail in the Memorandum of Law filed

concurrently herewith, Parus requests that the Court consider a number of remedies relating to

the Debtors' failure to preserve and maintain information relevant to Parus' claims.

WHEREFORE, Parus respectfully requests that the Court enter an order:

(a)    Granting an adverse inference against the Debtors in favor of Parus;

(b)    Barring the Debtors from presenting and/or contesting evidence related to
damages asserted by Parus;

(c)    Awarding damages against the Debtors; and/or

---

[1] Parus submits that it has complied with the Court's Local Rules, including Rule 7007-1.  This matter is already pending before the Court and has been pending before the Court on numerous occasions. At the July 11, 2006 hearing before the Court, prior counsel to Parus alleged that the Debtors were required to preserve documents relating to Parus and that possible sanctions such as an adverse inference were appropriate.  In response, the Court ordered the Debtors to produce their IT employees for deposition.  The Court then addressed the very issue of what steps the Debtors took to preserve data, noting:

I assume it is an industry-wide standard as to what you would apply coupled with the issues about knowing whether a litigation or having any indication that a litigation may follow as to what then you do with data and whether or not proper actions were taken to preserve data once it became known that there was an issue that may ultimately end in litigation.

(July 31, 2006 Hearing Transcript, 16:22-17:4).  The Court then informed the parties to come back for a hearing once the IT depositions were complete – which is what Parus is doing.  Indeed, on September 5, 2006 Parus further apprized the Court of its spoliation case when it filed Parus' Motion to Stay Court's Ruling on Debtors' Motion for Summary Judgment Pending Discovery Regarding Spoliation.  At the October 6, 2006 hearing, the Court again invited the parties to appear before it. (Oct. 3, 2006 Hearing Transcript, 10:19-12:3).  As such, compliance with Rule 7007-1 has been satisfied.

[2] Parus' Claims are designated as Claim Nos. 11242 and 11173.

A 03432

(d)     Granting such other and further relief as this Court deems just and proper, including, but not limited to, a denial of the Debtors' pending summary judgment motion against Parus.

Dated: January 26, 2007                    Respectfully submitted,

                                           By:____/s/ Jill L. Murch_____
                                                  Robert A. Scher (RS 2910)
                                                  FOLEY & LARDNER LLP
                                                  90 Park Avenue
                                                  New York, NY 10016
                                                  Phone:  (212) 682-7474

                                                       -and-

                                                  Mark L. Prager (*admitted pro hac vice*)
                                                  William J. McKenna (*admitted pro hac vice*)
                                                  Jill L. Murch (*admitted pro hac vice*)
                                                  Joanne Lee (*admitted pro hac vice*)
                                                  FOLEY & LARDNER LLP
                                                  321 N. Clark Street, Suite 2800
                                                  Chicago, IL 60610
                                                  Phone:  (312) 832-4500
                                                  Fax:  (312) 832-4700

                                                  *Attorneys for Claimant Parus Holdings, Inc., Successor-By-Merger to EffectNet, Inc. and EffectNet, LLC*

CHIC_1392161

**A 03433**

FOLEY & LARDNER LLP
90 Park Avenue
New York, NY 10016
Phone: (212) 682-7474
Fax: (212) 682-2329
email: rscher@foley.com

-and-

Mark L. Prager (*admitted pro hac vice*)
William J. McKenna (*admitted pro hac vice*)
Jill L. Murch (*admitted pro hac vice*)
Joanne Lee (*admitted pro hac vice*)
FOLEY & LARDNER LLP
321 N. Clark Street, Suite 2800
Chicago, IL 60610
Phone: (312) 832-4500
Fax: (312) 832-4700

*Attorneys for Claimant Parus Holdings, Inc.*
*Successor-By-Merger to EffectNet, Inc. and*
*EffectNet, LLC*

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | CHAPTER 11 |
| | ) | Jointly Administered |
| WORLDCOM, INC., et al., | ) | |
| | ) | |
| Debtors. | ) | Case No. 02-13533 (AJG) |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
PARUS HOLDINGS, INC.'S  MOTION FOR RELIEF
RESULTING FROM THE DEBTORS' SPOLIATION OF EVIDENCE**

