subscribers by December 2001 and through the remainder of the Initial Term, December 2003, and Intermedia agreed to this request. Indeed, it was the parties' expectations that Intermedia would provide a minimum of 10,000 active account subscribers with monthly services fees of at least $27.40 per month, generating revenues to EffectNet in the range of anywhere between approximately $50.7 million and $81.2 million, depending upon the number of subscribers, the total usage by subscribers, the time it took to achieve 100,000 subscribers during the life of the UC Agreement, and the product mix. Intermedia never lived up to its promise and made its last payment to EffectNet on December 7, 2001.

### B. Nature of Dispute as to Intermedia & WorldCom

In addition to the damages that have accrued as a result of Intermedia's anticipatory repudiation of the UC Agreement, Parus has asserted that it has incurred substantial damages as a result of WorldCom's and Intermedia's systematic and calculated scheme to damage EffectNet and Webley Systems, Inc. ("Webley") as discussed below.

#### *The Intermedia/WorldCom Merger*

Prior to WorldCom's agreement to acquire Intermedia on September 1, 2000, Intermedia was in the process of active development and implementation of IntermediaOne. IntermediaOne directly competed with WorldCom's genD NextGeneration IP Unified Messaging/VoiceMail product suite (the "genD Products"). Nearly two months later, on November 20, 2000, Intermedia executed the UC Agreement with EffectNet. The MCI/Intermedia merger (the "MCI/Intermedia Merger") was finalized on July 1, 2001.

#### *The Webley/EffectNet Merger Discussions*

On January 21, 2001, EffectNet announced a proposed merger with Webley (the "Webley/EffectNet Merger"). Salomon Smith Barney ("Salomon"), the investment banker for

3

A 03440

the Webley/EffectNet Merger, conditioned any private placement financing upon the consummation of the proposed merger between EffectNet and Webley. One of the reasons Salomon conditioned Webley's financing upon merger was the significant forecasted customer base and revenue EffectNet would generate under the UC Agreement. In April and May 2001, Salomon solicited potential investors, including WorldCom Ventures, a WorldCom venture capital firm. The private placement memorandum included, _inter alia_, information regarding EffectNet's UC Agreement with Intermedia and its critical importance to the Webley/EffectNet Merger.

### *The Webley/WorldCom Licensing Negotiations*

In or about February or March 2001, Webley was informed that WorldCom intended to negotiate a licensing agreement under a Master Agreement for Software Licenses (the "MASL") for certain software technology products, including Webley's session initiation protocol, or SIP, based unified communications platform for implementation of WorldCom's genD Products. As part of the MASL financial due diligence, WorldCom obtained from Webley significant financial disclosures, including the private placement memorandum and the importance the UC Agreement played in the Webley/EffectNet merger. The MASL was executed on September 14, 2001.

By anticipatorily repudiating the UC Agreement, Intermedia acted in concert with WorldCom to harm EffectNet and Webley. More specifically, by repudiating the UC Agreement, Intermedia intentionally eliminated the very UC Agreement revenues that were essential to the Webley/EffectNet Merger. Because this source of funding (which was required for the Webley/EffectNet Merger) was eliminated, WorldCom was able to extract favorable

4

CHIC_1392725

A 03441

pricing concessions from Webley regarding the MASL.[2]

In fact, on September 10, 2001 - four days before the MASL was expected to be executed - Intermedia cancelled substantially all of the UC Agreement subscriptions. Therefore, Webley was forced to concede to WorldCom's demands for a substantial reduction of the MASL prices. The damages to Parus in connection with the MASL are a minimum of $20 million and are in addition to Parus' UC Agreement claims of approximately $50.7 million to $81.2 million.

## ARGUMENT

### I.    THE REQUIREMENTS FOR SPOLIATION.

Spoliation is the "destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999); see also Zubulake IV, 220 F.R.D. at 216; Zubulake V, 229 F.R.D. at 430. "The authority to sanction litigants for spoliation arises jointly under the Federal Rules of Civil Procedure and the court's inherent powers." Id. (citing Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 72 (S.D.N.Y. 1991); Shepherd v. Am. Broad. Cos., 62 F.3d 1469, 1474 (D.C. Cir. 1995)); see also Phoenix Four, Inc. v. Strategic Res. Corp., 05 Civ. 4837(HB), 2006 WL 1409413, at *3 (S.D.N.Y. May 23, 2006) (a court has the authority to impose sanctions on a party for spoliation and other discovery misconduct under its inherent power to manage its own affairs or under Rule 37 of the Federal Rules of Civil Procedure). The appropriate sanction for spoliation lies within the sound discretion of the trial judge and is determined on a case-by-case basis. Id. (citing Fujitsu Ltd. v.

---

[2] Pursuant to the MASL, WorldCom purchased from Webley the same technology that Intermedia had procured under the UC Agreement. The key difference was that the UC Agreement involved a wholesale relationship in which the technology was hosted by EffectNet and which generated monthly recurring revenue. In contrast, the MASL involved a one-time perpetual license fee at a fraction of the cost of the IntermediaOne service, which technology was hosted by WorldCom and unlike IntermediaOne generated no recurring product revenue

CHIC_1392725

A 03442

Fed. Exp. Corp., 247 F.3d 423, 436 (2d Cir. 2001)).

A case for spoilation encompasses the following elements:

> A party seeking an adverse inference instruction (or other sanctions) based on the spoliation of evidence must establish the following three elements: (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a "culpable state of mind" and (3) that the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

Zubulake V, 229 F.R.D. at 430 (citing Byrnie v. Town of Cromwell, 243 F.3d 93, 107-12 (2d Cir. 2001)).  Not only has the three-part test for spoliation under Zubulake IV and V been satisfied, the Debtors' conduct illustrates additional exacerbating circumstances.  First, the Debtors had an obligation to preserve evidence as early as July 1, 2001, if not earlier, but under no circumstances later than February 28, 2002.  Second, the Debtors allowed information relevant to Parus' claims to be destroyed and/or to become inaccessible at and after the time the Debtors' duty to preserve attached.  Third, the Debtors failed to comply with their own document retention policies.  Fourth, the Debtors failed to ensure their continued compliance with their preservation obligations as mandated by the Zubulake decisions.  Fifth, the Debtors' destroyed evidence with a "culpable state of mind."  Sixth, the evidenced destroyed by the Debtors was relevant to Parus' claims.  Seventh, as a result of the Debtors' spoliation, Parus is entitled to a variety of remedies against the Debtors, including an adverse inference, the preclusion of evidence, and/or an award of damages as well as any other remedies the Court deems just and proper.

CHIC_1392725

A 03443

## II.  THE DEBTORS HAD AN OBLIGATION TO PRESERVE EVIDENCE AS EARLY AS JULY 1, 2001, IF NOT EARLIER, BUT UNDER NO CIRCUMSTANCES, LATER THAN FEBRUARY 28, 2002.

"'The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation.'" Zubulake IV, 220 F.R.D. at 216 (emphasis added) (quoting Fujitsu Ltd. v. Fed. Exp. Corp., 247 F.3d 423, 436 (2d Cir. 2001)) and (citing Silvestri v. Gen. Motors Corp., 271 F.3d 583, 591 (4th Cir. 2001) ("The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation.")); see also Kronisch v. U.S., 150 F.3d 112, 126 (2d Cir. 1998).  Indeed, a duty to preserve can arise before a claim is filed by a claimant, as demonstrated by Zubulake.  Id.  Here, the Debtors' duty to preserve evidence arose as early as **July 1, 2001**, if not earlier.

Yet even if the Court finds that the duty did not attach as early as July 1, 2001, undisputable evidence exists that the Debtors failed to preserve evidence that they knew or should have known would be relevant to future litigation.  When the Debtors' duty to preserve arose is demonstrated as follows: (1) the timeline of events related to the July 1, 2001 MCI/Intermedia Merger; (2) the Debtors' own privilege log which withholds a February 28, 2002 fax coversheet on the ground of attorney work product in which an Intermedia employee seeks advice from the Debtors' in-house lawyer regarding "liability and strategy" as to the UC Agreement; and (3) Parus' demand letters to the Debtors.  Even more disturbing is that the Debtors – even now – do not know when their own duty to preserve attached.

### A.  The Debtors' Duty To Preserve Evidence Arose On July 1, 2001, If Not Earlier, When the Debtors Decided to Terminate IntermediaOne And the UC Agreement.

The facts of this case are clear.  As in any major corporate acquisition, the acquiring

7

A 03444

company must perform due diligence to determine both the assets it will acquire and the obligations it will honor post-merger. In the MCI/Intermedia Merger, MCI wanted certain of Intermedia's assets and not others. The fallout from the merger revealed that MCI did not want to continue to pursue Intermedia's "flagship" product IntermediaOne. (Nov. 17, 2006 Deposition Transcript of James Renforth, 47:14-15) (hereinafter "Renforth Dep. Tr."). A copy of the relevant portions of the Renforth Dep. Tr. is attached as <u>Exhibit A</u>. Indeed, there was no reason for MCI to assume the IntermediaOne obligations since MCI already had its own product, GenD, that directly competed with IntermediaOne.

As a result, every reason existed for MCI to shed the obligations of IntermediaOne (including the third-party contracts necessary to support the IntermediaOne product, including the UC Agreement). Indeed, MCI's key motivation in acquiring Intermedia was *not* to obtain the IntermediaOne product, but rather to secure Intermedia's DIGEX business,[3] which was unrelated to IntermediaOne. (<u>Id</u>. at 76:19-77:5). In fact, the launch of IntermediaOne was frozen when the MCI/Intermedia merger discussions began.

The following timeline of events demonstrates how MCI positioned itself to terminate IntermediaOne and the UC Agreement and how Intermedia began implementing its internal wind down of the IntermediaOne product per MCI's instructions.

- <u>July 1, 2001</u> – The MCI/Intermedia Merger is consummated.

- <u>July 11, 2001</u> – Intermedia informs an unsuspecting Parus of a slow down of subscribers under the UC Agreement, stating: "Increase in account volumes [under the UC Agreement] is not anticipated to begin before August 1, 2001." (July 11, 2001 Email from Jack Kerrigan of Intermedia to, <u>inter alia</u>, Javid Freeman of Parus) (hereinafter, the "Slowdown Email," a copy of which is

---

[3] DIGEX was Intermedia's internet backbone which was a digital switching network across the United States that provided the transport and connectivity through different cities. (Renforth Dep. Tr., Ex. A. at 76:25-77:5; 88:4-12; 93:1-5).

CHIC_1392725

A 03445

attached as <u>Exhibit B</u>) (brackets added).

- The Debtors stated: "After July 1, 2001, Intermedia's project manager for the UC Agreement was terminated and Intermedia's sales force was disbanded through terminations of employment or reassignment to other projects. (Debtors' Statement of Material Facts As to Which There Are No Genuine Issues To Be Tried, ¶ 12) (hereinafter, "Debtors' Stmt. of Undisputed Facts," a copy of which is attached as <u>Exhibit C</u>).

- <u>September 10, 2001</u> – Intermedia cancels 94% of the subscriptions for services to be provided under the UC Agreement. ("Debtors' Answers to Request to Admit, No. 164, at p. 34) (hereinafter, the "Debtors' Admissions" a copy of the relevant portions of which is attached as <u>Exhibit D</u>).

