Debtors' efforts to implement and monitor a litigation hold.  Id.[15]  Parus is hard-pressed to see how the Debtors can credibly assert that a timely and complete litigation hold was both implemented and monitored for compliance, when the Debtors refuse to provide a single document evidencing such implementation or compliance.

To further exacerbate matters, the Debtors contend in their Litigation Hold Response that "In-House and outside counsel communicated orally *and in writing* with regard to . . . preserving documents that might relate to Claimant's Claims, the UC Contract, the relationship between Claimant and the Debtors, and the relationship between Webley and the Debtors.  (Litigation Hold Response, Ex. H, at p. 11) (emphasis added).  Yet, no such written communications were produced in response to Parus' document requests.  To the extent such documents actually exist, Parus invites the Debtors to submit for *in camera* inspection such documents.

### 2.    *No Mention Is Made Regarding the Debtors' Litigation Hold in the Debtors' Privilege Log.*

The Debtors' Privilege Log further highlights the complete dearth of documentary evidence regarding the Debtors' litigation hold.  The Debtors have raised myriad objections to Parus' request for such litigation hold information, including the attorney-client privilege.  If the documents evidencing the implementation of and compliance with a litigation hold are privileged (which Parus disputes), then (a) why did the Debtors fail to identify these documents in their November 2005 Privilege Log and (b) why did the Debtors fail to produce a privilege log identifying these documents in response to Parus' Second Request for Production?  Again, the Debtors fail to provide any answer.  As noted in the <u>Metro Opera</u> decision, the Debtors' non-compliance should not be taken lightly.    <u>Metro. Opera Assoc., Inc. v. Local 100, Hotel Employ.</u>

---

[15] In fact, the Debtors did not provide <u>one single page</u> of documents in response to Parus' 164 document requests.  Instead, the Debtors interposed 128 pages of objections to such document requests.

CHIC_1392725

A 03490

& Rest. Employ. Int'l Union, 212 F.R.D. 178, 222 (S.D.N.Y. 2003).

> **3.**    ***The Debtors Cannot Rely on an Order Entered by the District Court on July 1, 2002 Regarding Unrelated Federal Securities Litigation as Evidence of Their Implementation of and Compliance with a Litigation Hold With Respect to Parus.***

Realizing for the first time that the Debtors failed to implement a timely and specific litigation hold as to Parus' claims, the Debtors struggle to rely upon a July 1, 2002 order entered in totally unrelated securities litigation in S.E.C. v. WorldCom, Inc., Case No. 1:02-cv-04963-JSR, United States District Court for the Southern District of New York (the "Securities Litigation Order"). A copy of the Securities Litigation Order is attached as Exhibit S. In its Litigation Hold Response, the Debtors allege that they have complied with their duty to preserve as a result of the entry of the Securities Litigation Order:

> Further, pursuant to a Stipulation and Order entered on July 1, 2002 in the matter of S.E.C. v. WorldCom, Inc., Case No. 1:02-cv-04963-JSR (the "Order") (attached as Exhibit B), "WorldCom, its officers, agents, accountants, employees, and attorneys, and those persons in active concert or participation with them" preserved all documents "relating to, referring to or concerning any aspect of WorldCom's financial reporting obligations, public disclosures required by the federal securities laws, or any other accounting matters relating to WorldCom...." To comply with this Order, WorldCom and its affiliates preserved all daily backup tapes of their email systems (including Intermedia's email system), as well as non-email electronic data and paper documents encompassed by the order."

(Litigation Hold Response, Ex. H, at Ans. 6, pp. 6-7) (emphasis added).

A plethora of problems exist with the Debtors' reliance on the Securities Litigation Order as evidence of compliance with a litigation hold as to Parus. First, the Securities Litigation Order was entered on July 1, 2002 – exactly one year after the Debtors' duty to preserve evidence began. Second, the Securities Litigation Order has no application to Parus' claims or the litigation hold required to be implemented by the Debtors regarding Parus. The Debtors'

CHIC_1392725

Litigation Hold Response selectively quotes from the Securities Litigation Order.  Indeed, the Securities Litigation Order actually provides:

> Defendant, WorldCom, its officers, agents, accountants, employees, and attorneys, and those persons in active concert or participation with them, and each of them, <u>who receive actual notice of this Order by personal service or otherwise</u>, shall not destroy, mutilate, conceal, alter, or dispose of any item (including but not limited to books, records, documents, contracts, agreements, assignments, evidence of obligations or payments, press releases, public announcements, drafts of any of the foregoing, or any other item within their possession, custody or control) relating to, referring to or concerning any aspect of WorldCom's <u>financial reporting obligations, public disclosures required by the federal securities laws, or any accounting matters relating to WorldCom, including but not limited to the matters referred to in the Commission's Complaint filed herein;</u>"

(Securities Litigation Order, Ex. H, at ¶ 1) (emphasis added).  Nothing in the Securities Litigation Order encompasses an obligation to preserve documents related to actual or anticipated litigation between the Debtors and Parus.  Rather, the order simply addresses "financial reporting obligations, public disclosures required by federal securities laws, and accounting matters."  <u>Id</u>.  Indeed, it would make little sense for this order to encompass the UC Agreement dispute with Parus since the scope of the SEC's two-count complaint against WorldCom (the "SEC Complaint") stemmed from WorldCom's failure to disclose improper accounting that materially overstated WorldCom's income before taxes and minority interests in violation of the Securities Exchange Act of 1934.  A copy of the SEC Complaint is attached hereto as <u>Exhibit T</u>.

<u>Third</u>, only parties who receive "actual notice" of the Securities Litigation Order were bound by its terms.  The Debtors provide no evidence that those at the Debtors with knowledge or information regarding Parus even received the Securities Litigation Order or, for that matter, could have conceivably construed the Securities Litigation Order as requiring the preservation of

CHIC_1392725

A 03492

documents related to Parus.

Fourth, the Debtors allege that they have kept all back up tapes as required by the Securities Litigation Order. However, the existence of such tapes does not satisfy the Debtors' obligation to implement a litigation regarding Parus for no less than 3 reasons: (a) the backup tapes relate to data that was created 1 year *after* the Debtors' preservation obligation arose; (b) the Debtors and their IT professionals admit that they have failed to keep the tapes in an accessible format in contravention of its electronic preservation obligations under Treppel v. Biovail Corp., 233 F.R.D. 363, 372 n.4 (S.D.N.Y. 2006); and (c) the backup tapes do not contain all information related to Parus. Instead, the backup tapes are mere "snapshots" in time. (Chung Decl., Ex. K, at ¶ 12); see also (LaMantia Dep. Tr., Ex. M, at 48:12-6); see also (Valdes Dep Tr., Ex. J, at 106:4-8).

Therefore, if an individual created a document but deleted that document before the "snapshot" was taken on the backup tape, that document is lost forever. Rather than relying on the backup tapes required by the Securities Litigation Order, the Debtors were under a specific duty to identify employees with information and direct them to save information related to Parus' claims – not hope that a backup tape may or may not capture such information. The Debtors cannot now in hindsight use the Securities Litigation Order as a shield to protect themselves from their own failure to implement an appropriate and timely litigation hold.

## VI.    THE DEBTORS DESTROYED EVIDENCE WITH A "CULPABLE STATE OF MIND."

In order to demonstrate a culpable state of mind, Parus need only show that the Debtors acted with ordinary negligence: "In this circuit, a 'culpable state of mind' for purposes of a spoliation inference includes ordinary negligence." Zubulake V, 229 F.R.D. at 431 (citing Res. Fund. Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 108 (2d Cir. 2002)); see also Ruta v. Delta Air

A 03493

Lines, Inc., 324 F. Supp. 2d 524, 528 (S.D.N.Y. 2004) (negligent loss of relevant evidence constitutes spoliation). In fact, "[o]nce the duty to preserve attaches, any destruction of documents is, at a minimum, negligent." Zubulake IV, 220 F.R.D. at 220 (brackets added); see also Chan v. Triple 8 Palace, Inc., Case No. 03CIV6048(GEL), 2005 WL 1925579, at *7 (S.D.N.Y. Aug. 11, 2005) ("the utter failure to establish any form of litigation hold at the outset of litigation is grossly negligent"). Here, Parus has clearly established, at a minimum, ordinary negligence.

It is clear from the deposition testimony of Donald Ramsay that a litigation hold came too late, and once it finally was in place, no attorney adequately explained it to key recordkeepers and IT personnel or monitored it as evidenced by the testimony of Julio Valdes, Bryan Miller, Kenneth Croslin, Joseph Falleur, and James LaMantia. These recurring incidents at the very least establish ordinary negligence.

## VII. THE EVIDENCE DESTROYED AND/OR RENDERED INACCESSIBLE BY THE DEBTORS WAS "RELEVANT" TO PARUS' CLAIMS SUCH THAT A REASONABLE TRIER OF FACT COULD FIND THAT IT WOULD SUPPORT PARUS' CLAIMS.

In ascertaining the relevance of documents, courts have cautioned against "holding the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed evidence," explaining that doing so would "subvert the prophylactic and punitive purposes of the adverse inference . . . ." Kronisch v. U.S., 150 F.3d 112, 128 (2d Cir. 1998); see also Phoenix Four, Inc. v. Strategic Res. Corp., No. 05 Civ. 4837(HB), 2006 WL 1409413, at *4 (S.D.N.Y. May 23, 2006) ("[c]ourts should be careful not to hold the movant to 'too strict a standard of proof regarding the likely contents of the destroyed [or unavailable] evidence' however, lest the spoliator profits from its misconduct."). In fact, "it is not incumbent upon the plaintiff to show that specific documents were lost. It would be enough to demonstrate that certain types of

CHIC_1392725

A 03494

relevant documents existed and that they were necessarily destroyed . . . ." Treppel v. Biovail Corp., 233 F.R.D. 363, 372 (S.D.N.Y. 2006).

As the District Court for the Southern District of New York has held, a party may establish the relevance of destroyed documents in the following 2 ways:

> Relevance in this context may be established in two ways. First, it may be inferred if the spoliator is shown to have a sufficiently culpable state of mind. "Where a party destroys evidence in bad faith, that bad faith alone is sufficient circumstantial evidence from which a reasonable fact finder could conclude that the missing evidence was unfavorable to the party." . . . . Likewise, "a showing of gross negligence in the destruction or untimely production of evidence will in some circumstances suffice, standing alone, to support a finding that the evidence was unfavorable to the grossly negligent party." Second, the moving party may submit extrinsic evidence tending to demonstrate that the missing evidence would have been favorable to it.

Chan v. Triple 8 Palace, Inc., Case No. 03CIV6048(GEL), 2005 WL 1925579, at *8 (S.D.N.Y. Aug. 11, 2005) (internal citations omitted). Parus has satisfied both tests for relevance.

### A.    Parus Has Satisfied the Relevancy Test by Demonstrating that the Debtors Were Grossly Negligent.

"[A] showing of gross negligence in the destruction or untimely production of evidence will in some circumstances suffice, standing alone, to support a finding that the evidence was unfavorable to the grossly negligent party." Res. Fund. Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 109 (2d Cir. 2002). As described at length herein,[16] the Debtors were grossly negligent for no less than 3 reasons. First, the Debtors failed to implement a timely litigation hold. Chan v. Triple 8 Palace, Inc., Case No. 03CIV6048(GEL), 2005 WL 1925579, at *8 (S.D.N.Y. Aug. 11, 2005) ("the utter failure to establish any form of litigation hold at the outset of litigation is grossly negligent"). Second, the Debtors repeatedly failed to abide by their own document

---

[16] See supra §§ II-V herein.

CHIC_1392725

A 03495

retention policies and protocols. <u>Finally,</u> the Debtors failed to ensure continued compliance with their preservation obligations in dereliction of their duties under the <u>Zubulake</u> decisions.

### B.    Parus Has Also Satisfied the Relevancy Test by Demonstrating that the Missing Evidence Is Favorable to Parus.

Parus has tendered significant evidence demonstrating that the missing evidence would have been favorable to it. For example, the Debtors have alleged that Parus is only entitled to damages of $460,442.30. Yet, as fully detailed herein, James Renforth testified that Intermedia had numerous revenue reports and projections, business reports, marketing studies, and financial analysis regarding the IntermediaOne product and the use of Unified Messaging. (<u>See</u> <u>supra</u> § III.B.). This information was contained in electronic form (including email, information shared on Intermedia's 'K' drive, and Renforth's hard drive) as well as hard copy in the form of Word documents, Excel documents, and Microsoft Projects (which were also stored electronically). This information, if produced, would contravene the Debtors' allegation of de minimis damages of $460,442.30 and would fully support Parus' claim for expectation damages in the range of $50.7 million and $81.2 million for its breach of contract claim alone.

## VIII.   BECAUSE OF THE DEBTORS' SPOLIATION OF EVIDENCE, PARUS IS ENTITLED TO VARIOUS REMEDIES AGAINST THE DEBTORS.

A federal district court has broad power to impose sanctions under Fed. R. Civ. P. 37(b) "to serve the prophylactic, punitive and remedial rationales underlying the spoliation doctrine." <u>West v. Goodyear Tire & Rubber Co.</u>, 167 F.3d 776, 779 (2d Cir. 1999). Sanctions for spoliation include the entry of judgment in favor of the harmed party, the issuance of an adverse inference due to the unavailability of the evidence, the preclusion of certain evidence and testimony, and monetary sanctions. <u>See</u>, <u>e.g.</u>, <u>id.</u> at 780; <u>Chan v. Triple 8 Palace, Inc.</u>, Case No. 03CIV6048(GEL), 2005 WL 1925579, at *9 (S.D.N.Y. Aug. 11, 2005); <u>Rutgerswerke AG and Frendo S.P.A. v. Abex Corp.</u>, No. 93 CIV. 2914 JFK, 2002 WL 1203836, at *12 (S.D.N.Y. June

CHIC_1392725

A 03496

4, 2002); <u>Zubulake IV</u>, 220 F.R.D. at 219-222; <u>In re Kelsey</u>, Nos. 94-10415, 00-1034, 2001 WL

34050736, at *4 (Bankr. D. Vt. Oct. 23, 2001).

A.    **Parus Is Entitled to an Adverse Inference Against the Debtors.**

As evidenced in herein, the Debtors were grossly negligent with respect to their

discovery and preservation obligations. Therefore, the issuance of an adverse inference against

the Debtors is warranted. <u>Barsoum v. NYC Hous. Auth.</u>, 202 F.R.D. 396, 400 (S.D.N.Y. 2001)

("adverse inference sanction may also be predicated on a finding of bad faith, intentional

misconduct, or fault in the form of gross negligence"); <u>see</u> <u>also</u> <u>Broccoli v. Echostar Comms.</u>

<u>Corp.</u>, 229 F.R.D. 506, 512 (D. Md. 2005) (approving adverse inference instruction based on

gross spoliation of evidence); <u>cf.</u> <u>Chan v. Triple 8 Palace, Inc.</u>, Case No. 03CIV6048(GEL),

2005 WL 1925579, at *9 (S.D.N.Y. Aug. 11, 2005) ("Gross negligence qualifies as 'fault' such

that the threshold requirement for the sanction of dismissal or default is met."); <u>see</u> <u>also</u>;

<u>Pastorello v. City of N.Y.</u>, No. 95 Civ. 470(CSH), 2003 WL 1740606, *8 (S.D.N.Y. April 1,

2003) ("Gross negligence, willfulness, bad faith, or fault on the part of the sanctioned party may

make dismissal appropriate…").

