documents that were the subject of prior document requests. Other requests seek production of documents already provided to Claimant's prior counsel as part of the discovery process, such as Debtors' privilege log and the indices regarding Debtors' prior document productions. With markedly few exceptions, Claimant's discovery requests fail to actually address the claims and defenses asserted in this lawsuit.

### Debtors' Objections to Claimant's Definitions

2.    Debtors object to Claimant's definitions of "Communication(s)" and "Documents" because these definitions are confusing and inconsistent with the uniform definitions required to be used under this Court's local rules. See S.D.N.Y. Bank. R. 7026-1 and S.D.N.Y. R. 26.3.

3.    Debtors object to Claimant's definitions of "identify, when used in reference to a natural person," "identify, when used in reference to a Person," "identify, when used in reference to a Document" and "person" because these definitions are confusing and inconsistent with the uniform definitions required to be used under this Court's local rules. See S.D.N.Y. Bank. R. 7026-1 and S.D.N.Y. R. 26.3.

4.    Debtors object to Claimant's definition of "identify, when used in reference to a Communication" because it is confusing and unduly burdensome.

### Debtors' Objections to Claimant's Case-Specific Definitions

5.    Debtors object to the terms "29 Back Up Tapes" and "78 Back Up Tapes," as defined in Case-Specific Definition Nos. 9 and 10. These definitions are based on a reference to a "July 16, 2006 Letter." Presumably, Claimant intends to refer to Debtors' counsel's June 16, 2006 letter to the Court. With respect to the "29 Back Up Tapes," Claimant incorrectly assumes that there are only 29 inaccessible Intermedia backup tapes. Based on information known at this time, there are 72 inaccessible Intermedia backup tapes that may pertain to the relevant time period applied to electronically stored information, including the 9 previously sampled tapes. The remaining 63 tapes (including 16 tapes that Kroll Ontrack could not restore, but have been referred to another document specialist for restoration) are available for restoration and searching when the Court determines the cost-shifting issues.[2]

6.    Debtors object to the terms "Claimant" and "EffectNet" as defined by Claimant's Case-Specific Definition Nos. 14 and 19 to the extent these definitions include entities or persons other than Parus Holdings, Inc. and EffectNet LLC.

---

[2]    Originally, Debtors located 110 Intermedia backup tapes that needed to be evaluated to determine whether they pertained to the designated relevant time period. Of those tapes, 1 tape is blank, 5 tapes are corrupt or unsearchable and 32 tapes fall outside the relevant time period that Claimant designated. Consequently, there are 72 Intermedia backup tapes for Claimant's designated relevant time period. Of those 72 backup tapes, 9 tapes have been sampled using the relevant time period, custodians and terms designated by Claimant, and the remaining 63 tapes can be restored and searched when the Court determines the cost-shifting issues.

DB02/048629 0094_0019/7388998.2

**A 03880**

7.     Debtors object to the term "Debtors," "you," "your," as defined by Claimant's Case-Specific Definition No. 16, "Intermedia," as defined by Case Specific Definition No. 23 and "MCI" as defined by Specific Definition No. 31, to the extent these definitions include entities or persons other than MCI WorldCom Communications, Inc. or Intermedia Communications, Inc.

8.     Debtors object to the term "Disaster Recovery," as defined by Claimant in Case-Specific Definition No. 17, because Claimant's definition is contrary to the commonly understood meaning of this term. Debtors' disaster recovery systems provided the ability to restore a particular computer or computer system in the event such computer or computer system was damaged or inoperable. The disaster recovery system was not limited to recovery of particular documents in the event of the accidental loss or destruction of such documents.

9.     Debtors object to the term "GenD Products," as defined by Claimant in Case-Specific Definition No. 20, because Claimant's definition incorrectly describes this as a product containing unified messaging. GenD was a marketing platform referring to WorldCom's Generation Digital initiative that went far beyond unified messaging.

10.    Debtors object to the term "Litigation Hold," defined by Claimant in Case-Specific Definition No. 29 as "an express written or oral instruction, order or directive to preserve and/or maintain documents." Claimant's definition fails to acknowledge the principle that a "litigation hold" or duty to preserve documents does not arise until such time as a party is put on notice that litigation is reasonably anticipated. Even then, the obligation is limited to a duty to preserve documents that are relevant to the anticipated claim. Notably, during the relevant time period, the term "litigation hold" was not yet introduced and the expectation as to preserving electronically stored information had not been defined under the law. Moreover, the scope of a Litigation Hold, as that term is used by Claimant, exceeds any legal duty to preserve. Claimant's document requests seek documents for a Litigation Hold "on documents related to Claimant." When a duty to preserve arises, a party is not obligated to preserve all documents relating to the adverse party. Rather, the duty to preserve only applies to documents relevant to a particular reasonably anticipated claim. The existence of a duty to take affirmative steps to preserve documents, as well as the scope and extent of any such duty, must also be evaluated in the context of the Debtors' bankruptcy filing, the over 60,000 claims that were asserted, the imposition of an automatic stay under bankruptcy law, and Debtors' obligations under bankruptcy law at the time of the bankruptcy filing and thereafter. Claimant's definition improperly attempts to impose or assume a legal obligation to preserve certain documents at times when no such obligation existed and for documents that would not have been covered when such a duty did exist.

11.    Debtors object to the term "Webley" as defined by Claimant's Case-Specific Definition No. 39 to the extent this definition includes persons or entities other than Webley Systems, Inc.

## Debtors' Objections to Claimant's Instructions

12.    Debtors object to Claimant's Instruction No. 1, which directs Debtors to both produce documents as kept in the usual course of business and to organize and label the

DB02/048629 0094_0019/7388998.2

A 03881

produced documents to correspond with the categories set forth in Claimant's requests, because this instruction seeks to impose obligations beyond those set forth in Fed. R. Civ. P. 34.

13.     Debtors object to Claimant's Instruction No. 2, which directs Debtors to produce all documents if Debtors have a legal right to demand production of such documents from others, because this instruction seeks to impose obligations beyond those set forth in Fed. R. Civ. P. 34.

14.     Debtors object to Claimant's Instruction No. 3, which directs Debtors to produce all attachments and enclosures to all responsive documents to the extent that this instruction seeks to impose obligations beyond those set forth in Fed. R. Civ. P. 26.

15.     Debtors object to Claimant's Instruction No. 4, which directs Debtors to produce documents not responsive to a request "if such documents refer to, relate to, or explain the documents called for by a request or if such documents are attached documents called for by the Request and constitute routing slips, transmittal memoranda or letters, comments, evaluations or similar documents." Claimant's instruction fails to state with particularity the documents sought, seeks irrelevant documents and improperly seeks to impose obligations beyond those set forth in Fed. R. Civ. P. 26.

16.     Debtors object to Claimant's Instruction Nos. 5 and 6, which direct Debtors to provide extensive information for any document known to exist but which cannot be produced, or that "has been destroyed." Claimant's instructions demand this information even if such "destruction" took place as the result of the routine, good-faith operation of an electronic information system, took place long before any duty to preserve existed, and even if other copies or drafts of the document are produced. These instructions exceed the obligations imposed under Fed. R. Civ. P. 34, are unduly burdensome, seek information that is not relevant to any claim or defense asserted in this litigation and impermissibly assert interrogatories in violation of this Court's rules limiting the number and content limitations as set forth in Fed. R. Civ. P. 33 and S.D.N.Y. Bankr. R. 7033-1.

