Hearing Date and Time:  July 10, 2007 at 10:00 a.m. Eastern Time

STINSON MORRISON HECKER LLP
Robert L. Driscoll, Esq.
Allison M. Murdock, Esq.
Mark M. Iba, Esq.
1201 Walnut Street, Suite 2900
Kansas City, MO 64106
Telephone:  (816) 842-8600
Facsimile:  (816) 691-3495
Attorneys for Debtors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------x
**In re**                                    :
                                             :    **Chapter 11 Case No.  02-13533 (AJG)**
**WORLDCOM, INC., et al.,**                  :
                                             :    **(Jointly Administered)**
        **Debtors.**                         :
-------------------------------------------------------x

**DEBTORS' MEMORANDUM IN OPPOSITION TO PARUS HOLDINGS, INC.'S**
**AMENDED MOTION SEEKING SPOLIATION SANCTIONS**

**A 04080**

# TABLE OF CONTENTS

**Page**

Introduction ........................................................................................................................... 1

Argument ............................................................................................................................... 3

I.    PARUS HAS FAILED TO PROVE THAT DEBTORS LOST OR
      DESTROYED RELEVANT EVIDENCE ...................................................................... 3

    A.    Mr. Renforth's Declaration Fails to Establish That Debtors
       Lost or Destroyed Any Relevant Evidence ........................................................... 4

    B.    Parus Cannot Establish that Debtors Lost or Destroyed the
       UC Drafts and Meeting Documents when 63 Intermedia Backup
       Tapes Have Yet to be Restored and Searched ....................................................... 6

       1.    Continued discovery is no longer necessary given Debtors'
           Concurrently filed Motion for Partial Withdrawal of Claim
           Objection as to the price applicable to the four reconciliation
           Payments owed under the UC Contract .................................................... 8

    C.    Preserving Data On Inaccessible Backup Tapes Does Not Constitute
       Spoliation ............................................................................................................... 9

    D.    Parus Approved Debtors' Method for Searching the 10,000 Boxes of
       Paper Documents Intermedia Preserved, And Has Not Shown that
       Any of the Documents Mr. Renforth Described Were Maintained in
       Paper Form or Lost or Destroyed ......................................................................... 11

       1.    Mr. Renforth never testified that he had paper documents related
           to pricing under the UC Contract ........................................................... 11

       2.    Parus misleadingly implies that Debtors produced only the indexes of
           hard copy documents when, in fact, Debtors reviewed over 400 boxes
           of hard copy documents using a selection method Parus approved ........ 13

       3.    There is no legal support for Parus's spoliation claim as related to
           Intermedia's paper documents ................................................................ 15

    E.    An Alleged Failure to Timely Implement A Litigation Hold Without
       Showing the Loss or Destruction of Relevant Evidence Is Not Spoliation ........ 15

II.   PARUS HAS FAILED TO PROVE THAT DEBTORS LOST OR
      DESTROYED RELEVANT EVIDENCE AT A TIME THEY HAD
      A DUTY TO PRESERVE IT ...................................................................................... 16

    A.    Debtors Had No Duty as of July 1, 2001 to Preserve Documents
       Related to Pricing Under the UC Contract .......................................................... 17

       1.    Debtors could not have anticipated Parus's claims as of July 1, 2001 .... 18

       2.    The entries on Debtors' privilege log dated in the summer of 2001
           Relate to the antitrust litigation not anticipated litigation with Parus ..... 19

       3.    Debtors had no duty to preserve the documents described
           By Mr. Renforth ...................................................................................... 19

A 04081

B.    Debtors Had No Duty to Preserve Documents Regarding the Price
Applicable to Reconciliation Payments Until After March 12, 2002 ................ 20

III.    PARUS HAS FAILED TO PROVE THAT DEBTORS LOST OR
DESTROYED EVIDENCE WITH A CULPABLE STATE OF MIND ...................... 23

A.    Debtors Met Their Litigation Hold Obligations .................................. 24

B.    There Was No Failure to Comply with Document Retention Policies .............. 24

IV.    PARUS HAS FAILED TO SATISFY THE RELEVANCE REQUIREMENT ............ 25

A.    There Are No Grounds for an Inference of Favorability ................................... 28

B.    Parus Offers No Valid Extrinsic Evidence of Favorability ............................... 28

Conclusion ....................................................................................................................... 29

Exhibits

1.    James Renforth Deposition Excerpts

2.    Memorandum of Understanding (draft)

3.    October 24, 2005 Letter from Kevin Smith to Allison Murdock

4.    February 7, 2007 Letter from Jill Murch to Allison Murdock

5.    Donald Ramsay Deposition Excerpts

6.    Claimant's First Request for Production of Documents

7.    August 12, 2005 Letter from Robert Driscoll to Steven Wood

8.    September 1, 2005 Letter from Robert Driscoll to Steven Wood

9.    Final Judgment, United States v. WorldCom, Inc. et al.

10.    Hold Separate Stipulation and Order

11.    Declarations of Heather Gold dated 12/7/2000, 1/8/2001, 2/5/2001, 3/6/2001

12.    Declarations of Patricia Kurlin dated 4/9/2001, 6/6/2001

13.    Debtors' Litigation Hold Responses

14.    Julio Valdez Deposition Excerpts

15.    Joint Motion to Modify Hold Separate Stipulation and Order

16.    Modified Hold Separate Stipulation and Order

A 04082

## **Introduction**

Claimant Parus Holdings, Inc. ("Parus") originally alleged spoliation of evidence purportedly relating to claims and "expectation damages" that the Court ruled in its summary judgment opinion are barred as a matter of law.[1]  Under the Court's ruling, the sole remaining issue in this case is whether the four reconciliation payments Debtors owe should be calculated using the price for basic or unlimited service under the November 20, 2000 Unified Communications Services General Agreement ("UC Contract").  During the status hearing on May 22, 2007, the Court observed that because Parus's original spoliation motion focused on expectation damages, Parus would need to file an amended pleading to explain the *relevance* of spoliation in light of the summary judgment ruling and to identify documents that existed and no longer exist that relate to the sole remaining issue in this case.  Despite the Court's directions, Parus has filed an amended motion that incorporates its original 60-page spoliation motion in its entirety, again arguing substantive spoliation law (not the relevance of spoliation to the sole remaining issue in the case), but this time with respect to new allegations about documents that it did not previously argue were missing.[2]

The cornerstone for Parus's amended spoliation motion is the declaration of James Renforth, a former project manager for Intermedia.  That declaration, however, is a case study in calculated misdirection which fails to advise that:  (1) Mr. Renforth played no role in negotiating the pricing terminology used in the UC Contract – the only remaining relevant issue in this

---

[1]  See Opinion Partially Granting and Partially Denying Debtors' Motion for Summary Judgment and Motion to Strike Portions of Affidavits (Docket No. 18853).

[2]  Parus's amended motion is deceptively short because it is not self contained.  Parus explicitly incorporates and, in numerous places, implicitly relies upon arguments it made in its original spoliation motion.  Parus, however, has not asked the Court to rule on its original spoliation motion.  Debtors have attempted to treat here the major failings of Parus's accusations of spoliation, though this brief is by no means a complete response to Parus's original spoliation motion.

A 04083

matter; (2) Mr. Renforth's actual contract negotiation role involved having input concerning descriptions of the product Intermedia was buying from EffectNet (now Parus), otherwise he simply "facilitated" the negotiation process by shuffling drafts between the parties' negotiating lawyers; (3) Mr. Renforth has no personal knowledge of the negotiators' intent when they used the "base monthly price" terminology that appears in the reconciliation payment section of the Agreement; and (4) Debtors and Parus have in fact located and produced multiple drafts of the Agreement, none of which, however, contain variations of the pricing terminology used in the final agreement.

Relying solely on Mr. Renforth's declaration, which materially contradicts his prior deposition testimony, Parus now claims that broad, generically-described categories of documents existed in the summer of 2001 regarding pricing under the UC Contract, and that Debtors have not produced those documents. Parus ignores that Mr. Renforth's declaration refers to documents allegedly existing more than eight months before Debtors knew (or could have known) of Parus's claim, thus predating by months any obligation to preserve documents relevant to the claim. More egregious is Parus's complete disregard for the likelihood that the documents Mr. Renforth describes (assuming they ever actually existed) will be found on the 63 Intermedia backup tapes that have yet to be restored and searched. Under the law of this Circuit, which Parus similarly disregards, Debtors' use of backup tapes to preserve documents is not tantamount to spoliation and, until the backup tapes are restored and searched, any allegations of spoliation are premature.[3]

---

[3] Debtors were to restore and search these backup tapes after the Court determined whether Parus must pay all or some of the costs of electronic discovery. Consideration of cost-shifting and further electronic discovery now is unnecessary in light of Debtors' motion to partially withdraw their claim objection as to the price applicable to the four reconciliation payments owed under the UC Contract. This motion was filed because the attorney's fees and costs associated with further briefing and electronic discovery will likely exceed the actual value of the damages now at issue. See *infra* at pp. 8-9.

2

A 04084

Because Parus has not established and cannot establish that any relevant evidence actually was lost or destroyed, it necessarily follows that Parus cannot establish the remaining elements required to prove spoliation, each of which are predicated on the loss or destruction of relevant evidence. Therefore, Parus's amended spoliation motion should be denied.

<u>Argument</u>

Applicable law requires an intensely factual inquiry to determine whether there has been spoliation of evidence warranting sanctions. In particular, it must be determined, based on the facts of the case, whether (1) evidence actually has been destroyed; (2) the party with control over the evidence had an obligation to preserve it at the time it was destroyed; (3) the evidence was destroyed with a culpable state of mind, and; (4) the destroyed evidence was relevant to the parties' claims and defenses. See <u>West v. Goodyear Tire & Rubber Co.</u>, 167 F.3d 776, 779 (2d Cir. 1999); <u>Kronisch v. United States</u>, 150 F.3d 112, 126 (2d Cir. 1998); <u>Zubulake v. UBS Warburg LLC</u>, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) ("<u>Zubulake IV</u>"); <u>Zubulake v. UBS Warburg LLC</u>, 229 F.R.D. 422, 430 (S.D.N.Y. 2004) ("<u>Zubulake V</u>"). Parus's Amended Motion (like its original one) fails to set forth any facts establishing that Debtors lost or destroyed relevant evidence *at any time*, let alone at a time when they were obligated to preserve it.

**I.    PARUS HAS FAILED TO PROVE THAT DEBTORS LOST OR DESTROYED RELEVANT EVIDENCE.**

Parus acknowledges that spoliation is defined as the "destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." <u>See</u> Memorandum of Law In Support Of Parus' Original Spoliation Motion ("Parus Orig. Memo.") at 5l (Docket No. 18690); <u>see</u> <u>also</u> <u>West v. Goodyear Tire & Rubber Co.</u>, 167 F.3d 776, 779 (2d Cir. 1999); <u>Zubulake IV</u>, 220 F.R.D. at 216; <u>Zubulake V</u>, 229 F.R.D. at 422. Yet, Parus fails to identify a single piece of evidence that Debtors actually

A 04085

destroyed or failed to preserve. Parus instead complains of Debtors' methods for preserving electronic and paper documents and alleges that Debtors have not yet produced certain categories of documents allegedly related to pricing under the UC Contract. None of these complaints establishes that Debtors lost or destroyed evidence. Thus, Parus has not shown (and cannot show) this first essential element of its spoliation claim.

     **A.**     **Mr. Renforth's Declaration Fails To Establish That Debtors Lost Or Destroyed Any Relevant Evidence.**

Parus predicates its Amended Motion on the assertion that "Debtors failed to preserve evidence related to the Base Monthly Price," the terminology used in the Reconciliation Payment section of the UC Contract. Memorandum of Law In Support of Parus' Amended Spoliation Motion ("Parus Amended Memo.") at 6 (Docket No. 18936). As the sole factual support for this assertion, Parus offers the declaration of Intermedia's former employee, James Renforth, who states without qualification that he "was involved in the negotiation of the [UC Contract]," Renforth Declaration ¶ 4, that he attended "multiple meetings" at Intermedia where he and others "prepared" and "reviewed" drafts of the UC Contract, id. ¶ 8, and that the drafts of the UC Contract he reviewed contained changes and revisions that were relevant to "the parties understanding of the 'base monthly price' referred to in § 2.13 of the final version of the [UC Contract]," *i.e.*, the Reconciliation Payment section, id. ¶ 15.

The natural inferences from Mr. Renforth's declaration are that he had material involvement with negotiating and drafting the UC Contract, including personal knowledge and documents relating to the parties' intentions concerning the pricing terms of the UC Contract. Parus states unequivocally that Mr. Renforth "had clear and uncontested knowledge about the Base Monthly Price while employed at Intermedia." Parus Amended Memo. at 8. None of this is true, however, based on Mr. Renforth's earlier sworn deposition testimony.

A 04086

In his deposition, Mr. Renforth testified that EffectNet (Parus) sent him the initial draft of the UC Contract, which he then forwarded to Intermedia's in-house lawyer, and that the contract went back and forth between the parties' lawyers, through Mr. Renforth, until finalized. Renforth Depo. at 70:15-71:7 (Ex. 1). Apart from transmitting drafts to and from the lawyers for EffectNet and Intermedia, Mr. Renforth's only role in negotiating the UC Contract was to review for accuracy and completeness the terms of the contract relating to the functionality and capabilities of the product being sold to Intermedia. According to Mr. Renforth, negotiations on the remainder of the UC Contract terms (i.e., everything germane to this claim) were "lawyer-lawyer stuff." Id. at 70:25-71:2, 131:6-132:18. Specifically, Mr. Renforth testified that he did not draft or negotiate the pricing terms in the UC Contract and that he never discussed the terms that would apply in the event of an early termination. Id. at 133:22-134:11, 136:2-137:17, 233:22-234:4. Indeed, although Mr. Renforth said he believed Intermedia would need to pay the unlimited rate in the event of an early termination, id. at 67:12-71:10, 132:25-133:21, he admitted on cross examination that his belief came solely from his own reading of the contract, id. at 136:2-137:20, 233:22-234:4. In short, Mr. Renforth's actual involvement with the creation of the UC Contract was marginal, and even that had nothing to do with issues that have been or are still before this Court.[4]

Despite Mr. Renforth's prior deposition testimony, Parus now characterizes Mr. Renforth as front and center in the negotiations of the UC Contract. Parus claims that Mr. Renforth had (1) multiple drafts and versions of the UC Contract ("UC Drafts"); (2) reports, forecasts, and

---

[4]  The produced documents make clear that no draft iteration of the UC Contract that may have passed through Mr. Renforth's hands would be germane to determining the parties' intent in using the "base monthly price" terminology: the parties borrowed that terminology from the earlier Memorandum of Understanding ("MOU") under which they operated before entering into the UC Contract during Mr. Renforth's tenure. Compare Ex. 2 (MOU § 3.6) with UC Contract § 2.13 (Exhibit A of Docket No. 17402).

A 04087

drafts of the UC Contract; (3) correspondence and other documents related to the negotiation of the UC Contract; and (4) strategic initiatives and marketing plans that would be put into place once the UC Contract was executed (documents referenced in items 2-4 above collectively referred to hereafter as "Meeting Documents").  Parus Amended Memo. at 8-9 (citing Renforth Declaration ¶¶ 8, 11).  These are the only documents Parus claims existed but were not produced, and Parus offers no more specific description (such as date, author, recipient, etc.) than these broad categories.  Parus Amended Memo. at 7-10.

Mr. Renforth's equivocal testimony regarding vaguely described documents he believes existed in July 2001 fails to satisfy Parus's obligation to demonstrate that Debtors at any time lost or destroyed relevant documents.  See Zubulake IV, 220 F.R.D. at 219, and Zubulake V, 229 F.R.D. at 426-27 (spoliation determination based upon failure to preserve specifically identified emails and backup tapes).

**B.    Parus Cannot Establish That Debtors Lost Or Destroyed The UC Drafts And Meeting Documents When 63 Intermedia Backup Tapes Have Yet To Be Restored And Searched.**

Assuming Mr. Renforth's new version of his involvement in the UC Contract is to be believed, it at best establishes that there may be general categories of documents related to the UC Contract that Debtors have not yet produced.  This possibility hardly is news given that, as Parus knows, there still are 63 Intermedia backup tapes that remain to be restored and searched for responsive documents.  There is a tremendous volume of data on each of the Intermedia backup tapes, so much data that Parus agreed to narrow its requests to eliminate or limit search terms such as "Intermedia*One*" (the name of the product that included the UC Services).[5]

---

[5]   Just the search of the nine sample backup tapes using the search terms Parus selected "hit" on over 740,000 pages (or almost 300 boxes) of documents for review.  See June 16, 2006, letter from Allison Murdock to the Honorable Arthur J. Gonzalez at 6 (Docket No. 18338).

Parus now ignores the status of electronic discovery in this case and its role setting the parameters for that discovery. Parus provided Debtors with the list of search terms and custodian names to use in searching their electronic data, and Parus selected the backup tapes Debtors searched first for sampling purposes. See October 24, 2005, letter from Kevin Smith to Allison Murdock (Ex. 3); January 30, 2006, letter from Kevin Smith to Allison Murdock (Exhibit D to Docket No. 18338). After that discovery was completed, Debtors requested permission to file a motion for protective order and for cost-shifting. See June 16, 2006, letter from Allison Murdock to the Honorable Arthur J. Gonzalez (Docket No. 18338). In response, Parus sought depositions of Debtors' Information Technology personnel regarding their processes for maintaining electronic data for purposes of opposing the cost-shifting motion. The Court directed Debtors to produce these witnesses for depositions, and Debtors did so. Since then, Parus illogically has opposed Debtors' requests to file their cost-shifting motion by claiming that its spoliation motion should be resolved first. See February 7, 2007, letter from Jill Murch to Allison Murdock at 2 (Ex. 4) ("[t]he Debtors' request for cost-shifting should not proceed until the Court first determines the merits of Parus's Spoliation Motion, as such determination is necessary before the parties can even reach the issue of cost-shifting."). Debtors have not filed their cost-shifting motion because Parus insisted upon filing its spoliation motion first and because the Court entered its summary judgment opinion narrowing the issues in the case. As a result, the parties have not yet proceeded with the restoration and search of the remaining Intermedia backup tapes.

1.   Continued discovery is no longer necessary given Debtors' concurrently filed Motion for Partial Withdrawal of Claim Objection as to the price applicable to the four reconciliation payments owed under the UC Contract.

Debtors have filed concurrently with this opposition a Motion for an Order Permitting Partial Withdrawal of Claim Objection, Allowance of Resulting Claim, and Reservation of Right to Re-file Claim Objection ("Motion for Partial Withdrawal of Claim Objection").  Debtors filed this motion in light of the Court's May 2, 2007 summary judgment ruling that the only issue remaining in this case is whether the four reconciliation payments owed under the UC Contract should be calculated using the price for basic or unlimited service.  As more fully set forth in the motion, Debtors seek to withdraw their objection that the unlimited price applies to the four reconciliation payments owed (subject to the right to re-file their objection if the summary judgment ruling is reversed in whole or in part on appeal).  Debtors believe that the entry of an Order granting their motion will be in the best interests of all parties.  Despite Debtors' earlier offer to resolve Parus's remaining claim using the unlimited price, Parus appears determined to proceed with spoliation and cost-shifting briefing and electronic discovery.  The attorney's fees and costs associated with these efforts easily could exceed the actual value of the remaining damages at issue.  If the Court grants Debtors' motion, then further consideration of spoliation and cost-shifting will be unnecessary.

If the Court denies Debtors' Motion for Partial Withdrawal of Claim Objection, Parus's amended spoliation motion should not be considered until the Court determines cost-shifting and electronic discovery is completed.  The Zubulake cases from this judicial district make clear that a spoliation motion should not be brought until the inaccessible data sources have been restored and searched (pursuant to the court's cost-shifting determination) and unless that process reveals that relevant evidence has been destroyed.  See Zubulake v. UBS Warburg LLC, 217 F.R.D. 309

A 04090

(S.D.N.Y. 2003) ("Zubulake I"), and Zubulake IV, 220 F.R.D. at 215, and Zubulake V, 229 F.R.D. at 426 (court considered spoliation motion only after parties developed factual record for consideration of cost-shifting and electronic discovery was completed). Parus cannot in good faith assert that Debtors destroyed or failed to preserve relevant documents when the sources of the allegedly missing documents have not yet been restored and searched.

