relating to the Intermedia Assets, quality assurance and control procedures, design tools and simulation capability, all manuals and technical information defendants provide to their own employees, customers, suppliers, agents or licensees, and all research data concerning historic and current research and development efforts relating to the Intermedia Assets, including, but not limited to designs of experiments, and the results of successful and unsuccessful designs and experiments.

G.    "Merger" means the proposed merger of WorldCom and Intermedia pursuant to the merger agreement dated September 5, 2000.

## II.    OBJECTIVES

The Final Judgment filed in this case is meant to ensure defendants' prompt divestiture of the Intermedia Assets for the purpose of preserving a viable competitor in the provision of Internet backbone and access services in order to remedy the effects that the United States alleges would otherwise result from WorldCom's acquisition of Intermedia. This Hold Separate Stipulation and Order ensures, prior to such divestitures, that the Intermedia Assets remain independent, economically viable, and ongoing business concerns that will remain independent and uninfluenced by WorldCom, and that competition is maintained during the pendency of the ordered divestitures.

## III.    JURISDICTION AND VENUE

This Court has jurisdiction over each of the parties hereto and over the subject matter of this action, and venue of this action is proper in the United States District Court for the District of Columbia. The Complaint states a claim upon which relief may be granted against defendants under Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.

## IV.    COMPLIANCE WITH AND ENTRY OF FINAL JUDGMENT

3

**A 04179**

A.    The parties stipulate that a Final Judgment in the form attached hereto as Exhibit A may be filed with and entered by the Court, upon the motion of any party or upon the Court's own motion, at any time after compliance with the requirements of the Antitrust Procedures and Penalties Act (15 U.S.C. § 16), and without further notice to any party or other proceedings, provided that the United States has not withdrawn its consent, which it may do at any time before the entry of the proposed Final Judgment by serving notice thereof on defendants and by filing that notice with the Court.

B.    Defendants shall abide by and comply with the provisions of the proposed Final Judgment, pending the Judgment's entry by the Court, or until expiration of time for all appeals of any Court ruling declining entry of the proposed Final Judgment, and shall, from the date of the signing of this Stipulation by the parties, comply with all the terms and provisions of the proposed Final Judgment as though the same were in full force and effect as an order of the Court.

C.    Defendants shall not consummate the transaction sought to be enjoined by the Complaint herein before the Court has signed this Hold Separate Stipulation and Order.

D.    This Stipulation shall apply with equal force and effect to any amended proposed Final Judgment agreed upon in writing by the parties and submitted to the Court.

E.    In the event (1) the United States has withdrawn its consent, as provided in Section IV(A) above, or (2) the proposed Final Judgment is not entered pursuant to this Stipulation, the time has expired for all appeals of any Court ruling declining entry of the proposed Final Judgment, and the Court has not otherwise ordered continued compliance with the terms and provisions of the proposed Final Judgment, then the parties are released from all further obligations under this Stipulation, and the making of this Stipulation shall be without prejudice to any party in this or any

4

**A 04180**

other proceeding.

F.    Defendants represent that the divestiture ordered in the proposed Final Judgment can and will be made, and that defendants will later raise no claim of mistake, hardship or difficulty of compliance as grounds for asking the Court to modify any of the provisions contained therein.

G.    The United States and Defendants, WorldCom and Intermedia, by their respective attorneys, have consented to the entry of this Hold Separate Stipulation and Order without trial or adjudication of any issue of fact or law, and without this Hold Separate Stipulation and Order constituting any evidence against or admission by any party regarding any issue of fact or law.

## V.    HOLD SEPARATE PROVISIONS

A.    Until the closing of the Merger contemplated by the Final Judgment:

1.    Intermedia shall preserve, maintain, and continue to operate the Intermedia Assets as an independent, ongoing, economically viable competitive business, with management, sales, and operations of such assets held entirely separate, distinct, and apart from those of WorldCom's operations. WorldCom shall not coordinate its production, marketing, or terms of sale of any products with those produced by or sold under any of the Intermedia Assets. Within twenty (20) days after the entry of the Hold Separate Stipulation and Order, defendants will inform the United States of the steps defendants have taken to comply with this Hold Separate Stipulation and Order.

2.    Intermedia shall use all reasonable efforts to maintain and increase the sales and revenues of the services provided by the Intermedia Assets, and shall maintain at 2000 or previously approved levels for 2001, whichever are higher, all promotional, advertising, sales, technical assistance, network capacity configurations and expansions, marketing and

5

A 04181

merchandising support for the Intermedia Assets.

3.    Intermedia shall take all steps necessary to ensure that the Intermedia Assets are fully maintained in operable condition at no less than their current capacity and sales, including projected capacity expansions currently planned or planned prior to negotiations between the defendants relating to the Merger, and shall maintain and adhere to normal repair and maintenance schedules for the Intermedia Assets.

4.    Intermedia shall not remove, sell, lease, assign, transfer, pledge, or otherwise dispose of any of the Intermedia Assets.

5.    WorldCom shall not solicit to hire, or hire, any employee of any business that is a part of the Intermedia Assets.

6.    Defendants shall take no action that would jeopardize, delay, or impede the sale of the Intermedia Assets.

B.    After the closing of the Merger and until the divestiture required by the Final Judgment has been accomplished:

1.    Defendants shall preserve, maintain, and continue to operate the Intermedia Assets as an independent, ongoing, economically viable competitive business, with management, sales, and operations of such assets held entirely separate, distinct, and apart from those of WorldCom's other operations. WorldCom shall not coordinate its production, marketing, or terms of sale of any products with those produced by or sold under any of the Intermedia Assets. Within twenty (20) days after the closing of the Merger, defendants will inform the United States of the steps defendants have taken to comply with this Hold Separate Stipulation and Order.

6

A 04182

2.      Defendants shall take all steps necessary to ensure that (1) the Intermedia Assets will be maintained and operated as independent, ongoing, economically viable and active competitor in the provision of telecommunications services currently offered by Intermedia; (2) management of the Intermedia Assets will not be influenced by WorldCom (or Digex); and (3) the books, records, competitively sensitive sales, marketing and pricing information, and decision-making concerning provision of services by any of the Intermedia Assets will be kept separate and apart from WorldCom's other operations.

3.      Defendants shall use all reasonable efforts to maintain and increase the sales and revenues of the services provided by the Intermedia Assets, and shall maintain at 2000 or previously approved levels for 2001, whichever are higher, all promotional, advertising, sales, technical assistance, network capacity configurations and expansions, marketing and merchandising support for the Intermedia Assets.

4.      WorldCom shall provide sufficient working capital and lines and sources of credit to continue to maintain the Intermedia Assets as economically viable and competitive, ongoing businesses, consistent with the requirements of Sections V(A) and (B).

5.      WorldCom shall take all steps necessary to ensure that the Intermedia Assets are fully maintained in operable condition at no less than its current capacity and sales including projected capacity expansions currently planned or planned prior to negotiations between the defendants relating to the Merger, and shall maintain and adhere to normal repair and maintenance schedules for the Intermedia Assets.

6.      Defendants shall not, except as part of a divestiture approved by the United States in accordance with the terms of the proposed Final Judgment, remove, sell, lease,

7

A 04183

assign, transfer, pledge, or otherwise dispose of any of the Intermedia Assets.

7.    Defendants shall maintain, in accordance with sound accounting principles, separate, accurate, and complete financial ledgers, books, and records that report on a periodic basis, such as the last business day of every month, consistent with past practices, the assets, liabilities, expenses, revenues and income of products produced, distributed or sold utilizing the Intermedia Assets.

8.    Defendants shall take no action that would jeopardize, delay, or impede the sale of the Intermedia Assets.

9.    Except in the ordinary course of business or as is otherwise consistent with this Hold Separate Stipulation and Order, defendants shall not hire, transfer, terminate, or otherwise alter the salary or employment agreements for any Intermedia employee who, on the date of defendants' signing of this Hold Separate Stipulation and Order is a member of Intermedia's management.    Further, during the pendency of this Hold Separate Stipulation and Order, and consistent with the Final Judgment, defendant WorldCom shall not solicit to hire, or hire, any employee of any business that is a part of the Intermedia Assets.

C.    Defendants shall take no action that would interfere with the ability of any trustee appointed pursuant to the Final Judgment to complete the divestitures pursuant to the Final Judgment to an Acquirer acceptable to the United States.

8

A 04184

D.    This Hold Separate Stipulation and Order shall remain in effect until consummation

of the divestiture required by the proposed Final Judgment or until further order of the Court.

Dated: November 17, 2000.

Respectfully submitted,

FOR PLAINTIFF
UNITED STATES OF AMERICA

FOR DEFENDANT
WORLDCOM, INC.

FOR DEFENDANT
INTERMEDIA COMMUNICATIONS, INC.

**ORDER**

IT IS SO ORDERED by the Court, this 29 th day of May , 2000.

United States District Judge

9

A 04185

## CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing Hold Separate Stipulation and Order [ERRATA] was served, as indicated below, this 20th day of November, 2000 upon each of the parties listed below:

Charles F. Rule, Esq.  (BY HAND)
Covington & Burling
1201 Pennsylvania Avenue, N.W.
Washington, DC 20004-2401
(202) 662-5119
Counsel for WorldCom, Inc.

Brad E. Mutschelknaus, Esq.  (BY HAND)
Kelley Drye & Warren, LLP
1200 19th Street, N.W., Suite 500
Washington, D.C.  20036
(202) 955-9600
Counsel for Intermedia Communications, Inc.

David F. Smutny
Counsel for Plaintiff

# EXHIBIT 11

A 04187

# KELLEY DRYE & WARREN LLP

A LIMITED LIABILITY PARTNERSHIP INCLUDING PROFESSIONAL ASSOCIATIONS

1200 19TH STREET, N.W.

SUITE 500

WASHINGTON, D. C. 20036

———

(202) 955-9600

December 7, 2000

NEW YORK, N.Y.

LOS ANGELES, CA.

MIAMI, FL.

CHICAGO, IL.

STAMFORD, CT.

PARSIPPANY, N.J.

———

BRUSSELS, BELGIUM

HONG KONG

———

AFFILIATED OFFICES
NEW DELHI, INDIA
TOKYO, JAPAN

FACSIMILE

(202) 955-9792

BRAD E. MUTSCHELKNAUS

DIRECT LINE (202) 955-9765

E-MAIL: bmutschelknaus@kelleydrye.com

## HAND DELIVERED

David F. Smutny, Esquire
Trial Attorney
Telecommunications Task Force
Antitrust Division
United States Department of Justice
Main Justice Building
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

Re:    United States v. WorldCom, Inc. and Intermedia Communications Inc.

Dear David:

Enclosed please find two Declarations executed by Ms. Heather B. Gold, Vice President, Industry Policy for Intermedia Communications Inc. ("Intermedia"). The Declarations are provided in compliance with Sections IX.A and IX.B. of the Proposed Final Judgment filed on November 17, 2000 in connection with the above-referenced matter. Ms. Gold is located in Tampa, Florida and provided her signature via facsimile. I am submitting the facsimile signature, and will provide versions with original signatures upon receipt.

Please do not hesitate to call me at 202/955-9765 if you have any questions concerning this matter.

Sincerely,

Brad Mutschelknaus

MCIWC032226

DC01/MUTSB/134197.1

A 04188

## DECLARATION IN THE MATTER OF
### WORLDCOM, INC./INTERMEDIA COMMUNICATIONS INC.

1.    I, the undersigned, Heather B. Gold, Vice President, Industry Policy for

Intermedia Communications Inc. ("Intermedia" or "the Company"), submit this declaration

pursuant to Section IX.A. of the proposed Final Judgment filed on November 17, 2000, in United

States District Court for the District of Columbia in United States v. WorldCom, Inc. and

Intermedia Communications, Inc., Civ. No. 00-2789 ("Final Judgment"). The following

information describes compliance by Intermedia with Section IV of the proposed Final

Judgment. I have personal knowledge of the facts set forth herein, or those facts have been

gathered under my supervision and I believe that they are accurate. Capitalized terms used in

this Declaration have the same meaning as set forth in Section II of the proposed Final Judgment.

2.    I understand that WorldCom has retained Chase Securities, Inc., 27 Park

Avenue, New York, NY 10017 (Contact: Camilla Rab., Vice President), to set an auction

process for the sale of the Intermedia assets. I have been informed that Chase has contacted

persons who have previously expressed an interest in acquiring the Intermedia Assets (or any

portion thereof) as well as other potential buyers. Details of the auction process should be

provided in an affidavit to be provided by Ms. Mary L. Brown, Vice President, Federal Law and

Public Policy of WorldCom, Inc. of WorldCom, Inc.

I declare under penalty that the foregoing is true and correct.

Heather B. Gold
Vice President, Industry Policy
Intermedia Communications Inc.

Executed: December 7, 2000

DC01/MUTSB/134161.1

MCIWC032227

A 04189

### DECLARATION IN THE MATTER OF
### WORLDCOM, INC./INTERMEDIA COMMUNICATIONS INC.

1.    I, the undersigned, Heather B. Gold, Vice President, Industry Policy for
Intermedia Communications Inc. ("Intermedia" or "the Company"), submit this declaration
pursuant to Section IX.B. of the proposed Final Judgment filed on November 17, 2000, in U.S.
District Court for the District of Columbia in United States v. WorldCom, Inc. and Intermedia
Communications, Inc., Civ. No. 00-2789 ("Final Judgment"). I have personal knowledge of the
facts set forth herein, or those facts have been gathered under my supervision and I believe they
are accurate. Unless otherwise indicated, capitalized terms used in this Declaration have the
same meaning as set forth in Section II of the Final Judgment and Section I of the Hold Separate
Stipulation and Order.

2.    As of today's date, the Merger contemplated in the Final Judgment has not
yet been consummated. WorldCom and Intermedia accordingly continue to operate as separate
and independent entities.

3.    In order to ensure that Intermedia complies with the Final Judgment and
with Section V.A. of the Hold Separate Stipulation and Order governing Intermedia's obligations
prior to consummation of the Merger, responsible executives of Intermedia have been provided
with copies of the Final Judgment and the Hold Separate Stipulation and Order and have
reviewed the material requirements of both documents. They have been advised and understand
that compliance with these legal obligations is mandatory and that violations carry possible legal
sanctions and will not be tolerated by the Company. The responsible executives also have been
directed to raise promptly any compliance questions that they might have with the undersigned

MCIWC032228

**A 04190**

·or with Patricia A. Kurlin, Intermedia's General Counsel. There will be periodic communications to all concerned, reminding them of their compliance obligations.

4.     Pursuant to Section V.B.4 of the Hold Separate Stipulation and Order, on October 31, 2000, WorldCom executed a guaranty pursuant to which WorldCom provided a guarantee for a $350 million credit facility made available to Intermedia by Bank of America and Bank of New York. In addition, WorldCom and Intermedia entered into a Note Purchase Agreement dated October 31, 2000, pursuant to which WorldCom provided a $225 million subordinated debt facility to Intermedia.

5.     The Company believes that the foregoing actions will assure strict compliance with WorldCom's obligations under the proposed Final Judgment and Hold Separate Stipulation and Order. As noted, compliance will be monitored periodically throughout the divestiture period. If potential problems or issues are identified as a result of such oversight, adjustments promptly will be made and the Department will be informed. The Company likewise will timely notify the Department of any additions or modifications to this compliance plan as may be appropriate following consummation of the Merger pending ordered divestitures.

I declare under penalty that the foregoing is true and correct.

Heather B. Gold
Vice President, Industry Policy
Intermedia Communications Inc.

Executed:  December 7, 2000

A 04191

**KELLEY DRYE & WARREN** LLP

A LIMITED LIABILITY PARTNERSHIP

1200 19TH STREET, N.W.

SUITE 500

WASHINGTON, D.C. 20036

———

(202) 955-9600

NEW YORK, NY

LOS ANGELES, CA

CHICAGO, IL

STAMFORD, CT

PARSIPPANY, NJ

———

BRUSSELS, BELGIUM

HONG KONG

———

AFFILIATE OFFICES
BANGKOK, THAILAND
JAKARTA, INDONESIA
MANILA, THE PHILIPPINES
MUMBAI, INDIA
TOKYO, JAPAN

FACSIMILE

(202) 955-9792

www.kelleydrye.com

DIRECT LINE (202) 887-1230

E-MAIL: Gmorelli@KelleyDrye.com

January 8, 2001

**HAND DELIVERED**

J. Parker Erkmann, Esquire
Trial Attorney
Telecommunications Task Force
Antitrust Division
US Department of Justice
Main Justice Building
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

> Re:    United States v. WorldCom, Inc. and Intermedia Communications Inc.

Dear Parker:

Enclosed please find two Declarations executed by Ms. Heather B. Gold, Vice President, Industry Policy for Intermedia Communications Inc. ("Intermedia"). The Declarations are provided in compliance with Sections IX.A and IX.B. of the Proposed Final Judgment filed on November 17, 2000 in connection with the above-referenced matter.

Please do not hesitate to call me at 202/887-1230 or Brad Mutschelknaus at 202/955-9765 if you have any questions concerning this matter.

Sincerely,

Genevieve Morelli

MCIWC032262

A 04192

## DECLARATION IN THE MATTER OF
## WORLDCOM, INC./INTERMEDIA COMMUNICATIONS INC.

1.    I, the undersigned, Heather B. Gold, Vice President, Industry Policy for

Intermedia Communications Inc. ("Intermedia" or "the Company"), submit this declaration

pursuant to Section IX.B. of the proposed Final Judgment filed on November 17, 2000, in U.S.

