STINSON MORRISON HECKER LLP
Allison M. Murdock, Admitted *Pro Hac Vice*
Mark M. Iba, Admitted *Pro Hac Vice*
Brian O'Bleness, SDNY Bar Code 09790
1201 Walnut Street
Kansas City, MO 64106
Telephone: (816) 842-8600
Facsimile: (816) 691-3495
Attorneys for Appellees

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In RE WORLDCOM, INC., et al.,** <br> **Debtors** | **Bankruptcy Case No. 02-13533 (AJG)** <br> **(chapter 11)** |
| **PARUS HOLDINGS, INC.,** <br> **Appellant,** | **Appellate Case No. 07-cv-10507 (BSJ)** <br> <u>**ECF Case**</u> |
| **vs.** | |
| **WORLDCOM, INC., et al.,** <br> **Appellees.** | **BRIEF OF THE APPELLEES** |

# TABLE OF CONTENTS

TABLE OF CONTENTS ........ ii

TABLE OF AUTHORITIES ........ vi

STATEMENT OF THE ISSUES ........ 1

STANDARD OF APPELLATE REVIEW ........ 3

STATEMENT OF THE CASE ........ 3

I. NATURE OF THE CASE. ........ 3

II. SUMMARY OF PROCEEDINGS AND DISPOSITION OF CASE ........ 4

A. Debtors' Summary Judgment Motion. ........ 4

B. Parus's Original Spoliation Motion. ........ 4

C. Bankruptcy Court's Summary Judgment Opinion. ........ 6

D. Parus's Amended Spoliation Motion. ........ 6

E. Debtors' Amended Motion For Partial Withdrawal Of Claim Objection, Allowance Of Resulting Claim And Denial Of All Pending Motions As Moot. ........ 7

F. Orders Entering Summary Judgment, Allowing Claim And Denying All Pending Motions As Moot. ........ 8

III. RESPONSE TO PARUS'S "STATEMENT OF CASE" RELATED TO DISCOVERY ........ 9

A. Debtors' Initial Document Production. ........ 9

B. Parus's Motion To Compel Did Not Include Electronic Discovery ........ 9

C. Debtors Reviewed And Produced Responsive Paper Documents. ........ 10

D. Deposition Regarding Debtors' Search For And Review Of Paper Documents. ........ 10

E. Debtors' Electronic Discovery Efforts. ........ 11

F. Debtors Met Their Preservation Obligations. ........ 12

STATEMENT OF FACTS ....................14

I. RESPONSE TO PARUS'S ALLEGED "RELEVANT FACTS." ....................14

II. DEBTORS' RELEVANT FACTS. ....................19

A. WorldCom/Intermedia Merger And Intermedia's Performance Under UC Contract. ....................19

B. EffectNet Provides Notice Of Default And Terminates The UC Contract. ....................21

ARGUMENT ....................22

I. THE BANKRUPTCY COURT CORRECTLY INTERPRETED THE UC CONTRACT AS ALLOWING RECOVERY OF THE FOUR RECONCILIATION PAYMENTS OWED BY INTERMEDIA AT THE TIME PARUS TERMINATED THE CONTRACT. ....................22

A. The Parties To The UC Contract Bargained For Limited Liability. ....................23

B. Applicable Contract Interpretation Law Requires Enforcement Of The UC Contract As Written. ....................24

C. Parus's "Benefit Of The Bargain" Argument Ignores And Contradicts Express Terms Of The Parties' Contract. ....................25

1. Intermedia Could Unilaterally Terminate The UC Contract Early "For Any Reason." ....................25

2. Either Party Could Cause The UC Contract To Terminate Early Because Of The Other Party's Material Default. ....................26

D. Parus's New "Benefit Of The Bargain" Arguments Are Procedurally Improper And Substantively Without Merit. ....................27

1. Parus's Impermissible New Arguments Challenging The Limitation Of Liability Clause Are Based On Misstatements Of The Opinion. ....................27

2. Parus's New Argument Improperly Isolates And Attacks A Single Phrase Outside The Context Of The Full Limitation Of Liability Clause. ....................28

3. Parus Misstates The Significance The Bankruptcy Court Attached To Section 5.3 Of The UC Contract. ....................31

E. Parus Offers Only Inapposite Authority And Distortion Of The Bankruptcy Court's Opinion To Support Its Claim Of Anticipatory Repudiation. ....................33

F. EffectNet Elected To Terminate The UC Contract. ....................35

II. THE BANKRUPTCY COURT APPROPRIATELY ENTERED SUMMARY JUDGMENT ON PARUS'S CLAIMS AGAINST INTERMEDIA FOR BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING, CIVIL CONSPIRACY, AND UNFAIR AND DECEPTIVE TRADE PRACTICES. ................36

A. Summary Judgment Was Proper On The Claim Against Intermedia For Breach Of The Covenant Of Good Faith And Fair Dealing. ....................................37

B. Summary Judgment Was Proper On The Conspiracy Claim Against Intermedia. ...........................................................................................39

C. Summary Judgment Was Proper On The Claim Against Intermedia For Unfair And Deceptive Trade Practices. ....................................................40

III. THE BANKRUPTCY COURT CORRECTLY ENTERED SUMMARY JUDGMENT ON PARUS'S CLAIMS AGAINST WORLDCOM FOR TORTIOUS INTERFERENCE, CIVIL CONSPIRACY AND UNFAIR AND DECEPTIVE TRADE PRACTICES. ...................................................................42

A. The Bankruptcy Court Correctly Held That Parus's Tortious Interference Claim Fails As A Matter Of Law. ...........................................................42

1. The Bankruptcy Court Correctly Determined Pre-Merger Allegations Of Interference. ..........................................................................43

2. WorldCom Enjoyed A Pre-Merger Privilege To Interfere. ..............................45

3. WorldCom Enjoyed A Post-Merger Privilege To Interfere. .............................48

4. Parus Failed To Show Causation. ......................................................50

5. The Bankruptcy Court Correctly Ruled On Any Exceptions To Privilege. .............................................................................................51

B. The Bankruptcy Court Properly Found That Parus's Conspiracy Claim Against WorldCom Fails As A Matter Of Law. ......................................53

C. The Bankruptcy Court Appropriately Entered Summary Judgment On The Claim Under Unfair Trade And Deceptive Trade Practices Acts. ............................57

IV. THE MERITS OF PARUS'S SPOLIATION MOTIONS ARE NOT PROPERLY BEFORE THIS COURT. .......................................................................60

A. The Only Question Arguably Before This Court Is Whether The Bankruptcy Court Correctly Denied Parus's Amended Spoliation Motion As Moot. ...................60

B. Parus Has Not Presented This Court Any Factual Or Legal Basis Establishing Any Spoliation Of Evidence. ..............................................62

1. Parus Cannot Establish That Debtors Lost Or Destroyed Documents. .............62

2. Maintaining Electronic Documents On Backup Tapes Does Not Constitute Destruction Of Evidence. ................................................................64

3. Parus Has Not Shown And Cannot Show That Debtors Lost Or Destroyed Relevant Evidence At A Time They Had A Duty To Preserve It. ..........................................................................................................66

4. Debtors Met Their Preservation Obligations. ....................................................67

5. There Was No Failure To Comply With Document Retention Policies............68

6. Parus Has Failed To Satisfy The Relevance Requirement. ...............................69

V. PARUS IS NOT ENTITLED TO THE "INFERENCES" IT SEEKS. ..............................70

VI. THE BANKRUPTCY COURT DID NOT ABUSE ITS DISCRETION IN DENYING PARUS'S RULE 56(F) MOTION. ................................................................73

CONCLUSION..........................................................................................................75

# TABLE OF AUTHORITIES

**CASES**

Adcock v. Brakegate, Ltd.,
645 N.E.2d 888 (Ill. 1994) .......... 39

Agrimerica, Inc. v. Mathes,
557 N.E.2d 357 (Ill. App. Ct. 1990) .......... 42

American Broadcasting Co. v. Maljack Productions, Inc.,
34 F. Supp. 2d 665 (N.D. Ill. 1998) .......... 45-46

Atlantic Richfield Co. v. Misty Products, Inc.,
820 S.W.2d 414 (Tex. Ct. App. 1991) .......... 47, 57

Badger Pharmacal, Inc. v. Colgate-Palmolive Co.,
1 F.3d 621 (7th Cir. 1993) .......... 50

Baker Pacific Corp. v. Suttles,
269 Cal. Rptr. 709 (Cal. Ct. App. 1990) .......... 39

Bill Diodato Photography, LLC v. Kate Spade, LLC,
388 F. Supp. 2d 382 (S.D.N.Y. 2005) .......... 74

Borden, Inc. v. Spoor Behrins Campbell & Young, Inc.,
828 F. Supp. 216 (S.D.N.Y. 1993) .......... 57

Boulevard Assoc. v. Sovereign Hotels, Inc.,
72 F.3d 1029 (2d Cir. 1995) .......... 41-42, 48, 52

Burkons v. Ticor Title Ins.,
813 P.2d 710 (Ariz. 1991) .......... 37

Carl Hizel & Sons Inc. v. Browning Ferris Indust. Inc.,
590 F. Supp. 1201 (D. Colo. 1984) .......... 57

Catanzo v. Wing,
277 F.3d 99 (2d Cir. 2001) .......... 61

Chandler Medical Bldg. Partners v. Chandler Dental Grp.,
855 P.2d 787 (Ariz. Ct. App. 1993) .......... 24

Contemporary Mission, Inc. v. N.Y. Times Co.,
842 F2d 612 (2d Cir. 1988) .......... 74

Continental Holdings, Ltd. v. Leahy,
132 S.W.3d 471 (Tex. Ct. App. 2003) .......... 30-31

Convolve, Inc. v. Compaq Computer Corp.,
223 F.R.D. 162 (S.D.N.Y. 2004) ....................69

Copperweld Corp. v. Independence Tube Corp.,
467 U.S. 752 (1984).................... 56-57

De L'Ogier Park Dev. Corp. v. First Fed. Sav. & Loan,
286 N.E.2d 583 (Ill. Ct. App. 1972) ....................40

Delloma v. Consolidation Coal Co.,
996 F.2d 168 (7th Cir. 1993) ....................45

Diamos v. Hirsch,
372 P.2d 76 (Ariz. 1962)....................33

Dodge v. Fid. & Dep. Co. of Md.,
778 P.2d 1240 (Ariz. 1989)....................37

Donk v. Miller,
365 F.3d 159 (2d Cir. 2004)....................3

Dozier & Gay Paint Co. v. Dilley,
518 So.2d 946 (Fla. Ct. App. 1988).................... 47-48

Emerson Radio Corp. v. Orion Sales, Inc.,
2000 WL 49361 (D. N.J. Jan. 10, 2000)....................56

Emerson Radio Corp. v. Orion Sales, Inc.,
253 F.3d 159 (3d Cir. 2001)....................50, 56, 58

Evans v. Stephens,
407 F.3d 1272 (11th Cir. 2005) ....................70

Farella v. City of New York,
Nos. 05 Civ. 5711(NRB) and 05 Civ. 8264(NRB), 2007 WL 193867, at *3 (S.D.N.Y. Jan. 25, 2007)....................68

Flaherty v. Filardi,
388 F. Supp. 2d 274 (S.D.N.Y. 2005)....................74

Florida Fern Growers Ass'n, Inc. v. Concerned Citizens of Putnam County,
616 So.2d 562 (Fla. Dist. Ct. App. 1993) ....................39

Fogie v. Thorn Ams. Inc.,
190 F.3d 889 (8th Cir. 1999) ....................57

Fujitsu Ltd. v. Fed. Express Corp.,
247 F.3d 423 (2d Cir. 2001)....................67

G&S Investments v. Belman,
700 P.2d 1358 (Ariz. Ct. App. 1984)....................25

Gallagher Bassett Servs., Inc. v. Jeffcoat,
887 So.2d 777 (Miss. 2004)....................39

Gallo [v. Prudential Residential Services, Ltd. Partnership],
22 F.3d [1219,] 1224 [(2d Cir. 1994)]....................45

Golden v. Daiwa Corp.,
2000 WL 251736 (N.D. Tex. March 6, 2000)....................40, 47

Gurary v. Winehouse,
190 F.3d 37 (2d Cir. 1999)....................74

Herman Chanen Constr. v. Guy Apple Masonry Contractors, Inc.,
453 P.2d 541 (Ariz. Ct. App. 1969)....................31

HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.,
545 N.E.2d 672 (Ill. 1989)....................45-46, 51

In re ContiCommodity Services, Inc. Securities Lit.,
733 F. Supp. 1555 (N.D. Ill. 1990)....................57

In re Gaston & Snow,
243 F.3d 599 (2d Cir. 2001)....................3, 28, 58

In re Integrated Res., Inc.,
147 B.R. 650 (S.D.N.Y. 1992)....................3

In re Pudgie's Dev. of NY, Inc.,
239 B.R. 688 (S.D.N.Y. 1999)....................3, 14

JIT Concepts, Inc. v. Shelby County Healthcare Corp.,
358 F. Supp. 2d 678 (W.D. Tenn. 2005)....................40

John's Insulation, Inc. v. Siska Constr. Co., Inc.,
774 F. Supp. 156 (S.D.N.Y. 1991)....................40, 54

Kammert Bros. Enterprises, Inc. v. Tanque Verde Plaza Co.,
428 P.2d 678 (Ariz. Ct. App. 1967)....................33

Kronisch v. United States,
150 F.3d 112 (2d Cir. 1998)....................62, 69

Lamar Advertising of Penn., LLC v. Town of Orchard Park,
356 F.3d 365 (2d Cir. 2004)....................60

Lewis v. Cont'l Bank Corp.,
494 U.S. 472 (1990)....................61

McAlister v. Citibank,
829 P.2d 1253 (Ariz. Ct. App. 1992)....................37

McMahon v. Fiberglass Fabricators, Inc.,
496 P.2d 616 (Ariz. Ct. App. 1972)....................35

Meloff v. New York Life Ins. Co.,
51 F.3d 372 (2d Cir. 1995)....................74

Metropolitan Life Ins. Co. v. La Mansion Hotels & Resorts Ltd.,
762 S.W.2d 646 (Tex. Ct. App. 1988)....................47

Morganteen v. Cowboy Adventures, Inc.,
949 P.2d 552 (Ariz. Ct. App. 1997)....................32

Nelson v. Phoenix Resort Corp.,
888 P.2d 1375 (Ariz. 1994)....................37

Oldenburger v. Del E. Webb Dev. Co.,
765 P.2d 531 (Ariz. App. 1988)....................37

Penncro Assocs., Inc. v. Sprint Spectrum, L.P.,
499 F.3d 1151 (10th Cir. 2007)....................29-30, 36, 55

Phoenix Four, 2006 WL 1409413, at *5-7....................70

Presidential Life Ins. Co. v. Milken,
94 F.3d 65 (2d Cir. 1996)....................60

Provident Nat'l Assur. Co. v. Sbrocca,
885 P.2d 152 (Ariz. Ct. App. 1994)....................24

Quinby v. WestLB AG,
245 F.R.D. 94 (S.D.N.Y. 2006) ("Quinby II")....................65-66

Quinby v. WestLB AG,
No. 04 Civ 7406, 2005 WL 3453908 (S.D.N.Y. Dec. 15, 2005) ("Quinby I")....................65-66

Rancho Pescado v. Northwestern Mut. Life Ins. Co.,
680 P.2d 1235 (Ariz. Ct. App. 1984)....................33

Rawlings v. Apodaca,
726 P.2d 565 (Ariz. 1986)....................37-38

Realty Assocs. of Sedona v. Valley Nat'l Bank of Arizona,
738 P.2d 1121 (Ariz. Ct. App. 1986)....................24

Record Club of Am., Inc. v. United Artists Records, Inc.,
643 F. Supp. 925 (S.D.N.Y. 1986)....48

Residential Funding Corp. v. DeGeorge Fin. Corp.,
306 F.3d 99 (2d Cir. 2002)....69

Riddle v. Liz Claiborne, Inc.,
No. 00 Civ. 1374 (MBM)(HBP), 2003 WL 21976403, at *2 (S.D.N.Y. Aug. 19, 2003)....68

S.E.C. v. WorldCom, Inc.,
Case No. 1:02-cv-04963-JSR....13

Savard v. Selby,
508 P.2d 773 (Ariz. 1973)....40

Sirek v. Fairfield Snowbowl, Inc.,
800 P.2d 1291 (Ariz. Ct. App. 1990)....32

Smith v. Mosbarger,
156 P. 79 (Ariz. 1916)....25

Stamp v. Inamed Corp.,
777 F. Supp. 623 (N.D. Ill. 1991)....57

Teraforce Technology Corp. v. Vista Controls, Inc.,
2007 WL 3377441 (Bankr. N.D. Tex. Nov. 13, 2007)....53, 58-59

Texas Taco Cabana, L.P. v. Taca Cabana of N.M., Inc.,
304 F. Supp. 2d 903 (W.D. Tex. 2003)....48

Treppel v. Biovail Corp.,
233 F.R.D. 363 (S.D.N.Y. 2006)....65-67

Union Oil Company of California v. John Brown E&C,
1995 WL 354259 (N.D. Ill. June 9, 1995)....38

United States v. WorldCom, Inc., et al.,
Civ. Act. No. 1:00CV02789 (RWR) (D.D.C.)....19-20

United States v. WorldCom, Inc. et al.,
Case No. 1:00CV02789 (RWR) (D.D.C. August 29, 2001)....21

Uvodich v. Ariz. Bd. of Regents,
453 P.2d 229 (Ariz. 1969)....40

Voicestream Wireless Corp. v. U.S. Communications, Inc.,
912 So.2d 34 (Fla. 2005)....41

Waste Mfg. & Leasing Corp. v. Hambicki,
900 P.2d 1220 .....41

Wells Fargo Bank v. Ariz. Laborers, Teamsters,
38 P.3d 12 (Ariz. 2002).....38

West v. Goodyear Tire & Rubber Co.,
167 F.3d 776 (2d Cir. 1999).....62

Williams v. Shell Oil Co.,
18 F.3d 396 (7th Cir. 1994) .....46

Wright v. Coughlin,
132 F.3d 133 (2d Cir. 1998).....70

Zubulake v. UBS Warburg LLC,
217 F.R.D. 309 (S.D.N.Y. 2003) ("Zubulake I").....63

Zubulake v. UBS Warburg LLC,
220 F.R.D. 212 (S.D.N.Y. 2003) ("Zubulake IV") .....10, 62-63, 65-67, 69

Zubulake v. UBS Warburg LLC,
229 F.R.D. 422 (S.D.N.Y. 2004) ("Zubulake V") ..... 62-63, 69

**STATUTES**

Arizona Consumer Fraud Act, A.R.S. § 44-1522 .....59

California Civil Code section 1668.....39

Illinois Consumer Fraud and Deceptive Business practices Act, 815 ILCS § 505/1 .....59

Mississippi Consumer Fraud Act, Miss. Code Ann. §§ 75-24-3, 5 .....59

**OTHER AUTHORITIES**

Fed. R. Civ. P. 26(c) ..... 12-13

Fed. R. Evid. 401 .....69

Florida Deceptive and Unfair Trade Practices Act, F.S.A. § 501.203.....59

## STATEMENT OF THE ISSUES

1. Did the Bankruptcy Court correctly rule that Appellant Claimant Parus Holdings, Inc. ("Parus") could only recover the four Reconciliation Payments described in the parties' November 20, 2000 Unified Communications Services General Agreement (the "UC Contract") that were due and owing from Appellee Debtor Intermedia Communications, Inc. ("Intermedia") at the time Parus terminated the UC Contract, when the UC Contract both provided that, on termination, each party shall remain liable for obligations accruing prior to termination and expressly precluded liability "for any incidental, indirect, special, punitive, consequential or similar damages of any kind including without limitation, loss of profits, loss of business or interruption of business, whether such liability is predicated on contract, strict liability or any other theory[.]"?

2. Did the Bankruptcy Court properly enter summary judgment on Parus's claims against Intermedia for breach of the covenant of good faith and fair dealing when the parties agreed in the UC Contract to limit any recovery of damages to those permitted under the contract without regard to legal theory, when Arizona law precludes a tort action absent a special relationship that Parus has neither alleged nor proved, and when the breach of the covenant claim is just a restatement of Parus's claim for breach of the UC Contract?

3. Did the Bankruptcy Court properly enter summary judgment on Parus's tortious interference claims against Appellee Debtor WorldCom, Inc. ("WorldCom") when none of the actions Parus alleges, such as opening subscriber accounts only for Intermedia employees or transferring or terminating employees working on the UC Contract, constitutes a breach of the UC Contract or rises to the level of actionable wrongdoing by WorldCom, and when, in any event, WorldCom was both entitled and obligated to interfere with Intermedia because it was

Intermedia's parent corporation and had been ordered by the United States District Court for the District of Columbia to preserve Intermedia as an economically viable business?

4. Did the Bankruptcy Court properly enter summary judgment on Parus's claims against Intermedia and WorldCom for civil conspiracy when Intermedia and Parus agreed in the UC Contract to limit any recovery of damages to those permitted under the contract without regard to legal theory; when breach of contract cannot be the predicate for civil conspiracy, which depends on the existence of an underlying tort; and when Parus's tortious interference claim cannot serve as the underlying tort because a parent (WorldCom) and its subsidiary (Intermedia) are incapable of conspiracy and because WorldCom was privileged to interfere?

5. Did the Bankruptcy Court properly enter summary judgment on Parus's claims for unfair and deceptive trade practices when (as to Intermedia) the parties agreed in the UC Contract to limit recovery of damages to those permitted under the contract without regard to legal theory, and when Intermedia and WorldCom did not sell or otherwise distribute any goods or services that would satisfy the consumer protection goals of the applicable statutes?

6. Are the merits of Parus's motion for sanctions based on Debtors' alleged spoliation of evidence properly before this Court when the Bankruptcy Court never considered it on the merits, Parus did not oppose Debtors' motion seeking denial of the motion as moot, Parus did not appeal the Bankruptcy Court's denial of the motion as moot, and Parus has not established any factual or legal basis for this Court to conclude that Debtors lost or destroyed any evidence at all, let alone lost or destroyed relevant evidence at a time they were under an obligation to preserve it?

7. Did the Bankruptcy Court properly exercise its discretion to deny Parus's Rule 56(f) motion seeking additional discovery and enter summary judgment on matters of law and

undisputed material fact when the discovery at issue had no bearing on the merits of the summary judgment motion?

## STANDARD OF APPELLATE REVIEW

This Court has *de novo* review over the Bankruptcy Court's Order partially granting Debtors' summary judgment motion and, assuming it is even before this Court, the Bankruptcy Court's Order denying all other pending motions as moot. Donk v. Miller, 365 F.3d 159, 163, 164 (2d Cir. 2004) (holding that appellate court reviews *de novo* grant of summary judgment and any question of mootness). However, in reviewing these Orders, this Court should not consider arguments and factual issues not presented to the Bankruptcy Court. See In re Gaston & Snow, 243 F.3d 599 (2d Cir. 2001) (holding that an appellate court normally will not consider an argument for the first time on appeal); In re Pudgie's Dev. of NY, Inc., 239 B.R. 688, 697 (S.D.N.Y. 1999) ("As the reviewing court, we may not decide factual issues not addressed by the Bankruptcy Court.") (inner citation and quotations omitted)).

This Court reviews the Bankruptcy Court's denial of Parus's motion for Rule 56(f) discovery under an abuse of discretion standard. In re Integrated Res., Inc., 147 B.R. 650, 664 (S.D.N.Y. 1992).

## STATEMENT OF THE CASE

Appellee Debtors ("Debtors") are dissatisfied with Parus's "Statement of the Case" and therefore provide their own as permitted by Rule 8010.

### I. NATURE OF THE CASE.

In January 2003, Parus, the successor by merger to EffectNet, Inc. and EffectNet, LLC, filed Claim No. 11242 (replacing 9291) against MCI WorldCom Communications, Inc. ("WorldCom") and Claim No. 11173 (replacing 9293) against Intermedia in the bankruptcy

proceeding below.  All of Parus's claims related to the November 20, 2000 UC Contract between EffectNet and Intermedia, a wholly-owned subsidiary of WorldCom.  Under the UC Contract, EffectNet agreed to sell and Intermedia agreed to buy for resale a variety of voice communication services.  Parus sought compensatory damages from Intermedia for the alleged breach of the UC Contract and consequential damages from WorldCom and Intermedia for allegedly acting in concert to breach the UC Contract.  Parus also asserted tort theories of civil conspiracy to breach the UC Contract, tortious interference with contract, deceptive trade practices and violation of the implied covenant of good faith and fair dealing.

## II.    SUMMARY OF PROCEEDINGS AND DISPOSITION OF CASE.

### A.    Debtors' Summary Judgment Motion.

On October 18, 2005, with permission of the Bankruptcy Court, Debtors moved for summary judgment on all claims against Intermedia based on the plain language of the UC Contract, which expressly limited liability for non-contractual damages and set forth the basis for calculating the contractual damages Debtors admitted were owed.  At that same time, Debtors moved for summary judgment on all claims asserted against WorldCom because Parus could not establish each element of its claims as a matter of law.  Debtors' Motion for Summary Judgment Against Parus Holdings, Inc., Successor-By-Merger to EffectNet, Inc. and EffectNet, LLC ("S.J. Motion") (A01109-01213)[1] and Memorandum of Law in Support (S.J. Memo.) (A01214-32).

### B.    Parus's Original Spoliation Motion.

In September 2006, nearly a year after Debtors moved for summary judgment, Parus asked the Bankruptcy Court to stay its ruling on that motion so that Parus could depose five of Debtors' Information Technology ("IT") personnel.  Parus withdrew its stay motion, however,

---

[1]  To avoid unnecessary duplication, Debtors have cited, where possible, to documents contained in the Appendix to Appellant's Opening Brief.  Citation to Debtors' Appendix is "D_____."

when it became apparent that the depositions would be completed before the Bankruptcy Court ruled on Debtors' summary judgment motion. See Parus's Notice of Withdrawal of Motion to Stay Court Ruling on Summary Judgment ¶¶ 5-6 (D00003) (withdrawing motion because Bankruptcy Court advised it would not issue a ruling before December 15, 2006).

Parus completed the IT depositions and, on January 26, 2007, filed a motion seeking sanctions for Debtors' alleged spoliation of evidence related to its "expectation damages." See Memorandum of Law in Support of Parus Holdings, Inc.'s Motion For Relief Regarding Debtors' Spoliation of Evidence ("Orig. Spoliation Memo.") at 59 (A02957) (alleging that missing evidence "would contravene Debtors' allegation of de minimis damages" and support Parus's claim for recovery of "expectation damages"); 59-60 (A02957-58) (seeking relief related only to presentation of "expectation damages" evidence). Parus's spoliation motion did not allege that any documents *actually* were lost or destroyed; instead, it alleged that Debtors' retention of electronic data in an "inaccessible" format constituted destruction of evidence. See *infra* p. 65 n.37 (discussing inaccessibility of data as basis for Parus's original spoliation motion). The sanction Parus sought in its motion was an undefined "adverse inference," an order barring Debtors from presenting or contesting Parus's damages evidence, an award of damages and denial of Debtors' summary judgment motion. Orig. Spoliation Memo. at 61 (A02959).

After filing its original spoliation motion, Parus never asked the Bankruptcy Court to stay its ruling on Debtors' summary judgment motion. Nor did Parus explain in any filing with the Bankruptcy Court how any documents relating to its alleged "expectation damages" affected the Court's ability to decide Debtors' pending summary judgment motion. Instead, Parus's counsel simply expressed concern orally in a hearing that the Bankruptcy Court might rule on summary judgment before it ruled on its spoliation motion. The Bankruptcy Court advised it would

"factor all of that in." March 12, 2007 Hearing Transcript at 26 (A04446).

**C. Bankruptcy Court's Summary Judgment Opinion.**

The Bankruptcy Court entered its Opinion Partially Granting and Partially Denying Debtors' Motion for Summary Judgment and Motion to Strike Portions of Affidavits on May 2, 2007, and its Errata to that Opinion on May 4, 2007 (collectively the "Opinion"). Opinion (A03367-03401) and May 4, 2007 Errata (D00007-8). In its Opinion, the Bankruptcy Court granted Debtors' motion for summary judgment on Parus's claims for unfair and deceptive trade practices, breach of the implied covenant of good faith and fair dealing, and civil conspiracy. With respect to Parus's claim for breach of contract, the Bankruptcy Court ruled that Parus terminated the UC Contract on April 12, 2002, and that Debtors were contractually required to make Reconciliation Payments for four months (December 2001 through March 2002). The Bankruptcy Court further ruled that the Limitation of Liability clause in the UC Contract limited Intermedia's liability to the terms of the contract, thereby precluding non-contractual damages. Finally, the Bankruptcy Court found material factual issues as to which rate was the "base monthly price" for purposes of determining the amount of the four Reconciliation Payments. Thus, after the Bankruptcy Court's ruling, the sole remaining issue was whether the "base monthly price" for calculating the four Reconciliation Payments was the "basic service rate" of $11.45 or the "unlimited service rate" of $27.40.

**D. Parus's Amended Spoliation Motion.**

Parus contends that the Bankruptcy Court's failure to mention its original spoliation motion in the Opinion means that the Bankruptcy Court failed to consider the spoliation motion at all. Appellant's Opening Brief ("Parus Brief") at 7-8. The Opinion, however, implicitly addressed the spoliation motion by concluding that Parus could not recover "expectation

damages" as a matter of law. Because "expectation damages" were not recoverable, the spoliation motion – which complained about the alleged inaccessibility of evidence related to "expectation damages" – had no bearing on the outcome of summary judgment. Parus never asked the Bankruptcy Court to reconsideration this implicit finding. Instead, Parus attempted to convince the Bankruptcy Court that its original spoliation motion remained viable because it supposedly also related to pricing under the UC Contract. See May 15, 2007 Hearing Transcript at 7 (A04469). The Court disagreed, pointing out that the original spoliation motion related to "expectation damages," which were barred as a matter of law. The Bankruptcy Court, however, allowed Parus to amend its spoliation motion to show the relevance of any allegedly missing evidence to the remaining pricing issue in the case. See May 22, 2007 Hearing Transcript at 2-3, 5 (D00011-12).

On June 13, 2007, Parus filed an amended spoliation motion. Memorandum of Law in Support of Parus Holdings, Inc.'s Amended Motion For Relief Regarding Debtors' Spoliation of Evidence ("Am. Spoliation Memo.") (A03410-4079). Like its original motion, Parus's amended motion again alleged that Debtors' practice of storing electronic data on back up tapes constituted destruction of that data. See *infra* p. 65 n.37 (discussing inaccessibility of data as basis for Parus's amended spoliation motion). Parus asked the Bankruptcy Court to find an adverse inference that the higher of the two possible prices – *i.e.*, the "unlimited service rate" – applied to the four Reconciliation Payments owed under the UC Contract and to preclude Debtors from presenting any evidence to the contrary. Am. Spoliation Memo. at 18-19 (A03429-30).

**E. Debtors' Amended Motion For Partial Withdrawal Of Claim Objection, Allowance Of Resulting Claim And Denial Of All Pending Motions As Moot.**

The Bankruptcy Court's Opinion significantly narrowed the issues in the case and the amount of damages Parus could recover. If Parus's contention that the "base monthly price" was

intended to be the "unlimited service rate" of $27.40 was correct, the most it could recover was $1,101,844.27, less a deposited $175,000, for a total claim of $926,844.27 (treated as a Class 12 claim under the bankruptcy plan). Debtors' Amended Motion for an Order Seeking Partial Withdrawal of Claim Objection at 3 ("Am. Motion for Partial Withdrawal of Claim Obj.") (A04300). If Debtors prevailed in showing that the "basic service rate" of $11.45 applied, they would owe Parus $285,442.30. Reply Memorandum in Support of Debtors' Motion for Summary Judgment at 38 (A02721). Debtors believed that the fees and costs associated with conducting merits discovery on the issue of whether the basic service rate or unlimited service rate applied, in addition to the fees and costs of continuing to rebut Parus's spoliation claims, would quickly exceed the difference between the two rates. Debtors therefore asked the Bankruptcy Court to permit them to withdraw their claim objection in part on the rate applicable to the four Reconciliation Payments which would result in the allowance of Parus's Claim in the amount of $926,844.27 (treated as a Class 12 claim). Am. Motion for Partial Withdrawal of Claim Obj. at 3-4 (A04300-01). Because allowance of the claim in this amount ended the parties' dispute on the only remaining issue, Debtors' motion also sought an order denying all pending motions as moot, including Parus's spoliation motion. Id. Parus did not oppose entry of an order granting such relief. See Parus's Limited Objection to Debtors' Amended Motion for an Order Permitting Partial Withdrawal of Claim Objection at 2 (D00221).

### F. Orders Entering Summary Judgment, Allowing Claim And Denying All Pending Motions As Moot.

On October 3, 2007, the Bankruptcy Court entered an order consistent with its Opinion. Order on Summary Judgment (A04337-38). The Bankruptcy Court also entered an order granting Debtors' amended motion for permission to withdraw their claim objection in part, allowing a Class 12 claim under the Debtors' bankruptcy plan in the amount of $926,844.27, and

denying as moot all pending motions, including Parus's amended spoliation motion. Order Granting Am. Motion for Partial Withdrawal of Claim Obj. (A04339-40). This appeal followed.

## III. RESPONSE TO PARUS'S "STATEMENT OF CASE" RELATED TO DISCOVERY.

Parus appeals the Bankruptcy Court's Order denying its Rule 56(f) motion and also asks this Court to rule on the merits of its spoliation motion, which was denied as moot before it was ever fully submitted – a ruling that Parus did *not* appeal. See Parus Brief at 3. Parus then devotes several pages of its "Statement of the Case" to allegations regarding Debtors' discovery efforts which are unsupportable and, in any event, immaterial to this appeal. Id. at 8-16. Debtors provide the following response regarding their discovery efforts.

### A. Debtors' Initial Document Production.

While preparing their responses to Parus's February 2005 discovery requests, Debtors located over 10,000 boxes of paper documents related to Intermedia and over 483 electronic back up tapes potentially containing responsive data. WorldCom's Response and Opposition to Motion to Compel at 5-10 (A01047-52). Debtors attempted to devise a joint plan with Parus for the efficient review of their paper documents and, pursuant to controlling authority, asked Parus to share the cost of restoring and searching the back up tapes (estimated at that time to be between $496,000 and $2.1 million). Id. at 11 n.9 (A01053). Parus refused, and instead filed a motion to compel.[2]

### B. Parus's Motion To Compel Did Not Include Electronic Discovery.

Parus filed that motion to compel on July 13, 2005. That motion, however, did not include electronic discovery because the parties had not yet conferred on those issues. See

[2] Contrary to Parus's assertion, the Bankruptcy Court did not find that Debtors failed to produce responsive documents. It simply allowed Parus to file the motion. See June 29, 2005 Hearing Transcript at 14 (A00911).

Parus's Motion to Compel ¶ 72 (A00152) (stating that the factual record does not exist to even begin the type of cost-shifting analysis the Zubulake Court requires and, therefore, Parus's motion to compel does not address the production of electronic documents); see also August 9, 2005 Hearing Transcript at 15 (A02049) (Parus's counsel stating that the motion to compel does not address the issue of electronic documents because there is an insufficient factual record before the Court to deal with the issue of production or cost shifting).

**C. Debtors Reviewed And Produced Responsive Paper Documents.**

In their opposition to Parus's motion to compel and during the first hearing on the motion, Debtors advised the Court that they developed and were implementing a reasonable plan for review of the 10,000 boxes of paper documents related to Intermedia.[3] August 9, 2005 Hearing Transcript at 19-23 (A02736-38). Parus's counsel approved this procedure, as well as Debtors' estimated time frame for the production of responsive documents. Id. at 23-24 (A02738-39). Parus never advised Debtors of any additional boxes it believed Debtors should review. See August 12, 2005 and September 1, 2005 letters from Robert Driscoll to Steven Wood (A02748-49; A02751-54).

Debtors' outside counsel spent over 350 hours of attorney time reviewing the 464 boxes of documents selected for review. From these 464 boxes, Debtors culled 12 boxes of documents responsive to Parus's discovery requests, and produced those documents to Parus. WorldCom's Supplemental Opposition to Motion to Compel at 1-2 and Ex. 1 (D00020-21; 00031-32).

**D. Deposition Regarding Debtors' Search For And Review Of Paper Documents.**

The Bankruptcy Court granted Parus's request to depose Debtors' representative

[3] Debtors reviewed the indexes for the 10,000 boxes and, either based on the date or subject matter description listed on the index or the lack thereof – identified 464 (first 387 and then an additional 77) of the over 10,000 boxes that might contain responsive documents. Debtors then reviewed these boxes for responsive documents. WorldCom's Supplemental Opposition to Motion to Compel at 5-6 (D00024-25).

DB02/048629.0094_0019/7941749.1

regarding Debtors' search for and review of paper documents. November 1, 2005 Hearing Transcript at 12 (A02167). Parus deposed Debtors' counsel, Donald Ramsay, for seven hours regarding Debtors' paper document production. Parus contends that Mr. Ramsay "revealed that there were potentially thousands of documents that still needed to be reviewed." Parus Brief at 5 (citing A2220 at 203:6-15). Even a cursory review of the cited testimony shows that this is untrue. The testimony merely reflects that 10,000 boxes were found related to Intermedia. Id. Although Parus never directly asked Mr. Ramsay during his deposition about the completeness of Debtors' paper document production, he has testified by affidavit that, using the procedure Parus approved, all responsive paper documents were reviewed and produced. WorldCom's Supplemental Opposition to Motion to Compel at 1-9 and Ex. 1 (D00020-28; D00031-32).

**E. Debtors' Electronic Discovery Efforts.**

In October 2005, Parus provided Debtors with a list of search terms, custodian names and a more limited time period to be used in searching Debtors' electronic data.[4] See November 17, 2005 letter from Robert Driscoll to the Honorable Arthur Gonzalez at 2 and Ex. A (D00071; D00074-75). Parus also selected four back up tapes for Debtors to restore and review for sampling purposes. January 30, 2006 letter from Kevin Smith to Allison Murdock at 2 (D00114-15). For completeness, Debtors added five more tapes to the sample that were part of tape sets selected by Parus.[5] June 16, 2006 letter from Allison Murdock to the Honorable Arthur Gonzalez at 7-9 (D00085-87). Just searching these nine sample tapes using Parus's search terms and custodian names required Debtors' counsel to review over 740,000 pages (or almost 300 boxes) of documents and incur approximately $73,000 in costs (exclusive of attorney review

[4] Parus's narrowing of the relevant time period reduced the number of backup tapes to be reviewed to approximately 150.

[5] Debtors' electronic discovery vendor, Kroll Ontrack, recommended that these five additional tapes be restored and searched because they were part of tape sets selected by Parus. Id.

time). Over the course of several months, Debtors' and Parus's counsel conferred at least 20 times regarding the status of electronic document review and the refinement and limitation of various search terms, and Debtors made eight productions of electronic documents to Parus. Id. at 3 and Exs. A, C-G (D00081; D00090-92; D00108-132).

The number of responsive documents located as a result of this time consuming and expensive undertaking was extremely low (only approximately 3.3%). Id. at 7 (D00085). Extrapolating the costs from the nine backup tapes that were sampled, the costs associated with completing the remaining electronic discovery could have exceeded $1.2 million. Id. Parus refused to voluntarily bear any portion of those costs. July 11 Hearing Transcript at 8-11 (D00195-98).

Therefore, Debtors requested permission to file a motion seeking a protective order pursuant to Fed. R. Civ. P. 26(c) ordering that the discovery of the remaining back up tapes not be had or that Parus bear the expense associated with such discovery. June 16, 2006 letter from Allison Murdock to the Honorable Arthur Gonzalez at 7-9 (D00085-87). Parus insisted that the Bankruptcy Court consider whether there was spoliation of evidence before entertaining Debtors' cost-shifting motion. February 7, 2007 letter from Jill Murch to Allison Murdock (A04143).

**F. Debtors Met Their Preservation Obligations.**

In March 2002, Parus terminated the UC Contract effective April 12, 2002. Even then, Parus never threatened any litigation. At most, Debtors knew that Parus sought Reconciliation Payments from Intermedia under the termination provisions of the UC Contract. See Debtors' Verified Response to Claimant's Questions Regarding "Litigation Hold" ("Debtors' Litigation Hold Response") at 1-3 (A03076-78). Under the express terms of the UC Contract, Debtors believed that the Reconciliation Payments could be calculated using the contract and the

DB02/048629.0094_0019/7941749.1

invoices, all of which Debtors preserved. Id. There was no reasonable basis for Debtors to anticipate that Parus would seek any other recovery because Section 11 of the UC Contract expressly prohibited the recovery of other damages. Id. at 3-4 (A03078-79).

Debtors, however, also began preserving all daily backup tapes of their email systems in July 2002 in order to comply with a July 1, 2002 Stipulation and Order entered by the Honorable Jed S. Rakoff in the matter of S.E.C. v. WorldCom, Inc., Case No. 1:02-cv-04963-JSR. See Debtors' Litigation Hold Response at 8 (A03083); Valdes Dep. at 218:4-220:16; 249:3-21; 262:8-264:5 (A04249-51). They also preserved non-email electronic data encompassed by the Order, as subsequently modified or varied by agreement of the parties with regard to such data, as well as paper documents encompassed by the Order. See id.

By the end of 2001, nearly all of the Intermedia employees involved with the UC Contract had left the company. See Debtors' Litigation Hold Response at 13-18 (A03093-94). Intermedia had no document retention policy. Valdes Dep. at 103:14-104:20 (A04246). Employees leaving the company were directed to box the paper documents in their office for storage in off-site depositories. Ramsay Dep. at 53:1-17 (A04148). The electronic data on departing employees' computer hard drives was preserved by backing up their computers to the company servers. Julio Valdes Dep. at 117:1-8 (A04247). Even before Judge Rakoff's July 2002 Order, electronic data on Intermedia's servers was backed up (and had been for years) using an industry standard six week rotation with weekly, monthly and yearly backup tapes that were preserved and stored off-site. Id. at 18:12-22; 103:14-104:20; 146:20-147:6 (A04245-48).

WorldCom filed its bankruptcy proceeding on July 21, 2002. In January 2003, over 60,000 claims were filed, including Parus's filed on January 8, 2003. See Claim Nos. 9291, 9293, 11173, 11242 (A00001-23). Debtors' Response to Parus's Litigation Hold Questions

discusses in detail the steps undertaken to search for documents that might be relevant to those claims. See generally Debtors' Litigation Hold Response (A03076-3115). As reflected therein, the sources of possibly relevant evidence related to the UC Contract that existed in the spring of 2002 were preserved by Debtors and remain available today.

## STATEMENT OF FACTS

### I.    RESPONSE TO PARUS'S ALLEGED "RELEVANT FACTS."

Parus's Brief sets forth eight pages of purportedly "relevant facts." As described below, many of these "facts" were never presented to the Bankruptcy Court as required by Rule 56. Parus therefore cannot rely on them now. See In re Pudgie's Dev. of NY, Inc., 239 B.R. 688, 697 (S.D.N.Y. 1999) ("As the reviewing court, we may not decide factual issues not addressed by the Bankruptcy Court.") (inner citation and quotations omitted)). As to the "facts" Parus submitted to the Bankruptcy Court, Debtors provided in their summary judgment reply a detailed response identifying those facts that were undisputed, immaterial, unsupported, inaccurate or otherwise inadmissible. See S.J. Reply at 1-3, 5-8 (A02684-86, A02688-91); Debtors' Reply to Parus's Statement of Facts (A02817-23). In addition to the response in their summary judgment reply, Debtors respond below to each section of Parus's alleged "relevant facts."

Parus Brief, Sections V.A-B. (at 8-9):    Parus did not submit these alleged facts concerning the formation and purpose of Parus's predecessor, Webley Systems, Inc. ("Webley"), for consideration at summary judgment. Nor has Parus ever defined "UC Product." These sections rely entirely on a "Webley Private Placement Memorandum" that was included as an exhibit to Parus's summary judgment opposition to support the statement in an affidavit of Parus CEO, Taj Reneau, that Webley sought financing. The contents of the memorandum are inadmissible hearsay and were never submitted as fact to the Bankruptcy Court. These facts are, in any event, immaterial.

Parus Brief, Sections V.C-G. (at 9-10): These facts are undisputed generally, as discussed in the briefing before the Bankruptcy Court. Some of the facts Parus presents are interpretations of documents, such as the Hold Separate Order and the UC Contract, that speak for themselves.

Parus Brief, Section V.H. (at 10-11): Debtors did not dispute the facts in the first paragraph of Section H. However, the remaining "facts" in Section H, concerning forecasted revenues, are new. They are based entirely upon the deposition testimony of James Renforth, a former Intermedia project manager. Parus took Mr. Renforth's deposition nearly one year after the Bankruptcy Court took the summary judgment motion under advisement. Renforth Dep. at 1 (A04114) (deposition on November 17, 2006). Parus neither sought to supplement the factual record for summary judgment during the five months between the deposition and the date of the Opinion, nor argued for reconsideration. Accordingly, these "facts" should be disregarded on appeal. Furthermore, these facts are immaterial. They are speculative lost revenues that are not recoverable under sections 5.3 and 11 of the UC Contract.

Parus Brief, Section V.I. (at 11-12): Debtors did not dispute these facts.

Parus Brief Section V.J. (at 12-13): The only fact in this section Parus argued below is that EffectNet noticed in January 2001 (the first month of the rollout of services under the UC Contract) that Intermedia was only opening accounts for its own sales representatives and executives. Parus cited the affidavit of Taj Reneau for this observation, and Debtors did not dispute it for purposes of summary judgment. The remaining "facts" of Section V.J. are new. Worse, they contradict facts upon which Parus relied in the Bankruptcy Court. Citing general language in its March 12, 2002 notice of default (A1010), Parus now maintains that Intermedia defaulted on a requirement in the UC Contract to provide non-binding forecasts on or before

November 30, 2000 and again on February 20, 2001. Parus argued the contrary position in the Bankruptcy Court. See Affidavit of Taj Reneau at ¶ 23 (A02303) (attesting that Intermedia provided "multiple forecasts" including one in "November 2000" and March 2001); Reneau Exs. K-L (A02378-83). Parus cannot use a hearsay statement contained in its default notice to contradict specific language in its CEO's affidavit. Parus also alleges, for the first time on appeal, that Intermedia defaulted on a commitment to have 1,500 subscribers by March 18, 2001 and 3,000 as of June 18, 2001, and that "the few hundred subscribers that Intermedia did deliver were Intermedia's executives and representatives." For these statements, Parus relies on a chart that is inadmissible hearsay that Parus has not authenticated or established to be accurate. Moreover, the chart says nothing of the nature of the subscribers. Nevertheless, these new facts are immaterial. As the Bankruptcy Court determined, there was no breach of the "take or pay" UC Contract until later, when Intermedia failed to make its required Reconciliation Payments.

Parus Brief, Section V.K. (at 10-11, 13): Parus never submitted these facts concerning the discontinuance of an Intermedia product called IntermediaOne. These new "facts" depend entirely on the deposition of James Renforth, which took place almost a year after Debtors' summary judgment motion was fully submitted. Parus never attempted to supplement the summary judgment record with these facts before the Bankruptcy Court issued its Opinion nor sought reconsideration. None of these new "facts" are properly before this Court. Moreover, these "facts" are inadmissible and misleadingly incomplete. Renforth was characterizing a hearsay statement allegedly made during a staff meeting attributed to a vice president who allegedly said the company was shifting its focus from the IntermediaOne product. Renforth Dep. at 74:7-13 (A02973); 257-59 (A02975). Parus omits that Mr. Renforth also testified that his management told him that the company's back office could not support IntermediaOne, and

that, at the time he left the company in July 2001, Intermedia was continuing to work hard on the unified messaging project as well as the Intermedia product (because the belief was it would survive), and that Intermedia would continue to sell IntermediaOne despite what his supervisor had said. Id. at 74:23-75:4 (A02973); 225-26 (A04120); 258-59 (A02975). Parus also fails to include Mr. Renforth's denial of any personal knowledge of what happened to the unified messaging product after he left Intermedia. Id. at 217-18 (D00218).[6] Finally, even if these facts were properly before the Court (and they are not), they would be immaterial to the summary judgment motion.

Parus Brief, Section V.L. (at 13): Several facts in this section are new and unsupported. For example, the first sentence is based upon a press release that is inadmissible hearsay. As discussed before, the term UC Product is also undefined (and never used in the press release). Likewise, Parus's statement that "the UC Product . . . was in direct competition with genD of WorldCom" lacks any citation to the record and was not argued below. Parus also did not submit facts below that analogized WorldCom's genD marketing campaign to the "unified messaging bundle" that Intermedia offered. Indeed, they were substantially different. As indicated in the facts Parus submitted on summary judgment, the purported genD product related to data communications that could deliver voice traffic via the internet (i.e., Voice Over Internet Protocol "VOIP" communications). See A1247; A2306-07; A2523-92. By contrast, Intermedia did not offer VOIP service; it provided telephone services via traditional land lines.

Parus Brief, Section V.M. (at 14): For purposes of summary judgment, Debtors did not dispute Parus's allegation, though wrong, that Intermedia fired its former project manager James

[6] Debtors respectfully request permission to add these pages of Mr. Renforth's deposition testimony to the Record on Appeal so that they may respond to Parus's newly asserted arguments. Because Parus never relied on Mr. Renforth's testimony to support its summary judgment opposition, Debtors never had an opportunity to respond to Parus's characterization of that testimony as related to summary judgment.

Renforth and that Intermedia terminated or transferred personnel after July 1, 2001. As explained in the briefing below, those facts were immaterial to summary judgment. Now Parus argues that Mr. Renforth resigned (which is correct) because the "UC Project was 'scrapped.'" The reason for his resignation was never submitted at summary judgment. Further, Parus has mischaracterized his deposition testimony concerning his resignation. He testified that he left because he had heard that IntermediaOne would not be emphasized (because the back office could not support it), but that when he left, the company was continuing to work hard on the unified messaging project, was continuing to roll out the product to new cities across the country, and was conducting a "Swing for the Fences" campaign related to the World Series. Renforth Dep. at 212-14 (D00217).[7] Finally, as described in Debtors' summary judgment reply, Parus misconstrued the email of Jack Kerrigan that is referenced in the last paragraph of Section M. That email states when increased volumes of subscribers are anticipated, not that there would be no new customers. See S.J. Reply at 7 (A02690); Kerrigan email (A2380-89); see also Renforth Dep. at 210:11-212:4 (D00216-17).[8]

Parus Brief, Section V.N. (at 14): Parus asserts new "facts" comparing the technology that WorldCom licensed from Webley to the services offered under the UC Contract. Parus did not assert this fact for summary judgment. Further, for this comparison, Parus cites the Master Agreement for Software Licensing ("MASL"), which does not support the allegation. Parus also cites its own argument in its spoliation motion, which was filed long after the summary judgment motion was fully submitted. Finally, Parus cites Debtors' response to Parus's Requests for Admission, which also post-dated the summary judgment motion. Because Parus neither submitted nor argued these "facts" below, Parus should not be permitted to submit them now.

---

[7] See *supra* n.6.

[8] See *supra* n.6.

Moreover, because Parus cites no admissible evidence to support its allegation that the same technology used for the UC services was used for GenD, this allegation cannot create a disputed issue of material fact.

Parus Brief, V.O-Q. (at 14-16): Debtors did not dispute the facts in these sections, with one exception. Parus made no argument below about a failure to provide assurance of future performance. As described in Section I.E. hereafter, Parus never asked for an assurance of future performance, the predicate for any requirement to offer any such assurance. Therefore, the failure to provide assurance of future performance cannot create a disputed issue of material fact.

## II. DEBTORS' RELEVANT FACTS.

### A. WorldCom/Intermedia Merger And Intermedia's Performance Under UC Contract.

On September 5, 2000, WorldCom and Intermedia entered into a merger agreement. Final Judgment at 5, United States v. WorldCom, Inc., et al., Civ. Act. No. 1:00CV02789 (RWR) (D.D.C.). The United States Department of Justice ("DOJ") filed a Clayton Act action against WorldCom and Intermedia on November 17, 2000. United States v. WorldCom, Inc., et al., Civ. Act. No. 1:00CV02789 (RWR) (D.D.C.) (the "Clayton Act Action").

On November 20, 2000, before the WorldCom/Intermedia merger became effective, EffectNet LLC, a Nevada limited liability company with its principal place of business in Phoenix, Arizona ("EffectNet") and Intermedia, a Delaware corporation with its principal place of business in Florida, entered into the UC Contract. S.J. Motion at 3 (A01111). On that same date, Intermedia paid $175,000 to EffectNet as a contract performance deposit. Id. at 4 (A01112).

The UC Contract provided that its interpretation would be in accordance with Arizona law.  UC Contract § 12.3 (A00014).  It also provided that the parties to the contract shall not be liable to each other for any unspecified, non-contractual damages of any kind:

> **LIMITATION OF LIABILITY**.  EXCEPT FOR DAMAGES ARISING UNDER SECTION [left blank in original], IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY INCIDENTAL, INDIRECT, SPECIAL, PUNITIVE, CONSEQUENTIAL OR SIMILAR DAMAGES OF ANY KIND INCLUDING WITHOUT LIMITATION, LOSS OF PROFITS, LOSS OF BUSINESS OR INTERRUPTION OF BUSINESS, WHETHER SUCH LIABILITY IS PREDICATED ON CONTRACT, STRICT LIABILITY OR ANY OTHER THEORY WITHOUT REGARD TO WHETHER SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

Id. § 11 (A00014) (emphasis in original).

On June 26, 2001, the United States District Court for the District of Columbia entered an Order in the Clayton Act action directing WorldCom and Intermedia to "divest the Intermedia Assets as an ongoing, viable business" within 180 days from the closing of the merger (the "Original Hold Separate Order").  Final Judgment at 5-6, Doc. No. 12 in United States v. WorldCom, Inc., Civ. Act. No. 1:00CV02789 (RWR) (A01192-93).

The WorldCom/Intermedia merger became effective on July 1, 2001.  WorldCom, a Georgia corporation with its headquarters in Clinton, Mississippi, acquired Intermedia pursuant to the merger of a wholly-owned subsidiary of WorldCom with and into Intermedia.  S.J. Motion at 3 (A01111).  After the acquisition, which put WorldCom in control of Intermedia, EffectNet was advised that WorldCom would oversee all projects relating to the UC Contract.  Id. at 4 (A01112).[9]

After July 1, 2001, Intermedia's project manager for the UC Contract was terminated and

---

[9]  Debtors accepted certain facts Parus alleged as true solely for purposes of summary judgment.  S.J. Motion at 3 n.1 (A0111).

Intermedia's sales force was disbanded through terminations of employment or reassignment to other projects. Id. at 5 (A01113). In September, 2001, Intermedia cancelled 682 of the existing 729 subscriptions for services to be provided under the UC Contract. Id.

In August 2001, WorldCom, Intermedia and DOJ sought to modify the Original Hold Separate Order because downturns in the telecommunications industry over the previous ten months made continued compliance with the Order impractical. See Memorandum in Support of Joint Motion to Modify Hold Separate Order, United States v. WorldCom, Inc. et al., Case No. 1:00CV02789 (RWR) (D.D.C. August 29, 2001) (A02787-93). The Court granted modification of the Original Hold Separate Order to allow the sale of part of Intermedia's business operations, and shut down other components. See Modified Hold Separate Stipulation and Order (A02796-810).

On or about February 6, 2002, EffectNet invoiced Intermedia for payments under the UC Contract. Intermedia did not pay those invoices. S.J. Motion at 5 (A01113). On or about March 1, 2002, Intermedia requested cancellation of all remaining services under the UC Contract. Id.

**B. EffectNet Provides Notice Of Default And Terminates The UC Contract.**

By letter dated March 12, 2002, EffectNet gave notice of default to Intermedia under Section 5.2 of the UC Contract, as well as notice of its intent to enforce all default provisions in the UC Contract, including the contract termination provision. Id. By letter dated March 25, 2002, EffectNet confirmed its prior notices and advised that the UC Contract would be terminated on April 12, 2002 if Intermedia had not cured its defaults. Id. at 5-6 (A01113-14).

Section 5.2 of the UC Contract provides that termination of the UC Contract "shall be effective thirty (30) days after written notice to the defaulting Party if the default has not been cured within such thirty (30) day period." UC Contract § 5.2 (A01124). Intermedia did not cure its defaults under the UC Contract. S.J. Motion at 6 (A01114).

Section 5.3 of the UC Contract, captioned "Effect of Termination," provides that upon termination of the contract "for any reason, each Party shall remain liable for those obligations that accrued prior to the date of such termination . . ." UC Contract § 5.3 (A01124).

## ARGUMENT

As the Bankruptcy Court correctly found, this is a straightforward case of the amount Intermedia must pay for the four Reconciliation Payments that Intermedia admits it owes under the UC Contract. Unhappy with the damages that it receives under the UC Contract, Parus has attempted to convert an ordinary breach of contract into tort. In its appeal to this Court, Parus has advanced arguments that it never made in the Bankruptcy Court; submitted evidence that it did not submit below; argued, *inter alia*, that the Bankruptcy Court "ceased to be a neutral arbiter," "became WorldCom's advocate," and "upended equity"; and accused Debtors repeatedly of destroying "tens of thousands of documents" even though it has never identified a single document, let alone a single *relevant* document, that Debtors lost or destroyed. As explained below, the Bankruptcy Court correctly ruled each issue presented to it on summary judgment. Its ruling should be affirmed in its entirety.

### I. THE BANKRUPTCY COURT CORRECTLY INTERPRETED THE UC CONTRACT AS ALLOWING RECOVERY OF THE FOUR RECONCILIATION PAYMENTS OWED BY INTERMEDIA AT THE TIME PARUS TERMINATED THE CONTRACT.

This appeal involves purely legal questions of contract interpretation. The parties bargained explicitly about the effects of default, termination and liability under the UC Contract, and the Bankruptcy Court appropriately enforced that bargain. Parus does not contend on appeal that there were any issues of material fact that precluded the Bankruptcy Court's determination of these contractual terms as a matter of law. Nor does Parus appeal the Bankruptcy Court's rulings that (1) Intermedia defaulted on four Reconciliation Payments due under the "take or pay"

provisions of the contract; (2) Parus terminated the contract effective April 12, 2002; and (3) the contract's Limitation of Liability clause was unambiguous and enforceable. Instead, dissatisfied with an allowed claim of nearly $1 million, Parus argues that the Bankruptcy Court misinterpreted the Limitation of Liability clause, misconstrued the contract's termination provision and misapplied anticipatory repudiation law. As shown below, Parus's legal arguments all fail, and its attempts to rewrite the parties' bargain should be rejected. On each point, the Bankruptcy Court got it right.

**A. The Parties To The UC Contract Bargained For Limited Liability.**

Parus does not contest the Bankruptcy Court's finding that the UC Contract terminated 20 months early (on April 12, 2002) after Parus gave notice of default to Intermedia under Section 5.2 of the contract and Intermedia failed to pay overdue Reconciliation Payments within the 30 day cure period provided in that Section. Parus Brief at 1-2; Opinion at 19-20 (A03385-86). Early termination of the UC Contract pursuant to Section 5.2 is significant because it relieved the parties of specific future performance obligations upon termination.

Section 5.3 of the UC Contract provided that, upon termination, each party remained liable only for "obligations that had accrued prior to the date of termination."[10] Parus was excused from providing further services to Intermedia, id., and both parties were relieved of the performance obligations specified in the UC Contract Section 2, "Obligations of the Parties," through non-survival of those obligations after contract termination. UC Contract § 6 (A00010-11). On termination of the UC Contract, Intermedia no longer was obligated to meet a monthly minimum level of 10,000 subscribers, UC Contract § 2.12 (A00007-8), nor was it obligated any

10 Prior to termination of the UC Contract, Intermedia's alternative obligations either to supply a minimum number of subscribers each month after December 18, 2001 (UC Contract § 2.12) or to pay a monthly Reconciliation Payment for any shortfall in the number of subscribers (UC Contract § 2.13) accrued at the end of each month. UC Contract §§ 2.12 and 2.13 (A00007-8).

longer to make monthly Reconciliation Payments to cover any shortfalls, UC Contract § 2.13 (A00008).

Relieving Intermedia of these performance obligations upon termination of the UC Contract gave effect to the provisions of the UC Contract the parties negotiated. Conversely, a holding that Intermedia's Reconciliation Payment obligations survived termination of the UC Contract, as Parus argues, would be contrary to the negotiated terms of the contract and a contravention of applicable contract interpretation law.

### B. Applicable Contract Interpretation Law Requires Enforcement Of The UC Contract As Written.

Under controlling Arizona law,[11] a contract must be construed so that every part is given effect. Provident Nat'l Assur. Co. v. Sbrocca, 885 P.2d 152, 153 (Ariz. Ct. App. 1994); Chandler Medical Bldg. Partners v. Chandler Dental Grp., 855 P.2d 787, 791 (Ariz. Ct. App. 1993); Realty Assocs. of Sedona v. Valley Nat'l Bank of Arizona, 738 P.2d 1121, 1126 (Ariz. Ct. App. 1986). Similarly, each provision of a contract is to be read in relation to other contract provisions. Realty Assocs., 738 P.2d at 1126 ("It is a cardinal rule of construction that each section of [an] agreement must be read in relation to each other to bring harmony, if possible between all parts of the writing."). And neither the contract nor any of its provisions are to be construed so as to render them meaningless. Provident, 885 P.2d at 153-54; Chandler, 855 P.2d at 791; Realty Assocs., 738 P.2d at 1126.

As explained below, Parus's contractual "benefit of the bargain" argument violates each of these rules of contract interpretation. Further, the Court should reject Parus's argument because it circumvents and contravenes the express terms of the contract the parties negotiated.

---

[11] EffectNet, Parus's predecessor, and Intermedia expressly provided that the terms of the UC Contract were to be "interpreted in accordance with the laws of the State of Arizona." UC Contract ¶ 12.3 (A00014).

This is impermissible under long-standing Arizona law:

> We may state it as a general rule, when parties competent to contract have come together and reduced to writing the terms and conditions of their agreement, the law protects and guards with great caution the written memorial of their contract thus made.

Smith v. Mosbarger, 156 P. 79, 80 (Ariz. 1916); accord G&S Investments v. Belman, 700 P.2d 1358, 1368 (Ariz. Ct. App. 1984) ("Modern business practice mandates that the parties be bound by the contract they enter into, absent fraud or duress. . . . It is not the province of this court to act as a post-transaction guardian of either party.").

**C. Parus's "Benefit Of The Bargain" Argument Ignores And Contradicts Express Terms Of The Parties' Contract.**

Stating that it only "seeks profits that it had bargained for in the UC Contract," Parus Brief at 23, Parus claims contractual entitlement to monthly Reconciliation Payments for the 20 months of the contract term remaining after the UC Contract was terminated on April 12, 2002 – the so-called "benefit of its bargain." Parus Brief at 20-27. This argument ignores express terms of the bargain the parties actually negotiated. Those express terms demonstrate that the parties neither "expected" nor contractually bargained for an unconditional obligation on Intermedia to pay Reconciliation Payments through the conclusion of the original three-year term of the UC Contract. In fact, the early termination and other provisions of the UC Contract are at complete odds with Parus's litigation argument.

**1. Intermedia Could Unilaterally Terminate The UC Contract Early "For Any Reason."**

Section 5.4 of the UC Contract provides that Intermedia could unilaterally terminate the contract at any time "prior to the end of the initial term . . . for any reason" upon payment of no more than 12 months of Reconciliation Payments at the rate of $270,400 per month "as the sole remedy of [Parus] and the exclusive liability of Intermedia." UC Contract §5.4 (A00010).

DB02/048629.0094_0019/7941749.1

Intermedia's absolute, unfettered contractual right to truncate the parties' payment rights and obligations under the UC Contract is the diametric opposite of what Parus now claims it bargained for in that contract.

**2. Either Party Could Cause The UC Contract To Terminate Early Because Of The Other Party's Material Default.**

Further, either party could precipitate an early termination of the UC Contract if the other party failed to perform "material obligations" under the contract and, upon being given notice of that default, failed to cure the default within 30 days of the notice:

> Termination due to default under this Section shall be effective thirty (30) days after written notice to the defaulting Party if the default has not been cured within such thirty (30) day period.

UC Contract § 5.2 (A00010). As previously discussed, upon termination of the contract, each party remained liable for "obligations that had accrued prior to the date of termination." UC Contract § 5.3 (A00010). Parus was excused from providing further services to Intermedia, and Intermedia no longer was obligated to meet a monthly minimum level of 10,000 subscribers or make monthly Reconciliation Payments to cover any volume shortfall in the number of subscribers. See *supra* pp. 23-24.

Early termination under Section 5.2 of the UC Contract is exactly what happened here. On March 12, 2002, after Intermedia failed to pay Parus's February 12, 2002 invoice for December 2001 and January 2002 Reconciliation Payments, Parus sent a default notice to Intermedia pursuant to Section 5.2 of the UC Contract advising of the "required payment" Intermedia needed to make to bring its Reconciliation Payments current and the 30-day cure period in which to do that. March 12, 2002 letter from Robert McConnell, General Counsel of EffectNet, to Rich Black of Intermedia (A01205-07). Intermedia, however, failed to cure its Reconciliation Payment default. Thus, by operation of Section 5.2, the contract terminated and,

as permitted by Section 5.3 ("Effect of Termination"), Parus ceased performance. Response and Opposition to Debtor's Statement of Undisputed Material Facts ¶ 55 (A01303). Similarly, because the "Obligations of the Parties" section of the contract did not survive termination, Intermedia was relieved of its pre-termination obligations either to deliver a monthly minimum number of subscribers or to pay a Reconciliation Payment for any shortfall in that number. UC Contract § 6 (A00010-11).

Parus's argument that it bargained for contractual entitlement to receive Reconciliation Payments for the 20 months following termination cannot be squared with the actual terms of the UC Contract, which comprehensively provide for cessation, not continuation, of performance obligations upon termination.

**D. Parus's New "Benefit Of The Bargain" Arguments Are Procedurally Improper And Substantively Without Merit.**

**1. Parus's Impermissible New Arguments Challenging The Limitation Of Liability Clause Are Based On Misstatements Of The Opinion.**

In the proceeding below, Parus challenged enforcement of the Limitation of Liability clause by asserting that it was ambiguous and unreasonable because its enforcement would supposedly leave Parus without an adequate remedy. S.J. Response at 40-42 (A01272-74). The Bankruptcy Court considered and rejected both arguments. Opinion at 21-25 (A03387-91). On appeal, Parus does not challenge these rulings nor does it reassert either argument. Instead, Parus impermissibly challenges application of the Limitation of Liability clause on grounds it never presented to the Bankruptcy Court. See Parus Brief at 21-23.

Parus argues for the first time on appeal that the Reconciliation Payments it seeks for the 20 month period following termination of the UC Contract are not prohibited by the contract's Limitation of Liability clause because those payments are general damages, not consequential damages. Parus Brief at 21- 23. It attempts to disguise this new argument by claiming that

"[t]he Bankruptcy Court erred when it denied 'benefit of the bargain' damages on the ground that they are consequential rather than general damages." Parus Brief at 21. But that is not what the Bankruptcy Court did, nor is it what the Bankruptcy Court said. The Bankruptcy Court granted summary judgment, holding "that the limitation of liability clause limits Intermedia's liability to the express terms of the contract." Opinion at 25 (A03391).

The Bankruptcy Court did not address the argument Parus now makes on appeal – that general damages are different than consequential damages and are not barred under the UC Contract's Limitation of Liability clause – because Parus never presented it to the Bankruptcy Court. See S.J. Response at 40-42 (A01272-74) (limiting challenge regarding the UC Contract's Limitation of Liability clause to asserted ambiguity and unreasonableness of that clause). Parus may not now belatedly present the argument to this Court. E.,g., In re Gaston & Snow, 243 F.3d 599, 608 (2d Cir. 2001) ("We normally will not consider an argument raised for the first time on appeal (internal citation omitted), and decline to exercise our discretion to consider defendants' argument.").[12]

**2. Parus's New Argument Improperly Isolates And Attacks A Single Phrase Outside The Context Of The Full Limitation Of Liability Clause.**

In addition to not having been raised below, Parus's new argument is without merit. By focusing exclusively on the phrase "consequential damages" in the contract's Limitation of Liability provision, Parus mischaracterizes and unduly limits the true scope of the liabilities the contracting parties agreed to not assert against each other. See Parus Brief at 21-23. Section 11

---

[12] Although it is not formally designated an adversary proceeding as in Gaston & Snow, the instant proceeding in bankruptcy is analogous. The only parties involved are the Debtors and Parus, and the only issues concern payment of claims for money; if affirmed, the Bankruptcy Court's summary judgment order will be fully dispositive of those claims.

of the UC Contract provides:

> **<u>LIMITATION OF LIABILITY</u>.** EXCEPT FOR DAMAGES ARISING UNDER SECTION [left blank in original], IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY INCIDENTAL, INDIRECT, SPECIAL, PUNITIVE, CONSEQUENTIAL OR SIMILAR DAMAGES OF ANY KIND INCLUDING WITHOUT LIMITATION, LOSS OF PROFITS, LOSS OF BUSINESS OR INTERRUPTION OF BUSINESS, WHETHER SUCH LIABILITY IS PREDICATED ON CONTRACT, STRICT LIABILITY OR ANY OTHER THEORY WITHOUT REGARD TO WHETHER SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

UC Contract § 11 (A00014) (capitalization and bold in original). It is this expansive limitation of liability clause, not some narrow limitation that speaks only of consequential damages, to which the Bankruptcy Court referred when ruling that (1) Intermedia's liability to EffectNet (Parus) was limited to the express terms of the contract; and (2) EffectNet's non-contractual claims against Intermedia – unfair and deceptive trade practices, breach of the covenant of good faith and fair dealing and civil conspiracy – were prohibited. Opinion at 21-25 (A03387-91).

None of the decisions Parus relied on requires a different result. Only one, <u>Penncro Assocs., Inc. v. Sprint Spectrum, L.P.</u>, 499 F.3d 1151 (10th Cir. 2007), even involves analysis of a contractual liability clause. Although <u>Penncro</u> was decided on Kansas not Arizona law, <u>id.</u> at 1155, Parus nevertheless relies on the case claiming that it involves a limitation of liability clause "similar to the Limitation of Liability clause in the present case." Parus Brief at 23. To the contrary, the clause at issue in <u>Penncro</u> is not at all similar to the Limitation of Liability clause in the UC Contract, and the narrowly confined decision of the <u>Penncro</u> court is not instructive as to the scope of the much more broadly drafted Limitation of Liability clause present here.

Unlike the Limitation of Liability clause in the UC Contract, with its multi-faceted and expansive prohibitions, the limitation of liability clause at issue in <u>Penncro</u> involved only consequential damages. <u>Penncro</u>, 449 F.3d at 1156, 1162. And the holding in <u>Penncro</u> is

expressly limited to a narrow limitation of liability clause prohibiting only consequential damages: "We hold that . . . where parties to an agreement *exclude liability only for consequential damages* . . ." profits lost as a direct result of a breach may be recovered. Id. at 1162 (emphasis supplied). The parties here did far more than simply "exclude liability only for consequential damages." In the context of all the provisions that came into play upon termination of the UC Contract, the parties did exactly what the Bankruptcy Court determined – "limit[] Intermedia's liability to the express terms of the contract." Opinion at 25 (A03391).

Finally, and most importantly, the court in Penncro recognized, and implicitly approved of, a different result when the facts were much more analogous to this case. Citing Continental Holdings, Ltd. v. Leahy, 132 S.W.3d 471, 475-77 (Tex. Ct. App. 2003), the court in Penncro noted that direct lost profits could not be recovered in a case where an "early termination provision limited recovery to the time the contract was actually in effect, *i.e.*, only up to its termination, not to the end of the written contract period." See Penncro, 499 F.3d at 1158 n.9. In Continental Holdings, the plaintiff argued, as Parus does here, that the contract's limitation of liability provision only precluded "consequential" lost profits and should not be interpreted to bar direct lost profits.[13] 132 S.W.3d at 475. Like Parus, the plaintiff sought to recover profits it would have received during the full term of the contract had it not been terminated before its expiration. Id. at 476. But, as is the case here, the contract at issue contained an early termination provision that limited the parties' recovery to the time the contract was actually in effect. Because the plaintiff's alleged "direct" lost profits related to a period after the contract had been terminated, its requested remedy was "inconsistent with the early termination remedy."

[13] The limitation of liability provision at issue provided that neither party should bear any liability to the other for "loss of production, loss of profits, loss of business or any other indirect or consequential damages, including, inter-alia, special and punitive damages." Continental Holdings, 132 S.W.2d at 475

Id. at 476.    Furthermore, "the contract's early termination remedy [was] consistent with interpreting the limitation-of-liability provision to preclude the recovery of 'direct' lost profits." Id.  Otherwise, the court explained, the plaintiff "would be permitted to recover damages in excess of those permitted by the early termination remedy."  Id. at 476-77.

The very same analysis applies here.  The direct damages that Parus seeks here are based upon payments that it hoped Intermedia would make over the life of the UC Contract.  See Parus Brief at 26-27.  But such an interpretation would be inconsistent with the termination provision in Section 5.3 of the UC Contract.  As in Continental Holdings, the Bankruptcy Court correctly interpreted the Limitation of Liability provision in the UC Contract by holding that Parus could recover only the four outstanding Reconciliation Payments.  Otherwise, Parus would have been permitted to recover damages exceeding those that had accrued before termination, thereby rendering Section 5.3 of the UC Contract meaningless.[14]

### 3.    Parus Misstates The Significance The Bankruptcy Court Attached To Section 5.3 Of The UC Contract.

Parus incorrectly asserts – without any citation to the Opinion – that the Bankruptcy Court erroneously construed Section 5.3 "as releasing damages" for breach of the UC Contract. Parus Brief at 26.[15]  Parus then claims that this is error based on case law holding that a

---

[14]  Parus's argument also conflicts with the doctrine of *expressio unius est exclusio arterius*.  By agreeing under Section 5.3 of the UC Contract that each party should remain liable for those obligations that had accrued before termination, the parties excluded other forms of liability that might otherwise have attached at or after termination.  See Herman Chanen Constr. v. Guy Apple Masonry Contractors, Inc., 453 P.2d 541 (Ariz. Ct. App. 1969) (applying doctrine to limit indemnification to class of employees named in contract, excluding other employees not names).

[15]  Section 5.3 of the UC Contract provides:

> Effect of Termination.  Upon termination of this Agreement for any reason, each Party shall remain liable for those obligations that accrued prior to the date of such termination; provided, however, that nothing herein shall be construed to obligate EffectNet to offer Services to Intermedia after termination of this Agreement.

contractual release clause "must be strictly construed against the party" relying it. Id. at 27. Parus misstates the Bankruptcy Court's construction of Section 5.3, and the case law Parus cites about strict construction of contractual release clauses is inapt.

The only reference to UC Contract Section 5.3 in the Opinion (other than when noting the parties' background contentions) appears in the Bankruptcy Court's analysis of matters relating to termination of the contract. See Opinion at 19-20 (A03385-86). There, the Bankruptcy Court notes that (1) EffectNet conceded that it ceased performing services under the UC Contract after Intermedia failed to cure its default; (2) such a cessation of performance was permitted by Section 5.3 "upon termination" of the contract; and (3) EffectNet's cessation of performance provided "further support for this Court's conclusion" that the UC Contract was terminated. Opinion at 20 (A03386). The Court did not construe Section 5.3 to be a "release" of damages, as Parus now incorrectly asserts. See generally id.

Parus compounds its error by citing case law addressing contracts and contractual provisions that are not even remotely similar to the UC Contract or any of its provisions. Specifically, Parus cites cases concerning form agreements containing exculpatory covenants that purport to release a party from its own negligence, in advance. It is only this type of potentially overreaching, prospectively exculpatory clause that Parus's cited authority advises are to be "strictly construed against the party which attempts to rely on such clause." Parus Brief at 27 (citing Morganteen v. Cowboy Adventures, Inc., 949 P.2d 552, 553 (Ariz. Ct. App. 1997) ("preprinted exculpatory covenant releasing [a horse riding stable] in advance from liability for any injuries arising during the ride."); Sirek v. Fairfield Snowbowl, Inc., 800 P.2d 1291, 1294-95 (Ariz. Ct. App. 1990) (ski equipment rental agreement absolving rental company from liability in

---

UC Contract § 5.3 (A00010).

advance "for any injury which may result during or from [equipment] use")). It is difficult to imagine contractual relationships that are more dissimilar from the one memorialized in the UC Contract.[16]

**E. Parus Offers Only Inapposite Authority And Distortion Of The Bankruptcy Court's Opinion To Support Its Claim Of Anticipatory Repudiation.**

As Parus acknowledges, for Intermedia to have anticipatorily repudiated the UC Contract there must have been "a positive and unequivocal manifestation" by Intermedia that it would "not render the promised performance when the time fixed for it in the contract arrives." Parus Brief at 23-24 (quoting Diamos v. Hirsch, 372 P.2d 76, 78 (Ariz. 1962)). In its appellate brief, Parus cites alleged shortcomings in Intermedia's conduct, which Parus variously claims are manifestations that Intermedia either "might not" or "would not" perform its obligations under the UC Contract. Parus Brief at 24-25. Parus does not, however, provide Arizona case law on anticipatory repudiation against which Intermedia's conduct can be measured. This omission is telling. A review of Arizona case law makes clear that Intermedia's conduct falls well below what the Arizona courts consider sufficient to constitute "a positive and unequivocal manifestation" of intent to not perform.[17]

---

[16] The other cases Parus cites in this section of its appellate brief are equally unavailing. Each stands for the general, abstract proposition that contract damages either accrue from or are measured at the time of breach. None, however, involves contracts or fact patterns the same or similar to those present here. None involves alternative performance obligations that can be satisfied by either providing a specified performance (*i.e.*, Intermedia supplying the monthly minimum number of subscribers required by Section 2.12) or paying a calculable amount of money (*i.e.*, Intermedia paying a Reconciliation Payment to make up for any shortfall in performance as described in Section 2.13). And, none involve a contract providing for a notice of default followed by a contractually stipulated time for curing the default as specified in Section 5.2. See Parus Brief at 27.

[17] Compare Rancho Pescado v. Northwestern Mut. Life Ins. Co., 680 P.2d 1235, 1247 (Ariz. Ct. App. 1984) (finding an unequivocal manifestation to not perform in correspondence advising: "The license agreement is terminated for cause as of December 31, 1974"), and Kammert Bros. Enterprises, Inc. v. Tanque Verde Plaza Co., 428 P.2d 678, 683 (Ariz. Ct. App. 1967) (finding anticipatory repudiation when real estate seller refused to accept payment in full, demanding more "because the value of the land had increased.").

In the absence of supporting case law, Parus points to Intermedia's asserted failure to "offer assurances of performance" as an independent basis for finding that Intermedia anticipatorily repudiated performance under the UC Contract. Parus Brief at 25. This too is unavailing. As reflected in Section 251 of the Restatement (Second) of Contracts, on which Parus relies, it is only *after* a demand has been made for assurance of performance that the failure to provide such assurance may be treated as a repudiation. Here, the March 12, 2002 correspondence from EffectNet's General Counsel, to which Parus refers (Parus Brief at 25), did not seek assurances of any sort from Intermedia. Instead, as stated in the correspondence, EffectNet gave Intermedia "notice of default under Section 5.2 of the [UC Contract]," demanded the payment of money and advised that failure to pay within 30 days subjected the UC Contract to termination. March 12, 2002 letter from Robert McConnell, General Counsel of EffectNet, to Rich Black of Intermedia at 2 (A01206).

On appeal, Parus does not challenge the correctness of, or even mention, the Bankruptcy Court's determination that Intermedia had the contractual right to either deliver the required monthly minimum number of service subscribers (UC Contract § 2.12) or make a reconciliation payment to cover any subscriber shortfall (UC Contract § 2.13). Instead, Parus asserts the Bankruptcy Court "held" that Parus failed to establish anticipatory repudiation because there was "no breach 'within the four corners of the UC Contract.'" Parus Brief at 23. That is incorrect. The Court held that, because Intermedia had the contractual right to either provide a minimum number of subscribers or pay a Reconciliation Payment covering any shortfall, Intermedia's failure to perform one of those alternative obligations [deliver or do things promoting delivery of the minimum number of subscribers] did not constitute an unequivocal act of repudiation, or

"breach" of the contract. Opinion at 21 (A03387).[18]

Parus quarrels with the Bankruptcy Court's use of the word "breach" in this context. Parus Brief at 23-24. In doing so, Parus ignores that "anticipatory breach" and "anticipatory repudiation" have become virtual synonyms in legal parlance. Indeed, "[i]t is now the generally prevailing rule . . . that a definitive and unconditional repudiation of the contract . . . is a breach of contract . . . ." 10 Corbin on Contracts (Interim Ed) § 959 at 43; see also McMahon v. Fiberglass Fabricators, Inc., 496 P.2d 616, 618 (Ariz. Ct. App. 1972) ("In order to find a breach of contract, there must be a positive and unequivocal manifestation on the part of the repudiating party that he will not render the required performance when it is due."). Similarly, it is hardly surprising, let alone error, for a court faced with determining whether a contracting party's conduct has amounted to an anticipatory repudiation or breach of contract to view that conduct in the context of the entire contract, *i.e.*, from its "four corners" and not just in the context of some of its provisions. Indeed, to do otherwise would be inappropriate.

**F. EffectNet Elected To Terminate The UC Contract.**

In the final analysis, Parus's arguments about anticipatory repudiation are irrelevant: Parus undisputedly elected to wait until Intermedia defaulted on the Reconciliation Payments before terminating the UC Contract. Parus did not claim in 2001 or 2002 that Intermedia's conduct constituted an anticipatory repudiation. Nor did it attempt to exercise its right to sue for an anticipatory breach. Indeed, Parus's default letters of March 12 and 25, 2002 make no mention of any anticipatory breach. Instead, Parus elected to terminate the contract under Section 5.2. Accordingly, Parus's remedy is to collect the four Reconciliation Payment

[18] As the Court stated: "Parus negotiated terms in the UC Contract which gave Intermedia the right to either provide a minimum number of subscribers per month or pay a reconciliation payment for any shortfall." Opinion at 21 (A03387).

obligations that accrued before the UC Contract terminated on April 12, 2002, as provided in Section 5.3. This is what the Bankruptcy Court correctly determined.

## II. THE BANKRUPTCY COURT APPROPRIATELY ENTERED SUMMARY JUDGMENT ON PARUS'S CLAIMS AGAINST INTERMEDIA FOR BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING, CIVIL CONSPIRACY, AND UNFAIR AND DECEPTIVE TRADE PRACTICES.

After holding the Limitation of Liability clause enforceable and determining that it limits Intermedia's liability to the express terms of the contract, the Bankruptcy Court granted summary judgment for Intermedia on Parus's claims for breach of the covenant of good faith and fair dealing, civil conspiracy, and unfair and deceptive trade practices. Those claims against Intermedia failed, the Bankruptcy Court correctly held, because "the Limitation of Liability clause prohibited the imposition of any non-contractual damages against Intermedia." Opinion at 25 (A3391). The Bankruptcy Court found that Parus was entitled only to the four delinquent Reconciliation Payments owed pursuant to the contract before its termination and, thus, enforced the parties' agreement that they could not recover any other damages under any other theory.

Parus does not contend that any material fact precludes summary judgment on these three causes of action. Instead, it argues that the Limitation of Liability clause does not preclude general or direct damages and that it does not preclude damages based upon tort theories. For the most part, Parus's argument here simply rehashes its mistaken claims about the Penncro decision. See Parus Brief at 28. As discussed in Section I.D.2 above, Penncro does not apply here because its holding was expressly limited to a narrow limitation of liability clause prohibiting only consequential damages. Penncro, 449 F.3d at 1162. The Bankruptcy Court correctly awarded Parus the general, direct damages for which it bargained: the four outstanding Reconciliation Payments.

The remainder of Parus's argument concerns its purported entitlement to tort damages

under these three causes of action. See Parus Brief at 29. As explained below, summary judgment is proper with respect to each of these theories.

### A. Summary Judgment Was Proper On The Claim Against Intermedia For Breach Of The Covenant Of Good Faith And Fair Dealing.

Parus argues that it should be entitled to recover either general contract damages or direct tort damages on its claim for breach of the covenant of good faith and fair dealing. Parus cites Rawlings v. Apodaca, 726 P.2d 565, 574-75 (Ariz. 1986), as "controlling Arizona law" for the proposition that the duty of good faith and fair dealing is implied in every contract. Parus Brief at 29 n.11. But Parus ignores that a breach of that duty gives rise to a tort claim *only* when the type of contract is one in which the plaintiff "seeks something more than commercial advantage or profit." Id. at 575. Under Arizona law, a tort action for breach of the implied covenant will not lie without a "special relationship" between the parties arising from elements of "public interest, adhesion, and fiduciary responsibility."[19] Burkons v. Ticor Title Ins., 813 P.2d 710, 720 (Ariz. 1991). The two most important factors in determining whether a party may assert a tort claim for bad faith are "(1) whether the plaintiff contracted for security or protection rather than for profit or commercial advantage, and (2) whether permitting tort damages will provide a substantial deterrence against breach by the party who derives a commercial benefit from the relationship." Dodge v. Fid. & Dep. Co. of Md., 778 P.2d 1240, 1242 (Ariz. 1989).

---

[19] Although the Court in Rawlings left open the possibility that a tort action might be recognized outside of the relationship of insured and insurer, it appears that every attempt since Rawlings to extend the tort of bad faith in Arizona beyond the insurance industry has been rejected. In each instance, the court concluded that the "special circumstances" necessary to give rise to tort action for breach of the implied covenant of good faith and fair dealing were lacking. See Oldenburger v. Del E. Webb Dev. Co., 765 P.2d 531 (Ariz. App. 1988) (rejecting a bad faith tort remedy arising from a real estate contract); McAlister v. Citibank, 829 P.2d 1253 (Ariz. Ct. App. 1992) (rejecting a bad faith tort remedy arising from a banking contract); Nelson v. Phoenix Resort Corp., 888 P.2d 1375 (Ariz. 1994) (rejecting a bad faith tort remedy arising from an employment contract). While theoretically it is possible that someday in the future Arizona law may be extended to recognize a tort action for breach of the implied covenant of good faith and fair dealing beyond the insurer/insured relationship, the reality today is that it has only been applied to insurance companies.

Applying these principles to the undisputed facts in this case leads inexorably to the conclusion that Parus did not have a "special relationship" with Intermedia giving rise to a tort action for breach of the implied covenant of good faith and fair dealing. Indeed, Parus never argued below, and does not argue on appeal, that it had a special relationship with Intermedia. The UC Contract was an ordinary commercial contract between two sophisticated business entities pursued for "profit or commercial advantage." The public interest was not involved; no element of adhesion was present; no fiduciary relationship existed between the parties; and neither security nor protection was the subject of the contract. Absent a special relationship, which does not exist here, Parus has no tort action for breach of the covenant of good faith and fair dealing. Wells Fargo Bank v. Ariz. Laborers, Teamsters, 38 P.3d 12, 29 (Ariz. 2002).

Lacking a tort action, the UC Contract itself provides the remedy for an alleged breach of the covenant of good faith and fair dealing. See Rawlings, 726 P.2d at 574; Union Oil Company of California v. John Brown E&C, 1995 WL 354259, at *4 (N.D. Ill. June 9, 1995) (dismissing claim for breach of covenant as nothing more than a restatement of party's claim for breach of contract).[20] As described above, the Bankruptcy Court properly found that Intermedia owed only the four outstanding Reconciliation Payments as damages for breach of the UC Contract. Accordingly, the Bankruptcy Court correctly entered summary judgment on the claim for breach of the implied covenant of good faith and fair dealing.

---

[20] Parus misplaces reliance on Union Oil for the proposition that parties cannot disclaim the covenant of good faith. The court in Union Oil, which applied California law, rejected an effort to convert a breach of contract claim into a tort claim for breach of the covenant for the same reasons applicable here: there was no allegation or argument of the required "special relationship" between the parties. 1995 WL 354259, at *3-4. Moreover, the case does not even support the proposition for which Parus cited it. Although quoting another case applying California law that parties cannot disclaim the covenant, the same quotation also explained that parties "are free, within reasonable limits at least, to agree upon standards by which application of the covenant is to be measured." Id. at *2. Parus thus fails to cite any authority that precluded the limits the parties placed on the recovery of damages under the UC Contract.

**B. Summary Judgment Was Proper On The Conspiracy Claim Against Intermedia.**

In support of its civil conspiracy claim, Parus argues only that it is entitled to recover "direct damages" and that reading the Limitation of Liability clause to preclude the civil conspiracy claim violates public policy. Parus Brief at 29. Parus does not describe what its direct damages could be under the conspiracy claim or how they would differ from the four Reconciliation Payments allowed under the UC Contract. Parus also fails to offer any authority suggesting that parties cannot agree to limit damages, as they did here, for tort claims. Parus claims that Baker Pacific Corp. v. Suttles, 269 Cal. Rptr. 709, 712 (Cal. Ct. App. 1990), stands for the proposition that reading the Limitation of Liability clause to preclude Parus's civil conspiracy claim violates public policy. Parus Brief at 29. Parus is mistaken. Baker Pacific, which was decided under inapplicable California law,[21] involved very different facts. There, an employer sought to force two employees to sign a broad release as a condition of employment on an asbestos remediation project. Baker Pacific, Cal. Rptr. at 710-11. The court found that the broad language would include a release from liability for fraud and intentional acts and, thus, violated California Civil Code section 1668, which forbids such releases. Id. at 712. Parus has not pointed to such statute in any of the applicable jurisdictions, and Debtors are aware of none.

More fundamentally, a claim of civil conspiracy cannot rest on proof of a conspiracy alone. As Parus argued in the Bankruptcy Court, the purported conspirators must have engaged in unlawful conduct, or lawful conduct for an unlawful purpose, in furtherance of which at least one of the conspirators committed a tortious act. S.J. Response at 44 (citing Adcock v. Brakegate, Ltd., 645 N.E.2d 888, 894 (Ill. 1994)). Accord Gallagher Bassett Servs., Inc. v. Jeffcoat, 887 So.2d 777, 786 (Miss. 2004); Florida Fern Growers Ass'n, Inc. v. Concerned

[21] None of the parties claim that California law applies in this case. Opinion at 26 n.2 (A03392).

Citizens of Putnam County, 616 So.2d 562, 565 (Fla. Dist. Ct. App. 1993); Savard v. Selby, 508 P.2d 773, 776 (Ariz. 1973); Uvodich v. Ariz. Bd. of Regents, 453 P.2d 229 (Ariz. 1969). Parus, however, has never identified anything more than its claims for breach of contract and tortious interference as the underlying tortious acts. A simple breach of contract cannot serve as an underlying tort that would permit imposing joint and several liability through a conspiracy theory. John's Insulation, Inc. v. Siska Constr. Co., Inc., 774 F. Supp. 156, 162 (S.D.N.Y. 1991). Likewise, tortious interference cannot serve as the basis for civil conspiracy against Intermedia because the company could not tortiously interfere with its own contract. See Golden v. Daiwa Corp., 2000 WL 251736, at *3 (N.D. Tex. March 6, 2000). Nor can Parus hold Intermedia liable through a conspiracy theory for tortious interference when, as discussed below, its tortious interference claim against WorldCom fails as a matter of law. See id. John's Insulation, 744 F. Supp at 162-63; JIT Concepts, Inc. v. Shelby County Healthcare Corp., 358 F. Supp. 2d 678, 688 (W.D. Tenn. 2005) (holding that to prevail on civil conspiracy claim based on inducement to breach contract, plaintiff must first establish claim for inducement to breach a contract).[22] Because Parus did not identify a single material issue of fact on its conspiracy claim and likewise failed to establish a viable claim for tortious interference that could support a claim for conspiracy, the District Court should affirm the Bankruptcy Court's entry of summary judgment.

### C. Summary Judgment Was Proper On The Claim Against Intermedia For Unfair And Deceptive Trade Practices.

Like Parus's argument on its conspiracy claim, Parus supports its claim for unfair and deceptive trade practices by claiming only that it is entitled to recover "direct damages" from

[22] Nothing in Parus's arguments in opposition to summary judgment evidenced that the actions taken by WorldCom after July 1, 2001 were anything other than business decisions made in a competitive market. As such, they were not "unlawful" for purposes of Parus's civil conspiracy claim. See, e.g., De L'Ogier Park Dev. Corp. v. First Fed. Sav. & Loan, 286 N.E.2d 583, 586 (Ill. Ct. App. 1972) (holding that damage done to competitors, including forcing competitors out of business, is not per se unlawful).

Intermedia and that parties to a contract may not disclaim liability for violations of unfair and deceptive trade practice statutes. Parus Brief at 29. As with its conspiracy claim, Parus fails to describe how direct damages under its unfair trade practices theory would differ from the four Reconciliation Payments allowed under the UC Contract and fails to provide authority precluding two sophisticated businesses from agreeing to limit their recovery for tort claims.

Parus misplaces its reliance on Voicestream Wireless Corp. v. U.S. Communications, Inc., 912 So.2d 34, 38 (Fla. 2005), for the proposition that Intermedia and Parus could not disclaim liability for violations of unfair and deceptive trade practice statutes. That proposition in Voicestream applies in very different circumstances. The prohibition against disclaiming liability only applies when the limitation of liability defeats a statute's remedial purposes of protecting individuals and the public. Id. at 38. That is not the case here. Intermedia was the customer purchasing service from Parus. Intermedia's failure to pay four Reconciliation Payments to Parus do not implicate the type of public policy concerns that consumer protection statutes were designed to protect. Indeed, Parus has never cited, and Debtors are unaware of, any reported decision imposing liability on a customer under the consumer protection acts of Arizona, Mississippi, Florida or Illinois. To find that a consumer protection statute allows a service provider to sue its customer for a failure to pay four invoices "would require stretching the language of the Act beyond its intended reach." Cf. Waste Mfg. & Leasing Corp. v. Hambicki, 900 P.2d 1220, 1225 (rejecting argument by corporate plaintiff that scope of ACFA stretches to include sale of existing business entity as sale of merchandise). As the Second Circuit held, it is reversible error to find a simple contract breach sufficient to establish a violation of a consumer protection act. Boulevard Assoc., 72 F.3d at 1039 (reversing district court determination that defendant's breach of lease constituted violation of Connecticut Unfair

Trade Practices Act). Any rule to the contrary would convert every contract dispute into a consumer protection violation. Id.

## III. THE BANKRUPTCY COURT CORRECTLY ENTERED SUMMARY JUDGMENT ON PARUS'S CLAIMS AGAINST WORLDCOM FOR TORTIOUS INTERFERENCE, CIVIL CONSPIRACY AND UNFAIR AND DECEPTIVE TRADE PRACTICES.

### A. The Bankruptcy Court Correctly Held That Parus's Tortious Interference Claim Fails As A Matter Of Law.

Applying Illinois law, the Bankruptcy Court correctly held that Parus failed to establish the fourth element of a claim for tortious interference: a breach caused by defendant's wrongful conduct.[23] See Opinion at 28-33 (A3394-99). It also correctly held that Parus failed to provide evidence showing that WorldCom employed wrongful means that could overcome the privilege afforded WorldCom by law as a result of its relationship to Intermedia. Opinion at 30-33 and nn. 5-6 (A3396-99). Parus does not argue that there was a genuine issue of material fact that prevented summary judgment. Parus only complains about the Bankruptcy Court's legal analysis. Specifically, Parus criticizes the Bankruptcy Court for subdividing "actions relating to WorldCom's interference into 'pre-merger' and 'post-merger' wrongdoing," even though Parus itself raised the issue of "pre-merger" conduct to avoid summary judgment on the grounds of privilege. Parus also contends, in conclusory fashion, that the Bankruptcy Court erred in analyzing the issues of privilege, causation and wrongful means. Each of Parus's arguments fails.

---

[23] Parus argued that Illinois law governed its tortious interference claim, and the Bankruptcy Court applied it. Opinion at 28 (A03394). That law requires Parus to prove (1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the awareness on the part of the defendant of the contractual relation; (3) defendant's intentional and unjustified inducement of the breach of the contract; (4) a subsequent breach by the other caused by defendant's wrongful conduct; and (5) damages. Opinion at 29 (A3395) (citing Agrimerica, Inc. v. Mathes, 557 N.E.2d 357, 367 (Ill. App. Ct. 1990)).

**1. The Bankruptcy Court Correctly Determined Pre-Merger Allegations Of Interference.**

Parus argues that the Bankruptcy Court erred because WorldCom was not entitled to interfere with Parus's relationship with Intermedia before WorldCom acquired Intermedia. Parus Brief at 30. The Bankruptcy Court's ruling, however, did not depend on a finding of privilege with respect to any alleged pre-merger interference. Instead, the Bankruptcy Court correctly held that Parus's claim of pre-merger wrongdoing failed because the only evidence that Parus posited on the point was a statement that "as early as January 2001, [Parus] noticed that Intermedia was only opening accounts for Intermedia sales representative and certain Intermedia executives." Opinion at 29 (A03395). This statement alone was not enough to establish that WorldCom wrongfully induced a breach by Intermedia.

Examining Parus's allegations concerning pre-merger "interference" confirms the appropriateness of the Bankruptcy Court's findings. Parus never brought forward evidence to create a genuine issue of material fact to support its claim (used for both its tortious interference and conspiracy theories) that WorldCom "hatched" a plan before the merger to undermine Intermedia's performance under the UC Contract. See S.J. Response at 18 (A01250). Parus only alleged that WorldCom engaged in wrongful conduct *after* the WorldCom-Intermedia merger. See, e.g., Parus Opp. to Claim Obj. at ¶¶ 16-18 (A00057-58) (alleging acts that occurred "after the WorldCom-Intermedia business combination"), 79-81 (A00073) (alleging acts that occurred "[a]fter the Intermedia-WorldCom business combination"). Indeed, the only assertion Parus made of a conspiracy predating the July 1, 2001 merger was this equivocal allegation: "[Parus] believes that *on or before* July 1, 2001, Intermedia and WorldCom made a conscious election to breach and repudiate the UC Contract." Parus Opp. to Claim Obj. ¶ 15 (A00057).

At the summary judgment stage, Parus claimed for the first time that it had "indisputable

evidence" of a pre-merger plan to undermine Intermedia's performance under the UC Contract. S.J. Response at 18 (A01250). The only "evidence" of a pre-merger plan that Parus now claims was "ruled in error" was the statement of its CEO, Taj Reneau, that "as early as January 2001, [Parus] noticed that Intermedia was only opening accounts for Intermedia sales representatives and certain Intermedia executives."[24] See Affidavit of Taj Reneau ¶ 26 (A02304); Parus Brief at 30. Even construed in the light most favorable to Parus, this statement about what Parus noticed Intermedia doing is completely silent on any activity by WorldCom.

The very same assertion – that Parus noticed Intermedia opening accounts only for Intermedia personnel in January 2001 (the first month after the contract's Rollout date) – is also the only evidence Parus submitted of a pre-merger breach of the UC Contract. See S.J. Response at 9 (A01241). Nothing in the contract, however, prohibited Intermedia from opening accounts initially for its sales representatives and executives (a step that is obviously crucial to having the product succeed in the marketplace). Furthermore, the only assertion that Intermedia ceased opening new accounts (an allegation based upon a serious mischaracterization of an email) purportedly occurred *after* the WorldCom-Intermedia merger. See S.J. Response at 9-10 (A01241-42).

Without any discussion of privilege, the Bankruptcy Court explained why Parus's pre-merger "evidence" could not avoid summary judgment:

> Even if WorldCom induced Intermedia to cease opening up new accounts, such an action would not constitute a breach of the UC Contract since Intermedia was well within its rights to either meet the minimum number of subscribers each month or pay [Parus] a reconciliation payment for any shortfall. Therefore, element four of the five-part test for tortious interference with a contract would fail because such an action would not constitute a breach under the UC Contract.

[24] Parus made several other assertions of pre-merger conspiracy/interference, but the evidence it cited for those assertions did not remotely support the allegations. See S.J. Reply at 5-7 (A2688-90). Moreover, Parus does not assert any error with respect to their determination by the Bankruptcy Court.

> No reasonable jury could find in favor of Parus because the evidence to support its case with regard to alleged pre-merger wrongdoing is slight. See Gallo [v. Prudential Residential Services, Ltd. Partnership], 22 F.3d [1219,] 1224 [(2d Cir. 1994)]."

Opinion at 29-30 (A03395-96). Simply put, Parus's only evidence of pre-merger breach and pre-merger interference – a single statement about what Parus noticed Intermedia doing – does not suffice to create a genuine factual issue that WorldCom engaged in wrongdoing prior to its merger with Intermedia that caused a breach.

**2. WorldCom Enjoyed A Pre-Merger Privilege To Interfere.**

Parus claims that the Bankruptcy Court erred in applying a privilege for interferences that began before WorldCom acquired Intermedia. Parus Brief at 30. Parus argues that this was legal error because there allegedly was no "unity of interest" before WorldCom acquired Intermedia. Id. at 31. Although the court does not appear to have relied on a privilege to rule on Parus's pre-merger allegations, it would not have been error if it had.

Illinois law does not limit the privilege to parent-subsidiary situations. It is much broader. A privilege to interfere exists "when a defendant acts in good faith to protect an interest or uphold a duty." American Broadcasting Co. v. Maljack Productions, Inc., 34 F. Supp. 2d 665, 675 (N.D. Ill. 1998) (citing Delloma v. Consolidation Coal Co., 996 F.2d 168, 171 (7th Cir. 1993) and HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc., 545 N.E.2d 672, 677 (Ill. 1989) (privilege exists "where the defendant was acting to protect an interest which the law deems to be of equal or greater value than the plaintiff's contractual rights")). Courts apply privilege as a matter of law based upon the relationship of the parties and their respective interests. For example, in HPI Health Care, the Illinois Supreme Court found privilege and affirmed the dismissal of tortious interference claims against two hospital management companies (which were not affiliated with the hospital, but had contracts to manage the hospital

and collect its bills) because they, like corporate officers and directors, owed a duty to exercise business judgment in managing the hospital's affairs and, in particular, needed to exercise that judgment in choosing when, and to which creditors, payments should be made to satisfy the hospitals' debts. Id. at 677. See also Williams v. Shell Oil Co., 18 F.3d 396, 398 (7th Cir. 1994) (refinery owner privileged to direct vendor performing maintenance at refinery to remove employee from project); American Broadcasting Co., 34 F. Supp. 2d 665, 674-76 (N.D. Ill. 1998) (broadcaster privileged to interfere with a competitor's relationship with third party and to act on copyright interest).

Here, the undisputed facts showed that WorldCom and Intermedia entered into an agreement to merge on September 5, 2000, that the Department of Justice brought an antitrust action against them, and that the District Court for the District of Columbia ordered WorldCom to divest Intermedia (except for its Digex subsidiary) as an ongoing, viable business. Opinion at 2 (A03368). The undisputed facts presented at summary judgment also showed that Intermedia submitted a joint motion seeking modification of the district court's order, which was ultimately granted, because conditions in the telecommunications market had deteriorated.[25] Memo. in Supp. of Mot. to Modify Hold Separate Order at 3-7 (A02789-93); Modified Hold Separate Order (A02796). Although there is no evidence that WorldCom did anything to induce a breach before its merger with Intermedia, the law certainly afforded it a privilege to do so because of its

[25] After the summary judgment motion had been fully submitted, Debtors also obtained documents showing that Parus's former counsel, acting on behalf of Intermedia, had submitted multiple affidavits from Intermedia officers during the first half of 2001 to the district court attesting (1) that WorldCom had provided $575 million in financing to Intermedia; (2) that WorldCom and Intermedia continued to operate as separate entities; (3) that company executives had been advised of their obligations under the Hold Separate Order; (4) that the foregoing actions were to assure compliance with the obligations; and (5) that Intermedia executives had advised that market conditions had required Intermedia to postpone planned projects or network expansions, cancel other projects, and reduce staff all in an effort to preserve, maintain, and operate Intermedia as an economically viable competitive business. See Declarations of Heather B. Gold dated December 7, 2000, January 8, 2001, February 5, 2001, March 6, 2001 and Declarations of Patricia Kurlin dated April 19, 2001, June 6, 2001 (A4188-4215).

interests as an investor and acquirer of Intermedia, its duty under the Hold Separate Order to ensure Intermedia could be divested as an ongoing, viable business, and its interests as a competitor (in light of Parus's unsupported conjecture that WorldCom sought to sell its genD product in competition with Parus's unified communications services). Because Parus never alleged wrongful means, as described hereafter, there could be no error in finding privilege even in the pre-merger context.

In arguing about pre-merger privilege, Parus confuses tortious interference with conspiracy. Parus argues, for example, that the Bankruptcy Court "ignored longstanding authority holding that a defendant may not claim parent-subsidiary privilege with respect to a *conspiracy* that began prior to the acquisition even if it continued after." Parus Brief at 30 (emphasis added). For this proposition, Parus relies on a conspiracy decision in Dozier & Gay Paint Co. v. Dilley, 518 So.2d 946, 950 (Fla. Ct. App. 1988).[26] But, as that case shows, tortious interference does not depend upon a conspiracy. Even though the conspiracy claim in Dozier & Gay could not be ruled on summary judgment, the tortious interference claim could, and was. Id. at 947. The court of appeals did not clearly state the basis for affirming summary judgment on the tortious interference claim, but it appears that it affirmed because of the privilege afforded to

[26] The other case on which Parus relies is Metropolitan Life Ins. Co. v. La Mansion Hotels & Resorts Ltd., 762 S.W.2d 646, 652 (Tex. Ct. App. 1988). The court in that case expressly limited its discussion to the evidence of conspiracy, and affirmed a temporary injunction, the standard for which under inapplicable Texas law is "whether the applicant is entitled to preservation of the status quo . . . ." Id. at 647-48. The court maintained the injunction because a real estate foreclosure threatened to affect the posture of the parties during the litigation. Although observing that the alleged conspiracy had begun before an acquisition, that observation is not surprising because Metropolitan is one of the cases that has created a split in the Texas courts over whether a parent corporation and its subsidiary corporations are capable of conspiring together. See Golden v. Daiwa Corp., 2000 WL 251736, ay *3 (N.D. Tex. Mar. 6, 2000) (dismissing claims on grounds of privilege and observing split among Texas courts, comparing Atlantic Richfield Co. v. Misty Products, Inc., 820 S.W.2d 414, 420 (Tex. Ct. App. 1991) (parent cannot conspire with wholly-owned subsidiary) with Metropolitan Life).

those persons having business interests in a contract. See id. at 950.[27]

In this case, Parus cannot avoid summary judgment even if conspiracy were an element of a claim for tortious interference. Parus never alleged any pre-merger conspiracy. As set forth above, the Bankruptcy Court found that Parus's arguments concerning pre-merger interference did not satisfy the requirement that WorldCom cause a breach of the UC Contract.

**3. WorldCom Enjoyed A Post-Merger Privilege To Interfere.**

Parus incorrectly argues that the Bankruptcy Court failed to address whether a privilege applied. Parus Brief at 31. The history of the parties' arguments at summary judgment reveals the flaw in Parus's argument. In their briefing, Debtors cited multiple cases standing for the proposition that, as a matter of law, a parent company cannot be liable for interference with a contract of its subsidiary because the financial interests of both entities are so closely aligned that they are viewed as being the same entity when analyzing a claim for tortious interference. See S.J. Memo. at 10-11 (A01223-24) (citing *inter alia* Boulevard Assoc. v. Sovereign Hotels, Inc., 72 F.3d 1029, 1036 (2d Cir. 1995) and cases collected therein; Texas Taco Cabana, L.P. v. Taca Cabana of N.M., Inc., 304 F. Supp. 2d 903, 912 (W.D. Tex. 2003); Record Club of Am., Inc. v. United Artists Records, Inc., 643 F. Supp. 925, 943 (S.D.N.Y. 1986)). Parus did not dispute this general rule. Instead, it argued that even if the general rule applied, WorldCom lost the privilege because it acted detrimentally to Intermedia's interest and engaged in wrongful conduct. S.J.

[27] Although the conspiracy count in Dozier & Gay could not be resolved by summary judgment, it was entirely different from that alleged here. In Dozier & Gay, the alleged conspiracy went beyond merely a corporation and its subsidiary. It involved four brothers, their company, and two employees of the plaintiff, which was a supplier to the brothers' company. While the supplier's employees still worked for the supplier, they agreed that the four brothers would form a third company to compete with the supplier, that the employees would move to the new company, and that the brothers' company would move its business from the supplier to the new company. The court rejected the brothers' claim that they should be shielded as inactive shareholders of the new company, holding that at the point in time of the alleged conspiracy, the new company did not even exist and, thus, the plaintiff had not alleged conspiracy against the brothers in their capacity as shareholders of the new company. Id. at 947-48, 950.

Response at 47-51 (A01279-83). Contrary to Parus's contention that the Bankruptcy Court failed to address whether privilege applied, the Bankruptcy Court acknowledged the parties' arguments and provided its own analysis of the law. See opinion at 30-31 n.5 (A3396-97). Citing HPI Health Care, the Bankruptcy Court explained that the decisions of the defendant hospital management company in that case were privileged because the company was exercising its business judgment. Id. Applying these principles, the Bankruptcy Court found that "even assuming WorldCom induced a breach of the UC Contract, Parus has failed to create an issue of fact regarding WorldCom's misuse of such business judgment." Id.

With respect to post-merger matters, Parus also submits a completely new argument: that there was no privilege after the WorldCom-Intermedia merger because of the Hold Separate Order. Parus Brief at 31. Parus made no such argument to the Bankruptcy Court and cannot raise new arguments on appeal. See *supra* p. 3. Nevertheless, Parus's new argument also fails. As explained above, WorldCom had an interest in, and duties with respect to, Intermedia's economic viability and, thus, enjoyed a privilege attributable not only to its relationship with Intermedia but also to the Hold Separate Order itself. Parus further omits that the District Court for the District of Columbia approved modifications to the Hold Separate Order because the telecommunications marketplace had deteriorated, growth in telecommunications services markets had slowed dramatically, and a glut had developed of carrier business and assets available at distressed prices, resulting in many companies being forced to restructure or substantially downsize their operations. Memo. in Supp. of Mot. to Modify Hold Separate Order at 3-7 (A02789-93); Modified Hold Separate Order (A02796). Those modifications eliminated any requirement for WorldCom to hold separate or otherwise preserve the business of which the UC Contract was a part. Id.

### 4. Parus Failed To Show Causation.

Parus argues in the title of its third subsection on tortious interference that "WorldCom's Interference Did Cause Intermedia to Breach the UC Contract." Parus Brief at 31 (emphasis in original). The content of Parus's argument, however, does not support its billing. Parus argues that Intermedia's failure to meet certain subscription levels for the service under the UC Contract is actionable breach or, at least, evidence of a breach of the covenant of good faith and fair dealing, entitling Parus to more damages.[28] Parus never articulated this theory of breach at summary judgment. The only pre-merger breach that Parus argued at summary judgment was that Parus "noticed that Intermedia was only opening accounts for Intermedia sales representatives and certain Intermedia executives." S.J. Response at 9 (A01241).[29] But even assuming that argument were valid—and the Bankruptcy Court properly held that it is not—Parus points to no evidence that WorldCom caused that breach in any way at all, let alone by any wrongdoing. The Bankruptcy Court recognized this absence of evidence and entered summary judgment because Parus did not advance evidence on the fourth element of a tortious interference

[28] Parus's reliance on Emerson Radio Corp. v. Orion Sales, Inc., 253 F.3d 159 (3d Cir. 2001), and Badger Pharmacal, Inc. v. Colgate-Palmolive Co., 1 F.3d 621, 630 (7th Cir. 1993), is misplaced. Both turned on an interpretation of a contract requiring minimum royalty payments, not language as is found in the UC Contract providing for a Reconciliation Payment upon failure to achieve a minimum number of accounts. Furthermore, although Emerson reversed summary judgment on a claim for breach of the covenant of good faith and fair dealing (for reasons totally distinguishable here), it *affirmed* summary judgment on a tortious interference claim because the purported interferor had an ownership relationship with the breaching party and, thus, was not subject to liability for tortious interference. Emerson, 253 F.3d at 173-74. Badger did not involve a tortious interference claim at all.

[29] The only argument that approached Parus's new theory of breach is found at page 49 of Parus's summary judgment opposition brief. Parus did not argue that failure to meet minimum subscriber levels was a breach. Instead, it included the requirement to obtain a minimum number of accounts in a long list of Intermedia obligations and actions that Parus used to speculate that the UC Contract was a "major undertaking" for Intermedia and that shutting it down "could not have been in Intermedia's interest." See S.J. Response at 49 (A01281). Of course, it is unreasonable to infer that a major undertaking is in Intermedia's interest when the undisputed facts show that Intermedia, WorldCom, and the Department of Justice were testifying to the district court of Intermedia's unprofitability and deteriorating economic conditions in the telecommunications market. See Memo. in Supp. of Mot. to Modify Hold Separate Order at 3-7 (A02789-93).

claim: that WorldCom's wrongful conduct caused Intermedia to breach the UC Contract. Opinion at 30, 33 (A03396, A03399).

### 5.    The Bankruptcy Court Correctly Ruled On Any Exceptions To Privilege.

Parus complains that the Bankruptcy Court also erred in addressing the exceptions to privilege that Parus argued.[30]    In conclusory fashion, Parus contends that WorldCom acted contrary to Intermedia's interests and claims the Bankruptcy Court ignored that WorldCom's interference with the UC Contract harmed Intermedia because it subjected Intermedia to damages for breach of contract and related claims and deprived Intermedia of an important product.  Parus Brief at 33.

Contrary to Parus's argument, the Bankruptcy Court explicitly noted this argument. Opinion at 31 (A03397).  It also observed that Parus provided "numerous citations of cases that provide for exceptions to the privileged activity of a parent, [but that] Parus merely allege[d] that Intermedia's incurrence of damages based on the breach of the UC Contract constitute[d] 'wrongful means.'"  Id. at 33 (A03399).  Accordingly, the Bankruptcy Court entered summary judgment because Parus "failed to provide anything other than conclusory statements with regard to the argument that WorldCom's actions were not privileged . . . ."  Id.

This ruling was appropriate.  Parus never provided anything more than unsupported allegations and argument that do not suffice at the summary judgment stage.  Further, Parus has never cited any authority for its assertion that breaching the UC Contract was contrary to Intermedia's economic interests because it subjected Intermedia to contract or related damages.

---

[30]    When a defendant's conduct is privileged, the plaintiff has the burden to plead and prove that the defendant's conduct was unjustified.  HPI Health Care, 545 N.E.2d at 677.  A defendant that is protected by a privilege is not justified in engaging in conduct that is totally unrelated or antagonistic to the interest that gave rise to the defendant's privilege.  Id. at 678.  Nor does the privilege protect a defendant that uses illegal means to induce a breach of contract.  Id.

Debtors have not located a single case that would permit a finding of tortious interference on this ground. This is because such an exception would swallow the rule. By definition, a subsidiary is liable for contract damages, if any, when a parent corporation causes it to breach a contract. The subsidiary's liability for contract damages is necessarily presumed even though the parent cannot be charged with tortious interference. Hence the Second Circuit held in Boulevard Assoc. that the parent corporation could not be liable for tortious interference even though the subsidiary owed and had apparently paid contract damages. 72 F.3d at 1032 (noting that the subsidiary settled a suit for contract damages brought by the party that succeeded to Boulevard's rights under the lease in question). The subsidiary's obligation to pay any contract damages is irrelevant to the issue of a parent's tortious interference. Even Phil Crowley Steel, the only case Parus cited in its opposition to summary judgment that actually turned on an economic detriment to the subsidiary, did not adopt Parus's tautology. It never discussed contract damages at all. Parus's argument that Intermedia owes contract damages is, thus, nothing more than the predicate of every case in which summary judgment has been granted for a parent corporation that interfered with a subsidiary's contract. It does not establish a genuine issue of improper conduct.

Parus's argument that it established wrongful means because interference with the UC Contract would have violated the Hold Separate Order is new. Furthermore, the argument is based upon a misstatement of the facts concerning the Hold Separate Order. As set forth above, the Department of Justice agreed that Intermedia's unprofitability and a downturn in the telecommunications industry warranted modifications to the Hold Separate Order, allowing a more limited divestiture which did not include the UC Contract. Memo. in Supp. of Mot. to Modify Hold Separate Order at 3-7 and n.1 (A02789-93); Modified Hold Separate Order (A02796). Moreover, Parus ignores that the D.C. District Court expressly stated that nothing in

its order provided any person or entity not a party to the Final Judgment "any rights with respect to its enforcement, modification or termination." Final Judgment at 8 (A01195). As the Bankruptcy Court noted, Parus lacks standing to collect damages as a result of an alleged failure to comply with the Final Judgment and its efforts to do so are improper. Opinion at 26 n.3 (A3392).

Finally, Parus's assertion that WorldCom engaged in wrongful means by violating Unfair and Deceptive Trade Practices Acts constitutes yet another new argument that Parus failed to articulate at the summary judgment stage. Accordingly the Court may disregard the argument. Furthermore, Parus errs in its reliance on Teraforce Technology Corp. v. Vista Controls, Inc., 2007 WL 3377441, at *8-9 (Bankr. N.D. Tex. Nov. 13, 2007). Teraforce was not a summary judgment case. It denied a motion for judgment on the pleadings because the plaintiff adequately pled unfair trade practices under North Carolina law and that violation, if proved, could satisfy the "improper means" requirement for tortious interference. See Id. at *12-13. Of course, the standard at summary judgment substantially differs. Parus cannot rest on its pleadings. Even if it could advance new arguments on appeal, and even if unfair trade practices could satisfy the "wrongful means" test under Illinois law, Parus still would have needed to come forward with admissible evidence satisfying the elements of an unfair trade practices claim. As described in section III.C. below, it has not and cannot make such a showing. Accordingly, the Bankruptcy Court's judgment should be affirmed.

**B. The Bankruptcy Court Properly Found That Parus's Conspiracy Claim Against WorldCom Fails As A Matter Of Law.**

The Bankruptcy Court granted summary judgment on Parus's conspiracy claim for three reasons, each of which was independently sufficient to dispose of Parus's claims. First, WorldCom could not be guilty of conspiracy when there was no second party with which to

conspire in light of the Bankruptcy Court's decision to grant summary judgment on the conspiracy claim against Intermedia. Opinion at 27 (A3393). Second, even if WorldCom and Intermedia had agreed to breach the UC Contract, such an agreement would not, by itself, rise to the level of civil conspiracy. Id. Third, the take or pay mechanism of the UC Contract allowed Intermedia to choose not to meet its minimum subscriber requirements and, thus, an agreement that Intermedia would exercise that right could not constitute conspiracy. Id. at 27-28 (A3393-93).

Parus challenges each of these grounds. Parus argues that the Bankruptcy Court "mischaracterized" the conspiracy claim as being limited to breaching the UC Contract when, according to Parus, the claim was a conspiracy to force Parus into bankruptcy. Parus Brief at 34. Parus never made this argument to the Bankruptcy Court. Instead, Parus told the Bankruptcy Court in its summary judgment papers that the "crux" of its claim was that the parties conspired to interfere with Intermedia's performance under the UC Contract. S.J. Response at 43 (A01275). Because a breach of contract claim cannot serve as the underlying tort for a claim of conspiracy, John's Insulation, 774 F. Supp. at 162, the Bankruptcy Court properly found that the existence of an agreement to breach the UC Contract did not rise to the level of civil conspiracy. Opinion at 27 (A03393). Parus's attempt to re-characterize its allegation of conspiracy at this late date should be deemed a non-starter.

Furthermore, the only evidence Parus cites (for the first time on appeal) for this alleged conspiracy to force Parus into bankruptcy is a provision in the MASL between WorldCom and Webley, which provided that the parties to that agreement would retain their rights under the Bankruptcy Code and that WorldCom would retain the rights licensed under the MASL if Webley declared bankruptcy. See Parus Brief at 34 (citing MASL § 18.16 (A02609)). That the

DB02/048629.0094_0019/7941749.1

parties to the MASL contemplated how bankruptcy might affect them during a time of economic distress for the telecommunications industry does not support in any way Parus's bizarre and newly made speculation of a conspiracy to drive Parus into bankruptcy by depriving it of revenues from Intermedia under the UC Contract.

Parus also argues that the Bankruptcy Court erred in ruling that WorldCom could not be guilty of conspiracy when Intermedia was entitled to summary judgment on that claim. Parus Brief at 33-34. Parus relies on Penncro for the proposition that the Limitation of Liability provision did not preclude all non-contractual claims. Id. at 34. Penncro, however, did not involve the type of termination provision found in the UC Contract that established an agreed upon mechanism for determining allowed damages upon a termination for default. See Penncro, 499 F.3d at 1155-56, 1158 and n.9 (distinguishing limitation of liability clause prohibiting only consequential damages from contract containing early termination provision limiting recovery to time contract actually in effect). Penncro's holding that a ban on consequential damages does not preclude direct lost profits has no bearing here. The accrued Reconciliation Payments under the UC Contract were general, direct damages and were the only damages permitted under Section 5.3 of the UC Contract following its termination.

With respect to the Bankruptcy Court's third independent reason for granting summary judgment – that the take or pay mechanism of the UC Contract allowed Intermedia to choose not to meet its minimum subscriber requirements and, thus, an agreement that Intermedia would exercise that right could not constitute conspiracy – Parus misconstrues the Bankruptcy Court's opinion. The Bankruptcy Court did not hold, as Parus mistakenly claims, that "third parties are free to conspire to intentionally breach a contract as long as the contract has a minimum payment clause." See Parus Brief at 34. The Bankruptcy Court merely explained that the take or pay

mechanism in sections 2.12 and 2.13 of the UC Contract meant that the failure to procure the minimum number of subscribers, cancellation of accounts, and transfer or termination of employees could not be considered either a breach or a tort. This is a correct interpretation of the UC Contract, as explained in Section I.E. above.

Parus misplaces reliance on Emerson, 253 F.3d at 169-72, for its argument that "the existence of a minimum payments clause" should not preclude recovery for breach of the covenant of good faith and fair dealing. Parus Brief at 34. This language has nothing to do with Parus's conspiracy claim. Indeed, Parus ignores that the district court in Emerson granted summary judgment on the conspiracy claim because the underlying tort claims had also failed.[31] Emerson Radio Corp. v. Orion Sales, Inc., 2000 WL 49361, *10 (D. N.J. Jan. 10, 2000). Moreover, Emerson involved a license agreement with required minimum royalty payments. That was not the case here. Beginning in December 2001, the UC Contract required a minimum number of accounts and, if Intermedia did not meet the number, imposed a Reconciliation Payment. Had Intermedia paid the Reconciliation Payment, there would have been no breach. Finally, and most importantly, even if Emerson did apply, it would only result in the availability of a claim for breach of contract or breach of the covenant of good faith and fair dealing. As set forth above, Arizona law would not consider the latter claim to be a tort in these circumstances. Thus, under no circumstance would Emerson provide a basis for recognizing a tort as the predicate for a civil conspiracy action.

Finally, Parus ignores, and provides no basis for diverging from, the Supreme Court's ruling that a parent and its wholly-owned subsidiary cannot conspire with each other due to a unity of economic interest. See Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752,

[31] That ruling apparently was not appealed.

777 (1984) (parent and wholly-owned subsidiary have complete unity of interest and are incapable of conspiring); Fogie v. Thorn Ams. Inc., 190 F.3d 889, 898 (8th Cir. 1999) (same); Carl Hizel & Sons Inc. v. Browning Ferris Indust. Inc., 590 F. Supp. 1201 (D. Colo. 1984) (same); Atlantic Richfield Co. v. Misty Prods, Inc., 820 S.W.2d 414, 420 (Tex. Ct. App. 1991) ("As a matter of law, a parent corporation cannot conspire with its fully owned subsidiary.").[32] These cases provide yet a further basis for affirming summary judgment on the conspiracy claim against WorldCom.

**C. The Bankruptcy Court Appropriately Entered Summary Judgment On The Claim Under Unfair Trade And Deceptive Trade Practices Acts.**

Parus questions the Bankruptcy Court's neutrality claiming that it "advocat[ed] for WorldCom." Criticizing the Bankruptcy Court because it did not cite any legal authorities for what Parus calls its "astounding ruling," Parus mischaracterizes the ruling as holding that clauses in the UC Contract immunized WorldCom from the unfair and deceptive trade practices claim. Parus Brief at 35.

The Bankruptcy Court's decision is neither biased nor astounding. The Bankruptcy Court merely pointed out the illogic of Parus's claim. It did not need to cite authority to reveal Parus's logical fallacy. Parus negotiated and agreed to section 2.13 of the UC Contract, which provided a Reconciliation Payment if Intermedia did not obtain sufficient subscribers, and section 5.4,

[32] Parus cited some decisions at summary judgment that questioned the extent to which Copperweld should apply, but all are factually distinguishable. For example, in Stamp v. Inamed Corp., 777 F. Supp. 623 (N.D. Ill. 1991), the court held that a subsidiary could sue its parent corporation, not that a parent and subsidiary could be sued for a conspiracy. Id. at 625-26. Likewise, in In re ContiCommodity Services, Inc. Securities Lit., 733 F. Supp. 1555, 1568 (N.D. Ill. 1990), the court did not hold, as Parus Holdings argues, that a subsidiary can conspire with its parent; it held that an agent cannot conspire with a principal, but that the plaintiffs might be able to prove a conspiracy if they failed to hold the parent liable on agency principles. Id. In Borden, Inc. v. Spoor Behrins Campbell & Young, Inc., 828 F. Supp. 216 (S.D.N.Y. 1993), the court discussed Copperweld's scope in dicta, but ultimately concluded that Copperweld did not pose a hurdle because the parent and subsidiary had conspired with other third parties so as to allow the conspiracy claims to proceed. Id.

which provided for liquidated damages if Intermedia prematurely terminated the contract for any reason. In other words, Parus negotiated a mechanism for it to be paid if Intermedia did not make the services under the UC Contract available to enough subscribers. It also agreed Intermedia could terminate the contract early *for any reason* and negotiated a liquidated damages provision so it would be paid if Intermedia exercised that right and thereby deprived subscribers and potential subscribers of those services. The Bankruptcy Court recognized that Parus could not negotiate and agree upon these means of recovery when Intermedia did not obtain sufficient subscribers and, simultaneously, seek recovery for unfair and deceptive trade practices on the same – that Intermedia did not obtain enough subscribers and potential subscribers. Opinion at 34 (A03400) (citing S.J. Response at 54 (A01286)).

Parus's remaining arguments take a kitchen-sink approach to the unfair trade practices claim. Parus repeats its baseless conjecture that the Debtors' goal was to force Parus into bankruptcy, contends (correctly) that WorldCom was not a party to the UC Contract, asserts (correctly) that Intermedia did not invoke its rights under section 5.4 to terminate early for any reason, and returns to the inapposite holding in Emerson to argue that its damages should not be limited to the outstanding Reconciliation Payments. Parus Brief at 35-36. Parus made none of these arguments at summary judgment and may not raise them now. See In re Gaston & Snow, 243 F.3d at 608.

Finally, Parus fails to advance any legitimate legal basis or genuine dispute of material fact that would preclude summary judgment. Parus has not argued how its claim against WorldCom meets any of the requirements under any applicable unfair and deceptive trade practices act. Parus cites to the decision in Teraforce, 2007 WL 3377441, at *12, which applied inapplicable North Carolina law. But Parus ignores that Teraforce applied the standards for

judgment on the pleadings, not summary judgment. Teraforce merely held that the plaintiff's allegations sufficed to survive dismissal. By contrast, Parus has not shown how it has met any of the elements of the claim against WorldCom. For example, Parus does not make any attempt to show how its claim satisfied the consumer protection goals of the various deceptive trade practices acts nor how WorldCom could be considered a seller or to have provided or distributed any good or service when the UC Contract plainly reflected that Intermedia was purchasing communications services from Parus. See Arizona Consumer Fraud Act, A.R.S. § 44-1522 (prohibiting deception "in connection with the *sale* or advertisement of any merchandise); Illinois Consumer Fraud and Deceptive Business practices Act, 815 ILCS § 505/1 (covering "advertising, offering for sale, sale, or distribution of any services and any property"); Mississippi Consumer Fraud Act, Miss. Code Ann. §§ 75-24-3, 5 (covering the "advertising, offering for sale, or distribution of any services and any property");[33] Florida Deceptive and Unfair Trade Practices Act, F.S.A. § 501.203 (applying to the "advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service"). Finally, Parus fails to address any of the arguments that Debtors made at summary judgment, which Debtors incorporate here. See S.J. Memo at 11-13 (A01224-26); S.J. Reply at 32-35 (A02715-18). The Bankruptcy Court correctly entered summary judgment on Parus's deceptive trade practices claim and, accordingly, should be affirmed.

[33] Parus also fails to state how it has standing to sue under Mississippi's law. See Miss. Code §§ 75-24-5(1) (limiting right of action to attorney general); 75-24-15(1) and (2) (limiting private action to persons who purchased or leased goods or services primarily for personal, family or household purposes and who first made a reasonable attempt to resolve any claim through an informal dispute settlement program approved by the Attorney General).

## IV.    THE MERITS OF PARUS'S SPOLIATION MOTIONS ARE NOT PROPERLY BEFORE THIS COURT.

### A.    The Only Question Arguably Before This Court Is Whether The Bankruptcy Court Correctly Denied Parus's Amended Spoliation Motion As Moot.

Parus falsely accuses Debtors of destroying "tens of thousands of documents" even though it cannot point to a single document – let alone a single *relevant* document – that Debtors lost or destroyed.  Despite its inability to establish any loss or destruction of evidence, Parus claims that the Bankruptcy Court "rewarded Debtors," "punished Parus," "upended equity" and committed reversible error "by failing to grant Parus any relief" arising from Debtors' alleged spoliation of evidence.  Parus Brief at 36, 39.  Based on its unfounded spoliation arguments, Parus now asks this Court to reverse the Bankruptcy Court's summary judgment ruling and remand the case with direction to enter judgment in Parus's favor or, alternatively, award Parus damages and impose adverse inferences based solely on its spoliation allegations.  Id. at 47.

In seeking this relief, Parus asks this Court to consider the merits of a spoliation motion the Bankruptcy Court ruled was moot.  Parus has not cited (nor are Debtors aware of) any legal authority supporting such a procedural free-for-all.  The only question arguably before this Court is whether the Bankruptcy Court correctly denied Parus's amended spoliation motion as moot. See Lamar Advertising of Penn., LLC v. Town of Orchard Park, 356 F.3d 365, 379-80 (2d Cir. 2004) (holding that because the district court had dismissed the claims as moot without reaching the merits, the court remanded the case and refused to express any opinion concerning the merits of the claims); Presidential Life Ins. Co. v. Milken, 94 F.3d 65, 70-71 (2d Cir. 1996) (remanding case to the district court because the reviewing court did not have "the benefit of the district court's views on the merits on the motions").

Parus's amended spoliation motion (like its original one) was premised entirely on its allegation that Debtors lost or destroyed evidence by maintaining documents in an "inaccessible"

format. See *infra* p. 65 n.37. After the Bankruptcy Court granted summary judgment, however, Parus shifted its argument to claim that the allegedly missing documents related not to "expectation damages" but to the sole remaining factual issue of pricing under the UC Contract. May 15, 2007 Hearing Transcript at 7 (A04469).

To avoid the costs associated with discovery and trial on the remaining pricing issue, Debtors moved for permission to withdraw their claim objection in part to allow calculation of the four remaining Reconciliation Payments using the rate advocated by Parus, *i.e.*, the "unlimited service rate." Am. Motion for Partial Withdrawal of Claim Obj. at 3-4 (A04300-01). In other words, with respect to the sole remaining issue in the case, Debtors agreed to allow a claim in the full amount Parus could recover if it prevailed on its spoliation motion or proceeded to trial and prevailed.

As part of their partial withdrawal of the claim objection, Debtors also asked the Bankruptcy Court to rule that all remaining motions, including Parus's amended spoliation motion, be denied as moot.[34] Id. Parus did not oppose this relief. Rather, Parus submitted a proposed order providing for *the very same relief*. Parus's Limited Objection to Debtors' Amended Motion Seeking Partial Withdrawal of Claim Objection (D00220-239). The Bankruptcy Court properly denied the remaining motions as moot, as all parties requested. Am. Motion for Partial Withdrawal of Claim Obj. (A04339-40). Parus did not appeal the Bankruptcy Court's ruling that its spoliation motions were moot. Parus Brief at 3. Nor does Parus argue on appeal that the Bankruptcy Court's decision that its spoliation motion was moot was erroneous. Id. at 36-41. Even if Parus did appeal the mootness ruling, there is no basis for reversing the

---

[34] "The mootness doctrine, which is mandated by the "case or controversy" requirement in Article III of the United States Constitution requires that federal courts may not adjudicate matters that no longer present an actual dispute between the parties." Catanzo v. Wing, 277 F.3d 99, 107 (2d Cir. 2001) (citing Lewis v. Cont'l Bank Corp., 494 U.S. 472, 477-78 (1990)).

ruling because the allowed claim gave Parus all of the relief it was seeking in the amended spoliation motion. Once Debtors had withdrawn their claim objection on this point, there was no actual dispute between the parties.

**B.    Parus Has Not Presented This Court Any Factual Or Legal Basis Establishing Any Spoliation Of Evidence.**

Even assuming this Court's consideration of Parus's spoliation allegations is appropriate, Parus has failed to provide the Court any basis to conclude that Debtors lost or destroyed relevant evidence. Parus's scattershot argument obfuscates the factual and legal analysis courts must undertake to determine whether spoliation sanctions are warranted. In considering such sanctions, a court must determine, based on the facts of the case, whether (1) evidence actually has been destroyed; (2) the party with control over the evidence had an obligation to preserve it at the time it was destroyed; (3) the evidence was destroyed with a culpable state of mind, and; (4) the destroyed evidence was relevant to the parties' claims and defenses. See West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999); Kronisch v. United States, 150 F.3d 112, 126 (2d Cir. 1998); Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) ("Zubulake IV"); Zubulake v. UBS Warburg LLC, 229 F.R.D. 422, 430 (S.D.N.Y. 2004) ("Zubulake V"). Parus's Brief (like its spoliation motions filed below) fails to establish that Debtors lost or destroyed relevant evidence *at any time*, let alone at a time when they were obligated to preserve it. See Parus Brief at 36-37.

**1.    Parus Cannot Establish That Debtors Lost Or Destroyed Documents.**

Parus contends that Debtors "stonewalled" legitimate discovery requests because they had "destroyed material and responsive documents." See Parus Brief at 37 (citing only its own spoliation motion in support). To the contrary, Debtors sampled their sources of electronic data using the backup tapes, search terms and custodian names Parus selected, and made eight

electronic data productions. See *supra* pp. 11-12 (discussing electronic data sampling process). Debtors further advised Parus in correspondence and formal discovery responses that they had at least 63 Intermedia backup tapes, 78 MCI/WorldCom backup tapes and a terabyte[35] of data preserved from a decommissioned Intermedia server that remained to be restored and searched once the Bankruptcy Court determined cost-shifting.[36] See *supra* pp. 11-12 (discussing factual basis for seeking cost-shifting).

Parus, however, opposed Debtors' request to file their cost-shifting motion contending (contrary to controlling authority) that its spoliation motion should be resolved first. See February 7, 2007, letter from Jill Murch to Allison Murdock at 2 (A04143) ("[t]he Debtors' request for cost-shifting should not proceed until the Court first determines the merits of Parus's Spoliation Motion, as such determination is necessary before the parties can even reach the issue of cost-shifting."). The Zubulake cases from this District make clear that a spoliation motion should not be brought until the inaccessible data sources have been restored and searched (pursuant to the court's cost-shifting determination) and unless that process reveals that relevant evidence has been destroyed. See Zubulake v. UBS Warburg LLC, 217 F.R.D. 309 (S.D.N.Y. 2003) ("Zubulake I"), and Zubulake IV, 220 F.R.D. at 215, and Zubulake V, 229 F.R.D. at 426 (court considered spoliation motion only after parties developed factual record for consideration of cost-shifting and electronic discovery was completed). Parus cannot in good faith assert that Debtors "stonewalled" discovery or lost and destroyed documents when, as a result of Parus's own procedural maneuverings, most of Debtors' electronic data had yet to be restored and searched.

---

[35] A terabyte is roughly equal to 1 million documents or a small library containing 5,000 books.

[36] Parus's broad discovery requests and voluminous search terms and custodian names made the electronic discovery costs so high as to warrant entry of a protective order that the requested discovery not be had or, alternatively, that Parus bear some or all of the costs of that discovery.

**2. Maintaining Electronic Documents On Backup Tapes Does Not Constitute Destruction Of Evidence.**

Parus misrepresents the record in this case when it claims that Debtors' representatives "testified that substantial documents and sources of discovery were destroyed" after Parus "sent its demand" in March 2002 and filed its proof of claim in January 2003. See Parus Brief at 38. Parus cites no support for its accusation because none exists. See id. Instead, Parus refers to the deposition testimony of Julio Valdes (one of Intermedia's IT personnel) regarding the decommissioning of certain Intermedia servers, as though this testimony somehow shows that data from these servers were lost or destroyed. Id. It does not. Parus then omits Mr. Valdes's testimony that all data on Intermedia's servers were saved to backup tapes before the servers were ever decommissioned. Valdes Dep. at 262-64 (A04251). Mr. Valdes specifically testified, among other things, that (1) Intermedia had been preserving backup tapes of its electronic data and email systems for several years; (2) the backup tapes available in March and April of 2002, when Parus terminated the UC Contract, were still available then, in 2003 and 2004, and remain available today; (3) the electronic data and email on the two Intermedia servers that remained in 2006 were searched for responsive documents; and (4) all data on the two Intermedia servers that remained in 2006 were saved to back up tapes prior to decommissioning those servers. Id. Simply put, Mr. Valdes testified that Intermedia preserved documents. Parus suggestions to the contrary are false.

Knowing there are backup tapes for all of the decommissioned servers, Parus is forced to argue that preserving data on backup tapes is the same as destroying that data. See Parus Brief at 38 (claiming that "[w]here records are not maintained in an accessible format, courts have held

that this violates an entity's preservation obligations").[37]  Parus relies on *dicta* in a footnote in Treppel v. Biovail Corp., 233 F.R.D. 363, 372 n.4 (S.D.N.Y. 2006),[38] to support this proposition. However, Parus fails to advise the Court that at least three controlling decisions in this District completely refute its argument.

In Zubulake IV, the court explained the obligation to preserve relevant documents and stated that "[i]n recognition of the fact that there are many ways to manage electronic data, litigants are free to choose how this task is accomplished."  220 F.R.D. at 218.  Likewise, in Quinby v. WestLB AG, No. 04 Civ 7406, 2005 WL 3453908, at *8 n.10 (S.D.N.Y. Dec. 15, 2005) ("Quinby I"), the court rejected a request for sanctions that was virtually identical to Parus's request here.  Observing that it was unaware of any case holding that the duty to preserve electronic data included a duty to keep the data in an accessible format, the court refused to sanction the defendant for converting data from an accessible to inaccessible format, even if it should have anticipated litigation.  Id.  Finally, in Quinby v. WestLB AG, 245 F.R.D. 94, 104

---

[37]  Although more prominently featured in the spoliation motions filed with the Bankruptcy Court, Parus's appellate brief similarly is premised on the false notion that preserving data on inaccessible backup tapes constitutes destruction of that data.  See also Parus Brief at 40 (the Bankruptcy Court should have made adverse against Debtors "as to each issue on which a document had been destroyed, *made inaccessible* or otherwise not produced); Parus Am. Spoliation Memo. at 12 (A03423) ("Debtors' Failure to Keep Document In An Accessible Form"), 17 (A03428) (Debtors ". . . Destroyed *and/or* Rendered Inaccessible Evidence . . ."); Parus Orig. Spoliation Memo. at 6, 15 (A02904, A02913) (Debtors allowed information to be "destroyed and/or to become inaccessible"), 18 (A02916) (Debtors failed to issue a litigation hold notice to preserve "all documents relating to Parus in an accessible or searchable format"), 19 (A02917) ("Debtors' failure to preserve information in an accessible format constitutes a clear violation of the Debtors' preservation obligation"), 19 (A02917) ("Debtors must be held accountable for their utter failure to even attempt to preserve information related to Parus's claims in an accessible format"), 37 (A02935) (comparing inaccessible data to music on an 8-track tape which cannot be played without the 8-track player, but not explaining that the data can, and has been, restored and made accessible), 43 (A02941) (Debtors failed to keep hard copy documents "in readily accessible format"), 48-49 (A02946-47) (Intermedia should be sanctioned because it failed keep data from the servers in "retrievable and readable" format), 57 (A02955) ("evidence destroyed and/or rendered inaccessible").

[38]  This footnote states, in pertinent part:  "permitting the downgrading of data to a less accessible form – which systematically hinders future discovery by making the recovery of the information more costly and burdensome – is a violation of the preservation obligation."  233 F.R.D. at 372 n.4.

(S.D.N.Y. 2006) ("Quinby II"), the court reiterated that a party has no duty to preserve emails in an accessible format and that converting data to an inaccessible format does not constitute spoliation: "Preservation of data, even in an inaccessible form, **will not result in spoliation** because the responding party will be able to produce the electronic evidence by restoring it from an inaccessible format, albeit at a higher cost." Quinby II, 245 F.R.D. at 104 (emphasis added). The court in Quinby II also expressly rejected the Treppel footnote upon which Parus relies. It explained that the *dicta* is erroneous and observed that the conversion of electronic documents to an inaccessible format, like moving hard copies to an off-site storage facility, cannot constitute spoliation because the documents still are retrievable. See id. at nn.12 & 13.[39]

Parus also lacks any factual basis for suggesting that inaccessible data is destroyed or irretrievable. Debtors' electronic data vendor was able to restore and search the nine Intermedia backup tapes Parus selected for sampling. Those nine tapes alone held the equivalent of over 300 boxes of documents containing Parus's selected search terms and custodian names. See *supra* pp. 11-12. The notion that all of the data on Debtors' back up tapes was irretrievable is simply untrue.

**3. Parus Has Not Shown And Cannot Show That Debtors Lost Or Destroyed Relevant Evidence At A Time They Had A Duty To Preserve It.**

In addition to being factually unfounded, Parus's request for sanctions is inappropriate in any event. A party cannot be sanctioned for destroying or losing evidence unless it had a duty to preserve it. Zubulake IV, 220 F.R.D. at 216. The only duty Parus articulates here is the duty that arises when a party has notice that the evidence is relevant to existing litigation or when a

---

[39] Parus's reliance on Treppel's *dicta* also is surprising because the meaning of the *dicta* is highly uncertain. Although the Treppel footnote criticizes the holding in Quinby I, the main body of the Treppel decision is consistent with Quinby I because it characterizes saving data to backup tapes as an act of preservation, not spoliation. See Treppel, 233 F.R.D. at 371-72.

party should know that the evidence may be relevant to future litigation.[40] See Parus Brief at 37 (citing, *inter alia*, Zubulake IV, 220 F.R.D. at 216; Fujitsu Ltd. v. Fed. Express Corp., 247 F.3d 423, 436 (2d Cir. 2001)). The duty to preserve documents does not exist in a vacuum without boundaries. It is limited in time and scope. See Zubulake IV, 220 F.R.D. at 216 ("Identifying the boundaries of the duty to preserve involves two related inquiries: *when* does the duty to preserve attach, and *what* evidence must be preserved?"). The "mere existence of a dispute" does not mean that the parties should reasonably have anticipated litigation and taken steps to preserve evidence. Treppel v. Biovail Corp., 233 F.R.D. 363, 371 (S.D.N.Y. 2006). Furthermore, the preservation duty does not begin simply because "key events giving rise to the plaintiff's claims occurred." Id.

**4. Debtors Met Their Preservation Obligations.**

Parus's argument that Debtors somehow violated their preservation obligations by not issuing a formal "litigation hold" until 2004 confuses the preservation obligation with the "litigation hold" notice discussed in Zubulake. See Parus Brief at 37-38. Debtors deny Parus's allegations of untimeliness. See *supra* pp. 12-14. But even if true, the untimely implementation of a litigation hold, standing alone, does not constitute spoliation. As set forth in Treppel, which Parus ignores here, there also must be a loss of evidence. See Treppel, 233 F.R.D. at 371-72 (refusing to enter preservation order because plaintiff failed to show that delay in establishing preservation program led to the loss of any evidence). Parus has failed to show any loss of evidence. Therefore, the timing of Debtors' litigation hold is irrelevant.[41]

---

[40] Unlike the Zubulake cases and other cases upon which Parus relies, in which the non-movants were subject to securities and employment regulations that required the preservation of certain types of records that were pertinent to the claims at issue in those cases, there is no other preservation duty applicable in this case.

[41] Parus conceded this point when it refused to respond to discovery regarding the timing of its litigation hold claiming that it was "immaterial since spoliation only becomes an issue when evidence is lost or

Moreover, Debtors met their preservation obligations. As discussed more fully in Debtors' Statement of the Case, Debtors timely preserved all electronic and paper documents relevant to Parus's claims. See *supra* pp. 12-14.[42] Thus, as Parus argued with respect to its own preservation obligations, whether Debtors sent out a formal litigation hold notice is "immaterial" because Debtors already had preserved all relevant documents.

**5. There Was No Failure To Comply With Document Retention Policies.**

Continuing with the erroneous premise that Intermedia documents were destroyed, Parus next claims that Debtors failed to comply with MCI's document retention policies. Parus Brief at 38. Parus ignores, however, that the companies were under the obligation, pursuant to the Hold Separate Order, to operate separately and independently. See *supra* p. 20. A company's document retention policy cannot trump a United States District Court's Hold Separate Order. More importantly, Parus fails to show that any evidence was destroyed. Even if there had been a failure to comply with document retention policies (and Parus has not shown that to be the case), this District has held that the failure to maintain documents in accordance with document policies does not prove spoliation. See Farella v. City of New York, Nos. 05 Civ. 5711(NRB) and 05 Civ. 8264(NRB), 2007 WL 193867, at *3 (S.D.N.Y. Jan. 25, 2007) (quoting Riddle v. Liz Claiborne, Inc., No. 00 Civ. 1374 (MBM)(HBP), 2003 WL 21976403, at *2 (S.D.N.Y. Aug. 19, 2003) (holding that, even assuming the defendant failed to maintain documents in accordance with its own policies and federal regulations, such a failure did not constitute spoliation because

---

irretrievable in the first instance." See February 14, 2007, letter from Jill Murch to the Honorable Arthur J. Gonzalez at 3 (D00243) ("Moreover, because Parus preserved all of its electronic and hard copy documents, whether it initiated a litigation hold is immaterial since spoliation only becomes an issue when evidence is lost or irretrievable in the first instance.") (emphasis added).

[42] Parus again selectively cites from Mr. Valdes's deposition testimony. Although Mr. Valdes did not recall implementing a "litigation hold" for the Parus claims, he testified that he was preserving all backup tapes anyway pursuant to the District Court's July 2002 preservation order. Valdes Dep. at 218-20, 249, 262-64 (A04249-51).

the plaintiff failed to show that the allegedly missing documents ever existed)).

**6. Parus Has Failed To Satisfy The Relevance Requirement.**[43]

Because Parus seeks severe sanctions, Parus must do more than satisfy the ordinary relevance test of Fed. R. Evid. 401; it must also prove that the evidence would have been favorable to its case. Zubulake V, 229 F.R.D. at 431 (citing Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 108-09 (2d Cir. 2002)). Parus never makes any attempt to demonstrate that any assertedly lost document is relevant and favorable. Parus Brief at 39. Instead, it suggests that relevance should be "inferred." Id. In support, Parus misplaces reliance on two cases, Kronisch and Phoenix Four. Parus Brief at 39. Both are distinguishable. For instance, unlike Kronisch, there is no evidence here that any document has been destroyed. See 150 F.3d at 118, 128-19. And although Phoenix Four noted a relaxed standard of proof, it did not allow a presumption of relevance. To the contrary, in Phoenix Four, the court found that the abandonment of evidence was gross negligence, but did not support an inference that the evidence was unfavorable because the plaintiff failed to establish that a reasonable trier of fact could find that the abandoned evidence would have supported its claims or defenses. See 2006 WL 1409413 at *4-5.

Just as no case Parus cites excuses it from showing relevance to establish spoliation, no case Parus cites excuses it from showing favorability. In fact, Parus ignores the holdings in Zubulake V and Phoenix Four, which both observe that favorability is not automatically inferred from gross negligence. See Zubulake V, 229 F.R.D. at 431 (the "corroboration requirement" that

---

[43] Parus does not even attempt to, nor can, establish the third essential element of spoliation – that evidence was lost or destroyed with a culpable state of mind. Absent any evidence that documents have been lost or destroyed, there is no misconduct as to which culpability may be judged. See, e.g., Convolve, Inc. v. Compaq Computer Corp., 223 F.R.D. 162, 175-177 (S.D.N.Y. 2004) (court found culpability not shown and sanctions not warranted where plaintiff failed to prove the substance of emails or the circumstances under which any particular email was deleted).

the evidence be both relevant and harmful to the alleged spoliator cannot be inferred in cases of ordinary negligence, gross negligence, or recklessness, only *willful* spoliation); Phoenix Four, 2006 WL 1409413, at *5-7 (finding gross negligence, but refusing to infer relevance). Parus offers no reason and no case law that would permit an inference of favorability in this context – where there is no evidence of any destruction or loss and where Parus has insisted upon resolving spoliation issues before Debtors' backup tapes were searched to determine whether they contained relevant documents.

**V. PARUS IS NOT ENTITLED TO THE "INFERENCES" IT SEEKS.**

Parus asserts that the Bankruptcy Court failed to give it the benefit of reasonable inferences. Parus Brief at 41-44. Parus does not, however, identify conflicting facts that the court should have ruled in its favor. See Wright v. Coughlin, 132 F.3d 133 (2d Cir. 1998) (court erred by resolving disputed facts in movant's favor); Evans v. Stephens, 407 F.3d 1272, 1278 (11th Cir. 2005) (court on summary judgment must credit non-moving party's version of conflicting facts). Parus argues, instead, that the Bankruptcy Court should have reached different legal conclusions. That does not, however, establish a failure to apply the established summary judgment standards.

Parus identifies six instances in which it contends the Bankruptcy Court failed to construe facts in the light most favorable to Parus. But each instance Parus identifies has nothing to do with crediting one version of facts over another. It reflects, instead, Parus's dissatisfaction with the court's legal analysis based on undisputed facts.

Starting with its claim for unfair and deceptive trade practices, Parus complains that the Bankruptcy Court *sua sponte* raised an argument that the parties had not themselves raised. Parus Brief at 42. Parus does not, however, identify any conflicting versions of the facts relating to that claim. The Bankruptcy Court was presented with no material issues of fact and, thus

ruled as a matter of law. The specific ruling of which Parus complains was born of Parus's self-contradictory contentions. It is no violation of the summary judgment standards for a court to reject a meritless legal argument. <u>See</u> *supra* at pp. 57-59.

Parus complains next that the Bankruptcy Court failed to give it the benefit of favorable inferences on its claim for breach of contract when the court ruled that Mr. McConnell's letters had the legal effect of terminating the UC Contract. Parus Brief at 43. Again, Parus fails to identify any genuine issue of fact. Indeed, there are no disputed facts relating to the contents of Mr. McConnell's letter (which gave Intermedia "written notice of default under Section 5.2 of the [UC Contract]"), the content of Section 5.2 (specifying the UC Contract would terminate if a cure had not been effected within 30 days after notice of default) and the fact that Intermedia failed to cure its default within 30 days from Mr. McConnell's letter. Parus now complains that the Bankruptcy Court disregarded Mr. McConnell's affidavit in which he attempted to deny, with conclusory and improper arguments, the legal effect of his letter and Section 5.2 of the UC Contract. But Parus does not provide any authority to support Mr. McConnell's affidavit and does not appeal, in any event, the Bankruptcy Court's order striking that affidavit. <u>See</u> Parus Brief at 1-3 (listing Issues on Appeal). Finally, Parus has not appealed the Bankruptcy Court's ruling that the UC Contract terminated effective April 12, 2002. Parus Brief at 1-2 (listing Issues on Appeal). Accordingly, Parus identifies no inferences that the Court failed to view in the light most favorable to Parus nor grounds for reversing the Bankruptcy Court's order, based upon undisputed facts and applicable law.

With respect to its claims for anticipatory breach, civil conspiracy and tortious interference. Parus argues that the Bankruptcy Court disregarded instances where Intermedia allegedly failed to perform obligations under the UC Contract. Parus Brief at 43-44. Parus does

not identify any genuine issues of fact for trial.  Rather, Parus asserts that the Bankruptcy Court should have inferred from these instances that Intermedia repudiated the contract and that WorldCom conspired to interfere with the contract.  Parus Brief at 43-44.  The Opinion, by contrast, reveals that the Bankruptcy Court did not disregard the undisputed facts with respect to any of these claims.  The court merely ruled, based upon the alternative "take or pay" structure in Section 2 of the UC Contract, that the "instances" about which Parus argues did not, under applicable law, constitute positive and unequivocal repudiation of the UC Contract.  See Opinion at 21 (A03387).  Furthermore, the Opinion shows that the Court assumed the existence of a conspiracy and interference.  As explained above, it ruled that those causes of action failed as a matter of law for reasons independent of any facts of interference or conspiracy.  See e.g. Opinion at 27 (A03393) (assuming agreement to breach contract, but such an agreement does not rise to the level of civil conspiracy); 29-30 (A03395-96) (assuming inducement to cease opening new accounts, but such an action would not constitute breach caused by wrongful conduct).

Finally, Parus premises an argument about inferences on its unfounded assertion that Debtors destroyed documents.  Parus Brief at 44.  As described above, Parus's arguments about spoliation are procedurally and substantively infirm.  Parus has not appealed the Bankruptcy Court's denial of its spoliation motion as moot and, in any event, has not established any basis for an inference or any other relief for alleged spoliation.  As set forth throughout this brief, the Bankruptcy Court correctly applied summary judgment principles, viewed the facts in the light most favorable to Parus, and ruled as a matter of law on the undisputed facts and questions of law.

## VI. THE BANKRUPTCY COURT DID NOT ABUSE ITS DISCRETION IN DENYING PARUS'S RULE 56(f) MOTION.

Parus's appeal of the Court's denial of its Rule 56(f) motion is premised on the very same misrepresentations used to support its spoliation allegations. As discussed previously and in multiple submissions filed below, Debtors have fully complied with their discovery obligations. See *supra* pp. 9-14; S.J. Reply at Addendum 1-9 (A02724-32); Am. Spoliation Opp. at 6-25 (A04088-4107). The record in this case disproves Parus's contention that Debtors refused to produce paper and electronic documents, see *supra* pp. 10-11, just as the record disproves Parus's contention that it could not depose Debtors' representatives. Debtors objected to Parus's improper attempts to depose their in-house litigation counsel whose only knowledge of the case was protected from discourse pursuant to the attorney-client privilege and the work product doctrine. Debtors' Motion to Compel Parus to Appear for Properly Noticed Rule 30(b)(6) Deposition at Ex. I (D00451-457).[44] Parus noticed only one merits deposition, that of James Renforth. Debtors did not object to that deposition proceeding.

In the more than one and a half years between the time summary judgment was filed and decided, Parus could have noticed depositions of any number of fact witnesses, but chose not to. Parus made the strategic decision to focus nearly all of its attention on its unfounded spoliation motion rather than proceed with the restoration and searching of thousands of available electronic documents and the deposition of fact witnesses. Parus should not now be heard to complain that it did not have the opportunity to conduct discovery.

---

[44] Debtors also objected to producing witnesses in response to "litigation hold" questions. Parus agreed that Debtors could provide written responses to "litigation hold" questions in lieu of depositions, but then attempted to schedule depositions on these issues without first explaining how Debtors' written responses were deficient and providing Debtors the opportunity to correct any deficiencies. Id.

Parus's discovery complaints merely are an attempt to distract attention from its inability to support the merits of a Rule 56(f) motion.  The Bankruptcy Court concluded that Parus offered only "speculation as to what potentially could be discovered."  See Opinion at 18 (A03384). Even now, Parus fails to explain how the Bankruptcy Court's conclusion was incorrect.  Indeed, Parus still fails to meet its obligation to show (1) what facts it seeks and how they are to be obtained; (2) how those facts are reasonably expected to create a genuine issue of material fact; (3) what efforts were made to obtain them; and (4) why Parus was unsuccessful in those efforts. See Gurary v. Winehouse, 190 F.3d 37, 43 (2d Cir. 1999); Meloff v. New York Life Ins. Co., 51 F.3d 372, 375 (2d Cir. 1995).  Parus lists six categories of documents that it sought, but never identifies what *facts* it sought from those documents.  See Parus Brief at 45.  Parus also has never explained how those categories of documents (or any facts therein) could reasonably be expected to create a genuine issue of fact.  Parus argues that those categories of potential documents are "relevant" and "obviously necessary," but never states how they are relevant or necessary.  In addition, just because a document is relevant or necessary does not mean it creates a genuine issue of fact.  See Flaherty v. Filardi, 388 F. Supp. 2d 274, 291 (S.D.N.Y. 2005) (denying plaintiff's request for additional discovery under Rule 56(f) because plaintiff failed to establish that there was any material issue as to which additional evidence was necessary to decide the pending motion for summary judgment).  Because Parus has never identified how the documents it purports to seek would raise material issues precluding summary judgment, its appeal should fail.

Most importantly, the categories of documents Parus claims to seek are irrelevant to the issues that the Court adjudicated.  See Bill Diodato Photography, LLC v. Kate Spade, LLC, 388 F. Supp. 2d 382, 395 (S.D.N.Y. 2005) (citing Contemporary Mission, Inc. v. N.Y. Times Co.,

842 F2d 612, 622 (2d Cir. 1988)). As the Bankruptcy Court explained, it could decide the issues based on the plain language of the UC Contract. Opinion at 18 (A03384). Indeed, the bases for Debtors' motion and the Bankruptcy Court's Opinion with respect to each of Parus's contract and tort claims confirm the propriety of the Court's denial of the Rule 56(f) motion. As the Bankruptcy Court found, each claim can be, and was, ruled as a matter of law without the need for anything more than the contract itself and the relatively few undisputed facts submitted with the pleadings. See generally Opinion and *supra* pp. 22-36 (discussing how each of Parus's claims can be resolved as a matter of law based on application of the plain language of the UC Contract, Parus's letters terminating the contract and controlling legal authority).

The Bankruptcy Court did not put Parus in a "Catch-22," as Parus asserts, the Bankruptcy Court simply required Parus to comply with Rule 56(f). Parus failed to do so, and the Court exercised its discretion to deny the motion. Accordingly, the Bankruptcy Court should be affirmed.

**CONCLUSION**

For the reasons stated herein, Debtors' respectfully request that this Court enter an Order affirming in all respects the Bankruptcy Court's Order partially granting Debtors' summary judgment motion and its Order denying all remaining claims as moot.

Dated: February 19, 2008
Kansas City, Missouri

Respectfully submitted,

STINSON MORRISON HECKER LLP

By: *_____/s/Allison M. Murdock_________*
Allison M. Murdock, Admitted *Pro Hac Vice*
Mark M. Iba, Admitted *Pro Hac Vice*
Brian O'Bleness, SDNY Bar Code 09790
1201 Walnut, Suite 2900
Kansas City, MO 64016
Telephone: 816-842-8600
Fax Number: 816-691-3495

COUNSEL FOR APPELLEE

**CERTIFICATE OF SERVICE**

I hereby certify that on February 19, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to all parties receiving electronic means.

/s/*Allison M. Murdock*______
Attorney for Debtors

STINSON MORRISON HECKER LLP
Allison M. Murdock, Admitted *Pro Hac Vice*
Mark M. Iba, Admitted *Pro Hac Vice*
Brian O'Bleness, SDNY Bar Code 09790
1201 Walnut Street
Kansas City, MO 64106
Telephone: (816) 842-8600
Facsimile: (816) 691-3495
Attorneys for Appellees

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **In RE WORLDCOM, INC., et al.,** | : | |
| | : | **Bankruptcy Case No. 02-13533 (AJG) (chapter 11)** |
| **Debtors** | : | |
| | : | |
| **PARUS HOLDINGS, INC.,** | : | |
| | : | |
| **Appellant,** | : | **Appellate Case No. 07-cv-10507 (BSJ)** |
| | : | |
| | : | **<u>ECF Case</u>** |
| vs. | : | |
| | : | |
| **WORLDCOM, INC., et al., OF THE APPELLEES** | : | **APPENDIX TO APPELLEES' BRIEF** |
| | : | |
| **Appellees.** | : | |

**TABLE OF CONTENTS**

| Volume | Exhibit | Title | Begin Bates | End Bates | Designation |
|---|---|---|---|---|---|
| I | A | Parus Holdings, Inc.'s Notice of Withdrawal of Its Motion to Stay Court's Ruling on Debtors' Motion for Summary Judgment Pending Discovery Regarding Spoliation | D00001 | D00006 | Appellant No. 50 |
| I | B | Errata Order regarding Summary Judgment Opinion | D00007 | D00008 | Appellee No. 6 |
| I | C | May 22, 2007 Hearing Transcript | D00009 | D00018 | Appellant No. 85 |
| I | D | WorldCom's Supplemental Opposition to Motion to Compel | D00019 | D00068 | Appellee No. 3 |
| I | E | November 17, 2005 Letter from Robert L. Driscoll to Honorable Arthur J. Gonzales | D00069 | D00077 | Appellee No. 4 |
| I | F | June 16, 2002 letter from Allison M. Murdock to Honorable Arthur J. Gonzales with Exhibits | D00078 | D00186 | Appellant No. 45 |
| I | G | July 11, 2006 Hearing Transcript | D00187 | D00213 | Appellant No. 47 |
| I | H | November 17, 2006 James Renforth Deposition Transcript, Volume II pp. 208-219 | D00214 | D00218 | |

| | | | | | |
|---|---|---|---|---|---|
| II | I | Parus Holdings, Inc.'s Limited Objection to Debtors' Amended Motion for an Order Permitting Partial Withdrawal of Claim Objection to Parus Holdings, Inc.'s Proof of Claim No. 11173 (Replacing 9293), Allowing Resulting Claim, and Denying All Other Pending Motions as Moot | D00219 | D00239 | Appellant No. 81 |
| II | J | February 14, 2007 letter from Jill Murch to the Honorable Arthur J. Gonzales | D00240 | D00269 | Appellant No. 62 |
| II | K | Memorandum of Law in Support of Debtors' Motion to Compel Claimant Parus Holdings, Inc. to Appear for a Properly Noticed Rule 30(b)(6) Deposition | D00270 | D00458 | Appellant No. 65 |

Respectfully submitted,

STINSON MORRISON HECKER LLP

By: */s/Allison M. Murdock*
Allison M. Murdock, Admitted *Pro Hac Vice*
Mark M. Iba, Admitted *Pro Hac Vice*
Brian O'Bleness, SDNY Bar Code 09790
1201 Walnut, Suite 2900
Kansas City, MO 64016
Telephone: 816-842-8600
Fax Number: 816-691-3495

COUNSEL FOR APPELLEE

**CERTIFICATE OF SERVICE**

I hereby certify that on February 19, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to all parties receiving electronic means and I also served on this date a copy of the foregoing via U.S. Mail, postage prepaid, on the following:

Jill L. Murch, Esq.
Foley & Lardner LLP
321 North Clark Street
Suite 2800
Chicago, IL 60610

*/s/Allison M. Murdock*
Attorney for Debtors

# EXHIBIT A

D00001

Robert A. Scher (RS 2910)
FOLEY & LARDNER LLP
90 Park Avenue
New York, NY 10016
Phone: (212) 682-7474
Fax: (212) 682-2329
email: rscher@foley.com

-and-

Mark L. Prager *(admitted pro hac vice)*
Jill L. Murch *(admitted pro hac vice)*
Joanne Lee *(admitted pro hac vice)*
FOLEY & LARDNER LLP
321 N. Clark Street, Suite 2800
Chicago, IL 60610
Phone: (312) 832-4500
Fax: (312) 832-4700

*Attorneys for Claimant Parus Holdings, Inc. Successor-By-Merger to EffectNet, Inc. and EffectNet, LLC*

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | CHAPTER 11 |
| | ) | Jointly Administered |
| WORLDCOM, INC., et al., | ) | |
| | ) | |
| Debtors. | ) | Case No. 02-13533 (AJG) |
| | ) | |

**PARUS HOLDINGS, INC.'S NOTICE OF WITHDRAWAL OF ITS MOTION TO STAY COURT'S RULING ON DEBTORS' MOTION FOR SUMMARY JUDGMENT PENDING DISCOVERY REGARDING SPOLIATION**

Claimant Parus Holdings, Inc., as successor by merger to EffectNet, Inc. and EffectNet, LLC ("Parus"),[1] by and through its attorneys Foley & Lardner LLP, hereby provides notice of the withdrawal of its Motion to Stay this Court's Ruling on the Debtors' Motion for Summary Judgment Pending Discovery Regarding Spoliation ("Motion to Stay") (docket entry no. 18490) and respectfully states as follows:

[1] EffectNet merged into Parus on January 28, 2004.

1. Parus filed and served the Motion to Stay on September 5, 2006.

2. In its Motion to Stay, Parus moved this Court to stay its ruling on the Debtors' Motion for Summary Judgment, pending the completion of depositions the Court had previously ordered on July 11, 2006.

3. On September 20, 2006, the Debtors filed and served a letter requesting the Court to strike Parus' Motion to Stay, on the grounds that the Motion failed to comply with three Local Rules of the United States Bankruptcy Court for the Southern District of New York ("Letter Request"). The Debtors sought a telephone hearing with the Court in order to discuss the Letter Request.

4. Pursuant to the Debtors' Letter Request, the Court held a telephone hearing on October 3, 2006, for which counsel for both parties were present.

5. During the telephone hearing, the Court stated that it would not issue a ruling on the Debtors' Motion for Summary Judgment prior to December 15, 2006.

6. As a result, Parus hereby withdraws its Motion to Stay without prejudice to re-file or renew the motion at a later date.

Dated: October 4, 2006

Respectfully submitted,

By: /s/ Jill L. Murch

Robert A. Scher (RS 2910)
FOLEY & LARDNER LLP
90 Park Avenue
New York, NY 10016
Phone: (212) 682-7474

-and-

Mark L. Prager (*admitted pro hac vice*)
Jill L. Murch (*admitted pro hac vice*)
Joanne Lee (*admitted pro hac vice*)
FOLEY & LARDNER LLP
321 N. Clark Street, Suite 2800
Chicago, IL 60610
Phone: (312) 832-4500
Fax: (312) 832-4700

*Attorneys for Claimant Parus Holdings, Inc., Successor-By-Merger to EffectNet, Inc. and EffectNet, LLC*

Robert A. Scher (RS 2910)
FOLEY & LARDNER LLP
90 Park Avenue
New York, NY 10016
Phone: (212) 682-7474
Fax: (212) 682-2329
email: rscher@foley.com

-and-

Mark L. Prager (*admitted pro hac vice*)
Jill L. Murch (*admitted pro hac vice*)
Joanne Lee (*admitted pro hac vice*)
FOLEY & LARDNER LLP
321 N. Clark Street, Suite 2800
Chicago, IL 60610
Phone: (312) 832-4500
Fax: (312) 832-4700

*Attorneys for Claimant Parus Holdings, Inc. Successor-By-Merger to EffectNet, Inc. and EffectNet, LLC*

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | CHAPTER 11 |
| | ) | Jointly Administered |
| WORLDCOM, INC., et al., | ) | |
| | ) | |
| Debtors. | ) | Case No. 02-13533 (AJG) |
| | ) | |

**CERTIFICATION OF SERVICE**

Katherine E. Hall, of full age, certifies as follows:

I am a Paralegal employed with the firm of Foley & Lardner LLP, Attorneys for Claimant Parus Holdings, Inc. Successor-By-Merger to EffectNet, Inc. and EffectNet, LLC listed in the documents herein.

On October 4, 2006, I filed PARUS HOLDINGS, INC.'S NOTICE OF WITHDRAWAL OF ITS MOTION TO STAY COURT'S RULING ON DEBTORS' MOTION FOR SUMMARY JUDGMENT PENDING DISCOVERY REGARDING SPOLIATION electronically with the United States Bankruptcy Court for the Southern District of New York.

The following parties were served at the addresses and e-mails set forth herein as indicated by first class U.S. mail or electronic delivery.

/s/ Katherine E. Hall

Sworn to before me this
4th day of October 2006
Yolanda C. Peña
Notary Public, State of Illinois

**Via First Class Mail**
MCI LLC
dba Verizon Business
Attn: Brian H. Benjet, Esq..
1133 19th Street N.E.
Washington, D.C. 20036

Alfredo R. Perez
Weil, Gotshal & Manges LLP
700 Louisiana, Suite 1600
Houston, TX 77002

Marcia L. Goldstein
Lori R. Fife
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153

Hon. Judge Arthur J. Gonzalez
United States Bankruptcy Court
Alexander Hamilton Custom House
One Bowling Green
New York, NY 10004

Akin Gump Strauss Hauer & Feld LLP
Attn: Daniel Golden
590 Madison Avenue
New York, NY 10022

Office of the United States Trustee
Attn: Mary Elizabeth Tom, Esq.
33 Whitehall Street, 21st Floor
New York, NY 10004

**Via First Class Mail and E-Mail**
Allison M. Murdock
Stinson Morrison Hecker LLP
1201 Walnut Street, Suite 2900
Kansas City, Missouri 64106-2150
amurdock@stinsonmoheck.com

# EXHIBIT B

D00007

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

For Publication

In re

WORLDCOM, INC., et. al.,

Reorganized Debtors.

Chapter 11

Case No. 02-13533 (AJG)

**ERRATA ORDER**

ORDERED, that the Opinion Partially Granting and Partially Denying Debtors' Motion for Summary Judgment and Motion to Strike Portions of Affidavits, dated May 2, 2007, Docket Number 18853, be amended as follows:

1. Page 28, the sentence beginning on line 5, reading, "The fact that Intermedia chose not to meet its minimum monthly amount of subscribers, regardless of WorldCom's urging, did not constitute tortious conduct nor a breach of the UC Contract Therefore, summary judgment is denied with regard to Parus's conspiracy claim against WorldCom." should be corrected to read as follows:

> "The fact that Intermedia chose not to meet its minimum monthly amount of subscribers, regardless of WorldCom's urging, did not constitute tortious conduct nor a breach of the UC Contract. Therefore, summary judgment is granted with regard to Parus's conspiracy claim against WorldCom."

Dated: New York, New York
May 4, 2007

s/Arthur J. Gonzalez
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT C

D00009

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
In re

WORLDCOM, INC., et al,

Reorganized Debtors.
------------------------------x

Case No. 02-13533(AJG)

New York, New York
May 22, 2007
2:28 p.m.

DIGITALLY RECORDED PROCEEDINGS

02:00 STATUS CONFERENCE re motion by Debtors to apply Bankruptcy Rule 7068 (offer of judgment) to the proceedings on claim nos. 11242 (replacing 9291) and 11173 (replacing 9293). Response by Parus Holdings, Inc. filed.

02:00 STATUS CONFERENCE re motion by Debtors to compel Claimant Parus Holdings, Inc. to appear for a properly noticed Rule 30(b)(6) deposition. Opposition filed.

B E F O R E:

THE HONORABLE ARTHUR J. GONZALEZ
United States Bankruptcy Judge

A P P E A R A N C E S:

STINSON MORRISON HECKER LLP
Special Counsel for Reorganized Debtors Worldcom and Intermedia
1201 Walnut Street
Kansas, Missouri 64106

BY: ALLISON MURDOCK, ESQ. (via telephone)

FOLEY & LARDNER LLP
Attorneys for Parus Holdings
777 East Wisconsin Avenue
Milwaukee, Wisconsin 53202

BY: JILL MURCH, ESQ. (via telephone)

DEBORAH HUNTSMAN, Court Reporter
(212) 608-9053 (718) 774-2551 (917) 723-9898
Proceedings Recorded by Electronic Sound Recording,
Transcript Produced by Court Reporter

JUDGE GONZALEZ: This is Judge Gonzalez. Hello?

THE OPERATOR: Your Honor, this is the operator. Counsel are now on the line.

JUDGE GONZALEZ: All right. Thank you.

This is Judge Gonzalez.

MS. MURDOCK: Your Honor, Allison Murdock on behalf of the Debtors.

MS. MURCH: Your Honor, Jill Murch of Foley & Lardner on behalf of Parus Holdings.

JUDGE GONZALEZ: We reconvened this to give me an opportunity to review the spoliation motion in light of the Court's recent opinion. It appears to me that if Parus Holdings wants to proceed with spoliation, they are going to have to amend the motion and set forth the relevant issues related to the determination of the basic versus the unlimited rate that would be related to the spoliation motion. I can't really ascertain that from reviewing it. The focus of the motion was in light of, in my view, the expectation damages. It is replete with references that would incorporate that concept into it. I understand why at the time it was done that way, but in light of my opinion recently it would seem to me that it would take a considerable amount of time for me to parse through it and I am not even sure what I am going to find.

Second and possibly more relevant, it seems as well or

it is stated as well the purpose of the spoliation motion is really to shift the burden of proof onto WorldCom, but the Court has already found that the basic versus the unlimited rate needs to be determined in order to determine the amount of damages that Parus Holdings would be entitled to under the contract. That is really a contract interpretation issue that burden of proof I think has very little impact on that determination. Arguably I guess if there was a fact at issue, the burden of proof may become relevant about who has to establish the particular fact, but when it is all said and done the Court has to assess based on a contract interpretation as to what the proper damage is under the contract for that damage provision in the contract.

As far as the 7068 motion, as I said the last time, I don't believe the Court should exercise discretion, even if it could under the circumstance of the way the case is postured. But nonetheless, I think I can simply put that off until we finally address the spoliation motion.

So with all of that said, what I will do is give Parus Holdings a period of time. I will give them until June 13th to file an amendment to the spoliation motion focusing specifically on the issue that the Court has identified as the remaining issue to be determined. Obviously, when all of this is completed at this level, if an appellate court were to reverse the Court and revive expectation damages, this whole

issue of the spoliation motion I think as well could be arguably revived by Paris Holdings to the extent it needs to go forward with respect to expectation damages, if the Court were to be reversed on that issue. But nonetheless, I think as I have suggested and stated, June 13th would be the deadline. Thereafter, WorldCom can have until June 22nd to respond to that, and we can have a hearing the following Tuesday, June 26th, with no further papers.

If Parus Holdings decides, in light of the Court's ruling and explanation of what the Court believes the state of the issues are or the state of issues is, that it is not going to move forward with modification of the spoliation motion, just notify WorldCom and the Court, and then we can proceed to schedule another hearing with respect to moving forward directly on the basic versus the unlimited rate. As well, as I mentioned earlier, I will adjourn without date or actually I will carry it forward to this hearing date of June 26th the Rule 7068 and the 30(b)(6) issues. Any questions?

MS. MURCH: Your Honor, Jill Murch on behalf of Parus Holdings. My sincere apology. On June 26th I will actually be out of the country.

JUDGE GONZALEZ: All right. Probably the next reasonable date will be July 10th.

MS. MURCH: That would be perfectly fine with me, Your Honor.

JUDGE GONZALEZ: If it is July 10th, then I will give WorldCom until the 27th of June then to respond to any motion you file.

MS. MURDOCK: Your Honor, Allison Murdock on behalf WorldCom. Our motion to take a Rule 30(b)(6) deposition of Parus went to issues with respect to how does it maintain documents as well as the expectation damages. So to the extent that Parus is still going to be seeking spoliation sanctions from us, we would request that we be permitted to take the Rule 30(b)(6) deposition that was noticed in advance of having to oppose the spoliation motion.

JUDGE GONZALEZ: What needs to be responded to, and I should have clarified this, with the spoliation motion is more not on the substance of the motion, but really on the relevance of the issue. I think that is probably a better way to address it. So I will have to make that clear, because I didn't make it clear. The spoliation motion gets filed and says that spoliation of A, B, C and D would have an impact on the basic versus the unlimited, and I really just want you to respond to that. Because until I determine the relevance of spoliation, there is no sense in really going forward with this 30(b)(6) issue.

MS. MURDOCK: I see, Your Honor. I did not understand.

JUDGE GONZALEZ: I don't blame either one of you, and

I didn't hear from Parus Holdings' counsel, but I should have made that clear, because that is really what I am looking for is the relevance of this whole issue of spoliation.

MS. MURCH: Your Honor, this is Jill Murch for Parus Holdings. Just for clarification, in connection with that motion, we will be pointing out to the Court evidence that did exist as to the 11 versus 27, and then we will be highlighting the relevance of that information?

JUDGE GONZALEZ: Yes.

MS. MURCH: Okay. Great.

JUDGE GONZALEZ: That did exist and at this time does not exist?

MS. MURCH: Correct.

MS. MURDOCK: Your Honor, this is Allison Murdock again, if I may? So June 13th is the date that Parus will be filing its amended pleading, and June 27th is WorldCom's response date, and then the hearing date is July 10th?

JUDGE GONZALEZ: Correct.

All right. Thank you.

(Time noted: 2:37 p.m.)

C E R T I F I C A T E

STATE OF NEW YORK )
: SS:
COUNTY OF NEW YORK )

I, DEBORAH HUNTSMAN, a Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify:

That the within is a true and accurate transcript from the official electronic sound recording of the proceedings held on the 22nd day of May, 2007.

I further certify that I am not related by blood or marriage to any of the parties and that I am not interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 26th day of May, 2007.

DEBORAH HUNTSMAN
DEBORAH HUNTSMAN

**0**

02-13533(AJG [1] - 1:2
02:00 [2] - 1:6, 1:9

**1**

10th [3] - 4:23, 5:1, 6:17
11 [1] - 6:7
11173 [1] - 1:7
11242 [1] - 1:7
1201 [1] - 1:16
13th [3] - 3:20, 4:5, 6:15

**2**

2007 [3] - 1:4, 7:10, 7:15
212 [1] - 1:23
22 [1] - 1:4
22nd [2] - 4:6, 7:10
26th [4] - 4:8, 4:17, 4:20, 7:15
27 [1] - 6:7
27th [2] - 5:2, 6:16
2:28 [1] - 1:4
2:37 [1] - 6:20

**3**

30(b)(6 [5] - 1:10, 4:18, 5:5, 5:10, 5:22

**5**

53202 [1] - 1:20

**6**

608-9053 [1] - 1:23
64106 [1] - 1:16

**7**

7068 [3] - 1:7, 3:14, 4:18
718 [1] - 1:23
723-9898 [1] - 1:23
774-2551 [1] - 1:23
777 [1] - 1:19

**9**

917 [1] - 1:23
9291 [1] - 1:7
9293) [1] - 1:7

**A**

accurate [1] - 7:8
address [2] - 3:18, 5:16
adjourn [1] - 4:16
advance [1] - 5:10
al [1] - 1:3
ALLISON [1] - 1:17
Allison [3] - 2:6, 5:4, 6:14
amend [1] - 2:14
amended [1] - 6:16
amendment [1] - 3:21
amount [2] - 2:22, 3:4
apology [1] - 4:20
appear [1] - 1:9
appellate [1] - 3:24
apply [1] - 1:6
Arguably [1] - 3:8
arguably [1] - 4:2
ARTHUR [1] - 1:12
ascertain [1] - 2:17
assess [1] - 3:11
Attorneys [1] - 1:19
Avenue [1] - 1:19

**B**

BANKRUPTCY [1] - 1:1
Bankruptcy [2] - 1:7, 1:12
based [1] - 3:11
basic [4] - 2:15, 3:3, 4:15, 5:19
become [1] - 3:9
behalf [4] - 2:6, 2:9, 4:19, 5:4
believes [1] - 4:10
better [1] - 5:15
blame [1] - 5:25
blood [1] - 7:11
burden [3] - 3:2, 3:7, 3:9
BY [2] - 1:17, 1:21

**C**

carry [1] - 4:17
Case [1] - 1:2
case [1] - 3:16
certify [2] - 7:7, 7:11
circumstance [1] - 3:16
claim [1] - 1:7
Claimant [1] - 1:9
clarification [1] - 6:5
clarified [1] - 5:13
clear [3] - 5:16, 5:17, 6:2
compel [1] - 1:9
completed [1] - 3:24
concept [1] - 2:20
CONFERENCE [2] - 1:6, 1:9
connection [1] - 6:5
considerable [1] - 2:22
contract [5] - 3:6, 3:11, 3:13
Correct [2] - 6:13, 6:18
Counsel [2] - 1:15, 2:3
counsel [1] - 6:1
country [1] - 4:21
COUNTY [1] - 7:3
court [1] - 3:24
Court [11] - 1:23, 1:24, 3:3, 3:11, 3:15, 3:22, 3:25, 4:3, 4:10, 4:13, 6:6
COURT [1] - 1:1
Court's [2] - 2:12, 4:9

**D**

damage [2] - 3:12, 3:13
damages [5] - 2:18, 3:5, 3:25, 4:3, 5:7
date [6] - 4:16, 4:17, 4:23, 6:15, 6:17
deadline [1] - 4:6
DEBORAH [4] - 1:23, 7:5, 7:18, 7:19
Debtors [5] - 1:4, 1:6, 1:9, 1:15, 2:7
decides [1] - 4:9
deposition [3] - 1:10, 5:5, 5:10
determination [2] - 2:15, 3:8
determine [2] - 3:4, 5:20
determined [2] - 3:4, 3:23
DIGITALLY [1] - 1:6
directly [1] - 4:15
discretion [1] - 3:15
DISTRICT [1] - 1:1
documents [1] - 5:7
done [2] - 2:20, 3:11

**E**

East [1] - 1:19
either [1] - 5:25
electronic [1] - 7:9
Electronic [1] - 1:24
entitled [1] - 3:5
ESQ [2] - 1:17, 1:21
establish [1] - 3:10
et [1] - 1:3
evidence [1] - 6:6
exercise [1] - 3:15
exist [3] - 6:7, 6:11, 6:12
expectation [4] - 2:18, 3:25, 4:3, 5:7
explanation [1] - 4:10
extent [2] - 4:2, 5:8

**F**

fact [2] - 3:8, 3:10
far [1] - 3:14
file [2] - 3:21, 5:3
filed [3] - 1:8, 1:10, 5:17
filing [1] - 6:16
finally [1] - 3:18
fine [1] - 4:24
focus [1] - 2:17
focusing [1] - 3:21
FOLEY [1] - 1:18
Foley [1] - 2:8
following [1] - 4:7
forth [1] - 2:14
forward [5] - 4:3, 4:12, 4:14, 4:17, 5:21

**G**

GONZALEZ [11] - 1:12, 2:1, 2:4, 2:10, 4:22, 5:1, 5:12, 5:25, 6:9, 6:11, 6:18
Gonzalez [2] - 2:1, 2:5
Great [1] - 6:10
guess [1] - 3:8

**H**

hand [1] - 7:14
hear [1] - 6:1
hearing [4] - 4:7, 4:14, 4:17, 6:17
HECKER [1] - 1:14
held [1] - 7:10
Hello [1] - 2:1
hereby [1] - 7:6
hereunto [1] - 7:14
highlighting [1] - 6:7
Holdings [11] - 1:8, 1:9, 1:19, 2:9, 2:13, 3:5, 3:20, 4:2, 4:9, 4:20, 6:5
Holdings' [1] - 6:1
Honor [9] - 2:2, 2:6, 2:8, 4:19, 4:25, 5:4, 5:23, 6:4, 6:14
HONORABLE [1] - 1:12
HUNTSMAN [4] - 1:23, 7:5, 7:18, 7:19

**I**

identified [1] - 3:22
impact [2] - 3:7, 5:18
IN [1] - 7:14
INC [1] - 1:3
Inc [2] - 1:8, 1:9
incorporate [1] - 2:19
information [1] - 6:8
interested [1] - 7:12
Intermedia [1] - 1:15
interpretation [2] - 3:6, 3:12
issue [9] - 3:6, 3:8, 3:22, 3:23, 4:1, 4:4, 5:15, 5:22, 6:3
issues [5] - 2:14, 4:11, 4:18, 5:6

**J**

JILL [1] - 1:21
Jill [3] - 2:8, 4:19, 6:4
Judge [3] - 1:12, 2:1, 2:5
JUDGE [10] - 2:1, 2:4, 2:10, 4:22, 5:1,

5:12, 5:25, 6:9, 6:11, 6:18
judgment [1] - 1:7
July [3] - 4:23, 5:1, 6:17
June [9] - 3:20, 4:5, 4:6, 4:8, 4:17, 4:20, 5:2, 6:15, 6:16

**K**

Kansas [1] - 1:16

**L**

LARDNER [1] - 1:18
Lardner [1] - 2:8
last [1] - 3:14
level [1] - 3:24
light [4] - 2:11, 2:18, 2:21, 4:9
line [1] - 2:3
LLP [2] - 1:14, 1:18
looking [1] - 6:2

**M**

maintain [1] - 5:6
marriage [1] - 7:12
matter [1] - 7:13
mentioned [1] - 4:16
Milwaukee [1] - 1:20
Missouri [1] - 1:16
modification [1] - 4:12
MORRISON [1] - 1:14
motion [19] - 1:6, 1:9, 2:11, 2:14, 2:16, 2:18, 3:1, 3:14, 3:18, 3:21, 4:1, 4:12, 5:2, 5:5, 5:11, 5:13, 5:14, 5:17, 6:6
move [1] - 4:12
moving [1] - 4:14
MS [10] - 2:6, 2:8, 4:19, 4:24, 5:4, 5:23, 6:4, 6:10, 6:13, 6:14
MURCH [7] - 1:21, 2:8, 4:19, 4:24, 6:4, 6:10, 6:13
Murch [3] - 2:8, 4:19, 6:4
MURDOCK [5] - 1:17, 2:6, 5:4, 5:23, 6:14
Murdock [3] - 2:6, 5:4, 6:14

**N**

needs [3] - 3:4, 4:2, 5:12
NEW [3] - 1:1, 7:2, 7:3
New [3] - 1:3, 7:6
next [1] - 4:22
nonetheless [2] - 3:17, 4:4
nos [1] - 1:7
Notary [1] - 7:6
noted [1] - 6:20
noticed [2] - 1:9, 5:10
notify [1] - 4:13

**O**

Obviously [1] - 3:23
OF [3] - 1:1, 7:2, 7:3
offer [1] - 1:7
official [1] - 7:9
one [1] - 5:25
OPERATOR [1] - 2:2
operator [1] - 2:2
opinion [2] - 2:12, 2:21
opportunity [1] - 2:11
oppose [1] - 5:11
Opposition [1] - 1:10
order [1] - 3:4
outcome [1] - 7:13

**P**

p.m [2] - 1:4, 6:20
papers [1] - 4:8
Paris [1] - 4:2
parse [1] - 2:23
particular [1] - 3:10
parties [1] - 7:12
Parus [14] - 1:8, 1:9, 1:19, 2:9, 2:12, 3:5, 3:19, 4:9, 4:19, 5:6, 5:8, 6:1, 6:4, 6:15
perfectly [1] - 4:24
period [1] - 3:20
permitted [1] - 5:9
pleading [1] - 6:16
pointing [1] - 6:6
possibly [1] - 2:25
postured [1] - 3:16
proceed [2] - 2:13, 4:13
Proceedings [1] - 1:24
PROCEEDINGS [1] - 1:6
proceedings [2] - 1:7, 7:10
Produced [1] - 1:24
proof [3] - 3:2, 3:7, 3:9
proper [1] - 3:12
properly [1] - 1:9
provision [1] - 3:13
Public [1] - 7:6
purpose [1] - 3:1
put [1] - 3:17

**Q**

questions [1] - 4:18

**R**

rate [3] - 2:16, 3:4, 4:15
re [3] - 1:2, 1:6, 1:9
really [7] - 2:17, 3:2, 3:6, 5:14, 5:19, 5:21, 6:2
reasonable [1] - 4:23
recent [1] - 2:12
recently [1] - 2:21
reconvened [1] - 2:10
Recorded [1] - 1:24
RECORDED [1] - 1:6
Recording [1] - 1:24
recording [1] - 7:9
references [1] - 2:19
related [3] - 2:15, 2:16, 7:11
relevance [4] - 5:15, 5:20, 6:3, 6:8
relevant [3] - 2:14, 2:25, 3:9
remaining [1] - 3:23
Reorganized [2] - 1:4, 1:15
replacing [2] - 1:7
replete [1] - 2:19
Reporter [3] - 1:23, 1:24, 7:5
request [1] - 5:9
respect [3] - 4:3, 4:14, 5:6
respond [3] - 4:7, 5:2, 5:20
responded [1] - 5:12
Response [1] - 1:8
response [1] - 6:17
reverse [1] - 3:25
reversed [1] - 4:4
review [1] - 2:11
reviewing [1] - 2:17
revive [1] - 3:25
revived [1] - 4:2
Rule [5] - 1:7, 1:10, 4:18, 5:5, 5:10
ruling [1] - 4:10

**S**

sanctions [1] - 5:9
schedule [1] - 4:14
Second [1] - 2:25
see [1] - 5:23
seeking [1] - 5:8
seem [1] - 2:21
sense [1] - 5:21
set [2] - 2:14, 7:14
shift [1] - 3:2
Shorthand [1] - 7:5
simply [1] - 3:17
sincere [1] - 4:20
sound [1] - 7:9
Sound [1] - 1:24
SOUTHERN [1] - 1:1
Special [1] - 1:15
specifically [1] - 3:22
spoliation [15] - 2:11, 2:13, 2:16, 3:1, 3:18, 3:21, 4:1, 4:12, 5:8, 5:11, 5:13, 5:17, 5:18, 5:21, 6:3
SS [1] - 7:2
state [2] - 4:10, 4:11
STATE [1] - 7:2
State [1] - 7:6
STATES [1] - 1:1
States [1] - 1:12
STATUS [2] - 1:6, 1:9
still [1] - 5:8
STINSON [1] - 1:14
Street [1] - 1:16
substance [1] - 5:14
suggested [1] - 4:5

**T**

telephone [2] - 1:17, 1:21
THE [2] - 1:12, 2:2
Thereafter [1] - 4:6
Transcript [1] - 1:24
transcript [1] - 7:9
true [1] - 7:8
Tuesday [1] - 4:8

**U**

under [3] - 3:5, 3:12, 3:16
UNITED [1] - 1:1
United [1] - 1:12
unlimited [4] - 2:15, 3:3, 4:15, 5:19

**V**

versus [5] - 2:15, 3:3, 4:15, 5:19, 6:7
via [2] - 1:17, 1:21
view [1] - 2:18

**W**

Walnut [1] - 1:16
wants [1] - 2:13
WHEREOF [1] - 7:14
whole [2] - 3:25, 6:3
Wisconsin [2] - 1:19, 1:20
WITNESS [1] - 7:14
WORLDCOM [1] - 1:3
Worldcom [6] - 1:15, 3:2, 4:6, 4:13, 5:2, 5:5
WorldCom's [1] - 6:16

**Y**

YORK [3] - 1:1, 7:2, 7:3
York [3] - 1:3, 7:6

# EXHIBIT D

D00019

STINSON MORRISON HECKER LLP

Robert L. Driscoll, Esq.
Allison M. Murdock, Esq.
Jodi M. Hoss, Esq.
1201 Walnut, Suite 2900
Kansas City, MO 64106
Attorney for Debtors and Debtors-in-Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | : | CHAPTER 11 CASE |
| | : | NO. 02-13533 (AJG) |
| WORLDCOM, INC., et al., | : | (Jointly Administered) |
| Debtors. | : | |
| | : | |

**WORLDCOM'S SUPPLEMENTAL OPPOSITION TO CLAIMANT'S MOTION TO COMPEL PRODUCTION OF RESPONSIVE DOCUMENTS AND TO EXTEND DISCOVERY DEADLINES**

WorldCom, Inc. ("WorldCom") provides the following supplemental opposition to Claimant Parus Holdings, Inc.'s ("Parus Holdings") Motion to Compel and to Extend Discovery Deadlines ("Motion") (Docket No. 16423).

## INTRODUCTION

On July 13, 2005, Parus Holdings filed a motion to compel related solely to the production of WorldCom's paper documents. Parus Holdings' Motion specifically excludes the production of electronic documents. See Parus Holdings' Motion at 32 (Docket No. 16423); Parus Holdings' Reply at 9 (Docket No. 16715).

The Court heard argument on Parus Holdings' Motion on August 9 and September 13, 2005, and continued the hearing for November 1, 2005. As discussed herein, WorldCom's counsel has spent over 350 attorney hours reviewing over 450 boxes of documents to produce documents responsive to Parus Holdings' document requests. In addition, WorldCom's counsel

has interviewed numerous present and former WorldCom and Intermedia Communications, Inc. ("Intermedia") employees in an effort to locate responsive documents. From these efforts, WorldCom has culled and produced to Parus Holdings 12 ½ boxes, consisting of 29,303 pages, of documents, including some documents that were maintained in electronic form. WorldCom has complied with its obligations to produce paper documents responsive to Parus Holdings' requests. Therefore, Parus Holdings' motion to compel should be denied.

## ARGUMENT

Set forth below is a recitation of WorldCom's efforts to locate documents responsive to Parus Holdings' document requests and WorldCom's production of documents. Attached hereto as Exhibit 1 is the Supplemental Declaration of Donald C. Ramsay, the attorney who has had primarily responsibility for locating documents responsive to Parus Holdings' requests and coordinating the document production. As set forth in Mr. Ramsay's supplemental declaration, all of the facts set forth herein regarding WorldCom's efforts to locate documents and its production of documents are true and correct. See Supplemental Ramsay Declaration ¶ 2 (Ex. 1).

### I. WorldCom's Search for Documents and Initial Productions.

WorldCom's counsel began their search for documents related to Parus Holdings' claims months before Parus Holdings served its document request on WorldCom. WorldCom's counsel contacted *via* email those current WorldCom employees who, based on the allegations in the proofs of claim, might have relevant information and/or documents. These employees were provided information regarding Parus Holdings' proofs of claim, and asked to advise WorldCom's counsel of any information and documents they possessed regarding the claims and to identify any other persons who might have relevant information or documents. As a result of

these searches, WorldCom produced 255 pages of documents to Parus Holdings on January 26, 2005. Parus Holdings subsequently served Claimants' Request for Documents in February of 2005.

WorldCom's counsel continued its search for documents related to Parus Holdings' claims as well as documents responsive to Parus Holdings' document requests. WorldCom's counsel telephoned the employees who did not provide documents in response to the earlier emails to determine whether they had responsive documents and/or information regarding where such documents might be located. WorldCom's counsel also telephoned certain former WorldCom and Intermedia employees to determine whether they possessed responsive documents or information or knew where responsive documents might be located. As part of this process, WorldCom's counsel has interviewed over 20 current or former WorldCom and/or Intermedia employees (in addition to WorldCom's in-house counsel) for the purpose of locating documents that might be responsive to Parus Holdings' claims and document requests.

During the course of these telephone interviews, WorldCom's counsel learned that when Intermedia ceased doing business (which was long before Parus Holdings filed its claims), Intermedia's employees were directed to box their documents for storage. Through WorldCom's records information management function, WorldCom's counsel located over 10,000 boxes of Intermedia documents stored in depositories in Florida, Virginia, Colorado and Mississippi. WorldCom's counsel was provided with the indexes of these boxes, and the operator of the depositories, Iron Mountain, provided counsel with cost estimates for the retrieval of the boxes. WorldCom advised Parus Holdings of the existence of the stored Intermedia documents in Debtors' Response to Claimant's Request for Documents, which was timely served on March 25, 2005. WorldCom further produced to Parus Holdings on that date an additional 229 pages of

documents that were located as a result of WorldCom's continued search for responsive documents.

Based on Iron Mountain's written estimate, it would have cost approximately $149,000 to retrieve the 10,000 boxes, ship them to the Kansas City Iron Mountain facility, obtain space in that facility for review and return the boxes to storage. Because of the cost associated with the retrieval and review of the Intermedia stored documents, WorldCom's counsel made several proposals to Parus Holdings for the review of these documents. WorldCom offered to allow Parus Holdings to designate which of the 10,000 boxes WorldCom should review; offered to arrange for Parus Holdings to review all of the boxes (with an agreement that no privilege would be waived); or offered to review the boxes if Parus Holdings would share in the costs of retrieving them. Parus Holdings would not agree to any of these methods for review and made no reasonable counter-proposals. See WorldCom's Opposition at 6-9 (Docket No. 16687). Instead, Parus Holdings filed its motion to compel.

## II. WorldCom's Review of WorldCom Documents and Intermedia Stored Documents.

WorldCom's counsel continued its efforts to locate WorldCom documents responsive to Parus Holdings' requests. We obtained from current WorldCom employees electronic documents regarding the Master Licensing Agreement between Webley and WorldCom, WorldCom's financial analysis of Webley, and documents concerning the integration of Intermedia and WorldCom and the significant reduction in force that occurred after the WorldCom/Intermedia merger. WorldCom's counsel has located only a limited number of documents in WorldCom's files related to the UC Contract between Intermedia and Parus Holdings' predecessor, EffectNet, at issue in this action because beginning in September of 2001, the entire voice product line of business known as IntermediaOne was terminated. Based on the

documents reviewed (and produced), IntermediaOne never migrated over to WorldCom and it was never integrated into WorldCom. <u>See</u> *infra* p. 7-8 (stating that the aforementioned documents were produced as part of WorldCom's September and October 2005 productions).

In addition, because Parus Holdings declined to agree on a method for retrieving and reviewing the Intermedia stored documents, WorldCom proceeded with its own review of the documents using the indexes to select those boxes that might contain responsive documents. Using the document indexes, WorldCom identified 387 of the over 10,000 boxes of documents in the Florida, Virginia and Colorado depositories that – either based on the date or subject matter description listed on the index or the lack thereof – might contain responsive documents.[1] Consequently, if the description of a box on the index suggested that the box might contain responsive documents, WorldCom retrieved the box for review. Similarly, if the indexes did not describe the contents of a box and the documents were listed as being in the relevant time frame or no time frame was listed, WorldCom retrieved the box for review. In a few instances, it appeared from the description on indexes that certain categories of boxes were unlikely to contain responsive documents, but counsel could not be certain. In these instances, WorldCom's counsel selected a sample of approximately five boxes for review. If after review of the sample, it was possible that the remaining similarly described boxes could contain responsive documents, then counsel retrieved all of the similarly described boxes for review. These boxes were shipped to WorldCom's counsel's office to avoid the costs associated with using depository space for

[1] The contract at issue in this action is dated November 20, 2000. <u>See</u> Parus Holdings' Motion at 2 (¶ 6). The contract was terminated by EffectNet on April 12, 2002. <u>See</u> March 25, 2002, letter from Mr. McConnell to Mr. Bacon (WorldCom's Opposition, Ex. M) (Docket No. 16687). WorldCom did not retrieve boxes that dated before January 1, 2000, unless it appeared based on their description that they might contain potentially responsive documents.

review and travel, and to ensure that the boxes will remain easily accessible throughout this case.[2]

WorldCom described the aforementioned selection method in its opposition to Parus Holdings' motion to compel and WorldCom's counsel also explained the selection method during the hearing on August 9, 2005. WorldCom's Opposition at 9-10 (Docket No. 16687). On August 12, 2005, WorldCom provided Parus Holdings a list of all of the boxes WorldCom selected from the indexes for review and invited Parus Holdings to advise of any additional boxes it believed WorldCom should review. See August 12, 2005, letter from Robert Driscoll to Steven Wood (attached hereto as Ex. 2). For ease of reference, WorldCom also provided Parus Holdings on this same date a highlighted copy of the indexes showing the boxes selected for review. Id. Parus Holdings never identified any additional boxes that it believed WorldCom should have reviewed.

After reviewing the boxes originally retrieved from the depositories, WorldCom's counsel re-examined the indexes in light of documents found during the initial review to determine whether additional boxes should be retrieved from the depositories. Based on this re-examination, WorldCom's counsel retrieved an additional 77 boxes from the depositories for review. Once again, WorldCom provided Parus Holdings a list of the additional boxes it intended to review. See September 1, 2005, letter from Robert Driscoll to Steven Wood (attached hereto as Ex. 3). And, again, Parus Holdings did not identify any additional boxes it believed WorldCom should review.

---

[2] Consistent with its discovery objections, WorldCom did not retrieve and review Intermedia boxes that, based on the subject matter and/or time period described on the indexes, are unrelated to this action.

## III. WorldCom's September 2005 and October 2005 Document Productions.

Over an approximately six week period, seven lawyers (from outside counsel's office) reviewed the approximately 380 boxes of Intermedia documents initially retrieved from the depositories. Some of these lawyers also reviewed electronically stored documents obtained from a current WorldCom and former Intermedia employee. From this review, the lawyers culled 25,427 pages, or 11 ½ boxes, of documents responsive to Parus Holdings' requests. These documents were Bates numbered and produced to Parus Holdings on September 22, 2005. With its production, WorldCom provided to Parus Holdings an index showing by Bates number the document requests to which the produced documents were responsive and, where applicable, the number of the box in which the documents were found. See Index of MCI's Response to First Request for Documents – September 22, 2005 (attached hereto as Ex. 4). WorldCom also provided to Parus Holdings a privilege log identifying those responsive documents that were withheld from production on the basis of the attorney-client privilege and/or the litigation work product doctrine.

Six lawyers (from outside counsel's office) reviewed the additional 77 boxes of documents retrieved from the depositories. From this review, WorldCom's counsel culled an additional 3,876 pages, or 1½ boxes, of responsive documents. WorldCom's counsel Bates numbered these documents and produced them to Parus Holdings on October 7, 2005. WorldCom again produced an index showing by Bates number the document requests to which the produced documents are responsive and, where applicable, the number of the box in which the documents were found. See Index of MCI's Supplemental Response to First Request for

Documents – October 7, 2005 (attached hereto as Ex. 5). WorldCom also provided to Parus Holdings an amended privilege log.

WorldCom's outside counsel has spent over 350 hours of attorney time reviewing documents for the productions on September 22 and October 7, 2005. These 350 hours do not include time spent interviewing current and former employees to locate documents, identifying boxes from the indexes to review, arranging for the transfer of the Intermedia boxes to Kansas City or preparation of the indexes provided to Parus Holdings.

WorldCom's productions have included printed versions of electronically stored documents relating to the Master Licensing Agreement with Webley; personnel files of individuals who dealt with the UC Contract; the Unified Communications Services General Agreement; Intermedia's payment of the $175,000 deposit to EffectNet; termination of Intermedia's operations and its integration with WorldCom; the finances of EffectNet and Webley; and documents concerning Intermedia and WorldCom's unified voice products.

As reflected in the indexes produced by WorldCom with its documents productions (which show by Bates number the documents requests to which the produced documents are responsive), WorldCom's September and October 2005 productions have included documents responsive to all but six of Parus Holdings' 35 document requests. As to five of these requests (Request Nos. 5 and 7-10), WorldCom produced responsive documents in its earlier productions or the requests relate to WorldCom's legal theories based on the language of the UC Contract.[3]

---

[3] Request Nos. 5, 8, 9 and 10 request documents related to WorldCom's contentions that Parus Holdings is not entitled to a double recovery, seeks an unenforceable penalty, has calculated damages using amount per commitment higher than the contract specifies and the contract prohibits assignment. These all are legal issues related to the language of the contract. Request No. 7 requests documents concerning WorldCom's contention that Parus Holdings' terminated the contract. Parus Holdings' letters to Intermedia terminating the contract were produced in WorldCom's earlier document productions.

As to the remaining request (Request No. 18), WorldCom has not located any documents regarding communications between WorldCom and Intermedia regarding the General Agreement between Intermedia and Parus Holdings' predecessor, EffectNet.

WorldCom is making continuing efforts to ensure that its document production is complete. If additional non-privileged and responsive documents are located, they will be produced.

## IV. WorldCom's Production of Electronic Documents.

Parus Holdings' Motion specifically excludes the production of electronic documents. See Parus Holdings' Motion at 32 (Docket No. 16423) (stating that the parties had not yet conferred regarding electronic document production and the factual record does not exist for the Court to undertake a cost-shifting analysis); see also Parus Holdings' Reply at 9 (Docket No. 16715) (same). However, as discussed above, WorldCom already has printed, reviewed and produced some of its electronic documents.

On October 5, 2005, Parus Holdings' counsel advised for the first time that Parus Holdings is willing to propose search terms for electronic discovery. On October 24, 2005, Parus Holdings provided WorldCom a list of proposed search terms including names of individuals. WorldCom is currently obtaining an estimate of the cost for conducting the scope of search now proposed by Parus Holdings.

## CONCLUSION

For the reasons set forth herein and in WorldCom's opposition to Parus Holdings' motion to compel, Parus Holdings' Motion to Compel and to Extend Discovery Deadlines should be denied. WorldCom has complied with its obligations to produce paper documents responsive to Parus Holdings' requests – which is the only subject of Parus Holdings' Motion.

Respectfully submitted,

STINSON MORRISON HECKER LLP

By: *s/Robert L. Driscoll*
Robert L. Driscoll
Lawrence W. Bigus
1201 Walnut Street, Suite 2800
Kansas City, MO 64106
(816) 842-8600 – Telephone
(816) 691-3495 – Facsimile

ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

**CERTIFICATE OF SERVICE**

I hereby certify that on October 27th, 2005, I electronically filed the foregoing with the Clerk of the Bankruptcy Court using the CM/ECF system which sent notification of such filing to all parties receiving electronic means.

*s/Robert L. Driscoll*
Attorney for Debtors

# EXHIBIT 1

D00030

STINSON MORRISON HECKER LLP

Robert L. Driscoll, Esq.
Allison M. Murdock, Esq.
Jodi M. Hoss, Esq.
1201 Walnut, Suite 2900
Kansas City, MO 64106
Attorney for Debtors and Debtors-in-Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | : | CHAPTER 11 CASE |
| | : | NO. 02-13533 (AJG) |
| WORLDCOM, INC., et al., | : | (Jointly Administered) |
| Debtors. | : | |
| | : | |

**SUPPLEMENTAL DECLARATION OF DONALD C. RAMSAY**

I, Donald C. Ramsay, of lawful age and having been duly sworn, depose and state as follows:

1. I am an attorney with the law firm of Stinson Morrison Hecker LLP. I am the attorney who has had primarily responsibility for locating documents responsive to Claimant's First Request for Documents and coordinating WorldCom's document production. I have personal knowledge of the matters set forth herein.

2. All of the facts set forth in WorldCom's Supplemental Opposition to Claimant's Motion to Compel Production of Responsive Documents and to Extend Deadlines regarding WorldCom's efforts to locate documents responsive to Parus Holdings' document requests and WorldCom's production of documents are true and correct.

EXHIBIT
1

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 27, 2005.

Donald C. Ramsay

# EXHIBIT 2

D00033



STINSON
MORRISON
HECKER LLP

Robert L. Driscoll
(816) 691-3102
bdriscoll@stinsonmoheck.com
www.stinsonmoheck.com

1201 Walnut, Suite 2900
Kansas City, MO 64106-2150

*Tel* (816) 842-8600
*Fax* (816) 691-3495

August 12, 2005

**<u>VIA FEDERAL EXPRESS</u>**

Mr. Steven Wood
Kelley Drye & Warren LLP
333 West Wacker Drive, Suite 2600
Chicago, Illinois 60606

Re: In re Worldcom, Inc. -- Claim of Parus Holdings, Inc.

Dear Steve:

As discussed at the conclusion of the hearing held on Tuesday, August 9, I am enclosing a list of the boxes of Intermedia Communications, Inc. ("Intermedia") documents that have been shipped to Kansas City and currently are being reviewed. Also enclosed are copies of the five indexes, which were previously provided to you by email, with the boxes selected for review highlighted. The highlighted indexes provide the same information as the list. (The index for the boxes in the Mississippi Filings Systems depository is not highlighted because it does not appear that there are any responsive documents in that depository.)

As you will see in reviewing the highlighted indexes, a sampling of boxes was selected for review in a few instances even though the boxes appeared to contain non-responsive documents. For example, there are approximately 12 boxes of documents in the Tampa depository described as "CS & SO Stop Bill Migration." We have selected five of these boxes for review to determine whether the boxes described in that manner may contain responsive documents. If so, we will retrieve the remaining approximately seven boxes with this same description for review.

Also, as you may have gathered from my responses to the Court on August 9 regarding future scheduling, I will be out of the office the next couple of weeks. In my absence, please call my partner, Allison Murdock, if you have any questions regarding the boxes selected for review or if you identify any additional boxes that you believe should be reviewed. Allison's direct dial is (816) 691-3138. Concerning

KANSAS CITY
OVERLAND PARK
WICHITA
WASHINGTON, D.C.
PHOENIX
ST. LOUIS
OMAHA
JEFFERSON CITY

EXHIBIT
2

Mr. Steven Wood
August 12, 2005
Page 2

the related point of electronically stored documents, Allison will contact you soon to discuss review and production of those documents.

Very truly yours,

**STINSON MORRISON HECKER LLP**

Robert L. Driscoll

Enclosures

cc: Allison M. Murdock

D00035

Parus Holdings, Inc.'s Claims
Boxes Selected for Review

| Customer ID | Location | Customer Box # | SKP Box # | Box Dept. | Box Record | Description |
|---|---|---|---|---|---|---|
| CP661 | Denver | 298408973 | 298408973 | | | WorldCom Unified Messaging Project Plans |
| CWWLD | Denver | 128790428 | | | | Alfred Binford, file: 50-0084 |
| CWWLD | Denver | 187965984 | | | | Alfred Binford, file: 50-0084 |
| CWWLD | Denver | 167394560 | | | | Alfred Binford, file: 50-0084 |
| CWWLD | Denver | 216725800 | | | | Richard Buyens, files: 50-8015 |
| CWWLD | Denver | 167394564 | | | | Richard Buyens, files: 50-8015 |
| CWWLD | Denver | 216725800 | | | | Kathleen Victory, file: 86-6141 |
| CWWLD | Denver | 258791684 | | | | Kathleen Victory, file: 86-6141 |
| CWWLD | Denver | 167394539 | | | | Kathleen Victory, file: 86-6141 |
| CWWLD | Denver | 216725712 | | | | Richard Black, file: 50-1918 |
| CWWLD | Denver | 216725712 | | | | Richard Black, file: 38-7983 |
| CWWLD | Denver | 216725800 | | | | Richard Black |
| CWWLD | Denver | 258791684 | | | | Richard Black, file: 56-0806 |
| CWWLD | Denver | 167394506 | | | | Richard Black |
| CWWLD | Denver | 368064274 | | | | Richard Black, filed: 60-5408 |
| CWWLD | Denver | 367795562 | | | | James Renfro, file: 98-4808 |
| CWWLD | Denver | 167394664 | | | | Len Jasczak, file: 52-8781 |
| CWWLD | Denver | 167394580 | | | | Len Jasczak, file: 52-8781 |
| CWWLD | Denver | 306445276 | | | | Jack Kerrington, file: 27-6262 |
| T094D | Tampa | 6288 Only | 121486916 | | | MBA |
| T094D | Tampa | 18CR | 165034480 | | | File Room |
| T094D | Tampa | 6391-6403 | 121486928 | | | MBA |
| T094D | Tampa | 6379-6390 | 121486927 | | | MBA |
| T094D | Tampa | 6371-6379 | 121486926 | | | MBA |
| T094D | Tampa | 6352-6370 | 121486925 | | | MBA |
| T094D | Tampa | 6341-6351 | 121486924 | | | MBA |
| T094D | Tampa | 226516617 | 226516617 | | | Intermedia-Tampa FL - CS&SO Stop Bill Migration |
| T094D | Tampa | 226516616 | 226516616 | | | Intermedia-Tampa FL - CS&SO Stop Bill Migration |
| T094D | Tampa | 226516615 | 226516615 | | | Intermedia-Tampa FL - CS&SO Stop Bill Migration |
| T094D | Tampa | 226516614 | 226516614 | | | Intermedia-Tampa FL - CS&SO Stop Bill Migration |
| T094D | Tampa | 226516613 | 226516613 | | | Intermedia-Tampa FL - CS&SO Stop Bill Migration |

Parus Holdings, Inc.'s Claims
Boxes Selected for Review

| Customer ID | Location | Customer Box # | SKP Box # | Box Dept. | Box Record | Description |
|---|---|---|---|---|---|---|
| T094D | Tampa | 226516612 | 226516612 | | | Intermedia-Tampa FL - CS&SO Stop Bill Migration |
| T094D | Tampa | 224664998 | 224664998 | | | Intermedia-Tampa FL - CS&SO Disconnect Files A-Z |
| T094D | Tampa | 224664997 | 224664997 | | | Intermedia-Tampa FL - CS&SO Disconnect Files A-M |
| T094D | Tampa | 224664962 | 224664962 | | | Intermedia-Tampa FL - CS and SO LNP Files-E |
| T094D | Tampa | 224664961 | 224664961 | | | Intermedia-Tampa FL - CS and SO LNP Files-E |
| T094D | Tampa | 224664960 | 224664960 | | | Intermedia-Tampa FL - CS and SO LNP Files-E |
| T094D | Tampa | 224664959 | 224664959 | | | Intermedia-Tampa FL - CS and SO LNP Files-E |
| T094D | Tampa | 224664958 | 224664958 | | | Intermedia-Tampa FL - CS and SO LNP Files-E |
| T094D | Tampa | 224664927 | 224664927 | | | Intermedia-Tampa FL - CS&SO LNP Files Out E |
| T094D | Tampa | 224664926 | 224664926 | | | Intermedia-Tampa FL - CS&SO LNP Files Out E |
| T094D | Tampa | 224664912 | 224664912 | | | |
| T094D | Tampa | 224664908 | 224664908 | | | |
| T094D | Tampa | 224664907 | 224664907 | | | |
| T094D | Tampa | 224664905 | 224664905 | | | |
| T094D | Tampa | 224664904 | 224664904 | | | |
| T094D | Tampa | 224664903 | 224664903 | | | |
| T094D | Tampa | 224664901 | 224664901 | | | |
| T094D | Tampa | 224664900 | 224664900 | | | |
| T094D | Tampa | 224664899 | 224664899 | | | |
| T094D | Tampa | 224664898 | 224664898 | | | |
| T094D | Tampa | 224664897 | 224664897 | | | |
| T094D | Tampa | 224664896 | 224664896 | | | |
| T094D | Tampa | 224664895 | 224664895 | | | |
| T094D | Tampa | 224664894 | 224644894 | | | |
| T094D | Tampa | 224664893 | 224664893 | | | |
| T094D | Tampa | 224664892 | 224664892 | | | |

D00037

Parus Holdings, Inc.'s Claims
Boxes Selected for Review

| Customer ID | Location | Customer Box # | SKP Box # | Box Dept. | Box Record | Description |
|---|---|---|---|---|---|---|
| T094D | Tampa | 224664891 | 224664891 | | | |
| T094D | Tampa | 224664890 | 224664890 | | | |
| T094D | Tampa | 224664889 | 224664889 | | | |
| T094D | Tampa | 224664886 | 224664886 | | | |
| T094D | Tampa | 224664885 | 224664885 | | | |
| T094D | Tampa | 224644884 | 224664884 | | | |
| T094D | Tampa | 224664883 | 224664883 | | | |
| T094D | Tampa | 224664882 | 224664882 | | | |
| T094D | Tampa | 224664881 | 224644881 | | | |
| T094D | Tampa | 224664880 | 224664880 | | | |
| T094D | Tampa | 224664879 | 224664879 | | | |
| T094D | Tampa | 224664878 | 224664878 | | | |
| T094D | Tampa | 224664877 | 224664877 | | | |
| T094D | Tampa | 224664876 | 224664876 | | | |
| T094D | Tampa | 224664875 | 224664875 | | | |
| T094D | Tampa | 224664874 | 224664874 | | | |
| T094D | Tampa | 224664873 | 224664873 | | | |
| T094D | Tampa | 224664872 | 224664872 | | | No Transmittal Received |
| T094D | Tampa | 224664871 | 224664871 | | | No Transmittal Received |
| T094D | Tampa | 224664870 | 224664870 | | | |
| T094D | Tampa | 224664869 | 224664869 | | | |
| T094D | Tampa | 224664868 | 224664868 | | | |
| T094D | Tampa | 224664867 | 224664867 | | | |
| T094D | Tampa | 224664866 | 224664866 | | | |
| T094D | Tampa | 224664865 | 224664865 | | | |
| T094D | Tampa | 224664864 | 224664864 | | | |
| T094D | Tampa | 224664863 | 224664863 | | | |
| T094D | Tampa | 224664862 | 224664862 | | | |
| T094D | Tampa | 224664861 | 224664861 | | | |
| T094D | Tampa | 224664860 | 224664860 | | | |
| T094D | Tampa | 224664859 | 224664859 | | | |
| T094D | Tampa | 224664858 | 224664858 | | | |
| T094D | Tampa | 224664857 | 224664857 | | | |
| T094D | Tampa | 224664856 | 224664856 | | | |
| T094D | Tampa | 224664855 | 224664855 | | | |
| T094D | Tampa | 224664854 | 224664854 | | | |

Parus Holdings, Inc.'s Claims
Boxes Selected for Review

| Customer ID | Location | Customer Box # | SKP Box # | Box Dept. | Box Record | Description |
|---|---|---|---|---|---|---|
| T094D | Tampa | 224664853 | 224664853 | | | |
| T094D | Tampa | 224664852 | 224664852 | | | |
| T094D | Tampa | 224664851 | 224664851 | | | |
| T094D | Tampa | 224664850 | 224664850 | | | |
| T094D | Tampa | 224664849 | 224664849 | | | |
| T094D | Tampa | 224664848 | 224664848 | | | |
| T094D | Tampa | 224664847 | 224664847 | | | |
| T094D | Tampa | 224664846 | 224664846 | | | |
| T094D | Tampa | 224664845 | 224664845 | | | |
| T094D | Tampa | 224664844 | 224664844 | | | |
| T094D | Tampa | 224664843 | 224664843 | | | |
| T094D | Tampa | 224664842 | 224664842 | | | |
| T094D | Tampa | 224664841 | 224664841 | | | |
| T094D | Tampa | 224664840 | 224664840 | | | |
| T094D | Tampa | 224664839 | 224664839 | | | |
| T094D | Tampa | 224664838 | 224664838 | | | |
| T094D | Tampa | 224664837 | 224664837 | | | |
| T094D | Tampa | 224664832 | 224644832 | | | |
| T094D | Tampa | 224644831 | 224644831 | | | |
| T094D | Tampa | 224664829 | 224664829 | | | |
| T094D | Tampa | 224664828 | 224664828 | | | |
| T094D | Tampa | 224664827 | 224644827 | | | |
| T094D | Tampa | 224664826 | 224664826 | | | |
| T094D | Tampa | 224664824 | 224664824 | | | |
| T094D | Tampa | 224664823 | 224664823 | | | |
| T094D | Tampa | 224664822 | 224664822 | | | |
| T094D | Tampa | 224664821 | 224664821 | | | |
| T094D | Tampa | 224664820 | 224664820 | | | |
| T094D | Tampa | 224664819 | 224664819 | | | |
| T094D | Tampa | 224664818 | 224664818 | | | |
| T094D | Tampa | 224664817 | 224664817 | | | |
| T094D | Tampa | 224664816 | 224664816 | | | |
| T094D | Tampa | 224664815 | 224664815 | | | |
| T094D | Tampa | 224664814 | 224664814 | | | |
| T094D | Tampa | 224664813 | 224664813 | | | |
| T094D | Tampa | 224664812 | 224664812 | | | |

Parus Holdings, Inc.'s Claims
Boxes Selected for Review

| Customer ID | Location | Customer Box # | SKP Box # | Box Dept. | Box Record | Description |
|---|---|---|---|---|---|---|
| T094D | Tampa | 224664811 | 224664811 | | | |
| T094D | Tampa | 224664810 | 224664810 | | | |
| T094D | Tampa | 224664809 | 224664809 | | | |
| T094D | Tampa | 224664808 | 224664808 | | | |
| T094D | Tampa | 224664807 | 224664807 | | | |
| T094D | Tampa | 224664806 | 224664806 | | | |
| T094D | Tampa | 224664805 | 224664805 | | | |
| T094D | Tampa | 224664804 | 224664804 | | | |
| T094D | Tampa | 224664800 | 224664800 | | | |
| T094D | Tampa | 224664799 | 224664799 | | | |
| T094D | Tampa | 224664798 | 224664798 | | | |
| T094D | Tampa | 224664797 | 224664797 | | | |
| T094D | Tampa | 224664796 | 224664796 | | | |
| T094D | Tampa | 224664793 | 224664793 | | | |
| T094D | Tampa | 224664791 | 224664791 | | | |
| T094D | Tampa | 224664790 | 224664790 | | | |
| T094D | Tampa | 224664789 | 224664789 | | | |
| T094D | Tampa | 224664788 | 224644788 | | | |
| T094D | Tampa | 224664786 | 224664786 | | | |
| T094D | Tampa | 224664785 | 224664785 | | | |
| T094D | Tampa | 224664784 | 224664784 | | | |
| T094D | Tampa | 224664783 | 224664783 | | | |
| T094D | Tampa | 224664782 | 224664782 | | | |
| T094D | Tampa | 224664781 | 224664781 | | | |
| T094D | Tampa | 224664780 | 224664780 | | | |
| T094D | Tampa | 224664779 | 224664779 | | | |
| T094D | Tampa | 224664778 | 224664778 | | | |
| T094D | Tampa | 224664777 | 224664777 | | | |
| T094D | Tampa | 224664776 | 224664776 | | | |
| T094D | Tampa | 224664775 | 224664775 | | | |
| T094D | Tampa | 224664772 | 224664772 | | | |
| T094D | Tampa | 224664771 | 224664771 | | | |
| T094D | Tampa | 224664770 | 224644770 | | | |
| T094D | Tampa | 224664769 | 224664769 | | | |
| T094D | Tampa | 224664768 | 224644768 | | | |
| T094D | Tampa | 224664767 | 224664767 | | | |

Parus Holdings, Inc.'s Claims
Boxes Selected for Review

| Customer ID | Location | Customer Box # | SKP Box # | Box Dept. | Box Record | Description |
|---|---|---|---|---|---|---|
| T094D | Tampa | 224664766 | 224664766 | | | |
| T094D | Tampa | 224664765 | 224664765 | | | |
| T094D | Tampa | 224664742 | 224664742 | | | |
| T094D | Tampa | 224664741 | 224664741 | | | |
| T094D | Tampa | 224664740 | 224664740 | | | |
| T094D | Tampa | 224664739 | 224664739 | | | |
| T094D | Tampa | 224664734 | 224664734 | | | |
| T094D | Tampa | 224664715 | 224664715 | | | Intermedia-Tampa FL/Customer Service & Support Disconnect |
| T094D | Tampa | 187572540 | 187572540 | | | Paid Invoices H-Z - Dothan-AL |
| T094D | Tampa | 187572539 | 187572539 | | | Paid Invoices A-G - Dothan-AL |
| T094D | Tampa | 177204264 | 177204264 | | | Bev's file Cabinet |
| T094D | Tampa | 177204263 | 177204263 | | | Bev's file Cabinet |
| T094D | Tampa | 177204262 | 177204262 | | | Bev's file Cabinet |
| T094D | Tampa | 177199708 | 177199708 | | | Vendor Mgt - Contract Documentation |
| T094D | Tampa | 177199707 | 177199707 | | | Vendor Mgt - Contract Documentation |
| T094D | Tampa | 177199706 | 177199706 | | | Vendor Mgt - Contract Documentation |
| T094D | Tampa | 177199704 | 177199704 | | | Vendor Mgt - Contract Documentation |
| T094D | Tampa | 177199703 | 177199703 | | | Vendor Mgt - Contract Documentation |
| T094D | Tampa | 177199702 | 177199702 | | | Vendor Management - Contract Backup Documentation |
| T094D | Tampa | 168157699 | 168157699 | | | Payroll Local 164 2000 WK Rpts and Monthly Benefit Request |
| T094D | Tampa | 165274660 | 165274660 | | | IBI CR |
| T094D | Tampa | 165274659 | 165274659 | | | IBI CR |
| T094D | Tampa | 165030232 | 165030232 | | | |
| T094D | Tampa | 165012792 | 165012792 | | | See Attached Record |
| T094D | Tampa | 165012791 | 165012791 | | | See Attached Record |
| T094D | Tampa | 165012790 | 165012790 | | | See Attached Record |
| T094D | Tampa | 165012789 | 165012789 | | | See Attached Record |
| T094D | Tampa | 165012788 | 165012788 | | | See Attached Record |
| T094D | Tampa | 165012787 | 165012787 | | | See Attached Record |
| T094D | Tampa | 165012786 | 165012786 | | | See Attached Record |
| T094D | Tampa | 165012785 | 165012785 | | | See Attached Record |
| T094D | Tampa | 165012783 | 165012783 | | | See Attached Record |
| T094D | Tampa | 165012782 | 165012782 | | | See Attached Record |

Parus Holdings, Inc.'s Claims
Boxes Selected for Review

| Customer ID | Location | Customer Box # | SKP Box # | Box Dept. | Box Record # | Description |
|---|---|---|---|---|---|---|
| T094D | Tampa | 165012781 | 165012781 | | | See Attached Record |
| T094D | Tampa | 165012780 | 165012780 | | | See Attached Record |
| T094D | Tampa | 165012779 | 165012779 | | | See Attached Record |
| T094D | Tampa | 165012778 | 165012778 | | | See Attached Record |
| T094D | Tampa | 165012777 | 165012777 | | | See Attached Record |
| T094D | Tampa | 165012776 | 165012776 | | | See Attached Record |
| T094D | Tampa | 165012775 | 165012775 | | | See Attached Record |
| T094D | Tampa | 165012774 | 165012774 | | | See Attached Record |
| T094D | Tampa | 165012773 | 165012773 | | | See Attached Record |
| T094D | Tampa | 165012772 | 165012772 | | | See Attached Record |
| T094D | Tampa | 165012771 | 165012771 | | | See Attached Record |
| T094D | Tampa | 165012770 | 165012770 | | | See Attached Record |
| T094D | Tampa | 165012769 | 165012769 | | | See Attached Record |
| T094D | Tampa | 165012768 | 165012768 | | | See Attached Record |
| T094D | Tampa | 165012767 | 165012767 | | | See Attached Record |
| T094D | Tampa | 165012766 | 165012766 | | | See Attached Record |
| T094D | Tampa | 165012765 | 165012765 | | | See Attached Record |
| T094D | Tampa | 165012764 | 165012764 | | | See Attached Record |
| T094D | Tampa | 165012763 | 165012763 | | | See Attached Record |
| T094D | Tampa | 165012762 | 165012762 | | | See Attached Record |
| T094D | Tampa | 165012761 | 165012761 | | | See Attached Record |
| T094D | Tampa | 121695308 | 121695308 | | | Payroll ICX Term EE files 2001 |
| T094D | Tampa | 121695307 | 121695307 | | | Payroll ICX Term EE files 2001 |
| T094D | Tampa | 121695306 | 121695306 | | | Payroll ICX Term EE files 2001 |
| T094D | Tampa | 121846859 | 121846859 | | | 6122-6126 |
| T094D | Tampa | 121486858 | 121486858 | | | 6108-6120 |
| T094D | Tampa | 121486857 | 121486857 | | | 6103-6107 |
| T094D | Tampa | 121486856 | 121486856 | | | 6084-6102 |
| T094D | Tampa | 121486855 | 121486855 | | | 6082-6084 |
| T094D | Tampa | 121486854 | 121486854 | | | 6068-6078 |
| T094D | Tampa | 121486853 | 121486853 | | | 6060-6066 |
| T094D | Tampa | 121486852 | 121486852 | | | 6054-6059 |
| T094D | Tampa | 121486851 | 121486851 | | | 6045-6052 |
| T094D | Tampa | 121486850 | 121486850 | | | 6039-6044 |
| T094D | Tampa | 121486849 | 121486849 | | | 6036-6039 |
| T094D | Tampa | 121486848 | 121486848 | | | 6021-6036 |

D00042

Parus Holdings, Inc.'s Claims
Boxes Selected for Review

| Customer ID | Location | Customer Box # | SKP Box # | Box Dept. | Box Record | Description |
|---|---|---|---|---|---|---|
| T094D | Tampa | 121486847 | 121486847 | | | 6014-6020 |
| T094D | Tampa | 121486846 | 121486846 | | | 6014-6018 |
| T094D | Tampa | 121486845 | 121486845 | | | 6008-6012 |
| T094D | Tampa | 121486803 | 121486803 | | | 6000-6006 |
| T094D | Tampa | 121486802 | 121486802 | | | 5979-6000 |
| T094D | Tampa | 121486801 | 121486801 | | | 5973-5978 |
| T094D | Tampa | 121486800 | 121486800 | | | 5969-5972 |
| T094D | Tampa | 121481657 | 121481657 | | | Jan-Mar 2000 Kruse Reports |
| T094D | Tampa | 228407 | DST314165 | | | 00000228407 Audit Folders #231-285 |
| T094D | Tampa | 228406 | DST314164 | | | 00000228406 Audit Folders #286-390 |
| T094D | Tampa | 228405 | DST314163 | | | 00000228405 Audit Folders #411-520 |
| T094D | Tampa | 228404 | DST314162 | | | 00000228404 Audit Folders #2154-2225 |
| T094D | Tampa | 228348 | DST314106 | | | 00000228348 Intermedia Year 2000 Readiness & System/APP |
| T094D | Tampa | 200985 | 125572974 | | | C/R |
| T094D | Tampa | 200984 | 125572973 | | | C/R |
| T094D | Tampa | 200983 | 125572984 | | | CR Research TR Rep G/L W/S |
| T094D | Tampa | 200982 | 125572979 | | | CR |
| T094D | Tampa | 200981 | 125572972 | | | CR |
| T094D | Tampa | 200980 | 125572969 | | | CR |
| T094D | Tampa | 200868 | DST313415 | | | 00000200868 IBI |
| T094D | Tampa | 200868 | DST313416 | | | 00000200869 IBI |
| T094D | Tampa | 200867 | DST313414 | | | 00000200867 IBI |
| T094D | Tampa | 200866 | DST313413 | | | 00000200866 IBI |
| T094D | Tampa | 200865 | DST313412 | | | 00000200865 IBI |
| T094D | Tampa | 196536 | DST306078 | | | 00000196536 IBI |
| T094D | Tampa | 196535 | DST306077 | | | 00000196535 IBI |
| T094D | Tampa | 196534 | DST306076 | | | 00000196534 IBI |
| T094D | Tampa | 181990 | 128609636 | | | INT-Research 99/00 I-Z |
| T094D | Tampa | 169070 | DST301252 | | | 00000169070 Litigation File |
| T094D | Tampa | 169067 | DST301250 | | | 00000169067 Litigation File Cybergate |
| T094D | Tampa | 169066 | DST301249 | | | 00000169066 Litigation File |
| T094D | Tampa | 169065 | DST301248 | | | 00000169065 Litigation File |
| T094D | Tampa | 169064 | DST301247 | | | 00000169064 Litigation File |
| T094D | Tampa | 168507 | DST301237 | | | 00000168507 Phone One Files 94-96 |
| T094D | Tampa | 168507 | DST301237 | | | 00000168507 Phone One Files 94-96 |

D00043

Parus Holdings, Inc.'s Claims
Boxes Selected for Review

| Customer ID | Location | Customer Box # | SKP Box # | Box Dept. | Box Record | Description |
|---|---|---|---|---|---|---|
| T094D | Tampa | 166140 | DST273550 | | | 00000166140 Jim Geiger - #Name ? |
| T094D | Tampa | 166139 | DST273549 | | | 00000166139 Jim Geiger - #Name ? |
| T094D | Tampa | 166138 | DST273548 | | | 00000166138 Jim Geiger - #Name ? |
| T094D | Tampa | 150354 | DST262583 | | | 00000150354 Commission Statements Sales Persons |
| T094D | Tampa | 150350 | DST262579 | | | 00000150350 Commission Statements - Sales Persons |
| T094D | Tampa | 142604 | DST301230 | | | 00000142604 Intermedia Annual Reports |
| T094D | Tampa | 142602 | DST301228 | | | 00000142602 Miscellaneous Customer Files |
| T094D | Tampa | 134131 | DST264505 | | | 00000134131 Management Reports |
| T094D | Tampa | 109633 | DST260721 | | | 00000109633 A/P Vendor Files |
| T094D | Tampa | 106847 | DST260557 | | | 00000106847 LDDS Project |
| T094D | Tampa | 106846 | DST260556 | | | 00000106846 LDDS Project |
| T094D | Tampa | 106845 | DST260555 | | | 00000106845 LDDS Project |
| T094D | Tampa | 106844 | DST260554 | | | 00000106844 LDDS Project |
| T094D | Tampa | 106756 | DST260478 | | | 00000106756 A/P Vendor Files |
| T094D | Tampa | 106755 | DST260477 | | | 00000106755 A/P Vendor Files |
| T094D | Tampa | 106754 | DST260476 | | | 00000106754 A/P Vendor Files |
| T094D | Tampa | 96590 | DST247651 | | | 00000096590 Billing Reports/Tax Recap Phone One |
| T094D | Tampa | 87831 | DST260871 | | | 00000087831 Audit |
| T094D | Tampa | 84658 | DST227801 | | | 00000084658 Phone One Case Postings |
| T094D | Tampa | 84629 | DST227772 | | | 00000084629 Orlando Records - #Name ? |
| T094D | Tampa | 84628 | DST227771 | | | 00000084628 Orlando Records - #Name ? |
| T094D | Tampa | 82839 | DST227435 | | | 00000082839 Phone One Accounts |
| T094D | Tampa | 82833 | DST227429 | | | 00000082833 Phone One Comm. Reports |
| T094D | Tampa | 82832 | DST227428 | | | 00000082832 Phone One Comm. Reports |
| T094D | Tampa | 82815 | DST227411 | | | 00000082815 Indiana Bell - Indiana Town-Tel-Lakedel Tel |
| T094D | Tampa | 82728 | DST227325 | | | 00000082728 Legal Accounts |
| T094D | Tampa | 82656 | DST227254 | | | 00000082656 Closed Files |
| T094D | Tampa | 82273 | DST227214 | | | 82273 |
| T094D | Tampa | 82266 | DST227207 | | | 82266 |
| T094D | Tampa | 82265 | DST227206 | | | 82265 |
| T094D | Tampa | 82264 | DST227205 | | | 82264 |

D00044

Parus Holdings, Inc.'s Claims
Boxes Selected for Review

| Customer ID | Location | Customer Box # | SKP Box # | Box Dept. | Box Record | Description |
|---|---|---|---|---|---|---|
| T094D | Tampa | 82263 | DST227204 | | | 82263 |
| T094D | Tampa | 82228 | DST227169 | | | Phone One Billing Reports Tax Recap |
| T094D | Tampa | 82223 | DST227164 | | | 00000082223 Phone One Miscellaneous Reports |
| T094D | Tampa | 82222 | DST227163 | | | 00000082222 Phone One Miscellaneous Reports |
| T094D | Tampa | 76173 | DST230608 | | | 00000076173 Admin. Files |
| T094D | Tampa | 76172 | DST230607 | | | 00000076172 Admin. Files |
| T094D | Tampa | 51448 | DST226883 | | | 00000051448 Legal Closed Files |
| T094D | Tampa | 26188 | DST250936 | | | 00000026188 Purged Files |
| T094D | Tampa | 26187 | DST250935 | | | 00000026187 Purged Files |
| T094D | Tampa | 26186 | DST250934 | | | 00000026186 Purged Files |
| T094D | Tampa | 26185 | DST250933 | | | 00000026185 Purged Files |
| T094D | Tampa | 26184 | DST250932 | | | 00000026184 Purged Files |
| T094D | Tampa | 26183 | DST250931 | | | 00000026183 Purged Files |
| T094D | Tampa | 26182 | DST250930 | | | 00000026182 Purged Files |
| T094D | Tampa | 26181 | DST250929 | | | 00000026181 Purged Files |
| T094D | Tampa | 2162 | DST170332 | | | 00000004681 Records |
| T094D | Tampa | 2161 | DST170344 | | | 00000004693 Records |
| T094D | Tampa | 2160 | DST170334 | | | 00000004683 Records |
| T094D | Tampa | 2158 | DST170337 | | | 00000004686 Records |
| T094D | Tampa | 2157 | DST170329 | | | 00000004678 Records |
| T094D | Tampa | 2156 | DST170339 | | | 00000004688 Records |
| T094D | Tampa | 2155 | DST170359 | | | 00000004708 Records |
| T094D | Tampa | 2154 | DST170328 | | | 00000004677 Records |
| T094D | Tampa | 2154 | DST070330 | | | 00000004679 Records |
| T094D | Tampa | 2153 | DST170338 | | | 00000004687 Records |
| T094D | Tampa | 2152 | DST170354 | | | 00000004703 Records |
| T094D | Tampa | 2151 | DST170353 | | | 00000004702 Records |
| T094D | Tampa | 2150 | DST170350 | | | 00000004699 Records |
| T094D | Tampa | 2149 | DST170358 | | | 00000004707 Records |
| T094D | Tampa | 2148 | DST170342 | | | 00000004691 Records |
| T094D | Tampa | 2147 | DST170341 | | | 00000004690 Records |
| T094D | Tampa | 2146 | DST170352 | | | 00000004701 Records |
| T094D | Tampa | 2145 | DST170347 | | | 00000004696 Records |
| T094D | Tampa | 2144 | DST170349 | | | 00000004698 Records |

Parus Holdings, Inc.'s Claims
Boxes Selected for Review

| Customer ID | Location | Customer Box # | SKP Box # | Box Dept. | Box Record | Description |
|---|---|---|---|---|---|---|
| T094D | Tampa | 2143 | DST170356 | | | 00000004705 Records |
| T094D | Tampa | 2142 | DST170336 | | | 00000004685 Records |
| T094D | Tampa | 2141 | DST170360 | | | 00000004709 Records |
| T094D | Tampa | 2140 | DST170345 | | | 00000004694 Records |
| T094D | Tampa | 2139 | DST170343 | | | 00000004692 Records |
| T094D | Tampa | 2139 | DST170346 | | | 00000004695 Records |
| T094D | Tampa | 2137 | DST170348 | | | 00000004697 Records |
| T094D | Tampa | 780 | DST137447 | | | X0070101087 Phone One #Name ? |
| T094D | Tampa | 577 | DST301257 | | | 00000197338 Miscellaneous Corp |
| T094D | Tampa | 575 | DST301255 | | | 00000197335 Miscellaneous Corp |
| T094D | Tampa | 574 | DST301256 | | | 00000197337 Miscellaneous Corp |
| T094D | Tampa | 573 | DST234247 | | | 00000092887 Miscellaneous Corp |
| T094D | Tampa | 572 | DST234252 | | | 00000092892 Miscellaneous Corp |
| T094D | Tampa | 571 | DST234241 | | | 00000092875 Miscellaneous Corp |
| T094D | Tampa | 570 | DST234250 | | | 00000092890 Miscellaneous Corp |
| T094D | Tampa | 569 | DST234242 | | | 00000092878 Miscellaneous Corp |
| T094D | Tampa | 561 | DST234244 | | | 00000092884 Miscellaneous Corp |
| T094D | Tampa | 560 | DST234245 | | | 00000092885 Miscellaneous Corp |
| T094D | Tampa | 559 | DST234251 | | | 00000092891 Miscellaneous Corp |
| T094D | Tampa | 557 | DST137147 | | | Z0100303016 Contracts Legal Dept |
| T094D | Tampa | 493 | DST242698 | | | 00000110429 CFO & Exec Admin Files |
| T094D | Tampa | 492 | DST242699 | | | 00000110430 CFO Chron Files |
| T094D | Tampa | 491 | DST242704 | | | 00000110435 Records |
| T094D | Tampa | 490 | DST242703 | | | 00000110434 Records |
| T094D | Tampa | 489 | DST242701 | | | 00000110432 Records |
| T094D | Tampa | 486 | DST242713 | | | 00000110444 Records |
| T094D | Tampa | 444 | DST176067 | | | 00000012578 Minute Books & Business Plans |
| T094D | Tampa | 369 | DST137441 | | | X0060801024 Financial Statements |
| T094D | Tampa | 357 | DST137483 | | | X0030801015 Marketing Misc |
| T094D | Tampa | 355 | DST137482 | | | X0030801007 Misc Correspondence & Other |
| T094D | Tampa | 93 | DST137467 | | | X0051208009 Executive Correspondence |
| T094D | Tampa | 85 | DST137461 | | | X0060501075 Personal |
| T094D | Tampa | 84 | 154208060 | | | 2028557-2028767 |
| T094D | Tampa | 84 | DST137460 | | | X0060501055 Personal |

Parus Holdings, Inc.'s Claims
Boxes Selected for Review

| Customer ID | Location | Customer Box # | SKP Box # | Box Dept. | Box Record | Description |
|---|---|---|---|---|---|---|
| T094D | Tampa | 75 | DST137438 | | | X0060501050 Board of Director Reports |
| T094D | Tampa | 12 | DST137541 | | | X0070803087 Phone I Terminations |
| T094D | Tampa | 11 | DST137540 | | | X0070803086 Phone I Terminations |
| T094D | Tampa | 10 | DST137539 | | | X0070803085 Phone I Terminations |
| T094D | Tampa | 9 | DST137538 | | | X0070803084 Phone I Terminations |
| T094D | Tampa | 8 | DST137537 | | | X0070803083 Phone I Terminations |
| T094D | Tampa | 7 | DST137536 | | | X0070803082 Phone I Terminations |
| T094D | Tampa | 6 | DST137535 | | | X0070803081 Phone I Terminations |
| T094D | Tampa | 5 | DST137473 | | | U0050207022 Marketing |
| T094D | Tampa | 5 | DST137534 | | | X0070803080 Phone I Terminations |
| T094D | Tampa | 4 | DST137472 | | | U0050207019 Marketing |
| T094D | Tampa | 4 | DST137533 | | | X0070803079 Phone I Terminations |
| T094D | Tampa | 3 | 154207979 | | | 44773-68172 |
| T094D | Tampa | 3 | DST137471 | | | U0050207018 Marketing |
| T094D | Tampa | 3 | DST137532 | | | X0070803078 Phone I Terminations |
| T094D | Tampa | 2 | DST137470 | | | U0050207017 Marketing |
| T094D | Tampa | 2 | DST137531 | | | X0070803077 Phone I Terminations |
| T094D | Tampa | 1 | DST137469 | | | U0050207016 Marketing |
| T094D | Tampa | 1 | DST137530 | | | X0070803076 Phone I Terminations |
| MWLDK | Virginia | 270740450 | | 8408 | RS430 | Intermedia WP's 1999-2000 Annual Report |
| MWLDK | Virginia | 273701050 | | 9850 | RS706 | WorldCom/Intermedia Merger |
| MWLDK | Virginia | 273701086 | | 9850 | RS706 | WorldCom/Intermedia Merger |
| MWLDK | Virginia | 273701085 | | 9850 | RS706 | WorldCom/Intermedia Merger |
| MWLDK | Virginia | 273701045 | | 9850 | RS706 | WorldCom/Intermedia Merger |
| MWLDK | Virginia | 273701042 | | 9850 | RS706 | WorldCom/Intermedia Merger |
| MWLDK | Virginia | 273701046 | | 9850 | RS706 | WorldCom/Intermedia Merger |
| MWLDK | Virginia | 273701041 | | 9850 | RS706 | WorldCom/Intermedia Merger |
| MWLDK | Virginia | 273701044 | | 9850 | RS706 | WorldCom/Intermedia Merger |
| MWLDK | Virginia | 273696642 | | Tax | RS445 | Intermedia & Subs Annual Reports |
| MWLDK | Virginia | 273696643 | | Tax | RS445 | Intermedia & Subs Annual Reports |
| MWLDK | Virginia | 273696641 | | Tax | RS445 | Intermedia & Subs Annual Reports |
| MWLDK | Virginia | 273696648 | | Tax | RS445 | Intermedia & Subs Annual Reports |
| MWLDK | Virginia | 26181 | | 610 | RS741 | |
| | Virginia | | | | | |
| Ashburn Corporate Library - D1-1-400 ref. the OSS - WorldCom Intermedia Acquisition 2001 | | | | | | |
| | Virginia | Redwell I | | | | |

D00047

# Parus Holdings, Inc.'s Claims
## Boxes Selected for Review

| Customer ID | Location | Customer Box # | SKP Box # | Box Dept. | Box Record | Description |
|---|---|---|---|---|---|---|
| | Virginia | Redwell II | | | | |
| | Virginia | Redwell 15 | | | | |
| | Virginia | Redwell 11 | | | | |
| | Virginia | Redwell VI | | | | |
| | Virginia | Box 22 | | | | Intermedia Financial Statement |
| | Virginia | Box 28 | | | | Intermedia/Digex Balance Sheet Analysis Jan.-June 2001 |
| | Virginia | Box 29 | | | | Intermedia/Digex Balance Sheet Analysis Jan.-June 2001 |
| | Virginia | Box 30 | | | | Intermedia/Digex Balance Sheet Analysis Jan.-June 2001 |
| | Virginia | Box 34 | | | | Intermedia JE's 2000 |
| | Virginia | Box 40 | | | | Intermedia F/S Sept/Nov. 2000 |
| | Virginia | Box 46 | | | | Intermedia Financial Statement Analysis |
| | Virginia | Box 59 | | | | June 2000 JE Log Books |
| | Virginia | Box 62 | | | | June 2000 JE Log Books |
| | Virginia | Box 68 | | | | GL Intermedia 2000 |
| | Virginia | Box 71 | | | | Shared Revenue 2000 |
| | Virginia | Box 74 | | | | Balance Sheet Analysis 2000 |
| | Virginia | Box 84 | | | | Financial Closing Files 6/2000 |
| | Virginia | Box 88 | | | | Financial Statements 1/2000 |
| | Virginia | Box 108 | | | | Intermedia |
| | Virginia | Box 114 | | | | Intermedia JE's |
| | Virginia | Box 115 | | | | JE's 2001 |

# EXHIBIT 3

D00049



STINSON
MORRISON
HECKER LLP

Robert L. Driscoll
(816) 691-3102
bdriscoll@stinsonmoheck.com
www.stinsonmoheck.com

1201 Walnut, Suite 2900
Kansas City, MO 64106-2150

*Tel* (816) 842-8600
*Fax* (816) 691-3495

September 1, 2005

Mr. Steven Wood
Kelley Drye & Warren LLP
333 West Wacker Drive, Suite 2600
Chicago, Illinois 60606

Re: In re Worldcom, Inc. -- Claim of Parus Holdings, Inc.

Dear Steve:

I am writing to advise that we now have completed our review of the over 350 boxes of Intermedia Communications, Inc. ("Intermedia") documents that were shipped to Kansas City for review before the August 9 hearing. We are in the process of copying and Bates numbering the responsive documents and preparing a privilege log. I will contact you once this process is competed to discuss the manner in which you would like these documents produced.

Also, we determined that approximately 70 additional boxes of Intermedia documents listed on the Tampa index should be reviewed. A list of those boxes is attached. The boxes have been shipped to Kansas City and currently are being reviewed.

Please call Allison Murdock or me if you have any questions.

Very truly yours,

**STINSON MORRISON HECKER LLP**

Robert L. Driscoll

KANSAS CITY
OVERLAND PARK
WICHITA
WASHINGTON, D.C.
PHOENIX
ST. LOUIS
OMAHA
JEFFERSON CITY

Enclosure

cc: Allison M. Murdock

EXHIBIT
3

DB02/048629 0094/6805988.1

# Parus Holdings Claims
## Additional Boxes Selected for Review

| Customer ID | Location | Customer Box # | SKP Box # | Description |
|---|---|---|---|---|
| T094D | Tampa | W15420803 | 154208034 | |
| T094D | Tampa | R10115/C105 | 165034485 | Sandy Pechin |
| T094D | Tampa | C2043 | 165034479 | Mills Computer |
| T094D | Tampa | C2013 | 165034484 | W. Adams |
| T094D | Tampa | C1350 | 165034483 | Shepahali |
| T094D | Tampa | C1348 | 165034491 | Inactive Files - Angela Palms |
| T094D | Tampa | C1348 | 165034486 | Inactive Files - Rodney |
| T094D | Tampa | C1348 | 165034490 | Recurring Angela Palms |
| T094D | Tampa | C1051 | 165034481 | Sandy Pechin |
| T094D | Tampa | B1015 | 165034475 | |
| T094D | Tampa | AV113 | 165034489 | File Room |
| T094D | Tampa | AV103 | 165034477 | File Room |
| T094D | Tampa | 226516611 | 226516611 | Intermedia-Tampa FL CS&SO Sop Bill Migration files |
| T094D | Tampa | 226516610 | 226516610 | Intermedia-Tampa FL CS&SO Sop Bill Migration files |
| T094D | Tampa | 226516609 | 226516609 | Intermedia-Tampa FL CS&SO Sop Bill Migration files |
| T094D | Tampa | 226516608 | 226516608 | Intermedia-Tampa FL CS&SO Sop Bill Migration files |
| T094D | Tampa | 226516606 | 226516606 | Intermedia-Tampa FL CS&SO Sop Bill Migration files |
| T094D | Tampa | 226516605 | 226516605 | Intermedia-Tampa FL CS&SO Sop Bill Migration files |
| T094D | Tampa | 224664982 | 224664982 | Intermedia-Tampa FL CS and SO LNP files-I |
| T094D | Tampa | 224664981 | 224664981 | Intermedia-Tampa FL CS and SO LNP files-I |
| T094D | Tampa | 224664980 | 224664980 | Intermedia-Tampa FL CS and SO LNP files-I |
| T094D | Tampa | 224664979 | 224664979 | Intermedia-Tamp FL CS and SO LNP files-i |
| T094D | Tampa | 224664978 | 224664978 | Intermedia-Tampa FL CS and SO LNP files-I |
| T094D | Tampa | 224664933 | 224664933 | Intermedia-Tampa FL CS and SO LNP Out J |
| T094D | Tampa | 224664932 | 224664932 | Intermedia-Tampa FL CS and SO LNP Out I |
| T094D | Tampa | 177204267 | 177204267 | Bev's File Cabinet Binders |
| T094D | Tampa | 177204266 | 177204266 | Bev's File Cabinet Binders |
| T094D | Tampa | 177204265 | 177204265 | Bev's File Cabinet Smith Credenza |
| T094D | Tampa | 177204261 | 177204261 | Bev's File Cabinet |
| T094D | Tampa | 177204260 | 177204260 | Bev's File Cabinet |
| T094D | Tampa | 177204259 | 177204259 | Bev's File Cabinet |
| T094D | Tampa | 177204258 | 177204258 | Bev's File Cabinet |
| T094D | Tampa | 177204256 | 177204256 | Bev's File Cabinet |
| T094D | Tampa | 177204255 | 177204255 | Bev's File Cabinet |
| T094D | Tampa | 177204254 | 177204254 | Bev's File Cabinet |
| T094D | Tampa | 177204253 | 177204253 | Bev's File Cabint |

# Parus Holdings Claims
## Additional Boxes Selected for Review

| | | | | |
|---|---|---|---|---|
| T094D | Tampa | 177204252 | 177204252 | Sheila McDaniel's File |
| T094D | Tampa | 177204054 | 177204054 | Wanda Friend - Binders |
| T094D | Tampa | 177204053 | 177204053 | Wanda Friend - Binders |
| T094D | Tampa | 177204052 | 177204052 | Wanda Friend - Binders |
| T094D | Tampa | 177204051 | 177204051 | Wanda Friend - Binders |
| T094D | Tampa | 166137 | DST273547 | 00000166137 Jim Geiger |
| T094D | Tampa | 166136 | DST273546 | 00000166136 Jim Geiger |
| T094D | Tampa | 166135 | DST273545 | 00000166135 Jim Geiger |
| T094D | Tampa | 166134 | DST273544 | 00000166134 Jim Geiger |
| T094D | Tampa | 166133 | DST273543 | 00000166133 Jim Geiger |
| T094D | Tampa | 166132 | DST273542 | 00000166132 Jim Geiger |
| T094D | Tampa | 166131 | DST273541 | 00000166131 Jim Geiger |
| T094D | Tampa | 166130 | DST273540 | 00000166130 Jim Geiger |
| T094D | Tampa | 166129 | DST273539 | 00000166129 Jim Geiger |
| T094D | Tampa | 166128 | DST272538 | 00000166128 Jim Geiger |
| T094D | Tampa | 166127 | DST273537 | 00000166127 Jim Geiger |
| T094D | Tampa | 166126 | DST273536 | 00000166126 Jim Geiger |
| T094D | Tampa | 166125 | DST273535 | 00000166125 Jim Geiger |
| T094D | Tampa | 166124 | DST273534 | 00000166124 Jim Geiger |
| T094D | Tampa | 166123 | DST273533 | 00000166123 Jim Geiger |
| T094D | Tampa | 166122 | DST273532 | 00000166122 Jim Geiger |
| T094D | Tampa | 166121 | DST273531 | 00000166121 Jim Geiger |
| T094D | Tampa | 166120 | DST273530 | 00000166120 Jim Geiger |
| T094D | Tampa | 166119 | DST273529 | 00000166119 Jim Geiger |
| T094D | Tampa | 166118 | DST273528 | 00000166118 Jim Geiger |
| T094D | Tampa | 166117 | DST273527 | 00000166117 Jim Geiger |
| T094D | Tampa | 166116 | DST273526 | 00000166116 Jim Geiger |
| T094D | Tampa | 166114 | DST273525 | 00000166114 Jim Geiger |
| T094D | Tampa | 166113 | DST273524 | 00000166113 Jim Geiger |
| T094D | Tampa | 166112 | DST273523 | 00000166112 Jim Geiger |
| T094D | Tampa | 166111 | DST273522 | 00000166111 Jim Geiger |
| T094D | Tampa | 166110 | DST273521 | 00000166110 Jim Geiger |
| T094D | Tampa | 166109 | DST273520 | 00000166109 Jim Geiger |
| T094D | Tampa | 166108 | DST273519 | 00000166108 Jim Geiger |
| T094D | Tampa | 166107 | DST273518 | 00000166107 Jim Geiger |
| T094D | Tampa | 166106 | DST273517 | 00000166106 Jim Geiger |
| T094D | Tampa | 166105 | DST273516 | 00000166105 Jim Geiger |

# Parus Holdings Claims

## Additional Boxes Selected for Review

| | | | | | |
|---|---|---|---|---|---|
| T094D | Tampa | | 166104 | DST273515 | 00000166104 Jim Geiger |
| T094D | Tampa | | 166103 | DST273514 | 00000166103 Jim Geiger |
| T094D | Tampa | | 166102 | DST273513 | 00000166102 Jim Geiger |
| T094D | Tampa | | 166101 | DST273512 | 00000166101 Jim Geiger |

# EXHIBIT 4

D00054

**In re: WorldCom, Inc., et al.**
**02-13555**
**Parus Holdings/EffectNet Claim**

**MCI'S RESPONSE TO FIRST REQUEST FOR DOCUMENTS**
**September 22, 2005**

**Parus Holdings' Requests for Documents**

1. Documents concerning objection to Claim No. 9291
2. Documents concerning objection to Claim No. 9293.
3. Documents concerning objection to Claim No. 11173.
4. Documents concerning objection to Claim No. 112242.
5. Documents concerning objection on ground that Claimant is not entitled to double recovery.
6. Documents concerning Debtors' alleged payment.
7. Documents concerning Debtors' contention that Claimant terminated the UC contract.
8. Documents concerning allegation that Claimant seeks an unenforceable penalty.
9. Documents concerning allegation that Claimant has calculated its damages using amount per commitment higher than contract specifies.
10. Documents concerning allegation that UC Contract prohibits assignment.
11. Documents concerning the General Agreement.
12. Documents concerning the Memorandum of Understanding.
13. Documents concerning the Interim Agreement.
14. Documents concerning decision to give notice to cancel accounts in September 2001.
15. Documents concerning decision to give notice to cancel accounts in March 2002.
16. Communication between Debtor and Claimant re: General Agreement.
17. Documents concerning payment under General Agreement.
18. Communication among Debtors concerning General Agreement.

19. Documents concerning communications among Debtors re: cancellation of accounts created pursuant to the General Agreement.

20. Documents concerning Claimant.

21. Documents concerning analysis of Claimants' finances, business, technology, or products.

22. Documents concerning Master Licensing Agreement ("MLA").

23. Documents concerning communication between Debtors and Claimant re: MLA.

24. Documents concerning communication between Debtors and Claimant from September 1, 2000 to present re: products and services provided under MLA.

25. Documents concerning price to be paid under MLA.

26. Documents concerning Debtors' payments under MLA.

27. Documents concerning Debtors' communications among each other re: MLA.

28. Documents concerning Jim Renforth's ceasing employment.

29. Documents concerning Jimmy Faust's ceasing employment.

30. Documents concerning in product suite IntermediaOne.

31. Documents concerning launch of IntemediaOne.

32. Communications among debtors re: IntermediaOne.

33. Documents re: merger that relate to Claimant.

34. Documents re: merger that relate to Unified Messaging Product.

35. Documents concerning efforts to develop, obtain, market or launch Unified Communications product or service.

**DOCUMENT INDEX BY REQUEST NUMBER**

| BOX NO. | BATES NO. | CORRESPONDING REQUEST NO. |
|---|---|---|
| Not from Iron Mountain Boxes | MCIW000561-1027 | 14, 15, 28, 29, 30 |
| | MCIW001028-1126 | 20, 21, 22, 23, 24, 25, 26, 27 |
| | MCIW001127-1538 | 20, 21, 22, 23, 24, 27 |
| | MCIW001539-1609 | 20 |
| | MCIW001610 | 25 |
| | MCIW001611-1617 | 20 |
| | MCIW001618 | 25 |
| | MCIW001619-1637 | 20 |
| | MCIW001638 | 27 |
| | MCIW001639 | 25, 27 |
| | MCIW001640-1645 | 20 |
| | MCIW001646-1660 | 22, 27 |
| | MCIW001661-1670 | 20 |
| | MCIW001671-1675 | 25 |
| | MCIW001676-1705 | 20 |
| | MCIW001706-1735 | 20, 21 |
| | MCIW001736-1763 | 20 |
| | MCIW001764-1765 | 22 |
| | MCIW001766-1769 | 20 |
| | MCI001770-1771 | 22, 23, 24 |
| | MCIW001772-1774 | 22, 25 |

| BOX NO. | BATES NO. | CORRESPONDING REQUEST NO. |
|---|---|---|
| | MCIW001775-1776 | 22, 25 |
| | MCIW001777-1780 | 21 |
| | MCIW001781-1792 | 20 |
| | MCIW001793-1795 | 22, 25 |
| | MCIW001796-1817 | 20 |
| | MCIW001818-1826 | 22, 25 |
| | MCIW001827-1838 | 20 |
| | MCIW001839-1880 | 22, 23, 24 |
| | MCIW001881-1883 | 22, 23, 24, 25 |
| | MCIW001884-1908 | 20, 22, 23, 24 |
| | MCIW001909-1917 | 20 |
| | MCIW001918-1938 | 22, 23, 24, 25 |
| | MCIW001939-1983 | 20, 22, 23, 24 |
| | MCIW001984-2013 | 20 |
| | MCIW002014-2041 | 20, 25 |
| | MCIW002042-2095 | 20 |
| | MCIW002096-2098 | 21 |
| | MCIW002099-2242 | 20 |
| | MCIW002243-2248 | 20 |
| | MCIW002249-2772 | 22, 23, 24 |
| | MCIW002773-2311 | 20 |
| | MCIW002312-2337 | 20, 25 |

| BOX NO. | BATES NO. | CORRESPONDING REQUEST NO. |
|---|---|---|
| | MCIWM002338-2423 | 20, 23, 24 |
| | MCIW002424-2425 | 23, 24, 25 |
| | MCIW002426-2510 | 20 |
| | MCIW002511-2514 | 20, 23, 24, 25 |
| | MCIW002515-2565 | 20 |
| | MCIWC002566-2601 | 20, 24 |
| | MCIWC002602-2604 | 22, 25 |
| | MCIW002605-2691 | 20, 24 |
| | MCIW002692-2741 | 20, 23, 24, 25 |
| | MCIW002742-2747 | 20, 23, 24, 25 |
| | MCIW002748-2826 | 20-26 |
| | MCIW002827-3021 | 20, 24 |
| | MCIW003022-3036 | 22, 25 |
| | MCIW003037-3046 | 20 |
| | MCIW003047-3087 | 22, 25 |
| | MCIW003048-3087 | 20, 21 |
| | MCIW003088-3093 | 20, 21, 22 |
| | MCIW003094-3105 | 20, 21, 22, 25 |
| | MCIW003106-3173 | 20 |
| | MCIW003174-3176 | 20, 22, 23, 24 |
| | MCIW003177-3207 | 20 |
| | MCIW003208 | 20, 23, 24 |

| BOX NO. | BATES NO. | CORRESPONDING REQUEST NO. |
|---|---|---|
| | MCIW003209-3323 | 20, 22, 23, 24 |
| | MCIW003324-3390 | 20, 22, 23, 24 |
| | MCIW003391-3489 | 20, 23, 24 |
| | MCIW003490-3494 | 20, 21, 22, 25 |
| | MCIW003495-3629 | 20, 22, 23, 24, 25 |
| | MCIW003630-3755 | 22 |
| | MCIW003756-3762 | 20, 24 |
| | MCIW003763-3788 | 20, 22 |
| | MCIW003789-3858 | 22 |
| | MCIW003859-3895 | 20, 21, 22, 23, 24 |
| | MCIW003896-6321 | 20-26 |
| 177204262 | MCIW006322-6333 | 30, 31, 35 |
| 177204262 | MCIW006334-6348 | 35 |
| 177204262 | MCIW006349-6352 | 34 |
| 224664893 | MCIW006353-6404 | 35 |
| 224664894 | MCIW006405-6595 | 11, 30, 35 |
| 224664897 | MCIW006596-6946 | 35 |
| 224664901 | MCIW006947-7217 | 35 |
| 224664771 | MCIW007218-7375 | 11, 30, 35 |
| 165012767 | MCIW007376-7386 | 11, 30, 35 |
| 165012767 | MCIW007397-7418 | 11, 30, 35 |
| 165012767 | MCIW007419-7424 | 11, 30, 35 |

| BOX NO. | BATES NO. | CORRESPONDING REQUEST NO. |
|---|---|---|
| 177204263 | MCIW007425-7427 | 35 |
| 177204263 | MCIW007428-7467 | 34, 35 |
| 177204264 | MCIW007468-7648 | 34, 35 |
| 226516617 | MCIW007649-7698 | 11, 30, 35 |
| 226516616 | MCIW007699-7711 | 35 |
| 224664908 | MCIW007712-8267 | 35 |
| 224664908 | MCIW008268-8331 | 11, 30, 35 |
| 224664908 | MCIW008332-8632 | 35 |
| 224664908 | MCIW008633-9438 | 35 |
| 224664793 | MCIW009439-9845 | 35 |
| 224664886 | MCIW009846-9873 | 35 |
| 224664904 | MCIW009874-9943 | 11, 30, 35 |
| 224664904 | MCIW009945-10248 | 35 |
| 224664884 | MCIW010249-10752 | 35 |
| 224664884 | MCIW010753-11001 | 11, 30, 35 |
| 224664884 | MCIW011002-11141 | 35 |
| 224664884 | MCIW011142-11220 | 11, 30, 35 |
| 224664884 | MCIW011221-11243 | 37 |
| 224664883 | MCIW011244-11939 | 35 |
| 224664881 | MCIW011940-12645 | 35 |
| 224664905 | MCIW012646-12816 | 11, 30, 35 |
| 224664905 | MCIW012817-12984 | 35 |

| BOX NO. | BATES NO. | CORRESPONDING REQUEST NO. |
|---|---|---|
| 224664882 | MCIW012985-13180 | 11, 30, 35 |
| 224664882 | MCIW013181-13243 | 35 |
| 224664889 | MCIW013244-13255 | 11, 30, 35 |
| 224664889 | MCIW013256-13578 | 35 |
| 224664896 | MCIW013579-14172 | 35 |
| 191496627 | MCIW014173-14196 | 11, 18, 30, 31, 32, 35 |
| 191496627 | MCIW014197-14220 | 11, 18, 30, 31, 35 |
| 191496627 | MCIW014221 | 1, 2, 3, 4, 11, 14, 15, 19, 30, 32 |
| 191496627 | MCIW014222-14252 | 35 |
| 191496627 | MCIW014253 | 1, 2, 3, 4, 11, 14, 15, 19, 26, 32 |
| 191496627 | MCIW014254 | 35 |
| 298468973B | MCIW014255-14353 | 35 |
| 224664899 | MCIW014354-15855 | 35 |
| 224664899 | MCIW015856-16152 | 11, 30, 35 |
| 224664885 | MCIW016153-16226 | 35 |
| 224664885 | MCIW016227-16434 | 11, 30, 35 |
| 224664885 | MCIW016435-17927 | 35 |
| 224664890 | MCIW017928-18590 | 11, 30, 35 |
| 224664890 | MCIW018591-18621 | 35 |
| 224664890 | MCIW018622-18900 | 11, 30, 35 |
| 224664890 | MCIW018901-19998 | 35 |

| BOX NO. | BATES NO. | CORRESPONDING REQUEST NO. |
|---|---|---|
| VA 002 | MCIW019999-20110 | 1, 2, 3, 4, 5, 14, 15 |
| 224664903 | MCIW020111-20307 | 11, 30, 35 |
| 224664903 | MCIW020308-21942 | 35 |
| 224664905 | MCIW021943-22451 | 11, 30, 35 |
| 298408973A | MCIW022452-23058 | 35 |
| 224664879 | MCIW023059-23651 | 11, 30, 35 |
| 224664879 | MCIW023652-23726 | 35 |
| 224664879 | MCIW023727-24418 | 11, 30, 35 |
| 224664879 | MCIW024419-24503 | 35 |
| 224664879 | MCIW024504-25016 | 11, 30, 35 |
| 224664891 | MCIW025017-25678 | 35 |
| 191496627 | MICW025679-015912 | 1, 2, 3, 4, 14, 15 |
| VA 016 | MCIW025913-0225914 | 17 |
| VA002 | MCIW025915-025926 | 1, 2, 3, 4, 14, 15 |
| Not from Iron Mountain Boxes | MCI025927-025988 | 1, 2, 3, 4, 14, 15 |

**EXHIBIT 5**

D00064

**In re: WorldCom, Inc., et al.**
**02-13555**
**Parus Holdings/EffectNet Claim**

**MCI'S SUPPLEMENTAL RESPONSE TO FIRST REQUEST FOR DOCUMENTS**
**October 7, 2005**

**Parus Holdings' Requests for Documents**

1. Documents concerning objection to Claim No. 9291

2. Documents concerning objection to Claim No. 9293.

3. Documents concerning objection to Claim No. 11173.

4. Documents concerning objection to Claim No. 112242.

5. Documents concerning objection on ground that Claimant is not entitled to double recovery.

6. Documents concerning Debtors' alleged payment.

7. Documents concerning Debtors' contention that Claimant terminated the UC contract.

8. Documents concerning allegation that Claimant seeks an unenforceable penalty.

9. Documents concerning allegation that Claimant has calculated its damages using amount per commitment higher than contract specifies.

10. Documents concerning allegation that UC Contract prohibits assignment.

11. Documents concerning the General Agreement.

12. Documents concerning the Memorandum of Understanding.

13. Documents concerning the Interim Agreement.

14. Documents concerning decision to give notice to cancel accounts in September 2001.

15. Documents concerning decision to give notice to cancel accounts in March 2002.

16. Communication between Debtor and Claimant re: General Agreement.

17. Documents concerning payment under General Agreement.

18. Communication among Debtors concerning General Agreement.

19. Documents concerning communications among Debtors re: cancellation of accounts created pursuant to the General Agreement.

20. Documents concerning Claimant.

21. Documents concerning analysis of Claimants' finances, business, technology, or products.

22. Documents concerning Master Licensing Agreement ("MLA").

23. Documents concerning communication between Debtors and Claimant re: MLA.

24. Documents concerning communication between Debtors and Claimant from September 1, 2000 to present re: products and services provided under MLA.

25. Documents concerning price to be paid under MLA.

26. Documents concerning Debtors' payments under MLA.

27. Documents concerning Debtors' communications among each other re: MLA.

28. Documents concerning Jim Renforth's ceasing employment.

29. Documents concerning Jimmy Faust's ceasing employment.

30. Documents concerning in product suite IntermediaOne.

31. Documents concerning launch of IntermediaOne.

32. Communications among debtors re: IntermediaOne.

33. Documents re: merger that relate to Claimant.

34. Documents re: merger that relate to Unified Messaging Product.

35. Documents concerning efforts to develop, obtain, market or launch Unified Communications product or service.

**DOCUMENT INDEX BY REQUEST NUMBER**

| BOX NO. | BATES NO. | CORRESPONDING REQUEST NO. |
|---|---|---|
| 177204265 | MCIW025989-025995 | 32, 30 |
| 177204265 | MCIW025996-025999 | 35 |
| 177204265 | MCIW02600-02675 | 32, 30 |
| 177204265 | MCIW026076-026077 | 18 |
| 177204265 | MCIW026078-026089 | 1, 2, 3, 4 |
| 177204265 | MCIW026090-026094 | 30 |
| 177204265 | MCIW026095-026141 | 18 |
| 177204259 | MCIW026142-026256 | 1, 2, 3, 4, 14, 30, 32, 33 |
| 177204259 | MCIW026257-026281 | 31, 35 |
| 177204259 | MCIW026282-026333 | 30, 31, 32, 35 |
| 166134 | MCIW026334-026396 | 30, 31, 32, 35 |
| 166110 | MCIW026397-026420 | 35 |
| 166103 | MCIW026421-026435 | 30, 31, 32, 35 |
| 177204253 | MCIW026436-026517 | 30, 32 |
| 177204255 | MCIW026518-026663 | 30, 32, 35 |
| 166107 | MCIW026664-026786 | 31, 35 |
| 177204254 | MCIW026787-026798 | 30, 32, 35 |
| 224664879 | MCIW026799-028760 | 30, 35 |
| Not from Iron Mountain boxes | MCIW028761-028773 | 1, 2, 3, 4 |
|  | MCIW028774-029033 | 1, 2, 3, 4, 29 |
|  | MCIW029036-029088 | 1, 2, 3, 4, 29 |
|  | MCIW029089-029208 | 1, 2, 3, 4, 30, 31, 35 |

| BOX NO. | BATES NO. | CORRESPONDING REQUEST NO. |
|---|---|---|
| | MCIW029209-029232 | 1, 2, 3, 4 |
| | MCIW029233-029244 | 1, 2, 3, 4 |
| | MCIW029245-029249 | 1, 2, 3, 4 |
| | MCIW029250-029252 | 1, 2, 3, 4, 14 |
| | MCIW029253-029267 | 1, 2, 3, 4 |
| | MCIW029228-029295 | 1, 2, 3, 4, 30, 32 |
| | MCIW029296-02865 | 1, 2, 3, 4, 14, 30, 32 |
| | MCIW029866-030180 | 1, 2, 3, 4, 14, 30, 32 |

# EXHIBIT E

D00069



STINSON
MORRISON
HECKER LLP

Robert L. Driscoll
(816) 691-3102
bdriscoll@stinsonmoheck.com
www.stinsonmoheck.com

1201 Walnut, Suite 2900
Kansas City, MO 64106-2150

*Tel* (816) 842-8600
*Fax* (816) 691-3495

November 17, 2005

The Honorable Arthur J. Gonzalez
U.S. Bankruptcy Judge
United States Bankruptcy Court
Alexander Hamilton Customs House-One Bowling Green
New York, New York 10004-1408

Re: *In re WorldCom, Inc., Chapter 11*, Case No. 02-13533
Parus Holdings' Claims

Dear Judge Gonzalez:

Pursuant to LBR 7007-1, I am writing to request an informal discovery conference with the Court and counsel for claimant Parus Holdings to discuss, and hopefully resolve, WorldCom's request to temporarily stay discovery until the Court determines WorldCom's pending motion for summary judgment. WorldCom has twice requested Parus Holdings' assent to such a stay. See attached letters of November 11, 2005 (Exhibit A) and November 16, 2005 (Exhibit B) to counsel for Parus Holdings from counsel for WorldCom. Counsel for Parus Holdings responded yesterday evening, advising that it would not consent to WorldCom's proposed stay.

**WorldCom's Motion for Summary Judgment.** With leave from this Court, WorldCom has filed a motion seeking summary judgment on all claims presented in this proceeding by Parus Holdings. If granted, that motion will eliminate all non-breach of contract claims asserted by Parus Holdings and its breach of contract claim will be valued at $460,442.30. Parus Holdings has not sought to forestall determination of the summary judgment motion in order to take discovery as provided by Fed. R. Civ. P. 56(f) and, as discussed, there is no basis to do so. The response of Parus Holdings to the motion is due Friday, November 18, 2005, and oral argument of the motion has been set by the Court for December 6, 2005.

**Status of Discovery**. In addition to its initial disclosure of core documents, WorldCom has produced in excess of 29,000 pages of hard copy documents after reviewing the contents of over 400 boxes of Reorganized Debtors' stored documents. As suggested by this Court, Parus Holdings was twice offered the opportunity to participate in selecting from document indexes additional stored documents for review. It never did so. Instead, it has chosen, after-the-fact, to second-guess and disparage the hard copy document production efforts of WorldCom. The post-production conduct of Parus Holdings is on-going.

KANSAS CITY
OVERLAND PARK
WICHITA
WASHINGTON, D.C.
PHOENIX
ST. LOUIS
OMAHA
JEFFERSON CITY

Regarding electronic discovery, WorldCom has already produced several thousands of pages of e-mail communications. In addition, after receiving search terms and other search criteria from Parus Holdings, WorldCom obtained a cost estimate range from Kroll Ontrack of $207,633.99 to $331,160.12 to perform the search of electronic media that Parus Holdings has proposed. The vendor's estimated search costs, which do not include the additional costs that will be incurred for qualified personnel to review and produce responsive, non-privileged documents from those electronically identified, exceeds the cash distribution value of Parus Holdings' breach of contract claim--$191,544-- assuming the Court's interpretation of the contract at issue is the same as WorldCom's and Parus Holdings' claim is treated as a Class 12 Intermedia claim.

**Impact of a Temporary Stay of Discovery.** No legal prejudice will result to either party if discovery is temporarily stayed until the Court decides WorldCom's pending summary judgment motion. Discovery is not needed to respond to the motion because it presents only issues of law and contract interpretation. Further, if summary judgment is granted to WorldCom on Parus Holdings' non-contract claims, a temporary stay of discovery prior to such a ruling would prevent expending funds on discovery that would have no utility for the remaining breach of contract claim. Finally, if discovery remains a necessity after the Court decides the motion, WorldCom has already informed Parus Holdings' counsel that it will agree to any reasonable discovery extension that Parus Holdings might propose.

Fed. R. Civ. P. 26(c) authorizes the Court to stay discovery upon a finding of good cause. See Johnson v. New York Univ. School of Education, 205 F.R.D. 433, 434 (S.D.N.Y. 2002) (granting stay, and considering "the breadth of discovery sought and the burden of responding to it"); Spencer Trask Software and Information Services LLC v. RPost Int'l Ltd., 206 F.R.D. 367, 368 (S.D.N.Y. 2002). "Good cause may be shown where a party has filed a dispositive motion, the stay is for a short period of time, and the opposing party will not be prejudiced by the stay." Spencer Trask, 206 F.R.D. at 368 (holding that proceeding with discovery during pendency of a dispositive motion "would unnecessarily drain the parties' resources"). WorldCom believes that the circumstances described above constitute good cause for a temporary stay of discovery in this matter until the pending motion for summary judgment is decided by the Court.

Therefore, pursuant to LBR 7007-1, I respectfully request an informal conference with the Court to discuss a temporary stay of discovery until the Court determines WorldCom's pending motion for summary judgment. Because counsel for the parties will be before the Court on December 6, 2005 to argue WorldCom's summary judgment motion, that would be an appropriate time to schedule a conference on WorldCom's temporary stay of discovery request, unless the Court wishes to address it at an earlier time.

The Honorable Arthur J. Gonzalez
November 17, 2005
Page 3

Respectfully submitted,

**STINSON MORRISON HECKER LLP**

Robert L. Driscoll

RLD:lkm
Attachments

cc: John M. Callagy, Esq. (via ECF and e-mail)
Robert S. Friedman, Esq. (via ECF and e-mail)
Kevin J. Smith, Esq. (via ECF and e-mail)

D00072

# EXHIBIT A

D00073

STINSON
MORRISON
HECKER LLP

Robert L. Driscoll
(816) 691-3102
bdriscoll@stinsonmoheck.com
www.stinsonmoheck.com

1201 Walnut, Suite 2900
Kansas City, MO 64106-2150

*Tel* (816) 842-8600
*Fax* (816) 691-3495

November 11, 2005

**Via Facsimile 212-808-7897**
John M. Callagy, Esq.
Robert S. Friedman, Esq.
Kevin J. Smith, Esq.
Kelley Drye & Warren LLP
101 Park Avenue
New York, New York 10178

Re: *In re WorldCom, Inc., Chapter 11,* Case No. 02-13533
Parus Holdings' Claims

Gentlemen:

I am writing concerning the electronic discovery you have proposed that MCI undertake regarding the claims of Parus Holdings.

Following receipt of Mr. Smith's letter of October 24, 2005, we requested that Kroll Ontrack provide us with a cost estimate for searching the electronic media of MCI and Intermedia (quarterly back-up tapes) utilizing the names, search terms and time-frame specified in Mr. Smith's letter. We have now received that estimate which ranges from $207,633.99 to $331,160.12, depending on assumed amounts of retained MCI data.

These estimated costs from a search vendor, of course, do not include the necessary additional costs that will be incurred for qualified personnel to review electronically identified documents regarding their actual responsiveness or privileged nature before production. All told, costs associated with the proposed electronic discovery will be considerably higher than the cash distribution value of Parus Holdings' breach of contract claim--$191,544--if MCI's summary judgment is granted and Parus' claim is treated as a Class 12 Intermedia claim. Further, none of the requested electronic discovery--and for that matter, none of the hard-copy production discovery that you are pursuing--is needed to determine the validity of either the contract or the non-contract claims of Parus Holdings. MCI's pending summary judgment motion on these issues centers entirely on questions of law and contract interpretation.

Under these circumstances, I am requesting that you consent to a temporary stay of discovery until the Court rules on MCI's pending motion for summary judgment. Such a stay would not cause legal prejudice to Parus Holdings and it would prevent the unnecessary expenditure of hundreds of thousands of dollars by MCI and Parus Holdings. If discovery becomes necessary in the future, however, we

KANSAS CITY
OVERLAND PARK
WICHITA
WASHINGTON, D.C.
PHOENIX
ST. LOUIS
OMAHA
JEFFERSON CITY

John M. Callagy, Esq.
Robert S. Friedman, Esq.
Kevin J. Smith, Esq.
November 11, 2005
Page 2

in return will agree to any reasonable extension of the discovery period that you propose.

Your consideration of this request would be appreciated. Please contact me if there are particular matters you wish to discuss about either the Kroll Ontrack estimate or the proposed temporary stay.

Very truly yours,

**STINSON MORRISON HECKER LLP**

Robert L. Driscoll

RLD:lkm

D00075

# EXHIBIT B

D00076



STINSON
MORRISON
HECKER LLP

Robert L. Driscoll
(816) 691-3102
bdriscoll@stinsonmoheck.com
www.stinsonmoheck.com

1201 Walnut, Suite 2900
Kansas City, MO 64106-2150

Tel (816) 842-8600
Fax (816) 691-3495

November 16, 2005

**Via Facsimile 212-808-7897**

John M. Callagy, Esq.
Robert S. Friedman, Esq.
Kevin J. Smith, Esq.
Kelley Drye & Warren LLP
101 Park Avenue
New York, New York 10178

Re: *In re WorldCom, Inc., Chapter 11*, Case No. 02-13533
Parus Holdings' Claims

Gentlemen:

You have not yet responded to my request of last week that discovery regarding the Parus Holdings' claims be temporarily stayed until the Court decides MCI's pending motion for summary judgment. Although I recognize that such a stay would alter the course of action you are pursuing, a temporary stay of discovery would conserve the parties' resources, without prejudicing either party, and would assist the Court by permitting it to direct its energies to a matter that is potentially dispositive rather than have those energies diverted to a continuing series of discovery filings.

Please advise me today if you will agree to such a temporary stay.

Very truly yours,

**STINSON MORRISON HECKER LLP**

Robert L. Driscoll

RLD:lkm

KANSAS CITY
OVERLAND PARK
WICHITA
WASHINGTON, D.C.
PHOENIX
ST. LOUIS
OMAHA
JEFFERSON CITY

# EXHIBIT F

D00078



STINSON
MORRISON
HECKER LLP

Allison M. Murdock
(816) 691-3138
amurdock@stinsonmoheck.com
www.stinsonmoheck.com

1201 Walnut, Suite 2900
Kansas City, MO 64106-2150

*Tel* (816) 842-8600
*Fax* (816) 691-3495

June 16, 2006

**VIA CM/ECF**

The Honorable Arthur J. Gonzalez
United States Bankruptcy Judge
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, NY 10004

Re: In re WorldCom, Inc., et al., Case No. 02-13533
Claims of Parus Holdings, Inc.

Dear Judge Gonzalez:

I am writing in response to the letter filed on June 2, 2006, by Robert Friedman, counsel for Claimant Parus Holdings, Inc. ("Parus Holdings"), requesting that a scheduling order be entered with regard to Parus Holdings' claims or, alternatively, seeking an informal conference to discuss Parus Holdings' proposed scheduling order and Debtors' alleged failure to produce electronic documents.

As discussed more fully below, Mr. Friedman's letter contains numerous misrepresentations regarding the status of electronic discovery in this case. Mr. Friedman's letter also demonstrates a complete lack of understanding as to the substantive issues related to Debtors' electronic discovery. His statements that certain electronic data is inaccessible because of alleged delays related to electronic discovery is untrue. As reflected in my correspondence and subsequent discussions with Mr. Friedman's colleague, Kevin Smith, MCI Telecommunications, Inc. ("MCI") did not begin backing up (i.e., retaining) information from its Exchange email system until July of 2002. As Mr. Friedman knows, this is *after* the relevant time period identified by Parus Holdings – September 1, 2000 through April 12, 2002 – which ended more than three months before Debtors filed their petition in Bankruptcy and more than a year before Parus Holdings filed its claims. See December 15, 2005 letter from Ms. Murdock to Messrs. Callagy, Friedman and Smith (Ex. A). No backup tapes were destroyed, as Mr. Friedman erroneously suggests.

Moreover, as Mr. Smith was advised, Debtors have located for the relevant time period 78 backup tapes related to MCI's email system known as "POP email." With regard to the 29 backup tapes of Debtor Intermedia Communications, Inc.

KANSAS CITY
OVERLAND PARK
WICHITA
WASHINGTON, D.C.
PHOENIX
ST. LOUIS
OMAHA
JEFFERSON CITY

("Intermedia") mentioned in Mr. Friedman's letter, Mr. Smith was advised that Kroll Ontrack, the vendor assisting Debtors with electronic discovery, is unable to restore these tapes because of the manner in which the tapes are formatted but has located another vendor that believes it can restore the tapes. Mr. Friedman either failed to obtain this information from Mr. Smith or chose not to disclose this information in his letter to the Court.

In fact, contrary to Mr. Friedman's accusations, Debtors diligently have been conducting electronic discovery. The scope of Parus Holdings' electronic discovery requests have made this effort extraordinarily time consuming and costly. Debtors, however, already have reviewed the equivalent of over 375 boxes of electronic documents, have made eight electronic document productions to Parus Holdings and have incurred electronic discovery costs of over $130,000. These efforts, nevertheless, have yielded only a very small percentage of documents responsive to Parus Holdings' discovery requests. It is anticipated that the remaining electronic discovery will be equally burdensome, even more costly and will yield a similarly small percentage of responsive documents.

Debtors, therefore, request a pre-motion conference pursuant to Local Bankruptcy Rule 7007-1(b) to discuss the filing of a protective order to shift the costs associated with electronic discovery to Parus Holdings. Debtors respectfully submit that until the Court determines whether Parus Holdings must bear all or some portion of the costs of the electronic discovery it seeks, and any further electronic discovery is completed (assuming any further electronic discovery should even be had), it is premature to enter a scheduling order.

The entry of a scheduling order at this time also is premature because Mr. Friedman's firm only last month returned to Debtors 388 boxes of their client files that Debtors requested from his firm over six months ago. Parus Holdings complains as part of its claim that Debtors MCI and Intermedia conspired with one another prior to their merger in violation of a Hold Separate Order entered by the United States District Court for the District of Columbia as part of an investigation by the United States Justice Department into the propriety of their merger.

Mr. Friedman's own firm, Kelley Drye & Warren LLP ("Kelley Drye"), represented Intermedia with regard to the merger and the Hold Separate Order. Because Parus Holdings complains that there should be additional paper documents related to the merger that Debtors have not yet produced, Debtors requested in November of 2005 that Kelley Drye return their client files so the files could be searched for responsive documents. See November 18, 2005 Letter from Maureen F. Del Duca to James J. Kirk (Ex. B). Despite repeated requests that the files be returned, Mr. Friedman's firm failed to return the files until last month.

Given that Mr. Friedman's firm only recently has returned Debtors' client files for review and Parus Holdings' own requests have made electronic discovery an unnecessarily time consuming and costly endeavor, Debtors should be given an opportunity to complete their review of the Kelley Drye files and file their motion for

protective order regarding further electronic discovery and cost-shifting before any scheduling order is entered.

**I. DEBTORS RESPECTFULLY SUBMIT THAT IT IS PREMATURE TO ENTER A SCHEDULING ORDER.**

**A. Debtors Have Been Complying With Their Electronic Discovery Obligations.**

Mr. Friedman's accusation that Debtors have failed to produce electronic discovery is patently false. Debtors diligently have been complying with their electronic discovery obligations. In the past few months alone, Debtors, among other things, have

- restored and searched accessible and inaccessible electronic media, including nine back up tapes, four of which were selected by Parus Holdings' counsel for the purpose of sampling the inaccessible data, so that Debtors could determine whether a cost-shifting motion is appropriate (which it is);
- searched the electronic media using the search terms and custodian names provided by Parus Holdings' counsel;
- reviewed over 900,000 pages of electronic documents, which is the equivalent of over 375 boxes of documents;
- made eight separate electronic document productions to Parus Holdings;
- conferred by telephone and in writing at least 20 times with Mr. Smith regarding the status of Debtors' electronic discovery efforts; and
- incurred over $130,000 in costs complying with Debtors' electronic discovery obligations.

In accusing Debtors of failing to undertake electronic discovery, Mr. Friedman either failed to confer with Mr. Smith regarding Debtors' electronic document productions or consciously disregarded the information he received. In either event, the accusations and misrepresentations set forth in Mr. Friedman's June 2 letter to the Court are inexcusable and counter-productive to the open lines of communications that had been established with Mr. Smith regarding Debtors' electronic discovery efforts. See December 15, 2005 letter from Ms. Murdock to Messrs. Callagy, Friedman and Smith (outlining all sources of electronic discovery) (Ex. A); January 26, 2006 letter from Ms. Murdock to Mr. Smith (requesting the selection of backup tapes for sampling purposes in order to determine cost-shifting) (Ex. C); January 30, 2006 letter from Mr. Smith to Ms. Murdock (selecting tapes to be sampled) (Ex. D); April 4, 2006 letter from Ms. Murdock to Mr. Smith (discussing the need to limit search terms) (Ex. E); April 7, 2006 letter from Mr. Smith to Ms. Murdock (agreeing to limit certain search terms) (Ex. F); Letters from Ms. Murdock to Mr. Smith enclosing electronic document productions (Ex. G).

**B. <u>The Scheduling Order Proposed By Parus Holdings Is Unrealistic.</u>**

Parus Holdings proposes that the production of all outstanding documents be completed by the end of June, including electronic documents. This proposed deadline completely disregards that as a result of Mr. Friedman's firm's repeated delays in returning Debtors' client files, Debtors just recently have received 388 boxes of documents that must be reviewed for responsiveness to Parus Holdings' discovery requests. Parus Holdings' proposed deadline further disregards that, although Debtors already have completed a large amount of electronic discovery, a tremendous amount of work is left to be completed and Debtors have not yet had an opportunity to file their cost-shifting motion.

**1. <u>Additional time is needed to review the 388 boxes of Debtors' client files that Kelley Drye failed to return to Debtors until last month.</u>**

On behalf of Parus Holdings, Kelley Drye has served discovery requests on Debtors seeking documents related to MCI's and Intermedia's operations before and after their merger, and accuses Debtors of failing to produce the requested documents. Also, although not referenced in its original claims, Parus Holdings, since filing its claims, has accused MCI and Intermedia of conspiring with one another prior to their merger in violation of the Hold Separate Order in order to cause damage to Parus Holdings. <u>See</u> Hearing Transcript dated January 17, 2006 at 38-39 (Ex. H).

As previously discussed, Kelley Drye represented MCI and Intermedia before the bankruptcy. It sought from MCI, and was given, a limited conflict waiver to represent Parus Holdings with regard to its claims. More significantly, however, Kelley Drye represented Intermedia with regard to its merger with MCI and with regard to the very Hold Separate Order it now accuses MCI and Intermedia of conspiring to violate. In fact, Kelley Drye partner Brad Mutschelknause actually signed the Hold Separate Oder on Intermedia's behalf. November 17, 2000 Hold Separate Stipulation and Order (Ex. I).

Given Kelley Drye's representation of Intermedia and the accusations now made regarding that representation, Debtors believe that some of the documents requested by Parus Holdings, as well as documents needed for Debtors' defense of Parus Holdings' claims, may be in Debtors' files maintained by Kelley Drye. Therefore, on November 15, 2005, Maureen Del Duca, Vice President of Litigation for MCI, sent a written request to James Kirk, the managing partner of Kelley Drye, requesting that Kelley Drye turn over all original files, including any files or documents maintained electronically, related to its representation of MCI, Intermedia and/or an affiliated company, Digex, within ten days. <u>See</u> November 18, 2005 letter from Ms. Del Duca to Mr. Kirk (Ex. B). On November 29, 2005, Mr. David Wachen, Associate Litigation Counsel for MCI spoke with Mr. Steven Caley of Kelley Drye to follow up on the status of Ms. Del Duca's request. Mr. Caley advised that other than leaving a voice mail message or two for Jonathan Canis, the Kelley Drye lawyer

whom Mr. Caley believed to be in charge of the Debtors' representation, no steps had been taken to begin collecting the requested documents. See November 29, 2005 letter from Mr. Wachen to Mr. Caley (Ex. J). Mr. Wachen requested again that Kelley Drye return the requested files as soon as possible and no later than December 6. Id.

In response, Mr. Caley requested that Debtors should provide a more focused request for the files they needed and advised that Kelley Drye expected to be compensated for any efforts undertaken in segregating, reviewing and supplying the files to Debtors. See November 30, 2005 letter from Mr. Caley to Mr. Wachen (Ex. K). Mr. Caley then directed that, because of his other commitments, any further communications regarding Debtors' request for the return of their files needed to be directed to yet other attorneys at Kelley Drye, Richard Donovan and Glenn Manishin. Id.

Having heard no response regarding the status of Kelley Drye's efforts to return Debtors' files, Ms. Mary Coyne, Associate General Counsel for Verizon, wrote to Messrs. Donovan and Manishin requesting again that the files be returned immediately. See February 7, 2006 letter from Ms. Coyne to Messrs. Donovan and Manishin (Ex. L). Ms. Coyne further advised Messrs. Donovan and Manishin that while Debtors reserved the right to have all of their files and documents returned, their request here was more narrow and could be limited to the files and documents related to the MCI/Intermedia merger and the antitrust litigation that the Department of Justice brought in connection with that merger, and that resolution of any cost issues (if there are any) should not hold up the return of these documents. Id.

On February 15, 2006, Mr. Manishin wrote Ms. Coyne to advise that although it had "initiated the process [of] locating and assembling" the requested files, Kelley Drye still was not prepared to discuss the logistics of returning them to Debtors. See February 15, 2006 letter from Mr. Manishin to Ms. Coyne (Ex. M). He also requested that Ms. Coyne provide confirmation that she had authority on behalf of the Debtors to request the return of the files. Id. On February 21, Ms. Coyne provided Mr. Manishin with the confirmation he sought and again requested that he advise when the files would be returned. See February 21, 2006 letter from Ms. Coyne to Mr. Manishin (Ex. N).

On March 10, 2006, Mr. Manishin finally notified Ms. Coyne that Kelley Drye was in possession of 382 boxes of Intermedia and Digex documents and had completed its review of these documents. However, Mr. Manishin proposed returning all 382 boxes of client files to Debtors rather than incur the time, cost and expense to identify those files related to the MCI/Intermedia merger and the related antitrust issues. See March 10, 2006 email from Mr. Manishin to Ms. Coyne (Ex. O). Mr. Manishin directed that arrangements would have to be made through Mr. Canis to pick up the documents and wanted Debtors to reimburse Kelley Drye for the costs

associated with copying and returning the files. Id.; March 14, 2006 email from Mr. Manishin to Ms. Coyne (Ex. O).

Debtors' counsel, Mark Iba, then contacted Mr. Canis to inquire as to the amount of payment Kelley Drye expected for the return of the files. Despite repeated requests for this information, Mr. Canis failed to provide the information until April 22, 2006, when he estimated that Kelley Drye's charges would be approximately $15,000. See April 22, 2006 email from Mr. Canis to Mr. Iba (Ex. P). An invoice was then sent to Mr. Iba on April 27, 2006, seeking payment for $19,606.14 almost half of which is attributable to time recorded by Kelley Drye lawyers spent "considering" Debtors' request, discussing document review and production issues and discussing and preparing the invoice to Debtors. See April 27, 2006 Invoice (Ex. Q).

On April 27, 2006, Mr. Iba requested that Mr. Canis confirm whether Kelley Drye intended to retain Debtors' the files until the invoice was paid. See April 27, 2006 email from Mr. Iba to Mr. Canis (Ex. R). Mr. Canis finally advised that Debtors could make arrangements to pick up the files, which by then were in 388 boxes. See April 28, 2006 email from Mr. Canis to Mr. Iba (Ex. R). Debtors promptly made the necessary arrangements, and the 388 boxes of documents were shipped to Debtors counsel's office in mid-May.

Kelley Drye took almost six months to return Debtors' client files despite its ethical obligation to return the files immediately. Debtors had to make repeated requests for the files, and their requests were pushed off to at least four Kelley Drye lawyers, all of whom billed for the time spent conferring with one another regarding Debtors' request. The return of the files further was held up for well over a month while Kelley Drye sought assurances that it would be paid for its time and calculated the amount of payment it expected receive. Now Kelley Drye wants Debtors to complete a substantive review the 388 boxes of documents before the end of this month. Debtors should not be subjected to this unreasonable deadline when their inability to meet it is a direct result of Kelley Drye's delay in returning their client files.

2. **Additional time is needed for Debtors to complete electronic discovery and file their cost-shifting motion.**

Parus Holdings' proposed deadline further disregards that, although Debtors already have completed a large amount of electronic discovery, much work still is left to be completed and Debtors have not yet had an opportunity to file their cost-shifting motion. Using the search terms proposed by Parus Holdings, Debtors already have been required to review the equivalent of over 375 boxes of documents, and there are dozens of backup tapes that still must be restored and reviewed. This work cannot be completed by the end of June.

Moreover, although Parus Holdings wants Debtors to continue their electronic discovery efforts while the Court determines the cost-shifting issue, Parus Holdings to date has refused to agree to be bound by the Court's Order and pay all portions of the costs that may be shifted to it for the electronic discovery conducted while the cost-shifting motion is pending. Essentially, Parus Holdings wants Debtors to incur costs for electronic discovery while the Court considers the cost-shifting issue and then, if ordered to pay all or some portion of the costs that have been and will be incurred, it wants the ability to withdraw its overly broad requests so as to avoid paying those costs. This should not be permitted. As has been the procedure in other cases involving the cost-shifting issue, the Court should determine cost-shifting before further electronic discovery proceeds. Parus Holdings may prefer to forego the broad discovery it now seeks if it is required to pay the costs associated with it.

The other deadlines proposed by Parus Holdings are similarly unrealistic given the additional time needed to complete paper and electronic discovery.

## II. DEBTORS SHOULD BE PERMITTED TO FILE A MOTION FOR PROTECTIVE ORDER AND COST-SHIFTING.

Most of the electronic discovery that remains to be completed is on backup tapes which are clearly inaccessible. Zubulake v. UBS Warburg, 217 F.R.D. 309, 320 (S.D.N.Y. 2003). In particular, there are 71 Intermedia backup tapes that still must be restored and searched and 78 email tapes from MCI's POP email system. Just searching the nine tapes selected for sampling using Parus Holdings' search terms required Debtors' counsel to review over 740,000 pages (or almost 300 boxes) of documents and incur approximately $73,000 in costs (which does not include any attorney review time).[1] And the number of responsive documents located as a result of this time consuming and expensive undertaking was extremely low (only approximately 3.3%). Extrapolating the costs from the nine backup tapes that were sampled, the costs associated with completing the remaining electronic discovery could exceed $1.2 million.[2]

The search and review of the electronic data is unduly burdensome and expensive particularly in light of the low percentage of responsive documents that are being found as a result of the electronic discovery. Parus Holdings refuses to voluntarily bear any portion of costs associated with the inaccessible electronic discovery. Therefore, Debtors request that the Court enter a protective order ordering

---

[1] Parus Holdings selected four tapes for sampling. Because one of these tapes was part of a set, Kroll Ontrack advised Debtors that they should sample all of the tapes in the set in order to obtain complete data. Debtors, therefore, sampled nine tapes rather than just the four selected by Parus Holdings.

[2] A search of the nine sample tapes alone resulted in 746,228 pages of documents to review (an average of 82,914 pages of documents per tape), at a cost of approximately $72,900 (an average of $8,100 per tape), not including attorney review time. Using these numbers to estimate the volume of data and cost for the remaining 71 Intermedia backup tapes and the 78 MCI POP email backup tapes, a search could result in an additional 12,354,186 pages of documents (4,942 boxes) to review at a cost of approximately $1,206,900, not including attorney review time.

that the discovery not be had or that Parus Holdings bear the expense associated with such discovery, which could be in excess of $1.2 million.

Fed. R. Civ. P. 26(c) gives the Court broad authority to protect a party from undue burden or expense by ordering relief ranging from a complete bar of the discovery to reasonable restrictions. Under Rule 26(c), the Court may impose limits on the scope of discovery by weighing the benefits against the burden of discovery, and may shift the costs of discovery. Mitchell v. Fishbein, 227 F.R.D. 239 (S.D.N.Y. 2005); Zubulake v. UBS Warburg, 217 F.R.D. 309 (S.D.N.Y. 2003); see also Hagemeyer N. Am. v. Gateway Data Science Corp., 222 F.R.D. 594, 601 (E.D. Wis. 2004).

Cost-shifting should be considered when, as here, discovery imposes an undue burden or expense on the requesting party. Zubulake, 217 F.R.D. at 318. Whether production of documents is unduly burdensome or expensive turns primarily on whether the documents are kept in an accessible or inaccessible format. Id. Here, there is no question that the backup tapes are inaccessible. They cannot be retrieved and restored without incurring substantial cost.

Application of the Zubulake factors favors shifting the costs of electronic discovery to Parus Holdings. Factors 1 and 2 address the extent to which the requests are tailored to discover relevant information and the availability of such information from other sources. Id. at 318. The less likely it is that the documents contain information relevant to a claim or defense, the more unjust it would be to make the responding party search for the documents at its own expense. Id. Debtors have reviewed 746,228 pages of documents from the nine backup tapes that were sampled of which only 24,483 pages were responsive to Parus Holdings' document requests. Even this number, however, is artificially high because several documents are spreadsheets that are hundreds of pages long but contain only one or two responsive lines of information.[3] In addition, the responsive documents are of limited utility. The productions consist largely of copies of executed contracts and agreements already in possession of both parties, lengthy reports that contain one or two lines detailing payments made to Parus Holdings, training schedules and manuals, emails and attachments regarding the IntermediaOne product suite and/or Parus Holdings' product, several versions or drafts of the same power point presentations, and many other documents that contain very little substance.

The court in Zubulake grouped factors 3, 4 and 5 together in a category referred to as "cost issues:" "'How expensive will this production be?' and, 'Who can handle that expense?'" Id. at 323. These factors mitigate in favor of cost-shifting in this case. Debtors are responding to claims as debtors in a bankruptcy proceeding.

---

[3] For example, 44 documents are between 100 and 706 pages long. These lengthy spreadsheets consist of a combined total of 9,955 pages. Each document, however, generally contains only one or two lines that are relevant to this claim. The relevant lines generally involve payments made to EffectNet by Intermedia.

The estimated costs of responding to Parus Holdings' broad document requests are extremely high – exceeding $1.2 million.

Zubulake factors 6 and 7 – the importance of the issues at stake in the litigation and the benefit to the parties of retrieval – also favor cost-shifting. This action involves a business dispute and nothing more. Compare Zubulake, 217 F.R.D. at 321 (describing actions involving "important issues" as including toxic tort class actions, environmental actions, and "so called 'impact' or social reform litigation"). Also, Debtors have no business purpose for retrieving these documents. The backup tapes were created for disaster recovery purposes. Any benefit of retrieval will be derived solely by Parus Holdings.

Application of the Zubulake factors to the circumstances of this case overwhelmingly favors shifting to Parus Holdings the costs related to restoring and searching the remaining 71 Intermedia backup tapes and the 78 MCI POP email backup tapes.

Accordingly, Debtors respectfully request permission to file a motion for protective order and cost-shifting. Debtors further request that the Court postpone entering a scheduling order until after the cost-shifting issue is resolved and paper and any further electronic discovery is completed.

Respectfully submitted,

**STINSON MORRISON HECKER LLP**

*/s/ Allison M. Murdock*

Allison M. Murdock

AMM:af

cc: Mr. Robert S. Friedman (*Via* CM/ECF)
Mr. Kevin J. Smith (*Via* CM/ECF)

**EXHIBITS TO JUNE 16, 2006 LETTER TO COURT**

EXHIBIT A -- December 15, 2005 letter from Ms. Murdock to Messrs. Callagy, Friedman and Smith

EXHIBIT B -- November 18, 2005 Letter from Maureen F. Del Duca to James J. Kirk

EXHIBIT C -- January 26, 2006 letter from Ms. Murdock to Mr. Smith

EXHIBIT D -- January 30, 2006 letter from Mr. Smith to Ms. Murdock

EXHIBIT E -- April 4, 2006 letter from Ms. Murdock to Mr. Smith

EXHIBIT F -- April 7, 2006 letter from Mr. Smith to Ms. Murdock

EXHIBIT G -- Letters from Ms. Murdock to Mr. Smith enclosing electronic document productions

EXHIBIT H -- Hearing Transcript dated January 17, 2006 at 38-39

EXHIBIT I -- November 17, 2000 Hold Separate Stipulation and Order

EXHIBIT J -- November 29, 2005 letter from Mr. Wachen to Mr. Caley

EXHIBIT K -- November 30, 2005 letter from Mr. Caley to Mr. Wachen

EXHIBIT L -- February 7, 2006 letter from Ms. Coyne to Messrs. Donovan and Manishin

EXHIBIT M -- February 15, 2006 letter from Mr. Manishin to Ms. Coyne

EXHIBIT N -- February 21, 2006 letter from Ms. Coyne to Mr. Manishin

EXHIBIT O -- March 10, 2006 email from Mr. Manishin to Ms. Coyne; March 14, 2006 email from Mr. Manishin to Ms. Coyne

EXHIBIT P -- April 22, 2006 email from Mr. Canis to Mr. Iba

EXHIBIT Q -- April 27, 2006 Kelley Drye Invoice

EXHIBIT R -- April 27, 2006 email from Mr. Iba to Mr. Canis; April 28, 2006 email from Mr. Canis to Mr. Iba

EXHIBIT A

D00089



STINSON
MORRISON
HECKER LLP

Allison M. Murdock
(816) 691-3138
amurdock@stinsonmoheck.com
www.stinsonmoheck.com

1201 Walnut, Suite 2900
Kansas City, MO 64106-2150

*Tel* (816) 842-8600
*Fax* (816) 691-3495

December 15, 2005

**VIA FACSIMILE 212/808-7897**
**AND U.S. MAIL**

John M. Callagy, Esq.
Robert S. Friedman, Esq.
Kevin J. Smith, Esq.
Kelley Drye & Warren LLP
101 Park Avenue
New York, New York 10178

Re: In re WorldCom, Inc., Chapter 11, Case No. 02-13533
Parus Holdings' Claims

Gentlemen:

I am writing with regard to the electronic discovery you have proposed that MCI undertake in the above-referenced matter.

As you know, we have requested an informal conference with the Court to discuss MCI's request to temporarily stay discovery pending the Court's ruling on MCI's motion for summary judgment. Because the informal conference was not held on December 6 as anticipated and it has not yet been rescheduled, we are proceeding in good faith with the production of electronic discovery (in addition to the thousands of pages of electronic documents already produced) as set forth below. However, we continue to believe that a discovery stay is appropriate in this proceeding for all of the reasons previously indicated and reserve all of our rights to continue to advocate that course. Our ongoing discovery effort during the pendency of our request simply reflects our attempt to comply in good faith with our obligations under applicable rules given that the Court has not addressed the stay issue at this time, and is being done without prejudice to our belief that the Court should stay discovery pending resolution of MCI's summary judgment motion.

Intermedia Electronic Media

There are 110 Intermedia backup tapes (63 email tapes and 47 data tapes) that may fall within the September 1, 2000, to April 12, 2002, date range set forth in

KANSAS CITY
OVERLAND PARK
WICHITA
WASHINGTON, D.C.
PHOENIX
ST. LOUIS
OMAHA
JEFFERSON CITY

EXHIBIT
A

Kevin Smith's October 24, 2005, letter. All but one of these backup tapes is undated. We are proceeding with indexing the undated backup tapes (which requires restoration of the tapes) in order to determine whether any of the tapes were created from September 1, 2000 to April 12, 2002. Once the indexing is complete, three or four backup tapes from those that fall within the September 1, 2000, to April 12, 2002, date range, will be sent initially to Kroll Ontrack to process using the search terms set forth in Mr. Smith's October 24, 2005, letter. If you wish to participate in the selection of this initial group of tapes, please let us know. We then will review the documents identified from Kroll Ontrack's processing of the sampled backup tapes and produce non-privileged and/or non-work product documents that are responsive to Parus Holdings' document requests. This sampling procedure should provide a factual basis for the Court to determine the cost shifting issue with respect to the Intermedia backup tapes.

There are two remaining active Intermedia servers. (These servers previously were searched for key words and individual names, but no responsive documents were found.) We will run searches on these two servers again using the custodians and search terms set forth in Mr. Smith's October 24 letter.

WorldCom Electronic Media

Pursuant to the retention policy in effect from September 1, 2000, through April 12, 2002, MCI did not retain backup for emails for that time period. Because it is possible that email backup tapes created in July of 2002 may contain email for the September 1, 2000, through April 12, 2002, time period, MCI is proceeding with searching the July of 2002 email backup tapes for the custodians identified in Mr. Smith's October 24, 2005, letter. Three or four of these backup tapes will then be sent to Kroll Ontrack to process using the search terms set forth in Mr. Smith's October 24 letter. Again, to the extent you wish to participate in the selection of these tapes, please let us know. We then will review the documents identified from Kroll Ontrack's processing of the sampled backup tapes and produce non-privileged and/or non-work product documents that are responsive to Parus Holdings' document requests.

It is not feasible to search the email backup tapes using the search terms only (without regard to specific custodians) because there are in excess of 38,000 custodians.

MCI also has the ability to restore email relay logs for the September 1, 2000, to April 12, 2002, time period. The relay logs, which must be restored by custodian, identify the addressee, recipient and subject or "re" line for emails sent to and received by ___@wcom.com email addresses. The relay logs do not set forth the content of any emails. MCI can restore the relay logs for the custodians *and* the search terms identified in Mr. Smith's October 24 letter. (As with the email backup

tapes, it is not feasible to search the relay logs using the search terms only because there are in excess of 38,000 custodians.)

Because the information that may be obtained from the relay logs is limited and the restoration of the relay log for each custodian is extremely time consuming, we will restore a relay log for the September 1, 2000, to August 12, 2002, time period for one WorldCom employee chosen by you. We then will search the restored relay log using the search terms identified in Mr. Smith's October 24 letter. After you review the restored relay log, we can confer as to whether the restoration of additional relay logs is necessary or appropriate.

With regard to WorldCom data, we have been advised that there are backup tapes of PC hard drives for only one of the WorldCom employees identified in Mr. Smith's October 24 letter, Peter Cassidy, that could have data for the September 1, 2000, to August 12, 2002, time period. We are proceeding with searching the backup tapes for Mr. Cassidy's PC hard drive in order to make this determination.

We also are proceeding with searching the MCI servers for the custodians *and* search terms identified in Mr. Smith's October 24 letter.

We will notify you once the indexing of the Intermedia backup tapes is complete so that you may participate in the selection of backup tapes for sampling if you wish to do so. In the meantime, please let me know the name of the WorldCom employee whose relay log you would like restored.

Very truly yours,

**STINSON MORRISON HECKER LLP**

Allison M. Murdock

Allison M. Murdock

AMM:af

DB02/048629 0094/6962420.1

EXHIBIT B

D00093



Law and Public Policy
1133 19th Street, NW
Washington, DC 20036

November 18, 2005

VIA FACSIMILE 212/808-7897 & U.S. MAIL

James J. Kirk, Esq.
Managing Partner
Kelley Drye & Warren LLP
101 Park Avenue
New York, New York 10178-0002

Re: *In re WorldCom, Inc., Chapter 11,* Case No. 02-13533

Dear Mr. Kirk:

Your firm currently represents Parus Holdings, Inc., successor by merger to EffectNet, Inc. and EffectNet LLC ("Parus Holdings"), in claims filed against MCI and Intermedia Communications, Inc., which MCI acquired on July 1, 2001, in the above-referenced case. Because of your firm's prior representation of MCI, Intermedia and Digex, your firm sought from MCI, and was given, a limited conflict waiver to represent Parus Holdings in this case. The limited conflict waiver is set forth in my December 13, 2004, letter to Steve Szczepanski of your firm. A copy is attached for your reference.

On behalf of Parus Holdings, your firm has served a set of document requests on MCI, a copy of which is attached, seeking documents related to Intermedia's operations, and has accused MCI of failing to produce the requested documents. Given the scope of your firm's representation of Intermedia, we believe that some of the requested documents, as well as documents needed for MCI's and Intermedia's defense of Parus Holdings' claims, may be in our files maintained by your firm. Therefore, MCI requests that your firm turn over all original files, including any files or documents maintained electronically, related to your firm's representation of MCI, Intermedia and/or Digex within ten business days. The files should be delivered to my attention at the above address.

Please feel free to call me if you would like to discuss this further. Thank you for your immediate attention to this matter.

Very truly yours,

[signature]

Maureen F. Del Duca
Vice President, Litigation

EXHIBIT
8

D00094



Law & Public Policy
1133 19th Street, NW
Washington, DC 20036
Telephone 202 736 6000

Maureen F. Del Duca
Vice President, Litigation

*Direct Dial:* 202-736-2477
*Direct Fax:* 202-736-6072
*E-mail:* maureen.delduca@mci.com

December 13, 2004

Mr. Steve Z. Szczepanski
Kelley Drye & Warren LLP
333 W. Wacker Drive
Suite 2600
Chicago, IL 60606

Re: Conflict Waiver

Dear Mr. Szczepanski:

This will confirm that MCI, Inc. and its subsidiaries, including Digex, Incorporated (collectively "MCI"), have agreed to a limited waiver of specific actual or potential conflicts of interest based on prior representation by Kelley Drye & Warren LLP ("Kelley Drye") of MCI. Such waiver is for the limited purpose of allowing Kelley Drye to represent Parus Holdings ("Parus") in its pursuit of claims 11173, 11242, 9291 and 9293 filed in the WorldCom, Inc. bankruptcy, case number 02-13533 (AJG), pending in the United States Bankruptcy Court for the Southern District of New York. The foregoing is expressly conditioned on Kelley Drye's representation that: the firm is not currently providing services to MCI; that the firm will erect and maintain an ethical screen or "Chinese wall" between lawyers representing Parus and lawyers who have worked for Digex, Intermedia or MCI; and that the firm will keep confidential information obtained through its prior representation of Digex, Intermedia or MCI from being shared with Parus and lawyers representing Parus.

In addition, MCI's agreement to waive any actual or potential conflicts of interest as set forth in this letter is conditioned upon Parus's written agreement to waive any actual or potential conflicts of interest to Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.'s representation of MCI and Digex in litigation against Computer Associates International, Inc. pending in the Circuit Court for Prince George's County, Maryland (captioned Computer Associates International, Inc. v. Digex, Incorporated, Civil Action No. CAL03-02253 (WBS)).

In agreeing to the conflict waiver and statement of non-objection to Kelley Drye's representation of Parus in the matter described above, MCI confirms that it has considered the provisions of Rule 1.7 of the Rules of Professional Conduct, and applicable Disciplinary Rules, including without limitation DR 5-105 and 5-101. MCI further confirms that MCI has received all information that it deems necessary to decide to agree to the non-objection and conflict waiver.

Very truly yours,

[signature]

Maureen F. Del Duca

KELLEY DRYE & WARREN LLP
Stephen A. Wood (SW 6270)
Robert S. Friedman (RF 1538)
Robert L. LeHane (RL 9422)
Kevin J. Smith (KS 0441)
101 Park Avenue
New York, New York 10178
Attorneys for Parus Holdings, Inc.,
Successor-by-Merger to EffectNet, Inc.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| In re<br><br>WORLDCOM, INC., et al.,<br><br>Debtors. | CHAPTER 11 CASE<br><br>NO. 02-13533 (AJG)<br><br>(Jointly Administered) |
|---|---|

CLAIMANT'S FIRST REQUEST FOR DOCUMENTS

Pursuant to Rules 7026 and 7034 of the Federal Rules of Bankruptcy Procedure, made applicable by Rule 9014 of the Federal Rules of Bankruptcy Procedure to the instant contested matter and/or adversary proceeding regarding Claim Nos. 9291, 9293, 11173 and 11242 filed by Parus Holdings, Inc., Successor-by-Merger to EffectNet, Inc. (hereinafter "Claimant"), Claimant hereby requests that MCI WorldCom Communications, Inc., MCI WorldCom Network Services, Inc., and Intermedia Communications, Inc., and their affiliate and/or subsidiary companies (together, "Debtors") produce for inspection and copying at the offices of Kelley Drye & Warren LLP, 333 West Wacker Drive, Suite 2600, Chicago, Illinois 60606, within thirty (30) days from the date of the service of this request, each document described below in the possession, custody or control of each in accordance with the definitions and instructions set forth below and all applicable Federal and Local Rules of Civil Procedure and Bankruptcy Procedure.

**DEFINITIONS**

1. The provisions of Civil Rule 26.3 of the Local District Rules, made applicable pursuant to Local Rules for The United States Bankruptcy Court, Southern District of New York, are incorporated herein.

2. As used herein, "Claimant" shall mean Parus Holdings, Inc., Successor-by-Merger to EffectNet, Inc. and EffectNet, LLC, EffectNet LLC, EffectNet, Inc., Webley Systems, Inc., their predecessor companies and their officers, directors, employees, agents, contractors, accountants, advisors, attorneys, representatives, successors or assigns and all other persons acting or purporting to act on their behalf.

3. As used herein, "Claim No. 9291" shall mean that Proof of Claim bearing claim number 9291 filed by Claimant in this bankruptcy case.

4. As used herein, "Claim No. 9293" shall mean that Proof of Claim bearing claim number 9293 filed by Claimant in this bankruptcy case.

5. As used herein, "Claim No. 11173" shall mean that Proof of Claim bearing claim number 11173 filed by Claimant in this bankruptcy case.

6. As used herein, "Claim No. 11242" shall mean that Proof of Claim bearing claim number 11242 filed by Claimant in this bankruptcy case.

7. "Date," "Time," "Period," or "Amount" shall mean the approximate date, time, period or amount if the exact date, time, period or amount is not known.

8. "Draft" means any earlier, preliminary, preparatory or tentative version of all or part of a document, whether or not such draft was superceded by a later draft and whether or not the terms of the draft are the same as or different from the terms of the final document.

9. As used herein, "Debtors" shall mean WorldCom, Inc., and each of its affiliate or subsidiary companies, including but not limited to, MCI WorldCom Communications,

Inc., MCI WorldCom Network Services, Inc., Intermedia, Inc., their officers, directors, employees, agents, contractors, accountants, advisors, attorneys, representatives, successors or assigns and all other persons acting or purporting to act on their behalf.

10. As used herein, "Debtors' Objection" shall mean Debtors' Objection to All Proofs of Claim Filed by EffectNet, Inc. which is now merged into Parus Holdings, Inc., including but not limited to Claim Numbers 9291, 11242, 9293 and 11173, dated June 10, 2004.

11. As used herein, "General Agreement" shall mean the Unified Communications Services General Agreement for Intermedia Communications, Inc., dated as of November 20, 2000, between EffectNet, Inc. and Intermedia Communications, Inc. and all amendments, if any, and drafts of same.

12. As used herein, "Memorandum of Understanding" shall mean the Memorandum of Understanding between EffectNet, Inc. and Intermedia Communications, Inc. regarding communications services to be provided by EffectNet, Inc., and all amendments, if any, and drafts of same.

13. As used herein, "Interim Agreement" shall mean the Interim Agreement between EffectNet, Inc. and Intermedia Communications, Inc. regarding communications services to be provided by EffectNet, Inc., and all amendments, if any, and drafts of same

14. "Including" and "includes" shall be construed as referring only to an incomplete listing of illustrative examples and not as limiting or narrowing the generality of any definition, instruction or request.

15. As used herein, "Jim Renforth" shall mean the person who was employed by Debtors as a Senior Services Manager in connection with the General Agreement.

16. As used herein, "Jimmy Faust" shall mean the person who was employed by Debtors as a Senior Product Manager.

17. As used herein, "Master License Agreement" shall mean the Master Agreement for Software Licenses between MCI WorldCom Network Services, Inc. and Webley Systems, Inc., dated as of September 14, 2001, and all amendments, if any, entered into thereafter.

18. As used herein, "Minimum Monthly Commitment" shall have the same meaning as set forth in the General Agreement.

19. As used herein, "Unified Communications" shall mean all forms of call and multimedia/cross-media message-management functions controlled by an individual user for both business and social purposes. This includes any enterprise informational or transactional application process that emulates a human user and uses a single, content-independent personal messaging channel (mailbox) for contact access.

## INSTRUCTIONS

1. **General Instructions.** The party upon whom the request is served shall, in addition to producing responsive documents, serve a written response within 30 days after the service of the request. The response shall state, with respect to each item or category, that inspection and related activities will be permitted as requested, unless the request is objected to, in which event the reasons for the objection shall be stated. If objection is made to part of an item or category, the part shall be specified and inspection permitted of the remaining parts.

2. If any document requested herein is maintained in electronic form (e.g., computer files), you are requested to produce each such document in paper form as well as provide a copy of each document in electronic form (i.e., on computer disk or CD-ROM).

3. "And" includes "or"; "or" includes "and."

4. The singular includes the plural and vice versa.

5. The masculine includes the feminine and neuter and vice versa.

6. Each and every request for a document to be produced requires production of the document in its entirety (including the reverse side if it contains any printing, writing or information), without abbreviation or expurgation, and without redacting any portions of it.

7. If you do not clearly understand, or if you have any questions about, the definitions, instructions, or any discovery request, please contact counsel for Claimant promptly for clarification.

8. If you intend to resist the production of any document called for by these requests on the ground that it is privileged, identify the document by date, author, recipient(s) and subject matter and state the specific basis for the claim of privilege. Any such document is to be held separately and retained intact by Debtors subject to and pending a ruling by the Court as to the claimed privilege.

9. **Continuing Obligation.** Pursuant to the Federal Rules of Civil Procedure, this First Request for Documents is to be regarded as continuing. You are requested to provide by way of supplemental responses any other additional document which you or any person on your behalf may hereafter obtain, which will augment or add to the documents previously provided. Such additional documents shall be served upon counsel for Claimant promptly upon receipt by the affected Debtors or counsel for the Debtors. Nothing herein shall constitute a waiver of the right to bar at trial any documents not produced in a timely fashion or to seek any other appropriate sanction in the event that any document described herein is not produced in accordance with this First Request for Documents.

## DOCUMENTS REQUESTED

1. All documents concerning Debtors' objections to payment with respect to Claim No. 9291.

2. All documents concerning Debtors' objections to payment with respect to Claim No. 9293.

3. All documents concerning Debtors' objections to payment with respect to Claim No. 11173.

4. All documents concerning Debtors' objections to payment with respect to Claim No. 11242.

5. All documents concerning Debtors' objection to Claimant's Claim Nos. 9291, 9293, 11173 and 11242 on the ground that Claimant is not entitled to double recovery, as asserted in paragraph 14 of Debtors' Objection.

6. All documents concerning Debtors' alleged payment to Claimant in connection with Claim Nos. 9291, 9293, 11173 and 11242, as asserted in paragraph 19 of Debtors' Objection.

7. All documents concerning Debtors' contention that "Claimant terminated the contract upon which it based its claims" as asserted in paragraph 15 of Debtors' Objection.

8. All documents concerning Debtors' contention that Claimant seeks an "unenforceable penalty" in connection with its claims for minimum monthly commitment payments, as asserted in paragraph 16 of Debtors' Objection.

9. All documents concerning Debtors' contention that "Claimant has calculated its alleged damages using an amount per commitment which is significantly higher than the amount the contract specifies should be used", as asserted in paragraph 17 of the Debtors' Objection.

D00101

10. All documents concerning Debtors' contention that "the contract prohibits assignment", as asserted in paragraph 18 of the Debtors' Objection.

11. All documents concerning the General Agreement, including documents concerning the negotiation, drafting, and execution of the General Agreement and performance of Claimant and Debtors thereunder.

12. All documents concerning the Memorandum of Understanding, including documents concerning the negotiation, drafting, and execution of the Memorandum of Understanding and performance of Claimant and Debtors thereunder.

13. All documents concerning the Interim Agreement including documents concerning the negotiation, drafting, and execution of the Interim Agreement and performance of Claimant and Debtors thereunder.

14. All documents concerning Debtors' decision to give notice in September 2001 to cancel accounts created pursuant to the General Agreement.

15. All documents concerning Debtors' decision to give notice in March 2002 to cancel accounts created pursuant to the General Agreement.

16. All documents concerning communications between Debtors and Claimant regarding the General Agreement.

17. All documents concerning Debtors' payments to Claimant under the General Agreement.

18. All documents concerning Debtors' communications among each other regarding the General Agreement.

19. All documents concerning Debtors' communications among each other regarding the cancellation of accounts created pursuant to the General Agreement.

20. All documents concerning Claimant, including Claimant's finances, Claimant's business, Claimant's technology, or Claimant's products.

21. All documents concerning Debtors' evaluation or analysis of Claimant, including Claimant's finances, Claimant's business, Claimant's technology, or Claimant's products.

22. All documents concerning the Master License Agreement, including documents concerning the negotiation, drafting, and execution of the Master License Agreement and performance of Claimant and Debtors thereunder.

23. All documents concerning communications between Debtors and Claimant regarding the Master License Agreement.

24. All documents concerning communications between Debtors and Claimant from September 1, 2000 to the present regarding the products and services offered by Claimant to Debtors under the Master License Agreement.

25. All documents concerning the price(s) to be paid for licenses to be obtained from Claimant under the Master License Agreement.

26. All documents concerning Debtors' payments to Claimant pursuant to the Master License Agreement.

27. All documents concerning Debtors' communications among each other regarding the Master License Agreement.

28. All documents concerning Jim Renforth's ceasing employment with Debtors in 2001.

29. All documents concerning Jimmy Faust's ceasing employment with Debtors.

30. All documents concerning Intermedia Communications, Inc.'s product suite "IntermediaOne".

31. All documents concerning the launch of Intermedia Communications, Inc.'s "IntermediaOne".

32. All documents concerning Debtors' communications among each other regarding Intermedia Communications, Inc.'s "IntermediaOne".

33. All documents concerning the merger of Intermedia Communications, Inc. with WorldCom, Inc. that relate to Claimant, Claimant's finances, Claimant's business, Claimant's technology, Claimant's products, Intermedia Communications, Inc.'s "IntermediaOne", or Unified Communications.

34. All documents concerning the merger of Intermedia Communications, Inc. with WorldCom, Inc. that relate to the development, obtaining, marketing or launching of a Unified Communications product or service.

35. All documents concerning Debtors' efforts to develop, obtain, market, or launch a Unified Communications product or service for their use or for sale to customers.

Dated: New York, New York.
February 7, 2005

KELLEY DRYE & WARREN LLP

By: ______________________________
Stephen A. Wood (SW 6270)
Robert S. Friedman (RF 1538)
Robert L. LeHane (RL 9422)
Kevin J. Smith (KS 0441)

101 Park Avenue
New York, New York 10178
Telephone: (212) 808-7800
Facsimile: (212) 808-7897

*Attorneys for Parus Holdings, Inc., successor to EffectNet, Inc.*

D00104

TO: Lawrence W. Bigus, Esq.
Stinson Morrison Hecker LLP
9200 Indian Creek Parkway, Suite 450
Overland Park, Kansas 66210
*Attorneys for Debtors and Debtors-In-Possession*

**KELLEY DRYE & WARREN LLP**
**Stephen A. Wood (SW 6270)**
**Robert S. Friedman (RF 1538)**
**Robert L. LeHane (RL 9422)**
**Kevin J. Smith (KS 0441)**
**101 Park Avenue**
**New York, New York 10178**
**Attorneys for Paris Holdings, Inc.,**
**Successor-by-Merger to EffectNet, Inc.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| In re | **CHAPTER 11 CASE** |
|---|---|
| **WORLDCOM, INC., et al.,** | **NO. 02-13533 (AJG)** |
| **Debtors.** | **(Jointly Administered)** |

**CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that he caused a copy of **Claimant's First Request for Documents, dated February 7, 2005,** to be served BY OVERNIGHT COURIER (UNITED PARCEL SERVICE) on February 7, 2005, on the following attorney:

Lawrence W. Bigus, Esq.
Stinson Morrison Hecker LLP
9200 Indian Creek Parkway, Suite 450
Overland Park, Kansas 66210
*Attorneys for Debtors and Debtors-in-Possession*

Dated: February 8, 2005
New York, New York

Kevin J. Smith (KS 0441)

**EXHIBIT C**

D00107



STINSON
MORRISON
HECKER LLP

Allison M. Murdock
(816) 691-3138
amurdock@stinsonmoheck.com
www.stinsonmoheck.com

1201 Walnut, Suite 2900
Kansas City, MO 64106-2150

*Tel* (816) 842-8600
*Fax* (816) 691-3495

January 26, 2006

**VIA FACSIMILE 212/808-7897 AND U.S. MAIL**

Kevin J. Smith, Esq.
Kelley Drye & Warren LLP
101 Park Avenue
New York, New York 10178

Re: In re WorldCom, Inc., Chapter 11, Case No. 02-13533
Parus Holdings' Claims

Dear Kevin:

I am writing with regard to the 110 Intermedia backup tapes (63 email tapes and 47 data tapes) that we asked Kroll Ontrack to index in order to determine whether any of the tapes were created from September 1, 2000 to April 12, 2002, and the MCI email relay logs.

First, as we discussed on Tuesday, Kroll Ontrack has completed the indexing of the Intermedia backup tapes to the extent possible. Of the 110 Intermedia backup tapes, Kroll Ontrack has advised us that there are 29 tapes that it is unable to index or restore because the tapes are of an unknown format. We will investigate whether there are any other methods by which these tapes can be indexed or restored.

The following is a summary with regard to the remaining 81 Intermedia backup tapes:

- 20 backup tapes fall outside the date range stated above
- one backup tape is blank
- one backup tape is undated
- 59 backup tapes fall within the date range stated above.

Set forth below is a list of the 59 backup tapes that fall within the date range stated above and the one undated tape. The list identifies whether the backup tape contains email, data or both. As you will see, there are 10 data tapes, 37 email tapes and 13 tapes with both email and data.

KANSAS CITY
OVERLAND PARK
WICHITA
WASHINGTON, D.C.
PHOENIX
ST. LOUIS
OMAHA
JEFFERSON CITY

EXHIBIT
C

| Tape | Date | Media Type |
|---|---|---|
| A001 | 1/25/2002 | Email |
| A007 | 2/22/2002 | Email |
| A008 | 2/22/2002 | Email |
| A009 | 2/22/2002 | Email |
| A010 | 2/22/2002 | Email |
| A011 | 2/22/2002 | Email |
| A012 | 2/22/2002 | Email |
| A013 | 2/22/2002 | Email |
| A035 | 8/31/2001 | Email |
| A036 | 8/31/2001 | Email |
| A048 | 8/31/2001 | Email |
| A049 | 8/31/2001 | Email |
| A050 | 8/31/2001 | Email |
| A051 | 8/31/2001 | Email |
| A052 | 8/31/2001 | Email |
| A053 | 8/31/2001 | Email |
| A061 | 10/26/2001 | Email |
| A062 | 10/26/2001 | Email |
| A063 | 10/26/2001 | Email |
| A064 | 10/26/2001 | Email |
| A065 | 10/26/2001 | Email |
| A066 | 10/26/2001 | Email |

| Tape | Date | Media Type |
|---|---|---|
| A067 | 10/26/2001 | Email |
| A068 | 10/26/2001 | Email |
| A069 | 10/26/2001 | Email |
| A083 | 11/30/2001 | Email |
| A084 | 11/30/2001 | Email |
| A085 | 11/30/2001 | Email |
| A086 | 11/30/2001 | Email |
| A087 | 11/30/2001 | Email |
| A088 | 11/30/2001 | Email |
| A089 | 11/30/2001 | Email |
| A090 | 11/30/2001 | Email |
| A091 | 11/30/2001 | Email |
| A100 | 11/24/2000 | Email |
| A107 | 12/28/2001 | Email |
| A108 | 12/28/2001 | Email |
| A015 | 4/26/2002 | Data |
| A017 | 3/7/2001 | Data |
| A026 | 8/31/2001 | Data |
| A034 | Unknown | Data |
| A060 | 10/26/2001 | Data |
| A079 | Fall 2001 | Data |
| A082 | 8/4/2001 | Data |

| Tape | Date | Media Type |
|---|---|---|
| A092 | 12/2/2001 | Data |
| A093 | 11/30/2001 | Data |
| A109 | 7/28/2001 | Data |
| A070 | 10/26/2001 | Email/Data |
| A071 | 10/26/2001 | Email/Data |
| A072 | 10/26/2001 | Email/Data |
| A073 | 10/26/2001 | Email/Data |
| A074 | 10/26/2001 | Email/Data |
| A075 | 10/26/2001 | Email/Data |
| A076 | 10/26/2001 | Email/Data |
| A094 | 11/30/2001 | Email/Data |
| A095 | 11/30/2001 | Email/Data |
| A096 | 11/30/2001 | Email/Data |
| A097 | 11/30/2001 | Email/Data |
| A098 | 11/30/2001 | Email/Data |
| A099 | 11/30/2001 | Email/Data |

As set forth in my December 15, 2005, letter to you and as you and I have discussed, we request that you select three or four of these backup tapes to be fully restored and processed by Kroll Ontrack using the search terms set forth in your October 24, 2005, letter. We will review the documents identified from Kroll Ontrack's processing of the sampled backup tapes and produce non-privileged and/or non-work product documents that are responsive to Parus Holdings' document requests.

In our telephone conversations and in your January 13, 2006, letter, you objected to any sampling of MCI's inaccessible electronic media. As we have discussed, MCI recognizes that any non-privileged and/or non work product

documents responsive to Parus Holdings' discovery requests on the 60 backup tapes listed above, if any, are discoverable. However, the sampling procedure is provided for under applicable law so that the Court will have a factual basis to determine whether Parus Holdings should bear some portion of the costs associated with restoring MCI's electronic media and, if so, how much. Thus, by requesting that you select three or four tapes for sampling, MCI is not suggesting that the sampled tapes are the only tapes that will be restored and searched.

Next, in our telephone conversation on Tuesday and in your January 13, 2006, letter, you objected to MCI's proposal to restore and search (using your proposed search terms) an email relay log for the September 1, 2000, to August 12, 2002, time period for one WorldCom employee chosen by you. We made this proposal because the relay logs are extremely time consuming to restore and identify only the addressee, recipient and subject or "re" line for emails sent to and received by ___@wcom.com email addresses. The relay logs do not set forth the content of any emails.

As we have discussed, it is not feasible to restore the email relay logs for each of the 39 custodians identified in your letter for the September 1, 2000, to August 12, 2002, time period as suggested in your January 13 letter. The email relay logs must be restored by custodian. As I have explained, it took a full day to restore an email relay log for one custodian just for a one month time period. For this reason, we again request that you select a custodian whose relay log you would like restored and searched. If after reviewing the relay log, you still believe that the relay logs should be restored for each of the 39 custodians identified in your October 24 letter, then the parties can present the issue to the Court so that it can determine if such restoration is appropriate and, if so, who should bear the cost.

Please let me know at your convenience which three or four Intermedia backup tapes you would like restored and searched pursuant to the sampling procedure described above, as well as the name of the custodian whose email relay log you would like restored and searched.

Very truly yours,

STINSON MORRISON HECKER LLP

Allison M. Murdock

Allison M. Murdock

AMM:jmh

**EXHIBIT D**

D00113

KELLEY DRYE & WARREN LLP
A LIMITED LIABILITY PARTNERSHIP
101 PARK AVENUE
NEW YORK, NEW YORK 10178
(212) 808-7800

WASHINGTON, DC
TYSONS CORNER, VA
CHICAGO, IL
STAMFORD, CT
PARSIPPANY, NJ
BRUSSELS, BELGIUM
AFFILIATE OFFICES
JAKARTA, INDONESIA
MUMBAI, INDIA

FACSIMILE
(212) 808-7897
www.kelleydrye.com

DIRECT LINE: (212) 808-5102
EMAIL: ksmith@kelleydrye.com

January 30, 2006

**VIA FACSIMILE ((816) 691-3495)**
Allison M. Murdock, Esq.
Stinson Morrison Hecker LLP
1201 Walnut Street, Suite 2900
Kansas City, Missouri 64106

Re: In re WorldCom, Inc., Chapter 11 Case No. 02-13533
*Parus Holdings' Claims; Electronic Discovery Issues*

Dear Ms. Murdock:

This is in response to your January 26, 2006, letter and to follow-up our telephone discussions, including today, concerning Debtors' outstanding electronic discovery.

Your January 26th letter indicates that Debtors have identified 59, out of the 110, Intermedia e-mail and data backup tapes which fall within the date range September 1, 2000 to April 12, 2002. Debtors have requested that Parus Holdings identify three or four of these backup tapes to be fully restored and processed by Kroll Ontrack for "sampling". It is our understanding that Debtors intend to produce to Parus Holdings responsive, non-privileged documents out of this "sample". It also is our understanding that Debtors intend to use the results of this "sample" to estimate the expenses for restoring the remaining backup tapes. Debtors agree that all responsive documents from the 59 backup tapes should be produced.

We understand Debtors' position to be that "sampling" is necessary for a possible cost-shifting argument under Zubulake. However, Debtors still have failed to rebut the presumption that Debtors, as the responding party, should bear the full cost of restoring, searching and downloading responsive documents. Until Debtors demonstrate otherwise, Debtors should be restoring, searching and downloading all e-mail and data at their own cost to locate, and ultimately, produce all responsive documents.

In addition, as we have indicated previously, Parus Holdings has no knowledge about the contents of the backup tapes, other than the dates you have now identified, to make an informed selection of a "sample" of backup tapes for restoration and production. Further,

KELLEY DRYE & WARREN LLP

Allison M. Murdock, Esq.
January 30, 2006
Page Two

Debtors should not argue, based on the results of the "sample", they are not required to fully restore and produce all responsive, non-privileged documents obtained from the 55 remaining backup tapes. Indeed, Debtors have already conceded, in your January 26, 2006, letter, that "documents responsive to Parus Holdings' discovery requests on the 60 backup tapes listed above, if any, are discoverable" and "MCI is not suggesting that the sampled tapes are the only tapes that will be restored and searched." For purposes of expediting the restoration only and without waiving any rights, we recommend that Debtors immediately restore the following backup tapes: A015, A035, A100, and A099.

Based on our discussion today and upon our selection of the four backup tapes, it is our understanding that it will take less than one week for Kroll Ontrack to fully restore, search and provide to Debtors' counsel the results of the search, ultimately for production to Parus Holdings. We reiterate our concern over the continued delay and severe prejudice to Parus while Debtors have spent time investigating the parameters of required electronic discovery and related costs. We request, again, that Debtors expedite their full restoration and production of the four identified backup tapes.

Debtors also have requested our identification of one custodian for purposes of restoring the email relay logs. Our concerns for this approach with respect to the email relay logs are set forth in our January 13th letter and we do not reiterate them here. In the interest of expediting discovery, however, we request your restoration of the email relay log of Barry Zipp.

Based also on our discussion today, we understand that Debtors' counsel has received documents resulting from searches of the current Intermedia and WorldCom data servers and presently are reviewing them for responsiveness. Please advise us when that review will be completed and when responsive documents will be produced.

Further, with respect to the restoration of the WorldCom July 2002 email backup tapes, we understand that process is still ongoing. We request that restoration of those backup tapes be expedited and ask that you advise us as soon as possible when that will be completed.

Notwithstanding the above and our ongoing discussions regarding Debtors' electronic discovery, Parus reserves all of its rights regarding all discovery issues.

Sincerely,

Kevin J. Smith

**EXHIBIT E**

D00116



STINSON
MORRISON
HECKER LLP

Allison M. Murdock
(816) 691-3138
amurdock@stinsonmoheck.com
www.stinsonmoheck.com

1201 Walnut, Suite 2900
Kansas City, MO 64106-2150

*Tel* (816) 842-8600
*Fax* (816) 691-3495

April 4, 2006

**VIA FACSIMILE 212/808-7897**
**AND U.S. MAIL**

Kevin J. Smith, Esq.
Kelley Drye & Warren LLP
101 Park Avenue
New York, New York 10178

Re: In re WorldCom, Inc., Chapter 11, Case No. 02-13533
Parus Holdings, Inc.'s Claims

Dear Kevin:

I am writing to follow up on our telephone conversation yesterday as well as our earlier telephone conversations regarding the search terms for electronic discovery identified in your October 24, 2005, letter.

As you may recall, we already have produced portions of the email relay log for Barry Zipp, and responsive documents from the two remaining active Intermedia servers and from Intermedia backup tape A015, which is one of the four Intermedia backup tapes you identified for sampling in your January 30, 2006, letter.

Kroll Ontrack also has restored Intermedia backup tapes A035, A100 and A094 through A099. You identified backup tapes A035, A099 and A100 (along with backup tape A015) for sampling in your January 30 letter. At our request, Kroll Ontrack also restored and searched backup tapes numbered A094 through A098. Kroll Ontrack recommended that these additional backup tapes be restored and searched because they are a part of a set that included tape number A099.

In running the searches of the electronic media, we instructed Kroll Ontrack to use the search terms set forth in your October 24, 2005, letter. However, as you and I previously discussed, some of the search terms in your letter are pulling in an inordinate number of pages of documents that are not responsive to Parus Holdings, Inc.'s discovery requests. For example, as explained in my February 20, 2006, letter to you, the Intermedia servers contained documents for one of the custodians identified in your October 24, 2005, letter, Mr. Claro H. Hernandez. Over 180,000

KANSAS CITY
OVERLAND PARK
WICHITA
WASHINGTON, D.C.
PHOENIX
ST. LOUIS
OMAHA
JEFFERSON CITY

EXHIBIT
K



pages (the equivalent of over 70 boxes) of documents "hit" on the search terms you provided. We reviewed each of these documents, which took a substantial amount of attorney time, but found that less than 2% of the pages reviewed were responsive to Parus Holdings, Inc.'s document requests. Many of the non-responsive documents were pulled in for review only because they contained the terms WorldCom, wcom or WC.

The search term issue became more pronounced in Kroll Ontrack's restoration and search of the nine Intermedia backup tapes identified above. Over 200,000 pages (the equivalent of approximately 80 boxes) of documents were pulled in for review from tape A015 and just a portion of the A094-A99 tape set. Kroll Ontrack estimated that, before the restoration and search of the remainder of the A094-A099 tape set and tapes A035 and A100 was complete, there would be over 1 million additional pages (the equivalent of approximately 400 boxes) of documents that would need to be reviewed. Consequently, we instructed Kroll Ontrack to eliminate WorldCom, wcom and WC as search terms.

Kroll Ontrack re-ran the search of the remaining portion of the A094-A099 tape set and tapes A035 and A100 without using WorldCom, wcom and WC as search terms. Even after eliminating these terms, over 2.4 million pages of documents "hit" for review. This is the equivalent of over 950 boxes of documents. Kroll Ontrack's cost just for posting these pages of documents for review would be over $160,000. Given this, we have undertaken a statistical analysis of the documents that already have been reviewed (those documents posted from the Intermedia backup servers, tape A015 and a portion of the A094-A099 tape set) to determine whether it is necessary or appropriate to continue to use all of the search terms identified in your October 24, 2005, letter.

As you and I previously discussed, a statistical analysis of the documents that already have been reviewed reveals that Access databases (which, based on the documents we have reviewed, appear to contain only customer lists) and certain other search terms still were bringing in an inordinate number of pages of documents that were not responsive to Parus Holdings, Inc.'s discovery requests. We therefore instructed Kroll Ontrack to further narrow the search by eliminating Access databases and eliminating other search terms that we have determined will not yield responsive documents. These search terms are EN, Kate, UM, HMM, TTS, WSI, auto attendant, enhanced communic*, I One, Ione, and UC. The search terms HMM, TTS, UC and WSI pulled in more than 117,000 pages of documents, none of which were responsive. (UC did not pull in any responsive documents; however, we have instructed Kroll Ontrack to add two search terms: UC Contract and UC Servic*). The other search terms, EN, Kate, UM, auto attendant, enhanced communic*, I One and Ione, pulled in more than 192,000 pages of documents. Less than 2% of these documents were responsive, and it appears that there always is an additional search term such as Unified Messaging or EffectNet in the document that would have pulled the document in for review anyway.

Kroll has re-run the search of the remaining portion of the A094-A099 tape set and tapes A035 and A100 with the narrowed search term list and has advised us that nearly 1 million pages (the equivalent of approximately 400 boxes) of documents still have "hit" on the narrowed search term list. As you and I have discussed, even with the more limited search terms, there still are two search terms – "Intermedia One" and "IntermediaOne" – that pull in approximately 500,000 pages of documents. The statistical information currently available indicates that while some of these documents may be responsive to Parus Holdings, Inc.'s document requests, the vast majority are non-responsive. And those few documents with these search terms that are responsive do not appear to move the case forward in any meaningful way. Accordingly, we would like Parus Holdings, Inc. to agree to limit the "Intermedia One" and "IntermediaOne" search terms by coupling these terms with other targeted search terms such as "EffectNet" and "Unified Messaging."

A limitation of the "Intermedia One" and "IntermediaOne" search terms in the manner set forth above is in the interest of both parties. Such a limitation should eliminate pulling in a lot of unnecessary documents for review thereby reducing attorney review time, as well as the cost to be incurred by MCI and the costs that potentially may be shifted to Parus Holdings, Inc. by the Court. As you know, if thousands of unnecessary documents are pulled in for review, the percentage of responsive documents to the total number of documents likely will be quite low thus making it likely that the Court will shift most, if not all, of the costs to Parus Holdings, Inc.

Please let me know as soon as possible whether Parus Holdings, Inc. will agree to limit the "Intermedia One" and "IntermediaOne" search terms by coupling these terms with "EffectNet" and "Unified Messaging." As you and I discussed yesterday, if Parus Holdings, Inc. will not agree to this limitation, MCI then will evaluate whether it nonetheless will limit the search terms based on the objections asserted in its discovery responses.

Very truly yours,

**STINSON MORRISON HECKER LLP**

Allison M. Murdock

Allison M. Murdock

AMM:jmh

**EXHIBIT F**

D00120

KELLEY DRYE & WARREN LLP
A LIMITED LIABILITY PARTNERSHIP
101 PARK AVENUE
NEW YORK, NEW YORK 10178
(212) 808-7800

WASHINGTON, DC
TYSONS CORNER, VA
CHICAGO, IL
STAMFORD, CT
PARSIPPANY, NJ

BRUSSELS, BELGIUM

AFFILIATE OFFICES
JAKARTA, INDONESIA
MUMBAI, INDIA

FACSIMILE
(212) 808-7897
www.kelleydrye.com

DIRECT LINE: (212) 808-5102
EMAIL: ksmith@kelleydrye.com

April 7, 2006

**VIA FACSIMILE**
Allison M. Murdock, Esq.
Stinson Morrison Hecker LLP
1201 Walnut Street, Suite 2900
Kansas City, Missouri 64106

Re: In re WorldCom, Inc., Chapter 11 Case No. 02-13533
*Parus Holdings' Claims; Electronic Discovery*

Dear Ms. Murdock:

We write in connection with and as a follow-up to our April 3, 2006 telephone conversation and in response to your April 4, 2006 letter related to Debtors' electronic discovery.

Based on your representations during our discussion and set forth in your April 4th letter, we believe the "IntermediaOne" search term will most efficiently result in "hits" when combined with other search terms and/or custodian names. The "IntermediaOne" (and variants thereof) search term should not only be combined with "EffectNet" (and variants thereof) and "Unified Messaging" (and variants thereof), however. "IntermediaOne" should be combined with additional terms and names, including "GenD" (and variants thereof), "Minimum Commitment" (and variants thereof), "Webley" (and variants thereof), Barry Zipp, Kathy Victory, James Renforth, and Jack Kerrigan, among others. There are innumerable permutations of such combinations given the number of custodian names you have identified and other search terms. Notwithstanding our agreement to submit these combination suggestions, Parus Holdings reserves all its rights with respect to this and all other discovery issues and to seek additional searches if it appears necessary.

This also confirms our discussion that Debtors just recently identified 78 additional tapes containing "POP" e-mails located in various individuals' desktop computer files for the relevant time period (9/00 - 4/02) for the identified custodians. Please search these tapes and produce the results to us as soon as possible.

EXHIBIT
F

KELLEY DRYE & WARREN LLP

Allison M. Murdock, Esq.
April 7, 2006
Page Two

As I also mentioned in our telephone call, we believe Debtors should be much further in the discovery process and have significantly delayed the discovery in this case. Indeed, the "sampling" process which Debtors have undertaken has been an extremely slow process and ought to be moving at a much faster pace. We request, again, that Debtors expedite their full restoration and production of the back-up tapes and electronic discovery generally. Further, as discussed, we request your agreement to specific dates by which the "sampling" will be completed and documents produced to us. As I told you, we would like to agree upon a discovery schedule without the necessity of court intervention.

With respect to the restoration of the WorldCom July 2002 e-mail back-up tapes, we request that restoration of those back-up tapes be expedited and ask that you advise us as soon as possible when that will be completed and produce resultant documents.

Notwithstanding the above and our ongoing discussions regarding Debtors' electronic discovery, Parus Holdings reserves all of its rights regarding all discovery issues.

Sincerely,

Kevin J. Smith

APR 07 2006 2:30 PM FR KDW LLP 212 808 7897 TO *201574900589181 P.01

KELLEY DRYE

KELLEY DRYE & WARREN LLP
2006 APR -7 A 3:15

# FACSIMILE TRANSMISSION

| | |
|---|---|
| TO | Allison M. Murdock |
| FIRM | Stinson Morrison Hecker LLP |
| CITY | Kansas City, MO |
| FAX | 816-691-3495 |
| PHONE | 816-691-3138 |
| NO. OF PAGES | 3 (including this page) |
| DATE | April 7, 2006 |

KELLEY DRYE & WARREN LLP
101 PARK AVENUE
NEW YORK, NEW YORK 10178
(212) 808-7800
FAX (212) 808-7897

MESSAGE:

Please see attached letter.

| | |
|---|---|
| FROM | Kevin J. Smith |
| PHONE | (212) 808-5102 |
| E-MAIL | ksmith@kelleydrye.com |
| TIMEKEEPER ID | 04201 |
| CLIENT NO. | 015749-0058 |

NEW YORK, NY
WASHINGTON, DC
TYSONS CORNER, VA
CHICAGO, IL
STAMFORD, CT
PARSIPPANY, NJ
BRUSSELS

AFFILIATE OFFICES
JAKARTA
MUMBAI

IF PROBLEMS OCCUR DURING TRANSMISSION PLEASE CALL (212) 808-5035.

The information contained in this facsimile message is intended for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivery to the intended recipient, you are hereby notified that any use, copying, disclosure or dissemination of this communication may be subject to legal restriction or sanction.

NY01/SMITKE/1060329.1

**EXHIBIT G**

D00124



STINSON
MORRISON
HECKER LLP

Allison M. Murdock
(816) 691-3138
amurdock@stinsonmoheck.com
www.stinsonmoheck.com

1201 Walnut, Suite 2900
Kansas City, MO 64106-2150

*Tel* (816) 842-8600
*Fax* (816) 691-3495

February 28, 2006

**VIA FEDERAL EXPRESS**

Kevin J. Smith, Esq.
Kelley Drye & Warren LLP
101 Park Avenue
New York, New York 10178

Re: *In re WorldCom, Inc.*, Chapter 11, Case No. 02-13533
Parus Holdings' Claims

Dear Kevin:

Enclosed on CD is a supplemental production of documents by MCI. These documents, which are from electronic searches of the two remaining active Intermedia servers, are Bates numbered ME000000001-2698. Pursuant to our prior discussion, these documents are single page TIF files with a Summation load file.

Also enclosed is an index listing the document requests of Parus Holdings, Inc. to which these documents are responsive. No documents from this electronic search of the two remaining active Intermedia servers were withheld on the basis of the attorney-client privilege or work product doctrine.

Please call me if you have any questions.

Very truly yours,

**STINSON MORRISON HECKER LLP**

Allison M. Murdock

Allison M. Murdock

AMM:dl

Enclosures

KANSAS CITY
OVERLAND PARK
WICHITA
WASHINGTON, D.C.
PHOENIX
ST. LOUIS
OMAHA
JEFFERSON CITY

EXHIBIT
6

D00125



STINSON
MORRISON
HECKER LLP

Allison M. Murdock
(816) 691-3138
amurdock@stinsonmoheck.com
www.stinsonmoheck.com

1201 Walnut, Suite 2900
Kansas City, MO 64106-2150

*Tel* (816) 842-8600
*Fax* (816) 691-3495

March 16, 2006

VIA FEDERAL EXPRESS

Kevin J. Smith, Esq.
Kelley Drye & Warren LLP
101 Park Avenue
New York, New York 10178

Re: *In re WorldCom, Inc.*, Chapter 11, Case No. 02-13533
Parus Holdings' Claims

Dear Kevin:

Enclosed on CD is a supplemental production of documents by MCI. These documents, which are from the electronic search of the Intermedia backup tape labeled A015, are Bates numbered ME000002699-6970. As with the last production, these documents are single page TIF files with a Summation load file.

Also enclosed is an index listing the document requests of Parus Holdings, Inc. to which these documents are responsive. No documents from this electronic search were withheld on the basis of the attorney-client privilege or work product doctrine.

Please call me if you have any questions.

Very truly yours,

**STINSON MORRISON HECKER LLP**

Allison M. Murdock

Allison M. Murdock

AMM:af

Enclosures

KANSAS CITY
OVERLAND PARK
WICHITA
WASHINGTON, D.C.
PHOENIX
ST. LOUIS
OMAHA
JEFFERSON CITY

DB02/048629 0094_0019/7081758.1



STINSON
MORRISON
HECKER LLP

Allison M. Murdock
(816) 691-3138
amurdock@stinsonmoheck.com
www.stinsonmoheck.com

1201 Walnut, Suite 2900
Kansas City, MO 64106-2150

*Tel* (816) 842-8600
*Fax* (816) 691-3495

March 23, 2006

**VIA FEDERAL EXPRESS**

Kevin J. Smith, Esq.
Kelley Drye & Warren LLP
101 Park Avenue
New York, New York 10178

Re: *In re WorldCom, Inc.*, Chapter 11 Case No. 02-13533
Parus Holdings' Claims

Dear Kevin:

I am writing with regard to the email relay log that has been restored for Barry Zipp. As set forth in my prior correspondence to you and as we have discussed, it has taken a substantial amount of time to restore the relay log. The entire log is several thousand pages long. It identifies only the addressee, recipient and subject or "re" line for emails sent to and from Mr. Zipp, and does not set forth the content of any of the emails.

I have enclosed those pages from Mr. Zipp's relay log with emails that contain in the "re" line search terms set forth in your October 24, 2005, letter. These pages are Bates numbered MCIWC031311-MCIWC031426. Of the emails reflected on these pages, only a handful are even arguably responsive to Parus Holdings' discovery requests. Even then, these few emails only reflect the fact of a communication rather than its content, thus making them of limited utility.

After you have had an opportunity to review the enclosed pages, please contact me so that we confer as to whether the restoration of additional relay logs is necessary or appropriate.

Very truly yours,

**STINSON MORRISON HECKER LLP**

Allison M. Murdock

AMM:jmh

KANSAS CITY
OVERLAND PARK
WICHITA
WASHINGTON, D.C.
PHOENIX
ST. LOUIS
OMAHA
JEFFERSON CITY



STINSON
MORRISON
HECKER LLP

Allison M. Murdock
(816) 691-3138
amurdock@stinsonmoheck.com
www.stinsonmoheck.com

1201 Walnut, Suite 2900
Kansas City, MO 64106-2150

*Tel* (816) 842-8600
*Fax* (816) 691-3495

April 7, 2006

**VIA FEDERAL EXPRESS**

Kevin J. Smith, Esq.
Kelley Drye & Warren LLP
101 Park Avenue
New York, New York 10178

Re: *In re WorldCom, Inc.*, Chapter 11, Case No. 02-13533
Parus Holdings' Claims

Dear Kevin:

Enclosed on CD is a supplemental production of documents by MCI. These documents, which are from the electronic search of a portion of the Intermedia backup tape set labeled A094 through A099, are Bates numbered ME000006971-9548. As with the last production, these documents are single page TIF files with a Summation load file.

Also enclosed is an index listing the document requests of Parus Holdings, Inc. to which these documents are responsive. One document from this electronic search was withheld on the basis of the attorney-client privilege. Therefore, a supplemental privilege log also is enclosed.

Please call me if you have any questions.

Very truly yours,

**STINSON MORRISON HECKER LLP**

Allison M. Murdock

Allison M. Murdock

KANSAS CITY
OVERLAND PARK
WICHITA
WASHINGTON, D.C.
PHOENIX
ST. LOUIS
OMAHA
JEFFERSON CITY

AMM:jmh

Enclosures



STINSON
MORRIS
HECKER LLP

Allison M. Murdock
(816) 691-3138
amurdock@stinsonmoheck.com
www.stinsonmoheck.com

1201 Walnut, Suite 2900
Kansas City, MO 64106-2150

*Tel* (816) 842-8600
*Fax* (816) 691-3495

April 13, 2006

**VIA FEDERAL EXPRESS**

Kevin J. Smith, Esq.
Kelley Drye & Warren LLP
101 Park Avenue
New York, New York 10178

Re: *In re WorldCom, Inc.*, Chapter 11, Case No. 02-13533
Parus Holdings' Claims

Dear Kevin:

Enclosed on CD is a supplemental production of documents by MCI. These documents, which are from the electronic search of the earliest 2002 Exchange email backup tapes for Steve Hooper and Teresa Hastings, are Bates numbered ME000009549-9804. The date of the earliest backup tape for Mr. Hooper is July 13, 2002, and the date of the earliest backup tape for Ms. Hastings is August 3, 2002. As with the last production, these documents are single page TIF files with a Summation load file.

Also enclosed is an index listing the document requests of Parus Holdings, Inc. to which these documents are responsive. Three documents from this electronic search are redacted on the basis of the attorney-client privilege. Therefore, a supplemental privilege log also is enclosed.

Please call me if you have any questions.

Very truly yours,

**STINSON MORRISON HECKER LLP**

Allison M. Murdock

Allison M. Murdock

KANSAS CITY
OVERLAND PARK
WICHITA
WASHINGTON, D.C.
PHOENIX
ST. LOUIS
OMAHA
JEFFERSON CITY

AMM:jmh

Enclosures

7116184_1.DOC
DB02/048629 0094_0019/7116184.1

048629-0094-0019
corr



STINSON
MORRISON
HECKER LLP

Allison M. Murdock
(816) 691-3138
amurdock@stinsonmoheck.com
www.stinsonmoheck.com

1201 Walnut, Suite 2900
Kansas City, MO 64106-2150

*Tel* (816) 842-8600
*Fax* (816) 691-3495

May 5, 2006

**VIA FEDERAL EXPRESS**

Kevin J. Smith, Esq.
Kelley Drye & Warren LLP
101 Park Avenue
New York, New York 10178

Re: *In re WorldCom, Inc.*, Chapter 11, Case No. 02-13533
Parus Holdings' Claims

Dear Kevin:

Enclosed on CD is a supplemental production of documents by MCI. These documents, which are from the electronic search of the Intermedia backup tape labeled A100, are Bates numbered ME000009805-11095. As with the last production, these documents are single page TIF files with a Summation load file.

Also enclosed is an index listing the document requests of Parus Holdings, Inc. to which these documents are responsive. No documents from this electronic search were withheld on the basis of the attorney-client privilege or work product doctrine.

Please call me if you have any questions.

Very truly yours,

STINSON MORRISON HECKER LLP

Allison M. Murdock

AMM:jmh

Enclosures

KANSAS CITY
OVERLAND PARK
WICHITA
WASHINGTON, D.C.
PHOENIX
ST. LOUIS
OMAHA
JEFFERSON CITY



STINSON
MORRISON
HECKER LLP

Allison M. Murdock
(816) 691-3138
amurdock@stinsonmoheck.com
www.stinsonmoheck.com

1201 Walnut, Suite 2900
Kansas City, MO 64106-2150

*Tel* (816) 842-8600
*Fax* (816) 691-3495

May 12, 2006

**VIA FEDERAL EXPRESS**

Kevin J. Smith, Esq.
Kelley Drye & Warren LLP
101 Park Avenue
New York, New York 10178

Re: *In re WorldCom, Inc.*, Chapter 11, Case No. 02-13533
Parus Holdings' Claims

Dear Kevin:

Enclosed on CD is a supplemental production of documents by MCI. These documents, which are from the electronic search of the Intermedia backup tape labeled A35, are Bates numbered ME000011096-000014723. As with the last production, these documents are single page TIF files with a Summation load file.

Also enclosed is an index listing the document requests of Parus Holdings, Inc. to which these documents are responsive. One document from this electronic search was withheld on the basis of the attorney-client privilege or work product doctrine. Accordingly, a supplemental privilege log is also enclosed.

Please call me if you have any questions.

Very truly yours,

**STINSON MORRISON HECKER LLP**

Allison M. Murdock

AMM:jmh

Enclosures

KANSAS CITY
OVERLAND PARK
WICHITA
WASHINGTON, D.C.
PHOENIX
ST. LOUIS
OMAHA
JEFFERSON CITY



STINSON MORRISON HECKER LLP

Allison M. Murdock
(816) 691-3138
amurdock@stinsonmoheck.com
www.stinsonmoheck.com

1201 Walnut, Suite 2900
Kansas City, MO 64106-2150

*Tel* (816) 842-8600
*Fax* (816) 691-3495

May 30, 2006

**VIA FEDERAL EXPRESS**

Kevin J. Smith, Esq.
Kelley Drye & Warren LLP
101 Park Avenue
New York, New York 10178

Re: *In re WorldCom, Inc.*, Chapter 11, Case No. 02-13533
Parus Holdings' Claims

Dear Kevin:

Enclosed on DVD is a supplemental production of documents by MCI. These documents, which are from the electronic search of the remaining portion of the Intermedia backup tape set labeled A094 through A099, are Bates numbered ME000014724-000027418. As with the last production, these documents are single page TIF files with a Summation load file.

Also enclosed is an index listing the document requests of Parus Holdings, Inc. to which these documents are responsive. No documents from this electronic search were withheld on the basis of the attorney-client privilege or work product doctrine.

Please call me if you have any questions.

Very truly yours,

**STINSON MORRISON HECKER LLP**

Allison M. Murdock

Allison M. Murdock

AMM:jmh

Enclosures

KANSAS CITY
OVERLAND PARK
WICHITA
WASHINGTON, D.C.
PHOENIX
ST. LOUIS
OMAHA
JEFFERSON CITY

EXHIBIT H

D00133

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x
In re

WORLDCOM, INC., et al,

Case No. 02-13533

Reorganized Debtors.
-------------------------------x

January 17, 2006
11:50 a.m.
United States Custom House
One Bowling Green
New York, New York 10004

DIGITALLY RECORDED PROCEEDINGS
(E X C E R P T)

11:45 WORLDCOM, INC., ET AL
WorldCom's Motion for Summary Judgment Against Parus Holdings, Inc.'s, Successor-By-Merger to EffectNet, Inc. and EffectNet, LLC.

Opposition by Parus Holdings, Inc. filed.

Debtors' Motion to Strike Portions of Affidavits Submitted in Support of Claimant Parus Holdings, Inc.'s Response and Opposition to WorldCom's Motion for Summary Judgment.

Opposition by Parus Holdings, Inc. filed.

B E F O R E:

THE HONORABLE ARTHUR J. GONZALEZ
United States Bankruptcy Judge

DEBORAH HUNTSMAN, Court Reporter
198 Broadway, Suite 903
New York, New York 10038
(212) 608-9053 (917) 723-9898

EXHIBIT
H

A P P E A R A N C E S:

STINSON MORRISON HECKER LLP
Attorneys for Reorganzied Debtors
1201 Walnut Street
Kansas City, Missouri 64106

BY: ROBERT L. DRISCOLL, ESQ.

KELLEY DRYE & WARREN LLP
Attorneys for Parus Holdings, Inc.
101 Park Avenue
New York, New York 10178

BY: ROBERT S. FRIEDMAN, ESQ.
-and-
KEVIN J. SMITH, ESQ.

Proceedings

limited discovery, that between September 2000 and July 2001 there was significant evidence that WorldCom never intended to go forward with this contract. Because of their competitive product, they took the legs right out of our own product. What they do, Judge, is they say, "Well, you know what? We have this Antitrust Order, and it is curious that you didn't hear Mr. Driscoll mention the Antitrust Order, because this was this whole defense to our opposition." This was their whole response to our opposition, when we argued that it is a factual issue with respect to an exception, the exception of wrongful means. We showed that WorldCom used wrongful means with respect to their conduct on this contract. What they said was, "Hey, listen, we have this Antitrust Order that obligates us to divest of Intermedia."

Mr. Driscoll didn't mention this for several reasons during his argument. Number one, the Antitrust Order is extremely important, because the language of the Antitrust Order says that they are not to do anything to

abrogate or hinder the contractual relationships between Intermedia and its contracting parties. They must divest of these entities as a going concern. They violated that. Not only did they violate our rights, Your Honor, but they violated the Antitrust Order. In addition, if you accept that the Antitrust Order has any place as a defense to our showing that they used wrongful means, under the Antitrust Order there is no unity of interest. They don't have a privilege to begin with, because if you look at the terms of the Antitrust Order, it specifically says that WorldCom and Intermedia are to be deemed separate entities, competitive. This was a condition put upon them by the Department of Justice. They had no basis to assert a privilege under the Antitrust Order.

Your Honor, I think it is self-evident and I don't need to spend a lot of time on the exception to the privilege that they assert with respect to our tortious interference and the conspiracy claim. We

**EXHIBIT I**

D00138

FILED
MAY 3 0 2001

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,
Plaintiff,

v.

WORLDCOM, INC., and
INTERMEDIA COMMUNICATIONS, INC.
Defendants.

Case No. 1:00CV02789(RWR)

**HOLD SEPARATE STIPULATION AND ORDER**
**[ERRATA]**

It is hereby stipulated and agreed by and between the undersigned parties, subject to approval and entry by the Court, that:

## I. DEFINITIONS

As used in this Hold Separate Stipulation and Order:

A. "Acquirer" means the entity to whom defendants divest the Intermedia Assets.

B. "WorldCom" means defendant WorldCom, Inc., a Georgia corporation with its headquarters in Clinton, Mississippi, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents and employees.

C. "Intermedia" means defendant Intermedia Communications, Inc., a Delaware Corporation with its headquarters in Tampa, Florida, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents and employees.

D. "Digex" means Digex, Inc., a Delaware Corporation with its headquarters in Beltsville



Maryland, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents and employees.

E. "Capital Stock of Digex" means the capital stock of Digex, regardless of class, owned by Intermedia.

F. "Intermedia Assets" means all of assets of Intermedia, except for the Capital Stock of Digex, including:

1. All tangible assets that comprise the Intermedia business, including research and development activities; all networking equipment and fixed assets, personal property, office furniture, materials, supplies, and other tangible property and all assets used exclusively in connection with the Intermedia Assets; all licenses, permits and authorizations issued by any governmental organization relating to the Intermedia Assets; all contracts, teaming arrangements, agreements, leases, commitments, certifications, and understandings, relating to the Intermedia Assets, including supply agreements; all customer lists, contracts, accounts, and credit records; all repair and performance records and all other records relating to the Intermedia Assets;

2. All intangible assets used in the development, production, servicing and sale of Intermedia Assets, including, but not limited to all patents, licenses and sublicenses, intellectual property, copyrights, trademarks, trade names, service marks, service names, technical information, computer software and related documentation, know-how, trade secrets, drawings, blueprints, designs, design protocols, specifications for materials, specifications for parts and devices, safety procedures for the handling of materials and substances, all research data concerning historic and current research and development

relating to the Intermedia Assets, quality assurance and control procedures, design tools and simulation capability, all manuals and technical information defendants provide to their own employees, customers, suppliers, agents or licensees, and all research data concerning historic and current research and development efforts relating to the Intermedia Assets, including, but not limited to designs of experiments, and the results of successful and unsuccessful designs and experiments.

G. "Merger" means the proposed merger of WorldCom and Intermedia pursuant to the merger agreement dated September 5, 2000.

## II. OBJECTIVES

The Final Judgment filed in this case is meant to ensure defendants' prompt divestiture of the Intermedia Assets for the purpose of preserving a viable competitor in the provision of Internet backbone and access services in order to remedy the effects that the United States alleges would otherwise result from WorldCom's acquisition of Intermedia. This Hold Separate Stipulation and Order ensures, prior to such divestitures, that the Intermedia Assets remain independent, economically viable, and ongoing business concerns that will remain independent and "uninfluenced by WorldCom," and that competition is maintained during the pendency of the ordered divestitures.

## III. JURISDICTION AND VENUE

This Court has jurisdiction over each of the parties hereto and over the subject matter of this action, and venue of this action is proper in the United States District Court for the District of Columbia. The Complaint states a claim upon which relief may be granted against defendants under Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.

## IV. COMPLIANCE WITH AND ENTRY OF FINAL JUDGMENT

A. The parties stipulate that a Final Judgment in the form attached hereto as Exhibit A may be filed with and entered by the Court, upon the motion of any party or upon the Court's own motion, at any time after compliance with the requirements of the Antitrust Procedures and Penalties Act (15 U.S.C. § 16), and without further notice to any party or other proceedings, provided that the United States has not withdrawn its consent, which it may do at any time before the entry of the proposed Final Judgment by serving notice thereof on defendants and by filing that notice with the Court.

B. Defendants shall abide by and comply with the provisions of the proposed Final Judgment, pending the Judgment's entry by the Court, or until expiration of time for all appeals of any Court ruling declining entry of the proposed Final Judgment, and shall, from the date of the signing of this Stipulation by the parties, comply with all the terms and provisions of the proposed Final Judgment as though the same were in full force and effect as an order of the Court.

C. Defendants shall not consummate the transaction sought to be enjoined by the Complaint herein before the Court has signed this Hold Separate Stipulation and Order.

D. This Stipulation shall apply with equal force and effect to any amended proposed Final Judgment agreed upon in writing by the parties and submitted to the Court.

E. In the event (1) the United States has withdrawn its consent, as provided in Section IV(A) above, or (2) the proposed Final Judgment is not entered pursuant to this Stipulation, the time has expired for all appeals of any Court ruling declining entry of the proposed Final Judgment, and the Court has not otherwise ordered continued compliance with the terms and provisions of the proposed Final Judgment, then the parties are released from all further obligations under this Stipulation, and the making of this Stipulation shall be without prejudice to any party in this or any

other proceeding.

F. Defendants represent that the divestiture ordered in the proposed Final Judgment can and will be made, and that defendants will later raise no claim of mistake, hardship or difficulty of compliance as grounds for asking the Court to modify any of the provisions contained therein.

G. The United States and Defendants, WorldCom and Intermedia, by their respective attorneys, have consented to the entry of this Hold Separate Stipulation and Order without trial or adjudication of any issue of fact or law, and without this Hold Separate Stipulation and Order constituting any evidence against or admission by any party regarding any issue of fact or law.

## V. HOLD SEPARATE PROVISIONS

A. Until the closing of the Merger contemplated by the Final Judgment:

1. Intermedia shall preserve, maintain, and continue to operate the Intermedia Assets as an independent, ongoing, economically viable competitive business, with management, sales, and operations of such assets held entirely separate, distinct, and apart from those of WorldCom's operations. WorldCom shall not coordinate its production, marketing, or terms of sale of any products with those produced by or sold under any of the Intermedia Assets. Within twenty (20) days after the entry of the Hold Separate Stipulation and Order, defendants will inform the United States of the steps defendants have taken to comply with this Hold Separate Stipulation and Order.

2. Intermedia shall use all reasonable efforts to maintain and increase the sales and revenues of the services provided by the Intermedia Assets, and shall maintain at 2000 or previously approved levels for 2001, whichever are higher, all promotional, advertising, sales, technical assistance, network capacity configurations and expansions, marketing and

merchandising support for the Intermedia Assets.

3. Intermedia shall take all steps necessary to ensure that the Intermedia Assets are fully maintained in operable condition at no less than their current capacity and sales, including projected capacity expansions currently planned or planned prior to negotiations between the defendants relating to the Merger, and shall maintain and adhere to normal repair and maintenance schedules for the Intermedia Assets.

4. Intermedia shall not remove, sell, lease, assign, transfer, pledge, or otherwise dispose of any of the Intermedia Assets.

5. WorldCom shall not solicit to hire, or hire, any employee of any business that is a part of the Intermedia Assets.

6. Defendants shall take no action that would jeopardize, delay, or impede the sale of the Intermedia Assets.

B. After the closing of the Merger and until the divestiture required by the Final Judgment has been accomplished:

1. Defendants shall preserve, maintain, and continue to operate the Intermedia Assets as an independent, ongoing, economically viable competitive business, with management, sales, and operations of such assets held entirely separate, distinct, and apart from those of WorldCom's other operations. WorldCom shall not coordinate its production, marketing, or terms of sale of any products with those produced by or sold under any of the Intermedia Assets. Within twenty (20) days after the closing of the Merger, defendants will inform the United States of the steps defendants have taken to comply with this Hold Separate Stipulation and Order.

2. Defendants shall take all steps necessary to ensure that (1) the Intermedia Assets will be maintained and operated as independent, ongoing, economically viable and active competitor in the provision of telecommunications services currently offered by Intermedia; (2) management of the Intermedia Assets will not be influenced by WorldCom (or Digex); and (3) the books, records, competitively sensitive sales, marketing and pricing information, and decision-making concerning provision of services by any of the Intermedia Assets will be kept separate and apart from WorldCom's other operations.

3. Defendants shall use all reasonable efforts to maintain and increase the sales and revenues of the services provided by the Intermedia Assets, and shall maintain at 2000 or previously approved levels for 2001, whichever are higher, all promotional, advertising, sales, technical assistance, network capacity configurations and expansions, marketing and merchandising support for the Intermedia Assets.

4. WorldCom shall provide sufficient working capital and lines and sources of credit to continue to maintain the Intermedia Assets as economically viable and competitive, ongoing businesses, consistent with the requirements of Sections V(A) and (B).

5. WorldCom shall take all steps necessary to ensure that the Intermedia Assets are fully maintained in operable condition at no less than its current capacity and sales, including projected capacity expansions currently planned or planned prior to negotiations between the defendants relating to the Merger, and shall maintain and adhere to normal repair and maintenance schedules for the Intermedia Assets.

6. Defendants shall not, except as part of a divestiture approved by the United States in accordance with the terms of the proposed Final Judgment, remove, sell, lease,

assign, transfer, pledge, or otherwise dispose of any of the Intermedia Assets.

7. Defendants shall maintain, in accordance with sound accounting principles, separate, accurate, and complete financial ledgers, books, and records that report on a periodic basis, such as the last business day of every month, consistent with past practices, the assets, liabilities, expenses, revenues and income of products produced, distributed or sold utilizing the Intermedia Assets.

8. Defendants shall take no action that would jeopardize, delay, or impede the sale of the Intermedia Assets.

9. Except in the ordinary course of business or as is otherwise consistent with this Hold Separate Stipulation and Order, defendants shall not hire, transfer, terminate, or otherwise alter the salary or employment agreements for any Intermedia employee who, on the date of defendants' signing of this Hold Separate Stipulation and Order is a member of Intermedia's management. Further, during the pendency of this Hold Separate Stipulation and Order, and consistent with the Final Judgment, defendant WorldCom shall not solicit to hire, or hire, any employee of any business that is a part of the Intermedia Assets.

C. Defendants shall take no action that would interfere with the ability of any trustee appointed pursuant to the Final Judgment to complete the divestitures pursuant to the Final Judgment to an Acquirer acceptable to the United States.

D. This Hold Separate Stipulation and Order shall remain in effect until consummation of the divestiture required by the proposed Final Judgment or until further order of the Court.

Respectfully submitted,

FOR PLAINTIFF
UNITED STATES OF AMERICA

FOR DEFENDANT
WORLDCOM, INC.

FOR DEFENDANT
INTERMEDIA COMMUNICATIONS, INC.

**ORDER**

IT IS SO ORDERED by the Court, this 24th day of May, 2000.

United States District Judge

D00147

**CERTIFICATE OF SERVICE**

I hereby certify that copies of the foregoing Hold Separate Stipulation and Order [ERRATA] was served, as indicated below, this 20th day of November, 2000 upon each of the parties listed below:

Charles F. Rule, Esq. (BY HAND)
Covington & Burling
1201 Pennsylvania Avenue, N.W.
Washington, DC 20004-2401
(202) 662-5119
Counsel for WorldCom, Inc.

Brad E. Mutschelknaus, Esq. (BY HAND)
Kelley Drye & Warren, LLP
1200 19th Street, N.W., Suite 500
Washington, D.C. 20036
(202) 955-9600
Counsel for Intermedia Communications, Inc.

David F. Smutny
Counsel for Plaintiff

EXHIBIT J

D00149

Law and Public Policy
1133 19th Street, NW.
Washington, DC 20036

David S. Wachen
Associate Litigation Counsel

Direct Dial: 202-736-6547
Direct Fax: 703-341-6306
E-mail: david.wachen@mci.com

November 29, 2005

**VIA FACSIMILE AND U.S. MAIL**
Steven P. Caley, Esq.
Kelley Drye & Warren LLP
101 Park Avenue
New York, NY 10178-0002

Re: MCI/Intermedia Documents

Dear Mr. Caley:

I am writing as a follow-up to Maureen Del Duca's letter of November 18 to James J. Kirk of your firm in which she requests that your firm turn over all files relating to your firm's representation of MCI, Intermedia and/or Digex by December 6, 2005.

As we discussed today and as indicated in Ms. Del Duca's letter, in light of discovery being pursued by your firm in its representation of Parus Holdings in pending litigation against MCI, it is important that we receive these documents from you as soon as possible. Thus, I was disappointed to hear that you had not begun collecting these materials, but simply had left a message or two with Jonathan Canis, the person you believe to have been the partner in charge of the previous MCI/Intermedia/Digex work at your firm.

You said that you believed your firm may have a "substantial volume" of hard documents, which you described as being contained in "dozens" of boxes. You asked if we could be more precise about what we need. As I indicated, since I am not personally familiar with the entire scope of your firm's work for MCI, Intermedia or Digex, it might be helpful if you could provide us with more information about what you have and what work you did. Alternatively, given the volume of documents and in the interest of time, it might be best to just send us everything as Ms. Del Duca previously requested. As I mentioned, at an absolute minimum, we will need all documents responsive to the document requests served by your firm, as well as all documents concerning your work on the Intermedia-WorldCom merger. However, for purposes of our defense and in anticipation of future discovery, we likely will need more than that.

You also expressed concern about providing the firm's electronic documents because of the "effort to track down" the information and put it in into a usable form, all of which you indicated could be very costly. Unfortunately, I believe we will need this material as well.

Given the way law firms operate today in communicating via e-mail and creating and saving documents electronically (sometimes without a paper record), I do not see a meaningful reason for treating this material any differently.

We look forward to receiving this information on or before December 6. Any delay could result in prejudice to MCI in defending itself in the claims being pursued by Parus. Accordingly, please let me know as soon as possible if you foresee any difficult in meeting the previously requested timetable.

Thank you for your anticipated cooperation and immediate attention to this matter.

Very truly yours,

David S. Wachen

**EXHIBIT K**

D00152

NOV 30 2005 6:00 PM FR KDW LLP 212 808 7897 TO *208000100259170 P.02

KELLEY DRYE & WARREN LLP
A LIMITED LIABILITY PARTNERSHIP
101 PARK AVENUE
NEW YORK, NEW YORK 10178
(212) 808-7800

FACSIMILE
(212) 808-7897
www.kelleydrye.com

WASHINGTON, DC
TYSONS CORNER, VA
LOS ANGELES, CA
CHICAGO, IL
STAMFORD, CT
PARSIPPANY, NJ

BRUSSELS, BELGIUM
HONG KONG

AFFILIATE OFFICES
BANGKOK, THAILAND
JAKARTA, INDONESIA
MUMBAI, INDIA
TOKYO, JAPAN

STEVEN P. CALEY
DIRECT LINE (212) 808-7745
E-MAIL: scaley@kelleydrye.com

November 30, 2005

VIA FACSIMILE AND MAIL

David S. Wachen
MCI Law and Public Policy
1133 19th Street N.W.
Washington, D.C. 20036

Re: MCI/Intermedia Documents

Dear Mr. Wachen:

I am responding to your letter to me dated November 29, 2005 regarding the above.

While your letter suggests that this firm has unduly delayed with respect to your request, I remind you that I telephoned your colleague, Ms. Del Duca on Wednesday, November 23, 2005 to discuss the request with her and, in particular, to determine whether MCI could more narrowly focus its request in order to expedite matters and avoid undue burdens and costs on MCI and Kelley Drye & Warren. My voice mail was not returned until yesterday.

I also note that the Parus Holdings document request sent to us by Ms. Del Duca is dated February 7, 2005 – more than nine (9) months ago. Yet MCI did not contact us about providing you with files until Ms. Del Duca's letter to Mr. Kirk on November 18, 2005.

Unfortunately, your letter does little to focus our efforts regarding MCI and Intermedia's file. As the Firm's files relate to legal work for MCI and its affiliates and MCI is the recipient of the document request from Parus, and a party in the proceedings in which the request was served, MCI would appear to be in a better position to make such judgments. Nonetheless, as you suggest, we will concentrate our efforts now on files, if any, concerning any work on the Intermedia-WorldCom merger. Based upon the document request, I assume that you do not need any files from periods prior to the last quarter of 2000. Please confirm. If that is the case, the burden and time to respond may be reduced.

NY01/CALES/1066513.1

D00153

KELLEY DRYE & WARREN LLP

Please note that the Firm is entitled to be compensated for our time and expenses incurred in segregating, reviewing and supplying documents to you. *See* D.C. Bar, Op. 283; *Sage Realty Corp. v. Proskauer Rose Goetz and Mendelsohn LLP*, 91 N.Y.2d 30, 689 N.E.2d 879 (1997). If the volume of all files is as great as I suspect, this may cost many thousands of dollars. If you insist upon production of electronic materials, the costs could be many multiples of this.

Given that MCI only recently notified us that they believe they need these files to respond to Parus Holdings document request, and the apparent enormity of the task you propose, we will not be able to provide all files on or before December 6, 2005 as you demand, but will proceed diligently and reasonably to fulfill whatever responsibilities the Firm may have in this regard.

Because of other commitments of mine, you should address further communications in this matter to my partner Richard Donovan in our New York office and Glen Manishin in our Tysons Corner office.

Very truly yours,

Steven P. Caley

SPC:kjj

NY01/CALES/1066513.1

EXHIBIT L

D00155



Mary L. Coyne
Associate General Counsel
Litigation and Regulatory
1133 19th Street, N.W.
Washington, D.C. 20036

*VIA* FACSIMILE & U.S. MAIL

February 7, 2006

Richard Donovan, Esq.
Kelley Drye & Warren LLP
101 Park Avenue
New York, New York 10178-0002
Fax: (212) 808-7897
Alt. Fax: (212) 808-7898

Glenn B. Manishin, Esq.
Kelley Drye & Warren LLP
1200 19th Street, N.W.
Suite 500
Washington, DC 20036
Fax: (202) 955-9792

Re: *In re WorldCom, Inc., Chapter 11,* Case No. 02-13533

Gentlemen:

Kelley Drye represented Intermedia Communications, Inc. until it merged with WorldCom, Inc. More specifically, your firm represented Intermedia in the antitrust litigation that the Department of Justice brought in connection with that merger. I also understand that your firm has represented, at various times, WorldCom, MCI, and/or Digex, Inc. However, your firm now represents Parus Holdings, Inc. in litigation against WorldCom and Intermedia.

On January 17, 2006, Parus Holdings asserted during oral argument, which has been transcribed and filed in court, that Intermedia and WorldCom violated consent orders issued in the antitrust case. Brad Mutschelknause and others of your firm who represented Intermedia during its merger with WorldCom likely had numerous communications with the Department of Justice and others about those same consent orders. Given Parus Holdings' allegations that WorldCom and Intermedia violated the terms of those antitrust orders, it has become critical for us to retrieve all Intermedia and WorldCom files in your possession and control relating to the merger, including without limitation all communications by and between Intermedia, Kelley Drye, WorldCom, and the Department of Justice. We believe that Parus Holdings' allegations

are without merit and expect that these materials will assist in our defense and will enable us to determine whether Mr. Mutschelknause and others of your firm have information relevant to the alleged violation of the antitrust orders.

Please note that our request for these materials follows up on several communications between MCI and your firm about obtaining all of the files and documents of MCI, WorldCom, Intermedia, and Digex that are in your firm's possession or control because of your firm's former representation of those companies. On November 18, 2005, Maureen F. Del Duca, Vice President of Litigation at MCI, asked James J. Kirk of your firm to turn over all those files and documents. In subsequent communications between David S. Wachen of MCI and Steven P. Caley of your firm, Mr. Caley asked that we direct further communications to you because of his other commitments. I have attached a copy of the prior correspondence for your reference. Although Mr. Caley did not provide us with any information on the size or scope of these files, he took the position that the task of identifying and segregating all of our documents could be enormous and costly.[1]

Although we reserve the right to have all of our files and documents returned, our request here is more narrow. We believe that resolution of any issues of cost (if there are any) should not hold up the return of the discrete set of files in your firm's possession or control that relate to the merger of WorldCom and Intermedia, including, without limitation, the antitrust litigation that the Department of Justice brought in connection with that merger.

Accordingly, I would appreciate your prompt cooperation in returning these files.

Thank you for your immediate attention to this matter.

Very truly yours,

Mary L. Coyne

cc: Brad E. Mutschelknause, Esq.
Kelley Drye & Warren LLP
1200 19th Street, N.W.
Suite 500
Washington, DC 20036
Fax: (202) 955-9792

---

[1] Mr. Caley also proposed eliminating files that predate the last quarter of 2000, but since WorldCom and Intermedia entered into their merger agreement on September 5, 2000, it appears that an earlier starting point is necessary to ensure inclusion of all files relating to that merger.

EXHIBIT M

D00158

FEB 15 2006 6:03 PM FR KELLEY DRYE & WARREN855 9791 TO 97366072 P.02/03

KELLEY DRYE & WARREN LLP
A LIMITED LIABILITY PARTNERSHIP
1200 19TH STREET, N.W.
SUITE 500
WASHINGTON, D.C. 20036
(202) 955-9600

NEW YORK, NY
TYSONS CORNER, VA
CHICAGO, IL
STAMFORD, CT
PARSIPPANY, NJ
BRUSSELS, BELGIUM
AFFILIATE OFFICES
JAKARTA, INDONESIA
MUMBAI, INDIA

FACSIMILE
(202) 955-9792
www.kelleydrye.com

DIRECT LINE: (202) 955-9870
EMAIL: [illegible]@kelleydrye.com

February 15, 2006

**VIA FACSIMILE AND MAIL**

Mary L. Coyne, Esq.
Associate General Counsel
Litigation and Regulatory
Verizon Business
1133 19th Street, N.W.
Washington, D.C. 20036

Re: Worldcom Inc., Chapter 11 Case No. 02-13533 (Parus Holdings)

Dear Ms. Coyne:

I am writing in response to your letters to Richard Donovan and me dated February 7 and February 10, 2006.

Your summary of MCI's communications with my law firm on this subject are unfortunately incomplete. In addition to the correspondence, including Steve Caley's letter of November 30, 2005, in late December of last year I spoke extensively with David Wachen of MCI's legal department regarding the request for files. Not only did I express my firm's commitment to cooperate in identifying the appropriate files from our former representation of Intermedia and Digex, which Mr. Wachen requested in his November 29 letter, but I emphasized that Kelley Drye would be entitled to be compensated for our time and expenses incurred in segregating, reviewing and supplying documents to MCI. Mr. Wachen indicated he would have to consider the issue and that someone would get back to us; I understand that he is no longer with the company, following Verizon's acquisition of MCI, and have not received a response to our (quite reasonable) request.

Your letters ask that issues of cost not delay the process of providing the documents requested. Please be assured that we have in fact initiated the process locating and assembling the files requested by MCI — which are part of several hundred boxes of archived client files related to MCI, Intermedia and Digex — but reserve all of our rights with respect to

KELLEY DRYE & WARREN LLP

Mary L. Coyne, Esq.
February 15, 2006
Page 2

compensation. As soon as we have a better sense of the volume of documents involved, either Richard Donovan or I will be in touch with you again to arrange the logistics of their production.

It is important that you clarify one matter before we can complete this task. Kelley Drye has now received requests from both MCI and Verizon that we provide files compiled by the firm as a result of our representation of various direct and indirect subsidiaries. Before we produce those files to Verizon, we would appreciate it if you could provide us with a statement confirming what subsidiary and/or predecessor companies you are representing and with assurance that return of our files related to MCI, Intermedia and Digex has been approved by the applicable legal counsel and/or officers of each such subsidiary.

I am confident you understand our need for this clarification and, as I expressed to David Wachen, look forward to resolving this matter without further wrangling or delay. Had our prior representations (and thus the volume of materials to be reviewed) been narrower, I believe we would already be in a position to have satisfied MCI's request for documents. That did not prove to be the case, so your continued patience is much appreciated in advance.

Sincerely,

Glenn B. Manishin

GBM:cjk
cc: Richard Donovan, Esq.
Maureen F. Del Duca, Esq. (MCI)
Steven P. Caley, Esq.

** TOTAL PAGE.03 **

EXHIBIT N

D00161

verizon business

Mary L. Coyne
Associate General Counsel
Litigation and Regulatory
1133 19th Street, N.W.
Washington, D.C. 20036

*VIA* FACSIMILE & U.S. MAIL

February 21, 2006

Glenn B. Manishin, Esq.
Kelley Drye & Warren LLP
1200 19th Street, N.W.
Suite 500
Washington, DC 20036
Fax: (202) 955-9792

Re: *In re WorldCom, Inc., Chapter 11,* Case No. 02-13533

Dear Mr. Manishin:

Thank you for your letter dated February 15, 2006, responding to my earlier letters. This will confirm that Verizon Business is the successor by merger to MCI, which was the successor by merger to Intermedia and Digex. I hope that satisfies your query as to the reason that I am following up on the requests of Maureen Del Duca and David Wachen to return our company's files.

I appreciate your assurances that you have initiated the process of locating and assembling our files. It has now been nearly three months since we first asked for the return of our files, but we have not yet received a page. Please let me know when we will receive the much more limited documentation that I requested in my letters of February 7 and 10.

Thank you for your continued attention to this matter.

Very truly yours,

Mary L. Coyne

cc: Richard Donovan, Esq.
Fax: (212) 808-7897
Alt. Fax: (212) 808-7898

Brad E. Mutschelknause, Esq.
Fax: (202) 955-9792

D00162

**EXHIBIT O**

D00163

**Murdock, Allison**

---

**From:** Manishin, Glenn [mailto:GManishin@kelleydrye.com]
**Sent:** Tuesday, March 14, 2006 12:05 PM
**To:** mary.l.coyne@verizonbusiness.com
**Cc:** Canis, Jonathan E.
**Subject:** Re: Intermedia-Digex Documents

Once again, howeve, please respond to my inquiries, now thrice, regarding reimbursement of our costs. And thank you for providing a phone number; I obviously had your postal address in the old MCI building from your letterhead.

--------------------------
Sent from my BlackBerry Wireless Handheld (www.BlackBerry.net)

-----Original Message-----
From: Coyne, Mary L
To: Manishin, Glenn
CC: Canis, Jonathan E.
Sent: Tue Mar 14 11:56:51 2006
Subject: RE: Intermedia-Digex Documents

Thank you for your email. I'll be in contact with Mr. Canis about the mechanics of transferring our documents.

My contact information is:

Mary L. Coyne

Associate General Counsel

Litigation and Regulatory

1133 19th Street, N.W.

Washington, D.C. 20036

202-736-6535

From: Manishin, Glenn [mailto:GManishin@kelleydrye.com]

EXHIBIT
O

Sent: Friday, March 10, 2006 3:53 PM
To: mary.l.coyne@verizonbusiness.com
Cc: Canis, Jonathan E.
Subject: Intermedia-Digex Documents

Mary:

Further to our recent exchange of correspondence, Kelley Drye has completed its review and is in possession of 382 boxes of Intermedia and Digex documents. We propose transferring all of these (all defunct matters) files to you in lieu of incurring the time, cost and expense to identify documents relating specifically to the WorldCom-Intermedia acquisition or the antitrust issues raised with respect thereto.

If you would contact my partner, Jon Canis, who served as the billing partner for Kelley Drye on the Intermedia account, he can arrange to have the boxes available for your couriers on reasonable notice. In the interim, kindly reply to our requests as to whether Verizon (nee MCI) will, as our citations have indicated is its obligation, reimburse this firm for the costs associated with copying and returning these files to our former client.

Thank you.

Glenn

P.S. Your stationary and letters contain no telephone or email contact information, else I would gladly have called to give you this news and discuss logistical arrangements.

PLEASE NOTE NEW DIRECT DIAL AND ADDRESS INFO.
=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=

Glenn B. Manishin, Esq.
Kelley Drye & Warren LLP
1200 19th Street, N.W., Suite 500
Washington, DC 20036-2421
202.955.9670
202.955.9792 fax
202.256.4600 cell
703.918.2322 VA
<gmanishin@kelleydrye.com>
=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=

Pursuant to Treasury Regulations, any U.S. federal tax advice contained in this communication, unless otherwise stated, is not intended and cannot be used for the purpose of avoiding tax-related penalties.

The information contained in this E-mail message is privileged, confidential, and may be protected from disclosure; please be aware that any other use, printing, copying, disclosure or dissemination of this communication may be subject to legal restriction or sanction. If you think that you have received this E-mail message in error, please reply to the sender.

This E-mail message and any attachments have been scanned for viruses and are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened. However, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by Kelley Drye & Warren LLP for any loss or damage arising in any way from its use.

Pursuant to Treasury Regulations, any U.S. federal tax advice contained in this communication, unless otherwise stated, is not intended and cannot be used for the purpose of avoiding tax-related penalties.

The information contained in this E-mail message is privileged, confidential, and may be protected from disclosure; please be aware that any other use, printing, copying, disclosure or dissemination of this communication may be subject to legal restriction or sanction. If you think that you have received this E-mail message in error, please reply to the sender.

This E-mail message and any attachments have been scanned for viruses and are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened. However, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by Kelley Drye & Warren LLP for any loss or damage arising in any way from its use.

**EXHIBIT P**

D00167

**Murdock, Allison**

**From:** Canis, Jonathan E. [JCanis@KelleyDrye.com]
**Sent:** Saturday, April 22, 2006 5:06 PM
**To:** Iba, Mark
**Cc:** Manishin, Glenn; Caley, Steve
**Subject:** RE: Intermedia/Digex Documents

Hi Mark: Again, sorry for the delay -- my assistant's still out and I've been on travel. We finally have our act together, however. All boxes are assembled, and we've put together a high-level index. We've also accounted for all attorney, paralegal and assistant time through last month. We'll have a small amount of time reflected in the last 30 days, but the total cost for assembling all the materials will be about $15,000. I'll have a final accounting on Monday, and should be able to get you a bill on Tuesday. Upon receipt of payment, we can arrange pickup of the boxes at your convenience. Pls let me know if we can provide any additional information, and I'll circle back with you on Tuesday. -- Regards, Jon

-----Original Message-----
**From:** Iba, Mark [mailto:miba@stinsonmoheck.com]
**Sent:** Thursday, April 13, 2006 5:27 PM
**To:** Canis, Jonathan E.
**Subject:** RE: Intermedia/Digex Documents

Hi Jon. I hope your assistant is feeling better. I would like to make the arrangements for picking up the documents as soon as possible. Thanks. Mark

---

**From:** Canis, Jonathan E. [mailto:JCanis@KelleyDrye.com]
**Sent:** Friday, April 07, 2006 9:11 AM
**To:** Iba, Mark
**Cc:** Manishin, Glenn; Caley, Steve
**Subject:** RE: Intermedia/Digex Documents

Hi Mark: There's been some delay because my assistant has been out for two weeks with a bad back. We have pulled together all the information regarding secretarial and paralegal hours involved in preparing the documents, copying charges, and related matters. I will have a complete accounting of all charges no later than next Wednesday, April 12. We will be able to provide you with an index of what the boxes contain. All boxes are on premises at our DC offices, and can be picked up from our loading dock once we make the necessary arrangements. I'll have the information to you by Wednesday or before. -- Jon

Jon Canis
Kelley Drye & Warren LLP
1200 19th Street, N.W., Suite 500
Washington, D.C. 20036
Ph: 202-955-9664
Fx: 202-955-9792
jcanis@kelleydrye.com

-----Original Message-----
**From:** Iba, Mark [mailto:miba@stinsonmoheck.com]
**Sent:** Thursday, April 06, 2006 3:30 PM
**To:** Canis, Jonathan E.

**Subject:** RE: Intermedia/Digex Documents

Jon, can you let me know where things stand? Thanks. Mark

---

**From:** Canis, Jonathan E. [mailto:JCanis@KelleyDrye.com]
**Sent:** Thursday, March 30, 2006 2:39 PM
**To:** Iba, Mark
**Cc:** Caley, Steve; Manishin, Glenn
**Subject:** RE: Intermedia/Digex Documents

Hi Mark: We're getting the information together now. It's been delayed because my assistant has been out sick all week, and she knows most of the information. I've found that some copying has been done, but it reflects a pretty small amount -- less than a single box, from what I can tell. I should have the copy charges by tomorrow. We're pulling the time now -- which is primarily paralegal and secretarial. I can't guarantee that for tomorrow, but we'll have it early next week. -- Regards, Jon

-----Original Message-----
**From:** Iba, Mark [mailto:miba@stinsonmoheck.com]
**Sent:** Thursday, March 30, 2006 2:15 PM
**To:** Canis, Jonathan E.
**Subject:** Intermedia/Digex Documents

Hi Jon,

I am following up on our conversation Tuesday morning about the mechanics for transferring the Intermedia/Digex boxes. Were you able to talk to Glen Manishin?

Thanks,

Mark M. Iba
Stinson Morrison Hecker LLP
1201 Walnut, Suite 2900
Kansas City, Missouri 64106-2150
(816) 691-3289 (direct dial)
(816) 842-8600 (firm general number)
(816) 691-3495 (fax)
miba@stinsonmoheck.com

This communication is from a law firm and may contain confidential and/or privileged information. If it has been sent to you in error, please contact the sender for instructions concerning return or destruction, and do not use or disclose the contents to others.

Pursuant to Treasury Regulations, any U.S. federal tax advice contained in this communication, unless otherwise stated, is not intended and cannot be used for the purpose

of avoiding tax-related penalties.

The information contained in this E-mail message is privileged, confidential, and may be protected from disclosure; please be aware that any other use, printing, copying, disclosure or dissemination of this communication may be subject to legal restriction or sanction. If you think that you have received this E-mail message in error, please reply to the sender.

This E-mail message and any attachments have been scanned for viruses and are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened. However, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by Kelley Drye & Warren LLP for any loss or damage arising in any way from its use.

Pursuant to Treasury Regulations, any U.S. federal tax advice contained in this communication, unless otherwise stated, is not intended and cannot be used for the purpose of avoiding tax-related penalties.

The information contained in this E-mail message is privileged, confidential, and may be protected from disclosure; please be aware that any other use, printing, copying, disclosure or dissemination of this communication may be subject to legal restriction or sanction. If you think that you have received this E-mail message in error, please reply to the sender.

This E-mail message and any attachments have been scanned for viruses and are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened. However, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by Kelley Drye & Warren LLP for any loss or damage arising in any way from its use.

Pursuant to Treasury Regulations, any U.S. federal tax advice contained in this communication, unless otherwise stated, is not intended and cannot be used for the purpose of avoiding tax-related penalties.

The information contained in this E-mail message is privileged, confidential, and may be protected

from disclosure; please be aware that any other use, printing, copying, disclosure or dissemination of this communication may be subject to legal restriction or sanction. If you think that you have received this E-mail message in error, please reply to the sender.

This E-mail message and any attachments have been scanned for viruses and are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened. However, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by Kelley Drye & Warren LLP for any loss or damage arising in any way from its use.

**EXHIBIT Q**

D00172

**KELLEY DRYE & WARREN LLP**
A LIMITED LIABILITY PARTNERSHIP

1200 19TH STREET, N.W.
SUITE 500
WASHINGTON, D.C. 20036

NEW YORK, NY
TYSONS CORNER, VA
CHICAGO, IL
STAMFORD, CT
PARSIPPANY, NJ

BRUSSELS, BELGIUM

AFFILIATE OFFICES
JAKARTA, INDONESIA
MUMBAI, INDIA

FACSIMILE
(202) 955-9792
www.kelleydrye.com

JONATHAN E. CANIS
DIRECT LINE: (202) 955-9664
EMAIL: jcanis@kelleydrye.com

April 27, 2006

Verizon Business
Attn: Mary L. Coyne, Associate General Counsel
Litigation and Regulatory
1133 19th Street, N.W.
Washington, DC 20036

Re: Invoice for Intermedia Return of Client Records and Files

Dear Ms. Coyne:

I am enclosing the firm's invoices representing fees for professional services rendered regarding the return of Intermedia's client records and files to Verizon.

We would like to receive payment for services rendered within thirty (30) days from your receipt of these invoices. If you have any questions, please do not hesitate to contact me.

Sincerely,

Jonathan E. Canis

cc: Mark M. Iba, Esq.
Stinson Morrison Hecker LLP

DC01/CANIJ/247006.1

D00173

**KELLEY DRYE & WARREN LLP**

FEDERAL ID NO. 13-5335107

WASHINGTON
CHICAGO
TYSONS CORNER

NEW YORK
STAMFORD
PARSIPPANY
BRUSSELS

AFFILIATE OFFICES
JAKARTA, INDONESIA
MUMBAI, INDIA

VERIZON BUSINESS
ATTN: MARY L. COYNE, ASSOCIATE GENERAL COUNSEL
LITIGATION AND REGULATORY
1133 19TH STREET, N.W.
WASHINGTON, D.C. 20036

April 26, 2006
Invoice No. 1575043

080001 KELLEY DRYE & WARREN-INTERMEDIA
1539 VERIZON - RETURN OF RECORDS & FILES

**ACCOUNT SUMMARY AND REMITTANCE FORM**

| | |
|---|---|
| FEES: | $17,765.00 |
| OTHER CHARGES: | $24.39 |
| EXPENSES NOT YET POSTED (COPYING, BOX RETRIEVAL, LABLES): | $1,816.75 |
| **TOTAL AMOUNT DUE:** | **$19,606.14** |

**TERMS: PAYMENT DUE UPON RECEIPT**

**PLEASE RETURN THIS PAGE WITH YOUR PAYMENT**

PAYMENT BY CHECK:
KELLEY DRYE & WARREN LLP
ATTN: TREASURER'S DEPARTMENT
101 PARK AVENUE
NEW YORK, NEW YORK 10178
(212) 808-7800

PAYMENT BY WIRE:
JP MORGAN CHASE, N.A.
1211 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10036
ATTN: PRIVATE BANKING, 39TH FLOOR
ABA #:021-000-021
ACCOUNT NAME:KELLEY DRYE & WARREN LLP
ACCOUNT #:135-046110
PLEASE INDICATE CLIENT, MATTER AND INVOICE NUMBER AS PAYMENT REFERENCE

D00174

**KELLEY DRYE & WARREN LLP** FEDERAL ID NO. 13-5335107

WASHINGTON
CHICAGO
TYSONS CORNER

NEW YORK
STAMFORD
PARSIPPANY
BRUSSELS

AFFILIATE OFFICES
JAKARTA, INDONESIA
MUMBAI, INDIA

VERIZON BUSINESS
ATTN: MARY L. COYNE, ASSOCIATE GENERAL COUNSEL
LITIGATION AND REGULATORY
1133 19TH STREET, N.W.
WASHINGTON, D.C. 20036

April 26, 2006
Invoice No. 1575043

Client 080001
Matter 1539 VERIZON - RETURN OF RECORDS & FILES

Attorney: 00254 Page 1

FOR PROFESSIONAL SERVICES RENDERED

| Date | Att | Description | Hours |
|---|---|---|---|
| 01/10/06 | GBM | Emails from/to S. Caley and telephone call with D. Wachen regarding MCI document demands | 0.50 |
| 01/19/06 | GBM | Emails from/to S. Caley regarding MCI (Verizon) document requests | 0.40 |
| 01/19/06 | GBM | Conference call with S. Caley | 0.30 |
| 02/07/06 | GBM | Review letter from M. Coyne (Verizon); telephone call with S. Caley regarding same | 0.60 |
| 02/08/06 | GBM | Emails from/to B. Mutschelknaus and J. Canis regarding document review cost projections; emails from/to P. Madison regarding same | 0.50 |
| 02/09/06 | GBM | Emails from/to P. Madison and J. Canis regarding document review and production issues; emails from/to S. Caley regarding response to Verizon | 0.60 |
| 02/10/06 | MAD | Oversee delivery of boxes of Intermedia documents; begin review of same. | 5.00 |
| 02/14/06 | MAD | Reviewing boxes of Intermedia documents to ensure production of relevant mateials. | 7.00 |
| 02/15/06 | GBM | Review S. Caley draft letter response; emails regarding same; | 1.10 |

KELLEY DRYE & WARREN LLP

FEDERAL ID NO. 13-5335107

WASHINGTON
CHICAGO
TYSONS CORNER

NEW YORK
STAMFORD
PARSIPPANY
BRUSSELS

AFFILIATE OFFICES
JAKARTA, INDONESIA
MUMBAI, INDIA

---

| | | | |
|---|---|---|---|
| | | revise and finalize letter | |
| 02/15/06 | MAD | Reviewing boxes of Intermedia documents to ensure production of relevant mateials. | 8.00 |
| 02/16/06 | MAD | Reviewing boxes of Intermedia documents to ensure production of relevant mateials. | 8.00 |
| 02/21/06 | GBM | Review letter from M. Coyne and email to S. Caley and B. Mutchselknaus regarding same | 0.20 |
| 02/21/06 | MAD | Reviewing boxes of Intermedia documents to ensure production of relevant mateials. | 6.00 |
| 02/22/06 | MAD | Reviewing boxes of Intermedia documents to ensure production of relevant mateials. | 6.00 |
| 02/23/06 | MAD | Reviewing boxes of Intermedia documents to ensure production of relevant mateials. | 6.00 |
| 02/24/06 | MAD | Reviewing boxes of Intermedia documents to ensure production of relevant mateials. | 5.00 |
| 02/27/06 | MAD | Reviewing boxes of Intermedia documents to ensure production of relevant mateials. | 5.00 |
| 02/28/06 | MAD | Reviewing boxes of Intermedia documents to ensure production of relevant mateials. | 5.00 |
| 03/01/06 | MAD | Reviewing boxes of Intermedia documents to ensure production of relevant mateials. | 5.00 |
| 03/06/06 | GBM | Emails from/to M. Depasse and S. Caley regarding Intermedia/Digex document and file review | 0.60 |
| 03/06/06 | JEC | Emails and calls with S. Caley and G. Manishin regarding Intermedia files; meeting with M. Depasse regarding retrieving files out of storage and procedures for reviewing and preparing for production. | 1.20 |
| 03/06/06 | MAD | Reviewing boxes of Intermedia documents to ensure production of relevant mateials; conference with J. Canis regarding same; reviewing documents with J. Canis. | 5.00 |

KELLEY DRYE & WARREN LLP

FEDERAL ID NO. 13-5335107

WASHINGTON
CHICAGO
TYSONS CORNER

NEW YORK
STAMFORD
PARSIPPANY
BRUSSELS

AFFILIATE OFFICES
JAKARTA, INDONESIA
MUMBAI, INDIA

ZZ KDW/HOURLY RESTRICTIONS
Client 080001
Matter 1539
April 26, 2006
Page 3

| | | | |
|---|---|---|---|
| 03/06/06 | SPC | E-mail with J. Canis and G. Manishin regarding status of file retrieval, etc. | 0.30 |
| 03/07/06 | JEC | Reviewing boxes of Intermedia documents with M. Depasse. | 1.60 |
| 03/07/06 | MAD | Reviewing boxes with J. Canis; completing review of boxes of Inermedia documents. | 6.00 |
| 03/08/06 | MAD | Completing review of boxes of Inermedia documents. | 3.00 |
| 03/10/06 | GBM | Prepare email for M. Coyne (Verizon) regarding Intermedia document review/production | 0.50 |
| 03/10/06 | SPC | E-mail with various regarding status. | 0.10 |
| 03/15/06 | GBM | Emails from/to M. Coyne regarding Intermedia document production | 0.40 |
| 03/22/06 | GBM | Emails from/to M. Depasse regarding document production logistics | 0.30 |
| 03/27/06 | N M | Review file; conference with J. Callagy; client. | 0.50 |
| 03/28/06 | JEC | Reviewing prebills regarding preparation of Intermedia documents; conference calls with S. Caley and M. Depasse regarding same. | 1.00 |
| 03/28/06 | SPC | E-mail with various regarding status. | 0.30 |
| 03/30/06 | JEC | Emails to/from S. Caley regarding billing for document production; conferemce call with M. Depasse regarding same. | 0.60 |
| 03/30/06 | SPC | E-mail with J. Canis regarding fees. | 0.10 |
| 03/31/06 | SPC | E-mails with various regarding fees and expenses for document work. | 0.50 |
| 04/07/06 | JEC | Conference call with M. Depasse regarding billable time for processing documents; reviewing summary of storage charges and other related charges. | 1.00 |
| 04/21/06 | SPC | E-mails with J. Canis regarding billing for time, etc. | 0.20 |
| 04/24/06 | JEC | Reviewing billed time and document production charges; conference with C. Kave regarding accounting for prebilled time | 1.20 |

D00177

KELLEY DRYE & WARREN LLP

FEDERAL ID NO. 13-5335107

WASHINGTON
CHICAGO
TYSONS CORNER

NEW YORK
STAMFORD
PARSIPPANY
BRUSSELS

AFFILIATE OFFICES
JAKARTA, INDONESIA
MUMBAI, INDIA

ZZ KDW/HOURLY RESTRICTIONS
Client 080001
Matter 1539
April 26, 2006
Page 4

---

| | | | |
|---|---|---|---|
| | | for April; related research. | |
| 04/25/06 | JEC | Assembling billing data; preparing bill; conference with G. Manishin regarding same; conferences and emails with D. Fahey regarding procedures and format for preparing bill; assigning client codes to all charges; preparing final bill. | 1.70 |

D00178

**KELLEY DRYE & WARREN LLP**

FEDERAL ID NO. 13-5335107

WASHINGTON
CHICAGO
TYSONS CORNER

NEW YORK
STAMFORD
PARSIPPANY
BRUSSELS

AFFILIATE OFFICES
JAKARTA, INDONESIA
MUMBAI, INDIA

ZZ KDW/HOURLY RESTRICTIONS
Client 080001
Matter 1539
April 26, 2006
Page 5

---

| | |
|---|---|
| Total Services for this Matter: | 17,765.00 |

Other Charges:

| | |
|---|---|
| $24.00 | Facsimile |
| 0.39 | Postage |

| | |
|---|---|
| Total Other Charges for this Matter: | 24.39 |
| Expenses not yet posted (Copying, Box retrieval, labels): | 1,816.75 |
| Total this Invoice | $19,606.14 |

D00179

**KELLEY DRYE & WARREN LLP**

FEDERAL ID NO. 13-5335107

WASHINGTON
CHICAGO
TYSONS CORNER

NEW YORK
STAMFORD
PARSIPPANY
BRUSSELS

AFFILIATE OFFICES
JAKARTA, INDONESIA
MUMBAI, INDIA

ZZ KDW/HOURLY RESTRICTIONS
Client 080001
Matter 1539
April 26, 2006
Page 6

| Attorney | Hours | Rate | Amount |
|---|---|---|---|
| CALEY, STEVEN P | 1.50 | 550.00 | $825.00 |
| MERKL, NEIL | 0.50 | 525.00 | 262.50 |
| CANIS, JONATHAN E | 8.30 | 525.00 | 4,357.50 |
| MANISHIN, GLENN B | 6.00 | 520.00 | 3,120.00 |
| DEPASSE, MICHELE A | 80.00 | 115.00 | 9,200.00 |

PAYMENT BY CHECK:
KELLEY DRYE & WARREN LLP
ATTN: TREASURER'S DEPARTMENT
101 PARK AVENUE
NEW YORK, NEW YORK 10178
(212) 808-7800

PAYMENT BY WIRE:
JP MORGAN CHASE, N.A.
1211 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10036
ATTN: PRIVATE BANKING, 39TH FLOOR
ABA #:021-000-021
ACCOUNT NAME:KELLEY DRYE & WARREN LLP
ACCOUNT #:135-046110
PLEASE INDICATE CLIENT, MATTER AND INVOICE NUMBER AS PAYMENT REFERENCE

D00180

**EXHIBIT R**

D00181

**Murdock, Allison**

---

**From:** Canis, Jonathan E. [JCanis@KelleyDrye.com]
**Sent:** Friday, April 28, 2006 2:51 PM
**To:** Iba, Mark
**Cc:** Lee, Erwin; Depasse, Michele A.; Manishin, Glenn; Caley, Steve
**Subject:** RE: Intermedia/Digex Documents

Hi Mark:

Checked with Glenn and Steve, and you can pick them up any time. You can talk to my assistant -- Michelle Depasse (direct #: 202-955-9878) or the office manager in charge of the project -- Erwin Lee (direct #: 202-887-1239). 388 boxes, located on the 4th Floor of our offices at 1200 19th St. NW.

As to your comments on the bill, we were extraordinarily forgiving in accounting for the time it took to review the 388 boxes -- consisting of over 400 linear feet of documents. By Steve's instructions, we started our accounting in February, despite the fact that Steve, Glenn and Michelle booked substantial hours relating to this project in November, December and January. We also did not include the hours booked by the workroom staff in assembling and moving the documents, or the four secretaries that assisted Michelle in researching and reviewing the files. Finally, the only documents we copied were the storage indexes -- which themselves constitute a 4-inch high pile of paper. In so doing, we deliberately chose to forego keeping copies of the files, and imposing those copying costs on you. In any event, if you wish to contest the charges, pls direct your correspondence to Steve Caley.

-- Jon

-----Original Message-----
**From:** Iba, Mark [mailto:miba@stinsonmoheck.com]
**Sent:** Thursday, April 27, 2006 3:54 PM
**To:** Canis, Jonathan E.
**Subject:** RE: Intermedia/Digex Documents

Jon,

I need to know your position on when we can pick up the boxes. As you may recall, Maureen Del Duca requested the files on November 18, 2005 and Mary Coyne reiterated the need for the files on February 7 of this year. Their letters note that these files are needed because they might contain information responsive to the document requests your firm served on behalf of Parus Holdings and may also contain information addressing Parus Holdings' assertion that WorldCom and Intermedia violated a consent order in the antitrust action brought by the DOJ in relation to their merger. We cannot continue to wait for these documents and risk irreparable harm if they are further delayed. We would like to pick them up as soon as possible, so I need to know if you really intend to retain them until you receive payment.

As for the invoice, please forward it to Mary Coyne with a copy to me. Obviously, we need to review it in detail, but the amount seems excessive, and we anticipate disputing the charges. Mary's address is 1133 19th Street, N.W., Washington, D.C. 20036. My contact information is below. If you can fax or email it to me, that would be great.

Thanks,

Mark M. Iba
Stinson Morrison Hecker LLP
1201 Walnut, Suite 2900

Kansas City, Missouri 64106-2150
(816) 691-3289 (direct dial)
(816) 842-8600 (firm general number)
(816) 691-3495 (fax)
miba@stinsonmoheck.com

---

**From:** Canis, Jonathan E. [mailto:JCanis@KelleyDrye.com]
**Sent:** Wednesday, April 26, 2006 12:08 PM
**To:** Iba, Mark
**Cc:** Caley, Steve; Manishin, Glenn
**Subject:** RE: Intermedia/Digex Documents

Hi Mark: Completed the review of legal time and disbursements. Total comes to $19,606.14. We're preparing the bill now, which has full detail of lawyer and non-lawyer time and disbursements. We are now planning to send it to Verizon, but please let us know if we should direct it to a different party. As I mentioned to you previously, we have about 388 boxes of documents, plus an index. These are on premises at our offices, and are available for pickup as soon as we receive payment. Please let me know if we can provide any additional information. -- Regards, Jon

-----Original Message-----
**From:** Iba, Mark [mailto:miba@stinsonmoheck.com]
**Sent:** Thursday, April 13, 2006 5:27 PM
**To:** Canis, Jonathan E.
**Subject:** RE: Intermedia/Digex Documents

Hi Jon. I hope your assistant is feeling better. I would like to make the arrangements for picking up the documents as soon as possible. Thanks. Mark

---

**From:** Canis, Jonathan E. [mailto:JCanis@KelleyDrye.com]
**Sent:** Friday, April 07, 2006 9:11 AM
**To:** Iba, Mark
**Cc:** Manishin, Glenn; Caley, Steve
**Subject:** RE: Intermedia/Digex Documents

Hi Mark: There's been some delay because my assistant has been out for two weeks with a bad back. We have pulled together all the information regarding secretarial and paralegal hours involved in preparing the documents, copying charges, and related matters. I will have a complete accounting of all charges no later than next Wednesday, April 12. We will be able to provide you with an index of what the boxes contain. All boxes are on premises at our DC offices, and can be picked up from our loading dock once we make the necessary arrangements. I'll have the information to you by Wednesday or before. -- Jon

Jon Canis
Kelley Drye & Warren LLP
1200 19th Street, N.W., Suite 500
Washington, D.C. 20036
Ph: 202-955-9664
Fx: 202-955-9792
jcanis@kelleydrye.com

-----Original Message-----
**From:** Iba, Mark [mailto:miba@stinsonmoheck.com]
**Sent:** Thursday, April 06, 2006 3:30 PM
**To:** Canis, Jonathan E.
**Subject:** RE: Intermedia/Digex Documents

Jon, can you let me know where things stand? Thanks. Mark

---

**From:** Canis, Jonathan E. [mailto:JCanis@KelleyDrye.com]
**Sent:** Thursday, March 30, 2006 2:39 PM
**To:** Iba, Mark
**Cc:** Caley, Steve; Manishin, Glenn
**Subject:** RE: Intermedia/Digex Documents

HI Mark: We're getting the information together now. It's been delayed because my assistant has been out sick all week, and she knows most of the information. I've found that some copying has been done, but it reflects a pretty small amount -- less than a single box, from what I can tell. I should have the copy charges by tomorrow. We're pulling the time now -- which is primarily paralegal and secretarial. I can't guarantee that for tomorrow, but we'll have it early next week. -- Regards, Jon

-----Original Message-----
**From:** Iba, Mark [mailto:miba@stinsonmoheck.com]
**Sent:** Thursday, March 30, 2006 2:15 PM
**To:** Canis, Jonathan E.
**Subject:** Intermedia/Digex Documents

Hi Jon,

I am following up on our conversation Tuesday morning about the mechanics for transferring the Intermedia/Digex boxes. Were you able to talk to Glen Manishin?

Thanks,

Mark M. Iba
Stinson Morrison Hecker LLP
1201 Walnut, Suite 2900
Kansas City, Missouri 64106-2150
(816) 691-3289 (direct dial)
(816) 842-8600 (firm general number)
(816) 691-3495 (fax)
miba@stinsonmoheck.com

This communication is from a law firm and may contain confidential and/or privileged information. If it has been sent to you in error, please contact the sender for instructions concerning return or destruction, and do not use or disclose the contents to others.

Pursuant to Treasury Regulations, any U.S. federal tax advice contained in this communication, unless otherwise stated, is not intended and cannot be used for the purpose of avoiding tax-related penalties.

The information contained in this E-mail message is privileged, confidential, and may be protected from disclosure; please be aware that any other use, printing, copying, disclosure or dissemination of this communication may be subject to legal restriction or sanction. If you think that you have received this E-mail message in error, please reply to the sender.

This E-mail message and any attachments have been scanned for viruses and are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened. However, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by Kelley Drye & Warren LLP for any loss or damage arising in any way from its use.

Pursuant to Treasury Regulations, any U.S. federal tax advice contained in this communication, unless otherwise stated, is not intended and cannot be used for the purpose of avoiding tax-related penalties.

The information contained in this E-mail message is privileged, confidential, and may be protected from disclosure; please be aware that any other use, printing, copying, disclosure or dissemination of this communication may be subject to legal restriction or sanction. If you think that you have received this E-mail message in error, please reply to the sender.

This E-mail message and any attachments have been scanned for viruses and are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened. However, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by Kelley Drye & Warren LLP for any loss or damage arising in any way from its use.

Pursuant to Treasury Regulations, any U.S. federal tax advice contained in this communication, unless otherwise stated, is not intended and cannot be used for the purpose of avoiding tax-related penalties.

The information contained in this E-mail message is privileged, confidential, and may be protected from disclosure; please be aware that any other use, printing, copying, disclosure or dissemination of this communication may be subject to legal restriction or sanction. If you think that you have received this E-mail message in error, please reply to the sender.

This E-mail message and any attachments have been scanned for viruses and are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened. However, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by Kelley Drye & Warren LLP for any loss or damage arising in any way from its use.

Pursuant to Treasury Regulations, any U.S. federal tax advice contained in this communication, unless otherwise stated, is not intended and cannot be used for the purpose of avoiding tax-related penalties.

The information contained in this E-mail message is privileged, confidential, and may be protected from disclosure; please be aware that any other use, printing, copying, disclosure or dissemination of this communication may be subject to legal restriction or sanction. If you think that you have received this E-mail message in error, please reply to the sender.

This E-mail message and any attachments have been scanned for viruses and are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened. However, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by Kelley Drye & Warren LLP for any loss or damage arising in any way from its use.

# EXHIBIT G

D00187

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------x

In re

WORLDCOM, INC., et al,

Reorganized Debtors.

-------------------------------x

Case No. 02-13533(AJG)

July 11, 2006
10:00 a.m.
New York, New York

FINAL TRANSCRIPT
DIGITALLY RECORDED PROCEEDINGS
(Excerpt -- Parus Holdings, Inc.)

Pre-Motion Discovery Conference re Claims of Parus Holdings, Inc.

B E F O R E:

THE HONORABLE ARTHUR J. GONZALEZ
United States Bankruptcy Judge

A P P E A R A N C E S:

STINSON MORRISON HECKER LLP
Special Counsel for Reorganized Debtors
1201 Walnut Street
Kansas City, Missouri 64106

BY: ALLISON M. MURDOCK, ESQ.

KELLEY DRYE & WARREN LLP
Attorneys for Parus Holdings, Inc.
101 Park Avenue
New York, New York 10178

BY: ROBERT S. FRIEDMAN, ESQ.

DEBORAH HUNTSMAN, Court Reporter
(212) 608-9053 (917) 723-9898
Proceedings Recorded by Electronic Sound Recording,
Transcript Produced by Court Reporter

(Whereupon, the following is an excerpt from 7/11/2006 In re WorldCom, Inc., et al, Case No. 02-13533).

JUDGE GONZALEZ: Please be seated.

The WorldCom matters.

MR. SHAIKEN: Good morning, Your Honor. Mark Shaiken of Stinson Morrison Hecker representing the Reorganized Debtors.

The first item on the contested docket this morning is the informal conference in the Parus Holdings matter, and my colleague Allison Murdock is handling that.

MS. MURDOCK: May it please the Court, I am Allison Murdock appearing on behalf of the Debtors.

Your Honor, MCI requests today permission to file a motion for protective order under Rule 26(c) to shift some or all of the costs of electronic discovery in the matter to Parus Holdings or for an order that the electronic discovery that Parus Holdings is seeking not be had.

When the parties last appeared before you on discovery issues, counsel advised the Court that we were just beginning to undertake the factual analysis that would be necessary in order to determine the appropriateness of shifting the costs of electronic

discovery in this matter.

MCI believes that the factual record necessary for the Court to make a cost shifting determination now has been completed and that there is ample evidence that supports the shifting of costs of electronic discovery to Parus Holdings.

By way of very brief background, Parus Holdings has asserted claims against MCI and a subsidiary Intermedia allegedly arising out of a contract between Intermedia and Parus Holdings' predecessor EffectNet. In November of 2000, Intermedia and EffectNet entered into what was called a Unified Communications Services General Agreement, which the parties in shorthand referred to as the UC Contract. Under the UC Contract, Intermedia was to purchase unified messaging services from EffectNet for resale to Intermedia's customers.

As set forth in the summary judgment papers that MCI has filed in this matter, EffectNet terminated the UC Contract in April of 2002. MCI filed summary judgment last fall because it believes that all of the Parus Holdings' claims, both those sounding in contract and in tort, can be resolved as a matter of law based on the plain language of the UC Contract that controls.

Now, as counsel advised during the last hearing on discovery issues, Parus Holdings had just provided to MCI a list of search terms and individual names that Parus Holdings wanted MCI to use in searching the electronic data of MCI and Intermedia. MCI in turn provided Parus Holdings' search terms and individual key names to the vendor that is assisting us with electronic discovery to attempt to get a cost estimate as to electronic discovery based on the actual search terms that Parus Holdings wanted us to use. That estimate came back to us in the range between $208,000 to $331,000 just in costs to perform the electronic data searches that Parus Holdings was requesting. Because of those costs associated with electronic discovery, we sought an informal conference to seek permission to file a motion to stay discovery while the Court considered our motion for summary judgment, and when the Court did not entertain our request for informal conference, we proceeded with electronic discovery.

Our electronic discovery efforts had been related both to MCI and Intermedia for electronic data and data that is considered both accessible and inaccessible. We recognize that under controlling authority, cost shifting is appropriate only for that

electronic data that is viewed as being inaccessible, and the cost shifting motion that we seek to file would be limited accordingly.

Now, Mr. Friedman has suggested in a letter recently written to the Court that MCI has undertaken no electronic discovery efforts to date. On the contrary, in addition to the electronic discovery that we have done with respect to MCI and Intermedia's accessible electronic data, MCI, consistent with the controlling authority, also has now sampled the inaccessible electronic data. In fact, Parus Holdings is the one that chose the tapes that would be sampled for purposes of the electronic discovery cost shifting analysis. Parus Holdings selected four backup tapes that it wanted sampled for purposes of determining the cost shifting issue. For technical reasons related to one of the tapes that Parus Holdings selected, we actually sampled five additional tapes for a total of nine tapes.

The search of just those nine tapes alone, using Parus Holdings' search terms and the key names that they had identified, pulled in for review approximately 750,000 pages of documents, which is the equivalent of 300 boxes of documents. That number is actually after we had conferred with Parus Holdings'

counsel, Mr. Kevin Smith, to limit the search terms that were being used by Parus Holdings, and of these 750,000 pages, only about 3.28 percent were even responsive to Parus Holdings' request. I think counsel would agree that it is a fair characterization that even those documents that were responsive don't really move the case forward in any meaningful way.

The cost that was associated with just the sampling of these nine tapes that were selected by Parus Holdings was $72,000 just for the sampling alone. This doesn't take into account any of the attorney review time necessary to review the documents that were pulled as a result of the searches.

JUDGE GONZALEZ: One second, please. I am getting a little confused as to why we are here today. It seems to me that this was an informal conference dealing with discovery and the scheduling order for a contested matter and you have requested a hearing date. What is your request?

MS. MURDOCK: MCI also requested an informal conference seeking permission to file a motion for cost shifting under Rule 26(c). That was in our June 16th letter to the Court that is identified on the docket.

JUDGE GONZALEZ: If that request is granted to

schedule the cost shifting or, alternatively, the protective order, that impacts the scheduling order, doesn't it?

MS. MURDOCK: Yes, it does, Your Honor. We submit that it is premature at this time to enter a scheduling order in the case, because of the volume of electronic discovery that is yet to be completed and because the Court has not yet had an opportunity to determine whether there should be cost shifting. If the Court were to decide that there should be cost shifting, then it is possible that Parus Holdings would decide to limit the requests, if it is required to pay for some of the discovery it is seeking, or that it might not want the discovery. So under the legal authority that usually controls the cost shifting cases, sampling is done and the Court considers whether there should be cost shifting. Once that decision is made, then the parties proceed to complete the remainder of the electronic discovery.

JUDGE GONZALEZ: Let me then hear from Parus Holdings with respect to the request to schedule a hearing on the issue of the cost shifting and protective order.

MR. FRIEDMAN: Good morning, Judge. Robert Friedman of Kelley, Drye & Warren for Parus Holdings.

Just to give the entire chronology of this motion, the genesis of this conference is our application to the Court for a scheduling order. We want to move this case forward with discovery. It has been pending for over three years now. The claims objections were fully briefed two years ago. Each time we try to start discovery, there is another attempt by the Debtors to stop discovery and impede, in our view at least, the resolution of this matter.

First, as you are aware, when we made a motion to compel hard copy documents last year, that is when after two and a half years of the case pending they first filed a motion for summary judgment. After that was fully briefed, we had discussions with the Debtors and were trying to get electronic documents. We don't have any documents relating to the most crucial areas. What we believe then is that we should move discovery forward. They should be required to produce whatever documents we have requested that are relevant to this case, and I will mention a few as examples. In response to that, Judge, we have a cost shifting application. It is just another step that we are seeing in an effort to delay discovery.

JUDGE GONZALEZ: Let me ask you this question. If I don't take up the cost shifting, are you willing

to assume the risk or is your client willing to assume the risk, that when do take it up, I may determine that it should be borne or should have been borne by your client?

MR. FRIEDMAN: Your Honor, I don't think we are there yet. We don't have a factual basis to even have the cost shifting question come up right now under Zubulake, and I can explain why. That is why I can't answer that question yet. Under Zubulake there were several things that had occurred which predated even the cost shifting inquiry. Number one, there was extensive fact discovery and extensive record and depositions of the key IT people as to the efforts that were made to preserve documents. Here we have none of that. In fact, we specifically do not have any depositions of their IT people. We have no idea right now, Judge. I have no idea how they have maintained their electronic documents. They have submitted no facts. All we have are assertions relating to searches of backup tapes. That is number one. Number two, in Zubulake the most crucial witness, who was the supervisor of Mrs. Zubulake, it was an employment case, all of that person's e-mails and the backup tapes had already been produced. Here we have nothing. The way the Debtors keep their

records, we can't search the most relevant actors so that that can be produced without cost shifting. Right now any cost shifting inquiry, even by the Court, is premature right now, because we have no factual record. So I think it is a fair question by the Court, and I think that is the ultimate question that can be asked. But I think it is premature at this point.

JUDGE GONZALEZ: If it is premature at this point and it ultimately matures and then goes to a hearing, the consequences could be that the costs get shifted for what would have then taken place. I am just speaking without firsthand knowledge of really what the processes would be. But at least theoretically, it seems to me, if we go down that path and three months or two months or six months from now, whatever the time frame is, the cost shifting application issue arises again and the facts demonstrate under the relevant case law that the shift should take place, it wouldn't be prospective necessarily at that point?

MR. FRIEDMAN: I believe it would under Zubulake. There was no retroactive cost shifting that was imposed, and I don't believe there is any decision that I have read that imposes cost shifting

retroactively. If the Court is going to allow them to make a motion, and I think the proper process -- and unfortunately it would impose some delay -- would be for us to depose their IT people.

JUDGE GONZALEZ: I am sorry to interrupt you. I almost need a motion to determine whether or not this is premature in some respects.

MR. FRIEDMAN: But in any event, we would be entitled, I think, before consideration of that motion, to depose their IT people, and that would not be subject to any cost shifting. So I think, if the Court is going to allow the Debtors to make the motion, we should do that beforehand and get that out of the way from both standpoints. Because under Zubulake they have to submit anyway a detailed, sworn affidavit from their IT people. When the Court in Zubulake was considering the motion, Judge Scheindlin had depositions of the IT people as well as fact depositions, and it was only prospective from that point.

So while I certainly would like to have a scheduling order and that was our initial application here, if the Court is going to consider any cost shifting inquiry at that point, I submit that it makes the most sense to do this limited IT discovery so we

can actually determine what they have done and what they have not done. One thing that comes to mind immediately is, from our view at least, and I know the Debtors dispute this, we have Intermedia and we have WorldCom. These are two different groups of documents. There are no WorldCom documents, except for maybe possibly a few of what they call POP e-mails. We believe that those documents should have been preserved at the time that they intentionally breached the contract. Instead, they were destroyed and now they are completely inaccessible. We need to inquire as to what the process was at the time that they breached our contract and why they didn't preserve the documents. There are no documents from the WorldCom side possibly, and we need to inquire as to that, because not only could that affect the cost shifting but it could also affect possible sanctions such as adverse inferences and other types of sanctions that we anticipate making based upon what the evidence shows.

JUDGE GONZALEZ: All right. Let me hear from the Debtors with respect to the IT discovery before the motion.

MS. MURDOCK: Your Honor, we have made every attempt to make this process as transparent as

possible. We have identified in correspondence to Parus Holdings' counsel all the different types of electronic data there are both for Intermedia and MCI. We have made eight document productions of electronic data, including document productions of WorldCom documents. Those document productions have been identified as being either from WorldCom or Intermedia. So this has been a transparent process. We have told them everything that exists. We have produced documents from the WorldCom side. No documents have been destroyed. The sampling that has been done with respect to the inaccessible data or the backup tapes is the type of sampling that was contemplated in the Zubulake decision. We believe it is unnecessary for there to be depositions of their IT people in advance of a cost shifting motion, because we can provide affidavits in support of our cost shifting motion that show the various types of discovery and information that we have already provided. This has already been provided to counsel. We can provide it in the form of affidavits, though, if they wish. The notion that it is important to take deposition discovery of the electronic data that exists seems unnecessary in light of the transparent information that we have been providing to Parus

Holdings' counsel over the past six months about all of the sources of electronic discovery.

JUDGE GONZALEZ: Whether the information has been as transparent as you say it is, is one of the central issues. Your affidavits about what may have already been produced doesn't answer the question of how things were kept, and what may have been available at one point in time, and then what happened to it.

MS. MURDOCK: Actually, Your Honor, the affidavits I contemplated would be on the subject you just mentioned. Not what has been produced, but all of the sources of electronic data that are available.

JUDGE GONZALEZ: Under the circumstances of this case, why do you think that would suffice? It is going to be challenged from the outset. They are going to want to take the deposition of the affiant.

MS. MURDOCK: I am sorry, Your Honor?

JUDGE GONZALEZ: They will want to take the deposition of the very party that you are going to provide the affidavit from. So what in the world am I going to do with it? Am I going to just accept it as your affidavit, and they have to file the equivalent of a Rule 56(f) type response to it and say, "We need to take discovery or a deposition of the affiant to find what was kept, how it was kept, and whatever is

set forth is accurate"?

MS. MURDOCK: Apparently, what Mr. Friedman is alleging is that the information that counsel has provided to them about the sources of electronic discovery is incomplete or incorrect and we don't believe it is. We have done a very thorough job in searching for electronic discovery. If the Court believes that it is appropriate to have depositions of the IT people -- and we are not talking about a single person, there would be more than one person involved -- then all that that would provide is the scope of the discovery that is out there to access. It doesn't really impact the cost shifting issue. It just impacts where you go to find the electronic discovery.

JUDGE GONZALEZ: Depending on what is discovered, what responses the affiant has to questions as to why something didn't exist and why it did exist and no longer exists or what efforts have been made to search various databases, I don't see how it would be necessarily relevant to the cost shifting. I think it depends on what the answers are.

MS. MURDOCK: In this case, the inaccessible data that we have are backup tapes. I don't think that there is any dispute about that. The cost

shifting issue would go to the inaccessible data.

JUDGE GONZALEZ: It may be my ignorance of all of the facts here, but when someone says their backup tapes, that triggers in my mind an assumption that there were original tapes, and that is why we have backups. So I think there seems to be on the surface a legitimate inquiry as to what happened to the originals. If you had the originals and not the backup, would the search then be enhanced or facilitated? I don't know the answer to that. But if it is determined that the originals under the normal course of business or ordinary course of business in the industry would otherwise have been kept and for some reason it doesn't seem that appropriate actions were taken to retain records and now we then have to turn to the backup, there may be an argument from the party seeking the discovery that they shouldn't have to bear the costs for that. It may come down to whether it was appropriate to have eliminated the original data. I don't know the answer to that. Sitting here right now, I haven't the faintest idea what the standard is. I assume it is an industry-wide standard as to what you would apply coupled with the issues about knowing whether a litigation or having an indication that a litigation may follow as to what

then you do with data and whether or not proper actions were taken to preserve data once it became known that there was an issue that may ultimately end in litigation. I just throw out standards that may be applied, but I don't see how just receiving an affidavit as to WorldCom's point of view as to what happened, what we have, and this is what we have, and we think the costs should be shifted is necessarily going to bring me to a point in which I can make a determination because I am quite confident I am going to hear from Parus Holdings that they still need the discovery based on the representations made in the affidavits.

MS. MURDOCK: All right. Thank you, Your Honor.

JUDGE GONZALEZ: Let me hear then from Parus Holdings.

MR. FRIEDMAN: Judge, I think you are correct with respect to the affidavit. I just wanted to respond on the sampling issue. We were reluctant participants in the sampling process. We still really have very little information as to what they did. We provided search terms and will always be cooperative and provide search terms and limit it. I think that is part of the electronic discovery equation, but the

fact remains that we have targeted narrow groups of documents that are the most relevant to this case that have not been produced. I am not doubting counsel's efforts to attempt to provide the discovery. The fact remains that both Debtors that are involved here had in our view serious problems in maintaining and preserving the documents. The proof is in the pudding. We don't have any documents regarding the most important requests that we have.

JUDGE GONZALEZ: I think we are going to ultimately leave that determination for another day. In terms of taking discovery of the IT people, let me hear from the Debtors first. The Debtors can use the microphone at the table. You don't need to keep jumping up and down. You can use both sides. When would you believe that the relevant parties would be available?

MS. MURDOCK: Your Honor, I would have to check the schedules. I don't know, as I sit here today.

JUDGE GONZALEZ: With it being the summer, it is a little difficult for everyone to come up with a time frame, whether 30 days would be enough to do the depositions and assuming that the parties were accessible. It would seem to me that if you got the depositions completed by mid-August, we could then

have a hearing early in September on this issue. If it turns out that the parties can't coordinate the time, early in September may get pushed to later in September.

What I think you should do is let the Debtors contact the parties that would be involved from the Debtors' standpoint, and get them to give you some information regarding their schedule over the next 30 days. Then you will have to consider your own schedules over that period. Then work out a close of deposition time frame in which you will be ready to make the motion. My guess is the earliest that will take you to is probably mid-September. It may take you until later in September. If you see when you are going through the schedule you can ignore the fact that certain WorldCom dates may be blocked out, to the extent this schedule lands you on a blocked-out WorldCom date, let my chambers know and I will let you know whether that date otherwise can be made available for purposes of the hearing. So don't limit yourselves just to the days that appear on the website as available. Certain days may still be unavailable, but it is likely I can make an adjustment to that schedule. I really think we should leave everything else at this point until that hearing date.

Now, if you have problems coordinating discovery and the deposition of these parties, just contact my chambers and we can have a conference call to try to work out whatever scheduling issue arises. Is there anything further?

MR. FRIEDMAN: No, Your Honor. Thank you.

MS. MURDOCK: Thank you, Your Honor

JUDGE GONZALEZ: All right. Mr. Shaiken, what time is the next matter?

MR. SHAIKEN: At 10:40.

JUDGE GONZALEZ: All right. I will come back to the bench at 10:40. Thank you.

(Whereupon, from 10:26 a.m. to 10:42 a.m. a recess was taken.)

C E R T I F I C A T E

STATE OF NEW YORK )
: SS:
COUNTY OF NEW YORK )

I, DEBORAH HUNTSMAN, a Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify:

That the within is a true and accurate transcript from the official electronic sound recording of the proceedings held on the 11th day of July, 2006.

I further certify that I am not related by blood or marriage to any of the parties and that I am not interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 20th day of July, 2006.

DEBORAH HUNTSMAN

DEBORAH HUNTSMAN

PROOFREAD BY HALLIE CANTOR

PRELIMINARY TRANSCRIPT SENT VIA E-MAIL 7/16/2006

**$**

$208,000 [1] - 4:11
$331,000 [1] - 4:12
$72,000 [1] - 6:10

**0**

02-13533(AJG [1] - 1:3
02-13533) [1] - 2:3

**1**

101 [1] - 1:17
10178 [1] - 1:18
10:00 [1] - 1:4
10:26 [1] - 20:13
10:40 [2] - 20:10, 20:12
10:42 [1] - 20:13
11 [1] - 1:4
11th [1] - 21:10
1201 [1] - 1:14
16th [1] - 6:23

**2**

2000 [1] - 3:11
2002 [1] - 3:20
2006 [3] - 1:4, 21:11, 21:16
20th [1] - 21:16
212 [1] - 1:24
26(c [1] - 2:16
26(c) [1] - 6:22

**3**

3.28 [1] - 6:3
30 [2] - 18:22, 19:9
300 [1] - 5:24

**5**

56(f [1] - 14:23

**6**

608-9053 [1] - 1:24
64106 [1] - 1:14

**7**

7/11/2006 [1] - 2:2
7/16/2006 [1] - 21:22
723-9898 [1] - 1:24
750,000 [2] - 5:23, 6:3

**9**

917 [1] - 1:24

**A**

a.m [3] - 1:4, 20:13
accept [1] - 14:21
access [1] - 15:12
accessible [3] - 4:23, 5:9, 18:24
accordingly [1] - 5:3
account [1] - 6:11
accurate [2] - 15:1, 21:8
actions [2] - 16:14, 17:2
actors [1] - 10:1
actual [1] - 4:9
addition [1] - 5:7
additional [1] - 5:18
adjustment [1] - 19:23
advance [1] - 13:16
adverse [1] - 12:18
advised [2] - 2:22, 4:1
affect [2] - 12:16, 12:17
affiant [3] - 14:16, 14:24, 15:17
affidavit [5] - 11:16, 14:20, 14:22, 17:6, 17:19
affidavits [5] - 13:17, 13:21, 14:5, 14:10, 17:13
ago [1] - 8:6
agree [1] - 6:5
Agreement [1] - 3:13
al [2] - 1:4, 2:2
allegedly [1] - 3:9
alleging [1] - 15:3
ALLISON [1] - 1:15
Allison [2] - 2:11, 2:14
allow [2] - 11:1, 11:12
almost [1] - 11:6
alone [2] - 5:20, 6:11
alternatively [1] - 7:1
ample [1] - 3:4
analysis [2] - 2:23, 5:14
answer [4] - 9:9, 14:6, 16:10, 16:20
answers [1] - 15:22
anticipate [1] - 12:19
anyway [1] - 11:15
appear [1] - 19:21
appeared [1] - 2:21
appearing [1] - 2:14
application [4] - 8:3, 8:22, 10:18, 11:22
applied [1] - 17:5
apply [1] - 16:23
appropriate [4] - 4:25, 15:8, 16:14, 16:19
appropriateness [1] - 2:25
April [1] - 3:20
areas [1] - 8:16
argument [1] - 16:16
arises [2] - 10:18, 20:4
arising [1] - 3:9
ARTHUR [1] - 1:10
asserted [1] - 3:8
assertions [1] - 9:19
assisting [1] - 4:7
associated [2] - 4:14, 6:8
assume [3] - 9:1, 16:22
assuming [1] - 18:23
assumption [1] - 16:4
attempt [4] - 4:8, 8:8, 12:25, 18:4
attorney [1] - 6:12
Attorneys [1] - 1:17
August [1] - 18:25
authority [3] - 4:25, 5:10, 7:15
available [5] - 14:7, 14:12, 18:17, 19:19, 19:22
Avenue [1] - 1:17
aware [1] - 8:10

**B**

background [1] - 3:7
backup [8] - 5:14, 9:20, 9:24, 13:13, 15:24, 16:3, 16:9, 16:16
backups [1] - 16:6
BANKRUPTCY [1] - 1:1
Bankruptcy [1] - 1:11
based [4] - 3:24, 4:9, 12:19, 17:12
basis [1] - 9:6
bear [1] - 16:18
became [1] - 17:2
beforehand [1] - 11:13
beginning [1] - 2:23
behalf [1] - 2:14
believes [3] - 3:2, 3:21, 15:8
bench [1] - 20:12
between [2] - 3:9, 4:11
blocked [2] - 19:16, 19:17
blocked-out [1] - 19:17
blood [1] - 21:13
borne [2] - 9:3
boxes [1] - 5:24
breached [2] - 12:10, 12:13
brief [1] - 3:7
briefed [2] - 8:6, 8:14
bring [1] - 17:9
business [2] - 16:12
BY [3] - 1:15, 1:19, 21:21

**C**

CANTOR [1] - 21:21
Case [2] - 1:2, 2:2
case [10] - 6:7, 7:6, 8:4, 8:12, 8:20, 9:23, 10:19, 14:14, 15:23, 18:2
cases [1] - 7:16
central [1] - 14:5
certain [1] - 19:16
Certain [1] - 19:22
certainly [1] - 11:21
certify [2] - 21:7, 21:12
challenged [1] - 14:15
chambers [2] - 19:18, 20:3
characterization [1] - 6:5
check [1] - 18:18
chose [1] - 5:12
chronology [1] - 8:1
circumstances [1] - 14:13
City [1] - 1:14
claims [3] - 3:8, 3:22, 8:5
Claims [1] - 1:8
client [2] - 9:1, 9:4
close [1] - 19:10
colleague [1] - 2:11
Communications [1] - 3:12
compel [1] - 8:11
complete [1] - 7:19
completed [3] - 3:4, 7:7, 18:25
completely [1] - 12:11
Conference [1] - 1:8
conference [7] - 2:10, 4:15, 4:19, 6:16, 6:21, 8:2, 20:3
conferred [1] - 5:25
confident [1] - 17:10
confused [1] - 6:15
consequences [1] - 10:11
consider [2] - 11:23, 19:9
consideration [1] - 11:9
considered [2] - 4:17, 4:23
considering [1] - 11:17
considers [1] - 7:17
consistent [1] - 5:9
contact [2] - 19:6, 20:3
contemplated [2] - 13:14, 14:10
contested [2] - 2:9, 6:18
contract [4] - 3:9, 3:23, 12:10, 12:13
Contract [4] - 3:14, 3:15, 3:20, 3:25
contrary [1] - 5:7
controlling [2] - 4:24, 5:10
controls [2] - 3:25, 7:15
cooperative [1] - 17:23
coordinate [1] - 19:2
coordinating [1] - 20:1
copy [1] - 8:11
correct [1] - 17:18
correspondence [1] - 13:1

**cost** [31] - 3:3, 4:8, 4:25, 5:2, 5:13, 5:16, 6:8, 6:22, 7:1, 7:9, 7:10, 7:15, 7:17, 7:22, 8:21, 8:25, 9:7, 9:11, 10:2, 10:3, 10:17, 10:23, 10:25, 11:11, 11:23, 12:16, 13:16, 13:17, 15:13, 15:21, 15:25
**costs** [8] - 2:17, 2:25, 3:5, 4:12, 4:14, 10:11, 16:18, 17:8
**Counsel** [1] - 1:13
**counsel** [8] - 2:22, 4:1, 6:1, 6:5, 13:2, 13:20, 14:1, 15:3
**counsel's** [1] - 18:3
**COUNTY** [1] - 21:3
**coupled** [1] - 16:23
**course** [2] - 16:12
**Court** [20] - 1:23, 1:25, 2:13, 2:22, 3:3, 4:17, 4:18, 5:5, 6:23, 7:8, 7:10, 7:16, 8:3, 10:4, 10:6, 11:1, 11:12, 11:16, 11:23, 15:7
**COURT** [1] - 1:1
**crucial** [2] - 8:16, 9:21
**customers** [1] - 3:17

D

**data** [17] - 4:5, 4:13, 4:22, 4:23, 5:1, 5:9, 5:11, 13:3, 13:5, 13:12, 13:23, 14:12, 15:24, 16:1, 16:20, 17:1, 17:2
**databases** [1] - 15:20
**date** [5] - 5:6, 6:19, 19:18, 19:19, 19:25
**dates** [1] - 19:16
**days** [4] - 18:22, 19:9, 19:21, 19:22
**dealing** [1] - 6:17
**DEBORAH** [4] - 1:23, 21:5, 21:19, 21:20
**Debtors** [14] - 1:5, 1:13, 2:8, 2:14, 8:8, 8:14, 9:25, 11:12, 12:4, 12:22, 18:5, 18:13, 19:5
**Debtors'** [1] - 19:7
**decide** [2] - 7:10, 7:12
**decision** [3] - 7:18, 10:24, 13:14
**delay** [2] - 8:23, 11:3
**demonstrate** [1] - 10:19
**depose** [2] - 11:4, 11:10
**deposition** [6] - 13:23, 14:16, 14:19, 14:24, 19:11, 20:2
**depositions** [8] - 9:13, 9:16, 11:18, 11:19, 13:15, 15:8, 18:23, 18:25
**destroyed** [2] - 12:10, 13:11
**detailed** [1] - 11:15
**determination** [3] - 3:3, 17:10, 18:11
**determine** [5] - 2:24, 7:9, 9:2, 11:6, 12:1
**determined** [1] - 16:11
**determining** [1] - 5:15
**different** [2] - 12:5, 13:2
**difficult** [1] - 18:21
**DIGITALLY** [1] - 1:6
**discovered** [1] - 15:17
**Discovery** [1] - 1:8
**discovery** [42] - 2:17, 2:19, 2:22, 3:1, 3:6, 4:2, 4:8, 4:9, 4:15, 4:16, 4:20, 4:21, 5:6, 5:7, 5:13, 6:17, 7:7, 7:13, 7:14, 7:19, 8:4, 8:7, 8:8, 8:17, 8:23, 9:12, 11:25, 12:22, 13:19, 13:23, 14:2, 14:24, 15:5, 15:7, 15:12, 15:15, 16:17, 17:12, 17:25, 18:4, 18:12, 20:2
**discussions** [1] - 8:14
**dispute** [2] - 12:4, 15:25
**DISTRICT** [1] - 1:2
**docket** [2] - 2:9, 6:24
**document** [3] - 13:4, 13:5, 13:6
**documents** [21] - 5:23, 5:24, 6:6, 6:12, 8:11, 8:15, 8:16, 8:19, 9:14, 9:18, 12:6, 12:8, 12:14, 13:6, 13:10, 13:11, 18:2, 18:7, 18:8
**done** [6] - 5:8, 7:16, 12:1, 12:2, 13:12, 15:6
**doubting** [1] - 18:3
**down** [3] - 10:15, 16:18, 18:15
**Drye** [1] - 7:25
**DRYE** [1] - 1:16
**during** [1] - 4:1

E

**E-MAIL** [1] - 21:22
**e-mails** [2] - 9:23, 12:8
**earliest** [1] - 19:12
**early** [2] - 19:1, 19:3
**EffectNet** [4] - 3:10, 3:11, 3:16, 3:19
**effort** [1] - 8:23
**efforts** [5] - 4:21, 5:6, 9:13, 15:19, 18:4
**eight** [1] - 13:4
**either** [1] - 13:7
**electronic** [32] - 2:17, 2:19, 2:25, 3:6, 4:5, 4:8, 4:9, 4:12, 4:14, 4:19, 4:21, 4:22, 5:1, 5:6, 5:7, 5:9, 5:11, 5:13, 7:7, 7:19, 8:15, 9:18, 13:3, 13:4, 13:23, 14:2, 14:12, 15:4, 15:7, 15:14, 17:25, 21:9
**Electronic** [1] - 1:24
**eliminated** [1] - 16:19
**employment** [1] - 9:23
**end** [1] - 17:3
**enhanced** [1] - 16:9
**enter** [1] - 7:5
**entered** [1] - 3:11
**entertain** [1] - 4:18
**entire** [1] - 8:1
**entitled** [1] - 11:9
**equation** [1] - 17:25
**equivalent** [2] - 5:24, 14:22
**ESQ** [2] - 1:15, 1:19
**estimate** [2] - 4:8, 4:11
**et** [2] - 1:4, 2:2
**event** [1] - 11:8
**evidence** [2] - 3:5, 12:20
**examples** [1] - 8:20
**except** [1] - 12:6
**Excerpt** [1] - 1:7
**excerpt** [1] - 2:1
**exist** [2] - 15:18, 15:19
**exists** [3] - 13:9, 13:24, 15:19
**explain** [1] - 9:8
**extensive** [2] - 9:12
**extent** [1] - 19:17

F

**facilitated** [1] - 16:10
**fact** [7] - 5:11, 9:12, 9:15, 11:18, 18:1, 18:4, 19:15
**facts** [3] - 9:19, 10:18, 16:3
**factual** [4] - 2:23, 3:2, 9:6, 10:5
**faintest** [1] - 16:21
**fair** [2] - 6:5, 10:5
**fall** [1] - 3:21
**few** [2] - 8:20, 12:7
**file** [5] - 2:16, 4:16, 5:2, 6:21, 14:22
**filed** [3] - 3:19, 3:21, 8:13
**FINAL** [1] - 1:6
**First** [1] - 8:10
**first** [3] - 2:9, 8:13, 18:13
**firsthand** [1] - 10:13
**five** [1] - 5:18
**follow** [1] - 16:25
**following** [1] - 2:1
**form** [1] - 13:21
**forth** [2] - 3:18, 15:1
**forward** [3] - 6:7, 8:4, 8:18
**four** [1] - 5:14
**frame** [3] - 10:17, 18:22, 19:11
**FRIEDMAN** [7] - 1:19, 7:24, 9:5, 10:22, 11:8, 17:18, 20:6
**Friedman** [3] - 5:4, 7:25, 15:2
**fully** [2] - 8:6, 8:14

G

**General** [1] - 3:13
**genesis** [1] - 8:2
**GONZALEZ** [19] - 1:10, 2:4, 6:14, 6:25, 7:20, 8:24, 10:9, 11:5, 12:21, 14:3, 14:13, 14:18, 15:16, 16:2, 17:16, 18:10, 18:20, 20:8, 20:11
**granted** [1] - 6:25
**groups** [2] - 12:5, 18:1
**guess** [1] - 19:12

H

**half** [1] - 8:12
**HALLIE** [1] - 21:21
**hand** [1] - 21:16
**handling** [1] - 2:12
**hard** [1] - 8:11
**hear** [5] - 7:20, 12:21, 17:11, 17:16, 18:13
**hearing** [7] - 4:1, 6:18, 7:22, 10:11, 19:1, 19:20, 19:25
**HECKER** [1] - 1:13
**Hecker** [1] - 2:7
**held** [1] - 21:10
**hereby** [1] - 21:7
**hereunto** [1] - 21:15
**Holdings** [22] - 1:7, 1:8, 1:17, 2:11, 2:18, 2:19, 3:6, 3:7, 4:2, 4:4, 4:10, 4:13, 5:11, 5:14, 5:17, 6:2, 6:10, 7:11, 7:21, 7:25, 17:11, 17:17
**Holdings'** [8] - 3:10, 3:22, 4:6, 5:21, 5:25, 6:4, 13:2, 14:1
**Honor** [11] - 2:6, 2:15, 7:4, 9:5, 12:24, 14:9, 14:17, 17:15, 18:18, 20:6, 20:7
**HONORABLE** [1] - 1:10
**HUNTSMAN** [4] - 1:23, 21:5, 21:19, 21:20

I

**idea** [3] - 9:16, 9:17, 16:21
**identified** [4] - 5:22, 6:23, 13:1, 13:7
**ignorance** [1] - 16:2
**ignore** [1] - 19:15
**immediately** [1] - 12:3
**impact** [1] - 15:13
**impacts** [2] - 7:2, 15:14

**impede** [1] - 8:8
**important** [2] - 13:22, 18:9
**impose** [1] - 11:3
**imposed** [1] - 10:24
**imposes** [1] - 10:25
**IN** [1] - 21:15
**inaccessible** [7] - 4:24, 5:1, 5:11, 12:11, 13:12, 15:23, 16:1
**INC** [1] - 1:4
**Inc** [4] - 1:7, 1:8, 1:17, 2:2
**including** [1] - 13:5
**incomplete** [1] - 15:5
**incorrect** [1] - 15:5
**indication** [1] - 16:25
**individual** [2] - 4:3, 4:6
**industry** [2] - 16:13, 16:22
**industry-wide** [1] - 16:22
**inferences** [1] - 12:18
**informal** [5] - 2:10, 4:15, 4:19, 6:16, 6:20
**information** [6] - 13:19, 13:25, 14:3, 15:3, 17:22, 19:8
**initial** [1] - 11:22
**inquire** [2] - 12:12, 12:15
**inquiry** [4] - 9:11, 10:3, 11:24, 16:7
**Instead** [1] - 12:10
**intentionally** [1] - 12:9
**interested** [1] - 21:14
**Intermedia** [9] - 3:9, 3:10, 3:11, 3:15, 4:5, 4:22, 12:4, 13:3, 13:8
**Intermedia's** [2] - 3:16, 5:8
**interrupt** [1] - 11:5
**involved** [3] - 15:11, 18:5, 19:6
**issue** [9] - 5:16, 7:22, 10:18, 15:13, 16:1, 17:3, 17:20, 19:1, 20:4
**issues** [4] - 2:22, 4:2, 14:5, 16:24
**IT** [11] - 9:13, 9:16, 11:4, 11:10, 11:16, 11:18, 11:25, 12:22, 13:15, 15:9, 18:12
**item** [1] - 2:9

**J**

**job** [1] - 15:6
**Judge** [6] - 1:11, 7:24, 8:21, 9:17, 11:17, 17:18
**JUDGE** [18] - 2:4, 6:14, 6:25, 7:20, 8:24, 10:9, 11:5, 12:21, 14:3, 14:13, 14:18, 15:16, 16:2, 17:16, 18:10, 18:20, 20:8, 20:11
**judgment** [4] - 3:18, 3:21, 4:17, 8:13
**July** [3] - 1:4, 21:11, 21:16
**jumping** [1] - 18:15
**June** [1] - 6:23

**K**

**Kansas** [1] - 1:14
**keep** [2] - 9:25, 18:14
**KELLEY** [1] - 1:16
**Kelley** [1] - 7:25
**kept** [4] - 14:7, 14:25, 16:13
**Kevin** [1] - 6:1
**key** [3] - 4:7, 5:21, 9:13
**knowing** [1] - 16:24
**knowledge** [1] - 10:13
**known** [1] - 17:3

**L**

**lands** [1] - 19:17
**language** [1] - 3:24
**last** [4] - 2:21, 3:21, 4:1, 8:11
**law** [2] - 3:24, 10:19
**least** [3] - 8:9, 10:14, 12:3
**leave** [2] - 18:11, 19:24
**legal** [1] - 7:15
**legitimate** [1] - 16:7
**letter** [2] - 5:4, 6:23
**light** [1] - 13:24
**likely** [1] - 19:23
**limit** [4] - 6:1, 7:12, 17:24, 19:20
**limited** [2] - 5:3, 11:25
**list** [1] - 4:3
**litigation** [3] - 16:24, 16:25, 17:4
**LLP** [2] - 1:13, 1:16

**M**

**MAIL** [1] - 21:22
**mails** [2] - 9:23, 12:8
**maintained** [1] - 9:18
**maintaining** [1] - 18:6
**Mark** [1] - 2:6
**marriage** [1] - 21:13
**matter** [9] - 2:11, 2:18, 3:1, 3:19, 3:24, 6:18, 8:9, 20:9, 21:14
**matters** [1] - 2:5
**matures** [1] - 10:10
**MCI** [15] - 2:15, 3:2, 3:8, 3:19, 3:20, 4:3, 4:4, 4:5, 4:22, 5:5, 5:8, 5:9, 6:20, 13:3
**meaningful** [1] - 6:7
**mention** [1] - 8:20
**mentioned** [1] - 14:11
**messaging** [1] - 3:15
**microphone** [1] - 18:14
**mid** [2] - 18:25, 19:13
**mid-August** [1] - 18:25
**mid-September** [1] - 19:13
**might** [1] - 7:14
**mind** [2] - 12:2, 16:4
**Missouri** [1] - 1:14
**months** [4] - 10:16, 14:1
**morning** [3] - 2:6, 2:10, 7:24
**MORRISON** [1] - 1:13
**Morrison** [1] - 2:7
**most** [6] - 8:16, 9:21, 10:1, 11:25, 18:2, 18:9
**motion** [17] - 2:16, 4:16, 4:17, 5:2, 6:21, 8:2, 8:10, 8:13, 11:2, 11:6, 11:10, 11:13, 11:17, 12:23, 13:16, 13:18, 19:12
**Motion** [1] - 1:8
**move** [3] - 6:7, 8:4, 8:17
**MR** [8] - 2:6, 7:24, 9:5, 10:22, 11:8, 17:18, 20:6, 20:10
**MS** [11] - 2:13, 6:20, 7:4, 12:24, 14:9, 14:17, 15:2, 15:23, 17:14, 18:18, 20:7
**MURDOCK** [12] - 1:15, 2:13, 6:20, 7:4, 12:24, 14:9, 14:17, 15:2, 15:23, 17:14, 18:18, 20:7
**Murdock** [2] - 2:11, 2:14

**N**

**names** [3] - 4:3, 4:7, 5:21
**narrow** [1] - 18:1
**necessarily** [3] - 10:21, 15:21, 17:8
**necessary** [3] - 2:24, 3:2, 6:12
**need** [6] - 11:6, 12:11, 12:15, 14:23, 17:11, 18:14
**NEW** [3] - 1:2, 21:2, 21:3
**New** [5] - 1:5, 1:18, 21:6
**next** [2] - 19:8, 20:9
**nine** [3] - 5:19, 5:20, 6:9
**none** [1] - 9:15
**normal** [1] - 16:11
**Notary** [1] - 21:6
**nothing** [1] - 9:25
**notion** [1] - 13:22
**November** [1] - 3:11
**number** [2] - 5:24, 9:20
**Number** [2] - 9:11, 9:21

**O**

**objections** [1] - 8:6
**occurred** [1] - 9:10
**OF** [3] - 1:2, 21:2, 21:3
**official** [1] - 21:9
**Once** [1] - 7:17
**once** [1] - 17:2
**one** [7] - 5:12, 5:17, 9:11, 9:21, 14:4, 14:8, 15:10
**One** [2] - 6:14, 12:2
**opportunity** [1] - 7:8
**order** [10] - 2:16, 2:18, 2:24, 6:17, 7:2, 7:6, 7:23, 8:3, 11:22
**ordinary** [1] - 16:12
**original** [2] - 16:5, 16:20
**originals** [3] - 16:8, 16:11
**otherwise** [2] - 16:13, 19:19
**outcome** [1] - 21:14
**outset** [1] - 14:15
**own** [1] - 19:9

**P**

**pages** [2] - 5:23, 6:3
**papers** [1] - 3:18
**Park** [1] - 1:17
**part** [1] - 17:25
**participants** [1] - 17:21
**parties** [9] - 2:21, 3:13, 7:18, 18:16, 18:23, 19:2, 19:6, 20:2, 21:13
**party** [2] - 14:19, 16:17
**Parus** [30] - 1:7, 1:8, 1:17, 2:10, 2:18, 2:19, 3:6, 3:7, 3:10, 3:22, 4:2, 4:4, 4:6, 4:10, 4:13, 5:11, 5:14, 5:17, 5:21, 5:25, 6:2, 6:4, 6:10, 7:11, 7:20, 7:25, 13:2, 13:25, 17:11, 17:16
**past** [1] - 14:1
**path** [1] - 10:15
**pay** [1] - 7:13
**pending** [2] - 8:5, 8:12
**people** [9] - 9:13, 9:16, 11:4, 11:10, 11:16, 11:18, 13:16, 15:9, 18:12
**percent** [1] - 6:3
**perform** [1] - 4:12
**period** [1] - 19:10
**permission** [3] - 2:15, 4:16, 6:21
**person** [2] - 15:10
**person's** [1] - 9:23
**place** [2] - 10:12, 10:20
**plain** [1] - 3:24
**point** [9] - 10:8, 10:10, 10:21, 11:20, 11:24, 14:8, 17:6, 17:9, 19:25

**POP** [1] - 12:7
**possible** [3] - 7:11, 12:17, 13:1
**possibly** [2] - 12:7, 12:15
**Pre** [1] - 1:8
**Pre-Motion** [1] - 1:8
**predated** [1] - 9:10
**predecessor** [1] - 3:10
**PRELIMINARY** [1] - 21:22
**premature** [5] - 7:5, 10:4, 10:7, 10:9, 11:7
**preserve** [3] - 9:14, 12:14, 17:2
**preserved** [1] - 12:9
**preserving** [1] - 18:7
**problems** [2] - 18:6, 20:1
**proceed** [1] - 7:18
**proceeded** [1] - 4:19
**proceedings** [1] - 21:10
**PROCEEDINGS** [1] - 1:6
**Proceedings** [1] - 1:24
**process** [5] - 11:2, 12:12, 12:25, 13:8, 17:21
**processes** [1] - 10:14
**produce** [1] - 8:18
**Produced** [1] - 1:25
**produced** [6] - 9:24, 10:2, 13:10, 14:6, 14:11, 18:3
**productions** [3] - 13:4, 13:5, 13:6
**proof** [1] - 18:7
**PROOFREAD** [1] - 21:21
**proper** [2] - 11:2, 17:1
**prospective** [2] - 10:20, 11:19
**protective** [3] - 2:16, 7:2, 7:23
**provide** [6] - 13:17, 13:21, 14:20, 15:11, 17:24, 18:4
**provided** [6] - 4:2, 4:6, 13:20, 15:4, 17:23
**providing** [1] - 13:25
**Public** [1] - 21:6
**pudding** [1] - 18:8
**pulled** [2] - 5:22, 6:13
**purchase** [1] - 3:15
**purposes** [3] - 5:13, 5:15, 19:20
**pushed** [1] - 19:3

**Q**

**questions** [1] - 15:18
**quite** [1] - 17:10

**R**

**range** [1] - 4:11
**re** [3] - 1:3, 1:8, 2:2
**read** [1] - 10:25
**ready** [1] - 19:11
**really** [5] - 6:7, 10:13, 15:13, 17:21, 19:24
**reason** [1] - 16:14
**reasons** [1] - 5:16
**receiving** [1] - 17:5
**recently** [1] - 5:5
**recess** [1] - 20:14
**recognize** [1] - 4:24
**record** [3] - 3:2, 9:12, 10:5
**RECORDED** [1] - 1:6
**Recorded** [1] - 1:24
**recording** [1] - 21:10
**Recording** [1] - 1:24
**records** [2] - 10:1, 16:15
**referred** [1] - 3:14
**regarding** [2] - 18:8, 19:8
**related** [3] - 4:22, 5:16, 21:12
**relating** [2] - 8:16, 9:20
**relevant** [6] - 8:19, 10:1, 10:19, 15:21, 18:2, 18:16
**reluctant** [1] - 17:20
**remainder** [1] - 7:19
**remains** [2] - 18:1, 18:5
**Reorganized** [3] - 1:5, 1:13, 2:8
**Reporter** [3] - 1:23, 1:25, 21:5
**representations** [1] - 17:12
**representing** [1] - 2:7
**request** [5] - 4:18, 6:4, 6:19, 6:25, 7:21
**requested** [3] - 6:18, 6:20, 8:19
**requesting** [1] - 4:13
**requests** [3] - 2:15, 7:12, 18:9
**required** [2] - 7:12, 8:18
**resale** [1] - 3:16
**resolution** [1] - 8:9
**resolved** [1] - 3:23
**respect** [5] - 5:8, 7:21, 12:22, 13:12, 17:19
**respects** [1] - 11:7
**respond** [1] - 17:20
**response** [2] - 8:21, 14:23
**responses** [1] - 15:17
**responsive** [2] - 6:4, 6:6
**result** [1] - 6:13
**retain** [1] - 16:15
**retroactive** [1] - 10:23
**retroactively** [1] - 11:1
**review** [3] - 5:22, 6:12
**risk** [2] - 9:1, 9:2
**Robert** [1] - 7:24
**ROBERT** [1] - 1:19
**Rule** [3] - 2:16, 6:22, 14:23

**S**

**sampled** [4] - 5:10, 5:12, 5:15, 5:18
**sampling** [7] - 6:9, 6:10, 7:16, 13:11, 13:13, 17:20, 17:21
**sanctions** [2] - 12:17, 12:19
**schedule** [6] - 7:1, 7:21, 19:8, 19:15, 19:17, 19:24
**schedules** [2] - 18:19, 19:10
**scheduling** [6] - 6:17, 7:2, 7:6, 8:3, 11:22, 20:4
**Scheindlin** [1] - 11:17
**scope** [1] - 15:12
**search** [11] - 4:3, 4:6, 4:9, 5:20, 5:21, 6:1, 10:1, 15:20, 16:9, 17:23, 17:24
**searches** [3] - 4:13, 6:13, 9:20
**searching** [2] - 4:4, 15:7
**seated** [1] - 2:4
**second** [1] - 6:14
**see** [3] - 15:20, 17:5, 19:14
**seeing** [1] - 8:23
**seek** [2] - 4:15, 5:2
**seeking** [4] - 2:20, 6:21, 7:13, 16:17
**seem** [2] - 16:14, 18:24
**selected** [3] - 5:14, 5:17, 6:9
**sense** [1] - 11:25
**SENT** [1] - 21:22
**September** [5] - 19:1, 19:3, 19:4, 19:13, 19:14
**serious** [1] - 18:6
**Services** [1] - 3:12
**services** [1] - 3:16
**set** [3] - 3:18, 15:1, 21:15
**several** [1] - 9:10
**SHAIKEN** [2] - 2:6, 20:10
**Shaiken** [2] - 2:7, 20:8
**shift** [2] - 2:17, 10:19
**shifted** [2] - 10:12, 17:8
**shifting** [31] - 2:25, 3:3, 3:5, 4:25, 5:2, 5:13, 5:16, 6:22, 7:1, 7:9, 7:11, 7:16, 7:17, 7:22, 8:21, 8:25, 9:7, 9:11, 10:2, 10:3, 10:17, 10:23, 10:25, 11:11, 11:24, 12:17, 13:16, 13:18, 15:13, 15:21, 16:1
**Shorthand** [1] - 21:5
**shorthand** [1] - 3:13
**show** [1] - 13:18
**shows** [1] - 12:20
**side** [2] - 12:15, 13:10
**sides** [1] - 18:15
**single** [1] - 15:9
**sit** [1] - 18:19
**Sitting** [1] - 16:21
**six** [2] - 10:16, 14:1
**Smith** [1] - 6:1
**someone** [1] - 16:3
**sorry** [2] - 11:5, 14:17
**sought** [1] - 4:15
**Sound** [1] - 1:24
**sound** [1] - 21:9
**sounding** [1] - 3:23
**sources** [3] - 14:2, 14:12, 15:4
**SOUTHERN** [1] - 1:2
**speaking** [1] - 10:13
**Special** [1] - 1:13
**specifically** [1] - 9:15
**SS** [1] - 21:2
**standard** [2] - 16:22, 16:23
**standards** [1] - 17:4
**standpoint** [1] - 19:7
**standpoints** [1] - 11:14
**start** [1] - 8:7
**STATE** [1] - 21:2
**State** [1] - 21:6
**STATES** [1] - 1:1
**States** [1] - 1:11
**stay** [1] - 4:16
**step** [1] - 8:22
**still** [3] - 17:11, 17:21, 19:22
**Stinson** [1] - 2:7
**STINSON** [1] - 1:13
**stop** [1] - 8:8
**Street** [1] - 1:14
**subject** [2] - 11:11, 14:10
**submit** [3] - 7:5, 11:15, 11:24
**submitted** [1] - 9:19
**subsidiary** [1] - 3:8
**suffice** [1] - 14:14
**suggested** [1] - 5:4
**summary** [4] - 3:18, 3:21, 4:17, 8:13
**summer** [1] - 18:20
**supervisor** [1] - 9:22
**support** [1] - 13:17
**supports** [1] - 3:5
**surface** [1] - 16:6
**sworn** [1] - 11:15

**T**

**table** [1] - 18:14
**tapes** [13] - 5:12, 5:14, 5:17, 5:18, 5:19, 5:20, 6:9, 9:20, 9:24, 13:13, 15:24, 16:4, 16:5
**targeted** [1] - 18:1
**technical** [1] - 5:16
**terminated** [1] - 3:20
**terms** [8] - 4:3, 4:6,

4:10, 5:21, 6:1, 17:23, 17:24, 18:12
**THE** [1] - 1:10
**theoretically** [1] - 10:15
**thorough** [1] - 15:6
**three** [2] - 8:5, 10:16
**throw** [1] - 17:4
**today** [3] - 2:15, 6:15, 18:19
**tort** [1] - 3:23
**total** [1] - 5:18
**TRANSCRIPT** [2] - 1:6, 21:22
**transcript** [1] - 21:9
**Transcript** [1] - 1:25
**transparent** [4] - 12:25, 13:8, 13:24, 14:4
**triggers** [1] - 16:4
**true** [1] - 21:8
**try** [2] - 8:7, 20:4
**trying** [1] - 8:15
**turn** [2] - 4:5, 16:16
**turns** [1] - 19:2
**two** [5] - 8:6, 8:12, 9:21, 10:16, 12:5
**type** [2] - 13:13, 14:23
**types** [3] - 12:18, 13:2, 13:18

## U

**UC** [4] - 3:14, 3:20, 3:24
**ultimate** [1] - 10:6
**ultimately** [3] - 10:10, 17:3, 18:11
**unavailable** [1] - 19:22
**under** [9] - 2:16, 4:24, 6:22, 7:14, 9:7, 10:19, 10:22, 11:14, 16:11
**Under** [3] - 3:14, 9:9, 14:13
**undertake** [1] - 2:23
**undertaken** [1] - 5:5
**unfortunately** [1] - 11:3
**Unified** [1] - 3:12
**unified** [1] - 3:15
**UNITED** [1] - 1:1
**United** [1] - 1:11
**unnecessary** [2] - 13:15, 13:24
**up** [5] - 8:25, 9:2, 9:7, 18:15, 18:21

## V

**various** [2] - 13:18, 15:20
**vendor** [1] - 4:7
**VIA** [1] - 21:22
**view** [4] - 8:9, 12:3, 17:6, 18:6
**viewed** [1] - 5:1
**volume** [1] - 7:6

## W

**Walnut** [1] - 1:14
**WARREN** [1] - 1:16
**Warren** [1] - 7:25
**website** [1] - 19:21
**WHEREOF** [1] - 21:15
**wide** [1] - 16:22
**willing** [2] - 8:25, 9:1
**wish** [1] - 13:22
**WITNESS** [1] - 21:15
**witness** [1] - 9:22
**world** [1] - 14:20
**WORLDCOM** [1] - 1:4
**WorldCom** [10] - 2:2, 2:5, 12:5, 12:6, 12:15, 13:5, 13:7, 13:10, 19:16, 19:18
**WorldCom's** [1] - 17:6
**written** [1] - 5:5

## Y

**year** [1] - 8:11
**years** [3] - 8:5, 8:6, 8:12
**YORK** [3] - 1:2, 21:2, 21:3
**York** [5] - 1:5, 1:18, 21:7
**yourselves** [1] - 19:21

## Z

**Zubulake** [8] - 9:8, 9:9, 9:21, 9:22, 10:23, 11:15, 11:17, 13:14

# EXHIBIT H

D00214

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CHAPTER 11

CASE NO. 02-13533 (AJG)

In Re:

WORLDCOM, INC., et al.,

Debtors.

____________________________/

VIDEOTAPED DEPOSITION OF JAMES RENFORTH

(Volume II)

November 17, 2006
9:37 a.m. - 5:36 p.m.

Foley & Lardner, LLP
100 North Tampa Street
Suite 2700
Tampa, Florida 33602

-----------------------------------

REPORTED BY:
NANCY E. PAULSEN
Registered Professional Reporter
Notary Public, State of Florida at Large
Esquire Deposition Services - Tampa, Florida
813-221-2535 (800-838-2814)
Job No.: N 838672B

What was that about?
A. We had a -- just looking back through here, and I don't -- I don't remember without looking, we had a specific customer that had many locations throughout the United States. And they had -- they had the need to be able to conference upwards of a hundred people on a bridge periodically.
And they wanted to use our platform to do that with, but we could only go to 32 ports at that time.
Q. When you say "our platform" --
A. The Unified Messaging platform had conferencing capabilities also, but it was limited to 32 ports, 32 people. This customer wanted to put a hundred or more people on it. And we said, "Hey, we'll go check."
Q. So you were looking to see if EffectNet could do it?
A. And it wasn't available right then, but they -- they were willing to work on making that happen.
Q. Okay.
(Marked Deposition Exhibit Number 25.)
BY MR. IBA:
Q. All right, I've handed you Exhibit 25, which is another e-mail from Jack Kerrigan to Javid Freeman, Sherrie Baughman, Glenn Ireland, Donna Serdinak, and

you, you are copied on it, dated July 11th, 2001. Do you see that?
A. Yes.
Q. And it says, "All, here is a summary of the items we covered and the decisions made." And then Mr. Kerrigan identifies a number of items that are -- that were discussed and decisions with respect to them. Do you see that?
A. Yes.
Q. Okay. Item 1 talks about notification on closed accounts, and states what the issues are and what EffectNet is going to do. Do you see that?
A. Sure. Um-hum (affirmative).
Q. Item 2 talks about C.D.R. file transmissions. And there is questions and decisions made there. Correct?
A. Right.
Q. 3 talks about "When will we receive an invoice to process?" Do you know at that point had EffectNet not invoiced Intermedia?
A. Oh, yes.
Q. They had?
A. This was the electronic -- the E.D.I. transport we were talking about upgrading to over time.
Q. Now, item 4, it says, "When will multiple

accounts entry be available?" So they're discussing that still; correct?
A. Yes.
Q. It says a new design is being considered, and Javid is going to send an e-mail identifying details, etcetera.
What's a warm tranover process? Do you know what that is?
A. What the heck is that.
I think that's warm transfer.
Q. And then the final line says, "Increase in account volumes is not anticipated to begin before August 1st, 2001." Do you see that?
A. Yes.
Q. And what is that talking about?
A. Uh, I don't know.
It has to do with order processing.
Q. It has to do with the web-based order entry system --
A. Right.
Q. -- that you were talking about?
A. Right. Because that's what they're still talking about is additional changes and upgrades to that system, ongoing upgrades.
Q. So we saw that at the beginning of July or end

of June that I.S.R. has been completed and so they're ready to roll it out, but there are still a few issues that --
A. Not really issues. These are still enhancements to that.
Q. Okay.
A. Again, now, we've got the portal. We've got that -- I.S.R. has been approved. It was approved May 3rd, and it was finished early June. But remember, we still had the item -- one of the items was anytime we want to add, we have to enter all the information on that line. We want to be able to ditto.
And this is still talking about that kind of stuff right there, multiple accounts. And account volumes is anticipated to begin -- or to begin before August 1st. Again, being able to increase the amount of orders that they put in per day.
Q. So they were anticipating being able to start increasing the account volumes after August 1st, 2000; correct?
A. Yes. When all -- when some of these other things had happened.
(Attorney McConnell left the room.)
BY MR. IBA:
Q. Okay. Now, in all of that, my understanding

from what you've explained to me is that the more manual type of order processing was still going forward during all of this time; correct?

A. That's correct.

(Marked Deposition Exhibit Number 26.)

BY MR. IBA:

Q. I've handed you Exhibit 26, an e-mail from Susan Fuller on July 20th, 2001, to a lot of people, including you, about Unified Messaging training. Do you see that?

A. Yes.

Q. That Unified Messaging training was scheduled for Monday, July 23rd, at 12:30 p.m.; correct?

A. Correct.

Q. Okay. Do you have any recollection of what this involved?

A. Yes. This was -- I'm not -- I don't remember what state this was for, but it was for one -- one or more of the subsequent states that were being launched into. And by this time, you'll notice a different name on here, Jim Tills.

Q. Yes.

A. He was the host of that. This was his -- I think his -- his inauguration into the market management. Because until -- up until this time, the

product marketing representative -- or the director had been Mike Tyler.

Mike Tyler took over the A.B.N. business unit as director. Mark Tills came in as a director or product marketing.

So -- and we were -- we were rolling out the training to an aggregate of audience participants now. Where before, remember, we were just selling to -- or we were just rolling that out and training retail salespeople.

Now you'll see the audience is sales, retail sales, the A.B.N. sales, the data sales centers, and the district sales managers. So it was going to be -- we were training everybody that could sell it.

Q. Now, were you involved in the training?

A. Not this one.

Q. Okay. Now, I take it that rolling this out and doing this training takes a great deal of effort. Is that fair to say?

A. That's true, yes.

Q. Involves a lot of people?

A. A lot of people.

Q. A lot of money is invested to train all of the employees as you rolled out to more and more cities; correct?

A. Correct.

Q. Do you have any recollection of a campaign call Swing For the Fences?

A. Called what?

Q. Swing For the Fences?

A. Yeah. Yeah, it was during the World Series.

Q. Do you remember what it was? My -- I believe it was something going on in July of 2001.

A. I think that's what they called this thing (indicating).

Q. "This thing," pointing to Exhibit 26?

A. Yeah. I think that's what they ended up dubbing that was Swing For the Fences.

Q. It had to do with a sales campaign; correct?

A. Right.

Q. That was being undertaken in July of 2001?

A. (Nods head affirmatively.)

Q. Do you know if it went on after July of 2001?

A. I don't know. I don't know.

Q. You would think so if it was connected with the World Series, but --

A. Yeah, I think so. But I don't know. It may have gone on after I left.

Q. Earlier, we talked about forecast estimates?

A. Um-hum (affirmative).

Q. And so I just wanted to go through a few forecasts that I noticed.

(Marked Deposition Exhibit Number 27.)

BY MR. IBA:

Q. All right, I've handed you Exhibit 27, which is an e-mail from Jack Kerrigan to Javid Freeman, copied to a number of people, including you, with an attachment which is entitled "IntermediaOne Messaging Forecast".

A. Right.

Q. Do you see that?

A. Yes.

Q. Do you recognize what it is?

A. Yes.

Q. What is -- tell me what it is.

A. This was -- this was the -- the Unified Messaging forecast for hitting the 10,000 bogey.

Q. And are these numbers that were -- strike that.

My recollection is you told us that the 10,000 number came from EffectNet. Is that correct?

A. It did.

Q. Okay. And are these numbers that came from EffectNet?

A. The 10,000 came from EffectNet. The incremental monthly numbers came from product management

on, okay, what do we have to sell to hit the 10,000 in the first year.
Q. And so this was Jack Kerrigan sending to Mr. Freeman those incremental numbers, how it was going to happen; is that correct?
A. That's correct.
(Marked Deposition Exhibit Number 28.)
BY MR. IBA:
Q. Handing you now Exhibit 28, which is an e-mail from you to Javid Freeman and somebody Blanch. Do you know who that is?
A. Ryan Blanchard.
Q. Ryan Blanchard?
A. Ryan Blanchard.
Q. Okay. Which is again a forecast that gets you up to 10,000.
A. Same numbers.
Q. Same numbers?
A. Same spreadsheet, actually.
Q. Okay. And do you remember why you were sending it to those two people on November 28th, 2000?
A. A courtesy more than anything to say, okay, you know, we know we're going to sell -- we know we have to sell 10,000, here is -- here is the plan for doing it.

Q. Okay.
(Marked Deposition Exhibit Number 29.)
BY MR. IBA:
Q. All right, here is another one, an e-mail from you to Javid Freeman dated March 15th, 2001, with a forecast. It appears to be on a different format. Can you tell us what is going on here?
A. Yeah, this is the -- this is the same forecast, same breakdown that I had provided, only he had asked that we put it on one of their templates.
Based upon geographic -- geographic locations with the same monthly total.
Q. Okay. So you were using those same forecasts from October into March throughout that time period?
A. On requirements.
Q. Right.
A. Yes.
Q. Under the contract?
A. Under the contract.
Q. Do you have any personal knowledge of what happened to the Unified Messaging product after you left the company?
A. No.
Q. Okay. Anything that you know after your resignation would be what you've just heard from others?

A. Yes.
Q. Okay. Did you keep in contact with any folks at Intermedia?
A. Not -- not until they had left the company.
Q. Do you keep in contact with anyone from the company today?
A. Been a couple of years, I think, since I talked to anybody that had worked there.
Q. What kind of -- do you remember who you've talked to since you left?
A. Oh, sure. Jimmy Faust.
Q. Uh-huh (affirmative).
A. He took over the IntermediaOne product when I left. And he was on site -- on -- in-house at the time for the beta part.
And the other one was Sherrie Baughman. Cheryl Mellon. Well, the whole team. Jimmy Faust, Sherrie Baughman, Sherrie Butler, Crystal Simons, who was one of the clerks in the group, and Cheryl Mellon. Jack Lee. Kathy Victory. We've spoken over the years.
Q. And what are the topics that you've covered in your conversations with them?
A. "Hey, what are you guys doing? You got any openings?" Just chitchat.
Q. Okay. Any discussions about -- about

IntermediaOne and its success and --
A. Not really. Not -- nothing -- no. Christmas parties mostly when you see each other.
Q. Right.
Have you kept track of where they are today?
A. A few of them, yeah.
Q. Jimmy Faust, do you keep in touch with him?
A. I talked to him probably within the last three or four months. He had some -- some personal things going on in his -- in his -- in his family life, and he and I talked about that a little bit.
But I think he's working -- he's working here in Tampa, and still living in the area.
Q. Do you know where he works?
A. I believe the company is PharMerica, P-H-A-R, Merica.
Q. Sounds like pharmaceutical work?
A. Yeah, it is. It provides pharmaceuticals.
Q. How about any others? Others that you --
A. Sherrie Baughman.
Q. Sherrie Baughman?
A. Sherrie Baughman. My wife and I ran into her and her boyfriend at Coldstone ice cream store. That was just chitchat.
Q. Okay.

# EXHIBIT I

D00219

**Hearing Date and Time: September 25, 2007 at 10:00 a.m. Eastern Time**
**Response Deadline: September 6, 2007 at 4:00 p.m. Eastern Time**

Robert A. Scher (RS 2910)
FOLEY & LARDNER LLP
90 Park Avenue
New York, NY 10016
Phone: (212) 682-7474
Fax: (212) 682-2329
email: rscher@foley.com

-and-

Mark L. Prager *(admitted pro hac vice)*
Jill L. Murch *(admitted pro hac vice)*
Joanne Lee (admitted pro hac vice
FOLEY & LARDNER LLP
321 N. Clark Street, Suite 2800
Chicago, IL 60610
Phone: (312) 832-4500
Fax: (312) 832-4700

*Attorneys for Claimant Parus Holdings, Inc. Successor-By-Merger to EffectNet, Inc. and EffectNet, LLC*

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | CHAPTER 11 |
| | ) | Jointly Administered |
| WORLDCOM, INC., et al., | ) | |
| | ) | |
| Debtors. | ) | Case No. 02-13533 (AJG) |
| | ) | |

**PARUS HOLDINGS, INC.'S LIMITED OBJECTION TO DEBTORS' AMENDED MOTION FOR AN ORDER PERMITTING PARTIAL WITHDRAWAL OF CLAIM OBJECTION TO PARUS HOLDINGS, INC.'S PROOF OF CLAIM NO. 11173 (REPLACING 9293), ALLOWING RESULTING CLAIM, AND DENYING ALL OTHER PENDING MOTIONS AS MOOT**

Claimant Parus Holdings, Inc. ("Parus"), by and through its counsel, respectfully submits this limited objection (the "Objection") to the Debtor's Amended Motion for an Order Permitting Partial Withdrawal of Claim Objection to Parus Holding, Inc.'s Proof of Claim (Replacing 9293), Allowing Resulting Claim, and Denying All Other Pending Motions as Moot (the "Amended Withdrawal Motion").

Parus does not object generally to: (a) the Debtors' request to withdraw the Debtors'

objection to Parus' claim and (b) the Debtors' request that Parus' claim be allowed. Parus supports the entry of an order fully and finally adjudicating the contested claims litigation among the parties to allow the parties to pursue their respective appellate rights of the Court's final order and without the need to seek leave to file an interlocutory appeal.

Parus provided its comments regarding the Amended Withdrawal Motion to counsel for the Debtors, Mark Iba, on August 15, 2007. Rather than consulting with Parus about its comments and avoiding the need to further burden this Court, Mr. Iba did not respond to Parus' comments - many of which were merely clarifications. Instead, the Debtors filed the current Amended Withdrawal Motion. For the Court's convenience, Parus has attached the redlined changes that were previously provided to Mr. Iba as Exhibit A.

Also for purposes of clarity of the record, Parus notes the Debtors never filed a motion seeking to deny all pending motions as moot. However, by styling the Amended Withdrawal Motion in its current form, the Debtors imply that such a motion was in fact previously filed. The Amended Withdrawal Motion is the first time the Debtors request that all pending motions be held moot. In any event, the relief the Debtors seek is itself moot since the Court already concluded at the July 10, 2007 that all pending motions were rendered moot as a result of the Debtors' withdrawal of its claim objection.

For the Court's convenience, Parus has attached Exhibit B, which is the redline of changes that Parus requested that the Debtors' make to the proposed order. The Court will see that Parus' changes are minimal. However, the Debtors have refused to make such changes. Therefore, Parus respectfully submits this Objection and asks that Parus' proposed order, which is attached as Exhibit C, be entered by the Court.

Dated: September 6, 2007

Respectfully submitted,

By: /s/ Jill L. Murch

Robert A. Scher (RS 2910)
FOLEY & LARDNER LLP
90 Park Avenue
New York, NY 10016
Phone: (212) 682-7474

-and-

Mark L. Prager (*admitted pro hac vice*)
Jill L. Murch (*admitted pro hac vice*)
FOLEY & LARDNER LLP
321 N. Clark Street, Suite 2800
Chicago, IL 60610
Phone: (312) 832-4500
Fax: (312) 832-4700

*Attorneys for Claimant Parus Holdings, Inc., Successor-By-Merger to EffectNet, Inc. and EffectNet, LLC*

# EXHIBIT A

D00223

STINSON MORRISON HECKER LLP
Attorneys for the Reorganized Debtors
1201 Walnut Street
Kansas City, MO 64106
Telephone: (816) 842-8600
Facsimile: (816) 691-3495
Robert L. Driscoll, Esq.
Allison M. Murdock, Esq.
Mark M. Iba, Esq.
Mark A. Shaiken, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | : | |
| | : | Chapter 11 Case No. |
| WORLDCOM, INC., et al., | : | 02-13533 (AJG) |
| | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |

**DEBTORS' AMENDED MOTION FOR AN ORDER PERMITTING PARTIAL WITHDRAWAL OF CLAIM OBJECTION AND ALLOWANCE OF RESULTING CLAIM**

Deleted: UNOPPOSED

Deleted: AND DENYING ¶ ALL OTHER PENDING MOTIONS AS MOOT

WorldCom, Inc. (now Verizon Business Global LLC) and certain of its direct and indirect subsidiaries (collectively, the "Debtors"), respectfully request that the Court issue an order permitting them to withdraw their claim objection on the issue of the contract rate applicable to the four Reconciliation Payments that the Court has ruled are owed under the November 20, 2000 Unified Communications Service Agreement ("UC Contract"). This order is appropriate because it will resolve the one matter for which the Court did not enter summary judgment for the Debtors; that is, "which rate constitutes the 'base monthly'" price'" under the UC Contract.[1] It will also achieve judicial economy and eliminate the need for Debtors to incur

Deleted: dispute

Deleted: on the sole remaining issue in this litigation,

Deleted: ,

[1] In re WorldCom, Inc., ---- B.R. ----, Case No. 02-13533 (AJG) 2007 WL 12678390 (Bankr. S.D.N.Y.), at *11.

Formatted: Underline

further and substantial fees and costs that may exceed the value of the remaining issue in dispute, as well as allow Parus, in the event it chooses to do so, to appeal final orders of this Court. In support of this motion, Debtors state:

**Deleted:** Further, because entry of an Order granting this motion resolves the sole remaining issue in this litigation, Debtors move that the Court deny all other pending motions as moot.

1. On July 21, 2002 (the "Commencement Date") and November 8, 2002, the Debtors commenced cases (the "Bankruptcy Cases") under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

2. By Orders dated July 22, 2002 and November 12, 2002, the Debtors' chapter 11 cases were consolidated for procedural purposes only, and are being jointly administered.

3. By Order dated October 29, 2002, the Court established January 23, 2003 as the deadline for the filing of a proof of claim against any of the Debtors (the "Bar Date").

4. On October 31, 2003, the Debtors' Modified Second Amended Joint Plan of Reorganization (the "Plan") was confirmed, and became effective on April 20, 2004.

5. On June 10, 2004, the Debtors filed their objection to Proof of Claim number 11173 (replacing 9293) against Intermedia Communications, Inc. ("Intermedia") filed by Parus Holdings, Inc., successor-by-merger to EffectNet, Inc. and EffectNet, LLC (the "Parus Claim").

6. On May 2, 2007, this Court entered its Opinion Partially Granting and Partially Denying Debtors' Motion for Summary Judgment and Motion to Strike Portions of Affidavits (Dkt. No. 18853) (the "Opinion"). The only issue upon which the Court did not grant summary judgment to the Debtors was whether the "base monthly price" for purposes of calculating the four reconciliation payments is the "basic service rate" of $11.45 or the "unlimited service rate" of $27.40 ("Remaining Issue").[2]

**Deleted:** In that order, the Court granted Debtors' motion for summary judgment on Parus's claims for unfair and deceptive trade practices, breach of the implied covenant of good faith and fair dealing, and civil conspiracy. With respect to Parus's claim for breach of contract, the Court ruled that Parus terminated the UC Contract on April 12, 2002, and that Debtors are required to make reconciliation payments under the UC Contract for four months (December 2001 through March 2002). The Court further ruled that the Limitation of Liability clause in the UC Contract limits Intermedia's liability to the terms of the contract, thereby precluding non-contractual damages. Finally, the Court found material factual issues as to which rate is the "base monthly price" for purposes of determining the amount of the payments owed for December 2001 through March 2002. Thus, the sole remaining issue

**Deleted:** with respect to the Parus Claim is whether

**Deleted:** CHIC_1593693.1

[2] The Court granted summary judgment in favor of Debtors on Parus's amended claim against MCI, Claim No. 11242 (replacing 9291).

7. Parus contends that the "base monthly price" was intended to be the unlimited service rate of $27.40. If Parus's contention is correct with respect to the Remaining Issue, the amount of the Parus Claim would be $1,101,844.27, less a deposited $175,000, for a total claim of $926,844.27.

8. Debtors therefore request that the Court enter an order directing that (a) the Parus Claim be allowed in the amount of $926,844.27 and treated as a Class 12 claim under the Plan; and (b) the Debtors' objection to the Parus Claim with respect to the Remaining Issue is withdrawn. The form of the Proposed Order is attached as Exhibit A.

9. Debtors submit that the entry of the Proposed Order is in the parties' best interests. The Court's Opinion substantially narrowed the dispute between the parties. By entry of the Proposed Order, the Debtors' resources will not be further expended with respect to the Remaining Issue. It also remedies the Court's concern regarding the Debtors' prior motion for an order permitting withdrawal – that the prior motion did not resolve all issues before the Court. By entry of an order approving this amended motion, the parties may pursue appeals of final orders of this Court rather than seeking leave to file interlocutory appeals.

10. Under the Plan, the Debtors have the right to withdraw their claim objection at any time. See Plan § 7.06.

11.

WHEREFORE, for the reasons set forth here, the Debtors respectfully request that the Court enter an order in conformity with this Motion, and grant such other and further relief as is just.

Dated: July __, 2007
Kansas City, Missouri

**Deleted:** Despite Debtors' earlier offer to resolve Parus's claim, Parus appears determined to proceed with expensive, unnecessary spoliation and cost-shifting briefing and electronic discovery. The parties may well incur fees and costs on the narrow damages phase of this proceeding that surpass any award of damages.

**Deleted:** litigation before this Court will end, judicial economy will be served, and

**Deleted:** <#>Debtors further request that all other pending motions be denied as moot because the Court's Opinion together with an Order granting this motion disposes of Parus's claims in their entirety. The other pending motions, which Debtors request be denied as moot, are as follows: (1) Motion of Claimant Parus Holdings, Inc. to Compel Production of Documents and to Extend Discovery Deadlines (Docket No. 16423); (2) Motion of Claimant Parus Holdings, Inc. for Relief Resulting from the Debtors' Spoliation of Evidence (Docket No. 18689); (3) Amended Motion of Parus Holdings, Inc. for Relief Resulting from the Debtors' Spoliation of Evidence (Docket No. 18935); (4) Debtors' Motion to Apply Bankruptcy Rule 7068 (Offer of Judgment) to the Proceedings on Claim Nos. 11242 (Replacing 9291) and 11173 (Replacing 9293); and (4) Debtors' Motion to Compel Parus Holdings, Inc. to Appear for a Properly Noticed Rule 30(b)(6) Deposition (Docket No. 18740).¶
Debtors' counsel, Allison Murdock, has conferred with Parus's counsel, Jill Murch, regarding this Motion. Ms. Murch has advised that Parus has no objection to Motion or the form of the proposed Order submitted with the Motion.

**Formatted:** Bullets and Numbering

**Deleted:** CHIC_1593693.1

Respectfully submitted,

STINSON MORRISON HECKER LLP

By /s/
Robert L. Driscoll, Esq.
Mark A. Shaiken, Esq.
Allison M. Murdock, Esq.
Mark M. Iba, Esq.
1201 Walnut Street, Suite 2900
Kansas City, MO 64106
(816) 842-8600 – Telephone
(816) 691-3495 - Facsimile

ATTORNEYS FOR DEBTORS

**CERTIFICATE OF SERVICE**

I hereby certify that on July 10, 2007, I electronically filed the foregoing with the Clerk of the Bankruptcy Court using the CM/ECF system which sent notification of such filing to all parties receiving electronic means.

/s/
Attorney for Debtors

Deleted: CHIC_1593693.1

STINSON MORRISON HECKER LLP
Attorneys for the Reorganized Debtors
1201 Walnut Street
Kansas City, MO 64106
Telephone: (816) 842-8600
Facsimile: (816) 691-3495
Robert L. Driscoll, Esq.
Allison M. Murdock, Esq.
Mark M. Iba, Esq.
Mark A. Shaiken, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | |
| | Chapter 11 Case No. |
| WORLDCOM, INC., et al., | 02-13533 (AJG) |
| | (Jointly Administered) |
| Debtors. | |

**ORDER GRANTING DEBTORS' AMENDED MOTION FOR PARTIAL WITHDRAWAL OF CLAIM OBJECTION AND ALLOWANCE OF RESULTING CLAIM**

Deleted: UNOPPOSED
Formatted: Space After: 0 pt
Deleted: AND DENYING ALL OTHER PENDING MOTIONS AS MOOT
Formatted: Normal, Space After: 0 pt
Deleted: Unopposed
Deleted: and Denying All Other Pending Motions as Moot

THE COURT has considered Debtors' Amended Motion for an Order Permitting Partial Withdrawal of Claim Objection and Allowance of Resulting Claim (the "Motion") and the papers filed in support of the Motion. It is hereby ORDERED that:

1. The Debtors' objection is withdrawn to the "Parus Claim," as such term is defined in Paragraph 2 herein, with respect to the issue of whether the "base monthly price" is the "basic service rate" of $11.45 or the "unlimited service rate" of $27.40 for purposes of calculating the four Reconciliation Payments (the "Remaining Issue") that this Court found to be owed under its May 2, 2007 Opinion Partially Granting and Partially Denying Debtors' Motion for Summary

Judgment and Motion to Strike Portions of Affidavits (the "Opinion") (Docket No. 18853), and the unlimited service rate of $27.40 shall apply;

2. Proof of Claim number 11173 (replacing 9293) against Intermedia Communications, Inc. filed by Parus Holdings, Inc., successor-by-merger to EffectNet, Inc. and EffectNet, LLC (the "Parus Claim") is hereby allowed in the amount of $926,844.27 and treated as a Class 12 claim under the Debtors' Modified Second Amended Joint Plan of Reorganization (the "Plan"); and

3. Pursuant to the Court's statements on the record on July 10, 2007, the Court directs that all other pending motions are denied as moot. The motions denied as moot are as follows: (1) Motion of Claimant Parus Holdings, Inc. to Compel Production of Documents and to Extend Discovery Deadlines (Docket No. 16423); (2) Motion of Claimant Parus Holdings, Inc. for Relief Resulting from the Debtors' Spoliation of Evidence (Docket No. 18689); (3) Amended Motion of Parus Holdings, Inc. for Relief Resulting from the Debtors' Spoliation of Evidence (Docket No. 18935); (4) Debtors' Motion to Apply Bankruptcy Rule 7068 (Offer of Judgment) to the Proceedings on Claim Nos. 11242 (Replacing 9291) and 11173 (Replacing 9293); and (4) Debtors' Motion to Compel Parus Holdings, Inc. to Appear for a Properly Noticed Rule 30(b)(6) Deposition (Docket No. 18740).

Deleted: A

SO ORDERED

Dated: New York, New York
_____________, 2007

______________________________

HONORABLE ARTHUR J. GONZALEZ,
UNITED STATES BANKRUPTCY JUDGE

DB03/048629.0125/7754842.3

D00230

# EXHIBIT B

D00231

STINSON MORRISON HECKER LLP
Attorneys for the Reorganized Debtors
1201 Walnut Street
Kansas City, MO 64106
Telephone: (816) 842-8600
Facsimile: (816) 691-3495
Robert L. Driscoll, Esq.
Allison M. Murdock, Esq.
Mark M. Iba, Esq.
Mark A. Shaiken, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------x
In re :
: Chapter 11 Case No.
WORLDCOM, INC., et al., : 02-13533 (AJG)
:
: (Jointly Administered)
Debtors. :
-----------------------------------------------------x

**ORDER GRANTING DEBTORS' AMENDED MOTION FOR PARTIAL WITHDRAWAL OF CLAIM OBJECTION AND ALLOWANCE OF RESULTING CLAIM**

Deleted: UNOPPOSED
Formatted: Space After: 0 pt
Deleted: AND DENYING ALL OTHER PENDING MOTIONS AS MOOT
Formatted: Normal, Space After: 0 pt
Deleted: Unopposed
Deleted: and Denying All Other Pending Motions as Moot

THE COURT has considered Debtors' Amended Motion for an Order Permitting Partial Withdrawal of Claim Objection and Allowance of Resulting Claim (the "Motion") and the papers filed in support of the Motion. It is hereby ORDERED that:

1. The Debtors' objection is withdrawn to the "Parus Claim," as such term is defined in Paragraph 2 herein, with respect to the issue of whether the "base monthly price" is the "basic service rate" of $11.45 or the "unlimited service rate" of $27.40 for purposes of calculating the four Reconciliation Payments (the "Remaining Issue") that this Court found to be owed under its May 2, 2007 Opinion Partially Granting and Partially Denying Debtors' Motion for Summary

Judgment and Motion to Strike Portions of Affidavits (the "Opinion") (Docket No. 18853), and the unlimited service rate of $27.40 shall apply;

2. Proof of Claim number 11173 (replacing 9293) against Intermedia Communications, Inc. filed by Parus Holdings, Inc., successor-by-merger to EffectNet, Inc. and EffectNet, LLC (the "Parus Claim") is hereby allowed in the amount of $926,844.27 and treated as a Class 12 claim under the Debtors' Modified Second Amended Joint Plan of Reorganization (the "Plan"); and

3. Pursuant to the Court's statements on the record on July 10, 2007, the Court directs that all other pending motions are denied as moot. The motions denied as moot are as follows: (1) Motion of Claimant Parus Holdings, Inc. to Compel Production of Documents and to Extend Discovery Deadlines (Docket No. 16423); (2) Motion of Claimant Parus Holdings, Inc. for Relief Resulting from the Debtors' Spoliation of Evidence (Docket No. 18689); (3) Amended Motion of Parus Holdings, Inc. for Relief Resulting from the Debtors' Spoliation of Evidence (Docket No. 18935); (4) Debtors' Motion to Apply Bankruptcy Rule 7068 (Offer of Judgment) to the Proceedings on Claim Nos. 11242 (Replacing 9291) and 11173 (Replacing 9293); and (4) Debtors' Motion to Compel Parus Holdings, Inc. to Appear for a Properly Noticed Rule 30(b)(6) Deposition (Docket No. 18740).

Deleted: A

SO ORDERED

Dated: New York, New York
______________, 2007

______________________________

HONORABLE ARTHUR J. GONZALEZ,
UNITED STATES BANKRUPTCY JUDGE

DB03/048629.0125/7754842.3

D00234

# EXHIBIT C

D00235

STINSON MORRISON HECKER LLP
Attorneys for the Reorganized Debtors
1201 Walnut Street
Kansas City, MO 64106
Telephone: (816) 842-8600
Facsimile: (816) 691-3495
Robert L. Driscoll, Esq.
Allison M. Murdock, Esq.
Mark M. Iba, Esq.
Mark A. Shaiken, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>WORLDCOM, INC., et al.,<br><br>Debtors. | Chapter 11 Case No.<br>02-13533 (AJG)<br><br>(Jointly Administered) |

**ORDER GRANTING DEBTORS' AMENDED MOTION FOR PARTIAL WITHDRAWAL OF CLAIM OBJECTION AND ALLOWANCE OF RESULTING CLAIM**

THE COURT has considered Debtors' Amended Motion for an Order Permitting Partial Withdrawal of Claim Objection and Allowance of Resulting Claim (the "Motion") and the papers filed in support of the Motion. It is hereby ORDERED that:

1. The Debtors' objection is withdrawn to the "Parus Claim," as such term is defined in Paragraph 2 herein, with respect to the issue of whether the "base monthly price" is the "basic service rate" of $11.45 or the "unlimited service rate" of $27.40 for purposes of calculating the four Reconciliation Payments (the "Remaining Issue") that this Court found to be owed under its May 2, 2007 Opinion Partially Granting and Partially Denying Debtors' Motion for Summary

Judgment and Motion to Strike Portions of Affidavits (the "Opinion") (Docket No. 18853), and the unlimited service rate of $27.40 shall apply;

2. Proof of Claim number 11173 (replacing 9293) against Intermedia Communications, Inc. filed by Parus Holdings, Inc., successor-by-merger to EffectNet, Inc. and EffectNet, LLC (the "Parus Claim") is hereby allowed in the amount of $926,844.27 and treated as a Class 12 claim under the Debtors' Modified Second Amended Joint Plan of Reorganization (the "Plan"); and

3. Pursuant to the Court's statements on the record on July 10, 2007, the Court directs that all other pending motions are denied as moot. The motions denied as moot are as follows: (1) Motion of Claimant Parus Holdings, Inc. to Compel Production of Documents and to Extend Discovery Deadlines (Docket No. 16423); (2) Motion of Claimant Parus Holdings, Inc. for Relief Resulting from the Debtors' Spoliation of Evidence (Docket No. 18689); (3) Amended Motion of Parus Holdings, Inc. for Relief Resulting from the Debtors' Spoliation of Evidence (Docket No. 18935); (4) Debtors' Motion to Apply Bankruptcy Rule 7068 (Offer of Judgment) to the Proceedings on Claim Nos. 11242 (Replacing 9291) and 11173 (Replacing 9293); and (4) Debtors' Motion to Compel Parus Holdings, Inc. to Appear for a Properly Noticed Rule 30(b)(6) Deposition (Docket No. 18740).

SO ORDERED

Dated: New York, New York
______________, 2007

______________________________
HONORABLE ARTHUR J. GONZALEZ,
UNITED STATES BANKRUPTCY JUDGE

Robert A. Scher (RS 2910)
FOLEY & LARDNER LLP
90 Park Avenue
New York, NY 10016
Phone: (212) 682-7474
Fax: (212) 682-2329
email: rscher@foley.com

-and-

Mark L. Prager *(admitted pro hac vice)*
Jill L. Murch *(admitted pro hac vice)*
Joanne Lee *(admitted pro hac vice)*
FOLEY & LARDNER LLP
321 N. Clark Street, Suite 2800
Chicago, IL 60610
Phone: (312) 832-4500
Fax: (312) 832-4700

*Attorneys for Claimant Parus Holdings, Inc. Successor-By-Merger to EffectNet, Inc. and EffectNet, LLC*

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | CHAPTER 11 |
| | ) | Jointly Administered |
| WORLDCOM, INC., et al., | ) | |
| | ) | |
| Debtors. | ) | Case No. 02-13533 (AJG) |
| | ) | |

**CERTIFICATION OF SERVICE**

Katherine E. Hall, of full age, certifies as follows:

I am a Paralegal employed with the firm of Foley & Lardner LLP, Attorneys for Claimant Parus Holdings, Inc. successor by merger to EffectNet, Inc. and EffectNet, LLC listed in the documents herein.

On September 6, 2007, I filed the PARUS HOLDINGS, INC.'S LIMITED OBJECTION TO DEBTORS' AMENDED MOTION FOR AN ORDER PERMITTING PARTIAL WITHDRAWAL OF CLAIM OBJECTION TO PARUS HOLDINGS, INC.'S PROOF OF CLAIM NO. 11173 (REPLACING 9293), ALLOWING RESULTING CLAIM,

AND DENYING ALL OTHER PENDING MOTIONS AS MOOT, electronically with the United States Bankruptcy Court for the Southern District of New York.

The following parties were served at the addresses and electronic mail addresses set forth herein as indicated.

**Via Overnight Delivery**
Hon. Judge Arthur J. Gonzalez
United States Bankruptcy Court
Alexander Hamilton Custom House
One Bowling Green
New York, NY 10004

**Via E-Mail**
Allison Murdock
Mark Iba
Stinson Morrison Hecker LLP
1201 Walnut Street, Suite 2900
Kansas City, Missouri 64106-2150
amurdock@stinsonmoheck.com
miba@ stinsonmoheck.com
Fax: 816.691.3495

/s/ Katherine E. Hall

Sworn to before me this
6th day of September, 2007
/s/ Yolanda C. Peña
Notary Public, State of Illinois

# EXHIBIT J

D00240



FOLEY & LARDNER LLP

ATTORNEYS AT LAW
321 NORTH CLARK STREET, SUITE 2800
CHICAGO, IL 60610-4764
312.832.4500 TEL
312.832.4700 FAX
www.foley.com

WRITER'S DIRECT LINE
(312) 832-4522
jmurchl@foley.com EMAIL

CLIENT/MATTER NUMBER
078616-0103

February 14, 2007

<u>VIA CM/ECF AND OVERNIGHT DELIVERY</u>

The Honorable Arthur J. Gonzalez
United States Bankruptcy Judge
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, NY 10004

Re: In re WorldCom, Inc., et al., Case No. 02-13533
Claims of Parus Holdings, Inc. (Claim Nos. 9291, 9293, 11173, and 11242)

Dear Judge Gonzalez:

Per the Court's request, Parus Holdings, Inc. ("Parus") is submitting this letter in response to the February 12, 2007 letter tendered by Ms. Allison Murdock on behalf of MCI WorldCom Communications, Inc. and Intermedia Communications, Inc. (collectively, the "Debtors").

The Debtors have requested an informal conference to request that they be permitted to take the Rule 30(b)(6) deposition of Parus in order to respond to Parus' Motion for Relief Resulting from the Debtors' Spoliation of Evidence ("Parus' Spoliation Motion"). The Debtors' request is unfounded for no less than four reasons: (1) the Debtors' misconstrue the standard for spoliation under the <u>Zubulake</u> cases; (2) the Debtors' have caused their own conduct to become at issue; (3) unlike the Debtors, Parus' has never stated that it cannot produce relevant documents because they are inaccessible or unavailable; and (4) the Debtors have refused to tender their own Rule 30(b)(6) deponent to Parus for three months.

**A. The Debtors' Misconstrue the Standard for Spoliation under the <u>Zubulake</u> Cases.**

The sole basis for the Debtors' assertion that they need a Rule 30(b)(6) deposition to respond to Parus' Spoliation Motion is to determine whether Parus "stored electronic information in the same or similar manner as the Debtors." However, the Debtors misconstrue the standard for spoliation. Spoliation is not based on a comparison of document retention standards utilized by the respective parties.

Instead, whether spoliation has occurred depends on whether the Debtors failed to preserve evidence relevant to litigation at a time when they knew or should have known that the evidence may be relevant to future litigation. <u>Zubulake v. UBS Warburg LLC</u>, 220 F.R.D. 212,

BOSTON
BRUSSELS
CHICAGO
DETROIT
JACKSONVILLE
LOS ANGELES
MADISON
MILWAUKEE
NEW YORK
ORLANDO
SACRAMENTO
SAN DIEGO
SAN DIEGO/DEL MAR
SAN FRANCISCO
SILICON VALLEY
TALLAHASSEE
TAMPA
TOKYO
WASHINGTON, D.C.

D00241

216 (S.D.N.Y. 2003) ("Zubulake IV") ("'The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation.'"). In fact, the basis for Parus' Spoliation Motion is that the Debtors' failed to implement a timely litigation hold at a time when they knew or should have known that evidence existed that may be relevant to future litigation. "Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents." Zubulake IV, 220 F.R.D. at 218 (emphasis added). Furthermore, the Spoliation Motion asserts that the Debtors did not preserve records of Intermedia after July 1, 2001 as required by MCI's applicable written document retention policy so that even if a litigation hold obligation arose at a later date, it was too late for the Debtors to secure the evidence.

The Debtors have not and cannot provide any legal authority to demonstrate that whether they implemented a timely litigation hold is somehow or in any way contingent upon or related to the document retention polices put in place by another party. Instead, the standard for spoliation under Zubulake is clear on its face:

> A party seeking an adverse inference instruction (or other sanctions) based on the spoliation of evidence must establish the following three elements: (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a "culpable state of mind" and (3) that the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

Zubulake v. UBS Warburg LLC, 229 F.R.D. 422, 430 (S.D.N.Y. 2004). The Debtors should not be permitted to engraft an additional requirement upon Zubulake that is neither relevant nor exists. Indeed, a Rule 30(b)(6) deposition of Parus will in no way reveal or provide evidence explaining why the Debtors failed to implement a timely litigation hold.

**B. The Debtors' Have Caused Their Own Conduct to Become At Issue.**

The Debtors also omit from their letter to the Court that the reason the depositions of the Debtors' IT personnel occurred was because the Court ordered these depositions on July 11, 2006 in response to the Debtors' allegation that cost shifting was appropriate. Indeed, the Court itself raised the issue of whether the Debtors abided by their obligation to preserve evidence:

> It may be my ignorance of all of the facts here, but when someone says their [sic] backup tapes, that triggers in my mind an assumption that there were original tapes, and that is why we have backups. So I think there seems to be on the surface a legitimate

> inquiry as to what happened to the originals. If you had the originals and not the backup, would the search then be enhanced or facilitated? I don't know the answer to that. But if it is determined that the originals under the normal course of business or ordinary course of business in the industry would otherwise have been kept and for some reason it doesn't seem appropriate actions were taken to retain records and now we then have to turn to the backup, there may be an argument from the party seeking the discovery that they shouldn't have to bear the costs for that. It may come down to whether it was appropriate to have eliminated the original data. I don't know the answer to that. Sitting here now, I haven't the faintest idea what the standard is. I assume it is an industry-wide standard as to what you would apply coupled with the issues about knowing whether a litigation or having an indication that a litigation may follow as to what then you do with data and whether or not the proper actions were taken to preserve data once it became known that there was an issue that may ultimately end in litigation.

(July 11, 2006 Tr., p. 16 at ll. 2-25, p. 17, 1-4). Parus does not understand how such court-ordered depositions in response to the Debtors' own cost-shifting request placed Parus' own document retention at issue as alleged by the Debtors.

**C. Unlike the Debtors, Parus' Has Never Stated That It Cannot Produce Relevant Documents Because They Are Inaccessible Or Unavailable.**

Parus has at all times stated that it will produce all relevant electronic documents and hard copy documents, subject to the assertion of its objections. Unlike the Debtors, Parus has never asserted that its backup tapes are inaccessible or too costly to restore and unlike the Debtors, Parus has never requested cost shifting from this Court.

Parus has identified with specificity - through the testimony of James Renforth, a former employee of Intermedia - that Intermedia possessed significant documentation relevant to Parus' claims, including Word documents, Excel spreadsheets, PowerPoint presentations, Microsoft Project files, and emails. Yet such information has not been produced by the Debtors to Parus. See Parus' Spoliation Motion, at pp. 20-29. The Debtors, however, cannot point to any such breach of Parus' preservation obligation. In short, Parus has abided by its obligations and, unlike the Debtors, has never claimed that it cannot produce documents because they are unavailable or inaccessible. Moreover, because Parus preserved all of its electronic and hard copy documents, whether it initiated a litigation hold is immaterial since spoliation only becomes an issue when evidence is lost or irretrievable in the first instance.

**D. The Debtors Have Failed to Provide Their Own Rule 30(b)(6) Deponent for Three Months and Continue to Refuse to Provide Such a Deponent.**

Finally, on November 15, 2006, Parus served a Rule 30(b)(6) Notice of Deposition upon the Debtors in connection with, inter alia, the Debtors' implementation of a litigation hold and the Debtors' document retention. See Exhibit A. The Debtors have refused to tender any Rule 30(b)(6) witness and no such deposition has occurred. The Debtors reiterated their refusal to provide a Rule 30(b)(6) deponent to Parus on Monday of this week during a telephonic conference, even though Parus' initial notice of deposition was served three months ago.

To avoid burdening this Court with a discovery dispute related to this disagreement and to move the litigation forward, Parus agreed in November 2006 to stay the Rule 30(b)(6) deposition and stated that the Debtors could provide written responses in lieu of a deposition. Parus expressly reserved all rights to reschedule and conduct the Rule 30(b)(6) deposition as set forth in my correspondence to Ms. Murdock on November 21, 2006 in the event the Debtors failed to provide "full and complete written responses."[1] See Exhibit B. On January 17 and 19, 2007, Parus notified the Debtors that their written responses were deficient and requested that the Rule 30(b)(6) deposition be rescheduled. On Monday, February 12, 2007, the parties had a telephonic conference to discuss a number of outstanding discovery disputes. The Debtors reiterated their refusal to present a Rule 30(b)(6) deponent to Parus.[2]

The Debtors now complain that they have not been given an opportunity to conduct a Rule 30(b)(6) deposition on fourteen-days notice to Parus even though they have refused to provide a Rule 30(b)(6) deponent to Parus for 3 months. Parus has gone to great lengths to reach a consensual agreement with the Debtors by, as detailed above, even providing the Debtors with the opportunity to provide written responses in lieu of a deposition. Unfortunately, the Debtors have not extended this same courtesy to Parus. Parus had not previously requested an informal conference with this Court regarding its own Rule 30(b)(6) deposition as it did not want to burden this Court and had hoped that the parties could consensually resolve this matter without intervention by the Court.

In conclusion, the Court should not permit the Debtors to compel the Rule 30(b)(6) Deposition of Parus, where (1) the Debtors' misconstrue the standard for spoliation under the

---

[1] As a related matter, on November 17, 2006, Parus also served third-party subpoenas on David Wachen and Jeffrey Hsu, former in-house counsel to the Debtors, regarding the initiation and implementation of a litigation hold by the Debtors. Copies of the third-party subpoenas are attached as Exhibits C and D. The Debtors likewise have refused to tender Hsu and Wachen for deposition.

[2] Indeed, the Debtors reiterated their refusal to provide a Rule 30(b)(6) deponent to Parus even though the issues addressed by Parus' Rule 30(b)(6) notice were narrowly tailored to address those issues raised in Parus' Spoliation Motion. This is unlike the Debtors' Rule 30(b)(6) notice which is much broader in time and scope and does not relate to the allegations raised in Parus' Spoliation Motion.

FOLEY

FOLEY & LARDNER LLP

Zubulake cases; (2) the Debtors' have caused their own conduct to become at issue; (3) unlike the Debtors, Parus' has never stated that it cannot produce relevant documents because they are inaccessible or unavailable and (4) the Debtors have refused to tender their own Rule 30(b)(6) deponent for three months. Therefore, Parus respectfully requests that the Court decline the Debtors' request to impose a Rule 30(b)(6) deposition on the topics identified by the Debtors.

Sincerely yours,

/s/ Jill L. Murch

Jill L. Murch

Enclosure
cc: Ms. Allison Murdock (via facsimile)
Mr. Mark Iba (via facsimile)
Mr. Mark Prager
Mr. William McKenna

# EXHIBIT A

D00246

Robert A. Scher (RS 2910)
FOLEY & LARDNER LLP
90 Park Avenue
New York, NY 10016
Phone: (212) 682-7474
Fax: (212) 682-2329
email: rscher@foley.com

-and-

Mark L. Prager *(admitted pro hac vice)*
Jill L. Murch *(admitted pro hac vice)*
Joanne Lee *(admitted pro hac vice)*
FOLEY & LARDNER LLP
321 N. Clark Street, Suite 2800
Chicago, IL 60610
Phone: (312) 832-4500
Fax: (312) 832-4700

*Attorneys for Claimant Parus Holdings, Inc. Successor-By-Merger to EffectNet, Inc. and EffectNet, LLC*

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | CHAPTER 11 |
| | ) | Jointly Administered |
| WORLDCOM, INC., et al., | ) | |
| | ) | |
| Debtors. | ) | Case No. 02-13533 (AJG) |
| | ) | |

**NOTICE OF 30(b)(6) DEPOSITION OF DEBTORS**

**PLEASE TAKE NOTICE** that pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Parus Holdings, Inc., Successor-By-Merger to EffectNet, Inc. and EffectNet, LLC ("Parus") will take the deposition of Intermedia Communications, Inc. and MCI WorldCom Communications, Inc. ("Debtors"). The deposition will commence at 9:00 a.m. (C.S.T.) on December 4, 2006, at the office of Foley & Lardner LLP, 321 N. Clark Street, Suite 2800, Chicago, Illinois 60610, or at such other time and place as may be agreed upon by counsel and shall continue until adjourned or completed. The examination will be on the subjects set forth in the Rider attached hereto.

This 30(b)(6) deposition of the Debtors will be taken before a notary public or other officer authorized by law to administer oaths and will be recorded by stenographic means and

may also be recorded by sound-and-visual means.

**PLEASE TAKE FURTHER NOTICE** that the 30(b)(6) deponent herein shall produce all documents as requested in the attached Rider.

Dated: November 15, 2006

Respectfully submitted,

By: [signature]

Robert A. Scher (RS 2910)
FOLEY & LARDNER LLP
90 Park Avenue
New York, NY 10016
Phone: (212) 682-7474

-and-

Mark L. Prager (*admitted pro hac vice*)
Jill L. Murch (*admitted pro hac vice*)
Joanne Lee (*admitted pro hac vice*)
FOLEY & LARDNER LLP
321 N. Clark Street, Suite 2800
Chicago, IL 60610
Phone: (312) 832-4500
Fax: (312) 832-4700

*Attorneys for Claimant Parus Holdings, Inc., Successor-By-Merger to EffectNet, Inc. and EffectNet, LLC*

**CERTIFICATE OF SERVICE**

The undersigned, a non-attorney, on oath states that on November 15, 2006 she caused a true and correct copy of the foregoing **NOTICE OF 30(b)(6) DEPOSITION OF DEBTORS**, to be served via overnight delivery:

Allison Murdock
Stinson Morrison Hecker LLP,
1201 Walnut Street, Suite 2900
Kansas City, Missouri 64106-2150
Tel: 816-842-8600
Fax: 816-691-3495

Katherine E. Hall

Sworn to before me this
15th day of November 2006

Notary Public, State of Illinois

OFFICIAL SEAL
YOLANDA C. PEÑA
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 7-8-2010

**RIDER TO 30(b)(6) NOTICE OF DEPOSITION**

Pursuant to Federal Rule of Bankruptcy Procedure 7030(b)(6), Intermedia Communications, Inc. ("Intermedia") and MCI WorldCom Communications, Inc. ("MCI WorldCom") are requested to provide to Parus Holdings, Inc.'s ("Parus") counsel the following information three (3) days prior to the deposition date: (1) the identity of the person(s) designated for deposition for the Subjects set forth herein; and (2) the subject matter(s) to which each person will testify.

Copies of all documents shall be produced in person at the deposition.

**DEFINITIONS**

For purposes of these Subjects and Requests, the following terms are used with the indicated meanings:

1. "Document(s)" are used in the broadest possible sense and shall mean, without limitation, all written, printed, typed, photostatic, photographed, recorded, or otherwise reproduced communications or representations of every kind and description, whether comprised of letters, words, numbers, pictures, sounds, or symbols, or any combination thereof, whether prepared by hand or by mechanical, electronic, magnetic, photographic, or other means, as well as audio or video recordings of communications, oral statements, conversations, or events. This definition includes, but is not limited to, any and all originals and nonidentical copies of any and all of the following: electronic mail, computer-stored or computer-readable data, computer programs, computer printouts, correspondence, notes, minutes, records, messages, memoranda, telephone memoranda, diaries, contracts, agreements, invoices, orders, acknowledgements, receipts, bills, statements, appraisals, reports, forecasts, compilations, schedules, studies, summaries, analyses, pamphlets, brochures, advertisements, newspaper clippings, tables, tabulations, financial statements, working papers, tallies, maps, drawings, diagrams, sketches, x-rays, charts, labels, packaging materials, plans, photographs, pictures, film, microfilm, telegrams, telexes, telefacsimiles, tapes, transcripts, recordings, and all other sources or formats from which data, information, or communications can be obtained. Any preliminary versions, drafts, or revisions of any of the foregoing, any document which has or contains any attachment, enclosure, comment, notation, addition, insertion, or marking of any kind which is not a part of another document, or any document which does not contain a comment, notation, addition, insertion, or marking of any kind which is part of another document, is to be considered a separate document. "Document" and "documents" are used in the broadest possible sense and shall mean, without limitation, all written, printed, typed, photostatic, photographed, recorded, digital or otherwise reproduced communications or representations of every kind and description,

however produced or reproduced, whether comprised of letters, words, numbers, pictures, sounds, or symbols, or any combination thereof, whether prepared by hand or by mechanical, electronic, magnetic, photographic, or other means and shall include, but not be limited to, any and all originals and nonidentical copies of any and all of the following: correspondence, notes, minutes, records, messages, memoranda, telephone memoranda, diaries, contracts, agreements, invoices, orders, acknowledgments, receipts, bills, statements, appraisals, reports, forecasts, compilations, schedules, studies, summaries, analyses, pamphlets, brochures, advertisements, newspaper clippings, tables, tabulations, financial statements, working papers, tallies, maps, drawings, diagrams, sketches, charts, labels, packaging, plans, photographs, pictures, film, microfilm, microfiche, computer-stored or computer-readable data (including any data contained on handheld electronic devices and phones), computer programs, electronic mail (a.k.a. email) computer printouts, telegrams, telexes, facsimiles, tapes, transcripts, recordings, and all other sources or formats from which data, information, or communications can be obtained. Any preliminary versions, drafts, or revisions of any of the foregoing, any document which has or contains any attachment, enclosure, comment, notation, addition, insertion, or marking of any kind which is not a part of another document, or any document which does not contain a comment, notation, addition, insertion, or marking of any kind which is part of another document, is to be considered a separate document.

2. "Including" and "includes" shall be construed as referring only to an incomplete listing of illustrative examples and not as limiting or narrowing the generality of any definition, instruction or request.

3. "Refer," or "relate," or "regarding" shall mean evidencing, memorializing, comprising, connected with, mentioning, describing, containing, enumerating, involving or in any way concerning, pertaining, being connected with, reflecting upon, or resulting from a stated subject matter whether in whole or in part or directly or indirectly.

4. "Bankruptcy Cases" shall mean Intermedia Communications, Inc.'s chapter 11 bankruptcy case (Case No. 02-42154) and MCI Worldcom Communications, Inc.'s chapter 11 bankruptcy case (Case No. 02-42223), each pending before the United States Bankruptcy Court for the Southern District of New York and each jointly administered under In re Worldcom, Inc., et al. (02-13533).

5. "Claimant" shall mean Parus Holdings, Inc. (successor-by-merger to EffectNet, Inc. and EffectNet, LLC), EffectNet, LLC, EffectNet, Inc., Webley Systems, Inc., and their affiliates, predecessors or successors-in-interest, assigns, joint venturers, and former or present agents, including, but not limited to, officers, directors, employees, agents, contractors, accountants, advisors, attorneys, representatives, investigators, consultants, experts, representatives of any kind, and all other persons acting or purporting to act on their behalf.

6. "Debtors," "you," and "your" shall mean Intermedia Communications, Inc., MCI Worldcom Communications, Inc., and their respective affiliates, predecessors or successors-in-interest, assigns, joint venturers, and former or present agents, including, but not limited to, officers, directors, employees, agents, contractors, accountants, advisors, attorneys, representatives, investigators, consultants, experts, representatives of any kind, and all other persons acting or purporting to act on their behalf.

CHIC_1369057.1

D00251

7. "Hard Copy" shall mean all Documents that are in paper format. The term "Hard Copy" shall not include Documents that are in electronic format.

8. "Intermedia" shall mean Intermedia Communications, Inc. and its affiliates, predecessors or successors-in-interest, assigns, joint venturers, and former or present agents, including, but not limited to, officers, directors, employees, agents, contractors, accountants, advisors, attorneys, representatives, investigators, consultants, experts, representatives of any kind, and all other persons acting or purporting to act on its behalf. The term "Intermedia" shall not include MCI Worldcom Communications, Inc.

9. "Litigation" shall mean the litigation presently pending before the Bankruptcy Court that relates to the Claimant's Claim and the Debtors' Objection.

10. "Litigation Hold" shall mean any written or oral instruction, communication, order, or directive (whether by electronic means or Hard Copy Documents) to preserve, maintain, and keep accessible Documents.

11. "MCI" shall mean MCI Worldcom Communications, Inc. and its affiliates, predecessors or successors-in-interest, assigns, joint venturers, and former or present agents, including, but not limited to, officers, directors, employees, agents, contractors, accountants, advisors, attorneys, representatives, investigators, consultants, experts, representatives of any kind, and all other persons acting or purporting to act on its behalf. The term "MCI" shall not include Intermedia Communications, Inc.

12. "Person" shall mean any natural person (living or deceased), or any entity, including, but not limited to, a sole proprietorship, firm, partnership, corporation, business trust, association, joint venture, or any other organization or entity, and includes any respective former or present officer, director, partner, employee, or agent of any kind.

**INSTRUCTIONS**

1. In responding to these Requests, you are required to furnish all information that is within your possession, custody, control, or to which you have a legal right to demand the production of said responsive materials from others, including information in the possession of your attorneys, accountants, advisors, agents, or other persons directly or indirectly connected with you or your attorneys, and anyone else otherwise subject to your control.

2. In responding to these Requests, you are required to furnish all documents that respond, in whole or in part, to any portion of the Requests below in their entirety, including all attachments and enclosures.

3. With respect to any document or information which is withheld on a claim of privilege, the answer or response hereto shall provide a statement setting forth the following information:

a. The name(s) of the author(s) of the document;

b. The name(s) of the addressee(s) and all others who have received or read the document;

c. The names of those who have knowledge of the matters contained in the document;

d. The job title of each individual identified in (i), (ii), and (iii) above;

e. The date of the document;

f. The present location of the document and all copies of it;

g. The name of each and every person having custody or control of the document and all copies of it;

h. A brief description of the nature and subject matter of the document; and

i. The nature and basis of the privilege and the person asserting the privilege.

4. Notwithstanding a claim that a document is protected from disclosure, any document so withheld must be produced with the portion claimed to be protected excised and/or redacted.

5. You are hereby requested to supplement each and every response as new information is discovered or becomes available, from now until the commencement of any hearing, substantive or otherwise. You are also under a continuing duty to correct any incorrect responses to these Requests.

6. You are to produce documents as they are kept in the usual course of business or organized and labeled to correspond with the categories itemized in the below Requests. Documents that are ordinarily kept in electronic form are to be produced in electronic form. No information, including but not limited to metadata or other information about the development, use, and transmittal of such documents, is to be removed or deleted from any documents produced in electronic format.

7. The relevant time period for the Subjects and the Documents requested below is January 1, 2000 through and including the present.

**SUBJECTS**

1. MCI's policies and procedures (whether written or oral) regarding Litigation Holds.

2. Intermedia's policies and procedures (whether written or oral) regarding Litigation Holds.

3. Litigation Holds implemented by MCI that refer or relate to the Claimant.

4. Litigation Holds implemented by Intermedia that refer or relate to the Claimant.

5. Litigation Holds implemented by MCI that refer or relate to the Litigation.

6. Litigation Holds implemented by Intermedia that refer or relate to the Litigation.

7. Any and all oral and written instructions, communications, orders, directives, and/or requests to the employees, agents, officers, directors, and/or personnel of MCI and Intermedia to preserve, retain, make accessible and/or place a Litigation Hold on Documents related to any litigation in the Bankruptcy Cases since the petition dates of the Bankruptcy Cases.

8. Any and all oral and written instructions, communications, orders, directives, and/or requests to the employees, agents, officers, directors, and/or personnel of MCI and Intermedia to preserve, retain, make accessible and/or place a Litigation Hold on Documents related to the Claimant.

9. Any and all oral and written instructions, communications, orders, directives, and/or requests to the employees, agents, officers, directors, and/or personnel of MCI and Intermedia to preserve, retain, make accessible and/or place a Litigation Hold on Documents related to the Litigation.

10. The efforts and activities of MCI, Intermedia, and their respective counsel (regardless of whether outside counsel or in-house counsel) to monitor, oversee, and ensure compliance by MCI and Intermedia's respective employees, agents, officers, directors, and/or personnel with any and all instructions, communications, orders, requests to preserve, retain, make accessible and/or place a Litigation Hold on Documents related to the Claimant.

11. The efforts and activities of MCI, Intermedia, and their respective counsel (regardless of whether outside counsel or in-house counsel) to monitor, oversee, and ensure compliance by MCI and Intermedia's respective employees, agents, officers, directors, and/or personnel with any and all instructions, communications, orders, requests to preserve, retain, make accessible and/or place a Litigation Hold on Documents related to the Litigation.

12. The dates during which any and all Litigation Holds regarding the Claimant were implemented.

13. The dates during which any and all Litigation Holds regarding the Litigation were implemented.

14. Any and all instructions, communications, directives, orders and/or requests made by MCI and Intermedia to their respective employees, agents, officers, directors and/or personnel to destroy, erase, purge and/or render inaccessible or unsearchable Documents regarding or relating to the Litigation or the Claimant.

15. Any and all matters that touch upon or relate to Litigation Holds relating to the Claimant.

16. Any and all matters that touch upon or relate to Litigation Holds relating to the Litigation.

17. Any and all matters that touch upon or relate to spoliation of evidence that refer or relates to the Claimant, including, but not limited to, spoliation of electronic Documents, email, and Hard Copy Documents.

18. Any and all matters that touch upon or relate to rendering accessible Documents (including electronic Documents, email, and Hard Copy Documents) inaccessible as a result of MCI and Intermedia's failure to implement, monitor and/or ensure compliance with a Litigation Hold with respect to the Claimant or the Litigation.

**DOCUMENTS REQUESTED**

1. All Documents that refer or relate to requests by the following Debtors to their employees, agents, officers, directors, and/or personnel to preserve, retain, make accessible and/or place a Litigation Hold on Documents related to the Claimant or the Litigation, including, but not limited to, Documents relating to the Person who made such request(s), when such request(s) were made, and to whom such request(s) were made: (a) Intermedia and (b) MCI.

2. All Documents that refer or relate to policies of the following Debtors regarding requests by the Debtors to their employees, agents, officers, directors, and/or personnel to preserve, retain, make accessible and/or place a Litigation Hold on Documents related to the Claimant or the Litigation: (a) Intermedia and (b) MCI.

3. All Documents that refer, relate to, and/or evidence compliance and/or non-compliance with requests by the following Debtors to their employees, agents, officers, directors, and/or personnel to preserve, retain, make accessible and/or place a Litigation Hold on Documents related to the Claimant or the Litigation: (a) Intermedia and (b) MCI.

4. All Documents that refer, relate to, and/or evidence all efforts by the following Debtors (and their counsel) to monitor compliance and/or non-compliance with requests to their employees, agents, officers, directors, and/or personnel to preserve, retain, make accessible and/or place a Litigation Hold on Documents related to the Claimant or the Litigation: (a) Intermedia and (b) MCI.

5. All Documents that refer or relate to the destruction, spoliation, corruption, loss, and/or failure to maintain and/or preserve Documents by the following Debtors that relate to the Litigation or the Claimant: (a) Intermedia and (b) MCI.

6. All Documents that refer or relate to the following Debtors' efforts to maintain and/or preserve Documents (regardless of whether such Documents are Hard Copy or electronic Documents) related to the Litigation or the Claimant in an accessible and/or searchable format: (a) Intermedia and (b) MCI.

7. All Documents that refer or relate to requests made by the following Debtors to destroy, erase, purge and/or render inaccessible or unsearchable Documents regarding or relating to the Litigation or the Claimant: (a) Intermedia and (b) MCI.

8. All Documents that identify Persons at the following Debtors with the authority to preserve, maintain, purge, and/or destroy Documents relating to the Litigation or the Claimant: (a) Intermedia and (b) MCI.

# EXHIBIT B

D00257

**Murch, Jill L.**

**From:** Murch, Jill L.
**Sent:** Tuesday, November 21, 2006 5:03 PM
**To:** 'Murdock, Allison'
**Cc:** Prager, Mark L.; Szczepanski, Steve Z.; McKenna, William J.; Lee
**Subject:** WorldCom/Parus - Litigation Hold Discovery
**Attachments:** CHIC_1370080_1.DOC¤

**From the Desk of:** Jill L. Murch

FOLEY
FOLEY & LARDNER LLP

My Location My Vcard My Bio www.foley.com

Allison,

Per your request yesterday, attached please find the categories of information we would be seeking in connection with the Rule 30(b)(6) deposition, the deposition of Mr. David Wachen, and the deposition of Mr. Jeffery Hsu that were scheduled for November 30, December 1, 2006, and December 4, 2006 in connection with alleged litigation holds implemented by the debtors. We are requesting that you provide specific and complete responses to the issues identified in the attached list in writing and under oath by December 4, 2006. In addition, Parus is requesting that the debtors produce the documents identified in the Rider attached to the Rule 30(b)(6) deposition notice by December 15, 2006.

The attached list is being provided to you as a professional courtesy and as a mechanism to avoid burdening the court with a discovery dispute relating to litigation hold discovery. More specifically, you indicated that the debtors would file a motion to quash the Hsu and Wachen deposition subpoenas and would object to the Rule 30(b)(6) deposition notice based on the attorney/client privilege. We respectfully disagree that such information is protected by the privilege.

Please note that Parus reserves all rights to seek this and additional information related to litigation holds (including written discovery as well as oral testimony). Parus also reserves all of its rights to re-schedule and conduct the 30(b)(6) deposition, the Hsu deposition, and the Wachen deposition in the event the debtors fail to provide full and complete written responses to the information requested by the attached list by December 4, 2006.

As we discussed, I will contact you as we discussed on Tuesday, November 28, 2006 for further discussions.

Please have a safe and wonderful Thanksgiving.

Best regards,

Jill

Jill L. Murch
Foley & Lardner LLP
321 North Clark Street
Suite 2800
Chicago, IL 60610
Ph: (312) 832-4522
Fax:  (312) 832-4700

INFO

**Information Related to Alleged Litigation Hold(s)**

1. On what date did Intermedia and MCI believe that a possible threat of litigation with EffectNet/Parus existed.

2. On what date did Intermedia and MCI determine that litigation with EffectNet/Parus was likely to occur or may occur.

3. On what date Intermedia and MCI should have known that there was a possible threat of litigation with EffectNet/Parus.

4. Which persons at Intermedia and MCI identified the threat or possibility of litigation with EffectNet/Parus and how was such threat or possibility determined.

5. Was the possible threat of litigation with EffectNet/Parus identified as part of the due diligence related to the MCI/Intermedia merger. If yes, on what date, by whom, and how so.

6. On what date(s) did Intermedia and MCI implement a litigation hold relating to EffectNet/Parus.

7. How was the litigation hold regarding EffectNet/Parus implemented. More specifically, (a) who initiated the litigation hold; (b) the names of all persons involved in implementing the litigation hold and their respective responsibilities; (c) how was the litigation hold communicated to persons at MCI and Intermedia; (c) what was the scope of the documents subject to the litigation hold (i.e., all documents relating to EffectNet or Parus or a subset of such information); (d) did Intermedia and MCI identify or compile a list of persons who had information that would be need to be preserved pursuant to the litigation hold and if yes, where is that list presently located; (e) which persons at MCI and Intermedia were instructed to preserve documents (both electronic and hard copy) relating to EffectNet/Parus; (f) whether such persons complied with the litigation hold; (g) how such persons complied with the litigation hold; (h) whether documents subject to the litigation hold were ever destroyed, purged, or rendered inaccessible and why such documents were destroyed, purged, or rendered inaccessible; and (i) whether any outside third parties were used to assist with implementing the litigation hold and if yes, who.

8. How did Intermedia and MCI monitor compliance with the litigation hold. Did Intermedia and MCI request that persons respond or acknowledge either electronically or by hard copy document that they would agree to abide by the litigation hold. If no, why not. If acknowledgments were requested, where are the acknowledgements by such persons presently located.

9. How did Intermedia and MCI ensure compliance with the litigation hold. How did Intermedia and MCI monitor compliance with the litigation hold. Who was in charge of implementing the litigation hold, who was in charge of monitoring the litigation hold, who was in charge of taking possession or custody of documents subject to the litigation hold.

10.  How long was the litigation hold in effect. Did Intermedia and MCI send out reminders of the litigation hold. If yes, on what dates were such reminders transmitted, to whom were they transmitted, and how were such reminders transmitted. If such reminders were not transmitted, why not.

11.  Was the litigation hold implemented by Intermedia and MCI as to EffectNet/Parus in conformity with MCI and Intermedia's policies (whether written or oral) for litigation holds. If yes, how so. If no, how did the EffectNet/Parus litigation hold differ from Intermedia and MCI's policies.

12.  What was done with documents that were subject to the litigation hold and where are those documents presently located.

13.  Did outside counsel apprise Intermedia and MCI of the need for a litigation hold. If yes, (a) when was Intermedia and MCI notified, (b) who notified Intermedia and MCI, (c) when after notification by outside counsel did Intermedia and MCI implement the litigation hold.

# EXHIBIT C

D00262

# United States Bankruptcy Court

**DISTRICT OF COLUMBIA**

In re:

**WORLDCOM, INC. et al.,**

Debtors.

**SUBPOENA IN A CASE UNDER THE BANKRUPTCY CODE**

Case No. **02-13533**
*PENDING IN THE SOUTHERN DISTRICT OF NEW YORK*

**11**

To:
**David S. Wachen, Schulman, Rogers, Gandal, Pordy and Ecker, P.A.**
**11921 Rockville Pike, Rockville, Maryland 20852**

☐ YOU ARE COMMANDED to appear in the United States Bankruptcy Court at the place, date, and time specified below to testify in the above case.

| PLACE | COURTROOM |
|---|---|
| | DATE AND TIME |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above adversary proceeding.

| PLACE | DATE AND TIME |
|---|---|
| **Offices of Foley & Lardner LLP**<br>**Washington Harbour, 3000 K Street, NW - Suite 500**<br>**Washington, DC 20007-5101** | **NOVEMBER 30, 2006**<br>**9:00 a.m. (E.S.T.)** |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date and time specified below (list documents or objects):

**SEE ATTACHED RIDER**

| PLACE | DATE AND TIME |
|---|---|
| **Offices of Foley & Lardner LLP**<br>**Washington Harbour, 3000 K Street, NW - Suite 500**<br>**Washington, DC 20007-5101** | **NOVEMBER 30, 2006**<br>**9:00 a.m. (E.S.T.)** |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any subpoenaed organization not a party to this adversary proceeding shall designate one or more officers, directors or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify, Fed.R.Civ.P. 30(b)(6) made applicable in adversary proceedings by Rule 7030, Fed.R.Bankr.P.

| ISSUING OFFICER SIGNATURE AND TITLE | DATE |
|---|---|
| [signature] **Attorney for Parus Holdings, Inc., Successor-By-Merger to EffectNet, Inc. and EffectNet, LLC** | **November 15, 2006** |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
**Joanne Lee**
**(312) 832-4500**
**Foley & Lardner LLP**
**321 North Clark Street, Suite 2800**
**Chicago, Illinois 60610**

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF COLUMBIA

In re: Worldcom, Inc., et al.

No. 02-13533

**AFFIDAVIT OF SERVICE**

to wit: Washington, DC

I, FREDERICK PARSONS, JR., having been duly authorized to make service of the Deposition Subpoena Duces Tecum and Attachment in the above entitled case, hereby depose and say:

That my date of birth / age is 12-18-1965.

That my place of business is 1827 18th Street, N.W., Washington, D.C. 20009 (202) 667-0050.

That service was made by a private process server.

That I am not a party to or otherwise interested in this suit.

That at 2:30 pm on November 16, 2006, I served David S. Wachen at Schulman, Rogers, Gandal, Pordy and Ecker, P.A., 11921 Rockville Pike, Rockville, Maryland 20852 by serving Davis S. Wachen, personally. Described herein:

SEX- MALE
AGE- 40
HEIGHT- 5'10"
HAIR- BROWN
WEIGHT- 170
RACE- WHITE

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the RETURN of SERVICE and STATEMENT OF SERVICE FEES is true and correct.

Executed on 11.17.06
Date

FREDERICK PARSONS, JR.
1827 18th Street, N.W.,
Washington, D.C. 20009
Our File#- 179949

# EXHIBIT D

D00265

# United States Bankruptcy Court

DISTRICT OF COLUMBIA

In re:

WORLDCOM, INC. et al.,

Debtors.

SUBPOENA IN A CASE UNDER THE BANKRUPTCY CODE

Case No. 02-13533
*PENDING IN THE SOUTHERN DISTRICT OF NEW YORK*

11

To:
**Jeffrey T. Hsu, Heller Ehrman LLP**
**1717 Rhode Island Avenue NW, Washington, D.C. 20036**

☐ YOU ARE COMMANDED to appear in the United States Bankruptcy Court at the place, date, and time specified below to testify in the above case.

| PLACE | COURTROOM |
|---|---|
| | DATE AND TIME |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above adversary proceeding.

| PLACE | DATE AND TIME |
|---|---|
| **Offices of Foley & Lardner LLP**<br>**Washington Harbour, 3000 K Street, NW - Suite 500**<br>**Washington, DC 20007-5101** | **DECEMBER 1, 2006**<br>**9:00 a.m. (E.S.T.)** |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date and time specified below (list documents or objects):

**SEE ATTACHED RIDER**

| PLACE | DATE AND TIME |
|---|---|
| **Offices of Foley & Lardner LLP**<br>**Washington Harbour, 3000 K Street, NW - Suite 500**<br>**Washington, DC 20007-5101** | **DECEMBER 1, 2006**<br>**9:00 a.m. (E.S.T.)** |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any subpoenaed organization not a party to this adversary proceeding shall designate one or more officers, directors or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Fed.R.Civ.P. 30(b)(6) made applicable in adversary proceedings by Rule 7030, Fed.R.Bankr.P.

| ISSUING OFFICER SIGNATURE AND TITLE | DATE |
|---|---|
| [signature] **Attorney for Parus Holdings, Inc., Successor-By-Merger to EffectNet, Inc. and EffectNet, LLC** | **November 15, 2006** |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
**Joanne Lee**
**(312) 832-4500**

**Foley & Lardner LLP**
**321 North Clark Street, Suite 2800**
**Chicago, Illinois 60610**

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF COLUMBIA

In re: Worldcom, Inc., et al.

No. 02-13533

**AFFIDAVIT OF SERVICE**

to wit: Washington, DC

I, DANIEL F. PORTNOY, having been duly authorized to make service of the Deposition Subpoena Duces Tecum and Attachment in the above entitled case, hereby depose and say:

That my date of birth / age is 11-26-1971.

That my place of business is 1827 18th Street, N.W., Washington, D.C. 20009 (202) 667-0050.

That service was made by a private process server.

That I am not a party to or otherwise interested in this suit.

That at 5:00 pm on November 16, 2006, I served Jeffrey T. Hsu at Heller Ehrman LLP, 1717 Rhode Island Avenue, NW, 2nd Floor, Washington, DC 20036 by serving Jeffrey T. Hsu, personally. Described herein:

SEX- MALE
AGE- 45
HEIGHT- 5'9"
HAIR- BLACK
WEIGHT- 165
RACE- ASIAN

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the RETURN of SERVICE and STATEMENT OF SERVICE FEES is true and correct.

Executed on 11-17-06
Date

DANIEL F. PORTNOY
1827 18th Street, N.W.,
Washington, D.C. 20009
Our File#- 179950

Robert A. Scher (RS 2910)
FOLEY & LARDNER LLP
90 Park Avenue
New York, NY 10016
Phone: (212) 682-7474
Fax: (212) 682-2329
email: rscher@foley.com

-and-

Mark L. Prager (*admitted pro hac vice*)
William J. McKenna (*admitted pro hac vice*)
Jill L. Murch (*admitted pro hac vice*)
Joanne Lee (*admitted pro hac vice*)
FOLEY & LARDNER LLP
321 N. Clark Street, Suite 2800
Chicago, IL 60610
Phone: (312) 832-4500
Fax: (312) 832-4700

*Attorneys for Claimant Parus Holdings, Inc. Successor-By-Merger to EffectNet, Inc. and EffectNet, LLC*

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | CHAPTER 11 |
| | ) | Jointly Administered |
| WORLDCOM, INC., et al., | ) | |
| | ) | |
| Debtors. | ) | Case No. 02-13533 (AJG) |
| | ) | |

**CERTIFICATION OF SERVICE**

Katherine E. Hall, of full age, certifies as follows:

I am a Paralegal employed with the firm of Foley & Lardner LLP, Attorneys for Claimant Parus Holdings, Inc. successor by merger to EffectNet, Inc. and EffectNet, LLC listed in the documents herein.

On February 14, 2007, I filed the Letter to Honorable Arthur J. Gonzalez, dated February 14, 2007, electronically with the United States Bankruptcy Court for the Southern District of New York.

The following parties were served at the addresses and facsimiles set forth herein as indicated.

**Via Overnight Delivery**
Hon. Judge Arthur J. Gonzalez
United States Bankruptcy Court
Alexander Hamilton Custom House
One Bowling Green
New York, NY 10004

**Via Facsimile**
Allison Murdock
Mark Iba
Stinson Morrison Hecker LLP
1201 Walnut Street, Suite 2900
Kansas City, Missouri 64106-2150
amurdock@stinsonmoheck.com
Fax: 816.691.3495

/s/ Katherine E. Hall

Sworn to before me this
14th day of February 2007
/s/ Yolanda C. Peña
Notary Public, State of Illinois

# EXHIBIT K

D00270

**Response Deadline: March 8, 2007**
**Hearing Date and Time: March 12, 2007, at 10:00 A.M. Eastern Time**

STINSON MORRISON HECKER LLP

Robert L. Driscoll, Esq.
Allison M. Murdock, Esq.
Mark M. Iba, Esq.
1201 Walnut Street
Kansas City, MO 64106
Telephone: (816) 842-8600
Facsimile: (816) 691-3495
Attorneys for Reorganized Debtors

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | : | |
| | : | Chapter 11 Case No. 02-13533 (AJG) |
| WORLDCOM, INC., *et al.*, | : | |
| | : | (Jointly Administered) |
| Reorganized Debtors. | : | |

**MEMORANDUM IN SUPPORT OF DEBTORS' MOTION TO COMPEL CLAIMANT PARUS HOLDINGS, INC. TO APPEAR FOR A PROPERLY NOTICED RULE 30(b)(6) DEPOSITION**

Debtors file this memorandum in support of their Motion to Compel Claimant Parus Holdings, Inc. to Appear for a Properly Noticed Rule 30(b)(6) Deposition.

**Introduction**

Fed. R. Civ. P. 26(b)(1) expressly authorizes discovery regarding "the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter." In accordance with this Rule, Debtors noticed Claimant Parus Holdings, Inc. ("Parus") to appear for a deposition on February 13, 2007, to testify regarding Parus' email and other electronic information systems, document preservation practices, and the identity of persons responsible for carrying out those practices. Despite the plain language of Rule 26(b)(1), and without asserting any basis recognized under Rule 26 for avoiding its obligation to appear for a properly noticed

deposition, Parus has refused to produce its Rule 30(b)(6) witness claiming that its own document production and document preservation standards are irrelevant.

Parus should be compelled to appear for its Rule 30(b)(6) deposition. Rule 26(b)(1) entitles Debtors to take Parus' deposition on the noticed topics and deems those topics relevant. Moreover, the information Debtors seek is relevant to Parus' alleged damages and what evidence, if any, exists to support them. Parus has failed to produce any documents regarding the alleged "expectation damages" on its breach of contract claim – damages which Parus now claims for the first time in its spoliation motion are between $50.7 and $81.2 million. Debtors are entitled to discover how Parus maintained and searched its electronic documents, whether Parus' backup tapes (the existence of which Parus disclosed for the first time in its counsel's February 14, 2007, letter to the Court) contain all documents and whether Parus retained all of its backup tapes. Such information is relevant to the completeness of Parus' document production and whether any evidence exists to support Parus' new damages allegations.

The information Debtors seek also is relevant to Parus' motion alleging spoliation of evidence. For example, it is relevant to whether Parus used the same or similar document preservation procedures for which it now claims Debtors should be sanctioned and whether the documents Debtors allegedly destroyed or failed to preserve ever existed in the first place. It likewise is relevant to Debtors' request to shift to Parus all or some of the costs of restoring inaccessible electronic discovery and whether Debtors followed industry standards in storing its electronic data, a question which the Court already has stated is relevant to its consideration of cost-shifting.

The relevance and propriety of the topics noticed for Parus' Rule 30(b)(6) deposition is further underscored by Parus' discovery of Debtors *on the very same topics*.

## Background

On January 31, 2007, Debtors served Parus with the Notice of 30(b)(6) Deposition of Parus Holdings ("Notice"). See Notice (Docket No. 18694) and (Ex. A). As previously discussed, the Notice seeks testimony from Parus regarding its email and other electronic information systems, document preservation practices, and the identity of persons responsible for carrying out those practices. Id. These all are topics that Parus addressed during the five depositions it took of Debtors' Information Technology ("IT") personnel and that Parus addresses in its recently filed spoliation motion.

On February 9, 2007, less than two business days before the noticed deposition, Parus advised Debtors that it would not produce a witness on the scheduled date or any other date. See Ms. Murch's February 9, 2007, email to Mr. Iba (Ex. B to Docket No. 18711). Parus then sent a letter objecting to the deposition on the grounds that the topics are not relevant to the claims and defenses at issue in the case or its spoliation motion. See Ms. Murch's February 9, 2007, letter to Mr. Iba (Ex. C to Docket No. 18711).

On February 12, 2007, Debtors requested an informal conference to direct Parus to appear for the properly noticed Rule 30(b)(6) deposition. See Ms. Murdock's February 12, 2007, to Court (Docket No. 18711). Parus responded on February 14, 2007. See Ms. Murch's February 14, 2007, letter to Court (Docket No. 18716). An informal conference was held on February 16, 2007, during which the Court granted Debtors' request to file this motion to compel.

## Argument

### I. THE INFORMATION DEBTORS SEEK THROUGH THE RULE 30(b)(6) DEPOSITION IS RELEVANT AND, THEREFORE, FULLY AUTHORIZED BY RULE 26.

Parus asks the Court to assume that there are no issues related to its document production and, based on that assumption, deny Debtors basic discovery. Rule 26 is not so narrowly construed. The United States District Court for the Southern District of New York has held that Rule 26 relevance is an "obviously broad" rule that is "liberally construed." See, e.g., During v. City University, No. 05 Civ. 6992, 2006 U.S. Dist. LEXIS 53684, at *9 (S.D.N.Y. Aug. 1, 2006); Lyondell Citgo Refining, LP v. Petroleos de Venezuela et al., No. 02 Civ. 0795, 2004 U.S. Dist. LEXIS 23581, at *6-7 (S.D.N.Y. Nov. 19, 2004).

Rule 26(b)(1) provides that

> Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. . . .

Applying Rule 26(b)(1), this District has held that "[d]iscovery is relevant if there is any possibility that the information sought 'may be relevant to the subject matter of the action.'" During, 2006 U.S. Dist. LEXIS 53684, at *9 (quoting Goodyear Tire & Rubber Co. v. Kirk's Auto Servicenter of Haverstraw, Inc., No. 02 Civ. 0504, 2003 U.S. Dist. LEXIS 15917, at *5 (S.D.N.Y. Sept. 10, 2003)); see also Kaboggozamusoke v. Rye Town Hilton Hotel, No. 05 Civ. 4029, 2006 U.S. Dist. LEXIS 55818, at *3 (S.D.N.Y. Jan. Aug. 8, 2006) (relevancy under Rule

26 is broadly construed to encompass any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case).[1]

Parus bears the burden to show that Debtors are not entitled to the information they seek.[2] Under Fed. R. Civ. P. 26(c), Parus may seek protection from discovery where it can show that the requested discovery causes "annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c). Rule 26(b)(2) also enables a court to limit a party's discovery efforts if the court determines that:

> (i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.

Id.[3]

---

[1] Other sections of Rule 26 also illustrate the relevancy of the discovery Debtors seek. For example, Rule 26(f) contemplates that the parties in their Rule 26(f) planning meeting will verify the various sources of electronic information within their control and whether that information is accessible. See Comment to Rule 26(f)(1). In fact, Debtors provided all of this information to Parus in correspondence with Parus' prior counsel, and during the depositions of their IT personnel. Debtors simply seek to obtain this same information from Parus.

[2] Procedurally, Parus was required to seek a protective order preventing its Rule 30(b)(6) deposition from going forward. Debtors proceeded with filing a motion to compel because Parus voiced no intention of seeking a protective order and Debtors need to take Parus' Rule 30(b)(6) deposition before filing their opposition to Parus' spoliation motion.

[3] For example, Rule 26(b)(2) and (c) provides a basis for quashing Parus' attempt to depose Debtors' Rule 30(b)(6) witness on topics which, on their face, are designed to elicit privileged information because the deposition is unreasonably cumulative and duplicative and the discoverable information sought already has been obtained at Parus' own suggestion through a more convenient and less burdensome process. See *infra* pp. 15-16.

Parus voices no bases under Rule 26(b)(2) or (c) for avoiding its deposition. Instead, Parus' only objection to producing its Rule 30(b)(6) witness is that the designated topics are not relevant. On the contrary, as expressly recognized by Rule 26(b)(1), the discovery Debtors seek is relevant to whether there is any evidence to support Parus' new damages theory, whether the evidence Parus claims Debtors destroyed or failed to preserve ever existed in the first place and whether Parus, like Debtors, stores electronic information in an inaccessible format.

Parus cannot be heard to deny the relevancy of Debtors' requested discovery when it has taken extensive discovery of Debtors on the very same topics.

**A. The Discovery Debtors Seek Is Relevant To The Parties' Claims And Defenses And What Evidence Exists To Support Them.**

Parus asserts that it should be shielded from any discovery regarding its electronic information because it has agreed to produce relevant documents subject to its objections, and has not asserted that its backup tapes are inaccessible or too costly to restore. See Ms. Murch's February 14, 2007 Letter to Court (Docket No. 18716). Significantly, this is the first time Parus has ever disclosed that any of its electronic information related to this case is on backup tapes. Parus never disclosed the time period covered by its backup tapes, how its backup tapes are maintained, or what search terms and custodian names were used to search the backup tapes. Debtors have disclosed all of this information as it relates to their electronic documents, and they are entitled to discover the same information from Parus.

In addition, there is no dispute, nor can there be, that Parus bears the burden of proving damages in order to recover on its claims. Debtors, as reflected in their pending motion for summary judgment, submit that any damages Parus has suffered can be ascertained from the four corners of the contract at issue. Despite consistently placing its contract damages at approximately $5.4 or $6.3 million, Parus now claims for the first time in its spoliation motion

that it should recover "expectation damages" based solely on its contract claim in the range of $50.7 to $81.2 million.[4] Parus' new damage theory is believed to be completely without merit, and Debtors are entitled to conduct discovery on what documents, if any, exist to support Parus' ever evolving and increasing damage claim.

As stated above, Rule 26(b)(1) expressly authorizes Debtors to discover the existence, description, nature and location of documents that may relate to Parus' new damage theory or Debtors' defenses to that theory and the identity and location of persons that may have knowledge regarding the same. This is particularly important given that Parus has not produced any documents regarding how it interpreted the contract at issue; it has not produced any documents suggesting that Debtors created an expectation that Parus would earn over $50 million on the contract; it has not produced any documents regarding its analysis of profits expected under the contract; and it has not produced any documents related to its allegation that Intermedia's performance under the contract at issue impacted negotiations between Webley Systems, Inc. and MCI on a separate contract. In addition, there are dozens of attachments to electronic documents that Parus has failed to produce, and Parus' current counsel still has not

[4] In its Claims and subsequent responses to Debtors' Objections, Parus asserted a breach of contract claim against Intermedia for "damages equal to Intermedia's remaining minimum monthly commitment under the Agreement, multiplied by the number of months remaining in the term of the Agreement." Claim Nos. 11242 and 11173, Addendum to Proof of Claim at 1 (Ex. B) (seeking $6,855,844.27 based on its breach of contract claim); Parus' Response to Debtors' Objection at 9 (Docket No. 12199) (asserting claim for $5,480,000 for "lost revenues" under the minimum commitment provision of the UC Contract); Parus' Response to Debtors First Amended Objection at 1 (Docket No. 16247) (incorporating allegations in original objections). In its Rule 26(a)(1) disclosures, Parus claimed breach of contract damages in the amount of $5,480,000 and damages for its other tort-based claims that "may exceed $20 Million." Claimant's Initial Disclosures at 4-5 (Ex. C). In response to Debtors' interrogatories, Parus stated breach of contract damages in the amount of $6,307,844.27, and described other types of damages it would seek, such as diminution in reputation, but made no mention of "expectation damages." Claimant's Supp. Int. Responses, Int. No. 6 (Ex. D).

advised whether it even has possession of those attachments. See Mr. Iba's November 16, 2006, letter to Ms. Murch (Ex. E). Debtors are entitled to discover what these attachments state, how they were maintained, why they were not produced and where they might be stored.

Simply put, Parus has no legitimate basis for refusing to produce its Rule 30(b)(6) witness given that the discovery Debtors seek regarding the existence of relevant or potentially relevant documents is specifically authorized by Rule 26.

**B. The Discovery Debtors Seek Is Relevant To Parus' Spoliation Motion.**

Parus next seeks to shield itself from the noticed deposition by claiming that its document preservation systems and practices have no bearing on whether Debtors destroyed relevant evidence. See Ms. Murch's February 14, 2007, letter to Court (Docket No. 18716). This argument ignores that Parus' spoliation motion seeks relief based almost entirely on Debtors' *procedures* for preserving documents – not whether documents actually were preserved.

Parus' spoliation motion attempts to turn the law governing document preservation on its head, ignoring the principles set forth in Zubulake v. UBS Warburg LLC, 217 F.R.D. 309 (S.D.N.Y. 2003) ("Zubulake I") and its progeny. Indeed, as Debtors will show in their opposition to the spoliation motion, Parus misrepresents the law and the testimony in this case in an effort to recover through a frivolous sanctions motion that which it cannot recover under the contract at issue. In addition to the matters already stated, Parus' contortion of applicable law also places its own electronic document practices and procedures directly at issue.

The court in Zubulake I specifically recognizes that some parties, such as Debtors here, may store electronic data on inaccessible backup tapes. Explaining the difference between accessible and inaccessible data, the court stated:

> Of these, the first three categories [active online data; near-line data; offline storage/archives) are typically identified as accessible, and the latter two [backup

> tapes and erased, fragmented or damaged data] as inaccessible. The difference between the two classes is easy to appreciate. Information deemed "accessible" is stored in a readily usable format. Although the time it takes to actually access the data ranges from milliseconds to days, the data does not need to be restored or otherwise manipulated to be usable. "Inaccessible" data, on the other hand, is not readily usable. Backup tapes must be restored using a process similar to that previously described.... That makes such data inaccessible.

Zubulake I, 217 F.R.D. at 319-20. The Zubulake court used this distinction in determining who should bear the costs associated with searching electronic data; holding that accessible electronic data must be produced without cost-shifting but that cost-shifting should be considered for inaccessible data. Id. at 324. The Zubulake court never treated inaccessibility of electronic data as spoliation; on the contrary, it recognized that "there are many ways to manage electronic data, [and] litigants are free to choose how this task is accomplished." Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 218 (S.D.N.Y. 2003) ("Zubulake IV").

Moreover, less than six months ago, the United States District Court for the Southern District of New York expressly rejected any notion that a party may be sanctioned for preserving documents in an inaccessible format:

> In resolving a sanctions motion in *Quinby I*, I declined to sanction defendant for converting data from an accessible to an inaccessible format, even assuming that defendant should have anticipated litigation at the time it converted the data. . . . This conclusion ensures that in complying with a duty to preserve evidence, a party will be free to preserve electronic evidence in any format it chooses, including inaccessible formats. *See Zubulake IV*, *supra*, 220 F.R.D. at 218 ("In recognition of the fact that there are many ways to manage electronic data, litigants are free to choose how this task is accomplished."). *Preservation of data, even in an inaccessible form, will not result in spoliation because the responding party will be able to produce the electronic evidence by restoring it from an inaccessible format, albeit at a higher cost.*

Quinby v. Westlab AG, No. 04 Civ. 7406, 2006 WL 2597900, at * 9 and n.12 (S.D.N.Y. Sept. 5, 2006) ("Quinby II") (emphasis added) (expressly rejecting the dicta in Treppel v. Biovail Corp., 233 F.R.D. 363, 372 (S.D.N.Y. 2006) upon which Parus relies).

Despite this controlling authority, the cornerstone of Parus' spoliation motion is the legally and factually unsupportable notion that preserving documents on inaccessible backup tapes constitutes spoliation of evidence. For example, Parus alleges:

- "Debtors allowed information to be destroyed *and/or to become inaccessible.*" Parus' Memorandum in Support of Spoliation Motion ("Parus' Memo.") at 6, 15 (emphasis added) (Docket No. 18690).

- Debtors did not "send or distribute a notification to employees directing such employees to preserve all documents relating to Parus *in an accessible or searchable format.*" Id. at 18 (emphasis added).[5]

- "[T]here is no evidence that the Debtors *ever* requested that information relevant to Parus' claim be maintained *in an accessible format.*" Id. (emphasis added).

- "Debtors' failure to preserve information *in an accessible format* constitutes a clear violation of the Debtors' preservation obligation." Id. at 19 (emphasis added).

- "[D]ebtors must be held accountable for their utter failure to even attempt to preserve information related to Parus' claims *in an accessible format.*" Id. (emphasis added).

- "Debtors permitted information relevant to Parus' claims to be destroyed *or rendered inaccessible.*" Id. at 20 (emphasis added).

- "Debtors' decommissioning of servers *rendered its [sic] own data inaccessible.*" Id. at 37 (emphasis added).

- "Debtors also should be held liable for spoliation as a result of their failure to maintain hard copy documents *in a readily accessible format.*" Id. at 43 (emphasis added).

- Debtors failed to "keep the tapes *in an accessible format* in contravention of its electronic preservation obligations." Id. at 56 (emphasis added).

---

[5] This allegation provides yet another example of Parus' disregard for the law governing preservation. As will be discussed more fully in Debtors' opposition, Debtors had no obligation whatsoever to preserve "all documents relating to Parus." The duty to preserve applies only to documents relevant to *the claim*. See Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 107 (2d Cir. 2002) (holding that a party seeking sanctions for spoliation must establish that: (1) the party with control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the records were destroyed with a culpable state of mind; and (3) the destroyed evidence was *relevant to the party's claim or defense*).

Parus also complains in its spoliation motion that prior to July 2002, Intermedia backup tapes were rotated, id. at 30 n.12, that backup tapes are snapshots in time of the information contained on a particular server, id. at 34; and that Intermedia servers were decommissioned, id. at 36. Parus conveniently omits from its motion Debtors' testimony that all information on the Intermedia servers was saved to backup tapes before the servers were decommissioned and remains available for searching.

Given Parus' allegations, Parus cannot deny that the draconian sanctions it seeks – which include prohibiting Debtors from challenging Parus' alleged damages evidence – are based *at least in part* (and Debtors believe entirely) on Debtors' practices and procedures in preserving documents. If Parus is going to attempt to obtain judgment in this case in any amount it chooses based on Debtors' practices and procedures, then Debtors should be entitled to mount both a legal *and factual* defense in response. Debtors should be permitted to discover whether Parus maintained all of its responsive electronic data in an accessible format as it claims Debtors were required to do; whether Parus' newly-disclosed backup tapes are inaccessible such that they must be restored in order to search them for responsive documents; whether Parus' newly-disclosed backup tapes capture only a snapshot in time; whether Parus ever rotated its backup tapes; and whether Parus dismantled any servers since January of 2000. All of this information bears on the propriety and reasonableness of the relief Parus seeks in its spoliation motion.

In addition, this information is relevant to establishing whether the categories of documents Parus alleges Debtors have not produced ever existed in the first place. Parus completely disregards that it cannot obtain sanctions by merely criticizing Debtors' document preservation efforts. Spoliation requires the actual destruction (or failure to preserve) real paper or electronic evidence that is relevant to the claims. To prevail on spoliation, Parus must show

that Debtors actually destroyed (or failed to preserve) specific evidence that was relevant to a contested issue at a time when Debtors should have been on notice of Parus' claims. See Matya v. Dexter Corp., No. 97CV736C, 2006 WL 931870, at *11 (W.D.N.Y. Apr. 11, 2006) (no adverse inference because plaintiff failed to show specific records were lost or destroyed after the date the company should have been on notice of the impending litigation); Treppel v. Biovail Corp., 233 F.R.D. 363, 372 (S.D.N.Y. 2006) (the moving party must demonstrate that certain types of relevant documents actually existed and they were necessarily destroyed by the operation of company's computers).

Here, Parus' spoliation motion complains that Debtors have not produced certain broad categories of documents (such as product forecasts for the IntermediaOne product) that Parus claims would support its "expectation damages." But, once again, what Parus fails to disclose is that it has not produced any documents suggesting that Debtors created an expectation that it would earn over $50 million on the contract at issue; it has not produced any documents regarding its analysis of profits expected under the contract; and it has not produced any documents related to its allegation that Intermedia's performance under the contract at issue impacted negotiations between Webley Systems, Inc. and MCI on a separate contract. If, as Parus claims, it preserved and produced all responsive documents, then the absence of these documents is itself evidence that they never existed. Debtors cannot be accused of destroying documents that allegedly formed the basis for Parus' "expectations" under the contract and at the same time be blocked from discovering from Parus whether the documents ever existed in the first place.

Finally, Debtors are not asking the Court to rule now that Parus' electronic document practices and procedures dictate the outcome of its spoliation motion. They simply are

attempting to take a deposition – a right accorded them under Rule 26 – to discover what those practices and procedures are. If Parus is so sure of the legal and factual positions it has staked out in its spoliation motion, then it should welcome Debtors' discovery of how electronic information should be managed and preserved.

**C. The Discovery Debtors Seek Is Relevant To Their Request For Cost-Shifting.**

On July 11, 2006, the Court held an informal conference on Debtors' request to file a motion seeking to shift to Parus all or some of the costs of restoring and searching their inaccessible electronic discovery. Parus' new counsel apparently equates Debtors' request with a refusal or inability to produce their responsive electronic documents. See Ms. Murch's February 14, 2007 letter to Court (accusing Debtors of refusing to produce responsive documents). On the contrary, Debtors diligently have complied with their discovery obligations. Among other things, they have:

- restored and searched accessible and inaccessible electronic media, including nine back up tapes, four of which were selected by Parus' former counsel for the purpose of sampling the inaccessible data, so that Debtors could determine whether a cost-shifting motion is appropriate (which it is);
- searched the electronic media using the search terms and custodian names provided by Parus' former counsel;
- reviewed over 900,000 pages of electronic documents, which is the equivalent of over 375 boxes of documents;
- made eight separate electronic document productions to Parus Holdings;
- conferred by telephone and in writing at least 20 times with Parus' former counsel regarding the status of Debtors' electronic discovery efforts and the narrowing of Parus' search terms; and
- incurred over $130,000 in costs complying with Debtors' electronic discovery obligations.

As Debtors advised the Court last summer during the informal conference, the electronic discovery that remains to be completed is on more than 100 backup tapes that must be restored

and searched. Just searching a sampling of those backup tapes for Parus' former counsel required Debtors' counsel to review over 740,000 pages (or almost 300 boxes) of documents and incur approximately $73,000 in costs (which does not include any attorney review time). And the number of responsive documents located as a result of this time consuming and expensive undertaking was extremely low (only approximately 3.3%). Extrapolating the costs from the nine backup tapes that were sampled, the costs associated with completing the remaining electronic discovery could exceed $1.2 million.

The search and review of the electronic data is unduly burdensome and expensive particularly in light of the low percentage of responsive documents that are being found as a result of the electronic discovery. Parus Holdings refuses to voluntarily bear any portion of costs associated with the inaccessible electronic discovery. Therefore, as authorized by Zubulake I, Debtors have requested permission to file a cost-shifting motion.

Before Debtors filed their cost-shifting motion, Parus' former counsel requested that it be permitted to depose Debtors' IT personnel to ascertain whether Debtors should have or reasonably could have converted preserved electronic data in an accessible format. The Court granted Parus' request. In doing so, the Court also advised that industry standards regarding the storage of electronic data could be relevant in determining cost-shifting. In that regard, Parus' own practices for storing data are relevant, particularly given that Parus now admits that it too stored data related to this case on backup tapes. It is of no consequence that Parus has not sought cost-shifting. The question is whether it, too, stores electronic data in an inaccessible format.

In ordering Debtors' IT personnel to appear for depositions, the Court found that Parus was not required to rely on Debtors' counsel's representations as to the sources of Debtors' electronic data or how that data was stored – Parus was permitted to discover that information

directly from Debtors' witnesses. See July 11, 2007 Hearing Transcript at 12-14 (Ex. F). Debtors are only asking for the same consideration afforded Parus – Debtors should be permitted to discover from Parus' witnesses the sources of its electronic data and how that data was stored. As with Parus' spoliation motion, Debtors are not asking the Court to hold now that Parus' practices and procedures are determinative of the cost-shifting issue. They simply are asking to take a deposition – a right accorded them under Rule 26 – to discover what those practices and procedures are and have been during the relevant time period.

**III. PARUS CANNOT AVOID ITS RULE 30(b)(6) DEPOSITION BASED ON DEBTORS' OBJECTION TO PRODUCING A WITNESS TO TESTIFY ON TOPICS THAT, ON THEIR FACE, SEEK TO ELICIT PRIVILEGED INFORMATION.**

The only other basis Parus has identified for refusing to produce its Rule 30(b)(6) witness is Debtors objection to produce a Rule 30(b)(6) witness to testify on topics that, on their face, seek to elicit information protected from disclosure by the attorney-client privilege and work product doctrine. This completely unrelated issue provides absolutely no basis for Parus' refusal to appear for its deposition.

On November 15, 2006, Parus noticed the depositions of former in-house litigation counsel, David Wachen and Jeffrey Hsu, and Fed. R. Civ. P. 30(b)(6) representatives of Debtors to testify about subjects and produce documents regarding "litigation hold" issues. See Deposition Notices to David Wachen, Jeffrey Hsu and Debtors (Ex. G). Debtors objected to the depositions because the subjects identified for testimony and the documents requested sought to elicit privileged information. In response to Debtors' objections, *Parus* proposed to seek "litigation hold" information through written questions to which Debtors would provide verified written responses. See Ms. Murch's February 14, 2007, letter to Court (Docket No. 18716) (acknowledging that "Parus agreed in November 2006 to stay the Rule 30(b)(6) deposition and

stated that the Debtors could provide written responses in lieu of a deposition.") Debtors agreed to Parus' alternative procedure. Debtors' verified written response answers every one of Parus' "litigation hold" questions and also attaches supporting exhibits. See Debtors' Response to Claimant's Questions Regarding "Litigation Hold" (Ex. H). Debtors further have agreed to supplement their response to address two deficiencies alleged by Parus. See Ms. Murdock's January 30, 2007, letter to Ms. Murch at 6 (Ex. I). Thus, the parties still are in the middle of the "meet and confer" process. Until that process is complete, there is no controversy ripe for the Court's consideration.[6]

The Rule 30(b)(6) deposition that Debtors seek from Parus is not related to "litigation hold" issues. Rather, it is related to the types of document retention and storage information that Parus has already obtained from Debtors' IT personnel. Parus' "tit-for-tat" argument is inapposite. Debtors simply seek the same discovery opportunity that the Court already has afforded to Parus.

**Conclusion**

For the reasons set forth herein, Debtors respectfully request that the Court order Parus to produce a witness or witnesses to testify on the topics set forth in the Rule 30(b)(6) Notice Debtors served on Parus on January 31, 2007. Debtors further request that the time be extended for Debtors to file their opposition to Parus' spoliation motion until three weeks after Parus produces witnesses on each of the designated topics.

---

[6] If any dispute remains after the parties complete "meet and confer" process, Debtors will seek permission to file a motion for protective order.

Respectfully submitted,

STINSON MORRISON HECKER LLP

By: */s/ Allison M. Murdock*
Robert L. Driscoll
Allison M. Murdock
Mark M. Iba
1201 Walnut Street, Suite 2900
Kansas City, MO 64106
(816) 842-8600 – Telephone
(816) 691-3495 – Facsimile

ATTORNEYS FOR DEBTORS

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on February 26, 2007, I electronically filed the foregoing with the Clerk of the Bankruptcy Court using the CM/ECF system which sent notification of such filing to all parties receiving electronic means, including:

Jill L. Murch
Joanne Lee
FOLEY & LARDNER LLP
321 N. Clark Street, Suite 2800
Chicago, IL 60610

*/s/ Allison M. Murdock*
Attorney for Debtors

STINSON MORRISON HECKER LLP

Robert L. Driscoll, Esq.
Allison M. Murdock, Esq.
Mark M. Iba, Esq.
1201 Walnut Street
Kansas City, MO 64106
Telephone: (816) 842-8600
Facsimile: (816) 691-3495
Attorneys for Reorganized Debtors

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------x
In re : Chapter 11 Case No. 02-13533 (AJG)

WORLDCOM, INC., *et al.*, : (Jointly Administered)

Reorganized Debtors. :
-----------------------------------------------------x

**INDEX OF EXHIBITS TO MEMORANDUM IN SUPPORT OF DEBTORS' MOTION TO COMPEL CLAIMANT PARUS HOLDINGS, INC. TO APPEAR FOR A PROPERLY NOTICED RULE 30(b)(6) DEPOSITION**

Exhibit A – Notice of 30(b)(6) Deposition of Parus Holdings

Exhibit B – Parus Holdings, Inc.'s Claim Nos. 11242 and 11173

Exhibit C – Claimant Parus Holdings, Inc.'s Initial Disclosures

Exhibit D – Claimant Parus Holdings, Inc.'s Supplemental Interrogatory Responses

Exhibit E – Mr. Mark Iba's November 16, 2006, letter to Ms. Jill Murch

Exhibit F – Excerpt of July 11, 2007 Hearing Transcript

Exhibit G – Deposition Notices to David Wachen, Jeffrey Hsu and Debtors

Exhibit H – Debtors' Response to Claimant's Questions Regarding "Litigation Hold"

Exhibit I – Ms. Allison Murdock's January 30, 2007, letter to Ms. Jill Murch

**EXHIBIT A**

D00289

STINSON MORRISON HECKER LLP

Robert L. Driscoll, Esq.
Allison M. Murdock, Esq.
Mark M. Iba, Esq.
1201 Walnut Street
Kansas City, MO 64106
Telephone: (816) 842-8600
Facsimile: (816) 691-3495
Attorneys for Debtors

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>WORLDCOM, INC., et al.,<br><br>Debtors. | Chapter 11 Case No. 02-13533 (AJG)<br><br>(Jointly Administered) |

**NOTICE OF 30(b)(6) DEPOSITION OF PARUS HOLDINGS**

PLEASE TAKE NOTICE that pursuant to Fed. R. Civ. P. 30(b)(6), Debtors WorldCom Communications, Inc. and Intermedia Communications, Inc. ("Debtors") will take the deposition of Claimant Parus Holdings, Inc., successor-by-merger to EffectNet, Inc. and EffectNet, LLC ("Claimant"). The deposition will be taken at the offices of Foley& Lardner LLP, 321 N. Clark Street, Suite 2800, Chicago, Illinois 60610, on February 13, 2007 at 9:00 a.m. (C.S.T.), or at such other time and place as may be agreed upon by counsel, and shall continue until adjourned or completed. The 30(b)(6) deposition of Claimant will be taken before a notary public or other officer authorized by law to administer oaths and will be recorded by stenographic means and may also be recorded by sound and visual means.

PLEASE TAKE FURTHER NOTICE that, pursuant to Fed. R. Civ. P. 30(b)(6), Claimant shall designate one or more person to testify on Claimant's behalf to discuss the following:

1. Current and legacy email, file, data, and/or other servers of EffectNet, Parus, and Webley Systems, Inc., from September 1, 2000 through the present.

2. Current and legacy systems, practices, and procedures regarding the preservation of electronically stored information residing on email, file, data, and/or other servers of EffectNet, Parus, and Webley, from September 1, 2000 through the present.

3. Current and legacy systems, practices, and procedures for the preservation of electronically stored information residing on desktops and/or laptops of EffectNet, Parus, and Webley employees, from September 1, 2000 through the present.

4. Current and legacy systems, practices, and procedures for the preservation of hard copy documents of EffectNet, Parus, and Webley, from September 1, 2000 through the present.

5. Current and legacy document retention plans and/or procedures for EffectNet, Parus, and Webley, from September 1, 2000 through the present.

6. The person(s) involved with implementing and/or carrying out the current and legacy systems, practices, and procedures for the preservation of electronically stored information at EffectNet, Parus, and Webley, including but not limited to the person(s) who performed backups and otherwise worked with or maintained the current and legacy email, file, data, and/or other servers, and the desktop and laptop computers of EffectNet, Parus, and Webley, from September 1, 2000 through the present.

Pursuant to Fed. R. Bankr. P. 7030(b)(6), Debtors request that Claimant provide to Debtors' counsel the following information three days prior to the deposition date: (1) the identity of the person(s) designated for deposition for the Subjects set forth herein; and (2) the subject matter(s) to which each person will testify.

Dated: January 31, 2007

Respectfully submitted,

STINSON MORRISON HECKER LLP

By: *s/ Mark M. Iba*
Robert L. Driscoll, Esq.
Allison M. Murdock, Esq.
Mark M. Iba, Esq.
1201 Walnut Street, Suite 2800
Kansas City, MO 64106
(816) 842-8600 – Telephone
(816) 691-3495 – Facsimile

ATTORNEYS FOR DEBTORS

**CERTIFICATE OF SERVICE**

I hereby certify that on January 31, 2007, I served a copy of the foregoing by facsimile, email and regular U.S. mail directed to:

Jill L. Murch
Joanne Lee
FOLEY & LARDNER LLP
321 N. Clark Street, Suite 2800
Chicago, IL 60610
Facsimile: 312-832-4700

*s/ Mark M. Iba*
Attorney for Debtors

**EXHIBIT B**

D00293

new

Form B10 (Official Form 10) (Rev. 4.01)

**United States Bankruptcy Court** — **PROOF OF CLAIM**

Name of Debtor: MCI Worldcom Communications, Inc.

Case Number: 02-42223

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. §503.

Name of Creditor (The person or entity to whom the debtor owes money or property): EffectNet, Inc.

Name and Addresses Where Notices Should be Sent:
EffectNet, Inc.
c/o Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
Attn: George B. Hofmann
One Financial Center
Boston, MA 02111
Telephone No. 617-542-6000

☐ Check box if you are aw[are that] anyone else has filed a [proof of claim] relating to your claim. [Attach copy] of statement giving part[iculars].

☐ Check box if you have r[never] received any notices from the bankruptcy court in this case.

☒ Check box if the address differs from the address on the envelope sent to you by the court.

Filed: USBC - Southern District of New York
Worldcom, Inc., Et Al.
02-13533 (AJG) 0000011242

THIS SPACE IS FOR COURT USE ONLY

Account or other number by which creditor identifies debtor: N/A

Check here if this claim ☐ replaces ☒ amends a previously filed claim, dated: 1/8/03

**1. Basis for Claim**
☐ Goods sold
☒ Services performed
☐ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
☒ Other See Addendum
☐ Retiree benefits as defined in 11 U.S.C. §1114(a)
☐ Wages, salaries and compensation (Fill out below)
Your SS #: ____-____-____
Unpaid compensation for services performed from ______ (date) to ______ (date)

**2. Date debt was incurred:** December 2001 and thereafter

**3. If court judgment, date obtained:**

**4. Total Amount of Claim at Time Case Filed:** $6,855,844.27 plus unliquidated amounts
If all or part of your claim is secured or entitled to priority, also complete Item 5 or 6 below.
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5. Secured Claim.**
☐ Check this box if your claim is secured by collateral (including a right of setoff).
Brief Description of Collateral:
☐ Real Estate ☐ Motor Vehicle
☐ Other (See Addendum)
Value of Collateral: $
Amount of arrearage and other charges at time case filed included in secured claim, if any: $

**6. Unsecured Priority Claim.**
☐ Check this box if you have an unsecured priority claim
Amount entitled to priority $______
Specify the priority of the claim:
☐ Wages, salaries, or commissions (up to $4,650),* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. §507(a)(3)
☐ Contributions to an employee benefit plan - 11 U.S.C. §507(a)(4)
☐ Up to $2,100* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. §507(a)(6)
☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. §507(a)(7)
☐ Taxes or penalties of governmental units - 11 U.S.C. §507(a)(8)
☐ Other - Specify applicable paragraph of 11 U.S.C. §507(a) ( 1 ).
*Amounts are subject to adjustment on 4/1/04 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**7. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.
**8. Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.
**9. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY
RECEIVED JAN 15 2003 US BANKRUPTCY COURT SO. DIST. OF NEW YORK

Date: December 12, 2002

Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):
EffectNet, Inc. BY TAJ REVEAU, CHIEF EXECUTIVE OFFICER

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§152 and 3571.*

TRA 1742227v2

**Addendum to Proof of Claim**

Debtor: MCI Worldcom Communications, Inc. (the "Debtor")

Case No.: 02-42223 (AJG) (Jointly administered under case no. 02-13533 (AJG))

Creditor: EffectNet, Inc. ("EffectNet")

EffectNet, LLC[1] and Intermedia Communications, Inc. ("Intermedia") were parties to a certain Unified Communications Services General Agreement dated as of November 20, 2000 (the "Agreement"). A copy of the Agreement is attached to this Proof of Claim. Intermedia and the Debtor are affiliated bankrupt companies, whose bankruptcy cases are jointly administered. Pursuant to the Agreement, EffectNet was obligated to provide services to Intermedia for resale. Section 2.12 of the Agreement specified the minimum monthly commitment of Intermedia to purchase EffectNet's services, and the pricing for these services was provided in Appendix P to the Agreement.

Intermedia breached the Agreement by failing to pay amounts due under it for services provided by EffectNet, and by purposefully failing to purchase the services supplied by EffectNet under the Agreement. As a result of Intermedia's breach of the Agreement, EffectNet sent a letter dated March 25, 2002 (the "Letter"), a copy of which is attached to this Proof of Claim. The Letter details the amounts owing by Intermedia to EffectNet prior to March 2002.

In addition to the amounts described in the Letter, as a result of Intermedia's breach of the Agreement, EffectNet suffered damages equal to Intermedia's remaining minimum monthly commitment under the Agreement, multiplied by the number of months remaining in the term of the Agreement. These damages are summarized in the spreadsheet which is attached to this Proof of Claim.

The Debtor caused damages to EffectNet, which are included but not limited to those damages summarized in the spreadsheet. EffectNet has claims against the Debtor for tortious interference with contractual relations, unfair and deceptive trade practices, and conspiracy based on the Debtor's actions in concert with Intermedia. The Debtor and Intermedia agreed to cause

[1] EffectNet Inc. is the sucessor in interest to EffectNet LLC.

Intermedia to breach the Agreement, in an effort to wrongfully improve the Debtor's bargaining position with respect to a certain Master Agreement for Software Licenses ("MASL") with Webley Systems, Inc. ("Webley"), a company which is affiliated with EffectNet. The Debtor and Intermedia knew that the termination of the Agreement would place EffectNet and Webley in a position of severe financial distress, and would therefore force Webley to accept onerous terms in the negotiation of the MASL that favored the Debtor to a much greater degree than would have been possible had the Agreement been in full force and effect. The damages suffered by Webley and EffectNet as a result of the concerted action are substantial, but unliquidated in amount.

EffectNet expressly reserves its right to amend or supplement this Proof of Claim, including, but not limited to, for the purpose of quantifying the damages suffered as a result of the actions of Intermedia and the Debtor described in the preceeding paragraph. This proof of claim is made without prejudice to the filing by EffectNet of additional proofs of claim with respect to any other indebtedness or liability of the Debtor to EffectNet.

TRA 1742230v2

COPY

# EffectNet

# Unified Communications Services General Agreement For

# Intermedia Communications, Inc.

# UNIFIED COMMUNICATIONS SERVICES GENERAL AGREEMENT

This Unified Communications General Agreement (the "Agreement") is entered into as of the 20 day of November 2000, ("Effective Date") by and between EffectNet LLC, a Nevada Limited Liability Company ("EffectNet") and Intermedia Communications, Inc. organized under the laws of The State of Delaware, with a business address at One Intermedia Way, Tampa, FL 33647 ("Intermedia") (collectively "Parties" or individually a "Party").

WHEREAS, Intermedia is Integrated Communications Provider providing telecommunication services including local dial tone, long distance, data services, etc.

WHEREAS, EffectNet is a unified communications application service provider that offers private label Internet and telecommunications products and services, including unified communications and other value-added services, in-house customer services, billing and technical support (the "EffectNet Services").

WHEREAS, EffectNet desires to provide Intermedia with a customized Intermedia-branded wholesale communications service ("Private Label") for sale by Intermedia to its end user customers (the services collectively hereinafter described as "Intermedia UC Services" or "UC Services").

WHEREAS, EffectNet and Intermedia recognize that the provision of Intermedia UC Services requires the Parties to closely work together to meet customer needs and to implement and ensure the commercial viability of the Intermedia UC Services.

NOW THEREFORE, in consideration of the promises and mutual agreements contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which the Parties acknowledge, the Parties agree as follows:

1. GENERAL PROVISIONS.

1.1 Both Parties agree that EffectNet shall offer Intermedia UC Services for Intermedia as described in this Agreement. Intermedia will market the UC Services to Intermedia customers and end-users as it sees fit. For purposes of this Agreement, the term "customers" shall include, but not be limited to wholesale and retail customers of Intermedia UC Services.

1.2 EffectNet may make changes to the EffectNet Services from time to time in order to improve, modify or extend the EffectNet Services ("EffectNet Changes"), but in no event shall such changes decrease the quality of the EffectNet Services provided to Intermedia. EffectNet will provide Intermedia with notice ninety (90) days in advance of the commercial release date of such changes.

1.3 The Parties shall use their best efforts to accomplish the initial launch of the Intermedia UC Services ("Initial Launch Date") by December 18, 2000.

1.4 Each Party shall promptly notify the other in writing of any event, which might result in such Party's inability to continue to meet its obligations under this Agreement. Such event shall specifically include, but not be limited to, a materially adverse change in a Party's financial situation. EffectNet acknowledges and understands that Intermedia is in the process of a merger involving all of its assets with MCI/Worldcom, Inc. Such merger shall not, in and of itself, constitute an event requiring

notice pursuant to this provision, and that, accordingly, no further notice of the merger or the consummation thereof, shall be required of Intermedia.

## 2. OBLIGATIONS OF THE PARTIES.

2.1 Product Coordinator: EffectNet and Intermedia will each designate their own Product Coordinator to coordinate the process described below.

2.1.1 The designated Product Coordinators will be the principal points of contact between the parties on product issues (the "Product Advisory Process"). Each party may rely on the authority and technical competence of the other Party's Product Coordinator to represent its respective company in connection with the priorities, needs and progress of their company's product issues.

2.1.2 The Product Advisory Process will include In-person/telephonic/electronic communication between representatives, which should be ongoing, or occur not less than once each month during the Term of this Agreement, except if the parties expressly agree to some different frequency.

2.2 EffectNet Materials. EffectNet will provide Intermedia with regular access to and copies of the following:

2.2.1 Plans for current and future enhancements to the EffectNet Services which by their nature apply to the Intermedia UC Services; and

2.2.2 Functional descriptions, development plans, schedules and periodic status for enhancements to the EffectNet Services under development, as soon as such materials exist.

2.3 Product Development. Intermedia and EffectNet agree that the EffectNet Services provided to Intermedia will be the same version of the EffectNet Services generally made commercially available, unless Intermedia deploys modifications of the EffectNet Services in order to satisfy large blocks of customer/end users, provided, however, that EffectNet shall have no obligation to support Intermedia any modification not previously known to EffectNet.

2.3.1 Intermedia will implement new versions within 30 days with call avoidance measures built into the process, including but not limited to adequate customer notification of new features, benefits and the availability of training timed to coincide with the release of any new versions.

2.3.2 EffectNet will provide Intermedia with at least ninety (90) days advance notice of an expected new release or version of EffectNet Services.

2.4 Forecasts. Intermedia shall provide EffectNet with non-binding forecasts for expected mailbox activations, at minimum of once every two (2) months during the Term of this Agreement. Intermedia will also provide EffectNet with quarterly and annual non-binding forecasts of expected mailbox activations. The availability of platform capacity to be provided by EffectNet to Intermedia is conditioned on the platform capacity demand not exceeding the forecast provided by Intermedia for any period addressed by such forecast. With respect to timely provided mailbox activation forecasts only, EffectNet will use reasonable efforts to meet Intermedia's forecasted demand. However, EffectNet reserves the right to request additional guarantees from Intermedia when the forecasts provided by Intermedia require significant or unusual capital and cost

by EffectNet. Intermedia is to provide the first of such forecasts to EffectNet on or before November 30, 2000. For purposes of this section EffectNet must allocate constrained capacity to Intermedia on terms at least as favorable as offered to any other customer of EffectNet. In the event that EffectNet declines orders because of capacity constraints, then EffectNet shall notify Intermedia and the Parties shall use commercially reasonable efforts to develop a solution that will provide Intermedia with a method of ensuring that the needs of Intermedia's existing and potential end users are met while ensuring that EffectNet is permitted to increase capacity in an orderly fashion.

2.5 Billing Cycle. On an every 15-day basis, EffectNet will invoice Intermedia for account fees for each account active during the previous 15 days and any late charges for previous outstanding invoices.

2.6 Payment. Intermedia will pay EffectNet in then available U.S. funds on a net-15 day basis.

2.7 Call Detail Records for Billing. Each day, EffectNet will provide to Intermedia Calling Detail Records ("CDR") on a timely basis, in a mutually agreed-upon electronic format.

2.8 Billings and Collections. Intermedia shall be responsible, at its sole expense, for all invoicing and collections with its customers, end-users, agents, subagents or resellers. EffectNet will not be responsible for any collections or bad debt by Intermedia's customers, end-users, agents, subagents or resellers2.9 Fraud. Intermedia will be solely responsible for fraudulent misuse of the Intermedia UC Services due to credit fraud, fraudulently established accounts and stolen accounts (except to the extent if such theft occurs-through misuse or theft the records or facilities of EffectNet); provided that, Intermedia shall not be responsible for fraudulent misuse occurring after EffectNet has become aware of such occurrence; and, provided further, that the extent of Intermedia's liability to EffectNet for fraudulent misuse of Intermedia UC Services shall be EffectNet's direct damages and costs incurred. EffectNet shall notify Intermedia of fraud as soon as practicable, upon EffectNet's becoming aware of such fraud. The Parties will use commercially reasonable efforts to establish fraud control means and measures.

2.10 Customer Service Call Center and Technical Support. EffectNet shall maintain a customer service call center for its Intermedia customers and end-users, as appropriate in accordance with industry standards. This call center will be responsible for all customer support.

2.10.1 Call items outside the scope of EffectNet support services are: non-EffectNet related software problems and call forwarding issues.

2.11 Customer Fulfillment Process. Intermedia, when taking orders for new customers or end users, or taking orders to modify or update a customer's order, will use the EffectNet Customer Fulfillment Process or compatible process to gather the information required and to provide the customer information to EffectNet. Intermedia is responsible for providing to EffectNet such new mailbox account information reasonably required by EffectNet in order to activate a new mailbox. EffectNet shall provide documentation and training, in accordance with the training provision of this Agreement, to Intermedia on the EffectNet Customer Fulfillment Process. 2.12 Minimum Commitment. Intermedia hereby agrees to deliver a minimum 1,500 then current active subscribers on

or before three (3) months after December 18, 2000 (the "Rollout Date"); an additional 1,500 then current active subscribers (total 3,000) on or before six (6) months after the Rollout Date; and additional 3,500 then current active subscribers (total 6,500) on or before nine (9) months after the Rollout Date; and 10,000 total then current active subscribers on or before twelve (12) months after the Rollout Date (the "Ramp Date"), and at the end of each calendar month thereafter ( the "Minimum Commitment") for the Term of this Agreement.

2.13 Reconciliation Payment. On the Ramp Date and at the end of each calendar month thereafter, EffectNet will calculate the actual number of then current active subscribers on the last day of such calendar month and compare it to the Minimum Commitment. If the number of subscribers is less than the Minimum Commitment for the month in question, such difference will constitute a "Volume Shortfall." Intermedia shall pay EffectNet a Reconciliation Payment equal to the Volume Shortfall multiplied by the base monthly price applicable to the Intermedia UC Service per subscriber,

3. MARKETING AND BRANDING.

3.1 Web Presence. At no additional charge, EffectNet will provide Intermedia with a private label website, URL links and related branding as reasonably directed by Intermedia.

3.2 Use of Trademarks, Service Marks and Trade names. The Parties agree not to display or use any of the trade names, service marks, brands or trademarks of the other Party, and shall not permit the same to be displayed or used by third parties, other than in connection with the sale, distribution or promotion of the brand(s) used for the Intermedia UC Services covered by this Agreement and subject to the prior written approval of the other or a third Party owning such trademark, service mark or trade name (except where such approval between the Parties is contained in this Agreement). In the absence of specific prior written consent from the other Party, a Party shall not use any part of any of the other Party's trade names, service marks, brands or trademarks as part of its own name, service marks or trademarks or in any other manner not so approved by the other Party. It is expressly understood by both Parties that trade names, service marks and trademarks of the other party are proprietary and that nothing in this Agreement constitutes the grant of a general license to use said trade names, service marks and trademarks. Upon termination of this Agreement, any and all rights or privileges of a Party to use the other Party's trade names, service marks, brands or trademarks shall expire, and each Party shall discontinue the use of the other Party's trade names, service marks, brands. The provisions of this section shall also apply to third party branding incidental to this Agreement.

3.3 Intermedia Marketing Expenses. Intermedia as the buyer of the wholesale services from EffectNet, is responsible for all expenses and obligations incurred by Intermedia as a result of its efforts to attract and solicit customers for Intermedia UC Services. Intermedia expressly acknowledges that it is not entitled to any reimbursement by EffectNet for such expenses unless, and only to the extent that, both parties hereto agree in writing prior to the incursion of such expenses, as set forth in this Agreement.

4. CHARGES AND BILLING STATEMENTS.

4.1 Traffic- or usage-sensitive rates shall be computed in 30-second initial and 6-second continual increments.

4.2 Intermedia shall be responsible for all applicable taxes, including but not limited to sales or value-added taxes, utility or excise taxes, fees and/or surcharges that are imposed by federal, state, or local governments on the Intermedia UC Services or business generated by Intermedia through the sale of Intermedia UC Services as a result of long distance or services bundled within the Intermedia UC Services. Intermedia shall pay or reimburse EffectNet for all taxes collected or imposed on these services provided by EffectNet. The prices quotes in the following sections are exclusive of any and all taxes. Excluded from this responsibility are taxes based on EffectNet's net income. EffectNet shall comply with all federal and state regulations with respect to employee withholding taxes.

4.3 Pricing. Pricing shall be as indicated by Appendix "P" attached hereto.

4.4 Seven (7) working days post the close of the month, EffectNet shall provide to Intermedia a settlement statement ("Settlement Statement") providing a summary of charges for the previous month's billing cycle in an industry standard format. The settlement statement, unless specified elsewhere in this Agreement, shall contain the following:

4.4.1 A listing of monthly recurring charges for the current or prior month's billing cycle.

4.4.2 For calls or traffic originated by Intermedia or any customers, agents, sub-agents and/or end-users during the previous month, the individual call detail and the aggregate usage charge payable broken down by termination location.

4.4.3 For calls or traffic terminated by Intermedia or any customers, agents, sub-agents and/or end-users during the previous month, the individual call detail and the aggregate usage charge payable broken down by termination location.

4.4.4 Any taxes, fees and/or charges that are imposed by federal, state, and/or local governments.

4.4.5 The net amount payable by Intermedia to EffectNet or payable to Intermedia by EffectNet.

4.4.6 When applicable, any mutually negotiated additional fees.

4.5 Payment of the Settlement Statement shall be made within 15(fifteen) calendar days after the Settlement Statement and invoice are received by Intermedia (the "Due Date"). Payments to EffectNet shall be in United States dollars and are to be made for credit to an account of EffectNet to be determined by EffectNet and provided to Intermedia within three (3) days of the date of execution of this Agreement by the later signing party. If payment is not received by the Due Date, a late fee of the lesser of (a)

one (1) percent per month or (b) the maximum percentage permitted by law shall be assessed on the delinquent balance of undisputed usage not paid by the Due Date.

4.5.1 Deposit. Intermedia has provided EffectNet with a fully refundable deposit in anticipation of this Agreement in the amount of minimum subscriber commitment multiplied times $17.50 (US dollars) for a total of $175,000. This deposit shall be refunded to Intermedia in whole on or before the Ramp Date as long as Intermedia has met the Minimum Commitment as of such date. If Intermedia has not met the Minimum Commitment as of the Ramp Date, EffectNet shall refund to Intermedia the full amount of the deposit less the Reconciliation Payment then due. The amount of such Reconciliation Payment shall remain on deposit until such time as the Minimum Commitment is met.

4.5.2 In the event that Intermedia disputes any charge assessed by EffectNet, the Parties agree to cooperate to resolve the dispute at the earliest practicable date. The late charges set forth in Section of this Agreement shall not apply to payments that are the subject of a good faith dispute between EffectNet and Intermedia. If there is a good faith dispute, EffectNet cannot demand a late payment deposit.

5. TERM AND TERMINATION.

5.1 Term. Unless otherwise terminated as provided herein, this Agreement shall be in force for an initial term of three (3) years after the Effective Date (the "Initial Term"). This agreement shall continue automatically for successive one year terms under the same terms and conditions contained herein together with any subsequent amendments hereto, unless either Party has sent written notice of its intent not to renew the Term at least thirty (30) days prior to the expiration of the Initial Term or the renewal period then in effect.

5.2 Termination. Either Party may terminate this Agreement: (a) if the other Party fails to fulfill any of its material obligations under this Agreement; (b) if the other Party is in breach of Section 7 (Confidentiality); (c) if the other Party becomes insolvent or admits in writing its inability to pay debts as they mature, or makes an assignment for the benefit of creditors; or (d) if a petition under any foreign, state or United States bankruptcy act, receivership statute, or the like is filed by the other Party and is not dismissed within sixty (60) days after such filing. Termination due to default under this Section shall be effective thirty (30) days after written notice to the defaulting Party if the default has not been cured within such thirty (30) day period. 5.3 Effect of Termination. Upon termination of this Agreement for any reason, each Party shall remain liable for those obligations that accrued prior to the date of such termination; provided, however, that nothing herein shall be construed to obligate EffectNet to offer Services to Intermedia after the termination of this Agreement.

5.4 Early Termination. If prior to the end of the Initial Term this Agreement is terminated for any reason by Intermedia other than pursuant to Section 5.2, Intermedia shall pay EffectNet, as liquidated damages and as the sole remedy of EffectNet and the exclusive liability of Intermedia, a one-time early termination fee equal to $270,400 times the lesser of (i) 12 months, or (ii) the number of months remaining in the contract term.

6. SURVIVAL. The following provisions shall survive the expiration or termination, for any reason, of this Agreement: (Subscriber Information), (Charges and Billing

Statements); (Term and Termination); (Confidentiality); (Warranties); (Intellectual Property); (Indemnification); (Limitation of Liability); (General Provisions).

7. CONFIDENTIALITY. All information disclosed to the other party shall be deemed confidential and proprietary (hereinafter referred to as "Proprietary Information"). Such information includes, but is not limited to, trade secrets, know-how, technical specifications, processes, functional descriptions, architectural specifications, development plans, schedules, design information, customer lists, pricing and financial information concerning the parties' products or services, or other information relating to business development, operations, marketing, sales, performance, and any other information disclosed hereunder, which, by its nature, might reasonably be presumed to be proprietary in nature.

7.1 Each party agrees to use the Proprietary Information received from the other party only for the purposes of analyzing the business arrangement between the parties, and in accordance with this Agreement. No patent, copyright, trademark, invention, service mark, or other proprietary rights are implied or granted under this Agreement.

7.2 Proprietary information supplied pursuant to this Agreement shall not be reproduced in any form by the receiving party except as required to accomplish the intent of this Agreement.

7.3 The receiving party shall provide, at a minimum, the same care to avoid disclosure or unauthorized use of the Proprietary Information as is provided to protect its own Proprietary Information, but in no event less than a reasonable standard of care. It is agreed that all Proprietary Information shall be retained by the receiving party in a secure place with access limited to the receiving party's employees or agents who need to know of the content of such information for purposes of fulfilling its obligations pursuant to this Agreement. The receiving party shall be fully responsible for any breach of this Agreement by its employees or agents. The receiving party will promptly report to the disclosing party any actual or suspected violation of the terms of this Agreement, and will take all reasonable steps requested by the disclosing party to prevent, control or remedy any such violation.

7.4 All Proprietary Information, unless otherwise specified in writing, shall remain the property of the disclosing party. Such information shall be used by the receiving party only for the purpose set forth in this Agreement. In addition, such Proprietary Information, including all copies thereof, shall be returned to the disclosing party or, at the request of the disclosing party, may be destroyed by the receiving party and certified as destroyed by an officer of the receiving party after the Receiving party's need for it has expired, upon request of the disclosing party; and, in any event, upon termination of the Agreement.

7.5 Exceptions to confidentiality: It is understood that the parties have no obligation to maintain the confidentiality of Proprietary Information which:

7.5.1 has been published or is now otherwise in the public domain through no fault of the receiving party.

7.5.2 prior to disclosure hereunder is within the legitimate possession of the receiving party without obligation of confidentiality as can be demonstrated by written documentation.

7.5.3 subsequent to disclosure hereunder is lawfully received from a third party having rights to such Proprietary Information without restriction of the third party's right to disseminate the Proprietary Information and without notice of any restriction against its further disclosure, is disclosed with the written approval of the other party as can be proven by documentation.

7.5.4 is obligated to be produced by a Party under order of a court of competent jurisdiction or other government authority; provided however, that the receiving party shall immediately provide notice to the disclosing party such that the disclosing party may seek injunctive relief and/or a protective order; and further provided that the disclosing party shall use best efforts to ensure that the information shall be treated as confidential by the party to whom it is disclosed.

7.5.5 is independently developed by the receiving party without reference to or reliance upon the confidential information.

In the event of a disputed disclosure, the receiving party shall bear the burden of proof of demonstrating that the information falls under one of the above exceptions.

8. WARRANTIES.

8.1. Authorization. Each Party represents and warrants to the other Party that the execution and delivery of this Agreement and the performance of such Party's obligations under this Agreement have been duly authorized, and that the Agreement is a valid and binding agreement, enforceable in accordance with its terms.

8.2. Legal Compliance. Each Party represents and warrants that it has obtained, or will obtain prior to offering the Services hereunder, all licenses, approvals and/or regulatory authority necessary to provide the Services described herein. This Agreement is made expressly subject to all present and future valid orders and regulations of any regulatory body having jurisdiction over the subject matter of this Agreement.

8.3 No Other Warranties. With respect to the UC Services to be provided in, and to users accessing these services from the United States and Canada, EffectNet warrants that it will exercise commercially reasonable care in the performance of its obligations under this Agreement

**EFFECTNET DOES NOT WARRANT THAT THE EFFECTNET SERVICES OR THE PLATFORM THAT IT PROVIDES TO INTERMEDIA IS ERROR-FREE. IN ADDITION, THE EFFECTNET SERVICES OR INTERMEDIA PLATFORM IS PROVIDED "AS IS" AND WITHOUT ANY WARRANTY OF ANY KIND. EFFECTNET DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. NEITHER PARTY SHALL BE LIABLE FOR ANY DAMAGES ARISING FROM THE OTHER PARTY'S OR ANY THIRD PARTY'S USE OF THE EQUIPMENT, INCLUDING WITHOUT LIMITATION INDIRECT, INCIDENTAL, SPECIAL, OR CONSEQUENTIAL DAMAGES, EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILTY OF SUCH DAMAGES. THE PARTIES AGREE TO THE ALLOCATION OF LIABILITY RISK SET FORTH IN THIS SECTION. THIS LIMITATION ON LIABILITY IS INTENDED ITO APPLY WITHOUT REGARD TO**

**WHETHER OTHER PROVISIONS OF THIS CONTRACT HAVE BEEN BREACHED OR PROVEN INEFFECTIVE.** "AS IS" means the As Is condition of the EffectNet Services to be provided as Intermedia UC Services, including such customer support, software and hardware as required in the condition as of the Initial Launch Date agreed upon between the Parties and including any planned enhancement as well as any other changes mutually agreed upon. These products may as of the Initial Launch Date include works for hire for the benefit of Intermedia as further described in Section 9.2.

9. INTELLECTUAL PROPERTY.

9.1 General. Except as otherwise agreed in writing between the Parties, EffectNet shall own any Patent applications and Patents issued on inventions under this Agreement. All Inventions that are not the subject of patents or applications will be considered Confidential Information of EffectNet. Nothing in this Agreement shall be construed to transfer any right title or interest in EffectNet's designs, inventions, copyrights, trade secrets, trade names or other intellectual property.

**10. INDEMNIFICATION. Each Party ("Indemnitor") will defend, indemnify and hold harmless the other Party and such Party's affiliates, directors, officers, employees, proprietors, independent contractors, consultants, partners, shareholders, representatives, customers, agents, predecessors, successors, and permitted assigns (collectively, "Indemnitees") from and against any claim, suit, demand, loss, damage, expense (including reasonable attorneys' fees and costs) or liability that may result from, arise out of or relate to: (a) acts or omissions arising out of or in connection with this Agreement resulting in property damage; by Indemnitor and (b) intentional or negligent violations by Indemnitor of any applicable laws or governmental regulation.**

Intermedia shall indemnify and hold harmless EffectNet from and against any and all claims, expenses, judgments, liabilities, damages or losses, including reasonable attorney's fees and expenses, and shall defend all third-party actions and proceedings arising from any infringement or alleged infringement of any patent, copyright, trade secret, mask work, trade marks or service marks of any third party to the extent such claims are caused by the acts or omissions of Intermedia with respect to the marketing and/or provision of the Intermedia UC Services, but not including any claims, expenses, judgments, liabilities, damages or losses to the extent attributable to the EffectNet Services. EffectNet shall indemnify and hold harmless Intermedia from and against any and all claims, expenses, judgments, liabilities, damages or losses, including reasonable attorneys' fees and expenses, and shall defend all third-party actions and proceedings arising from any infringement or alleged infringement of any patent, copyright, trade secret, mask work or other intellectual property right of any third party, to the extent such claims are caused by use of the EffectNet Services. In the event that an injunction or restraining order is obtained against the use or distribution of any product or deliverable pursuant to this Agreement because of any infringement or alleged infringement of any patent, copyright, trade secret, mask work or other intellectual property right or any proprietary, contract or other right of any third party, or if in EffectNet's reasonable judgment any product or deliverable is likely to become the subject of a successful claim of such infringement, then EffectNet's sole obligation to Intermedia (in addition to its obligations of indemnification set forth above) shall be to promptly: (i) procure for Intermedia the right to use the product or deliverable as provided in this Agreement, (ii)

replace or modify the EffectNet product or deliverable so it becomes non-infringing without materially affecting the performance thereof, or if options (i) and (ii) are not available despite commercially reasonable efforts, (iii) terminate the licenses granted hereunder, and accept the return of all copies of all products.

11. LIMITATION OF LIABILITY. EXCEPT FOR DAMAGES ARISING UNDER SECTION , IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY INCIDENTAL, INDIRECT, SPECIAL, PUNITIVE, CONSEQUENTIAL OR SIMILAR DAMAGES OF ANY KIND INCLUDING WITHOUT LIMITATION, LOSS OF PROFITS, LOSS OF BUSINESS OR INTERRUPTION OF BUSINESS, WHETHER SUCH LIABILITY IS PREDICATED ON CONTRACT, STRICT LIABILITY OR ANY OTHER THEORY WITHOUT REGARD TO WHETHER SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

12. GENERAL PROVISIONS.

12.1 Monetary Values. All monetary values in the Agreement refer to U.S. dollars.

12.2 Assignment. Either Party may assign its rights or obligations under this Agreement with written notice to the other Party, and after obtaining written approval by the other party, which shall not be unreasonably withheld or delayed. In the event that Intermedia is acquired by WorldCom no such written approval shall be required. In the event of a restructuring, merger, or acquisition of either party, in which such party retains at least 25 percent control of the resulting entity such notice and approval shall not be required.

12.3 Governing Law. This Agreement will be interpreted in accordance with the laws of the state of Arizona, excluding its conflict of law rules. The Parties agree that the federal and state courts located in Arizona and/or Florida shall be the proper forum for any action brought against the other Party, and each Party shall take all necessary actions to consent to the jurisdiction of such courts.12.4 Notices. All notices or other communications between EffectNet and Intermedia under this Agreement shall be in writing and delivered personally, sent by confirmed facsimile, by confirmed e-mail, by certified mail, postage prepaid and return receipt requested, or by a nationally recognized express delivery service addressed to the Parties at the addresses first set forth below or at such other addresses, facsimile numbers or e-mail addresses or to such individuals as either Party may specify by notice to the other Party pursuant to this Section. All notices shall be in English and shall be effective upon receipt. As a courtesy, Parties are encouraged to send duplicate copies of notice, demands, or other by facsimile. Issuance of a facsimile copy of a notice, request, demand or other communication shall not replace the requirements for delivery by mail or overnight courier in the manner provided in this Section, nor shall the date the facsimile received constitute the official receipt date. Any Party may change the address to which notices, requests, demands or other to such Party shall be delivered or mailed by giving notice of the change to the other Party in the manner provided in this Section. The addresses for the Parties for the purposes of this Agreement are:

*For EffectNet:*

Taj Reneau
Chief Executive Officer
EffectNet
Phone: 602.296.3300
Fax: 602.296.3311

*For Intermedia Communications, Inc.*

Kathleen A. Victory
VP Product Line Management
Intermedia Communications Inc.
Phone: 813.829.6703
Fax: 813.829.2359

12.5 Independent Contractors. This Agreement and the relations hereby established do not constitute a partnership, joint venture, franchise or agency between the Parties. Both parties are independent contractors acting for their own accounts and neither is authorized to bind, or attempt to bind, the other to any contract, general warranty, covenant or undertaking of any nature whatsoever unless authorized in writing. Neither party shall have the authority to accept delivery, collect or otherwise take possession of any funds or other property of the other party, and if done so inadvertently, shall immediately notify the other party, shall hold same in trust and shall immediately deliver same to the other party. In all matters relating to this Agreement neither party nor such party's employees or agents are, or will act, as employees of the other party within the meaning of any federal or state laws.

12.6 Severability. If any provision of this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other term or provision hereof. The Parties agree that they will negotiate in good faith or will permit a court to replace any provision hereof so held invalid, illegal or unenforceable with a valid provision, which is as similar as possible in substance to the invalid, illegal or unenforceable provision.

12.7 Entire Agreement And Modifications. This Agreement together with any appendices, exhibits and attachments constitute the entire agreement between the Parties with regard to the subject matter hereof and supersedes all prior, agreements and understandings, whether written or oral, relating to the subject matter hereof. This Agreement may only be modified by a written instrument duly executed by each Party, making specific reference to this Agreement and to the clause to be modified.

12.8 Captions. Where provided, captions of the sections and subsections of this Agreement are for reference purposes only and do not constitute terms or conditions of this Agreement, and shall not limit or affect the terms and conditions hereof.

12.9 Waiver. No provision of, right, power or privilege under this Agreement shall be deemed to have been waived by any act, delay, omission or acquiescence on the part of either Party, its agents, or employees, but only by an instrument in writing signed by an authorized officer of each Party. No waiver by either Party of any breach or default of any provision of this Agreement by the other Party shall be effective as to any other breach or default, whether of the same or any other provision and whether occurring prior to, concurrent with, or subsequent to the date of such waiver.

12.10 Counterparts. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. In making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart.

12.11 Force Majeure. Neither Party shall have any liability to the other for delays resulting from any "Event of Force Majeure" or from any act or omission of the such other Party. An Event of Force Majeure shall include without limitation any delay or failure in performance due to acts of God, earthquake, labor disputes, changes in law, regulation or government policy, riots, war, fire, epidemic, acts or omissions of vendors or suppliers, equipment failures, transportation difficulties, or other occurrences which are beyond the affected Party's reasonable control.

12.12 Conflicts. To the extent the terms of this Agreement and the MOU conflict, the terms of this Agreement shall be controlling.

**IN WITNESS WHEREOF,** the Parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the date first written above.

| EffectNet, L.L.C. | Intermedia Communications, Inc. |
|---|---|
| Signature: [signature] | Signature: Kathleen A. Victory [signature] |
| Printed Name: Brad Steinmeyer | Printed Name: Kathleen A. Victory |
| Title: VP Partner Development | Title: VP Product Line Management |
| Date: 11/27/00 | Date: November 20, 2000 |

## APPENDIX P (Pricing)

EffectNet shall offer the following products to Intermedia at the prices attached thereto as follows:

1. **Basic**

$11.45 per month for each basic account with all platform usage and inbound call times on the EffectNet platform an additional $.10 per minute. The basic account includes unlimited free on-line usage including checking e-mails, faxes, etc... Outbound calling will be $.10 per minute. This package includes customer service and technical support. All basic accounts will be billed a base subscription price of $ 6.00 for the first calendar month of activation partial or full, and $11.45 for any calendar month thereafter partial or full.

2. **Unlimited**

$27.40 per month for each unlimited account with unlimited free platform usage and inbound call time included. Outbound calling will be $.10 per minute. The unlimited account includes unlimited free on-line usage including checking e-mails, faxes, etc. Outbound calls include: conference calls (per member), outbound long distance, outbound fax, follow me, notification, return calls, etc. All unlimited accounts will be billed a base subscription price of $ 14.00 for the first calendar month of activation partial or full, and $27.40 for any calendar month thereafter partial or full.

Intermedia shall be responsible for any and all expenses incurred related to the completion of the Virtual Private Network ("VPN"). No expenses shall be incurred on behalf of Intermedia for the VPN without prior consent from Intermedia.



One Parkway North
Fourth Floor North
Deerfield, Illinois 60015
Office: 888.444.6400

Writer's Direct No.
(888)-387-3481

March 25, 2002

**Via Federal Express Mail**
Mr. Brett Bacon
MCI/WorldCom
1945 Old Gallows Road
Vienna, Virginia 22182

Re: Unified Communications General Agreement, dated November 20, 2000, by and between EffectNet, Inc. (formerly EffectNet LLC) ("**EffectNet**") and Intermedia Communications, Inc. ("**Intermedia**") (the "**Agreement**")

Dear Mr. Bacon:

EffectNet, by letter to the attention of Mr. Rich Black, dated March 12, 2002, issued a written notice of default under Section 5.2 of the Agreement with respect to the Intermedia Defaults, as defined in the March 12 letter (the "**March 12 Letter**"). I understand from you that Mr. Black referred the March 12 letter to your attention upon receipt. As you know, the Agreement in Section 5.2 provides that "[t]ermination due to default under this Section shall be effective thirty (30) days after written notice to the defaulting Party if the default has not been cured within such thirty (30) day period." Accordingly, the Agreement will be terminated for default by Intermedia on or about April 12, 2002 if the Intermedia Defaults are not cured prior thereto.

I spoke with you on or about March 13 and you indicated that Intermedia and/or its affiliates were interested in pursuing immediate settlement discussions. I also understand that you spoke with Mr. Jim Calandra, Chief Financial Officer of EffectNet on March 18 and that you told Mr. Calandra that Mr. Barry Zip would

be handling settlement discussions. Further, I understand that you told Mr. Calandra that you would provide Mr. Zip with contact information of Mr. Calandra. On March 20, Mr. Calandra exchanged voice messages with you whereby Mr. Calandra inquired of Mr. Zip and the lack of communication from him and you responded by giving Mr. Calandra, for the first time, contact information for Mr. Zip. Mr. Calandra called Mr. Zip the same day, March 20, and left a voice message for Mr. Zip requesting that Mr. Zip return the call. Neither Mr. Calandra nor anyone else has since received any communications from Intermedia or its affiliates regarding this matter. As you might imagine, EffectNet is becoming increasingly concerned that Intermedia and/or its affiliates fail to understand the gravity of this matter and the urgency with which it must be addressed.

Intermedia should also take notice of the Due Date of invoice #1018, dated March 5, 2002, in the amount of $279,757.02 and delivered to Intermedia on March 6, 2002. Payment of this amount was due on or before March 21, 2002. EffectNet has not received this past due payment (the "**February Payment Default**").

Accordingly, EffectNet hereby gives Intermedia written notice of default under Section 5.2 of the Agreement with respect to the February Payment Default and EffectNet further hereby gives Intermedia written notice that EffectNet may (i) terminate the Agreement under Section 5.2 due to default effective thirty (30) days after this written notice (if the Agreement is not sooner terminated pursuant to the March 12 Letter) if the February Payment Default has not been cured within such thirty (30) day period, and (ii) further exercise all available remedies pursuant to the terms of the Agreement and as otherwise may be available at law or in equity.

EffectNet hereby demands immediate payment, in accordance with the terms of the Agreement, of the amounts itemized below:

| | |
|---|---|
| Total Amount Past Due on invoice 1010, dated February 6, 2002, and delivered to Intermedia on February 12, 2002 (for the December 2001 billing cycle): | $274,021.05 |
| Total Amount Past Due on invoice 1011, dated February 6, 2002, and delivered to Intermedia on February 12, 2002 (for the January 2002 billing cycle): | $274,066.20 |

Total Amount Past Due on Invoice #1018,
dated March 5, 2002, and delivered to
Intermedia on March 6, 2002
(for the February 2002 billing cycle): $279,757.02

**Required Payment:** $827,844.27

The total amount past due is as of March 21, 2002. EffectNet gives notice that all provisions of default will be [illegible] enforced. As indicated above, Intermedia has until the expiration of [illegible] (30) days after the March 12 Letter or this written notice, as the case may be, to remit the Required Payment. The Required Payment should be made payable and delivered by wire transfer to Wells Fargo Bank, Tempe, Arizona; ABA Routing Number 1221-05278; EffectNet Operations Account; Account Number 046-1657220; attn: Stephanie Jordan at 480-644-8396.

If Intermedia fails to cure the Intermedia Defaults and the February Payment Default and if the Agreement is terminated as aforesaid, EffectNet may claim damages for all amounts due pursuant to the Agreement.

Nothing in this letter is intended to be a waiver or release of any rights or remedies, or an election thereof, that EffectNet has under the Agreement or applicable law, and all such rights and remedies are hereby expressly reserved in their entirety.

Very truly yours,

Robert C. McConnell
General Counsel

CC: Mr. Rich Black

| Time period | Minimum Commitment | Price | Total per month | Total for period |
|---|---|---|---|---|
| Past due invoices prior to March, 2002 | | | | $827,844.27 |
| March 2002 through December 2002 | 10000 | $27.40 | $274,000.00 | $2,740,000.00 |
| December 18, 2002-December 18, 2003 | 10000 | $27.40 | $274,000.00 | $3,288,000.00 |
| | | | **Total:** | **$6,855,844.27** |

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.

One Financial Center
Boston, Massachusetts 02111

George B. Hofmann
*Direct dial 617 348 1753*
gbhofmann@mintz.com

617 542 6000
617 542 2241 *fax*

January 14, 2003

**BY FEDERAL EXPRESS**

United States Bankruptcy Court
WorldCom Claims Docketing Center
One Bowling Green, Room 534
New York, NY 10004-1408

Re: MCI Worldcom Communications, Inc.
Chapter 11; Case No. 02-42223

Dear Sir or Madam:

Enclosed please find the original and two copies of a proof of claim in connection with the above case. Please file the original and return one of the copies date-stamped to the undersigned in the enclosed self-addressed stamped envelope.

Thank you for your assistance. Please contact me if you have any questions.

Very truly yours,

MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY and POPEO, P.C.

George B. Hofmann

GBH
Enclosures

TRA 1750116v2

Form B10 (Official Form 10) (Rev. 4.01)

**United States Bankruptcy Court** | **PROOF OF CLAIM**

Name of Debtor: Intermedia Communications, Inc.

Case Number: 02-42154

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. §503.

Name of Creditor (The person or entity to whom the debtor owes money or property):
EffectNet, Inc.

Name and Addresses Where Notices Should be Sent:
EffectNet, Inc.
c/o Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
Attn: George B. Hofmann
One Financial Center
Boston, MA 02111
Telephone No. 617-542-6000

☐ Check box if you are aw anyone else has filed a relating to your claim. of statement giving part

☐ Check box if you have r received any notices fro bankruptcy court in this case.

☒ Check box if the address differs from the address on the envelope sent to you by the court.

Filed: USBC - Southern District of New York
Worldcom, Inc., Et Al.
02-13533 (AJG) 0000011173

THIS SPACE IS FOR COURT USE ONLY

Account or other number by which creditor identifies debtor: N/A

Check here if this claim ☐ replaces ☒ amends a previously filed claim, dated: 1/8/03

**1. Basis for Claim**
☐ Goods sold
☒ Services performed
☐ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
☒ Other See Addendum

☐ Retiree benefits as defined in 11 U.S.C. §1114(a)
☐ Wages, salaries and compensation (Fill out below)
Your SS #: ___
Unpaid compensation for services performed from ___ (date) to ___ (date)

**2. Date debt was incurred:** December 2001 and thereafter

**3. If court judgment, date obtained:**

**4. Total Amount of Claim at Time Case Filed:** $6,855,844.27 plus unliquidated amounts
If all or part of your claim is secured or entitled to priority, also complete Item 5 or 6 below.
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5. Secured Claim.**
☐ Check this box if your claim is secured by collateral (including a right of setoff).
Brief Description of Collateral:
☐ Real Estate ☐ Motor Vehicle
☐ Other (See Addendum)
Value of Collateral: $
Amount of arrearage and other charges at time case filed included in secured claim, if any: $

**6. Unsecured Priority Claim.**
☐ Check this box if you have an unsecured priority claim
Amount entitled to priority $___
Specify the priority of the claim:
☐ Wages, salaries, or commissions (up to $4,650),* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. §507(a)(3)
☐ Contributions to an employee benefit plan - 11 U.S.C. §507(a)(4)
☐ Up to $2,100* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. §507(a)(6)
☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. §507(a)(7)
☐ Taxes or penalties of governmental units - 11 U.S.C. §507(a)(8)
☐ Other - Specify applicable paragraph of 11 U.S.C. §507(a) ( ).
*Amounts are subject to adjustment on 4/1/04 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

7. **Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.
8. **Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.
9. **Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY
RECEIVED
JAN 15 2003
US BANKRUPTCY COURT
SO DIST OF NEW YORK

Date: December 12, 2002

Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):
[signature]
EffectNet, Inc. BY TAJ RENEAU, CHIEF EXECUTIVE OFFICER

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§152 and 3571.*

TRA 1739466v2

D00316

**Addendum to Proof of Claim**

Debtor: Intermedia Communications, Inc. (the "Debtor")

Case No.: 02-42154 (AJG) (Jointly administered under case no. 02-13533 (AJG))

Creditor: EffectNet LLC ("EffectNet")

EffectNet, LLC[1] and the Debtor were parties to a certain Unified Communications Services General Agreement dated as of November 20, 2000 (the "Agreement"). A copy of the Agreement is attached to this Proof of Claim. Pursuant to the Agreement, EffectNet was obligated to provide services to the Debtor for resale. Section 2.12 of the Agreement specified the minimum monthly commitment of the Debtor to purchase EffectNet's services, and the pricing for these services was provided in Appendix P to the Agreement.

The Debtor breached the Agreement by failing to pay amounts due under it for services provided by EffectNet, and by purposefully failing to purchase the services supplied by EffectNet under the Agreement. As a result of the Debtor's breach of the Agreement, EffectNet sent a letter dated March 25, 2002 (the "Letter"), a copy of which is attached to this Proof of Claim. The Letter details the amounts owing by the Debtor to EffectNet prior to March 2002.

In addition to the amounts described in the Letter, as a result of the Debtor's breach of the Agreement, EffectNet suffered damages equal to the Debtor's remaining minimum monthly commitment under the Agreement, multiplied by the number of months remaining in the term of the Agreement. These damages are summarized in the spreadsheet which is attached to this Proof of Claim.

EffectNet has additional claims against the Debtor for unfair and deceptive trade practices, breach of the implied covenant of good faith and fair dealing, and conspiracy based on the Debtor's actions in concert with MCI Worldcom Network Services, Inc. ("MCI"). The Debtor and MCI agreed to cause the Debtor to breach the Agreement, in an effort to wrongfully improve MCI's bargaining position with respect to a certain Master Agreement for Software Licenses ("MASL") with Webley Systems, Inc. ("Webley"), a company which is affiliated with

[1] EffectNet, Inc. is the sucessor in interest to EffectNet LLC.

EffectNet. The Debtor and MCI knew that the termination of the Agreement would place EffectNet and Webley in a position of severe financial distress, and would therefore force Webley to accept onerous terms in the negotiation of the MASL that favored MCI to a much greater degree than would have been possible had the Agreement been in full force and effect. The damages suffered by Webley and EffectNet as a result of the concerted action are substantial, but unliquidated in amount.

EffectNet expressly reserves its right to amend or supplement this Proof of Claim, including, but not limited to, for the purpose of quantifying the damages suffered as a result of the actions of MCI and the Debtor described in the preceding paragraph. This proof of claim is made without prejudice to the filing by EffectNet of additional proofs of claim with respect to any other indebtedness or liability of the Debtor to EffectNet.

TRA 1739472v2

COPY

# EffectNet

# Unified Communications Services General Agreement For

# Intermedia Communications, Inc.

# UNIFIED COMMUNICATIONS SERVICES GENERAL AGREEMENT

This Unified Communications General Agreement (the "Agreement") is entered into as of the 20 day of November 2000, ("Effective Date") by and between EffectNet LLC, a Nevada Limited Liability Company ("EffectNet") and Intermedia Communications, Inc. organized under the laws of The State of Delaware, with a business address at One Intermedia Way, Tampa, FL 33647 ("Intermedia") (collectively "Parties" or individually a "Party").

**WHEREAS,** Intermedia is Integrated Communications Provider providing telecommunication services including local dial tone, long distance, data services, etc.

**WHEREAS,** EffectNet is a unified communications application service provider that offers private label Internet and telecommunications products and services, including unified communications and other value-added services, in-house customer services, billing and technical support (the "EffectNet Services").

**WHEREAS,** EffectNet desires to provide Intermedia with a customized Intermedia-branded wholesale communications service ("Private Label") for sale by Intermedia to its end user customers (the services collectively hereinafter described as "Intermedia UC Services" or "UC Services").

**WHEREAS,** EffectNet and Intermedia recognize that the provision of Intermedia UC Services requires the Parties to closely work together to meet customer needs and to implement and ensure the commercial viability of the Intermedia UC Services.

**NOW THEREFORE,** in consideration of the promises and mutual agreements contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which the Parties acknowledge, the Parties agree as follows:

1. <u>GENERAL PROVISIONS</u>.

1.1 Both Parties agree that EffectNet shall offer Intermedia UC Services for Intermedia as described in this Agreement. Intermedia will market the UC Services to Intermedia customers and end-users as it sees fit. For purposes of this Agreement, the term "customers" shall include, but not be limited to wholesale and retail customers of Intermedia UC Services.

1.2 EffectNet may make changes to the EffectNet Services from time to time in order to improve, modify or extend the EffectNet Services ("EffectNet Changes"), but in no event shall such changes decrease the quality of the EffectNet Services provided to Intermedia. EffectNet will provide Intermedia with notice ninety (90) days in advance of the commercial release date of such changes.

1.3 The Parties shall use their best efforts to accomplish the initial launch of the Intermedia UC Services ("Initial Launch Date") by December 18, 2000.

1.4 Each Party shall promptly notify the other in writing of any event, which might result in such Party's inability to continue to meet its obligations under this Agreement. Such event shall specifically include, but not be limited to, a materially adverse change in a Party's financial situation. EffectNet acknowledges and understands that Intermedia is in the process of a merger involving all of its assets with MCI/Worldcom, Inc. Such merger shall not, in and of itself, constitute an event requiring

notice pursuant to this provision, and that, accordingly, no further notice of the merger or the consummation thereof, shall be required of Intermedia.

2. OBLIGATIONS OF THE PARTIES.

2.1 Product Coordinator: EffectNet and Intermedia will each designate their own Product Coordinator to coordinate the process described below.

2.1.1 The designated Product Coordinators will be the principal points of contact between the parties on product issues (the "Product Advisory Process"). Each party may rely on the authority and technical competence of the other Party's Product Coordinator to represent its respective company in connection with the priorities, needs and progress of their company's product issues.

2.1.2 The Product Advisory Process will include in-person/telephonic/electronic communication between representatives, which should be ongoing, or occur not less than once each month during the Term of this Agreement, except if the parties expressly agree to some different frequency.

2.2 EffectNet Materials. EffectNet will provide Intermedia with regular access to and copies of the following:

2.2.1 Plans for current and future enhancements to the EffectNet Services which by their nature apply to the Intermedia UC Services; and

2.2.2 Functional descriptions, development plans, schedules and periodic status for enhancements to the EffectNet Services under development, as soon as such materials exist.

2.3 Product Development. Intermedia and EffectNet agree that the EffectNet Services provided to Intermedia will be the same version of the EffectNet Services generally made commercially available, unless Intermedia deploys modifications of the EffectNet Services in order to satisfy large blocks of customer/end users, provided, however, that EffectNet shall have no obligation to support Intermedia any modification not previously known to EffectNet.

2.3.1 Intermedia will implement new versions within 30 days with call avoidance measures built into the process, including but not limited to adequate customer notification of new features, benefits and the availability of training timed to coincide with the release of any new versions.

2.3.2 EffectNet will provide Intermedia with at least ninety (90) days advance notice of an expected new release or version of EffectNet Services.

2.4 Forecasts. Intermedia shall provide EffectNet with non-binding forecasts for expected mailbox activations, at minimum of once every two (2) months during the Term of this Agreement. Intermedia will also provide EffectNet with quarterly and annual non-binding forecasts of expected mailbox activations. The availability of platform capacity to be provided by EffectNet to Intermedia is conditioned on the platform capacity demand not exceeding the forecast provided by Intermedia for any period addressed by such forecast. With respect to timely provided mailbox activation forecasts only, EffectNet will use reasonable efforts to meet Intermedia's forecasted demand. However, EffectNet reserves the right to request additional guarantees from Intermedia when the forecasts provided by Intermedia require significant or unusual capital and cost

by EffectNet. Intermedia is to provide the first of such forecasts to EffectNet on or before November 30, 2000. For purposes of this section EffectNet must allocate constrained capacity to Intermedia on terms at least as favorable as offered to any other customer of EffectNet. In the event that EffectNet declines orders because of capacity constraints, then EffectNet shall notify Intermedia and the Parties shall use commercially reasonable efforts to develop a solution that will provide Intermedia with a method of ensuring that the needs of Intermedia's existing and potential end users are met while ensuring that EffectNet is permitted to increase capacity in an orderly fashion.

2.5 Billing Cycle. On an every 15-day basis, EffectNet will invoice Intermedia for account fees for each account active during the previous 15 days and any late charges for previous outstanding invoices.

2.6 Payment. Intermedia will pay EffectNet in then available U.S. funds on a net-15 day basis.

2.7 Call Detail Records for Billing. Each day, EffectNet will provide to Intermedia Calling Detail Records ("CDR") on a timely basis, in a mutually agreed-upon electronic format.

2.8 Billings and Collections. Intermedia shall be responsible, at its sole expense, for all invoicing and collections with its customers, end-users, agents, subagents or resellers. EffectNet will not be responsible for any collections or bad debt by Intermedia's customers, end-users, agents, subagents or resellers2.9 Fraud. Intermedia will be solely responsible for fraudulent misuse of the Intermedia UC Services due to credit fraud, fraudulently established accounts and stolen accounts (except to the extent if such theft occurs-through misuse or theft the records or facilities of EffectNet); provided that, Intermedia shall not be responsible for fraudulent misuse occurring after EffectNet has become aware of such occurrence; and, provided further, that the extent of Intermedia's liability to EffectNet for fraudulent misuse of Intermedia UC Services shall be EffectNet's direct damages and costs incurred. EffectNet shall notify Intermedia of fraud as soon as practicable, upon EffectNet's becoming aware of such fraud. The Parties will use commercially reasonable efforts to establish fraud control means and measures.

2.10 Customer Service Call Center and Technical Support. EffectNet shall maintain a customer service call center for its Intermedia customers and end-users, as appropriate in accordance with industry standards. This call center will be responsible for all customer support.

2.10.1 Call items outside the scope of EffectNet support services are: non-EffectNet related software problems and call forwarding issues.

2.11 Customer Fulfillment Process. Intermedia, when taking orders for new customers or end users, or taking orders to modify or update a customer's order, will use the EffectNet Customer Fulfillment Process or compatible process to gather the information required and to provide the customer information to EffectNet. Intermedia is responsible for providing to EffectNet such new mailbox account information reasonably required by EffectNet in order to activate a new mailbox. EffectNet shall provide documentation and training, in accordance with the training provision of this Agreement, to Intermedia on the EffectNet Customer Fulfillment Process. 2.12 Minimum Commitment. Intermedia hereby agrees to deliver a minimum 1,500 then current active subscribers on

or before three (3) months after December 18, 2000 (the "Rollout Date"); an additional 1,500 then current active subscribers (total 3,000) on or before six (6) months after the Rollout Date; and additional 3,500 then current active subscribers (total 6,500) on or before nine (9) months after the Rollout Date; and 10,000 total then current active subscribers on or before twelve (12) months after the Rollout Date (the "Ramp Date"), and at the end of each calendar month thereafter ( the "Minimum Commitment") for the Term of this Agreement.

2.13 Reconciliation Payment. On the Ramp Date and at the end of each calendar month thereafter, EffectNet will calculate the actual number of then current active subscribers on the last day of such calendar month and compare it to the Minimum Commitment. If the number of subscribers is less than the Minimum Commitment for the month in question, such difference will constitute a "Volume Shortfall." Intermedia shall pay EffectNet a Reconciliation Payment equal to the Volume Shortfall multiplied by the base monthly price applicable to the Intermedia UC Service per subscriber,

3. MARKETING AND BRANDING.

3.1 Web Presence. At no additional charge, EffectNet will provide Intermedia with a private label website, URL links and related branding as reasonably directed by Intermedia.

3.2 Use of Trademarks, Service Marks and Trade names. The Parties agree not to display or use any of the trade names, service marks, brands or trademarks of the other Party, and shall not permit the same to be displayed or used by third parties, other than in connection with the sale, distribution or promotion of the brand(s) used for the Intermedia UC Services covered by this Agreement and subject to the prior written approval of the other or a third Party owning such trademark, service mark or trade name (except where such approval between the Parties is contained in this Agreement). In the absence of specific prior written consent from the other Party, a Party shall not use any part of any of the other Party's trade names, service marks, brands or trademarks as part of its own name, service marks or trademarks or in any other manner not so approved by the other Party. It is expressly understood by both Parties that trade names, service marks and trademarks of the other party are proprietary and that nothing in this Agreement constitutes the grant of a general license to use said trade names, service marks and trademarks. Upon termination of this Agreement, any and all rights or privileges of a Party to use the other Party's trade names, service marks, brands or trademarks shall expire, and each Party shall discontinue the use of the other Party's trade names, service marks, brands. The provisions of this section shall also apply to third party branding incidental to this Agreement.

3.3 Intermedia Marketing Expenses. Intermedia as the buyer of the wholesale services from EffectNet, is responsible for all expenses and obligations incurred by Intermedia as a result of its efforts to attract and solicit customers for Intermedia UC Services. Intermedia expressly acknowledges that it is not entitled to any reimbursement by EffectNet for such expenses unless, and only to the extent that, both parties hereto agree in writing prior to the incursion of such expenses, as set forth in this Agreement.

4. CHARGES AND BILLING STATEMENTS.

4.1 Traffic- or usage-sensitive rates shall be computed in 30-second initial and 6-second continual increments.

4.2 Intermedia shall be responsible for all applicable taxes, including but not limited to sales or value-added taxes, utility or excise taxes, fees and/or surcharges that are imposed by federal, state, or local governments on the Intermedia UC Services or business generated by Intermedia through the sale of Intermedia UC Services as a result of long distance or services bundled within the Intermedia UC Services. Intermedia shall pay or reimburse EffectNet for all taxes collected or imposed on these services provided by EffectNet. The prices quotes in the following sections are exclusive of any and all taxes. Excluded from this responsibility are taxes based on EffectNet's net income. EffectNet shall comply with all federal and state regulations with respect to employee withholding taxes.

4.3 Pricing. Pricing shall be as indicated by Appendix "P" attached hereto.

4.4 Seven (7) working days post the close of the month, EffectNet shall provide to Intermedia a settlement statement ("Settlement Statement") providing a summary of charges for the previous month's billing cycle in an industry standard format. The settlement statement, unless specified elsewhere in this Agreement, shall contain the following:

4.4.1 A listing of monthly recurring charges for the current or prior month's billing cycle.

4.4.2 For calls or traffic originated by Intermedia or any customers, agents, sub-agents and/or end-users during the previous month, the individual call detail and the aggregate usage charge payable broken down by termination location.

4.4.3 For calls or traffic terminated by Intermedia or any customers, agents, sub-agents and/or end-users during the previous month, the individual call detail and the aggregate usage charge payable broken down by termination location.

4.4.4 Any taxes, fees and/or charges that are imposed by federal, state, and/or local governments.

4.4.5 The net amount payable by Intermedia to EffectNet or payable to Intermedia by EffectNet.

4.4.6 When applicable, any mutually negotiated additional fees.

4.5 Payment of the Settlement Statement shall be made within 15(fifteen) calendar days after the Settlement Statement and invoice are received by Intermedia (the "Due Date"). Payments to EffectNet shall be in United States dollars and are to be made for credit to an account of EffectNet to be determined by EffectNet and provided to Intermedia within three (3) days of the date of execution of this Agreement by the later signing party. If payment is not received by the Due Date, a late fee of the lesser of (a)

one (1) percent per month or (b) the maximum percentage permitted by law shall be assessed on the delinquent balance of undisputed usage not paid by the Due Date.

4.5.1 Deposit. Intermedia has provided EffectNet with a fully refundable deposit in anticipation of this Agreement in the amount of minimum subscriber commitment multiplied times $17.50 (US dollars) for a total of $175,000. This deposit shall be refunded to Intermedia in whole on or before the Ramp Date as long as Intermedia has met the Minimum Commitment as of such date. If Intermedia has not met the Minimum Commitment as of the Ramp Date, EffectNet shall refund to Intermedia the full amount of the deposit less the Reconciliation Payment then due. The amount of such Reconciliation Payment shall remain on deposit until such time as the Minimum Commitment is met.

4.5.2 In the event that Intermedia disputes any charge assessed by EffectNet, the Parties agree to cooperate to resolve the dispute at the earliest practicable date. The late charges set forth in Section of this Agreement shall not apply to payments that are the subject of a good faith dispute between EffectNet and Intermedia. If there is a good faith dispute, EffectNet cannot demand a late payment deposit.

5. TERM AND TERMINATION.

5.1 Term. Unless otherwise terminated as provided herein, this Agreement shall be in force for an initial term of three (3) years after the Effective Date (the "Initial Term"). This agreement shall continue automatically for successive one year terms under the same terms and conditions contained herein together with any subsequent amendments hereto, unless either Party has sent written notice of its intent not to renew the Term at least thirty (30) days prior to the expiration of the Initial Term or the renewal period then in effect.

5.2 Termination. Either Party may terminate this Agreement: (a) if the other Party fails to fulfill any of its material obligations under this Agreement; (b) if the other Party is in breach of Section 7 (Confidentiality); (c) if the other Party becomes insolvent or admits in writing its inability to pay debts as they mature, or makes an assignment for the benefit of creditors; or (d) if a petition under any foreign, state or United States bankruptcy act, receivership statute, or the like is filed by the other Party and is not dismissed within sixty (60) days after such filing. Termination due to default under this Section shall be effective thirty (30) days after written notice to the defaulting Party if the default has not been cured within such thirty (30) day period. 5.3 Effect of Termination. Upon termination of this Agreement for any reason, each Party shall remain liable for those obligations that accrued prior to the date of such termination; provided, however, that nothing herein shall be construed to obligate EffectNet to offer Services to Intermedia after the termination of this Agreement.

5.4 Early Termination. If prior to the end of the Initial Term this Agreement is terminated for any reason by Intermedia other than pursuant to Section 5.2, Intermedia shall pay EffectNet, as liquidated damages and as the sole remedy of EffectNet and the exclusive liability of Intermedia, a one-time early termination fee equal to $270,400 times the lesser of (i) 12 months, or (ii) the number of months remaining in the contract term.

6. SURVIVAL. The following provisions shall survive the expiration or termination, for any reason, of this Agreement: (Subscriber Information), (Charges and Billing

Statements); (Term and Termination); (Confidentiality); (Warranties); (Intellectual Property); (Indemnification); (Limitation of Liability); (General Provisions).

7. CONFIDENTIALITY. All information disclosed to the other party shall be deemed confidential and proprietary (hereinafter referred to as "Proprietary Information"). Such information includes, but is not limited to, trade secrets, know-how, technical specifications, processes, functional descriptions, architectural specifications, development plans, schedules, design information, customer lists, pricing and financial information concerning the parties' products or services, or other information relating to business development, operations, marketing, sales, performance, and any other information disclosed hereunder, which, by its nature, might reasonably be presumed to be proprietary in nature.

7.1 Each party agrees to use the Proprietary Information received from the other party only for the purposes of analyzing the business arrangement between the parties, and in accordance with this Agreement. No patent, copyright, trademark, invention, service mark, or other proprietary rights are implied or granted under this Agreement.

7.2 Proprietary information supplied pursuant to this Agreement shall not be reproduced in any form by the receiving party except as required to accomplish the intent of this Agreement.

7.3 The receiving party shall provide, at a minimum, the same care to avoid disclosure or unauthorized use of the Proprietary Information as is provided to protect its own Proprietary Information, but in no event less than a reasonable standard of care. It is agreed that all Proprietary Information shall be retained by the receiving party in a secure place with access limited to the receiving party's employees or agents who need to know of the content of such information for purposes of fulfilling its obligations pursuant to this Agreement. The receiving party shall be fully responsible for any breach of this Agreement by its employees or agents. The receiving party will promptly report to the disclosing party any actual or suspected violation of the terms of this Agreement, and will take all reasonable steps requested by the disclosing party to prevent, control or remedy any such violation.

7.4 All Proprietary Information, unless otherwise specified in writing, shall remain the property of the disclosing party. Such information shall be used by the receiving party only for the purpose set forth in this Agreement. In addition, such Proprietary Information, including all copies thereof, shall be returned to the disclosing party or, at the request of the disclosing party, may be destroyed by the receiving party and certified as destroyed by an officer of the receiving party after the Receiving party's need for it has expired, upon request of the disclosing party; and, in any event, upon termination of the Agreement.

7.5 Exceptions to confidentiality: It is understood that the parties have no obligation to maintain the confidentiality of Proprietary Information which:

7.5.1 has been published or is now otherwise in the public domain through no fault of the receiving party.

7.5.2 prior to disclosure hereunder is within the legitimate possession of the receiving party without obligation of confidentiality as can be demonstrated by written documentation.

7.5.3 subsequent to disclosure hereunder is lawfully received from a third party having rights to such Proprietary Information without restriction of the third party's right to disseminate the Proprietary Information and without notice of any restriction against its further disclosure, is disclosed with the written approval of the other party as can be proven by documentation.

7.5.4 is obligated to be produced by a Party under order of a court of competent jurisdiction or other government authority; provided however, that the receiving party shall immediately provide notice to the disclosing party such that the disclosing party may seek injunctive relief and/or a protective order; and further provided that the disclosing party shall use best efforts to ensure that the information shall be treated as confidential by the party to whom it is disclosed.

7.5.5 is independently developed by the receiving party without reference to or reliance upon the confidential information.

In the event of a disputed disclosure, the receiving party shall bear the burden of proof of demonstrating that the information falls under one of the above exceptions.

8. <u>WARRANTIES</u>.

8.1. <u>Authorization</u>. Each Party represents and warrants to the other Party that the execution and delivery of this Agreement and the performance of such Party's obligations under this Agreement have been duly authorized, and that the Agreement is a valid and binding agreement, enforceable in accordance with its terms.

8.2. <u>Legal Compliance</u>. Each Party represents and warrants that it has obtained, or will obtain prior to offering the Services hereunder, all licenses, approvals and/or regulatory authority necessary to provide the Services described herein. This Agreement is made expressly subject to all present and future valid orders and regulations of any regulatory body having jurisdiction over the subject matter of this Agreement.

8.3 <u>No Other Warranties</u>. With respect to the UC Services to be provided in, and to users accessing these services from the United States and Canada, EffectNet warrants that it will exercise commercially reasonable care in the performance of its obligations under this Agreement

EFFECTNET DOES NOT WARRANT THAT THE EFFECTNET SERVICES OR THE PLATFORM THAT IT PROVIDES TO INTERMEDIA IS ERROR-FREE. IN ADDITION, THE EFFECTNET SERVICES OR INTERMEDIA PLATFORM IS PROVIDED "AS IS" AND WITHOUT ANY WARRANTY OF ANY KIND. EFFECTNET DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. NEITHER PARTY SHALL BE LIABLE FOR ANY DAMAGES ARISING FROM THE OTHER PARTY'S OR ANY THIRD PARTY'S USE OF THE EQUIPMENT, INCLUDING WITHOUT LIMITATION INDIRECT, INCIDENTAL, SPECIAL, OR CONSEQUENTIAL DAMAGES, EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILTY OF SUCH DAMAGES. THE PARTIES AGREE TO THE ALLOCATION OF LIABILITY RISK SET FORTH IN THIS SECTION. THIS LIMITATION ON LIABILITY IS INTENDED ITO APPLY WITHOUT REGARD TO

**WHETHER OTHER PROVISIONS OF THIS CONTRACT HAVE BEEN BREACHED OR PROVEN INEFFECTIVE.** "AS IS" means the As Is condition of the EffectNet Services to be provided as Intermedia UC Services, including such customer support, software and hardware as required in the condition as of the Initial Launch Date agreed upon between the Parties and including any planned enhancement as well as any other changes mutually agreed upon. These products may as of the Initial Launch Date include works for hire for the benefit of Intermedia as further described in Section 9.2.

9. INTELLECTUAL PROPERTY.

9.1 General. Except as otherwise agreed in writing between the Parties, EffectNet shall own any Patent applications and Patents issued on inventions under this Agreement. All Inventions that are not the subject of patents or applications will be considered Confidential Information of EffectNet. Nothing in this Agreement shall be construed to transfer any right title or interest in EffectNet's designs, inventions, copyrights, trade secrets, trade names or other intellectual property.

**10. INDEMNIFICATION. Each Party ("Indemnitor") will defend, indemnify and hold harmless the other Party and such Party's affiliates, directors, officers, employees, proprietors, independent contractors, consultants, partners, shareholders, representatives, customers, agents, predecessors, successors, and permitted assigns (collectively, "Indemnitees") from and against any claim, suit, demand, loss, damage, expense (including reasonable attorneys' fees and costs) or liability that may result from, arise out of or relate to: (a) acts or omissions arising out of or in connection with this Agreement resulting in property damage; by Indemnitor and (b) intentional or negligent violations by Indemnitor of any applicable laws or governmental regulation.**

Intermedia shall indemnify and hold harmless EffectNet from and against any and all claims, expenses, judgments, liabilities, damages or losses, including reasonable attorney's fees and expenses, and shall defend all third-party actions and proceedings arising from any infringement or alleged infringement of any patent, copyright, trade secret, mask work, trade marks or service marks of any third party to the extent such claims are caused by the acts or omissions of Intermedia with respect to the marketing and/or provision of the Intermedia UC Services, but not including any claims, expenses, judgments, liabilities, damages or losses to the extent attributable to the EffectNet Services. EffectNet shall indemnify and hold harmless Intermedia from and against any and all claims, expenses, judgments, liabilities, damages or losses, including reasonable attorneys' fees and expenses, and shall defend all third-party actions and proceedings arising from any infringement or alleged infringement of any patent, copyright, trade secret, mask work or other intellectual property right of any third party, to the extent such claims are caused by use of the EffectNet Services. In the event that an injunction or restraining order is obtained against the use or distribution of any product or deliverable pursuant to this Agreement because of any infringement or alleged infringement of any patent, copyright, trade secret, mask work or other intellectual property right or any proprietary, contract or other right of any third party, or if in EffectNet's reasonable judgment any product or deliverable is likely to become the subject of a successful claim of such infringement, then EffectNet's sole obligation to Intermedia (in addition to its obligations of indemnification set forth above) shall be to promptly: (i) procure for Intermedia the right to use the product or deliverable as provided in this Agreement, (ii)

replace or modify the EffectNet product or deliverable so it becomes non-infringing without materially affecting the performance thereof, or if options (i) and (ii) are not available despite commercially reasonable efforts, (iii) terminate the licenses granted hereunder, and accept the return of all copies of all products.

11. LIMITATION OF LIABILITY. EXCEPT FOR DAMAGES ARISING UNDER SECTION , IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY INCIDENTAL, INDIRECT, SPECIAL, PUNITIVE, CONSEQUENTIAL OR SIMILAR DAMAGES OF ANY KIND INCLUDING WITHOUT LIMITATION, LOSS OF PROFITS, LOSS OF BUSINESS OR INTERRUPTION OF BUSINESS, WHETHER SUCH LIABILITY IS PREDICATED ON CONTRACT, STRICT LIABILITY OR ANY OTHER THEORY WITHOUT REGARD TO WHETHER SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

12. GENERAL PROVISIONS.

12.1 Monetary Values. All monetary values in the Agreement refer to U.S. dollars.

12.2 Assignment. Either Party may assign its rights or obligations under this Agreement with written notice to the other Party, and after obtaining written approval by the other party, which shall not be unreasonably withheld or delayed. In the event that Intermedia is acquired by WorldCom no such written approval shall be required. In the event of a restructuring, merger, or acquisition of either party, in which such party retains at least 25 percent control of the resulting entity such notice and approval shall not be required.

12.3 Governing Law. This Agreement will be interpreted in accordance with the laws of the state of Arizona, excluding its conflict of law rules. The Parties agree that the federal and state courts located in Arizona and/or Florida shall be the proper forum for any action brought against the other Party, and each Party shall take all necessary actions to consent to the jurisdiction of such courts.12.4 Notices. All notices or other communications between EffectNet and Intermedia under this Agreement shall be in writing and delivered personally, sent by confirmed facsimile, by confirmed e-mail, by certified mail, postage prepaid and return receipt requested, or by a nationally recognized express delivery service addressed to the Parties at the addresses first set forth below or at such other addresses, facsimile numbers or e-mail addresses or to such individuals as either Party may specify by notice to the other Party pursuant to this Section. All notices shall be in English and shall be effective upon receipt. As a courtesy, Parties are encouraged to send duplicate copies of notice, demands, or other by facsimile. Issuance of a facsimile copy of a notice, request, demand or other communication shall not replace the requirements for delivery by mail or overnight courier in the manner provided in this Section, nor shall the date the facsimile received constitute the official receipt date. Any Party may change the address to which notices, requests, demands or other to such Party shall be delivered or mailed by giving notice of the change to the other Party in the manner provided in this Section. The addresses for the Parties for the purposes of this Agreement are:

| *For EffectNet:* | *For Intermedia Communications, Inc.* |
|---|---|
| Taj Reneau | Kathleen A. Victory |
| Chief Executive Officer | VP Product Line Management |
| EffectNet | Intermedia Communications Inc. |
| Phone: 602.296.3300 | Phone: 813.829.6703 |
| Fax: 602.296.3311 | Fax: 813.829.2359 |

12.5 Independent Contractors. This Agreement and the relations hereby established do not constitute a partnership, joint venture, franchise or agency between the Parties. Both parties are independent contractors acting for their own accounts and neither is authorized to bind, or attempt to bind, the other to any contract, general warranty, covenant or undertaking of any nature whatsoever unless authorized in writing. Neither party shall have the authority to accept delivery, collect or otherwise take possession of any funds or other property of the other party, and if done so inadvertently, shall immediately notify the other party, shall hold same in trust and shall immediately deliver same to the other party. In all matters relating to this Agreement neither party nor such party's employees or agents are, or will act, as employees of the other party within the meaning of any federal or state laws.

12.6 Severability. If any provision of this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other term or provision hereof. The Parties agree that they will negotiate in good faith or will permit a court to replace any provision hereof so held invalid, illegal or unenforceable with a valid provision, which is as similar as possible in substance to the invalid, illegal or unenforceable provision.

12.7 Entire Agreement And Modifications. This Agreement together with any appendices, exhibits and attachments constitute the entire agreement between the Parties with regard to the subject matter hereof and supersedes all prior, agreements and understandings, whether written or oral, relating to the subject matter hereof. This Agreement may only be modified by a written instrument duly executed by each Party, making specific reference to this Agreement and to the clause to be modified.

12.8 Captions. Where provided, captions of the sections and subsections of this Agreement are for reference purposes only and do not constitute terms or conditions of this Agreement, and shall not limit or affect the terms and conditions hereof.

12.9 Waiver. No provision of, right, power or privilege under this Agreement shall be deemed to have been waived by any act, delay, omission or acquiescence on the part of either Party, its agents, or employees, but only by an instrument in writing signed by an authorized officer of each Party. No waiver by either Party of any breach or default of any provision of this Agreement by the other Party shall be effective as to any other breach or default, whether of the same or any other provision and whether occurring prior to, concurrent with, or subsequent to the date of such waiver.

12.10 Counterparts. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. In making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart.

12.11 Force Majeure. Neither Party shall have any liability to the other for delays resulting from any "Event of Force Majeure" or from any act or omission of the such other Party. An Event of Force Majeure shall include without limitation any delay or failure in performance due to acts of God, earthquake, labor disputes, changes in law, regulation or government policy, riots, war, fire, epidemic, acts or omissions of vendors or suppliers, equipment failures, transportation difficulties, or other occurrences which are beyond the affected Party's reasonable control.

12.12 Conflicts. To the extent the terms of this Agreement and the MOU conflict, the terms of this Agreement shall be controlling.

**IN WITNESS WHEREOF,** the Parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the date first written above.

| EffectNet, L.L.C. | Intermedia Communications, Inc. |
|---|---|
| Signature: [signature] | Signature: Kathleen A Victory [signature] |
| Printed Name: Brad Steinmeyer | Printed Name: Kathleen A. Victory |
| Title: VP Partner Development | Title: VP Product Line Management |
| Date: 11/27/00 | Date: November 20, 2000 |

## APPENDIX P (Pricing)

EffectNet shall offer the following products to Intermedia at the prices attached thereto as follows:

**1. Basic**

$11.45 per month for each basic account with all platform usage and inbound call times on the EffectNet platform an additional $.10 per minute. The basic account includes unlimited free on-line usage including checking e-mails, faxes, etc... Outbound calling will be $.10 per minute. This package includes customer service and technical support. All basic accounts will be billed a base subscription price of $ 6.00 for the first calendar month of activation partial or full, and $11.45 for any calendar month thereafter partial or full.

**2. Unlimited**

$27.40 per month for each unlimited account with unlimited free platform usage and inbound call time included. Outbound calling will be $.10 per minute. The unlimited account includes unlimited free on-line usage including checking e-mails, faxes, etc. Outbound calls include: conference calls (per member), outbound long distance, outbound fax, follow me, notification, return calls, etc. All unlimited accounts will be billed a base subscription price of $ 14.00 for the first calendar month of activation partial or full, and $27.40 for any calendar month thereafter partial or full.

Intermedia shall be responsible for any and all expenses incurred related to the completion of the Virtual Private Network ("VPN"). No expenses shall be incurred on behalf of Intermedia for the VPN without prior consent from Intermedia.



One Parkway North
Fourth Floor North
Deerfield, Illinois 60015
Office: 888.444.6400

Writer's Direct No.
(888)-387-3481

March 25, 2002

**Via Federal Express Mail**
Mr. Brett Bacon
MCI/WorldCom
1945 Old Gallows Road
Vienna, Virginia 22182

Re: Unified Communications General Agreement, dated November 20, 2000, by and between EffectNet, Inc. (formerly EffectNet LLC) ("**EffectNet**") and Intermedia Communications, Inc. ("**Intermedia**") (the "**Agreement**")

Dear Mr. Bacon:

EffectNet, by letter to the attention of Mr. Rich Black, dated March 12, 2002, issued a written notice of default under Section 5.2 of the Agreement with respect to the Intermedia Defaults, as defined in the March 12 letter (the "**March 12 Letter**"). I understand from you that Mr. Black referred the March 12 letter to your attention upon receipt. As you know, the Agreement in Section 5.2 provides that "[t]ermination due to default under this Section shall be effective thirty (30) days after written notice to the defaulting Party if the default has not been cured within such thirty (30) day period." Accordingly, the Agreement will be terminated for default by Intermedia on or about April 12, 2002 if the Intermedia Defaults are not cured prior thereto.

I spoke with you on or about March 13 and you indicated that Intermedia and/or its affiliates were interested in pursuing immediate settlement discussions. I also understand that you spoke with Mr. Jim Calandra, Chief Financial Officer of EffectNet on March 18 and that you told Mr. Calandra that Mr. Barry Zip would

be handling settlement discussions. Further, I understand that you told Mr. Calandra that you would provide Mr. Zip with contact information of Mr. Calandra. On March 20, Mr. Calandra exchanged voice messages with you whereby Mr. Calandra inquired of Mr. Zip and the lack of communication from him and you responded by giving Mr. Calandra, for the first time, contact information for Mr. Zip. Mr. Calandra called Mr. Zip the same day, March 20, and left a voice message for Mr. Zip requesting that Mr. Zip return the call. Neither Mr. Calandra nor anyone else has since received any communications from Intermedia or its affiliates regarding this matter. As you might imagine, EffectNet is becoming increasingly concerned that Intermedia and/or its affiliates fail to understand the gravity of this matter and the urgency with which it must be addressed.

Intermedia should also take notice of the Due Date of Invoice #1018, dated March 5, 2002, in the amount of $279,757.02 and delivered to Intermedia on March 6, 2002. Payment of this amount was due on or before March 21, 2002. EffectNet has not received this past due payment (the "**February Payment Default**").

Accordingly, EffectNet hereby gives Intermedia written notice of default under Section 5.2 of the Agreement with respect to the February Payment Default and EffectNet further hereby gives Intermedia written notice that EffectNet may (i) terminate the Agreement under Section 5.2 due to default effective thirty (30) days after this written notice (if the Agreement is not sooner terminated pursuant to the March 12 Letter) if the February Payment Default has not been cured within such thirty (30) day period, and (ii) further exercise all available remedies pursuant to the terms of the Agreement and as otherwise may be available at law or in equity.

EffectNet hereby demands immediate payment, in accordance with the terms of the Agreement, of the amounts itemized below:

| | |
|---|---|
| Total Amount Past Due on invoice 1010, dated February 6, 2002, and delivered to Intermedia on February 12, 2002 (for the December 2001 billing cycle): | $274,021.05 |
| Total Amount Past Due on invoice 1011, dated February 6, 2002, and delivered to Intermedia on February 12, 2002 (for the January 2002 billing cycle): | $274,066.20 |

| | |
|---|---|
| Total Amount Past Due on invoice #1018, dated March 5, 2002, and delivered to Intermedia on March 6, 2002 (for the February 2002 billing cycle): | $279,757.02 |
| **Required Payment:** | $827,844.27 |

The total [illegible] EffectNet gives notice that all provisions [illegible] Intermedia has until the [illegible] Letter or this written notice, [illegible] Required Payment. The Required [illegible] delivered by wire transfer to Wells Fargo [illegible] EffectNet Operations [illegible] Stephanie Jordan at 480-644-8396.

If Intermedia fails to cure the Intermedia Defaults and the February Payment Default and if the Agreement is terminated as aforesaid, EffectNet may claim damages for all amounts due pursuant to the Agreement.

Nothing in this letter is intended to be a waiver or release of any rights or remedies, or an election thereof, that EffectNet has under the Agreement or applicable law, and all such rights and remedies are hereby expressly reserved in their entirety.

Very truly yours,

Robert C. McConnell
General Counsel

CC: Mr. Rich Black

| Time period | Minimum Commitment | Price | Total per month | Total for period |
|---|---|---|---|---|
| Past due invoices prior to March, 2002 | | | | $827,844.27 |
| March 2002 through December 2002 | 10000 | $27.40 | $274,000.00 | $2,740,000.00 |
| December 18, 2002-December 18, 2003 | 10000 | $27.40 | $274,000.00 | $3,288,000.00 |
| | | | Total: | $6,855,844.27 |

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
One Financial Center
Boston, Massachusetts 02111

George B. Hofmann
*Direct dial 617 348 1753*
gbhofmann@mintz.com

617 542 6000
617 542 2241 *fax*

January 14, 2003

**BY FEDERAL EXPRESS**

United States Bankruptcy Court
WorldCom Claims Docketing Center
One Bowling Green, Room 534
New York, NY 10004-1408

Re: Intermedia Communications, Inc.
Chapter 11; Case No. 02-42154

Dear Sir or Madam:

Enclosed please find the original and two copies of a proof of claim in connection with the above case. Please file the original and return one of the copies date-stamped to the undersigned in the enclosed self-addressed stamped envelope.

Thank you for your assistance. Please contact me if you have any questions.

Very truly yours,

MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY and POPEO, P.C.

George B. Hofmann

GBH
Enclosures

TRA 1750115v2

**EXHIBIT C**

D00338

MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY and POPEO, P.C.
Chrysler Center
666 Third Avenue
New York, New York 10017
Stephanie K. Hoos (SH-9821)

-and-

One Financial Center
Boston, Massachusetts 02111
H. Joseph Hameline (HH-7759)
Mathew C. Hurley (MH-5258)
Ian A. Hammel (IH-8267)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | |
| WORLDCOM, INC., et al. | Chapter 11 Case No. 02-13533 (AJG) |
| Debtors. | (Jointly Administered) |

**PARUS HOLDINGS, INC.'S**
**INITIAL DISCLOSURES**

Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure and Rule 7026 of the Federal Rules of Bankruptcy Procedure, Parus Holdings, Inc., successor-by-merger to EffectNet, Inc. and EffectNet, LLC, ("EffectNet") hereby tenders its initial disclosures to the Debtors in connection with the *"Debtors' Objection to all Proofs of Claim Filed by EffectNet, Inc. which is now Merged into Parus Holdings, Inc., Including, but not Limited to Claim Numbers 9291, 11242, 9293 and 11173"* that was filed in these proceedings on June 10, 2004 (the "Claims Objection").

**Rule 26(A)(1)(A) Disclosures**

The following persons are believed to have discoverable information that EffectNet may use in support of its claims and defenses in connection with the Claims Objection:

| Individuals believed to have discoverable information that EffectNet may use | Last known contact information | Connection to matter; Subjects of information |
|---|---|---|
| Reneau, Darius | c/o EffectNet | EffectNet President. Senior EffectNet officer in charge of UC Contract initiative. Claims and Damages |
| Reneau, Taj | c/o EffectNet | EffectNet CEO. Claims and Damages |
| Lister, Tom | c/o EffectNet | EffectNet director. Claims and Damages |
| Davis, Richard | c/o EffectNet | EffectNet director. Claims and Damages |
| Schell, Ted | Apax Partners<br>450 Park Ave.<br>New York, NY | Former EffectNet director. Claims and Damages |
| McConnell, Robert | c/o EffectNet | CFO EffectNet. Claims and Damages |
| Calandra, Jim | 12 Easy Street<br>Windham, NH<br>603-437-6175 | Former Webley Systems CFO. Claims and Damages |
| Does, John/Jane | Members of Intermedia president's club | Senior Intermedia sales and management personnel. Claims and Damages |
| Bieneman, Jane | Salomon Smith Barney<br>388 Greenwich Street, 33rd Floor<br>New York, NY 10013<br>212-816-7327 | Strategic importance of UC Contract and Damages |
| Moore, Kevin S. | Salomon Smith Barney<br>1001 Page Mill Road<br>Building 4, Suite 100<br>Palo Alto, CA<br>650-496-3213 | Strategic importance of UC Contract and Damages |
| Roberts, Christina | Salomon Smith Barney<br>1001 Page Mill Road<br>Building 4, Suite 100<br>Palo Alto, CA<br>650-496-3277 | Strategic importance of UC Contract and Damages |
| Baughman, Sherrie | c/o Intermedia | Senior Product Manager. Lead Intermedia representative concerning UC |

| | | |
|---|---|---|
| | | Contract. Claims and Damages |
| Renforth, Jim | c/o Intermedia | Senior Product Manager. Lead Intermedia representative concerning UC Contract. Claims and Damages |
| Kerrigan, Jack G. | c/o Intermedia | Program Manager. Lead Intermedia representative concerning UC Contract. Claims and Damages |
| Hill, Alan | c/o Intermedia | Director of Public Relations. Claims and Damages |
| Victory, Kathy | c/o Intermedia | VP Voice Services. Signed UC Contract. Claims and Damages |
| Faust, Jim | c/o Intermedia | Replaced Renforth as Lead Intermedia representative concerning UC Contract. Claims and Damages |
| Tills, Jim | c/o Intermedia | Director of Cross-Selling. Claims and Damages |
| Jasczak, Len | c/o Intermedia | Lead Intermedia trainer for Intermedia sales force. Claims and Damages |
| Hsu, Jeffrey T. | c/o WorldCom | Associate litigation counsel. Claims. |

EffectNet expressly reserves the right to amend or otherwise supplement the foregoing description.

**Rule 26(a)(1)(B) Disclosures**

As agreed to by the parties, EffectNet will produce documents that EffectNet may use in support of its claims and defenses in this matter on or before October 26, 2004. EffectNet expressly reserves the right to amend or otherwise supplement the foregoing description.

**Rule 26(a)(1)(C) Disclosures**

EffectNet has already made the disclosures required by Rule 26(a)(1)(C) in its "Response and Opposition of Parus Holdings, Inc. to Debtors' Objection to Proofs of Claim Filed by EffectNet, Inc." that was filed in these proceedings on July 30, 2004.

Further answering, EffectNet has claims based on (i) Intermedia's total breach and repudiation of its duties under a Unified Communications Services General Agreement between EffectNet and Intermedia dated as of November 20, 2000 (the "UC Contract"), (ii) Intermedia's unfair and deceptive trade practices, a breach of the implied covenant of good faith and fair dealing, and conspiracy, and (iii) WorldCom's separate interference with EffectNet's contractual relations under the UC Contract, unfair and deceptive trade practices, and civil conspiracy in procuring Intermedia's breach of the UC Contract.

EffectNet's damages based on the UC Contract include, at a minimum, (i) EffectNet's claims based on invoices totaling $827,844.27 that were issued under the UC Contract but were not paid, and (ii) additional contract damages for the period March 21, 2002 through November 20, 2003, when the initial term of the UC Contract was scheduled to expire. EffectNet's computation of its damages based on the UC Contract is ongoing. EffectNet reserves all rights concerning the value of these damages. EffectNet states that, at a minimum, EffectNet was damaged during the period March 21, 2002 through November 20, 2003 by the loss of certain take-or-pay payments contemplated by the UC Contract. As is more fully described in the Response and Opposition of Parus Holdings, Inc. to Debtors' Objection to Proofs of Claim Filed by EffectNet, Inc., EffectNet was, at a minimum, entitled to payments of $274,000 per month under the UC Contract between March 21, 2002 and November 20, 2003 in addition to EffectNet's claim for the $827,844.27 in unpaid invoices. EffectNet's minimum Claim for lost revenues over this portion of the term of the UC Contract based on the minimum payments required by the UC Contract – a period of approximately 20 months - totals $5,480,000.

In addition to its damages for lost revenues based on Intermedia's breach of the UC Contract, EffectNet has incurred additional damages as the direct result of actions by the Debtors

**Further Assurances; Reservation of Rights**

EffectNet makes these disclosures based on information reasonably available at this time, in accordance with Rule 26(A)(1) of the Federal Rules of Civil Procedure, and will amend these disclosures as deemed necessary.

Date: New York, New York
October 8, 2004

By: ______________________
H. Joseph Hameline
Matthew C. Hurley
Ian A. Hammel
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY & POPEO
One Financial Center
Boston, Massachusetts 02111

-and-

Stephanie K. Hoos (SH-9821)
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY & POPEO, P.C.
Chrysler Center
666 Third Avenue
New York, New York 10017

Attorneys for Parus Holdings, Inc., successor to EffectNet, Inc.

EXHIBIT D

D00344

Kecd fl 8/9/05

**KELLEY DRYE & WARREN LLP**
**Stephen A. Wood (SW 6270)**
**Robert S. Friedman (RF 1538)**
**Robert L. LeHane (RL 9422)**
**Martin A. Krolewski (MK 3352)**
**101 Park Avenue**
**New York, New York 10178**
**(212) 808-7800**
**Attorneys for Parus Holdings, Inc.,**
**Successor-by-Merger to EffectNet, Inc.**
**and EffectNet, LLC**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re** | **CHAPTER 11 CASE** |
| **WORLDCOM, INC., et al,** | **No. 02-13533 (AJG)** |
| **Debtors.** | **(Jointly Administered)** |

**CLAIMANT'S SUPPLEMENTAL RESPONSES TO DEBTORS' INTERROGATORIES AND DOCUMENT PRODUCTION REQUESTS TO PARUS HOLDINGS**

Pursuant to Fed. R. Civ. P. 33 and Fed. R. Bankr. P. 9014 and 7033 with respect to the Interrogatories, Fed. R. Civ. P. 34 and Fed. R. Bankr. P. 9014 and 7034 with respect to the Document Production Requests, the Local Rules of this Court and that of the Southern District of New York, and pursuant to this Court's Order of June 14, 2005 on the Motion of Claimant, Parus Holdings, Inc. To Withdraw And/Or Amend Deemed Admissions And To Serve Late Responses And Objections To Debtors' Discovery Requests In Connection With Debtors' Objections To Proofs Of Claims Of Parus Holdings, Inc., Parus Holdings, Inc., successor-by-merger to EffectNet, Inc. and EffectNet LLC ("Claimant"), by its attorneys, Kelley Drye & Warren LLP,

hereby responds to Debtors' First Interrogatories and Document Production Requests to Parus Holdings (collectively, the "Requests").

## PRELIMINARY STATEMENT

The Supplemental Responses set forth below are made pursuant to this Court's Order of June 14th 2005 on the Motion of Claimant, Parus Holdings, Inc. To Withdraw And/Or Amend Deemed Admissions And To Serve Late Responses And Objections To Debtors' Discovery Requests In Connection With Debtors' Objections To Proofs Of Claims Of Parus Holdings, Inc. wherein the Court ruled that Claimant's previously asserted objections to Debtors' Interrogatories and Document Production Requests had been waived as untimely and because Claimant had not demonstrated excusable neglect. These Supplemental Responses are subject to and without waiver of any of Claimant's other rights and remedies under the Federal Rules of Civil Procedure, Federal Bankruptcy Rules of Procedure, and the Local Rules of this Court and that of the Southern District of New York. The Supplemental Responses set forth below are based upon information currently available, and Claimant reserves the right to further supplement, amend, or correct these Supplemental Responses in light of information later obtained through discovery or otherwise.

## SUPPLEMENTAL RESPONSES TO THE INTERROGATORIES

**INTERROGATORY NO.1:** Identify all persons having knowledge of and/or information related to any of the facts, allegations, and/or information set forth in Your answers to these Interrogatories.

A. In connection with each person identified please set forth in detail which subjects they have knowledge of and/or information concerning.

B. In connection with each person identified please set forth, by interrogatory number, which interrogatories they have knowledge of and/or information concerning.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY 1:**

Claimant states, on information and belief, that persons having knowledge and/or information related to any of the facts, allegations, and/or information set forth in the answers to these Interrogatories as well as the Proofs of Claim and/or Claimant's Response, include the following individuals:

| [illegible] | [illegible] | [illegible] |
|---|---|---|
| Reneau, Darius<br>EffectNet | EffectNet President. Senior EffectNet officer in charge of UC Contract initiative. Claims and Damages | 4, 5, 6 |
| Reneau, Taj<br>EffectNet | EffectNet CEO. Claims and Damages | 4, 5, 6 |
| Lister, Tom<br>EffectNet | EffectNet director. Claims and Damages | 4, 6 |
| Davis, Richard<br>EffectNet | EffectNet director. Claims and Damages | 4, 6 |
| Schell, Ted<br>Apax Partners<br>New York, NY | Former EffectNet director. Claims and Damages | 4, 6 |
| McConnell, Robert<br>EffectNet | CFO, General Counsel EffectNet. General Counsel Webley. Claims and Damages | 3, 4, 5, 6 |
| Calandra, Jim<br>12 Easy Street<br>Windham, NH | Former Webley Systems CFO. Claims and Damages. | 4, 5, 6 |
| Does, John/Jane<br>Members of Intermedia President's Club 2000 | Senior Intermedia sales and management personnel. Claims and Damages. | 4, 6 |
| Bieneman, Jane<br>Salomon Smith Barney<br>New York, NY 10013 | Strategic importance of UC Contract and Damages | 4, 5, 6 |
| Moore, Kevin S.<br>Salomon Smith Barney<br>Palo Alto, CA | Strategic importance of UC Contract and Damages | 4, 5, 6 |
| Roberts, Christina<br>Salomon Smith Barney<br>Palo Alto, CA | Strategic importance of UC Contract and Damages | 4, 5, 6 |

| [illegible] | [illegible] | [illegible] |
|---|---|---|
| Baughman, Sherrie<br>Intermedia | Senior Product Manager. Lead Intermedia representative concerning UC | 4, 5, 6 |
| Renforth, Jim<br>Intermedia | Senior Product Manager. Lead Intermedia representative concerning UC Contract. Claims and Damages | 4, 5, 6 |
| Kerrigan, Jack G.<br>Intermedia | Program Manager. Lead Intermedia representative concerning UC Contract. Claims and Damages | 4, 5, 6 |
| Hill, Alan<br>Intermedia | Director of Public Relations. Claims and Damages. | 4, 5, 6 |
| Victory, Kathy<br>Intermedia | VP Voice Services. Claims and Damages. | 4, 5, 6 |
| Faust, Jim<br>Intermedia | Service Product Manager. Claims and Damages. | 4, 5, 6 |
| Tillis, Jim<br>Intermedia | Director of Cross-Selling. Claims and Damages. | 4, 5, 6 |
| Jasczak, Len<br>Intermedia | Lead Intermedia trainer for Intermedia sales force. Claims and Damages. | 4, 5, 6 |
| Hsu, Jeffrey T.<br>WorldCom | Associate litigation counsel. Claims. | 3, 4, 5, 6 |
| Freeman, Javid<br>EffectNet | Project Manager. Claims and Damages. | 4, 5, 6 |
| Brames, Anne<br>Intermedia | Team Leader. Trouble Ticket procedures. | |
| Blanchard, Ray<br>EffectNet | Technical support for Intermedia account | |
| Bermudez-Sleeter, Monica A.<br>Intermedia | Marketing Analyst, Middle Markets. Sales and markets | 4, 6 |
| Barnes, Wade E.<br>Intermedia | Trouble Ticket and Order Entry training. | |
| Blair, Andy P.<br>Intermedia | Advanced Building Networks. | |
| Blake, Theresa M.<br>Intermedia | Customer Care Specialist assigned to U/M team. | |
| Brewster, Ben J.<br>Intermedia | Involved in Trouble Ticket procedures. | |
| Brice, Defina | Involved in customer care training. | |

| [redacted] | | |
|---|---|---|
| Daly, Janet A.<br>Intermedia | Associated with fulfillment. | |
| Darby, Rick | Involved in customer care training. | |
| Davidson, Jack W.<br>Intermedia | Involved in negotiating/drafting General Agreement. | 4, 6 |
| Dyer, Ralph R.<br>Intermedia | Involved in negotiating/drafting General Agreement. | 4, 6 |
| Elias, Lorraine<br>EffectNet | Marketing Manager. | |
| Friend, Wanda E.<br>Intermedia | Associated with Trouble Ticket procedures. Team Leader | |
| Von Grieff, Erwin<br>Intermedia | Involved in customer care training. | |
| Gurr, Tricia<br>Intermedia | Product Manager Frame Relay | |
| Hagy, Christopher L.<br>Intermedia | Order Entry Provisioning | |
| Hutton, Billy<br>EffectNet | Related to Call Detail Record's formats and transmission protocols | |
| Ireland, Glenn T.<br>Intermedia | | |
| Jessup, Jay<br>EffectNet | Executive Vice President | |
| Kandrac, David J.<br>Intermedia | Associated with Trouble Ticket Procedures | |
| Krantz, Mark<br>EffectNet | Product Manager | |
| Lee, Jack<br>Intermedia | | |
| Lee, John E.<br>Intermedia | | |
| Mellon, Cheryl D.<br>Intermedia | | |
| Monell, Michael A.<br>Intermedia | | |
| Peterson, Peter | Involved in customer care training. | |

| [illegible] | [illegible] | [illegible] |
|---|---|---|
| Powers, Sherri L.<br>Intermedia | Order Entry Provisioning | |
| Reed, Brian | Senior Manager – Sales Operations | |
| Sapp, Juanita<br>Intermedia | Marketing Analyst | |
| Scalf, Donald L.<br>Intermedia | Associated with Trouble Ticket Procedures. | |
| Serdinak, J. Donna<br>Intermedia | Call Detail Records/billing related | |
| Spyros, George N.<br>Intermedia | IS Applications Delivery – Billing | |
| Tumulty, Thomas C.<br>Intermedia | | |
| Tyler, Mike<br>Intermedia | Advanced Building Networks Director | |
| Wasylyna, Donald J.<br>Intermedia | Information Security | |
| Weber, Scott<br>Intermedia | District Sales Manager, Charlottee, NC | |
| Weber, Wendy D.<br>Intermedia | Involved in customer care training | |
| West, Jhan A.<br>Intermedia | Involved in Order Entry screens | |
| Wirth, John D.<br>Intermedia | Advanced Building Networks Senior Account Manager | |
| Hooper, Steve<br>WorldCom | Program Manager for Voice Mail and Unified Messaging | 4, 5, 6 |
| O'Brien, Mark<br>WorldCom | Lead Engineer for Voice Mail | |
| Truetken, John<br>WorldCom | Senior Manager | |
| Hastings, Teresa<br>WorldCom | Director, Multimedia Services Engineering | 4, 5, 6 |
| Pol, Denise<br>Webley Systems, Inc. | Project Manager | |
| Converse, Scott<br>MCI WorldCom | VP Business Development & Technology Planning | 4, 5, 6 |
| Lamm, Wendy<br>MCI WorldCom | Business Development & Technology Planning – Executive Assistant | |

CH01/WOODS/196195.3

D00350

| [illegible] | [illegible] | [illegible] |
|---|---|---|
| Fergus, Don<br>MCI WorldCom | Business Development & Technology Planning – Chief of Staff | 4, 5, 6 |
| Wurster, Dave<br>MCI WorldCom | Business Development & Technology Planning | 4, 5, 6 |
| Gross, Susan<br>Webley Systems, Inc. | Senior National Accounting Manager | 4, 6 |
| Kelley, Susan<br>Webley Systems, Inc. | Senior Vice President of Sales | 4, 5, 6 |
| VanderMotter, Kurt<br>Webley Systems, Inc. | Vice President, Sales | 4, 5, 6 |
| Mathis, Pat<br>Webley Systems, Inc. | CEO | 4, 5, 6 |
| Poel, Hal<br>Webley Systems, Inc. | Vice President Marketing | 4, 5, 6 |
| Kurganov, Alex<br>Webley Systems, Inc. | CTO | 4, 6 |
| Felman, Don<br>Webley Systems, Inc. | Project Manager | |
| Meeks-Johnson, James<br>WorldCom | Project Manager | |
| Whiteley, Jim<br>Vail Systems | CEO | |
| Karas, Ed<br>Webley Systems, Inc. | Comptroller | 4, 5, 6 |
| Pratscher, Lynda<br>Webley Systems, Inc. | Project Manager | |
| Smelyanskky, Vlad<br>Webley Systems, Inc. | Engineer | |
| Marchevsky, Roman<br>Webley Systems, Inc. | Engineer | |
| Padgett, Daniel<br>Webley Systems, Inc. | Engineer | |
| Shvartsman, Pavel<br>Webley Systems, Inc. | Engineer | |
| Steinmeyer, Brad<br>EffectNet | VP – Partner Development | |
| Duggan, Robert<br>Mintz Levin Cohn Ferris | Webley Outside Counsel | 3, 4, 5, 6 |
| Jeffers, Richard<br>EffectNet | Analyst | |

| [redacted] | | |
|---|---|---|
| Black, Rich<br>Intermedia | SVP of Sales and Marketing | 3, 4, 5, 6 |
| Zipp, Barry<br>WorldCom | Senior Director of Advanced Voice Service | 4, 5, 6 |
| Bacon, Brett<br>WorldCom | | 3, 4, 5, 6 |
| Does, John/Jane<br>WorldCom | Members of Debtors' Sales, Management, and Support Personnel | |

**INTERROGATORY NO.2:** Identify all persons having knowledge of any of the facts, allegations, and/or information set forth in the Proofs of Claim and/or in Your Response.

A. In connection with each person identified please set forth in detail which subjects they have knowledge of and/or information concerning,

B. In connection with each person identified please set forth by interrogatory number, which interrogatories they have knowledge of and/or information concerning.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY 2:**

Please see Supplemental Response to Interrogatory Number 1.

**INTERROGATORY NO.3:** If your response to any Request for Admission contained in this document is other than an unqualified admission please set forth for each such Request for Admission, in detail, all facts which indicate that the admission is not true and/or accurate.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY 3:**

Claimant has denied Requests for Admission Numbers 1, 2, and 3. Accordingly, Claimant responds to this Interrogatory as follows:

Request for Admission Number 1: There is no evidence that the Agreement was terminated by either party, on or about March 25, 2004 or at any other time. While Parus, through its predecessor EffectNet, corresponded with Intermedia regarding Intermedia's default under the Agreement and indicated that EffectNet may terminate the Agreement, it did not

actually terminate the Agreement by providing notice of termination. There is no evidence that Intermedia terminated the Agreement pursuant to the terms of the Agreement.

Request for Admission Number 2: See Response regarding Request for Admission Number 1.

Request for Admission Number 3: See Response regarding Request for Admission Number 1.

**INTERROGATORY NO.4:** Set forth in detail all damages You claim You incurred as a result of the alleged unfair and deceptive trade practices, breach of the implied covenant of good faith and fair dealing, and conspiracy that You allege were committed by the Debtor.

A. If you claim the damages are unliquidated please set forth a description of the damages and the amounts thereof which are liquidated.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY 4:**

The harm claimed as a result of Debtors' unfair trade practices, breach of the implied covenant of good faith and fair dealing and conspiracy includes, but is not limited to, EffectNet/Webley's inability to raise equity funding from existing and new investors, that EffectNet/Webley was forced to accept burdensome financing terms that impaired the credit standing and capital structure of EffectNet/Webley, that EffectNet/Webley was forced to undergo several reductions in force that severely impaired EffectNet/Webley's infrastructure, that EffectNet/Webley lost substantial enterprise value, that EffectNet/Webley suffered diminution of reputation, and that EffectNet/Webley lost substantial sales momentum and market appeal, all directly related to the actions taken by Debtors in connection with Intermedia's breach of the UC Contract and conspiracy among the Debtors. The damage resulting from this harm is unliquidated and cannot at this time be fixed by a mere mathematical calculation at this early stage of discovery in the case. In addition, Claimant refers Debtors to its Response and Opposition of Parus Holdings, Inc. to Debtors' Objection to Proofs of Claim filed by EffectNet,

Inc., dated July 30, 2004, ¶¶ 21-38. Further, Claimant reserves the right to supplement its response to this Interrogatory Request since discovery is continuing.

**INTERROGATORY NO.5:** You allege that there was an agreement between Intermedia and MCI to cause Intermedia to breach the Agreement in order to improve MCI's negotiating position with respect to other agreements. You claim that Intermedia and MCI knew that the termination of the Agreement would place EffectNet and Webley in a position of severe financial distress and therefore force Webley to accept onerous terms. In connection with these allegations please set forth in detail the exact knowledge that you claim Intermedia and/or MCI possessed.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY 5:**

EffectNet and Webley provided detailed financial information as well as information regarding their products and business models to WorldCom subsidiaries with whom Webley was either doing business or contemplating doing business. The financial information included balance sheets, income statements, revenue projections, marketing and sales strategies. The product information included detailed confidential proprietary information regarding Webley's unified messaging product and support service. This information was provided at the request of WorldCom which was evaluating whether to invest in EffectNet/Webley. In addition, Webley was negotiating the Master Agreement for Software Licensing with WorldCom in 2001 and had provided detailed confidential business information to WorldCom in connection with these negotiations. WorldCom was aware at this time that Webley and EffectNet were in the process of merging their businesses. This information revealed that the Intermedia Agreement was a principal source of revenue for EffectNet and Webley. WorldCom was aware that this revenue and the prospect of future business from WorldCom were vital to the stability, growth, and future financial health of the company.

**INTERROGATORY NO.6:** In paragraph 27 of Your Reply You state that "Effectnet asserts that it has incurred additional damages as the direct result of actions by the Debtors relating to the UC Contract's breach." Please list all such damages in detail and itemize your calculation of these damages.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY 6:**

Assuming that "Reply" refers to the Response and Opposition of Parus Holdings, Inc. to Debtors' Objection to Proofs of Claim Filed By EffectNet, Inc., Claimant responds as follows:

The harm caused by Debtors as a direct result of the UC Contract's breach includes, but is not limited to, lost revenues in the amount of $6,307,844.27 under the minimum take-or-pay provisions of the UC Contract and further contract damages. Additional harm claimed as a result of Debtors' actions related to the "UC Contract's breach" includes, but is not limited to, EffectNet/Webley's inability to raise equity funding from existing and new investors, that EffectNet/Webley was forced to accept burdensome financing terms that impaired the credit standing and capital structure of EffectNet/Webley, that EffectNet/Webley was forced to undergo several reductions in force that severely impaired EffectNet/Webley's infrastructure, that EffectNet/Webley lost substantial enterprise value, that EffectNet/Webley suffered diminution of reputation, and that EffectNet/Webley lost substantial sales momentum and market appeal, all directly related to the actions taken by Debtors in connection with Intermedia's breach of the UC Contract. The damages resulting from this additional harm are unliquidated and cannot at this time be fixed by a mere mathematical calculation at this early stage of discovery in the case. In addition, Claimant refers Debtors to its Response and Opposition of Parus Holdings, Inc. to Debtors' Objection to Proofs of Claim filed by EffectNet, Inc., dated July 30, 2004, ¶¶ 21-38. Further, Claimant reserves the right to supplement its response and objections to this Interrogatory Request since discovery is continuing.

In addition, Claimant states that the calculation of and itemization of such damages are properly within the province of expert testimony, and that Claimant will supplement its response

and objections to this Interrogatory Request with its expert disclosure, pursuant to Fed. R. Civ. P. 26, when it is required to be disclosed.

**RESPONSES TO DEBTORS'**
**DOCUMENT PRODUCTION REQUESTS**

**REQUEST FOR PRODUCTION NO. 1:** You allege that there was an agreement between Intermedia and MCI to cause Intermedia to breach the Agreement in order to improve MCI's negotiating position with respect to other agreements. You claim that Intermedia and MCI knew that the termination of the Agreement would place EffectNet and Webley in a position of severe financial distress and therefore force Webley to accept onerous terms. In connection with these allegations please furnish financial statements for both EffectNet and Webley as of the date of the alleged agreement between Intermedia and MCI. (If you do not have such documents for the exact date involved please furnish the last such document prepared before the date involved and the first such documents prepared after the date involved).

**SUPPLEMENTAL RESPONSE TO REQUEST NO. 1:**

Claimant will produce responsive documents for a range of time insofar as Claimant is unable to identify the "exact date" of the Agreement between Debtors.

**REQUEST FOR PRODUCTION NO. 2:** You allege that there was an agreement between Intermedia and MCI to cause Intermedia to breach the Agreement in order to improve MCI's negotiating position with respect to other agreements. You claim that Intermedia and MCI knew that the termination of the Agreement would place EffectNet and Webley in a position of severe financial distress and therefore force Webley to accept onerous terms. In connection with these allegations please furnish income statements for both EffectNet and Webley as of the date of the alleged agreement between Intermedia and MCI. (If you do not have such documents for the exact date involved please furnish the last such document prepared before the date involved and the first such documents prepared after the date involved).

**SUPPLEMENTAL RESPONSE TO REQUEST NO. 2:**

Claimant refers Debtors to Supplemental Response to Request No. 1.

**REQUEST FOR PRODUCTION NO. 3:** You allege that there was an agreement between Intermedia and MCI to cause Intermedia to breach the Agreement in order to improve MCI's negotiating position with respect to other agreements. You claim that Intermedia and MCI knew that the termination of the Agreement would place EffectNet and Webley in a position of severe financial distress and therefore force Webley to accept onerous terms. In connection with these allegations please furnish balance sheets for both EffectNet and Webley as of the date of the alleged agreement between Intermedia and MCI. (If you do not have such documents for the

exact date involved please furnish the last such document prepared before the date involved and the first such documents prepared after the date involved).

**SUPPLEMENTAL RESPONSE TO REQUEST NO. 3:**

    Claimant refers Debtors to Supplemental Response to Request No. 1.

**REQUEST FOR PRODUCTION NO. 4:**  Any and all correspondence by and between You and MCI.

**SUPPLEMENTAL RESPONSE TO REQUEST NO. 4:**

    Claimant will produce responsive documents.

**REQUEST FOR PRODUCTION NO. 5:**  Any and all correspondence by and between You and Intermedia.

**SUPPLEMENTAL RESPONSE TO REQUEST NO. 5:**

    Claimant will produce responsive documents.

**REQUEST FOR PRODUCTION NO. 6:**  You allege in your Response that WorldCom "made improper use of confidential information given to WorldCom." Please produce any and all such confidential information.

**SUPPLEMENTAL RESPONSE TO REQUEST NO. 6:**

    Claimant will produce responsive documents.

**REQUEST FOR PRODUCTION NO. 7:**  You allege in Your Response that Intermedia "represented to EffectNet at the time the UC Contract was signed that Intermedia had hundreds of sales personnel ... that would market the Services to Intermedia's customers." Please provide all documents that contain such statements and/or representations.

**SUPPLEMENTAL RESPONSE TO REQUEST NO. 7:**

    Claimant will produce responsive documents.

**REQUEST FOR PRODUCTION NO. 8:**  You allege in Your Response that "Intermedia and WorldCom made a conscious election to breach and repudiate the UC Contract." Please produce all documents which evidence such a "conscious election."

**SUPPLEMENTAL RESPONSE TO REQUEST NO. 8:**

Claimant will produce responsive documents.

**REQUEST FOR PRODUCTION NO. 9:** You allege in Your Response that "this decision may have been reached to make way for a competing WorldCom initiative to offer products which were similar to the Services provided by EffectNet under the UC Contract but were based on an incompatible business model." Please produce all documents which evidence that WorldCom had an initiative to offer products which were similar to the Services provided by EffectNet under the UC Contract.

**SUPPLEMENTAL RESPONSE TO REQUEST NO. 9:**

Claimant will produce responsive documents.

**REQUEST FOR PRODUCTION NO. 10:** You allege in Your Response that "this decision may have been reached to make way for a competing WorldCom initiative to offer products which were similar to the Services provided by EffectNet under the UC Contract but were based on an incompatible business model." Please produce all documents which evidence that any such products offered by WorldCom were based on an incompatible business model.

**SUPPLEMENTAL RESPONSE TO REQUEST NO. 10:**

Claimant will produce responsive documents.

**REQUEST FOR PRODUCTION NO. 11:** Invoice number 1010.

**SUPPLEMENTAL RESPONSE TO REQUEST NO. 11:**

Claimant will produce responsive documents. Claimant notes that a copy of Invoice No. 1010 was annexed to the Response and Opposition of Parus Holdings, Inc. to Debtors' Objection to Proofs of Claim filed by EffectNet, Inc., dated July 30, 2004.

**REQUEST FOR PRODUCTION NO. 12:** Invoice number 1011.

**SUPPLEMENTAL RESPONSE TO REQUEST NO. 12:**

Claimant will produce responsive documents. Claimant notes that a copy of Invoice No. 1011 was annexed to the Response and Opposition of Parus Holdings, Inc. to Debtors' Objection to Proofs of Claim filed by EffectNet, Inc., dated July 30, 2004.

**REQUEST FOR PRODUCTION NO. 13:** Invoice number 1018.

**SUPPLEMENTAL RESPONSE TO REQUEST NO. 13:**

Claimant will produce responsive documents. Claimant notes that a copy of Invoice No. 1018 was annexed to the Response and Opposition of Parus Holdings, Inc. to Debtors' Objection to Proofs of Claim filed by EffectNet, Inc., dated July 30, 2004.

**REQUEST FOR PRODUCTION NO. 14:** Any and all invoices issued to Intermedia related to and/or pursuant to the Agreement.

**SUPPLEMENTAL RESPONSE TO REQUEST NO. 14:**

Claimant will produce responsive documents.

**REQUEST FOR PRODUCTION NO. 15:** Any and all documents which establish which of the two price options in the Agreement was to be used in, calculating the Minimum Commitment.

**SUPPLEMENTAL RESPONSE TO REQUEST NO. 15:**

Claimant will produce responsive documents.

**REQUEST FOR PRODUCTION NO. 16:** Any and all documents evidencing an attempt by You to raise equity funding from investors.

**SUPPLEMENTAL RESPONSE TO REQUEST NO. 16:**

Claimant will produce responsive documents.

**REQUEST FOR PRODUCTION NO. 17:** Copies of any and all "financial and other disclosures to WorldCom" as referred to in paragraph 32 of Your Reply.

**SUPPLEMENTAL RESPONSE TO REQUEST NO. 17:**

Assuming this is intended to refer to the Response and Opposition of Parus Holdings, Inc. to Debtors' Objection to Proofs of Claim, Claimant will produce responsive documents.

**REQUEST FOR PRODUCTION NO. 18:** Any and all documents establishing Your cost per customer to provide services to Intermedia pursuant to the Agreement.

**SUPPLEMENTAL RESPONSE TO REQUEST NO. 18:**

Claimant will produce responsive documents.

**REQUEST FOR PRODUCTION NO. 19:** Any and all versions of the Agreement which you claim was being negotiated by and between MCI and Webley.

**SUPPLEMENTAL RESPONSE TO REQUEST NO. 19:**

Claimant will produce responsive documents.

**REQUEST FOR PRODUCTION NO. 20:** Any and all correspondence concerning and/or related to the agreement which you claim was being negotiated by and between MCI and Webley.

**SUPPLEMENTAL RESPONSE TO REQUEST NO. 20:**

Claimant will produce responsive documents.

**REQUEST FOR PRODUCTION NO. 21:** Any and all calculations used to compute any and/or all invoices issued to Intermedia in connection with the Agreement.

**SUPPLEMENTAL RESPONSE TO REQUEST NO. 21:**

Claimant will produce responsive documents.

**REQUEST FOR PRODUCTION NO. 22:** Any and all documents relevant, to any transaction between Claimant(s) and Debtors.

**SUPPLEMENTAL RESPONSE TO REQUEST NO. 22:**

Claimant will produce responsive documents.

Dated: New York, New York
August 5, 2005

Respectfully submitted,

KELLEY DRYE & WARREN LLP

By: [signature]
Stephen A. Wood (SW 6270)
Robert S. Friedman (RF 1538)
Robert L. LeHane (RL 9422)
Martin A. Krolewski (MK 3352)

101 Park Avenue
New York, New York 10178
Telephone: (212) 808-7800
Facsimile: (212) 808-7897
Attorneys for Claimant Parus Holdings, Inc., successor-by-merger to EffectNet, Inc. and EffectNet, LLC

**VERIFICATION**

STATE OF Illinois )
) ss.
COUNTY OF LAKE )

I, Robert McConnell, being first duly sworn, hereby depose and state:

I have read the foregoing responses to Interrogatories set forth above, and the answers contained therein are true and correct.

Executed this 5th day of August, 2005.

[signature]

Subscribed to and sworn before me this 5th day of August 2005.

[signature]

Notary Public in and for the State of IL

My Commission Expires:

5/12/09

OFFICIAL SEAL
ELIZABETH M FURLAN
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:05/12/09

**EXHIBIT E**

D00363



STINSON
MORRISON
HECKER LLP

1201 Walnut
Suite 2900
Kansas City, MO 64106
*Tel* (816) 842-8600
*Fax* (816) 691-3495

November 16, 2006

**VIA FACSIMILE (312) 832-4700 AND U.S. MAIL**

Jill L. Murch, Esq.
Foley & Lardner LLP
321 North Clark Street
Suite 2800
Chicago, IL 60610

Re: In re WorldCom, Inc., Chapter 11, Case No. 02-13533
Parus Holdings' Claims

Dear Jill:

I write to follow up on my July 6, 2006, letter to Kevin Smith regarding several concerns about documents and information that Parus Holdings has withheld from its production of documents. Although Mr. Smith acknowledged receipt of my letter, he never responded to it. Nor have I received any response from you since your firm entered its appearance in this case.

As you know, in its Order of June 14, 2005, the Court ruled that Parus Holdings had waived its objections to the Debtors' interrogatories and document requests. Nevertheless, it appears that Parus Holdings has withheld documents and other information on the basis of those waived objections. Indeed, we have been provided a privilege log listing hundreds of pages of documents that Parus Holdings has withheld despite the Court's ruling that the Claimant had waived its objections. Each of the documents on the privilege log should therefore be produced immediately.

An additional problem relates to the withheld documents listed on the privilege log with the prefix "KDW." There are large gaps in the numbering on the privilege log, suggesting that documents with this prefix were produced. (For example, the log shows that you withheld KDW00100267, KDW00100501, and KDW00100839-0010041, suggesting that Parus Holdings produced KDW00100268-00100500 and KDW100502-00100838). However, if Parus Holdings intended to

KANSAS CITY
OVERLAND PARK
WICHITA
WASHINGTON, D.C.
PHOENIX
ST. LOUIS
OMAHA
JEFFERSON CITY

produce any documents containing the "KDW" prefix, we have not received them. If it did not, please advise the reason for the gaps in the privilege log and confirm that you are not withholding any responsive "KDW" documents. Of course, as stated above, the "KDW" documents listed on the log should be produced.

Parus Holdings also has redacted many documents without identifying the grounds for the redactions. The following documents contain unexplained redactions:

| | | |
|---|---|---|
| PH 24326 | PH 24331 | PH 24339 |
| PH 24341 | PH 24346 | PH 24348 |
| PH 24350 | PH 24351 | PH 24356 |
| PH 24361 | PH 24362 | PH 24363 |
| PH 24364 | PH 24379 | PH 24385 |
| PH 24391 | PH 24393 | PH 24394 |
| PH 24396 | PH 24414 | PH 24428 |
| PH 24439 | PH 24453 | PH 24464 |
| PH 24465 | PH 24467 | PH 24469 |
| PH 24469 | PH 24471 | PH 24475 |
| PH 24477 | PH 24641 | PH 24642 |
| PH 24722 | PH 24807 | PH 24946 |
| PH 26740 | PH 26821 | PH 26835 |
| PH 26847 | PH 26849 | PH 26914 |
| PH 26955 | PH 27356 | PH 27626 |
| PH 27672 | PH 27673 | PH 28037 |
| PH 28041 | PH 28049 | PH 28058 |
| PH 28466 | PH 28577 | PH 28602 |
| PH 28604 | PH 28605 | PH 28797 |
| PH30307 | PH30609 | PH30612 |
| PH34541 | PH34625 | PH34626 |
| PH34627 | PH38920 | PH38972 |
| PH39042 | PH40979 | |

The privilege log fails to describe the information withheld by these redactions. Indeed, we have no log of withheld documents containing the "PH" prefix. Given that Parus Holdings waived its objections, it should produce unredacted copies of these documents. In addition, if Parus Holdings withheld any responsive documents containing the "PH" prefix on grounds of privilege or any other objection, please produce them.

In addition to the problems identified above, a large number of the documents that Parus Holdings produced are emails that reference an attached document. The attachment, however, was not produced with the email. This is the case for the documents listed on Exhibit A to this letter. Please produce each attachment to the

documents listed on Exhibit A. Because some of the attachments are audio files, they likely must be produced in electronic form.

Finally, as Allison Murdock noted in a previous letter to Kevin Smith, documents must be produced either as they are kept in the usual course of business or organized and labeled to correspond with the categories in the document requests. Although an index was provided with Parus Holdings' initial production of documents, we are unable to locate one for Parus Holdings' production of November 11, 2005. If an index was prepared for that set of documents, please forward us a copy. If you did not prepare one, please do so.

Given the time that has passed since our initial request for these documents and the index, we ask that you provide them within the next 10 days. Thank you for your cooperation on these matters.

Very truly yours,

**STINSON MORRISON HECKER LLP**

Mark M. Iba

MMI:jb

**EXHIBIT A**

**PARUS HOLDINGS DOCUMENTS MISSING ATTACHMENTS**

| | |
|---|---|
| PH 24085 | Voicemail |
| PH 24089 | Missing e-mail from Jim Calandra supposed to accompany memo |
| PH 24104 | Term sheet revised – term sheet 9_17 redline.doc |
| PH 24105 | Term sheet 9_17 redline2.doc |
| PH 24327 | Investor question |
| PH 24340 | Bridge loan, security agreement, promissory note, consent |
| PH 24388 | Revised documents re: bridge loan |
| PH 24390 | Audio |
| PH 24399 | Audio |
| PH 24404 | Fax |
| PH 24405 | Fax |
| PH 24410 | Monthly cash burn |
| PH 24412 | Bridge loan warrant redline |
| PH 24419 | Fax |
| PH 24420 | Fax – fourth restated |
| PH 24733 | Evaluation Agreement |
| PH 24895 | AOL update |
| PH 24896 | Webley Fin. Anal. |
| PH 24897 | (2) term sheet |
| PH 25667 | Voicemail |
| PH 25696 | NMS memo |
| PH 27124 | Webley Cash Burn Analysis |
| PH 27156 | Roadshow Calendar |
| PH 27157 | Term Sheets (3 attachments) |
| PH 27339 | PPM-Webley Terms 27.doc |
| PH 27344 | Presentation materials (8 attachments) |
| PH27651 | Intermedia hosted email |
| PH27672 | Webley financial updates |
| PH27818 | Fulfillment package (5 docs) |
| PH28537 | Fax – Amd 1 from WCom |
| PH28627 | Hardware equipment cost |
| PH28628 | License Agreement/signature page |
| PH28840 | Webley NDA |
| PH28918 | Webley-WCom feature frozen |
| PH29008 | Hardware equipment cost, Webley-WCom requirements |
| PH29012 | Training SOW, Customize software document |
| PH29669 | WCom/Webley/SIP Platform (3) |
| PH29847 | WCom MOU |
| PH29849 | Webley NDA |

| | |
|---|---|
| PH29878 | IP Comm NDA w/vendor Webley |
| PH29890 | WCom LDAP integration |
| PH29985 | Webley Indicast *Roger) Oct 20 |
| PH29986 | Indicast trial account |
| PH29989 | Relationship |
| PH30043 | Webley final |
| PH30075 | Webley final |
| PH30131 | 6 attachments |
| PH30185 | Sales pipeline report |
| PH30380 | Multiple attachments |
| PH32825 | Fax |
| PH32901 | Group B complete |
| PH33015 | Final Option II toll free order form |
| PH33094 | Move o Option 2 |
| PH33237 | WCom June billing |
| PH33239 | Fax |
| PH33244 | Contract |
| PH33255 | Fax |
| PH33257 | 2 attachments |
| PH33276 | Webley PRI quote for T1 |
| PH33296 | Fax - Amd 3 & 4 |
| PH33527 | Fax |
| PH33529 | Numbas6 |
| PH33538 | Fax |
| PH33539 | ? |
| PH33540 | Xls |
| PH33541 | Inbound Hawaii |
| PH33596 | Fax |
| PH33603 | Fax |
| PH33604 | Text |
| PH33605 | Text |
| PH33606 | Xls |
| PH33614 | Inbound Hawaii |
| PH33615 | Xls |
| PH33616 | Text |
| PH33617 | Fax |
| PH33626 | Numbas6 |
| PH33636 | Inbound Hawaii |
| PH33637 | dnis TG20 |
| PH33638 | Wiltel Numbers |
| PH33640 | WSI.SMS |
| PH33641 | Fax |
| PH33642 | Multiple attachments |

| | |
|---|---|
| PH33643 | 2 attachments |
| PH33692 | Xls |
| PH33784 | Text |
| PH33831 | 2 attachments |
| PH33897 | Wsi0420.800 |
| PH33898 | Port.txt |
| PH33900 | Webley enhanced |
| PH33901 | LOA |
| PH33906 | Webley enhanced |
| PH33907 | Webley enhanced |
| PH33914 | ABB_OCNTable |
| PH33920 | Disputes |
| PH33925 | Enhanced.txt |
| PH33927 | Enhanced.txt |
| PH33997 | Various connection modes |
| PH34051 | 2 attachments |
| PH34193 | Integrated order form |
| PH34642 | Webley summaries |
| PH34769 | Multiple attachments |
| PH34863 | Escalation |
| PH34896 | WCom users guide |
| PH35151 | WCom Canada & Hawaii traffic |
| PH35181 | Webley active toll free |
| PH35182 | Webley active toll free |
| PH35190 | Webley enhanced toll free |
| PH35191 | Webley enhanced toll free |
| PH35198 | Webley enhanced toll free |
| PH35257 | Multiple attachments |
| PH35281 | List of #'s for WCom T6 |
| PH35282 | List of #'s for WCom T6 |
| PH35323 | Header image 001 |
| PH35327 | Untitled doc<br>Media form<br>Webley doc<br>WCom Maintenance Esc List 2001<br>EDE req.2<br>Computer Access Request Form |
| PH35383 | Webley 062901 #1.doc<br>R114545.txt (both lists of toll free #'s (?) |
| PH35391 | 14 docs attached to email; only 4 docs produced w/email (contracts re Classic Product) |
| PH35816 | MASL (signed) |
| PH36701 | Webley 6th Am.<br>Webley ATF attachment |

| | |
|---|---|
| | Webley 1.2.4 (3 docs) |
| PH36984 | Failed toll frees |
| PH36987 | WS10710ER8.txt (re toll free #s) |
| PH37054 | List of #'s |
| PH37055 | Non-usage dispute 3 |
| PH37072 | Enhanced.txt (re toll free #s) |
| PH37074 | Billing dispute enhanced Tf.doc |
| PH37361 | Intermedia logo website.jpg |
| PH37520 | Intermedia sample file |
| PH37648 | Final UM list |
| PH37719 | Presidents Winners list 2000 |
| PH37720 | Officers VPIT Accounts (Voice Product Leadership Team) |
| PH37722 | UM Forecast 2001 |
| PH37733 | Internal user spreadsheet (Intermedia – U.M.) |
| PH37738 | Forecast template |
| PH37764 | Brand Management<br>Billing Package Management |
| PH37785 | Webley Provisioning WP |
| PH38500 | Program features<br>SAFE DSI Escrow<br>Hardware Platform<br>Branding<br>Training<br>License Agreement |
| PH38681 | WorldCom feature description |
| PH38742 | WorldCom SLA draft 1 |
| PH38746 | Picture (metafile) |
| PH38755 | Picture (metafile) |
| PH38769 | Picture (metafile) |
| PH38780 | Webley minutes |
| PH38870 | Training statement<br>Webley/WorldCom requirements<br>Brand Management (internet page)<br>Billing package (internet page) |
| PH39120 | Webley Ex. No. 4 |
| PH39326 | Pocket guides (3 documents) |

**EXHIBIT F**

D00371

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------x

In re

WORLDCOM, INC., et al,

Reorganized Debtors.

-------------------------------x

Case No. 02-13533(AJG)

July 11, 2006
10:00 a.m.
New York, New York

FINAL TRANSCRIPT
DIGITALLY RECORDED PROCEEDINGS
(Excerpt -- Parus Holdings, Inc.)

Pre-Motion Discovery Conference re Claims of Parus Holdings, Inc.

B E F O R E:

THE HONORABLE ARTHUR J. GONZALEZ
United States Bankruptcy Judge

A P P E A R A N C E S:

STINSON MORRISON HECKER LLP
Special Counsel for Reorganized Debtors
1201 Walnut Street
Kansas City, Missouri 64106

BY: ALLISON M. MURDOCK, ESQ.

KELLEY DRYE & WARREN LLP
Attorneys for Parus Holdings, Inc.
101 Park Avenue
New York, New York 10178

BY: ROBERT S. FRIEDMAN, ESQ.

DEBORAH HUNTSMAN, Court Reporter
(212) 608-9053 (917) 723-9898
Proceedings Recorded by Electronic Sound Recording,
Transcript Produced by Court Reporter

can actually determine what they have done and what they have not done. One thing that comes to mind immediately is, from our view at least, and I know the Debtors dispute this, we have Intermedia and we have WorldCom. These are two different groups of documents. There are no WorldCom documents, except for maybe possibly a few of what they call POP e-mails. We believe that those documents should have been preserved at the time that they intentionally breached the contract. Instead, they were destroyed and now they are completely inaccessible. We need to inquire as to what the process was at the time that they breached our contract and why they didn't preserve the documents. There are no documents from the WorldCom side possibly, and we need to inquire as to that, because not only could that affect the cost shifting but it could also affect possible sanctions such as adverse inferences and other types of sanctions that we anticipate making based upon what the evidence shows.

JUDGE GONZALEZ: All right. Let me hear from the Debtors with respect to the IT discovery before the motion.

MS. MURDOCK: Your Honor, we have made every attempt to make this process as transparent as

possible. We have identified in correspondence to Parus Holdings' counsel all the different types of electronic data there are both for Intermedia and MCI. We have made eight document productions of electronic data, including document productions of WorldCom documents. Those document productions have been identified as being either from WorldCom or Intermedia. So this has been a transparent process. We have told them everything that exists. We have produced documents from the WorldCom side. No documents have been destroyed. The sampling that has been done with respect to the inaccessible data or the backup tapes is the type of sampling that was contemplated in the Zubulake decision. We believe it is unnecessary for there to be depositions of their IT people in advance of a cost shifting motion, because we can provide affidavits in support of our cost shifting motion that show the various types of discovery and information that we have already provided. This has already been provided to counsel. We can provide it in the form of affidavits, though, if they wish. The notion that it is important to take deposition discovery of the electronic data that exists seems unnecessary in light of the transparent information that we have been providing to Parus

Holdings' counsel over the past six months about all of the sources of electronic discovery.

JUDGE GONZALEZ: Whether the information has been as transparent as you say it is, is one of the central issues. Your affidavits about what may have already been produced doesn't answer the question of how things were kept, and what may have been available at one point in time, and then what happened to it.

MS. MURDOCK: Actually, Your Honor, the affidavits I contemplated would be on the subject you just mentioned. Not what has been produced, but all of the sources of electronic data that are available.

JUDGE GONZALEZ: Under the circumstances of this case, why do you think that would suffice? It is going to be challenged from the outset. They are going to want to take the deposition of the affiant.

MS. MURDOCK: I am sorry, Your Honor?

JUDGE GONZALEZ: They will want to take the deposition of the very party that you are going to provide the affidavit from. So what in the world am I going to do with it? Am I going to just accept it as your affidavit, and they have to file the equivalent of a Rule 56(f) type response to it and say, "We need to take discovery or a deposition of the affiant to find what was kept, how it was kept, and whatever is

**EXHIBIT G**

D00376

Robert A. Scher (RS 2910)
FOLEY & LARDNER LLP
90 Park Avenue
New York, NY 10016
Phone: (212) 682-7474
Fax: (212) 682-2329
email: rscher@foley.com

-and-

Mark L. Prager (*admitted pro hac vice*)
Jill L. Murch (*admitted pro hac vice*)
Joanne Lee (*admitted pro hac vice*)
FOLEY & LARDNER LLP
321 N. Clark Street, Suite 2800
Chicago, IL 60610
Phone: (312) 832-4500
Fax: (312) 832-4700

*Attorneys for Claimant Parus Holdings, Inc. Successor-By-Merger to EffectNet, Inc. and EffectNet, LLC*

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | CHAPTER 11 |
| | ) | Jointly Administered |
| WORLDCOM, INC., et al., | ) | |
| | ) | |
| Debtors. | ) | Case No. 02-13533 (AJG) |
| | ) | |

## NOTICE OF DEPOSITION

To:
Allison Murdock
Stinson Morrison Hecker LLP
1201 Walnut Street, Suite 2900
Kansas City, Missouri 64106-2150

**PLEASE TAKE NOTICE THAT** pursuant to Federal Rule of Civil Procedure 30 and Federal Rule of Bankruptcy Procedure 7030, Parus Holdings, Inc. will take the deposition upon oral examination of the individual referenced herein on the date and time indicated, on the subjects set forth in the Rider attached hereto:

**Deponent:** **David S. Wachen**
**Date:** **November 30, 2006**
**Time:** **9:00 a.m. (E.S.T.)**

**Place:** **Foley & Lardner LLP**
**Washington Harbour, 3000 K Street, NW**
**Suite 500, Washington, DC 20007-5101**

The deposition will be taken before an officer authorized to administer oaths and will be recorded by stenographic means. The deposition will be conducted in accordance with the Federal Rules of Civil Procedure and the Federal Rules of Bankruptcy Procedure, and will continue from day to day until completed, excluding weekends and holidays.

**PLEASE TAKE FURTHER NOTICE** that the individual referenced herein shall produce all documents as identified in the attached Rider to Subpoena.

Dated: November 15, 2006

Respectfully submitted,

By: ______________________

Robert A. Scher (RS 2910)
FOLEY & LARDNER LLP
90 Park Avenue
New York, NY 10016
Phone: (212) 682-7474

-and-

Mark L. Prager (*admitted pro hac vice*)
Jill L. Murch (*admitted pro hac vice*)
Joanne Lee (*admitted pro hac vice*)
FOLEY & LARDNER LLP
321 N. Clark Street, Suite 2800
Chicago, IL 60610
Phone: (312) 832-4500
Fax: (312) 832-4700

*Attorneys for Claimant Parus Holdings, Inc., Successor-By-Merger to EffectNet, Inc. and EffectNet, LLC*

**CERTIFICATE OF SERVICE**

The undersigned, a non-attorney, on oath states that on November 15, 2006 she caused a true and correct copy of the foregoing **Notice of Deposition**, to be served in via overnight delivery:

Allison Murdock
Stinson Morrison Hecker LLP,
1201 Walnut Street
Suite 2900
Kansas City, Missouri 64106-2150
Tel: 816-842-8600
Fax: 816-691-3495

Katherine E. Hall

Sworn to before me this
15th day of November 2006

Notary Public, State of Illinois

# United States Bankruptcy Court

DISTRICT OF COLUMBIA

In re:

WORLDCOM, INC. et al.,

Debtors.

**SUBPOENA IN A CASE UNDER THE BANKRUPTCY CODE**

Case No. 02-13533
*PENDING IN THE SOUTHERN DISTRICT OF NEW YORK*

11

To:
**David S. Wachen, Schulman, Rogers, Gandal, Pordy and Ecker, P.A.**
**11921 Rockville Pike, Rockville, Maryland 20852**

☐ YOU ARE COMMANDED to appear in the United States Bankruptcy Court at the place, date, and time specified below to testify in the above case.

| PLACE | COURTROOM |
|---|---|
| | DATE AND TIME |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above adversary proceeding.

| PLACE | DATE AND TIME |
|---|---|
| **Offices of Foley & Lardner LLP**<br>**Washington Harbour, 3000 K Street, NW - Suite 500**<br>**Washington, DC 20007-5101** | **NOVEMBER 30, 2006**<br>**9:00 a.m. (E.S.T.)** |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date and time specified below (list documents or objects):

**SEE ATTACHED RIDER**

| PLACE | DATE AND TIME |
|---|---|
| **Offices of Foley & Lardner LLP**<br>**Washington Harbour, 3000 K Street, NW - Suite 500**<br>**Washington, DC 20007-5101** | **NOVEMBER 30, 2006**<br>**9:00 a.m. (E.S.T.)** |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any subpoenaed organization not a party to this adversary proceeding shall designate one or more officers, directors or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify, Fed.R.Civ.P. 30(b)(6) made applicable in adversary proceedings by Rule 7030, Fed.R.Bankr.P.

| ISSUING OFFICER SIGNATURE AND TITLE | DATE |
|---|---|
| [signature] **Attorney for Parus Holdings, Inc., Successor-By-Merger to EffectNet, Inc. and EffectNet, LLC** | **November 15, 2006** |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
**Joanne Lee**
**(312) 832-4500**

**Foley & Lardner LLP**
**321 North Clark Street, Suite 2800**
**Chicago, Illinois 60610**

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on ______________________________
DATE

______________________________
SIGNATURE OF SERVER

______________________________
ADDRESS OF SERVER

______________________________

Rule 45, Fed.R.Civ.P., Parts (c) & (d) made applicable in cases under the Bankruptcy Code by Rule 9016, Fed.R. Bankr.P.

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2)(A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## RIDER TO SUBPOENA

### Definitions

For purposes of these Subjects and Requests, the following terms are used with the indicated meanings:

1.    "Document(s)" are used in the broadest possible sense and shall mean, without limitation, all written, printed, typed, photostatic, photographed, recorded, or otherwise reproduced communications or representations of every kind and description, whether comprised of letters, words, numbers, pictures, sounds, or symbols, or any combination thereof, whether prepared by hand or by mechanical, electronic, magnetic, photographic, or other means, as well as audio or video recordings of communications, oral statements, conversations, or events.  This definition includes, but is not limited to, any and all originals and nonidentical copies of any and all of the following:  electronic mail, computer-stored or computer-readable data, computer programs, computer printouts, correspondence, notes, minutes, records, messages, memoranda, telephone memoranda, diaries, contracts, agreements, invoices, orders, acknowledgements, receipts, bills, statements, appraisals, reports, forecasts, compilations, schedules, studies, summaries, analyses, pamphlets, brochures, advertisements, newspaper clippings, tables, tabulations, financial statements, working papers, tallies, maps, drawings, diagrams, sketches, x-rays, charts, labels, packaging materials, plans, photographs, pictures, film, microfilm, telegrams, telexes, telefacsimiles, tapes, transcripts, recordings, and all other sources or formats from which data, information, or communications can be obtained.  Any preliminary versions, drafts, or revisions of any of the foregoing, any document which has or contains any attachment, enclosure, comment, notation, addition, insertion, or marking of any kind which is not a part of another document, or any document which does not contain a comment, notation, addition, insertion, or marking of any kind which is part of another document, is to be considered a separate document.  "Document" and "documents" are used in the broadest possible sense and shall mean, without limitation, all written, printed, typed, photostatic, photographed, recorded, digital or otherwise reproduced communications or representations of every kind and description, however produced or reproduced, whether comprised of letters, words, numbers, pictures, sounds, or symbols, or any combination thereof, whether prepared by hand or by mechanical, electronic, magnetic, photographic, or other means and shall include, but not be limited to, any and all originals and nonidentical copies of any and all of the following:  correspondence, notes, minutes, records, messages, memoranda, telephone memoranda, diaries, contracts, agreements, invoices, orders, acknowledgments, receipts, bills, statements, appraisals, reports, forecasts, compilations, schedules, studies, summaries, analyses, pamphlets, brochures, advertisements, newspaper clippings, tables, tabulations, financial statements, working papers, tallies, maps, drawings, diagrams, sketches, charts, labels, packaging, plans, photographs, pictures, film, microfilm, microfiche, computer-stored or computer-readable data (including any data contained on handheld electronic devices and phones), computer programs, electronic mail (a.k.a. email) computer printouts, telegrams, telexes, facsimiles, tapes, transcripts, recordings, and all other sources or formats from which data, information, or communications can be obtained.  Any preliminary versions, drafts, or revisions of any of the foregoing, any document which has or

contains any attachment, enclosure, comment, notation, addition, insertion, or marking of any kind which is not a part of another document, or any document which does not contain a comment, notation, addition, insertion, or marking of any kind which is part of another document, is to be considered a separate document.

2. "Including" and "includes" shall be construed as referring only to an incomplete listing of illustrative examples and not as limiting or narrowing the generality of any definition, instruction or request.

3. "Refer," or "relate," or "regarding" shall mean evidencing, memorializing, comprising, connected with, mentioning, describing, containing, enumerating, involving or in any way concerning, pertaining, being connected with, reflecting upon, or resulting from a stated subject matter whether in whole or in part or directly or indirectly.

4. "Bankruptcy Cases" shall mean Intermedia Communications, Inc.'s chapter 11 bankruptcy case (Case No. 02-42154) and MCI Worldcom Communications, Inc.'s chapter 11 bankruptcy case (Case No. 02-42223), each pending before the United States Bankruptcy Court for the Southern District of New York and each jointly administered under In re Worldcom, Inc., et al. (02-13533).

5. "Claimant" shall mean Parus Holdings, Inc. (successor-by-merger to EffectNet, Inc. and EffectNet, LLC), EffectNet, LLC, EffectNet, Inc., Webley Systems, Inc., and their affiliates, predecessors or successors-in-interest, assigns, joint venturers, and former or present agents, including, but not limited to, officers, directors, employees, agents, contractors, accountants, advisors, attorneys, representatives, investigators, consultants, experts, representatives of any kind, and all other persons acting or purporting to act on their behalf.

6. "Debtors," shall mean Intermedia Communications, Inc., MCI Worldcom Communications, Inc., and their respective affiliates, predecessors or successors-in-interest, assigns, joint venturers, and former or present agents, including, but not limited to, officers, directors, employees, agents, contractors, accountants, advisors, attorneys, representatives, investigators, consultants, experts, representatives of any kind, and all other persons acting or purporting to act on their behalf.

7. "Hard Copy" shall mean all Documents that are in paper format. The term "Hard Copy" shall not include Documents that are in electronic format.

8. "Intermedia" shall mean Intermedia Communications, Inc. and its affiliates, predecessors or successors-in-interest, assigns, joint venturers, and former or present agents, including, but not limited to, officers, directors, employees, agents, contractors, accountants, advisors, attorneys, representatives, investigators, consultants, experts, representatives of any kind, and all other persons acting or purporting to act on its behalf. The term "Intermedia" shall not include MCI Worldcom Communications, Inc.

9. "Litigation" shall mean the litigation presently pending before the Bankruptcy Court that relates to the Claimant's Claim and the Debtors' Objection.

10. "Litigation Hold" shall mean any written or oral instruction, communication, order, or directive (whether by electronic means or Hard Copy Documents) to preserve, maintain, and keep accessible Documents.

11. "MCI" shall mean MCI Worldcom Communications, Inc. and its affiliates, predecessors or successors-in-interest, assigns, joint venturers, and former or present agents, including, but not limited to, officers, directors, employees, agents, contractors, accountants, advisors, attorneys, representatives, investigators, consultants, experts, representatives of any kind, and all other persons acting or purporting to act on its behalf. The term "MCI" shall not include Intermedia Communications, Inc.

12. "Person" shall mean any natural person (living or deceased), or any entity, including, but not limited to, a sole proprietorship, firm, partnership, corporation, business trust, association, joint venture, or any other organization or entity, and includes any respective former or present officer, director, partner, employee, or agent of any kind.

**Instructions**

1. In responding to these Requests, you are required to furnish all information that is within your possession, custody, control, or to which you have a legal right to demand the production of said responsive materials from others, including information in the possession of your attorneys, accountants, advisors, agents, or other persons directly or indirectly connected with you or your attorneys, and anyone else otherwise subject to your control.

2. In responding to these Requests, you are required to furnish all documents that respond, in whole or in part, to any portion of the Requests below in their entirety, including all attachments and enclosures.

3. With respect to any document or information which is withheld on a claim of privilege, the answer or response hereto shall provide a statement setting forth the following information:

a. The name(s) of the author(s) of the document;

b. The name(s) of the addressee(s) and all others who have received or read the document;

c. The names of those who have knowledge of the matters contained in the document;

d. The job title of each individual identified in (i), (ii), and (iii) above;

e. The date of the document;

f. The present location of the document and all copies of it;

g. The name of each and every person having custody or control of the document and all copies of it;

    h. A brief description of the nature and subject matter of the document; and

i. The nature and basis of the privilege and the person asserting the privilege.

4. Notwithstanding a claim that a document is protected from disclosure, any document so withheld must be produced with the portion claimed to be protected excised and/or redacted.

5. You are hereby requested to supplement each and every response as new information is discovered or becomes available, from now until the commencement of any hearing, substantive or otherwise. You are also under a continuing duty to correct any incorrect responses to these Requests.

6. You are to produce documents as they are kept in the usual course of business or organized and labeled to correspond with the categories itemized in the below Requests. Documents that are ordinarily kept in electronic form are to be produced in electronic form. No information, including but not limited to metadata or other information about the development, use, and transmittal of such documents, is to be removed or deleted from any documents produced in electronic format.

7. The relevant time period for the Subjects and the Documents requested below is January 1, 2000 through and including the present.

**Subjects**

1. MCI's policies and procedures (whether written or oral) regarding Litigation Holds.

2. Intermedia's policies and procedures (whether written or oral) regarding Litigation Holds.

3. Litigation Holds implemented by MCI that refer or relate to the Claimant.

4. Litigation Holds implemented by Intermedia that refer or relate to the Claimant.

5. Litigation Holds implemented by MCI that refer or relate to the Litigation.

6. Litigation Holds implemented by Intermedia that refer or relate to the Litigation.

7. Any and all oral and written instructions, communications, orders, directives, and/or requests to the employees, agents, officers, directors, and/or personnel of MCI and Intermedia to preserve, retain, make accessible and/or place a Litigation Hold on Documents related to any litigation in the Bankruptcy Cases since the petition dates of the Bankruptcy Cases.

8. Any and all oral and written instructions, communications, orders, directives, and/or requests to the employees, agents, officers, directors, and/or personnel of MCI and

Intermedia to preserve, retain, make accessible and/or place a Litigation Hold on Documents related to the Claimant.

9. Any and all oral and written instructions, communications, orders, directives, and/or requests to the employees, agents, officers, directors, and/or personnel of MCI and Intermedia to preserve, retain, make accessible and/or place a Litigation Hold on Documents related to the Litigation.

10. The efforts and activities of MCI, Intermedia, and their respective counsel (regardless of whether outside counsel or in-house counsel) to monitor, oversee, and ensure compliance by MCI and Intermedia's respective employees, agents, officers, directors, and/or personnel with any and all instructions, communications, orders, requests to preserve, retain, make accessible and/or place a Litigation Hold on Documents related to the Claimant.

11. The efforts and activities of MCI, Intermedia, and their respective counsel (regardless of whether outside counsel or in-house counsel) to monitor, oversee, and ensure compliance by MCI and Intermedia's respective employees, agents, officers, directors, and/or personnel with any and all instructions, communications, orders, requests to preserve, retain, make accessible and/or place a Litigation Hold on Documents related to the Litigation.

12. The dates during which any and all Litigation Holds regarding the Claimant were implemented.

13. The dates during which any and all Litigation Holds regarding the Litigation were implemented.

14. Any and all instructions, communications, directives, orders and/or requests made by MCI and Intermedia to their respective employees, agents, officers, directors and/or personnel to destroy, erase, purge and/or render inaccessible or unsearchable Documents regarding or relating to the Litigation or the Claimant.

15. Any and all matters that touch upon or relate to Litigation Holds relating to the Claimant.

16. Any and all matters that touch upon or relate to Litigation Holds relating to the Litigation.

17. Any and all matters that touch upon or relate to spoliation of evidence that refer or relates to the Claimant, including, but not limited to, spoliation of electronic Documents, email, and Hard Copy Documents.

18. Any and all matters that touch upon or relate to rendering accessible Documents (including electronic Documents, email, and Hard Copy Documents) inaccessible as a result of MCI and Intermedia's failure to implement, monitor and/or ensure compliance with a Litigation Hold with respect to the Claimant or the Litigation.

**Documents Requested**

1. All Documents that refer or relate to requests by the following Debtors to their employees, agents, officers, directors, and/or personnel to preserve, retain, make accessible and/or place a Litigation Hold on Documents related to the Claimant or the Litigation, including, but not limited to, Documents relating to the Person who made such request(s), when such request(s) were made, and to whom such request(s) were made: (a) Intermedia and (b) MCI.

2. All Documents that refer or relate to policies of the following Debtors regarding requests by the Debtors to their employees, agents, officers, directors, and/or personnel to preserve, retain, make accessible and/or place a Litigation Hold on Documents related to the Claimant or the Litigation: (a) Intermedia and (b) MCI.

3. All Documents that refer, relate to, and/or evidence compliance and/or non-compliance with requests by the following Debtors to their employees, agents, officers, directors, and/or personnel to preserve, retain, make accessible and/or place a Litigation Hold on Documents related to the Claimant or the Litigation: (a) Intermedia and (b) MCI.

4. All Documents that refer, relate to, and/or evidence all efforts by the following Debtors (and their counsel) to monitor compliance and/or non-compliance with requests to their employees, agents, officers, directors, and/or personnel to preserve, retain, make accessible and/or place a Litigation Hold on Documents related to the Claimant or the Litigation: (a) Intermedia and (b) MCI.

5. All Documents that refer or relate to the destruction, spoliation, corruption, loss, and/or failure to maintain and/or preserve Documents by the following Debtors that relate to the Litigation or the Claimant: (a) Intermedia and (b) MCI.

6. All Documents that refer or relate to the following Debtors' efforts to maintain and/or preserve Documents (regardless of whether such Documents are Hard Copy or electronic Documents) related to the Litigation or the Claimant in an accessible and/or searchable format: (a) Intermedia and (b) MCI.

7. All Documents that refer or relate to requests made by the following Debtors to destroy, erase, purge and/or render inaccessible or unsearchable Documents regarding or relating to the Litigation or the Claimant: (a) Intermedia and (b) MCI.

8. All Documents that identify Persons at the following Debtors with the authority to preserve, maintain, purge, and/or destroy Documents relating to the Litigation or the Claimant: (a) Intermedia and (b) MCI.

Robert A. Scher (RS 2910)
FOLEY & LARDNER LLP
90 Park Avenue
New York, NY 10016
Phone: (212) 682-7474
Fax: (212) 682-2329
email: rscher@foley.com

-and-

Mark L. Prager (*admitted pro hac vice*)
Jill L. Murch (*admitted pro hac vice*)
Joanne Lee (*admitted pro hac vice*)
FOLEY & LARDNER LLP
321 N. Clark Street, Suite 2800
Chicago, IL 60610
Phone: (312) 832-4500
Fax: (312) 832-4700

*Attorneys for Claimant Parus Holdings, Inc. Successor-By-Merger to EffectNet, Inc. and EffectNet, LLC*

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | CHAPTER 11 |
| | ) | Jointly Administered |
| WORLDCOM, INC., et al., | ) | |
| | ) | |
| Debtors. | ) | Case No. 02-13533 (AJG) |
| | ) | |

**NOTICE OF DEPOSITION**

To:
Allison Murdock
Stinson Morrison Hecker LLP
1201 Walnut Street, Suite 2900
Kansas City, Missouri 64106-2150

**PLEASE TAKE NOTICE THAT** pursuant to Federal Rule of Civil Procedure 30 and Federal Rule of Bankruptcy Procedure 7030, Parus Holdings, Inc. will take the deposition upon oral examination of the individual referenced herein on the date and time indicated, on the subjects set forth in the Rider attached hereo:

**Deponent:** **Jeffrey T. Hsu**
**Date:** **December 1, 2006**
**Time:** **9:00 a.m. (E.S.T.)**

**Place:** **Foley & Lardner LLP**
**Washington Harbour, 3000 K Street, NW**
**Suite 500, Washington, DC 20007-5101**

The deposition will be taken before an officer authorized to administer oaths and will be recorded by stenographic means. The deposition will be conducted in accordance with the Federal Rules of Civil Procedure and the Federal Rules of Bankruptcy Procedure, and will continue from day to day until completed, excluding weekends and holidays.

**PLEASE TAKE FURTHER NOTICE** that the individual referenced herein shall produce all documents as identified in the attached Rider to Subpoena.

Dated: November 15, 2006

Respectfully submitted,

By: ______________________

Robert A. Scher (RS 2910)
FOLEY & LARDNER LLP
90 Park Avenue
New York, NY 10016
Phone: (212) 682-7474

-and-

Mark L. Prager (*admitted pro hac vice*)
Jill L. Murch (*admitted pro hac vice*)
Joanne Lee (*admitted pro hac vice*)
FOLEY & LARDNER LLP
321 N. Clark Street, Suite 2800
Chicago, IL 60610
Phone: (312) 832-4500
Fax: (312) 832-4700

*Attorneys for Claimant Parus Holdings, Inc., Successor-By-Merger to EffectNet, Inc. and EffectNet, LLC*

**CERTIFICATE OF SERVICE**

The undersigned, a non-attorney, on oath states that on November 15, 2006 she caused a true and correct copy of the foregoing **Notice of Deposition**, to be served via overnight delivery:

Allison Murdock
Stinson Morrison Hecker LLP,
1201 Walnut Street, Suite 2900
Kansas City, Missouri 64106-2150
Tel: 816-842-8600
Fax: 816-691-3495

Katherine E. Hall

Sworn to before me this
15th day of November 2006

Notary Public, State of Illinois

OFFICIAL SEAL
YOLANDA C. PENÃ
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 7-8-2010

# United States Bankruptcy Court

DISTRICT OF COLUMBIA

In re:

**WORLDCOM, INC. et al.,**

Debtors.

**SUBPOENA IN A CASE UNDER THE BANKRUPTCY CODE**

Case No. 02-13533

*PENDING IN THE SOUTHERN DISTRICT OF NEW YORK*

11

To:
**Jeffrey T. Hsu, Heller Ehrman LLP**
**1717 Rhode Island Avenue NW, Washington, D.C. 20036**

☐ YOU ARE COMMANDED to appear in the United States Bankruptcy Court at the place, date, and time specified below to testify in the above case.

| PLACE | COURTROOM |
|---|---|
| | DATE AND TIME |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above adversary proceeding.

| PLACE | DATE AND TIME |
|---|---|
| **Offices of Foley & Lardner LLP**<br>**Washington Harbour, 3000 K Street, NW - Suite 500**<br>**Washington, DC 20007-5101** | **DECEMBER 1, 2006**<br>**9:00 a.m. (E.S.T.)** |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date and time specified below (list documents or objects):

**SEE ATTACHED RIDER**

| PLACE | DATE AND TIME |
|---|---|
| **Offices of Foley & Lardner LLP**<br>**Washington Harbour, 3000 K Street, NW - Suite 500**<br>**Washington, DC 20007-5101** | **DECEMBER 1, 2006**<br>**9:00 a.m. (E.S.T.)** |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any subpoenaed organization not a party to this adversary proceeding shall designate one or more officers, directors or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify, Fed.R.Civ.P. 30(b)(6) made applicable in adversary proceedings by Rule 7030, Fed.R.Bankr.P.

| ISSUING OFFICER SIGNATURE AND TITLE | DATE |
|---|---|
| [signature] **Attorney for Parus Holdings, Inc., Successor-By-Merger to EffectNet, Inc. and EffectNet, LLC** | **November 15, 2006** |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
**Joanne Lee**
**(312) 832-4500**

**Foley & Lardner LLP**
**321 North Clark Street, Suite 2800**
**Chicago, Illinois 60610**

CHIC_1369023.1

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |
| SERVED BY (PRINT NAME) | TITLE |
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on ______________________________
DATE

______________________________
SIGNATURE OF SERVER

______________________________
ADDRESS OF SERVER

______________________________

Rule 45, Fed.R.Civ.P., Parts (c) & (d) made applicable in cases under the Bankruptcy Code by Rule 9016, Fed.R. Bankr.P.

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2)(A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

**RIDER TO SUBPOENA**

**Definitions**

For purposes of these Subjects and Requests, the following terms are used with the indicated meanings:

1. "Document(s)" are used in the broadest possible sense and shall mean, without limitation, all written, printed, typed, photostatic, photographed, recorded, or otherwise reproduced communications or representations of every kind and description, whether comprised of letters, words, numbers, pictures, sounds, or symbols, or any combination thereof, whether prepared by hand or by mechanical, electronic, magnetic, photographic, or other means, as well as audio or video recordings of communications, oral statements, conversations, or events. This definition includes, but is not limited to, any and all originals and nonidentical copies of any and all of the following: electronic mail, computer-stored or computer-readable data, computer programs, computer printouts, correspondence, notes, minutes, records, messages, memoranda, telephone memoranda, diaries, contracts, agreements, invoices, orders, acknowledgements, receipts, bills, statements, appraisals, reports, forecasts, compilations, schedules, studies, summaries, analyses, pamphlets, brochures, advertisements, newspaper clippings, tables, tabulations, financial statements, working papers, tallies, maps, drawings, diagrams, sketches, x-rays, charts, labels, packaging materials, plans, photographs, pictures, film, microfilm, telegrams, telexes, telefacsimiles, tapes, transcripts, recordings, and all other sources or formats from which data, information, or communications can be obtained. Any preliminary versions, drafts, or revisions of any of the foregoing, any document which has or contains any attachment, enclosure, comment, notation, addition, insertion, or marking of any kind which is not a part of another document, or any document which does not contain a comment, notation, addition, insertion, or marking of any kind which is part of another document, is to be considered a separate document. "Document" and "documents" are used in the broadest possible sense and shall mean, without limitation, all written, printed, typed, photostatic, photographed, recorded, digital or otherwise reproduced communications or representations of every kind and description, however produced or reproduced, whether comprised of letters, words, numbers, pictures, sounds, or symbols, or any combination thereof, whether prepared by hand or by mechanical, electronic, magnetic, photographic, or other means and shall include, but not be limited to, any and all originals and nonidentical copies of any and all of the following: correspondence, notes, minutes, records, messages, memoranda, telephone memoranda, diaries, contracts, agreements, invoices, orders, acknowledgments, receipts, bills, statements, appraisals, reports, forecasts, compilations, schedules, studies, summaries, analyses, pamphlets, brochures, advertisements, newspaper clippings, tables, tabulations, financial statements, working papers, tallies, maps, drawings, diagrams, sketches, charts, labels, packaging, plans, photographs, pictures, film, microfilm, microfiche, computer-stored or computer-readable data (including any data contained on handheld electronic devices and phones), computer programs, electronic mail (a.k.a. email) computer printouts, telegrams, telexes, facsimiles, tapes, transcripts, recordings, and all other sources or formats from which data, information, or communications can be obtained. Any preliminary versions, drafts, or revisions of any of the foregoing, any document which has or

contains any attachment, enclosure, comment, notation, addition, insertion, or marking of any kind which is not a part of another document, or any document which does not contain a comment, notation, addition, insertion, or marking of any kind which is part of another document, is to be considered a separate document.

2. "Including" and "includes" shall be construed as referring only to an incomplete listing of illustrative examples and not as limiting or narrowing the generality of any definition, instruction or request.

3. "Refer," or "relate," or "regarding" shall mean evidencing, memorializing, comprising, connected with, mentioning, describing, containing, enumerating, involving or in any way concerning, pertaining, being connected with, reflecting upon, or resulting from a stated subject matter whether in whole or in part or directly or indirectly.

4. "Bankruptcy Cases" shall mean Intermedia Communications, Inc.'s chapter 11 bankruptcy case (Case No. 02-42154) and MCI Worldcom Communications, Inc.'s chapter 11 bankruptcy case (Case No. 02-42223), each pending before the United States Bankruptcy Court for the Southern District of New York and each jointly administered under In re Worldcom, Inc., et al. (02-13533).

5. "Claimant" shall mean Parus Holdings, Inc. (successor-by-merger to EffectNet, Inc. and EffectNet, LLC), EffectNet, LLC, EffectNet, Inc., Webley Systems, Inc., and their affiliates, predecessors or successors-in-interest, assigns, joint venturers, and former or present agents, including, but not limited to, officers, directors, employees, agents, contractors, accountants, advisors, attorneys, representatives, investigators, consultants, experts, representatives of any kind, and all other persons acting or purporting to act on their behalf.

6. "Debtors," shall mean Intermedia Communications, Inc., MCI Worldcom Communications, Inc., and their respective affiliates, predecessors or successors-in-interest, assigns, joint venturers, and former or present agents, including, but not limited to, officers, directors, employees, agents, contractors, accountants, advisors, attorneys, representatives, investigators, consultants, experts, representatives of any kind, and all other persons acting or purporting to act on their behalf.

7. "Hard Copy" shall mean all Documents that are in paper format. The term "Hard Copy" shall not include Documents that are in electronic format.

8. "Intermedia" shall mean Intermedia Communications, Inc. and its affiliates, predecessors or successors-in-interest, assigns, joint venturers, and former or present agents, including, but not limited to, officers, directors, employees, agents, contractors, accountants, advisors, attorneys, representatives, investigators, consultants, experts, representatives of any kind, and all other persons acting or purporting to act on its behalf. The term "Intermedia" shall not include MCI Worldcom Communications, Inc.

9. "Litigation" shall mean the litigation presently pending before the Bankruptcy Court that relates to the Claimant's Claim and the Debtors' Objection.

10. "Litigation Hold" shall mean any written or oral instruction, communication, order, or directive (whether by electronic means or Hard Copy Documents) to preserve, maintain, and keep accessible Documents.

11. "MCI" shall mean MCI Worldcom Communications, Inc. and its affiliates, predecessors or successors-in-interest, assigns, joint venturers, and former or present agents, including, but not limited to, officers, directors, employees, agents, contractors, accountants, advisors, attorneys, representatives, investigators, consultants, experts, representatives of any kind, and all other persons acting or purporting to act on its behalf. The term "MCI" shall not include Intermedia Communications, Inc.

12. "Person" shall mean any natural person (living or deceased), or any entity, including, but not limited to, a sole proprietorship, firm, partnership, corporation, business trust, association, joint venture, or any other organization or entity, and includes any respective former or present officer, director, partner, employee, or agent of any kind.

**Instructions**

1. In responding to these Requests, you are required to furnish all information that is within your possession, custody, control, or to which you have a legal right to demand the production of said responsive materials from others, including information in the possession of your attorneys, accountants, advisors, agents, or other persons directly or indirectly connected with you or your attorneys, and anyone else otherwise subject to your control.

2. In responding to these Requests, you are required to furnish all documents that respond, in whole or in part, to any portion of the Requests below in their entirety, including all attachments and enclosures.

3. With respect to any document or information which is withheld on a claim of privilege, the answer or response hereto shall provide a statement setting forth the following information:

a. The name(s) of the author(s) of the document;

b. The name(s) of the addressee(s) and all others who have received or read the document;

c. The names of those who have knowledge of the matters contained in the document;

d. The job title of each individual identified in (i), (ii), and (iii) above;

e. The date of the document;

f. The present location of the document and all copies of it;

g. The name of each and every person having custody or control of the document and all copies of it;

    h. A brief description of the nature and subject matter of the document; and

i. The nature and basis of the privilege and the person asserting the privilege.

4. Notwithstanding a claim that a document is protected from disclosure, any document so withheld must be produced with the portion claimed to be protected excised and/or redacted.

5. You are hereby requested to supplement each and every response as new information is discovered or becomes available, from now until the commencement of any hearing, substantive or otherwise. You are also under a continuing duty to correct any incorrect responses to these Requests.

6. You are to produce documents as they are kept in the usual course of business or organized and labeled to correspond with the categories itemized in the below Requests. Documents that are ordinarily kept in electronic form are to be produced in electronic form. No information, including but not limited to metadata or other information about the development, use, and transmittal of such documents, is to be removed or deleted from any documents produced in electronic format.

7. The relevant time period for the Subjects and the Documents requested below is January 1, 2000 through and including the present.

**Subjects**

1. MCI's policies and procedures (whether written or oral) regarding Litigation Holds.

2. Intermedia's policies and procedures (whether written or oral) regarding Litigation Holds.

3. Litigation Holds implemented by MCI that refer or relate to the Claimant.

4. Litigation Holds implemented by Intermedia that refer or relate to the Claimant.

5. Litigation Holds implemented by MCI that refer or relate to the Litigation.

6. Litigation Holds implemented by Intermedia that refer or relate to the Litigation.

7. Any and all oral and written instructions, communications, orders, directives, and/or requests to the employees, agents, officers, directors, and/or personnel of MCI and Intermedia to preserve, retain, make accessible and/or place a Litigation Hold on Documents related to any litigation in the Bankruptcy Cases since the petition dates of the Bankruptcy Cases.

8. Any and all oral and written instructions, communications, orders, directives, and/or requests to the employees, agents, officers, directors, and/or personnel of MCI and

Intermedia to preserve, retain, make accessible and/or place a Litigation Hold on Documents related to the Claimant.

9. Any and all oral and written instructions, communications, orders, directives, and/or requests to the employees, agents, officers, directors, and/or personnel of MCI and Intermedia to preserve, retain, make accessible and/or place a Litigation Hold on Documents related to the Litigation.

10. The efforts and activities of MCI, Intermedia, and their respective counsel (regardless of whether outside counsel or in-house counsel) to monitor, oversee, and ensure compliance by MCI and Intermedia's respective employees, agents, officers, directors, and/or personnel with any and all instructions, communications, orders, requests to preserve, retain, make accessible and/or place a Litigation Hold on Documents related to the Claimant.

11. The efforts and activities of MCI, Intermedia, and their respective counsel (regardless of whether outside counsel or in-house counsel) to monitor, oversee, and ensure compliance by MCI and Intermedia's respective employees, agents, officers, directors, and/or personnel with any and all instructions, communications, orders, requests to preserve, retain, make accessible and/or place a Litigation Hold on Documents related to the Litigation.

12. The dates during which any and all Litigation Holds regarding the Claimant were implemented.

13. The dates during which any and all Litigation Holds regarding the Litigation were implemented.

14. Any and all instructions, communications, directives, orders and/or requests made by MCI and Intermedia to their respective employees, agents, officers, directors and/or personnel to destroy, erase, purge and/or render inaccessible or unsearchable Documents regarding or relating to the Litigation or the Claimant.

15. Any and all matters that touch upon or relate to Litigation Holds relating to the Claimant.

16. Any and all matters that touch upon or relate to Litigation Holds relating to the Litigation.

17. Any and all matters that touch upon or relate to spoliation of evidence that refer or relates to the Claimant, including, but not limited to, spoliation of electronic Documents, email, and Hard Copy Documents.

18. Any and all matters that touch upon or relate to rendering accessible Documents (including electronic Documents, email, and Hard Copy Documents) inaccessible as a result of MCI and Intermedia's failure to implement, monitor and/or ensure compliance with a Litigation Hold with respect to the Claimant or the Litigation.

**Documents Requested**

1. All Documents that refer or relate to requests by the following Debtors to their employees, agents, officers, directors, and/or personnel to preserve, retain, make accessible and/or place a Litigation Hold on Documents related to the Claimant or the Litigation, including, but not limited to, Documents relating to the Person who made such request(s), when such request(s) were made, and to whom such request(s) were made: (a) Intermedia and (b) MCI.

2. All Documents that refer or relate to policies of the following Debtors regarding requests by the Debtors to their employees, agents, officers, directors, and/or personnel to preserve, retain, make accessible and/or place a Litigation Hold on Documents related to the Claimant or the Litigation: (a) Intermedia and (b) MCI.

3. All Documents that refer, relate to, and/or evidence compliance and/or non-compliance with requests by the following Debtors to their employees, agents, officers, directors, and/or personnel to preserve, retain, make accessible and/or place a Litigation Hold on Documents related to the Claimant or the Litigation: (a) Intermedia and (b) MCI.

4. All Documents that refer, relate to, and/or evidence all efforts by the following Debtors (and their counsel) to monitor compliance and/or non-compliance with requests to their employees, agents, officers, directors, and/or personnel to preserve, retain, make accessible and/or place a Litigation Hold on Documents related to the Claimant or the Litigation: (a) Intermedia and (b) MCI.

5. All Documents that refer or relate to the destruction, spoliation, corruption, loss, and/or failure to maintain and/or preserve Documents by the following Debtors that relate to the Litigation or the Claimant: (a) Intermedia and (b) MCI.

6. All Documents that refer or relate to the following Debtors' efforts to maintain and/or preserve Documents (regardless of whether such Documents are Hard Copy or electronic Documents) related to the Litigation or the Claimant in an accessible and/or searchable format: (a) Intermedia and (b) MCI.

7. All Documents that refer or relate to requests made by the following Debtors to destroy, erase, purge and/or render inaccessible or unsearchable Documents regarding or relating to the Litigation or the Claimant: (a) Intermedia and (b) MCI.

8. All Documents that identify Persons at the following Debtors with the authority to preserve, maintain, purge, and/or destroy Documents relating to the Litigation or the Claimant: (a) Intermedia and (b) MCI.

Robert A. Scher (RS 2910)
FOLEY & LARDNER LLP
90 Park Avenue
New York, NY 10016
Phone: (212) 682-7474
Fax: (212) 682-2329
email: rscher@foley.com

-and-

Mark L. Prager (*admitted pro hac vice)*
Jill L. Murch (*admitted pro hac vice*)
Joanne Lee (*admitted pro hac vice*)
FOLEY & LARDNER LLP
321 N. Clark Street, Suite 2800
Chicago, IL 60610
Phone: (312) 832-4500
Fax: (312) 832-4700

*Attorneys for Claimant Parus Holdings, Inc. Successor-By-Merger to EffectNet, Inc. and EffectNet, LLC*

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | CHAPTER 11 |
| | ) | Jointly Administered |
| WORLDCOM, INC., et al., | ) | |
| | ) | |
| Debtors. | ) | Case No. 02-13533 (AJG) |
| | ) | |

**NOTICE OF 30(b)(6) DEPOSITION OF DEBTORS**

**PLEASE TAKE NOTICE** that pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Parus Holdings, Inc., Successor-By-Merger to EffectNet, Inc. and EffectNet, LLC ("Parus") will take the deposition of Intermedia Communications, Inc. and MCI WorldCom Communications, Inc. ("Debtors"). The deposition will commence at 9:00 a.m. (C.S.T.) on December 4, 2006, at the office of Foley & Lardner LLP, 321 N. Clark Street, Suite 2800, Chicago, Illinois 60610, or at such other time and place as may be agreed upon by counsel and shall continue until adjourned or completed. The examination will be on the subjects set forth in the Rider attached hereto.

This 30(b)(6) deposition of the Debtors will be taken before a notary public or other officer authorized by law to administer oaths and will be recorded by stenographic means and

may also be recorded by sound-and-visual means.

**PLEASE TAKE FURTHER NOTICE** that the 30(b)(6) deponent herein shall produce all documents as requested in the attached Rider.

Dated: November 15, 2006

Respectfully submitted,

By: [signature]

Robert A. Scher (RS 2910)
FOLEY & LARDNER LLP
90 Park Avenue
New York, NY 10016
Phone: (212) 682-7474

-and-

Mark L. Prager (*admitted pro hac vice*)
Jill L. Murch (*admitted pro hac vice*)
Joanne Lee (*admitted pro hac vice*)
FOLEY & LARDNER LLP
321 N. Clark Street, Suite 2800
Chicago, IL 60610
Phone: (312) 832-4500
Fax: (312) 832-4700

*Attorneys for Claimant Parus Holdings, Inc., Successor-By-Merger to EffectNet, Inc. and EffectNet, LLC*

**CERTIFICATE OF SERVICE**

The undersigned, a non-attorney, on oath states that on November 15, 2006 she caused a true and correct copy of the foregoing **NOTICE OF 30(b)(6) DEPOSITION OF DEBTORS**, to be served via overnight delivery:

Allison Murdock
Stinson Morrison Hecker LLP,
1201 Walnut Street, Suite 2900
Kansas City, Missouri 64106-2150
Tel: 816-842-8600
Fax: 816-691-3495

Katherine E. Hall

Sworn to before me this
15th day of November 2006

Notary Public, State of Illinois

OFFICIAL SEAL
YOLANDA C. PENÃ
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 7-8-2010

**RIDER TO 30(b)(6) NOTICE OF DEPOSITION**

Pursuant to Federal Rule of Bankruptcy Procedure 7030(b)(6), Intermedia Communications, Inc. ("Intermedia") and MCI WorldCom Communications, Inc. ("MCI WorldCom") are requested to provide to Parus Holdings, Inc.'s ("Parus") counsel the following information three (3) days prior to the deposition date: (1) the identity of the person(s) designated for deposition for the Subjects set forth herein; and (2) the subject matter(s) to which each person will testify.

Copies of all documents shall be produced in person at the deposition.

**DEFINITIONS**

For purposes of these Subjects and Requests, the following terms are used with the indicated meanings:

1. "Document(s)" are used in the broadest possible sense and shall mean, without limitation, all written, printed, typed, photostatic, photographed, recorded, or otherwise reproduced communications or representations of every kind and description, whether comprised of letters, words, numbers, pictures, sounds, or symbols, or any combination thereof, whether prepared by hand or by mechanical, electronic, magnetic, photographic, or other means, as well as audio or video recordings of communications, oral statements, conversations, or events. This definition includes, but is not limited to, any and all originals and nonidentical copies of any and all of the following: electronic mail, computer-stored or computer-readable data, computer programs, computer printouts, correspondence, notes, minutes, records, messages, memoranda, telephone memoranda, diaries, contracts, agreements, invoices, orders, acknowledgements, receipts, bills, statements, appraisals, reports, forecasts, compilations, schedules, studies, summaries, analyses, pamphlets, brochures, advertisements, newspaper clippings, tables, tabulations, financial statements, working papers, tallies, maps, drawings, diagrams, sketches, x-rays, charts, labels, packaging materials, plans, photographs, pictures, film, microfilm, telegrams, telexes, telefacsimiles, tapes, transcripts, recordings, and all other sources or formats from which data, information, or communications can be obtained. Any preliminary versions, drafts, or revisions of any of the foregoing, any document which has or contains any attachment, enclosure, comment, notation, addition, insertion, or marking of any kind which is not a part of another document, or any document which does not contain a comment, notation, addition, insertion, or marking of any kind which is part of another document, is to be considered a separate document. "Document" and "documents" are used in the broadest possible sense and shall mean, without limitation, all written, printed, typed, photostatic, photographed, recorded, digital or otherwise reproduced communications or representations of every kind and description,

however produced or reproduced, whether comprised of letters, words, numbers, pictures, sounds, or symbols, or any combination thereof, whether prepared by hand or by mechanical, electronic, magnetic, photographic, or other means and shall include, but not be limited to, any and all originals and nonidentical copies of any and all of the following: correspondence, notes, minutes, records, messages, memoranda, telephone memoranda, diaries, contracts, agreements, invoices, orders, acknowledgments, receipts, bills, statements, appraisals, reports, forecasts, compilations, schedules, studies, summaries, analyses, pamphlets, brochures, advertisements, newspaper clippings, tables, tabulations, financial statements, working papers, tallies, maps, drawings, diagrams, sketches, charts, labels, packaging, plans, photographs, pictures, film, microfilm, microfiche, computer-stored or computer-readable data (including any data contained on handheld electronic devices and phones), computer programs, electronic mail (a.k.a. email) computer printouts, telegrams, telexes, facsimiles, tapes, transcripts, recordings, and all other sources or formats from which data, information, or communications can be obtained. Any preliminary versions, drafts, or revisions of any of the foregoing, any document which has or contains any attachment, enclosure, comment, notation, addition, insertion, or marking of any kind which is not a part of another document, or any document which does not contain a comment, notation, addition, insertion, or marking of any kind which is part of another document, is to be considered a separate document.

2. "Including" and "includes" shall be construed as referring only to an incomplete listing of illustrative examples and not as limiting or narrowing the generality of any definition, instruction or request.

3. "Refer," or "relate," or "regarding" shall mean evidencing, memorializing, comprising, connected with, mentioning, describing, containing, enumerating, involving or in any way concerning, pertaining, being connected with, reflecting upon, or resulting from a stated subject matter whether in whole or in part or directly or indirectly.

4. "Bankruptcy Cases" shall mean Intermedia Communications, Inc.'s chapter 11 bankruptcy case (Case No. 02-42154) and MCI Worldcom Communications, Inc.'s chapter 11 bankruptcy case (Case No. 02-42223), each pending before the United States Bankruptcy Court for the Southern District of New York and each jointly administered under In re Worldcom, Inc., et al. (02-13533).

5. "Claimant" shall mean Parus Holdings, Inc. (successor-by-merger to EffectNet, Inc. and EffectNet, LLC), EffectNet, LLC, EffectNet, Inc., Webley Systems, Inc., and their affiliates, predecessors or successors-in-interest, assigns, joint venturers, and former or present agents, including, but not limited to, officers, directors, employees, agents, contractors, accountants, advisors, attorneys, representatives, investigators, consultants, experts, representatives of any kind, and all other persons acting or purporting to act on their behalf.

6. "Debtors," "you," and "your" shall mean Intermedia Communications, Inc., MCI Worldcom Communications, Inc., and their respective affiliates, predecessors or successors-in-interest, assigns, joint venturers, and former or present agents, including, but not limited to, officers, directors, employees, agents, contractors, accountants, advisors, attorneys, representatives, investigators, consultants, experts, representatives of any kind, and all other persons acting or purporting to act on their behalf.

7. "Hard Copy" shall mean all Documents that are in paper format. The term "Hard Copy" shall not include Documents that are in electronic format.

8. "Intermedia" shall mean Intermedia Communications, Inc. and its affiliates, predecessors or successors-in-interest, assigns, joint venturers, and former or present agents, including, but not limited to, officers, directors, employees, agents, contractors, accountants, advisors, attorneys, representatives, investigators, consultants, experts, representatives of any kind, and all other persons acting or purporting to act on its behalf. The term "Intermedia" shall not include MCI Worldcom Communications, Inc.

9. "Litigation" shall mean the litigation presently pending before the Bankruptcy Court that relates to the Claimant's Claim and the Debtors' Objection.

10. "Litigation Hold" shall mean any written or oral instruction, communication, order, or directive (whether by electronic means or Hard Copy Documents) to preserve, maintain, and keep accessible Documents.

11. "MCI" shall mean MCI Worldcom Communications, Inc. and its affiliates, predecessors or successors-in-interest, assigns, joint venturers, and former or present agents, including, but not limited to, officers, directors, employees, agents, contractors, accountants, advisors, attorneys, representatives, investigators, consultants, experts, representatives of any kind, and all other persons acting or purporting to act on its behalf. The term "MCI" shall not include Intermedia Communications, Inc.

12. "Person" shall mean any natural person (living or deceased), or any entity, including, but not limited to, a sole proprietorship, firm, partnership, corporation, business trust, association, joint venture, or any other organization or entity, and includes any respective former or present officer, director, partner, employee, or agent of any kind.

## INSTRUCTIONS

1. In responding to these Requests, you are required to furnish all information that is within your possession, custody, control, or to which you have a legal right to demand the production of said responsive materials from others, including information in the possession of your attorneys, accountants, advisors, agents, or other persons directly or indirectly connected with you or your attorneys, and anyone else otherwise subject to your control.

2. In responding to these Requests, you are required to furnish all documents that respond, in whole or in part, to any portion of the Requests below in their entirety, including all attachments and enclosures.

3. With respect to any document or information which is withheld on a claim of privilege, the answer or response hereto shall provide a statement setting forth the following information:

a. The name(s) of the author(s) of the document;

b. The name(s) of the addressee(s) and all others who have received or read the document;

c. The names of those who have knowledge of the matters contained in the document;

d. The job title of each individual identified in (i), (ii), and (iii) above;

e. The date of the document;

f. The present location of the document and all copies of it;

g. The name of each and every person having custody or control of the document and all copies of it;

h. A brief description of the nature and subject matter of the document; and

i. The nature and basis of the privilege and the person asserting the privilege.

4. Notwithstanding a claim that a document is protected from disclosure, any document so withheld must be produced with the portion claimed to be protected excised and/or redacted.

5. You are hereby requested to supplement each and every response as new information is discovered or becomes available, from now until the commencement of any hearing, substantive or otherwise. You are also under a continuing duty to correct any incorrect responses to these Requests.

6. You are to produce documents as they are kept in the usual course of business or organized and labeled to correspond with the categories itemized in the below Requests. Documents that are ordinarily kept in electronic form are to be produced in electronic form. No information, including but not limited to metadata or other information about the development, use, and transmittal of such documents, is to be removed or deleted from any documents produced in electronic format.

7. The relevant time period for the Subjects and the Documents requested below is January 1, 2000 through and including the present.

**SUBJECTS**

1. MCI's policies and procedures (whether written or oral) regarding Litigation Holds.

2. Intermedia's policies and procedures (whether written or oral) regarding Litigation Holds.

3. Litigation Holds implemented by MCI that refer or relate to the Claimant.

4. Litigation Holds implemented by Intermedia that refer or relate to the Claimant.

5. Litigation Holds implemented by MCI that refer or relate to the Litigation.

6. Litigation Holds implemented by Intermedia that refer or relate to the Litigation.

7. Any and all oral and written instructions, communications, orders, directives, and/or requests to the employees, agents, officers, directors, and/or personnel of MCI and Intermedia to preserve, retain, make accessible and/or place a Litigation Hold on Documents related to any litigation in the Bankruptcy Cases since the petition dates of the Bankruptcy Cases.

8. Any and all oral and written instructions, communications, orders, directives, and/or requests to the employees, agents, officers, directors, and/or personnel of MCI and Intermedia to preserve, retain, make accessible and/or place a Litigation Hold on Documents related to the Claimant.

9. Any and all oral and written instructions, communications, orders, directives, and/or requests to the employees, agents, officers, directors, and/or personnel of MCI and Intermedia to preserve, retain, make accessible and/or placc a Litigation Hold on Documents related to the Litigation.

10. The efforts and activities of MCI, Intermedia, and their respective counsel (regardless of whether outside counsel or in-house counsel) to monitor, oversee, and ensure compliance by MCI and Intermedia's respective employees, agents, officers, directors, and/or personnel with any and all instructions, communications, orders, requests to preserve, retain, make accessible and/or place a Litigation Hold on Documents related to the Claimant.

11. The efforts and activities of MCI, Intermedia, and their respective counsel (regardless of whether outside counsel or in-house counsel) to monitor, oversee, and ensure compliance by MCI and Intermedia's respective employees, agents, officers, directors, and/or personnel with any and all instructions, communications, orders, requests to preserve, retain, make accessible and/or place a Litigation Hold on Documents related to the Litigation.

12. The dates during which any and all Litigation Holds regarding the Claimant were implemented.

13. The dates during which any and all Litigation Holds regarding the Litigation were implemented.

14. Any and all instructions, communications, directives, orders and/or requests made by MCI and Intermedia to their respective employees, agents, officers, directors and/or personnel to destroy, erase, purge and/or render inaccessible or unsearchable Documents regarding or relating to the Litigation or the Claimant.

15. Any and all matters that touch upon or relate to Litigation Holds relating to the Claimant.

16. Any and all matters that touch upon or relate to Litigation Holds relating to the Litigation.

17. Any and all matters that touch upon or relate to spoliation of evidence that refer or relates to the Claimant, including, but not limited to, spoliation of electronic Documents, email, and Hard Copy Documents.

18. Any and all matters that touch upon or relate to rendering accessible Documents (including electronic Documents, email, and Hard Copy Documents) inaccessible as a result of MCI and Intermedia's failure to implement, monitor and/or ensure compliance with a Litigation Hold with respect to the Claimant or the Litigation.

## DOCUMENTS REQUESTED

1. All Documents that refer or relate to requests by the following Debtors to their employees, agents, officers, directors, and/or personnel to preserve, retain, make accessible and/or place a Litigation Hold on Documents related to the Claimant or the Litigation, including, but not limited to, Documents relating to the Person who made such request(s), when such request(s) were made, and to whom such request(s) were made: (a) Intermedia and (b) MCI.

2. All Documents that refer or relate to policies of the following Debtors regarding requests by the Debtors to their employees, agents, officers, directors, and/or personnel to preserve, retain, make accessible and/or place a Litigation Hold on Documents related to the Claimant or the Litigation: (a) Intermedia and (b) MCI.

3. All Documents that refer, relate to, and/or evidence compliance and/or non-compliance with requests by the following Debtors to their employees, agents, officers, directors, and/or personnel to preserve, retain, make accessible and/or place a Litigation Hold on Documents related to the Claimant or the Litigation: (a) Intermedia and (b) MCI.

4. All Documents that refer, relate to, and/or evidence all efforts by the following Debtors (and their counsel) to monitor compliance and/or non-compliance with requests to their employees, agents, officers, directors, and/or personnel to preserve, retain, make accessible and/or place a Litigation Hold on Documents related to the Claimant or the Litigation: (a) Intermedia and (b) MCI.

5. All Documents that refer or relate to the destruction, spoliation, corruption, loss, and/or failure to maintain and/or preserve Documents by the following Debtors that relate to the Litigation or the Claimant: (a) Intermedia and (b) MCI.

6. All Documents that refer or relate to the following Debtors' efforts to maintain and/or preserve Documents (regardless of whether such Documents are Hard Copy or electronic Documents) related to the Litigation or the Claimant in an accessible and/or searchable format: (a) Intermedia and (b) MCI.

7. All Documents that refer or relate to requests made by the following Debtors to destroy, erase, purge and/or render inaccessible or unsearchable Documents regarding or relating to the Litigation or the Claimant: (a) Intermedia and (b) MCI.

8. All Documents that identify Persons at the following Debtors with the authority to preserve, maintain, purge, and/or destroy Documents relating to the Litigation or the Claimant: (a) Intermedia and (b) MCI.

EXHIBIT H

D00409

STINSON MORRISON HECKER LLP

Robert L. Driscoll, Esq.
Allison M. Murdock, Esq.
Mark M. Iba, Esq.
1201 Walnut Street
Kansas City, MO 64106
Telephone: (816) 842-8600
Facsimile: (816) 691-3495
Attorneys for Reorganized Debtors

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | : | |
| | : | Chapter 11 Case No. 02-13533 (AJG) |
| WORLDCOM, INC., *et al.*, | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |

**DEBTORS' RESPONSE TO CLAIMANT'S QUESTIONS REGARDING "LITIGATION HOLD"**

Debtors MCI WorldCom Communications, Inc. ("MCI") and Intermedia Communications, Inc. ("Intermedia") (collectively "Debtors") provide the following responses to the questions regarding "litigation hold" served by Claimant Parus Holdings, Inc. successor-by-merger to EffectNet, Inc. and EffectNet, LLC ("Claimant") on November 21, 2006.[1]

**General Objection**

Claimant's questions use the phrase "litigation hold" without explanation or definition. If Claimant intends "litigation hold" to be defined as set forth in Claimant's Second Request for

[1] Claimant served these questions after Debtors objected to subpoenas served on their former in-house litigation counsel Jeffrey Hsu and David Wachen and to a notice of deposition served on Debtors pursuant to Fed. R. Civ. P. 30(b)(6) because they sought information and documents protected from disclosure by the attorney-client privilege and/or litigation work product immunity.

Production of Documents served on October 20, 2006, Debtors object to that definition. In its second document request, Claimant defines "litigation hold" to mean "an express written or oral instruction, order or directive to preserve and/or maintain documents." This definition fails to acknowledge or include the concept that a duty to preserve documents does not arise until the party is put on notice that litigation is reasonably anticipated. Even then, the obligation is limited to a duty to preserve documents that are relevant to the anticipated claim. The existence of a duty to take affirmative steps to preserve documents, as well as the scope and extent of any such duty, must also be evaluated in the context of the Debtors' bankruptcy filing in which over 60,000 claims were asserted. Thus, Debtors object to Claimant's definition of "litigation hold" because it improperly attempts to impose or assume a legal obligation to preserve certain documents at times when no such obligation existed.

**Specific Objections and Responses**

Subject to and without waiving the foregoing general objection, Debtors respond to Claimant's questions as follows:

**Question 1. On what date did Intermedia and MCI believe that a possible threat of litigation with EffectNet/Parus existed.**

**Answer.** Regarding the breach of contract claim, Debtors have not identified the date on which they first believed that a possible or likely threat of litigation existed regarding Claimant's claim that Intermedia failed to make reconciliation payments in breach of the Unified Communications Services General Agreement dated November 20, 2000 between Intermedia and EffectNet LLC ("UC Contract"). Although Claimant did not bill Intermedia for reconciliation payments under the UC Contract until February 2002, during March 2002,

Claimant's General Counsel advised that if Intermedia did not make those reconciliation payments on or before April 12, 2002, the UC Contract would terminate on that date pursuant to §5.2 of the contract and that Claimant "may claim damages for all amounts due pursuant to the [UC Contract]." Intermedia did not make the reconciliation payments that Claimant claimed were due. Nevertheless, Claimant did not assert any claim for breach of contract until after WorldCom had instituted bankruptcy proceedings on July 21, 2002.

Regarding consequential damage and tort claims, Debtors had no reason to believe that there was a threat or likelihood of litigation before Claimant actually asserted such claims. This is true for three reasons. First, under section §11 of the UC Contract, the parties (which include Parus Holdings, Inc. and WorldCom as successors by merger to EffectNet LLC and Intermedia, respectively) may not assert any claims for consequential damages against each other. Second, WorldCom and Intermedia were prohibited from engaging in the type of business activities that Claimant has alleged as the bases for its consequential damage and tort claims. Specifically, from and after November 17, 2000, WorldCom and Intermedia were subject to a Hold Separate Stipulation and Order entered into with the United States Department of Justice and filed with the federal court requiring WorldCom and Intermedia to maintain the business operations of Intermedia (including its contractual relationships) separate from and uninfluenced by WorldCom. See Hold Separate Stipulation and Order dated November 17, 2000, USA v. WorldCom, Inc. & Intermedia Communications, Inc., D.D.C., Case No. 1:00CV02789 (RWR) (attached as Exhibit A). Third,

Intermedia was a subsidiary of WorldCom on and after July 1, 2001. As a matter of black letter law, a subsidiary cannot conspire with its parent, nor does a claim lie for a parent interfering with its contracts, which are what Claimant has alleged. Debtors did not know (nor did they have any reason to know) that the Claimant was going to make such allegations until after Claimant filed its claim in the bankruptcy proceeding. Prior to reviewing Claimant's filing – which was one of over 60,000 claims filed in WorldCom's bankruptcy proceeding – Debtors believed that Claimant was seeking only unpaid reconciliation payments under the UC Contract raised in 2002.

**Question 2.** **On what date did Intermedia and MCI determine that litigation with EffectNet/Parus was likely to occur or may occur.**

**Answer.** See Debtor's response to Question No. 1.

**Question 3.** **On what date Intermedia and MCI should have known that there was a possible threat of litigation with EffectNet/Parus.**

**Answer.** Debtors object to this request as seeking a legal conclusion, not facts. Without waiving this objection, see Debtors' response to Question No. 1.

**Question 4.** **Which persons at Intermedia and MCI identified the threat or possibility of litigation with EffectNet/Parus and how was such threat or possibility determined.**

**Answer.** Debtors' in-house counsel identified the threat or possibility of litigation with Claimant concerning an alleged breach of contract after Intermedia failed to make certain reconciliation payments on or before April 12, 2002 based on correspondence from Claimant's General Counsel stating (1) that the UC Contract

would be terminated as of April 12, 2002 pursuant to §5.2 of that contract if Intermedia did not make certain payments by that date and (2) that Claimant "may claim damages for all amounts due pursuant to the [UC Contract]" if Intermedia did not make those payments.

Debtors did not identify a threat or possibility of litigation with Claimant concerning any consequential damages or tort claims until Claimant actually asserted those claims in WorldCom's bankruptcy proceeding. Debtors' counsel determined that such claims had been made by evaluating Claimant's proofs of claim among the over 60,000 of proofs of claim filed in the bankruptcy proceeding.

**Question 5.** **Was the possible threat of litigation with EffectNet/Parus identified as part of the due diligence related to the MCI/Intermedia merger. If yes, on what date, by whom, and how so.**

**Answer.** For purposes of responding to this question, Debtors assume that the phrase "the due diligence related to the MCI/Intermedia merger" means during the time preceding the July 1, 2001 effective date of the MCI/Intermedia merger during which the parties were undertaking pre-merger due diligence. Based on that assumption, as of July 1, 2001, Intermedia had not yet failed to make the reconciliation payments which underlie Claimant's breach of contract claim, and Claimant had not yet made known its consequential damage or tort claims. In addition, all of the acts that Claimant has advanced to support its consequential damage and tort claims took place after July 1, 2001. Accordingly, Debtors do not believe that a possible threat of litigation was identified, nor could have been

identified, during the due diligence period regarding either the breach of contract or consequential damage and tort claims, both of which were only asserted by Claimant after July 1, 2001. Please also see Debtors' responses to Question Nos. 1 and 4.

**Question 6. On what date(s) did Intermedia and MCI implement a litigation hold relating to EffectNet/Parus.**

**Answer.** Subject to and without waiving the general objection set forth above regarding Claimant's use of the phrase "litigation hold," Debtors respond to Question No. 6 as follows: Concerning Claimant's breach of contract claims, after being advised by Claimant that the UC Contract would terminate on April 12, 2002 and that Claimant "may claim damages for all amounts due pursuant to the [UC Contract]" unless Intermedia made certain payments under that contract on or before April 12, 2002, coupled with the fact that Intermedia did not make the demanded payments, Debtors' in-house counsel preserved (1) correspondence from Claimant's General Counsel advising of the possible contract claim, and (2) the UC Contract itself. Further, pursuant to a Stipulation and Order entered on July 1, 2002 in the matter of S.E.C. v. WorldCom, Inc., Case No. 1:02-cv-04963-JSR (the "Order") (attached as Exhibit B), "WorldCom, its officers, agents, accountants, employees, and attorneys, and those persons in active concert or participation with them" preserved all documents "relating to, referring to or concerning any aspect of WorldCom's financial reporting obligations, public disclosures required by the federal securities laws, or any accounting matters relating to WorldCom...." To comply with this Order, WorldCom and its

affiliates preserved all daily backup tapes of their email systems (including Intermedia's email system), as well as non-email electronic data and paper documents encompassed by the Order.

**Question 7.** **How was the litigation hold regarding EffectNet/Parus implemented. More specifically, (a) who initiated the litigation hold; (b) the names of all persons involved in implementing the litigation hold and their respective responsibilities; (c) how was the litigation hold communicated to persons at MCI and Intermedia; (c) [sic] what was the scope of the documents subject to the litigation hold (i.e., all documents relating to EffectNet or Parus or a subset of such information); (d) did Intermedia and MCI identify or compile a list of persons who had information that would be need to be preserved pursuant to the litigation hold and if yes, where is that list presently located; (e) which persons at MCI and Intermedia were instructed to preserve documents (both electronic and hard copy) relating to EffectNet/Parus; (f) whether such persons complied with the litigation hold; (g) how such persons complied with the litigation hold; (h) whether documents subject to the litigation hold were ever destroyed, purged, or rendered inaccessible and why such documents were destroyed, purged, or rendered inaccessible; and (i) whether any outside third parties were used to assist with implementing the litigation hold and if yes, who.**

**Answer.** Subject to and without waiving the general objection set forth above regarding Claimant's use of the phrase "litigation hold," Debtors respond to Question No. 7 as follows:

(a) The Honorable Jed S. Rakoff entered the Stipulation and Order in the matter of S.E.C. v. WorldCom, Inc., Case No. 1:02-cv-04963-JSR, on July 1, 2002, directing "WorldCom, its officers, agents, accountants, employees, and attorneys, and those persons in active concert or participation with them" to preserve all documents "relating to, referring to or concerning any aspect of WorldCom's financial reporting obligations, public disclosures required by the federal securities laws, or any accounting matters relating to WorldCom...." To comply with this Order, WorldCom and its affiliates preserved all daily backup tapes of their email systems (including Intermedia's email system). Debtors also preserved non-email electronic data encompassed by the Order, as subsequently modified or varied by agreement of the parties with regard to such data. Debtors also preserved paper documents encompassed by the Order.

In-house counsel for MCI preserved (1) correspondence from Claimant's General Counsel advising of the possible contract claim, and (2) the UC Contract. The people who would have participated in preserving these documents included in-house counsel Brett Bacon, Jeffrey Hsu, and the in-house counsel who succeeded them.

David Wachen, in-house counsel for MCI, and Sharon Stolte, Donald Ramsay, and Lawrence Bigus, attorneys with Stinson Morrison Hecker LLP, were responsible for attempting to locate documents related to the claims asserted by Claimant in WorldCom's bankruptcy proceeding, the UC Contract, the relationship between Claimant and Debtors, and the relationship between Webley Systems, Inc. ("Webley") and Debtors with regard to the September 14, 2001

Master Agreement for Software Licenses ("MASL"). These individuals also were responsible for directing that such documents be preserved for purposes of litigating Claimant's claims.

(b) "WorldCom, its officers, agents, accountants, employees, and attorneys, and those persons in active concert or participation with them" were responsible for implementing the preservation of the documents identified in Judge Rakoff's July 1, 2002 Order. In addition, Jeffrey Jacobs, Associate Litigation Counsel for MCI, was responsible for distributing Judge Rakoff's July 1, 2002 Order to WorldCom's information technology employees. Julio Valdes, Bryan Miller and Joseph Falleur and employees in their respective IT-related departments were responsible for preserving the daily backup tapes of WorldCom and its affiliates' email systems (including Intermedia's email system) in response to Judge Rakoff's July 1, 2002 Order.

In-house counsel for MCI preserved (1) correspondence from Claimant's General Counsel advising of the possible contract claim, and (2) the UC Contract. The people who would have participated in preserving these documents included in-house counsel Brett Bacon, Jeffrey Hsu, and the in-house counsel who succeeded them.

Philip Hasselvander, in the Debtors' Records Information and Management department, preserved the boxes of stored paper documents of MCI and Intermedia that might relate to Claimant's claims, the UC Contract, the relationship between Claimant and Debtors, and the relationship between Webley and Debtors by delivering to counsel all boxes that counsel requested. Claimant

has been provided with copies of the indices of the stored boxes of Debtors' documents related to Intermedia and with a list of the boxes from those indices that Debtors' counsel reviewed.

Julio Valdes testified at his deposition that, in addition to preserving email backup tapes as described above, he also preserved the Intermedia backup tapes for the time period identified by Debtors' counsel by delivering such backup tapes to Kroll Ontrack, which is assisting Debtors with their electronic data. The relevant time period given to Mr. Valdes by Debtors' counsel was that set forth by Claimant in its counsel's October 24, 2005 letter to Debtors' counsel.

Bryan Miller testified in his deposition that, in addition to preserving email backup tapes as described above, he also preserved MCI's POP email backup tapes for the time period identified by Debtors' counsel by delivering such backup tapes to Kroll Ontrack. The relevant time period given to Mr. Miller by Debtors' counsel was that set forth by Claimant in its counsel's October 24, 2005 letter to Debtors' counsel. Mr. Miller also preserved the earliest backup tapes available for MCI's Exchange email system by delivering such backup tapes to Kroll Ontrack. Mr. Miller also preserved the backup tapes for MCI's email system known as MCI Mail, and those tapes remain in the possession of Debtors.

Kenneth Croslin testified at his deposition that he preserved the desktop data for the persons identified by Debtors' counsel. The persons identified by Debtors' counsel were certain of the custodians identified by Claimant in its counsel's October 24, 2005 letter to Debtors' counsel.

Of the remaining persons identified by Debtors' counsel who might have documents related to Claimant's claims, the UC Contract, the relationship between Claimant and Debtors, and the relationship between Webley and Debtors with regard to the MASL, only two had any such documents: Teresa Hastings and Steve Hooper. These persons preserved their documents by promptly turning them over to Debtors' counsel.

(c) In-house and outside counsel communicated orally and in writing with regard to preserving documents pursuant to Judge Rakoff's July 1, 2002 Order and to preserving documents that might relate to Claimant's claims, the UC Contract, the relationship between Claimant and Debtors, and the relationship between Webley and Debtors.

(c) [sic] Judge Rakoff's July 1, 2002 Order directed the preservation of all documents relating to, referring to or concerning any aspect of WorldCom's financial reporting obligations, public disclosures required by the federal securities laws, or any accounting matters relating to WorldCom. To comply with this Order, WorldCom and its affiliates preserved all daily backup tapes of their email systems (including Intermedia's email system). Debtors also preserved non-email electronic data encompassed by the Order, as subsequently modified or varied by agreement of the parties with regard to such data. Debtors also preserved paper documents encompassed by the Order.

In-house and outside counsel further requested that all documents that might relate to Claimant's claims, the UC Contract, the relationship between

Claimant and Debtors, and the relationship between Webley and Debtors be preserved.

Also preserved are: Intermedia backup tapes for the relevant time period set forth by Claimant in its counsel's October 24, 2005 letter to Debtors' counsel; MCI's POP email backup tapes for the relevant time period set forth by Claimant in its counsel's October 24, 2005 letter to Debtors' counsel; the earliest backup tapes available for MCI's Exchange email; the backup tapes for MCI's email system known as MCI Mail; and desktop data for certain custodians identified by Claimant in its counsel's October 24, 2005 letter to Debtors' counsel.

(d) Debtors' in-house and outside counsel identified current and former Intermedia and MCI employees who might have documents that might relate to Claimant's claims, the UC Contract, the relationship between Claimant and Debtors, and the relationship between Webley and Debtors, and information regarding other persons who might have such documents. These persons were contacted (to the extent they could be found); as more information became known, additional persons were contacted. There is no single "list" of persons contacted; however, Debtors have identified the persons contacted in response to subpart (e) below.

(e) Debtors' in-house and outside counsel contacted the following current and former Intermedia and MCI employees to determine if they had documents regarding Claimant's claims, the UC Contract, the relationship between Claimant and Debtors, and the relationship between Webley and Debtors, and to direct that any such documents be preserved:

Maria Ayala – Ms. Ayala was an MCI employee when she was contacted. Ms. Ayala was involved with the collection of Webley's purchase of wholesale telecommunications services from WorldCom ("Webley's wholesale account"), but she had no connection to the MASL or Claimant. Ms. Ayala did not have and would not have had any potentially relevant documents.

Roger Beckman – Mr. Beckman was an MCI employee in the Records and Information Management ("RIM") department when he was contacted. Mr. Beckman assisted Debtors' counsel in finding indices for Debtors' stored paper documents.

Richard Black – Mr. Black was an MCI employee when he was contacted. Prior to that, Mr. Black was employed by Intermedia. Mr. Black had no responsive documents.

Fred Briggs – Mr. Briggs was an MCI employee when he was contacted. Mr. Briggs had no connection to the MASL or Claimant. Mr. Briggs did not have and would not have had any potentially relevant documents.

Thomas Brand – Mr. Brand was an MCI employee when he was contacted. Mr. Brand had no connection to the MASL or Claimant. Mr. Brand did not have and would not have had any potentially relevant documents.

Jennifer Carroll – Ms. Carroll was an MCI employee when she was contacted. Ms. Carroll had no connection to the MASL or Claimant. Ms. Carroll did not have and would not have had any potentially relevant documents.

Peter Cassidy – Mr. Cassidy was an MCI employee when he was contacted. Mr. Cassidy was involved with Webley's wholesale account, but had

no connection to the MASL or Claimant. Mr. Cassidy did not have and would not have had any potentially relevant documents.

Kenneth Croslin -- Claimant has deposed Mr. Croslin.

Shirley ("Beth") Denham-Dale – Ms. Denham-Dale was an MCI employee when she was contacted. She was involved with Webley's wholesale account. Ms. Denham-Dale did not have and would not have had any potentially relevant documents.

Pamela F. Dunnam – Ms. Dunnam was an MCI employee when she was contacted. Ms. Dunnam did not have and would not have had any potentially relevant documents.

Ralph Dyer – Mr. Dyer was a former Intermedia employee when he was contacted. Mr. Dyer ceased working for Intermedia in September 2001. Mr. Dyer had no responsive documents.

Joseph Falleur – Claimant has deposed Mr. Falleur.

James Faust – Mr. Faust was a former Intermedia employee when he was contacted. Mr. Faust ceased working for Intermedia in October 2001. Mr. Faust had no responsive documents.

Donald Fergus – Mr. Fergus was a former Intermedia employee when he was contacted. Mr. Fergus ceased working for Intermedia in December 2001. Mr. Fergus had no responsive documents.

Phil Hasselvander – Mr. Hasselvander was an MCI employee in the RIM department when he was contacted. Mr. Hasselvander assisted Debtors' counsel with the search for Debtors' stored paper documents.

Teresa Hastings – Ms. Hastings was an MCI employee when she was contacted. Ms. Hastings provided Debtors' counsel documents related to the MASL.

Steve Hooper – Mr. Hooper was an MCI employee when he was contacted. Mr. Hooper provided Debtors' counsel with documents related to the MASL.

Mandy Johnson – Ms. Johnson was an MCI employee when she was contacted. Ms. Johnson did not have and would not have had any potentially relevant documents.

Susan Kennedy – Ms. Kennedy was an MCI employee when she was contacted. Ms. Kennedy was involved with Webley's wholesale account, but she had no connection to the MASL or Claimant. Ms. Kennedy did not have and would not have had any potentially relevant documents.

Mary Kilmartin – Ms. Kilmartin was an MCI employee when she was contacted. Ms. Kilmartin was involved with Webley's wholesale account, but she had no connection to the MASL or Claimant. Ms. Kilmartin did not have and would not have had any potentially relevant documents.

Patricia Kurlin – Ms. Kurlin was a former Intermedia employee when she was contacted. Ms. Kurlin ceased working for Intermedia in August 2001. Ms. Kurlin had no responsive documents.

James LaMantia – Claimant has deposed Mr. LaMantia.

Mark Mancini – Mr. Mancini was an MCI employee when he was contacted. Mr. Mancini assisted Debtors' counsel in determining the appropriate information technology personnel to assist them in locating electronic data.

Cheryl Mellon – Ms. Mellon was a former Intermedia employee when she was contacted. Ms. Mellon ceased working for Intermedia in August 2002. Debtors' initial attempts to locate Ms. Mellon were unsuccessful. At the time Ms. Mellon was located and contacted, she did not have any potentially relevant documents. She believes that she may have downloaded data onto a CD when she left Intermedia but she cannot locate the CD.

Bryan Miller – Claimant already has deposed Mr. Miller.

Carleen Mitchell – Ms. Mitchell was an MCI employee when she was contacted. Ms. Mitchell was involved with Webley's wholesale account, but she had no connection to the MASL or Claimant. Ms. Mitchell did not have and would not have had any potentially relevant documents.

Joyce Moultry – Ms. Moultry was an MCI employee in the RIM department when she was contacted. Ms. Moultry assisted in providing information to Debtors' counsel regarding Debtors' stored documents.

Margorie Polgar – Ms. Polgar was an MCI employee when she was contacted. Ms. Polgar did not have and would not have had any potentially relevant documents.

Michael Randels – Mr. Randels was an MCI employee when he was contacted. Mr. Randels formerly worked for Intermedia. Mr. Randels assisted Debtors' counsel in locating personnel records and information.

Pam Rask – Ms. Rask was an MCI employee when she was contacted. Ms. Rask did not have and would not have had any potentially relevant documents.

James Renforth – Mr. Renforth was a former Intermedia employee when he was contacted. Claimant already has deposed Mr. Renforth.

Nasser Sheikh – Mr. Sheikh was an MCI employee when he was contacted. Mr. Sheikh was involved with Webley's wholesale account, but he had no connection to the MASL or Claimant. Mr. Sheikh did not have and would not have had any potentially relevant documents.

Joe Stephens – Mr. Stephens was an MCI employee in the RIM department when he was contacted. Mr. Stephens assisted Debtors' counsel with the search for Debtors' stored paper documents.

Linda "Diane" Stevens – Ms. Stevens was an MCI employee when she was contacted. Ms. Stevens was a former Intermedia employee. Ms. Stevens had no relevant documents.

Brenda Tate – Ms. Tate was an MCI employee in the RIM department when she was contacted. Ms. Tate assisted Debtors' counsel with the search for Debtors' stored paper documents.

Amy Taylor – Ms. Taylor was an MCI employee in the RIM department when she was contacted. Ms. Tate assisted Debtors' counsel with the search for Debtors' stored paper documents.

Julio Valdes – Claimant has deposed Mr. Valdes.

Kathleen Victory – Ms. Victory was a former Intermedia employee when she was contacted. Ms. Victory ceased working for Intermedia in October 2001. Ms. Victory had no relevant documents.

Barry Zipp – Mr. Zipp was an MCI employee when he was contacted. Mr. Zipp had no relevant documents.

(f) It is Debtors understanding and belief that all persons identified above complied with Debtors' direction to locate and preserve documents regarding Claimant's claims, the UC Contract, the relationship between Claimant and Debtors, and the relationship between Webley and Debtors with regard to the MASL.

(g) To the extent persons identified above had documents regarding Claimant's claims, the UC Contract, the relationship between Claimant and Debtors and the relationship between Webley and Debtors with regard to the MASL, they gave those documents to Stinson Morrison Hecker LLP for review and preservation. Paper documents were delivered to Stinson Morrison Hecker LLP and electronic data was delivered to Stinson Morrison Hecker LLP or Kroll Ontrack. The backup tapes for MCI's email system known as MCI Mail remain in Debtors' possession.

(h) Debtors are not aware of, and do not believe that, any documents counsel requested to be preserved regarding Claimant's claims, the UC Contract, the relationship between Claimant and Debtors and the relationship between Webley and Debtors with regard to the MASL were ever destroyed, purged, or rendered inaccessible. As Julio Valdes testified during his deposition, searches of

the active Intermedia servers using the search terms identified by Claimant in its counsel's October 2005 letter were unsuccessful because of the volume of data contained on those servers.

(i) Debtors' outside counsel and Kroll Ontrack have assisted Debtors in implementing the preservation of documents regarding Claimant's claims, the UC Contract, the relationship between Claimant and Debtors, and the relationship between Webley and Debtors with regard to the MASL. Electronic Data Systems, Inc. was responsible for maintaining MCI's POP email system. At counsel's request, EDS provided to Kroll Ontrack the backup tapes for MCI's POP email system for the relevant time period as set forth by Claimant in its counsel's October 24, 2005 letter to Debtors' counsel.

**Question 8.** **How did Intermedia and MCI monitor compliance with the litigation hold. Did Intermedia and MCI request that persons respond or acknowledge either electronically or by hard copy documents that they would agree to abide by the litigation hold. If no, why not. If acknowledgments were requested, where are the acknowledgements by such persons presently located.**

**Answer.** Subject to and without waiving the general objection set forth above regarding Claimant's use of the phrase "litigation hold," Debtors respond to Question No. 8 as follows:

Debtors' monitoring of preservation of documents related to Claimant's claims, the UC Contract, the relationship between Claimant and Debtors, and the relationship between Webley and Debtors with regard to the MASL was

accomplished by delivering the paper documents to Stinson Morrison Hecker LLP and the electronic documents to Stinson Morrison Hecker LLP or Kroll Ontrack. Also, Debtors are retaining the backup tapes for MCI's email system known as MCI Mail.

**Question 9** **How did Intermedia and MCI ensure compliance with the litigation hold. How did Intermedia and MCI monitor compliance with the litigation hold. Who was in charge of implementing the litigation hold, who was in charge of monitoring the litigation hold, who was in charge of taking possession or custody of documents subject to the litigation hold.**

**Answer.** Subject to and without waiving the general objection set forth above regarding Claimant's use of the phrase "litigation hold," Debtors respond to Question No. 9 as follows:

Debtors ensured preservation of documents related to Claimant's claims, the UC Contract, the relationship between Claimant and Debtors, and the relationship between Webley and Debtors with regard to the MASL by delivering the paper documents to Stinson Morrison Hecker LLP and the electronic documents to Stinson Morrison Hecker LLP or Kroll Ontrack. Debtors further have ensured preservation of the backup tapes for MCI's email system known as MCI Mail. The persons responsible for implementing the preservation of such documents already have been identified in response to Question No. 7. Please also refer to Debtors' answer to Question No. 8, which Debtors incorporate here.

**Question 10** **How long was the litigation hold in effect. Did Intermedia and MCI send out reminders of the litigation hold. If yes, on what dates were such**

**reminders transmitted, to whom were they transmitted, and how were such reminders transmitted. If such reminders were not transmitted, why not.**

**Answer.** Subject to and without waiving the general objection set forth above regarding Claimant's use of the phrase "litigation hold," Debtors respond to Question No. 10 as follows:

All documents regarding Claimant's claims, the UC Contract, the relationship between Claimant and Debtors and the relationship between Webley and Debtors with regard to the MASL were collected and continue to be preserved as set forth in Debtors' response to Question No. 8 above and to Question No. 12 below, both of which Debtors incorporate here.

**Question 11 Was the litigation hold implemented by Intermedia and MCI as to EffectNet/Parus in conformity with MCI and Intermedia's policies (whether written or oral) for litigation holds. If yes, how so. If no, how did the EffectNet/Parus litigation hold differ from Intermedia and MCI's policies.**

**Answer.** Yes. Subject to and without waiving the general objection set forth above regarding Claimant's use of the phrase "litigation hold," Debtors respond to Question No. 11 as follows:

The procedures used by in-house and outside counsel in attempting to locate and preserve documents regarding Claimant's claims, the UC Contract, the relationship between Claimant and Debtors, and the relationship between Webley and Debtors with regard to the MASL were consistent with the way documents were located and retained for other litigation matters during the time period in question. Moreover, the procedures used were reasonable and appropriate given

that, at the time, Debtors' and their counsel were investigating and defending over 60,000 claims filed in the bankruptcy proceeding. Also, in the period after WorldCom declared bankruptcy, there were numerous personnel changes including changes in MCI's in-house counsel. As a result, by the time Claimant filed its claim most of the custodians of potentially responsive materials, or potential witnesses, were no longer employed by Debtors.

**Question 12 What was done with documents that were subject to the litigation hold and where are those documents presently located.**

**Answer.** Subject to and without waiving the general objection set forth above regarding Claimant's use of the phrase "litigation hold," Debtors respond to Question No. 12 as follows:

All paper documents that Debtors were able to locate regarding Claimant's claims, the UC Contract, the relationship between Claimant and Debtors, and the relationship between Webley and Debtors with regard to the MASL are at the offices of Stinson Morrison Hecker LLP or at an Iron Mountain storage facility in Kansas City, Missouri, as are all of the boxes of documents identified on the paper documents indices (which have been provided to Claimant) that were reviewed by Debtors' counsel. The remaining boxes of documents identified on the indices are maintained at the storage facility identified on the indices.

All paper documents responsive to Claimant's discovery requests have been produced twice to Claimant. The initial production was made to Kelley Drye, LLP, Claimant's prior counsel. At the request of Claimant's current

counsel, Foley & Lardner, LLP, such documents were made available again to Claimant in September and October 2006.

All electronic documents that Debtors have located in the electronic discovery completed to date regarding Claimant's claims, the UC Contract, the relationship between Claimant and Debtors, and the relationship between Webley and Debtors with regard to the MASL, as well as all Intermedia backup tapes and MCI POP email tapes for the relevant time period identified by Claimant in its counsel's October 24, 2005 letter to Debtors' counsel, are maintained by Kroll Ontrack. All Intermedia and MCI backup tapes outside the relevant time period identified in Claimant's October 24, 2005 letter continue to be maintained by Debtors. The backup tapes for MCI's email system known as MCI Mail are maintained by Debtors.

The electronic documents responsive to Claimant's document requests that were from accessible electronic data and the responsive electronic documents located on the backup tapes Claimant selected for sampling have been produced to Claimant twice. The initial production was made to Kelley Drye, LLP, Claimant's prior counsel. At the request of Claimant's current counsel, Foley & Lardner, LLP, such documents were made available again to Claimant in September and October 2006.

**Question 13** **Did outside counsel apprise Intermedia and MCI of the need for a litigation hold. If yes, (a) when was Intermedia and MCI notified, (b) who notified Intermedia and MCI, (c) when after notification by outside counsel did Intermedia and MCI implement the litigation hold.**

**Answer.** Subject to the general objection set forth above regarding Claimant's use of the phrase "litigation hold," Debtors respond to Question 13 as follows:

Debtors object to this request as seeking information that is protected from disclosure pursuant to the attorney-client privilege and/or litigation work product immunity. Further, the information requested is not relevant to the issue of whether documents were properly preserved by Debtors. Subject to and without waiving these objections, however, Debtors state that, as noted above, both in-house counsel and outside counsel understood the need to locate and preserve documents and, in most instances, worked together with regard to the preservation of documents related to Claimant's claims, the UC Contract, the relationship between Claimant and Debtors and the relationship between Webley and Debtors with regard to the MASL.

Respectfully submitted,

STINSON MORRISON HECKER LLP

By: [signature]

Robert L. Driscoll
Allison M. Murdock
Mark M. Iba
1201 Walnut Street, Suite 2900
Kansas City, MO 64106
(816) 842-8600 – Telephone
(816) 691-3495 – Facsimile

ATTORNEYS FOR REORGANIZED DEBTORS

**Certificate of Service**

I hereby certify that on this 19th day of December, 2006, I served a copy of the foregoing *via* United States mail, postage prepaid, directed to:

Robert A. Scher
Emily Sausen
FOLEY & LARDNER LLP
90 Park Avenue
New York, NY 10016

Mark L. Prager
William J. McKenna
Jill L. Murch
Joanne Lee
FOLEY & LARDNER LLP
321 N. Clark Street, Suite 280
Chicago, IL 60610

and a copy of the foregoing *via* electronic mail to Jill L Murch at jmurch@foley.com.

Attorney for Reorganized Debtors

**Verification**

I verify under penalty of perjury that I am the Associate General Counsel - Litigation and Regulatory for Verizon Business, that I have read Debtors' Response to Claimant's Questions Regarding "Litigation Hold," and that the responses are true to the best of my knowledge, information, and belief.

Mary L. Coyne

Dated: December 19, 2006.

FILED
MAY 30 2001

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,
Plaintiff,

v.

WORLDCOM, INC., and
INTERMEDIA COMMUNICATIONS, INC
Defendants.

Case No. 1:00CV02789(RWR)

**HOLD SEPARATE STIPULATION AND ORDER**
**[ERRATA]**

It is hereby stipulated and agreed by and between the undersigned parties, subject to approval and entry by the Court, that:

## I. DEFINITIONS

As used in this Hold Separate Stipulation and Order:

A. "Acquirer" means the entity to whom defendants divest the Intermedia Assets.

B. "WorldCom" means defendant WorldCom, Inc., a Georgia corporation with its headquarters in Clinton, Mississippi, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents and employees.

C. "Intermedia" means defendant Intermedia Communications, Inc., a Delaware Corporation with its headquarters in Tampa, Florida, its successors and assigns, and its subsidiaries divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers agents and employees.

D "Digex" means Digex, Inc., a Delaware Corporation with its headquarters in Beltsville.

Exhibit A

9

Maryland, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents and employees.

E. "Capital Stock of Digex" means the capital stock of Digex, regardless of class, owned by Intermedia.

F. "Intermedia Assets" means all of assets of Intermedia, except for the Capital Stock of Digex, including:

1. All tangible assets that comprise the Intermedia business, including research and development activities; all networking equipment and fixed assets, personal property, office furniture, materials, supplies, and other tangible property and all assets used exclusively in connection with the Intermedia Assets; all licenses, permits and authorizations issued by any governmental organization relating to the Intermedia Assets; all contracts, teaming arrangements, agreements, leases, commitments, certifications, and understandings, relating to the Intermedia Assets, including supply agreements; all customer lists, contracts, accounts, and credit records; all repair and performance records and all other records relating to the Intermedia Assets;

2. All intangible assets used in the development, production, servicing and sale of Intermedia Assets, including, but not limited to all patents, licenses and sublicenses, intellectual property, copyrights, trademarks, trade names, service marks, service names, technical information, computer software and related documentation, know-how, trade secrets, drawings, blueprints, designs, design protocols, specifications for materials, specifications for parts and devices, safety procedures for the handling of materials and substances, all research data concerning historic and current research and development

relating to the Intermedia Assets, quality assurance and control procedures, design tools and simulation capability, all manuals and technical information defendants provide to their own employees, customers, suppliers, agents or licensees, and all research data concerning historic and current research and development efforts relating to the Intermedia Assets, including, but not limited to designs of experiments, and the results of successful and unsuccessful designs and experiments.

G. "Merger" means the proposed merger of WorldCom and Intermedia pursuant to the merger agreement dated September 5, 2000.

## II. OBJECTIVES

The Final Judgment filed in this case is meant to ensure defendants' prompt divestiture of the Intermedia Assets for the purpose of preserving a viable competitor in the provision of Internet backbone and access services in order to remedy the effects that the United States alleges would otherwise result from WorldCom's acquisition of Intermedia. This Hold Separate Stipulation and Order ensures, prior to such divestitures, that the Intermedia Assets remain independent, economically viable, and ongoing business concerns that will remain independent and uninfluenced by WorldCom, and that competition is maintained during the pendency of the ordered divestitures.

## III. JURISDICTION AND VENUE

This Court has jurisdiction over each of the parties hereto and over the subject matter of this action, and venue of this action is proper in the United States District Court for the District of Columbia. The Complaint states a claim upon which relief may be granted against defendants under Section 7 of the Clayton Act, as amended, 15 U.S.C § 18.

## IV. COMPLIANCE WITH AND ENTRY OF FINAL JUDGMENT

A. The parties stipulate that a Final Judgment in the form attached hereto as Exhibit A may be filed with and entered by the Court, upon the motion of any party or upon the Court's own motion, at any time after compliance with the requirements of the Antitrust Procedures and Penalties Act (15 U.S.C. § 16), and without further notice to any party or other proceedings, provided that the United States has not withdrawn its consent, which it may do at any time before the entry of the proposed Final Judgment by serving notice thereof on defendants and by filing that notice with the Court.

B. Defendants shall abide by and comply with the provisions of the proposed Final Judgment, pending the Judgment's entry by the Court, or until expiration of time for all appeals of any Court ruling declining entry of the proposed Final Judgment, and shall, from the date of the signing of this Stipulation by the parties, comply with all the terms and provisions of the proposed Final Judgment as though the same were in full force and effect as an order of the Court.

C. Defendants shall not consummate the transaction sought to be enjoined by the Complaint herein before the Court has signed this Hold Separate Stipulation and Order.

D This Stipulation shall apply with equal force and effect to any amended proposed Final Judgment agreed upon in writing by the parties and submitted to the Court.

E. In the event (1) the United States has withdrawn its consent, as provided in Section IV(A) above, or (2) the proposed Final Judgment is not entered pursuant to this Stipulation, the time has expired for all appeals of any Court ruling declining entry of the proposed Final Judgment, and the Court has not otherwise ordered continued compliance with the terms and provisions of the proposed Final Judgment, then the parties are released from all further obligations under this Stipulation, and the making of this Stipulation shall be without prejudice to any party in this or any

other proceeding.

F. Defendants represent that the divestiture ordered in the proposed Final Judgment can and will be made, and that defendants will later raise no claim of mistake, hardship or difficulty of compliance as grounds for asking the Court to modify any of the provisions contained therein.

G. The United States and Defendants, WorldCom and Intermedia, by their respective attorneys, have consented to the entry of this Hold Separate Stipulation and Order without trial or adjudication of any issue of fact or law, and without this Hold Separate Stipulation and Order constituting any evidence against or admission by any party regarding any issue of fact or law.

## V. HOLD SEPARATE PROVISIONS

A. Until the closing of the Merger contemplated by the Final Judgment:

1. Intermedia shall preserve, maintain, and continue to operate the Intermedia Assets as an independent, ongoing, economically viable competitive business, with management, sales, and operations of such assets held entirely separate, distinct, and apart from those of WorldCom's operations. WorldCom shall not coordinate its production, marketing, or terms of sale of any products with those produced by or sold under any of the Intermedia Assets. Within twenty (20) days after the entry of the Hold Separate Stipulation and Order, defendants will inform the United States of the steps defendants have taken to comply with this Hold Separate Stipulation and Order.

2. Intermedia shall use all reasonable efforts to maintain and increase the sales and revenues of the services provided by the Intermedia Assets, and shall maintain at 2000 or previously approved levels for 2001, whichever are higher, all promotional, advertising, sales, technical assistance, network capacity configurations and expansions, marketing and

merchandising support for the Intermedia Assets.

3. Intermedia shall take all steps necessary to ensure that the Intermedia Assets are fully maintained in operable condition at no less than their current capacity and sales, including projected capacity expansions currently planned or planned prior to negotiations between the defendants relating to the Merger, and shall maintain and adhere to normal repair and maintenance schedules for the Intermedia Assets.

4. Intermedia shall not remove, sell, lease, assign, transfer, pledge, or otherwise dispose of any of the Intermedia Assets.

5. WorldCom shall not solicit to hire, or hire, any employee of any business that is a part of the Intermedia Assets.

6. Defendants shall take no action that would jeopardize, delay, or impede the sale of the Intermedia Assets.

B. After the closing of the Merger and until the divestiture required by the Final Judgment has been accomplished:

1. Defendants shall preserve, maintain, and continue to operate the Intermedia Assets as an independent, ongoing, economically viable competitive business, with management, sales, and operations of such assets held entirely separate, distinct, and apart from those of WorldCom's other operations. WorldCom shall not coordinate its production, marketing, or terms of sale of any products with those produced by or sold under any of the Intermedia Assets. Within twenty (20) days after the closing of the Merger, defendants will inform the United States of the steps defendants have taken to comply with this Hold Separate Stipulation and Order.

2. Defendants shall take all steps necessary to ensure that (1) the Intermedia Assets will be maintained and operated as independent, ongoing, economically viable and active competitor in the provision of telecommunications services currently offered by Intermedia; (2) management of the Intermedia Assets will not be influenced by WorldCom (or Digex); and (3) the books, records, competitively sensitive sales, marketing and pricing information, and decision-making concerning provision of services by any of the Intermedia Assets will be kept separate and apart from WorldCom's other operations.

3. Defendants shall use all reasonable efforts to maintain and increase the sales and revenues of the services provided by the Intermedia Assets, and shall maintain at 2000 or previously approved levels for 2001, whichever are higher, all promotional, advertising, sales, technical assistance, network capacity configurations and expansions, marketing and merchandising support for the Intermedia Assets.

4. WorldCom shall provide sufficient working capital and lines and sources of credit to continue to maintain the Intermedia Assets as economically viable and competitive, ongoing businesses, consistent with the requirements of Sections V(A) and (B).

5. WorldCom shall take all steps necessary to ensure that the Intermedia Assets are fully maintained in operable condition at no less than its current capacity and sales, including projected capacity expansions currently planned or planned prior to negotiations between the defendants relating to the Merger, and shall maintain and adhere to normal repair and maintenance schedules for the Intermedia Assets.

6. Defendants shall not, except as part of a divestiture approved by the United States in accordance with the terms of the proposed Final Judgment, remove, sell, lease,

assign, transfer, pledge, or otherwise dispose of any of the Intermedia Assets

7. Defendants shall maintain, in accordance with sound accounting principles, separate, accurate, and complete financial ledgers, books, and records that report on a periodic basis, such as the last business day of every month, consistent with past practices, the assets, liabilities, expenses, revenues and income of products produced, distributed or sold utilizing the Intermedia Assets.

8. Defendants shall take no action that would jeopardize, delay, or impede the sale of the Intermedia Assets.

9. Except in the ordinary course of business or as is otherwise consistent with this Hold Separate Stipulation and Order, defendants shall not hire, transfer, terminate, or otherwise alter the salary or employment agreements for any Intermedia employee who, on the date of defendants' signing of this Hold Separate Stipulation and Order is a member of Intermedia's management. Further, during the pendency of this Hold Separate Stipulation and Order, and consistent with the Final Judgment, defendant WorldCom shall not solicit to hire, or hire, any employee of any business that is a part of the Intermedia Assets.

C. Defendants shall take no action that would interfere with the ability of any trustee appointed pursuant to the Final Judgment to complete the divestitures pursuant to the Final Judgment to an Acquirer acceptable to the United States.

D. This Hold Separate Stipulation and Order shall remain in effect until consummation of the divestiture required by the proposed Final Judgment or until further order of the Court.

Dated: November 17, 2000.

Respectfully submitted,

FOR PLAINTIFF
UNITED STATES OF AMERICA

FOR DEFENDANT
WORLDCOM, INC.

FOR DEFENDANT
INTERMEDIA COMMUNICATIONS, INC

**ORDER**

IT IS SO ORDERED by the Court, this 29th day of May, 2000.

United States District Judge

**CERTIFICATE OF SERVICE**

I hereby certify that copies of the foregoing Hold Separate Stipulation and Order [ERRATA] was served, as indicated below, this 20th day of November, 2000 upon each of the parties listed below:

Charles F. Rule, Esq. (BY HAND)
Covington & Burling
1201 Pennsylvania Avenue, N.W.
Washington, DC 20004-2401
(202) 662-5119
Counsel for WorldCom, Inc.

Brad E. Mutschelknaus, Esq. (BY HAND)
Kelley Drye & Warren, LLP
1200 19th Street, N.W., Suite 500
Washington, D.C. 20036
(202) 955-9600
Counsel for Intermedia Communications, Inc.

David F. Smutny
Counsel for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, Plaintiff, v. WORLDCOM, INC., Defendant. | Civ No. 02-CV-4963 (JSR) |

STIPULATION AND ORDER

Plaintiff Securities and Exchange Commission ("Commission"), and defendant WorldCom, Inc. ("WorldCom"), by and through their counsel of record, hereby agree and stipulate to the Court's entry of the following Order in the above-captioned matter, subject to the Court's approval:

IT IS HEREBY ORDERED THAT:

1. Defendant WorldCom, its officers, agents, accountants, employees, and attorneys, and those persons in active concert or participation with them, and each of them, who receive actual notice of this Order by personal service or otherwise, shall not destroy, mutilate, conceal, alter or dispose of any item (including but not limited to books, records, documents, contracts, agreements, assignments, evidence of obligations or payments, press releases, public announcements, drafts of any of the foregoing, or any other item within their possession, custody or control) relating to, referring to or concerning any aspect of WorldCom's financial reporting obligations, public disclosures required by the federal securities laws, or any accounting matters relating to WorldCom, including but not limited to the matters referred to in the Commission's Complaint filed herein;

MICROFILM JUL - 1 2002 - 12:00 PM

Exhibit B

2. Upon appointment by the Court pursuant to this Order, the Corporate Monitor for WorldCom shall have oversight responsibility with respect to all compensation paid by WorldCom. The intent of the parties is that the Corporate Monitor shall exercise its oversight responsibility to prevent unjust enrichment as a result of the conduct alleged in the Complaint and to ensure that the assets of WorldCom are not dissipated by payments that are not necessary to the operation of its business. For purposes of this Stipulation and Order, compensation is defined so as to include salary, as well as any severance payment, bonus, indemnification, gift, loan, reimbursement, advance, or consideration of any kind in excess of established salary, but does not include payments to reimburse employees for ordinary business expenses incurred. In exercising its oversight responsibility, the Corporate Monitor shall have discretion to determine the type of compensation to review and either approve or disapprove, as well as the discretion to determine the group of officers, directors and employees with respect to which such compensation shall be reviewed and either approved or disapproved;

3. Until a Corporate Monitor is in place, WorldCom, its officers, agents, accountants, employees, attorneys, and those persons in active concert or participation with them, and each of them, who receive actual notice of this Order by personal service or otherwise, shall not (1) make any payment greater than $100,000 to any present or former officer, director or employee of WorldCom or any of its affiliates, or (2) make any extraordinary payment (which is defined for purposes of this Stipulation and Order as any payment other than those WorldCom is required to make by virtue of a legal obligation established prior to May 15, 2002) to any present or former director of WorldCom, any present or former officer of WorldCom who currently holds or formerly held a position at or above the level of Vice-President, or any person currently

or formerly employed within WorldCom's financial reporting or accounting functions;

4. In the event the Corporate Monitor does not promptly approve any payment of compensation sought to be made by WorldCom, WorldCom may, upon notice to the Commission, seek the Court's approval for such payment;

5. By further Order of this Court, and subject to the Court's approval, a Corporate Monitor for defendant WorldCom, to be jointly named and proposed to the Court by the parties hereto, shall be appointed to exercise the oversight responsibility referenced in paragraph 2 of this Order, and, with respect to paragraph 1 of this Order, the Corporate Monitor shall confirm that WorldCom has implemented reasonable document retention policies and the Corporate Monitor shall take reasonable steps to oversee compliance with those policies. The Corporate Monitor shall report forthwith to the Court any evidence or indication of a violation of this Order of which the Corporate Monitor becomes aware;

6. If the parties cannot agree to a Corporate Monitor by July 3, 2002, the parties will ask the Court for an immediate conference with respect to the selection and appointment of a Corporate Monitor;

7. WorldCom shall cooperate in full with the Corporate Monitor and make its books, records and accounts available to the Corporate Monitor as the Corporate Monitor shall, in his or her discretion, request in order to perform the duties outlined above;

8. The Corporate Monitor's fees and expenses shall be paid by WorldCom.

9. The term of the Corporate Monitor will cease no later than the date on which the Commission's investigation of this matter concludes, the Court determines the function of the

-02 19:58 SIMPSON THACHER & BARTLETT ID=12 P05

Corporate Monitor is no longer necessary, or the parties so agree.

SO ORDERED SUBJECT TO THE CONDITIONS STATED AND AGREED TO IN COURT ON 6/28/02

Dated: June 28, 2002

United States District Judge

Consented to:

Peter H. Bresnan
Deputy Chief Litigation Counsel
Securities and Exchange Commission
450 Fifth Street, NW
Washington, DC 20549
202/942-4788 (phone)
202/942-9581 (fax)

Michael H. Salsbury
Executive Vice President and General Counsel
WorldCom, Inc.
1133 19th St., N.W.
Washington, D.C.

**EXHIBIT I**

D00450



STINSON MORRISON HECKER LLP

Allison M. Murdock
(816) 691-3138
amurdock@stinsonmoheck.com
www.stinsonmoheck.com

1201 Walnut, Suite 2900
Kansas City, MO 64106-2150

*Tel* (816) 842-8600
*Fax* (816) 691-3495

January 30, 2007

**VIA E-MAIL AND U.S. MAIL**

Jill L. Murch, Esq.
Foley & Lardner LLP
321 North Clark Street
Suite 2800
Chicago, IL 60610

Re: In re WorldCom, Inc., et al., Case No. 02-13533
Claims of Parus Holdings, Inc., Claim Nos. 9291, 9293, 11173, and 11242

Dear Jill:

I am writing in response to your January 19, 2007 letter regarding Debtors' Response to Claimant's Questions Regarding "Litigation Hold" served on December 19, 2006, and Debtors' Objections to Claimant Parus Holdings, Inc.'s First Interrogatories, Debtors' Objections and Responses to Claimant Parus Holdings, Inc.'s Second Request for Production of Documents and Debtors' Response to Claimant Parus Holdings, Inc.'s First Set of Requests for Admission served on December 22, 2006.

**I. Debtors' Objections to Parus' Discovery Requests Are Proper.**

Your claim that Debtors have "delayed and obstructed" Parus Holdings, Inc.'s ("Parus") efforts to "uncover the facts of this case" by asserting objections to Parus' recent discovery requests ignores that the Federal Rules of Civil Procedure authorize such objections, that these requests were objectionable in multiple respects, and that Debtors have reviewed and produced thousands of pages of documents in response to Parus' earlier discovery requests. Debtors' December 22 discovery responses set forth in detail the factual and legal basis for each of their objections. We note that you do not identify a single objection with which Parus takes issue, implicitly conceding the propriety of Debtors' objections.

KANSAS CITY
OVERLAND PARK
WICHITA
WASHINGTON, D.C.
PHOENIX
ST. LOUIS
OMAHA
JEFFERSON CITY

Parus has made virtually no attempt in the five months since your firm has served as its counsel to "uncover the facts of this case." Instead, Parus' discovery has focused almost exclusively on the discovery process itself. Also, the vast majority of Parus' 349 discovery requests confirm that you are unfamiliar with the extensive discovery that was conducted before your firm's entry of appearance – and perhaps still do not have the case file from Parus' prior counsel. In fact, the few document requests Parus served that actually relate to the facts of this case were duplicative of Parus' first document requests.[1]

You also imply that Debtors have refused to produce any documents in response to Parus' second document requests. On the contrary, although most of Parus' documents requests are objectionable, Debtors agreed to produce certain documents subject to their objections. In the month since Debtors served their discovery responses, however, neither you nor any member of your firm has contacted me to arrange for the copying of Debtors' document production. If you now wish to obtain a copy of that production, please contact me to make copying arrangements.

Your claim that Debtors should have conferred with you regarding the objectionable nature of Parus' discovery requests before responding to them ignores the time constraints on our responses that *you* imposed. Setting aside that Debtors have no obligation under the Federal Rules of Civil Procedure or the Court's rules to do what you propose, you refused to extend Debtors the courtesy of a single, 30-day extension of time to respond to Parus' 349 discovery requests. Debtors were required to seek that extension from the Court. Debtors devoted a tremendous amount of time and effort to preparing their responses and, in doing so, explained in detail the factual and legal basis for each of their objections. Parus' discovery requests are so voluminous and objectionable that there simply would not have been time to negotiate with you regarding the scope and nature of Parus' requests and meet the deadline you imposed. The better course would have been for you to obtain the case file from Parus' prior counsel and review it before filing voluminous, duplicative and obviously objectionable discovery requests.

**II. Debtors Have Responded To All Of Parus' Discovery Requests and Motions.**

You spend almost a page of your letter complaining about discovery that is unrelated to Debtors' December 22, 2006 discovery responses. Your complaints simply highlight that you do not know what transpired in the litigation prior to your firm becoming Parus' counsel, and have not yet obtained or bothered to review the case file from Parus' prior counsel. Your lack of diligence in this regard is costing Debtors time and money. Although it is inefficient to revisit every discovery issue

---

[1] For example, as Debtors specifically identified in their responses to Parus' second document requests, Document Request Nos. 106, 113-131, 133-156 and 158-161 seek the production of documents related to, among other things, IntermediaOne and the UC Contract that already were encompassed by Parus' first document requests.

that has arisen during the course of this case, I have briefly responded below to the matters you raised since your firm still is without the case file.

• Debtors have responded to Parus' initial discovery requests. You apparently are under the mistaken impression that Debtors filed their motion for summary judgment in lieu of responding to Parus' initial discovery requests. On the contrary, Debtors have produced paper documents responsive to Parus' first document requests as well as the responsive documents from Debtors' accessible electronic data and the responsive documents from the nine backup tapes Parus selected for sampling. Parus delayed Debtors' review and production of responsive documents from their remaining backup tapes by requesting that it be permitted to depose Debtors' IT personnel before Debtors file any cost-shifting motion. The depositions were scheduled late last summer, but you postponed them when your firm entered its appearance in this case. The depositions were not completed until last November, and were immediately followed by Parus' voluminous written discovery requests and "litigation hold" questions. Now that Parus has obtained the discovery it requested, it presumably is prepared to respond to Debtors' cost-shifting motion, and the parties can contact the Court regarding the filing of the same.

• Debtors responded to Parus' motion to compel, and neither Parus' motion nor Debtors' response related to electronic discovery or cost-shifting. Parus has filed only one motion to compel in this case and, according to that motion, it related solely to paper discovery. If you will review the case file or even the Court's electronic docketing system you will find that Debtors filed a response to Parus' motion to compel. The Court also heard oral argument on the motion twice.

Debtors did not, as you claim, respond to Parus' motion by suggesting "for the first time" that cost-shifting is appropriate. Debtors advised Parus even before it filed its motion that they would seek cost-shifting for electronic discovery. In fact, if you will review Parus' motion and the hearing transcripts you will find that *Parus' counsel* advised the Court that Parus' motion did *not* relate to electronic discovery and that the factual record did not yet exist for the Court to make a determination with regard to cost-shifting. It is for this very reason that Debtors' and Parus' prior counsel worked cooperatively to select backup tapes for sampling and narrow search parameters – so that a factual record could be developed upon which the Court could base a cost-shifting decision.

Your letter appears to suggest that Debtors have stated that they failed to keep electronic documents in a readily accessible format and failed to implement a litigation hold. As you should know, Debtors have made no such allegation. Debtors are entitled to seek cost-shifting for the reasons set forth in my June 16, 2006 letter to the Court. Debtors' Response to Claimant's Questions Regarding "Litigation Hold" shows that Debtors fulfilled their obligations with regard to retaining documents relevant to Parus' claims. Moreover, any issues Parus may have regarding "litigation holds" have no bearing on whether Parus must pay all or a part of Debtors' costs for electronic discovery.

• Debtors and their former in-house litigation counsel, David Wachen and Jeffrey Hsu, appropriately objected to Parus' attempt to obtain testimony and documents protected from disclosure by the attorney-client privilege and litigation work product doctrine. The subpoenas duces tecum that Parus served on David Wachen and Jeffrey Hsu were objectionable on their face. Both Messrs. Wachen and Hsu are licensed attorneys who were employed by MCI/WorldCom as in-house litigation counsel. Neither Mr. Wachen nor Mr. Hsu was involved in drafting the UC Contract that gives rise to Parus' claims. They have no personal factual knowledge regarding the intent or meaning of the UC Contract or any of the matters giving rise to Parus' claims, other than information they obtained in Debtors' defense against those claims. The knowledge of Messrs. Wachen and Hsu, as well as any documents concerning facts and circumstances relevant to Parus' claims, were obtained exclusively as legal counsel providing legal advice to Debtors. As a result, Debtors and Messrs. Wachen and Hsu objected to the depositions. You have not identified any objections that Parus considers inappropriate. Moreover, when I advised you that Debtors objected to these depositions, you postponed them. You suggested an alternative procedure of seeking the information that would have been sought by deposition from Messrs. Wachen and Hsu through written "litigation hold" questions to which Debtors would provide verified written responses. Debtors agreed to your alternative procedure and, as agreed, they have provided verified written responses to the questions Parus propounded.

• Debtors responded to all of Parus' discovery requests. You repeat Parus' complaint that Debtors asserted objections to Parus' discovery requests, as is their right under the Federal Rules of Civil Procedure. You also complain again that Debtors have not produced any documents in response to those requests. As has already been addressed, your letter fails to identify a single objection with which Parus takes issue, and you have never contacted me to make arrangements for copying the documents that Debtors agreed to produce subject to their objections.

• Debtors agreed to produce the indices they provided to Parus' former counsel. Parus' second document requests requested that Debtors produce indices *they already had provided to Parus' prior counsel.* This was the first time you ever requested a copy of these indices. If you will review Debtors' responses, you will see that Debtors agreed to produce these indices, and they are among the documents that are available for copying.

Debtors have proposed that discovery be stayed because your firm still has not obtained the case file from Parus' prior counsel. I am surprised that you are unwilling to agree to this proposal. Your firm entered its appearance in this case five months ago and represented to the Court that there would be no delay or prejudice to any party and that it already was well-versed on the facts, issues and pleadings in this case. Despite your representations to the Court, your firm served discovery requests seeking the production of documents that Debtors already have produced. It also has refused to respond to Debtors' requests that Parus produce documents that should have been produced months ago because your firm still does not have Parus'

discovery responses or the documents in question. Your firm's desire to proceed with discovery even though it has not obtained and familiarized itself with the case file has led to duplicative, objectionable and, in some instances, nonsensical discovery requests. A stay of discovery to enable your firm to obtain the case file from Parus' prior counsel would be in the interest of all parties and, further, would avoid presenting the Court with unnecessary disputes.

**III. Until the Court Considers Cost-Shifting and Electronic Discovery Is Completed, Entry Of A Scheduling Order Is Premature.**

As you would see from the case file if you decide to review it, Parus requested last summer that the Court enter a scheduling order. Debtors advised the Court that they believe it is premature to enter a scheduling order until the Court has had an opportunity to consider Debtors' cost-shifting motion and any remaining electronic discovery is completed. The Court did not grant Parus' request to enter a scheduling order. Instead, it directed the parties to complete the IT depositions Parus requested and then contact the Court regarding Debtors' request to file a cost-shifting motion. As previously discussed, the parties now appear to be in a position to proceed on this issue.

**IV. Debtors' Responses To Parus' Requests For Admission.**

You have identified three of Debtors' responses to the requests for admission that Parus claims are deficient – responses to Request Nos. 43, 44 and 49.

Request No. 43 asks Debtors to "[a]dmit that for the period prior to March 2002, MCI had at least on one occasion implemented a Litigation Hold when it received written correspondence alleging that MCI had breached a contract MCI had with a third party." Similarly, Request No. 44 asks Debtors to "[a]dmit that for the period prior to March 2002, Intermedia had at least on one occasion implemented a Litigation Hold when it received written correspondence alleging that Intermedia had breached a contract Intermedia had with a third party." Debtors objected to these requests because Parus' definition of "Litigation Hold" improperly attempts to impose or assume a legal obligation to preserve documents at a time when no such obligation existed, and because the requests are overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

Debtors have re-reviewed their objections to these two requests and continue to believe they are appropriate. To respond to these requests would require Debtors to identify litigation matters for MCI and Intermedia that are over five years old, locate and review the case files to determine the nature of the matters and investigate the steps in-house counsel took to gather case documents. It would be difficult, if not impossible, to find the records necessary to respond to these requests. Moreover, even assuming such information could be located, what Debtors or their counsel did or did not do in another case has no bearing on the parties' claims and defenses in this case.

You contend that Debtors did not fully respond to Request No. 49, which requests that Debtors "[a]dmit that Intermedia had a document retention policy." Debtors objected to this request as vague and ambiguous because Parus failed to define the phrase "document retention policy." Nonetheless, Debtors responded "that they have not been able to locate a written document retention policy at Intermedia and, accordingly, deny Request No. 49." You now complain that Request No. 49 was intended to include oral document retention policies, which Debtors' response does not address. Debtors are not familiar with the concept of oral document retention policies in the corporate environment. However, now that you have clarified the request, Debtors will amend their response to state that that they have not been able to locate an oral or written document retention policy at Intermedia and, accordingly, deny Request No. 49.

**V. Debtors' Response To Parus' "Litigation Hold" Questions.**

You have identified four alleged deficiencies in Debtors' responses to Parus' "Litigation Hold" questions.

You complain that, in response to Question No. 4, Debtors did not identify the in-house counsel that first identified the threat or the possibility of litigation with Parus. Although this information is irrelevant, Debtors will amend their response to this question.

You complain that, in response to Question No. 6, Debtors did not provide any specific date on which preservation of documents related to Parus' contract claims and tort clams began. Debtors believe this information is set forth in their responses but are willing to supplement their response to this question to more specifically identify the information requested.

You complain that, in response to Question Nos. 8 and 10, Debtors did not indicate whether they sought any acknowledgment to abide by the litigation hold or sent reminders regarding the continued effect of the litigation hold. As set forth in Debtors' responses, either our firm or Kroll Ontrack took, and continue to have, possession of all of the paper and electronic documents. Thus, there are no persons to whom acknowledgments or reminders need to be sent.

I note that you end your letter by claiming that it sets forth "examples" of the alleged deficiencies in Debtors' discovery responses and responses to the "litigation hold" questions. Parus has had these responses for over a month. To the extent Parus identified any additional alleged deficiencies, you presumably would have included them in your letter. Debtors have re-reviewed their objections and responses and, other than as set forth in this letter, do not intend to amend or supplement them. If you cannot specifically identify alleged deficiencies after a month, then it is fair to assume that you have found none.

Finally, I also note that none of the complaints in your letter relate to discovery of the underlying facts of this case; rather they all relate to the discovery process. If there has been any unnecessary delay in this case, it has been caused by

Parus' decision to spend the last five months conducting voluminous discovery of the discovery process itself.

Debtors reviewed over 400 boxes of paper documents and the equivalent of over 300 boxes of electronic documents just in responding to Parus' first document requests. They also worked cooperatively with Parus' prior counsel for several months to complete the sampling of the electronic discovery necessary to lay the factual foundation for the Court's consideration of cost-shifting. Your accusation that Debtors have obstructed the discovery process is inexcusable particularly given that you have not even reviewed the case file to ascertain the discovery efforts previously undertaken in this case, and refuse to provide the long-overdue discovery that Debtors repeatedly have requested.

Please contact me if you have any questions.

Very truly yours,

**STINSON MORRISON HECKER LLP**

*Allison M. Murdock*

Allison M. Murdock

AMM:af

Jill L. Murch, Esq.
January 30, 2007
Page 8

bcc:    Ms. Coyne
        Mr. Driscoll
        Mr. Iba

D00458