Robert A. Scher (RS 2910)
FOLEY & LARDNER LLP
90 Park Avenue
New York, NY 10016
Phone:    (212) 682-7474
Facsimile: (212) 682-2329
Email:    rscher@foley.com

-and-

Mark L. Prager (*pro hac vice*)
Steve Szczepanski (*pro hac vice*)
David B. Goroff (*pro hac vice*)
Mary Jo Boldingh (*pro hac vice*)
Jill L. Murch (4535712)
FOLEY & LARDNER LLP
321 N. Clark Street, Suite 2800
Chicago, IL 60610
Phone:    (212) 832-4500
Facsimile: (213) 832-4700
Email:    sszczepanski@foley.com
*Attorneys for Appellant Parus Holdings, Inc.*
*Successor-By-Merger to EffectNet, Inc. and*
*EffectNet, LLC*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| WORLDCOM, INC., et al., | ) Jointly Administered |
| | ) |
| Debtors, | ) Case No. 02-13533 (AJG) |
| | ) |
| PARUS HOLDINGS, INC., | ) |
| | ) |
| Appellant, | ) Case No. 07-cv-10507 (BSJ) |
| | ) |
| v. | ) ECF Case |
| | ) |
| WORLDCOM, INC., et al. | ) **REPLY BRIEF** |
| | ) **FOR APPELLANT** |
| | ) **PARUS HOLDINGS, INC.** |
| | ) |
| | ) **ORAL ARGUMENT** |
| | ) **REQUESTED** |

# TABLE OF CONTENTS

Page

I.    SUMMARY ............................................................................................................. 1

II.   PARUS' REPLY TO DEBTORS' SUBSTANTIVE ARGUMENTS ................................ 4

    A.    Debtors Cannot Overcome Parus' Entitlement To Benefit Of The Bargain
          Damages Due To Intermedia's Material Breach Of Contract (DB27-35) ............. 4

          1.    Debtors Cite No Authority To Dispute That "Benefit Of The
                Bargain" Damages Are General Damages And, Therefore, Are Not
                Excluded By The Limitation Of Liability Clause (DB27-31) ................... 4

          2.    Debtors Cite No Authority That Contradicts Well-Established Law
                That Breach Of The Four Corners Of A Contract Is Not Required
                For Anticipatory Repudiation (DB33-35) .................................................. 6

          3.    Debtors Cannot Refute That Parus Is Entitled To Recover All
                Reconciliation Payments As Damages (DB31-33) .................................... 8

    B.    Debtors Have No Authority Justifying Dismissal Of Parus' Claims
          Against Intermedia For Breach Of Covenant Of Good Faith, Civil
          Conspiracy And Deceptive Practices (DB36-42) .................................................. 9

          1.    Debtors Have No Authority Permitting The Rewriting Of A
                Limitation Of Liability Clause (DB36) ...................................................... 9

          2.    Debtors Improperly Raise New Summary Judgment Theories
                (DB36-42) ................................................................................................. 10

    C.    Debtors Cannot Rebut Parus' Showing That The Court Erred In Granting
          Summary Judgment Against Parus' Tortious Interference Claim Against
          WorldCom (DB42-53) ......................................................................................... 12

          1.    Debtors First Try To Defend The Ruling Based On A New Theory
                That Is Contradicted By Facts And Inferences (DB42) ........................... 12

          2.    Debtors Sidestep The Critical Issue That They Cannot Establish
                Privilege As A Matter Of Law (DB43-45) ................................................ 13

          3.    Debtors Cannot Rebut Law That Privilege Does Not Apply
                Because WorldCom's Interference Began Before It Acquired
                Intermedia (DB45-48) ............................................................................. 13

          4.    Debtors Cannot Dispute Parus' Evidence That The Hold Separate
                Order Destroyed The Required Unity Of Interest (DB49) ...................... 15

5.    Debtors Ignore That The Court Erred By Failing To Consider Parus' Argument That WorldCom Lost Any Privilege By Acting Contrary To Intermedia's Interest (DB51-52) ......................................... 15

6.    Debtors Cannot Rebut Evidence Of "Wrongful Means" (DB52-53) ....... 16

D.    Debtors Cannot Rebut Parus' Showing That The Court Erred In Granting Summary Judgment Against Parus' Civil Conspiracy Claim Against WorldCom (DB53-57) ......................................................................................... 17

1.    Debtors Cannot Dispute That The Opinion Was Impermissibly Based On Theories Not In Debtors' Summary Judgment Motion (DB53) ......................................................................................... 17

2.    Debtors Cannot Defend The Court's Holding That Immunity For Intermedia Defeats Parus' Conspiracy Claim (DB53-57) ........................ 17

3.    Debtors Cannot Meaningfully Address *Emerson*, Which Demonstrates The Error in The Court's Holding That The Presence Of Minimums Precludes Breach For Non-Performance (DB56) ............. 17

4.    Debtors' New Theories For Summary Judgment Cannot Sustain The Court's Erroneous Dismissal Of The Conspiracy Claim (DB56-57) ......................................................................................... 19

E.    Debtors Have No Meaningful Response To Parus' Arguments That The Court Erred In Dismissing Parus' Deceptive Practices Claim Against WorldCom (DB57-59) ......................................................................................... 19

III.    DEBTORS' "HEARSAY" AND "NEW DOCUMENTS" ARGUMENTS ARE NOT SUPPORTABLE ............................................................................................. 21

IV.    DEBTORS CANNOT REFUTE THAT THE COURT COMMITTED REVERSIBLE ERROR BY FAILING TO IMPOSE SANCTIONS FOR DEBTORS' SPOLIATION (DB60-70) ............................................................ 23

A.    Debtors Did Not Satisfy Their Duty To Preserve Documents (DB66-69) ........... 23

B.    Contrary To Their Argument, Debtors <u>Did</u> Destroy Documents (DB62) ........... 25

C.    Debtors Erroneously Dispute Their Culpability For Spoliation (DB69) ............. 31

D.    Debtors Erroneously Dispute The Relevance Of The Evidence They Destroyed Or Rendered Inaccessible (DB66) ....................................................... 32

E.    Each Of Debtors' Attempted Defenses To Spoliation Fails (DB60-62) ............... 32

V.    DEBTORS CANNOT REFUTE THAT THE COURT IMPROPERLY DENIED
      PARUS THE BENEFIT OF REASONABLE INFERENCES (DB70-72) ...................... 34

VI.   DEBTORS CANNOT REFUTE THE COURT'S ABUSE OF DISCRETION IN
      DENYING PARUS' RULE 56(F) REQUEST (DB73-75) ............................................. 36

VII.  CONCLUSION AND REQUEST FOR RELIEF ............................................................ 37

# TABLE OF AUTHORITIES

Page

**FEDERAL CASES**

*Bank Brussels Lambert v. Credit Lyonnais (Suisse), S.A.*,
  210 F.R.D. 506 (S.D.N.Y. 2002) ........................................................................23

*Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*,
  945 F. Supp. 693 (S.D.N.Y.) .............................................................................36

*Boulevard Assocs. v. Sovereign Hotels, Inc.*,
  72 F.3d 1029 (2d Cir. 1995).............................................................................16

*Broccoli v. Echostar Commc'ns Corp.*,
  229 F.R.D. 506 (D. Md. 2005)..........................................................................24

*Carpenter v. Gulf States Mfg., Inc.*,
  764 F.Supp. 427 (N.D. Miss. 1991) ..........................................................12, 20

*Carter v. AT&T Commc'ns*,
  759 F. Supp. 155 (S.D.N.Y. 1991) ...................................................................36

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ................................................................................... 21-22

*Chan v. Triple 8 Palace, Inc.*,
  2005 WL 1925579 (S.D.N.Y. Aug. 11, 2005) ...................................................31

*Diamond v. Sokol*,
  468 F.Supp. 2d 626 (S.D.N.Y. 2006) ...............................................................21

*Emerson Radio Corp. v. Orion Sales, Inc.*,
  253 F.3d 159 (3d Cir. 2001)........................................................................*Passim*

*Houlihan v. Marriott Int'l, Inc.*,
  2003 WL 22271206 (S.D.N.Y. Sept. 30, 2003)..................................................23

*Kronisch v. U.S.*,
  150 F.3d 112 (2d Cir. 1998)..............................................................................32

*Penncro Assocs. v. Sprint Spectrum, L.P.*,
  499 F.3d 1151 (10th Cir. 2007) ................................................................ 5-6, 9, 10

*Phil Crowley Steel Corp. v. Sharon Steel Corp.*,
  782 F.2d 781 (8th Cir. 1986) ............................................................................16

*Quinby v. WestLB AG*,
  2005 WL 3453908 (S.D.N.Y. Dec. 15, 2005) .............................................. 28-29

*Quinby v. WestLB AG*,
   245 F.R.D. 94 (S.D.N.Y. 2006) ................................................................ 26, 28-29

*Ramsey v. Coughlin*,
   94 F.3d 71 (2d Cir. 1992) ........................................................................*Passim*

*Residential Funding Corp. v. DeGeorge Fin. Corp.*,
   306 F.3d 99 (2d Cir. 2002)..................................................................28, 32

*Ruta v. Delta Air Lines, Inc.*,
   324 F. Supp. 2d 524 (S.D.N.Y. 2004)..................................................24

*Teraforce Tech. Corp. v. Vista Controls*,
   2007 WL 3377441 (Bankr. N.D. Tex. Nov. 13, 2007)....................18, 20

*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*,
   487 F.3d 89 (2d Cir. 2007)................................................................4

*Treppel v. Biovail Corp.*,
   233 F.R.D. 363 (S.D.N.Y. 2006) ......................................................26, 32

*TVT Records v. Island Def Jam Music Group*,
   412 F.3d 82 (2d Cir. 2005) ..............................................................36

*Zubulake v. UBS Warburg LLC*,
   217 F.R.D. 309 (S.D.N.Y. 2003) ......................................................29

*Zubulake v. UBS Warburg LLC*,
   220 F.R.D. 212 (S.D.N.Y. 2003) ......................................................23, 31

*Zubulake v. UBS Warburg*,
   229 F.R.D. 422 (S.D.N.Y. 2004) ......................................................31

## STATE CASES

*Alexander & Alexander, Inc. v. B. Dixon Evander & Assocs.*,
   596 A.2d 687 (Md. Ct. Spec. App. 1991) ........................................17

*Gamez v. Brush Wellman, Inc.*,
   201 Ariz. 266 (Ariz. App. 2001) ......................................................11

*Kammert Bros. Enters., Inc. v. Tanque Verde Plaza Co.*,
   428 P.2d 678 (Ariz. Ct. App. 1967) ................................................6-7

*Palmer v. Kelly*,
   54 Ariz. 466 (1939)..........................................................................4

*Rawlings v. Apodaca*,
   151 Ariz. 149 (1986).......................................................................11

*Shattuck v. Precision-Toyota, Inc.,*
   566 P.2d 1332 (Ariz. 1977) ...................................................................................10

*United Dairymen of Ariz. v. Schugg,*
   212 Ariz. 133 (Ariz. App. 2001)............................................................................11

*Wells Fargo Bank v. Arizona Laborers,*
   201 Ariz. 474 (2002)..............................................................................................11

**RULES**

Fed. R. Civ. P. 56(f)......................................................................................... 3, 36-37

**TREATISES**

Williston on Contracts § 63:22 at 513-16...................................................................11

Williston on Contracts § 64:12 at 123 .........................................................................4

**OTHER**

Restatement (Second) of Contracts § 347....................................................................4

## I.     SUMMARY

In their Brief ("DB"), Debtors spin a tale that a $1 million award for an injury that exceeds

$133 million is justified because the parties had agreed to limit their liabilities in the UC Contract.

The problem with Debtors' spin is that the Bankruptcy Court went <u>beyond</u> the agreed-upon

limitations in the UC Contract to bar damages and claims that are fully recoverable.  The plain

reading of the Limitation of Liability clause and controlling legal authorities establish that Parus

merits its direct and general damages for its contract claims.  Such general and direct damages

include Parus' "benefit of the bargain" or "expectation" damages – the amount necessary to put

Parus in the position it would have been had Intermedia performed.  However, Debtors misled the

Bankruptcy Court into denying Parus benefit of the bargain damages by erroneously characterizing

such damages as being consequential damages.  Debtors do not deny that benefit of the bargain

damages are general damages and cite no contrary authority.  Accordingly, the Court committed

reversible error by denying Parus benefit of the bargain damages for Debtors' breach.

Contrary to the Bankruptcy Court's ruling, the plain language of the Limitation of Liability

clause also does not limit Parus from recovering its general and direct damages that flow from

Intermedia's wrongful conduct, including claims for Intermedia's breach of the covenant of good

faith ("Covenant"), civil conspiracy and unfair and deceptive trade practices ("Deceptive

Practices").  Debtors offer no authority or analysis to support the Bankruptcy Court's re-writing of

the Limitation of Liability clause to bar "all non-contractual damages."  It is fundamental that courts

may not re-write contracts in the guise of interpreting them.  Thus, the Bankruptcy Court also

committed reversible error in dismissing the three remaining claims against Intermedia.

Continuing their spin, Debtors argue that § 5.4 of the UC Contract, which allowed

Intermedia to terminate early by paying a termination fee, somehow limited Intermedia's damages.

To the contrary, Parus suffered large damages <u>because Intermedia did not terminate under § 5.4 or</u>

<u>pay the early termination fee</u> and concealed from Parus its decision not to perform under the UC

Contract. Had Intermedia timely told Parus it was terminating, and then timely paid Parus the early termination fee, Parus would have been able to pursue another marketing partner and could have avoided certain injury. However, as Debtors admit, Intermedia did not invoke early termination under § 5.4. DB58. Instead, Intermedia concealed the decision not to perform under the UC Contract, keeping Parus from finding another partner. The termination here was under § 5.2, and therefore, § 5.4, by its own terms, does not apply.

Debtors try to extend the Bankruptcy Court's erroneous reliance on § 5.3 of the UC Contract as limiting Parus' ability to recover benefit of the bargain damages. A10. Section 5.3 provides that, as to obligations already accrued prior to termination, the parties "shall remain liable" after termination. For instance, if Intermedia owed EffectNet, Parus' predecessor, a payment before prior to termination, this remained owed. This section does not address non-accrued obligations and does not release damages, which here, in any event, had all accrued prior to termination. Debtors try to rewrite the plain terms of § 5.3 to add the word "only" and other limitations not in the UC Contract. Section 5.3 specifically excludes only EffectNet's obligation to offer services after termination but in no way limits damages owed by Intermedia for performance failures.

In short, none of the agreed-upon limitations bars Parus' recovery of benefit of the bargain damages or any other general or direct damages against Intermedia. The UC Contract also does not limit Parus' claims against WorldCom, because WorldCom was not a party to the UC Contract.

As to Parus' claims against WorldCom, the court ruled on several grounds that were not raised on Debtors motion. Additionally, WorldCom has no basis for a claim of privilege because it began to interfere with the UC Contract before it acquired Intermedia and against Intermedia's interests. Under established law, WorldCom's scheme with Intermedia to keep unsuspecting Parus on the hook while WorldCom established its rival genD product constitutes tortious interference, Deceptive Practices, and tortious conduct and civil conspiracy claim.

2

Debtors raise several new theories for summary judgment that were not in Debtors' summary judgment motion ("SJ Motion") or properly before this Court. Parus had no opportunity to submit evidence to rebut them and they were not ruled upon by the Bankruptcy Court.

Apart from the Bankruptcy Court's errors as to the merits of Parus' substantive claims, reversal is independently required because of Debtors' spoliation of evidence. Debtors had a duty to preserve evidence once they knew of potential litigation by Parus. Here, their privilege log shows they knew this by March 23, 2001. A3031. Nonetheless, Debtors imposed no litigation hold for at least three years and perhaps never did. In the meantime, they destroyed or made inaccessible boxes and boxes of hard copy documents, along with the vast majority of computer servers, which now makes it impossible to recover relevant electronic data. Debtors argue that Parus could not show what documents are missing, yet Debtors' own witnesses testified to tens of categories of documents that once existed but have not been produced. The spoliation here is so egregious that sanctions, including denial of Debtors' SJ Motion, were warranted. Instead, the Bankruptcy Court ignored spoliation in its Opinion, effectively rewarding Debtors for their misconduct.