CHIC_1392725

**A 03434**

## <u>TABLE OF CONTENTS</u>

OVERVIEW ....................................................................................................... 1

BACKGROUND .............................................................................................. 1

ARGUMENT .................................................................................................... 5

I.    THE REQUIREMENTS FOR SPOLIATION................................................. 5

II.   THE DEBTORS HAD AN OBLIGATION TO PRESERVE EVIDENCE AS
      EARLY AS JULY 1, 2001, IF NOT EARLIER, BUT UNDER NO
      CIRCUMSTANCES, LATER THAN FEBRUARY 28, 2002......................... 7
      A.    The Debtors' Duty To Preserve Evidence Arose On July 1, 2001, If Not
            Earlier, When the Debtors Decided to Terminate IntermediaOne And the
            UC Agreement. ........................................................................................ 7
      B.    The Debtors' Privilege Log Also Supports that the Debtors' Duty Arose as
            Early as July 2001, If Not Earlier, But In Any Event, No Later Than
            February 28, 2002. ................................................................................... 9
      C.    Parus' Demand Letter Put the Debtors On Express Notice Such that They
            Should Have Known of Their Obligation to Preserve Evidence on March
            12, 2002. ................................................................................................ 14
      D.    The Debtors Admit That They Do Not Know When Their Duty To
            Preserve Attached. ................................................................................ 15

III.  THE DEBTORS ALLOWED INFORMATION RELEVANT TO PARUS'
      CLAIMS TO BE DESTROYED AND/OR TO BECOME INACCESSIBLE AT
      AND AFTER THE TIME THE DEBTORS' DUTY TO PRESERVE
      ATTACHED. .............................................................................................. 15
      A.    The Debtors Failed To Implement a Timely Litigation Hold................ 15
            1.    The Debtors Admit that No Litigation Hold Was In Place as of
                  March 25, 2002 – Long After the Debtors' Duty to Preserve Arose
                  on July 1, 2001. ........................................................................ 16
            2.    In-House Counsel for the Debtors Did Not Request the
                  Preservation of Documents Related to Parus' Claims Until the Fall
                  of 2004 – Long After the Duty to Preserve Attached. ............... 17
            3.    The Debtors Also Admit that No Direction Was Given to the
                  Debtors' Employees to Preserve or Maintain Records in an
                  Accessible Format as of September 1, 2004. ............................. 18
            4.    If the Debtors Cannot Identify When Their Duty to Preserve
                  Arose, How Can They Allege in Good Faith That They
                  Implemented a Timely Litigation Hold?.................................... 19
      B.    At the Time the Debtors' Duty to Preserve Arose, Intermedia and MCI
            Possessed Substantial Information Relating to Parus' Claims, Including
            Evidence Relating to IntermediaOne, Unified Messaging, and the UC
            Agreement................................................................................................ 20

A 03435

C.    Significant Evidence Has Now Been Irretrievably Lost or Rendered
      Inaccessible as a Result of the of the Debtor's Failure to Preserve
      Evidence........................................................................................................ 29
      1.    The Debtors Failed to Preserve Relevant Electronic Data........................ 29
            a.    Servers:  The Debtors Decommissioned and Dismantled
                  Servers with Relevant Information. ............................................ 34
            b.    Backup Tapes:  The Debtors Failed to Retain the
                  Equipment Necessary to Read the Relevant Backup Tapes. ........ 36
            c.    Email:  The Debtors Failed to Preserve Relevant POP3
                  Email. ........................................................................................ 38
            d.    Hard Drives:  The Debtors Failed to Image the Hard Drives
                  of Key Witnesses' Computers. .................................................... 40
            e.    Backup Tapes:  The Debtors Failed to Pull Relevant
                  Backup Tapes out of Rotation Prior to July 2002.......................... 41
      2.    The Debtors Failed to Preserve Hard-Copy Documents and Also
            Failed to Keep Such Documents in Readily Accessible Format. ............. 43

IV.   THE DEBTORS FAILED TO COMPLY WITH THEIR OWN DOCUMENT
      RETENTION POLICIES............................................................................... 47
      1.    The Debtors Failed to Comply with Their Own Retention Policy
            When They Decommissioned the Intermedia Servers............................. 48
      2.    The Debtors Failed to Comply with their Retention Policy When
            They Failed to Preserve James Renforth's Email As Well as the
            Email of Any Other Employee Who Left the Debtors and Had
            Relevant Information Related to Parus. ................................................... 49

V.    THE DEBTORS FAILED TO ENSURE CONTINUED COMPLIANCE WITH
      THEIR PRESERVATION OBLIGATIONS IN DERELICTION OF THEIR
      DUTIES UNDER THE ZUBULAKE DECISIONS. ...................................... 50
      1.    The Debtors Fail to Provide Any Documentary Evidence
            Regarding Ensuring the Continued Compliance with Their Alleged
            Litigation Hold.......................................................................................... 51
      2.    No Mention Is Made Regarding the Debtors' Litigation Hold in the
            Debtors' Privilege Log.............................................................................. 53
      3.    The Debtors Cannot Rely on an Order Entered by the District
            Court on July 1, 2002 Regarding Unrelated Federal Securities
            Litigation as Evidence of Their Implementation of and Compliance
            with a Litigation Hold With Respect to Parus. ......................................... 54