- <u>March 1, 2002</u> – Intermedia demands cancellation of all remaining subscriptions under the UC Agreement. (Debtors' Stmt. of Undisputed Facts, Ex. C, at ¶ 15); <u>see</u> <u>also</u> (Debtors' Admissions, Ex. D, No. 167, at p. 34).

This timeline establishes that either before or shortly after the MCI/Intermedia Merger on July 1, 2001, the Debtors put in place a plan to terminate IntermediaOne and the UC Agreement supporting the unified message services under IntermediaOne.

**B.    The Debtors' Privilege Log Also Supports that the Debtors' Duty Arose as Early as July 2001, If Not Earlier, But In Any Event, No Later Than February 28, 2002.**

Courts have held that when a party makes "attempts to prepare for litigation itself . . . it [has] a duty to preserve evidence in its possession for use by the opposing party." <u>Houlihan v. Marriott Int'l, Inc.</u>, No. 00 Civ. 7439 (RRC), 2003 WL 22271206, at *2 (S.D.N.Y. Sept. 30, 2003). The Debtors' privilege log contains further evidence that the Debtors' duty to preserve evidence arose on at least July 1, 2001. In <u>Zubulake IV</u>, the district court held that the defendant should have known that the possibility of future litigation existed when the defendant circulated emails containing the assertion of the attorney-client privilege, not when the lawsuit was initiated. <u>Zubulake IV</u>, 220 F.R.D. at 216-17. ("Thus, the relevant people at UBS anticipated litigation in April 2001. The duty to preserve attached at the time that litigation was reasonably

9

CHIC_1392725

A 03446

anticipated.").

On November 4, 2005, the Debtors provided their privilege log (the "Privilege Log") to Parus, a copy of which is attached hereto as Exhibit E. Several entries contained in the Privilege Log suggest that the Debtors were or should have been on notice of the litigation long before Parus filed its proofs of claim in the Debtors' bankruptcy cases.[4] As the Debtors are aware, the assertion of the attorney work product privilege provides for a "qualified immunity from discovery for documents *prepared in anticipation of litigation or for trial.*'" Bank Brussels Lambert v. Credit Lyonnais (Suisse), S.A., 210 F.R.D. 506, 509 (S.D.N.Y. 2002) (emphasis added); see also Martin v. Valley Nat'l Bank of Ariz., 140 F.R.D. 291, 304 (S.D.N.Y. 1991) ("the work-product rule applies only to documents prepared principally or exclusively to assist in anticipated or ongoing litigation"). As such, any entries in the Privilege Log asserting the attorney work product privilege provide significant evidence that the Debtors knew or should have known that they had an obligation to preserve evidence. Just a few examples of the entries contained in the Debtors' Privilege Log are listed below:[5]

| Date | Bates Range | Author | Recipient | CC | Description | Privilege |
|------|-------------|--------|-----------|-----|-------------|-----------|
| 05/17/01 | | **Michele Kloeppel** | | | Attorney Notes re: Intermedia transaction and legal issues to be resolved. | Attorney-Client Communication<br><br>Attorney Work Product |
| 06/12/01 | | **Michele Kloeppel** | | | Attorney Notes re: Intermedia closing and list of issues | Attorney-Client Communication<br><br>Attorney Work Product |
| 06/14/01 06/15/01 | | **Michele Kloeppel** | | | Attorney Notes re: certificate of designation and | Attorney-Client Communication |

_____

[4] Parus filed its proofs of claim on January 8, 2003.

[5] The Debtors' Privilege Log indicates that names in bold are the names of attorneys. (Ex. E, at p. 1).

10

CHIC_1392725

A 03447

| | | | | | preparation for closing of merger[6] | Attorney Work Product |
|---|---|---|---|---|---|---|
| 2/28/02 | MCIWC000293-306 | Cheryl Mellon | **Brett Bacon** | | Fax cover requesting review of EffectNet contract by in-house counsel and seeking advice re: liability and strategy. Contract copy has hand written notes in margin attached | Attorney-Client Communication<br><br>Attorney Work Product |
| 03/14/02 | MCIWC000309-313 | **Brett Bacon** | **Paul Eskildsen** | | Fax between in-house counsel re: EffectNet invoices for 2/6/02 and 3/5/02 and handling of claims arising therefrom (Invoices produced separately) | Attorney-Client Communication<br><br>Attorney Work Product |
| 3/20/02 | MCIWC00000324 | **Laurie Adams** | Brett Bacon | Steve McCann, Suresh Koshy | E-mail from and to in-house counsel re: legal issues to be considered in resolving claim by EffectNet and proposing conference call re same. | Attorney-Client Communication<br><br>Attorney Work Product |
| 3/21/02 | MCIWC00000323 | **Laurie Adams** | Teresa Hastings, Barry Zip, **Brett Bacon** | Steven Mccann, Suresh Koshy, **Paul Eskildsen** | E-mail from and to-in-house counsel and others re: conference call to discuss legal issues relating to EffectNet/Intermedia contract and providing information concerning one of those legal issues | Attorney-Client Communication<br><br>Attorney Work Product |
| 3/27/02 | MCIWC0003222 | **Laurie Adams** | **Jeff Hsu** | | E-mail from and to in-house counsel forwarding copy of e-mail form Pamela Dunnam re: re-assessment from Webley and claims by Webley/EffectNet. | Attorney-Client Communication<br><br>Attorney Work Product |
| 3/29/02 | MCIWC000318 | **Laurie Adams** | **Jeffrey Hsu** | | E-mail from and to in-house counsel re: status of payments on EffectNet Accounts and | Attorney-Client Communication<br><br>Attorney Work |

---

[6] The Debtors' admit that schedules, lists or documents exist in connection with the MCI/Intermedia merger identifying the UC Agreement. (Debtors' Admissions, Ex. D, No. 179, at p. 36).

CHIC_1392725

| | | | | | claims made regarding the same. | Product |
|---|---|---|---|---|---|---|
| 06/21/02 | MCIWC0002 89-292 | **Jeffrey Hsu** | **Thomas O'Neil** | **David Smorodin Laurie Adams** | Memorandum by in-house counsel analyzing legal aspects and potential liability issues relating to EffectNet claims. | Attorney-Client Communication  Attorney Work Product |
| 10/03/02 | MCIWC0002 87 | **Jeffrey Hsu** | Carleen Mitchell, Megan Lawless, Timothy Vogel | Jennifer Carroll | E-Mail from in-house counsel explaining EffectNet and Webley claims. | Attorney-Client Communication  Attorney Work Product |

As seen in the Privilege Log entries above, the Debtors were bracing for litigation relating to the MCI/Intermedia Merger as early as May and June 2001. As a result, the obligation to preserve documents arose on at least July 1, 2001, when the merger was consummated. Houlihan v. Marriott Int'l, Inc., No. 00 Civ. 7439 (RRC), 2003 WL 22271206, at *2 (S.D.N.Y. Sept. 30, 2003) ("Because Defendant made attempts to prepare for litigation itself, the Court finds that it had a duty to preserve evidence in its possession for use by the opposing party.")

Yet even if the Court accepts that the duty to preserve evidence did not attach as early as July 1, 2001, it is indisputable that the Debtors were acutely aware of a litigation threat by Parus on **February 28, 2002**, when Cheryl Mellon sought advice from in-house lawyer Brett Bacon regarding the "EffectNet contract" and "and seeking advice re: liability and strategy" from Bacon:

| Date | Bates Range | Author | Recipient | CC | Description | Privilege |
|---|---|---|---|---|---|---|
| 2/28/02 | MCIWC0002 93-306 | Cheryl Mellon | **Brett Bacon** | | Fax cover requesting review of EffectNet contract by in-house counsel and seeking advice re: liability and strategy. Contract copy has hand written notes in margin attached | Attorney-Client Communication  Attorney Work Product |

(Privilege Log, Ex. E, at p. 2). Indeed, the Privilege Log documents a flurry of allegedly

CHIC_1392725

A 03449

privileged activity specifically regarding the UC Agreement starting February 28, 2002 and continuing for months thereafter. As such, the Debtors duty to preserve arose *no later than February 28, 2002.*

   In addition to the sampling of entries relating to the attorney work product, several entries in the Privilege Log have been claimed to be protected by the attorney-client privilege. Although the attorney-client privilege covers communications that are not necessarily prepared in anticipation of litigation,[7] numerous attorney-client privileged entries evidence the Debtors' awareness of future litigation with Parus.

| Date | Bates Range | Author | Recipient | CC | Description | Privilege |
|---|---|---|---|---|---|---|
| 3/23/01 | MCIWC000322 | Teresa Hasting | **Laurie Adams** Barry Zipp, **Brett Bacon,** Patrice C [sic] | Steven Mccann, Suresh Koshy, Paul Eskildsen, Pamela Dunnam, Robert Laird | E-mail to in-house counsel and others describing claims by EffectNet for the purpose of obtaining legal advice. | Attorney-Client Communication |
| 3/6/02 | MCIWC000314-317 | Cheryl Mellon | **Brett Bacon** | | Fax to in-house counsel forwarding information on the Webley/EffectNet merger to be used in providing legal advice. | Attorney-Client Communication |
| 3/14/02 | MCIWC000325 | **Brett Bacon** | **Paul Eskildsen** | Cheryl D. Mellon, Barry Zipp, Richard Black | E-mail from and to in-house counsel advising of discussions with Robert McConnell of EffectNet about EffectNet's demand letter and describing options for resolution | Attorney-Client Communication |
| 3/20/02 | MCIWC000324-000325 | **Paul Eskildsen** | **Brett Bacon** | Cheryl D. Mellon, | E-mail from and to in-house counsel | Attorney-Client Communication |

---

   [7] "The attorney-client privilege protects confidential communications made for the purpose of obtaining legal advice." In re Grand Jury Subpoenas dated Mar. 9, 2001, 179 F. Supp. 2d 270, 274 (S.D.N.Y. 2001).

13

CHIC_1392725

**A 03450**

| | | | | Barry Zipp, Richard Black | responding to in-house counsel's description of conversation with Robert McConnell and strategy to resolve claim of EffectNet. | |
| --- | --- | --- | --- | --- | --- | --- |
| 3/24/02 | MCIWC000358 | Robert Laird | Teresa Hastings, **Laurie Adam,** Barry Zipp, **Brett Bacon,** Patrice Carroll | Steven McCann, Suresh Koshy, Paul Eskildsen, Pamela Dunnam | E-mail re: potential option for resolution of EffectNet contract claim sent to in-house counsel and others to obtain legal advice. | Attorney-Client Communication |

(Privilege Log, Ex. E, at pp. 3, 4, 6, 9). Again, these entries are merely a sampling. There are no less than 19 entries in March 2002 alone relating to the UC Agreement which are claimed to be privileged.

> ### C.  Parus' Demand Letter Put the Debtors On Express Notice Such that They Should Have Known of Their Obligation to Preserve Evidence on March 12, 2002.