B.    **Parus Is Entitled to an Order Barring the Debtors from Presenting and/or
      Contesting Evidence Related to Damages Asserted by Parus.**

This Court may also bar the Debtors from presenting or contesting evidence related to

damages. A court may preclude "the culpable party from giving testimony regarding the

destroyed evidence." <u>Rutgerswerke AG and Frendo S.P.A. v. Abex Corp.</u>, 2 No. 93 CIV. 2914

JFK, 2002 WL 1203836, at *12 (S.D.N.Y. June 4, 2002; <u>see</u> <u>also</u> Fed. R. Civ. P. 37(c)(1). The

"overwhelming weight of authority is that preclusion is *required* and *mandatory* absent some

unusual or extenuating circumstances." <u>Elion v. Jackson</u>, No. 05-0992 (PLF), 2006 WL

2583694, at *1 (D.D.C. Sept. 8, 2006) (emphasis in original). Here, the Debtors should be

60

**A 03497**

barred from presenting and/or contesting any evidence related to damages asserted by Parus.

## C.    Parus Is Entitled to an Award of Damages.

An award of damages in this case is also appropriate.  Parus has gone to extraordinary lengths to obtain proper discovery in this case and has been thwarted at every turn by the Debtors.  Indeed, certain electronic documents produced by Parus were never produced by the Debtors even though these documents were originated by the Debtors. A court may assess attorney's fees when a party delays or disrupts the litigation.  Wachtel v. Health Net, Inc., ---- F.R.D.----, Nos. Civ.01 4183, Civ.03 18012006 WL 3538935 at *15 (D.N.J. Dec. 6, 2006).  See also Fed. R. Civ. P. 37(a)(4).  Therefore, an award of damages is also appropriate.

## CONCLUSION

For each of the reasons cited herein, the Court should not countenance the Debtors' behavior and their failure to preserve and maintain evidence in a timely and appropriate fashion. Therefore, Parus respectfully requests that the relief sought herein be granted, including, but not limited to:  (a)  an adverse inference against the Debtors; (b) an order barring the Debtors from presenting and/or contesting evidence related to damages asserted by Parus; (c) an award of damages against the Debtors; and/or (d) such other remedies as this Court deems just and proper, including a denial the Debtors' pending summary judgment motion.

Dated:  January 26, 2007                          Respectfully submitted,

                                                  By:   /s/ Jill L. Murch
                                                        Robert A. Scher (RS 2910)
                                                        FOLEY & LARDNER LLP
                                                        90 Park Avenue
                                                        New York, NY 10016
                                                        Phone:  (212) 682-7474

                                                          -and-

                                                        Mark L. Prager (*admitted pro hac vice*)
                                                        William J. McKenna  (*admitted pro hac*

61

A 03498

*vice*)
Jill L. Murch (*admitted pro hac vice*)
Joanne Lee (*admitted pro hac vice*)
FOLEY & LARDNER LLP
321 N. Clark Street, Suite 2800
Chicago, IL 60610
Phone: (312) 832-4500
Fax: (312) 832-4700

*Attorneys for Claimant Parus Holdings,*
*Inc., Successor-By-Merger to EffectNet,*
*Inc. and EffectNet, LLC*

CHIC_1392725

**A 03499**

JAMES RENFORTH       VOLUME I       NOVEMBER 17, 2006

**Page 14**

1  Q.  And when did you join Intermedia?
2  A.  That was January 1998.
3  Q.  And how did you join Intermedia?
4  A.  I joined Intermedia as a consultant,
5  contractor.
6  Q.  And for how long were you a consultant?
7  A.  About nine months.  There were three
8  successive 90-day contracts.
9  Q.  And what did you do, Mr. Renforth, as a
10  consultant during that nine-month period?
11  A.  The initial charter for me was to analyze the
12  local resale business unit, to identify sales
13  improvements, process improvements, and to turn the
14  gross margins around.
15  Q.  Now, when you say charter, what do you mean by
16  charter?
17  A.  My responsibility.
18  Q.  Now, let me back up.  You said you had three
19  successive 90-day contracts.  So were those renewed
20  after --
21  A.  Yes.  The initial contract was 90 days.  It
22  was then renewed again for another 90 days, and then a
23  third 90 days.
24  Q.  And tell me a little bit about the local
25  resale business that you were chartered with

**Page 15**

1  responsibilities.
2  A.  Okay.  The local resale business, when they --
3  when Intermedia brought me in, had -- initially, the
4  objective of the local resale business was for
5  Intermedia to obtain a market presence in the local
6  telephone business.
7  And subsequently to that, over a period of
8  time, their gross margins had dropped to like a negative
9  34 percent.  And the C.E.O., Dave Ruberg, wanted to know
10  what do we need to do to fix this.
11  So my analysis, my team's analysis uncovered
12  several discrepancies in that -- in that business unit
13  whereby we could recover lost monthly recurring
14  revenues.
15  Q.  And how did you identify those discrepancies?
16  What were those problems that you corrected?
17  A.  Okay, good question.
18  One of the initial things we did was to look
19  at what was being resold.  And the company, Intermedia,
20  at that time was doing what's known in the industry as
21  bill flips.
22  In other words, they were taking over the
23  responsibility of billing the end-user customers simply
24  by contacting the local incumbent, who was at the time
25  Verizon, or Bell South, or Southwestern Bell, whatever

**Page 16**

1  area that customer resided in, and just flipping a bill
2  from the end-user customer to Intermedia, then
3  Intermedia would bill the end-user customer.
4  And there was an inherent ten percent margin
5  built into that for Intermedia.  But what we found when
6  we looked first into the billing system was that there
7  were over 10,000 items in the billing system that had
8  been zero rated, in other words, Intermedia was charging
9  zero to the customer because they didn't know what it
10  was.
11  So our team restructured the local resale
12  business unit with regard to products being resold and
13  identified just like a half a dozen features that should
14  be part of the local resale business, rather than just
15  everything.
16  So we streamlined the business unit with
17  regard to what they were selling, we identified what
18  those items were in the local incumbent's tariffs, and
19  then charged accordingly to the end-user customer.
20  Q.  And how successful were you in restructuring
21  the business?  I know you mentioned that you had -- that
22  Intermedia had negative 34 percent margin?
23  A.  Yes.
24  Q.  When you were done, what --
25  A.  When we were done, the margins had improved to

**Page 17**

1  a positive 35 percent, and we recovered over 5 million
2  dollars in monthly recurring revenues to the company.
3  Q.  So needless to say, you did a good job.
4  A.  Well, we did a good job.
5  Q.  So what happened after your nine-month
6  consultant period was over?
7  A.  Intermedia brought me on full time.
8  Q.  And why were you brought on full time?  What
9  did you do as a full-time employee?
10  A.  Oh, as a full-time employee?
11  Q.  Um-hum (affirmative).
12  A.  I came in as a product manager.  Senior --
13  senior product manager.
14  Q.  And can you tell me what you did as a senior
15  product manager?
16  A.  Sure.  As a senior product manager, I was then
17  responsible for what I had created.  I was responsible
18  for life cycle support of the local resale business,
19  initially.
20  Q.  And can you tell us what you mean by life
21  cycle support for the resale business?
22  A.  Just to make sure that sales was selling what
23  they should be selling, to provide any updated training
24  that was required in the field for salespeople, and to
25  monitor results.

5 (Pages 14 to 17)

Exhibit A

JAMES RENFORTH      VOLUME I      NOVEMBER 17, 2006

Page 18

1    Q.   Now, you had mentioned that you had assembled
2  a team regarding local resale.  Can you tell us a little
3  bit about that team?
4    A.   Sure.  That team was comprised of several unit
5  representatives within the company.  We had
6  representatives from the billing department, a
7  representative from sales.  We had a representative from
8  the product marketing department, product management,
9  the service department, and customer operations.
10   Q.   And you were in which department, Mr.
11 Renforth?
12   A.   Well, I was assigned under product management.
13   Q.   And tell me what this team did with respect to
14 local resale.
15   A.   They did the actual legwork with regard to
16 downloading reports from the billing system, identifying
17 the products that were being resold, and then the next
18 step would be -- was to identify the products that we
19 should be reselling.
20   Q.   And did these teams -- or did the team members
21 meet?
22   A.   Oh, yes.
23   Q.   And for local resale, about how many times did
24 they meet, if you recall?
25   A.   At least once a week.

Page 19

1    Q.   And do you know if minutes were kept of these
2  team meetings?
3    A.   Absolutely.
4    Q.   And what were done with these minutes, were
5  they distributed to anyone?
6    A.   Yes, minutes were distributed to each of the
7  members.
8    Q.   Each of the members of the team?
9    A.   Each of the team members.  Each of their
10 immediate supervisors, those respective directors, and
11 the executive staff.
12   Q.   And were all team minutes distributed to these
13 people?
14   A.   Yes.
15   Q.   And do you recall how they were distributed?
16   A.   Yeah.  They were both -- they were distributed
17 both soft copy and hard copy.
18   Q.   And when you say soft copy, do you mean, for
19 example, e-mail, or --
20   A.   E-mail, with the document attached.  And then
21 hard copies through intercompany mail.
22   Q.   Okay.  So let's jump back to when you were
23 retained by Intermedia or brought on full time.  What
24 happened when you were retained full time?  What were
25 you charged to do?

Page 20

1    A.   Life cycle support for the local resale
2  business initially.
3    Q.   And for about how long was that?
4    A.   That was about four months.
5    Q.   Um-hum (affirmative).  And then what happened
6  next?
7    A.   Then right before Thanksgiving that same year
8  --
9    Q.   And that year would be?
10   A.   That was '98.
11        My immediate supervisor and our director and
12 myself met at a lunch meeting.  And my director during
13 that meeting gave me a new responsibility.
14   Q.   Um-hum (affirmative).
15   A.   And that was to develop a local line-side
16 service product.  And when I say line side, prior to
17 that, the only -- well, not the only, but the two major
18 products and service that Intermedia sold were the local
19 resale and a product called single T.  Single T was
20 targeted towards larger P.B.X. business customers, and
21 provided trunk-side services.
22        Intermedia had an imbedded -- an imbedded base
23 of Northern Telecom central office switches around the
24 country that also had the capability to provide
25 line-side services, and that being for residential or

Page 21

1  smaller business customers that used key systems.
2        Key systems were targeted at that time for
3  customers that had, oh, typically from one to -- ten
4  lines for business lines.  But that capability was not
5  being used anywhere in the company.
6        So at that meeting, our director asked me to
7  develop a new line-side service product for the smaller
8  and midsized business customers.
9    Q.   And when you say smaller and midsized business
10 customers, about how large would those be?
11   A.   Typically, from 20 to a hundred employees, and
12 five to ten lines, business lines.
13        That was a market segment that Intermedia had
14 never been able to access before.
15   Q.   And so what happened at this meeting in
16 November '98 to create a product to target these smaller
17 and midsized business customers?  What do you do after
18 that meeting?
19   A.   Put the team back together.  Same members as
20 described before.
21   Q.   And what happened after you put the team
22 together?
23   A.   Well, that was after the holidays.  We came
24 back after Thanksgiving, put that team back together.  A
25 lot of the representatives were the same.  We had

6  (Pages 18 to 21)

ESQUIRE DEPOSITION SERVICES, LLC - CHICAGO
312.782.8087   800.708.8087   FAX: 312.704.4950

b0c218e2-9fb7-469b-8cdf-a85... A-03501

JAMES RENFORTH          VOLUME I          NOVEMBER 17, 2006

Page 22

1   billing represented, customer service, customer
2   operations, switching, sales, sales support, product
3   marketing. Regulatory was then brought in, because we
4   were creating a new product, and it would have to be
5   tariffed.
6          Our director then took that -- took that idea
7   to the executive committee, presented what we had --
8   what we were planning to do with regard to putting this
9   new product together. They got terrific buy-in, all the
10  way from the C.E.O. through all the -- all the executive
11  staff. There was tremendous dedication given to
12  developing that product and launching that product.
13         Our team -- the team that we assembled met
14  nearly every day for about the first month and a half.
15         Q. And when you say there was tremendous dedicate
16  -- well, let me back up.
17         What did this product -- what was the name of
18  this product that it eventually became?
19         A. It became Unified Voice.
20         Q. And for Unified Voice, you said that there was
21  tremendous dedication by the team. What kinds of things
22  did the team do specifically to try to get this product
23  launched?
24         A. Well, we had to design the product first, what
25  was it going to do, who was it going to be targeted to.

Page 23

1   We had to identify what the market was that we were
2   going to sell into. We had to bring human resources
3   training department in to put together training
4   curriculum for the sales force and for customer service
5   and switching service.
6          We had to allocate funds, certainly, from --
7   from the company to do this work. And when I say
8   dedication, I mean people worked around the clock on
9   this, seven days a week at times. And the product was
10  launched in 62 days.
11         Q. That seems like it's pretty fast.
12         A. Real fast. Typically in the industry for that
13  time, life cycle for the product -- for the launch of a
14  new product was anywhere upwards to three years.
15         But the company was small enough that we could
16  move quickly. So 62 days from that meeting in November
17  of '98, the product was launched.
18         Q. Now, you talked about steps that the team
19  took, for example, the product had to be designed. What
20  went into the product -- designing the product?
21         A. One of the things that we did was to --
22  product marketing contacted a -- a market analysis
23  company in Long Beach, California.
24         And one of the things we did was set up focus
25  groups, customer focus groups. We did that in five

Page 24

1   cities around the country, where we brought prospective
2   market segment customers in to identify are we making
3   something that you really want.
4          Q. And in what cities were the focus groups
5   conducted, if you recall?
6          A. They were Boston, Charlotte, Chicago, New
7   York, and Raleigh.
8          Q. And can you tell me a little bit more how the
9   focus groups were conducted?
10         A. Sure. It was fun. We had -- the company that
11  we hired for out of California -- out of Long Beach was
12  the facilitator.
13         Product marketing and product management put
14  together a list of questions and specific scenarios with
15  regard to size, and features, and functionality that we
16  asked the customers are these items important to you, or
17  based upon a range from one to ten, which are most
18  important to you.
19         And we invited companies from all over the
20  spectrum. I mean, mom-and-pop pizza places. We had
21  Fortune 500 and Fortune 200 people in those groups. And
22  those groups ranged anywhere from 15 to 20 attendees in
23  each session.
24         And we performed these in areas that provided
25  an isolated space for Intermedia people to be behind the

Page 25

1   one-way mirrors to take notes and watch what was going
2   on and just to learn from that. And it was a -- it was
3   a great experience in actually asking our customers what
4   would you like to have.
5          Q. And did you ever help determine or create any
6   questions for the focus groups?
7          A. Oh, sure. With regard to features and
8   functionality. Since I was the product manager
9   designing the product, we had to know what kinds of
10  things would you like for us to be able to do, other
11  than just being able to get dial tone and make calls.
12         Q. And what kind of things and features and
13  functionality did you see that people were interested
14  in?
15         A. For the Unified Voice product, they just
16  wanted -- they wanted basic custom calling features
17  along with being able to get dial tone and make calls,
18  and those being voicemail, call waiting, three-way
19  calling, call forwarding, transfer.
20         Q. And were the results of the focus groups
21  documented?
22         A. Yes.
23         Q. In addition to conducting the focus groups,
24  what else were your responsibilities in terms of
25  designing the product?