17.     Debtors object to Claimant's Instruction No. 7, which directs Debtors to provide an extensive privilege log because Claimant's instruction seeks to impose obligations beyond those set forth in this Court's rules, is unduly burdensome, seeks information that is not relevant to any claim or defense asserted in this litigation and is an improper interrogatory in violation of this Court's rules limiting the number and content of interrogatories. See Fed. R. Civ. P. 26(b)(5) and S.D.N.Y. Bankr. R. 7034-1(c), S.D.N.Y. Bankr. R. 7033-1. Debtors further object to document-by-document identification in a privilege log as to documents contained in the litigation file created by Debtors and Debtors' counsel in this action. The discovery requests seeking documents from this file are patently inappropriate, and creating a detailed list of all documents in the litigation file in this matter would be unduly burdensome.

18.     Debtors object to Claimant's Instruction No. 9 regarding the supplementation of discovery responses to the extent that it exceeds the obligations imposed by Fed. R. Civ. P. 26. Debtors will supplement any response to these discovery requests to the extent required by Fed. R. Civ. P. 26(e).

DB02/048629 0094_0019/7388998.2

**A 03882**

19.    Debtors object to Claimant's Instruction No. 10, which provides that the relevant time period for purposes of responding to these requests is the time period January 1, 2000 through the present date. The bases for this objection are set forth in Debtors' Special Objection A as to Time and incorporated here by reference.

## DEBTORS' SPECIAL OBJECTIONS

A.    **Special Objection A as to Time**. Debtors object to Instruction No. 10, which provides that the relevant time period for purposes of responding to these requests is January 1, 2000 through the present date. This expanded time period is overbroad, harassing, unduly burdensome, unreasonably cumulative, unreasonably duplicative, contrary to the deadlines approved or directed by Claimant's counsel for searching paper documents and electronically stored information, would require the production of documents that are not relevant to the claims and defenses asserted in this litigation, seeks information that Claimant has had ample opportunity by discovery in the action to obtain, and the burden or expense of the proposed discovery outweighs its likely benefit. The contract at issue was effective November 20, 2000 and terminated on April 12, 2002. Debtors advised Claimant and the Court that they would use the relevant time period of January 1, 2000 to December 31, 2002 for purposes of identifying and reviewing the hundreds of boxes of stored paper documents. Claimant did not object to use of this time period. Debtors then reviewed over 400 boxes of documents using this time period. Claimant subsequently directed Debtors to use the relevant time period of September 1, 2000 to April 12, 2002 in conducting searches of electronically stored information. Debtors used this time period in searching accessible electronically stored information and the nine sample tapes of inaccessible electronically stored information. To now expand the time period to January 1, 2000 through the present would require Debtors to conduct a second evaluation of the indices identifying the 10,000 boxes of stored paper documents, then conduct a second manual review of the 400 previously selected boxes and review any additional boxes pertaining to the expanded time period. Debtors would also have to re-do prior searches of electronically stored information. For purposes of responding to these requests, Debtors will use January 1, 2000 through December 31, 2002 as the relevant time period for paper discovery and September 1, 2000 to April 12, 2002 as the relevant time period for electronically stored information.

B.    **Special Objection B as to Requests Seeking Discovery of the Discovery Process**. As identified below, certain document requests seek discovery of the process by which Debtors investigated Claimant's claims and responded to Claimant's discovery requests, rather than documents relevant to the claims or defenses asserted in this litigation. These requests seek to impose a massive burden on Debtors and seek documents contained in the internal litigation file created by Debtors and Debtors' counsel in defense of this litigation. These requests improperly and unnecessarily increase the expense of this litigation. Debtors object to these requests because they are unduly burdensome, harassing, fail to seek documents that are relevant to the claims and defenses asserted in this litigation, and seek privileged and work product documents.

C.    **Special Objection C as to Relevance**. As identified below, Debtors object to certain document requests because they seek documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Claimant's claims arise from the Unified Communications Services General Agreement ("UC Contract") dated November 20,

A 03883

2000 between Claimant EffectNet (now Parus Holdings, Inc.) and Intermedia Communications, Inc. By letters dated March 12, 2002 and March 25, 2002, Claimant terminated the UC Contract. Debtors do not dispute that the contract was terminated; they only dispute the amount Claimant alleges as due under the contract. Claimant also seeks consequential damages under claims of tortious interference with contractual relations, unfair and deceptive trade practices, civil conspiracy and breach of an implied covenant of good faith and fair dealing. With rare exception, Claimant's discovery requests do not seek information relating to these claims.

D.     **Special Objection D as to Undue Burden**. As identified below, Debtors object to certain document requests as harassing, overbroad, unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence because, as drafted, they seek the production of hundreds, if not thousands, of documents that are peripheral to documents previously sought by Claimant. Claimant repeatedly requests "[a]ll documents that refer to, relate to or identify" the document or category of documents requested. For example, Claimant seeks in Request No. 1 "[a]ll documents that refer to, relate to or identify" the location of any documents it has requested. Responding to this request as drafted would lead to the absurd result of Debtors producing leases for any facility where their documents are stored, telephone directories identifying those locations and other similar documents that are completely unrelated to and have no bearing on this lawsuit. Similarly, Claimant seeks in Request No. 20, the production of "[a]ll documents that refer to, relate to or identify" the persons who searched Debtors' servers for documents. Responding to this request as drafted would require the production of such documents as telephone directories, and time and medical records.

E.     **Special Objection E as to Searches of Inaccessible Electronically Stored Information**. Pursuant to Fed. R. Civ. P. 26(b)(2)(B) and 26(b)(2)(C), at this time Debtors will not produce documents from the sources of electronically stored information identified in this Special Objection because such data is not reasonably accessible due to undue burden and cost. Documents responsive to these requests (and Claimant's first document requests) may be located in the following sources of inaccessible electronically stored information: (1) 72 Intermedia backup tapes (including the 9 previously sampled tapes) for the relevant time period previously dictated by Claimant's counsel in its October 24, 2005 letter to Debtors' counsel; (2) 78 MCI POP email backup tapes for the relevant time period previously dictated by Claimant's counsel; (3) MCI Mail backup tapes that have not yet been evaluated for the relevant time period; (4) email relay logs that were initially evaluated and produced as to custodian Barry Zipp;[3] and (5) a terabyte[4] of data preserved from a decommissioned Intermedia server, although it is believed that information is duplicative of the information contained on the backup tapes.[5]

---

[3]     Claimant's counsel selected Barry Zipp as the initial sample. After obtaining this information, Claimant's counsel did not request further production of email relay logs for other custodians.

[4]     A terabyte is a measurement term for data storage capacity equal to 1024 gigabytes, i.e. one trillion (short scale) bytes. This measurement can also be expressed as 1,000,000,000,000 bytes or $1000^4$ or $10^{12}$ bytes. A terabyte is roughly equal to 1 million documents or a small library containing 5,000 books.

[5]     Debtors searched this server before it was decommissioned and the data preserved, but the search yielded very little responsive information. The cost to conduct further searches of this server data would be substantial.