### C. Preserving Data On Inaccessible Backup Tapes Does Not Constitute Destruction Of That Data.

Apparently aware that the restoration and search of the remaining 63 Intermedia backup tapes is likely to eliminate any opportunity to establish spoliation, Parus claims that the mere fact Debtors preserved electronic data on inaccessible backup tapes (i.e., tapes that must be restored to be searched) means that Debtors destroyed that data.[6] Parus has no legitimate legal or factual basis for this position.

Indeed, Parus relies solely on *obiter dicta* found in a footnote in Treppel v. Biovail Corp., 233 F.R.D. 363, 372 n.4 (S.D.N.Y. 2006), to support its argument that preserving data on backup tapes is the same as destroying that data.[7] Parus Amended Memo. at 18-19, 43, 47, 56.

---

[6] Although more prominently featured in its original motion, Parus's amended motion similarly is premised on the false notion that preserving data on inaccessible backup tapes constitutes destruction of that data. See Parus Amended Memo. at 12 ("Debtors' Failure to Keep Document In An Accessible Form"), 17 (Debtors ". . . Destroyed *and/or* Rendered Inaccessible Evidence . . ."); Parus Orig. Memo. at 6, 15 (Debtors allowed information to be "destroyed and/or to become inaccessible"), 18 (Debtors failed to issue a litigation hold notice to preserve "all documents relating to Parus in an accessible or searchable format"), 19 ("Debtors' failure to preserve information in an accessible format constitutes a clear violation of the Debtors' preservation obligation"), 19 ("Debtors must be held accountable for their utter failure to even attempt to preserve information related to Parus's claims in an accessible format"), 37 (comparing inaccessible data to music on an 8-track tape which cannot be played without the 8-track player, but not explaining that the data can, and has been, restored and made accessible), 43 (Debtors failed to keep hard copy documents "in readily accessible format"), 48-49 (Intermedia should be sanctioned because it failed keep data from the servers in "retrievable and readable" format), 57 ("evidence destroyed and/or rendered inaccessible").

[7] This footnote states, in pertinent part: "permitting the downgrading of data to a less accessible form—which systematically hinders future discovery by making the recovery of the information more costly and burdensome—is a violation of the preservation obligation." 233 F.R.D. at 372 n.4.

A 04091

However, Parus fails to advise the Court that at least three controlling decisions in this District completely refute its argument. In <u>Zubulake IV</u>, the court explained the obligation to preserve relevant documents and stated that "[i]n recognition of the fact that there are many ways to manage electronic data, litigants are free to choose how this task is accomplished." 220 F.R.D. at 218. Likewise, in <u>Quinby v. WestLB AG</u>, No. 04 Civ 7406, 2005 WL 3453908, at *8 n.10 (S.D.N.Y. Dec. 15, 2005) ("<u>Quinby I</u>"), the court rejected a request for sanctions that was virtually identical to Parus's request here. Observing that it was unaware of any case holding that the duty to preserve electronic data included a duty to keep the data in an accessible format, the court refused to sanction the defendant for converting data from an accessible to inaccessible format, even if it should have anticipated litigation. <u>Id.</u> Finally, in <u>Quinby v. WestLB AG</u>, No. 04 Civ. 7406, 2006 WL 2597900, at *9 (S.D.N.Y. Sept. 5, 2006) ("<u>Quinby II</u>"), the court reiterated that a party has no duty to preserve emails in an accessible format and that converting data to an inaccessible format does not constitute spoliation:

> In resolving a sanctions motion in <u>Quinby I</u>, I declined to sanction defendant for converting data from an accessible to an inaccessible format, even assuming that defendant should have anticipated litigation at the time it converted the data.... This conclusion ensures that in complying with a duty to preserve evidence, a party will be free to preserve electronic evidence in any format it chooses, including inaccessible formats. <u>See</u> <u>Zubulake IV</u>, <u>supra</u>, 220 F.R.D. at 218 ("In recognition of the fact that there are many ways to manage electronic data, litigants are free to choose how this task is accomplished."). Preservation of data, even in an inaccessible form, **will not result in spoliation** because the responding party will be able to produce the electronic evidence by restoring it from an inaccessible format, albeit at a higher cost.

<u>Quinby II</u>, 2006 WL 2497900, at *9 (emphasis added). The court in <u>Quinby II</u> also expressly rejected the <u>Treppel</u> footnote upon which Parus relies. It explained that the *dicta* is erroneous and observed that the conversion of electronic documents to an inaccessible format, like moving

A 04092

hard copies to an off-site storage facility, cannot constitute spoliation because the documents still are retrievable.  See id. at nn.12 & 13.[8]

Parus also lacks any factual basis for suggesting that inaccessible data is destroyed or irretrievable.  Debtors' electronic data vendor was able to restore and search the nine Intermedia backup tapes Parus selected for sampling.  Those nine tapes alone held the equivalent of over 300 boxes of documents containing Parus's selected search terms.  See supra at p. 7 n.5.  The notion that all of the data on Intermedia's 63 backup tapes is irretrievable is simply untrue.

> **D.    Parus Approved Debtors' Method For Searching The 10,000 Boxes Of Paper Documents Intermedia Preserved, And Has Not Shown That Any Of The Documents Mr. Renforth Described Were Maintained In Paper Form Or Lost Or Destroyed.**

In a further attempt to support its spoliation allegations, Parus devotes several pages of its amended motion to complaints that Intermedia allegedly failed to preserve paper documents.  Ironically, there are over 10,000 boxes of paper documents related to Intermedia, almost 400 of which Debtors reviewed using a selection method approved by Parus.  Nonetheless, Parus contends that Debtors (1) failed to produce certain paper documents that it claims Mr. Renforth said existed; and (2) failed to keep Intermedia's hard copy documents in a readily accessible format.  Parus Amended Memo. at 8-9, 12-15.  Both contentions lack merit.

> 1.    <u>Mr. Renforth Never Testified That He Had Paper Documents Related To Pricing Under The UC Contract.</u>

Parus attempts to use a "sleight of hand" to suggest that Mr. Renforth maintained paper documents related to pricing under the UC Contract.  In fact, Mr. Renforth never testified as to what purportedly relevant documents actually existed in hard copy form in his files.  Instead,

---

[8]    Parus's reliance on <u>Treppel</u>'s *dicta* also is surprising because the meaning of the *dicta* is highly uncertain.  Although the <u>Treppel</u> footnote criticizes the holding in <u>Quinby I</u>, the main body of the <u>Treppel</u> decision is consistent with <u>Quinby I</u> because it characterizes saving data to backup tapes as an act of preservation, not spoliation.  See <u>Treppel</u>, 233 F.R.D. at 371-72.

A 04093

exhibiting his lack of specific recollection, Mr. Renforth stated only that he retained documents "in at least one of four locations," three of which were electronic. Renforth Declaration ¶ 18. Mr. Renforth never stated that relevant documents were contained in each of the four locations. Nor did he ever state that any of the purportedly relevant Meeting Documents or UC Drafts were in hard copy form. Thus, Mr. Renforth's declaration cannot be used to establish that any relevant hard copy documents even existed in the first place.

Moreover, even assuming Mr. Renforth kept some of the purported Meeting Documents and UC Drafts in hard copy form in his files, there is no reason to believe Mr. Renforth's name or the name of his files would appear on the indexes for the 10,000 boxes of Intermedia documents. Parus relies on the testimony of Debtors' counsel, Don Ramsay, to suggest that Mr. Renforth, like other employees, would have been required to box his documents and index them when he left the company. Parus Amended Memo. at 10-11. Parus, however, fails to disclose that this testimony was in response to Parus's questions regarding the protocol used during Intermedia's reduction in force in the fall of 2001, after Mr. Renforth already had left Intermedia. Ramsay Depo. at 53:1-17 (Ex. 5). Mr. Renforth resigned from Intermedia on July 27, 2001, before the reductions in force began. He never testified that he indexed or was asked to index his documents when he resigned.[9]

---

[9] Parus also omits two further key points: (1) Parus never requested that Debtors produce any documents related to or files maintained by Mr. Renforth other than his personnel file and documents related to his resignation, see Claimant's First Request for Documents, RFP No. 28 (Ex. 6); and (2) the indexes for the Intermedia boxes were not titled in a way that was specific to any individual. See Ramsay Depo. at 53 (Ex. 5). Thus, when Mr. Ramsay asked the personnel in Debtors' records management group for Mr. Renforth's documents, it is no surprise that the indexes did not identify any particular set of boxes. This does not evidence any spoliation. Debtors have produced reports, forecasts, drafts, correspondence, strategic initiatives, marketing plans, and other documents relating to the UC Contract that match the description Mr. Renforth gave of documents that he had maintained.

A 04094

2.    <u>Parus Misleadingly Implies That Debtors Produced Only The Indexes Of Hard Copy Documents When, In Fact, Debtors Reviewed Over 400 Boxes Of Hard Copy Documents Using A Selection Method Parus Approved.</u>

Citing Mr. Ramsay's deposition testimony regarding the nature of the Intermedia document indexes, Parus implies that Debtors only produced the indexes of the hard copy documents and nothing more. <u>See</u> Parus Amended Memo. at 13. On the contrary, because Parus refused to propose a method for retrieving and reviewing the Intermedia stored documents, Debtors reviewed over 400 boxes of documents using the indexes to select those boxes that might contain responsive documents.[10] Using the document indexes, Debtors initially identified 387 of the over 10,000 boxes of documents that – either based on the date or subject matter description listed on the index or the lack thereof – might contain responsive documents. Consequently, if the description of a box on the index suggested that the box might contain responsive documents, Debtors retrieved the box for review. Similarly, if the indexes did not describe the contents of a box and the documents were listed as being in the relevant time frame or no time frame was listed, Debtors retrieved the box for review. WorldCom's Opposition at 9-10 (Docket No. 16687); WorldCom's Supplemental Opposition at 5-6 (Docket No. 17471).[11]

Debtors described their selection method in their opposition to Parus's motion to compel and Debtors' counsel explained it again during the August 9, 2005, hearing on the motion.

---

[10]   Paper documents related to Intermedia were kept in 10,000 boxes stored in depositories across the country. Because of the cost associated with the retrieval and review of the Intermedia stored documents, Debtors' counsel made several proposals to Parus for the review of these documents. Debtors offered to allow Parus to designate which of the 10,000 boxes Debtors should review; offered to arrange for Parus to review all of the boxes (with an agreement that no privilege would be waived); or offered to review the boxes if Parus would share in the costs of retrieving them. Parus would not agree to any of these methods for review and made no reasonable counter-proposals. <u>See</u> WorldCom's Opposition at 6-9 (Docket No. 16687).

[11]   In a few instances, it appeared from the description on indexes that certain categories of boxes were unlikely to contain responsive documents, but counsel could not be certain. In these instances, Debtors' counsel selected a sample of approximately five boxes for review. If after review of the sample, it was possible that the remaining similarly described boxes could contain responsive documents, then counsel retrieved all of the similarly described boxes for review. <u>Id.</u>

A 04095

WorldCom's Opposition at 9-10 (Docket No. 16687); August 9, 2005 Hearing Transcript at 19-20 (Docket No. 17920). When the Court specifically asked Parus if it had any objection to Debtors' proposed method for reviewing these documents, Parus advised that it had no objection and that it did not want Debtors to review all 10,000 boxes:

> JUDGE GONZALEZ: Parus Holdings, what is your objection to that proposal other than you may think it took too long to get there?
>
> MR. WOOD: . . . As far as their agreeing to review and produce 387 boxes of documents and reviewing them for responsiveness or producing responsive documents to us at their cost, I have no objection to that whatsoever.
>
> I was going to make a suggestion, Your Honor. I think it might make sense at this point and I don't want Debtors' counsel to review all 10,000 boxes of documents. If there are documents in there or boxes of documents clearly outside the relevant time frame or clearly unrelated to the issues in this case, I don't want to waste time looking at all 10,000 boxes of documents. . . .

Id. at 23-24 (Docket No. 17920).

On August 12, 2005, Debtors provided Parus a list of all of the boxes they selected from the indexes for review and invited Parus to advise of any additional boxes it believed Debtors should review. See August 12, 2005 letter from Mr. Driscoll, WorldCom's counsel, to Mr. Wood, Claimant's counsel (Ex. 7). For ease of reference, Debtors also provided Parus a highlighted copy of the indexes showing the boxes selected for review. Id. Parus never identified any additional boxes that it believed Debtors should have reviewed.[12]

Parus even deposed Debtors' counsel, Don Ramsay, in November 2005 regarding Debtors' method for reviewing the paper documents. Now, more than a year and a half later, and

---

[12] After reviewing the boxes originally retrieved from the depositories, Debtors' counsel re-examined the indexes in light of documents found during the initial review to determine whether additional boxes should be retrieved from the depositories. Based on this re-examination, Debtors' counsel retrieved an additional 77 boxes from the depositories for review. WorldCom's Supplemental Opp. to Motion to Compel at 6 (Docket No. 17471). Once again, Debtors provided Claimant a list of the additional boxes it intended to review. See September 1, 2005 letter from Mr. Driscoll to Mr. Wood (Ex. 8). And, again, Parus did not identify any additional boxes it believed Debtors should review. WorldCom's Supplemental Opp. to Motion to Compel at 6 (Docket No. 17471).

A 04096

after approving Debtors' methodology for hard copy document review, the moment has long passed for Parus to challenge the production of paper documents in this case. Those issues should have been raised in the hearing before this Court where the procedure was discussed or through a meet and confer process and a discovery motion seeking relief if Parus truly objected to the paper discovery process. To raise this issue now, after Debtors spent thousands of dollars gathering and reviewing the documents using an agreed upon procedure, is improper, and most certainly does not support a finding of spoliation.

3.    There is no legal support for Parus's spoliation claim as related to Intermedia's paper documents.

Relying on Treppel's rejected *dicta*, Parus nonsensically argues that Debtors somehow violated their preservation obligation, not because any hard copy documents have been destroyed or lost, but because the indexes to over 10,000 Intermedia boxes of documents are difficult to decipher. See Parus Amended Memo. at 12-13. Parus has no basis for arguing hard copy documents have been lost or destroyed. As noted in Quinby II, off-site storage of hard copy documents may increase the difficulty of retrieving relevant documents, but it is not spoliation because the documents are still retrievable. See Quinby II, 2006 WL 2497900, at * 9 n.13.

**E.    An Alleged Failure to Timely Implement A Litigation Hold Without Showing The Loss Or Destruction Of Relevant Evidence Is Not Spoliation.**

In a further attempt to obtain spoliation sanctions without ever showing that any relevant evidence has been lost or destroyed, Parus contends that "the basis for [its] Spoliation Motion is that the Debtors failed to implement a timely litigation hold . . . ." See February 14, 2007, letter from Jill Murch to the Honorable Arthur J. Gonzalez at 2 (Docket No. 18716); see also Parus Orig. Memo. at 15-20. Debtors deny Parus's allegations of untimeliness. See *infra* at pp. 21-23. But even if true, the untimely implementation of a litigation hold, standing alone, does not constitute spoliation. As set forth in Treppel, which Parus ignores here, there also must be a loss

A 04097

of evidence.  See Treppel, 233 F.R.D. at 371-72 (refusing to enter preservation order because plaintiff failed to show that delay in establishing preservation program led to the loss of any evidence).  Parus has failed to show any loss of evidence.  Therefore, the timing of Debtors' litigation hold is irrelevant.

Moreover, Parus already has conceded the correctness of Debtors' position on this point. When Debtors sought discovery regarding Parus's litigation hold, Parus opposed that discovery proclaiming that whether and when a litigation hold is implemented is immaterial if a party has preserved its documents.  February 14, 2007, letter from Jill Murch to the Honorable Arthur J. Gonzalez at 3 (Docket No. 18716) ("Moreover, because Parus preserved all of its electronic and hard copy documents, whether it initiated a litigation hold is immaterial since spoliation only becomes an issue when evidence is lost or irretrievable in the first instance.") (emphasis added).

## II.    PARUS HAS FAILED TO PROVE THAT DEBTORS LOST OR DESTROYED RELEVANT EVIDENCE AT A TIME THEY HAD A DUTY TO PRESERVE IT.

In this instance, Parus has failed to show that Debtors lost or destroyed any evidence at all.  But even assuming Parus could make that showing, sanctions still would be inappropriate. A party cannot be sanctioned for destroying or losing evidence unless it had a duty to preserve it. Zubulake IV, 220 F.R.D. at 216.  The only duty Parus articulates here is the duty that arises when a party has notice that the evidence is relevant to existing litigation or when a party should know that the evidence may be relevant to future litigation.[13]  Parus Orig. Memo. at 7 (citing, inter alia, Zubulake IV, 220 F.R.D. at 216; Fujitsu Ltd. v. Fed. Express Corp., 247 F.3d 423, 436 (2d Cir. 2001)).  The duty to preserve documents does not exist in a vacuum without boundaries.

---

[13]   Unlike the Zubulake cases and other cases upon which Parus relies, in which the non-movants were subject to securities and employment regulations that required the preservation of certain types of records that were pertinent to the claims at issue in those cases, there is no other preservation duty applicable in this case.

A 04098

It is limited in time and scope.  See Zubulake IV, 220 F.R.D. at 216 ("Identifying the boundaries of the duty to preserve involves two related inquiries:  *when* does the duty to preserve attach, and *what* evidence must be preserved?").  The "mere existence of a dispute" does not mean that the parties should reasonably have anticipated litigation and taken steps to preserve evidence. Treppel v. Biovail Corp., 233 F.R.D. 363, 371 (S.D.N.Y. 2006).  Furthermore, the preservation duty does not begin simply because "key events giving rise to the plaintiff's claims occurred." Id.

Parus's amended spoliation motion fails to include any discussion of when Debtors' duty to preserve evidence allegedly arose.  Instead, Parus incorporates wholesale an entire section of its original spoliation motion, which is completely irrelevant to the remaining issue in the case. By doing so, Parus contends that Debtors' duty to preserve relevant evidence related to pricing under the UC Contract may have arisen as early as July 1, 2001, and no later than February 28, 2002.  Parus Amended Memo. at 6 n.2 (incorporating Parus Orig. Memo. at 7-15).  Debtors had no obligation to preserve documents related to UC Contract pricing as of the earlier date, which was at least nine months before Debtors knew or could have known of Parus's breach of contract claim.  And, by the later date, those documents were being preserved and remain available today.

### A.    Debtors Had No Duty As Of July 1, 2001, To Preserve Documents Related To Pricing Under The UC Contract.

Parus's original spoliation motion, which forms the sole basis for Parus's arguments as to the alleged timing of Debtors' preservation obligations, first contends that Debtors should have anticipated litigation regarding the UC Contract at the time of Intermedia and WorldCom's merger on July 1, 2001 because, according to Parus, by then it had been decided that the IntermediaOne product line (of which the UC Contract services were a part) would be "shed." Parus Orig. Memo. at 8.  Parus also contends that entries in Debtors' privilege log dated summer

17

A 04099

of 2001 show that Debtors anticipated litigation with Parus at that time. Id. at 9-14. The original spoliation motion makes no reference to anticipated disputes in July 2001 regarding pricing under the UC Contract, which is the only remaining issue in this case and the only issue the Court directed Parus to brief. Id. But, more importantly, Parus's claim that any disputes regarding the UC Contract were or could have been anticipated as of July 1, 2001, the effective date of the WorldCom/Intermedia merger, is factually insupportable.

## 1.    Debtors could not have anticipated Parus's claims as of July 1, 2001.

WorldCom and Intermedia entered into their merger agreement on September 5, 2000, more than two months before the parties here entered into the UC Contract. See Final Judgment at 5, United States v. WorldCom, Inc., et al., Case No. 1:00CV02789 (RWR) (D.D.C. June 27, 2001) (Ex. 9). Almost immediately, the United States Department of Justice ("DOJ") filed suit to ensure that the proposed merger would not violate federal antitrust laws. In response, WorldCom, Intermedia and DOJ stipulated to the entry of a "Hold Separate Order" requiring WorldCom to divest all of Intermedia (except for its holdings of capital stock in Digex, Inc.) as an ongoing, viable business within 180 days from the closing of the merger and to operate Intermedia as an independent competitive business, with all management and operations held separate from WorldCom, until the merger closed. See Hold Separate Stipulation and Order dated November 17, 2000 ¶¶ 1-6, United States v. WorldCom, Inc. et al., Case No. 1:00CV02789 (RWR) (D.D.C.) (Ex. 10).[14] To make compliance with the Hold Separate Order feasible, WorldCom provided $575 million in financing to Intermedia. See Heather Gold

---

[14]    Although the Court did not sign the Hold Separate Order until May 30, 2001, compliance with the Order was required as of the date of filing on November 17, 2000. This is reflected by the declarations Intermedia submitted monthly to the DOJ attesting that WorldCom and Intermedia continued to operate as separate entities and that company executives had been advised of their obligations under the Hold Separate Order. Declarations of Heather Gold dated December 7, 2000, January 8, 2001, February 5, 2001 March 6, 2001 (Ex. 11); Declarations of Patricia Kurlin dated April 19, 2001, June 6, 2001 (Ex. 12).