District Court for the District of Columbia in United States v. WorldCom, Inc. and Intermedia

Communications, Inc., Civ. No. 00-2789 ("Final Judgment"). I have personal knowledge of the

facts set forth herein, or those facts have been gathered under my supervision and I believe they

are accurate. Unless otherwise indicated, capitalized terms used in this Declaration have the

same meaning as set forth in Section II of the Final Judgment and Section I of the Hold Separate

Stipulation and Order.

2.    As of today's date, the Merger contemplated in the Final Judgment has not

yet been consummated. WorldCom and Intermedia accordingly continue to operate as separate

and independent entities.

3.    In order to ensure that Intermedia complies with the Final Judgment and

with Section V.A. of the Hold Separate Stipulation and Order governing Intermedia's obligations

prior to consummation of the Merger, responsible executives of Intermedia have been provided

with copies of the Final Judgment and the Hold Separate Stipulation and Order and have

reviewed the material requirements of both documents. They have been advised and understand

that compliance with these legal obligations is mandatory and that violations carry possible legal

sanctions and will not be tolerated by the Company. The responsible executives also have been

directed to raise promptly any compliance questions that they might have with the undersigned

MCIWC032263

A 04193

or with Patricia A. Kurlin, Intermedia's General Counsel. There will continue to be periodic communications to all concerned, reminding them of their compliance obligations.

        4.     Pursuant to Section V.B.4 of the Hold Separate Stipulation and Order, on October 31, 2000, WorldCom executed a guaranty pursuant to which WorldCom provided a guarantee for a $350 million credit facility made available to Intermedia by Bank of America and Bank of New York. In addition, WorldCom and Intermedia entered into a Note Purchase Agreement dated October 31, 2000, pursuant to which WorldCom provided a $225 million subordinated debt facility to Intermedia.

        5.     The Company believes that the foregoing actions will assure strict compliance with WorldCom's obligations under the proposed Final Judgment and Hold Separate Stipulation and Order. As noted, compliance will continue to be monitored periodically throughout the divestiture period. If potential problems or issues are identified as a result of such oversight, adjustments promptly will be made and the Department will be informed. The Company likewise will timely notify the Department of any additions or modifications to this compliance plan as may be appropriate following consummation of the Merger pending ordered divestitures.

I declare under penalty that the foregoing is true and correct.

                _Heather B. Gold_

Heather B. Gold
Vice President, Industry Policy
Intermedia Communications Inc.

Executed: January 8, 2001

MCIWC032264

A 04194

## DECLARATION IN THE MATTER OF
## WORLDCOM, INC./INTERMEDIA COMMUNICATIONS INC.

1.      I, the undersigned, Heather B. Gold, Vice President, Industry Policy for

Intermedia Communications Inc. ("Intermedia" or "the Company"), submit this declaration

pursuant to Section IX.A. of the proposed Final Judgment filed on November 17, 2000, in United

States District Court for the District of Columbia in United States v. WorldCom, Inc. and

Intermedia Communications, Inc., Civ. No. 00-2789 ("Final Judgment"). The following

information describes compliance by Intermedia with Section IV of the proposed Final

Judgment. I have personal knowledge of the facts set forth herein, or those facts have been

gathered under my supervision and I believe that they are accurate. Capitalized terms used in

this Declaration have the same meaning as set forth in Section II of the proposed Final Judgment.

2.      I understand that WorldCom has retained Chase Securities, Inc., 27 Park

Avenue, New York, NY 10017 (Contact: Camilla Rab, Vice President), to set an auction process

for the sale of the Intermedia assets. I have been informed that Chase has contacted persons who

have previously expressed an interest in acquiring the Intermedia Assets (or any portion thereof)

as well as other potential buyers. Status of the auction process should be provided in an affidavit

to be provided by Ms. Mary L. Brown, Vice President, Federal Law and Public Policy of

WorldCom, Inc. of WorldCom, Inc.

I declare under penalty that the foregoing is true and correct.

Heather B. Gold
Vice President, Industry Policy
Intermedia Communications Inc.

Executed: January 8, 2001

MCIWC032265

## KELLEY DRYE & WARREN LLP

A LIMITED LIABILITY PARTNERSHIP INCLUDING PROFESSIONAL ASSOCIATIONS

1200 19TH STREET, N.W.

SUITE 500

WASHINGTON, D. C. 20036

(202) 955-9600

NEW YORK, N.Y.
LOS ANGELES, CA.
MIAMI, FL.
CHICAGO, IL.
STAMFORD, CT.
PARSIPPANY, N.J.
———
BRUSSELS, BELGIUM
HONG KONG
———
AFFILIATED OFFICES
NEW DELHI, INDIA
TOKYO, JAPAN

FACSIMILE
(202) 955-9792

February 5, 2001

BRAD E. MUTSCHELKNAUS
DIRECT LINE (202) 955-9765
E-MAIL: bmutschelknaus@kelleydrye.com

**VIA HAND DELIVERY**

J. Parker Erkmann, Esquire
Trial Attorney
Telecommunications Task Force
Antitrust Division
United States Department of Justice
Main Justice Building
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

      Re:    United States v. WorldCom, Inc. and Intermedia Communications Inc.

Dear Mr. Erkmann:

      Enclosed please find two Declarations executed by Ms. Heather B. Gold, Vice President, Industry Policy for Intermedia Communications Inc. ("Intermedia"). The Declarations are provided in compliance with Sections IX.A and IX.B. of the Proposed Final Judgment filed on November 17, 2000 in connection with the above-referenced matter.

      Please do not hesitate to call me at (202) 955-9765 if you have any questions concerning this matter.

                      Sincerely,

                      Brad E. Mutschelknaus

Enclosures

MCIWC032275

DC01/MUTSB/139210.1

## DECLARATION IN THE MATTER OF
## WORLDCOM, INC./INTERMEDIA COMMUNICATIONS INC.

1.    I, the undersigned, Heather B. Gold, Vice President, Industry Policy for

Intermedia Communications Inc. ("Intermedia" or "the Company"), submit this declaration

pursuant to Section IX.B. of the proposed Final Judgment filed on November 17, 2000, in U.S.

District Court for the District of Columbia in United States v. WorldCom, Inc. and Intermedia

Communications, Inc., Civ. No. 00-2789 ("Final Judgment"). Except as otherwise indicated, I

have personal knowledge of the facts set forth herein, or those facts have been gathered under

my supervision and I believe they are accurate. Unless otherwise indicated, capitalized terms

used in this Declaration have the same meaning as set forth in Section II of the Final Judgment

and Section I of the Hold Separate Stipulation and Order.

2.    As of today's date, the Merger contemplated in the Final Judgment has not

yet been consummated. WorldCom and Intermedia accordingly continue to operate as separate

and independent entities.

3.    In order to ensure that Intermedia complies with the Final Judgment and

with Section V.A. of the Hold Separate Stipulation and Order governing Intermedia's obligations

prior to consummation of the Merger, responsible executives of Intermedia have been provided

with copies of the Final Judgment and the Hold Separate Stipulation and Order and have

reviewed the material requirements of both documents. They have been advised and understand

that compliance with these legal obligations is mandatory and that violations carry possible legal

sanctions and will not be tolerated by the Company. The responsible executives also have been

directed to raise promptly any compliance questions that they might have with the undersigned

MCIWC032276

A 04197

or with Patricia A. Kurlin, Intermedia's General Counsel. There will continue to be periodic communications to all concerned, reminding them of their compliance obligations.

4.    Pursuant to Section V.B.4 of the Hold Separate Stipulation and Order, on October 31, 2000, WorldCom executed a guaranty pursuant to which WorldCom provided a guarantee for a $350 million credit facility made available to Intermedia by Bank of America and Bank of New York. In addition, WorldCom and Intermedia entered into a Note Purchase Agreement dated October 31, 2000, pursuant to which WorldCom provided a $225 million subordinated debt facility to Intermedia.

5.    The Company believes that the foregoing actions will assure strict compliance with WorldCom's obligations under the proposed Final Judgment and Hold Separate Stipulation and Order. As noted, compliance will continue to be monitored periodically throughout the divestiture period. If potential problems or issues are identified as a result of such oversight, adjustments promptly will be made and the Department will be informed. The Company likewise will timely notify the Department of any additions or modifications to this compliance plan as may be appropriate following consummation of the Merger pending ordered divestitures.

I declare under penalty that the foregoing is true and correct.

Heather B. Gold
Vice President, Industry Policy
Intermedia Communications Inc.

Executed: January 6, 2001

MCIWC032277

A 04198

813-829-7588                P. 4

## DECLARATION IN THE MATTER OF
## WORLDCOM, INC./INTERMEDIA COMMUNICATIONS INC.

1.    I, the undersigned, Heather B. Gold, Vice President, Industry Policy for

Intermedia Communications Inc. ("Intermedia" or "the Company"), submit this declaration

pursuant to Section IX.A. of the proposed Final Judgment filed on November 17, 2000, in United

States District Court for the District of Columbia in United States v. WorldCom, Inc. and

Intermedia Communications, Inc., Civ. No. 00-2789 ("Final Judgment"). The following

information describes compliance by Intermedia with Section IV of the proposed Final

Judgment. Except as otherwise indicated, I have personal knowledge of the facts set forth

herein, or those facts have been gathered under my supervision and I believe that they are

accurate. Capitalized terms used in this Declaration have the same meaning as set forth in

Section II of the proposed Final Judgment.

2.    I understand, from reviewing prior declarations submitted by WorldCom

officials, that WorldCom has retained Chase Securities, Inc., 27 Park Avenue, New York, NY

10017 (Contact: Camilla Rab., Vice President), to establish an auction process for the sale of the

Intermedia assets. According to prior declarations filed by WorldCom officials, Chase has

contacted persons who have previously expressed an interest in acquiring the Intermedia Assets

(or any portion thereof) as well as other potential buyers. For the current status of the auction

process, please refer to declarations to be provided by Ms. Mary L. Brown, Vice President,

Federal Law and Public Policy of WorldCom, Inc.

I declare under penalty that the foregoing is true and correct.

Heather B. Gold
Vice President, Industry Policy
Intermedia Communications Inc.

Executed: January 6, 2001

DC01/MOREG/136179.2

MCIWC032278

**A 04199**

W or ICIO

## KELLEY DRYE & WARREN LLP

A LIMITED LIABILITY PARTNERSHIP INCLUDING PROFESSIONAL ASSOCIATIONS

1200 19TH STREET, N.W.

SUITE 500

WASHINGTON, D. C. 20036

(202) 955-9600

NEW YORK, N.Y.

LOS ANGELES, CA.

MIAMI, FL.

CHICAGO, IL.

STAMFORD, CT.

PARSIPPANY, N.J.

BRUSSELS, BELGIUM

HONG KONG

AFFILIATED OFFICES
NEW DELHI, INDIA
TOKYO, JAPAN

FACSIMILE
(202) 955-9792

March 6, 2001

BRAD E. MUTSCHELKNAUS
DIRECT LINE (202) 955-9765
E-MAIL: bmutschelknaus@kelleydrye.com

### VIA HAND DELIVERY

J. Parker Erkmann, Esquire
Trial Attorney
Telecommunications Task Force
Antitrust Division
United States Department of Justice
Main Justice Building
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

Re:    United States v. WorldCom, Inc. and Intermedia Communications Inc.

Dear Parker:

Enclosed please find two Declarations executed by Ms. Heather B. Gold, Vice President, Industry Policy for Intermedia Communications Inc. ("Intermedia"). The Declarations are provided in compliance with Sections IX.A and IX.B. of the Proposed Final Judgment filed on November 17, 2000 in connection with the above-referenced matter.

Please do not hesitate to call me at (202) 955-9765 if you have any questions concerning this matter.

Sincerely,

Brad E. Mutschelknaus

Enclosures

MCIWC032279

DC01/MUTSB/139210.1

A 04200

### DECLARATION IN THE MATTER OF
### WORLDCOM, INC./INTERMEDIA COMMUNICATIONS INC.

1.  I, the undersigned, Heather B. Gold, Vice President, Industry Policy for Intermedia Communications Inc. ("Intermedia" or "the Company"), submit this declaration pursuant to Section IX.A. of the proposed Final Judgment filed on November 17, 2000, in United States District Court for the District of Columbia in United States v. WorldCom, Inc. and Intermedia Communications, Inc., Civ. No. 00-2789 ("Final Judgment"). The following information describes compliance by Intermedia with Section IV of the proposed Final Judgment. Except as otherwise indicated, I have personal knowledge of the facts set forth herein, or those facts have been gathered under my supervision and I believe that they are accurate. Capitalized terms used in this Declaration have the same meaning as set forth in Section II of the proposed Final Judgment.

2.  I understand, from reviewing prior declarations submitted by WorldCom officials, that WorldCom has retained Chase Securities, Inc., 27 Park Avenue, New York, NY 10017 (Contact: Camilla Rab., Vice President), to establish an auction process for the sale of the Intermedia assets. According to prior declarations filed by WorldCom officials, Chase has contacted persons who have previously expressed an interest in acquiring the Intermedia Assets (or any portion thereof) as well as other potential buyers. For the current status of the auction process, please refer to declarations to be provided by Ms. Mary L. Brown, Vice President, Federal Law and Public Policy of WorldCom, Inc.

I declare under penalty that the foregoing is true and correct.

Heather B. Gold
Vice President, Industry Policy
Intermedia Communications Inc.

Executed: March 6, 2001

DC01/MOREG/136179.3

MCIWC032280

**A 04201**

## DECLARATION IN THE MATTER OF
## WORLDCOM, INC./INTERMEDIA COMMUNICATIONS INC.

1.      I, the undersigned, Heather B. Gold, Vice President, Industry Policy for

Intermedia Communications Inc. ("Intermedia" or "the Company"), submit this declaration

pursuant to Section IX.B. of the proposed Final Judgment filed on November 17, 2000, in U.S.

District Court for the District of Columbia in United States v. WorldCom, Inc. and Intermedia

Communications, Inc., Civ. No. 00-2789 ("Final Judgment"). Except as otherwise indicated, I

have personal knowledge of the facts set forth herein, or those facts have been gathered under

my supervision and I believe they are accurate. Unless otherwise indicated, capitalized terms

used in this Declaration have the same meaning as set forth in Section II of the Final Judgment

and Section I of the Hold Separate Stipulation and Order.

2.      As of today's date, the Merger contemplated in the Final Judgment has not

yet been consummated. WorldCom and Intermedia accordingly continue to operate as separate

and independent entities.

3.      In order to ensure that Intermedia complies with the Final Judgment and

with Section V.A. of the Hold Separate Stipulation and Order governing Intermedia's obligations

prior to consummation of the Merger, responsible executives of Intermedia have been provided

with copies of the Final Judgment and the Hold Separate Stipulation and Order and have

reviewed the material requirements of both documents. They have been advised and understand

that compliance with these legal obligations is mandatory and that violations carry possible legal

sanctions and will not be tolerated by the Company. The responsible executives also have been

directed to raise promptly any compliance questions that they might have with the undersigned

MCIWC032281

A 04202

or with Patricia A. Kurlin, Intermedia's General Counsel. There will continue to be periodic communications to all concerned, reminding them of their compliance obligations.

      4.      Pursuant to Section V.B.4 of the Hold Separate Stipulation and Order, on October 31, 2000, WorldCom executed a guaranty pursuant to which WorldCom provided a guarantee for a $350 million credit facility made available to Intermedia by Bank of America and Bank of New York. In addition, WorldCom and Intermedia entered into a Note Purchase Agreement dated October 31, 2000, pursuant to which WorldCom provided a $225 million subordinated debt facility to Intermedia.

      5.      The Company believes that the foregoing actions will assure strict compliance with WorldCom's obligations under the proposed Final Judgment and Hold Separate Stipulation and Order. As noted, compliance will continue to be monitored periodically throughout the divestiture period. If potential problems or issues are identified as a result of such oversight, adjustments promptly will be made and the Department will be informed. The Company likewise will timely notify the Department of any additions or modifications to this compliance plan as may be appropriate following consummation of the Merger pending ordered divestitures.

      I declare under penalty that the foregoing is true and correct.

Heather B. Gold
Vice President, Industry Policy
Intermedia Communications Inc.

Executed: March 6, 2001

MCIWC032282

A 04203

# EXHIBIT 12

A 04204

## KELLEY DRYE & WARREN LLP

A LIMITED LIABILITY PARTNERSHIP INCLUDING PROFESSIONAL ASSOCIATIONS

1200 19TH STREET, N.W.

SUITE 500

WASHINGTON, D. C. 20036

(202) 955-9600

NEW YORK, N.Y.
LOS ANGELES, CA.
MIAMI, FL.
CHICAGO, IL.
STAMFORD, CT.
PARSIPPANY, N.J.

BRUSSELS, BELGIUM
HONG KONG

AFFILIATED OFFICES
NEW DELHI, INDIA
TOKYO, JAPAN

FACSIMILE
(202) 955-9792

BRAD E. MUTSCHELKNAUS
DIRECT LINE (202) 955-9765
E-MAIL: bmutschelknaus@kelleydrye.com

April 9, 2001

**VIA HAND DELIVERY**

J. Parker Erkmann, Esquire
Trial Attorney
Telecommunications Task Force
Antitrust Division
United States Department of Justice
Main Justice Building
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

Re:    United States v. WorldCom, Inc. and Intermedia Communications Inc.