Debtors also have no good response to the Bankruptcy Court's failure to construe inferences in Parus' favor as nonmovant. Debtors argue that Parus cannot show fact disputes that the Bankruptcy Court failed to resolve in Parus' favor; yet this is untrue. Parus gave six examples in its Opening Brief of where it was harmed by the Bankruptcy Court's denying it beneficial inferences and Debtors did not effectively respond to any of these examples.

Finally, the Bankruptcy Court erred by deciding Debtors' SJ Motion against Parus despite Parus' Rule 56(f) request. The Court held and Debtors erroneously argue that because their SJ Motion was based on the UC Contract language, no other documents were necessary. WorldCom was not a party to the UC Contract. Accordingly, Parus' claims against WorldCom are necessarily based on facts outside the UC Contract. However, Debtors produced only a tiny fraction of the

3

documents relevant to Parus' claims and based this production on indices that were, as Debtors

admit, inadequate. A806.

For these reasons, this Court should reverse the Court's grant of summary judgment.

## II.    PARUS' REPLY TO DEBTORS' SUBSTANTIVE ARGUMENTS

### A.    Debtors Cannot Overcome Parus' Entitlement To Benefit Of The Bargain Damages Due To Intermedia's Material Breach Of Contract (DB27-35)

#### 1.    Debtors Cite <u>No</u> Authority To Dispute That "Benefit Of The Bargain" Damages Are General Damages And, Therefore, Are Not Excluded By The Limitation Of Liability Clause (DB27-31)

The Bankruptcy Court drastically reduced Parus' damages for Intermedia's breach of the

UC Contract by denying Parus benefit of the bargain damages.  The Bankruptcy Court recognized

Debtors' erroneous argument that benefit of the bargain damages are a form of consequential

damages.  A3387 ("The Debtors further contend that the Limitation of Liability clause prohibits

Parus from seeking 'benefit of the bargain' damages or other consequential damages").  The

Bankruptcy Court then limited Parus' damages to the minimums already owed under the UC

Contract as of the termination date.  A3391.  ("Therefore, summary judgment is granted with regard

to the Debtors' argument that the Limitation of Liability clause limits Intermedia's liability to the

express terms of contract").  This misreading cost Parus at least $132 million in damages.

In its Brief, Parus demonstrated that the Bankruptcy Court erred because benefit of the

bargain damages <u>are</u> general damages and, indeed, are the classic form of damages awarded to

victims of breach of contract to restore them to the position in which they would have been had the

contract been performed.  POB21-23.  Such general damages are not excluded by the Limitation of

Liability clause. POB21 & n.7. Parus cited legal authorities, including learned treatises, the

Restatement (Second) of Contracts ("Restatement") and Arizona and Second Circuit law, which

each establish that loss-of-bargain damages are general damages <u>not</u> consequential damages.  *E.g.,*

Williston On Contracts § 64:12 at 123; Restatement §347; *Palmer v. Kelly*, 54 Ariz. 466

(1939); *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 109 (2d Cir. 2007);

4

and *Penncro Assocs. v. Sprint Spectrum, L.P.,* 499 F.3d 1151, 1156 (10th Cir. 2007).  POB21-23.

Parus also argued that, under the maxim of *expressio unius est exclusio alterius,* because the

Limitation of Liability clause listed those forms of damages that were excluded, those forms which

were not listed – *e.g.,* general and direct damages – were not excluded and remained available.

POB21 n.7.  Debtors <u>do not dispute</u> the fundamental principle that benefit of the bargain damages

are general, <u>not</u> consequential damages.  DB27-33.  Debtors <u>cite no legal authority</u> that supports

that benefit of the bargain damages sought by Parus are consequential damages.  DB27-33.  Debtors

also do not dispute the application of the maxim.  DB27-33.

However, to prevent this Court from ruling on the issue, Debtors falsely represent that

Parus' benefit of the bargain argument is <u>new</u> and should not be considered.  DB27-28.  The record

below belies Debtors' statement.  In their brief for summary judgment below, Debtors argued that

the Limitation of Liability clause precludes "consequential or similar damages." A1218.  Parus

responded that Debtors' arguments "completely ignore Parus' claim for <u>benefit of the bargain</u> on

the breach of contract."  A1271 (emphasis added).  Parus noted that Arizona follows the

Restatement, "which defines a party's 'expectation interest' as 'his interest in having the <u>benefit of</u>

<u>his bargain</u> by being put in as good a position as he would have in had the contract been performed.'

Restatement § 344."  A1271.  Parus concluded that the Limitation of Liability clause does not

preclude loss of value damages (which include benefit of the bargain damages).  A1272.  To

demonstrate Debtors' mischaracterizations of the record, Parus attaches, as Exhibit 4 hereto, the

pertinent pages (A1271-1272) of Parus' response brief below.  (POB Exs. 1-3).

*Penncro* is the only authority of Parus that Debtors even attempt to address and Debtors'

arguments as to *Penncro* utterly fail.  Debtors first argue that *Penncro* was decided under Kansas

rather than Arizona law but show no way in which such law differs.  Rather, as noted above,

Arizona follows the Restatement and hornbook law that benefit of the bargain damages are general

5

and not consequential damages.  Debtors' second argument is that the limitation of liability clause in "*Penncro* involved only consequential damages."  DB29.  Yet, Debtors received summary judgment here because the Court agreed that benefit of the bargain damages were a form of unrecoverable <u>consequential</u> damages.  A339.

In short, Debtors present no legal authority or argument that can salvage the Bankruptcy Court's erroneous ruling denying Parus benefit of the bargain damages.

### 2.    Debtors Cite <u>No</u> Authority That Contradicts Well-Established Law That Breach Of The Four Corners Of A Contract Is Not Required For Anticipatory Repudiation (DB33-35)

The Bankruptcy Court ruled that Parus did not establish anticipatory repudiation because there was no breach "within any of the four corners of the UC Contract."  A3387.  In its Opening Brief, Parus established that a breach of a contract's "four corners" is not a prerequisite for establishing anticipatory repudiation.  POB23-24.  Nevertheless, Parus set forth evidence of Intermedia's repeated breaches and failures to perform.  POB10-16, 24-25.  This evidence demonstrated "a positive and unequivocal manifestation" by Intermedia not to perform its UC Contract obligations.  At the very least, Parus' facts raised a genuine issue of material fact which made the grant of summary judgment against Parus erroneous.  POB25-26.

Debtors do not deny that a breach within the four corners is not required for anticipatory repudiation. Debtors, instead, mistakenly argue that anticipatory repudiation is irrelevant. DB36. To the contrary, as Debtors admit, anticipatory repudiation is one way in which a contract-party may materially breach its contract.  DB35.  It also supports Parus' claims for breach of the Covenant, tortious interference, conspiracy and Deceptive Practices.  Here, Parus established both actual material breach and anticipatory repudiation, further solidifying its position that the Bankruptcy Court committed reversible error by denying Parus benefit of the bargain damages.

Debtors argue that Parus cites no Arizona case against which to measure anticipatory repudiation (DB33 and n.17), yet Debtors' own case – *Kammert Bros. Enters., Inc. v. Tanque Verde*

6

*Plaza Co.,* 428 P.2d 678, 683 (Ariz. Ct. App. 1967) (DB33 n. 17), supports Parus.  In *Kammert*, the Court found anticipatory repudiation merely based on a real estate developer's refusal to accept payment in full under a contract and its demand of additional sums because the land value had increased.  Parus presented evidence of repeated breaches and failures to perform, including Debtors' suggestion of "settlement" when Parus notified them of performance failures.  A3070-74. Certainly Intermedia's breaches and performance failures far exceeded the mere refusal to accept payment and demand for additional payment which sufficiently established anticipatory repudiation in *Kammert* and at the very least, they create a triable issue of fact.

Apparently recognizing that the Bankruptcy Court erred in ruling that a breach "within the four corners" of the agreement was required for anticipatory repudiation, Debtors mistakenly argue that the Court did not so rule.  Instead, the Court stated:

> Therefore, Parus claims that under Arizona law, Intermedia anticipatorily repudiated the UC Contract, thereby entitling it to receive its "benefit of the bargain" damages until the end of the UC Contract in December 2003.

A3386.  The Bankruptcy Court then searched for breaches and dismissed Parus' evidence that Intermedia manifested non-performance on the ground that Parus relied on acts and omissions outside the "four corners" of the UC Contract:

> WorldCom's transfer or termination of employees working in furtherance of the UC Contract upon completion of its merger with Intermedia does not constitute a breach within any of the four corners of the UC Contract.  Moreover, Parus's observance that as of January 1, 2001, the only accounts being opened by Intermedia were for its employees also does not constitute a breach of the UC Contract.

A3387.  Indeed, the Opinion indicates that breach alone might not suffice:

> The fact that Intermedia did not meet its minimum number of subscribers does not evidence any type of breach, much less the type of "positive and unequivocal manifestation on the part of the party allegedly repudiating that he will not render the promised performance when the time fixed for it in the contract arrives."

A3387.  In any event, Parus identified a long list of repeated performance failures by Intermedia (POB24-25), that establishes anticipatory breach or at least raises a genuine issue of material fact.

CHIC_1700579.14

With one immaterial exception,[1] Debtors do not deny these performance failures.

### 3.    Debtors Cannot Refute That Parus Is Entitled To Recover <u>All</u> Reconciliation Payments As Damages (DB31-33)

The Bankruptcy Court limited recovery of damages for reconciliation payments to those that were due prior to the termination date based on its misreading of § 5.3.  A3387 ("The Debtors are only required to pay Parus for the months of December 2001 until March 2002.").  In its Opening Brief, Parus pointed out that § 5.3 merely specifies that the parties are liable for accrued obligations even after the termination date but does not release damages.  POB26.  In any event, all damages accrued prior to the termination.  POB27.  Debtors, apparently recognizing the problem with the Bankruptcy Court's ruling, try to re-write § 5.3 as though it limited the obligations that both parties are liable for after termination.  Thus, Debtors try to insert the word "only" into § 5.3, claiming:

> Section 5.3 of the UC Contract provided that, upon termination, each party remained liable **ONLY** for 'obligations that had occurred prior to the date of termination.'

DB26 (emphasis added).  As Debtors admit, fanciful construction should not overcome a clause's plain meaning.  DB23-24.  Section 5.3, instead, mandates the parties "shall remain liable" for obligations that had already accrued at time of breach but does not excuse <u>any</u> form of damages for Intermedia's breach of contract:

> <u>Effect of Termination</u>.  Upon Termination of this Agreement for any reason each Party <u>shall remain liable</u> for those obligations that accrued prior to the date of such termination …

§ 5.3, A10 (emphasis added). In other words, amounts already accrued by either party at the time of termination "remain" owed.  Section 5.3 does not address liabilities that had not arisen before termination.  It does not excuse either party from liability or damages upon breach.  Further, Intermedia's material breaches caused all damages to accrue, which was <u>before</u> termination.

---

[1] Intermedia argues that there is an inconsistency between the affidavit of Parus' CEO and Parus' position that Intermedia failed to give forecasts required under the UC Contract. DB15-16. There is no inconsistency.  Parus' CEO's affidavit refers to <u>projected</u> forecasts which were in the UC Contract.  The performance failure at issue came later, when Intermedia failed to provide its required ongoing <u>actual</u> forecasts. DB217-18; A6.

Debtors attempt to rely on the *expressio uniis* maxim (DB31, n. 14), but this maxim actually favors Parus.  Just because a party remains on the hook for what it owes to a counterparty at the time a contract terminates does not mean it will not owe more if it breaches that contract.  Moreover, the second clause of § 5.3 <u>excuses EffectNet</u> from future performance after termination <u>but says nothing about Intermedia</u>.  The singling out of EffectNet specifically certainly cannot be read to excuse Intermedia from liability for its performance failures.

Thus, the Bankruptcy Court committed reversible error by drastically limiting Intermedia's reconciliation payment damages.

**B.    Debtors Have <u>No</u> Authority Justifying Dismissal Of Parus' Claims Against Intermedia For Breach Of Covenant Of Good Faith, Civil Conspiracy And Deceptive Practices (DB36-42)**

**1.    Debtors Have <u>No</u> Authority Permitting The Rewriting Of A Limitation Of Liability Clause (DB36)**

The Bankruptcy Court summarily dismissed Parus' claims against Intermedia for (1) breach of Covenant (2) conspiracy and (3) Deceptive Practices based on its erroneous ruling that "the Limitation of Liability clause prohibited the imposition of any non-contractual damages against Intermedia." A3391.  Parus demonstrated that the Bankruptcy Court erred because the Limitation of Liability clause does not bar either general or direct damages, regardless of the theory of liability.  POB27-29.  Parus relied both on the clause's plain language and the Tenth Circuit Court's careful analysis of a strikingly similar clause in *Penncro*.  POB28.

Debtors argue that *Penncro* does not apply because the limitation of liability clause there prohibits only consequential damages.  DB36.  Debtors rely on a distinction without a difference regarding *Penncro's* analysis.  In *Penncro*, the limitation of liability clause forbade consequential damages "include[ing], but not limited to, lost profits, lost revenues and lost business opportunities." *Penncro,* 499 F.3d at 1155.  The Court held that whatever follows the term "including" are examples of the general term which precedes that word:

The more general term informs the subsequently listed examples, not the other way

9

around, and so lost profits here refer only to those that are "a part or component" of the larger group or class of consequential damages.

*Penncro,* 499 F.3d at 1156.  Here, "any other theory" is also a subset of the five categories of precluded damages listed before the term "including":

> "any incidental, indirect, special, punitive, consequential or similar damages, including without limitation, loss of profits, loss of business or interruption of business whether such liability is predicated on contract, strict liability or any other theory without regard to whether such party has been advised of the possibility of such damages."

A14 §11 (emphasis added).  As in *Penncro,* the Limitation of Liability clause does not preclude general or direct damages for any claim, contractual or non-contractual.  The Bankruptcy Court re-wrote the Limitation of Liability clause, which is a reversible error.  *E.g., Shattuck v. Precision-Toyota, Inc.,* 566 P.2d 1332, 1334 (Ariz. 1977) ("It is not within the province or power of the court to alter, revise, modify, extend, rewrite or remake an agreement").

## 2.    Debtors Improperly Raise New Summary Judgment Theories (DB36-42)

Parus demonstrated that the damages it seeks on all counts against Intermedia are general or direct damages that are not prohibited by the Limitation of Liability clause and that the Bankruptcy Court erred by dismissing Parus' tort claims as seeking something other than general or direct damages.  The Bankruptcy Court had no other basis for dismissing these tort claims.  Debtors try to sidestep that Parus rebutted the sole theory raised by the Bankruptcy Court and reframe the issue as one of Parus' "entitlement to tort damages." DB36-37. Debtors then raise a series of new theories challenging whether Parus established the elements of its various tort claims.  *See, e.g., Ramsey v. Coughlin*, 94 F.3d 71, 73-74 (2d Cir. 1992) (improper to raise new summary judgment theory that nonmovant lacks sufficient opportunity to address).

In any event, Debtors' new theories each fail.  Specifically, with respect to the breach of Covenant, Debtors assert two new theories:  (1) Parus will not be able to prove the requirements for a tort-based claim for breach of Covenant and (2) that to the extent Parus' claim for breach of Covenant is based on contract, it duplicates Parus' breach of contract claim.  DB37-38.

10

Besides being improperly asserted, Debtors' <u>new</u> theories regarding the breach of Covenant claim are contrary to controlling law.  As to the issue of a "tort-based claim," Debtors misleadingly argue that Arizona law essentially limits tort-based claims for breach of Covenant to insured-insurer relationships.  DB38.  To the contrary, the Arizona Supreme Court made it clear that tortious breach of the covenant is <u>not</u> limited to insured-insurer relationships.  *Rawlings v. Apodaca,* 151 Ariz. 149, 158-161 (1986).  As to Debtors' assertion that a contract claim for the breach of Covenant duplicates a breach of contract claim Debtors falsely try to suggest that controlling Arizona law supports this proposition by combining *Rawlings* in a cite with an Illinois case which applies <u>California</u> law that supports Debtors' point. DB38. Debtors fail to advise the Court, however, that there is a well-recognized split among jurisdictions over whether a contract-based claim for breach of the Covenant is independent of or included in a breach of contract claim.  WILLISTON ON CONTRACTS § 63:22 at 513-16 ("While some courts allow a plaintiff to recover for breach of the duty of good faith and fair dealing even though there has been no breach of a specific contractual clause, provision or duty . . .").  While California may be on one side of the divide, Arizona is on the other and recognizes contract-based breach of Covenant as a distinct cause of action.  As explained by the Arizona Supreme Court, a claim for breach of contract is distinct from one for breach of Covenant in that a party can breach one without breaching the other:

> A party may breach an express covenant of the contract without breaching the
> implied covenant of good faith and fair dealing.  Conversely, because a party may be
> injured when the other party to a contract manipulates bargaining power to its own
> advantage, a party may nevertheless breach its duty of good faith without actually
> breaching an express covenant in the contract.