CHIC_1392725

A 03436

VI.    THE DEBTORS DESTROYED EVIDENCE WITH A "CULPABLE STATE OF
       MIND." ........................................................................................................... 56

VII.   THE EVIDENCE DESTROYED AND/OR RENDERED INACCESSIBLE BY
       THE DEBTORS WAS "RELEVANT" TO PARUS' CLAIMS SUCH THAT A
       REASONABLE TRIER OF FACT COULD FIND THAT IT WOULD
       SUPPORT PARUS' CLAIMS.......................................................................... 57
       A.    Parus Has Satisfied the Relevancy Test by Demonstrating that the Debtors
             Were Grossly Negligent........................................................................ 58
       B.    Parus Has Also Satisfied the Relevancy Test by Demonstrating that the
             Missing Evidence Is Favorable to Parus. ............................................... 59

VIII.  BECAUSE OF THE DEBTORS' SPOLIATION OF EVIDENCE, PARUS IS
       ENTITLED TO VARIOUS REMEDIES AGAINST THE DEBTORS.......................... 59
       A.    Parus Is Entitled to an Adverse Inference Against the Debtors........................... 60
       B.    Parus Is Entitled to an Order Barring the Debtors from Presenting and/or
             Contesting Evidence Related to Damages Asserted by Parus. ........................... 60
       C.    Parus Is Entitled to an Award of Damages. ....................................... 61

       CONCLUSION............................................................................................... 61

CHIC_1392725

A 03437

Claimant Parus Holdings, Inc., as successor by merger to EffectNet, Inc. and EffectNet LLC ("Parus" and/or "EffectNet"), respectfully tenders this Memorandum of Law in Support of Parus' Motion for Relief Resulting from the Debtors' Spoliation of Evidence.

## OVERVIEW

"'The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation.'" Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) ("Zubulake IV") (emphasis added) (quoting Fujitsu Ltd. v. Fed. Exp. Corp., 247 F.3d 423, 436 (2d Cir. 2001)). When a party fails to preserve evidence (whether through mere negligence, gross negligence, or intentional misconduct), an opposing party may seek remedies for spoliation. Zubulake IV, 220 F.R.D. at 220; see also Zubulake v. UBS Warburg LLC, 229 F.R.D. 422, 431 (S.D.N.Y. 2004) ("Zubulake V").

Here, Intermedia Communications, Inc. ("Intermedia") and MCI WorldCom Communications, Inc. ("MCI" and together, the "Debtors") failed to preserve evidence at a time when they knew or should have known that such evidence may have been relevant to the pending contested claims litigation with Parus. As a result, Parus is entitled to the relief requested herein, including, but not limited to: (a) an adverse inference against the Debtors; (b) an order barring the Debtors from presenting and/or contesting evidence related to damages asserted by Parus; (c) an award of damages against the Debtors; and/or (d) such other remedies as this Court deems just and proper, including, but not limited to, denying the Debtors' pending summary judgment motion.

## BACKGROUND

This case involves, inter alia, a claim for damages resulting from Intermedia's anticipatory repudiation of a Unified Communications Services General Agreement (the "UC

A 03438

Agreement") with EffectNet (now known as Parus). When the various layers of the claims objection litigation are peeled away, the UC Agreement dispute is quite simple. The Debtors have admitted that Intermedia breached the UC Agreement, but contest the amount of damages owed to Parus. Indeed, Intermedia anticipatorily repudiated the UC Agreement, thereby entitling Parus to, inter alia, expectation damages. Thus, the only issue in dispute with respect to the UC Agreement is the amount of damages owed by Intermedia to Parus.

It is here where the dispute becomes substantial. Intermedia contends that its liability is limited to a mere $460,442.30. Parus, however, has contended and will establish that it has damages, including, but not limited to, expectation damages in the range of $50.7 million and $81.2 million under its breach of contract claim alone.[1]

### A.    Nature of Dispute as to UC Agreement with Intermedia

Parus is a leading integrator and provider of unified communications services and applications and voice portal technologies. On November 20, 2000, EffectNet entered into the UC Agreement with Intermedia pursuant to which EffectNet agreed to provide, and Intermedia agreed to use and sell to end-user customers (i.e., subscribers), a platform of telecommunication services for a term of three years. Under the UC Agreement, EffectNet agreed to provide private label internet and telecommunication products and services, including unified communications and other value-added services, in-house customer services, billing, and technical support. In sum, EffectNet was to provide the unified messaging component of Intermedia's flagship product IntermediaOne.

EffectNet required that Intermedia guarantee a *minimum* of 10,000 active account

---

[1] This figure does not include other damages, including, but not limited to, consequential, incidental, indirect, special, punitive, and any and all other damages that Parus has asserted or may assert. Parus reserves all rights to assert these damages and any other type of damages.

2

A 03439