Courts have held that a duty to preserve relevant evidence arises as soon as a party sent a demand letter. Ruta v. Delta Air Lines, Inc., 324 F. Supp. 2d 524, 526-27 (S.D.N.Y. 2004); see also Consol. Aluminum Corp. vs. Alcoa, Inc., No. 03-1055-C-M2, 2006 U.S. Dist. LEXIS 66642, at *12, n.8 (M.D. La., July 19, 2006) (defendant failed to uphold duty to preserve evidence when it instituted a litigation hold two and a half years after it received a demand letter from plaintiff). On March 12, 2002, Robert McConnell ("McConnell"), in-house counsel for Parus, sent a demand letter to Richard Black, Intermedia's Senior Vice President of Sales and Marketing, regarding Intermedia's default under the UC Agreement (the "March 12, 2002 Letter"). A copy of the March 12, 2002 Letter is attached as Exhibit F. On March 25, 2002, McConnell sent another demand letter to Brett Bacon, an in-house lawyer for Intermedia, again advising of the default (the "March 25, 2002 Letter"). A copy of the March 25, 2002 Letter is attached hereto as Exhibit G. In light of these letters, the duty to preserve attached on both

14

A 03451

March 12, 2002 and March 25, 2002.

    **D.**    **The Debtors Admit That They Do Not Know When Their Duty To Preserve Attached.**

On December 19, 2006, the Debtors provided Debtors' Response to Claimants Questions Regarding "Litigation Hold" (the "Debtors' Litigation Hold Response"). A copy of the relevant portions of the Debtors' Litigation Hold Response is attached as <u>Exhibit H</u>.[8] When asked when the Debtors believed that a possible threat of litigation with Parus existed, the Debtors responded:

> Regarding the breach of contract claim, **Debtors have not identified the date on which they first believed that a possible or likely threat of litigation existed regarding Claimant's claim** that Intermedia failed to make reconciliation payments in breach of the Unified Communications Services General Agreement dated November 20, 2002 between Intermedia and EffectNet LLC ("UC Agreement").

(Debtors' Litigation Hold Response, Ex. H. at Ans. 1, p. 2) (emphasis added). In light of this response, Parus is compelled to ask the following: how could the Debtors uphold their obligation to preserve evidence when they themselves have not - to this day - identified when they should have known of future litigation with Parus? The answer is simple. The Debtors never identified that critical date.

**III.**    **THE DEBTORS ALLOWED INFORMATION RELEVANT TO PARUS' CLAIMS TO BE DESTROYED AND/OR TO BECOME INACCESSIBLE AT AND AFTER THE TIME THE DEBTORS' DUTY TO PRESERVE ATTACHED.**

    **A.**    **The Debtors Failed To Implement a Timely Litigation Hold.**

By failing to implement a timely litigation hold, the Debtors neglected to take even the most rudimentary of steps to satisfy their obligation to preserve evidence. "Once a party

---

[8] The Debtors' Litigation Hold Response was verified by Mary L. Coyne, Associate General Counsel, on behalf of the Debtors.

CHIC_1392725

**A 03452**

reasonably anticipates litigation, it <u>must</u> suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents." <u>Zubulake IV</u>, 220 F.R.D. at 218 (emphasis added). Yet, as evidenced below, no such litigation hold was executed when the Debtors' duty to preserve arose.

### 1. The Debtors Admit that No Litigation Hold Was In Place as of March 25, 2002 – Long After the Debtors' Duty to Preserve Arose on July 1, 2001.

The undisputed facts are simple. At no time prior to March 25, 2002 did the Debtors implement a litigation hold relating to Parus nor did the Debtors notify their employees to preserve relevant documents related to Parus. In fact, the Debtors admit these very facts. In response to Parus' First Set of Requests for Admission, the Debtors acknowledge that they failed to implement a litigation hold and failed to instruct employees to preserve documents as of March 25, 2002:

- The Debtors admit that at no time prior to March 25, 2002 did MCI or Intermedia implement a Litigation Hold with respect to documents related to Parus. (Debtors' Admissions, Ex. D, Nos. 25-26, at pp. 8-9); and

- The Debtors also admit that at no time prior to March 25, 2002 did MCI or Intermedia distribute a notification to employees at MCI or Intermedia to implement a Litigation Hold with respect to documents related to Parus. (<u>Id.</u> at Nos. 17-18, at p. 6).

The Debtors' failure to implement a litigation hold not only offends, but clearly contravenes, the preservation obligations imposed by the <u>Zubulake</u> decisions, their predecessors, and their progeny. <u>See</u>, <u>e.g.</u>, <u>Samsung Elec. Co., Ltd. v. Rambus, Inc.</u>, 439 F. Supp. 2d 524, 543 (E.D. Va. 2006) ("Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents."); <u>Broccoli v. Echostar Comms. Corp.</u>, 229 F.R.D. 506, 510 (D. Md. 2005); <u>Zubulake IV</u>, 220 F.R.D. at 218; <u>Zubulake V</u>, 229 F.R.D. at 431; <u>Ruta v. Delta Air Lines, Inc.</u>,

16

A 03453

324 F. Supp. 2d 524, 528 (S.D.N.Y. 2004).

> **2.    *In-House Counsel for the Debtors Did Not Request the Preservation of Documents Related to Parus' Claims Until the Fall of 2004 – Long After the Duty to Preserve Attached.***

Even more perplexing is the testimony of Donald Ramsey ("Ramsey"), a lawyer at Stinson Morrison and outside counsel for the Debtors. Ramsey testified that in-house counsel for the Debtors did not send an email requesting that employees retain documents until early fall or late fall of 2004. (Nov. 14, 2005 Deposition Transcript of Donald Ramsey, 30:2-3) (hereinafter "Ramsey Dep Tr."). A copy of the relevant portions of the Ramsey Dep. Tr. is attached as <u>Exhibit I</u>. In fact, Ramsey testified as follows:

> **Q.    Do you know when Mr. Wachen sent the e-mail you mentioned, advising to retain e-mails or documents?**
>
> **A.    Part of that initial effort before I became involved, early fall, late fall, of '04.**
>
> Q.    Do you know who he sent the e-mail to?
>
> A.    I couldn't try to list them.
>
> \*\*\*
>
> Q.    Have you ever seen the e-mail that he sent?
>
> A.    I have.
>
> Q.    Does Stinson have it in its possession?
>
> A.    I assume so?
>
> Mr. Smith:    I'd like to request a copy of that e-mail as well.

(Ramsey Dep. Tr., Ex. I, at 29:23-30:15) (emphasis added). Interestingly, Parus has never received a copy of Wachen's email even though two formal requests have been made – the first during Ramsey's deposition and the second in Parus' Second Request for Production of Documents to the Debtors ("Parus' Second Request for Production").

Yet, even if the Debtors had produced this email, a fall 2004 litigation hold could not have conceivably complied with the Debtors' obligation to preserve evidence. The following

CHIC_1392725

A 03454

timeline of events underscores Wachen's egregious delay in sending the preservation email:

- The Debtors waited <u>over 3 years</u> after their July 1, 2001 obligation to preserve documents arose.

- The Debtors waited <u>over 2 years</u> after Cheryl Mellon sent a fax to Brett Bacon, an in-house lawyer for Intermedia, requesting a review of the UC Agreement and "seeking advice" regarding "liability and strategy." (Privilege Log, Ex. E, at p. 2).

- The Debtors waited <u>over 2 years</u> after Bob McConnell sent not 1, but 2 demand letters to Intermedia. (March 12, 2002 Letter and March 25, 2002 Letter, at Exs. F and G, respectively).

- The Debtors waited <u>almost 2 years</u> after Parus filed its initial Proofs of Claim on January 8, 2003 and its Amended Proofs of Claim on January 15, 2003.

The utter failure to communicate the preservation obligation to employees – especially after the commencement of the contested claims litigation – is grossly negligent at best and warrants the imposition of the relief requested by Parus.

### 3. The Debtors Also Admit that No Direction Was Given to the Debtors' Employees to Preserve or Maintain Records in an Accessible Format as of September 1, 2004.

The Debtors have also admitted that at no time prior to September 1, 2004 did MCI or Intermedia send or distribute a notification to employees directing such employees to preserve all documents relating to Parus in an accessible or searchable format. (Debtors' Admissions, Ex. D, Nos. 37-38, at pp. 12-13). Indeed, there is no evidence that the Debtors *ever* requested that information relevant to Parus' claims be maintained in an accessible format. In fact, quite to the contrary, the Debtors repeatedly admit that backup tapes from the relevant time period are inaccessible. The Debtors have even made an informal request to the Court that the costs of electronic production be shifted to Parus because the relevant backup tapes are "inaccessible."

Yet, how can the Debtors in good faith make such demands when they never once requested that information related to Parus' claims be maintained in an accessible format –

18

A 03455

particularly after their own preservation obligations attached?

More importantly, the Debtors' failure to preserve information in an accessible format

constitutes a clear violation of the Debtors' preservation obligation:

> The Second Circuit has held that conduct that hinders access to relevant information is sanctionable, even if it does not result in the loss or destruction of evidence . . . . <u>Accordingly, permitting the downgrading of data to a less accessible form--which systematically hinders future discovery by making the recovery of the information more costly and burdensome--is a violation of the preservation obligation.</u>

<u>Treppel v. Biovail Corp.</u>, 233 F.R.D. 363, 372 n.4 (S.D.N.Y. 2006) (emphasis added) (citing

<u>Res. Fund. Corp. v. DeGeorge Fin. Corp.</u>, 306 F.3d 99, 110 (2d Cir. 2002)).  As such, the

Debtors must be held accountable for their utter failure to even attempt to preserve information

related to Parus' claims in an accessible format.

> **4.     *If the Debtors Cannot Identify When Their Duty to Preserve Arose, How Can They Allege in Good Faith That They Implemented a Timely Litigation Hold?***

Even to this day, the Debtors have not identified when their duty to persevere arose

(Debtors' Litigation Hold Response, Ex. H, Ans. 1, at p. 2).  In fact, when asked the specific

question "On what date(s) did Intermedia and MCI implement a litigation hold relating to

Effectnet/Parus," the Debtors evasively responded:

> Subject to and without waiving the general objection set forth above regarding Claimant's use of the phrase, "litigation hold," Debtors respond to Question No. 6 as follows:  Concerning Claimant's breach of contract claims, after being advised by Claimant that the UC Agreement would terminate on April 12, 2002 and that Claimant "may claim damages for all amounts due pursuant to the [UC Agreement]" unless Intermedia made certain payments under that contract on or before April 12, 2002, coupled with the fact that Intermedia did not make the demanded payments, Debtors' in-house counsel preserved (1) correspondence from Claimant's General Counsel advising of the possible contract claim, and (2) the UC Agreement itself.

19

CHIC_1392725

(Debtors' Litigation Hold Response, Ex. H, Ans. 6, at p. 6).  Conspicuously absent from the Debtors' response is the answer to Parus' straightforward and fundamental question:  when was a litigation hold regarding Parus put in place?  In fact, there is nothing to suggest in the Debtors' answer that a litigation hold as described by Zubulake IV and V was ever implemented.  Indeed, after requesting discovery regarding litigation holds, including (a) taking 5 depositions of the Debtors' IT employees, (b) serving the Debtors with formal questions regarding the alleged litigation hold, (c) serving a Second Request for Documents, (d) issuing a Rule 30(b)(6) request for deposition regarding the Debtors' litigation hold, and (e) serving third-party subpoenas to 2 former employees,[9] the Debtors still have not provided Parus with the exact date on which the Debtors implemented a litigation hold.  As such, how can the Debtors allege a timely litigation hold when they cannot state on which date a litigation hold was implemented?

Yet even if the Debtors could point to the implementation of a litigation hold, such a hold was wholly unsuccessful and the Debtors permitted information relevant to Parus' claims to be destroyed or rendered inaccessible.