7  (Pages 22 to 25)

b0c218e2-9fb7-469b-8cdf-a897610739b2

A-03502

JAMES RENFORTH        VOLUME I        NOVEMBER 17, 2006

---

**Page 26**

1    A.  Well, certainly working with product marketing
2  to identify what is our target market, where do we sell
3  this and who do we sell it to.  And also identifying
4  what do we charge for it.
5    Q.  And how was it determined what was a target
6  market?
7    A.  Product marketing led that effort with regard
8  to where we were going to sell it, who we were going to
9  sell it to.
10       And that department actually assembled the
11  data based on market demographics and research
12  information that they had, and then made the
13  recommendations to product marketing -- or to product
14  management and to -- with input from sales, of course,
15  as to where we would sell it initially.
16       Ultimately, it was going to be ubiquitously
17  available across the United States in all of the large
18  metropolitan areas where Intermedia had a switch.
19    Q.  And when you say where Intermedia had a
20  switch, what do you mean?
21    A.  Well, if you think about your -- your line
22  here or at home, when you pick it up, you get a dial
23  tone.  And that dial tone comes from a central office.
24       Well, when I mean Intermedia had a switch, I
25  mean they had a central office in 54, 55 cities around

---

**Page 27**

1  the country.
2    Q.  Now, in terms of designing this Unified Voice
3  product, were each of the steps in designing the product
4  documented?
5    A.  Yes.
6    Q.  And how were they documented?
7    A.  In minutes.  And not only minutes, but we also
8  had -- the team had a project coordinator assigned to
9  keep track of everything, all of the meeting minutes,
10  each department's responsibility, who that key person
11  was on the team that represented the particular
12  department, put timelines and milestones together that
13  were to be met during that launch period.
14       And that was documented in Microsoft Projects.
15    Q.  And were these documents distributed among the
16  team members?
17    A.  Yes.
18    Q.  And again, that would have been hard copy and
19  soft copy?
20    A.  Hard copy and soft copy.
21    Q.  Were there any forecasts or financial analysis
22  created in the launch of Unified Voice?
23    A.  Sure, there were.  We had a lot of detail that
24  came in from product marketing with regard to forecasts,
25  based upon, again, where we were going to take it, who

---

**Page 28**

1  we were going to sell it to, and how much we were going
2  to charge for it, and what the -- well, what the costs
3  were going to be to Intermedia.
4    Q.  And again, this was all documented?
5    A.  That was documented.
6    Q.  Were there any Excel spreadsheets as well?
7    A.  Yes, Excel spreadsheets, Microsoft Projects,
8  Word documents.
9    Q.  What was the culture at Intermedia in terms of
10  documenting a launch of a product such as this?
11    A.  Not only just the launch of this product, the
12  culture was -- it was document, document, document.
13  Paper trail was extremely high profile at Intermedia.
14    Q.  So was it safe to say that basically every
15  step you took in the launch of a new product would have
16  been documented by Intermedia?
17    A.  Yes.
18    Q.  And would this have been done, this
19  documenting each of the steps, would that have been done
20  for every launch of a new product?
21    A.  Oh, absolutely.
22    Q.  Sir, you talked about there were four steps in
23  bringing Unified Voice to market, and that was to design
24  the product, to target the market, and then the third
25  one you mentioned was training.  Can you talk a little

---

**Page 29**

1  bit about training?
2    A.  Yes.  Product management and human resources
3  training department took the lead on developing the
4  product description and providing a final document that
5  would become the training curriculum for sales and
6  customer service.
7    Q.  And again, was this all documented?
8    A.  Oh, yeah.
9    Q.  And I think the fourth step you mentioned was
10  allocating funds from the company?  Is that budgeting?
11  What do you mean by that?
12    A.  Budgeting.  We had -- certainly, there was
13  operating capital that the company operated on and
14  functioned on.  And there had to be funds dedicated to
15  pay salaries, pay expenses, pay for material creation,
16  sales collateral, public relations, bulletins, internal
17  and external.
18       Dollars had to be allocated and earmarked for
19  that launch.
20    Q.  So this wasn't something that was simply done
21  in isolation.  It seems to me it would impact a whole
22  host of areas within the company.
23    A.  Yes, impacted the entire company.
24    Q.  And how successful was Unified Voice?
25    A.  Very.

8 (Pages 26 to 29)

b0c218e2-9fb7-469b-8cdf-a89a6af75603

JAMES RENFORTH     VOLUME I     NOVEMBER 17, 2006

Page 30

1    Q.   What were the estimated revenues from Unified
2  Voice for the first year?
3    A.   First year, the revenues for the company
4  increased from -- I believe it was 65 million to over a
5  hundred and -- over a hundred million.
6    Q.   So people must have liked this product?
7    A.   Yes.
8    Q.   And when you joined Intermedia, do you
9  remember approximately how many employees there were?
10   A.   I think about 3,000.
11   Q.   And how would you compare your experience
12  between G.T.E. and Intermedia?  How would you compare
13  those two?
14   A.   G.T.E. was great.  I mean, it was a terrific
15  experience, a terrific career.  Intermedia was exciting.
16  A little different than G.T.E., because it felt like
17  G.T.E. probably would have been 20 years earlier,
18  because it was smaller, had a lot of excitement,
19  individual activity.
20        Not that that didn't exist, but it was just --
21  it was just a different culture.  It wasn't as fast
22  paced.  Intermedia was -- it was a little faster paced.
23  Decisions could be made very, very quickly.  We could
24  change direction of the company quite rapidly because it
25  was so -- it was so much smaller.

Page 31

1    Q.   So how often would the Unified Voice team
2  meet?
3    A.   For the first month and a half or so, it was
4  nearly every day.
5    Q.   And were minutes taken?
6    A.   Yes.
7    Q.   And about how long would these meetings be
8  every day?
9    A.   About an hour.
10   Q.   And --
11   A.   First thing in the morning.
12   Q.   Bright and early.
13   A.   Bright and early.
14   Q.   And the minutes were then distributed to team
15  members?
16   A.   Just -- not just team members.  They were
17  distributed to the same distribution list that I
18  mentioned before; team members, their immediate
19  supervisors, directors, and executive staff.
20   Q.   And when you say executive staff, does that
21  include Dave Ruberg?
22   A.   Yes.
23   Q.   And what was Dave's title at Intermedia?
24        MR. IBA:  Asked and answered.
25   A.   C.E.O.

Page 32

1  BY MS. MURCH:
2    Q.   How many markets were -- was Unified Voice
3  going to be put in?
4    A.   All 50-some.  54, 55.
5    Q.   Now, were there any reports after the -- let
6  me back up.  You said that there were 62 -- this product
7  was launched in 62 days.  After the launch, were any
8  reports made with respect to the Unified Voice product?
9    A.   Sure.  Business analysis did monthly reports
10  on product performance, net gain for customers, new
11  customers brought on.
12   Q.   Any kind of monthly revenue reports?
13   A.   And the revenue reports, certainly.
14   Q.   Let's talk a little bit in general about the
15  development of new products overall.  How is it that, at
16  Intermedia, a new product would be developed?  And I
17  mean how did you determine if there was a need or what
18  direction Intermedia was going?
19        Did you learn that from sales staff?  What --
20   A.   Actually, two fronts -- well, three, really.
21  Product marketing certainly did the -- the demographics
22  and the -- the market research.  And let me -- let me
23  preface that with saying Intermedia was a market-driven
24  company, rather than being product driven.
25        So, in other words, the company didn't just

Page 33

1  design something and then try to force feed the public
2  with it.  We actually designed our products based on the
3  market.  So it was a market-driven company.
4        So the -- the design of new products actually
5  rested on the shoulders of three or four departments;
6  product marketing, product management, sales, and then
7  certainly switching services, is it something we can do.
8  It had to be available.
9    Q.   So would it be something that, for example,
10  your sales force would be out there and they would have
11  customers say, "We would like X, Y feature," and then
12  they would come back to you or -- and say this is a
13  trend we are seeing?
14        Or is it something you -- you would research
15  and say, "Boy, the market seems to be wanting this?"  Or
16  --
17   A.   Actually, both.  Yeah, sales would come in
18  with requests from customers for what was called then a
19  special assembly process where it was a little bit
20  outside what was in the box for them.
21        If they wanted a -- a capability or feature
22  that wasn't part of the standard offering, then they
23  would come to product management and request some
24  special pricing, and to determine is it something that
25  we can do.

9  (Pages 30 to 33)

JAMES RENFORTH       VOLUME I       NOVEMBER 17, 2006

Page 38

1  Voice?  What were you -- what were your responsibilities
2  after that?
3      A.  Again, life cycle support.  And being the
4  product manager, part of the product manager's
5  responsibility is to add services and -- and -- vertical
6  services and enhancements to an existing product set.
7  Which led us to the next iteration of Unified Voice,
8  which was to add high-speed internet access to it.
9      Q.  To Unified Voice?
10     A.  To Unified Voice.
11     Q.  And what was that product called?
12     A.  That product was called Unified Voice Dot Net,
13  after the internet component was added to it.
14     Q.  And do you remember about what time frame
15  Unified Voice Dot Net was created?
16     A.  Oh, gosh, that was --
17     Q.  If you don't remember, that's okay.
18     A.  I think it was mid 1999.
19     Q.  And why was it that internet access was added?
20     A.  Customer demand.  Customer desire.
21     Q.  And was a team assembled, then, for the
22  creation of Unified Voice Dot Net?
23     A.  It was, but it was not nearly as demanding as
24  the initial launch, because not every department really
25  needed to be involved in developing it.

Page 39

1           Because we pretty much knew what internet was.
2  And we had the capability to do it, we just needed to
3  create the -- the billing system information, do a
4  little updated training for sales, and operations, and
5  customer service, price it and tariff it, and assign
6  someone responsible for it.
7      Q.  And so Unified Voice Dot Net was basically
8  Unified Voice, the same thing, but just adding internet
9  service?
10     A.  Exactly.
11     Q.  Okay.  And what came after the Unified Voice
12  Dot Net product?
13     A.  Ah.  After the Unified Voice Dot Net product
14  came -- well, it ultimately became IntermediaOne.
15     Q.  And can you tell me how IntermediaOne came
16  about?
17     A.  Yeah, that was exciting, too.
18          We had research from market -- product
19  marketing and from product management that identified a
20  new vertical service that the market was seeing that was
21  being received extremely well, it was called Unified
22  Messaging.
23     Q.  And when was this about, kind of the inception
24  of IntermediaOne?
25     A.  The inception of IntermediaOne was -- in a

Page 40

1  nutshell was bringing the Unified Messaging service onto
2  the Unified Voice Dot Net platform.
3      Q.  And would this have been sometime in 2000?
4      A.  It was -- yes, that was in 2000.
5      Q.  And how was it Intermedia came to learn about
6  this Unified Messaging component?
7      A.  Actually, it came from two directions; one
8  internally, one externally.  And when I say that, I mean
9  it had caught our eye in product management because it
10  had been appearing in -- in trade journals, business
11  industry magazines, publications.
12          And I as a product manager started looking at
13  Unified Messaging, and had put out a few feelers,
14  looking for someone that could provide that service,
15  rather than us building it, because it was already being
16  built, we just needed to find somebody that could do it.
17     Q.  Um-hum (affirmative).
18     A.  And about that same time, we had -- we got a
19  call -- actually, I got a -- one of these lovely little
20  sticky notes handed to me that had said, "You need to
21  call these guys."  That's what the note said.
22          And it was a note -- the note came from Dave
23  Ruberg's office through my director to my supervisor to
24  me.  And it was a Unified Messaging provider.  The
25  company's name was EffectNet.

Page 41

1      Q.  And what happened after you got that little
2  sticky post-it?
3      A.  Well, there was a flurry -- flurry of
4  activity.
5          But at that time, there was one other company
6  that I had weeded through and kept to make contact with.
7  And EffectNet and this other company were the only two
8  that were really in the running.
9          I made the phone call to EffectNet, and I
10  think the -- Jay Jessup was the gentleman I had the name
11  and phone number for that came from Dave Ruberg's office
12  that said, "You need to call these guys."
13          So I called Jay Jessup, explained what we
14  were, who Intermedia was, what we were looking to do.
15  This was -- and I remember distinctly because it was so
16  unique in the industry.
17          At that time, again, remember, the industry
18  being huge, it moves like a battleship.  I mean, it's so
19  slow.  But Intermedia being able to move quickly.  And
20  it was unique to see another company that moved as
21  quickly.
22          The conversation I remember took place on a
23  Tuesday.  And I had, in talking to Jay Jessup, I
24  described what we were thinking of doing, had a little
25  bit of an idea what EffectNet could provide, and I asked

ESQUIRE DEPOSITION SERVICES, LLC - CHICAGO
312.782.8087   800.708.8087   FAX: 312.704.4950

JAMES RENFORTH      VOLUME I      NOVEMBER 17, 2006

Page 42

1  him how soon can we get together.
2          He said, "We'll be there Thursday."
3      Q.  And can you tell me when you say Unified
4  Messaging what you mean?
5      A.  Yes.  Unified Messaging at that time was the
6  capability to access all of your messaging information,
7  I mean voicemail, e-mail, faxes, via a touchtone
8  telephone.  It had the capability, the system had the
9  capability to do text-to-voice translations.
10         One of the things that we had gotten from our
11  customer base was I need to be -- I need to be able to
12  access my messaging, I need to be able to access
13  voicemail, e-mail, and faxes from other than in my
14  office, because I'm not there, I'm out, I'm traveling,
15  I'm in the airport, I can't get my e-mail, I know there
16  is an important e-mail in there for me, I can't get to
17  it.
18         Well, Unified Messaging has -- has that
19  service -- inherent with that service, one of the
20  capabilities was to be able to access all of that
21  messaging information, translate it from text to voice,
22  and have your e-mails read to you over the phone.
23         Then you could not only respond to that e-mail
24  with a voice message attached back to an e-mail message
25  as a wav file for the sender to receive, but you could

Page 43

1  also forward it, you could save it, you could have faxes
2  read to you over the phone.
3          So it was a -- it was an incredible asset to
4  our -- to our product set.
5      Q.  And what did you think of Unified Messaging at
6  the time, your overall impression?
7      A.  Cutting edge.  It was expected to be a huge
8  business.  Market analysis at that time calculated a 16
9  billion dollar business.
10     Q.  And did Intermedia conduct business analysis
11  regarding Unified Messaging and its profitability?
12     A.  Yes.
13     Q.  Now, I'm just going to back up a second.  You
14  said you talked to someone from EffectNet on a Tuesday,
15  and they came out on a Thursday.
16     A.  Right.
17     Q.  So what happened on that Thursday?
18     A.  That Thursday, we had -- I got my team
19  together.  My team included at that time my -- my peers
20  in product management, because it encompassed other than
21  just the -- the Unified Voice product, in fact, the
22  Unified Voice Dot Net.
23         So it was my peers, our supervisor, and I
24  think there were two -- two members from EffectNet that
25  were in that meeting.  They brought PowerPoint

Page 44

1  presentations and product description information, more
2  detailed than what I had had at that time.
3          And in that meeting, we decided, "we",
4  Intermedia decided to move forward with negotiations
5  with EffectNet.
6      Q.  And what exactly happened at that meeting?
7      A.  Well, we saw a terrific presentation that
8  described what we envisioned as being a great product to
9  add to our Unified Voice Dot Net service.  And we saw a
10  team of people that was as dedicated as we were and
11  responsive to -- to our needs.
12     Q.  And do you know if there were profitability
13  studies conducted regarding Unified Messaging at
14  Intermedia?
15     A.  Yes.
16     Q.  So let's talk about the decision to go with
17  EffectNet and offer a Unified Messaging product.  That
18  addition of Unified Messaging to Unified Voice Dot Net
19  eventually became IntermediaOne?
20     A.  Became IntermediaOne.
21     Q.  So can you walk me through the systems for the
22  launch for that product?
23     A.  The launch was -- it was -- it was very
24  exciting to launch.  It wasn't as demanding as
25  developing a brand new product, like Unified Voice was,

Page 45

1  because we already had the -- the basic framework in
2  place.
3          But the Unified Voice -- I mean the Unified
4  Messaging component of IntermediaOne -- of what became
5  IntermediaOne created a lot of excitement, again, in the
6  company.
7          IntermediaOne, based upon its capabilities,
8  Intermedia became the -- largest CLEC in the United
9  States that was able to provide that combined service,
10  that integrated service.
11         Dave Ruberg, our C.E.O., dubbed IntermediaOne
12  our flagship product.
13     Q.  So was the IntermediaOne product important to
14  Intermedia's revenues?
15     A.  Tremendously.
16     Q.  You said there was a lot of excitement about
17  the IntermediaOne product.  What do you mean by
18  excitement?
19     A.  Oh, yeah.  Because this was something that the
20  salespeople had brought in to us.  So they were
21  tremendous -- they were behind it a hundred percent.
22         Because one of the things they had told us
23  from the customers was I need to be able to get access
24  to our messaging.  I can't do it, I'm in the airport.
25  You know, there was no wi-fi in those days, no hot --