DB02/048629 0094_0019/7388998.2

**A 03884**

In a letter to the Court dated June 16, 2006, Debtors requested permission to file a motion for protective order and for cost-shifting with respect to inaccessible electronic information. Prior to this request, counsel for Debtors and Claimant engaged in cooperative efforts to initiate a sampling process to gauge the cost and effectiveness of searching Debtors' backup tapes. Claimant directed Debtors to search electronically stored information using the custodians and search terms set forth in its counsel's October 24, 2005 letter ("Claimant's Custodian List" and "Claimant's Search Terms"). Claimant selected four backup tapes and Debtors selected five additional backup tapes because search of those tapes was necessary to make Claimant's selected sampling complete. Kroll Ontrack then searched the sample backup tapes using Claimant's Custodian List and Claimant's Search Terms.[6] The June 16, 2006 letter to the Court (as well as prior correspondence to Claimant's counsel) disclosed that restoring and searching nine tapes selected for sampling using Claimant's Custodian List and Claimant's Search Terms resulted in the selection of over 740,000 pages (or almost 300 boxes) of documents. Debtors incurred approximately $73,000 in costs (excluding substantial additional cost for attorney review time). Debtors then undertook the time-consuming and expensive task of reviewing the documents for responsiveness and privilege. Notably, the number of responsive documents was extremely low (only approximately 3.3% of the documents electronically selected). Debtors advised the Court that, extrapolating costs from the nine sampled backup tapes, the costs associated with completing the remaining electronic discovery could exceed $1.2 million.[7] Thus, Debtors asked the Court to permit the filing of a motion to shift costs. Claimant responded that they wanted to take depositions of Debtors' IT personnel regarding the process by which Debtors obtained the inaccessible electronically stored information. The Court directed Debtors to produce these witnesses for depositions. Significant delay ensued after Claimant terminated its prior counsel and retained new counsel who dramatically expanded the scope of these depositions and initiated other discovery to attack all aspects of Debtors' paper and electronic discovery preservation, restoration, search, review and production efforts. As a result, the restoration and search of the previously identified sources of inaccessible electronically stored information has not yet taken place.

Debtors object to the strategy undertaken by Claimant's new counsel to disavow the prior negotiated agreements regarding sampling, including the relevant time period, Claimant's Search Terms and Claimant's Custodian List. For instance, in Document Request No. 84, Claimant asked Debtors to produce all documents relating to Claimant's claims that were sent or received by 59 identified persons. Half of those persons were not included in the prior Claimant's

---

[6]    As part of that process, certain of the custodians originally selected by Claimant were eliminated as it was determined that they had no involvement in the EffectNet contract or the Webley MASL. In addition, Claimant and Debtors agreed to eliminate or limit certain search terms because they substantially increased the cost of the search while providing no relevant information.

[7]    A search of the nine sample tapes alone resulted in 746,228 pages of documents to review (an average of 82,914 pages of documents per tape), at a cost of approximately $72,900 (an average of $8,100 per tape), not including attorney review time. Using these numbers to estimate the volume of data and cost for the remaining Intermedia backup tapes and MCI POP email back up tapes, a search could result in an additional 12,354,186 pages of documents (4,942 boxes) to review at a cost of approximately $1,206,900, not including attorney review time. This estimate will substantially increase if additional terms or custodians are added to the search or the relevant time period is expanded. The sample searches also would have to be re-done.

7

A 03885

Custodian List.  Debtors object to any attempt to expand the scope of searching inaccessible electronically stored information beyond the discovery parameters that Claimant's prior counsel established, including any second search of the nine previously sampled backup tapes, because such search is unduly burdensome, seeks unreasonably cumulative and duplicative information, seeks information that is available from other sources that are more convenient, less burdensome or less expensive, the burden or expense of the proposed discovery outweighs its likely benefit, and the expanded search is contrary to the relevant time period selected by Claimant's counsel.

Although Debtors do not oppose producing responsive documents from the identified backup tapes for the relevant time period Claimant's counsel identified in its October 24, 2005 letter to Debtors' counsel, they request that the Court compel Claimant to bear the costs for restoring and searching these tapes.

Debtors object to further production of information from the email relay logs because such search is unduly burdensome, seeks unreasonably cumulative and duplicative information, seeks information that is available from other sources that are more convenient, less burdensome or less expensive and the burden or expense of the proposed discovery outweighs its likely benefit.

Debtors object to further searching the Intermedia server data because such search is unduly burdensome, seeks unreasonably cumulative and duplicative information, seeks information that is available from other sources that are more convenient, less burdensome or less expensive and the burden or expense of the proposed discovery outweighs its likely benefit.

All of the issues set forth in this Special Objection will have to be resolved by the Court before Debtors proceed with restoring and searching these identified sources of inaccessible electronically stored information.

F.    **Special Objection F as to Duplicative Searches of Electronically Stored Information**.    Debtors object to Claimant's requests seeking documents contained in electronically stored information that already has been searched and reviewed by Debtors because these requests are overbroad, harassing, unduly burdensome, unreasonably cumulative, unreasonably duplicative, seek documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, the burden or expense of the proposed discovery outweighs its likely benefit, and the request is contrary to the relevant time periods directed by Claimant's counsel for searching electronically stored information.  In response to Claimant's first document requests, Debtors located, identified and searched certain sources of electronically stored information that were reasonably accessible.  Debtors did not ask Claimant to share the costs of these searches because the searched electronically stored information was accessible.  Prior to searching, Debtors' counsel and Claimant's predecessor counsel engaged in cooperative efforts to guide the search of electronically stored information.  Through that process, Claimant directed the search parameters as to relevant time period, identified custodians and identified search terms.  Claimant's new counsel is attempting to disavow these previously agreed upon discovery parameters, upon which Debtors relied in responding to discovery.  Debtors incurred hundreds of thousands of dollars conducting searches under those discovery parameters.

8

G.    **Special Objection G as to Duplicative Searches of Previously Searched Paper Documents**. Debtors object to the extent these document requests seek paper documents other than or beyond those produced in response to Claimant's first document requests. In response to Claimant's first document requests, Debtors located approximately 10,000 boxes of Debtors' documents stored in warehouses. Based on indices of those records, Debtors selected more than 400 boxes for review, provided Claimant the opportunity to select additional boxes for Debtors to review, then reviewed the boxes for documents responsive to Claimant's first document requests. Debtors object to Claimant's requests seeking a second review of paper documents because these requests would require a second search and therefore are overbroad, harassing, unduly burdensome, unreasonably cumulative, unreasonably duplicative, the burden or expense of the proposed discovery outweighs its likely benefit, the request is contrary to the relevant time period approved or directed by Claimant's counsel for searching paper documents and Claimant has had ample opportunity by discovery in the action to obtain the information sought.