A 04100

Declarations ¶ 4 (Ex. 11).  Thus, contrary to Parus's unsupported speculation that WorldCom desired to "shed" itself of IntermediaOne, WorldCom had every obligation and incentive to hold Intermedia separate and to maximize the value of Intermedia as an ongoing business.  Thus, there is no basis to allege that Debtors should have anticipated litigation with Parus as of July 1, 2001, based on the status of the IntermediaOne product line.

> 2.    The entries on Debtors' privilege log dated in the summer of 2001 relate to the antitrust litigation not anticipated litigation with Parus.

Parus served discovery requests seeking the production of certain documents related to the WorldCom/Intermedia merger.  Thus, it is not surprising that Debtors' privilege log identifies several privileged and work product documents withheld from production related to the merger and the antitrust litigation.  Parus inexplicably relies on these privilege log entries to claim that Debtors anticipated litigation with Parus in July 2001 regarding the pricing under the UC Contract.  The description of each of the privileged documents, which Parus quotes in its motion, show this is untrue.[15]  Parus's claim that these privilege log entries establish Debtors' knowledge of anticipated litigation with Parus over UC Contract pricing is frivolous.

> 3.    Debtors had no duty to preserve the documents described by Mr. Renforth.

As with Parus's efforts to elevate Mr. Renforth into the role of a prominent actor in negotiating the UC Contract (a "key" witness according to Parus's Amended Memo. at 7), Parus's efforts to demonstrate that his documents were improperly destroyed or not retained involves uses of disinformation.  Indeed, Parus intends for the Court to infer from Mr. Renforth's testimony that if certain documents were created when he was at Intermedia, they must have continued to exist after he left the company and after a duty to preserve arose.  Mr. Renforth,

---

[15]  The descriptions include "Attorney Notes re: Intermedia transaction and legal issues to be resolved;" "Attorney Notes re: Intermedia closing and list of issues;" "Attorney Notes re: certificate of designation and preparation for merger."  Parus Orig. Memo. at 10-11.

A 04101

however, quit his job at Intermedia effective July 27, 2001.[16]  This was approximately eight months before EffectNet (Parus) advised that, starting with the December 2001 reconciliation payment, Intermedia was in default of its contractual obligations because it had failed to make reconciliation payments required by the UC Contract, and approximately nine months before EffectNet advised that failure to cure this default within 30 days (i.e., by April 12, 2002) would cause the contract to terminate and possibly subject Intermedia to a claim for damages. Summary Judgment Opinion at 5-6.

Thus, Mr. Renforth left Intermedia eight to nine months before Debtors had any duty to preserve documents related to pricing under the UC Contract.  Significantly, Mr. Renforth has no knowledge whether his alleged documents existed a day after he left, let alone months later when Parus threatened a claim.  See e.g., Renforth Depo. at 217-18 (Ex. 1) (stating that he did not keep in contact with employees at Intermedia after he left and denying personal knowledge of what happened to the Unified Messaging product after he left).  Debtors did not and could not have foreseen at the time Mr. Renforth left Intermedia that there would be any litigation with Parus and, thus, had no obligation whatsoever to preserve his documents during the months after he left the company.

### B.    Debtors Had No Duty To Preserve Documents Regarding The Price Applicable To Reconciliation Payments Until After March 12, 2002.

Parus implicitly recognizes the flawed nature of its attempt to impose a July 1, 2001, preservation date by alternatively proposing that a duty to preserve arose in February or March 2002, when it threatened termination of the UC Contract if Intermedia did not make

---

[16]  In his declaration, Mr. Renforth states he was employed at Intermedia "to June 2001."  Renforth Declaration ¶ 3.  However, Mr. Renforth testified in his deposition that he left his employment at Intermedia on July 27, 2001.  Renforth Dep. at 226:13-21.

A 04102

Reconciliation Payments within 30 days. Parus Orig. Memo. at 12-15. Assuming that such a duty arose in March 2002, Debtors satisfied that duty.[17]

In March 2002, Parus terminated the UC Contract effective April 12, 2002. Even then, however, Parus never threatened any litigation. At most, Debtors knew that Parus sought reconciliation payments from Intermedia under the termination provisions of the UC Contract. See Debtors' Verified Response to Claimant's Questions Regarding "Litigation Hold" ("Debtors' Litigation Hold Response") at 1-3 (Ex. 13). Under the express terms of the UC Contract, Debtors believed that the reconciliation payments could be calculated using the contract and the invoices, all of which WorldCom and Intermedia preserved. Id.

In March and April 2002, Debtors also had (and have today) any then existing electronic and paper documents related to the UC Contract. In the fall of 2001, Intermedia implemented reductions in force because of the declining success of the telecommunications industry.[18] By the end of 2001 (months before any duty to preserve documents arose regarding the later claim of Parus), hundreds of Intermedia employees had resigned or been laid off. This included nearly

---

[17] Both Intermedia and WorldCom's paper and electronic documents were timely preserved. Debtors, however, do not address preservation of WorldCom's documents in this brief because these documents are no longer at issue. The only remaining issue in the case is the price to be used in calculating the four reconciliation payments under the UC Contract. The UC Contract was executed months before the WorldCom/Intermedia merger was consummated and WorldCom was never a party to the UC Contract. In fact, Parus's amended spoliation motion makes no reference to WorldCom documents.

[18] In August 2001, WorldCom, Intermedia and DOJ sought to modify the Hold Separate Order because downturns in the telecommunications industry over the previous ten months made continued compliance with the Order impractical. See Joint Motion to Modify Hold Separate Order, United States v. WorldCom, Inc. et al., Case No. 1:00CV02789 (RWR) (D.D.C. August 29, 2001) (Ex. 15). The Court granted modification of the Original Hold Separate Order to allow the sale of part of Intermedia's business operations, and shut down other components. See Modified Hold Separate Stipulation and Order (Ex. 16).

A 04103

all of the Intermedia employees involved with the UC Contract.  See Debtors' Litigation Hold Response at 13-18 (Ex. 13).[19]

Intermedia had no document retention policy.  Valdes Depo. at 103:14-104:20 (Ex. 14). Employees leaving the company were directed to box the paper documents in their office for storage in off-site depositories.  Ramsay Depo. at 53:1-17 (Ex. 5).[20]  The electronic data on these certain employees' computer hard drives was preserved by backing up their computers to the company servers.  Julio Valdes Depo. at 117:1-8 (Ex. 14).  Electronic data on Intermedia's servers already was backed up (and had been for years) using an industry standard six week rotation with weekly, monthly and yearly backup tapes that were preserved and stored off-site. Id. at 18:12-22; 103:14-104:20; 146:20-147:6.

In July 2002, Debtors also began preserving all electronic backup tapes.  They did so pursuant to a Stipulation and Order entered by the Honorable Jed S. Rakoff in the matter of S.E.C. v. WorldCom, Inc., Case No. 1:02-cv-04963-JSR, on July 1, 2002.  This Order directed "WorldCom, its officers, agents, accountants, employees, and attorneys, and those persons in active concert or participation with them" to preserve all documents "relating to, referring to or concerning any aspect of WorldCom's financial reporting obligations, public disclosures required by the federal securities laws, or any accounting matters relating to WorldCom . . . ."  To comply with this Order, WorldCom and Intermedia preserved all daily backup tapes of their email systems.  See Debtors' Litigation Hold Response at 8 (Ex. 13); Valdes Depo. at 218:4-220:16; 249:3-21; 262:8-264:5 (Ex. 14).  They also preserved non-email electronic data encompassed by

---

[19]  Patricia Kurlin left Intermedia in August 2001; Ralph Dyer in September 2001; James Faust and Kathleen Victory in October 2001; and Donald Fergus in December 2001.  Id.  James Renforth resigned effective July 27, 2001.  Renforth Depo. at 226:13-21 (Ex. 1).

[20]  As previously discussed, there are 10,000 boxes of paper documents related to Intermedia stored in depositories across the country.  See supra at pp. 12-16.

A 04104

the Order, as subsequently modified or varied by agreement of the parties with regard to such data, as well as paper documents encompassed by the Order.  See id.

Thus, based on Intermedia's historic practice and Judge Rakoff's Order, by mid-2002, Intermedia had been preserving backup tapes of its electronic data and email systems for several years.  The backup tapes available in March and April 2002, when Parus terminated the UC Contract were still available then, in 2003 and 2004, and remain available today.  Valdes Depo. at 262:8-264:5 (Ex. 14).  Similarly, the electronic data and email on the two Intermedia servers that remained in operation during the pendency of this bankruptcy were preserved on backup tapes, which remain available today.  Id. at 262:8-23.

Simply put, the sources of possibly relevant evidence related to UC Contract pricing that existed in the spring of 2002 were preserved by Debtors and remain available today.

## III.    PARUS HAS FAILED TO PROVE THAT DEBTORS LOST OR DESTROYED EVIDENCE WITH A CULPABLE STATE OF MIND.

Without identifying a single act of destruction or loss, Parus attempts to satisfy the "culpability" element by arguing that Debtors failed to implement a timely "litigation hold" and failed to comply with their own document retention policy.  Parus Amended Memo. at 11-15. Parus fails, however, in its effort to prove culpability.  Absent any evidence that documents have been destroyed or lost, there is no misconduct as to which culpability may be judged.  See, e.g., Convolve, Inc. v. Compaq Corp., 223 F.R.D. 162, 175-177 (S.D.N.Y. 2004) (court found culpability not shown and sanctions not warranted where plaintiff failed to prove the substance of emails or the circumstances under which any particular email was deleted).  Parus has not shown that the Debtors neglected their preservation obligations in any way.  Nor has Parus shown that any of Debtors' purported shortcomings caused the loss of any evidence.

## A.    Debtors Met Their Litigation Hold Obligations.

Ignoring its own statement that the issuance of a litigation hold is immaterial when a party has preserved relevant evidence, Parus argues that Debtors failed to implement a litigation hold as of March 25, 2002; and that Debtors did not request the preservation of documents related to Parus's claims until the fall of 2004.  Parus Orig. Memo. at 16-18.  Parus confuses the preservation obligation with the "litigation hold" notice discussed in <u>Zubulake</u>.  As discussed in the preceding section, Debtors preserved all electronic and paper documents relevant to Parus's claim as of the spring of 2002.  <u>See</u> *supra* at pp. 12-16, 21-23.[21]  Thus, as Parus argued with respect to its own preservation obligations, whether Debtors sent out a formal litigation hold notice is "immaterial" because Debtors already had preserved all relevant documents.  <u>See</u> February 14, 2007, letter from Jill Murch to the Honorable Arthur J. Gonzalez at 3 (Docket No. 18716).

## B.    There Was No Failure to Comply with Document Retention Policies.

In a further effort to show culpability, Parus claims that Intermedia failed to comply with WorldCom's document retention policies by failing to preserve Mr. Renforth's emails and hard copy files.  Parus Amended Memo. at 11-15.  Parus claims that WorldCom's document retention policy required Intermedia to become subject to it upon the companies' merger.  Parus ignores, however, that the companies were under the obligation, pursuant to the Hold Separate Order, to operate separately and independently.  A company's document retention policy cannot trump a

---

[21]   There was no obligation to direct a litigation hold notice to preserve Intermedia's backup tapes.  As a general rule, a litigation hold "does not apply to inaccessible backup tapes (*e.g.* those typically maintained solely for the purpose of disaster recovery), which may continue to be recycled on the schedule set forth in the company's policy."  <u>Zubulake IV</u>, 220 F.R.D. at 218.  <u>See also</u>, Sedona Principles:  Best Practices, Recommendations & Principles for Addressing Electronic Document Production, at 23 (March 2003) ("Sedona Principles – March 2003"), available at <u>www.thesedonaconference.org/publications</u>.  ("Absent specific circumstances, preservation obligations should not extend to disaster recovery backup tapes created in the ordinary course of business.").

A 04106

United States District Court's Hold Separate Order. More importantly, Parus fails to show that any evidence was destroyed. Even if there had been a failure to comply with document retention policies (and Parus has not shown that to be the case), this District has held that the failure to maintain documents in accordance with document policies does not prove spoliation:

> The principal problem with plaintiff's [argument] is that plaintiff offers no evidence whatsoever that the allegedly missing documents ever existed and, thus, she has failed to offer any evidence suggested that they were destroyed by LCI…. [E]ven if I assume that LCI has failed to maintain documents in accordance with either of its own policies or with applicable federal regulations, such a shortcoming is simply not the destruction or alteration of evidence which is central to the doctrine of spoliation. Whatever relevance the failure to maintain files may have for the fact-finder, it simply does not rise to the level of spoliation.

Farella v. City of New York, Nos. 05 Civ. 5711(NRB) and 05 Civ. 8264(NRB), 2007 WL 193867, at *3 (S.D.N.Y. Jan. 25, 2007) (quoting Riddle v. Liz Claiborne, Inc., No. 00 Civ. 1374 (MBM)(HBP), 2003 WL 21976403, at *2 (S.D.N.Y. Aug. 19, 2003)).[22]

## IV. PARUS HAS FAILED TO SATISFY THE RELEVANCE REQUIREMENT.

Parus's amended motion also fails to satisfy the relevance requirement for spoliation sanctions. Even the cases Parus cites hold that, when a party seeks severe sanctions such as an adverse inference, the relevance element requires Parus to do more than satisfy the ordinary relevance test of Fed. R. Evid. 401; it must also prove that the evidence would have been favorable to its case. Zubulake V, 229 F.R.D. at 431 (citing Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 108-09 (2d Cir. 2002); Chan v. Triple 8 Palace, Inc., No. 03

---

[22] Parus offers no evidence that Mr. Renforth's emails were destroyed or lost. Parus argues that it produced certain emails created by Mr. Renforth that Debtors did not produce. It refuses, however, to identify those emails, state whether those emails were responsive to any request, or explain how they are relevant. Moreover, Parus fails to state whether Debtors ever would have had these emails. For example, Parus produced emails that Mr. Renforth sent to it from his personal email account after he left Intermedia. Debtors never possessed such emails and, thus, could not have produced them. Finally, Parus fails to acknowledge that Debtors produced numerous Renforth emails after searching the nine sample Intermedia backup tapes and that more may be on the remaining 63 Intermedia tapes. Parus's argument about Mr. Renforth's emails thus fails to show any loss of relevant evidence and fails to show any culpability.

A 04107

Civ. 6048, 2005 WL 1935579, at *7 (S.D.N.Y. Aug. 11, 2005). "This corroboration requirement is even more necessary where the destruction was merely negligent, since in those cases it cannot be inferred from the conduct of the spoliator that the evidence would even have been harmful to him." Zubulake V, 229 F.R.D. at 431 (citing Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 77 (S.D.N.Y. 1991). The need for showing that lost evidence would have been both relevant and favorable "is equally true in cases of gross negligence or recklessness; only in the case of *willful* spoliation does the degree of culpability give rise to a presumption of the relevance of the documents destroyed." Id. (citing Residential Funding, 306 F.3d at 109).[23]

Rather than attempting to demonstrate that any assertedly lost document is relevant and favorable (i.e., that the document tended to establish that the unlimited rate should apply in calculating Reconciliation Payments), Parus argues that it should be excused from showing that specific documents were lost and that relevance should be presumed. In support, Parus misplaces reliance on three cases, Kronisch, Phoenix Four, and Treppel. Parus Amended Memo. at 15. Each is distinguishable. For instance, unlike Kronisch, there is no evidence here that any document has been destroyed. See 150 F.3d at 118, 128-19. And although Phoenix Four and Treppel noted a relaxed standard of proof, neither court allowed a presumption of relevance. On the contrary, in Phoenix Four, the court found that the abandonment of evidence was gross negligence, but did not support an inference that the evidence was unfavorable because the plaintiff had failed to establish that a reasonable trier of fact could find that the abandoned evidence would have supported its claims or defenses. See 2006 WL 1409413 at *4-5.[24]

---

[23]  But see Chan, 2005 WL 1925579, at *8 (gross negligence may suffice "in some circumstances"—which are not present here—to support a finding that the evidence was unfavorable to the grossly negligent party) (citing Residential Funding, 306 F.3d at 109).

[24]  The court found no need to infer relevance (and denied the request for an adverse inference) as to documents that were produced after the close of discovery, even though gross negligence caused the

A 04108

Treppel is even more inapposite.  In that case, the court addressed the completely different context of determining whether the plaintiff had met a relevance requirement for imposing a preservation order, not an adverse inference.  233 F.R.D. at 372.  The court refused to enter the requested preservation order because the defendant had preserved information on backup tapes and the plaintiff had not made even "the most basic showing that any documents potentially relevant to this litigation were lost."  Id.

No case cited by Parus excuses it from showing how any of the documents Mr. Renforth described has any bearing on the remaining issue in the case.  There is no evidence here that any document has been lost or destroyed.  On the contrary, the evidence is that (i) Debtors preserved 10,000 boxes of Intermedia hard copy documents, advised Parus of that fact, proposed a method for searching their contents, and Parus agreed to the method and stated that it did not want Debtors to search all 10,000 boxes;[25] and (ii) Debtors have preserved over 70 Intermedia backup tapes from the time period in question (nine sample backup tapes and 63 backup tapes that remain to be restored and searched) and are prepared to complete the restoration and search of these tapes when the costs of doing so have been allocated pursuant to the patterns established in Zubulake and the Federal Rules of Civil Procedure (but Parus has insisted that spoliation should be determined first).  There is no reason to believe that documents fitting the categories described by Mr. Renforth are not contained on the backup tapes that have not been searched and among the documents that Parus agreed need not be searched.[26]

---

delay, because it could determine relevance from descriptions of some of the documents that had been untimely produced.  Phoenix Four, 2006 WL 1409413, at *6.

[25]  Parus likely will reply that it never agreed to the method and that it reserved all of its rights, but the reality is that Parus never objected, never suggested other boxes to be reviewed, and never proposed an alternate method for selecting boxes for review.

[26]  Indeed, Debtors have produced many documents that match Mr. Renforth's broad descriptions.

A 04109

### A.    There Are No Grounds for An Inference of Favorability.

Without any meaningful analysis of the facts or case law, and without even showing that any of the documents it complains about meet the basic standard of relevance under Fed. R. Evid. 401, Parus argues that the Court should infer loss, relevance, and favorability because of purportedly gross negligence. Parus ignores the holdings in <u>Zubulake V</u> and <u>Phoenix Four</u>, which both observe that favorability is not automatically inferred from gross negligence. <u>See</u> <u>Zubulake V</u>, 229 F.R.D. at 431 (the "corroboration requirement" that the evidence be both relevant and harmful to the alleged spoliator cannot be inferred in cases of ordinary negligence, gross negligence, or recklessness, only *willful* spoliation); <u>Phoenix Four</u>, 2006 WL 1409413, at *5-7 (finding gross negligence, but refusing to infer relevance). Parus offers no reason and no case law that would permit an inference of favorability in this context—where there is no evidence of any destruction or loss and where Parus has insisted upon resolving spoliation issues <u>before</u> Intermedia's backup tapes have been searched to determine whether they contain relevant documents.

### B.    Parus Offers No Valid Extrinsic Evidence of Favorability.

Parus argues that hard copy and electronic documents existed that "related" to the Base Monthly Price. Parus Amended Memo. at 16. Even if that conclusory statement were true, it does not establish favorability. That a document merely "relates" to the Base Monthly Price says nothing about whether the Base Monthly Price refers to the unlimited or basic rate. During his deposition, Mr. Renforth testified that his understanding of what Debtors would owe when the UC Contract was terminated came solely from his own reading of the contract. Renforth Depo. at 136:2-137:20 and 233:22-234:4. Now, in his new declaration, he claims that he received and reviewed other documents—UC Drafts and some Meeting Documents—that informed his view. Mr. Renforth's statements are contradictory and should be disregarded. Mr. Renforth's

A 04110

inconsistent testimony does not suffice to prove the content of documents that may exist on backup tapes which are themselves the best evidence of their own contents.