Dear Parker:

Enclosed please find two Declarations executed by Ms. Patricia A. Kurlin, Senior Vice President & General Counsel of Intermedia Communications Inc. ("Intermedia"). The Declarations are provided in compliance with Sections IX.A and IX.B. of the Proposed Final Judgment filed on November 17, 2000 in connection with the above-referenced matter. As I mentioned in our call earlier today, there are a few modifications from prior versions, since it has come to our attention that the prolonged merger uncertainty and recent economic down turn has led to some expense reductions by Intermedia. These expense reductions have been undertaken by management in a prudent effort to maintain Intermedia as a viable, ongoing business as required by the decrees. As I mentioned, we would be pleased to meet with you to discuss these developments in detail if you wish,

MCIWC032283

A 04205

**KELLEY DRYE & WARREN LLP**

J. Parker Erkmann, Esquire
April 9, 2001
Page 2

Please do not hesitate to call me at (202) 955-9765 if you have any questions concerning this matter.

Sincerely,

Brad E. Mutschelknaus

Enclosures

cc:    Patricia Kurlin  (Intermedia)
       Mary Brown  (WorldCom)
       Rick Rule  (Fried Frank)

MCIWC032284

A 04206

## DECLARATION IN THE MATTER OF
## WORLDCOM, INC./INTERMEDIA COMMUNICATIONS INC.

1.    I, the undersigned, Patricia A. Kurlin, Senior Vice President & General Counsel for Intermedia Communications Inc. ("Intermedia" or "the Company"), submit this declaration pursuant to Section IX.A. of the proposed Final Judgment filed on November 17, 2000, in United States District Court for the District of Columbia in <u>United States v. WorldCom, Inc. and Intermedia Communications, Inc.</u>, Civ. No. 00-2789 ("Final Judgment"). The following information describes compliance by Intermedia with Section IV of the proposed Final Judgment. Except as otherwise indicated, I have personal knowledge of the facts set forth herein, or those facts have been gathered under my supervision and I believe that they are accurate. Capitalized terms used in this Declaration have the same meaning as set forth in Section II of the proposed Final Judgment.

2.    I understand, from reviewing prior declarations submitted by WorldCom officials, that WorldCom has retained Chase Securities, Inc., 27 Park Avenue, New York, NY 10017 (Contact: Camilla Rab., Vice President), to establish an auction process for the sale of the Intermedia assets. According to prior declarations filed by WorldCom officials, Chase has contacted persons who have previously expressed an interest in acquiring the Intermedia Assets (or any portion thereof) as well as other potential buyers. For the current status of the auction process, please refer to declarations to be provided by Ms. Mary L. Brown, Vice President, Federal Law and Public Policy of WorldCom, Inc.

I declare under penalty that the foregoing is true and correct.

Patricia A. Kurlin
Senior Vice President & General Counsel
Intermedia Communications Inc.

Executed: April 9, 2001

DC01/MOREG/136179.4

MCIWC032285

### DECLARATION IN THE MATTER OF
### WORLDCOM, INC./INTERMEDIA COMMUNICATIONS INC.

1.    I, the undersigned, Patricia A. Kurlin, Senior Vice President & General Counsel for Intermedia Communications Inc. ("Intermedia" or "the Company"), submit this declaration pursuant to Section IX.B. of the proposed Final Judgment filed on November 17, 2000, in U.S. District Court for the District of Columbia in United States v. WorldCom, Inc. and Intermedia Communications, Inc., Civ. No. 00-2789 ("Final Judgment"). Except as otherwise indicated, I have personal knowledge of the facts set forth herein, or those facts have been gathered under my supervision and I believe they are accurate. Unless otherwise indicated, capitalized terms used in this Declaration have the same meaning as set forth in Section II of the Final Judgment and Section I of the Hold Separate Stipulation and Order.

2.    As of today's date, the Merger contemplated in the Final Judgment has not yet been consummated. WorldCom and Intermedia accordingly continue to operate as separate and independent entities.

3.    In order to ensure that Intermedia complies with the Final Judgment and with Section V.A. of the Hold Separate Stipulation and Order governing Intermedia's obligations prior to consummation of the Merger, responsible executives of Intermedia have been provided with copies of the Final Judgment and the Hold Separate Stipulation and Order and have reviewed the material requirements of both documents. They have been advised and understand that compliance with these legal obligations is mandatory and that violations carry possible legal sanctions and will not be tolerated by the Company. The responsible executives also have been directed to raise promptly any compliance questions that they might have with the undersigned. In the past month, some of these executives have raised with me certain measures implemented

DC01/MOREG/136171.4

MCIWC032286

A 04208

since late last year in order to ensure that the Intermedia Assets remain an economically viable and ongoing competitive business concern. The executives have informed me that, in order to maximize sales and revenues, as well as preserve the Intermedia Assets for prospective acquirers, Intermedia has postponed some planned projects or network expansions and canceled certain others. The current conditions of the markets in which the Intermedia Assets compete have also made it difficult for Intermedia to maintain staff, especially sales force, at end of year 2000 or at budgeted 2001 levels; the Intermedia Assets have experienced reductions against both budgeted and actual sales forces and in advertising dollars. Taken as a whole, however, in light of the current state of the markets in which the Intermedia Assets compete, Intermedia has taken all reasonable steps necessary to maintain the sales and revenues of the services provided by the Intermedia Assets and to preserve, maintain, and operate the Intermedia Assets as an ongoing, economically viable competitive business. There have been and will continue to be periodic communications to all concerned, reminding them of their compliance obligations.

      4.      Pursuant to Section V.B.4 of the Hold Separate Stipulation and Order, on October 31, 2000, WorldCom executed a guaranty pursuant to which WorldCom provided a guarantee for a $350 million credit facility made available to Intermedia by Bank of America and Bank of New York. In addition, WorldCom and Intermedia entered into a Note Purchase Agreement dated October 31, 2000, pursuant to which WorldCom provided a $225 million subordinated debt facility to Intermedia.

      5.      The Company believes that the foregoing actions will assure strict compliance with WorldCom's obligations under the proposed Final Judgment and Hold Separate Stipulation and Order. As noted, compliance will continue to be monitored periodically throughout the divestiture period. If potential problems or issues are identified as a result of such

MCIWC032287

A 04209

oversight, adjustments promptly will be made and the Department will be informed. The

Company likewise will timely notify the Department of any additions or modifications to this

compliance plan as may be appropriate following consummation of the Merger pending ordered

divestitures.

I declare under penalty that the foregoing is true and correct.

Patricia A. Kurlin
Senior Vice President & General Counsel
Intermedia Communications Inc.

Executed: April 9, 2001

MCIWC032288

A 04210

.ELLEY DRYE & WARREN LLP

A LIMITED LIABILITY PARTNERSHIP

1200 19TH STREET, N.W.

NEW YORK, NY

LOS ANGELES, CA

CHICAGO, IL

STAMFORD, CT

PARSIPPANY, NJ

———

BRUSSELS, BELGIUM

HONG KONG

———

AFFILIATE OFFICES
BANGKOK, THAILAND
JAKARTA, INDONESIA
MANILA, THE PHILIPPINES
MUMBAI, INDIA
TOKYO, JAPAN

SUITE 500

WASHINGTON, D.C. 20036

———

(202) 955-9600

FACSIMILE
(202) 955-9792
www.kelleydrye.com

June 6, 2001

**VIA HAND DELIVERY**

J. Parker Erkmann, Esquire
Trial Attorney
Telecommunications Task Force
Antitrust Division
United States Department of Justice
1401 H Street, N.W.
Suite 8000
Washington, D.C. 20530-0001

    Re:    United States v. WorldCom, Inc. and Intermedia Communications Inc.

Dear Parker:

    Enclosed please find two Declarations executed by Ms. Patricia A. Kurlin, Senior Vice
President & General Counsel of Intermedia Communications Inc. ("Intermedia"). The
Declarations are provided in compliance with Sections IX.A and IX.B. of the Proposed Final
Judgment filed on November 17, 2000 in connection with the above-referenced matter.

    Please do not hesitate to call me at (202) 955-9765 if you have any questions concerning
this matter.

                            Sincerely,

                            Brad E. Mutschelknaus

Enclosures

cc:    Patricia Kurlin  (Intermedia)
       Mary Brown  (WorldCom)
       Rick Rule  (Fried Frank)

DC01/MUTSB/139210.4

MCIWC032289

**A 04211**

## DECLARATION IN THE MATTER OF
## WORLDCOM, INC./INTERMEDIA COMMUNICATIONS INC.

1.    I, the undersigned, Patricia A. Kurlin, Senior Vice President & General

Counsel for Intermedia Communications Inc. ("Intermedia" or "the Company"), submit this

declaration pursuant to Section IX.B. of the proposed Final Judgment filed on November 17,

2000, in U.S. District Court for the District of Columbia in United States v. WorldCom, Inc. and

Intermedia Communications, Inc., Civ. No. 00-2789 ("Final Judgment"). Except as otherwise

indicated, I have personal knowledge of the facts set forth herein, or those facts have been

gathered under my supervision and I believe they are accurate. Unless otherwise indicated,

capitalized terms used in this Declaration have the same meaning as set forth in Section II of the

Final Judgment and Section I of the Hold Separate Stipulation and Order.

2.    As of today's date, the Merger contemplated in the Final Judgment has not

yet been consummated. WorldCom and Intermedia accordingly continue to operate as separate

and independent entities.

3.    In order to ensure that Intermedia complies with the Final Judgment and

with Section V.A. of the Hold Separate Stipulation and Order governing Intermedia's obligations

prior to consummation of the Merger, responsible executives of Intermedia have been provided

with copies of the Final Judgment and the Hold Separate Stipulation and Order and have

reviewed the material requirements of both documents. They have been advised and understand

that compliance with these legal obligations is mandatory and that violations carry possible legal

sanctions and will not be tolerated by the Company. The responsible executives also have been

directed to raise promptly any compliance questions that they might have with the undersigned.

As previously discussed in my Declarations dated April 9, 2001 and May 7, 2001, several of

DC01/MOREG/136178.6

MCIWC032290

**A 04212**

these executives have informed me of certain measures implemented since late last year in order to ensure that the Intermedia Assets remain an economically viable and ongoing competitive business concern. The executives informed me that, in order to maximize sales and revenues, as well as preserve the Intermedia Assets for prospective acquirers, Intermedia has postponed some planned projects or network expansions and canceled certain others. The current conditions of the markets in which the Intermedia Assets compete have also made it difficult for Intermedia to maintain staff, especially sales force, at end of year 2000 or at budgeted 2001 levels; the Intermedia Assets have experienced reductions against both budgeted and actual sales forces and in advertising dollars. Taken as a whole, however, in light of the current state of the markets in which the Intermedia Assets compete, Intermedia has taken all reasonable steps necessary to maintain the sales and revenues of the services provided by the Intermedia Assets and to preserve, maintain, and operate the Intermedia Assets as an ongoing, economically viable competitive business. On April 26, 2001 Intermedia provided a written response to the Department's request for further information regarding these matters. There have been and will continue to be periodic communications to all concerned, reminding them of their compliance obligations.

4.    Pursuant to Section V.B.4 of the Hold Separate Stipulation and Order, on October 31, 2000, WorldCom executed a guaranty pursuant to which WorldCom provided a guarantee for a $350 million credit facility made available to Intermedia by Bank of America and Bank of New York. In addition, WorldCom and Intermedia entered into a Note Purchase Agreement dated October 31, 2000, pursuant to which WorldCom provided a $225 million subordinated debt facility to Intermedia.

DC01/MOREG/136178.6                                    2

MCIWC032291

A 04213

    5.    The Company believes that the foregoing actions will assure continuing compliance with WorldCom's obligations under the proposed Final Judgment and Hold Separate Stipulation and Order. As noted, compliance will continue to be monitored periodically throughout the divestiture period. If potential problems or issues are identified as a result of such oversight, adjustments promptly will be made and the Department will be informed. The Company likewise will timely notify the Department of any additions or modifications to this compliance plan as may be appropriate following consummation of the Merger pending ordered divestitures.

    I declare under penalty that the foregoing is true and correct.

Patricia A. Kurlin
Senior Vice President & General Counsel
Intermedia Communications Inc.

Executed: June 6, 2001

DC01/MOREG/13617&6        3

MCIWC032292

A 04214

## DECLARATION IN THE MATTER OF
## WORLDCOM, INC./INTERMEDIA COMMUNICATIONS INC

1.    I, the undersigned, Patricia A. Kurlin, Senior Vice President & General Counsel for Intermedia Communications Inc. ("Intermedia" or "the Company"), submit this declaration pursuant to Section IX.A. of the proposed Final Judgment filed on November 17, 2000, in United States District Court for the District of Columbia in United States v. WorldCom, Inc. and Intermedia Communications, Inc., Civ. No. 00-2789 ("Final Judgment"). The following information describes compliance by Intermedia with Section IV of the proposed Final Judgment. Except as otherwise indicated, I have personal knowledge of the facts set forth herein, or those facts have been gathered under my supervision and I believe that they are accurate. Capitalized terms used in this Declaration have the same meaning as set forth in Section II of the proposed Final Judgment.

2.    I understand, from reviewing prior declarations submitted by WorldCom officials, that WorldCom has retained Chase Securities, Inc., 27 Park Avenue, New York, NY 10017 (Contact: Camilla Rab., Vice President), to establish an auction process for the sale of the Intermedia assets. According to prior declarations filed by WorldCom officials, Chase has contacted persons who have previously expressed an interest in acquiring the Intermedia Assets (or any portion thereof) as well as other potential buyers. For the current status of the auction process, please refer to declarations to be provided by Ms. Mary L. Brown, Vice President, Federal Law and Public Policy of WorldCom, Inc.

I declare under penalty that the foregoing is true and correct.

Patricia A. Kurlin
Senior Vice President & General Counsel
Intermedia Communications Inc.

Executed:  June 6, 2001

DC01/MOREG/136179 6

MCIWC032293

A 04215

# EXHIBIT 13

A 04216

STINSON MORRISON HECKER LLP

Robert L. Driscoll, Esq.
Allison M. Murdock, Esq.
Mark M. Iba, Esq.
1201 Walnut Street
Kansas City, MO 64106
Telephone:     (816) 842-8600
Facsimile:     (816) 691-3495
Attorneys for Reorganized Debtors

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

|  |  |  |
|---|---|---|
| In re | : | |
| | : | Chapter 11 Case No. 02-13533 (AJG) |
| WORLDCOM, INC., *et al.*, | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |

-------------------------------------------------------x

## DEBTORS' RESPONSE TO CLAIMANT'S
## QUESTIONS REGARDING "LITIGATION HOLD"

Debtors MCI WorldCom Communications, Inc. ("MCI") and Intermedia

Communications, Inc. ("Intermedia") (collectively "Debtors") provide the following responses to

the questions regarding "litigation hold" served by Claimant Parus Holdings, Inc. successor-by-

merger to EffectNet, Inc. and EffectNet, LLC ("Claimant") on November 21, 2006.[1]

### General Objection

Claimant's questions use the phrase "litigation hold" without explanation or definition. If

Claimant intends "litigation hold" to be defined as set forth in Claimant's Second Request for

---

[1] Claimant served these questions after Debtors objected to subpoenas served on their former in-house litigation counsel Jeffrey Hsu and David Wachen and to a notice of deposition served on Debtors pursuant to Fed. R. Civ. P. 30(b)(6) because they sought information and documents protected from disclosure by the attorney-client privilege and/or litigation work product immunity.

Production of Documents served on October 20, 2006, Debtors object to that definition. In its

second document request, Claimant defines "litigation hold" to mean "an express written or oral

instruction, order or directive to preserve and/or maintain documents." This definition fails to

acknowledge or include the concept that a duty to preserve documents does not arise until the

party is put on notice that litigation is reasonably anticipated. Even then, the obligation is limited

to a duty to preserve documents that are relevant to the anticipated claim. The existence of a

duty to take affirmative steps to preserve documents, as well as the scope and extent of any such

duty, must also be evaluated in the context of the Debtors' bankruptcy filing in which over

60,000 claims were asserted. Thus, Debtors object to Claimant's definition of "litigation hold"

because it improperly attempts to impose or assume a legal obligation to preserve certain

documents at times when no such obligation existed.

## Specific Objections and Responses

Subject to and without waiving the foregoing general objection, Debtors respond to

Claimant's questions as follows:

**Question 1.    On what date did Intermedia and MCI believe that a possible threat of
litigation with EffectNet/Parus existed.**

**Answer.**                 Regarding the breach of contract claim, Debtors have not identified the

date on which they first believed that a possible or likely threat of litigation

existed regarding Claimant's claim that Intermedia failed to make reconciliation

payments in breach of the Unified Communications Services General Agreement

dated November 20, 2000 between Intermedia and EffectNet LLC ("UC

Contract"). Although Claimant did not bill Intermedia for reconciliation

payments under the UC Contract until February 2002, during March 2002,

2

A 04218

Claimant's General Counsel advised that if Intermedia did not make those reconciliation payments on or before April 12, 2002, the UC Contract would terminate on that date pursuant to §5.2 of the contract and that Claimant "may claim damages for all amounts due pursuant to the [UC Contract]." Intermedia did not make the reconciliation payments that Claimant claimed were due. Nevertheless, Claimant did not assert any claim for breach of contract until after WorldCom had instituted bankruptcy proceedings on July 21, 2002.