*Wells Fargo Bank v. Arizona Laborers*, 201 Ariz. 474, 491 (2002); *Gamez v. Brush Wellman, Inc.*, 201 Ariz. 266, 272-73 (Ariz. App. 2001) (allowing separate Covenant and contract claims); *United Dairymen of Ariz. v. Schugg*, 212 Ariz. 133, 137 (Ariz. App. 2001).  *Emerson,* cited by Parus in its Opening Brief, demonstrates that benefit of the bargain damages are recoverable under a Covenant claim <u>even if, unlike here, defendant pays the contract minimums</u>.  *Emerson Radio Corp. v. Orion*

11

*Sales, Inc.,* 253 F.3d 159 (3d Cir. 2001). Accordingly, under Arizona law, Parus may recover for

breach of Covenant under a tort theory but even if Parus cannot establish the additional

requirements for tortious breach of Covenant, it may still recover for contract breach of Covenant.

Similarly, Debtors' new theory as to conspiracy is, in essence, that Parus did not prove its

conspiracy claim. DB37. Likewise, with respect to Parus' Deceptive Practices claim against

Intermedia, Debtors argue that Parus did not "describe" its direct damages or how they differ from

awarded damages. DB41. Debtors' arguments are immaterial because in response to Debtors'

summary judgment motion, Parus needed only to respond to the grounds that Debtors had raised in

their Motion. *E.g., Ramsey v. Coughlin*, 94 F.3d 71, 73-74 (2d Cir. 1992). Parus did not need to

prove its case. *E.g., Carpenter v. Gulf States Mfg., Inc.*, 764 F. Supp. 427, 432 (N.D. Miss. 1991).

### C. Debtors Cannot Rebut Parus' Showing That The Court Erred In Granting Summary Judgment Against Parus' Tortious Interference Claim Against WorldCom (DB42-53)

The Bankruptcy Court ruled that WorldCom's activities were privileged and that "Parus has

failed to meet the necessary burden to show that WorldCom utilized wrongful means with respect to

any activity in connection with Intermedia and the breach of the UC Contract." A3399. In its

Opening Brief, Parus argued that privilege is not applicable because (1) the interference <u>began</u>

before the acquisition; (2) WorldCom and Intermedia did not have the required unity of interest; (3)

WorldCom lost any privilege when it acted contrary to Intermedia's interest; and (4) WorldCom's

violation of the Hold Separate Order and its Deceptive Practices constituted "wrongful means"

which vitiated any privilege. POB30-33.[2]

### 1. Debtors First Try To Defend The Ruling Based On A New Theory That Is Contradicted By Facts And Inferences (DB42)

Debtors first try to justify the Bankruptcy Court's ruling by claiming Parus failed to

---

[2] Debtors falsely imply that, at the time of the execution of the UC Contract, Intermedia was a wholly-owned subsidiary of WorldCom. DB4. WorldCom admitted the opposite in its Statement of Material Facts. A1111.

establish the fourth element of its tortious interference claim. DB42. As Debtors read the Opinion,

this ruling would be another instance of a reversible *sua sponte* ruling by the Bankruptcy Court to

which Parus had no opportunity to submit evidence or fully respond.  The record is clear that

Debtors moved for summary judgment as to tortious interference solely on two theories:  (1)

whatever WorldCom did was required by the Hold Separate Order and (2) WorldCom's interference

was privileged.  *See* Ex. 5 at A1222-A1224.  Debtors did not move for summary judgment on the

ground that Parus could not prove the fourth element of its interference claim.  Accordingly, for this

reason alone, this theory cannot properly support affirmance of summary judgment.

### 2. Debtors Sidestep The Critical Issue That They Cannot Establish Privilege As A Matter Of Law (DB43-45)

Next, Debtors argue that the Bankruptcy Court correctly ruled "that Parus failed to provide

evidence showing that WorldCom employed wrongful means that could overcome the privilege…."

DB42.  Debtors skip over the <u>critical threshold</u> issue:  whether they established <u>as a matter of a law</u>

that WorldCom was privileged to interfere.  Parus set forth three reasons why the Bankruptcy Court

erred in finding privilege. POB30-33. Debtors cannot rebut Parus' arguments.  At best, Debtors'

arguments establish the existence of genuine issues of material fact with respect to these issues.

### 3. Debtors Cannot Rebut Law That Privilege Does Not Apply Because WorldCom's Interference Began Before It Acquired Intermedia (DB45-48)

Parus' first ground for error was that the Bankruptcy Court was mistaken in requiring that

WorldCom's entire interference (including Intermedia's resulting breach) be completed before

WorldCom acquired Intermedia in order to avoid privilege.  Instead, the law is that once the

interference <u>begins</u>, the interfering party may not avoid liability by purchasing the interfered entity.

POB30.  Parus also demonstrated that a corporation is not privileged to interfere prior to the

acquisition.  POB30.  Importantly, Debtors do not deny Parus' statement of the controlling law or

cite any contrary authority.  Instead, Debtors try to obfuscate the Bankruptcy Court's clear error.

First, Debtors mistakenly argue that Parus contradicts itself as to whether pre/post-merger

13

distinction is pertinent.  DB42.  There is no inconsistency.  Parus has established that interference which <u>begins</u> prior to the merger is not immunized by the subsequent acquisition and that the acquiring company does not enjoy any pre-merger privilege.  In this respect, the pre/post acquisition distinction is critical.  The Bankruptcy Court erred by requiring that the entire interference <u>including the breach</u> be completed prior to the acquisition in order to defeat privilege.  A3395-96.

Debtors seem to recognize their error because they improperly launch a new theory, to which Parus had no opportunity to submit evidence and which was not ruled upon the Bankruptcy Court.  *E.g., Ramsey*, 94 F.3d at 73-74.  Debtors newly argue that they had a <u>pre-merger</u> privilege to interfere.  DB45-48.  Debtors' SJ Motion was limited to the parent-subsidiary privilege. Ex. 5, A1223-A1224.  Debtors' new theory is defeated by their admissions in their summary judgment statement that WorldCom acquired control of Intermedia only <u>after</u> the acquisition.  A1112.  To try to avoid this admission, Debtors refer to an order which modified the Hold Separate Order but the modifications reinforce the earlier order and do not support any privilege for WorldCom.  A2796. Debtors' reliance on the modified hold order is misplaced because as part of IBI business UC Product was still subject to the hold separate requirement.  A2806.  Debtors also rely on new declarations which they admit they obtained "[a]fter the summary judgment motion had been fully submitted…."  DB46 & n.25.  Of course Parus had no opportunity to address this evidence in connection with the new theory.  More importantly, this evidence only support the proposition that WorldCom had to divest Intermedia as a viable company.  They in no way support that WorldCom had to (a) destroy the UC Contract; (b) interfere with Intermedia's right to have a UC Product of its own at the time of divestiture; or (c) prefer WorldCom's own genD rival product in order to keep Intermedia "viable."  How, for example, does it benefit Intermedia to deprive it of the UC Product[3]

---

[3] Debtors complain that Parus does not define "UC Product". DB14, DB17. As the context demonstrates, the UC Product is the product intended for marketing under the UC Contract.

14

when, WorldCom could not give Intermedia the genD product?

### 4.    Debtors Cannot Dispute Parus' Evidence That The Hold Separate Order Destroyed The Required Unity Of Interest (DB49)

As to Parus' argument that the Bankruptcy Court erred by failing to address whether there was post-acquisition privilege because the Hold Separate Order destroyed the unity of interest, Debtors point to footnote 5 at pages 30-31 of the Opinion (A3396-97) and argue that the Bankruptcy Court reviewed Arizona, Illinois and Mississippi case law and ruled that all these states recognize the parent-subsidiary privilege. DB49. Nevertheless, the Court did not address whether this privilege applied here in view of the Hold Separate Orders, which clearly precluded WorldCom from controlling the pertinent part of Intermedia and destroyed the required unity of interest.[4]

Also, with respect to the "unity of interest" requirement, Debtors argue that "Illinois does not limit the privilege to parent-subsidiary situations." DB45. This is true but irrelevant because unity of interest is universally required.

### 5.    Debtors Ignore That The Court Erred By Failing To Consider Parus' Argument That WorldCom Lost Any Privilege By Acting Contrary To Intermedia's Interest (DB51-52)

Parus argued that the Bankruptcy Court ignored two applicable exceptions to privilege here: (1) acting contrary to subsidiary's interest; and (2) using wrongful means. Parus argued that the Bankruptcy Court ignored the first <u>exception</u> to privilege – which arises when a parent acts contrary to its subsidiary's interest. POB32. Debtors argue that Parus is wrong and point to the Opinion showing that the court did not ignore <u>the second exception</u> – the "wrongful means" exception. DB51. Thereafter, Debtors obfuscate the issues by switching between the two exceptions. It appears that Debtors address the first exception to privilege – where a parent acts against its subsidiary's best interests – only in the paragraph beginning on pp. 51-52, starting with the word

---

[4] Debtors argue that Hold Separate Order was not brought up below. The Antitrust Order cited by Parus in the SJ Response – which required compliance (A1199) with the Hold Separate Order (A3102-11) – was brought up. A1189-1203. A1234-5.

CHIC_1700579.14

"Further." Debtors try to distinguish *Phil Crowley Steel Corp. v. Sharon Steel Corp.*, 782 F.2d 781, 784, claiming that it actually turned on an economic detriment of the subsidiary. To the contrary, the court noted that the subsidiary's contract was profitable. *Id.* ("steel operations reflected some profit.") Debtors err in arguing that this case "never discussed contract damages at all." DB52.

Debtors' only case – *Boulevard Assocs. v. Sovereign Hotels, Inc.*, 72 F.3d 1029 (2d Cir. 1995) – does not question the general rule that privilege is defeated when a parent acts in its own interest but to the detriment of the subsidiary. The court applied the rule but found no exception where: (1) the parent ordered subsidiary to breach the contract to limit subsidiary losses, (2) the subsidiary was losing money, and (3) there was no evidence that interests of the parent and the subsidiary were different. *Id.* at 1038. Here, the facts are opposite: Intermedia expected to make huge profits on the UC Product. It was advantageous to Intermedia to proceed but UC Product but detrimental to WorldCom because WorldCom had a competing product – genD. WorldCom ordered termination of the UC Product for its own benefit but to Intermedia's detriment. Intermedia, which, by virtue of the Hold Separate Order could not have access to the genD product and, thus, was to be divested without any state-of-the-art UC Product.

### 6.    Debtors Cannot Rebut Evidence Of "Wrongful Means" (DB52-53)

Moreover, Parus did sufficiently establish WorldCom's wrongful conduct. Parus noted that WorldCom had the motive to harm EffectNet because WorldCom was sponsoring a rival product – genD. Parus also showed that WorldCom had the opportunity to harm EffectNet. Even before its acquisition of Intermedia was final, WorldCom began to get financial information about EffectNet which revealed how dependent EffectNet was on the UC Contract. WorldCom, as Intermedia's parent-to-be, also had influence over it. After acquisition negotiations began, Intermedia, which previously had been eager to launch the UC Product, instead started first to stall and then to dismantle marketing efforts, in breach of the UC Contract. These circumstances and losses create the inference that Intermedia so acted because of WorldCom. Debtors have no evidence to disprove

16

this. Therefore, the issue was not a proper one for summary judgment.

### D.  Debtors Cannot Rebut Parus' Showing That The Court Erred In Granting Summary Judgment Against Parus' Civil Conspiracy Claim Against WorldCom (DB53-57)

Debtors correctly note that the Bankruptcy Court dismissed Parus' conspiracy claim against WorldCom based on erroneous rulings that (1) since the claim against Intermedia was dismissed, WorldCom had no "second party with whom to conspire" and (2) that the alleged conduct did not rise "to the level of civil conspiracy" because it was "not tortious nor a breach" because the UC Contract provided for minimum payments. A3393. *See* DB53-54. Neither argument properly supports summary judgment here.

### 1.  Debtors Cannot Dispute That The Opinion Was Impermissibly Based On Theories Not In Debtors' Summary Judgment Motion (DB53)

The threshold problem with the Bankruptcy Court's dismissal of civil conspiracy against WorldCom is that it was based on a grounds that Debtors did not advance in their SJ Motion. Parus had no opportunity to submit evidence to rebut them and the Bankruptcy Court's decision should be reversed for this reason alone. *Ramsey*, 94 F.3d at 73-74.

### 2.  Debtors Cannot Defend The Court's Holding That Immunity For Intermedia Defeats Parus' Conspiracy Claim (DB53-57)

Parus argued that, since the Limitation of Liability clause does not preclude direct damages, Intermedia was liable as a co-conspirator for direct tort damages even if that clause applied to intentional torts. POB33-34. Parus further argued that, even if Intermedia had contractual immunity for <u>damages</u>, that does not bar a claim against WorldCom as its co-conspirator. POB33 n.12. *See Alexander & Alexander, Inc. v. B. Dixon Evander & Assocs.*, 596 A.2d 687, 698 (Md. Ct. Spec. App. 1991) (Even if one conspirator is dismissed plaintiff may sue other conspirators). Debtors have no contrary authority.

### 3.  Debtors Cannot Meaningfully Address *Emerson*, Which Demonstrates The Error in The Court's Holding That The Presence Of Minimums Precludes Breach For Non-Performance (DB56)

As to the second ground for the Bankruptcy Court's ruling, *Emerson*, too, holds that a provision for minimum payments does not preclude a claim where these are not made. *Emerson*, 253 F.3d at 169-72. In addition, Debtors rely on the same misreading of § 2.13 of the UC Contract as did the Bankruptcy Court, arguing that the Section gave Intermedia the right to either meet a certain minimum number of subscribers or pay a reconciliation payment. DB34. But Section 2.13 did not give Intermedia any "right" or "option" at all. Rather, it mandated that Intermedia "<u>shall pay</u>" EffectNet monthly reconciliation payments if EffectNet calculated at the end of each calendar month that Intermedia failed to meet its active subscriber minimums. A8. Here, Intermedia missed its monthly minimum requirements and then failed to make the mandatory reconciliation payments to EffectNet that § 2.13 required. Nothing in the UC Contract allows Intermedia to use § 2.13 to avoid liability or damages here, especially where, Intermedia defied its requirements.

Finally, Parus argued that the Bankruptcy Court mischaracterized the conspiracy as being limited to the breach of the UC Contract and from this flawed premise held that a contract claim could not be the basis for a civil conspiracy claim. Instead, Parus argued that, as in *Teraforce Tech. Corp. v. Vista Controls,* 2007 WL 3377441 (Bankr. N.D. Tex. Nov. 13, 2007), the conspiracy had a broader objective: to use the UC Contract to lead Parus on and keep Parus' UC Product from competing with WorldCom's genD product and to let WorldCom seize the rights to the UC Product if Parus also became insolvent because of lack of revenue from the UC Contract. POB34. Debtors argue that as to post-merger conduct, there can be no intracorporate conspiracy. Since the conspiracy started before the acquisition by WorldCom, the privilege does not apply. POB31.

Debtors mistakenly claim that Parus newly argues on appeal that WorldCom was trying to force it into bankruptcy. DB54-55. Rather, Parus earlier argued that WorldCom knew of EffectNet's dependence on the UC Contract and tried to take advantage of this by getting EffectNet to agree to give Intermedia ongoing rights in the UC Contract if EffectNet went bankrupt. As

CHIC_1700579.14

Debtors admit, Parus attached the MASL between Parus and Webley that provided for this to the Affidavit of its President and CEO, Taj Reneau, in support of Parus' Opposition to Debtors' SJ Motion. DB54 (citing A2609). Debtors' citation to the place in the record appendix where this evidence is belies its claim that this evidence is new here. DB54.

> **4.    Debtors' New Theories For Summary Judgment Cannot Sustain The Court's Erroneous Dismissal Of The Conspiracy Claim (DB56-57)**

Debtors otherwise raise a series of new theories regarding Parus' civil conspiracy claim. Thus, Debtors argue that "Parus did not describe what its direct damages could be" and that Parus did not describe how direct damages for conspiracy "would differ from the four reconciliation payments awarded by the Bankruptcy Court." DB39. Debtors further suggest that Parus has not identified unlawful conduct or lawful conduct for an unlawful purposes, as a conspiracy claim requires. None of these theories was in Debtors' SJ Motion. Parus, therefore, had no need to address them and the Bankruptcy Court never ruled on them. *Ramsey*, 94 F.3d at 73-74.