**B.    At the Time the Debtors' Duty to Preserve Arose, Intermedia and MCI Possessed Substantial Information Relating to Parus' Claims, Including Evidence Relating to IntermediaOne, Unified Messaging, and the UC Agreement.**

A key witness in the pending litigation is James Renforth ("Renforth").  Renforth served as Project Manager for the IntermediaOne Product and was responsible for, inter alia:

- Designing and developing products for Intermedia, including the

---

[9] On November 15, 2006, Parus served the Debtors with a Rule 30(b)(6) notice of deposition regarding litigation holds allegedly implemented by the Debtors as well as a third-party subpoena to Jeffrey Hsu and David Wachen, both former in-house lawyers with the Debtors.  The Debtors have objected to the third-party subpoenas both on behalf of the Debtors and the third-parties and have also not yet provided Parus for dates for the Rule 30(b)(6) deposition.  Parus reserves all rights to supplement its Motion and this Memorandum of Law based on further evidence it obtains through discovery, including the requested depositions.

CHIC_1392725

A 03457

IntermediaOne product;
- Identifying IntermediaOne's target market;
- Identifying where IntermediaOne would be sold;
- Determining how much to charge for IntermediaOne;
- Adding Unified Messaging to the IntermediaOne product; and
- Working with EffectNet in negotiating, implementing, and executing the UC Agreement.

(Renforth Dep. Tr., Ex. A, at 17:5-13; 18:11-16; 22:17-23:5; 25:3-26:4).

As part of his duties, Renforth was responsible for developing new products for Intermedia. (Id. at 20:11-21:8). While at Intermedia, Renforth developed a product called UnifiedVoice.net, which provided bundled line-side telephone services along with internet access to customers.[10] (Id. at 21:6-8; 39:7-10). With the addition of the Unified Messaging services provided by EffectNet under the UC Agreement to UnifiedVoice.net, the UnifiedVoice.net product evolved into IntermediaOne. (Id. at 39:15-40:2). The development of IntermediaOne was significant to Intermedia. Indeed, the IntermediaOne product was hailed by Intermedia's CEO, Dave Ruberg, as Intermedia's "flagship" product, and the revenues to be generated from IntermediaOne were "tremendously" important to Intermedia. (Id. at 45:11-15).

Renforth testified at length that he, as well as Intermedia, had in their possession significant amounts of documentation relating to IntermediaOne and Unified Messaging, including, but not limited to, meeting minutes, timelines, milestones, forecasts, projections, budgets, Microsoft Projects, Excel Spreadsheets, email, Word documents, and business analysis regarding Unified Messaging and its profitability. (Id. at 27:2-14; 43:10-12; 46:17-47:2; 51:24-52:1). Such documents were kept by Renforth in both hard copy and electronic form in several locations. (Id. at 27:15-20). In addition, Renforth testified that, as with any new product offered

---

[10] UnifiedVoice.net was the predecessor product to IntermediaOne. (Renforth Dep. Tr., Ex. A, at 47:20-22).

CHIC_1392725

A 03458

by Intermedia, Intermedia maintained significant and specific documentation related to the launch of each product (including IntermediaOne) and its potential revenues, including, but not limited, to forecasts, financial analyses, and business analyses:

> Q.    Were there any forecasts or financial analysis created in the launch of Unified Voice?
>
> A.    Sure, there were.  We had a lot of detail that  came in from product marketing with regard to forecasts, based upon, again, where we were going to take it, who we were going to sell it to, and how much we were going to charge for it, and what the -- well, what the costs were going to be to Intermedia.
>
> Q.    And again, this was all documented?
>
> A.    That was documented.
>
> Q.    Were there any Excel spreadsheets as well?
>
> A.    Yes, Excel spreadsheets, Microsoft Projects, Word documents.
>
> **Q.    What was the culture at Intermedia in terms of documenting a launch of a product such as this?**
>
> **A.    Not only just the launch of this product, the culture was -- it was document, document, document.  Paper trail was extremely high profile at Intermedia.**
>
> Q.    So was it safe to say that basically every step you took in the launch of a new product would have been documented by Intermedia?
>
> A.    Yes.
>
> Q.    And would this have been done, this documenting each of the steps, would that have been done for every launch of a new product?
>
> A.    Oh, absolutely.

(Id. at 27:21-28:21) (emphasis added).

In addition to these documents, further documents were created by a team assembled by Renforth involving personnel from the following departments:  product marketing, product management, sales, customer service, customer operations, switching, regulatory, and public relations.  (Id. at 18:4-9; 50:21-52:19).  Meeting minutes would be created for each team meeting

CHIC_1392725

A 03459

and such minutes would be distributed to team members, their immediate supervisors, directors, and executive staff. (Id. at 31:1-19; 50:17-19). These minutes would be documented in various forms, including Microsoft Word, Microsoft Projects, and Excel spreadsheets and would be distributed in hard copy and electronic format. (Id. at 50:20-51:3). In addition, Jack Lee, Renforth's supervisor, would hold additional meetings with Intermedia executives, including Intermedia's "V.P.'s, V.P.'s, C.E.O., C.F.O., all the C level officers." (Id. at 49:22-50:3).

Renforth kept all of his information relating to IntermediaOne in three distinct locations: (1) a shared drive on the company server designated as the "K" drive; (2) in folders on his computer's hard drive; and (3) in soft copies in filed drawers in his office. (Id. at 51:4-15). In addition, other users placed information relating to IntermediaOne on the shared "K" drive. (Id. at 51:21-23). In fact, Renforth's testimony below succinctly demonstrates the broad scope of documents held by Intermedia relating to IntermediaOne and Unified Messaging and, more importantly, that these documents supported Parus' significant claim for damages:

> Q.    Did product marketing at Intermedia perform demographic studies and due diligence regarding IntermediaOne product?
>
> A.    Yes.
>
> Q.    And again, were these documented?
>
> A.    Yes, they were.
>
> ***
>
> Q.    Was a team assembled for IntermediaOne?
>
> ***
>
> Q.    And the team assembled included which departments?
>
> ***
>
> A.    Product marketing, product management, sales, customer service, customer operations, switching, regulatory, public relations, and -- I think I said switching.
>
> Q.    And were there minutes taken of the IntermediaOne team meetings?
>
> A.    Yes.
>
> Q.    And what did you -- and were those minutes for the

23

CHIC_1392725

**A 03460**

IntermediaOne team meetings documented?

A.    Yes.

Q.    And how were they documented?

A.    Documented, again, in Word, Microsoft Projects, Excel spreadsheets.

Q.    And how did you receive copies of those minutes?

A.    Soft and hard copies.

Q.    And what did you do with those copies you received?

A.    I had two repositories -- actually, three.  We had a shared drive on a company server.  I had soft copies in folders on my hard drive.  And then hard copies in file drawers in my office.

Q.    And do you remember the name or the letter of the shared drive at IntermediaOne where the IntermediaOne information was stored?

A.    Yeah.

Q.    And that was which drive?

A.    It was K.  I hadn't thought of that in years.

Q.    And so you said you had information on the shared drive. So would any -- would financial or any other information regarding the IntermediaOne product have been put on the shared drive at Intermedia?

A.    Yes.

Q.    So in addition to you, there were other users who would put information on that shared drive?

A.    That's correct.

Q.    And you said you also had electronic documents?

A.    That's right.

Q.    And where did you keep those electronic documents, Mr. --

A.    On my hard drive.

Q.    Would that include e-mail, Mr. Renforth?

A.    Yes, ma'am.

Q.    And did you ever delete any of these documents off of your hard drive?

A.    Only really old e-mail messages.  And I say old, 1990 -- 1998, early 1998, as a -- as a prompt from our I.T. folks saying, "Hey, you've got too much stuff.  You need to get rid of some of

24

A 03461

it."

Q.    And so the old e-mail messages -- the only thing you got off -- deleted from your hard drive is old e-mail messages from 1997 and 1998?

***

Q.   Can you tell me, was there anything else you deleted off your hard drive besides certain e-mails?

A.    No.

Q.    And when were those e-mails deleted off -- from what time period did those e-mails come?

A.    Probably first few months of 1998.

Q.    Did you ever delete any of the documents related to IntermediaOne off your hard drive?

A.    No.

***

A.    And let me back up.  The e-mails weren't deleted.  They were removed and saved to floppies.

Q.    So there was always a copy of the e-mails you had?

A.    Oh, yeah.

Q.    And what happened to those floppies?

A.    They were in my desk.

Q.    So is it safe to say that during your time at IntermediaOne, you always kept records of every electronic e-mail and document you had, whether it was on your hard drive or on floppy?

A.    Yes.

Q.    Did other people at Intermedia embrace kind of the same policy you had of saving all of this information?

***

A.    I -- yes.  I think because of the culture of the company.

Q.    And you also mentioned that you had hard copy documents relating to the IntermediaOne product?

A.    That's correct.

Q.    And where were those stored, Mr. Renforth?

A.    In a file drawer in my drawer -- in my office.

Q.    And were these file drawers relate – somehow labeled?

A.    The folders in the drawers were.

25

A 03462

Q.    And so if you had -- well, let me back up. Did you have file folders related to the IntermediaOne product?

A.    Sure.

Q.    And were these folders labeled?

A.    Yes.

Q.    And how were they labeled?

A.    Well, there were several -- several hanging folders, because of the amount, that were labeled IntermediaOne, and then manila folders inside those hanging folders with specific labels with regard to content, such as "product description", "training," "forecasts", "reports".

Q.    So you kept a hard copy of the reports and forecasts for the IntermediaOne product?

A.    Yes.

Q.    And again, this was both -- I'm sorry, was on hard copy in file -- labeled file folders in your office, on your hard drive, and as well as on the shared drive in Intermedia?

A.    That's correct.

***

Q.    Okay. Mr. Renforth, we were talking about, earlier in your deposition, that you had stored information on the shared K drive, the hard drive, and you also had hard copies. Would that information that you kept on the shared K drive, the Intermedia -- on your personal hard drive, and the hard copies regarding the IntermediaOne product include information regarding Unified Messaging?

A.    Yes.

Q.    I'm going to talk about -- you had mentioned that everyone at Intermedia was very excited about the IntermediaOne product and enthusiastic. Were there forecasts created for the usage of the IntermediaOne product?

A.    For usage?

Q.    I'm sorry, for the number of customers or --

A.    Oh, yes. For the number of customers, yeah.

Q.    And what kind of forecasts were created?

A.    Two that I was familiar with. And there were others, again with the other business units, A.B.N. and standalone. We had a forecast from product marketing that identified the objective for -- or the -- the estimate for new customers and existing customers.

26

A 03463

Q.    And can you tell me about the forecasts for    new customers?

A.    New customers, sure.    We had, from product marketing, that identified an estimate of 300 plus, excuse me, new customers a month.    Each of those new customers was estimated to have 100 employees, and conservatively, to be equipped with five Unified Messaging mailboxes for each customer.

Q.    So about how many mailboxes would that have been per month?

A.    About -- between 15 and 16,000 -- no.

Q.    1500?

A.    Yeah, 15 to 1600.

Q.    And then we would multiply that by 12 months?

A.    Yes.

Q.    Okay.

A.    The other forecast was for existing customers, both Unified Voice Dot Net, which ultimately became IntermediaOne, and single T customers.    There were approximately 12,000 existing customers that could be up-sold.    And that estimate was at ten percent, which would have been 1200 customers.    And again, we used the five mailbox figure. So in addition to the 15 to 1600, we were talking about adding about 6,000 a month to that base.