12 (Pages 42 to 45)

b0c218e2-9fb7-469b-8cdf-a85a570d5506

A-70506

JAMES RENFORTH        VOLUME I        NOVEMBER 17, 2006

**Page 46**

1 you know, or very few hot spots. So you had -- you just
2 couldn't get that -- the access to that information
3 while you were a business traveler.
4      So we were satisfying a need sales saw. We
5 were satisfying an opportunity product marketing saw
6 that was going to be a tremendous business opportunity,
7 16 billion dollars. So Intermedia saw an opportunity to
8 make a lot of money with that product.
9      Q. And do you know if there was any marketing
10 analysis?
11     A. Yeah. Yeah, there was. And we had -- and
12 that was done, again, by product marketing. We didn't
13 see a lot of the detail in the background information,
14 but we just saw pretty much a flag go up, say, "Yeah,
15 the market wants it, and here's what -- here's what it
16 can bear with regard to pricing."
17     Q. And would you describe Intermedia as being
18 thorough in terms of its investigation of a new product
19 launch?
20     A. Yes.
21     Q. And why would you say it would be thorough?
22     A. Thorough because we didn't -- we didn't make a
23 move, the company didn't make a move on launching any
24 product without all of the I's being dotted, all of the
25 T's being crossed, document, document, document, the

**Page 47**

1 analysis being done, and approval from the executive
2 staff to go forward.
3      Q. And how was IntermediaOne viewed with respect
4 to Intermedia's strategic plan going forward?
5      MR. IBA: Objection, foundation.
6 BY MS. MURCH:
7      Q. Let me back up. You testified earlier that
8 Intermedia was, I'll paraphrase, extremely important to
9 Intermedia's revenues. How was it viewed within
10 Intermedia this IntermediaOne product going forward?
11     MR. IBA: Objection, foundation.
12 BY MS. MURCH:
13     Q. You can answer.
14     A. IntermediaOne, again, Dave Ruberg called it
15 our flagship product. So that message coming personally
16 from our C.E.O., that led every employee in the company
17 to believe we need to focus on making this successful.
18     Q. And -- and how did people try to make this
19 product as successful as possible?
20     A. Well, the -- the Unified Messaging component
21 was not only added to the Unified Voice Dot Net product,
22 which became IntermediaOne.
23     The Unified Voice -- or the Unified Messaging
24 capability was also added to every other business unit
25 in the company as a standalone product that could be

**Page 48**

1 sold independently. And I say independently, I mean
2 independently from what had been Unified Voice Dot Net
3 and IntermediaOne.
4      Unified Messaging was not only part of the
5 IntermediaOne offering, it could also be sold standalone
6 to existing customers that were in the single T product
7 environment, to other business units, the Advanced
8 Business Unit, called A.B.U., that encompassed
9 multi-tenant high-rise buildings in large metropolitan
10 service areas around the country. That business unit
11 was also chartered with selling Unified Messaging.
12     The single T customer was going to be up-sold
13 Unified Messaging. And Unified Messaging as a
14 standalone product could be sold to any business,
15 anywhere.
16     Q. So if I'm understanding you correctly, in
17 addition to selling it in the 54, 55 markets where
18 Intermedia had a product, it could be sold nationwide?
19     A. Where Intermedia had a switch --
20     Q. A switch.
21     A. -- it could be sold nationwide.
22     And not just nationwide. Worldwide. Because
23 access to that functionality was based upon having a
24 touchtone phone and dialing a toll free 800 number.
25     Q. And EffectNet was the partner with Intermedia

**Page 49**

1 in assisting with that Unified Messaging?
2      A. Yes.
3      Q. How committed at that meeting that you had, I
4 believe it was on a Thursday, did EffectNet seem to
5 making the Unified Messaging a reality?
6      A. Extremely. There was -- Jay Jessup's words
7 were "We'll do whatever we have to do to make this
8 happen for you."
9      Q. And do you feel that EffectNet did that?
10     A. Yeah. Yes, I do.
11     Q. Did product marketing at Intermedia perform
12 demographic studies and due diligence regarding
13 IntermediaOne product?
14     A. Yes.
15     Q. And again, were these documented?
16     A. Yes, they were.
17     Q. And were there -- we talked a little bit
18 earlier in your deposition about team meetings, you
19 know, the team was assembled.
20     A. Um-hum (affirmative).
21     Q. Was a team assembled for IntermediaOne?
22     A. Yes, IntermediaOne, and the team was led by
23 actually our director, Jack Lee, he took the forefront
24 on that to ensure that we had representation from all
25 the departments, buy-in from all the executives.

13 (Pages 46 to 49)

JAMES RENFORTH        VOLUME I        NOVEMBER 17, 2006

Page 50

1    And when I say the executives, I mean senior
2  V.P.'s, V.P.'s, C.E.O., C.F.O., all the C level
3  officers.  And I know he had independent meetings with
4  them that our team certainly wasn't involved in, but I
5  know he -- he acquired all of the support that the
6  company needed to go forward with developing the
7  IntermediaOne product, which again, became the flagship
8  product.
9    Q.  And the team assembled included which
10  departments?
11    A.  All of those I mentioned before.
12    Q.  Um-hum (affirmative).
13    A.  Product marketing, product management, sales,
14  customer service, customer operations, switching,
15  regulatory, public relations, and -- I think I said
16  switching.
17    Q.  And were there minutes taken of the
18  IntermediaOne team meetings?
19    A.  Yes.
20    Q.  And what did you -- and were those minutes for
21  the IntermediaOne team meetings documented?
22    A.  Yes.
23    Q.  And how were they documented?
24    A.  Documented, again, in Word, Microsoft
25  Projects, Excel spreadsheets.

Page 51

1    Q.  And how did you receive copies of those
2  minutes?
3    A.  Soft and hard copies.
4    Q.  And what did you do with those copies you
5  received?
6    A.  I had two repositories -- actually, three.  We
7  had a shared drive on a company server.  I had soft
8  copies in folders on my hard drive.  And then hard
9  copies in file drawers in my office.
10    Q.  And do you remember the name or the letter of
11  the shared drive at IntermediaOne where the
12  IntermediaOne information was stored?
13    A.  Yeah.
14    Q.  And that was which drive?
15    A.  It was K.  I hadn't thought of that in years.
16    Q.  And so you said you had information on the
17  shared drive.  So would any -- would financial or any
18  other information regarding the IntermediaOne product
19  have been put on the shared drive at Intermedia?
20    A.  Yes.
21    Q.  So in addition to you, there were other users
22  who would put information on that shared drive?
23    A.  That's correct.
24    Q.  And you said you also had electronic
25  documents?

Page 52

1    A.  That's right.
2    Q.  And where did you keep those electronic
3  documents, Mr. --
4    A.  On my hard drive.
5    Q.  Would that include e-mail, Mr. Renforth?
6    A.  Yes, ma'am.
7    Q.  And did you ever delete any of these documents
8  off of your hard drive?
9    A.  Only really old e-mail messages.  And I say
10  old, 1990 -- 1998, early 1998, as a -- as a prompt from
11  our I.T. folks saying, "Hey, you've got too much stuff.
12  You need to get rid of some of it."
13    Q.  And so the old e-mail messages -- the only
14  thing you got off -- deleted from your hard drive is old
15  e-mail messages from 1997 and 1998?
16    A.  19 --
17    MR. IBA:  Objection, misstates the testimony.
18  BY MS. MURCH:
19    Q.  Can you tell me, was there anything else you
20  deleted off your hard drive besides certain e-mails?
21    A.  No.
22    Q.  And when were those e-mails deleted off --
23  from what time period did those e-mails come?
24    A.  Probably first few months of 1998.
25    Q.  Did you ever delete any of the documents

Page 53

1  related to IntermediaOne off your hard drive?
2    A.  No.
3    Q.  And you --
4    A.  And let me back up.  The e-mails weren't
5  deleted.  They were removed and saved to floppies.
6    Q.  So there was always a copy of the e-mails you
7  had?
8    A.  Oh, yeah.
9    Q.  And what happened to those floppies?
10    A.  They were in my desk.
11    Q.  So is it safe to say that during your time at
12  IntermediaOne, you always kept records of every
13  electronic e-mail and document you had, whether it was
14  on your hard drive or on floppy?
15    A.  Yes.
16    Q.  Did other people at Intermedia embrace kind of
17  the same policy you had of saving all of this
18  information?
19    MR. IBA:  Objection, foundation.
20  BY MS. MURCH:
21    Q.  You can answer.
22    A.  I -- yes.  I think because of the culture of
23  the company.
24    Q.  And you also mentioned that you had hard copy
25  documents relating to the IntermediaOne product?

14  (Pages 50 to 53)

b0c218e2-9fb7-469b-8cdf-a89f6d42a5b8

JAMES RENFORTH      VOLUME I      NOVEMBER 17, 2006

| Page 54 | Page 56 |
|---|---|
| 1    A.  That's correct.<br>2    Q.  And where were those stored, Mr. Renforth?<br>3    A.  In a file drawer in my drawer -- in my office.<br>4    Q.  And were these file drawers relate -- somehow<br>5  labeled?<br>6    A.  The folders in the drawers were.<br>7    Q.  And so if you had -- well, let me back up.<br>8        Did you have file folders related to the<br>9  IntermediaOne product?<br>10   A.  Sure.<br>11   Q.  And were these folders labeled?<br>12   A.  Yes.<br>13   Q.  And how were they labeled?<br>14   A.  Well, there were several -- several hanging<br>15  folders, because of the amount, that were labeled<br>16  IntermediaOne, and then manila folders inside those<br>17  hanging folders with specific labels with regard to<br>18  content, such as "product description", "training,"<br>19  "forecasts", "reports".<br>20   Q.  So you kept a hard copy of the reports and<br>21  forecasts for the IntermediaOne product?<br>22   A.  Yes.<br>23   Q.  And again, this was both -- I'm sorry, was on<br>24  hard copy in file -- labeled file folders in your<br>25  office, on your hard drive, and as well as on the shared | 1  IntermediaOne product and enthusiastic.  Were there<br>2  forecasts created for the usage of the IntermediaOne<br>3  product?<br>4    A.  For usage?<br>5    Q.  I'm sorry, for the number of customers or --<br>6    A.  Oh, yes.  For the number of customers, yeah.<br>7    Q.  And what kind of forecasts were created?<br>8    A.  Two that I was familiar with.  And there were<br>9  others, again with the other business units, A.B.N. and<br>10  standalone.<br>11       We had a forecast from product marketing that<br>12  identified the objective for -- or the -- the estimate<br>13  for new customers and existing customers.<br>14   Q.  And can you tell me about the forecasts for<br>15  new customers?<br>16   A.  New customers, sure.  We had, from product<br>17  marketing, that identified an estimate of 300 plus,<br>18  excuse me, new customers a month.  Each of those new<br>19  customers was estimated to have 100 employees, and<br>20  conservatively, to be equipped with five Unified<br>21  Messaging mailboxes for each customer.<br>22   Q.  So about how many mailboxes would that have<br>23  been per month?<br>24   A.  About -- between 15 and 16,000 -- no.<br>25   Q.  1500? |

| Page 55 | Page 57 |
|---|---|
| 1  drive in Intermedia?<br>2    A.  That's correct.<br>3    Q.  Mr. Renforth, we've been going about an hour,<br>4  so I'm going to take a little five- or ten-minute break,<br>5  if that's okay with you.<br>6    A.  Works for me.<br>7    Q.  Let you get a cup of coffee.<br>8        THE VIDEOGRAPHER:  Going off the record at<br>9    10:45.<br>10       (Recess.)<br>11       THE VIDEOGRAPHER:  This is tape number two of<br>12   the continued videotaped deposition of James<br>13   Renforth.  We're back on the record at 10:58.<br>14  BY MS. MURCH:<br>15   Q.  Okay.  Mr. Renforth, we were talking about,<br>16  earlier in your deposition, that you had stored<br>17  information on the shared K drive, the hard drive, and<br>18  you also had hard copies.<br>19       Would that information that you kept on the<br>20  shared K drive, the Intermedia -- on your personal hard<br>21  drive, and the hard copies regarding the IntermediaOne<br>22  product include information regarding Unified Messaging?<br>23   A.  Yes.<br>24   Q.  I'm going to talk about -- you had mentioned<br>25  that everyone at Intermedia was very excited about the | 1    A.  Yeah, 15 to 1600.<br>2    Q.  And then we would multiply that by 12 months?<br>3    A.  Yes.<br>4    Q.  Okay.<br>5    A.  The other forecast was for existing customers,<br>6  both Unified Voice Dot Net, which ultimately became<br>7  IntermediaOne, and single T customers.  There were<br>8  approximately 12,000 existing customers that could be<br>9  up-sold.  And that estimate was at ten percent, which<br>10  would have been 1200 customers.  And again, we used the<br>11  five mailbox figure.<br>12       So in addition to the 15 to 1600, we were<br>13  talking about adding about 6,000 a month to that base.<br>14   Q.  So if I understand the forecast correctly, the<br>15  new customers would be about -- you said there were<br>16  about 15 to 16 hundred a month.  That would be at a<br>17  minimum about 18,000 mailboxes for the first year?<br>18   A.  For the first year.<br>19   Q.  And then for the existing customers, you said<br>20  about 6,000 a month was being --<br>21   A.  A month.<br>22   Q.  To the base.<br>23       So 6,000 times 12, plus the 18,000 that you<br>24  had mentioned?<br>25   A.  That's correct. |

15 (Pages 54 to 57)

b0c218e2-9fb7-469b-8cdf-a85... A-03509

JAMES RENFORTH         VOLUME I         NOVEMBER 17, 2006

Page 58

1    Q.  And the forecasts you had seen, were they for
2  three years?  Or were they for just one year?  Projected
3  out.
4    A.  Three years.  With incremental growth monthly.
5    Q.  And what do you mean by incremental growth
6  monthly?
7    A.  Well, the -- the 1500 to 1600 plus the 6,000 a
8  month.
9    Q.  Um-hum (affirmative).
10   A.  Cumulative, cumulated over the three-year
11 period.
12   Q.  So IntermediaOne -- or Intermedia didn't
13 expect those numbers to remain stagnant?
14   A.  No, absolutely not.
15   Q.  And did IntermediaOne -- or, I'm sorry,
16 Intermedia continue to expect those numbers to grow year
17 after year?
18   A.  Yes.  Yes.  In fact, I might add that those --
19 the numbers were very conservative in these estimates.
20 Because if you think about having a sales force of 600
21 plus people, 600 salespeople, and targeting 300 new
22 accounts a month, that's only selling a half a deal a
23 month.
24   Q.  And do you know if whoever created those
25 forecasts factored in this sales force of 600?

Page 59

1    A.  No, I don't think they did.  No.  I'm sure
2  they didn't.
3    Q.  And do you know if there were any quotas for
4  sales staff?
5    A.  There were.
6    Q.  So sales staff did have to sell a certain
7  amount of IntermediaOne product?
8    A.  Yes.
9    Q.  And do you know if they received commissions
10 for IntermediaOne product?
11   A.  Yes, they did.  In fact, the commission was
12 structured so that they would be -- and, you know,
13 salespeople sell what they get paid for.
14      So IntermediaOne, with the Unified Messaging
15 component, was targeted in a very lucrative commission
16 base that would incent the salespeople, here is what I'm
17 going to sell because this is what I make money on.
18   Q.  Do you think that Intermedia was generally
19 conservative in its forecasts for new launches?
20   A.  Yes, I do.
21   Q.  And in terms of, for example, the Unified
22 Voice Dot Net, you had talked about the revenue base
23 jumped from, I may not quite have the numbers right,
24 approximately 65 million to over a hundred million?
25   A.  Um-hum (affirmative).  That's correct.