H.    **Special Objection H to Requests Seeking Litigation Hold Information**. Pursuant to Fed. R. Civ. P. 26(b)(2)(C), Debtors object to Claimant's document requests seeking discovery of "Litigation Hold" information because the discovery sought is unreasonably cumulative or duplicative, Claimant has had ample opportunity by discovery in the action to obtain the information sought, and the burden or expense of the proposed discovery outweighs its likely benefit. Since their entry in this litigation, Claimant's new counsel has initiated pounding waves of discovery relating almost exclusively to an issue unrelated to the merits of the case – preservation of documents. Pursuant to this Court's directive, Debtors produced five witnesses (Ken Croslin, Joe Falleur, Jim LaMantia, Bryan Miller and Julio Valdes) to explain Debtors' efforts to locate and restore inaccessible electronic data. Claimant's counsel took these depositions, demanding that all witnesses and counsel travel to Chicago so that the depositions could be taken in the office of Claimant's counsel. However, Claimant's counsel focused very little on the question of accessibility of electronic data, but rather focused on issues related to preservation of information, including efforts to locate, identify, restore and produce accessible and inaccessible electronically stored information. Claimant's new counsel served these 410 discovery requests, directed primarily to the same non-merit issues. Claimant's new counsel then noticed and subpoenaed for deposition two prior in-house counsel for MCI and Intermedia and noticed a Rule 30(b)(6) deposition to address the same so-called litigation hold issues, accompanied by extensive document requests demanding document production at the depositions on short notice. Claimant noticed these depositions without consulting Debtors' counsel to ascertain the availability of the witnesses or counsel. In an effort to forestall the staggering onslaught of this discovery, Debtors agreed to provide sworn responses to a list of questions submitted by Claimant's counsel addressing a plethora of issues all related to so-called litigation hold issues (the "Litigation Hold Questions"). Debtors object to these document requests seeking information relating to litigation hold issues because this information was addressed or could have been requested in the Litigation Hold Questions.

I.    **IntermediaOne**. Debtors assert Special Objection I as to requests seeking production of documents relating to IntermediaOne because these requests are overbroad, unduly burdensome and seek information that is not relevant to the claims or defenses asserted in this matter. IntermediaOne and the unified messaging product sold by EffectNet were not the same product. Unified messaging (provided under the UC Contract) was merely a component of the

9

A 03887

IntermediaOne suite of products. Therefore, many documents relating to IntermediaOne or IntermediaOne sales are unrelated to Claimant's claims.

J.      **Information Could Be Obtained by Deposition**. Pursuant to Fed. R. Civ. P. 26(b)(2)(C), Debtors assert Special Objection J to those discovery requests where the information can less burdensomely be obtained by depositions. Debtors object because the discovery sought is unreasonably cumulative or duplicative, is obtainable from other sources that are more convenient, less burdensome, or less expensive, Claimant had ample opportunity to obtain the information sought, and the burden or expense of the proposed discovery outweighs its likely benefit. The information sought by these requests either was addressed or could have been addressed in the depositions of Don Ramsay, Ken Croslin, Joseph Falleur, James LaMantia, Bryan Miller and Julio Valdes.

DB02/048629 0094_0019/7388998.2

**A 03888**

Intermedia's tapes for the relevant time period Claimant identified in its counsel's October 24, 2005 letter to Debtors' counsel. It is Debtors' understanding that, at least as of the date Claimant's second document requests were served, Claimant had not obtained its file from its prior counsel. If Claimant still is without its file, Debtors are willing to provide Claimant another copy of the aforementioned documents.

   **3.    All Documents, indices, schedules, and lists searched and/or reviewed by the Debtors in connection with the Claimants' Documents Requests.**

   RESPONSE: Debtors object to this request to the extent it seeks documents protected from disclosure by the attorney-client privilege and/or the work product doctrine. Debtors further object to this request because it is overbroad, unduly burdensome, harassing and seeks documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

   Claimant's request for "all documents" searched and reviewed by Debtors in connection with Claimant's requests is absurd on its face in that it literally would require production of all documents without regard to their content. Debtors have reviewed thousands of documents in order to respond to Claimant's discovery, many of which were neither relevant to Claimant's claims nor responsive to Claimant's prior document requests. Similarly, many documents reviewed by Debtors contained what can be described as indices, schedules and lists on a wide variety of topics that are neither relevant to Claimant's claims nor responsive to Claimant's prior document requests. There is no legitimate basis for requesting the production of these documents.

   As more specifically discussed in Special Objections B, C and D, this request is unduly burdensome and improperly seeks the production of documents regarding the discovery process itself, including privileged and work product documents from Debtors' and their counsel's litigation file, rather than documents relevant to the claims or defenses asserted in this lawsuit.

   As more specifically discussed in Special Objections A, F and G, responding to this duplicative request with Claimant's newly expanded time period and content would require Debtors to re-review the equivalent of over 775 boxes of paper and electronic documents previously reviewed in response to Claimant's first document requests. Debtors contemporaneously apprised Claimant of the efforts they were undertaking to respond to Claimant's first document requests. Claimant has no legitimate excuse for waiting until now to expand the relevant time period and content that it had originally dictated. Requiring Debtors now to re-do their extensive review of documents is unduly burdensome and harassing.

   As more specifically discussed in Special Objection E, Debtors object to the production of documents that are inaccessible. Pursuant to Fed. R. Civ. P. 26(b)(2)(B) and 26(b)(2)(C), Debtors have identified in Special Objection E those sources of electronically stored information that are not reasonably accessible because of undue burden and cost.

   Subject to and without waiving their objections, Debtors state that they have produced to Claimant on multiple occasions the indices for Debtors' stored paper documents regarding Intermedia. Debtors also previously have provided to Claimant indices identifying the document

DB02/048629 0094_0019/7388998.2

**A 03889**

requests to which their previous document productions are responsive, and indices of Intermedia's tapes for the relevant time period Claimant identified in its counsel's October 24, 2005 letter to Debtors' counsel. If Claimant still has not obtained its file from prior counsel, Debtors are willing to provide Claimant another copy of the aforementioned documents.

**4.    All Documents that refer to or relate to efforts undertaken by the following Debtors to identify, locate, review and/or retrieve Documents that are responsive to the Claimant's Discovery Requests: (a) Intermedia and (b) MCI.**

RESPONSE: Debtors object to this request to the extent it seeks documents protected from disclosure by the attorney-client privilege and/or the work product doctrine. Debtors further object to this request because it is overbroad, unduly burdensome, harassing, seeks documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and exceeds the obligations imposed by Fed. R. Civ. P. 34.

As more specifically discussed in Special Objections B, C and D, this request is unduly burdensome and improperly seeks the production of documents regarding the discovery process itself, including privileged and work product documents from Debtors' and their counsel's litigation file, rather than documents relevant to the claims or defenses asserted in this lawsuit.

In addition, Fed. R. Civ. P. 34 requires only that a party provide a written response to a document request and produce responsive, non-privileged documents. Claimant's demand that Debtors also produce all documents that refer or relate to efforts to identify, locate, review or retrieve responsive documents imposes an exceptional burden not required by Fed. R Civ. P. 34.

Subject to and without waiving their objections, Debtors state that they have identified in their responses to Claimant's Litigation Hold Questions information regarding the preservation of documents relevant to this lawsuit.