## Conclusion

Parus is not entitled to any sanctions.  Parus has failed to show any destruction or loss of documents and has failed to satisfy any of the elements required for spoliation sanctions.  Here, there is no evidence of spoliation, no evidence that Debtors breached a duty to preserve relevant documents, no showing of culpability, and no showing of relevance or harm.  In addition, Parus fails to take into account the conditions of the Intermedia merger, the discontinuation of much of Intermedia's business, and the Debtors' subsequent bankruptcy (and its associated tens of thousands of claims).  Even if there had been a loss of the documents that Parus maintains are at issue here, the materiality and value of such documents has not been demonstrated.  At no time has Parus suggested that it needs those documents to prove its case for the unlimited rate or that it is precluded in any way from fully and fairly preparing for trial on the remaining issue in the case.  Finally, continued discovery, motion practice, and argument on these issues have no remaining purpose because of Debtors' motion to withdraw their objection as to the price applicable to the four Reconciliation Payments owed under the UC Contract.  For all of the foregoing reasons, Parus's amended motion for spoliation sanctions should be denied.

Dated: June 27, 2007
     Kansas City, Missouri

                STINSON MORRISON HECKER LLP

                By  /s/ *Mark M. Iba*
                Robert L. Driscoll, Esq.
                Allison M. Murdock, Esq.
                Mark M. Iba, Esq.
                1201 Walnut Street, Suite 2900
                Kansas City, MO 64106
                (816) 842-8600 – Telephone
                (816) 691-3495 - Facsimile
                ATTORNEYS FOR DEBTORS

A 04111

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 27, 2007, I electronically filed the foregoing with the Clerk of the Bankruptcy Court using the CM/ECF system which sent notification of such filing to all parties receiving electronic means.

/s/      *Mark M. Iba*
Attorney for Debtors

A 04112

# EXHIBIT 1

A 04113

Page 1

```
 1              UNITED STATES BANKRUPTCY COURT
             FOR THE SOUTHERN DISTRICT OF FLORIDA
 2
                       CHAPTER 11
 3
 4              CASE NO. 02-13533 (AJG)
 5
 6
       In Re:
 7
 8      WORLDCOM, INC., et al.,
 9
                Debtors.
10
11      --------------------------/
12
13
              VIDEOTAPED DEPOSITION OF JAMES RENFORTH
14
                       (Volume I)
15
16
                    November 17, 2006
17                  9:37 a.m. - 5:36 p.m.
18
                    Foley & Lardner, LLP
19                  100 North Tampa Street
                        Suite 2700
20                  Tampa, Florida  33602
21          ---------------------------------
22      REPORTED BY:
        NANCY E. PAULSEN
23      Registered Professional Reporter
        Notary Public, State of Florida at Large
24      Esquire Deposition Services - Tampa, Florida
        813-221-2535 (800-838-2814)
25      Job No.:  N 838672A
```

Page 66

1    Q. And so to your knowledge, then, Intermedia was
2  also looking to sell Unified Messaging through its
3  Advanced Business Unit arm?
4    A. That's exactly right.
5    Q. And I believe you also talked about agent
6  sales --
7    A. Agent sales.
8    Q. -- as another area in addition to what you
9  were familiar with where this Unified Messaging would be
10 sold?
11   A. That's right.
12   Q. And can you tell me a little bit about that?
13   A. Just a little bit, because I was involved just
14 briefly at the outset, and that was to go train one
15 specific agent in Boston on what the product was and how
16 to sell it.
17        And then they were going to implement it on
18 their website to sell to business customers in the
19 Boston area.
20   Q. And who was going to provide that online sales
21 vehicle? Do you know?
22   A. It would be a direct electronic link from that
23 company to Intermedia's order entry system.
24   Q. And so a customer, rather than having to deal
25 with a live person, could just go online and place an

Page 67

1  order for those Unified Messaging product?
2    A. That's correct.
3    Q. And do you remember the name of the company
4  that would offer that internet service with Intermedia?
5    A. That one was called Simplicity.
6        (Knock on door.)
7        MR. JUNG: Come in.
8  BY MS. MURCH:
9    Q. And do you know what ever happened with
10 Simplicity?
11   A. No.
12   Q. Mr. Renforth, let's talk about pricing of the
13 IntermediaOne product.
14   A. IntermediaOne or the Unified Messaging
15 component?
16   Q. Unified Messaging component.
17   A. Okay.
18   Q. What can you tell me about that?
19   A. We had three different tiers set up, based
20 upon customer's need. And I'm not -- I don't really
21 remember the exact numbers, but I'm thinking 9.95,
22 19.95, and 24.95, something like that.
23   Q. And how was this pricing determined?
24   A. Based upon market -- product marketing,
25 research, what the market would bear, and Intermedia's

Page 68

1  costs, make sure we had a margin.
2    Q. So for the 4.90 -- or, I'm sorry, the 9.95,
3  what was the approximate cost to Intermedia?
4    A. It was around $5.
5    Q. $5?
6        And so the gross margin would have been, what,
7  about a hundred percent?
8    A. About a hundred percent. And that was -- that
9  was across the board for all three tiers.
10   Q. Now, under the Unified Communications
11 Agreement, there were two tiers of pricing, there was
12 limited service and unlimited service. Do you know, for
13 purposes of the new mailboxes, did Intermedia assume it
14 would be unlimited service at the 27.40 price or at the
15 lower price?
16       MR. IBA: Objection, leading, misstates, the
17     contract speaks for itself.
18 BY MS. MURCH:
19   Q. Mr. Renforth, do you know which pricing would
20 have been used under the Unified Communications
21 Agreement?
22   A. The -- the unlimited was used.
23   Q. Okay. I'm going to hand you a copy of the
24 Unified Communications Agreement, which has been marked
25 as Exhibit 2. Here is a copy for your counsel.

Page 69

1        Mr. Renforth, I'm going to ask you to go to
2  the very last page, which is pricing. And you'll see
3  there is a basic of 11.45 and an unlimited of 27.40. Do
4  you see those two figures there?
5    A. I do.
6    Q. And so which two of these figures did
7  Intermedia assume, was it the 11.45 or the 27.40?
8    A. 27.40.
9        MR. IBA: Objection.
10       Mr. Renforth, you need to let me assert my
11     objections first --
12       THE DEPONENT: Oh, I'm sorry.
13       MR. IBA: -- before you answer.
14       I'm going to object to foundation, and vague
15     and ambiguous.
16       MS. MURCH: Okay.
17 BY MS. MURCH:
18   Q. We'll back up, Mr. Renforth. You see Exhibit
19 2, which is the EffectNet Unified Communications Service
20 General Agreement for Intermedia Communications, Inc.?
21   A. Yes.
22   Q. Have you seen this document before?
23   A. Yes.
24   Q. And were you involved at all in negotiating
25 this agreement?

ESQUIRE DEPOSITION SERVICES, LLC - CHICAGO
312.782.8087  800.708.8087 FAX: 312.704.4950

A 04115

Page 70

1    A.   Yes.
2    Q.   And how so?
3    A.   I was the facilitator between both legal
4   departments and both contract negotiation lawyers, at
5   EffectNet and Intermedia, in finalizing the verbiage,
6   content, and material contained in this agreement.
7    Q.   And so were you familiar with the prices
8   identified on the last page of Exhibit 2?
9    A.   Yes.
10    Q.   Is it your belief that Intermedia, in
11   considering its financial forecasts, relied on the 27.40
12   number or the 11.45?
13    A.   27.40.
14    Q.   Thank you.
15       Now, you mentioned you were the facilitator
16   for the Unified Communications Agreement? Can you tell
17   me a little bit about that?
18    A.   Yes. The original contract in its -- in its
19   entirety was passed from the EffectNet lawyer, and I
20   don't remember his name, but, to me, then from me to
21   Intermedia's attorney for content changes, verbiage
22   changes, product information, with regard to product
23   information, specific to Intermedia, functionality and
24   services.
25       I would review those as the product manager to

Page 71

1   make sure that the information was accurate and complete
2   with regard to functionality and capabilities.
3    Q.   Okay.
4    A.   Then this -- the original document in soft
5   copy would pass from Intermedia to EffectNet through me,
6   and then from EffectNet to Intermedia through me until
7   it was finalized.
8    Q.   And so you were basically the point of contact
9   for both sides?
10    A.   Yes.
11    Q.   Now let's talk a little bit about training for
12   the folks on IntermediaOne.
13    A.   Okay.
14    Q.   Can you tell me how that was implemented?
15    A.   The training was implemented by product
16   management, product marketing, sales, and human
17   resources training department. The training curriculum
18   was assembled by the training department with input from
19   all three of those other groups.
20       Then we went -- went to each city --
21   physically went to each city during the initial launch
22   period, the seven cities, to train salespeople and
23   operations on the specifics of the product.
24       PowerPoint presentations, Excel spreadsheets,
25   Word documents were all provided in those training

Page 72

1   sessions for each person. Content pretty much was
2   here's what it is, here is how it works, here is who you
3   sell it to, and here is what you charge them.
4       And then on the customer service side was here
5   is how you input an order, here is how you handle
6   trouble reports.
7    Q.   And did you see any of these training
8   materials?
9    A.   Yes.
10    Q.   And did you have copies of those training
11   materials?
12    A.   I did.
13    Q.   And did you keep those copies?
14    A.   I did.
15    Q.   You kept everything?
16    A.   Everything.
17    Q.   And was there -- and you may have said this, I
18   just didn't catch it. Was there a kind of a -- did
19   EffectNet have any role in training?
20    A.   They did. Initially, they did what was called
21   train the trainer. EffectNet provided some training
22   folks to come out and train the people at Intermedia who
23   were going to be doing the training for both sales and
24   provisioning.
25    Q.   So EffectNet would -- would train the trainer,

Page 73

1   and then the trainers at Intermedia would go forth and
2   --
3    A.   That's right.
4    Q.   -- train others?
5       Now, Mr. Renforth, do you recall when you left
6   Intermedia?
7    A.   Yes.
8    Q.   Okay. And when would that have been?
9    A.   That was June 27th, 2001.
10    Q.   And why did you leave?
11    A.   In -- let me preface that by saying that
12   the -- the IntermediaOne product that we had launched
13   had another tremendous impact on our revenues. We were
14   up to 105 million now.
15       In April, May of that year, I'm going to say,
16   I'm not sure which, around the end of April, first of
17   May, we had a -- we, product management, had a staff
18   meeting, and in that meeting were -- . .
19       MR. IBA: Well, hold on. I'm going to object,
20   nonresponsive.
21       You may continue.
22       THE DEPONENT: Okay.
23   BY MS. MURCH:
24    Q.   Okay, well, let me -- let me ask, what was the
25   reason why you left?

ESQUIRE DEPOSITION SERVICES, LLC - CHICAGO
312.782.8087  800.708.8087  FAX: 312.704.4950

A 04116

Page 130

1    And just to loop back and make sure I've got
2 it covered, you don't know that -- you don't -- you
3 assume that other people at EffectNet were involved, but
4 you don't know any details about what their involvement
5 was; correct?
6    A.  That's true. Yeah.
7    Q.  And you don't know who was involved other than
8 their lawyer?
9    A.  No, I wouldn't.
10    Q.  Okay. And let me turn -- have you turn to the
11 second-to-the-last page of Exhibit 2. Because I think
12 you misspoke about who signed it. You'll see that for
13 Intermedia, Kathy -- Kathleen Victory signed it, and for
14 EffectNet, it was Brad Steinmeyer.
15    A.  Brad Steinmeyer. Okay, I had forgotten about
16 him.
17    Q.  Yeah, not Mr. Reneau.
18        So do you have any knowledge of any
19 involvement that Mr. Reneau, Taj Reneau or Darius Reneau
20 had in negotiating this contract?
21    A.  No, I don't.
22    Q.  Okay. And -- and now that you see Brad
23 Steinmeyer's name on there, do you remember if Brad
24 Steinmeyer was involved at all?
25    A.  I don't know that he was.

Page 131

1    Q.  Okay.
2    A.  But I know he -- now seeing his name --
3    Q.  You know he signed it.
4    A.  Yeah. He was a -- he was an officer in their
5 company, so.
6    Q.  Okay. And I want to make sure I understand
7 the part that you played in the negotiations. I think
8 you said that you reviewed it for functionality and
9 capabilities; is that correct?
10    A.  Yes.
11    Q.  Anything else that you reviewed it for?
12    A.  No.
13    Q.  When you talk about functionality, what do you
14 mean?
15    A.  Well, let's see if I can find an example for
16 you. Product functionalities.
17        Page 2, this talks about product coordination.
18        MS. MURCH:  I'm sorry, I hate to interrupt.
19        Page 2 of which document, Mr. Renforth?
20        THE DEPONENT:  Of Exhibit 2.
21        MR. IBA:  Exhibit 2.
22    A.  Page 2 talks about product-specific
23 information. "Product coordinator. EffectNet and
24 Intermedia will designate their other project
25 coordinator to coordinate the process as described

Page 132

1 below." That product coordinator on the EffectNet side
2 and then the product coordinator on the Intermedia side,
3 which I took that role.
4        Product development. We're talking about any
5 upgrades or any changes to the product functionality and
6 features. That part rested in my office also.
7        And let's see.
8        And then on page 4, where it's talking about
9 marketing and branding. And again, it's back -- back to
10 one of the original e-mail documents that we started
11 with with that list of questions.
12    Q.  Right.
13    A.  This talks about web presence and EffectNet
14 customizing that for Intermedia. And that was some
15 negotiations that I was involved in also.
16        I mean, as far as that agreement, that's
17 pretty much what I -- what I was involved in. The rest
18 of it's all lawyer-lawyer stuff.
19    Q.  Okay. Do you recall any discussions or issues
20 in -- that were related to the negotiation of this
21 Exhibit 2?
22    A.  I'm not sure I follow what you --
23    Q.  Probably not a very good question.
24        What do you remember about the negotiations?
25        Let me ask you this way. Do you recall any

Page 133

1 discussions about what would happen if the contract were
2 terminated by either side?
3    A.  Only that it was part of the -- of the legal
4 requirement, that our department -- our legal department
5 wanted to make sure that Intermedia was covered, and
6 EffectNet wanted to make sure they were covered. And we
7 just agreed that there would be a penalty or some kind
8 of payment that would be required if we cancelled the
9 contract.
10    Q.  Okay. And -- and do you remember what that
11 was? Or is that something that the lawyers worked out?
12    A.  I remember a little bit about it in the effect
13 that it was based on the unlimited price and on the
14 shortfall of the 10,000 mailboxes.
15    Q.  And -- and where do you have -- tell me about
16 that discussion that you remember.
17    A.  That if we should fail to meet that number or
18 if we should terminate the contract, as of that date,
19 through the life of the contract, we would be obligated
20 to pay X number times whatever the unlimited rate was,
21 24.60 or 24.90.
22    Q.  And that was what you negotiated?
23    A.  No. -
24    Q.  Okay. So if the --
25    A.  That's -- that's what the companies

Page 134

1 negotiated.
2    Q.   Okay.  At least that's your recollection of
3 what the companies negotiated?
4    A.   Yes.
5    Q.   But you weren't involved in drafting it;
6 correct?
7    A.   Correct.
8    Q.   Okay.  And so if the language says something
9 different, you wouldn't have any reason to doubt what
10 the language says; correct?
11    A.   Correct.
12    Q.   Okay.  I want you to turn to the last page.
13 It says Appendix P.  Do you see that?
14    A.   Yes.
15    Q.   And it talks about the basic and unlimited
16 pricing; right?
17    A.   Right.
18    Q.   And then on both of them, I want to understand
19 something here.  The last line of basic, it says, "All
20 basic accounts will be billed a base subscription price
21 of $6 for the first calendar month of activation,
22 partial or full, and then 11.45 for calendar months
23 thereafter, partial or full."
24       Do you see that?
25    A.   Yes.

Page 135

1    Q.   So this base subscription price, tell me what
2 that meant.  That's just when you first sign up, you get
3 it for six bucks?
4    A.   Let me read this thing a second.
5    Q.   Sure.
6    A.   Okay.  Now, what was your question?  Thank
7 you.
8    Q.   My question is what -- my question was does
9 this mean that when you sign up a customer, that for the
10 first month, they get it for $6 a month?
11    A.   No.  What that means is for the first month,
12 Intermedia pays $6 a month.
13    Q.   Okay.  So you pay EffectNet $6 as a base price
14 when somebody signs up?
15    A.   For the first month.
16    Q.   Okay.
17    A.   And then it's each successive month 11.45.
18    Q.   Right.
19       And so that's the base subscription price;
20 right?
21    A.   Correct.
22    Q.   And then on unlimited accounts, the base price
23 would be $14 for the first month; is that right?
24    A.   That's right.
25    Q.   Okay.

Page 136

1    A.   Charged to Intermedia.
2    Q.   Okay.  Now, do you remember anything else
3 about what would happen if either party terminated the
4 contract early?
5    A.   Other than what I said, no.
6    Q.   Okay.
7    A.   Just that -- the penalty that was built in.
8    Q.   And how did you understand what that penalty
9 was to be?
10    A.   It was based --
11       MS. MURCH:  I object based -- asking for a
12 legal conclusion.
13    A.   Other than there was a number that we were
14 required to hit of 10,000.  If that was not reached, my
15 understanding was that we would pay whatever that --
16 BY MR. IBA:
17    Q.   And I think you're -- I think we got what your
18 understanding was.  My question was how did you get that
19 understanding?  Did -- did somebody tell that to you?
20    A.   No, it was part of the document.
21    Q.   So -- so you got that understanding just from
22 reading it?
23    A.   Yeah.
24    Q.   Okay.  That wasn't something that you
25 negotiated?

Page 137

1    A.   No.
2    Q.   Okay.  Did you gain that understanding from
3 anyone at EffectNet?
4    A.   No.  I think it was part of the agreement.
5    Q.   And did anyone at Intermedia give you that
6 understanding?
7    A.   No.
8    Q.   It's just from what you read?
9    A.   Yes.
10    Q.   Okay.  When did you last read Exhibit 2?
11 Other than today.
12    A.   Gosh.
13       MR. JUNG:  Well, he didn't read it today.
14    A.   I haven't read it today.
15 BY MR. IBA:
16    Q.   Okay.
17    A.   That had to have been November 2000, I guess.
18    Q.   You haven't read it since it was really
19 entered into?
20    A.   No.
21    Q.   Okay.  Now, number of accounts, you said there
22 was a minimum of 10,000?  How did you come up with that
23 number?
24    A.   I didn't.
25    Q.   That came from where?

A 04118

Page 175

```
 1              UNITED STATES BANKRUPTCY COURT
            FOR THE SOUTHERN DISTRICT OF FLORIDA
 2
                      CHAPTER 11
 3

 4              CASE NO. 02-13533 (AJG)

 5

 6
     In Re:
 7

 8    WORLDCOM, INC., et al.,

 9
                Debtors.
10

11    --------------------------/

12

13

             VIDEOTAPED DEPOSITION OF JAMES RENFORTH
14
                      (Volume II)
15

16
                   November 17, 2006
17               9:37 a.m. - 5:36 p.m.

18
                   Foley & Lardner, LLP
19               100 North Tampa Street
                      Suite 2700
20               Tampa, Florida  33602

21        ----------------------------------

22   REPORTED BY:
     NANCY E. PAULSEN
23   Registered Professional Reporter
     Notary Public, State of Florida at Large
24   Esquire Deposition Services - Tampa, Florida
     813-221-2535 (800-838-2814)
25   Job No.:  N 838672B
```

Page 224

1  -- had any communications between Intermedia and
2  WorldCom or M.C.I. about the U.C. contract; correct?
3      A.  Correct.
4      Q.  Do you have any knowledge of the market
5  conditions in 2000, 2001 for the telecommunications
6  industry?
7      A.  2000, 2001 was still pretty much on an
8  upswing.
9      Q.  Do you know what was happening to other
10 CLEC's?
11     A.  I know they were still making money.
12     Q.  Is it something that you followed very closely
13 or not?
14     A.  Pretty closely, in our environment, certainly.
15     Q.  Okay.
16     A.  I know at the time, there were some -- there
17 were some litigations taking place in the F.C.C.
18 environment with regard to specific tariffed platforms
19 that CLEC's were operating under.  And subsequently,
20 those rulings were disadvantageous to the CLEC
21 environment.
22        But I think that -- that didn't happen until
23 2002, 2003 time frame.
24     Q.  Do you know if there were a number of other
25 CLEC's that were in bankruptcy in 2001, late 2000?