Regarding consequential damage and tort claims, Debtors had no reason to believe that there was a threat or likelihood of litigation before Claimant actually asserted such claims. This is true for three reasons. First, under section §11 of the UC Contract, the parties (which include Parus Holdings, Inc. and WorldCom as successors by merger to EffectNet LLC and Intermedia, respectively) may not assert any claims for consequential damages against each other. Second, WorldCom and Intermedia were prohibited from engaging in the type of business activities that Claimant has alleged as the bases for its consequential damage and tort claims. Specifically, from and after November 17, 2000, WorldCom and Intermedia were subject to a Hold Separate Stipulation and Order entered into with the United States Department of Justice and filed with the federal court requiring WorldCom and Intermedia to maintain the business operations of Intermedia (including its contractual relationships) separate from and uninfluenced by WorldCom. See Hold Separate Stipulation and Order dated November 17, 2000, USA v. WorldCom, Inc. & Intermedia Communications, Inc., D.D.C., Case No. 1:00CV02789 (RWR) (attached as Exhibit A). Third,

3

**A 04219**

Intermedia was a subsidiary of WorldCom on and after July 1, 2001. As a matter of black letter law, a subsidiary cannot conspire with its parent, nor does a claim lie for a parent interfering with its contracts, which are what Claimant has alleged. Debtors did not know (nor did they have any reason to know) that the Claimant was going to make such allegations until after Claimant filed its claim in the bankruptcy proceeding. Prior to reviewing Claimant's filing – which was one of over 60,000 claims filed in WorldCom's bankruptcy proceeding – Debtors believed that Claimant was seeking only unpaid reconciliation payments under the UC Contract raised in 2002.

**Question 2.** **On what date did Intermedia and MCI determine that litigation with EffectNet/Parus was likely to occur or may occur.**

**Answer.** See Debtor's response to Question No. 1.

**Question 3.** **On what date Intermedia and MCI should have known that there was a possible threat of litigation with EffectNet/Parus.**

**Answer.** Debtors object to this request as seeking a legal conclusion, not facts. Without waiving this objection, see Debtors' response to Question No. 1.

**Question 4.** **Which persons at Intermedia and MCI identified the threat or possibility of litigation with EffectNet/Parus and how was such threat or possibility determined.**

**Answer.** Debtors' in-house counsel identified the threat or possibility of litigation with Claimant concerning an alleged breach of contract after Intermedia failed to make certain reconciliation payments on or before April 12, 2002 based on correspondence from Claimant's General Counsel stating (1) that the UC Contract

4

A 04220

would be terminated as of April 12, 2002 pursuant to §5.2 of that contract if Intermedia did not make certain payments by that date and (2) that Claimant "may claim damages for all amounts due pursuant to the [UC Contract]" if Intermedia did not make those payments.

Debtors did not identify a threat or possibility of litigation with Claimant concerning any consequential damages or tort claims until Claimant actually asserted those claims in WorldCom's bankruptcy proceeding. Debtors' counsel determined that such claims had been made by evaluating Claimant's proofs of claim among the over 60,000 of proofs of claim filed in the bankruptcy proceeding.

**Question 5.** **Was the possible threat of litigation with EffectNet/Parus identified as part of the due diligence related to the MCI/Intermedia merger. If yes, on what date, by whom, and how so.**

**Answer.** For purposes of responding to this question, Debtors assume that the phrase "the due diligence related to the MCI/Intermedia merger" means during the time preceding the July 1, 2001 effective date of the MCI/Intermedia merger during which the parties were undertaking pre-merger due diligence. Based on that assumption, as of July 1, 2001, Intermedia had not yet failed to make the reconciliation payments which underlie Claimant's breach of contract claim, and Claimant had not yet made known its consequential damage or tort claims. In addition, all of the acts that Claimant has advanced to support its consequential damage and tort claims took place after July 1, 2001. Accordingly, Debtors do not believe that a possible threat of litigation was identified, nor could have been

5

A 04221

identified, during the due diligence period regarding either the breach of contract

or consequential damage and tort claims, both of which were only asserted by

Claimant after July 1, 2001. Please also see Debtors' responses to Question Nos.

1 and 4.

**Question 6.** **On what date(s) did Intermedia and MCI implement a litigation hold**
**relating to EffectNet/Parus.**

**Answer.**         Subject to and without waiving the general objection set forth above

regarding Claimant's use of the phrase "litigation hold," Debtors respond to

Question No. 6 as follows: Concerning Claimant's breach of contract claims,

after being advised by Claimant that the UC Contract would terminate on April

12, 2002 and that Claimant "may claim damages for all amounts due pursuant to

the [UC Contract]" unless Intermedia made certain payments under that contract

on or before April 12, 2002, coupled with the fact that Intermedia did not make

the demanded payments, Debtors' in-house counsel  preserved (1) correspondence

from Claimant's General Counsel advising of the possible contract claim, and

(2) the UC Contract itself. Further, pursuant to a Stipulation and Order entered on

July 1, 2002 in the matter of S.E.C. v. WorldCom, Inc., Case No. 1:02-cv-04963-

JSR (the "Order") (attached as Exhibit B), "WorldCom, its officers, agents,

accountants, employees, and attorneys, and those persons in active concert or

participation with them" preserved all documents "relating to, referring to or

concerning any aspect of WorldCom's financial reporting obligations, public

disclosures required by the federal securities laws, or any accounting matters

relating to WorldCom...." To comply with this Order, WorldCom and its

6

**A 04222**

affiliates preserved all daily backup tapes of their email systems (including Intermedia's email system), as well as non-email electronic data and paper documents encompassed by the Order.

**Question 7.** **How was the litigation hold regarding EffectNet/Parus implemented.  More specifically, (a) who initiated the litigation hold; (b) the names of all persons involved in implementing the litigation hold and their respective responsibilities; (c) how was the litigation hold communicated to persons at MCI and Intermedia; (c) [sic] what was the scope of the documents subject to the litigation hold (i.e., all documents relating to EffectNet or Parus or a subset of such information); (d) did Intermedia and MCI identify or compile a list of persons who had information that would be need to be preserved pursuant to the litigation hold and if yes, where is that list presently located; (e) which persons at MCI and Intermedia were instructed to preserve documents (both electronic and hard copy) relating to EffectNet/Parus; (f) whether such persons complied with the litigation hold; (g) how such persons complied with the litigation hold; (h) whether documents subject to the litigation hold were ever destroyed, purged, or rendered inaccessible and why such documents were destroyed, purged, or rendered inaccessible; and (i) whether any outside third parties were used to assist with implementing the litigation hold and if yes, who.**

**Answer.**         Subject to and without waiving the general objection set forth above regarding Claimant's use of the phrase "litigation hold," Debtors respond to Question No. 7 as follows:

7

**A 04223**

(a) The Honorable Jed S. Rakoff entered the Stipulation and Order in the matter of S.E.C. v. WorldCom, Inc., Case No. 1:02-cv-04963-JSR, on July 1, 2002, directing "WorldCom, its officers, agents, accountants, employees, and attorneys, and those persons in active concert or participation with them" to preserve all documents "relating to, referring to or concerning any aspect of WorldCom's financial reporting obligations, public disclosures required by the federal securities laws, or any accounting matters relating to WorldCom...." To comply with this Order, WorldCom and its affiliates preserved all daily backup tapes of their email systems (including Intermedia's email system). Debtors also preserved non-email electronic data encompassed by the Order, as subsequently modified or varied by agreement of the parties with regard to such data. Debtors also preserved paper documents encompassed by the Order.

In-house counsel for MCI preserved (1) correspondence from Claimant's General Counsel advising of the possible contract claim, and (2) the UC Contract. The people who would have participated in preserving these documents included in-house counsel Brett Bacon, Jeffrey Hsu, and the in-house counsel who succeeded them.

David Wachen, in-house counsel for MCI, and Sharon Stolte, Donald Ramsay, and Lawrence Bigus, attorneys with Stinson Morrison Hecker LLP, were responsible for attempting to locate documents related to the claims asserted by Claimant in WorldCom's bankruptcy proceeding, the UC Contract, the relationship between Claimant and Debtors, and the relationship between Webley Systems, Inc. ("Webley") and Debtors with regard to the September 14, 2001

8

A 04224

Master Agreement for Software Licenses ("MASL"). These individuals also were responsible for directing that such documents be preserved for purposes of litigating Claimant's claims.

(b) "WorldCom, its officers, agents, accountants, employees, and attorneys, and those persons in active concert or participation with them" were responsible for implementing the preservation of the documents identified in Judge Rakoff's July 1, 2002 Order. In addition, Jeffrey Jacobs, Associate Litigation Counsel for MCI, was responsible for distributing Judge Rakoff's July 1, 2002 Order to WorldCom's information technology employees. Julio Valdes, Bryan Miller and Joseph Falleur and employees in their respective IT-related departments were responsible for preserving the daily backup tapes of WorldCom and its affiliates' email systems (including Intermedia's email system) in response to Judge Rakoff's July 1, 2002 Order.

In-house counsel for MCI preserved (1) correspondence from Claimant's General Counsel advising of the possible contract claim, and (2) the UC Contract. The people who would have participated in preserving these documents included in-house counsel Brett Bacon, Jeffrey Hsu, and the in-house counsel who succeeded them.

Philip Hasselvander, in the Debtors' Records Information and Management department, preserved the boxes of stored paper documents of MCI and Intermedia that might relate to Claimant's claims, the UC Contract, the relationship between Claimant and Debtors, and the relationship between Webley and Debtors by delivering to counsel all boxes that counsel requested. Claimant

9

A 04225

has been provided with copies of the indices of the stored boxes of Debtors'
documents related to Intermedia and with a list of the boxes from those indices
that Debtors' counsel reviewed.

Julio Valdes testified at his deposition that, in addition to preserving email
backup tapes as described above, he also preserved the Intermedia backup tapes
for the time period identified by Debtors' counsel by delivering such backup tapes
to Kroll Ontrack, which is assisting Debtors with their electronic data. The
relevant time period given to Mr. Valdes by Debtors' counsel was that set forth by
Claimant in its counsel's October 24, 2005 letter to Debtors' counsel.

Bryan Miller testified in his deposition that, in addition to preserving
email backup tapes as described above, he also preserved MCI's POP email
backup tapes for the time period identified by Debtors' counsel by delivering such
backup tapes to Kroll Ontrack. The relevant time period given to Mr. Miller by
Debtors' counsel was that set forth by Claimant in its counsel's October 24, 2005
letter to Debtors' counsel. Mr. Miller also preserved the earliest backup tapes
available for MCI's Exchange email system by delivering such backup tapes to
Kroll Ontrack. Mr. Miller also preserved the backup tapes for MCI's email
system known as MCI Mail, and those tapes remain in the possession of Debtors.

Kenneth Croslin testified at his deposition that he preserved the desktop
data for the persons identified by Debtors' counsel. The persons identified by
Debtors' counsel were certain of the custodians identified by Claimant in its
counsel's October 24, 2005 letter to Debtors' counsel.

10

**A 04226**

Of the remaining persons identified by Debtors' counsel who might have documents related to Claimant's claims, the UC Contract, the relationship between Claimant and Debtors, and the relationship between Webley and Debtors with regard to the MASL, only two had any such documents: Teresa Hastings and Steve Hooper. These persons preserved their documents by promptly turning them over to Debtors' counsel.

(c) In-house and outside counsel communicated orally and in writing with regard to preserving documents pursuant to Judge Rakoff's July 1, 2002 Order and to preserving documents that might relate to Claimant's claims, the UC Contract, the relationship between Claimant and Debtors, and the relationship between Webley and Debtors.

(c) [sic] Judge Rakoff's July 1, 2002 Order directed the preservation of all documents relating to, referring to or concerning any aspect of WorldCom's financial reporting obligations, public disclosures required by the federal securities laws, or any accounting matters relating to WorldCom. To comply with this Order, WorldCom and its affiliates preserved all daily backup tapes of their email systems (including Intermedia's email system). Debtors also preserved non-email electronic data encompassed by the Order, as subsequently modified or varied by agreement of the parties with regard to such data. Debtors also preserved paper documents encompassed by the Order.

In-house and outside counsel further requested that all documents that might relate to Claimant's claims, the UC Contract, the relationship between

11

A 04227

Claimant and Debtors, and the relationship between Webley and Debtors be preserved.

Also preserved are: Intermedia backup tapes for the relevant time period set forth by Claimant in its counsel's October 24, 2005 letter to Debtors' counsel; MCI's POP email backup tapes for the relevant time period set forth by Claimant in its counsel's October 24, 2005 letter to Debtors' counsel; the earliest backup tapes available for MCI's Exchange email; the backup tapes for MCI's email system known as MCI Mail; and desktop data for certain custodians identified by Claimant in its counsel's October 24, 2005 letter to Debtors' counsel.

(d) Debtors' in-house and outside counsel identified current and former Intermedia and MCI employees who might have documents that might relate to Claimant's claims, the UC Contract, the relationship between Claimant and Debtors, and the relationship between Webley and Debtors, and information regarding other persons who might have such documents. These persons were contacted (to the extent they could be found); as more information became known, additional persons were contacted. There is no single "list" of persons contacted; however, Debtors have identified the persons contacted in response to subpart (e) below.

(e) Debtors' in-house and outside counsel contacted the following current and former Intermedia and MCI employees to determine if they had documents regarding Claimant's claims, the UC Contract, the relationship between Claimant and Debtors, and the relationship between Webley and Debtors, and to direct that any such documents be preserved:

12

A 04228

Maria Ayala – Ms. Ayala was an MCI employee when she was contacted. Ms. Ayala was involved with the collection of Webley's purchase of wholesale telecommunications services from WorldCom ("Webley's wholesale account"), but she had no connection to the MASL or Claimant. Ms. Ayala did not have and would not have had any potentially relevant documents.

Roger Beckman – Mr. Beckman was an MCI employee in the Records and Information Management ("RIM") department when he was contacted. Mr. Beckman assisted Debtors' counsel in finding indices for Debtors' stored paper documents.

Richard Black – Mr. Black was an MCI employee when he was contacted. Prior to that, Mr. Black was employed by Intermedia. Mr. Black had no responsive documents.

Fred Briggs – Mr. Briggs was an MCI employee when he was contacted. Mr. Briggs had no connection to the MASL or Claimant. Mr. Briggs did not have and would not have had any potentially relevant documents.

Thomas Brand – Mr. Brand was an MCI employee when he was contacted. Mr. Brand had no connection to the MASL or Claimant. Mr. Brand did not have and would not have had any potentially relevant documents.

Jennifer Carroll – Ms. Carroll was an MCI employee when she was contacted. Ms. Carroll had no connection to the MASL or Claimant. Ms. Carroll did not have and would not have had any potentially relevant documents.

Peter Cassidy – Mr. Cassidy was an MCI employee when he was contacted. Mr. Cassidy was involved with Webley's wholesale account, but had

13

A 04229

no connection to the MASL or Claimant. Mr. Cassidy did not have and would not have had any potentially relevant documents.

Kenneth Croslin – Claimant has deposed Mr. Croslin.

Shirley ("Beth") Denham-Dale – Ms. Denham-Dale was an MCI employee when she was contacted. She was involved with Webley's wholesale account. Ms. Denham-Dale did not have and would not have had any potentially relevant documents.

Pamela F. Dunnam – Ms. Dunnam was an MCI employee when she was contacted. Ms. Dunnam did not have and would not have had any potentially relevant documents.

Ralph Dyer – Mr. Dyer was a former Intermedia employee when he was contacted. Mr. Dyer ceased working for Intermedia in September 2001. Mr. Dyer had no responsive documents.

Joseph Falleur – Claimant has deposed Mr. Falleur.

James Faust – Mr. Faust was a former Intermedia employee when he was contacted. Mr. Faust ceased working for Intermedia in October 2001. Mr. Faust had no responsive documents.

Donald Fergus – Mr. Fergus was a former Intermedia employee when he was contacted. Mr. Fergus ceased working for Intermedia in December 2001. Mr. Fergus had no responsive documents.

Phil Hasselvander – Mr. Hasselvander was an MCI employee in the RIM department when he was contacted. Mr. Hasselvander assisted Debtors' counsel with the search for Debtors' stored paper documents.

14

A 04230

Teresa Hastings – Ms. Hastings was an MCI employee when she was contacted. Ms. Hastings provided Debtors' counsel documents related to the MASL.

Steve Hooper – Mr. Hooper was an MCI employee when he was contacted. Mr. Hooper provided Debtors' counsel with documents related to the MASL.

Mandy Johnson – Ms. Johnson was an MCI employee when she was contacted. Ms. Johnson did not have and would not have had any potentially relevant documents.

Susan Kennedy – Ms. Kennedy was an MCI employee when she was contacted. Ms. Kennedy was involved with Webley's wholesale account, but she had no connection to the MASL or Claimant. Ms. Kennedy did not have and would not have had any potentially relevant documents.

Mary Kilmartin – Ms. Kilmartin was an MCI employee when she was contacted. Ms. Kilmartin was involved with Webley's wholesale account, but she had no connection to the MASL or Claimant. Ms. Kilmartin did not have and would not have had any potentially relevant documents.

Patricia Kurlin – Ms. Kurlin was a former Intermedia employee when she was contacted. Ms. Kurlin ceased working for Intermedia in August 2001. Ms. Kurlin had no responsive documents.

James LaMantia – Claimant has deposed Mr. LaMantia.

15

A 04231

Mark Mancini – Mr. Mancini was an MCI employee when he was contacted. Mr. Mancini assisted Debtors' counsel in determining the appropriate information technology personnel to assist them in locating electronic data.

Cheryl Mellon – Ms. Mellon was a former Intermedia employee when she was contacted. Ms. Mellon ceased working for Intermedia in August 2002. Debtors' initial attempts to locate Ms. Mellon were unsuccessful. At the time Ms. Mellon was located and contacted, she did not have any potentially relevant documents. She believes that she may have downloaded data onto a CD when she left Intermedia but she cannot locate the CD.

Bryan Miller – Claimant already has deposed Mr. Miller.

Carleen Mitchell – Ms. Mitchell was an MCI employee when she was contacted. Ms. Mitchell was involved with Webley's wholesale account, but she had no connection to the MASL or Claimant. Ms. Mitchell did not have and would not have had any potentially relevant documents.

Joyce Moultry – Ms. Moultry was an MCI employee in the RIM department when she was contacted. Ms. Moultry assisted in providing information to Debtors' counsel regarding Debtors' stored documents.