Debtors cannot refute Parus' arguments that show that the Bankruptcy Court committed reversible error in granting summary judgment against Parus' civil conspiracy claim.

**E.    Debtors Have No Meaningful Response To Parus' Arguments That The Court Erred In Dismissing Parus' Deceptive Practices Claim Against WorldCom (DB57-59)**

The Bankruptcy Court dismissed Parus' claim for Deceptive Practices <u>against WorldCom</u> on the ground that <u>Intermedia</u> did not breach the UC Contract when <u>Intermedia</u> failed to provide a minimum number of subscribers or make the required reconciliation payments owed for such failures. Ex. 3, A3399-3401. Parus argued the ruling should be reversed because the Court:

1.    made the decision *sua sponte* on a ground not argued by Debtors, thereby denying Parus an opportunity to present evidence and arguments, *see, e.g., Ramsey*, 94 F.3d at 73-74;

2.    wrongly assumed that Parus' claim was based solely on the failure to deliver subscribers where, in fact, Parus' claim is based on WorldCom's scheme to conceal Debtors' decision not to perform under the UC Contract to keep Parus bound to the UC Contract to keep Parus' UC Product from competing with WorldCom's genD

19

product. An analogous scheme was found to be actionable as a Deceptive Practices violation in *Teraforce,* 2007 WL 3377441; and

3.    misread inapplicable and untriggered provisions in the UC Contract which cannot immunize WorldCom from unfair and deceptive practices statutes, especially since WorldCom was not a party to the UC Contract and breach of the covenant of good faith is actionable even if the minimums were paid. *Emerson*, 253 F.3d at 169-172.

POB35-36. Debtors urge this Court to ignore Parus' arguments because Parus did not make them below. DB58-59. Of course, Parus could not have made such arguments below because they are in response to a ground first raised *sua sponte* by the Bankruptcy Court in its Opinion.

Debtors offer no meaningful response to Parus' remaining arguments. Specifically, Debtors do not address Parus' argument that the Bankruptcy Court incorrectly assumed that the theory of Parus' Deceptive Practices claim is based on Intermedia's failure to deliver minimum subscribers under the UC Contract. Rather, Parus was pursuing a claim for Deceptive Practices on the same grounds as those in *Teraforce*, 2007 WL 3377441 at *12. Debtors try to distinguish *Teraforce* on the grounds that (1) it applied North Carolina law; (2) it concerned a motion to dismiss rather than a summary judgment motion; and (3) Parus has not proven all elements of its claim. These arguments fail. First, *Teraforce* validates Parus' theory and Debtors have no cases from Arizona, Florida, Mississippi, Illinois or any other state whose Deceptive Practices act might possibly apply that holds otherwise. Second, once again, Parus does not have to prove its case; it only needs to respond to the theories raised by Debtors in their SJ Motion. *E.g., Carpenter.* Parus should be allowed to prove its entire case at trial.

Debtors ignore Parus' arguments that the UC Contract cannot immunize WorldCom, which was not a party to the UC Contract. POB35-36. Similarly, as discussed in the paragraph bridging pages 1 and 2, Debtors' reliance (DB57-58) on § 5.4 is misplaced.

Debtors also fail to meaningfully address Parus' argument that the existence of minimums does not prevent action for non-performance under a contract, even if, unlike here, such minimums were paid. In its Opening Brief, Parus relied on *Emerson* to establish this. In *Emerson*, defendant

20

argued that it was not liable for benefit of the bargain damages because, although it did not perform under the contract, <u>it paid the minimums</u>. The Court held that plaintiff was entitled to recover benefit of the bargain damages to the extent that the parties had expected actual performance to exceed the minimums. The Bankruptcy Court's holding below is premised on the erroneous notion that the mere existence of minimums in the UC Contract precludes breach by nonperformance and nonpayment of required monthly amounts. Debtors claim that *Emerson* involved a minimum royalty payment and forgetting §2.13, erroneously assert that no minimum payment was required here. DB56. Instead, *Emerson* not only applies, but the facts here are even more compelling in establishing a violation because Intermedia <u>did not pay the minimums</u>.

Debtors argue that Parus did not respond to the argument that Debtors made in their Bankruptcy Court briefs that Intermedia was not a "seller" of goods. Yet, Parus <u>did</u> address and refute this argument in its Bankruptcy Court filings. A1284-A1286. The Bankruptcy Court assumed Debtors' argument to be true "<u>without deciding</u>," A3400. Debtors did not cross-appeal. Accordingly, the grounds on which Debtors based their SJ Motion is not on appeal. In any event, Debtors are plainly wrong because Intermedia <u>was</u> a seller of services and intangibles which satisfies the Deceptive Practices statutes of Arizona, Florida, Mississippi and Illinois, all states which apply here. A1284-A1286.

Finally, here, too, Debtors err in arguing that Parus fails to describe how direct damages under its deceptive practices claim differ from the awarded payments. Again, Debtors' SJ Motion was not directed to lack of direct damages and Parus has no duty to quantify or establish its damages in response to an argument Debtors never raised. *See Diamond*, 468 F.Supp. 2d 626, 640.

## III. DEBTORS' "HEARSAY" AND "NEW DOCUMENTS" ARGUMENTS ARE NOT SUPPORTABLE

Debtors argue that Parus impermissibly relies on certain purportedly inadmissible documents. Debtors overlook the Supreme Court's *Celotex Corp. v. Catrett*, 477 U.S. 317, 324

21

(1986), which specifically ruled that a nonmoving party need not "produce evidence in a form that would be admissible at trial in order to avoid summary judgment." Clearly the documents objected to will be qualified by Parus at trial under business record, admission or other exceptions.

Debtors argue that Parus may not rely upon the deposition testimony of James Renforth, or Debtors' responses to Parus' Requests for Admission (A2984-A3021), because they post-date the summary judgment briefing. DB15-18. However, both of these were exhibits to Parus' spoliation motion and there was no need for Parus to supplement the record because the Bankruptcy Court had agreed to factor the spoliation arguments into its summary judgment motion deliberations. A4446.

Debtors' argument that Mr. Renforth lacked personal knowledge of the unified messaging product after he left Intermedia (DB17) overlooked that this section of Parus' brief concerns decisions made by Intermedia while Mr. Renforth was employed. Because the initiation of the UC Product was approved at Intermedia's highest executive levels, a reasonable inference is that the decision to scrap the product also had to be approved at this high level. A2968-69. Debtors also argue that Parus mischaracterized Mr. Renforth's deposition testimony concerning his resignation. DB18. However, Debtors' own attorney's summary refutes Debtors' argument. A2975 ("And you were going to leave as a result of your product being scrapped.").

Debtors' argument that an email from an Intermedia employee which states "Increase in account volumes is not anticipated to begin before August 1, 2001" (A2389) does not mean that there will be no new customers (DB18) is not well founded. Parus is entitled to an inference, based upon this email and other evidence, that Debtors had no intention to perform under the UC Contract and that they were concealing that intention from Parus.

Debtors argue that the direct competition between the UC Product and WorldCom's genD product was not raised below. However, Parus did assert in its SJ Response that both products were platforms for unified communications/messaging. A1236; A1247.

22

**IV.    DEBTORS CANNOT REFUTE THAT THE COURT COMMITTED REVERSIBLE ERROR BY FAILING TO IMPOSE SANCTIONS FOR DEBTORS' SPOLIATION (DB60-70)**

Debtors agree on the elements necessary to establish spoliation: (1) evidence actually has been destroyed; (2) the party with control over the evidence had an obligation to preserve it at the time it was destroyed; (3) the evidence was destroyed with a culpable state of mind; and (4) the destroyed evidence was relevant to the parties' claims and defenses. DB62. Debtors cannot dispute, and often simply fail to address, the facts and law showing that Parus satisfied each of these elements.

**A.    Debtors Did Not Satisfy Their Duty To Preserve Documents (DB66-69)**

"[T]he obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party <u>should have known that the evidence may be relevant to future litigation</u>." *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) ("*Zubulake IV*") (emphasis added, quotation omitted). A duty to preserve can arise before a claim is filed. *Id.*

Debtors offer no date when they agree they had a duty to preserve documents. Yet, as Parus argued in its Opening Brief (POB37), Debtors should have known of their duty to preserve when they first asserted attorney-client privilege as to communications regarding EffectNet on March 23, 2001. *See Houlihan v. Marriott Int'l, Inc.*, 2003 WL 22271206, at *2 (S.D.N.Y. Sept. 30, 2003). Debtors' privilege log shows they began asserting the attorney-client privilege as of that date as to "claims by EffectNet," evidencing that they knew of potential litigation. A2908, A2911. By May 17, 2001, Debtors began to assert the work product privilege as to documents. A2908. This privilege reflects that documents are "prepared in anticipation of litigation or for trial." *Bank Brussels Lambert v. Credit Lyonnais (Suisse), S.A.*, 210 F.R.D. 506, 509 (S.D.N.Y. 2002) (citations omitted). Debtors also ignore this issue and do not explain why, if they anticipated litigation in May 2001, they issued no notice to employees and no "litigation hold."

Additionally, Parus sent a demand letter to Debtors on March 12, 2002, outlining Intermedia's defaults under the UC Contract and sent a follow-up letter March 26, 2002 ("Demand

23

Letters"). A2912, A3070-75. This independently triggered a duty to preserve. POB38. Controlling authority holds that the duty to preserve arises once such a demand letter is received. *E.g., Ruta v. Delta Air Lines, Inc.*, 324 F. Supp. 2d 524, 526-27 (S.D.N.Y. 2004). Debtors admit the Demand Letters put them on notice of potential litigation by Parus, yet Debtors failed to discharge their legal duty once they received this notice. Debtors incorporate their "Response To Claimant's Question Regarding Litigation Hold" dated December 19, 2006 (Debtors' "Litigation Hold Brief"). DB12-14, 67. In this document, Debtors admit that the Demand Letters notified them of the threat of breach of contract litigation with EffectNet after Intermedia failed to make reconciliation payments on or before April 12, 2002. A3079-80. After receiving such notice, however, Debtors only preserved their correspondence and the UC Contract itself! A3081. (In their Brief, Debtors add that they also preserved invoices. DB13). Debtors describe no other litigation hold. DB67.

Debtors claim they had "no reasonable" basis . . . to anticipate that Parus would seek any other recovery [besides the reconciliation payments] because [the Limitation of Liability clause] expressly prohibited the recovery of other damages." DB13. Debtors ignore that Parus had numerous non-contract theories as to both Intermedia and WorldCom. A litigant may not limit its document retention based on those legal theories it speculates its opponent will raise. Rather, "[t]he duty to preserve encompasses any documents or tangible items made by individuals likely to have discoverable information that the opposing party may use to support its claims or defenses" and covers "any information relevant to the claims or defenses of any party, or which is relevant to the subject matter involved in the litigation …." *Broccoli v. Echostar Commc'ns Corp.*, 229 F.R.D. 506, 510 (D. Md. 2005).

As to WorldCom, Debtors admit that they did not impose any litigation hold until [Parus] asserted its claims in WorldCom's bankruptcy, yet Debtors should have known Parus might sue WorldCom in view of WorldCom's interference with the UC Contract. A3080. In their Litigation

CHIC_1700579.14

Hold Brief, Debtors also note that they complied with a document preservation order that Judge Rakoff imposed in *SEC v. WorldCom, Inc.*, No. 1:02-CV-4903-JSR (A3081), but this order did not encompass EffectNet, the UC Contract, the UC Product or WorldCom's genD competitor. Instead, it required preservation of largely immaterial documents relating to WorldCom's financial reporting obligations, disclosures required by the securities laws and accounting matters. A3113.

Further, the record shows that Debtors independently had a duty to preserve evidence as of July 1, 2001, when the WorldCom/Intermedia merger was consummated and Debtors should have known that they were taking steps detrimental to EffectNet's rights under the UC Contract, including ceasing the enrollment of commercial subscribers. A2906-2907, A2976, A2981, A3017. Debtors below argued that they had not identified any threat of litigation by this date because Intermedia had yet to fail to make its reconciliation payments and Parus had yet to assert any tort claim. A3080-81. Yet, this argument is belied by the fact that Debtors already had begun to assert privileges as to EffectNet <u>four months</u> before that date. A2908, A2911. Debtors generally refer to their 129-page Litigation Hold Brief and claim this evidences the search they undertook for documents responsive to the many claims filed in WorldCom's Bankruptcy. DB14. Without citation, Debtors assert that "[a]s reflected therein, the sources of possibly relevant evidence related to the UC Contract that existed in the Spring of 2002 were preserved by Debtors and remain available today." DB14. Debtors inappropriately ask Parus and this Court to comb through 129 pages vainly looking for support for Debtors' assertion. In fact, that Brief shows no such preservation efforts.

### B.    Contrary To Their Argument, Debtors <u>Did</u> Destroy Documents (DB62)

Debtors falsely suggest that they preserved hard copies and electronic documents of Intermedia employees as they left Intermedia, which nearly all had after 2001. DB13. Rather, Debtors admitted that they imposed no litigation hold prior to March 25, 2002. A2914, A2989, A2991-92. Indeed, Intermedia's witness, Dennis Ramsay, admitted that Debtors sent no

communication telling employees to retain documents until <u>at earliest</u> Fall 2004 – more than three years after Debtors first asserted privilege as to Parus.  A2915, A3116-17.

Even 2004 is suspect, however.  Despite Parus' requests, Debtors did not produce the Fall 2004 email they claim their in-house counsel sent advising employees to preserve documents.  A3046, A3116-17.  Julio Valdes, Intermedia's former Director of Systems Support, who had responsibility for implementing litigation holds, testified that he was <u>never</u> told to impose any litigation hold as to Parus, even during this litigation, and did not even learn of the Parus/Intermedia dispute until 2005.  A2929-30, A3129, A3154-55.  Moreover, the four WorldCom witnesses that Debtors produced as having most knowledge about preservation issues each admitted in deposition that he knew of no litigation hold imposed by WorldCom.  A2930-32, A3171, A3178, A3183-85.

Debtors argue that the failure to impose a litigation hold by itself does not equal spoliation.  DB67.  But Debtors' own authority, *Quinby v. WestLB AG*, 245 F.R.D. 94, 104 (S.D.N.Y. 2006) ("*Quinby II*") (DB63) holds to the contrary.  ("[O]nce a party reasonably anticipates litigation, it must suspend its active routing document retention/destruction policy and put in place a litigation hold . . ..")  Debtors violated the *Quinby II* directive.

Debtors miscite *Treppel v. Biovail Corp.*, 233 F.R.D. 363 (S.D.N.Y. 2006), in arguing that "there also must be a loss of evidence."  DB67.  Instead, *Treppel* holds that there need only be a "risk that documents will be destroyed in the future" and makes clear that this "is 'often met by demonstrating that the opposing party has lost or destroyed evidence in the past or has inadequate retention procedures in place.'"  *Id.* at 371 (quotation omitted).  *Treppel* found that risk to be absent because of specific steps the defendant there took, including making two separate back-ups of the relevant servers and imaging the relevant employees' laptops. *Id*. at 372.  Here, by contrast, Debtors destroyed relevant documents.  Also, it is undisputed that in April and May 2003, Intermedia closed its data center and dismantled equipment, including 250 of 300 computer servers.  A3126-28;

26

A3132-35.  Debtors also disposed of Intermedia's exchange email server and destroyed emails.
A3150-51, A3158-59.  This took place more than one year after the Demand Letters.  Incredibly, in
2006, while Parus was seeking additional discovery, Debtors decommissioned the two remaining
servers that contained information regarding Parus.  A3139-40, A3149, A3152. [5]

Debtors claim, in error, that Intermedia created back-up tapes since 2002.  DB64.  First,
even if true, Debtors cannot explain why Intermedia did not create tapes after March 23, 2001,
when Intermedia began to assert privilege, or account for what may have been destroyed between
that date and when any back up started.  Second, Mr. Valdes did not testify about any back-up by
WorldCom, whose behavior is independently relevant.  Third, Debtors misquote Mr. Valdes in
claiming that "all data on Intermedia servers was saved to back-up tapes before the servers were
ever decommissioned" and that back-up tapes date back to March and April 2002.  DB64.  He
instead testified that the mandate to back-up tapes came down in "2003 maybe."  A4249-50.