Q.    So if I understand the forecast correctly, the new customers would be about -- you said there were about 15 to 16 hundred a month.    That would be at a minimum about 18,000 mailboxes for the first year?

A.    For the first year.

Q.    And then for the existing customers, you said about 6,000 a month was being --

A.    A month.

Q.    To the base.    So 6,000 times 12, plus the 18,000 that you

had mentioned?

A.    That's correct.

Q.    And the forecasts you had seen, were they for three years? Or were they for just one year?    Projected out.

A.    Three years.    With incremental growth monthly.

Q.    And what do you mean by incremental growth monthly?

A.    Well, the -- the 1500 to 1600 plus the 6,000 a month.

27

A 03464

Q.    Um-hum (affirmative).

A.    Cumulative, cumulated over the three-year period.

Q.    So IntermediaOne -- or Intermedia didn't expect those numbers to remain stagnant?

A.    No, absolutely not.

Q.    And did IntermediaOne -- or, I'm sorry, Intermedia continue to expect those numbers to grow year after year?

A.    Yes. Yes. In fact, I might add that those -- the numbers were very conservative in those estimates. Because if you think about having a sales force of 600 plus people, 600 salespeople, and targeting 300 new accounts a month, that's only selling a half a deal a month.

Q.    And do you know if whoever created those forecasts factored in this sales force of 600?

A.    No, I don't think they did. No. I'm sure they didn't.

***

Q.    Do you think that Intermedia was generally conservative in its forecasts for new launches?

A.    Yes, I do.

(Id. at 49:11-59:20).    Renforth's testimony evidences that numerous documents existed that would support Parus' damages calculations.    Renforth also testified that for purposes of calculating revenues, Intermedia assumed that subscribers would pay the $27.40 price per month for unlimited use rather than the $11.45 per month for limited use. (Id. at 68:10-22).

Yet, despite the existence of the extensive documents created and kept by Renforth (which were conspicuously labeled), the only hard copy documents the Debtors could find from Renforth were Renforth's personnel file:

Q.    Do you know if, for example, I think you mentioned a Jim Renforth or James Renforth; do you know if he had created an index of whatever documents he had at the time he left employment with Intermedia?

A.    I know that I'd ask records management to run his name against their stored documents, and *it produced only his personal file. No other documents identify as his.*

28

A 03465

(Ramsey Dep. Tr., Ex. I, at 53:18-54:2) (emphasis added).

**C.**    **Significant Evidence Has Now Been Irretrievably Lost or Rendered Inaccessible as a Result of the of the Debtor's Failure to Preserve Evidence.**

Zubulake IV provides a succinct description of the types of evidence the Debtors were required to retain:

> The broad contours of the duty to preserve are relatively clear.  That duty should certainly extend to any documents or tangible things (as defined by Rule 34(a)) made by individuals "likely to have discoverable information that the disclosing party may use to support its claims or defenses."  The duty also includes documents prepared *for* those individuals, to the extent those documents can be readily identified (*e.g.,* from the "to" field in e-mails).  The duty also extends to information that is relevant to the claims or defenses of *any* party, or which is "relevant to the subject matter involved in the action."  Thus, the duty to preserve extends to those employees likely to have relevant information--the "key players" in the case.

Id. at 217-218.  Despite this obligation, the Debtors failed to preserve such evidence.

### *1.    The Debtors Failed to Preserve Relevant Electronic Data.*

On July 11, 2006, the Court ordered the deposition of the Debtors' IT personnel.  The Debtors identified and produced the following five IT employees[11] as being the most knowledgeable about the Debtors' electronic records as they related to Parus:  Julio Valdes, Bryan Miller, James LaMantia, Joseph Falleur, and Kenneth Croslin.  As evidenced below, four of these five individuals did not receive notice of a litigation hold regarding Parus' claims (even though they had implemented litigation holds with respect to other matters).  Indeed, as set forth in detail below, the IT deponents had not even heard of Parus or EffectNet until recently.  The fifth, who had received notice of a request to preserve documents, did not receive such notice

---

[11] For a description of the IT deponents' job responsibilities, as described by counsel for the Debtors, see July 31, 2006 Letter by Allison Murdock (hereinafter the "July 31, 2006 Murdock Letter").  A copy of the July 31, 2006 Murdock Letter is attached as Exhibit U.

CHIC_1392725

A 03466

until February or March of 2006.

### *Intermedia IT Deponent:  Julio Valdes*

By way of example, Julio Valdes, served as Intermedia's Director of Systems Support and had responsibility for, among other things, all of Intermedia's Windows servers.  (Nov. 2, 2006 Deposition Transcript of Julio Valdes, 24:12-15) (hereinafter "Valdes Dep. Tr.").  A copy of the relevant portions of the Valdes Dep. Tr. is attached as <u>Exhibit J</u>.  After the MCI/Intermedia Merger, Valdes became a Senior Manager at MCI.  (<u>Id.</u> at 131:13-15).  Valdes is also the person "most familiar" with the Intermedia backup tapes."  (<u>Id.</u> at 131:13-15).  Valdes testified that he had in the past implemented litigation holds for Intermedia so that relevant information could be preserved:

> Q.    Now, you said you have done litigation holds in the past --
>
> A.    Yes.
>
> ***
>
> Q.    Can you kind of walk me through step by step what was done, how you received notice of the litigation hold and what you then, in turn, did?
>
> A.    We would be instructed to not erase any tapes at all, not even in a rotation.[12]
>
> ***
>
> Q.    What then would you do?  What was your next step?

---

[12]  In the absence of a litigation hold, Intermedia tapes were generally rotated every six weeks. (Valdes Dep., Ex. J at 124:6-8).  The six-week rotation policy however was suspended in July 2002, when an order mandating the preservation of certain information was entered by the District Court for the Southern District of New York in unrelated securities litigation commenced by the Securities and Exchange Commission.  (<u>Id.</u> at 198:4-24).

Backup tapes are used to store information from servers.  <u>See</u> Declaration of Alison Chung, at ¶ 12, (hereinafter "Chung Decl."), a copy of which is attached hereto as <u>Exhibit K</u>.  To save money, such tapes are often "rotated," a process wherein information that currently exists on a tape is written over and replaced with new information.  (<u>Id.</u> at ¶ 17); <u>see also</u> <u>Zubulake V</u>, 229 F.R.D. at 434 (noting the "comedy of errors" that occurred when the defendant had written over 881 of the 1,298 backup tales that contained backup data for the relevant time period).   Once the information on the backup tape is written over, that information is lost forever from the backup tape.  (Chung Decl., at ¶ 17).

CHIC_1392725

A 03467

> A.    I would work with my managers or engineers directly to give the instruction that no tapes are to be recycled, and we would not recycle any tapes. We would follow along with our continued 6 six-week rotation, but after the six weeks those tapes would not be erased. We would just -- we would rotate in new tapes so that none would be erased.
>
> Q.    And you're talking about backup tapes?
>
> A.    Yes.

(Id. at 198:4-199:10). Yet, interestingly, Valdes (the very person in charge of Intermedia's Windows backup tapes) was never asked to implement a litigation hold regarding Parus. In fact, Valdes learned of the Parus/Intermedia dispute for the first time in the beginning of 2005 - long after the duty to preserve attached on July 1, 2001. (Id. at 19:17-20).

> Q.    Okay. For the purpose of that term ["litigation hold"] what I mean is an instruction perhaps by someone at Stinson or an instruction by in-house counsel or an instruction basically by anybody saying we want you to hold or preserve all documents in connection with a certain party. We'll call that a litigation hold. Make sure you do not destroy any documents and that all documents are kind of frozen in time. Have you ever done that?
>
> A.    Have I ever had to do that, or for this particular case?
>
> Q.    Have you ever had to do that?
>
> A.    We have had to do that in the past.
>
> Q.    Okay. Did you do that for this particular case with respect to Parus?
>
> A.    No.
>
> Q.    Do you know why not?
>
> A.    Wasn't -- first off, the data -- there was never data clearly identified as to what was to be kept or what not kept. We just followed our -- we continued to follow our standard procedures for backing up and purging of data.
>
> Q.    Were you aware of any e-mails or notices sent by Mr. -- I believe it was David Wachen, W-a-c-h-e-n, regarding a litigation hold as to Parus?
>
> A.    No.
>
> Q.    Did you ever instruct anyone to retain or preserve documents relating to Parus?

31

A 03468

> A.    No.

(<u>Id.</u> at 196:13-197:16) (brackets added).  Equally left in the dark were other key IT employees

Bryan Miller, James LaMantia, and Joseph Falleur, who were not informed of the alleged Parus

litigation hold.

### *MCI IT Deponent:  Bryan Miller*

Bryan Miller was responsible for email systems and backups.  (July 31, 2006 Murdock

Letter, Ex. U at p. 1); (Nov. 8, 2006 Deposition Transcript of Bryan Miller, 13:14-14:1)

(hereinafter, "Miller Dep. Tr.")).  A copy of the relevant portions of the Miller Dep. Tr. is

attached hereto as <u>Exhibit L</u>).  Miller testified:

> Q.    *** Do you know what a litigation hold is?
>
> A.    Yes.
>
> ***
> A.    My team implements litigation holds based on a request by
> one of several organizations within the company to save all current
> e-mail on a system for a specific user and also make copies of
> those e-mails as they enter or leave the account in the future.
>
> Q.    And did you ever implement a litigation hold with respect
> to Parus?
>
> A.    I did not.  My team may have but not for Parus that I know
> of.

(<u>Id.</u> at 94:14-95:11).

### *MCI IT Deponent:  James LaMantia*

James LaMantia was responsible for managing file and print servers, as well as desktops.

(Nov. 3, 2006 Deposition Transcript of James LaMantia, 56:3-8) (hereinafter, "LaMantia. Dep.

Tr.")  A copy of the relevant portions of the LaMantia Dep. Tr. is attached as <u>Exhibit M</u>.  As

with Valdes and Miller, James LaMantia was not instructed to implement a litigation hold:

> Q.    Did you ever receive a litigation hold with respect to Parus?
>
> A.    No.

CHIC_1392725

A 03469

> Q.    With an – how about with respect to an entity called EffectNet?
>
> A.    No.
>
> Q.    And how about with respect to an entity named Webley?
>
> A.    No.

(Id. at 115:12-20).  Indeed, LaMantia was not contacted by MCI's in-house lawyer, Jeff Jacobs, to conduct a search regarding the Parus until mid-2005.  (Id. at 7:12-20; 8:2-5).

### *MCI IT Deponent:  Joseph Falleur*

Joseph Falleur was responsible for managing relaying and unified messaging, as well as assisting with searches of backup tapes and relay logs. (July 31, 2006 Murdock Letter, Ex. U, at p. 1); (Nov. 10, 2006 Deposition Transcript of Joseph Falleur, 28:15-20 (hereinafter, "Falleur Dep. Tr.).  A copy of the relevant portions of the Falleur Dep. Tr. is attached hereto as Exhibit N.  Falleur also had no recollection regarding a litigation hold for Parus:

> Q.    And did you ever receive a litigation hold request with respect to Parus?
>
> A.    I don't recall.  Seriously, I don't recall.
>
> Q.    ***Do you recall if there were any names asked of you to put litigation holds on that may have related to Parus?
>
> A.    During that time frame?
>
> Q.    No.
>
> A.    At any time?
>
> Q.    At any time.
>
> A.    I don't recall any holds.