Page 60

1    Q.  And so then again, as exemplified by the
2  Unified Voice product, that also exceeded expectations?
3    A.  The Unified Messaging --
4      MR. IBA:  Objection, mischaracterizes
5    testimony, assumes facts not in evidence.
6  BY MS. MURCH:
7    Q.  Mr. Renforth, I'm going to back up.
8    A.  Okay.
9    Q.  And if you can explain to me how Unified
10 Voice, that product, exceeded expectations.
11   A.  The Unified Voice product?
12   Q.  Um-hum (affirmative).
13   A.  Exceeded expectations exponentially.  Nearly
14 doubled the company's revenues.
15   Q.  And the Unified Voice product was basically
16 the basis for Unified Voice Dot Net, which was the basis
17 then in turn for IntermediaOne; is that fair?
18   A.  That's correct.
19   Q.  And let's talk about how many cities were
20 targeted for the launch, if you recall, for the
21 IntermediaOne product.
22   A.  For IntermediaOne?
23   Q.  Um-hum (affirmative).
24   A.  Initially, seven.
25   Q.  And do you recall which cities those were?

Page 61

1    A.  I think so.  Now, I know five of them were the
2  five that we did the customer focus groups in.
3    Q.  Okay.
4    A.  And then there were two additional ones.  The
5  additional ones were Minneapolis and Pittsburgh.
6    Q.  And just for the record, if you could recall
7  what the other five were.
8    A.  Boston, Charlotte, Chicago, New York, and
9  Raleigh.
10   Q.  And how were the other cities factored in?  I
11 know you had mentioned that IntermediaOne had 54 to 55
12 cities.  How did those factor into the launch in
13 IntermediaOne?
14   A.  They were going to be -- those cities were
15 going to be turned up for sales monthly after the
16 initial launch in those seven cities through the end of
17 2000.  So there would have been probably four to five a
18 month, new cities turned on.
19   Q.  And would the financial -- I'm sorry, the
20 forecasts, would those have been updated as the
21 additional cities were added to the launch?
22   A.  Yes, they would be.
23   Q.  And what time frame did Intermedia have for
24 adding all of the 54 to 55 cities?
25   A.  That was through the end of 2000.

16  (Pages 58 to 61)

b0c218e2-9fb7-469b-8cdf-a89f6c47731d

JAMES RENFORTH      VOLUME I      NOVEMBER 17, 2006

Page 66

1     Q.   And so to your knowledge, then, Intermedia was
2   also looking to sell Unified Messaging through its
3   Advanced Business Unit arm?
4     A.   That's exactly right.
5     Q.   And I believe you also talked about agent
6   sales --
7     A.   Agent sales.
8     Q.   -- as another area in addition to what you
9   were familiar with where this Unified Messaging would be
10  sold?
11    A.   That's right.
12    Q.   And can you tell me a little bit about that?
13    A.   Just a little bit, because I was involved just
14  briefly at the outset, and that was to go train one
15  specific agent in Boston on what the product was and how
16  to sell it.
17         And then they were going to implement it on
18  their website to sell to business customers in the
19  Boston area.
20    Q.   And who was going to provide that online sales
21  vehicle?  Do you know?
22    A.   It would be a direct electronic link from that
23  company to Intermedia's order entry system.
24    Q.   And so a customer, rather than having to deal
25  with a live person, could just go online and place an

Page 67

1   order for those Unified Messaging product?
2     A.   That's correct.
3     Q.   And do you remember the name of the company
4   that would offer that internet service with Intermedia?
5     A.   That one was called Simplicity.
6          (Knock on door.)
7          MR. JUNG:  Come in.
8   BY MS. MURCH:
9     Q.   And do you know what ever happened with
10  Simplicity?
11    A.   No.
12    Q.   Mr. Renforth, let's talk about pricing of the
13  IntermediaOne product.
14    A.   IntermediaOne or the Unified Messaging
15  component.
16    Q.   Unified Messaging component.
17    A.   Okay.
18    Q.   What can you tell me about that?
19    A.   We had three different tiers set up, based
20  upon customer's need.  And I'm not -- I don't really
21  remember the exact numbers, but I'm thinking 9.95,
22  19.95, and 24.95, something like that.
23    Q.   And how was this pricing determined?
24    A.   Based upon market -- product marketing,
25  research, what the market would bear, and Intermedia's

Page 68

1   costs, make sure we had a margin.
2     Q.   So for the 4.90 -- or, I'm sorry, the 9.95,
3   what was the approximate cost to Intermedia?
4     A.   It was around $5.
5     Q.   $5?
6          And so the gross margin would have been, what,
7   about a hundred percent?
8     A.   About a hundred percent.  And that was -- that
9   was across the board for all three tiers.
10    Q.   Now, under the Unified Communications
11  Agreement, there were two tiers of pricing, there was
12  limited service and unlimited service.  Do you know, for
13  purposes of the new mailboxes, did Intermedia assume it
14  would be unlimited service at the 27.40 price or at the
15  lower price?
16         MR. IBA:  Objection, leading, misstates, the
17  contract speaks for itself.
18  BY MS. MURCH:
19    Q.   Mr. Renforth, do you know which pricing would
20  have been used under the Unified Communications
21  Agreement?
22    A.   The -- the unlimited was used.
23    Q.   Okay.  I'm going to hand you a copy of the
24  Unified Communications Agreement, which has been marked
25  as Exhibit 2.  Here is a copy for your counsel.

Page 69

1          Mr. Renforth, I'm going to ask you to go to
2   the very last page, which is pricing.  And you'll see
3   there is a basic of 11.45 and an unlimited of 27.40.  Do
4   you see those two figures there?
5     A.   I do.
6     Q.   And so which two of these figures did
7   Intermedia assume, was it the 11.45 or the 27.40?
8     A.   27.40.
9          MR. IBA:  Objection.
10         Mr. Renforth, you need to let me assert my
11  objections first --
12         THE DEPONENT:  Oh, I'm sorry.
13         MR. IBA:  -- before you answer.
14         I'm going to object to foundation, and vague
15  and ambiguous.
16         MS. MURCH:  Okay.
17  BY MS. MURCH:
18    Q.   We'll back up, Mr. Renforth.  You see Exhibit
19  2, which is the EffectNet Unified Communications Service
20  General Agreement for Intermedia Communications, Inc.?
21    A.   Yes.
22    Q.   Have you seen this document before?
23    A.   Yes.
24    Q.   And were you involved at all in negotiating
25  this agreement?

18 (Pages 66 to 69)

A 03511

b0c218e2-9fb7-469b-8cdf-a85757176a3b

JAMES RENFORTH          VOLUME I          NOVEMBER 17, 2006

Page 74

1     A.  I left because my product was scrapped.
2     Q.  And how did you learn your product was
3  scrapped?
4     A.  Product management staff meeting April, May
5  time frame.
6     Q.  Of which year, Mr. Renforth?
7     A.  2001.
8         We had our vice president, Kathy Victory, Jack
9  Lee, our director, Cheryl Mellon, my supervisor, my
10 peers, and myself.  In that meeting, we learned that the
11 IntermediaOne product was going to be dropped, and that
12 Intermedia's focus would go back to the single T
13 product.
14    Q.  So let me get this straight.  So all of the
15 work for Unified Voice, which was transferred into
16 Unified Voice Dot Net, which was then transferred into
17 the flagship product of IntermediaOne, was being
18 scrapped?
19    A.  Yes.
20    Q.  And Intermedia was going back to the single T
21 product which it had back in 1990 --
22    A.  In the 1990's.
23    Q.  How was it determined, do you know, that the
24 IntermediaOne product was going to be scrapped?
25    A.  The reason we were given -- because several of

Page 75

1  us were very involved, as you know, and were verbally
2  upset by that news.  And when we asked why, the reason
3  that we were given from our V.P. was "The back office
4  can't keep up."
5     Q.  Did you believe that reason?
6     A.  No.
7     Q.  And what role did the executives have in
8  scrapping that product?
9     A.  I don't know.  Other than just saying we're
10 not going to sell it anymore.
11    Q.  Was there ever a -- in April, May 2001, was
12 there an executive committee decision to scrap the
13 product?
14        MR. IBA:  Objection, foundation.
15    A.  I don't know.
16 BY MS. MURCH:
17    Q.  I'm sorry?
18    A.  There had to have been.
19        MR. IBA:  Speculative.
20 BY MS. MURCH:
21    Q.  And so the product you found out in April, May
22 2000 was going to be scrapped, and you decided to leave
23 because?
24        MR. IBA:  Objection, asked and answered.
25 BY MS. MURCH:

Page 76

1     Q.  You can answer.
2     A.  I just thought my product is gone, I need to
3  get out of here.
4     Q.  What can you tell me about the merger between
5  M.C.I. and Intermedia --
6         MR. IBA:  Objection, calls --
7  BY MS. MURCH:
8     Q.  -- and your involvement?
9         MR. IBA:  It calls for a narrative answer.
10 BY MS. MURCH:
11    Q.  Mr. Renforth, did you do anything in
12 connection with the M.C.I./Intermedia merger?
13    A.  No.
14    Q.  Were you aware of the M.C.I./Intermedia
15 merger?
16    A.  I was aware that there were negotiations.
17    Q.  And what was your knowledge of those
18 negotiations?
19    A.  Initially was that M.C.I. was doing due
20 diligence or asked for due diligence from Intermedia.
21 And the word that we got as employees was their initial
22 interest was in just the Digex Properties.
23    Q.  And Digex, D-I-G- --
24    A.  D-I-G-E-X.
25    Q.  And was Digex related to the IntermediaOne

Page 77

1  product?
2     A.  They provided the transport, the -- the
3  connectability between all those cities, they provided
4  the backbone, transport facilities through digital
5  medium.
6     Q.  At the time, did you feel that the
7  M.C.I./Intermedia merger would have had an impact on
8  IntermediaOne?
9     A.  No.
10    Q.  And why not?
11    A.  Because we were a local services provider and,
12 again, their interest, what we heard from our -- from
13 our other employees was that they were interested in
14 just Digex, not the Intermedia products or services.
15    Q.  So Intermedia products and services were
16 independent of the Digex?
17    A.  Independent from the Digex Property, sure.
18    Q.  I'm just going to skip around for one quick
19 moment.  We had talked about gross margins for the
20 IntermediaOne product.  And I think you said it was
21 roughly 90 to a hundred percent?  Is that accurate?
22    A.  Unified Messaging was.
23    Q.  Yes.  Um-hum (affirmative).
24    A.  Yes.
25    Q.  And was it always geared towards 90 to a

ESQUIRE DEPOSITION SERVICES, LLC - CHICAGO
312.782.8087   800.708.8087   FAX: 312.704.4950

b0c218e2-9fb7-469b-8cdf-a89f6d48a512

A-03512

JAMES RENFORTH       VOLUME I       NOVEMBER 17, 2006

Page 82

1  manager when I left. And I gave him access to those
2  files with my I.D. and password.
3      Q. So when you left, did you throw anything away?
4      A. No.
5      Q. Did you delete anything from your hard drive
6  when you left?
7      A. No.
8      Q. Did you delete any e-mail?
9      A. No.
10     Q. Did you throw away any hard-copy documents?
11     A. No.
12     Q. So all of the information relating to
13  IntermediaOne and Unified Messaging, when you left
14  Intermedia, was kept intact by you?
15     A. Yes.
16         MS. MURCH: I'm just going to take a quick
17  five-minute break.
18         THE VIDEOGRAPHER: Going off the record at
19  11:38.
20     (Recess.)
21         THE VIDEOGRAPHER: This is tape number three
22  of the continued videotaped deposition of James
23  Renforth. We're back on the record at 11:48.
24  BY MS. MURCH:
25     Q. Now, Mr. Renforth, can you tell me when

Page 83

1  approximately your last day of employment was with
2  Intermedia?
3      A. Yes. June 27th, 2001.
4      Q. Now, do you know if Intermedia had a document
5  retention policy? A written document retention policy?
6      A. I don't remember seeing one, but I know it was
7  verbally stated throughout the company.
8      Q. And what was that verbal statement?
9      A. Document, document, document. I can hear my
10  director saying it.
11     Q. And do you know if there was a periodic
12  destruction of records by Intermedia?
13     A. Periodic destruction?
14     Q. Um-hum (affirmative). For example, was there
15  a schedule where documents would be destroyed monthly or
16  yearly?
17     A. Not that I know of.
18     Q. Do you know if other people who were working
19  on the IntermediaOne product put documents on the K
20  drive?
21     A. Yes.
22     Q. And who had access to the K drive?
23     A. The team -- the team members, their directors,
24  immediate supervisors, and the executive staff. And I
25  know they were password protected, so not just anybody

Page 84

1  could get in there.
2      Q. And do you know what departments shared the K
3  drive?
4      A. Some. That would have been product
5  management, product marketing.
6      Q. And so would all -- oh, go ahead.
7      A. And I don't know who else.
8      Q. And so would all information, say, for
9  example, related to a launch, whether it be Unified
10  Voice or IntermediaOne, would that have been stored on
11  the K drive?
12     A. Yes.
13         MS. MURCH: I don't have any other questions
14  for you right now.
15         THE DEPONENT: You're not -- you're done?
16         MS. MURCH: I -- I think so. Knock wood. I'm
17  going to turn it over to Mr. Iba.
18         THE DEPONENT: Thank you.
19         MR. JUNG: All right.
20             CROSS-EXAMINATION
21  BY MR. IBA:
22     Q. Mr. Renforth, I want to just take us back
23  quickly and talk a little bit about Intermedia as a
24  company.
25     A. Um-hum (affirmative).

Page 85

1      Q. What did Intermedia do?
2      A. Intermedia was a competitive local exchange
3  carrier, a CLEC.
4      Q. And how do CLEC's work?
5      A. CLEC's, at that time, when I joined them, they
6  resold local resale.
7      Q. So they would go to the incumbent local
8  exchange carrier, buy time on the local company's
9  facilities, and then resell that time, is that --
10     A. That, plus take ownership and responsibility
11  for specific end-user customers who had agreed to sign
12  up with that CLEC.
13         In other words, nothing would change, the
14  infrastructure would not change in the way a customer
15  was connected to the local incumbent's facilities. The
16  only thing that would change is the billing.
17         The billing from the incumbent would move from
18  billing end-user customer to billing the CLEC, then the
19  CLEC would bill the end-user customer with a seven
20  percent gross margin built in.
21     Q. So if -- I can't remember where Intermedia had
22  switches. Did they have switches down here in Florida?
23     A. Yes.
24     Q. All right. What city?
25     A. Tampa.

22  (Pages 82 to 85)

JAMES RENFORTH    VOLUME I I    NOVEMBER 17, 2006

Page 256

1   Q.   So is it fair to say IntermediaOne was an
2   evolving product with enhancements going forward?
3   A.   Yes.  Absolutely.
4   Q.   Mr. Renforth, I remember you testifying about
5   an E.D.I. transport upgrade?
6   A.   Yes.
7   Q.   Could you tell me what that is?  I don't know
8   that I followed you on that.
9   A.   E.D.I. stands for electronic data information,
10  or data interface.  That was the automated billing
11  system that we wanted to put in place between EffectNet
12  and Intermedia.  Where before I said we received both a
13  paper copy and a C.D. with the billing data.
14  Q.   Um-hum (affirmative).
15  A.   We wanted to be able to upgrade that, so we
16  had immediate and real time of day updates to the
17  system.
18  Q.   And would the E.D.I. have been part of the
19  enhancements to the IntermediaOne product?
20  A.   Yes.
21  Q.   Now, I believe earlier you testified that you
22  left Intermedia in June 2001, but based on the
23  correspondence you see today, it would have been in July
24  2001; is that accurate?
25  A.   It was -- that's correct, July 27th.