**5.    All Documents that refer or relate to efforts undertaken by the following Debtors to identify, locate, review and/or retrieve Documents under their mandatory disclosure obligations pursuant Federal Rule of Civil Procedure 26(a): (a) Intermedia and (b) MCI.**

RESPONSE: Debtors object to this request to the extent it seeks documents protected from disclosure by the attorney-client privilege and/or the work product doctrine. Debtors further object to this request because it is overbroad, unduly burdensome, harassing, seeks documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and exceeds the obligations imposed by Fed. R. Civ. P. 26.

As more specifically discussed in Special Objections B, C and D, this request improperly seeks the production of documents regarding the discovery process itself, including privileged and work product documents from Debtors' and their counsel's litigation file, rather than documents relevant to the claims or defenses asserted in this lawsuit.

In addition, Fed. R. Civ. P. 26(a)(1)(b) requires a party to provide copies of documents that the disclosing party may use to support its claims or defenses, but does not require production of documents that refer or relate to the party's efforts to comply with this rule.

A 03890

burdensome, harassing, and seeks documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

As more specifically discussed in Special Objections B, C and D, this request is unduly burdensome and improperly seeks the production of documents regarding the discovery process itself, including privileged and work product documents from Debtors' and their counsel's litigation file, rather than documents relevant to the claims or defenses asserted in this lawsuit.

Subject to and without waiving their objections, Debtors state that, to the extent that this request is intended to refer to the Intermedia backup tapes that Kroll Ontrack was unable to restore and, consequently, has retained the services of another document specialist for such restoration, Debtors presently are not aware of any non-privileged documents/non work product documents responsive to this request.

**43.    All Documents that identify the steps and/or procedures MCI has followed in order to restore MCI's 78 Back Up Tapes.**

RESPONSE: Debtors object to this request to the extent it seeks documents protected from disclosure by the attorney-client privilege and/or the work product doctrine. Debtors further object to this request because it is vague and ambiguous because there are more than 78 MCI backup tapes. Debtors further object to this request because it is overbroad, unduly burdensome, harassing, seeks documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence and seeks information that was or could have been obtained in depositions.

As more specifically discussed in Special Objections B, C and D, this request is unduly burdensome and improperly seeks the production of documents regarding the discovery process itself, including privileged and work product documents from Debtors' and their counsel's litigation file, rather than documents relevant to the claims or defenses asserted in this lawsuit.

Pursuant to Fed. R. Civ. P. 26(b)(2)(C), and as more specifically discussed in Special Objection J, this request seeks information that Claimant either addressed or could have addressed in the depositions of Ken Croslin, Joe Falleur, Jim LaMantia, Bryan Miller and Julio Valdes.

Subject to and without waiving their objections, Debtors state that, to the extent that this request is intended to refer to the MCI POP email tapes that Kroll Ontrack will restore once cost-shifting is determined by the Court, Debtors do not have documents regarding the steps and/or procedures that Kroll Ontrack will use to restore such tapes.

**44.    All Documents that identify the steps and/or procedures Intermedia has followed in order to restore Intermedia's 29 Back Up Tapes.**

RESPONSE: Debtors object to this request to the extent it seeks documents protected from disclosure by the attorney-client privilege and/or the work product doctrine. Debtors object to this request because it is vague and ambiguous because there are more than 29 Intermedia backup tapes. Debtors further object to this request because it is overbroad, unduly burdensome,

DB02/048629 0094_0019/7388998.2

A 03891

litigation file, rather than documents relevant to the claims or defenses asserted in this lawsuit.

Subject to and without waiving their objections, Debtors state that they presently are not aware of any non-privileged/non work product documents responsive to this request.

**47.     All Documents that identify the cost to take the necessary steps and/or procedures to render all of the following Debtors' inaccessible Hard Copy Documents that are relevant to the Claimant's Discovery Requests accessible:  (a) Intermedia and (b) MCI.**

RESPONSE:  Debtors object to this request as nonsensical to the extent it suggests that Debtors have the ability to render accessible only those hard copy documents "relevant to Claimant's Discovery Requests."  Debtors further object to this request to the extent it seeks documents protected from disclosure by the attorney-client privilege and/or the work product doctrine, and because it is overbroad, unduly burdensome, harassing, and seeks documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

As more specifically discussed in Special Objections B, C and D, this request is unduly burdensome and improperly seeks the production of documents regarding the discovery process itself, including privileged and work product documents from Debtors' and their counsel's litigation file, rather than documents relevant to the claims or defenses asserted in this lawsuit. Debtors already have reviewed over 400 boxes of stored paper documents in order to respond to respond to Claimant's first discovery requests using a method and procedure which Claimant approved.  Although these documents were (and remain) inaccessible, Debtors did not seek cost-shifting with respect to the review of these documents.

Subject to and without waiving their objections, Debtors state that they are not aware of any non-privileged /non work product documents responsive to this request.

**48.     All Documents that refer or relate to document storage, maintenance, and retention policies, including, but not limited to, manuals, policies, procedures, or guidelines adopted, issued, or followed by the following Debtors:  (a) Intermedia and (b) MCI.**

RESPONSE:  Debtors object to this request to the extent it seeks documents protected from disclosure by the attorney-client privilege and/or the work product doctrine.  Debtors further object to this request because it is overbroad, unduly burdensome, harassing, seeks documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence and seeks information that was or could have been obtained in depositions.

As more specifically discussed in Special Objections A, F and G, responding to this duplicative request with Claimant's newly expanded time period and content would require Debtors to re-review the equivalent of over 775 boxes of paper and electronic documents previously reviewed in response to Claimant's first document requests.  Debtors contemporaneously apprised Claimant of the efforts they were undertaking to respond to Claimant's first document requests.  Claimant has no legitimate excuse for waiting until now to expand the relevant time period and content that it had originally dictated.  Requiring Debtors now to re-do their extensive review of documents is unduly burdensome and harassing.

As more specifically discussed in Special Objections B, C and D, this request is unduly



U.S. DISTRICT COURT
FILED
JUL - 1 2002
S.D. OF N.Y.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,
                                Plaintiff,            :    Civ No. 02-CV-4963 (JSR)

                v.

WORLDCOM, INC.,
                                Defendant.

## STIPULATION AND ORDER

Plaintiff Securities and Exchange Commission ("Commission"), and defendant

WorldCom, Inc. ("WorldCom"), by and through their counsel of record, hereby agree and

stipulate to the Court's entry of the following Order in the above-captioned matter, subject to the

Court's approval:

IT IS HEREBY ORDERED THAT:

1.  Defendant WorldCom, its officers, agents, accountants, employees, and attorneys, and

those persons in active concert or participation with them, and each of them, who receive actual

notice of this Order by personal service or otherwise, shall not destroy, mutilate, conceal, alter or

dispose of any item (including but not limited to books, records, documents, contracts,

agreements, assignments, evidence of obligations or payments, press releases, public

announcements, drafts of any of the foregoing, or any other item within their possession, custody

or control) relating to, referring to or concerning any aspect of WorldCom's financial reporting

obligations, public disclosures required by the federal securities laws, or any accounting matters

relating to WorldCom, including but not limited to the matters referred to in the Commission's

Complaint filed herein;