Page 225

1      A.  No, I don't know.
2      Q.  Did you have any awareness of the action
3  brought by the Department of Justice in connection with
4  the WorldCom/Intermedia merger?
5      A.  No.
6      Q.  And is it fair to say that what you know about
7  that merger would just be hearsay?
8      MS. MURCH:  Objection.  I do not know that the
9  witness knows what hearsay is.
10     A.  Other than the -- the impact directly to the
11 company I worked for, no, I wouldn't.
12 BY MR. IBA:
13     Q.  And other than -- I mean, the impact being
14 that the company was purchased?
15     A.  Right.  And subsequently scrapped.
16     Q.  Or parts of it?
17     A.  (Nods head affirmatively.)
18     Q.  And we have -- do you have any recollection of
19 when the merger between WorldCom and Intermedia was
20 consummated?
21     A.  Oh, gosh.  I think late 2001.  It was sometime
22 after I left.
23     Q.  After you left?
24     A.  Yes.
25     Q.  At the time that you left, as we've discussed,

Page 226

1  everyone was still working pretty hard on the Unified
2  Messaging project?
3      A.  Sure.  And on the Intermedia product.  Because
4  at that time we still thought probably the Intermedia
5  component would survive.
6      Q.  You had IntermediaOne and Unified Messaging;
7  right?
8      A.  Yes.
9         (Marked Deposition Exhibit Number 30.)
10        MR. IBA:  30?
11        THE COURT REPORTER:  Yes.
12 BY MR. IBA:
13     Q.  Mr. Renforth, I'm handing you Exhibit 30,
14 which appears to be a resignation -- your resignation
15 letter dated July 16th, 2001 to Cheryl Mellon; is that
16 correct?
17     A.  Yes.
18     Q.  Okay.  And in it, you tell Ms. Mellon that you
19 will be resigning from Intermedia, with your last day
20 being Friday, July 27th, 2001; correct?
21     A.  Right.
22     Q.  And I just want to go through a couple of
23 other exhibits here connected with your departure.
24        (Marked Deposition Exhibit Number 31.)
25 BY MR. IBA:

Page 227

1      Q.  Exhibit 31 appears to be a letter from you to
2  Brad Steinmeyer on June 28th, 2001.  You say, "Hello,
3  Brad.  It was very nice talking with you this morning.
4  It seems like such a long time since we were on the
5  first tee box at South Mountain."
6         I assume that was referring to some golfing
7  that you did with him?
8      A.  Yes.
9      Q.  You talk about having the opportunity to take
10 a deep breath, shake off due diligence for a moment, and
11 then you talk about the future.  Is this -- are you
12 talking to Mr. Steinmeyer about opportunities you might
13 have at EffectNet?
14     A.  I am.
15     Q.  Okay.  And did he get back to you?
16     A.  Yes.
17     Q.  And what was the -- tell me what happened, as
18 you were talking with them about going to --
19     A.  Well, we just had -- we had several
20 conversations off and on over the next few months, and
21 ultimately, nothing came about as a result of that.
22        (Marked Deposition Exhibit Number 32.)
23 BY MR. IBA:
24     Q.  Exhibit 32 is an e-mail from you to Ryan
25 Blanchard, Brad Steinmeyer, Jay Jessup, Taj Reneau, that

14 (Pages 224 to 227)

JAMES RENFORTH    VOLUME I I    NOVEMBER 17, 2006

Page 232

1  of the Unified -- the U.C. contract?
2      A.  Unified Messaging?  Not then.  Not then.
3      Q.  Okay.  And that was a few months ago?
4      A.  Yes.
5      Q.  Anyone else on that call?
6      A.  Not that time, no.
7      Q.  Just Taj Reneau and you?
8      A.  Yes.
9      Q.  Okay.  What happened next?
10     A.  Well, again, it was later this summer, I got
11 another call from Taj and Bob McConnell, who were both
12 on the phone, conference call.  And we reiterated and
13 rehashed some of those same questions that he'd asked
14 before, only this time with -- with counsel on there.
15         And they asked at that time "Would you be
16 willing to give a deposition on behalf of what you
17 remember from these negotiations and from your -- from
18 Intermedia's commitments?"
19         And I said, "Certainly."
20     Q.  About how long did you talk with Mr. Reneau
21 and Mr. McConnell during that conversation?
22     A.  That was short.  Maybe 15, 20 minutes.
23     Q.  All right.  And it sounded to me like from the
24 previous answer that you did talk about the terms of the
25 contract at some point.

Page 233

1      A.  Yes.
2      Q.  Was that during this --
3      A.  That was during the second conversation.
4      Q.  And what do you remember the conversation
5  about that?
6      A.  Only that we covered "Do you remember what the
7  quantities were that we agreed to?"
8          And I said, "Yes."  You know, I remembered it
9  was 10,000.
10         "Do you remember anything about the forecast?"
11         And I shared those details as best I could
12 remember, with regard to the new customers and the
13 existing customers that we were going to go back and
14 up-sell to, and about the pricing tiers, and what the --
15 what the default was in the contract language.
16         And I recalled it as best we could, that --
17 that we had agreed in content in the agreement to use
18 the unlimited figure on any shortfalls we had.  Because
19 we fully anticipated to blow those numbers completely
20 away, because our forecasts were so -- so conservative
21 and so small with respect to the opportunity.
22     Q.  Okay.  And -- and my recollection is that your
23 understanding of the terms of the contract was based on
24 what you had read?
25     A.  Sure.

Page 234

1      Q.  Not any outside discussions with --
2      A.  No.
3      Q.  -- anyone else?
4      A.  Just what was written.
5      Q.  Okay.  Any other topics that you covered with
6  Mr. McConnell -- Mr. McConnell and Mr. Reneau?
7      A.  No.  People, the termination, the forecasts,
8  and would I be willing to come.  That was -- that was
9  it.
10     Q.  All right.  Then take me to the next stage.
11     A.  Okay, the next stage was a month ago.  And I
12 think it was a month to the day.  I met with Mr. Taj and
13 Bob.  They came down to Tampa.  We met at the airport.
14 Had a -- talked a little bit about what we had talked
15 about the other two conversations.
16         And this time -- you know, as you -- as you
17 talk -- as you discuss things, memories come back.  So I
18 could put some -- put some timelines with regard to when
19 things happened.
20         And I know we took some notes.  Bob took some
21 notes.  I refreshed my memory and took some notes.
22 Because I -- with regard to when I had left, who took
23 over after I left, and those kinds of things.
24         So it was kind of -- it was more a social
25 visit other -- than anything else, plus to pick my brain

Page 235

1  a little bit to see what else we could dredge up out of
2  my memory.
3      Q.  All right.  Have you kept your notes of that
4  conversation?
5      A.  Yes.
6      Q.  Did anyone make a recording of that
7  conversation?
8      A.  No.
9      Q.  Or that meeting?
10     A.  Not that I know of.
11     Q.  Okay.  You didn't?
12     A.  I didn't.
13     Q.  Did you get a copy of the notes that Mr.
14 McConnell and Mr. Reneau took?
15     A.  A few.
16     Q.  Do you have a copy of their notes?
17     A.  I have a copy of a few of -- a few of the
18 notes that they took on just some scratch paper.
19     Q.  Did -- did they review any documents with you?
20     A.  A few of these e-mails that we've reviewed.
21     Q.  And they -- anything else besides e-mails?
22     A.  No.
23     Q.  Do you remember any e-mails that we have not
24 reviewed that you discussed with them?
25     A.  That we have not?  No.

ESQUIRE DEPOSITION SERVICES, LLC - CHICAGO
312.782.8087  800.708.8087  FAX: 312.704.4950

A 04121

# EXHIBIT 2

A 04122

**From:** Renforth, Jim [EXCH]
**Sent:** Monday, October 16, 2000 1:46 PM
**To:** 'jjessup@effectnet.com'; 'rblanch@effectnet.com'
**Cc:** Davidson, Jack W. (EXCH); Dyer, Ralph R. (EXCH)
**Subject:** EffectNet General Agreement

Hello Jay,

We've all been so busy gathering information and doing field sales training since the first of September, we've nearly lost sight of the General Agreement.

The original MOU (attached) was replaced with the Interim Agreement, signed and dated September 1, 2000.

EffectNet and Intermedia now need to put the General Agreement into motion through our respective Contract Administration and Legal departments.

The initial MOU seems to be a very good place to start and will require minimal modifications:
1. I would sense that we need to add specific verbiage surrounding the EffectNet Network Operation Center support commitments, end user support, and escalation procedures between both organizations.
2. Define the circumstances attending the transfer and handling of end user calls into both companies.
3. Define Tier One, Tier Two, and Tier Three support.
4. Define the requirement for forecasts (other than the initial forecast Intermedia provided).
5. Adjust pricing relative to Intermedia supplying the toll free end user numbers.

Please work up the initial General Agreement for me to submit to Contract Administration and Legal.

Thank you.

Best Regards,

Jim Renforth
Sr. Services Manager - Local Services
813-829-4962
Mail Code: FLT-WH1

**intermedia**



Intermedia MOU_.doc

MCIWC000254

A 04123

| From: | Renforth, Jim [EXCH] |
|---|---|
| Sent: | Monday, October 16, 2000 1:46 PM |
| To: | 'jjessup@effectnet.com'; 'rblanch@effectnet.com' |
| Cc: | Davidson, Jack W. (EXCH); Dyer, Ralph R. (EXCH) |
| Subject: | EffectNet General Agreement |

Hello Jay,

We've all been so busy gathering information and doing field sales training since the first of September, we've nearly lost sight of the General Agreement.

The original MOU (attached) was replaced with the Interim Agreement, signed and dated September 1, 2000.

EffectNet and Intermedia now need to put the General Agreement into motion through our respective Contract Administration and Legal departments.

The initial MOU seems to be a very good place to start and will require minimal modifications:
1.  I would sense that we need to add specific verbiage surrounding the EffectNet Network Operation Center support commitments, end user support, and escalation procedures between both organizations.
2.  Define the circumstances attending the transfer and handling of end user calls into both companies.
3.  Define Tier One, Tier Two, and Tier Three support.
4.  Define the requirement for forecasts (other than the initial forecast Intermedia provided).
5.  Adjust pricing relative to Intermedia supplying the toll free end user numbers.

Please work up the initial General Agreement for me to submit to Contract Administration and Legal.

Thank you.

Best Regards,

Jim Renforth
*Sr. Services Manager - Local Services*
813-829-4962
*Mail Code:* FLT-WH1




Intermedia MOU_.doc

MCIWC000255

A 04124



## Facsimile Transmittal Sheet

| | |
|---|---|
| **To:** | Jim Renforth – Intermedia Communications |
| **CC:** | |
| **From:** | Ryan Blanchard- EffectNet Communications |
| **Date:** | August 29th, 2000 |
| **Fax:** | 813.829.5426 |
| **Phone** | 813.829.4962 |
| **Pages:** | 9 |
| **Re:** | Memorandum of Understanding |

☐ Urgent    ☐ For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

**Notes:**

10230 S. 50ᵗʰ Place, Phoenix, AZ 85044 **602.296.3303, phone  602.296.3311,fax**

MCIWC000256

A 04125

# Memorandum of Understanding

This Memorandum of Understanding (the "MOU") is made effective as of _____, 2000 (the "Effective Date") between EffectNet, LLC, a limited liability company organized under the laws of Nevada with its principal business location at 10230 S. 50th Place, Phoenix, Arizona 85044 (hereinafter referred to as "EffectNet"), and Intermedia Communications, Inc., a corporation duly incorporated under the laws of the State of Delaware with executive offices at One Intermedia Way, Tampa, Florida 33647 (hereinafter referred to as "Intermedia").

## 1. Scope of MOU

1.1.    EffectNet is a communications service provider that offers private-label Internet and telecommunications products and services, including unified communications and other value-added services, in-house customer service, billing and technical support.

1.2.    Intermedia is a competitive local exchange carrier ("CLEC") that offers long distance and communications services (the "Intermedia Services").

1.3.    EffectNet and Intermedia desire to set forth the general terms and conditions under which the Effectnet Services will be provided to Intermedia and as shall be more specifically set forth in a General Agreement embodying definitive terms and conditions.

This MOU, including Exhibits attached hereto, shall govern the mutual obligations of the parties from the Effective Date until the Initial Launch Date or the execution by the parties hereto of a General Agreement. The parties agree to execute the MOU by not later than September 1, 2000. The Parties will use best efforts to reach an Initial Launch Date of September 15, 2000.

## 2. EffectNet Services

2.1.    The EffectNet Services shall be the unified communications' features and functionality as commercially offered by Effectnet on the Effective Date and as set forth in Exhibit A.  Exhibit A describes which EffectNet Services shall be made available through individually assigned toll free numbers to each user of the EffectNet Services.

2.2.    The parties will promptly disclose to each other in writing any Errors of which they become aware.

2.3.    EffectNet may make changes to the EffectNet Services from time to time in order to improve, modify or extend the EffectNet Services ("EffectNet Changes"), but in no event shall such changes materially decrease the quality of the EffectNet Services provided to Intermedia.  EffectNet will use commercially reasonable efforts

MCIWC000257

A 04126

to provide Intermedia with notice ninety (90) days in advance of the commercial
release date of such changes. Deployment of new releases (EffectNet Services
features/functionality) is the decision and option of Intermedia. The parties agree to
permit multiple versions of the product. Intermedia may decline to use any enhanced
or changed version of the EffectNet Services and continue to use the version then in
use by Intermedia so long as it is commercially reasonable for EffectNet to continue
to support such pre-existing version.

    2.3.1.    EffectNet and Intermedia will each designate their own Product
Coordinator to coordinate the process described below.

        • The designated Product Coordinators will be the principal points
of contact between the parties on product issues (the "Product
Advisory Process"). Each party may rely on the authority and
technical competence of the other Party's Product Coordinator to
represent its respective company in connection with the priorities,
needs and progress of their company's product issues.

    2.3.2.    EffectNet will provide Intermedia with regular access to and copies
of the following:

        • Plans for current and future enhancements to the EffectNet
services which by their nature apply to the Intermedia Services; and

        • Functional descriptions, architecture descriptions, specifications,
development plans, schedules and periodic status for enhancements
to the EffectNet Services under development, as soon as such
materials exist.

    2.4.    EffectNet and Intermedia agree that the EffectNet Services provided to
Intermedia will be the same version of the EffectNet Services generally made
commercially available, unless Intermedia deploys multiple versions of the EffectNet
service in order to satisfy large blocks of customer/end users, provided, however, that
EffectNet shall have no obligation to support Intermedia modification not previously
agreed to by EffectNet.

## 3. Pricing and Identification of EffectNet Services

    3.1.    EffectNet Services for Intermedia will encompass three products initially.
based on a three year term: .

    3.1.1.    CommuniKate Basic: Intermedia will pay $11.45 Per month for each
CommuniKate basic account with all platform usage and inbound call time on
the Effectnet platform an additional 10 cents per minute! The basic account
includes unlimited free on-line usage including checking emails, faxes, etc...
Outbound calling will be 10 cents per minute. .

*base monthly price tie to $6 [handwritten annotation]*

MCIWC000258

A 04127

3.1.2. CommuniKate Unlimited: Intermedia will pay $27.40 per month for each CommuniKate unlimited account with unlimited free platform usage and inbound call time included. Outbound calling will be 10 cents per minute.

3.1.3. CommuniKate Corporate: Intermedia will pay $11.45 per month and $29.50 per receptionist for each CommuniKate corporate account which is the enterprise version where a call to an enterprise's general number leads to the employee list and then goes to individual extensions. Receptionist is $11.45 per month for enterprise users with 10 or more accounts.

3.1.4. Intermedia may provide its own DIDs and pricing will be adjusted in a manner to be defined in the general agreement.

3.2. On a bi-weekly basis EffectNet will invoice Intermedia for account fees for each account active during the previous month. Intermedia will be charged a daily pro rated amount for start-up and terminated accounts.

3.3. Call detail information will be agreed upon in the General Agreement.

3.4. Intermedia will pay EffectNet on a net-10 day basis. EffectNet may attach penalties for late payment.

3.5. <u>Minimum Commitment</u>. Intermedia hereby agrees to deliver a minimum 1,500 then current active Subscribers on or before three (3) months after the Rollout Date; an additional 1,500 then current active Subscribers (total 3,000) on or before six (6) months after the Rollout Date; an additional 3,500 then current active Subscribers (total 6,500) on or before nine (9) months after the Rollout Date; and 10,000 total then current active Subscribers on or before twelve (12) months after the Rollout Date (the "Ramp Date"), and at the end of each calendar month thereafter (the "Minimum Commitment") for the term of the agreement. Minimum Commitment levels shall relate to the CommuniKate unlimited pricing account.

3.6. <u>Reconciliation Payment</u>. On the Ramp Dates, and at the end of each calendar month thereafter, EffectNet will calculate Intermedia's actual number of then current active Subscribers on the last day of such calendar month and compare it to the Minimum Commitment. If Intermedia does not meet or exceed the Minimum Commitment for the month in question, Intermedia will have a Volume Shortfall, and Intermedia shall pay EffectNet a Reconciliation payment associated with that Volume Shortfall. Each month is measured independently; there is no carry back or forward of surpluses or deficiencies. The Reconciliation Payment is equal to the Volume Shortfall multiplied by the base monthly price applicable to the UM Service per Subscriber, based on a total number of Subscribers equal to the Minimum Commitment level (the "Base Monthly Fee").

3.7. The pricing described in this MOU does not include taxes. Intermedia shall pay or reimburse EffectNet for any sales or use taxes associated with EffectNet Services, which have been provided according to the terms of this MOU. If EffectNet should have to pay new Federal taxes under laws already in place, then Intermedia

MCIWC000259

A 04128

will pay its share. EffectNet shall be responsible for all taxes based on EffectNet's net income.

3.8.    Intermedia will provide concurrent with the execution of this MOU a non-refundable deposit of $250,000 to cause Effectnet to begin the provisioning process of the Intermedia accounts: Should Intermedia cancel the project for any reason prior to the execution of the General Agreement then this amount shall remain with Effectnet as total liquidated damages. In no event will Intermedia be liable for any damages beyond this amount for failure to execute a General Agreement. When all contractual obligations have been met Effectnet shall return said amount to Intermedia.

## 4.  EffectNet Obligations

4.1.    EffectNet will provide Intermedia with all existing customer service procedures, training materials, FAQ's and scripts. A dedicated EffectNet team will work on site with Intermedia to train Intermedia's trainers at a cost of $1,500 per trainer per day plus out of pocket travel expenses if at Intermedia.

4.2.    EffectNet will provide Intermedia with help desk technical support necessary to the implementation of the Initial Launch Date within the normal course of the relationship, and for a reasonable period thereafter.

4.3.    Arrangements will be defined in the general agreement for transfer of calls and handling thereof. Intermedia will qualify and transfer technical support calls. Definition of "qualification" and costs related thereto.

4.4.    EffectNet will provide 24/7 Network Operation Center support for Tier Three calls. Tier Three support includes power outages, and EffectNet System and network outages. Tier Three support will be provided by EffectNet at no charge.

4.5.    EffectNet will provide call detail records ("CDR's") to Intermedia in a media and at an interval to be determined in the general agreement.

## 5.  Intermedia Obligations

5.1.    Intermedia will be responsible for all new account provisioning, manuals, user training, fulfillment materials, billing and collections, Tier One customer support and Tier Two customer support

5.2.    Intermedia will be solely responsible for fraudulent misuse of (a) domestic (United States) EffectNet services due to credit fraud, fraudulently established accounts, stolen accounts, and (b) all international accounts, regardless of the method of fraud. EffectNet will use commercially reasonable efforts to cooperate with Intermedia to arrive at fraud control means and measures to curtail and/or eliminate fraud.

MCIWC000260

A 04129

5.3.    The general agreement will define the requirement of forecasts of account activations anticipated at certain intervals also to be defined. The assurance of availability of Platform capacity is conditioned on demand from Intermedia not exceeding a variance of twenty percent of forecast estimates. EffectNet reserves the right to request additional guarantees from Intermedia when forecasts require significant or unusual capital and cost by EffectNet.

5.4.    Each of the Parties shall notify the other in writing promptly of any event, which might result in such Party's inability to continue to meet its obligations under this MOU. Such event shall specifically include, but not be limited to a material adverse change in a Party's financial situation.

5.5.    An abuse of service clause will be agreed upon between Effectnet and Intermedia and included in the general agreement.

## 6. Other Provisions

6.1.    Confidentiality

6.1.1.    All information disclosed to the other party shall be deemed confidential and proprietary (hereinafter referred to as "Proprietary Information"). Such information includes, but is not limited to, trade secrets, know-how, technical specifications, processes, design information, customer lists, pricing and financial information concerning the party's products or services, or other information relating to business development, operations, marketing, sales, performance, and any other information disclosed hereunder, which, by its nature, might reasonably be presumed to be proprietary in nature.

6.1.2.    Each party agrees to use the Proprietary Information received from the other party only for the purposes of analyzing the business arrangement between the parties, and in accordance with this MOU. No patent, copyright, trademark, invention, service mark, or other proprietary rights are implied or granted under this Agreement.