Margorie Polgar – Ms. Polgar was an MCI employee when she was contacted. Ms. Polgar did not have and would not have had any potentially relevant documents.

Michael Randels – Mr. Randels was an MCI employee when he was contacted. Mr. Randels formerly worked for Intermedia. Mr. Randels assisted Debtors' counsel in locating personnel records and information.

16

A 04232

Pam Rask – Ms. Rask was an MCI employee when she was contacted. Ms. Rask did not have and would not have had any potentially relevant documents.

James Renforth – Mr. Renforth was a former Intermedia employee when he was contacted. Claimant already has deposed Mr. Renforth.

Nasser Sheikh – Mr. Sheikh was an MCI employee when he was contacted. Mr. Sheikh was involved with Webley's wholesale account, but he had no connection to the MASL or Claimant. Mr. Sheikh did not have and would not have had any potentially relevant documents.

Joe Stephens – Mr. Stephens was an MCI employee in the RIM department when he was contacted. Mr. Stephens assisted Debtors' counsel with the search for Debtors' stored paper documents.

Linda "Diane" Stevens – Ms. Stevens was an MCI employee when she was contacted. Ms. Stevens was a former Intermedia employee. Ms. Stevens had no relevant documents.

Brenda Tate – Ms. Tate was an MCI employee in the RIM department when she was contacted. Ms. Tate assisted Debtors' counsel with the search for Debtors' stored paper documents.

Amy Taylor – Ms. Taylor was an MCI employee in the RIM department when she was contacted. Ms. Tate assisted Debtors' counsel with the search for Debtors' stored paper documents.

Julio Valdes – Claimant has deposed Mr. Valdes.

17

A 04233

Kathleen Victory – Ms. Victory was a former Intermedia employee when she was contacted. Ms. Victory ceased working for Intermedia in October 2001. Ms. Victory had no relevant documents.

Barry Zipp – Mr. Zipp was an MCI employee when he was contacted. Mr. Zipp had no relevant documents.

(f) It is Debtors understanding and belief that all persons identified above complied with Debtors' direction to locate and preserve documents regarding Claimant's claims, the UC Contract, the relationship between Claimant and Debtors, and the relationship between Webley and Debtors with regard to the MASL.

(g) To the extent persons identified above had documents regarding Claimant's claims, the UC Contract, the relationship between Claimant and Debtors and the relationship between Webley and Debtors with regard to the MASL, they gave those documents to Stinson Morrison Hecker LLP for review and preservation. Paper documents were delivered to Stinson Morrison Hecker LLP and electronic data was delivered to Stinson Morrison Hecker LLP or Kroll Ontrack. The backup tapes for MCI's email system known as MCI Mail remain in Debtors' possession.

(h) Debtors are not aware of, and do not believe that, any documents counsel requested to be preserved regarding Claimant's claims, the UC Contract, the relationship between Claimant and Debtors and the relationship between Webley and Debtors with regard to the MASL were ever destroyed, purged, or rendered inaccessible. As Julio Valdes testified during his deposition, searches of

18

A 04234

the active Intermedia servers using the search terms identified by Claimant in its
counsel's October 2005 letter were unsuccessful because of the volume of data
contained on those servers.

(i) Debtors' outside counsel and Kroll Ontrack have assisted Debtors in
implementing the preservation of documents regarding Claimant's claims, the UC
Contract, the relationship between Claimant and Debtors, and the relationship
between Webley and Debtors with regard to the MASL. Electronic Data Systems,
Inc. was responsible for maintaining MCI's POP email system. At counsel's
request, EDS provided to Kroll Ontrack the backup tapes for MCI's POP email
system for the relevant time period as set forth by Claimant in its counsel's
October 24, 2005 letter to Debtors' counsel.

**Question 8.**  **How did Intermedia and MCI monitor compliance with the litigation hold.
Did Intermedia and MCI request that persons respond or acknowledge
either electronically or by hard copy documents that they would agree to
abide by the litigation hold. If no, why not. If acknowledgments were
requested, where are the acknowledgements by such persons presently
located.**

**Answer.**  Subject to and without waiving the general objection set forth above
regarding Claimant's use of the phrase "litigation hold," Debtors respond to
Question No. 8 as follows:

Debtors' monitoring of preservation of documents related to Claimant's
claims, the UC Contract, the relationship between Claimant and Debtors, and the
relationship between Webley and Debtors with regard to the MASL was

19

A 04235

accomplished by delivering the paper documents to Stinson Morrison Hecker LLP and the electronic documents to Stinson Morrison Hecker LLP or Kroll Ontrack. Also, Debtors are retaining the backup tapes for MCI's email system known as MCI Mail.

**Question 9**    **How did Intermedia and MCI ensure compliance with the litigation hold. How did Intermedia and MCI monitor compliance with the litigation hold. Who was in charge of implementing the litigation hold, who was in charge of monitoring the litigation hold, who was in charge of taking possession or custody of documents subject to the litigation hold.**

**Answer.**    Subject to and without waiving the general objection set forth above regarding Claimant's use of the phrase "litigation hold," Debtors respond to Question No. 9 as follows:

Debtors ensured preservation of documents related to Claimant's claims, the UC Contract, the relationship between Claimant and Debtors, and the relationship between Webley and Debtors with regard to the MASL by delivering the paper documents to Stinson Morrison Hecker LLP and the electronic documents to Stinson Morrison Hecker LLP or Kroll Ontrack. Debtors further have ensured preservation of the backup tapes for MCI's email system known as MCI Mail. The persons responsible for implementing the preservation of such documents already have been identified in response to Question No. 7. Please also refer to Debtors' answer to Question No. 8, which Debtors incorporate here.

**Question 10**    **How long was the litigation hold in effect. Did Intermedia and MCI send out reminders of the litigation hold. If yes, on what dates were such**

20

**reminders transmitted, to whom were they transmitted, and how were such reminders transmitted. If such reminders were not transmitted, why not**.

**Answer.**        Subject to and without waiving the general objection set forth above regarding Claimant's use of the phrase "litigation hold," Debtors respond to Question No. 10 as follows:

All documents regarding Claimant's claims, the UC Contract, the relationship between Claimant and Debtors and the relationship between Webley and Debtors with regard to the MASL were collected and continue to be preserved as set forth in Debtors' response to Question No. 8 above and to Question No. 12 below, both of which Debtors incorporate here.

**Question 11**    **Was the litigation hold implemented by Intermedia and MCI as to EffectNet/Parus in conformity with MCI and Intermedia's policies (whether written or oral) for litigation holds. If yes, how so. If no, how did the EffectNet/Parus litigation hold differ from Intermedia and MCI's policies**.

**Answer.**        Yes. Subject to and without waiving the general objection set forth above regarding Claimant's use of the phrase "litigation hold," Debtors respond to Question No. 11 as follows:

The procedures used by in-house and outside counsel in attempting to locate and preserve documents regarding Claimant's claims, the UC Contract, the relationship between Claimant and Debtors, and the relationship between Webley and Debtors with regard to the MASL were consistent with the way documents were located and retained for other litigation matters during the time period in question. Moreover, the procedures used were reasonable and appropriate given

21

A 04237

that, at the time, Debtors' and their counsel were investigating and defending over 60,000 claims filed in the bankruptcy proceeding. Also, in the period after WorldCom declared bankruptcy, there were numerous personnel changes including changes in MCI's in-house counsel. As a result, by the time Claimant filed its claim most of the custodians of potentially responsive materials, or potential witnesses, were no longer employed by Debtors.

**Question 12** **What was done with documents that were subject to the litigation hold and where are those documents presently located.**

**Answer.** Subject to and without waiving the general objection set forth above regarding Claimant's use of the phrase "litigation hold," Debtors respond to Question No. 12 as follows:

All paper documents that Debtors were able to locate regarding Claimant's claims, the UC Contract, the relationship between Claimant and Debtors, and the relationship between Webley and Debtors with regard to the MASL are at the offices of Stinson Morrison Hecker LLP or at an Iron Mountain storage facility in Kansas City, Missouri, as are all of the boxes of documents identified on the paper documents indices (which have been provided to Claimant) that were reviewed by Debtors' counsel. The remaining boxes of documents identified on the indices are maintained at the storage facility identified on the indices.

All paper documents responsive to Claimant's discovery requests have been produced twice to Claimant. The initial production was made to Kelley Drye, LLP, Claimant's prior counsel. At the request of Claimant's current

22

counsel, Foley & Lardner, LLP, such documents were made available again to Claimant in September and October 2006.

All electronic documents that Debtors have located in the electronic discovery completed to date regarding Claimant's claims, the UC Contract, the relationship between Claimant and Debtors, and the relationship between Webley and Debtors with regard to the MASL, as well as all Intermedia backup tapes and MCI POP email tapes for the relevant time period identified by Claimant in its counsel's October 24, 2005 letter to Debtors' counsel, are maintained by Kroll Ontrack. All Intermedia and MCI backup tapes outside the relevant time period identified in Claimant's October 24, 2005 letter continue to be maintained by Debtors. The backup tapes for MCI's email system known as MCI Mail are maintained by Debtors.

The electronic documents responsive to Claimant's document requests that were from accessible electronic data and the responsive electronic documents located on the backup tapes Claimant selected for sampling have been produced to Claimant twice. The initial production was made to Kelley Drye, LLP, Claimant's prior counsel. At the request of Claimant's current counsel, Foley & Lardner, LLP, such documents were made available again to Claimant in September and October 2006.

**Question 13    Did outside counsel apprise Intermedia and MCI of the need for a litigation hold. If yes, (a) when was Intermedia and MCI notified, (b) who notified Intermedia and MCI, (c) when after notification by outside counsel did Intermedia and MCI implement the litigation hold.**

23

**Answer.**          Subject to the general objection set forth above regarding Claimant's use

of the phrase "litigation hold," Debtors respond to Question 13 as follows:

Debtors object to this request as seeking information that is protected from

disclosure pursuant to the attorney-client privilege and/or litigation work product

immunity.  Further, the information requested is not relevant to the issue of

whether documents were properly preserved by Debtors.  Subject to and without

waiving these objections, however, Debtors state that, as noted above, both in-

house counsel and outside counsel understood the need to locate and preserve

documents and, in most instances, worked together with regard to the preservation

of documents related to Claimant's claims, the UC Contract, the relationship

between Claimant and Debtors and the relationship between Webley and Debtors

with regard to the MASL.


Respectfully submitted,

STINSON MORRISON HECKER LLP

By: _____

Robert L. Driscoll
Allison M. Murdock
Mark M. Iba
1201 Walnut Street, Suite 2900
Kansas City, MO 64106
(816) 842-8600 – Telephone
(816) 691-3495 – Facsimile

ATTORNEYS FOR REORGANIZED DEBTORS

24

A 04240

## Certificate of Service

I hereby certify that on this 19th day of December, 2006, I served a copy of the foregoing *via* United States mail, postage prepaid, directed to:

> Robert A. Scher
> Emily Sausen
> FOLEY & LARDNER LLP
> 90 Park Avenue
> New York, NY  10016

> Mark L. Prager
> William J. McKenna
> Jill L. Murch
> Joanne Lee
> FOLEY & LARDNER LLP
> 321 N. Clark Street, Suite 280
> Chicago, IL  60610

and a copy of the foregoing *via* electronic mail to Jill L Murch at jmurch@foley.com.

Attorney for Reorganized Debtors

25

A 04241

## **Verification**

I verify under penalty of perjury that I am the Associate General Counsel - Litigation and Regulatory for Verizon Business, that I have read Debtors' Response to Claimant's Questions Regarding "Litigation Hold," and that the responses are true to the best of my knowledge, information, and belief.

Mary L. Coyne

Dated: December _17_, 2006.

26

A 04242

# EXHIBIT 14

A 04243

UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

In re:                          ) CHAPTER 11

                                ) Jointly Administered

WORLDCOM, INC., et al.,         )

                                )

    Debtors.                    ) Case No. 02-13533 (AJG)

                                )

_____


        The Deposition of JULIO VALDES, taken before

Nancy B. Gialamas, C.S.R. and a Notary Public within

and for the State of Illinois, pursuant to the Federal

Bankruptcy Rules of Procedure, the Federal Rules of

Civil Procedure, and the Bankruptcy Rules for the

Southern District of New York, taken at 321 North

Clark Street, Suite 2800, Chicago, Illinois,

commencing at the hour of approximately 9:00 a.m. on

the 2nd day of November, 2006.

A 04244

1  tapes that would be in production or disposed of?
2    A.    No.
3    Q.    Do you know at the time if there were any
4  equipment or tapes or electronic media at that time
5  that was disposed of that related to Parus?
6          MS. MURDOCK:  Well, objection.  That
7  misstates his testimony that there was ever any backup
8  tapes or data disposed of.
9          MS. MURCH:  I can clarify that.  That's no
10  problem.
11  BY MS. MURCH:
12    Q.    As part of the data center, were there any
13  backup tapes?
14    A.    There was.
15    Q.    Okay.  And about how many?  Do you know?
16    A.    I would say several thousand.
17    Q.    Like 5,000, 2,000?
18    A.    I think there was 3,000, 3- or 4,000 tapes,
19  3,000 I think.
20    Q.    And what years did those cover?
21    A.    Oh, gosh, they probably went back to 1996
22  maybe all the way through 2003.
23    Q.    Okay.  And do any of those backup tapes,
24  would they have included, if you know, information
25  related to Parus?

18

1    A.    I don't know.
2    Q.    I'm going to back up a little bit.
3          Have you talked to anyone who's been deposed
4  in this litigation between Parus and the Debtors other
5  than Mr. Ramsay?
6    A.    No.
7    Q.    Have you reviewed any deposition transcripts,
8  other court transcripts, in connection with this
9  litigation?
10    A.    No.
11    Q.    Do you know who Parus is?
12    A.    Vaguely.
13    Q.    Okay.  What do you know about Parus briefly?
14    A.    Just what -- what's been discussed.
15    Q.    And discussed by whom?
16    A.    Myself and the attorneys.
17    Q.    Okay.  And when did you first learn of Parus?
18    A.    I want to say at the beginning of 2005.
19    Q.    And you learned about Parus through --
20    A.    First by one of the company attorneys, I
21  don't remember his name, but then later worked with
22  Don Ramsay.
23    Q.    And do you know anyone at Parus?
24    A.    No, ma'am.
25    Q.    In your own words, how would you describe the

19

1  nature of the dispute between Parus and the Debtors?
2          MS. MURDOCK:  Objection.  He's already stated
3  that he doesn't know anything other than what's been
4  discussed.
5  BY MS. MURCH:
6    Q.    You can answer.
7    A.    The only thing I understand is something
8  having to do with some contract that was between I
9  guess Parus and Intermedia for selling some type of
10  service and something happened to where I guess the
11  agreement was not met.
12    Q.    Did you know what was sold at all under that
13  agreement?
14    A.    No, ma'am.
15    Q.    Do you have any idea how much money is
16  involved in connection with the litigation?
17    A.    No, ma'am.
18    Q.    Do you know what the UC Agreement is or
19  Unified Communications Agreement is?
20    A.    No, ma'am.
21    Q.    Do you know what the Master Agreement for
22  Software License is or MASL is?
23    A.    No, ma'am.
24    Q.    As an employee of Intermedia -- you are an
25  employee of Intermedia, correct?

20

1    A.    I was an employee of Intermedia, yes.
2    Q.    Okay.  What do you know about a product
3  called Intermedia One?
4    A.    I don't.
5    Q.    Were you generally aware of the kind of
6  products that Intermedia sold?
7    A.    No, ma'am.
8          (Ms. Chung enters room.)
9  BY MS. MURCH:
10    Q.    Okay.  Mr. Valdes, let's just get a little
11  personal information about you.
12          What is your date of birth?
13    A.    1-30-72.
14    Q.    And what's your current home address?
15    A.    1252 Tuxford Drive, Brandon, Florida 33511.
16    Q.    So today's weather might be a little bit of a
17  shock to your system, I'm assuming?
18    A.    It is.
19    Q.    What's your educational background since you
20  graduated from high school?
21    A.    I have some college.
22    Q.    And where?
23    A.    Brandon HCC, Hillsboro Community College, and
24  Irwin Vocational Technical School.
25    Q.    And did you receive any degrees from either

21

A 04245

1  before the next backup occurred.

2      Q.    And were all backups -- I know you mentioned

3  monthly.  Were all backups done -- or, I'm sorry,

4  nightly?

5      A.    Backups were done nightly.  Not all backups

6  were full, though.

7      Q.    Which ones were full?

8      A.    The Exchange servers.

9      Q.    And were those the only ones that were not

10  full backups?

11      MS. MURDOCK:  That misstates his testimony.

12  BY MS. MURCH:

13      Q.    Okay.  I must have misunderstood.  Could you

14  restate that?

15      A.    The Exchange servers were full backsups every

16  night.  There were some servers that were full

17  backups.  It depended on the size of the backup

18  whether or not we did incrementals or fulls.

19      Q.    Okay.  So Exchanges were full backups.  Which

20  ones were not full backups?

21      A.    There were some based on the amount of size

22  and the amount of tape changes that helped us

23  determine whether we did incrementals or not.

24      Q.    How about the four systems that you talked

25  about, Tampa Data, Tampa e-mail?

                                          102

1      A.    Tampa Mail and Tampa Data were -- we did

2  incremental backups during the week, full backups on

3  the weekends.

4          Intramedia I believe was -- I believe full

5  backups were done on those nightly.  I'm not sure

6  about Intramedia.