Mr. Valdes testified that, before 2003, only certain monthly, quarterly and yearly tapes were
picked from rotation and backed up.  A4250.  At the pages cited by Debtors (DB64, citing A4251),
Mr. Valdes said that he believed that those tapes that had been backed up in 2003 and shipped to
Intermedia's Ashburn Virginia facility would still have been available in 2005, not that all tapes had
been backed up, as Debtors claim.  More importantly, in talking about backing up server
information, Mr. Valdes was talking only about the two servers decommissioned in 2006 (A4251)
not the 250 servers decommissioned before that.  A4251.

Because Debtors decommissioned Intermedia's servers, even those back-up tapes that
remain are unreadable and unrestorable.  Debtors omit that Mr. Valdes testified that Debtors lack
the ability to search data on the Intermedia's back-up tapes "[b]ecause the systems that we would

---

[5] Debtors comment that 60,000 claims were filed in the WorldCom Bankruptcy (DB13)
makes it all the more inexcusable that Debtors destroyed hard copies, closed data centers and
decommissioned servers that might have had data relevant to so many claims.

need to try and search that data is not available.  In some cases, it's not accessible.  In order to

search the data, we would have to restore it.  We don't have the systems to restore it."  Valdes Dep.,

additional excerpts attached hereto as Ex. 6, at 141-42.  *See also* A2931-2935, A3100-31.  Under

*Treppel,* data need not be destroyed entirely for there to be spoliation:

> The Second Circuit has held that conduct that hinders access to relevant information
> is sanctionable, if even it does not result in the loss or destruction of evidence ….
> Permitting the downgrading of data to a less accessible form – which systemically
> hinders future discovery by making the recovery of the information more costly and
> burdensome – is a violation of the preservation obligation.

233 F.R.D. at 372 n.4 (S.D.N.Y. 2006) (citing *Residential Funding Corp. v. DeGeorge Fin. Corp.*,

306 F.3d 99, 110 (2d Cir. 2002)).  Debtors claim *Treppel's* ruling is dicta (POB65), ignoring that

the passage expressly restates Second Circuit law.  It would be illogical if the law were otherwise.

Evidence that is made inaccessible is just as useless to an opponent as evidence that is actually

destroyed.

Debtors urge this Court to look at *Quinby v. WestLB AG*, 2005 WL 3453908, at *8 n.10

(S.D.N.Y. Dec. 15, 2005) ("*Quinby I*"), and its successor – *Quinby II*, 245 F.R.D. 94, where the

Court refused to award sanctions merely because an opponent failed to keep electronic data in a

more accessible format.  DB65-66.  However, in *Quinby II*, the Court explained that this was

because that data, while inaccessible, did not result in spoliation because the responding party could

still restore it "albeit at a higher cost."  *Quinby II*, 245 F.R.D. at 104.  By contrast, Debtors either

cannot or will not restore the missing documents.

Instead, Debtors admit that there are more than 9,000 boxes of documents they never even

looked at (DB11-12), along with 63 Intermedia back-up tapes, 78 WorldCom back-up tapes and

approximately a "terabyte" (1 million documents) that have not been restored or searched. DB63.

Debtors note that in August 2005 Parus' counsel agreed to initially review a sampling of boxes,

forgetting that he made clear that he "want[ed] them to produce documents that are responsive to

our requests" and reserved the right to later seek additional documents.  A2736-39.

28

Debtors suggest that because Parus believed that its Spoliation Motion should be decided before cost-shifting was ruled on that this somehow excused Debtors from their duty to produce. DB63. Debtors' authority disproves this. Under *Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 317 (S.D.N.Y. 2003) (*Zubulake I*), a desire by a responding party to shift electronic discovery costs does not typically excuse its performance. *Quinby II* confirms that spoliation issues should be resolved before cost-shifting is considered, as the Court there considered the plaintiff's spoliation motion first (*Quinby I*) and then took up the employer's cost-shifting motion (*Quinby II*). *Quinby II* reiterated the presumption that the responding party should bear the costs of production and should not shift costs "if a party creates its own burden or expense by converting into an inaccessible format data that it should have reasonably foreseen would be discoverable material at a time when it should have anticipated litigation." 245 F.R.D. at 104.

Debtors quote out of context a letter from Parus' counsel to Debtors' counsel which articulated Parus' position that it was necessary to determine if there had been spoliation before there was any basis to justify shifting costs to Parus. DB63, citing A4143. This letter was written to identify and resolve disputed items between the parties. A4143. Debtors describe no effort they made to address these concerns. Again, Parus' position is the only logical one – why should Parus have to pay costs for relevant discovery if these costs were caused by Debtors' gross negligence or acts of spoliation? *Quinby II* makes clear that, under such circumstances, cost-shifting is inappropriate. 245 F.R.D. at 104. Therefore, unless Debtors defeated the Spoliation Motion – which they could not have had it been properly considered on the merits – any attempt to shift costs would be premature. Here, as noted above, there was no basis for cost-shifting because Debtors engaged in massive destruction of hard copies of documents and more-accessible sources of electronic data <u>after</u> Debtors should have known of the duty to preserve.

Debtors falsely claim that Parus did not allege that documents were actually lost, but merely

CHIC_1700579.14

that they were inaccessible.  DB5, 60-62, 65 n.37.  Rather, in the Spoliation Motion, Parus relied

significantly on deposition testimony of James Renforth, Intermedia's Project Manager for the UC

Product.  He testified that the culture at Intermedia was "document, document, document.  Paper

trail was extremely high profile . . .."  A2920, A2965.  He also testified that he and Intermedia

possessed significant documents related to the UC Contract, including:  (a) meeting minutes; (b)

timelines; (c) milestones; (d) forecasts; (e) projections; (f) budgets; (g) Microsoft projects; and (h)

Excel spreadsheets and email, in both hard copy and electronic form.  A2919-20, A2962, A2964,

A2967-69, A2964.  Mr. Renforth specifically testified that he kept all of his information relating to

the UC Product in three locations, including on his computer's hard drive and in file drawers in his

office.  A2921, A2969-71.  Yet, none of Mr. Renforth's hard copy documents remain, except

immaterial personnel documents.  A2926-27, A2764.

Debtors also misquote Mr. Valdes in claiming that "[t]he electronic data on departing

employees' computer hard drives was preserved by backing up their computers to the company

servers."  DB13 (citing A4247).  Rather, Mr. Valdes was describing in general terms one possibility

of what might happen to a former employee's hard drive, not what actually happened here.  A4247.

He testified that if a user left the system, his/her hard drive would be turned into their manager and

sent back in to the PC Support Team, and that, depending on the user, they would either hold that

system, provide its files to their manager or do nothing with the system.  Even when held, this was

only for 1-2 months, at which point it was recycled for another use.  A4247.  Back-up was done on

a case-by-case basis at the manager's request.  A4247.  Mr. Valdes knew of no criteria used to do

this.  He did not know whether hard drives were ever erased or wiped out. A3145. Here, while most

of the Intermedia employees responsible for the UC Product left by 2001 (DB13), Intermedia has no

record that it backed-up their hard drives when they did so.  A2938-39, A3153.

Debtors also ignore the absence of data concerning WorldCom's communications with

Intermedia about, among other things, EffectNet, the UC Product and WorldCom's competing

product – genD. Such documents are especially important since the claims against WorldCom are

not based on the language of the UC Contract and are dependent on facts, yet Parus has been denied

access to relevant data that would corroborate its allegations.

While Debtors talk about there having been 10,000 boxes available (DB10), the indices to

these boxes was, as Debtors admitted, impossible to decipher. A806 ("If the indexes were useful

we would have narrowed the number of boxes down by using the indexes."). For this reason,

Debtors refused to determine where relevant documents were located and asked Parus to provide

key words to search these indices. A2943, A3123. Therefore, instead of having hard copies

available from the readily-identifiable employees of Intermedia who had clearly defined

responsibilities for the UC Product, Parus was left to search for needles in a haystack by using

useless indices.

### C.   Debtors Erroneously Dispute Their Culpability For Spoliation (DB69)

Debtors falsely state that "Parus does not even attempt to, nor can" establish culpability.

DB69 n. 3. Parus discussed this element in detail in its Spoliation Motion. A2954-55. To show

culpability, Parus need only show that Debtors acted with ordinary negligence. *Zubulake v. UBS*

*Warburg,* 229 F.R.D. 422, 431 (S.D.N.Y. 2004) ("*Zubulake V*"). Once documents are destroyed

after a duty to preserve attaches, this is, at a minimum, negligent. *Zubulake IV*, 220 F.R.D. at 220.

Here, Parus established more than just negligence. Applicable authority holds that failure to

establish a litigation hold at the outset of litigation is gross negligence. *See Chan*, 2005 WL

1925579 at *7. Debtors' gross negligence is further shown by, among other things, the destruction

of servers containing information about Parus five years after Debtors began to assert privilege;

their violation by Debtors of the Hold Separate Order, which required that documents be held until

Intermedia was divested or the Order expired after 10 years (A1200 at 3(c)); and, as to WorldCom,

the violation of MCI's Document Retention policies. *See* POB38 & A3273, A3280.

31

### D.   Debtors Erroneously Dispute The Relevance Of The Evidence They Destroyed Or Rendered Inaccessible (DB66)

The Second Circuit has cautioned against "holding the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed evidence," because doing so would "subvert the prophylactic and punitive purposes of the adverse inference …." *Kronisch v. U.S.*, 150 F.3d 112, 128 (2d Cir. 1998. Rather a movant need only demonstrate that documents existed and that they were necessarily destroyed. *Treppel*, 233 F.R.D. at 372. As the Second Circuit has stated, where a party acts with gross negligence in destroying documents that, standing alone, may support a finding that the evidence was unfavorable to that party. *Res. Fund.*, 306 F.3d at 109. Again, Mr. Renforth admitted Intermedia's policy was "document, document, document," yet Debtors produced <u>no</u> documents as to many categories where he testified documents once existed.

### E.   Each Of Debtors' Attempted Defenses To Spoliation Fails (DB60-62)

Debtors also raise flawed procedural arguments urging this Court to avoid the merits. First, Debtors argue that this Court cannot consider the spoliation issue because the Bankruptcy Court did not reach the merits. (DB60). This actually assists Parus, because Debtors admit that, despite the Bankruptcy Court's promise that it would take Parus' Spoliation Motion into account, it did not so. Second, Debtors erroneously suggest that the Bankruptcy Court found the Spoliation Motion to be moot. DB60. The Court made no ruling whatsoever about spoliation in its Opinion. After issuing the Opinion, however, the Court was specific that it wanted any further motion regarding spoliation to solely address whether damages should be calculated at $27.40 or $11.45 base rate. A4470. Since Debtors agreed to the higher rate, the Court found the Amended Spoliation Motion to be moot. This process in no way insulates the Bankruptcy Court's treatment of the Spoliation Motion from review here. To the contrary, the Court was initially wrong in failing to consider spoliation and then compounded its error by limiting its reconsideration of the issue.

Debtors errs in arguing that Parus did not appeal the Bankruptcy Court's finding of

32

mootness (DB61), yet Parus appealed <u>all</u> aspects of the Bankruptcy Court's handling of spoliation, without limitation.  POB3, 7-8, 36-41.  Moreover, Debtors forget that an appellate court may review even a mootness finding to determine whether this was in error.  Debtors rely on two inapposite cases that do not concern spoliation or bar an appellate court from giving direction to a lower court that erred in failing to reach the merits and that, in any event, each support at least remand where a lower court errs as to mootness.  *See* DB60.  Debtors' cases do not preclude this Court from finding that the Bankruptcy Court erred in its handling of spoliation or from instructing the Bankruptcy Court on how to handle spoliation on remand.

Debtors erroneously argue that Parus' Spoliation Motions relate solely to its entitlement to expectation damages and, from this false premise, argue further erroneously that additional documents are irrelevant because that issue may be decided as a matter of law.  DB5-7, 60.  As Parus' filings make clear, Debtors' spoliation taints <u>all</u> issues in this case and impairs Parus' ability to establish its tort claims and claims against WorldCom.  A2892.  Parus emphasized expectation damages in its Spoliation Motion to quantify the harm from such spoliation, because there was a glaring gap between the amount that the Debtors were willing to pay Parus for damages at the time – which was $460,442.30 – and what Parus believed were its expectancy damages, which were at least $50.7 million and potentially exceeded $133 million.  Indeed, in their Brief, Debtors confirm that the Spoliation Motion concerned more than just expectation damages.  As Debtors admit, DB5, among the relief that Parus sought was denial of the summary judgment motion in its entirety.  A2892. This would obviously include Parus' claims against WorldCom.

In its Opening Brief, Parus demonstrated why it was entitled to each sanction it seeks for spoliation, including the denial of Debtors' SJ Motion.  POB41.  Debtors ignore this authority and do not dispute what should follow if spoliation is found.  Debtors' spoliation has repercussions well beyond summary judgment and will impair Parus' ability to pursue its case at trial.  Therefore,

spoliation remedies, including a finding against Debtors, adverse inferences in any ongoing matter and monetary damages each remain especially important.

Debtors' spoliation provides an independent reason why the Bankruptcy Court's finding in favor of both WorldCom and Intermedia as to all claims was reversible error.

## V.    DEBTORS CANNOT REFUTE THAT THE COURT IMPROPERLY DENIED PARUS THE BENEFIT OF REASONABLE INFERENCES (DB70-72)

Debtors cannot dispute that Parus not only was entitled to the benefit of all record inferences but also was entitled to have any conflict in the parties' facts decided in its favor.  POB41-42.  Yet, Debtors ignore the notion of inferences completely and focus solely on the issue of conflicting facts. DB70.  As to the six specific inferences emphasized by Parus in its Opening Brief (POB41-44), Debtors mistakenly argue that Parus shows no factual dispute that the District Court ignored. DB70.

As Parus noted in its Opening Brief, the most egregious example where the Bankruptcy Court failed to construe evidence in its favor was with regard to the Bankruptcy Court's decision as to Parus' Deceptive Practices claim. Debtors do not dispute that their only argument for summary judgment was that Parus could not state a claim because Intermedia was not a "seller" for purposes of that statute. Below, Parus handily defeated this argument.  A1284-86.  Had the Court weighed the parties' conflicting interpretations of the evidence, it would have found that Intermedia was subject to the statute and denied summary judgment for Debtors on this issue.  Instead, as Debtors do not dispute, the Bankruptcy Court, *sua sponte*, raised an entirely different argument for the first time in its Opinion that Parus had no ability to anticipate or respond to:  that §§ 5.4 and 11 of the UC Contract prohibit a Deceptive Practices claim against both Intermedia and WorldCom.  Where a court grants summary judgment on an issue not raised by the parties and where the nonmoving party has no basis to respond, this, alone, constitutes reversible error.  *E.g., Ramsey,* 94 F.3d at 73-74.  Debtors ignore this and argue that Parus has no contrary facts, (DB70-71), but this disregards: (1) the <u>fact</u> that WorldCom was not a

party to the contract; (2) the <u>fact</u> that the express language of Section 5.4 says that it applies only where *Intermedia* terminates early and does not apply to terminations caused by breaches pursuant to Section 5.2, which is what happened here; (3) the <u>fact</u> that, prior to dealing with WorldCom, Intermedia forecasted a large and successful rolling out of the UC Product that it utterly failed to deliver on after merger discussions began with WorldCom; and (4) the <u>fact</u> that WorldCom's competing product – genD – would benefit if sales of the UC Product were thwarted. These "facts" give rise to an inference that the reason for Intermedia and WorldCom's conduct was because they tortiously decided to deny Parus the benefits of its UC Contract in order to favor WorldCom's rival product.

Debtors deny that any conflicting facts as to the Demand Letter, which the Bankruptcy Court read as having only one possible meaning – that Parus had terminated the UC Contract. DB71. However, a court that gave a nonmovant the benefit of inferences would recognize the distinction between a default letter and a termination letter. This is specifically true here where, as Debtors admit, Parus in the Demand Letter gave Intermedia 30 days to cure the defaults before there would be a breach. Termination letters do not give opportunities to cure.[6]

With regard to the other tort claims of Parus, Debtors argue that because the Bankruptcy Court decided as a matter of law that there was a "take or pay" option in the UC Contract for Intermedia, there are no competing fact issues as to these torts. DB71-72. First, as noted above, this again ignores that WorldCom is not a party to the UC Contract and not entitled to the benefits of its terms. Moreover, as noted above, the Bankruptcy Court simply misread the <u>facts</u> of Section 2.13, which was a provision <u>for EffectNet's benefit</u> and required <u>Intermedia</u> to make immediate payment to EffectNet if it failed to deliver promised monthly enrollment targets.