(Nov. 10, 2006 Deposition Transcript of Joseph Falleur, at 131:7-23) (hereinafter "Falleur Dep. Tr.").  A copy of the relevant portions of the Falleur Dep. Tr. is attached hereto as Exhibit N.

### *MCI IT Deponent:  Kenneth Croslin*

Indeed, the only person who was asked to implement a litigation hold was Kenneth Croslin.  Croslin was responsible for maintaining backups and addressing any server failings or

CHIC_1392725

A 03470

maintenance issues.   (Nov. 9, 2006 Deposition Transcript of Kenneth Croslin, 23:17-19)

(hereinafter, "Croslin Dep. Tr."). A copy of the relevant portions of the Croslin Dep. Tr. is

attached hereto as <u>Exhibit O</u>. Yet even Croslin did not receive a request to hold until February or

March 2006:

> Q.    Mr. Croslin, are you aware of what a litigation hold is?
>
> A.    Not specifically.
>
> Q.    I'm going to tell you what my impression of a litigation
> hold is and then I'll ask you if you were ever asked to do so.  A
> litigation hold is a request made to preserve all documents going
> forward, whether it's electronic, whether it's e-mail, whether it's
> Word, whatever you would have had responsibility for.
>
> ***
>
> Other than those names that you were given in February/March of
> 2006, did you ever get any information related to Parus or any
> names related to Parus asking to preserve documents?
>
> A.    Other than the February and March 2006, no.

(<u>Id</u>. at 102:3-103:22).  The Debtors' utter failure to even apprize these key IT personnel of a

litigation hold is highly troublesome.  Without the implementation of a timely litigation hold by

key IT personnel, electronic documents related to backup tapes, hard drives, and shared drives

relevant to Parus could not have been preserved.

> ### a.    Servers:    The Debtors Decommissioned and Dismantled Servers with Relevant Information.

Computer servers house all types of electronic data, including email, documents, and a

number of other applications relating to electronic information on a company's network. (Chung

Decl., Ex. K, at ¶ 9).  There can be several types of servers, including email servers, file servers,

and print servers.  (<u>Id</u>. at ¶ 10).  The information contained on a server, in turn, is backed up by a

backup tape.  (<u>Id</u>. at ¶ 12).  Such backup tapes are simply snapshots in time of the information

contained on a particular server.  (<u>Id</u>.).

Prior to its merger with MCI, Intermedia maintained a data center in Tampa, Florida (the

CHIC_1392725

A 03471

"Intermedia Data Center"). (Valdes Dep. Tr., Ex. J, at 11:15-22). Contained in the data center were Intermedia computer systems, tapes, and hardware which constituted the "infrastructure for Intermedia." (Id. at 12:11-21). Also included in the Data Center were approximately 300 Windows servers. (Id. at 28:1-7; 31:10-14). These servers contained email and electronic documents. (Id.).

In April or May of 2003, the Intermedia Data Center was closed at MCI's request, and "much" of the equipment contained in the Intermedia Data Center was disassembled and sent to MCI's Ashburn, Virginia facility. (Id. at 12:4-6, 24). Julio Valdes had lead responsibility for shutting down the Intermedia Data Center. (Id. at 15:25-16:1). Some of the equipment from the Data Center was placed back into production while some of the equipment was "disposed of." (Id. at 13:4-9). Of the 300 servers that existed, "roughly only 50 or so servers are left." (Id. at 41:20-25). Valdes testified that some servers were disposed of when the Data Center was closed in 2003 and that additional servers were disposed of in 2004 – long after the Debtors' preservation obligation arose on July 1, 2001, long after Parus sent its March 12, 2002 demand letter, and long after Parus filed its proof of claim on January 8, 2003:

> Q.    And what happened to the rest of the servers that you had mentioned?
>
> A.    They were put in a storage -- a storage area and later I believe it might have been disposed of through asset disposal.
>
> ***
>
> Q.    Do you know when they were disposed of?
>
> A.    I would have to say sometime in 2004.
>
> Q.    Do you know if there was information relating to Parus on any of those servers that were disposed of?
>
> A.    I don't know.
>
> ***
>
> Q.    But how about for the other -- the non-50 servers, you know, we don't know the number exactly. So I'll just call them the non-50 servers, how would you know or find out if there's any information related to Parus on those non-50

35

A 03472

servers?

A.      I don't know.

Q.      Could searches be run on those?

A.      Not that I'm aware of.  I don't believe those servers are in Ashburn anymore.

Q.      Okay.  When did they leave Ashburn?

A.      I believe it was sometime in 2004.

***

Q.      Do you know any grounds for why those non-50 servers left Ashburn?

A.      They were part of asset disposal from what I understand.

Q.      And what do you mean by asset disposal?

A.      When a system is end of life or is no longer needed, they -- I believe they used to have a process for asset disposal where they would take the hardware or any assets off the books and dispose of it.

(Id. at 42:1-24; 70:15-71:12).  In fact, among the servers that were decommissioned were Intermedia's Exchange email servers.  (Id. at 79:21-23).  The problem with having servers decommissioned is that such servers contain information.  When those servers are decommissioned or disposed of, the only evidence of the information contained on them is backup tapes.  (Id. at ¶ 11).

### b.      Backup Tapes:  The Debtors Failed to Retain the Equipment Necessary to Read the Relevant Backup Tapes.

As discussed above, Julio Valdes testified that Intermedia had approximately 300-350 Windows servers containing email and other electronic data. (Valdes Dep. Tr., Ex. J, at 28:1-7; 31:10-14).  Of these 300-350 servers, only 50 servers were retained in 2003, and as of 2006 no servers with information relevant to Parus were active.  (Valdes Dep. Tr., Ex. J, at 12:4-6, 24). Certain of the backup tapes that the Debtors pulled in connection with the Parus litigation are from servers that have been disposed of.

This presents a unique problem.  By way of example, an 8-track tape does a person no good if that person does not have an 8-track tape player.  While the 8-track tape has music on it,

36

CHIC_1392725

the music simply cannot be played without the 8-track tape player. In the same way, by disposing of the equipment, i.e., the severs, necessary to read the Intermedia backup tapes long after the Debtors' preservation obligation arose and long after the litigation with Parus was commenced, the Debtors rendered its own data inaccessible:

> Q.    Now, did Intermedia -- I'm assuming at some point in time Intermedia did have the ability to search the data on the backup tapes that are referenced in your -- or, I'm sorry, the servers?
>
> A.   We didn't have the ability to search -- search the data on the tapes. We could search for a file and identify the file and restore it and then search the file, but we would have to -- in order to search files, we would have to restore them.
>
> Q.    And that's just a common, routine practice --
>
> A.    Correct.
>
> Q.    -- whenever you're searching for files?
>
> A.    Correct, on tape.
>
> Q.    On tape. But the difference is here you don't have the equipment to restore the tape?
>
> A.    Correct.
>
> Q.    Is that accurate?
>
> A.    Correct.
>
> Q.    Okay. And at what point in time did Intermedia lose the ability to search -- or to restore that data? Is that when the servers were decommissioned?
>
> A.    When servers are decommissioned, yes.

(Valdes Dep. Tr., Ex. J, at 145:11-146:8). In fact, Valdes identified that as of 2004, only two remaining active Intermedia servers with information relevant to Parus existed. (Id. at 132:16-133:10). However, in 2006 the Debtors even decommissioned these two remaining active servers. (Id. at 165:7-15). As such, the tapes for these two formerly active servers have also now been rendered unreadable. (Id. at 81:8-22). Had a litigation hold been in place, this scenario could have been obviated. In fact, nothing could more succinctly demonstrate this than Valdes' own testimony:

CHIC_1392725

**A 03474**

> Q.     [C]ould Intermedia have preserved that capability had it wanted to restore those tapes?
>
> A.     Yes.
>
> Q.     And what would have been required to do so?
>
> A.     We would just have had to have been given instructions to do so.

(Id. at 260:20-261:1).

###     c.     Email:  The Debtors Failed to Preserve Relevant POP3 Email.

How a server stores information depends upon the program it is operating.  For example, the Debtors have disclosed that they had at least 2 types of email programs:  POP3 email and Exchange email.  (Valdes Dep. Tr., at 204:3-6).  One of the fundamental differences between POP3 email and Exchange email is *how* such email is stored on the respective POP3 and Exchange email servers.  For example, POP3 email is routed through a server directly to a user's computer.  (Id. at ¶ 15).  The POP3 email is not stored on the server and a copy of the POP3 email is not saved on the server.  (Id.).  Instead, POP3 email is routed to and written on the hard-drive of an individual user's computer.  (Id.).  The only POP3 email contained on a POP3 email server would be *undelivered* POP3 email that is waiting to be delivered to a user's hard drive:

> Q.     Now, can you explain to me what the POP e-mail system is?
>
> A.     The way I understand POP e-mail is that it's more of a gateway.  An e-mail comes in.  It's stored there until you get it.  Once you get it, it's gone from the system and it goes on.

(Valdes Dep. Tr., Ex. J, at 204:14-19).

The Debtors repeatedly allege that Intermedia has 78 POP3 email backup tapes for the relevant time period.  (June 16, 2006 Letter by Allison Murdock) (the "June 16, 2006 Murdock Letter").  A copy of the June 16, 2006 Murdock Letter is attached as Exhibit P.  However, the Debtors fail to reveal a cardinal problem with this type of alleged electronic preservation.

38

A 03475

Copies of POP3 emails are not stored on the POP3 server and instead are directly routed to a user's hard drive. Only undelivered email is contained on the POP3 server. Therefore, the information on a POP3 server is severely limited. Moreover, as the Court may recall, backup tapes are only snapshots in time of information contained on a server. (Chung Decl., Ex. K, at ¶ 12). Therefore, if the POP3 servers do not contain POP3 email, then the backup tapes will not contain POP3 email. (Id. at ¶ 16). As such, the POP3 email backup tapes that the Debtors tout as available are actually worthless.

Rather than relying on POP3 backup tapes, the Debtors and their counsel were under an obligation to ascertain the IT structure of the POP3 email system and its servers. Zubulake V, 229 F.R.D. at 432 (noting that counsel should become "fully familiar" with their client's document retention policies, as well as the client's data retention architecture and should speak with information technology personnel, who can explain system-wide backup procedures and the actual implementation of the client's recycling policy.). Had they done so, they would have learned (if they didn't already know) that the POP3 emails would not be stored on backup tape, but instead on an individual user's computer, where the only record of such POP3 emails would lie. Therefore, the Debtors were required to: (a) identify those users with relevant information who had POP3 email accounts, (b) ensure that such users did not delete their POP3 emails, and (c) make a copy of such relevant emails from those users' hard drives. This was not done. MCI did not back up the hard drives of all of its employees. (LaMantia Dep. Tr., Ex. M, at 68:24-69:4; 125:17-19). Instead, MCI only backed up the hard drives of users who were directors and - even then - such backups were entirely optional and were only used by a minority of such high-level employees. (Id.); see also id. at 125:1-126:2.