Page 257

1   Q.   Now, Mr. Renforth, I want to get back to your
2   reasons for leaving Intermedia.  You had mentioned that
3   you thought there was a meeting where it was announced,
4   and I may be wrong, so correct me, I thought it was
5   maybe the April, May 2001 time frame where there was an
6   announcement where the IntermediaOne product was going
7   to be scrapped.  And you were going to leave as a result
8   of your product being scrapped.
9        And today we've seen some correspondence that
10  talks about the IntermediaOne product that postdates
11  that.
12       Can you kind of square away your recollection
13  as to when that announcement was made where the product
14  was going to be scrapped?  Do you remember hearing that?
15  And how that kind of fits in with the -- for example,
16  the exhibits that Mr. Iba gave?
17  A.   That announcement was made to us through our
18  V.P., Kathy Victory, through our direct supervisors,
19  that the focus, Intermedia's focus was shifting back to
20  the single T product, and that the IntermediaOne product
21  was not going to be our primary objective for sales.
22       And that didn't mean that there was not going
23  to be any sales, because there were still some in the
24  process.  What I saw that was, what I saw that as being
25  was that the product was going to be scrapped, and I

Page 258

1   being the product manager, you know, you see the
2   handwriting on the wall.
3        So I thought, okay, this -- this shows a lack
4   of confidence on the company's part for product that I'm
5   managing.  So, you know, I just felt that my expertise
6   and my abilities were in danger.
7        So rather than waiting for the ax to fall, I
8   said, hey, I've got to get out of here.
9   Q.   And can you tell me a little bit more about
10  that conversation that Kathy Victory made the
11  announcement?  Was that common knowledge, or was that
12  just disseminated to you, or --
13  A.   I don't know where else it had gone in the
14  company, but I know it came from her, which meant that
15  it had to have come from some agreement that the
16  executive committee -- or the executive staff had come
17  to.
18       And it was -- I don't know who else knew it,
19  at that time whether we were the first to know it or
20  whether we were the last to know it.  But I know the
21  statement was made, and it was quite nonchalant.
22  Actually, it was just an agenda item in the meeting,
23  IntermediaOne was gone, single T is the primary focus.
24       And we were just all very much in shock.  We
25  all just said, "Well, what do you mean?  Why are we

Page 259

1   doing this?"  And the reason, again, as I stated before,
2   was, as she said, the back office can't keep up.
3   Q.   And when she told you Intermedia was gone, why
4   did Intermedia continue to sell the IntermediaOne
5   product?
6   A.   Because it was still part and parcel of the
7   products that we sold.
8   Q.   Did you construe that to mean while you might
9   continue to sell it now, it might be scrapped in the
10  near future entirely?  Or how did you --
11  A.   And, yeah, that was just my thoughts.  My
12  thoughts were, and my instinct told me if -- if our
13  focus is now off the IntermediaOne product, it's -- it's
14  downhill from here.
15  Q.   Okay, Mr. Renforth, I'm going to ask you to go
16  to Exhibit 27.
17  A.   Got it.
18  Q.   Now, if I recall your testimony, you said that
19  these requirement -- the -- for example, the attachment
20  to be 27, the second page, I believe you said that these
21  were requirements, not forecasts?  What did you mean by
22  that?
23  A.   These were requirements that we had put into
24  place to meet that 10,000 bogey by the end of the first
25  year of the agreement.  It was not our forecast.  Our

22 (Pages 256 to 259)

fa2bd518-aeb9-45ff-93ed-bef8ede209bb
A.03514

```
                        Effectnet - Conf Call Notes 711
From: Kerrigan, Jack G. (EXCH) [JGKerrigan@intermedia.com]
Sent: Wednesday, July 11, 2001 1:15 PM
To: 'Javid Freeman'; Ireland, Glenn T. (EXCH); Baughman, Sherrie (EXCH);
Serdinak, J. Donna [EXCH]
Cc: Renforth, Jim [EXCH]
Subject: Effectnet - Conf Call Notes 7/11
```

Importance: High

All,  Here is a summary of the items we covered and the decisions made:

1.  Notification Back on "Closed Accounts"  submissions:
     a)  When closed accounts are submitted to Effectnet immediate
acknowledgement is recevd.
     b)  Effectnet is to provide an email back to the email submitting the
Closed Accounts email within 24
          hours. This is not happening.  Javid will have Debbie contact Jack
to bring closure.

2.  When will CDR file transmission officially begin:
     a)  According to Donna Serdinak, transmission is already underway.
     b)  CDRs on the files received go back to August 2000.  Should these
files be processed?
          -  Jack, Sherrie and Donna will meet to determine when to begin
procesing the CDR files.

3.  When will we receive an invoice to proces:
     a)  Javid has committed to arranging to have the invoice provided to
Sherrie Baughman by Monday,
          July 16.

4.  When will mulitple accounts entry be available:
     a)  A new design is being considered to handle this capability.  Javid
will send an email to Jack
          identifying the details and a potential date for when this
capability can be ready for testing.

5.  "Warm Tranover" process and followup:
     a)  Glenn Ireland and Debbie (Effectnet) have been discussion this
topic.
     b)  Glen will provide the details of how the process will work when he
and Debbie have completed their
          discussions.

Increase in account volumes is not anticipated to begin before August 1,
2001.

Jack

# Exhibit B

Page 1

.S    279

A 03515

Hearing Date and Time: December 6, 2005, at 10:00 A.M. Eastern Time
Response Deadline:  November 18, at 4:00 P.M. Eastern Time
Reply Deadline:  December 2, 2005, at 4:00 P.M. Eastern Time

STINSON MORRISON HECKER LLP

Robert L. Driscoll, Esq.
Allison M. Murdock, Esq.
Jodi M. Hoss, Esq.
1201 Walnut Street
Kansas City, MO  64106
Telephone:  (816) 842-8600
Facsimile:  (816) 691-3495
Attorneys for Reorganized Debtors

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
        --------------------------------------------------------x

In re                                               :
                                                    :        Chapter 11 Case No. 02-13533 (AJG)
WORLDCOM, INC., et al.,                             :
                                                    :        (Jointly Administered)
                        Debtors.                    :
--------------------------------------------------------x

## WORLDCOM'S MOTION FOR SUMMARY JUDGMENT AGAINST PARUS HOLDINGS, INC., SUCCESSOR-BY-MERGER TO EFFECTNET, INC. AND EFFECTNET, LLC

Pursuant to Fed. R. Civ. P. 56, Fed. R. Bankr. P. 7056, and Fed. R. Bankr. P. 9014, the

above-captioned reorganized debtors ("Reorganized Debtors" or "WorldCom") move for

summary judgment against Parus Holdings, Inc., successor-by-merger to EffectNet, Inc. and

EffectNet, LLC ("Parus Holdings" or "Claimant") on Claim No. 11242 (replacing 9291) against

MCI WorldCom Communications, Inc. ("WorldCom") and Claim No. 11173 (replacing 9293)

against Intermedia Communications, Inc. ("Intermedia").

WorldCom's Statement of Material Facts as to Which There Are No Genuine Issues to be

Tried is annexed hereto as Schedule I.  In addition, this motion is supported by WorldCom's

Memorandum of Law, which will be filed contemporaneously with this Motion, and by the

Exhibit C

exhibits contained in WorldCom's Appendix of Exhibits, which will be provided as an

attachment to this Motion.

Respectfully submitted,

STINSON MORRISON HECKER LLP

By:   *s/Robert L. Driscoll*
       Robert L. Driscoll, Esq.
       Allison M. Murdock, Esq.
       Jodi M. Hoss, Esq.
       1201 Walnut Street, Suite 2800
       Kansas City, MO  64106
       (816) 842-8600 – Telephone
       (816) 691-3495 – Facsimile

ATTORNEYS FOR REORGANIZED DEBTORS

## CERTIFICATE OF SERVICE

I hereby certify that on October 18, 2005, I electronically filed the foregoing with the Clerk of the Bankruptcy Court using the CM/ECF system which sent notification of such filing to all parties receiving electronic means.

*s/Robert L. Driscoll*
Attorney for Reorganized Debtors

A 03517

**Schedule I**
**WorldCom's Statement of Material Facts**
**As to Which There Are No Genuine Issues To Be Tried**

**The Contracting Parties and the Contract at Issue**

1.       On November 20, 2000, EffectNet LLC, a Nevada limited liability company with its principal place of business in Phoenix, Arizona ("EffectNet") and Intermedia Communications, Inc., a Delaware corporation with its principal place of business in Florida ("Intermedia") entered into a Unified Communications Services General Agreement (the "UC Contract").  Ex. A, UC Contract.

2.       Parus Holdings, Inc. is the successor in interest to EffectNet.  Ex. B, Response and Opposition of Parus Holdings, Inc. to Debtors' Objection to Proofs of Claim Filed by EffectNet, Inc. ("Parus Opposition") at p. 1. [1]

3.       On July 1, 2001, WorldCom, Inc., a Georgia corporation with its headquarters in Clinton, Mississippi ("WorldCom"), acquired Intermedia pursuant to the merger of a wholly owned subsidiary of WorldCom with and into Intermedia.  Findings of Fact and Conclusions of Law (1) Approving (i) Substantive Consolidation and (ii) the Settlements Under Debtors' Modified Second Amended Joint Plan of Reorganization, dated October 21, 2003, and (2) Confirming Debtors' Modified Second Amended Joint Plan of Reorganization, dated October 21, 2003 (Doc. #9681) at p. 34 § II.C(i); Ex. B, Parus Opposition at p. 6 ¶ 14.

---

[1]       For the purposes of this motion only, WorldCom accepts as true the referenced statements of fact made in the Parus Opposition.  WorldCom reserves the right to contest any and all statements contained in the Parus Opposition in the event the Court determines that a trial is necessary.

A 03518

4.      After the acquisition, WorldCom controlled Intermedia and EffectNet was advised that WorldCom would be overseeing all projects relating to the UC Contract.  Ex. B, Parus Opposition at p. 22, ¶ 79.

5.      Exhibit A is a true copy of the November 20, 2000, UC Contract between EffectNet and Intermedia.  Ex. B, Parus Opposition at p. 3, ¶ 3.

6.      The UC Contract provides that its interpretation will be in accordance with the laws of the State of Arizona.  Ex. A, UC Contract at p. 10, § 12.3.

7.      The UC Contract provides that the parties to the contract shall not be liable to each other

> FOR ANY INCIDENTAL, INDIRECT, SPECIAL, PUNITIVE, CONSEQUENTIAL OR SIMILAR DAMAGES OF ANY KIND INCLUDING WITHOUT LIMITATION, LOSS OF PROFITS, LOSS OF BUSINESS OR INTERRUPTION OF BUSINESS, WHETHER SUCH LIABILITY IS PREDICATED ON CONTRACT, STRICT LIABILITY OR ANY OTHER THEORY WITHOUT REGARD TO WHETHER SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

Ex. A, UC Contract at p. 10, § 11.

**B.      The Actions of Intermedia**

**Before Acquisition by WorldCom**

8.      On September 5, 2000, WorldCom and Intermedia entered into a merger agreement.  Ex. C, Final Judgment at 5, <u>United States v. WorldCom, Inc., et al.</u>, Civ. Act. No. 1:00CV02789 (RWR) (D.D.C.).

9.      On November 17, 2000, the United States Department of Justice filed an action against WorldCom and Intermedia under the Clayton Act.  <u>United States v. WorldCom, Inc., et al.</u>, Civ. Act. No. 1:00CV02789 (RWR) (D.D.C.).

10.     On November 20, 2000, Intermedia paid $175,000 to EffectNet as a contract performance deposit.  <u>See</u> Ex. A, UC Contract at p. 6, § 4.5.1.

A 03519

11.    On June 26, 2001, the United States District Court for the District of Columbia ordered and directed WorldCom and Intermedia to "divest the Intermedia Assets as an ongoing, viable business" within 180 days from the closing of the merger.  Ex. C, Final Judgment at 5-6, Doc. No. 12 in United States v. WorldCom, Inc., Civ. Act. No. 1:00CV02789 (RWR).

**After Acquisition by WorldCom**

12.    After July 1, 2001, Intermedia's project manager for the UC Contract was terminated and Intermedia's sales force was disbanded through terminations of employment or reassignment to other projects.  Ex. B, Parus Opposition at p. 6, ¶ 16.

13.    In September, 2001, Intermedia cancelled 682 of the existing 729 subscriptions for services to be provided under the UC Contract.  Id. at p. 7, ¶ 17.

14.    On or about February 6, 2002, EffectNet invoiced Intermedia for payments under the UC Contract.  Intermedia did not pay those invoices.  Ex. D, March 12, 2002 letter from Robert C. McConnell, General Counsel of EffectNet, to Rich Black of Intermedia at p. 2; Ex. B, Parus Opposition at p. 7, ¶ 18.

15.    On or about March 1, 2002, Intermedia requested cancellation of all remaining services under the UC Contract.  Ex. B, Parus Opposition at pp. 6-7, ¶ 17.

**C.    EffectNet's Termination of the UC Contract**

16.    By letter dated March 12, 2002, EffectNet gave notice of default to Intermedia under Section 5.2 of the UC Contract and notice of EffectNet's intent to strictly enforce all provisions of default in the UC Contract, including the contract termination provision.  Ex. D, March 12, 2002 letter from Robert C. McConnell, General Counsel of EffectNet, to Rich Black of Intermedia.

17.    By letter dated March 25, 2002, EffectNet confirmed its March 12, 2002 notice of default to Intermedia under Section 5.2 of the UC Contract, confirmed its intent to strictly

A 03520

enforce the default provisions of the UC Contract, including the contract termination provision, and advised that the UC Contract would be terminated on April 12, 2002 if Intermedia had not cured its defaults.  Ex. E, March 25, 2002 letter from Robert C. McConnell, General Counsel of EffectNet, to Brett Bacon of MCI/WorldCom.

18.    Section 5.2 of the UC Contract provides that termination of the UC Contract "shall be effective thirty (30) days after written notice to the defaulting Party if the default has not been cured within such thirty (30) day period."  Ex. A, UC Contract at p. 6, § 5.2.

19.    Intermedia did not cure its defaults under the UC Contract.  Ex. B, Parus Opposition at p. 7, ¶ 20.

20.    Section 5.3 of the UC Contract, captioned "Effect of Termination," provides that upon termination of the contract "for any reason, each Party shall remain liable for those obligations that accrued prior to the date of such termination . . ."  Ex. A, UC Contract at p. 6, § 5.3.

**D.    Unpaid Obligations Under the UC Contract that Accrued Prior to April 12, 2002**

21.    During the December 2001 billing cycle, Intermedia delivered 47 active mailboxes, EffectNet billed WorldCom $1,308.85 for the active mailboxes, and Intermedia had a volume shortfall of 9,953 mailbox subscriptions.  Ex. C, attachment to Ex. B, Parus Opposition. The volume shortfall times the basic rate of $11.45 equals $113,961.85.  See Ex. P (Pricing), attached to Ex. A, UC Contract.

22.    During the January 2002 billing cycle, Intermedia delivered 47 active mailboxes, EffectNet billed WorldCom $1,308.85 for the active mailboxes and Intermedia had a volume shortfall of 9,953 mailbox subscriptions.  Ex. D, attachment to Ex. B, Parus Opposition.  The volume shortfall times the basic rate of $11.45 equals $113,961.85.  See Ex. P (Pricing), attached to Ex. A, UC Contract.

A 03521

23.    During the February 2002 billing cycle, Intermedia delivered 42 active mailboxes, EffectNet billed WorldCom $1,381.80 for the active mailboxes, and Intermedia had a volume shortfall of 9,958 mailbox subscriptions.  Ex. E, attachment to Ex. B, Parus Opposition.  The volume shortfall times the basic rate of $11.45 equals $114,019.10.  See Ex. P (Pricing), attached to Ex. A, UC Contract.

24.    The minimum commitment for the March 2002 billing cycle was 10,000.  Ex. A, UC Contract § 2.12.  The minimum commitment times the basic rate of $11.45 equals $114,500.00.  See Ex. P (Pricing), attached to Ex. A, UC Contract.

25.    The total volume shortfall for the billing cycles of December 2001, and January 2002 through March 2002, multiplied by the $11.45 per month basic rate specified in the UC Contract, plus amounts due for active mailboxes, equals $460,442.30.  Undisputed Facts ¶¶ 21-24; Ex. P (Pricing), attached to Ex. A, UC Contract.