Exhibit S

Exhibit B

A 03893

2. Upon appointment by the Court, pursuant to this Order, the Corporate Monitor for WorldCom shall have oversight responsibility with respect to all compensation paid by WorldCom. The intent of the parties is that the Corporate Monitor shall exercise its oversight responsibility to prevent unjust enrichment as a result of the conduct alleged in the Complaint and to ensure that the assets of WorldCom are not dissipated by payments that are not necessary to the operation of its business. For purposes of this Stipulation and Order, compensation is defined so as to include salary, as well as any severance payment, bonus, indemnification, gift, loan, reimbursement, advance, or consideration of any kind in excess of established salary, but does not include payments to misfortune employees for ordinary business expenses incurred. In exercising its oversight responsibility, the Corporate Monitor shall have discretion to determine the type of compensation to review and either approve or disapprove, as well as the discretion to determine the group of officers, directors and employees with respect to which such compensation shall be reviewed and either approved or disapproved;

3. Until a Corporate Monitor is in place, WorldCom, its officers, agents, accountants, employees, attorneys, and those persons in active concert or participation with them, and each of them, who receive actual notice of this Order by personal service or otherwise, shall not (1) make any payment greater than $100,000 to any present or former officer, director or employee of WorldCom or any of its affiliates, or (2) make any extraordinary payment (which is defined for purposes of this Stipulation and Order as any payment other than those WorldCom is required to make by virtue of a legal obligation established prior to May 15, 2002) to any present or former director of WorldCom, any present or former officer of WorldCom who currently holds or formerly held a position at or above the level of Vice-President, or any person currently

A 03894

or formerly employed within WorldCom's financial reporting or accounting functions;

4. In the event the Corporate Monitor does not promptly approve any payment of compensation sought to be made by WorldCom, WorldCom may, upon notice to the Commission, seek the Court's approval for such payment;

5. By further Order of this Court, and subject to the Court's approval, a Corporate Monitor for defendant WorldCom, to be jointly named and proposed to the Court by the parties hereto, shall be appointed to exercise the oversight responsibility referenced in paragraph 2 of this Order; and, with respect to paragraph 1 of this Order, the Corporate Monitor shall confirm that WorldCom has implemented reasonable document retention policies and the Corporate Monitor shall take reasonable steps to oversee compliance with those policies. The Corporate Monitor shall report forthwith to the Court any evidence or indication of a violation of this Order of which the Corporate Monitor becomes aware;

6. If the parties cannot agree to a Corporate Monitor by July 3, 2002, the parties will ask the Court for an immediate conference with respect to the selection and appointment of a Corporate Monitor;

7. WorldCom shall cooperate in full with the Corporate Monitor and make its books, records and accounts available to the Corporate Monitor as the Corporate Monitor shall, in his or her discretion, request in order to perform the duties outlined above;

8. The Corporate Monitor's fees and expenses shall be paid by WorldCom.

9. The term of the Corporate Monitor will cease no later than the date on which the Commission's investigation of this matter concludes, the Court determines the function of the

5

A 03895

'02 10:55 SIMPSON THACHER & BARTLETT    ID=12    P05

Corporate Monitor is no longer necessary, or the parties so agree.

SO ORDERED SUBJECT TO THE CONDITIONS STATED
AND AGREED TO IN COURT ON 6/08/02

Dated: June 20, 2002

United States District Judge

Consented to:

Peter H. Bresnan
Deputy Chief Litigation Counsel
Securities and Exchange Commission
450 Fifth Street, NW
Washington, DC 20549
202/942-4788 (phone)
202/942-9581 (fax)

Michael H. Salsbury
Executive Vice President and General Counsel
WorldCom, Inc.
1133 19th St., N.W.
Washington, D.C.

4

A 03896


PROVIDED BY
FindLaw
W W W . F I N D L A W . C O M

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>450 Fifth Street, N.W.<br>Washington, D.C. 20539 | ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Civil Action No.** |
| WORLDCOM, INC., | ) ) | **COMPLAINT**<br>**(Securities Fraud)** |
| **Defendant.** | ) ) | |

The Securities and Exchange Commission ("the Commission") alleges for its Complaint as follows:

1.     From at least the first quarter of 2001 through the first quarter of 2002, defendant WorldCom Inc. ("WorldCom") defrauded investors.  In a scheme directed and approved by its senior management, WorldCom disguised its true operating performance by using undisclosed and improper accounting that materially overstated its income before income taxes and minority interests by approximately $3.055 billion in 2001 and $797 million during the first quarter of 2002.

2.     By improperly transferring certain costs to its capital accounts, WorldCom falsely portrayed itself as a profitable business during 2001 and the first quarter of 2002.  WorldCom's transfer of its costs to its capital accounts violated the established standards of generally accepted accounting principles ("GAAP").  WorldCom's improper transfer of certain costs to its capital accounts

Exhibit T

A 03897

FindLaw
P R O V I D E D   B Y
W W W . F I N D L A W . C O M

was not disclosed to investors in a timely fashion, and misled investors about WorldCom's reported earnings.  This improper accounting action was intended to manipulate WorldCom's earnings in the year ending 2001 and in the first quarter of 2002 to keep them in line with estimates by Wall Street analysts.

     3.  By engaging in this conduct, WorldCom violated the anti-fraud and reporting provisions of the federal securities laws and, unless restrained and enjoined by this Court, will continue to do so. The Commission requests, among other things, that Worldcom be enjoined from further violations of the federal securities laws as alleged herein, and that it pay a monetary penalty.

### THE FRAUDULENT SCHEME

     4.  WorldCom is a major global communications provider, operating in more than 65 countries.  WorldCom provides data transmission and Internet services for businesses, and, through its MCI unit, provides telecommunications services for businesses and consumers.  WorldCom became an important player in the telecommunications industry in the 1990s.  However, as the economy cooled in 2001, WorldCom's earnings and profits similarly declined, making it difficult to keep WorldCom's earnings in line with expectations by industry analysts.

     5.  Starting at least in 2001, WorldCom engaged in an improper accounting scheme intended to manipulate its earnings to keep them in line with Wall Street's expectations, and to support WorldCom's stock price.  One of WorldCom's major operating expenses was its so-called "line costs."  In general, "line costs" represent fees WorldCom paid to third party telecommunication

2

A 03898

network providers for the right to access the third parties' networks. Under GAAP, these fees must be expensed and may not be capitalized. Nevertheless, beginning at least as early as the first quarter of 2001, WorldCom's senior management improperly directed the transfer of line costs to WorldCom's capital accounts in amounts sufficient to keep WorldCom's earnings in line with the analysts' consensus on WorldCom's earnings. Thus, in this manner, WorldCom materially understated its expenses, and materially overstated its earnings, thereby defrauding investors.

6. As a result of this improper accounting scheme, WorldCom materially underreported its expenses and materially overstated its earnings in its filings with the Commission, specifically, on its Form 10-K for the fiscal year ending on December 31, 2001, and on its Form 10-Q for the quarter ending on March 31, 2002.

7. In particular, WorldCom reported on its Consolidated Statement of Operations contained in its 2001 Form 10-K that its line costs for 2001 totaled $14.739 billion, and that its earnings before income taxes and minority interests totaled $2.393 billion, whereas, in truth and in fact, WorldCom's line costs for that period totaled approximately $17.794 billion, and it suffered a **loss** of approximately $662 million.