6.1.3.    Proprietary information supplied pursuant to this Agreement shall not be reproduced in any form by the receiving party except as required to accomplish the intent of this Agreement.

6.1.4.    The receiving party shall provide, at a minimum, the same care to avoid disclosure or unauthorized use of the Proprietary Information as is provided to protect its own similar Proprietary Information, but in no event less than a reasonable standard of care. It is agreed that all Proprietary Information shall be retained by the receiving party in a secure place with access limited to the receiving party's employees or agents who need to know such information for purposes of this Agreement. The receiving party shall be fully responsible for any breach of this MOU by its employees or agents. The receiving party will promptly report to the disclosing party any actual or

Page 5 of 8

MCIWC000261

A 04130

AUG-29-2002  13:20      EFFECT

suspected violation of the terms of this MOU, and will take all reasonable steps requested by the disclosing party to prevent, control or remedy any such violation.

6.1.5.  All Proprietary Information, unless otherwise specified in writing, shall remain the property of the disclosing party. Such information shall be used by the receiving party only for the purpose set forth in this Agreement. In addition, such Proprietary Information, including all copies thereof, shall be returned to the disclosing party or, at the request of the disclosing party, may be destroyed by the receiving party and certified as destroyed by an officer of the receiving party after the Receiving party's need for it has expired, upon request of the disclosing party; and, in any event, upon termination of the Agreement.

6.1.6.  Exceptions to confidentiality

It is understood that the parties have no obligation to maintain the confidentiality of Proprietary Information which:

> • has been published or is now otherwise in the public domain through no fault of the receiving party.
>
> • prior to disclosure hereunder is within the legitimate possession of the receiving party without obligation of confidentiality as can be demonstrated by written documentation.
>
> • subsequent to disclosure hereunder is lawfully received from a third party having rights to such Proprietary Information without restriction of the third party's right to disseminate the Proprietary Information and without notice of any restriction against its further disclosure, is disclosed with the written approval of the other party as can be proven by documentation.
>
> • is obligated to be produced under order of a court of competent jurisdiction or other government authority; provided however, that the receiving party shall immediately provide notice to the disclosing party such that the disclosing party may seek injunctive relief; and further provided that the disclosing party shall use best efforts to ensure that the information shall be treated as confidential by the party to whom it is disclosed.
>
> • is independently developed by the receiving party without reference to or reliance upon the confidential information

In the event of a disputed disclosure, the receiving party shall bear the burden of proof of demonstrating that the information falls under one of the above exceptions.

MCIWC000262

A 04131

6.1.7.    EffectNet will not use Intermedia's customer information or other proprietary information or data for any purpose other than as set forth in their MOU.

6.1.8.    Remedies. The parties agree that, without limiting any other rights and remedies against each other for damages or otherwise, upon breach of this Agreement, an injunction may be sought by the party disclosing information to protect its right thereunder. Disputes between the parties shall be resolved by arbitration.

6.2.    This MOU will terminate in six (6) months or at the time a general agreement is signed, whichever comes first. The general agreement shall have a term of three (3) years (the "Initial Term") based upon pricing options selected by Intermedia. Said term to begin at the end of the Ramp Period.

6.3.    Effectnet does not warrant that the Effectnet services that it provides to Intermedia are error-free. Effectnet disclaims all warranties, express or implied, including but not limited to the warranties of merchantability and fitness for a particular purpose. Neither party shall be liable for any damages arising from the other party's or any third party's use of the equipment, including without limitation indirect, incidental, special, or consequential damages, even if it has been advised of the possibility of such damages.

6.4.    At all times, the relationship between the parties shall be that of independent contractors. Neither party shall have any authority to contract for, or bind any other parties in any manner whatsoever.

6.5.    No addition to or modification of this MOU shall be effective or binding on either of the parties hereto unless agreed in writing and executed by the respective duly authorized representatives of each of the parties hereto. The terms and conditions in this MOU and the attached Exhibits supersede all prior oral and written understandings, discussions and agreements between the parties regarding the subject matter hereof and constitute the entire agreement of the parties with respect to such subject matter.

6.6.    The construction, interpretation and performance of this MOU and all transactions under it shall be governed by the laws of Arizona, notwithstanding its provisions relating to conflicts of law. The parties agree that they shall not assert any claim that they are not subject to the jurisdiction of such courts, that the venue is improper, that the forum is inconvenient or any similar objection, claim or argument.

6.7.    Any notices required or permitted under this MOU shall be in writing and delivered in person or sent by nationally-recognized overnight courier or registered or certified mail, return receipt requested, with proper postage affixed to the parties, at the addresses set forth above. No purchase order or other document that purports to modify or supplement the text of this MOU or any section, schedule or exhibit shall add to or vary the terms of this MOU. Neither party shall be liable for any failure to

MCIWC000263

A 04132

perform other than failure to pay amounts due hereunder due to causes beyond its reasonable control. The failure by a party to exercise any right hereunder shall not operate as a waiver of such party's right to exercise that right or any other right in the future and any waiver must be in writing to be effective. In the event that any of the terms of this MOU become or are declare to invalid or void by any court or tribunal of competent jurisdiction, such terms or terms shall be null and void and shall be deemed severed from this MOU and all the remaining terms of this MOU shall remain in full force and effect.

6.8.    The parties intend that the general terms and conditions contained in this MOU be included in a General Agreement along with such other definitive terms and conditions as are consistent therewith.

6.9.This MOU may be executed and delivered in two or more counterparts, each of which, when so executed and delivered, shall be deemed an original, and all such counterparts together shall constitute but one and the same MOU. The parts shall not be binding on any party until all parties have executed it.

6.10.   The EffectNet Services covered by this MOU shall be available in the contiguous 48 United States.


**IN WITNESS WHEREOF** the parties have executed the Memorandum of Understanding effective as of the Effective Date.


Effectnet, LLC                          Intermedia Communications, Inc.

By: _____            By: _____
    Printed Name                            Printed Name
    Its _____            Its _____


_____            _____
**Signature**              **Date**     **Signature**              **Date**

TOTAL P.09

MCIWC000264

A 04133

# EXHIBIT 3

A 04134

## KELLEY DRYE & WARREN LLP

A LIMITED LIABILITY PARTNERSHIP

IOI PARK AVENUE

NEW YORK, NEW YORK IOI78

(212) 808-7800

WASHINGTON, DC

TYSONS CORNER, VA

CHICAGO, IL

STAMFORD, CT

PARSIPPANY, NJ
_____
BRUSSELS, BELGIUM
_____

AFFILIATE OFFICES
JAKARTA, INDONESIA
MUMBAI, INDIA

FACSIMILE

(212) 808-7897

www.kelleydrye.com

DIRECT LINE: (212) 808-5102

EMAIL: ksmith@kelleydrye.com

October 24, 2005

**VIA FACSIMILE ((816) 691-3495)**
Robert L. Driscoll, Esq.
Stinson Morrison Hecker LLP
1201 Walnut Street, Suite 2800
Kansas City, Missouri 64106

> Re:    In re WorldCom, Inc., Chapter 11 Case No. 02-13533
>         *Parus Holdings' Claims; Discovery Issues*

Dear Mr. Driscoll:

As discussed on Friday, October 21, 2005, at the settlement conference, and in a further attempt to resolve our outstanding discovery issues, we write to provide you with specific categories of documents previously requested, but not yet produced in this litigation. In addition, we provide you with names of individuals whose electronic databases and e-mail boxes should be searched as well as search terms for searches in Debtors' electronic databases and e-mail boxes. The items identified below are an attempt to narrow certain categories of documents pursuant to your request. We reserve all rights with respect to Parus Holdings' document requests.

First, please refer to our October 11, 2005 letter to Judge Gonzalez and copied to you. In addition, the following highlight certain outstanding production categories for electronic and hard-copy documents, which should be produced:

> • Documents concerning the Unified Communications Services General Agreement ("General Agreement") itself, including the pricing of services, negotiation, drafting or communications among Intermedia employees and/or between Intermedia and WorldCom/MCI, regarding the General Agreement. (Document Request No. 11.)
>
> • Documents reflecting Intermedia's payments to Claimant for any services provided by Claimant under the General Agreement or any documents concerning communications regarding payments to Claimant. (Document Request No. 17.)

**A 04135**

### KELLEY DRYE & WARREN LLP

Robert L. Driscoll, Esq.
October 24, 2005
Page Two

> • Documents concerning the cessation or termination of Intermedia's operations as it related to Claimant.[1] (Document Request Nos. 14, 15, and 19.)
>
> • Documents concerning Claimant from the files of related WorldCom entities including, but not limited to, WorldCom Ventures. (Document Request Nos. 20 and 21.)
>
> • Documents concerning Debtors' evaluation or analysis of Claimant's finances, business, technology or products. (Document Request Nos. 20 and 21.)
>
> • Documents related to the WorldCom/MCI genD initiative, a competitor to EffectNet's Unified Communications product. (Doc. Req. No. 35.)
>
> • Documents from key individual employee's work files, including but not limited to, James Renforth, James Faust, Kathy Victory, Brett Bacon, Barry Zipp, Richard Black and Cheryl Mellon, regarding the General Agreement and the Master Agreement for Software Licenses, dated September 14, 2001 ("MASL"), and the drafting, negotiation, pricing and performance of same. (Document Request Nos. 11 and 22.)

**MCI Documents.** Please produce forthwith the MCI Documents identified in Debtors' Supplemental Responses to Claimant's First Request for Production of Documents, dated July 1, 2005. Our understanding is that we have received thus far only Intermedia documents.

**WorldCom Entities Other than MCI WorldCom Communications, Inc. and Intermedia Communications, Inc.** In Debtors' Responses to Claimant's First Request for Production of Documents, dated March 25, 2005, Debtors objected to including in the definition of Debtors any entity other than Intermedia Communications, Inc. or MCI WorldCom Communications, Inc. Please confirm that Debtors no longer maintain that objection and Debtors will produce documents from all WorldCom entities which have documents responsive and relevant to both the contract and tort claims or documents reasonably calculated to lead to the discovery of admissible evidence.

We also have a concern regarding the Debtors' production of only 11 boxes of purportedly responsive documents from a total of 10,000 boxes held in various depositories in the United States which contained potentially responsive paper documents of Intermedia

---

[1]   Debtors have produced documents regarding the cessation or termination of Intermedia operations concerning only technical integration issues between Intermedia and WorldCom products, as well as a reduction in headcount of Intermedia employees.

### KELLEY DRYE & WARREN LLP

Robert L. Driscoll, Esq.
October 24, 2005
Page Three

Communications, Inc.  The 11 boxes of Intermedia documents were apparently identified by Debtors' counsel from certain indices generated previously by Intermedia personnel.  Based on our review of the indices and lists of boxes at the depositories, only 14 of the boxes identified on these lists had descriptions sufficient to determine that they may contain responsive documents. The remainder of the 10,000 boxes have either no description at all, descriptions that are meaningless, or the descriptions are too vague.  While you have informed us that your review and production has been made in good faith and in compliance with your discovery obligations, we believe the only way to determine whether Debtors have complied fully with their discovery obligations is through testimony of a corporate representative(s) of Debtors regarding their document production.  Accordingly, please provide dates on which such corporate representatives are available to testify.

Further, enclosed are the lists of names of individuals whose documents and email boxes should be searched for responsive documents and the search terms to be used for that search.

Thank you for your cooperation in this matter.

Sincerely,

Kevin J. Smith

Enclosures

## KELLEY DRYE & WARREN LLP

### In re: WorldCom, Inc.
### Claims of Parus Holdings, Inc., Claim Nos. 11242 and 11173

Names and Search Terms for Searches of MCI/WorldCom electronic media and Intermedia
electronic media, for the period September 1, 2000 through April 12, 2002:

### The names of individuals whose e-mail boxes and hard-drives should be searched using the terms below:

Maria Ayala
Biaji Bary
Jennifer Carroll
Peter Cassidy
Shirley Elizabeth Denham-Dale
Vicky Galante-Lee
Claro Hernandez
Steve Hooper
Mandy Johnson
Sharon Kasimow
Susan Kennedy
Mary Kilmartin
Carleen Mitchell
Nasser Sheikh
Pamela F. Dunnam
Don Fergus
Dave Wurster
Teresa Hastings
Patrice Carroll
James Meeks-Johnson
Brenda Speer
Cheryl Mellon
James Renforth
James Faust
Kathy Victory
Richard Jeffers
Brett Bacon
Barry Zipp
Richard Black
Sherri Baughman
Alan Hill
Jim Tills
Jack Kerrigan
James DeMerlis
Angela Baker
Scott Concourse
Scott E. Pospichel

1

A 04138

## KELLEY DRYE & WARREN LLP

**Databases, search terms and phrases include:**

**I.    Documents on hard drives and the above referenced individuals' e-mail boxes which include the following terms:**

EffectNet, or
EN, or
Webley, or
WSI , or
IntermediaOne  (including variations such as Intermedia One, IM1, IOne, I One, I-One, etc.), or
Unified Communications, or
UC, or
Unified Communications Services General Agreement (and variations of that Agreement), or
Unified Messaging, or
UM, or
CommuniKate, or
Kate, or
HearMyMail, or
HMM, or
auto attendant, or
text to speech, or
TTS, or
genD, or
voice recognition (use "!" to broaden search), or
speech recognition (use "!" to broaden search), or
speech enabled (use "!" to broaden search), or
voice activated (use "!" to broaden search), or
enhanced communications (use "!" to broaden search), or
Master Agreement for Software Licenses (and variations of that Agreement), or
MASL, or
Webley AND license(s), or
Minimum Commitment.


**II.    Any e-mail communications to and/or from wcom.com and intermedia.com e-mail boxes which contain the above terms should be produced.**

2

A 04139

KELLEY DRYE & WARREN LLP

III.    All _____@wcom.com emails (with attachments) to or from ANY other address
        that include any of the following words:

EffectNet,
EN,
Webley,
WSI ,
IntermediaOne (including variations such as Intermedia One, IM1, IOne, I One, I-One, etc.,)
or
CommuniKate,
Kate,
HearMyMail,
HMM,
auto attendant,
text to speech,
TTS.

IV.    All intermedia.com emails (with attachments) to or from effectnet.com e-mails.

V.     All intermedia.com emails (with attachments) to or from ANY other address that
       include any of the following words:

genD
WCom (include aka's)

        AND

EffectNet
EN
Webley
WSI
IntermediaOne  (including variations such as Intermedia One, IM1, IOne, I One, I-One, etc.),
Unified Communications
UC
Unified Communications Services General Agreement (and variations of that Agreement),
Unified Messaging
UM
CommuniKate
Kate
HearMyMail
HMM.

3

A 04140

# EXHIBIT 4



**FOLEY & LARDNER LLP**

**ATTORNEYS AT LAW**

321 NORTH CLARK STREET, SUITE 2800
CHICAGO, IL 60610-4764
312.832.4500 TEL
312.832.4700 FAX
www.foley.com

WRITER'S DIRECT LINE
312.832.4522
jmurch@foley.com EMAIL

CLIENT/MATTER NUMBER
078616-0103

February 7, 2007

<u>VIA E-MAIL</u>

Allison M. Murdock, Esq.
Stinson Morrison Hecker LLP
1201 Walnut, Suite 2900
Kansas City, MO 64106

> Re:     *In re WorldCom, Inc., et al.*, Case No. 02-13533, Claims of Parus
> Holdings, Inc. (Claim Nos. 9291,9293, 11173, 11242) (the
> "Litigation")

Dear Allison:

Per our discussion, the parties agreed that each party would provide a brief bullet point list of open items for the parties to discuss. Please note that this list was requested as a result of a "disconnect" resulting from the various letters Parus has received from the Debtors. The Debtors first requested a stay of discovery, but then shortly thereafter issued a Rule 30(b)(6) deposition notice to Parus. As I indicated to you on Thursday, the goal is to avoid burdening the Court with issues that could be handled consensually. For your consideration are the following:

- The Debtors have asserted that the litigation should not move forward until Parus has retrieved all files from its prior counsel. However, during our discussions in the fall of 2006, you represented that the Debtors made available for copying and inspection all documents produced by both parties in connection with the Litigation. Parus has made copies of and have reviewed all such documents. If you were mistaken in your representation that the Debtors provided all documents produced in the Litigation by both parties, please advise me of such.

- As a related matter, you have referenced certain privilege logs tendered in this case and certain documents that you are demanding related to such privilege logs. It was my understanding that such privilege logs and such written discovery responses by the parties would be tendered to Parus in connection with the fall 2006 re-production. If not, we are requesting that those logs and written discovery be produced. Parus will gladly coordinate with you to have a third-party vendor retrieve this information from you and will have them copied at its own expense. Please note that Parus also made a specific request for the logs on December 8, 2006 from Mr. Iba. Mr. Iba never responded to Parus' request for such information. Instead, Mr. Iba recommended that the litigation be stayed. A simple and easy solution to this issue is for the Debtors simply to tender these logs to Parus so that it can review the merits of the Debtors' demands in the first instance. As such, Parus requests that the Debtors tender all privilege logs, written discovery responses, and indices produced in the Litigation for copying by a third-party vendor of

BOSTON          LOS ANGELES     SACRAMENTO          TALLAHASSEE
BRUSSELS        MADISON         SAN DIEGO           TAMPA
CHICAGO         MILWAUKEE       SAN DIEGO/DEL MAR   TOKYO
DETROIT         NEW YORK        SAN FRANCISCO       WASHINGTON, D.C.
JACKSONVILLE    ORLANDO         SILICON VALLEY

CHIC_1398921.2

**A 04142**



FOLEY & LARDNER LLP

Allison M. Murdock
February 7, 2007
Page 2

Parus' choice at Parus' expense. I am a bit perplexed that the Debtors have made demands of Parus based on such information yet has not produced such information.

- The Debtors have demanded the production of privileged information resulting from an alleged waiver of the privilege based upon comments made by the Court on June 14, 2005. However, the Debtors have failed to demonstrate that such a waiver occurred other than asserting that the Debtors construe the Court's comments to include a waiver of the attorney-client privilege. Moreover, as I indicated in my December 8, 2006 letter to Mr. Iba, I do not see on the docket any order to this effect from which an appeal could be taken. If an agreement cannot be reached on this point by the parties, a clarification of the Court's ruling may be necessary.

- Parus still lacks electronic discovery from the Debtors. The Debtors have refused to provide such electronic information. The Debtors previously raised the issue of cost-shifting with the Court. In response, the Court ordered discovery to determine, inter alia, whether the Debtors appropriately maintained such information. The Court-ordered discovery is now the subject of Parus' Motion for Relief Resulting from Debtors' Spoliation of Evidence (Parus' Spoliation Motion"). The Debtors' request for cost-shifting should not proceed until the Court first determines the merits of Parus' Spoliation Motion, as such a determination is first necessary before the parties can even reach the issue of cost-shifting. In other words, was it proper for the Debtors in the first instance to allow electronic documents to become inaccessible at a time when they knew or should have known they had a duty to preserve such information.

- Parus is demanding that the Debtors produce an index key to all indices they have tendered to Parus in connection with hard-copy production as well as someone who is capable of explaining the information contained in such keys and indices. As set forth in Parus' Spoliation Motion, the Court ordered the Debtors to produce for deposition an individual who could explain the Debtors' document production. The Debtors produced Mr. Ramsey, a lawyer from Stinson Morrison, who testified that neither he nor anyone at the Debtors could explain what a number of the entries on the indices meant. Parus is requesting a key to such indices as well as that someone be made available who can competently explain such key as well as all indices.

- The information related to the Debtors' initiation and implementation of a litigation hold is not privileged. If the Court determines it is privileged, such privilege has been waived. Parus welcomes an *in camera* inspection of such allegedly privileged documents if the Court is willing an if it will expedite a resolution of this matter.

CHIC_1398921.2

A 04143

# ▪FOLEY

FOLEY & LARDNER LLP

Allison M. Murdock
February 7, 2007
Page 3

- The Debtors stated that they would produce certain documents subject to their Objections in response to Parus' Second Request for Production of Documents. Parus tendered its Second Request for Production on October 20, 2006.[1] In your January 30, 2006 letter to me, I was surprised to see that you stated that you were waiting for me to contact you to produce these documents. As an initial matter, I note that of the 164 document requests tendered to the Debtors, the Debtors stated it would provide responsive documents with respect to only 5 of the 164 requests. These were Request Nos. 2 and 3 (indices prepared or reviewed in connection with discovery); Request Nos. 14 (privilege logs); and Request Nos. 65 and 67 (documents related to costs allegedly incurred by to date the Debtors related to electronic discovery). The Debtors stated that they would produce documents related to experts at the time and manner directed by the Court (Request No. 162). Per your request, we are contacting you regarding the production of these specific items.