7      Q.    Okay.  Would a backup tape -- and I apologize

8  for my ignorance.  But would a backup tape somehow

9  reflect whether or not Intermedia deleted documents

10  related to Parus?  Would you have any way of --

11      A.    I don't know.

12      Q.    -- piecing that together?

13      A.    No.

14      Q.    How would you compare Intermedia's electronic

15  document retention policies to that of Intermedia's

16  peers?

17      A.    Well, Intermedia didn't have a retention

18  policy.  We followed industry standards.

19      Q.    So there was no written policy?

20      A.    There was no written policy.

21      Q.    Was there kind of an oral policy where that

22  was communicated to --

23      A.    There was -- we had documented more for

24  training purposes for the people who would change

25  tapes as to how we went about changing our tapes and

                                          103

1  how our backups were performed, but it was not an

2  official policy.

3      Q.    Was an official policy ever discussed?

4      A.    For Intermedia?

5      Q.    Uh-huh.

6      A.    We had discussed about the creation of a

7  policy, but we never got around to it.

8      Q.    And when did you discuss that?

9      A.    Over time, over years.

10      Q.    What years?

11      A.    I would have to say over the years that I

12  worked there.  You know, a policy's great to have, but

13  if you're already following something, what value did

14  it bring.

15      Q.    And what were you following?  I know you said

16  industry standard.

17      A.    We were following industry standard, a

18  six-week tape rotation and incrementals during the

19  week, full-system backups on the weekends, saving off

20  monthly tapes, quarterly tapes, and yearly tapes.

21      Q.    Okay.  And what's the industry standard?

22  What industy are you talking about?

23      A.    Well, around that time we were subscribed to

24  Gartner Group, which is a consortium, and based on

25  what other companies were doing we were somewhat

                                          104

1  following the same.

2      Q.    And tell me a little bit about the

3  Gartner Group.

4      A.    Gartner Group, from what I understand, is a

5  consortium of different technology companies that come

6  together and share information about how their IT

7  systems work.

8      Q.    What other industry stands did you use with

9  respect to electronic document retention?  I know you

10  mentioned six-week tape rotation, monthly tapes were I

11  think you said tied off?  What did you say with

12  respect to those?

13      A.    Monthly tapes -- we saved off monthly tapes,

14  quarterly tapes and yearly tapes.

15      Q.    And what do you mean by saved off?

16      A.    What we would do as part of that six-week

17  rotation, when the end of the month came, whatever

18  date that fell on, let's just say that full backup

19  fell, we would pull that and that would be our monthly

20  tape.

21          You know, as we would go throughout the year,

22  you know, every three months that would be our

23  quarterly tape.  And at the end of the year we would

24  have -- the end of the year would be our yearly tape.

25      Q.    Okay.  So you could have information that was

                                          105

A 04246

1  one of them had I believe 20 gigs of space that was
2  needed for restores when we did do restores in the
3  past.
4      Q.  Okay.  Where were Intermedia's OST files
5  stored?
6      A.  At the Tampa Data Center on the Exchange
7  servers.
8      Q.  And how long were they kept?
9      A.  Rephrase the question.
10      Q.  How long were the OST files kept or preserved
11  or --
12      A.  Well, if I'm not mistaken, the OST files are
13  user -- the user mail repository from when you connect
14  to the Exchange server and download your mail.  So
15  that would -- in that case the OST files would be on
16  the users' desktops, not necessarily on the Exchange
17  servers.
18          Oh, gosh, see, that's what I don't remember.
19  I don't remember if OSTs are on the servers or not.  I
20  know that we had -- I don't remember.
21      Q.  Who would know?
22      A.  Probably Steve Romano.
23      Q.  Let me just talk a little bit about a PST
24  file so I understand it.  A PST file is moved off, for
25  example, an Exchange e-mail system and then stored on

114

1  on Tampa Mail?
2      A.  We wouldn't know about the user's hard drive.
3  We would only know if the file existed on Tampa Mail.
4      Q.  And did Intermedia have any policy with
5  respect to retention of PST files on users' hard
6  drives?
7      A.  No.  Not that I'm aware of, no.
8      Q.  So it's possible, then, that a PST file on a
9  person's hard drive could be lost forever?
10      A.  I don't know.  It's possible.
11      Q.  If the -- let me ask you this:  Let's say an
12  employee who had a PST file on his or her hard drive
13  was terminated or quit, what happens to that hard
14  drive?
15      A.  That system, that hard drive, that system,
16  would be turned back in to either their manager and
17  sent back in to the PC Support Team.  And depending on
18  the user, they would either -- they would either hold
19  that system, provide the files to their manager, or do
20  nothing with the system.
21      Q.  Now, when you say hold the system, what do
22  you mean?
23      A.  They would hold onto that desktop until a
24  later time, a month or two months, and then at that
25  point they would recycle it, use it for someone else.

116

1  an individual user's hard drive?  Is that accurate?
2      A.  It can be.
3      Q.  Okay.  How was it done with Intermedia?
4      A.  That same way, where it was stored on a
5  user's hard drive or stored in a file repository like
6  Tampa Mail, or, if the user chose, he could put it on
7  Tampa Data.
8      Q.  Did people actually choose to put it on
9  Tampa Data?
10      A.  In some cases, yes.
11      Q.  About how many people?
12      A.  I don't know.
13      Q.  Was it significant?  Was it 5, 100?
14      A.  From time to time we would find a PST file.
15  We would communicate with the customer that Tampa Mail
16  exists, and we would ask them to either move it
17  themselves or we would move it for them.
18      Q.  But it was done less than it was done -- let
19  me rephrase that.
20          Was it infrequently done where a PST file was
21  put on Tampa Data by a user?
22      A.  It was more user education.  So I would say
23  it happened from time to time.
24      Q.  How would you know whether a PST file for a
25  particular user was saved on the user's hard drive or

115

1      Q.  Okay.  So is it three options, either hold it
2  for an undetermined amount of time or they would take
3  files off of the computer and provide it to managers
4  or they would do nothing?  Is that --
5      A.  There might be one more option, and that was
6  I recall that there were some instances where they
7  would back up the entire user's system to a file
8  server and retain that data for a period of time.
9      Q.  And under what circumstances was that backup
10  done?
11      A.  It was based on the manager's request.
12      Q.  And was that done on a case-by-case basis?
13      A.  I believe so.
14      Q.  Was there any criteria for determining -- was
15  there any criteria a manager would use for determining
16  whether or not a user's individual hard drive should
17  be backed up?
18      A.  I don't know.
19      Q.  And how long would that e-mail -- or that
20  user's system be backed up for?  Is there a standard
21  period?
22      A.  No, I don't -- I don't know if they had a
23  standard or not.  I think it might have had to do with
24  space.
25      Q.  Okay.  Were hard drives -- where PST files

117

A 04247

1    A.    Correct.

2    Q.    Is that accurate?

3    A.    Correct.

4    Q.    Okay.  And at what point in time did

5    Intermedia lose the ability to search -- or to restore

6    that data?  Is that when the servers were

7    decommissioned?

8    A.    When servers are decommissioned, yes.

9    Q.    Let's talk about the decommissioning of the

10   servers.  Now, you had mentioned that Intermedia did

11   not have a formal document retention policy but used,

12   was it, Gartner policy?

13   A.    We used industry standards, just common

14   practice.

15   Q.    And the industry standards were based on

16   Gartner.  Was there anyone else?

17   A.    It's -- Gartner is, like I said, a consortium

18   of different companies and how they go about doing

19   things.

20   Q.    But I'm just trying to get an idea of what

21   the universe -- what in your mind is an industry

22   standard.

23   A.    Well, our industry standard is what we were

24   following, which is a six-week rotation.

25   Q.    Was there any other kind of standards,

146

1    though, because I know document retention policies can

2    be, you know, fairly substantial?  Besides a six-week

3    retention, was there anything else that you felt was

4    an industry norm?

5    A.    Monthly backups, the quarterlies, the

6    yearlies, sending them off site, which we did.

7    Q.    When you were trying to communicate to others

8    what the industry standard was, in addition to the

9    things you just mentioned, would you say anything else

10   or mention any other standards?

11   A.    I don't think so.

12   Q.    Now, in Paragraph 5, again, of your affidavit

13   you state:  In order to search information on the

14   backup tapes, the data must first be restored to a

15   server comparable to the server from which the data

16   was taken.

17         Now, are the two active Intermedia servers

18   you mentioned in Paragraph 2 incapable or not

19   comparable for purposes of the Intermedia backup

20   tapes?

21   A.    Do you mean as far as each other, being able

22   to restore them onto each other?

23   Q.    Uh-huh.

24   A.    There's a difference between the two.

25   Q.    Okay.  And they cannot be restored onto the

147

1    two active data tapes -- onto the two active servers?

2    A.    If you're asking if we could restore the old

3    tapes, the tapes we're identifying here, to the

4    systems that exist today, that is correct, we would

5    not be able to.

6    Q.    Okay.  Now, in Paragraph 6 of your affidavit,

7    Mr. Valdes, you stated that Mr. Ramsay requested that

8    you ran searches for key words and individual names on

9    the two remaining active servers.  When was this

10   request made?

11   A.    This was sometime in 2005.  I don't remember

12   exactly when.

13   Q.    And what did you say and what did he say to

14   you?

15         MS. MURDOCK:  Objection.  That's privileged.

16   I'm instructing him not answer.

17         If you would ask what he did, that's fine,

18   but he's not going to tell you what was said with

19   counsel.

20   BY MS. MURCH:

21   Q.    Okay.  What -- after your conversation with

22   Mr. Ramsay asking you to run searches, what did you

23   do?

24   A.    We took the key search words that he had

25   asked, and we attempted to run the searches on all of

148

1    the data on these servers.

2    Q.    And do you have a list of those key search

3    words?

4    A.    I probably do somewhere in e-mail.

5    Q.    Do you know if that list has been produced to

6    Parus?

7    A.    I don't know.

8    Q.    Do you recall some of the names or items

9    listed on that list of key search terms?

10   A.    I remember some of the key search terms were

11   very broad search terms like WorldCom, MCI,

12   Intermedia, and some names.  The only one I can really

13   recall off the top of my head is Claro Hernandez.

14   Q.    Now, so it was not you, though, who ran the

15   searches?  It was Mr. Romano?

16   A.    I tried -- I tried once and then I had Steve

17   try himself several times because we were asked to try

18   and run these searches I believe it was two times and

19   we tried several times ourselves and we were never

20   successful.

21   Q.    Okay.  So you tried once.  About how many

22   times did Mr. Romano try?

23   A.    I don't know.

24   Q.    Can you ballpark it, like ten?

25   A.    A couple of times.

149

A 04248

1     A.   When you say the protocol, what do you mean?
2     Q.   I mean, for example, how often are the tapes
3 rotated for MCI?
4     A.   Today the largest backup system that my team
5 supports is still following the mandate from DOJ to
6 not erase any tapes. We've not changed from that
7 because we knew that it would later be changing -- the
8 responsibility would be changing hands.
9     Q.   Okay. So when did this mandate come down
10 from the DOJ?
11     A.   I don't remember. I would have to say 2003
12 maybe.
13     Q.   And what was the purpose or why was this
14 mandated?
15     A.   I believe it had to do with the bankruptcy.
16     Q.   Okay. And so all backup tapes have been
17 preserved since then?
18     A.   For that big backup system, yes. There --
19     Q.   Now -- go ahead.
20     A.   There's other smaller backup systems that we
21 have changed.
22     Q.   Okay. When you say the big backup system,
23 what is that?
24     A.   It is a backup system that we have that over
25 the network currently backs up about 400 or so

218

1 servers.
2     Q.   And which are the smaller ones that have been
3 changed?
4     A.   More individualized -- the departmental
5 servers that we've inherited that have backups.
6     Q.   And do you know when those other servers were
7 changed?
8     A.   Over time after we were told that we didn't
9 have to follow the seven-year no-erase policy.
10     Q.   Tell me a little bit about the seven-year
11 no-erase policy. What is that?
12     A.   We were told that after the bankruptcy that
13 we were not allowed to erase any tapes, even
14 incrementals, that we would have to put in new tapes
15 into our rotation and that no tapes could be erased.
16     Q.   And where are those tapes currently, the ones
17 that could not be erased?
18     A.   In Ashburn.
19     Q.   That's got to be a lot of tapes.
20     And what was the policy before this kind of
21 directive came down about a no -- don't destroy tapes?
22     A.   Before it was just a basic six-week rotation
23 that we followed. In fact, at that time before then I
24 wasn't even -- I don't think I was even aware of
25 these, of this policy.

219

1     Q.   And how were these backed up? Were they
2 incrementally, full backed up?
3     A.   A combination.
4     Q.   Okay. Did you ever preserve the ability to
5 restore these tapes prior to the directive of the
6 bankruptcy?
7     MS. MURDOCK: Objection, vague.
8 BY MS. MURCH:
9     Q.   For example, if I were to ask you to pull a
10 tape, say, for example, from 2001 for MCI, would MCI
11 have the equipment to be able to restore that tape?
12     A.   I believe they probably would for the main
13 backup system.
14     Q.   And the main backup system, is this one that
15 you say encompasses about 400 --
16     A.   Yes.
17     Q.   -- servers?
18     And why is there such a large backup system?
19 I mean, why is it called the main backup system?
20     A.   It's common practice that you have a backup
21 system that backs up multiple servers. We've moved
22 away from the traditional single server single tape to
23 a network backup type system.
24     Q.   What about, now, you said that probably for
25 the main backup system. What about the smaller ones,

220

1 would you know if there's the equipment to be able to
2 restore the backup tapes?
3     A.   In some cases we may, and in some cases we
4 may not.
5     Q.   Do you know who would know for certain?
6     A.   No.
7     Q.   Let me ask you this: What happens -- and I'm
8 going to jump to Intermedia and then I'll ask the same
9 question for MCI -- if one of Intermedia's offices
10 were destroyed, like, for example, 9/11, if, you know,
11 your office in New York were destroyed in the process
12 of 9/11, what procedures would be used to restore
13 information in that office? What was the policy?
14     A.   I don't believe there was one.
15     Q.   Okay. Did you ever have a situation where
16 you had an office that was destroyed or had problems
17 with, you know, weather or any kind of related issues?
18     A.   We have.
19     Q.   Okay. And what was done in those
20 circumstances?
21     A.   In the one circumstance I'm thinking of the
22 server got wet from a leak. The server was pretty
23 much destroyed. We ended up having to build another
24 server at the time. And if we were able to -- if we
25 had tapes for that facility, we would restore from

221

1    Q.    And now we're going to hop to 31816.  I
2  apologize for this being kind of drudgery here.
3         And there's -- this page and the page behind
4  it is a series of e-mails in reverse chronological
5  order written in April of 2001 with the subject line
6  Tape Rotation.  If you could turn to the following
7  page, that's 31817, and go to the e-mail at the bottom
8  dated April 10th, 2001 by Lisa Hayward.
9  Ms. Hayward's -- a portion of Ms. Hayward's e-mail
10 says:  Just to recap our meeting today, I want to make
11 sure that you understand that you are not to give
12 authorization for tape rotation to any group.  It will
13 be necessary that each end user requesting tape
14 rotation put their request in writing with all the
15 necessary information we need in order to access RIM's
16 role.
17        I think that must mean assess rather than
18 access.
19        The e-mail needs to indicate the department
20 making the request, the department's function, why
21 they need tape rotations, what type of information on
22 the tape, how often do they want the rotations, how
23 many tapes, et cetera, as well as the other questions
24 that Vicki referenced in her e-mail.
25        Did you ever make -- in your responsibilities

246

1  at MCI with respect to the Windows backup tapes, did
2  you ever formalize any request such as this in
3  writing?
4    A.    No.
5    Q.    Did you have to confer or consult with
6  anybody about when tapes were rotated for the MCI
7  Windows backup tapes?
8    A.    No.
9    Q.    So that was solely within your discretion?
10   A.    Yes.
11   Q.    Now, if you would flip to the prior page,
12 which is 31816 of Exhibit 4, you'll see about halfway
13 down Draft Policy Re Tape Rotation.
14        Do you know if a formal policy was ever
15 implemented?
16   A.    When?
17   Q.    From the time you joined -- well, this e-mail
18 was in 2001, so any time after 2001?
19   A.    I was not made aware of any of these RIM
20 documents until sometime I would have to say 2004.
21   Q.    Maybe the beginning, end, middle, do you
22 know?
23   A.    I don't remember.
24   Q.    Okay.  Do you know when MCI began using
25 backup tapes?

247

1    A.    No.
2    Q.    Let's go to Page 31870.  This is a Guide For
3  New Acquisitions.  That's what it's called.
4         Did you ever receive this document in
5  connection with the MCI/Intermedia merger?
6    A.    No.
7    Q.    Do you know if anyone else at Intermedia
8  received this document?
9    A.    No, I do not know.
10   Q.    If you turn to the following page, 31871, at
11 the top it says:  While your records program is being
12 evaluated by RIM, absolutely no records destruction of
13 any kind can take place.
14        Did you ever receive that directive from MCI?
15   A.    I was only -- I only received those
16 directives from Frank Ludlow sometime in I want to say
17 2003 I think, late 2003.  I don't -- sometime that
18 year.
19   Q.    And how long for a period after you learned
20 in 2003 were records no longer destroyed?
21   A.    Well --
22        MS. MURDOCK:  I'll object.  I'm not sure I
23 understood what your question was.  Can you read that
24 question for me and the question before.
25        (Read back.)