---

[6] Debtors' argument that the Court struck Mr. McConnell's affidavit (DB71) points to another error. A3379-80. Mr. McConnell as a declarant had personal knowledge of his own intent.

CHIC_1700579.14

Debtors do not dispute Parus' case law that reversal of summary judgment is required where a court fails to properly accord inferences in favor of a nonmovant. POB42. This is true here.

## VI. DEBTORS CANNOT REFUTE THE COURT'S ABUSE OF DISCRETION IN DENYING PARUS' RULE 56(F) REQUEST (DB73-75)

Debtors incorrectly argue that Parus' Rule 56(f) Request is premised on the same grounds as its spoliation allegations. DB73. Rather, Parus filed its Rule 56(f) Request as part of its Response in Opposition to Debtors' SJ Motion dated November 18, 2005. At the time that Parus sought Rule 56(f) protection, it did not know that Debtors had spoliated substantial evidence. Thus, Parus' Rule 56(f) Request was directed at Debtors' failure to properly produce documents that were plainly in their possession or to otherwise explain why documents that should have existed were absent from Debtors' production, while the Spoliation Motion was directed at the Debtors' active destruction of documents that Parus learned of later.

The Bankruptcy Court disregarded Rule 56(f)'s standards here. Rule 56(f) "requires courts to insure that parties have a reasonable opportunity to make their record before ruling on a SJ Motion" and that this should "be applied with a spirit of liberality." *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.,* 945 F. Supp. 693, 706 (S.D.N.Y.), *abrogated on other grounds*, *TVT Records v. Island Def Jam Music Group,* 412 F.3d 82 (2d Cir. 2005) (citations omitted). Where a summary judgment movant fails to comply with a nonmovant's discovery requests, Rule 56(f) counsels for denying that motion. *See Carter v. AT&T Commc'ns,* 759 F. Supp. 155, 160 (S.D.N.Y. 1991). POB46-47. Debtors cannot reconcile the Bankruptcy Court's actions with this standard.

Any argument by Debtors that they complied with discovery is laughable. While Debtors originally identified 10,000 existing boxes of documents, they produced eight boxes. They did so through a "sampling" of boxes gleaned from indices that they admit were plainly flawed and incomplete. A806. Debtors produced no documents in response to numerous discovery requests by Parus that were undeniably relevant. Debtors argue that Parus took only one "merits" deposition

36

CHIC_1700579.14

<u>after</u> Debtors' SJ Motion was filed, (DB73), but sidestep that the Rule 56(f) Request was directed at Debtors' discovery failures that occurred before summary judgment was filed which Debtors never corrected.  Such failures impaired Parus' attempt to defend against Debtors' Motion.

As Parus emphasized in its Rule 56(f) Request, Debtors systematically ignored Parus' targeted discovery requests directed at:  (a) the nature of WorldCom's relationship with Intermedia and communications prior to their merger; (b) all communications among Debtors as well as between Debtors and Parus between 2000 and July 2001; (c) Debtors' review of Parus' financials; and (d) WorldCom's development of competitive products, including "genD."  A1254-1255.  In response to most of Parus' requests, Debtors responded that they were "continuing efforts to locate documents" and produced only several hundred pages of documents.  At the time that it was required to respond to that Motion and before it knew of Debtors' spoliation, Parus pointed out that these were key areas where Debtors had not produced documents.  A1259-60.

In their Brief, Debtors argue that documents would have made no difference because the Bankruptcy Court decided the case as a matter of law based on the terms of the UC Contract alone. DB73-75.  The UC Contract cannot preclude any claims against non-party WorldCom or intentional tort claims against Intermedia (*e.g.,* Covenant, Conspiracy and Deceptive Practice Claims).  The Bankruptcy Court's short-circuiting of Parus' ability to develop its case and oppose Debtors' SJ Motion is further grounds for reversal.

## VII.    CONCLUSION AND REQUEST FOR RELIEF

For reasons stated in Parus' briefs, Parus respectfully requests the relief specified in Parus Opening Brief.  POB47.

CHIC_1700579.14

Dated:  March 10, 2008                    FOLEY & LARDNER LLP


By:_____/s/ Steve Z. Szczepanski_____
      Robert A. Scher (RS 2910)
      90 Park Avenue
      New York, NY 10016
      Phone:  (212) 682-7474

      -and-

      FOLEY & LARDNER LLP
      Mark L. Prager
      Steve Z. Szczepanski
      David B. Goroff
      Mary Jo Boldingh
      Jill L. Murch (4535712)
      321 N. Clark Street, Suite 2800
      Chicago, IL 60610
      Phone:  (312) 832-4500

      Attorneys for Appellant Parus Holdings, Inc.
      Successor-By-Merger to EffectNet, Inc. and
      EffectNet, LLC

CHIC_1700579.14

section only applies if Intermedia terminates the UC Contract early (as opposed to breaching the

agreement or repudiating it), the use of the "Unlimited Service" rate in that context shows the

parties' intent to use that rate, rather than the "Basic Service" rate, to compute Parus's damages

under the Agreement. *Id.*

      B.     <u>Debtors Ignore Parus' Benefit of the Bargain Damages</u>

          Debtors completely ignore Parus' claim for benefit of the bargain on the breach of

contract. In the absence of either a statute or common law, the courts of Arizona follow the

Restatement. *See Naarden Trust v. Kieber*, 195 Ariz. 526, 528 (Ariz.App. 1999) (citing *Dorman

v. Swift & Co.*, 162 Ariz. 228, 231 (1989)). Arizona follows the Restatement (Second) of

Contracts (the "Restatement") which defines a party's "expectation interest" as "his interest in

having the benefit of his bargain by being put in as good a position as he would have in had the

contract been performed." Restatement § 344; *see also Reynolds Metals Co. v. Westinghouse

Electric Corp.*, 758 F.2d 1073, 1079 (5th Cir. 1985) ("The law of contract, whether under the

common law or the Uniform Commercial Code, generally authorizes damages for breach in the

amount of the expectancy interest of the wronged party").

          Section 347 of the Restatement states the general measure of contract damages

based on the injured party's "expectation interest":

        (a) the loss in the value to him of the other party's performance
        caused by its failure or deficiency, plus

        (b) any other loss, including incidental or consequential loss,
        caused by the breach, less

        (c) any cost or other loss that he has avoided by not having to
        perform.

Restatement § 347. The term "value" is not defined. However, Comment (b) to Section 347

states, "If no performance is rendered, the loss in value caused by the breach is equal to the value

A 01271

that the performance would have had to the injured party." *See also* Illustrations (1) & (2) to §

347; *Kenco Homes, Inc. v. Williams*, 94 Wash.App. 219, 224 (Wash.App. 1999) ("When a buyer

breaches before either side has begun to perform, the amount needed to give the seller the benefit

of his or her bargain is the difference between the contract price and the seller's expected cost of

performance"). As set forth above, the Restatement specifically differentiates between loss of

value damage and "incidental or consequential loss". Accordingly, even if the limitation of

liability provision is enforced, Parus is still entitled to the loss of value damages.

     C.    <u>The Limitation of Liability Section Should Not Be Enforced</u>

          1.    The Construction of the Limitation of Liability Section Urged By Debtors
<u>Is Unreasonable Because It Would Leave Parus Without A Remedy</u>

The Limitation of Liability provision at Section 11 of the UC Contract provides in

full:

> <u>LIMITATION OF LIABILITY</u>. EXCEPT FOR DAMAGES
> ARISING UNDER SECTION , IN NO EVENT SHALL EITHER
> PARTY BE LIABLE TO THE OTHER PARTY FOR ANY
> INCIDENTAL, INDIRECT, SPECIAL, PUNITIVE,
> CONSEQUENTIAL OR SIMILAR DAMAGES OF ANY KIND
> INCLUDING WITHOUT LIMITATION, LOSS OF PROFITS,
> LOSS OF BUSINESS OR INTERRUPTION OF BUSINESS,
> WHETHER SUCH LIABILITY IS PREDICATED ON
> CONTRACT, STRICT LIABILITY OR ANY OTHER THEORY
> WITHOUT REGARD TO WHETHER SUCH PARTY HAS
> BEEN ADVISED OF THE POSSIBILITY OF SUCH
> DAMAGES.

(Reneau Aff., Ex. F at § 11). Adopting the construction of the limitation of liability provision

urged by Debtors—which would permit Claimant to recover only the damages under the past due

invoices—would leave Claimant without an adequate remedy for its expectation damages under

the contract with Intermedia. There is no support for applying this provision to the "take or pay"

commitment through the end of the UC Contract. Such amounts are direct contractual damages,

as are the benefit of the bargain losses. Moreover, such a result would be patently unreasonable.

A 01272

Hearing Date and Time: December 6, 2005, at 10:00 A.M. Eastern Time
Response Deadline: November 18, 2005, at 4:00 P.M. Eastern Time
Reply Deadline: December 2, 2005, at 4:00 P.M. Eastern Time

STINSON MORRISON HECKER LLP

Robert L. Driscoll, Esq.
Allison M. Murdock, Esq.
Jodi M. Hoss, Esq.
1201 Walnut Street
Kansas City, MO  64106
Telephone:  (816) 842-8600
Facsimile:  (816) 691-3495
Attorneys for Reorganized Debtors

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
In re                                                          :
                                                               :        Chapter 11 Case No. 02-13533 (AJG)
WORLDCOM, INC., et al.,                       :
                                                               :        (Jointly Administered)
                            Debtors.                    :
------------------------------------------------------x

### MEMORANDUM IN SUPPORT OF WORLDCOM'S MOTION FOR SUMMARY JUDGMENT AGAINST PARUS HOLDINGS, INC., SUCCESSOR-BY-MERGER TO EFFECTNET, INC. AND EFFECTNET, LLC

Pursuant to Fed. R. Civ. P. 56, Fed. R. Bankr. P. 7056, and Fed. R. Bankr. P. 9014, the

above-captioned debtors ("Reorganized Debtors" or "WorldCom"), submit their Memorandum in

Support of WorldCom's Motion for Summary Judgment Against Parus Holdings Inc., successor-

by-merger to EffectNet, Inc. and EffectNet, LLC ("Parus Holdings" or "Claimant") on Claim

Nos. 11242 (replacing 9291) and 11173 (replacing 9293).

### INTRODUCTION

All of the claims of Parus Holdings relate to the November 2000 Unified

Communications Services General Agreement (the "UC Contract") between EffectNet, Inc. (a

predecessor of Parus Holdings) and Intermedia Communications, Inc. ("Intermedia"), a wholly

owned subsidiary of WorldCom.  Under the UC Contract, EffectNet agreed to sell and

Intermedia agreed to buy (for resale) a variety of voice communication services.  Parus Holdings

A 01214

now seeks compensatory damages from Intermedia for the alleged breach of the UC Contract and consequential damages from WorldCom and Intermedia for allegedly acting in concert to breach the UC Contract. All of Parus Holdings' claims are appropriate for summary adjudication by the Court.

The consequential damage claims of Parus Holdings fail as matters of indisputable fact and law for the following reasons:

- EffectNet and Intermedia agreed in the UC Contract that in "no event" would either party be liable to the other "for any incidental, indirect, special, punitive, consequential or similar damages of any kind." As a result, by contractual agreement, Parus Holdings (as successor to EffectNet) has no claim for consequential damages against Intermedia.

- Claimant's tort theories of civil conspiracy to breach the UC Contract and tortious interference with that contract fail because it is a matter of indisputable fact--contrary to Parus Holdings' unsupported assertions of improper purpose--that Intermedia assets were divested after the July 2001 merger of Intermedia and WorldCom under the auspices and pursuant to the direct order of the United States District Court for the District of Columbia.

- Claimant's tort theories of civil conspiracy to breach the UC Contract and tortious interference with that contract also fail because the assertedly conspiratorial and/or interfering conduct was between a parent corporation (WorldCom) and its wholly owned subsidiary (Intermedia), a unified interest relationship that precludes such claims. Moreover, WorldCom's actions in pursuit of its legitimate business interests were privileged and, as a matter of law, did not constitute tortious interference.

2

A 01215

- The claim that WorldCom and Intermedia engaged in deceptive trade practice fails because neither WorldCom nor Intermedia sold any service or product to EffectNet. Indeed, it was the other way around. Moreover, EffectNet was not the target of any deceptive advertising, and claimant therefore cannot maintain an action under any consumer fraud or deceptive practices act.

- Parus Holdings' breach of the implied covenant of good faith and fair dealings is solely a contract claim. Intermedia did not act in bad faith; a court order directed divestiture of Intermedia assets. In any event, the remedy for any such breach is on the UC Contract itself.

Parus Holdings' breach of contract claim is also appropriate for summary adjudication. The UC Contract provides that it will terminate 30 days after one of the contracting parties provides written notice of default to the other, assuming the default is not cured in that 30 day time period. It is undisputed that EffectNet provided such a notice of default to Intermedia, and it is further undisputed that the default was not cured. As a result, the UC Contract was terminated. Under such a circumstance, the defaulting party's liability is limited to "those obligations that accrued prior to the date of termination." The dollar value of Intermedia's accrued obligations at the time of contract termination is calculable by applying the terms of the UC Contract itself – a process which yields $460,442.30 as the amount owed.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

WorldCom respectfully refers the Court to its Statement of Material Facts as to Which There Are No Genuine Issues to be Tried ("Undisputed Facts"), which was filed concurrently with the instant Motion.

A 01216

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the movant demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Forsyth v. Fed'n Empl. & Guidance Serv., 409 F.3d 565, 569 (2d Cir. 2005). The substantive law governing the case will identify those facts which are material and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "The mere existence of factual issues – where those issues are not material to the claims before the court – will not suffice to defeat a motion for summary judgment." Quarles v. General Motors Corp., 758 F.2d 839, 840 (2d Cir. 1985).

Summary judgment is "an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). Indeed, summary judgment permits a court to "streamline the process for terminating frivolous claims and to concentrate its resources on meritorious litigation." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986). Where, as here, there is no dispute as to material facts, and the motion is well founded in the law, summary judgment should be granted. Anderson, 477 U.S. at 247-48; Knight, 804 F.2d at 11 (citing Fed. R. Civ. P. 56(c)).

As set forth below, there are no genuine issues of material fact and WorldCom is entitled to summary judgment as a matter of law on the issues addressed below.

4

A 01217

# ARGUMENT

**I.    Parus Holdings is Precluded by the Terms of the UC Contract from Recovering Consequential or Other Similar Damages from Intermedia**

In this proceeding, Parus Holdings seeks to recover damages from Intermedia based on Intermedia's alleged breach of the UC Contract. Parus Holdings' Proof of Claim No. 11173. In addition to damages flowing directly from that breach, Parus Holdings also seeks to recover from Intermedia an additional amount that "may exceed $20 million" because Intermedia and WorldCom assertedly "acted in concert to breach the UC Contract." Id.; see also Ex. B, Parus Opposition at 3, ¶ 4 and 11, ¶¶ 37-38. Unlike its straight breach of contract claim, this additional claim by Parus Holdings for consequential damages is not appropriately before the Court. Indeed, it is expressly precluded from being brought by the terms of the very contract that Parus Holdings seeks to enforce in this proceeding.

Section 11 of the UC Contract provides:

> LIMITATION OF LIABILITY. EXCEPT FOR DAMAGES ARISING UNDER
> SECTION [left blank in original], IN NO EVENT SHALL EITHER PARTY BE
> LIABLE TO THE OTHER PARTY FOR ANY INCIDENTAL, INDIRECT,
> SPECIAL, PUNITIVE, CONSEQUENTIAL OR SIMILAR DAMAGES OF
> ANY KIND INCLUDING WITHOUT LIMITATION, LOSS OF PROFITS,
> LOSS OF BUSINESS OR INTERRUPTION OF BUSINESS, WHETHER SUCH
> LIABILITY IS PREDICATED ON CONTRACT, STRICT LIABILITY OR
> ANY OTHER THEORY WITHOUT REGARD TO WHETHER SUCH PARTY
> HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

Ex. A, UC Contract § 11; Undisputed Facts ¶ 7. This unequivocal prohibition against either party to the UC Contract from seeking to impose liability on the other for consequential or similar damages is clearly preclusive of the consequential damage element of Parus Holdings' claim and it is enforceable under controlling Arizona law.[1] See Southwest Pet Prods., Inc. v.