CHIC_1392725

A 03476

### d. Hard Drives: The Debtors Failed to Image the Hard Drives of Key Witnesses' Computers.

Julio Valdes testified that a number of procedures could occur with respect to a person's hard drive when he or she left Intermedia, ranging from doing nothing all the way to completing a full backup:

> Q. Let's say an employee who had a PST file on his or her hard drive was terminated or quit, what happens to that hard drive?
>
> A. That system, that hard drive, that system, would be turned back in to either their manager and sent back in to the PC Support Team. And depending on the user, they would either -- they would either hold that system, provide the files to their manager, or do nothing with the system.
>
> Q. Now, when you say hold the system, what do you mean?
>
> A. They would hold onto that desktop until a later time, a month or two months, and then at that point they would recycle it, use it for someone else.
>
> Q. Okay. So is it three options, either hold it for an undetermined amount of time or they would take files off of the computer and provide it to managers or they would do nothing? Is that --
>
> A. There might be one more option, and that was I recall that there were some instances where they would back up the entire user's system to a file server and retain that data for a period of time.
>
> Q. And under what circumstances was that backup one?
>
> A. It was based on the manager's request.
>
> Q. And was that done on a case-by-case basis?
>
> A. I believe so.

(Valdes Dep. Tr., Ex. J, at 116:11-117:13). Valdes testified that as part of a litigation hold, Intermedia would have asked in the past that a user's hard drive be backed up:

> Q. Had you done anything else [in connection with a litigation hold] besides taking a tape out of rotation?
>
> A. We have been asked by HR or security to back up someone's files in the past.
>
> Q. Would that be on a server or on their hard drive?

40

CHIC_1392725

> A.    It would be both . . . .

(Valdes, Dep. Tr., Ex. J, at 199:16-22) (brackets added).  However, there is no record that images

of hard drives were made of anyone's computers with respect to the Parus dispute.  Moreover,

Valdes is not aware of any record kept by Intermedia identifying which of these procedures were

performed with respect to a person's hard drive when he or she left Intermedia.  (Id. at 169:3-12).

Such a fact is particularly troublesome, particularly when James Renforth stated that he stored

extensive IntermediaOne and unified messaging files on his hard drive.

> e.    **Backup Tapes:  The Debtors Failed to Pull Relevant Backup Tapes out of Rotation Prior to July 2002.**

Zubulake IV proffered the following guidelines when determining whether backup tapes

must be preserved:

> As a general rule, that litigation hold does not apply to inaccessible backup tapes (*e.g.,* those typically maintained solely for the purpose of disaster recovery), which may continue to be recycled on the schedule set forth in the company's policy.  On the other hand, if backup tapes are accessible (*i.e.,* actively used for information retrieval), then such tapes *would* likely be subject to the litigation hold.
>
> However, it does make sense to create one exception to this general rule.  If a company can identify where particular employee documents are stored on backup tapes, then the tapes storing the documents of "key players" to the existing or threatened litigation should be preserved if the information contained on those tapes is not otherwise available.  This exception applies to *all* backup tapes.

Zubulake IV, 220 F.R.D. at 218 (underline added; italics in original).  Here, Intermedia satisfied

both of these rules.  First, Intermedia actively used backup tapes for information retrieval:

> Q.    Did Intermedia actively use backup tapes for information retrieval?
>
> A.    Yes.

(Valdes Dep. Tr., Ex. J, at 121:2-4).  Second, the use of home directories on computer servers

41

A 03478

enables an IT professional to identify where a particular user's documents were or have been stored on servers. Therefore, the IT professional would be able to identify which backup tapes were used to backup those home directories. (Chung Decl., Ex. K, at ¶ 19). Intermedia had the ability to locate backup tapes based on "home directories." In fact, Valdes testified that Intermedia had utilized such home directories:

> Q.    Did Intermedia's file servers include user data folders called home directories?
>
> A.    Yes.
>
> Q.    Let me ask how these home directors worked. If I wanted to find, you know, Johm [sic] Smith's user data on the home directory, how difficult would that be?
>
> A.    It would not be difficult.

(Valdes Dep. Tr., Ex. J, at 96:20-23). In addition, MCI had the ability to trace users to certain servers in connection with MCI's Legato system.

> Q.    For the period of 2000 to 2002 would there have been any lists of directors who said they wanted to be or were backed up by Legato?
>
> A.    I'm sure there was. There was an account listings of that.
>
> ***
>
> Q.    Was there a list created as to which users were on Legato?
>
> A.    It would have to be -- it depends on what point in time there is, and I don't know if those were saved or not.
>
> Q.    But there was a list at some point in time?
>
> A.    Sure, at some point in time. We knew what counts [sic][13] were on which.

(LaMantia Dep. Tr., Ex. M, at 67:18-22; 72:13-20).

The Debtors failure to retain backup tapes prior to July 1, 2002 is in clear derogation of their duty to preserve evidence for two cardinal reasons. First, the Debtors had in the past been

---

[13] This is a typographical error. The word should be "accounts," not "counts."

CHIC_1392725

A 03479

asked to preserve backup tapes in connection with litigation holds, but in the case of Parus failed

to do so. Second, the Debtors had the capability to identify the "key players" regarding the UC

Contract dispute and even had the ability to ascertain which backup tapes these key players'

information would have been stored. However, the Debtors declined to do so.

### 2. The Debtors Failed to Preserve Hard-Copy Documents and Also Failed to Keep Such Documents in Readily Accessible Format.

In addition to their failure to preserve electronic data, the Debtors have failed to preserve

hard copy documents. Donald Ramsey, outside counsel for the Debtors, testified that in his

opinion, the Debtors' hard copy document production was complete. (Ramsey Dep. Tr., Ex. I, at

182:15-19). However, conspicuously absent from the Debtors' production were any of the hard

copy documents identified by James Renforth, including the labeled file folders contained in his

office relating to IntermediaOne and Unified Messaging. (Renforth Dep. Tr., Ex. A, at 51:6-9).

It is disconcerting that none of these labeled folders was produced, particularly when Renforth

testified that Intermedia's policy was to "document, document, document." (Id. at 83:9). Given

Intermedia's corporate culture of creating a "paper trial" and Renforth's own diligence in

preserving hard copy documents, no legitimate explanation exists as to why these documents

were not produced to Parus. (Id. at 29:13).

The Debtors' should also be held liable for spoliation as a result of their failure to

maintain hard copy documents in a readily accessible format.:

> The Second Circuit has held that conduct that hinders access to
> relevant information is sanctionable, even if it does not result in the
> loss or destruction of evidence . . . . Accordingly, permitting the
> downgrading of data to a less accessible form--which
> systematically hinders future discovery by making the recovery of
> the information more costly and burdensome--is a violation of the
> preservation obligation.

Treppel v. Biovail Corp., 233 F.R.D. 363, 372 n.4 (S.D.N.Y. 2006) (citing Res. Fund. Corp. v.

CHIC_1392725

A 03480

DeGeorge Fin. Corp., 306 F.3d 99, 110 (2d Cir. 2002)).  Approximately 13 boxes have been

produced to Parus, out of an estimated 10,000 boxes in existence.  In fact, only one document

relating to the UC Agreement (other than copies of the UC Agreement itself) has been produced

by MCI.  The Debtors posit that they have satisfied their obligations to produce relevant

documents by providing Parus with indices that purport to indicate the content of the 10,000

boxes in existence.  Yet, ironically, even the Debtors admit that the so-called "indices" are

impossible to decipher, and the Debtors acknowledge that they themselves are incapable of

determining the contents of the 10,000 boxes:

> A.     I asked [the Records Management people] if there was
> anyone who could read the index and know what was going to be
> contained in the boxes from the index, to help us select or help
> anybody, Parus, anybody select boxes to be reviewed.
>
> Q.     Did they have a response to you?
>
> A.     They indicated there was none, didn't have anybody that
> can do that.
>
> Q.     When you say they didn't have anybody that can do that,
> meaning no one that could interpret, so to speak, the terms of the
> index and tell you based on that, what was in the actual boxes?
>
> A.     Yes.

(Ramsey Dep. Tr., Ex. I, at 106:7-20) (brackets added).  In fact, Ramsey admitted that neither he

nor anyone else at MCI could interpret the various descriptions on the indices in order to

determine what was actually contained in the boxes:

> Q.     With respect to any of the major description, minor
> descriptions, or long descriptions that are contained, not just in this
> particular entry in Ramsay Exhibit no. 4, but all of the entries in
> Ramsay Exhibit 4, did you contact anyone at Records Management
> to determine what different entries meant?
>
> A.     Well, I talked to them to some extent, as I mentioned, and
> tried to find somebody who maybe could interpret the descriptions,
> and was told there really wasn't anybody ho could interpret those
> description any better than we could, from looking at them.  They
> didn't know about what was in these boxes.

CHIC_1392725

A 03481

> \*\*\*
>
> Q.    After having received index that we marked for identification as Ramsay Exhibit No. 4, did you contact anyone to determine what any of the descriptions meant within the index?
>
> \*\*\*
>
> A.    I talked to Joe Stevens and/or Hasselvander about descriptions and what they might mean.  I was told they didn't know either.

(Id. at 114:22-115:11; 123:2-5; 123:9-11).

In an sheer and unabashed abdication of their discovery obligations, Ramsay testified that it was because the Debtors themselves were unable to decipher the indices that the Debtors asked Parus to select the boxes they wished to review for relevant documents:

> Q.    If you look on the first line of that entry, it says engagement letter for sale of Intermedia, attorneys notes and correspondence.  Is there any way to tell from this file, why, or is there any way to tell from this entry as to what attorneys notes and correspondence might contain?
>
> A.    I can't tell from that entry.  This is among the reasons we asked for – Parus on selection of boxes.

(Id. at 138:4-12).  How can the Debtors reasonably expect Parus to construe such hieroglyphics when the Debtors themselves are unable to do so?  As a result of these indecipherable indices, the Debtors have effectively rendered the hard copy documents in their possession inaccessible.

In fact, Ramsay revealed his own inability to understand the information contained in the indices the Debtors' produced:

> Q.    On the first page of Ramsey Exhibit No. 4 towards the middle of the page, there's an entry that says one of 10 of 338 records searched.
>
> A.    I see that, yes.
>
> Q.    Do you know what this refers to, what the means?
>
> A.    I'm not certain.
>
> Q.    And the next line says "with customer equals M" as in Mary "WLDK."
>
> \*\*\*

CHIC_1392725

A 03482

Q.    Do you have an understanding as to what that line is referring to, and then what the customer is referring to?

A.    No.

\*\*\*

Q.    Still, on the first page of the Ramsay Exhibit No. 4, there's an entry that says 290 and then there's a space or something, 48. Do you know what that refers to?

A.    I don't.

Q.    And then moving across on the same line, it says status; do you know what this is referring to?

A.    I don't.

\*\*\*

Q.    And then the next line is box department 59823.  Do you have an understanding of what that means?

A.    I don't.

\*\*\*

Q.    [referring to Ramsay Exhibit No. 11]  It's a description management book analysis balance sheet REC's, February to September 2001.  It carries over to the following line.  It says STFI revenue elimination January to September 2001.

A.    Yes.

Q.    Do you know what those entries refer to?

A.    I do not know for certain, no.

Q.    Dropping below to box number 65 it looks like, it says a description it says JE Jan '01 – Sept '01

A.    I see that.

Q.     Do you know what that refers to?

A.    I don't.

\*\*\*

Q.    Box number 68, if you look under the description for that it says GLIFC 2000, GLDGX 2000, GLD Roman numeral two or two I's, 2000, GLINT8 / 2000.  Do you know what that refers to?