## CERTIFICATE OF COUNSEL

I certify that I am authorized to and do, on behalf of Reorganized Debtors, stipulate to the facts stated above in paragraphs 21 through 25.

       *s/Robert L. Driscoll*
       Robert L. Driscoll
       ATTORNEY FOR REORGANIZED DEBTORS

A 03522

STINSON MORRISON HECKER LLP
Mark A. Shaiken, Esq.
Robert L. Driscoll, Esq.
Allison M. Murdock, Esq.
1201 Walnut Street
Kansas City, MO  64106
Telephone:  (816) 842-8600
Facsimile:  (816) 691-3495
Attorneys for Debtors


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

In re                                                 :

                                                      :        Chapter 11 Case No. 02-13533 (AJG)

WORLDCOM, INC., *et al.*,                              :

                                                      :        (Jointly Administered)

          Debtors.                                    :

-------------------------------------------------------x

### DEBTORS' OBJECTIONS AND RESPONSES TO CLAIMANT
### PARUS HOLDINGS, INC.'S FIRST SET OF REQUESTS FOR ADMISSION

Debtors submit the following objections and responses to Claimant Parus Holdings, Inc.'s

First Request for Admission to Debtors ("Requests for Admission").

### Objections to Claimant's Definitions

1.       Pursuant to S.D.N.Y. Bankr. R. 7026-1 and S.D.N.Y. R. 26.3, Debtors object to

Claimant's definitions of the terms "Communication(s)," "Document(s)," and "Person" because

they are broader than the uniform definitions established in this Court's local rules.  Debtors will

apply the definitions established in this Court's local rules.

2.       Debtors object to Claimant's definition of "Claimant" as overbroad because it

includes entities and individuals that do not assert claims in this proceeding.  Debtors will

construe "Claimant" to mean Parus Holdings, Inc., successor-by-merger to EffectNet, LLC.

Exhibit D

**A 03523**

3.      Debtors object to Claimant's definition of "EffectNet" as overbroad because it includes entities and individuals that do not assert claims in this proceeding and did not have any agreement with Debtors that is at issue in this proceeding.  Debtors will construe "EffectNet" to mean EffectNet, LLC, the entity that executed the UC Agreement.

4.      Debtors object to Claimant's definition of "Debtors," "you," "your," "Intermedia," and "MCI" to the extent that they seek to impose discovery obligations on Debtors that exceed those permitted under the Federal Rules of Civil Procedure and the local rules of this Court on persons that are not parties to this proceeding and therefore have no obligation to respond to Claimant's Requests for Admission.

5.      Debtors object to Claimant's definition of "Litigation Hold" because it ignores that, under controlling law, a "litigation hold" or duty to preserve records did not arise until Debtors were put on notice that litigation was reasonably anticipated.  There also is no duty to preserve documents that are unrelated to the anticipated litigation.  For instance, Debtors had no duty to preserve documents "related to the Claimant" that are not relevant to the claims or defenses of the parties.  Here, moreover, the existence of a duty to take affirmative steps to preserve documents, as well as the scope and extent of any such duty, must be evaluated in the context of the Debtors' bankruptcy filing, in which over 60,000 claims were asserted.  Thus, Claimant's definition of "litigation hold" improperly assumes a legal obligation to preserve documents when none existed, and ignores Debtors' circumstances after they filed for bankruptcy.

6.      Debtors object to Claimant's definition of "Webley" as vague and ambiguous because it includes multiple corporate entities and individuals.  Debtors construe "Webley" to mean Webley Systems, Inc.

DB02/048629.0094_0019/7336339.5

## Objections to Claimant's Instructions

1.      Debtors object to Claimant's instructions in their entirety.  Claimant's have two inconsistent sets of instructions.  In addition to the instructions contained in its First Set of Requests for Admission, Claimant purports to incorporate the instructions contained in its Second Request for Production of Documents to the Debtors, which apply to requests for the production of documents, not requests for admission.

2.      Debtors object to the instructions in Claimant's First Set of Requests for Admission because they attempt to impose obligations that exceed those of the Federal Rules of Civil Procedure and this Court's local rules, including without limitation Claimant's attempts to shorten the time period for a response to the requests, require a sworn statement under oath, provide specific facts relating to an asserted privilege, and expand obligations to supplement. Debtors will comply with their obligations under the federal rules and local rules of this Court.

## Objections and Responses to Claimant's Requests to Admit

Subject to the foregoing general objections, Debtors respond to Claimant's requests for admission as follows:

**Request No.1:      Admit that each of the following documents attached as an Exhibit to these Requests to Admit is a copy of a genuine original:**

| EXHIBIT | DESCRIPTION |
|---|---|
| 1 | MOU |
| 2 | Interim Agreement |
| 3 | UC Agreement |
| 4 | Master License Agreement |
| 5 | March 12, 2002 Letter from Robert McConnell to Rich Black |
| 6 | March 25, 2002 Letter from Robert McConnell to Brett Bacon |

RESPONSE:

Exhibit 1:      Denied.

Exhibit 2:      Denied.

Exhibit 3:      Denied.

Exhibit 4:      Denied.

3

A 03525

Exhibit 5:        Denied.

Exhibit 6:        Denied.

**Request No. 2:**        **Admit that MCI used two email systems.**

RESPONSE:  Denied.

**Request No. 3:**        **Admit that MCI used a POP email system.**

RESPONSE:  Admitted.

**Request No. 4:**        **Admit that MCI used an Exchange email system.**

RESPONSE:  Admitted.

**Request No. 5:        Admit that MCI had no other email system other than the POP email system and the Exchange email system.**

RESPONSE:  Denied.

**Request No. 6:        Admit that Intermedia used two email systems.**

RESPONSE:  Denied.

**Request No. 7:        Admit that Intermedia used a POP email system.**

RESPONSE:  Denied.

**Request No. 8:        Admit that Intermedia used an Exchange email system.**

RESPONSE:  Admitted.

**Request No. 9:        Admit that Intermedia had no other email system other than the POP email system and the Exchange email system.**

RESPONSE:  Debtors deny that Intermedia had a POP email system and admit that it
                    had no email system other than an Exchange email system.

**Request No. 10:        Admit that EffectNet's General Counsel, Robert C. McConnell, wrote a letter dated March 12, 2002 alleging that Intermedia's conduct breached the terms of the UC Agreement.**

A 03526

RESPONSE:   Debtors admit that EffectNet's General Counsel, Robert C. McConnell, wrote a letter dated March 12, 2002, but deny Claimant's characterization of the letter, which speaks for itself.

**Request No. 11:      Admit that EffectNet's General Counsel, Robert C. McConnell, wrote a letter dated March 28 [sic], 2002 alleging that Intermedia continued to breach the UC Agreement.**

RESPONSE:   Debtors deny the request as written because they are not aware of a March 28, 2002 letter. However, Debtors admit that EffectNet's General Counsel, Robert C. McConnell, wrote a letter dated March 25, 2002, but deny Claimant's characterization of the letter, which speaks for itself.

**Request No. 12:      Admit that the letters identified in Request Nos. 11 and 12 were sent to MCI's in-house counsel.**

RESPONSE:   Debtors deny that the March 12, 2002 letter identified in Request No. 10 was sent to MCI's in-house counsel. Debtors admit that the March 25, 2002 letter identified in the response to Request No. 11 was sent to MCI's in-house counsel.

**Request No. 13:      Admit that the letters identified in Request Nos. 11 and 12 were sent to MCI's outside counsel.**

RESPONSE:   Denied.

**Request No. 14:      Admit that MCI did not begin backing up electronic data from its Exchange email system until July 2002.**

RESPONSE:   Denied.

**Request No. 15:      Admit that at no time prior to March 12, 2002 did MCI send or distribute a notification to employees at MCI to implement a Litigation Hold with respect to Documents related to the Claimant.**

RESPONSE:   As explained in their Objection to Claimant's Definitions ¶ 5, Debtors object to Claimant's definition of "Litigation Hold" because it improperly attempts to impose or assume a legal obligation to preserve documents at a time when no such obligation existed and because it is overbroad. Debtors had no obligation to implement a litigation hold with respect to "Documents relating to the Claimant" that are not relevant to the claims or defenses of the parties. Subject to their objections, Debtors admit Request

DB02/048629 0094_0019/7336339.5

A 03527

No. 15, but deny any implication that MCI had an obligation to send or distribute such a notification before March 12, 2002.

**Request No. 16:      Admit that at no time prior to March 12, 2002 did Intermedia send or distribute a notification to employees at Intermedia to implement a Litigation Hold with respect to Documents related to the Claimant.**

RESPONSE:    As explained in their Objection to Claimant's Definitions ¶ 5, Debtors object to Claimant's definition of "Litigation Hold" because it improperly attempts to impose or assume a legal obligation to preserve documents at a time when no such obligation existed and because it is overbroad.  Debtors had no obligation to implement a litigation hold with respect to "Documents relating to the Claimant" that are not relevant to the claims or defenses of the parties.  Subject to their objections, Debtors admit Request No. 16, but deny any implication that Intermedia had an obligation to send or distribute such a notification before March 12, 2002.

**Request No. 17:      Admit that at no time prior to March 25, 2002 did MCI send or distribute a notification to employees at MCI to implement a Litigation Hold with respect to Documents related to the Claimant.**

RESPONSE:    As explained in their Objection to Claimant's Definitions ¶ 5, Debtors object to Claimant's definition of "Litigation Hold" because it improperly attempts to impose or assume a legal obligation to preserve documents at a time when no such obligation existed and because it is overbroad.  Debtors had no obligation to implement a litigation hold with respect to "Documents relating to the Claimant" that are not relevant to the claims or defenses of the parties.  Subject to their objections, Debtors admit Request No. 17, but deny any implication that MCI had an obligation to send or distribute such a notification before March 25, 2002.

**Request No. 18:      Admit that at no time prior to March 25, 2002 did Intermedia send or distribute a notification to employees at Intermedia to implement a Litigation Hold with respect to Documents related to the Claimant.**

RESPONSE:    As explained in their Objection to Claimant's Definitions ¶ 5, Debtors object to Claimant's definition of "Litigation Hold" because it improperly attempts to impose or assume a legal obligation to preserve documents at a time when no such obligation existed and because it is overbroad.  Debtors had no obligation to implement a litigation hold with respect to "Documents relating to the Claimant" that are not relevant to the claims or defenses of the parties.  Subject to their objections, Debtors admit Request No. 18, but deny any implication that Intermedia had an obligation to send or distribute such a notification before March 25, 2002.

DB02/048629 0094_0019/7336339.5

**A 03528**

**Request No. 19:**     **Admit that at no time prior to January 8, 2003 did MCI send or distribute a notification to employees at MCI to implement a Litigation Hold with respect to Documents related to the Claimant.**

> RESPONSE:     As explained in their Objection to Claimant's Definitions ¶ 5, Debtors object to Claimants' definition of "Litigation Hold" because it improperly attempts to impose or assume a legal obligation to preserve documents at a time when no such obligation existed and because it is overbroad. Debtors had no obligation to implement a litigation hold with respect to "Documents relating to the Claimant" that are not relevant to the claims or defenses of the parties. Subject to their objections, Debtors deny Request No. 19.

**Request No. 20:**     **Admit that at no time prior to January 8, 2003 did Intermedia send or distribute a notification to employees at Intermedia to implement a Litigation Hold with respect to Documents related to the Claimant.**

> RESPONSE:     As explained in their Objection to Claimant's Definitions ¶ 5, Debtors object to Claimants' definition of "Litigation Hold" because it improperly attempts to impose or assume a legal obligation to preserve documents at a time when no such obligation existed and because it is overbroad. Debtors had no obligation to implement a litigation hold with respect to "Documents relating to the Claimant" that are not relevant to the claims or defenses of the parties. Subject to their objections, Debtors deny Request No. 20.

**Request No. 21:**     **Admit that at no time prior to September 1, 2004 did MCI send or distribute a notification to employees at MCI to implement a Litigation Hold with respect to Documents related to the Claimant.**

> RESPONSE:     As explained in their Objection to Claimant's Definitions ¶ 5, Debtors object to Claimants' definition of "Litigation Hold" because it improperly attempts to impose or assume a legal obligation to preserve documents at a time when no such obligation existed and because it is overbroad. Debtors had no obligation to implement a litigation hold with respect to "Documents relating to the Claimant" that are not relevant to the claims or defenses of the parties. Subject to their objections, Debtors deny Request No. 21.

**Request No. 22:**     **Admit that at no time prior to September 1, 2004 did Intermedia send or distribute a notification to employees at Intermedia to implement a Litigation Hold with respect to Documents related to the Claimant.**

DB02/048629 0094 _0019/7336339.5

A 03529

RESPONSE:   As explained in their Objection to Claimant's Definitions ¶ 5, Debtors object to Claimants' definition of "Litigation Hold" because it improperly attempts to impose or assume a legal obligation to preserve documents at a time when no such obligation existed and because it is overbroad. Debtors had no obligation to implement a litigation hold with respect to "Documents relating to the Claimant" that are not relevant to the claims or defenses of the parties. Subject to their objections, Debtors deny Request No. 22.

**Request No. 23:    Admit that at no time prior to March 12, 2002 did MCI implement a Litigation Hold with respect to Documents relating to the Claimant.**

RESPONSE:   As explained in their Objections to Claimant's Definitions ¶ 5, Debtors object to Claimant's definition of "Litigation Hold" because it improperly attempts to impose or assume a legal obligation to preserve documents at a time when no such obligation existed and because it is overbroad. Debtors had no obligation to implement a litigation hold with respect to "Documents relating to the Claimant" that are not relevant to the claims or defenses of the parties. Subject to their objections, Debtors admit Request No. 23, but deny any implication that MCI had such an obligation prior to March 12, 2002.

**Request No. 24:    Admit that at no time prior to March 12, 2002 did Intermedia implement a Litigation Hold with respect to Documents relating to the Claimant.**

RESPONSE:   As explained in their Objections to Claimant's Definitions ¶ 5, Debtors object to Claimant's definition of "Litigation Hold" because it improperly attempts to impose or assume a legal obligation to preserve documents at a time when no such obligation existed and because it is overbroad. Debtors had no obligation to implement a litigation hold with respect to "Documents relating to the Claimant" that are not relevant to the claims or defenses of the parties. Subject to their objections, Debtors admit Request No. 24, but deny any implication that Intermedia had such an obligation prior to March 12, 2002.

**Request No. 25:    Admit that at no time prior to March 25, 2002 did MCI implement a Litigation Hold with respect to Documents relating to the Claimant.**

RESPONSE:   As explained in their Objections to Claimant's Definitions ¶ 5, Debtors object to Claimant's definition of "Litigation Hold" because it improperly attempts to impose or assume a legal obligation to preserve documents at a time when no such obligation existed and because it is overbroad. Debtors had no obligation to implement a litigation hold with respect to "Documents relating to the Claimant" that are not relevant to the claims or defenses of the parties. Subject to their objections, Debtors admit Request

A 03530

No. 25, but deny any implication that MCI had such an obligation prior to March 25, 2002.

**Request No. 26:    Admit that at no time prior to March 25, 2002 did Intermedia implement a Litigation Hold with respect to Documents relating to the Claimant.**

RESPONSE:    As stated more fully in their Objections to Claimant's Definitions ¶ 5, Debtors object to the phrase "Litigation Hold" because it improperly attempts to impose or assume a legal obligation to preserve documents at a time when no such obligation existed and because it is overbroad.  Debtors had no obligation to implement a litigation hold with respect to "Documents relating to the Claimant."  Subject to their objections, Debtors admit Request No. 26, but deny any implication that Intermedia had such an obligation prior to March 25, 2002.

**Request No. 27:    Admit that at no time prior to January 8, 2003 did MCI implement a Litigation Hold with respect to Documents relating to the Claimant.**

RESPONSE:    As explained in their Objections to Claimant's Definitions ¶ 5, Debtors object to Claimant's definition of "Litigation Hold" because it improperly attempts to impose or assume a legal obligation to preserve documents at a time when no such obligation existed and because it is overbroad.  Debtors had no obligation to implement a litigation hold with respect to "Documents relating to the Claimant" that are not relevant to the claims or defenses of the parties.  Subject to their objections, Debtors deny Request No. 27.