8. Further, WorldCom reported on its Consolidated Statement of Operations contained in its Form 10-Q for the first quarter of 2002 that its line costs for that quarter totaled $3.479 billion, and that its income before income taxes and minority interests totaled $240 million, whereas, in truth and in fact,

3

A 03899

WorldCom's line costs for that period totaled approximately $4.276 billion and it suffered a **loss** of approximately $557 million.

9.  Worldcom's disclosures in its 2001 Form 10-K and in its Form 10-Q for the first quarter of 2002 failed to include material facts necessary to make the statements made in light of the circumstances in which they were made not misleading.  In particular, these filings failed to disclose the company's accounting treatment of its line costs, that such treatment had changed from prior periods, and that the company's line costs were actually increasing substantially as a percentage of its revenues.

## JURISDICTION

10. The Commission brings this action pursuant to Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d)].

11. This Court has jurisdiction over this action pursuant to Sections 21(d), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa].

12. The defendant, directly and indirectly, has engaged in, and unless restrained and enjoined by this Court will continue to engage in, transactions, acts, practices, and courses of business that violate Sections 10(b) and 13(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(a)] and Rules 10b-5, 12b-20, 13a-1, and 13a-13 thereunder [17 C.F.R. §§240.10b-5, 240.12b-20, 240.13a-1, and 240.13a-13].

## THE DEFENDANT

13.  WorldCom is a Clinton, Mississippi-based company incorporated in Georgia, which provides a broad range of communications services to both U.S.

4

A 03900

and non-U.S. based businesses and consumers.  WorldCom is a public company whose securities are registered with the Commission pursuant to Section 12(b) of the Exchange Act and it is required to file periodic reports with the Commission pursuant to Section 13 of the Act.  Throughout the relevant time period, WorldCom's stock was covered by Wall Street analysts who routinely issued quarterly and annual earnings estimates.

## CLAIMS FOR RELIEF

### FIRST CLAIM

14.  Paragraphs 1 through 13 above are incorporated herein by this reference.

15.   Defendant Worldcom, directly or indirectly, by use of the means or instruments of interstate commerce, or of the mails, or of a facility of a national securities exchange, knowingly or recklessly (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon the purchasers of securities and upon other persons, in connection with the purchase or sale of a security.

16.  Defendant WorldCom, and members of its senior management, knew, should have known, or were reckless in not knowing, that its 2001 Form 10-K, and its Form 10-Q for the first quarter of 2002, including the financial statements contained therein, as filed with the Commission, contained material misstatements and omissions.

17.  By reason of the foregoing, WorldCom violated Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5.

A 03901

FindLaw
W W W . F I N D L A W . C O M
P R O V I D E D   B Y

## SECOND CLAIM

### Violation of Section 13(a) of the Exchange Act and
### Exchange Act Rules 13a-1, 13a-13, and 12b-20

18.  Paragraphs 1 through 13 are hereby realleged and incorporated

herein by reference as if set forth fully.

19.  Section 13(a) of the Exchange Act and Rules 13a-1 and 13a-13

thereunder require issuers of registered securities to file with the Commission

factually accurate annual and quarterly reports.  Exchange Act Rule 12b-20

provides that in addition to the information expressly required to be included in a

statement or report, there shall be added such further material information, if any,

as may be necessary to make the required statements, in the light of the

circumstances under which they are made. not misleading.

As a result of the accounting actions set forth above, WorldCom violated Section

13(a) of the Exchange Act and Exchange Act Rule 13a-1, 13a-13, and 12b-20.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

Enter Orders:

A.  Permanently restraining and enjoining WorldCom from violating

Section  10(b) of the Exchange Act and Rule 10b-5 thereunder;

B.  Permanently restraining and enjoining WorldCom from violating

Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13

thereunder;

A 03902


FindLaw
WWW.FINDLAW.COM

C.  Imposing civil monetary penalties on WorldCom pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78u];

D.  Prohibiting WorldCom and its affiliates, officers, directors, employees, and agents, from destroying, altering, or removing from the court's jurisdiction any documents relevant to the matters alleged herein;

E.  Prohibiting WorldCom and its affiliates from making any extraordinary payments to any present or former affiliate, or officer, director, or employee of WorldCom, or its affiliates, including but not limited to any severance payments, bonus payments, or indemnification payments.

F.  Appointing a corporate monitor to ensure compliance with items D and E, above; and

G. Granting such other and additional relief as this Court may deem just and proper.

Respectfully submitted,

_____

Stephen M. Cutler
William R. Baker III
Charles D. Niemeier
Peter H. Bresnan (PB 9168)
Arthur S. Lowry (AL 9541)
Lawrence A. West
Neil Welch
Jose Rodriguez

Counsel for the Plaintiff
Securities and Exchange Commission
Stop 9-11
450 Fifth St., N.W.
Washington, D.C. 20549
(202) 942-4868 (Lowry)
(202) 942-9581 (Fax)

Dated:  June 26, 2002

A 03903



STINSON
MORRISON
HECKER LLP

Allison M. Murdock
(816) 691-3138
amurdock@stinsonmoheck.com
www.stinsonmoheck.com

1201 Walnut, Suite 2900
Kansas City, MO 64106-2150

*Tel* (816) 842-8600
*Fax* (816) 691-3495

July 31, 2006

***VIA* FACSIMILE 212/808-7897
AND U.S. MAIL**

Kevin J. Smith, Esq.
Kelley Drye & Warren LLP
101 Park Avenue
New York, New York  10178

      Re:    In re WorldCom, Inc., Chapter 11, Case No. 02-13533
             Parus Holdings' Claims

Dear Kevin :

    I am writing to follow up on our telephone conversation last Friday and your letter of last Friday regarding deposition scheduling.

    In your letter you have advised that you have six days between August 21 and the end of September on which you are available for depositions:  August 22, 30 and 31, September 1, 7 and 8.  As we have discussed, it appears at this time that it will be necessary for us to produce five witnesses.  These witnesses are as follows:

    Julio Valdez – During 2000 to 2002, served as Director of Operations for Intermedia Communications, Inc. and, after the Intermedia/ WorldCom, Inc. merger, continued employment with WorldCom, Inc. Mr. Valdes is in charge of all Windows backup tapes for Intermedia and the remaining active Intermedia Windows servers.

    Bryan Miller – During 2000 to 2002, served as WorldCom, Inc.'s Manager of Software Development and Support within messaging systems in IT with responsibility for, among other things, email systems and backups.

    Joseph Falleur – During 2000 to 2002, served as WorldCom, Inc.'s Team Lead for messaging group relating to relaying and unified messaging. Assisted in search of email backup and relay log.

    Kenneth Croslin – During 2000 to 2002, served in WorldCom, Inc.'s Desktop Support.  Assisted in search of desktops, shared drives and desktop backups.

KANSAS CITY

OVERLAND PARK

WICHITA

WASHINGTON, D.C.

PHOENIX

ST. LOUIS

OMAHA

JEFFERSON CITY

DB02/048629 0094_0019/7241538.1

Exhibit U

**A 03904**

Kevin J. Smith, Esq.
July 31, 2006
Page 2

> James LaMantia – During 2000 to 2002, served in WorldCom, Inc.'s Enterprise Field Services managing its desktops and active data. Assisted in search of desktops, shared drives and desktop backups.