- For convenience, I will reference the information requested by Parus in connection with the Debtors' alleged litigation hold as the "Litigation Hold Materials." In my January 17, 2007 letter to Ms. Theresa Clark of your offices, I provided examples of where the Debtors' litigation hold responses were deficient. I received no response from Ms. Clark, but instead you responded with a January 22, 2007 letter requesting a conference, which we have done. Yet you now contend in your January 30, 2007 letter that you will assume that Parus can identify no further deficiencies. Such an assumption is incorrect and Parus will tender to you a list of all such deficiencies for your review in connection with the Litigation Hold Materials. In addition, Parus will provide you with a list of the Debtors' deficient responses in connection with the Debtors' responses to Parus' First Request for Admission, First Set of Interrogatories, and Second Request for Production.

- Parus is requesting a privilege log related to Parus' First Request for Admission, First Set of Interrogatories, and Second Request for Production, as well as the Litigation Hold Materials.

- Parus is requesting an agreement that the Hsu and Wachen and the Rule 30(b)(6) depositions go forward at a mutually amenable date and time.

Please note that while I have endeavored to be brief and to identify a number of issues for the parties' consideration, there may be other which we will need to discuss, that are necessarily

---

[1] Parus stated that it would gladly enter into an extension for the Debtors' production if the Debtors'

agreed to stay a resolution of their pending summary judgment motion. The Debtor refused. At the hearing before the Court, Parus agreed to an extension to the Debtors to respond until December 22, 2006 in light of the Court's statement that it would not reach any conclusion regarding summary judgment before the end of January 2007. Also, at the time of the hearing, the Debtors had ample occasion to raise the relevance and scope of the discovery before responding, but instead chose not to do so.



**FOLEY**

FOLEY & LARDNER LLP

Allison M. Murdock
February 7, 2007
Page 4

subject to motions currently pending before the Court, or that may arise during our telephonic conference. In requesting a bullet point list, it was my hope to at least begin a starting point for a dialogue among the parties. To the extent the bullet points do not encompass grievances or concerns by both sides, I am glad to discuss ways to further memorialize and resolve such grievances or concerns.

Very truly yours,

Jill L. Murch

cc:     Mark Prager, Esq.
        William McKenna, Esq.

CHIC_1398921.2

# EXHIBIT 5

A 04146

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------x

IN RE:

   WORLDCOM, INC., ET AL

   REORGANIZED DEBTORS          No. 02-13533

------------------------------x

DEPOSITION OF DONALD C. RAMSAY

New York, New York

Monday, November 14, 2005

Reported by:

Miriam Kaplan

JOB NO. 179461

1        Ramsay
2  January 1, 2000 through the end of 2002, December
3  of 2002?
4      **A.  Time frame for what?**
5      Q.  For your request for of their search in
6  these stored documents?
7      **A.  Well, that is a time frame we worked**
8  **with, but I don't believe their search for stored**
9  **documents was limited in that way.  They searched**
10 **for terms and sometimes what I recall concepts,**
11 **marketing, that sort of thing, Intermedia**
12 **marketing, names.  I'm sure we did give them dates,**
13 **but I know the index we produced includes documents**
14 **from earlier time frames, so it can't have been**
15 **that limited.**
16     Q.  Do you know where the documents that
17 they had indices of were stored?
18     **A.  I don't know where they were stored.**
19 **They were stored sometimes, at least in commercial**
20 **storage companies, like Iron Mountain, and perhaps**
21 **all over the world for that matter.**
22     Q.  Do you know how the indices that they
23 had were created?
24     **A.  I have some information about how the**
25 **index of Intermedia originating documents were**
                                        Page 50

1        Ramsay
2      **were asked to box up documents and create an index**
3      **and leave them in their office or their space.**
4      Q.  You said RIF, I assume you're talking
5  about reduction in force?
6      **A.  Correct.**
7      Q.  As I understand your testimony, at the
8  time when Intermedia was either being merged into
9  or shutting down, in some way the employees who
10 were laid off or terminated, in some way were told
11 to box up their documents, create an index for
12 those documents, and leave them where they were?
13     **A.  That's my understanding, yes.**
14     Q.  Do you know if they were given some
15 template to create an index what was contained in
16 whatever documents they had?
17     **A.  I don't know.**
18     Q.  Do you know what information they
19 included in there respective indices?
20     **A.  Well, we have the index, but beyond**
21 **that, no.  We have overall large index you've seen**
22 **on those boxes.**
23     Q.  Well, were the indices that were given
24 to you, and ultimately given to us in this case,
25 the indices of each individual employee?
                                        Page 52

1            Ramsay
2  **created.**
3      Q.  Before I get to that, you make a
4  distinction between the index of Intermedia
5  documents and between other documents?
6      **A.  In terms of how they were created, yes.**
7      Q.  Do you know if there were different
8  indices for different entities?
9      **A.  My understanding, again, is it's when**
10 **computerized indexing system, whether they go to**
11 **two to three separate systems.  I'm not absolutely**
12 **sure of that, but the information on the indexes, I**
13 **guess, is what I have some information on as it**
14 **relates to Intermedia originated documents.**
15     Q.  I don't recall if this was the question
16 I just asked you.  Do you know how the indices were
17 created?
18     **A.  I again, I've been told, in some respect**
19 **how information for the indexes was generated for**
20 **Intermedia.**
21     Q.  Okay, and what information were you told
22 about, how the information was gathered for
23 Intermedia documents?
24     **A.  That as Intermedia was winding up and**
25 **employees were leaving their employment, RIF, they**
                                        Page 51

1            Ramsay
2      **A.  That is my understanding.**
3      Q.  For employees who were not either laid
4  off, terminated, or in some way, do you know what
5  they did with respect to their documents?
6      **A.  I only know that was the process and, I**
7  **don't know who you'd be referring to, or what**
8  **circumstance you'd be referring to, but as they**
9  **left to merge to go to MCI or to leave employment,**
10 **whatever; they were asked to box them and leave an**
11 **index.**
12     Q.  Do you know if their boxes were titled
13 in some way specific to those particular
14 individuals?
15     **A.  Well again, from the indexes that you've**
16 **seen, we've seen, there are some instances where**
17 **that's the case, but generally not.**
18     Q.  Do you know if, for example, I think you
19 mentioned a Jim Renforth or James Renforth; do you
20 know if he had created an index of whatever
21 documents he had at the time that he left
22 employment with Intermedia?
23     **A.  I know that I'd ask records management**
24 **to run his name against their stored documents, and**
25 **it produced only his personal file.  No other**
                                        Page 53

# EXHIBIT 6

A 04149

**KELLEY DRYE & WARREN LLP**
Stephen A. Wood (SW 6270)
Robert S. Friedman (RF 1538)
Robert L. LeHane (RL 9422)
Kevin J. Smith (KS 0441)
101 Park Avenue
New York, New York 10178
Attorneys for Parus Holdings, Inc.,
Successor-by-Merger to EffectNet, Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | **CHAPTER 11 CASE** |
| **WORLDCOM, INC., et al.,** | **NO. 02-13533 (AJG)** |
| **Debtors.** | **(Jointly Administered)** |

## CLAIMANT'S FIRST REQUEST FOR DOCUMENTS

Pursuant to Rules 7026 and 7034 of the Federal Rules of Bankruptcy Procedure, made applicable by Rule 9014 of the Federal Rules of Bankruptcy Procedure to the instant contested matter and/or adversary proceeding regarding Claim Nos. 9291, 9293, 11173 and 11242 filed by Parus Holdings, Inc., Successor-by-Merger to EffectNet, Inc. (hereinafter "Claimant"), Claimant hereby requests that MCI WorldCom Communications, Inc., MCI WorldCom Network Services, Inc., and Intermedia Communications, Inc., and their affiliate and/or subsidiary companies (together, "Debtors") produce for inspection and copying at the offices of Kelley Drye & Warren LLP, 333 West Wacker Drive, Suite 2600, Chicago, Illinois 60606, within thirty (30) days from the date of the service of this request, each document described below in the possession, custody or control of each in accordance with the definitions and instructions set forth below and all applicable Federal and Local Rules of Civil Procedure and Bankruptcy Procedure.

A 04150

20.    All documents concerning Claimant, including Claimant's finances, Claimant's business, Claimant's technology, or Claimant's products.

21.    All documents concerning Debtors' evaluation or analysis of Claimant, including Claimant's finances, Claimant's business, Claimant's technology, or Claimant's products.

22.    All documents concerning the Master License Agreement, including documents concerning the negotiation, drafting, and execution of the Master License Agreement and performance of Claimant and Debtors thereunder.

23.    All documents concerning communications between Debtors and Claimant regarding the Master License Agreement.

24.    All documents concerning communications between Debtors and Claimant from September 1, 2000 to the present regarding the products and services offered by Claimant to Debtors under the Master License Agreement.

25.    All documents concerning the price(s) to be paid for licenses to be obtained from Claimant under the Master License Agreement.

26.    All documents concerning Debtors' payments to Claimant pursuant to the Master License Agreement.

27.    All documents concerning Debtors' communications among each other regarding the Master License Agreement.

28.    All documents concerning Jim Renforth's ceasing employment with Debtors in 2001.

29.    All documents concerning Jimmy Faust's ceasing employment with Debtors.

30.    All documents concerning Intermedia Communications, Inc.'s product suite "IntermediaOne".

8

# EXHIBIT 7

A 04152



STINSON
MORRISON
HECKER LLP

Robert L. Driscoll
(816) 691-3102
bdriscoll@stinsonmoheck.com
www.stinsonmoheck.com

1201 Walnut, Suite 2900
Kansas City, MO 64106-2150

*Tel* (816) 842-8600
*Fax* (816) 691-3495

August 12, 2005

**VIA FEDERAL EXPRESS**

Mr. Steven Wood
Kelley Drye & Warren LLP
333 West Wacker Drive, Suite 2600
Chicago, Illinois 60606

   Re: In re Worldcom, Inc. -- Claim of Parus Holdings, Inc.

Dear Steve:

   As discussed at the conclusion of the hearing held on Tuesday, August 9, I am enclosing a list of the boxes of Intermedia Communications, Inc. ("Intermedia") documents that have been shipped to Kansas City and currently are being reviewed. Also enclosed are copies of the five indexes, which were previously provided to you by email, with the boxes selected for review highlighted. The highlighted indexes provide the same information as the list. (The index for the boxes in the Mississippi Filings Systems depository is not highlighted because it does not appear that there are any responsive documents in that depository.)

   As you will see in reviewing the highlighted indexes, a sampling of boxes was selected for review in a few instances even though the boxes appeared to contain non-responsive documents. For example, there are approximately 12 boxes of documents in the Tampa depository described as "CS & SO Stop Bill Migration." We have selected five of these boxes for review to determine whether the boxes described in that manner may contain responsive documents. If so, we will retrieve the remaining approximately seven boxes with this same description for review.

   Also, as you may have gathered from my responses to the Court on August 9 regarding future scheduling, I will be out of the office the next couple of weeks. In my absence, please call my partner, Allison Murdock, if you have any questions regarding the boxes selected for review or if you identify any additional boxes that you believe should be reviewed. Allison's direct dial is (816) 691-3138. Concerning

KANSAS CITY
OVERLAND PARK
WICHITA
WASHINGTON, D.C.
PHOENIX
ST. LOUIS
OMAHA
JEFFERSON CITY

DB02/048629 0094/6769393.1

**A 04153**

Mr. Steven Wood
August 12, 2005
Page 2

the related point of electronically stored documents, Allison will contact you soon to
discuss review and production of those documents.

Very truly yours,

STINSON MORRISON HECKER LLP

Robert L. Driscoll

Enclosures

cc:     Allison M. Murdock

A 04154

# EXHIBIT 8

A 04155



STINSON
MORRISON
HECKER LLP

Robert L. Driscoll
(816) 691-3102
bdriscoll@stinsonmoheck.com
www.stinsonmoheck.com

1201 Walnut, Suite 2900
Kansas City, MO 64106-2150

*Tel* (816) 842-8600
*Fax* (816) 691-3495

September 1, 2005

Mr. Steven Wood
Kelley Drye & Warren LLP
333 West Wacker Drive, Suite 2600
Chicago, Illinois 60606

      Re:    In re Worldcom, Inc. -- Claim of Parus Holdings, Inc.

Dear Steve:

      I am writing to advise that we now have completed our review of the over 350 boxes of Intermedia Communications, Inc. ("Intermedia") documents that were shipped to Kansas City for review before the August 9 hearing. We are in the process of copying and Bates numbering the responsive documents and preparing a privilege log. I will contact you once this process is competed to discuss the manner in which you would like these documents produced.

      Also, we determined that approximately 70 additional boxes of Intermedia documents listed on the Tampa index should be reviewed. A list of those boxes is attached. The boxes have been shipped to Kansas City and currently are being reviewed.

      Please call Allison Murdock or me if you have any questions.

      Very truly yours,

      **STINSON MORRISON HECKER LLP**

      Robert L. Driscoll

KANSAS CITY
OVERLAND PARK
WICHITA     Enclosure
WASHINGTON, D.C.
PHOENIX     cc:    Allison M. Murdock
ST. LOUIS
OMAHA
JEFFERSON CITY

DB02/048629 0094/6805988.1

MCI - Parus Holdings
(Effernet)

A 04156

## Parus Holdings Claims
## Additional Boxes Selected for Review

| | | | | Description |
|---|---|---|---|---|
| T094D | Tampa | W15420803 | 154208034 | |
| T094D | Tampa | R10115/C105 | 165034485 | Sandy Pechin |
| T094D | Tampa | C2043 | 165034479 | Mills Computer |
| T094D | Tampa | C2013 | 165034484 | W. Adams |
| T094D | Tampa | C1350 | 165034483 | Shepahali |
| T094D | Tampa | C1348 | 165034491 | Inactive Files - Angela Palms |
| T094D | Tampa | C1348 | 165034486 | Inactive Files - Rodney |
| T094D | Tampa | C1348 | 165034490 | Recurring Angela Palms |
| T094D | Tampa | C1051 | 165034481 | Sandy Pechin |
| T094D | Tampa | B1015 | 165034475 | |
| T094D | Tampa | AV113 | 165034489 | File Room |
| T094D | Tampa | AV103 | 165034477 | File Room |
| T094D | Tampa | | 226516611 | Intermedia-Tampa FL CS&SO Sop Bill Migration files |
| T094D | Tampa | | 226516610 | Intermedia-Tampa FL CS&SO Sop Bill Migration files |
| T094D | Tampa | | 226516609 | Intermedia-Tampa FL CS&SO Sop Bill Migration files |
| T094D | Tampa | | 226516608 | Intermedia-Tampa FL CS&SO Sop Bill Migration files |
| T094D | Tampa | | 226516606 | Intermedia-Tampa FL CS&SO Sop Bill Migration files |
| T094D | Tampa | | 226516605 | Intermedia-Tampa FL CS&SO Sop Bill Migration files |
| T094D | Tampa | | 224664982 | Intermedia-Tampa FL CS and SO LNP files-I |
| T094D | Tampa | | 224664981 | Intermedia-Tampa FL CS and SO LNP files-I |
| T094D | Tampa | | 224664980 | Intermedia-Tampa FL CS and SO LNP files-I |
| T094D | Tampa | | 224664979 | Intermedia-Tampa FL CS and SO LNP files-I |
| T094D | Tampa | | 224664978 | Intermedia-Tamp FL CS and SO LNP files-I |
| T094D | Tampa | | 224664933 | Intermedia-Tampa FL CS and SO LNP Out J |
| T094D | Tampa | | 224664932 | Intermedia-Tampa FL CS and SO LNP Out I |
| T094D | Tampa | | 177204267 | Bev's File Cabinet Binders |
| T094D | Tampa | | 177204266 | Bev's File Cabinet Binders |
| T094D | Tampa | | 177204265 | Bev's File Cabinet Smith Credenza |
| T094D | Tampa | | 177204261 | Bev's File Cabinet |
| T094D | Tampa | | 177204260 | Bev's File Cabinet |
| T094D | Tampa | | 177204259 | Bev's File Cabinet |
| T094D | Tampa | | 177204258 | Bev's File Cabinet |
| T094D | Tampa | | 177204256 | Bev's File Cabinet |
| T094D | Tampa | | 177204255 | Bev's File Cabinet |
| T094D | Tampa | | 177204254 | Bev's File Cabinet |
| T094D | Tampa | | 177204253 | Bev's File Cabinet |

A 04157

## Parus Holdings Claims
### Additional Boxes Selected for Review

| | | | | |
|---|---|---|---|---|
| T094D | Tampa | 177204252 | 177204252 | Sheila McDaniel's File |
| T094D | Tampa | 177204054 | 177204054 | Wanda Friend - Binders |
| T094D | Tampa | 177204053 | 177204053 | Wanda Friend - Binders |
| T094D | Tampa | 177204052 | 177204052 | Wanda Friend - Binders |
| T094D | Tampa | 177204051 | 177204051 | Wanda Friend - Binders |
| T094D | Tampa | 166137 | DST273547 | 0000166137 Jim Geiger |
| T094D | Tampa | 166136 | DST273546 | 0000166136 Jim Geiger |
| T094D | Tampa | 166135 | DST273545 | 0000166135 Jim Geiger |
| T094D | Tampa | 166134 | DST273544 | 0000166134 Jim Geiger |
| T094D | Tampa | 166133 | DST273543 | 0000166133 Jim Geiger |
| T094D | Tampa | 166132 | DST273542 | 0000166132 Jim Geiger |
| T094D | Tampa | 166131 | DST273541 | 0000166131 Jim Geiger |
| T094D | Tampa | 166130 | DST273540 | 0000166130 Jim Geiger |
| T094D | Tampa | 166129 | DST273539 | 0000166129 Jim Geiger |
| T094D | Tampa | 166128 | DST273538 | 0000166128 Jim Geiger |
| T094D | Tampa | 166127 | DST273537 | 0000166127 Jim Geiger |
| T094D | Tampa | 166126 | DST273536 | 0000166126 Jim Geiger |
| T094D | Tampa | 166125 | DST273535 | 0000166125 Jim Geiger |
| T094D | Tampa | 166124 | DST273534 | 0000166124 Jim Geiger |
| T094D | Tampa | 166123 | DST273533 | 0000166123 Jim Geiger |
| T094D | Tampa | 166122 | DST273532 | 0000166122 Jim Geiger |
| T094D | Tampa | 166121 | DST273531 | 0000166121 Jim Geiger |
| T094D | Tampa | 166120 | DST273530 | 0000166120 Jim Geiger |
| T094D | Tampa | 166119 | DST273529 | 0000166119 Jim Geiger |
| T094D | Tampa | 166118 | DST273528 | 0000166118 Jim Geiger |
| T094D | Tampa | 166117 | DST273527 | 0000166117 Jim Geiger |
| T094D | Tampa | 166116 | DST273526 | 0000166116 Jim Geiger |
| T094D | Tampa | 166114 | DST273525 | 0000166114 Jim Geiger |
| T094D | Tampa | 166113 | DST273524 | 0000166113 Jim Geiger |
| T094D | Tampa | 166112 | DST273523 | 0000166112 Jim Geiger |
| T094D | Tampa | 166111 | DST273522 | 0000166111 Jim Geiger |
| T094D | Tampa | 166110 | DST273521 | 0000166110 Jim Geiger |
| T094D | Tampa | 166109 | DST273520 | 0000166109 Jim Geiger |
| T094D | Tampa | 166108 | DST273519 | 0000166108 Jim Geiger |
| T094D | Tampa | 166107 | DST273518 | 0000166107 Jim Geiger |
| T094D | Tampa | 166106 | DST273517 | 0000166106 Jim Geiger |
| T094D | Tampa | 166105 | DST273516 | 0000166105 Jim Geiger |

A 04158

## Parus Holdings Claims

### Additional Boxes Selected for Review

| | | | |
|---|---|---|---|
| T094D | Tampa | 166104 | DST273515 | 0000166104 Jim Geiger |
| T094D | Tampa | 166103 | DST273514 | 0000166103 Jim Geiger |
| T094D | Tampa | 166102 | DST273513 | 0000166102 Jim Geiger |
| T094D | Tampa | 166101 | DST273512 | 0000166101 Jim Geiger |

A 04159

# EXHIBIT 9

A 04160

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>v.<br><br>WORLDCOM, INC., and<br>INTERMEDIA COMMUNICATIONS, INC.<br>Defendants. | )<br>)<br>)<br>)  Civil Action No.  1:00CV02789 (RWR)<br>)<br>)<br>)<br>)<br>) |

FILED

JUN 2 7 2001

NANCY MEYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

### FINAL JUDGMENT

WHEREAS, plaintiff, United States of America, filed its Complaint on November 17, 2000,

and plaintiff and defendants, WorldCom Inc. ("WorldCom") and Intermedia Communications, Inc.