248

1  BY MS. MURCH:
2    Q.    I'll rephrase that.  That's no problem.
3         So you were notified by Frank Ludlow in late
4  2003 or approximately in 2003 that no documents could
5  be destroyed; is that correct?
6    A.    We were told that no tapes could be recycled.
7    Q.    And why was that?
8    A.    The -- what I was told was that it had to do
9  with the bankruptcy proceedings.
10   Q.    And so prior to that communication from
11 Frank Ludlow were backup tapes preserved?
12   A.    My understanding is that, yes, they were
13 preserved.
14   Q.    But were they only preserved --
15   A.    What was in the rotation, rotation and what
16 we pulled from the rotation.
17   Q.    And what was pulled from the rotation?
18        MS. MURDOCK:  Objection, asked and answered.
19        Go ahead.
20        THE WITNESS:  Monthlies, quarterly tapes,
21 yearly tapes.
22   BY MS. MURCH:
23   Q.    Okay.  Got it.  Okay.  If you go on to
24 Page 31871, the same page, the second paragraph says:
25 Employees should be informed that any company records

249

1    Q.   But there was only one meeting only one time?
2  So your testimony earlier this morning about the
3  number of times you met with counsel was correct?
4    A.   I'm sorry.  Ask me the question.
5    Q.   Met in person.  I don't mean to confuse you.
6    A.   Met in person, I had not met counsel in
7  person until just this week.
8    Q.   Okay.  Now, Ms. Murch asked you a number of
9  questions about the migration of data from the two
10 servers that are mentioned in Deposition Exhibit
11 No. 5 to newer servers.
12   A.   Okay.
13   Q.   Prior to the time that that data was migrated
14 to the newer servers, did you do anything to ensure
15 that that document -- that the data on the two
16 existing servers mentioned in Exhibit No. 5 would be
17 retained?
18   A.   Yes, we were continuing the backups of those
19 servers during that time.
20   Q.   So all of the information on the two existing
21 servers mentioned in Exhibit 5 are now on backup
22 tapes?
23   A.   Yes.
24   Q.   Ms. Murch just a few moments ago asked what
25 would have been required to have kept the systems in

262

1  place to be able to restore today the information
2  that's currently on the Intermedia backup tapes.  Do
3  you recall the question she asked?
4    A.   I recall.
5    Q.   What would have been necessary -- you said
6  you would have had to have been directed to do that,
7  but what would have been necessary in terms of
8  logistics in order to do that?
9    A.   We would have had to have storage, racks,
10 space available to be able to store the systems,
11 storage for the continued storage for the tapes, of
12 course, which we already have, and the time and the
13 resources to be able to make that happen.
14   Q.   Would you have to maintain licenses as well?
15   A.   We would have to maintain licenses, the
16 backup software licenses, the operating system
17 licenses.
18   Q.   And I believe in 2005 when you were contacted
19 about the Intermedia backup tapes, did all the
20 tapes -- were all the same tapes available to you in
21 2005 that would have been available to you in 2003 or
22 2002?
23   A.   From what I understand, the tapes that we
24 shipped up to Ashburn in 2003 is what is there today.
25   Q.   So they were available in 2003, correct?

263

1    A.   Yes.
2    Q.   And they're available in 2005?
3    A.   Yes.
4    Q.   And they're available today?
5    A.   Yes.
6         MS. MURDOCK:  That's all I have.
7
8              REDIRECT EXAMINATION
9         BY MS. MURCH:
10
11   Q.   Okay.  Just a couple of follow-up questions
12 on Ms. Murdock's.
13        To the extent there weren't tapes available
14 in 2003 or were missing, they certainly wouldn't be
15 available in 2005, would they?
16   A.   If there were any tapes missing -- you're
17 asking me if there were any tapes missing, or are you
18 asking me if there were any tapes missing, then would
19 they be missing today?
20   Q.   Yeah.
21   A.   I would say the answer is yes.
22   Q.   And with respect to Intermedia, we talked
23 briefly about meta data.  Was meta data preserved on
24 Intermedia systems?
25   A.   Help me understand what do you mean by meta

264

1  data.  What do you define as meta data?
2    Q.   For example, I have a document and I'll send
3  you a Word document and you'll see the words on the
4  page, but the meta data is, for example, if I made an
5  edit to that document that you don't see prior to that
6  version of the document or if there were other
7  revisions that wouldn't be necessarily available to
8  your eye, was there any way to preserve that meta
9  data?
10   A.   I don't know.
11   Q.   Were the server hard drives saved or are they
12 available for Intermedia?
13   A.   What server hard drives?
14   Q.   I'm sorry, the two active server hard
15 drives -- or server drives that you referenced in your
16 affidavit.
17   A.   Are the hard drives for the two servers that
18 I referenced still available?
19   Q.   Yes.
20   A.   I don't know.
21   Q.   Do you know who would know?
22   A.   Steve Romano would.
23        MS. MURCH:  I don't have anymore.
24        MS. MURDOCK:  I don't either.
25

265

A 04251

# EXHIBIT 15

A 04252

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>v.<br><br>WORLDCOM, INC.,<br>INTERMEDIA COMMUNICATIONS, INC.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)  Civil Case No. 1:00CV02789(RWR)<br>)<br>)<br>)  **FILED**<br>)<br>)  AUG 2 9 2001<br>)<br> CLERK, U.S. DISTRICT COURT<br> DISTRICT OF COLUMBIA |

### JOINT MOTION TO MODIFY
### HOLD SEPARATE STIPULATION AND ORDER

Through undersigned counsel, the parties to the above-captioned action move for

modification of the Hold Separate Stipulation and Order entered by this Court on May 30, 2001,

in connection with WorldCom's acquisition of Intermedia Communications, Inc. The reasons

for this motion are set forth in the accompanying Memorandum in Support of the Joint Motion

to Modify Hold Separate Stipulation and Order.

Dated: _August 29, 2001_

Respectfully submitted,

*Parker Erkmann*

Hillary Burchuk (DC Bar #366755)
J. Parker Erkmann, Trial Attorney
Telecommunications Task Force
Antitrust Division
United States Department of Justice
1401 H St. N.W., Suite 8000
Washington, DC 20530
(202) 514-5621

*Michael H. Salsbury / FCF*

Michael H. Salsbury (DC Bar #365888)
  Executive Vice President & General
Counsel WorldCom, Inc.
1133 19th Street, N.W.
Washington, DC 20036
(202) 736-6000

1

MCIWC032472

15

A 04253

_Deborah A. Garza_

Deborah A. Garza (DC Bar #395295)
Fried Frank Harris Shriver & Jacobson
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2505
(202) 639-7270
Counsel for Intermedia Communications, Inc.

2

MCIWC032473

A 04254

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>            Plaintiff,<br><br>            v.<br><br>WORLDCOM, INC.,<br>INTERMEDIA COMMUNICATIONS, INC.,<br><br>            Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)      Civil Case No. 1:00CV02789(RWR)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**FILED**

AUG 2 9 2001

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

## MEMORANDUM IN SUPPORT OF JOINT MOTION
## TO MODIFY HOLD SEPARATE STIPULATION AND ORDER

Through undersigned counsel, the parties to this action move for modification of the

Hold Separate Stipulation and Order ("HSO") entered by this Court on May 30, 2001, in

connection with WorldCom's acquisition of Intermedia Communications, Inc. ("Intermedia").

Specifically, the parties propose three principal modifications to the HSO:

   (1)    to limit the assets to be held separate to Intermedia's stand-alone Internet business

          unit, IBI;

   (2)    to appoint a trustee to hold separate and manage IBI; and

   (3)    to provide this trustee with sufficient flexibility to operate IBI rationally under

1

MCIWC032474

A 04255

today's market conditions, in order to improve the profitability and, therefore, the
marketability of IBI.

This request to modify the HSO is proposed for the purpose of enhancing the prospect of
a rapid and successful divestiture of the IBI business as a viable competitor. The proposed
modifications are limited and do not interfere with the remediation of the competitive concern
identified in the United States' complaint -- namely, the preservation of competition in the
provision of Internet backbone and access services. The requested modifications are necessitated
by unforeseen and substantial changes in the telecommunications marketplace which the parties
reasonably could not have anticipated when they agreed to the HSO. At the same time, the
modifications sought are modest ones which, in no way, undermine the core principle of
maintaining and ultimately divesting a separate and viable IBI business. The proposed
modifications are designed to help ensure that the purpose and intention of the Final Judgment
are effectuated on a timely basis.

I.      BACKGROUND

WorldCom executed a definitive agreement to acquire Intermedia on September 5, 2000.
In response to concerns raised by the United States regarding the transaction's effect on the
competitive provision of Internet backbone and access services, WorldCom and Intermedia
agreed to divest all of Intermedia except for its holdings of capital stock in Digex, Inc.
("Digex"). A proposed Final Judgment and HSO were filed with the Court on November 17,
2000, and the HSO was entered on May 30, 2001. The Final Judgment was entered on June 27,
2001, and WorldCom and Intermedia closed the transaction a few days later, on July 1, 2001.

In relevant part, the HSO requires WorldCom to hold separate all of the Intermedia

2

MCIWC032475

A 04256

Assets and binds Intermedia during the HSO period to continue to operate its business according to the business plan put in place in 1999, when conditions in the telecommunications marketplace were markedly different than they are today. These restrictions have impeded WorldCom's ability to divest the IBI business by tying it to Intermedia's competitive local exchange carrier ("CLEC") business and by preventing Intermedia's management from attempting to put IBI on a path to profitability.[1]

Growth in telecommunications services markets has slowed dramatically since the fourth quarter of 2000. Significant capital investments made by competitive telecommunications carriers in anticipation of future growth have proved difficult to pay for when the projected revenues were not achieved. Since WorldCom agreed to divest the Intermedia assets, no fewer than 14 competitive providers have filed for bankruptcy,[2] resulting in a glut of carrier businesses and assets becoming available at distressed prices. Many remaining competitors have been forced to restructure or substantially downsize their operations.

While Intermedia's Internet backbone business remains an attractive asset, efforts to divest the business have been hampered by both the lack of interest by buyers in the non-Internet Intermedia assets and the need to revise the IBI business plans and operations in light of current market conditions.

---

[1]    The Final Judgment requires WorldCom to divest the "Intermedia Assets," as defined therein within 180 calendar days from the closing of the merger. Although the Final Judgment defines "Intermedia Assets" broadly to include all of Intermedia's assets except the Digex stock, it expressly anticipates that less than all of Intermedia's assets actually might be appropriate or necessary to divest in order to effectuate the desired relief, in that it permits a smaller subset of the assets to be sold if the United States consents in writing. Final Judgment, IV.G. This proposal accordingly does not require any modification to the Final Judgment.

[2]    These companies include American Metrocomm, NETtel, ICG, Northpoint, Rhythms NetConnections, e.spire, Teligent, Winstar, Advanced Radio Telecom, 360networks, PSINet, Convergent, World Access, and Metricom.

3

MCIWC032476

A 04257

## II.    PROPOSED CHANGES TO THE HOLD SEPARATE ORDER

The parties propose to address the marketability problems encountered thus far by untethering IBI from Intermedia's non-Internet assets and providing the flexibility to alter IBI's operations in such a way as to make it a more viable and marketable business in today's environment. The proposal in no way derogates from the fundamental purpose and intent of either the Final Judgment or the HSO. The modifications are expressly designed to improve the chances for accomplishing the divestiture of a viable and ongoing Internet business to an acceptable purchaser. The trustee will insure that IBI would remain fully separate from the operations and influence of WorldCom, as currently provided in the HSO, and any business changes would be made by the trustee, in consultation with IBI's current independent management.

### A.    Limit the Scope of the Hold Separate Order to IBI

Under the Final Judgment, defendants are obligated to divest all the non-Digex portions of Intermedia, although with the written consent of the United States, defendants would be permitted to divest something less than this. The United States anticipates consenting to defendants' request to divest only the IBI assets, because the divestiture of IBI alone appears to be sufficient to remedy the harm alleged in the Complaint, and the unsuccessful efforts to divest the Intermedia Assets indicate that the divestiture of IBI is being hindered, rather than aided, by the requirement that other business units besides IBI be divested. Accordingly, there is no longer any need for other business units besides IBI to be covered by the HSO.

The proposed revised HSO is limited in scope to IBI. The IBI assets, employees, revenue, and customer base would continue to be held separately from WorldCom. IBI would

4

continue to operate independently, with management under the supervision and control of the trustee, without any control by or direction from WorldCom. The divestiture of IBI as a stand-alone business will resolve any competitive issues in the provision of Internet backbone and access services, the affected market alleged by the United States, and the HSO is geared to ensuring that IBI remains a separate, viable, competitive entity until the divestiture is accomplished.

**B.    Appoint an Independent Trustee to Manage the IBI Business**

As discussed further below, certain business decisions regarding IBI need to be taken in order to enhance the prospects of a successful divestiture. Rather than commit these decisions to employees of defendants, the proposed revised HSO contemplates the selection of an impartial, independent trustee by the United States, and his or her appointment by the Court. The trustee will be tasked with carrying out the purposes of the Final Judgment, and given necessary and appropriate powers to do so. The fact that this trustee is independent, selected by the United States, and approved by this Court helps guarantee that IBI will be operated in a manner best calculated to enhance its viability and attractiveness to potential purchasers.

**C.    Give the Trustee Sufficient Flexibility to Manage IBI Rationally**

In addition, the parties request that the HSO be modified to enable the independent trustee to undertake rational business measures to make IBI a viable business. The HSO currently requires WorldCom to cause IBI to maintain at 2000 levels or previously approved levels for 2001, whichever are higher, all promotional, advertising, sales, technical assistance, network capacity configurations and expansions, marketing and merchandising support for the Intermedia Assets. Hold Separate Stipulation and Order V.A.2. It also requires WorldCom to

5

MCIWC032478

A 04259

cause IBI to maintain "projected capacity expansions . . . planned prior to negotiations between defendants relating to the Merger. . . ." Hold Separate Stipulation and Order V.B.5, and prohibits the termination of any Intermedia employee during the pendency of the HSO. Hold Separate Stipulation and Order V.B.9. Because of these restrictions, Intermedia's management has been unable to undertake appropriate measures to reduce costs or otherwise respond to conditions in the telecommunications/CLEC marketplace. However, to operate an Internet business today as though the market is as was expected and hoped in 1999 and 2000 is not only irrational, but makes it more difficult to package IBI as a desirable business to prospective purchasers.

To enable WorldCom to promptly divest IBI, the parties urge the Court to amend the HSO in the following ways:

> • As provided in Section V of the Proposed Modified Hold Separate Stipulation and Order, the United States will select an independent Hold Separate Trustee to serve as manager of the IBI business from the time of his or her appointment until the IBI business is sold. Working with IBI's existing management team, the Trustee will have the responsibility, and flexibility, to ensure that IBI is managed so as to maximize its revenue and cash flow so as to permit its expeditious divestiture in a manner consistent with the Final Judgment. It will monitor the organization of the IBI business; control and operate the IBI business to ensure as much as possible that it is an ongoing, economically viable competitor in the provision of Internet backbone and access services; maintain the independence of the IBI business from WorldCom; manage the IBI business in order to maximize its value and effect its expeditious divestiture in a manner consistent with the Final Judgment; and assure the defendants' compliance with their obligations pursuant to the Modified HSO. See Para. V.C.2. of the Proposed Modified Hold Separate Stipulation and Order.

6

MCIWC032479

A 04260

- As provided in Section VI of the Proposed Modified Hold Separate Stipulation and Order, defendants shall offer to provide IBI with certain services and products currently provided by Intermedia to the IBI business which are not included within the IBI business, such as human resources administrative services, preparation of tax returns, and the like.

A full copy of the Proposed Modified Hold Separate Stipulation and Order is attached to this Memorandum, in both a clean form and a form marked to show differences between the original and proposed modified order. Attachment A is the clean version, and Attachment B is the version marked to show differences.

## III.    MODIFYING THE HOLD SEPARATE ORDER IS IN THE PUBLIC INTEREST

The central purpose of the HSO, to ensure that the divestiture assets remain "an independent, ongoing, economically viable competitive business," is served by the proposed modifications and, therefore, is in the public interest.

For the foregoing reasons, the parties respectfully request that this Court grant this Joint Motion to Modify Hold Separate Stipulation and Order entered in this action on May 30, 2001.

Dated: _August 29, 2001_

Respectfully submitted,

Hillary Burchuk, Trial Attorney
(DC Bar #366755)
J. Parker Erkmann, Trial Attorney
Telecommunications Task Force
Antitrust Division
United States Department of Justice
1401 H St. N.W.
Suite 8000
Washington, DC 20530
(202) 514-5621

Michael H. Salsbury (DC Bar #365888)
Executive Vice President & General
  Counsel WorldCom, Inc.
1133 19th Street, N.W.
Washington, DC 20036
(202) 736-6000

7

MCIWC032480

A 04261

*Deborah A. Garza*

Deborah A. Garza (DC Bar #395295)
Fried Frank Harris Shriver & Jacobson
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2505
(202) 639-7270
Counsel for Intermedia Communications, Inc.

8

MCIWC032481

A 04262

# EXHIBIT 16

A 04263

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED

AUG 2 3 2001

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

```
UNITED STATES OF AMERICA,          )
                Plaintiff,          )
                                    )      Case No. 1:00CV02789 (RWR)
        v.                          )
                                    )
WORLDCOM, INC.,                     )
INTERMEDIA COMMUNICATIONS, INC.     )
                Defendants.         )
                                    )
```

## MODIFIED HOLD SEPARATE STIPULATION AND ORDER

This matter came before the Court on the parties' Joint Motion to Modify Hold Separate

Stipulation and Order. This Court, having considered the Motion and the memorandum in support

thereof and being fully advised of its premise, hereby grants this Motion and modifies the Hold

Separate Stipulation and Order, entered on May 30, 2001. It is hereby stipulated and agreed by

and between the undersigned parties, subject to approval and entry by the Court, that:

### I.   DEFINITIONS

As used in this Hold Separate Stipulation and Order:

A.      "Acquirer" means the entity to whom defendants divest the IBI business.

B.      "WorldCom" means defendant WorldCom, Inc., a Georgia corporation with its

headquarters in Clinton, Mississippi, its successors and assigns, and its subsidiaries, divisions,

groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents

1

MCIWC032517

A 04264

and employees.