---

[1]    EffectNet, the predecessor of Parus Holdings, and Intermedia expressly provided that the terms of their UC Contract were to be "interpreted in accordance with the laws of the State of Arizona." Ex. A, UC Contract at 10, ¶ 12.3; Undisputed Facts ¶ 6. Under circumstances that are present here, the courts of New York enforce such contractual choice of law provisions. See Finucane v. Interior Constr. Corp., 695 N.Y.S.2d 322, 324-25 (N.Y. App.

A 01218

Koch Indus., Inc., 107 F. Supp. 2d 1108, 1113-15 (D. Ariz. 2000) (holding a contract clause that limits incidental and consequential damages was enforceable).  "Under Arizona law, where a contract provides the remedy in event of breach, its terms will control the determination of contract damages." Tucson Elec. Power Co. v. Bailey Controls Co., No. CIV 92-185 TUC RMB, 1992 WL 430467, at *2 (D. Ariz. Oct. 5, 1992) (citing Green v. Snodgrass, 79 Ariz. 319, 322 (1955)).[2]

Accordingly, Parus Holdings' claim for recovery of consequential damages against Intermedia should be summarily dismissed.

## II.    The Court Should Dismiss Parus Holdings' Tort and Statutory Claims Against WorldCom and Intermedia Because They Fail Based on Indisputable Fact and as Matters of Law

Parus Holdings asserts claims against Intermedia for conspiracy based on its alleged actions in concert with WorldCom to breach the UC Contract, unfair and deceptive trade practices, and breach of the implied covenant of good faith and fair dealing.  Ex. B, Parus Opposition at 3, ¶ 4.  Parus Holdings asserts claims against WorldCom for civil conspiracy based on its alleged actions in concert with Intermedia to cause Intermedia to breach the UC Contract, tortious interference with EffectNet's contractual relations, as well as unfair and deceptive trade practices.  Id. ¶ 5.  Reorganized Debtors request that the Court enter summary judgment against Parus Holdings on all of its tort and statutory claims because they are all deficient in fact and in law.

---

Div. 1999) (New York courts enforce contractual choice of law provisions if state selected has reasonable relationship to contract and selected laws do not violate a fundamental public policy of New York).  Here one of the contracting parties, EffectNet, was principally officed in Arizona [Undisputed Facts ¶ 1] and no fundamental public policy of New York is implicated, let alone violated, by the UC Contract.
[2]   This is consistent with the law in every other jurisdiction having a connection to the disputed claim of Parus Holdings.  See, e.g., Voicestream Wireless v. U.S. Communications, Inc., No. 4D04-4913, 2005 WL 2016838, at *2-3 (Fla. App. 4 Dist. Aug. 24, 2005) (Florida law, enforcing contractual prohibition of consequential damages); Royer Homes v. Chandeleur Homes, 857 So.2d 748, 754 (Miss. 2003) (same, applying Mississippi law); Peluso v. Tauscher Cronacher Prof'l Eng'rs, 270 A.D.2d 325, 325 (N.Y.S.2d 2000) (same, applying New York law).

A 01219

### A.    Choice of Law for Tort Claims

In New York, courts engage in a choice of law analysis only where an "actual conflict" exists between the applicable rules of the relevant jurisdictions.[3]  In re Allstate Ins. Co., 613 N.E.2d 936 (N.Y. 1993).  An actual conflict exists when the applicable law from each jurisdiction provides different substantive rules and those differences are relevant to the issue at hand and have a "significant possible effect on the outcome of the trial."  Simon v. Philip Morris, Inc., 124 F. Supp. 2d 46,71 (E.D.N.Y. 2000).  Here, Arizona or Mississippi law could apply to Parus Holdings' claims against WorldCom, and Arizona or Florida law could apply to Parus Holdings' claims against Intermedia.[4]  Regardless of the law applied, however, there are no differences in the substantive rules that would effect an analysis on the merits of the claims at issue.

### B.    Parus Holdings' Conspiracy and Tortious Interference Claims Fail as a Matter of Indisputable Fact

Unlike criminal conspiracy, which is based on the act of conspiracy itself, civil conspiracy cannot be established by proof of the conspiracy alone.  To establish an actionable civil conspiracy under Arizona, Mississippi or Florida law, Parus Holdings must prove that Intermedia and WorldCom agreed to accomplish an unlawful purpose or to accomplish a lawful objective by unlawful means, causing damages.[5]  Gallagher Bassett Servs., Inc. v. Jeffcoat, 887

---

[3]  Although the UC Contract contains a choice of law clause, it does not apply to claimant's tort claims. Knieriemen v. Bache Halsey Stuart Shilds Inc., 427 N.Y.S.2d 10 (App. Div. 1st Dep't 1980) overruled on other grounds, Rescildo v. R.H. Macy's, 594 N.Y.S.2d 139 (App. Div. 1st Dep't 1993) (New York courts are reluctant to construe contractual choice of law clauses broadly to encompass extra-contractual causes of action); see Twinlab Corp. v. Paulson, 724 N.Y.S.2d 496, 496 (App. Div. 2d Dep't 2001).  Under New York law, tort claims are outside the scope of contractual choice of law provisions that specify what law governs construction of the terms of the contract even when the contract includes a broader forum selection clause.  Knock v. Lipsay, 97 F.3d 640, 645 (2d Cir. 1996) (applying New York law to interpret scope of choice of law clause).

[4]  EffectNet had its principal place of business in Arizona, Intermedia had its principal place of business in Florida, and WorldCom had its principal place of business in Mississippi.  Undisputed Facts ¶¶ 1, 3.

[5]  Under Arizona law, "there is no claim for relief for civil conspiracy in and of itself, but . . . the action is one for damages arising out of the acts committed pursuant to the conspiracy."  Savard v. Selby, 508 P.2d 773, 776 (Ariz. Ct. App. 1973).  Florida law recognizes an independent tort of civil conspiracy, but only when the defendants have

7

A 01220

So.2d 777, 786 (Miss. 2004); <u>Florida Fern Growers Ass'n, Inc. v. Concerned Citizens of Putnam County</u>, 616 So.2d 562, 565 (Fla. Dist. Ct. App. 1993); <u>Savard v. Selby</u>, 508 P.2d 773, 776 (Ariz. 1973); <u>Uvodich v. Ariz. Bd. of Regents</u>, 453 P.2d 229 (Ariz. 1969).

Here, Parus Holdings asserts an unsupported belief that, after WorldCom and Intermedia merged in July 2001, Intermedia was prevented from performing the UC Contract because it was dismantled for improper purposes.[6] To the contrary, it is a matter of public record that WorldCom and Intermedia divested the assets of Intermedia under the auspices and pursuant to the direct order of the United States District Court for the District of Columbia. See Ex. C, Final Judgment at 5-6, <u>United States v. WorldCom, Inc., et al.</u>, Case No. 1:00CV02789 (RWR) (D.D.C.).

As the court record reflects, on June 26, 2001, the United States District Court for the District of Columbia "ordered and directed" WorldCom and Intermedia to "divest the Intermedia Assets as an ongoing, viable business" within 180 days from closing of the WorldCom/Intermedia merger. <u>Id.</u> at 5-6; Undisputed Facts ¶ 11. As the Final Judgment of the District Court also reflects, the divestiture order of the Court was prompted by a Clayton Act complaint, involving the asserted anti-competitive impact of the WorldCom/Intermedia merger,

---

some "peculiar power of coercion . . . by virtue of their combination, which power an individual would not possess." <u>Churraca v. Miami Jai Alai, Inc.</u>, 353 So.2d 547, 550 (Fla. 1977). "When the acts of the defendants do not create a greater harm than if the acts were committed by one person alone, then there can be no recovery." <u>Martin v. Marlin</u>, 529 So.2d 1174, 1179 (Fla. App. 3 Dist. 1988) (citation omitted). Here, if Intermedia breached the UC Contract, it could have done so with or without the aid and cooperation of anyone else. Thus, the peculiar power of coercion necessary to establish an independent tort of civil conspiracy is not present. Mississippi law does not address whether an independent tort of conspiracy is recognized.

[6] In support of its claims, Claimant points to the following acts occurring after the July 2001 merger between WorldCom and Intermedia:

      1) The firing of Intermedia's project manager for the UC Contract, disbanding of Intermedia's sales force, and reassignment of that sales force to different projects. Undisputed Facts ¶ 12.

      2) Intermedia's cancellation of 682 of the existing 729 subscriptions for service. <u>Id.</u> ¶ 13.

      3) EffectNet's invoicing Intermedia for payments under the UC Contract and Intermedia's failure to pay those invoices. <u>Id.</u> ¶ 14.

      4) Intermedia's request that all remaining accounts for services under the UC Contract be cancelled. <u>Id.</u> ¶ 15.

A 01221

which had been filed by the United States on November 17, 2000--three days before EffectNet and Intermedia entered into the UC Contract. Ex. C, Final Judgment at 1, 3. Furthermore, the potentially adverse impact of the WorldCom/Intermedia merger on Intermedia's ability to perform under the UC Contract was understood and expressly acknowledged by EffectNet in the UC Contract. See Ex. A, UC Contract § 1.4 wherein EffectNet expressly acknowledges the fact of the WorldCom/Intermedia merger and agrees that the merger "shall not, in and of itself, constitute an event" requiring notice of Intermedia's inability to meet its obligations under the UC Contract.

It is indisputable fact, as evidenced by the public record and as foreseen in the UC Contract itself, that Intermedia's failure to perform its obligations under the UC Contract was not the result of improper acts.

### C. A Parent Corporation Cannot Conspire with or Tortiously Interfere with Its Wholly Owned Subsidiary

In addition to being factually unsupported, Parus Holdings' allegations of civil conspiracy and tortious interference are legally deficient.

**Civil Conspiracy.** Consistent with the fundamental proposition that a civil conspiracy requires a concerted action of "two or more persons," it is Arizona law (as well as the law elsewhere) that "[a] corporation cannot conspire with itself any more than a private individual can." Rowland v. Union Hills Country Club, 757 P.2d 105, 110 (Ariz. App. 1988) (quotations omitted) (citing Nelson Radio & Supply Co. v. Motorola, 200 F.2d 911, 914 (5th Cir. 1952); 15A C.J.S. Conspiracy § 2 (1967)); St. Petersburg Yacht Charters, Inc. v. Morgan Yacht, Inc., 457 So.2d 1028, 1041 n.4 (Fla. Ct. App. 1984). Further, it is the general rule that parent and wholly owned subsidiary corporations (such as WorldCom and Intermedia) have such a unity of interest that they are legally incapable of engaging in an actionable conspiracy with each other. See

A 01222

Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 777 (1984) (parent and wholly-

owned subsidiary have complete unity of interest and are incapable of conspiring); Fogie v.

Thorn Ams. Inc., 190 F.3d 889, 898 (8th Cir. 1999) (parent and wholly owned subsidiary share

common purpose and cannot conspire with each other); Carl Hizel & Sons Inc. v. Browning

Ferris Indust. Inc., 590 F. Supp. 1201 (D. Colo. 1984) (same); Atlantic Richfield Co. v. Misty

Prods, Inc., 820 S.W.2d 414, 420 (Tex. Ct. App. 1992) ("As a matter of law, a parent corporation

cannot conspire with its fully owned subsidiary.") (citing Copperweld, 467 U.S. at 777;

Deauville Corp. v. Federated Dep't Stores, Inc., 756 F.2d 1183, 1192 (5th Cir. 1985)).

Here, each act assertedly undertaken by WorldCom and Intermedia in furtherance of their

alleged conspiracy occurred after the July 2001 merger of those corporations. See Undisputed

Facts ¶¶ 12-15. Accordingly, Parus Holdings' claim of conspiracy fails as a matter of law.

**Tortious Interference.** Parus Holdings' claim for tortious interference with a contractual

relationship also fails as a matter of law. A parent company cannot be liable for interference

with a contract of its subsidiary because the financial interests of both entities are so closely

aligned that they are viewed as being the same entity when analyzing a claim for tortious

interference. See Boulevard Assoc. v. Sovereign Hotels, Inc., 72 F.3d 1029, 1036 (2d Cir. 1995)

(citing multiple cases supporting the proposition that a "parent company does not engage in

tortious conduct when it directs a wholly-owned subsidiary to breach a contract that is no longer

in the subsidiary's economic interest to perform."); Texas Taco Cabana, L.P. v. Taco Cabana of

N. M., Inc., 304 F. Supp. 2d 903, 912 (W.D. Tex. 2003) ("As a matter of law, a parent

corporation is incapable of tortiously interfering with its subsidiary's contracts. A parent and its

subsidiary are so closely aligned in business interests as to render them, for tortious interference

purposes, the same entity." (internal citations omitted)); Battenfield of Am. Holdings, Inc. v.

10

A 01223

Baird, Kurtz & Dobson, No. 97-2336-JWL, 1999 WL 232915, at *4 (D. Kan. Feb. 5, 1999);

Starcom, Inc. v. U.S. Telecom, Inc., Civ. A. No. 87-2540-V, 1991 WL 279291, at *3 (D. Kan.

Dec. 11, 1991) (two subsidiaries of a common parent corporation cannot, as a matter of law,

tortiously interfere with each other's contracts); Record Club of Am., Inc. v. United Artists

Records, Inc., 642 F. Supp. 925, 943 (S.D.N.Y. 1986) (citing Felsen v. Sol Café Mfg. Corp., 249

N.E.2d 459, 461 (N.Y. 1969) (parent has privilege of interfering with contract of subsidiary and

third party)), *vacated on other grounds*, 890 F.2d 1264 (2d Cir. 1989).

### D. Parus Holdings' Deceptive Trade Practices Claims Fail as a Matter of Law

Claimant alleges that Intermedia and WorldCom engaged in "unfair and deceptive trade

practices." Ex. B, Parus Opposition at 3, ¶¶ 4, 5, 15, 53, 54. Arizona, Mississippi and Florida

law regarding unfair and deceptive practices is statutory. See Arizona Consumer Fraud Act,

A.R.S. § 44-1522; Mississippi Consumer Protection Act, Miss. Code Ann. § 75-24-5; Florida

Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 et seq.

Arizona's Consumer Fraud Act makes it illegal to commit fraud or deception "in

connection with the sale or advertisement of any merchandise." A.R.S. § 44-1522. "The clear

intent of this provision is to protect unwary buyers from unscrupulous sellers." Sutter Home

Winery, Inc. v. Vintage Selections, Ltd., 971 F.2d 401, 407 (9th Cir. 1992); Enyart v.

Transamerica Ins. Co., 985 P.2d 556, 563 (Ariz. Ct. App. 1999) ("The Consumer Fraud Act is a

broadly drafted remedial provision designed to eliminate unlawful practices in merchant-

consumer transactions.") (citation omitted).

The Mississippi Consumer Fraud Act prohibits specific acts or practices "in the conduct

A 01224

of any trade or commerce.[7]  Miss. Code Ann. § 75-24-5.  The Florida Deceptive and Unfair

Trade Practices Act also makes it illegal to commit unfair or deceptive acts in the conduct of

trade or commerce.  Fla. Stat. § 501.204.  "Trade or commerce" means "the advertising,

soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good

or service, or any property . . ."  Fla. Stat. § 501.203(8).

Claimant alleges that Intermedia and WorldCom engaged in unspecified deceptive trade

practices related to Intermedia's alleged breach of the UC Contract.  That allegation, however,

fails as a matter of law because:

- EffectNet was not a "buyer" of services, it was the seller.  Ex. A, UC Contract

- Intermedia was not the "seller" of anything to EffectNet.  Id.

- WorldCom was not a party to the 2000 UC Contract.  Id.

Moreover, neither Intermedia nor WorldCom engaged in any of the acts prohibited by the

Arizona, Mississippi or Florida Acts, nor are they alleged to have done so.  Consequently,

---

[7]  The Mississippi Act specifically prohibits the following acts and practices:
(a) Passing off goods or services as those of another;
(b) Misrepresentation of the source, sponsorship, approval, or certification of goods or services;
(c) Misrepresentation of affiliation, connection, or association with, or certification by another;
(d) Misrepresentation of designation of geographic origin in connection with goods or services;
(e) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have;
(f) Representing that goods are original or new if they are reconditioned, reclaimed, used, or secondhand;
(g) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;
(h) Disparaging the goods, services, or business of another by false or misleading representation of fact;
(i) Advertising goods or services with intent not to sell them as advertised;
(j) Advertising goods or services with intent not to supply reasonably expected public demand, unless the advertisement discloses a limitation of quantity;
(k) Misrepresentation of fact concerning the reasons for, existence of, or amounts of price reductions;
(l) Advertising by or on behalf of any licensed or regulated health care professional which does not specifically describe the license or qualifications of the licensed or regulated health care professional.
Miss. Code Ann. § 75-24-5.