A.    I don't know for certain, no.

(Id. at 111:6-14; 111:16-19; 112:3-11; 113:5-8; 180:8-21) (brackets added).

Equally disturbing is that when MCI initiated a reduction in force of Intermedia employees, Intermedia employees were simply advised to box up their documents and create an

46

CHIC_1392725

index of those hard copy documents (Id. at 52:7-13). However, there is no indication that the employees were given any type of template or guidelines to help them properly code or label their documents. (Id. at 52:14-17).

The Court should not reward the Debtors for their utter failure to preserve hard copy documents in a retrievable format. Indeed, such haphazard storage is tantamount to spoliation, and Parus should be entitled to relief against the Debtors as a result. Treppel v. Biovail Corp., 233 F.R.D. 363, 372 n.4 (S.D.N.Y. 2006) (citing Res. Fund. Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 110 (2d Cir. 2002)).

## IV.   THE DEBTORS FAILED TO COMPLY WITH THEIR OWN DOCUMENT RETENTION POLICIES.

Not only did the Debtors fail to uphold their obligations to preserve evidence under federal common law, the Debtors failed to comply with their very own document retention policies. While Intermedia had no written document retention policy, Intermedia alleged in public filings that it was ISO[14] certified. MCI, on the other hand, did have a written document retention policy (the "Retention Policy"), a copy of which is attached as Exhibit Q.

Upon the MCI/Intermedia Merger on July 1, 2001, Intermedia became subject to MCI's Retention Policy. Indeed, MCI's Retention Policy clearly specifies that "[w]hen MCI acquires or merges with another company, it is RIM's responsibility to bring the new company into compliance with the retention program." (Id. at p. 27). Even more significant was a mandate issued by the Retention Policy that all companies with whom MCI mergers must preserve all documents during the merger process: "While your records program is being evaluated by RIM,

---

[14]   The acronym ISO stands for "International Organization for Standardization." (http://www.iso.org/iso/en/aboutiso/introduction/index.html). Note that ISO is, in fact, the proper acronym for the International Organization for Standardization even though the acronym's letters are inverted. ISO is the world's largest developer of standards. Id.

CHIC_1392725

A 03484

absolutely no records destruction of any kind can take place." (Id. at p. 78) (emphasis added).
Note that Julio Valdes was the person responsible for ensuring that Intermedia's electronic data
was in compliance with the Retention Policy during the merger. (Valdes Dep. Tr., Ex. J, at
234:15-23). Yet, Valdes was not even aware of MCI's tape rotation policy until 2004 – long
after the July 1, 2001 MCI/Intermedia Merger was consummated. (Valdes Dep. Tr., Ex. J, at
247:11-20).

Specific instances of when the Debtors failed to comply with the Retention Policy
include the following: (1) the servers at issue were decommissioned and tapes were rendered
unreadable; and (2) the Debtors failed to retain information from the hard drives of James
Renforth, among others.

### 1. The Debtors Failed to Comply with Their Own Retention Policy When They Decommissioned the Intermedia Servers.

After the MCI/Intermedia Merger, MCI ordered the decommissioning of Intermedia's
servers. (See supra § III.C.1.a). However, the Debtors failed to comply with their own Retention
Policy, which mandated that data on a decommissioned system be retrievable and readable until
it has reached its full retention requirement:

### DECOMMISSIONING SYSTEMS

\*\*\*

> Any data contained on the decommissioned system that has a
> retention requirement must be retrievable and readable until it has
> fulfilled its retention requirement . . . . If the data contained on a
> system can only be read with a particular program, the program
> must be retained for the life of the system, and then migrated to the
> new system, or until the retention requirement for the data has been
> reached.

(Retention Policy, Ex. Q. at p. 85) (emphasis added).

The Retention Policy set forth detailed schedules specifying such "retention
requirements." (Id. at p. 42). However, the Debtors did not preserve in retrievable and readable

48

A 03485

form documents that remained subject to such retention requirements. For example, the retention requirement for the UC Agreement, drafts, and correspondence relating to UC Agreement negotiations was 15 years after the UC Agreement was closed, completed or canceled. (Id. at p. 43-44). However, this was not done and the Debtors now claim that the relevant backup tapes relating to the UC Contract are unreadable and inaccessible. (June 16, 2006 Murdock Letter, Ex. P, at p. 7).

> **2.    The Debtors Failed to Comply with their Retention Policy When They Failed to Preserve James Renforth's Email As Well as the Email of Any Other Employee Who Left the Debtors and Had Relevant Information Related to Parus.**

The Retention Policy specifically provides, "When an employee leaves the company, all files on his/her computer must be reviewed (including e-mail and e-mail attachments) for retention requirements under the Records Retention Schedule . . . . Files that require retention must be pulled of thee computer and stored appropriately." (Retention Policy, Ex. Q, at p. 112). In addition, the Retention Policy requires the Debtors to save the email of a departing or terminated employee 3 years after that employee departed or was terminated. Id. at 44. As in the case of James Renforth, Renforth had extensive email communications regarding IntermediaOne and the UC Agreement. (See supra § III.B.). His employment with Intermedia ended on July 27, 2001. (Renforth Dep. Tr., Ex. A, at 257:25). The Debtors were, therefore, under an obligation to preserve Renforth's email until July 27, 2004 by virtue of the Retention Policy.

From July 27, 2004 going forward, the Debtors were required to preserve Renforth's email pursuant to a litigation hold, as it was relevant to Parus' claims. The same holds true for Renforth's supervisor Jack Lee, as well as a number of former Intermedia employees. Equally disconcerting is the fact that Parus has not received all of Renforth's emails from the Debtors.

49

A 03486

For example, Parus has produced to the Debtors certain emails created by Renforth. Yet the Debtors never produced these same emails to Parus.

The Debtors may attempt to allege that such email is located on an inaccessible backup tape and that is why such email has not been produced. However, this poses yet another pitfall for the Debtors, as the Debtors' own document retention policy mandates that such information be maintained in a readily retrievable format. (Retention Policy, Ex. Q, at pp. 4, 26) ("Also, the program is designed to ensure that in the event that legal or financial problems do occur, the organization will have, in a readily retrievable form, the information it needs to defend itself."). These failings simply underscore the Debtors' irregular and haphazard treatment of documents related to Parus.

## V.  THE DEBTORS FAILED TO ENSURE CONTINUED COMPLIANCE WITH THEIR PRESERVATION OBLIGATIONS IN DERELICTION OF THEIR DUTIES UNDER THE ZUBULAKE DECISIONS.

Even assuming *arguendo* that the Debtors had instituted a timely litigation hold, the Debtors' alleged litigation hold did not comply with the strictures set forth in the Zubulake decisions. In other words, simply making a general request for preservation is not enough. A party must oversee compliance with the litigation hold: "A party's discovery obligations do not end with the implementation of a "litigation hold"-to the contrary, that's only the beginning. Counsel must oversee compliance with the litigation hold, monitoring the party's efforts to retain and produce the relevant documents." Zubulake V, 229 F.R.D. at 432. In fact, counsel "must take *affirmative steps* to monitor compliance so that all sources of discoverable information are identified and searched." Id. at 432. (emphasis added). Counsel must issue a "litigation hold" at the "outset of litigation or whenever litigation is reasonably anticipated," and the litigation hold should "be periodically re-issued so that new employees are aware of it, and so that it is fresh in the minds of all employees." Id. at 433.

50

A 03487

"'The obligation to retain discoverable materials is an affirmative one; it requires that the agency or corporate officers having notice of discovery obligations communicate those obligations to employees in possession of discoverable materials.'" Samsung Elec. Co., Ltd. v. Rambus, Inc., 439 F. Supp. 2d 524, 543 (E.D. Va. 2006) (quoting National Ass'n of Radiation Survivors v. Turnage, 115 F.R.D. 543, 557-58 (N.D. Cal. 1987)). "It is no defense that particular employees were not on notice of the duty to preserve evidence or what kinds of evidence were material to the potential litigation." Id. "'To hold otherwise would permit an agency, corporate officer, or legal department to shield itself from discovery obligations by keeping its employees ignorant.'" Id. (quoting Turnage, 115 F.R.D. at 557). Indeed, a failure to monitor and ensure compliance with a litigation hold is "not taken lightly." Metro. Opera Assoc., Inc. v. Local 100, Hotel Employ. & Rest. Employ. Int'l Union, 212 F.R.D. 178, 222 (S.D.N.Y. 2003) (ordering default judgment because counsel, inter alia, never gave adequate instructions to clients about clients' overall discovery obligations, including what constitutes a 'document' and knew the client had no document retention or filing systems and yet failed to implement a systematic procedure for document production or for retention of documents).

However, the facts as they stand today, reveal no significant efforts by the Debtors to undertake the guidelines set forth in Zubulake V and to monitor and ensure continuing compliance with a litigation hold.

### 1. The Debtors Fail to Provide Any Documentary Evidence Regarding Ensuring the Continued Compliance with Their Alleged Litigation Hold.

The Debtors have failed to provide any written documentation regarding monitoring and compliance with a litigation hold. For example, Parus' Second Request for Production sought, inter alia, information related to the Debtors' efforts to (a) preserve documents and (b) implement and monitor litigation holds relating to Parus. Such request included the following:

51

CHIC_1392725

A 03488

Request No. 51    All Documents that refer or relate to the following Debtors' compliance and/or non-compliance with the following Debtors' document preservation manuals, policies, procedures, or guidelines regarding Documents related to the Claimant: (a) Intermedia and (b) MCI.

Request No. 52    All Documents that refer or relate to requests by the following Debtors to their employees, agents, and/or personnel to preserve, retain, make accessible and/or place a Litigation Hold on Documents related to the Claimant, including, but not limited to, Documents relating to the Person who made such request(s), when such request(s) were made, and to whom such request(s) were made: (a) Intermedia and (b) MCI.

Request No. 53    All Documents that refer or relate to policies of the following Debtors regarding requests by the Debtors to their employees, agents, and/or personnel to preserve, retain, make accessible and/or place a Litigation Hold on Documents: (a) Intermedia and (b) MCI.

Request No. 54    All Documents that refer, relate to, and/or evidence compliance and/or non-compliance with requests by the following Debtors to their employees, agents, and/or personnel to preserve, retain, make accessible and/or place a Litigation Hold on Documents related to the Claimant: (a) Intermedia and (b) MCI.

Request No. 55    All Documents that refer or relate to the destruction, spoliation, corruption, loss, and/or failure to maintain and/or preserve Documents by the following Debtors that relate to the Claimant's Claim: (a) Intermedia and (b) MCI.

Request No. 56    All Documents that refer or relate to the following Debtors' efforts to maintain and/or preserve Documents (regardless of whether such Documents are Hard Copy or electronic Documents) related to the Claimant and/or the Claimant's Claim in an accessible and/or searchable format: (a) Intermedia and (b) MCI.

Request No. 57    All Documents that refer or relate to requests made by the following Debtors to destroy, erase, purge and/or render inaccessible or unsearchable Documents regarding or relating to the Claimant: (a) Intermedia and (b) MCI.

See Debtors' Objections and Responses to Claimant Parus Holding, Inc.'s Second Request for Production of Documents, Nos. 51-57 ("Debtors' Document Production Responses"), a copy of the relevant portions of which is attached as Exhibit R.

In response, the Debtors refused to produce a single page or document relating to the

CHIC_1392725

A 03489