**Request No. 28:    Admit that at no time prior to January 8, 2003 did Intermedia implement a Litigation Hold with respect to Documents relating to the Claimant.**

RESPONSE:    As explained in their Objections to Claimant's Definitions ¶ 5, Debtors object to Claimant's definition of "Litigation Hold" because it improperly attempts to impose or assume a legal obligation to preserve documents at a time when no such obligation existed and because it is overbroad.  Debtors had no obligation to implement a litigation hold with respect to "Documents relating to the Claimant" that are not relevant to the claims or defenses of the parties.  Subject to their objections, Debtors deny Request No. 28.

**Request No. 29:    Admit that at no time prior to September 1, 2004 did MCI implement a Litigation Hold with respect to Documents relating to the Claimant.**

RESPONSE:    As explained in their Objections to Claimant's Definitions ¶ 5, Debtors object to Claimant's definition of "Litigation Hold" because it improperly

9

**A 03531**

attempts to impose or assume a legal obligation to preserve documents at a time when no such obligation existed and because it is overbroad.  Debtors had no obligation to implement a litigation hold with respect to "Documents relating to the Claimant" that are not relevant to the claims or defenses of the parties.  Subject to their objections, Debtors deny Request No. 29.

**Request No. 30:      Admit that at no time prior to September 1, 2004 did Intermedia implement a Litigation Hold with respect to Documents relating to the Claimant.**

RESPONSE:   As explained in their Objections to Claimant's Definitions ¶ 5, Debtors object to Claimant's definition of "Litigation Hold" because it improperly attempts to impose or assume a legal obligation to preserve documents at a time when no such obligation existed and because it is overbroad.  Debtors had no obligation to implement a litigation hold with respect to "Documents relating to the Claimant" that are not relevant to the claims or defenses of the parties.  Subject to their objections, Debtors deny Request No. 30.

**Request No. 31:      Admit that at no time prior to March 12, 2002 did MCI send or distribute a notification to employees at MCI directing such employees to preserve all Documents relating to the Claimant in an accessible or searchable format.**

RESPONSE:   Debtors object to Request No. 31 because it improperly attempts to impose or assume a legal obligation to preserve documents at a time when no such obligation existed and because it is overbroad.  MCI had no obligation to direct employees to preserve "all Documents relating to the Claimant."  Debtors also object to Request No. 31 on the grounds that it is vague and ambiguous because the courts have ascribed different meanings and obligations connected with the term "accessible."  Subject to their objections, Debtors admit Request No. 31, but deny any implication that MCI had an obligation to send or distribute such a notification before March 12, 2002.

**Request No. 32:      Admit that at no time prior to March 12, 2002 did Intermedia send or distribute a notification to employees at Intermedia directing such employees to preserve all Documents relating to the Claimant in an accessible or searchable format.**

RESPONSE:   Debtors object to Request No. 32 because it improperly attempts to impose or assume a legal obligation to preserve documents at a time when no such obligation existed and because it is overbroad.  Intermedia had no obligation to direct employees to preserve "all Documents relating to the Claimant."  Debtors also object to Request No. 32 on the grounds that it is vague and ambiguous because the courts have ascribed different meanings and obligations connected with the term "accessible."  Subject to their

DB02/048629 0094_0019/7336339.5

A 03532

objections, Debtors admit Request No. 32, but deny any implication that Intermedia had an obligation to send or distribute such a notification before March 12, 2002.

**Request No. 33:       Admit that at no time prior to March 25, 2002 did MCI send or distribute a notification to employees at MCI directing such employees to preserve all Documents relating to the Claimant in an accessible or searchable format.**

> RESPONSE:    Debtors object to Request No. 33 because it improperly attempts to impose or assume a legal obligation to preserve documents at a time when no such obligation existed and because it is overbroad.  MCI had no obligation to direct employees to preserve "all Documents relating to the Claimant."  Debtors also object to Request No. 33 on the grounds that it is vague and ambiguous because the courts have ascribed different meanings and obligations connected with the term "accessible."  Subject to their objections, Debtors admit Request No. 33, but deny any implication that MCI had an obligation to send or distribute such a notification before March 25, 2002.

**Request No. 34:       Admit that at no time prior to March 25, 2002 did Intermedia send or distribute a notification to employees at Intermedia directing such employees to preserve all Documents relating to the Claimant in an accessible or searchable format.**

> RESPONSE:    Debtors object to Request No. 34 because it improperly attempts to impose or assume a legal obligation to preserve documents at a time when no such obligation existed and because it is overbroad.  Intermedia had no obligation to direct employees to preserve "all Documents relating to the Claimant."  Debtors also object to Request No. 34 on the grounds that it is vague and ambiguous because the courts have ascribed different meanings and obligations connected with the term "accessible."  Subject to their objections, Debtors admit Request No. 34, but deny any implication that Intermedia had an obligation to send or distribute such a notification before March 25, 2002.

**Request No. 35:       Admit that at no time prior to January 8, 2003 did MCI send or distribute a notification to employees at MCI directing such employees to preserve all Documents relating to the Claimant in an accessible or searchable format.**

> RESPONSE:    Debtors object to Request No. 35 because it improperly attempts to impose or assume a legal obligation to preserve documents in an accessible or searchable format at a time when no such obligation existed and because it is overbroad.  MCI had no obligation to direct employees to preserve "all Documents relating to the Claimant."  Debtors also object to Request No. 35 on the grounds that it is vague and ambiguous because the courts have ascribed different meanings and obligations connected with

11

A 03533

the term "accessible." Subject to their objections, Debtors admit that employees were not directed to preserve "all Documents relating to the Claimant" in an accessible format but deny that employees were not directed to preserve documents in a searchable format.

**Request No. 36:**     **Admit that at no time prior to January 8, 2003 did Intermedia send or distribute a notification to employees at Intermedia directing such employees to preserve all Documents relating to the Claimant in an accessible or searchable format.**

RESPONSE:    Debtors object to Request No. 36 because it improperly attempts to impose or assume a legal obligation to preserve documents in an accessible or searchable format at a time when no such obligation existed and because it is overbroad. Intermedia had no obligation to direct employees to preserve "all Documents relating to the Claimant." Debtors also object to Request No. 36 on the grounds that it is vague and ambiguous because the courts have ascribed different meanings and obligations connected with the term "accessible." Subject to their objections, Debtors admit that employees were not directed to preserve "all Documents relating to the Claimant" in an accessible format but deny that employees were not directed to preserve documents in a searchable format.

**Request No. 37:**     **Admit that at no time prior to September 1, 2004 did MCI send or distribute a notification to employees at MCI directing such employees to preserve all Documents relating to the Claimant in an accessible or searchable format.**

RESPONSE:    Debtors object to Request No. 37 because it improperly attempts to impose or assume a legal obligation to preserve documents in an accessible or searchable format at a time when no such obligation existed and because it is overbroad. MCI had no obligation to direct employees to preserve "all Documents relating to the Claimant." Debtors also object to Request No. 37 on the grounds that it is vague and ambiguous because the courts have ascribed different meanings and obligations connected with the term "accessible." Subject to their objections, Debtors admit that employees were not directed to preserve "all Documents relating to the Claimant" in an accessible format but deny that employees were not directed to preserve documents in a searchable format.

**Request No. 38:**     **Admit that at no time prior to September 1, 2004 did Intermedia send or distribute a notification to employees at Intermedia directing such employees to preserve all Documents relating to the Claimant in an accessible or searchable format.**

RESPONSE:    Debtors object to Request No. 38 because it improperly attempts to impose or assume a legal obligation to preserve documents in an accessible or searchable format at a time when no such obligation existed

12

A 03534

and because it is overbroad. Intermedia had no obligation to direct employees to preserve "all Documents relating to the Claimant." Debtors also object to Request No. 38 on the grounds that it is vague and ambiguous because the courts have ascribed different meanings and obligations connected with the term "accessible." Subject to their objections, Debtors admit that employees were not directed to preserve "all Documents relating to the Claimant" in an accessible format but deny that employees were not directed to preserve documents in a searchable format.

**Request No. 39:    Admit that at no time did MCI make any effort to monitor whether MCI's employees were preserving all Documents relating to the Claimant.**

    RESPONSE:    Debtors object to Request No. 39 because it is overbroad and improperly attempts to impose or assume a legal obligation to preserve "all Documents relating to the Claimant" when no such obligation existed. Subject to their objections, Debtors deny Request No. 39.

**Request No. 40:    Admit that at no time did Intermedia make any effort to monitor whether Intermedia's employees were preserving all Documents relating to the Claimant.**

    RESPONSE:    Debtors object to Request No. 40 because it is overbroad and improperly attempts to impose or assume a legal obligation to preserve "all Documents relating to the Claimant" when no such obligation existed. Subject to their objection, Debtors deny Request No. 40.

**Request No. 41:    Admit that MCI had a policy (whether written or otherwise) regarding the implementation of Litigation Holds.**

    RESPONSE:    As explained in their Objections to Claimant's Definitions ¶ 5, Debtors object to Claimant's definition of "Litigation Hold" because it improperly attempts to impose or assume a legal obligation to preserve documents at a time when no such obligation existed. Subject to their objections, Debtors admit Request No. 41.

**Request No. 42:    Admit that Intermedia had a policy (whether written or otherwise) regarding the implementation of Litigation Holds.**

    RESPONSE:    As explained in their Objections to Claimant's Definitions ¶ 5, Debtors object to Claimant's definition of "Litigation Hold" because it improperly attempts to impose or assume a legal obligation to preserve documents at a time when no such obligation existed. Subject to their objections, Debtors admit Request No. 42.

DB02/048629 0094_0019/7336339.5

**A 03535**

**Request No. 43:** **Admit that for the period prior to March 2002, MCI had at least on one occasion implemented a Litigation Hold when it received written correspondence alleging that MCI had breached a contract MCI had with a third party.**

RESPONSE: As explained in their Objections to Claimant's Definitions ¶ 5, Debtors object to Claimant's definition of "Litigation Hold" because it improperly attempts to impose or assume a legal obligation to preserve documents at a time when no such obligation existed. Debtors also object to Request No. 43 on the grounds that it is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

**Request No. 44:** **Admit that for the period prior to March 2002, Intermedia had at least one occasion implemented a Litigation Hold when it received written correspondence alleging that Intermedia had breached a contract Intermedia had with a third party.**

RESPONSE: As explained in their Objections to Claimant's Definitions ¶ 5, Debtors object to Claimant's definition of "Litigation Hold" because it improperly attempts to impose or assume a legal obligation to preserve documents at a time when no such obligation existed. Debtors also object to Request No. 44 on the grounds that it is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

**Request No. 45:** **Admit that MCI did not comply with MCI's policies for implementing a Litigation Hold with respect to the Claimant.**

RESPONSE: Denied.

**Request No. 46:** **Admit that MCI did not comply with MCI's policies for implementing a Litigation Hold with respect to the UC Agreement.**

RESPONSE: Denied.

**Request No. 47:** **Admit that Intermedia did not comply with Intermedia's policies for implementing a Litigation Hold with respect to the UC Agreement.**

RESPONSE: Denied.

**Request No. 48:** **Admit that Intermedia did not comply with Intermedia's policies for implementing a Litigation Hold with respect to the Claimant.**

RESPONSE: Debtors object to this request because it is overbroad and improperly attempts to impose or assume a legal obligation to implement a litigation

14

A 03536

hold "with respect to the Claimant" when no such obligation existed. Subject to their objections, Debtors deny Request No. 48.

**Request No. 49:**     **Admit that Intermedia had a document retention policy.**

RESPONSE:   Debtors object to Request No. 49 because it is vague and ambiguous. Subject to their objections, Debtors state that they have not been able to locate a written document retention policy at Intermedia and, accordingly, deny Request No. 49.

**Request No. 50:**     **Admit that MCI had a document retention [policy].**

RESPONSE:   Admitted.

**Request No. 51:     Admit that Intermedia failed to comply with the terms of its document retention policy in connection with Documents that refer or relate to the Claimant or the Claimant's Claim.**

RESPONSE:   Denied.

**Request No. 52:     Admit that MCI failed to comply with the terms of its document retention policy in connection with Documents that refer or relate to the Claimant or the Claimant's Claim.**

RESPONSE:   Denied.

**Request No. 53:     Admit that MCI destroyed, erased, or purged some of the Documents relating to the Claimant and/or the Claimant's Claim.**

RESPONSE:   Debtors object to this request because it is overbroad and improperly attempts to impose or assume a legal obligation to preserve documents that relate to the Claimant without regard to whether they are relevant to the claims or defenses of the parties. Subject to their objections, Debtors deny Request No. 53.

**Request No. 54:     Admit that Intermedia destroyed, erased, or purged some of the Documents relating to the Claimant and/or the Claimant's Claim.**

RESPONSE:   Debtors object to this request because it is overbroad and improperly attempts to impose or assume a legal obligation to preserve documents that relate to the Claimant without regard to whether they are relevant to the claims or defenses of the parties. Subject to their objections, Debtors deny Request No. 54.

15

A 03537

**Request No. 55:**       Admit that MCI made no effort, other than in the ordinary course of its business, to retain or preserve any Documents that refer or relate to the Claimant or the Claimant's Claim until September 1, 2004.

    RESPONSE:  Denied.

**Request No. 56:**       Admit that Intermedia made no effort, other than in the ordinary course of its business, to retain or preserve any Documents that refer or relate to the Claimant or the Claimant's Claim until after September 1, 2004.

    RESPONSE:  Denied.

**Request No. 57:**       Admit that MCI failed to preserve all Documents that refer or relate to the Claimant.

    RESPONSE:  Denied.

**Request No. 58:**       Admit that MCI failed to preserve all Documents that refer or relate to the Litigation.

    RESPONSE:  Denied.

**Request No. 59:**       Admit that MCI failed to preserve all Documents that refer or relate to the Claimant's Claim.

    RESPONSE:  Denied.

**Request No. 60:**       Admit that MCI failed to preserve all Documents that refer or relate to the UC Agreement.

    RESPONSE:  Denied.

**Request No. 61:**       Admit that Intermedia failed to preserve all Documents that refer or relate to the Claimant.

    RESPONSE:  Denied.

**Request No. 62:**       Admit that Intermedia failed to preserve all Documents that refer or relate to the Litigation.

    RESPONSE:  Denied.

DB02/048629 0094_0019/7336339.5

A 03538

**Request No. 63:**     Admit that Intermedia failed to preserve all Documents that refer or relate to the Claimant's Claim.

      RESPONSE:  Denied.

**Request No. 64:**     Admit that Intermedia failed to preserve all Documents that refer or relate to the UC Agreement.

      RESPONSE:  Denied.

**Request No. 65:**     Admit that MCI has no more than 78 back up tapes containing information that may be relevant to the Claimant's Discovery Requests.

      RESPONSE:  Denied.

**Request No. 66:**     Admit that MCI has no back up tapes of its email system from before July 2002.

      RESPONSE:  Denied.

**Request No. 67:**     Admit that MCI has no back up tapes of its Exchange email system from before July 2002.

      RESPONSE:  Denied.

**Request No. 68:**     Admit that Intermedia has no more than 29 back up tapes containing information that may be relevant to the Claimant's Discovery Requests.

      RESPONSE:  Denied.

**Request No. 69:**     Admit that MCI's 78 Back Up Tapes only contain information from MCI's POP email servers.

      RESPONSE:  Based upon the definition of "78 Back Up Tapes" in Claimant's Second Request for the Production of Documents, Debtors admit Request No. 69.

**Request No. 70:**     Admit that Intermedia's 29 Back Up Tapes only contain information from Intermedia's email servers.

      RESPONSE:  Denied.

DB02/048629 0094_0019/7336339.5

A 03539