You have requested that we produce these witnesses for depositions in New York City. We are willing to do so. However, because you are unsure how long you will take to conduct each of the depositions and our witnesses must travel to New York for the depositions (from Florida, Colorado, Oklahoma, Texas and Illinois), we believe it is prudent to schedule only one deposition per day. Consequently, we propose producing a witness for deposition on each of the followings days: August 22, 30 and 31 and September 7 and 8. (As you and I discussed, we have left September 1 off the schedule so as to not require our witnesses to be in depositions and traveling on the Friday before Labor Day weekend.)

Also, if another lawyer from your office is available to cover the depositions, we also can make our witnesses available for depositions on August 23, 24 and 25, September 6, 19, 20, 21, 22 and, with the exception of Bryan Miller, September 26, 27, 28, and 29.

In your letter you also requested Debtors' document retention policies. I have requested these from our client and will forward them to you once I receive them.

Finally, when we spoke on Friday, you advised that Parus Holdings may challenge cost-shifting on the basis that MCI's document retention policies gave rise to what you have referred to as a "destruction" of documents. Although we do not believe such an argument has any merit or that it provides any basis to avoid cost-shifting, it may be necessary for us to conduct discovery in order to respond to this argument. As we discussed, I will let you know as soon as we have determined what discovery we may need to take.

Please let me know as soon as possible which depositions you would like to take on which dates so that we can notify our witnesses.

Very truly yours,

**STINSON MORRISON HECKER** LLP

Allison M. Murdock

AMM:dl

Robert A. Scher (RS 2910)
FOLEY & LARDNER LLP
90 Park Avenue
New York, NY 10016
Phone: (212) 682-7474
Fax: (212) 682-2329
email: rscher@foley.com

-and-

Mark L. Prager (*admitted pro hac vice*)
William J. McKenna (*admitted pro hac vice*)
Jill L. Murch (*admitted pro hac vice*)
Joanne Lee (*admitted pro hac vice*)
FOLEY & LARDNER LLP
321 N. Clark Street, Suite 2800
Chicago, IL 60610
Phone: (312) 832-4500
Fax: (312) 832-4700

*Attorneys for Claimant Parus Holdings, Inc.
Successor-By-Merger to EffectNet, Inc. and
EffectNet, LLC*

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | CHAPTER 11 |
| | ) | Jointly Administered |
| WORLDCOM, INC., et al., | ) | |
| | ) | |
| Debtors. | ) | Case No. 02-13533 (AJG) |
| | ) | |
| STATE OF FLORIDA | ) | |
| | ) SS: | |
| COUNTY OF HILLSBOROUGH | ) | |

**DECLARATION OF JAMES RENFORTH**

1.      James Renforth, being first duly sworn, hereby states under oath as follows:

2.      I have personal knowledge of the facts stated in this Declaration.  If called as a witness, I could testify competently as to each of the facts stated in this Declaration.

3.      I was employed with Intermedia Communications, Inc. ("Intermedia"), one of the Debtors in the above-captioned bankruptcy, from January 1998 to June 2001.



EXHIBIT
B

A 0 906

4.    As an employee of Intermedia, I was involved in the negotiation of the Unified Communications General Services Agreement ("UC Agreement") that was executed by Intermedia and EffectNet LLC ("EffectNet") (collectively, the "Parties") on November 20, 2000.

5.    At the time of the negotiation and the execution of the UC Contract, I was employed by Intermedia as a Senior Product Manager.

6.    Among my responsibilities as a Senior Product Manager, I worked with marketing and sales in order to develop a marketing plan for all new products, including Unified Messaging, the product that Intermedia purchased from EffectNet under the UC Agreement.

7.    Unified Messaging was intended to be a component of Intermedia*One*, a unified telecommunications service and Intermedia's flagship product.

8.    I attended multiple meetings at Intermedia involving representatives from several departments at Intermedia (including product marketing, product management, sales, customer service, customer operations, switching, regulatory, and public relations (the "Interdepartmental Meetings") in which various employees (including myself) and officers of Intermedia prepared, circulated, and reviewed hard copies and electronic copies of: (a) reports, forecasts, and drafts of the UC Agreement; (b) correspondence and other documents related to the negotiation of the UC Agreement; and (c) the strategic initiatives and marketing plans that would be put into place once the UC Agreement was executed (collectively, the " Meeting Documents").

9.    Among these Meeting Documents were documents that contained information relating to the prices to be charged or expected to be charged by Intermedia to subscribers for Unified Messaging under the UC Agreement.

A 03907

10.     Among those individuals employed by Intermedia who were present at such Interdepartmental Meetings in which the UC Agreement was discussed was Jack Lee, a director at Intermedia.

11.     In addition to seeing, reviewing, and/or receiving the Meeting Documents referenced in Paragraphs 8 and 9, I acted as the liaison or the point person between the Parties with respect to the UC Agreement. As the point person, I reviewed and retained multiple drafts and versions of the UC Agreement from Intermedia. (the "UC Drafts")

12.     The UC Drafts were transmitted to me from other Intermedia employees in both hard and electronic form and via facsimile and e-mail.

13.     I reviewed the language of the UC Drafts, as such language was relevant to product functionality.

14.     At the time the Parties were negotiating and finalizing the terms of the UC Agreement, Intermedia's management decided that Intermedia would not focus its sales of Unified Messaging on usage based per minute charges. Instead, Intermedia would market Unified Messaging as a package. The Basic Accounts were charged $0.10 per minute for all inbound and outbound calls, while the Unlimited Accounts permitted unlimited free platform usage and inbound call time. As such, Intermedia made the decision to market Unlimited Accounts to its customers.

15.     The UC Drafts that I reviewed contained changes and revisions that were relevant to Intermedia's decision to concentrate its marketing efforts on selling package deals to its customers (as opposed to usage based per minute charges), as well as the Parties' understanding of the "base monthly price" referred to in § 2.13 of the final version of the UC Agreement.

16.     I also had discussions with Jack Lee and other employees of Intermedia regarding the terms of the UC Agreement, as well as the UC Drafts.

17.     The Meeting Documents and the UC Drafts that I received, reviewed, and retained evidenced Intermedia's desire and intention that the "base monthly price applicable to the Intermedia UC Service" in § 2.13 of the UC Agreement to refer to the Unlimited price of $27.40 per subscriber, because this was the price for the services Intermedia agreed to under the UC Agreement in accordance with its strategic decision to market Unlimited Accounts. Therefore, any Volume Shortfall, as defined by § 2.13 would be multiplied by $27.40 in order to determine the Reconciliation Payment owed to EffectNet.  For example, Intermedia's forecasts with respect to Intermedia*One* were calculated and prepared under the assumption that Intermedia would only be selling Unlimited Accounts.

18.     I retained all of the Meeting Documents and UC Drafts in <u>at least</u> one of four locations: (a) hard copies of the documents inside labeled file folders in my office, (b) electronic copies of the documents on the hard drive of my office desktop computer, (c) electronic copies of the documents on a floppy disk I kept in my office, and (d) electronic copies of the documents saved onto Intermedia's shared network drive ("K Drive").

19.     At no time did I destroy, delete, purge, or erase any of the Meeting Documents or UC Drafts.

**A 03909**