("Intermedia"), by their respective attorneys, have consented to the entry of this Final Judgment

without trial or adjudication of any issue of fact or law;

AND WHEREAS, this Final Judgment does not constitute any evidence against or admission

by any party regarding any issue of fact or law;

AND WHEREAS, defendants agree to be bound by the provisions of this Final Judgment

pending its approval by the Court;

AND WHEREAS, the essence of this Final Judgment is the prompt and certain divestiture

of certain rights or assets by the defendants to assure that competition is not substantially lessened;

AND WHEREAS, plaintiff requires defendants to make certain divestitures for the purpose

of remedying the loss of competition alleged in the Complaint;

AND WHEREAS, defendants have represented to the United States that the divestitures

MCIWC032429

required below can and will be made and that they will later raise no claims of hardship or difficulty as grounds for asking the Court to modify any of the divestiture provisions contained below;

NOW THEREFORE, before testimony is taken, and without trial or adjudication of any issue of fact or law, and upon consent of the parties, it is ORDERED, ADJUDGED, AND DECREED:

## I.    JURISDICTION

This Court has jurisdiction over the subject matter of and each of the parties to this action. The Complaint states a claim upon which relief may be granted against defendants under Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.

## II.    DEFINITIONS

As used in this Final Judgment:

A.    "Acquirer" means the entity to whom defendants divest the Intermedia Assets.

B.    "WorldCom" means defendant WorldCom, Inc., a Georgia corporation with its headquarters in Clinton, Mississippi, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents and employees.

C.    "Intermedia" means defendant Intermedia Communications, Inc., a Delaware Corporation with its headquarters in Tampa, Florida, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents and employees.

D.    "Digex" means Digex, Inc., a Delaware Corporation with its headquarters in Beltsville, Maryland, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships

3

MCIWC032430

A 04162

and joint ventures, and their directors, officers, managers, agents and employees.

      E.    "Capital Stock of Digex" means the capital stock of Digex, regardless of class, owned by Intermedia.

      F.    "Intermedia Assets" means all of assets of Intermedia, except for the Capital Stock of Digex, including:

      1.    All tangible assets that comprise the Intermedia business, including research and development activities; all networking equipment and fixed assets, personal property, office furniture, materials, supplies, and other tangible property and all assets used exclusively in connection with the Intermedia Assets; all licenses, permits and authorizations issued by any governmental organization relating to the Intermedia Assets; all contracts, teaming arrangements, agreements, leases, commitments, certifications, and understandings, relating to the Intermedia Assets, including supply agreements; all customer lists, contracts, accounts, and credit records; all repair and performance records and all other records relating to the Intermedia Assets;

      2.    All intangible assets used in the development, production, servicing and sale of Intermedia Assets, including, but not limited to all patents, licenses and sublicenses, intellectual property, copyrights, trademarks, trade names, service marks, service names, technical information, computer software and related documentation, know-how, trade secrets, drawings, blueprints, designs, design protocols, specifications for materials, specifications for parts and devices, safety procedures for the handling of materials and substances, all research data concerning historic and current research and development relating to the Intermedia Assets, quality assurance and control procedures, design tools and

4

MCIWC032431

A 04163

simulation capability, all manuals and technical information defendants provide to their own employees, customers, suppliers, agents or licensees, and all research data concerning historic and current research and development efforts relating to the Intermedia Assets, including, but not limited to designs of experiments, and the results of successful and unsuccessful designs and experiments.

G.    "Merger" means the proposed merger of WorldCom and Intermedia pursuant to the merger agreement dated September 5, 2000.

### III.    APPLICABILITY

A.    This Final Judgment applies to WorldCom and Intermedia, as defined above, and all other persons in active concert or participation with any of them who receive actual notice of this Final Judgment by personal service or otherwise.

B.    Defendants shall require, as a condition of the sale or other disposition of all or substantially all of their assets or of lesser business units that include the Intermedia Assets, that the purchaser  agrees to be bound by the provisions of this Final Judgment, provided, however, that defendants need not obtain such an agreement from the Acquirer.

### IV.    DIVESTITURES

A.    Defendants are ordered and directed, within one hundred eighty (180) calendar days from the closing of the Merger following the receipt of all required approvals by the Federal Communications Commission and state authorities, to divest the Intermedia Assets as an ongoing, viable business in a manner consistent with this Final Judgment to an Acquirer acceptable to the United States in its sole discretion.  The United States, in its sole discretion, may agree to an

5

MCIWC032432

A 04164

extension of this time period for up to thirty (30) calendar days after regulatory approvals required to close the divestiture of the Intermedia Assets have been obtained. The United States shall notify the Court in the case of such an extension. Defendants agree to use their best efforts to divest the Intermedia Assets as expeditiously as possible.

B.    In accomplishing the divestiture ordered by this Final Judgment, defendants promptly shall make known, by usual and customary means, the availability of the Intermedia Assets. Defendants shall inform any person making an inquiry regarding a possible purchase of the Intermedia Assets that they are being divested pursuant to this Final Judgment and provide that person with a copy of this Final Judgment. Defendants shall offer to furnish to all prospective Acquirers, subject to customary confidentiality assurances, all information and documents relating to the Intermedia Assets customarily provided in a due diligence process except such information or documents subject to attorney-client privilege or attorney work-product privileges. Defendants shall make available such information to the United States at the same time that such information is made available to any other person.

C.    Defendants shall provide the Acquirer and the United States information relating to the personnel involved in the management of the Intermedia Assets and personnel engaged in the provision and selling of services offered by the Intermedia Assets in order to enable the Acquirer to make offers of employment. Defendants shall not interfere with any negotiations by the Acquirer to employ any Intermedia employee who works at, or whose primary responsibility concerns, any business that is part of the Intermedia Assets. Further, for a period of twelve (12) months following the closing of the Merger, defendants shall not solicit to hire, or hire, any Intermedia employee who, within six (6) months of the date of the sale of the business that is part of the Intermedia Assets that

6

MCIWC032433

A 04165

employs the individual, receives a reasonable offer of employment from the approved Acquirer of the Intermedia Assets, unless such employee is terminated or laid off by the Acquirer.

      D.      Defendants shall permit prospective Acquirers of the Intermedia Assets to have reasonable access to personnel and to make inspections of the physical facilities of the Intermedia Assets any and all environmental, zoning, and other permit or license documents and information, and to make inspection of the Intermedia Assets, and have access to any and all financial, operational, business, strategic or other documents and information customarily provided as part of a due diligence process.

      E.      Defendants shall warrant to any Acquirer of the Intermedia Assets that the assets will be fully operational on the date of sale.

      F.      Defendants shall not take any action, direct or indirect, that will impede in any way the operation, sale, or divestiture of the Intermedia Assets.

      G.      Unless the United States otherwise consents in writing, the divestitures pursuant to Section IV or by trustee appointed pursuant to Section V of this Final Judgment shall include all Intermedia Assets and be accomplished in such a way as to satisfy the United States, in its sole discretion, that the Intermedia Assets can and will be used by the Acquirer as a viable, ongoing business engaged in the provision of Internet backbone and access services. Unless the United States otherwise consents in writing, the divestitures required by Section IV or V shall be made to a single Acquirer. If, after making a reasonable, good faith effort, Defendants are unable to effect a sale to a single Acquirer, they may submit more than one Acquirer for approval by the United States which, in its sole discretion, may determine whether to permit such a sale. The divestiture, whether pursuant to Section IV or Section V of this Final Judgment, shall be made to an Acquirer for whom it is

7

MCIWC032434

A 04166

demonstrated to the United States's sole satisfaction that: (1) the Acquirer has the capability and intent of competing effectively in the provision of Internet backbone and access services; and (2) the Acquirer has the managerial, operational, and financial capability to compete effectively in the provision of Internet backbone and access services. Such divestiture shall be accomplished so as to satisfy the United States, in its sole discretion, that none of the terms of any agreement between an Acquirer and defendants gives any defendant the ability unreasonably to raise the Acquirer's costs, lower the Acquirer's efficiency, or otherwise interfere in the ability of the Acquirer to compete effectively.

      H.     Nothing herein shall be construed to provide to any person or entity that is not a party to this Final Judgment any rights with respect to its enforcement, modification or termination.

## V.   APPOINTMENT OF TRUSTEE

      A.     In the event that defendants have not divested the Intermedia Assets within the time specified in Section IV(A) of this Final Judgment, defendants shall notify the United States of that fact in writing. Upon application of the United States, the Court shall appoint a trustee to be selected by the United States and approved by the Court to effect the divestiture of the Intermedia Assets.

      B.     After the appointment of the trustee becomes effective, only the trustee shall have the right to divest the Intermedia Assets. The trustee shall have the power and authority to accomplish the divestiture to an Acquirer acceptable to the United States at such price and on such terms as are then obtainable upon reasonable efforts of the trustee, subject to the provisions of Sections IV, V and VI of this Final Judgment, and shall have such other powers as the Court shall deem appropriate. Subject to Section V(D) of this Final Judgment, the trustee shall have the power and authority to hire

8

MCIWC032435

A 04167

at the cost and expense of defendants any investment bankers, attorneys, or other agents, who shall be solely accountable to the trustee, reasonably necessary in the judgment of the trustee to assist in the divestiture. The trustee shall have the power and authority to accomplish the divestiture at the earliest possible time to an Acquirer acceptable to the United States, in its sole discretion, and shall have such other powers as this Court shall deem appropriate.

C.    Defendants shall not object to a sale by the trustee on any ground other than the trustee's malfeasance. Any such objections by defendants must be conveyed in writing to the United States and the trustee within ten (10) calendar days after the trustee has provided the notice required under Section VI.

D.    The trustee shall serve at the cost and expense of defendants, on such terms and conditions as the United States approves, and shall account for all monies derived from the sale of each asset sold by the trustee and all costs and expenses so incurred. After approval by the Court of the trustee's accounting, including fees for its services and those of any professionals and agents retained by the trustee, all remaining money shall be paid to defendants and the trust shall then be terminated. The compensation of such trustee and of any professionals and agents retained by the trustee shall be reasonable in light of the value of the divested Intermedia Assets and based on a fee arrangement providing the trustee with an incentive based on the price and terms of the divestiture and the speed with which it is accomplished, but timeliness is paramount.

E.    Defendants shall use their best efforts to assist the trustee in accomplishing the required divestitures, including their best efforts to effect all necessary regulatory approvals. The trustee and any consultants, accountants, attorneys, and other persons retained by the trustee shall have full and complete access to the personnel, books, records, and facilities of the Intermedia Assets,

9

MCIWC032436

A 04168

and defendants shall develop financial and other information relevant to such business as the trustee may reasonably request, subject to reasonable protection for trade secrets or other confidential research, development or commercial information. Defendants shall take no action to interfere with or to impede the trustee's accomplishment of the divestiture.

F.    After its appointment, the trustee shall file monthly reports with the United States and the Court setting forth the trustee's efforts to accomplish the divestitures ordered under this Final Judgment. To the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court. Such reports shall include the name, address, and telephone number of each person who, during the preceding month, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Intermedia Assets, and shall describe in detail each contact with any such person. The trustee shall maintain full records of all efforts made to divest the Intermedia Assets.

G.    If the trustee has not accomplished such divestiture within six months after its appointment, the trustee shall file promptly with the Court a report setting forth (1) the trustee's efforts to accomplish the required divestiture, (2) the reasons, in the trustee's judgment, why the required divestiture has not been accomplished, and (3) the trustee's recommendations. To the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court. The trustee shall at the same time furnish such report to the United States, who shall have the right to make additional recommendations consistent with the purpose of the trust. The Court thereafter shall enter such orders as it shall deem appropriate to carry out the purpose of the Final Judgment, which may, if necessary, include extending the trust and the term of

10

MCIWC032437

A 04169

the trustee's appointment by a period requested by the United States.

## VI.    NOTICE OF PROPOSED DIVESTITURE

A.    Within two (2) business days following execution of a definitive divestiture agreement, defendants or the trustee, whichever is then responsible for effecting the divestiture, shall notify the United States of the proposed divestiture. If the trustee is responsible, it shall similarly notify defendants. The notice shall set forth the details of the proposed transaction and list the name, address, and telephone number of each person not previously identified who offered, or expressed an interest in or desire to acquire any ownership interest in the Intermedia Assets, together with full details of the same.

B.    Within fifteen (15) calendar days of receipt by the United States of such notice, the United States may request from defendants, the proposed Acquirer, any other third party, or the trustee, if applicable, additional information concerning the proposed divestiture, the proposed Acquirer, or any other potential Acquirer. Defendants and the trustee shall furnish any additional information requested within fifteen (15) calendar days of the receipt of the request, unless the parties shall otherwise agree.

C.    Within thirty (30) calendar days after receipt of the notice or within twenty (20) calendar days after the United States has been provided the additional information requested from defendants, the proposed Acquirer, any third party, and the trustee, whichever is later, the United States shall provide written notice to defendants and the trustee, if there is one, stating whether or not it objects to the proposed divestiture. If the United States provides written notice that it does not object, the divestiture may be consummated, subject only to defendants' limited right to object to the

11

MCIWC032438

sale under Section V(C) of this Final Judgment. Absent written notice that the United States does not object to the proposed Acquirer, or upon objection by the United States, a divestiture proposed under Section IV or Section V shall not be consummated. Upon objection by defendants under Section V(C), a divestiture proposed under Section V shall not be consummated unless approved by the Court.

## VII.    FINANCING

Defendants shall not finance all or any part of any purchase made pursuant to Section IV or V of this Final Judgment.

## VIII.    HOLD SEPARATE

Until the divestiture required by this Final Judgment has been accomplished, defendants shall take all steps necessary to comply with the Hold Separate Stipulation and Order entered by this Court. Defendants shall take no action that would jeopardize the divestiture order by this Court.

## IX.    AFFIDAVITS

A.    Within twenty (20) calendar days of the filing of the Complaint in this matter and every thirty (30) calendar days thereafter until the divestiture has been completed, pursuant to Section IV or Section V of this Final Judgment, defendants shall deliver to the United States an affidavit as to the fact and manner of compliance with Sections IV or V of this Final Judgment. Each such affidavit shall include the name, address, and telephone number of each person who during the preceding thirty days made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Intermedia Assets, and shall

12

MCIWC032439

A 04171

describe in detail each contact with any such person during that period. Each such affidavit shall also include a description of the efforts defendants have taken to solicit buyers for the Intermedia Assets and to provide required information to prospective Acquirers, including the limitations, if any, on such information. Assuming the information set forth in the affidavit is true and complete, any objection by the United States to information provided by defendants, including limitation on information, shall be made within fourteen (14) days of receipt of such affidavit.

   B.  Within twenty (20) calendar days of the filing of the Complaint in this matter, defendants shall deliver to the United States an affidavit which describes in reasonable detail all actions defendants have taken and all steps defendants have implemented on an ongoing basis to preserve and maintain the Intermedia Assets and to comply with Section VIII of this Final Judgment. The affidavit also shall describe, but not be limited to, defendants' efforts to maintain and operate the Intermedia Assets as a viable active competitor; to maintain separate management, staffing, sales, marketing, and pricing the Intermedia Assets; and to maintain the Intermedia Assets in operable condition at current (and currently projected future) capacity configurations. Defendants shall deliver to the United States an affidavit describing any changes to the efforts and actions outlined in defendants' earlier affidavit(s) filed pursuant to this section within fifteen (15) calendar days after the change is implemented.

   C.  Defendants shall keep all records of all efforts made to preserve and divest the Intermedia Assets until one year after such divestiture has been completed.

   D.  Defendants shall promptly inform the United States of any change in the management or operation of the Intermedia Assets that would affect the defendants' ability to fulfill their obligations under this Final Judgment or the Hold Separate Stipulation and Order. Such notice shall

13

MCIWC032440

A 04172

include a description of all the steps defendants have taken or will take regarding the subject of such notice.

## X.    COMPLIANCE INSPECTION

A.    For the purposes of determining or securing compliance with this Final Judgment, or of determining whether the Final Judgment should be modified or vacated, and subject to any legally recognized privilege, from time to time duly authorized representatives of the United States Department of Justice, including consultants and other persons retained by the United States, shall, upon written request of a duly authorized representative of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to defendants, be permitted:

1.    Access during office hours of defendants to inspect and copy, or at the option of the United States, to require defendants to provide copies of, all books, ledgers, accounts, correspondence, memoranda, and other records and documents in the possession or under the control of defendants, relating to any matters contained in this Final Judgment; and

2.    To interview, either informally or on the record, defendant's officers, employees, or agents, who may have their individual counsel present, regarding such matters. The interviews shall be subject to the reasonable convenience of the interviewee and without restraint of interference by the defendants.

B.    Upon the written request of a duly authorized representative of the Assistant Attorney General in charge of the Antitrust Division, defendants shall submit such written reports, under oath if requested, relating to any of the matters contained in this Final Judgment and the Hold Separate Stipulation and Order as may be requested.

14

MCIWC032441

C.     No information or documents obtained by the means provided in this section shall be divulged by the United States to any person other than an authorized representative of the executive branch of the United States, except in the course of legal proceedings to which the United States is a party (including grand jury proceedings), or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

D.     If at the time information or documents are furnished by defendants to the United States, defendants represent and identify in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(7) of the Federal Rules of Civil Procedure, and defendants mark each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(7) of the Federal Rules of Civil Procedure," then the United States shall give defendants ten (10) calendar days notice prior to divulging such material in any legal proceeding (other than a grand jury proceeding).

## XI.    NO REACQUISITION

Defendants may not reacquire any part of the Intermedia Assets during the term of this Final Judgment.

## XII.    RETENTION OF JURISDICTION

This Court retains jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

15

MCIWC032442

A 04174

## XIII.    EXPIRATION OF FINAL JUDGMENT

Unless this Court grants an extension, this Final Judgment will expire upon the tenth anniversary of the date of its entry.

## XIV.    PUBLIC INTEREST DETERMINATION

Entry of this Final Judgment is in the public interest.

Date:_____6/26/01_____.

Court approval subject to procedures of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16.

**United States District Judge**

16

MCIWC032443

A 04175

# EXHIBIT 10

A 04176

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FILED

MAY 3 0 2001

```
                                  )
UNITED STATES OF AMERICA,         )
           Plaintiff,             )
                                  )        Case No. 1:00CV02789(RWR)
      v.                          )
                                  )
WORLDCOM, INC., and               )
INTERMEDIA COMMUNICATIONS, INC.   )
           Defendants.            )
                                  )
```

## HOLD SEPARATE STIPULATION AND ORDER
## [ERRATA]

It is hereby stipulated and agreed by and between the undersigned parties, subject to approval and entry by the Court, that:

### I.    DEFINITIONS

As used in this Hold Separate Stipulation and Order:

A.    "Acquirer" means the entity to whom defendants divest the Intermedia Assets.

B.    "WorldCom" means defendant WorldCom, Inc., a Georgia corporation with its headquarters in Clinton, Mississippi, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents and employees.

C.    "Intermedia" means defendant Intermedia Communications, Inc., a Delaware Corporation with its headquarters in Tampa, Florida, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents and employees.

D.    "Digex" means Digex, Inc., a Delaware Corporation with its headquarters in Beltsville,



A 04177

Maryland, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents and employees.

E.    "Capital Stock of Digex" means the capital stock of Digex, regardless of class, owned by Intermedia.

F.    "Intermedia Assets" means all of assets of Intermedia, except for the Capital Stock of Digex, including:

1.    All tangible assets that comprise the Intermedia business, including research and development activities; all networking equipment and fixed assets, personal property, office furniture, materials, supplies, and other tangible property and all assets used exclusively in connection with the Intermedia Assets; all licenses, permits and authorizations issued by any governmental organization relating to the Intermedia Assets; all contracts, teaming arrangements, agreements, leases, commitments, certifications, and understandings, relating to the Intermedia Assets, including supply agreements; all customer lists, contracts, accounts, and credit records; all repair and performance records and all other records relating to the Intermedia Assets;

2.    All intangible assets used in the development, production, servicing and sale of Intermedia Assets, including, but not limited to all patents, licenses and sublicenses intellectual property, copyrights, trademarks, trade names, service marks, service names, technical information, computer software and related documentation, know-how, trade secrets, drawings, blueprints, designs, design protocols, specifications for materials, specifications for parts and devices, safety procedures for the handling of materials and substances, all research data concerning historic and current research and development

2

A 04178