C.    "Intermedia" means defendant Intermedia Communications, Inc., a Delaware Corporation with its headquarters in Tampa, Florida, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents and employees.

D.    "Intermedia Business Internet" or "IBI business" means Intermedia's Internet backbone and access services business and includes:

1.    All tangible assets that comprise Intermedia's Internet backbone and access services business, including research and development activities, all networking equipment and fixed assets, personal property, office furniture, materials, supplies, and other tangible property and all assets used exclusively in connection with the IBI business; all licenses, permits and authorizations issued by any governmental organization relating to the IBI business; all contracts, teaming arrangements, agreements, leases, commitments, certifications, and understandings, relating to the IBI business, including supply agreements; all customer lists, contracts, accounts, and credit records; all repair and performance records and all other records relating to the IBI business;

2.    All intangible assets used in the development, production, servicing and sale of the IBI business, including, but not limited to all patents, licenses and sublicenses, intellectual property, copyrights, trademarks, trade names, service marks, service names, technical information, computer software and related documentation, know-how, trade

2

MCIWC032518

A 04265

secrets, drawings, blueprints, designs, design protocols, specifications for materials,

specifications for parts and devices, safety procedures for the handling of materials and

substances, all research data concerning historic and current research and development

relating to the IBI business, quality assurance and control procedures, design tools and

simulation capability, all manuals and technical information defendants provide to their

own employees, customers, suppliers, agents or licensees, and all research data

concerning historic and current research and development efforts relating to the IBI

business, including, but not limited to designs of experiments, and the results of

successful and unsuccessful designs and experiments.

## II.    OBJECTIVES

The Final Judgment filed in this case is meant to ensure the prompt divestiture of

Intermedia's assets for the purpose of preserving a viable competitor in the provision of Internet

backbone and access services and to remedy the effects that the United States alleges would

otherwise result from WorldCom's acquisition of Intermedia. The parties believe this goal can

be best accomplished through this modification to the original Hold Separate Stipulation and

Order. This Modified Hold Separate Stipulation and Order ensures, prior to such divestiture,

that the IBI business remains an economically viable, and ongoing business concern that will

remain independent and uninfluenced by WorldCom, and that competition is maintained during

the pendency of the ordered divestiture .

## III.    JURISDICTION AND VENUE

This Court has jurisdiction over each of the parties hereto and over the subject matter of

3

MCIWC032519

A 04266

this action, and venue of this action is proper in the United States District Court for the District of Columbia. The Complaint states a claim upon which relief may be granted against defendants under Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.

## IV.    COMPLIANCE WITH THE FINAL JUDGMENT

A.    Defendants shall continue to abide by and comply with the provisions of the Final Judgment, entered in this matter on June 27, 2001.

B.    Defendants shall not take any steps in contravention of the original Hold Separate Stipulation and Order before the Court has entered this Modified Hold Separate Stipulation and Order.

C.    This Modified Hold Separate Stipulation and Order shall apply with equal force and effect to any amended Final Judgment agreed upon in writing by the parties and submitted to the Court.

D.    Defendants represent that the divestiture ordered in the Final Judgment can and will be made, and that defendants will later raise no claim of mistake, hardship or difficulty of compliance as grounds for asking the Court to modify any of the provisions contained therein.

E.    The United States and defendants WorldCom and Intermedia, by their respective attorneys, have consented to the entry of this Modified Hold Separate Stipulation and Order without trial or adjudication of any issue of fact or law, and without this Modified Hold Separate Stipulation and Order constituting any evidence against or admission by any party regarding any issue of fact or law.

4

MCIWC032520

**A 04267**

## V.    APPOINTMENT OF HOLD SEPARATE TRUSTEE

The United States will select and the Court will approve and appoint a Hold Separate

Trustee to serve as manager of the IBI business from the time of his or her appointment until the

IBI business is sold.  This Modified Hold Separate Stipulation and Order shall not be interpreted

to prevent the Hold Separate Trustee from becoming the divestiture trustee pursuant to Section

V of the Final Judgment.

A.    As soon as practicable, the United States will identify to defendants the individual

or entity it proposes to select as the Hold Separate Trustee.  Defendants shall not object to the

selection of the trustee on any grounds other than irremediable conflict of interest. Defendants

must make any such objection within five (5) business days after plaintiff notifies defendants of

the trustee's selection.  Upon application of the United States, the Court shall approve and

appoint a Hold Separate Trustee to manage the IBI business in anticipation of an expeditious sale

of the IBI business.

B.    Promptly after the appointment of the Hold Separate Trustee by the Court,

defendants shall enter into a trustee agreement with the Hold Separate Trustee subject to the

approval of the United States that will grant the rights, powers, and authorities necessary to

permit the Hold Separate Trustee to perform his or her duties and responsibilities, pursuant to

this Modified Hold Separate Stipulation and Order.  The trustee agreement shall require the

following:

1.    The Hold Separate Trustee shall serve, without bond or other security, at

the cost and expense of defendants, on such terms and conditions as the United States approves

5

MCIWC032521

A 04268

with a fee arrangement that is reasonable in light of the person's experience and responsibilities;

2.     The defendants shall indemnify the Hold Separate Trustee and hold him or her harmless against any losses, claims, damages, liabilities, or expenses arising out of, or in connection with, the performance of the Hold Separate Trustee's duties, including all reasonable fees of counsel and other expenses incurred in connection with the preparation for, or defense of any claim, whether or not resulting in any liability, except to the extent that such liabilities, losses, damages, claims, or expenses result from misfeasance, gross negligence, willful or wanton acts, or bad faith by the Hold Separate Trustee;

3.     When the United States approves the trustee agreement, the Hold Separate Trustee will assume all rights, powers, and authorities necessary to permit the Hold Separate Trustee to perform his or her duties and responsibilities, pursuant to this Modified Hold Separate Stipulation and Order and consistent with the purposes of the Final Judgment;

4.     The Hold Separate Trustee will assume the powers and responsibilities listed in Section V.C of this Modified Hold Separate Stipulation and Order;

5.     Limitations shall be placed on the powers of the Hold Separate Trustee pursuant to Section V.D of this Modified Hold Separate Stipulation and Order.

C.     The Hold Separate Trustee will have the following powers and responsibilities with respect to the IBI business:

1.     Thirty (30) days after the Hold Separate Trustee has been approved by the Court, and every thirty (30) days thereafter until the termination of this order, the Hold Separate Trustee shall report in writing to the United States concerning the efforts to accomplish the

6

MCIWC032522

**A 04269**

purposes of this Modified Hold Separate Stipulation and Order and the Final Judgment. Included within that report shall be the Hold Separate Trustee's assessment of the extent to which the IBI business is meeting (or exceeding) its projected goals as are reflected in existing or revised operating plans, budgets, projections or any other regularly prepared financial statements;

2.    The Hold Separate Trustee shall have a duty to, consistent with the terms of this Modified Hold Separate Stipulation and Order and the Final Judgment, monitor the organization of the IBI business; control and operate the IBI business to ensure that the IBI business remains an ongoing, economically viable competitor in the provision of Internet backbone and access services; maintain the independence of the IBI business from WorldCom; manage the IBI business in order to maximize its value so as to permit its expeditious divestiture in a manner consistent with the Final Judgment; and assure defendants' compliance with their obligations pursuant to this Modified Hold Separate Stipulation and Order and the Final Judgment;

3.    The Hold Separate Trustee will ensure that the IBI business shall be staffed with sufficient employees to maintain its viability and competitiveness. To the extent that any employees of the IBI business leave or have left the IBI business prior to the divestiture of the IBI business, the Hold Separate Trustee may replace departing or departed employees with persons who have similar experience and expertise or determine not to replace such departing or departed employees.

4.    The Hold Separate Trustee shall have the authority to employ, at the cost and expense of Defendants, such consultants, accountants, attorneys, and other representatives

7

MCIWC032523

A 04270

and assistants as are reasonably necessary to carry out the Hold Separate Trustee's duties and responsibilities.

5.    The Hold Separate Trustee and any consultants, accountants, attorneys, and any other persons retained by the trustee, shall have full and complete access to all personnel, books, records, documents and facilities of the IBI business or to any other relevant information as the Hold Separate Trustee may reasonably request, including, but not limited to, all documents and records kept in the normal course of business that relate to the IBI business. Defendants shall develop such financial or other information as the Hold Separate Trustee may request and shall cooperate with the Hold Separate Trustee. Defendants shall take no action to interfere with or impede the Hold Separate Trustee's ability to monitor defendants' compliance with this Modified Hold Separate Stipulation and Order and the Final Judgment or otherwise to perform his/her duties and responsibilities consistent with the terms of this Modified Hold Separate Stipulation and Order.

6.    The Hold Separate Trustee will have the power to manage the IBI business in the ordinary course of business consistent with this Modified Hold Separate Stipulation and Order. Only with the prior written approval of the United States may the Hold Separate Trustee make any decision, take any action, or enter any transaction that is outside the ordinary course of business.

D.    The following limitations shall apply to the Hold Separate Trustee:

1.    The Hold Separate Trustee shall not be involved, in any way, in the operations of the other businesses of defendants during the term of this Modified Hold Separate

8

MCIWC032524

**A 04271**

Stipulation and Order;

2.    The Hold Separate Trustee shall have no financial interests affected by defendants' revenues, profits or profit margins, except that the Hold Separate Trustee's compensation for managing the IBI business may include economic incentives dependent on the financial performance of the IBI business provided that those incentives are consistent with the objectives of this Modified Hold Separate Stipulation and Order and the Final Judgment and are approved by the United States;

3.    The Hold Separate Trustee shall be prohibited from performing any further work for WorldCom for two (2) years after the close of the divestiture.

E.    Defendants, defendants' employees, and the Hold Separate Trustee will take all reasonable efforts to preserve the confidentiality of information that is material to the operation of either the IBI business or defendants' businesses.

1.    The United States may require the Hold Separate Trustee and his agents and employees to sign an appropriate confidentiality agreement relating to materials belonging to and in the custody of the United States and information received in connection with performance of the Hold Separate Trustee's duties.

2.    Defendants may require the Hold Separate Trustee and his agents and employees to sign a confidentiality agreement prohibiting the disclosure of any material confidential information gained as a result of his or her role as Hold Separate Trustee to anyone other than the United States.

3.    Defendants' personnel supplying services or products to the IBI business

9

MCIWC032525

A 04272

pursuant to Section VI.A must retain and maintain the confidentiality of any and all confidential information material to the IBI business. Except as permitted by this Modified Hold Separate Stipulation and Order, such persons shall be prohibited from providing, discussing, exchanging, circulating or otherwise furnishing the confidential information of the IBI business to or with any person whose employment involves any of defendants' businesses.

F.    If the Hold Separate Trustee ceases to act or fails to act diligently and consistent with the purposes of this Modified Hold Separate Stipulation and Order, if the Hold Separate Trustee resigns, or if for any other reason the Hold Separate Trustee ceases to serve in his or her capacity as Hold Separate Trustee, the United States may select and the Court may appoint a substitute Hold Separate Trustee in the same manner as provided in Paragraph V.A of this Order.

## VI.    DEFENDANTS' PROVISION OF SERVICES TO THE IBI BUSINESS

A.    In connection with support services not included within the IBI business, defendants shall provide to the IBI business at no cost to IBI the following services and products from the Defendants:

1.    Federal and state regulatory policy development and compliance;

2.    Human resources administrative services;

3.    Environmental health and safety services, which develops corporate policies and insures compliance with federal and state regulations and corporate policies;

4.    Preparation of tax returns;

5.    Financial accounting and reporting services;

6.    Audit services; and

10

MCIWC032526

A 04273

7.    Legal services.

B.    If in the judgment of the Hold Separate Trustee, WorldCom fails to provide the services listed in VI.A to the satisfaction of the Hold Separate Trustee, upon notification to WorldCom and approval by the United States, the Hold Separate Trustee may engage third parties unaffiliated with the defendants to provide those services for the IBI business, provided, however, that WorldCom may satisfy itself that the IBI business is in compliance with all applicable laws, rules, and regulations.

C.    At the option of the Hold Separate Trustee, defendants may also provide other products and services, including but not limited to local access and backbone services, on an arms-length basis provided that IBI is not obligated to obtain any other service from defendants and may acquire such services from third parties unaffiliated with defendants.

## VII.    HOLD SEPARATE PROVISIONS

After this Modified Hold Separate Stipulation and Order is approved by the Court and until the divestiture required by the Final Judgment have been accomplished, except as otherwise approved in advance in writing by the United States:

A.    Defendants and the Hold Separate Trustee shall preserve, maintain, and continue to support the IBI business as an independent, ongoing, economically viable competitive business, with management, sales and operations of such assets held entirely separate, distinct and apart from those of defendants' other operations. Within twenty (20) days after the entry of the Modified Hold Separate Stipulation and Order, defendants will inform the United States of the steps defendants have taken to comply with this Modified Hold Separate Stipulation and

11

MCIWC032527

A 04274

Order.

B.      Defendants and the Hold Separate Trustee shall take all steps necessary to ensure that (1) the IBI business will be maintained and operated as independent, ongoing, economically viable and active competitors in the market for Internet backbone and access services; (2) management of the IBI business will not be influenced by Defendants; and (3) the books, records, competitively sensitive sales, marketing and pricing information, and decision-making concerning production, distribution or sales of products by or under any of the IBI business will be kept separate and apart from Defendants' other operations.

C.      The Hold Separate Trustee and Defendants shall use all reasonable efforts to increase revenues, profitability, and the competitive viability of the IBI business.

D.      Defendants shall provide sufficient working capital and lines and sources of credit as deemed necessary by the Hold Separate Trustee to continue to maintain the IBI business as economically viable and competitive ongoing business, consistent with the requirements of this Modified Hold Separate Stipulation and Order.

E.      The Hold Separate Trustee, with the Defendants' cooperation consistent with this Modified Hold Separate Stipulation and Order and the Final Judgment, shall take all steps necessary to manage the IBI business in order to maximize its revenue, profitability, and the competitive viability so as to permit its expeditious divestiture in a matter consistent with the Final Judgment including, without limitation by maintaining and adhering to normal repair and maintenance schedules for the assets of the IBI business.

F.      Defendants shall not, except 1) as recommended by the Hold Separate Trustee

12

MCIWC032528

A 04275

and approved by the United States, or 2) as part of a divestiture approved by the United States in accordance with the terms of the Final Judgment, remove, sell, lease, assign, transfer, pledge or otherwise dispose of any of the assets of the IBI business.

      G.     The Hold Separate Trustee, with the Defendants' cooperation consistent with this Modified Hold Separate Stipulation and Order and the Final Judgment, shall maintain, in accordance with sound accounting principles, separate, accurate and complete financial ledgers, books and records that report on a periodic basis, such as the last business day of every month, consistent with past practices, the assets, liabilities, expenses, revenues and income of the IBI business.

      H.     Defendants shall take no action that would jeopardize, delay, or impede the sale of the IBI business.

      I.     Defendants shall take no action that would interfere with the ability of any trustee appointed pursuant to the Final Judgment to complete the divestitures pursuant to the Final Judgment to an Acquirer acceptable to the United States.

      L.     Except for support services employees involved in providing services to the IBI business pursuant to subparagraph VI.A, defendants shall not permit any other of its employees, officers, or directors to be involved in the operations of the IBI business.

      M.     Except as required by law in the course of 1) complying with this Modified Hold Separate Stipulation and Order or the Final Judgment; 2) overseeing compliance with policies and standards concerning the safety, health and environmental aspects of the operations of the IBI business and the integrity of the IBI business financial controls; 3) defending legal claims,

13

MCIWC032529

A 04276

investigations or enforcement actions threatened or brought against the IBI business; or 4) obtaining legal advice, defendants' employees (excluding support services employees involved in providing support to the IBI business pursuant to subparagraph VI.A) shall not receive, or have access to, or use or continue to use any material confidential information, not in the public domain, of the IBI business. Defendants may receive aggregate financial information relating to the IBI business to the extent necessary to allow defendants to prepare the defendants' consolidated financial reports, tax returns, reports required by securities laws, and personnel reports. Any such information that is obtained pursuant to this subparagraph shall be used only for the purposes set forth in this subparagraph.

     N.     Defendants may offer a bonus or severance to employees included in the IBI business that continue their employment with the IBI business until the divestiture (in addition to any other bonus or severance to which the employees would otherwise be entitled).

14

MCIWC032530

A 04277

O.    This Modified Hold Separate Stipulation and Order shall remain in effect until

consummation of the divestiture required by the Final Judgment or until further order of the

Court.

Done and Ordered this __ day of _____, 2001 in Washington, D.C.


_____
**United States District Judge**

Approved as to form and
·    Substance:


Hillary Burchuk (DC Bar #366755)
J. Parker Erkmann, Trial Attorney
Telecommunications Task Force
Antitrust Division
United States Department of Justice
1401 H St. N.W.
Suite 8000
Washington, DC 20530
(202) 514-5621


Michael H. Salsbury (DC Bar #365888)
Executive Vice President & General Counsel WorldCom, Inc.
1133 19th Street, N.W.
Washington, DC 20036
(202) 736-6000


Deborah A. Garza (DC Bar #395295)
Fried Frank Harris Shriver & Jacobson
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2505
(202) 639-7270
Counsel for Intermedia Communications, Inc.

15

MCIWC032531

A 04278