A 01225

EffectNet cannot maintain an action under the Arizona, Mississippi or Florida Acts and, therefore, Parus Holdings' claims fail as a matter of law.

### E.    Parus Holdings' Claim of Breach of an Implied Covenant of Good Faith Fails as a Matter of Law

Claimant alleges that Intermedia breached an implied covenant of good faith and fair dealing when it allegedly acted in concert with WorldCom to breach the UC Contract.  Ex. B, Parus Opposition at 3, ¶ 4 and 15, ¶ 53.

It is well settled that Arizona law implies a covenant of good faith and fair dealing in every contract.  Enyart v. Transamerica Ins., Co., 985 P.2d 556, 561, ¶ 14 (Ariz. 1998) (citing Rawlings v. Apodaca, 726 P.2d 565 (Ariz. 1986)).  "The essence of that duty is that neither party will act to impair the right of the other to receive the benefits which flow from their agreement or contractual relationship."  Rawlings, 726 P.2d at 570.  "[T]he relevant inquiry always will focus on the contract itself, to determine what the parties did agree to."  Id. (quoting Wagenseller v. Scottsdale Mem'l Hosp., 710 P.2d 1025, 1040 (Ariz. 1985).  "A party may breach an express covenant of a contract without breaching the implied covenant of good faith and fair dealing."  Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund, 39 P.3d 12, 29 (Ariz. 2002) (citations omitted).  Intermedia did not act in bad faith or breach any implied covenant.  After the acquisition by WorldCom, it merely followed a court order.  See Ex. C, Final Judgment at 5-6.

In any event, even if Intermedia breached the implied covenant of good faith and fair dealing, the remedy for such breach is on the UC Contract itself.[8]  Rawlings, 726 P.2d at 574

---

[8]  Parus Holdings is not entitled to tort damages for this claim.  Under Arizona law a party may not bring an action in tort claiming damages for a breach of the implied covenant of good faith and fair dealing unless there exists a "special relationship . . . arising from elements of public interest, adhesion, and fiduciary responsibility."  Burkons v. Ticor Title Ins., 813 P.2d 710, 720 (Ariz. 1991).  The two most important factors in determining whether a tort action for bad faith will lie are "(1) whether the plaintiff contracted for security or protection rather than for profit or commercial advantage, and (2) whether permitting tort damages will provide a substantial deterrence against breach

A 01226

(citing <u>Wagenseller</u>, 710 P.2d at 1038).  As discussed *infra*, the UC Contract provides specific

remedies for an alleged breach and any damages are limited to contractual damages.

**III.    The UC Contract Limits Parus Holdings' Damages for Breach of Contract to $460,422.30**

Pursuant to the UC Contract, Arizona law governs Parus Holdings' contract claims.  Ex.

A, UC Contract at 10, § 12.3; Undisputed Fact ¶ 6; <u>see</u> <u>Finucane v. Interior Constr. Corp.</u>, 695

N.Y.S.2d 322, 324-25 (N.Y. App. Div. 1999) (New York courts enforce contractual choice of

law provisions if state selected has reasonable relationship to contract and selected laws do not

violate a fundamental public policy of New York).  Under Arizona law, "the plain language of

the contract must control." <u>Campisano v. Phillips</u>, 547 P.2d 26, 30 (Ariz. Ct. App. 1976).

Contracts are given a reasonable construction "so as to accomplish the intention of the parties."

<u>Harris v. Harris</u>, 991 P.2d 262, 265 (Ariz. Ct. App. 1999).  A contract is "to be read in light of

the parties' intentions as reflected by their language and in view of all circumstances; if the

intention of the parties is clear from such a reading, there is no ambiguity." <u>Id.</u>  A contract is not

ambiguous just because the parties disagree about its meaning.  <u>Chandler Med. Bldg. Partners v.</u>

<u>Chandler Dental Group</u>, 855 P.2d 787, 791 (Ariz. Ct. App. 1993).  Instead, language is only

ambiguous when it can reasonably be construed to have more than one meaning.  <u>State ex re.</u>

<u>Goddard v. R.J. Reynolds Tobacco Co.</u>, 75 P.3d 1075, 1078 (Ariz. Ct. App. 2003).  Whether

contract language is reasonably susceptible to more than one interpretation is a question of law

for the Court. <u>Hartford v. Indus. Comm'n of Ariz.</u>, 870 P.2d 1202, 1207 (Ariz. Ct. App. 1996);

---

by the party who derives a commercial benefit from the relationship." <u>Dodge v. Fid. & Deposit Co. of Md.</u>, 778 P.2d 1240, 1242 (Ariz. 1989).  EffectNet did not have a "special relationship" with Intermedia.  The UC Contract was between two commercial enterprises that pursued their respective business interests:  public interest was not involved, no element of adhesion was present, no fiduciary relationship existed between the parties and neither security nor protection was the subject of the contract.  Absent a special relationship, and there is none here, EffectNet's claims sound in contract, not tort. <u>Wells Fargo Bank v. Ariz. Laborers, Teamsters</u>, 38 P.3d 12, 29 (Ariz. 2002).

A 01227

L.K. Comstock & Co., Inc. v. United Eng'rs & Constructors, Inc., 880 F.2d 219, 221 (9th Cir. 1989) (applying Arizona law).

### A.     The UC Contract was Terminated on April 12, 2002

On March 12, 2002, pursuant to Section 5.2 of the UC Contract, EffectNet gave notice of default to Intermedia.[9]  Undisputed Facts ¶ 16.  The March 12, 2002 letter from Robert C. McConnell, General Counsel of EffectNet, to Rich Black of Intermedia specifically stated:

> EffectNet hereby gives Intermedia written notice of default under Section 5.2 of the Agreement with respect to the Intermedia Defaults and EffectNet further hereby gives Intermedia written notice that EffectNet may (i) terminate the Agreement under Section 5.2 due to the default effective thirty (30) days after this written notice if each of the Intermedia Defaults has not been cured within such thirty (30) days.

Ex. D, March 12, 2002 letter from Richard C. McConnell; Undisputed Facts ¶ 16.  On March 25, 2002, EffectNet's General Counsel confirmed termination of the UC Contract in his letter to Brett Bacon of MCI/WorldCom, in which he stated:

> EffectNet, by letter to the attention of Mr. Rich Black, dated March 12, 2002, issued a written notice of default under Section 5.2 of the Agreement with respect to the Intermedia Defaults, as defined in the March 12, letter ("March 12 Letter"). I understand from you that Mr. Black referred the March 12 Letter to your attention upon receipt.  As you know, the Agreement in Section 5.2 provides that "[t]ermination due to default under this Section shall be effective thirty (30) days after written notice of the defaulting Party if the default has not been cured within such thirty (30) day period."  Accordingly, the Agreement will be terminated for default by Intermedia on or about April 12, 2002 if the Intermedia Defaults are not cured prior thereto.

---

[9]  Section 5.2 of the UC Contract provides:
> Either party may terminate this Agreement: (a) if the other Party fails to fulfill any of its material obligations under this Agreement; (b) if the other parties are in breach of Section 7 (Confidentiality); (c) if the other Party becomes insolvent or admits in writing its inability to pay debts as they mature, or makes an assignment for the benefit of creditors; or (d)  if a petition under any foreign, state or United States bankruptcy act, receivership statute, or the like is filed by the other Party and is not dismissed within sixty (60) days after such filing.  Termination due to default under this Section shall be effective thirty (30) days after written notice to the defaulting Party if the default has not been cured within such thirty (30) day period.

Ex. A, UC Contract § 5.2 (emphasis added); Undisputed Facts ¶ 18.

A 01228

Ex. E, March 25, 2002 letter from Richard C. McConnell (emphasis added); Undisputed Facts ¶ 17.

Section 5.2 of the UC Contract unambiguously states that termination due to default "shall be effective" thirty days after written notice. Ex. A, UC Contract § 5.2; Undisputed Facts ¶ 18. EffectNet clearly understood this to be the case as evidenced by the words of its own General Counsel advising that the UC Contract "will be terminated . . . on or about April 12, 2002" unless Intermedia cured its defaults. Undisputed Facts ¶ 17. It is also undisputed that Intermedia did not cure its defaults. Id. ¶ 19. Accordingly, the UC Contract was terminated on April 12, 2002, thirty days after EffectNet's notice of default.

### B.     The UC Contract Limits Liability to Obligations That Accrued Before Termination on April 12, 2002

EffectNet's termination of the UC Contract triggered Section 5.3 of the UC Contract, which provides that upon termination of the Agreement for any reason, "each Party shall remain liable for those obligations that accrued prior to the date of such termination." Ex. A, UC Contract § 5.3 (emphasis added); Undisputed Facts ¶ 20. Accordingly, pursuant to the plain language of Section 5.3, Intermedia remained responsible only for those obligations that accrued prior to April 12, 2002 – the date of termination. Under Arizona contract construction rules, by the parties' provision in the UC Contract that each would remain liable for obligations which accrued prior to the date of termination, the parties excluded other forms of liability that might be applicable. Herman Chanen Constr. Co. v. Guy Apple Masonry Contractors, Inc. 453 P.2d 541, 543 (Ariz. App. 1969) (applying the doctrine of *Expressio unius est exclusion arterius* to limit indemnification to class of employees named in contract, excluding other employees not named). This interpretation of Section 5.3 is also consistent with Section 11 of the UC Contract which precludes liability of either contracting party for "incidental, indirect, special, punitive,

16

consequential or similar damages of any kind."

    **C.**    **Under the Terms of the UC Contract, the Maximum Revenue Due Parus Holdings Equals $460,422.30**

The amounts accrued prior to April 12, 2002 include the adjusted amounts for three past-due invoices (charges for December, 2001 and January and February, 2002), and the minimum commitment amount for March, 2002. The minimum commitment provision of the contract obligated Intermedia to deliver 10,000 subscribers per month starting December 18, 2001. Ex. A, UC Contract § 2.12. The so-called "reconciliation" provision of the contract provided that if Intermedia failed to deliver the minimum commitment for a month, it must pay a reconciliation payment for the shortfall "equal to the volume Shortfall multiplied by the base monthly price applicable to the Intermedia UC Service per subscriber." Id. § 2.13 (emphasis added). Appendix P (Pricing) to the UC Contract provided two pricing options: "Basic" at a rate of $11.45 per month, and "Unlimited" at a rate of $27.40 per month. Ex. P (Pricing), attached to Ex. A, UC Contract. Applying the basic – or base – rate, the upper limit of Intermedia's obligation – accrued amounts from December 18, 2001 to April 12, 2002 – are as follows:

| BILLING CYCLE | DAMAGES |
|---|---|
| December 2001 (unpaid invoice #1010 – adjusted to $11.45 for shortfall of 9,953) | $115,270.70 |
| January 2002 (unpaid invoice #1011 – adjusted to $11.45 for shortfall of 9953) | $115,270.70 |
| February 2002 (unpaid invoice #1018 – adjusted to $11.45 for shortfall of 9958) | $115,400.90 |
| March 2002 (one month at $11.45 for 10,000) | $114,500.00 |
| TOTAL | $460,442.30 |

Undisputed Facts ¶¶ 21-25.

A 01230

## CONCLUSION

Parus Holdings, through Claim Nos. 11242 and 11173, attempts to transform a relatively straightforward breach of contract claim into numerous torts claims. The UC Contract expressly precludes claimant from recovering consequential or other similar damages from Intermedia, and claimant's tort and statutory claims fail as a matter of law. Further, contract damages allowable as a matter of law are limited to amounts accrued prior to April 12, 2002. For these reasons, WorldCom requests that this Court grant summary judgment against Parus Holdings, dismissing its statutory and tort based claims and limiting its recovery for breach of contract to the amount provided by the parties' contract, to wit: $460,442.30.

Respectfully submitted,

STINSON MORRISON HECKER LLP


By:    _s/Robert L. Driscoll_____
        Robert L. Driscoll, Esq.
        Allison M. Murdock, Esq.
        Jodi M. Hoss, Esq.
        1201 Walnut Street, Suite 2800
        Kansas City, MO  64106
        (816) 842-8600 – Telephone
        (816) 691-3495 – Facsimile

ATTORNEYS FOR REORGANIZED DEBTORS

A 01231

## CERTIFICATE OF SERVICE

I hereby certify that on October 18, 2005, I electronically filed the foregoing with the Clerk of the Bankruptcy Court using the CM/ECF system which sent notification of such filing to all parties receiving electronic means.

s/Robert L. Driscoll
_____
Attorney for Reorganized Debtors

A 01232

1391ngvaldes.txt

7    physical tapes.

8        Q.    And did you actually see the backup tapes or

9    any of them or were you just given the list from Lynn?

10       A.    I was given the list because the tapes were

11   in Ashburn.  I was in Tampa, but I was part of the

12   group that boxed up the tapes to send up to Ashburn.

13       Q.    Okay.  Now, if you could please turn to

14   Paragraph 4 of your declaration, that's, again

15   Exhibit 5, you state that there were 483 monthly

16   backup tapes for Intermedia for the time period from

17   January 1, 2000 through December 31, 2002.

18           Are there any months during that time period

19   for which there are no backup tapes or no monthly

20   tapes?

21       A.    I don't know.

22       Q.    How would we -- how would you find out?

23       A.    I would have to look at the inventory and see

24   if there's a backup tape for each month.

25       Q.    Was that done when you were requested by

141

1    Mr. Ramsay?

2        A.    Yes.

3        Q.    And, again, would that be reflected on the

4    list you created for Mr. Ramsay?

5        A.    Yes, it would.

6        Q.    And as you sit here today, you just don't

7    recall if all those tapes existed?

8            MS. MURDOCK:   Objection, vague.

9            You can answer.

1391ngvaldes.txt

10        THE WITNESS:  If ∎ recall, there were some --

11    ∎ can't say whether or not they were all there or not.

12    ∎ do recall possibly some months not being there.

13    BY MS. MURCH:

14        Q.    okay.  Now, you also state in Paragraph 4

15    that you estimate that there may be 15 gigabytes of

16    data per backup tape.   on what did you base that

17    estimate?

18        A.    Based on the amount of data that the tapes

19    could hold.

20        Q.    And what kind of tapes were these?

21        A.    DIt tapes.

22        Q.    Now let's move to Paragraph 5 of your

23    affidavit.  You say that MCI current -- I'm sorry --

24    MCI does not currently have the ability to search data

25    on the Intermedia backup tapes.   why not?


                                                    142


1        A.    Because the systems that we would need to try

2    and search that data is not available.   In some cases

3    it's not available.

4            In order to search the data, we would have to

5    restore it.  we don't have the systems to restore it.

6        Q.    How much space does a typical server hard

7    drive take up?  Is it six inches by six inches by two

8    inches?  what are the dimensions of a server hard

9    drive?

10        A.    A server hard drive is typically four inches

11    wide, two inches high, six inches long.

12        Q.    And how many hard drives would you have had

                        Page 128

1391ngvaldes.txt

13   at Intermedia for the period of 2000 to 2002

14   approximately?

15        A.    Hundreds.

16        Q.    Hundreds like 500, 800?

17             MS. MURDOCK:  Objection, asked and answered.

18             THE WITNESS:  I don't know.

19   BY MS. MURCH:

20        Q.    How much do you think it would cost to store,

21   if you know, the hard drives, the server hard drives

22   that are four inches by two inches by six inches?

23        A.    To store them?

24        Q.    Uh-huh.

25        A.    Like a storage bin?


                                                        143

1         Q.    Like if you were to store them at Ashburn?

2         A.    I don't know.

3         Q.    If you had to estimate how much space these

4    hard drives would encompass for the period of 2000 to

5    2002 for the server hard drives, would you say it

6    would fit in a room of, you know, four-by-four or what

7    kind of storage space?

8         A.    ▮ don't know.

9         Q.    were hard drives ever stored by Intermedia,

10   server hard drives?

11        A.    Yes.

12        Q.    And where were they stored?

13        A.    They were stored in cabinets.

14        Q.    And where were those cabinets?

15        A.    At the data center.

                     Page 129